## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES III,

      *Plaintiffs*,

v.

CHRIS NOCCO, in his official
capacity as Pasco County Sheriff,

      *Defendant*.

Case No. 8:21-cv-00555-SDM-CPT

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, FOR MORE DEFINITE STATEMENT, OR FOR DETERMINATION OF MISJOINDER

### INTRODUCTION

This case involves a civil rights challenge to the Pasco County Sheriff's Office's ("PCSO") practice of "predictive policing."[1] As Plaintiffs allege in their Complaint, the PCSO's "Intelligence-Led Policing Program" ("the Program") uses a crude computer algorithm to identify individuals who may commit unspecified future crimes and then subjects those individuals and their families to "relentless pursuit, arrest, and prosecution" in order to "take them out." Compl. ¶ 2. In doing

---

[1] The Defendant, Pasco County Sheriff Chris Nocco, is sued in his official capacity as head of the PCSO and is hereinafter referred to as the "PCSO." *See Ramirez v. Hillsborough Cnty. Sheriff's Office*, No. 8:10-c-v1819-T-23TBM, 2011 WL 976380, at *1–2 (M.D. Fla. Mar. 18, 2011).

so, the Program adopts a policy and custom under which PCSO deputies routinely violate the constitutional rights of those they are sworn to protect. This lawsuit seeks to put an end to those systematic abuses.

Plaintiffs in this case are four Pasco County residents who have all suffered harms that are directly attributable to the Program. And all of the harms described in the Complaint are harms that would not have occurred but for the Program.

PCSO nevertheless argues that the Program cannot be considered in a single case. It asserts the Plaintiffs are too diverse and their harms too numerous. In other words, because the Complaint alleges the Program harms too many people, in too many ways, PCSO argues that Plaintiffs cannot challenge it in a single case.

That is wrong. All the harms suffered by Plaintiffs stem from the very same policy and custom: the Program. And those harms were all perpetrated by a single entity: the PCSO. This case is thus properly brought in one action against one defendant. That the Program is so pervasive that it harms numerous people in numerous ways is not a reason to dismiss this case. It is the reason it was filed.

## ARGUMENT

PCSO attacks the Complaint on both technical and substantive grounds. This response addresses both. In Part I, Plaintiffs address PCSO's threshold contention that the Complaint is drafted as an improper "shotgun pleading." In Part II, Plaintiffs address PCSO's argument that Plaintiffs are improperly joined. And in Part III,

Plaintiffs show that they sufficiently alleged constitutional claims for which relief may be granted.

## I.   THE COMPLAINT IS NOT A SHOTGUN PLEADING.

PCSO argues the Complaint is a so-called "shotgun" pleading. While not clearly stated, the crux of PCSO's concern seems to be that this case involves "multiple claims" and that those claims were brought by "multiple parties." *See* Mot. 7–8. This alone, PCSO seems to argue, somehow amounts to a failure to give "adequate notice" of Plaintiffs' claims. *Id.* at 8.

But none of the cases PCSO cites support that contention. The Complaint describes the challenged policy or custom—the Program. *See* Compl. ¶¶ 113–85. The Complaint separately sets out how each Plaintiff was affected by the Program, using separate subheadings for each Plaintiff and for each category—facts and harm. *See id.* ¶¶ 10–98 (facts), 186–223 (harms). And then the Complaint alleges that the Program violates the Constitution in several respects, and, in doing so, separately identifies which Plaintiff's injuries are traceable to each violation. *See id.* ¶¶ 224–77. This structure does not make for a shotgun pleading; it is how the Eleventh Circuit has indicated a complaint *should* be drawn. *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1324–25 (11th Cir. 2015) ("[The Complaint] is greatly simplified by the organization of . . . factual allegations into three subsections, the first of which is titled 'Facts Surrounding [Plaintiff]'").

