## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES III,

     *Plaintiffs*,

v.

CHRIS NOCCO, in his official
capacity as Pasco County Sheriff,

     *Defendant.*

Case No. 8:21-cv-00555-SDM-CPT

## PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF

### I.    INTRODUCTION

1.    The Pasco County Sheriff's Office punishes people for crimes they have not yet committed and may never commit. It first predicts that certain people may commit future crimes, and then it harasses these people—and their relatives and friends—with relentless visits to their homes at all hours of the day, with unwarranted stops and seizures, and with repeated citations for petty code violations. In the words of a former Pasco deputy, the policy is meant to "[m]ake their lives

miserable until they move or sue."[1] Here, four Pasco County residents sue under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

2. The Pasco County Sheriff's Office, hereinafter the "PCSO," has adopted an official policy and widespread custom of harassing individuals and their families because it thinks they are likely to commit unspecified future crimes. The PCSO refers to this policy and custom as its "Intelligence-Led Policing Program," and for ease of reference this Complaint refers to this policy and custom simply as "the Program." Under the Program, the PCSO uses questionable criteria (such as whether one is a bystander in other people's police reports) to compile a list of individuals who, it believes, are likely to commit crimes in the future. The PCSO then subjects these individuals—referred to in the Complaint as Targeted Persons— as well as their families to "relentless pursuit, arrest, and prosecution" to, in the words of Sheriff Chris Nocco, "take them out."

3. PCSO deputies repeatedly make unannounced visits to the homes of Targeted Persons—who are often minors—during which deputies demand entry to the home or information about a Targeted Person's comings and goings. While there, PCSO deputies also gather additional information about a Targeted Person's familial and social networks so that PCSO deputies can identify, catalog, track, and visit

---

[1] Kathleen McGrory and Neil Bedi, *Targeted: Pasco's sheriff created a futuristic program to stop crime before it happens*, Tampa Bay Times (Sept. 3, 2020), https://projects.tampabay.com/projects/2020/investigations/police-pasco-sheriff-targeted/intelligence-led-policing/.

those individuals as well. PCSO deputies routinely threaten friends and family members who allegedly do not cooperate with deputies enforcing the Program. And during visits to listed individuals' or their families' homes, deputies initiate pretextual code enforcement actions—actions which have no connection to the original purpose of the visit. PCSO routinely ignores requests that these visits stop. Likewise, PCSO deputies typically do not leave when residents ask them to do so. Instead, when individuals object to the unwanted visits, PCSO deputies subdue, arrest, and sometimes imprison Targeted Persons or their family and friends.

4.     But the U.S. Constitution guarantees the right to be secure in one's home and to be free from arbitrary and suspicionless police tactics. The government cannot punish you—or your friends or your family—for crimes you haven't committed. The PCSO's official policy and widespread custom of predictive policing therefore violates the First, Fourth, and Fourteenth Amendments to the U.S. Constitution.

## II.     JURISDICTION AND VENUE

5.     Plaintiffs Dalanea Taylor, Tammy Heilman, Darlene Deegan, and Robert A. Jones III ("Plaintiffs") bring this civil rights lawsuit pursuant to 42 U.S.C. § 1983 for violations of the First, Fourth, and Fourteenth Amendments to the U.S. Constitution stemming from Defendant's authorization and implementation of the PCSO's Intelligence-Led Policing Program.

6.      Plaintiffs seek declaratory and injunctive relief against Defendant to bar further implementation of the Program insofar as the Program involves strategies and policies that violate the First, Fourth, and Fourteenth Amendments to the U.S. Constitution.

7.      Plaintiffs seek compensatory and nominal damages from Defendant for the harms caused by Defendant as a direct and proximate result of Defendant's authorization and implementation of the Program.

8.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

9.      Venue is proper in this Court under 28 U.S.C. § 1391.

### III.   PARTIES

**A.    PLAINTIFF DALANEA TAYLOR**

10.    Plaintiff Dalanea Taylor ("Dalanea") resides in Pasco County, Florida.

11.    Dalanea hung out with a bad crowd in her mid-to-late teens, and she got into trouble and was arrested and charged as an adult for multiple property crimes, the worst of which were a series of auto thefts in 2014. Dalanea was never suspected of, arrested for, or charged with any violent criminal offenses.

12.    Dalanea has paid her debt to society. She was incarcerated for about two years, from age 15 to 17. When she got out from prison, she cleaned up her act.

13.     Dalanea is now a working mother of two, and she has stayed out of trouble since she was released from prison in March 2017.

14.     Dalanea was identified by the PCSO as a Targeted Person anyway.

15.     Because Dalanea was listed by the PCSO as a Targeted Person, PCSO deputies continued to track her even after she was released from prison and severed ties with her old acquaintances.

16.     As part of the implementation of the Program, PCSO deputies began making routine visits to Dalanea's residences shortly after her release from prison in March 2017. These visits continued for over three years, with the most recent occurring in September 2020, just before the *Tampa Bay Times* published its investigation of the Program.

17.     PCSO deputies made unannounced checks on Dalanea on a regular basis, sometimes as often as every other day.

18.     PCSO's suspicionless, warrantless visits to Dalanea's residences could occur at any time of the day or night.

19.     On one occasion, for example, deputies appeared at 6:30 in the morning and began banging on the door and demanding to speak to Dalanea.

20.     Dalanea asked PCSO deputies to cease these warrantless, suspicionless visits to her residence, but deputies responded that they could not stop making these visits because they were required under the Program.

21.    During these visits, PCSO deputies would frequently ask Dalanea's roommates for permission to come inside to search the property or otherwise locate Dalanea.

22.    PCSO deputies also demanded that Dalanea and her friends answer probing personal questions about Dalanea's social circles and her relationship status.

23.    As was the case with others on the PCSO's various "lists," PCSO deputies got aggressive when Dalanea or her roommates would decline to cooperate with their inquiries or requests to access the property.

24.    During one suspicionless visit to Dalanea's residence, Delanea's previous landlord (and friend) was threatened with petty code violations—for trash in her yard—because deputies perceived that she was not providing the deputies with sufficient information regarding Dalanea's whereabouts.

25.    PCSO's suspicionless, warrantless visits to Dalanea's residences persisted for years, even though she has been out of prison and stayed out of trouble during that time.

26.    During one visit, during the early morning hours of New Year's Day, a family friend implored PCSO deputies to cease their constant harassment. But PCSO deputies told her that they were following protocol and would continue to monitor Dalanea for at least a "couple of years" more.

### B.   PLAINTIFF TAMMY HEILMAN

27.    Plaintiff Tammy Heilman ("Tammy") resides in Pasco County, Florida.

28.    Tammy's then-minor son was identified under the Program as a Targeted Person around 2015, when the son was fifteen years old.

29.    Because of Tammy's son's status as a Targeted Person, PCSO made repeated visits to her property. These visits continued for five years, up until the publication of a *Tampa Bay Times* article describing the Program in September 2020.

30.    The frequency of these visits fluctuated over time. On some occasions, PCSO deputies would visit Tammy's property multiple times per week or even multiple times per day.

31.    Tammy told PCSO deputies the visits constituted harassment and asked them to stop, but deputies refused to stop the visits. At one point, a deputy responded that they could not stop the visits because they were required by the Sheriff.

32.    During these visits, PCSO deputies would sometimes walk around the side of the house, where they would attempt to look through the fence into the backyard.

33.    On one occasion during a nighttime visit, PCSO deputies walked into the flower bed next to the house, knocked on the window with a flashlight, and shined a light into the home.

34.     PCSO deputies would also sometimes demand entry into the home, and they would demand information from Tammy and from other residents on the whereabouts of Tammy's son during visits to the home.

35.     In one instance in September 2016, during an encounter in which a PCSO deputy was asking Tammy about her son, Tammy stated that she refused to speak with a deputy without an attorney present and left her residence in her car.

36.     Although both Tammy and her daughter were wearing a seatbelt, PCSO deputies pulled her over for alleged seatbelt violations and attempted to forcibly remove her from the car. Tammy was scared and refused to get out, calling 911 instead.

