UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DALANEA TAYLOR, et al.,

     Plaintiff,

v.                                                      CASE NO. 8:21-cv-555-SDM-CPT

CHRIS NOCCO, in his official capacity
a Sheriff of Pasco County, Florida,

     Defendants.
_____/

### ORDER

     Sheriff Nocco moves (Doc. 42) to dismiss Count V of the amended complaint, which alleges a violation of the Equal Protection Clause of the Fourteenth Amendment.  The plaintiff opposes (Doc. 45) the motion.

     In the amended complaint, the plaintiffs attack "intelligence-based policing," also labeled "predictive policing," as allegedly practiced in Pasco County, Florida, under the authority and direction of the sheriff.  Allegedly the sheriff's "official policy and widespread custom" includes harassing designated persons and their family because the sheriff believes them more likely than others to commit a future crime.  According to the plaintiffs, the sheriff uses "questionable criteria" to compile a list of persons — "targeted persons" — and their families for "relentless pursuit, arrest, and prosecution" including (1) "unannounced visits to the homes of targeted persons to obtain information about the targeted persons, (2) "pretextual code enforcement

actions" unconnected to the purpose of the deputies' visits to the home, and (3) un-warranted attempts to "subdue," harass, arrest, and imprison persons who object to the deputies' visits, who refuse to cooperate with the deputies, and who insist the deputies leave the premises.  To provide detail, the amended complaint alleges information about each of the four plaintiffs.

### Dalanea Taylor

Taylor "hung out with a bad crowd in her mid-to-late teens"; committed, among other offenses, several "auto thefts"; and served a two-year sentence.  Released in 2017, Taylor is a "working mother" with two children.  According to the amended complaint, the sheriff's deputies without suspicion or a warrant visited Taylor often "at any time of the day or night" to speak to Taylor.

### Tammy Heilman

Because of unspecified (by the plaintiffs) misconduct as a fifteen-year-old, Heilman's son is a targeted person, a designation that caused deputies to visit Heilman's home "multiple times per week or even multiple times per day."  The plaintiffs allege the deputies "sometimes" walk around the home, look into the back yard, shine a light "into the home," ask to enter the home, and ask for information about Heilman's son (now apparently an adult).  After refusing to provide the requested information on an occasion, Heilman departed the home in her car but was stopped by deputies and charged after refusing to leave the car and resisting the deputies.  She later pleaded guilty to "miscellaneous battery, obstructing and resisting a deputy without violence, and giving false information to law enforcement."  Later, while on

probation and because of an incident with a deputy, Heilman served seventy-six days in jail for a violation of probation and pleaded guilty to a felony.  Heilman alleged that, because of her not cooperating, deputies have "punished" her with code violations, such as missing mailbox numbers and keeping chickens at her home.  Heilman claims that deputies arrested her younger son to "retaliate" against her for her "perceived lack of compliance."

### Polly Deegan

Deegan's son, an opioid addict, committed "non-violent crimes" and became "billed as a Targeted Person."  When asked about her son's location, Deegan often and allegedly truthfully denied knowledge.  According to the amended complaint, deputies began warrantless, suspicion-less, harassing, and disruptive visits to Deegan's home "in 2016 and . . . until her son's death in 2019" and scaled a fence to enter the yard, used a bullhorn to summon her son, and threatened to "take [Deegan, the mother] to jail."  Deegan claims she was charged and fined for "trivial code violations."  Also, Deegan cites a raid on her son's rented home, which resulted in her son's arrest.

### Robert A. Jones III

Jones's son, Robert IV, was a targeted person, although the amended complaint alleges no reason for the designation.  After admission into the Joneses' home by Robert III, deputies discovered "trace amounts of marijuana" in Robert IV's bedroom.  Later, deputies "repeatedly visited" the home "multiple times a day or even

in the middle of the night" and "multiple times every week."  Deputies allegedly parked across the street to watch the home.  Paragraph 78 alleges:

> Robert on some occasions came home from work to find as many as eighteen PCSO deputies outside his home, banging on the windows and yelling at his young daughters while they were hiding under the bed.

