UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES, III,

  Plaintiffs,

vs.                    Case No.: 8:21-cv-00555-SDM-CPT

CHRIS NOCCO, in his
official capacity as
Pasco County Sheriff,

  Defendant.
_____/


PROCEEDINGS:          Deposition of
                      MARK CELESTE


DATE:                 January 4, 2022


TIME:                 9:03 a.m. - 12:14 p.m.


PLACE:                New Port Richey Executive Suites
                      8520 Government Drive, Suite 1
                      New Port Richey, Florida


REPORTED BY:          Judy Anderson, Court Reporter
                      Notary Public
                      State of Florida at Large


ANDERSON COURT REPORTING
P.O. Box 2426
Dade City, FL 33526-2426
Judy@andersoncourtreporting.com
(352) 567-5484

```
 1    APPEARANCES:

 2    ROBERT E. JOHNSON, ESQUIRE
      Institute for Justice
 3    16781 Chagrin Boulevard, Ste. 256
      Shaker Heights, OH 44120
 4    703-682-9320
      Rjohnson@ij.org
 5          Counsel for Plaintiffs

 6    CAROLINE GRACE BROTHERS, ESQ. (Appearing via telephone)
      Institute for Justice
 7    901 N. Glebe Road, Ste. 900
      Arlington, VA 22203
 8    703-682-9320
      Cgbrothers@ij.org
 9          Co-counsel for Plaintiffs

10    ARI S. BARGIL, ESQUIRE (Appearing via telephone)
      Institute for Justice
11    2 S. Biscayne Blvd., Ste. 3180
      Miami, FL 33131
12    305-721-1600
      Abargil@ij.org
13          Co-counsel for Plaintiffs

14    THOMAS W. POULTON, ESQUIRE
      Debevoise & Poulton, P.A.
15    1035 S. Semoran Blvd., Ste. 1010
      Winter Park, FL 32792-5512
16    407-673-5000
      Poulton@debevoisepoulton.com
17    Holborn@debevoisepoulton.com
      Cook@debevoisepoulton.com
18          Counsel for Defendant

19

20

21

22

23

24

25
```

1                        **I N D E X**

2                                                    Page

3    Direct Examination by Mr. Johnson              5
     Stipulation                                 111
4    Certificate of Oath                         112
     Certificate of Reporter                     113
5    Deponent's Signature Page                   114
     Errata Sheet                                115

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     **E X H I B I T S**
                                        Page
2
A - CAD Report                                    20
3
B - CAD Report                                    21
4
C - 2016 ILP Manual                               26
5
D - MPR 3-4-19 to 3-4-20                          28
6
E - MPR 3-4-18 to 3-4-19                          33
7
F - MPR 3-4-16 to 3-4-17                          35
8
G - ILP District 1                                43
9
H - ILP District 3                                46
10
I - Citation Report                               53
11
J - CAD Report                                    56
12
K - Video 3-28-16 Code Violation-2                60
13
L - CAD Report                                    69
14
M - Video Sheriff's Office Investigation.mp4      71
15
N - Celeste's Notes                               83
16
O - Citation Report                               84
17
P - CAD Report                                    88
18
Q - CAD Report                                    88
19
R - CAD Report 3-14-2018                          90
20
S - Video 3-14-18                                 93
21
T - ILP Slides for District 3                     98
22
U - AIM Slides                                   103
23
V - AIM Slides                                   105
24

25

1                    MARK CELESTE,

2      being first duly sworn to tell the truth, the whole

3      truth, and nothing but the truth, was examined and

4      testified as follows:

5               THE WITNESS:  Yes.

6                    DIRECT EXAMINATION

7   BY MR. JOHNSON:

8      Q.   Can you please state your name for the record.

9      A.   Mark Celeste.

10     Q.   And what is your current employer?

11     A.   Pasco County Sheriff's Office.

12     Q.   And what is your position at the Pasco County

13  Sheriff's Office?

14     A.   Property crimes detective.

15     Q.   How long have you been a property crimes

16  detective?

17     A.   July of 2016.  I'm sorry, 2019.  July of 2019.

18     Q.   Okay.  And what was your position prior to July

19  of 2019?

20     A.   Code enforcement corporal for district three.

21     Q.   And when did you become the code enforcement

22  corporal for district three?

23     A.   February of '16.

24     Q.   And what was your position prior to February of

25  2016?

1      A.   A deputy on patrol.

2      Q.   And when did you begin that position?

3      A.   March of 2013.

4      Q.   When did you begin employment at the Pasco

5  County Sheriff's Office?

6      A.   March of 2013.

7      Q.   Were you in law enforcement prior to March of

8  2013?

9      A.   No.

10      Q.   Okay.  Have you been deposed previously?

11      A.   Not on this case.

12      Q.   But you've been deposed in other cases?

13      A.   Yes.

14      Q.   Well, then I won't belabor the rules too much,

15  but just the main thing is if I ask you a yes or no

16  question, just give me a verbal yes --

17      A.   Yep.

18      Q.   -- so that the court reporter can take that

19  down.

20      A.   Okay.

21      Q.   Have you done anything to prepare for today's

22  deposition?

23      A.   Yes.

24      Q.   What did you do to prepare?

25      A.   I reviewed my reports as well as some body

1    camera video, and I looked at the CAD records of the

2    addresses.

3        Q.   Okay.

4            (Off-the-record discussion.)

5            (Ms. Brothers joined the deposition by

6       telephone at this time.)

7    BY MR. JOHNSON:

8        Q.   So you mentioned that you reviewed reports to

9    prepare for the deposition.  Which reports did you

10   review?

11       A.   The one -- the citation reports to Tammy

12   Heilman and Robert Jones.

13       Q.   Okay.  And you also mentioned that you reviewed

14   body-worn camera footage.  Which --

15       A.   Correct.

16       Q.   -- footage did you review?

17       A.   From the citations.

18       Q.   From the citations.  Do you have the dates of

19   those citations?

20       A.   Yes.  For Tammy, it would be March 1st of 2016

21   and March 3rd of 2016.

22           (Off-the-record discussion.)

23       A.   As well as Robert Jones the dates were March

24   28, 2016 and March 29th of 2016.

25   BY MR. JOHNSON:

1          Q.    So I have March 1, 2016 and March 3, 2016 for

2     Tammy Heilman; is that correct?

3          A.    Yes.

4          Q.    Okay.  And then you said that you reviewed CAD

5     reports for the addresses?

6          A.    Correct.

7          Q.    Which addresses?

8          A.    For 3229 Primrose Drive, 3810 Headsail Drive.

9          Q.    And did you review all the CAD reports for

10    those addresses?

11         A.    No.

12         Q.    Which ones did you review?

13         A.    The ones associated with me responding out to

14    the addresses.

15         Q.    Okay.  And are those the same dates that you

16    just mentioned?

17         A.    Yes.

18         Q.    Okay.  Did you do anything else to prepare for

19    today's deposition?

20         A.    No.

21         Q.    Did you talk to anybody at the Pasco County

22    Sheriff's Office other than your attorneys?

23         A.    They know about that I have this deposition.

24    That's about it.

25         Q.    Okay.  What were your responsibilities in your

1   position as code enforcement corporal for district

2   three?

3       A.   To specialize in code enforcement and issuance

4   of code enforcement citations and the enforcement of the

5   county's code.

6       Q.   Does the county have code enforcement officers

7   who do not work for the Pasco County Sheriff's Office?

8       A.   Yes.

9       Q.   Okay.  But you worked for the Pasco County

10  Sheriff's Office?

11      A.   Correct.

12      Q.   What's the difference between what you did for

13  the Pasco County Sheriff's Office and what the

14  non-Sheriff's Office code enforcement officials would

15  do?

16      A.   Yep.  So the Sheriff's Office, we don't have to

17  provide warnings to issue citations, and we don't

18  typically take citizen-generated complaints for code

19  enforcement issues unlike county code enforcement.

20      Q.   So county code enforcement would be required to

21  issue a warning before --

22      A.   Correct.  Most of the time, unless it's a life

23  safety issue.

24      Q.   But as a Pasco County Sheriff's Office

25  official, you're not required to issue --

1    A.    Correct.

2    Q.    -- a warning?

3          Okay.  And apologize for this, but for the ease

4    of the court reporter, if you could just let me finish

5    my question before you answer --

6    A.    Sure.

7    Q.    -- it will just result in a cleaner record.

8          Okay.  If a county code enforcement official

9    comes to a street, do you know if they're required to

10   issue citations for every violation that they see on

11   that street?

12   A.    I don't believe so.

13   Q.    You don't believe so, okay.

14         How do you select or how did you select as a

15   code enforcement corporal the homes that you would visit

16   to review for code enforcement issues?

17   A.    Typically looked for problem houses, houses

18   with a large call volume, houses with violations that

19   are life safety or houses that have tips of criminal

20   activity.

21   Q.    What do you mean by tips of criminal activity?

22   A.    So a lot of times citizens don't want to call

23   in 911 or the nonemergency line to say that there's drug

24   activity occurring.  They submit anonymous tips.  Then

25   that's when we would go out and either investigate those

 1    tips, and when we're investigating them, check for

 2    violations.

 3        Q.    So if you received a tip that there might be

 4    criminal activity going on at a house, you would then

 5    visit the house in order to look for code enforcement

 6    violations?

 7        A.    Right.

 8        Q.    Okay.  And when you say a house with a large

 9    call volume, what do you mean by that?

10        A.    If there are problems in the community, a lot

11    of times there will be a lot of calls to that residence

12    for quality of life issues or suspected drug activity.

13        Q.    Okay.  So if there's a large number of calls

14    from the house, would --

15        A.    Or --

16        Q.    Go ahead.

17        A.    Or to a house whether the neighbors call.

18        Q.    Okay.  So if police are being directed to a

19    house on a large number of calls, that would be a reason

20    to target it for code enforcement violations?

21        A.    Depending on what the calls are for.

22        Q.    What types of calls would result in you

23    visiting the house to review for code enforcement

24    issues?

25        A.    Drug activity.

1     Q.   Anything else?

2     A.   Quality of life issues, noise violations.

3     Q.   Anything else?

4     A.   Not off the top of my head.

5     Q.   What do you mean by drug activity?

6     A.   A lot of times we'll get calls to a house where

7  people are pulling up for short periods of time, going

8  in, coming out with baggies and leaving, and then

9  overdoses at locations.

10    Q.   And why would you target a house for code

11  violations because there are -- there's drug activity

12  going on at the house?

13       MR. POULTON:  Object to the form.  Go ahead.

14  BY MR. JOHNSON:

15    Q.   You can answer.

16       MR. POULTON:  Yes.

17    A.   A lot times, in my experience, these houses

18  have a lot of code violations, and they turn into

19  quality of life issues with the surrounding neighbors.

20  BY MR. JOHNSON:

21    Q.   Are there houses that have code violations that

22  don't have drug activity?

23    A.   Yes.

24    Q.   Do you target those houses?

25    A.   Depending on how -- the seriousness of the

```
 1   violation.
 2              MR. POULTON:  Just to clarify, all these
 3         questions relate back to the time when he was doing
 4         that work; right?  Because you're asking him sort of
 5         in present tense, but he doesn't do that anymore.
 6              MR. JOHNSON:  Yes.
 7              MR. POULTON:  Just clarifying.
 8              MR. JOHNSON:  Yeah.  No, I appreciate that.
 9              MR. POULTON:  Yes.
10   BY MR. JOHNSON:
11         Q.   These questions pertain to the time between
12   2016 and 2019 --
13         A.   Yes.
14         Q.   -- when you were working as a code enforcement
15   corporal.
16         A.   Yes.
17              MR. POULTON:  And it's just it's changed.
18              MR. JOHNSON:  Okay.
19              MR. POULTON:  Yes.
20   BY MR. JOHNSON:
21         Q.   Are you familiar with the term prolific
22   offender?
23         A.   Yes.
24         Q.   What does that term mean?
25         A.   It's a set of criteria that somebody would meet
```

```
1    depending on their criminal history.
2         Q.   So as a code enforcement corporal, would you be
3    aware whether a house was a residence of a prolific
4    offender?
5         A.   Most of the time.
6         Q.   How would you be aware?
7         A.   Typically, it would be a problem or a house
8    that we would receive information that a prolific
9    offender lives there.
10        Q.   And how would you receive that information?
11        A.   Through reports.
12        Q.   What kind of reports?
13        A.   Intelligence reports.
14        Q.   And what do you mean by intelligence reports?
15        A.   We would receive from the analysts who's a
16   prolific offender in each zone.
17        Q.   How would the analysts provide that information
18   to you?
19        A.   It would be on our intranet site.
20        Q.   And as a code enforcement corporal, would you
21   check the intranet site for that information?
22        A.   Yes.
23        Q.   How often would you check the intranet for that
24   information?
25        A.   It depends on my daily activities for -- for
```

1     the time.

2         Q.   Was it more than once a week?

3         A.   Sometimes.

4         Q.   Was it sometimes more than two times a week?

5         A.   It might be, depending on who it is.  I didn't

6     want -- a lot of times when checks are done, they're

7     documented.  So I want to make sure that we don't go out

8     there too often.

9         Q.   When you say go out there too often, do you

10    mean that you would go to the homes of prolific

11    offenders to check for code enforcement violations?

12        A.   Sometimes the complaints would come in

13    unbeknownst that they were prolific or not.  So

14    sometimes I would check to see if they were or not.

15             So if a complaint comes out, for example, at

16    Donnie McDougall's house and I wasn't aware that he was

17    prolific, I would check the address and make sure that

18    if someone's been out there before or if a warning's

19    been issued before or not, and that would determine if I

20    was going to go out there or not.

21        Q.   Are you familiar with the term prolific

22    offender check?

23        A.   Yes.

24        Q.   And what does that term mean?

25        A.   To check on the prolific offender, make sure

1    the address is correct, and see -- make sure the address

2    is correct and just check up on them.

3        Q.   What do you mean by check up on them?

4        A.   See how they're doing, see if they need any

5    services, make sure they're going to show up to their

6    court dates.

7        Q.   When you say see how they're doing, what do you

8    mean by that?

9        A.   I'm not sure.

10       Q.   Would you ask questions during a prolific

11   offender check?

12       A.   Sometimes.

13       Q.   What types of questions would you ask?

14       A.   See how they're doing, if they know of any

15   activity going on in the community -- any criminal

16   activity.

17       Q.   So you would ask them if they know about

18   criminal activity?

19       A.   Yes.

20       Q.   Were you ever trained in how to conduct a

21   prolific offender check?

22       A.   I don't remember if I was.

23       Q.   Have you ever trained anybody in how to conduct

24   a prolific offender check?

25       A.   I don't believe I have.

1      Q.    During a prolific offender check, do you ask

2   about whether an individual is currently in school?

3      A.    Yes.

4      Q.    Would you ask them if they're working?

5      A.    Yes.

6      Q.    Would you ask them about who they're

7   associating with?

8      A.    Yes.

9      Q.    Would you try to solicit tips that you could

10   use to search for other criminal activity in the

11   community?

12      A.    Yes.

13      Q.    How would you determine what house to visit for

14   a prolific offender check?

15      A.    I'm not sure.

16      Q.    Would you conduct a prolific offender check at

17   the prolific offender's residence?

18      A.    Yes.

19      Q.    Okay.  So before you would conduct your

20   prolific offender check, what would happen?  Would you

21   look up the address on the computer?

22      A.    Right.

23      Q.    Okay.

24      A.    To see who's been out there or the call

25   history.

1    Q.   How would you determine which prolific offender
2  should be the subject of a prolific offender check on a
3  particular day?
4    A.   Personally?
5    Q.   Yes.
6    A.   If there's an area that's having a high
7  criminal activity to solicit for tips.
8    Q.   Are you familiar with the term TOP 5 offender?
9    A.   Yes.
10   Q.   What does that term mean?
11   A.   I don't know the exact definition.
12   Q.   But what do you understand it to mean?
13   A.   A prolific offender that has more recent
14  history than anyone else.
15   Q.   If you went to a house to search for code
16  enforcement violations, would you know whether the
17  person who lived in the house was a TOP 5 offender?
18   A.   Most of the time.
19   Q.   How would you know?
20   A.   It would be on the intranet page.
21   Q.   Okay.  Are you familiar with the term spider
22  chart?
23   A.   No.
24   Q.   Are you familiar with the term focused
25  deterrence?

1      A.   No.

2      Q.   Have you ever attended an AIM meeting?

3      A.   I have.

4      Q.   What is an AIM meeting?

5      A.   It's a comp stat meeting.

6      Q.   Can you explain what you mean by that?

7      A.   It's crime statistics in the area, any evolving

8  trends or sprees occurring in the district.

9      Q.   Would you discuss prolific offenders at an AIM

10  meeting?

11      A.   We would.

12      Q.   Okay.  And to be clear, would you participate

13  in AIM meetings as a code enforcement corporal?

14      A.   I do.

15      Q.   How would you participate as a code enforcement

16  corporal?

17      A.   I would provide my weekly statistics for my

18  activities.

19      Q.   Would you discuss your interactions with

20  prolific offenders?

21      A.   Sometimes.

22          MR. JOHNSON:  We'll mark this as Exhibit A.

23      There's a copy for you, Tom.

24          MR. POULTON:  Thanks.

25          (Exhibit A was marked for identification.)

1    BY MR. JOHNSON:

2        Q.   Are you familiar with this document?

3        A.   Yes.

4        Q.   Did you review this document prior to today's

5    deposition?

6        A.   Yes.

7        Q.   And what is this document?

8        A.   It's a CAD report or CAD notes.

9        Q.   Does this pertain to a visit in which you were

10   involved?

11       A.   Yes.

12       Q.   And what was nature of that visit?

13       A.   It was a prolific offender check.

14       Q.   And who is the subject of that prolific

15   offender check?

16       A.   Robert Jones.

17       Q.   Would that be Robert Jones, Sr., or Robert

18   Jones, III?

19       A.   The third.

20       Q.   And how would you have determined to visit

21   Robert Jones for this prolific offender check?

22            MR. POULTON:  Object to the form.

23   BY MR. JOHNSON:

24       Q.   You can answer.

25       A.   I assumed he was a prolific offender at that

1    time.

2         Q.   At the time of this visit were you a code

3    enforcement corporal, or were you working as a district

4    three or, excuse me, deputy on patrol?

5         A.   I was a deputy on patrol.

6         Q.   What was the purpose of visiting Bobby Jones

7    for this prolific offender check?

8         A.   I can't remember.

9         Q.   This prolific offender check was on September

10   26, 2015?

11        A.   Yes.

12        Q.   Okay.  I'm going to mark this as Exhibit B.

13             (Exhibit B was marked for identification.)

14   BY MR. JOHNSON:

15        Q.   Are you familiar with this document?

16        A.   It's a CAD -- CAD notes.

17        Q.   Okay.  Is this for an incident in which you

18   were involved?

19        A.   Yes.

20        Q.   And what was the nature of this incident?

21        A.   It was a prolific offender check.

22        Q.   And who is the subject of this prolific

23   offender check?

24        A.   The same person, Robert Jones.

25        Q.   Okay.  Do you remember the purpose of this

1    prolific offender check?

2         A.   Other than it was a prolific offender check.

3         Q.   Okay.  The date on this check was October 9,

4    2015; is that correct?

5         A.   Yes.

6         Q.   So that's approximately two weeks after the

7    previous prolific offender check that we marked as

8    Exhibit A; is that correct?

9         A.   Yeah.

10        Q.   What would be the purpose of visiting

11   Bobby Jones twice within a period of two weeks?

12             MR. POULTON:  Object to the form.  Go ahead.

13        A.   I don't remember.

14   BY MR. JOHNSON:

15        Q.   Would it be common to visit a prolific offender

16   twice within a period of two weeks?

17             MR. POULTON:  Object to the form.

18   BY MR. JOHNSON:

19        Q.   You can answer.

20        A.   Yes.

21        Q.   It would be common?

22        A.   Yes.

23        Q.   Why would you visit prolific offenders on --

24   within a -- twice within a period of two weeks?

25             MR. POULTON:  Object to the form.  Could you

1      just clarify do you mean this time or just

2      generally?

3           MR. JOHNSON:  Generally.

4           MR. POULTON:  Okay.

5      A.   There could be many reasons, to include tips,

6  criminal activity in their neighborhood, them committing

7  criminal activity, stuff like that.

8  BY MR. JOHNSON:

9      Q.   Okay.  But it wouldn't necessarily have to be

10  that they specifically were suspected of a particular

11  criminal activity?

12      A.   Not all the time.

13      Q.   Okay.  It might be that there was something

14  going on in the neighborhood?

15      A.   Sometimes.

16      Q.   Okay.

17      A.   I'm not sure if I actually made contact with

18  him during this -- this call.

19      Q.   Okay.  The duration of this call runs from

20  18:47 to 19:13; is that correct?

21      A.   It is.  However, I got canceled from the call

22  and redispatched to the call, and I didn't put it in the

23  CAD notes that I actually made contact.  So I couldn't

24  say for sure if I actually made contact with him or not.

25      Q.   Is it possible that you knocked on the door and

1     no one answered?

2         A.    It's possible.

3             MR. POULTON:  If you don't mind my asking, how

4         do you tell that it's canceled?

5             THE WITNESS:  This right here is the radio log.

6             MR. POULTON:  Oh, I see.  Gotcha.  Sorry.

7     BY MR. JOHNSON:

8         Q.    And just for the clarity though, when it says

9     pre-empted to event, that doesn't necessarily mean that

10    you didn't meet with Bobby Jones?

11        A.    Correct.  Pre-empted to event means they could

12    have dispatched me to another call or canceled the call

13    and put me on another call.

14        Q.    But that occurred it appears 20 minutes after

15    this.

16        A.    Right.

17        Q.    So in that 20-minute period, you very well

18    could have met with Robert Jones?

19        A.    Possibly.

20        Q.    Okay.  Now I just want to return, and just

21    asking generally, you said that it would be common to

22    meet with prolific offenders on a rate of once every two

23    weeks or so; is that correct?

24        A.    So it all depends.  I might meet with him on

25    one day, and someone else might meet with him a week and

1    a half later.

2         Q.    Okay.  What's the most frequently that you

3    might have deputies meeting with a prolific offender?

4              MR. POULTON:  Object to the form.

5         A.    I'm not sure.

6    BY MR. JOHNSON:

7         Q.    What's the most -- what is the shortest

8    duration that you've had go by between you personally

9    conducting prolific offender checks on an individual?

10        A.    I'm not sure.

11        Q.    Is it shorter than ten days?

12        A.    It was so long ago that there could be

13   exceptions.  I really couldn't tell you.

14        Q.    Is it accurate to say that as a code

15   enforcement officer, part of your job was to focus on

16   prolific offenders?

17        A.    Not solely.

18        Q.    Not solely?

19        A.    That was a small portion.

20        Q.    So is it accurate to say that a portion of your

21   job was to focus on prolific offenders?

22        A.    They would meet some of the criteria for being

23   problems -- problem houses in the community.

24              MR. JOHNSON:  I'm going to mark this as

25        Exhibit C.

1                    (Exhibit C was marked for identification.)

2    BY MR. JOHNSON:

3         Q.    Are you familiar with this document?

4         A.    I am.

5         Q.    What is this document?

6         A.    It's a 2016 ILP manual.

7         Q.    And did you review this document during your

8    time as a code enforcement officer?

