```
                UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
                       TAMPA DIVISION
```

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES, III,

  Plaintiffs,

vs.                          Case No.: 8:21-cv-00555-SDM-CPT

CHRIS NOCCO, in his
official capacity as
Pasco County Sheriff,

  Defendant.
_____/


PROCEEDINGS:            Deposition of
                       DARLENE DEEGAN


DATE:                  March 24, 2022


TIME:                  1:05 p.m. - 3:32 p.m.


PLACE:                 Via Zoom


REPORTED BY:           Judy Anderson, Court Reporter
                       Notary Public
                       State of Florida at Large



                ANDERSON COURT REPORTING
                     P.O. Box 2426
                 Dade City, FL 33526-2426
            Judy@andersoncourtreporting.com
                     (352) 567-5484

```
 1   APPEARANCES VIA ZOOM:

 2   ROBERT E. JOHNSON, ESQUIRE
     Institute for Justice
 3   16781 Chagrin Boulevard, Ste. 256
     Shaker Heights, OH 44120
 4   703-682-9320
     Rjohnson@ij.org
 5          Counsel for Plaintiffs

 6   ARI S. BARGIL, ESQ.
     Institute for Justice
 7   2 S. Biscayne Blvd., Ste. 3180
     Miami, FL 33131
 8   305-721-1600
     Abargil@ij.org
 9          Co-counsel for Plaintiffs

10   THOMAS W. POULTON, ESQUIRE &
     ROBERT HOLBORN, II, ESQUIRE
11   Debevoise & Poulton, P.A.
     1035 S. Semoran Blvd., Ste. 1010
12   Winter Park, FL 32792-5512
     407-673-5000
13   Poulton@debevoisepoulton.com
     Holborn@debevoisepoulton.com
14   Cook@debevoisepoulton.com
            Counsel for Defendant
15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                                                      Page

3    Direct Examination by Mr. Poulton              7
     Cross Examination by Mr. Bargil               63
4    Redirect Examination by Mr. Poulton           67
     Stipulation                                   71
5    Certificate of Oath                           72
     Certificate of Reporter                       73
6    Deponent's Signature Page                     74
     Errata Sheet                                  75

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    E X H I B I T S

 2                                       Page

 3
       1 - Plaintiffs' First Supplemental Rule 26(a)(1)     8
 4         Initial Disclosures

 5     2 - Incident Report 5-15-16                          14

 6     3 - Incident Report 7-1-16                           21

 7     4 - Incident Report 9-24-16                          22

 8     5 - Incident Report 4-10-18                          28

 9     6 - CAD Report 6-8-16                                35

10     7 - Incident Report 9-16-18                          35

11     8 - CAD Report 10-27-18                              38

12     9 - CAD Report 12-7-18                               39

13     10 - CAD Report 12-13-18                             42

14     11 - CAD Report 3-29-19                              44

15     12 - CAD Report 3-31-19                              45

16     13 - Incident Report 4-9-19                          48

17     14 - Incident Report 5-8-19                          50

18     15 - CAD Report 6-10-19                              52

19     16 - CAD Report 9-7-19                               53

20     17 - Incident Report 6-14-20                         55

21     Composite 18 - Four Citations                        57

22     19 - Email                                           61

23     20 - Receipt                                         63

24

25
```

1                    DARLENE DEEGAN,

2     being first duly sworn to tell the truth, the whole

3     truth, and nothing but the truth, was examined and

4     testified as follows:

5               THE WITNESS:  Yeah.

6               MR. BARGIL:  Okay.  Really quickly, Madam Court

7          Reporter, I just wanted to interject.  I know you

8          heard some back and forth before we started, and I

9          just want to get it on the record.

10              Mr. Poulton represented to us a moment ago that

11         there were some documents that had just been

12         furnished to us that he intends to use in this

13         deposition that had not been provided prior, and

14         Mr. Poulton also represented that additional

15         documents might be on their way, including some

16         documents that were used as exhibits or referenced

17         in yesterday's deposition of Ms. Heilman.

18              Tom, obviously, we would like to have had those

19         documents sooner.  To the extent that you intend to

20         rely on any of that stuff either today or in the

21         case in general, you are under an obligation to

22         produce those and we expect them in short order.  So

23         I thank you for your appreciation or for your

24         cooperation with that.

25              MR. POULTON:  In short, just to clarify, the

1    documents that were used yesterday in Ms. Heilman's

2    deposition were sent to you yesterday.

3         MR. BARGIL:  Okay.

4         MR. POULTON:  And then the issue that arose was

5    I believe that there was a request for production

6    that had a defined time limit to it, and that's what

7    guided us on what we produced before, but we had

8    earlier provided a list of all incidents, and these

9    are just the reports for those incidents.  But I

10   understand what you're saying, do not disagree that

11   you should be able to look at these prior to any

12   questions about it.  So, in fact, what I'll do is

13   I'll start in 2016, and you should have those

14   already, and there's about maybe six or seven others

15   that are before then and, you know, on a break we

16   can take a look at those so that you have an

17   opportunity to --

18        MR. BARGIL:  Okay.  Obviously, this is

19   suboptimal, and we want to be clear that, yes, you

20   did turn over the documents, the Heilman documents

21   yesterday, but that was after the deposition

22   concluded.  So, obviously, not what we were hoping

23   for, and for this deposition at least we'll want to

24   see whatever you can give us as soon as possible.

25        MR. POULTON:  Of course.

1                    DIRECT EXAMINATION

2    BY MR. POULTON:

3        Q.    All right.  With all of that being said, can

4    you give us your full name, please, Ms. Deegan?

5        A.    Darlene Deegan.

6        Q.    And that's D-E-E-G-A-N?

7        A.    Correct, D-E-E-G-A-N.

8        Q.    Have you ever had your deposition taken before?

9        A.    Yes.

10       Q.    Okay.  So you're familiar with the basics of it

11   which is to try to let me finish asking the question

12   before you answer, and I'll try to let you answer before

13   I ask the next question.

14             It's also important that your answers be

15   audible so that the court reporter can write them down.

16   So no uh-uhs and huh-huhs and shakes of heads and nods

17   of heads.  Okay?

18       A.    Yes.

19       Q.    Very good.  Where do you currently reside?

20       A.    14137 Amanda Avenue in Hudson, Florida 34667.

21       Q.    Okay.  In the past did you live at 5907 Beverly

22   Drive?

23       A.    Yes.

24       Q.    And did you also live at one point at 12412

25   U.S. Highway 19?  I'm sorry.  That may be a pawnshop

1    nearby.  Does that ring a bell?

2        A.    I had owned a property where that pawnshop is

3    or was.

4        Q.    Okay.  Is that -- is U.S. Highway 19 near

5    Amanda Avenue?

6        A.    Yes.

7        Q.    All right.  We'll figure that out when we get

8    there.

9              Who lives with you at 14137 Amanda Avenue?

10       A.    I live alone.

11             MR. POULTON:  Let me begin with a document.

12       This is will be Exhibit 1, Madam Court Reporter,

13       Plaintiffs' First Supplemental Rule 26 Initial

14       Disclosures dated July 26, 2021.

15             (Exhibit 1 was marked for identification.)

16    BY MR. POULTON:

17       Q.    Can you see that document on your end?

18       A.    Yes.

19       Q.    Okay.  Good.  This is a part of the exchange

20    that the attorneys make in the case where the claim for

21    damages is outlined, and I just want to confirm with you

22    that this is correct.

23             This is subsection C, Computation of Damages,

24    beginning on page 4, and this indicates that you request

25    -- this is in the money damages part of it.  You're

1 asking for one dollar in nominal damages, and then

2 you're asking for reimbursement for any code enforcement

3 citations you paid.  This indicates you missed some work

4 and arriving late to work because of PCSO deputies as a

5 result of the program visits by deputies, and then --

6    MR. BARGIL:  Tom, I think that count refers to

7   Dalanea that you're looking at.

8    MR. POULTON:  I'm so sorry.  Yes, you're right.

9   Thank you.  I got stuck at the DA part.

10 BY MR. POULTON:

11  Q.   All right.  So you wanted reimbursement for the

12 code enforcement citations and then some stolen personal

13 property and having to retrieve a dog when deputies as

14 it's put here raided a home; is that correct?

15  A.   Yes.

16  Q.   All right.  And this indicates that you're not

17 seeking damages for any sort of income or emotional or

18 reputational harm.

19  A.   Correct.

20  Q.   All right.  So that will be Exhibit 1.

21   Let me ask you because I'm not sure that I

22 understand what incident this was about replacing stolen

23 property and retrieving your dog.  When did that

24 incident occur?

25  A.   I don't remember the exact year, but it's when

1   they went to the property on Beverly Drive and removed

2   my son Tyler from the property, took the dog to the dog

3   pound, made the roommate vacate, left the doors

4   unlocked, and someone went in there and stole my

5   property.

6       Q.   Okay.  They removed Tyler.  Was he arrested?

7       A.   I don't know.  I don't have any copy of any

8   report, so I don't know what -- the reason for taking

9   him away.

10      Q.   Was he living in the home at the time, or was

11   he living in a trailer in the back?

12      A.   He was living there on Beverly Drive.

13      Q.   Okay.  But my recollection is there's a house

14   and then there was a trailer or maybe two in the back.

15   Do you remember?

16      A.   That's my home on Amanda Avenue.

17      Q.   Oh, I'm so sorry.  Okay.

18          So this was when you lived at 5907 Beverly

19   Drive?

20      A.   This is -- you're referring here to the

21   property at 5907 Beverly Drive.

22      Q.   Right.  And I'm just trying to under- -- Okay.

23   When did you move from 5907 Beverly Drive?

24      A.   I just recall that I was living in the other

25   property 2012.

1    Q.   Okay.  Maybe we'll figure it out by looking at

2    the paperwork.  Maybe it will come up.

3         All right.  So can you tell me what property

4    was taken?

5    A.   There was my two bikes.  There were two kayaks,

6    all of Tyler's possessions, and Roxy, our pet, was

7    taken.

8    Q.   Did you retrieve Roxy from the Animal Services?

9    A.   Yes.

10   Q.   Was there an expense associated with that?

11   A.   Yes.

12   Q.   How much?  Do you recall?

13   A.   No, I don't recall what the total amount was.

14   Q.   Okay.  And what is the value that you put on

15   the bicycles, the kayaks and Tyler's property?

16   A.   I don't have a figure right now.

17   Q.   Okay.  Was anything of particular value taken

18   like any sort of electronics or jewelry, anything of

19   that nature?

20   A.   I don't know what all of Tyler's property was.

21   But, no, I did have not any jewelry or electronics

22   there.

23   Q.   Okay.  All right.  And then there was a

24   reference here to code enforcement.  How many times were

25   you given code citations?

1      A.    I could just approximate seven.  About seven.

2      Q.    Do you remember when the last of those was?

3      A.    The last one I don't recall the exact year, but

4  it was on tall grass in the easement.

5      Q.    Was that in the last say three years or earlier

6  than that do you think?

7      A.    No, I believe it probably was within the last

8  three years.

9      Q.    Okay.  Now, and incidentally you indicated that

10  there were seven -- I'm not sure if it's seven times you

11  got code citations or seven citations in total with

12  perhaps one or more -- more than one given to you at one

13  time.  Can you clarify?

14      A.    More than one given at one time.

15      Q.    Okay.  So --

16          MR. BARGIL:  Just to be clear, Tom, she was

17      also approximating.

18          MR. POULTON:  I understand.

19  BY MR. POULTON:

20      Q.    And we'll go back and we should be able to

21  locate those.  But how many different times were you

22  given code citations?  And an estimate is fine.

23      A.    Two times I believe.

24      Q.    Two times?

25      A.    Yeah, I believe two times.

1    Q.   Okay.  My understanding is that in one set of

2    those you wrote a letter to the County Attorney and came

3    into compliance, and they ended up dismissing those.  Do

4    you recall that?

5    A.   Yes.

6    Q.   Because you didn't have to pay anything that

7    particular time; correct?

8    A.   No, that's not correct.

9    Q.   All right.  You did have to pay something.

10   What did you have to pay?

11   A.   I believe it was $250 to the County Attorney's

12   Office.

13   Q.   Okay.  And that took care of all the violations

14   on that particular incident?

15   A.   The County Attorney handled that matter.

16   Q.   Okay.  And then on the other occasion did you

17   end up having to pay any sort of a fine?

18   A.   I had to pay I believe it was a court -- court

19   fee of I think it was something like $37.

20   Q.   Okay.  Anything else?

21   A.   Those are the ones that I recall that were

22   addressing those code violations.

23   Q.   And I'm sorry.  It was a poorly-worded

24   question.  On that particular occasion did you have to

25   pay anything other than the approximately $37 in court

1    fees?

2        A.   No.

3        Q.   So the total amount that you would be

4    out of pocket for the code violations would be

5    approximately $287?

6        A.   That would be approximately probably, yes.

7        Q.   We'll try to look for the documents themselves,

8    but I was just kind of curious as to what your own

9    recollection was.

10           So I want to walk you through some of the

11   incidents that occurred according to the Sheriff's

12   Office's records, and I wanted to start in June of 2013,

13   but we sent those to your attorneys a bit ago because I

14   think that you probably don't have those yet.  So I

15   wanted to start for right now -- we'll take a break and

16   you can look at those others.  They're not many -- in

17   May of 2016.

18           MR. POULTON:  Counsel, do you have that one,

19       May 15, 2016?

20           MR. BARGIL:  We should if you produced it, but

21       I'd like to see what you're going to show.

22           MR. POULTON:  Sure, sure, sure, sure.

23           MR. BARGIL:  I don't have a second laptop here.

24           MR. POULTON:  I understand.

25           (Exhibit 2 was marked for identification.)

1   BY MR. POULTON:

2       Q.   Okay.  This is Exhibit 2.  It's an incident

3   report dated May 15, 2016.  The location of the incident

4   is 13402 Peace Boulevard, Spring Hill, but I think --

5   yeah, the home address, it's your home address listed

6   here on Amanda Avenue.  Do you see that?

7       A.   Yes.

8       Q.   Okay.  Let's see.  Trying to find the part

9   where you might be mentioned.

10          Okay.  On this occasion this gentleman called

11  the Sheriff's Office to report a trailer had been

12  stolen, pulled off of his property, had white -- two

13  white golf carts and a moped which were in the trailer

14  and then --

15          MR. BARGIL:  Tom, do you want to give her a

16      moment to just read the document --

17          MR. POULTON:  Okay.  Sure, sure, sure.  I'm

18      sorry.

19          MR. BARGIL:  -- that way she can just --

20          MR. POULTON:  No problem.

21          MR. BARGIL:  -- agree with your

22      characterization or not?

23          MR. POULTON:  Okay.  Let me know when you want

24      me to toggle down.

25          MR. BARGIL:  Take a look, and when you're done

1      at the one place, when you're done let him know.

2              THE WITNESS:   Okay.   Can he scroll down?

3   BY MR. POULTON:

4      Q.   I can scroll down now?

5      A.   Yes.

6      Q.   Okay.

7      A.   Okay.   Can you scroll down more?

8      Q.   Of course.   Trying to get to some narrative for

9   you.

10     A.   Okay.   Okay.   If you can scroll down.

11     Q.   Sure.

12     A.   Okay.   If you can scroll down, please.

13     Q.   Sure.

14     A.   Okay.   Is there more on this?

15     Q.   Let's see.   Okay?

16     A.   Okay.   Is that the end of it?

17     Q.   No, I think there's more.

18     A.   Oh, okay.

19     Q.   That's all right.

20     A.   Okay.

21     Q.   And incidentally, the other reports we're going

22  to look at are not this long.

23     A.   Okay.

24     Q.   Okay.   So --

25     A.   Okay.

1       Q.   Okay.

2       A.   Okay.  If you could scroll down.

3       Q.   Sure.

4       A.   Okay.  You can scroll down, please.

5       Q.   Sure.

6       A.   Okay.  I've got that.

7       Q.   Okay.

8       A.   Okay, I got that.

9       Q.   Okay?

10      A.   I got that.

11           Okay, I got that.

12      Q.   All right.

13      A.   Okay, I have that.  Okay, okay.

14      Q.   And that's the end of that document.

15      A.   Okay.

16      Q.   So let me begin by asking you whether you

17   remember this incident involving the trailer that had,

18   well, at one point I guess two golf carts in it, but

19   when it was found, it had one golf cart and a moped in

20   it.

21           MR. BARGIL:  Objection, Tom.  I don't think it

22      said that there were two golf cars in the trailer.

23      I think two were stolen, and one was alledgedly

24      found in there.

