1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES, III,

  Plaintiffs,

vs.                    Case No.: 8:21-cv-00555-SDM-CPT

CHRIS NOCCO, in his
official capacity as
Pasco County Sheriff,

  Defendant.
_____/


PROCEEDINGS:         Deposition of
                    TAMMY HEILMAN


DATE:               March 23, 2022


TIME:               10:05 a.m. - 3:08 p.m.


PLACE:              Via Zoom


REPORTED BY:        Judy Anderson, Court Reporter
                    Notary Public
                    State of Florida at Large


ANDERSON COURT REPORTING
P.O. Box 2426
Dade City, FL 33526-2426
Judy@andersoncourtreporting.com
(352) 567-5484

APPEARANCES VIA ZOOM:

ROBERT E. JOHNSON, ESQUIRE
Institute for Justice
16781 Chagrin Boulevard, Ste. 256
Shaker Heights, OH 44120
703-682-9320
Rjohnson@ij.org
        Counsel for Plaintiffs

CAROLINE GRACE BROTHERS, ESQ.
Institute for Justice
901 N. Glebe Road, Ste. 900
Arlington, VA 22203
703-682-9320
Cgbrothers@ij.org
        Co-counsel for Plaintiffs

THOMAS W. POULTON, ESQUIRE &
ROBERT HOLBORN, II, ESQUIRE
Debevoise & Poulton, P.A.
1035 S. Semoran Blvd., Ste. 1010
Winter Park, FL 32792-5512
407-673-5000
Poulton@debevoisepoulton.com
Holborn@debevoisepoulton.com
Cook@debevoisepoulton.com
        Counsel for Defendant

1                          I N D E X

2                                                      Page

3      Direct Examination by Mr. Poulton            6
       Cross Examination by Ms. Brothers           112
4      Stipulation                                 114
       Certificate of Oath                         116
5      Certificate of Reporter                     117
       Deponent's Signature Page                   118
6      Errata Sheet                                119

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**E X H I B I T S**

2

Page

3   1 - Plaintiffs' First Supplemental Rule 26(a)(1)      11
       Initial Disclosures

4

    2 - 3-1-16 Citation & 5-12-16 Judgment (Mailbox)     16

5

    3 - 3-1-16 Citation & 5-12-16 Judgment (Chickens)    21

6

    4 - Complaint Affidavit & Judgment (Battery)         22

7

    5 - 10-18-17 Citation & 1-25-18 Judgment             25

8

    6 - 9-18-18 Complaint & 12-13-18 Judgment            27

9

    7 - 6-9-10 Incident Report                           29

10

    8 - 11-14-13 Incident Report                         37

11

    9 - 4-7-14 Incident Report                           38

12

    10 - 12-28-14 Incident Report                        40

13

    11 - 6-29-16 CAD Report                              45

14

    12 - 9-28-16 CAD Report                              48

15

    13 - 11-17-16 CAD Report                             51

16

    14 - 11-29-16 CAD Report                             52

17

    15 - 7-22-17 Incident Report                         53

18

    16 - 5-6-17 CAD Report                               54

19

    17 - 5-14-17 CAD Report                              56

20

    18 - 6-15-17 CAD Report                              58

21

    19 - 9-17-18 CAD Report                              64

22

    20 - 9-29-18 CAD Report                              65

23

    21 - 3-25-19 Incident Report                         66

24

    22 - 6-18-19 Incident Report                         73

25

1                    E X H I B I T S

2                                          Page

3    23 - 6-26-19 Incident Report                77

4    24 - 9-28-19 CAD Report                      83

5    25 - 7-10-19 Incident Report                85

6    26 - 12-5-19 CAD Report                      86

7    27 - 4-25-20 Incident Report                89

8    28 - Body Cam Footage Extraction 1.1 County    91
          Ordinance Chickens
9
     29 - Body Cam Footage 11-7-17 X83015724       98
10
     30 - Body Cam Footage 7-26-18 X83015725      103
11
     31 - Body Cam Footage 5-23-18 X83046953      105
12
13

14

15

16

17

18

19

20

21

22

23

24

25

1                    TAMMY HEILMAN,

2       being first duly sworn to tell the truth, the whole

3       truth, and nothing but the truth, was examined and

4       testified as follows:

5               THE WITNESS:  I do.

6                    DIRECT EXAMINATION

7    BY MR. POULTON:

8       Q.   Good morning, Ms. Heilman.

9       A.   Good morning.

10      Q.   Can you hear me okay?

11      A.   Yes.

12      Q.   All right.  Turn this volume up a fbit on my

13   end.

14           Okay.  First of all, can we get the full

15   spelling of your name?

16      A.   First and last?

17      Q.   Yes.

18      A.   First is Tammy, T-A-M-M-Y, last Heilman,

19   H-E-I-L-M-A-N.

20      Q.   Ms. Heilman, have you ever had your deposition

21   taken before?

22      A.   Yes.

23      Q.   Okay.  So you're familiar with the rules which

24   is that, especially with the Zoom mechanism, it's

25   important for you to let me finish asking my question

1    before you start to answer, and I'll do my best to let

2    you finish answering before I ask the next question.

3         A.    Okay.

4         Q.    And also, the court reporter is taking down

5    everything we say.  So she can't take down nonverbal

6    answers like uh-huh or uh-uh or shakes or nods of the

7    head.  So it's important to verbalize your answers

8    fully.  Okay?

9         A.    Yes.

10        Q.    All right.  And at any point you want to take a

11   break, just let me know and we will.

12        A.    Okay.

13        Q.    And my plan would be to go until a little bit

14   before maybe lunchtime, take like a 45-minute or an hour

15   break and then come back and finish.  Okay?

16        A.    Okay.

17        Q.    Do you have any time constraints today that we

18   need to know about?

19        A.    No.

20        Q.    Okay.  Good.

21              First of all, where do you currently reside?

22        A.    In Holiday.

23        Q.    The street address?

24        A.    3229 Primrose Drive, Holiday, Florida.

25        Q.    And who currently lives with you at 3229

1    Primrose Drive?

2         A.    Myself, my husband, and my children.

3         Q.    Okay.  What's your husband's name?

4         A.    Jeffrey Zander.

5         Q.    Z-A-N-D-E-R?

6         A.    Correct.

7         Q.    All right.  And how many children do you have?

8         A.    Living with me three.

9         Q.    I'm sorry.  Say that again.

10        A.    You're referring to the ones living with me?

11        Q.    Well, let's start with total.

12        A.    I have five.

13        Q.    And three of them currently reside with you?

14        A.    Correct.

15        Q.    All right.  And who are the three that

16   currently reside with you?  And if you would give us

17   their ages, please.

18        A.    Anthony McDougall, 19; ███████████, 13;

19   ████████████, 10.

20        Q.    Can you spell those first names for us?

21        A.    Sure.  Anthony is A --

22        Q.    Well, I think we've got Anthony.  The Zanders.

23        A.    Okay.  █████ is █████████.

24        Q.    And the other?

25        A.    █████████ is ████████████.

```
 1        Q.    See, I would have definitely misspelled that.
 2   So I'm glad -- Thank you.  Appreciate it.
 3              And then the other two children are Donnie?
 4        A.    Correct.  Donnie McDougall.
 5        Q.    Is it Donald?
 6        A.    No, it's just Donnie.
 7        Q.    Donnie, okay.  And then the other one?
 8        A.    My daughter Tyler.
 9        Q.    All right.  Now I understand that Donnie is
10   currently incarcerated?
11        A.    That's correct.
12        Q.    And how about Tyler?
13        A.    Tyler has passed.
14        Q.    Oh, I didn't know that.  I'm sorry.
15        A.    Thank you.
16        Q.    When did Tyler pass away?
17        A.    In '20 -- 2020.
18        Q.    2020, okay.  My condolences on that.  I'm
19   sorry.
20        A.    Thank you.
21        Q.    All right.  So does anybody besides Jeffrey and
22   Anthony,        , and              live with you currently at
23   3229 Primrose?
24        A.    Actually, I do have I guess a roommate.  I have
25   a friend that comes and stays.
```

1    Q.   And who's that?

2    A.   Dora.  No, I'm sorry.  That is not her name.

3    Q.   Okay.

4    A.   Sorry.  That's when we call her.

5    Q.   Okay.  What's her name?

6    A.   Dorinda.

7    Q.   D-O-R-E-N-D-A?

8    A.   D-O-R-I-N-D-A.

9    Q.   I was close.  Go ahead.

10   A.   Lavas, L-A-V-A-S.

11   Q.   L-A-V-A-S, Lavas.  Okay.  What relation is

12   Dorinda Lavas to you or your family?

13   A.   She's not real a blood relative.  She's on like

14   an on-again off-again girlfriend of my brother's.

15   Q.   Okay.  Your brother doesn't live with you?

16   A.   No.

17   Q.   What's your brother's name?

18   A.   Edward.

19   Q.   Heilman?

20   A.   Correct.

21   Q.   Okay.  And so sometimes Dorinda comes to live

22   with you?

23   A.   She mainly lives with us, but she leaves a lot

24   of time too.  So I wanted to make sure you know that

25   she's there as well.

1    Q.    Is there -- okay -- any particular reason

2  Dorinda doesn't live with Edward?

3    A.    Edward lives with his parents.

4    Q.    Your parents?

5    A.    Correct.

6    Q.    Okay.  All right.  So I want to ask you a

7  couple just preliminary questions about the lawsuit, and

8  I've got a bunch of different folders opened up I'll be

9  honest here on my end because I've got things sort of

10  scattered.  So if it takes me a minute to find

11  something, please bear with me.

12       In the lawsuit, one of the things that the

13  plaintiff has to do is to tell us what they are suing

14  over, okay, what is it that they're looking to achieve.

15       I'm going to try to share screen here with you.

16       (Exhibit No. 1 was designated to be marked for

17       identification.)

18  BY MR. POULTON:

19    Q.    This will be Exhibit No. 1, and this is a --

20  can you see that?

21    A.    Yes.

22    Q.    Okay.  This was a Supplemental Rule 26 Initial

23  Disclosure.  Rule 26 is one of the rules we have to

24  abide by, and in this your attorneys filled out a

25  section on page -- beginning on page 4 called C.

1   Computation of Damages.  I just want to kind of go over

2   this with you to make sure we're all on the same page

3   about what it is that you in particular seek as damages

4   of the lawsuit.  Okay?

5          So if you'd just take a look at that here on

6   the screen and this subsection C, as I see it you're

7   only listed in C.1. and C.2., but we can look at this.

8   This indicates that plaintiffs have updated their list

9   of costs related to damages for lost future income and

10  emotional and reputational harm.  Do you see that?

11     A.    Yes.

12     Q.    Okay.  And then it says subject to revision

13  plaintiffs seek damages to the extent they are available

14  under the relevant law here, and it says Tammy Heilman

15  and a couple of the other plaintiffs, looks like you're

16  seeking compensation for the fines for code enforcement

17  citations, quote, as a result of the program, end quote,

18  and then yourself and Robert Jones bail bond fees, legal

19  fees and court costs stemming from arrests as a result

20  of the program.  Do you sees those two?

21     A.    I do.

22     Q.    All right.  So as I understand it -- Pardon?

23  I'm sorry.  I thought I heard you say --

24          So I just want to clarify that and just make

25  sure we're on the same page that you seek a dollar

1    amount in damages -- I'm speaking now in terms of the

2    financial damages -- one dollar in nominal damage, and

3    then you want to be reimbursed for any fines that you

4    had to pay for code violations that are as a result of

5    the program, and then also bail bond fees, legal and

6    court costs from the arrests, but that's it; correct?

7        A.   Whatever it says in the -- in the --

8        Q.   Okay.  Let me just explain a little bit.

9    There's a variety of different types of damages you can

10   claim.   Initially when we got the documentation from

11   your attorneys, it indicated you would be seeking

12   damages for things like emotional pain and suffering,

13   but then this document indicated -- indicates that

14   you're removing those, and you're not seeking damages

15   for emotional pain and suffering.  You're just seeking

16   the -- what it looks like basically these out-of-pocket

17   costs that you had for the code violations and for the

18   arrests.  Do you see that?

19       A.   I do.

20       Q.   Okay.  Are we agreed that that's what you're

21   seeking here?

22       A.   Yes.

23       Q.   Okay.  You're not seeking emotional pain and

24   suffering damages; correct?

25       A.   No.

1      Q.   Well, I better rephrase that so we're clear.

2   Are you seeking damages in this case for emotional pain

3   and suffering?

4      A.   No.

5      Q.   Okay, good.  All right.  So that's Exhibit 1.

6           MR. POULTON:  And just real quick off the

7      record.

8           (Off-the-record discussion.)

9   BY MR. POULTON:

10     Q.   All right.  So I have in theory the court

11  documents -- give me just one second here -- and I just

12  want to go through these with you and outline whether --

13  outline them and kind of what happened in these

14  different code citation cases, I believe there were two

15  arrests, what happened in those, and just -- and see if

16  we're missing any.  Okay?

17     A.   Yes.

18     Q.   So I'm gonna do that, and these are in date

19  order.  Can you see?  Let's see.  So the first one I

20  have for you is a citation in -- Can you see that?  Do I

21  need to zoom it?  I need to zoom it for myself.

22          COURT REPORTER:  Would you mind if I recorded

23      it?  Because we're going to have a lot of documents

24      for me to keep track of.  Is that okay?

25          MR. POULTON:  I don't mind.

1          COURT REPORTER:  It will just be for my

2     purposes.

3          MR. POULTON:  Yeah.  To make sure you get it

4     right, sure, it's fine with me.

5          COURT REPORTER:  Okay.  Here.  Wait a minute.

6     Okay.  Then I won't have to keep asking what the

7     documents are called.

8          MR. POULTON:  Well, that's good because --

9  BY MR. POULTON:

10     Q.   Can you see that, Ms. Heilman, on the screen?

11     A.   Yes.

12          MR. JOHNSON:  Just to be clear, so the

13     recording is not going to be put in the record; it's

14     just for your purposes?

15          COURT REPORTER:  Right.

16          MR. POULTON:  Yes.

17          COURT REPORTER:  It will not be released even

18     if it's asked for.  It's not done by a videographer,

19     so it's not part of the record.  It will just be so

20     I can look at what document it's called because

21     sometimes it's vague what you're saying and I have

22     to match the document with the -- with what you've

23     said and it's hard without four hands.

24          MR. JOHNSON:  Okay.  Yeah.  On that

25     understanding, no problem.  That's fine.

1          COURT REPORTER:  Thank you.

2          MR. POULTON:  Yeah, that's how I understood it

3     too.  So, you know, the stipulation is the recording

4     is just for the benefit of the court reporter to

5     help her keep track of what items are being used as

6     exhibits.

7          MR. JOHNSON:  Right.  Sounds good.  Thank you.

8          MR. POULTON:  Sure.

9  BY MR. POULTON:

10     Q.  The first citation that I have is this one,

11  which is March 1, 2016 and it's -- if you look right

12  there on the citation, the citation indicates that there

13  were warnings given by Deputy Schell and myself to put

14  numbers on her mailbox.  Subject still has no visible

15  numbers on the mailbox.

16          Let's see.  How do I -- Oh, probably this way.

17  And then that is signed off on by Corporal Celeste.  Do

18  you see that?

19     A.  Yes.

20          MR. POULTON:  And then that will be I guess,

21     Madam Court Reporter Exhibit 2 to the deposition.

22          (Exhibit No. 2 was designated to be marked for

23     identification.)

24  BY MR. POULTON:

25     Q.  And then in association with that I have a

1   judgment entered by a Pasco County judge whose name I

2   can't make out dated May 12, 2016.  You see right here

3   charge is lack of posted address?

4        A.   Yes.

5        Q.   And then it appears that you denied the

6   violation, the Court withheld adjudication and had you

7   pay a fine of $30, plus $40 for the recovery contest

8   fee, recovery filing fee of $10, teen court fee of $3,

9   local government fund charge of $3, and that you had to

10  come into compliance within ten days and then pay the

11  fine within thirty.  Do you see that?

12       A.   Yes.

13       Q.   Okay.  So a lot of this is to help us just get

14  organized on both ends about what document goes with

15  what.  So do you recall getting this citation for the

16  not having the numbers on the mailbox?

17       A.   Yes.

18       Q.   Okay.  And were there numbers on the mailbox or

19  no?

20       A.   I don't recall.

21       Q.   Okay.  Fair enough.  And then do you remember

22  going to the court and the judge ordering you to pay

23  this look likes about $86 total?

24       A.   Yes, I believe so.

25       Q.   Did you end up paying that?

1   A.   I believe so, yes.

2   Q.   Okay.  Did you have to pay anything else

3   besides that?

4   A.   Honestly, it's been a while.  I don't recall.

5   Q.   Okay.  That's a perfectly fine.  If you don't

6   remember something, that's fine.  Okay?  Just let us

7   know as you're doing.

8        There was an order in there that you come into

9   compliance.  Do you remember doing anything about

10  putting some numbers on the mailbox after the citation

11  was issued or the court hearing?

12  A.   I mean, I know I have numbers on my mailbox

13  now.  I don't know at what point they were put on.

14  Q.   Okay.  Fair enough.

15       All right.  Then the next one I have is March

16  3rd.  This is a couple days later.  This was the

17  citation for the chickens in the backyard.

18  A.   Yes.

19       MR. POULTON:  And this will be exhibit -- what

20       are we up to, four I guess, Madam Court Reporter?

21       COURT REPORTER:  You didn't actually say you

22       wanted the other one on there, but okay.

23       MR. POULTON:  Yes, the judgment -- I'm sorry.

24       That judgment that we were looking at in relation to

25       the numbers on the mailbox, let's make that 3.

1          MR. HOLBORN:  Hey, Tom, can we do folders for

2      the exhibits and so the documents within that folder

3      are going to be Exhibit 2, which were from March 1,

4      2016, and then the documents from folder March 3,

5      2016 will be Exhibit 3?

6          MR. POULTON:  That's fine with me.

7          COURT REPORTER:  I'm confused.

8          MR. POULTON:  What we're going to do is were

9      going to make it a composite.

10          COURT REPORTER:  Composite, okay.  So what's

11      going to be in Composite Exhibit 2?  Tell me that.

12          MR. POULTON:  The citation, which is dated

13      March 1, 2016, and then the county court judgment in

14      connection with that citation which is dated May 12,

15      2016.

16          COURT REPORTER:  Okay.  So now this Exhibit 3

17      is going to be maybe a composite.  I don't know.

18      What's this we're looking at now?

19          MR. POULTON:  This will just be Composite

20      Exhibit 2.  Exhibit 1 was the Rule 26 Disclosure,

21      and Composite Exhibit 2 has both the citation and

22      the judgment.

23          COURT REPORTER:  Okay.  Thank you.

24  BY MR. POULTON:

25      Q.   And then going back to the citation for March

1    1, 2016, this is the citation for the chickens, and this

2    indicates that you acknowledge that there were five

3    chickens living in the backyard.  Do you see this?

4        A.    Yes.

5        Q.    Okay.  Were there five chickens in the

6    backyard?

7        A.    Yes.

8        Q.    Now I've seen some video, and maybe we'll look

9    at it later, but I believe it was Mr. Zander, your

10   husband, who told deputies that the chickens were

11   considered by you to be pets.

12       A.    Correct.

13       Q.    Okay.  And then the judgment that we believe

14   goes with that, the county court judgment, was again you

15   denied the violation.  You had to come into compliance

16   within ten days, and the fine was $100 plus the costs

17   that were noted before, the $40 for the recovery contest

18   fee, $10 for the recovery filing fee, $3 for the teen

19   court fee, and $3 for the court costs.  Do you see that?

20       A.    Yes.

21       Q.    Let me ask you first, do you remember whether

22   you got rid of chickens as a result of this court

23   hearing?

24       A.    Yes, we did.

25       Q.    And did you have to pay the hundred and looks

1    like fifty-six dollars?

2        A.    I believe my husband did.

3        Q.    Okay.  Mr. Zander you believe paid it?

4        A.    Correct.

5        Q.    Okay.  All right.  Then the next incident I

6    have is a incident which occurred on September 16, 2016.

7             MR. POULTON:  Oh, I'm sorry, Madam Court

8        Reporter, before we moved on, I needed to make as

9        Composite Exhibit 3 the citation form and the

10       judgment related to the code violation for chickens.

11       Okay?  Got it.

12            COURT REPORTER:  Got it.

13            (Composite Exhibit No. 3 was designated to be

14       marked for identification.)

15   BY MR. POULTON:

16       Q.    So now we're on what will eventually become

17   Composite Exhibit 4.  This is where -- we'll get into

18   the underlying facts, but this was the incident where

19   you were arrested from the vehicle.  Do you recall that

20   one?

21       A.    Yes, I do.

22       Q.    Okay.  And you were charged with resisting an

23   officer and obstructing without violence.  Do you see

24   that in the report?

25       A.    Yes.

1     Q.   Okay.  And then the judgment in relation to

2  that incident indicates that you pled guilty to a

3  battery, obstructing or resisting an officer without

4  violence, and giving false information to law

5  enforcement, all three misdemeanors.  Do you see that?

6     A.   I do.

7     Q.   Okay.  And the Court ended up adjudicating you

8  guilty and placed you on probation for it looks like for

9  twelve months.  Do you see those?

10     A.   Yes.

11     Q.   Okay.  So we'll make this Composite Exhibit 4.

12        (Composite Exhibit No. 4 was designated to be

13     marked for identification.)

14  BY MR. POULTON:

15     Q.   Was that the outcome of that criminal case that

16  you pled guilty, were adjudicated guilty and were placed

17  on probation for twelve months?

18     A.   Yes.

19     Q.   Okay.  So that judgment is accurate?

20     A.   This is my first time actually seeing this.

21     Q.   Oh, okay.  You want to take a second and look

22  at it?  By all means, listen, as we look at documents,

23  because I'm looking at them and I'm scrolling on the

24  screen, if there's something you want to read more

25  fully, let me know.  Okay?

1     A.    Okay.

2     Q.    So I'll -- let me just go down to the substance

3 of it, and you can take a look at that and I'll -- just

4 let me know when you want me to thumb down.

5     A.    Yeah, it's fine.

6     Q.    Okay.

7     A.    Okay.

8     Q.    All right.  So, I mean, is that an accurate

9 statement of the outcome of the criminal case?

10     A.    I didn't realize I was -- I had the giving

11 false information because when they heard the court, we

12 only focused on the charge of battery on the LEO.  So I

13 didn't realize I was also charged with giving false

14 information.

15     Q.    Okay.  Well, as far as the charges for battery

16 and for obstructing or resisting an officer without

17 violence, your understanding was you were pleading

18 guilty and being adjudicated guilty of those two

19 charges; correct?

20     A.    Yes.

21     Q.    All right.  And then -- let me look at this

22 real quick.

23           All right.  So we'll -- for right now we'll

24 just -- that will be Composite Exhibit 4, I believe;

25 right?  Okay?

1    MS. BROTHERS:  Tom, I'm not sure that we've

2    seen these judgment documents before either.

3    MR. POULTON:  We should have been sending them

4    to you.  I thought that you had asked for that.  If

5    you want to -- want me to go more slowly and each

6    time we pull these up so you can look them over?

7    MS. BROTHERS:  The speed that we're going at is

8    fine now.

9    MR. POULTON:  Okay.

10    MS. BROTHERS:  But I just want to be sure that

11    we don't have them now, but they'll be --

12    MR. POULTON:  Well, we'll make sure you get it

13    all.

14    MS. BROTHERS:  Okay.

15    MR. POULTON:  Okay?  Yeah, because we've -- I

16    mean, some of these things come in frankly kind of

17    piecemeal, you know, particularly the code

18    materials.  So what we'll do is we'll just copy

19    these for you and send them all to you at some point

20    so you have the same universe.

21    MS. BROTHERS:  Great.

22    MR. POULTON:  It's all court documents, so --

23    BY MR. POULTON:

24    Q.  And then -- Let's see.  Okay.  Then the next

25    code citation that I see -- and I'm trying to go in

1    chronological order with these -- is October of 2017,

2    and this was a citation for accumulation of junk or

3    debris in the yard.  Do you recall that citation?

4        A.   Oh, that's from the hurricane.  Yes.

5        Q.   And then the disposition that we have for that

6    -- so this will, I guess, be Composite Exhibit 5, Madam

7    Court Reporter -- is you denied it, adjudication was

8    withheld, and you had to pay $125 fine plus those

9    similar court costs as before.  Do you recollect that?

10       A.   Yes.

11            (Composite Exhibit No. 5 was designated to be

12            marked for identification.)

13   BY MR. POULTON:

14       Q.   And it said -- well, now it didn't have us come

15   into compliance with this one had the -- I believe there

16   was a cinder block, for example, in the yard, some other

17   things.  Do that you recall?

18       A.   Yes.  My child's car, a cinder block and -- a

19   cinder block, you know, like a piece of a brick.

20       Q.   Right.

21       A.   And I think maybe there was a piece of fence

22   that had been blown over, but, yeah, they were taken

23   care of.

24       Q.   Right.

25            MR. POULTON:  And just to be clear, Madam Court

1      Reporter, the date on the citation was October 18,

2      2017.  The date on the judgment is January 25, 2018.

3      Okay?  And so that that will be Composite Exhibit

4      whatever I'm up to.  Is this five?

