UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES, III,

  Plaintiffs,

vs.               Case No.: 8:21-cv-00555-SDM-CPT

CHRIS NOCCO, in his
official capacity as
Pasco County Sheriff,

  Defendant.
_____/


PROCEEDINGS:       Deposition of
                    STEPHEN HIEBERT


DATE:             January 12, 2022


TIME:             2:17 p.m. - 5:13 p.m.


PLACE:           New Port Richey Executive Suites
                    8520 Government Drive, Suite 1
                    New Port Richey, Florida


REPORTED BY:      Judy Anderson, Court Reporter
                    Notary Public
                    State of Florida at Large


ANDERSON COURT REPORTING
P.O. Box 2426
Dade City, FL 33526-2426
Judy@andersoncourtreporting.com
(352) 567-5484

```
 1    APPEARANCES:

 2    ROBERT E. JOHNSON, ESQUIRE (Appearing via telephone)
      Institute for Justice
 3    16781 Chagrin Boulevard, Ste. 256
      Shaker Heights, OH 44120
 4    703-682-9320
      Rjohnson@ij.org
 5          Counsel for Plaintiffs

 6    CAROLINE GRACE BROTHERS, ESQUIRE
      Institute for Justice
 7    901 N. Glebe Road, Ste. 900
      Arlington, VA 22203
 8    703-682-9320
      Cgbrothers@ij.org
 9          Co-counsel for Plaintiffs

10    ARI S. BARGIL, ESQUIRE
      Institute for Justice
11    2 S. Biscayne Blvd., Ste. 3180
      Miami, FL 33131
12    305-721-1600
      Abargil@ij.org
13          Co-counsel for Plaintiffs

14    THOMAS W. POULTON, ESQUIRE (Appearing via Zoom)
      Debevoise & Poulton, P.A.
15    1035 S. Semoran Blvd., Ste. 1010
      Winter Park, FL 32792-5512
16    407-673-5000
      Poulton@debevoisepoulton.com
17    Holborn@debevoisepoulton.com
      Cook@debevoisepoulton.com
18          Counsel for Defendant

19

20

21

22

23

24

25
```

1                            I N D E X

2                                                    Page

3    Direct Examination by Mr. Bargil              5
     Cross Examination by Mr. Poulton             101
4    Redirect Examination by Mr. Bargil           103
     Stipulation                                  107
5    Certificate of Oath                          108
     Certificate of Reporter                      109
6    Deponent's Signature Page                    110
     Errata Sheet                                 111

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**E X H I B I T S**

Page

A - ILP Manual                                          11

B - MPR Stephen Hiebert                                 46

C - ILP 5 Year Review                                   65

D - Unvetted Prolifics for part of 2018                 75

E - Prolific Offender List                              79

F - Unvetted Prolific Offender List Dec. 2020           81

G - Unvetted Prolific Offender List April 2021          84

H - Prolific Offender Pool List                         84

I - Rankings of Plaintiffs in Historical               88
    Prolific Lists

J - Prolific Offender List                              97

1              STEPHEN HIEBERT,

2    being first duly sworn to tell the truth, the whole

3    truth, and nothing but the truth, was examined and

4    testified as follows:

5              THE WITNESS:  I do.

6                    DIRECT EXAMINATION

7  BY MR. BARGIL:

8      Q.   Good afternoon, sir.  How are you doing today?

9      A.   Very well, thank you.

10     Q.   Okay.  My name is Ari Bargil.  I'm joined this

11  morning by my colleague Caroline Grace Brothers.  I'm

12  going to be taking your deposition today, and I want to

13  start by thanking you for your patience.  I'm sorry we

14  got such a late start.

15     A.   It's all right.

16     Q.   Okay.  Now before we get any further, I want to

17  make sure I am correctly pronouncing your last name.  Is

18  it Hiebert?

19     A.   Yes.

20     Q.   Okay, Mr. Hiebert.  So, and you're a civilian;

21  correct?

22     A.   Correct.

23     Q.   Okay.  So I will call you mister unless you

24  have any preferred nomenclature.

25     A.   That's good.

1       Q.   Okay, great.  Before we really get going, I

2  just want to explain a little bit about what we're going

3  to be doing here today.  Have you ever had your

4  deposition taken before?

5       A.   Yes.

6       Q.   Okay.  How many times?

7       A.   Just once.

8       Q.   Okay.  And what case -- what kind of case was

9  that?

10       A.   There was a suit against Pasco County.  A

11  registered sexual offender had moved from his parents'

12  elsewhere and then was not allowed to move back to his

13  parents' because of the zoning.

14       Q.   Okay.  And the City got sued and you were a

15  witness?

16       A.   Yes.

17       Q.   Okay.  This is a different type of case I

18  suppose, but some of the same ground rules will apply.

19  I'll ask you questions.  I ask that you allow me to

20  finish asking my question before you begin to answer it,

21  and just the same, I will not interrupt you when you're

22  providing your answer.  This is all going to help the

23  court reporter get everything down so we have a nice

24  clear record.

25            When I ask you a yes or no question, please

```
 1    make sure to respond with either a yes or a no as

 2    opposed to uh-uh or uh-huh.  And of course, make sure

 3    you verbalize all of your answers rather than gesturing

 4    or shaking your head yes or shaking your head no.  Is

 5    all that clear to you?

 6         A.   Yes.

 7         Q.   Okay.  Any reason why you're not going to be

 8    able to testify truthfully here this morning?

 9         A.   No.

10         Q.   Okay.

11         A.   Afternoon.

12         Q.   That's right.  Thank you.

13              If at any point you would like to take a break,

14    we can usually accommodate that.  The only thing that

15    I'll probably ask you is that you answer a question if

16    there's a question pending.  Your lawyer might interject

17    at certain points in time to object to questions.

18    Typically though, you will be asked to answer the

19    question unless in the rare instance that he tells you

20    not to.

21              What did you do to prepare for this deposition?

22         A.   Nothing.

23         Q.   Okay.  Did you talk to anybody?

24         A.   I talked with my boss this morning, asked him

25    how long it would go.
```

1      Q.    Who is your boss?

2      A.    Larry Kraus.

3      Q.    Okay.  When you asked him how long it would go,

4  did you ask him how long it would go because he had

5  already been deposed?

6      A.    Yes.

7      Q.    Okay.

8      A.    Yep.

9      Q.    Did you discuss the substance of this

10  deposition?

11      A.    No.

12      Q.    Okay.  What is your educational background?

13      A.    Bachelor's in math and physics, bachelor's in

14  industrial engineering and management, and all but the

15  thesis for master's, and a master's in criminal justice

16  administration.

17      Q.    Okay.  How many degrees do you have post

18  graduate?

19      A.    Just one.

20      Q.    How long have you been with the Pasco County

21  Sheriff's Office?

22      A.    February it will be 16 years.

23      Q.    Does that mean you started in about 2007?

24      A.    Six I believe.

25      Q.    Six?  All right.  Did you do anything before

1   that?

2       A.   Yes.  I was research analyst for North Dakota

3   Department of Public Instruction for seven years, and I

4   was a programmer for 15 years before that.

5       Q.   Where were you a programmer?

6       A.   Defense Logistics Agency, Library of Congress,

7   contractor at Ore-Ida, and Blue Cross Blue Shield of

8   North Dakota.

9       Q.   Was the Defense Logistics Agency working for

10  the Library of Congress, or are they separate jobs?

11      A.   Those were separate jobs.

12      Q.   Okay.  And some other stuff before that; right?

13      A.   Yes.  High school teacher math and the Peace

14  Corps.

15      Q.   You've had a very full career.

16      A.   Thank you.

17      Q.   Since starting at the Sheriff's Office in 2006,

18  what jobs have you held?  And try to -- let's try to go

19  in order from the beginning.

20      A.   Started out as planning and research

21  coordinator.

22      Q.   And what years was that?

23      A.   That was 2006 to 2009 probably.  I don't

24  remember exactly, two or three years.

25      Q.   Okay.

1        A.    And then application support analyst.  I

2   transferred over to information technology.  And then

3   in --

4        Q.    Let's get the years for application support

5   analyst.

6        A.    That would be about 2009 through 2011, pretty

7   close.

8        Q.    And then to IT?

9        A.    Yes.

10        Q.    And what year?

11        A.    Oh, that was for IT.

12        Q.    Okay.

13        A.    And then my current job started in about 2011

14   until now, and that's a strategic analyst at

15   intelligence-led policing.

16        Q.    Did anyone have your current position before

17   you?

18        A.    No, in none of the cases.

19        Q.    Hmm?

20        A.    In none of the three positions.

21        Q.    Okay.

22             MR. BARGIL:  Tom, are you able to, to the

23        extent possible, minimize some of the background

24        noise?

25             (Off-the-record discussion.)

1    BY MR. BARGIL:

2        Q.    Okay.  So where did you get your -- you

3    mentioned some of the degrees you got.  What

4    institutions did you get those from?

5        A.    Bethel College in St. Paul, Minnesota, for the

6    math and physics double major.

7        Q.    Okay.

8        A.    And North Dakota State University for the

9    industrial engineering and management, and Saint Leo

10   University for criminal justice administration.

11       Q.    Out of respect for you, sir, I won't ask you

12   what years you graduated.

13            MR. BARGIL:  Tom, I just handed the witness the

14       intelligence-led policing plan, which is going to be

15       marked as Exhibit A for this deposition.

16            (Exhibit A was marked for identification.)

17   BY MR. BARGIL:

18       Q.    Take a look at -- first of all, are you

19   familiar with the document in front of you?

20       A.    Yes.  I read it many years ago.

21       Q.    Okay.  Did you also contribute to its creation?

22       A.    No.

23       Q.    Do you know who wrote this?

24       A.    Depending on the version, it was probably

25   Captain Ross.

1    Q.   Okay.  Can you turn to page 57 of the document,

2    please.  Before I ask you questions about the document,

3    I guess I'll ask you some general questions about ILP.

4         What is your -- how would you describe your

5    responsibilities in your current position as a strategic

6    analyst?

7    A.   I assist other analysts by creating

8    applications, and I do reports that require lots of --

9    lots of data from the records management system and

10   other databases that the Sheriff's Office has.

11   Q.   What kind of reports do you create using that

12   data?

13   A.   Wow.  It's different every week, but quite

14   often they're unique reports.  Like several years ago

15   when a county commissioner wanted to explore the

16   possibility of a four-day school week, I was asked would

17   that require more deputies, and if so, how many.  So I

18   made an attempt at figuring out how many would be

19   needed.

20   Q.   Okay.

21   A.   Or we have K-9 deputies.  Are they more

22   efficient or less efficient than the others and what

23   should we do.

24   Q.   Do you also analyze crime data?

25   A.   Yes.

1    Q.   What would you say is the bulk of your time

2  devoted to?

3    A.   The main forms of data are calls for service

4  and case reports.  The calls for service are recorded by

5  the call center, and the case reports are written by the

6  deputies.  So I analyze both, but rarely do I read the

7  written part of the reports because I'm usually dealing

8  with mass quantities of data.

9    Q.   Okay.  As you mentioned a moment ago, you might

10  get an odd ball request to find out whether more

11  deputies would be needed if there were a four-day school

12  week; is that right?

13    A.   Yes.

14    Q.   Do you also get other types of requests related

15  to people and personnel asking you to run data about

16  them?

17    A.   Very rarely.  The other analysts know the

18  people in their districts, so I rarely get involved in

19  looking at a specific person.

20    Q.   Okay.  So you deal with the universe of data on

21  a more general level?

22    A.   Correct.

23    Q.   Are you familiar with the term prolific

24  offender?

25    A.   Yes.

1    Q.   What does that term mean?

2    A.   That is an attempt to reduce crime by finding

3    people who have been doing a lot of it.

4    Q.   So would a -- I don't want to put words in your

5    mouth, but would a prolific offender as you're

6    testifying, would that be someone who is, quote,

7    unquote, doing a lot of crime?

8    A.   Yes.  Offending prolifically basically.

9    Q.   Gotcha.

10        So did you play a role in the agency's creation

11   of the prolific offender definition?

12   A.   I've made suggestions, but I don't make the

13   decisions.

14   Q.   Who do you make the suggestions to?

15   A.   Larry Kraus or the -- there's been three

16   previous inspectors for ILP.

17   Q.   Okay.  And who are they?

18   A.   Brian Prescott, Lieutenant, Tony Gallo, Justin

19   Ross and Larry Kraus.

20   Q.   Okay.  And at this moment Larry Kraus, is he

21   your immediate supervisor?

22   A.   I have an intermediate supervisor.

23   Q.   Who is that?

24   A.   Dave Santos.

25   Q.   Okay.  When you say you make representations

1    but you don't make decisions, who do you pass your

2    recommends on to?

3         A.    To Larry.

4         Q.    To Larry?

5         A.    Yeah.

6         Q.    I asked you before about if you -- well, did

7    you make a recommendation to Larry about how the agency

8    should define the term prolific offender?

9         A.    I got involved a little bit.  The initial

10   definition was by a previous analyst.

11        Q.    Okay.  And just so we're clear about what we

12   mean by definition, I'm not yet talking about the

13   scoring system.

14        A.    Right.

15        Q.    I'm just talking about the actual sort of

16   verbal definition that we're going over?

17        A.    Oh, well, that's -- that definition is similar

18   but slightly different for many different law

19   enforcement agencies.

20        Q.    Okay.

21        A.    It's a common definition across the US and

22   other countries.

23        Q.    We're going to be speaking only about Pasco

24   County here today unless I specify otherwise though.

25        A.    Uh-huh.

1    Q.   Okay?

2    A.   Yes.

3    Q.   I mentioned a second ago the prolific offender

4    scoring system.  Are you familiar with that scoring

5    system?

6    A.   Yes.

7    Q.   Did you develop that scoring system?

8    A.   I programmed it.

9    Q.   What do you mean when you say you programmed

10   it?

11   A.   I took the definition and wrote it into an

12   algorithm that then selects a list of offenders.

13   Q.   So the system -- in a nutshell, the system

14   assigns a score, does it not?

15   A.   Correct.  Yes.

16   Q.   And that score assignment system is a system

17   that you developed?

18   A.   Yes.

19   Q.   That you developed mechanically, not

20   intellectually?

21   A.   Correct.

22   Q.   Who developed it intellectually?

23   A.   We looked at examples from other agencies and

24   put together recommendations, including me, and then

25   they were decided upon by I believe it was Tony Gallo at

1    that time.

2        Q.   When you say we looked at definitions for

3    scoring systems --

4        A.   The other analysts and I.

5        Q.   -- who were they?

6        A.   I don't remember at the time.  I mean, at the

7    time they were district analysts, and then -- and then

8    the director at that time.  Inspector is the new title

9    for ILP.  It used to be director.

10       Q.   Okay.  So I just want to make sure I'm getting

11   this right.  Is it fair to say that you were asked by

12   someone above you to help develop a scoring system to

13   determine who the prolific offenders are?

14       A.   Yes.

15       Q.   And is it also fair to say that you and several

16   other analysts got together to do that?

17       A.   Yes.

18       Q.   And as part of that process, you considered

19   what other locals do?

20       A.   Correct.

21       Q.   Did you consider anything other than what other

22   locals did?

23       A.   No.

24       Q.   Did you look at academic literature on policing

25   or crime statistics?

1    A.   Yes.

2    Q.   What were some of those things that you looked

3    at?

4    A.   The main one was Intelligence-Led Policing the

5    book by Jerry Ratcliffe.

6    Q.   Were you instructed to use that as your guide?

7    A.   No.

8    Q.   Whose idea was it to go off of that?

9    A.   It was just a given since he is the expert on

10   ILP or was at that time.

11   Q.   Okay.  So was part of the instruction that was

12   given to you early on that the department is going to

13   apply an intelligence-led policing philosophy and that

14   you would be asked to come up with a scoring system for

15   prolific offenders?

16   A.   Yes.

17   Q.   And so you just knew to look to Ratcliffe's

18   work on the topic?

19   A.   Yes.  Also, he came and visited.

20   Q.   So looking at the exhibit that I put in front

21   of you a few minutes ago, I think I already asked you

22   this, but just to be clear, do you recognize this

23   document?

24   A.   Yes.

25   Q.   And what is it?

1      A.    Oh, it's the intelligence-led policing manual.

2      Q.    Okay.  And focusing on the page that I directed

3   your attention to before, can I ask you some questions

4   about the mechanics of the program?

5      A.    Yes.

6      Q.    If you look down toward the bottom where it

7   says intelligence-led policing division, if you look at

8   the final sentence of the first paragraph there, can you

9   read that, please?

10     A.    Oh, looks like the -- the final paragraph?

11     Q.    The final sentence of the first paragraph

12  under --

13     A.    Okay.  The intelligence-led policing division

14  consists of 29 members, including a director, manager,

15  four detectives, and 23 analysts in varying levels and

16  roles.

17     Q.    Okay.  Is that still accurate?

18     A.    I believe there are a few more.  I'm positive.

19     Q.    A few more what?

20     A.    Analysts.

21     Q.    Okay.  Have the numbers -- the other numbers

22  stayed basically the same?

23     A.    Yes.

24     Q.    Okay.  Where do you fall within this hierarchy?

25     A.    One of the analysts.

1      Q.   Are you a senior analyst?

2      A.   Yes.

3      Q.   Are there any analysts above you?

4      A.   No.

5      Q.   Okay.  Dave Santos, what is his title?

6      A.   Manager.

7      Q.   Manager of ILP?

8      A.   Yes.

9      Q.   Okay.  And what is Larry Kraus's title?

10     A.   Inspector.

11     Q.   Is he the inspector of ILP?

12     A.   I think so.

13     Q.   If you look at the next paragraph, will you

14  read that first sentence, please?

15     A.   Two strategic analysts (a mid-level strategic

16  analyst and a senior strategic analyst) develop products

17  that offer insight and understanding to help inform

18  big-picture decisions pertaining to policy formation,

19  planning, resource allocation, manpower deployment, and

20  the agency's overall crime fighting efforts.

21     Q.   Okay.  I think I know the answer to this, but

22  just so we're clear, when it references the two

23  strategic analysts, you are one of those two; is that

24  right?

25     A.   Yes.

1      Q.    And you are the senior strategic analyst; is

2    that right?

3      A.    Yes.

4      Q.    Who is the mid-level strategic analyst?

5      A.    It is Michelle Kacprzak, K-A-C-P-R-Z-A-K.

6      Q.    If you read the sentence that -- will you go

7    ahead and read the sentence that follows?

8      A.    Let's see.  The strategic analysts define and

9    identify prolific offenders and assist in forming the

10   district STAR boxes.

11     Q.    Okay.  When it talks about strategic analysts

12   define and identify prolific offenders, is that

13   responsibility under the umbrella of your job duties?

14     A.    Yes, partially.

15     Q.    Who else shares that responsibility?

16     A.    The part that I do is to write the program and

17   apply the scoring, and the other analysts provide a

18   manual overview because programs can get things wrong

19   and data are sometimes wrong.

20     Q.    Let's maybe talk about that.  Maybe not yet

21   though.  Are you familiar with the term STAR team?

22     A.    Yes.

23     Q.    What is a STAR team?

24     A.    Strategic targeted area response team.

25     Q.    Do you have any interaction with STAR teams?

1    A.   No.

2    Q.   Did you used to?

3    A.   No.

4    Q.   Do the STAR teams use the information supplied

5  by you and your fellow analysts?

6    A.   Yes.

7    Q.   How do they use that information?

8    A.   One of the ways is we define areas the STAR

9  boxes where there is a lot of suppressible crime that

10  occurs, for instance, violence and burglary.  Some of

11  the other types of crimes we can't suppress very well.

12  So we're looking to find types of crimes that deputies

13  might be able to suppress rather than having to make

14  arrests after the fact.

15    Q.   So you mentioned suppression.  Can you explain

16  a little bit about the theory of suppressing crime?

17    A.   Sometimes people commit crime for -- to get

18  money to feed a habit or because they're involved with

19  other people that encourage them to, and with a little

20  bit of county services, they may be able to avoid that.

21  If they have a little bit of attention, they may not

22  want to do crime.  They may age out.  There are a lot of

23  reasons why people stop doing crime.

24    Q.   So is the idea to focus on those people

25  preventatively?

1      A.    Yes.

2      Q.    And your job is identifying who those people

3  you just described are?

4      A.    Right.  And then in the STAR boxes the areas

5  that are more problem areas.

6      Q.    Okay.  I'm curious about how the STAR boxes

7  interact with the problem people.  Under ILP are

8  deputies asked to target people who -- to target people

9  who are within those STAR boxes?

10      A.    The STAR teams --

11           MR. POULTON:  Object to the form.  Object to

12      the form.  Go ahead.  You can go ahead and answer.

13      A.    Okay.  The STAR teams concentrate on the

14  suppressible type of crime within the STAR boxes, and

15  the deputies, as part of their normal duties, are asked

16  to check on the prolific offenders.

17  BY MR. BARGIL:

18      Q.    Are they asked to check on anybody else?

19      A.    Yes.  There are a few other definitions that

20  I'm not involved with.

21      Q.    Is the only classification that you're involved

22  with prolific offender?

23      A.    Yes.

24      Q.    Do you have anything to do with the Top 5

25  classification?

1  A. I do not.

2  Q. Did you have anything to do with I think

3 at-risk youth classification?

4  A. No.

5  Q. Do you have anything to do with I think abusive

6 offender classification?

7  A. Yes, I run a program for that.

8  Q. Okay.  When you say you run a program for

9 that --

10  A. I -- it's a similar algorithm to the prolific

11 offender program and -- but it's not used by the

12 deputies.  It's used by the major crimes unit.

13  Q. Okay.  And the purpose of this algorithms as

14 it's name would indicate is to focus on, quote, unquote,

15 abusive offenders?

16  A. Correct.

17  Q. And how would you, in layman's term, describe

18 what an abusive offender is?

19  A. The definition -- I looked at that recently --

20 was if they've had two abuse-related arrests within the

21 past six months, and then a scoring system based on what

22 they've done in the past three years.

23  Q. Okay.  Is it fair to say that the abusive

24 offender classification is focused more on, quote,

25 unquote, violent offenses?

1      A.   It's mostly domestic.

2      Q.   Okay.  What would you say the prolific offender

3   classification is focused on preventing?

4      A.   The focus crimes for prolific offender are

5   burglaries and violence.

6      Q.   Okay.  Are there any others?

7      A.   There is --  drug offenses are added in at a

8   smaller calculation.

9      Q.   Okay.  Is it focused on what the district

10  refers to as the Big 4?

11     A.   Yes.

12     Q.   Or the agency?  I should correct myself.  On

13  what the agency refers to as the Big 4?

14     A.   Yes.

15     Q.   Okay.  Do you know what deputies are asked to

16  do when they make prolific offender checks?

17     A.   No.

18          MR. POULTON:  Object to the form.

19  BY MR. BARGIL:

20     Q.   You mentioned that those are folks who you

21  believe -- when I say folks, you mentioned that prolific

22  offenders are folks who in your belief would not be

23  committing crimes if certain civil services were

24  afforded to them.  Is that a fair --

25     A.   Not necessarily.

1      Q.   Okay.

2      A.   Some of them.

3      Q.   Okay.  Do you know what civil services are

4  offered?

5      A.   I don't.

6      Q.   Okay.  Take a look at page 75 of the document

7  that's in front of you.  Are you familiar with this

8  specific section?

