UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO. 8:21-cv-00555-SDM-CPT

```
_____
                                )
DALANEA TAYLOR, TAMMY HEILMAN,  )
DARLENE DEEGAN, and ROBERT A.   )
JONES, III,                     )
                                )
            Plaintiffs,         )          DEPOSITION OF
                                )
     vs.                        )          DR. RICHARD M. HOUGH, SR.
                                )
CHRIS NOCCO, in his official    )
capacity as Pasco County Sheriff, )
                                )
            Defendant.          )
_____)
```

        On Monday, April 18, 2022, commencing at 9:14 a.m., the

deposition of Dr. Richard M. Hough, Sr., was taken via Zoom on

behalf of the Plaintiffs and was attended by Counsel as follows:

APPEARANCES VIA ZOOM:

        JOSHUA A. HOUSE, ESQ.
        Institute for Justice
        901 North Glebe Road, Suite 900
        Arlington, Virginia  22203
        on behalf of the Plaintiffs

        ROBERT E. JOHNSON, ESQ.
        Institute for Justice
        16781 Chagrin Boulevard, Suite 256
        Shaker Heights, Ohio  44120
        on behalf of the Plaintiffs

        THOMAS W. POULTON, ESQ.
        Debevoise & Poulton, PA
        1035 South Semoran Boulevard, Suite 1010
        Winter Park, Florida  32792
        on behalf of the Defendants


ATTENDING:   David Kennedy

REPORTED BY:  Mai-Beth Ketch, CVR-M, CCR
              ASHEVILLE REPORTING SERVICE

2

(Document CB1138)

INDEX

Signature (Reserved). . . . . . . . . . . . . .  3

Direct Examination By Mr. House . . . . . . . .  4

Certificate of Notary Public  . . . . . . . . 161

EXHIBITS:

Plaintiff's Exhibit A Introduced  . . . . . . .  7

     *(Report by Dr. Hough)*

Plaintiff's Exhibit B Introduced  . . . . . . . 45

     *(Article by Dr. Hough – June, 2021 –*

     *Administrative Evil)*

Plaintiff's Exhibit C Introduced  . . . . . . . 49

     *(Article Co-Authored by Dr. Hough)*

Plaintiff's Exhibit D Introduced  . . . . . . . 57

     *(Textbook Excerpt – American Homicide)*

Plaintiff's Exhibit E Introduced  . . . . . . . 76

     *(Textbook Excerpt – Criminal Investigations*

     *Today)*

Plaintiff's Exhibits A – E Marked . . . . . . 160

3

1          PURSUANT TO NOTICE and/or Agreement to Take

2     Depositions, the within Deposition was taken by me,

3     MAI-BETH KETCH, CVR-M, CCR, a Notary Public as

4     required in Rules 26 and 30 of the North Carolina

5     Rules of Civil Procedure.

6     <u>SIGNATURE:</u>

7          The Deponent did agree that both the reading

8     over and signing of the transcript are hereby

9     reserved.

10    <u>BY THE COURT REPORTER:</u>

11          The attorneys participating in this proceeding

12          acknowledge that I am not physically present

13          in the proceeding room and that I will be

14          reporting this proceeding remotely.  They

15          further acknowledge that in lieu of an oath

16          administered in person the witness will

17          verbally declare his or her testimony in this

18          matter under penalty of perjury.  The parties

19          and their counsel consent to this arrangement

20          and waive any objections to this manner of

21          reporting please indicate your agreement by

22          stating your name and your agreement on the

23          record.

24    <u>BY MR. HOUSE:</u>

25          Joshua House, and I agree to the agreement.

4

1    BY MR. POULTON:

2        Tom Poulton on behalf of the Defendant.  We

3        agree.

4    BY MR. JOHNSON:

5        This is Rob Johnson for the Plaintiffs, also

6        agree.

7    BY THE COURT REPORTER:

8        And, Dr. Hough, do you agree?

9    BY THE DEPONENT:

10        Yes, I agree.  This is Richard Hough, yeah.

11    DIRECT EXAMINATION BY MR. HOUSE:

12    Q   So let's jump right into it.  So Mr. -- or

13        Professor Hough, my name is Joshua House.  I

14        represent the Plaintiffs in the lawsuit Taylor

15        versus Nocco.  You understand that when I say

16        this lawsuit or this case I will be referring

17        to Taylor versus Nocco?

18    A   Yes, sir.

19    Q   Great, thanks.  I'm just going to go over some

20        basic ground rules.  I know you've done some

21        depositions before so you're probably used to

22        this but I just want to get it all -- get it

23        all on the record.  I'm going to be asking

24        questions.  You're going to be answering them.

25        And we ask that you do so verbally in order

5

1          for the court reporter to get it on the

2          record.  Do you understand that?

3      A   I do.

4      Q   Also, I'd ask that you not speak over me.

5          I'll try not to speak over you.  This can

6          sometimes be an issue with Zoom, so I

7          apologize if it happens.  But do you -- do you

8          understand that you should endeavor not to

9          speak over me, as I will do you?

10     A   Yes, sir.

11     Q   If you need a break just let me know.  I'm

12         just going to ask that you finish answer any

13         question that's pending before we take a

14         break.  Does that make sense?

15     A   Yes, sir.

16     Q   Great.  Now, there hasn't been a swearing in,

17         as we're all aware.  But do you understand

18         that you're under an obligation today to give

19         testimony that is true as if you were

20         testifying in a court of law?

21     A   Yes, I do.

22     Q   My friend, Mr. Poulton, might occasionally

23         object, but do you -- do you understand that

24         unless instructed not to answer by him that

25         you still have an obligation to answer the

6

1        question?

2    A   Yes, sir.

3    Q   Is there anything that might prevent you from

4        giving full or accurate answers today?

5    A   No, there is not.

6    Q   Are you on any medication that might prevent

7        you from giving a truthful answer today?

8    A   I am not.

9    Q   Do you have any illness that might prevent you

10       from giving a truthful answer today?

11   A   No.

12   Q   Do you have your expert report in this case in

13       front of you today?

14   A   I do somewhere here.  Yes, I do have it.

15   BY MR. HOUSE:

16       I'm going to introduce it as our first exhibit

17       right now and I'm going to screen share,

18       although it might be easier I think at times

19       just to have you look at the page number I'm

20       referring to rather than screen sharing every

21       time I refer to a different page.  But, you

22       know, Tom, let me know if you'd rather me

23       screen share everything.

24   BY MR. POULTON:

25       Whatever makes sense for you and the witness.

7

BY MR. HOUSE:

2      So I'm just going to -- I'll screen share it

3      now but I just thought I'd mention that.

BY THE DEPONENT:

5      Yes, we have probably all noticed that with

6      some of the screen sharing it can be very tiny

7      even when we try to blow it up.

BY MR. HOUSE:

9      Exactly.

(PLAINTIFF'S EXHIBIT A INTRODUCED)

DIRECT EXAMINATION RESUMED BY MR. HOUSE:

Q    So can you see my screen?

A    Yes, sir.

Q    And on my screen do you see -- do you

      recognize the document that is on my screen?

A    Yes, sir.  That is my report.

Q    Great.  And just real quick.  Do you have --

      is there anything else with you today that you

      plan to refer to?

A    There is not.  I will just say that I am

      looking at your screen share which shows 71

      pages.  The report I have shows 66.  I don't

      know if that's just a formatting issue or

      there's some -- something additional.

BY MR. POULTON:

8

1         You see there at the end you have the --

2         right.

BY MR. HOUSE:

4         Yeah.  It might be that it has the beginning.

5         The original cover material, yeah.

BY MR. POULTON:

7         Very good.

DIRECT EXAMINATION RESUMED BY MR. HOUSE:

9    Q    So what you do see on my screen though is your

10        expert report; correct?

11   A    Yes, sir.

12   Q    Great.  And did you write this report?

13   A    Yes, sir.

14   Q    If you could turn to Appendix D.

15   A    I'll note even including the typos are mine.

16        Yes, sir.  I'm at D.

17   Q    So I see from Appendix D in your report that

18        you've been deposed before; is that correct?

19   A    Yes, sir.  I have.

20   Q    In Appendix D where it says the term

21        deposition does that mean you were deposed?

22   A    Yes, sir.

23   Q    And then where it says hearing next to each

24        line, does that mean you gave live testimony

25        in a courtroom?

9

```
 1    A    Either -- I know there was I think at least
 2         one that was done as we are doing today, a
 3         hearing in South Florida recently by Zoom, but
 4         otherwise for a hearing or where they say
 5         trial it will have been live testimony.
 6    Q    Is it fair -- is it fair to say that hearing
 7         took place -- if it's marked a hearing that it
 8         took place in front of a judge?
 9    A    Yes, sir.
10    Q    Where it says defendant on each of these
11         items, does that mean that for that item you
12         were retained by the defendant in that case?
13    A    Yes, sir.  That's correct.
14    Q    Is it accurate to say that in the past four
15         years you've only ever provided testimony on
16         the side of a municipal government?
17    A    No.  There have been -- and the distinction I
18         think partly would be county sheriff's
19         offices, some I think that were -- and, you
20         know, to different risk funds.  So if a firm
21         such as yours or Mr. Poulton's firm were to
22         reach out to me it -- it would vary.  But I
23         think if, yeah, we went through those that the
24         majority -- I'm just trying to remember if
25         there were any private entities.  There was a
```

10

1        retention or two by a plaintiff, and semantics

2        not withstanding there were some actions

3        where, for instance, any agency terminated an

4        employee and the employee sued.  So the agency

5        becomes, you know, technically the defendant

6        even though it was an action against the

7        criminal justice actor.  But largely, yes, I

8        think that's fair.  I don't -- I don't do any

9        paid advertisement, so there's not that many

10       here.  It's just word of mouth.  Like I said,

11       you call me up.

12   Q   Sure, sure.  So let's assume that county

13       sheriff's departments are a municipal

14       government just for the sake of my question.

15       So assuming that, in which case have you not

16       provided -- in which of the cases listed have

17       you not provided testimony on a -- excuse me.

18       In which of the cases listed have you not

19       provided testimony for a municipal government?

20   A   I think that would mean that each one of these

21       would be for, a you say, a municipal

22       government.

23   Q   Have you provided testimony in any other cases

24       in the past four years besides those listed

25       here?

11

1   A   Let me scroll to see from the report.  I

2       believe there were two depositions since the

3       completion of this report and both of those

4       would -- would fit the same category of -- for

5       a municipal government entity and/or

6       employees.

7   Q   So and then are those two the only ones that

8       are on this list?

9   A   Those should be the only two that are not on

10      this list.

11   Q   Have you ever provided testimony in a lawsuit

12      about intelligence-led policing as you

13      understand that term right now?

14   A   Not specifically.  There are various cases

15      that deal with the criminal investigative

16      functions of different agencies and entities.

17      And so written broadly, depending on as we

18      know the differing definitions that agencies

19      have, it may incorporate that.  But as to

20      specifically as we have in this case, no.

21   Q   To your knowledge have you ever provided

22      testimony in which you use the term focused

23      deterrence as you -- let me ask the question

24      again.  Have you ever provided testimony in

25      which you use the term focused deterrence?

1    A    I don't recall sitting here today whether I

2         have used that -- that at any point in a case

3         over the years.

4    Q    Have you ever been involved in a lawsuit where

5         you did not provide testimony?

6    A    Oh, yes.

7    Q    About -- well, let me ask, about how many?

8    A    I'm not sure.  That would be maintained

9         separately since Rule 26 doesn't require

10        listing those in a report.

11   Q    Sure.

12   A    But it -- it would be certainly more -- I

13        would say, easily 100 percent more.  So I

14        don't know many are listed here.  If there's

15        20 here there would be at least 40 in cases as

16        you know that don't end up with either

17        deposition or trial.

18   Q    And what was your role in those?  You can

19        group them together if need be because I

20        understand that there's a lot of them.  But

21        what role did you play in those?

22   A    Expert witness services typically to evaluate

23        and render a report.

24   Q    So have you ever been involved in a lawsuit

25        where you were not providing expert witness

13

| | | |
|---|---|---|
| 1 | | services or the other thing that you mentioned |
| 2 | | just there? |
| 3 | A | I've done briefings on lethal force cases for |
| 4 | | a lot of the State Attorney districts in |
| 5 | | Florida, so that would surely be -- and that |
| 6 | | actually may be listed in here.  I'm not sure. |
| 7 | | I've done Grand Jury testimony.  But |
| 8 | | predominantly nothing else is coming to mind |
| 9 | | right now that wouldn't fit into the Rule 26 |
| 10 | | here. |
| 11 | Q | Have you ever been sued? |
| 12 | A | I have not.  Well, I may have been once as |
| 13 | | director of corrections.  I think right after |
| 14 | | the state of Florida made buildings -- public |
| 15 | | buildings no tobacco use, I think the sheriff |
| 16 | | -- I was director of corrections.  I think the |
| 17 | | sheriff and I may have been sued for cruel and |
| 18 | | unusual punishment because we didn't let this |
| 19 | | particular inmate smoke, even though it was |
| 20 | | against the law.  So I can't remember but I |
| 21 | | think the agency's attorney had to reply to |
| 22 | | that, but (pause) --- |
| 23 | Q | Were you sued in that case in your official |
| 24 | | capacity? |
| 25 | A | Yeah.  It would definitely be official |

14

1      capacity.  Again, the -- the clear point here

2      is someone arrested smokes and wanted to smoke

3      and sued even though it was illegal to use

4      tobacco in public buildings.  I don't know

5      what happened with the case, but in full

6      fairness I think I may have been named in that

7      25 or so years ago.  I'm not sure.

8    Q  Have you ever been involved in a lawsuit

9      involving Pasco County?

10   A  I am not certain.  I don't recall any as I sit

11     here today.  I may have but I just don't

12     recall.

13   Q  Why do you say you may have?

14   A  I've been doing expert witness work for more

15     than 30 years, most of in Florida, so I just

16     don't know.

17   Q  Before this lawsuit have you been retained by

18     Pasco County for any reason?

19   A  As I said -- as a matter of fact, we can

20     search this one document that we both have up

21     here.  But again, as I sit here I don't recall

22     one.  But I only see ---

23   Q  Well, I mean, this document is limited to I

24     think your expert services if I'm not mistaken

25     and my question was -- was broader.  Just any

```
 1            -- any reason.
 2    A    Oh, no.  If it wasn't for evaluation of a
 3         case, no, I've never had any work or done
 4         anything with them.
 5    Q    And when you say case you mean a lawsuit?
 6    A    Yes.
 7    Q    What is your going hourly rate in cases in
 8         which you testify?
 9    A    For -- and I'll probably have to refer to
10         this.  For research and work that doesn't
11         involve testimony it's $250 per hour.  For
12         work -- I think it's -- I don't want to missay
13         this or do a memory test so we'll just --
14         we'll look at see what I have listed here.
15    Q    Is it the same as the going rates that is
16         listed in Appendix -- in the Appendix ---
17    A    B.
18    Q    --- B?
19    A    Yes, sir.
20    Q    That makes it easy.  We can just refer to
21         that.
22    A    Yes, sir.
23    Q    What would you say on average you make per
24         case in total?  So let me rephrase that.  What
25         would you say is the total amount that you
```

16

```
 1            bring in for each case that you work on?
 2     A     We can -- I don't generally do math, and I
 3            certainly don't do it on the stand, but we
 4            could probably guesstimate.  As you see from
 5            Appendix B the two-part retainer totals
 6            $5,000, and that goes for 20 hours of work
 7            produce in a case.  If a case -- the work goes
 8            beyond that then the hourly rate would be
 9            applied.  I would say that over the past, I'd
10            say, three, five years or so it has probably
11            just for the most part been on average the
12            retainer amount, which until just a couple of
13            years ago it was I think $4,500.  So now that
14            would be probably in the last two years
15            approximating the 5,000.
16     Q     How did you prepare for this deposition?
17     A     Predominantly just review of my report in the
18            matter.
19     Q     Did you prepare for this deposition with
20            anyone?  And I want to be clear insofar as it
21            involved counsel you don't -- do not tell me
22            about the content of your conversations with
23            counsel.  I just want to know did you prepare
24            with anybody else for this -- for this
25            deposition?
```

17

1    A    No, I did not.

2    Q    Have you made any public statements concerning

3         this lawsuit?

4    A    I have not.

5    Q    Have you spoken to anyone besides counsel in

6         this case about this lawsuit?

7    A    No, I have not.

8    Q    Have you read any of the legal filings in this

9         case?

10   A    I believe I read the initial -- I don't know

11        whether it's second amended complaint or if

12        there was one, but the -- whatever is listed

13        in the appendix.  But I did, I think, read the

14        complaint.

15   Q    Do you disagree with any of the factual

16        allegations in that complaint?

17   A    Working from a complaint document which I

18        understand is produced by attorneys who have

19        an advocacy role versus mine as a social

20        scientist I don't initially agree or disagree

21        with statements that are in those because I

22        don't necessarily take those as factual or the

23        basis for the scope of my work.

24   Q    What is your current job?

25   A    I'm a professor at practice at East Tennessee

18

1          State University of Criminal Justice and

2          Criminology.

3     Q    How long have you done that?

4     A    At East Tennessee State since January of this

5          year.

6     Q    And what were you -- January of 2022?  I'm

7          sorry.  Is that correct?

8     A    Yes, that's correct.

9     Q    And what did you do before that?

10    A    I was an instructor at the University of West

11         Florida in Pensacola.

12    Q    So returning to your current position, what --

13         what do you do on a daily basis in your

14         current position?

15    A    The -- what would -- we understand in academia

16         is sort of the standard of research, teaching

17         and service.

18    Q    Is that a tenure track position?

19    A    It is not.

20    Q    I think -- let's turn to, just for reference

21         because we're on this topic, Appendix C of

22         your report.  That's page 41.

23    A    All right, sir.  Got it.

24    Q    Yeah, I forgot to have us turn there earlier.

25         And then is it fair to say that your previous

19

1          position at the University of West Florida

2          involved the same daily tasks as your current

3          position?

4     A    Within two different departments, but yes.

5     Q    Are there any significant differences between

6          your work in the two positions?

7     A    Not in the general functions, no.

8     Q    So I see that the positions we talked about

9          are discussed here on page 41 of your academic

10         appointments.  And then you also have some, I

11         believe, professional experience on page 44.

12         Just as a general matter, is Appendix C a

13         complete statement of your employment history?

14    A    Predominantly it is.  Of course, having been

15         on earth for a while I would not claim that

16         each of those contained a full accounting of

17         the things that I was involved in or worked on

18         in each of those, but in terms of general

19         timeline, yes.

20    Q    So are there any -- I guess let me ask are

21         there any jobs where you earned an income that

22         are missing from the list?

23    A    I'm sure prior to when I entered policing in

24         1979, yes.

