UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES, III,

  Plaintiffs,

vs.               Case No.: 8:21-cv-00555-SDM-CPT

CHRIS NOCCO, in his
official capacity as
Pasco County Sheriff,

  Defendant.
_____/


PROCEEDINGS:      Deposition of
                     SHELLEY GARDNER


DATE:             January 11, 2022


TIME:             1:39 p.m. - 4:55 p.m.


PLACE:           New Port Richey Executive Suites
                     8520 Government Drive, Suite 1
                     New Port Richey, Florida


REPORTED BY:      Judy Anderson, Court Reporter
                     Notary Public
                     State of Florida at Large


ANDERSON COURT REPORTING
P.O. Box 2426
Dade City, FL 33526-2426
Judy@andersoncourtreporting.com
(352) 567-5484

```
 1    APPEARANCES:

 2    ROBERT E. JOHNSON, ESQUIRE (Appearing via telephone)
      Institute for Justice
 3    16781 Chagrin Boulevard, Ste. 256
      Shaker Heights, OH 44120
 4    703-682-9320
      Rjohnson@ij.org
 5         Counsel for Plaintiffs

 6    CAROLINE GRACE BROTHERS, ESQ.
      Institute for Justice
 7    901 N. Glebe Road, Ste. 900
      Arlington, VA 22203
 8    703-682-9320
      Cgbrothers@ij.org
 9         Co-counsel for Plaintiffs

10    ARI S. BARGIL, ESQUIRE
      Institute for Justice
11    2 S. Biscayne Blvd., Ste. 3180
      Miami, FL 33131
12    305-721-1600
      Abargil@ij.org
13         Co-counsel for Plaintiffs

14    THOMAS W. POULTON, ESQUIRE
      Debevoise & Poulton, P.A.
15    1035 S. Semoran Blvd., Ste. 1010
      Winter Park, FL 32792-5512
16    407-673-5000
      Poulton@debevoisepoulton.com
17    Holborn@debevoisepoulton.com
      Cook@debevoisepoulton.com
18         Counsel for Defendant

19

20

21

22

23

24

25
```

1                         I N D E X

2                                              Page

3    Direct Examination by Mr. Bargil          5
     Stipulation                             119
4    Certificate of Oath                     120
     Certificate of Reporter                 121
5    Deponent's Signature Page               122
     Errata Sheet                            123

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      **E X H I B I T S**

                                        Page
2

1 - MPR Shelley Gardner                       9
3

2 - ILP Manual                              11
4

3 - 8-25-20 Email                           36
5

4 - ILP Slides                              53
6

5 - Florida Statutes Chapter 874            61
7

6 - AIM Slides                              84
8

7 - 8-25-20 Email                           87
9

8 - Tampa Bay Times Request                 89
10

9 - ILP Training Documents                  99
11

10 - ILP Prolific Offender Selection Process  103
12

11 - Ranking of Plaintiffs in Historical    110
13        Prolific Lists

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        SHELLEY GARDNER,

2      being first duly sworn to tell the truth, the whole

3      truth, and nothing but the truth, was examined and

4      testified as follows:

5                 THE WITNESS:  I do.

6                      DIRECT EXAMINATION

7   BY MR. BARGIL:

8      Q.   Okay.  Good afternoon.

9      A.   Good afternoon.

10     Q.   Ms. Gardner, is there a rank that I should be

11  using to refer to you or --

12     A.   No, I'm civilian.

13     Q.   Okay.  You're a civilian.

14     A.   Yes.

15     Q.   Okay.  I expected as much, but I wanted to make

16  sure.

17     A.   Thank you.

18     Q.   Have you ever had your deposition taken before?

19     A.   Yes, once.

20     Q.   Okay.  Was it in a law enforcement matter?

21     A.   It was in regards to an administrative hearing

22  for the Sheriff's Office on a human resources

23  standpoint.

24     Q.   How long ago was that?

25     A.   Eleven, twelve years ago.
```

1      Q.    All right.  So I'll give you a quick refresher.

2    I'm sure your attorney has prepared you.

3              MR. POULTON:  Hey.

4    BY MR. BARGIL:

5      Q.    Just a few ground rules.  I think the most

6    important is that we not talk over each other.  I'll ask

7    you the question and make sure not to interrupt you when

8    you're answering.  Please don't interrupt me when I'm

9    asking it.  It's also important to make sure that you

10   answer questions verbally as opposed to nodding your

11   head, or if it's a yes or no question, please make sure

12   to say yes or no as opposed to uh-huh or uh-uh.  That

13   could be all the more important given that you're

14   wearing a mask today.  Does that all make sense?

15     A.    Yes.

16     Q.    Okay.  And again, you passed the test.

17             If at any point you need to take a break, we

18   can break for a few minutes.  I'll probably just ask you

19   to answer the question if there's a pending question,

20   and then we'll be able to take a break.  At some point

21   your lawyer might make objections.  That doesn't mean

22   that you can't or shouldn't answer the question.  He's

23   just getting them on the record.

24             Can I ask what did you do to prepare for this

25   deposition?

1        A.    Not very much because I'm not sure what my

2    portion is in regards to today.

3        Q.    Okay.

4        A.    With my time and experience and in ILP, I've

5    done everything from analyst to my current role as a

6    supervisor.  So I don't know if I'm here more for the

7    historical or current or all the above.

8        Q.    Okay.  I think the purpose of the deposition

9    will come clear soon enough.  But other than your

10   attorney, have you spoken with anyone about this

11   deposition?

12       A.    Just my analyst Ashley Burch knowing that she

13   was here last week.

14       Q.    Okay.

15       A.    She just advised me of the calendar call

16   because she does report to me so to advise where she

17   would be during that date and time.

18       Q.    Okay.  Did you follow up with her after her

19   deposition?

20       A.    Just to know that she was out and she was back

21   on duty at her office, yes.

22       Q.    Okay.  Did you guys discuss your deposition?

23       A.    No.

24       Q.    Okay.  What is your educational background?

25       A.    I have a bachelor's degree in criminal justice

1    from Troy University.

2        Q.   And when did you earn that?

3        A.   2012.  December 2012.

4        Q.   Okay.  Troy University in Alabama?

5        A.   Yes.

6        Q.   Okay.  And what is that bachelor's degree in?

7        A.   Criminal justice.

8        Q.   Did you do anything before that?

9        A.   As far as college?

10       Q.   Career or --

11       A.   Prior to that I was working as a human

12   resources investigator at Pasco Sheriff's Office.

13       Q.   Did you move to Alabama to go to school or was

14   it --

15       A.   No, online.

16       Q.   As part of your criminal justice education, did

17   you learn -- did you take any courses in statistics?

18       A.   I don't recall one.

19       Q.   Okay.  Did you take any courses in psychology?

20       A.   Yes.

21       Q.   What psychology courses did you take?

22       A.   Actually, I should say sociology I believe it

23   was --

24       Q.   Okay.

25       A.   -- not specific to psychology.

1        Q.   Is this -- the degree you got from Troy, is

2    that what would be described as a four-year degree?

3        A.   Yes, it was a bachelor of science degree.

4        Q.   I'll pull out my first exhibit here.

5             (Exhibit 1 was marked for identification.)

6    BY MR. BARGIL:

7        Q.   Does this document look familiar to you?

8        A.   Yes.

9        Q.   Okay.  And what is it?

10       A.   It's my annual performance evaluation.

11       Q.   Is it more than one of them?

12       A.   Yes.

13       Q.   Might be referring to this a couple times

14   throughout, but I think the first couple things I'd like

15   to do is to take a look at --

16            Well, before we dive in, why don't you describe

17   to me a little bit about your current role and what it

18   entails.  What your current job title?

19       A.   Current title is analyst supervisor.

20       Q.   Okay.  And who is -- how many people do you

21   have above you and below you?  You can take those two

22   things separately.

23       A.   Okay.  Below I currently have eleven reporting

24   to me.

25       Q.   Okay.

1      A.    And above -- within ILP?

2      Q.    We can break that up if you want, yeah.  Why

3   don't we start with ILP?

4      A.    Okay.  Within ILP I have two -- two above.

5      Q.    Okay.  And who are they?

6      A.    That's Manager David Santos and Inspector Larry

7   Kraus.

8      Q.    Okay.  Is Santos immediately above you and

9   Kraus is above him?

10     A.    Correct.  Yes.

11     Q.    Okay.  And what about the non-ILP people, who

12  are your supervisors?

13     A.    The next rank up from that would be Major

14  Kapusta.

15     Q.    Okay.  Anyone else?

16     A.    Above him would be the colonel and the sheriff.

17     Q.    The sheriff, okay.  What are the job titles of

18  the people who are below you?

19     A.    I have both crime analysts and crime

20  intelligence analysts.

21     Q.    Anyone else?

22     A.    No.

23     Q.    What is the difference between those two

24  things?

25     A.    The crime analysts tend to focus on what is

1    occurring in the district.  The intelligence analysts

2    are typically recruited more to look at why it's

3    happening and what we can do about it.

4        Q.   Okay.  And in your role as their supervisor,

5    what is -- how would you describe your job?

6        A.   Providing oversight to their day-to-day

7    operations and providing any guidance when questions

8    come to us.

9        Q.   Okay.  Do you assist or do you formulate the

10   methods that your analysts use in doing their jobs?

11       A.   No.

12       Q.   Who crafted those methods?

13       A.   If it was in regards to processes, that would

14   be above.  It would probably be Larry or even further up

15   the chain than him.  I think it would be dependent on

16   what method.  I don't think we have one specific person

17   who would be responsible for every method or process

18   that we do.

19       Q.   Okay.  I know we just marked one thing and

20   didn't ask any questions about, but we'll get back to it

21   shortly.

22            (Exhibit 2 was marked for identification.)

23   BY MR. BARGIL:

24       Q.   Do you recognize this document?

25       A.   Yes.

1    Q.   Okay.  And what is it?

2    A.   It's the ILP manual.

3    Q.   Did you take a role in creating this document?

4    A.   Beyond just review, no.

5    Q.   When you say beyond just review, what was your

6  role in reviewing it?

7    A.   A lot of the time I'm asked to just provide

8  proofreading and point out any errors that may be in it

9  before it goes for the next level of review.

10    Q.   Okay.  But as far as substance, would you say

11  you did review?

12    A.   No.

13    Q.   Okay.  And so in various parts of this document

14  where there's discussion about how to score prolific

15  offenders or things like that, that would not have been

16  something that you would have provided review on?

17    A.   No.

18    Q.   Okay.  Have you read this document?

19    A.   Yes.

20    Q.   Have you read it repeatedly?

21    A.   Yes.

22    Q.   And when I say have you read it repeatedly, I

23  mean have you read it repeatedly sort of outside of your

24  role as a reviewer other looking for errors?

25    A.   For familiarity with the document?

1    Q.    Yes.

2    A.    Yes.

3    Q.    Are you expected to have a working knowledge of

4    what's in this document?

5    A.    Yes.

6    Q.    Turn to page 25 of the document.

7    A.    Okay.

8    Q.    If you look under the heading that says Problem

9    Groups - Criminal Networks, take a look at the first

10   line of the second paragraph under that heading, and

11   feel free to read it out loud.

12   A.    "The Pasco Sheriff's Office has found social

13   network analysis to be a great complement to its

14   intelligence-led policing philosophy."

15   Q.    Okay.  What is social network analysis?

16   A.    Social network analysis is a method that's used

17   in an attempt to associate persons or networks with one

18   another and also measure the degree of that association.

19   Q.    Okay.  And how do you do that?

20   A.    From my studies with SNA, which has been years

21   ago, we used a program called ORA, O-R-A, and we input

22   our data, our name, and it measures the degrees in that

23   amount of association --

24   Q.    Okay.

25   A.    -- through I don't know what formula or what

1    the scientific formula is behind it.

2         Q.   Do your analysts usual social network analysis

3    in their day-to-day operations?

4         A.   I wouldn't -- I don't know about day to day,

5    but they do use SNA.

6         Q.   Okay.  And part of the job of an analyst is

7    understanding and using SNA?

8         A.   Correct.  At some level in their career they

9    are trained in it.

10        Q.   Okay.  Are you still familiar with how it works

11   or are you remembering back to when you took a training

12   several years ago?

13        A.   I'm remembering back to my training because I

14   don't actively use it in my role.

15        Q.   Do you know what type of -- do you know whether

16   that program is still being used?

17        A.   I believe SNA is being used, but it's with a

18   different program now.  I don't think we use ORA

19   anymore, or it might be that they do use ORA and

20   not Pajek.  I know I'm -- I'm sorry.  Hopefully, I'm not

21   talking too fast.

22             There's two different systems that were used

23   for SNA, Pajek and ORA.  So I'm not sure which is used

24   now to input data.

25        Q.   What was the first one?

1    A.   Pajek, P-A-J-E-K I believe is how it's spelled.

2    Q.   Is that an acronym?

3    A.   No.  I think that was the name of it.

4    Q.   Does part of SNA involve reviewing social media

5    accounts?

6    A.   Not to my knowledge.  The SNA that I would do

7    was -- it was name-based and association-based, and SNA

8    is often confused with social media.  A lot of people

9    will confuse social networking and social media, and

10   they are two different items.

11   Q.   Okay.  Setting aside whether it's a part of

12   SNA, do your analysts review social media?

13   A.   They review whatever's open --

14   Q.   Okay.

15   A.   -- open source.

16   Q.   Meaning what?

17   A.   Meaning if something on social media is marked

18   private or locked down, we don't have access to it.

19   Q.   By marked private, do you mean -- well, what if

20   certain things are viewable if you are, quote, unquote,

21   friends with someone through one of those mediums or

22   platforms?

23   A.   If they are using an undercover account, they

24   can see it.  If that person adds an undercover account,

25   they would see it.

1    Q.    Do your analysts use undercover accounts?

2    A.    I believe some of them still do, yes.

3    Q.    Did more of them used to?

4    A.    I can't speak for the other analysts.

5    Q.    Do you do performance reviews for the different

6    analysts?

7    A.    Yes, for the ones that report to me.

8    Q.    Are there analyst who don't report to you?

9    A.    There are.

10   Q.    So you're an analyst supervisor.  Are there

11   other people with that same title?

12   A.    There is an analyst supervisor for the realtime

13   crime center, and then the other analysts in ILP report

14   directly to Dave Santos.

15   Q.    Okay.  Is he an analyst supervisor?

16   A.    He is ILP manager.

17   Q.    Oh, that's right.  So some of the analysts

18   report to you, and you report to Santos, but some of the

19   analysts report directly to Santos?

20   A.    Correct.  So the analysts who report to Santos

21   are in different realms.  They are more strategic in

22   nature.  They're not crime analysts.  They handle more

23   of the data.  So Steve Hiebert, for example, reports

24   directly to Dave because his job description is

25   different from a crime analyst or a crime intel analyst.

1    Q.   Okay.  How many people does Dave Santos have

2    under him?

3    A.   Oh, I believe five.  I'm sorry, six.  There's

4    Melinda as well, the realtime crime center supervisor.

5    Q.   And do you have anything to do with supervising

6    the those six people under Dave Santos?

7    A.   No.

8    Q.   Are you technically within the umbrella of ILP

9    though?

10   A.   Yes.

11   Q.   So under ILP there are -- am I correct if I'm

12   saying this -- there are two analyst supervisors?

13   A.   Yes.

14   Q.   You are one of them.  Dave Santos is the other?

15   A.   No.  Melinda Warner is the other.  She's the

16   realtime center analyst.  Dave Santos does supervise but

17   as a manager.  So he is in an umbrella basically.  He

18   would be one level up above Melinda and myself.

19   Q.   So does Melinda Warner oversee the other five

20   on that team?

21   A.   No.

22   Q.   So she -- I'm just trying to get a sense.  So

23   it sounds like Melinda Warner is sort of lateral to the

24   other five people who all report together to Santos?

25   A.   In terms of who they report to, yes.

1    Q.   I see.

2    A.   Melinda is a lateral to me --

3    Q.   Okay.

4    A.   -- as far as supervising.

5    Q.   What is the distinction between the -- you sort

6    of might have already answered this, but I'm totally not

7    getting it.  So bear with me.

8         What is the difference between the work being

9    done by the crime analysts and crime intelligence

10   analysts who are under you and the work being done by

11   the analysts who work with Mel Warner under Dave Santos?

12   A.   The ones that work for Melinda?

13   Q.   Yeah.

14   A.   They work in the realtime crime center.

15   Q.   Okay.

16   A.   So they handle active calls, for example.

17   Whereas, the ones that work under me are handling things

18   after -- after the fact.  They're handling district

19   level or investigative.

20   Q.   I see.  So if a deputy is going onto a

21   property, for example -- and if this is a bad example,

22   I'm sorry.  But if a deputy is going out to a property

23   and wants more information on maybe who lives there or

24   what their past history is, would that deputy contact

25   the realtime crime center, or would he contact your

1   department?

2       A.   If it was for an active call like they get that

3   call and they're I don't want to say in pursuit because

4   it's not really a pursuant call, but if they're headed

5   to that call at that time, they would reach out to

6   realtime crime center.  It's a 24-hour service that's

7   provided.

8       Q.   Who would -- does your team -- and by your team

9   I mean you and the eleven people beneath you -- do you

10  work with the STAR teams?

11      A.   The district analysts do.

12      Q.   Okay.  And where do district analysts fall

13  within this hierarchy?

14      A.   They report to me.

15      Q.   Okay.  So when you say district analysts, are

16  you referring to the eleven analysts who are below you?

17      A.   So some of my analysts are district.  The

18  eleven analysts that report to me are each assigned to a

19  certain area of responsibility:  Major crimes, vice and

20  narcotics, or organized crime.  And then we have the

21  districts, districts one, two and three in Pasco County.

22  So those five district analysts or five of the eleven

23  are assigned to the actual district.

24      Q.   Okay.

25      A.   And those five would be the ones that work with

1    the STAR team or property crimes.

2         Q.   Are they also the same people who work with

3    deputies who are doing prolific offender checks?

4         A.   Yes.

5         Q.   Do you know the names of those analysts

6    offhand?

7         A.   Yes.

8         Q.   May I have them?

9         A.   Yes.  Michael Gartenberg.

10        Q.   Can you spell that for us?

11        A.   G-A-R-T-E-N-B-E-R-G.  He's assigned to district

12   one.  Madison Jarrard, J-A-R-R-A-R-D, is assigned to

13   district two.  Also district two is Megan Ralle,

14   R-A-L-L-E.  Ashley Burch, B-U-R-C-H, is assigned to

15   district three, and her D3 counterpart is Mary Sardone,

16   S-A-R-D-O-N-E.

17        Q.   Okay.  Now I asked you before if you do

18   performance reviews for your analysts, and I think you

19   said yes.

20        A.   Yes.

21        Q.   And so you obviously do them for the five

22   people who work with STAR teams and property crimes; is

23   that correct?

24        A.   Yes.

25        Q.   What are some of the things -- speaking only of

1    the five analysts who work in STAR and property crimes,

2    what are some of the factors that you consider when

3    rating their performance on a yearly basis?

4        A.   Well, our performance evals are formatted with

5    questions for us to fill in.  So the measures are kind

6    of given to us on those forms.  For performance, we're

7    looking, one, at their ability to work well with others.

8    I'm looking to ensure that they are growing in their

9    position and that they have an understanding of their

10   role.  I take into account any performance observation

11   that's given by the people they work with, POR's for

12   example, performance observation reports, any attaboys

13   or attagirls that are turned in.

14       Q.   Okay.

15       A.   And then what their training is.  We compare

16   their goals from one year to the next.  One of the

17   sections on the MPR, the member performance report, is

18   we list goals for the following year.  So then the year

19   after that we would compare those goals to see what they

20   have met and if they continue to grow in that role.

21       Q.   Okay.  Do any of the comments or attaboys or

22   attagirls that come in come from members of STAR teams?

23       A.   I don't believe I've seen any from STAR.  The

24   only one I can think of offhand is one that came from a

25   property crime sergeant.  I don't see any of them.

1      Q.   Okay.

2      A.   But that is something that anyone in the agency

3   is actually able to write to another member if they go

4   above and beyond in their performance.

5      Q.   Are you familiar with the term prolific

6   offender?

7      A.   Yes.

8      Q.   What does it mean?

9      A.   It's a label that is given to offenders who

10  have met a certain criteria scoring and are affecting

11  the current crime environment.  They have to offend a

12  certain number of times certain type of offense to meet

13  that specific scoring first, and then if they are

14  currently committing crime or believed to be committing

15  crime, they receive that prolific offender label.

16     Q.   Okay.  You mentioned scoring in describing

17  prolific offender.  Are you familiar with the scoring

18  system?

19     A.   If it was put in front of me, yes.  As far as

20  the actual point system, no, because I don't do the

21  scoring on it.  I know what criteria is used for it, but

22  as far as how many points go to each, not without

23  looking it up.

24     Q.   Well, it's not a pop quiz, and I'll probably

25  show it to you in a little bit here.

1          So do you -- I mean, I think I know the answer

2     to this, but do you have any role in developing the

3     scoring system?

4          A.   No.

5          Q.   Do you have any role in applying the scoring

6     system?

7          A.   No.

8          Q.   So to the extent that you know, how does the

9     scoring system operate?  I guess I'll rephrase.  You

10    mentioned that there is a scoring system.  Who develops

11    that scoring system?

12         A.   When you say develops, do you mean as far as on

13    the routine basis who produces it or who originally came

14    up with the system that's used?

15         Q.   So if there's a formula to determine whether or

16    not someone is or is not a prolific offender and you get

17    so many points for crime X and so many points for crime

18    Y, who is the person who developed the point allocation

19    system?

20              MR. POULTON:  Object to the form.  Go ahead and

21         answer it.

22         A.   I don't know who came up with that originally

23    -- who came up with the point system.

24    BY MR. BARGIL:

25         Q.   And it's totally fine if you don't know the

1    answer to the questions.

2         A.   No.

3         Q.   Okay.  When did you join the Sheriff's Office?

4         A.   The Sheriff's Office in September of 2004.

5         Q.   Okay.  And I know you mentioned that before

6    your were in your current position you were in HR with

7    the Sheriff's Office; is that right?

8         A.   That's correct, yes.

9         Q.   What other -- was that the position that you

10   started at in 2004?

11        A.   Yes.  In 2004, I started as the human resources

12   specialist, and then moved into a role as a human

13   resources investigator in 2008 I believe it was.

14        Q.   Okay.  And how long were you in that position?

15        A.   Until 2011 when I moved to ILP.

16        Q.   In between 2011 and -- I might be getting my

17   dates confused.  You moved to ILP in 2011.  What

18   positions did you have within ILP?

19        A.   Criminal intelligence analyst, senior analyst,

20   and analyst supervisor.

21        Q.   And how many -- how long have you been in your

22   current position as analyst supervisor?

23        A.   Since 2018.

24        Q.   And I apologize if you answered that already.

25             Are you familiar with the term TOP 5?

1      A.    Yes.

2      Q.    What is it?  What is it?

3            MR. POULTON:  Object to the form.  Well, go

4      ahead.  Go ahead.

5      A.    TOP 5 is a classification given to people who

6   are currently affecting a crime picture but may be more

7   new to the role.  They haven't been around at least in

8   Pasco County long enough to hit the prolific offender

9   classification, but we know right now they're causing a

10  picture to -- or a problem to the crime picture.

11  They're committing a lot of burglaries or we see some

12  kind of a trend with their crime performance.

13  BY MR. BARGIL:

14     Q.    You mentioned that a lot of them are new to the

15  -- I don't want to misstate what you said, but I think

16  the testimony was that they're new to at least the crime

17  environment in Pasco.  Is that a fair encapsulation of

18  what you said?

19     A.    Yes.  The reason I say that is because there's

20  a possibility that they've just moved into Pasco or

21  they're crossing county lines because they're offending

22  outside of where they live.  We may not know them as

23  well as say someone who has been in Pasco all their

24  life.  Pasco, for example, sees a number of crimes from

25  individuals who live in Pinellas and Hillsborough

1    County.  Crime doesn't stop at the county line.  So

2    while they may not have offended in Pasco before, they

3    may have a robust crime history in another county and

4    they're just moving up into somewhere where they're not

5    as well known or they're just new to the crime picture

6    in Pasco.  Again, if they don't have as robust of a

7    crime history as a prolific offender per se, that

8    doesn't mean that it's not somebody that we still want

9    to get off of the streets to stop the crime from

10   happening.

11       Q.   Is it correct that part of the prolific

12   offender calculation does not include conduct outside of

13   Pasco County?

14       A.   Our prolific offender designates -- the only

15   data that we use with prolific offender is within Pasco.

16       Q.   That's a better way to say it.

17            MR. POULTON:  We know what you meant.

18   BY MR. BARGIL:

19       Q.   Yeah.  And so one way to identify people who

20   could potentially impact the crime environment but

21   aren't prolific offenders is to put them on a TOP 5

22   list?

23       A.   Correct.

24       Q.   Do you know how that process works, the process

25   of ending up on a TOP 5 list, how you go from just being

1    someone who is not on the Sheriff's Office's radar to

2    being a TOP 5 designee?

3        A.    If I recall, input is given from throughout the

4    district.  Input comes from the detectives, the

5    supervisors, the people who are actually out on the

6    streets, the boots on the ground who have the experience

7    with these individuals.  They're seeing what's happening

8    with crime.  They provide that recommendation.  The

9    analyst would do the research to link whatever may

10   involve that person and then classify them as a TOP 5 if

11   they are of interest to keep a focus on.

12       Q.    What are some of the things that an analyst

13   will -- when you say they do the research to see whether

14   they merit TOP 5 classification?

15           MR. POULTON:  Let me just object to the form in

16       terms of timeframe.  Because as we know, you're

17       using present tense and I -- just to clarify when

18       you say will, like they will use the criteria, but

19       that's -- there's no more TOP 5 --

20           MR. BARGIL:  Okay.

21           MR. POULTON:  -- in use.  So I just want to

22       clarify we're talking about different time periods.

23           MR. BARGIL:  Fair enough.  Very well.

24           MR. POULTON:  Okay.

25   BY MR. BARGIL:

1    Q.    When TOP 5 offender designations were in use

2    and an analyst would review the information I think you

3    said to determine whether someone was worthy of TOP 5

4    classification, what would be some of the things that

5    they would take into consideration?

6    A.    Their criminal history, how many crimes have

7    they committed, how many crimes were they suspected of

8    committing in the county.  That was the largest part of

9    the analyst contribution.

10   Q.    And you mentioned it would be based on a number

11   recommendations from what you described as boots on the

12   ground.  I want to get a better sense of who those

13   people were.  Would people on patrol say I think you

14   should -- did they have the opportunity to say to your

15   analysts, I think this person is worthy of TOP 5

16   classification?

17   A.    They had the opportunity to provide their

18   input, yes.

19   Q.    Any deputy in the district?

20   A.    Yes.

21   Q.    People who were on STAR teams?

22   A.    Yes.

23   Q.    Detectives?

24   A.    Yes.

25   Q.    Anybody in the department?

1     A.   I would not go as far as to say anyone in the

2    department, because somebody in budgeting, for example,

3    wouldn't have it.

4     Q.   Any sworn law enforcement?

5     A.   Yes.

6     Q.   Okay.  Yes, I should have excluded civilians.

7    Thank you for doing that for me.

8          So in that process -- so somebody or a number

9    of people hypothetically tell an analyst you should

10   check this person out.  The analyst does that review.

11   And say an analyst concludes that somebody maybe does

12   merit or did merit TOP 5 classification.  Who ultimately

13   makes the call on whether that person lands on a TOP 5

14   list or not?

15    A.   I don't know.

16    Q.   Okay.  Could it be -- was it ever you?

17    A.   No.

18    Q.   Was it decided above you?

19    A.   It -- I don't know.  I -- I don't want to make

20   guesses on this because I don't know if it's right or

21   not.  I -- my -- my -- can I make an assumption?

22          MR. POULTON:  Sure.  As long as you --

23    A.   I don't want to --

24          MR. POULTON:  As long as you clarify that

25     you're speculating.

1      A.   My speculation would be a district commander.

2  So a captain, a lieutenant, would have that final

3  blessing so to speak.

4  BY MR. BARGIL:

5      Q.   If a STAR deputy say contacts an analyst and

6  says, "I know this guy from another county.  I've got a

7  friend in Hillsborough who tells me we've got to look

8  out for him.  I know that this person's up to no good.

9  They just moved here.  Let's get him on a list right

10 away," can that sometimes be enough to just -- for

11 somebody to end up on a TOP 5 list?

12         MR. POULTON:  Object to the form.  Go ahead if

13     you can answer.

14     A.   No, no.  If we had a call come in from an out

15 of county -- trying to think of the best way to word it.

16 I think the best way to word that is you don't have to

17 have a classification for us to have reason to

18 investigate if we have a reasonable suspicion that

19 you're committing some type of a crime.  You don't have

20 to be labeled as a TOP 5.  You don't have to be labeled

21 as a prolific offender or a target.  If we have some

22 kind of information indicating that you are affecting

23 our crime environment, with or without that label, our

24 deputies can investigate.

25     Q.   I see.  But my question was -- and that makes

1    sense.  I appreciate that answer.  My question though

2    was more directly if a person or a handful of people are

3    just adamant that somebody belongs on a TOP 5 list based

4    on something they've heard from out of county and an

5    analyst checks it out and says, "You know what?  I think

6    that could be right," is that enough generally speaking

7    or would that have been enough generally speaking for

8    somebody to end up on a TOP 5 list?

9            MR. POULTON:  Object to the form.  Go ahead.

10        A.    I don't know because I don't recall ever seeing

11    that type of scenario.

12    BY MR. BARGIL:

13        Q.    Okay.  Will you take a look at page 75 of the

14    ILP manual, please.

15        A.    Okay.

16        Q.    And can you describe really quickly what it is

17    that we're looking at?

18        A.    It is the prolific offender calculation.

19        Q.    Okay.  Actually, I'm sorry, let's flip back two

20    pages -- three pages to page 72.  I'm sorry, 70.  Are

21    you familiar with what this depicts?

22        A.    I'm familiar with the term.

23        Q.    Okay.  And what is the term?

24        A.    At risk youth.

25        Q.    Okay.  Did you play any role in the

1    identification of at risk youth?

2        A.    No.

3        Q.    Do your analysts?

4        A.    I don't know how the at risk youth are

5    identified.  We do have a juvenile analyst that works

6    with the school board that may be involved in this, but

7    I don't know if she's actually the one who would pull

8    the criteria for this -- pull the criteria or the data.

9        Q.    Do you know who developed the scoring system?

10       A.    I do not.

11       Q.    Can you turn to page 72, please.

12            If you look toward the bottom, about halfway

13   down I should say, it seems like there's a description

14   there of how this data is compiled.  Can you read that

15   first sentence aloud that begins with "to start"?

16       A.    "To start, we take the active rosters for each

17   school in the company and match each student with data

18   from the school board's early warning system, also known

19   as EWS, our record manager system (RMS), and DCF's

20   Florida Safe Family Network (FSFN)."

21       Q.    Okay.  What is the school board's early warning

22   system?

23       A.    From looking at a couple pages prior, it's a

24   system that identifies certain criteria.

25       Q.    Okay.  Do you know what DCF's Florida Safe

1    Families Network is?

2        A.   I know it's a database that's used by our child

3    protective investigation.

4        Q.   Do you still have access to the early warning

5    system?

6        A.   I don't know if I ever had access to the early

7    warning system.

8        Q.   Okay.

9        A.   I don't know where that's housed.

10       Q.   Okay.  Do you know -- and when I say you, I

11   should be more specific.  Do you know whether your

12   analysts or your department has access to the early

13   warning system?

14       A.   I don't.

15       Q.   Okay.  Do you know if they did before?

16       A.   I don't.

17       Q.   Okay.  Same question.  It's going to get

18   mechanical but --

19       A.   Sure.

20       Q.   -- do you or people in your department have

21   access to the Florida Safe Families Network?

22       A.   Yes.

23       Q.   And do you still have access to that?

24       A.   Yes.

25       Q.   What kind of data is in that -- is in that

1    database?

2        A.   Documentation of investigation from the child

3    protection unit.

4        Q.   And does the child protection unit share that

5    information with ILP analysts?

6        A.   If it's in FSFN.

7        Q.   You're going to have to -- oh, okay.

8        A.   I'm sorry.  So FSFN is the short term for

9    Florida Safe Families Network --

10       Q.   Okay.

11       A.   -- FSFN.

12       Q.   And the data that are in that network, do you

13   need to request it in order to have access to it, or you

14   can just pull it as needed?

15       A.   There is an audit trail to it.  So you have to

16   have a criminal predicate or a justification to run

17   anything in it.

18       Q.   Okay.  Do you know what the consequence is for

19   being identified as an at risk youth?

20       A.   No.

21       Q.   Do analysts pay attention to that

22   classification as part of their duties?

23            MR. POULTON:  Object to the form.  Can you

24       specify which type of analyst?  I think she said

25       there's a juvenile analyst that I would assume is

1          very focused on that versus, you know, district

2          three for example.

3     BY MR. BARGIL:

4          Q.   Well, if there's a distinction that should be

5     drawn, please draw it, but I'm just curious whether

6     analysts who work in your department --

7          A.   So if any -- if any of my analysts have access

8     to EWS, the early warning system, it would be the

9     juvenile analyst, and that is a fairly new position that

10    we have.  We did not have that -- I don't remember what

11    year that position came into play.  I want to say two to

12    three years ago.

13         Q.   Okay.  But specifically speaking about the at

14    risk youth classification, is that relevant information

15    for your analysts to have access to?

16         A.   I don't believe so.

17         Q.   Okay.  Do you know whether being identified as

18    an at risk youth is a factor in whether someone would

19    ever be classified a prolific offender?

20         A.   I don't know.

21         Q.   Do you know whether being identified as an at

22    risk youth could have been considered a factor in

23    classifying someone as TOP 5?

24         A.   I don't know.

25         Q.   Once someone is classified as at risk youth,

