UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO. 8:21-cv-00555-SDM-CPT

_____
                                    )
DALANEA TAYLOR, TAMMY HEILMAN,      )
DARLENE DEEGAN, and ROBERT A.       )
JONES, III,                         )
                                    )
            Plaintiffs,             )        DEPOSITION OF
                                    )
     vs.                            )        DR. RICHARD M. HOUGH, SR.
                                    )
CHRIS NOCCO, in his official        )            (PART 2)
capacity as Pasco County Sheriff,   )
                                    )
            Defendant.              )
_____)


          On Wednesday, April 20, 2022, commencing at 11:30 a.m.,

the continued deposition of Dr. Richard M. Hough, Sr., was taken

via Zoom on behalf of the Plaintiffs and was attended by Counsel

as follows:

APPEARANCES VIA ZOOM:

          JOSHUA A. HOUSE, ESQ.
          Institute for Justice
          901 North Glebe Road, Suite 900
          Arlington, Virginia  22203
          on behalf of the Plaintiffs

          ROBERT D. HOLBORN, II, ESQ.
          Debevoise & Poulton, PA
          1035 South Semoran Boulevard, Suite 1010
          Winter Park, Florida  32792
          on behalf of the Defendants


REPORTED BY:  Jennifer R. Weatherly, CCR
              ASHEVILLE REPORTING SERVICE

2

1      (Document CB1140)

2                          <u>INDEX</u>

3      Signature (Reserved). . . . . . . . . . . . . .  3

4      Direct Examination By Mr. House . . . . . . . .  4

5      Cross-Examination By Mr. Holborn  . . . . . . . 41

6      Redirect Examination By Mr. House . . . . . . . 49

7      Certificate of Notary Public  . . . . . . . . . 53

8      <u>EXHIBITS:</u>

9      Plaintiff's Exhibit A Introduced  . . . . . . .  4

10          *(Report by Dr. Hough)*

11     Plaintiff's Exhibit F Introduced  . . . . . . . 32

12          *(Report by David Kennedy)*

13     Defendant's Exhibit No. 2 Introduced  . . . . . 42

14          *(Pasco Sheriff's Office General Order 1.2)*

15     Defendant's Exhibit No. 1 Introduced  . . . . . 43

16          *(Article Prevention and Prevarication)*

17     Plaintiff's Exhibit F Marked  . . . . . . . . . 52

18     Defendant's Exhibit Nos. 1, 2 Marked  . . . . . 52

19

20

21

22

23

24

25

3

1         PURSUANT TO NOTICE and/or Agreement to Take

2    Depositions, the within Deposition was taken by me,

3    JENNIFER R. WEATHERLY, CCR, a Notary Public as

4    required in Rules 26 and 30 of the North Carolina

5    Rules of Civil Procedure.

6    SIGNATURE:

7         The Deponent did agree that both the reading

8    over and signing of the transcript are hereby

9    reserved.

10    BY THE COURT REPORTER:

11         The attorneys participating in this proceeding

12         acknowledge that I am not physically present

13         in the proceeding room and that I will be

14         reporting this proceeding remotely.  They

15         further acknowledge that in lieu of an oath

16         administered in person the witness will

17         verbally declare his or her testimony in this

18         matter under penalty of perjury.  The parties

19         and their counsel consent to this arrangement

20         and waive any objections to this manner of

21         reporting please indicate your agreement by

22         stating your name and your agreement on the

23         record.

24    BY MR. HOUSE:

25         Joshua House, counsel for the Plaintiffs, and

4

```
 1         I agree.
 2    BY MR. HOLBORN:
 3         Rob Holborn, counsel for the Defendant
 4         Sheriff, and we agree.
 5    BY THE DEPONENT:
 6         Dr. Richard Hough, and I agree.
 7    DIRECT EXAMINATION BY MR. HOUSE:
 8    Q    Well, thanks for coming back, Mr. Hough.  I
 9         told Rob via email earlier that ideally this
10         should not -- should not take more than 30 --
11         30 minutes, an hour tops.  So hopefully we can
12         power through at the speed we were at when we
13         left off.
14    A    Well, yeah.  You said 10 minutes the other
15         day.
16    Q    It was -- yeah, I mean, you know, again, those
17         are conservative estimates.  But we were
18         moving towards the end and so hopefully we can
19         keep up that pace.  I will share my screen.
20         We were on Exhibit A, which was your report,
21         and we were at finding number seven, I
22         believe, which is on page 35 or 36.  So let me
23         throw -- it's on 35, but let me throw that up
24         on the screen.
25    (PREVIOUSLY MARKED PLAINTIFF'S EXHIBIT A
```

1  INTRODUCED)

2  DIRECT EXAMINATION RESUMED BY MR. HOUSE:

3  Q    Is that up on the screen now?

4  A    I see it.

5  Q    Great.  So let's see.  We were at finding

6       number seven -- or we had just finished with

7       seven.  I think we are on to finding number

8       11.

9  A    Okay.

10 Q    Let's see.  At finding number 11 you say,

11      quote, "The documentation I have reviewed in

12      this matter does not review a -- reveal,"

13      excuse me, "a pattern of objectionable

14      policies or behaviors that breach

15      constitutional criteria routinely considered

16      in local-level public safety policymaking,"

17      end quote.  So you see that?

18 A    Yes, sir.

19 Q    Just a quick point of clarification.  Does

20      your review of the documentation reveal a

21      pattern of behavior at all or just -- let me

22      ask it this way.  Does your review reveal a

23      pattern of behavior or does it, I guess,

24      reveal random actions by the -- by the people

25      involved in those documents?

6

1    BY MR. HOLBORN:

2         Object to the form of the question.

3    BY THE DEPONENT:

4         I think I understand the gist of that.  My

5         evaluation or look at the program itself was

6         that it's a discretionary program with the

7         local government and not looking at a pattern

8         that would be classified, I guess, as

9         behaviors whether positive, negative or

10        neutral.  So I guess the answer would be no.

11   DIRECT EXAMINATION RESUMED BY MR. HOUSE:

12   Q    So, I mean, I guess what I'm trying to figure

13        out is, you know, the comment in her says that

14        -- as I understand it, that it doesn't review

15        -- it doesn't reveal an unconstitutional

16        pattern.  Is that a -- is that a fair

17        assessment of your statement?

