UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


DALANEA TAYLOR;
TAMMY HEILMAN;
DARLENE DEEGAN;
and ROBERT A.
JONES, III,

   Plaintiffs,

vs.                         Case No.:  8:21-cv-00555-SDM-CPT

CHRIS NOCCO, in his
official capacity as
Pasco County Sheriff,

   Defendant.
_____/


PROCEEDINGS:         Deposition of
                     LARRY KRAUS

DATE:                September 23, 2021


TIME:                9:01 A.M. - 12:59 P.M.


PLACE:               New Port Richey Executive Suites
                     8520 Government Drive
                     New Port Richey, Florida

REPORTED BY:         Jacquelyn Altilio, Court Reporter
                     Notary Public
                     State of Florida at Large



               ANDERSON COURT REPORTING
                  14150 Third Street
                    P.O. Box 2426
                 Dade City, FL 33526-2426
                 AndersonCourtReporting.com

Phone (352) 567-5484              Fax (352) 567-9151

1   APPEARANCES:

2   ROB JOHNSON, ESQUIRE
    Institute for Justice
3   16781 Chagrin Boulevard, #256
    Shaker Heights, Ohio 44120
4   703-682-9320
    Rjohnson@ij.org
5          Co-counsel for Plaintiffs

6   ARI S. BARGIL, ESQUIRE
    Institute for Justice
7   2 S. Biscayne Boulevard, Suite 3180
    Miami, Florida 33131
8   305-721-1600
    Abargil@ij.org
9          Co-counsel for Plaintiffs

10

    THOMAS W. POULTON, ESQUIRE
11  DeBevoise & Poulton, P.A.
    1035 S. Semoran Boulevard, Suite 1010
12  Winter Park, Florida 32792
    407-673-5000
13  Poulton@debevoisepoulton.com
           Counsel for Defendant
14
    LINDSAY MOORE, ESQUIRE
15  Pasco Sheriff's Office
    8700 Citizens Drive
16  New Port Richey, Florida 34654
    727-844-7701
17  Lmoore@pascosheriff.org
           General Counsel for Pasco Sheriff's Office
18

19
                    I N D E X
20
                                              Page
21
    Direct Examination by Mr. Johnson         4
22  Stipulation                             154
    Certificate of Oath                     155
23  Certificate of Reporter                 156
    Errata Sheet                            157
24

25

1              E X H I B I T S

                                                    Page
2   Exhibit A- 2018 ILP Manual                     5
    Exhibit B- 2016 ILP Manual                     9
3   Exhibit C- Internal Policy                     31
    Exhibit D- List                                33
4   Exhibit E- Tip Document                        86
    Exhibit F- Overnight Email Morning Report      112
5   Exhibit G- Image                               119
    Exhibit H- Image                               120
6   Exhibit I- Emails                              123
    Exhibit J- Email                               131
7   Exhibit K- Checklist                           134
    Exhibit L- VIP List                            136
8   Exhibit M- Emails                              139
    Exhibit N- SPI Grant Mission Statement         140

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        LARRY KRAUS,

2      being first duly sworn to tell the truth, the whole

3      truth, and nothing but the truth, was examined and

4      testified as follows:

5              THE WITNESS:  I do.

6                      DIRECT EXAMINATION

7   BY MR. JOHNSON:

8      Q.   Can you state your name for the record?

9      A.   Larry Kraus.

10     Q.   And what is your -- are you currently employed

11  by the Pasco Sheriff's Office?

12     A.   Yes.  My current title is inspector.  I oversee

13  the Intelligence-Led Policing section.

14     Q.   Okay.  And how long have you been in that

15  position?

16     A.   Since 2017, October 2017.  I was the -- I was

17  promoted to director from manager.  So I started at the

18  sheriff's office in 2016, I believe September 3rd.  I

19  was the manager.  I worked under lieutenant, and then

20  the lieutenant was promoted to captain in October 2017,

21  and then I was promoted to director.  And then I think

22  in late '18 I was transferred over to an inspector role.

23     Q.   Did you have any role at the Pasco Sheriff's

24  Office before 2016?

25     A.   No, just worked -- I was a Florida State

1   Trooper prior to that, so I worked with the sheriff's

2   office throughout my daily duties as a trooper.

3       Q.   Okay.  And what are your responsibilities as

4   the director of the ILP?

5       A.   So I oversee 39 individuals, roughly 30

6   analysts.  I have four supervisors, and I have ten

7   detectives that work multiple investigations related to

8   federal investigations.  They're task force officers for

9   FBI, ATF, FTA, his, things of that nature.

10      Q.   Okay.  I'm just going to start with this and

11  provide you with this document.  Do you recognize that

12  document?

13      A.   I do.  It's one of our revisions for our

14  Intelligence-Led Policing manual.

15          MR. JOHNSON:  We'll mark that as Exhibit A.

16          (Exhibit A was marked for identification.)

17  BY MR. JOHNSON:

18      Q.   And what is this document?

19      A.   So this was a manual that was created -- it was

20  probably created prior to me.  I -- like I said, I got

21  there in 2016, and then it was rewritten by our

22  lieutenant at the time, which was Captain Ross or now

23  Captain Ross.

24      Q.   And what is Captain Ross's role in the program?

25      A.   Captain Ross was the director of ILP from 2016

1  to late 2017.

2       Q.   Okay.  And is he currently involved in the

3  program?

4       A.   No.  He works for operational -- I mean, well,

5  everybody's involved in -- so ILP's not a program.  It's

6  a policing philosophy.  So the entire agency is kind of

7  immersed in the intelligence-led policing philosophy.

8  Again, it's just like a -- it's no different from

9  community policing.  It actually encompasses all the

10  policing philosophies almost into kind of one philosophy

11  as a whole.

12       Q.   But there is some unit within the Pasco

13  Sheriff's Office of which you are the director?

14       A.   Yes.

15       Q.   And what is that unit called?

16       A.   It's called the Intelligence-Led Policing Unit.

17  It's basically to provide intelligence and analysis.

18       Q.   Okay.  So there's no program, but there's a

19  unit; is that fair?

20       A.   Well, so there -- yeah.  So there's no special

21  ops program, but there's a special operations division.

22       Q.   I just want to get the terminology right.

23       A.   Yeah.  I mean, it's kind of odd to hear it as a

24  program.  I guess you can call anything a program, but

25  it's just a policing philosophy.

1      Q.    Understood.  Who was the director of the ILP

2   unit prior to Captain Ross?

3      A.    Was that Brian Prescott?  I think it's Brian

4   Prescott.

5      Q.    And when would he have been the director?

6      A.    I honestly couldn't tell you.  Like I said, I

7   got there -- no.  I apologize.  There was another

8   gentleman before Brian, Tony -- I can't remember that

9   guy's last name.  He left prior to me getting here,

10   Tony.  I'm sure we can get you his last name.

11      Q.    That's fine.

12      A.    It will come to me probably in about

13   five minutes, and I'll blurt it out.

14      Q.    That's okay.  So is this the most recent

15   version, Exhibit A?  Is this the most recent version of

16   the ILP manual?

17      A.    No.  We have since revised a lot of this.  It's

18   a lot shorter, and then we have a law enforcement

19   directive.

20      Q.    When was it revised?

21      A.    Late 2020.  I think it was just -- I think it

22   may still be in revision like as far as approval, you

23   know, to go through the process.  We have -- we look at

24   it, we change some -- we change whatever language we

25   need to change, it goes up the chain of command.  The

1    chain of command determines whether, you know, we make

2    those changes or not.

3        Q.    So that -- the revised version has not yet been

4    approved?

5        A.    No.  I don't think it's fully been approved

6    yet, no.

7        Q.    So this would be the current effective version?

8        A.    Yes.

9        Q.    Okay.  What changes are you contemplating

10   making in the new revised version?

11       A.    Just shortening it a little bit.  It's super

12   long, especially for digesting from a deputy's

13   standpoint.  It's more focused towards probably a law

14   enforcement directive, right, or a policy to kind of go

15   through and take a look at what we're doing.

16            Every five years, we do an assessment on the

17   program; right?  So like anything else, there's a

18   philosophy of what we're doing.  In the process, we

19   assess it.  Hey, are we doing the right thing here, or

20   has something changed in the crime environment?  If the

21   crime environment's changed, does our metric still allow

22   us to kind of focus on that crime environment?  Because

23   crime environment does not stay the same.  It fluctuates

24   throughout.

25            So if you look at a 20-year history of any

1    police agency, they will tell you that their violent

2    crime may go down for two to three years, and then all

3    of a sudden, we're seeing a significant spike in violent

4    crimes.  So nationwide right now, we're seeing a

5    significant spike in violent crime.  We're seeing a

6    reduction in property crime.

7         So if agencies don't adjust to that dynamic of

8    what they're looking at, they're going to miss all the

9    crimes happening in the violent crime category compared

10   to all the things that are happening in property crime.

11   So there's some analysis that has to go into what your

12   current crime environment looks like in your AOR, and

13   it's different for every agency.  Pasco doesn't have the

14   same crime problems as Chicago does.

15       Q.   Right.  I want to show you another document.

16   And we'll probably come back to these, but I just want

17   to start by getting these identified.

18            MR. JOHNSON:  Let's go ahead and mark that as

19       Exhibit B.

20            (Exhibit B was marked for identification.)

21   BY MR. JOHNSON:

22       Q.   Do you recognize this document?

23       A.   This one's before me.  I mean, I recognize the

24   content, but -- yeah, I recognize the content, but this

25   was one was written before me.  If you look, it's

1    February 1, 2016.  I didn't get here until September,

2    and this was already in the -- whatever this -- I

3    believe this was already in the rewrite phase from that

4    standpoint when the new director came in.

5         Q.   So was there any version of the manual between

6    the version that's been marked as Exhibit A and the

7    version that's been marked as Exhibit B?

8         A.   I don't believe so.

9         Q.   Okay.  So when you started at the sheriff's

10   office, this would have been the effective --

11        A.   This would have been -- yeah, this would have

12   been like --

13        Q.   Exhibit A?

14        A.   Exhibit A would have been what I would have

15   seen coming into the sheriff's office, so -- no.  I'm

16   sorry.  This was -- we didn't look at this when I came

17   in.  We were still in the process of kind of revamping

18   how intelligence-led policing worked at that point in

19   time.

20             Anytime you bring a new leader or a new head

21   in, they're going to ultimately look at the totality of

22   the circumstances of what's going on in that unit and

23   then make some changes.  So I can -- I don't know if

24   this was the version that Captain Ross was working off

25   of at the time to revamp it and make it this, but this

1    was what we were working through.  This should have some

2    Homeland Security stuff in it.  It should be kind of the

3    new -- like some of the new modeling.

4          MR. POULTON:  Do me a favor, just for the

5       clarity of the record.  When you said this just now,

6       could you say which one you're referring to?  You're

7       referring to the 2018 --

8          THE WITNESS:  Yeah.  So the 2018 was the one

9       that we got basically from when I came in.  This was

10      the version that they were revamping from Captain

11      Ross's perspective.  So Exhibit A was being

12      rewritten.  I don't know if it was being rewritten

13      from Exhibit B or from scratch, so that would be a

14      question for Captain Ross.

15   BY MR. JOHNSON:

16      Q.   Okay.  So it's your testimony that when you

17   came in 2016, which was only seven months after Exhibit

18   B was issued, at that point the effective manual would

19   have been Exhibit A, which is dated January of 2018?

20      A.   No, the one that I am accustomed to.  I did not

21   have anything to do with Exhibit B.

22      Q.   Well, I understand you didn't draft Exhibit B.

23   I want to understand, what was the effective policy when

24   you started in 2016?  What was the policy that you were

25   following in your role as the manager of the ILP unit?

```
 1        A.    What do you mean by following a policy?

 2        Q.    What was the -- as the manager of the ILP unit,

 3   you --

 4        A.    But this is not a policy.

 5        Q.    What do you view these documents as?

 6        A.    It's a manual.  It's a guide.  So it's a guide

 7   of what ILP is.  It's not a policy.  So this is way

 8   different than what you're talking about.  So, again,

 9   this is a manual.  It's a guide.  It's like any other

10   manual.  So you have a manual to put together furniture.

11   This is a manual of what -- probably where ILP started.

12             I recognize all the content.  The content's

13   from academia.  This can be traced back to the cycle.

14   These are all -- again, all this stuff comes from

15   literature, from academia.  Based on the date, yeah,

16   this was the active manual when I came in.  But I'm

17   telling you that I did not go off this manual when I

18   came in.

19             I came in as a manager.  We assessed the entire

20   program.  Me and Captain Ross were going through the

21   process of how to reorganize the analytics, right, so

22   basically going to put analysts in certain specific

23   places that we needed them to enhance our analytical

24   capabilities, i.e., a district or attached to a

25   Real-Time Crime Center.
```

1          So, yeah, I mean, by date, this was the active

2   manual.  But I will tell you I didn't follow this from a

3   policy perspective.  I was still getting my bearings

4   when I came here in 2016 identifying, you know, what the

5   current -- what the current makeup of the

6   Intelligence-Led Policing Unit was, then going back and

7   making my recommendations to, you know, build up the

8   analytical process.

9       Q.   So when you say you didn't go off of Exhibit B,

10  what did you go off?

11      A.   My training and experience.

12      Q.   Would you say that the training and experience

13  and the procedures that you followed are accurately

14  represented in the manual that's Exhibit A?

15      A.   I would say both.  So I don't think A and B are

16  much different to tell you the truth, looking at what

17  you're looking at.  I don't think they're much

18  different.  I think, again, some of the core -- the core

19  information from academia is still -- from B is still

20  represented in A.

21          I mean, I would have to go through line by line

22  to compare the actual changes, but there's still

23  performance expectations from this manual to supervisors

24  as a guide to, you know, law enforcement supervisors.

25  There's still an understanding of effective

1    communication this one.  The intelligence cycle is still

2    represented in this one.  So if we went through line by

3    line, I don't think you're going to find much of a

4    difference between possibly '16 or '18, except for maybe

5    a little bit more academic research in the way of

6    focused deterrence.

7              So without me going through each guide and

8    identifying what's different, I can tell you that

9    looking at that one compared to this one -- and I've

10   looked at this manual a little bit, and it's been -- the

11   key terms are there.  There's a couple of other things

12   that are added -- that we looked at or added to A that

13   we looked at, but I think it's pretty similar.

14             I wouldn't say there's like a complete overhaul

15   or drastic change between this manual and this one right

16   here from what I'm looking at, just based on content and

17   the content page.  Again, there's some, I mean, maybe

18   stylistic changes, but it looks like some of the same

19   content is in here.  There may be some updated language

20   from, you know, some of the literature, like I said,

21   from Dr. Jerry Ratcliffe that has kind of enhanced over

22   the years from, you know, his book that he wrote on ILP

23   and then from the book that he wrote on reduced crime.

24   There's probably some more updated versions of that

25   academia in here.

1      Q.    Okay.  And just -- I just want to have this

2  clear for the record.  Between 2016 and 2018, is there

3  any other version of the manual other than these two

4  versions?

5      A.    Not that I'm aware of.  I don't know if there's

6  a finalized version.  This is the revised one.  I don't

7  know if there's another -- there should be -- there

8  might be another one if this says revised in 2018.

9      Q.    But you're not aware of it?

10      A.    I'm not aware of it.  This is -- again, like I

11  said, this is what I work off, kind of the final

12  version.

13      Q.    Okay.  When you say, "This is what I work off,"

14  what do you mean by that?

15      A.    No, this is what we would work off in the

16  agency to kind of provide to our members that works as a

17  guide.  So it still needs context; right?  We still do

18  training within the agency.  We still identify and let

19  individuals know like what the essence of intelligence

20  is, what it's designed to do, what it's designed not to

21  do.

22          So, you know, with this, again, a lot of

23  academia.  When you have a brand new deputy coming in

24  trying to learn stuff, it's kind of difficult; right?

25  They're still trying to learn their job.  They're still

1    trying to understand how to deal with people if they've

2    never had, you know, that life experience of how to talk

3    to an individual that's in crisis.

4            So when they read this, they're reading this,

5    and then you ask them a question, and then you get this

6    -- you know, the blank look.  So you try to understand

7    and let these guys know like, hey, this is pretty

8    simplistic; right?  This is not rocket science.  Neither

9    one of these manuals are.  This is basically -- it's

10   policing that's been going on for a better part of a

11   couple decades in multiple different jurisdictions

12   across the country.  It's just more of an academic feel

13   to understand what intelligence -- how intelligence

14   drives the mission.

15       Q.   So just to make sure I got that right, is it

16   correct that you give this manual to new deputies when

17   they start at the Pasco Sheriff's Office?

18       A.   Yes.  They're encouraged to read the manual,

19   yes.

20       Q.   And then you ask them questions about it?

21       A.   We do a basic ILP new member orientation.

22       Q.   Okay.  What does that consist of?

23       A.   Has a PowerPoint presentation.  We talk about,

24   you know, how intelligence drives the mission.  We talk

25   about -- we provide examples.  I teach this, so a lot of

1   it comes from my experience of, you know, 21 years in

2   law enforcement and then probably over 11 years in the

3   intelligence field.

4       Q.   Okay.  Can you give us sort of a broad

5   overview?  What do you tell them in that presentation?

6       A.   Yeah.  So basic concept, right, we talk about

7   what intelligence-led policing is, the very essence of

8   it, what it does.  It talks -- focuses on problem

9   people, places, and groups.  There's a -- if you look at

10  the data, there's a smaller percentage of individuals

11  committing crime in those locations, in those areas.

12       When you look at your -- you know, your problem

13  people, when you're dealing with these individuals,

14  there's a couple things you can do; right?  There's an

15  off-ramp.  There's an off-ramp to criminal activity.

16  That off-ramp should be advertised in resources through

17  the community.  You know, law enforcement has a lot of

18  discretion.

19       So we have, you know, through the crime

20  environment -- Pasco, for instance, we had a lot of

21  property crime.  So some of our ILP-focused crimes were

22  auto burglary, auto theft, business burglary, and --

23  sorry.  I'm drawing a blank.  Auto theft, auto burglary,

24  business burglary, residential burglary.  Those are the

25  four, and then robbery was the one that was kind of like

1     the four plus one.

2              So we were, you know, through a certain period

3     of time from probably way before I -- probably before I

4     got here now until -- 2016 probably until 2018, late

5     '19, property crime was significantly on the rise.  And

6     then, you know, we say these are our ILP-focused crimes.

7     That's what we do.  Violent crime you can never ignore,

8     and you have to identify individuals that are

9     victimizing the most amount of people within the

10    community.

11             We talk about the off-ramp mentality.  You

12    can't just go out -- you can't arrest your way out of a

13    problem; right?  That's one of the key focuses that we

14    tell individuals.  Nor do we want to arrest everybody

15    that's there; right?  It's not fair to the community,

16    it's not fair to the jail, and it's not fair to the

17    detention deputies that have to monitor these

18    individuals on a regular basis.

19             We talk about the tenets of -- you know, of

20    ILP.  We talk about, you know, what a prolific -- how

21    prolifics score in Pasco County.  We talk about what

22    district targets look like.  You know, these are

23    individuals that have warrants, have the -- that's the

24    primary focus of these, individuals that have warrants.

25    They get -- they'll be focused on at a higher rate if,

1    you know, you're creating an ILP-focused crime or you're

2    a violent criminal; right?  So if your warrant has to do

3    with violent crime, you're going to take priority, and

4    rightfully so.

5            So that's kind of it.  It's super basic.  It's

6    about a two-hour, two-and-a-half-hour kind of overview

7    of, you know, basic intelligence, what intelligence is

8    driven to do.  The one thing we tell them is that, in my

9    mind, there's no such thing as predictive policing.  The

10   word's used there.  It's a great slogan.  It's a great

11   catch.  It's great for marketing.  It's good to sell

12   software, but this is pattern analysis.  This is what

13   happens.  You look at patterns, you collect evidence,

14   you take an evidence-based approach to how you're going

15   to handle crime.

16           That's one of the things we kind of stress with

17   them is that intelligence doesn't give you a crystal

18   ball.  There's no person on the planet that I know of

19   yet that I've met that can say, "Hey, a crime's going to

20   absolutely happen tomorrow."  And I think that's a

21   common misconception of what intelligence-led policing

22   does.  I hear a lot in our space like, "Oh, you're going

23   to stop future crimes."  Well, no, probably not; right?

24   Can we do prevention?  Yeah.  If we put ten deputies in

25   an area where we're having a ton of burglaries, are we

1    going to prevent crime?  Absolutely.  Could it happen

2    somewhere else?  Absolutely.

3         So one of the things we want to stress to them

4    is that there's no crystal ball here.  These are a bunch

5    of individuals taking data, identifying patterns in that

6    data, and putting that information out to become

7    actionable intelligence; right?  And most intelligence

8    needs to be actionable; right?

9         Even if I stick a be on the lookout, right, or

10   some kind of intelligence BOLO that, hey, this

11   individual is suspected of committing this crime,

12   ultimately, an action is there to be taken; right?  So,

13   you know, you'll go out, and someone goes, "Yes, I know

14   that individual.  Here's -- you know, I know that

15   they're committing crimes.  I've watched them commit X

16   crime," whether a burglary or not.  That's information

17   that needs to come back to the analyst.

18        The analyst needs to analyze that information

19   again, try to vet it as much as possible, and then put

20   that out to the detectives and say, "Hey, we believe we

21   have a suspect for your crime."  So, A, it's increasing

22   our odds of solvability for these cases, you know.  And

23   I have a slide in there that tells you intelligence can,

24   intelligence can't.

25        And the one big thing is we cannot predict the

1    future, and we get a lot of that.  I think people think

2    I have an oracle in the closet somewhere, or I believe

3    it was noted that this is the minority report.  That is

4    absolutely insane, and there's no way, shape, or form we

5    can do that.  It's probabilities; right?  I will give

6    you from an analytical perspective whether you have a

7    low, medium, or high probability, and that's where we

8    move in this space.  It's designed to enhance

9    decision-making, and that's the biggest thing we focus

10   with them.

11           And, you know, one of the big examples I give

12   everybody when I teach is that if you go buy a car, and

13   you walk into a dealership, and you don't do your

14   homework on that car, and the dealer knows more than

15   you, guess what you walk out with?  You walk out with

16   the dealer's deal.  But if you know more than the

17   dealer, you know how many cars he has on the lot, how

18   much taxes he's paying, how long the car's been sitting

19   there, and you go at the right times and place and

20   things and you do your homework, you're probably going

21   to walk out with a better deal.

22           And we always ask people, do you want more or

23   less information when you're making a decision?  And, of

24   course, thank God, all of them are going, "I want more

25   -- I want more information."  So that, kind of in a

1     nutshell, is how basic intelligence, the NML works.

2            It's hard to teach -- you can't teach young

3     deputies -- I don't have three, six, eight months to

4     send them to schools to learn just how intelligence

5     works.  So that's why I have intelligence analysts that

6     are able to provide that information out to them.  And

7     then what they do with that information once they get it

8     is based on district strategy and things of that nature.

9          Q.   Do you talk about the prolific offender list

10    during the training?

11         A.   No.  We talk about how the prolifics score;

12    right?  They're going to understand how the prolifics

13    are identified once that comes out there through their

14    field training officers, through their command staff,

15    through the analyst interaction.  If they interact with

16    their analysts on a daily basis, they'll get that

17    information there.  We don't talk about who's on the

18    list at the time.  We just give them the basic

19    understanding of how people get to that pool and how

20    people are selected and why they're selected.

21         Q.   Okay.  So what do you tell them about how

22    people are selected and why they're selected?

23         A.   So there's a scoring system; right?  It's

24    pretty simple.  We look at your last three years of

25    history within Pasco County.  We look at ILP-focused

1    crimes and violent crimes.  If you commit any of those

2    crimes, you get specific scoring points; right?

3            So the more violent the crime, the higher the

4    points.  So if you commit a violent crime, it's four

5    points.  If you commit a violent crime with a firearm,

6    it's five points.  If you commit an ILP-focused crime, I

7    believe it's three points.  I'll have to look at it.  I

8    have an analyst that does all this.  And then any other

9    criminal act is two points.

10            And then once you get into the pool, there's

11   some enhancers.  So if you're a documented gang member,

12   you'll get a 15 percent enhancer.  And then if you have

13   a -- if we pull the number of failure to appears and

14   VOPs, if you have a -- that doesn't get you into the

15   pool.  What that does is it enhances your scoring system

16   outside the pool.

17       Q.   This manual that I'm pointing to, Exhibit A,

18   does it describe the scoring system?

19       A.   Yeah, I'm pretty sure.  I'll have to look for

20   exactly where it's at, but it does describe -- I'll have

21   to go through it, but most likely, it's in here.

22       Q.   Page 17 to 18?

23       A.   There should be an actual scoring system in

24   here, like a scoring -- it should be before that.

25            MR. POULTON:  My reference is in appendix B.

1    BY MR. JOHNSON:

2        Q.   It's page 75 I believe, or if you look at the

3    base numbers at the bottom, page 52 of 7.

4        A.   Yup.  So, yeah, the appendix is here.  So,

5    yeah.  So you're looking at -- I'm sorry -- four points

6    for any big four arrest, or any violent crime related to

7    a firearm or related firearms for aggravated

8    circumstances.  You've got three points for any big four

9    arrest, two points for an arrest involving grand theft,

10   pawn scraping violations, violent crime outside of the

11   agency focus, narcotics violations.

12            We do not include misdemeanor marijuana

13   arrests.  It doesn't really affect it.  You look at half

14   of the applicable listed awarded suspicion of an offense

15   listed one through four.  One point's added for other

16   offenses -- any other offense type.  You know, so if

17   it's anything outside of the focused offenses, you get

18   the one point.  And then there's a moderate enhancer for

19   the FTAs, but that's after you get in the pool.  And

20   then there's a moderate enhancement for any of the --

21   each involved other reporting person, victim, witness

22   for five or more criminal reports, so basically,

23   negative interaction with law enforcement from that

24   standpoint.

25       Q.   I would like to go back to something that you

1    mentioned.  The pool, what is the pool, and how does

2    that work?

3        A.   So the pool is based on the basic scoring

4    element; right?  So three or more arrests within -- I'm

5    sorry -- two or more arrests within a three-year period;

6    right?  That's the pool.  So the pool doesn't

7    necessarily get you to be a focus.  What happens is when

8    you do a pool like that, it allow -- it probably puts

9    out anywhere from 11 to 1,800 individuals; right?

10            However, those individuals are probably not

11   affecting the crime environment at that time, right,

12   within three-year time span.  The goal of having the --

13   you know, we were focusing on the top 100 prolifics only

14   because it was more manageable.  That was kind of the

15   rule, right, top 100.

16            And then out of the top 100, the analysts are

17   going to review them.  If they're not affecting the

18   crime environment, we should not be focusing on them.

19   That's the rule in the districts, right, like, hey, they

20   need to be affecting the crime environment whether they

21   have a suspicion of committing a crime, we know they're

22   committing a crime, or they're associates with

23   individuals that have committed -- in other words,

24   they're with people while they're committing crimes.

25            Outside of that, they should not be a focus.

1    That's why we have the analysts.  We have no machine

2    learning.  We have no AI.  This is done through an

3    Access database that pulls data from the backside of our

4    record management system.  Our analyst that has done it

5    has been here for 15 years, so he's been here since the

6    beginning of this inception.  And when he runs it,

7    that's why we have the analysts take a look at it.

8         So they all have an understanding between, you

9    know, meeting with their district commanders, meeting

10   with their district deputies, meeting with their

11   district STAR teams.  They'll have an understanding of

12   who is affecting the crime environment.  If they're not

13   affecting the crime environment, they would not become

14   the focus.

15   Q.   So just to make sure I understand, the pool is

16   generated by identifying people with three or more

17   arrests --

18   A.   Two or more arrests within three years.

19   Q.   Two or more arrests within three years.  And

20   then once you've identified the pool, within the pool,

21   you rank the individuals using this scoring system that

22   is set out?

23   A.   They'll score.  So, I mean -- yeah, I mean, I

24   don't think the rank really -- the rank's really not

25   relevant to us because they're split up between

1    districts.  So it's really like -- again, if the person

2    that's number one on the scoring lives in district one

3    and only commits crime in district one, and district two

4    and three doesn't see him, that's not district two or

5    district three's primary focus.  Does that make sense?

6        Q.    Yeah.

7        A.    So they will score high.  So, I mean, of

8    course, the higher score is going to be at the top.  The

9    person that scores the highest in that pool is going to

10   be at the top.  That's what's going to indicate the top

11   100.  So the top 100 are the individuals that scored in

12   the top 100 of that 1,100-to-1,800 people list.

13       Q.    That's what I wanted to understand.  So you

14   identify the top 100 by applying the scoring system that

15   is set out in the manual?

16       A.    Yes, and then you were -- but that doesn't

17   automatically make them a focus.  I want to make that

18   perfectly clear.

19       Q.    And that's what I want to understand is what

20   is -- is there any document that sets out the criteria

21   that analysts apply in determining then who should be a

22   focus?

23       A.    Yeah, there's no document.  It's if they're

24   affecting the crime environment, in other words, if that

25   person has been arrested, if they are suspected of

1    committing a crime, if they're under investigation for

2    committing a crime.  You know, we have intelligence to

3    believe that that individual is currently active in the

4    crime environment right now.

5        Q.   So there's -- what you're saying -- and I just

6    want to understand what you're saying.  Generally, the

7    people who are on the prolific offender list are the

8    ones who are in the top 100 of the scoring system;

9    correct?

10       A.   Did you say the -- so there's a pool from 11 to

11   18 -- roughly about 1,100 people.  Let's just say 1,100

12   people.  We look at the top 100 because there's no way

13   to focus on 1,100 people.  It's absolutely impossible.

14   The top 100 out of that, the analyst will determine

15   whether or not those individuals are actually active in

16   the current crime environment.

17            So you've got to remember, it's got a

18   three-year -- there's a three-year time span.  So let's

19   say we had a guy that was super active in year one and

20   two, but he's not currently active in year three, but

21   he's still on the prolific list.  If that person's not

22   active right now, there's no reason to focus on that

23   individual.

24       Q.   Has that always been the case?

25       A.   Yes.  Well, as long as I've been here.  I can't

1    attest for prior to when I've been here.  But as long as

2    I've been here, that's the goal.  My goal is that we're

3    almost looking to change this to a crime 365 model;

4    right?  If you haven't committed a crime in the last

5    365 days, then we may not even look at you anymore

6    depending what the analysts tell me; right?

7         Because you've got to remember, there's a lot

8    of intel you're -- you know, you looked at a document

9    earlier that had a TipSoft program.  The TipSoft program

10   comes from the public.  We get a lot of tips and leads

11   from the public saying that this individual is in our

12   neighborhood committing crime, making -- committing

13   burglaries.  We have individuals on surveillance footage

14   that, hey, this person's committing burglaries.  They

15   could have been wearing gloves.  We don't necessarily

16   have the forensic evidence to kind of tie into it, but

17   people are identifying that individual as, "Yeah, that's

18   Billy or Timmy," or whatever.

19        So as long as I've been here, the goal has been

20   that prolific has to be affecting the crime environment.

21   You have to have a reason.  If I come to you and go,

22   "Why are we focusing on this person?"  There should be a

23   reason.  You should be able to tell me a reason when I

24   ask that question.  It's the same thing when we have a

25   threat.  You know, if this person's a threat, why do you

1     believe they're a threat?  If this person's going to

2     carry on an act of violence, why do you believe this

3     person's going to carry on an act of violence?

4         Q.   Could you point me to the place in the manual

5     where it says that?

6         A.   There's no place in the manual where it says

7     that, not in those words.  But if you look at the

8     prolifics and you're talking about, you know, if you

9     look at the totality of it, when you look at a prolific

10    scoring system -- and again, there's hundreds of

11    agencies doing the same thing across the country -- it's

12    basically identifying that small portion of the

13    individuals that are committing most of your crime.

14        Q.   Is there any other policy document that talks

15    about this limitation that you're saying that it has to

16    be someone who's affecting the crime environment?

17        A.   No.  That's guidance from me to my analyst.  We

18    have an internal policy.

19        Q.   So it's not written down anywhere?

20        A.   I don't think it specifically says that.

21        Q.   What do you mean when you say you have an

22    internal policy?

23        A.   On how intel works, like identifying the

24    intelligence cycle.  We have an internal policy to ILP.

25        Q.   Is that policy written down anywhere?

1     A.   Yes.

2     Q.   Where is it written down?

3     A.   It's written down in something like this.

4     Q.   So you have a policy document that talks about

5  how to make the prolific offender list?

6     A.   No.  Our analyst does that.  Well, we do have a

7  policy document that stated that.  I think you guys got

8  that.  There was a --

9          THE WITNESS:  You know what I'm talking about?

10         There was a document I think we shared with them

11         that has the little circle that says the pool, and

12         it has the prolific --

13         MR. POULTON:  I don't -- I didn't bring all the

14         documents with me, so I don't know.

15         Does that ring a bell to you, Rob?

16         MR. JOHNSON:  Yeah.  One second.

17         Let's mark that as Exhibit C.

18         (Exhibit C was marked for identification.)

19    A.   Yeah, this was created prior to me getting

20  here.

21  BY MR. JOHNSON:

22    Q.   Is this the document that you're referring to?

23    A.   Yeah.  This talks about how the scoring is

24  going to work, introductions, basically talking about

25  the selection process.

1      Q.   Is this the internal policy for creating the

2   prolific offender list?

3      A.   This is.

4      Q.   And does this document say that an individual

5   has to be affecting the criminal environment?

6      A.   No.  Again, that's something we train our

7   analysts to do that they have to be affecting the crime

8   environment; right?  Again, logically, it doesn't make

9   sense to deal with people that are not affecting the

10  crime environment.

11     Q.   Okay.  Just to be clear though, this is your

12  internal policy for creating --

13     A.   This is the internal document, yes, that our

14  analyst goes by.

15          MR. POULTON:  This is Exhibit C?  I'm sorry.

16          MR. JOHNSON:  Yes.

17  BY MR. JOHNSON:

18     Q.   Okay.  Now I'd like to talk about just the

19  mechanics of creating the prolific offender list.  How

20  does an analyst do it?  Just very concretely, like what

21  does it involve?

22     A.   So one of our analysts has an Access database

23  that, you know, basically pulls RMS data, the record

24  management data.  The way he has the database built, it

25  will identify individuals that have three or more

1    arrests in Pasco County within the timeframe -- or two

2    or more arrests within that three-year timeframe.  He

3    pulls the data into Access and then runs the internal

4    algorithm from Access database to score the system.  He

5    would have to get more into the science about it.

6         Q.   What is Access database?

7         A.   It's a Microsoft Access database program.  It

8    comes from Microsoft Office.  It's nothing -- yeah, kind

9    of like -- I guess it would be like the beefed up

10   version of Excel to handle advanced data.

11        Q.   So then -- let's see.

12             MR. JOHNSON:  We can mark this as Exhibit D.

13             (Exhibit D was marked for identification.)

14   BY MR. JOHNSON:

15        Q.   Are you familiar with not this specific

16   document, but this type of document?

17        A.   Yeah.  This looks like the list of names that

18   would be on the actual prolific list maybe.  Hold on a

19   second.  This looks like -- yup.  It looks like that.

20   Is this what we gave it to you as?

21        Q.   This was produced to us in discovery, yes.

22        A.   Okay.  Yeah, that's what it looks like from my

23   perspective right now, unless it's labeled as something

24   else.  It looks like there's some scoring here.

25        Q.   So what is this?

1      A.   So it looks like a list of prolific offenders,

2   whether they have a gang, whether they looks like

3   reoffended within one year -- or released in one year.

4   So that's released in one year, number of points.  Yeah,

5   I mean, it looks standard.  Again, Steve would have to

6   verify whether or not this is his or not.  But, yeah.

7      Q.   Who is Steve?

8      A.   He's one of our analysts.  He's our analyst who

9   does our prolific scoring.

10      Q.   What's his last name?

11      A.   Heibert.

12      Q.   Can you spell that, please?

13      A.   H-E-I-B-E-R-T.

14      Q.   Is he the only analyst who does the prolific

15   scoring?

16      A.   Yes.

17      Q.   How long has he been doing that?

18      A.   As long as I've been here, so probably before

19   that to tell you the truth.

20      Q.   Okay.  Is this the document that -- when you

21   say that there's something produced through Access

22   database, is this the type of document that you're

23   referring to?

24      A.   This looks like an Excel spreadsheet.

25      Q.   So there's some other document that's produced

1    through Access database?

2        A.   He draws it directly.  I think he can export it

3    into Excel to see a more manageable -- more manageable

4    data set, but I would have to ask him specifically if

5    that's what he did.  But I know it's all done in Access

6    database, but this does look like a list from Excel.

7        Q.   And you said this is the actual prolific

8    offender list; is that right?

9        A.   This is -- it looks like one of them.  I mean,

10   there's names on it.  I mean, again, we'd have to ask

11   him.  So it's missing a lot of pages.  I mean, you have

12   1 of 89, so you've got 4 pages of 289 pages.