Another case cited by PCSO, *Chiron Recovery Center, LLC v. United Healthcare Services, Inc.*, No. 9:18-CV-81761, 2020 WL 3547047 (S.D. Fla. June 30, 2020), is likewise inapposite. There, the court determined that a multi-plaintiff count was problematic because the plaintiffs "d[id] not reference individual-specific transactions or individual-specific facts" such that the court could determine "how each Individual Plaintiff is alleged to have been wronged." *Id.* at *5.[2] Again, Plaintiffs did the opposite here—alleging dozens of "individual-specific facts" and tethering those paragraphs to separate sections alleging individual-specific harms. Nor do Plaintiffs, as PCSO wrongly argues, allege "wrongdoing by multiple parties across multiple transactions." Mot. 8 (marks and citation omitted). Just the opposite, Plaintiffs allege wrongdoing by a single party through a single law enforcement program. While the Complaint alleges multiple interactions between Plaintiffs and the PCSO, it does so only because the challenged policy and practice *requires* such repeated interactions—and PCSO's deputies have acted in accordance with that policy and practice.

In the end, as in *Weiland*, the structure of this Complaint makes it "hardly a task at all" for PCSO to determine "the specific claims against them and the factual

---

[2] Even when there is some overlap among multiple plaintiffs' factual allegations, that does not instantaneously render the Complaint a shotgun pleading. *Mullins v. Epiderma, Inc.*, No. 08-80907-CIV-Marra/Johnson, 2009 WL 10667038, at *3 (S.D. Fla, Apr. 2, 2009) ("The Court does not find the Amended Complaint to be an improper 'shotgun pleading' on the basis that several of the factual allegations apply to multiple Plaintiffs in this case.")

allegations that support those claims." *Weiland*, 792 F.3d at 1325. Indeed, PCSO has failed to show—as it is required to—that it cannot "discern[] [Plaintiffs'] exact theory," *Chudasama v. Mazda Motor Corp*., 123 F.3d 1353, 1359 n.9 (11th Cir. 1997), much less that "'it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief.'" *Cont'l 332 Fund, LLC v. Albertelli*, No. 2:17-CV-41-FtM-38MRM, 2018 WL 3656472, at *3 (M.D. Fla., Aug. 2, 2018) (quoting *Weiland*). Absent that showing, dismissal is improper.

## II.   THE PLAINTIFFS ARE PROPERLY JOINED BECAUSE THEIR CLAIMS ARE ALL LOGICALLY RELATED TO THE PROGRAM.

PCSO separately argues that the four Plaintiffs are "improperly joined" under Rule 20. The "central purpose" of joining parties and claims is to "promote trial convenience and expedite the resolution of disputes." *Alexander v. Fulton County*, 207 F.3d 1303, 1323 (11th Cir. 2000), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003). Accordingly, Rule 20(a) imposes only two requirements for joinder of plaintiffs: First, each plaintiff's claims must arise out of "the same transaction, occurrence, or series of transactions or occurrences." Second, there must be some "question of law or fact common to all plaintiffs." Fed. R. Civ. P. 20(a)(1). Both requirements are satisfied here.

First, Plaintiffs' claims arise out of the same "transaction, occurrence, or series of transactions or occurrences" because they all involve the implementation of the Program. In the Eleventh Circuit, this requirement is satisfied when claims

5

bear a "logical relationship" to each other. *Alexander*, 207 F.3d at 1323. And that "logical relationship" is present when claims "stem from the same core allegation that [the plaintiffs] were subject to a *systemic* pattern or practice." *Id.* at 1324. Here, each of the Plaintiffs' claims bear a logical relationship to each other because they all "stem from the same core allegation" that they were subject to the Program. *Id.* at 1324–25 (holding plaintiffs' claims challenging common policy were related even though they involved "different work histories, employment decisions, and prayers for relief"); *see also Harvard v. Inch*, 411 F. Supp. 3d 1220, 1237 (N.D. Fla. 2019) (finding "a logical relationship" where plaintiffs challenged "policies and practices promulgated by high-level officials," even though "each Plaintiff might suffer harm based on their unique circumstances").