37.     PCSO deputies forcibly removed Tammy from the car and arrested her. On the way to jail, the arresting PCSO deputy explained PCSO policy: "[T]he direction we receive from our sheriff's office, from the top down, is to go out there and for every single violation that person commits, to come down and enforce it upon them."

38.     Accordingly, PCSO's formal policy required deputies to visit Tammy's property and search for potential violations, even though she (and not her son) owned it, and regardless of whether Tammy's son had done anything wrong or was even suspected of doing anything wrong.

39.     In order to avoid prosecution and the risk of additional time in jail, Tammy pled guilty in March 2018 to the offenses of misdemeanor battery, obstructing or resisting an officer without violence, and giving false information to law enforcement.

40.     Subsequently, in September 2018, during another visit to Tammy's property conducted as part of the Program, PCSO officials arrested Tammy for opening her front screen door into a PCSO deputy in the process of consenting to a search.

41.     Because she was on probation stemming from the prior arrest, Tammy spent 76 days in jail. She accepted a plea deal to avoid additional jail time, and now she is a convicted felon.

42.     Tammy's arrest and prosecution would not have occurred but for PCSO's enforcement of the Program and its perception that Tammy was not cooperating with the Program.

43.     PCSO deputies have also used code enforcement against Tammy to punish her for her perceived lack of cooperation with the Program. The most recent of Tammy's code enforcement citations was assessed in October 2017.

44.     PCSO deputies ticketed Tammy for having missing mailbox numbers and having a cinderblock in her front yard.

45. PCSO deputies also fined her $2,500 for having chickens in her backyard.

46. These code enforcement citations would not have been issued but for PCSO's enforcement of the Program and its perception that Tammy was not cooperating with the Program.

47. As recently as 2020, PCSO deputies arrested Tammy's younger son and brought him to a juvenile correctional facility.

48. Tammy's younger son was under the age of 18 at the time of this arrest.

49. When Tammy went to pick up her younger son from the facility, she was informed by officers at the facility that he should not have been arrested.

50. On information and belief, PCSO deputies arrested Tammy's minor son in order to retaliate against Tammy and her family for their perceived lack of compliance with PCSO's Program.

### C. PLAINTIFF DOLLY DEEGAN

51. Plaintiff Darlene Deegan ("Dolly") resides in Pasco County, Florida.

52. Dolly's late son, Tyler, developed an opioid addiction after receiving pain medication following a severe accident.

53. To fund his addiction, Tyler committed non-violent crimes in Pasco County, a pattern of behavior that caused the PCSO to list him as a Targeted Person.

54.     PCSO deputies would regularly visit Dolly's residence in order to harass her about her son's whereabouts, even though she frequently told them, truthfully, that she did not know where he was and that she would call police if she did.

55.     On some occasions, PCSO deputies visited Dolly's residence every day for consecutive days.

56.     PCSO's visits to Dolly's residence began in 2016 and continued for over three years, up until her son's death in December 2019.

57.     PCSO's tactics when searching for Tyler were often harassing and disruptive. In one instance, PCSO deputies scaled a privacy fence to gain access to Dolly's property. And in another, PCSO deputies assembled outside the residence and, using a bullhorn, demanded that Tyler—who was not there—come outside.

58.     Dolly asked PCSO deputies to cease these warrantless, suspicionless visits to her residence, but deputies responded that they could not stop making these visits because the visits were required under the Program.

59.     To punish Dolly for her failure to consent to warrantless searches, PCSO deputies threatened to take her to jail.

60.     If curious neighbors engaged with PCSO deputies on the scene, the deputies would insist that anyone who saw Tyler at or near Dolly's house should call police immediately.

61.    PCSO officials falsely accused Dolly of lying to protect her son.

62.    As retribution for Dolly's perceived failure to cooperate with the Program, Dolly was cited for trivial code violations. Specifically, Dolly was fined $3,000 for missing house numbers, tall grass and having construction materials on her property while putting up a fence. The most recent of these code enforcement citations was assessed in October 2019. These code enforcement citations would not have been issued but for PCSO's perception that Dolly was not cooperating with the Program.

63.    In another instance, PCSO deputies raided a house that Dolly owned and was renting to her son, who she believed was trying to break himself of his drug habit.

64.    The raid resulted in the arrest of her son and the impoundment of the family dog.

65.    When PCSO deputies finished the raid, they left the front door ajar. The house was promptly robbed of its contents, which included Dolly's own personal property.

### D.    PLAINTIFF ROBERT A. JONES III

66.    Plaintiff Robert A. Jones III ("Robert") resides in Pasco County, Florida.

67.     Robert's son, Robert Jones IV ("Robert Jr."), was identified as a Targeted Person by the PCSO after Robert and his family moved to Pasco County in 2015.

68.     One day not long after the family arrived in Pasco County, PCSO deputies enforcing the Program visited Robert at his home.

69.     During this initial visit, Robert allowed deputies into the home thinking that they simply wanted to speak with his son.

70.     The deputies then searched his son's room and seized several empty sandwich bags.

71.     The deputies subsequently arrested Robert's son, claiming that the sandwich bags had tested positive for trace amounts of marijuana.

72.     When he realized that PCSO was using entry into the home to search for evidence of crimes, Robert declined to allow deputies into the home on future visits or to further cooperate with the Program.

73.     PCSO deputies nevertheless repeatedly visited Robert's home, often multiple times a day or even in the middle of the night.

74.     These visits occurred multiple times every week.

75.     Most days, PCSO deputies would also park across the road from Robert's house and would approach anyone they saw leaving or entering the house.

76.     Robert asked PCSO deputies to cease these warrantless, suspicionless visits to his residence, but deputies responded that they could not stop making these visits because the visits were required under the Program.

77.     PCSO deputies would sometimes visit the home when Robert was at work, and they would demand that his young daughters provide entry into the home.

78.     Robert on some occasions came home from work to find as many as eighteen PCSO deputies outside his home, banging on the windows and yelling at his young daughters while they were hiding inside under the bed.

79.     Because PCSO deputies perceived that Robert was not cooperating with the Program, deputies repeatedly cited Robert for property code violations—including citations for overly long grass, for missing numbers on the mailbox, and for having a trailer on the property.

80.     The PCSO failed to notify Robert that he had been issued these property code citations.

81.      Then, when Robert failed to appear for hearings of which he had no notice, the PCSO obtained arrest warrants.

82.     PCSO deputies arrested Robert under these bogus failure-to-appear warrants on three occasions—first in October 2015, again in January 2016, and finally in April 2016.

83.     On another occasion, in December 2015, deputies looked through the windows of the house as part of a regular visit to the residence and saw an employee of Robert's business inside the house smoking a cigarette.

84.     When Robert refused to allow the deputies into the home, the deputies arrested him on charges of contributing to the "delinquency of a minor" and "resisting an officer."

85.     A PCSO deputy subsequently explained that they arrested Robert because, "we couldn't get the kids, so we arrested the dad."

86.     Those charges were ultimately dropped after state prosecutors examined the facts and found no basis to proceed.

87.     In March 2016, again because PCSO perceived that Robert was not cooperating with the Program, PCSO obtained a warrant to search the home.

88.     On information and belief, the warrant was obtained under false pretenses.

89.     The PCSO executed the warrant and seized significant amounts of personal property from the home, including laptops, tablets, and phones belonging to Robert and his four children.

90.     Following the March 2016 search, again because PCSO perceived that Robert was not cooperating with the Program, Robert was charged with possession

of marijuana and with child neglect. Both of these charges were ultimately dropped after state prosecutors examined the facts and found no basis to proceed.

91.    In all, PCSO arrested Robert on five occasions between October 2015 and April 2016, all because PCSO deputies perceived that Robert was not cooperating with the Program. None of these arrests resulted in any conviction for any crime.

92.    Because of the persistent harassment from the PCSO, Robert and his family moved away from Pasco County in April 2016.

93.    To avoid further harassment from the PCSO, Robert moved his family away from Pasco County in the middle of the night into a hotel.

94.    But for the PCSO's harassment as part of the Program, Robert and his family would not have left Pasco County.

95.    The PCSO's harassment continued even after Robert and his family left Pasco County. The state continued to pursue its retaliatory charges for marijuana possession and child neglect until April 2017, at which point prosecutors asked the court to enter a judgment of nolle prosequi on the ground that "the facts and circumstances revealed to date do not warrant prosecution."