The amended complaint alleges that deputies charged code violations, Robert III failed to attend the hearings (Robert III claims lack of notice), and deputies arrested Robert III.  Further, the amended complaint alleges that several charges ensued for Robert III's refusal to admit deputies to his home but that the charges were "dropped," that deputies seized "significant amounts of personal property . . . belonging to Robert [III] and his four children," and that later more charges were "dropped."  In sum, Robert III alleges five arrests without a conviction.  Robert III and his family moved from Pasco County.  Apparently after the move, marijuana charges were brought but dismissed after a "judgment of nolle prosequi."

## Count V

Count V alleges violation of the Equal Protection Clause of the Fourteenth Amendment, which allegedly "protects the right to be free from arbitrary, irrational, and pretextual enforcement of the law" (Doc. 41 ¶ 282).  The claim asserts that the sheriff's "official policy and widespread custom" fails "to treat similarly situated individuals similarly" (Doc. 41 ¶ 281) and results in a "classification that burdens the fundamental rights of Targeted Persons."  The "fundamental rights" allegedly burdened are the plaintiffs' fundamental rights (1) "to be free from punishment for

hypothetical future crimes" (Doc. 41 ¶ 285), (2) "to be presumed innocent" (Doc. 41 ¶ 285), (3) "to be secure in their homes and their property" (Doc. 41 ¶ 287), and "to be free from arrest" (Doc. 41 ¶ 288).  The amended complaint alleges that the sheriff's violation of "fundamental rights" subjects the sheriff's policies and customs "to at least heightened scrutiny" by the judiciary.

### The Motion to Dismiss

In the motion (Doc. 42) to dismiss, the sheriff objects that the plaintiffs lack standing, because of a putative failure to "allege that the criteria [were] or [are] being used as to them" or "as to anyone," to assert in Count V that the criteria used by the sheriff in "intelligence-led policing" are unconstitutional.  But any fair reading of the amended complaint readily refutes the asserted deficiency; the amended complaint from beginning to end asserts exactly the sheriff's use of the challenged criteria against the plaintiffs, as well as others.  Further, paragraph 297 of the amended complaint states, "The [sheriff] will continue to engage in these violations of the Fourteenth Amendment if [he] is not enjoined from continuing to enforce [intelligence-led policing] in the future."

The central and more telling objection by the sheriff to the sufficiency of Count V is that:

> Plaintiffs ask that the Court apply a heightened scrutiny standard to [intelligence-led policing], rather than a reasonable relationship test as in the Court's earlier Order. Plaintiffs, however, have not alleged facts showing that the Plaintiffs were treated differently based on being members of a suspect class, nor have they described violations of "fundamental rights" so as to warrant a heightened scrutiny standard.

The sheriff argues that the plaintiffs identify themselves as members of no "suspect classification" — race, alienage, national origin, or the like — that might elevate the applicable standard of scrutiny.  Further, the motion to dismiss argues (1) that the rights allegedly infringed are not "fundamental rights" as defined in governing precedent and (2) that the law enforcement and community goals of deterring crime and more closely monitoring those who commit crime or associate closely with those who commit crime is, at least, rationally related to the means adopted and applied by the sheriff in the program of "intelligence-led policing."

The plaintiffs claim the existence of a "discrete and identifiable class consisting of those who are included on the list, whom it deems 'Prolific Offenders,' as well as their family members and associates."  (Doc. 45 at 4)  To support the existence of their putative group of offenders, family, and friends, the plaintiffs cite only *Corey Airport Services, Inc. v. Clear Channel Outdoor, Inc.*, 682 F.3d 1293 (11th Cir. 2012), in which Corey, the second-place finisher in a bidding competition for the advertising concession at Atlanta's major airport, alleged a conspiracy — in violation of the Equal Protection Clause of the Fourteenth Amendment — by the city to prefer "political insiders" to "political outsiders" in awarding contracts.  But the Eleventh Circuit in *Corey* found that "Corey's proposed group definitions fail to support a claim under the Equal Protection Clause," 682 F3d at 1297, and stated further:

> Stripped of its "insider" and "outsider" labels, Corey's effort at group identification stands solely on this substantive group characteristic: all members lost the airport-advertising bid. In reality, Corey is defining the class discriminated against as simply the group of individuals allegedly unfairly treated by