9         A.    I did.

10        Q.    Okay.  About how many times would you say that

11   you reviewed it?

12        A.    A few.

13        Q.    And would this document have been available to

14   you on the intranet?

15        A.    It is.

16        Q.    Can you turn to page 55?

17             MR. JOHNSON:  Here you go.

18             MR. POULTON:  Oh, I don't need -- well, thanks.

19        More paper.  You're going to what page?

20             THE WITNESS:  55.

21   BY MR. JOHNSON:

22        Q.    Would you read the last bullet point on page

23   55, please?

24        A.    Utilize Code Ordinance citations as a strategic

25   tool to target prolific offenders and problem locations

1    within the STAR box.  Coordinate missions with Corporal

2    Art Madden and Code Enforcement to conduct STAR box Code

3    Enforcement blitzes.

4        Q.   And when it references Code Enforcement

5    capitalized, is that referring to code enforcement

6    corporals such as yourself?

7        A.   Or county code enforcement.

8        Q.   But it would refer at least in part to code

9    enforcement corporals within the Pasco County Sheriff's

10   Office?

11       A.   Yes.

12       Q.   Okay.  And would you use citations as a

13   strategic tool to target prolific offenders as a code

14   enforcement corporal?

15       A.   If there were violations at the residence.

16       Q.   Okay.  So you would visit the residence to look

17   for violations?

18       A.   Sometimes.

19       Q.   Now at this point, unfortunately, due to issues

20   with COVID and our printer, I don't have copies of all

21   of the exhibits.  So I'm going to show you an exhibit on

22   my computer, which I will then email to the court

23   reporter after the deposition, and I will designate this

24   as Exhibit D.

25            (Exhibit D was designated to be attached at a

1     later date.)

2          MR. POULTON:  Which one is this going to be

3     then just so I know?  And unfortunately I'm having

4     -- I'm still having these issues of trying to

5     troubleshoot it from a distance, and I'm not getting

6     anywhere.  I can't pull it up on mine.

7          THE WITNESS:  You had your mouse for a little

8     bit.

9          (Off-the-record discussion.)

10   BY MR. JOHNSON:

11        Q.   Are you familiar with this document?

12        A.   I am.

13        Q.   And what is this document?

14        A.   It's a performance report for me.

15        Q.   And just to be clear, it's a report reviewing

16   your performance as a code enforcement official?

17        A.   I had been promoted part of that performance

18   report.

19        Q.   So for part of this report, you were working as

20   a code enforcement official?

21        A.   Yes.

22             MR. POULTON:  What's the date of it just so I

23        can find it later?

24             MR. JOHNSON:  March 2020.

25             MR. POULTON:  Thank you.

1    BY MR. JOHNSON:

2         Q.    Now I'm going to go to page 5 of the document.

3    Is this text that you input into the document yourself?

4         A.    It is.

5         Q.    And what's the purpose of inputting this text?

6         A.    To document what I believe was my most

7    significant work-related accomplishment, and the

8    strengths of my position, and what I would like to

9    improve.

10        Q.    Okay.  I'd like you to read here where it

11   begins "I have assisted."

12        A.    I have assisted in getting the people

13   (including prolific offenders) from the following

14   addresses evicted (and properties cleaned up):  7139

15   Bromley Drive, 3420 Clydesdale Drive.

16        Q.    Thank you.  You don't have to read all of the

17   addresses.

18             So did you -- is it fair to say that you listed

19   as a significant accomplishment during this period that

20   you succeeded in having prolific offenders evicted from

21   their homes?

22             MR. POULTON:  Object to the form.

23        A.    They were problem locations that they might

24   have been a prolific offender at the time.

25   BY MR. JOHNSON:

1    Q.   Did you specifically note in this evaluation

2  that some these individuals were prolific offenders?

3    A.   Yes.

4    Q.   And why would you note that?

5    A.   Because they were prolific offenders, they were

6  significant problems in the community.

7    Q.   So, in your view, the fact that someone is a

8  prolific offender means that they are a significant

9  problem in the community?

10    A.   Or have been.

11    Q.   And is that a reason to target an individual

12  for increased code enforcement?

13         MR. POULTON:  Object to the form.

14  BY MR. JOHNSON:

15    Q.   You can answer.

16    A.   Depending on the circumstances if it's a

17  problem location.

18    Q.   And by if it's a problem location, you mean

19  it's a location with code enforcement violations?

20    A.   Or quality of life issues.

21    Q.   What do you mean by quality of life issues?

22    A.   If there's noise violations, drug activity,

23  drug tips.

24    Q.   Okay.  But it could also mean that there's code

25  enforcement violations?

1     A.    Correct.

2     Q.    So if a prolific offender lives in a location

3    with code enforcement violations, that would be a reason

4    to issue citations?

5     A.    It could be.

6     Q.    Would you focus on prolific offenders more than

7    just a general citizen in the community?

8           MR. POULTON:  Object to the form.  Go ahead.

9     A.    My focus on prolific offenders was a small

10   portion of the citations that I've issued or the houses

11   that I visited.

12   BY MR. JOHNSON:

13    Q.    Okay.  But you would focus on prolific

14   offenders?

15    A.    They would also be on my list, yes.

16    Q.    What do you mean by they would be on your list?

17    A.    To see if there's violations at the residences.

18    Q.    Is this a list that you would draw up at the

19   beginning of the day, beginning of the week?

20    A.    Sometimes.

21    Q.    Okay.  And how would you put together this

22   list?

23    A.    I would look at the tips of criminal activity,

24   I would look at reports in the community to determine if

25   there's a problem in the neighborhood.

1     Q.   Okay.  So in every -- well, let me back up.

2   How often would you put together this list?

3     A.   Weekly.

4     Q.   Weekly, okay.  Would you put it together at the

5   beginning of week?

6     A.   Correct.

7     Q.   And you would put it together based on your

8   review of tips?

9     A.   Correct.

10     Q.   Is there anything else you would review in

11   addition to tips?

12     A.   Reports from the prior week.

13     Q.   What type of reports?

14     A.   If there were noise violations, large calls for

15   service for noise violations or drug -- suspected drug

16   activity.

17     Q.   Would you rely on information that you received

18   in the AIM meeting?

19     A.   I could.

20     Q.   And some of these addresses would be the

21   addresses of prolific offenders?

22     A.   They could be.

23     Q.   Is there anything else that you would look at

24   in putting together this list of addresses?

25     A.   I can't remember right now off the top of my

1    head.  It's been a while.

2        Q.   So the main things that you remember are tips,

3    reports, and information from the AIM meeting?

4        A.   Correct.

5        Q.   Would you coordinate with officials on the STAR

6    team when determining your list of addresses?

7        A.   Sometimes they would provide me with addresses.

8        Q.   How would they provide you with addresses?

9        A.   They would talk to me in passing or call me.

10       Q.   So the STAR team deputies might call you to

11   provide you with addresses?

12       A.   Sometimes.

13       Q.   Would those be addresses of prolific offenders?

14       A.   They might be.

15           MR. JOHNSON:  I'm going to pull up another

16       exhibit which I would designate as Exhibit E.

17           (Exhibit E was designated to be attached at a

18       later date.)

19   BY MR. JOHNSON:

20       Q.   Are you familiar with this document?

21       A.   Yes.

22       Q.   What is this document?

23       A.   Another member performance report for me for

24   the dates 2018 to 2019.

25       Q.   And were you a code enforcement corporal during

1    this period covered by this report?

2        A.   Yes.

3        Q.   Okay.  I'm going to turn to page 5 again.  What

4    are we looking at here on page 5?

5        A.   It's the page where I would document my

6    self-evaluation.

7        Q.   Okay.  So again this reflects what you would

8    view as your most significant accomplishments for this

9    period?

10       A.   Yes.

11       Q.   Okay.  Would you read beginning at "I have"?

12       A.   I have assisted in getting the people

13   (including prolific offenders) from the following

14   addresses evicted (and properties cleaned up):  2611

15   Sweetwood Drive.

16       Q.   Okay.  Yeah, there's no reason to read the

17   addresses.  Thank you.

18            So did you, again, in this self-evaluation,

19   mention that you had had prolific offenders evicted from

20   their homes?

21       A.   Yes.

22       Q.   Okay.  Will you read what you wrote under E?

23       A.   Other than improving my interview skills, I

24   plan on using ILP more to use my portion as a code

25   enforcement ordinance corporal to benefit not only the

1    Sheriff's Office, but to make Pasco County a better

2    place.

3        Q.    How would you use ILP in your position as the

4    code enforcement corporal?

5        A.    To focus on problem people and problem

6    locations.

7        Q.    And what does it mean to use ILP?

8        A.    To use intelligence information gathered to

9    create intelligence to determine where the best impact

10    to focus crime prevention techniques at.

11        Q.    What you mean by problem people?

12        A.    People with -- suspected of crime or that

13    continue to be involved in crime.

14        Q.    Would it include prolific offenders?

15        A.    It could.

16            MR. JOHNSON:  I'm going to designate another

17        exhibit as Exhibit F.  I'm going to open this up

18        here.

19            (Exhibit F was designated to be attached at a

20        later date.)

21            MR. JOHNSON:  When we're some point down the

22        line here maybe forward those to the court reporter

23        by email the ones that you don't have paper copies

24        of.

25            MR. JOHNSON:  That's the plan.

1          MR. POULTON:  That's the plan?

2          MR. JOHNSON:  Yeah.

3          MR. POULTON:  Okay, great.  You can just copy

4     me.  That would be great.  Thanks.  I'm keeping

5     track, but --

6          MR. JOHNSON:  No, of course, of course.

7          MR. POULTON:  Thank you.

8  BY MR. JOHNSON:

9     Q.   Are you familiar with this document?

10     A.   Yes.  It's another performance evaluation for

11  me from 2016 to 2017 when I was a code enforcement

12  corporal.

13     Q.   Okay.  I'm going to turn to page 2 of this

14  document.  This is text that was inputted by your

15  supervisor; is that correct?

16     A.   Yes.

17     Q.   Okay.  Would you read what it says starting at

18  Corporal Celeste?

19     A.   Corporal Celeste reviews, tracks, and enforces

20  the county ordinances to the fullest extent and connects

21  those cases to our worst offenders.  Recently, he

22  coordinated with --

23     Q.   Yeah, I think that's --

24     A.   Okay.

25     Q.   So what does it mean to connect code

1    enforcement to the worst offenders?

2        A.   Focusing on problem people.

3        Q.   So part of your job as code enforcement

4    corporal was to focus on problem people?

5        A.   Correct.

6        Q.   Okay.  And again, that would include prolific

7    offenders?

8        A.   It could.

9        Q.   Do these problem people -- scratch that.

10           Just I think for the clarity of the record,

11   when we talk about code enforcement violations, what

12   types of things are we talking about?

13       A.   Junk and debris, overgrown grass, trailer

14   violations, possible minimum housing violations, zoning

15   violations, broken down cars, noise violations.

16       Q.   Okay.  So when you would focus on problem

17   people, you would be looking for those types of

18   violations?

19       A.   Correct.

20       Q.   Okay.  I'm going to turn to page 5 of this

21   document.  Is this another self-evaluation

22   questionnaire?

23       A.   It is.

24       Q.   Okay.

25           MR. POULTON:  Is that a new exhibit?

```
 1              MR. JOHNSON:  We're still on Exhibit --

 2              MR. POULTON:  You're still on F?

 3              MR. JOHNSON:  F, yeah.

 4              MR. POULTON:  Okay.

 5   BY MR. JOHNSON:

 6        Q.   Would you read under A here?

 7        A.   My most significant work-related accomplishment

 8   is learning the great position -- or the great

 9   possibilities of this position.  I have had multiple

10   people evicted from their houses by working with the

11   landlord/property owners.  For example, I have issued

12   prolific offender -- prolific offender's mother multiple

13   ordinances at -- gave the address -- and she moved out

14   of her residence.

15        Q.   And then what do you say after that?

16        A.   Unfortunately still in IDA.

17        Q.   What is IDA?

18        A.   That's half the zone in district three.

19        Q.   Okay.  So when you say that, you're saying

20   unfortunately she still lives in district three?

21        A.   Correct.

22        Q.   Okay.  So just to be clear, you listed as an

23   accomplishment for this period that you had a prolific

24   offender's mother evicted from her house?

25        A.   Correct.
```

1    Q.   Okay.  But you noted that unfortunately she

2   still lives in the district?

3    A.   Correct.

4    Q.   Okay.

5        MR. POULTON:  Do you mind if we just for the

6       record get what the address is so I can figure out

7       who that is?

8        THE WITNESS:  3168 Harvardson Loop.

9        MR. POULTON:  H-A-R-V-E-S-T-O-N.

10      THE WITNESS:  H-A-R-V-A-R-D-S-O-N Loop.

11      MR. POULTON:  Harvardson?

12      THE WITNESS:  Yep.

13      MR. POULTON:  Okay.  Gotcha.

14  BY MR. JOHNSON:

15    Q.   Why would it be an accomplishment to have a

16  prolific offender's mother evicted from her home?

17    A.   Because it would provide relief to the

18  surrounding neighbors.

19    Q.   And why would it be unfortunate that she would

20  still live within the district?

21    A.   Because I believe it would still be another

22  problem house just moving.

23    Q.   And that's because of the identity of the

24  person who had lived in the house?

25    A.   Correct.

1    Q.   Okay.  When you issued a citation, you issued

2    the citation to the owner of the home?

3    A.   It depends --

4    Q.   Okay.

5    A.   -- on the situation.

6    Q.   If it's a rented home, would you issue the

7    citation to the person who's living there?

8    A.   I could.

9    Q.   Okay.  How would you make the determination

10   whether to issue the citation to the owner or to the

11   resident?

12   A.   It would depend on if the owner knew the

13   violation was continuing or if I gave the owner a

14   previous warning.

15   Q.   If you have a family living in the house, would

16   you issue the citation to the adult in the house?

17   A.   With the person that is actually being cited or

18   just providing the citation to?

19   Q.   Who's the person who is cited in that situation

20   where there's a family?

21   A.   Well, it depends who caused the violation.

22   Q.   What do you mean?

23   A.   So if it's a family but they have an adult son

24   and the adult son has a broke down car in the driveway,

25   I can issue it to anybody in the house or just to the

1    adult son, or if the landlord knew of the violation and

2    didn't correct it, I can issue everybody that same

3    citation.

4        Q.   Okay.  So let's say there's a situation where

5    there's tall grass and there's a family living in the

6    house.  Who would you issue the citation for tall grass

7    to?

8        A.   The adult that is primarily the most in charge

9    at the house.

10       Q.   Okay.  And is the same true with debris in the

11   yard?

12       A.   Most of the time.

13       Q.   Okay.  So if you had a situation where there's

14   a problem person in the house and the problem person is

15   a juvenile, you would be issuing citations to the

16   juvenile's parents; is that correct?

17       A.   Or whoever is responsible for the violation.

18       Q.   Okay.  But you're at the house because of the

19   problem person who lives there?

20            MR. POULTON:  Object to the form.

21   BY MR. JOHNSON:

22       Q.   You can answer.

23       A.   Like I said, it would depend on the criteria,

24   not just a single person at a house.

25       Q.   Okay.  But you visit a house because of the

```
 1    problem person.  You wouldn't necessarily issue

 2    citations to the problem person?

 3            MR. POULTON:  Object to the form.  Go ahead.

 4        A.   If they're juvenile, I wouldn't typically.

 5    BY MR. JOHNSON:

 6        Q.   You would issue it to the parents?

 7        A.   If they lived at the house or were responsible

 8    for the violation, yes.

 9        Q.   Okay.  And that's true even if you were there

10    because of the juvenile?

11        A.   It could be.

12            MR. JOHNSON:  Okay.  I'm going to open another

13        exhibit.  I will designate this --

14            Well, Tom, this is one of the AIM slides --

15            MR. POULTON:  Okay.

16            MR. JOHNSON:  -- that has not been reviewed.

17        Do you want me to --

18            MR. POULTON:  Just put a marker for it just to

19        give us a descriptor or whatever, and you can go

20        ahead and give it a -- I guess we're on G now;

21        right?

22            MR. JOHNSON:  Yes.

23            MR. POULTON:  So, and then once they get

24        reviewed -- I mean, I really don't anticipate

25        problems.  I think so far it's been pretty small
```

1      number that have been redacted anyway, but just in

2      case.

3            MR. JOHNSON:  Okay.

4            MR. POULTON:  And then it's good because you

5      don't even have it here to add.  So we'll have to do

6      it later, yeah, but that's fine.

7            MR. JOHNSON:  We will mark this as Exhibit G.

8      It's a set of AIM slides from May 14, 2017.

9            (Exhibit G was designated to be attached at a

10      later date.)

11  BY MR. JOHNSON:

12      Q.   Are you familiar with this document?

13      A.   Yes.

14      Q.   What is this document?

15      A.   It says district one ILP.  Looks like a weekly

16  slide.

17      Q.   Okay.  And would these be displayed at the AIM

18  meeting?

19      A.   They would.

20      Q.   Okay.  I'm going to turn to page 8.

21            MR. POULTON:  That's just -- just to be clear,

22      that's district one though; right?

23            MR. JOHNSON:  Yes.

24            MR. POULTON:  Okay.

25  BY MR. JOHNSON:

1       Q.    What are we looking at here on page 10 of the

2   PDF, page 8 of the document?

3       A.    That looks like a table of addresses visited by

4   the county ordinance corporal.

5       Q.    Okay.  And here on the date is May 10th?

6       A.    2017.

7       Q.    Yeah.  Does this row review a code citation

8   issued to a woman named Theresa Squires?

9       A.    Yes.

10      Q.    Okay.  Were those citations issued by you?

11      A.    I'm not sure.

12      Q.    Does it say that they were issued by you on

13  this document?

14      A.    The document says that, yes.

15      Q.    Okay.  Would you read what it says in the note

16  section down here?

17      A.    One location in D1 was issued code enforcement

18  citations last week.  Theresa Squires was issued three

19  citations at 10136 Markham Street totaling $804.  Earl

20  Squires was issued one citation at the same address for

21  $168 for a D1 grand total of $972.

22      Q.    And then what does it say under that?

23      A.    Earl Squires is an associate of TOP 5 Gary

24  Baker.

25      Q.    Okay.  Does that mean that one person at this

1    address was an associate of a TOP 5 offender?

2        A.    That's what it says, yes.

3        Q.    Why would it be relevant that somebody at the

4    address was an associate of a TOP 5 offender?

5        A.    I'm not sure.

6        Q.    Would you have been aware of that fact when you

7    issued the code enforcement citations?

8        A.    I'm not --

9            MR. POULTON:  Object to the form.

10   BY MR. JOHNSON:

11       Q.    You can answer.

12       A.    I don't know.

13       Q.    If you were at the address, would you have been

14   able to determine whether the people who lived at the

15   address were associated with a TOP 5 offender?

16       A.    During this particular day, the dog had

17   attacked us, either this day or a day close to this.  I

18   wasn't aware that there was an associate of a TOP 5 at

19   this address.

20       Q.    Would this address have been on your list of

21   addresses to visit?

22       A.    No.

23       Q.    Then why would you have been at this address?

24       A.    Because I was assisting the district one code

25   enforcement corporal.

1     Q.   So they would have put together the list of

2   addresses to visit?

3     A.   They could have.

4     Q.   Okay.

5     A.   We wound up shooting this dog at some point

6   because it bit my partner.

7     Q.   Okay.

8     A.   So --

9     Q.   And you don't know why you were at this

10  address?

11    A.   I was assisting the district one code

12  enforcement corporal.

13    Q.   So they would have chosen to be at this

14  address?

15    A.   Correct.

16    Q.   Okay.

17    A.   I also know from the experience with this

18  address there were numerous noise complaints and quality

19  of life issues in addition to, I guess, there being

20  associate at the house.

21        MR. JOHNSON:  I'm going to open another set of

22     AIM slides from May 9, 2019, and designate that as

23     Exhibit H.

24        (Exhibit H was designated to be attached at a

25     later date.)

1    BY MR. JOHNSON:

2        Q.   Are you familiar this document?

3        A.   I am.

4        Q.   What is this document?

5        A.   It's an ILP slide for district three.

6            MR. POULTON:  What's the date again?  I'm

7        sorry.

8            MR. JOHNSON:  May 9, 2019.

9            MR. POULTON:  Thank you.

10   BY MR. JOHNSON:

11       Q.   I'm going to turn to page 25 of this document,

12   25 on the slides.  Would you read the first couple

13   sentences of this paragraph here?

14       A.   Michael Nichols.  STAR and Corporal Mark

15   Celeste made contact with Nichols at 1730 Holiday Drive.

16   Nichols and other unknown subjects were repairing a blue

17   Chevrolet pickup truck.  The vehicle is registered to

18   his mother, Laurel Nichols.  Nichols was uncooperative,

19   stated he was being harassed, and there was no reason

20   for law enforcement to be at his residence.  While on

21   scene, several male and female subjects left the

22   residence carrying suitcases and backpacks.  They all

23   refused to speak with STAR.  STAR later responded to

24   Laurel's residence at 3452 Chauncy Road and warned her

25   of the consequences of allowing unlicensed drivers to

1    operate her vehicle.  Nichols' driver's license was

2    suspended on 5-21 of '18.

3         Q.   Okay.  And above that these notes correspond

4    with the slide in the ILP spreadsheet; is that correct?

5         A.   Yes.

6         Q.   Who would have inputted these notes?

7         A.   Some ILP analyst.

8         Q.   And that would have been based on something

9    that someone said at the meeting?

10        A.   No.  It could have been from CAD reports.

11        Q.   Okay.  And is this individual Nichols listed on

12   the corresponding slide?

13        A.   He is.

14        Q.   Okay.  Is he listed as a TOP 5 offender?

15        A.   He is.

16        Q.   Okay.  So this indicates that you were at the

17   house of an individual who is listed a TOP 5 offender?

18        A.   I'm not sure if he was a TOP 5 at that time or

19   if they listed him as a TOP 5 during this week.

20        Q.   Okay.  But he was listed during the period

21   around which this happened?

22        A.   Yes.

23        Q.   Okay.  And you were there in your capacity as a

24   code enforcement corporal?

25        A.   Yes.

1      Q.   And is this somebody who you would have put on

2    your list of houses to visit?

3      A.   Yes.

4      Q.   Okay.  And would you have been aware that he

5    was listed as a TOP 5 offender?

6      A.   I don't know if I was at that time or not.

7      Q.   Would you have been able to find out that

8    information?

9      A.   I don't know when he was listed as a TOP 5, if

10   it was before or after that date that I went there.

11     Q.   That's fair.  If you visited his house, would

12   you have been able at that time to check on the intranet

13   if he was listed as a TOP 5 offender?

14     A.   Yes.

15     Q.   So you would have been able to determine

16   whether or not he was listed?

17     A.   Yes.

18     Q.   Okay.

19     A.   This is one of the situations where he just

20   happens to be at a problem house that was focused on

21   before he even was associate with the house.

22     Q.   You were at that house with the STAR team?

23     A.   Yes.

24     Q.   And the purpose of the STAR team is to focus on

25   problem offenders; is that correct?

1          MR. POULTON:  Object to the form.  Go ahead.

2     A.   I don't know what they were doing on that day

3  exactly.  I know I went with them.

4  BY MR. JOHNSON:

5     Q.   You were there with the STAR team?

6     A.   Yes.

7     Q.   And you're saying that you happened to be there

8  had nothing to do with the fact that the STAR team was

9  there?

10     A.   A lot of times I will bring the STAR team with

11  me to addresses, or I'll accompany them because a lot of

12  times the problem locations I don't like going by

13  myself.

14     Q.   What made his house a problem house in your

15  view?

16     A.   The neighbors complaining of drug activity.

17     Q.   Were you there to look for drug activity?

18     A.   No.

19     Q.   You were there to look for code enforcement

20  citations?

21     A.   Correct.

22     Q.   And was the house of this individual who was

23  listed as a TOP 5 offender?

24     A.   He was staying there at the time.  The house

25  still remains a problem even after he moved out.

1    Q.    When you say it remains a problem, you don't

2    mean -- you mean because of drug activity?

3    A.    Correct.

4    Q.    Not because of code enforcement citations?

5    A.    There's still code enforcement violations

6    there.

7    Q.    But those aren't what make it a problem house?

8    A.    The neighbors have complained about that, about

9    the code enforcement violations.

10    Q.    Okay.  But that's not the reason that you would

11    identify that as a problem house; correct?

12    A.    As well as the tips and the problem people that

13    visit.

14    Q.    Okay.  But the reason that you would be at that

15    house as opposed to some other house is because you view

16    it as a house where criminal activity is going on?

17    A.    Correct.

18    Q.    Okay.  But your purpose in being at the house

19    is not to actually look for criminal activity?

20          MR. POULTON:  Object to the form.

21    BY MR. JOHNSON:

22    Q.    You can answer.

23    A.    We could also receive information of criminal

24    activity during our visits.

25    Q.    You would be looking for tips during your

1    visits?

2        A.   My sole purpose for visiting is for code

3    enforcement violations though.

4        Q.   Okay.  But you would look for tips during a

5    visit?

6        A.   I could, yes.

7        Q.   Okay.  When you're doing a visit for code

8    enforcement, do you go onto the property?

9        A.   I do.

10       Q.   Do you walk around the back of the house?

11       A.   It depends.

12       Q.   Could you walk around the back of the house?

13       A.   If there's no fence, no signage, I could.

14       Q.   Okay.  And what's your purpose in doing so?

15       A.   Looking for code enforcement violations.

16       Q.   Is that something you frequently do during

17   visits?

18            MR. POULTON:  Object to the form.

19   BY MR. JOHNSON:

20       Q.   As a code enforcement corporal, is that

21   something you would frequently do during visits?

22            MR. POULTON:  Same objection.  Go ahead.

23       A.   Sometimes.

24   BY MR. JOHNSON:

25       Q.   How many code enforcement corporals are there

1    who work for the Pasco County Sheriff's Office?

2            MR. POULTON:  Object to the form.  Do you mean

3        now or then?

4    BY MR. JOHNSON:

5        Q.    During the time that you were a Pasco County

6    Sheriff's Office code corporal, how many other code

7    corporals were there?

8        A.    Two.

9        Q.    Two per district or total?

10       A.    Total.  Three total.  Me and two others.

11       Q.    I see.  So there were -- there was -- was there

12   one assigned to each district?

13       A.    Yes.

14       Q.    Okay.  So you were responsible for the entirety

15   of district three?

16       A.    Correct.

17           MR. JOHNSON:  Okay.  I'd like to discuss

18       another exhibit.  This one I have on paper.  We'll

19       mark this as Exhibit I.

20           (Exhibit I was marked for identification.)

21           MR. JOHNSON:  Here, Tom.

22           MR. POULTON:  Thank you, sir.

23   BY MR. JOHNSON:

24       Q.    Are you familiar with this document?

25       A.    I am.

1    Q.   What is this document?

2    A.   It is a citation and a report.

3    Q.   Who issued this citation?

4    A.   I did.

5    Q.   When did you issue it?

6    A.   On 3-28 of 2016.

7    Q.   And to whom did you issue this citation?

8    A.   To Robert Jones.

9    Q.   And what was the citation for?

10   A.   RV's, boats and trailers.

11   Q.   Okay.  And what was the reason for issuing the

12   citation?

13   A.   Because there was violation on the property.

14   Q.   And what was the violation?

15   A.   It was a double jet ski trailer on the side of

16   the property and an enclosed trailer on the other side

17   of the property.

18   Q.   So why would that be a violation?

19   A.   The ordinance states that if you have a trailer

20   on the side of the property in a residential

21   neighborhood, it has to have a fence blocking the view

22   from the roadway.

23   Q.   Would it be a violation if both things were on

24   the same side of the property?

25   A.   I'm not sure.  I can look at the specific

1    ordinance.

2         Q.   Okay.  So the violation was having a trailer

3    and a jet ski parked on the property?

4         A.   Correct.

5         Q.   Okay.

6         A.   Visible by the roadway.

7         Q.   Okay.  Is it common for people in Pasco County

8    to park trailers on their property?

9              MR. POULTON:  Object to the form.

10   BY MR. JOHNSON:

11        Q.   You can answer.

12        A.   I'm not sure.

13        Q.   Is it uncommon?

14             MR. POULTON:  Same objection.

15        A.   It is a violation if you don't follow the

16   ordinance.

17   BY MR. JOHNSON:

18        Q.   Okay.  Do you have occasion to drive around

19   Pasco County in your job as code enforcement corporal or

20   did you?

21        A.   Yes.

22        Q.   And did you observe this violation at other

23   addresses?

24        A.   I have throughout the county.

25        Q.   Would you always cite people for this when you

1    observed this violation?

2        A.   No.

3        Q.   So why did you cite Robert Jones for this?

4        A.   Because I was at the house for complaints.

5        Q.   Why were you at the house?

6        A.   Because of violations.

7        Q.   Did STAR ask you to visit the house?

8        A.   I can't remember.

9        Q.   Were you there with the STAR team?

10       A.   I'm not sure.

11            MR. JOHNSON:  I'll mark another exhibit.

12            MR. POULTON:  What was the manual?  What number

13       was that?  Oh, that was C.  Thank you.

14            MR. JOHNSON:  I'm mark this as Exhibit J.

15            (Exhibit J was marked for identification.)

16   BY MR. JOHNSON:

17       Q.   Are you familiar with this document?

18       A.   I am.

19       Q.   What is this document?

20       A.   It's a CAD printout.

21            MR. POULTON:  Do you have an extra of that,

22       Rob?

23            MR. JOHNSON:  Oh, yes.

24            MR. POULTON:  Sorry.  Thank you.

25   BY MR. JOHNSON:

1      Q.    Does this correspond with the incident report

2   that we just looked at?

3      A.    It does.

4      Q.    Okay.  Does this indicate that there were units

5   from the STAR team with you at the house?

6      A.    They were.

7      Q.    Okay.  So when you issued this citation for the

8   jet ski, you were at the house with members of the STAR

9   team?

10      A.    Yes.

11      Q.    Okay.  Would this house have been on your list

12   of houses to visit for the week?

13      A.    I'm not sure if it was on the list for the week

14   or if they just asked me to go with them.

15      Q.    Okay.  So either you put it on your list, or

16   the STAR team just asked you to accompany them?

17      A.    Correct.

18      Q.    Okay.  Why did you issue the citation to

19   Robert Jones as opposed to some other individual?

20      A.    Because he was the main resident at the house.

21      Q.    Okay.  Were you aware of there being a prolific

22   offender living at the house?

23      A.    I don't know if he was a prolific offender at

24   the time.  I'm sorry.  Yes, I was.

25      Q.    And who the prolific offender at the house?

1       A.   It was his son, Robert Jones.

2       Q.   Okay.  So you were aware that his son was a

3   prolific offender?

4       A.   Yes.

5       Q.   Okay.  And you were aware of that at the time

6   that you issued him a citation?

7       A.   Yes.

8       Q.   Okay.  Did you make some notes before you came

9   to the deposition today?

10      A.   I did.

11      Q.   Okay.  Are those notes that you made about

12  those incidents?

13      A.   Yes.

14      Q.   Okay.  Would you mind sharing them?

15      A.   Sure.

16           MR. POULTON:  I'm going to object.  I think

17      that's work protect since it's for the litigation.

18  BY MR. JOHNSON:

19      Q.   Who made those notes?

20      A.   I did.

21      Q.   Did you share them with your attorney?

22      A.   No.

23           MR. POULTON:  But still --

24  BY MR. JOHNSON:

25      Q.   Did your attorney have any role in making them?

1     A.    No.

2     Q.    Would you mind sharing them then?

3           MR. POULTON:  Well, it's the same objection.

4           MR. JOHNSON:  On what basis?

5           MR. POULTON:  Pardon?

6           MR. JOHNSON:  Because he's not an attorney.

7           MR. POULTON:  It doesn't matter.  It's work

8     product.  It's his -- it's for trial.  It's for

9     trial preparation by him.  It doesn't have to be an

10    attorney that does it.  If he writes up notes to

11    prepare for a deposition, that's still work product.

12          MR. JOHNSON:  Okay.  Well, maybe Ari or CG

13    can --

14          MR. POULTON:  If I'm mistaken, I'm happy to

15    revisit it.

16          MR. JOHNSON:  Ari or CG, why don't you give

17    some thought to this issue and then we can revisit

18    it.  Ari, maybe you're --

19          MR. BARGIL:  Yeah, I'm happy to look at this.

20          MR. JOHNSON:  Okay.  We can come back to that.

21          MR. POULTON:  Okay.  I'm going to have people

22    in my office do the same thing.  All right.  Give me

23    a second.

24          MR. JOHNSON:  Sorry.  You're the Ping-Pong

25    ball.

```
1          MR. POULTON:  Yeah.  If I'm wrong, I'm wrong,
2      but you know I --
3          MR. BARGIL:  Are you guys still there?
4          MR. POULTON:  Yeah, yeah.
5          MR. BARGIL:  If you are, I can't hear you.
6          MR. POULTON:  No, we're just taking a break
7      while I contact my office as well on this same
8      issue.
9          MR. BARGIL:  Okay.  Very well.
10          MR. POULTON:  All right.  So I've got the same
11      issue outside.  Go ahead.
12  BY MR. JOHNSON:
13      Q.   I'm going to show you a video now.
14          MR. JOHNSON:  I don't think it's necessary to
15      record the audio of the video.  The video will be
16      its own exhibit.
17          (Off-the-record discussion.)
18          (Exhibit K was designated to be attached at a
19      later date.)
20          MR. JOHNSON:  The file is called -- it's a
21      video from 3-28 of '16, and the audio file is Code
22      Violation-2.
23          (A video was played at this time.)
24  BY MR. JOHNSON:
25      Q.   I'm just going to pause the video at the 35
```

1    second mark.  You agree that the grass that's depicted

2    in this video is generally a fairly short height?

3              MR. POULTON:  Object to the form.

4        A.   It's hard to tell on the video.

5              (A video was played at this time.)

6    BY MR. JOHNSON:

7        Q.   I'm going to pause here.  What are you doing in

8    this image?

9        A.   I'm measuring the weeds.

10       Q.   Okay.  And this is at the 40 second mark.  Why

11   are you measuring the weeds?

12       A.   Because it appeared they were more than twelve

13   inches in height.

14       Q.   And this is just a single weed in the yard?

15       A.   That's what it looks like.

16       Q.   Okay.  Just to pause here at the one minute, 26

17   second mark, what are you doing in this image?

18       A.   Taking a photograph.

19       Q.   And what are you taking a photograph of here?

20       A.   The west side of the house where the trailer

21   is.

22       Q.   Okay.  So you were taking a photograph of the

23   trailer?

24       A.   Taking a photograph of the trailer.

25       Q.   I'm going to pause at the 1:44 mark.  Are you

1    now on the side of the house?

2        A.   I am.

3        Q.   Okay.  And there's no pathway here on the side

4    of the house that you're on; is that correct?  You're

5    just on the lawn?

6        A.   Correct.

7             (A video was played at this time.)

8    BY MR. JOHNSON:

9        Q.   I'm going to pause again.  We're at about the

10   2:14 mark.  In that image just a few seconds ago, were

11   you measuring the grass again?

12       A.   I was.

13       Q.   Okay.  Would you agree that most of the grass

14   at this property is well under 12 inches tall?

15            MR. POULTON:  Object to the form.  Go ahead.

16       A.   Yes.

17   BY MR. JOHNSON:

18       Q.   You would agree?

19       A.   I would.

20       Q.   Okay.

21            (A video was played at this time.)

22   BY MR. JOHNSON:

23       Q.   I'm going to pause again.  From the image that

24   we can see -- we're at the 2:33 mark -- were you able to

25   see, get a good view of the grass from that image?

1      A.    From the body camera, it's hard to tell.

2      Q.    Were you able to tell from the image whether

3   the grass was twelve inches or taller?

4      A.    From the body cam image, it's very hard to

5   tell.

6           (A video was played at this time.)

7   BY MR. JOHNSON:

8      Q.    In this video, you're taking pictures.  Are

9   those pictures saved somewhere?

10      A.    Yes.

11      Q.    Would they still be saved somewhere?

12           MR. POULTON:  Object to the form.

13      A.    It's an old system we used to upload to.  I

14   can't remember.

15   BY MR. JOHNSON:

16      Q.    How would you check if you wanted to find out?

17      A.    I would get with our forensics department.

18      Q.    Okay.  Who in the forensics department would

19   know whether something like that was available?

20      A.    I don't know a name.

21      Q.    But you would ask the forensics department?

22      A.    Yes.

23      Q.    Would those photos be stored by incident

24   number?

25      A.    Yes.

1    Q.   Okay.  So you would give them the incident

2    number and ask if they had the photos?

3    A.   The case number, yes.

4    Q.   Okay.

5         (A video was played at this time.)

6    BY MR. JOHNSON:

7    Q.   Just going to pause again.  We're at the 2:56

8    mark.  Is it accurate to say that you walked all the way

9    to the back of the house along the side?

10   A.   Yes.

11        (A video was played at this time.)

12   BY MR. JOHNSON:

13   Q.   We're looking now at the image about 4:11.  Are

14   these other Pasco County Sheriff's Office deputies?

15   A.   Yes.

16   Q.   And these would the the other individuals who

17   accompanied you to the house?

18   A.   Yes.

19   Q.   Are those individuals members of the STAR team?

20   A.   They are.

21   Q.   How many other deputies would you say are here

22   on there?

23   A.   Five or six.

24   Q.   Would it be common for you as a code

25   enforcement corporal to visit a house along with five or

1    six other deputies?

2        A.   Sometimes.

3        Q.   What would be the reason for having that many

4    people there for a code enforcement visit?

5        A.   If there's an ongoing criminal investigation.

6             (A video was played at this time.)

7    BY MR. JOHNSON:

8        Q.   Did you hear the statement that that deputy

9    made in the video just previously?

10       A.   Yes.

11       Q.   Okay.  How do you understand that statement?

12       A.   That he's trying to solicit information.

13       Q.   Okay.  And is it your understanding that they

14   would be willing to not write the code enforcement

15   violations if the information were provided?

16       A.   That's what he was saying, yes.

17       Q.   Is that something that it would be common to

18   do?

19            MR. POULTON:  Object to the form.

20       A.   No.

21   BY MR. JOHNSON:

22       Q.   No?  Is it something that has happened

23   previously?

24       A.   I can't remember.

25       Q.   You can't remember if it's ever happened?

1      A.   I'm not sure.

2      Q.   But you can't say it hasn't?

3      A.   Sometimes we issue warnings instead of

4   citations.

5      Q.   So in your experience, you're not sure if

6   you've ever had code enforcement citations that you did

7   not issue because an individual agreed to cooperate with

8   law enforcement?

9      A.   We might issue a warning or a citation.

10     Q.   So just so I understand what you're saying,

11  there might be a situation where if someone agrees to

12  cooperate, you might issue a warning rather than a

13  citation?

14     A.   Maybe.

15     Q.   Is that something that's happened in your

16  experience?

17     A.   I'm not -- I can't recall.  I don't know.

18     Q.   But it might have happened?

19     A.   Maybe.

20     Q.   And it might have happened in your experience?

21     A.   It might.

22          (A video was played at this time.)

23  BY MR. JOHNSON:

24     Q.   How often would you visit homes with members of

25  the STAR team in your position as a code enforcement

1    corporal?

2        A.   It's hard to say.  They came on at 2 p.m.  I

3    went home at 4:30 p.m.  So it all depends.  It's hard to

4    tell you how often.

5        Q.   You said they came on -- the STAR team would

6    come on at 2:30, is that what you said?

7        A.   Typically 2 p.m.

8        Q.   Okay.

9        A.   Typically I would go home at 4:30.

10       Q.   So if you visited homes together, it would

11   often be in the window of when you were both working?

12       A.   Most of the time.

13       Q.   Okay.  And we look at Exhibit I, it looks like

14   the STAR officers arrived at the Jones house around

15   2:34 p.m.; is that correct?

16       A.   Exhibit J, yes.

17       Q.   Oh, yeah, my apologies.  So looking at Exhibit

18   J, STAR arrived around 2:34 p.m.?

19       A.   Yes.

20       Q.   And it appears that STAR units remained at the

21   house as late as 4:00 p.m.?

22       A.   So, I'm sorry.  At 2:34 is when they went

23   en route.  The CAD doesn't show a STAR -- the first STAR

24   team arriving until 14:59.

25       Q.   Uh-huh.

1      A.   I don't see STAR 32 showing he arrived.  So he

2  might have hit -- forgot to hit the arrive button.

3      Q.   Okay.  But the STAR team didn't clear from the

4  scene until 4:44?

5      A.   According to the CAD records, correct.

6      Q.   Okay.  And you arrived at the scene at 1:39?

7      A.   1:49.

8      Q.   Arrived at 1:49.

9           Now after you issued this citation, it was

10  discussed in a subsequent AIM meeting; is that correct?

11      A.   It could have been.  I don't remember the exact

12  day.

13      Q.   When you say it could have been, why do you say

14  that?

15      A.   I don't know if I was out during the AIM

16  meeting.  I don't know if I was the one that discussed

17  it, but typically, my activity is shown during the ILP

18  meeting.

19      Q.   And why would your activity be relevant to the

20  ILP meeting?

21           MR. POULTON:  Object to the form.

22      A.   Code enforcement was part of ILP.

23  BY MR. JOHNSON:

24      Q.   What do you mean when you say that code

25  enforcement is part of ILP?

1      A.    The problem locations I visit might have

2  relevance to other units or investigations other people

3  might be working.

4      Q.    Is the same true of the problem people?

5      A.    It could, yes.

6      Q.    Were you aware of any reason that this

7  particular location would have been relevant to a

8  subsequent AIM meeting?

9      A.    Bobby Jones was a prolific offender.

10     Q.    Okay.

11     A.    I'm sorry, Robert Jones.  He goes by Bobby,

12  so --

13     Q.    And by that you mean the son who lived at the

14  location?

15     A.    Yes.

16           MR. JOHNSON:  I'm going to review another

17      exhibit which I'll mark as exhibit -- are we up to

18      H?

19           COURT REPORTER:  L.

20           (Exhibit L was marked for identification.)

21  BY MR. JOHNSON:

22     Q.    Are you familiar with this document?

23     A.    I am.

24     Q.    And what is this document?

25     A.    It's a CAD record.

1      Q.   Is this for an incident in which you were

2   involved?

3      A.   Yes.

4      Q.   And what's the date of this record?

5      A.   March 29, 2016.

6      Q.   Okay.  Is this the day following the previous

7   incident?

8      A.   Yes.

9      Q.   Okay.  Do you remember why you were -- well,

10   let me back up a step.  Are you at the same house where

11   you were the previous day?

12      A.   Yes.

13      Q.   And this is the Robert Jones residence?

14      A.   Yes.

15      Q.   Do you remember why you were at the Robert

16   Jones residence on March 29th?

17      A.   I do.

18      Q.   Why was that?

19      A.   A search warrant.

20      Q.   Okay.  And why would you as code enforcement

21   corporal be involved in executing the search warrant?

22      A.   The squad that executed the search warrant is

23   the squad that I actually worked for.  So I worked for

24   property crimes.

25      Q.   So as a code enforcement corporal, you worked

1      for the property crimes --

2           A.   Yes.

3           Q.   -- squad?

4                Was that true the entire time that you were a

5      code enforcement corporal?

6           A.   No.

7           Q.   When did that become the case?

8           A.   It was sometime 2019 it switched to the -- to

9      be supervised under the STAR unit or STAR team.

10          Q.   Okay.  So from 2016 to 2019 code enforcement

11     was part of property crimes, but then in 2019 it was

12     part of the STAR unit?

13          A.   Yes.  I don't have the exact date.  It was

14     sometime around the beginning of 2019.

15          Q.   Okay.  So on the 29th you were not there to

16     look for code enforcement violations?

17          A.   No.  I was there to assist with the search

18     warrant.

19               MR. JOHNSON:  Okay.  I'm going to show another

20          video.

21               MR. POULTON:  So this will be M?

22               MR. JOHNSON:  Yes.

23               (Exhibit M was designated to be attached at a

24          later date.)

25               MR. JOHNSON:  This is a video from the March

1      29th incident.

2           MR. POULTON:  So it's the one you just did the

3      CAD report for?

4           MR. JOHNSON:  Yes.  And the name of the file is

5      SO investigation.mp4.

6  BY MR. JOHNSON:

7      Q.   I'm going to skip ahead to the 6:10 mark to

8  save us a bit of silence and -- I'm going to go back to

9  5:50.  Is that you speaking?

10     A.   It is.

11     Q.   And you're asking Robert about the citations?

12     A.   To make sure he received them from his son.

13     Q.   Okay.  And why was Robert out in front of his

14 house at this point?

15     A.   I -- I --

16     Q.   You don't know?

17     A.   -- don't remember.

18     Q.   Okay.

19          (A video was played at this time.)

20 BY MR. JOHNSON:

21     Q.   Is it fair to say that during this incident on

22 the 29th, you're talking to Robert about the property

23 code citations that you issued the previous day?

24     A.   Yes.

25     Q.   Okay.  Can you tell if Robert is in handcuffs

1    at this time?

2        A.   I can't tell or not.

3        Q.   Okay.

4             (A video was played at this time.)

5    BY MR. JOHNSON:

6        Q.   Can you see from this angle where Robert

7    Jones's -- this is the senior -- Robert Jones, Senior,

8    the father, could you tell from video whether his hands

9    are in handcuffs?

10       A.   Yes, they were.

11       Q.   And it appears from the video they were in

12   handcuffs that entire time?

13       A.   Yes.

14       Q.   So they would have been in handcuffs when you

15   were talking to him about the code enforcement citations

16   from the previous day?

17       A.   Yes.

18       Q.   Okay.

19            (A video was played at this time.)

20   BY MR. JOHNSON:

21       Q.   Are you present during this conversation still?

22       A.   I don't remember.

23       Q.   Okay.  Can you hear your voice at this point on

24   the video?

25       A.   I couldn't.

1     Q.   Okay.

2         (A video was played at this time.)

3         MR. JOHNSON:  I'm going to skip ahead a minute

4    to the 10:50 mark.

5         (A video was played at this time.)

6  BY MR. JOHNSON:

7     Q.   Do you recognize the voice of the individual

8  who is saying that?

9     A.   I do.

10    Q.   Who is that?

11    A.   Corporal Bollenbacher.

12    Q.   That's Corporal Bollenbacher.  I see.

13        MR. POULTON:  What's the time stamp on that?

14        MR. JOHNSON:  10:58.

15        MR. POULTON:  Thank you.

16  BY MR. JOHNSON:

17     Q.   And I don't expect you to repeat it back

18  verbatim, but could you just so that we have it for

19  clarity of the record paraphrase what he was just saying

20  there?

21     A.   He was talking to somebody saying you're just

22  as much of a problem as your son is, or something to

23  that effect.

24        (A video was played at this time.)

25  BY MR. JOHNSON:

1      Q.   I'm just going to pause it again at the 12

2   minute mark.  There was somebody there who was saying

3   should go back to Clearwater.  Do you know -- did you

4   recognize that voice?

5      A.   Yes.

6      Q.   Whose voice is that?

7      A.   Sergeant Thomas.

8      Q.   Sergeant Thomas, okay.

9           (A video was played at this time.)

10  BY MR. JOHNSON:

11     Q.   I'm going to pause.  We're at the 12:57 mark.

12  There's a deputy who is speaking saying that someone --

13  that Robert's son is victimizing people.  Do you

14  recognize that voice?

15     A.   I do.

16     Q.   Who is that?

17     A.   Sergeant Thomas.

18     Q.   That's Sergeant Thomas again, okay.

19          (A video was played at this time.)

20  BY MR. JOHNSON:

21     Q.   Is that still Sergeant Thomas who said that

22  Sheriff Nocco is an aggressive sergeant?

23     A.   Sheriff, yes.

24     Q.   Sheriff Nocco, yes.

25          Do you agree with that statement, Sheriff Nocco

```
 1    is an aggressive --
 2         A.   I do.
 3         Q.   What makes him aggressive?
 4         A.   No tolerance on criminal activity and focusing
 5    on mental health.
 6         Q.   Is part of that also a focus on problem people?
 7         A.   And problem locations, yes.
 8         Q.   So part of what makes Sheriff Nocco an
 9    aggressive sheriff is his focus on problem people and
10    problem locations?
11         A.   That's part of it.
12         Q.   Okay.
13              (A video was played at this time.)
14    BY MR. JOHNSON:
15         Q.   All right.  All right.  I'm going to ask you
16    about a couple more incidents.  I'm going to label
17    another exhibit.
18              MR. POULTON:  Can we take a restroom break
19         before we get going?
20              MR. JOHNSON:  Yes.
21              MR. POULTON:  Let me just -- can we go off the
22         record?
23              (Off-the-record discussion.)
24    BY MR. JOHNSON:
25         Q.   Have you looked at your notes during the course
```

1    of this deposition?

2         A.   I glanced over at the paper.

3         Q.   Are they in front of you?

4         A.   They are.

5         Q.   Have they been in the front of you the entire

6    time we've been in this room?

7         A.   They have.

8              MR. POULTON:  Yeah, but have you actually

9         substantively gleaned anything from them?  Have they

10        been used to refresh your recollection?

11             THE WITNESS:  No.

12   BY MR. JOHNSON:

13        Q.   Have you looked at them to verify dates?

14        A.   No.

15             MR. BARGIL:  I'm here.  I can shed light on it

16        if you like.

17             MR. POULTON:  Thanks.

18             MR. BARGIL:  Yeah.  This is governed by Rule

19        612 of the Federal Rules of Evidence, Tom, which

20        says that an adverse party -- I'm sorry -- that

21        unless 18 USC 3500 provides otherwise in a criminal

22        case, an adverse party is entitled to have any --

23             MR. JOHNSON:  Ari, slow down.  Slow down.

24             MR. BARGIL:  I'm sorry, Madame Court Reporter.

25        I apologize.  I apologize.

1          So when a witness uses a writing to refresh

2     memory either while testifying or before testifying,

3     and cases have said that applies to depositions,

4     this is a quote, an adverse party is entitled to

5     have the writing produced at the hearing, to inspect

6     it, to cross-examine the witness about it, and to

7     introduce in evidence any portion that relates to

8     the witness's testimony.

9          MR. POULTON:  Okay.

10          MR. BARGIL:  And that's the end of the quote.

11     The cases that I'm finding that address whether or

12     not privilege or work product attach to such

13     writings almost unequivocally say, no, that they

14     don't unless it's part of some of a communication,

15     which my understanding is that these were notes that

16     he testified earlier he crafted himself.

17          MR. POULTON:  Okay.  There's a precurser step

18     to 612 in the research that I'm looking at.  It's

19     rule, it would be what, 26 3, trial preparation

20     materials.  If you at a case called Mann, M-A-N-N, v

21     Falk, F-A-L-K, it's 2012 Westlaw 12868708 it kind

22     of -- it walks through the process the difference

23     between fact work product and opinion work product,

24     and it's a little bit of a different situation.  I

25     mean, there's some complicating factors in that one,

1       but I'm not entirely satisfied yet because if he

2       wrote them up just to prepare for deposition, I

3       mean, they seem to fall into 3A.  It says,

4       Ordinarily a party may not discover documents and

5       tangible things that are prepared in anticipation of

6       litigation or for trial by or for another party or

7       its representative, including the party's attorney,

8       but subject to 26B4 may be discovered if otherwise

9       discoverable under 26B1 and the party shows it has

10      substantial need for the materials to prepare its

11      case and cannot without undue hardship obtain their

12      substantial equivalent by other means.  And I think

13      that what the situation we have here is if he's just

14      generated those notes by looking through his

15      incident reports, which I believe is what he said,

16      then it's the same material -- I mean, the fact of

17      whatever is in the notes is going to be in the

18      incident reports, which, you know, you're obviously

19      well acquainted with.

20              MR. BARGIL:  Uh-huh.

21              MR. POULTON:  So his own notes to refresh his

22      recollection, which he ultimately hasn't done and I

23      think at some of the cases I'm looking at suggest

24      that matters, why wouldn't it fit under 26 3A?

25              MR. BARGIL:  The cases that I'm looking at are

1      pretty clear about the fact that work product

2      applies almost exclusively to product created by

3      counsel and not by testifying witnesses.  I direct

4      your attention to Johnson v Baltimore Police

5      Department.  This is a district court decision.

6      It's a slip opinion from 2021.  The cite is 2021

7      Westlaw 1985014, and the Court there goes through

8      and provides a pretty extensive discussion of

9      distinction between work product and attorney-client

10     privilege and I think --

11          MR. POULTON:  Well, they're not

12     attorney-client.

13          MR. BARGIL:  -- pretty squarely addresses --

14          MR. POULTON:  Unless --

15          MR. BARGIL:  I wasn't sure what privilege you

16     were asserting, but I just -- maybe we'll have to

17     litigate this, Tom.

18          MR. POULTON:  Yeah.

19          MR. BARGIL:  But, you know, I'm just not right

20     now seeing a way in which something created by a

21     client before a deposition and used in a deposition

22     is not discoverable under federal rules.

23          MR. POULTON:  Did the notes reference anything

24     you and I talked about?

25          THE WITNESS:  About the addresses, the case

1      numbers, the dates.

2          MR. POULTON:  Okay.

3          THE WITNESS:  Just what the report says.

4          MR. POULTON:  Just what's in the reports?

5      Okay.  All right.  Let's take a break.  I'm looking

6      at them in the meantime.  Maybe it's a nonfactor.

7      From what he's saying, it may just be a list of

8      dates and incident reports.  I don't know.

9          MR. JOHNSON:  I was going to say --

10          MR. POULTON:  It may be a fight over nothing,

11     so let me -- but I need to use the restroom anyway.

12     So let's take what, five?

13          MR. JOHNSON:  Our witness doesn't appear

14     particularly concerned --

15          MR. POULTON:  No, I know.

16          MR. JOHNSON:  So it's probably -- so probably

17     arguing about nothing.

18          MR. POULTON:  Probably.

19          THE WITNESS:  So this is one of the first

20     depositions I've been to where I was provided with

21     material.  I wasn't -- I just wanted to make sure if

22     I wasn't provided with material I'd be -- I would

23     know what I'm talking about.

24          MR. JOHNSON: Understood.

25          THE WITNESS:  Since it was five years ago.

1          MR. JOHNSON:  Understood.

2          MR. POULTON:  Yeah, right.

3          MR. JOHNSON:  Let's go off the record.

4          (Short break.)

5          MR. BARGIL:  I guess we can go back on the

6     record and say that our understanding is that this

7     wouldn't be protected by work product --

8          MR. POULTON:  Okay.

9          MR. BARGIL:  -- and so you're producing it and

10    you're not waiving future possible objections, and I

11    presume then at future depositions you won't have

12    witnesses bringing things with them.

13         MR. POULTON:  Okay.  Go ahead.

14         MR. JOHNSON:  Okay.  So I think we -- it seems

15    like we did go back on the record when Ari said we

16    could go back on record, and so that is on the

17    record.

18         I think what we're going to do, if you don't

19    mind, is just take that out of your book.  You're

20    welcome to keep it if you want to refer to it, and

21    then what we'll do is put a -- we'll just mark it as

22    Exhibit --

23         MR. POULTON:  N.  You're up to N, I believe.

24         MR. JOHNSON:  -- N.  So we'll just put a

25    sticker on the back of it, and your notes will be

```
 1        memorialized --
 2              MR. POULTON:  Forever.
 3              MR. JOHNSON:  -- forever.
 4              (Exhibit N was marked for identification.)
 5              MR. POULTON:  But just, Madame Court Reporter,
 6        I just want to make sure you got the agreement with
 7        counsel that this would not -- that allowing the
 8        production of that and the marking of that won't be
 9        interpreted as a waiver of any future objections to
10        other documents.  Right, Ari?
11              MR. BARGIL:  Yeah, I think that sounds right to
12        me.
13              MR. POULTON:  Okay, thanks.
14              MR. JOHNSON:  Okay.
15              MR. POULTON:  Where were you?  You were on M.
16              MR. JOHNSON:  Yeah.
17              MR. POULTON:  You just did N which were the
18        notes.
19              THE WITNESS:  L is the CAD notes.
20              (Off-the-record discussion.)
21  BY MR. JOHNSON:
22        Q.   I want to go back to the performance
23  evaluations.  Do you recall that in your performance
24  evaluations you mentioned your use of ILP information?
25        A.   Yes.
```

1     Q.   Would visiting the home of Bobby Jones to issue

2   code citations qualify as the use of ILP information?

3     A.   Solely to issue citations probably not.

4     Q.   Would your visit to the home on March 29th have

5   qualified as a use of ILP information?

6     A.   No.  We were there for a search warrant.

7     Q.   Okay.  And you were aware -- well, we've

8   already covered this.

9          Okay.  Well, then I want to move on to Tammy

10  Heilman.  I have a citation, excuse me, a new exhibit

11  which I guess we're on O.

12         MR. POULTON:  Uh-huh.

13         (Exhibit O was marked for identification.)

14  BY MR. JOHNSON:

15    Q.   Are you familiar with this document?

16    A.   I am.

17    Q.   And what is this document?

18    A.   It's a report that I completed as well as a

19  county ordinance citation and affidavit for attempted

20  service.

21    Q.   Okay.  And is this a citation that you issued?

22    A.   It is.

23    Q.   And when did you issue it?

24    A.   March 1st of 2016.

25    Q.   And to whom did you issue it?

1     A.    Tammy Heilman.

2     Q.    Okay.  And what was the citation for?

3     A.    Lack of posted address.

4     Q.    Okay.  What would that mean exactly?

5     A.    The address numbers were in violation of the

6   ordinance, if there were address numbers, or lack of

7   posted address.

8     Q.    So is it possible that the address was there

9   but not in your view sufficiently visible?

10    A.    Correct.

11    Q.    Okay.  Did you issue a citation for the same

12  offense to Robert Jones?

13          MR. POULTON:  I'm going to object to the form.

14  BY MR. JOHNSON:

15    Q.    You can --

16    A.    Can I look at my notes?

17    Q.    Yes, please.

18    A.    Yes, I did.

19    Q.    Okay.  So you issued a citation under the same

20  county ordinance provision to both Robert Jones and

21  Tammy Heilman?

22    A.    So the ordinance number changed.  They moved it

23  to the Land Development Code.  I don't know the exact

24  dates when it did, but it's -- it should mirror.

25  Whether or not it's 82 dash whatever or the 900.1, it's

1  the same violation.

2      Q.  Okay.  You don't know when the ordinance number

3  changed?

4      A.  I don't.

5      Q.  How would I find that out?

6      A.  Look up the Land Development Code.

7      Q.  Who passes the Land Development Code?  Who

8  enacts it?

9      A.  The County.

10      Q.  Okay.  Do you know why you were at Tammy

11  Heilman's house?

12      A.  To follow up on a warning I issued for a

13  violation.

14      Q.  When did you issue the warning?

15      A.  I'll refer to my notes.  That was December 23rd

16  of 2015.

17      Q.  Do you know why you were at the house to issue

18  the warning?

19      A.  It was --

20          MR. POULTON:  Object to the form.  Go ahead.

21      A.  It was a call for service.

22  BY MR. JOHNSON:

23      Q.  What does that mean?

24      A.  It was a -- it was a call where somebody called

25  us for law enforcement service, and while I was there

1    completing that law enforcement service, I provided her

2    a warning -- a verbal warning for the violation.

3        Q.   Okay.  So this house had been on your list that

4    you made that week?

5            MR. POULTON:  Object to the form.  Which week?

6        Are you talking about December 15th or March 16th?

7    BY MR. JOHNSON:

8        Q.   So when you visited Tammy Heilman's house on

9    March 1st, would this house have been on your list of

10   houses to visit?

11       A.   To follow up with the warning I issued, yes.

12       Q.   Okay.  At this time did you consider this house

13   to be a problem house?

14       A.   I don't know at the time or not.

15       Q.   Do you know -- do you know if Bobby would have

16   been listed as a TOP 5 offender around this time?

17       A.   Bobby Jones?

18       Q.   Yes.

19       A.   I'm not sure if he was or not.

20       Q.   Oh, excuse me.  We're not talking about --

21       A.   You're talking about Donnie McDougall.

22           MR. POULTON:  Donnie McDougall.

23   BY MR. JOHNSON:

24       Q.   Do you know whether Donnie McDougall would have

25   been listed as a TOP 5 offender at this time?

```
 1        A.    I don't know at that time or not.

 2        Q.    Okay.

 3              MR. JOHNSON:  All right.  I'm going to mark

 4        another exhibit, Exhibit P.

 5              (Exhibit P was marked for identification.)

 6   BY MR. JOHNSON:

 7        Q.    Are you familiar with this document?

 8        A.    I am.

 9        Q.    And what is this document?

10        A.    It's CAD notes.

11        Q.    Okay.  Is this for a visit to Tammy Heilman's

12   house?

13        A.    It is.

14        Q.    Okay.  And did you make that visit?

15        A.    I did.

16        Q.    And did you make that visit on April 4th?

17        A.    Yes.

18        Q.    Okay.  And is this to follow up on the citation

19   that you issued on March 1st?

20        A.    Yes.

21              MR. JOHNSON:  Okay.  I'm going to mark another

22        exhibit.  This will be Exhibit Q.

23              (Exhibit Q was marked for identification.)

24   BY MR. JOHNSON:

25        Q.    Are you familiar with this document?
```

1        A.    Yes.

2        Q.    And is this a CAD report for another visit to

3   Tammy Heilman's house?

4        A.    Yes.

5        Q.    And is this a visit that you made to Tammy

6   Heilman's house?

7        A.    It is.

8        Q.    And what is the date on this visit?

9        A.    April 24, 2017.

10       Q.    Okay.  Were you at her house to look for code

11  enforcement violations?

12       A.    I drove by and did not observe any.

13       Q.    Okay.  Why would you have driven by her house?

14       A.    To see if there were any violations.

15       Q.    Would that mean that she was on the list that

16  you had to visit?

17       A.    She could have been.

18       Q.    Is there any other reason you would have been

19  there if she was not on the list?

20       A.    It could have been a complaint --

21       Q.    Okay.

22       A.    -- from that neighborhood.

23       Q.    So it either would have been a complaint or she

24  was on your list?

25       A.    Yes.

1    Q.   Okay.  And during this visit, you looked for

2    violations but found none?

3    A.   I didn't see any violations.

4    Q.   Okay.  Where it says prime unit it says CD3.

5    Does that indicate that you were the code enforcement

6    corporal for district three?

7    A.   Yes.

8    Q.   Okay.  So if I saw that same unit identifier on

9    a CAD report during the period in which you were the

10   code enforcement corporal for district three, that would

11   be you?

12   A.   Yes.  That changed.  Unlike the other reports

13   where the unit number was 2377, that's my radio ID.

14   Q.   Okay.  So from 2017 through the period of 2019

15   when you switched jobs, that would refer to you?

16   A.   Yes.

17   Q.   Okay.  All right.  This one we're going to have

18   to use the computer.

19        (Exhibit R was designated to be attached at a

20        later date.)

21   BY MR. JOHNSON:

22   Q.   Are you familiar this this document?

23   A.   Yes, it's another CAD report.

24   Q.   Okay.  Is this for another visit to Tammy

25   Heilman's residence?

1      A.   Yes.

2           MR. POULTON:  Could I have the date again?  I'm

3      so sorry.

4           MR. JOHNSON:  Date on this is March 14, 2018.

5           MR. POULTON:  Thank you.

6  BY MR. JOHNSON:

7      Q.   Do you see your unit identifier on this?

8      A.   I do.

9      Q.   Does that mean you were there for this visit?

10     A.   It shows I went en route.  If you scroll down,

11 I might -- yes, I was there.

12     Q.   Okay.  You were there from 8:14 in the morning

13 to 8:28 until morning?

14     A.   That's when I arrived and cleared.  Usually I

15 -- sometimes I'll clear after I actually get down the

16 road or --

17     Q.   Okay.  But you were -- you arrived at 8:14 in

18 the morning?

19     A.   Yes.

20     Q.   And what would the purpose of your being there

21 have been?

22     A.   I was backing up a patrol deputy.

23     Q.   Okay.  And is this time you were working as a

24 code enforcement corporal?

25     A.   Yes.

1       Q.   So how would a code enforcement corporal back

2   up a patrol deputy?

3       A.   If I see a patrol deputy by himself, I'll jump

4   on the call and go with him.

5       Q.   Was this deputy by himself?

6       A.   No.

7       Q.   How many other patrol deputies were there when

8   you arrived?

9       A.   If you scroll down, scroll down.  There was

10  only one when I arrived.  The second one arrived about

11  ten minutes after me or nine minutes after me.

12      Q.   Okay.  But when you were there at the house,

13  there were two patrol deputies with you at the house?

14      A.   It was one other at the house.  Then I arrived,

15  and then nine minutes later the other deputy arrived.

16  So there were three of us.

17      Q.   And what would your purpose of being there with

18  the other two deputies have been?

19          MR. POULTON:  Object to the form.  Go ahead.

20      A.   That day I don't remember.

21  BY MR. JOHNSON:

22      Q.   Do you accompany patrol deputies on visits to

23  homes?

24      A.   Yes.

25      Q.   And why do you accompany patrol deputies on

1    visits to homes?

2        A.   If there's nobody else or if it's a location

3    that I've been to before to follow up.

4        Q.   Would you be looking for code enforcement

5    violations while you were present at such a visit?

6        A.   Yes.

7            MR. JOHNSON:  Okay.  I'm going to show another

8        video.  This video is for March 14, 2015.

9            MR. POULTON:  So it will be S?

10           MR. JOHNSON:  And it will be Exhibit S.

11           MR. POULTON:  Yeah.  And I'm sorry, it's S, but

12       if you give me the date of the video.

13           MR. JOHNSON:  Sorry.  What?

14           MR. POULTON:  What was the date of the video?

15           MR. JOHNSON:  So it's March 14, 2018.

16           MR. POULTON:  Oh, so it goes with that CAD

17       report.  Got it.

18           MR. JOHNSON:  Yes.

19           MR. POULTON:  Thank you.

20           (Exhibit S was designated to be attached at a

21       later date.)

22           (A video was played at this time.)

23   BY MR. JOHNSON:

24       Q.   I'm going to pause it at about the 30 second

25   mark.  There are three deputies.  There's one deputy in

1   the video and two at the house.  Do you know where you

2   are on this video?

3        A.   I think I'm the one with the body camera on.

4        Q.   So this would be your body cam.  And you said

5   you think you are.  Do you know whether you are?

6        A.   I can't say for sure.

7        Q.   There's a number at the top 17367.  Is that a

8   badge ID?

9        A.   I don't know what that is.

10       Q.   Okay.  But you think this is your body camera?

11            (A video was played at this time.)

12       A.   Yeah, that's me.

13  BY MR. JOHNSON:

14       Q.   I'm just going to pause so the court reporter

15  can get that.  Did you say, yes, this is you?

16       A.   It is.

17       Q.   Okay.

18            (A video was played at this time.)

19  BY MR. JOHNSON:

20       Q.   I'm going to pause about the 47 second mark.

21  It sounded to me, and you tell me whether you agree with

22  it, but the two deputies were asking questions to the

23  resident at the home about Donnie McDougall.  Does that

24  sound accurate to you?

25       A.   That's what it sounds like, yes.

1    Q.   Okay.  And you are not standing at the doorway;

2   is that correct?

3    A.   Correct.

4    Q.   Okay.

5         (A video was played at this time.)

6   BY MR. JOHNSON:

7    Q.   I'm going to pause here.  We're at the 53

8   second mark.  You appear to have walked along the back

9   fence line on the side of the house; is that accurate?

10    A.   On the side of the neighbor's house, yes.

11    Q.   Okay.  Did you have permission from the

12   neighbor to go in their house?

13    A.   I don't think so.

14         (Court reporter asked for clarification.)

15         MR. JOHNSON:  Alongside their house.  Thank

16    you.

17         (A video was played at this time.)

18   BY MR. JOHNSON:

19    Q.   I'm going to pause at the one minute mark.

20   What are you doing here?

21    A.   I'm looking in the backyard through the broken

22   fence.

23    Q.   And what is your purpose in looking into the

24   backyard through the broken fence?

25    A.   That day I don't remember.

1      Q.    Is this something that you would routinely do

2  during visits to people's homes?

3      A.    If I'm looking for violations.

4      Q.    So it's possible that you were looking for

5  violations?

6      A.    I could have been.

7      Q.    What else would you have been looking for?

8      A.    I'm not sure.  I don't know if we were looking

9  for Donnie at that specific time if he had a warrant or

10  not to make sure he didn't run out the back.

11      Q.    Okay.  But it's also possible that you were

12  looking for violations?

13      A.    Yes.

14            (A video was played at this time.)

15            MR. JOHNSON:  I'll just pause it at about the

16      1:25 mark.  I don't think there's anything else that

17      we need to talk about.

18            Okay.  Now I'm going to pull up another

19      exhibit, which I guess will be Exhibit T.

20            (Exhibit T was designated to be attached at a

21      later date.)

22  BY MR. JOHNSON:

23      Q.    These are AIM meetings from March 17, 2016.  Do

24  recognize this document?

25      A.    I don't.

1      Q.   You don't recognize these as AIM slides?

2      A.   It looks like it's in a different format.

3      Q.   Oh, I see.  I see.  Oh, wait.  I'm sorry.

4   Well, okay.  You know what?  I'm not actually going to

5   use that.  So I know this is going to be -- I'm just

6   going to -- there's a different set of AIM slides that

7   I'm going to use and label as Exhibit T.  So that

8   document --

9           MR. POULTON:  Different date.  Okay.

10          (A different document was designated as

11      Exhibit T to be attached at a later date.)

12  BY MR. JOHNSON:

13      Q.   And these are AIM slides -- well, let me ask

14  you, do you recognize this document?

15      A.   Yes.  They are ILP slides for district three.

16      Q.   Okay.

17          MR. POULTON:  Is there a date?

18  BY MR. JOHNSON:

19      Q.   If you look at these dates here, could you tell

20  about the time range that these slides correspond to?

21      A.   February 5th of 2018 to March 4th of 2018.

22      Q.   Okay.  So these are shortly after March 4,

23  2018.

24          Okay.  I'm going to turn to page 24.  The

25  pagination is off because of the notes.

1          So this is page 45 of the PDF.  It's page 24 on

2     the slide show.  The pagination is off because there are

3     notes included with the slide show.

4          Are you familiar with this type of slide?

5     A.   Yes.

6     Q.   Okay.  What is this type of slide?

7     A.   It shows individuals with their pictures,

8     names, dates of births, and if they're associate of a

9     prolific offender.

10    Q.   Okay.  And this would have been displayed

11    during the AIM meeting?

12    A.   Yes.

13    Q.   And that would have been in March 2018?

14    A.   Yes.

15    Q.   Okay.  Is Donnie McDougall on this slide?

16    A.   Yes.

17    Q.   Okay.  And can you read what it says under his

18    name?

19    A.   Probation, curfew and a friend of Justin

20    Vazquez.

21    Q.   Do you know who Justin Vazquez is?

22    A.   He's at the top highlighted in red.  I'm not

23    sure if that means he's a prolific offender or not.

24    Q.   Okay.  What would be the purpose of noting that

25    Donnie McDougall is a friend of Justin Vazquez?

1        MR. POULTON:  Object to the form.  Go ahead.

2     A.   In this document I don't know.

3  BY MR. JOHNSON:

4     Q.   Okay.  Would you have been present at -- you

5  were present at AIM meetings?

6     A.   Not all of them.  Most of them.

7     Q.   You don't know if you were present at this one?

8     A.   I don't know if I was present at this one or

9  not.

10    Q.   But you were present at most of them?

11    A.   Correct.

12    Q.   Okay.  So you probably were present when this

13  slide was displayed?

14    A.   If I had the date, I can check my calendar and

15  see.

16    Q.   I believe the date of this meeting was --

17    A.   If I'm able to look.

18    Q.   It's fine with me.

19    A.   Okay.  It might or might not.  I don't list if

20  I go to them or not, but if I had training or during

21  that timeframe I was out of the county for a lot of

22  training, I --

23    Q.   I won't try to take your full calendar from

24  you.

25    A.   My calendar doesn't go back that far, so I

1    don't know.  So I don't know if I was gone during that

2    training or -- with training or if I was at this ILP

3    meeting or not.

4        Q.    Okay.  But unless you had some sort of

5    training, you would have been present?

6        A.    Unless I had training or vacation or sick --

7    well, not sick -- or just unavailable to be there.

8        Q.    Okay.  And you said this slide -- these types

9    of slides list associates of prolific offenders; is that

10   correct?

11       A.    In this slide I'm not sure if Justin Vazquez

12   was prolific offender or not.

13       Q.    Okay.  So this slide is listing associates of

14   Justin Vazquez?

15       A.    Yes.

16       Q.    Okay.  And just to be clear, this is within a

17   several week period of when you visited the house and

18   the video that we watched and that we labeled as Exhibit

19   S?

20       A.    So the one you labeled as -- did you give me

21   the CAD notes on that or no?

22       Q.    I believe I did, yeah.

23       A.    Actually, I think you had them up on the

24   computer, so --

25       Q.    Yeah, you're right.  Well, that visit was March

1   14, 2018.  So that would have been approximately the

2   same time --

3        A.   Around the same time.

4        Q.   -- as this AIM meeting?

5             Okay.  Is it possible that you were at the

6   house with those other deputies because Donnie McDougall

7   was a focus of attention at that time?

8             MR. POULTON:  Object to the form.

9        A.   I can't remember.

10  BY MR. JOHNSON:

11       Q.   Would Donnie -- would you have considered

12  Donnie McDougall a problem person during this time?

13            MR. POULTON:  Object to the form.

14       A.   At that time I don't -- I can't remember.  I

15  mean, he's been involved in so many things.  It's hard

16  to put a timeline together this far away.

17  BY MR. JOHNSON:

18       Q.   Okay.  In general, would you consider

19  Donnie McDougall a problem person?

20       A.   Yes.

21       Q.   Okay.  Do you consider Tammy Heilman a problem

22  person?

23       A.   No.

24       Q.   Okay.  Do you consider Robert Jones, III, the

25  young -- the son to be a problem person?

1      A.   Yes.

2      Q.   And would you consider his father, Robert

3   Jones, Sr., to be a problem person?

4      A.   His lack of supervision creates the problem.

5      Q.   Okay.  So you would consider him a problem

6   person because he does not supervise his son?

7      A.   Correct.

8      Q.   Okay.  Apart from his failure to supervise his

9   son, would you consider him to be a problem person?

10      A.   After the search warrant, yeah, with the drug

11   -- you know, the marijuana inside with the toddler and

12   his kids, and so yes.

13      Q.   Prior to the search warrant, would you have

14   considered him to be a problem person?

15      A.   I can't remember this far.

16          MR. JOHNSON:  Why don't we take a quick

17      five-minute break.

18          MR. POULTON:  Okay.

19          MR. JOHNSON:  It's almost noon.

20          (Off-the-record discussion.)

21   BY MR. JOHNSON:

22      Q.   I have a few things.  Almost done.  I just want

23   to clean up a few more things.  One just quickly, I'm

24   going to label this -- are we on U; is that correct?

25          COURT REPORTER:  Yes.

1           (Exhibit U was designated to be attached at a

2       later date.)

3    BY MR. JOHNSON:

4       Q.   I'm going to label this as Exhibit U, and the

5    file is Celeste Tab 34.  I'm going to turn on this file

6    to page 10.  Oh, and before I continue, are you familiar

7    with this document?

8       A.   It doesn't look familiar.

9       Q.   Okay.

10      A.   It's some sort of intelligence product.

11      Q.   Okay.  We're looking here at page 10.  It says

12   at the top AIM Meeting Notes.  Does that help tell you

13   what this document is that we're looking at?

14      A.   I don't want to say wrong.  I believe this is

15   the notes that the analysts take when we speak during

16   the ILP meeting.

17      Q.   Okay.  So these would have been generated by an

18   analyst?

19      A.   Yes.

20      Q.   Okay.  And do you see your name on this page?

21      A.   I do.

22      Q.   Okay.  Can you read what it says after your

23   name?

24      A.   Citations issued to Jones Senior on Roanoke.

25   Chad Edwards parent was issued citation.  Elias Horn has

1   connections with Stephanie Edwards and Blanco.

2        Q.   When it refers to Jones Senior, do you take

3   that to refer to Robert Jones, the parent?

4        A.   Yes.

5        Q.   Okay.  Do you know who Chad Edwards is?

6        A.   I don't remember.

7        Q.   Okay.

8        A.   Not off the top of my head.

9        Q.   It says parent.  Do you know if that refers to

10  a parent of a prolific offender?

11       A.   I'm not sure.

12       Q.   Okay.  I'm just going to turn to page 22.  Is

13  there a person with the last name of Edwards listed on

14  page 22?

15       A.   Yes, Stephanie Edwards.

16       Q.   Okay.  Is that -- is she listed because she is

17  a prolific offender?

18            MR. POULTON:  Object to the form.

19  BY MR. JOHNSON:

20       Q.   Do you know why she's listed on this page?

21       A.   I don't.

22       Q.   You don't?  Okay.

23       A.   It appears that she might be an associate of

24  Alex Blanco.

25       Q.   Okay.

1          MR. POULTON:  Was that a separate exhibit, or

2     is that part of the AIM slides?

3          MR. JOHNSON:  It's part of Exhibit U.

4          MR. POULTON:  So that is a separate exhibit

5     then, U?

6          MR. JOHNSON:  Yes.

7          MR. POULTON:  Okay.

8  BY MR. JOHNSON:

9     Q.   One more exhibit.  I'm going to designate this

10 as Exhibit V, and the file name on this is Celeste Tab

11 32.

12          (Exhibit V was designated to be attached at a

13     later date.)

14 BY MR. JOHNSON:

15     Q.   Are you familiar with this document?

16     A.   It looks different than -- it's some sort of

17 intelligence product --

18     Q.   Okay.

19     A.   -- for district 3.

20     Q.   I'm going to turn to page 11 of this document.

21 It says at the top AIM meeting notes.  Do you take that

22 to be similar to the other document we looked at, these

23 would be notes that were taken by an analyst during the

24 AIM meeting?

25     A.   Yes.

1     Q.   Okay.  Can you read what it says under after

2   Jones?

3     A.   Can you zoom in a little bit?

4     Q.   I could try.

5     A.   Under Jones?

6     Q.   Yeah.

7     A.   If you hit that, it should get bigger.  Deputy

8   Bollenbacher attempted contact.  Dad not answering door.

9   Will be taking Corporal Celeste (Code Enforcement) to

10  visit Dad.  Informant told Williamson that Jones'

11  younger siblings had a lemonade stand.  Local drug

12  dealers came by and yelled to stop taking away their

13  business.  It -- okay.

14    Q.   Does this indicate that -- and again, the date

15  on this is March 1, 2016.  Does this suggest that Hans

16  Bollenbacher was -- requested that you accompany him to

17  the Jones residence in March of 2016?

18    A.   Yes.

19    Q.   Okay.  Is that consistent with your

20  recollection?

21    A.   Yes.

22    Q.   Okay.

23    Q.   Do you know who Hans Bollenbacher is?

24    A.   I do.

25    Q.   Who is he?

1    A.    He's currently a corporal with our marine unit.

2    Q.    And who was he at the time of these AIM meeting

3    notes?

4    A.    I don't know his -- I don't remember his

5    position.  He's had quite a few positions in the last

6    couple years.

7    Q.    Do you know if he would have been associated

8    with the STAR team?

9    A.    He could have been on the STAR team.

10   Q.    Okay.  In the break you mentioned Dalanea

11   Taylor.  Are you familiar with Dalanea Taylor?

12   A.    I've heard of her name and been by her house.

13   Q.    How did you come to be familiar with Dalanea

14   Taylor?

15   A.    Through the ILP meetings.

16   Q.    Okay.  Why would you have gone by Dalanea's

17   house?

18   A.    For code violations.

19   Q.    Okay.  Does that mean that you would have put

20   her house on the list that you make at the beginning of

21   each week?

22   A.    It could have been.

23   Q.    Have you ever put her house on that list?

24   A.    I know I've been to it, but there weren't any

25   violations.

1      Q.    And you would have been aware of her house

2   because she was on the ILP slides?

3      A.    Yes.

4      Q.    When you worked as a code enforcement corporal,

5   who was your supervisor?

6           MR. POULTON:  Object to the form.

7      A.    While I was supervised under property crimes,

8   it would have been the property crimes sergeant.  The

9   first half was Detective or Sergeant Chris Thomas.  The

10  second half of that after someone else got that position

11  it was Sergeant -- I'm drawing a blank -- Sergeant

12  Boyer, and then when it went to under STAR it was

13  Sergeant Formoso.

14     Q.    When the code enforcement unit was part of the

15  property crimes unit, did you still work closely with

16  the STAR team?

17     A.    I mean not -- not very closely.  They would

18  assist me with addresses if there was an address I

19  needed to go to, but I didn't go to -- I typically

20  didn't go to calls with them.

21     Q.    Would they accompany you on calls?

22     A.    Sometimes.

23     Q.    How frequently would they accompany you on

24  calls?

25     A.    Less than ten percent of the time.

```
 1        Q.   Was it more than five percent of the time?

 2        A.   Probably not.

 3        Q.   Was it more than two percent?

 4        A.   It's hard to tell.  I mean, I've been to

 5   hundreds of addresses in the last -- during those three

 6   and a half years, so --

 7        Q.   Okay.  So it's a large number of addresses that

 8   you've been to.  So even a small percent could be a

 9   significant number of addresses?

10        A.   It could be.

11             MR. POULTON:  Object to the form.

12        A.   It could be.

13   BY MR. JOHNSON:

14        Q.   If you had to guess, how many addresses has the

15   STAR team accompanied you to?

16             MR. POULTON:  Object to the form.

17        A.   In the three and a half years that I did it?

18   BY MR. JOHNSON:

19        Q.   Uh-huh.

20        A.   Maybe thirty.

21        Q.   And I should be clear.  I said if you had to

22   guess, but I'm not asking you to guess.  I'm asking you

23   to estimate.

24             MR. POULTON:  Same objection.  Go ahead.

25        A.   Yeah, I couldn't -- I mean, I couldn't even get
```

```
 1    close.  I -- I don't want to speak wrong.
 2    BY MR. JOHNSON:
 3        Q.   Okay.  Who in the STAR team would you speak to
 4    when you worked as a code enforcement corporal?
 5        A.   I don't remember.
 6        Q.   Would you speak to multiple people on the STAR
 7    team?
 8        A.   Sometimes.  I couldn't give names that long
 9    ago.
10        Q.   Would you discuss addresses to visit with
11    people on the STAR team?
12        A.   For me to have them visit?
13        Q.   No, for you to visit.
14        A.   They would ask me to visit addresses from time
15    to time.
16        Q.   Was there a particular person on the STAR team
17    who would ask you to visit addresses?
18        A.   No.
19        Q.   So it could be any member of the STAR team?
20        A.   Yes.
21        Q.   Okay.  I think we're probably good for today so
22    that people have time to get some lunch.  I'm just going
23    to hold this open in the sense of, you know, I may
24    need -- we have some outstanding documents that are
25    still coming in, so I might need to ask you some more
```

1   questions.

2        A.   Okay.

3        Q.   If we do, it's possible we will just do that

4   over Zoom.

5        A.   That's fine.

6        Q.   But we're done for today.

7        A.   Thank you.

8             MR. POULTON:  He'll read.

9                    *   *   *   *   *   *

10            (THEREUPON, THE TAKING OF THE DEPOSITION WAS

11       CONCLUDED AT 12:14 P.M.)

12                    *   *   *   *   *   *

13                    S T I P U L A T I O N

14        It was thereupon stipulated and agreed by and

15   between counsel present for the respective parties and

16   the deponent that the reading and signing of this

17   deposition is not waived.

18                    *   *   *   *   *   *

19

20

21

22

23

24

25

1                         CERTIFICATE OF OATH

2    STATE OF FLORIDA

3    COUNTY OF PASCO

4          I, the undersigned authority, certify that

5    Mark Celeste personally appeared before me and was

6    duly sworn on January 4, 2022.

7          WITNESS my hand and official seal this 12th

8    day of January, 2022.

9

10

11    _____
                  Judy Anderson

12                Notary Public - State of Florida
                  Commission No.:  GG 276821

13                My Commission Expires:  1-5-2023

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF PASCO

5

6         I, JUDY ANDERSON, Court Reporter, certify that I

7    was authorized to and did stenographically report the

8    foregoing deposition and that the transcript is a true

9    record of the testimony given by the witness.

10

11        I further certify that I am not a relative,

12   employee, attorney, or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties'

14   attorney or counsel connected with the action, nor am I

15   financially interested in the action.

16

17        Dated this 12th day of January, 2022.

18

19                        _____

20                        Judy Anderson, Court Reporter

21

22

23

24

25

1   DALANEA TAYLOR; TAMMY
    HEILMAN; DARLENE DEEGAN;
2   and ROBERT A. JONES, III,

3    Plaintiffs,

4   vs.               Case No.: 8:21-cv-00555-SDM-CPT

5   CHRIS NOCCO, in his
    official capacity as
6   Pasco County Sheriff,

7    Defendant.
    _____/
8

9

                DEPONENT'S SIGNATURE PAGE
10

11      I HAVE READ THE FOREGOING TRANSCRIPT OF MY

12    DEPOSITION AND HEREBY SUBSCRIBE TO THE FOREGOING

13    DEPOSITION, SAID SUBSCRIPTION TO INCLUDE ANY

14    CORRECTIONS AND/OR AMENDMENTS HERETO.

15

16

    _____    _____
17   Mark Celeste                  Date

18

19

20

21

22

23

24

25

1                              ERRATA SHEET

2        PAGE      LINE                 CORRECTION

3        _____   _____   _____

4        _____   _____   _____

5        _____   _____   _____

6        _____   _____   _____

7        _____   _____   _____

8        _____   _____   _____

9        _____   _____   _____

10       _____   _____   _____

11       _____   _____   _____

12       _____   _____   _____

13       _____   _____   _____

14       _____   _____   _____

15       _____   _____   _____

16       _____   _____   _____

17       _____   _____   _____

18       _____   _____   _____

19       _____   _____   _____

20       _____   _____   _____

21       _____   _____   _____

22       _____   _____   _____

23       _____   _____   _____

24       _____   _____   _____

25       _____   _____   _____

**A**

a.m 1:15
Abargil@ij.org 2:12
able 45:14 49:7,12,15
  62:24 63:2 99:17
accompanied 64:17
  109:15
accompany 50:11 57:16
  92:22,25 106:16
  108:21,23
accomplishment 29:7,19
  38:7,23 39:15
accomplishments 34:8
accurate 25:14,20 64:8
  94:24 95:9
acquainted 79:19
action 113:14,15
activities 14:25 19:18
activity 10:20,21,24 11:4
  11:12,25 12:5,11,22
  16:15,16,18 17:10
  18:7 23:6,7,11 30:22
  31:23 32:16 50:16,17
  51:2,16,19,24 68:17
  68:19 76:4
add 43:5
addition 32:11 46:19
address 15:17 16:1,1
  17:21 38:13 39:6
  44:20 45:1,4,13,15,19
  45:20,23 46:10,14,18
  78:11 85:3,5,6,7,8
  108:18
addresses 7:2 8:5,7,10,14
  29:14,17 32:20,21,24
  33:6,7,8,11,13 34:14
  34:17 44:3 45:21 46:2
  50:11 55:23 80:13,25
  108:18 109:5,7,9,14
  110:10,14,17
adult 40:16,23,24 41:1,8
adverse 77:20,22 78:4
affidavit 84:19
aggressive 75:22 76:1,3
  76:9
ago 25:12 62:10 81:25
  110:9
agree 61:1 62:13,18
  75:25 94:21
agreed 66:7 111:14
agreement 83:6
agrees 66:11
ahead 11:16 12:13 22:12
  31:8 42:3,20 50:1
  52:22 60:11 62:15
  72:7 74:3 82:13 86:20
  92:19 99:1 109:24
AIM 4:22,23 19:2,4,9,13
  32:18 33:3 42:14 43:8
  43:17 46:22 68:10,15
  69:8 96:23 97:1,6,13
  98:11 99:5 101:4
  103:12 105:2,21,24
  107:2
Alex 104:24
allowing 47:25 83:7
Alongside 95:15
AMENDMENTS 114:14
analyst 48:7 103:18
  105:23
analysts 14:15,17 103:15
AND/OR 114:14
Anderson 1:19,22
  112:11 113:6,19
angle 73:6
anonymous 10:24

**B**

B 4:1,3 21:12,13
back 13:3 32:1 52:10,12

answer 10:5 12:15 20:24
  22:19 30:15 41:22
  45:11 51:22 55:11
answered 24:1
answering 106:8
anticipate 42:24
anticipation 79:5
anybody 8:21 16:23
  40:25
anymore 13:5
anyway 43:1 81:11
Apart 102:8
apologies 67:17
apologize 10:3 77:25,25
appear 81:13 95:8
APPEARANCES 2:1
appeared 61:12 112:5
Appearing 2:6,10
appears 24:14 67:20
  73:11 104:23
applies 78:3 80:2
appreciate 13:8
approximately 22:6
  101:1
April 88:16 89:9
area 18:6 19:7
arguing 81:17
Ari 2:10 59:12,16,18
  77:23 82:15 83:10
Arlington 2:7
arrive 68:2
arrived 67:14,18 68:1,6
  68:8 91:14,17 92:8,10
  92:10,14,15
arriving 67:24
Art 27:2
asked 57:14,16 95:14
asking 13:4 24:3,21
  72:11 94:22 109:22,22
asserting 80:16
assigned 53:12
assist 71:17 108:18
assisted 29:11,12 34:12
assisting 45:24 46:11
associate 44:23 45:1,4,18
  46:20 49:21 98:8
  104:23
associated 8:13 45:15
  107:7
associates 100:9,13
associating 17:7
assumed 20:25
attach 78:12
attached 27:25 33:17
  35:19 43:9 46:24
  60:18 71:23 90:19
  93:20 96:20 97:11
  103:1 105:12
attacked 45:17
attempted 84:19 106:8
attended 19:2
attention 80:4 101:7
attorney 58:21,25 59:6
  59:10 79:7 113:12,14
attorney-client 80:9,12
attorneys 8:22
audio 60:15,21
authority 112:4
authorized 113:7
available 26:13 63:19
aware 14:3,6 15:16 45:6
  45:18 49:4 57:21 58:2
  58:5 69:6 84:7 108:1

**C**

C 4:4 25:25 26:1 56:13
CAD 4:2,3,11,13,17,18
  4:19 7:1 8:4,9 20:8,8
  21:16,16 23:23 48:10
  56:20 67:23 68:5
  69:25 72:3 83:19
  88:10 89:2 90:9,23
  93:16 100:21
calendar 99:14,23,25
call 10:18,22 11:9,17
  17:24 23:18,19,21,22
  24:12,12,13 33:9,10

59:20 64:9 70:10 72:8
  74:17 75:3 82:5,15,16
  82:25 83:22 92:1 95:8
  96:10 99:25
backing 91:22
backpacks 47:22
backyard 95:21,24
badge 94:8
baggies 12:8
Baker 44:24
ball 59:25
Baltimore 80:4
BARGIL 2:10 59:19
  60:3,5,9 77:15,18,24
  78:10 79:20,25 80:13
  80:15,19 82:5,9 83:11
based 32:7 48:8
basis 59:4
beginning 31:19,19 32:5
  34:11 71:14 107:20
begins 29:11
belabor 6:14
believe 10:12,13 16:25
  29:6 39:21 79:15
  82:23 99:16 100:22
  103:14
benefit 34:25
best 35:9
better 35:1
bigger 106:7
births 98:8
Biscayne 2:11
bit 28:8 46:6 72:8 78:24
  106:3
Blanco 104:1,24
blank 108:11
blitzes 27:3
blocking 54:21
blue 47:16
Blvd 2:11,15
boats 54:10
Bobby 21:6 22:11 24:10
  69:9,11 84:1 85:12
body 6:25 63:1,4 94:3,4
  94:10
body-worn 7:14
Bollenbacher 74:11,12
  106:8,16,23
book 82:19
Boulevard 2:3
box 1:23 27:1,2
Boyer 108:12
break 60:6 76:18 81:5
  82:4 102:17 107:10
bring 50:10
bringing 82:12
broke 40:24
broken 37:15 95:21,24
Bromley 29:15
Brothers 2:6 7:5
bullet 26:22
business 106:13
button 68:2

86:21,24 92:4
called 60:20 78:20 86:24
calls 11:11,13,19,21,22
  12:6 32:14 108:20,21
  108:24
cam 63:4 94:4
camera 7:1,14 63:1 94:3
  94:10
canceled 23:21 24:4,12
capacity 1:7 48:23 114:5
capitalized 27:5
car 40:24
CAROLINE 2:6
carrying 47:22
cars 37:15
case 1:6 6:11 43:2 64:3
  71:7 77:22 78:20
  79:11 80:25 114:4
cases 6:12 36:21 78:3,11
  79:23,25
caused 40:21
CD3 90:4
Celeste 1:12 5:1,9 36:18
  36:19 47:15 103:5
  105:10 106:9 112:5
  114:17
Celeste's 4:15
Certificate 3:4,4 112:1
  113:1
certify 112:4 113:6,11
CG 59:12,16
Cgbrothers@ij.org 2:6
Chad 103:25 104:5
Chagrin 2:3
changed 13:17 85:22
  86:3 90:12
charge 41:8
chart 18:22
Chauncy 47:24
check 11:1 14:21,23
  15:11,14,17,22,25
  16:2,3,11,21,24 17:1
  17:14,16,20 18:2
  20:13,15,21 21:7,9,21
  21:23 22:1,2,3,7 49:12
  63:16 99:14
checks 15:6 25:9
Chevrolet 47:17
chosen 46:13
Chris 1:7 108:9 114:5
circumstances 30:16
citation 4:10,16 7:11
  40:1,2,7,10,16,18 41:3
  41:6 44:7,20 54:2,3,7
  54:9,12 57:7,18 58:6
  66:9,13 68:9 84:10,19
  84:21 85:2,11,19
  88:18 103:25
citations 7:17,18,19 9:4
  9:17 10:10 26:24
  27:12 31:4,10 41:15
  42:2 44:10,18,19 45:7
  50:20 51:4 46:4,6
  72:11,23 73:15 84:2,3
  103:24
cite 55:25 56:3 80:6
cited 40:17,19
citizen 31:7
citizen-generated 9:18
citizens 10:22
City 1:23
clarification 95:14
clarify 13:2 23:1
clarifying 13:7
clarity 24:8 37:10 74:19
clean 102:23
cleaned 29:14 34:14

cleaner 10:7
clear 19:12 28:15 38:22
  43:21 68:3 80:1 91:15
  100:16 109:21
cleared 91:14
Clearwater 75:3
client 80:21
close 45:17 110:1
closely 108:15,17
Clydesdale 29:15
Co-counsel 2:9,13
code 4:12 5:20,21 9:1,3,4
  9:5,6,14,18,19,20 10:8
  10:15,16 11:5,20,23
  12:10,18,21 13:14
  14:2,20 15:11 18:15
  19:13,15 21:2 25:14
  26:8,24 27:2,2,4,5,7,8
  27:13 28:16,20 30:12
  30:19,24 31:3 33:25
  34:24 35:4 36:11,25
  37:3,11 44:7,17 45:7
  45:24 46:11 48:24
  50:19 51:4,5,9 52:2,7
  52:15,20,25 53:6,6
  55:19 60:21 64:24
  65:4,14 66:6,25 68:22
  68:24 70:20,25 71:5
  71:10,16 72:23 73:15
  84:2 85:23 86:6,7
  89:10 90:5,10 91:24
  92:1 93:4 106:9
  107:18 108:4,14 110:4
come 15:12 59:20 67:6
  107:13
comes 10:9 15:15
coming 12:8 110:25
Commission 112:12,13
committing 23:6
common 22:15,21 24:21
  55:7 64:24 65:17
communication 78:14
community 11:10 16:15
  17:11 25:23 30:6,9
  31:7,24
comp 19:5
complained 51:8
complaining 50:16
complaint 15:15 89:20
  89:23
complaints 9:18 15:12
  46:18 56:4
completed 84:18
completing 87:1
complicating 78:25
computer 17:21 27:22
  90:18 100:24
concerned 81:14
CONCLUDED 111:11
conduct 16:20,23 17:16
  17:19 27:2
conducting 25:9
connect 36:25
connected 113:14
connections 104:1
connects 36:20
consequences 47:25
consider 87:12 101:18
  101:21,24 102:2,5,9
considered 101:11
  102:14
consistent 106:19
contact 23:17,23,24
  47:15 60:7 106:8
continue 35:13 103:6
continuing 40:13
conversation 73:21

**Cook@debevoisepoult...**
2:17
**cooperate** 66:7,12
**coordinate** 27:1 33:5
**coordinated** 36:22
**copies** 27:20 35:23
**copy** 19:23 36:3
**corporal** 5:20,22 9:1
10:15 13:15 14:2,20
19:13,16 21:3 27:1,14
33:25 34:25 35:4
36:12,18,19 37:4 44:4
45:25 46:12 47:14
48:24 52:20 53:6
55:19 64:25 67:1
70:21,25 71:5 74:11
74:12 90:6,10 91:24
92:1 106:9 107:1
108:4 110:4
**corporals** 27:6,9 52:25
53:7
**correct** 7:15 8:2,6 9:11
9:22 10:1 16:1,2 22:4
22:8 23:20 24:11,23
31:1 32:6,9 33:4 36:15
37:5,19 38:21,25 39:3
39:25 41:2,16 46:15
48:4 49:25 50:21 51:3
51:11,17 53:16 55:4
57:17 62:4,6 67:15
68:5,10 85:10 95:2,3
99:11 100:10 102:7,24
**CORRECTION** 115:2
**CORRECTIONS**
114:14
**correspond** 48:3 57:1
97:20
**corresponding** 48:12
**counsel** 2:5,18 80:3 83:7
111:15 113:12,14
**county** 1:8 5:11,12 6:5
8:21 9:6,7,9,13,19,20
9:24 10:8 27:7,9 35:1
36:20 44:4 53:1,5 55:7
55:19,24 64:14 84:19
85:20 86:9 99:21
112:3 113:14 114:6
**county's** 9:5
**couple** 47:12 76:16 107:6
**course** 36:6,6 76:25
**court** 1:1,19,22 6:18 10:4
16:6 27:22 35:22
69:19 77:24 80:5,7
83:5 94:14 95:14
102:25 113:6,19
**covered** 34:1 84:8
**COVID** 27:20
**crafted** 78:16
**create** 35:9
**created** 80:2,20
**creates** 102:4
**crime** 19:7 35:10,12,13
**crimes** 5:14,15 70:24
71:1,11 108:7,8,15
**criminal** 10:19,21 11:4
14:1 16:15,18 17:10
18:7 23:6,7,11 31:23
51:16,19,23 65:5 76:4
77:21
**criteria** 13:25 25:22
41:23
**cross-examine** 78:6
**curfew** 98:19
**current** 5:10
**currently** 17:2 107:1

**D**

**D** 3:1 4:5 27:24,25
**D1** 44:17,21
**Dad** 106:8,10
**Dade** 1:23
**daily** 14:25
**Dalanea** 1:3 107:10,11
107:13 114:1
**Dalanea's** 107:16
**DARLENE** 1:3 114:1
**dash** 85:25
**date** 1:14 22:3 28:1,22
33:18 35:20 43:10
44:5 46:25 47:6 49:10
60:19 70:4 71:13,24
89:8 90:20 91:2,4
93:12,14,21 96:21
97:9,11,17 99:14,16
103:2 105:13 106:14
114:17
**Dated** 113:17
**dates** 7:18,23 8:15 16:6
33:24 77:13 81:1,8
85:24 97:19 98:8
**day** 18:3 24:25 31:19
45:16,17,17 50:2
68:12 70:6,11 72:23
73:16 92:20 95:25
112:8 113:17
**days** 25:11
**dealers** 106:12
**Debevoise** 2:14
**debris** 37:13 41:10
**December** 86:15 87:6
**decision** 80:5
**DEEGAN** 1:3 114:1
**Defendant** 1:9 2:18
114:7
**definition** 18:11
**department** 63:17,18,21
80:5
**depend** 40:12 41:23
**depending** 11:21 12:25
14:1 15:5 30:16
**depends** 14:25 24:24
40:3,21 52:11 67:3
**depicted** 61:1
**deponent** 111:16
**Deponent's** 3:5 114:9
**deposed** 6:10,12
**deposition** 1:12 6:22 7:5
7:9 8:19,23 20:5 27:23
58:9 59:11 77:1 79:2
80:21,21 111:10,17
113:8 114:12,13
**depositions** 78:3 81:20
82:11
**deputies** 25:3 33:10
64:14,21 65:1 92:7,13
92:18,22,25 93:25
94:22 101:6
**deputy** 6:1 21:4,5 65:8
75:12 91:22 92:2,3,5
92:15 93:25 106:7
**descriptor** 42:19
**designate** 27:23 33:16
35:16 42:13 46:22
105:9
**designated** 27:25 33:17
35:19 43:9 46:24
60:18 71:23 90:19
93:20 96:20 97:10
103:1 105:12
**detective** 5:14,16 108:9
**determination** 40:9
**determine** 15:19 17:13
18:1 31:24 35:9 45:14
49:15

**determined** 20:20
**determining** 33:6
**deterrence** 18:25
**Development** 85:23 86:6
86:7
**difference** 9:12 78:22
**different** 78:24 97:2,6,9
97:10 105:16
**direct** 3:3 5:6 80:3
**directed** 11:18
**discover** 79:4
**discoverable** 79:9 80:22
**discovered** 79:8
**discuss** 19:9,19 53:17
110:10
**discussed** 68:10,16
**discussion** 7:4,22 28:9
60:17 76:23 80:8
83:20 102:20
**dispatched** 24:12
**displayed** 43:17 98:10
99:13
**distance** 28:5
**distinction** 80:9
**district** 1:1,1 4:8,9,21
5:20,22 9:1 19:8 21:3
38:18,20 39:2,20
43:15,22 45:24 46:11
47:5 53:9,12,15 80:5
90:6,10 97:15 105:19
**DIVISION** 1:2
**document** 20:2,4,7 21:15
26:3,5,7,13 28:11,13
29:2,3,6 33:20,22 34:5
36:9,14 37:21 43:12
43:14 44:2,13,14 47:2
47:4,11 53:24 54:1
56:17,19 69:22,24
84:15,17 88:7,9,25
90:22 96:24 97:8,10
97:14 99:2 103:7,13
105:15,20,22
**documented** 15:7
**documents** 79:4 83:10
110:24
**dog** 45:16 46:5
**doing** 13:3 16:4,7,14
50:2 52:7,14 61:7,17
95:20
**Donnie** 15:16 87:21,22
87:24 94:23 96:9
98:15,25 101:6,11,12
101:19
**door** 23:25 106:8
**doorway** 95:1
**double** 54:15
**draw** 31:18
**drawing** 108:11
**drive** 1:17 8:8,8 29:15,15
34:15 47:15 55:18
**driven** 89:13
**driver's** 48:1
**drivers** 47:25
**driveway** 40:24
**drove** 89:12
**drug** 10:23 11:12,25 12:5
12:11,22 30:22,23
32:15,15 50:16,17
51:2 102:10 106:11
**due** 27:19
**duly** 5:2 112:6
**duration** 23:19 25:8

**E**

**E** 2:2 3:1 4:1,6 33:16,17
34:22
**Earl** 44:19,23

**earlier** 78:16
**ease** 10:3
**Edwards** 103:25 104:1,5
104:13,15
**effect** 74:23
**either** 10:25 45:17 57:15
78:2 89:23
**Elias** 103:25
**email** 27:22 35:23
**employee** 113:12,13
**employer** 5:10
**employment** 6:4
**en** 67:23 91:10
**enacts** 86:8
**enclosed** 54:16
**enforcement** 5:20,21 6:7
9:1,3,4,4,6,14,19,19,20
10:8,15,16 11:5,20,23
13:14 14:2,20 15:11
18:16 19:13,15 21:3
25:15 26:8 27:2,3,4,5
27:7,9,14 28:16,20
30:12,19,25 31:3
33:25 34:25 35:4
36:11 37:1,3,11 44:17
45:7,25 46:12 47:20
48:24 50:19 51:4,5,9
52:3,8,15,20,25 55:19
64:25 65:4,14 66:6,8
66:25 68:22,25 70:20
70:25 71:5,10,16
73:15 86:25 87:1
89:11 90:5,10 91:24
92:1 93:4 106:9 108:4
108:14 110:4
**enforces** 36:19
**entire** 71:4 73:12 77:5
**entirely** 79:1
**entirety** 53:14
**entitled** 77:22 78:4
**equivalent** 79:12
**Errata** 3:5 115:1
**ESQ** 2:6
**ESQUIRE** 2:2,10,14
**estimate** 109:23
**evaluation** 30:1 36:10
**evaluations** 83:23,24
**event** 24:9,11
**everybody** 41:2
**evicted** 29:14,20 34:14
34:19 38:10,24 39:16
**evidence** 77:19 78:7
**evolving** 19:7
**exact** 18:11 68:11 71:13
85:23
**exactly** 50:3 85:4
**Examination** 3:3 5:6
**examined** 5:3
**example** 15:15 38:11
**exceptions** 25:13
**exclusively** 80:2
**excuse** 21:4 84:10 87:20
**executed** 70:22
**executing** 70:21
**Executive** 1:17
**exhibit** 19:22,25 21:12
21:13 22:8 25:25 26:1
27:21,24,25 33:16,16
33:17 35:17,17,19
37:25 38:1 42:13 43:7
43:9 46:23,24 53:18
53:19,20 56:11,14,15
60:16,18 67:13,16,17
69:17,17,20 71:23
76:17 82:22 83:4
84:10,13 88:4,4,5,22
88:22,23 90:19 93:10

**93:20 96:19,19,20**
97:7,11 100:18 103:1
103:4 105:1,3,4,9,10
105:12
**exhibits** 27:21
**expect** 74:17
**experience** 12:17 46:17
66:5,16,20
**Expires** 112:13
**explain** 19:6
**extensive** 80:8
**extent** 36:20
**extra** 56:21

**F**

**F** 4:7 35:17,19 38:2,3
**F-A-L-K** 78:21
**fact** 30:7 45:6 50:8 78:23
79:16 80:1
**factors** 78:25
**failure** 102:8
**fair** 29:18 49:11 72:21
**fairly** 61:2
**Falk** 78:21
**fall** 79:3
**familiar** 13:21 15:21
18:8,21,24 20:2 21:15
26:3 28:11 33:20 36:9
43:12 47:2 53:24
56:17 69:22 84:15
88:7,25 90:22 98:4
103:6,8 105:15 107:11
107:13
**family** 40:15,20,23 41:5
**far** 42:25 99:25 101:16
102:15
**father** 73:8 102:2
**February** 5:23,24 97:21
**federal** 77:19 80:22
**female** 47:21
**fence** 52:13 54:21 55:9
95:22,24
**fight** 81:10
**figure** 39:6
**file** 60:20,21 72:4 103:5
103:5 105:10
**financially** 113:15
**find** 28:23 49:7 63:16
86:5
**finding** 78:11
**fine** 43:6 99:18 111:5
**finish** 10:4
**first** 5:2 47:12 67:23
81:19 108:9
**fit** 79:24
**five** 64:23,25 81:12,25
109:1
**five-minute** 102:17
**FL** 1:23 2:11,15
**Florida** 1:1,18,20 112:2
112:12 113:3
**focus** 25:15,21 31:6,9,13
35:5,10 37:4,16 49:24
76:6,9 101:7
**focused** 18:24 49:20
**focusing** 37:2 76:4
**follow** 55:15 86:12 87:11
88:18 93:3
**following** 29:13 34:13
70:6
**follows** 5:4
**footage** 7:14,16
**foregoing** 113:8 114:11
114:12
**forensics** 15:19 17,18,21
**forever** 83:2,3
**forgot** 68:2

**form** 12:13 20:22 22:12
22:17,25 25:4 29:22
30:13 31:8 41:20 42:3
45:9 50:1 51:20 52:18
53:2 55:9 61:3 62:15
63:12 65:19 68:21
85:13 86:20 87:5
92:19 99:1 101:8,13
104:18 108:6 109:11
109:16
**format** 97:2
**Formoso** 108:13
**forward** 35:22
**found** 90:2
**frequently** 25:2 52:16,21
108:23
**friend** 98:19,25
**front** 72:13 77:3,5
**full** 99:23
**fullest** 36:20
**further** 113:11
**future** 82:10,11 83:9

**G**

**G** 4:8 42:20 43:7,9
**Gary** 44:23
**gathered** 35:8
**general** 31:7 101:18
**generally** 23:2,3 24:21
61:2
**generated** 79:14 103:17
**getting** 28:5 29:12 34:12
**GG** 112:12
**give** 6:16 42:19,20 59:16
59:22 64:1 93:12
100:20 110:8
**given** 113:9
**glanced** 77:2
**gleaned** 77:9
**Glebe** 2:7
**go** 10:25 11:16 12:13
15:7,9,10,20 22:12
25:8 26:17 29:2 31:8
42:3,19 50:1 52:8,22
57:14 60:11 62:15
67:9 72:8 75:3 76:21
82:3,5,13,15,16 83:22
86:20 92:4,19 95:12
99:1,20,25 108:19,19
108:20 109:24
**goes** 69:11 80:7 93:16
**going** 11:4 12:7,12 15:20
16:5,15 21:12 23:14
25:24 26:19 27:21
28:2 29:2 33:15 34:3
35:16,17 36:13 37:20
42:12 43:20 46:21
47:11 50:12 51:16
58:16 59:21 60:13,25
61:7,25 62:9,23 64:7
69:16 71:19 72:7,8
74:3 75:1,11 76:15,16
76:19 79:17 81:9
82:18 85:13 88:3,21
90:17 93:7,24 94:14
94:20 95:7,19 96:18
97:4,5,6,7,24 102:24
103:4,5 104:12 105:9
105:20 110:22
**good** 43:4 62:25 110:21
**Gotcha** 24:6 39:13
**governed** 77:18
**Government** 1:17
**GRACE** 2:6
**grand** 44:21
**grass** 37:13 41:5,6 61:1
62:11,13,25 63:3

**great** 36:3,4 38:8,8
**guess** 42:20 46:19 82:5
84:11 96:19 109:14,22
109:22
**guys** 60:3

**H**

**H** 4:1,9 46:23,24 69:18
**H-A-R-V-A-R-D-S-O-N**
39:10
**H-A-R-V-E-S-T-O-N**
39:9
**half** 25:1 38:18 108:9,10
109:6,17
**hand** 112:7
**handcuffs** 72:25 73:9,12
73:14
**hands** 73:8
**Hans** 106:15,23
**happen** 17:20
**happened** 48:21 50:7
65:22,25 66:15,18,20
**happens** 49:20
**happy** 59:14,19
**harassed** 47:19
**hard** 61:4 63:1,4 67:2,3
101:15 109:4
**hardship** 79:11
**Harvardson** 39:8,11
**He'll** 111:8
**head** 12:4 33:1 104:8
**Headsalt** 8:8
**health** 76:5
**hear** 60:5 65:8 73:23
**heard** 107:12
**hearing** 78:5
**height** 61:2,13
**Heights** 2:3
**Heilman** 1:3 7:12 8:2
84:10 85:1,21 101:21
114:1
**Heilman's** 86:11 87:8
88:11 89:3,6 90:25
**help** 103:12
**HERETO** 114:14
**high** 18:6
**highlighted** 98:2
**history** 14:1 17:25 18:14
**hit** 68:2,2 106:7
**Holborn@debevoisepo...**
2:17
**hold** 110:23
**Holiday** 47:15
**home** 39:16 40:2,6 67:3,9
84:1,4 94:23
**homes** 10:15 15:10 29:21
34:20 66:24 67:10
92:23 93:1 96:2
**Horn** 103:25
**house** 11:4,5,8,14,17,19
11:23 12:6,10,12 14:3
14:7 15:16 17:13
18:15,17 38:24 39:22
39:24 40:15,16,25
41:6,9,14,18,24,25
42:7 46:20 48:17
49:11,20,21,22 50:14
50:14,22,24 51:7,11
51:15,15,16,18 52:10
52:12 56:4,5,7 57:5,8
57:11,20,22,25 61:20
62:1,4 64:9,17,25
67:14,21 70:10 72:14
86:11,17 87:3,8,9,12
87:13 88:12 89:3,6,10
89:13 92:12,13,14
94:1 95:9,10,12,15

100:17 101:6 107:12
107:17,20,23 108:1
**houses** 10:17,17,18,19
12:17,21,24 25:23
31:10 38:10 49:2
57:12 87:10
**housing** 37:14
**hundreds** 109:5

**I**

**ID** 90:13 94:8
**IDA** 38:16,17
**identification** 19:25
21:13 26:1 53:20
56:15 69:20 83:4
84:13 88:5,23
**identifier** 90:8 91:7
**identify** 51:11
**identity** 39:23
**III** 1:4 20:18 101:24
114:2
**ILP** 4:4,8,9,21 26:6
34:24 35:3,7 43:15
47:5 48:4,7 68:17,20
68:22,25 83:24 84:2,5
97:15 100:2 103:16
107:15 108:2
**image** 61:8,17 62:10,23
62:25 63:2,4 64:13
**impact** 35:9
**improve** 29:9
**improving** 34:23
**inches** 61:13 62:14 63:3
**incident** 21:17,20 57:1
63:23 64:1 70:1,7 72:1
72:21 79:15,18 81:8
**incidents** 58:12 76:16
**include** 23:5 35:14 37:6
114:13
**included** 98:3
**including** 29:13 34:13
79:7
**increased** 30:12
**indicate** 57:4 90:5
106:14
**indicates** 48:16
**individual** 17:2 25:9
30:11 48:11,17 50:22
57:19 66:7 74:7
**individuals** 30:2 64:16
64:19 98:7
**Informant** 106:10
**information** 14:8,10,17
14:21,24 32:17 33:3
35:8 49:8 51:23 65:12
65:15 83:24 84:2,5
**input** 29:3
**inputted** 36:14 48:6
**inputting** 29:5
**inside** 102:11
**inspect** 78:5
**Institute** 2:2,6,10
**intelligence** 14:13,14
35:8,9 103:10 105:17
**interactions** 19:19
**interested** 113:15
**interpreted** 83:9
**interview** 34:23
**intranet** 14:19,21,23
18:20 26:14 49:12
**introduce** 78:7
**investigate** 10:25
**investigating** 11:1
**investigation** 65:5
**investigation.mp4** 4:14
72:5
**investigations** 69:2

**involved** 20:10 21:18
35:13 70:2,21 101:15
**issuance** 9:3
**issue** 9:17,21,23,25 10:10
31:4 40:6,10,16,25
41:2,6 42:1,6 54:5,7
57:18 59:17 60:8,11
66:3,7,9,12 84:1,3,23
84:25 85:11 86:14,17
**issued** 15:19 31:10 38:11
40:1,1 44:8,10,12,17
44:18,20 45:7 54:3
57:7 58:6 68:9 72:23
84:21 85:19 86:12
87:11 88:19 103:24,25
**issues** 9:19 10:16 11:12
11:24 12:2,19 27:19
28:4 30:20,21 46:19
**issuing** 41:15 54:11

**J**

**J** 4:11 56:14,15 67:16,18
**January** 1:14 112:6,8
113:17
**jet** 54:15 55:3 57:8
**job** 25:15,21 37:3 55:19
**jobs** 90:15
**Johnson** 2:2 3:3 5:7 7:7
7:25 12:14,20 13:6,8
13:10,18,20 19:22
20:1,23 21:14 22:14
22:18 23:3,8 24:7 25:6
25:24 26:2,17,21
28:10,24 29:1,25
30:14 31:12 33:15,19
35:16,21,25 36:2,6,8
38:1,3,5 39:14 41:21
42:5,12,16,22 43:3,7
43:11,23,25 45:10
46:21 47:1,8,10 50:4
51:21 52:19,24 53:4
53:17,21,23 55:10,17
56:11,14,16,23,25
58:18,24 59:4,6,12,16
59:20,24 60:12,14,20
60:24 61:6 62:8,17,22
63:7,15 64:6,12 65:7
65:21 66:23 68:23
69:16,21 71:19,22,25
72:4,6,20 73:5,20 74:3
74:6,14,16,25 75:10
75:20 76:14,20,24
77:12,23 80:4 81:9,13
81:16,24 82:1,3,14,24
83:3,14,16,21 84:14
85:14 86:22 87:7,23
88:3,6,21,24 90:21
91:4,6 92:21 93:7,10
93:13,15,18,23 94:13
94:19 95:6,15,18
96:15,22 97:12,18
99:3 101:10,17 102:16
102:19,21 103:3
104:19 105:3,6,8,14
109:13,18 110:2
**joined** 7:5
**Jones** 1:4 7:12,23 20:16
20:17,18,21 21:6,24
22:11 24:10,18 54:8
56:3 57:19 58:1 67:14
69:9,11 70:13,16 73:7
84:1 85:12,20 87:17
101:24 102:3 103:24
104:2,3 106:2,5,17
114:2
**Jones'** 106:10
**Jones's** 73:7

**Judy** 1:19 112:11 113:6
113:19
**Judy@andersoncourtr...**
1:24
**July** 5:17,18,18
**jump** 92:3
**Junk** 37:13
**Justice** 2:2,6,10
**Justin** 98:19,21,25
100:11,14
**juvenile** 41:15 42:4,10
**juvenile's** 41:16

**K**

**K** 4:12 60:18
**keep** 82:20
**keeping** 36:4
**kids** 102:12
**kind** 14:12 78:21
**knew** 40:12 41:1
**knocked** 23:25
**know** 8:23 10:9 16:14,17
18:11,16,19 28:3
45:12 46:9,17 49:6,9
50:2,3 57:23 60:2
63:19,20 66:17 68:15
68:16 72:16 75:3
79:18 80:19 81:8,15
81:23 85:23 86:2,10
86:17 87:14,15,15,24
88:1 94:1,5,9 96:8
97:4,5 98:21 99:2,7,8
100:1,1 102:11 104:5
104:9,20 106:23 107:4
107:7,24 110:23

**L**

**L** 4:13 69:19,20 83:19
111:13
**label** 76:16 97:7 102:24
103:4
**labeled** 100:18,20
**lack** 85:3,6 102:4
**Land** 85:23 86:6,7
**landlord** 41:1
**landlord/property** 38:11
**large** 1:20 10:18 11:8,13
11:19 32:14 109:7
**late** 67:21
**Laurel** 47:18
**Laurel's** 47:24
**law** 6:7 47:20 66:8 86:25
87:1
**lawn** 62:5
**learning** 38:8
**leaving** 12:8
**left** 47:21
**lemonade** 106:11
**let's** 41:4 81:5,12 82:3
**license** 48:1
**life** 9:22 10:19 11:12
12:2,19 30:20,21
46:19
**light** 77:15
**line** 10:23 35:22 95:9
115:2
**list** 31:15,16,18,22 32:2
32:24 33:6 45:20 46:1
49:2 57:11,13,15 81:7
87:3,9 89:15,19,24
99:19 100:9 107:20,23
**listed** 29:18 38:22 48:11
48:14,17,19,20 49:5,9
49:13,16 50:23 87:16
87:25 104:13,16,20
**listing** 100:13

litigate 80:17
litigation 58:17 79:6
little 28:7 78:24 106:3
live 39:20
lived 18:17 39:24 42:7
   45:14 69:13
lives 14:9 31:2 38:20
   39:2 41:19
living 40:7,15 41:5 57:22
Local 106:11
location 30:17,18,19
   31:2 44:17 69:7,14
   93:2
locations 12:9 26:25
   29:23 35:6 50:12 69:1
   76:7,10
log 24:5
long 5:15 25:12 110:8
look 11:5 17:21 27:16
   31:23,24 32:23 50:17
   50:19 51:19 52:4
   54:25 59:19 67:13
   71:16 85:16 86:6
   89:10 97:19 99:17
   103:8
looked 7:1 10:17 57:2
   76:25 77:13 90:1
   105:22
looking 34:4 37:17 44:1
   51:25 52:15 64:13
   67:17 78:18 79:14,23
   79:25 81:5 93:4 95:21
   95:23 96:3,4,7,8,12
   103:11,13
looks 43:15 44:3 61:15
   67:13 97:2 105:16
Loop 39:8,10
lot 10:22 11:10,11 12:6
   12:17,18 15:6 50:10
   50:11 99:21
lunch 110:22

### M

M 4:14 71:21,23 83:15
M-A-N-N 78:20
Madame 77:24 83:5
Madden 27:2
main 6:15 33:2 57:20
making 58:25
male 47:21
Mann 78:20
manual 4:4 26:6 56:12
March 6:3,6,7 7:20,21
   7:23,24 8:1,1 28:24
   70:5,16 71:25 84:4,24
   87:6,9 88:19 91:4 93:8
   93:15 96:23 97:21,22
   98:13 100:25 106:15
   106:17
marijuana 102:11
marine 107:1
mark 1:12 5:1,9 19:22
   21:12 25:24 43:7
   47:14 53:19 56:11,14
   61:1,10,17,25 62:10
   62:24 64:8 69:17 72:7
   74:4 75:2,11 82:21
   88:3,21 93:25 94:20
   95:8,19 96:16 112:5
   114:17
marked 19:25 21:13 22:7
   26:1 53:20 56:15
   69:20 83:4 84:13 88:5
   88:23
marker 42:18
Markham 44:19
marking 83:8

material 79:16 81:21,22
materials 78:20 79:10
matter 59:7
matters 79:24
McDougall 87:21,22,24
   94:23 98:15,25 101:6
   101:12,19
McDougall's 15:16
mean 10:21 11:9 12:5
   13:24 14:14 15:10,24
   16:3,8 18:10,12 19:6
   23:1 24:9 30:18,21,24
   31:16 35:7,11 36:25
   40:22 42:24 44:25
   51:2,2 53:2 68:24
   69:13 78:25 79:3,16
   85:4 86:23 89:15 91:9
   101:15 107:19 108:17
   109:4,25
means 24:11 30:8 79:12
   98:23
measuring 61:9,11 62:11
meet 13:25 24:10,22,24
   24:25 25:22
meeting 19:2,4,5,10 25:3
   32:18 33:3 43:18 48:9
   68:10,16,18,20 69:8
   98:11 99:16 100:3
   101:4 103:12,16
   105:21,24 107:2
meetings 19:13 96:23
   99:5 107:15
member 33:23 110:19
members 57:8 64:19
   66:24
memorialized 83:1
memory 78:2
mental 76:5
mention 34:19
mentioned 7:8,13 8:16
   83:24 107:10
met 24:18
Miami 2:11
Michael 47:14
MIDDLE 1:1
mind 24:3 39:5 58:14
   59:2 82:19
mine 28:6
minimum 37:14
minute 61:16 74:3 75:2
   95:19
minutes 24:14 92:11,11
   92:15
mirror 85:24
missions 27:1
mistaken 59:14
morning 91:12,13,18
mother 38:12,24 39:16
   47:18
mouse 28:7
move 84:9
moved 38:13 50:25
   85:22
moving 39:22
MPR 4:5,6,7
multiple 38:9,12 110:6

### N

N 2:7 3:1 4:15 82:23,23
   82:24 83:4,17 111:13
name 5:8 63:20 72:4
   98:18 103:20,23
   104:13 105:10 107:12
named 44:8
names 98:8 110:8
nature 20:12 21:20
necessarily 23:9 24:9

42:1
necessary 60:14
need 16:4 26:18 79:10
   81:11 96:17 110:24,25
needed 108:19
neighbor 95:12
neighbor's 95:10
neighborhood 23:6,14
   31:25 54:21 89:22
neighbors 11:17 12:19
   39:18 50:16 51:8
new 1:17,18 37:25 84:10
Nichols 47:14,15,16,18
   47:18 48:11
Nichols' 48:1
nine 92:11,15
Nocco 1:7 75:22,24,25
   76:8 114:5
noise 12:2 30:22 32:14
   32:15 37:15 46:18
non-Sheriff's 9:14
nonemergency 10:23
nonfactor 81:6
noon 102:19
Notary 1:20 112:12
note 30:1,4 44:15
noted 39:1
notes 4:15 20:8 21:16
   23:23 48:3,6 58:8,11
   58:19 59:10 76:25
   78:15 79:14,17,21
   80:23 82:25 83:18,19
   85:16 86:15 88:10
   97:25 98:3 100:21
   103:12,15 105:21,23
   107:3
noting 98:24
number 11:13,19 43:1
   56:12 63:24 64:2,3
   85:22 86:2 90:13 94:7
   109:7,9
numbers 81:1 85:5,6
numerous 46:18

### O

O 4:16 84:11,13 111:13
Oath 3:4 112:1
object 12:13 20:22 22:12
   22:17,25 25:4 29:22
   30:13 31:8 41:20 42:3
   45:9 50:1 51:20 52:18
   53:2 55:9 58:16 61:3
   62:15 63:12 65:19
   68:21 85:13 86:20
   87:5 92:19 99:1 101:8
   101:13 104:18 108:6
   109:11,16
objection 52:22 55:14
   59:3 109:24
objections 82:10 83:9
observe 55:22 89:12
observed 56:1
obtain 79:11
obviously 79:18
occasion 55:18
occurred 24:14
occurring 10:24 19:8
October 22:3
Off-the-record 7:4,22
   28:9 60:17 76:23
   83:20 102:20
offender 13:22 14:4,9,16
   15:22,25 16:11,21,24
   17:1,14,16,20 18:1,2,8
   18:13,17 20:13,15,21
   20:25 21:7,9,21,23
   22:1,2,7,15 25:3,9

29:24 30:8 31:2 38:12
   45:1,4,15 48:14,17
   49:5,13 50:23 57:22
   57:23,25 58:3 69:9
   87:16,25 98:9,23
   100:12 104:10,17
offender's 17:17 38:12
   38:24 39:16
offenders 15:11 19:9,20
   22:23 24:22 25:16,21
   26:25 27:13 29:13,20
   30:2,5 31:6,9,14 32:21
   33:3 34:13,19 35:14
   36:21 37:1,7 49:25
   100:9
offense 85:12
office 4:14 5:11,13 6:5
   8:22 9:7,10,13,14,16
   9:24 27:10 35:1 53:1,6
   59:22 60:7 64:14
officer 25:15 26:8
officers 9:6 67:14
official 1:7 9:25 10:8
   28:16,20 112:7 114:5
officials 9:14 33:5
Oh 2:3 24:6 26:18 56:13
   56:23 67:17 87:20
   93:16 97:3,3 103:6
okay 5:18 6:10,20 7:3,13
   8:4,15,18,25 9:9 10:3
   10:8,13 11:8,13,18
   13:18 17:19,23 18:21
   19:12 21:12,17,25
   22:3 23:4,9,13,16,19
   24:20 25:2 26:10
   27:12,16 29:10 30:24
   31:13,21 32:1,4 34:3,7
   34:11,16,22 36:3,13
   36:17,24 37:6,16,20
   37:24 38:4,19,22 39:1
   39:4,13 40:1,4,9 41:4
   41:10,13,18,25 42:9
   42:12,15 43:3,17,20
   43:24 44:5,10,15,25
   46:4,7,16 48:3,11,14
   48:16,20,23 49:4,18
   51:10,14,18 52:4,7,14
   53:14,17 54:11 55:2,5
   55:7,18 57:4,7,11,15
   57:18,21 58:2,5,8,11
   58:14 59:12,20,21
   60:9 61:10,16,22 62:3
   62:13,20 63:18 64:1,4
   65:11,13 67:8,13 68:3
   68:6 69:10 70:6,9,20
   71:10,15,19 72:13,18
   72:25 73:3,18,23 74:1
   75:8,18 76:12 78:9,17
   81:2,5 82:8,13,14
   83:13,14 84:7,9,21
   85:2,4,11,19 86:2,10
   87:3,12 88:2,11,14,18
   88:21 89:10,13,21
   90:1,4,8,14,17,24
   91:12,17,23 92:12
   93:7 94:10,17 95:1,4
   95:11 96:11,18 97:4,9
   97:16,22,24 98:6,10
   98:15,17,24 99:4,12
   99:19 100:4,8,13,16
   101:5,18,21,24 102:5
   102:8,18 103:9,11,17
   103:20,22 104:5,7,12
   104:16,22,25 105:7,18
   106:1,13,19,22 107:10
   107:16,19 109:7 110:3
   110:21 111:2

old 63:13
once 15:2 24:22 42:23
ones 8:12,13 35:23
ongoing 65:1
open 35:17 42:12 46:21
   110:23
operate 48:1
opinion 78:23 80:6
opposed 51:15 57:19
order 11:5
ordinance 26:24 34:25
   44:4 54:19 55:1,16
   84:19 85:6,20,22 86:2
ordinances 36:20 38:13
Ordinarily 79:4
outside 60:11
outstanding 110:24
overdoses 12:9
overgrown 37:13
owner 40:2,10,12,13
owners 38:11

### P

P 4:17 88:4,5 111:13
P.A 2:14
p.m 1:15 67:2,3,7,15,18
   67:21 111:11
P.O 1:23
page 3:2,5 4:1 18:20
   26:16,19,22 29:2 34:3
   34:4,5 36:13 37:20
   43:20 44:1,2 47:11
   97:24 98:1,1 103:6,11
   103:20 104:12,14,20
   105:20 114:9 115:2
pagination 97:25 98:2
paper 26:19 35:23 53:18
   77:2
paragraph 47:13
paraphrase 74:19
Pardon 59:5
parent 103:25 104:3,9,10
parents 41:16 42:6
park 2:15 55:8
parked 55:2
part 25:15 27:8 28:17,19
   37:3 68:22,25 71:11
   71:12 76:6,8,11 78:14
   105:2,3 108:14
participate 19:12,15
particular 18:3 23:10
   45:16 69:7 110:16
particularly 81:14
parties 111:15 113:12
parties' 113:13
partner 46:6
party 77:20,22 78:4 79:4
   79:6,9
party's 79:7
Pasco 1:8 5:11,12 6:4
   8:21 9:7,9,13,24 27:9
   35:1 53:1,5 55:7,19
   64:14 112:3 113:4
   114:6
passes 86:7
passing 33:9
pathway 62:3
patrol 6:1 21:4,5 91:22
   92:2,3,7,13,22,25
pause 60:25 61:7,16,25
   62:9,23 64:7 75:1,11
   93:24 94:14,20 95:7
   95:19 96:15
PDF 44:2 98:1
people 12:7 29:12 34:12
   35:5,11,12 37:2,4,9,17
   38:10 45:14 51:12

55:7,25 59:21 65:4
69:2,4 75:13 76:6,9
110:6,11,22
**people's** 96:2
**percent** 108:25 109:1,3,8
**performance** 28:14,16
28:17 33:23 36:10
83:22,23
**period** 22:11,16,24 24:17
29:19 34:1,9 38:23
48:20 90:9,14 100:17
**periods** 12:7
**permission** 95:11
**person** 18:17 21:24
39:24 40:7,17,19
41:14,14,19,24 42:1,2
44:25 101:12,19,22,25
102:3,6,9,14 104:13
110:16
**personally** 18:4 25:8
112:5
**pertain** 13:11 20:9
**photograph** 61:18,19,22
61:24
**photos** 63:23 64:2
**pickup** 47:17
**pictures** 63:8,9 98:7
**Ping-Pong** 59:24
**place** 1:17 35:2
**Plaintiffs** 1:5 2:5,9,13
114:3
**plan** 34:24 35:25 36:1
**played** 60:23 61:5 62:7
62:21 63:6 64:5,11
65:6 66:22 72:19 73:4
73:19 74:2,5,24 75:9
75:19 76:13 93:22
94:11,18 95:5,17
96:14
**please** 5:8 26:23 85:17
**point** 26:22 27:19 35:21
46:5 72:14 73:23
**police** 11:18 80:4
**Port** 1:17,18
**portion** 25:19,20 31:10
34:24 78:7
**position** 5:12,18,24 6:2
9:1 29:8 35:3 38:8,9
66:25 107:5 108:10
**positions** 107:5
**possibilities** 38:9
**possible** 23:25 24:2
37:14 82:10 85:8 96:4
96:11 101:5 111:3
**Possibly** 24:19
**posted** 85:3,7
**Poulton** 2:14,14 12:13,16
13:2,7,9,17,19 19:24
20:22 22:12,17,25
23:4 24:3,6 25:4 26:18
28:2,2,22,25 29:22
30:13 31:8 36:1,3,7
37:25 38:2,4 39:5,9,11
39:13 41:20 42:3,15
42:18,23 43:4,21,24
45:9 47:6,9 50:1 51:20
52:18,22 53:2,22 55:9
55:14 56:12,21,24
58:16,23 59:3,5,7,14
59:21 60:1,4,6,10 61:3
62:15 63:12 65:19
68:21 71:21 72:2
74:13,15 76:18,21
77:8,17 78:9,17 79:21
80:11,14,18,23 81:2,4
81:10,15,18 82:2,8,13
82:23 83:2,5,13,15,17

84:12 85:13 86:20
87:5,22 91:2,5 92:19
93:9,11,14,16,19 97:9
97:17 99:11 101:8,13
102:18 104:18 105:1,4
105:7 108:6 109:11,16
109:24 111:8
**Poulton@debevoisepo...**
2:16
**pre-empted** 24:9,11
**precursor** 78:17
**preparation** 59:9 78:19
**prepare** 6:21,24 7:9 8:18
59:11 79:2,10
**prepared** 79:5
**present** 13:5 73:21 93:5
99:4,5,7,8,10,12 100:5
111:15
**presume** 82:11
**pretty** 42:25 80:1,8,13
**prevention** 35:10
**previous** 22:7 40:14 70:6
70:11 72:23 73:16
**previously** 6:10 65:9,23
**primarily** 41:8
**prime** 90:4
**Primrose** 8:8
**printer** 27:20
**printout** 56:20
**prior** 5:18,24 6:7 20:4
32:12 102:13
**privilege** 78:12 80:10,15
**probably** 81:16,16,18
84:3 99:12 109:2
110:21
**Probation** 98:19
**problem** 10:17 14:7
25:23 26:25 29:23
30:9,17,18 31:25 35:5
35:5,11 37:2,4,9,16
39:22 41:14,14,19
42:1,2 49:20,25 50:12
50:14,25 51:1,7,11,12
69:1,4 74:22 76:6,7,9
76:10 87:13 101:12,19
101:21,25 102:3,4,5,9
102:14
**problems** 11:10 25:23
30:6 42:25
**PROCEEDINGS** 1:12
**process** 78:22
**produced** 78:5
**producing** 82:9
**product** 59:8,11 78:12
78:23,23 80:1,2,9 82:7
103:10 105:17
**production** 83:8
**prolific** 13:21 14:3,8,16
15:10,13,17,21,25
16:10,21,24 17:1,14
17:16,17,20 18:1,2,13
19:9,20 20:13,14,21
20:25 21:7,9,21,22
22:1,2,7,15,23 24:22
25:3,9,16,21 26:25
27:13 29:13,20,24
30:2,5,8 31:2,6,9,13
32:21 33:13 34:13,19
35:14 37:6 38:12,12
38:23 39:16 57:21,23
57:25 58:3 69:9 98:9
98:23 100:9,12 104:10
104:17
**promoted** 28:17
**properties** 29:14 34:14
**property** 5:14,15 52:8
54:13,16,17,20,24

55:3,8 62:14 70:24
71:1,11 72:22 108:7,8
108:15
**protect** 58:17
**protected** 82:7
**provide** 9:17 14:17 19:17
33:7,8,11 39:17
**provided** 65:15 81:20,22
87:1
**provides** 77:21 80:8
**providing** 40:18
**provision** 85:20
**Public** 1:20 112:12
**pull** 28:6 33:15 96:18
**pulling** 12:7
**purpose** 21:6,25 22:10
29:5 49:24 51:18 52:2
52:14 91:20 92:17
95:23 98:24
**put** 23:22 24:13 31:21
32:2,4,7 42:18 46:1
49:1 57:15 82:21,24
101:16 107:19,23
**putting** 32:24

---

**Q**

**qualified** 84:5
**qualify** 84:2
**quality** 11:12 12:2,19
30:20,21 46:18
**question** 6:16 10:5
**questionnaire** 37:22
**questions** 13:3,11 16:10
16:13 94:22 111:1
**quick** 102:16
**quickly** 102:23
**quite** 107:5
**quote** 78:4,10

---

**R**

**R** 4:19 90:19
**radio** 24:5 90:13
**range** 97:20
**rate** 24:22
**read** 26:22 29:10,16
34:11,16,22 36:17
38:6 44:15 47:12
98:17 103:22 106:1
111:8 114:11
**reading** 111:16
**really** 25:13 42:24
**reason** 11:19 30:11 31:3
34:16 47:19 51:10,14
54:11 65:3 69:6 89:18
**reasons** 23:5
**recall** 66:17 83:23
**receive** 14:8,10,15 51:23
**received** 11:3 32:17
72:12
**recognize** 74:7 75:4,14
96:24 97:1,14
**recollection** 77:10 79:22
106:20
**record** 5:8 10:7 37:10
39:6 60:15 69:25 70:4
74:19 76:22 82:3,6,15
82:16,17 113:9
**records** 7:1 68:5
**red** 98:22
**redacted** 43:1
**redispatched** 23:22
**refer** 27:8 82:20 86:15
90:15 104:3
**reference** 80:23
**references** 27:4
**referring** 27:5

**refers** 104:2,9
**reflects** 34:7
**refresh** 77:10 78:1 79:21
**refused** 47:23
**registered** 47:17
**relate** 13:3
**relates** 78:7
**relative** 113:11,13
**relevance** 69:2
**relevant** 45:3 68:19 69:7
**relief** 39:17
**rely** 32:17
**remained** 67:20
**remains** 50:25 51:1
**remember** 16:22 21:8,25
22:13 32:25 33:2 56:8
63:14 65:24,25 68:11
70:9,15 72:17 73:22
92:20 95:25 101:9,14
102:15 104:6 107:4
110:5
**rented** 40:6
**repairing** 47:16
**repeat** 74:17
**report** 4:2,3,10,11,13,16
4:17,18,19 20:8 28:14
28:15,18,19 33:23
34:1 54:2 57:1 72:3
81:3 84:18 89:2 90:9
90:23 93:17 113:7
**REPORTED** 1:19
**reporter** 1:19 3:4 6:18
10:4 27:23 35:22
69:19 77:24 83:5
94:14 95:14 102:25
113:1,6,19
**REPORTING** 1:22
**reports** 6:25 7:8,9,11 8:5
8:9 14:11,12,13,14
31:24 32:12,13 33:3
48:10 79:15,18 81:4,8
90:12
**representative** 79:7
**requested** 106:16
**required** 9:20,25 10:9
**research** 78:18
**residence** 11:11 14:3
17:17 27:15,16 38:14
47:20,22,24 70:13,16
90:25 106:17
**residences** 31:17
**resident** 40:11 57:20
94:23
**residential** 54:20
**respective** 111:15
**responded** 47:23
**responding** 8:13
**responsibilities** 8:25
**responsible** 41:17 42:7
53:14
**restroom** 76:18 81:11
**result** 10:7 11:22
**return** 24:20
**review** 7:10,16 8:9,12
10:16 11:23 20:4 26:7
32:8,10 44:7 69:16
**reviewed** 6:25 7:8,13 8:4
26:11 42:16,24
**reviewing** 28:15
**reviews** 36:19
**revisit** 59:15,17
**Richey** 1:17,18
**right** 11:7 13:4 17:22
24:5,16 32:25 42:21
43:22 59:22 60:10
76:15,15 80:19 81:5
82:2 83:10,11 88:3

90:17 100:25
**Rjohnson@ij.org** 2:4
**road** 2:7 47:24 91:16
**roadway** 54:22 55:6
**Roanoke** 103:24
**Rob** 56:22
**Robert** 1:4 2:2 7:12,23
20:16,17,17,21 21:24
24:18 54:8 56:3 57:19
58:1 69:11 70:13,15
72:11,13,22,25 73:6,7
85:12,20 101:24 102:2
104:3 114:2
**Robert's** 75:13
**role** 58:25
**room** 77:6
**route** 67:23 91:10
**routinely** 96:1
**row** 44:7
**rule** 77:18 78:19
**rules** 6:14 77:19 80:22
**run** 96:10
**runs** 23:19
**RV's** 54:10

---

**S**

**S** 2:10,11,15 4:1,20 93:9
93:10,11,20 100:19
111:13
**safety** 9:23 10:19
**satisfied** 79:1
**save** 72:8
**saved** 63:9,11
**saw** 90:8
**saying** 38:19 50:7 65:16
66:10 74:8,19,21 75:2
75:12 81:7
**says** 24:8 36:17 43:15
44:14,15 45:2 77:20
79:3 81:3 90:4,4 98:17
103:11,22 104:9
105:21 106:1
**scene** 47:21 68:4,6
**school** 17:2
**scratch** 37:9
**scroll** 91:10 92:9,9
**seal** 112:7
**search** 17:10 18:15 70:19
70:21,22 71:17 84:6
102:10,13
**second** 59:23 61:1,10,17
92:10 93:24 94:20
95:8 108:10
**seconds** 62:10
**section** 44:16
**see** 10:10 15:14 16:1,4,4
16:7,14 17:24 24:6
31:17 53:11 62:24,25
68:1 73:6 74:12 89:14
90:3 91:7 92:3 97:3,3
99:15 103:20
**seeing** 80:20
**select** 10:14,14
**self-evaluation** 34:6,18
37:21
**Semoran** 2:15
**senior** 73:7 103:24
104:2
**sense** 110:23
**sentences** 47:13
**separate** 105:1,4
**September** 21:9
**sergeant** 75:7,8,17,18,21
75:22 108:8,9,11,11
108:13
**seriousness** 12:25
**service** 32:15 84:20

86:21,25 87:1
services 16:5
set 13:25 43:8 46:21 97:6
Shaker 2:3
share 58:21
sharing 58:14 59:2
shed 77:15
Sheet 3:5 115:1
sheriff 1:8 75:22,23,24
  75:25 76:8,9 114:6
Sheriff's 4:14 5:11,13 6:5
  8:22 9:7,10,13,16,24
  27:9 35:1 53:1,6 64:14
shooting 46:5
short 12:7 61:2 82:4
shorter 25:11
shortest 25:7
shortly 97:22
show 16:5 27:21 60:13
  67:23 71:19 93:7 98:2
  98:3
showing 68:1
shown 68:17
shows 79:9 91:10 98:7
siblings 106:11
sick 100:6,7
side 54:15,16,20,24
  61:20 62:1,3 64:9 95:9
  95:10
signage 52:13
Signature 3:5 114:9
significant 29:7,19 30:6
  30:8 34:8 38:7 109:9
signing 111:16
silence 72:8
similar 105:22
single 41:24 61:14
sir 53:22
site 14:19,21
situation 40:5,19 41:4,13
  66:11 78:24 79:13
situations 49:19
six 64:23 65:1
ski 54:15 55:3 57:8
skills 34:23
skip 72:7 74:3
slide 43:16 47:5 48:4,12
  98:2,3,4,6,15 99:13
  100:8,11,13
slides 4:21,22,23 42:14
  43:8 46:22 47:12 97:1
  97:6,13,15,20 100:9
  105:2 108:2
slip 80:6
slow 77:23,23
small 25:19 31:9 42:25
  109:8
sole 52:2
solely 25:17,18 84:3
solicit 17:9 18:7 65:12
somebody 13:25 45:3
  49:1 74:21 75:2 86:24
someone's 15:18
son 40:23,24 41:1 58:1,2
  69:13 72:12 74:22
  75:13 101:25 102:6,9
sorry 5:17 24:6 47:7
  56:24 57:24 59:24
  67:22 69:11 77:20,24
  91:3 93:11,13 97:3
sort 13:4 100:4 103:10
  105:16
sound 94:24
sounded 94:21
sounds 83:11 94:25
speak 47:23 103:15
  110:1,3,6

speaking 72:9 75:12
specialize 9:3
specific 54:25 96:9
specifically 23:10 30:1
spider 18:21
spreadsheet 48:4
sprees 19:8
squad 70:22,23 71:3
squarely 80:13
Squires 44:8,18,20,23
Sr 20:17 102:3
stamp 74:13
stand 106:11
standing 95:1
STAR 27:1,2 33:5,10
  47:14,23,23 49:22,24
  50:5,8,10 56:7,9 57:5
  57:8,16 64:19 66:25
  67:5,14,18,20,23,23
  68:1,3 71:9,9,12 107:8
  107:9 108:12,16
  109:15 110:3,6,11,16
  110:19
starting 36:17
stat 19:5
state 12:0 5:8 112:2,12
  113:3
stated 47:19
statement 65:8,11 75:25
states 1:1 54:19
statistics 19:7,17
staying 50:24
Ste 2:3,7,11,15
stenographically 113:7
step 70:10 78:17
Stephanie 104:1,15
sticker 82:25
stipulated 111:14
Stipulation 3:3
stop 106:12
stored 64:23
strategic 26:24 27:13
street 10:9,11 44:19
strengths 29:8
stuff 23:7
subject 18:2 20:14 21:22
  79:8
subjects 47:16,21
submit 10:24
SUBSCRIBE 114:12
SUBSCRIPTION
  114:13
subsequent 68:10 69:8
substantial 79:10,12
substantively 77:9
succeeded 29:20
sufficiently 85:9
suggest 79:23 106:15
suitcases 47:22
Suite 1:17
Suites 1:17
supervise 102:6,8
supervised 71:9 108:7
supervision 102:4
supervisor 36:15 108:5
sure 10:6 15:7,17,25
  16:1,5,9 17:15 23:17
  23:24 25:5,10 44:11
  45:5 48:18 54:25
  55:12 56:10 57:13
  58:15 66:1,5 72:12
  80:15 81:21 83:6
  87:19 94:6 96:8,10
  98:23 100:11 104:11
surrounding 12:19 39:18
suspected 11:12 23:10
  32:15 35:12

suspended 48:2
Sweetwood 34:15
switched 71:8 90:15
sworn 5:2 112:6
system 63:13

_____

T

T 4:1,21 96:19,20 97:7
  97:11 111:13,13
Tab 103:5 105:10
table 44:3
take 6:18 9:18 76:18 81:5
  81:12 82:19 99:23
  102:16 103:15 104:2
  105:21
taken 105:23
talk 8:21 33:9 37:11
  96:17
talked 80:24
talking 37:12 72:22
  73:15 74:21 81:23
  87:6,20,21
tall 41:5,6 62:14
taller 63:3
Tammy 1:3 7:11,20 8:2
  84:9 85:1,21 86:10
  87:8 88:11 89:3,5
  90:24 101:21 114:1
TAMPA 1:2
tangible 79:5
target 11:20 12:10,24
  26:25 27:13 30:11
Taylor 1:3 107:11,11,14
  114:1
team 33:6,10 49:22,24
  50:5,8,10 56:9 57:5,9
  57:16 64:19 66:25
  67:5,24 68:3 71:9
  107:8,9 108:16 109:15
  110:3,7,11,16,19
techniques 35:10
telephone 2:6,10 7:6
tell 5:2 24:4 25:13 61:4
  63:1,2,5 67:4 72:25
  73:2,8 94:21 97:19
  103:12 109:4
ten 25:11 92:11 108:25
tense 13:5
term 13:21,24 15:21,24
  18:8,10,21,24
testified 5:4 78:16
testifying 78:2,2 80:3
testimony 78:8 113:9
text 29:3,5 36:14
Thank 28:25 29:16 34:17
  36:7 47:9 53:22 56:13
  56:24 74:15 91:5
  93:19 95:15 111:7
thanks 19:24 26:18 36:4
  77:17 83:13
Theresa 44:8,18
thing 6:15 59:22
things 33:2 37:12 54:23
  79:5 82:12 101:15
  102:22,23
think 36:23 37:10 42:25
  58:16 60:14 79:12,23
  80:10 82:14,18 83:11
  94:3,5,10 95:13 96:16
  100:23 110:21
third 20:19
thirty 109:20
Thomas 2:14 75:7,8,17
  75:18,21 108:9
thought 59:17
three 5:20,22 9:2 21:4
  38:18,20 44:18 47:5

53:10,15 90:6,10
  92:16 93:25 97:15
  109:5,17
time 1:15 7:6 9:22 12:7
  13:3,11 14:5 15:1
  18:18 21:1,2 23:1,12
  26:8 29:24 41:12
  48:18 49:6,12 50:24
  53:5 57:24 58:5 60:23
  61:5 62:7,21 63:6 64:5
  64:11 65:6 66:22
  67:12 71:4 72:19 73:1
  73:4,12,19 74:2,5,13
  74:24 75:9,19 76:13
  77:6 87:12,14,16,25
  88:1 91:23 93:22
  94:11,18 95:5,17 96:9
  96:14 97:20 101:2,3,7
  101:12,14 107:2
  108:25 109:1 110:14
  110:15,22
timeframe 99:21
timeline 101:16
times 10:22 11:11 12:16
  12:17 15:4,6 26:10
  50:10,12
tip 11:3
tips 10:19,21,24 11:1
  17:9 18:7 23:5 30:23
  31:23 32:8,11 33:2
  51:12,25 52:4
today 58:9 110:21 111:6
today's 6:21 8:19 20:4
toddler 102:11
told 106:10
tolerance 76:4
Tom 19:23 42:14 53:21
  77:19 80:17
tool 26:25 27:13
top 12:4 18:8,17 32:25
  44:23 45:1,4,15,18
  48:14,17,18,19 49:5,9
  49:13 50:23 87:16,25
  94:7 98:22 103:12
  104:8 105:21
total 44:21 53:9,10,10
totaling 44:19
track 36:5
tracks 36:19
trailer 37:13 54:15,16,19
  55:2 61:20,23,24
trailers 54:10 55:8
trained 16:20,23
training 99:20,22 100:2
  100:2,5,6
transcript 113:8 114:11
trends 19:8
trial 59:8,9 78:19 79:6
troubleshoot 28:5
truck 47:17
true 41:10 42:9 69:4 71:4
  113:8
truth 5:2,3,3
try 17:9 99:23 106:4
trying 28:4 65:12
turn 12:18 26:16 34:3
  36:13 37:20 43:20
  47:11 97:24 103:5
  104:12 105:20
twelve 61:12 63:3
twice 22:11,16,24
two 15:4 22:6,11,16,24
  24:22 53:8,9 90:9,23
  92:18 94:1,22 109:3
type 32:13 98:4,6
types 11:22 16:13 37:12
  37:17 100:8

typically 9:18 10:17 14:7
  42:4 67:7,9 68:17
  108:19

_____

U

U 4:22 102:24 103:1,4
  105:3,5 111:13
Uh-huh 67:25 79:20
  84:12 109:19
ultimately 79:22
unavailable 100:7
unbeknownst 15:13
uncommon 55:13
uncooperative 47:18
undersigned 112:4
understand 18:12 65:11
  66:10
understanding 65:13
  78:15 82:6
Understood 81:24 82:1
undue 79:11
unequivocally 78:13
unfortunate 39:19
unfortunately 27:19 28:3
  38:16,20 39:1
unit 71:9,12 90:4,8,13
  91:7 107:1 108:14,15
UNITED 1:1
units 57:4 67:20 69:2
unknown 47:16
unlicensed 47:25
upload 63:13
USC 77:21
use 17:10 27:12 34:24
  35:3,7,8 81:11 83:24
  84:2,5 90:18 97:5,7
uses 78:1
Usually 91:14
Utilize 26:24

_____

V

v 4:23 78:20 80:4 105:10
  105:12
VA 2:7
vacation 100:6
Vazquez 98:20,21,25
  100:11,14
vehicle 47:17 48:1
verbal 6:16 87:2
verbatim 74:18
verify 77:13
victimizing 75:13
video 4:12,14,20 7:1
  60:13,15,15,21,23,25
  61:2,4,5 62:7,21 63:6
  63:8 64:5,11 65:6,9
  66:22 71:20,25 72:19
  73:4,8,11,19,24 74:2,5
  74:24 75:9,19 76:13
  93:8,8,12,14,22 94:1,2
  94:11,18 95:5,17
  96:14 100:18
view 30:7 34:8 50:15
  51:15 54:21 62:25
  85:9
violation 10:10 13:1
  40:13,21 41:1,17 42:8
  54:13,14,18,23 55:2
  55:15,22 56:1 85:5
  86:1,13 87:2
Violation-2 4:12 60:22
violations 10:18 11:2,6
  11:20 12:2,11,18,21
  15:11 18:16 27:15,17
  30:19,22,25 31:3,17
  32:14,15 37:11,14,14

37:15,15,18 51:5,9
52:3,15 56:6 65:15
71:16 89:11,14 90:2,3
93:5 96:3,5,12 107:18
107:25
**visible** 55:6 85:9
**visit** 10:15 11:5 17:13
20:9,12,20 21:2 22:15
22:23 27:16 41:25
45:21 46:2 49:2 51:13
52:5,7 56:7 57:12
64:25 65:4 66:24 69:1
84:4 87:10 88:11,14
88:16 89:2,5,8,16 90:1
90:24 91:9 93:5
100:25 106:10 110:10
110:12,13,14,17
**visited** 31:11 44:3 49:11
67:10 87:8 100:17
**visiting** 11:23 21:6 22:10
52:8 84:1
**visits** 51:24 52:1,17,21
92:22 93:1 96:2
**voice** 73:23 74:7 75:4,6
75:14
**volume** 10:18 11:9
**vs** 1:6 114:4

**W**

**W** 2:14
**wait** 97:3
**waived** 111:17
**waiver** 83:9
**waiving** 82:10
**walk** 52:10,12
**walked** 64:8 95:8
**walks** 78:22
**want** 10:22 15:6,7 24:20
42:17 82:20 83:6,22
84:9 102:22 103:14
110:1
**wanted** 63:16 81:21
**warned** 47:24
**warning** 9:21 10:2 40:14
66:9,12 86:12,14,18
87:2,2,11
**warning's** 15:18
**warnings** 9:17 66:3
**warrant** 70:19,21,22
71:18 84:6 96:9
102:10,13
**wasn't** 15:16 45:18 80:15
81:21,22
**watched** 100:18
**way** 64:8 80:20
**we'll** 12:6 19:22 43:5
53:18 80:16 82:21,21
82:24
**we're** 11:1 35:21 38:1
42:20 60:6 62:9,24
64:7,13 75:11 82:18
84:11 87:20 90:17
95:7 103:11,13 110:21
111:6
**we've** 77:6 84:7
**weed** 61:14
**weeds** 61:9,11
**week** 15:2,4 24:25 31:19
32:5,12 44:18 48:19
57:12,13 87:4,5
100:17 107:21
**weekly** 19:17 32:3,4
43:15
**weeks** 22:6,11,16,24
24:23
**welcome** 82:20
**went** 18:15 49:10 50:3

67:3,22 91:10 108:12
**weren't** 107:24
**west** 61:20
**Westlaw** 78:21 80:7
**Williamson** 106:10
**willing** 65:14
**window** 67:11
**Winter** 2:15
**witness** 5:5 24:5 26:20
28:7 39:8,10,12 77:11
78:1,6 80:25 81:3,13
81:19,25 83:19 112:7
113:9
**witness's** 78:8
**witnesses** 80:3 82:12
**woman** 44:8
**work** 9:7 13:4 53:1 58:17
59:7,11 78:12,23,23
80:1,9 82:7 108:15
**work-related** 29:7 38:7
**worked** 9:9 70:23,23,25
108:4 110:4
**working** 13:14 17:4 21:3
28:19 38:10 67:11
69:3 91:23
**worst** 36:21 37:1
**wouldn't** 23:9 42:1,4
79:24 82:7
**wound** 46:5
**write** 65:14
**writes** 59:10
**writing** 78:1,5
**writings** 78:13
**wrong** 60:1,1 103:14
110:1
**wrote** 34:22 79:2

**X**

**X** 3:1 4:1

**Y**

**yard** 41:11 61:14
**yeah** 13:8 22:9 34:16
36:2,23 38:3 43:6 44:7
59:19 60:1,4,4 67:17
77:8,18 80:18 82:2
83:11,16 93:11 94:12
100:22,25 102:10
106:6 109:25
**years** 81:25 107:6 109:6
109:17
**yelled** 106:12
**Yep** 6:17 9:16 39:12
**young** 101:25
**younger** 106:11

**Z**

**zone** 14:16 38:18
**zoning** 37:14
**zoom** 106:3 111:4

**0**

**1**

**1** 1:17 4:8 8:1 106:15
**1-5-2023** 112:13
**1:25** 96:16
**1:39** 68:6
**1:44** 61:25
**1:49** 68:7,8
**10** 44:1 103:6,11
**10:50** 74:4
**10:58** 74:14
**1010** 2:15
**10136** 44:19
**103** 4:22

**1035** 2:15
**105** 4:23
**10th** 44:5
**11** 105:20
**111** 3:3
**112** 3:4
**113** 3:4
**114** 3:5
**115** 3:5
**12** 62:14 75:1
**12:14** 1:15 111:11
**12:57** 75:11
**12868708** 78:21
**12th** 112:7 113:17
**14** 43:8 91:4 93:8,15
101:1
**14:59** 67:24
**15th** 87:6
**16** 5:23 60:21
**16781** 2:3
**168** 44:21
**16th** 87:6
**17** 96:23
**1730** 47:15
**17367** 94:7
**18** 48:2 77:21
**18:47** 23:20
**19:13** 23:20
**1985014** 80:17
**1st** 7:20 84:24 87:9 88:19

**2**

**2** 2:11 36:13 67:2,7
**2:14** 62:10
**2:30** 67:6
**2:33** 62:24
**2:34** 67:15,18,22
**2:56** 64:7
**20** 4:2 24:14
**20-minute** 24:17
**2012** 78:21
**2013** 6:3,6,8
**2015** 21:10 22:4 86:16
93:8
**2016** 4:4 5:17,25 7:20,21
7:24,24 8:1,1 13:12
26:6 36:11 54:6 70:5
71:10 84:24 96:23
106:15,17
**2017** 36:11 43:8 44:6
89:9 90:14
**2018** 33:24 91:4 93:15
97:21,21,23 98:13
101:1
**2019** 5:17,17,19 13:12
33:24 46:22 47:8 71:8
71:10,11,14 90:14
**2020** 28:24
**2021** 80:6,6
**2022** 1:14 112:6,8 113:17
**21** 4:3
**22** 104:12,14
**22203** 2:7
**2377** 90:13
**23rd** 86:15
**24** 89:9 97:24 98:1
**2426** 1:23
**25** 47:11,12
**256** 2:3
**26** 4:4 21:10 61:16 78:19
79:24
**2611** 34:14
**26B1** 79:9
**26B4** 79:8
**276821** 112:12
**28** 4:5 7:24
**29** 70:5

**29th** 7:24 70:16 71:15
72:1,22 84:4

**3**

**3** 4:9,21 8:1 78:19 105:19
**3-14-18** 4:20
**3-14-2018** 4:19
**3-28** 54:6 60:21
**3-28-16** 4:12
**3-4-16** 4:7
**3-4-17** 4:7
**3-4-18** 4:6
**3-4-19** 4:5,6
**3-4-20** 4:5
**30** 93:24
**305-721-1600** 2:12
**3168** 39:8
**3180** 2:11
**32** 68:1 105:11
**3229** 8:8
**32792-5512** 2:15
**33** 4:6
**33131** 2:11
**33526-2426** 1:23
**34** 103:5
**3420** 29:15
**3452** 47:24
**3500** 77:21
**352** 1:24
**3810** 8:8
**3A** 79:3,24
**3rd** 7:21

**4**

**4** 1:14 97:22 112:6
**4:00** 67:21
**4:11** 64:13
**4:30** 67:3,9
**4:44** 68:4
**40** 61:10
**407-673-5000** 2:16
**43** 4:8
**44120** 2:3
**45** 98:1
**46** 4:9
**47** 94:20
**4th** 88:16 97:21

**5**

**5** 3:3 18:8,17 29:2 34:3,4
37:20 44:23 45:1,4,15
45:18 48:14,17,18,19
49:5,9,13 50:23 87:16
87:25
**5-21** 48:2
**5:50** 72:9
**53** 4:10 95:7
**55** 26:16,20,23
**56** 4:11
**567-5484** 1:24
**5th** 97:21

**6**

**6:10** 72:7
**60** 4:12
**612** 77:19 78:18
**69** 4:13

**7**

**703-682-9320** 2:4,8
**71** 4:14
**7139** 29:14

**8**

**8** 43:20 44:2
**8:14** 91:12,17
**8:21-cv-00555-SDM-C...**
1:6 114:4
**8:28** 91:13
**804** 44:19
**82** 85:25
**83** 4:15
**84** 4:16
**8520** 1:17
**88** 4:17,18

**9**

**9** 22:3 46:22 47:8
**9:03** 1:15
**90** 4:19
**900** 2:7
**900.1** 85:25
**901** 2:7
**911** 10:23
**93** 4:20
**972** 44:21
**98** 4:21