25           MR. POULTON:  Yeah, that's what I said.

1    BY MR. POULTON:

2        Q.   Did you understand me, Ms. Deegan, that it was

3    originally reported there were two golf carts in there,

4    but when it was found, there was only one?

5        A.   Yes.

6             MR. BARGIL:   Same objection.

7        A.   I'm just going by that report in front of me.

8    BY MR. POULTON:

9        Q.   Right.   I mean, do you remember this incident

10   with the trailer being found on your property?

11       A.   Yes.

12       Q.   Now Tyler was how old at this time?   Let's see.

13   This was in 2000 -- His date of birth was what?

14       A.   Whose date of birth?

15       Q.   Tyler's.

16       A.   ████████████████.

17       Q.   Okay.   So he would have been about 32 at this

18   time?   31, 32?

19       A.   Yes, I would say about the age of 32.

20       Q.   Okay.   Having read this report, is it accurate

21   to the best of your knowledge as to the back and forth

22   you had with the deputies in terms of locating the

23   trailer and getting your permission to retrieve it?

24       A.   Yes.

25       Q.   Do you remember anything about the incident

1    other than what is indicated in this report?

2        A.    I don't remember much on it.  I know I was

3    contacted because I've got a half acre and asked if they

4    could store the trailer.  I had a lot of room, and I had

5    no problem.

6        Q.    Okay.  You say they asked you if they could

7    store the trailer there.  Who is they?

8        A.    Well, I say they.  The guy that brought it and

9    I -- I saw it in that report because I had taken down

10   the tag number when he brought it in.  So then I must

11   have given that information to the deputy because I see

12   the information there in the report.

13       Q.    Okay.  And this was Jason Meotti was the person

14   who contacted you and asked you if he could store the

15   trailer on your property?

16       A.    I don't remember his name now because that was

17   about five, six years ago.

18       Q.    Okay.

19       A.    Whoever it was I talked to and they said what

20   their name, but I just remembered writing down the plate

21   number on the vehicle that he brought the trailer with.

22       Q.    All right.  So when whoever it was had asked

23   you if they could store it on your property, you didn't

24   realize at the time that it was stolen?

25       A.    No, not at all.

1    Q.   You later found out that it had been stolen?

2    A.   Well, from the deputies, yes.

3    Q.   Did you ever speak with Tyler about that?

4    A.   I -- I don't remember because they apprehended

5    Tyler and put him in jail.  So I really don't remember

6    if I ever talked to him about that.

7    Q.   Okay.  Do you know what the outcome of the

8    criminal charge was in this particular incident as far

9    as Tyler?

10   A.   No, I don't know.

11   Q.   Okay.  Whoops, where is this?  Oh, there we go.

12        By the way, back during that timeframe -- and I

13   could pull up the document again if you'd like -- it

14   indicated I think you were going back and forth between

15   the address on Beverly and the address on Amanda?

16   A.   No, I -- I was living in Amanda, and I also

17   would go back up to the house on Beverly.

18   Q.   You owned both of those?

19   A.   I'm sorry?

20   Q.   You owned both of those at the time?

21   A.   Yes, yes.

22   Q.   Do you still own both?

23   A.   No.

24   Q.   Are you Tyler's birth mother?

25   A.   Yes.

1    Q.   And there was reference in that report to his

2    father.  Was that his biological father or stepfather?

3    A.   Yes.  No, it's his biological father.  Yes.

4    Q.   And what's his name?

5    A.   Theodore Paneson.

6    Q.   Are you and Mr. Paneson divorced?

7    A.   Yes.

8    Q.   All right.  I'd like to show you a -- well, you

9    may remember this one.  There's a -- this will be

10   exhibit I guess we're on three now.  It's dated July 1,

11   2016, and I'll let you take a look at it.

12             (Exhibit 3 was marked for identification.)

13   BY MR. POULTON:

14   Q.   Let me know when you're ready for me to scroll

15   down.

16   A.   Okay, you can scroll down.

17        Okay, you can scroll down.

18   Q.   All right.  One second.

19   A.   Okay.

20   Q.   All right.  That's the end of that one.

21        Do you remember this incident where somebody

22   was at Kmart using your store credit card?

23   A.   No.  What -- Do you know what credit card?

24   Q.   It says the store credit card.

25   A.   No, I don't remember this at all.

1      Q.   See there the store credit card was in Darlene

2   Deegan's name?  No?

3      A.   No.

4      Q.   So nobody notified you of that?

5      A.   No.  I don't recall my credit card company

6   contacting me.  I know there's been times I've had to

7   close a card and open a new one.

8      Q.   I think everybody these days has had that

9   experience.  Unfortunately, a very common thing.

10          All right.  I'm going to show you what I

11   believe this is Exhibit 4 now.

12          (Exhibit 4 was marked for identification.)

13   BY MR. POULTON:

14      Q.   This is an incident report dated 9-24-2016.

15   Location of the incident you see there is Beverly Drive?

16      A.   Yes.

17      Q.   All right.  Now I believe in this incident

18   Tyler Paneson called the Sheriff's Office after you

19   called him because -- Well, I'll let you read it.

20      A.   Okay, if you can scroll down.

21      Q.   Sure.

22      A.   Okay, if you can scroll.  Okay.

23      Q.   Okay.  So let me begin by asking you do you

24   remember this incident?

25      A.   I don't.

1    Q.   Okay.  I gather from the narrative here that

2    you were working at Busch Gardens; is that correct?   In

3    this timeframe, were you working at Busch Gardens?

4    A.   Yes.

5    Q.   And Tyler -- you don't remember calling Tyler

6    to report that the motion sensors were going off?

7    A.   I don't remember this, no.

8    Q.   Okay.  I think I know the answer, but I'll ask

9    anyway.  Do you remember talking to Tyler about this

10   incident?

11   A.   No.

12   Q.   There's a reference in here to cameras.  Did

13   you have cameras outside the residence or inside the

14   residence or both in 2016?

15   A.   I remember at some point, and I don't know what

16   year we installed them, but we had some outside.

17        I had inside ones that I remember if you broke

18   the glass that it would go to the alarm company, but I

19   don't remember when I installed that.

20   Q.   Okay.  So that was like a -- like a --

21   A.   Like Brinks.

22   Q.   Yeah, like a panic alarm inside the house?

23   A.   I -- I had, yes, if you broke in or you broke

24   glass that it was a Brinks -- I think it was Brinks

25   security system with the key pad.

1    Q.   I see.  So it had sensors on the windows, so if

2  if the windows were broken, it would send an alarm to

3  the alarm company?

4    A.   Yes.

5    Q.   And, as you know, there's -- well, I assume you

6  know that there's body-worn camera video of some of the

7  deputy visits to your residence; right?  You've seen a

8  couple of those?

9    A.   Yes.

10   Q.   And I've seen some still shots that your

11  attorneys have sent to me presumably from your video

12  system; is that right do you know?

13   A.   Yes.

14   Q.   Do you have any video of -- from those or just

15  the screenshots?

16   A.   I don't really recall what has still been saved

17  from videos.

18   Q.   Okay.

19   A.   But I definitely have taken pictures of the

20  screen with the video.

21   Q.   Oh, okay.  So you would maybe with a cell phone

22  take a picture of the video as you watched it?

23   A.   Well, not with a cell phone.  I have a good

24  camera, a professional camera.

25   Q.   So you used your camera to take pictures of

1     still shots of the video as you watched it?

2         A.   I -- I can and I have in the past, yes.

3         Q.   Do you know whether or not you have any of the

4     video still around of deputies on your property or at

5     your property?

6         A.   I'm not sure.

7              MR. POULTON:  Counsel, if you could check into

8         that if there's any -- if she has any video.

9              MR. BARGIL:  Sure.  I think we -- yeah, we can

10        do that.  I want to make sure to be clear about

11        something.  I think that this police report is in

12        reference to the Beverly address, and I believe that

13        what you're referencing as far as screenshots is

14        the other, the Amanda.

15             MR. POULTON:  Amanda?

16             MR. BARGIL:  Yeah.  I'm not sure if it matters

17        for purposes of this line of questioning.  I just

18        want to make sure that you're aware.

19             MR. POULTON:  Yeah, I appreciate that.  You're

20        right.  It doesn't matter for this particular issue,

21        but I'll ask it both ways.

22    BY MR. POULTON:

23        Q.   This particular incident report referenced 5907

24    Beverly Drive in Hudson.  I believe that the screenshots

25    that have been sent to me are from the other address,

1    the Amanda Avenue address; is that right?

2        A.    Yes.

3        Q.    Okay.  Just so we're clear, did both addresses

4    in 2016 have video camera systems on the exterior?

5        A.    Both properties had video cameras installed at

6    some point, but I can't tell you the exact year that

7    each one of them had them installed.

8        Q.    Are any of the complaints that you're making in

9    this case -- do any of those deal with the Beverly Drive

10   address, or are they all complaints about deputy

11   interactions with you at the Amanda Avenue address?

12       A.    It would relate to both properties because Roxy

13   was taken from the Beverly Drive property --

14       Q.    Okay.

15       A.    -- and there were things taken when the place

16   was unsecured when they had everybody vacate.  That was

17   the Beverly Drive property.

18       Q.    Okay.  Were there any other incidents that

19   you're complaining about in this lawsuit other than that

20   one at the Beverly Drive address?

21       A.    Regarding this matter here?

22       Q.    Well, in this lawsuit, you know, there's a

23   series of incidents of deputies coming to the -- to I

24   guess both residences at least once.  We know the 5907

25   Beverly Drive address was visited in 2016 because of a

1    call from Tyler.  That's the one we've just been over;

2    right?

3        A.    Right.

4        Q.    And then you're alluding to another one in

5    terms of Roxy having been able to escape and some

6    property being stolen because the residence was left

7    unsecured.  That was also at Beverly; right?

8             MR. BARGIL:  I just want to object to the

9        characterization of her testimony.  It wasn't --

10       again, I'm not sure it's relevant.  The dog wasn't

11       able to escape.  She was impounded.

12            MR. POULTON:  Oh, I misunderstood.  I'm sorry.

13   BY MR. POULTON:

14       Q.    Okay.  So -- and this -- we're just trying to

15   get on my end organized here.

16       A.    Okay.

17       Q.    So in terms of deputy response that you're

18   suing over, okay, put it that way, there's the incident

19   where the dog was impounded, Roxy, and some items were

20   stolen from the residence, and that occurred at the

21   Beverly Drive address; correct?

22       A.    Correct.

23       Q.    And then we know that there are a series of

24   interactions at the Amanda Avenue address.  We'll get to

25   those here a minute.  But my question is -- right now is

1    are there any other criticisms that you have of the

2    deputies relevant to this lawsuit that pertain to the

3    5907 Beverly Drive address?

4         MR. BARGIL:  Object to form.

5    BY MR. POULTON:

6         Q.   You can answer.  Do you understand my question?

7         A.   Well, what I can recall right now that that --

8    those are the issues right now that I remember relating

9    to 5907 Beverly Drive.

10        Q.   Okay.

11             (Exhibit 5 was marked for identification.)

12   BY MR. POULTON:

13        Q.   All right.  Let me show what will be Exhibit 5.

14   This is dated April 10, 2018, and this pertains to the

15   Amanda Avenue address.  Do you see that?

16        A.   Yes.

17        Q.   Okay.  I'll just let you read this narrative.

18   It's brief.

19        A.   Okay.

20        Q.   All right.  I have to ask some intrusive

21   questions about Tyler.  My understanding is that he

22   developed a drug problem; is that correct?

23        A.   Yes.

24        Q.   Okay.  About when did that start?

25        A.   I wouldn't know exactly when it started.

1      Q.   When --

2      A.   I could only estimate.

3      Q.   I was going to say when did you first become

4   aware of it?

5      A.   Probably around maybe 2012.

6      Q.   Was it one particular substance that he abused

7   or multiple?

8      A.   Marijuana.

9      Q.   Anything more -- anything more serious?

10     A.   Not that I was with any knowledge of, no.

11     Q.   This incident -- this is exhibit what am I up

12   to, five I think?

13          COURT REPORTER:  Yes.

14   BY MR. POULTON:

15     Q.   This is Exhibit 5, and do you remember this

16   incident?

17     A.   Do I remember the incident?

18     Q.   Right.

19     A.   Yes.

20     Q.   Okay.  So as I understand it, you called the

21   Sheriff's Office because you wanted Tyler to be

22   trespassed from the Amanda Avenue address?

23     A.   Yes.

24     Q.   I mean, can I ask why?

25     A.   Because I did not allow drug use or any drugs

1     on my property.  I didn't want that.  And Tyler needed

2     to get a job and get straightened out because he was a

3     different person on drugs.

4          Q.   Was he -- now is it the Amanda Avenue address

5     that has the trailer in the back?

6          A.   Yes.

7          Q.   Was he living in the house or was he living in

8     the trailer or both in this timeframe?

9          A.   He wasn't living in either.  If you're

10    referring to the couple of days here?

11         Q.   Right.

12         A.   In my house.

13         Q.   Do you know if he was trying to get help with

14    the drug issue?

15         A.   That I don't know.

16         Q.   Okay.  Do you -- well, do you remember any

17    deputy at any point telling you that Tyler had been

18    designated as a prolific offender?

19         A.   Yes.

20         Q.   Do you remember when that was?

21         A.   No.

22         Q.   What do you remember about the conversation

23    where you were told that?

24         A.   The only thing I remember on it, because it

25    really stood out, was him telling me that Tyler is one

1    of the Top 5 people in Pasco as a prolific offender, and

2    that really stood out to me.

3        Q.    I apologize if I -- I think I already asked you

4    if you remembered when that was.  I think you said you

5    didn't remember; is that right?

6        A.    No, I don't remember.

7        Q.    Do you remember where that conversation

8    occurred?

9        A.    No.

10        Q.    So it could have been at Amanda or it could

11    have been at Beverly?

12        A.    I -- No, I would have been living on Amanda

13    when I was told that.

14        Q.    Okay.  You had sold the Beverly address by

15    then?

16        A.    What year are we talking?

17        Q.    Well, when I'm looking through the reports, for

18    example, in 2018 moving forward, they all have the

19    Amanda Avenue address to them.  So I'm wondering if you

20    sold the Beverly address maybe in 2017 or '18?

21        A.    I think it would have been transferred right in

22    2018 -- 2017 or '18.

23            MR. BARGIL:  Don't guess if you don't know.

24    BY MR. POULTON:

25        Q.    You can always qualify it by saying your best

1    recollection is or you think and you're not sure.

2        A.   I actually think it would have been

3    approximately 2017, 2018.

4        Q.   Do you recall the name of the deputy that told

5    you this?

6        A.   I know it's a detective, and I -- I just know

7    the last part of his name is I-N-G-E-R.

8        Q.   Okay.

9        A.   I mean --

10       Q.   Of course, I'm curious as to how you remember

11   the partial name.

12       A.   He gave me his business card.

13       Q.   Ah, okay.  Could it have been Bollinger,

14   B-O-L-L-I-N-G-E-R?

15       A.   I don't remember.

16       Q.   Okay.

17           MR. BARGIL:  Tom, my guess is it's not who it

18       was.  We can go back and take a look but --

19           MR. POULTON:  Do you want to take a look and

20       see if you can figure it out?

21           MR. BARGIL:  Well, we can -- it might have

22       been -- we can take a look after the deposition.

23           MR. POULTON:  Right.

24   BY MR. POULTON:

25       Q.   I will say this.  There is a -- Let me show you

1    this.  This might help.  This is -- this doesn't need to

2    be an exhibit.  There's almost nothing to it, but

3    there's this name Pfenninger.

4        A.    That's him.

5        Q.    Okay.  So he gave you at some point his

6    business card and told you about Tyler having been

7    designated Top 5 or prolific offender?

8        A.    Yes.

9        Q.    Did you interact with Deputy Pfenninger or

10   Detective Pfenninger multiple times?

11       A.    I don't recall how many times, but he would sit

12   out in front of my house.

13       Q.    Did you talk to him about why?

14       A.    No.

15       Q.    Did he ever tell you that he was looking for

16   Tyler?

17       A.    I don't recall him talking to me about looking

18   for Tyler.

19       Q.    Okay.  Did he tell you how it came to be that

20   Tyler had been designated a prolific offender or Top 5?

21       A.    No, he didn't elaborate when he made that

22   statement.

23       Q.    Did you ask anybody from the Sheriff's Office

24   about why Tyler had been designated in that fashion?

25       A.    I attempted to get Pasco County records on

1    Tyler.

2         Q.   Okay.

3         A.   I was told by them that it was a lot, and I'd

4    have to pay a lot of money or what I considered to be a

5    lot of money to get records.

6         Q.   Did you try to get the records from the court

7    clerk or from the Sheriff's Office, do you recall?

8         A.   Sheriff's Office.

9         Q.   Okay.  And they wanted to charge you for the

10   copies?

11        A.   They said because there was a lot, yes.

12        Q.   Do you know whether these were, for example,

13   arrest reports or investigative reports, or were they

14   some other type of document?

15        A.   I asked for anything, if there's incident

16   reports, if there's arrest reports.

17        Q.   Do you remember how much it was going to cost?

18        A.   No.

19        Q.   That report we saw where you called to ask that

20   Tyler be trespassed, that happened in April of 2018.

21   Did Tyler ever come back to the residence at Amanda

22   Avenue?

23        A.   Yes.

24        Q.   Did you let him live there for a period of

25   time?

1        A.   No.

2        Q.   Do you know whether he was at any point living

3    in the trailer in the back after April of 2018?

4        A.   No, the trailer wasn't a place you could live.

5        Q.   Okay.  Show you I think we're at 7?

6             COURT REPORTER:  6.

7             (Exhibit 6 was marked for identification.)

8    BY MR. POULTON:

9        Q.   Exhibit 6.  This a report dated 6-8-18.  It's a

10   CAD report.  I see it's at the Amanda Avenue address.

11   The nature field is SO Investigation, and it's just a

12   short note if you want to read that right there in the

13   middle.

14       A.   Okay.  Okay.

15       Q.   This is looks like a Deputy Mello, M-E-L-L-O.

16   Do you remember this particular interaction?

17       A.   I don't really recall it.

18            (Exhibit 7 was marked for identification.)

19   BY MR. POULTON:

20       Q.   Okay.  I'm showing you what we will mark as

21   Exhibit 7.  This is an incident report dated September

22   16, 2018.  You see this is that Amanda Avenue address?

23       A.   Yes.

24       Q.   Okay.

25       A.   Okay.

1    Q.   And I don't know that it's necessary to read

2    the whole thing, but I would imagine maybe this one you

3    recall?

4    A.   Yes, I do.

5    Q.   Okay.  And my impression from this is that you

6    had this gentleman Robert Downey working on your roof?

7    A.   Yes.

8    Q.   And you determined that he was stealing from

9    you; correct?

10   A.   Yes.

11   Q.   So was it you that called the Sheriff's Office

12   to report this, or was it somebody else?  Do you know?

13   A.   I called to report it.

14   Q.   So Sheriff's Office came out and interviewed

15   you and took a statement?

16   A.   Yes.

17   Q.   Okay.  What was the outcome of this ultimately?

18   Do you remember?

19   A.   Mr. Downey was arrested, and I never went to

20   any of the court hearings.  Then I was contacted and

21   said that he wanted to pay for the items that were taken

22   and would I agree to that so he could be released from

23   jail, and the prosecuting attorney I said okay.

24   Q.   Do you know if -- well, he was in jail for

25   this?

1     A.   Yes.

2     Q.   All right.  Do you know if he was ultimately

3  convicted?

4     A.   I don't know.

5     Q.   Okay.  And I'm reading on here, and if you

6  wanted to take a look here, when they came out to

7  investigate, it looks like you gave permission to the

8  deputies to come into the garage to take photographs.

9  Do you remember that?

10    A.   Yes.

11         MR. BARGIL:  I'm not sure it says anything

12      about photographs in here.

13         MR. POULTON:  Top of page 6 of the exhibit.

14         MR. BARGIL:  Okay.

15  BY MR. POULTON:

16    Q.   All right.  Do you recall an incident -- We may

17  not even need to pull up the report just if you remember

18  this one -- in October of 2018 where you called the

19  Sheriff's Office because a neighbor of yours was renting

20  your home out as an airbnb?

21    A.   Not renting out my home.

22    Q.   Okay.  Oh, I see.  Renting out her own home,

23  and the tenants were parking their cars in the road

24  blocking you from getting in and out of your residence?

25    A.   Yes.

1        Q.   So it was you that called the Sheriff's Office

2    that particular time?

3        A.   Yes, because it was illegal to do that.  We

4    were residential zoned.

5        Q.   Oh, so it was illegal to do an airbnb there?

6        A.   Yes.

7        Q.   Do you know what the outcome of that was?

8        A.   Eventually, she had to go before a board

9    hearing for them to give her permission to be able to

10   make that, you know, short-term rental.

11       Q.   Okay.  Do you know if they ultimately let her

12   do that?

13       A.   Yes.

14       Q.   And that was at the Amanda Avenue address;

15   right?

16       A.   Yes.

17            MR. POULTON:  Tell you what we will do just to

18       make it complete so we're all eventually talking

19       about the same thing.  We'll just mark as exhibit --

20       now I'm on eight; right?

21            COURT REPORTER:  Right.

22            (Exhibit 8 was marked for identification.)

23   BY MR. POULTON:

24       Q.   October, 27, 2018, this a CAD report, 14137

25   Amanda Avenue.  They have you down as Darlene Vegan.

1     A.   I've been -- Yeah, I've been called that

2   before.

3     Q.   Okay.  I think that's just a typo, but this is

4   the -- I believe this is the report that corresponds to

5   that.  Do you see the call details there?

6     A.   Yes.

7          (Exhibit 9 was marked for identification.)

8   BY MR. POULTON:

9     Q.   All right.  This will be Exhibit 9.  That is a

10  CAD report dated December 7, 2018, so a little over two

11  months later.  You see this is at the Amanda Avenue

12  address?

13    A.   Yes.

14    Q.   And they got your name right this time or close

15  anyway.  It indicates that you were the caller, and you

16  were reporting that somebody had ripped your fence down?

17    A.   I don't remember this.

18    Q.   Okay.  If you look at the bottom here states

19  caller wants deputy --

20    A.   Oh.

21    Q.   Well, let me just read this into the record if

22  you don't mind.  "Caller wants deputy to respond to her

23  home.  I spoke with Darlene Deegan," and it's got a date

24  of birth, "in regards to an ongoing neighbor issue.

25  Darlene stated her neighbor removed her fence which went

1    across the street (county property).  Darlene stated she

2    did not have a permit to put the fence up.  She stated

3    her neighbor removed the without her permission.  I

4    advised her the issue was going to be taken care of in

5    civil court."

6             Does that refresh your memory?

7        A.   Yes.

8        Q.   So I'm a little confused by the note by the

9    deputy here, but if I understand correctly, you called

10   the Sheriff's Office; correct?

11       A.   Yes.

12       Q.   And you wanted a deputy to come out to speak to

13   you?

14       A.   To assist with the property owner from across

15   the street who was an investor.  She doesn't live at

16   that property.

17       Q.   This is across the street from your address on

18   Amanda Avenue?

19       A.   Yes.

20       Q.   And she just -- she owned a home but didn't

21   reside there?

22       A.   She bought the property across the street and

23   was renovating without permits and decided that she

24   wanted to take down the fence at the end of the street

25   so that she could make another right of way.

1      Q.   Was this a fence that you shared on your

2  property with her property?

3      A.   No.

4      Q.   Okay.  What was the problem with her taking

5  down -- Well, let me rephrase it.  Was the fence on her

6  property?

7      A.   No.

8      Q.   Was it like a common area or just walled off

9  the end of the street?

10     A.   Common area at the end of the dead end street.

11     Q.   Do you know what the outcome was?

12     A.   I did not take it to civil court.

13     Q.   All right.

14         By the way, up at the top it says cross street

15  Hudson Avenue.  Is that the Hudson Avenue that you had

16  the other house on?

17     A.   No.  The other house was on Beverly Drive.

18     Q.   I'm sorry.  Right.  In Hudson.  Amanda Avenue

19  is in Hudson.  I got it.

20     A.   Yes.

21     Q.   Okay.

22         MR. BARGIL:  Tom, are you reaching a natural

23     stopping point?

24         MR. POULTON:  Sure, sure.

25         MR. BARGIL:  Stretch our legs.

1          MR. POULTON:  Yeah, we're moving along pretty

2      well.  I think -- Let's take a 10-minute break, but

3      I think that we'll be done within an hour or so.

4          MR. BARGIL:  Okay.

5          MR. POULTON:  Okay?

6          MR. BARGIL:  Sounds good.

7          MR. POULTON:  Thank you.

8          (A break was taken at 2:19 p.m., and the

9      deposition resumed at 2:32 p.m.)

10  BY MR. POULTON:

11     Q.   All right.  So let me show you what will be

12  Exhibit 9?

13          COURT REPORTER:  10.

14  BY MR. POULTON:

15     Q.   10 I mean.

16          (Exhibit 10 was marked for identification.)

17  BY MR. POULTON:

18     Q.   This is a CAD report dated December 13, 2018,

19  at the Amanda Avenue address.  Indicates that you're the

20  caller, and the notes state that you said somebody set a

21  fire near your house and you thought it was on purpose

22  to catch your house on fire.  Do you see that?

23     A.   I see that.

24     Q.   So the fire department came out?

25     A.   Yes, they did.

1      Q.   Okay.  And you told the Sheriff's Office that

2  you knew that it was a threat by a subject you had

3  issues with in the past, but you didn't have any

4  evidence of that.  It was your belief; is that fair?

5      A.   This summary is not accurate to my

6  communication with the Pasco Sheriff's Department.

7      Q.   Okay.  Why don't you tell me what your

8  recollection of it was?

9      A.   The investor was burning debris, things that

10  she cut down, and she was burning them in the yard with

11  no safety factors around.  I just happened to come

12  outside about 7:30 to get my mail, and I saw her drive

13  away.  So she left this fire burning with no one there

14  attending it.  And I had expressed to them that with all

15  our trees and with everything that she had cut down that

16  was dead -- dead shrubbery and brush that the sparks

17  going up could easily catch the trees on fire, and my

18  house could have been in jeopardy.

19      Q.   You relayed all of that to the Sheriff's

20  dispatcher when you called?

21      A.   I relayed that to them, yes.

22      Q.   Okay.  Was this the same investor that you had

23  the problem with on the fence issue?

24      A.   Yes.

25      Q.   Does she still own that house across the

1    street?

2        A.    She owns one of them, yes.

3        Q.    How is your relationship with her now?

4        A.    I have no interaction at all with her.

5        Q.    Did a deputy actually come out for this

6    incident or just a phone call?

7        A.    I really don't remember if a deputy came out.

8    I was there when the fire department came, and they put

9    the fire out, and they put a red tag on her front door.

10       Q.    Do you know what the tag was for?

11       A.    Burning a fire illegally and left unattended.

12       Q.    So she got a code citation violation is your

13   understanding?

14       A.    I don't know if it was a citation or a warning.

15   I don't know.

16            (Exhibit 11 was marked for identification.)

17   BY MR. POULTON:

18       Q.    Okay.  We will mark this as Exhibit 11.  Can

19   you see that on your end?

20       A.    Yes.

21       Q.    Okay.  It is a CAD report dated March 29, 2019.

22   We see the address is your address there 14137 Amanda

23   Avenue, and this indicates that you were the caller.  Do

24   you see that?

25       A.    I do, yes.

1    Q.   Okay.  And see if you remember this incident.

2    A.   Okay.

3    Q.   Okay.  Do you remember this incident?

4    A.   I believe I do, yes.

5    Q.   Okay.  The notes indicate that you called

6  because Tyler was at the residence and he threatened to

7  burn your house down if he didn't get his belongings; is

8  that accurate?

9    A.   I -- I don't remember that statement.

10   Q.   You don't remember making that statement you

11  mean?

12   A.   I just don't remember that part of the

13  incident, but I do remember calling for assistance with

14  Tyler there at the property and doing that.  I just

15  don't remember if I did make that statement that if

16  Tyler was on drugs, maybe he did make that statement to

17  me.

18   Q.   And at the end it indicates that you wanted

19  Tyler to leave.  He left on foot, and but you wanted to

20  trespass him I guess again?

21   A.   Yes.

22   Q.   Okay.  Do you remember that?

23   A.   Yes.

24       (Exhibit 12 was marked for identification.)

25  BY MR. POULTON:

1      Q.   So now that was on 3-29, and then this is I

2   guess is going to be Exhibit 12.  This is two days later

3   on March 31, 2019.  You see you're the caller and again

4   it's Amanda Avenue?

5      A.   Yes.

6      Q.   Okay.  And, well, I'll let you read it.

7      A.   Okay.

8      Q.   Okay.  Do you remember this incident?  It would

9   have been two days later.

10     A.   Yes.

11     Q.   And I gather from this that despite your

12  telling him to leave and not come back, he did come back

13  again?

14     A.   Yes.

15     Q.   This right in the middle of the narrative here

16  it indicates that Tyler had a history of burglary, grand

17  theft, meth or cocaine possession, and carrying a

18  concealed firearm in 2007.  Were you aware of those --

19     A.   No.

20     Q.   -- prior criminal charges?

21          Okay.  And it says here searching property per

22  the homeowner.  Did you have the deputies come onto the

23  property to search it to look for Tyler?

24     A.   No, they didn't need to.

25     Q.   Had he left by then?

1    A.    I'm sorry?

2    Q.    Had he left by the time the deputies got there?

3    A.    Well, he -- he left on foot, and they knew the

4    direction that he was going, and so they apprehended him

5    on Hudson Ave.

6    Q.    Oh, okay.  Do you know what ultimately happened

7    as a result of that?

8    A.    I only know that the officer came back to me

9    and told me that they did find Tyler and the girl, and

10   that they would arrest Tyler for trespassing on my

11   property.

12   Q.    Because he had already been given the trespass

13   warning?

14   A.    I don't know if they had found him in the prior

15   two days prior.  I don't know.

16   Q.    All right.  Is it your understanding that Tyler

17   was arrested and charged with trespassing as a result of

18   either the incident on the 29th or the 31st?

19   A.    Yes.

20   Q.    The end of the note it indicates that you

21   wanted to file a restraining order against Tyler.  Do

22   you remember talking about that with the deputy?

23   A.    I don't remember talking to the deputy about

24   that, but it was something that I was concerned for with

25   when Tyler would be on drugs.

1      Q.   I understand.  Did you ultimately seek a

2   restraining order?

3      A.   No.

4      Q.   I believe we're on Exhibit 13 now.  Hang on.  I

5   may have the wrong one.  I'm sorry.  I've got the wrong

6   one here.  Hang on one second.  Let me do this.  Okay.

7   Found it.

8           (Exhibit 13 was marked for identification.)

9   BY MR. POULTON:

10     Q.   Exhibit 13 is an incident report dated April 9,

11  2019, and I'll let you look at the narrative here a

12  minute.  Just confirm this is at your Amanda Avenue

13  address.  You see that?

14     A.   Yes.

15     Q.   Okay.  Let you take a look at that.  Let me

16  know when you get to a point where you recognize the

17  incident.

18     A.   Oh, I recognize it.

19     Q.   So a female -- as I understand it, you called

20  the Sheriff's Office for this one?

21     A.   Yes.

22     Q.   And this was about a week and a half after the

23  two incidents with Tyler coming back to the property;

24  right?

25     A.   I don't remember what that other date was,

1    but --

2        Q.   Well, those were on March 29 and March 31,

3    2019, and this is April 9, 2019.  So it's about ten days

4    later.

5        A.   Okay.

6        Q.   Okay.  Was this Tyler's girlfriend that was --

7    had come into the home or into the garage to steal?

8        A.   That -- I don't believe that that was a

9    girlfriend of Tyler's.

10       Q.   Okay.  Well, the reason I ask that is because

11   it -- early on the reports it said, "While inside the

12   garage, the offender located and took into her

13   possession a significant amount of the victim's hidden

14   jewelry as well as her silver dollar collection."  Do

15   you see that?

16       A.   Yes, I see that.

17       Q.   So was this somebody that you knew?

18       A.   No.  And --

19       Q.   Go ahead.

20       A.   I called the Sheriff's Department after I saw

21   on the video surveillance the girl walking down my

22   driveway to unlock my gate to go out with the bag with

23   my jewelry and valuables in it.  I hadn't realized I had

24   even been robbed.

25       Q.   Oh, until you saw the surveillance video of the

1  person walking away with it?

2      A.   Right.

3      Q.   What kind of silver dollars did you have?

4      A.   Like Carver.  What were some of the other ones?

5  Liberty.  They were silver dollars.

6      Q.   What ultimately happened with it?

7      A.   Nothing.

8      Q.   They didn't find the person who did it or

9  recover the property?

10     A.   No.  I gave the video over to the Sheriff's

11 Department.  It showed the girl leaving my property, and

12 a car was there to pick her up.

13     Q.   Yes, I see here the description of the video.

14 You see that, 15 minutes long and goes through what

15 occurred?

16     A.   Yes.

17     Q.   Okay.

18          MR. POULTON:  What am I up to now, Madam Court

19     Report, Exhibit 15?

20          COURT REPORTER:  14, sir.

21          (Exhibit 14 was marked for identification.)

22 BY MR. POULTON:

23     Q.   This is an incident report dated May 8, 2019.

24 You see here it's the Amanda Avenue --

25     A.   Yes.

1      Q.   -- address?  And the crimes were trespass on

2    property other than structure or conveyance but then

3    also heroin possession?

4      A.   Yes.

5      Q.   Okay.  This relates to Tyler again I believe.

6    I'll just let you take a look at the narrative and see

7    if you remember this incident?

8      A.   Okay.  So now I'm getting confused with these

9    police reports.

10     Q.   Sure.

11     A.   I told you that other one was with Tyler

12   trespassing, but this is actually the report.  So I got

13   confused with that other one you showed me previously.

14     Q.   Okay.  I understand what you're saying.  So if

15   I understand correctly, this incident on May 8, 2019, is

16   the incident that you recollect where Tyler was arrested

17   in part on the trespass?

18     A.   Yes, yes, because this one shows with a female,

19   and this is the one I thought you were showing me

20   before.

21     Q.   The female is identified as Sarah Smith.  Was

22   that his girlfriend?

23     A.   I don't know who that girl is.  No, I don't --

24   I don't know if he had a girlfriend.

25     Q.    This is the portion that I believe you were

1    referencing here kind of in the middle of the page.  It

2    states, "I contacted Darlene Deegan via telephone.

3    Darlene advised Tyler had snuck onto her property with

4    an unknown female.  Darlene advised she does not want

5    Tyler there and he did not live at her residence.

6    Darlene informed me she had security cameras around her

7    house and had Tyler on video on her property."

8         A.    Yes.

9         Q.    Okay.  The top of the report says, "On

10   5-18-2019 at approximately 0813 hours I responded to

11   14137 Amanda Avenue in reference to a trespassing, later

12   reclassified to a possession of heroin, possession of

13   paraphernalia, and trespassing."  Do you see that?

14        A.    Yes.

15        Q.    Okay.  If I'm reading this correctly then, you

16   called the Sheriff's Office on this date to report the

17   trespassing, and then they found him near Hudson and

18   Amanda and ended up finding the drugs and adding those

19   charges; is that fair?

20        A.    That's correct.

21             (Exhibit 15 was marked for identification.)

22   BY MR. POULTON:

23        Q.    I'll show you now what is now Exhibit 15 I'm

24   sure, a June 10, 2019, CAD report.  This time they have

25   you as Darlene David on Amanda Avenue.  I'll let you

1    take a look at that little narrative and see if you

2    remember that.

3         A.    Okay.  I don't remember specifically this, but

4    I do know that there was always people parking in the

5    street that were going to that like short-term rental

6    property across the street.

7         Q.    Well, as I read this, it appears that you

8    called because the vehicle had been sitting there for a

9    while, and so you became suspicious of it, but then you

10   ended up calling and asking to cancel the report because

11   a male had gotten out of the vehicle and went into the

12   airbnb.  Does that --

13        A.    That would be possible.

14        Q.    Okay.  You just don't remember one way or the

15   other?

16        A.    I don't, no.

17        Q.    All right.  That's fine.  Almost done.

18             (Exhibit 16 was marked for identification.)

19   BY MR. POULTON:

20        Q.    All right.  Exhibit 16, September 7, 2019

21   report, the Amanda Avenue address.  It was trespassing

22   delayed.  I'll just let you take a look at that and see

23   if you recognize that incident?

24        A.    Yes, I do.

25        Q.    Okay.  Is the neighbor, well, the lady, the

1    investor across the street this person Marisela

2    Anzziani?

3        A.    Correct.

4        Q.    So this is part of the ongoing dispute with

5    her?

6        A.    Yes.

7        Q.    What's your recollection of what happened in

8    this particular incident?

9        A.    On my surveillance cameras, I could see her.

10   She was mowing over on her side, and she came over and

11   started mowing down on my landscaping.

12       Q.    Well, you mean she actually crossed the street

13   and mowed your grass?

14       A.    Yes.

15       Q.    Did she tell you she was going to do that?

16       A.    No.

17       Q.    Did you talk to her about it afterwards?

18       A.    Only when -- I don't know if deputies came for

19   that, but, no, I did not have any words with her on this

20   date.

21       Q.    Okay.  This indicates you asked the deputy to

22   do a trespass warning.  Do you know if that happened?

23       A.    I went and researched.  I did not see any

24   trespass warning issued to her.

25       Q.    Okay.

1          MR. BARGIL:  Tom, just for the clarity, so this

2     happened at the very end of a dead end.

3          MR. POULTON:  I know.

4          MR. BARGIL:  Okay.  So the house that's, quote,

5     unquote, across the street, you don't have to cross

6     the street to come onto one another's property.

7     There's that grassy area in between them.

8          MR. POULTON:  I understand what you're saying.

9     I seen, you know, captured in some of the videos the

10    discussion the deputies would have had with this

11    woman.  I'm assuming that's who it is.  So I think

12    -- I mean, I think you could tell from the videos

13    what the geography fee is, but thanks for pointing

14    that out.  That's a good point.

15         (Exhibit 17 was marked for identification.)

16  BY MR. POULTON:

17    Q.   All right.  And then let's see here, I think

18  this is 17.  This is an incident report dated June 14,

19  2020, at the Amanda Avenue address.  I'll just let you

20  take a look at this real quick.  My guess you will

21  remember this very quickly, but why don't you take a

22  look.

23    A.   I remember this.

24    Q.   Okay.  What do you remember about this

25  incident?

1    A.   Well, I was out in the front working on my yard

2  work, and John Merritt was standing there on the other

3  side off his fence.  He had on like a longer shirt --

4  T-shirt and like basketball pants.  He caught my

5  attention, and when he did, he lifted his shirt and

6  exposed his genitals.  I then left and went in the

7  house.

8         Now that had me wondering what else would be on

9  my security cameras, and I started seeing other times

10  where he was doing this and I wasn't realizing it.

11    Q.   Do you know what the outcome was?

12    A.   When I attempted to find out, they told me it

13  was still under investigation.

14         I had also given them a USB drive with video,

15  and then I didn't follow up any further.

16    Q.   Okay.  So you don't know what ultimately

17  happened with it?

18    A.   I don't.

19    Q.   Okay.  Have you had any conversation with this

20  neighbor about this incident?

21    A.   No.

22         MR. POULTON:  Okay.  Let's go off the record

23      real quick for a minute.

24         (A break was taken at 3:01 p.m., and the

25      deposition resumed at 3:10 p.m.)

1    BY MR. POULTON:

2        Q.   All right.  Just a couple of things more to

3    show you, Ms. Deegan.

4            My understanding is that in 2018 there was a

5    group of five citations that were issued all at once.

6    I'll show you the citations and see if you remember

7    these.  This one was at the Amanda Avenue address, and

8    they were issued on June 6, 2018.  This particular

9    citation was failing to have three-inch address numbers

10   posted on the home in a color-contrasting manner.  Do

11   you see that?

12       A.   Yes.

13       Q.   It was Corporal Ojeda who issued the citation,

14   and the total amount was $518.

15           MR. POULTON:  We'll mark these as a composite

16       exhibit, Madam Court Reporter.  Okay?  So whatever

17       number we're up to.  There should be five of them.

18           (Composite Exhibit No. 18 was marked for

19       identification.)

20   BY MR. POULTON:

21       Q.   Same date.  This was a citation for having two

22   commercial containers stored on the property.  That fine

23   was going to be $1,018.  Do you see that?

24       A.   Yes.

25       Q.   Okay.

1        MR. POULTON:  And I don't seem to have right

2     handy -- I could be wrong.  Maybe it's -- I don't

3     know why I don't have that one.  Rob Holborn?

4        MR. HOLBORN:  Yeah, I'll look for it.  Give me

5     a second.

6  BY MR. POULTON:

7     Q.   All right.  So skipping ahead, June 6, 2018,

8  there was an RV set up, again Deputy Ojeda, a $518 fine.

9  Do you remember that one?

10    A.   Yes.

11       MR. BARGIL:  $500 for the fine and 18 for cost

12    costs.

13       MR. POULTON:  I'm sorry.  No, you're

14    technically correct.  And the one prior was $1,000

15    plus 18 in court costs, not a $1,018 fine.  You're

16    correct.

17  BY MR. POULTON:

18    Q.   And then this will be the fourth one since

19  we're still waiting on that other one.  This was issued

20  on June 6, 2018, and this was various yard debris and

21  junk stored on the property, and the fine was for $125

22  plus $18 in court costs again by Deputy Ojeda.  Do you

23  see that?

24    A.   Yes.

25    Q.   Do you remember that one as well?

1    A.   Yes.

2         MR. POULTON:  Okay.  Rob, where are we on that

3    fifth one?

4         MR. HOLBORN:  It doesn't look like it was

5    included with the --

6         MR. POULTON:  -- package from the clerk?  Okay.

7         MR. HOLBORN:  Yeah.

8  BY MR. POULTON:

9    Q.   Well, is it your memory that there were five of

10  them in toto?

11   A.   As I recall, I believe there was five.

12   Q.   Do you remember what this other one was that I

13  just don't seem to have a copy of right now?

14   A.   No.

15   Q.   No?  Okay.  Well, at any rate, did you contact

16  the County Attorney's Office about it?

17   A.   The County what?

18   Q.   The County Attorney?

19   A.   Yes.  I had to be in communication with the

20  attorney, yes.

21   Q.   Did you reach an agreement with the County

22  Attorney on how to resolve the citations?

23   A.   Well, yes, because after he reviewed the

24  videos, the deputies had trespassed on my property to

25  write the citation.  So he decided just pay him $250 for

1   I guess the County Attorney's costs.

2        Q.   Did he tell you that the reason that he was

3   going to reach this agreement with you was because of

4   the deputies going onto your property, or did he say

5   that it was because you were coming into compliance?

6        A.   Well, I was going into compliance, but I also

7   told him that I was going to contest these fines and

8   take it all the way through the courts.

9        Q.   Okay.  What did you do to come into compliance?

10       A.   Had to put house numbers up.

11       Q.   And there was --

12       A.   And --

13       Q.   Go ahead.

14       A.   And the so-called building debris happened to

15   be my fence that I was installing, and it was in

16   different sections of my yard, which if they weren't in

17   my backyard, they wouldn't see all of this material that

18   was being erected.

19       Q.   Was there some -- Okay.  Was there some debris

20   in the front yard though?  I have recollection of seeing

21   on a video you were cleaning up that area of the

22   property.  Do you remember that?

23       A.   The one thing that I remember that I had in the

24   front was one roll of chain link fence, and I had a

25   Rubbermaid container that was probably three feet wide

1    by two feet tall that had the cushions for my outdoor

2    patio furniture, and they considered that to be trashy.

3         Q.   Did you end up moving that out of that

4    location?

5         A.   Yes, I did.  I took everything that I had in

6    the front, and everything was moved into the backyard,

7    and then the fence was erected.  So it wasn't there

8    anymore.

9         Q.   That container with the chain link fence and

10   the other materials in the front yard, would that have

11   been visible from the roadway or walking up to the

12   fence?

13        A.   Well, the one roll chain link fence?

14        Q.   Yes.

15        A.   You -- you -- well, if you walked up to the

16   property, yes, you would see it.

17        Q.   Now the trailer in the back, what ultimately

18   happened with that?

19        A.   Nothing.

20        Q.   Okay.  How about the two -- there was a

21   reference to commercial storage containers?

22        A.   Correct.

23             (Exhibit 19 was marked for identification.)

24   BY MR. POULTON:

25        Q.   Let's look at what this will be Exhibit 19.

1    This is an email from Patrick Moore, who I understand to

2    be the Assistant County Attorney.  Do you see that?

3        A.    Yes.

4        Q.    Okay.  And it's to Notary518@yahoo.com.  Was

5    that your email address, or is that your email address?

6        A.    Yes, it is.

7        Q.    Okay.  And this appears to be memorializing the

8    conversation you had with him about the paying the $250

9    and coming into compliance.  Do you see that?

10       A.    Yes.  And when I met with him, I brought him

11   pictures of everything.

12       Q.    Okay.  Well, in this email he says that he did

13   not believe that your motion to suppress would be

14   granted, but that he thought that your cooperation,

15   compliance and the circumstances merit a dismissal upon

16   payment of the fines.  Do you see that?

17       A.    Yes.

18       Q.    Did you email him back?

19       A.    I don't remember.  I mean, I had a conversation

20   with him on the phone.

21       Q.    Okay.

22       A.    I mean, because I went to his office and

23   brought him the money.  So I really don't remember if I

24   responded to this email, but I talked to him on the

25   phone and then brought him a check.

```
 1              (Exhibit 20 was marked for identification.)
 2    BY MR. POULTON:
 3         Q.    Okay.  And then Exhibit 20 is a receipt.  Is
 4    that the receipt for the $250 you paid and it's got the
 5    case numbers in it?
 6         A.    Yes.
 7              MR. POULTON:  Rob, do we have that fifth one or
 8         no?  Do we know?
 9              MR. HOLBORN:  No.
10              MR. POULTON:  All right.  That is all the
11         questions that I have for you.  I appreciate it --
12         appreciate doing it by Zoom today.  Makes it a
13         little bit easier for everybody.  So that's it for
14         me.  I don't know if your attorney has any questions
15         to follow up with you on.
16              MR. BARGIL:  Yes, very briefly.  Thanks, Tom.
17              MR. POULTON:  Sure.
18                        CROSS EXAMINATION
19    BY MR. BARGIL:
20         Q.    So I have the opportunity now to ask you a
21    couple of questions.
22         A.    Uh-huh.
23         Q.    And there's just a couple things that I want to
24    make sure we got clear for the sake of the record.
25              Mr. Poulton asked you sort of early on in the
```

1    deposition about an incident at the Beverly property

2    where Tyler was removed by the police and then following

3    that removal the property as you testified was robbed;

4    is that correct?

5        A.    Yes.

6        Q.    I just want to make sure that we're clear on a

7    couple of things.  Is it correct that at the time Tyler

8    was removed from the property, the police were the ones

9    who took and impounded the dog?

10       A.    Well, I don't -- I think it's like one of their

11   departments that handles animals.

12       Q.    Okay.

13       A.    So --

14       Q.    A government entity?

15       A.    A government entity that they called me and, of

16   course, they called my home line instead of the cell,

17   and I was working.  So a message was left on my

18   voicemail that they were taking Roxy to the pound.

19       Q.    And I ask this just because I want to be clear

20   that it was either the police or some other government

21   entity who was responsible for taking Roxy to the pound

22   and not that Roxy was later stolen from the property?

23       A.    No, it was they took her to the pound.

24       Q.    But it is the case, in fact, that after the

25   police left, the property was not secured, and then

1    criminals robbed the property of your bikes and some

2    kayaks and some other personal property of Tyler's; is

3    that right?

4        A.    That's correct.

5        Q.    Okay.  You were also asked a few questions by

6    Mr. Poulton about an incident in May of 2016 I believe

7    involving some allegedly stolen property being on your

8    property.  Do you recall that line of questioning?

9        A.    A trailer.

10       Q.    Uh-huh.  I just want to confirm because I don't

11   think it was clear.  At any point in time had the police

12   advised you the belief that the trailer was stolen, were

13   you aware that the trailer was stolen?

14       A.    Absolutely not.

15            MR. BARGIL:  Madam Court Reporter, can you pull

16       up Exhibit 19 real quickly?

17            COURT REPORTER:  Mr. Poulton will have to do

18       that.

19            MR. BARGIL:  Oh, yes.

20            MR. POULTON:  Which one was that?

21            MR. BARGIL:  This was the email.

22            MR. POULTON:  The email.  All right.  Just a

23       sec.  Can you see that?

24            MR. BARGIL:  Yes.

25            MR. POULTON:  Okay.

1    BY MR. BARGIL:

2        Q.   If you take a look at the first paragraph, do

3    you see where in the last line the County Attorney says

4    that he finds that your corporation, compliance and

5    circumstances merit a dismissal?

6            MR. POULTON:   I'm highlighting it for you.

7    BY MR. BARGIL:

8        Q.   I'm asking you.

9        A.   Well, I understood that he was going to get

10   that taken out of the clerk record by me giving him $250

11   which he said to me was for the Court -- the attorney

12   court costs, not that I was paying for a fine.

13       Q.   Well, in any case, I just want to make sure

14   that -- it's not a trick question.  So as a result of --

15   As a result of this email, was it your understanding

16   that your property was in compliance?

17       A.   That's correct.

18       Q.   Okay.

19           MR. BARGIL:   And, Tom, if you can go to Exhibit

20       20, which is the receipt.

21   BY MR. BARGIL:

22       Q.   This also indicates that all five case numbers

23   are considered resolved as a result of the payment of

24   this sum.  Is that your understanding?

25       A.   Yes, it is.

1          MR. BARGIL:  Okay.  And so if you go back to

2      the last exhibit real quick, Tom.

3  BY MR. BARGIL:

4      Q.   So while it may say here that the County

5  Attorney believes there to be that the commercial

6  storage containers are a violation, it's also the case

7  that the County Attorney is telling you in this very

8  same email that your property is fully compliant; is

9  that correct?

10     A.   That's correct.

11     Q.   Okay.  Did you ever have a phone conversation

12  with the County Attorney in which he told you that he

13  believes that those items might be grandfathered?

14     A.   Yes.

15          MR. BARGIL:  Okay.  That's everything that I

16      have.

17                  REDIRECT EXAMINATION

18  BY MR. POULTON:

19     Q.   I need to follow up on something.  The incident

20  that happened at Beverly with the stolen property and

21  Roxy, the dog --

22     A.   Yes.

23     Q.   -- why was it the deputies went out to the

24  property on that particular day?  Do you know?

25     A.   I don't know the reason.  You know --

1          MR. BARGIL:  If you don't know, don't

2     speculate.

3     A.    -- I really -- I don't know who made them go

4     there.

5     BY MR. POULTON:

6     Q.    You said though that Tyler and somebody else

7     were removed from the property?

8     A.    Well, they physically removed Tyler and they

9     told the -- his roommate to leave.

10    Q.    Oh, I'm sorry.  I thought that was a female.

11    Was it a male?

12    A.    A male.

13    Q.    Do you know on what basis they removed Tyler?

14         MR. BARGIL:  Objection, asked and answered.

15    A.    No, I don't know the exact date.

16    BY MR. POULTON:

17    Q.    Do you know whether the deputies that went to

18    the Beverly Drive address on that occasion were there to

19    do a prolific offender check or a Top 5 check on Tyler?

20         MR. BARGIL:  Objection, asked and answered.

21    A.    No, I don't know.

22    BY MR. POULTON:

23    Q.    And I believe we asked you earlier and you

24    didn't remember when this happened?

25    A.    The Beverly Drive incident?

1      Q.    Right, the incident where Tyler was physically

2   removed by the deputies and later you had some items

3   stolen.

4      A.    I don't remember the exact date, no.

5      Q.    You don't even remember the year; correct?

6      A.    I wouldn't want to say a year because it's been

7   a long time here.

8      Q.    I understand.  You don't want to be wrong on

9   it.  I understand.

10         Do you know if the deputies had a warrant for

11  Tyler on that occasion?

12     A.    That I don't know.

13     Q.    How did you come to learn that -- Well, let me

14  ask it a different way.

15         Were you living in the Beverly Drive address at

16  that time, or were you living at the Amanda Avenue --

17         MR. BARGIL:  Objection.  This is outside the

18     scope of my cross.

19  BY MR. POULTON:

20     Q.    You can answer.

21     A.    What year are we talking?

22     Q.    Well, at the time that this incident occurred

23  when the items were stolen.

24     A.    On Beverly Drive?

25     Q.    At the Beverly Drive address.  I'm asking were

1    you living at the address at the time, or were you

2    living at the Amanda Avenue address at the time?

3        A.    I was living out of the Amanda Avenue property

4    and still had furnishings in the Beverly Drive.

5        Q.    Okay.  And were you aware that Tyler was living

6    in the Beverly Drive address with the roommate at that

7    time?

8        A.    Absolutely.  I'm the one that told him to go

9    there.

10            MR. POULTON:  Okay.  All right.  Thanks.

11       That's all I have.  I assume you will read, Ari?

12            MR. BARGIL:  Yes.

13            MR. POULTON:  Okay.  Thank you very much,

14       Ms. Deegan.  Appreciate your time.

15            THE WITNESS:  Okay.

16            MR. BARGIL:  Tom, I presume you're ordering,

17       and we'll take a copy.

18            MR. POULTON:  Yes.  I will order it, and we

19       will ship the exhibits via Dropbox or something

20       suitable to everybody.

21            MR. BARGIL:  Okay.  And you'll include

22       everything that's outstanding that even if you

23       didn't rely on it today that you anticipate possibly

24       relying on at trial?

25            MR. POULTON:  Every report.  Every report we

1      have whether it's -- you know, in the four years,

2      whether it's in your request for production, every

3      report we have involving the plaintiffs we will get

4      to you.

5            MR. BARGIL:  Okay.

6            MR. POULTON:  Okay?

7            COURT REPORTER:  Ari, do you want a copy of the

8      transcript?

9            MR. BARGIL:  Yes, please.  Yes, please.

10           MR. POULTON:  I assume she'll read?

11           MR. BARGIL:  Yes.

12                  *  *  *  *  *  *

13           (THEREUPON, THE TAKING OF THE DEPOSITION WAS

14      CONCLUDED AT 3:32 P.M.)

15                  *  *  *  *  *  *

16                S T I P U L A T I O N

17         It was thereupon stipulated and agreed by and

18   between counsel present for the respective parties and

19   the deponent that the reading and signing of this

20   deposition is not waived.

21                  *  *  *  *  *  *

22

23

24

25

1                          CERTIFICATE OF OATH

2     STATE OF FLORIDA

3     COUNTY OF PASCO

4          I, the undersigned authority, certify that

5     DARLENE DEEGAN personally appeared before me via Zoom

6     and was duly sworn on March 24, 2022.

7          WITNESS my hand and official seal this 18th

8     day of April, 2022.

9

10

11     _____

       Judy Anderson

12                       Notary Public - State of Florida
                         Commission No.:  GG 276821
13                       My Commission Expires:  1-5-2023

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF PASCO

5

6         I, JUDY ANDERSON, Court Reporter, certify that I

7    was authorized to and did stenographically report the

8    foregoing deposition and that the transcript is a true

9    record of the testimony given by the witness.

10

11        I further certify that I am not a relative,

12   employee, attorney, or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties'

14   attorney or counsel connected with the action, nor am I

15   financially interested in the action.

16

17        Dated this 18th day of April, 2022.

18

19        _____

20        Judy Anderson, Court Reporter

21

22

23

24

25

1    DALANEA TAYLOR; TAMMY
     HEILMAN; DARLENE DEEGAN;
2    and ROBERT A. JONES, III,

3      Plaintiffs,

4    vs.                     Case No.: 8:21-cv-00555-SDM-CPT

5    CHRIS NOCCO, in his
     official capacity as
6    Pasco County Sheriff,

7      Defendant.
     _____/

8

9

10               DEPONENT'S SIGNATURE PAGE

11

12        I HAVE READ THE FOREGOING TRANSCRIPT OF MY

13     DEPOSITION AND HEREBY SUBSCRIBE TO THE FOREGOING

14     DEPOSITION, SAID SUBSCRIPTION TO INCLUDE ANY

15     CORRECTIONS AND/OR AMENDMENTS HERETO.

16

17

18   _____
     Darlene Deegan

19

20   _____
     Date

21

22

23

24

25

1                           ERRATA SHEET

2       PAGE      LINE              CORRECTION

3       _____     _____     _____

4       _____     _____     _____

5       _____     _____     _____

6       _____     _____     _____

7       _____     _____     _____

8       _____     _____     _____

9       _____     _____     _____

10      _____     _____     _____

11      _____     _____     _____

12      _____     _____     _____

13      _____     _____     _____

14      _____     _____     _____

15      _____     _____     _____

16      _____     _____     _____

17      _____     _____     _____

18      _____     _____     _____

19      _____     _____     _____

20      _____     _____     _____

21      _____     _____     _____

22      _____     _____     _____

23      _____     _____     _____

24      _____     _____     _____

25      _____     _____     _____

**A**

Abargil@ij.org 2:8
able 6:11 12:20 27:5,11
    38:9
Absolutely 65:14 70:8
abused 29:6
accurate 18:20 43:5 45:8
acre 19:3
action 73:14,15
adding 52:18
additional 5:14
address 15:5,5 20:15,15
    25:12,25 26:1,10,11
    26:20,25 27:21,24
    28:3,15 29:22 30:4
    31:14,19,20 35:10,22
    38:14 39:12 40:17
    42:19 44:22,22 48:13
    51:1 53:21 55:19 57:7
    57:9 62:5,5 68:18
    69:15,25 70:1,2,6
addresses 26:3
addressing 13:22
advised 40:4 52:3,4
    65:12
age 18:19
ago 5:10 14:13 19:17
agree 15:21 36:22
agreed 71:17
agreement 59:21 60:3
Ah 32:13
ahead 49:19 58:7 60:13
airbnb 37:20 38:5 53:12
alarm 23:18,22 24:2,3
alledgedly 17:23
allegedly 65:7
allow 29:25
alluding 27:4
Amanda 7:20 8:5,9 10:16
    15:6 20:15,16 25:14
    25:15 26:1,11 27:24
    28:15 29:22 30:4
    31:10,12,19 34:21
    35:10,22 38:14,25
    39:11 40:18 41:18
    42:19 44:22 46:4
    48:12 50:24 52:11,18
    52:25 53:21 55:19
    57:7 69:16 70:2,3
AMENDMENTS 74:15
amount 11:13 14:3 49:13
    57:14
AND/OR 74:15
Anderson 1:18,22 72:11
    73:6,19
Animal 11:8
animals 64:11
another's 55:6
answer 7:12,12 23:8 28:6
    69:20
answered 68:14,20
answers 7:14
anticipate 70:23
anybody 33:23
anymore 61:8
anyway 23:9 39:15
Anzziani 54:2
apologize 31:3
APPEARANCES 2:1
appeared 72:5
appears 53:7 62:7
appreciate 25:19 63:11
    63:12 70:14
appreciation 5:23
apprehended 20:4 47:4
approximate 12:1

approximately 13:25
    14:5,6 32:3 52:10
approximating 12:17
April 28:14 34:20 35:3
    48:10 49:3 72:8 73:17
area 41:8,10 55:7 60:21
Ari 2:6 70:11 71:7
arose 6:4
arrest 34:13,16 47:10
arrested 10:6 36:19
    47:17 51:16
arriving 9:4
asked 19:3,6,14,22 31:3
    34:15 54:21 63:25
    65:5 68:14,20,23
asking 7:11 9:1,2 17:16
    22:23 53:10 66:8
    69:25
assist 40:14
assistance 45:13
Assistant 62:2
associated 11:10
assume 24:5 70:11 71:10
assuming 55:11
attempted 33:25 56:12
attending 43:14
attention 56:5
attorney 13:2,15 36:23
    59:18,20,22 62:2
    63:14 66:3,11 67:5,7
    67:12 73:12,14
Attorney's 13:11 59:16
    60:1
attorneys 8:20 14:13
    24:11
audible 7:15
authority 72:4
authorized 73:7
Ave 47:5
Avenue 7:20 8:5,9 10:16
    15:6 26:1,11 27:24
    28:15 29:22 30:4
    31:19 34:22 35:10,22
    38:14,25 39:11 40:18
    41:15,15,18 42:19
    44:23 46:4 48:12
    50:24 52:11,25 53:21
    55:19 57:7 69:16 70:2
    70:3
aware 25:18 29:4 46:18
    65:13 70:5

**B**

B 4:1
B-O-L-L-I-N-G-E-R
    32:14
back 5:8 10:11,14 12:20
    18:21 20:12,14,17
    30:5 32:18 34:21 35:3
    46:12,12 47:8 48:23
    61:17 62:18 67:1
backyard 60:17 61:6
bag 49:22
Bargil 2:6 3:3 5:6 6:3,18
    9:6 12:16 14:20,23
    15:15,19,21,25 17:21
    18:6 25:9,16 27:8 28:4
    31:23 32:17,21 37:11
    37:14 41:22,25 42:4,6
    55:1,4 58:11 63:16,19
    65:15,19,21,24 66:1,7
    66:19,21 67:1,3,15
    68:1,14,20 69:17
    70:12,16,21 71:5,9,11
basics 7:10
basis 68:13
basketball 56:4

beginning 8:24
belief 43:4 65:12
believe 6:5 12:7,23,25
    13:11,18 22:11,17
    25:12,24 39:4 45:4
    48:4 49:8 51:5,25
    59:11 62:13 65:6
    68:23
believes 67:5,13
bell 8:1
belongings 45:7
best 18:21 31:25
Beverly 7:21 10:1,12,18
    10:21,23 20:15,17
    22:15 25:12,24 26:9
    26:13,17,20,25 27:7
    27:21 28:3,9 31:11,14
    31:20 41:17 64:1
    67:20 68:18,25 69:15
    69:24,25 70:4,6
bicycles 11:15
bikes 11:5 65:1
biological 21:2,3
birth 18:13,14 20:24
    39:24
Biscayne 2:7
bit 14:13 63:13
blocking 37:24
Blvd 2:7,11
board 38:8
body-worn 24:6
Bollinger 32:13
bottom 39:18
bought 40:22
Boulevard 2:3 15:4
Box 1:23
break 6:15 14:15 42:2,8
    56:24
brief 28:18
briefly 63:16
Brinks 23:21,24,24
broke 23:17,23,23
broken 24:2
brought 19:8,10,21
    62:10,23,25
brush 43:16
building 60:14
burglary 46:16
burn 45:7
burning 43:9,10,13
    44:11
Busch 23:2,3
business 32:12 33:6

**C**

C 8:23
CAD 4:9,11,12,13,14,15
    4:18,19 35:10 38:24
    39:10 42:18 44:21
    52:24
call 27:1 39:5 44:6
called 15:10 22:18,19
    29:20 34:19 36:11,13
    37:18 38:1 39:1 40:9
    43:20 45:5 48:19
    49:20 52:16 53:8
    64:15,16
caller 39:15,19,22 42:20
    44:23 46:3
calling 23:5 45:13 53:10
camera 24:6,24,24,25
    26:4
cameras 23:12,13 26:5
    52:6 54:9 56:9
cancel 53:10
capacity 1:7 74:5
captured 55:9

car 50:12
card 21:22,23,24 22:1,5
    22:7 32:12 33:6
care 13:13 40:4
carrying 46:17
cars 17:22 37:3
cart 17:19
carts 15:13 17:18 18:3
Carver 50:4
case 1:6 5:21 8:20 26:9
    63:5 64:24 66:13,22
    67:6 74:4
catch 42:22 43:17
caught 56:4
cell 24:21,23 64:16
Certificate 3:5,5 72:1
    73:1
certify 72:4 73:6,11
Chagrin 2:3
chain 60:24 61:9,13
characterization 15:22
    27:9
charge 20:8 34:9
charged 47:17
charges 46:20 72:10
check 25:7 62:25 68:19
    68:19
CHRIS 1:7 74:5
circumstances 62:15
    66:5
citation 44:12,14 57:9,13
    57:21 59:25
citations 4:21 9:3,12
    11:25 12:11,11,22
    57:5,6 59:22
City 1:23
civil 40:5 41:12
claim 8:20
clarify 5:25 12:13
clarity 55:1
cleaning 60:21
clear 6:19 12:16 25:10
    26:3 63:24 64:6,19
    65:11
clerk 34:7 59:6 66:10
close 22:7 39:14
Co-counsel 2:9
cocaine 46:17
code 9:2,12 11:24,25
    12:11,22 13:22 14:4
    44:12
collection 49:14
color-contrasting 57:10
come 11:2 34:21 37:8
    40:12 43:11 44:5
    46:12,12,22 49:7 55:6
    60:9 69:13
coming 26:23 48:23 60:5
    62:9
commercial 57:22 61:21
    67:5
Commission 72:12,13
common 22:9 41:8,10
communication 43:6
    59:19
company 22:5 23:18 24:3
complaining 26:19
complaints 26:8,10
complete 38:18
compliance 13:3 60:5,6,9
    62:9,15 66:4,16
compliant 67:8
composite 4:21 57:15,18
Computation 8:23
concealed 46:18
concerned 47:24
concluded 6:22 71:14

confirm 8:21 48:12
    65:10
confused 40:8 51:8,13
connected 73:14
considered 34:4 61:2
    66:23
contact 59:15
contacted 19:3,14 36:20
    52:2
contacting 22:6
container 60:25 61:9
containers 57:22 61:21
    67:6
contest 60:7
conversation 30:22 31:7
    56:19 62:8,19 67:11
conveyance 51:2
convicted 37:3
Cook@debevoisepoult...
    2:14
cooperation 5:24 62:14
copies 34:10
copy 10:7 59:13 70:17
    71:7
Corporal 57:3
corporation 66:4
correct 7:7 8:23 9:14,19
    13:7,8 23:2 27:21,22
    28:22 36:9 40:10
    52:20 54:3 58:14,16
    61:22 64:4,7 65:4
    66:17 67:9,10 69:5
CORRECTION 75:2
CORRECTIONS 74:15
correctly 40:9 51:15
    52:15
corresponds 39:4
cost 34:17 58:11
costs 58:12,15,22 60:1
    66:12
counsel 2:5,14 14:18
    25:7 71:18 73:12,14
count 9:6
county 1:8 13:2,11,15
    33:25 40:1 59:16,17
    59:18,21 60:1 62:2
    66:3 67:4,7,12 72:3
    73:4 74:6
couple 24:8 30:10 57:2
    63:21,23 64:7
course 6:25 16:8 32:10
    64:16
court 1:1,18,22 5:6 7:15
    8:12 13:18,18,25
    29:13 34:6 35:6 36:20
    38:21 40:5 41:12
    42:13 50:18,20 57:16
    58:15,22 65:15,17
    66:11,12 71:7 73:6,19
courts 60:8
credit 21:22,23,24 22:1,5
    22:7
crimes 51:1
criminal 20:8 46:20
criminals 65:1
criticisms 28:1
cross 3:3 41:14 55:5
    63:18 69:18
crossed 54:12
curious 14:8 32:10
currently 7:19
cushions 61:1
cut 43:10,15

**D**

D 3:1
D-E-E-G-A-N 7:6,7
DA 9:9

**Dade** 1:23
**Dalanea** 1:3 9:7 74:1
**damages** 8:21,23,25 9:1
   9:17
**Darlene** 1:3,12 5:1 7:5
   22:1 38:25 39:23,25
   40:1 52:2,3,4,6,25
   72:5 74:1,18
**date** 1:14 18:13,14 39:23
   48:25 52:16 54:20
   57:21 68:15 69:4
   74:20
**dated** 8:14 15:3 21:10
   22:14 28:14 35:9,21
   39:10 42:18 44:21
   48:10 50:23 55:18
   73:17
**David** 52:25
**day** 67:24 72:8 73:17
**days** 22:8 30:10 46:2,9
   47:15 49:3
**dead** 41:10 43:16,16 55:2
**deal** 26:9
**Debevoise** 2:11
**debris** 43:9 58:20 60:14
   60:19
**December** 39:10 42:18
**decided** 40:23 59:25
**Deegan** 1:3,12 5:1 7:4,5
   18:2 39:23 52:2 57:3
   70:14 72:5 74:1,18
**Deegan's** 22:2
**Defendant** 1:9 2:14 74:7
**defined** 6:6
**definitely** 14:19
**delayed** 53:22
**department** 42:24 43:6
   44:8 49:20 50:11
**departments** 64:11
**deponent** 71:19
**Deponent's** 3:6 74:10
**deposition** 1:12 5:13,17
   6:2,21,23 7:8 32:22
   42:9 56:25 64:1 71:13
   71:20 73:8 74:13,14
**deputies** 9:4,5,13 18:22
   20:2 25:4 26:23 28:2
   37:8 46:22 47:2 54:18
   55:10 59:24 60:4
   67:23 68:17 69:2,10
**deputy** 19:11 24:7 26:10
   27:17 30:17 32:4 33:9
   35:15 39:19,22 40:9
   40:12 44:5,7 47:22,23
   54:21 58:8,22
**description** 50:13
**designated** 30:18 33:7,20
   33:24
**despite** 46:11
**details** 39:5
**detective** 32:6 33:10
**determined** 36:8
**developed** 28:22
**different** 12:21 30:3
   60:16 69:14
**Direct** 3:3 7:1
**direction** 47:4
**disagree** 6:10
**Disclosures** 4:4 8:14
**discussion** 55:10
**dismissal** 62:15 66:5
**dismissing** 13:3
**dispatcher** 43:20
**dispute** 54:4
**DISTRICT** 1:1,1
**DIVISION** 1:2
**divorced** 21:6

**document** 8:11,17 15:16
   17:14 20:13 34:14
**documents** 5:11,15,16,19
   6:1,20,20 14:7
**dog** 9:13,23 10:2,2 27:10
**doing** 45:14 56:10 63:12
**dollar** 9:1 49:14
**dollars** 50:3,5
**door** 44:9
**doors** 10:3
**Downey** 36:6,19
**drive** 7:22 10:1,12,19,21
   20:14 22:15 25:24
   26:9,13,17,20,25
   27:21 28:3,9 41:17
   43:12 56:14 68:18,25
   69:15,24,25 70:4,6
**driveway** 49:22
**Dropbox** 70:19
**drug** 28:22 29:25 30:14
**drugs** 29:25 30:3 45:16
   47:25 52:18
**duly** 5:2 72:6

**E**

**E** 2:2 3:1 4:1
**earlier** 6:8 12:5 68:23
**early** 49:11 63:25
**easement** 12:4
**easier** 63:13
**easily** 43:17
**eight** 38:20
**either** 5:20 30:9 47:18
   64:20
**elaborate** 33:21
**electronics** 11:18,21
**email** 4:22 62:1,5,5,12,18
   62:24 65:21,22 66:15
   67:8
**emotional** 9:17
**employee** 73:12,13
**ended** 13:3 52:18 53:10
**enforcement** 9:2,12
   11:24
**entity** 64:14,15,21
**erected** 60:18 61:7
**Errata** 3:6 75:1
**escape** 27:5,11
**ESQ** 2:6
**ESQUIRE** 2:2,10,10
**estimate** 12:22 29:2
**eventually** 38:8,18
**everybody** 22:8 26:16
   63:13 70:20
**evidence** 43:4
**exact** 9:25 12:3 26:6
   68:15 69:4
**exactly** 28:25
**Examination** 3:3,3,4 7:1
   63:18 67:17
**examined** 5:3
**example** 31:18 34:12
**exchange** 8:19
**exhibit** 8:12,15 9:20
   14:25 15:2 21:10,12
   22:11,12 28:11,13
   29:11,15 33:2 35:7,9
   35:18,21 37:13 38:19
   38:22 39:7,9 42:12,16
   44:16,18 45:24 46:2
   48:4,8,10 50:19,21
   52:21,23 53:18,20
   55:15 57:16,18 61:23
   61:25 63:1,3 65:16
   66:19 67:2
**exhibits** 5:16 70:19

**expect** 5:22
**expense** 11:10
**experience** 22:9
**Expires** 72:13
**exposed** 56:6
**expressed** 43:14
**extent** 5:19
**exterior** 26:4

**F**

**fact** 6:12 64:24
**factors** 43:11
**failing** 57:9
**fair** 43:4 52:19
**familiar** 7:10
**far** 20:8 25:13
**fashion** 33:24
**father** 21:2,2,3
**fee** 13:19 55:13
**fees** 14:1
**feet** 60:25 61:1
**female** 48:19 51:18,21
   52:4 68:10
**fence** 39:16,25 40:2,24
   41:1,5 43:23 56:3
   60:15,24 61:7,9,12,13
**field** 35:11
**fifth** 59:3 63:7
**figure** 8:7 11:1,16 32:20
**file** 47:21
**financially** 73:15
**find** 15:8 47:9 50:8 56:12
**finding** 52:18
**finds** 66:4
**fine** 12:22 13:17 53:17
   57:22 58:8,11,15,21
   66:12
**fines** 60:7 62:16
**finish** 7:11
**fire** 42:21,22,24 43:13,17
   44:8,9,11
**firearm** 46:18
**first** 4:3 5:2 8:13 29:3
   66:2
**five** 19:17 29:12 57:5,17
   59:9,11 66:22
**FL** 1:23 2:7,12
**Florida** 1:1,19 7:20 72:2
   72:12 73:3
**follow** 56:15 63:15 67:19
**following** 64:2
**follows** 5:4
**foot** 45:19 47:3
**foregoing** 73:8 74:12,13
**form** 28:4
**forth** 5:8 18:21 20:14
**forward** 31:18
**found** 17:19,24 18:4,10
   20:1 47:14 48:7 52:17
**four** 4:21 71:1
**fourth** 58:18
**front** 18:7 33:12 44:9
   56:1 60:20,24 61:6,10
**full** 7:4
**fully** 67:8
**furnished** 5:12
**furnishings** 70:4
**furniture** 61:2
**further** 56:15 73:11

**G**

**garage** 37:8 49:7,12
**Gardens** 23:2,3
**gate** 49:22
**gather** 23:1 46:11
**general** 5:21

**genitals** 56:6
**gentleman** 51:10 36:6
**geography** 55:13
**getting** 18:23 37:24 51:8
**GG** 72:12
**girl** 47:9 49:21 50:11
   51:23
**girlfriend** 49:6,9 51:22
   51:24
**give** 6:24 7:4 15:15 38:9
   58:4
**given** 11:25 12:12,14,22
   19:11 47:12 56:14
   73:9
**giving** 66:10
**glass** 23:18,24
**go** 12:20 20:11,17 23:18
   32:18 38:8 49:19,22
   56:22 60:13 66:19
   67:1 68:3 70:8
**goes** 50:14
**going** 14:21 16:21 18:7
   20:14 22:10 23:6 29:3
   34:17 40:4 43:17 46:2
   47:4 53:5 54:15 57:23
   60:3,4,6,7 66:9
**golf** 15:13 17:18,19,22
   18:3
**good** 7:19 8:19 24:23
   42:6 55:14
**gotten** 53:11
**government** 64:14,15,20
**grand** 46:16
**grandfathered** 67:13
**granted** 62:14
**grass** 12:4 54:13
**grassy** 55:7
**group** 57:5
**guess** 17:18 21:10 26:24
   31:23 32:17 45:20
   46:2 55:20 60:1
**guided** 6:7
**guy** 19:8

**H**

**H** 4:1
**half** 19:3 48:22
**hand** 72:7
**handled** 13:15
**handles** 64:11
**handy** 58:2
**Hang** 48:4,6
**happened** 34:20 43:11
   47:6 50:6 54:7,22 55:2
   56:17 60:14 61:18
   67:20 68:24
**harm** 9:18
**heads** 7:16,17
**heard** 5:8
**hearing** 38:9
**hearings** 36:20
**Heights** 2:3
**Heilman** 1:3 5:17 6:20
   74:1
**Heilman's** 6:1
**help** 30:13 33:1
**HERETO** 74:15
**heroin** 51:3 52:12
**hidden** 49:13
**highlighting** 66:6
**Highway** 7:25 8:4
**Hill** 15:4
**history** 46:16
**Holborn** 2:10 58:3,4
   59:4,7 63:9
**Holborn@debevoisepo**
   **2:13**

**home** 9:14 10:10,16 15:5
   15:5 37:20,21,22
   39:23 40:20 49:7
   57:10 64:16
**homeowner** 46:22
**hoping** 6:22
**hour** 42:3
**hours** 52:10
**house** 10:13 20:17 23:22
   30:7,12 33:12 41:16
   41:17 42:21,22 43:18
   43:25 45:7 52:7 55:4
   56:7 60:10
**Hudson** 7:20 25:24 41:15
   41:15,18,19 47:5
   52:17
**huh-huhs** 7:16

**I**

**I-N-G-E-R** 32:7
**identification** 8:15 14:25
   21:12 22:12 28:11
   35:7,18 38:22 39:7
   42:16 44:16 45:24
   48:8 50:21 52:21
   53:18 55:15 57:19
   61:23 63:1
**identified** 51:21
**II** 2:10
**III** 1:4 74:2
**illegal** 38:3,5
**illegally** 44:11
**imagine** 30:2
**important** 7:14
**impounded** 27:11,19
   64:9
**impression** 36:5
**incident** 4:5,6,7,8,10,16
   4:17,20 9:22,24 13:14
   15:2,3 17:17 18:9,25
   20:8 21:21 22:14,15
   22:17,24 23:10 25:23
   27:18 29:11,16,17
   34:15 35:21 37:16
   44:6 45:1,3,13 46:8
   47:18 48:10,17 50:23
   51:7,15,16 53:23 54:8
   55:18,25 56:20 64:1
   65:6 67:19 68:25 69:1
   69:22
**incidentally** 12:9 16:21
**incidents** 6:8,9 14:11
   26:18,23 48:23
**include** 70:21 74:14
**included** 59:5
**including** 5:15
**income** 9:17
**indicate** 45:5
**indicated** 12:9 19:1
   20:14
**indicates** 8:24 9:3,16
   39:15 42:19 44:23
   45:18 46:16 47:20
   54:21 66:22
**information** 19:11,12
**informed** 52:6
**Initial** 4:4 8:13
**inside** 23:13,17,22 49:11
**installed** 23:16,19 26:5,7
**installing** 60:15
**Institute** 2:2,6
**intend** 5:19
**intends** 5:12
**interact** 33:9
**interaction** 35:16 44:4
**interactions** 26:11 27:24
**interested** 73:15

**interject** 5:7
**interviewed** 36:14
**intrusive** 28:20
**investigate** 37:7
**investigation** 35:11
  56:13
**investigative** 34:13
**investor** 40:15 43:9,22
  54:1
**involving** 17:1 65:7
  71:3
**issue** 6:4 25:20 30:14
  39:24 40:4 43:23
**issued** 54:24 57:5,8,13
  58:19
**issues** 28:8 43:3
**items** 27:19 36:21 67:13
  69:2,23

**J**

**jail** 20:5 36:23,24
**Jason** 19:13
**jeopardy** 43:18
**jewelry** 11:18,21 49:14
  49:23
**job** 30:2
**John** 56:2
**JOHNSON** 2:2
**JONES** 1:4 74:2
**Judy** 1:18 72:11 73:6,19
**Judy@andersoncourtr...**
  1:24
**July** 8:14 21:10
**June** 14:12 52:24 55:18
  57:8 58:7,20
**junk** 58:21
**Justice** 2:2,6

**K**

**kayaks** 11:5,15 65:2
**key** 23:25
**kind** 14:8 50:3 52:1
**Kmart** 21:22
**knew** 43:2 47:3 49:17
**know** 5:7 6:15 10:7,8
  11:20 15:23 16:1 19:2
  20:7,10 21:14,23 22:6
  23:8,15 24:5,6,12 25:3
  26:22,24 27:23 28:25
  30:13,15 31:23 32:6,6
  34:12 35:2 36:1,12,24
  37:2,4 38:7,10,11
  41:11 44:10,14,15
  47:6,8,14,15 48:16
  51:23,24 53:4 54:18
  54:22 55:3,9 56:11,16
  58:3 63:8,14 67:24,25
  67:25 68:1,3,13,15,17
  68:21 69:10,12 71:1
**knowledge** 18:21 29:10

**L**

**L** 71:16
**lady** 53:25
**landscaping** 54:11
**laptop** 14:23
**Large** 1:19
**late** 9:4
**lawsuit** 26:19,22 28:2
**learn** 69:13
**leave** 45:19 46:12 68:9
**leaving** 50:11
**left** 10:3 27:6 43:13
  44:11 45:19 46:25
  47:2,3 56:6 64:17,25
**legs** 41:25

**let's** 15:8 16:15 18:12
  42:2 55:17 56:22
  61:25
**letter** 13:2
**Liberty** 50:5
**lifted** 35:5
**limit** 6:6
**line** 21:17 64:16 65:8
  66:3 75:2
**link** 60:24 61:9,13
**list** 6:8
**listed** 15:5
**little** 39:10 40:8 53:1
  63:13
**live** 7:21,24 8:10 34:24
  35:4 40:15 52:5
**lived** 10:18
**lives** 8:9
**living** 10:10,11,12,24
  20:16 30:7,7,9 31:12
  35:2 69:15,16 70:1,2,3
  70:5
**locate** 12:21
**located** 49:12
**locating** 18:22
**location** 15:3 22:15 61:4
**long** 16:22 50:14 69:7
**longer** 56:3
**look** 6:11,16 14:7,16
  15:25 16:22 21:11
  32:18,19,22 37:6
  39:18 46:23 48:11,15
  51:6 53:1,22 55:20,22
  58:4 59:4 61:25 66:2
**looking** 9:7 11:1 31:17
  33:15,17
**looks** 35:15 37:7
**lot** 19:4 34:3,4,5,11

**M**

**M-E-L-L-O** 35:15
**Madam** 5:6 8:12 50:18
  57:16 65:15
**mail** 43:12
**making** 26:8 45:10
**male** 53:11 68:11,12
**manner** 9:1
**March** 1:14 44:21 46:3
  49:2,2 72:6
**Marijuana** 29:8
**Marisela** 54:1
**mark** 35:20 38:19 44:18
  57:15
**marked** 8:15 14:25 21:12
  22:12 28:11 35:7,18
  38:22 39:7 42:16
  44:16 45:24 48:8
  50:21 52:21 53:18
  55:15 57:18 61:23
  63:1
**material** 60:17
**materials** 61:10
**matter** 13:15 25:20
  26:21
**matters** 25:16
**mean** 18:9 29:24 32:9
  42:15 45:11 54:12
  55:12 62:19,22
**Mello** 35:15
**memorializing** 62:7
**memory** 40:6 59:9
**mentioned** 15:9
**Meotti** 19:13
**merit** 62:15 66:5
**Merritt** 56:2
**message** 64:17
**met** 62:10

**meth** 46:17
**Miami** 2:7
**middle** 1:1 35:13 46:15
  52:1
**mind** 39:22
**minute** 37:25 48:12
  56:23
**minutes** 50:14
**missed** 9:3
**misunderstood** 27:12
**moment** 5:10 15:16
**money** 8:25 34:4,5 62:23
**month** 39:11
**Moore** 62:1
**moped** 15:13 17:19
**mother** 20:24
**motion** 23:6 62:13
**move** 10:23
**moved** 61:6
**moving** 31:18 42:1 61:3
**mowed** 54:13
**mowing** 54:10,11
**multiple** 29:7 33:10

**N**

**N** 3:1 71:16
**name** 7:4 19:16,20 21:4
  22:2 32:4,7,11 33:3
  39:14
**narrative** 16:8 23:1
  28:17 46:15 48:11
  51:6 53:1
**natural** 41:22
**nature** 11:19 35:11
**near** 8:4 42:21 52:17
**nearby** 8:1
**necessary** 36:15
**need** 33:1 37:17 46:24
  67:19
**needed** 30:1
**neighbor** 37:19 39:24,25
  40:3 53:25 56:20
**never** 36:19
**new** 22:7
**NOCCO** 1:7 74:5
**nods** 7:16
**nominal** 9:1
**Notary** 1:19 72:12
**Notary518@yahoo.com**
  62:4
**note** 35:12 40:8 47:20
**notes** 42:20 45:5
**notified** 22:4

██████████████  18:16

**number** 19:10,21 57:17
**numbers** 57:9 60:10 63:5
  66:22

**O**

**O** 71:16
**Oath** 3:5 72:1
**object** 27:8 28:4
**objection** 17:21 18:6
  68:14,20 69:17
**obligation** 5:21
**obviously** 5:18 6:18,22
**occasion** 13:16,24 15:10
  68:18 69:11
**occur** 9:24
**occurred** 14:11 27:20
  31:8 50:15 69:22
**October** 37:18 38:24
**offender** 30:18 31:1 33:7
  33:20 49:12 68:19
**office** 13:12 15:11 22:18
  29:21 33:23 34:7,8

36:11,14 37:19 38:1
  40:10 43:1 48:20
  52:16 59:16 62:22
**Office's** 14:12
**officer** 47:8
**official** 1:7 72:7 74:5
**Oh** 2:3 10:17 16:18
  20:11 24:21 27:12
  37:22 38:5 39:20 47:6
  48:18 49:25 65:19
  68:10
**Ojeda** 57:13 58:8,22
**okay** 5:6 6:3,18 7:10,17
  7:22 8:4,19 10:6,13,17
  10:22 11:1,14,17,23
  12:9,15 13:1,13,16,20
  15:2,8,10,17,23 16:2,6
  16:7,10,10,12,14,15,16
  16:18,20,23,24,25
  17:1,2,4,6,7,8,9,11,13
  17:13,13,15 18:17,20
  19:6,13,18 20:7,11
  21:16,17,19 22:20,22
  22:22,23 23:1,8,20
  24:18,21 26:3,14,18
  27:14,16,18 28:10,17
  28:19,24 29:20 30:16
  31:14 32:8,13,16 33:5
  33:19 34:2,9 35:5,14
  35:14,20,24,25 36:5
  36:17,23 37:5,14,22
  38:11 39:3,18 41:4,21
  42:4,5 43:1,7,22 44:18
  44:21 45:1,2,3,5,22
  46:6,7,8,21 47:6 48:6
  48:15 49:5,6,10 50:17
  51:5,8,14 52:9,15 53:3
  53:14,25 54:21,25
  55:4,24 56:16,19,22
  57:16,25 59:2,6,15
  60:9,19 61:20 62:4,7
  62:12,21 63:3 64:12
  65:5,25 66:18 67:1,11
  67:15 70:5,10,13,15
  70:21 71:5,6
**old** 18:12
**once** 26:24 57:5
**ones** 13:21 23:17 50:4
  64:8
**ongoing** 39:24 54:4
**open** 22:7
**opportunity** 6:17 63:20
**order** 5:22 47:21 48:2
  70:18
**ordering** 70:16
**organized** 27:15
**originally** 18:3
**outcome** 20:7 36:17 38:7
  41:11 56:11
**outdoor** 61:1
**outlined** 8:21
**outside** 23:13,16 43:12
  69:17
**outstanding** 70:22
**owned** 8:2 20:18,20
  40:20
**owner** 40:14
**owns** 44:2

**P**

**P** 71:16
**P.A** 2:11
**p.m** 1:15,15 42:8,9 56:24
  56:25 71:14
**P.O** 1:23
**package** 59:6
**pad** 23:25

**page** 3:2,6 4:2 8:24 37:13
  52:1 74:10 75:2
**paid** 9:3 63:4
**Paneson** 21:5,6 22:18
**panic** 23:22
**pants** 56:4
**paperwork** 11:2
**paragraph** 66:2
**paraphernalia** 52:13
**Park** 2:12
**parking** 37:23 53:4
**part** 8:19,25 9:9 15:8
  32:7 45:12 51:17 54:4
**partial** 32:11
**particular** 1:1 17 13:7,14
  13:24 20:8 25:20,23
  29:6 35:16 38:2 54:8
  57:8 67:24
**parties** 71:18 73:12
**parties'** 73:13
**Pasco** 1:8 31:1 33:25
  43:6 72:3 73:4 74:6
**patio** 61:1
**Patrick** 62:1
**pawnshop** 7:25 8:2
**pay** 13:6,9,10,17,18,25
  34:4 36:21 59:25
**paying** 62:8 66:12
**payment** 62:16 66:23
**PCSO** 9:4
**Peace** 15:13
**people** 31:1 53:4
**period** 34:24
**permission** 18:23 37:7
  38:9 40:3
**permit** 40:2
**permits** 40:23
**person** 19:13 30:3 50:1,8
  54:1
**personal** 9:12 65:2
**personally** 72:5
**pertain** 28:2
**pertains** 28:14
**pet** 11:6
**Pfenninger** 33:3,9,10
**phone** 24:21,23 44:6
  62:20,25 67:11
**photographs** 37:8,12
**physically** 68:8 69:1
**pick** 50:12
**picture** 24:22
**pictures** 24:19,25 62:11
**place** 1:17 16:1 26:15
  35:4
**plaintiffs** 1:5 2:5,9 71:3
  74:3
**Plaintiffs'** 4:3 8:13
**plate** 19:20
**please** 7:4 16:12 17:4
  71:9,9
**plus** 58:15,22
**pocket** 14:4
**point** 7:24 17:18 23:15
  26:6 30:17 33:5 35:2
  41:23 48:16 55:14
  65:11
**pointing** 55:13
**police** 25:11 51:9 64:2,8
  64:20,25 65:11
**poorly-worded** 13:23
**portion** 51:25
**possession** 46:17 49:13
  51:3 52:12,12
**possessions** 11:6
**possible** 6:24 53:13
**possibly** 70:23
**posted** 57:10

**Poulton** 2:10,11 3:3,4
5:10,14,25 6:4,25 7:2
8:11,16 9:8,10 12:18
12:19 14:18,22,24
15:1,17,20,23 16:3
17:25 18:1,8 21:13
22:13 25:7,15,19,22
27:12,13 28:5,12
29:14 31:24 32:19,23
32:24 35:8,19 37:13
37:15 38:17,23 39:8
41:24 42:1,5,7,10,14
42:17 44:17 45:25
48:9 50:18,22 52:22
53:19 55:3,8,16 56:22
57:1,15,20 58:1,6,13
58:17 59:2,6,8 61:24
63:2,7,10,17,25 65:6
65:17,20,22,25 66:6
67:18 68:5,16,22
69:19 70:10,13,18,25
71:6,10
**Poulton@debevoisepo...**
2:13
**pound** 10:3 64:18,21,23
**present** 71:18
**presumably** 24:11
**presume** 70:16
**pretty** 42:1
**previously** 51:13
**prior** 5:13 6:11 46:20
47:14,15 58:14
**probably** 12:7 14:6,14
29:5 60:25
**problem** 15:20 19:5
28:22 41:4 43:23
**PROCEEDINGS** 1:12
**produce** 5:22
**produced** 6:7 14:20
**production** 6:5 71:2
**professional** 24:24
**program** 9:5
**prolific** 30:18 31:1 33:7
33:20 68:19
**properties** 26:5,12
**property** 8:2 9:13,23
10:1,2,5,21,25 11:3,15
11:20 15:12 18:10
19:15,23 25:4,5 26:13
26:17 27:6 30:1 40:1
40:14,16,22 41:2,2,6
45:14 46:21,23 47:11
48:23 50:9,11 51:2
52:3,7 53:6 55:6 57:22
58:21 59:24 60:4,22
61:16 64:1,3,8,22,25
65:1,2,7,8 66:16 67:8
67:20,24 68:7 70:3
**prosecuting** 36:23
**provided** 5:13 6:8
**Public** 1:19 72:12
**pull** 20:13 37:17 65:15
**pulled** 15:12
**purpose** 42:21
**purposes** 25:17
**put** 9:14 11:14 20:5
27:18 40:2 44:8,9
60:10

---

**Q**

**qualify** 31:25
**question** 7:11,13 13:24
27:25 28:6 66:14
**questioning** 25:17 65:8
**questions** 6:12 28:21
63:11,14,21 65:5
**quick** 55:20 56:23 67:2

**quickly** 5:6 55:21 65:16
**quote** 55:4

---

**R**

**raided** 9:14
**rate** 59:15
**reach** 59:21 60:3
**reaching** 41:22
**read** 15:16 18:20 22:19
28:17 35:12 36:1
39:21 46:6 53:7 70:11
71:10 74:12
**reading** 37:5 52:15 71:19
**ready** 21:14
**real** 55:20 56:23 65:16
67:2
**realize** 19:24
**realized** 49:23
**realizing** 56:10
**really** 5:6 20:5 24:16
30:25 31:2 35:17 44:7
62:23 68:3
**reason** 10:8 49:10 60:2
67:25
**recall** 10:24 11:12,13
12:23 13:4,21 22:5
24:16 28:7 32:4 33:11
33:17 34:7 35:17 36:3
37:16 59:11 65:8
**receipt** 4:23 63:3,4 66:20
**reclassified** 52:12
**recognize** 48:16,18 53:23
**recollect** 51:16
**recollection** 10:13 14:9
32:1 43:8 54:7 60:20
**record** 5:9 39:21 56:22
63:24 66:10 73:9
**records** 14:12 33:25 34:5
34:6
**recover** 50:9
**red** 44:9
**Redirect** 3:4 67:17
**reference** 11:24 21:1
23:12 25:12 52:11
61:21
**referenced** 5:16 25:23
**referencing** 25:13 52:1
**referring** 10:20 30:10
**refers** 9:6
**refresh** 40:6
**Regarding** 26:21
**regards** 39:24
**reimbursement** 9:2,11
**relate** 26:12
**relates** 51:5
**relating** 28:8
**relationship** 44:3
**relative** 73:11,13
**relayed** 43:19,21
**released** 36:22
**relevant** 27:10 28:2
**rely** 5:20 70:23
**relying** 70:24
**remember** 9:25 10:15
12:2 17:17 18:9,25
19:2,16 20:4,5 21:9,21
21:25 22:24 23:5,7,9
23:15,17,19 28:8
29:15,17 30:16,20,22
30:24 31:5,6,7 32:10
32:15 34:17 35:16
36:18 37:9,17 39:17
44:7 45:1,3,9,10,12,13
45:15,22 46:8 47:22
47:23 48:25 51:7 53:2
53:3,14 55:21,23,24
57:6 58:9,25 59:12

**60:22,23 62:19,23
68:24 69:4,5
**remembered** 19:20 31:4
**removal** 64:3
**removed** 10:1,6 39:25
40:3 64:2,8 68:7,8,13
69:2
**renovating** 40:23
**rental** 38:10 53:5
**renting** 37:19,21,22
**rephrase** 41:5
**replacing** 9:22
**report** 4:5,6,7,8,9,10,11
4:12,13,14,15,16,17,18
4:19,20 10:8 15:3,11
18:7,20 19:1,9,12 21:1
22:14 23:6 25:11,23
34:19 35:9,10,21
36:12,13 37:17 38:24
39:4,10 42:18 44:21
48:10 50:19,23 51:12
52:9,16,24 53:10,21
55:18 70:25,25 71:3
73:7
**reported** 1:18 18:3
**reporter** 1:18 3:5 5:7
7:15 8:12 29:13 35:6
38:21 42:13 50:20
57:16 65:15,17 71:7
73:1,6,19
**reporting** 1:22 39:16
**reports** 6:9 16:21 31:17
34:13,13,16,16 49:11
51:9
**represented** 5:10,14
**reputational** 9:18
**request** 6:5 8:24 71:2
**researched** 54:23
**reside** 7:19 40:21
**residence** 23:13,14 24:7
27:6,20 34:21 37:24
45:6 52:5
**residences** 26:24
**residential** 38:4
**resolve** 59:22
**resolved** 66:23
**respective** 71:18
**respond** 39:22
**responded** 52:10 62:24
**response** 27:17
**responsible** 44:7
**restraining** 47:21 48:2
**result** 9:5 47:7,17 66:14
66:15,23
**resumed** 42:9 56:25
**retrieve** 9:13 11:8 18:23
**retrieving** 9:23
**reviewed** 59:23
**right** 7:3 8:7 9:8,11,16
9:20 10:22 11:3,16,23
13:9 14:15 16:19
17:12 18:9 19:22 21:8
21:18,20 22:10,17
24:7,12 25:20 26:1
27:2,3,7,25 28:7,8,13
28:20 29:18 30:11
31:5,21 32:23 35:12
37:2,16 38:15,20,21
39:9,14 40:25 41:13
41:18 42:11 46:15
47:16 48:24 50:2
53:17,20 55:17 57:2
58:1,7 59:13 63:10
65:3,22 69:1 70:10
**ring** 8:1
**ripped** 39:16
**Rjohnson@ij.org** 2:4

**road** 37:23
**roadway** 61:11
**Rob** 58:3 59:2 63:7
**robbed** 49:24 64:3 65:1
**Robert** 1:4 2:2,10 36:6
74:2
**roll** 60:24 61:13
**roof** 36:6
**room** 19:4
**roommate** 10:3 68:9
70:6
**Roxy** 11:6,8 26:12 27:5
27:19 64:18,21,22
67:21
**Rubbermaid** 60:25
**Rule** 4:3 8:13
**RV** 58:8

---

**S**

**S** 2:6,7,11 4:1 71:16
**safety** 43:11
**sake** 63:24
**Sarah** 51:21
**saved** 24:16
**saw** 19:9 34:19 43:12
49:20,25
**saying** 6:10 31:25 51:14
**says** 21:24 37:11 41:14
46:21 52:9 62:12 66:3
**scope** 69:18
**screeby** 24:20
**screenshots** 24:15 25:13
25:24
**scroll** 16:2,4,7,10,12 17:2
17:4 21:14,16,17
22:20,22
**seal** 72:7
**search** 46:23
**searching** 46:21
**see** 65:23
**second** 14:23 21:18 48:6
58:5
**sections** 60:16
**secured** 64:25
**security** 23:25 52:6 56:9
**see** 6:24 8:17 14:21 15:16
15:8 16:15 18:12
19:11 22:1,15 24:1
28:15 32:20 35:10,22
37:22 39:5,11 42:22
42:23 44:19,22,24
45:1 46:3 48:13 49:15
49:16 50:13,14,24
51:6 52:13 53:1,22
54:9,23 55:17 57:6,11
57:23 58:23 60:17
61:16 62:2,9,16 65:23
66:3
**seeing** 56:9 60:20
**seek** 48:1
**seeking** 9:17
**seen** 24:7,10 55:9
**Semoran** 2:11
**send** 24:2
**sensors** 23:6 24:1
**sent** 6:2 14:13 24:11
25:25
**September** 35:21 53:20
**series** 26:23 27:23
**serious** 29:9
**Services** 11:8
**set** 13:1 42:20 58:8
**seven** 6:14 12:1,1,10,10
12:11
**Shaker** 2:3
**shakes** 7:16

**shared** 41:1
**she'll** 71:10
**Sheet** 3:6 75:1
**Sheriff** 1:8 74:6
**Sheriff's** 14:11 15:11
22:18 29:21 33:23
34:7,8 36:11,14 37:19
38:1 40:10 43:1,6,19
48:20 49:20 50:10
52:16
**ship** 70:19
**shirt** 56:3,5
**short** 5:22,25 35:12
**short-term** 38:10 53:5
**shots** 24:10 25:1
**show** 14:21 21:8 22:10
28:13 32:25 35:5
42:11 52:23 57:3,6
**showed** 50:11 51:13
**showing** 35:20 51:19
**shows** 51:18
**shrubbery** 43:16
**side** 54:10 56:3
**Signature** 3:6 74:10
**significant** 49:13
**signing** 71:19
**silver** 49:14 50:3,5
**sir** 50:20
**sit** 33:11
**sitting** 53:8
**six** 6:14 19:17
**skipping** 58:7
**Smith** 51:21
**snuck** 52:3
**so-called** 60:14
**sold** 31:14,20
**somebody** 21:21 36:12
39:16 42:20 49:17
68:6
**son** 10:2
**soon** 6:24
**sooner** 5:19
**sorry** 7:25 9:8 10:17
13:23 15:18 20:19
27:12 41:18 47:1 48:5
58:13 68:10
**sort** 9:17 11:18 13:17
63:25
**Sounds** 42:6
**sparks** 43:16
**speak** 20:3 40:12
**specifically** 53:3
**speculate** 68:2
**spoke** 39:23
**Spring** 15:4
**standing** 56:2
**start** 6:13 14:12,15 28:24
**started** 5:8 28:25 54:11
56:9
**state** 1:19 42:20 72:2,12
73:3
**stated** 39:25 40:1,2
**statement** 33:22 36:15
45:9,10,15,16
**states** 1:1 39:18 52:2
**Ste** 2:3,7,11
**steal** 49:7
**stealing** 36:8
**stenographically** 73:7
**stepfather** 21:2
**stipulated** 71:17
**Stipulation** 3:4
**stole** 10:4
**stolen** 9:12,22 15:12
17:23 19:24 20:1 27:6
27:20 64:22 65:7,12
65:13 67:20 69:3,23

**stood** 30:25 31:2
**stopping** 41:23
**storage** 61:21 67:6
**store** 19:4,7,14,23 21:22
  21:24 22:1
**stored** 57:22 58:21
**straightened** 30:2
**street** 40:1,15,17,22,24
  41:9,10,14 44:1 53:5,6
  54:1,12 55:5,6
**Stretch** 41:25
**structure** 51:2
**stuck** 9:9
**stuff** 5:20
**subject** 43:2
**suboptimal** 6:19
**SUBSCRIBE** 74:13
**SUBSCRIPTION** 74:14
**subsection** 8:23
**substance** 29:6
**suing** 27:18
**suitable** 70:20
**sum** 66:24
**summary** 43:5
**Supplemental** 4:3 8:13
**suppress** 62:13
**sure** 9:21 12:10 14:22,22
  14:22,22 15:17,17,17
  16:11,13 17:3,5 22:21
  25:6,9,10,16,18 27:10
  32:1 37:11 41:24,24
  51:10 52:24 63:17,24
  64:6 66:13
**surveillance** 49:21,25
  54:9
**suspicious** 53:9
**sworn** 5:2 72:6
**system** 23:25 24:12
**systems** 26:4

---

**T**

**T** 4:1 71:16,16
**T-shirt** 56:4
**tag** 19:10 44:9,10
**take** 6:16 14:15 15:25
  21:11 24:22,25 32:18
  32:19,22 37:6,8 40:24
  41:12 42:2 48:15 51:6
  53:1,22 55:20,21 60:8
  66:2 70:17
**taken** 7:8 11:4,7,17 19:9
  24:19 26:13,15 36:21
  40:4 42:8 56:24 66:10
**talk** 33:13 54:17
**talked** 19:19 20:6 62:24
**talking** 23:9 31:16 33:17
  38:18 47:22,23 69:21
**tall** 12:4 61:1
**TAMMY** 1:3 74:1
**TAMPA** 1:2
**TAYLOR** 1:3 74:1
**technically** 58:14
**telephone** 52:2
**tell** 5:2 11:3 26:6 33:15
  33:19 38:17 43:7
  54:15 55:12 60:2
**telling** 30:17,25 46:12
  67:7
**ten** 49:3
**tenants** 37:23
**terms** 18:22 27:5,17
**testified** 5:4 64:3
**testimony** 27:9 73:9
**thank** 5:23 9:9 42:7
  70:13
**thanks** 55:13 63:16 70:10
**theft** 46:17

---

**Theodore** 21:5
**thing** 22:9 30:24 36:2
  38:19 60:23
**things** 26:15 43:9 57:2
  63:23 64:7
**think** 9:6 12:6 13:19
  14:14 15:4 16:17
  17:21,23 20:14 22:8
  23:8,24 25:9,11 29:12
  31:3,4,21 32:1,2 35:5
  39:3 42:2,3 55:11,12
  55:17 64:10 65:11
**THOMAS** 2:10
**thought** 42:21 51:19
  62:14 68:10
**threat** 43:2
**threatened** 45:6
**three** 12:5,8 21:10 60:25
**three-inch** 57:9
**time** 1:15 6:6 10:10
  12:13,14 13:7 18:12
  18:18 19:24 20:20
  34:25 38:2 39:14 47:2
  52:24 64:7 65:11 69:7
  69:16,22 70:1,2,7,14
**timeframe** 20:12 23:3
  30:8
**times** 11:24 12:10,21,23
  12:24,25 22:6 33:10
  33:11 56:9
**today** 5:20 63:12 70:23
**toggle** 15:24
**told** 30:23 31:13 32:4
  33:6 34:3 43:1 47:9
  51:11 56:12 60:7
  67:12 68:9 70:8
**Tom** 5:18 9:6 12:16
  15:15 17:21 32:17
  41:22 55:1 63:16
  66:19 67:2 70:16
**top** 31:1 33:7,20 37:13
  41:14 52:9 68:19
**total** 11:13 12:11 14:3
  57:14
**toto** 59:10
**trailer** 10:11,14 15:11,13
  17:17,22 18:10,23
  19:4,7,15,21 30:5,8
  35:3,4 61:17 65:9,12
  65:13
**transcript** 71:8 73:8
  74:12
**transferred** 31:21
**trashy** 61:2
**trees** 43:15,17
**trespass** 45:20 47:12
  51:1,17 54:22,24
**trespassed** 29:22 34:20
  59:24
**trespassing** 47:10,17
  51:12 52:11,13,17
  53:21
**trial** 70:24
**trick** 66:14
**true** 73:8
**truth** 5:2,3,3
**try** 7:11,12 14:7 34:6
**trying** 10:22 15:8 16:8
  27:14 30:13
**turn** 6:20
**two** 10:14 11:5,5 12:23
  12:24,25 15:12 17:18
  17:22,23 18:3 39:10
  46:2,9 47:15 48:23
  57:21 61:1,20
**Tyler** 10:2,6 18:12 20:3,5
  20:9 22:18 23:5,5,9

---

27:1 28:21 29:21 30:1
  30:17,25 33:6,16,18
  33:20,24 34:1,20,21
  45:6,14,16,19 46:16
  46:23 47:9,10,16,21
  47:25 48:23 51:5,11
  51:16 52:3,5,7 64:2,7
  68:6,8,13,19 69:1,11
  70:5
**Tyler's** 11:6,15,20 18:15
  20:24 49:6,9 65:2
**type** 34:14
**typo** 39:3

---

**U**

**U** 71:16
**U.S** 7:25 8:4
**Uh-huh** 63:22 65:10
**uh-uhs** 7:16
**ultimately** 36:17 37:2
  38:11 47:6 48:1 50:6
  56:16 61:17
**unattended** 44:11
**under-** 10:22
**undersigned** 74:6
**understand** 6:10 9:22
  12:18 14:24 18:2 28:6
  29:20 40:9 48:1,19
  51:14,15 55:8 62:1
  69:8,9
**understanding** 13:1
  28:21 44:13 47:16
  57:4 66:15,24
**understood** 66:9
**Unfortunately** 22:9
**UNITED** 1:1
**unknown** 52:4
**unlock** 49:22
**unlocked** 10:4
**unquote** 55:5
**unsecured** 26:16 27:7
**USB** 56:14
**use** 5:12 29:25

---

**V**

**vacate** 10:3 26:16
**valuables** 49:23
**value** 11:14,17
**various** 58:20
**Vegan** 38:25
**vehicle** 19:21 53:8,11
**victim's** 49:13
**video** 24:6,11,14,20,22
  25:1,4,8 26:4,5 49:21
  49:25 50:10,13 52:7
  56:14 60:21
**videos** 24:17 55:9,12
  59:24
**violation** 44:12 67:6
**violations** 13:13,22 14:4
**visible** 61:11
**visited** 26:25
**visits** 9:5 24:7
**voicemail** 64:18
**vs** 1:6 74:4

---

**W**

**W** 2:10
**waiting** 58:19
**waived** 71:20
**walk** 14:10
**walked** 61:15
**walking** 49:21 50:1 61:11
**walled** 41:8
**want** 5:9 6:19,23 8:21
  14:10 15:15,23 25:10

---

25:18 27:8 30:1 32:19
  35:12 52:4 63:23 64:6
  64:19 65:10 66:13
  69:6,8 71:7
**wanted** 5:7 9:11 14:12,15
  29:21 34:9 36:21 37:6
  40:12,24 45:18,19
  47:21
**wants** 39:19,22
**warning** 44:14 47:13
  54:22,24
**warrant** 69:10
**wasn't** 27:9,10 30:9 35:4
  56:10 61:7
**watched** 22:22 25:1
  27:18 40:25 41:14
  53:14 60:8 69:14
**ways** 25:21
**we'll** 6:23 8:7 11:1 12:20
  14:7,15 27:24 38:19
  42:3 57:15 70:17
**we're** 16:21 21:10 26:3
  27:14 35:5 38:18 42:1
  48:4 57:17 58:19 64:6
**we've** 27:1
**week** 48:22
**went** 10:1,4 36:19 39:25
  53:11 54:23 56:6
  62:22 67:23 68:17
**weren't** 60:16
**white** 15:12,13
**Whoops** 20:11
**wide** 60:25
**windows** 24:1,2
**Winter** 2:12
**witness** 5:5 16:2 70:15
  72:7 73:9
**woman** 55:11
**wondering** 31:19 56:8
**words** 54:19
**work** 9:3,4 56:2
**working** 32:2,3 36:6 56:1
  64:17
**wouldn't** 28:25 60:17
  69:6
**write** 7:15 59:25
**writing** 19:20
**wrong** 48:5,5 58:2 69:8
**wrote** 13:2

---

**X**

**X** 3:1 4:1

---

**Y**

**yard** 43:10 56:1 58:20
  60:16,20 61:10
**yeah** 5:5 12:25 15:5
  17:25 23:22 25:9,16
  25:19 39:1 42:1 58:4
  59:7
**year** 9:25 12:3 23:16
  26:6 31:16 69:5,6,21
**years** 12:5,8 19:17 71:1
**yesterday** 6:1,2,21
**yesterday's** 5:17

---

**Z**

**zoned** 38:4
**Zoom** 1:17 2:1 63:12
  72:5

---

**0**

**0813** 52:10

---

**1**

---

**1** 4:3 8:12,15 9:20 21:10
**1-5-2023** 72:13
**1,000** 58:14
**1,018** 57:23 58:15
**1:05** 1:15
**10** 4:13 28:14 42:13,15
  42:16 52:24
**10-27-18** 4:11
**10-minute** 42:2
**1010** 2:11
**1035** 2:11
**11** 4:14 44:16,18
**12** 4:15 45:24 46:2
**12-13-18** 4:13
**12-7-18** 4:12
**12412** 7:24
**125** 58:21
**13** 4:16 42:18 48:4,8,10
**13402** 15:4
**14** 4:5,17 50:20,21 55:18
**14137** 7:20 8:9 38:24
  44:22 52:11
**15** 4:18 14:19 15:3 50:14
  50:19 52:21,23
**16** 4:19 35:22 53:18,20
**16781** 2:3
**17** 4:20 55:15,18
**18** 4:21 31:20,22 57:18
  58:11,15,22
**18th** 72:7 73:17
**19** 4:22 7:25 8:4 61:23,25
  65:16
☐ 18:16

---

**2**

**2** 2:7 4:5 14:25 15:2
**2:19** 42:8
**2:32** 42:9
**20** 4:23 63:1,3 66:20
**2000** 18:13
**2007** 46:18
**2012** 10:25 29:5
**2013** 14:12
**2016** 6:13 14:17,19 15:3
  21:11 23:14 26:4,25
  65:6
**2017** 31:20,22 32:3
**2018** 28:14 31:18,22 32:3
  34:20 35:3,22 37:18
  38:24 39:10 42:18
  57:4,8 58:7,20
**2019** 44:21 46:3 48:11
  49:3,3 50:23 51:15
  52:24 53:20
**2020** 55:19
**2021** 8:14
**2022** 1:14 72:6,8 73:17
**21** 4:6
**22** 4:7
**24** 1:14 72:6
**2426** 1:23
**250** 13:11 59:25 62:8
  63:4 66:10
**256** 2:3
**26** 8:13,14
**26(a)(1)** 4:3
**27** 38:24
**276821** 72:12
**28** 4:8
**287** 14:5
**29** 18:16 44:21 49:2
☐ 47:18

---

**3**

**3** 4:6 21:12
**3-29** 46:1

**3-29-19** 4:14
**3-31-19** 4:15
**3:01** 56:24
**3:10** 56:25
**3:32** 1:15 71:14
**305-721-1600** 2:8
**31** 18:18 46:3 49:2
**3180** 2:7
**31st** 47:18
**32** 18:17,18,19
**32792-5512** 2:12
**33131** 2:7
**33526-2426** 1:23
**34667** 7:20
**35** 4:9,10
**352** 1:24
**37** 13:19,25
**38** 4:11
**39** 4:12

---
**4**

**4** 4:7 8:24 22:11,12
**4-10-18** 4:8
**4-9-19** 4:16
**407-673-5000** 2:12
**42** 4:13
**44** 4:14
**44120** 2:3
**45** 4:15
**48** 4:16

---
**5**

**5** 4:8 28:11,13 29:15 31:1
    33:7,20 68:19
**5-15-16** 4:5
**5-18-2019** 52:10
**5-8-19** 4:17
**50** 4:17
**500** 58:11
**518** 57:14 58:8
**52** 4:18
**53** 4:19
**55** 4:20
**567-5484** 1:24
**57** 4:21
**5907** 7:21 10:18,21,23
    25:23 26:24 28:3,9

---
**6**

**6** 4:9 35:6,7,9 37:13 57:8
    58:7,20
**6-10-19** 4:18
**6-14-20** 4:20
**6-8-16** 4:9
**6-8-18** 35:9
**61** 4:22
**63** 3:3 4:23
**67** 3:4

---
**7**

**7** 3:3 4:10 35:5,18,21
    39:10 53:20
**7-1-16** 4:6
**7:30** 43:12
**703-682-9320** 2:4
**71** 3:4
**72** 3:5
**73** 3:5
**74** 3:6
**75** 3:6

---
**8**

**8** 4:3,11 38:22 50:23
    51:15
**8:21-cv-00555-SDM-C...**
    1:6 74:4

---
**9**

**9** 4:12 39:7,9 42:12 48:10
    49:3
**9-16-18** 4:10
**9-24-16** 4:7
**9-24-2016** 22:14
**9-7-19** 4:19