5           MR. HOLBORN:  Five.

6           MR. POULTON:  Okay.

7  BY MR. POULTON:

8      Q.   So am I correct in assuming that between the

9  time of the citation in October of 2017 and the time of

10 the court hearing, the cinder block and I believe you

11 mentioned there was a toy or a child's bicycle, those

12 sorts of things had all been gotten rid of in the

13 interim?

14     A.   Right.  They picked up the next day for trash

15 delivery pickup.

16     Q.   Okay.  Did you have to pay any fines other than

17 these to your recollection in the judgment dated January

18 25, 2018, for that particular violation?

19     A.   Not to my recollection, no.

20     Q.   Okay.  And then I have an arrest dated

21 9-18-2018, and this was when you were arrested in what

22 we'll call the screen door incident.  Do you recall that

23 one?

24     A.   Yes.

25     Q.   All right.  And I believe you were charged with

1   battery on a law enforcement officer.  Do you see that?

2       A.    Yes.

3       Q.    Okay.  And then as I understand it the outcome

4   was that you entered a plea of guilty, a third degree

5   felony, adjudication of guilt was withheld, but you were

6   placed on probation for 24 months, and that is in an

7   order dated December 13, 2018.  Do you see that on

8   screen?

9       A.    Yes.

10          MR. POULTON:   Okay.  And so, Madam Court

11      Reporter, we'll make the complaint form and the

12      judgment Composite Exhibit 6.

13          (Composite Exhibit No. 6 was designated to be

14      marked for identification.)

15  BY MR. POULTON:

16      Q.    All right.  So those are the documents that I

17  have that relate to either code citations or to arrests.

18  So it's three sets of code citations:  One for the

19  missing numbers, one for the chickens, one for the

20  debris in the front yard, and then the arrest for

21  battery on a law enforcement officer related to the

22  incident in the vehicle, and then battery on a law

23  enforcement officer for the screen door incident.

24          Were there any other code violations other than

25  those three to your recollection?

1    A.   Not to my recollection.

2    Q.   Okay.  And were there any other arrests besides

3  those two arrests that we went over?

4    A.   No.

5    Q.   Okay.  All right.  What I'd like to do is just

6  -- and for some of these I have reports, for some of

7  them we're still trying to locate them, but I'm just

8  going to ask you if you remember some incidents, and as

9  I say, for some of them I have reports and I'll try to

10  pull those up.

11        How are we doing by the way?  Need a break or

12  are you doing okay?

13    A.   I'm okay.

14    Q.   Keep going.  Okay.  Good.

15        We have indicated an incident in June of 2010

16  where Donnie McDougall punched -- or it was reported

17  that Donnie McDougall had punched a female student.  Do

18  you have -- let me share this.  Do you have any memory

19  of that incident?

20    A.   Well, my son was ten years old at that time.

21  So, no, I don't recall.  That was quite a while ago.

22    Q.   Okay.  Do you remember an allegation that he

23  had punched a student named Emily condom in art class?

24    A.   No, I don't recall.

25    Q.   Okay.  Let me show you what will be Exhibit 6?

1              COURT REPORTER:   7.

2              MR. POULTON:   7?

3              COURT REPORTER:   Yes.

4              MR. POULTON:   Thank you.

5              (Exhibit No. 7 was designated to be marked for

6      identification.)

7     BY MR. POULTON:

8         Q.   It's an incident reported dated June 9, 2010.

9     Do you see that?

10        A.   Yes, I see it.

11        Q.   And the issue was battery, and the victim was

12    Emily Condom.  Daniel Condom was her father.  And you

13    see you're listed as a witness?

14        A.   I do see, yes.

15        Q.   Okay.  And I'll skip over this first part

16    because you weren't there for this, but the -- I'll

17    just -- if you want to read it, you can read it.  But

18    the allegation was Emily said that Donnie had punched

19    her on his way walking back into the classroom the

20    chalkboard, and then there was an interview, and I'll

21    just let you read this here.  If you'll start this one,

22    "On 6-20-2010 I responded to 3229 Primrose Drive and met

23    with Donnie McDougall and his mother Tammy."  Okay.  So

24    if you want to just kind of read the rest of it, and

25    then I'll ask if you remember that incident.

1          (Court reporter asked for clarification.)

2          MR. POULTON:   Sorry.  I'll get it exactly

3     right.  I said chalkboard, but that's actually not

4     accurate.  The incident report itself indicates,

5     quote, Emily told me she was in art class today

6     (which was right before she was released to go

7     home), when the suspect, Donnie McDougall (unknown

8     spelling at this time), walked up to the front of

9     the room and then returned to where he was.  Emily

10    said on his way back Donnie punched her on her right

11    shoulder against her will.  As she was sitting

12    down."

13          Then a little bit further, Emily informed me

14    that vice principal of the school sat both her and

15    Donnie down and talked to them about what happened,

16    but nothing was done.  Emily explained she's very

17    afraid of Donnie, and there have been days when she

18    told her parents that she was feeling sick and

19    couldn't go to school even though she wasn't sick at

20    all.  Emily conveyed she has come from school on

21    some days and cried because she's afraid of Donnie

22    and it bothers her that much.  Emily said Donnie's

23    always picking on her because of her last name.

24    Emily next told me Donnie had kicked her, spit on

25    her and threatened to knock her off her bike.  Emily

```
 1        stated Donnie kicked her in the hallway of the

 2        school about a month ago, and he was suspended from

 3        school for it.

 4   BY MR. POULTON:

 5        Q.    So let me ask you this first.  Do you remember

 6   Donnie being suspended from school in relation to an

 7   incident with Emily Condom?

 8        A.    This is a long time ago.  You're really going

 9   back a long time.  I mean, my child was ten years old at

10   the time.  He's now 22.

11        Q.    Okay.  I'm just asking if you remember it?

12        A.    I don't.  Not saying that it didn't happen.  I

13   just don't remember.

14        Q.    Right.  Well, you weren't there for that

15   discussion between the deputy and Emily.  According to

16   the report it's later that he comes to 3229 Primrose

17   Drive and speaks with Donnie and with you.  Do you

18   remember a deputy coming to your home in two thousand --

19   on or about June 20, 2010, to speak with you and with

20   Donnie about this episode in art class?

21        A.    Again, I don't recall.

22        Q.    Okay.  That's perfectly fine.  I realize it was

23   some time ago.  I'm just -- if you don't remember,

24   that's fine.

25             MS. BROTHERS:  And I'll just object for the
```

1          record that I don't think we've seen this incident

2          report either before.

3                MR. POULTON:   Okay.

4          A.    This is elementary school.   I don't know why it

5     said Anclote.   It's high school.

6          Q.    All right.   So stop share.

7                There's an indication that in November of 2010

8     you called Sheriff's Office to report that your juvenile

9     daughter was making suicidal threats.

10         A.    That's probably possible, yes.

11         Q.    Yeah.   Now would that have been -- who -- which

12    daughter?

13         A.    What year was it?

14         Q.    2010.

15         A.    That would have been my older daughter.

16         Q.    The one that's since passed away?

17         A.    Correct.

18         Q.    In February 2011, there's an indication that

19    you called the Sheriff's Office to report that your

20    daughter was acting out about being punished.   Any

21    recollection of that particular one?

22         A.    Again, this was a long time ago.

23         Q.    I know.

24         A.    We went through a lot of things with the kids

25    growing up as teenagers, so there's -- it is possible.

1    Q.    There's next in September 2011 an indication

2    that you called the Sheriff's Office to report that your

3    juvenile daughter was having issues with being bullied

4    in school and was making suicidal threats.   Any

5    recollection of that, or is the answer the same?

6    A.    It's gonna be the same, yes.

7    Q.    Okay.   In February of 2012, there's an

8    indication that the Pasco Sheriff's Office responded to

9    an overdose complaint involving Donnie McDougall having

10   smoked spice and that you were contacted about that

11   situation.   Do you remember that?

12   A.    I believe he was at the hospital, and they

13   contacted me.   Yes, he was out with some friends.

14   Q.    Okay.   So he was at the hospital, and the

15   Sheriff's Office contacted you to let you know what had

16   happened?

17   A.    Yes.

18   Q.    Okay.   Later in October of -- now let me ask

19   you this and refresh my memory.   What was the older

20   daughter's name?

21   A.    Tyler.

22   Q.    Tyler.   Thank you.   Yeah, all right.

23        Now Tyler in two thousand -- what was Tyler's

24   date of birth?

25   A.    ▆▆▆▆▆▆▆.

1    Q.   Okay.  In October of 2012, there's an

2  indication there was a report of a stolen vehicle where

3  it just says Heilman's juvenile daughter, so I'm going

4  to assume that was Tyler, was a suspect and that when

5  the Sheriff's Office contacted you, you stated that you

6  should report her as a missing juvenile.  Does that

7  sound familiar?

8    A.   It kind of strikes a little bit of a memory,

9  but I'm not a hundred percent sure.

10   Q.   Well, did she run away from home maybe at the

11  age of 14 or 15?

12   A.   She had left and was gone with a friend, so was

13  under the -- you know, under the --

14   Q.   Influence of a friend?

15   A.   Friend's house.

16   Q.   I'm sorry?

17   A.   I was under the assumption she was at her

18  friend's house when they had contacted me.

19   Q.   Okay.  So the Sheriff's Office called to let

20  you know there was an incident about a stolen vehicle,

21  and you said, well, at this point you wanted to or you

22  should -- you might consider reporting her as missing?

23   A.   I don't recall.  I know there was a time there

24  was a stolen vehicle and it had to do with the friend

25  that she was -- the friend's house that she was staying

1    at, I think they had taken their parents' car or

2    something at that point.

3        Q.   Okay.

4            MS. BROTHERS:  We don't -- I'm objecting.  We

5        don't have the documentation for any of these

6        incidents.

7            MR. POULTON:  Yeah, I don't have those myself

8        right now either.  I have the one for Emily Condom,

9        which I believe we're attaching as an exhibit, and

10       we'll make sure to get that to you.

11           Just off -- let's go off the record real quick.

12           (Off-the-record discussion.)

13   BY MR. POULTON:

14       Q.   And again, some of these are listed that I

15   don't even have the incident report itself at this

16   point.  We're still trying to get some of them.  Okay?

17           And what I'm -- what I'm trying to demonstrate

18   is, Ms. Heilman, just so you know, is that there were

19   occasions where you had called or somebody from your

20   home had called for service.  For example, do you recall

21   an incident in October of 2012 where you called the

22   Sheriff's Office to report that Donnie had been thrown

23   to the ground by an adult male?  Your son was pushed to

24   the ground.  Do you remember that one?

25       A.   I remember some sort of a incident where he

1    was, but I don't recall the details.

2        Q.    All right.  Do you recall an incident in

3    October of 2012 where the Sheriff's Office contacted you

4    over allegations that your juvenile daughter was allowed

5    to record two other juveniles having sexual intercourse?

6        A.    Well, since this was ten years ago, no, I don't

7    recall.

8        Q.    Okay.  Do you recall calling the Sheriff's

9    Office in -- Do you recall calling the Sheriff's Office

10   in February of 2013 to let them know that there were two

11   juveniles trespassing on your property and these were

12   friends of your daughter and they were trespassed?

13       A.    Again, I don't recall.

14       Q.    Okay.  Is it possible you called the Sheriff's

15   Office because some these troublemakers -- we'll call

16   them that -- associate -- that were -- that Tyler was

17   associating with were at your house and you wanted them

18   trespassed?  Does that sound familiar?

19       A.    I mean, it's very possible, yes, but --

20       Q.    In November of 2013, I have an indication --

21   let's see -- and we may have a report for this.  If you

22   want to look it over, we can look it over -- but that

23   you had called the Sheriff's Office because Tyler had

24   struck you and you went to the hospital?

25       A.    No, I don't recall my daughter striking me.

1      Q.    All right.  Let me --

2            This was an incident regarding where you took a

3      necklace off Tyler's neck because she had a house key on

4      it?

5      A.    I don't recall.

6  BY MR. POULTON:

7      Q.    All right.  I'll share screen.  This may be one

8      that you do not have, Counsel.  So why don't we take a

9      minute to -- we'll just let her read it.  If you want to

10     talk to her about it before I ask her if it refreshes

11     her recollection, just let me know.  You see that, that

12     report?

13           MS. BROTHERS:  Yeah, we do not have this.

14           MR. POULTON:  Okay.

15           MR. HOLBORN:  Tom, this is Exhibit 8.

16           MR. POULTON:  Thank you.

17           It's an incident report dated 11-4-2013, Madam

18     Court Reporter.

19           (Exhibit No. 8 was designated to be marked for

20     identification.)

21  BY MR. POULTON:

22     Q.    Let me know when you want me to scroll down.

23     A.    You can scroll.  What year is this?

24     Q.    2013.  It's November 4, 2013.

25     A.    Yeah, it does ring a bell now that I read it.

1    Q.   Okay.  Do you -- I just want to know if you

2    remember that and whether or not it accurately sets

3    forth what happened?

4    A.   Yes and no.  I mean, it's the gist of it I

5    suppose.

6    Q.   Okay.  Let me try to isolate these a little

7    bit.

8         Do you remember calling the Sheriff's Office in

9    2014 and asking them to respond because a male had

10   approached your son in a subdivision and threatened to

11   fight him over the suspect's sister and that you stated

12   that you were afraid because the suspect was in a gang

13   and that they had threatened to shoot up your home?

14   A.   Do you have the document?

15   Q.   I think probably so.  Let's see.

16        Well, I may have spoken too soon.  Hang on.

17        MR. POULTON:  So this is what now, Exhibit 9?

18        COURT REPORTER:  Yes, sir.

19        (Exhibit No. 9 was designated to be marked for

20   identification.)

21   BY MR. POULTON:

22   Q.   Okay.  This is a incident report dated April 7,

23   2014.  Weston Davidson, does that ring a bell?

24   A.   I don't know that person's name.

25   Q.   Okay.

1     A.   Oh, yes.  This -- this has to do with the Emily

2   girl it says.  I guess this is when somebody jumped my

3   son on his way home from school and told him he was in a

4   gang.  Yeah, I do remember that.

5     Q.   And it looks like maybe Weston Davidson is

6   Emily Condom's sister?

7     A.   I don't know either party, so --

8     Q.   Fair enough.  Do you remember calling the

9   Sheriff's Office though because you were concerned about

10  this incident and somebody assaulting Donnie?

11    A.   Well, it says right here that I flagged down

12  the sheriff.

13    Q.   My mistake.  You reached out to the Sheriff's

14  Office though to ask for their assistance in regards to

15  this incident.  Do you recall that?

16    A.   No.  Corporal Winthrop is a -- she was a school

17  resource officer.  She had been driving through the

18  neighborhood.  That's who I flagged down.

19    Q.   Oh, you flagged down the school resource

20  officer?

21    A.   Yes, which is who they refer you to anyway if

22  anything happens outside of school.

23    Q.   Do you think that happened because it was

24  school related?

25    A.   I honestly don't know why it happened.

1    Q.   Okay.  Well, the deputy that did this report

2    was Deputy Hatfield.   Do you see that?

3    A.   I see that.

4    Q.   Okay.  Let me ask you this.  Do you remember

5    the circumstances of how it was that you were

6    communicated with by the Sheriff's Office regarding this

7    incident, whether it was Hatfield or SRO Winthrop or

8    both?  Do you remember either way?

9    A.   I don't recall.

10   Q.   Okay.  In December of 2014, December 28th,

11   there is a Pasco Sheriff's response or a report of a

12   battery by Donnie.  Let me pull it up.

13        And this is I guess Exhibit 10.  It's incident

14   December 28, 2014.

15        (Exhibit No. 10 was designated to be marked for

16        identification.)

17   BY MR. POULTON:

18   Q.   Do you recognize the names Jeremy Schreiber

19   and/or Heidi Machmer, M-A-C-H-M-E-R?

20   A.   Yes.

21   Q.   Do you remember this incident?

22   A.   I remember their names, but I need to read it

23   first.

24   Q.   Okay.  Sure.  Go ahead.  No, take your time.

25        MS. BROTHERS:  I'll just note that we don't

1        have this document.

2            MR. POULTON:    Right.    I think if it's going to

3        be pre-2016, that may be the case.    So what I'm

4        going to do is try to -- at this point try to skip

5        those and maybe during lunch have my associate email

6        you the ones that I might ask her about, and we'll

7        take a few minutes before we start back up again to

8        let you look through those, okay, so we avoid that

9        problem.

10       A.    Can you scroll down?

11   BY MR. POULTON:

12       Q.    Sure.

13       A.    Can you scroll down?

14            Okay.

15       Q.    Okay.    Now having read the narrative of the

16   report from December 28, 2014, does that refresh your

17   recollection about the sequence of events?

18       A.    I remember there was a confrontation between

19   Jeremy and my son.    There was other confrontations as

20   well.

21       Q.    And the accusation was that Donnie had battered

22   this young man Jeremy; right?

23       A.    Well, if you read the whole thing, it would say

24   that his witness said that he didn't push him, so --

25       Q.    No, I understand that.    I'm just saying that

1    was the allegation though by Jeremy; correct?

2        A.   That's the allegation, yes.

3        Q.   And do you remember that you were in -- that

4    the deputy came and spoke to Donnie and you were

5    present?

6        A.   Yes, I believe so.

7        Q.   Okay.  Tell what you I'm gonna do.  I'm gonna

8    skip -- as we discussed, I'm gonna skip -- What is that?

9    That was --

10           Let me ask you this before I go on.  Do you

11   remember whether or not the State Attorney did anything

12   with that incident?

13       A.   I don't recall.

14       Q.   So you don't know one way or the other whether

15   Donnie was charged?

16       A.   No.

17           MR. POULTON:  All right.  I'm going to skip

18       ahead.  I'll skip through 2015 and go to 2016.  What

19       we'll do is in the break -- there are about -- well,

20       there's some that I don't have reports for, but it

21       looks like they are one, two, three, four, five that

22       I might have reports for for 2015, and I'll have

23       those sent to you in advance before we go back to

24       those.  Okay?

25           All right.  If we see any reports here from

1       2016 that you don't think you have, let me know as

2       well.  We'll deal with that.

3              MS. BROTHERS:  All right.  We will.

4  BY MR. POULTON:

5       Q.    Do you remember in February 2016 the Pinellas

6  County Sheriff's Office alerting deputies to Donnie and

7  two others having stolen a vehicle and arresting him?

8       A.    I don't recall.  You're not giving me very much

9  information for me to go on.

10      Q.    Yeah, I don't see -- let me see.  I don't

11 think --

12             Right.  It doesn't appear that I have a report

13 for that one.  The notes just indicate that you were

14 contacted and allowed deputies to interview Donnie while

15 in his presence -- in your presence, and he was arrested

16 in relation to this stolen car from Pinellas County.

17 Does that refresh your memory at all?

18             You can say no.  I'm sorry?

19      A.    No.

20             MS. BROTHERS:  Tom, when you're referring to

21      notes, what are you referencing?

22             MR. POULTON:  I can't hear you, Caroline.  What

23      was that?

24             MS. BROTHERS:  When you say that there's a note

25      of something happening, what are you referencing?

1          MR. POULTON:  No, this is my own notes.

2          MS. BROTHERS:  Okay.

3          MR. POULTON:  It's not -- it's not a report.

4     We're looking for some of these reports ourselves,

5     and I think some of them might have to do with the

6     fact that at the time he was a juvenile.  So this

7     dovetails back to the problem we have -- we all have

8     which is we don't have the juvenile records at this

9     point.  I only have the agency records, and there

10    might not be one of this if he was arrested by a

11    Pinellas.  So hopefully we'll get that from the

12    court or from DJJ as we proceed.  And, obviously, if

13    we get any of that, we'll send you that.

14         MS. BROTHERS:  Right.  I'm just making sure the

15    notes aren't based on other documentation other than

16    incident reports that we --

17         MR. POULTON:  No.

18         MS. BROTHERS:  Okay.

19         MR. POULTON:  Well, let me make a note of that.

20  BY MR. POULTON:

21    Q.    In June of 2016, were you aware that Donnie

22  called the Sheriff's Office to report that his

23  girlfriend was making suicide threats?

24    A.    Who was the girlfriend?

25    Q.    I tell you what, I'll pull up the report.  And

1    this is exhibit -- what am I now on, eleven?

2            COURT REPORTER:  Yes.

3            (Exhibit No. 11 was designated to be marked for

4      identification.)

5    BY MR. POULTON:

6       Q.   This is dated June 29, 2016.  You see there

7    suicide threat in progress and your address of 3229

8    Primrose Drive?

9       A.   Yes.

10      Q.   The caller is listed as Donnie McDougall.  Do

11   you see that?

12      A.   Yes.

13      Q.   And then the transcription of the notes is

14   caller advises that suspect is upset or mad or

15   something, also is trying to kill herself.  Does not

16   have GPS, which I assume means location, on suspect,

17   thinks subject may be at his location by now.

18           I'm looking for the name.

19           Caller put subject on the line.  Subject

20   refused to give her last name.

21      A.   I'm sorry.  I can't help you.  I don't know who

22   it is.

23      Q.   Okay.  Well, I -- if you don't know, you don't

24   know.

25      A.   I don't know.

1     Q.   There is an indication of a name of Ava.  I

2  don't know if that's her name or a dispatcher's name.

3  Did he have a girlfriend named Ava?

4     A.   No.

5        MS. BROTHERS:  What is the date on this CAD

6  report?

7        MR. POULTON:  That is June 29, 2016.

8        MS. BROTHERS:  Okay.

9        MR. POULTON:  Do you have that one?

10       MS. BROTHERS:  I believe so.

11       MR. POULTON:  Okay.

12       MS. BROTHERS:  Well, can you scroll back up

13  again, please?

14       MR. POULTON:  Sure.  Got the event ID?

15       MS. BROTHERS:  Yes, that's -- okay.

16       MR. POULTON:  Okay.  I'm sympathetic to the

17  point you're making or at least empathetic to the

18  point you're making about the earlier reports, and

19  to be fair, we'll get you the other reports that we

20  do have for those incidents prior and then for --

21  for 2015 definitely before we start back up.

22       MS. BROTHERS:  Right.

23       MR. POULTON:  And we'll go back to that.  Okay.

24       MS. BROTHERS:  You had said a different date in

25  June, but --

1           MR. POULTON:  Oh, did I?  I'm sorry.  June 29,

2       2016.

3           MS. BROTHERS:  Yeah.  It's right.  We have

4       those.

5           MR. POULTON:  Okay.

6   BY MR. POULTON:

7       Q.   Do you remember anybody being Baker Acted as a

8   result of this?

9       A.   If I remembered the incident, I would probably

10  be able to tell you.

11      Q.   Okay.  So I guess you don't remember a Baker

12  Act growing out of this particular interest?

13      A.   Well, you already asked me if I remember this,

14  and I told you no.

15      Q.   Okay.  Do you remember in July 2016 calling the

16  Sheriff's Office to report that Donnie McDougall had cut

17  himself with a razor following an argument he had with

18  his girlfriend and that he was Baker Acted?

19      A.   My son has been Baker Acted before.  Whether

20  that was the date or not, I do not know.

21      Q.   Okay.  Do you recall an incident in September

22  -- on September 28, 2016, where Donnie called EMS to

23  report that you weren't breathing and that Fire Rescue

24  was called out to your home for you?

25      A.   Do you have more information?  It was probably

48

1   when I had my heart attack.

2       Q.    That's -- I mean, I assumed there was some

3   medical emergency.  I just didn't know if you remembered

4   anything about it.  So we will find it.  Let's see.

5   Oops, here it is.  Sorry, hit the wrong button.

6           MR. HOLBORN:  This is going to be Exhibit 12.

7           MR. POULTON:  Thank you.  Exhibit 12, Madam

8       Court Reporter.

9           (Exhibit No. 12 was designated to be marked for

10      identification.)

11  BY MR. POULTON:

12      Q.    This is dated September 28, 2016, and the

13  address you see is 3229 Primrose Drive.  Do you see

14  that?

15      A.    Yes.

16      Q.    Okay.  I'll just let you look at the --

17      A.    This is right after the arrest.  I was having

18  severe anxiety issues, and actually I had had a heart

19  attack.

20      Q.    So you went to the hosp- -- so your son

21  called -- he called 911 it looks like, maybe not the

22  Sheriff's Office.  He called 911?

23      A.    Yes.

24      Q.    And so Fire Rescue came out and the Sheriff's

25  Office also came out?

1      A.    Probably.  They usually come together.  I'm not

2  sure if I went to the hospital at that point or not or

3  if they were able to clear me as okay or whatever, but I

4  do know that I went shortly after this.  It was within a

5  few days I ended up going into the hospital.

6      Q.    I see a line here a female came on the line,

7  said it's an anxiety attack and this happens to patient

8  all the time.

9      A.    Well, recently.

10     Q.    Right.

11     A.    Yeah, it wasn't all the time, but yeah.

12     Q.    Event spawned breathing problems.  Calling

13  Medfleet to see if there's a closer unit.

14         So you don't remember actually whether you went

15  to the hospital this time?

16     A.    I'm not sure 'cause they -- my kids had called

17  a couple of times around that time.  So I'm not sure if

18  I went to the hospital.  Actually, no, I don't think I

19  did go to the hospital because I ended up driving

20  myself.  So I don't think I ever went in the ambulance.

21     Q.    Were you -- were you actually diagnosed as

22  having had a heart attack?

23     A.    Yes.

24     Q.    Okay.  We probably don't have to get into the

25  details of it since you're not claiming that as part

1  of -- you're not claiming that as part of your damages;

2  correct?

3      A.   It should be.

4      Q.   Well, I think we agreed earlier you're not.

5  You're only claiming the out-of-pocket expenses for the

6  code violations and for the arrests; correct?

7      A.   I guess so.

8      Q.   Well, because if we're expanding the universe

9  of damages, then I have to start doing things like

10 getting medical records and whatnot.  So it's important

11 that we be sure we're talking about the same universe of

12 damages being claimed in the case.  That's why I asked

13 those questions at the beginning.

14          So I'll give you a chance to talk to your

15 attorneys here at some point.  We'll just come back to

16 that again before we conclude for the day.  Okay?

17     A.   Okay.

18     Q.   All right.  So that was -- Oh, wrong one.

19 Sorry.  All right.

20          How did Donnie get along with Tyler in 2016?

21     A.   Oh, in 2016 Donnie would have been 16, and she

22 would have probably been like 18, so just as well as any

23 other two siblings that age.

24     Q.   Well, I'm just -- I'm seeing reports, and I

25 don't know if you were aware of them or not, of them

1    kind of alternatively calling.

2        A.   Back and forth on each other, yes.

3        Q.   You do.  Okay.  So you were aware of that.  And

4    just so we're on the same page here --

5            MR. POULTON:  By the way that -- what am I up

6        to 13 now, Rob?

7            MR. HOLBORN:  Yes.

8            (Exhibit No. 13 was designated to be marked for

9        identification.)

10   BY MR. POULTON:

11       Q.   Okay.  So there was a report that on November

12   17, 2016, the report was disturbance juvenile in

13   progress.  It was a domestic disturbance.  Brother is

14   going crazy, is spitting on people.  Were you present

15   for that one?

16       A.   I don't recall.

17       Q.   It says the caller was Tyler.  That would have

18   been your daughter; correct?

19       A.   Yes.

20       Q.   So she called the 911 to report that Donnie,

21   date of birth ███████, was going crazy and spitting on

22   people.  You see that?

23       A.   I do see that.

24       Q.   Okay.  And then about twelve days later --

25       A.   Donnie called on her.

1          Q.    Right.  She had sprayed him in the face with

2    mace?

3          A.    Oh, yeah, I do remember that.

4          Q.    You do remember that one?

5          A.    I do.

6          Q.    Were you home for that one?

7          A.    I was.

8          Q.    Okay.  And do you remember what the outcome of

9    it was?

10         A.    I think that's when she ended up moving out.

11               COURT REPORTER:  Is that another exhibit?

12               MR. POULTON:  Yes.  Sorry.  What am I on?

13               COURT REPORTER:  14.

14               MR. POULTON:  14.

15               (Exhibit No. 14 was designated to be marked for

16         identification.)

17   BY MR. POULTON:

18         Q.    Do you have a neighbor named Samantha Martinez?

19         A.    No.

20         Q.    Okay.

21         A.    I mean, I could.  I just don't know --

22         Q.    You just don't know.  Okay.  That's fair.

23               (Court reporter asked for clarification.)

24         A.    I could have a neighbor named Samantha

25    Martinez.  I just don't know who that person is.

BY MR. POULTON:

Q.   Do remember a Baker Act transportation of

Donnie in July of 2017 regarding Pinellas County

Sheriff's Office had called because Donnie there was a

report had attempted to kill himself in Palm Harbor

before he came home?  He had some red marks on his left

arm.  Does that ring a bell?

I'll show you the -- I'll show you the report

on that one.

A.   Okay.

MR. POULTON:  And this is going to be Exhibit

what, 15?

COURT REPORTER:  Yes.

(Exhibit No. 15 was designated to be marked for

identification.)

BY MR. POULTON:

Q.   Okay.  And it's dated July 22, 2017.  Reporting

deputy is Garmon.  See the address is 3229 Primrose

Drive; right?

A.   That says location of incident, but you said

this was in Pinellas.  I'm not in Pinellas.

Q.   Well, okay, I'll explain or I'll let the

report --

A.   Because it said location of the incident.

Q.   Well, that's where I think he -- they contacted

1    him and ultimately Baker Acted him from.  The suicide

2    report had come from Pinellas County, you see?  I'll let

3    you read the report and just see if that refreshes your

4    recollection.

5        A.    Yes, that sounds familiar.

6        Q.    Okay.  There's a note in here that you -- at

7    first you were hostile, but then once the deputy

8    explained why he was there, you became cooperative.  Do

9    you see that?

10       A.    Yes.

11       Q.    Okay.  Do you remember that?

12       A.    Well, yes.  I'm glad my son was okay.

13       Q.    Okay.  Do you recall an incident in May of

14   2017?  And I apologize I went backwards.  Tell you what.

15   We'll just share screen.  Why not?

16            MR. POULTON:  This will be Exhibit 16?

17            MR. HOLBORN:  Yes.

18            (Exhibit No. 16 was designated to be marked for

19       identification.)

20   BY MR. POULTON:

21       Q.    Okay.  This is a CAD report dated May 6, 2017.

22   You see the location is 3229 Primrose.  It was a

23   trespassing, and the caller was Jeff Zander.  I think

24   it's misspelled, but they have it as S-A-N-D-E-R here.

25   And the notes were caller advised his stepson had

1  friends over, possibly juveniles and possibly in

2  possession of alcohol containers.  Caller stated

3  everyone left, adding stepson left too, adding his

4  mother was okay with it.  Advised caller to call PSO if

5  subjects come back so juveniles can be assessed for

6  curfew and alcohol containers.  Do you see that?

7       A.   I don't remember this.

8       Q.   Okay.  Let me close some of these.

9            About a week later, May 13, 2017, do you recall

10 an incident where deputies came to your home because

11 they were looking for a young lady that was refusing

12 Donnie's sexual advances and that she claimed that

13 Donnie was holding onto her phone?

14      A.   I don't recall any of that.

15      Q.   Were there ever occasions when Pasco deputies

16 came to the residence to speak to Donnie and you told

17 them that he was asleep, so they agreed to come back

18 later?

19      A.   I don't recall.

20      Q.   Do you know when it was that Donnie was first

21 designated as a prolific offender?

22      A.   I didn't know about this whole program until it

23 was happening to us.  I didn't know about what all this

24 was.

25      Q.   Well, at some point did a deputy tell you that

1    the reason that they were making some of the visits was

2    because of Donnie's status as a prolific offender?

3         A.    I think at some point I was advised, but not

4    until later on after like this had been going on and

5    they kept coming and coming and coming and coming.

6         Q.    Do you remember how it was you first learned

7    that Donnie had at any point been labeled as a prolific

8    offender?

9         A.    I don't recall when.

10        Q.    All right.  The first one that I see that is

11   labeled as a prolific offender check for Donnie -- and

12   what am I up to now, 17?

13             MR. HOLBORN:  Yes.

14             (Exhibit No. 17 was designated to be marked for

15        identification.)

16   BY MR. POULTON:

17        Q.    -- is dated May 14, 2017.  There may be others.

18   I'm just saying this is the first one that I'm seeing as

19   we're going through this.  I mean, we'll all look at it

20   at some point together, but I'll ask you if I remember

21   this incident based on the notes from the Sheriff's

22   Office.  It's dated May 14, 2017.  The address is 3229

23   Primrose Drive.  You see in the nature field here it

24   says prolific offender check, and then the note says I

25   attempted to make contact with the listed prolific

1    offender.  I made contact with Tammy Lynne Heilman.  She

2    advised me that he was sleeping.  She did not wish to

3    wake him up.  He has not been involved in any criminal

4    activity.

5              Does that refresh your memory at all?

6        A.   No.

7        Q.   Okay.

8        A.   He didn't do anything.  So, I mean, they were

9    just coming to check on my child that's sleeping.

10       Q.   Right.  And you didn't want to wake him up, and

11   then you told them that he had not been involved in any

12   criminal activity, and that's all that's reported in the

13   document.  I'm just wondering if you remember anything

14   about it, if you remember anything differently or more

15   or less than what is written here?

16       A.   It just says he was not -- he has not been

17   involved in any criminal activity.  I mean, no, I don't

18   recall.  They were at the house so many times, I don't

19   recall.

20       Q.   Well, I guess my question is do you have any

21   reason to disagree with the information contained in

22   that report?

23       A.   I -- No.  I mean, I can't object to something I

24   don't recall.

25             MR. POULTON:  Are you okay to go about another

1    fifteen minutes, maybe ten, and what I'll do is

2    we'll take a little bit longer break than I thought,

3    and we'll take like an hour and fifteen minutes so I

4    can have any associate gather those 2015 reports and

5    get them to you, and give you a little extra time?

6    That okay?  Go about ten more minutes?

7         MS. BROTHERS:  Are you okay with ten minutes?

8         THE WITNESS:  Yes.

9         MR. POULTON:  Okay.  So you get a little bit

10   longer break for lunch.

11        I think I'm up to Exhibit 18 or 19.  What do

12   you think, Madam Court Reporter?  What am I up to?

13        COURT REPORTER:  18, sir.

14        MR. POULTON:  18, okay.

15        (Exhibit No. 18 was designated to be marked for

16   identification.)

17   BY MR. POULTON:

18   Q.   So 18 is an event report dated June 15, 2017.

19   You see it has your address?

20   A.   Yes.

21   Q.   Right.  And it's listed as a prolific offender

22   check.  Looks like 8:30 in the morning Corporal Brock

23   and whoever the deputy is that's responding -- it will

24   be by number -- state they made contact with Donnie

25   McDougall.  Advised he's been staying out of trouble and

```
 1    is currently in a relationship with Jasmine Young.

 2         A.   Okay.

 3         Q.   Now is Jasmine Young his girlfriend currently

 4    or then or -- I'm trying to just get it straight in my

 5    own head.

 6         A.   Well, it says there that it was his girlfriend,

 7    so --

 8         Q.   Right.

 9         A.   -- I would have to say that that's his

10    girlfriend.

11         Q.   Well, what -- Donnie's in -- currently

12    incarcerated; correct?

13         A.   Correct.

14         Q.   Was there a battery associated on a young lady

15    that led to that?

16         A.   Not that I am aware of, no.

17         Q.   Okay.  Were you aware that he had been arrested

18    at some point for domestic violence on like a pregnant

19    girlfriend?

20         A.   Yes.

21         Q.   Was that Jasmine Young or somebody else?  Do

22    you recall?

23         A.   That was not Jasmine, no.

24         Q.   Okay.  Do you remember Jasmine Young?

25         A.   Yes, I do.
```

```
 1        Q.    Okay.  But then Donnie went on to advise that

 2   he believed that Brenden Showalter might be involved in

 3   car hopping in an unknown area of Pasco.  Do you

 4   remember Brenden Showalter?

 5        A.    Yes.

 6        Q.    Can you elaborate on that at all what was going

 7   on with that?

 8        A.    Well, it looks to me that my son is not in any

 9   trouble here, you're doing a check, and that he offered

10   information because they probably came out and were

11   saying that there was someone doing car hopping.  So

12   they came to my son, and my son is telling them somebody

13   that he knows of that is possibly doing this type of

14   thing is what this is right here.

15        Q.    Okay.  Well, did you have -- did you ever talk

16   to Donnie about what was going on with car hoping or

17   Brenden Showalter?

18        A.    I don't recall, no.

19        Q.    And just so we're clear, let me make sure we

20   have the same definition.  Car hopping is auto

21   burglaries; right?

22        A.    That's what -- yes.

23        Q.    Did you ever have any conversations with Donnie

24   where he acknowledged to you that he had at any point

25   engaged in car hopping?
```

61

1      A.    When he was initially -- when he was charged

2   with car hopping or burglary of a vehicle was really

3   when I found out about it.

4      Q.    Okay.  Do you know if he was like involved with

5   any sort of a group of juveniles that organized and

6   called themselves any sort of a name?

7      A.    Not to my knowledge, no.

8      Q.    Okay.  Have you ever heard of the name or the

9   phrase The Squad?

10      A.    No.

11      Q.    Okay.

12      A.    I've never heard that before.

13      Q.    It's in connection with a different person I

14   will just tell you.  I'm sure your lawyer will update

15   you, but I was just wondering if there might have been

16   any connection there?

17      A.    Oh, not that I'm aware of, no.

18         MR. POULTON:  Okay.  I tell you what.  You know

19      what?  Now is a good time to stop because there are

20      some videos that I wanted to show you, at least one.

21      So let's go ahead and take a break until one.  And,

22      Counsel, what I will do in the meantime is the

23      reports that I have for 2015 we will email to you.

24      Okay?  And then we can go back if we need to to

25      those.

1          MS. BROTHERS:  And we'll get the 2014 and

2     earlier reports?

3          MR. POULTON:  Right, right.  We'll get those to

4     you as well.  I just want to get the '15 ones now,

5     there's only I think four or five, just so you could

6     have them for the deposition.

7          MS. BROTHERS:  Right.  Okay.

8          MR. POULTON:  Okay?  All right.  And I'm sorry

9     if there's been any confusion over that on our end,

10    but we'll get you that.  We'll get you all of them

11    whether we talked about them today or not.

12         MS. BROTHERS:  Great.

13         MR. POULTON:  Okay.  So let's come back at one,

14    and I will have my associate email you that other

15    material.

16         MS. BROTHERS:  Okay.

17         MR. POULTON:  All right.  Thank you.

18         (A break was taken at 11:45 a.m., and the

19    deposition resumed at 1:00 p.m.)

20   BY MR. POULTON:

21         Q.    All right.  Ms. Heilman, we went back and

22   provided some of the reports that we might talk about to

23   your counsel.  And, you know, if we come across one that

24   you don't remember and want to take a look at as we go

25   again, just let me know and I'll put it up on the screen

 1   and let you read it through.

 2          Let me ask you -- and I'm going to finish kind

 3   of where I left off moving forward and then go back to

 4   2015.

 5          There was an incident reported -- I guess it

 6   was Mr. Zander, your husband, reported that Donnie had

 7   pointed a revolver at him in March of 2018.  Do you have

 8   any knowledge of that?

 9      A.   I wasn't home at the time.  So I can't say

10   either way.  I wasn't there.  I didn't witness anything.

11      Q.   Did you hear about it?

12      A.   I heard about it.

13      Q.   From Mr. Zander?

14      A.   Both.

15      Q.   Oh, from both?  Okay.  Do you know who called

16   law enforcement during that incident?

17      A.   I believe it was Mr. Zander.

18      Q.   Do you know what caused it?

19      A.   Again, I wasn't there.  So I'm not really sure

20   what exactly transpired.

21      Q.   Okay.  Were you home when Donnie was

22   interviewed regarding that incident or another incident

23   the next day coming back from Pinellas County?

24      A.   I don't recall.

25      Q.   Okay.  Do you know whether Donnie McDougall was

1    ever served with a domestic violence injunction order?

2        A.    I believe so.

3        Q.    Do you know what the -- what led to that?

4        A.    Who are you referring to?

5        Q.    Well, I don't know.  That's part of what I'm

6    asking.  I guess we could go back and look at the

7    reports.  I'll share screen.

8              MR. POULTON:  This will be Exhibit 19.  Is that

9        right?

10             COURT REPORTER:  Yes.

11             (Exhibit No. 19 was designated to be marked for

12        identification.)

13   BY MR. POULTON:

14       Q.    Okay.  Let's see.  The date of the report is

15   9-17-18 on Primrose Drive address, domestic violence.

16   Donnie McDougall was served with the domestic violence

17   injunction.  I don't think this -- I don't think this

18   particular document tells us who applied for it and

19   obtained it.  Do you happen to remember it?

20       A.    No, I do not.

21       Q.    Was there a point at which Mr. Zander forced

22   Donnie to move out?

23       A.    What do you mean by forced?

24       Q.    Well, that's -- I guess that's subject to

25   interpretation.  Was there a point at which Mr. Zander

1    demanded that Donnie McDougall move out?

2        A.   No.

3        Q.   I'll show you -- this will be number 20.   This

4    is an a CAD report from the Sheriff's Office dated

5    9-29-18, Primrose Drive.   It's a prolific offender

6    check.   All right.   I'll let you just read the notes

7    section there.

8            (Exhibit No. 20 was designated to be marked for

9        identification.)

10   BY MR. POULTON:

11       Q.   Do you see this line here that the deputy is

12   speaking with Anthony McDougall, and Anthony McDougall

13   said -- he stated their stepdad Jeff kicked him out

14   about a month ago.   Do you see that?

15       A.   Okay.

16       Q.   First of all, were you there during this

17   conversation between Anthony McDougall and the deputies?

18       A.   Please don't do that.

19       Q.   I'm so sorry.   I'll ask -- I was moving up and

20   down in the report to the see if there was any other

21   information for us there.

22            I'll ask the question again.   Were you present

23   when the deputies had this conversation with Anthony

24   McDougall about Jeff having kicked out Donnie about a

25   month prior?

1      A.   Well, it says here that they met with Anthony,

2   so I'm gonna say no.

3      Q.   Do you remember one way or the other whether

4   you were present?

5      A.   No.

6      Q.   Do you recall an incident in 2019 -- this would

7   be in March of 2019 -- when you had advised that a

8   nephew of yours threatened to slit your throat and kill

9   everyone in the house?

10      A.   No.  Do you have something to review?

11      Q.   Yeah, I don't know that I have that one.

12      A.   That's a pretty big accusation.  I'd like to

13   see --

14      Q.   Yeah, I -- Give me just a second.  Let me see

15   if I can't locate that.  Hang on.

16          Okay.  I do have that one.  This will be what,

17   Exhibit 21 I think we're up to.

18          (Exhibit No. 21 was designated to be marked for

19      identification.)

20   BY MR. POULTON:

21      Q.   This one may take a little while to read

22   through if you've not seen it before, but the date of

23   this incident report is March 25, 2019, and you see that

24   the location of the incident is 3229 Primrose Drive;

25   correct?

1      A.    Correct.

2      Q.    And I'll just let you start reading there.  You

3    let me know when you're ready for me to toggle down.

4      A.    You can scroll down.

5      Q.    Okay.

6      A.    Go ahead and scroll down.

7            You can scroll down.

8      Q.    Okay.

9      A.    Okay.

10      Q.    All right.  So there's a lot going on here in

11    this one, but it looks like as I understand it the

12    initial report came in to Child Protective

13    Investigations and deputies came out to investigate.  Do

14    you remember how all that transpired?

15      A.    Well, it just shows right here what happened.

16    They interviewed everybody.

17      Q.    Okay.  But do you know how it was -- This was

18    in March of 2019; correct?

19      A.    That's what it said, yes.

20      Q.    Well, I mean, do you have -- is your memory any

21    different?

22      A.    What do you mean?

23      Q.    Well, if the report indicates that the response

24    to the agency or response by the agency was on March

25    25th regarding an incident occurring on March 24th, do

1   you have any reason to disagree with that?

2        A.   I don't even recall the date, so --

3        Q.   Okay.

4        A.   That's what it's saying.  Then I can only

5   assume that that's the correct date.

6        Q.   Okay.  And who is Camron Heilman?

7        A.   That's my nephew.

8        Q.   That's your nephew.  Okay.  Is that the son of

9   your brother?

10       A.   Correct.

11       Q.   This is the brother who currently lives with

12  your parents?

13       A.   Correct.

14       Q.   Was Camron living at your house at the time?

15       A.   Yes.

16       Q.   Why?

17       A.   Because I had custody of him.

18       Q.   You had custody of Camron.  Okay.  How long had

19  Camron been living at the house?

20       A.   (No response.)

21       Q.   That's a poorly-worded question.  Let me reask

22  it.

23            Do you remember -- do you remember

24  approximately how long Camron had been living at the

25  house prior to incident in late March of 2019?

1        A.    So he was living there -- I had him since he

2    was ten months old, so --

3        Q.    Okay.

4        A.    And this was -- so like I had him for -- he was

5    born in seven.

6        Q.    Okay.  So roughly eleven years?

7        A.    Yes.  I'd say, yeah, probably around eleven

8    years.

9        Q.    Okay.  All right.  And according to the first

10   page of the substantive notes, there was an altercation

11   -- a physical altercation between Mr. Zander and Camron.

12   Did you witness that interaction?

13       A.    No.

14       Q.    Did you tell the deputy as reported here about

15   an incident where you asked Camron to assist with chores

16   and the dishes, he refused, his wifi was disconnected,

17   and he then stated to you things such as, "I'll do

18   whatever the fuck I want.  Fuck you, you fat bitch.

19   I'll fucking slit your throat.  I'll kill you and

20   everyone in this house"?

21       A.    Well, what are you asking me?

22       Q.    Well, I'm asking you first do you remember

23   telling the deputy that Camron had said these things?

24       A.    This was a long time ago.  If it says it in the

25   report that that's what I said, then that's what I said.

1      Q.   Well, I mean, did that happen?  Did Camron say

2  those things to you?

3      A.   I don't remember.

4      Q.   So Camron would have been about twelve?

5      A.   Yes.

6      Q.   And this was in 2019.  So it was a little less

7  than that three years ago and you don't remember --

8      A.   No.

9      Q.   Let me finish the question.  You don't remember

10  that a little less than three years ago your

11  twelve-year-old nephew was telling you, "I'll do

12  whatever the fuck I want.  Fuck you, you fat bitch.

13  I'll fucking slit your throat.  I'll kill you and

14  everyone in this house" -- you don't remember that?

15      A.   I don't remember exactly what transpired.

16      Q.   Okay.

17      A.   You know, I don't remember every word that's

18  ever been said out of anybody's mouth on that specific

19  date.

20      Q.   Do you remember any conversation like that with

21  Camron at all ever?

22      A.   I mean, it wasn't like him to speak like that.

23  So, I mean, I really don't recall.  I recall there being

24  an incident at some point, but I don't recall -- I mean,

25  I'm reading it here, but I don't recall all of the

1  details.

2      Q.   Do you know whether or not it was -- Well,

3  okay.  You'd had interaction with Child Protective

4  Investigative Services before; correct?

5      A.   For?

6      Q.   Anything?  Donnie, Anthony, any of the other

7  children, Tyler?

8      A.   Not to my knowledge.  No, I don't believe I

9  had.

10     Q.   Was this the first time you recollect Child

11  Protective Investigative Services being involved?

12     A.   Yes, I believe so.

13     Q.   Okay.  Do you remember Camron being Baker Acted

14  as a result of this incident with Mr. Zander and the

15  fight over the beer?

16     A.   Allegedly.  Now it says here if you read it --

17  can you please stop doing that?  I can't read it while

18  you're moving it.

19     Q.   I'm just trying to find the place where it's

20  listed.  Go ahead.

21     A.   I remember taking him to the Baker Act, yes.

22     Q.   Do you remember why you were taking him?  And

23  this is Camron.  Do you remember why you were taking

24  Camron to Baker Act?

25     A.   Because he had been acting out and he needed

1   some type of help.  He was off the wall.  Obviously,

2   saying things like that, he needed some help.

3       Q.   Okay.  Before you move on and before I forget,

4   I just want to go back to that first set of questions

5   that we were talking about about the scope the damages

6   and then your comment on the heart attack, and I just

7   wanted to make sure that we were all still on the same

8   page that the damages that you're claiming in the case

9   are financial damage you're claiming in the case are the

10  one dollar in nominal damages plus you seek

11  reimbursement for the code violations and any costs

12  associated with those, and reimbursement for expenses

13  related to your criminal cases.  Am I correct?

14      A.   That's correct.

15      Q.   So you're not claiming damages for anxiety or

16  emotional pain and suffering in this case; correct?

17      A.   That's correct.

18      Q.   Do you recall an incident in April of 2019

19  where there was a altercation between Jeff Zander and

20  Anthony McDougall over Jeff's medical marijuana which

21  led to a physical altercation and Anthony being sent to

22  a adult or to a youth diversion program?

23      A.   I don't remember the details.

24      Q.   Well, do you remember the incident at all?

25      A.   Vaguely.

1      Q.   Do you know who it was that called the

2  Sheriff's Office on that occasion?

3      A.   No.

4      Q.   Was there a time in June of 2019 where --

5           I'm sorry?  Oh, I thought I heard something.

6  Sorry.

7           Do you recall a time in June of 2019 where

8  there was a concern that one of your children had been

9  the subject of a alleged sexual battery and you allowed

10  deputies to speak to the child but did not believe that

11  the deputies would -- or that she would speak with you?

12      A.   Yes.

13      Q.   What was that about?

14      A.   Well, pull up the report.

15      Q.   I'm looking for that particular one, but I'm

16  just curious as to what your memory was if you have one

17  of it.  Was this Tyler or one of the other children?

18      A.   One of the other children.

19      Q.   Okay.

20           MR. POULTON:  Let's see.  I'm on what now,

21      Exhibit 21?

22           COURT REPORTER:  22.

23           MR. POULTON:  22.  Thank you.

24           (Exhibit No. 22 was designated to be marked for

25      identification.)

```
1    BY MR. POULTON:
2        Q.    So this is a report -- incident report dated
3    June 18, 2019, listed as juvenile problem/disturbance.
4    The people that are listed there is Camron Heilman,
5    ██████████████████, and Nautica Sky Walters.  We already
6    talked about Camron and ███████, but who is Nautica?
7        A.    That was my son's girlfriend who lived with me.
8        Q.    Anthony's girlfriend or Donnie's?
9        A.    Donnie's.
10       Q.    Let you read the substance of it.
11       A.    Yes, I remember.
12       Q.    Okay.  Do you remember who it was that would
13   have reported this to either law enforcement or to Child
14   Protective Investigation?  Do you know how that
15   transpired?
16       A.    Yeah, I'm not sure who did because when this
17   happened, I freaked the hell out to be honest with you.
18   This is my little girl, you know, and I freaked out as
19   any parent would and called my parents and told them to
20   come get him.  He has not been back since.  So I took
21   care of the situation.
22       Q.    This was Camron -- you had your parents come
23   get Camron?
24       A.    Yeah.
25       Q.    Is that when Camron left the house for good?
```

1    A.   Yes.

2    Q.   Okay.

3    A.   So I'm not really sure who made a call 'cause,

4  like I said, we had already taken care of the situation.

5  There was no need to put my children through this and

6  put their -- You know, it was terrifying enough I'm

7  assuming for my child.  But, yeah, I'm not sure who made

8  the -- who made the report.

9    Q.   Okay.

10   A.   Does it say in here?

11   Q.   I think it might, but I'm not sure that -- that

12  might be protected by the statute.  So I'll talk to your

13  lawyers about that.  If you don't know, that's good for

14  our purposes and we'll just -- we'll deal with that a

15  bit later.

16   A.   It may have been a friend of mine because I had

17  told my friend what had happened and she --

18   Q.   She might have --

19   A.   That's the only person -- like I only -- I just

20  told one person 'cause that's quite embarrassing and --

21   Q.   Okay.  Go ahead.  I didn't mean to interrupt

22  you.  Go ahead.

23   A.   Yeah.  I didn't want my children to go through

24  any more than they already had to, so --

25   Q.   Please understand I'm not -- I don't have the

1    least bit of interest in embarrassing you about this

2    either by pointing it out.  I'm just -- part of the case

3    is trying to distinguish between those incidents where

4    law enforcement are coming out for prolific offender

5    check versus incidents where it's some other cause.

6    Okay?  So I'm just trying to understand -- you know, get

7    kind of a broad view if you will of the different types

8    of interactions that might be going on.  Some are

9    prolific offender checks and some are not, would you

10   agree?

11        A.    Yeah.

12        Q.    Okay.  All right.  Do you know what the outcome

13   of that was?  Did Child Protective Investigations do

14   anything?

15        A.    They spoke -- they met up with my mom and my

16   nephew, and they spoke with him.  I don't know if

17   anything was done because we kind of took care of it

18   ourselves.  We separated, you know, took him away from

19   the situation.  So I don't know what -- what more they

20   could have done.  As far as I know, that was the end of

21   it.

22        Q.    One sec here.

23              All right.  I am back.

24              Let's see here.  In July of 2019, do you

25   remember deputies being called out to your residence

1   because of a ongoing dispute between Donnie and another

2   teen named Marcus Garmon?

3        A.   The name sounds familiar, but I'm not sure.

4        Q.   Okay.  Let me show you a report to see if

5   this -- well, I'll show you the report and just let you

6   read it.  See if it helps with your recollection of

7   this.  So this will be exhibit twenty whatever I'm on,

8   twenty --

9             COURT REPORTER:   23.

10  BY MR. POULTON:

11       Q.   -- 23.  It's a incident report dated June 26,

12  2019.

13            (Exhibit No. 23 was designated to be marked for

14       identification.)

15  BY MR. POULTON:

16       Q.   I'll go down to the -- it's apparently Nautica

17  Walters who called.

18       A.   Oh, okay.

19       Q.   I'll just let you read that.  Let me know when

20  you -- if this -- when you get to a point where you

21  remember it.

22       A.   Yes, I do remember.

23       Q.   Okay.  What do you remember about this

24  incident?

25       A.   I remember Marcus was somebody that would just

1    -- he didn't live in Florida, live in Florida.  He came

2    down here and would visit.  My son just knew him 'cause

3    he was friends with -- Marcus is a friend of -- who was

4    a friend of mine actually -- a friend -- I have a friend

5    Stacy, and her son -- she moved here from Ohio.  So this

6    is somebody that she knew from Ohio.  He's around my

7    son's age, so -- and she also has teenagers as well.  So

8    they would come down here and visit.  So we didn't like

9    know them from anywhere else other than from her.  So my

10   son like was friends with them -- became friends with

11   him.  So I didn't really personally know him, but he was

12   just somebody that he became friends with while he was

13   here.  And Marcus was -- it says here that they were

14   involved in a car crash, and that's what happened was

15   Marcus had stole some of my son's things, and he

16   confronted him about it, and then he told him that he

17   was gonna shoot up my house.  He was gonna pour gas all

18   over, set my house to fire, all kinds of things.

19        Q.   Excuse me.  This was Marcus saying this?

20        A.   Yes, yes.

21        Q.   Okay.  And so as I read it Nautica, you son's

22   girlfriend, called the police -- the Sheriff's

23   Department to report this ongoing feud because she was

24   getting concerned about the threats from Marcus; fair?

25        A.   Right.  She's getting -- yes.

1      Q.    Okay.   And the indication here is they spoke to

2   you and that you were aware of the fight.   So in this

3   particular one the threats are against Donnie

4   specifically, but then just you -- you and the house --

5   everybody in the house as well; fair?

6      A.    Correct.   Yes.

7      Q.    Okay.   Now Nautica -- was Nautica pregnant at

8   this point?

9      A.    I'm not sure if she was or not.

10      Q.    Was there a point at which the Sheriff's Office

11   was called because Donnie had -- was alleged to have

12   beaten her up?

13      A.    There was a -- yes.

14      Q.    What can you tell me about that incident?   What

15   do you remember?

16      A.    It was actually a feud between my daughter and

17   my son going back to the sibling rivalry.

18      Q.    This would be Tyler?

19      A.    Correct.

20      Q.    All right.   So go ahead.   I didn't mean to

21   interrupt.   I'm just trying keep everybody straight.   Go

22   ahead.

23      A.    Right.   So my daughter and son had a

24   confrontation between each other, and she didn't want my

25   son there.   Like I said, they had -- they loved each

1    other, but they -- it was a love-hate relationship.  So

2    she had actually was the one that called the police and

3    said that that had happened, which it did not happen,

4    and she even told them that it didn't happen, so -- but

5    my son wasn't there when they came.

6        Q.    Do you know if there was any sort of an outcome

7    in any of Donnie's criminal cases as a result of that

8    incident?

9        A.    I'm not sure I understand.

10        Q.    Well, was Donnie McDougall on probation at the

11    time?

12        A.    Yes.

13        Q.    Do you know whether or not his probation was

14    violated?

15        A.    Yes, his probation was violated.

16        Q.    And do you know what the outcome of that was,

17    that probation violation?  Was it sustained or --

18        A.    Well, he went to -- they arrested him for his

19    violation, and he was in jail, and I guess they told him

20    not to speak with her because she was a victim, and he

21    thought at this point that she was pregnant with his

22    child, so he still spoke with her.  And because of that,

23    he got himself in trouble for that, yes.

24        Q.    Okay.  So they violated his -- was he in jail

25    as a result of this report that he had beaten up Nautica

1    and then as a condition he was supposed to not speak to

2    Nautica, but then he did, and so his probation was

3    violated?  Have I got it right?

4         A.    I mean, he was arrested when he went to -- he

5    turned himself in to his probation because the police

6    wanted to speak with him, and he didn't live in the --

7    he didn't live with us.  So when he turned himself in to

8    probation, I guess the officers that wanted to talk with

9    him or whatever, but you're not allowed to have any

10   contact at all with law enforcement when you're on

11   probation, so he was violated.  And while he was in

12   there awaiting to go to trial or whatever, he was

13   advised by the judge I guess not to speak with her, and

14   he had been speaking with her.  So he violated that

15   judge's order.

16        Q.    Is that when Donnie went to prison?

17        A.    Yes.

18        Q.    Do you know what the -- what he was convicted

19   of?

20        A.    He was convicted of the charge because they

21   said that either way he was gonna get convicted with the

22   charge.  They weren't lowering it or they weren't doing

23   anything with it.  So he would either take the charge

24   for four years, or he would take it to trial and they

25   told him you're not gonna win, you're gonna end up doing

1    eight years.  So he took the -- he took the charges.

2        Q.   Okay.  So he ultimately -- your understanding

3    is he ultimately pled guilty to a battery on Nautica?

4        A.   He had no other option.  There was no other

5    choice.

6        Q.   Okay.  I understand you're giving the reason,

7    but I'm just trying to understand the sequence of

8    events.

9            So he gets arrested.  There's a probation

10   violation in association with it, and he ends up

11   pleading guilty to physically battering Nautica;

12   correct?

13       A.   I mean, he didn't take it to trial.  So he

14   didn't get his chance to actually speak and say what he

15   wanted to.  But, yes, I guess in essence that is what

16   happened.

17       Q.   And your explanation is that it didn't actually

18   happen, but that his alternative was to go to trial, and

19   if he lost at trial, he was told, perhaps by his

20   attorney, that he could be facing a longer sentence?

21       A.   Correct.  It was in his best interest to just

22   plead out to it regardless and to take the -- whatever

23   they were giving him -- they were offering.

24       Q.   Okay.  Do you recall an incident in September

25   of 2019 when your husband contacted the Sheriff's Office

1    to complain that Anthony was threatening him, meaning

2    Mr. Zander?

3        A.    I don't recall.

4        Q.    All right.  Let's see if I have a report for

5    that.  All right.  We'll put it up on the screen for

6    you.

7        A.    Okay.

8              MR. POULTON:  This will be Exhibit 24?

9              COURT REPORTER:  Yes.

10             (Exhibit No. 24 was designated to be marked for

11       identification.)

12   BY MR. POULTON:

13       Q.    September 28, 2019.  You see the caller is

14   Joseph Zander and --

15       A.    I don't know a Joseph Zander.

16       Q.    He's Jeff Zander; right?

17       A.    Correct.  But that's -- the information is

18   incorrect then.

19       Q.    I understand, but it's 3229 Primrose Drive;

20   correct?

21       A.    That part's correct.

22       Q.    Okay.  Let's see here.  Caller advised that

23   stepson is threatening him, name Anthony McDougall.

24   Made contact with Joseph.  He advised of a verbal

25   argument with stepson Anthony.  No physical contact.  I

1    attempted to speak with Anthony, but he had departed the

2    location.  Do you see that?

3        A.    I do see that.

4        Q.    Okay.  Had you heard anything about that from

5    Mr. Zander or from Anthony?

6        A.    I mean, it's not giving me very much

7    information here.  It just says that he called and that

8    there was -- there was no physical altercation or

9    anything.  So I'm not really sure.

10       Q.    Okay.  Well, the note is that the stepson,

11   meaning Anthony McDougall, was threatening Mr. Zander,

12   and I'm just wondering if you had any information one

13   way or the other whether that happened or whether the

14   phone call was made to the Sheriff's Office by

15   Mr. Zander or what the outcome was?

16       A.    Yeah, I can't say whether --

17       Q.    Okay.

18       A.    I don't know.

19       Q.    Do you recall an incident in December of 2019,

20   December 5th, where Mr. Zander could see your son

21   Anthony throwing things around the house trying to break

22   any cameras that you had installed?

23       A.    No.

24       Q.    This is Exhibit 25 I believe now.  This is a

25   CAD report dated December 5.  This time they have him as

```
 1    Jeff Dander.

 2         A.    Nice.

 3         Q.    Yeah, well -- and it's 3229 Primrose Drive.

 4               MR. HOLBORN:  Tom, I have this down as 26.

 5               MR. POULTON:  Sorry.  26 then.

 6               MR. HOLBORN:  Is that correct?

 7               COURT REPORTER:  I have it down as 25.  Really?

 8               MR. HOLBORN:  Do you?  Okay.

 9               MR. POULTON:  Well, then maybe we missed one.

10               MR. HOLBORN:  I'm sorry.  Did you do 8490?  I

11         have that down for 24.

12               COURT REPORTER:  For 24 I have the date of 9-28

13         of '19.

14               MR. POULTON:  Okay.  No.  I missed one.  It's

15         my fault.  Madam Court Reporter, you say for 24 you

16         have --

17               COURT REPORTER:  9-28 of '19.

18               MR. POULTON:  Okay.  Let's do this.  Let's

19         leave that at 24.

20               COURT REPORTER:  Okay.

21               MR. POULTON:  And we will make Exhibit 25 the

22         report dated 7-10-2019.

23               (Exhibit No. 25 was designated to be marked for

24         identification.)

25               MR. HOLBORN:  Thank you.
```

1      MR. POULTON:  So we're just -- we've got them

2   slightly reverse order there, but just for ease of

3   the court reporter.

4      COURT REPORTER:  Okay.  And then for 26 it's

5   going to be 12-5 of '19?

6      MR. HOLBORN:  Right.

7      COURT REPORTER:  Okay.  Thank you.

8      (Exhibit No. 26 was designated to be marked for

9   identification.)

10  BY MR. POULTON:

11     Q.   So let's just take a look at what the notes are

12  here.  Caller at work watching video camera, and son is

13  throwing stuff in house trying to break video cameras.

14  Do you recall having video cameras set up inside the

15  house?

16     A.   No.

17     Q.   Says son at home with wife Tammy -- Heilman,

18  Tammy.  Do you see that?

19     A.   I do see that.

20     Q.   Okay.  And then upon arrival I made contact

21  with homeowner Tammy Heilman who advised everything is

22  okay at the residence.  Tammy advised she told her son

23  Anthony not to invite any girls at the residence.  She

24  advised he did not like it and became upset.  Further

25  advised Anthony left the residence on foot to cool off.

1    No further action.

2              Does that refresh your memory at all?

3        A.    Not really.

4        Q.    Okay.  But you didn't have cameras in the home?

5        A.    Not in my house, no.

6        Q.    Do you know why Mr. Zander might have called

7    the Sheriff's Office to say that he was at work and

8    watching video cameras and that Anthony was throwing

9    things around the house trying to break the cameras?

10       A.    Probably because he -- I mean, you can look at

11   these reports and see that my husband has called on my

12   kids prior times.  So there's obviously -- he's the

13   stepfather.  So there's obviously friction between them.

14       Q.    Okay.  And so I meant to ask -- we have -- you

15   know, as you're well aware, there's body cam video

16   footage for some of the incidents in the case from the

17   Sheriff's Office.  Did you make any of your own videos

18   of your interactions with Pasco County deputies at any

19   time?

20       A.    I used to have surveillance at my house, but I

21   don't have any any longer.  Well, I don't have -- that's

22   not correct.  I do have some now, but at the time my --

23   what recorded all of the information had broke.  So I

24   don't have access to any of my footage.  It's gone.

25       Q.    So you had the cam- -- when we say that at the

1    time, let's be specific.  Okay?  So let's say -- well,

2    do you recall when it was you put cameras in?

3         A.    Well, I had cameras back then when these things

4    were happening.

5         Q.    Okay.  So say 2015 forward?

6         A.    Probably somewhere around there.  But at one

7    point the cameras stopped working.  So any type of

8    information that I would have had I no longer have.

9         Q.    So as we sit here today, you don't have any

10   video yourself of these incidents; correct?

11        A.    No.  I wish I did.  I really wish I did.

12        Q.    Are you aware of anybody else having any video

13   of any of your interactions with the Pasco Sheriff's

14   Office?

15        A.    Not to my knowledge.

16        Q.    Okay.  Did Anthony have a girlfriend named Ava?

17        A.    Yes.

18        Q.    Do you recall an incident in April of 2020

19   where Mr. Zander reported that Anthony had physically

20   attacked him?

21        A.    No.

22        Q.    Let me show you a report for -- this will be

23   dated -- this is number 27 I guess we're on -- April 25,

24   2020.  You see the address is 3229 Primrose.  The

25   reported crime was domestic violence.  And go down to

```
 1    the thing here and I'll just let you read this, and just

 2    let me know when you're ready for me to scroll down

 3    because there's quite a bit to this one.

 4              (Exhibit No. 27 was designated to be marked for

 5         identification.)

 6         A.    I'm a little confused here because it says here

 7    where it says after speaking to Jeffrey they said they

 8    met him at the 7-Eleven, but it says here that he -- it

 9    doesn't make sense here.

10    BY MR. POULTON:

11         Q.    Well, yeah.  I mean, I'm not asking you whether

12    it's factually accurate.  I'm just seeing if reading

13    this refreshes your memory of this incident where there

14    was this allegation against Anthony and the deputies are

15    called out and they interview everybody it looks like

16    including you of being in a verbal confrontation with

17    Mr. Zander and that -- and that Anthony punched

18    Mr. Zander in the face.  Do you see where it says that

19    you told the deputy that?

20         A.    Yes, I do see that.

21         Q.    Okay.  And then there was a -- you stood in

22    between them trying to break it up presumably; right?

23         A.    Yes.

24         Q.    And then Jeffrey and Anthony engaged in a fight

25    in the kitchen/dining room area.
```

1  A. Yes, I do see that.

2  Q. Okay.  Do you remember telling the deputy about

3 that?

4  A. Vaguely.  This -- I was taking care of my sick

5 daughter at the time, so I vaguely remember this.  My

6 husband ended up moving out of the house at this time.

7  Q. Mr. Zander?

8  A. Yes.

9  Q. Has he moved -- he's moved back then since

10 then?

11  A. Yes.

12  Q. Okay.  Do you know if Anthony was arrested as a

13 result of that incident?

14  A. I don't recall.

15  Q. Do you know if Anthony has ever been listed as

16 a prolific offender?

17  A. I'm not sure.

18  Q. Okay.  It's okay if you don't know.  I'm just

19 asking if you know one way or the other?

20  A. No, I don't.

21  MR. POULTON:  Okay.  Now want to take a quick

22 break -- restroom break here?  It's 2:00.  We've

23 been going an hour.  Why don't we do that?  I'm

24 going to show you just some videos and ask some

25 questions about them, but we're probably within an

```
 1        hour of being finished if that helps with you

 2        scheduling.  Okay?  So why don't take like a quick

 3        ten-minute break.

 4              MS. BROTHERS:  Sound good.

 5              MR. POULTON:  Okay.  Thanks.  Be back in ten.

 6              (A break was taken at 2:00 p.m., and the

 7        deposition resumed at 2:15 p.m.)

 8  BY MR. POULTON:

 9        Q.   All right.  So, Ms. Heilman, I wanted to show

10  you some videos -- body cam videos some of the

11  interactions starting with the one associated -- let's

12  see here -- with I believe this is going to be with the

13  -- let's see if this is the right one.  Hang on.  Okay.

14  It is not the right one.  Hang on.

15              Okay.  This video is -- the first one I'm going

16  to show you -- so this will be Exhibit 27?

17              COURT REPORTER:  28.

18              MR. POULTON:  Madam Court Reporter, you're on

19        -- I don't -- Oh, you know what?  Sorry.  I have to

20        turn on the sound, don't I.  27, correct?

21              COURT REPORTER:  No, it's 28.

22              (Exhibit No. 28 was designated to be marked for

23        identification.)

24  BY MR. POULTON:

25        Q.   All right.  This is body cam footage related to
```

1   the citation violation for the chickens.  So let me

2   share screen.  On my computer this is Extraction 1.1

3   County Ordinance Chicken, but it's also part of -- there

4   are two of them.  There are two deputies there.  The

5   incident number is 16-008432.

6           COURT REPORTER:  Both videos are you going to

7      use as 28?

8           MR. POULTON:  No, no, just the one.  They show

9      the same thing, just one deputy is standing to the

10     side and one's closer you can hear better.

11          MS. BROTHERS:  You can probably put the video

12     name in the Zoom chat too if that would be useful to

13     like just copy and paste it.  Only if it would be

14     useful to Judy I'm suggesting that.

15          MR. POULTON:  That's okay.  You know, some of

16     them have the -- you know, the numbers at the top --

17          MS. BROTHERS:  Right.

18          MR. POULTON:  -- in the ton right-hand corner.

19     This one does not.  Some do, some don't.  I think it

20     had to do with the beta testing and whatnot that was

21     going on, but at any rate that's how it's been

22     produced to me is Extraction 1.1 County Ordinance

23     Chicken you can see right there in the lower

24     left-hand corner.

25          COURT REPORTER:  Yes.  Okay.  Thank you.

1   BY MR. POULTON:

2       Q.   All right.   So I'm just going to play this.

3   It's about four and a half minutes long.   Then I'm going

4   to show you some other videos and then just sort of have

5   some collective questions about them.   Okay?

6       A.   Okay.

7            (Video was played at this time.)

8            MR. POULTON:   Video doesn't start until later

9       on some these.   Here we go.

10           (Video was played at this time.)

11  BY MR. POULTON:

12      Q.   Let me ask you, can you hear something now?

13      A.   Yes.

14      Q.   Just want to make sure it's coming through.

15  Okay.

16           (Video was played at this time.)

17  BY MR. POULTON:

18      Q.   All right.   I'm going to keep going here in

19  just a minute, but we're about a minute and twelve into

20  it.   Can we agree this is your house on Primrose?

21      A.   Yes, that's correct.

22           (Video was played at this time.)

23  BY MR. POULTON:

24      Q.   All right.   So we're at 1:34 into the video.

25  Is that your husband Mr. Zander?

1    A.   Yes.

2    Q.   Okay.  And you're kind of cutting up a little.

3  It's probably because I'm playing a video, but I didn't

4  catch it.  Yes, that is your husband?

5    A.   Yes.

6    Q.   Okay.

7         MR. POULTON:  Are you getting that, Madam Court

8     Reporter?  She seems a little choppy to me.

9         COURT REPORTER:  I got it.

10        MR. POULTON:  Okay.

11        (Video was played at this time.)

12 BY MR. POULTON:

13   Q.   All right.  This is at about 2:50 that you come

14 to the door; right?

15   A.   Yes.

16   Q.   Okay.

17        (Video was played at this time.)

18 BY MR. POULTON:

19   Q.   Okay.  And we see a little girl here in the

20 window of the door there.  Is that Tyler or --

21   A.   That's █████.

22   Q.   █████?

23   A.   Yes.

24   Q.   Okay.

25        (Video was played at this time.)

1    BY MR. POULTON:

2        Q.   Okay.  And just as you said, "Get you're

3    fucking nose out of my property," there's a young man to

4    your left.  Who's that?

5        A.   That's Camron.

6        Q.   Okay.

7             (Video was played at this time.)

8    BY MR. POULTON:

9        Q.   All right.  So now that correlates -- that was

10   on March 3, 2016, and I believe we talked about this

11   before that you acknowledge that there were chickens

12   there; right?

13       A.   Correct.

14       Q.   Okay.  Did you think that it was in any way

15   unlawful for the deputies -- Did you think at that time

16   that it was unlawful for the deputies to have given you

17   a citation for that?

18       A.   Yes.

19       Q.   Did you do anything about that?

20       A.   I went to court.

21       Q.   Okay.  Did you complain to anybody at the

22   Sheriff's Office?

23       A.   I'm not sure what you're asking me.  Prior to

24   going to court?

25       Q.   Well, did you go online and file a complaint or

1    call their supervisors, anything like that?

2         A.    I didn't know that was an option.

3         Q.    Okay.  Do you know if that code violation had

4    anything to do with the prolific offender status of

5    Donnie or Anthony?

6         A.    Yes, it did.

7         Q.    How do you know that?

8         A.    Because if I remember correctly, they were just

9    out a few days prior for the numbers on the mailbox, and

10   they had been coming by.  So they -- anytime that they

11   didn't get information they wanted to, they would give

12   out citations.

13        Q.    Okay.  So you believe that I guess it would be

14   Donnie at the time was a prolific offender under the

15   program?

16        A.    I believe so.  I can't say a hundred percent

17   sure, but knowing what I know now, I believe so.

18        Q.    What did you think was unlawful about the --

19   them giving you the citation that day?

20        A.    'Cause they came out I believe, like I said, it

21   was a day prior, maybe two days prior.  They said

22   something about mailbox -- numbers on my mailbox, gave

23   me a citation then.  And I guess that same day that they

24   were there they had gone into my neighbor's yard saying

25   that they had -- they were investigating a crime.  So

1   she let them in her back -- in through her house into

2   her backyard to look over my fence to look and see if I

3   had any crime going on or anything that I could be cited

4   for.   Then they came back two days later with this

5   chicken violation.   And we did check to see if you were

6   allowed to have chickens, and there was no law stating

7   that you could not.   As matter of fact, when I was in

8   court, they had said that they were going by the

9   surrounding counties because nothing was implemented in

10  Pasco County that says you could not have them.

11       Q.   All right.   But as of the day that it happened

12  on March 3, 2016, did you believe that the issuance of

13  the citations was unlawful, or is that something you

14  just decided later?

15       A.   Did I think it was unlawful for the citation?

16       Q.   On that day March 3, 2016, did you think it was

17  wrongful for them to have issued the citations?

18       A.   Yes.

19       Q.   Okay.   Now that video I think we can agree was

20  pretty confrontational; right?

21       A.   Correct.

22       Q.   Were all of the visits by Pasco deputies in say

23  the last four or five years confrontational?

24       A.   For the most part, probably.

25       Q.   Well, isn't it true that there were plenty that

1    were very cordial, polite, joking around?

2        A.    It depends on the officers that came out if

3    they wanted to be respectful or if they wanted to --

4        Q.    Okay.

5        A.    It all depended on how they approached us at

6    that point, but after being harassed so many times, you

7    get to a point where you're just -- you're sick of it.

8        Q.    My point is they weren't all conducted in the

9    same manner; fair?

10       A.    Fair.

11       Q.    Okay.  Let's look at a couple of others.  I'm

12   sorry.  Let me do these in date order as best I can.

13           MR. POULTON:  All right.  Madam Court Reporter,

14       this is going to be -- all right.  This is one that

15       has all those numbers at the time.  This is November

16       7, 2017.  There's an X number at the top which is

17       X83015724.

18           COURT REPORTER:  Thank you.  This will be

19       Exhibit 29.

20           MR. POULTON:  Exhibit No. 29.  Thanks.

21           (Exhibit No. 29 was designated to be marked for

22       identification.)

23   BY MR. POULTON:

24       Q.    And this video is about three minutes long.  So

25   let's watch this.  Okay?  And then -- well, let's watch

1    that.

2              COURT REPORTER:  It's not on our screen.

3              MR. POULTON:  Know what?  That's because I

4       didn't hit share screen.  I'll go back to the

5       beginning.  It's only a few seconds.

6              (Video was played at this time.)

7              MR. POULTON:  Can you see that?  Can you see

8       that, everybody?

9              COURT REPORTER:  Yeah.

10             MR. POULTON:  Okay.  Can you hear it?

11             MS. BROTHERS:  Yes.

12             MR. POULTON:  There's no talking yet.  Okay.

13             (Video was played at this time.)

14   BY MR. POULTON:

15       Q.    All right.  So we're at 1:49 there on the

16   video.  Is that Donnie --

17       A.    Donnie, yes.

18       Q.    -- coming out the door there?  Okay.

19             And so far they've asked him if he's committing

20   any auto burglaries or break-ins and they're asking if

21   he's going to school; right?

22       A.    Yes.

23             (Video was played at this time.)

24   BY MR. POULTON:

25       Q.    Okay.  So in that video would you agree with me

```
 1    that the deputies were encouraging him not to commit

 2    crime because he was about to turn 18?

 3              MS. BROTHERS:  Could you hear it okay?

 4              THE WITNESS:  I mean, you couldn't hear it very

 5       well.

 6              MS. BROTHERS:  The volume is kind of low.

 7              MR. POULTON:  Do you want me to go back?  I can

 8       turn it up as much as I can.  I'm not sure -- on

 9       your end I don't know how much of it -- it's only

10       another minute.  Let me do it from here.  I'm going

11       to turn up it as loud as I can on my end.

12              MS. BROTHERS:  Okay.  We can hear you just

13       fine, but the video is --

14              MR. POULTON:  Faint?

15              MS. BROTHERS:  Yeah.

16    BY MR. POULTON:

17       Q.   Okay.  What I want you to listen for, and then

18    we'll double back afterwards, is that the deputies -- I

19    think he says he's going to St. Pete.  Is that junior

20    college do you know?

21       A.   Yes.

22       Q.   Okay.  And well, I'll just let it speak for

23    itself.  You can listen.

24              (Video was played at this time.)

25    BY MR. POULTON:
```

1       Q.    Can you hear that?  They ask him if he's 17,

2   and what do you turn 18, and he says a few months.  Were

3   you able to hear that on your end?

4       A.    Yes.

5       Q.    Okay.

6             (Video was played at this time.)

7   BY MR. POULTON:

8       Q.    Were you able to hear that better?

9       A.    Yes.

10      Q.    Okay.  So this is a much more cordial reaction

11  than or interaction let's say than the first video,

12  would you agree?

13            MS. BROTHERS:  I'll just object that the video

14       speaks for itself.

15  BY MR. POULTON:

16      Q.    Okay.  Well, I mean, we heard on this video

17  that the deputies are encouraging him not to commit

18  crime especially 'cause he's about to turn 18.  Fair?

19  Ms. Heilman?

20      A.    Did they come to the house just to encourage

21  him not to commit crime?  I mean, why are they there to

22  begin with?  It's obviously nighttime.  Why are they

23  there?

24      Q.    Well, they were checking -- did you hear the

25  part about it being during his curfew, they were making

1   sure he was abiding by his curfew?

2           MS. BROTHERS:   Same objection.

3   BY MR. POULTON:

4       Q.   Did you hear that part?

5       A.   (No response.)

6       Q.   You can answer.   Your counsel is just objecting

7   to the form of the question, but you could still answer

8   unless she tells you not to.

9       A.   Oh, yes.

10      Q.   Okay.   You were able to hear that they were

11  making sure that he was abiding by his curfew; correct?

12      A.   Sure.

13      Q.   Okay.   And then they're encouraging him to get

14  a job down by the college and to not commit any crime

15  since he's on the cusp of turning 18; right?

16          MS. BROTHERS:   Same objection.

17  BY MR. POULTON:

18      Q.   You could answer.

19      A.   They're encouraging him to move to another

20  county.

21      Q.   Well, they're encouraging him to get a job and

22  an apartment down there; right?

23      A.   But why would you encourage him to leave the

24  county?

25      Q.   Okay.   That's what you took from that?

1          A.    Yeah, it is actually because that's their whole

2     tactic is to get you to either move or sue.

3          Q.    I see somebody's been reading the Tampa Bay

4     Times.

5          A.    When you're in it, it's a little hard not to.

6          Q.    Yeah.  Well, it's --

7               (Indecipherable simultaneous crosstalk.)

8               (Court reporter asked for clarification.)

9               COURT REPORTER:  I didn't hear it.

10              MR. POULTON:  Doesn't matter.

11              COURT REPORTER:  Okay.

12    BY MR. POULTON:

13         Q.    Did you see Donnie and the deputies gave each

14    other a little first bump at the end?

15              MS. BROTHERS:  Same objection.

16         A.    Yes.

17    BY MR. POULTON:

18         Q.    Okay.  So I'm going to show you now a video.

19    This will be what?  This is Exhibit 30?

20              COURT REPORTER:  Yes.

21              (Exhibit No. 30 was designated to be marked for

22         identification.)

23              MR. POULTON:  Okay.  And this is dated -- this

24         is dated 7-26-2018, and we've got the number at the

25         top X83015725.  This is only a few minutes long, so

```
 1          we'll watch this.
 2                (Video was played at this time.)
 3   BY MR. POULTON:
 4       Q.    This is a minute and 30 seconds or so, and
 5   that's you that came to the front door?
 6       A.    It looks like it, yes.
 7       Q.    One thing that I think we just need to note as
 8   we move forward, the time up here is 2:02:18, and it has
 9   a Z which I've always thought meant Zulu, but I think
10   you're about to tell them the reason that you can't talk
11   to them is because you're cooking dinner.  So you
12   wouldn't have been cooking dinner at two in the morning
13   or eight in the morning; right?
14       A.    Correct.
15       Q.    Okay.
16                (Video was played at this time.)
17   BY MR. POULTON:
18       Q.    All right.  So now that's -- I think you
19   mentioned earlier that in your opinion a lot of what
20   drove the -- whether the interaction with you was
21   confrontational was the demeanor of the deputies; right?
22       A.    Correct.
23       Q.    So this would be an example where you had a
24   cordial and polite back and forth, fair?
25                MS. BROTHERS:  Object that the video speaks for
```

```
 1        itself.

 2   BY MR. POULTON:

 3        Q.    You can answer.

 4        A.    Yes.

 5        Q.    You don't have a particular problem with this

 6   particular visit, do you?

 7             MS. BROTHERS:  Object.  Same objection.

 8   BY MR. POULTON:

 9        Q.    You can answer.

10        A.    Other than the fact that they keep coming out,

11   yes.

12        Q.    Okay.  But other than that, other than the fact

13   of the visit itself, there's nothing in the visit itself

14   that was particularly problematic, was there?

15        A.    Not this one.

16             MS. BROTHERS:  Same objection.

17             MR. POULTON:  Okay.  This is going to be number

18        31, and this is dated May 23, 2018, with the number

19        up at the top is X83046953.  This is a few minutes

20        as well, so we'll watch that one.

21             (Exhibit No. 31 was designated to be marked for

22        identification.)

23             (Video was played at this time.)

24   BY MR. POULTON:

25        Q.    All right.  So this is at 1:43.  In the video
```

```
 1   is that you there at the front door about to start
 2   speaking with the female deputy?
 3            MS. BROTHERS:  I just object that the video
 4       speaks for itself.
 5            MR. POULTON:  I'm asking if that's her.
 6       A.   Yes.
 7            (Video was played at this time.)
 8   BY MR. POULTON:
 9       Q.   All right.  Let me just ask you a quick
10   question here or a couple questions before we move on.
11   About 2:20 here we've stopped, and I believe you've
12   indicated to the deputies that at this point Donnie has
13   moved out of the house.
14            MS. BROTHERS:  Same objection.
15   BY MR. POULTON:
16       Q.   Is that right?
17       A.   I mean, from what I can hear, it sounded like
18   maybe that's what was said.
19       Q.   Well, had Donnie moved out of the house as of
20   May of 2018?
21       A.   I couldn't tell you whether he did or not.
22       Q.   There was something about him working for
23   somebody out of Tennessee.  Does that ring a bell?
24       A.   No.
25       Q.   Let me -- If you can't hear it very well, let
```

1    me turn up the volume.  We're doing this over Zoom.  So

2    it's not always the same on my end as yours.

3              (Video was played at this time.)

4    BY MR. POULTON:

5         Q.   I misspoke.  I believe you said that he's

6    working for an agency?

7              MS. BROTHERS:  Same objection.

8    BY MR. POULTON:

9         Q.   Did you hear that?

10        A.   I couldn't hear what they were saying.

11        Q.   Okay.  Let me just stop right there at 2:30 --

12   well, start at 2:27 to 2:32 and just ask you to pay

13   close attention to this interaction.  I'll turn it up as

14   loud as I can on my end.

15             (Video was played at this time.)

16   BY MR. POULTON:

17        Q.   Did you catch that back and forth you had with

18   the deputy when he said you got quite the guard dog

19   there?

20             MS. BROTHERS:  Same objection.

21        A.   I honestly couldn't hear what they were saying.

22   BY MR. POULTON:

23        Q.   You couldn't hearing yourself joking with the

24   deputy that he's ferocious?

25             MS. BROTHERS:  Same objection.

1    A.   No, I couldn't.  I can only hear parts of it.

2  BY MR. POULTON:

3    Q.   I'm going to rewind it a little bit for you so

4  you could try to hear it.  You're spelling your name,

5  and it sounds to me as though the deputy says you got,

6  you know, a guard there and you joke with him that the

7  dog is ferocious, obviously, being, what's the word, in

8  a joking manner, but let's watch it and you tell me if

9  you agree.

10       MS. BROTHERS:  Same objection.

11       (Video was played at this time.)

12  BY MR. POULTON:

13    Q.   Did you hear that?

14    A.   Yes.

15    Q.   Okay.  So you were joking with the deputy a

16  little bit at least in this incident at this particular

17  one --

18       MS. BROTHERS:  Same objection.

19  BY MR. POULTON:

20    Q.   -- about the dog; right?

21    A.   Okay.

22    Q.   I'm asking you if that's a fair

23  characterization of what we see here.

24    A.   Not every interaction is gonna be the same.

25  So, yeah, sure.

1                    (Video was played at this time.)

2    BY MR. POULTON:

3        Q.    Okay.  At the end there you asked them if they

4    had a card if Donnie needed to call, and they said, no,

5    just keep him out of trouble.  And what do you say at

6    the end?  No problem I think; right?

7                    MS. BROTHERS:  Same objection.

8    BY MR. POULTON:

9        Q.    Did you hear that right at the very end about

10   the five seconds to go mark?

11       A.    Yes.

12       Q.    Okay.  So that would be another example of a

13   cordial interaction; right?

14                   MS. BROTHERS:  Object to the vague phrasing.

15   BY MR. POULTON:

16       Q.    Do you know what I mean?

17       A.    Yes.

18       Q.    Would you agree that that was a pleasant,

19   courteous interaction of a couple of minutes, and you

20   were just relaying that as far as you knew Donnie was

21   out of trouble and had a job and you even asked if he

22   needed to contact somebody; fair?

23                   MS. BROTHERS:  Same objection.  The video

24       speaks for itself.

25       A.    I asked if he needed to speak with somebody

1   because they're at the house.  So why are they there?

2   BY MR. POULTON:

3       Q.    Okay.

4       A.    I am pretty sure we already told them he moved

5   out.

6       Q.    Did the deputies always come out the same day

7   of the week?

8       A.    No.

9       Q.    I mean, just looking at the paperwork, it

10  doesn't look like they came out like in any sort of like

11  a pattern, like there could be sometimes where it was a

12  few times a week and sometimes maybe once a month.  Is

13  that your recollection?

14          MS. BROTHERS:  Object to the word pattern.

15      A.    I don't know that it was a patter as to when

16  they came out.  They just sporadically showed up.

17  BY MR. POULTON:

18      Q.    Okay.  I mean, were there sometimes where it

19  was only a day or two apart?

20      A.    Yeah, there could be days, or there could be

21  days that they came every day or several times a day.

22      Q.    Could there be a week where they didn't come

23  out that week at all?

24      A.    There is a possibility, yes.

25      Q.    So all of the videos and all of the incidents

1    that we looked over -- and there are others on top of

2    that; right?

3        A.    Correct.

4        Q.    I only detected or I'm only aware of code

5    violations on three occasions, that being the numbers on

6    the mailbox, the cinder block and the hurricane debris

7    being the second one, and the chickens being the third.

8    Fair?

9        A.    To my knowledge, that's all I can recall.

10           MS. BROTHERS:   I'll object that the records

11       speak for themselves.

12           MR. POULTON:   Well, that's why I'm asking her

13       is were there any other code violation incidents or

14       episodes other than those three in the entire length

15       of her interactions with Pasco Sheriff's Office.

16           MS. BROTHERS:   Same objection.

17   BY MR. POULTON:

18       Q.    You can answer.

19       A.    Yes, as far as I -- as far as I can recall.

20       Q.    As far as you can recall, those three are the

21   only three?

22       A.    Correct.

23       Q.    And then there were just the two arrests,

24   right, the one out of the car for battery and then the

25   one with the door slamming incident; right?

```
 1        A.    Correct.

 2             MS. BROTHERS:  Same objection.

 3             MR. POULTON:  Tell you what.  Let's take a

 4      five-minute break, and I may be done.  I just want

 5      to kind of look over everything and make sure.  I

 6      told you it would be about an hour, so I'm right on

 7      time.  So if we could take a five-minute break and

 8      come back, and I think I'll finish up.  Okay?

 9             THE WITNESS:  Okay.

10             MR. POULTON:  Thanks.

11             (A break was taken at 2:55 p.m., and the

12      deposition resumed at 3:05 p.m.)

13             MR. POULTON:  Okay.  Probably the first time in

14      recorded history the questioner was dead on right an

15      hour.  I don't have anything further to ask you.

16      Your attorneys might want to follow up with you.  I

17      don't know.  Turn it over to them.

18                         CROSS EXAMINATION

19      BY MS. BROTHERS:

20        Q.    All right.  I just have a couple questions for

21      you, Tamm.

22        A.    Okay.

23        Q.    To return to the video that you were shown

24      where the deputy visited your home and you told him that

25      you were cooking dinner, in the top right-hand corner it
```

1    looked like it said 2 a.m., and if I were to represent

2    to you that that is 2 a.m. Greenwich Mean Time which

3    means about 10 p.m. Eastern, is that a reasonable time

4    for you to be cooking dinner?

5         A.    Yes.

6         Q.    Okay.  And when you told the -- did you -- in

7    that video did you tell the deputy that you didn't want

8    to talk right then?

9         A.    Yes.

10        Q.    What do you think the deputy should have done

11   at that point?

12             MR. POULTON:  Object to the form.  Object to

13        the form.  Go ahead.

14        A.    Should have probably listened and left.

15   BY MS. BROTHERS:

16        Q.    Okay.  And counsel characterized this visit and

17   a couple other visits as nonconfrontational.  Does an

18   interaction have to be confrontational in order for it

19   to violate your rights?

20             MR. POULTON:  Object.  Object to the form.  Go

21        ahead.

22        A.    No, it doesn't.

23             MS. BROTHERS:  Okay.  I don't have any other

24        questions.

25             MR. POULTON:  All right.  Thanks very much.

1    You want to explain to her -- I assume you're going

2    to read.

3         MS. BROTHERS:  Yes.

4         MR. POULTON:  Okay.  I want to order the

5    deposition.  I don't know if you caught the

6    conversation just before you came back, but Rob has

7    kept track -- my Rob has kept track of the exhibits

8    and is going to email out the bundle to the court

9    reporter, and we'll also copy you.

10        MS. BROTHERS:  For all the exhibits from this

11   deposition?

12        MR. POULTON:  All the exhibits from this

13   deposition, thirty whatever there are of them will

14   be in presumably Dropbox because it's got video.

15        MS. BROTHERS:  Right.  Okay.

16        MR. POULTON:  So you'll have it all in one

17   spot.

18        MS. BROTHERS:  Got it.

19        MR. POULTON:  All right?  Thanks.

20              *   *   *   *   *

21        (THEREUPON, THE TAKING OF THE DEPOSITION WAS

22   CONCLUDED AT 3:08 P.M.)

23              *   *   *   *   *

24              S T I P U L A T I O N

25      It was thereupon stipulated and agreed by and

1   between counsel present for the respective parties and

2   the deponent that the reading and signing of this

3   deposition is not waived.

4                    *   *   *   *   *   *

1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA

3    COUNTY OF PASCO

4         I, the undersigned authority, certify that

5    TAMMY HEILMAN appeared before me via Zoom and was

6    duly sworn on March 23, 2022.

7            WITNESS my hand and official seal this 10th

8    day of April, 2022.

9

10

11    _____
      Judy Anderson
12    Notary Public - State of Florida
      Commission No.:  GG 276821
13    My Commission Expires:  1-5-2023

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF PASCO

5

6         I, JUDY ANDERSON, Court Reporter, certify that I

7    was authorized to and did stenographically report the

8    foregoing deposition and that the transcript is a true

9    record of the testimony given by the witness.

10

11        I further certify that I am not a relative,

12   employee, attorney, or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties'

14   attorney or counsel connected with the action, nor am I

15   financially interested in the action.

16

17        Dated this 10th day of April, 2022.

18

19                            _Judy L. Anderson_

20                       Judy Anderson, Court Reporter

21

22

23

24

25

```
1   DALANEA TAYLOR; TAMMY
    HEILMAN; DARLENE DEEGAN;
2   and ROBERT A. JONES, III,

3     Plaintiffs,

4   vs.                      Case No.: 8:21-cv-00555-SDM-CPT

5   CHRIS NOCCO, in his
    official capacity as
6   Pasco County Sheriff,

7     Defendant.
    _____/
8

9              DEPONENT'S SIGNATURE PAGE

10

11         I HAVE READ THE FOREGOING TRANSCRIPT OF MY

12      DEPOSITION AND HEREBY SUBSCRIBE TO THE FOREGOING

13      DEPOSITION, SAID SUBSCRIPTION TO INCLUDE ANY

14      CORRECTIONS AND/OR AMENDMENTS HERETO.

15

16

17   _____
     Tammy Heilman
18

19   _____
     Date

20

21

22

23

24

25
```

ERRATA SHEET

PAGE        LINE            CORRECTION

1

2

3  _____    _____    _____

4  _____    _____    _____

5  _____    _____    _____

6  _____    _____    _____

7  _____    _____    _____

8  _____    _____    _____

9  _____    _____    _____

10  _____    _____    _____

11  _____    _____    _____

12  _____    _____    _____

13  _____    _____    _____

14  _____    _____    _____

15  _____    _____    _____

16  _____    _____    _____

17  _____    _____    _____

18  _____    _____    _____

19  _____    _____    _____

20  _____    _____    _____

21  _____    _____    _____

22  _____    _____    _____

23  _____    _____    _____

24  _____    _____    _____

25  _____    _____    _____

**A**

a.m 1:15 62:18 113:1,2
abide 11:24
abiding 102:1,11
able 47:10 49:3 101:3,8
102:10
access 87:24
accumulation 25:2
accurate 22:19 23:8 30:4
89:12
accurately 38:2
accusation 41:21 66:12
achieve 11:14
acknowledge 20:2 95:11
acknowledged 60:24
Act 47:12 53:2 71:21,24
Acted 47:7,18,19 54:1
71:13
acting 32:20 71:25
action 87:1 117:14,15
activity 57:4,12,17
adding 55:3,3
address 7:23 17:3 45:7
48:13 53:18 56:22
58:19 64:15 88:24
adjudicated 22:16 23:18
adjudicating 22:7
adjudication 17:6 25:7
27:5
adult 35:23 72:22
advance 42:23
advances 55:12
advise 60:1
advised 54:25 55:4 56:3
57:2 58:25 66:7 81:13
83:22,24 86:21,22,24
86:25
advises 45:14
Affidavit 4:6
afraid 30:17,21 38:12
age 34:11 50:23 78:7
agency 44:9 67:24,24
107:6
ages 8:17
ago 28:21 31:2,8,23
32:22 36:6 65:14
69:24 70:7,10
agree 76:10 93:20 97:19
99:25 101:12 108:9
109:18
agreed 13:20 50:4 55:17
114:25
ahead 10:9 40:24 42:18
61:21 67:6 71:20
75:21,22 79:20,22
113:13,21
alcohol 55:2,6
alerting 43:6
allegation 28:22 29:18
42:1,2 89:14
allegations 36:4
alleged 73:9 79:11
Allegedly 71:16
allowed 36:4 43:14 73:9
81:9 97:6
altercation 69:10,11
72:19,21 84:8
alternative 82:18
alternatively 51:1
ambulance 49:20
AMENDMENTS 118:14
amount 13:1
Anclote 32:5
and/or 40:19 118:14
Anderson 1:18,22
116:11 117:6,19

**ANSWER** / answer 7:1 33:5 102:6,7
102:18 105:3,9 111:18
answering 7:2
answers 7:6,7
Anthony 8:18,21,22 9:22
65:12,12,17,23 66:1
71:6 72:20,21 83:1,23
83:25 84:1,5,11,21
86:23,25 87:8 88:16
88:19 89:14,17,24
90:12,15 96:5
Anthony's 74:8
anxiety 48:18 49:7 72:15
anybody 9:21 47:7 88:12
95:21
anybody's 70:18
anytime 96:10
anyway 39:21
apart 110:19
apartment 102:22
apologize 54:14
apparently 77:16
appear 43:12
APPEARANCES 2:1
appeared 116:5
appears 17:5
applied 64:18
Appreciate 9:2
approached 38:10 98:5
approximately 68:24
April 38:22 72:18 88:18
88:23 116:8 117:17
area 60:3 89:25
argument 47:17 83:25
Arlington 2:7
arm 53:7
arrest 26:20 27:20 48:17
arrested 21:19 26:21
43:15 44:10 59:17
80:18 81:4 82:9 90:12
arresting 43:7
arrests 12:19 13:6,18
14:15 27:17 28:2,3
50:6 111:23
arrival 86:20
art 28:23 30:5 31:20
asked 15:18 24:4 30:1
47:13 50:12 52:23
69:15 99:19 103:8
109:3,21,25
asking 6:25 15:6 31:11
38:9 64:6 69:21,22
89:11 90:19 95:23
99:20 106:5 108:22
111:12
asleep 55:17
assaulting 39:10
assessed 55:5
assist 69:15
assistance 39:14
associate 36:16 41:5 58:4
62:14
associated 59:14 72:12
91:11
associating 36:17
association 16:25 82:10
assume 34:4 45:16 68:5
114:1
assumed 48:2
assuming 26:8 75:7
assumption 34:17
attaching 35:9
attack 48:1,19 49:7,22
72:6
attacked 88:20
attempted 53:5 56:25
84:1

**B**

B 4:1 5:1
back 7:15 19:25 29:19
30:10 31:9 41:7 42:23
44:7 46:12,21,23
50:15 51:2 55:5,17
61:24 62:13,21 63:3
63:23 64:6 72:4 74:20
76:23 79:17 88:3 90:9
91:5 97:1,4 99:4 100:7
100:18 104:24 107:17
112:8 114:6
backwards 54:14
backyard 18:17 20:3,6
97:2
bail 12:8 13:5
Baker 47:7,11,18,19 53:2
54:1 71:13,21,24
based 44:15 56:21
basically 13:16
battered 41:21
battering 82:11
battery 4:6 22:3 23:12,15
27:1,21,22 29:11
40:12 59:14 73:9 82:3
111:24
Bay 103:3
bear 11:11
beaten 79:12 80:25
beer 71:15
beginning 11:25 50:13
99:5
believe 14:14 17:24 18:1
20:9,13 21:2,3 23:24
25:15 26:10,25 33:12
35:9 42:6 46:10 63:17
64:2 71:8,12 73:10
84:24 91:12 95:10
96:13,16,17,20 97:12
106:11 107:5
believed 60:2
bell 37:25 38:23 53:7
106:23
benefit 16:4
best 7:1 82:21 98:12
beta 92:20
better 14:1 92:10 101:8
bicycle 26:11
big 66:12
bike 30:25
birth 33:24 51:21
bit 7:13 13:8 30:13 34:8
38:7 58:2,9 75:15 76:1
89:3 108:3,16
bitch 69:18 70:12
block 25:16,18,19 26:10
111:6
blood 10:13
blown 25:22
Blvd 2:11
body 5:8,9,10,11 87:15

91:10,25
bond 12:8 13:5
born 69:5
bothers 30:22
Boulevard 2:3
Box 1:23
break 7:11,15 28:11
42:19 58:2,10 61:21
62:18 84:21 86:13
87:9 89:22 90:22,22
91:3,6 112:4,7,11
break-ins 99:20
breathing 47:23 49:12
Brenden 60:2,4,17
brick 25:19
broad 76:7
Brock 58:22
broke 87:23
brother 10:15 51:13 68:9
68:11
brother's 10:14,17
Brothers 2:6 3:3 24:1,7
24:10,14,21 31:25
35:4 37:13 40:25 43:3
43:20,24 44:2,14,18
46:5,8,10,12,15,22,24
47:3 58:7 62:1,7,12,16
91:4 92:11,17 99:11
100:3,6,12,15 101:13
102:2,16 103:15
104:25 105:7,16 106:3
106:14 107:7,20,25
108:10,18 109:7,14,23
110:14 111:10,16
112:2,19 113:15,23
114:3,10,15,18
bullied 33:3
bump 103:14
bunch 11:8
bundle 114:8
burglaries 60:21 99:20
burglary 61:2
button 48:5

**C**

C 11:25 12:6
C.1 12:7
C.2 12:7
CAD 4:13,14,15,16,18
4:19,20,21,22 54:6,6
46:5 54:21 65:4 84:25
call 10:4 26:22 36:15
55:4 75:3 84:14 96:1
109:4
called 11:25 15:7,20 32:8
32:19 33:2 34:19
35:19,20,21 36:14,23
44:22 47:22,24 48:21
48:21,22 49:16 51:20
51:25 53:4 61:6 63:15
73:1 74:19 76:25
77:17 78:22 79:11
80:2 84:7 87:6,11
89:15
caller 45:10,14,19 51:17
54:23,25 55:2,4 83:13
83:22 86:12
calling 36:8,9 38:8 39:8
47:15 49:12 51:1
cam 5:8,9,10,11 87:15
91:10,25
cam- 87:25
camera 86:12
cameras 84:22 86:13,14
87:4,8,9 88:22,23
Camron 68:6,14,18,19
68:24 69:11,15,23

70:1,4,21 71:13,23,24
74:4,6,22,23,25 95:5
capacity 1:7 118:5
car 25:18 35:1 43:16
60:3,11,16,20,25 61:2
78:14 111:24
card 109:4
care 25:23 74:21 75:4
76:17 90:4
Caroline 2:6 43:22
case 1:6 14:2 22:15 23:9
41:3 50:12 72:8,9,16
76:2 87:16 118:4
cases 14:14 72:13 80:7
catch 94:4 107:17
caught 114:5
cause 49:16 75:3,20 76:5
78:2 96:20 101:18
caused 63:18
Celeste 16:17
Certificate 3:4,5 116:1
117:1
certify 116:4 117:6,11
Cgbrothers@ij.org 2:8
Chagrin 2:3
chalkboard 29:20 30:3
chance 50:14 82:14
characterization 108:23
characterized 113:16
charge 17:3,9 23:12
81:20,22,23
charged 21:22 23:13
26:25 42:15 61:1
charges 23:15,19 82:1
chat 92:12
check 56:11,24 57:9
58:22 60:9 65:6 76:5
97:5
checking 101:24
cheeks 76:9
chicken 92:3,23 97:5
chickens 4:5 5:8 18:17
20:1,3,5,10,22 21:10
27:19 92:1 95:11 97:6
111:7
child 31:9 57:9 67:12
71:3,10 73:10 74:13
75:7 76:13 80:22
child's 25:18 26:11
children 8:2,7 9:3 71:7
73:8,17,18 75:5,23
choice 82:5
choppy 94:8
chores 69:15
CHRIS 1:7 118:5
chronological 25:1
cinder 25:16,18,19 26:10
111:6
circumstances 40:5
citation 4:4,5,7 14:14,20
16:10,12,12 17:15
18:10,17 19:12,14,21
19:25 20:1 21:9 24:25
25:2,3 26:1,9 92:1
95:17 96:19,23 97:15
citations 12:17 27:17,18
96:12 97:13,17
cited 97:3
City 1:23
claim 13:10
claimed 50:12 55:12
claiming 49:25 50:1,5
72:8,9,15
clarification 30:1 52:23
103:8
clarify 12:24
class 28:23 30:5 31:20

classroom 29:19
clear 14:1 15:12 25:25 49:3 60:19
close 10:9 55:8 107:13
closer 49:13 92:10
Co-counsel 2:9
code 12:16 13:4,17 14:14 21:10 24:17,25 27:17 27:18,24 50:6 72:11 96:3 111:4,13
collective 93:5
college 100:20 102:14
come 7:15 17:10 18:8 20:15 24:16 25:14 30:20 49:1 50:15 54:2 55:5,17 62:13,23 74:20,22 78:8 94:13 101:20 110:6,22 112:8
comes 9:25 10:21 31:16
coming 31:18 56:5,5,5,5 57:9 63:23 76:4 93:14 96:10 99:18 105:10
comment 72:6
Commission 116:12,13
commit 100:1 101:17,21 102:14
committing 99:19
communicated 40:6
compensation 12:16
complain 83:1 95:21
complaint 4:6,8 27:11 33:9 95:25
compliance 17:10 18:9 20:15 25:15
composite 19:9,10,11,17 19:19,21 21:9,13,17 22:11,12 23:24 25:6 25:11 26:3 27:12,13
Computation 12:1
computer 92:2
concern 73:8
concerned 39:9 78:24
conclude 50:16
CONCLUDED 114:22
condition 81:1
condolences 9:18
condom 28:23 29:12,12 31:7 35:8
Condom's 39:6
conducted 98:8
confrontation 41:18 79:24 89:16
confrontational 97:20,23 104:21 113:18
confrontations 41:19
confronted 78:16
confused 19:7 89:6
confusion 62:9
connected 117:14
connection 19:14 61:13 61:16
consider 34:22
considered 20:11
constraints 7:17
contact 56:25 57:1 58:24 81:10 83:24,25 86:20 109:22
contacted 33:10,13,15 34:5,18 36:3 43:14 53:25 82:25
contained 57:21
containers 55:2,6
contest 17:7 20:17
conversation 65:17,23 70:20 114:6
conversations 60:23
conveyed 30:20

convicted 81:18,20,21
Cook@debevoisepoult... 2:14
cooking 104:11,12 112:25 113:4
cool 86:25
cooperative 54:8
copy 24:18 92:13 114:9
cordial 98:1 101:10 104:24 109:13
corner 92:18,24 112:25
Corporal 16:17 39:16 58:22
correct 8:6,14 9:4,11 10:20 11:5 13:6,24 20:12 21:4 23:19 26:8 32:17 42:1 50:2,6 51:18 59:12,13 66:25 67:1,18 68:5,10,13 71:4 72:13,14,16,17 79:6,19 82:12,21 83:17,20,21 85:6 87:22 88:10 91:20 93:21 95:13 97:21 102:11 104:14,22 111:3,22 112:1
CORRECTION 119:2
CORRECTIONS 118:14
correctly 96:8
correlates 95:9
costs 12:9,19 13:6,17 20:16,19 25:9 72:11
counsel 2:5,14 37:8 61:22 62:23 102:6 113:16 115:1 117:12 117:14
counties 97:9
county 1:8 5:8 17:1 19:13 20:14 43:6,16 53:3 54:2 63:23 87:18 92:3,22 97:10 102:20 102:24 116:3 117:4 118:6
couple 11:7 12:15 18:16 49:17 98:11 106:10 109:19 112:20 113:17
court 1:1,18,22 7:4 12:19 13:6 14:10,22 15:1,5 15:15,17 16:1,4,21 17:6,8,22 18:11,20,21 19:7,10,13,16,23 20:14,19,19,22 21:7 21:12 22:7 23:11 24:22 25:7,9,25 26:10 27:10 29:1,3 30:1 37:18 38:18 44:12 45:2 48:8 52:11,13,23 53:13 58:12,13 64:10 73:22 77:9 83:9 85:7 85:12,15,17,20 86:3,4 86:7 91:17,18,21 92:6 92:25 94:7,9 95:20,24 97:8 98:13,18 99:2,9 103:8,9,11,20 114:8 117:6,19
courteous 109:19
crash 78:14
crazy 51:14,21
cried 30:21
crime 88:25 96:25 97:3 100:2 101:18,21 102:14
criminal 22:15 23:9 57:3 57:12,17 72:13 80:7
Cross 3:3 112:18
crosstalk 103:7

curfew 55:6 101:25 102:1,11
curious 73:16
currently 7:21,25 8:13 8:16 9:10,22 59:1,3,11 68:11
cusp 102:15
custody 68:17,18
cut 47:16
cutting 94:2

D

D 3:1
D-O-R-E-N-D-A 10:7
D-O-R-I-N-D-A 10:8
Dade 1:23
DALANEA 1:3 118:1
damage 13:2 72:9
damages 12:1,3,9,13 13:1,2,9,12,14,24 14:2 50:1,9,12 72:5,8,10,15
Dander 85:1
Daniel 29:12
DARLENE 1:3 118:1
date 1:14 14:18 26:1,2 33:24 46:5,24 47:20 51:21 64:14 66:22 68:2,5 70:19 85:12 98:12 118:19
dated 17:2 19:12,14 26:17,20 27:7 29:8 37:17 38:22 45:6 48:12 53:17 54:21 56:17,22 58:18 65:4 74:2 77:11 84:25 85:22 88:23 103:23,24 105:18 117:17
daughter 9:8 32:9,12,15 32:20 33:3 34:3 36:4 36:12,25 51:18 79:16 79:23 90:5
daughter's 33:20
Davidson 38:23 39:5
day 26:14 50:16 63:23 96:19,21,23 97:11,16 110:6,19,21,21 116:8 117:17
days 17:10 18:16 20:16 30:17,21 49:5 51:24 96:9,21 97:4 110:20 110:21
dead 112:14
deal 43:2 75:14
Debevoise 2:11
debris 25:3 27:20 111:6
December 27:7 40:10,10 40:14 41:16 84:19,20 84:25
decided 97:14
DEEGAN 1:3 118:1
Defendant 1:9 2:14 118:7
definitely 9:1 46:21
definition 60:20
degree 27:4
delivery 26:15
demanded 65:1
demeanor 104:21
demonstrate 35:17
denied 17:5 20:15 25:7
departed 84:1
Department 78:23
depended 98:5
depends 98:2
deponent 115:2
Deponent's 3:5 118:9
deposition 1:12 6:20

16:21 62:6,19 91:7 112:12 114:5,11,13,21 115:3 117:8 118:12,13
deputies 20:10 43:6,14 55:10,15 65:17,23 67:13 73:10,11 76:25 87:18 89:14 92:4 95:15,16 97:22 100:1 100:18 101:17 103:13 104:21 106:12 110:6
deputy 16:13 31:15,18 40:1,2 42:4 53:18 54:7 55:25 58:23 65:11 69:14,23 89:19 90:2 92:9 106:2 107:18,24 108:5,15 112:24 113:7 113:10
designated 11:16 16:22 21:13 22:12 25:11 27:13 29:5 37:19 38:19 40:15 45:3 48:9 51:8 52:15 53:14 54:18 55:21 56:14 58:15 64:11 65:8 66:18 73:24 77:13 83:10 85:23 86:8 89:4 91:22 98:21 103:21 105:21
details 36:1 49:25 71:1 72:23
detected 111:4
diagnosed 49:21
different 11:8 13:9 14:14 46:24 61:13 67:21 76:7
differently 57:14
dinner 104:11,12 112:25 113:4
Direct 3:3 6:6
disagree 57:21 68:1
Disclosure 11:23 19:20
Disclosures 4:3
disconnected 69:16
discussed 42:8
discussion 14:8 31:15 35:12
dishes 69:16
dispatcher's 46:2
disposition 25:5
dispute 77:1
distinguish 76:3
DISTRICT 1:1,1
disturbance 51:12,13
diversion 72:22
DIVISION 1:2
DJJ 44:12
document 13:13 15:20 15:22 17:14 38:14 41:1 57:13 64:18
documentation 13:10 35:5 44:15
documents 14:11,23 15:7 19:2,4 22:22 24:2,22 27:16
dog 107:18 108:7,20
doing 18:7,9 28:11,12 50:9 60:9,11,13 71:17 81:22,25 107:1
dollar 12:25 13:2 72:10
dollars 21:1
domestic 51:13 59:18 64:1,15,16 88:25
Donald 9:5
Donnie 9:3,4,6,7,9 28:16 28:17 29:18,23 30:7 30:10,15,17,21,24 31:1,6,17,20 33:9

35:22 39:10 40:12 41:21 42:4,15 43:6,14 44:21 45:10 47:16,22 50:20,21 51:20,25 53:3,4 55:13,16,20 56:7,11 58:24 60:1,16 60:23 63:6,21,25 64:16,22 65:1,24 71:6 77:1 79:3,11 80:10 81:16 96:5,14 99:16 99:17 103:13 106:12 106:19 109:4,20
Donnie's 30:22 55:12 56:2 59:11 74:8,9 80:7
door 26:22 27:23 94:14 94:20 99:18 104:5 106:1 111:25
Dora 10:2
Dorinda 10:6,12,21 11:2
double 100:18
dovetails 44:7
Drive 7:24 8:1 29:22 31:17 45:8 48:13 53:19 56:23 64:15 65:5 66:24 83:19 85:3
driving 39:17 49:19
Dropbox 114:14
drove 104:20
duly 6:2 116:6

E

E 2:2 3:1 4:1 5:1
earlier 46:18 50:4 62:2 104:19
ease 86:2
Eastern 113:3
Edward 10:18 11:2,3
eight 82:1 104:13
either 24:2 27:17 32:2 35:8 39:7 40:8 63:10 74:13 76:2 81:21,23 103:2
elaborate 60:6
elementary 32:4
eleven 45:1 69:6,7
email 41:5 61:23 62:14 114:8
embarrassing 75:20 76:1
emergency 48:3
Emily 28:23 29:12,18 30:5,9,13,16,20,22,24 30:25 31:7,15 35:8 39:1,6
emotional 12:10 13:12 13:15,23 14:2 72:16
empathetic 46:17
employee 117:12,13
EMS 47:22
encourage 101:20 102:23
encouraging 100:1 101:17 102:13,19,21 90:6
ends 17:14 82:10
enforcement 12:16 22:5 27:1,21,23 63:16 74:13 76:4 81:10
engaged 60:25 89:24
entered 17:1 27:4
entire 111:14
episode 31:20
episodes 111:14
Errata 3:6 119:1
especially 6:24 101:18
ESQ 2:6
ESQUIRE 2:2,10,10

essence 82:15
event 46:14 49:12 58:18
events 41:17 82:8
eventually 21:16
everybody 67:16 79:5,21
  89:15 99:8
exactly 30:2 63:20 70:15
Examination 3:3,3 6:6
  112:18
examined 6:3
example 25:16 35:20
  104:23 109:12
Excuse 78:19
exhibit 11:16,19 14:5
  16:21,22 18:19 19:3,5
  19:11,16,20,20,21
  21:9,13,17 22:11,12
  23:24 25:6,11 26:3
  27:12,13 28:25 29:5
  35:9 37:15,19 38:17
  38:19 40:13,15 45:1,3
  48:6,7,9 51:8 52:11,15
  53:11,14 54:16,18
  56:14 58:11,15 64:8
  64:11 65:8 66:17,18
  73:21,24 77:7,13 83:8
  83:10 84:24 85:21,23
  86:8 89:4 91:16,22
  98:19,20,21 103:19,21
  105:21
exhibits 16:6 19:2 114:7
  114:10,12
expanding 50:8
expenses 50:5 72:12
Expires 116:13
explain 13:8 53:22 114:1
explained 30:16 54:8
explanation 82:17
extent 12:13
extra 58:5
Extraction 5:8 92:2,22

**F**

face 52:1 89:18
facing 82:20
fact 44:6 97:7 105:10,12
facts 21:18
factually 89:12
Faint 100:14
fair 17:21 18:14 39:8
  46:19 52:22 78:24
  79:5 98:9,10 101:18
  104:24 108:22 109:22
  111:8
false 22:4 23:11,13
familiar 6:23 34:7 36:18
  54:5 77:3
family 10:12
far 23:15 76:20 99:19
  109:20 111:19,19,20
fat 69:18 70:12
father 29:12
fault 85:15
fbit 6:12
February 32:18 33:7
  36:10 43:5
fee 17:8,8,8 20:18,18,19
feeling 30:18
fees 12:18,19 13:5
felony 27:5
female 28:17 49:6 106:2
fence 25:21 97:2
ferocious 107:24 108:7
fend 78:23 79:16
field 56:23
fifteen 58:1,3
fifty-six 21:1

fight 38:11 71:15 79:2
  89:24
file 95:25
filing 17:8 20:18
filled 11:24
financial 13:2 72:9
financially 117:15
find 11:10 48:4 71:19
fine 15:4,25 17:7,11 18:5
  18:6 19:6 20:16 23:5
  24:8 25:8 31:22,24
  100:13
fines 12:16 13:3 26:16
finish 6:25 7:2,15 63:2
  70:9 112:8
finished 91:1
fire 47:23 48:24 78:18
first 4:3 6:2,14,16,18
  7:21 8:20 14:19 16:10
  20:21 22:20 29:15
  31:5 40:23 54:7 55:20
  56:6,10,18 65:16 69:9
  69:22 71:10 72:4
  91:15 101:11 103:14
  112:13
five 8:12 20:2,5 26:4,5
  42:21 62:5 97:23
  109:10
five-minute 112:4,7
FL 1:23 2:12
flagged 39:11,18,19
Florida 1:1,19 7:24 78:1
  78:1 116:2,12 117:3
focused 23:12
folder 19:2,4
folders 11:8 19:1
follow 112:16
following 47:17
follows 6:4
foot 86:25
footage 5:8,9,10,11
  87:16,24 91:25
forced 64:21,23
foregoing 117:8 118:11
  118:12
forget 72:3
form 21:9 27:11 102:7
  113:12,13,20
forth 38:3 51:2 104:24
  107:17
forward 63:3 88:5 104:8
found 61:3
four 15:23 18:20 42:21
  62:5 81:24 93:3 97:23
frankly 24:16
freaked 74:17,18
friction 87:13
friend 9:25 34:12,14,24
  75:16,17 78:3,4,4,4
friend's 34:15,18,25
friends 33:13 36:12 55:1
  78:3,10,10,12
front 27:20 30:8 104:5
  106:1
fuck 69:18,18 70:12,12
fucking 69:19 70:13 95:3
full 6:14
fully 7:8 22:25
fund 17:9
further 30:13 86:24 87:1
  112:15 117:11
future 12:9

**G**

gang 38:12 39:4
Garmon 53:18 77:2
gas 78:17

gather 58:4
getting 17:15 50:10
  78:24,25 94:7
GG 116:12
girl 39:2 74:18 94:19
girlfriend 10:14 44:23,24
  46:3 47:18 59:3,6,10
  59:19 74:7,8 78:22
  88:16
girls 86:23
gist 38:4
give 8:16 14:11 45:20
  50:14 58:5 66:14
  96:11
given 16:13 95:16 117:9
giving 22:4 23:10,13
  43:8 82:6,23 84:6
  96:19
glad 9:2 54:12
Glebe 2:7
go 7:13 10:9 12:1 14:12
  23:2 24:5,25 30:6,19
  35:11 40:24 42:10,18
  42:23 43:9 46:23
  49:19 57:25 58:6
  61:21,24 62:24 63:3
  64:6 67:6 71:20 72:4
  75:21,22,23 77:16
  79:20,21 81:12 82:18
  88:25 93:9 95:25 99:4
  100:7 109:10 113:13
  113:20
goes 17:14 20:14
going 11:15 14:23 15:13
  17:22 19:3,8,9,11,17
  19:25 24:7 28:8,14
  31:8 34:3 41:2,4 42:17
  48:6 49:5 51:14,21
  53:11 56:4,19 60:6,16
  63:2 67:10 76:8 79:17
  86:5 90:23,24 91:12
  91:15 92:6,21 93:2,3
  93:18,18 95:24 97:3,8
  98:14 99:21 100:10,19
  103:18 105:17 108:3
  114:1,8
gonna 14:18 33:6 42:7,7
  42:8 66:2 78:17,17
  81:21,25,25 108:24
good 6:8,9 7:20 14:5
  15:8 16:7 28:14 61:19
  74:25 75:13 91:4
gotten 26:12
government 17:9
GPS 45:16
GRACE 2:6
Great 24:21 62:12
Greenwich 113:2
ground 35:23,24
group 61:5
growing 32:25 47:12
guard 107:18 108:6
guess 9:24 16:20 18:20
  25:6 39:2 40:13 47:11
  50:7 57:20 63:5 64:6
  64:24 80:19 81:8,13
  82:15 88:23 96:13,23
guilt 27:5
guilty 22:2,8,16,16 23:18
  23:18 27:4 82:3,11

**H**

H 4:1 5:1
H-E-I-L-M-A-N 6:19
half 93:3
hallway 31:1
hand 116:7

hands 15:23
Hang 38:16 66:15 91:13
  91:14
happen 31:12 64:19 70:1
  80:3,4 82:18
happened 14:13,15 30:15
  33:16 38:3 39:23,25
  67:15 74:17 75:17
  78:14 80:3 82:16
  84:13 97:11
happening 43:25 55:23
  88:4
happens 39:22 49:7
harassed 98:6
Harbor 53:5
hard 15:23 103:5
harm 12:10
Hatfield 40:2,7
head 7:7 59:5
hear 6:10 43:22 63:11
  92:10 93:12 99:10
  100:3,4,12 101:1,3,8
  101:24 102:4,10 103:9
  106:17,25 107:9,10,21
  108:1,4,13 109:9
heard 12:23 23:11 61:8
  61:12 63:12 73:5 84:4
  101:16
hearing 18:11 20:23
  26:10 107:23
heart 48:1,18 49:22 72:6
Heidi 40:19
Heights 2:3
Heilman 1:3,12 6:1,8,18
  6:20 10:19 12:14
  15:10 35:18 57:1
  62:21 68:6 74:4 86:17
  86:21 91:9 101:19
  116:5 118:1,17
Heilman's 34:3
hell 74:17
help 16:5 17:13 45:21
  72:1,2
helps 77:6 91:1
HERETO 118:14
Hey 19:1
high 32:5
history 112:14
hit 48:5 99:4
HOLBORN 2:10 19:1
  26:5 37:15 48:6 51:7
  54:17 56:13 85:4,6,8
  85:10,25 86:6
Holborn@debevoisepo...
  2:13
holding 55:13
Holiday 7:22,24
home 30:7 31:18 34:10
  35:20 38:13 39:3
  47:24 52:6 53:6 55:10
  63:9,21 86:17 87:4
  112:24
homeowner 86:21
honest 11:9 74:17
honestly 18:4 39:25
  107:21
hopefully 44:11
hoping 60:16
hopping 60:3,11,20,25
  61:2
hosp- 48:20
hospital 33:12,14 36:24
  49:2,5,15,18,19
hostile 54:7
hour 7:14 58:3 90:23
  91:1 112:6,15
house 34:15,18,25 36:17

37:3 57:18 66:9 68:14
68:19,25 69:20 70:14
74:25 78:17,18 79:4,5
84:21 86:13,15 87:5,9
87:20 90:6 93:20 97:1
101:20 106:13,19
110:1
hundred 20:25 34:9
  96:16
hurricane 25:4 111:6
husband 8:2 20:10 21:2
  63:6 82:25 87:11 90:6
  93:25 94:4
husband's 8:3

**I**

                           8:25
ID 46:14
identification 11:17
  16:23 21:14 22:13
  25:12 27:14 29:6
  37:20 38:20 40:16
  45:4 48:10 51:9 52:16
  53:15 54:19 56:15
  58:16 64:12 65:9
  66:19 73:25 77:14
  83:11 85:24 86:9 89:5
  91:23 98:22 103:22
  105:22
II 2:10
III 1:4 118:2
implemented 97:9
important 6:25 7:7 50:10
incarcerated 9:10 59:12
incident 4:9,10,11,12,17
  4:23,24 5:3,5,7 21:5,6
  21:18 22:2 26:22
  27:22,23 28:15,19
  29:8,25 30:4 31:7 32:1
  34:20 35:15,21,25
  36:2 37:2,17 38:22
  39:10,15 40:7,13,21
  42:12 44:16 47:9,21
  53:20,24 54:13 55:10
  56:21 63:5,16,22,22
  66:6,23,24 67:25
  68:25 69:15 70:24
  71:14 72:18,24 74:2
  77:11,24 79:14 80:8
  82:24 84:19 88:18
  89:13 90:13 92:5
  108:16 111:25
incidents 28:8 35:6 46:20
  76:3,5 87:16 88:10
  110:25 111:13
INCLUDE 118:13
including 89:16
income 12:9
incorrect 83:18
Indecipherable 103:7
indicate 43:13
indicated 13:11,13 28:15
  106:12
indicates 12:8 13:13
  16:12 20:2 22:2 30:4
  67:23
indication 32:7,18 33:1,8
  34:2 36:20 46:1 79:1
Influence 34:14
information 22:4 23:11
  23:14 43:9 47:25
  57:21 60:10 65:21
  83:17 84:7,12 87:23
  88:8 96:11
informed 30:13
initial 4:3 11:22 67:12
initially 13:10 61:1

injunction 64:1,17
inside 86:14
installed 84:22
Institute 2:2,6
interaction 69:12 71:3
  101:11 104:20 107:13
  108:24 109:13,19
  113:18
interactions 76:8 87:18
  88:13 91:11 111:15
intercourse 36:5
interest 47:12 76:1 82:21
interested 117:15
interim 26:13
interpretation 64:25
interrupt 75:21 79:21
interview 29:20 43:14
  89:15
interviewed 63:22 67:16
investigate 67:13
investigating 96:25
Investigation 74:14
Investigations 67:13
  76:13
Investigative 71:4,11
invite 86:23
involved 57:3,11,17 60:2
  61:4 71:11 78:14
involving 33:9
isolate 38:6
issuance 97:12
issue 29:11
issued 18:11 97:17
issues 33:3 48:18
items 16:5
  ▮▮▮ 8:19,25 9:22
  74:5,6

**J**

jail 80:19,24
January 26:2,17
Jasmine 59:1,3,21,23,24
Jeff 54:23 65:13,24
  72:19 83:16 85:1
Jeff's 72:20
Jeffrey 8:4 9:21 89:7,24
Jeremy 40:18 41:19,22
  42:1
job 102:14,21 109:21
JOHNSON 2:2 15:12,24
  16:7
joke 108:6
joking 98:1 107:23 108:8
  108:15
Jones 1:4 12:18 118:2
Joseph 83:14,15,24
judge 17:1,22 81:13
judge's 81:15
judgment 4:4,5,6,7,8
  17:1 18:23,24 19:13
  19:22 20:13,14 21:10
  22:1,19 24:2 26:2,17
  27:12
Judy 1:18 92:14 116:11
  117:6,19
Judy@andersoncourtr...
  1:24
July 47:15 53:3,17 76:24
jumped 39:2
June 28:15 29:8 31:19
  44:21 45:6 46:7,25
  47:1 58:18 73:4,7 74:3
  77:11
junior 100:19
junk 25:2
Justice 2:2,6
juvenile 32:8 33:3 34:3,6

36:4 44:6,8 51:12 74:3
juveniles 36:5,11 55:1,5
  61:5

**K**

keep 14:24 15:6 16:5
  28:14 79:21 93:18
  105:10 109:5
kept 56:5 114:7,7
key 37:3
kicked 30:24 31:1 65:13
  65:24
kids 32:24 49:16 87:12
kill 45:15 53:5 66:8
  69:19 70:13
kind 12:1 14:13 24:16
  29:24 34:8 51:1 63:2
  76:7,17 94:2 100:6
  112:5
kinds 78:18
kitchen/dining 89:25
knew 78:2,6 109:20
knock 30:25
know 7:11,18 9:14 10:24
  16:3 18:7,12,13 19:17
  22:25 23:4 24:17
  25:19 32:4,23 33:15
  34:13,20,23 35:18
  36:10 37:11,22 38:1
  38:24 39:7,25 42:14
  43:1 45:21,23,24,25
  46:2 47:20 48:3 49:4
  50:25 52:21,22,25
  55:20,22,23 61:4,18
  62:23,25 63:15,18,25
  64:3,5 66:11 67:3,17
  70:17 71:2 73:1 74:14
  74:18 75:6,13 76:6,12
  76:16,18,19,20 77:19
  78:9,11 80:6,13,16
  81:18 83:15 84:18
  87:6,15 89:2 90:12,15
  90:18,19 91:19 92:15
  92:16 96:2,3,7,17 99:3
  100:9,20 108:6 109:16
  110:15 112:17 114:5
knowing 96:17
knowledge 61:7 63:8
  71:8 88:15 111:9
knows 60:13

**L**

L 114:24
L-A-V-A-S 10:10,11
labeled 56:7,11
lack 17:3
lady 55:11 59:14
Large 1:19
late 68:25
Lavas 10:10,11,12
law 12:14 22:4 27:1,21
  27:22 63:16 74:13
  76:4 81:10 97:6
lawsuit 11:7,12 12:4
lawyer 61:14
lawyers 75:13
learned 56:6
leave 85:19 102:23
leaves 10:23
led 59:15 64:3 72:21
left 34:12 53:6 55:3,3
  63:3 74:25 86:25 95:4
  113:14
left-hand 92:24
legal 12:18 13:5
length 111:14

LEO 23:12
let's 8:11 14:19 16:16
  18:25 24:24 35:11
  36:21 38:15 48:4
  61:21 62:13 64:14
  73:20 76:24 83:4,22
  85:18,18 86:11 88:1,1
  91:11,13 98:11,25,25
  101:11 108:8 112:3
likes 17:23
line 45:19 49:6,6 65:11
  119:2
list 12:8
listed 12:7 29:13 35:14
  45:10 56:25 58:21
  71:20 74:3,4 90:16
listen 22:22 100:17,23
listened 113:14
little 7:13 13:8 30:13
  34:8 38:6 58:2,5,9
  66:21 70:6,10 74:18
  89:6 94:2,8,19 103:5
  103:14 108:3,16
live 9:22 10:15,21 11:2
  78:1,1 81:6,7
lived 74:7
lives 7:25 10:23 11:3
  68:11
living 8:8,10 20:3 68:14
  68:19,24 69:1
local 17:9
locate 28:7 66:15
location 45:16,17 53:20
  53:24 54:22 66:24
  84:2
long 31:8,9 32:22 68:18
  68:24 69:24 93:3
  98:24 103:25
longer 58:2,10 82:20
  87:21 88:8
look 12:5,7 15:20 16:11
  17:23 20:8 22:21,22
  23:3,21 24:6 36:22,22
  41:8 48:16 56:19
  62:24 64:6 86:11
  87:10 97:2,2 98:11
  110:10 112:5
looked 111:1 113:1
looking 11:14 18:24
  19:18 22:23 44:4
  45:18 55:11 73:15
  110:9
looks 12:15 13:16 20:25
  22:8 39:5 42:21 48:21
  58:22 60:8 67:11
  89:15 104:6
lost 12:9 82:19
lot 10:23 14:23 17:13
  32:24 67:10 104:19
loud 100:11 107:14
love-hate 80:1
loved 79:25
low 100:6
lower 92:23
lowering 81:22
lunch 41:5 58:10
lunchtime 7:14
Lynne 57:1

**M**

M-A-C-H-M-E-R 40:19
mace 52:2
Machmer 40:19
mad 45:14
Madam 16:21 18:20 21:7
  25:6,25 27:10 37:17
  48:7 58:12 85:15

91:18 94:7 98:13
mailbox 4:4 16:14,15
  17:16,18 18:10,12,25
  96:9,22,22 111:6
making 32:9 33:4 44:14
  44:23 46:17,18 56:1
  101:25 102:11
male 35:23 38:9
man 41:22 95:3
manner 98:9 108:8
March 1:14 16:11 18:15
  19:3,4,13,25 63:7 66:7
  66:23 67:18,24,25
  68:25 95:10 97:12,16
  116:6
Marcus 77:2,25 78:3,13
  78:15,19,24
marijuana 72:20
mark 109:10
marked 11:16 16:22
  21:14 22:13 25:12
  27:14 29:5 37:19
  38:19 40:15 45:3 48:9
  51:8 52:15 53:14
  54:18 56:14 58:15
  64:11 65:8 66:18
  73:24 77:13 83:10
  85:23 86:8 89:4 91:22
  98:21 103:21 105:21
marks 53:6
Martinez 52:18,25
match 15:22
material 62:15
materials 24:18
matter 97:7 103:10
McDougall 8:18 9:4
  28:16,17 29:23 30:7
  33:9 45:10 47:16
  58:25 63:25 64:16
  65:1,12,12,17,24
  72:20 80:10 83:23
  84:11
mean 18:12 23:8 24:16
  31:9 36:19 38:4 48:2
  52:21 56:19 57:8,17
  57:23 64:23 67:20,22
  70:1,22,23,24 75:21
  79:20 81:4 82:13 84:6
  87:10 89:11 100:4
  101:16,21 106:17
  109:16 110:9,18 113:2
meaning 83:1 84:11
means 22:22 45:16 113:3
meant 87:14 104:9
mechanism 6:24
Medfleet 49:13
medical 48:3 50:10 72:20
memory 28:18 33:19
  34:8 43:17 57:5 67:20
  73:16 87:2 89:13
mentioned 26:11 104:19
met 29:22 66:1 76:15
  89:8
MIDDLE 1:1
mind 14:22,25
mine 75:16 78:4
minute 11:10 15:5 37:9
  93:19,19 100:10 104:4
minutes 41:7 58:1,3,6,7
  93:3 98:24 103:25
  105:19 109:19
misdemeanors 22:5
missed 85:9,14
missing 14:16 27:19 34:6
  34:22
misspelled 9:1 54:24
misspoke 107:5

mistake 39:13
mom 76:15
month 31:2 65:14,25
  110:12
months 22:9,17 27:6
  69:2 101:2
morning 6:8,9 58:22
  104:12,13
mother 29:23 55:4
mouth 70:18
move 64:22 65:1 72:3
  102:19 103:2 104:8
  106:10
moved 21:8 78:5 90:9,9
  106:13,19 110:4
moving 52:10 63:3 65:19
  71:18 90:6

**N**

N 2:7 3:1 114:24
name 6:15 8:3 10:2,5,17
  17:1 30:23 33:20
  38:24 45:18,20 46:1,2
  46:2 61:6,8 77:3 83:23
  92:12 108:4
named 28:23 46:3 52:18
  52:24 77:2 88:16
names 8:20 40:18,22
narrative 41:15
nature 56:23
Nautica 74:5,6 77:16
  78:21 79:7,7 80:25
  81:2 82:3,11
neck 37:3
necklace 37:3
need 7:18 14:21,21 28:11
  40:22 61:24 75:5
  104:7
needed 21:8 71:25 72:2
  109:4,22,25
neighbor 52:18,24
neighbor's 96:24
neighborhood 39:18
nephew 66:8 68:7,8
  70:11 76:16
never 61:12
Nice 85:2
nighttime 101:22
NOCCO 1:7 118:5
nods 7:6
nominal 13:2 72:10
nonconfrontational
  113:17
nonverbal 7:5
nose 95:3
Notary 1:19 116:12
note 40:25 43:24 44:19
  54:6 56:24 84:10
  104:7
noted 20:17
notes 43:13,21 44:1,15
  45:13 54:25 56:21
  65:6 69:10 86:11
November 32:7 36:20
  37:24 51:11 98:15
number 58:24 65:3
  88:23 92:5 98:16
  103:24 105:17,18
numbers 16:14,15 17:16
  17:18 18:10,12,25
  27:19 92:16 96:9,22
  98:15 111:5

**O**

O 114:24
Oath 3:4 116:1

object 31:25 57:23
  101:13 104:25 105:7
  106:3 109:14 110:14
  111:10 113:12,12,20
  113:20
objecting 35:4 102:6
objection 102:2,16
  103:15 105:7,16
  106:14 107:7,20,25
  108:10,18 109:7,23
  111:16 112:2
obstructing 21:23 22:3
  23:16
obtained 64:19
obviously 44:12 72:1
  87:12,13 101:22 108:7
occasion 73:2
occasions 35:19 55:15
  111:5
occurred 21:6
occurring 67:25
October 25:1 26:1,9
  33:18 34:1 35:21 36:3
off-again 10:14
Off-the-record 14:8
  35:12
offender 55:21 56:2,8,11
  56:24 57:1 58:21 65:5
  76:4,9 90:16 96:4,14
offered 60:9
offering 82:23
Office 32:8,19 33:2,8,15
  34:5,19 35:22 36:3,9,9
  36:15,23 38:8 39:9,14
  40:6 43:6 44:22 47:16
  48:22,25 53:4 56:22
  65:4 73:2 79:10 82:25
  84:14 87:7,17 88:14
  95:22 111:15
officer 21:23 22:3 23:16
  27:1,21,23 39:17,20
officers 81:8 98:2
official 1:7 116:7 118:5
Oh 2:3 9:14 16:16 21:7
  22:21 25:4 39:1,19
  47:1 50:18,21 52:3
  61:17 63:15 73:5
  77:18 91:19 102:9
Ohio 78:5,6
okay 6:10,14,23 7:3,8,12
  7:15,16,20 8:3,23 9:7
  9:18 10:3,5,11,15,21
  11:1,6,14,22 12:4,12
  13:8,20,23 14:5,16,24
  15:5,6,24 17:13,18,21
  18:2,5,6,14,22 19:10
  19:16,23 20:5,13 21:3
  21:5,11,22 22:1,7,11
  22:19,21,25 23:1,6,7
  23:15,25 24:9,14,15
  24:24 26:3,6,16,20
  27:3,10 28:2,5,12,13
  28:14,22,25 29:15,23
  31:11,22 32:3 33:7,14
  33:18 34:1,19 35:3,16
  36:8,14 37:14 38:1,6
  38:22,25 40:1,4,10,24
  41:8,14,15 42:7,24
  44:2,18 45:23 46:8,11
  46:15,16,23 47:5,11
  47:15,21 48:16 49:3
  49:24 50:16,17 51:3
  51:11,24 52:8,22,22
  53:10,17,22 54:6,11
  54:12,13,21 55:8,4
  57:7,25 58:6,7,9,14
  59:2,17,24 60:1,15

61:4,8,11,18,24 62:7,8
  62:13,16 63:15,21,25
  64:14 65:15 66:16
  67:5,8,9,17 68:3,6,8,18
  69:3,6,9 70:16 71:3,13
  72:3 73:19 74:12 75:2
  75:9,21 76:6,12 77:4
  77:18,23 78:21 79:1,7
  80:24 82:2,6,24 83:7
  83:22 84:4,10,17 85:8
  85:14,18,20 86:4,7,20
  86:22 87:4,14 88:1,5
  88:16 89:21 90:2,12
  90:18,18,21 91:2,5,13
  91:15 92:15,25 93:5,6
  93:15 94:2,6,10,16,19
  94:24 95:2,6,14,21
  96:3,13 97:19 98:4,11
  98:25 99:10,12,18,25
  100:3,12,17,22 101:1
  101:10,16 102:10,13
  102:25 103:11,18,23
  104:15 105:12,17
  107:11 108:15,21
  109:3,12 110:3,18
  112:8,9,13,22 113:6
  113:16,23 114:4,15
old 28:20 31:9 69:2
older 32:15 33:19
on-again 10:14
once 54:7 110:12
one's 92:10
ones 8:10 41:6 62:4
ongoing 77:1 78:23
online 95:25
Oops 48:5
opened 11:8
opinion 104:19
option 82:4 96:2
order 14:19 18:8 25:1
  27:7 64:1 81:15 86:2
  98:12 113:18 114:4
ordering 17:22
Ordinance 58:9 92:3,22
organized 17:14 61:5
out-of-pocket 13:16 50:5
outcome 22:15 23:9 27:3
  52:8 76:12 80:6,16
  84:15
outline 14:12,13
outside 39:22
overdose 33:9

P

P 114:24
P.A 2:11
p.m 1:15 62:19 91:6,7
  112:11,12 113:3
  114:22
P.O 1:23
page 3:2,5 4:2 5:2 11:25
  11:25 12:2,25 51:4
  69:10 72:8 118:9
  119:2
paid 29:21
pain 13:12,15,23 14:2
  72:16
Palm 53:5
paperwork 110:9
Pardon 12:22
parent 74:19
parents 11:3,4 30:18
  68:12 74:19,22
parents' 35:1
Park 2:12
part 15:19 29:15 49:25
  50:1 64:5 76:2 92:3

97:24 101:25 102:4
part's 83:21
particular 11:1 12:3
  26:18 32:21 47:12
  64:18 73:15 79:3
  105:5,6 108:16
particularly 24:17
  105:14
parties 115:1 117:12
parties' 117:13
parts 108:1
party 39:7
Pasco 1:8 17:1 33:8
  40:11 55:15 60:3
  87:18 88:13 97:10,22
  111:15 116:3 117:4
  118:6
pass 9:16
passed 9:13 32:16
paste 92:13
patient 49:7
patter 110:15
pattern 110:11,14
pay 13:4 17:7,10,22 18:2
  20:25 25:8 26:16
  107:12
paying 17:25
people 51:14,22 74:4
percent 34:9 96:16
perfectly 18:5 31:22
person 52:25 61:13
  75:19,20
person's 38:24
personally 78:11
Pete 100:19
pets 20:11
phone 55:13 84:14
phrase 61:9
phrasing 109:14
physical 69:11 72:21
  83:25 84:8
physically 82:11 88:19
picked 26:14
picking 30:23
pickup 26:15
piece 25:19,21
piecemeal 24:17
Pinellas 43:5,16 44:11
  53:3,21,21 54:2 63:23
place 1:17 71:19
placed 22:8,16 27:6
plaintiff 11:13
plaintiffs 1:5 2:5,9 12:8
  12:13,15 118:3
Plaintiffs' 4:3
plan 7:13
play 93:2
played 93:7,10,16,22
  94:11,17,25 95:7 99:6
  99:13,23 100:24 101:6
  104:2,16 105:23 106:7
  107:3,15 108:11 109:1
playing 94:3
plea 27:4
plead 82:22
pleading 23:17 82:11
pleasant 109:18
please 8:17 11:11 46:13
  65:18 71:17 75:25
pled 22:2,16 82:3
plenty 97:25
plus 17:7 20:16 25:8
  72:10
point 7:10 18:13 24:19
  34:21 35:2,16 41:4
  44:9 46:17,18 49:2
  50:15 55:25 56:3,7,20

59:18 60:24 64:21,25
  70:24 77:20 79:8,10
  80:21 88:7 98:6,7,8
  106:12 113:11
pointed 63:7
pointing 76:2
police 78:22 80:2 81:5
  polite 98:1 104:24
poorly-worded 68:21
possession 55:2
possibility 110:24
possible 32:10,25 36:14
  36:19
possibly 55:1,1 60:13
posted 17:3
Poulton 2:10,11 3:3 6:7
  11:18 14:6,9,25 15:3,8
  15:9,16 16:2,8,9,20,24
  18:19,23 19:6,8,12,19
  19:24 21:7,15 22:14
  24:3,9,12,15,22,23
  25:13,25 26:6,7 27:10
  27:15 29:2,4,7 30:2
  31:4 32:3 35:7,13 37:6
  37:14,16,21 38:17,21
  40:17 41:2,11 42:17
  43:4,22 44:1,3,17,19
  44:20 45:5 46:7,9,11
  46:14,16,23 47:1,5,6
  48:7,11 51:5,10 52:12
  52:14,17 53:1,11,16
  54:16,20 56:16 57:25
  58:9,14,17 61:18 62:3
  62:8,13,17,20 64:8,13
  65:10 66:20 73:20,23
  74:1 77:10,15 83:8,12
  85:5,9,14,18,21 86:1
  86:10 89:10 90:21
  91:5,8,18,24 92:8,15
  92:18 93:1,8,11,17,23
  94:7,10,12,18 95:1,8
  98:13,20,23 99:3,7,10
  99:12,14,24 100:7,14
  100:16,25 101:7,15
  102:3,17 103:10,12,17
  103:23 104:3,17 105:2
  105:8,17,24 106:5,8
  106:15 107:4,8,16,22
  108:2,12,19 109:2,8
  109:15 110:2,17
  111:12,17 112:3,10,13
  113:12,20,25 114:4,12
  114:16,19
Poulton@debevoisepo...
  2:13
pour 78:17
pre-2016 41:3
pregnant 59:18 79:7
  80:21
preliminary 11:7
presence 43:15,15
present 42:5 51:14 65:22
  66:4 115:1
presumably 89:22
  114:14
pretty 66:12 97:20 110:4
Primrose 7:24 8:1 9:23
  29:22 31:16 45:8
  48:13 53:18 54:22
  56:23 64:15 65:5
  66:24 83:19 85:3
  88:24 93:20
principal 30:14
prior 46:20 65:25 68:25
  87:12 95:23 96:9,21
  96:21
prison 81:16

probably 16:16 32:10
  38:15 47:9,25 49:1,24
  50:22 60:10 69:7
  87:10 88:6 90:25
  92:11 94:3 97:24
  112:13 113:14
probation 22:8,17 27:6
  80:10,13,15,17 81:2,5
  81:8,11 82:9
problem 15:25 41:9 44:7
  105:5 109:6
problem/disturbance
  74:3
problematic 105:14
problems 49:12
proceed 44:12
PROCEEDINGS 1:12
produced 92:22
program 12:17,20 13:5
  55:22 72:22 96:15
progress 45:7 51:13
prolific 55:21 56:2,7,11
  56:24,25 58:21 65:5
  76:4,9 90:16 96:4,14
property 36:11 95:3
protected 75:12
Protective 67:12 71:3,11
  74:14 76:13
provided 62:22
PSO 55:4
Public 1:19 116:12
pull 24:6 28:10 40:12
  44:25 73:14
punched 28:16,17,23
  29:18 30:10 89:17
punished 32:20
purposes 15:2,14 75:14
push 41:24
pushed 35:23
put 15:13 16:13 18:13
  45:19 62:25 75:5,6
  83:5 88:22 92:11
putting 18:10

Q

question 6:25 7:2 57:20
  65:22 68:21 70:9
  102:7 106:10
questioner 112:14
questions 11:7 50:13
  72:4 90:25 93:5
  106:10 112:20 113:24
quick 14:6 23:22 35:11
  90:21 91:2 106:9
quite 28:21 75:20 89:3
  107:18
quote 12:17,17 30:5

R

rate 92:21
razor 47:17
reached 39:13
reaction 101:10
read 22:24 29:17,17,21
  29:24 37:9,25 40:22
  41:15,23 54:3 63:1
  65:6 66:21 71:16,17
  74:10 77:6,19 78:21
  89:1 114:2 118:11
reading 67:2 70:25 89:12
  103:3 115:2
ready 67:3 89:2
real 10:13 14:6 23:22
  35:11
realize 23:10,13 31:22
really 31:8 61:2 63:19

70:23 75:3 78:11 84:9
85:7 87:3 88:11
reask 68:21
reason 11:1 56:1 57:21
68:1 82:6 104:10
reasonable 113:3
recall 17:15,20 18:4
21:19 25:3,17 26:22
28:21,24 31:21 34:23
35:20 36:1,2,7,8,9,13
36:25 37:5 39:15 40:9
42:13 43:8 47:21
51:16 54:13 55:9,14
55:19 56:9 57:18,19
57:24 59:22 60:18
63:24 66:6 68:2 70:23
70:23,24,25 72:18
73:7 82:24 83:3 84:19
86:14 88:2,18 90:14
111:9,19,20
recognize 40:18
recollect 25:9 71:10
recollection 26:17,19
27:25 28:1 32:21 33:5
37:11 41:17 54:4 77:6
110:13
record 14:7 15:13,19
32:1 35:11 36:5 117:9
recorded 14:22 87:23
112:14
recording 15:13 16:3
records 44:8,9 50:10
111:10
recovery 17:7,8 20:17,18
red 53:6
refer 39:21
referencing 43:21,25
referring 8:10 43:20
64:4
refresh 33:19 41:16
43:17 57:5 87:2
refreshes 37:10 54:3
89:13
refused 45:20 69:16
refusing 55:11
regarding 37:2 40:6 53:3
63:22 67:25
regardless 82:22
regards 39:14
reimbursed 13:3
reimbursement 72:11,12
relate 27:17
related 12:9 21:10 27:21
39:24 72:13 91:25
relation 10:11 18:24 22:1
31:6 43:16
relationship 59:1 80:1
relative 10:13 117:11,13
relaying 109:20
released 15:17 30:6
relevant 12:14
remember 17:21 18:6,9
20:21 28:8,22 29:25
31:5,11,13,18,23
33:11 35:24,25 38:2,8
39:4,8 40:4,8,21,22
41:18 42:3,11 43:5
47:7,11,13,15 49:14
52:3,4,8 53:2 54:11
55:7 56:6,20 57:13,14
59:24 60:4 62:24
64:19 66:3 67:14
68:23,23 69:22 70:3,7
70:9,14,15,17,20
71:13,21,22,23 72:23
72:24 74:11,12 76:25
77:21,22,23,25 79:15

90:2,5 96:8
remembered 47:9 48:3
removing 13:14
rephrase 14:1
report 4:9,10,11,12,13
4:14,15,16,17,18,19,20
4:21,22,23,24 5:3,4,5,6
5:7 21:24 30:4 31:16
32:2,8,19 33:2 34:2,6
35:15,22 36:21 37:12
37:17 38:22 40:1,11
41:16 43:12 44:3,22
44:25 46:6 47:16,23
51:11,12,20 53:5,8,23
54:2,3,21 57:22 58:18
64:14 65:4,20 66:23
67:12,23 69:25 73:14
74:2,2 75:8 77:4,5,11
78:23 80:25 83:4
84:25 85:22 88:22
117:7
reported 1:18 28:16 29:8
57:12 63:5,6 69:14
74:13 88:19,25
reporter 1:18 3:5 7:4
14:22 15:1,5,15,17
16:1,4,21 18:20,21
19:7,10,16,23 21:8,12
25:7 26:1 27:11 29:1,3
30:1 37:18 38:18 45:2
48:8 52:11,13,23
53:13 58:12,13 64:10
73:22 77:9 83:9 85:7
85:12,15,17,20 86:3,4
86:7 91:17,18,21 92:6
92:25 94:8,9 98:13,18
99:2,9 103:8,9,11,20
114:9 117:1,6,19
reporting 1:22 34:22
53:17
reports 28:6,9 42:20,22
42:25 44:4,16 46:18
46:19 50:24 58:4
61:23 62:2,22 64:7
87:11
represent 113:1
reputational 12:10
Rescue 47:23 48:24
reside 7:21 8:13,16
residence 55:16 76:25
86:22,23,25
resisting 21:22 22:3
23:16
resource 39:17,19
respectful 98:3
respective 115:1
respond 38:9
responded 29:22 33:8
responding 58:23
response 40:11 67:23,24
68:20 102:5
rest 29:24
restroom 90:22
result 12:17,19 13:4
20:22 47:8 71:14 80:7
80:25 90:13
resumed 62:19 91:7
112:12
return 112:23
returned 30:9
reverse 86:2
review 66:10
revision 12:12
revolver 63:7
rewind 108:3
rid 20:22 26:12
right 6:12 7:10 8:7,15

9:9,21 11:6 12:22 14:5
14:10 15:4,15 16:7,11
17:2 18:15 21:5 23:8
23:21,23,23,25 25:20
25:24 26:14,25 27:16
28:5 30:3,6,10 31:14
32:6 33:22 35:8 36:2
37:1,7 39:11 41:2,22
42:17,25 43:3,12
44:14 46:22 47:3
48:17 49:10 50:18,19
52:1 53:19 56:10
57:10 58:21 59:8
60:14,21 62:3,3,7,8,17
62:21 64:9 65:6 67:10
67:15 69:9 76:12,23
78:25 79:20,23 81:3
83:4,5,16 86:6 89:22
91:9,13,14,25 92:17
92:23 93:2,18,24
94:13,14 95:9,12
97:11,20 98:13,14
99:15,21 102:15,22
104:13,18,21 105:25
106:9,16 107:11
108:20 109:6,9,13
111:2,24,25 112:6,14
112:20 113:8,25
114:15,19
right-hand 92:18 112:25
rights 113:19
ring 37:25 38:23 53:7
106:23
rivalry 79:17
Rjohnson@ij.org 2:4
Road 2:7
Rob 51:6 114:6,7
Robert 1:4 2:2,10 12:18
118:2
room 30:9 89:25
roommate 9:24
roughly 69:6
Rule 4:3 11:22,23 19:20
rules 6:23 11:23
run 34:10

S

S 2:11 4:1 5:1 114:24
S-A-N-D-E-R 54:24
Samantha 52:18,24
sat 30:14
saying 15:21 31:12 41:25
56:18 60:11 68:4 72:2
78:19 96:24 107:10,21
says 12:12,14 13:7 34:3
39:2,11 51:17 53:20
56:24,24 57:16 59:6
66:1 69:24 71:16
78:13 84:7 86:17 89:6
89:7,8,18 97:10
100:19 101:2 108:5
scattered 11:10
scheduling 91:2
Schell 16:13
school 30:14,19,20 31:2
31:3,6 32:4,5 33:4
39:3,16,19,22,24
99:21
Schreiber 40:18
scope 72:5
screen 11:15 12:6 15:10
22:24 26:22 27:8,23
37:7 54:15 62:25 64:7
83:5 92:2 99:2,4
scroll 37:22,23 41:10,13
46:12 67:4,6,7 89:2
scrolling 22:23

seal 116:7
sec 76:22
second 14:11 22:21
66:14 111:7
seconds 99:5 104:4
109:10
section 11:25 65:7
see 9:1 11:20 12:6,10
13:18 14:15,19,19,20
15:10 16:16,18 17:2
17:11 20:3,19 21:23
22:5,9 24:24,25 27:1,7
29:9,10,13,14 36:21
37:11 38:15 40:2,3
42:25 43:10,10 45:6
45:11 48:4,13,13 49:6
49:13 51:22,23 53:18
54:2,3,9,22 55:6 56:10
56:23 58:19 64:14
65:11,14,20 66:13,14
66:23 73:20 76:24
77:4,6 83:4,13,22 84:2
84:3,20 86:18,19
87:11 88:24 89:18,20
90:1 91:12,13 92:23
94:19 97:2,5 99:7,7
103:3,13 108:23
seeing 22:20 50:24 56:18
89:12
seek 12:3,13,25 72:10
seeking 12:16 13:11,14
13:15,21,23 14:2
seen 20:8 24:2 32:1
66:22
sees 12:20
Semoran 2:11
send 24:19 44:13
sending 24:3
sense 89:9
sent 42:23 72:21
sentence 82:20
separated 76:18
September 21:6 33:1
47:21,22 48:12 82:24
83:13
sequence 41:17 82:7
served 64:1,16
service 35:20
Services 71:4,11
set 72:4 78:18 86:14
sets 27:18 38:2
seven 69:5
severe 48:18
sexual 36:5 55:12 73:9
Shaker 2:3
shakes 7:6
share 11:15 28:18 32:6
37:7 54:15 64:7 92:2
99:4
Sheet 3:6 119:1
sheriff 1:8 39:12 118:6
Sheriff's 32:8,19 33:2,8
33:15 34:5,19 35:22
36:3,8,9,14,23 38:8
39:9,13 40:6,11 43:6
44:22 47:16 48:22,24
53:4 56:21 65:4 73:2
78:22 79:10 82:25
84:14 87:7,17 88:13
95:22 111:15
shoot 38:13 78:17
shortly 49:4
shoulder 30:11
show 28:25 53:8,8 61:20
65:3 77:4,5 88:22
90:24 91:9,16 92:8
93:4 103:18

Showalter 60:2,4,17
showed 110:16
shown 112:23
shows 67:15
sibling 79:17
siblings 50:23
sick 30:18,19 90:4 98:7
side 92:10
Signature 3:5 118:9
signed 16:17
signing 115:2
similar 25:9
simultaneous 103:7
sir 38:18 58:13
sister 38:11 39:6
sit 88:9
sitting 30:11
situation 33:11 74:21
75:4 76:19
skip 29:15 41:4 42:8,8,17
42:18
Sky 74:5
slamming 111:25
sleeping 57:2,9
slightly 86:2
slit 66:8 69:19 70:13
slowly 24:5
smoked 33:10
somebody 35:19 39:2,10
59:21 60:12 77:25
78:6,12 106:23 109:22
109:25
somebody's 103:3
son 28:20 35:23 38:10
39:3 41:19 47:19
48:20 54:12 60:8,12
60:12 68:8 78:2,5,10
79:17,23,25 80:5
84:20 86:12,17,22
son's 74:7 78:7,15,21
soon 38:16
sorry 8:9 9:14,19 16:2,4
12:23 18:23 21:7 30:2
34:16 43:18 45:21
47:1 48:5 50:19 52:12
62:8 65:19 73:5,6 85:5
85:10 91:19 98:12
sort 11:9 35:25 61:5,6
80:6 93:4 110:10
sorts 26:12
sound 34:7 36:18 91:4,20
sounded 106:17
sounds 16:7 54:5 77:3
108:5
spawned 49:12
speak 31:19 55:16 70:22
73:10,11 80:20 81:1,6
81:13 82:14 84:1
100:22 109:25 111:11
speaking 13:1 65:12
81:14 89:7 106:2
speaks 31:17 101:14
104:25 106:4 109:24
specific 70:18 88:1
specifically 79:4
speed 24:7
spell 8:20
spelling 6:15 30:8 108:4
spice 33:10
spit 30:24
spitting 51:14,21
spoke 42:4 76:15,16 79:1
80:22
spoken 38:16
sporadically 110:16
spot 114:17
sprayed 52:1

Squad 61:9
SRO 40:7
St 100:19
Stacy 78:5
standing 92:9
start 7:1 8:11 29:21 41:7
   46:21 50:9 67:2 93:8
   106:17 107:12
starting 91:11
state 1:19 42:11 58:24
   116:2,12 117:3
stated 31:1 34:5 38:11
   55:2 65:13 69:17
statement 23:9
STATES 1:1
stating 97:6
status 56:2 96:4
statute 75:12
staying 34:25 58:25
stays 9:25
Ste 2:3,7,11
stemming 12:19
stenographically 117:7
stepdad 65:13
stepfather 87:13
stepson 54:25 55:3 83:23
   83:25 84:10
stipulated 114:25
stipulation 3:4 16:3
stole 78:15
stolen 34:2,20,24 43:7,16
stood 89:21
stop 32:6 61:19 71:17
   107:11
stopped 88:7 106:11
straight 59:4 79:21
street 7:23
strikes 34:8
striking 36:25
struck 36:24
student 28:17,23
stuff 86:13
subdivision 38:10
subject 12:12 16:14
   45:17,19,19 64:24
   73:9
subjects 55:5
SUBSCRIBE 118:12
SUBSCRIPTION
   118:13
subsection 12:6
substance 23:2 74:10
substantive 69:10
sue 103:2
suffering 13:12,15,24
   14:3 72:16
suggesting 92:14
suicidal 32:9 33:4
suicide 44:23 45:7 54:1
suing 11:13
supervisors 96:1
Supplemental 4:3 11:22
suppose 38:5
supposed 81:1
sure 8:21 10:24 12:2,25
   15:3,4 16:8 24:1,10,12
   34:9 35:10 40:24
   41:12 44:14 46:14
   49:2,16,17 50:11
   60:19 61:14 63:19
   72:7 74:16 75:3,7,11
   77:3 79:9 80:9 84:9
   90:17 93:14 95:23
   96:17 100:8 102:1,11
   102:12 108:25 110:4
   112:5
surrounding 97:9

surveillance 87:20
suspect 30:7 34:4 38:12
   45:14,16
suspect's 38:11
suspended 31:2,6
sustained 80:17
sworn 6:2 116:6
sympathetic 46:16

                T
T 4:1 5:1 114:24,24
T-A-M-M-Y 6:18
tactic 103:2
take 7:5,10,14 12:5 22:21
   23:3 37:8 40:24 41:7
   58:2,3 61:21 62:24
   66:21 81:23,24 82:13
   82:22 86:11 90:21
   91:2 112:3,7
taken 6:21 25:22 35:1
   62:18 75:4 91:6
   112:11
takes 11:10
talk 37:10 50:14 60:15
   62:22 75:12 81:8
   104:10 113:8
talked 30:15 62:11 74:6
   95:10
talking 50:11 72:5 99:12
Tamm 112:21
Tammy 1:3,12 6:1,18
   12:14 29:23 57:1
   86:17,18,21,22 116:5
   118:1,17
Tampa 1:2 103:3
TAYLOR 1:3 118:1
teen 17:8 20:18 77:2
teenagers 32:25 78:7
tell 6:2 11:13 19:11 42:7
   44:25 47:10 54:14
   55:25 61:14,18 69:14
   79:14 104:10 106:21
   108:8 112:3 113:7
telling 60:12 69:23 70:11
   90:2
tells 64:18 102:8
ten 17:10 20:16 28:20
   31:9 36:6 58:1,6,7
   69:2 91:5
ten-minute 91:3
Tennessee 106:23
terms 13:1
terrifying 75:6
testified 6:4
testimony 117:9
testing 92:20
Thank 9:2,15,20 16:1,7
   19:23 29:4 33:22
   37:16 48:7 62:17
   73:23 85:25 86:7
   92:25 98:18
Thanks 91:5 98:20
   112:10 113:25 114:19
theory 14:10
thing 41:23 60:14 89:1
   92:9 104:7
things 11:9,12 13:12
   24:16 25:17 26:12
   32:24 50:9 69:17,23
   70:2 72:2 78:15,18
   84:21 87:9 88:3
think 8:22 25:21 32:1
   35:1 38:15 39:23 41:2
   43:1,11 44:5 49:18,20
   50:4 52:10 53:25
   54:23 56:3 58:11,12
   62:5 64:17,17 66:17

75:11 92:19 95:14,15
   96:18 97:15,16,19
   100:19 104:7,9,18
   109:6 112:8 113:10
thinks 45:17
third 27:4 111:7
thirty 17:11 114:13
THOMAS 2:10
thought 12:23 24:4 58:2
   73:5 80:21 104:9
thousand 31:18 33:23
threat 45:7
threatened 30:25 38:10
   38:13 66:8
threatening 83:1,23
   84:11
threats 32:9 33:4 44:23
   78:24 79:3
three 8:8,13,15 22:5
   27:18,25 42:21 70:7
   70:10 98:24 111:5,14
   111:20,21
throat 66:8 69:19 70:13
throwing 84:21 86:13
   87:8
thrown 35:22
thumb 23:4
time 1:15 7:17 10:24
   22:20 24:6 26:9,9
   28:20 30:8 31:8,9,10
   31:23 32:22 34:23
   40:24 44:6 49:8,11,15
   49:17 58:5 61:19 63:9
   68:14 69:24 71:10
   73:4,7 80:11 84:25
   87:19,22 88:1 90:5,6
   93:7,10,16,22 94:11
   94:17,25 95:7,15
   96:14 98:15 99:6,13
   99:23 100:24 101:6
   104:2,8,16 105:23
   106:7 107:3,15 108:11
   109:1 112:7,13 113:2
   113:3
times 49:17 57:18 87:12
   98:6 103:4 110:12,21
today 7:17 30:5 62:11
   88:9
toggle 67:3
told 20:10 30:5,18,24
   39:3 47:14 55:16
   57:11 74:19 75:17,20
   78:16 80:4,19 81:25
   82:19 86:22 89:19
   110:4 112:6,24 113:6
Tom 19:1 24:1 37:15
   43:20 85:4
ton 92:18
top 92:16 98:16 103:25
   105:19 111:1 112:25
total 8:11 17:23
toy 26:11
track 14:24 16:5 114:7,7
transcript 117:8 118:11
transcription 45:13
transpired 63:20 67:14
   70:15 74:15
transportation 53:2
trash 26:14
trespassed 36:12,18
trespassing 36:11 54:23
trial 81:12,24 82:13,18
   82:19
trouble 58:25 60:9 80:23
   109:5,21
troublemakers 36:15
true 97:25 117:8

truth 6:2,3,3
try 11:15 28:9 38:6 41:4
   41:4 108:4
trying 24:25 28:7 35:16
   35:17 45:15 59:4
   71:19 76:3,6 79:21
   82:7 84:21 86:13 87:9
   89:22
turn 6:12 91:20 100:2,8
   100:11 101:2,18 107:1
   107:13 112:17
turned 81:5,7
turning 102:15
twelve 92:9,17 51:24
   70:4 93:19
twelve-year-old 70:11
twenty 77:7,8
two 9:3 12:20 14:14
   33:23 36:5,10 42:21
   43:7 50:23 92:4,4
   96:21 97:4 104:12
   110:19 111:23
Tyler 9:8,12,13,16 33:21
   33:22,23 34:4 36:16
   36:23 50:20 51:17
   71:7 73:17 79:18
   92:20
Tyler's 33:23 37:3
type 60:13 72:1 88:7
types 13:9 76:7

                U
U 114:24
uh-huh 7:6
uh-uh 7:6
ultimately 54:1 82:2,3
underlying 21:18
undersigned 116:4
understand 9:9 12:22
   27:3 41:25 67:11
   75:25 76:6 80:9 82:6,7
   83:19
understanding 15:25
   23:17 82:2
understood 16:2
unit 49:13
UNITED 1:1
universe 24:20 50:8,11
unknown 30:7 60:3
unlawful 95:15,16 96:18
   97:13,15
update 61:14
updated 12:8
upset 45:14 86:24
use 92:7
useful 92:12,14
usually 49:1

                V
VA 2:7
vague 15:21 109:14
vaguely 72:25 90:4,5
variety 13:9
vehicle 21:19 27:22 34:2
   34:20,24 43:7 61:2
verbal 83:24 89:16
verbalize 7:7
versus 76:5
vice 30:14
victim 29:11 80:20
video 20:8 86:12,13,14
   87:8,15 88:10,12
   91:15 92:11 93:7,8,10
   93:16,22,24 94:3,11
   94:17,25 95:7 97:19

98:24 99:6,13,16,23
   99:25 100:13,24 101:6
   101:11,13,16 103:18
   104:2,16,25 105:23,25
   106:3,7 107:3,15
   108:11 109:1,23
   112:23 113:7 114:14
videographer 15:18
videos 61:20 87:17 90:24
   91:10,10 92:6 93:4
   110:25
view 76:7
violate 113:19
violated 80:14,15,24
   81:3,11,14
violation 17:6 20:15
   21:10 26:18 80:17,19
   82:10 92:1 96:3 97:5
   111:13
violations 13:4,17 27:24
   50:6 72:11 111:5
violence 21:23 22:4
   23:17 59:18 64:1,15
   64:16 88:25
visible 16:14
visit 78:2,8 105:6,13,13
   113:16
visited 112:24
visits 56:1 97:22 113:17
volume 6:12 100:6 107:1
vs 1:6 118:4

                W
W 2:10
Wait 15:5
waived 115:3
wake 57:3,10
walked 30:8
walking 29:19
wall 72:1
Walters 74:5 77:17
want 7:10 11:6 12:1,24
   13:3 14:12 22:21,24
   23:4 24:5,5,10 29:17
   29:24 36:22 37:9,22
   38:1 57:10 62:4,24
   69:18 70:12 72:4
   75:23 79:24 90:21
   93:14 100:7,17 112:4
   112:16 113:7 114:1,4
wanted 10:24 18:22
   34:21 36:17 61:20
   72:7 81:6,8 82:15 91:9
   96:11 98:3,3
warnings 16:13
wasn't 30:19 49:11 63:9
   63:10,19 70:22 80:5
watch 98:25,25 104:1
   105:20 108:8
watching 86:12 87:8
way 16:16 28:11 29:19
   30:10 39:3 40:8 42:14
   51:5 63:10 66:3 81:21
   84:13 90:19 95:14
we'll 20:8 21:17 22:11
   23:23,23 24:12,18,18
   26:22 27:11 35:10
   36:15 37:9 41:6 42:19
   43:2 44:1,13 46:19
   46:23 50:15 54:15
   56:19 58:2,3 62:1,3,10
   62:10 75:14,14 83:5
   100:18 104:1 105:20
   114:9
we're 12:2,25 14:1,16,23
   19:8,18 21:16 24:7
   28:7 35:9,16 44:4 50:8

50:11 51:4 56:19
60:19 66:17 86:1
88:23 90:25 93:19,24
99:15 107:1
we've 8:22 24:1,15 32:1
86:1 90:22 103:24
106:11
week 55:9 110:7,12,22,23
went 28:3 32:24 36:24
48:20 49:2,4,14,18,20
54:14 60:1 62:21
80:18 81:4,16 95:20
weren't 29:16 31:14
47:23 81:22,22 98:8
Weston 38:23 39:5
whatnot 50:10 92:20
wife 86:17
wifi 69:16
win 81:25
window 94:20
Winter 2:12
Winthrop 39:16 40:7
wish 57:2 88:11,11
withheld 17:6 25:8 27:5
witness 6:5 29:13 41:24
58:8 63:10 69:12
100:4 112:9 116:7
117:9
wondering 57:13 61:15
84:12
word 70:17 108:7 110:14
work 86:12 87:7
working 88:7 106:22
107:6
wouldn't 104:12
written 57:15
wrong 48:5 50:18
wrongful 97:17

**X**

X 3:1 4:1 5:1 98:16
X83015724 5:9 98:17
X83015725 5:10 103:25
X83046953 5:11 105:19

**Y**

yard 25:3,16 27:20 96:24
yeah 15:3,24 16:2 23:5
24:15 25:22 32:11
33:22 35:7 37:13,25
39:4 43:10 47:3 49:11
49:11 52:3 66:11,14
69:7 74:16,24 75:7,23
76:11 84:16 85:3
89:11 99:9 100:15
103:1,6 108:25 110:20
year 32:13 37:23
years 28:20 31:9 36:6
69:6,8 70:7,10 81:24
82:1 97:23
young 41:22 55:11 59:1
59:3,14,21,24 95:3
youth 72:22

**Z**

Z 104:9
Z-A-N-D-E-R 8:5
█████████ 8:23
Zander 8:4,18,19 20:9
21:3 54:23 63:6,13,17
64:21,25 69:11 71:14
72:19 74:5 83:2,14,15
83:16 84:5,11,15,20
87:6 88:19 89:17,18
90:7 93:25
Zanders 8:22

█████████ 8:18,23 9:22 94:21
94:22
zoom 1:17 2:1 6:24 14:21
14:21 92:12 107:1
116:5
Zulu 104:9

**0**

**1**

1 4:3 11:16,19 14:5 16:11
19:3,13,20 20:1
1-25-18 4:7
█████████ 51:21
1-5-2023 116:13
1.1 5:8 92:2,22
1:00 62:19
1:34 93:24
1:43 105:25
1:49 99:15
10 4:12 8:19 17:8 20:18
40:13,15 113:3
10-18-17 4:7
10:05 1:15
100 20:16
1010 2:11
103 5:10
1035 2:11
105 5:11
10th 116:7 117:17
11 4:3,13 45:3
11-14-13 4:10
11-17-16 4:15
11-29-16 4:16
11-4-2013 37:17
11-7-17 5:9
11:45 62:18
112 3:3
114 3:4
116 3:4
117 3:5
118 3:5
119 3:6
12 4:14 17:2 19:14 48:6,7
48:9
12-13-18 4:8
12-28-14 4:12
█████████ 33:25
12-5 86:5
12-5-19 5:6
125 25:8
13 4:15 8:18 27:7 51:6,8
55:9
14 4:16 34:11 52:13,14
52:15 56:17,22
15 4:17 34:11 53:12,14
58:18 62:4
16 4:4,18 21:6 50:21
54:16,18
16-008432 92:5
16781 2:3
17 4:19 51:12 56:12,14
101:1
18 4:20 26:1 50:22 58:11
58:13,14,15,18 74:3
100:2 101:2,18 102:15
19 4:21 8:18 58:11 64:8
64:11 85:13,17 86:5

**2**

2 4:4 16:21,22 19:3,11,20
19:21 113:1,2
2:00 90:22 91:6
2:02:18 104:8
2:15 91:7
2:20 106:11

2:27 107:12
2:30 107:11
2:32 107:12
2:50 94:13
2:55 112:11
20 4:22 9:17 31:19 65:3,8
32:7,14
2010 28:15 29:8 31:19
2011 32:18 33:1
2012 33:7 34:1 35:21
36:3
2013 36:10,20 37:24,24
2014 38:9,23 40:10,14
41:16 62:1
2015 42:18,22 46:21 58:4
61:23 63:4 88:5
2016 16:11 17:2 19:4,5
19:13,15 20:1 21:6
42:18 43:1,5 44:21
45:6 46:7 47:2,15,22
48:12 50:20,21 51:12
95:10 97:12,16
2017 25:1 26:2,9 53:3,17
54:14,21 55:9 56:17
56:22 58:18 98:16
2018 26:2,18 27:7 63:7
105:18 106:20
2019 66:6,7,23 67:18
68:25 70:6 72:18 73:4
73:7 74:3 76:24 77:12
82:25 83:13 84:19
2020 9:17,18 88:18,24
2022 1:14 116:6,8 117:17
21 4:5,23 66:17,18 73:21
22 4:6,24 31:10 53:17
73:22,23,24
22203 2:7
23 1:14 5:3 77:9,11,13
105:18 116:6
24 5:4 27:6 83:8,10 85:11
85:12,15,19
2426 1:23
24th 67:25
25 4:7 5:5 26:2,18 66:23
84:24 85:7,21,23
88:23
256 2:3
25th 67:25
26 5:6 11:22,23 19:20
77:11 85:4,5 86:4,8
26(a)(1) 4:3
27 4:8 5:7 88:23 89:4
91:16,20
276821 116:12
28 5:8 40:14 41:16 47:22
48:12 83:13 91:17,21
91:22 92:7
28th 40:10
29 4:9 5:9 45:6 46:7 47:1
98:19,20,21

3 4:5 17:8,9 18:25 19:4,5
19:16 20:18,19 21:9
21:13 95:10 97:12,16
3-1-16 4:4,5
3-25-19 4:23
3:05 112:12
3:08 1:15 114:22
30 5:10 17:7 103:19,21
104:4
31 5:11 105:18,21
3229 7:24,25 9:23 29:22
31:16 45:7 48:13
53:18 54:22 56:22
66:24 83:19 85:3
88:24

32792-5512 2:12
33526-2426 1:23
352 1:24
37 4:10
38 4:11
3rd 18:16

**4**

4 4:6 11:25 21:17 22:11
22:12 23:24 37:24
4-25-20 5:7
4-7-14 4:11
40 4:12 17:7 20:17
407-673-5000 2:12
44120 2:3
45 4:13
45-minute 7:14
48 4:14

**5**

5 4:7 25:6,11 84:25
5-12-16 4:4,5
5-14-17 4:19
5-23-18 5:11
5-6-17 4:18
51 4:15
52 4:16
53 4:17
54 4:18
56 4:19
567-5484 1:24
58 4:20
5th 84:20

**6**

6 3:3 4:8 27:12,13 28:25
54:21
6-15-17 4:20
6-18-19 4:24
6-20-2010 29:22
6-26-19 5:3
6-29-16 4:13
6-9-10 4:9
64 4:21
65 4:22
66 4:23

**7**

7 4:9 29:1,2,5 38:22
98:16
7-10-19 5:5
7-10-2019 85:22
7-22-17 4:17
7-26-18 5:10
7-26-2018 103:24
7-Eleven 89:8
703-682-9320 2:4,8
73 4:24
77 5:3

**8**

8 4:10 37:15,19
8:21-cv-00555-SDM-C...
1:6 118:4
8:30 58:22
83 5:4
8490 85:10
85 5:5
86 5:6 17:23
89 5:7

**9**

9 4:11 29:8 38:17,19
9-17-18 4:21 64:15
9-18-18 4:8

9-18-2018 26:21
9-28 85:12,17
9-28-16 4:14
9-28-19 5:4
9-29-18 4:22 65:5
900 2:7
901 2:7
911 48:21,22 51:20
98 5:9