9      A.   Yes.

10      Q.   And is this the appendix that provides the

11  prolific offender calculation?

12      A.   Yes.

13      Q.   Okay.  I'd like, if we could, to go through the

14  process, and it might be mechanical, of how raw data

15  comes to be a list of prolific offenders.  I think I

16  have an idea, but why don't you go ahead and tell me,

17  and then when you're done I'll ask you some questions.

18      A.   Okay.  The first part of the process is not

19  shown here.  It's in our database.  Occasionally

20  offenders get more than one unique name ID because the

21  deputy's in a hurry or doesn't -- the name is

22  sufficiently different from what's already in the system

23  that they add them a second time.  So I put together as

24  much as I can those name IDs, because if two offenses

25  had fallen under one name ID and three under the other

1    and they weren't put together, then we wouldn't have as

2    good of a calculation.

3            Then we look for people who have been arrested

4    for two of our focus offenses, which you already

5    covered, within the past three years.  And then once we

6    get that pool of people, then we run through all of the

7    things that they are noted for in the records management

8    system and assign point values to those items.

9            Then we rank the group, and the top are given

10   to the district analysts to vet whether or not they

11   actually should be a prolific offender.

12       Q.   Okay.  Going back to the beginning -- I thank

13   you for that explanation.  So the first thing you do is

14   you focus on establishing like a sound data set?

15       A.   Correct.

16       Q.   And then you apply your point system to those

17   individuals; is that right?

18       A.   Yes.  Although the criteria is first to get the

19   pool of those with two offenses --

20       Q.   Oh, that's right.

21       A.   -- or two arrests.

22       Q.   Two arrests within the last three years for

23   that specific set of offenses?

24       A.   Correct.

25       Q.   Or is it two arrests period?

1    A.   No, two of those specific offenses.

2    Q.   And is this in Pasco County only or anywhere?

3    A.   Only -- all of this data comes from the Pasco

4  records management system, which now includes

5  Zephyrhills and I believe New Port Richey, but I'm not

6  positive.  So we could include those.

7    Q.   Well, New Port Richey -- is New Port Richey in

8  Pasco County?

9    A.   Yes.

10    Q.   And so is Zephyrhills too?

11    A.   But they maintain their own databases.

12    Q.   I see.  So they were previously not included in

13  this calculating?

14    A.   Correct.

15    Q.   So in the past it would have been isolated to

16  individuals with two arrests in the last three years in

17  Pasco County excluding New Port Richey and Zephyrhills?

18    A.   Correct.

19    Q.   Okay.  Do you know when that changed?

20    A.   I don't remember.

21    Q.   Okay.  Do you know why they weren't sharing

22  their records with the County?

23    A.   Change is difficult.

24    Q.   Fair enough.

25         So we were talking about the inclusion or the

1    creation of the pool, which seems to be what it's

2    described as, and so it's two arrests -- I think I asked

3    you this, but I'm not sure what you -- I forget what you

4    said.  Is it two arrests of any kind or two arrests

5    within the Big 4?

6        A.    Two arrested of the focus crimes.

7        Q.    Okay.  Are there people who might have two

8    arrests of the focus crimes within the last three years

9    who don't end up making it into the pool?

10       A.    Yes.

11       Q.    Why?

12       A.    Because they've done very little where we try

13   -- with the ranking that we do later, we rank them

14   according to how many points they get.  If all they've

15   done is those two offenses, it's very unlikely that they

16   would be a prolific offender.

17       Q.    I see.  I want to be clear though.  I'm talking

18   only about the pool -- the creation of the pool before

19   the application of the formula, so --

20       A.    Oh, I consider a prolific offender one that has

21   been both put into the pool and then vetted by the

22   district analyst and chosen as a prolific offender.

23       Q.    Okay.  I didn't mean to -- if I used the term

24   prolific offender, pardon me.  I didn't mean to.  At

25   this point I'm just talking about an individual who

1    might have had two arrests within the Big 4 in the last

2    three years.  That person will automatically be fed into

3    the pool for application of the algorithm?

4        A.   Correct.

5        Q.   You don't do any culling of the herd at that

6    point?

7        A.   No, no.

8        Q.   Okay.  So then you apply your point system to

9    all of those people?

10       A.   Yes.

11       Q.   Do you have any idea how many people the pool

12   -- I'm calling it the pool.  Is that the appropriate

13   term?

14       A.   I prefer that term.

15       Q.   Okay.  Do you have any idea how many people are

16   typically in the pool when you do this?

17       A.   Usually between 18 hundred and 2000.

18       Q.   Okay.  And then you apply the scoring system;

19   is that right?

20       A.   Yes.

21       Q.   And that will rank all of the people in the

22   pool?

23       A.   Correct.

24       Q.   And then -- and then what happens?  I know you

25   testified it to this earlier, but then what happens?

1      A.    Then I take the rank list, take about the top

2   250 because within that 250 the district analysts should

3   be able to find 100 or so of the top that they think

4   should be prolific offenders.

5      Q.    Okay.  You don't just lop off everyone after

6   number 100?

7      A.    No.

8      Q.    Okay.  So what do district analysts take into

9   account when they're trying to go from that roughly 250

10  number down to about 100?

11     A.    I'm not certain of all the things, but one of

12  them would be if the person is already in jail and will

13  be for the next three months, then it would not be

14  necessary for the deputies to check on them.

15     Q.    Okay.

16     A.    Another one is if they've moved out of county

17  and probably won't be a problem for us, if they're

18  deceased, and I'm not sure what other criteria they use.

19     Q.    Would they weight, you know, that person's past

20  behavior over the last two or three years since they

21  made their way into the pool?

22     A.    Oh, I'm confused.  The pool is created about

23  quarterly.

24     Q.    I apologize.  So just to be specific or more

25  clear, I'm asking whether they would take into

1    consideration maybe things that happened in that

2    three-year history since they became eligible for

3    inclusion in the pool?

4        A.   Oh, yes.

5        Q.   Does that make sense?

6        A.   Right.

7        Q.   So if somebody maybe hasn't done anything for

8    three years, they still might -- or, you know, two and

9    three-quarters years, they still might end up in the

10   pool?

11       A.   Oh, they would still be in the pool.

12       Q.   And they might still --

13       A.   And the district analyst may decide not to

14   include them for that reason.

15       Q.   So they do consider -- do they consider things

16   beyond whether that person is sort of -- let me

17   rephrase.  Do they consider things beyond just whether

18   an individual is logistically incapable of committing

19   crime because they're out of the state or in jail?

20       A.   I'm not sure what other criteria they use.  I

21   know that those are in use.

22       Q.   Okay.  Could there be others?

23       A.   The out of state, the in jail.

24       Q.   Could there be others?

25       A.   Possibly.  I don't know.

1    Q.   I'm gathering that you don't participate in

2  this process?

3    A.   No.  Once I finished with the list, I send it

4  to the district analysts and they deal with it.

5    Q.   Do you ever receive feedback from the district

6  analysts about the accuracy --

7    A.   Yes.

8    Q.   -- of your system?

9    A.   We've gone through several iterations of this,

10  but the name matching part that I told you about

11  earlier, part of that I do automatically, and part of it

12  that isn't quite as certain then I have to do it

13  manually.  In the automatic part, it joined two twins.

14  They have very similar first name, middle name, and of

15  course same last name and birth date.  So when I ran the

16  calculation, it put together all of their offenses.  So

17  we had one person who was really high on the list, and

18  one of the district analysts said something is wrong

19  here, so I went back and corrected that.

20    Q.   Okay.  Do you ever get a district analyst who

21  might say something like I can't believe that so and so

22  is not on this list?

23    A.   No.  I give them the detail of the offenses

24  that the people have done, and if they find someone that

25  should be on the list, it would be in the records

 1    management system.  So that would probably be a

 2    name-matching problem as well.

 3        Q.   You mentioned that the district analysts are

 4    the ones who I think you used the term vet the list; is

 5    that a fair description?

 6        A.   Yes.

 7        Q.   Does anybody else participate in the vetting?

 8        A.   Not that I'm aware of.

 9        Q.   Do you know whether deputies or patrol --

10        A.   No.

11        Q.   Is it all civilians who do the vetting?

12        A.   Yes.

13        Q.   I'd like to direct your attention to page 75 of

14    the manual.  I think you're turned to it already.  Can

15    you look at the -- do you see where it says Scoring a

16    few lines down?

17        A.   Yes.

18        Q.   Can you read that sentence and the two bullet

19    points?

20        A.   After being qualified to the pool of offenders,

21    each individual is scored on three criteria:  Criminal

22    history, enhancements.

23        Q.   Okay.  I was wondering if you could clarify

24    something that's been confusing me.  It says scored on

25    three criteria, and then it list two items.

1          A.   Yes, I just noticed that too.

2          Q.   Is it two criteria and those are the two, or is

3     it three and we're missing one?

4          A.   Two.

5          Q.   Okay.  And those two would be criminal history

6     and enhancements?

7          A.   Yes.

8          Q.   I won't belabor it, but do you remember -- do

9     you see the point value assignment system that's

10    bulleted out there at the bottom?

11         A.   Yes.

12         Q.   I'll give you a moment to look that over.

13              Are those point values still accurate?

14         A.   Yes.

15         Q.   Going back to eligibility within the pool --

16    actually, if you take a look at the second line -- sorry

17    we're switching gears backward a little bit -- the

18    second line at the top of the page, I know you testified

19    that you confined yourself in the pool if you've had two

20    arrests within the last three years in Pasco County; is

21    that right?

22         A.   Yes.  ILP focus crimes.

23         Q.   Can you also find yourself in the pool if

24    you've had only suspicions?

25         A.   No.

1      Q.    Okay.  So you're looking only at arrests?

2      A.    Correct.

3      Q.    Now going down to the point value system, do

4  you recall how these have changed over time?

5      A.    No.  We've made minor modifications several

6  times.

7      Q.    Has it been generally consistent since its

8  inception?

9      A.    Yes.

10         MR. POULTON:   Object to the form.  Go ahead.

11  BY MR. BARGIL:

12     Q.    If you look at the last two a bullet points on

13  that list, do you see where it says Moderated

14  enhancement for each FTA and/or VOP?

15     A.    Yes.

16     Q.    And the next line starts with Moderated

17  enhancement as well; is that right?

18     A.    Correct.

19     Q.    Can you explain to me what a moderated

20  enhancement is?

21     A.    Purpose first.  People -- sometimes when

22  deputies arrest a person, they don't take them to jail.

23  They assign a court date.  If the person fails to

24  appear, then they get a failure to appear, FTA, or if

25  they have a VOP, violation of parole, that means they've

1    not been doing what the Court told them to.  So we want

2    to count that into the prolific offender, but we don't

3    want to count it real heavily.  So when we did our

4    initial test on that, we came up with panhandlers being

5    our most prolific offenders.  This was not on a real

6    prolific offender list but on a test to see if that

7    would work, and because some of the panhandlers had 40

8    or 50 FTAs --

9        Q.   Sure.

10       A.   -- and we didn't want them to be the top

11   prolific offenders, but we still wanted to include it.

12   So if you take the point value and take the square root

13   of it, it's a calculation based on that.  So if they

14   have four FTAs and VOPs versus 16, the 16 is double the

15   points rather than four times the points.

16       Q.   So by moderated enhancement, you're just

17   calculating the number of failures to appear and

18   violations of probation or parole and taking the square

19   root of that number --

20       A.   Basically.

21       Q.   -- and adding that to the score?

22       A.   Yes.

23       Q.   Does that apply as well for the following

24   bullet point for other involvement?

25       A.   For the numbers over five other appearances.

1    So if someone had four business burglaries and another

2    person had four business burglaries but they had also

3    been on the scene for 20 different crimes, we wanted to

4    give the person who's everywhere bad a little bit more

5    of a score.

6        Q.   Okay.

7        A.   And so of the other involvements above five

8    that were not arrests or suspicions, then we start

9    counting from there.

10       Q.   Okay.  In your estimation, when this algorithm

11   is functioning at its best, what are the types or who

12   are the types of people that tend to find their way to

13   the top of the list?

14       A.   I don't -- I don't know how to answer that.

15       Q.   Well, I assume part of the answer is not

16   panhandlers.

17       A.   Correct.  Right.

18       Q.   So at the other end of the spectrum what -- the

19   goal is to identify who?

20       A.   We get a mix of people with burglaries and some

21   that are violent, some that have done drug sales but

22   have also done the focus crimes, at least two of them.

23   So I think they find their nitch, and there's no real

24   common commonality between the people in the group other

25   than they've done a lot of it.

1          (Short break.)

2     BY MR. BARGIL:

3          Q.   I know you said you weren't involved in the

4     vetting process, but for purposes of testing your

5     algorithm's accuracy for lack of a better word, do you

6     look to see after the fact how many of your top 100

7     remain in the top 100 after the vetting process?

8          A.   I did a report a few years ago to find out how

9     effective it was, and it was difficult to know because

10    some of the people had moved in and out of the Top 5 and

11    the district target classifications as well, and so it's

12    -- basically, I was only able to focus on those people

13    during one quarter that had not previously been assigned

14    to any of those other classifications to see how they

15    were going forward and it did reduce their crime.

16         Q.   I think you might have misunderstood my

17    question.  So I guess what I'm getting at is you develop

18    your -- you identify your pool, you apply your

19    algorithm, you end up with your top 250 who then get

20    vetted; is that right?

21         A.   Yes.

22         Q.   And the goal is to bring that number down to

23    about 100; is that right?

24         A.   Right.

25         Q.   Have you ever reconciled the top 100 as

1    identified post vetting with what would have been your

2    top 100 prevetting?

3        A.    No.

4        Q.    Fair to say that there's some discrepancy

5    between those two things?

6        A.    Yeah.  Probably the sociology is not a good

7    predictor of human behavior.

8        Q.    What do you mean by that?

9        A.    If someone has done three business burglaries

10   on consecutive Thursday nights, are they going to do one

11   on the fourth?  There are many different reasons why

12   they would not, like the wife wanted them to go to the

13   pharmacy that evening, or I mean you can come up with

14   all the reasons.  So predicting human behavior is not

15   real effective.

16       Q.    Okay.  If you look at the enhancements at the

17   bottom of the page on page 75, it says a 10 percent

18   enhancement is added to the final score for an active

19   gang member; is that right?

20       A.    Yes.

21       Q.    Are there any other enhancements?

22       A.    I would really have called the FTA, VOP and

23   other involvement enhancements, but that's it.

24       Q.    Is there anything that's not listed setting

25   aside how it's classified?

1    A.   No.   At one point we considered putting in age

2    because a lot of people age out of crime, but there are

3    certain crimes that they don't, so we took that out.

4    Q.   Okay.   How do you know whether someone is an

5    active gang member?

6    A.   I go by our gang analysts' determination, and

7    they use the Florida Statute definition.

8    Q.   What are -- well, strike that.

9         How frequently do you modify your formula?

10   A.   Probably once every two years minor

11   modifications.

12   Q.   Why every two years?

13   A.   Oh, it's just because one of the analysts

14   notices something and says could we do this differently.

15   Q.   When was the last time you modified it?

16   A.   About two years ago.

17   Q.   Do you recall what prompted it in that

18   instance?

19   A.   Yes.   When someone does an auto burglary, it's

20   usually not an isolated event for that evening.   They

21   may do five or six of them in that same evening just

22   going down the street, and so we only count one burglary

23   auto per day arrest now.

24   Q.   I see.   Is that what's described, if you look

25   at step one criminal history?   No, that's not -- strike

1    that.

2        A.   Oh, that's slightly different.

3        Q.   Yeah, yeah, I see that.

4             What is the reasoning behind not counting five

5    separate offenses as five separate offenses?

6        A.   Many of the auto burglaries are minor in

7    nature.  They lift the door handle, take a couple coins

8    out of the glove box or something that is not a real big

9    harm to society.  When they break the glass window, then

10   that's big because that's expensive.  But in general the

11   auto burglaries are considered less of a problem --

12   well, they aren't as much harm to society as a business

13   burglary or a residential burglary.

14       Q.   I see.  So fair to say you tweaked the formula

15   so as to not over emphasize certain crimes that you see

16   as not being extraordinarily problematic?

17       A.   They occur a lot, but the auto burglaries,

18   burglaries who do a lot on a day often do a lot of days

19   too.

20       Q.   Okay.

21       A.   So we count them.

22       Q.   Okay.

23       A.   We hope just not inordinately.

24       Q.   I see.  Okay.

25            Okay.  We'll get to the unvetted list a little

1    bit later maybe, but just to circle back, you mentioned

2    that you believe that I think Larry Kraus was the

3    primary drafter of the ILP manual?

4         A.   Captain Ross, I believe.

5         Q.   Captain Ross.  I'm sorry.

6              And did you at least contribute this section or

7    is this somebody else taking what they know to be your

8    work and putting it in here?

9         A.   I put together one of these documents.  I think

10   it's been modified a few times by other people, and then

11   of course I would either modify it myself according to

12   the changes that the director had put together or --

13   well, yeah, I would -- I would modify it according to

14   what the new decisions were.

15        Q.   Okay.  Coming back to something else that I

16   mentioned earlier, we talked about prolific offender,

17   prolific offender classifications, and I think your

18   testimony was that you didn't have any hand in any of

19   the other classifications applied by the agency; is that

20   right?

21        A.   Other than the abusive offenders.

22        Q.   Other than -- so that was my next question.  So

23   your testimony was at first was that you didn't have any

24   involvement but abusive offenders you do.  Are there any

25   others that you might be forgetting?

1    A.   We have a revictimization report.

2    Q.   And you --

3    A.   So people who have been victimized multiple

4  times, our victim advocates go try to counsel them how

5  not to be victimized more.

6    Q.   And am I correct in assuming that you help

7  identify who those repeat victims are?

8    A.   Yes.

9    Q.   Okay.  Based on your review of the data?

10    A.   Correct.

11    Q.   Okay.  And again, you don't have anything to do

12  with the identification system for Top 5 offenders; is

13  that right?

14    A.   Correct.

15    Q.   Do you know who identifies Top 5 offenders?

16    A.   The district analysts as far as I know.

17    Q.   Do they do that with any direction from you?

18    A.   No.

19    Q.   Do you know what they take into account?

20    A.   No.

21    Q.   But you are their supervisor; is that right?

22    A.   No.

23    Q.   No?

24    A.   I don't supervise anyone.

25    Q.   Do you work pretty much -- I mean, you report

1    to somebody, but you work independently?

2         A.   Correct.

3         Q.   Okay.  Are you familiar with the term Top 5

4    offender?

5         A.   Yes.

6         Q.   What does it mean as far as you understand it?

7         A.   District analysts using whatever criteria they

8    use to select five people per district to be looked at.

9              (Cell phone interruption.)

10        A.   Sorry about that.

11   BY MR. BARGIL:

12        Q.   That's okay.

13             So is it your understanding that there is a

14   criteria?

15        A.   I think there is.  I don't -- I mean, I know

16   they talk about it amongst themselves, but I don't -- I

17   don't know what it is.

18        Q.   You know they talk about the criteria or you

19   know they talk about Top 5 offenders?

20        A.   About the Top 5 offenders.

21        Q.   So there may or may not be a criteria as far as

22   you know?

23        A.   I don't know.

24        Q.   Okay.  You hope there would be one; right?

25   Right?

1       A.   Yes.

2            (Exhibit B was marked for identification.)

3            MR. BARGIL::  Tom this will be Exhibit B.  I've

4       just handed the witness Pasco County Sheriff's

5       Office member performance report for one Stephen

6       Hiebert spelled with a P-H and an I-E.

7   BY MR. BARGIL:

8       Q.   Sir, do you recognize what I've put in front of

9   you?

10      A.   Yes.

11      Q.   Okay.  And what is it?

12      A.   Occasionally I get a performance report on how

13  I've been working in the recent past.

14      Q.   Okay.  Let me take a look at -- I'm going to go

15  by the Bates number that's the long number on the bottom

16  right corner.  Okay.  Can you take a look at page 18995?

17  And is this the member performance report for 2019?

18      A.   Yes.

19      Q.   Okay.  I will you direct attention to part E at

20  the top.

21      A.   Okay.

22      Q.   Would you read goal number one for me?

23      A.   Complete the data guide.

24      Q.   Okay.  And am I correct that this is a

25  recommended goal for you for the next evaluation period?

```
 1      A.   Yes.

 2      Q.   Who recommended this goal for you?

 3      A.   I don't recall if it was either me or my

 4   supervisor or Director Kraus.

 5      Q.   Okay.  You can cheat by looking at the bottom.

 6   I think there's some --

 7      A.   Okay.

 8      Q.   It's not ultimately relevant if you still don't

 9   know the answer.

10      A.   I made suggestions as far as my goals.  So I

11   don't know which ones were my idea and which ones were

12   his.

13      Q.   I see.  I think your ideas are in a separate

14   section, but maybe they overlap.  In any case, are you

15   familiar with this suggestion?

16      A.   Yes.

17      Q.   What is the air quote data guide?

18      A.   I believe that is a guide to our records

19   management system so the other analysts would be able to

20   navigate through the databases.

21      Q.   Why was that necessary?

22      A.   It's complicated.  There are probably forty or

23   fifty tables that that I normally use, and some of the

24   other analysts may use ten or twelve of them.

25      Q.   Okay.
```

1      A.    So knowing which ones realistically can be

2  joined with others and how and why is important.

3      Q.    Okay.  So when you say it's complicated, you

4  mean that the records management system is complicated?

5      A.    Yes.

6      Q.    I agree.  So did you complete that task?

7      A.    Partially.  I gave a training to the other

8  analysts with some documentation about how they could

9  join tables.

10      Q.    Okay.  Read goal number two.

11      A.    Research and assist in the development of an

12  automated process for social network analysis.

13      Q.    Okay.  What is social network analysis?

14      A.    It's a way of joining people via relationships

15  they have.

16      Q.    Okay.  What are some of the data that you take

17  into account when mapping that?

18      A.    If two people have been involved in the same

19  crime, then either as co-offenders or offender victim,

20  then -- well, if they're co-offenders, then they very

21  likely know each other.  And if they're offender victim

22  in a domestic, they very likely know each other.

23      Q.    Any other things you take into consideration?

24      A.    Let's see.  A lot.  If they -- if there's a

25  missing person report, quite often there's one parent to

1    juvenile last known to be with, et cetera.  So those

2    people all know each other.

3         Q.   Do you consider familial relationships?

4         A.   We don't really have an accurate way of

5    determining that.

6         Q.   If someone's a juvenile, do you know who their

7    parents are?

8         A.   No, not unless if it's been entered by a deputy

9    in some note section.

10        Q.   If someone is married, do you know who their

11   spouse is?

12        A.   No, unless if they've been in a domestic or if

13   they're in one parent to and missing child.

14        Q.   Well, I ask because I think some of those

15   things would be public record.  So do you ever search

16   outside of the records management system to develop the

17   social network?

18        A.   No.

19        Q.   Did you look at social media?

20        A.   I don't.

21        Q.   Does anyone else?

22        A.   Some of the district analysts do when they're

23   looking at a case and a specific case, but I don't look

24   at specific cases.

25        Q.   Do you know what kind of social media they look

1  at?

2      A.   No.  Yeah, social network analysis is

3  completely different than social media.

4      Q.   I understand.

5      A.   Okay.

6      Q.   But as part of social network analysis is

7  social media ever consulted?

8      A.   I've never used it.

9      Q.   You've never used it?  Do you know if others

10  use it as part of social network analysis?

11      A.   I really doubt it.

12      Q.   Do you think it would be helpful?

13      A.   No.

14      Q.   So if someone's Facebook profile says that

15  they're in a relationship with, you know, John --

16      A.   Oh, I'm talking about an automated software

17  product where you could put this data into a network,

18  and so the amount of research and typing would be

19  enormous for something like that.

20      Q.   I see.  I don't want to belabor it, but maybe I

21  guess my question is so I understand that your task was

22  to develop an automated process.

23      A.   Yes.

24      Q.   Without -- I understand why given your answer

25  that automated process would be necessary.

1    A.    Right.

2    Q.    But as far as the way social network analysis

3    is done now or at least at the time of this writing

4    prior to the existence of an automated process, do you

5    know whether social network analysis involved review of

6    social media?

7    A.    Oh, no.  We started with social network

8    analysis during a project with naval post graduate

9    school, and that was -- they taught us methods.

10    Q.    And those methods did not include --

11    A.    And so the -- right.  They suggested --

12    Q.    I guess the question is and those methods did

13    not include consulting or reviewing social media?

14    A.    They suggested doing a lot of hand typing, and

15    I did not like that idea.  I wanted to pull it from the

16    records management system because I could get a lot of

17    data for a little effort.

18    Q.    When you say they suggested a lot of hand

19    typing, what does that mean?

20    A.    That analysts read the narratives and associate

21    people based on that, where I could do it automatically.

22    Q.    I see.  So you wanted -- so is it the goal here

23    to develop a system that would pull data in a way that

24    could spit out a result about who's conducted to whom?

25    A.    Yes.

1      Q.   Okay.  And thank you for accepting my very

2   general description of what you were trying to do.  I'm

3   sure it's more complicated than that.

4           So I guess moving to goal number three, it says

5   research and assist in the development of an automated

6   process for prolific offenders; is that right?

7      A.   Correct.

8      Q.   Would you not describe your algorithm as an

9   automated process for prolific offenders?

10     A.   Yes.

11     Q.   You would not describe it as that?

12     A.   I would describe it as that, and like I said,

13  there's occasional updates to the process.

14     Q.   Okay.  So why would it -- why would you be

15  given a goal to develop an automated process if that is

16  what it is already?

17     A.   I don't know.

18     Q.   I guess going --

19     A.   I think that referred just to the upgrades

20  modifications.

21     Q.   I see.  I see.  But in terms of like the

22  vetting process, if we're going back, it is true that

23  there is a human component to the prolific offender

24  designation; is that right?

25     A.   Yes.

1    Q.   Okay.

2    A.   Oh, I think I recall about that.  I had

3  initially a database with a whole bunch of queries that

4  I had to run, and since then we got this mid-level

5  strategic analyst that worked with me.  Then we wanted

6  to put it into a more automated system where you take

7  about five steps and it's done rather than doing fifty

8  steps.

9    Q.   Okay.  I have a couple questions about that.

10  You said that you had to do a bunch of like independent

11  queries that you had to run?

12    A.   Yes.

13    Q.   At what stage in the prolific offender

14  designation process did you run those queries?

15    A.   Oh, all of them.  The name matching, the pool

16  selection and the scoring and sorting.

17    Q.   What kind of queries would you run in this as

18  you were scoring?

19    A.   Oh, similar to the scoring system that we

20  looked at in the ILP manual.

21    Q.   You were doing that all --

22    A.   A few queries at a time.

23    Q.   When you say queries, what is a query?

24    A.   There is Microsoft Access is what I normally

25  use, and it has what they call a query.  It's basically

1     a structured query language request for information from

2     the database.  So one query will grab data from the

3     cases and those involved, and the cases and those

4     arrests.  So there's just probably forty or fifty

5     different queries against one or more tables at a time

6     that need to be done in order.

7              It was a complicated process because you had to

8     know which queries to run at what time.  So then per

9     this goal, I put it together into a much more

10    streamlined process where you have about five or ten

11    steps that do this, do that.

12       Q.   Forgive my ignorance, but is what you're

13    describing essentially a process in which the computer

14    is asking you to tell it what to consider in running the

15    algorithm?

16       A.   Oh, no.  The algorithm has -- to the best of my

17    ability is a translation of that English document that

18    we saw in the ILP manual for scoring and for pool

19    selection.

20       Q.   So is the queries that you're running -- are

21    these much more like -- are these mechanistic within the

22    software that you're running?

23       A.   Yes.

24       Q.   Yeah.

25       A.   They're -- well, by its name, structured query

1   language was developed by IBM, and it is very specific,

2   almost like legalese, in what you want.  You want to

3   select these data items from this table sorted in this

4   order and connected via the name ID to find out what the

5   birth date of that person was.

6       Q.   Okay.  So you are -- fair to say that those

7   queries are part of your, you know, offering commands to

8   the system?

9       A.   Yes.

10      Q.   Okay.  I'll stop there on this line of

11  questioning because, frankly, I don't know what I'm

12  talking about, but --

13      A.   I was a programmer for fifteen years, so --

14      Q.   Yeah.  Well, now we're -- this is programming

15  language; is that right?

16      A.   Yes.

17      Q.   Yeah.  So I profess that that is not my strong

18  suit.

19            Now, so the goal was to streamline that

20  process?

21      A.   Yes.

22      Q.   And did you do that?

23      A.   Yes.

24      Q.   Did that do anything besides making the process

25  of prolific offender designation easier on your end?

1      A.    It was just for me or my replacement or the

2  mid-level strategic analyst, whoever else that needs to

3  run it when it needs to be run.

4      Q.    I see.  It wasn't changing outcomes?

5      A.    No.

6      Q.    Okay.  Gosh, I wish I would have just asked

7  that from the beginning.

8            So looking at -- if you turn a few more pages,

9  I think this is also in the 2019 performance review.  If

10  you look at page 18999, now am I correct if we look at

11  part C that this is a continuation from a previous

12  page's discussion?

13      A.    Yes.

14      Q.    Okay.  But focusing on what is in this section,

15  will you read -- well, why don't you just go ahead and

16  read that.  It's only two sentences.  Why don't you go

17  ahead and read them both.

18      A.    Part C?

19      Q.    Yes.

20      A.    In addition, it is imperative when working on

21  joint projects each team member understands the

22  methodology in which the data is collected and analyzed

23  for final product review and dissemination.  Strategic

24  Analyst Hiebert is encouraged to ensure any

25  discrepancies in data are thoroughly discussed prior to

1  finalizing or presenting a project or product.

2      Q.   Okay.  If you look at the first sentence, it

3  was suggested to you or said that it was imperative when

4  working on joint projects that each team member

5  understands the methodology in which the data is

6  collected and analyzed.  Why is that something that was

7  communicated to you?

8      A.   I'm not sure, but I believe it was in probably

9  several projects, but in the prolific offender list how

10  exactly did I get there with that list in other

11  projects, especially when working jointly, when I work

12  with other people, everybody has to have the same

13  definition of what the data mean.

14     Q.   In terms of the methodology for prolific

15  offenders, have you ever had disagreements with other

16  folks in the department, whether they're analysts or

17  supervisors or anyone in between, any conflicts about

18  the methodology applied?

19     A.   No.  Yeah, like I said, I don't make the

20  definition.  I make suggestions and then implement what

21  the decision is.

22     Q.   Well, when you make those suggestions, are they

23  generally accepted?

24     A.   I don't know.  We had -- about two years ago

25  when we were talking about the auto burglaries, we had a

1    meeting of all of the district analysts and me, and I

2    brought that up, and they agreed that that would be a

3    good thing to do.  So then we gave it to Larry, and he

4    approved it.

5         Q.   Any other examples you can think of like that?

6         A.   No.  It doesn't happen that often.

7         Q.   Any instances you can think of where you

8    suggested a change and it was rejected?

9         A.   I suggested we look at having the age as a

10   factor, but then after I did some tests on it, I decided

11   not -- that that was not a good suggestion.

12        Q.   In the second sentence it says, "Strategic

13   Analyst Hiebert is encouraged to ensure any

14   discrepancies in data are thoroughly discussed prior to

15   finalizing or presenting a project or product."  Do you

16   know why that was something that was specifically

17   referenced by a supervisor?

18        A.   I don't remember.

19        Q.   Do you have -- do you ever find that there are

20   discrepancies in data?

21        A.   Yes.

22        Q.   Can you give an example of what a discrepancy

23   in data might be?

24        A.   One of them that we use with the prolific

25   offender definition is there's a type of call -- a type

1    of case that is called throw/shoot deadly missile, and

2    it's throw/shoot deadly missile into home, into vehicle,

3    et cetera.  The point value is different if it's a brick

4    or if it's a firearm.  The firearm gets lots of points

5    and the brick not so many.  Yes, it's technically

6    deadly, but if they threw it at the window and not the

7    person, rather than firing a firearm into a house, that

8    could be deadly.

9         Q.   How is that a data discrepancy?

10        A.   The deputies do not have a choice to say it's

11   the big point one or it's the little point one, so we

12   have to go through and manually vet them.

13        Q.   I see.

14        A.   That's where I get to read case narratives.

15        Q.   I see.  Is that something that happens before

16   you apply the algorithm or after?

17        A.   It's in the middle.  So after the pool has been

18   created, then all of those types of cases that the

19   people in the pool have done, then I have to go and look

20   at those cases.

21        Q.   So you run the algorithm and assign point

22   values for all of the people in the pool --

23        A.   No.

24        Q.   Let me finish my question.

25        A.   Okay.

1    Q.   You run the algorithm for all the people who

2    are in the pool, but then for those who are in the pool

3    and have an offense like either of the ones you

4    described, then you parse those out and figure out

5    whether it's the high point value one or the low point

6    value one?

7    A.   Correct.

8    Q.   And that way you make sure that their assigned

9    point value is consistent with the formula?

10   A.   Yes.

11   Q.   Okay.  Are there any other offenses for which

12   you do that?

13   A.   Those are the -- that's the only manual one.

14   Q.   Okay.  But it gets -- the problem is that it

15   gets charged the same way --

16   A.   Yes.

17   Q.   -- by the officer?

18   A.   The state statute is the same.

19   Q.   I see.  It says here they want you to ensure

20   that any discrepancies in data are thoroughly discussed

21   prior to finalizing and presenting a project or product.

22   Could that be in reference to something else?

23   A.   Possibly.  Occasionally we've had problems

24   pulling data from the records management system.  It

25   gives us a partial list rather than the complete list.

1    I think that's more network-related though.

2        Q.   Okay.

3             (Short break.)

4    BY MR. BARGIL:

5        Q.   Okay.  We're back on the record.  Why don't you

6    go ahead and correct whatever misstatement you made?

7        A.   Page 19001 of the evaluation document, member

8    performance, I'd forgotten about a couple lists that I

9    made -- used to make.

10       Q.   Ah.

11       A.   Under A about the middle it says, Minor and

12   Recurring Tasks.  Offender lists (Prolifics, Abusive,

13   Violent, Narcotics and Under the Radar).  Well, I've

14   never done under the radar.  I looked at it, but it

15   didn't pan out, so I didn't do anything.  But violent

16   and narcotics, I used to work with that, but we have a

17   grant position that took that over about the time that

18   this was written.

19       Q.   Okay.

20       A.   So I forgot about it.

21       Q.   Well, thank you for correcting your answer.  I

22   might have a quick followup.  I think this explains one

23   of the questions I asked earlier.

24             So is the violent offender classification a

25   classification that is somewhat similar to the prolific

1    offender classification but focuses rather on Big --

2    than on Big 4 it focuses on violent offenses?

3         A.    Yes.   That's a program that was grant funded

4    and run with USF cooperation.

5         Q.    Did you create a scoring system?

6         A.    No, I didn't.   USF did.

7         Q.    Okay.   Did USF play any role in the creation of

8    the prolific offender scoring system?

9         A.    No.

10        Q.    There is a narcotics list?

11        A.    I don't know if it's still -- it is still being

12   created by the grant analyst, and it's given only to

13   major crimes.

14        Q.    Okay.   And is the purpose of that list to

15   identify narcotic offenders?

16        A.    Yes.   Same with the violent offenders.

17        Q.    Okay.   And under the radar, what was that

18   designed to go after?

19        A.    I don't remember.   All I remember is that we

20   thought maybe there were some people that were -- that

21   should be on our radar that were being missed, and after

22   looking at it, that did not appear to be case.

23        Q.    Okay.   And if there are people that should be

24   on your list -- well, does --

25        A.    Or a list.

1    Q.   Is that concern partially addressed through the

2    vetting process at least in terms of prolific offenders?

3    A.   Oh, in the vetting, the district analysts do

4    not add people to the prolific pool or to the prolific

5    list.

6    Q.   Do they only take them off?

7    A.   Yes.  I think there is one caveat in the

8    definition that if someone has moved in from another

9    county that we're aware of and they did a whole lot of

10   crime there, that the district analysts could petition

11   Larry to have them instated as a prolific offender, but

12   I don't think that's ever been done.

13   Q.   Okay.  How would you know if it had been done?

14   A.   Well, the district analysts communicate with

15   analysts from neighboring jurisdictions, and so if

16   someone just moved here from that other jurisdiction and

17   I believe that they -- the other analysts sometimes

18   communicate, oh, you might be seeing some of Joe here.

19   Q.   Okay.  Would it be as simple as the district

20   analyst sending an email to Larry Kraus saying I think

21   this person should be included on the prolific offender

22   list?

23   A.   I think they would have to justify.

24   Q.   I understand that.

25   A.   Okay.

1    Q.   But they would, in the body of that email,

2    justify it or provide criminal history?

3    A.   Yes, they would have to list a certain number

4    of offenses that would make them equivalent to the other

5    prolific offenders that we have.

6    Q.   Okay.  Is another way to get someone elevated

7    for increased scrutiny to put them on the Top 5 list?

8    A.   I don't know.

9    MR. POULTON:  Object to the form.  You mean

10   then or now?

11   MR. BARGIL:  I don't know.  At the time that

12   the Top 5 list existed.  His answer was I don't

13   know, so --

14   MR. POULTON:  Understood.  Thank you.

15   BY MR. BARGIL:

16   Q.   Give me just one second.

17   In that hypothetical situation where a person

18   moves in from out of county and a district analyst

19   becomes aware that they've moved in, I just want to be

20   certain, is there a formal process in place for how that

21   person might find their way on Pasco County's prolific

22   offender list?

23   A.   It's listed in the definition document for the

24   prolific offenders.  I think the bottom paragraph it

25   just states that if the district analyst can petition to

1    add another prolific offender, if there's sufficient

2    justification from out of county or out of jurisdiction.

3         Q.   And but that wouldn't go through you?

4         A.   No.

5         Q.   It would go directly to Kraus?

6         A.   Right.  What happens -- what the process is,

7    once it leaves me, it goes to the district analysts and

8    then they update the records management system with

9    their -- with the new prolific offenders.

10        Q.   I see.  Okay.  Thank you for that.

11             (Exhibit C was marked for identification.)

12   BY MR. BARGIL:

13        Q.   Do you recognize what I have presented you

14   with?

15        A.   It's vaguely familiar.

16        Q.   Okay.  Does it appear to be a five-year review

17   of the intelligence-led policing program?

18        A.   Yes.

19        Q.   Take a look at what is -- we're going to be

20   looking at the Bates stamps -- basically page 2 of the

21   document, but the Bates number is 17397.  This goes to

22   some of the things that we discussed earlier, but if you

23   look at the assessment highlights on the left-hand

24   column, will you read the third bullet point, please?

25        A.   Identified prolific offenders showed a 75

1    percent reduction in arrest after being labeled

2    prolific.

3        Q.   Okay.  Have you done any studies to indicate or

4    establish why there is a reduction in arrests after

5    being labeled prolific?

6        A.   No.  Why is a really tough question for an

7    analyst to answer.

8        Q.   Okay.  See at the bottom where it says

9    Intelligence Analysis.  Can you read the second bullet

10   point?

11       A.   Prolific identification is successful.

12       Q.   Okay.  But again, all that the data tells us is

13   that there is a reduction in arrests after the prolific

14   offender classification is applied to somebody; is that

15   right?

16       A.   Yes.

17       Q.   And we don't know why that is; right?

18       A.   No.  I don't know if this was done, but I would

19   assume that they compared that 75 percent reduction in

20   arrests to possibly a group in the pool that were not

21   identified as prolific offenders.

22       Q.   Okay.  But as you testified before, there are a

23   lot of reasons why people stop committing crimes; right?

24       A.   Yes.

25       Q.   Is it possible that what this could tell us is

1    that the algorithm didn't accurately identify the people

2    who are most likely to commit future crimes?

3            MR. POULTON:  Object to the form.

4        A.   I would find it difficult to draw that

5    conclusion that it was not effective.

6    BY MR. BARGIL:

7        Q.   It could be the case though; right?

8        A.   There's a small chance, small probability.

9        Q.   And they generally don't have any data to

10   affirmatively establish otherwise; right?

11       A.   Correct.

12       Q.   Okay.  If you turn to page -- actually, I

13   actually want to clarify something on page -- well, it's

14   page 3 of the document.  I think the Bates number is

15   kind of lost maybe on that page.

16       A.   Uh-huh.

17       Q.   There are some graphs.  You might not be able

18   to answer this either because these are black and white

19   copies, but if you look on the left side, can you tell

20   us what we're looking at?

21       A.   Year over year comparison of violent Big 4 and

22   narcotics crimes.

23       Q.   Are you able to tell maybe based on your

24   experience or your super human eyesight what these

25   graphs -- which is which in these bar graphs?

1     A.    In general, Microsoft Excel, which is used

2  by -- that this chart is likely from, lists them in

3  order.  So violent would likely be the largest of the

4  bars for each -- or the columns for each of the years,

5  and followed by Big 4, followed by narcotics.

6     Q.    Okay.  And on the right-hand side, you have the

7  five-year crime trend nationally for violent crimes; is

8  that right?

9     A.    Yes.

10     Q.    Is it fair to say that the violent crime

11  nationally beginning in 2016 begins to drop?

12     A.    Yes.

13     Q.    And is it also fair to say that at that same

14  time in Pasco County there is an increase in violent

15  crime?

16     A.    Yes.

17     Q.    Could we go to -- I'll use the page number on

18  the document again.  Go to page 9.  What is this a

19  depiction of?

20     A.    Oh, Collier County was --

21     Q.    Before we get into that -- sorry, I don't want

22  to interrupt you, but what are we actually look at on

23  this page?

24     A.    Oh, we are looking at two different scoring

25  methods for potential prolific offender models.

1          Q.    And who are the two side-by-side comparisons?

2          A.    Collier County came to visit and look at our

3     prolific offender model.  They proposed one of their

4     own, and so I believe I put this -- this page together

5     showing what the different features were.

6          Q.    I see.  The reason for the comparison of

7     Collier County then was just that they happened to visit

8     and develop a system of their own?

9          A.    Yes.  And then I did a study to determine if --

10    how close theirs was to ours implementing their method

11    to our method and to find out if the rankings of the

12    people would be different.

13         Q.    What was your conclusion?

14         A.    They were very different.

15         Q.    Different how?

16         A.    Some people that we thought were big problems

17    did not appear to be problems in the Collier method and

18    vice versa.

19         Q.    Which type of people did not appear to be

20    problems if you used the Collier method?

21         A.    Let's see.  They gave a really high weighting

22    to forcible felonies, and they excluded a lot of the

23    features that we had in our score.  Also --

24         Q.    Like what?

25         A.    Let's see.  They only counted arrests.  They

1     did not include suspicions.  They did not distinguish

2     between firearm -- a case with a firearm was either

3     exhibited or used versus the other, and they -- I

4     believe they omitted a lot of other things.  I don't

5     know if they're shown here.  They had no -- let's see.

6     It's been a while since I looked at this.  Sorry.

7          Q.   Can I interrupt you really quickly?

8          A.   Sure.

9          Q.   The scoring system that's on the left-hand

10    side, is that the Pasco scoring system?

11         A.   Yes.

12         Q.   Can I ask you about number 7 where it says

13    there's a 15 percent enhancer for gang member

14    affiliation, is that what it says?

15         A.   Yes.

16         Q.   Is that different from what's in the ILP

17    manual?

18         A.   No.  I believe that that's in the ILP manual

19    under that single enhancement that we looked at.

20         Q.   I thought it was 10 percent.

21         A.   Hmm.  It could be that the manual was in error

22    because as far as I know we've always used 15 percent

23    when we use the gang enhancer.

24         Q.   It's on page 75 of the manual, which I believe

25    is Exhibit A?

```
 1              MS. BROTHERS:  Yes.

 2    BY MR. BARGIL:

 3         Q.   Yeah.

 4         A.   You're right.  It does say 10 percent.  We've

 5    always used 15 percent --

 6         Q.   Okay.

 7         A.   -- whenever we used gang enhancer.

 8         Q.   Do you no longer use gang enhancer?

 9         A.   Yes, we do.

10         Q.   Oh, okay.  And going back to that -- I should

11    have asked this before and maybe I did -- when it comes

12    to the enhancements, are those added by the analysts

13    during the vetting process, or they're added by you?

14         A.   It's in the calculation.

15         Q.   Okay.

16         A.   Or in the automated calculation.

17         Q.   Okay.  Will you look at the following page.  It

18    says Proposed Prolific Scoring Model; is that right?

19         A.   Yes.

20         Q.   Does this look familiar to you?

21         A.   Yes.

22         Q.   Okay.  Did you create this slide?

23         A.   I did.

24         Q.   Whose proposal is this?

25         A.   I believe it was Larry.  I'm pretty sure it was
```

1    Larry.  It was for me to look into various models that

2    would incorporate what Collier was proposing.

3         Q.   Okay.

4         A.   And I ran 196 different models, and then we

5    were most interested in two of them --

6         Q.   Okay.

7         A.   -- which I then compared with our method with

8    what the lists were.  That has not been implemented.

9         Q.   Do you know why it hasn't been implemented?

10        A.   No.

11             MR. BARGIL:  I'm sorry to have to do this.  Can

12        we take a quick break?  I'm getting a phone call in

13        a case for which something is due today, and I need

14        to make sure everything is okay.

15             MR. POULTON:  Sure.  No problem.

16             MR. BARGIL:  We'll go off the record real

17        quick.  I'll be right back.

18             (Short break.)

19    BY MR. BARGIL:

20        Q.   I apologize for that interruption.

21             So I suppose that the recommended prolific

22    scoring model that was rejected was what is described

23    here as scenario 9, variation 8?

24        A.   Yes.  I think so.  I don't -- I don't have that

25    page, do I?

1    Q.   Oh, you should.  I'm sorry.  It's in line 2

2    under Prolific Scoring.

3    A.   Oh, yes.

4    Q.   What was the purpose or what was the -- what

5    are the distinctions or what is the distinction between

6    the proposed model and the one currently in use?

7    A.   Let's see.  The scenarios were broken out by a

8    really short time to qualify for the pool and along

9    three -- you know, maybe one year to qualify for the

10   pool rather three years, two years to qualify for the

11   pool rather than three, and then three years, and then

12   to gather the points one year, two years, three years.

13   Q.   Okay.  And given that these are your words, it

14   was your belief that this model shows the greatest

15   results for accurately identifying prolific offenders

16   that are actively contributing to the modern crime

17   environment; is that right?

18   A.   Most accurately among the 196 that were

19   studied.

20   Q.   All right.  Did you compare along with the 196

21   to the existing formula?

22   A.   Yes.

23   Q.   Did you find that scenario 9 variation did a

24   better job than the existing formula?

25   A.   I didn't know how to define better, so we -- I

1   believe we showed that to the district analysts to make

2   a determination as to what was closest or what was good,

3   because while they know what the prolific pool looks

4   like or at least the top 250 that I show them, they have

5   their own ideas obviously on working with these people

6   which names keep popping on their radar, and so it's a

7   subjective method, but that was -- that was the best

8   method that they could see amongst 196.

9       Q.   Okay.  I should have spoken in more precise.

10  So it was your -- based on your calculation, you thought

11  scenario 9, variation 8, was based on the data more

12  likely to produce results that would be beneficial in

13  preventing crime?

14      A.   I don't --

15           MR. POULTON:  Object to the form.

16      A.   I don't know that.

17  BY MR. BARGIL:

18      Q.   Okay.

19      A.   It's just like the why, you know, and a data

20  analyst cannot answer why.

21      Q.   Yeah.  I understand that.  Fair enough.

22           Looking at the last bullet point on the

23  right-hand column, is it fair to say that you

24  recommended removing modifiers such as gang affiliation,

25  violation of probation, failure to appear, and

1    suspicions to focus strictly on arrest history?

2        A.    That was -- that was the result of -- that was

3    how the model was built was based on those factors.

4        Q.    So the proposed model would have removed things

5    currently taken into consideration under the model at

6    the time and the model as it exists now; is that right?

7        A.    Yes.  Also, it would make my work a lot easier

8    because I wouldn't have to do the name matching.

9        Q.    Ah.

10           (Exhibit D was marked for identification.)

11           MR. BARGIL:  Okay.  Tom, this is Exhibit D.  It

12       a spreadsheet depicting the unvetted prolifics for

13       part of 2018.

14           MR. POULTON:  Okay.

15   BY MR. BARGIL:

16       Q.    Mr. Hiebert, I know I just said out loud on the

17   record what we are looking at, but if you don't mind,

18   will you tell me what this is?

19       A.    This is the prolific pool for I don't know what

20   date but sorted in descending order by score.

21       Q.    Okay.  Will you turn to the last page of the

22   document, please, and will you look at the top line?

23       A.    Unvetted prolifics.

24       Q.    What's the line underneath that?

25       A.    This Excel shows the unvetted top 202 prolifics

1    in spreadsheet Top 202.

2         Q.   Okay.

3              MR. POULTON:  Can you -- I'm sorry, Ari.  Can

4         you tell me which order and which year that

5         corresponds to?  Do we know?

6              MR. BARGIL:  I could ask the witness on the

7         record.

8         A.   I do not know.

9    BY MR. BARGIL:

10        Q.   Okay.  My understanding is that this is 2018

11   and run at I think Q4 of 2018.  And you can confirm that

12   for me, sir, if you take a look at the second paragraph

13   on the last page, there's a line in there that talks

14   about the date here.

15        A.   Oh, very good.  Yes.

16             Column C indicates if they are at the Land O'

17   Lakes Jail on November 8th of 2018.

18        Q.   So when would that indicate to you that this

19   list was created?

20        A.   That means I did the calculation then, and it

21   was probably forwarded to the district analysts shortly

22   after that, within a week or two.

23        Q.   So this would have been for the fourth quarter

24   of 2018?

25        A.   The district analysts take data that's passed

1   to make a list for the deputies to look at for the

2   upcoming quarter.  So the data would have been through

3   November 8th, but the -- they would have been on the

4   prolific list probably starting January 1st or so.

5       Q.   Okay.  So this would have been more likely data

6   used for the prolific list for first quarter of 2019?

7       A.   Correct.

8       Q.   Okay.  Now looking in that same section in the

9   line that begins with some factors, can you read that

10  sentence for me?

11      A.   Some factors that may influence your choice on

12  whether to include them in your list of prolifics.

13      Q.   I want to focus on where you say your choice.

14      A.   Yes.

15      Q.   Is it the analyst's choice on who to include in

16  the list of prolifics?

17      A.   According to some strict criteria, and that's

18  what I tried to list here.

19      Q.   Okay.  Are these factors that you list, these

20  four things, are these -- these are strict criteria that

21  they must consider?

22      A.   No.  But if they notice, for instance, on the

23  third one, if they did eight business burglaries all on

24  one day not quite three years ago, then that might be a

25  reason to drop them off the list.

```
1        Q.   So are these recommendations to the district
2   analysts --
3        A.   Yes.
4        Q.   -- on things that they should take into
5   account?
6        A.   Sorry.  Yes.
7        Q.   Can they take other things into account?
8             MR. POULTON:  Object to the form.
9        A.   Deceased would be another one.
10  BY MR. BARGIL:
11       Q.   I'm not asking you to list them.
12       A.   Okay.
13       Q.   I'm just asking whether there are other things
14  not identified here as --
15       A.   Yes, very likely.
16       Q.   Let me finish my question.  Are there other
17  things not identified on this list of things that might
18  influence their decision that district analysts could
19  take into account when deciding on their final prolific
20  offender list?
21       A.   Very likely.  Like I just listed one, but it's
22  only for exclusion rather than inclusion.
23       Q.   Okay.  Can somebody be included as a result of
24  exclusion?
25       A.   I'm sorry.  I didn't follow.
```

1    Q.   Well, if the goal is to have roughly 100 people

2   and somebody is sitting at 105 and you exclude 5 people

3   above them, would that person now be sitting within the

4   top 100?

5    A.   Yes.

6    Q.   Okay.  Do you know whether district analysts

7   ever do that?

8    A.   That's why I give -- yes, that's why I give

9   them the list of 250 or so or 202 in this case, so that

10  when they remove certain, then they have more to look

11  at.

12   Q.   I see.

13        (Exhibit E was marked for identification.)

14  BY MR. BARGIL:

15   Q.   Okay.  Do you recognize the document that's in

16  front of you?

17   A.   Yes.

18   Q.   Will you explain what it is?

19   A.   It is another prolific offender list from

20  approximately three months prior to the last one.  No,

21  that was 2019?  Any how --

22   Q.   The sequence isn't --

23   A.   September of 2019, yes.

24   Q.   Okay.  And there's a cover note on this

25  spreadsheet as well; is that right?

1    A.    Yes.

2    Q.    And at the bottom will you read that final

3 sentence?

4    A.    The spreadsheets show if the offender is

5 currently in the Land O' Lakes Jail (not other

6 imprisonment).

7    Q.    Oh, I'm sorry.  And will you read the sentence

8 before that?

9    A.    Oh.  Some offenders may have moved, so trade

10 with other analysts as needed.

11    Q.    Okay.  Again, is this a note to the district

12 analysts?

13    A.    Yes.

14    Q.    Is that sentence there intended to help them

15 guide their weighing of prolifics?

16    A.    Yes.  Some offenders move from one district to

17 another.  Some are homeless and start hanging out in the

18 other districts.

19    Q.    Okay.

20    A.    But the district analysts are generally aware

21 of who moved where.

22    Q.    Okay.  It says, "The spreadsheets show if the

23 offender is currently in the Land O' Lakes Jail but not

24 other imprisonment."  Why wouldn't it show other

25 imprisonment?

1       A.   I don't have access to other jurisdictions

2   incarceration.

3       Q.   Okay.  How do you know whether someone has

4   moved?

5       A.   I don't.

6       Q.   Okay.  Speaking of whether someone's moved, is

7   it possible that -- well, we talked earlier about people

8   who are on the prolific offender list not being on the

9   prolific offender list in subsequent years.  Do you

10  remember that discussion?

11      A.   Yes.

12      Q.   Is one of the reasons why they might not be on

13  the prolific offender list in subsequent years because

14  they will have moved out of town?

15      A.   Yes.

16           (Exhibit F was marked for identification.)

17  BY MR. BARGIL:

18      Q.   Okay.  Do you recognize the document that's in

19  front of you?

20      A.   Yes.

21      Q.   Why don't you describe briefly?

22      A.   It's another list of the prolific pool in --

23  with sorted by descending number of points for December

24  of '20.

25      Q.   Okay.  Will you read the note at the bottom?

1      A.    After our recent discussion about multiple

2  arrests on the same day, I again modified the

3  calculations.  We wanted to count multiple robberies on

4  the same day but not multiple auto burglaries.  Column 3

5  now shows the extra unwanted points for additional auto

6  burglaries on the same day.  These points are subtracted

7  resulting in the new first column (Mod Points).

8      Q.    Okay.  Break it up.  If you look at the first

9  sentence that begins "after our recent discussion," do

10 you recall what discussion this refers to?

11     A.    Yes.  I referred to it earlier.  I sat down

12 with the district analysts, and we talked about what to

13 do with auto burglaries since they were -- appeared to

14 be over counted.

15     Q.    Okay.  So did you -- is it fair to say you

16 created one unvetted list, and in that unvetted list

17 there was concern that auto burglaries had been over

18 counted, and then a discussion was had to address that?

19     A.    No.  It had been a topic that we'd considered

20 over a period of time, and then when we had our meeting,

21 the analysts decided that they wanted to go with just

22 one auto burglary counted per day.

23     Q.    So in prior lists, unvetted lists from earlier

24 years before this, was that not how they were counted?

25     A.    Correct.  They were counted multiple --

1    multiple times.

2        Q.   Did this require you to make any formal changes

3    to the scoring system?

4        A.   Well, the database or the calculations changed

5    slightly.  I just -- whenever there are multiple, I just

6    counted the first one on that day and kept the rest of

7    them in the detail list, but gave them zero points.

8        Q.   Okay.  So you, basically, instructed the

9    computer to count those differently; is that right?

10       A.   Correct.  Yes.

11       Q.   Okay.  You still got the same number of points,

12   but whether that number of points was assigned multiple

13   times or just once was the change?

14       A.   If you look at the second page, there is an

15   example.  Our top offender here had 24 points subtracted

16   from his total score because of auto burglaries on the

17   same day.

18       Q.   I see.

19       A.   And since they count two, that means over a

20   period of days that he did auto burglaries there were

21   twelve that were duplicates.

22       Q.   I see.  Okay.  If you continue on in that first

23   sentence at the second clause there it says, "I again

24   modified the calculations."  The use of the word again

25   suggests that there were several iterations of

1    calculations; is that right?

2        A.   Yeah, about every two years is what I said

3    before.

4        Q.   Oh, okay.  And so this is a reference to having

5    changed from something that had been done a certain way

6    for about two years?

7        A.   Yes.

8        Q.   Okay.

9             (Exhibit G was marked for identification.)

10   BY MR. BARGIL:

11       Q.   Hold on one second.  Do you recognize what this

12   is?

13       A.   Yes.  This is the unvetted prolific pool list

14   for April of 2021.

15       Q.   Okay.  Let's set this aside for a moment.

16            (Exhibit H was marked for identification.)

17   BY MR. BARGIL:

18       Q.   Does this look familiar to you?

19       A.   Yes.  I don't know what date it's from, but

20   it's another prolific pool list.

21       Q.   Okay.  Will you look to what is Bates number

22   11305?

23       A.   I'm sorry?

24       Q.   I'm sorry.  11305.

25       A.   Okay.

1   Q.   Can you read the note there?

2   A.   "While the top 250 are divided into their

3   district of residence, the goal is to have about 100

4   prolific offenders for deputies to be aware of."

5   Q.   Okay.  And again, is that a note that you're

6   directing toward your analysts?

7   A.   Yeah, the district analysts.  As you can see,

8   the district one, district two, district three

9   distribution is not even.

10   Q.   Uh-huh.

11   A.   And so some of them were feeling left out.

12   Q.   All right.  Is the goal to have a roughly even

13   number in each district?

14   A.   No.  I don't know that there is a goal.  My

15   personal feeling is that they should be fairly evenly

16   distributed amongst the districts because so are the

17   scores.

18   Q.   I see.  Well, it shows here, if I'm not

19   mistaken, that the scores are not fairly evenly

20   distributed amongst the districts; is that right?

21   A.   Right.  But they should -- what I meant was

22   that it seems to me that if district one has as many in

23   the top 250 as districts two and three combined, then

24   they should probably have about half of the prolific

25   offenders.

1    Q.   Oh, okay.

2    A.   That's my feeling though.  That's not a rule.

3    Q.   Well, let me clarify what you said and make

4    sure I'm understanding what you said.  Are you

5    suggesting that in that scenario roughly half of the

6    prolific offenders would reside in district one?

7    A.   Yes.

8    Q.   Okay.  As opposed to that they should cut in

9    half the number of prolific offenders so that they can

10   be distributed to other districts?

11   A.   Right.

12   Q.   Okay.  Here you say the goal is to have about

13   100 prolific offenders?

14   A.   Yes.

15   Q.   Where does that number come from?

16   A.   When we started the program, there was a

17   discussion as to whether we should have a point value

18   cutoff, and everybody above that got to be a prolific

19   offender, barring exclusions, or if we wanted to have a

20   number certain.  And we decided on the number certain

21   because we could determine how many we wanted the

22   deputies to be aware of.  They can't handle looking at

23   too many people, and too few wouldn't be a good program.

24   Q.   Why would too few not be a good program?

25   A.   As far as the goal of suppressing crime, if you

1    take the top ones, then you hopefully reduce the crime

2    that they do, and 100 seemed like a good number to go

3    after.

4         Q.   Okay.  Was that based on anything?

5         A.   No.

6         Q.   I mean, if there were no crime in Pasco County

7    or scant little --

8         A.   That would be nice.

9         Q.   I'm sure it would be -- and the people who

10   were, you know, falling at the bottom end of the

11   prolific offender classification were people who were

12   law abiding citizens minding their own business but

13   happened to have done something two or three years or

14   been suspected of doing something two or three years

15   ago, would those people be removed from the list by the

16   district analysts, or would they want to stick to the

17   100 number?

18         MR. POULTON:  Object to the form.  Go ahead and

19      answer if you can.

20         A.   That's not the case.  I mean, as you saw,

21   violent crime is going up, and while property crime has

22   been going down, we still have a large number of

23   offenders, usually 1,800 to 2,000 to choose from.

24   BY MR. BARGIL:

25         Q.   It was a hypothetical question.

1        A.    Okay.

2        Q.    Answer it if you can.

3              MR. POULTON:  He's free to answer that it's a

4        terrible hypothetical, isn't he?

5              MR. BARGIL:  Did you have an objection, Tom?

6              MR. POULTON:  I made the objection.  I objected

7        to form and he answered.  You just seem to want to

8        debate it.

9   BY MR. BARGIL:

10       Q.    Well, I'm going to ask if you're able to answer

11  the hypothetical question, whether it was a good one or

12  a bad one.  There are no good hypothetical questions.

13  So if you'd like to attempt to answer it,  I'd

14  appreciate that.

15       A.    I don't -- I don't foresee that happening.  So

16  I think the hypothetical question is extremely unlikely

17  to occur.

18       Q.    Okay.

19             (Exhibit I was marked for identification.)

20             MR. BARGIL:  Tom, I just handed him the list

21       summary that you provided us.

22  BY MR. BARGIL:

23       Q.    Mr. Hiebert, I don't think you've seen this

24  before.

25       A.    I generated it.

1    Q.   Oh, you generated it.  I should have actually

2    known that.  Well, then you know, of course, what it is.

3    I was wondering if you could take a look at the last

4    column, which is the last vertical column, which says

5    Robert A. Jones, IV.

6    A.   Yes.

7    Q.   And it appears that he doesn't appear in the

8    rankings for any of the years other than quarter one of

9    2017; is that right?

10   A.   Correct.

11   Q.   Do you have any idea why that is?

12   A.   Well, even for that one quarter, he ranked at

13   198.  So it's unlikely that he would have been selected

14   as a prolific offender.

15   Q.   Do you know whether he was in fact selected as

16   a prolific offender?

17   A.   I did a recent check and -- because of a

18   question about that, and I don't believe that he was.  I

19   think he was a Top 5.

20   Q.   Okay, okay.  What did you look at when you were

21   trying to find out whether he had ever been designated

22   as a prolific offender?

23   A.   Oh, there is a table in the records management

24   system when the district analysts modify whenever they

25   put in prolific offender Top 5 district target, and it

1    -- as far as I know no rows have been deleted out of it,

2    but it shows the person or their name ID, and when the

3    record was added, and when the record was most recently

4    modified.  And so there was not, if I remember right, an

5    entry for prolific offender for Robert Jones, IV, but

6    there was a Top 5.

7        Q.   Okay.  If he had ended up on the prolific

8    offender list, do you have any idea how that would have

9    happened?

10       A.   No.  Data entry would be the only thing that I

11   could think of.

12       Q.   What did you say?

13       A.   Data entry problem, an error in data entry.

14       Q.   On whose part?

15       A.   Probably a district analyst, if he was a

16   prolific, but I don't believe he was a prolific.

17       Q.   Okay.  Could it have been a discretionary

18   decision made by a district analyst?

19       A.   I don't think so.

20            Oh, in case you were interested, these are the

21   ranking numbers in the pool for each of the people for

22   each those documents.  I was just asked to find when

23   these people showed up in documents that I generated.

24       Q.   So if he was 198 in the pool --

25       A.   Yes.

1     Q.    -- if, you know, 100 people were removed from

2  the pool --

3     A.    Then it's possible --

4     Q.    -- he could have found himself in the top 100?

5     A.    -- but it's unlikely.

6     Q.    Well, that goes to a question that I asked

7  before.  Do you have any sense, I mean, if there are

8  100 -- if you look at the top 100 in an unvetted list,

9  are you able to estimate how many of those people

10  roughly from quarter to quarter are removed --

11     A.    No.

12     Q.    -- for any reason?

13     A.    The only indication that I would have from the

14  data that I look at is whether or not they were

15  currently at Land O' Lakes Jail, but that's not

16  conclusive because they may be there for a one-week

17  stint, and then they would still be, according to the

18  analyst, a viable prolific offender.

19     Q.    Okay.  But having done this quarterly for

20  nearly a decade, you don't have any sense for how many

21  people out of the initial Top 100 end up being removed?

22     A.    No, I don't.

23     Q.    Okay.  And is part of the reason --

24     A.    I have been asked for more, and that's why I

25  went up to as many as 250 --

1      Q.   I see.

2      A.   -- but 250 is a great plenty.

3      Q.   Okay.  And the goal after giving over, you

4   know, a list of 250 is for about 150 of those to be

5   removed?

6      A.   Yes.

7      Q.   Do you find that the majority of those who are

8   removed are at the bottom end of the 250, or is it

9   evenly distributed?

10      A.   I haven't checked.

11      Q.   Okay.  Would checking help you ascertain the

12   usefulness of your scoring system?

13      A.   No, because the vast majority would be

14   incarcerated for three months or more.

15      Q.   How do you know that?

16      A.   That's -- that would be the primary reason for

17   someone not being selected as far as I could tell.

18      Q.   Okay.  But are you checking for anything else?

19      A.   No.

20      Q.   Okay.  Going back to the creation of the pool,

21   do you know if people who are in the top 250 are

22   notified whether they've been in the top 250?

23      A.   No.  As far as I know, there's no notification

24   of the prolific offenders.

25      Q.   Okay.  Do you know whether in an instance where

1   you're dealing with a juvenile, do you know whether

2   their parents are notified?

3        A.   Not that I know of.

4        Q.   Do you know whether once you've been put on the

5   prolific offender list -- I think you answered this, but

6   do you know whether once you've been put on the prolific

7   offender list you're notified?

8        A.   I don't know of any notification.

9        Q.   In the instance of a juvenile, once a juvenile

10  is put on the prolific offender list, do you know

11  whether the parents are notified?

12       A.   No.

13       Q.   Do you know whether there's a mechanism by

14  which someone could be taken off of the prolific

15  offender list?

16            MR. POULTON:   Object to the form.

17       A.   The district analysts take them off pretty much

18  every quarter.

19  BY MR. BARGIL:

20       Q.   Okay.

21       A.   Or that's the process.   There have been some

22  quarters where I did not generate a list and we went,

23  you know, six months or could be even longer between

24  lists that I generated, and so they may have stayed on

25  for longer than expected.

1      Q.   Okay.  And I think I misspoke.  Do you know

2  whether -- once someone finds out they have been put on

3  the prolific offender list, do you know whether they can

4  ask to be removed?

5      A.   I don't know.

6      Q.   Do you know whether a parent can ask for a

7  child to be removed from the prolific offender list?

8      A.   I don't know that either.

9      Q.   Okay.  So as far as you know, the only way to

10  be removed from the list is to be removed by an analyst?

11     A.   Yes.

12          MR. POULTON:  Object to the form.

13  BY MR. BARGIL:

14     Q.   I have another question.  Let's go back to

15  Exhibit A if you don't mind.

16          I think it's Exhibit A.  It's the ILP manual.

17  Go to page 76 of the manual.

18          You mentioned earlier on in your testimony that

19  part of the goal of having prolific offenders and

20  prolific offender checks is to provide people with

21  resources I think that will help them stay out of

22  trouble.  Is that a fair encapsulation?

23     A.   Yes.

24     Q.   Okay.  Do you recognize what this depicts on

25  page 76 of the manual?

1      A.   I have not seen it before, but I was aware of

2  many of these.

3      Q.   Okay.  When you say you were aware of many of

4  these, do you know what they are?

5      A.   Let's see.  Some of them are halfway houses for

6  abused or battered people.

7      Q.   I see.  So you're aware of the resources that

8  are written on this card?

9      A.   Yes.

10      Q.   As far as you know, is this something that's

11  handed to prolific offenders?

12      A.   I don't know that.

13          MR. POULTON:  Object to the form.

14  BY MR. BARGIL:

15      Q.   Could this also be something that's handed out

16  to homeless people?

17      A.   I don't know that either.

18      Q.   Do you have any idea why a prolific offender

19  might be advised that panhandling is prohibited in Pasco

20  County?

21          MR. POULTON:  Object to the form.

22      A.   The homeless people can be panhandlers.

23  BY MR. BARGIL:

24      Q.   Well, my question is so it -- let's start here.

25  Can we agree that at the top of the page this item is

1    identified as a prolific offender palm card?

2         A.   Okay.  Good.  I'd not -- I don't think I'd seen

3    it.

4         Q.   But we can agree this is how it's identified?

5         A.   Yes, that's what it says.

6         Q.   And based on your knowledge of the ILP manual,

7    do you know whether deputies are encouraged to provide

8    prolific offenders with prolific offender palm cards?

9         A.   I don't know.

10        Q.   Okay.  If I were to represent to you that they

11   are encouraged to provide that, would it be fair to say

12   that this would be that card?

13             MR. POULTON:  Object to the form.  The witness

14        has already said he doesn't know any of this.

15   BY MR. BARGIL:

16        Q.   You can try to answer.

17        A.   That's correct.  I don't know.  I mean, there

18   are services on here.  I don't know if it's a good list

19   or a bad list.

20        Q.   Okay, okay.  Well, I mean, you do know some of

21   these institutions; is that right?

22        A.   Yes.

23        Q.   Why don't you tell me which ones you know?

24        A.   Metropolitan Ministries, I know about them from

25   the news where they give food out to people.

1       Q.   Okay.

2       A.   Salvation Army West and East, one of them has a

3   halfway house for battered women.  Let's see.

4       Q.   You don't need to go through each and every one

5   of them.  Okay.  You don't have to go on.

6            Are any of these homeless charities?

7            MR. POULTON:  Object to the form.

8       A.   I don't know.  I'm looking through.  There's

9   specific ones, but I'm not fining any homeless charities

10  that I know of.

11  BY MR. BARGIL:

12      Q.   Okay.  That's fine.  We can take a quick break,

13  and I'll chat with my co-counsel really quickly, and

14  we'll go from there.

15           (Short break.)

16           (Exhibit J was marked for identification.)

17  BY MR. BARGIL:

18      Q.   Okay.  I want to thank you for your time today.

19  Just one or two quick follow-up questions.  Can you see

20  that screen okay?

21      A.   Yes.

22      Q.   Okay.  Will you --

23           MR. POULTON:  Can you tell me what it is?  I

24      can't see it from here.

25           MR. BARGIL:  Sure.  It is the document that you

1       sent us, I believe, Tom, and it is a listing of

2       Dalanea Taylor, Donnie McDougall, Tyler Paneson and

3       Robert Jones and the dates on which they were

4       identified as prolific offenders, I believe.

5            MR. POULTON:  Well, I'm glad you brought that

6       up because I was going to ask about it.  Well, I'll

7       let you go ahead and ask your question.  Then before

8       you wrap it up, I wanted to ask a question of you

9       guys on that, but go ahead.

10           MR. BARGIL:  Okay.  Or at least it says

11      offender type.

12  BY MR. BARGIL:

13      Q.   Can you see column -- the fourth column there

14  which is actually numbered 151?

15      A.   Person ID?

16      Q.   Well, just the bottom row.  Can you make that

17  out?

18      A.   Oh, yes.

19      Q.   And do you see where it says Robert Jones to

20  the right there?

21      A.   Yes.

22      Q.   And offender type it says prolific; is that

23  right?

24      A.   Yes, it does.  Okay.

25      Q.   Does this modify your testimony at all?

1       A.   Yes.  I'd forgotten that he was on this list.

2   I was thinking of someone else.

3       Q.   Okay.  So when you mentioned earlier that you

4   had looked in the RMS system --

5       A.   Right.

6       Q.   -- to see whether he had been classified a

7   prolific offender, is it correct that you were looking

8   perhaps at someone else?

9       A.   Yes.  It appears that he was a prolific

10  offender from January of 2017 to March of 2017.

11      Q.   Okay.  And that would coincide with the date

12  range on the document I showed you toward the end of the

13  deposition if we're --

14      A.   Yes.  So the unlikely happened.

15      Q.   The unlikely happened.  He was at 198, and

16  nevertheless he was a prolific offender, is that fair to

17  say?

18      A.   Yes.

19      Q.   So is it -- I want to get a good understanding

20  for why you were mistaken earlier.  Is it possible that

21  you were looking at the correct RMS profile and that it

22  wasn't accurately reflected in the profile, or would it

23  had to have been that you were looking at a different

24  person?

25      A.   I think I --

1       Q.   If you know?

2       A.   I think I had to be looking at the wrong

3   person.

4       Q.   Okay.

5       A.   Or I was remembering the wrong person.

6       Q.   Okay.  So you have confidence in the accuracy

7   of the RMS profile?

8       A.   Yes.

9       Q.   Okay.

10      A.   As I said before, there may have been some

11  deletions to this table that's reflected here early on,

12  but I don't think that there were.

13      Q.   Deletions to which table?

14      A.   To -- this information comes from a table of

15  all of the different Top 5 prolific, et cetera, and

16  they're all identified.

17      Q.   Why would somebody delete a record of someone's

18  classification as a prolific offender?

19      A.   When we didn't have a good process very early

20  on, there may have been some deletions, but I'm not

21  aware of any.

22      Q.   When you say very early on, when would that

23  have been?

24      A.   Probably -- I don't know.  When did the

25  prolific offender program start?  Maybe 2013, 2014.

1    Q.   Okay.  But if he were a prolific offender in

2    2017, there's no --

3    A.   I don't think that there -- no, I'm not -- I'm

4    quite confident there wouldn't have been any deletions

5    out of that table.

6    Q.   Okay.  So is it your testimony that if you were

7    to take a look at the RMS profile for Robert Jones, IV,

8    you would in fact see that he was classified as a

9    prolific offender in the first quarter of 2017?

10   A.   Yes.

11        MR. BARGIL:  Okay.  I don't think I have

12        anything further.

13        MR. POULTON:  I'd like to ask something just

14        while you still have that up there.

15        MR. BARGIL:  Tom, Tom, I don't mean to

16        interrupt you, but before we kind of rest, I just

17        want to check with Rob really quickly if he wanted

18        to confer again.

19        MR. JOHNSON:  Are we off the record?

20        MR. BARGIL:  We can be.  We're off, yes.

21        (Off-the-record discussion.)

22                      CROSS EXAMINATION

23   BY MR. POULTON:

24   Q.   Sorry.  When Rob spoke, it messed up my Zoom

25   here on my end on what I'm looking at.  There we go.

 1    Okay.  I can't see it no matter how much you try to zoom

 2    me in.  I appreciate it, but this -- did you generate

 3    this document?

 4        A.   Yes.

 5        Q.   You did?

 6        A.   A few days ago.

 7        Q.   Okay.  So when it uses the phrase -- and again

 8    I apologize I can't see it.  There's some sort of a

 9    status or type and it says prolific?

10        A.   Yes, offender type of prolific, P-R-O-L.

11        Q.   Is there any chance that during the timeframe

12    when this was generated, prolific might have been used

13    to describe both someone in the prolific offender list,

14    the formal prolific offender list, and also people who

15    might have been Top 5?

16        A.   No.  During that same time period there were

17    also Top 5's and targets, T-A-R-G.

18        Q.   Okay.  So that list is definitely prolific

19    offender list?

20        A.   Yes.

21        Q.   Okay.  All right.  I appreciate it.  I just

22    wasn't sure how that came to be, but okay.

23             MR. BARGIL:  Was what it, Tom?

24             MR. POULTON:  Yeah, that's it.  I'm sorry.

25        Yes, that's it.  Thanks.  I didn't in my own mind.

1          MR. BARGIL:  Okay.

2          MR. POULTON:  Because I know that, you know,

3      we've had prior testimony that sometimes going

4      back --

5          MR. BARGIL:  Okay.  Okay, Tom.

6          MR. POULTON:  -- four, five, six years ago

7      prolific offenders might have referred to both, but

8      I think that may just be in a deputy role.

9          MR. BARGIL:  Okay.  Thanks, Tom.  Just one last

10     I guess general question.

11                     REDIRECT EXAMINATION

12  BY MR. BARGIL:

13     Q.   If you don't mind for the sake of the record,

14  can you interpret this document for us?  And by that I

15  mean more specifically identify the people who are on it

16  and what their classification was and the dates on which

17  they were classified as such?

18     A.   Okay.  Let's see.  Dalanea Taylor was a

19  prolific offender from looks like March of 2017 until --

20  I'll have to come back to it -- possibly until September

21  of 2019.  However, if she was on and off the list during

22  that time, she was prolific for a while, not a prolific

23  for a while, prolific, not prolific, all we have is the

24  date that she was first added and the date that she was

25  most recently inactived --

1     Q.   Okay.

2     A.   -- or modified.  So we don't know from this

3  table or from any table in the records management system

4  whether when that turned on and off.

5     Q.   Okay.  That's fine.

6     A.   And then we have Donnie McDougall as prolific

7  offender from January of 2017 to September of 2021.

8  Again, possibly on and off, but I don't know.  Tyler

9  Paneson from January of 2017 to October of 2021, and

10 Robert Jones I'm assuming the fourth, because his birth

11 date is '99, from January of 2017 to March of 2017.

12    Q.   Okay.  And just to clarify, each one of these

13 people were classified as a prolific offender during

14 those date ranges?

15    A.   Yes.

16    Q.   And they are all inactive -- their prolific

17 status all -- for each of them their prolific status is

18 listed as inactive; is that right?

19    A.   Correct.

20         MR. BARGIL:  Okay.  I think that's everything.

21    Rob, did you want to confer again?

22         MR. JOHNSON:  Well, so this is something that I

23    don't know if this is a question of the witness.

24    Maybe while we have him here, we had discussed

25    whether this search was run for Anthony McDougall.

1      MR. POULTON:  I -- well, I just got an -- I

2   think I mentioned earlier today I got an email, and

3   I haven't had a chance to look at it yet.  But I

4   made that query for you.  I don't know if that's

5   happened or not.

6          THE WITNESS:  I did that query.

7   BY MR. BARGIL:

8      Q.   So if you're able to, since you're still here

9   and did that query, if you recall what the result was?

10     A.   Yeah.  Anthony was -- let's see.  He was a

11   prolific offender for about 20 minutes, so very likely

12   an analyst misstep and then they corrected it.

13     Q.   Okay.

14     A.   But he was also a Top 5 for a number of months,

15   and I don't remember which months it was.

16     Q.   Okay.  You'll have the opportunity to correct

17   that by the way since the information is not in front of

18   you --

19     A.   Okay.

20     Q.   -- but I appreciate that answer.

21         MR. POULTON:  I'll forward you whatever that

22   spreadsheet was on that issue.

23         MR. BARGIL:  Thank you, Tom.

24         MR. JOHNSON:  And again this is not necessarily

25   a question but just while we have the right person

1          here, is it possible to run the similar analysis for

2          Top 5 and, Tom, would you have any objection to

3          getting us that as well?

4                    MR. POULTON:  No, but I don't know that that --

5          well, I'll let him answer the first question.  Can

6          you do it for Top 5?

7                    THE WITNESS:  Yes.

8                    MR. POULTON:  Okay.  Yeah, we can do that.

9                    THE WITNESS:  For just the plaintiffs?

10                   MR. BARGIL:  And the kids very likely.

11                   MR. POULTON:  Oh, and the kids.

12                   MR. BARGIL:  We'll give you the names.

13                   THE WITNESS:  Well, I include that.

14                   MR. BARGIL:  You've got them all?

15                   THE WITNESS:  Yes.

16                   MR. BARGIL:  It will be the same people on the

17         list plus Anthony McDougall.  Oh, he's on here.

18         Okay.

19                   MR. POULTON:  Okay.  We can do that.

20                   MR. BARGIL:  Sir, I think our time for now is

21         done.  As we have done with the other depositions,

22         because discovery is ongoing, we are going to hold

23         this open and reserve the right to bring you back in

24         here to ask you additional questions.

25                   THE WITNESS:  Sure.

1          MR. BARGIL:  I hope that's not the case, and in

2     the meantime I want to thank you for your time with

3     us this afternoon, and again I apologize for our

4     tardiness in getting started.

5          THE WITNESS:  That's all right.

6          MR. POULTON:  We'll read.

7                    *  *  *  *  *  *

8          (THEREUPON, THE TAKING OF THE DEPOSITION WAS

9     CONCLUDED AT 5:13 P.M.)

10                   *  *  *  *  *  *

11                 S T I P U L A T I O N

12        It was thereupon stipulated and agreed by and

13    between counsel present for the respective parties and

14    the deponent that the reading and signing of this

15    deposition is not waived.

16                   *  *  *  *  *  *

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA

3    COUNTY OF PASCO

4        I, the undersigned authority, certify that

5    STEPHEN HIEBERT personally appeared before me and was

6    duly sworn on January 12, 2022.

7        WITNESS my hand and official seal this 2nd

8    day of February, 2022.

9

10

11    _____

12    Judy Anderson
      Notary Public - State of Florida
      Commission No.:  GG 276821
13    My Commission Expires:  1-5-2023

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF PASCO

        I, JUDY ANDERSON, Court Reporter, certify that I
was authorized to and did stenographically report the
foregoing deposition and that the transcript is a true
record of the testimony given by the witness.

        I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties,
nor am I a relative or employee of any of the parties'
attorney or counsel connected with the action, nor am I
financially interested in the action.

        Dated this 2nd day of February, 2022.


_____
Judy Anderson, Court Reporter

1   DALANEA TAYLOR; TAMMY
     HEILMAN; DARLENE DEEGAN;
2   and ROBERT A. JONES, III,

3    Plaintiffs,

4   vs.                Case No.: 8:21-cv-00555-SDM-CPT

5   CHRIS NOCCO, in his
     official capacity as
6   Pasco County Sheriff,

7    Defendant.
   _____/

8

9

              DEPONENT'S SIGNATURE PAGE

10

11      I HAVE READ THE FOREGOING TRANSCRIPT OF MY

12    DEPOSITION AND HEREBY SUBSCRIBE TO THE FOREGOING

13    DEPOSITION, SAID SUBSCRIPTION TO INCLUDE ANY

14    CORRECTIONS AND/OR AMENDMENTS HERETO.

15

16

   _____    _____
17   STEPHEN HIEBERT              Date

18

19

20

21

22

23

24

25

1                              ERRATA SHEET

2     PAGE      LINE                CORRECTION

3     _____    _____    _____

4     _____    _____    _____

5     _____    _____    _____

6     _____    _____    _____

7     _____    _____    _____

8     _____    _____    _____

9     _____    _____    _____

10    _____    _____    _____

11    _____    _____    _____

12    _____    _____    _____

13    _____    _____    _____

14    _____    _____    _____

15    _____    _____    _____

16    _____    _____    _____

17    _____    _____    _____

18    _____    _____    _____

19    _____    _____    _____

20    _____    _____    _____

21    _____    _____    _____

22    _____    _____    _____

23    _____    _____    _____

24    _____    _____    _____

25    _____    _____    _____

**A**

Abargil@ij.org 2:12
abiding 87:12
ability 54:17
able 7:8 10:22 22:13,20
  31:3 39:12 47:19
  67:17,23 88:10 91:9
  105:8
abuse-related 24:20
abused 95:6
abusive 24:5,15,18,23
  43:21,24 61:12
academic 17:24
accepted 57:23
accepting 52:1
access 53:24 81:1
accommodate 7:14
account 31:9 44:19 48:17
  78:5,7,19
accuracy 33:6 39:5 100:6
accurate 19:17 35:13
  49:4
accurately 67:1 73:15,18
  99:22
action 109:14,15
active 40:18 41:5
actively 73:16
actual 15:15
add 26:23 63:4 65:1
added 25:7 40:18 71:12
  71:13 90:3 103:24
adding 37:21
addition 56:20
additional 82:5 106:24
address 82:18
addressed 63:1
administration 8:11
  11:10
advised 45:18
advocates 44:4
affiliation 70:14 74:24
affirmatively 67:10
afforded 25:24
afternoon 5:8 7:11 107:3
age 22:22 41:1,2 58:9
agencies 15:19 16:23
agency 9:6,9 15:7 25:12
  25:13 43:19
agency's 14:10 20:20
ago 11:20 12:14 13:9
  16:3 18:21 39:8 41:16
  57:24 77:24 87:15
  102:6 103:6
agree 48:6 95:25 96:4
agreed 58:2 107:12
Ah 61:10 75:9
ahead 21:7 23:12,12
  26:16 36:10 56:15,17
  61:6 87:18 98:7,9
air 47:17
algorithm 16:12 24:10
  30:3 38:10 39:19 52:8
  54:15,16 59:16,21
  60:1 67:1
algorithm's 39:5
algorithms 24:13
allocation 20:19
allow 6:19
allowed 6:12
AMENDMENTS 110:14
amount 50:18
analysis 48:12,13 50:2,6
  50:10 51:2,5,8 66:9
  106:1
analyst 9:2 10:1,5,14
  12:6 15:10 20:1,16,16

21:1,4 29:22 32:13
  33:20 53:5 56:2,24
  58:13 62:12 63:20
  64:18,25 66:7 74:20
  90:15,18 91:18 94:10
  105:12
analyst's 77:15
analysts 12:7 13:17 17:4
  17:7,16 19:15,20,25
  20:3,15,23 21:8,11,17
  22:5 27:10 31:2,8 33:4
  33:6,18 34:3 41:13
  44:16 45:7 47:19,24
  48:8 49:22 51:20
  57:16 58:1 63:13,16,14
  63:15,17 65:7 71:12
  74:1 76:21,25 78:2,18
  79:6 80:10,12,20
  82:12,21 85:6,7 87:16
  89:24 93:17
analysts' 41:6
analyze 12:24 13:6
analyzed 56:22 57:6
and/or 36:14 110:14
Anderson 1:19,22
  108:11 109:6,19
answer 6:20,22 7:15,18
  20:21 23:12 38:14,15
  47:9 50:24 61:21
  64:12 66:7 67:18
  74:20 87:19 88:2,3,10
  88:13 96:16 105:20
  106:5
answered 88:7 93:5
answers 7:3
Anthony 104:25 105:10
  106:17
anybody 7:23 23:18 34:7
apologize 31:24 72:20
  102:8 107:3
appear 36:24,24 37:17
  62:22 65:16 69:17,19
  74:25 89:7
appearances 2:1 37:25
appeared 82:13 108:5
Appearing 2:2,14
appears 89:7 99:9
appendix 26:10
application 10:1,4 29:19
  30:3
applications 12:8
applied 43:19 57:18
  66:14
apply 6:18 18:13 21:17
  27:16 30:8,18 37:23
  39:18 59:16
appreciate 88:14 102:2
  102:21 105:20
appropriate 30:12
approved 58:4
approximately 79:20
April 4:8 84:14
area 21:24
areas 22:8 23:4,5
Ari 2:10 5:10 76:3
Arlington 2:7
Army 97:2
arrest 36:22 41:23 66:1
  75:1
arrested 27:3 29:6
arrests 22:14 24:20
  27:21,22,25 28:16
  29:2,4,4,8 30:1 35:20
  36:1 38:8 54:4 66:4,13
  66:20 69:25 82:2
ascertain 92:11
aside 40:25 84:15

asked 7:18,24 8:3 12:16
  15:6 17:11 18:14,21
  23:8,15,18 25:15 29:2
  56:6 61:23 71:11
  90:22 91:6,24
asking 6:20 13:15 31:25
  54:14 78:11,13
assessment 65:5
assign 27:8 36:23 59:21
assigned 39:13 60:8
  83:12
assignment 16:16 35:9
assigns 16:14
assist 12:7 21:9 48:11
  52:5
associate 51:20
assume 38:15 66:19
assuming 44:6 104:10
at-risk 24:3
attempt 12:18 14:2 88:13
attention 19:3 22:21
  34:13 46:19
attorney 109:12,14
authority 108:4
authorized 109:7
auto 41:19,23 42:6,11,17
  57:25 82:4,5,13,17,22
  83:16,20
automated 48:12 50:16
  50:22,25 51:4 52:5,9
  52:15 53:6 71:16
automatic 33:13
automatically 30:2 33:11
  51:21
avoid 22:20
aware 34:8 63:9 64:19
  80:20 85:4 86:22 95:1
  95:3,7 100:21

**B**

B 4:1,3 46:2,3
bachelor's 8:13,13
back 6:12 27:12 33:19
  35:15 43:1,15 52:22
  61:5 71:10 72:17
  92:20 94:14 103:4,20
  106:23
background 8:12 10:23
backward 35:17
bad 38:4 88:12 96:19
ball 13:10
bar 67:25
Bargil 2:10 3:3,4 5:7,10
  10:22 11:1,13,17
  23:17 25:19 36:11
  39:2 45:11 46:3,7 61:4
  64:11,15 65:12 67:6
  71:2 72:11,16,19
  74:17 75:11,15 76:6,9
  78:10 79:14 81:17
  84:10,17 87:24 88:5,9
  88:20,22 93:19 94:13
  95:14,23 96:15 97:11
  97:17,25 98:10,12
  101:11,15,20 102:23
  103:1,5,9,12 104:20
  105:7,23 106:10,12,14
  106:16,20 107:1
barring 86:19
bars 68:4
based 24:21 37:13 44:9
  51:21 67:23 74:10,11
  75:3 87:4 96:6
basically 14:8 19:22
  37:20 39:12 53:25
  65:20 83:8
Bates 46:15 65:20,21

67:14 84:21
battered 95:6 97:3
beginning 9:19 27:12
  56:7 68:11
begins 68:11 77:9 82:9
behavior 31:20 40:7,14
belabor 35:8 50:20
belief 25:22 73:14
believe 8:24 16:25 19:18
  25:21 28:5 33:21 43:2
  43:4 47:18 57:8 63:17
  69:4 70:4,18,24 71:25
  74:1 89:18 90:16 98:1
  98:4
beneficial 74:12
best 38:11 54:16 74:7
Bethel 11:5
better 39:5 73:24,25
beyond 32:16,17
big 25:10,13 29:5 30:1
  42:8,10 59:11 62:1,2
  67:21 68:5 69:16
big-picture 20:18
birth 33:15 55:5 104:10
Biscayne 2:11
bit 6:2 15:9 22:16,20,21
  35:17 38:4 43:1
black 67:18
Blue 9:7,7
Blvd 2:11,15
body 64:1
book 18:5
boss 7:24 8:1
bottom 19:6 35:10 40:17
  46:15 47:5 64:24 66:8
  80:2 81:25 87:10 92:8
  98:16
Boulevard 2:3
box 1:23 42:8
boxes 21:10 22:9 23:4,6
  23:9,14
break 7:13 39:1 42:9
  61:3 72:12,18 82:8
  97:12,15
Brian 14:18
brick 59:3,5
briefly 81:21
bring 39:22 106:23
broken 73:7
Brothers 2:6 5:11 71:1
brought 58:2 98:5
built 75:3
bulk 13:1
bullet 34:18 36:12 37:24
  65:24 66:9 74:22
bulleted 35:10
bunch 53:3,10
burglaries 25:5 38:1,2,20
  40:9 42:6,11,17,18
  57:25 77:23 82:4,6,13
  82:17 83:16,20
burglary 22:10 41:19,22
  42:13,13 82:22
business 38:1,2 40:9
  42:12 77:23 87:12

**C**

C 4:4 56:11,18 65:11
  76:16
calculating 28:13 37:17
calculation 25:8 26:11
  27:2 33:16 37:13
  71:14,16 74:10 76:20
calculations 82:3 83:4,24
  84:1
call 5:23 13:5 53:25
  58:25 72:12

called 40:22 59:1
calling 30:12
calls 13:3,4
capacity 1:7 110:5
Captain 11:25 43:4,5
card 95:8 96:1,12
cards 96:8
career 9:15
Caroline 2:6 5:11
case 1:6 6:8,8,17 13:4,5
  47:14 49:23,23 59:1
  59:14 62:22 67:7 70:2
  72:13 79:9 87:20
  90:20 107:1 110:4
cases 10:18 49:24 54:3,3
  59:18,20
caveat 63:7
Cell 45:9
center 13:5
certain 7:17 25:23 31:11
  33:12 41:3 42:15 64:3
  64:20 79:10 84:5
  86:20,20
Certificate 3:5,5 108:1
  109:1
certify 108:4 109:6,11
cetera 49:1 59:3 100:15
Cgbrothers@ij.org 2:8
Chagrin 2:3
chance 67:8 102:11
  105:3
change 28:23 58:8 83:13
changed 28:19 36:4 83:4
  84:5
changes 43:12 83:2
changing 56:4
charged 60:15
charities 97:6,9
chart 68:2
chat 97:13
cheat 47:5
check 23:16,18 31:14
  89:17 101:17
checked 92:10
checking 92:11,18
checks 25:16 94:20
child 49:13 94:7
choice 59:10 77:11,13,15
choose 87:23
chosen 29:22
CHRIS 1:7 110:5
circle 43:1
citizens 87:12
City 1:23 6:14
civil 25:23 26:3
civilian 5:20
civilians 34:11
clarify 34:23 67:13 86:3
  104:12
classification 23:21,25
  24:3,6,24 25:3 61:24
  61:25 62:1 66:14
  87:11 100:18 103:16
classifications 39:11,14
  43:17,19
classified 40:25 99:6
  101:8 103:17 104:13
clause 83:23
clear 6:24 7:5 15:11
  18:22 20:22 29:17
  31:25
close 10:7 69:10
closest 74:2
co-counsel 2:9,13 97:13
co-offenders 48:19,20
coincide 99:11
coins 42:7

colleague 5:11
collected 56:22 57:6
College 11:5
Collier 68:20 69:2,7,17
  69:20 72:2
column 65:24 74:23
  76:16 82:4,7 89:4,4
  98:13,13
columns 68:4
combined 85:23
come 18:14 40:13 86:15
  103:20
cones 26:15 28:3 71:11
  100:14
Coming 43:15
commands 55:7
Commission 108:12,13
commissioner 12:15
commit 22:17 67:2
committing 25:23 32:18
  66:23
common 15:21 38:24
commonality 38:24
communicate 63:14,18
communicated 57:7
compare 73:20
compared 66:19 72:7
comparison 67:21 69:6
comparisons 69:1
complete 46:23 48:6
  60:25
completely 50:3
complicated 47:22 48:3,4
  52:3 54:7
component 52:23
computer 54:13 83:9
concentrate 23:13
concern 63:1 82:17
CONCLUDED 107:9
conclusion 67:5 69:13
conclusive 91:16
conducted 51:24
confer 101:18 104:21
confidence 100:6
confident 101:4
confined 35:19
confirm 76:11
conflicts 57:17
confused 31:22
confusing 34:24
Congress 9:6,10
connected 55:4 109:14
consecutive 40:10
consider 17:21 29:20
  32:15,15,17 49:3
  54:14 77:21
consideration 32:1 48:23
  75:5
considered 17:18 41:1
  42:11 82:19
consistent 36:7 60:9
consists 19:14
consulted 50:7
consulting 51:13
continuation 56:11
continue 83:22
contractor 9:7
contribute 11:21 43:6
contributing 73:16
Cook@debevoisepoult...
  2:17
cooperation 62:4
coordinator 9:21
copies 67:19
corner 46:16
Corps 9:14
correct 5:21,22 13:22

16:15,21 17:20 24:16
  25:12 27:15,24 28:14
  28:18 30:4,23 36:2,18
  38:17 44:6,10,14 45:2
  46:24 52:7 56:10 60:7
  61:6 67:11 77:7 82:25
  83:10 89:10 96:17
  99:7,21 104:19 105:16
corrected 33:19 105:12
correcting 61:21
CORRECTION 111:2
CORRECTIONS
  110:14
correctly 5:17
corresponds 76:5
counsel 2:5,18 44:4
  107:13 109:12,14
count 37:2,3 41:22 42:21
  82:3 83:9,19
counted 69:25 82:14,18
  82:22,24,25 83:6
counting 38:9 42:4
countries 15:22
county 1:8 6:10 8:20
  12:15 15:24 22:20
  28:2,8,17,22 31:16
  35:20 46:4 63:9 64:18
  65:2 68:14,20 69:2,7
  87:6 95:20 108:3
  109:4 110:6
County's 64:21
couple 42:7 53:9 61:8
course 7:2 33:15 43:11
  89:2
court 1:1,19,22 6:23
  36:23 37:1 109:6,19
cover 79:24
covered 27:5
create 12:11 62:5 71:22
created 31:22 59:18
  62:12 76:19 82:16
creating 12:7
creation 11:21 14:10
  29:1,18 62:7 92:20
crime 12:24 14:2,7 17:25
  20:20 22:9,16,17,22
  22:23 23:14 32:19
  39:15 41:2 48:19
  63:10 68:7,10,15
  73:16 74:13 86:25
  87:1,6,21,21
crimes 22:11,12 24:12
  25:4,23 29:6,8 35:22
  38:3,22 41:3 42:15
  62:13 66:23 67:2,22
  68:7
criminal 8:15 11:10
  34:21 35:5 41:25 64:2
criteria 27:18 31:18
  32:20 34:21,25 35:2
  45:7,14,18,21 77:17
  77:20
Cross 3:3 9:7 101:22
culling 30:5
curious 23:6
current 10:13,16 12:5
currently 73:6 75:5 80:5
  80:23 91:15
cut 86:8
cutoff 86:18

──────────────

**D**

D 3:1 4:5 75:10,11
Dade 1:23
Dakota 9:2,8 11:8
Dalanea 1:3 98:2 103:18
  110:1

DARLENE 1:3 110:1
data 12:9,12,24 13:3,8,15
  13:20 21:19 26:14
  27:14 28:3 44:9 46:23
  47:17 48:16 50:17
  51:17,23 54:2 55:3
  56:22,25 57:5,13
  58:14,20,23 59:9
  60:20,24 66:12 67:9
  74:11,19 76:25 77:2,5
  90:10,13,13 91:14
database 26:19 53:3 54:2
  83:4
databases 12:10 28:11
  47:20
date 1:14 33:15 36:23
  55:5 75:20 76:14
  84:19 99:11 103:24,24
  104:11,14 110:17
Dated 109:17
dates 98:3 103:16
Dave 14:24 20:5
day 41:23 42:18 77:24
  82:2,4,6,22 83:6,17
  108:8 109:17
days 42:18 83:20 102:6
deadly 59:1,2,6,8
deal 13:20 33:4
dealing 13:7 93:1
debate 88:8
Debevoise 2:14
Dec 4:7
decade 91:20
deceased 31:18 78:9
December 81:23
decide 32:13
decided 16:25 58:10
  82:21 86:20
deciding 78:19
decision 57:21 78:18
  90:18
decisions 14:13 15:1
  20:18 43:14
DEEGAN 1:3 110:1
Defendant 1:9 2:18
  110:7
Defense 9:6,9
define 15:8 21:8,12 22:8
  73:25
definitely 102:18
definition 14:11 15:10,12
  15:16,17,21 16:11
  24:19 41:7 57:13,20
  58:25 63:8 64:23
definitions 17:2 23:19
degrees 8:17 11:3
delete 100:17
deleted 90:1
deletions 100:11,13,20
  101:4
department 9:3 18:12
  57:16
Depending 11:24
depicting 75:12
depiction 68:19
depicts 94:24
deployment 20:19
deponent 107:14
Deponent's 3:6 110:9
deposed 8:5
deposition 1:12 5:12 6:4
  7:21 8:10 11:15 99:13
  107:8,15 109:8 110:12
  110:13
depositions 106:21
deputies 12:17,21 13:6
  13:11 22:12 23:8,15

24:12 25:15 31:14
  34:9 36:22 59:10 77:1
  85:4 86:22 96:7
deputy 49:8 103:8
deputy's 26:21
descending 75:20 81:23
describe 12:4 24:17 52:8
  52:11,12 81:21 102:13
described 23:3 29:2
  41:24 60:4 72:22
describing 54:13
description 34:5 52:2
designated 89:21
designation 52:24 53:14
  53:25
designed 62:18
detail 33:23 83:7
detectives 19:15
determination 41:6 74:2
determine 17:13 69:9
  86:21
determining 49:5
develop 16:7 17:12 20:16
  39:17 49:16 50:22
  51:23 52:15 69:8
developed 16:17,19,22
  55:1
development 48:11 52:5
devoted 13:2
different 6:17 12:13
  15:18,18 26:22 38:3
  40:11 42:2 50:3 54:5
  59:3 68:24 69:5,12,14
  69:15 70:16 72:4
  99:23 100:15
differently 41:14 83:9
difficult 28:23 39:9 67:4
direct 3:3 5:6 34:13
  46:19
directed 19:2
directing 85:6
direction 44:17
directly 65:5
director 17:8,9 19:14
  43:12 47:4
disagreements 57:15
discovery 106:22
discrepancies 56:25
  58:14,20 60:20
discrepancy 40:4 58:22
  59:9
discretionary 90:17
discuss 8:9
discussed 56:25 58:14
  60:20 65:22 104:24
discussion 10:25 56:12
  81:10 82:1,9,10,18
  86:17 101:21
dissemination 56:23
distinction 73:5
distinctions 73:5
distinguish 70:1
distributed 85:16,20
  86:10 92:9
distribution 85:9
district 1:1,1 17:7 21:10
  25:9 27:10 29:22 31:2
  31:8 32:13 33:4,5,18
  33:20 34:3 39:11
  44:16 45:7,8 49:22
  58:1 63:3,10,14,19
  64:18,25 65:7 74:1
  76:21,25 78:1,18 79:6
  80:11,16,20 82:12
  85:3,7,8,8,8,13,22 86:6
  87:16 89:24,25 90:15
  90:18 93:17

districts 13:18 80:18
  85:16,20,23 86:10
divided 85:2
division 1:2 19:7,13
document 11:19 12:1,2
  18:23 26:6 54:17 61:7
  64:23 65:21 67:14
  68:18 75:22 79:15
  81:18 97:25 99:12
  102:3 103:14
documentation 48:8
documents 43:9 90:22,23
doing 5:8 6:3 14:3,7
  22:23 37:1 51:14 53:7
  53:21 87:14
domestic 25:1 48:22
  49:12
Donnie 98:2 104:6
door 42:7
double 11:6 37:14
doubt 50:11
drafter 43:3
draw 67:4
Drive 1:17
drop 68:11 77:25
drug 25:7 38:21
due 72:13
duly 5:2 108:6
duplicates 83:21
duties 21:13 23:15

──────────────

**E**

E 2:2 3:1 4:1,6 46:19
  79:13
earlier 30:25 33:11
  43:16 61:23 65:22
  81:7 82:11,23 94:18
  99:3,20 105:2
early 18:12 100:11,19,22
easier 55:25 75:7
East 97:2
educational 8:12
effective 39:9 40:15 67:5
efficient 12:22,22
effort 51:17
efforts 20:20
eight 77:23
either 7:1 43:11 47:3
  48:19 60:3 67:18 70:2
  94:8 95:17
elevated 64:6
eligibility 35:15
eligible 32:2
email 63:20 64:1 105:2
emphasize 42:15
employee 109:12,13
encapsulation 94:22
encourage 22:19
encouraged 56:24 58:13
  96:7,11
ended 90:7
enforcement 15:19
engineering 8:14 11:9
English 54:17
enhancement 36:14,17
  36:20 37:16 40:18
  70:19
enhancements 34:22
  35:6 40:16,21,23
  71:12
enhancer 70:13,23 71:7
  71:8
enormous 50:19
ensure 56:24 58:13
  60:19
entered 49:8
entry 90:5,10,13,13

environment 73:17
equivalent 64:4
Errata 3:6 111:1
error 70:21 90:13
especially 57:11
ESQUIRE 2:2,6,10,14
essentially 54:13
establish 66:4 67:10
establishing 27:14
estimate 91:9
estimation 38:10
et 49:1 59:3 100:15
evaluation 46:25 61:7
evening 40:13 41:20,21
evenly 85:15,19 92:9
event 41:20
everybody 57:12 86:18
exactly 9:24 57:10
Examination 3:3,3,4 5:6
    101:22 103:11
examined 5:3
example 58:22 83:15
examples 16:23 58:5
Excel 68:1 75:25
exclude 79:2
excluded 69:22
excluding 28:17
exclusion 78:22,24
exclusions 86:19
Executive 1:17
exhibit 11:15,16 18:20
    46:2,3 65:11 70:25
    75:10,11 79:13 81:16
    84:9,16 88:19 94:15
    94:16 97:16
exhibited 70:3
existed 64:12
existence 51:4
existing 73:21,24
exists 75:6
expected 93:25
expensive 42:10
experience 67:24
expert 18:9
Expires 108:13
explain 6:2 22:15 36:19
    79:18
explains 61:22
explanation 27:13
explore 12:15
extent 10:23
extra 82:5
extraordinarily 42:16
extremely 88:16
eyesight 67:24

F

F 4:7 81:16
Facebook 50:14
fact 22:14 39:6 89:15
    101:8
factor 58:10
factors 75:3 77:9,11,19
fails 36:23
failure 36:24 74:25
failures 37:17
fair 17:11,15 24:23 25:24
    28:24 34:5 40:4 42:14
    55:6 68:10,13 74:21
    74:23 82:15 94:22
    96:11 99:16
fairly 85:15,19
fall 19:24
fallen 26:25
falling 87:10
familial 49:3
familiar 11:19 13:23

16:4 21:21 26:7 45:3
    47:15 65:15 71:20
    84:18
far 44:16 45:6,21 47:10
    51:2 70:22 86:25 90:1
    92:17,23 94:9 95:10
features 69:5,23
February 8:22 108:8
    109:17
fed 30:2
feed 22:18
feedback 33:5
feeling 85:1,15 86:2
fellow 22:5
felonies 69:22
fifteen 55:13
fifty 47:23 53:7 54:4
fighting 20:20
figure 60:4
figuring 12:18
final 19:8,10,11 40:18
    56:23 78:19 80:2
finalizing 57:1 58:15
    60:21
financially 109:15
find 13:10 22:12 31:3
    33:24 35:23 38:12,23
    39:8 55:4 58:19 64:21
    67:4 69:11 73:23
    89:21 90:22 92:7
finding 14:2
finds 94:2
fine 97:12 104:5
fining 97:9
finish 6:20 59:24 78:16
finished 33:3
firearm 59:4,4,7 70:2,2
firing 59:7
first 5:2 11:18 19:8,11
    20:14 26:18 27:13,18
    33:14 36:21 43:23
    57:2 77:6 82:7,8 83:6
    83:22 101:9 103:24
    106:5
five 37:25 38:7 41:21
    42:4,5 45:8 53:7 54:10
    103:6
five-year 65:16 68:7
FL 1:23 2:11,15
Florida 1:1,18,20 41:7
    108:2,12 109:3
focus 22:24 24:14 25:4
    27:4,14 29:6,8 35:22
    38:22 39:12 75:1
    77:13
focused 24:24 25:3,9
focuses 62:1,2
focusing 19:2 56:14
folks 25:20,21,22 57:16
follow 78:25
follow-up 97:19
followed 68:5,5
following 37:23 71:17
follows 5:4 21:7
followup 61:22
food 96:25
forcible 69:22
foregoing 109:8 110:11
    110:12
foresee 88:15
forget 29:3
forgetting 43:25
Forgive 54:12
forgot 61:20
forgotten 61:8 99:1
form 23:11,12 25:18
    36:10 64:9 67:3 74:15

78:8 87:18 88:7 93:16
    94:12 95:13,21 96:13
    97:7
formal 64:20 83:2
    102:14
formation 20:18
forming 21:9
forms 13:3
formula 29:19 41:9
    42:14 60:9 73:21,24
forty 47:22 54:4
forward 39:15 105:21
forwarded 76:21
found 91:4
four 19:15 37:14,15 38:1
    38:2 77:20 103:6
four-day 12:16 13:11
fourth 40:11 76:23 98:13
    104:10
frankly 55:11
free 88:3
frequently 41:9
front 11:19 18:20 26:7
    46:8 79:16 81:19
    105:17
FTA 36:14,24 40:22
FTAs 37:8,14
full 9:15
functioning 38:11
funded 62:3
further 5:16 101:12
    109:11
future 67:2

G

G 4:8 84:9
Gallo 14:18 16:25
gang 40:19 41:5,6 70:13
    70:23 71:7,8 74:24
gather 73:12
gathering 33:1
gears 35:17
general 12:3 13:21 42:10
    52:2 68:1 103:10
generally 36:7 57:23
    67:9 80:20
generate 93:22 102:2
generated 88:25 89:1
    90:23 93:24 102:12
gesturing 7:3
getting 17:10 39:17
    72:12 106:3 107:4
GG 108:12
give 33:23 35:12 38:4
    58:22 64:16 79:8,8
    96:25 106:12
given 18:9,12 27:9 50:24
    52:15 62:12 73:13
    109:9
gives 60:25
giving 92:3
glad 98:5
glass 42:9
Glebe 2:7
glove 42:8
go 7:25 8:3,4 9:18 18:8
    21:6 23:12,12 26:13
    26:16 31:9 36:10
    40:12 41:6 44:4 46:14
    56:15,16 59:12,19
    61:6 62:18 65:3,5
    68:17,18 72:16 82:21
    87:2,18 94:14,17 97:4
    97:5,14 98:7,9 101:25
goal 38:19 39:22 46:22
    46:25 47:2 48:10
    51:22 52:4,15 54:9

55:19 79:1 85:3,12,14
    86:12,25 92:3 94:19
goals 47:10
goes 65:21 91:6
going 5:12 6:1,2,22 7:7
    11:14 15:16,23 18:12
    27:12 35:15 36:3
    39:15 40:10 41:22
    46:14 52:18,22 65:19
    71:10 87:21,22 88:10
    92:20 98:6 103:3
    106:22
good 5:8,25 27:2 40:6
    58:3,11 74:2 76:15
    86:23,24 87:2 88:11
    88:12 96:2,18 99:19
    100:19
Gosh 56:6
Gotcha 14:9
Government 1:17
grab 54:2
Grace 2:6 5:11
graduate 8:18 51:8
graduated 11:12
grant 61:17 62:3,12
graphs 67:17,25,25
great 6:1 92:2
greatest 73:14
ground 6:18
group 27:9 38:24 66:20
guess 12:3 39:17 50:21
    51:12 52:4,18 103:10
guide 18:6 46:23 47:17
    47:18 80:15
guys 98:9

H

H 4:1,9 84:16
habit 22:18
half 85:24 86:5,9
halfway 95:5 97:3
hand 43:18 51:14,18
    108:7
handed 11:13 46:4 88:20
    95:11,15
handle 42:7 86:22
hanging 80:17
happen 58:6
happened 32:1 69:7
    87:13 90:9 99:14,15
    105:5
happening 88:15
happens 30:24,25 59:15
    65:6
harm 42:9,12
head 7:4,4
heavily 37:3
Heights 2:3
HEILMAN 1:3 110:1
held 9:18
help 6:22 17:12 20:17
    44:6 80:14 92:11
    94:21
helpful 50:12
herd 30:5
HERETO 110:14
Hiebert 1:12 4:3 5:1,18
    5:20 46:6 56:24 58:13
    75:16 88:23 108:5
    110:17
hierarchy 19:24
high 9:13 33:17 60:5
    69:21
highlights 65:23
Historical 4:10
history 32:2 34:22 35:5
    41:25 64:2 75:1

Hmm 10:19 70:21
Holborn@debevoisepo...
    2:17
hold 84:11 106:22
home 59:2
homeless 80:17 95:16,22
    97:6,9
hope 42:23 45:24 107:1
hopefully 87:1
house 59:7 97:3
houses 95:5
human 40:7,14 52:23
    67:24
hundred 30:17
hurry 26:21
hypothetical 64:17 87:25
    88:4,11,12,16

I

I-E 46:6
IBM 55:1
ID 26:20,25 55:4 90:2
    98:15
idea 18:8 22:24 26:16
    30:11,15 47:11 51:15
    89:11 90:8 95:18
ideas 47:13 74:5
identification 11:16
    44:12 46:2 65:11
    66:11 75:10 79:13
    81:16 84:9,16 88:19
    97:16
identified 40:1 65:25
    66:21 78:14,17 96:1,4
    98:4 100:16
identifies 44:15
identify 21:9,12 38:19
    39:18 44:7 62:15 67:1
    103:15
identifying 23:2 73:15
IDs 26:24
ignorance 54:12
III 1:4 110:2
ILP 4:2,4 12:3 14:16
    17:9 18:10 20:7,11
    23:7 35:22 43:3 53:20
    54:18 70:16,18 94:16
    96:6
immediate 14:21
imperative 56:20 57:3
implement 57:20
implemented 72:8,9
implementing 69:10
important 48:2
imprisonment 80:6,24
    80:25
inactive 104:16,18
inactivated 103:25
incapable 32:18
incarcerated 92:14
incarceration 81:2
inception 36:8
include 28:6 32:14 37:11
    51:10,13 70:1 77:12
    77:15 106:13 110:13
included 28:12 63:21
    78:23
includes 28:4
including 16:24 19:14
inclusion 28:25 32:3
    78:22
incorporate 72:2
increase 68:14
increased 64:7
independent 53:10
independently 45:1
indicate 24:14 66:3

76:18
indicates 76:16
indication 91:13
individual 29:25 32:18 34:21
individuals 27:17 28:16
industrial 8:14 11:9
influence 77:11 78:18
inform 20:17
information 10:2 22:4,7 54:1 100:14 105:17
initial 15:9 37:4 91:21
initially 53:3
inordinately 42:23
insight 20:17
inspector 17:8 20:10,11
inspectors 14:16
instance 7:19 22:10 41:18 77:22 92:25 93:9
instances 58:7
instated 63:11
Institute 2:2,6,10
institutions 11:4 96:21
instructed 18:6 83:8
instruction 9:3 18:11
intellectually 16:20,22
Intelligence 66:9
intelligence-led 10:15 11:14 18:4,13 19:1,7 19:13 65:17
intended 80:14
interact 23:7
interaction 21:25
interested 72:5 90:20 109:15
interject 7:16
intermediate 14:22
interpret 103:14
interrupt 6:21 68:22 70:7 101:16
interruption 45:9 72:20
involved 13:18 15:9 22:18 23:20,21 39:3 48:18 51:5 54:3
involvement 37:24 40:23 43:24
involvements 38:7
isolated 28:15 41:20
issue 105:22
item 95:25
items 27:8 34:25 55:3
iterations 33:9 83:25
IV 89:5 90:5 101:7

**J**

J 4:12 97:16
jail 31:12 32:19,23 36:22 76:17 80:5,23 91:15
January 1:14 77:4 99:10 104:7,9,11 108:6
Jerry 18:5
job 10:13 21:13 23:2 73:24
jobs 9:10,11,18
Joe 63:18
John 50:15
JOHNSON 2:2 101:19 104:22 105:24
join 48:9
joined 5:10 33:13 48:2
joining 48:14
joint 56:21 57:4
jointly 57:11
Jones 1:4 89:5 90:5 98:3 98:19 101:7 104:10 110:2

Judy 1:19 108:11 109:6 109:19
Judy@andersoncourtr...
1:24
jurisdiction 63:16 65:2
jurisdictions 63:15 81:1
justice 2:2,6,10 8:15 11:10
justification 65:2
justify 63:23 64:2
Justin 14:18
juvenile 49:1,6 93:1,9,9

**K**

K-9 12:21
K-A-C-P-R-Z-A-K 21:5
Kacprzak 21:5
keep 74:6
kept 83:6
kids 106:10,11
kind 6:8 12:11 29:4 49:25 53:17 67:15 101:16
knew 18:17
know 11:23 13:17 20:21 25:15 26:3 28:19,21 30:24 31:19 32:8,21 32:25 34:9 35:18 38:14 39:3,9 41:4 43:7 44:15,16,19 45:15,17 45:18,19,22,23 47:9 47:11 48:21,22 49:2,6 49:10,25 50:9,15 51:5 52:17 54:8 55:7,11 57:24 58:16 62:11 63:13 64:8,11,13 66:17,18 70:5,22 72:9 73:9,25 74:3,16,19 75:16,19 76:5,8 79:6 81:3 84:19 85:14 87:10 89:2,15 90:1 91:1 92:4,15,21,23,25 93:1,3,4,6,8,10,13,23 94:1,3,5,6,8,9 95:4,10 95:12,17 96:7,9,14,17 96:18,20,23,24 97:8 97:10 100:1,24 103:2 103:2 104:2,8,23 105:4 106:4
knowing 48:1
knowledge 96:6
known 49:1 89:2
Kraus 8:2 14:15,19,20 43:2 47:4 63:20 65:5
Kraus's 20:9

**L**

L 107:11
labeled 66:1,5
lack 39:5
Lakes 76:17 80:5,23 91:15
Land 76:16 80:5,23 91:15
language 54:1 55:1,15
large 1:20 87:22
Larry 8:2 14:15,19,20 15:3,4,7 20:9 43:2 58:3 63:11,20 71:25 72:1
late 5:14
law 15:18 87:12
lawyer 7:16
layman's 24:17
leaves 65:7

left 67:19 85:11
left-hand 65:23 70:9
legalese 55:2
Leo 11:9
let's 9:18 10:4 21:8,20 48:24 69:21,25 70:5 73:7 84:15 94:14 95:5 95:24 97:3 103:18 105:10
level 13:21
levels 19:15
Library 9:6,10
Lieutenant 14:18
lift 42:7
line 35:16,18 36:16 55:10 73:1 75:22,24 76:13 77:9 111:2
lines 34:16
list 4:6,7,8,9,12 16:12 26:15 31:1 33:3,17,22 33:25 34:4,25 36:13 37:6 38:13 42:25 57:9 57:10 60:25,25 62:10 62:14,24,25 63:5,22 64:3,7,12,22 76:19 77:1,4,6,12,16,18,19 77:25 78:11,17,20 79:9,19 81:8,9,13,22 82:16,16 83:7 84:13 84:20 87:15 88:20 90:8 91:8 92:4 93:5,7 93:10,15,22 94:3,7,10 96:18,19 99:1 102:13 102:14,18,19 103:21 106:17
listed 40:24 64:23 78:21 104:18
listing 98:1
lists 4:11 61:8,12 68:2 72:8 82:23,23 93:24
literature 17:24
little 6:2 15:9 22:16,19 22:21 29:12 35:17 38:4 42:25 51:17 59:11 87:7
locals 17:19,22
logistically 32:18
Logistics 9:6,9
long 7:25 8:3,4,20 46:15
longer 71:8 93:23,25
look 11:18 17:24 18:17 19:6,7 20:13 26:6 27:3 34:15 35:12,16 36:12 39:6 40:16 41:24 46:14,16 49:19,23,25 56:10,10 57:2 58:9 59:19 65:19,23 67:19 68:22 69:2 71:17,20 72:1 75:12 76:12 77:1 79:10 82:8 83:14 84:18,21 89:3,20 91:8 91:14 101:7 105:3
looked 16:23 17:2 18:2 24:19 45:8 53:20 61:14 70:6,19 99:4
looking 13:19 18:20 22:12 36:1 47:5 49:23 56:8 62:22 65:20 67:20 68:24 74:22 75:17 77:8 86:22 97:8 99:7,21,23 100:2 101:25
looks 19:10 74:3 103:19
lop 31:5
lost 67:15
lot 14:3,7 22:9,22 38:25 41:2 42:17,18,18

48:24 51:14,16,18 63:9 66:23 69:22 70:4 75:7
lots 12:8,9 59:4
loud 75:16
low 60:5

**M**

main 13:3 18:4
maintain 28:11
major 11:6 24:12 62:13
majority 92:7,13
making 29:9 55:24
management 8:14 11:9 12:9 27:7 28:4 34:1 47:19 48:4 49:16 51:16 60:24 65:8 89:23 104:3
manager 19:14 20:6,7
manpower 20:19
manual 4:2 19:1 21:18 34:14 43:3 53:20 54:18 60:13 70:17,18 70:21,24 94:16,17,25 96:6
manually 33:13 59:12
mapping 48:17
March 99:10 103:19 104:11
marked 11:15,16 46:2 65:11 75:10 79:13 81:16 84:9,16 88:19 97:16
married 49:10
mass 13:8
master's 8:15,15
matching 33:10 53:15 75:8
math 8:13 9:13 11:6
matter 102:1
McDougall 98:2 104:6 104:25 106:17
mean 8:23 14:1 15:12 16:9 17:6 29:23,24 40:8,13 44:25 45:6,15 48:4 51:19 57:13 64:9 87:6,20 91:7 96:17,20 101:15 103:15
means 36:25 76:20 83:19
meant 85:21
mechanical 26:14
mechanically 16:19
mechanics 19:4
mechanism 93:13
mechanistic 54:21
media 49:19,25 50:3,7 51:6,13
meeting 58:1 82:20
member 40:19 41:5 46:5 46:17 56:21 57:4 61:7 70:13
members 19:14
mentioned 11:3 13:9 16:3 22:15 25:20,21 34:3 43:1,16 94:18 99:3 105:2
messed 101:24
method 69:10,11,17,20 72:7 74:7,8
methodology 56:22 57:5 57:14,18
methods 51:9,10,12 68:25
Metropolitan 96:24
Miami 2:11
Michelle 21:5
Microsoft 53:24 68:1

mid-level 20:15 21:4 53:4 56:2
middle 1:1 33:14 59:17 61:11
mind 75:17 94:15 102:25 103:13
minding 87:12
minimize 10:23
Ministries 96:24
Minnesota 11:5
minor 36:5 41:10 42:6 61:11
minutes 18:21 105:11
missed 62:21
missile 59:1,2
missing 35:3 48:25 49:13
misspoke 94:1
misstatement 61:6
misstep 105:12
mistaken 85:19 99:20
mister 5:23
misunderstood 39:16
mix 38:20
Mod 82:7
model 69:3 71:18 72:22 73:6,14 75:3,4,5,6
models 68:25 72:1,4
moderated 36:13,16,19 37:16
modern 73:16
modifications 36:5 41:11 52:20
modified 41:15 43:10 82:2 83:24 90:4 104:2
modifiers 74:24
modify 41:9 43:11,13 89:24 98:25
moment 13:9 14:20 35:12 84:15
money 22:18
months 24:21 31:13 79:20 92:14 93:23 105:14,15
morning 5:11 7:8,24
mouth 14:5
move 6:12 80:16
moved 6:11 31:16 39:10 63:8,16 64:19 80:9,21 81:4,6,14
moves 64:18
moving 52:4
MPR 4:3
multiple 44:3 82:1,3,4,25 83:1,5,12

**N**

N 2:7 3:1 107:11
name 5:10,17 24:14 26:20,21,24,25 33:10 33:14,14,15 53:15 54:25 55:4 75:8 90:2
name-matching 34:2
names 74:6 106:12
narcotic 62:15
narcotics 61:13,16 62:10 67:22 68:5
narratives 51:20 59:14
nationally 68:7,11
nature 42:7
naval 51:8
navigate 47:20
nearly 91:20
necessarily 25:25 105:24
necessary 31:14 47:21 50:25
need 54:6 72:13 97:4
needed 12:19 13:11

80:10
needs 56:2,3
neighboring 63:15
network 48:12,13 49:17
  50:2,6,10,17 51:2,5,7
network-related 61:1
never 50:8,9 61:14
nevertheless 99:16
new 1:17,18 17:8 28:5,7
  28:7,17 43:14 65:9
  82:7
news 96:25
nice 6:23 87:8
nights 40:10
nitch 38:23
NOCCO 1:7 110:5
noise 10:24
nomenclature 5:24
normal 23:15
normally 47:23 53:24
North 9:2,8 11:8
Notary 1:20 108:12
note 49:9 79:24 80:11
  81:25 85:1,5
noted 27:7
notice 77:22
noticed 35:1
notices 41:14
notification 92:23 93:8
notified 92:22 93:2,7,11
November 76:17 77:3
number 31:6,10 37:17,19
  39:22 46:15,15,22
  48:10 52:4 64:3 65:21
  67:14 68:17 70:12
  81:23 83:11,12 84:21
  85:13 86:9,15,20,20
  87:2,17,22 105:14
numbered 98:14
numbers 19:21,21 37:25
  90:21
nutshell 16:13

**O**

O 107:11
O' 76:16 80:5,23 91:15
Oath 3:5 108:1
object 7:17 23:11,11
  25:18 36:10 64:9 67:3
  74:15 78:8 87:18
  93:16 94:12 95:13,21
  96:13 97:7
objected 88:6
objection 88:5,6 106:2
obviously 74:5
occasional 52:13
Occasionally 26:19
  46:12 60:23
occur 42:17 88:17
occurs 22:10
October 104:9
odd 13:10
Off-the-record 10:25
  101:21
offender 4:6,7,8,9,12
  6:11 13:24 14:5,11
  15:8 16:3 23:22 24:6
  24:11,18,24 25:2,4,16
  26:11 27:11 29:16,20
  29:22,24 37:2,6 43:16
  43:17 45:4 48:19,21
  52:23 53:13 55:25
  57:9 58:25 61:12,24
  62:1,8 63:11,21 64:22
  65:1 66:14 68:25 69:3
  78:20 79:19 80:4,23
  81:8,9,13 83:15 86:19

offenders 16:12 17:13
  24:15 25:22 26:15,20
  31:4 34:20 37:5,11
  43:21,24 44:12,15
  45:19,20 52:6,9 57:15
  62:15,16 63:2 64:5,24
  65:9,25 66:21 73:15
  80:9,16 85:4,25 86:6,9
  86:13 87:23 92:24
  94:19 95:11 96:8 98:4
  103:7
Offending 14:8
offense 60:3
offenses 24:25 25:7
  26:24 27:4,19,23 28:1
  29:15 33:16,23 42:5,5
  60:11 62:2 64:4
offer 20:17
offered 26:4
offering 55:7
Office 8:21 9:17 12:10
  46:5
officer 60:17
official 1:7 108:7 110:5
oh 2:3 10:11 15:17 19:1
  19:10 27:20 29:20
  31:22 32:4,11 41:13
  42:2 50:16 51:7 53:2
  53:15,19 54:16 63:3
  63:18 68:20,24 71:10
  73:1,3 76:15 80:7,9
  84:4 86:1 89:1,23
  90:20 98:18 106:11,17
okay 5:10,16,20,23 6:1,6
  6:8,14,17 7:7,10,23
  8:3,7,12,17 9:12,25
  10:12,21 11:2,7,21
  12:1,20 13:9,20 14:17
  14:20,25 15:11,20
  16:1 17:10 18:11 19:2
  19:13,17,21,24 20:5,9
  20:21 21:11 23:6,13
  24:8,13,23 25:2,6,9,15
  26:1,3,6,13,18 27:12
  28:19,21 29:7,23 30:8
  30:15,18 31:5,8,15
  32:22 33:20 34:23
  35:5 36:1 38:6,10
  40:16 41:4 42:20,22
  42:24,25 43:15 44:9
  44:11 45:3,12,24
  46:11,14,16,19,21,24
  47:5,7,25 48:3,10,13
  48:16 50:5 52:1,14
  53:1,9 55:6,10 56:6,14
  57:2 59:25 60:11,14
  61:2,5,19 62:7,14,17
  62:23 63:13,19,25
  64:6 65:10,16 66:3,8
  66:12,22 67:12 68:6
  71:6,10,15,17,22 72:3
  72:6,14 73:13 74:9,18
  75:11,14,21 76:2,10
  77:5,8,19 78:12,23
  79:6,15,24 80:11,19
  80:22 81:3,6,18,25
  82:8,15 83:8,11,22
  84:4,8,15,21,25 85:5

86:1,8,12 87:4 88:1,18
  89:20,20 90:7,17
  91:19,23 92:3,11,18
  92:20,25 93:20 94:1,9
  94:24 95:3 96:2,10,20
  96:20 97:1,5,12,18,20
  97:22 98:10,24 99:3
  99:11 100:4,6,9 101:1
  101:6,11 102:1,7,18
  102:21,22 103:1,5,5,9
  103:18 104:1,5,12,20
  105:13,16,19 106:8,18
  106:19
omitted 70:4
once 6:7 27:5 33:3 41:10
  65:7 83:13 93:4,6,9
  94:2
one-week 91:16
ones 34:4 47:11,11 48:1
  60:3 87:1 96:23 97:9
ongoing 106:22
open 106:23
opportunity 105:16
opposed 7:2 86:8
order 9:19 54:6 55:4
  68:3 75:20 76:4
Ore-Ida 9:7
outcomes 56:4
outside 49:16
overall 20:20
overlap 47:14
overview 21:18

**P**

P 107:11
P-H 46:6
P-R-O-L 102:10
P.A 2:14
p.m 1:15,15 107:9
P.O 1:23
page 3:2,6 4:1 12:1 19:2
  26:6 34:13 35:18
  40:17,17 46:16 56:10
  61:7 65:20 67:12,13
  67:14,15 68:17,18,23
  69:4 70:24 71:17
  72:25 75:21 76:13
  83:14 94:17,25 95:25
  110:9 111:2
page's 56:12
pages 56:8
palm 96:1,8
pan 61:15
Paneson 98:2 104:9
panhandlers 37:4,7
  38:16 95:22
panhandling 95:19
paragraph 19:8,10,11
  20:13 64:24 76:12
pardon 29:24
parent 48:25 49:13 94:6
parents 49:7 93:2,11
parents' 6:11,13
Park 2:15
parole 36:25 37:18
parse 60:4
part 4:5 13:7 17:18
  18:11 21:16 23:15
  26:18 33:10,11,11,13
  38:15 46:19 50:6,10
  55:7 56:11,18 75:13
  90:14 91:23 94:19
partial 60:25
partially 21:14 48:7 63:1
participate 33:1 34:7
parties 107:13 109:12
parties' 109:13

Pasco 1:8 6:10 8:20
  15:23 28:2,3,8,17
  35:20 46:4 64:21
  68:14 70:10 87:6
  95:19 108:3 109:4
  110:6
pass 15:1
passed 76:25
patience 5:13
patrol 34:9
Paul 11:5
Peace 9:13
pending 7:16
people 13:15,18 14:3
  22:17,19,23,24 23:2,7
  23:8,8 27:3,6 29:7
  30:9,11,15,21 33:24
  36:21 38:12,20,24
  39:10,12 41:2 43:10
  44:3 45:8 48:14,18
  49:2 51:21 57:12
  59:19,22 60:1 62:20
  62:23 63:4 66:23 67:1
  69:12,16,19 74:5 79:1
  79:2 81:7 86:23 87:9
  87:11,15 90:21,23
  91:1,9,21 92:21 94:20
  95:6,16,22 96:25
  102:14 103:15 104:13
  106:16
percent 40:17 66:1,19
  70:13,20,22 71:4,5
  56:9 61:8
period 27:25 46:25 82:20
  83:20 102:16
person 13:19 30:2 31:12
  32:16 33:17 36:22,23
  38:2,4 48:25 55:5 59:7
  63:21 64:17,21 79:3
  90:2 98:15 99:24
  100:3,5 105:25
person's 31:19
personal 85:15
personally 108:5
personnel 13:15
pertaining 20:18
petition 63:10 64:25
pharmacy 40:13
philosophy 18:13
phone 45:9 72:12
phrase 102:7
physics 8:13 11:6
place 1:17 64:20
plaintiffs 1:5 2:5,9,13
  4:10 106:9 110:3
plan 11:14
planning 9:20 20:19
play 14:10 62:7
please 6:25 12:2 19:9
  20:14 65:24 75:22
plenty 92:2
plus 106:17
point 7:13 27:8,16 29:25
  30:6,8 35:9,13 36:3
  37:12,24 41:1 59:3,11
  59:11,21 60:5,5,9
  65:24 66:10 74:22
  86:17
points 7:17 29:14 34:19
  36:12 37:15,15 59:4
  73:12 81:23 82:5,6,7
  83:7,11,12,15
policing 10:15 11:14
  17:24 18:4,13 19:1,7
  19:13 65:17
policy 20:18

pool 4:9 27:6,19 29:1,9
  29:18,18,21 30:3,11
  30:12,16,22 31:21,22
  32:3,10,11 34:20
  35:15,19,23 39:18
  53:15 54:18 59:7,19
  59:22 60:2,2 63:4
  66:20 73:8,10,11 74:3
  75:19 81:22 84:13,20
  90:21,24 91:2 92:20
popping 74:6
Port 1:17,18 28:5,7,7,17
position 10:16 12:5
  61:17
positions 10:20
positive 19:18 28:6
possibility 12:16
possible 10:23 66:25
  81:7 91:3 99:20 106:1
possibly 32:25 60:23
  66:20 103:20 104:8
post 8:17 40:1 51:8
potential 56:1
Poulton 2:14,14 3:3
  23:11 25:18 36:10
  64:9,14 67:3 72:15
  74:15 75:14 76:3 78:8
  87:18 88:3,6 93:16
  94:12 95:13,21 96:13
  97:7,23 98:5 101:13
  101:23 102:24 103:2,6
  105:1,21 106:4,8,11
  106:19 107:6
Poulton@debevoisepo...
  2:16
precise 74:9
predicting 40:14
predictor 40:7
prefer 30:14
preferred 5:24
prepare 7:21
Prescott 14:18
present 107:13
presented 65:13
presenting 57:1 58:15
  60:21
pretty 10:6 44:25 71:25
  93:17
preventatively 22:25
preventing 25:3 74:13
prevetting 40:2
previous 14:16 15:10
  56:11
previously 28:12 39:13
primary 43:3 92:16
prior 51:4 56:25 58:14
  60:21 79:20 82:23
  103:3
probability 67:8
probably 7:15 9:23 11:24
  31:17 34:1 40:6 41:10
  47:22 54:4 57:8 76:21
  77:4 85:24 90:15
  100:24
probation 37:18 74:25
problem 23:5,7 31:17
  34:2 42:11 60:14
  72:15 90:13
problematic 42:16
problems 60:23 69:16,17
  69:20
PROCEEDINGS 1:12
process 17:18 26:14,18
  33:2 39:4,7 48:12
  50:22,25 51:4 52:6,9
  52:13,15,22 53:14
  54:7,10,13 55:20,24

63:2 64:20 65:6 71:13
93:21 100:19
**produce** 74:12
**product** 50:17 56:23
57:1 58:15 60:21
**products** 20:16
**profess** 55:17
**profile** 50:14 99:21,22
100:7 101:7
**program** 19:4 21:16 24:7
24:8,11 62:3 65:17
86:16,23,24 100:25
**programmed** 16:8,9
**programmer** 9:4,5 55:13
**programming** 55:14
**programs** 21:18
**prohibited** 95:19
**project** 51:8 57:1 58:15
60:21
**projects** 56:21 57:4,9,11
**prolific** 4:6,7,8,9,11,12
13:23 14:5,11 15:8
16:3 17:13 18:15 21:9
21:12 23:16,22 24:10
25:2,4,16,21 26:11,15
27:11 29:16,20,22,24
31:4 37:2,5,6,11 43:16
43:17 52:6,9,23 53:13
55:25 57:9,14 58:24
61:25 62:8 63:2,4,4,11
63:21 64:5,21,24 65:1
65:9,25 66:2,5,11,13
66:21 68:25 69:3
71:18 72:21 73:2,15
74:3 75:19 77:4,6
78:19 79:19 81:8,9,13
81:22 84:13,20 85:4
85:24 86:6,9,13,18
87:11 89:14,16,22,25
90:5,7,16,16 91:18
92:24 93:5,6,10,14
94:3,7,19,20 95:11,18
96:1,8,8 98:4,22 99:7
99:9,16 100:15,18,25
101:1,9 102:9,10,12
102:13,14,18 103:7,19
103:22,22,23,23 104:6
104:13,16,17 105:11
**prolifically** 14:8
**prolifics** 4:5 61:12 75:12
75:23,25 77:12,16
80:15
**prompted** 41:17
**pronouncing** 5:17
**property** 87:21
**proposal** 71:24
**proposed** 69:3 71:18
73:6 75:4
**proposing** 72:2
**provide** 21:17 64:2 94:20
96:7,11
**provided** 88:21
**provides** 26:10
**providing** 6:22
**public** 1:20 9:3 49:15
108:12
**pull** 51:15,23
**pulling** 60:24
**purpose** 24:13 36:21
62:14 73:4
**purposes** 39:4
**put** 14:4 16:24 18:20
26:23 27:1 29:21
33:16 43:9,12 46:8
50:17 53:6 54:9 64:7
69:4 89:25 93:4,6,10
94:2

**putting** 41:1 43:8

**Q**

**Q4** 76:11
**qualified** 34:20
**qualify** 73:8,9,10
**quantities** 13:8
**quarter** 39:13 76:23 77:2
77:6 89:8,12 91:10,10
93:18 101:9
**quarterly** 31:23 91:19
**quarters** 93:22
**queries** 53:3,11,14,17,22
53:23 54:5,8,20 55:7
**query** 53:23,25 54:1,2,25
105:4,6,9
**question** 6:20,25 7:15,16
7:19 39:17 43:22
50:21 51:12 59:24
66:6 78:16 87:25
88:11,16 89:18 91:6
94:14 95:24 98:7,8
103:10 104:23 105:25
106:5
**questioning** 55:11
**questions** 6:19 7:17 12:2
12:3 19:3 26:17 53:9
61:23 88:12 97:19
106:24
**quick** 61:22 72:12,17
97:12,19
**quickly** 70:7 97:13
101:17
**quite** 12:13 33:12 48:25
77:24 101:4
**quote** 14:6 24:14,24
47:17

**R**

**radar** 61:13,14 62:17,21
74:6
**ran** 33:15 72:4
**range** 99:12
**ranges** 104:14
**rank** 27:9 29:13 30:21
31:1
**ranked** 89:12
**ranking** 29:13 90:21
**rankings** 4:10 69:11 89:8
**rare** 7:19
**rarely** 13:6,17,18
**Ratcliffe** 18:5
**Ratcliffe's** 18:17
**raw** 26:14
**read** 11:20 13:6 19:9
20:14 21:6,7 34:18
46:22 48:10 51:20
56:15,16,17 59:14
65:24 66:9 77:9 80:2,7
81:25 85:1 107:6
110:11
**reading** 107:14
**real** 37:3,5 38:23 40:15
42:8 72:16
**realistically** 48:1
**really** 6:1 33:17 40:22
49:4 50:11 66:6 69:21
70:7 73:8 97:13
101:17
**reason** 7:7 32:14 69:6
77:25 91:12,23 92:16
**reasoning** 42:4
**reasons** 22:23 40:11,14
66:23 81:12
**recall** 36:4 41:17 47:3
53:2 82:10 105:9

**receive** 33:5
**recognize** 18:22 46:8
65:13 79:15 81:18
84:11 94:24
**recommendation** 15:7
**recommendations** 16:24
78:1
**recommended** 46:25
47:2 72:21 74:24
**recommends** 15:2
**reconciled** 39:25
**record** 6:24 49:15 61:5
72:16 75:17 76:7 90:3
90:3 100:7 101:19
103:13 109:9
**recorded** 13:4
**records** 12:9 27:7 28:4
28:22 33:25 47:18
48:4 49:16 51:16
60:24 65:8 89:23
104:3
**Recurring** 61:12
**Redirect** 3:4 103:11
**reduce** 14:2 39:15 87:1
**reduction** 6:1,4,13,19
**reference** 60:22 84:4
**referenced** 58:17
**references** 20:22
**referred** 52:19 82:11
103:7
**refers** 25:10,13 82:10
**reflected** 99:22 100:11
**registered** 6:11
**rejected** 58:8 72:22
**related** 13:14
**relationship** 50:15
**relationships** 48:14 49:3
**relative** 109:11,13
**relevant** 47:8
**remain** 39:7
**remember** 9:24 17:6
28:20 35:8 58:18
62:19,19 81:10 90:4
105:15
**remembering** 100:5
**remove** 79:10
**removed** 75:4 87:15 91:1
91:10,21 92:5,8 94:4,7
94:10,10
**removing** 74:24
**repeat** 44:7
**rephrase** 32:17
**replacement** 56:1
**report** 39:8 44:1,25 46:5
46:12,17 48:25 109:7
**REPORTED** 1:19
**reporter** 1:19 3:5 6:23
109:1,6,19
**REPORTING** 1:22
**reports** 12:8,11,14 13:4
13:5,7
**represent** 96:10
**representations** 14:25
**request** 13:10 54:1
**requests** 13:14
**require** 12:8,17 83:2
**research** 9:2,20 48:11
50:18 52:5
**reserve** 106:23
**reside** 86:6
**residence** 85:3
**residential** 42:13
**resource** 20:19
**resources** 94:21 95:7
**respect** 11:11
**respective** 107:13
**respond** 7:1

**response** 21:24
**responsibilities** 12:5
**responsibility** 21:13,15
**rest** 83:6 101:16
**result** 51:24 75:2 78:23
105:9
**resulting** 82:7
**results** 73:15 74:12
**revictimization** 44:1
**review** 4:4 44:9 51:5 56:9
56:23 65:16
**reviewing** 51:13
**Richey** 1:17,18 28:5,7,7
28:17
**right** 5:15 7:12 8:25 9:12
13:12 15:14 17:11
20:24 21:2 23:4 27:17
27:20 30:19 32:6
35:21 36:17 38:17
39:20,23,24 40:19
43:20 44:13,21 45:24
45:25 46:16 51:1,11
52:6,24 55:15 65:6
66:15,17,23 67:7,10
68:8 71:4,18 72:17
73:17,20 75:6 79:25
83:9 84:1 85:12,20,21
86:11 89:9 90:4 96:21
98:20,23 99:5 102:21
104:18 105:25 106:23
107:5
**right-hand** 68:6 74:23
**Rjohnson@ij.org** 2:4
**RMS** 99:4,21 100:7
101:7
**Road** 2:7
**Rob** 101:17,24 104:21
**robberies** 82:3
**Robert** 1:4 2:2 89:5 90:5
98:3,19 101:7 104:10
110:2
**role** 14:10 62:7 103:8
**roles** 19:16
**root** 37:12,19
**Ross** 11:25 14:19 43:4,5
86:5 91:10
**row** 98:16
**rows** 90:1
**rule** 86:2
**rules** 6:18
**run** 13:15 24:7,8 27:6
53:4,11,14,17 54:8
56:3,3 59:21 60:1 62:4
76:11 104:25 106:1
**running** 54:14,20,22

**S**

**S** 2:10,11,15 4:1 107:11
**Saint** 11:9
**sake** 103:13
**sales** 38:21
**Salvation** 97:2
**Santos** 14:24 20:5
**sat** 82:11
**saw** 54:18 87:20
**saying** 63:20
**says** 19:7 34:15,24 36:13
40:17 41:14 50:14
52:4 58:12 60:19
61:11 66:8 70:12,14
71:18 80:22 83:23
89:4 96:5 98:10,19,22
102:9
**scant** 87:7
**scenario** 72:23 73:23
74:11 86:5

**scenarios** 73:7
**scene** 38:3
**school** 9:13 12:16 13:11
51:9
**score** 16:14,16 37:21
38:5 40:18 69:23
75:20 83:16
**scored** 34:21,24
**scores** 85:17,19
**scoring** 15:13 16:4,4,7
17:3,12 18:14 21:17
24:21 30:18 34:15
53:16,18,19 54:18
62:5,8 68:24 70:9,10
71:18 72:22 73:2 83:3
92:12
**screen** 97:20
**scrutiny** 64:7
**seal** 108:7
**search** 49:15 104:25
**second** 16:3 26:23 35:16
35:18 58:12 64:16
66:9 76:12 83:14,23
84:11
**section** 26:8 43:6 47:14
49:9 56:14 77:8
**see** 21:8 28:12 29:17
34:15 35:9 36:13 37:6
39:6,14 41:24 42:3,14
42:15,24 47:13 48:24
50:20 51:22 52:21,21
56:4 59:13,15 60:19
65:10 66:8 69:6,21,25
70:5 73:7 74:8 79:12
83:18,22 85:7,18 92:1
95:5,7 97:3,19,24
98:13,19 99:6 101:8
102:1,8 103:18 105:10
**seeing** 63:18
**seen** 88:23 95:1 96:2
**select** 45:8 55:3
**selected** 89:13,15 92:17
**selection** 53:16 54:19
**selects** 16:12
**Semoran** 2:15
**send** 33:3
**sending** 63:20
**senior** 20:1,16 21:1
**sense** 32:5 91:7,20
**sent** 98:1
**sentence** 19:8,11 20:14
21:6,7 34:18 57:2
58:12 77:10 80:3,7,14
82:9 83:23
**sentences** 56:16
**separate** 9:10,11 42:5,5
47:13
**September** 79:23 103:20
104:7
**sequence** 79:22
**service** 13:3,4
**services** 22:20 25:23
26:3 96:18
**set** 27:14,23 84:15
**setting** 40:24
**seven** 9:3
**sexual** 6:11
**Shaker** 2:3
**shaking** 7:4,4
**shares** 21:15
**sharing** 28:21
**Sheet** 3:6 111:1
**Sheriff** 1:8 110:6
**Sheriff's** 8:21 9:17 12:10
46:4
**Shield** 9:7
**short** 39:1 61:3 72:18

73:8 97:15
shortly 76:21
show 74:4 80:4,22,24
showed 65:25 74:1 90:23 99:12
showing 69:5
shown 26:19 70:5
shows 73:14 75:25 82:5 85:18 90:2
side 67:19 68:6 70:10
side-by-side 69:1
Signature 3:6 110:9
signing 107:14
similar 15:17 24:10 33:14 53:19 61:25 106:1
simple 63:19
single 70:19
sir 5:8 11:11 46:8 76:12 106:20
sitting 79:2,3
situation 64:17
six 8:24,25 24:21 41:21 93:23 103:6
slide 71:22
slightly 15:18 42:2 83:5
small 67:8,8
smaller 25:8
social 48:12,13 49:17,19 49:25 50:2,3,6,7,10 51:2,5,6,7,13
society 42:9,12
sociology 40:6
software 50:16 54:22
somebody 32:7 43:7 45:1 66:14 78:23 79:2 100:17
someone's 49:6 50:14 81:6 100:17
somewhat 61:25
sorry 5:13 35:16 43:5 45:10 68:21 70:6 72:11 73:1 76:3 78:6 78:25 80:7 84:23,24 101:24 102:24
sort 15:15 32:16 102:8
sorted 55:3 75:20 81:23
sorting 53:16
sound 27:14
speaking 15:23 81:6
specific 13:19 26:8 27:23 28:1 31:24 49:23,24 55:1 97:9
specifically 58:16 103:15
specify 15:24
spectrum 38:18
spelled 46:6
spit 51:24
spoke 101:24
spoken 74:9
spouse 49:11
spreadsheet 75:12 76:1 79:25 105:22
spreadsheets 80:4,22
square 37:12,18
St 11:5
stage 53:13
stamps 65:20
STAR 21:10,21,23,25 22:4,8 23:4,6,9,10,13 23:14
start 5:13,14 38:8 80:17 95:24 100:25
started 8:23 9:20 10:13 51:7 86:16 107:4
starting 9:17 77:4
starts 36:16

state 1:20 11:8 32:19,23 60:18 108:2,12 109:3
states 1:1 64:25
statistics 17:25
status 102:9 104:17,17
statute 41:7 60:18
stay 94:21
stayed 19:22 93:24
Ste 2:3,7,11,15
stenographically 109:7
step 41:25
Stephen 1:12 4:3 5:1 46:5 108:5 110:17
steps 53:7,8 54:11
stick 87:16
stint 91:17
stipulated 107:12
Stipulation 3:4
stop 22:23 55:10 66:23
strategic 10:14 12:5 20:15,15,16,23 21:1,4 21:8,11,24 53:5 56:2 56:23 58:12
streamline 55:19
streamlined 54:10
street 41:22
strict 77:17,20
strictly 75:1
strike 41:8,25
strong 55:17
structured 54:1,25
studied 73:19
studies 66:3
study 69:9
stuff 9:12
subjective 74:7
SUBSCRIBE 110:12
SUBSCRIPTION 110:13
subsequent 81:9,13
substance 8:9
subtracted 82:6 83:15
successful 66:11
sued 6:14
sufficient 65:1
sufficiently 26:22
suggested 51:11,14,18 57:3 58:8,9
suggesting 86:5
suggestion 47:15 58:11
suggestions 14:12,14 47:10 57:20,22
suggests 83:25
suit 6:10 55:18
Suite 1:17
Suites 1:17
summary 88:21
super 67:24
supervise 44:24
supervisor 14:21,22 44:21 47:4 58:17
supervisors 57:17
supplied 22:4
support 10:1,4
suppose 6:18 72:21
suppress 22:11,13
suppressible 22:9 23:14
suppressing 22:16 86:25
suppression 22:15
sure 5:17 7:1,2 17:10 29:3 31:18 32:20 37:9 52:3 57:8 60:8 70:8 71:25 72:14,15 86:4 87:9 97:25 102:22 106:25
suspected 87:14
suspicions 35:24 38:8

70:1 75:1
switching 35:17
sworn 5:2 108:6
system 12:9 15:13 16:4,5 16:7,13,13,16,16 17:12 18:14 24:21 26:22 27:8,16 28:4 30:8,18 33:8 34:1 35:9 36:3 44:12 47:19 48:4 49:16 51:16,23 53:6 53:19 55:8 60:24 62:5 62:8 65:8 69:8 70:9,10 83:3 89:24 92:12 99:4 104:3
systems 17:3

## T

T 4:1 107:11,11
T-A-R-G 102:17
table 55:3 89:23 100:11 100:13,14 101:5 104:3 104:3
tables 47:23 48:9 54:5
take 7:13 11:18 26:6 31:1 31:1,8,25 35:16 36:22 37:12,12 42:7 44:19 46:14,16 48:16,23 53:6 63:6 65:19 72:12 76:12,25 78:4,7,19 87:1 89:3 93:17 97:12 101:7
taken 6:4 75:5 93:14
talk 7:23 21:20 45:16,18 45:19
talked 7:24 43:16 81:7 82:12
talking 15:12,15 28:25 29:17,25 50:16 55:12 57:25
talks 21:11 76:13
TAMMY 1:3 110:1
TAMPA 1:2
tardiness 107:4
target 23:8,8 39:11 89:25
targeted 21:24
targets 102:17
task 48:6 50:21
Tasks 61:12
taught 51:9
Taylor 1:3 98:2 103:18 110:1
teacher 9:13
team 21:21,23,24 56:21 57:4
teams 21:25 22:4 23:10 23:13
technically 59:5
technology 10:2
telephone 2:2
tell 5:2 26:16 54:14 66:25 67:19,23 75:18 76:4 92:17 96:23 97:7
tells 7:19 66:12
ten 47:24 54:10
tend 38:12
term 13:23 14:1 15:8 21:21 24:17 29:23 30:13,14 34:4 45:3
terms 52:21 57:14 63:2
terrible 88:4
test 37:4,6
testified 5:4 30:25 35:18 66:22
testify 7:8
testifying 14:6
testimony 43:18,23

94:18 98:25 101:6 103:3 109:9
testing 39:4
tests 58:10
thank 5:9 7:12 9:16 27:12 52:1 61:21 64:14 65:10 97:18 105:23 107:2
thanking 5:13
Thanks 102:25 103:9
theirs 69:10
theory 22:16
thesis 8:15
thing 7:14 27:13 58:3 94:10
things 18:2 21:18 27:7 31:1 32:1,15,17 40:5 48:23 49:15 65:22 70:4 75:4 77:20 78:4,7 78:13,17,17
think 18:21 20:12,21 24:2,5 26:15 29:2 31:3 34:4,14 38:23 39:16 43:2,9,17 45:15 47:6 47:13 49:14 50:12 52:19 53:2 56:9 58:5,7 61:1,22 63:7,12,20,23 64:24 67:14 72:24 76:11 88:16,23 89:19 90:11,19 93:5 94:1,16 94:21 96:2 99:25 100:2,12 101:3,11 103:8 104:20 105:2 106:20
thinking 90:2
third 65:24 77:23
THOMAS 1:14
thoroughly 56:25 58:14 60:20
thought 62:20 69:16 70:20 74:10
three 9:24 10:20 14:15 24:22 26:25 27:5,22 28:16 29:8 30:2 31:13 31:20 32:8 34:21,25 35:3,20 40:9 52:4 73:9 73:10,11,11,17 77:24 79:20 85:8,23 87:13 87:14 92:14
three-quarters 32:9
three-year 32:2
threw 59:6
throw/shoot 59:1,2
Thursday 40:10
time 1:15 7:17 13:1 17:1 17:6,7,8 18:10 26:23 36:4 41:15 51:3 53:22 54:5,8 61:17 64:11 68:14 73:8 75:6 82:20 97:18 102:16 103:22 106:20 107:2
timeframe 102:11
times 6:36 36:6 37:15 43:10 44:4 83:1,13
title 17:8 20:5,9
today 5:8,12 6:3 15:24 72:13 97:18 105:2
told 33:10 37:1
Tom 10:22 11:13 46:3 75:11 88:5,20 98:1 101:15,15 102:23 103:5,9 105:23 106:2
Tony 14:18 16:25
top 23:24 27:9 31:1,3 35:18 37:10 38:13 39:6,7,10,19,25 40:2 44:12,15 45:3,19,20

46:20 64:7,12 74:4 75:22,25 76:1 79:4 83:15 85:2,23 87:1 89:19,25 90:6 91:4,8 91:21 92:21,22 95:25 100:15 102:15,17 105:14 106:2,6
topic 18:18 82:19
total 83:16
tough 66:6
town 81:14
trade 80:9
training 48:7
transcript 109:8 110:11
transferred 10:2
translation 54:17
trend 68:7
tried 77:18
trouble 94:22
true 52:22 109:8
truth 5:2,3,3
truthfully 7:8
try 9:18,18 29:12 44:4 96:16 102:1
trying 31:9 52:2 89:21
turn 12:1 56:8 67:12 75:21
turned 34:14 104:4
tweaked 42:14
twelve 47:24 83:21
twins 33:13
two 9:24 20:15,22,23 24:20 26:24 27:4,19 27:21,22,25 28:1,16 29:2,4,4,6,7,15 30:1 31:20 32:8 33:13 34:18,25 35:2,2,4,5,19 36:12 38:22 40:5 41:10,12,16 48:10,18 56:16 57:24 68:24 69:1 72:5 73:10,12 76:22 83:19 84:2,6 85:8,23 87:13,14 97:19
Tyler 98:2 104:8
type 6:17 23:14 58:25,25 72:19 98:11,22 102:9 102:10
types 13:14 22:11,12 38:11,12 59:18
typically 7:18 30:16
typing 50:18 51:14,19

## U

U 107:11
uh-huh 7:2 15:25 67:16 85:10
uh-uh 7:2
ultimately 47:8
umbrella 21:13
underneath 75:24
undersigned 108:4
understand 45:6 50:4,21 50:24 63:24 74:21
understanding 20:17 45:13 76:10 86:4 99:19
understands 56:21 57:5
Understood 64:14
unique 12:14 26:20
unit 24:12
UNITED 1:1
universe 13:20
University 11:8,10
unquote 14:7 24:14,25
unvetted 4:5,7,8 42:25 75:12,23,25 82:16,16

82:23 84:13 91:8
**unwanted** 82:5
**upcoming** 77:2
**update** 65:8
**updates** 52:13
**upgrades** 52:19
**use** 18:6 22:4,7 31:18
32:20,21 41:7 45:8
47:23,24 50:10 53:25
58:24 68:17 70:23
71:8 73:6 83:24
**usefulness** 92:12
**uses** 102:7
**USF** 62:4,6,7
**usually** 7:14 13:7 30:17
41:20 87:23

___

**V**

**VA** 2:7
**vaguely** 65:15
**value** 35:9 36:3 37:12
59:3 60:5,6,9 86:17
**values** 27:8 35:13 59:22
**variation** 72:23 73:23
74:11
**various** 72:1
**varying** 19:15
**vast** 92:13
**vehicle** 59:2
**verbal** 15:16
**verbalize** 7:3
**versa** 69:18
**version** 11:24
**versus** 37:14 70:3
**vertical** 89:4
**vet** 27:10 34:4 59:12
**vetted** 29:21 39:20
**vetting** 34:7,11 39:4,7
40:1 52:22 63:2,3
71:13
**viable** 91:18
**vice** 69:18
**victim** 44:4 48:19,21
**victimized** 44:3,5
**victims** 44:7
**violation** 36:25 74:25
**violations** 37:18
**violence** 22:10 25:5
**violent** 24:25 38:21
61:13,15,24 62:2,16
67:21 68:3,7,10,14
87:21
**visit** 69:2,7
**visited** 18:19
**VOP** 36:14,25 40:22
**VOPs** 37:14
**vs** 1:6 110:4

___

**W**

**W** 2:14
**waived** 107:15
**want** 5:12,16 6:2 14:4
17:10 22:22 29:17
37:1,3,10 50:20 55:2,2
60:19 64:19 67:13
68:21 77:13 87:16
88:7 97:18 99:19
101:17 104:21 107:2
**wanted** 12:15 37:11 38:3
40:12 51:15,22 53:5
82:3,21 86:19,21 98:8
101:17
**wasn't** 56:4 99:22 102:22
**way** 31:21 38:12 48:14
49:4 51:2,23 60:8,15
64:6,21 84:5 94:9

105:17
**ways** 22:8
**we'll** 42:25 72:16 97:14
106:12 107:6
**we're** 6:2 15:11,16,23
20:22 22:12 35:3,17
52:22 55:14 61:5 63:9
65:19 67:20 99:13
101:20
**we've** 33:9 36:5 60:23
70:22 71:4 103:3
**week** 12:13,16 13:12
76:22
**weighing** 80:15
**weight** 31:19
**weighting** 69:21
**went** 33:19 91:25 93:22
**weren't** 27:1 28:21 39:3
**West** 97:2
**white** 67:18
**wife** 40:12
**window** 42:9 59:6
**Winter** 2:15
**wish** 56:6
**witness** 5:5 6:15 11:13
46:4 76:6 96:13
104:23 105:6 106:7,9
106:13,15,25 107:5
108:7 109:9
**women** 97:3
**wondering** 34:23 89:3
**word** 39:5 83:24
**words** 14:4 73:13
**work** 18:18 37:7 43:8
44:25 45:1 57:11
61:16 75:7
**worked** 53:5
**working** 9:9 46:13 56:20
57:4,11 74:5
**wouldn't** 27:1 65:3 75:8
80:24 86:23 101:4
**Wow** 12:13
**wrap** 98:8
**write** 21:16
**writing** 51:3
**written** 13:5,7 61:18 95:8
**wrong** 21:18,19 33:18
100:2,5
**wrote** 11:23 16:11

___

**X**

**X** 3:1 4:1

___

**Y**

**yeah** 15:5 40:6 42:3,3
43:13 50:2 54:24
55:14,17 57:19 71:3
74:21 84:2 85:7
102:24 105:10 106:8
**year** 4:4 10:10 67:21,21
73:9,12 76:4
**years** 8:22 9:3,4,22,24
10:4 11:12,20 12:14
24:22 27:5,22 28:16
29:8 30:2 31:20 32:8,9
35:20 39:8 41:10,12
41:16 55:13 57:24
68:4 73:10,10,11,12
73:12 77:24 81:9,13
82:24 84:2,6 87:13,14
89:8 103:6
**Yep** 8:8
**youth** 24:3

___

**Z**

**Zephyrhills** 28:5,10,17

**zero** 83:7
**zoning** 6:13
**zoom** 2:14 101:24 102:1

___

**0**

___

**1**

**1** 1:17
**1-5-2023** 108:13
**1,800** 87:23
**10** 40:17 70:20 71:4
**100** 31:3,6,10 39:6,7,23
39:25 40:2 79:1,4 85:3
86:13 87:2,17 91:1,4,8
91:8,21
**101** 3:3
**1010** 2:15
**103** 3:4
**1035** 2:15
**105** 79:2
**107** 3:4
**108** 3:5
**109** 3:5
**11** 4:2
**110** 3:6
**111** 3:6
**11305** 84:22,24
**12** 1:14 108:6
**15** 9:4 70:13,22 71:5
**150** 92:4
**151** 98:14
**16** 8:22 37:14,14
**16781** 2:3
**17397** 65:21
**18** 30:17
**18995** 46:16
**18999** 56:10
**19001** 61:7
**196** 72:4 73:18,20 74:8
**198** 89:13 90:24 99:15
**1st** 77:4

___

**2**

**2** 2:11 65:20 73:1
**2,000** 87:23
**2:17** 1:15
**20** 38:3 81:24 105:11
**2000** 30:17
**2006** 9:17,23
**2007** 8:23
**2009** 9:23 10:6
**2011** 10:6,13
**2013** 100:25
**2014** 100:25
**2016** 68:11
**2017** 89:9 99:10,10 101:2
101:9 103:19 104:7,9
104:11,11
**2018** 4:5 75:13 76:10,11
76:17,24
**2019** 46:17 56:9 77:6
79:21,23 103:21
**202** 75:25 76:1 79:9
**2020** 4:7
**2021** 4:8 84:14 104:7,9
**2022** 1:14 108:6,8 109:17
**22203** 2:7
**23** 19:15
**24** 83:15
**2426** 1:23
**250** 31:2,2,9 39:19 74:4
79:9 85:2,23 91:25
92:2,4,8,21,22
**256** 2:3
**276821** 108:12
**29** 19:14

**2nd** 108:7 109:17

___

**3**

**3** 67:14 82:4
**305-721-1600** 2:12
**3180** 2:11
**32792-5512** 2:15
**33131** 2:11
**33526-2426** 1:23
**352** 1:24

___

**4**

**4** 25:10,13 29:5 30:1 62:2
67:21 68:5
**40** 37:7
**407-673-5000** 2:16
**44120** 2:3
**46** 4:3

___

**5**

**5** 3:3 4:4 23:24 39:10
44:12,15 45:3,19,20
64:7,12 79:2 89:19,25
90:6 100:15 102:15
105:14 106:2,6
**5's** 102:17
**5:13** 1:15 107:9
**50** 37:8
**567-5484** 1:24
**57** 12:1

___

**6**

**65** 4:4

___

**7**

**7** 70:12
**703-682-9320** 2:4,8
**75** 4:5 26:6 34:13 40:17
65:25 66:19 70:24
**76** 94:17,25
**79** 4:6

___

**8**

**8** 72:23 74:11
**8:21-cv-00555-SDM-C...**
1:6 110:4
**81** 4:7
**84** 4:8,9
**8520** 1:17
**88** 4:10
**8th** 76:17 77:3

___

**9**

**9** 68:18 72:23 73:23
74:11
**900** 2:7
**901** 2:7
**97** 4:12
**99** 104:11