25    Q    Well, let's -- so let's turn to that.  So in

20

```
 1            1979 you're -- on page 46, it says Bradenton

 2            Beach Police Department.  Were you a law

 3            enforcement officer at that time?

 4    A       Yes.

 5    Q       And I assume for the Bradenton Beach Police

 6            Department; is that correct?

 7    A       Yes, sir.

 8    Q       Were those agencies ever sued during your time

 9            as an officer there?

10    A       Not that I'm aware of, no.

11    Q       Were you ever subject to discipline during

12            your tenure as an officer?

13    A       I think one time I was and that was when I was

14            at the Manatee County Sheriff's Office, and

15            that would -- that's a little bit further back

16            up, but (pause) ---

17    Q       And what did -- what were the circumstances of

18            that discipline?

19    A       We had a detective who had tried to arrest

20            somebody on a warrant who was at a pawn shop

21            and the fellow beat her up and left her by her

22            car and he took off, and I managed to be the

23            one to locate where this individual was

24            getting onto -- it's Interstate 75 which runs

25            down through much of Florida, and got into a
```

```
 1            low speed pursuit of 25 miles per hour into
 2            the next county, Sarasota County, very anti-
 3            dramatic as people kept passing us on the
 4            interstate, and then handed off the vehicle to
 5            several Sarasota sheriff's office squad cars
 6            who finished the pursuant and I returned.  And
 7            I received a letter of counseling for leaving
 8            the jurisdiction.
 9      Q     Besides that instance are there any other
10            instances of discipline during your tenure as
11            a police officer in any of the offices you've
12            worked with?
13      A     Nothing that I can recall, no.
14      Q     Have you ever been demoted during your time as
15            an officer?
16      A     No.
17      Q     So going back to the 1979 position in
18            Bradenton, what did you do before that
19            position?
20      A     Prior to that, again, that's a bit of a memory
21            test.  Immediately prior I worked at JC Penny
22            as the sporting goods manager person, and that
23            would have been in Bradenton, Florida.  Not
24            Bradenton Beach, but Bradenton.  Prior to
25            that, I'm sure the court will be fascinated, I
```

22

 1      was a manager at McDonald's.  Prior to that I

 2      was in the United States Air Force.  Prior to

 3      that, high school.

 4  Q   Could you turn to page two of your report,

 5      please.

 6  A   Two?

 7  Q   Yeah, way at the top.

 8  A   Yeah, here we go.  I'm there.

 9  Q   And I have it on the screen obviously as well.

10      And so I want to go to where it says

11      Qualifications, and it says, " I began my

12      career as a law enforcement officer in 1979 in

13      the State of Florida.  I have been

14      continuously training law enforcement and

15      corrections officers in various topics since

16      1980."  And so I just want to understand this.

17      So you've been training law enforcement

18      officers since the year 1980; is that correct?

19  A   That is correct.

20  Q   And at that time you only had one year of law

21      enforcement experience?

22  A   That is correct.

23  Q   Page two also mentions that you specifically

24      trained two Florida Sheriff's Offices; is that

25      right?

23

```
1    A    Well, I worked in two Florida Sheriff's
2         Offices.  Training in each of them would have
3         been a component of that.  I was in charge of
4         training the Manatee County Sheriff's Office
5         and conducted training as well at the Santa
6         Rosa County Sheriff's Office.
7    Q    And I just want to go down to midway through
8         the paragraph.  It says, "I specifically
9         conducted training as a criminal
10        investigations instructor for two Florida
11        Sheriff's Offices"; is that correct?
12   A    That is correct.
13   Q    And those are the two offices that you just
14        mentioned?
15   A    That is correct.
16   Q    What did each of those training include?  Feel
17        free to start with one or the other, or if
18        they're the same you can just tell me what
19        they both included.
20   A    Chronologically the Manatee County Sheriff's
21        Office would be first and was probably more
22        expansive.  I began teaching in the regional
23        academy in the area, which was not part of the
24        Sheriff's Office, in either 1983 or 1984.  The
25        agency -- we ended up beginning both the
```

24

1          corrections -- full-time corrections academy,

2          full-time law enforcement academy.  But prior

3          to that I conducted in-service training to

4          include investigative training.  I had been

5          selected -- I think Governor Graham at the

6          time, his words, not mine, called it the Super

7          Cop Program.  About 250 investigators from

8          around the state of Florida were selected to

9          be trained by the Florida Department of Law

10         Enforcement as trainers of trainers for

11         investigators.  And I think that was 1996 or

12         7, somewhere along in there.  Again, memory

13         test notwithstanding.  And so part of what I

14         did was in the academy, as well as in-service

15         -- I had already come out of detectives.  At

16         that point I think I was a patrol sergeant,

17         and conducted training and investigative

18         methods for personnel.  That continued as an

19         academy instructor, including when we began

20         our own academy at the Manatee County

21         Sheriff's Office.  And then subsequently --

22         well, before leaving down there -- so I see

23         also the year 1989 popped out to remind me.

24         That's when I began teaching college courses

25         as an adjunct instructor.  The first one and

25

```
 1           ever since was criminal investigations.

 2           That's one of the primary courses that I

 3           teach.

 4    Q      Just to be clear, just to get centered on our

 5           question, that was not with those offices;

 6           correct?  That's a separate position?

 7    A      That wasn't; right, yeah.  And so ---

 8    Q      And so on page two ---

 9    A      Yeah.

10    Q      --- you know, the trainings that I'm referring

11           to on just the Florida office ones, to your

12           knowledge do those trainings that you

13           conducted ever include the use of an algorithm

14           to track certain past offenders?

15    A      In that period of time and subsequently the

16           kind of algorithm approach to prior offenders

17           is what we referred to as repeat offenders.

18           So yes, discussion of the manner in which that

19           was done way back then.

20    Q      Did those trainings, to your knowledge, ever

21           include the use of home visits to check on

22           those repeat offenders?

23    A      That was one of the methods that both

24           prosecutors' offices through some of their

25           auspicious with grant monies, and some law
```

26

```
 1            enforcement agencies of size would do.

 2     Q     Which agencies?

 3     A     Well, Mr. House, there's 18,000 separate

 4            agencies in the U.S., which is why no one's in

 5            a position to state what they can or cannot do

 6            that doesn't violate law.  So as to which of

 7            those, given the fact that 85, 88 percent of

 8            them have fewer than 30 or so personnel total,

 9            generally it would not be those agencies.  It

10            would be larger ones in the ongoing attempts

11            to try to figure out what to do with crime

12            prevention.

13     Q     So and I understood your answer to be that --

14            you know, when I asked you -- just to be

15            clear, I asked you if those trainings that you

16            conducted ever included the use of the home

17            visits to check on past offenders and you said

18            some agencies.  And so I'm trying to figure

19            out which agencies that you trained did it

20            involve those -- those home visits.

21     A     Neither of the two agencies where I worked and

22            did in-service training and investigations and

23            patrol procedures, neither of those at the

24            time that I recall did that, but I'm not --

25            again, that's memory, because we did a fairly
```

27

```
 1            in-depth community oriented policing project,
 2            for instance, in 1987, '88 at the Manatee
 3            Sheriff's Office, and I just can't remember if
 4            that also included home visits with some of
 5            the more high capacity offenders.  I don't
 6            remember.  We did a lot with analysis of what
 7            we were dealing with in our jurisdiction.  The
 8            way all agencies must.
 9    Q     Did those trainings ever include the use of
10            traffic stops to check on repeat offenders?
11    A     I don't recall back then because you -- you
12            know, the idea of determining in traffic who
13            -- who somebody was to stop them would
14            probably have to wait until the achievement of
15            the automated license plate reader systems
16            many years later.
17    Q     Did the training ever include the threat of
18            code enforcement violations to coerce
19            compliance with a sheriff's office
20            interrogation?
21    BY MR. POULTON:
22            Objection to the form.  Go ahead.
23    BY THE DEPONENT:
24            I'm sorry.  You missed ---
25    BY MR. HOUSE:
```

28

1          I can repeat the question, yeah.

2     DIRECT EXAMINATION RESUMED BY MR. HOUSE:

3     Q    So did those trainings that you conducted ever

4          include using the threat of code compliance or

5          -- excuse me.  I'll repeat the question.  Did

6          the training ever include the use of the

7          threat of code enforcement to coerce

8          compliance with a sheriff's office

9          interrogation?

10    BY MR. POULTON:

11         Object to the form.  Go ahead.

12    BY THE DEPONENT:

13         Code enforcement as a component of community

14         oriented policing has been a foundational --

15         one of the techniques since the 1980s.  Your

16         additional part there about to coerce an

17         interrogation I'm not aware of that nor the

18         idea sort of coercing interrogations.  So no

19         would be your answer for that.

20    DIRECT EXAMINATION RESUMED BY MR. HOUSE:

21    Q    Page two also mentions that you have been

22         teaching de-escalation and communications

23         techniques for nearly your entire career; is

24         that correct?

25    A    That is correct.

29

1    Q    What are de-escalation techniques?

2    A    Well, sometimes it's all wine in new bottles.

3         In the Florida curriculum this began as

4         interpersonal communications which was the

5         first in-service topic I taught either in 19

6         -- I think 1984, somewhere along in there, and

7         is woven throughout the entirety of the

8         curriculum certainly in Florida's academies,

9         which is a state-wide set curriculum that all

10        agencies -- all academies have to utilize.

11        And eventually this morphs into what we hear

12        more commonly today as de-escalation.  The

13        Police Executive Research Forum uses -- I

14        forget the exact -- I have it in there

15        somewhere.  Yeah, the Integrated

16        Communications, Assessment and Tactics which

17        is largely for armed people.  But most of this

18        deals with the fact -- the bread and butter of

19        police officers, how do you interact with

20        folks, hopefully absent what you, the

21        individual -- kind of what's in your mind,

22        what's going on with you, but trying to focus

23        at least on the officer to communicate in ways

24        that may, if possible, calm the situation

25        sometimes or at least be clear so that you can

30

1          give and exchange information.

2     Q    And are there any other de-escalation

3          techniques besides those?

4     A    Well, a I said, that's -- it really is bread

5          and butter, part and parcel of what officers

6          do throughout their shift, how they interact

7          with individuals, and that is situational.

8          And I was perhaps too obtuse in saying like

9          you, you're the person.  I'm interacting with

10         you, or you with me, and Deputy House is

11         trying to speak with me and I'm not wanting to

12         speak to you.  And so perhaps my behavior, my

13         attitude, my reactions, my responses to you

14         are challenging your ability to either give or

15         receive information.  So the various things

16         that in your experience as either a one year

17         officer, a 10 year officer, what your

18         training's been, what your time on earth has

19         been will either equip you or not to be

20         successful there.  So the training, as I was

21         saying earlier, is woven throughout academy

22         training which is focused on communications.

23         Focused on, you know, sender and receiver

24         models.  What's your medium.  How are you --

25         what way am I sending you a memo, an email,

1           talking to you on the phone, talking to you in

2           a cellblock, talking to you on the street to

3           try to neatly encapsulate de-escalation in

4           some pithy acronym or simple principal really

5           isn't possible.

6      Q    And then it says communications techniques.

7           Do those differ in any way from the techniques

8           -- the de-escalation techniques that you've

9           been referring to?

10     A    Again, part of a -- just a large broad human

11          experiment since you first start babbling out

12          of the crib and working your way through.  I

13          mean, communication techniques is intended as

14          my rambling, I guess, response didn't make

15          clear a minute ago that communication is

16          impacted by a variety of different things.

17          And so the emphasis in the academy and in-

18          service training for officers is trying to

19          continually keep personnel aware of the

20          challenges and communications.

21     Q    Page two also says you are a former Verbal

22          Judo instructor; is that right?

23     A    That's correct.

24     Q    What is Verbal Judo?

25     A    Verbal Judo caught on in the 1980s through

32

1          much of the 1990s.  A lot of agencies still

2          use it even after the passing of the creator

3          of the program, and the -- the idea, hence the

4          Verbal Judo name of this particular way of

5          envisioning communication is to focus kind of

6          with a laser effect on what it is that you're

7          trying to either seek from somebody or tell

8          somebody and allow any difficult

9          communications, angry speech, hostile speech

10         from the individual you're dealing with to

11         kind of roll on past you as you remain focused

12         on what you're trying to do.

13    Q    Let's go to page three says that you have

14         taught the training block on Intelligence-Led

15         Policing in the Florida Law Enforcement Basic

16         Recruit Training Academy; is that correct?

17    A    That's correct.

18    Q    What is -- how do you define Intelligence-Led

19         Policing?

20    A    Well, of course, in the -- initially we can

21         say that's irrelevant.  The -- each agency,

22         those 18,000 separate agencies ---

23    Q    What is it -- I'm sorry.  What is it

24         irrelevant to?

25    A    Oh, see.  You already violated the don't cut

1          me off.

2     Q    I didn't say that.  I said I won't speak over

3          you.

4     A    It's irrelevant in my particular definition

5          because 18,000 separate agencies get to define

6          it any way they want to.  So how I define it

7          is not relevant.  How the Pasco Sheriff's

8          Office defines it would be -- and within the

9          academy curriculum, generally speaking, it's

10         leveraging, technology and data gathering,

11         social networking, to try to produce and

12         provide information and intelligence officers

13         and agencies to help guide them.  The

14         intelligence-led policing component is within

15         the community oriented policing, problem

16         oriented policing section of Florida's law

17         enforcement academy curriculum.

18    Q    Is it your understanding that the Pasco County

19         Sheriff's Department defines intelligence-led

20         policing differently than the -- than your

21         definition?

22    A    Again, I didn't offer a definition.

23    Q    So let's go back.  What is your definition of

24         intelligence-led policing?  I would like that.

25    A    Well, I appreciate that.  And so among the

34

```
 1            800,000 officers you might ask, or the extra
 2            million or so like me who aren't officers
 3            anymore or the ones who are police practices
 4            people or who teach policing you may get
 5            something similar to what I just sort of
 6            paraphrased from the Florida Law Enforcement
 7            Academy curriculum which I'll -- I'll just try
 8            to paraphrase again.  Utilizing technology,
 9            data, information to assist in guiding the
10            limited resources that the agencies have.
11    Q       And then so is it your understanding that the
12            Pasco Sheriff's Department uses the term
13            intelligence-led policing in any way different
14            from what you just -- the definition you just
15            gave me?
16    A       Well, of course, we know that -- I think their
17            -- I think at least maybe the 2918 version of
18            their intelligence-led policing manual is 80
19            some pages long.  Maybe the previous one.
20            They speak, of course, about evolution.  I'm
21            not here as an expert on their particular
22            program but about the fact that they can
23            design it any way they wish and utilize it.
24            So try and recall from memory?  Yeah, I'm not
25            going to do that for you out of the thousands
```

35

```
 1           and thousands and thousands of pages of
 2           documentation in this case as to what -- what
 3           theirs is.  We can certainly pull the manual
 4           up and you can direct me to something and I'll
 5           try to respond to it.
 6     Q     You said there that, you know, you're not --
 7           you're not there as an expert on the ILP
 8           manual; correct?
 9     A     That's correct.
10     Q     And then you said that -- but you're here as
11           an expert on the fact that they can design
12           their program as they wish; is that right?
13     A     I don't know that I said that I'm an expert on
14           they can define it any way they wish.  The
15           level, or acceptance of, you know, my
16           testimony as we know is going to be up to the
17           court in terms of what I can opine on.  But
18           certainly in terms of talking about what is
19           routine, customary, the norm, and attempting
20           to pursue the various functions of a law
21           enforcement agency I'll certainly offer what I
22           can about that.
23  BY MR. HOUSE:
24           Ms. Ketch, can you read back the answer from
25           two questions ago?  It was an answer and
```

36

1          response to my question about whether the

2          definition that he had given me was any

3          different from Pasco County's definition.

4     (COURT REPORTER READS BACK PRIOR QUESTION AND

5     ANSWER)

6     DIRECT EXAMINATION RESUMED BY MR. HOUSE:

7     Q    So, Mr. Hough, when -- again, my understanding

8          of the testimony there is that you're saying

9          you're here about the fact that they can

10         utilize it any way they wish; is that correct?

11    A    I think the quote was they can utilize it, but

12         I'll clarify that that's what I meant if that

13         -- if that wasn't it rather than go back

14         through things.  Yeah, the point being, to

15         give you the complete answer again, is for

16         18,000 separate agencies, community policing,

17         problem oriented policy, intelligence-led

18         policing, how the individual agency in their

19         individual community defines that and then

20         utilizes that is a choice, as I testified

21         earlier, within the law to utilize it in the

22         fashion they see most effective going forward.

23         So that's why, you know, in the academy when

24         we teach and talk about those community

25         oriented policing, problem oriented policing,

37

1          intelligence-led policing we provide law

2          enforcement recruits the background

3          information and talk about just generally what

4          these are, and then make the point that

5          depending on what agency, wherever you end up

6          being a law enforcement officer, that agency's

7          leadership will determine how, if at all,

8          those principles will be put into action in

9          that community.

10    Q    And you added a qualifier in your answer

11          there.  You said in the law.  Are you planning

12          to testify about what the law is today?

13    A    Well, of course, I'm not an attorney, and the

14          point is a simple qualifier that has nothing

15          to do with testifying about the law.  It's

16          that when you formulate policy in an agency it

17          has to be within the law.  So not meant as

18          some kind of legal conclusion.

19    Q    So the answer is no, you're not planning on

20          testifying about what the law is today; is

21          that correct?

22    A    Well, my answer is that wasn't an added

23          caveat.  I already testified to that about 40

24          minutes ago.  And so, again, what I'll testify

25          to now and at trial will be what is common and

38

```
 1            ordinary in policymaking withing criminal
 2            justice and law enforcement agencies as they
 3            frame their programs and enact them, and
 4            certainly a component of that is that they do
 5            so if there are -- if there are any guidelines
 6            withing the law for certain components it
 7            should obviously take that into account.
 8     Q      Will your testimony take the law into account?
 9     A      To the extent that in trying to explain things
10            as an expert witness, not as a fact witness
11            giving yeses and noses.  I certainly would
12            attempt to be comprehensive and where I saw
13            that a notable or a factor that is something I
14            would either teach in my role as a faculty
15            member or in my role as a law enforcement
16            trainer to the extent that the foundation
17            begins with the law.  Certainly that's going
18            to be in there.
19     Q      When you say that's going to be in there, you
20            mean you're going to testify to what the law
21            says; is that correct?
22     A      Although you've asked that and I've answered
23            that a couple of times.
24     Q      Well, I haven't gotten a yes or no.  So it
25            would be -- it would be quicker if I got a yes
```

39

```
1              or no on one of these.
2    A    Well, I just bet it would.  But, of course,
3         I'm not here to answer in a way that you'd
4         like me to.  I'm here to try to answer
5         faithful to what I do for a living and what
6         the last 40 years of my career has been.  So
7         I'll let you know now, counselor, I'm not just
8         going to serve you up with a bunch of quick
9         yeses and nos you can use later.  What I
10        testified to, and you've asked me three times
11        and I've answered three times, now I'll do it
12        a fourth, and that is that criminal justice
13        programs and policies are built with the law.
14        And so to the extent that you at trial,
15        defense at trial, the court asks me a
16        question, it will incorporate those things
17        that I believe give a complete answer.
18   Q    And those things that you're referring to
19        there by things, it may incorporate the law;
20        is that correct?
21   A    To the extent that the law is incorporated in
22        a policy or a program or the basis upon which
23        an agency may design and carry out a program
24        I'll comment in a way that I attempt to be
25        thorough.
```

40

1   Q   And when you attempt to be thorough will you

2       give what the law says?

3   A   I think as in perhaps the report, but if

4       there's a reference that needs to be made to

5       some particular statute or court precedent and

6       I'm able to appropriately cite or note that or

7       comment I would try to be thorough with that.

8   Q   Could you turn to page five of your report,

9       please.

10   A   I'm there.

11   Q   Just give me a sec while I find it because I

12       should have had a highlighted version and I

13       could just see the things I wanted to ask you

14       about.

15   A   I get that a lot.

16   (OFF THE RECORD)

17   <u>DIRECT EXAMINATION RESUMED BY MR. HOUSE:</u>

18   Q   So at the bottom of page five in your report,

19       Mr. Hough, about midway through that paragraph

20       at the bottom there's a sentence that says --

21       actually, my mistake.  It's actually the first

22       sentence of that last paragraph.  It says, "My

23       methodology in reviews is to list all case

24       materials, an assumed set of facts, not fact-

25       finding nor credibility judgment, and to

41

1          provide opinions comparing specific case facts

2          to accepted legal -- accepted practices,"

3          excuse me, "never legal conclusions nor

4          personal opinions."  Do you see that?

5     A    I do.

6     Q    So it's my understanding that you do not

7          anticipate providing personal opinions today;

8          is that correct?

9     A    The opinions, of course, provided within the

10         report, additional ones that I would perhaps

11         state today or anything for the court, would

12         be based on my knowledge-base and training,

13         experience, awareness of what's kind of going

14         on in the greater criminological and criminal

15         justice world.

16    Q    Sure.  So fair to say you expect to provide

17         expert opinions and not personal opinions; is

18         that fair?

19    A    Generally speaking, that's correct.  How

20         someone might interpret one way or another, of

21         course, we leave to the court.

22    Q    Sure.  But there's no reason today as you sit

23         here that you disagree with that sentence in

24         your report; is that correct?

25    A    Not at this point.  I don't see any reason to

42

1          disagree.

2     BY MR. POULTON:

3          Can you pull that back up on the screen?

4          We ---

5     BY MR. HOUSE:

6          Sure.

7     BY MR. POULTON:

8          I mean, I know it.  But it would just be

9          easier, like if you're looking at a bigger

10         thing, even highlight it maybe.

11    BY MR. HOUSE:

12         This was the sentence.

13    BY MR. POULTON:

14         Yeah.  No, I understand.

15    DIRECT EXAMINATION RESUMED BY MR. HOUSE:

16    Q    And as I do that, let's now turn to page 41 in

17         the report.  I believe that's an appendix.

18    A    Yes.

19    Q    Appendix C.  So it looks like page 41 contains

20         your educational credentials; is that correct?

21    A    Yes, sir.

22    Q    Is that a complete list of your educational

23         credentials?

24    A    No, sir.

25    Q    What's missing?

43

1    A    I earned an Associate of Arts degree in law

2         enforcement at what is now Manatee-Sarasota

3         State College.  And then I had some credits in

4         the Community College of the Air Force, mostly

5         in meteorology, I think.

6    Q    Anything else?

7    A    Not that I can recall from an education

8         standpoint.

9    Q    What does ABT mean next to your Master of

10        Public Administration from the University of

11        South Florida?

12   A    All but thesis.

13   Q    Got it.  And then I see at the University of

14        West Florida it says Doctor of Education; is

15        that correct?

16   A    That is correct.

17   Q    Is that a credential signifying an expertise

18        in teaching?

19   A    No.  The Doctor of Education degree, the EDD,

20        can take a variety of forms like so many

21        academic degrees, especially at the doctoral

22        level.  There are, I think in that one, three

23        tracks.  I believe mine was curriculum

24        instruction, which would be more aligned with

25        learning and teaching, if you will.  But then

44

1        as you see after the semicolon there the

2        concentration that I partook of was public

3        administration.  So again, about the

4        management of public sector agencies.

5    Q   Sure.  And, you know, because I don't quite

6        understand, I'll confess, what a Doctor of

7        Education exactly is, is it fair to -- how

8        would a Doctor of Education with a public

9        administration concentration differ from a PhD

10       in public administration?

11   A   Sure.  There's about more than 50 different

12       kinds of doctor outside of the medical field.

13       We won't get into all the subspecialties and

14       issues within medicine.  But within research

15       doctorates, the EDD are the more common ones

16       that's non-PhD.  PhD generally narrow and

17       focus on one particular issue that the student

18       becomes very adept with.  In education some of

19       it can be guided by whatever the dissertation

20       is that the practitioner or student is

21       pursuing.  With public administration there's

22       also DPA, Doctor of Public Administration,

23       which some places offer aside from PhD.  Let's

24       face it, these are -- these are often

25       confusing.  So the difference between one with

45

```
1        a public administration concentration is that
2        a -- I can't remember the number, but a large
3        percentage of the doctoral credits were
4        specific to public administration curriculum
5        as opposed to any other thing one might -- one
6        might do with it.  Some people would want to
7        focus -- if they're going to perhaps think in
8        terms of being a higher ed administrator they
9        may focus specifically on education related
10       management and leadership as opposed to the
11       more broad public administration leadership
12       and management.
13   (PLAINTIFF'S EXHIBIT B INTRODUCED)
14   DIRECT EXAMINATION RESUMED BY MR. HOUSE:
15   Q    Sure.  I'm going to introduce our next
16        exhibit.  I think it should just throw itself
17        on the screen since I'm sharing my Adobe.  So
18        you see this?
19   A    I do.
20   Q    Do you -- let me zoom out of it.  Do you
21        recognize what this document is?
22   A    Yes.  That's an article I wrote that was
23        published by the British Society of
24        Criminology.
25   Q    So you wrote this?
```

46

1    A    I did.

2    Q    What does administrative evil mean right there

3         in the title?

4    A    Yeah, it's just as well for me, but that's

5         okay.  Administrative evil is a concept where

6         essentially referring to things that perhaps

7         the individuals involved in governmental -- it

8         doesn't have to be governmental, but generally

9         a governmental type of agency or program or

10        some function that they perform are doing

11        things that they are directed to do that's

12        part of what their policies may be, but

13        perhaps at the same time by resulting in some

14        unattended consequences that may be

15        disadvantaging some unexpected others or

16        causing, you know, some -- some kind of

17        unwanted outcome that was not foreseen or is

18        not recognized by whoever those people within

19        that agency are at that time.  They may

20        sometimes take a historical look back to

21        recognize it.

22   Q    I'm going to turn to page 30 in this paper,

23        and I've got it highlighted here.  Can you see

24        what's highlighted?  Is it too small still?

25        Can I ---

47

| | | |
|---|---|---|
| 1 | A | I see what's highlighted and I'll -- yes, I'll |
| 2 | | note, as you said, that it's -- yeah, at least |
| 3 | | that many pages long.  So context |
| 4 | | notwithstanding I'll try to respond. |
| 5 | Q | Sure.  Can you -- can you read what's on the |
| 6 | | screen?  Is it big enough? |
| 7 | A | Yes, I can read that. |
| 8 | Q | I'll read it for the record, too.  So this |
| 9 | | sentence says, "Pragmatism has often masked |
| 10 | | harm throughout history without resorting to a |
| 11 | | defense of utilitarianism and the arguable |
| 12 | | legitimacy of the greater good.  But what of |
| 13 | | the "creep" of organization mission to be |
| 14 | | efficient in actions and effective to broad |
| 15 | | mandates?"  Can you tell me what -- well, what |
| 16 | | the second sentence means? |
| 17 | A | Well, again, it's -- we're on page, you know, |
| 18 | | 30 in a lengthy article talking about lethal |
| 19 | | use of force in law enforcement, as opposed to |
| 20 | | intelligence-led policing.  So what I'm |
| 21 | | referring to there, the best of part of my |
| 22 | | remembrance, is broadly talking about whether |
| 23 | | it's the water department, street department, |
| 24 | | highway department, etcetera, you may be doing |
| 25 | | things that you're following procedures, |

48

```
 1              etcetera.  This is kind of classic both PA and
 2              business school kinds of things.  You can be
 3              very, very efficient in what you're doing but
 4              it may not be the thing that are actually
 5              effective.  So whether it's the building the
 6              widgets, the imaginary article being turned
 7              down off the assembly line and you're really,
 8              really good at building those widgets and it
 9              turns out widgets went out of being useful
10              five years ago.  So just some of that general
11              managerial aspect of if you're just doing
12              things incrementally they may or may not be
13              productive, as opposed to doing innovative
14              things where you're -- where you're trying new
15              things and trying to evolve.
16         Q    And now I'm going to go down to page 39 in the
17              article.  There's a sentence here at the end
18              of the first paragraph on page 39.  "The
19              perceptions that officers have of the
20              priorities of their supervisors, along with
21              the modeling of desired behavior by those
22              supervisors, continues to exert influence on
23              officer behavior."  What does that sentence
24              mean?
25         A    Well, same caveat that we'll provide for the
```

49

```
 1            court which is a memory test on something I
 2            wrote a couple of years ago that wasn't about
 3            what we're here for today, so we're trying to
 4            monkey it into position to apply.  It's, of
 5            course, attributed to another author, Johnson,
 6            from a piece done in 2010 that if I'm your
 7            employee and I understand what your priorities
 8            are in something that that, as we know in all
 9            organizations, very often has an impact on how
10            I attempt to accomplish those things that you
11            set out before me.
12     Q      And I just want to be clear.  This article was
13            published in January, 2021; is that correct?
14     A      I believe that's correct.  I think that's when
15            they got to it, yes.
16     (PLAINTIFF'S EXHIBIT C INTRODUCED)
17     DIRECT EXAMINATION RESUMED BY MR. HOUSE:
18     Q      And then I'm going to introduce another --
19            another exhibit.  Can you see this on your
20            screen?
21     A      I can, yes.
22     Q      Do you recognize this document?
23     A      I do.  It's an article that I co-authored some
24            years ago.  Quite some years ago.
25     Q      Let's see.  I'm going to go down to page 40,
```

50

1            which I think is just the first page.  First

2            full page of the article.  Let's see here.

3            This highlighted portion.  This sentence says,

4            "Policy is a statement of agency philosophy,

5            though this is not a policy's sole function.

6            Officers look to policy for practice guidance

7            on what to do and how to do it."  Do you see

8            that?

9       A    I see that, yeah.

10      Q    What does -- what do those two sentences mean?

11      BY MR. POULTON:

12           I'm going to object to the form.  Go ahead.

13      BY THE DEPONENT:

14           Once again, this 12 year old article is about

15           the use of force in law enforcement, not about

16           intelligence-led policing.  The general

17           commentary there about policy and training.

18           Again, we can -- since we are writing about

19           officers, we can leave them officers, or talk

20           about grounds keepers, and the idea that

21           policy that is made is general and it

22           expresses typically what an organization's

23           overall broad philosophy is, and that's not,

24           you know, it's only function.  Part of the

25           function goes into issues like what you're

51

1         also saying to the public since an agency,

2         much like the Pasco Sheriff's Office, has all

3         these available to the public for

4         transparency.  But then our officers, or

5         grounds keepers or whoever, look to them also

6         for some guidance about what are the things

7         they're supposed to be doing, like crime

8         prevention, as well as how to go about doing

9         some of those things.

10    DIRECT EXAMINATION RESUMED BY MR. HOUSE:

11    Q   I'm going to skip down to page 52 of this

12       paper.

13    A   Yes, it's another long one.

14    Q   I had a great weekend.

15    A   I'm so sorry.

16    Q   So this is near -- the very end of the paper.

17       There's a sentence here that says -- it's

18       highlighted and it says, "Policies must also

19       be reviewed at least annually with appropriate

20       public input."  Do you see that?

21    A   I do see that.

22    Q   Do you agree with that statement still?

23    BY MR. POULTON:

24       Object to the form.  Go ahead.

25    BY THE DEPONENT:

52

```
1              In the context of what apparently you read

2         yesterday and I wrote probably 13 years ago,

3         if I wrote that part of it, this is as I

4         recall, and I'm sure I'll tell the court this

5         after I've reviewed it, was in a section on

6         commentary about a model use of force policy,

7         and given the movement that occurs in law

8         regarding the use of force that as the general

9         kind of policy admonition things should be

10        reviewed annually, and because we're talking

11        about the use of force that public input might

12        be, you know, appropriate in a formalized, you

13        know, fashion.  And again, since this, no more

14        than anything else, carries the effect of law

15        but was two scholars trying to talk about how

16        best to guide the use of force usage.  That's

17        the best I can remember from, I'll say,

18        probably 13 years ago when that was written.

19   DIRECT EXAMINATION RESUMED BY MR. HOUSE:

20   Q    What public input would be appropriate in ---

21   A    Well ---

22   Q    And let me ask it because I want to make sure

23        it's ---

24   A    Sure.

25   Q    --- tied to my previous question.  Sorry.
```

53

```
 1          What public input would be appropriate with
 2          respect to reviewing these policies you speak
 3          to in this paper?
 4    A     And I'm certainly not sure it's tied in to
 5          anything we're talking about since, again, it
 6          was about use of force specifically and
 7          policies on the use of force.  So public
 8          input, you have the opportunity -- and I'll
 9          try to help show some connection here.  Just
10          like the Pasco Sheriff's Office has that if
11          you want to complement, complain, or provide
12          information to an agency that's one medium.
13          That's one method you can have by having your
14          information available through public records
15          request as, say in this case, people can gain
16          copies of policies of the Pasco Sheriff's
17          Office.  That's another way that you can get
18          input after people review these.  Media, of
19          course, can get these as well.  So public --
20          appropriate public input is a bit of a
21          touchstone and difficult as we know in any
22          democracy where you may want input.  Some of
23          that is up to the individual agency of the --
24          of the individual.  Like do I want to comment
25          on a policy.
```

54

1    Q    Sure.  So -- and it seems like in terms of
2         appropriate public input that you said a
3         complaint system, records requests.  You
4         mentioned media.  Are there any others?
5    A    Well, I didn't specifically say complaint
6         system.  The system is ---
7    Q    I'm very sorry.  I thought you used the word
8         complaint.  My mistake.
9    A    I did use the word complaint, but what I said
10        was -- and I may have referred to, I think, in
11        the report is it's a complaint, concern or
12        complaint.  So I wouldn't want to
13        mischaracterize it as just complaints.  So
14        there are mechanisms as far as -- as far as
15        that goes.
16   Q    So besides that and the ability to have
17        records requests and media are there any other
18        forms of appropriate public input on these
19        policies you speak to in the article?
20   A    Well, public input comes in those ways that I
21        mentioned.  They can come in emails.  They can
22        come in retaining an attorney to either
23        communicate with an agency or sue an agency.
24        They certainly can come in written
25        correspondence.  They can come in advocates

55

1        making a case to some agency about some policy

2        or to your elected representatives, of course,

3        about the same kinds of things and whether the

4        policy translates, and then we get to talk

5        about procedures or just policy.  So it's

6        certainly not limited to what my memory might

7        draw up about this use of force article from

8        13 years ago, but important to have the

9        ability for input.

10   Q   Sure.  And I just want to make sure I have a

11        complete answer.  Are there any other forms of

12        public input that you didn't mention there?

13   A   Well, with my caveats I'm not claiming that's

14        a complete answer.  I may have remembered

15        three more by the time we get to trial.  So

16        again, not being in a memory test, the point

17        is about having the ability to have public

18        input and that can take a variety of form and

19        have different mechanisms.  But it is

20        important, as I said, in a democracy that

21        there are ways that public, be that at an

22        individual level, a group level, other agency

23        level, can communicate information to a public

24        agency about some input.

25   Q   Sure.  And you know I have to get this for the

56

1          record.  I'm not obviously being pedantic.

2          But when you say that there are three

3          mechanisms you may testify about at trial, as

4          you sit here today you cannot give me those

5          three methods; is that right?

6     A    Right, because it could be 13, or it could be

7          one or it could be no more, or it could be the

8          general statement, again, that what is

9          recommended in this normative article from 13

10         years ago about model use of force policies is

11         that there is some way for the public to give

12         input to an agency.

13    Q    Right.  Let's see.  I think -- now, I didn't

14         see the term focused deterrence in your

15         papers, but I might be -- missed something.

16         So have you ever discussed focused deterrence

17         in one of your academic papers?

18    A    I don't recall.  And, of course, you're saying

19         focused deterrence as if it's a monolithic

20         defined concept which, of course, it isn't.

21         But I don't recall specifically talking or

22         using that term as opposed to deterrence.  But

23         as I sit here today, since you're the one who

24         read some of this over the weekend, I don't

25         specifically recall in any books or -- you

57

1          know, specific use of the word focused before

2          deterrence.

3      (PLAINTIFF'S EXHIBIT D INTRODUCED)

4      <u>DIRECT EXAMINATION RESUMED BY MR. HOUSE:</u>

5      Q    Well, speaking -- speaking of your books,

6          let's turn to the next exhibit.  Do you

7          recognize this?

8      A    Yes, sir.

9      Q    It might be small on your screen.  What is

10         this document?

11     A    That is a textbook, American Homicide, that I

12         co-authored.

13     Q    And I'll represent to you that this is not the

14         entire textbook.  These are excerpts from the

15         textbook that I have in this -- in this PDF

16         here.  But I'm going to turn to -- and I'll

17         say it's also an excerpt from an electronic

18         copy of the textbook.  I'm going to turn to

19         what's marked as page 267.  And it's tough

20         because I don't want to make this so small

21         that you can't -- that you can't read it but

22         it won't quite all fit on the page.  So -- and

23         let me find -- I can't -- I can highlight it

24         like that.  So I will -- I will go up here.

25         So it's across these two pages here, again,

58

1          both of which are marked as page 267 on the

2          book because this is from an electronic copy.

3          But beginning at the bottom of this PDF page.

4          It's PDF page five.  It says -- and I don't

5          know if you can -- can you see where I'm

6          highlighting?  Can you see the words okay, Mr.

7          Hough -- or Professor Hough?

8    A     I can.

9    Q     So it says, "Checklist prediction must be

10         avoided.  The use of validated assessment

11         instruments can be helpful if they are used in

12         conjunction with a human interviewer.  On a

13         bad day in Mrs. Brown's third grade class, the

14         majority" -- and I'll scroll down.  "The

15         majority of kids may look to be heading to a

16         life of crime if a simple checklist were used

17         that tabulated deviant or disruptive

18         behavior."  Do you agree -- as we sit here

19         today do you agree with this statement?

20   A     So ---

21   BY MR. POULTON:

22         I'm going to object -- I'm going to object ---

23   BY THE DEPONENT:

24         Yeah.

25   BY MR. POULTON:

59

1          --- with two sentences out of a 300 page book.

2          But go for it.

3     BY THE DEPONENT:

4          Yeah, that's the comment I was going to make.

5          That ---

6     BY MR. HOUSE:

7          And, Tom, I'm not sure I totally -- I mean, I

8          can rephrase the question if need be.  I just

9          -- what I'm asking is if there's any reason

10         why the words here he would have reason to

11         disavow for any -- for any reason.

12    BY MR. POULTON:

13         Well, that -- I mean ---

14    BY MR. HOUSE:

15         As like -- as in like, I mean -- yeah.

16    BY MR. POULTON:

17         I just -- I object to the phraseology of that

18         -- of that question.  I think that that's -- I

19         understand the point you're trying to make,

20         but I'll object to the form and leave it at

21         that for now.  If you want me to elaborate I

22         will.

23    DIRECT EXAMINATION RESUMED BY MR. HOUSE:

24    Q    Professor Hough, I'll ask it again.  Just the

25         sentences that we read do you have any -- do

```
 1            you have any reason not to agree with the
 2            content in those sentences?
 3     A      As has been noted by defense counsel, it --
 4            it's a 301 page book that I'm holding in my
 5            hand here.  That's out of the final chapter in
 6            a book that is about homicide, and it's in a
 7            chapter about victims, society and the future.
 8            And that incredibly limited point here where
 9            we see the fanciful reference to Mrs. Brown's
10            third grade class is the point that merely
11            working from an attribute checklist, unlike
12            the instant case that we're dealing with, is
13            not something that people should casually
14            utilize in trying to make some kind of
15            concrete prognostication.  So do I agree with
16            what we wrote about kids in Mrs. Brown's third
17            grade class and the point to students and
18            others who would read this book about
19            homicide?  Yes, I do.  Is this written when it
20            was written to apply to intelligence-led
21            policing program at the Pasco Sheriff's
22            Office?  No.
23     Q      And I'll just say, because I'm going to be
24            asking you about other papers and books and
25            stuff, that I'm asking about them within their
```

61

1          context obviously.  I'm not -- you know, I

2          know you keep -- I don't want to slow down

3          your answers with that proviso every time

4          because I understand that if I'm asking about

5          the book it'll be about the book.  Do you --

6          do you understand that?

7     A    I understand deposition process.

8     Q    Yeah, again, I just want to -- I can make it

9          clear on the record I'm not asking you to

10         compare the book to what's going on in Pasco.

11         I'm trying to figure out some broad principles

12         of your background, if that ---

13    BY MR. POULTON:

14         Well, see, that's the objection.  It's taking

15         a couple of sentences like that in a different

16         context and trying to -- trying to argue that

17         they're broad principles that you're going to

18         then try to apply in another context.  That's

19         the objection I think.  And I think that Dr.

20         Hough's testified to that.

21    BY MR. HOUSE:

22         Sure.  But, I mean, these are his, you know,

23         background -- I mean, statements; right?

24         These are not -- again, this is part of

25         developing his background.  I'm not -- I'm not

62

1          saying, for instance, that these words are

2          applying, when he wrote them, to Pasco County.

3          I do not -- I do not mean to imply that.  So I

4          don't think it's necessary to have that

5          proviso every time.  I mean, the witness can

6          feel free obviously to add that.  But for the

7          record, when I ask about the book I'm asking

8          about the book.

9     DIRECT EXAMINATION RESUMED BY MR. HOUSE:

10    Q    So what -- you used the term in your last

11         answer, I believe.  You called it attribute

12         prediction; is that correct?

13    A    I may have used that, I think, together.

14    Q    Maybe it was attribute checklist?  Does that

15         sound right?

16    A    That could be.

17    Q    Is that -- and is that -- is an attribute

18         checklist the same as the term checklist

19         prediction that was on this -- this page right

20         here?

21    A    Well, no.  And the reason for that again is

22         this textbook, and me being in criminal

23         justice for more than four decades, this is a

24         textbook.  This isn't a statement of my broad

25         principles.  That's an advocacy piece is a

63

```
 1              statement of broad principles.  If I wrote an
 2              op-ed it might be about broad principles.  If
 3              I wrote some other kind of document or gave
 4              some kind of talk or said something in the
 5              media about what I personally, Richard Hough,
 6              liked or disliked, that might be a broad
 7              principle.  This is intentionally a textbook
 8              and, again, geared towards undergraduate,
 9              sometimes graduate university and college
10              students.  And in this specific part here
11              about checklist prediction is as I said a few
12              minutes ago that that's not in a vacuum.  You
13              don't just say attorney certain age, certain
14              whatever, oh, that means they're this.  That
15              would, you know, not be scientific.  It would
16              be probably logical or commonsense.  So again,
17              that's wildly taken this out of context to, as
18              you say, build what you think are my broad
19              principles which you will not divine from
20              this.
21         Q    Do your principles in any way disagree with
22              what's in this textbook?
23         A    We started our day with pointing to where I
24              said I'll do personal opinions in my reports.
25              And again, as the court understands, there's a
```

64

1      difference between an attorney and a

2      criminologist.  I'm not an advocate.  I'm not

3      here to advocate for the plaintiff or the

4      defense.  I'm here to provide information and

5      understanding of topics that I know something

6      about and the court will judge whether I know

7      enough to be of use.  So what I agree with,

8      don't agree with, I assess.  I assessed the

9      PSO's program and found it to be acceptable in

10     terms of customary practice.  As to what I

11     wrote a few years ago, if this is part that I

12     wrote about checklist prediction, that was

13     about Mrs. Brown's hypothetical third grade

14     class and not thinking they're all going to be

15     mass killers or serial killers.

16  Q   Is there -- would you say this book is within

17     the main stream of criminology?

18  A   As I pointed out in my report, even that kind

19     of phraseology is a bit fraught to say what's

20     mainstream criminology.  Deterrence has been

21     in Western thought for centuries or a

22     millennia perhaps.  A book in mainstream

23     criminology, it wasn't written with the intent

24     to be in mainstream criminology.  So I can

25     appreciate your question, but I don't -- I

65

1            don't know how to answer that, certainly not
2            at risk of having that pop back up again
3            somewhere out of context.
4       Q    Sure, sure.  I believe earlier you referenced
5            this as a textbook; is that correct?
6       A    That's correct.
7       Q    Do you use this as a textbook in your classes?
8       A    I do.
9       Q    So can you give me an example of how the
10           checklist that you refer to in Mrs. Brown's
11           third grade class would indicate that someone
12           is heading to a life of crime?
13      BY MR. POULTON:
14           Object to the form.
15      BY THE DEPONENT:
16           No, because that's not what this was written
17           about.
18      DIRECT EXAMINATION RESUMED BY MR. HOUSE:
19      Q    Well, so I'm -- my reading of this says, "On a
20           bad day in Mrs. Brown's third grade class, the
21           majority of kids may be -- may look to be
22           heading to a life of crime if a simple
23           checklist were used that tabulated deviant or
24           disruptive behavior."  And I guess what I'm
25           saying is can you give me an example of what

66

```
 1              that would look like if a checklist were used
 2              to tabulate deviant or disruptive behavior?
 3         A    Well, probably not from this because, again,
 4              that's -- we weren't writing to show examples
 5              of checklists.  We were writing, as I
 6              testified to a couple of times now, to not in
 7              a vacuum take a simple checklist of kids in a
 8              third grade class and try to extrapolate some
 9              eventual outcome in adolescence or adulthood.
10         Q    And why couldn't that be extrapolated?
11         A    Because you need things in context.  Perhaps
12              knowing past behavior, like a criminal record
13              or offenses.  But for this example in this
14              textbook about homicide, the point for
15              students and others in reading this is to not
16              merely take a simplistic checklist of
17              attributes in a fanciful hypothetical third
18              grade class and use that to say that somebody
19              is going to turn out to -- for a life of
20              crime.
21         Q    Is there anything else you would need for
22              context besides past behavior?
23         A    Well, again, I'll put this 301 page book on
24              homicide aside.  And in trying to use
25              different methodology, since I have to frame
```

```
 1          what I'm thinking on my side of the screen in
 2          terms of what case have I been asked to
 3          evaluate and opine, does it, you know, mesh
 4          with what criminal justice agencies in the
 5          U.S. try to do.  Yes, it does.  And then try
 6          to, from your question, reverse engineer.  Is
 7          there -- is there some statement about what
 8          someone would need.  What the Pasco Sheriff's
 9          Office has done is put 30 people or so
10          together, do a great deal of research, write a
11          lot, have a lot of bits and pieces that their
12          corporate representative and fact witnesses
13          would testify to about how the inner-workings
14          of it are.  For me to just extemporaneously
15          launch some kind of monolog about things that
16          might appear in someone's checklist about
17          something for committing a homicide where this
18          is a negative assessment of don't just do
19          that, I hope I'm giving you enough of why
20          that's not a yes or no kind of an answer
21          because that would be pretty irresponsible of
22          me to do that.
23     Q    So I'm going to object to that answer.  My
24          question was your answer before two questions
25          ago was that you need context including past
```

68

1     behavior.  And my question is what other

2     things would you need in order to form

3     context?

4  BY MR. POULTON:

5     Object to the form.  Do you mean in the -- can

6     you clarify do you mean in th sense of

7     homicide ---

8  BY MR. HOUSE:

9     Sure.  My understanding here was that I asked,

10     you know, why couldn't you use a checklist to

11     tabulate deviant or disruptive behavior.  My

12     understanding is that the witness' testimony

13     was that, well, you would need context

14     including past behavior.  So my question is

15     what other -- what other things besides past

16     behavior would you need for that context, if

17     indeed there's anything else.  It might be

18     past behavior is the only thing, but that's my

19     question.

20  BY MR. POULTON:

21     And I'll just ask you to clarify whether you

22     mean it -- have we left now the reality of the

23     book and now we're talking about ILP in Pasco

24     County or ---

25  BY MR. HOUSE:

69

1           No.  We are strictly -- again, I'm asking

2           strictly with this sentence about Mrs. Brown's

3           third grade class.  My understanding was that

4           the witness said, again, that a simple

5           checklist could not be used to tabulate

6           deviant or disruptive behavior.  And when I

7           asked why I was told that context was

8           necessary including past behavior, and I'm

9           asking what other context would be necessary.

10          So again, within the context of this -- this

11          book.

12    BY THE DEPONENT:

13          Okay.  So again, this isn't statements of

14          broad principles nor an exhaustive attempt

15          here in a deposition to say what things in my

16          remembrance and two cups of coffee would be in

17          a checklist for whether I think this example

18          was about mass killer or something a third

19          grader might respond to that may or may not in

20          the future indicate something that I didn't

21          flush out in this.  There was no then.  You're

22          -- understandably you're taking something and

23          now trying to fit it to what we're talking

24          about.  That's not what this was.  So I'm

25          having a hard time being responsive when I'm

70

1          trying very hard to be responsive.  But at the

2          risk of just saying something that gets

3          repeated back at some point that's -- that's

4          not in context and I wasn't creating a

5          checklist here.  This was cautioning people

6          not to just use a checklist on a third grader

7          for murder in the future because that couldn't

8          be complete.  So I'm trying diligently to be

9          responsive to your question.  I'm just not

10         sure how much ---

11    DIRECT EXAMINATION RESUMED BY MR. HOUSE:

12    Q    Sure.  And, Professor Hough, I think -- I

13         think part of the confusion here might be that

14         depositions can go beyond the scope of the

15         case a bit; right?  So again, I'm trying --

16         I'm not an expert in criminology.  You're here

17         as the expert.  I'm trying to figure out sort

18         of what things mean.  And so I am -- again,

19         I'm asking questions and I think trying to

20         figure that out.  And I think some of the

21         confusion might be you're trying to relate it

22         to Pasco.  And again, I'm just trying to get

23         answers to these questions on the book, on

24         your papers for my own background knowledge of

25         this field.  So, you know, that -- I

71

```
1          understand that, but that's why these
2          questions are going the way I think maybe he's
3          -- this would proceed a little quicker if we
4          didn't tie it to Pasco with every question
5          because again that's -- if I ask you about
6          Pasco, I'll ask you about Pasco.  Does that
7          make sense?
8     A    Well, it absolutely does and -- and you have
9          to know how much I appreciate and respect the
10         fact that you are here an advocate for
11         Plaintiffs, know that I've been giving
12         depositions since 1979, and to think that all
13         of a sudden you're going to be the one
14         attorney in hundreds that wasn't fishing to
15         have something to pull up out of context later
16         and go, "But you said."  So there's a trend
17         line.  There's a regression.  Forty-three
18         years of, you know, attorneys who are
19         advocates coming somewhere to ask questions
20         of, in this case, someone who's trying to give
21         factual contextual responses about things, not
22         defend or attack something, because that's not
23         what I'm here to do because I do understand my
24         role.  So I'm appreciate your role and I'm
25         trying to fit in mine.  So I can't just go,
```

72

```
 1              oh, yeah, this has nothing to do with the
 2              Pasco County Sheriff's Office, of course, it
 3              has everything to do with it.  And, by the
 4              way, I'm not here to defend them either, or be
 5              plaintiff or defense.  I'm here to try to
 6              respond to things I know about.
 7      Q     I think it's later on the same page -- again,
 8              I'm sorry for not pre-highlighting this.
 9      A     Right.
10      Q     But it says right here where I'm highlighting,
11              there's a sentence that says, "We can even
12              reasonably predict that many gang members will
13              continue to engage in violence, for instance,
14              and that their risk of committing murder or of
15              being murdered is significantly higher than
16              others in society or even people who are
17              otherwise matched for age or economic
18              position.  This knowledge alone cannot stop
19              violence.  Programs must use this information
20              to implement education and intervention
21              strategies."  My first question would be why
22              can't that knowledge alone stop violence?
23      A     Oh, my.  Okay.  Let me -- let me try to read
24              this and remember what maybe I was thinking
25              however many years ago I wrote this in this
```

73

```
1        summary chapter on predicting violence.  Of
2        course, we know that all humans are capable of
3        violence.  Well, reading it as simplistically
4        as I can without getting in the mindset of
5        everything that led up to this summary chapter
6        in the textbook, the point is just having
7        knowledge about a thing cannot necessarily
8        stop it, which again -- well, I'll let you ask
9        your question.  But that -- that was the --
10       kind of the point there.  But just knowing
11       about a potential risk doesn't allow you to
12       stop it.
13   Q   Well, so the next sentence after that says,
14       "Programs must use this information to
15       implement education and intervention
16       strategies."  What intervention strategies
17       might those be?
18   A   Things like home visits to people who might be
19       gang members who's just had somebody killed
20       within their gang.  That comes to mind since
21       we're talking in this limited slice here about
22       gangs and violence.
23   Q   Would a warrant normally be sought out before
24       those home visits?
25   A   So now we're, again, not talking for a second
```

74

1          about this passage of this 300 page book.

2     Q    No, no.  I am asking about -- so I believe

3          your answer was intervention strategies here

4          in the book might include home visits; is that

5          correct?

6     A    Sort of in a very loose way since, again, we

7          -- you're taking -- you're taking a question

8          about intervention in a sense about

9          implementing education and intervention

10         strategies, you know, for programs.  So again

11         asking me in a search for broad principles to,

12         you know, postulate some way that this

13         actually comes about in intervention

14         strategies.  Since this was about, you know,

15         something else and you're leaping from -- you

16         know, home visits is one thing.  If you're

17         going to come visit, you know, my home you

18         don't need a warrant to -- to do that.  You

19         can come knock on my door and talk to me.

20    Q    And so just to be clear for my question.  The

21         intervention strategies referenced in that

22         sentence which may include home visits, those

23         home visits would not then require a warrant

24         before taking place; is that correct?

25    A    Well, of course, there were no intervention

75

1        strategies mentioned in this sentence or

2        intended in this sentence.  As the writer, as

3        the author, as the criminologist, the point

4        was you should use information that you

5        possess in crafting intervention strategies.

6        Not gerrymandering statements that had nothing

7        to do with Taylor v. Pasco into this.  I

8        wasn't making a statement about specific

9        strategies.  I understand, just as well as you

10       do, what they're trying to ask me.  And while

11       being respectful I'm trying to be responsive.

12       Trying to, you know, respond faithfully like I

13       said to who I am and what I do.

14  BY MR. HOUSE:

15       I'm just going to ask can we go off the record

16       really quick?

17  (OFF THE RECORD)

18  DIRECT EXAMINATION RESUMED BY MR. HOUSE:

19  Q    Just a few followup questions about this book.

20       So I believe you testified earlier that you

21       used this textbook in your classes; is that

22       correct?

23  A    In the homicide class.

24  Q    Homicide class.  Do you use this textbook in

25       any other classes?

1    A    No.

2    Q    So I think later on this same page -- well,

3         you know what.  I think we're done with this

4         exhibit.  Let me bring up another exhibit.

5    (PLAINTIFF'S EXHIBIT E INTRODUCED)

6    DIRECT EXAMINATION RESUMED BY MR. HOUSE:

7    Q    Do you see -- let me reshare my screen.  Do

8         you see what's on my screen, Professor Hough?

9    A    Now I do, yes.

10   Q    Do you recognize what this is?

11   A    I do.

12   Q    What is it?

13   A    It's a cover of a textbook I wrote on criminal

14        investigations.

15   Q    And I'll represent to you again that these are

16        excerpts, not the entire book, and from an

17        electronic copy.  Turning to page 92 of the

18        book at this paragraph that I'm highlighting

19        for you.  It says, "In the 1990 book Beyond

20        911: A New Era for Policing, Sparrow, Moore,

21        and Kennedy mused about what uniform patrol

22        officers might do if they had time beyond that

23        spent running from one call for service to the

24        next."  Do you see that?

25   A    I do.

77

1    Q    Is the Kennedy cited here the same David

2         Kennedy in this lawsuit Plaintiff disclosed as

3         an expert?

4    A    It is.

5    Q    I think that's all I wanted to ask about that

6         for now.  And then have you ever discussed the

7         term focused deterrent in any of your books?

8    A    Well, I know you've already asked me that and,

9         again, deterrents certainly, and I had said

10        earlier that I could not recall whether

11        putting the word focused in front of it or any

12        other modifiers before or after the word

13        deterrence I don't recall.

14   Q    So if I recall correctly I was asking about

15        papers before, but is it your testimony is

16        that books -- same answer for books?

17   A    I think so.  I just don't independently recall

18        if in any of the writing using those two words

19        together.

20   Q    Let's turn to your report once again.  We'll

21        go to page four.  On page four of your report

22        you say, and I'll highlight it, "In case

23        analysis, as a consultant, I utilize

24        recommended national standards, model

25        policies, handbooks, and guides put forth by

78

1          various professional organizations."  Do you

2          see that?

3     A    I do.

4     Q    Did you perform the, quote, "case analysis,"

5          end quote in your report?

6     A    I'm not entirely sure what you mean.

7          That's ---

8     Q    Sure.  Sorry.

9     A    Go ahead.

10    Q    So it says in -- my understanding of this is

11         it says what you do in case analysis.  And so

12         my question is, is your report an example of

13         case analysis?

14    A    In this particular instance it is, but this is

15         not -- this paragraph is in all of my reports

16         on police issues to make the point that these

17         are the kinds of things that would be included

18         if applicable in looking at different things.

19         So for instance, I don't know -- I don't think

20         they're, for example, anything from the

21         National Tactical Officers Association that I

22         referenced in this report as far as I know.

23         So this is a general ---

24    Q    So, well, did you refer to any recommended

25         national standards in writing this report?

79

```
1    A    I can't recall.  I know somewhere in the body
2         of the report mentioning part of the
3         definitions from the -- or definition or
4         description from the International Association
5         of Chiefs of Police which, again, focused on
6         violent crime as opposed to the property
7         crimes.
8    Q    And that -- as you recall now, that would be
9         from a recommended national standard?
10   A    It would be from an organization one area of
11        discussion, because as we know none of these
12        are authoritative in the sense that they can
13        mandate any kind of regulation or standard or
14        policy.
15   Q    So do recommended national standards then come
16        from organizations like the one you just
17        mentioned?
18   A    They can.
19   Q    Where else do they come from?
20   A    These that are listed they -- you may
21        occasionally get ones from the National
22        Institute of Justice, as an example, or other
23        private organizations that may be advocacy
24        groups.  The American Bar Association.  A
25        variety of places that can produce something
```

80

1           that they would like those in the field to

2           consider when they draft policy and

3           procedures.

4      Q    Did you use any model policies in writing this

5           report?

6      A    If they were cited in text I'll -- I'll -- I

7           don't recall independently without just going

8           through the report.

9      Q    So did you use anything in writing this report

10          that's not cited in the text?

11     A    My knowledge-base and experience and just day-

12          to-day emersion in the literature and the

13          process.  But in terms of specific, those

14          things that are in the appendix and those

15          things that are cited in text would be the

16          predominate ones to show support.

17     Q    Sure.  And that was perhaps a bad question on

18          my end.  I think my actual question would have

19          been did you refer to any documents besides

20          those cited in your report to write your

21          report?

22     A    No, I don't believe so.

23     Q    Thanks.  So between pages four and five you

24          say that your analysis is informed by journals

25          and government sources; is that correct?

81

1    A    Yes, it can be.  Again, that's part of the

2         commentary that if it's -- if I deem it

3         appropriate in reviewing something, yes.

4    Q    But -- and I'm sorry.  I know this is sort of

5         repeating my last question but I just --

6         because I did it out of order I want to ask.

7         But any documents of those government sources

8         that you use would be cited to in your report;

9         is that correct?

10   A    That's correct.

11   Q    On page six, here at the bottom of page six it

12        says, "I may amend my opinions and supplement

13        my report as necessary based upon additional

14        information furnished to me as well as my own

15        research and further analysis of case

16        factors."  Do you see that?

17   A    I do.

18   Q    Is there any reason as of today that you would

19        want to amend the opinions in your report as

20        it is written?

21   A    Not at this time.

22   Q    Is there any reason as of today that you would

23        want to add to your report?

24   A    Not at this point.

25   Q    And then let's turn to -- we'll go down to the

82

```
 1          bottom really quick.  Pages 33 to 37 of your
 2          report.  So 33 where it says opinions and
 3          conclusions, and then if you go on to the
 4          following pages there's like a preliminary
 5          paragraph and then there's a list of -- let's
 6          see.  Nineteen, I believe, items.  So does
 7          that section under opinions and conclusions --
 8          well, let me ask it this way.  Are there any
 9          opinions or conclusions that you would like to
10          add to that section?
11     A    Unless something within the body of the report
12          itself would be interpreted that way as a part
13          of the report that's not a section labeled
14          opinions and conclusions, at this point I do
15          not have anything to add to this.
16     Q    Let's see.  We're going to go back up to page
17          seven.  We're really moving now.
18     BY MR. POULTON:
19          Yeah, you're doing better.
20     BY THE DEPONENT:
21          I'm trying to do my part.
22     DIRECT EXAMINATION RESUMED BY MR. HOUSE:
23     Q    So on page seven it looks like at the top
24          there are two blocks of text that follow a
25          sentence that says, "The following initial
```

83

1          information is used for purposes of analysis

2          in this matter."  My question is -- or do you

3          see that, first of all?

4    A   Yes, sir.

5    Q   My question is, does that mean that you took

6          the facts in those paragraphs to be true when

7          writing your report?

8    A   True is a tricky word.  That's why I put up

9          there utilized for purposes of analysis so

10        that there's something to comment on or a

11        baseline point from which to work.  I am aware

12        of some of this through living in that

13        general, you know, West-Central Florida area

14        for a while, so I know what the roads are that

15        go through there.  You understand what I mean?

16        I'm not -- I would certainly defer to any fact

17        witness.  And if you represented to me that,

18        you know, the agency doesn't have a certain

19        thing then that would be a matter of a fact

20        witness coming forward to say whether they do

21        or not, but (pause) ---

22    Q   Sure.  But is it fair to say that for your

23        report you assumed those items to be true?

24    A   Yes.

25    Q   So in footnote one, after the first block of

84

1           texts that we're talking about, it says you

2           cited to U.S. Census and other sources.  What

3           are those other sources?

4     A     I think the Pasco Chamber of Commerce, and

5           that's going from memory.  But since as you

6           see we're talking about general demographic

7           and geographic description type information.

8           That's what I recall that I utilized.

9     Q     Anything else that you can recall?

10    A     No.

11    Q     In the second block of texts it looks like to

12          me that you list -- is it fair to say that

13          these are facts about the Pasco Sheriff's

14          Office?

15    A     Yes.

16    Q     And then in footnote two you cite to the Pasco

17          Sheriff's Office official website; is that

18          correct?

19    A     That is correct.

20    Q     Do you have any other grounds besides the

21          PSO's website for believing those facts are

22          true?

23    A     Some parts of this, again, just from my

24          knowledge, Central and West-Central Florida

25          criminal justice and policing over time.  So

85

1          to get down into specific ones about when some

2          aspect of it started or didn't start I would

3          absolutely defer to their website or to their

4          30(b) witness or whoever they have.

5     Q    Well, so -- I mean, but for the purpose of

6          writing the report I guess my question is did

7          you reference anything besides Pasco Sheriff's

8          website?

9     A    I don't see that I referenced anything else

10         here.

11    Q    And then pages seven to eight.  Again, there's

12         sort of three blocks of texts which they may

13         be quotes.  I'm not -- or they just might be

14         offset.  I can't -- not sure.  And then it

15         cites footnote three for -- for them.  And I

16         believe footnote three cites also to the Pasco

17         Sheriff's website.  Do you see that?

18    A    Yes, sir.

19    Q    And again, just the same -- same question just

20         to be thorough.  Did you refer to any other

21         sources besides the website in coming -- in

22         writing those blocks of text?

23    A    Not that I can recall, no.

24    Q    Now, on page -- on page eight in the middle

25         there's a block quote.  Do you see that?

86

1    A    I do.

2    Q    I don't see a citation for that quote.  Where

3         did you get that quote?

4    A    Given that that is offset single spaced and in

5         quotation marks that's probably going to come

6         from the manual, but we have to probably look

7         and find it.

8    Q    On page nine you say, "But in the last 0 to 60

9         years academic researchers and entrepreneurial

10        law enforcement agency administrators have

11        experimented with techniques and programs that

12        go beyond response to 911 calls."  Do you see

13        that?

14   A    I do.

15   Q    I'm going to refer back to an exhibit we spoke

16        about a little earlier, and I'm trying to go

17        -- let's see, A, B, C, D, E.  I believe it

18        would be Exhibit E.  So is it your

19        understanding that the book Beyond 911 that we

20        spoke about earlier in Exhibit E involves the

21        same topic that you are referencing in the

22        first sentence that I just read here that

23        says, "Programs that beyond response to 911

24        calls"?

25   A    That would certainly be one of the -- one of

87

1          the sources.

2     Q    On page 10 you quoted work from -- I think

3          it's Loughran, or Loughran (different

4          pronunciation), Paternoster and Weiss which

5          says ---

6     BY MR. HOUSE:

7          And for the court reporter, I don't know if

8          you can see it but the first name that I

9          butchered is L-O-U-G-H-R-A-N.

10    DIRECT EXAMINATION RESUMED BY MR. HOUSE:

11    Q    And it says -- the quote says, "The body of

12         research suggests policing strategies that are

13         focused on particular geographic areas or

14         offenders are effective in deterring crime."

15         Do you see that?

16    A    I do.

17    Q    What policing strategies are they referring

18         to?

19    A    I don't recall.

20    Q    Later on page 10 you say -- later on page 10

21         we're saying -- or it says, "Interacting with

22         a subject with the hope of gaining compliance

23         can be blocked by the behavior of the subject,

24         as in the instant case."  Do you see that?

25    A    I do.

88

```
 1   Q   By instant case do you mean Taylor versus
 2       Nocco?
 3   A   That's correct.
 4   Q   What does the term subject mean there?
 5   A   Individual.  A person.
 6   Q   And so this sentence means that interaction
 7       with an individual can be blocked by that
 8       individual; is that correct?
 9   A   That is correct.
10   Q   Now, if the individual refuses to speak to an
11       officer is that a form of blocking?
12   A   It can be, yes.
13   Q   If the individual refuses to give information
14       to the officer is that a form of blocking?
15   A   Yes, it can be.
16   Q   If the individual refuses to speak to an
17       officer without a lawyer is that a form of
18       blocking?
19   A   It certainly could be.
20   Q   What does -- well, does graining compliance in
21       this sentence mean getting an individual to
22       speak to an officer?
23   A   It certainly can.  This is a broader statement
24       about interacting with people.  And so it
25       certainly may be you're asking me a question
```

89

```
1            and in one way or another I'm unresponsive to

2            that.  I may be blocking the communication.

3    Q      The next sentence says, "Each of the documents

4            and individual investigative efforts in the

5            case represent the information-gathering

6            expected and routinely seen during cases with

7            any potential or actual repeat prolific

8            offender, such as the instant one."  So you

9            see where it says that?

10   A      I do.

11   Q      And again, when you say "the case" in that

12           sentence and "the instant one," both of those

13           terms refer to Taylor versus Nocco; is that

14           right?

15   A      Yes.

16   Q      When you say investigative efforts in that

17           sentence do you -- do you include a traffic

18           stop to preform a prolific offender check?

19   BY MR. POULTON:

20           Object to the form.  Go ahead.

21   BY THE DEPONENT:

22           If that was something that some officer

23           utilized in some aspect of this matter and in

24           furtherance of this kind of program I -- I

25           don't recall a specific one and I don't
```

90

1          necessarily recall from the manual that that

2          was a directed specific technique.  So I'm not

3          sure because I don't know -- if you represent

4          to me kind of that's what happened and that

5          was in the manual as something that's

6          instructed, that -- then I would probably

7          agree with that.

8    DIRECT EXAMINATION RESUMED BY MR. HOUSE:

9    Q    Sure.  And perhaps -- you know, maybe that's a

10         fact in contention and I understand you

11         emphasize you're not here to take a position

12         on facts.  But let's assume for the sake of my

13         next question that traffic stops to perform

14         checks do happen.  Your statement says that

15         the information gathering is expected and

16         routinely seen during cases.  So my question

17         would be, again, assuming that traffic stops

18         to do prolific offender checks are occurring,

19         have you seen traffic stops performed for

20         prolific offender checks anywhere else besides

21         Pasco?

22   BY MR. POULTON:

23         Object to the form.  Go ahead.

24   BY THE DEPONENT:

25         Again, I'm not aware of it in Pasco.  So

91

1        hopefully you're aware by now I'm blocking you

2        but I don't know about having something to say

3        anywhere else but in addition to Pasco because

4        I'm not aware that that was a guided function

5        or task that is in the intelligence-led

6        policing program.  So I'm not -- I'm not aware

7        as I sit here right now of any ILP which,

8        again, my knowledge isn't exhaustive, that

9        says find people in traffic and stop them to

10       have a interaction.

11   DIRECT EXAMINATION RESUMED BY MR. HOUSE:

12   Q    And again, just to make sure my -- because

13        again, I can see my question wasn't clear.

14        Putting Pasco aside, do you know of any

15        program outside of Pasco that does the thing

16        that I said that does traffic stops to perform

17        checks?

18   A    Not that I'm aware.

19   Q    And then, again, when you say investigative

20        efforts in this sentence do you mean the use

21        of an algorithm to catagorize certain repeat

22        offenders?

23   BY MR. POULTON:

24        Object to the form.

25   BY THE DEPONENT:

92

1            What I was referring to there was broadly what

2            lawful methods were used.  That could be,

3            again, the home visits and certainly could be

4            social network analysis or just the various

5            efforts that either this agency or any other

6            agency take to try to gather information.

7    DIRECT EXAMINATION RESUMED BY MR. HOUSE:

8    Q    Sure.  And I guess -- and then maybe -- again,

9            maybe I'm not using the right terminology

10           here.  But when I'm asking about what those

11           investigative efforts might be my question is

12           does the use of an algorithm to categorize

13           certain repeat offenders constitute one of

14           those investigative efforts?

15   A    What typically would be seen, and so that's

16           the only way I can answer this, I'm not aware

17           that in Pasco that it's strictly based off an

18           algorithm as opposed to analysis and handling

19           by an analyst and again what -- what the

20           factors are that go into that to nominate

21           whatever the pool or population of people are

22           that may get further consideration in the

23           program.  Yeah, that -- that sort of use of

24           data analytics has certainly become more

25           common.

1    Q    Where else have you seen that use of data

2         analytics?

3    A    Sitting here independently trying to think of

4         an agency where that's specific used, I'm not

5         able to do that.  We've seen a proliferation

6         of articles and books within criminology and

7         criminal justice and vary under disciplines --

8         various other disciplines, rather, to, you

9         know, kind of highlight some of those.  So

10        again, it's -- it's a well documented now

11        increasing trend, but I can't sit here and

12        tell you that city or county X, Y, Z is

13        utilizing any particular algorithm.

14    Q    Sure.  What articles are you referring to?

15    A    Again, just the things as I mentioned to you

16        earlier, that I am a wash in on a daily basis

17        whether it's teaching a policing class or an

18        investigative class or, you know, just the

19        casual reading that someone does.

20    Q    Sure.  Can you provide just a name of on of

21        the articles?

22    A    Nope.

23    Q    And can you provide a book that you were

24        referring to two answers ago?

25    A    No, because as I told you there's nothing else

94

```
 1            in here that I wouldn't have cited that I

 2            specifically took something from.

 3     Q     When you say investigative efforts here does

 4            that include putting repeat offenders on a

 5            list without their knowledge?

 6     A     Again speaking broadly and not about this

 7            particular case, whether someone is on a

 8            repeat offender list, A, they know they're a

 9            repeat offender, B, they know they're in

10            official databases as having committed

11            offenses.  So whether I recall again an

12            article or a book where I saw a sentence that

13            says and there's lists of these repeat

14            offender and the people don't know about it,

15            I've never seen that.  That wouldn't make a

16            lot of sense to me.

17     Q     And you say -- and you say again that these

18            investigative efforts are routine.  Do you

19            have any other -- any other particular

20            locations where these databases you just

21            referred to are used?

22     A     Yes.

23     Q     Where else?

24     A     Every single county, state, municipality in

25            the U.S. has access to the state crime
```

95

1           database and NCIC, the National Crime

2           Information Center, which contains criminal

3           records of those people who have been arrested

4           and convicted or -- and/or just arrested.

5      Q    Are you familiar with any other agency that

6           uses those records to create a top five list?

7      A    Specific -- specifically I'm not aware of what

8           the -- then we'd have to add in in addition

9           kind of municipal and county.  The others

10          probably would get us up to about 25,000

11          separate agencies.  I don't know what the

12          various agencies refer to their particular

13          framework of how they attempt to track those

14          individuals disproportionately involved in the

15          most crime.

16     Q    When you say investigative efforts does that

17          mean -- well, actually, let me -- let me ask

18          it this way.  So you referenced a data base in

19          your recent answers using criminal history.

20          Is that an accurate -- is it a criminal

21          history database?  Is that an accurate way of

22          framing it?

23     A    That's what it is referred to as.

24     Q    So are you aware of any investigative efforts

25          that involve using the criminal history

96

```
 1              database to create a separate list of repeat

 2              offenders used by agencies?

 3        A     Well, I mean, this case, as I recall in the

 4              2018 manual they're using within Paco County

 5              data, and I can't recall whether they actually

 6              utilized when this matter would be either the

 7              Florida Crime Information Center or the

 8              National Crime Information Center.  So again,

 9              a I answered about the top five how -- you

10              know, if there was a house police department

11              how the agency members and house police

12              department decided they were going to

13              accomplish that would be unique and up to

14              them.  So I'm not aware of specific individual

15              parameters of any particular agency.

16        Q     Yeah, and I think you sort of got to my

17              followup question but again I have to ask it

18              just -- just for the record.  So you're not

19              aware of a particular agency outside of Pasco

20              that uses a criminal history database to

21              create a separate list of repeat offenders?

22        A     Not currently.

23        Q     When you say investigative efforts in that

24              sentence do you mean the use of home visits to

25              check on previous offenders?
```

97

1  A    Yes, that would be one of those.

2  Q    And you say that this is expected and routine.

3       Where else besides Pasco have you seen the use

4       of home visits to check on certain routine

5       offenders?

6  A    As I mentioned earlier, this -- the practice

7       itself, whether it was repeat offender squad,

8       certainly probation and parole.  That's a

9       mainstay of how that's -- how people monitor

10      those who are on that kind of a caseload.

11 Q    Sure.  With parole and probation -- and again,

12      correct me if I'm wrong.  Parole and

13      probation, I could be on parole -- someone

14      could be on parole or probation even if

15      they've only committed one offense; is that

16      right?

17 A    That is correct.

18 Q    So I guess my question is, again, are you

19      aware of anywhere where of any -- excuse me.

20      Are you aware of any agencies where they use

21      home visits to check in on repeat offenders?

22 A    So let's, yeah, get this clear on the

23      question.

24 Q    Yeah.

25 A    Even though a we know probation and parole can

98

1   be one offense and people come to your home on

2   all hours of the day and night on a frequent

3   basis, we're very well aware of that.  For

4   repeat offenders, again, that may be probation

5   and parole, or that could be a program such as

6   the one in Pasco.  Sitting here today

7   independently right now I cannot name another

8   specific agency that is utilizing that as part

9   of their approach.

10 Q And then when you say investigative efforts

11   here does that include the use of code

12   enforcement citations to get a subject to

13   answer an officer's questions?

14 A As you asked that a couple of hours ago the --

15   I'm not aware, first of all, either in this

16   case or in specifically any other agency where

17   someone is utilizing, as you're representing,

18   the threat of code enforcement to speak.  I'm

19   not aware of that.

20 Q On page 13 of your report.  Skipping down a

21   bit.  Near the top.  You say, "Innovative

22   policing approaches, such a the PSO

23   Intelligence-Led Policing approach, takes,

24   'the statistical analysis of large amounts of

25   historical data and serve to anticipate new

99

```
1              crime events or phenomena.'"  Do you see that?
2    A    I see that.
3    Q    What does innovative in that sentence mean?
4    A    Something that -- and I'm just going to give
5              you the caveat that this is in general.
6              Things that others may not be doing or you may
7              be doing sooner than others or attempting
8              something.
9    Q    And then just to get the quote clear here.
10             Later on in that sentence where you say, "The
11             statistical analysis of large amounts of
12             historical data and serve to anticipate new
13             crime events or phenomena," is the -- that
14             sentence that I just read, or that portion of
15             the sentence, is that what you are saying in
16             the sentence is what the PSO intelligence-led
17             policing approach does?
18   A    Well, prior -- immediately prior to that
19             section in quotation marks the clause that I'd
20             written says "such as the PSO intelligence-led
21             policing approach," and that the quote is
22             applied to say using the analysis of data to
23             anticipate new crime events or phenomena,
24             which would be the language of the authors
25             that I cite to.
```

100

1    Q    Sure.  Let me -- and just again, because I'm

2         -- again, I'm trying to nail down exactly what

3         the sentence needs.  Let me rephrase it and

4         you can tell me if I have it wrong -- or let

5         me rephrase my question.  How about that?

6         Does the PSO intelligence-led policing

7         approach take statistical analysis of large

8         amounts of historical data and serve to

9         anticipate new crime events or phenomena?

10   BY MR. POULTON:

11        Object to the form.

12   BY THE DEPONENT:

13        And as I responded earlier, I defer to the

14        fact witnesses from the Pasco Sheriff's Office

15        to speak about the mechanisms and algorithm

16        and specific factors that they utilize in

17        arriving at their actionable intelligence.  So

18        that's -- that's not intended to make that a

19        specific I am saying what they do.

20   DIRECT EXAMINATION RESUMED BY MR. HOUSE:

21   Q    Sure.  And again, I totally understand that

22        you said you're not here to give fact, but I'm

23        trying to nail down what the sentence or

24        report means.  Let me reask that.  For the

25        purposes of the report and for the -- you

101

```
 1              know, you know, the documents you reviewed to
 2              write the report, did you understand the PSO
 3              intelligence-led policing approach to take
 4              statistical analysis of large amounts of
 5              historical data and serve to anticipate new
 6              crime events or phenomena?
 7         A    Well, to similarly try to clarify, as I
 8              appreciate that you just did, it is no more
 9              nor less of analyzing the data that you do
10              have to try to have some insights into, you
11              know, future crime or deterring people.
12         Q    Let me -- I'll try to ask the question again
13              because -- so just reading this sentence.  I'm
14              trying to nail down the meaning of the
15              sentence.  Does the sentence mean that the PSO
16              intelligence-led policing approach is an
17              approach that takes statistical analysis of
18              large amounts of historical data and serve to
19              anticipate new crime events or phenomena?
20    BY MR. POULTON:
21              Object to the form.  Go ahead.
22    BY THE DEPONENT:
23              The reason I would defer that to the fact
24              witnesses three times, even though I wrote
25              part of the sentence and used a quote for the
```

102

```
1          rest is, again, you may see it as dodging a

2          question or an answer.  I see it as

3          responsible witnessing.  I can't say what

4          large amount of historical data --

5          semantically what that would mean.  What I've

6          said to try to clarify three times now is that

7          analyzed data to try to foresee events or

8          phenomena -- crime events or phenomena.  Past

9          that, that was my intent.  So I'm telling you

10         what I intended with that sentence.  A fourth

11         asking of it I can't reinterpret it any

12         further.

13    DIRECT EXAMINATION RESUMED BY MR. HOUSE:

14    Q    Sure.  And I guess maybe perhaps the confusion

15         here is, again, I'm not asking you to opine

16         factually on what happened in Pasco County.

17         You've already said -- you made clear you're

18         not giving a factual interpretation of what's

19         going on.  I'm just trying to figure out for

20         the purpose of the report does the PSO

21         intelligence-led policing approach, as you

22         understood it in writing the report, takes

23         statistical analysis of large amounts of

24         historical data and serve to anticipate crime

25         events or phenomena.
```

103

1    BY MR. POULTON:

2          Object to the form.

3    BY THE DEPONENT:

4          This is one of the problems with -- which is

5          inherent.  I trust you as an experienced

6          attorney know this as well as I do.  In trying

7          to get at this is that retrospectively trying

8          -- for me to try to reinterpret something that

9          places you in my answer, you just said, oh,

10         that's not what I'm asking you but I am asking

11         you is that what you meant, and I'm saying to

12         you what I meant was they analyze data in

13         their efforts to determine crime events or

14         phenomena.  So I found a supporting reference

15         to how some of this is done.  I cannot, I will

16         not say what amounts.  So that's the limits of

17         what ---

18   DIRECT EXAMINATION RESUMED BY MR. HOUSE:

19   Q    Sure.  And, again, I understand that.  And

20         here again, let me -- let me just be pretty

21         transparent here is there are typos -- at

22         least apparent typos in the sentence.  I don't

23         know if they're yours or in the quote.  The

24         sentence is not written very well.  And

25         obviously if I am going to, you know, cross-

104

1          examine you at trial I want to make sure I

2          know what it is that's in your report before I

3          cross-examine you.  So I'm not trying to get

4          you to say or reinterpret anything that the

5          sentence doesn't.  I'm trying to nail down the

6          grammatical structure of this sentence because

7          it's not written totally well.  And again, I'm

8          not saying the typos are yours.  I think the

9          typos might have been in the quote.  So I'm

10         just trying to rephrase the sentence for

11         grammatical clarity, and that's why I'm

12         belaboring this.  So if you'll excuse me

13         repeating the question one more time.  I'm

14         going to -- I'll give it another shot.  Again,

15         does this sentence mean that the PSO

16         intelligence-led policing approach as --

17         again, as you understood when writing this

18         sentence, takes the statistical analysis of

19         large amounts of historical data and serve to

20         anticipate new crime events and/or phenomena?

21    BY MR. POULTON:

22         Object to the form.

23    BY THE DEPONENT:

24         Again, yeah, good grammar and your grammar or

25         mechanics commentary notwithstanding,

105

1          innovative policing can be trying something

2          different.  How PSO uses their particular

3          flavor of intelligence-led policing to my

4          understanding involves analyzing data and that

5          serves to anticipate new crime.  And I'm

6          using, of course, a quote to try to show, you

7          know, support for that's one of the things

8          that are done.  Analyzing that amount.  So

9          yeah, as to grammar, I'm going to be willing

10         to bet a dollar that the court is not going to

11         necessarily going to pick at my grammar.

12    DIRECT EXAMINATION RESUMED BY MR. HOUSE:

13    Q    No, but that actually helped a lot and I

14         appreciate you giving, you know, a

15         clarification in that -- in the answer.  So

16         turning to -- I guess remaining on the same

17         page.  It says here that -- oh, you know what?

18         Real quick.  Actually that same sentence we

19         were talking about, the footnote 21.  It cites

20         footnote and footnote 21 is a -- I believe

21         it's a journal article from Hardyns and

22         Rummens; is that correct?

23    A    That is correct.

24    Q    And the title of the journal article is

25         Predictive Policing as a New Tool for Law

106

1         Enforcement; is that correct?

2   A    That is what it lists, as well as the subtitle

3         Recent Developments and Challenges, yes.

4   Q    Yeah, thanks.  On page 14 it looks like you

5         quote a large passage from a book and say,

6         "Though not mentioned in the above summary" --

7         sorry, that's right here.  "Though not

8         mentioned in the above summary, Plaintiff's

9         expert in this matter, Professor Kennedy,

10        assets a central role in the project."  Do you

11        see that?

12   A    I'm trying to see if that was from -- yeah,

13        that was from a book.  Yes, I see it.

14   Q    Do you have any reason to doubt that Professor

15        Kennedy played a central role in the project

16        cited by that passage?

17   A    I have no reason to think that.

18   Q    On page 15 ---

19 BY MR. HOUSE:

20         Well, you know what?  Before we go to page 15,

21         we're about to hit lunchtime.  Do you want to

22         take a break, Tom, or ---

23 BY MR. POULTON:

24         No, I would really like to if you don't mind,

25         because I need to run down -- it seems like

107

1        we're going a lot faster than we were before,

2        so maybe you feel more comfortable with that

3        now.

4   (OFF THE RECORD)

5   DIRECT EXAMINATION RESUMED BY MR. HOUSE:

6   Q    Professor Hough, so I'll share my screen

7        again.  I think we're at page 15 of your

8        report.  Can you see my screen?

9   A    Yes.

10  Q    Great.  So I highlighted -- I have a sentence

11       here that says, "While target-hardening

12       against crime by individual citizens may be

13       effective, it is not widely found in most

14       communities."  Do you see that?

15  A    Yes.

16  Q    What is target-hardening?

17  A    Making it more difficult for someone to commit

18       a crime against you or against your property.

19  Q    And how might -- what is one way that target-

20       hardening may be preformed?

21  A    Well, an example often given would be your

22       personal home.  Making sure you utilize

23       deadlocks, trim back bushes from around your

24       windows and doors, have exterior lighting.

25       Things of that nature to make it more

108

1    challenging for someone who might think of

2    your house as a target and in all likelihood

3    would go somewhere else then.

4 Q  Now, from the documents that you've reviewed

5    in writing this report do you know if the

6    Pasco Sheriff's Office was performing target-

7    hardening?

8 A  Well, I understood in the sentence that I

9    wrote that's individual citizens is what I'm

10    referring to.

11 Q  I get it.  I get it.  So it's -- reading the

12    sentence it's, "Target-hardening against crime

13    by individual citizens."  In other words, it's

14    the citizens doing the hardening; is that

15    right?

16 A  Yes.

17 Q  Now, later on in that same page you say that,

18    "According to a RAND Corporate study, the main

19    objectives of the approach," and then after

20    that quote you list what looks like three

21    objectives.  What is, quote, "the approach",

22    end quote, that you are referring to in that

23    sentence?

24 A  Let me go back to figure it out.

25 Q  Sure.

109

```
 1    A    "Various data-driven policing strategies to
 2         leverage information using the algorithms to
 3         focus those limited resources."
 4    Q    You then say, "In the early-ish years of such
 5         policing, scholars, citizens and practitioners
 6         look to the lessons of other disciplines using
 7         data-based prediction to guide the inevitable
 8         debate around ethics and transparency."  Do
 9         you see that?
10    A    Yes.
11    Q    Is there a debate around ethics and
12         transparency?  Let me -- let me rephrase it.
13         I'm sorry.  Just again, for the purposes of
14         the sentence here that I just read, is there a
15         debate such as the one you refer to in the
16         sentence about ethics and transparency?
17    A    Yes, I believe so.
18    Q    What is being debated in that debate?
19    A    I'm not a participant or someone in-depth in
20         the debate.  The questions that always arise
21         in public policy would include whether, as the
22         second point, transparency exists in some
23         particular policy and its construction and
24         implementation.  And then ethically, depending
25         on where someone sits or stands, viewing
```

110

| | | |
|---|---|---|
| 1 | | whether some group or individual believes that |
| 2 | | some governmental action may not be fully |
| 3 | | ethical. |
| 4 | Q | Let's go down to page 19.  Let's see here.  On |
| 5 | | page 19 your report says, "Deputies at the |
| 6 | | Pasco Sheriff's Office are expected and |
| 7 | | instructed to act within the law, agency |
| 8 | | policy, and contemporary training."  Do you |
| 9 | | see that? |
| 10 | A | I do. |
| 11 | Q | Now, I don't see a footnote for that sentence. |
| 12 | | I'm wondering on what -- well, let me ask the |
| 13 | | question this way.  What source do you have |
| 14 | | for that statement that I just read? |
| 15 | A | We have to look in the appendix, but any -- |
| 16 | | any of the policies that they have existing, |
| 17 | | plus that is the admonition of what agencies |
| 18 | | must do, and so in the general orders and |
| 19 | | policies.  That also goes with accreditation. |
| 20 | | So we'll have to go, as I said, to the |
| 21 | | appendix of the documents.  I see the IP |
| 22 | | directives.  Since most of -- and then, of |
| 23 | | course, the manuals, and then a lot of |
| 24 | | referencing of just defendant. |
| 25 | Q | If I were to look for -- again, referring to |

111

```
 1            the sentence I read.  If I were to look for --
 2            and this might be similar to the answer you
 3            just gave me, but here's the question.  If I
 4            were to look for what deputies are expected
 5            and instructed to do, would I look for the
 6            information in the appendix that you just
 7            cited?
 8    A       No.  A person would look in the policies and
 9            procedures of any given agency, as well as
10            Florida state statutes.
11    Q       And is it your understanding that insofar as
12            Pasco is concerned that the plaintiffs have
13            been provided all of the things on which you
14            would based that statement?  And when I say
15            things, I'm sorry.  Let me ask the question.
16            Is it your understanding as you -- let me
17            rephrase that.  The sentence that I read which
18            refers to Pasco Sheriff's Office and what
19            deputies are expected and instructed to do, is
20            it your understanding that the documents on
21            which you base that have also been provided to
22            plaintiffs in this case?
23    BY MR. POULTON:
24            Object to the form.  Go ahead.
25    BY THE DEPONENT:
```

1        Yeah, I'm not either aware nor responsible for

2        whatever documents plaintiff has received.

3    <u>DIRECT EXAMINATION RESUMED BY MR. HOUSE:</u>

4  Q   And we kind of talked about this earlier.

5        It's your understanding that the documents on

6        which you base that would be cited somewhere

7        in the report either in a footnote or the

8        appendix; is that right?

9  A   No, not -- not necessarily.  Because again,

10       out of the hundreds and hundreds of agencies,

11       policies and general procedures that I've

12       examined, those are contained within, as I've

13       testified to a minute ago, policy and

14       procedure.  Contemporary training is certainly

15       the academy training that I referred to

16       already.  The law is what the law is.  So the

17       issue comes down, I guess, to your asking

18       about agency policy.  So what you've obtained

19       from the agency in regards to its policy what

20       I've examined, you know, online about their

21       policy or cited here within the report is --

22       is in general what I'm referring to.

23  Q   And I'll again just rephrase it just to make

24       it clear for the record, because I think you

25       did answer this earlier.  To the extent you

113

| | | |
|---|---|---|
| 1 | | relied on any documents in writing that |
| 2 | | sentence, those documents would be cited in |
| 3 | | that report; is that correct? |
| 4 | A | As well as my knowledge of policies and |
| 5 | | procedures within the state of Florida for law |
| 6 | | enforcement agencies. |
| 7 | Q | Sure, but then you would be -- in that case |
| 8 | | you'd be relying on your knowledge rather than |
| 9 | | on the documents; is that right? |
| 10 | A | My knowledge based on documents.  I've done, I |
| 11 | | think, the only comprehensive survey research |
| 12 | | of the state of Florida agencies in regards to |
| 13 | | both use of force and homicide investigative |
| 14 | | methodologies.  So we can spend as much time |
| 15 | | as you want here.  I don't know what those |
| 16 | | defendant document ones were.  I had to look |
| 17 | | each one of them up as I opened them to read |
| 18 | | them.  I don't independently recall as a |
| 19 | | memory test which things were and were not in |
| 20 | | those things cited in Appendix A with the |
| 21 | | documents but, yeah, I'm referring to what are |
| 22 | | in agency policies. |
| 23 | Q | So again, the -- and I'm only going at this |
| 24 | | because I think it's contradicting, at least |
| 25 | | to my mind, maybe something that said earlier, |

114

1         although I'm not sure.  So you're saying that

2         in writing this sentence it is possible that

3         you referred to documents that are not cited

4         in this report; is that right?

5    A    That's possible.  And instead it's my

6         knowledge of the policies and procedures of

7         agencies throughout the state.

8    Q    As you sit here now can you give me the name

9         of a possible document to which you would

10        refer in writing that sentence that is not

11        cited in the report?

12   A    The general orders of the agency -- go ahead.

13   Q    No, sorry.  Go ahead.

14   A    I was going to say specifically I don't know

15        which one.  It's generally the first general

16        order in the policies and procedures or

17        something up close there, as well as Florida

18        accreditation standards calling for it, as

19        well as the swearing in document for every

20        deputy sheriff.  Again, we can spend as much

21        time as you want on this.  This is

22        unbelievably utterly what agencies do and

23        cannot be contested by anybody.  But please

24        keep asking.

25   Q    Where can I find those documents that you just

115

```
1          referred to?

2     A    Pasco Sheriff's Office.

3     Q    So the Pasco Sheriff's Office would have those

4          policies.  Are there any -- are there any

5          documents that are not within the -- that you

6          believe would not be in the possession of the

7          Pasco Sheriff's Department that you would

8          refer to in writing that sentence?

9     BY MR. POULTON:

10         If I might interject here just ---

11    BY MR. HOUSE:

12         Yes.

13    BY MR. POULTON:

14         --- to try to help move this along, and I

15         don't ---

16    BY MR. HOUSE:

17         Sure.

18    BY MR. POULTON:

19         If you want -- if you want to let him answer

20         first, and then I can -- so that you don't

21         interpret it as a speaking objection.  But I

22         think I know where the problem is if you want

23         him to go ahead and answer first.

24    BY MR. HOUSE:

25         No, you can -- you can go ahead, Tom.  I think
```

116

1      you know ---

2   BY MR. POULTON:

3      Part of this is that every agency is going to

4      have in its policies a statement that

5      deputies, or officers as the case may be, must

6      act within the law.  They have to act in good

7      faith compliance with any agency -- specific

8      agency policies and procedures.  They're also

9      going to be trained on that at the academy.

10     And it's -- it's -- well, you know, it's

11     incumbent -- it's incumbent in Monell sense

12     for you to identify a policy or a custom

13     that's going to deviate from that.  And I --

14     and I think that that ---

15  BY MR. HOUSE:

16     So I think you're reading way too much into

17     what I'm asking.  I'm just -- I'm literally

18     just trying to get what the universe of

19     relevant documents that I need to research is.

20     And so I understand the witness to be saying

21     that there are documents this statement that

22     have not been cited in the report and I'm just

23     trying to figure out what the documents are

24     and where I can find them.  It's just a

25     document review situation.  I am not trying to

117

```
1         make a substantive point here.  So maybe that
2         clears it up, Professor.
3    BY MR. POULTON:
4         If you want me to -- if you want me to get the
5         agency to -- an order or policy -- I can't
6         remember what it's called.  Some general
7         policy and procedures that, as he said, is
8         going to usually be in the first one or two
9         that instructs deputies to act within the law,
10        I'm happy to do that.
11   BY MR. HOUSE:
12        Yeah, that would be -- no, that would be
13        great.  And again, my question was just if
14        there are any before that.
15   BY MR. POULTON:
16        I'm doing an email as we speak.
17   DIRECT EXAMINATION RESUMED BY MR. HOUSE:
18   Q    And, Professor Hough, just again, any other
19        documents besides that one?
20   A    No, and I was -- yeah, what Mr. Poulton said
21        just -- just trying to make sure that that's -
22        - because of the nomenclature, because of the
23        accreditation and the way that these things
24        have organically grown over the century it's
25        just -- that's always right up from that says
```

118

 1          you shall.

 2     Q    It says that you -- later on in that paragraph

 3          it says, "While a retroactive view of an

 4          officer's decision-marking is often officer-

 5          centered, this would fail to appropriately

 6          incorporate an unknown and dynamic thought

 7          process by the subjects involved."  Do you see

 8          that?

 9     A    I do.

10     Q    Now, you mentioned here a retroactive view of

11          an officer's decision-making.  What is a

12          retroactive view?

13     A    In some sense it can be what we're doing now

14          but, you know, commentary or examination after

15          the fact 2020 hindsight, those various things

16          about looking backwards at what may be the

17          officer, what he or she decided or did.  And

18          then the point of the rest of that that you

19          read, the rest of my sentence was that very

20          often in a lot of police actions fails to take

21          into account you the person and what you're

22          doing, and instead we find just a total focus

23          on the officer.

24     Q    What other kinds of views are there besides

25          retroactive views?

119

```
 1    A    Oh, this wasn't a semantic issue about future
 2         reading or sideways reading or anything.  It's
 3         the point that in legal actions, whether in
 4         criminal court or in a civil matter such as
 5         this, the looking backwards which, of course,
 6         we know the Supreme Court specifically warns
 7         us about in writing different kinds of cases
 8         rather than looking in the instant, you know,
 9         moment of some action, the emphasis of my
10         writing here was it's often mainly or
11         exclusively about the officer's decision-
12         marking as opposed to the Homosapien with the
13         agency to do whatever it is that he or she
14         wishes, feels or is compelled to do in the
15         moment.  So it's -- I see where you're going
16         where you're looking for some other view that
17         I wasn't trying to make here about
18         retroactive.
19    Q    And I think you might just be reading a little
20         bit too far into it.  I'm trying to just
21         define the universe of things to ask about.
22         And so are there other -- maybe I should
23         phrase it this way.  Are there other sorts of
24         views besides retroactive views?
25    A    And I get it, and I think this is the problem
```

120

1          we've run into in a variety of aspects of

2          whether you're not in sync with my writing

3          style or I have bad grammar and don't express

4          myself well or whatever it is.  I'm not

5          writing about the views.  I'm writing about

6          are we looking at officer decision-making or

7          the person they're interacting with.

8     Q    The next -- the next part of that sentence is

9          you said, it says the view is often officer-

10          centered.  So when is it not officer-centered?

11    A    When we take into account the actions of the

12          individual the officer is interacting with.

13    Q    Got it.  Are there any other times that it is

14          not officer-centered?

15    A    We're taking into account other people who

16          aren't there.  Yeah, so the point -- and I

17          understand you're trying to make my sentences

18          bigger than what they are and you're reading

19          more into them than what are there.  The point

20          that I've stated now a couple of times is that

21          very often there's just a -- if Deputy House

22          decided to move his car because there were

23          some people in the street, all we're thinking

24          about is why did Deputy House move the car

25          instead of the people in the street.  So the

```
 1            point is to take the broader view and
 2            understand that it isn't just ever, you know,
 3            one individual in the interaction here.  You
 4            have to think about the various other people
 5            who might be in the interaction.
 6       Q    In that sentence it says that the view that
 7            we're speaking about, the retroactive view,
 8            "would fail to appropriately incorporate an
 9            unknown and dynamic thought process by the
10            subjects involved."  Do you see that?
11       A    I do.
12       Q    And subjects you stated earlier I think just
13            means individuals involved?
14       A    Yes, sir.
15       Q    So when you say that the individuals have an
16            unknown and dynamic thought process, what is a
17            dynamic thought process?
18       A    It's constantly moving, changing, evolving,
19            devolving.  Just the fact that each of us, you
20            know, have a lot going on in our thought
21            process.
22       Q    Does that differ at all from normal thought
23            processes?
24       A    No, that's pretty much referring to normal
25            thought process.
```

122

```
 1    Q    On page 20.  It's the next page.  It says at
 2         the beginning of this -- in the middle of the
 3         page.  It's the first full paragraph.  It
 4         says, "Deputies responding to interact with
 5         individual believed to be at risk of re-
 6         offending acted within the law, their
 7         training, and the policies of the Pasco County
 8         Sheriff's Office."  Do you see that?
 9    A    I do.
10    Q    What does "deputies responding to interact
11         with individuals," mean?
12    A    I think when I wrote that sentence I was
13         primarily thinking about home visits.
14    Q    And just focusing on the word responding.  Do
15         you know -- what are they responding to?
16    A    The continued picking at the word -- word
17         selection here, Mr. House.  Just going to,
18         heading to, set to, thinking to go to.  It's
19         not anything more than the word responding.
20         It's however it is that an officer or deputy
21         ends up interacting with somebody, who in this
22         sentence would be individuals.
23    Q    It sounds like responding might have a meaning
24         in sort of police circles that means those
25         things; is that -- is that right?
```

123

```
 1   A   Well, no, not as in like you're responding to
 2       a burglar alarm.  It isn't, yeah, intended to
 3       be someone called and then you responded,
 4       because I don't think the contention here is
 5       that plaintiff's called to have the deputies
 6       come.
 7   Q   And that's all I was trying to nail down is
 8       whether -- of those two meanings.  And then
 9       when you say in that sentence the deputies
10       that are responding, which deputies are you
11       referring to?
12   A   Any deputies.  I don't have any specific ones.
13       I don't know of any specific ones.
14   Q   And you're talking about any PSO deputy; is
15       that right?
16   A   Well, I think as I wrote this I was thinking
17       of whoever was assigned the duties to see the
18       individuals to be at risk of re-offending.  So
19       whoever defined within how the PSO, as you
20       mentioned came up with the individuals who
21       they were intending to interact with as
22       potential prolific offenders.  So whichever
23       deputies, or all of them -- again, deferring
24       to the fact witnesses on what is the current
25       schema on who's response.  Who is it that is
```

124

```
 1              supposed to, or is everybody supposed to.  It
 2              wasn't any more specific than that.
 3         Q    And then just jumping off of where you left
 4              off there.  When you say "individuals believed
 5              to be at risk of re-offending" in that
 6              sentence, are you referring to the individuals
 7              referred -- or sorry, excuse me.  Are you
 8              referring to the individuals designated by the
 9              PSO as, quote, "prolific offenders," end
10              quote?
11         A    Yes.  And it may be more expansive than that
12              because I know that within their approach.
13              And again, my whole point giving rise to this
14              of law enforcement agencies anywhere in the
15              U.S. do not have sufficient resources to
16              address all the things that might be expected
17              or desired.  I know that they filter down to
18              x-amount of individuals to try to devote
19              resources to.  So to the extent that there's a
20              narrower band of those who they think to be at
21              risk of re-offending most.
22         Q    On page 22 you say, "Once again, the Pasco
23              Sheriff's Office, through the Intelligence-Led
24              Policing program under examination here, made
25              efforts, relying on research and public
```

125

1          expectation, to address specific property

2          crimes within their community."  Do you see

3          that?

4     A    I do see that.

5     Q    What research did the PSO rely on?

6     A    The variety of things that were cited within

7          their manuals I know would be a component of

8          that, and I just don't recall among either two

9          or three versions of the manual, or I may also

10         be thinking of the three page prolific

11         offender definition.  But in the -- in the

12         development -- or ongoing, I should say,

13         evolution, as well as the development of the

14         ILP and whatever all they do, which I know

15         exceeds I think just the one thing we're

16         talking about today.  I'm just referring to

17         their research.  So beyond what's cited in the

18         documents I've cited to it would be whatever

19         the fact witnesses speak to.

20    Q    And as you sit here today do you know if any

21         of that research is peer reviewed?

22    A    Well, certainly the documents that they refer

23         to with Professor Ratcliff.  And I'm just --

24         again, unless we have those here and could

25         check them, I'm not sure what other items are

126

1          in their referred list.

2     Q    Also in that sentence it says they relied --

3          it says "relying on research and public

4          expectation."  Do you see that?

5     A    Yes.

6     Q    How do you know that they relied on public

7          expectation?

8     A    Well, this is for me, once again, a broader

9          understanding of being involved in American

10         policing for more than 40 years and media

11         expectations or the -- the articulation of

12         public expectation through media, through

13         advocacy groups, just in all ways through the

14         election of public officials, etcetera.  So

15         not pointing to like a survey that I'm aware

16         of or sum specific one time forum of public

17         expectation.  So that's -- that's a broad

18         general statement of what the public expects.

19    Q    And how would you know if PSO, or any other

20         agency for that matter, was not operating in

21         reliance on public expectation?

22    A    Again, I appreciate the question.  I would

23         find that almost an other worldly alien

24         language that you're speaking about an elected

25         public official, a sheriff, funded by another

127

```
1              group of elected public officials, the County

2              Commission, being elected and re-elected and

3              continuing on if there were no public

4              expectation that you are working to deter

5              crime.  If something's presented to me which I

6              did not see in plaintiff expert report that

7              says the public doesn't expect crime

8              deterrence I'm open to it, and that would be

9              one of those things that I would be -- I would

10             say, well, we found one county out of 3,000 or

11             so in the U.S. that doesn't have a public

12             expectation to deter crime and I -- I'd look

13             at my opinions again.  But I'm not -- I'm not

14             looking -- I'm not relying, like I said, on

15             someone coming in and polling 560,000 people

16             to see if there are some of them that don't

17             want crime prevention.

18     Q      The next -- the next paragraph begins with, "A

19             review of programs recorded by the

20             International Association of Chiefs of Police

21             under the rubric of focused deterrence speak

22             exclusively to violent personal crime."  Do

23             you see that?

24     A      I do.

25     Q      Is this a complete review of programs?  Let me
```

128

```
 1            rephrase that.  Are there any programs

 2            recorded by the International Association of

 3            Chiefs of Police under the rubric of focused

 4            deterrence that are not listed here in your

 5            report?

 6    A     Well, as I said, it's a sampling of programs.

 7            Sampling indicating it's not an exhaustive

 8            list.

 9    Q     Got it.  So, yes.  So the list that you

10            provide here is not exhaustive?  That's all --

11            that's ---

12    A     Yes, sir.  Yes, sir.

13    Q     Are you aware of any police department that

14            uses, quote, "focused deterrence," end quote,

15            on property crime besides the PSO?

16    BY MR. POULTON:

17            Object to the form.

18    BY THE DEPONENT:

19            Well, this I know will keep -- and it already

20            has, but will return to us time and time again

21            because there's no copyright or claim or

22            definition that is only focused deterrence and

23            there's only one brand of focused deterrence.

24            So yes, 18,000 separate law enforcement

25            agencies use deterrence on property crime.
```

129

<u>DIRECT EXAMINATION RESUMED BY MR. HOUSE:</u>

1

2   Q   Sure.  Let me use this list that you provided

3       here because clearly the International

4       Association Chiefs of Police is using a

5       definition or a rubric of focused deterrence

6       here.  So let's use whatever you reviewed for

7       the report.  So using that definition, are you

8       aware of any police departments that used

9       focused deterrence not on violent personal

10      crime?

11  A   Well, using this report that I've cited from

12      the International Association of Chiefs of

13      Police what I noted there was that the

14      sampling of programs comes after pointing out

15      that the focused deterrence speaks exclusively

16      to violent personal crime, not to property

17      crimes.

18  Q   Let's go to page 27.  It says -- let's see

19      here.  "A person, even a criminologist, in a

20      report to the court may not simply start

21      naming new categories thought of to imply

22      legitimate scientific method."  Do you see

23      that?

24  A   No, but I'm working to find it.  Yes, I've got

25      it.

130

1   Q   I have it highlighted on my screen.

2   A   It's too small.  Go ahead.

3   Q   So and is it -- do you have -- well, is it

4       your testimony that plaintiff's expert report

5       in this matter in this matter simply name --

6       excuse me, simply started naming new

7       categories?

8   A   My testimony as pointing at what I've written

9       in the report is that nobody, not even a

10      criminologist, can just start adding to the

11      list of adverse childhood experience, which is

12      something that actually has its basis in the

13      study from the CDC and Kaiser Permanente and

14      just interpolating or saying that being

15      questioned by police now all of a sudden is a

16      new category in adverse childhood experiences.

17   Q   Sure.  So did Professor Kennedy's report say

18      that -- or let me put it this way.  Did

19      Professor Kennedy's report add to the list of

20      adverse childhood experiences?

21   A   I'm not here to do tit for tat with an expert

22      or another criminologist and I've tried to

23      make that clear in the report.  I'm not seeing

24      anything from the CDC that says they want to

25      take something from the report in this matter

131

```
 1              and add that now to the list of accepted

 2              adverse childhood experiences.

 3      Q    Sure.  Let me -- let me phrase it this way.

 4              So, I mean, I believe you testified earlier,

 5              but correct me if I'm wrong, that you reviewed

 6              Professor Kennedy's report in this case?

 7      A    I did.

 8      Q    So having reviewed his report did he add any

 9              categories of adverse childhood experiences to

10              the list that you just referred to from the

11              CDC?

12      A    I can't recall verbatim, and how could I, the

13              specific words that Professor Kennedy used.

14              We'll certain defer to the court's reading on

15              some of the things he did say in that section

16              that regarded adverse childhood experiences.

17              If you want to pull it up I'm sure I can

18              scroll to it and find the parts that spoke to

19              that.

20      Q    Sure.  But a you sit here today nothing's

21              coming to mind that he added -- or, excuse me,

22              as you sit here today there are no categories

23              that are coming to mind that he added to

24              adverse childhood experiences; is that right?

25      A    No, that's not right.  David, I hope you're
```

132

```
 1           paying close attention listening here.  Yeah,
 2           the wording he utilized within the report
 3           seemed to indicate that some activities within
 4           law enforcement were adverse childhood
 5           experiences.  How well the court raised that
 6           that's an expansion or an attempt at expansion
 7           of an established list by the CDC and others,
 8           that'll be for the court to decide.
 9     Q     And what in particular were those police
10           activities that you were just referring to?
11     A     As I testified to, I know Professor Kennedy's
12           report was similarly somewhat lengthy, so we'd
13           have to pull it up and try to look and find
14           those things.  But as I said, it's in the area
15           where the commentary regarding adverse
16           childhood experiences was.  My memory test of
17           what someone else wrote, we saw that it was
18           difficult to take things that I wrote years
19           ago in 300 page books and 30 page articles and
20           try to ---
21     Q     Sure, yeah.  I mean, and I'll just -- you
22           know, maybe one more question might help jog
23           your memory, although maybe not.  But I guess
24           one way of thinking about it is, so it sounds
25           like from your report that you do have in mind
```

133

```
 1            a set of categories of commonly accepted
 2            adverse childhood experiences; is that right?
 3     A      I've referred to the study from Centers for
 4            Disease Control and Kaiser Permanente.  I deal
 5            with and encounter ACE in other cases and in
 6            other settings, so yes.
 7     Q      And then again, just as you sit here today can
 8            you think of any particular way in which
 9            Professor Kennedy's report differs from the
10            list in those sources?
11     A      Yes.  As I repeatedly testified to, yes.
12     Q      And which -- what is -- what is one of those
13            ways?
14     A      And as I repeatedly testified to unless you
15            pull the document up, rather than have me do a
16            memory test out of the thousands and thousands
17            and thousands and thousands of pages in this
18            case as to what specifically how do you phrase
19            some particular thing, I don't remember.  I'm
20            sure at trial we can bring the actual document
21            out since you've seem loath to do so and use
22            our time here to scroll through and find it.
23            I don't know.
24     Q      So you -- yeah, that is fine.  We'll move
25            along.  On page 28 it says -- at the bottom of
```

134

1          page 28 it says, "I do not believe a faithful

2          reading of the Intelligence-Led Policing

3          manual in its entirety and in context supports

4          Professor Kennedy's assertion."  Do you see

5          where it says that?

6     A    I do.

7     Q    What assertion are you referencing here?

8     A    Well, let's try to figure it out together.

9          Obviously it would have been something that

10         came before that sentence you plucked out

11         there.  So let's take a look at the most

12         recent thing before that.  That if and as the

13         agency utilizes as a component of their

14         program knowledge about adverse childhood

15         experiences that -- and that's, of course, in

16         quotes from Professor Kennedy, that that

17         knowledge is used to target children as

18         destined to a life of crime.  And yes, I go on

19         from there to point out that in that 80 some

20         pages manual, whichever is the current one,

21         and/or the section that just simply deals with

22         ACE, that in my view the more faithful broader

23         reading doesn't support that.

24    Q    Moving on to page 29.  You say, "The use of

25         home visits by social workers, probation

135

| | | |
|---|---|---|
| 1 | | officers, parole officers, and others who |
| 2 | | maintain a caseload to explore an individual's |
| 3 | | activities nothing new.  There remain |
| 4 | | circumstances in which staffing is not |
| 5 | | consistent to effectively carry out such |
| 6 | | visits consistently.  Providing accountability |
| 7 | | and monitoring of those assigned such check |
| 8 | | ins are still useful to many."  Do you see |
| 9 | | that? |
| 10 | A | I do. |
| 11 | Q | So I believe you testified earlier that |
| 12 | | probation officers do home visits? |
| 13 | A | Yes. |
| 14 | Q | And I think this sentence is saying that |
| 15 | | social workers also perform home visits; is |
| 16 | | that right? |
| 17 | A | That's correct. |
| 18 | Q | What do social workers do during their visits? |
| 19 | | BY MR. POULTON: |
| 20 | | Object to the form. |
| 21 | | BY THE DEPONENT: |
| 22 | | Well, speaking on behalf of colleagues who do |
| 23 | | social work, to include guardian ad litem, |
| 24 | | etcetera, folks who are tasked by the court as |
| 25 | | representatives for juveniles, they do go to |

136

```
 1              homes to determine circumstances in which

 2              children are living.  Child protective

 3              investigators from around the country do the

 4              same thing, where there are family

 5              circumstances or individual circumstances

 6              deemed to have a level of risk that requires

 7              interacting with both the individual who may

 8              be at risk, as well as the family members and

 9              others who may be at or around the home.

10   DIRECT EXAMINATION RESUMED BY MR. HOUSE:

11   Q    And what do probation officers do during their

12              home visits?

13   A    They do a wide variety of things that maybe

14              also assess the state of what the

15              circumstances are in the home.  Interact with

16              people who are at the home, question and speak

17              with the probationer in regards to his or her

18              current pursuits, employment, adhering to the

19              orders of the court, etcetera.

20   Q    Now, in that first sentence where you say that

21              the use of home visits, and you list a variety

22              of officers, to explore an individual's

23              activities is nothing new.  My question is are

24              the prolific offender checks that we spoke

25              about earlier, are you including those in your
```

1        statement of home visits?

2   A    Yes.

3   Q    And so where else have you seen prolific

4        offender checks performed?

5   A    Starting in probably the 1970s the use of

6        repeat offender type programs.  I mentioned

7        this earlier, sometimes this was right out of

8        prosecutors offices, sometimes out of larger

9        law enforcement agencies that had the

10       resources to actually pursue this kind of

11       program would visit with offenders once they

12       were no longer under an incarcerated setting

13       with -- with again the idea decades ago that

14       as we understand in criminology and just basic

15       criminal justice that there is minority of

16       offenders who are responsible for a majority

17       of criminal offenses.

18  Q    And so can you name an agency from -- you

19       know, I think you believe that -- I think you

20       testified in the 1970s, that performed

21       prolific offender checks?

22  A    I'm not sure, but as much a Professor Kennedy

23       refers to like Professor Mark Moore, Professor

24       Mark Kleiman and others sitting in the classes

25       at the Kennedy school and talking about these,

138

```
 1              and that's 30 years ago, in regards to how
 2              these types of programs work and whether there
 3              was the resources, you know, for those, and
 4              the idea about why focus on things that --
 5              economists would call it the parador rule.
 6              This idea that the large amount of some
 7              phenomena, in this case crime, is committed by
 8              the smaller number of individuals, these --
 9              however you want to put them, repeat
10              offenders, prolific offenders.  The reason
11              that, as you're aware, legislatures around the
12              country do enhanced penalties for repeat
13              offenders in, again, an effort at individual
14              -- let's call -- I'll call it today focused
15              deterrence.
16         Q    Later on in the same page you have a statement
17              that says, "Regardless, empirical evidence
18              does not support a categorical contention that
19              of 'the failed history of attempts to prevent
20              crime and improve supervisee outcomes through
21              intensive probation and parole supervision,
22              or,' quote, 'intensive supervision programs,'"
23              end quote.  Do you see that?
24         A    I must have been on the wrong page or else
25              my ---
```

139

| | | |
|---|---|---|
| 1 | Q | Page 29 -- midway through page 29, the bottom |
| 2 | | of the first paragraph. |
| 3 | A | Oh, I see it. |
| 4 | Q | So my question is what empirical evidence are |
| 5 | | you referring to in that sentence? |
| 6 | A | Well, let's see if we can -- I'm trying to see |
| 7 | | if there's a specific, you know, document. |
| 8 | | Because again, my statement covers more than |
| 9 | | 30 years of teaching college and university |
| 10 | | courses in regards to these things.  I'm sure |
| 11 | | what the courts experience, which will come to |
| 12 | | bear as well, that home visits which are being |
| 13 | | used today, as in literally right this moment, |
| 14 | | no, I can't tell you what agency is currently |
| 15 | | visiting someone's home near you.  The fact |
| 16 | | that this -- this is still a mainstay of, as I |
| 17 | | said, individuals who carry a caseload to |
| 18 | | determine some accountability issues, |
| 19 | | probation, parole program such as this |
| 20 | | prolific offender one or used innovatively |
| 21 | | such as this.  So specific document, once I |
| 22 | | see it, you know, cited here in text.  And I |
| 23 | | thought -- I thought we did, but --- |
| 24 | Q | Yeah, I mean, I see a citation, but I believe |
| 25 | | footnote 52 is just to Professor Kenney's |

140

1          report; is that right?

2     A    It looks as though that was just to his

3          report.  But then I see -- no, wait a minute.

4          That may go on -- well, then it goes on right

5          below where you were -- the next paragraph

6          where it talks about the one from the National

7          Institute of Justice to look at probation and

8          parole home visits.

9     Q    Yeah, I believe -- well, and I can -- I

10         suppose I can ask about that.  You mention

11         knock-and-talks ---

12    A    Well, that ---

13    Q    --- at the beginning of that paragraph; right?

14    A    Yeah, yeah.  No, I was saying that is -- that

15         program is one of the ones -- or that report

16         was one of the ones I was looking at.

17    Q    So at least as far as we're talking about how

18         you use it in your report, knock-and-talks are

19         a method of probation or parole supervision;

20         is that -- is that right?

21    BY MR. POULTON:

22         Object to the form.  Go ahead.

23    BY THE DEPONENT:

24         Knock-and-talk, much like any kind of two

25         words put together, like focused deterrence or

141

1        home visit, can be defined by whatever agency

2        any way they want.  Sometimes you'll see this

3        as to just talk to someone who's under some

4        kind of supervision, or it can be something

5        like knock on the door and ask if you're, you

6        know, making meth out -- out back.  Would you

7        like to talk to us about that.  Are you

8        growing marijuana in your -- in your bedroom.

9        So, you know, it's the point that there's

10       different ways, given that the majority of

11       crime occurs out of sight of the public or law

12       enforcement, that there are lawful ways to try

13       to gain information from individuals, and that

14       might include knocking on the door and asking

15       them.

16   DIRECT EXAMINATION RESUMED BY MR. HOUSE:

17   Q    So and I think my question was trying to get

18        at is the paragraph beginning with the knock-

19        and-talk sentence that we just reviewed, that

20        has some studies in it, as you point out, from

21        the National Institute for Justice -- of

22        Justice; is that right?

23   A    That -- that was certainly one of them, yes.

24   Q    And then the studies that the National

25        Institute of Justice -- or the National

142

1          Institute of Justice study mentioned in that

2          paragraph refers, is a lot of the empirical

3          evidences that you refer to at the bottom of

4          the prior paragraph; is that right?

5     A    That would be one of them.

6     Q    That -- that's what I was getting at.  In that

7          sentence where you say right after the first

8          -- that is the second sentence of the -- of

9          that last paragraph.  It says, "It is not

10         uncommon in the wake of a consensual knock-

11         and-talk encounter or someone to claim that an

12         interaction with an officer was unwanted."

13         And I guess my question is how do you know

14         that this is not uncommon?

15    A    Well, I've certainly encountered that

16         anecdotally myself as a law enforcement

17         officer, but certainly in 40 years of readings

18         and trainings and education and teaching this,

19         that's one of the various ways that we might

20         encounter someone who would like to have

21         something suppressed that went against their

22         self-interests that perhaps occurred after the

23         fact.

24    Q    And because I don't really -- you know, I'm

25         not trained in this.  Is there a -- is

143

1          consensual here a -- well, let me ask it this

2          way.  When would an officer determine that a

3          knock-and-talk is consensual?

4     BY MR. POULTON:

5          Object to the form.

6     BY THE DEPONENT:

7          The discretion that an officer utilizes to

8          determine consent is certainly situational,

9          and based on, you know, what the circumstances

10         are you're actually seeking specific -- you

11         know, and here we're getting into talking

12         about potentially criminal matters and whether

13         or not someone is providing any statements

14         that are done consensually, or at least with

15         no expectation of being provided a warning of

16         constitutional rights before making some

17         statement against self-interest.  So

18         consensuality.  If you're driving by in your

19         squad car and pull up next to me on the

20         sidewalk and say can I ask you a question and

21         I agree, that's consensual.

22    DIRECT EXAMINATION RESUMED BY MR. HOUSE:

23    Q    So when you say agree, you know, let's just

24         say hypothetically the person says the words I

25         agree.  In your mind that makes that encounter

144

```
1          consensual; is that right?
2      A   I might just grunt and raise my chin at you.
3          I might stare blankly at you.  I might adopt a
4          disinterested view but not walk away.  I mean,
5          that's -- it's almost literally limitless as
6          far as -- as far as that goes, besides me
7          going, you know, I don't wish to have the
8          conversation and walk away from you.
9      Q   Got it.  So it could take -- and just to get
10         the testimony clear.  It could take any number
11         of the forms -- let me rephrase that.  Consent
12         could take any number of the forms that you
13         just listed in that prior answer; is that
14         right?
15     A   Certainly that's -- that's a sampling of how
16         it might be interpreted that someone consents
17         to speak or listen.
18     Q   Let's see.  On page 30 -- bottom of page 30 to
19         31 there's a couple of bullet points.  It says
20         -- it says, "From the study's survey," midway
21         on page 30 and I just want to be clear.  We're
22         talking -- when you say "this study" there
23         you're talking about the National Institute of
24         Justice study; is that right?
25     A   I think that's right.  Let me scroll down 54.
```

145

         "Evaluating the Impact of Probation and Parole
1

2        Home Visits from 2019."

3    Q   Oh, that's the study.  I'm sorry.  So -- and

4        that's from Abt Associates; is that right?

5    A   Abt Associates, yes.

6    Q   What is Abt Associates?

7    A   Well, Abt is a human being.  It is a

8        consulting group that gets a variety of

9        governmental grant work type things.  Maybe we

10       can compare it to RAND, or maybe that's too

11       grand to refer to RAND.  But it was a study

12       done, as you see here, about evaluating home

13       visits specifically done a couple of years

14       ago.

15   Q   And my understanding of that study is that it

16       was reviewing home visits in the context of

17       probation and parole; is that -- is that

18       correct?

19   A   That was the primary thrust of that

20       evaluation, yes.

21   Q   And looking on to page 34.  On page 34 at the

22       top you say -- right before you start listing

23       what I believe we established earlier were

24       your opinions and conclusions you say, "Based

25       on a reasonable degree of law enforcement and

```
 1              criminal justice certainty, I find that," and

 2              then you list a number of things.  Do you see

 3              that?

 4     A    I do.

 5     Q    What is law enforcement certainty?

 6     A    The type of phraseology that every single

 7              federal report in this domain I've ever seen

 8              as listed there, as so mine over the last 30

 9              years.

10     Q    Sure.  And what is it -- I'm not familiar with

11              the term.  What does it mean?

12     A    Okay, yeah.  That's interesting that you're

13              not familiar with the term as this may be the

14              first federal report for you, this is where

15              typically it has an assurance or attestation

16              to a court that this is based upon empirically

17              as opposed to emotive advocacy, and looking at

18              those things that I refer to in the very

19              beginning of the report where it is looking,

20              to the extent we can objectively look at

21              something based on those empirical documents

22              and what's actually trained, what's actually

23              been accepted, what's actually not been

24              contested under law and found to be unlawful,

25              etcetera.  So the certainty with which my
```

147

1           evaluation, my assessment, my analysis of some

2           matter under review is based on documentable

3           objective information.

4      Q    Sure.  And maybe -- maybe just to be clear,

5           maybe I can ask it this way.  Is law

6           enforcement certainty different from normal

7           certainty?

8      A    The -- whether it's term of art counselor in

9           -- well, maybe you're not the one to answer if

10          you've never seen this before.  Why every

11          expert uses something that has the degree of

12          certainty language in it is something I can

13          let you and Mr. Poulton discuss.  I just know

14          that that's in all reports and is meant to

15          attest, as I said, to the court, that this

16          isn't based on whim or my opinion, or I just

17          thought this up or I feel or I believe or I

18          think a certain way.  The same sort of thing.

19          I would never allow students to put into

20          research papers and just say I feel this is

21          awful, I feel this is fantastic.  This is

22          based on the documentations and information

23          I'm able to review and look at.

24     Q    Sure.  And how does law enforcement certainty

25          differ from criminal justice certainty?

148

```
 1    A    The broader inclusion then of correctional
 2         methodologies, theoretical methodologies.
 3    Q    And then moving on to page -- well, later on
 4         page 34 on finding number two.  You say --
 5         finding number two -- or I'll say opinion and
 6         conclusion number two.  Excuse me.  Well,
 7         should I call them findings, Professor Hough?
 8         Is that accurate?
 9    A    Opinion would probably be most appropriate.
10    Q    We'll do opinion number two.  It says -- you
11         stated that, "The Intelligence-Led Policing
12         program of the Pasco Sheriff's Office is well
13         conceived, staffed and operated pursuant to an
14         agency-wide philosophy and manual.  Do you see
15         that?
16    A    I do.
17    Q    How do you know that the program is well
18         conceived?
19    A    The thoroughness and comprehensiveness with
20         which the manual is put together and things
21         that's covered.
22    Q    And when you say the program's operated
23         pursuant to an agency-wide philosophy and
24         manual, does the programs operation to which
25         you are referring to include the prolific
```

149

1           offender text?

2     A     It does.

3     Q     Does it include making a list of prolific

4           offenders?

5     A     Somewhere within, again, the most recent,

6           which I think was the 2018, or the other

7           manuals as the program has evolved, I think

8           included, as I recall, the part of the

9           methodology.  But then earlier I also

10          testified and referred to the three page

11          document in regards to that.  So again, I'll

12          defer to, at this moment today, what's in

13          place there.

14    Q     On finding number three on that page it says,

15          "The Pasco Sheriff's Office appropriately

16          utilized traditional approaches and innovative

17          methods to influence offenders, potential

18          offenders, and criminogenic conditions that

19          the agency can impact."  Do you see that?

20    A     I do.

21    Q     So when you say that the PSO utilizes

22          traditional approaches what are those

23          traditional approaches?

24    A     Very often just as simple as responding to

25          calls for service, but then also the ways in

```
 1              which law enforcement agencies may reach out

 2              to the community through public service

 3              announcements, press releases, the manner in

 4              which in addition to response to calls for

 5              service that officers instructed to patrol.

 6        Q     And then when you say innovative approaches,

 7              why are the innovative -- excuse me.  What are

 8              the innovative approaches that you are

 9              referring to?

10        A     Initially the ones that I listed early in the

11              report that we talked about this morning from

12              -- from the agencies website.

13        Q     Are there any other approaches besides -- and

14              I'm talking about in general, not that the PSO

15              uses.  But are there any other approaches

16              besides either traditional or innovative

17              approaches?

18        A     Those two rubrics, traditional and innovative,

19              are in no way meant to be exhaustive as the

20              only two categories.  So without -- well, I

21              don't really care if I sound like a broken

22              record.  With 18,000 separate law enforcement

23              agencies you -- you can't get a hundred agency

24              administrators in a row and necessarily have

25              them agree on its community oriented policing,
```

151

1          and this is something that many of us have

2          struggled with and been well aware of for more

3          than 30 years.  So sure, categories are what,

4          you know -- well, you're not a chief of police

5          or sheriff, but if you were, that you might

6          want to come up with today.

7     Q    Sure.  What are those -- what are some of

8          those other categories of approaches?

9     A    You know, as I said, that's -- that's -- you

10         know, I'm not a sheriff or a chief at the

11         moment either.  So 18,000 agencies and what

12         those might be.  If I sitting here with a

13         migraine come up with three of them that's --

14         that's not going to be -- I know, we're back

15         to where you think I'm trying to defend or not

16         versus what I know my job is.

17    Q    Well, can you -- can you just, I guess, just

18         the -- is there another category that's

19         missing here or that exists in the world that

20         you can name besides traditional innovative?

21    A    Well, I appreciate you asking the same

22         question in a somewhat different way, and I

23         just say those two that you named, traditional

24         and innovative out of, you know, plucking some

25         things here, would not be an exhaustive list,

152

 1          and that may not even be the right language.

 2          So there are methods.  (Inaudible) foot

 3          patrol.  You could be doing foot patrol.  You

 4          could be doing airplane (inaudible).  You may

 5          be in a suburban environment and (inaudible)

 6          walking patrol (inaudible).  So, you know, and

 7          then we get caught up in (inaudible).  And as

 8          I (inaudible) community policing which would

 9          be partnering with all those who you can with

10          or be partnered with (inaudible) to try to do

11          (inaudible) or agents administrators or

12          (inaudible) in some county or city.  So it's

13          like trying to claim that there's (inaudible)

14          level of deterrence.  (Inaudible), you know,

15          there's four and here's (inaudible).  We

16          talked about the term innovative earlier today

17          and, you know, my (inaudible) ---

18     BY MR. POULTON:

19          You broke -- he froze on me.

20     BY MR. HOUSE:

21          Yeah, he was breaking up the whole time on

22          that answer.  And there's no -- there's no

23          video anymore as well.

24     (OFF THE RECORD)

25     DIRECT EXAMINATION RESUMED BY MR. HOUSE:

153

```
 1    Q    So we were at -- I think I asked you about

 2         approaches.  Let's go back to that same

 3         sentence in finding number three.  Let's see

 4         here.  When you use the term "potential

 5         offenders" ---

 6    A    Yes, sir.

 7    Q    What do you mean by that?

 8    A    Nothing more than someone who may offend or

 9         re-offend.

10    Q    What do you mean by criminogenic conditions?

11    A    Those can be anything from environment of the

12         neighborhood where someone lives or works or

13         goes to school or hangs out to conditions

14         within the home in terms of the actual social

15         interactions with -- social interactions with

16         relevant others, peers, whether those are

17         students or perhaps just friends or

18         acquaintances.  So it covers, you know, both

19         the social world of the individual as well as

20         the physical.

21    Q    And then on number five you say that, "STAR

22         Teams' actions in this case were objectively

23         reasonable and appropriate and in accordance

24         with Constitutional guidance, state law, case

25         law policy, training and law enforcement
```

154

```
1            practices."  Do you see that?
2       A    Yes.
3       Q    What makes an action objectively reasonable?
4       A    Those that in context of law enforcement would
5            be ones that the majority of (inaudible)
6            following the same type of behavior.
7       Q    And then what makes an action by a deputy
8            appropriate?
9       A    Appropriate in this context would refer to
10           doing that which not only is objectively
11           reasonable but is according to training and
12           what the guidance of an agency through policy,
13           procedures, training would be.  So appropriate
14           in that sense.
15      Q    And what makes a deputy's actions in
16           accordance with Constitutional guidance?
17      A    Well, we're aware that -- again, without
18           stepping on the toes of the court or a trier
19           of fact, that the laws in each state must
20           follow the Constitution and that agency policy
21           cannot ignore or violate Constitutional
22           specific called out mandates or that from case
23           law.  So that -- that's an ongoing assessment
24           of agency policy.
25      Q    And so your opinion here in number five is
```

155

```
 1              that the actions by deputies did not violate

 2              Constitutional case law; is that accurate?

 3       A      Well, as I said, without -- since I'm not in a

 4              position to make legal pronouncements, but

 5              what we do both in teaching in the university

 6              classroom, as well as training in the academy

 7              classroom has to do very much with making

 8              officers and students aware of certain

 9              Constitutional requirements or conditions and

10              admonishing them the agencies can't create

11              policy that would be in violation of those

12              Constitutional standards.

13       Q      On page -- the next page 35.  Finding number

14              six says, "Plaintiff asserts that any

15              reference to the term," quote, 'focused

16              deterrence'", end quote, "or Plaintiff's

17              expert's writings equates to a wholesale

18              adoption of the exact approach used initially

19              30 years prior by Plaintiff's expert."  Do you

20              see that?

21       A      I do.

22       Q      Now, when you say "Plaintiff describes" and

23              "Plaintiff asserts" in that finding, because I

24              think it says -- excuse me.  So the part that

25              I read said "Plaintiff asserts."  But earlier
```

1          on in that same finding I think it says

2          "Plaintiff describes."  Do you mean

3          Plaintiff's expert witness asserts?

4     A    Yes.  Professor Kennedy.

5     Q    And then are you -- again, as you sit here

6          today can you recall where in Professor

7          Kennedy's report that asserted that a

8          reference to the term focused deterrence

9          equates to a wholesale adoption of the exact

10         approach initially 30 years prior by him?

11    A    Well, since that's my sentence and not

12         Professor Kennedy's sentence, this is part of

13         the summation on my part of how I read his

14         report to the extent that if it's not his

15         brand of focused deterrence then the PSO

16         should not utilize that term.

17    Q    And there's just -- just for the record,

18         there's no citation to Professor Kennedy's

19         report in that finding, is there?

20    A    Yes, in six.

21    Q    Oh, there is?  Is finding six where's the

22         citation to Professor Kennedy's report?

23    A    Plaintiff's expert's writings.

24    Q    Oh, excuse me.  I'm sorry.  So what I mean is

25         a citation to a page in his report.

157

| | | |
|---|---|---|
| 1 | A | Oh, a specific page?  Well, obviously neither |
| 2 | | you nor I see one there.  But let's be clear |
| 3 | | that's what I'm referring to. |
| 4 | Q | You're referring to his report; right? |
| 5 | A | I am. |
| 6 | Q | Page seven -- or, excuse me, finding seven on |
| 7 | | the -- I guess it's sort of the next page.  We |
| 8 | | were straddling pages before.  It says, |
| 9 | | "Neither the ILP manual nor written policies |
| 10 | | direct deputies on how to conduct a prolific |
| 11 | | offender check."  Do you see that? |
| 12 | A | I do. |
| 13 | Q | So based on your review of the documents does |
| 14 | | that -- does that -- does that mean that the |
| 15 | | PSO deputies were operating outside of the PSO |
| 16 | | policy when they conducted the prolific |
| 17 | | offender checks? |
| 18 | A | No, I certainly didn't say that.  My |
| 19 | | independent recollection as I, you know, wrote |
| 20 | | this there's -- as would be typical in a |
| 21 | | manual or policy, there's not necessarily a |
| 22 | | step-by-step job task analysis. |
| 23 | Q | And when you say typical you mean policies do |
| 24 | | not normally contain those step-by-step |
| 25 | | analysis; is that right? |

158

| | | |
|---|---|---|
| 1 | A | For a policy, that's correct. |
| 2 | Q | But if I understand your testimony that |
| 3 | | doesn't mean that the PSOs were operating |
| 4 | | outside of the policy when they performed the |
| 5 | | checks even if there wasn't a step-by-step on |
| 6 | | how to perform the checks; is that right? |
| 7 | A | No, that's not what I was saying. |
| 8 | Q | So let me -- I'll just reask it to be clear |
| 9 | | because I thought -- so I asked if you |
| 10 | | contended that PSO deputies were operating |
| 11 | | outside of the policy and I believe your |
| 12 | | testimony was no, that's not what you were |
| 13 | | contending.  And so my question is -- or was |
| 14 | | -- well, your answer then said that it was |
| 15 | | typical for policies not to have step-by-step |
| 16 | | instructions.  Is that accurate? |
| 17 | A | That's true. |
| 18 | Q | So my question to you is that even though the |
| 19 | | PSO deputies did not have step-by-step |
| 20 | | instructions on how to perform those checks, |
| 21 | | it doesn't mean that they were operating |
| 22 | | outside of a policy when they did that; is |
| 23 | | that right? |
| 24 | A | Well, I think that's right because I don't |
| 25 | | know what of thousands of actions we're |

159

1          talking about.

2     Q    Sure.  And I'm just talking about performing

3          the checks at large, not any individual

4          instance of a check.  So assuming that, is it

5          true that, again, just because there aren't

6          step-by-step instructions in the policy they

7          might still be acting within that policy?

8     BY MR. POULTON:

9          Object to the form.

10    BY THE DEPONENT:

11         My understanding of the manual and the policy

12         is that offender checks -- prolific offender

13         checks is a component of the program.

14    BY MR. HOUSE:

15         Well, we're at 1:45, Tom, so ---

16    BY MR. POULTON:

17         Yes.

18    BY MR. HOUSE:

19         I mean, I don't have -- I don't have much more

20         of a ---

21    BY MR. POULTON:

22         I mean, I can't.  I'm sorry.  I wish I

23         could ---

24    BY MR. HOUSE:

25         I know.  I know it's ---

160

1    BY MR. POULTON:

2         I wish we could, but I got to go.

3    BY MR. HOUSE:

4         We'll wrap this up on Wednesday at 11:30.

5    (PLAINTIFF'S EXHIBITS A, B, C, D, E MARKED)

6    (PROCEEDINGS IN THE ABOVE-ENTITLED MATTER WERE

7    ADJOURNED AT APPROXIMATELY 1:46 P.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

161

## CERTIFICATE

I, <u>Mai-Beth Ketch, CVR-M, CCR,</u> Court Reporter and Notary Public, do hereby certify that the foregoing <u>160 pages</u> are an accurate transcript of the deposition of <u>Dr. Richard M. Hough, Sr.,</u> taken by me and transcribed under my supervision.

I further certify that I am not financially interested in the outcome of this action, a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel.

This is the 5th day of May, 2022.

MAI-BETH KETCH, CVR-M, CCR

Notary Public No.:  19981410006

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)