```
 1    are they notified that they have been classified as

 2    such?

 3         A.   I don't know.

 4         Q.   Do you know whether if they're a juvenile their

 5    parents are notified that they've been classified as

 6    such?

 7         A.   I don't know.

 8         Q.   Once someone's been classified as an at risk

 9    youth, do you know whether there's a mechanism to get to

10    remove that classification?

11         A.   I don't.

12         Q.   Okay.  I have to find an exhibit here.

13              MR. POULTON:  Could I use the restroom while

14         you're doing that?

15              MR. BARGIL:  Sure.

16              (Short break.)

17              (Exhibit 3 was marked for identification.)

18    BY MR. BARGIL:

19         Q.   You understand you're still under oath?

20         A.   Yes.

21         Q.   Okay.

22              MR. BARGIL:  Tom, I have an exhibit for you.

23              MR. POULTON:  Oh, thank you.

24    BY MR. BARGIL:

25         Q.   Do you -- can you identify for us for the
```

1   record what this is?

2       A.   It looks like an email from Larry to Chase with

3   Major Kapusta, myself, Analyst Brummett and Analyst

4   Hiebert copied regarding feedback to questions from

5   Tampa Bay Times.

6       Q.   Okay.  Can you read item number one there in

7   this email?  And I should -- Sorry.  Let me interrupt

8   you.

9           MR. BARGIL:  Tom, there was evidently an

10      attachment to this email --

11          MR. POULTON:  Okay.

12          MR. BARGIL:  -- and I haven't included it just

13      because I want to talk about the email, not the

14      attachment.  If there's an objection, we can settle

15      it later on.

16          MR. POULTON:  What was the attachment just so I

17      know?

18          MR. BARGIL:  I don't remember offhand.  I

19      didn't think it was relevant enough to include.

20          MR. POULTON:  Okay.

21          MR. BARGIL:  I think it's a draft of the

22      response to Tampa Bay Times.

23          MR. POULTON:  That's fine.

24   BY MR. BARGIL:

25       Q.   So looking at item number one, can you read the

1    first sentence there?

2        A.   Yes.  "To clarify, prolific offenders are based

3    on a scoring system.  This is done by Steve Hiebert,

4    then a list is provided to the analyst for review."

5        Q.   Okay.  I want to make sure I'm understanding

6    correctly.  So can you, to the best of your ability,

7    describe the process by which you start with raw data

8    and then end up with a person being classified as a

9    prolific offender?

10       A.   Yes.  And Steve may be able to better go into

11   detail on his role in the initial daily pull, but the

12   process starts with Steve Hiebert.  He pulls the raw

13   data with that criteria that was referenced earlier, the

14   two or more arrests, and then the -- after that data

15   with the two or more arrests in Pasco County is pulled,

16   it's broken down with the further criteria that I

17   mentioned needing to see the paperwork to provide the

18   detail on the five points for violent crime, four points

19   for -- you get the gist of which it is?

20       Q.   Uh-huh.  Sure.

21       A.   Breaks down the information based on that

22   scoring criteria, and then sends the list to the

23   district analyst for further review.  That list is

24   reviewed by our district analyst to determine, one, who

25   is currently in prison, because if they're in prison

1    they're not in affecting our crime picture, and then,

2    two, determine further who are we aware of right now,

3    who is affecting the crime picture.  If we're not

4    hearing somebody's name or seeing them affecting or

5    committing crime, there's no reason to put that focus on

6    them.

7         Once the analysts review that list and send the

8    recommendations back, that's when we -- I don't know the

9    word other than we bless that as the offender list for

10   that quarter.

11        Q.   Okay.  Can the analyst take somebody off or

12   remove somebody from consideration for prolific offender

13   classification based on the review you just described?

14        A.   Yes.  They would -- that's what their review is

15   for, to make the determination further on based on these

16   names who would best qualify for that designation at

17   this time.

18        Q.   Can the analyst add somebody into the list?

19        A.   I don't know.  I don't think so.

20        Q.   Okay.  You mentioned earlier on or you said

21   that part of being considered starts with being

22   identified for inclusion in like the broader pool; is

23   that right?

24        A.   Yes.

25        Q.   And correct me if I'm wrong, but I think you

1    said that to be considered to be a part of the pool, you

2    need two prior arrests.

3         A.   Two or more arrests in Pasco County I believe

4    is the criteria.

5         Q.   In a certain period of time or just ever?

6         A.   I don't remember the time period.

7         Q.   Okay.  Is everyone who's had two or more

8    arrests in Pasco County, whether there's a time period

9    or not, included in that pool?

10             MR. POULTON:  Object to the form.  I think

11        it's -- well, I don't want to put words in your

12        mouth.  Go ahead.

13             MR. BARGIL:  I think there is a time

14        limitation.

15             MR. POULTON:  I think it's three years.

16             MR. BARGIL:  Yeah.

17   BY MR. BARGIL:

18        Q.   Assuming there is one, does Stephen Hiebert

19   ever take people out of that pool before he even runs

20   the calculation, the scoring system?

21        A.   I don't know.

22        Q.   Let's take a look back at what I think was

23   Exhibit 2, the ILP manual, and let's look at page 75,

24   please, if you're there.

25        A.   Okay.

```
 1              MR. POULTON:  75?

 2              MR. BARGIL:  Yeah.

 3              MR. POULTON:  Thank you.

 4   BY MR. BARGIL:

 5       Q.   And take a look at the top where it says

 6   Appendix B:  Prolific Offender Calculation.

 7       A.   Okay.

 8       Q.   Can you read that paragraph to yourself and

 9   kind of let me know when you're done?

10       A.   Okay.

11       Q.   Do you see where it says under Scoring, "After

12   being qualified to the pool of offenders, each

13   individual is scored on three criteria"?

14       A.   I do.

15       Q.   And then beneath that there are two bullet

16   points.  What are those two bullet points?

17       A.   Criminal history and enhancements.

18       Q.   So is it a typo where it says they're scored on

19   three criteria?

20       A.   I don't know.

21       Q.   Do you know of other things besides criminal

22   history and enhancements that are taken into

23   consideration?

24       A.   No.

25       Q.   Speaking of -- turning to Criminal History, is
```

1    it still the case that someone would get five points for

2    a violent crime arrest?

3        A.    Yes.

4        Q.    Four points for a violent crime arrest or a Big

5    4 arrest involving a firearm or aggravated

6    circumstances?

7        A.    Yes.

8        Q.    Do you know what the aggravated circumstances

9    would be?

10       A.    A violent -- a violent aspect to it.  Armed

11   burglary, for example, if someone breaks into a home

12   either armed with even a knife or if they steal a gun or

13   a knife during that burglary it's classified.

14       Q.    So I would get three points for a Big 4 arrest?

15       A.    Yes.

16       Q.    So I get two points for an arrest involving

17   grand theft, pawn/scrap violation, violent crime outside

18   of agency focus, or narcotics violation (except

19   misdemeanor marijuana)?

20       A.    Yes.

21       Q.    When it says violent crime outside of the

22   agency focus, what does that mean?

23       A.    I don't know.

24       Q.    Do you have any idea what a violent crime would

25   be that the agency wouldn't care about?

1              MR. POULTON:  Object to the form.

2         A.   I don't.

3    BY MR. BARGIL:

4         Q.   So I get half of the applicable point values

5    for suspicion of an offense listed in one through four?

6         A.   I don't know if that one's still on there.  I

7    don't know of any changes made to it though.

8         Q.   Okay.  And one point for all other types of

9    offenses?

10        A.   Yes.

11        Q.   And now it says here you get a moderated

12   enhancement for each FTA and/or VOP.  Is that still the

13   case?

14        A.   That one I don't know.  Again, I don't know of

15   any changes that have been made on this, so I believe

16   it's still on there.

17        Q.   Okay.  Is an FTA a failure to appear?

18        A.   Yes.

19        Q.   And VOP is violation of probation?

20        A.   Correct.

21        Q.   What is a moderated enhancement?

22        A.   I don't know what it's referring to when it

23   says moderated enhancement.  An FTO or a VOP is another

24   crime being committed.  It's another arrest.  So I don't

25   know what the term is on there for.

1    Q.   Okay.  And also it says moderated enhancement

2    for each other involvement in five or more criminal

3    reports; is that right?

4    A.   Yes.

5    Q.   And one of those, quote, unquote, involvements

6    includes being a reporting person; is that right?

7    A.   Yes.

8    Q.   It also includes being a victim?

9    A.   Yes.

10    Q.   Also being a witness?

11    A.   Yes.

12    Q.   So is it possible to score out as a prolific

13    offender without ever having been arrested for anything?

14    A.   No, because this point system is only taken

15    into account once the raw data is pulled showing two or

16    more arrests.  So anyone who is being reviewed for these

17    points has already been pulled into a query of data from

18    two or more arrests.

19    Q.   Okay.  Is it possible for somebody to end up a

20    prolific offender never having been arrested ever again

21    besides those two or more arrests?

22    A.   I don't -- I don't understand.

23    Q.   Well, once you qualify for the pool, is it

24    possible to be classified as a prolific offender even if

25    you've never done anything criminal after those two

1    arrests?

2         MR. POULTON:  I'm going to object to the form.

3       Go ahead.

4       A.   You would likely end up in the list, but you

5    wouldn't be ranked high enough to be reviewed.  Plus,

6    you wouldn't be committing or offending in that crime

7    picture to affect it to be labeled.  So you would be on

8    the list but not likely as a prolific.

9    BY MR. BARGIL:

10      Q.   Would that be the sort of person that an

11   analyst would say, hey, maybe we should take this person

12   out of consideration?

13      A.   Yes.

14      Q.   Okay.  Do you know why there's an enhancement

15   for being a victim of a crime?

16      A.   From what I'm reading on this, it's only if

17   they are in five or more reports is that classification,

18   and the belief at that point would be -- likely be due

19   to association or just always being in those types of

20   situations, but it's not where you're a victim one time

21   so you're receiving that enhancement.  It's because

22   you're constantly in that environment five or more

23   times.

24      Q.   So if someone is in like an abusive

25   relationship or something and they have been victimized

1    five times by their domestic partner, that could result

2    in a moderated enhancement?

3        A.    The way that this reads, yes.

4        Q.    Okay.  Looking at Step 2:  Enhancements which

5    are at the bottom of the page.

6        A.    Uh-huh.

7        Q.    You get a 10 percent enhancement to your final

8    score if you're an active gang member; is that right?

9        A.    Correct.

10       Q.    How do you determine whether someone is an

11   active gang member?

12       A.    By Florida state statute criteria.

13       Q.    Okay.  And do you know what those criteria are?

14       A.    Self-admission, admission from a reliable

15   source, hand signs, colors which would be either a

16   bandana, flag, wearing colors that associate to a

17   certain gang.  For example, if you're a Bloods member,

18   you're constantly wearing red and black.  Confidential

19   informant advising of that, which would also be a

20   reliable source.  To be documented as a gang member, you

21   have to meet two or more of those criteria.

22       Q.    I see.

23             As far as TOP 5 classification goes, does the

24   TOP 5 designation require consideration of any of the

25   factors we just discussed that apply to prolific

1    offenders?

2        A.   I don't know.

3        Q.   Once somebody ends up on the prolific offender

4    list, are they advised that they've been designated as a

5    prolific offender?

6            MR. POULTON:   Object to the form.   Go ahead.

7        A.   I don't know.

8    BY MR. BARGIL:

9        Q.   If they're a juvenile, do you know whether a

10   parent is advised that their child has been designated

11   as a prolific offender?

12       A.   I don't know.

13       Q.   Is there a way to ask to be removed from the

14   prolific offender list?

15       A.   I don't know.

16       Q.   Is there a way for a parent to ask for their

17   child to be removed from the prolific offender list?

18       A.   I don't know.

19       Q.   Look at the next page, please.

20       A.   Page 76?

21       Q.   Page 76, yeah.   Are you familiar with what that

22   is?

23       A.   Beyond just seeing it in the ILP manual, no.

24       Q.   Okay.   Are these supposed to be -- it says

25   prolific offender palm card; is that right?

1      A.   It does, yes.

2      Q.   Have you ever seen one of these in real life

3  before?

4      A.   No.

5      Q.   Is this the first time you've seen it?

6      A.   Beyond seeing it in the ILP manual in the past.

7      Q.   Do deputies carry these with them?

8      A.   I don't know.

9      Q.   Are these supposed to be provided to prolific

10  offenders?

11           MR. POULTON:  Object to the form.  Go ahead.

12      A.   I don't know.

13  BY MR. BARGIL:

14      Q.   Do you know if they are provided to prolific

15  offenders?

16      A.   I don't know.

17      Q.   Do you have any idea why the first thing

18  written on this card is that panhandling is prohibited

19  in Pasco County?

20      A.   I don't.

21      Q.   Could you turn to the next page, page 77.  This

22  says Appendix D:  Enforcement Action Plan; correct?

23      A.   Correct.

24      Q.   Have you ever seen this form before?

25      A.   No.

1    Q.   Do you know if this is a form that's in use?

2    A.   I don't know if it's still being used.

3    Q.   Do you know if it was ever being used?

4    A.   I don't.

5    Q.   Okay.

6    A.   At least in my experience it was -- it was

7    never used when I was an analyst.

8    Q.   Okay.  And in your capacity as an analyst

9    supervisor?

10   A.   I've never seen it.

11   Q.   Okay.  Are you familiar with AIM meetings?

12   A.   Yes.

13   Q.   AIM is an acronym.  Would you tell us what it

14   stands for?

15   A.   Actionable intelligence meeting.

16   Q.   Okay.  What was your role in -- well, let's --

17   so you were an analyst before you were a supervisor; is

18   that right?

19   A.   Correct.  Yes.

20   Q.   What was your role with regard to AIM meetings

21   when you were an analyst?

22   A.   We would prepare slides weekly to present to

23   the deputies, the detectives, the command staff.  The

24   slides typically briefed what had happened the prior

25   week.  So it was almost a here's what we're looking at

1    from the prior week and here's almost a case update or a

2    status update on any cases that are of note to provide

3    to the deputies, detectives, captains, whoever attended

4    those meetings.

5            As the analysts, we prep the slides and then we

6    brief them at those meetings.

7        Q.   Were you required as an analyst to be at those

8    meetings?

9        A.   Yes.

10       Q.   Who else was required to be at those meetings?

11       A.   I don't know if they were required or if it was

12   more attendance optional.  Typically, we had attendance

13   from the property crime sergeant, whichever detectives

14   were available if they weren't tied up at court or at

15   jail for interviews, whichever deputies that were on

16   shift that weren't active on calls or at minimum their

17   supervisors or sergeant or corporal would attend.  When

18   I was in the district, we occasionally had a

19   representative from DOC like probation officer.  Other

20   agencies like New Port Richey Police Department or Port

21   Richey Police Department sometimes would send one of

22   their representatives.

23       Q.   Were members of the STAR team present at any of

24   these?

25       A.   Yes.

1      Q.    Were they supposed to be present at all of

2  them?

3      A.    I don't know if it was a rule set in place by

4  their sergeant.  Again, just like a deputy, if they were

5  available to be there, they would.

6      Q.    Were individuals from code enforcement in

7  attendance at AIM meetings?

8      A.    We didn't have code enforcement when I was in

9  the district.  So I don't know if that was a requirement

10  when we did have code enforcement deputies.

11      Q.    Was there a transition made where code

12  enforcement deputies were added to the ILP teams?

13          MR. POULTON:  Object to the form.  Go ahead.

14  BY MR. BARGIL:

15      Q.    I'll rephrase.  So you mentioned a moment ago

16  that when -- is this -- I want to be clear about what

17  you were talking about.  So when you were an analyst, is

18  it correct that you didn't have code enforcement

19  participating in AIM meetings because code enforcement

20  wasn't -- you didn't have code enforcement deputies at

21  the time; is that right?

22      A.    Correct.  When I was an analyst, we had county

23  code enforcement, which were civilian employees who did

24  sometimes attend, but they were not deputies.  They were

25  not Pasco Sheriff's Office employees.  Those positions

1    were created later on after I had worked in a district

2    as an analyst.

3         Q.   Okay.  Were they added during the time where

4    you were an analyst supervisor?

5         A.   I don't remember what year.  So it's possible

6    that I was an organized crime analyst or analyst

7    supervisor or a senior.  I don't remember what year we

8    got those positions.

9         Q.   Okay.  Do AIM meetings still occur?

10        A.   They do.

11        Q.   Do you attend those in your current position?

12        A.   I do.  Due to COVID, AIM meetings are done via

13   Teams.

14        Q.   I see.

15        A.   So they're virtual.

16        Q.   Does that help or hurt attendance?

17        A.   I don't know.  Could be all of the above.  I

18   think it depends on the week.

19        Q.   But now in any case setting that aside, now

20   that there is a code enforcement deputy position in

21   place, is that person now a typical attendee at the AIM

22   meetings?

23        A.   I don't --

24             MR. POULTON:  Object to the form.  They don't

25        have them anymore.

1          MR. BARGIL:  Okay.

2          MR. POULTON:  You might want to clarify.

3          MR. BARGIL:  Okay.

4    BY MR. BARGIL:

5      Q.   Before the position ceased to be, were code

6    enforcement deputies regular attendees at AIM meetings?

7      A.   I don't know if they were regular attendees.

8    They would attend just as any other deputy if they were

9    available.

10     Q.   Okay.

11     A.   Again, I don't know if it was a requirement for

12   each individual or if it was more of a if you're

13   available, be there.

14          (Exhibit 4 was marked for identification.)

15   BY MR. BARGIL:

16     Q.   Okay.  Do you recognize the document that's in

17   front of you?

18     A.   Without looking through it, no.  But just

19   quickly skimming through it, it appears to be a slide

20   deck or a PowerPoint presentation that Inspector Kraus

21   would present for new member orientation.

22     Q.   Okay.  Starting at page -- what is basically

23   page 3 if you're counting them off, the Bates stamps

24   here are super faint, but we can try to do it that way.

25     A.   Oh, boy.

```
 1              MR. POULTON:  I don't even see them.

 2   BY MR. BARGIL:

 3       Q.    00355.

 4       A.    Okay.

 5              MR. POULTON:  Ari, mine doesn't have any Bates

 6       stamps.

 7              MR. BARGIL:  Oh, they're there.

 8       A.    It's very, very, very faint.  It would be the

 9   paradigm one; correct?

10   BY MR. BARGIL:

11       Q.    Actually, the one before it.  I'm sorry.

12              MR. POULTON:  Mine literally don't.

13              MS. BROTHERS:  It's in this corner.

14              MR. POULTON:  Oh, it's in that corner.  Oh,

15       it's -- Okay.  I'm looking in the wrong -- Okay.  I

16       was looking over here.

17              MS. BROTHERS:  Yeah.

18              MR. POULTON:  Sorry.

19              MR. BARGIL:  We're at the vision page.

20              MR. POULTON:  Vision?

21              MR. BARGIL:  Yeah.

22              MR. POULTON:  All right.

23   BY MR. BARGIL:

24       Q.    Could you read that quote aloud for me?

25       A.    Yes.  "I skate to where the puck is going to
```

1   be, not where it has been."

2        Q.   Okay.  How does that encapsulate the vision of

3   ILP as far as you understand it?

4        A.   To try to be ahead of the crime, to try and

5   prevent it rather than be reactive and acting toward it

6   or reacting to it.

7        Q.   Are you trying to predict where it will take

8   place?

9             MR. POULTON:  Object to the form.  Go ahead.

10       A.   We don't predict anything.  We look at past

11  data, past history to try to -- but based on that past

12  history, we deduce what may occur again based on

13  performance factors, based on environmental factors.

14  For example, auto burglaries may occur more frequently

15  on a street without streetlights because it's dark.  So

16  we look at a number of factors to try to prevent the

17  crime from happening.

18  BY MR. BARGIL:

19       Q.   Will you take a look at 00379?

20            MR. POULTON:  I think I'll be able to find it.

21            MR. BARGIL:  This is the offender problem.

22            MR. POULTON:  Got it.

23            THE WITNESS:  You beat me to it.

24       A.   You said 379?

25  BY MR. BARGIL:

1    Q.   That's right.

2         MR. POULTON:  It helps if you kind of look at

3    it from an angle.

4         MR. BARGIL:  The light has to hit it just

5    right.

6         MR. POULTON:  Right.

7    A.   Okay.

8  BY MR. BARGIL:

9    Q.   It appears that this is a definition of

10  prolific offender; is that right?

11        MR. POULTON:  Object to the form.  Go ahead.

12   A.   Yes, the definition is on that side.

13  BY MR. BARGIL:

14   Q.   Okay.  Can you read that definition into the

15  record, please?

16   A.   Yes.  A person of any age who meets or exceeds

17  a threshold calculated by weighing their three-year

18  history in Pasco County of arrests and suspicions for

19  burglary, theft, narcotics violations, robbery and/or

20  any other forcible felony.

21   Q.   Okay.  Is that still the definition?

22        MR. POULTON:  Object to the form.

23   A.   That's a summary of it, yes.

24  BY MR. BARGIL:

25   Q.   Has there been discussion about changing the

1    definition of prolific offender?

2        A.   Not to my knowledge.

3        Q.   Now if you would will you turn to Fox 00382?

4        A.   Okay.

5        Q.   You can read this to yourself.

6        A.   Okay.

7        Q.   Are you familiar with what this says?

8        A.   Yes.

9        Q.   And is it fair to say this is a description of

10   how one -- of how a person may be classified as a TOP 5

11   offender?

12           MR. POULTON:  Object to the form.

13       A.   Any criteria to meet that TOP 5 offender

14   designation.

15   BY MR. BARGIL:

16       Q.   Criteria would be a good word, yeah.  I should

17   have used it.

18           If we look at the first bullet point, does it

19   say you must be classified as a prolific offender and/or

20   have a documented criminal history?

21       A.   It does.

22       Q.   Okay.  So you don't have to be a prolific

23   offender to be a TOP 5 designee; is that right?

24       A.   Correct.

25           MR. POULTON:  I'll just object to the form

1           again.  It not a clear on the timeframe.

2                   MR. BARGIL:  Yeah.

3           A.    The TOP 5 don't -- they no longer exist.

4    BY MR. BARGIL:

5           Q.    Right.

6           A.    But at the time of this presentation or at the

7    time --

8                   MR. POULTON:  As long as we're just clear that

9           it's a former designation and we're speaking in the

10          past tense, I'll stop bothering you.

11                  MR. BARGIL:  That's fine, and I'll do my best

12          to not mess that up as well.

13                  MR. POULTON:  It's just when we're like, for

14          example, on summary judgment I don't want the Court

15          to be confused that TOP 5 offender might still be an

16          active thing.

17                  MR. BARGIL:  It's a perfectly reasonable thing

18          to point out, and I will endeavor to do better.

19    BY MR. BARGIL:

20          Q.    So it says here if you're looking at the second

21    line, you must either be a prolific offender or have a

22    documented criminal history, and it goes on.  Is that

23    criminal history isolated to Pasco County?

24          A.    I don't know.  I would believe it would be just

25    because that's all we have access to in our records

1    management.

2         Q.   Okay.

3         A.   But I don't want to say it definitely is

4    because I don't know.

5         Q.   Okay.  Okay.  The next bullet point or criteria

6    is that you must have a network of a minimum of five

7    criminal associates.  Do you know how that's defined?

8         A.   As far as how we know associations?

9         Q.   Well, I guess there are two separate parts to

10   that.  The first is what constitutes being a criminal

11   associate?

12        A.   Committing crimes with one another, or if the

13   associate has criminal history, which we would know

14   through a report say subject A and subject B commit an

15   auto burglary together.  Then you're associates.  You're

16   committing crimes together.

17        Q.   What does it take to qualify as having a

18   criminal history?  Is it -- would a conviction

19   constitute a criminal history?

20        A.   In this definition, I don't know.

21        Q.   Would an arrest without a conviction?

22             MR. POULTON:  Well, objection.  I don't think

23        she's -- I think she said she doesn't know.

24             MR. BARGIL:  Well --

25        A.   I don't know.

1    BY MR. BARGIL:

2        Q.   Okay.

3        A.   I don't know what the definition for a

4    conviction or arrest or a history would be on this.

5        Q.   So is it fair to say you don't know what

6    constitutes the appropriate criminal history to be

7    classified as a criminal associate for this definition?

8        A.   Correct.

9        Q.   Okay.  Do you know what it means to be in a

10   network with a person?

11       A.   Yes, yes.  A network would be the association.

12       Q.   Okay.  How close of an association do you have

13   to be to be considered within someone's network?

14       A.   I don't know there's a definition other than if

15   you're committing a crime together or if it's two

16   subjects offending with one another, and I believe that

17   definition is enough to say you're a criminal associate.

18       Q.   What about if people know each other and have

19   committed crimes separately but not together?

20       A.   I don't know if that qualifies or not.

21       Q.   Same sort of question moving to the next bullet

22   point where it says in order to be a TOP 5 offender, you

23   must have a direct involvement with active Big 4 or

24   violent criminal activity.  Do you know how direct

25   involvement is defined?

1      A.   Direct involvement would be a suspect in the

2    case, or if you're another -- maybe you're with the

3    person offending at the time.

4      Q.   The bullet point sort of answers the question

5    above about associates of TOP 5, but again do you know

6    what it means to have a verified connection with an

7    offender?

8      A.   Verified being something documented such as the

9    record -- an offense record.

10      Q.   Okay.  Do you need all of these things to be

11    classified as TOP 5, or can it be a combination, some

12    but not others?

13      A.   We don't do the TOP 5 anymore, so I can't speak

14    on that.  And I know we've mentioned that, but I believe

15    it was all at the time.

16      Q.   Okay.

17           (Exhibit 5 was marked for identification.)

18    BY MR. BARGIL:

19      Q.   Okay.  Do you recognize the document that is in

20    front of you?

21      A.   Yes.

22      Q.   What is it?

23      A.   It's Statute 874.03 which is what defines

24    criminal gang enforcement and prevention.  It also lists

25    that criteria I referenced earlier as far as what has to

1  be met to be documented as a criminal gang associate or

2  criminal gang member.

3      Q.   Okay.  Look at subsection (2)(c).

4           Okay.  Is that one of the factors that can

5  allow someone to be a criminal -- classified as a

6  criminal gang associate?

7      A.   I don't see a (2)(c).  I see (2)(a), (b), and

8  then it goes to a (3) if I'm reading it correctly.

9      Q.   (1)(a), (b), and then (2)(c) about halfway

10  down.

11      A.   Oh, it's under (3).

12      Q.   It is under (3).

13      A.   Okay.  I'm sorry.  What did you ask about that?

14      Q.   (3)(c), which says criminal gang member,

15  there's a set of factors that can lead to someone being

16  classified as a criminal gang member if they meet two or

17  more of the following criteria; is that right?

18      A.   Correct.

19      Q.   Okay.  And what does (3)(c) say?

20      A.   (3)(c) is, is identified as a criminal gang

21  member by a documented reliable informant.

22      Q.   Okay.  Now when we take a look at -- looks like

23  you're already on the page -- 400 of the PowerPoint we

24  were looking at a moment ago --

25      A.   Right.

1      Q.    -- can you read the example of an invalid tip?

2      A.    An invalid tip, a concerned citizen who wishes

3   to remain anonymous called the dispatcher to report a

4   suspicious male on her street this morning lurking

5   around her garbage cans as they sat on the curb waiting

6   for pickup.

7      Q.    Actually strike this question.  Sorry.

8            Look to 408 in the PowerPoint.  This is a slide

9   describing AIM meetings; correct?

10     A.    Yes, it is.

11     Q.    And is it correct based on this reading and

12  based on your testimony that the analysts essentially

13  run the meetings?

14     A.    Yes.

15     Q.    Okay.  What is your role these days as an

16  analyst supervisor with regard to the AIM meetings?

17     A.    I don't have a role in them.  I just -- I'm an

18  observer.

19     Q.    Okay.  But the analysts prepare the slides?

20     A.    They do.

21     Q.    And based on what information are those slides

22  prepared?

23     A.    I don't know what information they utilize.  If

24  it's what it was when I was a district analyst, it would

25  be the CAD calls, the RMS reports, discussions with

1    detectives.  If there's maybe an update on PC for

2    somebody that's not entered into RMS yet, they could

3    include that information on the slide.

4         Q.    Informal conversations as well?

5         A.    That is an example I think, yeah, would be an

6    informal if a detective came to one of the analysts and

7    asked about PC, I just haven't done my supplement yet,

8    they could update that on the slide.

9         Q.    Okay.  Are you familiar with pre-AIM meetings?

10        A.    No.  Those were done after I moved out of the

11   analyst role.  I know what they are.  I've never been to

12   them though.

13        Q.    When did -- if you could give me a ballpark,

14   when the pre-AIM meetings started?

15        A.    I don't -- I don't remember.  I would -- know

16   it was pre-COVID, so I know it's been over a year, year

17   and a half because I recall they were doing them in

18   person before we all went remote, but I don't recall how

19   long exactly.

20        Q.    How would you describe what a pre-AIM meeting

21   is?

22        A.    From my understanding, it's a preparation for

23   the captain and lieutenant and the property crimes

24   sergeant just a briefing of what's going to be discussed

25   at the meeting, so if there's any additional questions

1    that any of the command have that they want researched

2    before the AIM, the analyst can go back and do more

3    research on it.  It's just -- it's preparation for the

4    commanders.

5        Q.   How far in advance of the AIM meeting does the

6    pre-AIM meeting typically take place?

7        A.   I don't believe they're uniform across each

8    district.  I think each district has a different time

9    based on the captain's schedule.

10       Q.   Is it more than a day?

11       A.   Oh, no.  It's the same day.  It's just I belive

12   some are in the morning, some are literally right before

13   the AIM.  Aim's are always done in the afternoon.

14       Q.   Is part of the discussion at a pre-AIM meeting

15   whether to add or remove individuals from various lists?

16       A.   I don't know.  I haven't been to them.

17       Q.   Okay.  Who attends the pre-AIM meetings?  Is it

18   like -- is it anyone else besides the ones you mentioned

19   before?

20       A.   To my knowledge, it's the captain, a district

21   lieutenant, the analyst and a property crimes sergeant

22   or a designee for that person.

23       Q.   Okay.

24       A.   Sorry.  I'm watching you look for the page

25   number knowing I'm gonna do the same.

1    Q.   Oh, okay.  I'm setting this aside for now.

2         MR. POULTON:  Are we at a good moment to just

3    stretch my legs?

4         MR. BARGIL:  Sure.

5         MR. POULTON:  Thank you, sir.

6         (Short break.)

7    BY MR. BARGIL:

8    Q.   Okay.  Welcome back.

9    A.   Thank you.

10   Q.   You acknowledge you're still under oath?

11   A.   Yeah.

12   Q.   Okay.  Couple of questions going back to some

13   of the stuff we talked about before.

14   A.   Okay.

15   Q.   You mentioned at one point that you gave the

16   example that if there were a number of car thefts or car

17   burglaries on a specific block that had no streetlights,

18   you might focus more attention or your analysts might

19   suggest that there be more attention focused on that

20   area.  Is that a fair --

21   A.   Yes.

22   Q.   -- description of what you testified?

23   A.   Yes.

24   Q.   What would you do if there was a belief that

25   the same person or persons were involved in suspected

1    criminal activity?

2        A.   I'm trying to process what you're asking.  I'm

3    sorry.

4        Q.   Well, it's a terrible question.  I guess, what

5    does ILP say about not places but people?  Would there

6    be focused attention on the individuals?

7        A.   There could be focused attention on an

8    individual if we have reason to believe that they're

9    involved in a criminal activity.

10       Q.   Okay.  And what does that focused attention

11   look like, do you know?

12       A.   It would be person and district specific, crime

13   specific.  It could be interviewing the person.  It

14   could being just monitoring that person.  It could be

15   looking on social media, for example, to see if there's

16   anything indicative of what they're up to.  Some

17   criminals, for example, will post pictures of what

18   they're doing.  Not so much anymore because I think they

19   have a better idea of social media being seen.  But it

20   just -- it depends on every -- every situation is a

21   little bit more unique.

22       Q.   Okay.  You mentioned in the list of things that

23   you were talking about that there might be monitoring.

24   What do you mean by monitoring?

25       A.   The social media.

1      Q.   Okay.

2      A.   Any reports management, looking in CAD, which

3  is our call system, or RMS for any FIR's, for example,

4  to see if we've had any suspicious incidents reported

5  where -- an example from when I was an analyst is a

6  suspect was FIRed, field interviewed, riding a bike a

7  block over from where there had been a rash of

8  burglaries.  So we have to take that into account

9  because that places that person in the general vicinity

10  of the crime at a close hour to when everything

11  occurred.

12      Q.   So is this sort of how the agency skates to

13  where the puck is going to be to borrow that quote?

14          MR. POULTON:  Object to the form.  Go ahead.

15      A.   I believe so.

16  BY MR. BARGIL:

17      Q.   Is the goal to get out in front of what might

18  happen if that person isn't subject to increased

19  monitoring for example?

20          MR. POULTON:  Same objection.

21      A.   I think the goal is to prevent crime from

22  happening before -- rather than being reactive, trying

23  to stop it before it happens to reduce the

24  victimization, reduce the crime.

25  BY MR. BARGIL:

1    Q.   Okay.  In talking about prolific offenders, do

2  you have access or do your analysts have access to the

3  database of current and past prolific offenders?

4    A.   Yeah, so when the offenders are pulled by Steve

5  Hiebert and they're emailed out to the analysts to

6  review, it's kept in a spreadsheet.  Once the list is

7  finalized, which would be by the analyst, an alert is

8  put on the name file in the RMS system, and that's where

9  they're able to access if someone is or isn't a prolific

10  offender.

11    Q.   So if you go into the RMS system searching for

12  a specific person who is a prolific offender, would you

13  be able to tell by looking in the system on what date

14  they were classified as a prolific offender?

15    A.   Yes, because they're done quarterly and they

16  input an active date.

17    Q.   Okay.  Is the same generally true for TOP 5?

18    A.   I don't know.  When we did -- when we did TOP

19  5, I know they did the alert.  I don't know if a date

20  was input at that time.

21    Q.   When someone -- when you were doing TOP 5, when

22  someone was classified as TOP 5, was there an immediate

23  alert that went out that there's a new person in the TOP

24  5?

25    A.   With the RMS, I don't know what the system was.

1    I know they were put on the following week of AIM

2    slides.

3         Q.    Okay.

4         A.    They were presented that route.

5         Q.    Okay.  When did the agency stop using the TOP 5

6    classification?

7         A.    I don't know.

8         Q.    Was it within the last two years?

9         A.    Without looking back at records, I don't want

10   to say it was two years or three years.  It was not less

11   than two years.  I'm comfortable saying it's been two

12   plus years.

13        Q.    Between two and three?

14        A.    I believe.  But again, I don't want to say that

15   for sure because I don't know.

16        Q.    Do you know why the classification was

17   eliminated?

18        A.    I don't other than my understanding was we did

19   not need to label an individual that was actively

20   impacting the crime picture in order to target.  If they

21   were committing crime, we didn't need a label to make an

22   arrest or further investigate that suspicion.

23        Q.    Is there some other system in place now that is

24   intended to direct agency focus on certain individuals?

25        A.    No.  To my knowledge, the only systems we have

1    are prolific offenders and we have the -- it's not

2    district target -- well, it is a district target which

3    is a subject who has a warrant or a probable cause that

4    we're attempting to locate.

5         Q.   But district targets listed before TOP 5

6    classifications were eliminated; is that right?

7         A.   They existed at the same time, yes.

8         Q.   Do you know why the TOP 5 designation was

9    eliminated?  Or you just told me.

10             MR. POULTON:  Thirty seconds ago.  Been a long

11        day.

12             MR. BARGIL:  Yeah.

13   BY MR. BARGIL:

14        Q.   Does it have anything to do with attention that

15   the agency was receiving connected to its use of TOP 5

16   classifications?

17        A.   I don't know.  I wasn't privy to the decision.

18        Q.   Who made that decision?

19        A.   I don't know.  I don't know if the decision was

20   at the ILP level or further above.

21        Q.   Do you meet with supervisors on a fairly

22   regular basis?

23        A.   Supervisors as far as within ILP?

24        Q.   Your own supervisors?

25        A.   Yes.

1      Q.   I think you mentioned that it was -- can't read

2  my own handwriting but --

3      A.   Santos?

4      Q.   Santos and Kraus?

5      A.   Correct, yes.

6      Q.   Are you in regular contact with them?

7      A.   I am, yes.

8      Q.   Do they consult with you on decisions about the

9  administration of ILP?

10         MR. POULTON:  Object to the form.  Go ahead.

11     A.   Not so much the administration.  Any consulting

12  with me is usually in regards to my staff members.

13  BY MR. BARGIL:

14     Q.   In what sense?

15     A.   Any staff concerns whether it be their

16  well-being, any concerns with performance, anything that

17  I might need to address, for example, if a deputy or a

18  captain might come to them with a concern about

19  performance or a question about a level of performance

20  or something that is being done, they will bring it to

21  my attention to address as a direct supervisor.

22     Q.   Okay.  Take a look finally now at Exhibit 1.

23     A.   Okay.

24     Q.   And we talked briefly about what it was before.

25  I'm going to I think do this starting from the back to

1    the front --

2        A.   Okay.

3        Q.   -- so that it goes in chronological order.  So

4    why don't we start with Bates number 18968.

5        A.   Okay.

6        Q.   Can you tell what year this is from?

7        A.   2018.

8        Q.   Okay.  And is this page the self-evaluation

9    questionnaire on your member performance report?

10       A.   Yes, it is.

11       Q.   Would you read what's written under section D

12   at the top?

13       A.   "I was out for work for 12 weeks of this rating

14   period for family medical leave, which set me back on a

15   number of tasks.  As I get caught up, I plan to see

16   through all tasks that I had previously planned on

17   completing.  That includes gaining more experience or a

18   better understanding of SNA, getting cross-training with

19   the realtime crime center supervisor, and attending more

20   of the district AIM's.

21       Q.   Okay.  Now this being in 2018, were you already

22   an analyst supervisor at the time of this review?

23       A.   I was, yes.

24       Q.   Okay.  Did you -- seems like at the time is it

25   fair to say that you felt like you wanted to have a

1    better understanding of social networking analysis?

2        A.   I did.

3        Q.   Okay.  Have you done that?

4        A.   I have not.

5        Q.   Okay.  What is an RTCC supervisor?

6        A.   That's the counterpart I referenced earlier,

7    Melinda Warner, she oversees the realtime crime center.

8        Q.   You also said that you wanted to attend more of

9    the district AIM's.

10       A.   Correct.

11       Q.   I think your testimony earlier was that you're

12   a regular attendee of those meetings; is that right?

13       A.   At this time I am.  They're done remotely via

14   Teams.

15       Q.   Oh.

16       A.   So it's a lot easier to attend.  At the time in

17   2018 they were still being done in person, so I wasn't

18   able to attend three places at one time.  Each district

19   has their own AIM.  So I couldn't get from Dade City to

20   Trinity, for example.  Now I'm able to at least attend

21   live two meetings each week and then review the recorded

22   following.

23       Q.   Okay.  Can you go to the previous page 18967?

24       A.   Okay.

25       Q.   This is still part of the self-evaluation.  Can

1    you read those two sentences?

2        A.    "I'm a firm believer in a supervisor having the

3    ability to not only understand but perform the tasks of

4    his or her employees.  With that said, I lack experience

5    in court services and juvenile analysis."

6        Q.    And did you provide this in response to the

7    question about what areas of performance you would most

8    like to improve?

9        A.    Yes.

10       Q.    Why court services and juvenile analysis?

11       A.    During my experience as an analyst, I've worked

12   with major crimes, I've worked with districts which is

13   property crimes and patrol, I've worked with vice and

14   narcotics and organized crime, but I never worked as an

15   analyst in the jail which is court services and the

16   juvenile analyst.  Those are roles that I never worked

17   as an analyst in.  So I'd like to develop a better

18   understanding of the day-to-day operations for those two

19   roles just because I believe a supervisor should know

20   and be able to provide backup to their personnel if

21   they're out sick or they're out on any kind of leave,

22   and those are the two areas that I am least familiar

23   with.

24       Q.    What is the juvenile -- when you say juvenile

25   analysis, that would be the job of -- I forget the title

1    -- the -- there's a designated analyst within your

2    department that focuses on juveniles; is that right?

3        A.   There is.  At this time juvenile analysis was

4    more geared toward assisting child protective

5    investigations and SRO's.  Since the time of this

6    writing, we've received a grant funded position for an

7    actual juvenile analyst, and that's the one I referenced

8    that's embedded with the school board.

9            MR. POULTON:  Real quick, I'm going to try to

10        get Larry to be prepared to tell you more about that

11        because it's not -- it's like its own animal.  It's

12        housed in ILP, but it's not got the same level of

13        connection to the other parts that, you know,

14        individual like district analysts do, and I figured

15        you'd want to know that.

16           MR. BARGIL:  Yeah?

17           MR. POULTON:  Yeah.

18           MR. BARGIL:  We'll explore.

19           MR. POULTON:  Okay.  We'll have a long day with

20        Larry Kraus.

21   BY MR. BARGIL:

22       Q.   You can turn now to Defendant 18953.

23       A.   Okay.

24       Q.   And is this another member performance report?

25       A.   It is.  This is one of the pages that was

1  written by my supervisor with regards to me.

2      Q.   Okay.  Looks like it's jointly submitted; is

3  that right?

4      A.   Yes, by Santos and Kraus.

5      Q.   Okay.  And what is the date range for this?

6      A.   September 2018 till September 2019.

7      Q.   Is this your MPR from your first full year as

8  an analyst supervisor?

9      A.   Yes.

10      Q.   If we look down in the left-hand column, I

11  think it says B plus, C plus, C plus.

12      A.   Correct.

13      Q.   Are these letters grades describing your

14  performance?

15      A.   I believe these are supplements, and the

16  letters that are next to it would be in reference to the

17  previous pages.  So, for example, if you look at 18947,

18  B is the question of what are the member's strengths and

19  notable accomplishments.  So then the one that's next to

20  B on 53 is just a continuation of that writing.

21      Q.   I see.

22      A.   With the member performance reports, they don't

23  do a grading scale --

24      Q.   Okay.

25      A.   -- on the numbers.  It's all comment based.

1    Q.   Well, then I guess for one reason or another

2    I'm more interested in stuff that ended up in the

3    supplements, but on this page 18953 if we look at the

4    followup to B plus or supplement to B I suppose, the

5    first sentence references an annual intelligence audit

6    for 2018.  Do you see where I'm looking?

7    A.   Yes, I do.

8    Q.   And it says that the goal of the audit is to

9    make sure -- actually, what is the goal of the audit?

10   A.   To ensure we're in compliance with 28 C.F.R.,

11   which is guidelines given for the housing of

12   intelligence information.

13   Q.   Is this a federal regulation?

14   A.   It is.

15   Q.   Do you get audited by the federal government

16   for the way you keep your -- to make sure that you're

17   appropriately storing sensitive information?

18   A.   I don't know if they do actual audits in our

19   system or not or if it's done in-house or if it's just

20   done -- if it stops with me.

21   Q.   What do you do as part of that audit?

22   A.   I query the information that's considered

23   intelligence, so any workups, any gang documentation,

24   anything that's five years or older.  And in 2018, being

25   it was the first one, we looked at everything beyond

1    five years.  I research it to determine if it's still

2    considered active.  So if it's regarding a case that we

3    do still have active information on, then it's kept

4    open.  If it's gang information, for example, if 2018 we

5    documented a member of a gang and we've had contact with

6    that person since that time, say we've seen them in gang

7    colors or we know they're still associating, then we can

8    keep it active.  If we've not had any other reason to

9    believe that it's either active criminal intelligence or

10   that it's a gang member, for example, then it's purged

11   out of the system.  I go into the report.  I redact that

12   person's name so it's no longer on their name record,

13   and I document a memo how many reports, how many workups

14   were purged for that year.

15       Q.   Okay.  After it's purged is it completely

16   unavailable?  Do you store it anywhere else?

17       A.   No.

18       Q.   Any of the names mentioned in the purged

19   information are redacted in future or --

20       A.   They're redacted from those old reports.

21       Q.   From those old reports?

22       A.   So if I redacted subject A as a gang member

23   because we have nothing more recent than five years

24   showing their active status, that gang report still

25   exists, but it is not connected to a name, and it's got

1    a long white space where the name would be because we

2    can't physically remove a whole report from the reports

3    management system.

4        Q.   Okay.

5        A.   So it's just basically a shell report.  It says

6    blank was documented on this date as this gang member.

7        Q.   Okay.  I guess that was my question.  So the

8    reports continue to exist, just without identifying

9    information?

10       A.   Correct.

11       Q.   Okay.  If you look at a few lines down, what is

12   the second C supplement?  There's a criticism there in

13   the first two sentences.  Can you read into the record

14   what that says?

15       A.   Yeah.  The first two sentences?

16       Q.   Uh-huh.

17       A.   "Analyst Supervisor Gardner needs improvement

18   in dealing with conflict resolution among her analyst

19   and fellow supervisors.  Improving her ability to

20   effectively communicate when a conflict arises is

21   critical when dealing with both internal and external

22   conflict."

23       Q.   Okay.  What is that in reference to?

24       A.   I don't recall any specific incident that that

25   would be in reference to.

1          I'm just -- I'm reading the rest of it to see

2     if it triggers any memory.

3          Q.   Are there sometimes conflicts between analysts

4     and supervisors?

5          MR. POULTON:  Object to the form.  Go ahead.

6          A.   I'm just -- I'm trying to --

7          MR. POULTON:  No, go ahead.

8          A.   -- trigger any memory I have of what it might

9     be in reference to.

10          There's conflicts, but it's never something

11     that's not remedied at our level.

12     BY MR. BARGIL:

13          Q.   What are some of the issues that ultimately

14     lead to conflicts?

15          A.   The majority of issues that I recall are always

16     personality conflicts.  When I have eleven people under

17     me, sometimes there are disagreements with one another,

18     and it usually just requires talking it out and

19     understanding that we all think differently and we may

20     all take a different approach to that thought process,

21     but ultimately it ends the same -- the same way.

22          Q.   Are there ever disagreements about how to

23     interpret some of the intelligence that your analysts

24     gathered or are analyzing?

25          A.   If there is, it's never brought to my attention

1    that I recall.

2        Q.   Okay.  Are there ever conflicts about whether

3    someone should be or should not be either classified as

4    a prolific offender or a TOP 5?

5        A.   That's never been brought to my attention.  But

6    again, these analysts have the say in that

7    interpretation or that classification.

8        Q.   If you look at 18927 --

9        A.   Okay.

10       Q.   All right.  Look down at part D.

11       A.   Okay.

12       Q.   And again, is this a member performance report?

13       A.   Yes, it is.

14       Q.   And can you tell me what year this is from?

15       A.   It was for the rating period of 2020 to 2021.

16       Q.   Okay.

17            MR. POULTON:  I'm sorry.  What page are we on?

18       I missed it.

19            MR. BARGIL:  18927.

20            MR. POULTON:  27.  Okay.  Thank you.

21   BY MR. BARGIL:

22       Q.   If you look down at part D, what does that

23   first sentence say?

24       A.   "Supervisor Gardner was unable to complete a

25   written standard operating procedure (SOP) concerning

1    the associated task involved in completing the annual

2    purge of intelligence records as well as the proper

3    handling of public records requests."

4        Q.   Can you describe a little bit about what the

5    assignment was for you to do here?

6        A.   Sure.  So I was asked to complete a operating

7    procedure or a summarized process so that someone other

8    than myself would be able to complete an intelligence

9    purge or a public records request.  The writing of the

10   SOP wasn't complete because of a very large number of

11   public records requests that came in from multiple

12   requesters that were assigned to me.  So that put me

13   behind on quite a bit because they continue to come in.

14   They assigned me to handle the redaction of all the

15   slides, for example.  So it's in process.  It's just not

16   completed.

17       Q.   So do you handle all of the public records

18   requests that go to what?  Let me just stop there.  Do

19   you handle public records requests?

20       A.   I handle public records requests that are

21   relevant to ILP.

22       Q.   Okay.  And there was an influx or an inordinate

23   number of ILP-related public records requests during

24   this time period time; is that right?

25       A.   That's right.

1    Q.   And those were assigned to you?

2    A.   Yes.

3    Q.   And your job as you said is to what, to redact?

4    A.   To review and redact anything that's considered

5    still active intelligence or falls within that exemption

6    from public record.

7    Q.   Okay.  Are you supposed to review or redact

8    anything else that doesn't fall into those categories?

9         MR. POULTON:  Object to the form.  Go ahead.

10   A.   No.

11        (Exhibit 6 was marked for identification.)

12        MR. POULTON:  This is 6?  Okay.

13   BY MR. BARGIL:

14   Q.   Okay.  What is this document in front of you?

15   A.   This is the district three actionable

16   intelligence slides that would have been presented at

17   the AIM following the week of August 27, '18 till

18   September 23rd -- oh, I'm sorry.  That's weekly

19   comparison -- September 17th to September 23rd of '18.

20   Q.   The week ending September 23rd?

21   A.   Right.  So the AIM meetings are typically held

22   on a Wednesday.  So they look at the week prior to that

23   for any review of cases.

24   Q.   Okay.  I would like you to turn to -- this is

25   much easier to read the Bates numbers on.

1    MR. POULTON:  Yeah.

2 BY MR. BARGIL:

3  Q. Take a look at Defendant 16447.

4  A. Okay.

5  Q. And what is this slide showing us?

6  A. This is the district three TOP 5 offenders.

7  Q. Okay.  And right underneath where it says

8 district three TOP 5, does it say as of when this info

9 is valid?

10  A. It says info valid as of 9-25-18 at 1100 hours.

11  Q. Okay.  But that doesn't -- does that mean that

12 that is the date of the meeting?

13  A. No.  That means that was at the time that the

14 analyst preparing the slides looked the information up,

15 and the reason that they would do that is because today

16 at 10:30 Tyler McCambridge might be out running around

17 on the streets and then at 11:01 he might be arrested

18 for something.

19  Q. Okay.

20  A. So they -- and they would note, for example --

21 that's a bad example because it does say juvenile

22 probation on his.

23  Q. Okay.

24  A. But his status could change within a minute.

25 So they make sure to time stamp when the information was

1    researched.

2        Q.   Okay.  If you look and the bottom right corner

3    there, can you tell me who you see?

4        A.   Donnie McDougall.

5        Q.   Okay.  The number that appears after his name,

6    what does that denote?

7        A.   It's a number 8, and it denotes the number of

8    days that he's been on the target list.

9        Q.   Okay.  So if this was info valid as of 9-25-18

10   and as of 9-25-18 he'd been on the list for eight days,

11   does that mean he was put on the list on the 17th?

12       A.   Based on that information, yes.  I didn't put

13   him on the list, so I can't say that for sure.  But

14   based on the eight day mark and the information being

15   valid, counting back, yes.

16       Q.   Okay.

17       A.   Well, 17th or possibly the 18th depending on

18   what days they count.  Right?  17, 18, 19, 20, 21, 22,

19   23, 24 would be eight days.  So possibly the 18th or the

20   17th, but on or around that date.

21       Q.   Okay.  Is there any policy or practice like if

22   we wanted to be sure whether it was the 17th or 18th for

23   how they calculate dates?

24       A.   I could confer back to the analyst who prepared

25   the slide, and they may be able to advise.

1      Q.   Okay.  Or would there be RMS data that would

2  tell us for sure?

3      A.   Again, back to the question on the TOP 5, I

4  don't know when we did the alerts if there were dates

5  put on those.

6      Q.   Okay.  The list of -- I don't know what you

7  would call it -- violations, crimes, that are under each

8  TOP 5 individual, are these all things that these people

9  were convicted of?

10      A.   Again, back to the previous conversation, I

11  don't know if it's convictions or arrests.

12      Q.   Okay.

13      A.   But it would be their offense history out of

14  our RMS.

15      Q.   Okay.  Would it include things that were only

16  suspicion of?

17      A.   I don't know.  I would imagine this is anything

18  they were either listed as a suspect or offender in.

19      Q.   Okay.

20           (Exhibit 7 was marked for identification.)

21  BY MR. BARGIL:

22      Q.   Is it apparent to you what we're looking at

23  here?

24      A.   I'm reviewing it right now.

25      Q.   Okay.

1    A.   It's an email from Chase to Larry and Larry

2  myself with a draft response, but I don't see the

3  attachment to see specifically which edit or what it's

4  in regard to.

5    Q.   I've got that next.

6    A.   Okay.

7    Q.   I'm introducing this so I can introduce that.

8    A.   Okay.

9    Q.   But is it your understanding based on this

10  email that this is an email thread regarding a draft

11  response to the Tampa Bay Times?

12    A.   Yes, likely in response to some kind of a

13  records request.

14    Q.   Uh-huh.  Who's Chase Daniels?

15    A.   Chase Daniels is the executive director to the

16  sheriff or assistant executive director.  At that time

17  he was handling a lot of the incoming public records and

18  he was routing them.

19    Q.   And I see Jeffrey Peak is on here as well.  Who

20  is Jeffrey Peak?

21    A.   Jeffrey Peak is the major over criminal

22  investigations or special investigations division.

23    Q.   Is he still with the Sheriff's Office?

24    A.   Yes, sir.

25    Q.   Okay.  The body of this email from Chase says

1    that he and Amanda have been working on this.  Who is

2    Amanda?

3         A.    Amanda, she is in the public information

4    office.  I don't know her actual title.

5         Q.    Okay.  And Larry specifically forwarded this to

6    you?

7         A.    Right.

8         Q.    And we'll get to, I guess, the email in a

9    second, but why would he send it specifically to you?

10        A.    Because I was handling a lot of the public

11   records requests.

12        Q.    Okay.

13              (Exhibit 8 was marked for identification.)

14   BY MR. BARGIL:

15        Q.    Okay.  Does this appear to be the attachment

16   that would have come along with that email?

17        A.    It is an attachment.  I can't say for sure that

18   it's reference to that email, but it is an attachment

19   that was sent to me regarding a Tampa Bay Times request.

20        Q.    Okay.  Is your response to the questions

21   written in bold below each like individual's name?

22        A.    There is a response.  Without looking back in

23   my email, I can't say if I provided the response or if I

24   enlisted one of my analysts who's familiar with these

25   cases to assist with the responses, but I did likely

1    send this back to Larry as a blanket response.

2         Q.   Okay.

3         A.   There are a number of occasion where I asked

4    Ashley Burch for help as the D3 analyst, as she was

5    already familiar with some of the cases or offenders, to

6    do the research to help alleviate some of --

7         Q.   Okay.

8         A.   -- the workload.

9         Q.   Will you look to the -- about halfway down on

10   page 1 --

11        A.   Sure.

12        Q.   -- there's a mention of an individual named Rio

13   Wojtecki.  I'm probably butchering that last name.  Does

14   that -- do you see where I'm looking?

15        A.   I do.

16        Q.   Okay.  And there are two questions that are

17   posed I believe to you, and the second one begins with,

18   "Was Rio on any TOP 5 list?"  Do you see where I'm

19   looking?

20        A.   The first question under his name?

21        Q.   Well, it's actually the second I think.

22        A.   Okay.  Yes, I do see.

23        Q.   And -- well, actually, let's go back to the

24   first one.  I'm sorry.

25             It says here, "Rio was made a district three

1    TOP 5 on 9-18-2019."  Correct?

2        A.    Correct.

3        Q.    And so there was a way at least in your

4    response here to determine precisely the date on which

5    he was placed on the TOP 5; is that right?

6        A.    Correct.

7        Q.    And it says he had been arrested once prior; is

8    that right?

9        A.    Yes.

10       Q.    Does that mean he would have been ineligible

11   for consideration as a prolific offender?

12       A.    Based on the criteria for prolific offender,

13   yes, ineligible as a prolific offender, however, not

14   ineligible as a TOP 5 --

15       Q.    Okay.

16       A.    -- based on criteria.

17       Q.    Now moving to the second question, would you

18   read out loud what the question posed there was?

19       A.    "Was Rio on any TOP 5 list, and if so, why?

20   Based on previous answers he would have a warrant or an

21   active PC pickup.  Can we find out what the warrant or

22   active PC pickup was for?"

23       Q.    Okay.  Can you read the first sentence of your

24   answer there?

25       A.    "Rio was made a district TOP 3," or I'm sorry,

1    "a district three TOP 5 due to his prior Big 4 arrest,

2    which was for burglary of a business and burglary

3    dwelling (both curtilage only), but mainly due to his

4    criminal network and associations."

5        Q.   Okay.  Do you know if that's enough based on

6    the criteria that we discussed before for him to be

7    classified as TOP 5?

8            MR. POULTON:  Object to the form.  Go ahead.

9        A.   Without looking back on that criteria so I

10   can  --

11   BY MR. BARGIL:

12       Q.   Let's get the criteria.

13       A.   Okay.

14           MR. POULTON:  What number is it?

15           THE WITNESS:  It was 4; right?

16           MS. BROTHERS:  Yes.

17   BY MR. BARGIL:

18       Q.   Okay.  We're looking back at Exhibit 4, and it

19   was Bates -- and I know you love this part -- Bates

20   007382.

21       A.   So Rio would have had the documented criminal

22   history as an offender.  It does reference a criminal

23   network and association, so he meets that.

24       Q.   Does it say whether he --

25       A.   Without reading further into the paragraph, the

1   direct involvement with active Big 4 or violent criminal

2   history or criminal activity --

3              MR. POULTON:  But it's --

4       A.    I'd have to read further into it.

5              MR. POULTON:  I can -- well, I'll let you find

6       it on your own.  I think it -- just to help along, I

7       think where it starts out "additionally" kind of

8       like the fourth or fifth line down, kind of in the

9       middle there.

10      A.    "At the time of Rio's placement into TOP 5

11  status, he was currently on probation, and per an email

12  dated 9-11-19 from his JPO, Rio is on probation until

13  6-20-21 with a curfew."

14             MR. POULTON:  I'm looking up above that.

15             THE WITNESS:  It's above that.

16             MR. POULTON:  Additionally.

17      A.    "Additionally Rio associated and still

18  currently associates with several juveniles who have Big

19  4 arrest history, including a current district three

20  zone focus offender Alberto Camacho."  So that would

21  cover his associations, his network.

22  BY MR. BARGIL:

23      Q.    Right.  Does that establish that he has direct

24  involvement with active Big 4 or violent criminal

25  activity?

1          MR. POULTON:  Object to the form.  Go ahead.

2      A.   He has associations with people that do.  I

3  don't know based on this definition if they're looking

4  for him to be identified as an offender or if he can be

5  associated with offenders for that.

6  BY MR. BARGIL:

7      Q.   As far as you know, would that -- would being

8  associated with people who have Big 4 arrest history

9  constitute direct involvement with active Big 4

10 activity?

11     A.   I don't know.  I do not know.

12     Q.   So active -- a requirement for active -- for

13 connection to active involvement could mean a connection

14 to those with past involvement?

15     A.   I'm sorry.  Can you say that again?

16     Q.   Well, what I'm asking is if the requirement

17 says that you had to have direct involvement with active

18 Big 4 or violent criminal activity, and this says that

19 he has a connection to people who have, quote, Big 4

20 arrest history --

21          MR. POULTON:  Object to the form.  You're only

22     reading one -- just object to the form.

23     A.   I don't know what the definition for direct

24 involvement is.

25 BY MR. BARGIL:

1    Q.   Fair enough.

2         Go down a little bit to where you stopped

3    reading before.  It's about halfway down where the

4    sentence that begins, "When Rio was selected".

5    A.   Okay.

6    Q.   Can you read that sentence or two?

7    A.   Sure.  "When Rio was selected as a TOP 5, the

8    entire TOP 5 was completely replaced at the request of

9    Captain Frick and prior to that taking effect, possible

10   candidates were discovered with STAR during a pre-AIM

11   meeting, which is when STAR also suggested Rio as a TOP

12   5."

13   Q.   Okay.  Who is Captain Frick?

14   A.   Captain Frick is the D3 commander, the D3

15   captain.

16   Q.   Okay.  Based on this, it would appear that he

17   has the authority to replace the TOP 5; is that right?

18   A.   Based on this information, yes.

19   Q.   And, in fact, he did do that in this instance;

20   is that right?

21   A.   According to this document, yes.

22   Q.   And this was discussed with STAR during a

23   pre-AIM meeting; is that correct?

24   A.   According to this, yes.

25   Q.   And Rio was suggested by STAR as a TOP 5; is

1    that right?

2        A.    Yes, according to this.

3        Q.    And the following sentence, will you go ahead

4    and read that one as well?

5        A.    "STAR advised there was rarely any parental

6    supervision at Rio's home, and other problematic

7    juveniles were frequently at the residence."

8        Q.    Okay.  Is there any -- as far as you know, did

9    the TOP 5 criteria take into consideration whether there

10   was a sufficient amount of parental supervision at a

11   residence?

12       A.    Not to my knowledge.

13       Q.    Do you know why Captain Frick -- or I shouldn't

14   even say -- do you know why a district commander would

15   want to replace a TOP 5?

16       A.    I don't.

17       Q.    Do you know whether there was always required

18   to be a TOP 5?

19       A.    I don't know that it was a requirement.  To my

20   recollection, there always was on the slides.  I don't

21   know if it was an actual requirement to always have.

22       Q.    If a TOP 5 person was captured or arrested,

23   would the job of the analysts be to supply a new TOP 5

24   or to at least come up with a pool of candidates for a

25   new TOP 5?

1       A.   Not always.  An arrest did not constitute

2    replacement of that TOP 5 because many times someone

3    could be out of jail in a day.  They could be out of

4    jail in 21 more days and reaffecting the crime picture.

5    So to my recollection, we didn't always replace the TOP

6    5 just due to an arrest.  In addition, from what I'm

7    remembering, the TOP 5 network was a focus.  So just

8    because the person in the middle of that was arrested,

9    it didn't mean that the other five or whatever names

10   were surrounding as associations were not still active.

11       Q.   Would you sometimes immediately if somebody --

12   but -- strike that.

13           Even though like what you just said

14   notwithstanding, were there instances where somebody who

15   was TOP 5 got arrested and was removed from the TOP 5

16   list because of the arrest?

17       A.   Not to an immediate recollection.  I'd have to

18   look back on every week to know for sure if that ever

19   happened.

20       Q.   Okay.

21       A.   I didn't directly monitor.

22       Q.   If somebody was TOP 5 and got arrested and sent

23   to jail for two years, would there be any reason to keep

24   them on a TOP 5 list that entire time?

25       A.   No, not for two years.

1    Q.    Could it be the case though that the instant

2    they got out of jail they would be put back on the TOP 5

3    list?

4            MR. POULTON:   Object to the form.   Go ahead.

5    A.    I don't know.   I think it is important to

6    mention though with the TOP 5 that an example like that

7    with the two years would have to be post sentencing.   So

8    they would have already been through some sentencing

9    process.   We wouldn't know if they were going to be in

10   Land O' Lakes Jail or DJJ, for example, for a two-year

11   period.

12           So just at the time of an arrest, I don't

13   believe they would just typically move them off the list

14   not knowing how long they were going to be out of the

15   picture for.

16   BY MR. BARGIL:

17   Q.    Okay.

18   A.    So it would be a post-sentence --

19   Q.    They might wait for a conviction or a

20   sentencing?

21   A.    Correct.

22   Q.    Okay.

23   A.    And the convictions to my knowledge are not

24   noted in RMS.   So they would have to be -- they would

25   have to check comprehensive case information system, and

1    I don't know if they did that for the TOP 5.

2        Q.   Okay.  Do you know whether individuals were --

3    deputies or anyone else were specifically trained on the

4    ILP manual?

5        A.   I don't know that there was training specific

6    to the manual.  I believe the training was offered

7    through the PowerPoint that you presented earlier, which

8    was Exhibit 4, and at some point I believe that was

9    offered in I remember orientation as well as in-service.

10   So the existing deputies were also provided that as well

11   as you, but training surrounding the manual itself, I

12   don't know.

13       Q.   Okay.  What about training surrounding the

14   policies expressed in the manual?

15       A.   I don't know.

16            (Exhibit 9 was marked for identification.)

17            MR. BARGIL:  Are you emailing me in the middle

18       of the deposition, Tom?

19            MR. POULTON:  Because if I don't, I'll forget.

20            THE WITNESS:  That's when we're on the Teams

21       meeting you see the email from me pop up on

22       someone's meeting.

23            MR. POULTON:  I'm just pointing out I'd like to

24       depose McDougall and Jones just for half a day and

25       asking if you can help us coordinate that.  That's

1      all.  Like I said, I'll forget if I don't do it now.

2  BY MR. BARGIL:

3      Q.   Does this document in front of you look

4  familiar to you?  Can you tell me what it is?

5      A.   It doesn't ring a bell till I look at it, but

6  I'm in the "from" field, so it must be.  Subject is

7  training documents and there's attachments to it, which

8  is the checklist for a crime analyst training.  It looks

9  like it was sent to Larry Kraus on February 19th, and

10  attached to that is a spreadsheet of areas of training

11  that's offered to the crime analysts.

12     Q.   Is this required training?

13     A.   Yes.

14     Q.   Who administers this training?

15     A.   Depends on who the training person is.

16  Typically, if it's a district analyst, it's whoever the

17  counterpart is.  So, for example, when Mary came into

18  district three, Ashley would have been her trainer.

19     Q.   Okay.  Have you ever used this in training

20  somebody?

21     A.   I have not.

22     Q.   Are all of the district analysts trained on

23  this?

24     A.   I can't say that they are for sure because I

25  don't know when this list started.

1    Q.   Okay.

2    A.   When I came into ILP, for example, this list

3  was not in existence.  So I don't believe I would have

4  had a formalized checklist with my name on it.  A number

5  of our analysts come in from other areas of the agency.

6  A number of them came in from realtime crime center, so

7  they were likely given this training before coming to my

8  supervision.

9    Q.   If someone were hired today, is this -- do you

10 still use this?

11   A.   I have not had a new hire under my area since

12 2018 I want to say.  Everyone that I've brought in has

13 been internally mainly from realtime crime center.  So

14 they were trained pre me or pre coming over to my side

15 of ILP.

16   Q.   Would there be any reason why this wouldn't be

17 used for a non-internal hire?

18   A.   The only reason it wouldn't be used is if there

19 has been any updates to it.  If there's been new areas

20 to add or areas to remove from it.

21   Q.   Are you aware whether there have been any

22 updates?

23   A.   I'm not.  I could check with Melinda Warner.

24 She would likely have this because she does a lot of the

25 new training for realtime crime center.

1     Q.   Okay.  If you look at 05939, at the bottom

2  toward the bottom --

3     A.   Uh-huh.

4     Q.   -- shows that there is a separate category for

5  ILP; is that right?

6     A.   There is.

7     Q.   And analysts are trained on what looks to be a

8  couple dozen maybe, dozen and a half different areas of

9  ILP.

10     A.   Okay.

11     Q.   Is there an expectation that an analyst will

12  have working knowledge of all of these categories?

13     A.   Working knowledge at minimum.  If you look

14  across the top, it shows verbalized, shown, completed

15  additional.  So some of the areas may be applicable to

16  specific areas of assignment.  For example, information

17  security is something that would be gone over with all

18  analysts or really anyone in the agency.  Patrol --

19  well, patrol districts is a bad example as well because

20  everyone is expected to know those lines.  The unified

21  report, for example, that's something that's produced by

22  the realtime crime center.  So with folks on my side on

23  the -- the district analysts and the juvenile analysts

24  and such, they may not be trained on or shown how to do

25  the unified, but they're made aware of what it is and

1    familiar with what to use it for.

2        Q.   Would they be made aware of, at least to the

3    extent they still used it, TOP 5 offenders and

4    associates?

5        A.   They should have been made at least aware that

6    it was a thing, that it was in existence at the time.

7    They may not know the criteria or how to produce that

8    list if they're not assigned to a district.

9        Q.   Okay.  If they were assigned to a district,

10   they would be expected to understand the criteria on how

11   to produce the list?

12       A.   If they were assigned to a district when we had

13   them, yes, when we had the target.

14       Q.   Same question for prolific offenders.  If an

15   analyst were assigned to a district, would they be

16   expected to understand how prolific offenders became

17   classified as such?

18       A.   Yes.

19       Q.   And would they play a role in the designation

20   of prolific offender status for some of the prolific

21   offenders?

22       A.   If they're assigned to a district, they would

23   play the role of reviewing that list once it's produced

24   by Steve Hiebert.

25            (Exhibit 10 was marked for identification.)

1    BY MR. BARGIL:

2        Q.    Does this document look familiar to you?

3        A.    It does not, again, without reading through it

4    to see what it is.

5        Q.    Do you want to take a second to read it?

6        A.    Please.

7              Okay.

8        Q.    What is your understanding what this document

9    is?

10       A.    It looks like a 2017 revision of what the

11   prolific offender selection process is.  It breaks down

12   the criteria and kind of defines what and how the

13   prolific offenders are selected and scored.

14       Q.    Take a look at the third paragraph.

15       A.    On page 1?

16       Q.    Yes, please.

17       A.    Okay.

18       Q.    Will you read the second sentence that begins

19   with RMS?

20       A.    "RMS/JMS data is the most viable source for

21   evaluation of chronic offending in Pasco County at this

22   time; however, a limitation is criminal activity outside

23   of the county is not considered."

24       Q.    Okay.  So is this saying that RMS and JMS data

25   is the best -- well, says the most viable source for

 1    evaluating chronic offending in Pasco County; is that

 2    right?

 3         A.    Yes.

 4         Q.    But then it also acknowledges that the

 5    limitation on that is that it doesn't take into account

 6    criminal activity outside the county?

 7         A.    It does because that's not always information

 8    that we are privy to.  We don't have access to other

 9    agency RMS systems.

10         Q.    Okay.  You don't have access to other agency

11    systems when determining whether someone would have been

12    TOP 5 though; right?

13         A.    What do you mean?  Because TOP 5 is specific to

14    Pasco County.

15         Q.    Yeah.  Strike the question.

16              So, well, are prolific offenders specific to

17    Pasco County as well?

18         A.    In what way?  As far as the criteria that we

19    identify them with is Pasco County offenses.

20         Q.    Okay.  And are there other --

21         A.    If you're asking, for example, do other

22    counties have prolific offender programs, yes, they do,

23    but I don't know what their criteria is.  It varies by

24    county.

25         Q.    That wasn't my question.

1    A.    Okay.

2    Q.    So my question -- we gather that the prolific

3    offender classification is based only on information and

4    activity taking place within Pasco County; correct?

5    A.    Correct.

6    Q.    TOP 5 on the other hand -- or I should say

7    rather than on the other hand, when classifying someone

8    as TOP 5, would you also only consider conduct taking

9    place within Pasco County?

10    MR. POULTON:  Object to the form.  I think it's

11    been gone over a couple times, but go ahead.

12    A.    I don't know, and that's why I was going to

13    reference back to earlier in the conversation when you

14    referenced say a deputy from another county calling

15    saying, hey, you need to look at this person.  I don't

16    know if that was ever taken into consideration for

17    selection of a TOP 5.

18    BY MR. BARGIL:

19    Q.    Okay.  If look down at the bottom of that page,

20    I think it's the last full sentence begins with

21    additional weight, can you read that sentence, please?

22    A.    "Additional weight is awarded for violation of

23    probation or parole (VOP), failure to appear (FTA),

24    length of time between offenses, repetitive appearance

25    in criminal incident reports listed as victim, witness,

1    or other involved, and for having a known gang

2    affiliation."

3        Q.   We talked about this a little bit before, but

4    I'm curious do you know whether or do you know why it

5    was decided to just afford additional weight at the back

6    end of the calculation instead of just including it as

7    part of the scoring system?

8        A.   I don't know why the decision would have been

9    made for that.  I can speculate, but I don't know why.

10       Q.   Go to the next page, page 2 of 4 of the

11   document.  If look down at the third paragraph that

12   begins with lastly --

13       A.   Uh-huh.

14       Q.   -- can you read that paragraph to yourself and

15   then read the final sentence?

16       A.   The last sentence is, "After individual

17   vetting, the top 100 active individuals by point value

18   under these criteria are assessed as prolific offenders

19   in Pasco County."

20       Q.   Okay.  I want to focus on the first clause in

21   that sentence after individual vetting.

22       A.   Okay.

23       Q.   What is individual vetting as far as your

24   understanding?

25       A.   I believe by the definition that the individual

1    vetting is when the data is sent out to the district

2    analysts for further review to look at who's currently

3    incarcerated in prison, who may not be residing in Pasco

4    anymore, who is not currently affecting that crime

5    environment, who do we not even recognize, for example,

6    if we haven't heard these names.  Those are the ones

7    that kind of drop to the bottom of the list, and then we

8    take that top 100.

9        Q.    And those are your prolific offenders?

10       A.    Correct.

11       Q.    Does it go district by district?

12       A.    I believe that -- well, I know the same list is

13   sent to all the districts, and then it's the district

14   analyst's responsibility to work on whichever names

15   reside within their district, and then they compile it

16   all back together into one list.  So it's not 100 per

17   district.  It's 100 for the county.

18       Q.    Okay.  Turn to the last page, please.  Will you

19   look at Step 3:  Enhancements?

20       A.    Okay.

21       Q.    Do you know if it's still the case that a 10

22   percent enhancement -- well, let me back up.

23             What does item number two under Enhancements

24   say?

25       A.    It says, "A 10 percent enhancement is added to

1    the final score for an individual who is known to deal

2    in or carry firearms.  This is calculated based off

3    arrest history and name alerts within RMS.

4         Q.   Okay.  Does that enhancement still apply?

5         A.   It would be best to ask Steve Hiebert on that.

6    I don't know.  To my knowledge, they haven't changed it,

7    but I don't know if it's still been used or not.

8         Q.   How would you know if someone carries firearms?

9              MR. POULTON:  Object to the form.

10        A.   Based on this, there's two ways that you could:

11   A name alert -- deputies have the availability to put an

12   alert on a name file for officer safety for someone who

13   is known to carry weapons or known to carry needles just

14   for officer safety purposes.  So if a deputy has an

15   interaction with someone that, for example, has a

16   history of felon in possession of a firearm, they can

17   put that alert on the name file so we're aware, hey, if

18   you're in contact with that person, that first thing you

19   see before you walk to the car for a traffic stop is

20   this person may have a firearm.  It's just that extra --

21   extra flag or extra alert to be aware.

22             Or just like I said before, with a felon in

23   possession, if we have a report of them that would

24   involve them carrying a firearm, if they have stolen a

25   firearm before, if they have been involved in a

1    shooting, any report classification that would involve a

2    firearm in their person or on their possession.

3        Q.   If you're a non-felon and you illegally own a

4    firearm, could that lead to your -- to 10 percent

5    enhancement?

6            MR. POULTON:  Object to the form.

7        A.   Again, I would refer that to Steve for a better

8    understanding, but I don't see why not.  You still have

9    a gun.  You could still be an officer safety issue.  You

10   could still utilize that gun.

11   BY MR. BARGIL:

12       Q.   Okay.

13           MR. POULTON:  What number was that?

14           THE WITNESS:  10.

15           MR. POULTON:  Thank you.  I'm just trying to

16       make sure.  Yeah.

17           (Exhibit 11 was marked for identification.)

18   BY MR. BARGIL:

19       Q.   Are you familiar with what this document

20   depicts?

21       A.   I can make assumptions on what it depicts.

22   This is the first time I'm seeing this one or recalling

23   it.

24           It appears to be a breakdown of historical

25   prolific designations on the plaintiffs in this.  It was

1    likely pulled by either Steve or Ross.  It looks like a

2    strategic project or product based on the file name

3    because that's his naming mechanism.

4         Q.   Okay.  I'd like you to take a look at the final

5    column.  Well, first let's talk a little bit about what

6    this shows.

7         A.   Okay.

8         Q.   So across the top there are eight names; is

9    that right?

10        A.   Yes, correct.

11        Q.   And under each name am I correct in reading

12   this as a list of rankings -- past rankings in the pool

13   for each of these names?

14        A.   That is my understanding of it.

15        Q.   Okay.  So, for example, you know, list number

16   10 for Donnie McDougall shows that in 2021 he was number

17   1,092; is that right?

18        A.   Correct.

19        Q.   Okay.  I'd like you to take a look at the last

20   column, Robert A. Jones, IV.

21        A.   Okay.

22        Q.   He is not listed in any of the rows other than

23   the second one which is for 2017; is that right?

24        A.   Correct.

25        Q.   And in that year in 2017, his rank is 198; is

1    that right?

2        A.    That is correct.

3        Q.    Now is it also correct that only the top 100

4    are classified as prolific offenders?

5        A.    Based on the other document that we read, yes.

6        Q.    Okay.

7            MR. POULTON:  Well, go ahead.  I think

8        they're -- go ahead.

9        A.    I don't know because it's not noting it on the

10   file name of that one if this was pre-vetting or

11   post-vetting.  So I don't know if he was ranked as

12   number 198 before it was vetted by the districts where

13   they could have said he is actively affecting the crime

14   picture or whether he was 198 when Steve provided to the

15   districts and they had not taken a look at it yet.

16   BY MR. BARGIL:

17       Q.    Okay.  He's on what appears to be prolifics

18   2017 Q1.  It doesn't say unvetted.

19       A.    Right.  And I don't know if that was a lack of

20   naming mechanism.

21            MR. POULTON:  Off the record for just a second.

22            (Off-the-record discussion.)

23   BY MR. BARGIL:

24       Q.    If we're looking at Robert A. Jones, IV

25   again --

1    A.   Yes.

2    Q.   And again, there's only one column where he is

3  listed as having been ranked at all; is that right?

4    A.   That is correct.

5    Q.   And that is in Q1 of 2017 where he ranked 198;

6  is that right?

7    A.   That is correct.

8    Q.   He would not have been able to have even

9  qualified for the pool if he didn't have two arrests in

10  Pasco County previously; is that right?

11    A.   He would not have shown up on that pool from

12  Steve Hiebert had he not had two prior arrests.  That is

13  correct.

14    Q.   Do you know whether Robert A. Jones, IV, was

15  ever listed as a TOP 5?

16    A.   I don't.

17    Q.   Do you know how he could have ended up as a

18  TOP 5 assuming had he -- you know, if I represent to you

19  that he was in fact at one point a TOP 5 offender, do

20  you know how he could have ended up in the TOP 5 without

21  ever having been listed as a prolific offender?

22        MR. POULTON:  Object to form.  That's been --

23    A.   If I remember right, it wasn't required.  You

24  didn't have to be a prolific offender to be a TOP 5 if

25  your criminal history met a certain standing.

```
 1              MR. POULTON:  And just to be clear, you're
 2       talking about Robert Jones, IV?
 3              MR. BARGIL:  That's right.
 4              MR. POULTON:  Okay.
 5              MR. BARGIL:  Actually, why don't we take a
 6       five-minute break anyway.
 7              MR. POULTON:  Okay.
 8              (Short break.)
 9  BY MR. BARGIL:
10       Q.   All right.  You know you're still under oath?
11       A.   I do, yes.
12       Q.   Okay.  I have one question for you -- one last
13  line of questioning for you.
14              MR. POULTON:  Rob, you're still on the phone.
15              MR. BARGIL:  He is.  Oh, you're not on mute.
16       You're not on mute.
17              MR. JOHNSON:  Oh, I'll mute it.  Sorry.
18  BY MR. BARGIL:
19       Q.   You mentioned that part of your job duties
20  include assisting in responses to FOIA requests; is that
21  right?
22       A.   Yes.
23       Q.   And do you recall providing responses to public
24  records requests in connection with the ILP program in
25  the last two years?
```

1    A.   Yes.

2    Q.   And do you recall if any of those inquiries

3  required you to look into the criminal histories of the

4  plaintiffs in this case?

5    A.   I recall requests regarding them.  Without

6  looking back in my emails, I believe a number of those

7  requests I handed over to Ashley.  While she's a

8  district analyst, she also is oftentimes my acting

9  supervisor.  So I've been I don't want to say training,

10  but trying to prepare her for an understanding what a

11  supervisor role might entail, and oftentimes one for her

12  familiarity would be three and two because of her

13  interest in supervision I've assigned those tasks out to

14  her.

15         So what I had referenced before when we were

16  talking about Rio I think it was --

17    Q.   Uh-huh.

18    A.   -- is that that might have been information she

19  included and I forwarded back to Larry because I don't

20  recall pulling that specific information.

21    Q.   Okay.

22    A.   So while the FOIA requests would have come to

23  me, I may have assigned them out to Ashley for

24  assistance with.

25    Q.   Very well.

1          If you were asked to calculate how many times a

2     person, whether it's a plaintiff in this case or anybody

3     else, had been arrested, is that the type of request

4     that you could field?

5          A.   That's the type of request that I could field

6     to either Ashley or possibly Steve.  Steve has ways of

7     pulling data that are more advanced.

8          Q.   Okay.  How do you calculate the number of

9     arrests that a person has experienced?

10         A.   If it was myself providing that information?

11         Q.   Yeah.

12         A.   I would physically count each arrest in the RMS

13    log.

14         Q.   Okay.  And say somebody, you know, gets charged

15    with five different separate criminal acts all arising

16    from the same facts and circumstances.  Would that count

17    as five arrests, or would it be one arrest and five

18    charges?

19         A.   It should show five charges with that one date

20    if it's all on the same date.  It would list as one

21    arrest, and on the booking log it would show the

22    different charges --

23         Q.   So in essence --

24         A.   But I don't know in a records request how they

25    would list that.

1      Q.   In that hypothetical situation, if we're

2   talking about person X has those five charges arising

3   from the same set of facts and circumstances and you get

4   a request where you're asked how many times was that

5   person arrested, would you say that person was arrested

6   five times or once?

7      A.   It would be based on offense.  Five.

8      Q.   Okay.

9      A.   I would list the charges.

10      Q.   Would a code violation count as an arrest if

11   you were issued a citation?

12           MR. POULTON:  Object to the form.  Do you mean

13       in the context of answering the public records

14       request?

15           MR. BARGIL:  Yes.

16           MR. POULTON:  Okay.

17      A.   I don't know because I don't know that I've had

18   that come up in any that I've done.  I feel like that

19   has come up, but it might have been one I assigned to

20   Ashley.  So I'd have to look back on my records.

21   BY MR. BARGIL:

22      Q.   Would your response to the question be

23   different if it weren't in response to a public records

24   request?

25      A.   No, it would be the same.

1      Q.   So if a deputy calls an analyst and says, I'm

2   going over to this house, I want to know how many times

3   the person there has been arrested, and if that same

4   hypothetical person we were talking about, the response

5   would be that person has been arrested five times?

6      A.   I would say five times, but I would provide it

7   in the deputy's case a summary of what the arrests were

8   because a VOP or code violation may not be as extensive

9   as an attempted homicide.

10     Q.   Okay.

11     A.   So I verbalize the offense type.

12     Q.   You would say there's five arrests?

13     A.   Five arrests, one is of note for this or, you

14   know, five burglaries.

15     Q.   Okay.  If it were all arising out of the same

16   basic set of facts and circumstances?

17     A.   I will bring up what's most important or what's

18   most notable.  But with a public records request, we're

19   going to provide what's requested.  We're not going to

20   break down that additional information unless it's

21   requested I don't think.

22     Q.   Okay.  I think that's everything.  As with the

23   other depositions, we hope not to haul you back in here,

24   but discovery is still ongoing.  So thank you very much

25   for your time.

1      A.    Thank you.

2      Q.    And we'll hold it open if need be, but hope not

3    to have to see you again.  And I mean that in the nicest

4    of ways.

5      A.    I appreciate that.

6           MR. POULTON:  She will read.

7                    *   *   *   *   *   *

8           (THEREUPON, THE TAKING OF THE DEPOSITION WAS

9      CONCLUDED AT 4:55 P.M.)

10                   *   *   *   *   *   *

11                S T I P U L A T I O N

12        It was thereupon stipulated and agreed by and

13    between counsel present for the respective parties and

14    the deponent that the reading and signing of this

15    deposition is not waived.

16                   *   *   *   *   *   *

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA

3    COUNTY OF PASCO

4         I, the undersigned authority, certify that

5    SHELLEY GARDNER personally appeared before me and was

6    duly sworn on January 11, 2022.

7         WITNESS my hand and official seal this 25th

8    day of January, 2022.

9

10

11    _____
      Judy Anderson
12    Notary Public - State of Florida
      Commission No.:  GG 276821
13    My Commission Expires:  1-5-2023

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF PASCO

5

6           I, JUDY ANDERSON, Court Reporter, certify that I

7    was authorized to and did stenographically report the

8    foregoing deposition and that the transcript is a true

9    record of the testimony given by the witness.

10

11          I further certify that I am not a relative,

12   employee, attorney, or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties'

14   attorney or counsel connected with the action, nor am I

15   financially interested in the action.

16

17          Dated this 25th day of January, 2022.

18

19                          _____

20                          Judy Anderson, Court Reporter

21

22

23

24

25

1    DALANEA TAYLOR; TAMMY
     HEILMAN; DARLENE DEEGAN;
2    and ROBERT A. JONES, III,

3      Plaintiffs,

4    vs.                      Case No.: 8:21-cv-00555-SDM-CPT

5    CHRIS NOCCO, in his
     official capacity as
6    Pasco County Sheriff,

7      Defendant.
     _____/

8

9

                    DEPONENT'S SIGNATURE PAGE
10

11        I HAVE READ THE FOREGOING TRANSCRIPT OF MY

12     DEPOSITION AND HEREBY SUBSCRIBE TO THE FOREGOING

13     DEPOSITION, SAID SUBSCRIPTION TO INCLUDE ANY

14     CORRECTIONS AND/OR AMENDMENTS HERETO.

15

16

     _____        _____
17   SHELLEY GARDNER                        Date

18

19

20

21

22

23

24

25

1                               ERRATA SHEET

2       PAGE        LINE                    CORRECTION

3       _____      _____       _____

4       _____      _____       _____

5       _____      _____       _____

6       _____      _____       _____

7       _____      _____       _____

8       _____      _____       _____

9       _____      _____       _____

10      _____      _____       _____

11      _____      _____       _____

12      _____      _____       _____

13      _____      _____       _____

14      _____      _____       _____

15      _____      _____       _____

16      _____      _____       _____

17      _____      _____       _____

18      _____      _____       _____

19      _____      _____       _____

20      _____      _____       _____

21      _____      _____       _____

22      _____      _____       _____

23      _____      _____       _____

24      _____      _____       _____

25      _____      _____       _____

**A**

Abargil@ij.org 2:12
ability 21:7 38:6 75:3
80:19
able 6:20 22:3 38:10
55:20 69:9,13 74:18
74:20 75:20 83:8
86:25 113:8
abusive 45:24
access 15:18 33:4,6,12
33:21,23 34:13 35:7
35:15 58:25 69:2,2,9
105:8,10
accomplishments 77:19
account 15:23,24 21:10
44:15 68:8 105:5
accounts 15:5 16:1
acknowledge 66:10
acknowledges 105:4
acronym 15:2 49:13
acting 55:5 115:8
action 48:22 121:14,15
actionable 49:15 84:15
active 18:16 19:2 32:16
46:8,11 50:16 58:16
60:23 69:16 79:2,3,8,9
79:24 84:5 91:21,22
93:1,24 94:9,12,12,13
94:17 97:10 107:17
actively 14:14 70:19
112:13
activity 60:24 67:1,9
93:2,25 94:10,18
104:22 105:6 106:4
acts 116:15
actual 19:23 22:20 76:7
78:18 89:4 96:21
adamant 31:3
add 39:18 65:15 101:20
added 51:12 52:3 108:25
addition 97:6
additional 64:25 102:15
106:21,22 107:5
118:20
additionally 93:7,16,17
address 72:17,21
adds 15:24
administers 100:14
administration 72:9,11
administrative 5:21
admission 46:14
advance 65:5
advanced 116:7
advise 7:16 86:25
advised 7:15 47:4,10
96:5
advising 46:19
affect 45:7
affiliation 107:2
afford 107:5
afternoon 5:8,9 65:13
age 56:16
agencies 50:10
agency 22:5 42:18,22,25
68:12 70:5,24 71:15
101:5 102:18 105:9,10
aggravated 42:5,8
ago 5:24,25 13:21 14:12
35:12 51:15 62:24
71:10
agreed 119:12
ahead 23:20 25:4,4 30:12
31:9 40:12 45:3 47:6
48:11 51:13 55:4,9
56:11 68:14 72:10
81:5,7 84:9 92:8 94:1

96:3 98:4 106:11
112:7,8
AIM 4:7 49:11,13,20
51:7,19 52:9,12,21
53:6 63:9,16 65:2,5,13
70:1 74:19 84:17,21
Aim's 65:13 73:20 74:9
Alabama 8:4,13
Alberto 93:20
alert 69:7,19,23 109:11
109:12,17,21
alerts 87:4 109:3
alleviate 90:6
allocation 23:18
allow 62:5
aloud 32:15 54:24
Amanda 89:1,2,3
AMENDMENTS 122:14
amount 13:23 96:10
analysis 13:13,15,16 14:2
74:1 75:5,10,25 76:9
analyst 7:5,12 9:19 14:6
16:8,10,12,15,25,25
17:12,16 24:19,19,20
24:22 27:9,12 28:2,9
29:9,10,11 30:5 31:5
32:5 34:24,25 35:9
37:3,3 38:4,23,24
39:11,18 45:11 49:7,8
49:17,21 50:7 51:17
51:22 52:2,4,6,6 63:16
63:24 64:11 65:2,21
68:5 69:7 73:22 75:11
75:15,16,17 76:1,7
77:8 80:17,18 85:14
86:24 90:4 100:8,16
102:11 103:15 115:8
118:1
analyst's 108:14
analysts 10:19,20,25
11:1,10 14:2 15:12
16:1,4,6,13,17,19,20
16:22 18:9,10,11
19:11,12,15,16,17,18
19:22 20:5,18 21:1
28:15 32:3 33:12 34:5
34:21 35:6,7,15 39:7
50:5 63:12,19 64:6
66:18 69:2,5 76:14
81:3,23 82:6 89:24
96:23 100:11,22 101:5
102:7,18,23,23 108:2
analyzing 81:24
and/or 43:12 56:19 57:19
122:14
Anderson 1:19,22
120:11 121:6,19
angle 56:3
animal 76:11
annual 9:10 78:5 83:1
anonymous 63:3
answer 6:10,19,22 23:1
23:21 24:1 30:13 31:1
91:24
answered 18:6 24:24
answering 6:8 117:13
answers 61:4 91:20
anybody 28:25 116:2
anymore 14:19 52:25
61:13 67:18 108:4
anyway 114:6
apologize 24:24
apparent 87:22
appear 43:17 89:15
95:16 106:23
appearance 106:24
APPEARANCES 2:1

appeared 120:5
Appearing 2:2
appears 53:19 56:9 86:5
110:24 112:17
Appendix 41:6 48:22
applicable 43:4 102:15
apply 46:25 109:4
applying 23:5
appreciate 31:1 119:5
approach 81:20
appropriate 60:6
appropriately 78:17
area 19:19 66:20 101:11
areas 75:7,22 100:10
101:5,19,20 102:8,15
102:16
Ari 2:10 54:5
arises 80:20
arising 116:15 117:2
118:15
Arlington 2:7
armed 42:10,12
arrest 42:2,4,5,14,16
43:24 59:21 60:4
70:22 92:1 93:19 94:8
94:20 97:1,6,16 98:12
109:3 116:12,17,21
117:10
arrested 44:13,20 85:17
91:7 96:22 97:8,15,22
116:3 117:5,5 118:3,5
arrests 38:14,15 40:2,3,8
44:16,18,21 45:1
56:18 87:11 113:9,12
116:9,17 118:7,12,13
Ashley 7:12 20:14 90:4
100:18 115:7,23 116:6
117:20
aside 15:11 52:19 66:1
asked 12:7 20:17 64:7
83:6 90:3 116:1 117:4
asking 6:9 67:2 94:16
99:25 105:21
aspect 42:10
assessed 107:18
assigned 19:18,23 20:11
20:12,14 83:12,14
84:1 103:8,9,12,15,22
115:13,23 117:19
assignment 83:5 102:16
assist 11:9 89:25
assistance 115:24
assistant 88:16
assisting 76:4 114:20
associate 13:17 46:16
59:11,13 60:7,17 62:1
62:6
associated 83:1 93:17
94:5,8
associates 59:7,15 61:5
93:18 103:4
associating 79:7
association 13:18,23
45:19 60:11,12 92:23
association-based 15:7
associations 59:8 92:4
93:21 94:2 97:10
assume 34:25
assuming 40:18 113:18
assumption 29:21
assumptions 110:21
attaboys 21:12,21
attached 100:10
attachment 37:10,14,16
88:3 89:15,17,18
attachments 100:7
attagirls 21:13,22

attempt 13:17
attempted 118:9
attempting 71:4
attend 50:17 51:24 52:11
53:8 74:8,16,18,20
attendance 50:12,12 51:7
52:16
attended 50:3
attendee 52:21 74:12
attendees 53:6,7
attending 73:19
attends 65:17
attention 34:21 66:18,19
67:6,7,10 71:14 72:21
81:25 82:5
attorney 6:2 7:10 121:12
121:14
audit 34:15 78:5,8,9,21
audited 78:15
audits 78:18
August 84:17
authority 95:17 120:4
authorized 121:7
auto 55:14 59:15
availability 109:11
available 50:14 51:5 53:9
53:13
awarded 106:22
aware 39:2 101:21
102:25 103:2,5 109:17
109:21

**B**

b 4:1 41:6 59:14 62:7,9
77:11,18,20 78:4,4
B-U-R-C-H 20:14
bachelor 9:3
bachelor's 7:25 8:6
back 7:20 11:20 14:11,13
31:19 39:8 40:22 65:2
66:8,12 70:9 72:25
73:14 86:15,24 87:3
87:10 89:22 90:1,23
92:9,18 97:18 98:2
106:13 107:5 108:16
108:22 115:6,19
117:20 118:23
background 7:24
backup 75:20
bad 18:21 85:21 102:19
ballpark 64:13
bandana 46:16
Bargil 2:10 3:3 5:7 6:4
9:6 11:23 23:24 25:13
26:18 27:20,23,25
30:4 31:12 35:3 36:15
36:18,22,24 37:9,12
37:18,21,24 40:13,16
40:17 41:2,4 43:3 45:9
47:8 48:13 51:14 53:1
53:3,4,15 54:2,7,10,19
54:21,23 55:18,21,25
56:4,8,13,24 57:15
58:2,4,11,17,19 59:24
60:1 61:18 66:4,7
68:16,25 71:12,13
72:13 76:16,18,21
81:12 82:19,21 84:13
85:2 87:21 89:14
92:11,17 93:22 94:6
94:25 98:16 99:17
100:2 104:1 106:18
110:11,18 112:16,23
114:3,5,9,15,18
117:15,21
based 28:10 31:3 38:2,21
39:13,15 55:11,12,13

63:11,12,21 65:9
77:25 86:12,14 88:9
91:12,16,20 92:5 94:3
95:16,18 106:3 109:2
109:10 111:2 112:5
117:7
basic 118:16
basically 17:17 53:22
80:5
basis 21:3 23:13 71:22
84:25 92:19,19
Bay 4:9 37:5,22 88:11
89:19
bear 18:7
beat 55:23
begins 32:15 90:17 95:4
104:18 106:20 107:12
belief 45:18 66:24
believe 8:22 14:17 15:1
16:2 17:3,21 23:24 24:13
35:16 40:3 43:15
58:24 60:16 61:14
65:7 67:8 68:15 70:14
75:19 77:15 79:9
90:17 98:13 99:6,8
101:3 107:25 108:12
115:6
believed 22:14
believer 75:2
belive 65:11
bell 100:5
belongs 31:3
beneath 19:9 41:15
best 30:15,16 38:6 39:16
58:11 104:25 109:5
better 26:16 28:12 38:10
58:18 67:19 73:18
74:1 75:17 110:7
beyond 12:4,5 22:4 47:23
48:6 78:25
Big 42:4,14 60:23 92:1
93:1,18,24 94:8,9,18
94:19
bike 68:6
Biscayne 2:11
bit 9:17 22:25 67:21 83:4
83:13 95:2 107:3
111:5
black 46:18
blank 80:6
blanket 90:1
bless 39:9
blessing 30:3
block 66:17 68:7
Bloods 46:17
Blvd 2:11,15
board 32:6 76:8
board's 32:18,21
body 88:25
bold 89:21
booking 116:21
boots 27:6 28:11
borrow 68:13
bothering 58:10
bottom 32:12 46:5 86:2
102:1,2 106:19 108:7
Boulevard 2:3
Box 1:23
boy 53:25
break 6:17,18,20 10:2
36:16 66:6 114:6,8
118:20
breakdown 110:24
breaks 38:21 42:11
104:11
brief 50:6

**briefed** 49:24
**briefing** 64:24
**briefly** 72:24
**bring** 72:20 118:17
**broader** 39:22
**broken** 38:16
**BROTHERS** 2:6 54:13
54:17 92:16
**brought** 81:25 82:5
101:12
**Brummett** 37:3
**budgeting** 29:2
**bullet** 41:15,16 57:18
59:5 60:21 61:4
**Burch** 7:12 20:14 90:4
**burglaries** 25:11 55:14
66:17 68:8 118:14
**burglary** 42:11,13 56:19
59:15 92:2,2
**business** 92:2
**butchering** 90:13

**C**

**c** 62:3,7,9,14,19,20 77:11
77:11 80:12
**C.F.R** 78:10
**CAD** 63:25 68:2
**calculate** 86:23 116:1,8
**calculated** 56:17 109:2
**calculation** 26:12 31:18
40:20 41:6 107:6
**calendar** 7:15
**call** 7:15 19:2,3,4,5 29:13
30:14 68:3 87:7
**called** 13:21 63:3
**calling** 106:14
**calls** 18:16 50:16 63:25
118:1
**Camacho** 93:20
**candidates** 95:10 96:24
**cans** 63:5
**capacity** 1:7 49:8 122:5
**captain** 30:2 64:23 65:20
72:18 95:9,13,14,15
96:13
**captain's** 65:9
**captains** 50:3
**captured** 96:22
**car** 66:16,16 109:19
**card** 47:25 48:18
**care** 42:25
**career** 8:10 14:8
**CAROLINE** 2:6
**carries** 109:8
**carry** 48:7 109:2,13,13
**carrying** 109:24
**case** 1:6 42:1 43:13 50:1
52:19 61:2 79:2 98:1
98:25 108:21 115:4
116:2 118:7 122:4
**cases** 50:2 84:23 89:25
90:5
**categories** 84:8 102:12
**category** 102:4
**caught** 73:15
**cause** 71:3
**causing** 25:9
**ceased** 53:5
**center** 16:13 17:4,16
18:14,25 19:6 73:19
74:7 101:6,13,25
102:22
**certain** 15:20 19:19
22:10,12,12 32:24
40:5 46:17 70:24
113:25
**Certificate** 3:4,4 120:1

121:1
**certify** 120:4 121:6,11
**Cgbrothers@ij.org** 2:8
**Chagrin** 2:3
**chain** 11:15
**change** 85:24
**changed** 109:6
**changes** 43:7,15
**changing** 56:25
**Chapter** 4:6
**charged** 116:14
**charges** 116:18,19,22
117:2,9
**Chase** 37:2 88:1,14,15,25
**check** 29:10 98:25
101:23
**checklist** 100:8 101:4
**checks** 20:3 31:5
**child** 33:2 34:2,4 47:10
47:17 76:4
**CHRIS** 1:7 122:5
**chronic** 104:21 105:1
**chronological** 13:2
**circumstances** 42:6,8
116:16 117:3 118:16
**citation** 117:11
**citizen** 63:2
**City** 1:23 74:19
**civilian** 5:12,13 51:23
**civilians** 29:6
**clarify** 27:17,22 29:24
38:2 53:2
**classification** 25:5,9
27:14 28:4,16 29:12
30:17 34:22 35:14
36:10 39:13 45:17
46:23 70:6,16 82:7
106:3 110:1
**classifications** 71:6,16
**classified** 35:19,25 36:1,5
36:8 38:8 42:13 44:24
57:10,19 60:7 61:11
62:5,16 69:14,22 82:3
92:7 103:17 112:4
**classify** 27:10
**classifying** 35:23 106:7
**clause** 107:20
**clear** 7:9 51:16 58:1,8
114:1
**close** 60:12 68:10
**Co-counsel** 2:9,13
**code** 51:6,8,10,11,18,19
51:20,23 52:20 53:5
117:10 118:8
**college** 8:9
**colonel** 10:16
**colors** 46:15,16 79:7
**column** 77:10 111:5,20
113:2
**combination** 61:11
**come** 7:9 11:8 21:22,22
30:14 72:18 83:13
89:16 96:24 101:5
115:22 117:18,19
**comes** 27:4
**comfortable** 70:11
**coming** 101:7,14
**command** 49:23 65:1
**commander** 30:1 95:14
96:14
**commanders** 65:4
**comment** 77:25
**comments** 21:21
**Commission** 120:12,13
**commit** 59:14
**committed** 28:7 43:24
60:19

**committing** 22:14,14
25:11 28:8 30:19 39:5
45:6 59:12,16 60:15
70:21
**communicate** 80:20
**company** 32:17
**compare** 21:15,19
**comparison** 84:19
**compile** 108:15
**compiled** 32:14
**complement** 13:13
**complete** 82:24 83:6,8,10
**completed** 83:16 102:14
**completely** 79:15 95:8
**completing** 73:17 83:1
**compliance** 78:10
**comprehensive** 98:25
**concern** 72:18
**concerned** 63:2
**concerning** 82:25
**concerns** 72:15,16
**CONCLUDED** 119:9
**concludes** 29:11
**conduct** 26:12 106:8
**confer** 86:24
**Confidential** 46:18
**conflict** 80:18,20,22
**conflicts** 8:7,3,10,14,16
82:2
**confuse** 15:9
**confused** 15:8 24:17
58:15
**connected** 71:15 79:25
121:14
**connection** 61:6 76:13
94:13,13,19 114:24
**consequence** 34:18
**consider** 21:2 106:8
**consideration** 28:5 39:12
41:23 45:12 46:24
91:11 96:9 106:16
**considered** 35:22 39:21
40:1 60:13 78:22 79:2
84:4 104:23
**constantly** 45:22 46:18
**constitute** 59:19 94:9
97:1
**constitutes** 59:10 60:6
**consult** 72:8
**consulting** 72:11
**contact** 18:24,25 72:6
79:5 109:18
**contacts** 30:5
**context** 117:13
**continuation** 77:20
**continue** 21:20 80:8
83:13
**contribution** 28:9
**conversation** 87:10
106:13
**conversations** 64:4
**convicted** 87:9
**conviction** 59:18,21 60:4
98:19
**convictions** 87:11 98:23
**Cook@debevoisepoult...**
2:17
**coordinate** 99:25
**copied** 37:4
**corner** 54:13,14 86:2
**corporal** 50:17
**correct** 10:10 14:8 16:20
17:11 20:23 24:8
26:11,23 39:25 43:20
46:9 48:22,23 49:19
51:18,22 54:9 57:24
60:8 62:18 63:9,11

72:5 74:10 77:12
80:10 91:1,2,6 95:23
98:21 106:4,5 108:10
111:10,11,18,24 112:2
112:3 113:4,7,13
**CORRECTION** 123:2
**CORRECTIONS**
122:14
**correctly** 38:6 62:8
**counsel** 2:5,18 119:13
121:12,14
**count** 86:18 116:12,16
117:10
**counterpart** 20:15 74:6
100:17
**counties** 105:22
**counting** 53:23 86:15
**county** 1:8 19:21 25:8,21
26:1,1,3,13 28:8 30:6
30:15 31:4 38:15 40:3
40:8 48:19 51:22
56:18 58:23 104:21,23
105:1,6,14,17,19,24
106:4,9,14 107:19
108:17 113:10 120:3
121:4 122:6
**couple** 9:13,14 32:23
66:12 102:8 106:11
**courses** 8:17,19,21
**court** 1:1,19,22 50:14
58:14 75:5,10,15
121:6,19
**cover** 93:21
**COVID** 52:12
**crafted** 11:12
**created** 52:1
**creating** 12:3
**crime** 10:19,19,25 16:13
16:22,25,25 17:4 18:9
18:9,14,25 19:6,20
21:25 22:11,14,15
23:17,17 25:6,10,12
25:16 26:1,3,5,7,9,20
27:8 30:19,23 38:18
39:1,3,5 42:2,4,17,21
42:24 43:24 45:6,15
50:13 52:6 55:4,17
60:15 67:12 68:10,21
68:24 70:20,21 73:19
74:7 75:14 97:4 100:8
100:11 101:6,13,25
102:22 108:4 112:13
**crimes** 19:20 21,22
21:1 25:24 28:6,7
59:12,16 60:19 64:23
65:21 75:12,13 87:7
**criminal** 7:25 8:7,16 13:9
24:19 28:6 34:16
41:17,21,25 44:2,25
57:20 58:22,23 59:7
59:10,13,18,19 60:6,7
60:17,24 61:24 62:1,2
62:5,6,14,16,20 67:1,9
79:9 88:21 92:4,21,22
93:1,2,24 94:18
104:22 105:6 106:25
113:25 115:3 116:15
**criminals** 67:17
**criteria** 22:10,21 27:18
32:8,8,24 38:13,16,22
40:4 41:13,19 46:12
46:13,21 57:13,16
59:5 61:25 62:17
91:12,16 92:6,9,12
96:9 103:7,10 104:12
105:18,23 107:18
**critical** 80:21

**criticism** 80:12
**cross-training** 73:18
**crossing** 25:21
**curb** 63:5
**curfew** 93:13
**curious** 35:5 107:4
**current** 7:5,7 9:17,18,19
22:11 24:6,22 52:11
69:3 93:19
**currently** 9:23 22:14
25:6 38:25 93:11,18
108:2,4
**curtilage** 92:3

**D**

**D** 3:1 48:22 73:11 82:10
82:22
**D3** 20:15 90:4 95:14,14
**Dade** 1:23 74:19
**daily** 38:11
**DALANEA** 1:3 122:1
**Daniels** 88:14,15
**dark** 55:15
**DARLENE** 1:3 122:1
**data** 13:22 14:24 16:23
26:15 32:8,14,17
33:25 34:12 38:7,13
38:14 44:15,17 55:11
87:1 104:20,24 108:1
116:7
**database** 33:2 34:1 69:3
**date** 1:14 7:17 69:13,16
69:19 77:5 80:6 85:12
86:20 91:4 116:19,20
122:17
**dated** 93:12 121:17
**dates** 24:17 86:23 87:4
**Dave** 16:14,24 17:1,6,14
17:16 18:11
**David** 10:6
**day** 14:4,4 65:10,11
71:11 76:19 86:14
97:3 99:24 120:8
121:17
**day-to-day** 11:6 14:3
75:18
**days** 63:15 86:8,10,18,19
97:4
**DCF's** 32:19,25
**deal** 109:1
**dealing** 80:18,21
**Debevoise** 2:14
**December** 8:3
**decided** 29:18 107:5
**decision** 71:17,18,19
107:8
**decisions** 72:8
**deck** 53:20
**deduce** 55:12
**DEEGAN** 1:3 122:1
**Defendant** 1:9 2:18
76:22 85:3 122:7
**defined** 59:7 60:25
**defines** 61:23 104:12
**definitely** 59:3
**definition** 56:9,12,14,21
57:1 59:20 60:3,7,14
60:17 94:3,23 107:25
**degree** 7:25 8:6 9:1,2,3
13:18
**degrees** 13:22
**denote** 86:6
**denotes** 86:7
**department** 19:1 28:25
29:2 33:12,20 35:6
50:20,21 76:2
**dependent** 11:15

**depending** 86:17
**depends** 52:18 67:20
  100:15
**depicts** 31:21 110:20,21
**deponent** 119:14
**Deponent's** 3:5 122:9
**depose** 99:24
**deposition** 1:12 5:18
  6:25 7:8,11,19,22
  99:18 119:8,15 121:8
  122:12,13
**depositions** 118:23
**deputies** 20:3 30:24 48:7
  49:23 50:3,15 51:10
  51:12,20,24 53:6 99:3
  99:10 109:11
**deputy** 18:20,22,24
  28:19 30:5 51:4 52:20
  53:8 72:17 106:14
  109:14 118:1
**deputy's** 118:7
**describe** 9:16 11:5 31:16
  38:7 64:20 83:4
**described** 9:2 28:11
  39:13
**describing** 22:16 63:9
  77:13
**description** 16:24 32:13
  57:9 66:22
**designated** 47:4,10 76:1
**designates** 26:14
**designation** 39:16 46:24
  57:14 58:9 71:8
  103:19
**designations** 28:1 110:25
**designee** 27:2 57:23
  65:22
**detail** 38:11,18
**detective** 64:6
**detectives** 27:4 28:23
  49:23 50:3,13 64:1
**determination** 39:15
**determine** 23:15 28:3
  38:24 39:2 46:10 79:1
  91:4
**determining** 105:11
**develop** 75:17
**developed** 23:18 32:9
**developing** 23:2
**develops** 23:10,12
**difference** 10:23 18:8
**different** 14:18,22 15:10
  16:5,21,25 27:22 65:8
  81:20 102:8 116:15,22
  117:23
**differently** 81:19
**direct** 3:3 5:6 60:23,24
  61:1 70:24 72:21 93:1
  93:23 94:9,17,23
**directly** 16:14,19,24 31:2
  97:21
**director** 88:15,16
**disagreements** 81:17,22
**discovered** 95:10
**discovery** 118:24
**discuss** 7:22
**discussed** 46:25 64:24
  92:6 95:22
**discussion** 12:14 56:25
  65:14 112:22
**discussions** 63:25
**dispatcher** 63:3
**distinction** 18:5 35:4
**district** 1:1,1 11:1 18:18
  19:11,12,15,17,22,23
  20:11,13,13,15 27:4
  28:19 30:1 35:1 38:23

38:24 50:18 51:9 52:1
  63:24 65:8,8,20 67:12
  71:2,2,5 73:20 74:9,18
  76:14 84:15 85:6,8
  90:25 91:25 92:1
  93:19 96:14 100:16,18
  100:22 102:23 103:8,9
  103:12,15,22 108:1,11
  108:11,13,15,17 115:8
**districts** 19:21,21 75:12
  102:19 108:13 112:12
  112:15
**dive** 9:16
**division** 1:2 88:22
**DJJ** 98:10
**DOC** 50:19
**document** 9:7 11:24 12:3
  12:13,18,25 13:4,6
  53:16 61:19 79:13
  84:14 95:21 100:3
  104:2,8 107:11 110:19
  112:5
**documentation** 34:2
  78:23
**documented** 46:20 57:20
  58:22 61:8 62:1,21
  79:5 80:6 92:21
**documents** 4:10 100:7
**doing** 11:10 20:3 29:7
  36:14 64:17 67:18
  69:21
**domestic** 46:1
**Donnie** 86:4 111:16
**dozen** 102:8,8
**draft** 37:21 88:2,10
**draw** 35:5
**drawn** 35:5
**Drive** 1:17
**drop** 108:7
**due** 45:18 52:12 92:1,3
  97:6
**duly** 5:2 120:6
**duties** 34:22 114:19
**duty** 7:21
**dwelling** 92:3

**E**

**E** 2:2 3:1 4:1
**earlier** 38:13 39:20
  61:25 74:6,11 99:7
  106:13
**early** 32:18,21 33:4,6,12
  97:6
**earn** 8:2
**easier** 74:16 84:25
**edit** 88:3
**education** 8:16
**educational** 7:24
**effect** 95:9
**effectively** 80:20
**eight** 86:10,14,19 111:8
**either** 42:12 46:15 58:21
  79:9 82:3 87:18 111:1
  116:6
**eleven** 5:25 9:23 19:9,16
  19:18,22 81:16
**eliminated** 70:17 71:6,9
**email** 4:4,8 37:2,7,10,13
  88:1,10,10,25 89:8,16
  89:18,23 93:11 99:21
**emailed** 69:5
**emailing** 99:17
**emails** 115:6
**embedded** 76:8
**employee** 121:12,13
**employees** 51:23,25 75:4
**encapsulate** 55:2

**encapsulation** 25:17
**endeavor** 58:18
**ended** 78:2 113:17,20
**ends** 47:3 81:21
**enforcement** 5:20 29:4
  48:22 51:6,8,10,12,18
  51:19,20,23 52:20
  53:6 61:24
**enhancement** 43:12,21
  43:23 44:1 45:14,21
  46:2,7 108:22,25
  110:7 114:5
**enhancements** 41:17,22
  46:4 108:19,23
**enlisted** 89:24
**ensure** 21:8 78:10
**entail** 115:11
**entails** 9:18
**entered** 64:2
**entire** 95:8 97:24
**environment** 22:11
  25:17 26:20 30:23
  45:22 108:5
**environmental** 55:13
**Errata** 3:5 123:1
**errors** 12:8,24
**ESQ** 2:6
**ESQUIRE** 2:2,10,14
**essence** 116:23
**essentially** 63:12
**establish** 93:23
**evals** 21:4
**evaluating** 105:1
**evaluation** 9:10 104:21
**evidently** 37:5
**EWS** 32:19 35:8
**exactly** 64:19
**Examination** 3:3 5:6
**examined** 5:3
**example** 16:23 18:16,21
  18:21 21:12 25:24
  29:2 35:2 42:11 46:17
  55:14 58:14 63:1 64:5
  66:16 67:15,17 68:3,5
  68:19 72:17 74:20
  77:17 79:4,10 83:15
  85:20,21 98:6,10
  100:17 101:2 102:16
  102:19,21 105:21
  108:5 109:15 111:15
**exceeds** 56:16
**excluded** 29:6
**executive** 1:17 88:15,16
**exemption** 84:5
**exhibit** 9:4,5 11:22 36:12
  36:17,22 40:23 53:14
  61:17 72:22 84:11
  87:20 89:13 92:18
  99:8,16 103:25 110:17
**exist** 58:3 80:8
**existed** 71:7
**existence** 101:3 103:6
**existing** 99:10
**exists** 79:25
**expectation** 102:11
**expected** 5:15 13:3
  102:20 103:10,16
**experience** 7:4 27:6 49:6
  73:17 75:4,11
**experienced** 116:9
**Expires** 120:13
**explore** 76:18
**expressed** 99:14
**extensive** 118:8
**extent** 23:8 103:3
**external** 80:21
**extra** 109:20,21,21

**F**

**fact** 18:18 95:19 113:19
**factor** 35:18,22
**factors** 21:2 46:25 55:13
  55:13,16 62:4,15
**facts** 116:16 117:3
  118:16
**failure** 43:17 106:23
**faint** 53:24 54:8
**fair** 25:17 27:23 57:9
  60:5 66:20 73:25 95:1
**fairly** 35:9 71:21
**fall** 19:12 84:8
**falls** 84:5
**familiar** 9:7 14:10 22:5
  22:17 24:25 31:21,22
  47:21 49:11 57:7 64:9
  75:22 89:24 90:5
  100:4 103:1 104:2
  110:19
**familiarity** 12:25 115:12
**Families** 33:1,21 34:9
**family** 32:20 73:14
**far** 8:9 12:10 18:4 22:19
  22:22 23:12 29:1
  46:23 55:3 59:8 61:25
  65:5 71:23 94:7 96:8
  105:18 107:23
**fast** 14:21
**February** 100:9
**federal** 78:13,15
**feedback** 37:4
**feel** 13:11 117:18
**fellow** 80:19
**felon** 109:16,22
**felony** 56:20
**felt** 73:25
**field** 68:6 100:6 116:4,5
**fifth** 93:8
**figured** 76:14
**file** 69:8 109:12,17 111:2
  112:10
**fill** 21:5
**final** 30:2 46:7 107:15
  109:1 111:4
**finalized** 69:7
**finally** 72:22
**financially** 121:15
**find** 36:12 55:20 91:21
  93:5
**fine** 23:25 37:23 58:11
**FIR's** 68:3
**firearm** 42:5 109:16,20
  109:24,25 110:2,4
**firearms** 109:2,8
**FIRed** 68:6
**firm** 75:2
**first** 5:2 9:4,14 13:9
  14:25 22:13 32:15
  38:1 48:5,17 57:18
  59:10 77:7 78:5,25
  80:13,15 82:23 90:20
  90:24 91:23 107:20
  109:18 110:22 111:5
**five** 17:3,19,24 19:22,22
  19:25 20:21 21:1
  38:18 42:1 44:2 45:17
  45:22 46:1 59:6 78:24
  79:1,23 97:9 116:15
  116:17,17,19 117:2,6
  117:7 118:5,6,12,13
  118:14
**five-minute** 114:6
**FL** 1:23 2:11,15
**flag** 46:16 109:21
**flip** 31:19

**Florida** 1:1,18,20 4:6
  32:20,25 33:21 34:9
  46:12 120:2,12 121:3
**focus** 10:25 27:11 39:5
  42:18,22 66:18 70:24
  93:20 97:7 107:20
**focused** 35:1 66:19 67:6
  67:7,10
**focuses** 76:2
**FOIA** 114:20 115:22
**folks** 102:22
**follow** 7:18
**following** 21:18 62:17
  70:1 74:22 84:17 96:3
**follows** 5:4
**followup** 78:4
**forcible** 56:20
**foregoing** 121:8 122:11
  122:12
**forget** 75:25 99:19 100:1
**form** 23:20 25:3 27:15
  30:12 31:9 34:23
  40:10 43:1 45:2 47:6
  48:11,24 49:1 51:13
  52:24 55:9 56:11,22
  57:12,25 68:14 72:10
  81:5 84:9 92:8 94:1,21
  94:22 98:4 106:10
  109:9 110:6 113:22
  117:12
**formalized** 101:4
**formatted** 21:4
**former** 58:9
**forms** 21:6
**formula** 13:25 14:1
  23:15
**formulate** 11:9
**forwarded** 89:5 115:19
**found** 13:12
**four** 38:18 42:4 43:5
**four-year** 9:2
**fourth** 93:8
**Fox** 57:3
**free** 13:11
**frequently** 55:14 96:7
**Frick** 95:9,13,14 96:13
**friend** 30:7
**friends** 15:21
**front** 22:19 53:17 61:20
  68:17 73:1 84:14
  100:3
**FSFN** 32:20 34:6,8,11
**FTA** 43:12,17 106:23
**FTO** 43:23
**full** 77:7 106:20
**funded** 76:6
**further** 11:14 38:16,23
  39:2,15 70:22 71:20
  92:25 93:4 108:2
  121:11
**future** 79:19

**G**

**G-A-R-T-E-N-B-E-R-G**
  20:11
**gaining** 73:17
**gang** 46:8,11,17,20 61:24
  62:1,2,6,14,16,20
  78:23 79:4,5,6,10,22
  79:24 80:6 107:1
**garbage** 63:5
**Gardner** 1:12 4:2 5:1,10
  80:17 82:24 120:5
  122:17
**Gartenberg** 20:9
**gather** 106:2
**gathered** 81:24

**geared** 76:4
**general** 68:9
**generally** 31:6,7 69:17
**getting** 6:23 18:7 24:16 73:18
**GG** 120:12
**gist** 38:19
**give** 6:1 64:13
**given** 6:13 21:6,11 22:9 25:5 27:3 78:11 101:7 121:9
**Glebe** 2:7
**go** 8:13 22:3,22 23:20 25:3,4 26:25 29:1 30:12 31:9 38:10 40:12 45:3 47:6 48:11 51:13 55:9 56:11 65:2 68:14 69:11 72:10 74:23 79:11 81:5,7 83:18 84:9 90:23 92:8 94:1 95:2 96:3 98:4 106:11 107:10 108:11 112:7,8
**goal** 68:17,21 78:8,9
**goals** 21:16,18,19
**goes** 12:9 46:23 58:22 62:8 73:3
**going** 18:20,22 33:17 34:7 45:2 54:25 64:24 66:12 68:13 72:25 76:9 98:9,14 106:12 118:2,19,19
**gonna** 65:25
**good** 5:8,9 30:8 57:16 66:2
**government** 1:17 78:15
**GRACE** 2:6
**grades** 77:13
**grading** 77:23
**grand** 42:17
**grant** 76:6
**great** 13:13
**ground** 6:5 27:6 28:12
**Groups** 13:9
**grow** 21:20
**growing** 21:8
**guess** 23:9 59:9 67:4 78:1 80:7 89:8
**guesses** 29:20
**guidance** 11:7
**guidelines** 78:11
**gun** 42:12 110:9,10
**guy** 30:6
**guys** 7:22

**H**

**H** 4:1
**half** 43:4 64:17 99:24 102:8
**halfway** 32:12 62:9 90:9 95:3
**hand** 46:15 106:6,7 120:7
**handed** 115:7
**handful** 31:2
**handle** 16:22 18:16 83:14,17,19,20
**handling** 18:17,18 83:3 88:17 89:10
**handwriting** 72:2
**happen** 68:10
**happened** 49:24 97:19
**happening** 11:3 26:10 27:7 55:17 68:22
**happens** 68:23
**haul** 118:23
**head** 6:11

**headed** 19:4
**heading** 13:8,10
**heard** 31:4 108:6
**hearing** 5:21 39:14
**Heights** 2:3
**HEILMAN** 1:3 122:1
**held** 84:21
**help** 52:16 90:4,6 93:6 99:25
**helps** 56:2
**HERETO** 122:14
**hey** 6:3 45:11 106:15 109:17
**Hiebert** 16:23 37:4 38:3 38:12 40:18 69:5 103:24 109:5 113:12
**hierarchy** 19:13
**high** 45:5
**Hillsborough** 25:25 30:7
**hire** 101:11,17
**hired** 101:9
**historical** 4:12 7:7 110:24
**histories** 115:3
**history** 18:24 26:3,7 28:6 41:17,22,25 55:11,12 56:18 57:20 58:22,23 59:13,18,19 60:4,6 87:13 92:22 93:2,19 94:8,20 109:3,16 113:25
**hit** 25:8 56:4
**Holborn@debevoisepo—** 2:17
**hold** 119:2
**home** 42:11 96:6
**homicide** 118:9
**hope** 118:23 119:2
**Hopefully** 14:20
**hour** 68:10
**hours** 85:10
**house** 118:2
**housed** 33:9 76:12
**housing** 78:11
**HR** 24:6
**human** 5:22 8:11 24:11 24:12
**hurt** 52:16
**hypothetical** 117:1 118:4
**hypothetically** 29:9

**I**

**idea** 42:24 48:17 67:19
**identification** 9:5 11:22 32:1 36:17 53:14 61:17 84:11 87:20 89:13 99:16 103:25 110:17
**identified** 32:5 34:19 35:17,21 39:22 62:20 94:4
**identifies** 32:24
**identify** 26:19 36:25 105:19
**identifying** 80:8
**III** 1:4 122:2
**illegally** 110:3
**ILP** 4:3,5,10,11 7:4 10:1 10:3,4 12:2 16:13,16 17:8,11 24:15,17,18 31:14 34:5 40:23 47:23 48:6 51:12 55:3 67:5 71:20,23 72:9 76:12 83:21 99:4 101:2,15 102:5,9 114:24
**ILP-related** 83:23

**imagine** 87:17
**immediate** 69:22 97:17
**immediately** 10:8 97:11
**impact** 26:20
**impacting** 70:20
**important** 6:6,9,13 98:5 118:17
**improve** 75:8
**improvement** 80:17
**Improving** 80:19
**in-house** 78:19
**in-service** 99:9
**incarcerated** 108:3
**incident** 80:24 106:25
**incidents** 68:4
**include** 26:12 37:19 64:3 87:15 114:20 122:13
**included** 37:12 40:9 115:19
**includes** 44:6,8 73:17
**including** 93:19 107:6
**inclusion** 39:22
**incoming** 88:17
**increased** 68:18
**indicating** 30:22
**indicative** 67:16
**individual** 41:13 53:12 67:8 70:19 76:14 87:8 90:12 107:16,21,23,25 109:1
**individual's** 89:21
**individuals** 25:25 27:7 51:6 65:15 67:6 70:24 99:2 107:17
**ineligible** 91:10,13,14
**influx** 83:22
**info** 85:8,10 86:9
**informal** 64:4,6
**informant** 46:19 62:21
**information** 18:23 28:2 30:22 34:5 35:14 38:21 63:21,23 64:3 78:12,17,22 79:3,4,19 80:9 85:14,25 86:12 86:14 89:3 95:18 98:25 102:16 105:7 106:3 115:18,20 116:10 118:20
**initial** 38:11
**inordinate** 83:22
**input** 13:21 14:24 27:3,4 28:18 69:16,20
**inquiries** 115:2
**Inspector** 10:6 53:20
**instance** 95:19
**instances** 97:14
**instant** 99:1
**Institute** 2:2,6,10
**intel** 16:25
**intelligence** 10:20 11:1 18:9 24:19 49:15 78:5 78:12,23 79:9 81:23 83:2,8 84:5,16
**intelligence-led** 13:14
**intended** 70:24
**interaction** 109:15
**interest** 27:11 115:13
**interested** 78:2 121:15
**internal** 80:21
**internally** 101:13
**interpret** 81:23
**interpretation** 82:7
**interrupt** 6:7,8 37:7
**interviewed** 68:6
**interviewing** 67:13
**interviews** 50:15
**introduce** 88:7

**introducing** 88:7
**invalid** 63:1,2
**investigate** 30:18,24 70:22
**investigation** 33:3 34:2
**investigations** 76:5 88:22 88:22
**investigative** 18:19
**investigator** 8:12 24:13
**involve** 15:4 27:10 109:24 110:1
**involved** 32:6 66:25 67:9 83:1 107:1 109:25
**involvement** 44:2 60:23 60:25 61:1 93:1,24 94:9,13,14,17,24
**involvements** 44:5
**involving** 42:5,16
**isolated** 58:23
**issue** 110:9
**issued** 117:11
**issues** 81:13,15
**item** 37:6,25 108:23
**items** 15:10
**IV** 111:20 112:24 113:14 114:2

**J**

**J-A-R-R-A-R-D** 20:12
**jail** 50:15 75:15 97:3,4 97:23 98:2,10
**January** 1:14 120:6,8 121:17
**Jarrard** 20:12
**Jeffrey** 88:19,20,21
**JMS** 104:24
**job** 9:18 10:17 11:5 14:6 16:24 75:25 84:3 96:23 114:19
**jobs** 11:10
**JOHNSON** 2:2 114:17
**join** 24:3
**jointly** 77:2
**Jones** 1:4 99:24 111:20 112:24 113:14 114:2 122:2
**JPO** 93:12
**judgment** 58:14
**Judy** 1:19 120:11 121:6 121:19
**Judy@andersoncourtr—** 1:24
**justice** 2:2,6,10 7:25 8:7 8:16
**justification** 34:16
**juvenile** 32:5 34:25 35:9 36:4 47:9 75:5,10,16 75:24,24 76:3,7 85:21 102:23
**juveniles** 76:2 93:18 96:7

**K**

**Kapusta** 10:14 37:3
**keep** 27:11 78:16 79:8 97:23
**kept** 69:6 79:3
**kind** 21:5 25:12 30:22 33:25 41:9 56:2 75:21 88:12 93:7,8 104:12 108:7
**knife** 42:12,13
**know** 7:6,20 11:19 13:25 14:4,15,15,20 20:5 22:21 23:1,8,22,25 24:5 25:9,22 26:17,24 27:16 29:15,19,20

**knowing** 7:12 65:25 98:14
**knowledge** 13:3 15:6 57:2 65:20 70:25 96:12 98:23 102:12,13 109:6
**known** 26:5 32:18 107:1 109:1,13,13
**Kraus** 10:7,9 53:20 72:4 76:20 77:4 100:9

**L**

**L** 119:11
**label** 22:9,15 30:23 70:19 70:21
**labeled** 30:20,20 45:7
**lack** 75:4 112:19
**Lakes** 98:10
**Land** 98:10
**lands** 29:13
**large** 1:20 83:10
**largest** 28:8
**Larry** 6:16 11:14 37:2 76:10,20 88:1,1 89:5 90:1 100:9 115:19
**lastly** 107:12
**lateral** 17:23 18:2
**law** 5:20 29:4
**lawyer** 6:21
**lead** 62:15 81:14 110:4
**learn** 8:17
**leave** 73:14 75:21
**left-hand** 77:10
**legs** 66:3
**length** 106:24
**let's** 30:9 31:19 40:22,23 49:16 90:23 92:12 111:5
**letters** 77:13,16
**level** 12:9 14:8 17:18 18:19 71:20 72:19 76:12 81:11
**lieutenant** 30:2 64:23 65:21
**life** 25:24 48:2

**30:6,8 31:5,10 32:4,7 32:9,25 33:2,6,9,10,11 33:15 34:18 35:1,17 35:20,21,24 36:3,4,7,9 37:17 39:8,19 40:21 41:9,20,21 42:8,23 43:6,7,14,14,22,25 45:14 46:13 47:2,7,9 47:12,15,18 48:8,12 48:14,16 49:1,2,3 50:11 51:3,9 52:17 53:7,11 58:24 59:4,7,8 59:13,20,23,25 60:3,5 60:9,14,18,20,24 61:5 61:14 63:23 64:11,15 64:16 65:16 67:11 69:18,19,19,25 70:1,7 70:15,16 71:8,17,19 71:19 75:19 76:13,15 78:18 79:7 87:4,6,11 87:17 89:4 92:5,19 94:3,7,11,11,23 96:8 96:13,14,17,19,21 97:18 98:5,9 99:1,2,5 99:12,15 100:25 102:20 103:7 105:23 106:12,16 107:4,4,8,9 108:12,21 109:6,7,8 111:15 112:19,19,23 113:14,17,18,20 114:10 116:14,24 117:17,17 118:2,14**

**light** 56:4
**limitation** 40:14 104:22
105:5
**line** 13:10 26:1 58:21
93:8 114:13 123:2
**lines** 25:21 80:11 102:20
**link** 27:9
**list** 21:18 26:22,25 29:14
30:9,11 31:3,8 38:4,22
38:23 39:7,9,18 45:4,8
47:4,14,17 67:22 69:6
86:8,10,11,13 87:6
90:18 91:19 97:16,24
98:3,13 100:25 101:2
103:8,11,23 108:7,12
108:16 111:12,15
116:20,25 117:9
**listed** 43:5 71:5 87:18
106:25 111:22 113:3
113:15,21
**lists** 4:13 61:24 65:15
**literally** 54:12 65:12
**little** 9:17 22:25 67:21
83:4 95:2 107:3 111:5
**live** 25:22,25 74:21
**lives** 18:23
**locate** 71:4
**locked** 15:18
**log** 116:13,21
**long** 5:24 24:14,21 25:8
29:22,24 58:8 64:19
71:10 76:19 80:1
98:14
**longer** 58:3 79:12
**look** 9:7,15 11:2 13:8,9
30:7 31:13 32:12
40:22,23 41:5 47:19
55:10,16,19 56:2
57:18 62:3,22 63:8
65:24 67:11 72:22
77:10,17 78:3 80:11
82:8,10,22 84:22 85:3
86:2 90:9 97:18 100:3
100:5 102:1,13 104:2
104:14 106:15,19
107:11 108:2,19 111:4
111:19 112:15 115:3
117:20
**looked** 78:25 85:14
**looking** 12:24 21:7,8
22:23 31:17 32:23
37:25 46:4 49:25
53:18 54:15,16 58:20
62:24 67:15 68:2
69:13 70:9 78:6 87:22
89:22 90:14,19 92:9
92:18 93:14 94:3
112:24 115:6
**looks** 37:2 62:22 77:2
100:8 102:7 104:10
111:1
**lot** 12:7 15:8 25:11,14
74:16 88:17 89:10
101:24
**loud** 13:11 91:18
**love** 92:19
**lurking** 63:4

**M**

**Madison** 20:12
**major** 10:13 19:19 37:3
75:12 88:21
**majority** 81:15
**male** 63:4
**management** 59:1 68:2
80:3
**manager** 10:6 16:16

17:17 32:19
**manual** 4:2 12:2 31:14
40:23 47:23 48:6 99:4
99:6,11,14
**marijuana** 42:19
**mark** 86:14
**marked** 9:5 11:19,22
15:17,19 36:17 53:14
61:17 84:11 87:20
89:13 99:16 103:25
110:17
**Mary** 20:15 100:17
**mask** 6:14
**match** 32:17
**matter** 5:20
**McCambridge** 85:16
**McDougall** 86:4 99:24
111:16
**mean** 6:21 12:23 15:19
19:9 22:8 23:1,12 26:8
42:22 67:24 85:11
86:11 91:10 94:13
97:9 105:13 117:12
119:3
**Meaning** 115:2
**means** 60:9 61:6 85:13
**meant** 26:17
**measure** 13:18
**measures** 13:22 21:5
**mechanical** 33:18
**mechanism** 36:9 111:3
112:20
**media** 15:4,8,9,12,17
67:15,19,25
**medical** 73:14
**mediums** 15:21
**meet** 22:12 46:21 57:13
62:16 71:21
**meeting** 49:15 64:20,25
65:5,6,14 85:12 95:11
95:23 99:21,22
**meetings** 49:11,20 50:4,6
50:8,10 51:7,19 52:9
52:12,22 53:6 63:9,13
63:16 64:9,14 65:17
74:12,21 84:21
**meets** 56:16 92:23
**Megan** 20:13
**Mel** 18:11
**Melinda** 17:4,15,18,19
17:23 18:2,12 74:7
101:23
**member** 21:17 22:3 46:8
46:11,17,20 53:21
62:2,14,16,21 73:9
76:24 77:22 79:5,10
79:22 80:6 82:12
**member's** 77:18
**members** 21:22 50:23
72:12
**memo** 79:13
**memory** 81:2,8
**mention** 90:12 98:6
**mentioned** 22:16 23:10
24:5 25:14 28:10
38:17 39:20 51:15
61:14 65:18 66:15
67:22 72:1 79:18
114:19
**merit** 27:14 29:12,12
**mess** 58:12
**met** 21:20 22:10 62:1
113:25
**method** 11:16,17 13:16
**Miami** 2:11
**Michael** 20:9

**middle** 1:1 93:9 97:8
99:17
**mine** 54:5,12
**minimum** 50:16 59:6
102:13
**minute** 85:24
**minutes** 6:18
**misdemeanor** 42:19
**missed** 82:18
**misstate** 25:15
**moderated** 43:11,21,23
44:1 46:2
**moment** 51:15 62:24
66:2
**monitor** 97:21
**monitoring** 67:14,23,24
68:19
**morning** 63:4 65:12
**mouth** 40:12
**move** 8:13 98:13
**moved** 24:12,15,17 25:20
30:9 64:10
**moving** 26:4 60:21 91:17
**MPR** 4:2 21:17 77:7
**multiple** 83:11
**mute** 114:15,16,17

**N**

**N** 2:7 3:1 119:11
**name** 13:22 15:3 39:4
69:8 79:12,12,25 80:1
86:5 89:21 90:13,20
101:4 109:3,11,12,17
111:2,11 112:10
**name-based** 15:7
**named** 90:12
**names** 20:5 39:16 79:18
97:9 108:6,14 111:8
111:13
**naming** 111:3 112:20
**narcotics** 19:20 42:18
56:19 75:14
**nature** 16:22
**need** 6:17 34:13 40:2
61:10 70:19,21 72:17
106:15 119:2
**needed** 34:14
**needing** 38:17
**needles** 109:13
**needs** 80:17
**network** 13:13,15,16
14:2 32:20 33:1,21
34:9,12 59:6 60:10,11
60:13 92:4,23 93:21
97:7
**networking** 15:9 74:1
**networks** 13:9,17
**never** 44:20,25 49:7,10
64:11 75:14,16 81:10
81:25 82:5
**new** 1:17,18 25:7,14,16
26:5 35:9 50:20 53:21
69:23 96:23,25 101:11
101:19,25
**nicest** 119:3
**NOCCO** 1:7 122:5
**nodding** 6:10
**non-felon** 110:3
**non-ILP** 10:11
**non-internal** 101:17
**notable** 17:19 118:18
**Notary** 1:20 120:12
**note** 50:2 85:20 118:13
**noted** 98:24
**notified** 36:1,5
**noting** 112:9
**notwithstanding** 97:14

**number** 22:12 25:24
28:10 29:8 37:6,25
55:16 65:25 66:16
73:4,15 83:10,23 86:5
86:7,7 90:3 92:14
101:4,6 108:23 110:13
111:15,16 112:12
115:6 116:8
**numbers** 77:25 84:25

**O**

**O** 119:11
**O'** 98:10
**O-R-A** 13:21
**oath** 3:4 36:19 66:10
114:10 120:1
**object** 23:20 25:3 27:15
30:12 31:9 34:23
40:10 43:1 45:2 47:6
48:11 51:13 52:24
55:9 56:11,22 57:12
57:25 68:14 72:10
81:5 84:9 92:8 94:1,21
94:22 98:4 106:10
109:9 110:6 113:22
117:12
**objection** 37:14 59:22
68:20
**objections** 6:21
**observation** 21:10,12
**observer** 63:18
**obviously** 20:21
**occasion** 90:3
**occasionally** 50:18
**occur** 52:9 55:12,14
**occurred** 68:11
**occurring** 11:1
**Off-the-record** 112:22
**offend** 22:11
**offended** 26:2
**offender** 4:11 20:3 22:6
22:15,17 23:16 25:8
26:7,12,14,15 28:1
30:21 31:18 35:19
38:9 39:9,12 41:6
44:13,20,24 47:3,5,11
47:14,17,25 55:21
56:10 57:1,11,13,19
57:23 58:15,21 60:22
61:7 69:10,12,14 82:4
87:18 91:11,12,13
92:22 93:20 94:4
103:20 104:11 105:22
106:3 113:19,21,24
**offenders** 12:15 22:9
26:21 38:2 41:12 47:1
48:10,15 69:1,3,4 71:1
85:6 90:5 94:5 103:3
103:14,16,21 104:13
105:16 107:18 108:9
112:4
**offending** 55:21 45:6
60:16 61:3 104:21
105:1
**offense** 22:12 43:5 61:9
87:13 117:7 118:11
**offenses** 43:9 105:19
106:24
**offered** 99:6,9 100:11
**offhand** 20:6 21:24 37:18
**office** 5:22 7:21 8:12
13:12 24:3,4,7 51:25
88:23 89:4
**Office's** 27:1
**officer** 50:19 109:12,14
110:9
**official** 1:7 120:7 122:5

**oftentimes** 115:8,11
**oh** 2:3 16:17 17:3 34:7
36:23 53:25 54:7,14
54:14 62:11 65:11
66:1 74:15 84:18
114:15,17
**okay** 5:8,13,15,20 6:16
7:3,8,14,18,22,24 8:4,6
8:19,24 9:9,20,23,25
10:4,5,8,11,15,17 11:4
11:9,19 12:1,10,13,18
13:7,15,19,24 14:6,10
15:11,14 16:15 17:1
18:3,15 19:12,15,24
20:17 21:14,21 22:1
22:16 24:3,5,14 27:20
27:24 29:6,16 31:13
31:15,19,23,25 32:21
32:25 33:8,10,15,17
34:7,10,18 35:13,17
36:12,21 37:6,11,20
38:5 39:11,20 40:7,25
41:7,10 43:8,17 44:1
44:19 45:14 46:4,13
47:24 49:5,8,11,16
52:3,9 53:1,3,10,16,22
54:4,15,15 55:2 56:7
56:14,21 57:4,6,22
59:2,5,5 60:2,9,12
61:10,16,19 62:3,4,13
62:19,22 63:15,19
64:9 65:17,23 66:1,8
66:12,14 67:10,22
68:1 69:1,17 70:3,5
72:22,23 73:2,5,8,21
73:24 74:3,5,23,24
76:19,23 77:2,5,24
79:15 80:4,7,11,23
82:2,9,11,16,20 83:22
84:7,12,14,24 85:4,7
85:11,19,23 86:2,5,9
86:16,21 87:1,6,12,15
87:19,25 88:6,8,25
89:5,12,15,20 90:2,7
90:16,22 91:15,23
92:5,13,18 95:5,13,16
96:8 97:20 98:17,22
99:2,13 100:19 101:1
102:1,10 103:9 104:7
104:17,24 105:10,20
106:1,19 107:20,22
108:18,20 109:4
110:12 111:4,7,15,19
111:21 112:6,17 114:4
114:7,12 115:21 116:8
116:14 117:8,16
118:10,15,22
**old** 79:20,21
**older** 78:24
**once** 5:19 35:25 36:8
39:7 44:15,23 47:3
69:6 91:7 103:23
117:6
**one's** 43:6
**ones** 16:7 18:12,17 19:25
65:18 108:6
**ongoing** 118:24
**online** 8:15
**open** 15:13,15 79:4 119:2
**operate** 23:9
**operating** 82:25 83:6
**operations** 11:7 14:3
75:18
**opportunity** 28:14,17
**opposed** 6:10,12
**optional** 50:12
**ORA** 13:21 14:18,19,23

order 34:13 60:22 70:20
73:3
organized 19:20 52:6
75:14
orientation 53:21 99:9
originally 23:13,22
outside 12:23 25:22
26:12 42:17,21 104:22
105:6
oversee 17:19
oversees 74:7
oversight 11:6

**P**

P 119:11
P-A-J-E-K 15:1
P.A 2:14
p.m 1:15,15 119:9
P.O 1:23
page 3:2,5 4:1 13:6 31:13
31:20 32:11 40:23
46:5 47:19,20,21
48:21,21 53:22,23
54:19 62:23 65:24
73:8 74:23 78:3 82:17
90:10 104:15 106:19
107:10,10 108:18
122:9 123:2
pages 31:20,20 32:23
76:25 77:17
Pajek 14:20,23 15:1
palm 47:25
panhandling 48:18
paperwork 38:17
paradigm 54:9
paragraph 13:10 41:8
92:25 104:14 107:11
107:14
parent 47:10,16
parental 96:5,10
parents 36:5
Park 2:15
parole 106:23
part 8:16 14:6 15:4,11
26:11 28:8 34:22
39:21 40:1 65:14
74:25 78:21 82:10,22
92:19 107:7 114:19
participating 51:19
parties 119:13 121:12
parties' 121:13
partner 46:1
parts 12:13 59:9 76:13
Pasco 1:8 8:12 13:12
19:21 25:8,17,20,23
25:24 26:2,6,13,15
38:15 40:3,8 48:19
51:25 56:18 58:23
104:21 105:1,14,17,19
106:4,9 107:19 108:3
113:10 120:3 121:4
122:6
passed 6:16
patrol 28:13 75:13
102:18,19
pawn/scrap 42:17
pay 34:21
PC 64:1,7 91:21,22
Peak 88:19,20,21
pending 6:19
people 9:20 10:11,18
15:8 16:11 17:1,6,24
19:9 20:2,22 21:11
25:5 26:19 27:5 28:13
28:13,21 29:9 31:2
33:20 40:19 60:18
67:5 81:16 87:8 94:2,8

94:19
percent 46:7 108:22,25
110:4
perfectly 58:17
perform 75:3
performance 9:10 16:5
20:18 21:3,4,6,10,12
21:17 22:4 25:12
55:13 72:16,19,19
73:9 75:7 76:24 77:14
77:22 82:12
period 40:5,6,8 73:14
82:15 83:24 98:11
periods 27:22
person 11:16 15:24
23:18 27:10 28:15
29:10,13 31:2 38:8
44:6 45:10,11 52:21
56:16 57:10 60:10
61:3 64:18 65:22
66:25 67:12,13,14
74:17 79:6 96:22 97:8
100:15 106:15 109:18
109:20 110:2 116:2,9
117:2,5,5 118:3,4,5
person's 30:8 79:12
personality 81:16
personally 120:5
personnel 75:20
persons 13:17 66:25
philosophy 13:14
phone 114:14
physically 80:2 116:12
pickup 63:6 91:21,22
picture 25:6,10,10 26:5
39:1,3 45:7 70:20 97:4
98:15 112:14
pictures 67:17
Pinellas 25:25
place 1:17 51:3 52:21
55:8 65:6 70:23 106:4
106:9
placed 91:5
placement 93:10
places 67:5 68:9 74:18
plaintiff 116:2
plaintiffs 1:5 2:5,9,13
4:12 110:25 115:4
122:3
plan 48:22 73:15
planned 73:16
platforms 15:22
play 31:25 35:11 103:19
103:23
please 6:8,11 31:14
32:11 35:5 40:24
47:19 56:15 104:6,16
106:21 108:18
plus 45:5 70:12 77:11,11
77:11 78:4
point 6:17,20 12:8 22:20
23:18,23 43:4,8 44:14
45:18 57:18 58:18
59:5 60:22 61:4 66:15
99:8 107:17 113:19
pointing 99:23
points 22:22 23:17,17
38:18,18 41:16,16
42:1,4,14,16 44:17
Police 50:20,21
policies 99:14
policing 13:14
policy 86:21
pool 39:22 40:1,9,19
41:12 44:23 96:24
111:12 113:9,11

pop 22:24 99:21
POR's 21:11
Port 1:17,18 50:20,20
portion 7:2
posed 90:17 91:18
position 21:9 24:6,9,14
24:22 35:9,11 52:11
52:20 53:5 76:6
positions 24:18 51:25
52:8
possession 109:16,23
110:2
possibility 25:20
possible 44:12,19,24
52:5 95:9
possibly 86:17,19 116:6
post 67:17 98:7
post-sentence 98:18
post-vetting 112:11
potentially 26:20
Poulton 2:14,14 6:3
23:20 25:3 26:17
27:15,21,24 29:22,24
30:12 31:9 34:23
36:13,23 37:11,16,20
37:23 40:10,15 41:1,3
43:1 45:2 47:6 48:11
51:13 52:24 53:2 54:1
54:5,12,14,18,20,22
55:9,20,22 56:2,6,11
56:22 57:12,25 58:8
58:13 59:22 66:2,5
68:14,20 71:10 72:10
76:9,17,19 81:5,7
82:17,20 84:9,17 85:1
92:8,14 93:3,5,14,16
94:1,21 98:4 99:19,23
106:10 109:9 110:6,13
110:15 112:7,21
113:22 114:1,4,7,14
117:12,16 119:6
Poulton@debevoisepo...
2:16
PowerPoint 53:20 62:23
63:8 99:7
practice 86:21
pre 101:14,14
pre-AIM 64:9,14,20 65:6
65:14,17 95:10,23
pre-COVID 64:16
pre-vetting 112:10
precisely 91:4
predicate 34:16
predict 55:7,10
prep 50:5
preparation 64:22 65:3
prepare 6:24 49:22
63:19 115:10
prepared 6:2 63:22
76:10 86:24
preparing 35:14
present 27:17 49:22
50:23 51:1 53:21
119:13
presentation 53:20 58:6
presented 70:4 84:16
99:7
prevent 55:5,16 68:21
prevention 61:24
previous 74:23 77:17
87:10 91:20
previously 73:16 113:10
prior 8:11 32:23 40:2
49:24 50:1 84:22 91:7
92:1 95:9 113:12
prison 38:25,25 108:3
private 15:18,19

privy 71:17 105:8
probable 71:3
probably 6:18 11:14
22:24 90:13
probation 43:19 50:19
85:22 93:11,12 106:23
problem 13:8 25:10
55:21
problematic 96:6
procedure 82:25 83:7
PROCEEDINGS 1:12
process 4:11 11:17 26:24
26:24 29:8 38:7,12
67:2 81:20 83:7,15
98:9 104:11
processes 11:13
produce 103:7,11
produced 102:21 103:23
produces 23:13
product 111:2
program 13:21 14:16,18
114:24
programs 105:22
prohibited 48:18
project 111:2
prolific 4:11,13 12:14
20:3 22:5,15,17 23:16
25:8 26:7,11,14,15,21
30:21 31:18 35:19
38:2,9 39:12 41:6
44:12,20,24 45:8
46:25 47:3,5,11,14,17
47:25 48:9,14 56:10
57:1,19,22 58:21 69:1
69:3,9,12,14 71:1 82:4
91:11,12,13 103:14,16
103:20,20 104:11,13
105:16,22 106:2
107:18 108:9 110:25
112:4 113:21,24
prolifics 112:17
proofreading 12:8
proper 83:2
property 18:21,22 20:1
20:22 21:1,25 50:13
64:23 65:21 75:13
protection 34:3,4
protective 33:3 76:4
provide 12:7 27:8 28:17
38:17 50:2 75:6,20
118:6,19
provided 12:16 19:7 38:4
48:9,14 89:23 99:10
112:14
providing 11:6,7 114:23
116:10
psychology 8:19,21,25
public 1:20 83:3,9,11,17
83:19,20,23 84:6
88:17 89:3,10 114:23
117:13,23 118:18
120:12
puck 54:25 68:13
pull 9:4 32:7,8 34:14
38:11
pulled 38:15 44:15,17
69:4 111:1
pulling 115:20 116:7
pulls 38:12
purge 83:2,9
purged 79:10,14,15,18
purpose 7:8
purposes 109:14
pursuant 19:4
pursuit 19:3
put 21:29 26:21 39:5
40:11 69:8 70:1 83:12

86:11,12 87:5 98:2
109:11,17

**Q**

Q1 112:18 113:5
qualified 41:12 113:9
qualifies 60:20
qualify 39:16 44:23
59:17
quarter 39:10
quarterly 69:15
query 44:17 78:22
question 6:7,11,19,19,22
30:25 31:1 33:17
60:21 61:4 63:7 67:4
72:19 75:7 77:18 80:7
87:3 90:20 91:17,18
103:14 105:15,25
106:2 114:12 117:22
questioning 114:13
questionnaire 73:9
questions 6:10 11:7,20
21:5 24:1 37:4 64:25
66:12 89:20 90:16
quick 6:1 76:9
quickly 31:16 53:19
quite 83:13
quiz 22:24
quote 15:20 44:5 54:24
68:13 94:19

**R**

R-A-L-L-E 20:14
radar 27:1
Ralle 20:13
range 77:5
rank 5:10 10:13 111:25
ranked 45:5 112:11
113:3,5
Ranking 4:12
rankings 111:12,12
rarely 96:5
rash 68:7
rating 21:3 73:13 82:15
raw 38:7,12 44:15
reach 19:5
reacting 55:6
reactive 55:5 68:22
read 12:18,20,22,23
13:11 32:14 37:6,25
41:8 54:24 56:14 57:5
63:1 72:1 73:11 75:1
80:13 84:25 91:18,23
93:4 95:6 96:4 104:5
104:18 106:21 107:14
107:15 112:5 119:6
122:11
reading 45:16 62:8 63:11
81:1 92:25 94:22 95:3
104:3 111:11 119:14
reads 46:3
reaffecting 97:4
real 48:2 76:9
really 19:4 31:16 102:18
realms 16:21
realtime 16:12 17:4,16
18:14,25 19:6 73:19
74:7 101:6,13,25
102:22
reason 25:19 30:17 39:5
67:8 78:1 79:8 85:15
97:23 101:16,18
reasonable 30:18 58:17
recall 8:18 27:3 31:10
64:17,18 80:24 81:15
82:1 114:23 115:2,5

115:20
recalling 110:22
receive 22:15
received 76:6
receiving 45:21 71:15
recognize 11:24 53:16
  61:19 108:5
recollection 96:20 97:5
  97:17
recommendation 27:8
recommendations 28:11
  39:8
record 6:23 32:19 37:1
  56:15 61:9,9 79:12
  80:13 84:6 112:21
  121:9
recorded 74:21
records 58:25 70:9 83:2
  83:3,9,11,17,19,20,23
  88:13,17 89:11 114:24
  116:24 117:13,20,23
  118:18
recruited 11:2
red 46:18
redact 79:11 84:3,4,7
redacted 79:19,20,22
redaction 83:14
reduce 68:23,24
refer 5:11 110:7
reference 77:16 80:23,25
  81:9 89:18 92:22
  106:13
referenced 38:13 61:25
  74:6 76:7 106:14
  115:15
references 78:5
referring 9:13 19:16
  43:22
refresher 6:1
regard 49:20 63:16 88:4
regarding 37:4 79:2
  88:10 89:19 115:5
regards 5:21 7:2 11:13
  72:12 77:1
regular 53:6,7 71:22
  72:6 74:12
regulation 78:13
relationship 45:25
relative 121:11,13
relevant 35:14 37:19
  83:21
reliable 46:14,20 62:21
remain 63:3
remedied 81:11
remember 35:10 37:18
  40:6 52:5,7 64:15 99:9
  113:23
remembering 14:11,13
  97:7
remote 64:18
remotely 74:13
remove 36:10 39:12
  65:15 80:2 101:20
removed 47:13,17 97:15
repeatedly 12:20,22,23
repetitive 106:24
rephrase 23:9 51:15
replace 95:17 96:15 97:5
replaced 95:8
replacement 97:2
report 7:16 16:7,8,13,18
  16:18,19,20 17:24,25
  19:14,18 21:17 59:14
  63:3 73:9 76:24 79:11
  79:24 80:2,5 82:12
  102:21 109:23 110:1
  121:7

reported 1:19 68:4
Reporter 1:19 3:4 121:1
  121:6,19
reporting 1:22 9:23 44:6
reports 16:23 21:12 44:3
  45:17 63:25 68:2
  77:22 79:13,20,21
  80:2,8 106:25
represent 113:18
representative 50:19
representatives 50:22
request 4:9 34:13 83:9
  88:13 89:19 95:8
  116:3,5,24 117:4,14
  117:24 118:18
requested 118:19,21
requesters 83:12
requests 83:3,11,18,19
  83:20,23 89:11 114:20
  114:24 115:5,7,22
require 46:24
required 50:7,10,11
  96:17 100:12 113:23
  115:3
requirement 51:9 53:11
  94:12,16 96:19,21
requires 81:18
research 27:9,13 65:3
  79:1 90:6
researched 65:1 86:1
reside 108:15
residence 96:7,11
residing 108:3
resolution 80:18
resources 5:22 8:12
  24:11,13
respective 119:13
response 37:22 75:6 88:2
  88:11,12 89:20,22,23
  90:1 91:4 117:22,23
  118:4
responses 89:25 114:20
  114:23
responsibility 19:19
  108:14
responsible 11:17
rest 81:1
restroom 36:13
result 46:1
review 12:4,5,9,11,16
  15:12,13 28:2 29:10
  38:4,23 39:7,13,14
  69:6 73:22 74:21 84:4
  84:7,23 108:2
reviewed 38:24 44:16
  45:5
reviewer 12:24
reviewing 12:6 15:4
  87:24 103:23
reviews 16:5 20:18
revision 104:10
Richey 1:17,18 50:20,21
riding 68:6
right 6:1 16:17 24:7 25:9
  29:20 30:9 31:6 39:2
  39:23 44:3,6 46:8
  47:25 49:18 51:21
  54:22 56:1,5,6,10
  57:23 58:5 62:17,25
  65:12 71:6 74:12 76:2
  77:3 82:10 83:24,25
  84:21 85:7 86:2,18
  87:24 89:7 91:5,8
  92:15 93:23 95:17,20
  96:1 102:5 105:2,12
  111:9,17,23 112:1,19
  113:3,6,10,23 114:3

114:10,21
ring 100:5
Rio 90:12,18,25 91:19,25
  92:21 93:12,17 95:4,7
  95:11,25 115:16
Rio's 93:10 96:6
risk 31:24 32:1,4 34:19
  35:14,18,22,25 36:8
Rjohnson@ij.com 2:4
RMS 32:19 63:25 64:2
  68:3 69:8,11,25 87:1
  87:14 98:24 104:19,24
  105:9 109:3 116:12
RMS/JMS 104:20
Road 2:7
Rob 114:14
robbery 56:19
Robert 1:4 2:2 111:20
  112:24 113:14 114:2
  122:2
robust 26:3,6
role 7:5 9:17 11:4 12:3,6
  12:24 14:14 21:6 25:7
  31:25 38:11 49:16,20
  63:15,17 64:11 103:19
  103:23 115:11
roles 75:16,19
Ross 111:1
rosters 32:16
route 70:4
routine 23:13
routing 88:18
rows 111:22
RTCC 74:5
rule 51:3
rules 6:5
run 34:16 63:13
running 85:16
runs 40:19

                S
S 2:10,11,15 4:1 119:11
S-A-R-D-O-N-E 20:16
Safe 32:20,25 33:21 34:9
safety 109:12,14 110:9
says 13:8 30:6 31:5 41:5
  41:11,18 42:21 43:11
  43:23 44:1 47:24
  48:22 57:7 58:20
  60:22 62:14 77:11
  78:8 80:5,14 85:7,10
  88:25 90:25 91:7
  94:17,18 104:25
  108:25 118:1
scale 77:23
scenario 31:11
schedule 65:9
school 8:13 32:6,17,18
  32:21 76:8
science 9:3
scientific 14:1
score 12:14 44:12 46:8
  109:1
scored 41:13,18 104:13
scoring 22:10,13,16,17
  22:21 23:3,5,9,10,11
  32:9 38:3,22 40:20
  41:11 107:7

se 26:7
seal 120:7
searching 69:11
second 13:10 58:20
  80:12 89:9 90:17,21
  91:17 104:5,18 111:23
  112:21
seconds 71:10
section 73:11
sections 21:17
security 102:17
see 15:24,25 18:1,20
  21:19,25 25:11 27:13
  30:25 38:17 41:11
  46:22 52:14 54:1 62:7
  62:7 67:15 68:4 73:15
  77:21 78:6 81:8 86:3
  88:2,3,19 90:14,18,22
  99:21 104:4 109:19
  110:8 119:3
seeing 27:7 31:10 39:4
  47:23 48:6 110:22
seen 21:23 48:2,5,24
  49:10 67:19 79:6
sees 25:24
selected 95:4,7 104:13
selection 4:11 104:11
  106:17
Self-admission 46:14
self-evaluation 73:8
  74:25
Semoran 2:15
send 39:7 50:21 89:9
  90:1
sends 38:22
senior 24:19 52:7
sense 6:14 17:22 28:12
  31:1 72:14
sensitive 78:17
sent 89:19 97:22 100:9
  108:1,13
sentence 32:15 38:1 78:5
  82:23 91:23 95:4,6
  96:3 104:18 106:20,21
  107:15,16,21
sentences 75:1 80:13,15
sentencing 98:7,8,20
separate 59:9 102:4
  116:15
separately 9:22 60:19
September 24:4 77:6,6
  84:18,19,19,20
sergeant 21:25 50:13,17
  51:4 64:24 65:21
service 19:6
services 75:5,10,15
set 51:3 62:15 73:14
  117:3 118:16
setting 15:11 52:19 66:1
settle 37:14
Shaker 2:3
share 34:4
Sheet 3:5 123:1
shell 80:5
Shelley 1:12 4:2 5:1
  120:5 122:17
sheriff 1:8 10:16,17
  88:16 122:6
Sheriff's 5:22 8:12 13:12
  24:3,4,7 27:1 51:25
  88:23
shift 50:16
shooting 110:1
short 34:8 36:16 66:6
  114:8
shortly 11:21
show 22:25 116:19,21

showing 44:15 79:24
  85:5
shown 102:14,24 113:11
shows 102:4,14 111:6,16
sick 75:21
side 56:12 101:14 102:22
Signature 3:5 122:9
signing 119:14
signs 46:15
sir 66:5 88:24
situation 67:20 117:1
situations 45:20
six 17:3,6
skate 54:25
skates 68:12
skimming 53:19
slide 53:19 63:8 64:3,8
  85:5 86:25
slides 4:5,7 49:22,24 50:5
  63:19,21 70:2 83:15
  84:16 85:14 96:20
SNA 13:20 14:5,7,17,23
  15:4,6,7,12 73:18
social 13:12,15,16 14:2
  15:4,8,9,9,12,17 67:15
  67:19,25 74:1
sociology 8:22
somebody 26:8 29:2,8,11
  30:11 31:3,8 39:11,12
  39:18 44:19 47:3 64:2
  97:11,14,22 100:20
  116:14
somebody's 39:4
someone's 36:8 60:13
  99:22
soon 7:9
SOP 82:25 83:10
sorry 14:20 17:3 18:22
  31:19,20 34:8 37:7
  54:11,18 62:13 63:7
  65:24 67:3 82:17
  84:18 90:24 91:25
  94:15 114:17
sort 12:23 17:23 18:5
  45:10 60:21 61:4
  68:12
sounds 17:2
source 15:15 46:15,20
  104:20,25
space 80:1
speak 16:4 30:3 61:13
speaking 20:25 31:6,7
  35:13 41:25 58:9
special 88:22
specialist 24:12
specific 8:25 11:16 22:13
  33:11 66:17 67:12,13
  69:12 80:24 99:5
  102:16 105:13,16
  115:20
specifically 35:13 88:3
  89:5,9 99:3
specify 34:24
speculate 107:9
speculating 29:25
speculation 30:1
spell 20:10
spelled 15:1
spoken 7:10
spreadsheet 69:6 100:10
SRO's 76:5
staff 49:23 72:12,15
stamp 85:25
stamps 53:23 54:6
standard 82:25
standing 113:25
standpoint 5:23

stands 49:14
STAR 19:10 20:1,22
  21:1,22,23 28:21 30:5
  50:23 95:10,11,22,25
  96:5
start 10:3 32:15,16 38:7
  73:4
started 24:10,11 64:14
  100:25
starting 53:22 72:25
starts 38:12 39:21 93:7
state 1:20 46:12 120:2,12
  121:3
STATES 1:1
statistics 8:17
status 50:2 79:24 85:24
  93:11 103:20
statute 46:12 61:23
Statutes 4:6
Ste 2:3,7,11,15
steal 42:12
stenographically 121:7
Step 46:4 108:19
Stephen 40:18
Steve 16:23 38:3,10,12
  69:4 103:24 109:5
  110:7 111:1 112:14
  113:12 116:6,6
stipulated 119:12
Stipulation 3:3
stolen 109:24
stop 26:1,9 58:10 68:23
  70:5 83:18 109:19
stopped 95:2
stops 78:20
store 79:16
storing 78:17
strategic 16:21 111:2
street 55:15 63:4
streetlights 55:15 66:17
streets 26:9 27:6 85:17
strengths 77:18
stretch 66:3
strike 63:7 97:12 105:15
student 32:17
studies 13:20
stuff 66:13 78:2
subject 59:14,14 68:18
  71:3 79:22 100:6
subjects 60:16
submitted 77:2
SUBSCRIBE 122:12
SUBSCRIPTION
  122:13
subsection 62:3
substance 12:10
sufficient 96:10
suggest 66:19
suggested 95:11,25
Suite 1:17
Suites 1:17
summarized 83:7
summary 56:23 58:14
  118:7
super 53:24
supervise 17:16
supervising 17:5 18:4
supervision 96:6,10
  101:8 115:13
supervisor 7:6 9:19 11:4
  16:10,12,15 17:4
  24:20,22 49:9,17 52:4
  52:7 63:16 72:21
  73:19,22 74:5 75:2,19
  77:1,8 80:17 82:24
  115:9,11
supervisors 10:12 17:12

27:5 50:17 71:21,23
  71:24 80:19 81:4
supplement 64:7 78:4
  80:12
supplements 77:15 78:3
supply 96:23
suppose 78:4
supposed 47:24 48:9
  51:1 84:7
sure 5:16 6:2,7,9,11 7:1
  14:23 29:22 33:19
  36:15 38:5,20 66:4
  70:15 78:9,16 83:6
  85:25 86:13,22 87:2
  89:17 90:11 95:7
  97:18 100:24 110:16
surrounding 97:10 99:11
  99:13
suspect 61:1 68:6 87:18
suspected 28:7 66:25
suspicion 30:18 43:5
  70:22 87:16
suspicions 56:18
suspicious 63:4 68:4
sworn 5:2 29:4 120:6
system 22:18,20 23:3,6,9
  23:10,11,14,19,23
  32:9,18,19,22,24 33:5
  33:7,13 35:8 38:3
  40:20 44:14 68:3 69:8
  69:11,13,25 70:23
  78:19 79:11 80:3
  98:25 107:7
systems 14:22 70:25
  105:9,11

T

T 4:1 119:11,11
take 6:17,20 8:17,19,21
  9:15,21 12:3 13:9
  21:10 28:5 31:13
  32:16 39:11 40:19,22
  41:5 45:11 55:7,19
  59:17 62:22 65:6 68:8
  72:22 81:20 85:3 96:9
  104:5,14 105:5 108:8
  111:4,19 114:5
taken 5:18 41:22 44:14
  106:16 112:15
talk 6:6 37:13 111:5
talked 66:13 72:24 107:3
talking 14:21 27:22
  51:17 67:23 69:1
  81:18 114:2 115:16
  117:2 118:4
TAMMY 1:3 122:1
Tampa 1:2 4:9 37:5,22
  88:11 89:19
target 30:21 70:20 71:2,2
  86:8 103:13
targets 71:5
task 83:1
tasks 73:15,16 75:3
  115:13
TAYLOR 1:3 122:1
team 17:20 19:8,8 20:1
  51:21
teams 19:10 20:22 21:22
  28:21 51:12 52:13
  74:14 99:20
technically 17:8
telephone 2:2
tell 5:2 29:9 49:13 69:13
  73:6 76:10 82:14 86:3
  87:2 100:4
tells 30:7
tend 10:25

tense 27:17 58:10
term 22:5 24:25 31:22,23
  34:8 43:25
terms 17:25 27:16
terrible 67:4
test 6:16
testified 5:4 66:22
testimony 25:16 63:12
  74:11 121:9
thank 5:17 29:7 36:23
  41:3 66:5,9 82:20
  110:15 118:24 119:1
theft 42:17 56:19
thefts 66:16
thing 11:19 48:17 58:16
  58:17 103:6 109:18
things 9:14,22 10:24
  12:15 15:20 18:17
  20:25 27:12 28:4
  41:21 61:10 67:22
  87:8,15
think 6:5 7:8 9:14 11:15
  11:16 14:18 15:3
  20:18 21:24 23:1
  25:15 28:2,13,15
  30:15,16 31:5 34:24
  37:19,21 39:19,25
  40:10,13,15,22 52:18
  55:20 59:22,23 64:5
  65:8 67:18 68:21 72:1
  72:25 74:11 77:11
  81:19 90:21 93:6,7
  98:5 106:10,20 112:7
  115:16 118:21,22
third 104:14 107:11
Thirty 71:10
THOMAS 2:14
thought 81:20
thread 88:10
three 19:21 20:15 31:20
  35:2,12 40:15 41:13
  41:19 42:14 70:10,13
  74:18 84:15 85:6,8
  90:25 92:1 93:19
  100:18 115:12
three-year 56:17
threshold 56:17
tied 50:14
till 77:6 84:17 100:5
time 1:15 7:4,17 12:7
  19:5 27:22 39:17 40:5
  40:6,8,13 45:20 48:5
  51:21 52:3 58:6,9 61:3
  61:15 65:8 69:20 71:7
  73:22,24 74:13,16 74:21
  76:3,5 79:6 83:24,24
  85:13,25 88:16 93:10
  97:24 98:12 103:6
  104:22 106:24 110:22
  118:25
timeframe 27:16 58:1
times 4:9 9:13 22:12 37:5
  37:22 45:23 46:1
  88:11 89:19 97:2
  106:11 116:1 117:4,6
  118:2,5,6
tip 63:1,2
title 9:18,19 16:11 75:25
  89:4
titles 10:17
today 6:14 7:2 85:15
  101:9
told 71:9
Tom 36:22 37:9 99:18
top 24:25 25:5 26:21,25
  27:2,10,14,19 28:1,3
  28:15 29:12,13 30:11

30:20 31:3,8 35:23
  41:5 46:23,24 57:10
  57:13,23 58:3,15
  60:22 61:5,11,13
  69:17,18,21,22,23
  70:5 71:5,8,15 73:12
  82:4 85:6,8 87:3,8
  90:18 91:1,5,14,19,25
  92:1,7 93:10 95:7,8,11
  95:17,25 96:9,15,18
  96:22,23,25 97:2,5,7
  97:15,15,22,24 98:2,6
  99:1 102:14 103:3
  105:12,13 106:6,8,17
  107:17 108:8 111:8
  112:3 113:15,18,19,20
  113:24
totally 18:6 23:25
traffic 109:19
trail 34:15
trained 14:9 99:3 100:22
  101:14 102:7,24
trainer 100:18
training 4:10 14:11,13
  21:15 99:5,6,11,13
  100:7,8,10,12,14,15,19
  101:7,25 115:9
transcript 121:8 122:11
transition 51:11
trend 25:12
trigger 81:8
triggers 81:2
Trinity 74:20
Troy 8:1,4 9:1
true 69:17 121:8
truth 5:2,3,3
try 53:24 55:4,4,11,16
  76:9
trying 17:22 30:15 55:7
  67:2 68:22 81:6
  110:15 115:10
turn 13:6 32:11 48:21
  57:3 76:22 84:24
  108:18
turned 21:13
turning 41:25
twelve 5:25
two 9:21 10:4,4,23 14:22
  15:10 17:12 19:21
  20:13,13 31:19 35:11
  38:14,15 39:2 40:2,3,7
  41:15,16 42:16 44:15
  44:18,21,25 46:21
  59:9 60:15 62:16 70:8
  70:10,11,11,13 74:21
  75:1,18,22 80:13,15
  90:16 95:6 97:23,25
  98:7 108:23 109:10
  113:9,12 114:25
  115:12
two-year 98:10
Tyler 85:16
type 14:15 22:12 30:19
  31:11 34:24 116:3,5
  118:11
types 43:8 45:19
typical 52:21
typically 11:2 49:24
  50:12 65:6 84:21
  98:13 100:16
typo 41:18

U

U 119:11
uh-huh 6:12 38:20 46:6
  80:16 88:14 102:3
  107:13 115:17

uh-uh 6:12
ultimately 29:12 81:13
  81:21
umbrella 17:8,17
unable 82:24
unavailable 79:16
undercover 15:23,24
  16:1
underneath 85:7
undersigned 120:4
understand 36:19 44:22
  55:3 75:3 103:10,16
understanding 14:7 21:9
  38:5 64:22 70:18
  73:18 74:1 75:18
  81:19 88:9 104:8
  107:24 110:8 111:14
  115:10
unified 102:20,25
uniform 65:7
unique 67:21
unit 34:3,4
UNITED 1:1
University 8:1,4
unquote 15:20 44:5
unvetted 112:18
update 50:1,2 64:1,8
updates 101:19,22
use 11:10 14:5,14,18,19
  16:1 26:15 27:18,21
  28:1 36:13 49:1 71:15
  101:10 103:1
usual 14:2
usually 72:12 81:18
utilize 63:23 110:10

V

VA 2:7
valid 85:9,10 86:9,15
value 107:17
values 43:4
varies 105:23
various 12:13 65:15
verbalize 118:11
verbalized 102:14
verbally 6:10
verified 61:6,8
versus 35:1
vetted 112:12
vetting 107:17,21,23
  108:1
viable 104:20,25
vice 19:19 75:13
vicinity 68:9
victim 44:8 45:15,20
  106:25
victimization 68:24
victimized 45:25
viewable 5:20
violation 42:17,18 43:19
  106:22 117:10 118:8
violations 56:19 87:7
violent 38:18 42:2,4,10
  42:10,17,21,24 60:24
  93:1,24 94:18
virtual 52:15
vision 54:19,20 55:2
VOP 43:12,19,23 106:23
  118:8
vs 1:6 122:4

W

W 2:14
wait 98:19
waiting 63:5
waived 119:15

walk 109:19
want 10:2 19:3 25:15
  26:8 27:21 28:12
  29:19,23 35:11 37:13
  38:5 40:11 51:16 53:2
  58:14 59:3 65:1 70:9
  70:14 76:15 96:15
  101:12 104:5 107:20
  115:9 118:2
wanted 5:15 73:25 74:8
  86:22
wants 18:23
Warner 17:15,19,23
  18:11 74:7 101:23
warning 32:18,21 33:4,7
  33:13 35:8
warrant 71:3 91:20,21
wasn't 51:20 71:17 74:17
  83:10 105:25 113:23
watching 65:24
way 26:16,19 30:15,16
  46:3 47:13,16 53:24
  78:16 81:21 91:3
  105:18
ways 109:10 116:6 119:4
we'll 6:20 11:20 76:18,19
  89:8 119:2
we're 21:6 27:22 31:17
  39:3 49:25 54:19 58:8
  58:9,13 71:4 78:10
  87:22 92:18 99:20
  109:17 112:24 117:1
  118:18,19
we've 30:7 61:14 68:4
  76:6 79:5,6,8
weapons 109:13
wearing 6:14 46:16,18
Wednesday 84:22
week 7:13 49:25 50:1
  52:18 70:1 74:21
  84:17,20,22 97:18
weekly 49:22 84:18
weeks 73:13
weighing 56:17
weight 106:21,22 107:5
Welcome 66:8
well-being 72:16
went 64:18 69:23
weren't 50:14,16 117:23
whatever's 15:13
whichever 50:13,15
  108:14
white 80:1
Winter 2:15
wishes 63:2
witness 5:5 44:10 55:23
  92:15 93:15 99:20
  106:25 110:14 120:7
  121:9
Wojtecki 90:13
word 30:15,16 39:9
  57:16
words 40:11
work 18:8,10,11,12,14
  18:17 19:10,25 20:2
  20:22 21:1,7,11 35:6
  73:13 108:14
worked 52:1 75:11,12,13
  75:14,16
working 8:11 13:3 89:1
  102:12,13
workload 90:8
works 14:10 26:24 32:5
workups 78:23 79:13
worthy 28:3,15
wouldn't 14:4 29:3 42:25
  45:5,6 98:9 101:16,18

write 22:3
writing 76:6 77:20 83:9
written 48:18 73:11 77:1
  82:25 89:21
wrong 39:25 54:15

**X**

X 3:1 4:1 23:17 117:2

**Y**

Y 23:18
yeah 10:2 18:13 26:19
  40:16 41:2 47:21
  54:17,21 57:16 58:2
  64:5 66:11 69:4 71:12
  76:16,17 80:15 85:1
  105:15 110:16 116:11
year 21:16,18,18 35:11
  52:5,7 64:16,16 73:6
  77:7 79:14 82:14
  111:25
yearly 21:3
years 5:25 13:20 14:12
  35:12 40:15 70:8,10
  70:10,11,12 78:24
  79:1,23 97:23,25 98:7
  114:25
youth 31:24 32:1,4 34:19
  35:14,18,22,25 36:9

**Z**

zone 93:20

**0**

00355 54:3
00379 55:19
00382 57:3
007382 92:20
05939 102:1

**1**

1 1:17 4:2 9:5 62:9 72:22
  90:10 104:15
1-5-2023 120:13
1,092 111:17
1:39 1:15
10 4:11 46:7 103:25
  108:21,25 110:4,14
  111:16
10:30 85:16
100 107:17 108:8,16,17
  112:3
1010 2:15
103 4:11
1035 2:15
11 1:14 4:3,12 110:17
  120:6
11:01 85:17
110 4:12
1100 85:10
119 3:3
12 73:13
120 3:4
121 3:4
122 3:5
123 3:5
16447 85:3
16781 2:3
17 86:18
17th 84:19 86:11,17,20
  86:22
18 84:17,19 86:18
18927 82:8,19
18947 77:17
18953 76:22 78:3
18967 74:23

18968 73:4
18th 86:17,19,22
19 86:18
198 111:25 112:12,14
  113:5
19th 100:9

**2**

2 2:11 4:3 11:22 40:23
  46:4 62:3,7,7,9 107:10
20 86:18
2004 24:4,10,11
2008 24:13
2011 24:15,16,17
2012 8:3,3
2017 104:10 111:23,25
  112:18 113:5
2018 24:23 73:7,21 74:17
  77:6 78:6,24 79:4
  101:12
2019 77:6
2020 82:15
2021 82:15 111:16
2022 1:14 120:6,8 121:17
21 86:18 97:4
22 86:18
22203 2:7
23 86:19
23rd 84:18,19,20
24 86:19
24-hour 19:6
2426 1:23
25 13:6
256 2:3
25th 120:7 121:17
27 82:20 84:17
276821 120:12
28 78:10

**3**

3 4:4 36:17 53:23 62:8,11
  62:12,14,19,20 91:25
  108:19
305-721-1600 2:12
3180 2:11
32792-5512 2:15
33131 2:11
33526-2426 1:23
352 1:24
36 4:4
379 55:24

**4**

4 4:5 42:5,14 53:14 60:23
  92:1,15,18 93:1,19,24
  94:8,9,18,19 99:8
  107:10
4:55 1:15 119:9
400 62:23
407-673-5000 2:16
408 63:8
44120 2:3

**5**

5 3:3 4:6 24:25 25:5
  26:21,25 27:2,10,14
  27:19 28:1,3,15 29:12
  29:13 30:11,20 31:3,8
  35:23 46:23,24 57:10
  57:13,23 58:3,15
  60:22 61:5,11,13,17
  69:17,19,21,22,24
  70:5 71:5,8,15 82:4
  85:6,8 87:3,8 90:18
  91:1,5,14,19 92:1,7
  93:10 95:7,8,12,17,25

96:9,15,18,22,23,25
  97:2,6,7,15,15,22,24
  98:2,6 99:1 103:3
  105:12,13 106:6,8,17
  113:15,18,19,20,24
53 4:5 77:20
567-5484 1:24

**6**

6 4:7 84:11,12
6-20-21 93:13
61 4:6

**7**

7 4:8 87:20
70 31:20
703-682-9320 2:4,8
72 31:20 32:11
75 31:13 40:23 41:1
76 47:20,21
77 48:21

**8**

8 4:9 86:7 89:13
8-25-20 4:4,8
8:21-cv-00555-SDM-C...
  1:6 122:4
84 4:7
8520 1:17
87 4:8
874 4:6
874.03 61:23
89 4:9

**9**

9 4:2,10 99:16
9-11-19 93:12
9-18-2019 91:1
9-25-18 85:10 86:9,10
900 2:7
901 2:7
99 4:10