18   A    Well, that might get us back to Monday's

19        discussion of not being an attorney, not

20        making legal pronouncements, but being able

21        within my role in what I do to comment on

22        whether the things that I looked at are the

23        types of things generally that we look at as

24        policymakers at the local level that might

25        breach some kind of constitutional barrier or

7

| | | |
|---|---|---|
| 1 | | threshold.  So once again, what I was |
| 2 | | expressing in opinion 11 is that I saw no such |
| 3 | | things that would create that based on what |
| 4 | | policymakers actually do in real life. |
| 5 | Q | Would create what? |
| 6 | A | Some kind of breach that would be based on the |
| 7 | | case law and the guidance of how policy is |
| 8 | | formulated and how it is mandated to follow |
| 9 | | law. |
| 10 | Q | Right.  And is that -- is that breach -- is |
| 11 | | that breach that you did not detect, is that |
| 12 | | you did not detect a breach by a particular |
| 13 | | officer? |
| 14 | A | I did not examine, my goodness, but I'm sure |
| 15 | | in the length of time the intelligence-led |
| 16 | | policing division has it's various programs. |
| 17 | | Thousands, tens of thousands of actions.  So I |
| 18 | | was not looking at a granular level about each |
| 19 | | citizen interaction.  But again, is the |
| 20 | | program something that would follow routine |
| 21 | | customary acceptable discretionary policy by a |
| 22 | | local entity and it does.  So to the extent of |
| 23 | | each officer doing one thing or another, no. |
| 24 | | And I think we talked a little bit about that |
| 25 | | the other day. |

8

1    Q    And again, because -- just because that

2         answer's long and I need something clear for

3         the record.  So I believe you used the term

4         entity.  So you didn't look at a particular

5         officer, rather you looked at a particular

6         entity.  Is that a correct assessment of your

7         testimony?

8    A    I think that's a pretty fair characterization

9         of not having anyone confuse if Deputy House

10        does a particular thing that upon reflection

11        someone goes, awe, maybe that could have been

12        done differently, as opposed to the program of

13        intelligence-led policing, yes.

14   Q    And then what is -- what constitutional

15        criteria are routinely considered ---

16   BY MR. HOLBORN:

17        Objection to the form of the question.

18   DIRECT EXAMINATION RESUMED BY MR. HOUSE:

19   Q    And I'll finish my question here.  What

20        constitutional criteria are routinely

21        considered in local level public safety

22        policymaking?

23   BY MR. HOLBORN:

24        Objection to the form of the question.

25   BY THE DEPONENT:

9

```
 1          Sure.  The idea here again from the standpoint
 2          of what -- and I used examples the other day
 3          whether it's local street department, water
 4          department, Department of Environmental
 5          Protection, local Sheriff's Office, creating
 6          policies and programs to address the various
 7          tasks that those agencies have may not do so
 8          if it violates state law, may not do so if it
 9          violates federal law.  The part here that I
10          see you getting at about constitutional
11          criteria, state law regulation, federal law
12          all are built off of the U.S. Constitution for
13          many things, and then as we know other things
14          are left to the state since this is a federal
15          action with commentary regarding different
16          amendments.  That -- that's what I'm referring
17          to no particular breaches, while also again
18          point out that I'm -- I'm not in a position
19          beyond what the court directs me at trial to,
20          you know, make legal conclusions.
21   DIRECT EXAMINATION RESUMED BY MR. HOUSE:
22   Q    Sure.  And that's a fair point about other
23        state rules kind of growing from
24        constitutional principles.  I just want to pin
25        this down just a little and then we can -- we
```

1    can quickly move on.  But so can you -- can

2    you list any constitutional criteria -- sorry,

3    excuse me.  Let me phrase it this way.  Can

4    you list any constitutional provisions that

5    you're referring to when you use the term

6    constitutional criteria?

7  BY MR. HOLBORN:

8    Object to the form of the question.

9  BY MR. HOUSE:

10    Hold on.  Hold on, Professor.  Sorry, Rob.

11    You've objected a lot.  I'm just reading from

12    his report.  I'm not -- you know, they can't

13    be leading questions if I'm reading quotes

14    from his report or anything.  They can't be

15    improper questions.

16  BY MR. HOLBORN:

17    I'm just objecting to the form of the

18    question.

19  BY MR. HOUSE:

20    I understand.  But your objections are slowing

21    things down and they don't make any sense.

22  BY THE DEPONENT:

23    Well, they're not slowing me down.  I've been

24    used to for four decades attorneys making

25    objections in the middle of me speaking.  That

1      doesn't slow me down any more than a ---

2   BY MR. HOUSE:

3      That's fine.  I'm just trying to make it

4      easier on everyone here and, again, these

5      aren't trick questions.  They're reading from

6      the report.  I can address something -- if I

7      keep making the same mistake I guess I'd like

8      to know, but I'm ---

9   BY MR. HOLBORN:

10      I just think that -- well, I'm just going to

11      say that it takes me three seconds to object

12      to the form, and as the Middle District rules

13      say that's all I'm supposed to say.  I'm

14      trying to keep it as quick as possible.  And

15      we've spent more time on this discussion than

16      the entire time I'm going to make an

17      objection, so ---

18   BY MR. HOUSE:

19      Sure.

20   BY MR. HOLBORN:

21      I'm trying to just get it nice and quick and

22      easy as I've been objected to and ---

23   BY MR. HOUSE:

24      I mean, if you want to object to everything,

25      too, we can just have you object to every

12

1      question I'm going to ask and then we can ---

2   BY MR. HOLBORN:

3      And I haven't been -- and I haven't been

4      objecting to every single question.  Just for

5      the record, I have been allowing some

6      questions.  But ones where I feel there is

7      something to object to I'm going to quickly do

8      it and get out of your way so you can get the

9      answer.

10  BY MR. HOUSE:

11     Sure, okay.

12  DIRECT EXAMINATION RESUMED BY MR. HOUSE:

13  Q   So going back to the question, Professor

14      Hough, where your report has constitutional

15      criteria.  Do you have -- is there a

16      particular constitutional provision that

17      you're referring to?

18  A   As I sit here today remembering writing of the

19      report and speaking as someone involved in

20      policy analysis, policymaking, etcetera, this

21      is in its broader constitutional context.

22      Those things that are going to differ based on

23      policy for this particular one, again, the

24      legal conclusions or arguments are left to

25      those of you either on the plaintiff or the

13

```
 1              defendant side, not from my standpoint

 2              advocating any particular thing but just

 3              commenting that you must not at a local level

 4              make policies that breach whichever applicable

 5              constitutional criteria.  So for a list of

 6              items that were specifically in my head I

 7              think at the moment of writing that sentence,

 8              no, I'm not -- I'm not referring to let's pick

 9              a specific amendment and begin a debate that's

10              not appropriate for me to do in a deposition.

11      Q       And then in your answer I believe you

12              reference, you know, federal laws based on the

13              Constitution.  Were there any particular

14              federal laws that you were referring to in

15              that answer?

16      A       I was not referring to any particular federal

17              laws in that answer.

18      Q       And then I believe you also mentioned state

19              laws.  Were there any particular state laws

20              that you were referring to in your answer?

21      A       Not as -- not a particular state law being

22              breached by the program.

23      Q       And on page 36 at the top -- or second from

24              the top, excuse me, finding number 13.  It

25              says, "The Pasco County Sheriff's Office
```

14

1          responds to crime prevention in a manner

2          consistent with contemporary law enforcement

3          training and practices."  Do you see that?

4     A    I do.

5     Q    And I think, just to give you a heads up, the

6          quote -- the quote I'm going to read in

7          response to crime prevention, I think it's

8          similar to maybe something we talked about

9          earlier, so you might recognize these

10         questions.  And so I'm -- I'm apologizing at

11         the time these things are done.  But I think

12         it's slightly different so I have to do this.

13         So when you say, quote, "responds to crime

14         prevention," end quote, do you mean a traffic

15         stop to perform a, quote, "prolific offender

16         check," end quote?

17    A    Well, you're right, of course, we -- we did

18         cover that and I responded on Monday that I'm

19         not aware of specific traffic stops that were

20         in furtherance of or directed as that's part

21         of the intelligence-led policing program.

22    Q    And when you say, quote, "responds to crime

23         prevention," end quote, do you mean the use of

24         an algorithm to categorize certain repeat

25         offenders?

15

1    A    Well, that wouldn't be excluded.  My point

2         throughout the testimony had to do with the

3         fact that in some form or fashion all 18,000

4         law enforcement agencies in the U.S. do crime

5         prevention.  It is absolutely what all of them

6         do in this way in some fashion, whether it's

7         knowing, you know, that Mr. Holborn is a

8         repeat offender on my beat and I'm aware of

9         that because I've been on that beat for a long

10        time, or whether there's -- whether we want to

11        call it an algorithm or, as we were talking

12        about Monday, the Florida Crime Information

13        Center database, the National Crime

14        Information Center database that have been

15        around for decades and -- long before even I

16        came to police work in the '70s.  That's --

17        it's the same sort of thing.  So that's why I

18        mean consistent with the contemporary law

19        enforcement training and practices.  It's what

20        law enforcement does.

21   Q    When you used the term just then whether you

22        want to call it an algorithm, what is your

23        definition of the term algorithm?

24   BY MR. HOLBORN:

25        Object to the form of the question.

16

1    BY THE DEPONENT:

2        I'm not going to provide a definition of

3        algorithm, but I'll be happy to, you know,

4        maybe try to clarify a little bit the idea of

5        whether you look at some series of criteria in

6        a software program that filters and just gives

7        you some kind of result whether that's just

8        male offenders, female offenders.  That's an

9        algorithm.  Many, many things can certainly

10       qualify as ways to parse information that then

11       gets turned over to humans as actionable

12       intelligence to either use or not use.  That's

13       why I say it's not -- it's not new.

14   DIRECT EXAMINATION RESUMED BY MR. HOUSE:

15   Q   So why is it that you can't give me -- I

16       believe you began with saying that you can't

17       give me a definition of an algorithm; is that

18       correct?

19   A   Not that I would want to assert is either the

20       Pasco County Sheriff's Office's or is yours or

21       that is some broadly consensus definition of

22       algorithm.  I'm not a -- I'm neither a

23       computer mathematician or, you know, someone

24       who particularly occupies that -- that space.

25       So I think kind of by example of what I gave,

17

1        whether you're -- well, the one I gave you in

2        the answer would probably be as close to what

3        I would do without getting out a dictionary

4        and just reading one.

5    Q   Is there no -- is there -- within your field

6        is there an accepted definition of algorithm?

7    A   I don't -- I don't know if there is.  And if

8        we think in terms of within the field whether

9        that be as a forensic criminologist or as a

10       law enforcement practices person there would

11       certainly, you know, not be an absolute agreed

12       upon one.  Much the same way I said even

13       something as ubiquitous as community oriented

14       policing is going to be defined somewhat

15       differently probably in all 18,000 of those

16       local level law enforcement agencies who each

17       choose their own crime prevention methods.

18   Q   I'm going to jump back to a previous exhibit

19       that we spoke about.  And I apologize if you

20       can hear my neighbor mowing the lawn.  It's

21       bad timing.  I believe it was Exhibit D.  I'm

22       going to share it now on my screen.

23   (PREVIOUSLY MARKED PLAINTIFF'S EXHIBIT D

24   INTRODUCED)

25   DIRECT EXAMINATION RESUMED BY MR. HOUSE:

18

1   Q    Do you recall this exhibit?

2   A    I do recall that exhibit.

3   Q    So if we go to -- again, this is for -- for

4        Mr. Holborn's benefit.  So this was Exhibit D

5        and this was excerpts from, I believe, a book

6        that was written.  It's electronic --

7        excerpts, excuse me, from an electronic copy

8        of the book.  And here, what's marked as page

9        267 -- although you'll notice that there are

10       actually two pages that are 267 because it's

11       an electronic copy.  So it's PDF page six.

12       And this bottom paragraph here, I'm going to

13       zoom in a bit so you can see it, Professor

14       Hough.  So I'll read this portion.  Can you

15       see that on your screen, Professor Hough?

16  A    I can.

17  Q    So it says, "In addition, as we consider the

18       pace at which technology and data mining has

19       stitched together" ---

20  A    I can read it.

21  Q    I'm going to read it for the record.  I was

22       just wondering where you can gone.  "In

23       addition, as we consider the pace at which

24       technology and data mining has stitched

25       together a picture of who we are, we marvel at

19

1      the accuracy that an algorithm may discern out

2      actions or choice."  Do you see that sentence?

3  A   I do.  It's referring to predicting violence.

4  Q   Does that sentence jog your memory at all or,

5      you know, sort of -- maybe the way to ask it

6      is can you -- can you give us a definition of

7      how you use the term algorithm at least in

8      this sentence?

9  A   Well, and again, it's not an aversion to the

10     term algorithm or moving in on whether some,

11     you know, market or in a retail, you know,

12     establishment -- whatever Walmart does to

13     figure out what -- what things they're going

14     to pick to put on the shelves.  The point here

15     is about whether or not in this context out of

16     that 301 textbook that we wrote, that this is

17     referring to predicting violence and that if

18     we use something even as simple -- and I'm

19     giving you fair notice I'm still not, you

20     know, offering some consensus opinion of what

21     an algorithm is and getting stuck on this

22     probably won't amuse the court either.  It is

23     the idea that if there are indications, such

24     as those I've given about someone's past

25     criminal history and I know you've, you know,

```
 1          been arrested for 53 different burglaries,
 2          that doesn't take much of an algorithm or
 3          experience to say you may have a propensity to
 4          do property crime, and that may be one way.
 5          Just something, which I said, has been around
 6          for decades and decades.  As an algorithm
 7          that's just a regression line of you've done
 8          this in the past, and therefore the regression
 9          line might tend to show us, you know, the
10          potential for you to continue to do that.  So
11          when -- as you said, in the context of this.
12          Well, in the context of this I wasn't, you
13          know, discussing ILP or property crimes.  This
14          was -- we were writing on predicting violence.
15    Q     It also looks like you're using the term
16          algorithm in the context of things that a
17          marketers would use or a healthcare
18          professional would use; is that right?
19    A     I think that was part of the -- whenever we
20          wrote a couple of years ago in this edition of
21          the book some examples, some analogies to help
22          people kind of grasp that.
23    Q     And then just a couple of sentences later you
24          ask, well -- it says, "Why not threat
25          assessment?"  And then the next sentence says,
```

```
 1            "Well, in part, the answer to this rhetorical
 2            musing about who is dangerous, and to whom,
 3            goes to a procedural justice and ethics
 4            concern."  Do you see that?
 5       A    I certainly see that one sentence out of this
 6            textbook, yes.
 7       Q    So what -- what procedural justice and ethics
 8            concern are you -- is this sentence referring
 9            to?
10       A    Well, gosh, I'll say to the judge, Your Honor,
11            I'm not entirely certain what I was, you know,
12            thinking when -- when we wrote that.  But, of
13            course, in a large in sense, much like the
14            question and focus we had a few minutes ago on
15            not breaching constitutional, you know,
16            criteria is that you must in framing and
17            creating public policy and issues be
18            respectful of the law.  And so from the
19            standpoint ethically, first ethically are you
20            doing things that would be, you know, not a
21            breach of some ethics code and procedural
22            justice in the sense that is there, you know,
23            the process that's established under law that
24            provides whatever procedural steps a company,
25            any particular program.  So once again, I know
```

1       we got hung up a little on this the other day.

2       This wasn't contemplating either intelligence-

3       led policing or any specific program or

4       framework or model.  This is speaking in

5       general to undergraduate university students

6       that you must be respectful of existing law

7       and procedures when you create something.

8    Q  So turning -- turning back to Exhibit A.  On

9       page 36 of Exhibit A.  We were discussing, if

10      you recall, finding 13, the term response to

11      crime prevention.  My next question is when

12      you say response to crime convention -- crime

13      prevention, excuse me, does that include

14      putting repeat offenders on a list without

15      their knowledge?

16   A  Well, the specifics -- and I understand your -

17      - I think, your line of questioning about

18      pulling out specific issues that plaintiff has

19      in regards to this.  The idea of using

20      intelligence-led policing is what I was

21      addressing in this.  So much like what you

22      brought up a couple of times about a traffic

23      stop here or there that I may -- that I don't

24      know about, or what other specific items that

25      they, the Pasco Sheriff's Office, might use in

                                                                    23

1              terms of whether it's algorithm or whether it

2              is this question.  I'm not certain other than

3              the use of information to do these kinds of

4              things, whether it's Operation Ceasefire in

5              Boston 30 years ago or it's ILP in Pasco

6              County today, those are in keeping with what

7              has been happening in criminal justice for low

8              these last 30 or 40 years at least.

9       Q     I hate to -- I hate to ask the question again.

10             I want to phrase it in a way that's helpful to

11             you.  You know, I -- as we -- maybe this will

12             help.  You know, I guess, let me just be

13             transparent about what I'm trying to get at is

14             that, you know, the term response to crime

15             prevention is your term.  As far as I'm aware,

16             response to crime prevention doesn't appear in

17             Pasco's documents.  So I'm trying to figure

18             out whether, at least that your -- your

19             terminology overlaps with theirs.  It's

20             possible it does 50 percent of the time, 80

21             percent or whatever.  So that's -- I'm not --

22             I don't mean when I ask you this to say what

23             Pasco says.  I'm asking sort of what you're

24             saying by this.  And it's possible that you're

25             using a definition, Pasco uses a definition

24

1          and the plaintiffs in their complaint use a

2          definition and none of them agree.  And so I

3          think that's -- that's sort of what I'm trying

4          to get at here is ---

5     A    Yeah.

6     Q    --- it's possible that there is no agreement

7          whatsoever.  But I just need to know if there

8          is because I need to know then whether to ask

9          a followup.  So I'll ask it again. Maybe that

10         helps, maybe it doesn't.

11    A    Okay.

12    Q    So my question is when you say response to

13         crime prevention, does it include putting

14         repeat offenders on a list without their

15         knowledge?

16    BY MR. HOLBORN:

17         Object to the form of the question.

18    BY THE DEPONENT:

19         So I'm totally with how you, you know, explain

20         that which I think goes to what -- what I've

21         tried to say repeatedly which is every single

22         agency -- all 18,000 of those law enforcement

23         agencies get to define that how they wish,

24         crime prevention.  That, you know, is not a

25         big national mandate in the United States,

1        other than the expectation that your local law

2        enforcement agency try to prevent crime.  How

3        they go about that is discretionary decision

4        making left up to those local law enforcement

5        agencies.  So to your point was, well, maybe

6        there's overlap and it's not my definition.

7        Then -- then you went to the very, very

8        specific thing of putting repeat offenders on

9        a list without -- without their knowledge.

10       And I know you asked me that question in a

11       different form the other day and I responded

12       something along the lines of, well, if you're

13       a repeat offender you know you are, and I'm

14       not sure if we got, you know, any -- any

15       further than that.  As a matter of

16       intelligence-led policing definitely I would

17       opine that repeat offenders would very likely

18       be, you know, part of that.  We know that, you

19       know, three-quarters of people are released

20       from prison they are -- they go back and do

21       it.  If they're -- it's usually within five

22       years.  If they've been released before they

23       were 21 it's within two years.  So, you know,

24       there's just enough empirical evidence to say,

25       well, yeah, you're going to -- you're

26

1          certainly going to utilize in this quest to

2          appropriately use the public's money and

3          resources you're going to focus on offenders

4          who there is perhaps this idea of criteria.

5          Whatever agency sets their criteria.  Whether

6          it was the folks who did it for Operation

7          Ceasefire in Boston 30 years ago or whether

8          it's here, that's going to be their choice.

9     DIRECT EXAMINATION RESUMED BY MR. HOUSE:

10    Q    And I think this helps and actually shortcuts

11         maybe further questions I was going to ask

12         because -- well, I think I understand your

13         definition of crime prevention now, but let me

14         -- let me ask it just to confirm.  So is it

15         fair to say that crime prevention is just a --

16         is a broad principle that they want to prevent

17         crime rather than a specific list of

18         practices?  Is that -- is that a fair

19         definition of how you're using it?

20    A    I think for the purposes of this, yes, that is

21         a fair definition that all those agencies are

22         absolutely -- they're all doing, you know,

23         something like this to try to do crime

24         prevention.  How they specifically pursue it

25         is up to the individual agency.

27

1   Q   In finding number 14 you say, "In this matter

2        there was no indication that investigative

3        methods were used inappropriately, improperly,

4        unnecessarily, or in any other way than as

5        authorized."  Do you see that?

6   A   I do, yes.

7   Q   When you say authorized there, what authorized

8        the investigative methods in the documents you

9        reviewed?

10   A   Sure.  I think what I was getting at there in

11        a simplistic sense was the agency.  You know,

12        was there some thing in the intelligence-led

13        policing manual or approach that was not

14        authorized.  So, you know, maybe that's a word

15        that ends up being redundant.

16   Q   Yeah, so the -- and you used the agency.  When

17        you say agency in that answer do you mean the

18        Pasco Sheriff's Office?

19   A   Yes.

20   Q   And I'm going to jump to the top of the

21        report.  You're going to recall this

22        discussion but I just want to do this because

23        it'll help a definition in my following

24        question.  But you recall on page five at the

25        bottom you -- there was a statement that said

1       -- there it is up here.  "My methodology is to

2       -- in reviews is to list all case materials,

3       an assumed set of facts, not fact finding or

4       credibility judgement, and to provide opinions

5       comparing specific facts to accepted

6       practices, never legal conclusions nor

7       personal opinions."  Do you see that?

8    A  Yes.

9    Q  So I'm going to refer to that as we talk about

10      that previous finding number 14.  So in 14

11      where you use the terms -- when you use the

12      term inappropriate are you -- well, I'll just

13      ask you.  And I'm sure I know the answer but

14      this might be the quickest way to do it.  When

15      you say, you know, inappropriate in finding 14

16      -- or inappropriately, excuse me, are you

17      giving a personal opinion?

18   A  No.

19   Q  Are you giving a legal conclusion?

20   A  No.

21   Q  Are you giving a credibility judgment?

22   A  No.

23   Q  Same thing for the term improperly.  When you

24      say the term improperly are you giving a

25      personal opinion?

29

```
1    A    No.

2    Q    Are you giving a legal conclusion?

3    A    I am not.

4    Q    Are you giving a credibility judgment?

5    A    No.

6    Q    And then with the term unnecessarily are you

7         giving a legal conclusion?

8    A    I am not.

9    Q    Are you giving a personal opinion?

10   A    I am not.

11   Q    Are you giving a credibility judgment?

12   A    No.

13   Q    Thank you.  Thank you for helping me move

14        through that fast.

15   A    Yes.

16   Q    I actually think we are done with your report.

17        I just have -- well, actually no, I am not.  I

18        have quick questions to do for bureaucratic

19        reasons in Exhibit (sic) B which is, I

20        believe, your statement of fees.

21   A    Let me try to roll to that.  I think I'm

22        there.

23   Q    Is Appendix B to your report an accurate

24        statement of the fees that you are charging in

25        this case?
```

30

1    A    It should be ---

2    BY MR. HOLBORN:

3         Objection to the form of the question.

4    BY THE DEPONENT:

5         That's my standard, you know, fee agreement.

6    DIRECT EXAMINATION RESUMED BY MR. HOUSE:

7    Q    And is it a complete statement of your fees in

8         this case?

9    A    It is.  I found it's easiest to just use a

10        single page.

11   Q    Now, down in the deposition section near the

12        bottom you mention travel fees; correct?

13   A    Correct.

14   Q    Now, you didn't end up needing to travel for

15        this deposition; is that right?

16   A    That is correct.

17   Q    So I'll represent to you that plaintiff's

18        counsel sent payment for your fees in advance

19        back when travel was anticipated.  Have you

20        received that payment yet?

21   A    I have not.

22   Q    Now, since you did not need to travel will you

23        agree to return any portion of your travel

24        fees having to do with this deposition?

25   A    What we have is the -- then the $1,800 fee and

```
1          500 per hour, or any portion an hour that went
2          over the four -- four hours.  So I know we
3          began at 9:00 a.m. on Monday and concluded at
4          1:45 and took a 30 minute lunch.  So whatever
5          that math is.  And then whatever we end up
6          with today, yes, absolutely.  However that
7          math comes out from whatever I eventually
8          receive, yes, I will refund that.
9     Q    Yeah, and just to make that clear.  So, you
10         know, obviously -- basically of the travel
11         fees, of course, you'd only refund what we
12         didn't already owe you for the additional
13         hours; is that right?
14    A    Right.  And since I can't remember where that
15         was ---
16    Q    I think we only -- I think we only paid for
17         four hours.  So you're probably right, there's
18         some math that needs to be done.
19    A    Yeah, probably, because I suspect that there
20         may still be money owed to me based on this,
21         because I already was eliminating the standard
22         $600 per diem.  I just -- I just X'd that off
23         and was putting in the mileage.  And rather
24         than three meals, I think I put in something
25         like $30 per meal.  Yeah, I --- but plaintiff
```

1        certainly was, yeah, not being overcharged on

2        that.  But whatever the math is I certainly

3        would intend -- if it comes out that there's a

4        refund due, I would absolutely do that.

5    Q   And I just have, I believe, just two questions

6        about Professor Kennedy's report and then we

7        can wrap up.

8    (PLAINTIFF'S EXHIBIT F INTRODUCED)

9    DIRECT EXAMINATION RESUMED BY MR. HOUSE:

10   Q   I'm marking as Exhibit F, it's shared on the

11       screen right, is Professor Kennedy's expert

12       witness disclosure which I don't think has

13       been introduced before but we have spoken

14       about it; correct?

15   A   Yes.  I was trying to remember.  But yes, we

16       did talk Monday -- you referred to the report.

17   Q   Yeah, I don't think I introduced it.

18   BY MR. HOUSE:

19       And just for the record.  The court reporter

20       can check to make sure I've marked the numbers

21       correctly because it's been two days and I'm

22       doubting my numbering now.

23   BY THE DEPONENT:

24       I understand.

25   DIRECT EXAMINATION RESUMED BY MR. HOUSE:

1    Q    So what's up on my screen is the document; is

2         that -- is that right?

3    A    That appears to be the document, yes.

4    Q    So on page six of Professor Kennedy's report.

5         At the bottom paragraph he says, "PSO," the

6         Pasco Sheriff's Office, "commits the

7         foundational error of holding that

8         individuals, including children and juveniles,

9         can be identified as prolific offenders based

10        on brief snapshots of arrest and other

11        criminal justice records."  Do you see that?

12   A    I do see that.

13   Q    Do you disagree with -- well, let me ask you

14        this way.  I understand your testimony today

15        that you're not going to, you know, be giving

16        me facts about the PSO's practices.  Is that

17        accurate?

18   A    I think that's a fair assessment, yes.

19   Q    So let's, you know, pretend that he's not

20        talking about PSO because I understand that --

21        I don't want you to commit yourself to testify

22        about what PSO does.  So let's say, whatever

23        agency it is, I just want to know within your

24        criminal expertise would it be an error to

25        hold that individuals, including children and

34

1         juveniles, can be identified as prolific

2         offenders based on brief snapshots of arrest

3         and other criminal justice records?

4    BY MR. HOLBORN:

5         Object to the form of the question.

6    BY THE DEPONENT:

7         Trying to pull out Professor Kennedy's

8         assessment of a foundational error that then

9         goes on to, you know, give his opinion of what

10        they're doing is certainly different from

11        saying that 18 -- literally -- the literal

12        18,000 separate agencies and whatever he and

13        his team referred to in Operation Ceasefire in

14        Boston 30 years ago as their repeat offenders,

15        prolific offenders, high capacity offenders,

16        whatever their terminology was, each of those

17        18,000 agencies can use whatever term they

18        want.  So that's kind of the first problem.

19        Now, this idea about including humans who

20        haven't reached puberty yet, which is what a

21        child is.  So I don't know how much they're

22        indicating or that he thinks they're

23        indicating actual children as opposed to

24        advocacy semantics.  So the issues of based on

25        brief snapshots, I don't know what's in

```
 1            plaintiff's mind, Professor Kennedy's mind,
 2            your mind on his use of the phrase, "brief
 3            snapshots of arrest and criminal justice
 4            records."  Every law enforcement agency in the
 5            United States uses arrest and criminal just
 6            records in part of what they attempt to do on
 7            a day-to-day basis both at the tactical
 8            operational and strategic levels.  So again,
 9            forgive me for being a professor, but I can't
10            just take some other person's interpretation
11            of a term and say is this okay or is this not
12            okay.  I don't know that he's -- I don't know
13            that I would -- I mean, no, I do know.  I
14            would not have chosen to phrase something in
15            this way.  So to try to riff off of what
16            Professor Kennedy said is kind of tough.  Now,
17            rein me back in and ask me another question
18            and ---
19   DIRECT EXAMINATION RESUMED BY MR. HOUSE:
20   Q    Yeah, I think -- because I think I got where
21        you were going and then -- and then you
22        mentioned at the end that you wouldn't have
23        phrased things that way.  So maybe this --
24        this would be the easier way to ask it.  Just
25        as you sit here today do you agree with
```

36

1           Professor Kennedy's sentence?

2     BY MR. HOLBORN:

3           Object to the form.

4     BY THE DEPONENT:

5           Well, again, it isn't -- and I said this, you

6           know, Monday.  And I did briefly seem, I'll

7           tell you, Professor Kennedy's rebuttal report

8           which was interesting because he kept casting

9           it personally like I was saying something

10          about his opinions when, of course, my report

11          was furnished -- it had nothing to do with his

12          opinions.  It has to do with how do I evaluate

13          or assess the ILP.  So and what I said to you

14          on Monday was not doing some tit or tat about

15          what -- what a couple of criminologists, and

16          in my case also a police practices expert,

17          might think is the way to do something.  And

18          in my report I made it pretty clear it isn't

19          for a criminologist to say what a local level

20          elected or appointed official can do in

21          furtherance of crime prevention.  So again,

22          making some kind of value judgment that would

23          be professional -- you know, again, it's not a

24          personal opinion -- about his statement I

25          don't think is the -- you know, I was engaged

1          -- my scope was to look at the ILP.  Not what

2          does David Kennedy think and do I agree with

3          what David Kennedy thinks about what he thinks

4          this is.  So I say that, again -- that's a

5          little wordy, but that's pretty much exactly

6          what I -- what I would tell the court is that

7          that's not relevant, which is my point in the

8          report about, you know, put a -- put a bunch

9          of criminologists in a room, throw out the

10         word prolific offender, and then stand back.

11    DIRECT EXAMINATION RESUMED BY MR. HOUSE:

12    Q    And I think -- because I didn't mean to put

13         you on the spot with, you know, Professor

14         Kennedy, and I understand there's probably

15         comedy between professors about, you know,

16         calling people -- you know, the whole isn't

17         Twitter.  So I understand that.  I think it

18         might be me sort of misunderstanding the point

19         of your report then.  So are you -- did your

20         answer then -- well, let me ask it this way.

21         Are you saying that you were not engaged to

22         evaluate the -- well, accuracy of Professor

23         Kennedy's report?

24    BY MR. HOLBORN:

25         Object to the form of the question.

38

<u>BY THE DEPONENT:</u>

Right, no.  No, I -- I was not contacted and
said there's this fellow, Professor Kennedy,
and he's going to write a report and what's
your opinion of his opinion.  No, it's about
evaluating, you know, does the intelligent-led
policing program, you know, fit with the --
you know, where law enforcement has gone in
terms of trying, trying, trying, as all
agencies do, to do crime prevention.  And in
the way, as I was mentioning, things have gone
I'll say in the last -- certainly more so in
20 or so years, to use more intelligence
that's available.  Sometimes we call these
things evidence based, but at least on a day-
to-day basis intelligence-led to try to use
the resources more effectively since you can't
address everything.

<u>DIRECT EXAMINATION RESUMED BY MR. HOUSE:</u>

Q    Well, I'm done with that exhibit, so I'm going
to stop the screen share and ---

<u>BY THE COURT REPORTER:</u>

Excuse me.  Before you go on, Mr. House, I
wanted to let you know that on Monday the
exhibits you went through were 1 through 6.

39

1          You labeled this as F.  Would you like to

2          label this as 7?

3     BY MR. HOUSE:

4          Yeah, and I thought I was going by letters.

5          The only reason I'd say this, we might want to

6          check this transcript, is we did refer back to

7          one of the exhibits in the middle of Monday's

8          deposition as Exhibit E.

9     BY THE COURT:

10         And you maybe -- I didn't see the first half

11         of this ---

12    BY MR. HOUSE:

13         Yes.

14    BY THE COURT REPORTER:

15         --- but if you want to label it as F.  On the

16         papers that I saw it was 1 through 6, but

17         we'll leave it as F, and then we'll ---

18    BY MR. HOUSE:

19         Well, I'm just wondering can we change what

20         the labels were for Monday's then?  If they're

21         1 to 6 and they should be A to E can we change

22         that or is that -- has that ship sailed?

23    BY THE COURT REPORTER:

24         You would have to put on record, like on this

25         record, for that, because it'll probably be

1      written up as one big transcript from Monday

2      and today.  While you continue, let me just

3      check with my office to see what those

4      exhibits say, and then by the time you

5      conclude I'll be able to know.

6    BY MR. HOUSE:

7      Perfect.  And, Professor Hough, do you recall?

8      It was -- I believe I referred to one of yours

9      as a letter but it ---

10   BY THE DEPONENT:

11     I thought you did, too, and that's ---

12   BY MR. HOUSE:

13     Yeah.

14   BY THE DEPONENT:

15     Yeah.

16   BY MR. HOUSE:

17     Well, we'll figure that out.  I'm not picky.

18     I just want it to be consistent.  So yeah,

19     we're done with exhibits.  Just a couple of

20     final questions.

21   DIRECT EXAMINATION RESUMED BY MR. HOUSE:

22   Q    So do you anticipate testifying at trial to

23        any opinions that you have not given me here

24        in your deposition or elsewhere given in your

25        report?

41

1    A    Just that caveat we talked about Monday that,

2         you know, if there's more information that's

3         furnished that I review that creates some

4         difference, but I do not at this point

5         anticipate any.

6    Q    For any opinions that you intend to give at

7         trial, do you anticipate needing additional

8         facts to testify to those opinions?

9    A    Not at this point.

10   BY MR. HOUSE:

11        I think that's all I have, Rob.

12   BY MR. HOLBORN:

13        If you would give me one minute.  I'm just

14        creating an additional document to use.

15   CROSS-EXAMINATION BY MR. HOLBORN:

16   Q    Good afternoon, Dr. Hough.

17   A    Good afternoon.

18   Q    While I wasn't part of the initial deposition

19        on Monday, Mr. Poulton asked me to bring up

20        two items for you to discuss.  In your

21        deposition on Monday you talked about there's

22        generally foundational documents for law

23        enforcement offices in which in a general

24        sense they point to policies or orders that

25        say as an employee you have to follow the law

42

```
1            and not violate the rights that people have

2            under the Constitution.  Do you recall that

3            line of questioning?

4    A    Yes, that's correct.

5    BY MR. HOLBORN:

6            I'm going to go ahead and screen share and --

7            because of the way I kind of already sent it

8            out, mark this as Defendant's Exhibit 2, and

9            let me go ahead and share my screen here.

10   (DEFENDANT'S EXHIBIT NO. 2 INTRODUCED)

11   CROSS-EXAMINATION RESUMED BY MR. HOLBORN:

12   Q    And what I have up on the screen, which is

13           Defendant's Exhibit 2, is Pasco Sheriff's

14           Office General Order 1.2 titled Oath and Canon

15           of Ethics.  Do you see that up on the screen?

16   A    Yes, I do.

17   Q    And have you had an opportunity to review this

18           general order prior to today's deposition?

19   A    Yes, I have.

20   Q    And in this policy, I'm on the first page,

21           under Policy the general order says, "It is a

22           policy of the Sheriff's Office to comply with

23           all state and federal laws and to preserve and

24           protect the Constitutional rights of all

25           citizens.  In so doing, members will abide by
```

43

1          their oath of office and the Law Enforcement

2          Canon of Ethics."  Do you see that?

3     A    Yes.

4     Q    Does that comport with the type of policy that

5          you were referring to on Monday that is

6          generally found across law enforcement but in

7          different forms?

8     A    Yes, that is correct.

9     Q    And the rest of order -- the rest of this

10         general order found in Defendant's Exhibit 2

11         is consistent with the type of language that

12         you've seen in other agencies as well?

13    A    Yes, absolutely.

14    Q    The other item I would like to show you is

15         been marked as Defendant's Exhibit 1.

16    BY MR. HOLBORN:

17         And just for the record, Exhibit 2 was sent to

18         the Defense -- or to the Plaintiff yesterday

19         by the Defense, and this morning Exhibit 1 was

20         sent to the Plaintiff by Defense.  Let me see

21         if I can pull this up.

22    (DEFENDANT'S EXHIBIT NO. 1 INTRODUCED)

23    CROSS-EXAMINATION RESUMED BY MR. HOLBORN:

24    Q    Dr. Hough, do you recognize what I have up on

25         the screen as Defendant's Exhibit 1,

44

1       Prevention and prevarication by Steven Lab?

2    BY MR. HOUSE:

3       And real quick, Professor Hough, before you

4       answer.  So we're going to object to the

5       introduction of this exhibit.  Mr. Holborn

6       already knows our reasoning why, so it's not a

7       surprise to him.  And I'm probably going to

8       object to questions about it.  So sorry if

9       that's annoying but I'm going to have to do

10      that for each of these.

11   BY MR. HOLBORN:

12      Mr. House, (inaudible) objection as to that

13      specific issue for all the questions regarding

14      Defendant's Exhibit 1?

15   BY MR. HOUSE:

16      Yeah, sure.  So as, yeah, my email said, I

17      don't believe I asked about this document in

18      our -- in our deposition.  And so I think it's

19      outside of the scope of the redirect.  I do

20      not -- I also don't believe this was discussed

21      in Professor Hough's report, and so it's

22      outside of the scope of allowable expert

23      testimony.  So those are our objections.

24   BY MR. HOLBORN:

25      I recognize Mr. House's objection to any

45

1          questions related to this document going

2          forward without Mr. House having to object for

3          each of the questions.

4     BY MR. HOUSE:

5          I appreciate that, thanks.

6     CROSS-EXAMINATION RESUMED BY MR. HOLBORN:

7     Q    Dr. Hough, as a result of the deposition on

8          Monday and the questions asked by Plaintiff's

9          counsel did you do any research based on those

10         questions you were asked that would be

11         significant for us to know about?

12    A    Yes.

13    Q    And what was that?

14    A    Well, the line of questioning I think on

15         Monday was important and perhaps in my lack of

16         clarity about the fact that all agencies --

17         all agencies do crime prevention activities to

18         include officers knowing who their repeat

19         offenders are very frequently in an area.  I

20         looked Monday afternoon and a little bit

21         yesterday to what it was I was thinking of.

22         This is one of the articles.  Steven Lab is a

23         well known criminologist for a very long time

24         and spends a lot of time in crime prevention

25         research.  And so in looking specifically to

46

1          find this one that I remember talking about,

2          the pulling levers strategy, that's discussed

3          in here referring to Professor Kennedy -- our

4          Professor Kennedy in this case with the

5          Plaintiff, and specifically looking at the

6          fact that even the Operation Ceasefire

7          involved using code enforcement, legal code,

8          you know, issues against offenders, repeat

9          offenders, and their family members.  And that

10         this idea, as I tried to testify to on Monday,

11         you know, the use of code enforcement, for

12         instance, has been an elemental part of

13         community oriented policing since -- since the

14         beginning, which is like the mid to late

15         1980s.  So this -- this article is responsive.

16         Yes, it was not -- as Plaintiff counsel points

17         out, this wasn't in the original report nor

18         the thousands of other articles about the

19         crime prevention things.  It's the most

20         studied kind of issue within law enforcement

21         and criminal justice is how better -- that's

22         the part of the moving kind of issue here.

23         How better can agencies keep, you know,

24         getting with limited resources to be effective

25         in crime prevention.  So this -- this

47

1          certainly was the result of that.

2    Q    And so it's fair to say that Defendant's

3          Exhibit 1 is one of the foundational documents

4          that you used when making your opinion in

5          answering one of the questions -- at least one

6          of the questions asked of you on Monday during

7          the deposition?

8    BY MR. HOUSE:

9          Objection to form.

10    BY THE DEPONENT:

11          Yes, that's fair to say.

12    BY MR. HOLBORN:

13          With that I have no further questions.

14    BY MR. HOUSE:

15          I just have one followup.  And also I have an

16          additional objection to the use of the exhibit

17          because it became clear from the witness'

18          answer that he did additional research during

19          the pendency of the deposition and I -- I just

20          want to flag that as an additional objection

21          to the use of the document, and then we can go

22          on to my question.  I don't know, Mr. Holborn,

23          if you have any followups on that, but

24          (pause) ---

25    BY MR. HOLBORN:

1          As far as the research?  Is that the question
2          you asked of me?
3     BY MR. HOUSE:
4          My understanding is that he did additional
5          research during the deposition after following
6          one of -- one of the questions in the
7          deposition.  And so that's -- that's an
8          additional objection I have to the exhibit and
9          I was getting that on the record.  And I'm
10         just curious if you wanted to get anything on
11         the record before I move on to my questions.
12    BY MR. HOLBORN:
13         Sure, if I could just ask one question of Mr.
14         Hough -- Dr. Hough.
15    CROSS-EXAMINATION RESUMED BY MR. HOLBORN:
16    Q    Dr. Hough, when you say research, did you
17         already have this document in your files that
18         you've used previously?
19    A    Yes.  That was the point I was making when I
20         said this is the one I remembered.  And so I
21         went back to find it.  This is a well known
22         article on crime prevention.  It came out
23         several years ago, as I said.  So this for me
24         is not new research but a remembrance of -- as
25         we know in a report such as that, that does

49

1          rely upon the individual, that's me in this

2          case, or Professor Kennedy, and while not

3          encyclopedic knowledge of authors and dates of

4          things written, our business and

5          responsibility to understand what -- you know,

6          what is out there within the field.  This is

7          what I'm well aware of and had.

8    BY MR. HOLBORN:

9          And, Mr. House, go ahead and ask your

10         questions.

11   BY MR. HOUSE:

12         Yes, sure.

13   REDIRECT EXAMINATION BY MR. HOUSE:

14   Q    So a followup I have is, I believe, with

15        respect to Exhibit 2.  You were asked if other

16        agencies have similar documents.  Do you

17        recall that?

18   A    Yes, sir.

19   Q    What agencies were you referring to?

20   A    All -- we can generalize to all of those not

21        only that are accredited agencies at a state

22        level or through the national level, I have of

23        the 67 counties in Florida examined the

24        general orders of at least 50 of those,

25        possibly all 67.  They all have these.

50

```
 1            Sometimes it's word for word.  You'll also see
 2            footnote citation in that general order to CFA
 3            which is Florida's accreditation entity.  So
 4            the code of ethics that's in there is the
 5            paraphrased one from the International
 6            Association of Police -- Chiefs of Police.
 7            It's a hundred years old.  Agencies as a
 8            routine course begin their service to the
 9            public and their guidance of members by
10            including a general order such as this.
11      Q     Is a general order the same as like a policy?
12      A     Usually that is.  And so that distinction
13            becomes, you know, policy or general order to
14            say here's generally how we're approaching
15            something.  And then, again, usually no --
16            there's no law, that procedure will go down
17            to, okay, now here's how we're going to sort
18            of go about that with the recognition in both
19            realms, policy and procedure, that it is
20            always as a guideline and it can never include
21            everything.  And again, that's -- that is how
22            policymaking is done.
23      Q     Sure.  And the only reason I have a followup
24            on that is because I want to -- I want to make
25            sure that I can tie the use of this document
```

51

```
 1              to our discussions on Monday about policies.
 2              So I'll do it this way.  I believe that we
 3              were discussing policies, among many times
 4              probably, in the context of an article that
 5              you had written that had as one of its ideas
 6              that a policy guides the actions of the
 7              officers in that agency.  Is that an accurate
 8              restatement of one of the points that you make
 9              in those papers?
10    A    In, yeah, that article that we were referring
11              to was an article about use of force
12              continuums and polices on the use of force.
13              And so, yes.  And it was -- and part of there
14              was a suggested kind of here's the beginning
15              of a model policy.  It should include things
16              such as, you know, what's your overall
17              statement of purpose.  Does it have
18              definitions in it.  Does it have -- just a
19              variety of things that were in that article.
20    Q    So and understanding, of course, that a use of
21              force policy might be totally different.  But
22              just to tie the bow on it, so does -- does
23              this general order likewise guide the actions
24              of the officers in the -- in the Pasco agency?
25    A    Yes.  This specific one absolutely does.
```

52

1    BY MR. HOUSE:

2         That's all I have.

3    BY MR. HOLBORN:

4         I have no followup, and we'll go ahead and

5         read.

6    (PLAINTIFF'S EXHIBIT F MARKED)

7    (DEFENDANT'S EXHIBIT NOS. 1 AND 2 MARKED)

8    (PROCEEDINGS IN THE ABOVE-ENTITLED MATTER WERE

9    CONCLUDED AT APPROXIMATELY 12:34 P.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

53

<u>CERTIFICATE</u>

I, <u>Jennifer R. Weatherly, CCR,</u> Court Reporter and Notary Public, do hereby certify that the foregoing <u>52 pages</u> are an accurate transcript of the deposition of <u>Dr. Richard M. Hough, Sr.,</u> taken by me and transcribed under my supervision.

I further certify that I am not financially interested in the outcome of this action, a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel.

This is the 5th day day of May, 2022.


_____

JENNIFER R. WEATHERLY, CCR

Notary Public No.: 202119600339


(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)