13       Q.   Understood.

14       A.   I mean, again, if I knew which one it was that

15   we gave you -- I'd have to look at the whole document to

16   tell you, but it does look like an Excel spreadsheet.  I

17   mean, it looks like something that had -- it has the

18   scoring.  You're looking at released in one year.

19   You've got the gang -- whether you're documented as a

20   gang member.  You've got offense types.  They all look

21   like big four or violent crime.  Yeah.  I mean, I

22   couldn't tell you 100 percent, but it looks like an

23   Excel export from what would be a prolific offender

24   list.

25       Q.   Okay.  Now to go back to where we were, he runs

1    through this Access database, and what does he do after

2    he's done that?

3         A.   So once he gets the scoring and he identifies

4    the top 100, he shares the list with the districts.

5    This is just basic; right?  The districts look at the

6    list.  They determine whether or not the individual

7    they're looking at for their district is actually

8    affecting the crime environment, and then they will flag

9    them in record management.

10         So, basically, they'll get a prolific flag.

11   Simple as that.  And then they'll have discussions

12   weekly with the captains and lieutenants and sergeants

13   and determine, you know, again, what the focus is.  The

14   other thing, too, is they don't have to be a prolific to

15   be a focus.  Anybody committing crime within the space

16   -- about 25 percent of our crime happens from

17   individuals outside of the county.

18         Q.   So you mentioned record management systems.  Is

19   it -- what is record management systems?

20         A.   So it's where we write our reports.  So it's a

21   program that kind of, you know, solidifies the formation

22   of our reports, how our reports are supposed to be

23   formatted in Florida.  There's a standard arrest across

24   the state of Florida.  There's incident reports that we

25   write.  So when a deputy goes to a scene -- and let's

1    say it's domestic -- well, he has to document that

2    domestic.  So he documents it in the record management

3    system.  So everything goes in that central repository

4    for record management for the deputies.

5         Q.    Is it possible to search RMS to identify people

6    who have previously been listed as prolific offenders?

7         A.    Previously?

8         Q.    Yes.

9         A.    So like if we deactivate them or we take them

10   off?  I mean, there shouldn't be.  I mean, people --

11   like by just constant knowledge, you'll know that

12   they're a former prolific, right, because ultimately,

13   you know, individuals that are committing crime

14   repetitively ultimately spike in these deputies' minds

15   and heads; right?  So you'll remember certain names,

16   right, and a lot of our analysts do.  They're like,

17   "Hey, I remember that person when they were a juvenile.

18   And now they're an adult, and they committed another

19   crime," or things of that natural.

20              The goal is once we deactivate the prolific,

21   that that prolific list is gone.  That's why we do this

22   quarterly.  So every 90 days, a new list is ran.  The

23   goal for that is to allow people to fall off if they're

24   not committing crime anymore.  The goal is to keep that

25   list as fresh as possible to ensure that there's some

1   fairness and some, you know, understanding that we're

2   not going to keep a list from, you know, whenever it

3   started until now, right, five, six, seven, eight years

4   down the road.  It doesn't make sense.

5           We do know through research that people age out

6   of crime.  We do have other individuals that the only

7   time they're not committing crime is when they're in

8   jail, you know.  Again, super sad state of affairs.

9       Q.   So if you wanted to identify whether someone

10  has previously been on the list of prolific offenders,

11  could you do that?

12      A.   I mean, if we went back in like the archives

13  and maybe worked with IT to have them identify like what

14  flags were put on an offender and what flags weren't put

15  on an offender, maybe.  I'd have to verify.  I honestly

16  don't know.

17      Q.   How about outside of RMS?

18      A.   What do you mean outside of RMS?

19      Q.   Well, is there any other database that you

20  could use to determine whether someone has previously

21  been listed as a prolific offender?

22      A.   We have an interface that feeds from RMS.

23  It'll tell people -- like it has pictures, and it says,

24  hey, these are our prolific offenders for D1, D2, D3.

25  So there is a user interface for deputies, yes.

1    Q.   What is that called?

2    A.   Central command.

3    Q.   Okay.  And does central command include the

4    list of current prolific offenders?

5    A.   It won't -- it will include the flag.  Does

6    that make sense?  So like let's say your picture is on

7    our central command page; right?  When I click on your

8    global profile -- we have a thing called global profile

9    -- it will pull up all the demographics of you.  So that

10   goes for anybody that's been in our system ever, right,

11   whether you're prolific or not a prolific.  It pulls up

12   anybody that was included in a report ever in the

13   history of that RMS system.

14         So what it will do is if I click on your name,

15   right, if you are, in fact, a prolific, it will say you

16   are a prolific offender, and then it will give you a

17   date of when it was added and things of that nature --

18   or should give you a date.

19   Q.   And if somebody was previously a prolific

20   offender, would it also list that?

21   A.   Not previous.  It should come off.  So, in

22   other words, if you fall of the list, there should be no

23   flag there anymore, unless you're like -- I would say if

24   you're still documented as a gang member.  Again, we go

25   through that every five years as well.

1        As a matter of fact, every year, we check our

2   gang database to make sure like when's the last time

3   this person was active?  Hey, we didn't do an interview.

4   Let's make sure they're not involved in a gang anymore.

5   If they're not involved in a gang, let's push them out.

6        And again, that's just internal policy for me;

7   right?  I don't like things sticking in databases just

8   to stick in databases.  It doesn't make sense.  It

9   doesn't do us any good, and it doesn't do the deputy any

10   good, right, because they do age out.  I mean, we've had

11   young juveniles that start these weird groups, and then

12   all of a sudden now they're 21, 22 years old.  They've

13   got a family, kids, things of that nature, and they do

14   age out.

15        However, we do have people that carry that

16   moniker from the time -- the first time they met law

17   enforcement to now, and they're still active in gang

18   activity, and we still track that.  You know, we have a

19   lot of violent crime here with gangs both from the

20   region and here.  We have a lot of outlaw motorcycle

21   gang issues here, believe it or not, but we still track

22   that.

23        So once you fall off the list, that prolific

24   should be off.  No one should be able to see that

25   visually.  Whether we can see it on the backside, I

1    would have to verify, and we can verify that for you.

2         Q.   Can deputies enter information into the central

3    command database?

4         A.   Yes.  Well, in certain -- in certain ways

5    though.  So I think you'd have to -- we'd have to

6    clarify what that looks like.  So --

7         Q.   Well, let's say there's somebody who's been

8    listed as a prolific offender.  Can a deputy enter

9    information about that individual into the database?

10        A.   Yeah.  During a prolific offender check, yes.

11        Q.   Okay.  How does that work?

12        A.   They -- again, they go to the prolific offender

13   check.  They bring up a button.  It's a kind of document

14   that says, "Hey, I met with so-and-so on this date.

15   They're doing fine.  They're doing great," or, "Hey,

16   they're doing horrible.  We've got 17 reports with them,

17   you know, as associates or being with other people

18   during -- committing crimes.  Parents haven't seen them

19   in days.  They're a current runaway," things of that

20   nature.

21             So it's vice versa, right, and then it goes

22   back to kind of the resource model of, you know, giving

23   people off-ramps and making sure people are still -- you

24   know, hey, how's everything going?  You got everything

25   you need?  That type of mentality.

1    Q.   Okay.  And the deputies could do that also for

2    somebody who's an associate of a prolific offender?

3    A.   Yeah, they could.  I mean, it's possible.  I

4    mean, they could ask them.  But the goal for that is

5    that that prolific is active, you know what I mean?

6    There'd be no reason to do it if the prolific offender

7    was not active.

8         I mean, unless it's a circumstantial contact;

9    right?  I just happen to come in contact with you.  Me

10   and you have a rapport.  I know who you are and like,

11   "Hey, how is everybody doing," you know, so on and so

12   forth.  Those conversations happen at times as well.

13   Q.   Okay.  Other than central command, how do

14   deputies provide information on what they've learned

15   during prolific offender checks?

16   A.   Through -- well, so pretty much the prolific

17   offender checks are central to that; right?  Prior to

18   that, it could have been a field contact report.  It

19   could have been an intel report, like a simple intel

20   report if they made contact with an individual, but not

21   normally prolifics; right?  It's normally individuals

22   that they made contact in the field under suspicious

23   circumstances.

24        So, I mean, I'll give you an example.  A field

25   contact is as simple as this.  I come into contact with

1    you on the side of the road.  It's 2:00 in the morning.

2    We're having a lot of burglaries in the area.  Me and

3    you have a conversation.  I ask you for your name and

4    date of birth or whatever.  You give it to me, and I

5    write it down.  I'm not thinking anything of it.  Maybe

6    I don't have enough information on maybe the burglaries

7    in the area, and we talk.  We have a citizen's

8    encounter.  I document it all, and then I leave.

9           And then two days later, I'm talking to a

10   detective, and I'm like, "Hey, there were burglaries,

11   and here's the suspect description."  "Oh, man.  I

12   just -- I think I just ran into that guy."  They'll do

13   that as a field contact.  So anybody they've come into

14   contact with that they feel there's necessary

15   information that needs to go up to another -- whether an

16   analyst or a detective, they'll make that field contact

17   report.

18          Then there's an intel report; right?  The intel

19   report's a little more in depth in that we know that

20   these individuals are -- there's a lot of crime going on

21   in that area.  We know there's burglaries.  They fit the

22   suspect description.  They're not quite -- you know,

23   again, we don't have the forensic evidence back to

24   determine whether or not they are, but I come into

25   contact with them.  They'll write that intel report.

1    Hey, I know this individual, that he's been in this area

2    four or five times in the same night.  There's

3    burglaries two blocks down.  The description fits, and

4    they'll write those as well and send them up.

5        Q.   What is a tip?

6        A.   So a tip comes from the public; right?  So we

7    have a TipSubmit program we just recreated.  We don't

8    use TipSoft anymore.  Using third-party vendors is kind

9    of dangerous and allows individuals to, you know, be

10   weary of their data being leaked out there sometimes, so

11   we created our own tip program.  The public has access

12   to it.

13           The public can write anonymously.  They can

14   call into the tip line.  The tip line rings to our

15   Real-Time Crime Center, which is 24/7.  And they can

16   provide information on individuals, or it ranges from

17   anywheres like, "Hey, my neighbor has yard waste in the

18   yard," to, "Hey, my neighbor's hedges are too high," to,

19   "Hey, the neighborhood kid is legitimately stealing our

20   bicycles and -- or trying to break into our houses, and

21   we've observed him do other criminal activity."

22           It goes from human trafficking, it goes from,

23   "I know information on a murder," or "I know information

24   on a rape."  It goes significantly higher than that.

25   But it's our public portal to allow us to engage with

1    the community and allow them to not only report crime,

2    but report it anonymously if they don't feel like they

3    want to put their name on it.  And a lot of times just,

4    quite frankly, people don't like to put their name on

5    it.  It could induce a risk for them sometimes.

6         Q.   Is there any way for deputies to submit tips?

7         A.   There was in the past, and then we stopped it

8    because it just wasn't a good process.  Years ago we had

9    a program, which was called TipSoft.  The deputies from

10   the jail and patrol -- that was one of my first jobs

11   when I got here, right, was to kind of review that

12   process and what it looked like.  I didn't understand

13   why deputies were putting tips in because we have report

14   writing mechanisms.

15        So they did put tips in from -- you know,

16   specifically from the jail because sometimes the jail

17   guards, they don't have the same systems inside the pod.

18   So -- and when they're looking over 60 inmates, it's

19   very unsafe for them to stop what they're doing to put

20   in information.

21        Q.   But they would also submit from patrol?

22        A.   Yes, they could submit from patrol.  But we

23   stopped that in I want to say late '17-ish, '18-ish.

24   When they finally built the system, we transferred it

25   over.

1    Q.   And where did you transfer it over to?

2    A.   To our own tip -- I'm sorry.  Later than that.

3    Early 2020 we transferred over to our TipSubmit program,

4    our internal system.  So we have tips, if the data

5    export worked, from the old tip system.  I would have to

6    verify that through IT.

7    Q.   So up until early 2020, deputies could use

8    TipSoft to submit tips --

9    A.   Yes.

10   Q.   -- including when they're on patrol?

11   A.   Yes.  It was called TipSoft initially, and then

12   they called it -- then Motorola changed it.  I want to

13   say it was called TipSubmit.  I know they changed the

14   name.

15   Q.   And so currently, deputies can submit tips

16   using a new internal system?

17   A.   No, no, no.  We don't allow that anymore.  They

18   do the intel report inside the FIR module, the field

19   interview -- the field contact module.

20   Q.   Okay.  So the deputies could submit tips up

21   until early 2020?

22   A.   I belive so.  I mean, I can get you the exact

23   date.  This was a work in progress from '16 to -- up

24   until now, and it just -- it took a lot of time to kind

25   of make sure the vendor was going to be able to give us

1    our data back, make sure we were going to be able to

2    transfer stuff, have them build the system.  So there's

3    a lot of work that goes into the overall process.

4         Q.   So now today, instead of submitting a tip --

5         A.   They would do an intel report, what's called an

6    IR.

7         Q.   Just keep in mind, we should try not to talk

8    over each other.

9              MR. POULTON:  It's a rule I usually talk about

10        at the start.  It becomes conversational.

11   BY MR. JOHNSON:

12        Q.   I figured you've done this before.  Okay.  So

13   now we use intel reports; is that correct?

14        A.   Yes.

15        Q.   How long are intel reports retained by the

16   agency?

17        A.   Five years at a maximum.

18        Q.   And how long are tips retained?

19        A.   Tips don't have a retention unless there's some

20   type of analysis or criminal intelligence attached to

21   it.

22        Q.   What do you mean by that?

23        A.   So tips are not --

24        Q.   To be clear, when you say they don't have a

25   retention, what do you mean by that?

1    A.   So if they're not criminal intelligence,

2    there's no governing body to delete these at all.

3    Q.   Okay.  So they're just retained indefinitely?

4    A.   Yes.

5    Q.   So they might be deleted if they have some sort

6    of intelligence, but otherwise, they would be retained?

7    A.   Yes.

8    Q.   How about the notes that are made in contact

9    reports?  What is the retention period for those -- or

10   excuse me -- not contact reports, central command?

11   A.   Are you talking about the -- what reports are

12   you talking about in central command?

13   Q.   So if a deputy makes notes in central command,

14   for instance, about prolific offender checks, how long

15   would those notes be retained?

16   A.   If -- again, if -- it's the same -- it's the

17   same process.  If they're related to criminal

18   intelligence, and there's criminal intelligence there

19   and it's not just a simple check -- in other words, like

20   I went to person A's house, and they're doing fine.  If

21   there's criminal intelligence though, we would have to

22   purge them.  So, in other words, if there's stuff

23   implicating them in crimes or if there's stuff

24   implicating them as a gang member, and that's no longer

25   true, we can -- we would delete that or we would purge

1   it, part of our purge mechanism.

2       Q.   But if it's not implicating them in a crime, it

3   could be kept indefinitely?

4       A.   We could keep it indefinitely, yes.

5       Q.   Okay.  Let's turn to Exhibit A just briefly.

6   So let's turn to page 19.  And under, it says

7   performance expectations.  Do you see that?

8       A.   Yes.

9       Q.   The first bullet point says, "There is a zero

10  tolerance arrest policy for crimes committed by prolific

11  offenders."  Is there any document that explains what

12  that policy consists of?

13      A.   Not to my knowledge.

14      Q.   Okay.  If we go down one, two, three, four --

15  six -- the sixth bullet point, it says, "To conduct a

16  face-to-face prolific offender check at least once

17  quarterly with each active prolific offender."  How

18  do -- how does the Pasco County Sheriff's Office keep

19  track of whether that requirement is being satisfied?

20      A.   So are you asking -- so I would -- honestly,

21  that's a patrol function.  So, I mean, I really couldn't

22  speak to it.  It says quarterly in the manual.  Again, I

23  couldn't speak to that.  That's more for a patrol

24  question as far as like the frequency.  Again, this is a

25  guide.

1           MR. POULTON:  So those sorts of mechanical

2       questions I think are probably better for Major

3       Sanborn this afternoon.

4           MR. JOHNSON:  That's fine.

5   BY MR. JOHNSON:

6       Q.    The next bullet point where it says, "To learn

7   as much as possible about prolific offenders," and then

8   skipping a little bit, it says, "To document accordingly

9   the information you learned," how would information like

10  that be documented?  Is that in central command?

11      A.    Yeah.  It would either be through central

12  command, or it would be through, again, a field contact

13  report.  You know, at the time -- you know, again, we

14  talked about the tips.  At the time, the TipSoft program

15  was highly used for stuff like that.  The intel reports

16  are used for things like that as well, you know, just to

17  identify.

18          And a lot of times, it could be word of mouth

19  to the analyst; right?  This is what we learned, things

20  of that nature like, you know, we had a conversation.

21  That conversation led to X, Y, and Z.  This is what

22  they're telling me is going on in the crime environment,

23  and then you go on from there.

24          So this is, again, you know, a basic interview

25  of, honestly, what we would do with anybody that would

1   be committing crime.  These interviews, they're kind of

2   standard.  If we believe there's a suspicion of you

3   committing a crime, we should be conducting thorough

4   interviews as law enforcement to determine whether or

5   not this is true or whether or not it's not true.  It's

6   just as important to not -- in vetting, it's just as

7   important to prove something is not true than it is

8   true.

9       Q.   Okay.  Now the final bullet point, "To

10  participate in actionable intelligence meetings," could

11  you tell us, what are actionable intelligence meetings?

12      A.   So we have one every week.  It's an actionable

13  intelligence meeting to identify what's currently going

14  on in that district.  Usually, what happens is -- I

15  don't know if you're familiar with CompStat.  There's a

16  CompStat element to it like some statistics; right?

17  These are how many burglaries we have.  These are how

18  many robberies we have.  These are how many violent

19  crimes we've had, and things of that nature.

20           And then it goes into the essence of where

21  we're at on those crimes.  It identifies, you know,

22  individual suspects if we have them.  They'll also

23  identify if they have no suspects.  Hey, listen.  We

24  have this series of burglaries in this specific area.

25  We don't have any suspects right now.  There are

1    fingerprints that have been, you know, submitted to the

2    crime lab or submitted to our forensics team, and we're

3    going from there.

4            So they happen weekly.  It happens every

5    Wednesday roughly between -- I think each district is

6    now doing them virtually via Teams.  And we invite other

7    partners outside of our agencies, so other surrounding

8    agencies as far as police departments and, you know,

9    Department of Juvenile Justice, probation and parole,

10   things of that nature.  Our school resource officers are

11   involved in these meetings as well, and it's just kind

12   of a way to ensure that everybody understands what's

13   going on in that specific district for the week.

14       Q.   Are there agendas for those meetings?

15       A.   No.  I mean, there's AIM slides.  We don't have

16   an agenda.  It's more of like the analysts put together

17   a presentation, and they present that as a presentation.

18       Q.   And the presentation is in the form of slides?

19       A.   Yes, PowerPoints.  It's just easy visual to

20   allow it to happen.

21       Q.   And would those slides include information on

22   prolific offenders?

23       A.   They would.

24       Q.   What type of information on prolific offenders?

25       A.   Recent activity, kind of their -- I would say

1    their demographics; right?  You know, white male, white

2    female, you know, height, things of nature, just basic

3    demographics, what their crimes are currently, and

4    whether or not they're active, you know, talking about

5    their current activity in the crime environment, so kind

6    of like a baseball card.

7        Q.   Would it include information that was gathered

8    during prolific offender checks?

9        A.   It could.  Not always.  It just depends on

10   who's in the room I think.  Like if the deputy that did

11   it is in there, then I would say, yeah, he'd probably

12   chime in.  If the analyst is not necessarily aware of

13   what happened on the last check, then probably not.

14       Q.   Okay.  But if people in the room have the

15   information, they might share what they learned during a

16   prolific offender check?

17       A.   Sure, verbally, yes.

18       Q.   And that information -- would that information

19   be included on the AIM slides?

20       A.   It could be.  Again, each analyst is different

21   on what they present and what they -- you know, the

22   amount of information they present.  It can be verbally

23   broadcasted.  And again, usually, you know, like the way

24   the PowerPoint is designed -- the way it's designed is

25   to trigger talking points; right?

1          Going through a meeting with law enforcement

2     officers, we can't have dissertation-type style.  I

3     can't take this to a weekly briefing.  They would

4     probably laugh me out of the room.  But they're very

5     short, concise, and there's a lot of verbal

6     communication that goes on.

7          Q.   And what's the difference between -- there's a

8     weekly AIM meeting.  Is there also a quarterly AIM

9     meeting?

10         A.   We stopped those.  There used to be.  It used

11    to be a wrap-up -- a quarterly AIM used to be a wrap-up

12    for the entire quarter, where we were at.  It also

13    focused a lot on regional crime outside of the county.

14         Q.   When did you stop doing the quarterly AIMs?

15         A.   '18-ish, mid-'18-ish.

16         Q.   So prior to 2018, was the prolific offender

17    list for the quarter announced at the quarterly AIM?

18         A.   No.  Not in that manner, no.  Absolutely not.

19         Q.   So I just wanted to draw your attention to

20    pages 34 to 35.

21         A.   Okay.

22         Q.   And again, we're still in Exhibit A, just for

23    the record.  So at the top of page 35 where it's

24    discussing quarterly meetings, it says, "Also the

25    revised prolific offender lists and STAR box locations

1    are revealed."

2         A.   STAR box, yes.  We showed where STAR boxes were

3    at, but we didn't use those meetings for that purpose.

4         Q.   When you say that purpose, you mean you didn't

5    use those meetings to reveal --

6         A.   We didn't use them specifically to highlight

7    prolific offenders or STAR boxes for that matter.  These

8    are already known things for the districts, so rehashing

9    those things were kind of like going over the same

10   information, which kind of defeats the purpose of having

11   another meeting.

12        Like I said, when I got here, they were super

13   long meetings.  I mean, these things would go three

14   hours long.  And this was basically the districts

15   talking about, you know, everything that was going on in

16   the district.  And it wasn't a bad thing, but some of it

17   just wasn't relevant to the rest of the organization as

18   far as what they were specifically doing in each

19   district, except for the districts.  You know, there was

20   other bureaus that we had, and it just drew out a lot,

21   so we kind of shortened the process.

22        When you talk about the prolific list, I mean,

23   prolifics may have been on that slide deck to say, hey,

24   this person's still prolific, and here are their

25   associates.  But as far as this being the main focus for

1    that, it wasn't the main focus.  I mean, these things

2    adapt.  Again, that's why we call this a guide.  These

3    things adapt in flight.

4         There's a reason there's a review for ILP;

5    right?  If we no longer do it when we're looking at

6    this, we can't advise -- we can't revise this daily.

7    It's just not practical for what we do.  I mean, we're a

8    very busy law enforcement agency.  It's not practical.

9         So, you know, as we go into different things

10   and we make some adjustments, you know, later on when we

11   do our assessment, then we'll make those adjustments

12   later on to say, hey, we no longer do this.  We'll take

13   this out.  We don't even do monthly meetings anymore.

14   The monthly meetings are biweekly now.  So, you know,

15   some things have changed, and they will continue to be

16   adjusted as we move on, and things will continue to

17   change.

18   Q.   So how is the prolific offender list

19   communicated across the sheriff's office?

20   A.   So when you say communicated across the

21   sheriff's office, it kind of confuses me because not --

22   like finance doesn't really care about our prolific

23   offender list.

24   Q.   Okay.  How is it communicated to people who

25   need to know the information?

1    A.    So again, like central command in the most

2  simplistic of form; right?  We can't -- we're not just

3  giving everybody a list like that and going, "Hey, look

4  at your list and take a look at it."  You know, we kind

5  of simplify it a little bit more like, "Hey, here is the

6  person you should be focused on based after the

7  process."

8         So the process is ran from ILP and goes down to

9  the analysts.  The analysts make the final selection

10 with consultation with the district commanders.  And

11 once that is solidified, they will put the name alerts

12 on it.  And then through the name alerts, you will be

13 able to see that on central command or within our record

14 management system to ensure that, you know, these

15 individuals are actually active prolific offenders.

16   Q.    When you say that the analyst makes the final

17 selection, is that Steve Heibert?

18   A.    No.  So Steve produces the list.  The district

19 analysts review the list and determine, again, if that

20 individual is actually active in the criminal

21 environment, but they also consult with our STAR teams.

22 They also consult with our commanders, our captains,

23 lieutenants, sergeants in the districts to determine

24 whether or not they've seen these individuals in the

25 last -- you know, "Hey, have you heard anything?  Are

1     they still active?"

2             And if they're not, you know -- so what happens

3     if we have someone on the prolific list and they go to

4     jail?  Should we focus on that person that goes to jail?

5     No.  So you've got to let people know that that person's

6     incarcerated.  If that person dies, should we focus on

7     someone that's dead?  The answer is no, like you don't

8     do that.

9             So, again, that's why the analysts go through

10    there and go, hey, well, this person moved because, you

11    know, believe it or not, we still have some prolific

12    offenders that have very good rapport with our deputies,

13    and they go, "Hey, I'm moving to Indiana," or South

14    Carolina or something like that.

15            So when we say that the final review happens,

16    Steve does the list, reviews happen by the analysts in

17    consultation with the district, and then they determine

18    who goes -- who becomes a focus.

19    Q.    When you say the analysts, you mean the

20    district analysts?

21    A.    The district analysts, yes, sir.  Sorry.

22    Q.    Now the individuals who are subjected to the

23    prolific offender lists, are those individuals the --

24    are all the individuals who are identified on Steve's

25    list subjected to prolific offender checks quarterly?

1        A.   No.

2        Q.   So if an analyst takes someone off a list, they

3   are not to be subjected to prolific offender checks?

4        A.   They should not be, no.

5             MR. POULTON:  You want to take a quick break?

6             THE WITNESS:  No, I'm good.

7   BY MR. JOHNSON:

8        Q.   So the district analysts can take people off

9   the list?

10        A.   Yes.  They can choose not to focus on them,

11   yes.

12        Q.   Can they add people to the list?

13        A.   If they meet the criteria for the prolific

14   offender list.

15        Q.   And the criteria are?

16        A.   The three arrests within -- two arrests within

17   three years.  I'm getting a little dyslexic here.  Yeah,

18   the two arrests within the three years.  But also, they

19   have to be affecting the crime environment.  And I

20   believe, like I said earlier, the -- you don't have to

21   be a prolific to be a focus.  We have a lot of people

22   that commit crime outside of our county.  We have a lot

23   of individuals that are moving into Pasco County that we

24   have no idea.  I mean, we're one of the fastest growing

25   counties in the country.  So, you know, we're just going

1    to run into individuals that we just don't know that are

2    committing crime.  That doesn't alleviate the attention

3    we would give if you were committing a crime in the

4    county.

5         Q.   Now if an analyst decides to add somebody to

6    the list, do they have to get approval from somebody?

7         A.   They're usually consulting with their analyst

8    supervisor.  So the analyst supervisor -- again, so I'm

9    like three bosses removed from the analysts.  So the

10   analyst supervisor is consulted, and some of our

11   strategic analysts are often consulted, too, to just

12   make sure that we're keeping a balance.  So, you know,

13   they'll consult Steve or Ross Brummett, one of our other

14   strategic analysts.  Although he doesn't do the list, he

15   is trained on how to do the list, and he understands it

16   very well.  He also understands how to pull data very

17   well as well.

18        Q.   Who is the analyst supervisor?

19        A.   Shelly Gardner.

20        Q.   Does Shelly Gardner make the final approval for

21   adding somebody to the prolific offender list?

22        A.   No.  We'll trust our analyst.  If they believe

23   that individual meets criteria, and that individual is

24   committing crime in the current crime environment, then

25   we will trust our analyst to make that decision.

1    Q.    So the final decision is made by the analyst?

2    A.    Yes.

3    Q.    But they do consult with Shelly Gardner?

4    A.    Yeah.  They'll either consult with Shelly, or

5    they'll consult with our strategics just to double check

6    to make sure that everything's in the right place.

7    Q.    Got it.  You referenced affecting the criminal

8    environment.  What does that mean?

9    A.    I would say they're active in the crime

10   environment.  They're currently out there committing

11   crimes or have suspicion of committing crimes.

12   Q.    And you mentioned being associated with people

13   who commit crimes.

14   A.    Yes.

15   Q.    So someone could affect the environment if they

16   are associated with people who commit crimes?

17   A.    There are studies that talk about the

18   association during crime -- you know, whether --

19   depending on what the intel says.  A lot of times when

20   we're talking about association, we've seen these

21   individuals actually commit crimes together.  So, you

22   know, either they've been -- you know, stopped in the

23   middle of the night through a field interview report and

24   they've been together, or they're associates in a gang

25   when the gang ties come up.

1          So we have seen the entire group of

2    individuals, like small networks, actually committing

3    crime together, so looking at kind of the totality of

4    the circumstances.

5          Q.   So you would consider whether someone is

6    suspected of committing a crime, whether they committed

7    crimes in the past, and also whether they associate with

8    people committing crimes?

9          A.   Yes.

10          Q.   Is there anything else you would consider?

11          A.   Not right offhand.

12          Q.   Okay.  Why don't we go -- again, Exhibit A --

13    to page 26.  This mentions the District Top 5.

14          A.   Yes.

15          Q.   So what are the District Top 5?

16          A.   So, basically, looking at the totality of the

17    criminal network, these are what we believe the criminal

18    networks committing the crime -- a network can be two or

19    more people that we believe are committing crimes

20    throughout the county.  So through, you know, social

21    networking analysis and identifying individuals that are

22    actually committing crimes together, that would put them

23    in their District Top 5.

24          We no longer do this.  It's more for -- I don't

25    think we normally call it that anymore.  The District

1    Top 5 is gone.  The District Top 5 basically is, you

2    know, identified now as anybody that is in a network

3    that is committing crime together that also has the same

4    -- almost the same kind of pattern of crime as the

5    person we're looking at.

6            So if we have a prolific offender that has

7    people that are committing crimes with that individual,

8    they just haven't made it to the prolific offender list,

9    those individuals would potentially be a focus.  But the

10   top five doesn't exist anymore.  But this was a way to

11   identify networks; right?  It kind of deterred,

12   disrupted, and, you know, ultimately kind of dismantled

13   these criminal networks that were committing crimes

14   together.

15           We had large groups of juvenile offenders that

16   were comitting armed burglaries together coming from not

17   only outside of the county, but internally.  They would

18   go out, they would probably do a couple sprees a night,

19   and they were -- ended up arrested for it.  There was,

20   you know, multiple arrests throughout our system with

21   these individuals committing crime together, and that

22   was the District Top 5.

23           We'd also have gang members that were involved

24   in, you know, gang activity and violent crime that were

25   put into the District Top 5 as well.  So it was

1    basically focused on, you know, the primary suspect and

2    individuals in that network.

3         Q.   So when you say you no longer do this, when did

4    you stop doing this?

5         A.   We just -- we changed the focus.  So we had a

6    lot of training in social networking analysis looking

7    at, you know, criminal groups, and so we don't call it

8    the District Top 5.  We identify -- we basically just

9    say if the individual has a network, it's a criminal

10   network, and that's the way we're going to go after it.

11   And then everybody in the organization has either

12   committed a crime or something similar to that crime

13   they're currently committing.

14         So let's say we're looking at an auto burglary

15   ring, or we're looking at a narcotics ring -- a narcotic

16   network.  Most of the people in that network are

17   committing narcotics crime as well.  The other people

18   doing auto burglary are committing auto burglaries as

19   well.  So it's not called the District Top 5.  We just

20   call it criminal networks.

21         Q.   And when did you make that change?

22         A.   Probably late '19.

23         Q.   Okay.  So up until late 2019, you did have a

24   District Top 5?

25         A.   Yes.  I'd have to go back and get the exact

1    dates, but they did have a District Top 5 until we came

2    sometime in -- I want to say, again, somewhere in '19

3    that we changed that model because we also changed the

4    briefing model on top of that.

5         Q.   Can you guys supplement by just providing us

6    with a more exact date of when that happened?

7         A.   Yes.

8              MR. POULTON:  Can we take a five-minute break?

9              MR. JOHNSON:  Yes.

10             (Whereupon, a short recess was taken.)

11   BY MR. JOHNSON:

12        Q.   So I just want to circle back a little bit.  So

13   we have Exhibit A is the 2018 manual.  Exhibit B is the

14   2016 manual.  Is there any manual prior to 2016?

15        A.   Not that I'm aware of.  I think we gave some

16   documents over from Captain Ross that may add some like

17   internal revision stuff, but I'm not sure, to tell you

18   the truth.

19        Q.   So you don't know if there was a manual before

20   2016?

21        A.   I don't.

22        Q.   Okay.  Do you know when Pasco County started

23   creating prolific offender lists?

24        A.   I don't know that either.  I could probably get

25   you a date or a ballpark, but I don't know exactly.

1     Q.   Who would you ask to get that information?

2     A.   I probably would have to go through Steve

3  Heibert, to tell you the truth, get a good gauge of when

4  he believes it started.

5     Q.   So he's been here longer than you have?

6     A.   Oh, yes.

7     Q.   Got it.  Okay.  One thing I wanted to ask, is

8  the manual available on SharePoint?

9     A.   It's online.  It's on our intranet page.

10    Q.   Is this, Exhibit A, the version that's

11  currently available on the intranet page?

12    A.   I believe so.  Like I said, I've got to double

13  check to make sure we didn't authorize the other manual

14  and it wasn't posted, but the other manual is

15  significantly shorter.

16    Q.   So whichever version is currently authorized

17  would be on the intranet page?

18    A.   Yes.

19         MR. POULTON:  Are you saying inter or intra?

20         MR. JOHNSON:   Intra.

21    A.   Yeah, intranet.  So, yes, whatever

22  currently-authorized manual is on there would be on the

23  intranet page, yes.

24  BY MR. JOHNSON:

25    Q.   When you started in 2016, was the manual

1    available on the intranet page at that time?

2         A.   I would assume so.  I think we were just -- I

3    think we were still kind of ironing out the -- and I've

4    got to double check with Justin, but I think we were

5    just ironing out central command.  So I would assume it

6    was on there.  But, again, we went through some of the

7    revisions -- like this manual here is more familiar to

8    me than the other manual that you have.  So A is more

9    familiar to me than B.

10        Q.   No, I understand that.  I mostly want to

11   understand the mechanics of it.

12        A.   I'd have to get the exact date.  But when I

13   first started here, like I said, I was still the

14   manager.  I went -- I came immediately and went to a

15   training, and once I got to the training, I was

16   basically getting -- so it was kind of unique because I

17   was going to go down to our Tampa Bay Regional

18   Intelligence Center as a fusion -- I was going to run

19   the fusion center for them.

20             So I didn't get reassigned back to -- like I

21   was focused more on fusion-center-type information.

22   Captain Ross was focused more internal, the ILP, if that

23   makes sense.  And then I circled back around in probably

24   late '17, and then took over the unit, and then kind of

25   went from there.  This manual was already engaged --

1    almost like one of the manuals was already semi-engaged

2    like to be rewritten, and Captain Ross finished that

3    rewrite or that -- whatever he's rewriting it from.

4    Again, you'd probably have to ask him, to tell you the

5    truth.  He'd have way more knowledge than myself.  And

6    then that's when we went to this more updated version of

7    it.

8            MR. POULTON:  When you said fusion center, I

9      had this vision of you working with plutonium.

10          THE WITNESS:  I did that in my past life.

11   BY MR. JOHNSON:

12    Q.  So if I wanted to know more about the history

13   of the versions of the manual, I would ask Captain Ross?

14    A.  Captain Ross would have a lot more knowledge

15   than I do on the history of the manuals.

16          MR. POULTON:  Prior to '16?

17          THE WITNESS:  Yes.  And even during '16, to

18      tell you the truth, because, like I said, he was

19      still on the unit until late '17.

20   BY MR. JOHNSON:

21    Q.  Understood.  You mentioned the central command

22   and also the -- you sort of equated central command with

23   the intranet?  Are those the same?

24    A.  Yeah.  Central command is part of that intranet

25   page that we have.

1      Q.   So would a deputy be able to pull the manual

2  off of central command?

3      A.   Yes.

4      Q.   And you said that you were ironing out central

5  command around 2016?

6      A.   Yeah.  Captain Ross helped design the central

7  command like, basically, user interface, and there were

8  still -- again, some things were still changing through

9  the process.  It was visible there.  We had it, but, I

10  mean, things have changed over the course of the last

11  five years or so.

12      Q.   Okay.  So that's maybe also a question I should

13  ask Captain Ross.

14      A.   Yeah.  He honestly -- again, like I said, he

15  has a lot of knowledge in our record management system,

16  a ton of knowledge on -- you know, again, early 2016.

17  He's been at the agency a lot longer than I have.

18      Q.   Okay.  That's helpful.  Thank you.  So we were

19  talking before the break about the top five list, and

20  you mentioned social network analysis.  Is social

21  network analysis something that's done by the analysts?

22      A.   It can be, yes, and primarily it is.  It's not

23  done by deputies.

24      Q.   What tools do they use for that?

25      A.   So there's edge list that comes in the form of

1    Excel, like an Excel spreadsheet.  And then there's a

2    software called Aura, which helps visualize it.  So, in

3    other words, you create your edge list, and then you

4    have it visualized, and it will visualize a link

5    analysis.  I don't know if you're familiar with like i2

6    Analyst Notebook.  It's similar to that.

7        Q.   So what sort of data goes into that analysis?

8        A.   So the data would be any -- they would read the

9    reports, see any kind of association between

10   individuals.  They would take intelligence.  They would

11   look at open-source intelligence to link individuals

12   together.

13       Q.   What sort of open-source intelligence?

14       A.   So anything on the internet.

15       Q.   Would they look at Facebook?

16       A.   Yeah, if they have access to it.  So Facebook,

17   Instagram, any kind of social media platform that they

18   would have access to.  If they don't have access to it,

19   there's nothing to -- there's nothing for us to get

20   into, like locked Facebook accounts and things of that

21   nature.  So if you leave your Facebook account unlocked,

22   anybody can go into your Facebook account.  But anything

23   else on the internet, open-sourced court records,

24   open-sourced documents that are out there, there's tons

25   of data out there on the open-source environment.

1      Q.   Would they use information that was gathered

2   during prolific offender checks and that was put into

3   central command?

4      A.   They could, yes.  I mean, anything that a

5   deputy writes to link individuals together.  So the edge

6   lists are kind of unique; right?  The goal for that is

7   to ensure that you're finding the association between

8   subject A or subject B.

9      Q.   And would they use information that was

10   submitted by a deputy during -- in the form of a tip or

11   an intel report?

12      A.   Yes, they could.  Any and all data available to

13   us as far as from our record management system and

14   open-sourced, yes, we would use that after it was

15   vetted.

16      Q.   What sort of written product comes out of that

17   analysis?

18      A.   So it could be -- I don't know if you're

19   familiar with a link analysis chart.  So it would be a

20   link analysis chart, and that's what Aura does.  Aura

21   visualizes the edge list.  So in that edge list, if I

22   create a link between you and myself, it will create

23   that.

24           Now there's also -- this goes deeper into kind

25   of like analytics, but it will also calculate the

1    strength.  So, in other words, if I'm listed in a report

2    more times with you than I am with him, it will tell you

3    that my communication strength between me and you is

4    higher than his.  Does that make sense?  So it's

5    identifying the number of times that me and you have

6    contact within a period of time that I identified within

7    my edge list.

8           This was done by the Naval Postgraduate School.

9    The Naval Postgraduate School has a significant program

10   looking at social networking analysis.  We partnered

11   with them -- I want to say -- yeah, so that was my first

12   training when I came in 2016.  September 3, 2016, we

13   partnered with the Naval Postgraduate School.  We did

14   projects of looking at kind of large-scale criminal

15   networks, narcotics trafficking organizations, human

16   trafficking organizations, things of that nature, and we

17   used a social networking analysis to find individuals

18   that were part of criminal networks.

19      Q.   And how is the product of that analysis

20   communicated to deputies?

21      A.   So very few -- so it would be more of the

22   analyst would simplify that, right, because sometimes

23   the charts get busy.  So it could be communicated to a

24   deputy like, "Hey, here's the individual that's

25   committing crime, and here's five of his associates or

1    network that are committing crime as well, and these are

2    the reports.  These are basically how we know this," and

3    they would give that brief.

4         Q.   Okay.

5         A.   So it's very simplistic.

6         Q.   Would they put that into writing?

7         A.   It would be in the AIM brief.

8         Q.   Is that different from the AIM slides?

9         A.   Same thing, yeah.

10        Q.   So the analysis might be put into the AIM

11   slide?

12        A.   Yes.  Not the full analysis, but like an

13   executive summary.

14        Q.   The top five, are there only five networks that

15   are included in the top five?  Why is it -- what makes

16   it five?

17        A.   They -- they select this -- again, this was

18   done before I got there.  This was, again, like the top

19   -- instead of trying to -- you know, we could have

20   easily said it's the top 45.  The question is, can you

21   focus on 45 people at one time?  And the answer is

22   probably not, right, effectively.

23        Q.   So are the top five individuals?

24        A.   Yeah.  There's five individuals that are

25   attached to that one specific -- and there is -- there

1   is studies out there talking about co-offender models.

2   I don't know if you guys are familiar with any of that,

3   but there's tons of academic research about

4   co-offending.  So, basically, it breaks down to this,

5   right, if me and you co-offend together, there's

6   probably a higher probability that me and you will

7   commit crime in other places.  Not guaranteed, but

8   there's a higher probability that we will commit crime

9   together in the future.

10      Q.   So there are five individuals -- or excuse me.

11  There were, at the time that this was active, five

12  individuals who were listed as the top five?

13      A.   Yeah, for each district.  Like -- so there was

14  like -- so, in other words, there was a primary target

15  of potentially prolific, and then there were his top

16  five associates, in other words, the individuals that he

17  either committed crime with or associated the most

18  within the district.

19      Q.   Okay.  So for each district, there was a

20  primary target plus his five associates?

21      A.   Yes.  Primary focus or prolific, yeah.

22      Q.   And the top five, there were five individuals

23  in the top five for each district?

24      A.   Yes.

25      Q.   Okay.

1      A.   Wait.  Say that again.  I'm sorry.

2      Q.   So when this was active, each district had a

3  list of the five -- top five for that district?

4      A.   So let's say I have subject A, and subject A

5  has five associates that primarily commit crime or have

6  been associated with crime.  That specific target or

7  person A would have five associates that we would do,

8  and there could be multiple associates with other top

9  five offenders with them.  Does that make sense?

10      Q.   Sort of.

11      A.   I just want to make sure we're clear because I

12  don't want you to think that there's only like -- okay.

13  So you're a prolific.  You're a prolific, or you're a

14  focus.  You have five associates that is with him, and

15  you have five associates with you that we've identified

16  that are committing crime with the both of you.  You

17  each would have those top five offenders that we would

18  identify.

19      Q.   Okay.  So for prolific offenders who are a

20  focus to the district, you would also then identify the

21  five associates?

22      A.   Yeah.  If we believe they were also affecting

23  the crime environment, yes.

24      Q.   Okay.  And so would you do that analysis for

25  each prolific offender?

1    A.   Yes.  We would see if they had any associates

2    that were of concern for us.

3    Q.   So the sheriff's office would conduct a social

4    network analysis for each prolific offender?

5    A.   If we believe through intelligence that they

6    had other individuals that were committing crime with

7    them, yes.  It wasn't automatic for like every -- it

8    wasn't a standard thing for like every prolific to have

9    a top five; right?

10        There are -- you know, the way I describe this

11   is, you know, your associate is not necessarily your

12   mother; right?  Because if I do a social networking

13   analysis, and I put your mom as a -- she's in your

14   network ultimately; right?  So it would be brothers,

15   sisters, aunts, uncles, things of that nature.

16        If your mom's not committing crime, your mom's

17   not part of that network.  Do you see what I'm saying?

18   But if you and your mom are committing crime together,

19   then you and your mother are that network.  That's the

20   easiest way for me to explain it to individuals that are

21   just not doing the analysis and understanding the

22   analysis.

23        So if you're a prolific, and I don't feel like

24   you have any other individuals committing crime with

25   you, and you're the kind of lone offender, then we would

1    not associate a top five with you.  We're not going to

2    put your mom, grandma, uncles, aunts, and, you know,

3    your dentist as your top five.

4        Q.    Understood.  Would the prolific offenders'

5    mothers be identified in central command?

6        A.    I would say if they made contact with the mom,

7    possibly.  If they went and knocked on the door, and the

8    mom answered the door, the conversation would be

9    documented that -- or should be documented that they had

10   a conversation with the mom, right, like, "Hey, we know

11   your son's committing crime," or, "Your daughter's

12   committing crime."  And, "Hey, listen.  We really want

13   him to stop."

14          Again, I can't really give you a verbatim what

15   the conversation looks like.  But, I mean, listen, I've

16   done -- I've been on prolific offender checks, and they

17   usually know something about that.  Like, "Hey, mom.  Do

18   you know he is implicated in these crimes, and we've

19   arrested him six or seven times?  What are we going to

20   do to stop this?"  And sometimes they go really well,

21   and sometimes the parents are just not happy; right?  So

22   again, it just depends on the totality of the

23   circumstances.  You would have to read the remarks.

24       Q.    And that would be in the remarks in the central

25   command?

1      A.   Yes, sir.

2      Q.   The top five associates for a prolific

3   offender, would that be something that a deputy could

4   identify using central command?

5      A.   Yes.  At the time, yes.  And all that is an

6   alert, just like the prolifics.

7      Q.   I see.  And the alert would be on central

8   command?

9      A.   Yes.

10     Q.   Okay.  If I wanted to know if someone was

11   previously listed as a top five, or if you wanted to

12   know if someone was previously listed as top five, would

13   you be able to figure that out?

14     A.   I would have to go back to the slides.  If we

15   didn't purge them already, we would have to go back to

16   the slides.  And then if we took the name alert off, I

17   would have to determine with IT if that name alert

18   constantly stays in the memory somewhere.  I'm not

19   100 percent sure.  I couldn't tell you that.

20     Q.   When you say the slides, you mean the AIM

21   slides?

22     A.   Yes.

23     Q.   Are the AIM slides kept in a database?

24     A.   They're kept in a shared folder -- a secure

25   shared folder that only -- ILP only has access to.

1     Q.   Do you know how far back that folder goes?

2     A.   Right now, it goes back to 2016 because of all

3  criminal intelligence being purged for the five-year

4  mark.  There may be some straggling documents due to

5  like holds and stuff like that.  So honestly, 2016

6  should already be purged, but we've held it for some of

7  the legal litigation going on.

8     Q.   Are you familiar with the type of document

9  called a pinwheel?  No?  Okay.  Are you familiar with a

10  sociogram?

11     A.   Are you talking about like the grand scheme of

12  sociogram, like where we're putting --

13     Q.   Yeah, a type of document that's produced in an

14  analysis.

15     A.   Are you talking about a link analysis?  I'm not

16  sure what you're talking about, a sociogram.  So we

17  don't -- we don't call it that terminology if that's

18  what we call it.

19     Q.   So the terminology you would use is a link

20  analysis?

21     A.   Depending on what you're talking about.

22     Q.   The product of a social network analysis.

23     A.   Yes, so it would be a link analysis.

24     Q.   Are those retained?  Are the link analyses

25  retained anywhere in the record system?

1     A.    Not in the record management system.  If we had

2  it, it would be in the ILP product drive.  And that

3  would be dependent on -- and a lot of that stuff is

4  criminal intelligence, so it's subject to purge after

5  the five-year mark.

6     Q.    What is the ILP product drive?

7     A.    It's all of our finished intelligence.

8     Q.    Is that part of the intranet?

9     A.    No.  It's part of our -- again, it's an

10  internal drive that we keep separate based on 28 CFR

11  Part 23.  All finished intelligence is kept separate

12  from that database, and it allows us to go through and

13  be able to -- they're all serialized, and it allows us

14  to go through once the -- again, like I said, we do an

15  internal audit every year.  Once we do that internal

16  audit, if it meets the five-year mark, we review.  If it

17  meets the standards of retention as far as it's still

18  active criminal intelligence, we can retain it.  If it's

19  not active criminal intelligence, we have to purge it.

20     Q.    Are those documents organized by name of the

21  individual who's at the center of the network?

22     A.    It can be.  It depends what the network called

23  it.  If it's like a drug trafficking organization, we

24  may name it something else other than the actual name.

25  It may be something related to like the actual case.

1    And again, usually, those are active criminal cases that

2    we're looking into.

3        Q.   But if -- say -- you mentioned earlier that

4    they would do a link analysis sometimes on prolific

5    offenders.  How would those be flagged in the database

6    or saved in the database?

7        A.   It could be in the form of a product just like

8    you're seeing right there where you see -- you know,

9    again, if you open that up and you see the associates,

10   it could be as simple as that.

11       Q.   Okay.  And would -- the link analysis that was

12   done on that prolific offender, would that be saved in

13   the ILP product drive?

14       A.   If they did one in that form, yes.  But, I

15   mean, again, it could be as simple as that, or it could

16   be a link analysis, you know, to -- there's multiple

17   ways to create a network.  It doesn't always have to be

18   a link analysis.  The link analysis just makes it easier

19   for analysts to understand.

20            And even in link analysis, when you use i2

21   Analyst Notebook, right, it's basically drag and drop.

22   It's manual.  When I use an edge list, the edge list

23   actually does the work for us when we import it into

24   Aura.  And Aura has an algorithm built in that says,

25   hey, we're seeing a significant connection between me

1    and you, and then it produces this documentation, but it

2    does it in like color coding.  So my arrow and your

3    arrow would be purple because we communicate a lot, and

4    we can identify the times and the amount of time we

5    communicate.

6         Maybe myself and him, ours is black.  We

7    communicated one time, and it's a very weak link between

8    it.  There's a lot more that goes into it.  It's a lot

9    to consume.  It would definitely take me more than three

10   hours to go through social network analysis.  I'd

11   probably have to put you through about almost 80 to 120

12   hours of training, which we've put our analysts through.

13        Q.   Not necessary.

14        A.   I mean, if you want, you're more than welcome.

15        Q.   If I was to ask you whether there was a link

16   analysis that was done on say Donnie McDougall, not a

17   name that necessarily means anything to you, would you

18   be able to then look at the drive and determine whether

19   there was an analysis done?

20        A.   Yes.  If there was a link analysis or, again,

21   like I said, a product simply as that, absolutely.  We

22   would be able to see it, and -- if it hasn't been purged

23   already, depending on the date.  Again, if the date

24   warrants it, and we purge that, and he was no longer

25   active, we would have purged that document.  But, yeah,

1    we can check the drive.

2        Q.   Are -- is the database of tips -- and focusing

3    specifically on tips submitted by deputies -- is that

4    searchable, text searchable?

5        A.   So in the old system, it was not text

6    searchable.  It was very, very hard.  In the new system

7    when we transported it over, I think they're working on

8    that text searchability now.  We can definitely try to

9    find that tip through a search, but the way they

10   designed the new system search, you have to make sure

11   that it can search unstructured data, if that makes

12   sense.

13         Text fields or unstructured data compared to

14   like -- when you design a database, text fields are

15   unstructured data.  It's not data sometimes readily or

16   easily searched.  A lot of times we have to go through,

17   and if we didn't know the specific deputy, we would have

18   to go through each and every tip.  It took tons and tons

19   of manpower to do, and that's one of the reasons we

20   switched over because we have the ability to write the

21   backside to be able to search that data.

22         But at this point, I'm going to have to ask IT,

23   first and foremost, right, for your question.  And,

24   secondly, it was very difficult to search tips in the

25   old system, which we no longer have access to.

1    Q.   But the data from the old system has been

2    imported to the new system?

3    A.   It has.  From what I understand, yes, it has.

4    Q.   And it might be possible to search the new

5    system?

6    A.   Possibly.  Yeah, I'd have to ask IT.  We can

7    definitely verify.

8    Q.   How about intel reports?  Is the database of

9    intel reports searchable?

10   A.   Yes.  So we have two intel reports though, so

11   you'd have to describe which one you're talking about.

12   Q.   What are the two?

13   A.   So we have confidential intel reports, which

14   are more towards investigations; right?  They are

15   specific to like large-scale investigations, which those

16   are highly searchable; right?  Not releasable, but

17   searchable.

18        The other intel report is searchable as well,

19   but that's more of what the deputies put in.  That's how

20   we transitioned from deputies putting tips into a

21   program.  We allowed them to do the IR, which we can

22   track.  So both are searchable, but there's two

23   different ones, just so you know.  One's a confidential

24   intel report, and one's an intel report.

25   Q.   Before tips were searchable, how were they

1    organized?  Presumably, it wasn't just a huge mass of

2    data.  It must have been filed or organized in some way.

3         A.   Do you mean prior to the system?  So like we've

4    always -- since I've been here, we've always had a

5    system.  Again, we had -- it was called TipSoft and then

6    TipSubmit, and it was ran through Motorola.  Again, it

7    was a tip program like Crime Stoppers or anything else.

8    That's how it was organized.  It was organized through

9    their actual database.  So they would access the

10   database.  Everybody had a log in.  They would access

11   it.  They would put the tip in.  They would submit it,

12   and then we would -- as analysts, we would be able to

13   have access to it to go through it and look at it.

14        Q.   So if an analyst wanted to pull up all the tips

15   that pertain to somebody who is listed as a prolific

16   offender, would those be in a folder somewhere?

17             MR. POULTON:  I'll object to the form.

18   BY MR. JOHNSON:

19        Q.   How would an analyst pull up the tips relevant

20   to a prolific offender?

21        A.   They would have to do an individual search, and

22   it would be -- I don't think they would keep the tip

23   anywhere.  They would just kind of document it

24   somewhere.  Like in those documents where it says tip,

25   they would kind of transfer it from there.  We did

1    have -- we do have a process where we look at every tip.

2         Q.   When you say they would transfer it, where

3    would they transfer it to?

4         A.   To like that -- like that document, if you flip

5    the page on that document, where it says TipSoft -- or

6    TipSubmit.  I think we went over that -- you guys went

7    over that earlier just briefly, before we started.

8              MR. JOHNSON:  Let's mark this as Exhibit E.

9              (Exhibit E was marked for identification.)

10   BY MR. JOHNSON:

11        Q.   So we're talking Exhibit E.

12        A.   Yeah.  So let me go to -- so you see at the top

13   of page two?  Just flip the page.  You see TipSoft?  So

14   that's kind of how these are documented; right?  This is

15   kind of a basic workup of an individual.  You know, this

16   one, we have Victor Castillo.  It's a basic workup, you

17   know.  You go through the process, and then you get to

18   the tip program.  It says, hey, on 5/31, this was the

19   tip.  Narcotic tip advised X.

20             I would say probably about 90 percent of our

21   tips are narcotics related; right?  Someone's a drug

22   dealer, someone is selling drugs, the house on the

23   street is selling drugs.  All those tips are reviewed by

24   an analyst.  They are sent to -- if we have an analyst

25   that is specifically assigned to the specific topic,

1  i.e., vice narcotics, we have a vice narcotics analyst.

2  It will go to that analyst.  That analyst will revise it

3  to determine whether or not there is enough information

4  to go on to create an investigation, or it closes out as

5  information only.  From there, that's kind of what

6  happens.  I wouldn't say there's a folder of tips

7  anywhere just laying around.

8      Q.    So would they be transferred to the AIM slides?

9      A.    They could be.  Like if we had multiple tips on

10  an individual, they could identify them.  But they may

11  not -- what I'm saying is they may just summarize it,

12  say, "Hey, listen.  Victor Castillo, this is like the

13  tenth tip we've received in a short period of time on

14  this individual doing X, Y, and Z," whatever the crime

15  is or whatever the suspicion of crime is.  That's what

16  would happen.

17      Q.    Could they be documented in central command?

18      A.    In what way?

19      Q.    Would an analyst ever input information from a

20  tip into the remarks?

21      A.    No, not necessarily because we have a system.

22  So like we wouldn't cross -- there's no sense in

23  cross-pollenating a citizen for the remarks; right?  So

24  maybe a deputy might put that, like, "Hey we've received

25  a tip," and put that in there.  But again, you would

1    have to go through the individual portal to kind of look

2    at that.   In other words, you'd have to look at all

3    those submissions from the deputies to see if they put

4    something in there.   The analysts are not going in there

5    and entering that.   That's more of a deputy-type thing,

6    if that makes sense.

7        Q.   So where would the analysts, if there -- if

8    there was a tip about a prolific -- something that was

9    learned in an offender check about a prolific offender,

10   where would the analyst put that information?

11       A.   So it could be on the AIM slides.   It could be

12   something -- just knowledge they brief out like, "Hey,

13   you know, it's been brought to our attention that we had

14   a tip."

15            Again, our Real-Time Crime Center goes through

16   our tip system on a daily basis.   So if the Real-Time

17   Crime Center sent that tip out to a district analyst

18   saying, "Hey, just so you know, this tip came in,"

19   through either the line -- the phone line that they've

20   answered because they document the phone line, and

21   they'll just send it over to the district analyst.   It

22   could be via email.   It could be simple word of mouth.

23   It could be -- again, it could be in any -- a couple of

24   different forms.

25       Q.   Would they put it in any kind of notes?

1     A.    Notes like how?  I mean, I understand what

2   you're trying to say, but I just don't see it in a note

3   section.  They would put it in the AIM slide, or they

4   would just immediately notify, or we would send the tip

5   over.  Does that make sense?

6          There's a way in the new system that we can

7   email the tips to people.  That makes it a lot easier.

8   So, an example, so any tip that comes in on like an

9   agency member, or like let's say -- you know, we've

10  received tips on firefighters.  So when we look at the

11  administrative side of the county, that goes to a

12  supervisor for review.

13         So like let's say we have a tip on a

14  firefighter doing X, Y, and Z.  That comes to me for

15  review.  I review it, and then I pass it on to the

16  proper authorities, whether it be an investigations

17  bureau, whether it be Internal Affairs, whether it be

18  something else.  Because sometimes they come in like, "I

19  had a problem with this deputy," so we'll send it to

20  Internal Affairs to look at, or we'll send it over -- if

21  it's a district target -- not target -- if it's a

22  district problem, that tip will be sent to the district.

23         So in the new system, we have a way to shuffle

24  those over.  In the old system, it was more like, "Hey,

25  you may want to take a look at this specific tip."

1     Q.   Let's just go back to page 19 of the Exhibit A,

2  and we looked at this before.  There's a bullet point,

3  "To learn as much as possible about prolific offenders

4  in your assigned area to include their acquaintances,

5  vehicles, locations frequented, MO for offenses,

6  vehicles owned, et cetera, and then to document

7  accordingly the information."

8     A.   Okay.

9     Q.   So you mentioned that one way that that could

10  be done would be through tips?

11     A.   Yeah.  Prior to the actual offender check being

12  done, yes, that could be done.

13     Q.   Okay.  And so if that information was

14  documented through a tip --

15     A.   Yeah, they would have to -- someone would have

16  to go into the system, and someone would have to find

17  that to determine -- or the deputy would say, "Hey, I

18  entered a tip," and tell the analyst, "This is the tip

19  that I entered," and then we could search by deputy.

20     Q.   And if an analyst received that kind of a tip

21  -- because you said all tips are reviewed by analysts?

22     A.   They are.

23     Q.   So if an analyst was reviewing a tip that, for

24  instance, included information on the locations

25  frequented by a prolific offender, what would they do

1  with that tip?

2      A.   So again, they would probably equate it -- if

3  that was like part of the AIM slide, they would probably

4  say, "Hey, look.  We've also received tips on this

5  information."  So we know -- so intelligence

6  collection -- I guess I would have to explain like how

7  intelligence collection works, how vetting works, and

8  what the process of an analyst is for this to be fully

9  understood.

10     Q.   Well, I guess what I'm just asking is more

11  mechanical.  Would they record that information

12  anywhere?

13     A.   It would potentially be put in an AIM slide.

14  It may not come in like what you're trying to think

15  though.  It could be verbally.  They could understand

16  this knowledge, consume this knowledge, and understand

17  these tips are here, and be like, "Hey, we received a

18  tip from Deputy Smith.  Deputy Smith is saying that our

19  prolific offender is currently associating with this,"

20  and then maybe the associate's listed on the AIM slide,

21  "and by the way, they've moved addresses, and here's the

22  new address.  This was in the tip.  And also, too, the

23  MO of this prolific offender is he likes to go into

24  unlocked cars and take iPhones."

25          So they would put that -- if they were

1    identifying a prolific offender, this is just additional

2    information that they may brief during the AIM.

3        Q.   So I understand that.  I guess what I'm saying

4    is, say that it falls short of something that they would

5    share.  Would they report it anywhere for future

6    reference?

7        A.   There's no reason to record it because it

8    already exists in the database.  They have access to it

9    24/7, seven days a week.

10       Q.   Well, I guess what I'm focused on is the fact

11   that the database is not searchable.

12       A.   So it's searchable by deputy.  You asked if it

13   was searchable by text and having that -- having the

14   text field.  And sometimes the system, I told you, was

15   difficult.  So a lot of times we could put a keyword in

16   there, and it wouldn't come up.  And other times we

17   could put a keyword, and it would come up.

18            So the difficulty in the searching is, yes, if

19   they put a prolific offender's name in there, could they

20   potentially get a tip that comes up?  Yes.  The easier

21   way to do it is to understand what deputy put it in the

22   system, them notifying the analyst, and us being able to

23   go, "Hey, this is related to our prolific."

24            So it's designed that even though the Real-Time

25   Crime Center is the primary focus for advising tips,

1   every district analyst is aware that they need to go

2   into this tip program -- prior to us changing -- to go

3   into this tip program and look for any kind of tips that

4   would affect your area of operation, which would be your

5   district.

6          So the search function was not very good in

7   TipSoft.  So -- and again, my Real-Time Crime Center

8   supervisor, Melinda Warner, she is very knowledgeable on

9   both tip systems because she was my key lead on getting

10  some of the stuff changed over.  I'm not saying it

11  wouldn't be searchable.  I'm just saying sometimes it

12  was difficult to search.  So if it's in the database,

13  there's no reason for them to store that tip anywhere

14  else, other than if they were going to use that

15  information to put on a specific slide or specific

16  briefing point to say, "Hey, we received this

17  information from a tip," similar to this.

18          MR. POULTON:  Are you referring to Exhibit E?

19          THE WITNESS:  I'm sorry.  Yeah.

20  BY MR. JOHNSON:

21     Q.  So you mentioned the process of intelligence

22  gathering.  And I don't think we have to go over the

23  entire process, but what I want to understand is, is

24  there any type of software that an analyst would use to

25  compile information on a prolific offender?

1    A.   Their brain.  We don't use any predictive

2  software.  We don't use any kind of software off the

3  shelf.  We use analysts.  You know, there's a reason why

4  we have 30 of them.

5    Q.   Right.  But would they use any kind of software

6  to write down information?

7    A.   They may have -- I mean, maybe they have notes.

8  Maybe they use a Word document.  Maybe they just

9  transfer it right to the Word slide.  I don't know.

10  That would be a question for each individual analyst on

11  their process.  What we're looking at is -- what we've

12  established here is a tradecraft of analytics from the

13  jump, right, understanding, you know, that -- what

14  constitutes intelligence, and what constitutes

15  information, and what the difference between the two

16  are, how you brief your information.  There's certain

17  things that we do in the process that kind of shorten

18  the brevity.  We're not giving deputies 17-page

19  documents to read about their AOR.  We're giving them

20  short briefs because adult learning tells you that

21  adults can't handle it.

22    Q.   So an analyst might keep a Word document with

23  information on a prolific offender?

24    A.   Possibly, or they could transfer it right to

25  these intel reports or what we call workups, or they

1    could put it right into their slide.

2         Q.   Okay.  But they could keep a Word document?

3         A.   Possibly.

4         Q.   And would that be on any kind of shared folder?

5         A.   No.  I mean, unless -- they have their own

6    folders for their districts.  So unless they're keeping

7    that in their districts, I don't -- again, I'm not

8    checking those folders on a daily basis.  So that would

9    be something as far as how they do that in the process

10   for their daily -- we have dailies.  So again, that

11   stuff could be transferred to their dailies right from

12   whatever data source they're looking at to that

13   document.  And those dailies are actual products.

14        Q.   So they might have something like that on the

15   folder for their district?

16        A.   Possibly.  Like I said, I -- I couldn't tell

17   you on like what their -- I can tell you their daily

18   battle rhythm, but how they process things is something

19   individually unique to an analyst.  I do things

20   different, I mean, because I was an analyst as well.  I

21   was a senior counterterrorism analyst.  I do things

22   different.

23             So when I look at -- when I'm reading

24   documents, I go right into my intel document.  That's

25   where it goes.  It goes into this intel document.  My

1    research and development is all electronic.  Now I'll

2    keep the files, you know, like I'll download the links

3    and put them somewhere for what I call a sourcing

4    packet.

5            But -- although, like each individual analyst

6    is going to be different.  Could they exist?  Yes,

7    absolutely, and that's something I would have to ask

8    them.

9       Q.   Okay.  Now these intel documents, you said

10   Exhibit E is an example of an intel document?

11      A.   Yes.  This would be -- you know, at the time,

12   this would be actionable intelligence.  You're looking

13   at the top, kind of the reason for the document.  It

14   contains Victor Castillo as a person of interest in an

15   aggravated assault.  This was done in '18, so it's an

16   '18 case.  We're showing you that, hey, he's actually --

17   he has a warrant.  He was issued a warrant for the Hard

18   Rock Hotel and Casino, and this identifies kind of what

19   we're looking at.

20           It identifies that he has been a -- you know, a

21   previous drug dealer, identifies he has violent

22   tendencies because that comes from reporting, gang

23   member.  He was attached to The Squad.  And then you

24   look at some basic searches; right?  You look at your

25   tips, your TOL, which is trans unit.  It's like a

1    123people.  It's open-source data.

2          And then you talk about just some of the social

3    media posts he had.  It gives a social media handle,

4    things of that nature, so that's an example of the open

5    source.  And then you go back to the associates; right?

6    This is, you know, simply from -- you know, this is kind

7    of what that -- you know, another version of what we

8    could call a link analysis or a network analysis or an

9    associate analysis.  They're called multiple things.

10         So it goes down a list and says, hey, these are

11   his primary associates.  The reason we know they're

12   associates is because it's been reported that they've

13   been together.

14   Q.    Reported where?

15   A.    Through our records, through like deputies,

16   through actual arrest reports, incident reports, FIRs,

17   intels.  I mean, again, the slew of things that go into

18   our databases.

19         MR. POULTON:  If you look at -- back for

20         Dalanea Taylor in particular, if you go back to the

21         first page, she's included there.  And it indicates

22         auto burglary and vehicle theft reports from 2015.

23         So I'm assuming that's where that connection comes

24         from, but that's an example.

25         THE WITNESS:  Yeah.

1    BY MR. JOHNSON:

2        Q.   Are these intelligence reports saved on the ILP

3    unit drive?

4        A.   Yes.

5        Q.   And are they searchable?

6        A.   Yes.

7        Q.   So if I wanted to have all of these reports

8    that mention a particular individual, that would be

9    something that could be generated?

10       A.   Yeah.  If they're there, yes.  You've got to

11   remember, you're looking at the dates; right?  So '18,

12   of course, is there because it doesn't meet the

13   threshold to purge.  But I think, again, we're holding

14   '16.  So, technically, right now in 2021, we're looking

15   at '17 documents and below should be reviewed for purge.

16   Now if they're active criminal intelligence still, we

17   keep them.  If they're not, they purge based on 28 CFR

18   Part 23, and that's a federal code.

19       Q.   Are these reports generated for every prolific

20   offender?

21       A.   No, not necessarily.

22       Q.   Okay.  But they may be generated for prolific

23   offenders?

24       A.   Yeah.  We've had some for prolific offenders

25   involved in crimes, right, so basic workups

1    understanding who they are, what they're doing, who

2    they're associated with, and then same thing for be on

3    the lookouts or BOLOs, so if we're actively looking for

4    these or we have PCs.

5            MR. POULTON:  Can I ask a question?  Is this a

6        prolific person, or does it only come up because it

7        happens to list people who were prolific as

8        associates?

9            THE WITNESS:  Yeah, so this comes up -- so I

10       think the reason we shared this document is Dalanea

11       Taylor is a client of yours, and she's in it.  So,

12       ultimately, when we search her name, that's how

13       searchable they are.  So PDF, control-find, you can

14       search the name.  It will come up.

15           So when we use the control-find in the

16       document, how the shared drive works is we do the

17       control-find.  It will find any document that lists

18       her name or a name.  If it doesn't list it, it's

19       probably not there.  But we also do manual searches.

20       So like if we go through, hey, I have an analyst go

21       through and can manual search this entire folder to

22       make sure that we're not missing anything.

23   BY MR. JOHNSON:

24       Q.   If somebody is identified as an associate

25   through social media, is that recorded in any kind of

1    database?

2        A.    No.   I mean, usually, we can just ask the

3    analyst like, "Hey, how are they an associate?"   "We

4    identified them as an associate on social media."   For

5    them to be like a true associate, we usually want some

6    kind of crime activity or some kind of knowledge a crime

7    occurred, right, because we do have a lot of associates

8    that know the individual, and they know they've

9    committed a crime.   And in some cases, they have said,

10   "Yeah, listen.   They've done that," because it's been a

11   significant violent crime, and it's come back on them,

12   or they've been with them or things of that nature.

13            It all depends.   Again, it's not -- there's no

14   strength in it.   Like you're not seeing any Facebook

15   stuff here that says -- Facebook, Facebook -- they're

16   identifying them as associates.   Because, I mean, you

17   look at here, like that's his mother; right?   She's not

18   necessarily an associate, but they're identifying family

19   members in case we need to locate him and go find that

20   individual.   So if they have a warrant or something of

21   that nature, we can say, "Hey, mom.   Where is Victor

22   at?"

23            MR. POULTON:   But Victor doesn't have to be a

24      prolific offender for this to exist in this form.

25            THE WITNESS:   No.   And that's what I was trying

1        to explain earlier is that you do not have to be a

2        prolific offender for an agency to go, "Hey,

3        Victor's a suspect in an armed robbery.  Victor

4        lives in our county.  We already know that he's

5        committed acts of violence."

6             You know, the goal is if they have probable

7        cause for their arrest, and he lives in our county,

8        our goal is to assist that other police agency to

9        ensure that Victor does not commit another crime in

10       our county.

11   BY MR. JOHNSON:

12       Q.   I understand.  But what I want to understand is

13   that sometimes these types of reports are generated for

14   people who have been flagged as prolific offenders?

15       A.   Yes.

16       Q.   This may or may not be an example of one?

17       A.   Oh, yeah, absolutely.

18       Q.   If a deputy was to pull up a prolific offender

19   on central command, would the deputy within central

20   command be able to see what individuals have been

21   identified as associates?

22       A.   No.  That's not how it works.  Their associates

23   are usually briefed at the AIM, the actual intelligence

24   meeting.  They're not necessarily -- now you may see --

25   like if they look up that individual in their global

1    profile, they can go down and see people who have been

2    listed in reports with them.  If they click on that

3    document, it would possibly say -- it wouldn't say it

4    now, but back then, it would probably say top five

5    associates.  It wouldn't say just associate.  That's not

6    how it works.  It doesn't say mother.

7           Like, in other words, if I looked up Victor

8    Castillo right now on the global profile, her name is

9    not going to come up -- or his mom's name is not going

10   to come up as a mother.  So the deputy would have to

11   understand through reporting to look at like -- okay.

12   So I'm pulling up the -- we can access the report as

13   well.  So we'd have to access the report, look at it,

14   and see who's in -- like everybody listed in that report

15   the deputy can look at, but not -- not necessarily

16   central command.  There's links to it that go back to

17   other data sources that come into that.  Does that make

18   sense?

19       Q.   Sort of.  So let's go back to -- you mentioned

20   the global -- did you say global profile?

21       A.   Global profile.

22       Q.   What is the global profile?

23       A.   It's just like a picture -- like a giant

24   baseball card of everything that one person does.  So

25   let's say for me, for instance.  I'm in the system,

1    okay, which I am because I've been a witness to crimes,

2    and I've been a victim of a crime and things of that

3    nature.

4           So if you looked up Larry Kraus in the global

5    profiles, it would come up with every case that I've

6    been named in.  It would come up with my demographics.

7    It doesn't have my photo because I haven't had my

8    picture taken at the jail.  So it comes up with name,

9    date of birth, last known address.  It would come up

10   everybody listed in that report with me.  You know, me

11   being -- again, if I was a witness in the crime, if I'm

12   the only one in the report, I'm the only one in the

13   report.  But likely, me being a witness to a crime, I

14   was not the only one in the report.

15          So it would link me back to that report.  So,

16   in other words, it would say Larry Kraus linked in this

17   case number, you know, 000001, and I would click on

18   that.  I would be able to read that report as a deputy.

19   So it doesn't automatic- -- can they get the

20   information?  Yes, absolutely.  They can look at -- they

21   can -- deputies can read every single report in our

22   system that we have.

23       Q.   So if, for instance, you were to click on --

24   bring up the global profile for Victor Castillo, would

25   -- and then you were to look at his global profile,

1    would there be a way to determine that, you know,

2    Ms. Salazar is his mother?

3        A.   If it was in a report, yeah.  Like if we

4    documented that in a report, yes, absolutely, or if she

5    was in a report with him, yes, we would be able to

6    determine.  It may not say the relationship as mother,

7    but it will say have a relationship.

8        Q.   So she would be on the global profile if she

9    had been in a report?

10       A.   Yes, if she had been in a report.  Same thing

11   with the rest of the names in here.  So like if you look

12   at the names like -- let's just say Adrianna Perez;

13   right?  If Adrianna Perez was listed in a report with

14   Victor Castillo, there would be a thing that says -- now

15   it's slipping my mind.

16           There's like a little tab that accordions down

17   that says these are a list of the names that he's been

18   in reports with.  That means witnesses, victims,

19   suspects, anything else.  Doesn't necessarily say

20   associate.  It doesn't say associate in those.  It's

21   just more of like what's in the reporting.

22       Q.   Okay.  Understood.  When you say report, does

23   that include CAD reports?

24       A.   I don't think so.  I think it's just based on

25   our MFR, which is our mobile field reporting.  So like

1    inside the RMS there's all our mobile field forms, so

2    like incident reports, arrest reports, tow reports,

3    things of that nature.  It's all in that one block.  I

4    don't believe it includes CAD.  We're linked to CAD, but

5    CAD is operated by the County, if that makes sense.  We

6    don't operate our CAD system.  Our CAD system ingests

7    into our systems.  But sheriff's office runs our RMS.

8    County runs CAD.

9        Q.   Okay.  So you're not sure.  You're not certain

10   that it would not include it?

11       A.   I don't think it shows in global profiles like

12   the number of times we've went to a certain address, if

13   that makes sense.  So CAD will show that, like all the

14   calls for service, whether they called us, whether we

15   initiated the call, things of that nature.  I'm almost

16   99.9 percent sure that the CAD doesn't show up in that

17   manner.  We have to go to another system to look at

18   active CAD.

19            Now can we bring that data in?  Yes,

20   absolutely.  Can we search that data?  Absolutely, but

21   not in global profiles.

22       Q.   If a person was listed in the notes section by

23   name in a CAD report, would that person show up on

24   global profiles for the associated individual?

25       A.   I don't think so in CAD, no.

1      Q.   Okay.  But if they were listed in an incident

2  report, they would?

3      A.   Yes.  We would be able to see that.  That comes

4  up in the global profiles.  Like I said, I'm

5  99.9 percent sure.  I'd have to double check to make

6  sure, but I'm pretty sure it doesn't feed into CAD that

7  way with the notes.  I mean, we can read CAD notes

8  through another system, which is called Ops CAD.  I can

9  go in that CAD and look up prior reports and go through

10  them and say, "Okay.  This is the CAD reporting that

11  we've looked at."  So can I look at CAD reporting?  Yes,

12  I can.  I can look up call notes for every call that I

13  have, and so can deputies.

14      Q.   Got it.  What if a person is listed by name in

15  the remarks section of central command?  Would that

16  person, if they're listed by name in the remarks section

17  of central command, then show up in the global profile?

18      A.   I don't believe so.  I'd have to go to that

19  direct -- so where they're listed for the prolific

20  offender checks, I would have go to that direct system

21  to go through the actual -- in other words, I'd have to

22  go to a name.  I'd have to go to the name and see what

23  the notes are put in there.  It doesn't necessarily all

24  automatically come back and feed into what the global

25  profile is.

1      It doesn't -- like the global profile doesn't

2   say he has 13 prolific offender checks; right?  It's

3   separate from the global profile.  It will say the

4   contacts that law enforcement's had if a report was

5   taken.  But the notes section of prolifics was designed

6   so they didn't have to take the report.  So, in other

7   words, that wouldn't trigger another case number, if

8   that makes sense.

9      So like, in other words, we could look at it in

10  that contact.  You know, if there's a hundred contacts

11  with that individual and only four are arrest reports,

12  we want to make sure we delineate -- we show the

13  difference.  So the case number -- we show the prolific

14  offender based on that prolific offender check for that

15  name.  I would have to go back and see if it goes into

16  the global profile.  We don't have an accordion -- we

17  don't have a specific subsection or a topic that says

18  prolific offender check in the global profile for

19  anybody.  But I'd have to go back and double check.

20  Like I said, I'm in the 90th percentile sure that that

21  doesn't occur.

22      Q.   Okay.  You referenced the notes section.  Is

23  that the notes section of the profile?  What is the --

24      A.   The notes section is specific for where the

25  prolific offender checks are conducted.  So like you can

1    go to the name, and then you can go over, and there's

2    another tab that you hit for notes, and it will hit

3    notes, and it will send it to that prolific offender

4    check specifically.

5         Q.   So we need to back up.  Why don't we -- why

6    don't we just take this in a -- I think it's a little

7    unclear to me what you're -- where you are in the

8    software.  So if someone is taking a prolific offender

9    check, and they want to input information after

10   conducting the check, where do they input that

11   information?

12        A.   So they would go to the global profile; right?

13   So like I have a prolific offender, let's just say

14   prolific offender A.  So they would go into the global

15   profile.  There's a tab under the -- within the global

16   profile that they can push the notes into, but the notes

17   are not -- you would have to go back into that

18   subsection.  Do you get what I mean?

19            Like let's say, you know, there's -- this is

20   the global profile.  This has the names.  I open up the

21   tab.  The tab says add notes.  You hit add notes.  That

22   goes to a separate -- like sequel database created by

23   our IT department that's in there.  So it doesn't

24   necessarily work back into another tab in the global

25   profile itself.  It goes under that name, but it doesn't

1   necessarily -- like if I'm a deputy, and I look up the

2   global profile, I would have to know where to go to look

3   for this note.  Can they access it?  Yes, absolutely.

4   Deputies have access to pretty much everything that we

5   have access to.

6        Q.    Understood.  So there's a database that

7   includes notes from prolific offender checks?

8        A.    Yes.

9        Q.    What is that database called?

10        A.    Again, it's in the global profile.  It's in the

11   central command, inside central command.

12        Q.    Understood.

13        A.    It would -- I mean, it's so much easier to show

14   than it is to explain.

15        Q.    Would an analyst be able to access that

16   database?

17        A.    Can they access it?  Yes.  Do they put notes

18   in?  No.

19        Q.    Okay.  Is that database searchable?

20        A.    Yeah.  I don't see why it wouldn't be.  Yes.

21        Q.    Okay.  Can analysts search it?

22        A.    Analysts -- well, so the global profiles are

23   searchable by name.  Like we can search any name in that

24   global profile, yes.  So can the analysts search it?

25   Yes.  Are you talking about in the notes section, or

1    just in general?  Because there's a search capability in

2    the entire central command and global profile.

3         Q.   Okay.  So if an analyst wanted to, they could

4    search for an individual's name across all global

5    profiles?

6         A.   Oh, yeah, yeah.  Yes.  Again, just remember

7    that the global profiles, it's an interface.  It's data

8    we've already selected.  They can search it -- before

9    global profiles or central command, they could have

10   searched it anyways in our Ops CAD.

11        Q.   So can an analyst -- I understand that an

12   analyst cannot input data into the notes.

13        A.   It's not that they cannot.  They don't.  So

14   they can.  Listen, anybody that accesses that global

15   profile that has access to it, yeah, they can put notes

16   in there for that, but they don't.  That's primarily

17   used for deputies from the field.  It's not used for

18   analytical purposes.  It's used for the analysts to

19   consume rather than push back information into it.

20        Q.   The data in the notes section of the global

21   profile, what is the retention period for that data?

22        A.   Are you talking about for the actual person,

23   like if we put prolific stuff in there?

24        Q.   So if data is inputted after a prolific

25   offender check in notes, how long is that data retained?

1    A.   So if it's deemed actionable -- like criminal

2    intelligence, it can only be retained for five years.

3    But if it's just -- like I think I explained this

4    earlier.  If we put that data in there, and it's just

5    like, "Hey, talked to mom.  Mom says individual no

6    longer lives here," or mom says like, "I shipped him off

7    to Honduras to his dad," or whatever the case may be, if

8    we don't think that's criminal intelligence, we would

9    not need to purge it.  There would be no requirement to

10   purge, and the retention would remain for the life cycle

11   of the system.

12   Q.   Okay.  What are the morning reports?

13   A.   So the morning report is basically like things

14   that happened overnight.  So lieutenants, basically,

15   they run a platoon of individuals.  It would be an

16   equivalent of a shift commander.  So if we have like

17   shootings into a dwelling, a rape, murders, things of

18   that nature, there's a morning report that goes out to

19   command staff to kind of be aware when they wake up in

20   the morning.

21        It's kind of like -- it's no different than you

22   reading the news; right?  So like, hey, what happened in

23   Chicago today?  Well, ten dead, 14 injured, things of

24   that nature.  So that's the things that we do in our

25   morning reports.  It's just a simple blurb of the actual

 1    call for service.

 2         Q.   Would that include information on prolific

 3    offender checks?

 4         A.   No.

 5         Q.   Did it at one time include that?

 6         A.   I don't believe so, no.  I mean, maybe before

 7    my time.  But, no.  These are like significant events.

 8    These are not -- prolific offender checks are usually,

 9    like I said, contained within the district.  There's no

10    reason to brief that to a sheriff or a colonel or

11    majors.  They have to understand -- they have to trust

12    their individual folks out there to do what they're

13    supposed to be doing.

14              MR. POULTON:  Can we take a quick break?

15              MR. JOHNSON:  I just have one quick follow-up

16         on that.

17              MR. POULTON:  Sure, just when you're ready to

18         switch subjects.

19              MR. JOHNSON:  Let's mark this as Exhibit F.

20              (Exhibit F was marked for identification.)

21    BY MR. JOHNSON:

22         Q.   And I understand this is before your time, but

23    do you understand what type of document this is?

24         A.   Actually, I was here.  I was doing more work on

25    the fusion center at this point in time.  Yeah, I mean,

1    it's titled overnight email morning report.

2         Q.    So this is an example of a morning report?

3         A.    Yeah.  It doesn't look like this anymore.  But,

4    yes.

5         Q.    So if you turn to page 9261 --

6         A.    Okay.

7         Q.    If you read the first item -- you don't have to

8    read it out loud.  You can just read the first item for

9    Jeremy Kolhouer, K-O-L-H-O-U-E-R.  Just read that.

10        A.    Yes.  Yeah, I mean that would be the

11   documentation for a prolific offender check.  That's not

12   how that goes anymore.  I think that's been revamped

13   significantly.  Like, again, those are things that

14   probably should have stayed in the district, to tell you

15   the truth.  But, yeah, that's what it reads.

16        Q.    So at one time, these reports included

17   information on prolific offender checks?

18        A.    Yeah.  And at this time, I may not have been

19   getting these because, like I said, I was focused on

20   fusion center stuff.  So, yeah, at one time -- it's

21   there, so absolutely.

22        Q.    Understood.  It says at the bottom, "It was

23   observed on Nathan's prolific offender list that Blake

24   and Donnie were not listed as associates of his."  What

25   is the prolific offender list?

1      A.    So they're probably talking about the slides

2   because, again, we would not -- we don't give the

3   prolific offender list to the deputies.  They've got to

4   be talking about the AIM slides.  But without having

5   context on what they understand it to be, you know,

6   again, we have a lot of things that people call

7   different things.  And they're the same thing that me

8   and you are sitting here talking about, and you're like,

9   hey, I don't understand that because I'm not in that

10  game.

11          I use different words than the deputies do

12  because I have an analytic background, and then we've

13  got to explain what each other are talking about.  So I

14  would assume that they are talking about the slides that

15  identify the associates, and they didn't see that the

16  two were associated together.  So that may be a new

17  documentation that, hey, we've seen these individuals

18  together.  This is under what context we saw them in.

19     Q.    And then it says, "Tip submitted in regard to

20  the new information on associates of Nathan."

21     A.    Yeah, so that would be the type of tip that we

22  were talking about earlier from the TipSoft program that

23  deputies did use that at that point in time.

24     Q.    Okay.  And then what would an analyst do with

25  that information?

1      A.   So again, if they found the tip, and the

2  information was vetted and pertinent, and we believe

3  that those individuals were -- you know, have criminal

4  history or they -- it would be important to tell the

5  districts, they would potentially put that on an AIM

6  slide and put it back out there.

7      Q.   Does the prolific offender list that you keep

8  include information on the associates of prolific

9  offenders?

10     A.   Not from the actual list.  Not from like this

11  like you're talking about, Exhibit E.  There's no

12  associates on this.

13     Q.   Is there a version of it that does have

14  associates?

15     A.   No, not to my knowledge.

16     Q.   Is there a document that keeps track of who are

17  the associates of prolific offenders?

18     A.   I would say the AIM slides if anything.  And

19  again, like I said, that's significantly changed over

20  the course of the last couple of years.

21          MR. POULTON:  Is now a good time to take a

22      quick break?

23          MR. JOHNSON:  Yeah.

24          (Whereupon, a short recess was taken.)

25  BY MR. JOHNSON:

1    Q.   What is the daily intelligence brief?

2    A.   So that's daily -- that's daily information

3  that goes out, so if we had a burglary spree overnight

4  or burglaries overnight, any kind of big four crimes,

5  any kind of significant BOLOs, violent crime, anything

6  coming from regional intelligence.  Let's say we had a

7  murder in Hillsborough County and that person's still at

8  large, that will be briefed in the daily brief.

9    Q.   And does that include information on prolific

10  offenders?

11    A.   It can.

12    Q.   Would it include information on prolific

13  offender checks?

14    A.   No.

15    Q.   Would it include information on the associates

16  of prolific offenders?

17    A.   It could, but it's not commonly laid out like

18  that.  I mean, I can provide you an example of it.  It's

19  a lot easier to see.  I mean, we definitely have

20  something that is outside the realm of criminal

21  intelligence that I could share the dynamic of it.

22         So, you know, usually, it's kind of like one or

23  two like big bulletins that says, hey, suspect A or

24  suspect B is related to this burglary, and then it goes

25  down to like all the big four crimes in like -- kind of

1    like a spreadsheet almost like in Excel fashion, but

2    more -- I would say a table.  It says case number X --

3    this is, you know, let's just say case number one.

4              Case number one, this is an auto burglary.

5    This is where it occurred, and this is either the

6    suspect, or we don't have a suspect.  And it gives

7    everybody an understanding of like what we have solved

8    compared to what we haven't solved.  Does that make

9    sense?

10        Q.    Yeah.

11        A.    And it would be easier to show you.  So it's

12   just, again, almost like the 24-hour news cycle.  We

13   just make sure that everybody's got an understanding of

14   what current crimes are happening in the district on a

15   daily basis.

16        Q.    Okay.  I want to circle back because there was

17   some discussion off the record about whether the

18   information from the global profile would be something

19   that we could look at.  So the information on the global

20   profile, that includes in the notes section information

21   that would not be related to an ongoing investigation;

22   is that correct?

23        A.    Not always.  Again, that would have to be

24   reviewed.  So like I told you before, I think everything

25   has to be reviewed to determine whether or not that is

1   criminal intelligence or not, whether or not there is,

2   you know, a case specific to that individual.

3        So, you know, there are times where prolifics

4   are currently active in a case investigation where a

5   deputy may go in there and be like, hey, case number,

6   you know, again, 000001 is related to this individual.

7   We're doing this check to determine whether or not he's,

8   you know, at home or in the process, things of that

9   nature.

10        So we would have to review it.  I can't say yea

11   or nay whether it would have noncriminal information in

12   it or criminal information in there without me looking

13   at these documents or the actual note that the deputy

14   made.  I will tell you most of the time, it is kind of

15   benign; right?  It's like, hey, I made contact, or I

16   didn't make contact, or I talked to mom, I talked to an

17   aunt, I talked to a caretaker, or there was no answer at

18   the residence, and no one was there.  And again, that's

19   another option; right?  So sometimes we don't make

20   contact with them.  We attempt, but the contact's not

21   made.

22   Q.   And that type of benign information, there's no

23   reason that couldn't be produced that you're aware of?

24   A.   I don't believe so.  I mean, the information in

25   general; right?  Like, I mean -- again, even though you

1    have to be -- you have to be CJIS compliant to access

2    the database from our lens.  Like the information from a

3    public record request would be available, as long as it

4    doesn't meet any kind of exemption rules.

5        Q.   Okay.  So in that notes section there, is that

6    the type of benign information?

7        A.   I would say in certain ones, yeah.  I think

8    there's certain things that we could release, yes.  And

9    again, I mean, that would be up to legal and our public

10   records request section.

11           MR. JOHNSON:  I'll mark this as Exhibit G.

12           (Exhibit G was marked for identification.)

13   BY MR. JOHNSON:

14       Q.   So what are we looking at on the computer

15   screen in this image?

16       A.   That's our central command.

17       Q.   Okay.  And is that -- what are the -- who would

18   be photographed in those pictures, those thumbnail

19   pictures?

20       A.   So it looks like that one says district target,

21   the other one says prolific and career offenders.

22       Q.   Is this something that a deputy would be able

23   to see on their --

24       A.   Yeah.  This is accessible on their MVT.

25       Q.   So the district target and top five, that would

1    be the district target and then the top five offenders

2    for that district in which the deputy is operating?

3        A.   Yeah.  They can go between districts, yes.  And

4    again, that's central command.

5        Q.   And then to the right of that, there's also

6    pictures of the prolific offenders for that district?

7        A.   And career offenders, yes, based on Florida

8    statute.

9        Q.   Okay.  But that would also include pictures of

10   people who have been identified and flagged as prolific

11   offenders?

12       A.   Yes.

13       Q.   And that's something that a deputy, again,

14   would be able to access from their computer?

15       A.   Yes.

16       Q.   And then if they clicked on that prolific

17   offender, would that bring up the global profile?

18       A.   It would.

19           MR. JOHNSON:  I'll mark this as Exhibit H.

20           (Exhibit H was marked for identification.)

21   BY MR. JOHNSON:

22       Q.   So what are we looking at on the computer

23   screen of this image?

24       A.   It looks like it's the front part of their

25   global profile, the top page of their global profile

1    with other demographics on it.  And I can't really read

2    the writing, to tell you the truth, so I would have to

3    be able to look at it to --

4        Q.   So we don't know who this individual is, but we

5    know it's a global profile?

6        A.   I don't.  But it's a global profile, yeah.

7        Q.   Okay.  So, obviously, there's -- at the top,

8    there's information next to the picture.  What type of

9    information is there?

10       A.   That's usually their name, date of birth,

11   Social Security number, things of that nature, just

12   demographic information, last known address, things of

13   that nature.

14       Q.   And then there's some text or something that's

15   red.

16       A.   So the red text usually identifies if they have

17   a warrant.  Again, I'd have to see what that specific

18   box is saying.  The green can identify things, too, as

19   well, right, whether they're -- you know, they have like

20   warnings like -- you know, we have things like

21   individual with mental health issues that we'd send

22   different deputies out there to handle that because

23   they're highly trained in dealing with a crisis.  So

24   there's other things that we would deal with.

25       Q.   And then what is that white text below the

1    blue?  Actually, why don't we go in order.  What is the

2    blue?

3         A.   The blue is usually the number of incidents,

4    depending on what that accordion says.  Again, I'd have

5    to look at it from -- I'd have to look at it from my

6    laptop, to tell you the truth, to be able to say

7    100 percent that's what that is.

8              But usually, that's the number of incidents or

9    contacts they've had with the sheriff's office.  There's

10   usually a number in that box.  And again, that's what we

11   were talking about is maybe getting you some clearer

12   screen shots of how -- what global profile does and the

13   explanation of what it's designed to do because then

14   there's no confusion of what it is.

15             Like I said, looking at this, it's super

16   blurry.  You've got to remember my role.  I'm not on the

17   road anymore.  So I look at this, you know, maybe a

18   couple times a month, if that.  You know, again, this

19   was designed for deputies to use and have a better --

20   basically, instead of going through 15 different

21   databases, it's all in this user interface.  So it makes

22   it easier for the deputy to see, but they have access to

23   all this.

24             And again, that is a global profile accordion.

25   The red, green, and stuff like that are what alerts we

1    would put in the system based on that specific

2    individual.

3         Q.    Understood.  I'd like to go back.  We were

4    talking closer to the beginning of the deposition about

5    the training sessions that you run.  Do you conduct any

6    assessment at the end of the training session?

7         A.    What training sessions are you referring to?

8         Q.    For new deputies.

9         A.    And what do you mean by an assessment?

10        Q.    Is there any kind of testing?

11        A.    No.

12        Q.    Okay.  Separate from the training sessions, is

13   there any kind of testing of deputies on their knowledge

14   of the ILP manual?

15        A.    No.  Through the FTO process, they go through

16   that.  There's basically a basic awareness of what that

17   looks like.  That's built into the field training

18   process, which I think Major Sanborn can speak to better

19   than I can.

20        Q.    Sure.  When the new manual was put out, was

21   there an assessment done in 2018?

22        A.    An assessment on what?

23        Q.    Why don't I just back up here.

24             MR. JOHNSON:  We can mark this as Exhibit I.

25             (Exhibit I was marked for identification.)

1     A.   So I know exactly what you're talking about.

2  BY MR. JOHNSON:

3     Q.   So what is this referring to, this exhibit?

4     A.   This was something that myself and Captain Ross

5  had a conversation about, assessing the knowledge within

6  the field, right, what ILP looks like, you know, the

7  basic tenets of ILP.  We created an assessment with some

8  scenarios, but it never -- we never were able to

9  implement it fully.  I think he was creating a

10  SurveyMonkey.  And this would be something more for

11  Captain Ross to speak to, again.  But this was something

12  that we were looking to do throughout the agency that

13  was going to lead up to our five-year assessment within

14  the organization.

15     Q.   So this is something I can ask Captain Ross

16  about?

17     A.   Yes.  And, like I said, the assessment never

18  went into full effect.

19     Q.   What do you mean by that?

20     A.   So we never deployed it to the deputies.  We

21  never deployed it to the members.  Again, it was kind of

22  just a simple knowledge check of what intelligence-led

23  policing is.

24     Q.   Was it deployed to any members of the Pasco

25  County Sheriff's Office?

1      A.   No.  And I think he -- again, you'd have to

2  check with Captain Ross to make sure we didn't release

3  the SurveyMonkey, but I don't believe we did.

4      Q.   Okay.  I could ask him.

5      A.   There is a link.

6           MR. JOHNSON:  Off the record.

7           (Whereupon, an off-the-record discussion was

8      held.)

9  BY MR. JOHNSON:

10     Q.   If you can turn back to Exhibit A, go to page

11  50.

12     A.   Okay.

13     Q.   So what is the unified report?

14     A.   Unified report is all the other surrounding

15  jurisdictions, they provide significant calls for

16  service that they responded to in the county for us to

17  have awareness of.  So it's basically a sharing of

18  information that, hey, I responded to this burglary,

19  robbery, rape, murder, things of that nature to ensure

20  that we're sharing information on anybody involved in

21  criminal activity throughout the county.

22     Q.   And we've already talked about the daily

23  intelligence briefs.  Daily intelligence briefs, are

24  those saved on the ILP unit drive?

25     A.   They are.  We have them, yes.  And again, that

1    was something new.  I'll have to get you the exact date

2    on when that started, but that was something new we did.

3    I want to say maybe that was started '18, '19, but it

4    was something new that we started.  It wasn't always

5    there when we got here.

6        Q.    Now this suggests -- and I'm going to read from

7    the document here in the second paragraph.  The daily

8    intelligence briefs would include, "Updates to priority

9    offenders and their contacts with deputies and

10   involvements in PSO records."  Is that accurate?

11       A.    Yeah.  I mean, if they're focusing on that

12   individual that place and time, yes.  Again, this would

13   update like, you know, hey, the individual that has been

14   implicated in this crime has moved or has moved out of

15   county or no longer lives here.  Yeah, so those updates

16   can be provided whether in writing or whether in verbal

17   brief.

18       Q.    Okay.  What is the weekly actionable

19   intelligence product?

20       A.    That's our AIM slides.  We've talked about that

21   before.  Those are the AIM slides that the analysts

22   complete every week.

23       Q.    Understood.  If you look at page 18, there are

24   two bullet points.

25       A.    Okay.

1     Q.   Prolific offender arrests, what is that report?

2  Does that -- are you familiar with that type of report?

3     A.   So that's not necessarily a report.  I would

4  say if, you know, we have cases pending that individuals

5  are prolific, these individuals have committed prior

6  crimes, we will consult with the State Attorney's Office

7  to say, "Listen.  This is the fifth, sixth, seventh day

8  or time that this individual's been arrested.  What is

9  that individual looking at?"  They'll work with the

10 public defender and say, "Hey, this is the fifth, sixth

11 time that your individual has been arrested.  You know,

12 what are we looking at for sentencing," and things of

13 that nature.  So we'll provide information to the SAO on

14 information that we have based on their criminal

15 activity in the county.

16          So it's not necessarily a report.  A lot of

17 times that's -- and I don't know if they did something

18 different prior to me; right?  A lot of times, this is

19 just a meeting.  We'll sit down with them and say, "Hey,

20 look.  We have all these cases that you guys are

21 working.  Is there any information you're missing?"  If

22 there is, maybe we can provide that through reporting

23 and things of that nature.

24          So that was just like -- but there's no report

25 that we present to them currently.  I don't know what

1    was prior to me or not.

2         Q.   If you read this, it says that, "We have made

3    two reports available on the intranet for members to

4    access."  The first is prolific offender arrests, and

5    then it says, "This report --"

6         A.   Yeah, these are pulling from -- this is pulling

7    from the documentation from our RMS.  They're specific

8    like reports that you can pull down and say when were

9    these prolifics arrested?  You can pull that down when

10   they were arrested.  So we do have that, yes.

11        Q.   Okay.  And that's available on the intranet?

12        A.   It is.  It's internal, yes.

13        Q.   And the second bullet, prolific offender

14   involvement, that's also a report that's available?

15        A.   Yes.  If they were involved in any kind of case

16   number, criminal intelligence, things of that nature,

17   it's there.

18        Q.   Is that a PDF, or how is that presented?

19        A.   On the intranet.  Again, it's visual.  You pull

20   it down.  It's I guess inside the database forum.

21        Q.   Okay.  So just to make sure I understand it, a

22   deputy or an analyst could go on the intranet and, using

23   the intranet, could identify all of the different

24   involvements?

25        A.   Yes.  I could tell you the likelihood of the

1   deputies pulling this report are slim to none.  There's

2   probably a small percentage of those individuals that do

3   that.  I mean, I hate to say that.  It sounds horrible

4   on their part, but they're not using that.  That's why

5   global profiles is so -- global profiles and central

6   command is so useful for them.

7       Q.   So really, the more important tool from the

8   deputies perspective would be the global profile?

9       A.   Yes, sir.

10      Q.   Now this is probably obvious, but I just want

11  to be very clear about it.  We talked earlier about how

12  some of the notes associated with the global profile

13  might include -- I forget the exact wording you used,

14  but, essentially, generic information that wouldn't be

15  sensitive to a particular investigation.

16      A.   Yeah, I would say there's information inside

17  those.  That's a fair assessment.

18      Q.   Is that also true of some tips?

19      A.   Yeah, I would say so.  I mean, you've got to

20  remember, a lot of our tips are coming from the public.

21  So prior to the new tip program, I would say there's a

22  definite delineation between tips from the public and

23  tips from deputies; right?

24           Tips from deputies ultimately should be a

25  little bit more detail-oriented, at least we hope so.

1    Some are not; right?  It's hit or miss.  But the ones

2    from the public could be a simple, again, "Hey, that

3    house is a drug house," and that's all we get.  No

4    address, no information, nothing.

5         So it comes upon us, do we believe that's true?

6    And we have to vet the information.  If we don't believe

7    it's vetted information, there's not enough information

8    to sustain any kind of reasonable suspicion or to move

9    forward with an investigation or even to look at it, we

10   just leave it as information only or close it out.

11   Q.   So just focusing on the tips from the deputies,

12   some tips from deputies might include information that

13   is not particular to an ongoing investigation?

14   A.   It could be, yeah.  Again, we'd have to go

15   through them and look at them.  So without me having an

16   example in front of me saying yea or nay, then I would

17   say yes, some of that is not actual criminal

18   intelligence.  It's just information.

19   Q.   Okay.  And intel reports, would some intel

20   reports include information that is not specific to a

21   particular criminal investigation?

22   A.   Yeah, I would say so, but it still might be

23   considered criminal intelligence.  There's going to be a

24   difference between whether an investigation goes or we

25   believe there's active intelligence that deals with

1    criminal -- suspicion of crime.  So they would have to

2    be reviewed.

3              Again, if the document didn't have anything

4    into it to kind of either give away tradecraft or, you

5    know, kind of look at an investigation or keep case

6    integrity, then, yeah, it would be kind of just, again,

7    simple information.  And we would be able to release it,

8    unless there's some other exemption that I'm missing.

9         Q.   And again, I just -- I hate to belabor the

10   obvious, but I just want to make sure we've got this

11   very clear.  So on page 19 of Exhibit A, again, going

12   back to this bullet point, "To learn as much as possible

13   about prolific offenders," and then dot, dot, dot,

14   "including their acquaintances."  So information on

15   acquaintances of prolific offenders could be included in

16   a tip?

17        A.   Yeah.  It could be, yes.

18        Q.   And it could be included in an intel report?

19        A.   Yes.

20        Q.   And it also could be included in the remarks

21   section of the global profile?

22        A.   The remarks, the police report.  Absolutely,

23   yeah.

24             MR. JOHNSON:  I'll mark this as Exhibit J.

25             (Exhibit J was marked for identification.)

1    BY MR. JOHNSON:

2        Q.    Are you familiar with the individual who is

3    listed as the recipient of this email?

4        A.    Yeah.  This might be a judge's assistant.  I

5    don't remember -- I don't remember the email though.

6        Q.    You don't know who this person is?

7        A.    If it's who I think it is, she works for a

8    judge.

9        Q.    She works for a judge?

10       A.    Yeah.

11       Q.    Why would you be sending a copy of the manual

12   to someone who works for a judge?

13       A.    I have no idea.  Again, I don't know what's

14   attached to this or what the context of this was.

15       Q.    Okay.  Well, if you look under attachments --

16       A.    Yeah, I'm not sure.  I mean, 2018, I have no

17   idea what the request was or what it was.

18       Q.    Just curious.  We were produced seven copies of

19   this email.

20       A.    Is that right?  I know she's a judge's

21   assistant.  She works for a judge.  Honestly, I don't

22   know why I would send it to her.  I don't know if it was

23   a request from her or the judge or -- not sure.

24       Q.    That's fine.

25             MR. JOHNSON:  Why don't we just take a quick

1     break?

2          MR. POULTON:  Okay.

3          (Whereupon, a short recess was taken.)

4   BY MR. JOHNSON:

5     Q.   Does Pasco County Sheriff's Office conduct

6   performance evaluations for members of the ILP unit?

7     A.   Yes.  We do member evaluations, yes.

8     Q.   And that's the term, member evaluations?

9     A.   Yeah.  What is it?  Member performance review,

10  MPRs.  I have to remember because we call them evals,

11  and they call them MPRs.  So in our world, we call them

12  evals.

13    Q.   Okay.  For clarity, I'll call them MPRs I

14  guess.  Is there any written work product that comes out

15  of the MPRs?

16          MR. POULTON:  Object to the form, but go ahead.

17    A.   Yeah.  There's actually a document that -- it's

18  a set document that's identified for every MPR in the

19  agency, and then we put our feedback in these MPRs.  So

20  they're created by their immediate supervisors.  They're

21  reviewed by the bureau commander, and they're sent to

22  human resources.

23  BY MR. JOHNSON:

24    Q.   And is one of those documents produced for

25  every MPR?

1    A.   Yes.

2    Q.   Okay.  And are those retained in the database?

3    A.   No.  I think they're retained just by like

4    paper like in a file -- in the member's file.  Yeah,

5    they're not electronic if that's what you're asking.

6    Q.   So each member has a file that would include

7    those documents?

8    A.   Yeah.  I believe everyone has an internal HR

9    file that it goes into and training file -- a training

10   file if you're training.

11   Q.   So the file would include the MPRs, and you're

12   saying it would also include the training documents?

13   A.   It should, yeah.  I don't know exactly which --

14   training retains our training documents, and HR retains

15   our MPRs.

16       MR. JOHNSON:  I'll mark this as Exhibit K.

17       (Exhibit K was marked for identification.)

18   BY MR. JOHNSON:

19   Q.   Are you familiar with this document?

20   A.   No.  This must have been before me.  I mean, it

21   seems pretty standard.  We go through all of this, you

22   know, when we go through our training documents.

23   Q.   So what are the training documents?

24   A.   When we go through our training -- so they sit

25   with a senior analyst, and they go -- the Real-Time

1    Crime Center goes through a checklist, and our district

2    analysts go through a similar thing.

3            So this looks like a checklist, but normally,

4    we go based on the trainer.  The trainer keeps

5    documentation within their -- to themselves, and then

6    they provide feedback to the supervisor during eval

7    time.  So eval -- the first eval that you get when

8    you're a new member, you get quarterly evals, and then

9    we determine whether or not you're going on to retention

10   basically, like within the first year.  There's rules

11   that if they're not up to standard, up to par, that

12   those individuals are subject to be released by the

13   agency if, you know, there's necessary reason for it.

14           But, yeah.  I mean, it looks standard, but this

15   might have been created before me.  So Captain Ross may

16   know what this document is and when it was created.  And

17   I can go back and clarify if the analysts are still

18   using this.  Like I said, we have senior analysts that

19   train, so I can go back and check.

20   Q.   Do you know currently if you use a checklist?

21   A.   I'd have to ask our trainers.

22   Q.   You don't know.  Okay.

23           MR. JOHNSON:  Tom, can you follow up on that

24       and let us know if there's a current checklist?

25           MR. POULTON:  Sure.  I figured, you know, you

1    can probably email some additional requests or

2    follow-ups and whatnot.

3         MR. JOHNSON:  Yeah, we can do that after this.

4         MR. POULTON:  Add that to the list.

5         MR. JOHNSON:  I'm going to provide you with

6    another document.  We can mark this as Exhibit L.

7         (Exhibit L was marked for identification.)

8    BY MR. JOHNSON:

9    Q.   Are you familiar with this type of document?

10   A.   So this is not ours.

11   Q.   It's not.  Okay.

12   A.   I'm going to assume that this is referring to

13   the Tampa Police Department's VIP list.  But I'm not

14   100 percent sure, so don't put me down for 100 percent

15   sure.  But we didn't create this.  This would have been

16   a document shared with us from other agencies because

17   none of these individuals -- I can't even see the names.

18   But, yeah.

19   Q.   Is there a document similar to this that would

20   be created by the Pasco County Sheriff's Office?

21   A.   No.  If they're not in like a product similar

22   to this, it wouldn't come in this form.  I mean, again,

23   this is just another form of how they're identifying

24   individuals.  I can't speak for Tampa Police Department.

25   You'd have to ask them.

1          But again, this doesn't look to originate from

2    us.  So without having the context of where -- how you

3    got the document or where the document was given to you

4    -- I'm sure it was through a public records request and

5    we provided it -- I'm not sure.  So without seeing the

6    actual file, it looks like the VIP list.

7          MR. POULTON:  It says VIP at the top.

8       A.  I've seen it before.  But I think early '17,

9    '18 we talked to them, and they had something similar to

10   this.  But it wouldn't -- again, this would only affect

11   Tampa Police Department.

12   BY MR. JOHNSON:

13      Q.  We've talked about this previously, but I want

14   to make sure I understand it.  Exhibit D, you indicated

15   that this was -- this is an example of a prolific

16   offender list; is that correct?

17      A.  Yeah.  This would probably be something that

18   Steve kept internal for his own knowledge on what was

19   still active, who was still active, things of that

20   nature.  So it does look like an export of an Excel

21   spreadsheet, but I'm not 100 percent sure.

22      Q.  And do you know if these are saved somewhere?

23      A.  If anything, they would be in the product drive

24   if we still had them.

25      Q.  Is the product drive part of the ILP unit

1    drive?

2         A.   Yes.   That's what we store finished

3    intelligence in or our intel documents for that finished

4    intelligence.

5         Q.   Okay.   Is there any other document that is

6    produced that lists the active prolific offenders?

7         A.   It would be the export like this, like I said,

8    from like whatever Steve was sharing with the analysts.

9    It would be something similar to this.   So no other

10   database, no other document.   Again, this is pulled from

11   however he exports it to show like who the current

12   active offenders are.   That's what he would show.

13        And again, like I said, the intel analyst would

14   go through it.   Most of the time it's in Excel because

15   Excel is a lot easier to navigate.   It's a lot easier to

16   filter.   They can go through it and filter like -- so,

17   in other words, if their address is CADing up in

18   district two or district one or district three, they can

19   go through and just look at their district instead of

20   looking at an entire list of 1,100-plus people or

21   whatever it yielded that quarter.

22        And I definitely could follow up on that and

23   ask them, but I know I've seen an Excel spreadsheet

24   similar to this in the past.   So again, without me

25   seeing the actual icon of where this document came from,

1    then I could tell you because it will tell me it's a CSV

2    file.

3        Q.   Okay.  Who trains the analysts?

4        A.   Senior analysts in the unit, myself, the

5    manager.  Prior to me getting here, again, I don't know

6    what that looked like.  But the intel analysts come from

7    all over the place.  They come from different

8    backgrounds, different fields, things of that nature.

9        Q.   If I wanted to ask somebody questions about,

10   for instance, if there was a checklist, who would be the

11   best person for me to talk to?

12       A.   Melinda Warner for the training, and then

13   Shelly Gardner, too, because she's our analyst

14   supervisor.  She's been -- they've both been here longer

15   than I have.

16       Q.   Are you familiar with the job analysis tool?

17   No?  Okay.  I'm just going to provide you with a copy of

18   an email and see if its helpful.  If it's not helpful,

19   we don't have to mark it.  See if that jogs your

20   recollection at all.

21       A.   I don't recall what that is.  I don't know.  I

22   guess there needs to be more context.

23            MR. JOHNSON:  Actually, just for the clarity of

24       the record, let's mark this as Exhibit M.

25            (Exhibit M was marked for identification.)

1           THE WITNESS:  Oh, is this the CODY study?

2           MR. POULTON:  Can I see a copy?

3       A.    I mean, so I know routinely, we basically

4   review our job descriptions and make sure they're up to

5   date.  Other than that, I can't think of anything else.

6   I mean, if that would have came from HR or it came from

7   -- I mean, it looks like it is something from HR because

8   it's older because that director no longer works here.

9           I would say maybe that's us looking at the job

10  descriptions for our analysts and for our positions to

11  make sure that there's nothing that needs to be added,

12  taken away, there's no rules, regulations from an HR

13  perspective, but I'm only assuming.  Like I said, we do

14  it periodically, but I didn't know it was called the job

15  analysis tool.

16  BY MR. JOHNSON:

17      Q.    If I wanted to ask them more information about

18  this, who on the email list would make sense for me to

19  talk to?

20      A.    The HR director maybe.

21          MR. POULTON:  Off the record.

22          (Whereupon, an off-the-record discussion was

23      held.)

24  BY MR. JOHNSON:

25      Q.    What is the SPI grant?  Are you familiar with

1    that?

2        A.   I am familiar with the SPI grant.

3        Q.   What is the SPI grant?

4        A.   The SPI grant was written for -- to look at

5    violent and narcotic offenders in the county.

6             MR. JOHNSON:  We'll mark this as Exhibit N.

7             (Exhibit N was marked for identification.)

8    BY MR. JOHNSON:

9        Q.   Are you familiar with this document?

10       A.   Not this document, but I wrote the grant.

11       Q.   Okay.  But you're not familiar with this

12   document?  Are you familiar with the mission statement?

13       A.   Yes, but I haven't seen it in this platform.

14       Q.   So you're familiar with the content?

15       A.   I am, yes.

16       Q.   What is the mission statement for the SPI

17   grant?  Not what does it say, but what is its function?

18       A.   The function is to reduce violent crime within

19   the county, looking at violent prolific offenders, and

20   looking at narcotic prolific offenders, individuals that

21   have, you know, continuously committed violent crimes.

22   Yeah.  So, like I said, once I wrote the grant, the

23   grant got assigned over to our special investigations

24   division, and it was outside of my purview.  So I did

25   not oversee this grant after I wrote it.

1    Q.   So this mentions a -- I'm quoting now, "A

2  process evaluation to evaluate the validity of the

3  prolific offender lists."  And it says that will be

4  conducted by Dr. Fox.  Is that something that actually

5  happened?

6    A.   Completely separate -- I just want to make sure

7  we're on the record with this -- completely separate

8  from our prolific offender list at the Pasco County

9  Sheriff's Office, if that makes sense.

10    Q.   Please, explain.

11    A.   So this is a different set of individuals.  So

12  this does not have the same criteria as our prolific

13  scoring for day-to-day operations.  This is a specific

14  project based on violent and narcotic prolific

15  offenders.  So two specific categories of crime were --

16  was designed based on this grant to focus on, rather

17  than focusing on property crimes and violent crime as

18  well.  Two separate, different programs.

19    Q.   So the information that was provided to Dr. Fox

20  would not relate to the prolific offender lists?

21    A.   No.  It's drawn separately specific to its

22  grant.  So I'm familiar with Dr. Fox.  I'm familiar

23  she's a partner.  I'm familiar they were in the process

24  of the review.  I don't know where they're actually at

25  in the process.

1    Q.   Okay.  Has the Pasco County Sheriff's Office

2  provided Dr. Fox with information about the prolific

3  offender list that we've been primarily discussing

4  today?

5    A.   She's aware of it, but I don't know how much

6  information we've provided her with.  You're talking

7  about -- you're not talking about this one; right?

8  You're talking about the prolific offender list in the

9  past?

10   Q.   Yes.

11   A.   I believe she's aware of it.

12   Q.   Aware of it.

13   A.   Yeah.  She did some studies with Tampa on

14 prolifics.

15   Q.   Has she done studies with the Pasco County

16 Sheriff's Office?

17   A.   She's been an academic partner in multiple,

18 multiple programs.

19   Q.   Has she been an academic partner in the ILP

20 program or ILP --

21   A.   Not in general, just for specific grants.  I

22 would say she's grant-specific.

23   Q.   So is there any grant -- and this is tricky

24 because there are two prolific offender lists.  But when

25 I refer to the prolific offender list, I'm not referring

1    to the SPI grant.  The prolific offender list that is

2    discussed in the manual and that we've been discussing,

3    has she participated in any grants that relate to the

4    prolific offender list?

5        A.   I don't believe so, no.  And we would have to

6    check prior to me.  Again, like I said, you would have

7    to talk to Captain Ross and see if she had anything to

8    do with the prior or the previous directors, and

9    potentially Major Peake.

10       Q.   Okay.  How about -- are you familiar with

11   Dr. Jeremy Ratcliffe?

12       A.   Jerry Ratcliffe, yes, I am.

13       Q.   Has Jerry Ratcliffe been provided with any

14   information about the prolific offender lists?

15       A.   So I was told that he was consulted prior to my

16   arrival with another director.  I don't know what the

17   brevity or the depth of that was, but a lot of

18   literature that he has and research went into initially

19   starting up the intelligence-led policing philosophy at

20   the sheriff's office.

21       Q.   Who was that director?

22       A.   I want to say that would have been Brian

23   Prescott at the time.

24       Q.   Is Brian Prescott still employed with the

25   office?

1     A.   No, sir.  He's not.

2          MR. BARGIL:  Was that the name that you

3     couldn't remember before?

4          THE WITNESS:  No.  I still can't remember that

5     guy's name.  If I texted my analyst real quick, she

6     would absolutely know.  Tony Gallo.

7  BY MR. JOHNSON:

8     Q.   Let me go back.  What was the context that you

9  were trying to remember that name?

10    A.   You asked me who was the director prior to

11 Justin and myself, and I believe Tony Gallo -- he wasn't

12 the director, but he was the actual manager in charge of

13 the Intelligence-Led Policing Program.  And then prior

14 to that was Brian Prescott.  I wouldn't know anything

15 prior to that.  I just know based on someone telling me

16 that, hey, he was the guy that kind of was quested or

17 tasked with putting the system together.

18         MR. POULTON:  Is Gallo G-A-L-L-O, do you know?

19         THE WITNESS:  No.  We never officially met.

20 BY MR. JOHNSON:

21    Q.   So the directors -- I want to make sure I have

22 this right -- yourself, and Ross, then Tony Gallo --

23    A.   Was a manager.  He was a manager, but he -- he

24 was the -- he oversaw the ILP program or the ILP

25 philosophy.

1       Q.   So the individuals that oversaw the program in

2   reverse chronological order would be yourself, Captain

3   Ross, Tony Gallo, Brian Prescott?

4       A.   Yes.

5       Q.   And are you aware of anybody who oversaw the

6   program prior to Brian Prescott?

7       A.   Not to my knowledge.

8       Q.   And there's nobody else -- there's no one who

9   oversaw the program other than the individuals I just

10  listed that you're aware of?

11      A.   As far as I know, and all of which reported to

12  a major at the time.

13      Q.   Actually, that's a good question.  Who is your

14  supervisor?

15      A.   Mine is Phillip Kapusta.

16      Q.   And what is his rank?

17      A.   He's a major.

18      Q.   What is his place within the organization?

19      A.   So he's the bureau commander for the Future

20  Operations Bureau.

21      Q.   What is the Future Operations Bureau?

22      A.   It houses the Intelligence-Led Policing section

23  and the Behavioral Health Intervention Team.

24      Q.   What is the Behavioral Health Intervention

25  Team?

1          A.    So they are a group of trained deputies that go

2     out and deal with crisis -- the individuals that have

3     behavioral health crises, cognitive issues ranging from

4     an array of things; right?  So whether we deal with

5     individuals with autism or are on the spectrum, we deal

6     with people who have suicidal ideations, they will go

7     out and try to get them services connected to our --

8     BayCare, our behavioral health teams that are private

9     sector.  So we'll try to get them long-term care if

10    they're suffering from that.

11         Q.    Apart from the ILP and the behavioral health

12    segment, are there any other parts of the Pasco County

13    Sheriff's Office that fall within the Future Operations

14    Bureau?

15         A.    No.  I'm sorry.  We have a biotech officer, and

16    then we have a strategic planner or writer, and they're

17    just individuals that report directly to the major.

18         Q.    What is the role of the strategic planner?

19         A.    Looking at long-term strategic planning for the

20    agency.

21         Q.    Would that include strategic plans for ILP?

22         A.    Agency-wide, potentially.  Normally, we look at

23    the strategic outcome through the five-year analysis.  I

24    don't think there's been any strategic plan written on

25    ILP in general.  It's more of like where we go as an

1    agency, what the agency looks like 5, 10, 15 years from

2    now.  It's also -- it includes staffing, you know, what

3    do you do when there's a -- you know, a rise in

4    population but there's no rise in the amount of law

5    enforcement services that we have, or things of that

6    nature?  How do we work with our partners to better

7    deploy resources?  So it's things like that.

8         Q.   You mentioned a five-year -- is it five-year

9    assessment?

10        A.   The ILP five-year assessment.  We do an

11   assessment every five years.

12        Q.   What does that consist of?

13        A.   Just looking at overall what our processes,

14   policies, and procedures are within the organization and

15   make sure that we're still looking at the right thing.

16   It also looks at the crime environment.  Does the crime

17   environment still match what we're focusing on?  If

18   we're not focusing -- you know, we focus on big four and

19   violent crime, which is primarily in the lines of what

20   continues to plague the agency.

21             But we also look at other things like quality

22   of life crimes, things of that nature, right, things

23   that people call in like I told you earlier, like, "My

24   hedges are too high.  My neighbor smells.  There's waste

25   in my yard."  We deal with a lot of that.

1           So the five-year just kind of looks at the

2    policies and procedures inside and makes sure that we're

3    still focusing on the right things.  And if we're not,

4    we tend to kind of go -- we brief command and say, "Hey,

5    this is the path we think we need to go.  This is how

6    we're going to do it and how we're going to carry it

7    out."

8           Q.   And would that five-year assessment look at

9    policies for making the prolific offender list?

10          A.   It would look at the prolific list process,

11   right, so it would look at it and say, "Hey, is it still

12   -- does this work?"  It's like anything else we should

13   do in research and development; right?  You should

14   always assess what is working and what is not working.

15          Q.   And does it look at the process for making

16   prolific offender checks?

17          A.   It talks about everything, whether they're

18   successful or not, and there's an assessment done on

19   that from an analyst.

20          Q.   When was the last time the five-year assessment

21   was done?

22          A.   We just completed it.

23          Q.   Does that mean that another was done in 2016?

24          A.   I don't know if they did one in 2016.  I just

25   know that when I came in 2016, my goal was to do this

1    every five years, if not sooner.  So that was something

2    I kind of implemented from our point of view.  You would

3    have to ask the others if they did something prior to

4    that.

5        Q.   And to be clear, this is a retrospective

6    analysis, meaning it's looking back at the prior

7    five years?

8        A.   Yeah.  It's looking back at the five years

9    prior.  So from 2016 to now, it's looking back at those

10   -- you know, what happened in each year?  It looks at

11   crime environment, it looks at UCR data, it looks at the

12   amount of crime that we had.  Is our burglaries going up

13   or going down?  Is violent crime going up or going down?

14   Are we on par with what nationwide statistics say?

15            So like UCR numbers -- like are our numbers any

16   different from our region and then different from

17   nation?  So if what you're looking for -- so let's say

18   the nation goes down in violent crime, and we go up as

19   Pasco.  Why us?  So you're kind of looking at kind of

20   the why behind everything.  So it's not enough to go,

21   hey, here's what's happening.  You're supposed to

22   identify the why it's happening, so the causation behind

23   it.  Same thing we do with ILP, what's the root

24   causations of crime?

25       Q.   The future ops bureau, Major Kapusta is the

1    head of the bureau?

2        A.   Yes.

3        Q.   Do you know how long he's been in that

4    position?

5        A.   Not exactly.  I'd probably say '17, '18-ish.

6    Maybe later.

7        Q.   And who does he report to?

8        A.   The colonel, our chief deputy.

9        Q.   What's the colonel's name?

10       A.   Jeff Harrington.  I blanked.  Don't tell him.

11       Q.   Unfortunately, you're on the record.

12       A.   Tell him not to read this.

13       Q.   And then who does Jeff Harrington report to?

14       A.   The sheriff.

15       Q.   And Jeff Harrington, what is his position?

16       A.   He's the chief deputy.

17       Q.   And what aspects of the Pasco County Sheriff's

18   Office does he oversee?

19       A.   I would say all of it.  I mean, there's

20   definitely layers in between.  But, ultimately, he's the

21   chief.  So he oversees and then works with the

22   organizational chain of command and things of that

23   nature.

24            MR. JOHNSON:  Why don't we take just like a

25       very quick break, and then we'll wrap up any last

1      things.

2              MR. POULTON:  Great.  I understand.

3              (Whereupon, a short recess was taken.)

4      BY MR. JOHNSON:

5      Q.   I've got two small questions.  First question,

6      if we go to page 66 -- for context, you're going to want

7      to look at page 65 to 66.  Sorry.  We're on Exhibit A.

8      A.   Okay.  So you said 65 to 66?

9      Q.   So this is discussing school resource officers.

10     And under performance expectations, the third bullet

11     point, "To identify any priority offenders who attend

12     your school and look to collect information about their

13     activities and associates in the school."

14     A.   Okay.

15     Q.   If an SRO was to collect information about a

16     prolific offender, how would the SRO report that

17     information?

18     A.   So again, it depends what time period; right?

19     We talked about they used the tip program at one time to

20     enter that information.  Now it would potentially be an

21     intel report, or it could be verbal to the analyst or

22     straight to the district.  I mean, a lot of these

23     communications could be from deputy to deputy, or they

24     could be done during an AIM meeting where, you know, at

25     the end of the AIM meeting they ask, "Hey, does anybody

1    have anything?"  And that SRO speaks up like, "Hey, I

2    had contact with prolific A."

3         Q.   Okay.  But there's no separate --

4         A.   No.  It's the same process for them as other

5    deputies.  You've got to remember, they're still law

6    enforcement officers, right, regardless of whether

7    they're SROs or not.  The only difference between them

8    is that they do a lot of off-ramping and have a lot of

9    discretion where they try to get these kids to realize,

10   hey, let's not go down the path of crime, and let's see

11   if we can get you graduated to a better job or get you

12   on the right track.  They truly do do a lot of work with

13   our juveniles.

14        Q.   Next item below that, it talks about the STAR

15   teams.  And on page 67 -- we're still on Exhibit A -- it

16   says that the STAR team, "Is expected to actively work

17   with other PSO members (particularly ILP and detectives)

18   and outside agencies to identify and target prolific

19   offenders."  How does the STAR team help to identify

20   prolific offenders?

21        A.   So the STAR team is designed to look at

22   geographical policing, right, so you're looking at

23   hotspot policing.  You're looking at areas of our county

24   that have a higher concentration of crime than other

25   areas.

1          So within those STAR boxes, if prolifics are

2    active in that criminal nature, that's what they would

3    do.  They would tend to identify those individuals that

4    are active in that environment.  They would share that

5    information with other deputies.  And again, through the

6    AIM, through the analysts, through verbal briefing, same

7    process, right, through an intelligence report or a tip,

8    things of nature.  It's the same functionality across

9    the board.  But they are designed to look at areas of

10   concern within Pasco County that have a higher

11   concentration of crime.

12          MR. JOHNSON:  I think I'm done.

13          MR. BARGIL:  That was only two.

14          MR. POULTON:  And they were small.

15          He will read.  You can contact me directly.

16              *  *  *  *  *  *

17          (THEREUPON, THE TAKING OF THE DEPOSITION WAS

18       CONCLUDED AT 12:59 P.M.)

19              *  *  *  *  *  *

20              S T I P U L A T I O N

21       It was thereupon stipulated and agreed by and

22   between counsel present for the respective parties and

23   the deponent that the reading and signing of this

24   deposition is not waived.

25              *  *  *  *  *  *

1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA

3    COUNTY OF PASCO

4         I, the undersigned authority, certify that

5    LARRY KRAUS personally appeared before me and was duly

6    sworn on September 23, 2021.

7         WITNESS my hand and official seal this 25th

8    day of September, 2021.

9

10

11    _____
      Jacquelyn Altilio
12    Notary Public - State of Florida
      Commission No.:  GG 363241
13    My Commission Expires:  8-7-2023

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF PASCO

5

6          I, JACQUELYN ALTILIO, Court Reporter, certify

7    that I was authorized to and did stenographically report

8    the foregoing deposition and that the transcript is a

9    true record of the testimony given by the witness.

10

11         I further certify that I am not a relative,

12   employee, attorney, or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties'

14   attorney or counsel connected with the action, nor am I

15   financially interested in the action.

16

17         Dated this 25th day of September, 2021.

18

19   _____

20   Jacquelyn Altilio, Court Reporter

21

22

23

24

25
```

```
 1    Style:  Taylor v. Nocco
      Deposition of:  LARRY KRAUS
 2    Date:  September 23, 2021

 3                       ERRATA SHEET

 4       I have read my testimony in the foregoing transcript

 5    pages 1 through 157, inclusive, and herewith subscribe

 6    to same as the correct transcription of the answers made

 7    by me to the questions recorded therein, unless noted.

 8    PAGE     LINE                CORRECTION

 9    _____   _____    _____

10    _____   _____    _____

11    _____   _____    _____

12    _____   _____    _____

13    _____   _____    _____

14    _____   _____    _____

15    _____   _____    _____

16    _____   _____    _____

17    _____   _____    _____

18    _____   _____    _____

19    _____   _____    _____

20    _____   _____    _____

21    _____   _____    _____

22    _____   _____    _____

23    _____   _____    _____

24                       _____
                         LARRY KRAUS
25    DATED: _____
```

**A**

A's 48:20
A- 3:2
A.M 1:15
Abargil@ij.org 2:8
ability 83:20
able 22:6 29:23 40:24
  46:25 47:1 57:13 69:1
  78:13 80:13 82:18,22
  83:21 85:12 92:22
  101:20 103:18 104:5
  106:3 109:15 119:22
  120:14 121:3 122:6
  124:8 131:7
absolutely 19:20 20:1,2
  21:4 28:13 54:18
  82:21 96:7 101:17
  103:20 104:4 105:20
  105:20 109:3 113:21
  131:22 145:6
academia 12:13,15 13:19
  14:25 15:23
academic 14:5 16:12
  74:3 143:17,19
access 26:3 32:22 33:3,4
  33:6,7 34:21 35:1,5
  36:1 44:11 70:16,18
  70:18 78:25 83:25
  85:9,10,13 92:8
  102:12,13 109:3,4,5
  109:15,17 110:15
  119:1 120:14 122:22
  128:4
accesses 110:14
accessible 119:24
accordion 107:16 122:4
  122:24
accordions 104:16
account 70:21,22
accounts 70:20
accurate 126:10
accurately 13:13
accustomed 11:20
acquaintances 90:4
  131:14,15
act 23:9 30:2,3
action 20:12 156:14,15
actionable 20:7,8 51:10
  51:11,12 96:12 111:1
  126:18
active 12:16 13:1 28:3,15
  28:19,20,22 40:3,17
  42:5,7 49:17 53:4
  57:15,20 58:1 61:9
  74:11 75:2 80:18,19
  81:1 82:25 98:16
  105:18 118:4 130:25
  137:19,19 138:6,12
  154:2,4
actively 99:3 153:16
activities 152:13
activity 17:15 40:18
  44:21 52:25 53:5
  63:24 100:6 125:21
  127:15
acts 101:5
actual 13:22 23:23 33:18
  35:7 80:24,25 85:9
  90:11 95:13 97:16
  101:23 106:21 110:22
  111:25 115:10 118:13
  130:17 137:6 138:25
  145:12
adapt 56:2,3
add 59:12 60:5 65:16
  108:21,21 136:4

added 14:12,12 24:15
  39:17 140:11
adding 60:21
additional 92:1 136:1
address 91:22 103:9
  105:12 121:12 130:4
  138:17
addresses 91:21
adjust 9:7
adjusted 56:16
adjustments 56:10,11
administrative 89:11
Adrianna 104:12,13
adult 37:18 94:20
adults 94:21
advance 33:10
advanced 33:10
advertised 17:16
advise 56:6
advised 86:19
advising 92:25
affairs 38:8 89:17,20
affect 24:13 61:15 93:4
  137:10
afternoon 50:3
age 38:5 40:10,14
agencies 9:7 30:11 52:7,8
  136:16 153:18
agency 6:6 9:1,13 15:16
  15:18 24:11 47:16
  56:8 69:17 89:9 101:2
  101:8 124:12 133:19
  135:13 147:20 148:1,1
  148:20
Agency-wide 147:22
agenda 52:16
agendas 52:14
aggravated 24:7 96:15
ago 45:8
agreed 134:21
ahead 9:18 133:16
AI 26:2
AIM 52:15 53:19 54:8,8
  54:11,17 73:7,8,10
  78:20,23 87:8 88:11
  89:3 91:3,13,20 92:2
  101:23 114:4 115:5,18
  126:20,21 152:24,25
  154:6
AIMs 54:14
alert 78:6,7,16,17
alerts 57:11,12 122:25
algorithm 33:4 81:24
alleviate 60:2
allow 8:21 25:8 37:23
  44:25 45:1 46:17
  52:20
allowed 84:21
allows 44:9 80:12,13
Altilio 1:19 155:11 156:6
  156:19
amount 18:9 53:22 82:4
  148:4 150:12
analyses 79:24
analysis 6:17 9:11 19:12
  47:20 62:21 64:6
  69:20,21 70:5,7 71:17
  71:19,20 72:10,17,19
  73:10,12 75:24 76:4
  76:13,21,22 79:14,15
  79:20,22,23 81:4,11
  81:16,18,18,20 82:10
  82:16,19,20 97:8,8,9
  139:16 140:15 147:23
  150:6
analyst 20:17,18 22:15
  23:8 26:4 28:14 30:17
  31:6 32:14,20 34:8,14

43:16 50:19 53:12,20
  57:16 59:2 60:5,7,8,10
  60:18,22,25 61:1 70:6
  72:22 81:21 85:14,19
  86:24,24 87:1,2,2,19
  88:10,17,21 90:18,20
  90:23 91:8 92:22 93:1
  93:24 94:10,22 95:19
  95:20,21 96:5 99:20
  100:3 109:15 110:3,11
  110:12 114:24 128:22
  134:25 138:13 139:13
  145:5 149:19 152:21
analysts 5:6 12:22 22:5
  22:16 25:16 26:1,7
  27:21 29:6 32:7,22
  34:8 37:16 52:16 57:9
  57:9,19 58:9,16,19,20
  58:21 59:8 60:9,11,14
  69:21 81:19 82:12
  85:12 88:4,7 90:21
  94:3 109:21,22,24
  110:18 126:21 135:2
  135:17,18 138:8 139:3
  139:4,6 140:10 154:6
analytic 114:12
analytical 12:23 13:8
  21:6 110:18
analytics 12:21 71:25
  94:12
analyze 20:18
ANDERSON 1:22
AndersonCourtReport…
  1:24
announced 54:17
anonymously 44:13 45:2
answer 58:7 73:21
  118:17
answered 77:8 88:20
answers 157:6
anybody 36:15 39:10,12
  43:13 50:25 63:2
  70:22 107:19 110:14
  125:20 146:5 152:25
anymore 29:5 37:24
  39:23 40:4 44:8 46:17
  56:13 62:25 63:10
  113:3,12 122:17
Anytime 10:20
anyways 110:10
anywheres 44:17
AOR 9:12 94:19
Apart 147:11
apologize 7:7
APPEARANCES 2:1
appeared 155:5
appears 23:13
appendix 23:25 24:4
applicable 24:14
apply 27:21
applying 27:14
approach 19:14
approval 7:22 60:6,20
approved 8:4,5
archives 38:12
area 19:25 43:2,7,21
  44:1 51:24 90:4 93:4
areas 17:11 153:23,25
  154:9
ARI 2:6
armed 63:16 101:3
array 147:4
arrest 18:12,14 24:6,9,9
  36:23 49:10 97:16
  101:7 105:2 107:11
arrested 27:25 63:19
  77:19 127:8,11 128:9

128:10
arrests 24:13 25:4,5
  26:17,18,19 33:1,2
  59:16,16,18 63:20
  127:1 128:4
arrival 144:16
arrow 82:2,3
asked 92:12 145:10
asking 49:20 91:10 134:5
aspects 151:17
assault 96:15
assess 8:19 149:14
assessed 12:19
assessing 124:5
assessment 8:16 56:11
  123:6,9,21,22 124:7
  124:13,17 129:17
  148:9,10,11 149:8,18
  149:20
assigned 86:25 90:4
  141:23
assist 101:8
assistant 132:4,21
associate 42:2 62:7 76:11
  77:17 97:9 99:24 100:3
  100:4,5,18 102:5
  104:20,20
associate's 91:20
associated 61:12,16
  74:17 75:6 99:2
  105:24 114:16 129:12
associates 25:22 41:17
  55:25 61:24 72:25
  74:16,20 75:5,7,8,14
  75:15,21 76:1 78:2
  81:9 97:5,11,12 99:8
  100:7,16 101:21,22
  102:5 113:24 114:15
  114:20 115:8,12,14,17
  116:15 152:13
associating 91:19
association 61:18,20
  70:9 71:7
assume 67:2,5 114:14
  136:12
assuming 97:23 140:13
ATF 5:9
attached 12:24 47:20
  73:25 96:23 132:14
attachments 132:15
attempt 118:20
attend 152:11
attention 54:19 60:2
  88:13
attest 29:1
attorney 156:12,14
Attorney's 127:6
audit 80:15,16
aunt 118:17
aunts 76:15 77:2
Aura 70:2 71:20,20
  81:24,24
authorities 89:16
authority 155:4
authorize 66:13
authorized 66:16 156:7
autism 147:5
auto 17:22,22,23,23
  64:14,18,18 97:22
  117:4
automatic 76:7
automatic- 103:19
automatically 27:17
  106:24
available 66:8,11 67:1
  71:12 119:3 128:3,11
  128:14

awarded 24:14
aware 15:5,9,10 53:12
  65:15 93:1 111:19
  118:23 143:5,11,12
  146:5,10
awareness 123:16 125:17

**B**

B 3:1 9:19,20 10:7 11:13
  11:18,21,22 13:9,15
  13:19 23:25 65:13
  67:9 71:8 116:24
B- 3:2
back 9:16 12:13 13:6
  20:17 24:25 35:25
  38:12 41:22 43:23
  47:1 64:25 65:12
  67:20,23 78:14,15
  79:1,2 90:1 97:5,19,20
  100:11 102:4,16,19
  103:15 106:24 107:15
  107:19 108:5,17,24
  110:19 115:6 117:16
  123:3,23 125:10
  131:12 135:17,19
  145:8 150:6,8,9
background 114:12
backgrounds 139:8
backside 26:3 40:25
  83:21
bad 55:16
balance 60:12
ball 19:18 20:4
ballpark 65:25
BARGIL 2:6 145:2
  154:13
base 24:3
baseball 53:6 102:24
based 12:15 14:16 22:8
  25:3 57:6 80:10 98:17
  104:24 107:14 120:7
  123:1 127:14 135:4
  142:14,16 145:15
basic 16:21 17:6 19:5,7
  22:1,18 25:3 36:5
  50:24 53:2 86:15,16
  96:24 98:25 123:16
  124:7
basically 6:17 11:9 12:22
  16:9 24:22 30:12
  31:24 32:23 36:10
  55:14 62:16 63:1 64:1
  64:8 67:16 69:7 73:2
  74:4 81:21 111:13,14
  122:20 123:16 125:17
  135:10 140:3
basis 18:18 22:16 88:16
  95:8 117:15
battle 95:18
Bay 67:17
BayCare 147:8
bearings 13:3
beefed 33:9
beginning 26:6 123:4
behavioral 146:23,24
  147:3,8,11
belabor 131:9
believe 4:18 10:3,8 20:20
  21:2 23:7 24:2 28:3
  30:1,2 40:21 51:2
  58:11 59:20 60:22
  62:17,19 66:12 75:22
  76:5 105:4 106:18
  112:6 115:2 118:24
  125:3 130:5,6,25
  134:8 143:11 144:5
  145:11

believes 66:4
belive 46:22
bell 31:15
benign 118:15,22 119:6
best 139:11
better 16:10 21:21 50:2 122:19 123:18 148:6 153:11
bicycles 44:20
big 20:25 21:11 24:6,8 35:21 116:4,23,25 148:18
biggest 21:9
Billy 29:18
biotech 147:15
birth 43:4 103:9 121:10
Biscayne 2:7
bit 8:11 14:5,10 50:8 57:5 65:12 129:25
biweekly 56:14
black 82:6
Blake 113:23
blank 16:6 17:23
blanked 151:10
block 105:3
blocks 44:3
blue 122:1,2,3
blurb 111:25
blurry 122:14
blurt 7:13
board 154:9
body 48:2
BOLO 20:10
BOLOs 99:3 116:5
book 14:22,23
bosses 60:9
bottom 24:3 113:22
Boulevard 2:3,7,11
box 1:23 54:25 55:2 121:18 122:10
boxes 55:2,7 154:1
brain 94:1
brand 15:23
break 44:20 59:5 65:8 69:19 112:14 115:22 133:1 151:25
breaks 74:4
brevity 94:18 144:17
Brian 7:3,3,8 144:22,24 145:14 146:3,6
brief 73:3,7 88:12 92:2 94:16 112:10 116:1,8 126:17 149:4
briefed 101:23 116:8
briefing 54:3 65:4 93:16 154:6
briefly 49:5 86:7
briefs 94:20 125:23,23 126:8
bring 10:20 31:13 41:13 103:24 105:19 120:17
broad 17:4
broadcasted 53:23
brothers 76:14
brought 88:13
Brummett 60:13
build 13:7 47:2
built 32:24 45:24 81:24 123:17
bullet 49:9,15 50:6 51:9 90:2 126:24 128:13 131:12 152:10
bulletins 116:23
bunch 20:4
bureau 89:17 133:21 146:19,20,21 147:14 150:25 151:1

bureaus 55:20
burglaries 19:25 29:13 29:14 43:2,6,10,21 44:3 51:17,24 63:16 64:18 116:4 150:12
burglary 17:22,22,23,24 17:24 20:16 64:14,18 97:22 116:3,24 117:4 125:18
business 17:22,24
busy 56:8 72:23
button 41:13
buy 21:12

C
C 31:17,18 32:15
C- 3:3
CAD 104:23 105:4,4,5,6 105:6,8,13,16,18,23,25 106:6,7,8,9,10,11 110:10
CADing 138:17
calculate 71:25
call 6:24 44:14 56:2 62:25 64:7,20 79:17 79:18 94:25 96:3 97:8 105:15 106:12,12 112:1 114:6 133:10,11 133:11,13 148:23
called 6:15,16 39:1,8 45:9 46:11,12,13 47:5 64:19 70:2 79:9 80:22 85:5 97:9 105:14 106:8 109:9 140:14
calls 105:14 125:15
capabilities 12:24
capability 110:1
capacity 1:9
captain 4:20 5:22,23,24 5:25 7:2 10:24 11:10 11:14 12:20 65:16 67:22 68:2,13,14 69:6 69:13 124:4,11,15 125:2 135:15 144:7 146:2
captains 36:12 57:22
car 21:12,14
car's 21:18
card 53:6 102:24
care 56:22 147:9
career 119:21 120:7
caretaker 118:17
Carolina 58:14
carry 30:2,3 40:15 149:6
cars 21:17 91:24
case 1:7 28:24 80:25 96:16 100:19 103:5,17 107:7,13 111:7 117:2 117:3,4 118:2,4,5 128:15 131:5
cases 20:22 81:1 100:9 127:4,20
Casino 96:18
Castillo 86:16 87:12 96:14 102:8 103:24 104:14
catch 19:11
categories 142:15
category 9:9
causation 150:22
causations 150:24
cause 101:7
center 12:25 44:15 67:18 67:19 68:8 80:21 88:15,17 92:25 93:7 112:25 113:20 135:1
central 37:3 39:2,3,7

41:2 42:13,17 48:10 48:12,13 50:10,11 57:1,13 67:5 68:21,22 68:24 69:2,4,6 71:3 77:5,24 78:4,7 87:17 101:19,19 102:16 106:15,17 109:11,11 110:2,9 119:16 120:4 129:5
certain 12:22 18:2 37:15 41:4,4 94:16 105:9,12 119:7,8
Certificate 2:22,23 155:1 156:1
certify 155:4 156:6,11
cetera 90:6
CFR 80:10 98:17
Chagrin 2:3
chain 7:25 8:1 151:22
change 7:24,24,25 14:15 29:3 56:17 64:21
changed 8:20,21 46:12 46:13 56:15 64:5 65:3 65:3 69:10 93:10 115:19
changes 8:2,9 10:23 13:22 14:18
changing 69:8 93:2
charge 145:12
chart 71:19,20
charts 72:23
check 40:1 41:10,13 48:19 49:16 53:13,16 61:5 66:13 67:4 83:1 88:9 90:11 106:5 107:14,18,19 108:4,9 108:10 110:25 113:11 118:7 124:22 125:2 135:19 144:6
checking 95:8
checklist 3:7 135:1,3,20 135:24 139:10
checks 42:15,17 48:14 53:8 58:25 59:3 71:2 77:16 106:20 107:2,25 109:7 112:3,8 113:17 116:13 149:16
Chicago 9:14 111:23
chief 151:8,16,21
chime 53:12
choose 59:10
CHRIS 1:8
chronological 146:2
circle 31:11 65:12 117:16
circled 67:23
circumstances 10:22 24:8 42:23 62:4 77:23
circumstantial 42:8
citizen 87:23
citizen's 43:7
Citizens 2:15
City 1:23
CJIS 119:1
clarify 41:6 135:17
clarity 11:5 133:13
clear 15:2 27:18 32:11 47:24 75:11 129:11 131:11 150:5
clearer 122:11
click 39:7,14 102:2 103:17,23
clicked 120:16
client 99:11
close 130:10
closer 123:4

closes 87:4
closet 21:2
Co-counsel 2:5,9
co-offend 74:5
co-offender 74:1
co-offending 74:4
code 98:18
coding 82:2
CODY 140:1
cognitive 147:3
collect 19:13 152:12,15
collection 91:6,7
colonel 112:10 151:8
colonel's 151:9
color 82:2
come 7:12 9:16 20:17 29:21 39:21 42:9,25 43:13,24 61:25 89:18 91:14 92:16,17 99:6 99:14 100:11 102:9,10 102:17 103:5,6,9 106:24 136:22 139:6,7
comes 12:14 17:1 22:13 29:10 33:8 44:6 69:25 71:16 89:8,14 92:20 96:22 97:23 99:9 103:8 106:3 130:5 133:14
coming 10:15 15:23 63:16 116:6 129:20
comitting 63:16
command 7:25 8:1 22:14 39:2,3,7 41:3 42:13 48:10,12,13 50:10,12 57:1,13 67:5 68:21,22 68:24 69:2,5,7 71:3 77:5,25 78:4,8 87:17 101:19,20 102:16 106:15,17 109:11,11 110:2,9 111:9 111:19 119:16 120:4 129:6 149:4 151:22
commander 111:16 133:21 146:19
commanders 26:9 57:10 57:22
Commission 155:12,13
commit 20:15 23:1,4,5,6 59:22 61:13,16,21 74:7,8 75:5 101:9
commits 27:3
committed 25:23 29:4 37:18 49:10 62:6 64:12 74:17 100:9 101:5 127:5 141:21
committing 17:11 20:11 20:15 25:21,22,24 28:1,2 29:12,12,14 30:13 36:15 37:13,24 38:7 41:18 51:1,3 60:2 60:3,24 61:10,11 62:2 62:6,8,18,19,22 63:3,7 63:13,21 64:13,17,18 72:25 73:1 75:16 76:6 76:16,18,24 77:11,12
common 19:21
commonly 116:17
communicate 82:3,5
communicated 56:19,20 56:24 72:20,23 82:7
communication 14:1 54:6 72:3
communications 152:23
community 6:9 17:17 18:10,15 45:1
compare 13:22
compared 9:9 14:9 83:13

117:8
compile 93:25
complete 14:14 126:22
completed 149:22
completely 142:6,7
compliant 119:1
CompStat 51:15,16
computer 119:14 120:14 120:22
concentration 153:24 154:11
concept 17:6
concern 76:2 154:10
concise 54:5
CONCLUDED 154:18
concretely 32:20
conduct 49:15 76:3 123:5 133:5
conducted 107:25 142:4
conducting 51:3 108:10
confidential 84:13,23
confuses 56:21
confusion 122:14
connected 147:7 156:14
connection 81:25 97:23
consider 62:5,10
considered 130:23
consist 16:22 148:12
consists 49:12
constant 37:11
constantly 78:18
constitutes 94:14,14
consult 57:21,22 60:13 61:3,4,5 127:6
consultation 57:10 58:17
consulted 60:10,11 144:15
consulting 60:7
consume 82:9 91:16 110:19
contact 42:8,9,18,20,22 42:25,25 43:13,14,16 43:25 46:19 48:8,10 50:12 72:6 77:6 107:10 118:15,16,20 153:2 154:15
contact's 118:20
contacts 107:4,10 122:9 126:9
contained 112:9
contains 96:14
contemplating 8:9
content 9:24,24 12:12 14:16,17,19 141:14
content's 12:12
context 15:17 114:5,18 132:14 137:2 139:22 145:8 152:6
continue 55:16
continues 148:20
continuously 141:21
control-find 99:13,15,17 24:3 50:20 50:21 77:8,10,15 124:5
conversational 47:10
conversations 42:12
copies 132:18
copy 132:11 139:17 140:2
core 13:18,18
correct 16:16 28:9 47:13 117:22 137:16 157:6
CORRECTION 157:8
counsel 2:13,17 154:22 156:12,14
counterterrorism 95:21

counties 59:25
country 16:12 30:11
  59:25
county 1:9 18:21 22:25
  33:1 36:17 49:18
  54:13 59:22,23 60:4
  62:20 63:17 65:22
  89:11 101:4,7,10
  105:5,8 116:7 124:25
  125:16,21 126:15
  127:15 133:5 136:20
  141:5,19 142:8 143:1
  143:15 147:12 151:17
  153:23 154:10 155:3
  156:4
couple 14:11 16:11 17:14
  63:18 88:23 115:20
  122:18
course 21:24 27:8 69:10
  98:12 115:20
court 1:1,19,22 70:23
  156:6,19
create 70:3 71:22,22
  81:17 87:4 136:15
created 5:19,20 31:19
  44:11 108:22 124:7
  133:20 135:15,16
  136:20
creating 19:1 32:1,12,19
  65:23 124:9
crime 8:20,21,22,23 9:2
  9:5,6,9,10,12,14 12:25
  14:23 17:11,19,21
  18:5,7 19:1,3,15 20:1
  20:11,16,21 23:3,4,5,6
  24:6,10 25:11,18,20
  25:21,22 26:12,13
  27:3,24 28:1,2,4,16
  29:3,4,12,20 30:13,16
  32:7,10 35:21 36:8,15
  36:16 37:13,19,24
  38:6,7 40:19 43:20
  44:15 45:1 49:2 50:22
  51:1,3 52:2 53:5 54:13
  59:19,22 60:2,3,24,24
  61:9,18 62:3,6,18 63:3
  63:4,21,24 64:12,12
  64:17 72:25 73:1 74:7
  74:8,17 75:5,6,16,23
  76:6,16,18,24 77:11
  77:12 85:7 87:14,15
  88:15,17 92:25 93:7
  100:6,6,9,11 101:9
  103:2,11,13 116:5
  126:14 131:1 135:1
  141:18 142:15,17
  148:16,16,19 150:11
  150:12,13,18,24
  153:10,24 154:11
crime's 19:19
crimes 9:4,9 17:21 18:6
  19:23 20:15 23:1,1,2
  25:24 41:18 48:23
  49:10 51:19,21 53:3
  61:11,11,13,16,21
  62:7,8,19,22 63:7,13
  77:18 98:25 103:1
  116:4,25 117:14 127:6
  141:21 142:17 148:22
criminal 17:15 19:2 23:9
  24:22 32:5 44:21
  47:20 48:1,17,18,21
  57:20 61:7 62:17,17
  63:13 64:7,9,20 72:14
  72:18 79:3 80:4,8,19
  81:1 98:16 111:1,8
  115:3 116:20 118:1,12

125:21 127:14 128:16
  130:17,21,23 131:1
  154:2
crises 147:3
crisis 16:3 121:23 147:2
criteria 27:20 59:13,15
  60:23 142:12
cross 87:22
cross-pollenating 87:23
crystal 19:17 20:4
CSV 139:1
curious 132:18
current 4:12 8:7 9:12
  13:5,5 28:16 39:4
  41:19 53:5 60:24
  117:14 135:24 138:11
currently 4:10 6:2 28:3
  28:20 46:15 51:13
  53:3 61:10 64:13
  66:11,16 91:19 118:4
  127:25 135:20
currently-authorized
  66:22
cycle 12:13 14:1 30:24
  111:10 117:12

D

D 2:19 33:12,13 137:14
D- 3:3
D1 38:24
D2 38:24
D3 38:24
dad 111:7
Dade 1:23
dailies 95:10,11,13
daily 5:2 22:16 56:6
  88:16 95:8,10,17
  116:1,2,2,8 117:15
  125:22,23 126:7
Dalanea 1:3 97:20 99:10
dangerous 44:9
DARLENE 1:4
data 17:10 20:5,6 26:3
  32:23,24 33:3,10 35:4
  44:10 46:4 47:1 60:16
  70:7,8,25 71:12 83:11
  83:13,15,15,21 84:1
  85:2 95:12 97:1
  102:17 105:19,20
  110:7,12,20,21,24,25
  111:4 150:11
database 26:3 32:22,24
  33:4,6,7 34:22 35:1,6
  36:1 38:19 40:2 41:3,9
  78:23 80:12 81:5,6
  83:2,14 84:8 85:9,10
  92:8,11 93:12 100:1
  108:22 109:6,9,16,19
  119:2 128:20 134:2
  138:10
databases 40:7,8 97:18
  122:21
date 1:14 12:15 13:1
  39:17,18 41:14 43:4
  46:23 65:6,25 67:12
  82:23,23 103:9 121:10
  126:1 140:5 157:2
dated 11:19 156:17
  157:25
dates 65:1 98:11
daughter's 77:11
day 127:7 155:8 156:17
day-to-day 142:13
days 29:5 37:22 41:19
  43:9 92:9
deactivate 37:9,20
dead 58:7 111:23

deal 16:1 21:16,21 32:9
  121:24 147:2,4,5
  148:25
dealer 21:14,17 86:22
  96:21
dealer's 21:16
dealership 21:13
dealing 17:13 121:23
deals 130:25
DeBevoise 21:14
decades 16:11
decides 60:5
decision 21:23 60:25
  61:1
decision-making 21:9
deck 55:23
DEEGAN 1:4
deemed 111:1
deeper 71:24
defeats 55:10
Defendant 1:10 2:13
defender 127:10
definite 129:22
definitely 82:9 83:8 84:7
  116:19 138:22 151:20
delete 48:2,25
deleted 48:5
delineate 107:12
delineation 129:22
demographic 121:12
demographics 39:9 53:1
  53:3 103:6 121:1
dentist 77:3
department 52:9 108:23
  136:24 137:11
Department's 136:13
departments 52:8
dependent 80:3
depending 29:6 61:19
  79:21 82:23 122:4
depends 53:9 77:22
  80:22 100:13 152:18
deploy 148:7
deployed 124:20,21,24
deponent 154:23
deposition 1:12 123:4
  154:17,24 156:8 157:1
depth 43:19 144:17
deputies 16:16 18:17
  19:24 22:3 26:10 37:4
  38:25 41:2 42:1,14
  45:6,9,13 46:7,15,20
  58:12 69:23 72:20
  83:3 84:19,20 88:3
  94:18 97:15 103:21
  106:13 109:4 110:17
  114:3,11,23 121:22
  122:19 123:8,13
  124:20 126:9 129:1,8
  129:23,24 130:11,12
  147:1 153:5 154:5
deputies' 37:14
deputy 15:23 36:25 40:9
  41:8 48:13 53:10 69:1
  71:5,10 72:24 78:3
  83:17 87:24 89:19
  90:17,19 91:18,18
  92:12,21 101:18,19
  102:10,15 103:18
  109:1 118:5,13 119:22
  120:2,13 122:22
  128:22 151:8,16
  152:23,23
deputy's 8:12
deputy-type 88:5
describe 23:18,20 76:10
  84:11

description 43:11,22
  44:3
descriptions 140:4,10
design 69:6 83:14
designed 15:20,20 21:8
  53:24,24 83:10 92:24
  107:5 122:13,19
  142:16 153:21 154:9
detail-oriented 129:25
detective 43:10,16
detectives 5:7 20:20
  153:17
detention 18:17
determine 28:14 36:6,13
  38:20 43:24 51:4
  57:19,23 58:17 78:17
  82:18 87:3 90:17
  104:1,6 117:25 118:7
  135:9
determines 8:1
determining 27:21
deterred 63:11
deterrence 14:6
development 96:1
  149:13
dies 58:6
difference 14:4 54:7
  94:15 107:13 130:24
  153:7
different 6:8 9:13 12:8
  13:16,18 14:8 16:11
  53:20 56:9 73:8 84:23
  88:24 95:20,22 96:6
  111:21 114:7,11
  121:22 122:10 127:18
  128:23 139:7,8 142:11
  142:18 150:16,16
difficult 15:24 83:24
  92:15 93:12
difficulty 92:18
digesting 8:12
direct 2:21 4:6 106:19,20
directive 7:19 8:14
directly 35:2 147:17
  154:15
director 4:17,21 5:4,25
  6:13 7:1,5 10:4 140:8
  140:20 144:16,21
  145:10,12
directors 144:8 145:21
discovery 33:21
discretion 17:18 153:9
discussed 144:2
discussing 54:24 143:3
  144:2 152:9
discussion 117:17 125:7
  140:22
discussions 36:11
dismantled 63:12
disrupted 63:12
dissertation-type 54:2
district 1:1,1 12:24 18:22
  22:8 26:9,10,11 27:2,3
  27:3,4,5 36:7 51:14
  52:5,13 55:16,19
  57:10,18 58:17,20,21
  59:8 62:13,15,23,25
  63:1,22,25 64:8,19,24
  65:1 74:13,18,19,23
  75:2,3,20 88:17,21
  89:21,22,22 93:1,5
  95:15 112:9 113:14
  117:14 119:20,25
  120:1,2,6 135:1
  138:18,18,18,19
  152:22
districts 25:19 27:1 36:4

36:5 55:8,14,19 57:23
  95:6,7 115:5 120:3
division 1:2 6:21 141:24
document 3:4 5:11,12,18
  9:15,22 27:20,23 29:8
  30:14 31:4,7,10,22
  32:4,13 33:16,16
  34:20,22,25 35:15
  37:1 41:13 43:8 49:11
  50:8 79:8,13 82:25
  85:23 86:4,5 88:20
  90:6 94:8,22 95:2,13
  95:24,25 96:10,13
  99:10,16,17 102:3
  112:23 115:16 126:7
  131:3 133:17,18
  134:19 135:16 136:6,9
  136:16,19 137:3,3
  138:5,10,25 141:9,10
  141:12
documentation 82:1
  113:11 114:17 128:7
  135:5
documented 23:11 35:19
  39:24 50:10 77:9,9
  86:14 87:17 90:14
  104:4
documents 12:5 31:14
  37:2 65:16 70:24 79:4
  80:20 85:24 94:19
  95:24 96:9 98:15
  118:13 133:24 134:7
  134:12,14,22,23 138:3
doing 8:15,18,19 30:11
  34:17 41:15,15,16
  42:11 45:19 48:20
  52:6 54:14 55:18 64:4
  64:18 76:21 87:14
  89:14 99:1 112:13,24
  118:7
domestic 37:1,2
Donnie 82:16 113:24
door 77:7,8
dot 131:13,13,13
double 61:5 66:12 67:4
  106:5 107:19
download 96:2
Dr 14:21 142:4,19,22
  143:2 144:11
draft 11:22
drag 81:21
drastic 14:15
draw 54:19
drawing 17:23
drawn 142:21
draws 35:2
drew 55:20
drive 1:17 2:15 80:2,6,10
  81:13 82:18 83:1 98:3
  99:16 125:24 137:23
  137:25 138:1
driven 19:8
drives 16:14,24
drop 81:21
drug 80:23 86:21 96:21
  130:3
drugs 86:22,23
due 79:4
duly 4:2 155:5
duties 5:2
dwelling 111:17
dynamic 9:7 116:21
dyslexic 59:17

E

E 2:19 3:1 86:8,9,11
  93:18 96:10 115:11

**E-** 3:4
**earlier** 29:9 59:20 81:3
  86:7 101:1 111:4
  114:22 129:11 148:23
**early** 46:3,7,21 69:16
  137:8
**easier** 81:18 89:7 92:20
  109:13 116:19 117:11
  122:22 138:15,15
**easiest** 76:20
**easily** 73:20 83:16
**easy** 52:19
**edge** 69:25 70:3 71:5,21
  71:21 72:7 81:22,22
**effect** 124:18
**effective** 8:7 10:10 11:18
  11:23 13:25
**effectively** 73:22
**eight** 22:3 38:3
**either** 50:11 61:4,22
  64:11 65:24 74:17
  88:19 117:5 131:4
**electronic** 96:1 134:5
**element** 25:4 51:16
**email** 3:4,6 88:22 89:7
  113:1 132:3,5,19
  136:1 139:18 140:18
**Emails** 3:6,8
**employed** 4:10 144:24
**employee** 156:12,13
**encompasses** 6:9
**encounter** 43:8
**encouraged** 16:18
**ended** 63:19
**enforcement** 7:18 8:14
  13:24 17:2,17 24:23
  40:17 51:4 54:1 56:8
  148:5 153:6
**enforcement's** 107:4
**engage** 44:25
**engaged** 67:25
**enhance** 12:23 21:8
**enhanced** 14:21
**enhancement** 24:20
**enhancer** 23:12 24:18
**enhancers** 23:11
**enhances** 23:15
**ensure** 37:25 52:12
  57:14 71:7 101:9
  125:19
**enter** 41:2,8 152:20
**entered** 90:18,19
**entering** 88:5
**entire** 6:6 12:19 54:12
  62:1 93:23 99:21
  110:2 138:20
**environment** 8:20,22,23
  9:12 17:20 25:11,18
  25:20 26:12,13 27:24
  28:4,16 29:20 30:16
  32:5,8,10 36:8 50:22
  53:5 57:21 59:19
  60:24 61:8,10,15
  70:25 75:23 148:16,17
  150:11 154:4
**environment's** 8:21
**equate** 91:2
**equated** 68:22
**equivalent** 111:16
**Errata** 2:23 157:3
**especially** 8:12
**ESQUIRE** 2:2,6,10,14
**essence** 15:19 17:7 51:20
**essentially** 129:14
**established** 94:12
**et** 90:6
**eval** 135:6,7,7

**evals** 133:10,12 135:8
**evaluate** 142:2
**evaluation** 142:2
**evaluations** 13:4,6,7,8
**events** 112:7
**everybody** 18:14 21:12
  42:11 52:12 57:3
  64:11 85:10 102:14
  103:10 117:7
**everybody's** 6:5 117:13
**everything's** 61:6
**evidence** 19:13 29:16
  43:23
**evidence-based** 19:14
**exact** 46:22 64:25 65:6
  67:12 126:1 129:13
**exactly** 23:20 65:25
  124:1 134:13 151:5
**Examination** 2:21 4:6
**examined** 4:3
**example** 42:4 89:8
  96:10 97:4,24 101:16
  113:2 116:18 130:16
  137:15
**examples** 16:25 21:11
**Excel** 33:10 34:24 35:3,6
  35:16,23 70:1,1 117:1
  137:20 138:14,15,23
**excuse** 48:10 74:10
**executive** 1:17 73:13
**exemption** 119:4 131:8
**exhibit** 3:2,2,3,3,4,4,5,5,6
  3:6,7,7,8,8 5:15,16
  7:15 9:19,20 10:6,7,13
  10:14 11:11,13,17,19
  11:21,22 13:9,14
  23:17 31:17,18 32:15
  33:12,13 49:5 54:22
  62:12 65:13,13 66:10
  86:8,9,11 90:1 93:18
  96:10 112:19,20
  115:11 119:11,12
  120:19,20 123:24,25
  124:3 125:10 131:11
  131:24,25 134:16,17
  136:6,7 137:14 139:24
  139:25 141:6,7 152:7
  153:15
**exist** 63:10 96:6 100:24
**exists** 92:8
**expectations** 13:23 49:7
  152:10
**expected** 153:16
**experience** 13:11,12 16:2
  17:1
**Expires** 155:13
**explain** 76:20 91:6 101:1
  109:14 114:13 142:10
**explained** 111:3
**explains** 49:11
**explanation** 122:13
**export** 35:2,23 46:5
  137:20 138:7
**exports** 138:11

**F**

**F** 112:19,20
**F-** 3:4
**face-to-face** 49:16
**Facebook** 70:15,16,20,21
  70:22 100:14,15,15
**fact** 39:15 40:1 92:10
**failure** 23:13
**fair** 6:19 18:15,16,16
  129:17
**fairness** 38:1
**fall** 37:23 39:22 40:23

  147:13
**falls** 92:4
**familiar** 33:15 51:15
  67:7,9 70:5 71:19 74:2
  79:8,9 122:7 132:2
  134:19 136:9 139:16
  140:25 141:2,9,11,12
  141:14 142:2,22,23
  144:10
**family** 40:13 100:18
**far** 7:22 49:24 52:8 55:18
  55:25 71:13 79:1
  80:17 95:9 146:11
**fashion** 117:1
**fastest** 59:24
**favor** 11:4
**Fax** 1:25
**FBI** 5:9
**February** 10:1
**federal** 5:8 98:18
**feed** 106:6,24
**feedback** 133:19 135:6
**feeds** 38:22
**feel** 16:12 43:14 45:2
  76:23
**female** 53:2
**field** 17:3 22:14 42:18,22
  42:24 43:13,16 46:18
  46:19 50:12 61:23
  92:14 104:25 105:1
  110:17 123:17 124:1
**fields** 83:13,14 139:8
**fifth** 127:7,10
**figure** 78:13
**figured** 47:12 135:25
**file** 134:4,4,6,9,9,10,11
  137:6 139:2
**filed** 85:2
**files** 96:2
**filter** 138:16,16
**final** 15:11 51:9 57:9,16
  58:15 60:20 61:1
**finalized** 15:6
**finally** 45:24
**finance** 56:22
**financially** 156:15
**find** 14:3 72:17 83:9
  90:16 99:17 100:19
**finding** 71:7
**fine** 7:11 41:15 48:20
  50:4 132:24
**fingerprints** 52:1
**finished** 68:2 80:7,11
  138:2,3
**FIR** 46:18
**firearm** 23:5 24:7
**firearms** 24:7
**firefighter** 89:14
**firefighters** 89:10
**FIRs** 97:16
**first** 4:2 40:16 45:10 49:9
  67:13 72:11 83:23
  97:21 113:7,8 128:4
  135:7,10 152:5
**fit** 43:21
**fits** 44:3
**five** 7:13 8:16 23:6 24:22
  38:3 39:25 44:2 47:17
  63:10 69:11,19 72:25
  73:14,14,15,16,23,24
  74:10,11,12,16,20,22
  74:22,23 75:3,3,5,7,9
  75:14,15,17,21 76:9
  77:1,3 78:2,11,12
  102:4 111:2 119:25
  120:1 148:11 150:1,7
  150:8

**five-minute** 65:8
**five-year** 79:3 80:5,16
  124:13 147:23 148:8,8
  148:10 149:1,8,20
**FL** 1:23
**flag** 36:8,10 39:5,23
**flagged** 81:5 101:14
  120:10
**flags** 38:14,14
**flight** 56:3
**flip** 86:4,13
**Florida** 1:1,18,20 2:7,12
  2:16 4:25 36:23,24
  120:7 155:2,12 156:3
**fluctuates** 8:23
**focus** 8:22 18:24 21:9
  24:11 25:7,25 26:14
  27:5,17,22 28:13,22
  36:13,15 55:25 56:1
  58:4,6,18 59:10,21
  63:9 64:5 73:21 74:21
  75:14,20 92:25 142:16
  148:18
**focused** 8:13 14:6 18:25
  24:17 54:13 57:6 64:1
  67:21,22 92:10 113:19
**focuses** 17:8 18:13
**focusing** 25:13,18 29:22
  83:2 126:11 130:11
  142:17 148:17,18
  149:3
**folder** 78:24,25 79:1
  85:16 87:6 95:4,15
  99:21
**folders** 95:6,8
**folks** 112:12
**follow** 13:2 135:23
  138:22
**follow-up** 112:15
**follow-ups** 136:2
**followed** 13:13
**following** 11:25 12:1
**follows** 4:4
**footage** 29:13
**force** 5:8
**foregoing** 156:8 157:4
**foremost** 83:23
**forensic** 29:16 43:23
**forensics** 52:2
**forget** 129:13
**form** 21:4 52:18 57:2
  69:25 71:10 81:7,14
  85:17 100:24 133:16
  136:22,23
**formation** 36:21
**formatted** 36:23
**former** 37:12
**forms** 88:24 105:1
**forth** 42:12
**forum** 128:20
**forward** 130:9
**found** 115:1
**four** 5:6 17:25 18:1 23:4
  24:5,6,8,15 35:21 44:2
  49:14 107:11 116:4,25
  148:18
**Fox** 142:4,19,22 143:2
**frankly** 45:4
**frequency** 49:24
**frequented** 90:5,25
**fresh** 37:25
**front** 120:24 130:16
**FTA** 5:9
**FTAs** 24:19
**FTO** 123:13
**full** 73:12 124:18
**fully** 8:5 91:8 124:9

**G**

**G** 119:11,12
**G-** 3:5
**G-A-L-L-O** 145:18
**Gallo** 145:6,11,18,22
  146:3
**game** 114:10
**gang** 23:11 34:2 35:19,20
  39:24 40:2,4,5,17,21
  48:24 61:24,25 63:23
  63:24 96:22
**gangs** 40:19
**Gardner** 60:19,20 61:3
  139:13
**gathered** 53:7 71:1
**gathering** 93:22
**gauge** 66:3
**general** 2:17 110:1
  118:25 143:21 147:25
**Generally** 28:6
**generated** 26:16 98:9,19
  98:22 101:13
**generic** 129:14
**gentleman** 7:8
**geographical** 153:22
**getting** 7:9 9:17 13:3
  31:19 59:17 67:16
  93:9 113:19 122:11
  139:5
**GG** 155:12
**giant** 102:23
**give** 16:16 17:4 19:17
  21:5,11 22:18 39:16
  39:18 42:24 43:4
  46:25 60:3 73:3 77:14
  114:2 131:4
**given** 137:3 156:9
**gives** 97:3 117:6
**giving** 41:22 57:3 94:18
  94:19
**global** 39:8,8 101:25
  102:8,20,20,21,22
  103:4,24,25 104:8
  105:11,21,24 106:4,17
  106:24 107:1,3,16,18
  108:12,14,15,20,24
  109:2,10,22,24 110:2
  110:4,7,9,14,20
  117:18,19 120:17,25
  120:25 121:5,6 122:12
  122:24 129:5,5,8,12
  131:21
**gloves** 29:15
**go** 7:23 8:14 9:2,11,18
  12:17 13:9,10,21
  18:12 20:13 21:12,19
  23:21 24:25 29:21
  35:25 39:24 41:12
  43:15 49:14 50:23
  55:13 56:9 58:3,9,10
  58:13 62:12 63:18
  64:10,25 66:2 67:17
  70:22 77:20 78:14,15
  80:12,14 82:10 83:16
  83:18 85:13 86:12,17

87:2,4 88:1 90:1,16
91:23 92:23 93:1,2,22
95:24 97:5,17,20
99:20,20 100:19 101:2
102:1,16,19 105:17
106:9,9,18,20,21,22,22
107:15,19 108:1,1,12
108:14,17 109:2 118:5
120:3 122:1 123:3,15
125:10 128:22 130:14
133:16 134:21,22,24
134:25 135:2,4,17,19
138:14,16,19 145:8
147:1,6,25 149:4,5
150:18,20 152:6
153:10
**goal** 25:12 29:2,2,19
37:20,23,24 42:4 71:6
101:6,8 149:25
**God** 21:24
**goes** 7:25 20:13 32:14
36:25 37:3 39:10
41:21 44:22,22,24
47:3 51:20 54:6 57:8
58:4,18 70:7 71:24
79:1,2 82:8 88:15
89:11 95:25,25 97:10
107:15 108:22,25
111:18 113:12 116:3
116:24 130:24 134:9
135:1 150:18
**going** 5:10 9:8 10:21,22
12:20,22 13:6 14:3,7
16:10 19:3,14,19,22
20:1 21:20,24 22:12
25:17 27:8,9,10 30:1,3
31:24 38:2 41:24
43:20 46:25 47:1
50:22 51:13 52:3,13
54:1 55:9,15 57:3
59:25 64:10 67:17,18
77:1,19 79:7 83:22
88:4 93:14 96:6 102:9
102:9 122:20 124:13
126:6 130:23 131:11
135:9 136:5,12 139:17
149:6,6 150:12,13,13
150:13 152:6
**good** 19:11 40:9,10 45:8
58:12 59:6 66:3 93:6
115:21 146:13
**governing** 48:2
**Government** 1:17
**graduated** 153:11
**grand** 24:9 79:11
**grandma** 77:2
**grant** 3:8 140:25 141:2,3
141:4,10,17,22,23,25
142:16,22 143:23
144:1
**grant-specific** 143:22
**grants** 143:21 144:3
**great** 19:10,10,11 41:15
152:2
**green** 121:18 122:25
**group** 62:1 147:1
**groups** 17:9 40:11 63:15
64:7
**growing** 59:24
**guaranteed** 74:7
**guards** 45:17
**guess** 6:24 21:15 33:9
91:6,10 92:3,10
128:20 133:14 139:22
**guidance** 30:17
**guide** 12:6,6,9 13:24 14:7
15:17 49:25 56:2

**guy** 28:19 43:12 145:16
**guy's** 7:9 145:5
**guys** 16:7 31:7 65:5 74:2
86:6 127:20

**H**

**H** 3:1 120:19,20
**H-** 3:5
**H-E-I-B-E-R-T** 34:13
**half** 24:13
**hand** 155:7
**handle** 19:15 33:10
94:21 97:3 121:22
**happen** 19:20 20:1 42:9
42:12 52:4,20 58:16
87:16
**happened** 53:13 65:6
111:14,22 142:5
150:10
**happening** 9:9,10 117:14
150:21,22
**happens** 19:13 25:7
36:16 51:14 52:4 58:2
58:15 87:6 99:7
**happy** 77:21
**hard** 22:2 83:6 96:17
**Harrington** 151:10,13,15
**hate** 129:3 131:9
**head** 10:20 151:1
**heads** 37:15
**health** 121:21 146:23,24
147:3,8,11
**hear** 6:23 19:22
**heard** 57:25
**hedges** 44:18 148:24
**Heibert** 34:11 57:17 66:3
**height** 53:2
**Heights** 2:3
**HEILMAN** 1:4
**held** 79:6 125:8 140:23
**help** 153:19
**helped** 69:6
**helpful** 69:18 139:18,18
**helps** 70:2
**herewith** 157:5
**hey** 8:19 16:7 19:19
20:10,20 25:19 29:14
37:17 38:24 40:3
41:14,15,24 42:11
43:10 44:1,17,18,19
51:23 55:23 56:12
57:3,5,25 58:10,13
72:24 77:10,12,17
81:25 86:18 87:12,24
88:12,18 89:24 90:17
91:4,17 92:23 93:16
96:16 97:10 99:20
100:3,21 101:2 111:5
111:22 114:9,17
116:23 118:5,15
125:18 126:13 127:10
127:19 130:2 145:16
149:4,11 150:21
152:25 153:1,10
**high** 21:7 27:7 44:18
148:24
**higher** 18:25 23:3 27:8
44:24 72:4 74:6,8
153:24 154:10
**highest** 27:9
**highlight** 55:6
**highly** 50:15 84:16
121:23
**Hillsborough** 116:7
**history** 8:25 22:25 39:13
68:12,15 115:4
**hit** 108:2,2,21 130:1

**Hold** 33:18
**holding** 98:13
**holds** 79:5
**home** 118:8
**Homeland** 11:2
**homework** 21:14,20
**Honduras** 111:7
**honestly** 79:6 18:5 49:20
50:25 69:14 79:5
132:21
**hope** 129:25
**horrible** 41:16 129:3
**Hotel** 96:18
**hotspot** 153:23
**hours** 55:14 82:10,12
**house** 48:20 86:22 130:3
130:3
**houses** 44:20 146:22
**how's** 41:24
**HR** 134:8,14 140:6,7,12
140:20
**huge** 85:1
**human** 44:22 72:15
133:22
**hundred** 107:10
**hundreds** 30:10

**I**

**I-** 3:6
**i.e** 12:24 87:1
**i2** 70:5 81:20
**icon** 138:25
**idea** 59:24 132:13,17
**ideations** 147:6
**identification** 5:16 9:20
31:18 33:13 86:9
112:20 119:12 120:20
123:25 131:25 134:17
136:7 139:25 141:7
**identified** 9:17 22:13
26:20 58:24 63:2 72:6
75:15 77:5 99:24
100:4 101:21 120:10
133:18
**identifies** 36:3 51:21
96:18,20,21 121:16
**identify** 15:18 18:8 27:14
32:25 37:5 38:9,13
50:17 51:13,23 61:11
64:8 75:18,20 78:4
82:4 87:10 114:15
121:18 128:23 150:22
152:11 153:18,19
154:3
**identifying** 13:4 14:8
20:5 26:16 29:17
30:12,23 62:21 72:5
92:1 100:16,18 136:23
**ignore** 18:7
**III** 1:5
**ILP** 3:2,2 5:4,25 7:1,16
11:25 12:2,7,11 14:22
16:21 18:20 30:24
56:4 57:8 67:22 78:25
80:2,6 81:13 98:2
123:14 124:6,7 125:24
133:6 137:25 143:19
143:20 145:24,24
147:11,21,25 148:10
150:23 153:17
**ILP's** 6:5
**ILP-focused** 17:21 18:6
19:1 22:25 23:6
**image** 3:5,5 119:15
120:23
**immediate** 133:20
**immediately** 67:14 89:4

**immersed** 6:7
**implement** 124:9
**implemented** 150:2
**implicated** 77:18 126:14
**implicating** 48:23,24
49:2
**import** 81:23
**important** 51:6,7 115:4
129:7
**imported** 84:2
**impossible** 28:13
**incarcerated** 58:6
**inception** 66:6
**incident** 36:24 97:16
105:2 106:1
**incidents** 122:3,8
**include** 24:12 39:3,5
52:21 53:7 90:4
104:23 105:10 112:2,5
115:8 116:9,12,15
120:9 126:8 129:13
130:12,20 134:6,11,12
147:21
**included** 39:12 53:19
73:15 90:24 97:21
113:16 131:15,18,20
**includes** 105:4 109:7
117:20 148:2
**including** 46:10 131:14
**inclusive** 157:5
**increasing** 20:21
**indefinitely** 48:3 49:3,4
**Indiana** 58:13
**indicate** 27:10
**indicated** 137:14
**indicates** 97:21
**individual** 16:3 20:11,14
28:3,23 29:11,17 32:4
36:6 41:9 42:20 44:1
51:22 57:20 60:23,23
63:7 64:9 72:24 80:21
85:21 86:15 87:10,14
88:1 94:10 96:5 98:8
100:8,20 101:25
105:24 107:11 111:5
112:12 118:2,6 121:4
121:21 123:2 126:12
126:13 127:9,11 132:2
**individual's** 110:4 127:8
**individually** 95:19
**individuals** 5:15 15:19
17:10,13 18:8,14,18
18:23,24 20:5 25:9,10
25:23 26:21 27:11
28:15 29:13 30:13
32:25 36:17 37:13
38:6 42:21 43:20 44:9
44:16 57:15,24 58:22
58:23,24 59:23 60:1
61:21 62:2,21 63:9,21
64:2 70:10,11 71:5
72:17 73:23,24 74:10
74:12,16,22 76:6,20
76:24 101:20 111:15
114:17 115:3 127:4,5
129:2 135:12 136:17
136:24 141:20 142:11
146:1,9 147:2,5,17
154:3
**induce** 45:5
**information** 13:19 20:16
20:16,18 21:23,25
22:6,7,17 41:2,9 42:14
43:6,15 44:16,23,23
45:20 50:9,9 52:21,24
53:7,15,18,18,22
55:10 56:25 66:1

67:21 71:1,9 87:3,5,19
88:10 90:7,13,24 91:5
91:11 92:2 93:15,17
93:25 94:6,15,16,23
103:20 108:9,11
110:19 112:2 113:17
114:20,25 115:2,8
116:2,9,12,15 117:18
117:19,20 118:11,12
118:22,24 119:2,6
121:8,9,12 125:18,20
127:13,14,21 129:14
129:16 130:4,6,7,7,10
130:12,18,20 131:7,14
140:17 142:19 143:2,6
144:14 152:12,15,17
152:20 154:5
**ingests** 105:6
**initially** 46:11 144:18
**initiated** 105:15
**injured** 111:23
**inmates** 45:18
**input** 87:19 108:9,10
110:12
**inputted** 110:24
**insane** 21:4
**inside** 45:17 46:18 105:1
109:11 128:20 129:16
149:2
**inspector** 4:12,22
**Instagram** 70:17
**instance** 17:20 48:14
90:24 102:25 103:23
139:10
**Institute** 2:2,6
**integrity** 131:6
**intel** 29:8 30:23 42:19,19
43:18,18,25 46:18
47:5,13,15 50:5
61:19 71:11 84:8,9,10
84:13,18,24,24 94:25
95:24,25 96:9,10
130:19,19 131:18
138:3,13 139:6 152:21
**intelligence** 6:17 14:1
15:19 16:13,13,24
17:3 19:7,7,17 20:7,7
20:10,23,24 22:1,4,5
28:2 30:24 47:20 48:1
48:6,18,18,21 51:10
51:11,13,17 67:18 70:10
70:11,13 76:5 79:3
80:4,7,11,18,19 91:5,7
93:21 94:14 96:12
98:2,16 101:23 111:2
111:8 116:1,6,21
118:1 125:23,23 126:8
126:19 128:16 130:18
130:23,25 138:3,4
154:7
**intelligence-led** 4:13
5:14 6:7,16 10:18 13:6
17:7 19:21 124:22
144:19 145:13 146:22
**intels** 97:17
**inter** 66:19
**interact** 22:15
**interaction** 22:15 24:23
**interest** 96:14
**interested** 156:15
**interface** 38:22,25 69:7
110:7 122:21
**internal** 3:3 30:18,22,24
32:1,12,13 33:3 40:6
46:4,16 65:17 67:22
80:10,15,15 89:17,20
128:12 134:8 137:18

**internally** 63:17
**internet** 70:14,23
**Intervention** 146:23,24
**interview** 40:3 46:19
    50:24 61:23
**interviews** 51:1,4
**intra** 66:19,20
**intranet** 66:9,11,17,21
    66:23 67:1 68:23,24
    80:8 128:3,11,19,22
    128:23
**introductions** 31:24
**investigation** 28:1 87:4
    117:21 118:4 129:15
    130:9,13,21,24 131:5
**investigations** 5:7,8
    84:14,15 89:16 141:23
**invite** 52:6
**involve** 32:21
**involved** 6:2,5 24:21
    40:4,5 52:11 63:23
    98:25 125:20 128:15
**involvement** 128:14
**involvements** 126:10
    128:24
**involving** 24:9
**iPhones** 91:24
**IR** 47:6 84:21
**ironing** 67:3,5 69:4
**issued** 11:18 96:17
**issues** 40:21 121:21
    147:3
**It'll** 38:23
**item** 113:7,8 153:14

**J**

**J** 131:24,25
**J-** 3:6
**Jacquelyn** 1:19 155:11
    156:6,19
**jail** 18:16 38:8 45:10,16
    45:16 58:4,4 103:8
**January** 1:19
**Jeff** 151:10,13,15
**Jeremy** 113:9 144:11
**Jerry** 14:21 144:12,13
**job** 15:25 139:16 140:4,9
    140:14 153:11
**jobs** 45:10
**jogs** 139:19
**Johnson** 2:2,21 4:7 5:15
    5:17 9:18,21 11:15
    24:1 31:16,21 32:16
    32:17 33:12,14 47:11
    50:4,5 59:7 65:9,11
    66:20,24 68:11,20
    85:18 86:8,10 93:20
    98:1 99:23 101:11
    112:15,19,21 115:23
    115:25 119:11,13
    120:19,21 123:24
    124:2 125:6,9 131:24
    132:1,25 133:4,23
    134:16,18 135:23
    136:3,5,8 137:12
    139:23 140:16,24
    141:6,8 145:7,20
    151:24 152:4 154:12
**JONES** 1:18
**judge** 132:8,9,12,21,23
**judge's** 132:4,20
**jump** 94:13
**jurisdictions** 16:11
    125:15
**Justice** 2:2,6 52:9
**Justin** 67:4 145:11
**juvenile** 37:17 52:9

63:15
**juveniles** 40:11 153:13

**K**

**K** 134:16,17
**K-** 3:7
**K-O-L-H-O-U-E-R**
    113:9
**Kapusta** 146:15 150:25
**keep** 37:24 38:2 47:7
    49:4,18 80:10 85:22
    94:22 95:2 96:2 98:17
    115:7 131:5
**keeping** 60:12 95:6
**keeps** 115:16 135:4
**kept** 49:3 78:23,24 80:11
    137:18
**key** 14:11 18:13 93:9
**keyword** 92:15,17
**kid** 44:19
**kids** 40:13 153:9
**kind** 6:6,10,23 8:14,22
    10:17 11:2 14:21
    15:11,16,24 17:25
    19:5,6,16 20:10 21:25
    25:14 29:16 33:8
    36:21 41:13,22 44:8
    45:11 46:24 51:1
    52:11,25 53:5 55:9,10
    55:21 56:21 57:4 62:3
    63:4,11,12 67:3,16,24
    70:9,17 71:6,24 72:14
    76:25 85:23,25 86:14
    86:15 87:5 88:1,25
    90:20 93:3 94:2,5,17
    95:4 96:13,18 97:6
    99:25 100:6,6 111:19
    111:21 116:4,5,22,25
    118:14 119:4 123:10
    123:13 124:21 128:15
    130:8 131:4,5,6
    145:16 149:1,4 150:2
    150:19,19
**knew** 35:14
**knocked** 77:7
**know** 7:23 8:1 10:23
    11:12 13:4,7,24 14:20
    14:22 15:5,7,19,22
    16:2,6,7,24 17:1,12,17
    17:19 18:2,6,19,20,22
    19:1,7,18 20:13,13,14
    20:14,22 21:11,16,17
    24:16 25:13,21 26:9
    28:2 29:8,25 30:8 31:9
    31:14 32:23 35:5
    36:13,21 37:11,13
    38:1,2,5,8,16 40:18
    41:17,22,24 42:5,10
    42:11 43:19,21,22
    44:1,9,23,23 45:15
    46:13 50:13,13,16,20
    50:24 51:15,21 52:1,8
    53:1,2,4,21,23 55:15
    55:19 56:9,10,14,25
    57:4,14,25 58:2,5,11
    59:25 60:1,12 61:18
    61:22,22 62:20 63:2
    63:12,20,24 64:1,7
    65:19,22,24,25 68:12
    69:16 70:5 71:18 73:2
    73:19 74:2 76:10,11
    77:2,10,17,18 78:10
    78:12 79:1 81:8,16
    83:17 84:23 86:15,17
    88:13,18 89:9 91:5
    94:3,9,13 96:2,11,20
    97:6,6,7,11 100:8,8

101:4,6 103:10,17
    104:1 107:10 108:19
    109:2 114:5 115:3
    116:22 117:3 118:2,3
    118:6,8 121:4,5,19,20
    122:17,18 124:1,6
    126:13 127:4,11,17,25
    131:5 132:6,13,20,22
    132:22 134:13,22
    135:13,16,20,22,24,25
    137:22 138:23 139:5
    139:21 140:3,14
    141:21 142:24 143:5
    144:16 145:6,14,15,18
    146:11 148:2,3,18
    149:24,25 150:10
    151:3 152:24
**knowledge** 37:11 49:13
    68:5,14 69:15,16
    88:12 91:16,16 100:6
    115:15 123:13 124:5
    124:22 137:18 146:7
**knowledgeable** 93:8
**known** 55:8 103:9 121:12
**knows** 21:14
**Kolhouer** 113:9
**Kraus** 1:13 4:1,9 103:4
    103:16 155:5 157:1,24

**L**

**L** 136:6,7 154:20
**L-** 3:7
**lab** 52:2
**labeled** 33:23
**laid** 116:17
**language** 7:24 14:19
**laptop** 122:6
**large** 1:20 63:15 116:8
**large-scale** 72:14 84:15
**Larry** 1:13 4:1,9 103:4
    103:16 155:5 157:1,24
**late** 4:22 6:1 7:21 18:4
    45:23 64:22,23 67:24
    68:19
**laugh** 54:4
**law** 7:18 8:13 13:24 17:2
    17:17 24:23 40:16
    51:4 54:1 56:8 107:4
    148:4 153:5
**layers** 151:20
**laying** 87:7
**lead** 93:9 124:13
**leader** 10:20
**leads** 29:10
**leaked** 44:10
**learn** 15:24,25 22:4 50:6
    90:3 131:12
**learned** 42:14 50:9,19
    53:15 88:9
**learning** 26:2 94:20
**leave** 43:8 70:21 130:10
**led** 50:21
**left** 7:9
**legal** 79:7 119:9
**legitimately** 44:19
**lens** 119:2
**let's** 9:18 28:11,18 31:17
    33:11 36:25 39:6 40:4
    40:5 41:7 49:5,6 64:14
    75:4 86:8 89:9,13 90:1
    102:19,25 104:12
    108:13,19 112:19
    116:6 117:3 139:24
    150:17 153:10,10
**lieutenant** 4:19,20 5:22
**lieutenants** 36:12 57:23
    111:14

**life** 16:2 68:10 111:10
    148:22
**likelihood** 128:25
**likes** 91:23
**limitation** 30:15
**LINDSAY** 2:14
**line** 13:21,21 14:2,3
    44:14,14 88:19,19,20
    157:8
**lines** 148:19
**link** 70:4,11 71:5,19,20
    71:22 79:15,19,23,24
    81:4,11,16,18,18,20
    82:7,15,20 97:8
    103:15 125:5
**linked** 103:16 105:4
**links** 96:2 102:16
**list** 3:3,7 22:9,18 27:12
    28:7,21 31:5 32:2,19
    33:17,18 34:1 35:6,8
    35:24 36:4,6 37:21,22
    37:25 38:2,10 39:4,20
    39:22 40:23 54:17
    55:22 56:18,23 57:3,4
    57:18,19 58:3,16,25
    59:2,9,12,14 60:6,14
    60:15,21 63:8 69:19
    69:25 70:3 71:21,21
    72:7 75:3 81:22,22
    97:10 99:7,18 104:17
    113:23,25 114:3 115:7
    115:10 136:4,13 137:6
    137:16 138:20 140:18
    142:8 143:3,8,25
    144:1,4 149:9,10
**listed** 24:14,15 37:6
    38:21 41:8 72:1 74:12
    78:11,12 85:15 91:20
    102:2,14 103:10
    104:13 105:22 106:1
    106:14,16,19 113:24
    132:3 146:10
**listen** 51:23 77:12,15
    87:12 100:10 110:14
    127:7
**lists** 54:25 58:23 65:23
    71:6 99:17 138:6
    142:3,20 143:24
    144:14
**literature** 12:15 14:20
    144:18
**litigation** 79:7
**little** 8:11 14:5,10 31:11
    43:19 50:8 57:5 59:17
    65:12 104:16 108:6
    129:25
**lives** 27:2 101:4,7 111:6
    126:15
**Lmoore@pascosheriff....**
    2:17
**locate** 100:19
**locations** 17:11 54:25
    90:5,24
**locked** 70:20
**log** 85:10
**logically** 32:8
**lone** 76:25
**long** 4:14 8:12 21:18
    28:25 29:1,19 34:17
    34:18 47:15,18 48:14
    55:13,14 110:25 119:3
    151:3
**long-term** 147:9,19
**longer** 48:24 56:5,12
    62:24 64:3 66:5 69:17
    82:24 83:25 111:6
    126:15 139:14 140:8

**look** 7:23 8:15,25 9:25
    10:16,21 16:6 17:9,12
    18:22 19:13 22:24,25
    23:7,19 24:2,13 26:7
    28:12 29:5 30:7,9,9
    35:6,15,16,20 36:5
    57:3,4 70:11,15 82:18
    85:13 86:1 88:1,2
    89:10,20,25 91:4 93:3
    95:23 96:24,24 97:19
    100:17 101:25 102:11
    102:13,15 103:20,25
    104:11 105:17 106:9
    106:11,12 107:9 109:1
    109:2 113:3 117:19
    121:3 122:5,5,17
    126:23 127:20 130:9
    130:15 131:5 132:15
    137:1,20 138:19 141:4
    147:22 148:21 149:8
    149:10,11,15 152:7,12
    153:21 154:9
**looked** 14:10,12,13 29:8
    45:12 90:2 102:7
    103:4 106:11 139:6
**looking** 9:8 13:16,17
    14:9,16 24:5 29:3
    35:18 36:7 45:18 56:5
    62:3,16 63:5 64:6,14
    64:15 72:10,14 81:2
    94:11 95:12 96:12,19
    98:11,14 99:3 118:12
    119:14 120:22 122:15
    124:12 127:9,12
    138:20 140:9 141:19
    141:20 147:19 148:13
    148:15 150:6,8,9,17
    150:19 153:22,23
**lookout** 20:9
**lookouts** 99:3
**looks** 9:12 14:18 33:17
    33:19,19,22,24 34:1,2
    34:5,24 35:9,17,22
    41:6 77:15 119:20
    120:24 123:17 124:6
    135:3,14 137:6 140:7
    148:1,16 149:1 150:10
    150:11,11
**lot** 7:17,18 15:22 16:25
    17:17,20 19:22 21:1
    21:17 29:7,10 35:11
    37:16 40:19,20 43:2
    43:20 45:3 46:24 47:3
    50:18 54:5,13 55:20
    59:21,22 61:19 64:6
    68:14 69:15,17 80:3
    82:3,8,8 83:16 89:7
    92:15 100:7 114:6
    119:16 127:16,18
    129:20 138:15,15
    144:17 148:25 152:22
    153:8,8,12
**loud** 113:8
**low** 21:7

**M**

**M** 139:24,25
**M-** 3:8
**machine** 26:1
**main** 55:25 56:1
**major** 50:2 123:18 144:9
    146:12,17 147:17
    150:25
**majors** 112:11
**makeup** 13:5
**making** 8:10 13:7 21:23
    29:12 41:23 149:9,15

**male** 53:1
**man** 43:11
**manageable** 25:14 35:3,3
**management** 26:4 32:24
36:9,18,19 37:2,4
57:14 69:15 71:13
80:1
**manager** 4:17,19 11:25
12:2,19 67:14 139:5
145:12,23,23
**manner** 54:18 105:17
**manpower** 83:19
**manual** 3:2,2 5:14,19
7:16 10:5 11:18 12:6,9
12:10,10,11,16,17
13:2,14,23 14:10,15
15:3 16:16,18 23:17
27:15 30:4,6 49:22
65:13,14,14,19 66:8
66:13,14,22,25 67:7,8
67:25 68:13 69:1
81:22 99:19,21 123:14
123:20 132:11 144:2
**manuals** 16:9 68:1,15
**marijuana** 24:12
**mark** 5:15 9:18 31:17
33:12 79:4 80:5,16
86:8 112:19 119:11
120:19 123:24 131:24
134:16 136:6 139:19
139:24 141:6
**marked** 5:16 9:20 10:6,7
31:18 33:13 86:9
112:20 119:12 120:20
123:25 131:25 134:17
136:7 139:25 141:7
**marketing** 19:11
**mass** 85:1
**match** 148:17
**matter** 40:1 55:7
**maximum** 47:17
**McDougall** 82:16
**mean** 6:4,23 9:23 12:1
13:1,21 14:17 15:14
26:23,23 27:7 30:21
34:5 35:9,10,11,14,17
35:21 37:10,10 38:12
38:18 40:10 42:3,4,5,8
42:24 46:22 47:22,25
49:21 52:15 55:4,13
55:22 56:1,7 58:19
59:24 61:8 69:10 71:4
77:15 78:20 81:15
82:14 85:3 89:1 94:7
95:5,20 97:17 100:2
100:16 106:7 108:18
109:13 112:6,25
113:10 116:18,19
118:24,25 119:9 123:9
124:19 126:11 129:3
129:19 132:16 134:20
135:14 136:22 140:3,6
140:7 149:23 151:19
152:22
**meaning** 150:6
**means** 82:17 104:18
**mechanical** 50:1 91:11
**mechanics** 32:19 67:11
**mechanism** 49:1
**mechanisms** 45:14
**media** 70:17 97:3,3 99:25
100:4
**medium** 21:7
**meet** 59:13 98:12 119:4
**meeting** 26:9,9,10 51:13
54:1,8,9 55:11 101:24
127:19 152:24,25

**meetings** 51:10,11 52:11
52:14 54:24 55:3,5,13
56:13,14
**meets** 60:23 80:16,17
**Melinda** 93:8 139:12
**member** 16:21 23:11
35:20 39:24 48:24
89:9 96:23 133:7,8,9
134:6 135:8
**member's** 134:4
**members** 15:16 63:23
100:19 124:21,24
128:3 133:16 153:17
**memory** 78:18
**mental** 121:21
**mentality** 18:11 41:25
**mention** 98:8
**mentioned** 25:1 36:18
61:12 68:21 69:20
81:3 90:9 93:21
102:19 148:8
**mentions** 62:13 142:1
**met** 19:19 40:16 41:14
145:19
**metric** 8:21
**MFR** 104:25
**Miami** 2:7
**Microsoft** 33:7,8
**mid-'18-ish** 54:15
**middle** 1:1 61:23
**mind** 19:9 47:7 104:15
**minds** 37:14
**Mine** 146:15
**minority** 21:3
**minutes** 7:13
**misconception** 19:21
**misdemeanor** 24:12
**missing** 35:11 99:22
127:21 131:8
**mission** 3:8 16:14,24
141:12,16
**MO** 90:5 91:23
**mobile** 104:25 105:1
**model** 29:3 41:22 65:3,4
**modeling** 11:3
**models** 74:1
**moderate** 34:18 35:21
**module** 46:18,19
**mom** 76:13,18 77:2,6,8
77:10,17 100:21 111:5
111:5,6 118:16
**mom's** 76:16,16 102:9
**moniker** 40:16
**monitor** 18:17
**month** 122:18
**monthly** 56:13,14
**months** 11:17 22:3
**MOORE** 2:14
**morning** 3:43:1 111:12
111:13,18,20,25 113:1
113:2
**mother** 76:12,19 100:17
102:6,10 104:2,6
**mothers** 77:5
**motorcycle** 40:20
**Motorola** 46:12 85:6
**mouth** 50:18 88:22
**move** 21:8 56:16 130:8
**moved** 58:10 91:21
126:14,14
**moving** 58:13 59:23
**MPR** 133:18,25
**MPRs** 133:10,11,13,15
133:19 134:11,15
**multiple** 5:7 16:11 63:20
75:8 81:16 87:9 97:9
143:17,18

**murder** 44:23 116:7
125:19
**murders** 111:17
**MVT** 119:24

**N**

**N** 2:19 141:6,7 154:20
**N-** 3:8
**name** 4:8 7:9,10 34:10
39:14 43:3 45:3,4
46:14 57:11,12 78:16
78:17 80:20,24,24
82:17 92:19 99:12,14
99:18,18 102:8,9
103:8 105:23 106:14
106:16,22,22 107:15
108:1,25 109:23,23
110:4 121:10 145:2,5
145:9 151:9
**named** 103:6
**names** 33:17 35:10 37:15
104:11,12,17 108:20
136:17
**narcotic** 64:15 86:19
141:5,20 142:14
**narcotics** 24:11 64:15,17
72:15 86:21 87:1,1
**Nathan** 112:10
**Nathan's** 113:23
**nation** 150:17,18
**nationwide** 9:4 150:14
**natural** 37:19
**nature** 5:9 22:8 39:17
40:13 41:20 50:20
51:19 52:10 53:2
70:21 72:16 76:15
97:4 100:12,21 103:3
105:3,15 111:18,24
118:9 121:11,13
125:19 127:13,23
128:16 137:20 139:8
148:6,22 151:23 154:2
154:8
**Naval** 72:8,9,13
**navigate** 138:15
**nay** 118:11 130:16
**necessarily** 25:7 29:15
53:12 76:11 82:17
87:21 98:21 100:18
101:24 102:15 104:19
106:23 108:24 109:1
127:3,16
**necessary** 43:14 82:13
135:13
**need** 7:25 25:20 41:25
56:25 93:1 100:19
108:5 111:9 149:5
**needed** 12:23
**needs** 15:17 20:8,17,18
43:15 139:22 140:11
**negative** 24:23
**neighbor** 44:17 148:24
**neighbor's** 44:18
**neighborhood** 29:12
44:19
**Neither** 16:8
**network** 62:17,18 63:2
64:2,9,10,16,16 69:20
69:21 73:1 76:4,14,17
76:19 79:22 80:21,22
81:17 82:10 97:8
**networking** 62:21 64:6
72:10,17 76:12
**networks** 62:2,18 63:11
63:13 64:20 72:15,18
73:14
**never** 16:2 18:7 124:8,8

124:17,20,21 145:19
**new** 1:17,18 2:16 8:10
10:4,20,20 11:3,3
15:23 16:16,21 37:22
46:16 83:6,10 84:2,4
89:6,23 91:22 114:16
114:20 123:8,20 126:1
126:2,4 129:21 135:8
**news** 111:22 117:12
**night** 44:2 61:23 63:18
**NML** 22:1
**Nocco** 1:8 157:1
**noncriminal** 118:11
**normally** 42:21,21 62:25
133:2 147:22
**Notary** 1:19 155:12
**note** 89:2 109:3 118:13
**Notebook** 70:6 81:21
**noted** 21:3 157:7
**notes** 48:8,13,15 88:25
89:1 94:7 105:22
106:7,7,12,23 107:5
107:22,23,24 108:2,3
108:16,16,21,21 109:7
109:17,25 110:12,15
110:20,25 117:20
119:5 129:12
**notify** 89:4
**notifying** 92:22
**number** 23:13 27:2 34:4
72:5 103:17 105:12
107:7,13 117:2,3,4
118:5 121:11 122:3,8
122:10 128:16
**numbers** 24:3 150:15,15
**nutshell** 22:1

**O**

**O** 154:20
**Oath** 2:22 155:1
**object** 85:17 133:16
**observed** 44:21 113:23
**obvious** 129:10 131:10
**obviously** 121:7
**occur** 107:21
**occurred** 100:7 117:5
**October** 4:16,20
**odd** 6:23
**odds** 20:22
**off-ramp** 17:15,15,16
18:11
**off-ramping** 153:8
**off-ramps** 41:23
**off-the-record** 125:7
140:22
**offender** 22:9 28:7 31:5
32:2,19 35:8,23 38:14
38:15,21 39:16,20
41:8,10,12 42:2,6,15
42:17 48:14 49:16,17
53:8,16 54:16,25
56:18,23 58:23,25
59:3,14 60:21 63:6,8
65:23 71:2 75:25 76:4
76:25 77:16 78:3
81:12 85:16,20 88:9,9
90:11,25 91:19,23
92:1 93:25 94:23
98:20 100:24 101:2,18
106:20 107:2,14,14,18
107:25 108:3,8,13,14
109:7 110:25 112:3,8
113:11,17,23,25 114:3
115:7 116:13 120:17
127:1 128:4,13 137:16
142:3,8,20 143:3,8,24
143:25 144:1,4,14

149:9,16 152:16
**offender's** 92:19
**offenders** 34:1 37:6
38:10,24 39:4 49:11
50:7 52:22,24 55:7
57:15 58:12 63:15
75:9,17,19 81:5 90:3
98:23,24 101:14 115:9
115:17 116:10,16
119:21 120:1,6,7,11
126:9 131:13,15 138:6
138:12 141:5,19,20
142:15 152:11 153:19
153:20
**offenders'** 77:4
**offense** 24:14,16 35:20
**offenses** 24:16,17 90:5
**offhand** 62:11
**office** 2:15,17 4:11,18,24
5:2 6:13 10:10,15
16:17 33:8 49:18
56:19,21 76:3 105:7
122:9 124:25 127:6
133:5 136:20 142:9
143:1,16 144:20,25
147:13 151:18
**officer** 147:15
**officers** 5:8 22:14 52:10
54:2 152:9 153:6
**official** 1:9 155:7
**officially** 145:19
**Oh** 19:22 43:11 66:6
101:17 110:6 140:1
**Ohio** 2:3
**okay** 4:14 5:3,10 6:2,18
7:14 8:9 10:9 11:16
15:1,13 16:22 17:4
22:21 32:11,18 33:22
34:20 35:25 39:3
41:11 42:1,13 46:20
47:12 48:3 49:5,14
51:9 53:14 54:21
56:24 62:12 64:23
65:22 66:7 69:12,18
73:4 74:19,25 75:12
75:19,24 78:10 79:9
81:11 90:8,13 95:2
96:9 98:22 102:11
103:1 104:22 105:9
106:1,10 107:22
109:19,21 110:3
111:12 113:6 114:24
117:16 119:5,17 120:9
121:7 123:12 125:4,12
126:18,25 128:11,21
130:19 132:15 133:2
133:13 134:2 135:22
136:11 138:5 139:3,17
141:11 143:1 144:10
152:8,14 153:3
**old** 40:12 46:5 83:5,25
84:1 89:24
**older** 140:8
**once** 22:7,13 23:10 26:20
36:3 37:20 40:23
49:16 57:11 67:15
80:14,15 141:22
**one's** 9:23 84:23,24
**ones** 28:8 84:23 119:7
130:1
**ongoing** 117:21 130:13
**online** 66:9
**open** 81:9 97:4 108:20
**open-source** 70:11,13,25
97:1
**open-sourced** 70:23,24
71:14

**operate** 105:6
**operated** 105:5
**operating** 120:2
**operation** 93:4
**operational** 6:4
**operations** 6:21 142:13
146:20,21 147:13
**ops** 6:21 106:8 110:10
150:25
**option** 118:19
**oracle** 21:2
**order** 122:1 146:2
**organization** 55:17 64:11
80:23 124:14 146:18
148:14
**organizational** 151:22
**organizations** 72:15,16
**organized** 80:20 85:1,2,8
85:8
**orientation** 16:21
**originate** 137:1
**outcome** 147:23
**outlaw** 40:20
**outside** 23:16 24:10,17
25:25 36:17 38:17,18
52:7 54:13 59:22
63:17 116:20 141:24
153:18
**overall** 47:3 148:13
**overhaul** 14:14
**overnight** 3:4 111:14
113:1 116:3,4
**oversaw** 145:24 146:1,5
146:9
**oversee** 4:12 5:5 141:25
151:18
**oversees** 151:21
**overview** 17:5 19:6
**owned** 90:6

**P**

**P** 154:20
**P.A** 2:11
**P.M** 1:15 154:18
**P.O** 1:23
**packet** 96:4
**page** 2:20 3:1 14:17
23:22 24:2,3 39:7 49:6
54:23 62:13 66:9,11
66:17,23 67:1 68:25
86:5,13,13 90:1 97:21
113:5 120:25 125:10
126:23 131:11 152:6,7
153:15 157:8
**pages** 35:11,12,12 54:20
157:5
**paper** 134:4
**par** 135:11 150:14
**paragraph** 126:7
**parents** 41:18 77:21
**Park** 2:12
**parole** 52:9
**part** 16:10 49:1 68:24
72:18 76:17 80:8,9,11
91:3 98:18 120:24
129:4 137:25
**participate** 51:10
**participated** 144:3
**particular** 97:20 98:8
129:15 130:13,21
**particularly** 153:17
**parties** 154:22 156:12
**parties'** 156:13
**partner** 142:23 143:17
143:19
**partnered** 72:10,13
**partners** 52:7 148:6

**parts** 147:12
**Pasco** 1:9 2:15,17 4:11
4:23 6:12 9:13 16:17
17:20 18:21 22:25
33:1 49:18 59:23
65:22 124:24 133:5
136:20 142:8 143:1,15
147:12 150:19 151:17
154:10 155:3 156:4
**pass** 89:15
**path** 149:5 153:10
**patrol** 45:10,21,22 46:10
49:21,23
**pattern** 19:12 63:4
**patterns** 19:13 20:5
**pawn** 24:10
**paying** 21:18
**PCs** 99:4
**PDF** 99:13 128:18
**Peake** 144:9
**pending** 127:4
**people** 16:1 17:9,13 18:9
21:1,22 22:19,20,22
25:24 26:16 27:12
28:7,11,12,13 29:17
32:9 37:5,10,23 38:5
38:23 40:15 41:17,23
41:23 45:4 53:14
56:24 58:5 59:8,12,21
61:12,16 62:8,19 63:7
64:16,17 73:21 89:7
99:7 101:14 102:1
114:6 120:10 138:20
147:6 148:23
**percent** 23:12 35:22
36:16 78:19 86:20
105:16 106:5 122:7
136:14,14 137:21
**percentage** 17:10 129:2
**percentile** 107:20
**Perez** 104:12,13
**perfectly** 27:18
**performance** 13:23 49:7
133:6,9 152:10
**period** 18:2 25:5 48:9
72:6 87:13 110:21
152:18
**periodically** 140:14
**person** 19:18 24:21 27:1
27:9,25 29:22 37:17
40:3 48:20 57:6 58:4,6
58:10 63:5 75:7 96:14
99:6 102:24 105:22,23
106:14,16 110:22
132:6 139:11
**person's** 28:21 29:14,25
30:1,3 55:24 58:5
116:7
**personally** 155:5
**perspective** 11:11 13:3
21:6 33:23 129:8
140:13
**pertain** 85:15
**pertinent** 115:2
**phase** 10:3
**Phillip** 146:15
**philosophies** 6:10
**philosophy** 6:6,7,10,25
8:18 144:19 145:25
**phone** 1:25 88:19,20
**photo** 103:7
**photographed** 119:18
**picture** 39:6 102:23
103:8 121:8
**pictures** 38:23 119:18,19
120:6,9
**pinwheel** 79:9

**place** 1:17 21:19 30:4,6
61:6 126:12 139:7
146:18
**places** 12:23 17:9 74:7
**plague** 148:20
**Plaintiffs** 1:6 2:5,9
**plan** 147:24
**planet** 19:18
**planner** 147:16,18
**planning** 147:19
**plans** 147:21
**platform** 70:17 141:13
**platoon** 111:15
**please** 34:12 142:10
**plus** 18:1 74:20
**plutonium** 68:9
**pod** 45:17
**point** 10:18 11:18 24:18
30:4 49:9,15 50:6 51:9
83:22 90:2 93:16
112:25 114:23 131:12
150:2 152:11
**point's** 24:15
**pointing** 23:17
**points** 23:2,4,5,6,7,9 24:5
24:8,9 34:4 53:25
126:24
**police** 9:1 52:8 101:8
131:22 136:13,24
137:11
**policies** 148:14 149:2,9
**policing** 4:13 5:14 6:6,7
6:9,10,16,25 10:18
13:6 16:10 17:7 19:9
19:21 124:23 144:19
145:13 146:22 153:22
153:23
**policy** 3:3 8:14 11:23,24
12:1,4,7 13:3 30:14,18
30:22,24,25 31:4,7
32:1,12 40:6 49:10,12
**pool** 22:19 23:10,15,16
24:19 25:1,1,3,6,6,8
26:15,20,20 27:9
28:10 31:11
**population** 148:4
**Port** 1:17,18 2:16
**portal** 44:25 88:1
**portion** 30:12
**position** 4:15 151:4,15
**positions** 140:10
**possible** 20:19 37:5,25
42:3 50:7 84:4 90:3
131:12
**possibly** 14:4 77:7 84:6
94:24 95:3,16 102:3
**posted** 66:14
**Postgraduate** 72:8,9,13
**posts** 97:3
**potentially** 63:9 74:15
91:13 92:20 115:5
144:9 147:22 152:20
**Poulton** 2:10,11 11:4
23:25 31:13 32:15
47:9 50:1 59:5 65:8
66:19 68:8,16 85:17
93:18 97:19 99:5
100:23 112:14,17
115:21 133:2,16
135:25 136:4 137:7
140:2,21 145:18 152:2
154:14
**Poulton@debevoisepo—**
2:13
**PowerPoint** 16:23 53:24
**PowerPoints** 52:19
**practical** 56:7,8

**predict** 20:25
**predictive** 19:9 94:1
**Prescott** 7:3,4 144:23,24
145:14 146:3,6
**present** 52:17 53:21,22
127:25 154:22
**presentation** 16:23 17:5
52:17,17,18
**presented** 128:18
**Presumably** 85:1
**pretty** 14:13 16:7 22:24
23:19 42:16 106:6
109:4 134:21
**prevent** 20:1
**prevention** 19:24
**previous** 39:21 96:21
144:8
**previously** 37:6,7 38:10
38:20 39:19 78:11,12
137:13
**primarily** 69:22 75:5
110:16 143:3 148:19
**primary** 18:24 27:5 64:1
74:14,20,21 92:25
97:11
**prior** 5:1,20 7:2,9 29:1
31:19 42:17 54:16
65:14 68:16 85:3
90:11 93:2 106:9
127:5,18 128:1 129:21
139:5 144:6,8,15
145:10,13,15 146:6
150:3,6,9
**priority** 19:3 126:8
152:11
**private** 147:8
**probabilities** 21:5
**probability** 21:7 74:6,8
**probable** 101:6
**probably** 5:20 7:12 8:13
9:16 12:11 14:24 17:2
18:3,3,4 19:23 21:20
25:8,10 34:18 50:2
53:11,13 54:4 63:18
64:22 65:24 66:2
67:23 68:4 73:22 76:4
82:11 86:20 91:2,3
99:19 102:4 113:14
114:1 129:2,10 136:1
137:17 151:5
**probation** 52:9
**problem** 17:8,12 18:13
89:19,22
**problems** 9:14
**procedures** 13:13 148:14
149:2
**PROCEEDINGS** 1:12
**process** 7:23 8:18 10:17
12:21 13:8 31:25 45:8
45:12 47:3 48:17
55:21 57:7,8 69:9 86:1
86:17 91:8 93:21,23
94:11,17 95:9,18
118:8 123:15,18 142:2
142:23,25 149:10,15
153:4 154:7
**processes** 148:13
**produced** 33:21 34:21,25
79:13 118:23 132:18
133:24 138:6
**produces** 57:18 82:1
**product** 71:16 72:19
79:22 80:2,6 81:7,13
82:21 126:19 133:14
136:21 137:23,25
**products** 95:13
**profile** 39:8,8 102:1,8,20

102:21,22 103:24,25
104:8 106:17,25 107:1
107:3,16,18,23 108:12
108:15,16,20,25 109:2
109:10,24 110:2,15,21
117:18,20 120:17,25
120:25 121:5,6 122:12
122:24 129:8,12
131:21
**profiles** 103:5 105:11,21
105:24 106:4 109:22
110:5,7,9 129:5,5
**program** 5:24 6:3,5,18
6:21,24,24 8:17 12:20
29:9,9 33:7 36:21 44:7
44:11 45:9 46:3 50:14
72:9 84:21 85:7 86:18
93:2,3 114:22 129:21
143:20 145:13,24
146:1,6,9 152:19
**programs** 142:18 143:18
**progress** 46:23
**project** 142:14
**projects** 72:14
**prolific** 18:20 22:9 28:7
28:21 29:20 30:9 31:5
31:12 32:2,19 33:18
34:1,9,14 35:7,23
36:10,14 37:6,12,20
37:21 38:10,21,24
39:4,11,11,15,16,19
40:23 41:8,10,12 42:2
42:5,6,15,16 48:14
49:10,16,17 50:7
52:22,24 53:8,16
54:16,25 55:7,22,24
56:18,22 57:15 58:3
58:11,23,25 59:3,13
59:21 60:21 63:6,8
65:23 71:2 74:15,21
75:13,13,19,25 76:4,8
76:23 77:4,16 78:2
81:4,12 85:15,20 88:8
88:9 90:3,25 91:19,23
92:1,19,23 93:25
94:23 98:19,22,24
99:6,7 100:24 101:2
101:14,18 106:19
107:2,13,14,18,25
108:3,8,13,14 109:7
110:23,24 112:2,8
113:11,17,23,25 114:3
115:7,8,17 116:9,12
116:16 119:21 120:6
120:10,16 127:1,5
128:4,13 131:13,15
137:15 138:6 141:19
141:20 142:3,8,12,14
142:20 143:2,8,24,25
144:1,4,14 149:9,10
144:16 152:16 153:2
153:18,20
**prolifics** 18:21 22:11,12
25:13 30:8 42:21
55:23 78:6 107:5
118:3 128:9 143:14
154:1
**promoted** 4:17,20,21
**proper** 89:16
**property** 9:6,10 17:21
18:5 142:17
**prove** 51:7
**provide** 5:11 6:17 15:16
16:25 22:6 42:14
44:16 116:18 125:15
127:13,22 135:6 136:5
139:17

**provided** 126:16 137:5
142:19 143:2,6 144:13
**providing** 65:5
**PSO** 126:10 153:17
**public** 1:19 29:10,11
44:6,11,13,25 119:3,9
127:10 129:20,22
130:2 137:4 155:12
**pull** 23:13 39:9 60:16
69:1 85:14,19 101:18
128:8,9,19
**pulled** 138:10
**pulling** 102:12 128:6,6
129:1
**pulls** 26:3 32:23 33:3
39:11
**purge** 48:22,25 49:1
78:15 80:4,19 82:24
98:13,15,17 111:9,10
**purged** 79:3,6 82:22,25
**purple** 82:3
**purpose** 55:3,4,10
**purposes** 110:18
**purview** 141:24
**push** 40:5 108:16 110:19
**put** 12:10,22 19:24 20:19
38:14,14 45:3,4,15,19
52:16 57:11 62:22
63:25 71:2 73:6,10
76:13 77:2 82:11,12
84:19 85:11 87:24,25
88:3,10,25 89:3 91:13
91:25 92:15,17,19,21
93:15 95:1 96:3
106:23 109:17 110:15
110:23 111:4 115:5,6
123:1,20 133:19
136:14
**puts** 25:8
**putting** 20:6 45:13 79:12
84:20 145:17

**Q**

**quality** 148:21
**quarter** 54:12,17 138:21
**quarterly** 37:22 49:17,22
54:8,11,14,17,24
58:25 135:8
**quested** 145:16
**question** 11:14 16:5
29:24 49:24 69:12
73:20 83:23 94:10
99:5 146:13 152:5
**questions** 16:20 50:2
139:9 152:5 157:7
**quick** 59:5 112:14,15
115:22 132:25 145:5
151:25
**quite** 43:22 45:4
**quoting** 142:1

**R**

**ran** 37:22 43:12 57:8
85:6
**ranges** 44:16
**ranging** 147:3
**rank** 26:21,24 146:16
**rank's** 26:24
**rape** 44:24 111:17
125:19
**rapport** 42:10 58:12
**Ratcliffe** 14:21 144:11
144:12,13
**rate** 18:25
**read** 16:4,18 70:8 77:23
94:19 103:18,21 106:7

113:7,8,8,9 121:1
126:6 128:2 151:12
154:15 157:4
**readily** 83:15
**reading** 16:4 95:23
111:22 154:23
**reads** 113:15
**ready** 112:17
**real** 145:5
**Real-Time** 12:25 44:15
88:15,16 92:24 93:7
134:25
**realize** 153:9
**really** 24:13 26:24,24
27:1 49:21 56:22
77:12,14,20 121:1
129:7
**realm** 116:20
**reason** 28:22 29:21,23,23
42:6 56:4 92:7 93:13
94:3 96:13 97:11
99:10 112:10 118:23
135:13
**reasonable** 130:8
**reasons** 83:19
**reassigned** 67:20
**recall** 139:21
**received** 87:13,24 89:10
90:20 91:4,17 93:16
**recess** 65:10 115:24
133:3 152:3
**recipient** 132:3
**recognize** 5:11 9:22,23
9:24 12:12
**recollection** 139:20
**recommendations** 13:7
**record** 4:8 11:5 15:2
26:4 32:23 36:9,18,19
37:2,4 54:23 57:13
69:15 71:13 79:25
80:1 91:11 92:7
117:17 119:3 125:6
139:24 140:21 142:7
151:11 156:9
**recorded** 99:25 157:7
**records** 70:23 97:15
119:10 126:10 137:4
**recreated** 44:7
**red** 121:15,16 122:25
**reduce** 141:18
**reduced** 14:23
**reduction** 9:6
**refer** 143:25
**reference** 23:25 92:6
**referenced** 61:7 107:22
**referring** 11:6,7 31:22
34:23 93:18 123:7
124:3 136:12 143:25
**regard** 114:19
**regardless** 153:6
**region** 40:20 150:16
**regional** 54:13 67:17
116:6
**regular** 18:18
**regulations** 140:12
**rehashing** 55:8
**relate** 142:20 144:3
**related** 5:7 24:6,7 48:17
80:25 86:21 92:23
116:24 117:21 118:6
**relationship** 104:6,7
**relative** 156:11,13
**releasable** 84:16
**release** 119:8 125:2
131:7
**released** 34:3,4 35:18
135:12

**relevant** 26:25 55:17
85:19
**remain** 111:10
**remarks** 77:23,24 87:20
87:23 106:15,16
131:20,22
**remember** 7:8 28:17
29:7 37:15,17 98:11
110:6 122:16 129:20
132:5,5 133:10 145:3
145:4,9 153:5
**removed** 60:9
**reoffended** 34:3
**reorganize** 32:21
**repetitively** 37:14
**report** 3:4 21:3 39:12
42:18,19,20 43:17,18
43:25 45:1,2,13 46:18
47:5 50:13 61:23
71:11 72:1 84:18,24
84:24 92:5 102:12,13
102:14 103:10,12,13
103:14,15,18,21 104:3
104:4,5,9,10,13,22
105:23 106:2 107:4,6
111:13,18 113:1,2
125:13,14 127:1,2,3
127:16,24 128:5,14
129:1 131:18,22
147:17 151:7,13
152:16,21 154:7 156:7
**report's** 43:19
**reported** 1:19 97:12,14
146:11
**Reporter** 1:19 2:23
156:1,6,19
**reporting** 1:22 24:21
96:22 102:11 104:21
104:25 106:10,11
127:22
**reports** 24:22 36:20,22
36:22,24 41:16 47:13
47:15 48:9,10,11
50:15 70:9 73:2 84:8,9
84:10,13 94:25 97:16
97:16,22 98:2,7,19
101:13 102:2 104:18
104:23 105:2,2,2
106:9 107:11 111:12
111:25 113:16 128:3,8
130:19,20
**repository** 37:3
**represented** 13:14,20
14:2
**request** 119:3,10 132:17
132:23 137:4
**requests** 136:1
**requirement** 49:19 111:9
**research** 14:5 38:5 74:3
96:1 144:18 149:13
**residence** 118:18
**residential** 17:24
**resource** 41:22 52:10
152:9
**resources** 17:16 133:22
148:7
**respective** 154:22
**responded** 125:16,18
**responsibilities** 5:3
**rest** 55:17 104:11
**retain** 80:18
**retained** 47:15,18 48:3,6
48:15 79:24,25 110:25
111:2 134:2,3
**retains** 134:14,14
**retention** 47:19,25 48:9
80:17 110:21 111:10

135:9
**retrospective** 150:5
**revamp** 10:25
**revamped** 113:12
**revamping** 10:17 11:10
**reveal** 55:5
**revealed** 55:1
**reverse** 146:2
**review** 25:17 45:11 56:4
57:19 58:15 80:16
89:12,15,15 118:10
133:9 140:4 142:24
**reviewed** 86:23 90:21
98:1,5 117:24,25 131:2
133:21
**reviewing** 90:23
**reviews** 58:16
**revise** 56:6 87:2
**revised** 7:17,20 8:3,10
15:6,8 54:25
**revision** 7:22 65:17
**revisions** 5:13 67:7
**rewrite** 10:3 68:3
**rewriting** 68:3
**rewritten** 5:21 11:12,12
68:2
**rhythm** 95:18
**Richey** 1:17,18 2:16
**right** 6:22 8:14,17,19 9:4
9:15 12:21 14:15
15:17,24 16:8,15 17:6
17:14 18:13,15 19:2
19:23 20:7,8,9,12 21:5
21:19 22:12,23 23:2
25:4,6,9,11,15,19 28:4
28:22 29:4,6 32:8
33:23 35:8 36:5 37:12
37:15,16 38:3 39:7,10
39:15 40:7,10 41:21
42:9,17,21 43:18 44:6
45:11 50:19 51:16,25
53:1,25 56:5 57:2 61:6
62:11 63:11 71:6
72:22 73:22 74:5 76:9
76:12,14 77:10,21
79:2 81:8,21 83:23
84:14,16 86:14,21
87:23 94:5,9,13,24
95:1,11,24 96:24 97:5
98:11,14,25 100:7,17
102:8 104:13 107:2
108:12 111:22 118:15
118:19,25 120:5
121:19 124:6 127:18
129:23 130:1 132:20
143:7 145:22 147:4
148:15,22 149:3,11,13
152:18 153:6,12,22
154:7
**rightfully** 19:4
**ring** 31:15 64:15,15
**rings** 44:14
**rise** 18:5 148:3,4
**risk** 45:5
**Rjohnson@ij.org** 2:4
**RMS** 32:23 37:5 38:17
38:18,22 39:13 105:1
105:7 128:7
**road** 38:4 43:1 122:17
**Rob** 2:2 31:15
**robberies** 51:18
**robbery** 17:25 101:3
125:19
**ROBERT** 1:5
**Rock** 96:18
**rocket** 16:8
**role** 4:22,23 5:24 11:25

135:9

122:16 147:18
**room** 53:10,14 54:4
**root** 150:23
**Ross** 5:22,23,25 7:2
10:24 11:14 12:20
60:13 65:16 67:22
68:2,13,14 69:6,13
124:4,11,15 125:2
135:15 144:7 145:22
146:3
**Ross's** 5:24 11:11
**roughly** 5:5 28:11 52:5
**routinely** 140:3
**rule** 25:15,19 47:9
**rules** 119:4 135:10
140:12
**run** 60:1 67:18 111:15
123:5
**runaway** 41:19
**runs** 26:6 33:3 35:25
105:7,8

**S**

**S** 2:6,7,11 3:1 154:20
**sad** 38:8
**Salazar** 104:2
**Sanborn** 50:3 123:18
**SAO** 127:13
**satisfied** 49:19
**saved** 81:6,12 98:2
125:24 137:22
**saw** 114:18
**saying** 28:5,6 29:11
30:15 66:19 76:17
87:11 88:18 91:18
92:3 93:10,11 121:18
130:16 134:12
**says** 15:8 30:5,6,20 31:11
38:23 41:14 46:9,6,15
49:22 50:6,8 54:24
61:19 81:24 85:24
86:5,18 97:10 100:15
104:14,17 107:17
108:21 111:5,6 113:22
114:19 116:23 117:2
119:20,21 122:4 128:2
128:5 137:7 142:3
153:16
**scenarios** 124:8
**scene** 36:25
**scheme** 79:11
**school** 52:10 72:8,9,13
152:9,12,13
**schools** 22:4
**science** 16:8 33:5
**score** 18:21 22:11 26:23
27:7,8 33:4
**scored** 27:11
**scores** 27:9
**scoring** 22:23 23:2,15,18
23:23,24 25:3 26:21
27:2,14 28:8 30:10
31:23 33:24 34:9,15
35:18 36:3 142:13
**scraping** 24:10
**scratch** 11:13
**screen** 119:15 120:23
122:12
**seal** 155:7
**search** 37:5 83:9,10,11
83:21,24 84:4 85:21
90:19 93:6,12 99:12
99:14,21 105:20
109:21,23,24 110:1,4
110:8
**searchability** 83:8
**searchable** 83:4,4,6 84:9

84:16,17,18,22,25
92:11,12,13 93:11
98:5 99:13 109:19,23
searched 83:16 110:10
searches 96:24 99:19
searching 92:18
second 31:16 33:19
126:7 128:13
secondly 83:24
section 4:13 89:3 105:22
106:15,16 107:5,22,23
107:24 109:25 110:20
117:20 119:5,10
131:21 146:22
sector 147:9
secure 78:24
Security 11:2 121:11
see 27:4 33:11 35:3
40:24,25 49:7 57:13
70:9 76:1,17 78:7 81:8
81:9 82:22 86:12,13
88:3 89:2 101:20,24
102:1,14 106:3,22
107:15 109:20 114:15
116:19 119:23 121:17
122:22 136:17 139:18
139:19 140:2 144:7
153:10
seeing 9:3,4,5 81:8,25
100:14 137:5 138:25
seen 10:15 41:18 57:24
61:20 62:1 114:17
137:8 138:23 141:13
segment 147:12
select 73:17
selected 22:20,20,22,22
110:8
selection 31:25 57:9,17
sell 19:11
selling 86:22,23
semi-engaged 68:1
Semoran 2:11
send 22:4 44:4 88:21
89:4,19,20 108:3
121:21 132:22
sending 132:11
senior 95:21 134:25
135:18 139:4
sense 27:5 32:9 38:4 39:6
40:8 67:23 72:4 75:9
83:12 87:22 88:6 89:5
102:18 105:5,13 107:8
117:9 140:18 142:9
sensitive 129:15
sent 86:24 88:17 89:22
133:21
sentencing 127:12
separate 80:10,11 107:3
108:22 123:12 142:6,7
142:18 153:3
separately 142:21
September 1:14 4:18
10:1 72:12 155:6,8
156:17 157:2
sequel 108:22
sergeants 36:12 57:23
serialized 80:13
series 51:24
service 105:14 112:1
125:16
services 147:7 148:5
session 123:6
sessions 123:5,7,12
set 26:22 27:15 35:4
133:18 142:11
sets 27:20
seven 11:17 38:3 77:19

92:9 132:18
seventh 127:7
Shaker 2:3
shape 21:4
share 53:15 92:5 116:21
154:4
shared 31:10 78:24,25
95:4 99:10,16 136:16
SharePoint 66:8
shares 36:4
sharing 125:17,20 138:8
Sheet 2:23 157:3
shelf 94:3
Shelly 60:19,20 61:3,4
139:13
sheriff 1:9 112:10 151:14
sheriff's 2:15,17 4:11,18
4:23 5:1 6:13 10:9,15
16:17 49:18 56:19,21
76:3 105:7 122:9
124:25 133:5 136:20
142:9 143:1,16 144:20
147:13 151:17
shift 111:16
shipped 111:6
shootings 111:17
short 54:5 65:10 87:13
92:4 94:20 115:24
133:3 152:3
shorten 94:17
shortened 55:21
shortening 8:11
shorter 7:18 66:15
shots 122:12
show 9:15 105:13,16,23
106:17 107:12,13
109:13 117:11 138:11
138:12
showed 55:2
showing 96:16
shows 105:11
shuffle 89:23
side 43:1 89:11
significant 9:3,5 72:9
81:25 100:11 112:7
116:5 125:15
significantly 18:5 44:24
66:15 113:13 115:19
signing 154:23
similar 14:13 64:12 70:6
93:17 135:2 136:19,21
137:9 138:9,24
simple 22:24 36:11 42:19
42:25 48:19 81:10,15
88:22 111:25 124:22
130:2 131:7
simplify 57:5 72:22
simplistic 16:8 57:2 73:5
simply 82:21 97:6
single 103:21
sir 58:21 78:1 129:9
145:1
sisters 76:15
sit 127:19 134:24
sitting 21:18 114:8
six 22:3 38:3 49:15 77:19
sixth 49:15 127:7,10
skipping 50:8
slew 97:17
slide 20:23 55:23 73:11
89:3 91:3,13,20 93:15
94:9 95:1 115:6
slides 52:15,18,21 53:19
73:8 78:14,16,20,21
78:23 87:8 88:11
114:1,4,14 115:18
126:20,21

slim 129:1
slipping 104:15
slogan 19:10
small 30:12 62:2 129:2
152:5 154:14
smaller 17:10
smells 148:24
Smith 91:18,18
so-and-so 41:14
social 62:20 64:6 69:20
69:20 70:17 72:10,17
76:3,12 79:22 82:10
97:2,3 99:25 100:4
121:11
sociogram 79:10,12,16
software 19:12 70:2
93:24 94:2,2,5 108:8
solidified 57:11
solidifies 36:21
solvability 20:22
solved 117:7,8
somebody 39:19 41:7
42:2 60:5,6,21 85:15
99:24 139:9
Someone's 86:21
son's 77:11
sooner 150:1
sorry 10:16 17:23 24:5
25:5 32:15 46:2 58:21
75:1 93:19 147:15
112:7
sort 17:4 48:5 68:22 70:7
70:13 71:16 75:10
102:19
sorts 50:1
sounds 129:3
source 95:12 97:5
sources 102:17
sourcing 96:3
South 58:13
space 19:22 21:8 36:15
span 25:12 28:18
speak 49:22,23 123:18
124:11 136:24
speaks 153:1
special 6:20,21 141:23
specific 12:22 23:2 33:15
51:24 52:13 73:25
75:6 83:17 84:15
86:25 89:25 93:15,15
107:17,24 118:2
121:17 123:1 128:7
130:20 142:13,15,21
143:21
specifically 30:20 35:4
45:16 55:6,18 83:3
86:25 108:4
spectrum 147:5
spell 34:12
SPI 3:8 140:25 141:2,3,4
141:16 144:1
spike 9:3,5 37:14
split 26:25
spreadsheet 34:24 35:16
70:1 117:1 137:21
138:23
spree 116:3
sprees 63:18
Squad 96:23
SRO 152:15,16 153:1
SROs 153:7
staff 22:14 111:19
staffing 148:2
standard 34:5 36:23 51:2
76:8 134:21 135:11,14
standards 80:17
standpoint 8:13 10:4

24:24
STAR 26:11 54:25 55:2
55:2,7 57:21 153:14
153:16,19,21 154:1
start 5:10 9:17 16:17
40:11 47:10
started 4:17 10:9 11:24
12:11 38:3 65:22 66:4
66:25 67:13 86:7
126:2,3,4
starting 144:19
state 1:20 4:8,25 36:24
38:8 127:6 155:2,12
156:3
stated 31:7
statement 3:8 141:12,16
STATES 1:1
statistics 51:16 150:14
statute 120:8
stay 8:23
stayed 113:14
stays 78:18
stealing 44:19
stenographically 156:7
Steve 34:5,7 57:17,18
58:16 60:13 66:2
137:18 138:8
Steve's 58:24
stick 20:9 40:8
sticking 40:7
stipulated 154:21
Stipulation 2:22
stop 19:23 45:19 54:14
64:4 77:13,20
stopped 45:7,23 54:10
61:22
Stoppers 85:7
store 93:13 138:2
straggling 79:4
straight 152:22
strategic 60:11,14
147:16,18,19,21,23,24
strategies 61:5
strategy 22:8
street 1:22 86:23
strength 72:1,3 100:14
stress 19:16 20:3
studies 61:17 74:1
143:13,15
study 140:1
stuff 11:2 12:14 15:24
47:2 48:22,23 50:15
65:17 79:5 80:3 93:10
95:11 100:15 110:23
113:20 122:25
style 54:2 157:1
stylistic 14:18
subject 71:8,8 75:4,4
80:4 135:12
subjected 58:22,25 59:3
subjects 112:18
submissions 88:3
submit 45:6,21,22 46:8
46:15,20 85:11
submitted 52:1,2 71:10
83:3 114:19
submitting 47:4
subscribe 157:5
subsection 107:17
108:18
successful 149:18
sudden 9:3 40:12
suffering 147:10
suggests 126:6
suicidal 147:6
Suite 2:7,11
Suites 1:17

summarize 87:11
summary 73:13
super 8:11 19:5 28:19
38:8 55:12 122:15
supervisor 60:8,8,10,18
89:12 93:8 135:6
139:14 146:14
supervisors 5:6 13:23,24
133:20
supplement 65:5
supposed 36:22 112:13
150:21
sure 7:10 16:15 23:19
26:15 40:2,4 41:23
46:25 47:1 53:17
60:12 61:6 65:17
66:13 75:11 78:19
79:16 83:10 99:22
105:9,16 106:5,6,6
107:12,20 112:17
117:13 123:20 125:2
128:21 131:10 132:16
132:23 135:25 136:14
136:15 137:4,5,14,21
140:4,11 142:6 145:21
148:15 149:2
surrounding 52:7 125:14
surveillance 29:13
SurveyMonkey 124:10
125:3
suspect 20:21 43:11,22
64:1 101:3 116:23,24
117:6,6
suspected 20:11 27:25
62:6
suspects 51:22,23,25
104:19
suspicion 24:14 25:21
51:2 61:11 87:15
130:8 131:1
suspicious 42:22
sustain 130:8
switch 112:18
switched 83:20
sworn 4:2 155:6
system 22:23 23:15,18
23:23 26:4,21 27:14
28:8 30:10 33:4 37:3
39:10,13 45:24 46:4,5
46:16 47:2 57:14
63:20 69:15 71:13
79:25 80:1 83:5,6,10
83:25 84:1,2,5 85:3,5
87:21 88:16 89:6,23
89:24 90:16 92:14,22
102:25 103:22 105:6,6
105:17 106:8,20
111:11 123:1 145:17
systems 36:18,19 45:17
93:9 105:7

**T**

T 3:1 154:20,20
tab 104:16 108:2,15,21
108:21,24
table 117:2
take 8:15 19:3,14 26:7
37:9 54:3 56:12 57:4
59:5,8 65:8 70:10 82:9
89:25 91:24 107:6
108:6 112:14 115:21
132:25 151:24
taken 20:12 65:10 103:8
107:5 115:24 133:3
140:12 152:3
takes 59:2
talk 16:2,23,24 17:6

18:11,19,20,21 22:9
22:11,17 32:18 43:7
47:7,9 55:22 61:17
97:2 139:11 140:19
144:7
**talked** 50:14 111:5
118:16,16,17 125:22
126:20 129:11 137:9
137:13 152:19
**talking** 12:8 30:8 31:9,24
43:9 48:11,12 53:4,25
55:15 61:20 69:19
74:1 79:11,15,16,21
84:11 86:11 109:25
110:22 114:1,4,8,13
114:14,22 115:11
122:11 123:4 124:1
143:6,7,8
**talks** 17:8 30:14 31:4,23
149:17 153:14
**TAMMY** 1:4
**Tampa** 1:2 67:17 136:13
136:24 137:11 143:13
**target** 74:14,20 75:6
89:21,21 119:20,25
120:1 153:18
**targets** 18:22
**task** 5:8
**tasked** 145:17
**taxes** 21:18
**Taylor** 1:3 97:20 99:11
157:1
**teach** 16:25 21:12 22:2,2
**team** 52:2 146:23,25
153:16,19,21
**teams** 26:11 52:6 57:21
147:8 153:15
**technically** 98:14
**tell** 4:2 7:6 9:1 13:2,16
14:8 17:5 18:14 19:8
22:21 29:6,23 34:19
35:16,22 38:23 51:11
65:17 66:3 68:4,18
72:7 78:19 90:18
95:16,17 113:14 115:4
118:14 121:2 122:6
128:25 139:1,1 151:10
151:12
**telling** 12:17 50:22
145:15
**tells** 20:23 94:20
**ten** 5:6 19:24 111:23
**tend** 149:4 154:3
**tendencies** 96:22
**tenets** 18:19 124:7
**tenth** 87:13
**term** 133:8
**terminology** 6:22 79:17
79:19
**terms** 14:11
**testified** 4:4
**testimony** 11:16 156:9
157:4
**testing** 123:10,13
**text** 83:4,5,8,13,14 92:13
92:14 121:14,16,25
**texted** 16:5
**thank** 21:24 69:18
**theft** 17:22,23 24:9 97:22
**thing** 8:19 19:8,9 20:25
21:9 29:24 30:11
36:14 39:8 55:16 66:7
73:9 76:8 88:5 99:2
104:10,14 114:7 135:2
148:15 150:23
**things** 5:9 9:10 14:11
17:14 19:16 20:3

21:20 22:8 37:19
39:17 40:7,13 41:19
50:16,19 51:19 52:10
53:2 55:8,9,13 56:1,3
56:9,15,16 69:8,10
70:20 72:16 76:15
94:17 95:18,19,21
97:4,9,17 100:12
103:2 105:3,15 111:13
111:17,23,24 113:13
114:6,7 118:8 119:8
121:11,12,18,20,24
125:19 127:12,23
128:16 137:19 139:8
147:4 148:5,7,21,22
148:22 149:3 151:22
152:1 154:8
**think** 4:21 7:3,21,21 8:5
13:15,17,18 14:3,13
19:20 21:1,1 26:24
30:20 31:7,10 35:2
41:5 43:12 50:2 52:5
53:10 62:25 65:15
67:2,3,4 75:12 83:7
85:22 86:6 91:14
93:22 98:13 99:10
104:24,24 105:11,25
108:6 111:3,8 113:12
117:24 119:7 123:18
124:9 125:1 132:7
134:3 137:8 140:5
147:24 149:5 154:12
**thinking** 43:5
**third** 1:22 152:10
**third-party** 44:8
**THOMAS** 2:10
**thorough** 51:3
**threat** 29:25,25 30:1
**three** 9:2 22:3,24 23:7
24:8 25:4 26:16,18,19
27:4 28:20 32:25
49:14 55:13 59:16,17
59:18 60:9 82:9
138:18
**three's** 27:5
**three-year** 25:5,12 28:18
28:18 33:2
**threshold** 98:13
**thumbnail** 119:18
**tie** 29:16
**ties** 61:25
**time** 1:15 5:22 10:19,25
18:3 22:18 25:11,12
28:18 38:7 40:2,16,16
46:24 50:13,14 67:1
72:6 73:21 74:11 78:5
82:4,7 87:13 96:11
112:5,7,22,25 113:16
113:18,20 114:23
115:21 118:14 126:12
127:8,11 135:7 138:14
144:23 146:12 149:20
152:18,19
**timeframe** 33:1,2
**times** 21:19 42:12 44:2
45:3 50:18 61:19 72:2
72:5 77:19 82:4 83:16
92:15,16 105:12 118:3
122:18 127:17,18
**Timmy** 29:18
**tip** 3:4 44:5,6,11,14,14
46:2,5 47:4 71:10 83:9
83:18 85:7,11,22,24
86:1,18,19,19 87:13
87:20,25 88:8,14,16
88:17,18 89:4,8,13,22
89:25 90:14,18,18,20

90:23 91:1,18,22
92:20 93:2,3,9,13,17
114:19,21 115:1
129:21 131:16 152:19
154:7
**tips** 29:10 45:6,13,15
46:4,8,15,20 47:18,19
47:23 50:14 83:2,3,24
84:20,25 85:14,19
86:21,23 87:6,9 89:7
89:10 90:10,21 91:4
91:17 92:25 93:3
96:25 129:1,8,20,22,23
129:24 130:11,12
**TipSoft** 29:9,9 44:8 45:9
46:8,11 50:14 85:5
86:5,13 93:7 114:22
**TipSubmit** 44:7 46:3,13
85:6 86:6
**title** 4:12
**titled** 113:1
**today** 47:4 111:23 143:4
**TOL** 96:25
**told** 92:14 117:24 144:15
148:23
**tolerance** 49:10
**Tom** 135:23
**tomorrow** 19:20
**ton** 19:25 69:16
**tons** 70:24 74:3 83:18,18
**Tony** 7:8,10 145:6,11,22
146:3
**tool** 129:7 139:16 140:15
**tools** 69:24
**top** 25:13,15,16 27:8,10
27:10,11,12,14 28:8
28:12,14 36:4 54:23
62:13,15,23 63:1,1,10
63:22,25 64:8,19,24
65:1,4 69:19 73:14,15
73:18,20,23 74:12,15
74:22,23 75:3,8,17
76:9 77:1,3 78:2,11,12
86:12 96:13 102:4
119:25 120:1,25 121:7
137:7
**topic** 86:25 107:17
**totality** 10:21 30:9 62:3
62:16 77:22
**tow** 105:2
**traced** 12:13
**track** 40:18,21 49:19
84:22 115:16 153:12
**tradecraft** 94:12 131:4
**trafficking** 44:22 72:15
72:16 80:23
**train** 32:6 135:19
**trained** 60:15 121:23
147:1
**trainer** 135:4,4
**trainers** 135:21
**training** 13:11,12 15:18
22:10,14 64:6 67:15
67:15 72:12 82:12
123:5,6,7,12,17 134:9
134:9,10,12,14,14,22
134:23,24 139:12
**trains** 139:3
**trans** 96:25
**transcript** 156:8 157:4
**transcription** 157:6
**transfer** 46:1 47:2 85:25
86:2,3 94:9,24
**transferred** 4:22 45:24
46:3 87:8 95:11
**transitioned** 84:20
**transported** 83:7

**tricky** 143:23
**trigger** 53:25 107:7
**trooper** 5:1,2
**true** 48:25 51:5,5,7,8
100:5 129:18 130:5
156:9
**truly** 153:12
**trust** 60:22,25 112:11
**truth** 4:2,3,3 13:16 34:19
65:18 66:3 68:5,18
113:15 121:2 122:6
**try** 16:6 20:19 47:7 83:8
147:7,9 153:9
**trying** 15:24,25 16:1
44:20 73:19 89:2
91:14 100:25 145:9
**turn** 49:5,6 113:5 125:10
**two** 9:2 15:3 23:9 24:9
25:5 26:18,19 27:3,4
28:20 33:1 43:9 44:3
49:14 59:16,18 62:18
84:10,12,22 86:13
94:15 114:16 116:23
126:24 128:3 138:18
142:15,18 143:24
152:5 154:13
**two-and-a-half-hour**
19:6
**two-hour** 19:6
**type** 24:16 33:16 34:22
41:25 47:20 52:24
79:8,13 93:24 112:23
114:21 118:22 119:6
121:8 127:2 136:9
**types** 35:20 101:13

### U

**U** 154:20
**UCR** 150:11,15
**ultimately** 10:21 20:12
37:12,14 63:12 76:14
99:12 129:24 151:20
**unclear** 108:7
**uncles** 76:15 77:2
**undersigned** 156:4
**understand** 11:22,23
16:1,6,13 22:12 26:15
27:13,19 28:6 45:12
67:10,11 81:19 84:3
89:1 91:15,16 92:3,21
93:23 101:12,12
102:11 110:11 112:11
112:22,23 114:5,9
128:21 137:14 152:2
**understanding** 13:25
22:19 26:8,11 38:1
76:21 94:13 99:1
117:7,13
**understands** 52:12 60:15
60:16
**understood** 7:1 35:13
68:21 77:4 91:9
104:22 109:6,12
113:22 123:3 126:23
**Unfortunately** 151:11
**unified** 125:13,14
**unique** 67:16 71:6 95:19
**unit** 6:12,15,16,19 7:2
10:22 11:25 12:2 13:6
67:24 68:19 96:25
98:3 125:24 133:6
137:25 139:4
**UNITED** 1:1
**unlocked** 70:21 91:24
**unsafe** 45:19
**unstructured** 83:11,13
83:15

**update** 126:13
**updated** 14:19,24 68:6
**updates** 126:8,15
**use** 38:20 44:8 46:7
47:13 55:3,5,6 69:24
71:1,9,14 79:19 81:20
81:22 93:14,24 94:1,2
94:3,5,8 99:15 114:11
114:23 122:19 135:20
**useful** 129:6
**user** 38:25 69:7 122:21
**usually** 47:9 51:14 53:23
60:7 77:17 81:1 100:2
100:5 101:23 112:8
116:22 121:10,16
122:3,8,10

### V

**v** 157:1
**validity** 142:2
**vehicle** 97:22
**vehicles** 90:5,6
**vendor** 46:25
**vendors** 44:8
**verbal** 54:5 126:16
152:21 154:6
**verbally** 53:17,22 91:15
**verbatim** 77:14
**verify** 34:6 38:15 41:1,1
46:6 84:7
**versa** 41:21
**version** 7:15,15 8:3,7,10
10:5,6,7,24 11:10 15:3
15:6,12 33:10 66:10
66:16 68:6 97:7
115:13
**versions** 14:24 15:4
68:13
**vet** 20:19 130:6
**vetted** 71:15 115:2 130:7
**vetting** 51:6 91:7
**vice** 41:21 87:1,1
**victim** 24:21 103:2
**victimizing** 18:9
**victims** 110:18
**Victor** 86:16 87:12 96:14
100:21,23 101:3,9
102:7 103:24 104:14
**Victor's** 101:3
**view** 12:5 150:2
**violations** 24:10,11
**violence** 30:2,3 101:5
**violent** 9:1,3,5,9 18:7
19:2,3 23:1,3,4,5 24:6
24:10 35:21 40:19
51:18 63:24 96:21
100:11 116:5 141:5,18
141:19,21 142:14,17
148:19 150:13,18
**VIP** 3:7 136:13 137:6,7
**virtually** 52:6
**visible** 69:9
**vision** 68:9
**visual** 52:19 128:19
**visualize** 70:2,4
**visualized** 70:4
**visualizes** 71:21
**visually** 40:25
**VOPs** 23:14
**vs** 1:7

### W

**W** 2:10
**Wait** 75:1
**waived** 154:24
**wake** 111:19

**walk** 21:13,15,15,21
**want** 6:22 9:15,16 11:23
  15:1 18:14 20:3 21:22
  21:24,25 27:17,19
  28:6 45:3,23 46:12
  59:5 65:2,12 67:10
  72:11 75:11,12 77:12
  82:14 89:25 93:23
  100:5 101:12 107:12
  108:9 117:16 126:3
  129:10 131:10 137:13
  142:6 144:22 145:21
  152:6
**wanted** 27:13 38:9 54:19
  66:7 68:12 78:10,11
  85:14 98:7 110:3
  139:9 140:17
**Warner** 93:8 139:12
**warnings** 121:20
**warrant** 19:2 96:17,17
  100:20 121:17
**warrants** 18:23,24 82:24
**wasn't** 45:8 55:16,17
  56:1 66:14 76:7,8 85:1
  126:4 145:11
**waste** 44:17 148:24
**watched** 20:15
**way** 12:7 14:5 18:3,12
  21:4 28:12 32:24 45:6
  52:12 53:23,24 63:10
  64:10 68:5 76:10,20
  83:9 85:2 87:18 89:6
  89:23 90:9 91:21
  92:21 104:1 106:7
**ways** 41:4 81:17
**we'll** 5:15 9:16 56:11,12
  60:22 89:19,20 127:13
  127:19 141:6 147:9
  151:25
**we're** 8:15,18 9:3,4,5
  19:25 29:2 38:1 43:2
  51:21 52:2 54:22 56:5
  56:7 57:2 59:24,25
  60:12 61:20 63:5
  64:10,14,15 75:11
  77:1 79:12 81:2,25
  86:11 94:11,18,19
  96:16,19 98:13,14
  99:3,22 105:4 118:7
  125:20 142:7 148:15
  148:17,18 149:2,3,6,6
  152:7 153:15
**we've** 40:10 41:16 44:21
  51:19 61:20 75:15
  77:18 79:6 82:12 85:3
  85:4 87:13,24 89:9
  91:4 94:11 98:24
  105:12 106:11 110:8
  114:12,17 125:22
  126:20 131:10 137:13
  143:3,6 144:2
**weak** 82:7
**wearing** 29:15
**weary** 44:10
**Wednesday** 52:5
**week** 51:12 52:13 92:9
  126:22
**weekly** 36:12 52:4 54:3,8
  126:18
**weird** 40:11
**welcome** 82:14
**went** 14:2 38:12 48:20
  67:6,14,14,25 68:6
  77:7 86:6,6 105:12
  124:18 144:18
**weren't** 38:14
**whatnot** 136:2

**when's** 40:2
**whichever** 66:16
**white** 53:1,1 121:25
**Winter** 2:12
**witness** 4:5 11:8 24:21
  31:9 59:6 68:10,17
  93:19 97:25 99:9
  100:25 103:1,11,13
  140:1 145:4,19 155:7
  156:9
**witnesses** 104:18
**word** 50:18 88:22 94:8,9
  94:22 95:2
**word's** 19:10
**wording** 129:13
**words** 25:23 27:24 30:7
  39:22 48:19,22 70:3
  72:1 74:14,16 88:2
  102:7 103:16 106:21
  107:7,9 114:11 138:17
**work** 5:7 15:11,13,15
  25:2 31:24 41:11
  46:23 47:3 81:23
  108:24 112:24 127:9
  133:14 148:6 149:12
  153:12,16
**worked** 4:19,25 5:1
  10:18 38:13 46:5
**working** 10:24 11:1 68:9
  83:7 127:21 149:14,14
**works** 6:4 15:16 22:1,5
  30:23 91:7,7 99:16
  101:22 102:6 132:7,9
  132:12,21 140:8
  151:21
**workup** 86:15,16
**workups** 94:25 98:25
**world** 133:11
**wouldn't** 14:14 87:6,22
  92:16 93:11 102:3,5
  107:7 109:20 129:14
  136:22 137:10 145:14
**wrap** 151:25
**wrap-up** 54:11,11
**write** 36:20,25 43:5,25
  44:4,13 83:20 94:6
**writer** 147:16
**writes** 71:5
**writing** 45:14 73:6 121:2
  126:16
**written** 9:25 30:19,25
  31:2,3 71:16 133:14
  141:4 147:24
**wrote** 14:22,23 141:10
  141:22,25

**X**
**X** 2:19 3:1 20:15 50:21
  86:19 87:14 89:14
  117:2

**Y**
**Y** 50:21 87:14 89:14
**yard** 44:17,18 148:25
**yea** 118:10 130:16
**yeah** 6:20,23 9:24 10:11
  11:8 12:15 13:1 17:6
  19:24 23:19 24:4,5
  26:23 27:6,23 29:17
  31:16,19,23 33:8,17
  33:22 34:4,6 35:21
  41:10 42:3 50:11
  53:11 59:17 61:4
  66:21 68:24 69:6,14
  70:16 72:11 73:9,24
  74:13,21 75:22 79:13

82:25 84:6 86:12
  90:11,15 93:19 97:25
  98:10,24 99:9 100:10
  101:17 104:3 109:20
  110:6,6,15 112:25
  113:3,10,15,18,20
  114:21 115:23 117:10
  119:7,24 120:3 121:6
  126:11,15 128:6
  129:16,19 130:14,22
  131:6,17,23 132:4,10
  134:8,13 135:14 136:3
  136:18 137:17 141:22
  143:13 150:8
**year** 28:19,20 34:3,3,4
  35:18 40:1 80:15
  135:10 150:10
**years** 8:16 9:2 14:22 17:1
  17:2 22:24 26:5,18,19
  38:3 39:25 40:12 45:8
  47:17 59:17,18 69:11
  111:2 115:20 148:1,11
  150:1,7,8
**yielded** 138:21
**young** 22:2 40:11
**yup** 24:4 33:19

**Z**
**Z** 50:21 87:14 89:14
**zero** 49:9

**0**
**000001** 103:17 118:6

**1**
**1** 10:1 35:12 157:5
**1,100** 28:11,11,13
**1,100-plus** 138:20
**1,100-to-1,800** 27:12
**1,800** 25:9
**10** 148:1
**100** 25:13,15,16 27:11,11
  27:12,14 28:8,12,14
  35:22 36:4 78:19
  122:7 136:14,14
  137:21
**1010** 2:11
**1035** 2:11
**11** 17:2 25:9 28:10
**112** 3:4
**119** 3:5
**12:59** 1:15 154:18
**120** 3:5 82:11
**123** 3:6
**123people** 97:1
**13** 107:2
**131** 3:6
**134** 3:7
**136** 3:7
**139** 3:8
**14** 111:23
**140** 3:8
**14150** 1:22
**15** 23:12 26:5 122:20
  148:1
**154** 2:22
**155** 2:22
**156** 2:23
**157** 2:23 157:5
**16** 14:4 46:23 68:16,17
  98:14
**16781** 2:3
**17** 23:22 41:16 67:24
  68:19 98:15 137:8
  151:5

**17-ish** 45:23
**17-page** 94:18
**18** 4:22 14:4 23:22 28:11
  96:15,16 98:11 126:3
  126:23 137:9
**18-ish** 45:23 54:15 151:5
**19** 18:5 49:6 64:22 65:2
  90:1 126:3 131:11

**2**
**2** 2:7
**2:00** 43:1
**20-year** 8:25
**2015** 97:22
**2016** 3:2 4:18,24 5:21,25
  10:1 11:17,24 13:4
  15:2 18:4 65:14,14,20
  66:25 69:5,16 72:12
  72:12 79:2,5 149:23
  149:24,25 150:9
**2017** 4:16,16,20 6:1
**2018** 3:2 11:7,8,19 15:2,8
  18:4 54:16 65:13
  123:21 132:16
**2019** 64:23
**2020** 7:21 46:3,7,21
**2021** 1:14 98:14 155:6,8
  156:17 157:2
**21** 17:1 40:12
**22** 40:12
**23** 1:14 80:11 98:18
  155:6 157:2
**24-hour** 117:12
**24/7** 44:15 92:9
**2426** 1:23
**25** 36:16
**256** 2:3
**25th** 155:7 156:17
**26** 62:13
**28** 80:10 98:17
**289** 35:12

**3**
**3** 72:12
**30** 5:5 94:4
**305-721-1600** 2:8
**31** 3:3
**3180** 2:7
**32792** 2:12
**33** 3:3
**33131** 2:7
**33526-2426** 1:23
**34** 54:20
**34654** 2:16
**35** 54:20,23
**352** 1:25,25
**363241** 155:12
**365** 29:3,5
**39** 5:5
**3rd** 4:18

**4**
**4** 2:21 35:12
**407-673-5000** 2:12
**44120** 2:3
**45** 73:20,21

**5**
**5** 3:2 62:13,15,23 63:1,1
  63:22,25 64:8,19,24
  65:1 148:1
**5/31** 86:18
**50** 125:11
**52** 24:3
**567-5484** 1:25
**567-9151** 1:25

**6**
**60** 45:18
**65** 152:7,8
**66** 152:6,7,8
**67** 153:15

**7**
**7** 24:3
**703-682-9320** 2:4
**727-844-7701** 2:16
**75** 24:2

**8**
**8-7-2023** 155:13
**8:21-cv-00555-SDM-C...**
  1:7
**80** 82:11
**8520** 1:17
**86** 3:4
**8700** 2:15
**89** 35:12

**9**
**9** 3:2
**9:01** 1:15
**90** 37:22 86:20
**90th** 107:20
**9261** 113:5
**99.9** 105:16 106:5