Second, Plaintiffs' claims involve common legal and factual questions. Common factual questions concern the policies and customs that guide the implementation of the Program. *See*, *e.g.*, *Gittens v. Sch. Bd. of Lee Cnty.*, No. 2:16-cv-412-FtM-99MRM, 2018 WL 839242, at *3 (M.D. Fla. Feb. 13, 2018) (finding that the claims of four plaintiffs alleging they were subject to a "district-wide policy" involved common questions of fact). And common legal questions concern whether those policies and customs violate the Constitution.[3]

---

[3] As just one example, all four Plaintiffs allege that the Prolific Offender Checks created a "systematic practice" of unwarranted, suspicionless, nonconsensual visits. Compl. ¶¶ 16–22, 25–26, 29–34, 38, 54–59, 72–78, 139, 149, 154, 156, 160, 162, 225–36.

The PCSO's attempt to "illustrate"[4] the differences between the Plaintiffs is thus "premised on a fundamental misunderstanding of Plaintiffs' claims." *Harvard*, 411 F. Supp. 3d at 1236–37. Though not every encounter was exactly the same— and how could they be?—the Complaint alleges that each encounter arises from the same policies and customs that constitute the Program. *See id.* The PCSO's primary authority, *Cano-Diaz v. City of Alabaster*, No. 2:11-cv-3448-VEH, 2012 WL 2924006 (N.D. Ala. July 17, 2012), does not suggest differently. That case was brought by seven plaintiffs against four different municipalities, alleging they were subjected to *different* racially discriminatory treatment by police officers from *different* municipalities. *Id.* at *1. Here, unlike the plaintiffs in *Cano-Diaz*, the Plaintiffs allege the *same* unconstitutional treatment by the *same* entity—the PCSO—under the *same* law enforcement program.

In light of these common facts and legal questions, joinder in this case would "serve[] the interest of judicial economy by eliminating multiple suits challenging the same [county-wide] policies and practices." *Harvard*, 411 F. Supp. 3d at 1237– 38. The PCSO does not attempt to argue that joinder would cause prejudice, undue

---

[4] Mot. 16, 18. PCSO takes the curious step of asking this Court to take judicial notice of Plaintiffs' police records, and, in support of this otherwise-improper offering, suggests that the Court "may take judicial notice of its own records and the records of inferior courts." Mot. 16 (citing *United States v. Rey*, 811 F.2d 1453, 1457 (11th Cir. 1987)). But police reports are not court records, and, even if the Court *could* take judicial notice of these records it could not simply assume that they are accurate or complete when ruling on a motion to dismiss. *See, e.g.*, *Bryant v. Miami-Dade County*, No. 10-cv-23768, 2011 WL 13223543, at *3 n.3 (S.D. Fla. Nov. 22, 2011). To the contrary, the Court assumes the truth of the facts as alleged in the Complaint.

expense and delay, or unnecessary jury confusion such that severance under Rule 21 would be appropriate. Consequently, the PCSO has "fail[ed] to explain how [any asserted] prejudice would outweigh the convenience and judicial economy of keeping all Plaintiffs in one case and proceeding through discovery in one case." *Gittens*, 2018 WL 839242, at *3. The PCSO does not make that showing for a very simple reason: It cannot. Even when multiple plaintiffs bring multiple claims, "the efficiency of a consolidated trial outweigh[s] the potential for unfair prejudice or jury confusion" when the plaintiffs share a "common core of allegations" and their claims "overlap substantially." *Alexander*, 207 F.3d at 1325–26. Judicial economy would not be furthered by "duplicative suits with duplicative discovery." *Cox Television Jacksonville, LLC v. Fla. Cable, Inc.*, No. 5:16-cv-6-Oc-32PRL, 2016 WL 11578269, at *4 (M.D. Fla. July 13, 2016), all of which would challenge the same overarching policies and customs.

## III. THE PLAINTIFFS HAVE SUFFICIENTLY PLED CLAIMS ON WHICH RELIEF CAN BE GRANTED.

The PCSO also argues for the dismissal of all of Plaintiffs' claims. Here, the PCSO's primary contention seems to be that Plaintiffs cannot ultimately prove liability under *Monell* as this case is currently constituted, apparently because the PCSO believes that Plaintiffs will not be able to trace each of the injuries alleged in the Complaint to the policies and customs alleged in the Complaint. *See* Mot. 5. But there is no need to resolve that question of causation on a motion to dismiss.

The *only* question before this Court is whether Plaintiffs have sufficiently alleged that their injuries arise from an unconstitutional policy or custom, as required to establish potential *Monell* liability. *See, e.g., Fundiller v. City of Cooper City*, 777 F.2d 1436, 1442–43 (11th Cir. 1985) (on a motion to dismiss, allegation that law enforcement was "acting in accordance with the policy" would "provide the causal link between the challenged conduct and the [defendant's] policy"); *see also Swanson v. City of Miami*, No. 07-23006-CIV, 2009 WL 10701408, at *10 (S.D. Fla. Feb. 4, 2009) (finding that *Monell* allegations sufficiently alleged causation and observing that there "is no heightened pleading requirement when alleging a section 1983 claim against a municipality").[5] As to that question, the PCSO has little to say. And, indeed, there is no real question that the Complaint states viable constitutional claims.

## A.    FOURTH AMENDMENT[6]

PCSO argues, without citing authority, that Plaintiffs' Fourth Amendment claim should be dismissed. The bulk of this contention seems to be that Plaintiffs'

---

[5] Likewise, while the PCSO briefly suggests that Plaintiffs may be unable to recover for *some* of their injuries because they fall outside the applicable statute of limitations—or because they are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994)—the PCSO does not even try to argue that those doctrines would categorically preclude recovery on any of Plaintiffs' constitutional claims. The Court cannot dismiss Plaintiffs' claims simply because Plaintiffs might potentially be unable to recover for some of their damages.

[6] PCSO notes, correctly, that Plaintiffs' Fourth Amendment claim "makes no due process claim in the count." That is because Plaintiffs' reference to the Fourteenth Amendment in this context simply reflects the principle that the Fourth Amendment is applicable to state and local governments by way of incorporation into the Fourteenth. *Mapp v. Ohio*, 367 U.S. 643 (1961).

Fourth Amendment allegations "do[] not describe a search or seizure" such that relief in this case could be appropriate. Mot. 19.

That argument is incorrect. The Complaint is replete with allegations that the Program authorized—in fact, required—warrantless, suspicionless visits on Plaintiffs' property (including the curtilage). Compl. ¶¶ 151–56. And the Complaint further alleges that Plaintiffs either could not terminate these interactions or felt they must comply with them. *Id.* ¶¶ 3, 170, 189, 229, 232–33. That alone is sufficient to establish a well-pled Fourth Amendment claim. *See*, *e.g.*, *United States v. Ratcliff*, 725 F. App'x 894, 901 (11th Cir. 2018) (explaining that officers must have reasonable suspicion to "justify a knock and talk," even when the visit does not extend beyond the curtilage). Indeed, "[i]t is well-established that a warrantless entry of the home or the area immediately surrounding the home is presumed unreasonable unless it meets one of few narrow exceptions" not present here. *Morgan v. Fairfield County*, 903 F.3d 553, 566 (6th Cir. 2018) (finding *Monell* liability for injuries caused by "county[] policy . . . during every 'knock and talk[]'" that ignored "one's right to retreat into his or her home.") (quoting *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018)). The Fourth Amendment prohibits repeated visits to a home—including visits beyond the doorway, to the curtilage—without probable cause or reasonable suspicion.

Merits questions aside, PCSO further urges dismissal of Plaintiffs' Fourth Amendment claim because some of the warrantless interactions between Plaintiffs and PCSO, it argues, might have been actually legitimate. *See* Mot. 20 ("Not all law enforcement interactions, even if traceable to the [Program], are going to be unconstitutional."). PCSO suggests, therefore, that each Plaintiff must identify "the specific law enforcement action which was unconstitutional." *Id.* But, as Plaintiffs have alleged, virtually all of PCSO's visits to their homes under the Program were unconstitutional. Whether certain visits can in fact be tied to the Program is a textbook question of causation and damages, which cannot be resolved on a motion to dismiss. *Ashley v. City of Hialeah*, No. 11-20490-CIV, 2011 WL 3236051, at *4–5 (S.D. Fla. July 28, 2011) ("Because [Plaintiff] has alleged facts that support the plausible existence of municipal policy or custom leading to a deprivation of constitutional rights, the Court allows the cause to proceed."). There is no question that Plaintiffs have stated multiple allegations of "similar complaints or acts" that, together, "establish proof of a custom, policy or practice." *Woodworth v. City of St. Petersburg*, Case No. 8:18-CV-747-T-26TGW, 2018 WL 2267115, at *1–2 (M.D. Fla. May 17, 2018). Those allegations are sufficient to state a claim.

Ultimately, the PCSO appears to be simply overwhelmed by the sheer number of visits made by its own deputies to the Plaintiffs' homes. The PCSO laments that it will be "impossible" to defend this case without "knowing why the deputies visited

the residence of a given Plaintiff . . . and the circumstances of" every interaction, and the PCSO asks that Plaintiffs be forced to focus on some more "specific law enforcement interaction." But that misses the point. The Fourth Amendment violation in this case involved *multiple* warrantless, suspicionless visits to the Plaintiffs' homes over a period of years; the sheer number of those visits to the Plaintiffs' homes is part of why the PCSO's actions exceeded the scope of any "implied license to enter" the Plaintiffs' property. *Florida v. Jardines*, 569 U.S. 1, 10 (2013). The PCSO cannot point to the number of its intrusions on Plaintiffs' property as a reason it should escape liability. Nor would it make any sense to adopt that approach. The Plaintiffs primarily charge, after all, that the Program is unconstitutional because it compels constant intrusions on Plaintiffs' properties. That is the nature of the alleged violation, not a defect in the pleading.

### B.   FREEDOM OF ASSOCIATION

Plaintiffs also state a claim that the PCSO's Program violates their right to freedom of association. Tammy, Dolly, and Robert were "subject[ed] . . . to repeated harassment simply because they are associated with a Targeted Person." Compl. ¶ 240. This harassment includes the PCSO's frequent visits to their homes, as well as pretextual code enforcement and warrantless arrests. *Id.* ¶¶ 240, 242–43; *see also id.* ¶¶ 196, 209, 215. Such "increased enforcement directly imposes a penalty for an individual's association with a Targeted Person." *Id.* ¶ 239.

The PCSO's policy of guilt-by-association imposes an impermissible burden on Plaintiffs' associational rights. Prior to the establishment of the Eleventh Circuit, the Fifth Circuit explained that "[f]reedom from punishment in the absence of personal guilt is a fundamental element in the American scheme of liberty" and upheld a claim that a "policy which attributes a parent's misconduct to other family members is . . . guilt by association wholly alien to American liberty." *St. Ann v. Palisi*, 495 F.2d 423, 425 (5th Cir. 1974); *see also Adler v. Pataki*, 185 F.3d 35, 45 (2d Cir. 1999) (finding violation of associational rights, where state took action against husband for wife's conduct).[7] Thus, for instance, the court in *Brumit v. City of Granite City*, No. 19-cv-1090, 2021 WL 462624, at \*6 (S.D. Ill. Feb. 9, 2021), held that plaintiffs survived a motion to dismiss on their First Amendment claim that they were evicted from their home because of crimes allegedly committed by their child. Just as the eviction in *Brumit* constituted impermissible guilt by association, the same is true of the PCSO's near-constant harassment of Plaintiffs for associating with someone the PCSO believes may commit future crimes.

The PCSO in fact largely concedes the point, stating that "the Complaint alleges that Plaintiffs could have encountered some law enforcement action based

---

[7] While the Eleventh Circuit has held that government can evict *public housing* tenants from their homes based on the conduct of individuals within their households, that holding applies only where government "acts in one of its many proprietary roles (employer, purchaser, or landlord, to name a few)." *Burton v. Tampa Hous. Auth.*, 271 F.3d 1274, 1283 (11th Cir. 2001). Implicit in that analysis is the conclusion that the government cannot punish a family for a family member's misdeeds when (as here) it acts outside a proprietary role.

on their having been a family member of a targeted person." Mot. 21. The PCSO argues that the Complaint does not sufficiently allege "when, or in what manner," this occurred. *Id.* But the Complaint explains in its very first paragraph that it is concerned with a years-long campaign of harassment carried out "with relentless visits to their homes at all hours of the day, with unwarranted stops and seizures, and with repeated citations for petty code violations," Compl. ¶ 1, and then describes that campaign in detail. The fact that the PCSO interfered with the right to familial association through a pattern of harassment—rather than a single incident—does not change the fact that the interference occurred.

Instead, PCSO's arguments primarily focus on the Complaint's allegation that the PCSO interfered with Dalanea's associational freedom by extending its harassment to her friends. While it is true that familial relationships receive special protection, associational rights also extend to other "intimate" associations, *Moore v. Tolbert*, 490 F. App'x 200, 203 (11th Cir. 2012), and the Complaint here alleges that the PCSO used its visits to "demand[ ] that Dalanea and her friends answer probing personal questions about Dalanea's social circles and her relationship status." Compl. ¶ 22; *see also id.* ¶ 188. The PCSO also argues that Dalanea's claim raises "obvious standing issues," Mot. 21, but Dalanea alleges that the PCSO's harassment has caused her harm by impairing her relationships. *See* Compl. ¶ 192. In other words, Dalanea has stated a claim that the PCSO's campaign of harassment

14

"seeks to interfere with the social relationship of two or more people." *Wilson v. Taylor*, 733 F.2d 1539, 1544 (11th Cir. 1984); *see also Chesser v. Sparks*, 248 F.3d 1117, 1125 n.10 (11th Cir. 2001). Dalanea has stated a claim that the PCSO violated her associational rights by interfering with her relationships simply because it predicts she may commit future crimes.

### C.   PROCEDURAL DUE PROCESS

Next, the PCSO argues that Plaintiffs' procedural due process claim should be dismissed because Plaintiffs "do not allege that they are due [any] specific process under any statute or regulation." Mot. 22. However, no court anywhere has ever said that a "statute or regulation" is the primary guarantor of due process. We have the Fourteenth Amendment for that. Compl. ¶¶ 249–58. And to determine whether an existing process is adequate under the Fourteenth Amendment, courts weigh three factors: (1) the private interest affected, (2) the risk of an erroneous deprivation of that interest under current procedures and the value, if any, of other possible procedures, and (3) the government's interest, including the efficiency of the current procedures. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

The *Mathews* analysis has been held to apply to government list-making very similar to the list-making at issue here. *Mohamed v. Holder*, 995 F. Supp. 2d 520 (E.D. Va. 2014). In *Mohamed*, the court struck down the original federal "No-Fly List" because, like the PCSO, the government provided no notice or opportunity to

be heard for individuals targeted by the list. *Id.* at 539. As here, the list was generated "without any judicial involvement or review, and according to a standard of proof that is far less than that typically required when the deprivation of significant constitutional liberties are implicated." *Id.*

Applying *Mathews* here, Plaintiffs have likewise alleged a procedural due process claim. As to the first factor, Plaintiffs have alleged that the Program has deprived them of several protected interests. Compl. ¶¶ 224–77. Next, under the second *Mathews* factor, Plaintiffs have alleged—and the PCSO does not dispute—that the Program provides literally *no procedure whatsoever* to prevent against erroneous deprivation. *Id.* ¶ 256. And finally, under *Mathews*' third factor, the court must consider the government's interest and the efficiency of existing procedures. But again, *there are no existing procedures*. And as for the government's interest, even the suspected (but unasserted) interest of public safety does not suffice under these circumstances. *Mohamed*, 995 F. Supp. 2d at 538–39. (holding that even the most important government interests, like preventing terrorism, will not justify a total lack of process). PCSO's Program puts Plaintiffs, their families, and others on probation for unidentified predicted future crimes that may never occur. Before PCSO imposes that sanction, people must have an opportunity to challenge it.

### D.   SUBSTANTIVE DUE PROCESS

The PCSO also argues that Plaintiffs do not state a substantive due process claim because they have not alleged that "the actions of the Defendant in a given situation were conscience shocking." Mot. 22–23.[8] But the "shocks the conscience" standard has no place here, "a civil case for money damages." *Pasco CWHIP Partners, LLC v. Pasco County*, No. 8:13-cv-2377-T-23EAJ, 2014 WL 3805667, at *2 n.* (M.D. Fla. Aug. 1, 2014) (quoting *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994)). Rather, in this context, there are "two strands" of substantive due process—one that protects against the infringement of fundamental rights and one that protects against arbitrary and irrational government action. *Hillcrest Prop., LLP v. Pasco County*, 915 F.3d 1292, 1297 (11th Cir. 2019). Plaintiffs state a claim that the Program violates both.

First, Plaintiffs state a claim that the Program violates the fundamental right to be free from punishment for the crimes or wrongdoings of another. *See* Compl. ¶ 260; *Cook v. Stewart*, No. 1:13-cv-72-MW-GRJ, 2014 WL 12521335, at *5 (N.D. Fla. Apr. 22, 2014). The Program imposes punishment on listed individuals, as well as their friends and family, without a determination of personal guilt. *See* Compl. ¶¶ 262–64; *see also id.* ¶ 37 (explaining Defendant's directive to "go out there and for

---

[8] Once again, this argument betrays a misunderstanding of Plaintiffs' claim: Rather than challenging each individual interaction with PCSO deputies, Plaintiffs are challenging the policies that initiated and drove those interactions.

every single violation the person commits, to come down and enforce it upon them."); *id.* ¶¶ 141–45. The PCSO has provided no governmental interest—much less a compelling one—that would justify this violation of Plaintiffs' fundamental right. *See St. Ann*, 495 F.2d at 427–28 (applying strict scrutiny to the imposition of punishment without personal guilt). And even if such an interest could be hypothesized, the government cannot establish narrow tailoring on a motion to dismiss.

Second, Plaintiffs have also stated a claim that the Program involves an exercise of the police power in a manner that is "pretextual, arbitrary and capricious and, because unrelated to the proper reasons for [the government action], without any rational basis." *Hearn v. City of Gainesville*, 688 F.2d 1328, 1332 (11th Cir. 1982), *overruled on other grounds by McKinney*, 20 F.3d at 1550. The PCSO here is using its legitimate law enforcement functions—home visits, code enforcement, arrests, and other activities—in order to accomplish an illegitimate end—*i.e.*, the intimidation and coercion of individuals (and their friends and families) who the PCSO predicts may possibly commit unspecified future crimes. *See* Compl. ¶¶ 165, 170–85, 264. Such behavior uses the law enforcement function as a means to harass and strong-arm, and as such, "fails to advance a legitimate governmental purpose." *Hillcrest Prop., LLP v. Pasco County*, 939 F. Supp. 2d 1240, 1262–63 (M.D. Fla. 2013), *overruled on other grounds by Hillcrest Prop., LLP*, 915 F.3d at 1302–03.

### E.    EQUAL PROTECTION

Finally, the PCSO argues that Plaintiffs do not state an equal protection claim because they have not identified similarly-situated "comparator instances." Mot. 24.[9] This, however, rests on an implicit mischaracterization of Plaintiffs' claim as a "class of one" claim. *See* Mot. 24. To be clear, Plaintiffs are not alleging that they alone have been arbitrarily singled out for special law enforcement focus—as is the case in a class-of-one claim—and instead assert that the PCSO has adopted a formal policy that impermissibly divides the populace of the county into two unequal classes (those listed and their associates, and everyone else). In that context, Plaintiffs can prevail simply by "show[ing] that the classification is not rationally related to a legitimate state purpose." *Ingles v. Lake County*, No. 504CV465OC10GRJ, 2005 WL 3448026, at *4 n.22 (M.D. Fla. Dec. 15, 2005) (citing *E & T Realty v. Strickland*, 830 F.2d, 1107, 1112 (11th Cir. 1987)).

And there is no rational relationship between the classification created by the PCSO's policy—family members of Targeted Persons and everyone else in Pasco County—and the law enforcement functions at issue in the Complaint. *See* Compl. ¶¶ 165, 170–85, 274–75. It makes no sense, for instance, to cite an individual for tall grass, or chickens in the backyard, because that individual has a family member who

---

[9] In fact, Plaintiffs did allege that though other properties in their neighborhoods had similar code violations, their homes were singled out for citations because they had family members who were Targeted Persons. *See* Compl. ¶¶ 174–77.

(according to a computer algorithm) might commit some unspecified future crime. *Id.* ¶ 174–75. Similarly, it makes no sense to harass such individuals to "[m]ake their lives miserable" based on crimes that have not been—and may never be—committed. *Id.* ¶ 1. Such intimidation and harassment is "unrelated to the government's interest in the activity employed to target" the individuals subject to the Program. *Armendariz v. Penman*, 75 F.3d 1311, 1328 (9th Cir. 1996), *overruled in part on other grounds by Crown Point Dev., Inc. v. City of Sun Valley*, 506 F.3d 851 (9th Cir. 2007); *see also Lofton v. Sec'y of Dep't of Child. & Fam. Servs.*, 358 F.3d 804, 817 (11th Cir. 2004). It is therefore pretextual and irrational.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Defendants' Motion to Dismiss, For More Definite Statement, or For Determination of Misjoinder be denied.

Dated: May 13, 2021.          Respectfully submitted,

/s/ Ari S. Bargil
Ari S. Bargil (FL Bar No. 71454)
INSTITUTE FOR JUSTICE
2 S. Biscayne Boulevard, Suite 3180
Miami, FL 33131
Tel: (305) 721-1600
Fax: (305) 721-1601
abargil@ij.org

Joshua A. House (CA Bar No. 284856)*
Caroline Grace Brothers (DC Bar No. 1656094)*
INSTITUTE FOR JUSTICE

901 N. Glebe Road, Suite 900
Arlington, VA 22203
Tel.: (703) 682-9320
Fax: (703) 682-9321
jhouse@ij.org
cgbrothers@ij.org

Robert E. Johnson (OH Bar No. 0098498)*
INSTITUTE FOR JUSTICE
16781 Chagrin Boulevard, Suite 256
Shaker Heights, OH  44120
Tel.: (703) 682-9320
Fax: (703) 682-9321
rjohnson@ij.org

* Admitted *Pro Hac Vice*

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 13th day of May, 2021, a true and correct copy of the foregoing document was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to the following counsel of record:

Thomas W. Poulton
poulton@debevoisepoulton.com

Jeffrey K. Grant
grant@debevoisepoulton.com

Erin M. Tueche
tueche@debevoisepoulton.com

Robert D. Holborn, II
holborn@debevoisepoulton.com

DEBEVOISE & POULTON, PA
1035 S Semoran Blvd, Suite 1010
Winter Park, FL 32792-5512


/s/ Ari S. Bargil