96.    Meanwhile, in retaliation for Robert's perceived lack of cooperation with the Program, PCSO continued to retain property seized from Robert's family

16

until June 2017—at which point Robert obtained a court order directing the property's return.

97.    Robert has since moved back to Pasco County, and Robert lives in Pasco County today. As a result, Robert is continually at risk that he could once again be subjected to the Program.

98.    On information and belief, PCSO does not currently know that Robert has returned to Pasco County, and PCSO may resume its harassment as soon as PCSO learns that Robert has returned.

### E.    DEFENDANT PASCO SHERIFF CHRIS NOCCO

99.    Chris Nocco ("Sheriff Nocco") is the acting Sheriff of Pasco County. He has held that position since his appointment by then-Governor Scott in 2011.

100.   Sheriff Nocco is sued in his official capacity as Sheriff of Pasco County.

101.   Under the Florida Constitution, Sheriff Nocco holds his office as an officer of the local county government.

102.   In his capacity as Sheriff of Pasco County, Sheriff Nocco is the chief law enforcement officer of Pasco County and the head of the PCSO.

103.   Sheriff Nocco developed the Program pursuant to his authority as a local county officer, without any oversight or supervision from the State of Florida.

104.   The PCSO is funded out of the Pasco County budget, and Pasco County bears financial responsibility for judgments entered against the Sheriff of Pasco County in his official capacity.

105.   In his capacity as Sheriff of Pasco County, Sheriff Nocco has final authority over PCSO policies, practices, administration, and enforcement.

106.   Likewise, in his capacity as Sheriff of Pasco County, Sheriff Nocco has final authority over, and is currently tasked with designing, establishing, and overseeing, the policies, practices, administration, and enforcement of the Program.

107.   The Program did not exist prior to Sheriff Nocco's appointment in 2011. Following Sheriff Nocco's appointment in 2011, in his capacity as Sheriff of Pasco County, Sheriff Nocco spearheaded the PCSO's adoption of the Program.

108.   Sheriff Nocco is the architect and supervisor of the Program. In his capacity as Sheriff of Pasco County, Sheriff Nocco prepared the PCSO's Intelligence-Led Policing Manual ("ILP Manual"). The ILP Manual sets forth the policies, practices, administration, and enforcement guidelines for the Program.

109.   The ILP Manual contains a foreword section personally authored and signed by Sheriff Nocco. In the foreword, Sheriff Nocco advises that the PCSO will revise and modify the Program as needed. In his capacity as Sheriff of Pasco County, Sheriff Nocco (or his successor) is the PCSO official who will determine when and

how to adjust the policies, practices, administration, and enforcement of the Program in the future.

110. The PCSO has also released a document touting the PCSO's innovations. The document is extensively devoted to explaining the history and operational parameters of the Program and celebrating its purported benefits. Sheriff Nocco authored and signed the opening note in that document as well, advising that the goal of the document is to educate readers about "the evolution of policing and how [PCSO's] Intelligence-Led Policing philosophy has adapted [PCSO's] approach from being reactive to proactive."

111. As alleged in this Complaint, the description of the Program in the ILP Manual is also supplemented by widespread customs and unwritten policies of the PCSO. In his capacity as Sheriff of Pasco County, Sheriff Nocco formulates, develops, implements, and enforces these widespread customs and unwritten policies.

112. Sheriff Nocco is chief supervisor and manager of the PCSO. As such, Sheriff Nocco's (or his successor's) desired policies, procedures, and customs act as occupational requirements for all PCSO deputies in the field.

## IV.   FACTUAL ALLEGATIONS

### A.   PCSO's System of Predictive Policing

113.   The Program, as devised, designed, established, and overseen by Sheriff Nocco, is the official policy and widespread custom of the PCSO.

114.   The Program purports to "emphasize[] analysis and intelligence . . . to focus law enforcement on problem people, problem places, and problem groups." In plain terms, the PCSO uses an algorithm to identify people who are supposedly more likely to commit unspecified future crimes.

115.   Once the PCSO determines which people, places, and groups to focus on, the Program calls for the strategic allocation of disproportionate resources to allow "for an enhanced focus" on those people, places, and groups.

116.   Thus, the official policy and widespread custom of the PCSO is to use the Program to determine the "problem people, problem places, and problem groups" on which it should disproportionately focus its resources.

117.   After the Program was featured in a September 2020 article in the *Tampa Bay Times*, the PCSO issued a statement responding that it "will not back down nor apologize for keeping our community and children safe."

### B.   PCSO Gathers Information and Creates Lists to Keep Track of "Prolific Offenders"

118.   Implementation of the Program requires PCSO officials to maintain and act upon information about Pasco residents whom the PCSO predicts are more likely

to commit crimes. To that end, the Program identifies individuals as Targeted Persons.

119.   The PCSO identifies several categories of Targeted Persons, including, among others, "Prolific Offenders," "Juvenile Prolific Offenders," and "Top 5" targets.

120.   The PCSO defines "Prolific Offenders" as individuals "who ha[ve] evidenced through numerous arrests separated by time that he or she has not learned from their interactions with the criminal justice system," who are "not likely to reform," and whom the PCSO presumes to have "taken to a career of crime."

121.   The PCSO's list of Targeted Persons also includes juveniles who are, in its view, "most at-risk to fall into a life of crime" or "at-risk of developing into prolific offenders."

122.   The PCSO identifies Targeted Persons using a criminal-history "algorithm." This algorithm is actually nothing more than a human-calculated scoring system that involves adding up points assigned for various factors.

123.   The PCSO's algorithm considers information regarding past criminal histories. The algorithm awards points for arrests, as well as for past crimes that a potential Targeted Person was suspected of having committed but for which he or she was never charged.

124.   In order to identify Targeted Persons, the PCSO also takes into account information provided by the Pasco County public school system and the Florida Department of Children and Families—including information about school performance, family background, and socio-economic status.

125.   An individual need not have been convicted of an offense for that offense to factor into a person's identification as a Targeted Person.

126.   Even if an individual maintains a clean record for years, an individual can remain on the list based on years-old arrests or other incidents.

127.   The PCSO's algorithm also calls for a score enhancement for having "other involvement" in an offense, which the PCSO defines as appearing in criminal reports (even if not charged or suspected of the crime) or for being suspected to be an "active gang member."

128.   The PCSO considers being a witness, victim, or a reporting party to be "Other Involvement" that can be applied to obtain a score enhancement.

129.   The PCSO does not describe what it means to be an "active gang member" for purposes of score enhancement, and, on information and belief, the PCSO erroneously identifies people as "gang members" who are not actually associated with any criminal gang.

130.   The PCSO's algorithm also calls for a score enhancement for simply missing a court date.

22

131.   The PCSO's algorithm places "more emphasis . . . on how often an individual re-offends and less [emphasis] on how many charges for which an individual has been arrested." As a result, an individual who commits (or is suspected of committing) several small crimes in a short period of time is more likely to be identified as a Targeted Person than an individual who has spent a lifetime committing more severe crimes and then serving lengthy prison sentences.

132.   The Program aims to identify a predetermined number of Targeted Persons. As a result, the Program identifies Targeted Persons not based on fixed criteria, but rather based on a comparative analysis with other potential Targeted Persons. If Pasco County has fewer serious offenders, the Prolific Offender list will include more people with relatively minor criminal histories.

133.   A potential Targeted Person is never advised that the PCSO is considering them for classification as a Targeted Person.

134.   A potential Targeted Person is not afforded any opportunity to be heard or to otherwise contest their classification as a Targeted Person.

135.   Once a Targeted Person is classified as such, there is no mechanism by which they can request their removal from the PCSO's list of Targeted Persons or otherwise contest the consequences of their classification as a Targeted Person.

136.   The PCSO acknowledges that its process to identify Targeted Persons has shortcomings. For example, the PCSO recognizes that "[c]rime is a societal

issue" that policing alone cannot solve. The PCSO also admits that an individual's identification as a Targeted Person "does not guarantee that the individual will reoffend" because "past and present behavior . . . may not predict future behavior."

137.   On information and belief, once the PCSO's algorithm identifies a pool of individuals eligible for inclusion on the PCSO's list of Targeted Persons, a PCSO analyst makes the final determination as to which of those individuals should be listed as Targeted Persons. The analyst makes this determination subjectively, based merely on the analyst's prediction of which of those individuals are more likely to commit hypothetical future crimes. This final step in the process introduces a further potential for bias into the process of creating the list, and it also introduces a further element of irrationality into the criteria for inclusion as a Targeted Person.

138.   The ILP Manual includes a list of risk factors that PCSO believes indicate a person is likely to commit future crimes. These include that a person is "[s]ocio-economically deprived," that a person comes from a "broken home[ ]," that a person has "[l]ow intelligence," and that a person has "[r]eceived poor rearing as a child." Other factors include "[a]ntisocial behavior," "[h]anging around in public," and "[b]eing a victim of personal crime." On information and belief, PCSO analysts consider these factors when making their final subjective determination of which individuals flagged by the algorithm should be included on the PCSO's list of Targeted Persons.

24

C.   **PCSO's At-Home "Checks" for Targeted Persons Are Suspicionless and Warrantless Searches**

139.   Once an individual is classified as a Targeted Person, PCSO deputies are required to "[c]onduct a face-to-face prolific offender check at least once quarterly with each active prolific offender."

140.   The PCSO refers to these regular checks on Targeted Persons as "Prolific Offender Checks."

141.   The written policy is to conduct a Prolific Offender Check on each Targeted Person at least once per quarter, and, in fact, it is widespread custom for PCSO deputies to subject Targeted Persons to Prolific Offender Checks more frequently than once per quarter—sometimes as much as multiple times per week.

142.   Plaintiff Dalanea Taylor received Prolific Offender Checks as often as every other day for over three years. Plaintiff Tammy Heilman received Prolific Offender Checks as often as multiple times a week—or even multiple times per day—for five years. Plaintiff Dolly Deegan received Prolific Offender Checks, sometimes for multiple days in a row, for over three years. And Plaintiff Robert Jones received Prolific Offender Checks as often as multiple times per day for over one year.

143.   It is the official policy and widespread custom of PCSO deputies to aggressively pursue Prolific Offender Checks, including by making visits to

locations where a Targeted Person is not likely to be present, such as residences and places of business of family and friends.

144.   Prolific Offender Checks are supposedly "based on the theory of focused deterrence . . . [a] theory suggest[ing] that crime can be prevented if potential offenders believe the costs of committing a crime outweigh the benefits."

145.   Part of the PCSO's "focused deterrence" strategy, as it relates to Prolific Offender Checks, involves reminding Targeted Persons during checks "that because of their criminal activity, they have been identified for an enhanced focus by the Pasco Sheriff's Office." To that end, during checks, deputies are instructed to advise Targeted Persons that "they have only two options." The first option is to "stop committing crimes." And "the second option is to bear the consequences of their criminal ways through relentless pursuit, arrest, and prosecution."

146.   The PCSO has a zero-tolerance arrest policy for crimes committed by Targeted Persons. Accordingly, it is the official policy and widespread custom of the PCSO that deputies do not have discretion to elect to not pursue charges against a Targeted Person for any suspected transgressions. Additionally, in the instance of a Targeted Person who is a minor, it is the official policy and widespread custom of the PCSO to seek to have the minor charged as an adult and, if convicted, to be sentenced to a term of incarceration in a correctional facility for adults.

147.   The PCSO's zero-tolerance arrest policy also extends to offenses committed by family members of Targeted Persons. For instance, both Tammy and Robert were arrested pursuant to the PCSO's zero-tolerance arrest policy.

148.   The PCSO's zero-tolerance policy, in the PCSO's view, effectively achieves crime prevention because "[t]he longer they are incarcerated, the less opportunity they have to commit crime, thus having a preventative effect."

149.   The PCSO's zero-tolerance arrest policy means that Targeted Persons and their family members are subject to a different legal regime than other residents of Pasco County. If a normal resident commits an offense, then PCSO officials have discretion whether to subject that resident to legal sanctions, and such discretion is frequently used in order to moderate the application of otherwise-expansive legal provisions. By contrast, if a Targeted Person or the family member of a Targeted Person commits the same offense, the Targeted Person is subject to a rule of automatic arrest.

150.   In addition to "focused deterrence," PCSO deputies are also encouraged to use Prolific Offender Checks to interrogate Targeted Persons about the so-called "criminal environment." In particular, PCSO deputies involved in Prolific Offender Checks are told to extract information about "who is committing crimes, where, when, and how."

151.   It is an official policy and widespread custom for PCSO deputies to not obtain warrants before embarking on Prolific Offender Checks.

152.   It is an official policy and widespread custom for PCSO deputies to not possess any specific or articulable suspicion of wrongdoing before embarking on a Prolific Offender Check.

153.    With the exception of the March 2016 visit to Robert's home, none of the Plaintiffs were ever presented with a warrant during a Prolific Offender Check at their home. On information and belief, PCSO deputies conducted Prolific Offender Checks at each of the Plaintiffs' homes without specific or articulable suspicion of wrongdoing.

154.   Although PCSO deputies need not have any specific or articulable suspicion of wrongdoing when they conduct Prolific Offender Checks, the purpose of such checks is to search for evidence of any crimes committed by Targeted Persons or their families.

155.   It is an official policy and widespread custom for PCSO deputies to routinely enter onto private property, including the curtilage and main dwelling space of residential private property, during Prolific Offender Checks.

156.   For each of the Prolific Offender Checks performed at the Plaintiffs' homes, PCSO deputies entered into the curtilage—and sometimes into the main dwelling area—of each Plaintiff's residence to question them.

28

157.   It is the official policy and widespread custom for PCSO deputies to look into the windows of residences, to look over fences into the backyards of residences, and to otherwise seek to view the private spaces of Targeted Persons' residences during Prolific Offender Checks.

158.   During Prolific Offender Checks to her home, Tammy witnessed PCSO deputies walking around the side of her house and attempting to look into the backyard, and on one occasion Tammy witnessed PCSO deputies shining a flashlight into the windows of the home. During a Prolific Offender Check to Robert's home, PCSO deputies arrested him for "delinquency of a minor" and "resisting an officer" because they saw an employee of his business smoking a cigarette inside the house.

159.   It is an official policy and widespread custom for PCSO deputies to seek to enter the homes and businesses of Prolific Offenders or their friends and family during Prolific Offender Checks.

160.   During Prolific Offender Checks to Dalanea's residences, PCSO deputies frequently asked her landlords and roommates for permission to come inside to locate Dalanea. During Prolific Offender Checks to Tammy's, Dolly's, and Robert's homes, PCSO deputies demanded entry into their respective homes to gather evidence about each of their sons.

161.   It is an official policy and widespread custom for PCSO deputies to threaten code enforcement or other citations in the event that residents deny them access to the inside of a residence during Prolific Offender Checks.

162.   It is an official policy and widespread custom that PCSO deputies engaged in a Prolific Offender Check do not cease an interaction when a property owner indicates, explicitly or implicitly, that they would like the current interaction to cease.

163.   It is an official policy and widespread custom that PCSO deputies engaged in a Prolific Offender Check do not cease future interaction when a property owner indicates, explicitly or implicitly, that they would like all future visits to cease.

164.   Each of the Plaintiffs asked PCSO deputies to stop conducting Prolific Offender Checks at their home, but the PCSO deputies refused. Instead, the deputies indicated that they could not stop the visits because the visits were required under the Program.

165.   It is an official policy and widespread custom that PCSO deputies engaged in a Prolific Offender Check will demand that a Targeted Person physically present himself or herself to deputies. When deputies are knowingly at the residence of a Targeted Person's family or friends, deputies will sometimes falsely accuse the resident of wrongly harboring the Targeted Person and demand entry to determine whether he or she is there.

166.   PCSO deputies usually demanded to speak to Dalanea during visits to her residence. During visits to Tammy's, Dolly's, and Robert's homes, PCSO deputies demanded to speak with their respective sons. PCSO also falsely accused Dolly several times of lying to protect her son.

167.   It is an official policy and widespread custom that PCSO deputies engaged in a Prolific Offender Check will advise residents and any other individuals present on the property that they will suffer legal consequences for noncompliance with PCSO's demands to enter the residence, supply information about someone's location, or explain how various residents are connected socially.

168.   It is an official policy and widespread custom that PCSO deputies engaged in a Prolific Offender Check will advise residents that they will suffer legal consequences for noncompliance with PCSO demands in order to intimidate or coerce compliance from property owners, Targeted Persons, and their friends and family.

169.   PCSO deputies arrested Tammy and Robert multiple times, and PCSO deputies also subjected Tammy and Dolly to pretextual code enforcement charges, in order to retaliate for perceived non-compliance with demands made during Prolific Offender Checks.

170.   Based on the PCSO's official policies and widespread custom, PCSO deputies are ordered and expected to harass or intimidate Prolific Offenders and their

friends, family, and roommates by visiting their homes and looking for reasons to write tickets, citations, or make arrests.

### D.   PCSO RESORTS TO THE PRETEXTUAL USE OF CODE ENFORCEMENT AS A MEANS OF HARASSMENT AND INTIMIDATION

171.   It is an official policy and widespread custom that PCSO deputies engaged in Prolific Offender Checks are encouraged to look for potential civil code violations during Prolific Offender Checks.

172.   It is an official policy and widespread custom that PCSO deputies engaged in Prolific Offender Checks routinely issue citations for picayune violations, like tall grass or missing house numbers on a mailbox.

173.   The Program identifies the role of code enforcement as a means to address the factors that purportedly lead to greater criminality, like the existence or appearance of abandoned buildings, or to address issues on a property that is routinely the site of criminal behavior.

174.   On information and belief, PCSO employs full-time code enforcement officers—separate from Pasco County's Code Enforcement Department—whose main responsibility is to accompany deputies on Prolific Offender Checks to look for code enforcement violations. PCSO's code enforcement officers routinely issue more citations annually than Pasco County's dedicated code enforcement officials.

175.   By using PCSO code enforcement officers to issue citations to Targeted Persons and their family members, the PCSO is able to do several things that

traditional code enforcers may not, like set cases for mandatory court appearances and impose fines and jail time for noncompliance or failure to appear for scheduled court dates. Pasco County's Code Enforcement Department officers, by contrast, do not have the power to arrest or jail violators for noncompliance or failure to appear at code enforcement hearings. These differences mean that PCSO enforces county ordinances against Targeted Persons in a manner that is different from the way those ordinances are enforced against other residents of Pasco County.

176.   In addition, it is the official policy and widespread custom of the PCSO to wield code enforcement as a cudgel to coerce compliance with demands made during Prolific Offender Checks. PCSO deputies engaged in Prolific Offender Checks therefore threaten code enforcement violations against residents who invoke basic constitutional rights—such as asking deputies to leave their property, refusing to consent to a warrantless search, declining to answer questions, or attempting to end the engagement.

177.   It is the official policy and widespread custom of the PCSO to initiate petty code enforcement actions—by issuing citations for small violations like missing house numbers, tall grass, or accumulated trash—against property owners or residents who were uncooperative during at-home checks.

178.   In addition, it is the official policy and widespread custom of the PCSO to use threats of petty code enforcement actions as a bargaining chip when property owners or residents are uncooperative during at-home checks.

179.   When PCSO deputies thought Dalanea's landlord was not telling them everything she knew about Dalanea's whereabouts, they threatened her with citations for having trash in her yard.

180.   Because they were perceived as "noncooperative" during Prolific Offender Checks, Tammy received citations for missing mailbox numbers, having a cinderblock in her front yard, and having chickens in her backyard; Dolly received citations for missing house numbers, overly long grass, and having construction materials in her yard while putting up a fence; and Robert received citations for missing mailbox numbers, overly long grass, and having a trailer on his property.

181.   Many (if not all) of Plaintiffs' code enforcement citations were issued by the PCSO's special code enforcement arm (which is focused on Targeted Persons and their family members), and not by the county's civil code enforcement division (which is focused on other residents of Pasco County).

182.   PCSO deputies did not cite other properties in Plaintiffs' neighborhoods, although those properties could have been cited for the same violations.

183.   For instance, PCSO deputies did not cite other homes with missing mailbox numbers, over-length grass, or trailers on their properties.

184.   PCSO deputies subjected Plaintiffs to these code violation citations because Plaintiffs' family members were identified by the Program as Targeted Persons.

185.   At least one former PCSO deputy has admitted as much, publicly acknowledging that PCSO deputies would "literally go out there and take a tape measure and measure the grass if somebody didn't want to cooperate with us."

186.   In addition to using code enforcement to coerce compliance during at-home checks, it is also the official policy and widespread custom of the PCSO to use code enforcement simply as a mechanism to harass, intimidate, and bully Targeted Persons and their family and friends.

187.   For example, it is the official policy and widespread custom of the PCSO to initiate a Prolific Offender Check, without any suspicion of a code violation, with the intention of identifying and pursuing code violations upon arrival.

188.   Additionally, it is the official policy and widespread custom of the PCSO to identify and pursue code violations to punish property owners and co-residents—who are not themselves Targeted Persons—for the supposed misdeeds of others.

189.   Tammy, Dolly, and Robert—none of whom were themselves Targeted Persons—were each punished with code citations because their respective sons were Targeted Persons.

190.   On information and belief, because pretextual code enforcement is an official policy and widespread custom of the Program, PCSO deputies who express disagreement with or discomfort about the pretextual use of code enforcement, or who decline to pursue such code enforcement actions altogether, are subject to disciplinary action for insubordination.

191.   On information and belief, the use of code enforcement is part of the PCSO's overriding goal to "make [people's] lives miserable until they move."

192.   PCSO's primary purpose in using code enforcement against Targeted Persons and their family members, therefore, is not preventing safety and sanitation hazards on properties within the County. Rather, PCSO uses code enforcement against Targeted Persons and their family members primarily for the purported law-enforcement purpose of reducing crime by pressuring Targeted Persons and their associates to leave the County.

193.   On information and belief, many Targeted Persons and their families leave Pasco County to escape the continuous, unwanted, and suspicionless visits to their homes.

## V.   INJURY TO PLAINTIFFS

### A.   HARM TO DALANEA

194.   Dalanea has been directly harmed by the PCSO and the Program.

195.   Dalanea was released from prison in March 2017, and has not had been in trouble with the law since. Nevertheless, Dalanea was listed as a Targeted Person shortly after her release, and as a result, she has been receiving constant and unwanted visits from police since the first week after her release.

196.   Dalanea was subjected to Prolific Offender Checks roughly every week since, resulting in suspicionless visits that occurred at all hours of the day and night. Dalanea has also been followed by PCSO vehicles while walking through her neighborhood and asked to answer sensitive questions about her friends, neighbors, and even her romantic partners.

197.   When Dalanea asked PCSO deputies to leave her alone, they told her that the constant Prolific Offender Checks were simply "protocol" and that they were just following orders. Additionally, when Dalanea would ask PCSO deputies to end these unwanted Prolific Offender Checks, they would threaten to initiate code enforcement cases against her or her landlord for her obstinacy.

198.   On numerous occasions, Dalanea's encounters with police have forced her to miss or be late for work or child-care arrangements. This tardiness has cost Dalanea money. Thus, because of the Program and Dalanea's classification as a

Targeted Person, Dalanea was harassed and has lost earnings and incurred additional expenses.

199.   In addition, Dalanea's years of constant unwanted interactions with PCSO deputies have left her traumatized. Thus, because of the persistent campaign of harassment carried out as part of the Program and Dalanea's classification as a Targeted Person, Dalanea has suffered irreparable emotional harm and distress.

200.   Dalanea has also suffered reputational damage because of the PCSO's interactions with her friends in connection with the Program, as PCSO's statements to her friends have created the impression that she is a target of law enforcement activity.

201.   Dalanea has not been visited by PCSO for a Prolific Offender Check since the publication of a *Tampa Bay Times* article describing the Program in September 2020. However, Dalanea continues to reside in Pasco County, the PCSO has stated that it is not abandoning the program, and the Prolific Offender Checks could resume at any time.

202.   On information and belief, if PCSO is not enjoined from enforcing its Program, PCSO will resume its harassment of Dalanea.

**B.   HARM TO TAMMY**

203.   Tammy has been directly harmed by the PCSO and the Program.

204.   Tammy had not had any brushes with the law for many years until her son landed on the PCSO's Prolific Offender list. This led to Tammy having interactions with the PCSO that would not have occurred but for her son's inclusion on the list.

205.   For example, as a result of Tammy's son's identification by the Program and classification as a Targeted Person, Tammy was harassed and fined $2,500 for having chickens in her backyard. But for her son's classification, Tammy would not have been harassed and subjected to enhanced code enforcement; she would have been treated like others in the community and not fined at all.

206.   As a result of Tammy's son's identification by the Program and classification as a Targeted Person, Tammy was cited for missing mailbox numbers and having a cinderblock in her front yard. But for her son's classification, Tammy would not have been subject to enhanced code enforcement; she would have been treated like others in the community and not fined at all.

207.   As a result of Tammy's son's identification by the Program and classification as a Targeted Person, Tammy has been arrested twice—each time for her perceived lack of cooperation with PCSO deputies engaged in suspicionless, warrantless searches on her property.

208.   As a result of these arrests, Tammy has incurred substantial legal fees. Thus, but for her son's classification, Tammy would not have been arrested and forced to pay legal fees.

209.   As a result of Tammy's son's identification by the Program and classification as a Targeted Person, Tammy is now a felon whose employment opportunities have been severely diminished. Thus, but for her son's classification, Tammy would have better employment options.

210.   As a convicted felon, Tammy is also unable to participate in certain activities with her children. For instance, Tammy is unable to serve as a troop leader for her young daughter's scouting group.

211.   Additionally, as a result of the persistent campaign of harassment carried out as part of the Program and her son's classification as a Targeted Person, Tammy and her family have suffered irreparable emotional harm and distress.

212.   Tammy's older son is currently incarcerated awaiting trial, but, on information and belief, PCSO will resume Prolific Offender Checks at Tammy's home as soon as her oldest son is released.

213.   In addition, Tammy's younger son has also had run-ins with the PCSO and is at risk to be placed on Pasco's list, in which case PCSO would once again resume making Prolific Offender Checks at Tammy's home.

C.    HARM TO DOLLY

214.   Dolly has been directly harmed by the PCSO and the Program.

215.   Dolly's son, who is now deceased, was listed as a Targeted Person as a result of having committed a series of non-violent property crimes to support his drug addiction.

216.   PCSO deputies conducted numerous Prolific Offender Checks at Dolly's residence as a result of her son's identification as a Targeted Person.

217.   Dolly has never been arrested. But because of her son's classification as a Targeted Person, Dolly had numerous interactions with the PCSO that would not have occurred but for her son's inclusion on the list.

218.   Many of those instances arose when PCSO deputies would show up on Dolly's property looking for her son and, when he was not there, would demand to know where he was. If PCSO deputies perceived that Dolly was not cooperating with their requests, PCSO deputies would target Dolly for whatever violations they could find.

219.   Specifically, Dolly was harassed and fined $3,000 for petty code violations like tall grass. But for her son's classification, Dolly would not have been harassed and subjected to enhanced code enforcement; she would have been treated like others in the community and not fined at all.

220.   Additionally, Dolly lost substantial personal property when PCSO deputies, acting in accordance with their duties under the Program, raided a house that she owned where her son lived and left the door open when they left. Dolly also had to bear the costs of retrieving the family dog from the police impound. But for her son's classification, Dolly's house would not have been raided and she would not have had to incur the expenses associated with retrieving her dog and replacing stolen items.

221.   Additionally, as a result of the persistent campaign of harassment carried out as part of the Program and her son's classification as a Targeted Person, Dolly has suffered irreparable emotional harm and distress.

### D.   HARM TO ROBERT

222.   Robert has been directly harmed by the PCSO and the Program.

223.   PCSO deputies conducted numerous Prolific Offender Checks at Robert's residence as a result of his son's identification as a Targeted Person.

224.   Because of his perceived lack of cooperation with the Program, Robert was arrested on four separate occasions between October 2015 and April 2016. But for PCSO's classification of Robert's son as a Prolific Offender, these arrests would not have occurred.

225.   When he moved to Pasco County, Robert had dreams of attending law school. Because of PCSO's retaliatory actions, undertaken in response to his

perceived lack of compliance with the Program, Robert now has an extensive arrest record and has been forced to abandon his dream of attending law school.

226.   PCSO deputies also seized significant personal property from Robert and his children, including several laptop computers, tablets, and cellphones. PCSO held this personal property until June 2017, when it was forced to release the property by a court order. But for PCSO's classification of Robert's son as a Targeted Person, this property would not have been seized and would not have been held for such a lengthy time.

227.   Robert had to purchase new computers, tablets, and cellphones to replace the property while it was being held. Robert was thus forced to spend money to replace property seized and held by PCSO as a result of the Program.

228.   PCSO still has not returned some of the property that it seized from Robert's home. For instance, PCSO still has not returned Robert's daughter's iPhone, as well as a brand-new Samsung phone that was seized by the PCSO from Robert's home.

229.   Because of his harassment by PCSO, Robert and his family moved out of Pasco County in 2016. But for PCSO's classification of Robert's son as a Targeted Person, Robert and his family would not have been forced to move.

230.   Robert has subsequently returned to Pasco County, and Robert could once again be targeted by the Program again at any time.

43

231.   As a result of the persistent campaign of harassment carried out as part of the Program and his son's classification as a Targeted Person, Robert has suffered irreparable emotional harm and distress.

## VI.   CAUSES OF ACTION

### COUNT ONE:
### ON BEHALF OF ALL PLAINTIFFS
### FOURTH AMENDMENT UNREASONABLE SEARCH AND SEIZURE
### 42 U.S.C. § 1983

232.   Plaintiffs hereby incorporate paragraphs 1-231 by reference.

233.   The Fourth Amendment to the U.S. Constitution, as incorporated into the Fourteenth Amendment to the U.S. Constitution, protects individuals' right to be secure on their property and free from warrantless searches and seizures.

234.   Each of the Plaintiffs have been subjected to unwarranted and suspicionless Prolific Offender Checks at their homes by the PCSO, either because they were listed as a Targeted Person (in the case of Dalanea Taylor) or because they are related to individuals who were listed as Targeted Persons (in the cases of Tammy Heilman, Dolly Deegan, and Robert A. Jones III).

235.   The PCSO's official policy and widespread custom of unwarranted and suspicionless Prolific Offender Checks establishes a systematic practice of unconstitutional searches and seizures under the Fourth Amendment because they are non-consensual and are not precipitated by either probable cause or exigent circumstances.

236.   The PCSO's official policy and widespread custom of unwarranted and suspicionless Prolific Offender Checks establishes a systematic practice of unconstitutional searches and seizures under the Fourth Amendment insofar as they exceed the scope of any license—express or implied—to visit a property and ask to speak with someone inside.

237.   The PCSO's official policy and widespread custom of unwarranted and suspicionless Prolific Offender Checks establishes a systematic practice of unconstitutional searches and seizures under the Fourth Amendment insofar as they continue beyond the point at which the property owner expresses a desire to cease all interaction and terminate the encounter.

238.   The PCSO's official policy and widespread custom of unwarranted and suspicionless Prolific Offender Checks establishes a systematic practice of unconstitutional searches and seizures under the Fourth Amendment insofar as officers extend the visits beyond the pathway leading to the home and intrude upon the curtilage—including walking onto the sides of yards, peering into backyards, and looking through the windows of the residences.

239.   The PCSO's official policy and widespread custom of unwarranted and suspicionless Prolific Offender Checks establishes a systematic practice of unconstitutional searches and seizures under the Fourth Amendment insofar as they

occur at all times of the day or night, including at times when no reasonable visitor would approach a home.

240.   The PCSO's official policy and widespread custom of unwarranted and suspicionless Prolific Offender Checks establishes a systematic practice of unconstitutional searches and seizures under the Fourth Amendment because property owners and residents do not feel free to decline to engage with PCSO deputies, refuse their demands, or otherwise terminate the encounter.

241.   The PCSO's official policy and widespread custom of using or threatening to use code enforcement to secure consent to make a warrantless entry into private residential property establishes a systematic practice of unconstitutional searches and seizures under the Fourth Amendment because property owners and residents are coerced into providing such consent and generally do not feel free to decline to engage with PCSO deputies, refuse their demands, or otherwise terminate the encounter.

242.   A reasonable person would expect to be free from the types of intrusions onto the home and its curtilage perpetrated by the PCSO as part of its implementation of the Program and its Prolific Offender Checks.

243.   As a direct result of the PCSO's official policy and widespread custom of unwarranted and suspicionless Prolific Offender Checks, Plaintiffs have suffered an immediate and direct injury for which they are entitled to compensation.

244.    The PCSO will continue to engage in these violations of the Fourth Amendment if it is not enjoined from continuing to enforce the Program in the future.

## COUNT TWO:
### ON BEHALF OF ALL PLAINTIFFS
### FIRST AMENDMENT FREEDOM OF ASSOCIATION
### 42 U.S.C. § 1983

245.    Plaintiffs hereby incorporate paragraphs 1-231 by reference.

246.    The First Amendment to the U.S. Constitution, as incorporated into the Fourteenth Amendment to the U.S. Constitution, protects the right of individuals to freely associate.

247.    The PCSO's formal policy of systematically targeting friends and family of Targeted Persons for increased enforcement directly imposes a penalty for an individual's association with a Targeted Person.

248.    The PCSO has burdened the associational freedom of individuals who have family members on the list of Targeted Persons, including Plaintiffs Tammy Heilman, Dolly Deegan, and Robert A. Jones III, by subjecting those individuals to repeated harassment simply because they are associated with a Targeted Person.

249.    The PCSO has burdened the associational freedom of Targeted Persons, including Plaintiff Dalanea Taylor, by subjecting friends and family members of Targeted Persons to repeated harassment simply because they are associated with a listed individual.

250.   The PCSO subjects close friends and family members of Targeted Persons to increased code enforcement in order to secure their compliance with the PCSO's demands for information and access to Targeted Persons.

251.   The PCSO subjects close friends and family members of Targeted Persons to pretextual arrests in order to secure their compliance with the PCSO's demands for information and access to Targeted Persons.

252.   The only reason the PCSO targets these friends and family members for code enforcement or arrest is because those individuals are associated with an individual who has been identified as a Targeted Person.

253.   The PCSO's Program has none of the procedural protections associated with other legal tools, like the law of conspiracy, under which one individual may be held responsible for offenses committed by another.

254.   Instead, the PCSO's Program imposes guilt by association upon individuals who are merely associated with other individuals who the PCSO predicts may commit crimes in the future.

255.   As a direct result of the PCSO's official policy and widespread custom of systematically targeting friends and family of Targeted Persons, Plaintiffs have suffered an immediate and direct injury for which they are entitled to compensation.

256.   The PCSO will continue to engage in these violations of the First Amendment if it is not enjoined from continuing to enforce the Program in the future.

**COUNT THREE:**
**ON BEHALF OF DALANEA TAYLOR, TAMMY HEILMAN, AND ROBERT A. JONES III**
**FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS**
**42 U.S.C. § 1983**

257.   Plaintiffs hereby incorporate paragraphs 1-231 by reference.

258.   The Due Process Clause of the Fourteenth Amendment protects against government action that impairs constitutional rights without adequate procedural safeguards.

259.   The PCSO's creation of the list of Targeted Persons, without allowing potential Targeted Person any notice or opportunity to be heard, violates Procedural Due Process.

260.   Plaintiff Dalanea Taylor was placed on the City's list of Targeted Persons, but was not provided notice of that fact and was never provided with any opportunity to challenge her inclusion on the list—either before or after she was listed.

261.   The PCSO's creation of the list of Targeted Persons, without affording the parents of potential Targeted Persons any notice or opportunity to be heard, violates Procedural Due Process.

262.   Plaintiffs Tammy Heilman and Robert A. Jones III were parents of minor children who were placed on the City's list of Targeted Persons, but they were not provided notice of that fact and were never provided with any opportunity to

49

challenge their child's inclusion on the list—either before or after the child was listed.

263.   The PCSO's lists affect the liberty interests of listed individuals and their family members. Among other things, those individuals are subjected to a policy and custom of harassment in violation of their Fourth Amendment rights, and they are also subjected to a distinct legal regime that alters and limits the enforcement discretion of deputies and prosecutors.

264.   Once a person is placed on a list of Targeted Persons, there is no procedure provided to the individual, or his or her parents or guardians, to challenge that listing or to seek removal from the list. The PCSO does not notify people that they are on the list, and the PCSO does not provide any kind of hearing or any other opportunity to be heard concerning an individual's placement on the list.

265.   As a direct result of the PCSO's official policy and widespread custom of creating its list of Targeted Persons without providing Plaintiffs or their parents notice or opportunity to be heard, Plaintiffs have suffered an immediate and direct injury for which they are entitled to compensation.

266.   The PCSO will continue to engage in these violations of the Fourteenth Amendment if it is not enjoined from continuing to enforce the Program in the future.

## COUNT FOUR:
## ON BEHALF OF ALL PLAINTIFFS
## FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS
## 42 U.S.C. § 1983

267.   Plaintiffs hereby incorporate paragraphs 1-231 by reference.

268.   The Due Process Clause of the Fourteenth Amendment protects the right to be free from punishment for the crimes or wrongdoings of another.

269.   The Due Process Clause of the Fourteenth Amendment protects the right to be free from arbitrary, irrational, and pretextual enforcement of the law.

270.   The PCSO's formal policy of systematically targeting Targeted Persons for increased enforcement violates Substantive Due Process because it amounts to punishment for future crimes that have not yet occurred.

271.   The PCSO's formal policy of systematically targeting friends and family of Targeted Persons for increased enforcement violates Substantive Due Process because it amounts to punishment for the wrongdoing of another.

272.   The PCSO's formal policy of using code enforcement as a pretextual mechanism to coerce, intimidate and harass property owners violates Plaintiffs' right to substantive due process because it is arbitrary, irrational, and pretextual.

273.   The Program is broad-ranging and applies to at least hundreds of people within Pasco County.

274.   The Program affects rights protected by the federal Constitution, including the right not to be arrested or otherwise punished for future crimes that

have not yet occurred and the right not to be arrested or otherwise punished for crimes that were committed (or might be committed in the future) by another person.

275.   The Program shocks the conscience insofar as it subjects individuals to relentless harassment as punishment for future crimes that have not yet occurred, including future crimes that may be committed by friends or family members.

276.   As a direct result of the PCSO's official policy and widespread custom of punishing Targeted Persons for predicted future crimes, Plaintiffs have suffered an immediate and direct injury for which they are entitled to compensation.

277.   As a direct result of the PCSO's official policy and widespread custom of systematically targeting friends and family of Targeted Persons for increased enforcement, Plaintiffs have suffered an immediate and direct injury for which they are entitled to compensation.

278.   As a direct result of the PCSO's official policy and widespread custom of systematically deploying code enforcement as a pretextual means to coerce, intimidate and harass, Plaintiffs have suffered an immediate and direct injury for which they are entitled to compensation.

279.   The PCSO will continue to engage in these violations of the Fourteenth Amendment if it is not enjoined from continuing to enforce the Program in the future.

### COUNT FIVE:
### ON BEHALF OF ALL PLAINTIFFS
### FOURTEENTH AMENDMENT EQUAL PROTECTION
### 42 U.S.C. § 1983

280.   Plaintiffs hereby incorporate paragraphs 1-231 by reference.

281.   The Equal Protection Clause of the Fourteenth Amendment requires the government to treat similarly situated individuals similarly.

282.   The Equal Protection Clause of the Fourteenth Amendment also protects the right to be free from arbitrary, irrational, and pretextual enforcement of the law.

283.   The official policy and widespread custom of the PCSO is to subject Targeted Persons and their family members and associates to a different legal regime than the rest of Pasco County's residents. This legal regime brings with it a number of consequences, including the conducting of prolific offender checks, a zero-tolerance arrest policy, and heightened code enforcement.

284.   By singling out Targeted Persons and their family members and associates for this separate legal regime, PCSO creates a classification between them and all other residents of Pasco County.

285.   By singling out Targeted Persons for this separate legal regime, PCSO creates a classification that burdens the fundamental rights of Targeted Persons and their family members to be free from punishment for hypothetical future crimes that

have not occurred (and may never occur), as well as the fundamental right to be presumed innocent.

286.  By singling out the family members of Targeted Persons for this separate legal regime, PCSO creates a classification that burdens the fundamental right of family members and associates to be free from punishment for the crimes or wrongdoings of another.

287.  The PCSO's policy of subjecting Targeted Persons and their family members to prolific offender checks and to increased code enforcement burdens the fundamental right of those individuals to be secure in their homes and other property

288.  The PCSO's policy of subjecting Targeted Persons and their family members to a zero-tolerance arrest policy burdens the fundamental liberty right of those individuals to be free from arrest.

289.  Because the PCSO's discrimination between Targeted Persons and their family members, on the one hand, and ordinary citizens, on the other, affects fundamental rights, the classification drawn by the PCSO is subject to at least heightened scrutiny. PCSO's classification—based on nothing more than a prediction that a person *may* commit future crimes—cannot satisfy such heightened review.

290.  In fact, the criteria used by the PCSO to create its list is deeply illogical. Among other things, the PCSO's algorithm only considers crimes committed within

Pasco County; assigns greater weight to a large number of petty crimes (versus a few more significant crimes); treats people as a potential criminals simply because they *witness* a crime, are *victims* of a crime, or are mentioned in a police report; treats people as possible criminals simply because they have missed a court date; and treats people as possible criminals if they are associated with individuals who are flagged by this same flawed algorithm.

291.   On information and belief, once the PCSO's algorithm identifies individuals potentially subject to the list, a PCSO analyst then makes a subjective determination as to which of those individuals should in fact be listed as Targeted Persons and thus targeted for heightened scrutiny. This subjective determination creates a possible avenue for bias, and it also introduces a further element of irrationality into the program.

292.   On information and belief, when PCSO analysts make this final determination, they consider inappropriate criteria that are identified as "risk factors" in the ILP Manual, including a person's socio-economic background, family structure, and level of intelligence.

293.   As a result of this flawed and biased system of identification, the Program erratically identifies some individuals as Targeted Persons based on prior alleged criminality, and thus subjects those individuals and their families to prolific offender checks, a zero-tolerance arrest policy, and heightened code enforcement,

while others with similar or identical criminal histories are *not* identified as Targeted Persons and thus those individuals and their families are not subjected to prolific offender checks, a zero-tolerance arrest policy, and heightened code enforcement.

294.   In making this categorization, the PCSO also considers impermissible factors, including a person's socio-economic background, family structure, and intelligence level. As a result, individuals are listed as Targeted Persons—and they and their family members are subjected to heightened enforcement—because of these impermissible factors, while other individuals with similar or identical criminal histories but dissimilar socio-economic statuses, family structures, or intelligence levels are *not* identified as Targeted Persons.

295.   More broadly, inherently uncertain predictions about a person's possible future behavior are not a legitimate basis to subject a person to a formalized program of disparate treatment. By discriminating against Targeted Persons based on hypothetical future crimes, the PCSO disregards the fundamental principle that individuals are innocent until proven guilty.

296.   As a direct result of the PCSO's discrimination between Targeted Persons and their family members, on the one hand, and ordinary citizens, on the other, Plaintiffs have suffered an immediate and direct injury for which they are entitled to compensation.

297.   The PCSO will continue to engage in these violations of the Fourteenth Amendment if it is not enjoined from continuing to enforce the Program in the future.

## VII.   PRAYER FOR RELIEF

Plaintiffs respectfully request the following relief:

A.   A declaratory judgment in favor of Plaintiffs and against Defendant providing that the Program is unconstitutional insofar as the Program sanctions warrantless and suspicionless searches and seizures in violation of the Fourth Amendment.

B.   A declaratory judgment in favor of Plaintiffs and against Defendant providing that the Program is unconstitutional insofar as it punishes the friends and family of Targeted Persons in violation of the Freedom of Association Clause of the First Amendment.

C.   A declaratory judgment in favor of Plaintiffs and against Defendant providing that the Program is unconstitutional insofar as the PCSO creates its list of Targeted Persons without notice and opportunity to be heard in violation of the Due Process Clause of the Fourteenth Amendment.

D.   A declaratory judgment in favor of Plaintiffs and against Defendant providing that the Program is unconstitutional insofar as it punishes Targeted Persons and their friends and family, including through frequent visits by law

enforcement and pretextual code enforcement, in violation of the right to Substantive Due Process guaranteed under the Fourteenth Amendment.

E.     A declaratory judgment in favor of Plaintiffs and against Defendant providing that the Program is unconstitutional insofar as it sanctions the pretextual use of code enforcement in violation of the right to Equal Protection guaranteed under the Fourteenth Amendment.

F.     A permanent injunction prohibiting Defendant from enforcing the Program in a manner inconsistent with his Court's declaratory ruling as sought in this Complaint and articulated in Section VII, Paragraphs A – E above. Specifically, Plaintiffs request that this Court permanently enjoin Defendant from:

    i.  Implementing or enforcing any aspect of the Program insofar as it authorizes or requires PCSO deputies to initiate or engage in searches and seizures that violate the Fourth Amendment, including, but not limited to:

        a.  nonconsensual searches that are not precipitated by either probable cause or exigent circumstances;

        b.  suspicionless, warrantless searches or seizures that exceed the scope of any license—express or implied—to visit a property;

    c. suspicionless, warrantless searches or seizures that continue beyond the point at which a property owner expresses a desire to cease all interaction and end the encounter;

    d. suspicionless, warrantless searches or seizures which cause a resident to feel like he or she is not free to decline to engage with PCSO deputies, refuse their demands, or otherwise terminate the encounter;

    e. investigations or prosecutions that otherwise would not be initiated or engaged but for a property owner's or resident's actual or perceived lack of cooperation with PCSO's suspicionless, warrantless searches and seizures;

ii. Implementing or enforcing any aspect of the Program insofar as it authorizes or requires PCSO deputies to target friends and family of Targeted Persons for increased law enforcement activity—including increased code enforcement, arrests, and visits by law enforcement—because of their association with a Targeted Person;

iii. Implementing or enforcing any aspect of the Program insofar as it authorizes or requires PCSO deputies to create or maintain its list of Targeted Persons without providing a potential Targeted Person or his

or her parents/legal guardians with notice and an opportunity to be heard;

iv. Implementing or enforcing any aspect of the Program insofar as it authorizes or requires PCSO to use code enforcement or other law enforcement activity as a pretext to coerce, intimidate and harass property owners or otherwise punish property owners for crimes they did not commit; and

v. Implementing or enforcing any aspect of the Program insofar as it authorizes or requires PCSO to pursue code enforcement actions differently for family members and associates of Targeted Persons as compared to the rest of Pasco County residents.

G. An award of compensatory damages for each of the claims for relief in an amount to be proved at trial;

H. An award of one dollar in nominal damages for each separate Plaintiff;

I. An award of Plaintiffs' costs and expenses, together with reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988; and

J. Further legal or equitable relief as this Court may deem just and proper.

Dated: August 27, 2021.      Respectfully submitted,

/s/ Ari S. Bargil
Ari S. Bargil (FL Bar No. 71454)
INSTITUTE FOR JUSTICE
2 S. Biscayne Boulevard, Suite 3180
Miami, FL 33131
Tel: (305) 721-1600
Fax: (305) 721-1601
abargil@ij.org

Joshua A. House (CA Bar No. 284856)*
Caroline Grace Brothers (DC Bar No. 1656094)*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Tel.: (703) 682-9320
Fax: (703) 682-9321
jhouse@ij.org
cgbrothers@ij.org

Robert E. Johnson (OH Bar No. 0098498)*
INSTITUTE FOR JUSTICE
16781 Chagrin Boulevard, Suite 256
Shaker Heights, OH  44120
Tel.: (703) 682-9320
Fax: (703) 682-9321
rjohnson@ij.org

* Admitted *Pro Hac Vice*.

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 27th day of August, 2021, a true and correct copy of the foregoing document was served via the Court's CM/ECF system upon all counsel of record.

<u>/s/ Ari S. Bargil</u>