> Defendants: a kind of tautological equating of cause and effect. This characteristic alone cannot support properly an Equal Protection Clause claim. For a group to qualify properly as identifiable for purposes of a group-based discrimination claim, the group must be identifiable by some common set of traits that reach beyond simply not having been selected for a benefit or sharing a desire to do something which the allegedly discriminating party does not want them to do; the class for a class-based claim for equal protection purposes cannot be defined solely as those persons who suffered at the hands of the supposed discriminator. See *Bray* [*v. Alexandria Women's Health Clinic*], 113 S. Ct. 753, 759 (1993) ("Whatever may be the precise meaning of a 'class,'" the class cannot be defined simply as the group of victims of the protested action).
>
> This notion is especially true in the context of discretionary government activity. Every government-run bid process involves winners and losers: selection of a winner inherently involves a kind of discrimination in itself. If the law allowed groups defined basically as the "bid-losers" to be the basis for an Equal Protection Clause claim, every government bid process—with winners and losers—would theoretically support such an equal protection claim.

682 F.3d at 1298.

Like the losers in *Corey*, the proposed group of offenders, family, and friends is too indefinite and unascertainable.  Nor are the offenders assigned to the list because of some common and innate characteristic, such as race or sex or religion, against which the government acts invidiously.  The plaintiffs are merely a group of persons who claim that they individually are victims of a policy of local law enforcement or, in the words of *Corey*, "simply the group of individuals allegedly unfairly treated." *Corey* cites *Bray*, one of the well-known decisions about those demonstrating at abortion clinics.  *Bray* finds the group of anti-abortion demonstrators were not a distinct group for the purpose asserted and, more specifically, holds that for demonstrating a violation of the Equal Protection Clause the targets of the allegedly invidious

discrimination "cannot be defined simply as the group of victims of the protested action." For example, the members of a criminal "gang" or another criminal organization are often the recipients of more focused and more intense attention by law enforcement and subject to law enforcement by more immediate means than the typical, law-abiding citizen. But this is attributable to how gang members behave and not to who they are or to some immutable characteristic. Also, the United States Sentencing Guidelines treat two offenders quite differently if one is a Criminal History Category I offender and the other is a Criminal History Category VI offender. But this difference is attributable to how the offender behaves athwart the law and not to who the offender is or to some immutable characteristic. In other words, although the plaintiffs state that "at its heart, this case is about an official policy of class-based discrimination," the plaintiffs — to establish unconstitutionally disparate treatment of similarly situated persons — describe no constitutionally cognizable "class," as that term is defined to apply the Equal Protection Clause (and the plaintiffs action is not a "class action" under Rule 23).

The plaintiffs attempt to invoke heightened scrutiny by alleging a violation of fundamental constitutional rights. Although phrased slightly differently from time to time, the alleged "fundamental rights" are the right to be free from punishment for a hypothetical future crime, the right to be presumed innocent, the right to be secure in their homes and their property, and the right to be free from arrest. The complaint fails to allege an incident of constitutionally cognizable "punishment" for a hypothetical crime and fails to allege a conviction achieved without the benefit at trial of the

defendant's presumption of innocence (an omission that would command reversal of any conviction in any court, state or federal). Further, the "right to be secure" is an unmistakable reference to Fourth Amendment's protection against unreasonable search and seizure, which includes protection against forced intrusion into a constitutionally protected place but which does not include, for example, law enforcement's looking at places and things in plain or readily accessible public view or law enforcement's entering into, or observing from, a public or readily accessible place or entering premises with a warrant or in an exigent circumstance or law enforcement's entering a premises with consent. Also, as the sheriff notes, the law recognizes no generic and fundamental right "to be free from arrest." The law recognizes that, for example, law enforcement can approach and inquire at any time if the approached person is willing to stop and respond. Detention, even temporary detention, requires either an exigent circumstance or a modest level of reasonable suspicion, depending on the circumstances. Typically arrest requires probable cause. But, as stated, the law recognizes no generic right "to be free from arrest" (although prospective offenders might cheer that prospect). Of course, the result (heightened scrutiny) the plaintiffs pursue requires a violation of not just any perceived "right" but a violation of a recognized "fundamental right," which is a status that includes fewer than all recognized "rights." For these reasons and those advanced by the sheriff, the plaintiffs' Equal Protection theory fails.

**CONCLUSION**

The defendant's motion (Doc. 42) is **GRANTED**, and Count V is **DIS-MISSED**.  The defendants must answer the remainder of the amended complaint within fourteen days.

ORDERED in Tampa, Florida, on March 31, 2022.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE