UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES, III,

  Plaintiffs,

vs.                         Case No.: 8:21-cv-00555-SDM-CPT

CHRIS NOCCO, in his
official capacity as
Pasco County Sheriff,

  Defendant.
_____/


VOLUME 1 OF 2


PROCEEDINGS:          Deposition of
                     ROBERT JONES, III


DATE:                January 27, 2022


TIME:                9:10 a.m. - 5:12 p.m.


PLACE:               New Port Richey Executive Suites
                     8520 Government Drive, Suite 1
                     New Port Richey, Florida


REPORTED BY:         Judy Anderson, Court Reporter
                     Notary Public
                     State of Florida at Large



ANDERSON COURT REPORTING
P.O. Box 2426
Dade City, FL 33526-2426
Judy@andersoncourtreporting.com
(352) 567-5484

```
 1    APPEARANCES:

 2    ROBERT E. JOHNSON, ESQUIRE
      Institute for Justice
 3    16781 Chagrin Boulevard, Ste. 256
      Shaker Heights, OH 44120
 4    703-682-9320
      Rjohnson@ij.org
 5         Counsel for Plaintiffs

 6    CAROLINE GRACE BROTHERS, ESQ.
      Institute for Justice
 7    901 N. Glebe Road, Ste. 900
      Arlington, VA 22203
 8    703-682-9320
      Cgbrothers@ij.org
 9         Co-counsel for Plaintiffs

10    THOMAS W. POULTON, ESQUIRE
      Debevoise & Poulton, P.A.
11    1035 S. Semoran Blvd., Ste. 1010
      Winter Park, FL 32792-5512
12    407-673-5000
      Poulton@debevoisepoulton.com
13    Holborn@debevoisepoulton.com
      Cook@debevoisepoulton.com
14         Counsel for Defendant

15

16

17

18

19

20

21

22

23

24

25
```

1                           I N D E X

2                                                    Page
    Volume 1 of 2
3   Direct Examination by Mr. Poulton              8

4   Volume 2 of 2
    Direct Examination by Mr. Poulton (continued)  158
5   Cross Examination by Mr. Johnson               255
    Redirect Examination by Mr. Poulton            268
6   Stipulation                                    269
    Certificate of Oath                            270
7   Certificate of Reporter                        271
    Deponent's Signature Page                      272
8   Errata Sheet                                   273

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           E X H I B I T S

2                                              Page

3      1 -  Plf's First Supplemental Rule 26(a)(1)       30
            Initial Disclosures
4
       2 -  CAD Report                                   34
5
       3 -  CAD Report                                   36
6
       4 -  CAD Report                                   36
7
       5 -  CAD Report                                   38
8
       6 -  CAD Report                                   39
9
       7 -  Incident Report                              44
10
       8 -  Incident Report                              56
11
       9 -  Incident Report                              57
12
       10 - Incident Report                              59
13
       11 - Incident Report                              64
14
       12 - Incident Report                              66
15
       13 - CAD Report                                   67
16
       14 - CAD Report                                   68
17
       15 - CAD Report                                   72
18
       16 - Google Map                                   76
19
       17 - Google Map                                   77
20
       18 - Incident Report                              84
21
       19 - CAD Report                                   88
22
       20 - CAD Report                                   89
23
       21 - CAD Report                                   90
24
       22 - CAD Report                                   91
25

1                         **E X H I B I T S**

2                                              Page

3    23 - CAD Report                                94

4    24 - CAD Report                                96

5    25 - CAD Report                               101

6    26 - CAD Report                               103

7    27 - Incident Report                          109

8    28 - Jones 9-22-15 Search by Consent Video    114

9    29 - Jones 9-22-15 Encouraging to Avoid       122
         Crime Video
10
     30 - CAD Report                               127
11
     31 - Incident Report                          129
12
     32 - CAD Report                               132
13
     33 - CAD Report                               134
14
     34 - CAD Report                               134
15
     35 - CAD Report                               135
16
     36 - Incident Report                          136
17
     37 - CAD Report                               137
18
     38 - CAD Report                               138
19
     39 - CAD Report                               138
20
     40 - CAD Report                               139
21
     41 - CAD Report                               140
22
     42 - CAD Report                               141
23
     43 - Incident Report                          143
24
     44 - Letter                                   146
25

**E X H I B I T S**

Page

45 - Incident Report                                    150

46 - CAD Report                                         164

47 - CAD Report                                         166

48 - CAD Report                                         167

49 - CAD Report                                         168

50 - CAD Report                                         168

51 - CAD Report                                         169

52 - CAD Report                                         173

53 - CAD Report                                         175

54 - Incident Report                                    176

55 - CAD Report                                         180

56 - CAD Report                                    182, 185

57 - CAD Report                                         186

58 - CAD Report                                         187

59 - CAD Report                                         188

60 - CAD Report                                         189

61 - CAD Report                                         190

62 - CAD Report                                         191

63 - CAD Report                                         192

64 - CAD Report                                         194

65 - CAD Report                                         194

66 - CAD Report                                         195

67 - CAD Report                                         196

1                    **E X H I B I T S**

2                                          Page

3    68 - CAD Report                        198

4    69 - CAD Report                        200

5    70 - CAD Report                        201

6    71 - CAD Report                        203

7    72 - Incident Report                   204

8    73 - Body Cam Extraction 1.116012033 Video    207

9    74 - Pasco County Ordinance Citation   216

10   75 - Letter to Judge Wansboro          227

11   76 - Incident Report                   233

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    ROBERT JONES, III,

2      being first duly sworn to tell the truth, the whole

3      truth, and nothing but the truth, was examined and

4      testified as follows:

5              THE WITNESS:  I do.

6                    DIRECT EXAMINATION

7   BY MR. JOHNSON:

8      Q.   Good morning.  Can you state your full name

9   please for us for the record?

10     A.   It's Robert Arthur Jones, III.

11     Q.   All right.  Mr. Jones, have you ever had your

12  deposition taken before?

13     A.   No.

14     Q.   I'm sure that your attorneys have explained it

15  to you, but I'll give you a couple of ground rules to

16  help make this go more smoothly.

17          First of all, the most important thing probably

18  is the court reporter is taking down everything we say,

19  and so it's important to remember two things:  Number

20  one is let me -- these tend to become conversational.

21  Try to let me finish the full question before you

22  answer, and I'll try to extend the same courtesy of

23  letting you fully answer before I ask the next question.

24  That way the court reporter can get down both clearly.

25          The second thing is avoid nods of the head or

1      shakes of the head or uh-huh or uh-uhs because those

2      don't translate well.  Say either yes or no, and if you

3      have an explanation, go ahead and add that in.  Okay?

4          A.   Okay.

5          Q.   What is your current address?

6          A.   3114 Sandhill Drive, Holiday, Florida 34691.

7          Q.   And who lives with you at 3114 Sandhill Drive,

8      Holiday, Florida?

9          A.   My wife Donna Jones, my son Caleb Jones, my

10     daughter Kylie Jones, and my brother-in-law Dean Horace.

11         Q.   D-E-A-N?

12         A.   Yep.

13         Q.   H-O-R-R-I-S.

14         A.   H-O-R-A-C-E.

15         Q.   How long have you lived at 3114 Sandhill Drive?

16         A.   Since December of -- well, it would be January

17     of last year, 2020.

18         Q.   Okay.  Now Holiday is in Pasco County; right?

19         A.   Yes.

20         Q.   And my understanding is that there was a period

21     of time where you lived in Pinellas County and then you

22     moved to -- correct me if I'm wrong -- you lived in

23     Pinellas County, you moved to Pasco County, then you

24     moved back to Pinellas County, and now you're back here?

25         A.   Correct.

1      Q.   All right.  So let's try to get an idea of the

2   dates and where you were.

3      A.   Sure.

4      Q.   You moved here in 2015 to Pasco?  When I say

5   here, I mean Pasco County.

6      A.   Originally the first time, yes.

7      Q.   First time.  Okay.  Good way to put it.  So the

8   first time you were here was in 2015?

9      A.   Uh-huh.

10      Q.   You need to say yes or no.

11      A.   Yes, sir.

12      Q.   You did well.  You got through the first part.

13   Most people don't last that long.

14           All right.  And what was the address that you

15   moved to in Pasco County for the first time in 2015?

16      A.   It was the Headsail Drive address where all

17   these incidents happened.

18      Q.   3810 Headsail Drive?

19      A.   Correct.  And it was -- we were renting that

20   property.

21      Q.   Now at the time were you employed?

22      A.   Yes.

23      Q.   And where was your employment located?

24      A.   In Tampa.

25      Q.   Okay.  So you commuted back and forth?

```
 1        A.    Yes, sir.

 2        Q.    What was the job?

 3        A.    I was compliance officer for Legacy Components.

 4        Q.    What's Legacy Components?

 5        A.    An aerospace company.

 6        Q.    Do you still work for Legacy?

 7        A.    No.

 8        Q.    Okay.  Who do you -- are you currently

 9   employed?

10        A.    No.

11        Q.    When did you leave your job with Legacy

12   Components?

13        A.    It was November of 2019.

14        Q.    All right.  So you moved from -- was it

15   Pinellas County that you lived in before you moved to

16   Headsail?

17        A.    Correct.

18        Q.    Do you recall when it was that you first moved

19   to 3810 Headsail?

20        A.    I can't remember the date offhand.  I do know

21   though I believe it was in 2015.  I'm going to -- I

22   don't want to guess the actual date.

23        Q.    No.  That's okay.  If you don't know, that's

24   okay.

25        A.    I believe it was towards the end of the fiscal
```

1    school year because the only reason I moved was my son

2    was kicked out of school.

3         Q.    Okay.  This was -- this would be Robert Jones

4    IV?

5         A.    Correct.

6         Q.    What school was he in in --

7         A.    Dunedin High School.

8         Q.    Dunedin.  Okay.  And that's D-U-N-E-D-I-N, I

9    believe.

10        A.    Uh-huh.  Dunedin.

11        Q.    And I have to ask you some questions about

12   these things.  It's not meant to embarrass anybody, but

13   it's just part of the lawsuit just so I can understand

14   the history of everything that had gone on.

15        A.    Sure.

16        Q.    When you lived in -- prior to moving to 3810

17   Headsail in -- I believe that's also in Holiday, isn't

18   it?

19        A.    Uh-huh.

20        Q.    You need to say yes or no.

21        A.    Yes.

22        Q.    Okay.  You lived in Pinellas and you were

23   working for Legacy Components.  Do you recall the

24   address that you originally lived at there before you

25   moved to Pasco County?

1     A.    It was in Dunedin, Florida, Amberlea Drive.

2     Q.    Amberlea?

3     A.    Amberlea.  I can't remember the actual physical

4  address.

5     Q.    Can't recall the number?

6     A.    Yeah, the actual number, but it was in Dunedin.

7     Q.    How long had you lived at that address before

8  you moved to Pasco County in 2015?

9     A.    Two years.

10    Q.    Had Robert had problems prior to that?

11    A.    He was a straight A student up until he got

12  caught fighting and got kicked out of school.

13    Q.    Is that what caused him to get kicked out of

14  Dunedin High School?

15    A.    That, and when he got caught, he got caught

16  with marijuana.  So they did not want him back at

17  Dunedin High School.  They didn't want him back in any

18  Pinellas County school that was public.  They wanted him

19  to go to some special school for juveniles for behavior

20  issues.  I just refused to believe that knowing that my

21  kid was a straight A student.  So I moved ten miles into

22  Holiday where he was trying to finish up school and

23  these events all happened.

24    Q.    Okay.  So he -- when you moved here to -- when

25  I say here, again, I mean Pasco County in 2015 --

1    A.    Uh-huh.

2    Q.    -- you believe that would have been at the end

3    of the school year because that's when he was dismissed

4    from Dunedin High School?

5    A.    Yeah.  The end of the school year would have

6    been April-May-ish, somewhere around there.

7    Q.    Well, that makes sense because the initial --

8    the first reports that we have of interactions with

9    Pasco County Sheriff's Office are in the May-June

10   timeframe for 2015.  We'll go through those in a bit,

11   but --

12   A.    Sure.

13   Q.    Okay.  Other than the marijuana and the fight,

14   did Robert Junior -- I'll refer to him as Robert Junior

15   sometimes or Robert III just to keep it straight.

16         Other than the marijuana being found after the

17   fight in Dunedin High School, did he have any other

18   problems of a criminal nature?

19   A.    He had, obviously, at the time got new friends

20   because this was a new high school, and he was in ninth

21   grade at the time when all of this happened.  So there

22   was characters that, you know, came into play that I

23   didn't know.  But, yeah, I think he was probably hanging

24   out with the wrong crowd, which is how this all

25   happened.

1  Q. Okay.

2  A. I mean, that's the best I can give you for

3 that.

4  Q. Well, when you moved from Dunedin to Holiday in

5 2015, were you aware of any other criminal activity by

6 Robert Junior other than the marijuana and the fight?

7  A. No, no.

8  Q. Okay.  Did you know the person that you were

9 renting the house from on Headsail Drive, or was that

10 just something that you found?

11  A. It was something we found.

12  Q. All right.  And who -- let me ask you this.

13 Did the same people always live with you at the address

14 on Headsail from 2015 when you first moved in to 2016

15 when you moved out?

16  A. No.

17  Q. So some people changed?

18  A. My wife moved out.

19  Q. Okay.  So who was there the whole time?

20  A. Me and my -- me, my four children, and even

21 though my wife moved out, she only moved into a condo

22 ten minutes away.

23  Q. And your wife's name?

24  A. Donna Jones.

25  Q. Okay.  And she currently lives with you now

1  again --

2     A.   Correct.

3     Q.   -- in Holiday?

4     A.   Uh-huh.

5     Q.   You need to say yes or no.

6     A.   Yes.

7     Q.   Okay.  All right.  Did Donna moving out have

8  anything to do with Robert's ongoing troubles or

9  unrelated?

10    A.   No.  It was related to the Pasco County

11 Sheriff's Department in fear of arrest.  She saw me

12 being arrested for no reason, and she had never been

13 arrested before, and she knew that if she'd hung around,

14 she would be arrested as well.  She was told that.

15    Q.   Oh.  Who told her that?

16    A.   Pasco County Sheriff's Department.

17    Q.   Do you know which person at the Sheriff's

18 Office told her that?

19    A.   A multitude of them.

20    Q.   Do you know what it is they said to her?

21    A.   "If you don't let us search the house, you'll

22 be the next to be arrested."

23    Q.   Do you know when that comment was made?

24    A.   Yes.  When they arrested me for -- I'm trying

25 to remember the charge -- resisting arrest.

1     Q.   We'll get into the individual incidents later,

2   but is that the one where there was there was the --

3   um --

4     A.   No.

5     Q.   Okay.  A different one?

6     A.   Yes.

7     Q.   Okay.  Do you remember which one it was?

8     A.   It stands on it's own.  There was no other --

9   there was no other charges of any kind.  They -- I asked

10  them if they were investigating a crime.  They told me

11  no.  I went to close the door.  The officer stuck his

12  foot in the door and told me, "Sir, I'm going to arrest

13  you in your house or outside of your house.  You

14  choose."  And I turned around and looked at my wife.  He

15  said, "Don't look at her.  If she doesn't let us search,

16  she'll be the next to be arrested."

17     Q.   Okay.

18     A.   I put my hands behind my back.  They arrested

19  me at my doorway, walked me to my car or walked me to

20  the back of their police car.

21     Q.   Do you know if there's any video of that

22  incident?

23     A.   There's a lot of video I could not obtain when

24  I tried to obtain it through the Pasco County Sheriff's

25  website.  However, I did hear that we were able to get a

1    few videos.  I'm not sure if that's exactly one that was

2    given.

3         Q.   Okay.  Do you know if this -- the prelude to

4    the -- as I said, we'll get into the individual

5    incidents later, but do you recall whether the prelude

6    to this was somebody -- a juvenile in your home smoking?

7         A.   No.

8         Q.   You don't remember?  Was that a different one?

9         A.   That's totally different.

10        Q.   Okay.  We'll get through them.  We'll go

11   through them.

12             All right.  So anyway, Donna moved out for a

13   period of time.

14        A.   Forever.

15        Q.   Pardon?

16        A.   She never moved back to the Headsail Drive

17   house.

18        Q.   To Headsail?

19        A.   She never moved back there.  Correct.

20        Q.   And then how soon did she reunite with you and

21   the family when you moved to Dunedin?

22        A.   The day we moved out.  I moved my family into a

23   hotel around the corner for three weeks.

24        Q.   A hotel around the corner from Headsail?

25        A.   Correct.

1     Q.   And then moved back to Dunedin?

2     A.   And then I -- we actually bought a place in

3  St. Petersburg, Florida.

4     Q.   Okay.

5     A.   And we closed on that in August of 2016.

6     Q.   Did you live in that house?

7     A.   Correct.

8     Q.   Okay.  I --

9     A.   On Fargo Street.  1120 Fargo Street was the

10  name of the house in St. Petersburg that I moved to, the

11  house that I bought August 2016.

12     Q.   All right.  And how long did you live at 1120

13  Fargo Street?

14     A.   Four years until we moved into the new address

15  at the Sandhill Drive -- 3114 Sandhill Drive address

16  which we made purchase on in December of 2019 and moved

17  in in January of 2020.

18     Q.   Okay.  So if I understand correctly, after you

19  moved out of Headsail -- off of Headsail I should say --

20     A.   Uh-huh.

21     Q.   -- which you were renting, you stayed in a

22  hotel for a few weeks, and then you bought a house in

23  St. Pete?

24     A.   Uh-huh.

25     Q.   And you lived there for approximately three

1   years at 1120 Fargo Street?

2      A.   Uh-huh.

3      Q.   And then you moved to Sandhill Drive --

4      A.   Uh-huh.

5      Q.   -- in 2019?

6      A.   Right.

7      Q.   Sandhill Drive is the one in Dunedin?

8      A.   Sandhill Drive is in Holiday.  It's the one I

9   currently reside in.

10      Q.   All right.  I thought there was a -- I thought

11   you lived in Dunedin for a period of time.

12      A.   When I first moved here from Jacksonville, the

13   first place I lived, I lived there.  My son graduated

14   middle school and then went to Dunedin High School --

15      Q.   Okay.

16      A.   -- in ninth grade.  That's when he got in

17   trouble with the school.  At that point I had to decide

18   whether or not I wanted to enroll him into a lower

19   caliber of school or move my family into a new county

20   where he could have a new shot at high school, and

21   that's when we moved to Holiday.

22      Q.   Where does Robert Jones IV live now?

23      A.   Somewhere in Tampa.  I don't know the exact

24   address.  He lives with a roommate.

25      Q.   Do you know if he's in school or employed?

1     A.    I know he works as a salesman for a

2  telemarketing company or something.

3     Q.    Are you in touch with him?

4     A.    I speak to him from time to time.

5     Q.    Do you happen to know the address where he

6  lives?

7     A.    I don't.

8     Q.    And he has a roommate?

9     A.    He has a roommate.

10    Q.    After you -- and again, we'll go back through

11  the ones in Pasco, but after you moved from Headsail

12  back to the address you bought the place in St. Pete on

13  Fargo Street --

14    A.    Uh-huh.

15    Q.    -- did -- so that was in Pinellas County?

16    A.    Yes.

17    Q.    All right.  Did Robert Jones IV have any

18  further criminal problems in Pinellas County?

19    A.    Can you rephrase the question?

20    Q.    Sure.  Was Robert Jones IV arrested after you

21  moved out of Pasco County?

22    A.    He received a DUI.

23    Q.    Anything else?

24    A.    Not to my knowledge.

25    Q.    How long did he live with you at the address

1    1120 Fargo Street?

2         A.   Well, he was in prison for about a year, and

3    that was due to issues that happened when he was a

4    juvenile and lived in Dunedin.

5         Q.   Okay.  You say he was -- so when did that

6    start -- the prison term start, do you recall?

7         A.   I don't recall offhand.  It was 2017.

8         Q.   Okay.  So it was after you had moved away from

9    Pasco County?

10        A.   Right.

11        Q.   And you say that that stemmed from charges that

12   went back to prior to you having lived in Pasco County?

13        A.   Correct.

14        Q.   So those were charges that would have been

15   prior to 2000 -- at least prior to the summer of 2015?

16        A.   Right.

17        Q.   Do you remember what they were?

18        A.   I don't recall.

19        Q.   Do you remember whether he was arrested at one

20   point for having broken into a vehicle and tried to

21   steal a firearm?

22        A.   I -- I mean, I remember there was a group of

23   kids that he was hanging out with that had been arrested

24   for something like that.

25        Q.   Okay.  Do you remember whether he got a

1    sentence for that?

2        A.   I don't know.

3        Q.   While Robert IV was living here with you -- and

4    let me -- actually, let me ask you this first.  In the

5    entire -- well, when did you move out of Pasco County?

6        A.   2016.  It would have been prior to our purchase

7    of the St. Pete property in August of 2016, so --

8            MR. JOHNSON:  Well, don't guess at the exact

9        dates.

10           THE WITNESS:  Yeah.

11   BY MR. POULTON:

12       Q.   Well, let me ask you this.  Were you here for

13   roughly one year from about May of 2015 to May of 2016?

14   Does that sound right?

15       A.   It was really close.  I think the Pasco County

16   Sheriffs had been to the property so many times, they

17   spoke with the landlord, and the landlord told us that

18   we needed to vacate the property even before the lease

19   was over.  So we ended up moving out I believe early,

20   not even full term on the lease.

21       Q.   How long was the lease?

22       A.   Twelve months.

23       Q.   So you think you were here a little less than

24   twelve months?

25       A.   Right around there I believe, yes.

1      Q.   Okay.  Who was the landlord?

2      A.   Oh, geez.  The guy's name was Jimmy.  I

3  couldn't remember his last name.

4      Q.   And you say that Jimmy told you that the Pasco

5  Sheriff's Office had said they wanted you to move out?

6      A.   No.  The Pasco County Sheriff -- because the

7  owner of the property owned a few properties in the

8  neighborhood, which also contained renters, which also

9  would tell him that I don't know who's living on that

10  corner house of yours, but the sheriffs are there all

11  day every day.  And because of that, it was bringing the

12  value of his homes down.  And, you know, nobody wanted

13  to move in an area when the sheriffs are constantly next

14  door.

15      Q.   Okay.  So there was a couple levels of

16  communication there.  All right?  First, do you know who

17  the neighbors were that said this to Jimmy the landlord?

18      A.   Don't know.  Jimmy the landlord didn't tell me

19  their names.  He specifically told me, "Hey, I don't

20  know what you guys are doing in this house, but the

21  sheriffs coming here every day are making people not

22  want to renew their leases."

23      Q.   And do you know -- and I think you just said

24  you don't remember Jimmy's last name?

25      A.   I don't right offhand, no.

1     Q.    Is there anybody that you can think of that can

2  confirm these comments by the neighbors to Jimmy the

3  landlord?

4     A.    My wife, and I'm sure there's plenty of people

5  on body cam video.

6     Q.    You mean body cam video with --

7     A.    With the sheriffs who were speaking to the

8  neighbors about how bad we were.

9     Q.    Okay.  So you believe that sheriff's deputies

10  spoke to your neighbors?

11     A.    No, I did.  They whispered in my ear and told

12  me, "What do you think they think?"  After I sat in the

13  back of the police car after they arrested me for the

14  first offense of resisting arrest, all 18 officers that

15  were there laughing in the front yard rolled the back

16  window down and they stated to me, "What do you think

17  all these neighbors think about you," as they sat there

18  talking with the neighbors.  So I mean --

19     Q.    Okay.  You said there were 18 officers there

20  for the --

21     A.    At least.

22     Q.    Hold on.  Let me finish the question.

23          You're saying the first time that you were

24  arrested by the Pasco Sheriff's Office, there were 18

25  deputies there?

1     A.    Probably more.  But, yes, at least 18.

2     Q.    And that they spoke to you while you were in

3  the back of the --

4     A.    Yes.

5     Q.    Let me finish.  This is the thing about letting

6  me finish the question before you answer.  I'll try to

7  let you answer.  All right?

8          So you're in the back of the vehicle, and some

9  number of these deputies are having conversations with

10  your neighbors, and then the deputies turn to you and

11  said, "What do you think your neighbors think of you?"

12     A.    Yes.

13     Q.    Do you remember who any of those deputies were?

14     A.    They were there every day.  There was a bunch

15  of them.  I can't tell you exactly the names of all

16  these officers, but I will tell you that they were all

17  -- they were all employed by the Pasco County Sheriff's

18  Department, and every single one of them was part of the

19  STAR team.

20     Q.    Okay.  So -- Okay.  So 18 --

21     A.    Plus.

22     Q.    18 or more members of the STAR team?

23     A.    Correct.

24     Q.    Okay.  Well, we'll get into the individuals

25  just like I said.  We're kind of getting astray, but do

1    you know whether or not Robert Junior or Robert IV was

2    ever designated as an at-risk youth by the Pasco --

3        A.    I don't know.

4        Q.    You don't know.  Okay.  Let me go ahead and

5    finish the question.  I'll ask it.

6        A.    Okay.

7        Q.    Do you know whether Robert Jones IV was ever

8    designated as an at-risk youth by the Pasco County

9    school system?

10       A.    No.

11       Q.    Do you know whether Robert IV was ever

12   designated as an at-risk youth by the Pasco Sheriff's

13   Office?

14       A.    No.

15       Q.    Did you ever have any meetings with a school

16   resource officer in connection with Robert IV?

17       A.    No.

18       Q.    Was there a period of time that Robert was

19   wearing an ankle monitor, Robert Jones IV?

20       A.    Yes.

21       Q.    When was that?

22       A.    I don't know.

23       Q.    Do you know what it was in connection with?

24       A.    Yeah.  It was in lieu of being -- being inside

25   of jail.  What they did is they offered an ankle monitor

1    so that he would be monitored his location 24/7.

2        Q.   Do you know what -- had there been an arrest

3    and a criminal charge and --

4        A.   I don't know.

5        Q.   Okay, okay.  So I have -- and part of the issue

6    is there's a lot of different individual reports, and so

7    if I miss one, if you happen to recall it -- because I'm

8    trying to go in date order --

9        A.   Okay.

10       Q.   -- let me know.

11       A.   Sure.

12       Q.   So we'll do 2015 first.

13           The first -- these are called -- I'm going to

14   show you these and see if you recognize what it's about.

15   I don't know that you'll necessarily recognize the

16   communication.  So we'll mark this as Defense No. 1.

17           MR. POULTON:  And I've already made a mistake.

18       I wanted to mark something else as number one.  Is

19       it too late to fix it?

20           COURT REPORTER:  No.  We could change it if you

21       just give me that back.

22           MR. JOHNSON:  I'll just note also this has

23       never been -- I've never seen this before.

24           MR. POULTON:  Okay.  Well, we'll get --

25           MR. JOHNSON:  So I don't know that we need to

```
 1          step out, but I just want to say the witness
 2          obviously can answer what he knows about it.
 3               MR. POULTON:  Knows about it.
 4     BY MR. POULTON:
 5          Q.   Listen if -- Mr. Jones, two things:  Number one
 6     is that if we're going through an incident and you want
 7     to speak to your attorneys about it because you've not
 8     discussed it with them before for some reason, by all
 9     means please just let me know and we'll take a quick
10     break so you can do that.
11               The second thing is is that I know that you
12     would not have seen these communications before, and
13     that my point in showing them to you is to see whether
14     they jog your memory and you can tell -- you can fill in
15     some blanks about what might have happened during those
16     incidents.  Okay?
17          A.   Okay.
18               MR. POULTON:  Fair?
19               MR. JOHNSON:  Yes.
20     BY MR. POULTON:
21          Q.   Okay.  So the correct number one --
22               COURT REPORTER:  I'll take that one back.
23               MR. POULTON:  So sorry.  It ends up being
24     number two.
25               COURT REPORTER:  Okay.
```

1   BY MR. POULTON:

2        Q.   In the course of the litigation, one of the

3   things that both sides exchange is a list of damages,

4   for example, that are sought, what is it that you're

5   seeking compensation for, for example.  And let me know

6   if you -- this will be Defense No. 1.

7             (Exhibit 1 was marked for identification.)

8   BY MR. POULTON:

9        Q.   And if you'll look, this is a disclosure of --

10  from your attorneys of what it is you and the other

11  plaintiffs are seeking.  Okay?

12            So if you go to page 4, you'll see a section

13  entitled Computation of Damages.  Do you see that?

14       A.   Yes.

15       Q.   Okay.  The first thing that's listed there is

16  that each plaintiff seeks an award of one dollar in

17  nominal damages, which are basically symbolic damages,

18  but then there are compensatory damages which are listed

19  in these numbered paragraphs below.  Do you see those?

20       A.   Yes.

21       Q.   All right.  So I just want to make sure that's

22  the universe of damages that we're talking about for

23  you.  Okay?

24            So the first one is that it reads Tammy

25  Heilman, Darlene Deegan, and Robert A. Jones III paying

1    fines for pretextual code enforcement citations issued

2    by PCSO deputies as a result of the Program.

3           The way I interpret that is you're seeking to

4    have any fines that you paid for code violations

5    reimbursed to you; is that correct?

6        A.   Yes.

7        Q.   Then the second one is Tammy Heilman and Robert

8    A. Jones paying bail and bond fees, legal fees, and

9    court costs stemming from arrests as a result of the

10   Program.  And I think that's pretty self-explanatory,

11   but is that something that you seek?

12       A.   Yes.

13       Q.   And then you're mentioned down again at number

14   5, Robert A. Jones III replacing personal property

15   seized by PCSO deputies as a result of the Program.  So

16   as I understand it, there was an incident where some --

17   there was a search warrant and some property was seized,

18   and you've -- you complain either that you didn't get

19   everything back or that some things you got back were

20   damaged; is that right?

21       A.   Yes.

22       Q.   Okay.  And you seek reimbursement for that?

23       A.   Yes.

24       Q.   And then number 6 is Robert A. Jones III paying

25   moving expenses to move himself and his family out of

1   Pasco County to escape harassment by PCSO deputies as a

2   result of the Program, and we've talked a little bit

3   about that.  We'll talk about it more, but are those I

4   guess one, two, three, four, which would be numbers one,

5   two, five, and six on that disclosure, does that sum up

6   the damages that you seek in the case?

7       A.   Yes.

8       Q.   So you don't seek emotional pain and suffering

9   damages; correct?

10      A.   No.

11      Q.   It's a poorly worded question.  Are you seeking

12  emotional pain and suffering damages in this case?

13      A.   I'm not.

14      Q.   Very good.  All right.

15           Let me ask you before I forget, because I will,

16  the code enforcement fines that were paid and whatnot, I

17  think we can all figure out, the lawyers can from the

18  paperwork, but the bond and legal fees and court costs,

19  I may ask you to elaborate on that as we go through the

20  different incidents, but I'll just ask you here on the

21  front end.  Do you happen to have any sort of

22  documentation as to bail bonds or legal fees or court

23  costs that were paid in your criminal cases?

24      A.   I have some documents.

25      Q.   All right.  I don't know that I've seen those

1   or that they were listed, but we'll -- some of them

2   would be.

3           MS. BROTHERS:  Some of them, yeah.

4   BY MR. POULTON:

5       Q.   I know, for example, sometimes I believe -- and

6   we're just talking now, okay, not a question

7   necessarily.  But sometimes there were some failure to

8   appears on code violations, and what appears to have

9   happened is that the judge simply took whatever bond had

10  been paid on that and applied it to the code violations

11  and that was the end of the case.

12      A.   All of them.

13      Q.   That happened on all of them?

14      A.   Every single one.

15      Q.   That's going to be really helpful to all of us,

16  but did you -- well, when we get into them, I'll ask

17  whether you had to pay any attorney or anything like

18  that on those.  Okay?

19      A.   Okay.

20      Q.   And just as kind of a precursor, did you ever

21  hire an attorney to represent you in any criminal case

22  in Pasco County?

23      A.   No.

24      Q.   Okay.

25      A.   Oh, I did.  Benjamin DeBerg, and that was to

1   get my stuff back.

2       Q.   Benjamin DeBerg?

3       A.   Yes.

4       Q.   Did he represent you in the criminal case or

5   just to return property?

6       A.   I never -- I was only arrested.  Nobody ever

7   prosecuted me for anything.  Therefore, I never needed

8   to hire an attorney.  The problem was they never

9   released my items after they took all -- they stole all

10  fifty things over whatever was on the list.

11      Q.   Did you have to pay Mr. DeBerg anything?

12      A.   I did have to pay Mr. DeBerg.

13      Q.   First of all, do you recall how much you paid

14  him?

15      A.   I can't remember.

16      Q.   Do you know if there's any documentation of it?

17      A.   I believe there might be, yes.

18      Q.   All right.  Well, I'm sure your attorneys

19  will --

20      A.   Yes.

21      Q.   -- elaborate on that for me if there is.  Okay.

22  Well, that's helpful.  So that's number one.  Glad I

23  remembered.

24          And now we'll go to that first incident.

25          (Exhibit 2 was marked for identification.)

```
 1              (Off-the-record discussion.)
 2    BY MR. POULTON:
 3         Q.   All right.  So the first CAD report that I'm
 4    showing you -- and CAD is like a dispatch report -- is
 5    -- references serving civil process on May 11, 2015.  Do
 6    you see that?
 7         A.   Uh-huh.
 8         Q.   You need to say yes or no for the court
 9    reporter.
10         A.   Yes.
11         Q.   And let me ask -- there is a reference to
12    Eric Curtice --
13         A.   Uh-huh.
14         Q.   -- C-U-R-T-I-C-E.
15         A.   Yes.
16         Q.   And Eric is spelled E-R-I-C.  Do you know who
17    Eric Curtice is?
18         A.   He was an employee of mine.
19         Q.   Was Eric Curtice living with you at 3810
20    Headsail Drive at the time?
21         A.   He lived in Jacksonville, but he was an
22    employee working for me during the week and going home
23    on the weekends.  So it was easier for him to stay at
24    the house than it was for him to commute.
25         Q.   Do you happen to know why deputies or a deputy
```

1    would have come by to serve civil process with Eric

2    Curtice in the note section in May of 2015?

3         A.    I have no idea.

4         Q.    Do you -- were you present for that?

5         A.    No.

6         Q.    All right.  The next one is -- this will be

7    Exhibit 3, I suppose.

8              (Exhibit 3 was marked for identification.)

9    BY MR. POULTON:

10        Q.    If you want to take a look at that real quick.

11        A.    Uh-huh.

12        Q.    This is dated May 17, 2015, and indicates there

13   was a -- someone had accidentally dialed 911.  Do you

14   have any recollection about that?  Did you hear anything

15   about that?

16        A.    No.

17        Q.    Were you present for that?

18        A.    Nope.  I don't remember this at all.

19        Q.    All right.  So nobody told you, you know, hey,

20   Dad, we accidentally dialed 911 or --

21        A.    No.

22        Q.    Okay.  This will be number 4.

23              (Exhibit 4 was marked for identification.)

24   BY MR. POULTON:

25        Q.    And before we go on to this one, which is June

1    2, 2015, let me ask you regarding the civil process --

2    serving civil process on May 11, 2015, do you have any

3    reason to dispute the indication that there was an

4    attempt to serve civil process with the note being that

5    it was related to Eric Curtice?

6        A.   I don't even understand what you just said.

7        Q.   Okay, okay.  The note section of this --

8        A.   Uh-huh.

9        Q.   -- and this is Exhibit No. 2 -- indicates that

10   there was an attempt to serve civil process on May 11,

11   2015, and that's why a deputy would have been at that

12   residence.

13       A.   Okay.

14       Q.   Do you have any reason to dispute that that's

15   why he was there or she was there?

16       A.   That's why the deputy was there?

17       Q.   Right.

18       A.   No, I have no reason to dispute.  I've never

19   seen the document before.

20       Q.   Okay.  And you had not heard about that

21   particular incident?

22       A.   No.

23       Q.   Same thing with the unverified 911 call.  Do

24   you have any reason to dispute that there was an

25   accidental dial of 911?

1      A.   I have no reason to dispute it.

2      Q.   All right.  So we're on number 4 then.  This is

3  dated June 2, 2015.  There are notes for it.  It simply

4  says there was an SO investigation.  Do you happen to

5  remember this incident on June 2, 2015?

6      A.   I remember lots of incidents.  It's hard for me

7  to --

8      Q.   Distinguish?

9      A.   -- pinpoint the actual date and time.

10      Q.   All right.  That's fair.  All right.  If we

11  go -- some of these have a lot more detail in them.

12      A.   Uh-huh.

13      Q.   As we get into them, we have some incident

14  reports and whatnot which elaborate more.  I'm just

15  asking you whether you -- this is all I have as a

16  framework going one by one.

17      A.   I understand.

18      Q.   So I'm asking you if you happen to remember

19  this one?

20      A.   No.

21      Q.   You do not?

22      A.   Not specifically.

23      Q.   Okay.  Thanks.

24           (Exhibit 5 was marked for identification.)

25  BY MR. POULTON:

1    Q.   And this is similar to the very first one we

2    had.  This is June 11, 2015.  And again, it's serving

3    civil process.  In the note section is Eric Curtice, and

4    you'll note down in the radio log section it says

5    personal serve.  It's about three-quarters of the way

6    down.

7    A.   Uh-huh.

8    Q.   Does this jog your memory at all of Eric

9    Curtice getting served with like a summons or --

10   A.   No.

11   Q.   -- or anything of that nature?

12   A.   Huh-uh.

13   Q.   Did Eric Curtice ever tell you he had deputies

14   come to your residence to serve him?

15   A.   No.

16   Q.   Fair to say you don't have any personal

17   knowledge of this particular incident?

18   A.   No.

19   Q.   That was a poorly worded question.  Do you have

20   any personal knowledge of this particular incident?

21   A.   I have no idea what this -- what the item is

22   about.

23   Q.   Okay.  This will be number 6.

24        (Exhibit 6 was marked for identification.)

25        MR. JOHNSON:  If you want to take a break to

1    discuss anything, feel free.

2    BY MR. POULTON:

3        Q.   Or use the restroom or stretch your legs.  I

4    like to do that myself, so we'll have a few.

5        Okay.  Now on -- this one is dated June 17,

6    2015, and if you go to page 2 -- well, I'll let you read

7    through it.

8        A.   Uh-huh.

9        Q.   You just started, so I'll wait.

10       A.   Okay.

11       Q.   Okay.  So first of all, having looked at this,

12   does this -- do you have a memory of this particular

13   incident?

14       A.   No, not this actual particular one.

15       Q.   Okay.  If I go to page 2 of that document,

16   there's the third line down says entered caller name

17   Donna Jones or Jones, Donna.

18       A.   Uh-huh.

19       Q.   And then I look at the notes section and it

20   says, "Juvenile has left scene but was trying to come in

21   front door with caller barring door."  Then a little bit

22   further down, "Juvenile was trying to make access to the

23   house.  Caller advised he was told by PCSO to call if

24   juvenile is in area.  Caller advised 15-year-old son is

25   yelling at father."  Do you see those?

1        A.    Yes.

2        Q.    All right.  Now having looked at those and gone

3    through that, does that -- do you have a memory of that

4    one?

5        A.    I remember what happened.

6        Q.    Okay.  Can you tell us what happened with that

7    one?

8        A.    Yeah.  My wife, who's not the biological mother

9    to any of my children, she was at home, and my son was

10   trying to invite friends from school over, and she

11   wouldn't let them in.

12       Q.    Okay.

13       A.    And they got into a yelling fight, and she

14   threatened to call me.  And when I couldn't answer the

15   phone, I think she did -- obviously, she called the

16   police to scare them off, and they had no problem coming

17   to the house.

18       Q.    Okay.  So the deputies responded then -- your

19   recollection is deputies responded to the house because

20   your wife, who's the stepmother --

21       A.    Correct.

22       Q.    -- of your children --

23       A.    Uh-huh.

24       Q.    -- because she called trying to keep these

25   friends of Robert's out of the house?

1      A.   Correct.

2           MR. JOHNSON:  The document does not indicate

3      that any deputies came to the house.

4           MR. POULTON:  Okay.  You may -- You know what?

5      You may be correct.

6   BY MR. POULTON:

7      Q.   Do you know whether deputies came to the house?

8      A.   I wasn't there.

9      Q.   I think you said you were on the phone; right?

10     A.   She had tried to get ahold of me, but I was in

11  an office meeting.  And I don't know what this potential

12  duplicate event listed thing was to.

13     Q.   Okay.  Yeah, I don't know either, but counsel

14  makes a good point that it's not -- it's at best not

15  clear whether anybody actually responded and -- but you

16  weren't there; right?

17     A.   I wasn't there.

18     Q.   Okay.  Do you remember whether or not -- do you

19  remember who the children were or the juveniles were

20  that were trying to come in the house?

21     A.   No.  I wasn't there.

22     Q.   Was there an argument going on between your

23  wife and Robert IV as to whether the juveniles could

24  come in the house?

25     A.   Speaking truthfully --

1    Q.   Yeah.

2    A.   -- this was a common problem in our household

3    being that my son was turning of age.  He was a

4    fifteen-year-old boy and this was not his mother.  They

5    had always kind of got in little spats a lot, you know,

6    because of course you're not my mom, you can't tell me

7    what to do.  And then the only thing my wife could do

8    was lean on me to step in and do something.

9         At fifteen years old, my son was being arrested

10   quite often, and I believe from just looking at the

11   information my wife was just trying to scare him to do

12   what -- you know, do what he was told to do --

13   Q.   Right.

14   A.   -- by this.

15   Q.   Well, I don't want you to -- I'm only

16   interested in what you know.

17   A.   Right.

18   Q.   All right.  So it -- I'm not --

19   A.   That's all I can tell you as far as I know.  I

20   received phone calls before with the same common theme.

21   Q.   Oh, you mean --

22   A.   I can't tell you --

23   Q.   -- calls from --

24   A.   My wife saying, "Hey, the kids are out of

25   control.  Hey, can you talk to them?  Hey, I can't" --

1    Q.   We're doing that conversational thing.  Try to

2    let me get the question out.

3    A.   Sure.

4    Q.   As I understand it, around this time you would

5    get calls from Donna leaning on you as you put it to

6    deal with problems related to Robert IV not doing what

7    she wanted him to do or not obeying him or her?

8    A.   Well, that as well as if the police would show

9    up because of Bobby --

10   Q.   Okay.

11   A.   -- my wife would have no idea what to do, and

12   she would contact me and say, "I don't know what to do."

13   Q.   All right.  There are a series of reports --

14   incidents reports from May 30, 2015, and I'm going to

15   mark them each in sequence of what I believe is the time

16   order, but I may -- if I get them out of order a little

17   bit, they all kind of, I think, relate to same theme.

18   So we're up to what?  Seven?

19          (Exhibit 7 was marked for identification.)

20          THE WITNESS:  Seven, but it chronologically

21      should be four.

22          MR. JOHNSON:  Yeah.  They're marked in the

23      order that Mr. Poulton introduces them --

24          THE WITNESS:  Okay.

25          MR. JOHNSON:  -- you're right they're not in

1      chronological order.

2  BY MR. POULTON:

3      Q.   Did I get one back?  Did I get one off?

4      A.   Well, this date here you said was from May

5  30th --

6      Q.   Right.

7      A.   -- and the last document was from June 11th.

8      Q.   I'm so sorry.  Yes, I try to do them in --

9  you're right.  Actually the last --

10     A.   Two.

11     Q.   -- three were actually.  The last three are out

12  of order.  So sorry.

13          MR. JOHNSON:  It's okay.

14  BY MR. POULTON:

15     Q.   This group is a discrete day, so this won't be

16  a problem, but --

17          All right.  Do you want to look over that for a

18  minute?  Because there's a lot of similarity between

19  them, and then we can look at other.  So let's look at 7

20  for a minute.

21          And just so you know, the point at which your

22  son enters the picture on the documentation is on page

23  9.  I'm going to let you read through that.  Do you want

24  to take a minute?

25     A.   No.  I'm ready.

1        MR. JOHNSON:  Are you sure?  You're entitled to

2    talk to me because we just -- this is being sprung

3    on us in a sense.

4        MR. POULTON:  And I don't mind if counsel wants

5    to speak to you first I get the impression.

6        MR. JOHNSON:  I just want to know your insight.

7        MR. POULTON:  No, no.  It's the nature of the

8    beast here.  We'll go off the record.

9        (Short break.)

10   BY MR. POULTON:

11   Q.   All right.  So you had an opportunity to look

12   over this.  Now let me ask you a few questions.

13        Nathan, what is his last name?  Gorman, is that

14   it?

15   A.   I don't know.

16   Q.   Well, first of all, do you know Nathan Gorman?

17   A.   No.

18   Q.   Do you recognize that to be a friend of your

19   son's?

20   A.   No.

21   Q.   How about Nicole Gorman?

22   A.   No.

23   Q.   Do you -- you don't recognize that name either?

24   A.   Don't recognize either name, no.

25   Q.   And Vernon Dawson, do you recognize that name?

1     A.   No.

2     Q.   In the report on page 9, there's discussion of

3  a deputy having come to speak with you on June 1, 2015,

4  and he indicates first that you were not surprised that

5  your son had given him a false name and that he probably

6  did have a warrant since he had been arrested fourteen

7  times in Pinellas.  Does that -- first of all, let me

8  ask you is that statement true?

9     A.   No.

10     Q.   Do you recall having a conversation with a

11  deputy where you told him that you were not surprised

12  that your son gave him a false name?

13     A.   No, because my son gave him the correct name,

14  Bobby Jones.  It states it in the paragraph one.  He

15  said he stated his name was Bobby Jones, which is

16  exactly what his name is.

17     Q.   Well, what's Robert's middle name?

18     A.   Arthur.

19     Q.   Okay.  The indication is that he gave the name

20  Bobby Andrew Jones.

21     A.   But it isn't.  It states right here who called

22  himself Bobby Jones.  It was the officer that's

23  insinuating that he used Andrew in the statement created

24  right there in the bottom of paragraph one.

25     Q.   Okay.  And then can you look at the next

1    sentence?

2        A.   I saw -- I then saw that Bobby was Robert Jones

3    IV, not Bobby Andrew Jones.

4        Q.   Right.

5        A.   I don't know.

6        Q.   Let me -- let's break this down a little bit.

7        A.   So is Robert Jones IV not Robert Jones IV

8    because there's no A in the middle?

9        Q.   Let me ask you this.  If your son told the

10   deputy that he was Bobby Andrew Jones, that would have

11   been incorrect?

12       A.   Yes.

13       Q.   All right.  And then do you recall having

14   conversation with a deputy where you told him that you

15   were not surprised that he had given the deputy a false

16   name and that he had a warrant -- probably did have a

17   warrant because he had been arrested fourteen times in

18   Pinellas?

19       A.   I don't ever remember saying that.

20       Q.   Okay.  Is it possible that you said it and you

21   just don't remember it?

22       A.   No, I don't think I would have ever said that.

23       Q.   Okay.  I understand you're saying it's not

24   likely, but my question is is it possible that you said

25   it and you just don't remember it as we sit here today?

1    A.   No.

2    Q.   Do you recall the deputy telling you that there

3  were problems in the neighborhood and that he asked you

4  to look at some still photographs of a juvenile white

5  male that were taken from video surveillance?

6    A.   They did it a lot.  Every time they came by

7  they stated that's one of the reasons why they were

8  coming by.

9    Q.   Do you remember the deputy showing you pictures

10  -- still picture from video?

11    A.   Yes, I do.

12    Q.   The deputy goes on to state that he showed you

13  photographs and that you immediately identified the

14  juvenile white male as Robert's best friend Nathan.

15  Robert said Nathan and Robert used to commit crimes

16  together and tried to move Robert out of Pinellas County

17  to get away from him.

18    A.   No.

19    Q.   No?

20    A.   No.

21    Q.   You don't remember -- you're saying that you

22  did not have --

23    A.   It never happened.

24    Q.   You didn't have that conversation is what

25  you're saying?

```
 1        A.    Yes.
 2        Q.    Do you recall saying that Nathan comes in and
 3   out of the house all the time and in fact comes in just
 4   unannounced?
 5        A.    No.
 6        Q.    Were there any friends even if you -- not
 7   necessarily Nathan, but were there any friends like that
 8   that you were trying to get Robert away from?
 9        A.    Everyone.  We moved him to Holiday to a
10   different county to create new friends.  So anybody that
11   he was hanging out with in the past were people that we
12   were trying to get him away from to start a new life.
13        Q.    The --
14        A.    The rule was nobody in the house.
15        Q.    Oh, that was your rule?
16        A.    That was our rule.  Right.
17        Q.    Robert couldn't have friends in the house;
18   right?
19        A.    That was the rule, yeah.
20        Q.    And that would correlate to that one incident,
21   for example, where your wife --
22        A.    Correct.
23        Q.    Let me finish the question.
24        A.    Okay.
25        Q.    That would correlate then to that one incident
```

1    earlier where your wife had called you and evidently

2    called the Sheriff's Office because somebody was trying

3    to get in and she was blocking the door?

4        A.   Yes.

5        Q.   Okay.  Did -- at this time in June of 2015, to

6    your knowledge, did your son Robert Jones IV have

7    warrant -- a warrant out for his arrest from Pinellas

8    County?

9        A.   I don't know.

10       Q.   All right.  There's a note here that on June 4,

11   2015 -- this is on page 9 still of Exhibit No. 7 --

12   contact was made with Robert IV at his residence.

13   Robert advised he knew he had a warrant and was

14   cooperative.  He was arrested for JPO Case Number

15   15-20618, and then that that's when the deputy found out

16   that full name of Nathan was Nathan Gorman who was

17   discovered to be a juvenile.

18            Does any of this ring a bell for you -- do you

19   remember any of that?

20       A.   I mean, he made contact with Robert Jones IV.

21       Q.   Right.

22       A.   So that would be my son.

23       Q.   Right.

24       A.   I don't -- I mean, he's saying on this day they

25   made contact with Robert Jones.  I wasn't there that

1    day.

2        Q.   Well, that was going to be my question is

3    whether you -- first is whether you were present when

4    Robert was arrested on this warrant --

5        A.   No.

6        Q.   -- on June 4, 2000 --

7        A.   I don't believe I was.

8        Q.   We're doing that.  You know, the reason it

9    happens is because you know what I'm asking because it's

10   just like we're having a conversation, but if you could

11   try to let me finish the whole question even though you

12   know what's coming.  Okay?

13       A.   Okay.

14       Q.   All right.  So were you home or were you

15   present when Robert Jones IV was arrested at your

16   Headsail address on the warrant for JPO Case Number

17   15-20618?

18       A.   I honestly don't recall.

19       Q.   Do you remember hearing anything about him

20   being arrested?

21       A.   Yeah, I did.

22       Q.   What did you hear about him being arrested?

23       A.   He was always being arrested.  I mean, this is

24   just another time he was arrested.

25       Q.   Did you hear though that on in particular case

1    it was in reference to a warrant?

2        A.    No.

3        Q.    Okay.  And you don't know Nicole Gorman;

4    correct?

5        A.    Correct.

6        Q.    Did you hear anything about this person Nicole

7    or Nathan Gorman or anyone else stating to law

8    enforcement that Caleb Jones, your other son, and Nathan

9    had committed many burglaries of automobiles?

10       A.    No.

11       Q.    Do you know whether Caleb was ever involved in

12   that kind of activity?

13       A.    No.

14            MR. JOHNSON:  Do you mean you don't know or --

15            THE WITNESS:  Oh.

16   BY MR. POULTON:

17       Q.    I'll rephrase the question.  He's right.  It

18   was a poorly worded question.

19            Do you know one way or the other whether Caleb

20   was ever involved in any sort of auto burglaries?

21       A.    I don't know.

22       Q.    If you'll look at page 13, and I'll ask you to

23   read through that if you could.

24            Okay.  All right.  Having read that, does this

25   refresh your recollection at all as to Nathan Gorman

1    possibly being a friend of Robert's that had run away

2    and was trying to spend time with Robert?

3         A.   No.  This -- these statements look made up.

4         Q.   Okay.  Well, I'm asking whether you've just had

5    knowledge of Nathan Gorman and his connection to Robert?

6         A.   No.

7         Q.   You see the part in there about this Nathan

8    Gorman stating that he's in the video associated with

9    breaking into cars and that he identified Caleb as --

10   your son Caleb as having also been involved.  Did you

11   read that?

12        A.   Yes.

13        Q.   Did Caleb ever tell you that he had been

14   involved in anything like that?

15        A.   No.

16        Q.   Was there a time when Robert was so intoxicated

17   on these Loco drinks that he started throwing up and

18   that somebody took Caleb out car hopping?

19        A.   No.

20        Q.   Are you familiar with the phrase car hopping?

21        A.   No.

22        Q.   So fair to say you just don't have any

23   knowledge one way or the other of whether any of that

24   occurred?

25        A.   Yeah.

1          MR. JOHNSON:  For the record --

2          MR. POULTON:  Sure.  Uh-huh.

3          MR. JOHNSON:  -- this says that Nathan told me

4      the smaller person in the video was in fact Robert's

5      little brother Caleb, dot, dot, dot, but got sick

6      and went home and was not involved in the automobile

7      burglaries.

8          MR. POULTON:  And that his best friend Robert

9      was with him earlier in the night.

10         MR. JOHNSON:  Right.  But your question stated

11     that Caleb was involved.  I just wanted -- this

12     indicated that Caleb was involved.  I just wanted to

13     be clear that it says Caleb was not involved.

14         MR. POULTON:  No, no, no.  I think you're

15     misreading it.  If you read a little further, Nathan

16     explained he and Robert drank four Loco drinks each

17     and ate some chicken wings and went home and decided

18     to take -- I'm sorry -- and started at 0100 hours.

19     Nathan added they got extremely intoxicated, and

20     that is when Robert started throwing up.  So he went

21     home and decided to take out Caleb car hopping.  I

22     asked Nathan how many cars they hit.

23         MR. JOHNSON:  I think this is ambiguous.  He

24     may have meant -- and again --

25         MR. POULTON:  Either way.

1          MR. JOHNSON:  It's ambiguous because I think

2    the officer might have meant to say that because

3    earlier it indicates Caleb went home.  So it's

4    ambiguous on that point.

5          MR. POULTON:  All right.  All right.

6          MR. JOHNSON:  It's not for the witness.  I just

7    don't want it to --

8          MR. POULTON:  I understand your --

9          MR. JOHNSON:  And if you don't want me to bring

10    that sort of thing up, I won't.  It might be

11    helpful.

12          MR. POULTON:  Listen, in a sense it doesn't

13    matter because it's one or the other.

14          MR. JOHNSON:  Right.

15          MR. POULTON:  But anyway, we'll move on.  So

16    this is going to be number 8, and I'll just tell you

17    these are all going to mirror number 7.  They're

18    just different vehicles.

19          (Exhibit 8 was marked for identification.)

20  BY MR. POULTON:

21    Q.   I'll just let you take a look at that.

22         This and the last one and several others I'm

23  going to show all were reported on May 30, 2015, at

24  various points in time during the day.  As you'll see,

25  the description of what was stolen and the vehicle

1    involved are different, of course, but then as you get

2    into the investigation, they all relate back to this

3    I'll call it a spree of auto burglaries I believe that

4    there was an indication at one point by Nathan that they

5    tried probably 50 doors and that 30 were open.  Did you

6    read that part?

7         A.   Yes.

8         Q.   Okay.  My question is -- just briefly is

9    whether you have any knowledge of either Robert or Caleb

10   having been involved in this one way or the other?

11        A.   No.

12             (Exhibit 9 was marked for identification.)

13   BY MR. POULTON:

14        Q.   All right.  So this is an incident report and

15   associated documents for another auto burglary on the

16   same day and again with the same documentation at the

17   end.  I think there are a few more things added related

18   to this particular vehicle at the very end, but -- on

19   page 17, but I just ask you again if you have any

20   knowledge of either Caleb or Robert, your sons, have

21   been involved in this?

22        A.   I have no knowledge.

23        Q.   Okay.

24        A.   I do have a question.

25        Q.   Sure.

1   A.   And this kind of goes back to the original --

2   the chronological order of things --

3   Q.   Uh-huh.

4   A.   -- when the Pasco Sheriff's Department began

5   showing up at the house.  It seems like each one of

6   these documents that you're presenting me with is a

7   different officer's case supplemental report for the

8   same day.  So I don't know how many different officers

9   made cases on this day, but I guess I'll -- every single

10  one of them that showed up at the house did.

11  Q.   Well, the interview that is related as having

12  been done with you would appear to have been by

13  Investigator Yungaitis, which is spelled

14  Y-U-N-G-A-I-T-I-S.  When you see that section where they

15  talk about contact having been made with you on June 4

16  -- I'm sorry -- on -- I'm sorry on June 1 and the

17  discussion of Robert Junior having given a false name

18  and the discussion of trying to keep him away from

19  Nathan, that Caleb -- when he was speaking with you,

20  Caleb came out into the garage and appeared to match the

21  description of a juvenile on the video surveillance

22  associated with the burglaries.  That's all by the same

23  person.

24  A.   Right.  It's just -- but it's the same person

25  that noted that the original witness Vernon Dawson was

1    given the two photo packs of the juveniles, and after

2    serving him with the photo packs, he couldn't pick any

3    subject from them.

4        Q.   Right.

5        A.   Okay.  So it could have been anybody on the

6    street.

7        Q.   But the --

8        A.   I'm just saying I don't know anything about

9    this, and it's funny how 18 officers show up at my house

10   and all 18 of them have different cases for people in

11   the house that have literally -- I mean, they don't even

12   know who they are.

13       Q.   Okay.  We don't need to get into the details of

14   -- I mean, there's no need for a debate on them.

15       A.   No.

16       Q.   Right now the question is whether you know --

17       A.   Just the next ones you're going to give me are

18   all from the same date; right?

19       Q.   Right.

20       A.   May 13th, different officer, different cases

21   but same address.

22            (Exhibit 10 was marked for identification.)

23   BY MR. POULTON:

24       Q.   And I realize this is the first time you've

25   seen this, but just so you understand, there may be

1   different deputies who responded to calls for the car --

2   for each car burglary.  But then if you start at page 9,

3   for example, of this Exhibit No. 10, you will see that

4   there was a particular investigator who would review

5   that and related cases.  And if you look at the top of

6   the page on page 9 or about a third of the way down, it

7   says related cases, and then it lists them out.  He

8   starts off on 5-30-15 after learning of multiple auto

9   burglaries in the area, the district 3 STAR unit

10  encompassed Gulf Harbors.  While patrolling Gulf

11  Harbors, STAR unit and Murphy observed two juveniles

12  walking south on Topsail, and it continues, and then we

13  see the same report each time.

14       A.    Uh-huh.

15       Q.    So just so you understand, just to kind of

16  answer your question, different deputies may have

17  responded to each car burglary, but one particular

18  deputy then did one investigation because they all

19  appeared connected.  Does that help --

20       A.    Yeah.

21       Q.    -- to put it into context for you?

22             Okay.  That is what appears from the

23  documentation.  All right?  And I don't want to mislead

24  you.  I wasn't there myself.  All right?  So -- but I'm

25  just kind of trying to help clarify that for you.

1    That's why we keep seeing the same thing over and over

2    again.

3         A.    Sure.

4         Q.    Okay.  So, again, you don't have any

5    recollection of being interviewed -- well, let me ask

6    you this.  I don't know that I've asked you it quite

7    this way.  Do you have an recollection of being

8    interviewed regarding a series of car burglaries in the

9    neighborhood?

10        A.    They -- just so you know, the evidence is on 10

11   right now.

12        Q.    Uh-huh.

13        A.    And we haven't even gotten in a month to me

14   living at this residence.  The cops were by every single

15   day regardless of the date and timestamps these case

16   supplemental reports.  So they were always telling me

17   about them watching the neighborhood, them keeping an

18   eye on our residence, making sure that, you know, nobody

19   was going to be breaking any crimes, and if they did,

20   they were going to make sure to take them to jail, which

21   they did quite often.

22             So, I mean, I'm looking at the reports.  These

23   reports are dated from almost -- well, a while ago.  So

24   I do remember the content.  I don't remember the exact

25   dates.  A lot of these things they just -- they came in

1    and then they left.

2         Q.   All right.  I understand.  And it's been, well,

3    over six years since this particular group, and I

4    just -- part of what I was hoping is that reading these

5    reports would help jog your memory of a particular

6    incident.  I understand what you're saying that you were

7    spoken to a number of times; correct?

8         A.   Yes.

9         Q.   All right.  And I'm asking you whether these

10   reports help you remember being shown photographs from

11   a -- still photographs from a video that was connected

12   to car burglaries in that first month or so that you

13   lived there?

14        A.   I do remember seeing still shots of two hooded

15   individuals looking like they were maybe trying to open

16   car doors, but that's the extent of it.  You know, there

17   were no -- there -- the photos were bad already.  So it

18   made it really hard to take out or make out any kind of,

19   you know, anything that would say that, yeah, that's

20   somebody.

21        Q.   Okay.

22        A.   Yeah.

23        Q.   The comment that's made in each of these

24   reports is that you were able to immediately identify

25   one of the persons as a friend Robert's that you were

| | |
|---|---|
| 1 | trying to keep Robert away from, from Pinellas County. |
| 2 | And Robert Junior -- and when I say Robert, I mean |
| 3 | Robert Junior, Robert IV -- and Robert did end up being |
| 4 | arrested because there was the warrant for him. |
| 5 | A.   Uh-huh. |
| 6 | Q.   Right?  We know that; right? |
| 7 | A.   Correct. |
| 8 | Q.   All right.  And you remember that? |
| 9 | A.   Yes. |
| 10 | Q.   All right.  But there's a connection going on |
| 11 | here with this Nathan Gorman, and I recognize you say |
| 12 | you don't remember that name, but I'm wondering whether |
| 13 | you were able to say that is a person that is -- that I |
| 14 | know that Robert is friends with and we're trying to |
| 15 | keep him away.  Does that help you at all? |
| 16 | A.   No. |
| 17 | Q.   Okay. |
| 18 | A.   It doesn't. |
| 19 | Q.   Is it possible that that happened and you just |
| 20 | don't remember it? |
| 21 | A.   Anything's possible. |
| 22 | Q.   Okay. |
| 23 | A.   I -- I made it a point to make sure that nobody |
| 24 | was allowed to be in that house because, I mean, all our |
| 25 | stuff was there, and I just didn't want anybody being |

```
1   able to come in with my nine-year-old daughter.  And,
2   you know, my son at the time was dealing with a lot of
3   police activity.  Every single day the police were
4   coming to speak to somebody at the house, banging on the
5   windows and doors even when nobody was home.
6       Q.   Okay.  I just wanted to know if this spurred a
7   memory for you.  I have a couple -- I think one more
8   from that day --
9       A.   Sure.
10      Q.   -- and we can move on.  Maybe I have two.
11           MR. POULTON:  What am I up to?  I'm on 10?
12           COURT REPORTER:  Your next one's 11.
13           MR. POULTON:  Very good.  Let's do 11.  I have
14      an 11 and a 12 in that genre.
15           (Exhibit 11 was marked for identification.)
16           (Short break.)
17  BY MR. POULTON:
18      Q.   All right.  So number 11 is a report from the
19  same day.  Again, I try to keep these in time sequence.
20  As we know, I'm apparently challenged in regard to
21  keeping them and everything in chronological order, but
22  have you had a chance to look at that?
23      A.   Yes.
24      Q.   Do you see that's another auto burglary on the
25  same day with the same --
```

1    A.    Well, you attached page 9.  It looks familiar

2  on the supplemental or case supplement report with the

3  same people, which is I guess probably why they said

4  it's a duplicate case because it shows Vernon Dawson.

5    Q.    Right.  I'll give you by way of explanation, if

6  you look at back at page 8 and you see the beginning of

7  this narrative by Mr. Yungaitis, Y-U-N-G-A-I-T-I-S,

8  you'll see related cases, and it lists out six cases,

9  and one of them is 15-19958.  Do you see that, the last

10  one there on that line?

11    A.    Uh-huh.

12    Q.    And then you'll see this particular case number

13  is 15019958.

14    A.    Uh-huh.

15    Q.    You see?  So this is one in a sequence --

16    A.    Gotcha.

17    Q.    -- that were all investigated together.  And in

18  fact, before I move on, let me ask you, do you have

19  any -- I assume the answer will be the same, but do you

20  have any recollection of this interaction with the

21  deputy concerning either Robert having given a false

22  name or having identified this person in the still for

23  the video as being Nathan Gorman?  Do you have any

24  recollection of that?

25    A.    No.

1    Q.   And that's one way or the other; right?

2    A.   Right.

3         (Exhibit 12 was marked for identification.)

4    BY MR. POULTON:

5    Q.   Okay.  And then the last one in that group,

6    this is another car burglary report from the same date.

7    If you'll go to page 9, you'll see -- and I'll wait for

8    you.

9    A.   Uh-huh.

10   Q.   -- you'll see again the investigatory notes by

11   Deputy Yungaitis, and if you look at the related cases

12   there, the very last one is 15-19991, and if you look at

13   this incident report it is case 15019991.  See, so we've

14   gone through I believe all of them.  That's why that

15   report --

16   A.   Uh-huh.

17   Q.   -- is attached to each of those auto

18   burglaries.  Okay?  Does that --

19   A.   Yeah.

20   Q.   -- make sense to you?

21   A.   Yes.

22   Q.   Okay.  Again the same question:  Do you have

23   any recollection of having told the deputy that you were

24   not surprised that Robert had given a false name given

25   the presence of -- likely presence of a warrant or of

1    identifying the person as a friend in the still photo

2    the person being a friend of Robert's?

3        A.   No.

4        Q.   All right.  You'll have all of those.  You

5    know, not that group, but you'll have that group.  Okay.

6            MR. POULTON:  So next is -- what are we up to

7        13?

8            COURT REPORTER:  Yes.

9            (Exhibit 13 was marked for identification.)

10   BY MR. POULTON:

11       Q.   This is a CAD report of -- the nature field is

12   listed as SO investigation, but I don't see any

13   particular notes here of what occurred.  Do you have any

14   knowledge of what occurred on June 18, 2015?

15       A.   Just officers wanting to get paid.

16       Q.   Okay.  Do you recall being home when any deputy

17   arrived at your residence on June 18, 2015?

18       A.   No.

19       Q.   And that's going to be true on a lot of these

20   I'm sure that you just don't have a particular

21   recollection of it, and that's completely fine.  Okay?

22   I don't expect you to.  I'm just trying to keep in order

23   for the purposes of the attorneys and the Court --

24       A.   What's this reset watchdog timer?

25       Q.   I don't know.  You need to understand, and I

1   believe that the testimony has been and I'm sure counsel

2   would agree, that these notes -- a lot of these notes

3   are made or entries are made by county dispatchers.  So

4   we don't necessarily know what they meant by a

5   particular remark.

6           MR. JOHNSON:  I know what the watchdog timer

7       is, but I don't know that we need to go -- I think

8       it came up in one of the depositions.

9           MR. POULTON:  Oh, did it?  I don't even

10      remember.

11          MR. JOHNSON:  It's for officer safety.

12          THE WITNESS:  Oh, okay.

13          MR. POULTON:  That's right.  If they don't

14      report in after a period of time, they get yelled at

15      by the -- by the dispatcher.

16          MR. JOHNSON:  Somebody goes to look for them.

17          THE WITNESS:  Gotcha.

18   BY MR. POULTON:

19      Q.  But I just wanted to make sure you didn't have

20   any particular knowledge of that incident.

21      A.  No.

22      Q.  Okay.

23          (Exhibit 14 was marked for identification.)

24   BY MR. POULTON:

25      Q.  I'll give you a chance to look at that.

1              MR. POULTON:  Off the record for a second.

2              (Off-the-record discussion.)

3    BY MR. POULTON:

4        Q.   All right.  So you've had a chance now to look

5    at this incident report, which is dated June 29, 2015.

6        A.   Uh-huh.

7        Q.   Do you have any knowledge of a call having come

8    into the Sheriff's Office that -- well, let me ask you

9    -- let me backtrack a little.

10             Did anybody other than Robert Jones IV, during

11   the time you lived at Headsail, have to wear an ankle

12   monitor?

13       A.   No.

14       Q.   So only him?

15       A.   Only him.

16       Q.   Do you have any recollection of there being an

17   incident where it was called into the Sheriff's Office

18   that he had cut it off?

19       A.   No.

20       Q.   Okay.  So nobody told you about -- Were you

21   home for that?

22       A.    No.  But I mean what I do know is the ankle

23   monitor that he had, if it wasn't plugged in, would

24   automatically reach somebody to contact to say, hey,

25   plug your thing in.  If they couldn't get ahold of them,

1    then the Sheriff's Department would be in contact to

2    make sure that he was observing his rules to be at home.

3              So it looks like in this instance they were

4    called, they showed up, Bobby was there, showed his

5    ankle monitor, and it was blinking green.

6         Q.   Right.  That it had --

7         A.   Malfunctioned or something.

8         Q.   Well, there's a line here he stated it was

9    blinking red and he plugged it in.

10        A.   Right.

11        Q.   Was it like a power issue?

12        A.   Yes, probably.

13        Q.   Okay.  Did that happen on more than one

14   occasion to your recollection?

15        A.   Yes, yes.  And again, I can't remember exact

16   dates, but it did happen quite often.

17        Q.   Okay.  Can you estimated how many times that

18   might have happened?  I mean, are we talking two or

19   three --

20        A.   No.

21        Q.   -- or are we talking five?

22        A.   Probably five, ten.  It was a common issue.  We

23   actually had to -- I believe this one we had to swap it

24   out for another one because it was malfunctioning for

25   the same reason.

1      Q.   But you acknowledge in those instances the

2    deputy -- the Sheriff's Office would have received a

3    call from the agency responsible for monitoring him and

4    asking them to go check?

5      A.   I don't know if that's the process, but I mean,

6    it looks like from this here that's what happened.

7      Q.   Well, actually, if you look at page 2 --

8      A.   Yeah.

9      Q.   -- this might -- I think that this

10   substantiates what you're saying.

11     A.   Enter caller.

12     Q.   If you look down here, the caller is --

13     A.   Megan from Pinellas.

14     Q.   What is Pinellas JAC?

15     A.   The JAC center is where they actually place on

16   the monitoring system.  They're the ones that do all the

17   24-hour monitoring via --

18     Q.   Okay.  So that would be like maybe Juvenile

19   Assessment Center?

20     A.   Yes.

21     Q.   In Pinellas?

22     A.   Correct.

23     Q.   And so it's your recollection there were

24   occasions such as apparently demonstrated here where

25   Pinellas JAC would call the Pasco Sheriff's Office and

1     say, "Hey, we're getting an indicator that he's cut it

2     off," and they went and checked and determined that

3     there was a malfunction?

4          A.   Yes.

5          Q.   Did anything particularly bad happen during any

6     of those incidents?

7          A.   Not to my recollection.

8          Q.   Okay.   Thanks.

9               MR. POULTON:  15 I think; right?

10              COURT REPORTER:  Yes.

11              (Exhibit 15 was marked for identification.)

12    BY MR. POULTON:

13         Q.   You're going to want to read through that real

14    quick, particularly if you go to page 3.  I think

15    there's some discussion there was a call from a Sandra

16    Boyd, and why don't you go ahead and take a look at

17    that.  I'm going to use the restroom real quick while

18    you do that.  I'll be right back.

19              (Short break.)

20    BY MR. POULTON:

21         Q.   All right.  So going back on the record, have

22    you had an opportunity to review Exhibit 15, which is a

23    CAD report from July 30, 2015?

24         A.   Uh-huh.

25         Q.   You need to say yes or no for the court

1    reporter.

2        A.    Yes.  Sorry.

3        Q.    Do you have any knowledge of this particular

4    incident?  It appears somebody was housesitting while

5    you were in the Cayman Islands, and there was something

6    going on with somebody trying to get into the garage or

7    something.  Can you -- it's hard to read all these

8    notes.  Just do you have a recollection?

9        A.    I just want to know how somebody thinks I was

10   in the Cayman Islands.  I mean, I ain't never been to

11   the Cayman Islands before.  So for an officer to know to

12   stop by my house because I was out of town in the Cayman

13   Islands and then there to be some kind of report, and it

14   looks like the report was a neighbor or reporting police

15   presence at my property.  Unknown vehicles pulling in

16   and parking up at the front.  They're police cars.

17   They're one of the 18.  It literally states right here,

18   so --

19       Q.    Okay.

20       A.    The STAR team -- STAR units were working in the

21   area late last night.  I believe it was the STAR team

22   that was the problem here.

23       Q.    Let me ask you this:  First of all, around this

24   date of July 30, 2015, were you out of the area whether

25   it was the Cayman Islands or somewhere else?

1      A.   I don't know exactly.  I know I've never been

2   to the Cayman Islands.

3      Q.   Okay.

4      A.   I know that for sure, so --

5      Q.   Well, I don't know where that information would

6   have come from, but do you remember whether you were

7   just on vacation or visiting somewhere or out of the

8   area, maybe Jacksonville?

9      A.   Like I said, I'm not exactly sure --

10      Q.   Okay.

11      A.   -- about the exact date or where I exactly --

12   or where I was exactly at.  I'm just looking through the

13   document.  It looks like a neighbor called the cops on

14   vehicles that were parked in front of my house, which

15   seems to be the Sheriff's Department, which is probably

16   why they were always calling.

17      Q.   Well, the nature of the call is citizen assist.

18   Did you see that there on the first page?

19      A.   Yeah.  I don't know what that means.

20      Q.   Well, if you're -- do you know who this

21   neighbor was, this Sandra Boyd?

22      A.   No.

23      Q.   Okay.  The address she is listed as 3773

24   Floramar Ter, which is presumably Terrace.

25   F-L-O-R-A-M-A-R, okay, Terrace.

1           Is that a cross street with Headsail?  Does

2      that ring a bell?

3           A.    The dilemma is I lived on the corner of

4      Headsail and Floramar Terrace.  I'm not exactly sure

5      where her address correlates.  I do know that Floramar

6      is one of the cross streets, but I don't know where the

7      physical address is.

8           Q.    All right.  You brought up a pretty good point.

9      I was supposed to do this.  I had some --

10          A.    I don't see her report of any fights, any --

11     nothing.

12          Q.    No, but it --

13          A.    It's just there's a vehicle that's -- two

14     vehicles pulled up and left.

15          Q.    Well, do you see the report that the caller

16     thought that nobody was there, but the garage was open,

17     and there were cars in front?

18          A.    I --

19          Q.    Okay.

20          A.    Yeah.  I mean, I -- I see -- I just I don't

21     understand.

22          Q.    Just to get some bearings here, this will be --

23          A.    The STAR -- nobody ever came to the actual

24     house.  I mean, no officers came to interview anybody.

25     There's no statement from any person.  It says subject

1    was a resident.  That's it.  It doesn't state who the

2    subject was.  It doesn't state any of this.

3        Q.   Well, in the radio log section there from pages

4    1 to 3, there's an indication that some deputies arrived

5    and that it was cleared within a couple of minutes.  Do

6    you see that?

7        A.   Yes.

8        Q.   Okay.  But there was a -- in the remarks

9    section at the top of page 3 there's an indication of

10   trespassing in progress.  Do you know whether any of

11   Bobby's friends or anybody else might have come to that

12   house when nobody was there and -- we're trying to piece

13   it together.  Again, I just wonder if you have any

14   recollection.  Let me put it this way.  Do you have any

15   knowledge of what went on during this incident on July

16   30, 2015, other than what's in the CAD report?

17       A.   I have none.

18       Q.   Okay.  Good enough.

19            (Exhibit 16 was marked for identification.)

20       A.   Oh, there's no marked address on here though --

21   marked addresses.

22   BY MR. POULTON:

23       Q.   If you look at the one 3810 Headsail Drive,

24   New Port Richey --

25       A.   Yeah, that's the one I lived in, but where's

```
 1    the -- where would the resident be from that document

 2    that you just gave me on Exhibit 15?

 3        Q.   I don't know.  I was just trying to get my

 4    bearings on the relationship on the connection between

 5    Headsail and Floramar.  And if you look at this Google

 6    map, you will see that it appears that Headsail runs

 7    into Floramar.

 8        A.   Floramar is the only way in and the only way

 9    out of Gulf Harbors.

10        Q.   Okay.  That's what I thought.  I just wanted to

11    be sure.  Here, I've got a larger --

12        A.   I just wanted to see the correlation on the

13    address so I could have some kind of idea --

14        Q.   Who it was?

15        A.   -- which neighbor, yeah, because I didn't talk

16    to any neighbors.

17        Q.   I can't help you on that today.  I don't know

18    that.

19        A.   It's okay.  I just thought the map would have a

20    better indicator, but --

21        Q.   We have a little -- I'll wait.  That will be

22    Exhibit 17.

23             (Exhibit 17 was marked for identification.)

24        A.   I would like to add though --

25    BY MR. POULTON:
```

1      Q.    Sure.

2      A.    -- this does make sense that the neighbors

3  would have called because at this point here the STAR

4  team, all 38 of them, would have contacted every single

5  neighbor and let them know that, you know, this house

6  was a house that they wanted to make sure that the

7  people there moved out of as soon as possible.

8      Q.    Well, you're -- do you have a -- did you -- I

9  thought you said you didn't have any evidence?

10     A.    They told me that.  The evidence is they told

11  me verbally.

12     Q.    Hold on.  Okay.  Hold on.  I need to know who

13  they is.  Okay?

14     A.    The police officers.  The Pasco County

15  Sheriff's Department, the STAR team.  I believe we -- I

16  mean, there should be plenty of video of them saying it.

17     Q.    Okay.  What exactly did they say to you?

18     A.    That we're going to keep harassing you unless

19  you let us search your house.

20     Q.    Okay.  But a moment ago you said that they told

21  you that they were going to keep coming back until you

22  moved out.

23     A.    Or I sued.

24     Q.    Okay.  Now there's three different things

25  there.

1      A.   No, it's always been the same.  I just put them

2   two separate ways.  They said, "You're either gonna move

3   or you're gonna sue or we're gonna keep coming and

4   harassing you."

5      Q.   Who said that?

6      A.   The police officers, the Pasco County Sheriff's

7   Department, all in totality all 38 of them every time

8   they arrested me and every time they came by.

9      Q.   So your testimony is that every single deputy

10   you interacted with told you --

11      A.   They wanted to search my house, and if I didn't

12   let them, they were gonna make sure that I suffered

13   consequences.  Because I could beat the -- I could

14   always beat the rap, but I could never beat the ride.

15      Q.   It's important that we break this down.  Okay?

16      A.   To which officer said it?

17      Q.   Well, both what was said and which deputy said

18   it, if you know.  Okay?  Now --

19      A.   What I know is I sat in the back of the police

20   car, or I sat in the front while they scoured the

21   neighborhood speaking to neighbors.  I don't know what

22   they were saying to the neighbors.  All I can tell you

23   is what they told me.  While I sat there, they told me,

24   "Take a look at your neighbors.  What do you think they

25   think about you?"

1   Q.   Do you -- how -- okay.  When did you have that

2   conversation with a Pasco deputy?

3   A.   Every single time I was arrested.

4   Q.   Can you name any of the deputies that made

5   those comments to you?

6   A.   They're on body cam video.  So I don't know all

7   their names right offhand, but if we search through, I'm

8   sure we could find them.

9   Q.   Have you seen any body cam video yourself --

10  A.   Yes, yes.  A two days ago.

11  Q.   And on that body cam video what did they say to

12  you?

13  A.   "We're going to keep harassing you unless you

14  do what we tell you to do."

15  Q.   Was this body cam video where they were talking

16  to you and to your son?

17  A.   They were talking to me.

18  Q.   Okay.  And did they say specifically when you

19  said they said -- when you make the comment that they

20  told you that they would continue to harass you unless

21  you did what they said, did they elaborate by what?

22  A.   Yeah, they arrested me.

23  Q.   Did they elaborate by on what it was they

24  wanted you to do or else you would be arrested or --

25  A.   What they wanted what they told me to do,

1    search the house, let them in, tell them what they

2    wanted to know.  These are all commands they offered

3    towards me when I didn't have to say anything.  The only

4    thing I said was, "Are you investigating a crime?"  And

5    every time they said no, but they continued to try to

6    gain access to my property, continued talking to me,

7    harassed my children when I wasn't there and when I was

8    there.  They never ever stopped.

9        Q.   To your knowledge is there -- have you seen any

10   video where a deputy sheriff said, "If you don't let us

11   search, we" --

12       A.   Yes.

13       Q.   Hold on.  Hold on.  To your knowledge, is there

14   video where a Pasco deputy says to you, "If you don't

15   let us search, we will arrest you"?

16       A.   No.

17           MR. JOHNSON:  But just to be clear, I mean --

18           MR. POULTON:  I'm asking is he aware of any

19       such video.

20           MR. JOHNSON:  Right.  Yeah.  I mean, he hasn't

21       viewed all of the videos.

22           MR. POULTON:  I understand.

23   BY MR. POULTON:

24       Q.   You only know what you know sitting here right

25   now.

1    A.    Correct.  Yes.

2    Q.    My question is whether you had seen any video

3    leading up to today where a deputy said, "If you don't

4    let us search, I'm going to arrest you"?  And your

5    answer I believe was that you don't recall that?

6    A.    I don't recall that.

7    Q.    Okay.  Have you seen any videos where a deputy

8    said, "If you don't let us search, we're going to keep

9    coming back and harass you"?

10   A.    Yes.

11   Q.    You've seen that video?

12   A.    Correct.

13   Q.    Do you recall what that was in connection to?

14   A.    I don't recall which actual video it was.

15   Q.    Was this -- and we'll get to it later, but was

16   this the one where you gave permission to search and

17   they went into Robert Junior's room and they found the

18   baggies?

19   A.    I don't believe I gave them permission to

20   search.  I gave them permission to speak with -- to go

21   and speak with the kids.  I'm not -- I don't believe I

22   ever said, "Hey, you can go into my house and search for

23   whatever you want."  I actually advocated against them

24   coming into my house, and they argued with me that it

25   was gonna be a scared straight moment; that they were

1    doing this for the benefit of my household and my

2    children knowing that Bobby was the oldest of four kids

3    and that if they could keep him, meaning my son Bobby,

4    on the straight and narrow, that the other kids should

5    follow.

6            And me being a father and not wanting any

7    problems with the police department were thinking that

8    this STAR team was created for a good reason, you know,

9    to advocate some kind of youth improvement if you will,

10   and I allowed them to go into my house to speak to my

11   son.  Lo and behold, I didn't realize they were

12   searching through all the dressers and anything they

13   could to find to try to arrest anybody in the household

14   like they did, which is why that's the only time I ever

15   allowed them in my home.

16        Q.   All right.  Well, we'll get to that particular

17   incident.

18        A.   Okay.

19        Q.   Did you look at Exhibit 17, another map set up

20   further out?

21        A.   Oh, 17.  Yeah.

22        Q.   Okay.  So is that the Gulf of Mexico there off

23   to the west, there the blue?

24        A.   Uh-huh.

25        Q.   You need to say yes or no.

1      A.    Yes.

2      Q.    All right.  And we see there your address of

3   3810 Headsail and Floramar Terrace which is the way in

4   and out to Headsail; correct?

5      A.    Correct.

6      Q.    All right.

7            (Exhibit 18 was marked for identification.)

8   BY MR. POULTON:

9      Q.    So this was an incident on August 2, 2015, and

10  if you'll --

11     A.    Hmm.

12     Q.    -- go to page 3, and I'll just ask you.  Then

13  you can read this if you like, and we can take a break,

14  whatever you want to do.  But this was about a neighbor

15  calling because somebody had plugged a cord into her

16  electricity running over to your house, and you were

17  contacted, and Robert Jones IV was spoken to, and he

18  admitted that he had done this to run his

19  air conditioner.  And you and your son apologized, and

20  you offered to pay for the electricity because her bill

21  had gone up so much I guess during the period that he

22  had done this.

23            Does that ring a bell at all?  Are you familiar

24  with this incident?  If you want to read the whole

25  report, we can take a break.  It's up to you.

1      A.   I -- I remember hearing something about an

2   electrical cord being plugged into the neighbor's house,

3   but I honestly didn't even know the police were

4   involved.  Uh-huh.

5      Q.   Well, why don't you take a look at that?

6      A.   I did.

7      Q.   Oh, you did?  Okay.  Do you remember meeting

8   with a deputy as the deputy spoke to Robert Jones IV --

9   and I'm looking now in the middle -- who stated he

10  was --

11          MR. JOHNSON:  If you don't mind, why don't we

12      just step out quickly?

13          MR. POULTON:  Okay.

14          MR. JOHNSON:  I just want to chat about it real

15      quick.

16          (Short break.)

17  BY MR. POULTON:

18      Q.   All right.  So we were looking at Exhibit

19  No. 18, which is a report -- an incident report dated

20  August 2, 2015, excuse me, and this indicates that you

21  were contacted because there was an electrical cord

22  which ran from the neighbor's house to your house at

23  3810 Headsail Drive and that you said you didn't even

24  know there was an extension cord in the backyard.  You'd

25  been on vacation with your son in Mexico, and you had

1   just returned July 28th.

2          Let me stop there.  Do you remember that

3   conversation with the deputy?

4      A.   I remember the conversation with the deputy.

5   Yeah.

6      Q.   Okay.  Is that an accurate summary of the

7   beginning of your conversation with him, that you didn't

8   know that there was an electrical cord back there --

9      A.   Yes.

10     Q.   -- and you had been out of town?

11     A.   Uh-huh.

12     Q.   You need to say yes or no for the court

13  reporter.

14     A.   Yes.

15     Q.   And that you were asked who lives in the

16  Florida room, and you stated your son did.  This is

17  presumably an illusion to Robert Junior -- to Robert IV?

18     A.   Yes.

19     Q.   Okay.  And that's where the cord led to, and

20  that he asked if he could speak to your son and you said

21  yes.  Is that also correct?

22     A.   Yes.

23     Q.   Do you remember that?  Okay.

24          And then you -- the deputy spoke to Robert

25  Jones IV and -- with you there next to him, and he

1   admitted that he was responsible for the cord being

2   plugged into the neighbor's house and that he did it

3   because his room is very hot.  He was trying to hook up

4   the AC unit.  It was only for a couple of days.

5         Do you remember him having that conversation

6   with the deputy with you present?

7        A.   I believe so, yes.

8        Q.   Okay.  And do you remember then asking to speak

9   with your neighbor Amy, and that you and your son both

10  apologized for what had happened, and that Robert was

11  very apologetic and expressed this and explained why he

12  took the electricity, and that your son offered to pay

13  for an unspecified dollar amount for electricity taken?

14  Do you recall that?

15       A.   Yes.

16       Q.   And that Amy said that was satisfactory to her,

17  and she didn't want anything else done about it?

18       A.   Right.

19       Q.   All right.  Did anything else come of this to

20  your memory?

21       A.   No.

22       Q.   All right.  Do you know did Robert or you make

23  some restitution to the neighbor for the electricity?

24  Do you recall one way or the other?

25       A.   I don't recall.

1     Q.   Okay.

2          (Exhibit 19 was marked for identification.)

3     BY MR. POULTON:

4     Q.   All right.  Exhibit 19 is a CAD report that

5     indicates that a Deputy Royce Rodgers responded to your

6     residence on August 5, 2015, for what in the nature

7     field is labeled as an SO investigation.  I don't see

8     any particular notes of what occurred, but do you happen

9     to have any memory of a visit by a STAR deputy Royce

10    Rodgers on August 5, 2015?

11    A.   I don't have any specific recollection.  All I

12    can tell you is that I know they were there.

13    Q.   Okay.  I'm asking just if you remember about

14    that specific incident?

15    A.   No.

16    Q.   Okay.  And as I said, I think there will be a

17    lot of those.  Okay?

18    A.   Okay.

19    Q.   So --

20    A.   At 11:00 at night?

21    Q.   Well, if that's what the CAD report indicates.

22    A.   Yeah, it indicates that it happened at 11:00 at

23    night.

24    Q.   Let me ask you this.  Was Robert Jones IV ever

25    on a curfew?

1     A.   No.

2          (Exhibit 20 was marked for identification.)

3     BY MR. POULTON:

4     Q.   All right.  Exhibit No. 20 is a CAD report for

5     August 7, 2015.

6     A.   Two days later?

7     Q.   Two days later.  And the nature field is

8     directed patrol performed again by Royce Rodgers on the

9     STAR team, and in the notes section it says, "STAR

10    attempted contact with Bobby Jones, but he ran inside

11    upon our arrival."  Do you see that?

12    A.   Yes.

13    Q.   Okay.  Were you home on -- well, let me ask you

14    -- we'll back up a little bit.

15         Do you remember any incident in particular

16    occurring on August 7, 2015?

17    A.   Where the cops came over at midnight to bang on

18    my doors and windows?

19    Q.   Well, is it on this occasion that that occurred

20    or on some other occasion, or do you know?  Can you

21    differentiate between when that happened versus some

22    other time?

23    A.   No.  Again, the same problem exists.  This is

24    two days after the first time, same officer, and I'm

25    pretty positive they came to the door, knocked on the

1    window and door at midnight, and I let everybody in the

2    household know that nobody needs to be answering the

3    door for the police at midnight unless we called them.

4         Q.   Okay.  Do you remember that being the occasion

5    on this specific day or just you remember that occasion

6    on other -- just generally?

7         A.   That's the general rule.

8         Q.   Okay.

9         A.   Yes.

10        Q.   The indication that STAR attempted contact with

11   Bobby but he ran inside upon our arrival, do you

12   remember any sort of an incident where Bobby came

13   running in the house saying that he was running to avoid

14   the deputies?

15        A.   At midnight?

16        Q.   Well, this says 11:11 it looks like.

17        A.   11:11 at night, no.

18        Q.   Okay.

19             (Exhibit 21 was marked for identification.)

20   BY MR. POULTON:

21        Q.   All right.  This is an incident -- a CAD -- I'm

22   sorry -- CAD report for September 2, 2015.  The nature

23   is SO investigation again Royce Rodgers, and that's

24   R-O-D-G-E-R-S, Madame Court Reporter.  I don't see any

25   particular note here.  So this may be similar to others,

1   but do you happen to recall a particular incident

2   occurring on September 2, 2015?

3        A.   Do you mean when Mr. Rodgers knocked on my door

4   at 11:00 at night?

5        Q.   You remember him knocking on your door at 11:00

6   at night on --

7        A.   No, but the incident says 12:45, and there was

8   a lot of knocking on my door, and I specifically

9   remember telling everybody that we don't answer the door

10  for law enforcement at 11:00 at night.  And this is

11  again along with the same one.  This was a rule

12  throughout the house, not specific to this exact date

13  and time.

14       Q.   All right.  That's what I wanted to know is if

15  you remembered that specific date or if --

16       A.   No.  This was part of the harassment where I

17  didn't -- I didn't answer the door.

18            MR. POULTON:  What are we up to?

19            COURT REPORTER:  Exhibit 22 is the next one.

20            (Exhibit 22 was marked for identification.)

21  BY MR. POULTON:

22       Q.   All right.  You've had an opportunity now to

23  look that one over?

24       A.   Uh-huh.

25       Q.   You need to say yes or no for the court

1    reporter.

2        A.   Yes.

3        Q.   Thank you.

4             All right.   This is a CAD report dated

5    September 16, 2015, and the indication here is SO

6    investigation.   Then in the notes it states 13v in

7    driveway.   Don't know what that means, but no contact

8    made.   Prolific associate check Robert Jones.   Do you

9    see that?

10       A.   Yes.

11       Q.   Do you happen to remember --

12       A.   Yes.

13       Q.   Go ahead.

14       A.   Oh, I thought that was the end.

15       Q.   Well, no.   I was asking whether you have

16   knowledge that is unique to what might have happened on

17   September 16, 2015, as opposed to the general scenario

18   that you've described?

19       A.   Yes.

20       Q.   Okay.

21       A.   It was Robert Jones's birthday.

22       Q.   On September 16, 2015?

23       A.   ████, but celebrated on the 16th.

24       Q.   Oh, his birthday was on ████?

25       A.   Correct.

1    Q.   But you celebrated on 9-16?

2    A.   Correct.

3    Q.   Any particular reason?

4    A.   Just because that was the only time we had

5  available.

6    Q.   Okay.  And did you -- this indicates no contact

7  made; is that correct?

8    A.   Correct.

9    Q.   This is another incident where you told

10  everybody not to answer the door?

11    A.   Where they -- where the police came over at

12  midnight, yeah.

13        MR. JOHNSON:  And it might just help the

14    witness --

15        MR. POULTON:  Sure.

16        MR. JOHNSON:  One thing that -- because I know

17    these are not familiar documents.  If you look at

18    the radio log --

19        THE WITNESS:  Uh-huh.

20        MR. JOHNSON:  -- you can see when it says

21    STAR33, STAR34, each of those is an individual

22    officer.

23        THE WITNESS:  Uh-huh.

24        MR. JOHNSON:  So this indicates there was

25    STAR33, STAR34 --

1            THE WITNESS:  32, 31.

2            MR. JOHNSON:  -- STAR32, STAR31.  So that was

3       for --

4            THE WITNESS:  Officers that were there.

5            MR. JOHNSON:  Yeah.  So at least four members

6       of the STAR team.  It just might be helpful --

7            THE WITNESS:  Sure.

8            MR. JOHNSON:  The number of officers might be

9       helpful to jog his memory.

10            MR. POULTON:  It might be.

11   BY MR. POULTON:

12       Q.   But in any event, you had no interaction with

13   them on this particular day; right?

14       A.   No, not when they came over at midnight.

15       Q.   So they would have knocked at the door, and you

16   would have simply ignored it?

17       A.   Yes.

18       Q.   Okay.

19            (Off-the-record discussion.)

20            (Exhibit 23 was marked for identification.)

21   BY MR. POULTON:

22       Q.   Exhibit No. 23 is a CAD report labeled SO

23   investigation.  This is by Clifford Williams dated

24   September 21, 2015.  This is at I guess 7:00 -- 7:30 in

25   the evening.

1            Do you have any particular recollection of this

2       incident?  Or I shouldn't say incident, but do you have

3       a -- let me rephrase it.  Do you have any recollection

4       of interacting with a Pasco Sheriff's deputy

5       specifically on that date 9-21-15?

6            A.   Five days after the midnight incident when they

7       came over, I do not have any -- I mean, nothing stands

8       out about this report.

9            Q.   Okay.

10               THE WITNESS:  Who is ACE though?  It doesn't

11           say STAR.  So I'm not sure who they're saying.  Was

12           this not a STAR member?

13               MR. JOHNSON:  I can answer that.

14               Tom, do you mind if I --

15               MR. POULTON:  No, go ahead.

16               MR. JOHNSON:  So the ACE was another unit

17           within the Pasco County Sheriff's Office.  There's a

18           STAR unit and the ACE unit.  It was just another

19           unit.

20               THE WITNESS:  Okay.

21               MR. POULTON:  I don't think it's -- I'm trying

22           to remember if that one is still active or not.

23           Like the code enforcement corporals are not.  ACE is

24           no longer either.  I think you're right.  Okay.

25           Well, we'll double check, but --

1        All right.  You said 24?

2        COURT REPORTER:  Yes.

3        (Exhibit 24 was marked for identification.)

4    A.   The only other question I have about that

5    document is it states there's an SO investigation.

6    BY MR. POULTON:

7    Q.   Right.

8    A.   Into what?

9    Q.   I don't know.

10   A.   Okay.

11   Q.   I am just asking you whether or not you had a

12   particular knowledge of something on that particular day

13   other than --

14   A.   Yes, it's just another time they came over to

15   harass me.

16   Q.   Okay.  But I'm --

17   A.   It's okay.

18   Q.   I'm asking whether you had knowledge of

19   anything that had gone on specifically on that day, and

20   you said no; right?

21   A.   No.

22   Q.   Okay.

23   A.   I mean I said no.  Right.

24   Q.   Okay.  Good.

25   A.   So this is five days after the last one.

1    Q.   Okay.

2    A.   And this is 12:30 in the morning, yes.

3    Q.   Okay.

4    A.   So, yeah, 12:30 in the morning.

5    Q.   So this is listed as a prolific offender check

6  by Mark Celeste.

7    A.   What was the date?  September 26 --

8    Q.   26th.

9    A.   -- 2015; right?

10   Q.   Right.

11   A.   Okay.

12   Q.   And the notes state, "Robert Jones was

13 contacted by Captain Jenkins and myself.  He was told he

14 was being monitored due to his longstanding commitment

15 to criminal activity.  He was encouraged to abandon his

16 criminal ways.  We shared with Robert recent intel that

17 suggested he was attempting to, quote, put together a

18 crew, end quote.  He was advised any future criminal

19 activity would lead to him being direct filed as an

20 adult."

21   A.   And that's at 1:05 a.m.

22   Q.   Well --

23   A.   Yes.

24   Q.   I guess that's -- Okay.  My -- That's when the

25 note is entered, but regardless, do you remember --

1    First of all, were you there for that conversation?

2        A.    No.

3        Q.    Okay.  Did Robert Junior tell you on or about

4    September 26, 2015, that deputies had told him that he

5    should abandon his criminal ways and that intel had

6    suggested he was attempting to put together a crew and

7    that if he engaged in future criminal activity, he would

8    be direct filed as an adult?

9        A.    Not specifically, but it's not unknown to them

10   to have been saying this since day one, since the first

11   day they showed up at my house to introduce themselves.

12       Q.    So would it be fair to say that the sentiments

13   expressed in these notes was relayed to Robert Junior in

14   your presence multiple times even though you weren't

15   present for this particular one?

16       A.    I'm not sure that I wasn't present for that

17   one.  I'm pretty sure at 1:30 in the morning I was

18   there.

19       Q.    Okay.

20       A.    And again, if you look at all the date and

21   times collaboratively, they seem to happen between 11:00

22   or 12:00 at night and 1:30 the morning.  So, yeah, they

23   came to my house I'm pretty sure regularly.  This is all

24   within the last, what, three weeks the last three

25   documents where they came in the middle of the night.

1           Again, I know there was a multitude of times

2    where I told everybody not to answer the door.  So I'm

3    not exactly sure about the actual conversation itself

4    but like again, what's in the conversation has

5    definitely been spoken.  So it's -- you know, it's not

6    like that's not unheard of.  It's just, you know,

7    whether it happened at 1:30 a.m., you know, at this time

8    and date with Captain Jenkins, and I'm not exactly sure

9    who myself is Mark Celeste.

10       Q.   Okay.  So I'll rephrase then my question.  The

11   sentiments expressed in those notes you were present on

12   occasions, more than one, where that was expressed to

13   Robert Junior in your presence.  You just don't know

14   whether you were there for that particular one --

15       A.   So --

16       Q.   -- correct?

17       A.   Yes.

18       Q.   Okay.

19       A.   The first day they showed up, they -- the first

20   time I ever met anybody from the Pasco County Sheriff's

21   Department or STAR members, I again asked them if they

22   are investigating crime when they showed up at my house,

23   and they told me they were not.  They told me they heard

24   about Bobby from the county next door, and said that --

25   they said exactly this.  They said, "Hey, look.  If you

 1    do anything wrong, we're going to make sure we set you

 2    straight."  And they advised him right away that any

 3    criminal activity would surely lead to not only his

 4    arrest but to be filed as an adult as well.

 5         Q.   Was there at any point discussion of -- well,

 6    let me ask you this.  I'll back up.  I keep doing that

 7    to the court reporter, and I'm so sorry.

 8             Do you know what is meant by the phrase put a

 9    crew together?

10         A.   No.  He's a fourteen-year-old kid, fifteen.

11    The crews to Sheriff's Department is we fight as one,

12    which is the -- which is the branding the Pasco County

13    Sheriff uses.

14         Q.   Are you aware of Robert Junior attempting to

15    get a group of --

16         A.   No.

17         Q.   Let me finish -- attempting to get a group of

18    other juveniles together to commit things like auto

19    burglaries?

20         A.   No.

21         Q.   Have you ever heard of the phrase Hot Boys Club

22    or Hot Boys Group, anything like that?

23         A.   Sounds like a pop group or something.  No, I

24    mean, other than what it may sound like.

25         Q.   Okay.  To your knowledge, was Robert Junior

 1    ever a member of a group called the Hot Boys Club or the

 2    Hot Boys Group?

 3         A.   No.

 4              (Off-the-record discussion.)

 5              (Exhibit 25 was marked for identification.)

 6    BY MR. POULTON:

 7         Q.   Was that a remark you wanted to make on the

 8    record?

 9         A.   No, it's fine.

10         Q.   It's an aside?  Okay.  I kind of took it as an

11    aside.  Okay.

12              All right.  So Exhibit No. 25 indicates an SO

13    investigation on 9-28-15.

14         A.   So two days later.  Well, yeah, two days later

15    from the 26th to the 28th.

16         Q.   This is -- the note section is ACE32-transport,

17    and then there's a beginning mileage, and it indicates

18    in custody.

19         A.   Uh-huh.

20         Q.   Do you happen to remember whether anybody was

21    arrested on September 28, 2015?

22         A.   I don't have my chronological order of my

23    arrests, so I can't tell you if I was arrested on that

24    date.  If you're asking if I can remember anybody else

25    like my son being arrested on this date, I'm unsure of

1    the dates because I don't have that in my hand.

2        Q.    All right.

3        A.    According to the date time received somebody

4    was arrested.

5        Q.    Right.  And actually, if you look down in the

6    radio log it says To:  Pasco County Jail --

7        A.    Right.

8        Q.    -- which would further suggest that, but I'm

9    just wondering if you have a -- any -- as we sit here

10   today, do you have any recollection of anybody --

11   somebody being arrested there at 3810 Headsail Drive on

12   September 28, 2015?

13       A.    Well, I'm not going to speculate.  I don't have

14   the information in front of me.  Because that could have

15   been a day I was arrested and I don't even know.

16       Q.    Okay.

17       A.    So, yeah, I'm not exactly sure without any

18   names being written on here who this involves.

19       Q.    Okay.

20       A.    I don't think you do either.

21       Q.    I'm -- part of the reason I'm asking you is to

22   see what you know about it, and I'm not being clever.

23   I'm --

24       A.    No.  I'm just wondering if this even belongs in

25   our documents, but that's okay.

1      Q.   Well, it's at that address is the reason why I

2    think it came up.

3      A.   Okay.

4      Q.   And as we've talked about many times, there are

5    going to be instances where there's a record of an

6    interaction or a call and I'm asking you whether you can

7    fill in any information about that specific day, and

8    there will be many where you can't.  I understand.

9           (Exhibit 26 was marked for identification.)

10   BY MR. POULTON:

11     Q.   So this is -- Exhibit 26 is on -- I'm sorry --

12   October 12, 2015, about 9:00 in the evening it looks

13   like based on the time, I mean, assuming that's correct.

14   But the caller is listed as Donna Jones.

15     A.   Uh-huh.

16     Q.   Do you see that?

17     A.   Yes.

18     Q.   And then if you look at the bottom of page 2 of

19   3 -- and I'm sorry.  I had to go back.  Why don't you

20   look at that because I have to familiarize myself too

21   because I'm getting confused now.  So give me a minute,

22   and you take a minute.

23     A.   All right.

24     Q.   Probably got more out of page 3 honestly than

25   page 2.

1      A.    Yeah.

2      Q.    All right.  So the notes -- event notes

3   addendum here on page 3 of Exhibit 26 indicates that

4   Donna Jones called the Sheriff's Office because there

5   were -- your stepson or her stepson, I'm sorry, her

6   stepson has a group friends over that are refusing to

7   leave, and she wanted them -- it appears she wanted them

8   trespassed from the house, and that before law

9   enforcement arrived to respond, they left.  Up at the

10   top it says, "Subjects left the location prior to LEO

11   arrival" -- law enforcement officer arrival --

12      A.    Uh-huh.

13      Q.    "To include Robert IV (prolific offender).

14   Subject has a local JPO 10-49.  Caller/mother will

15   contact the SO when the subject returns home.  Caller

16   will call back if subject X97 in area," and some more

17   reference to prolific offender it looks like, reference

18   prolific for location.

19      A.    So they showed it as a prolific offender check

20   on October 12th of 2015.  That's what they have it

21   listed as.

22      Q.    I understand and just -- I don't know if you

23   want to talk to him about that.  I understand what the

24   nature field says.  Okay?  But based on the events notes

25   addendum, it appears that your wife called because

1    your -- Robert Junior had a group of friends over that

2    would not leave, and you had given the instruction he

3    couldn't have anybody in the house; right?

4        A.   Right.  And if you take a look at these, the

5    dates of interaction, October 12th where it's my wife,

6    she's still at the house at this point and at this point

7    working with the Sheriff's Department to try to -- you

8    know, they're explaining to them that everybody Bobby

9    knows and associated with is obviously a criminal, and

10   they're putting that in her brain, and that's what

11   spurred the whole ordeal about nobody coming to the

12   house because, you know, you can't pick a criminal out

13   by the way they look.

14       Q.   Well, I thought you had --

15       A.   Right.  That was it.  When I'm not around, you

16   know, obviously, she has a hard -- she had a hard enough

17   time taking care of my four children.

18       Q.   All right.  So if I understand correctly --

19   tell me if I'm wrong --

20       A.   Uh-huh.

21       Q.   -- but you were trying to get Robert Junior out

22   of that bad element that he had become associated with

23   in Pinellas?

24       A.   Right.  Uh-huh.

25       Q.   You moved -- for that reason you moved to the

1    address on Headsail in Pasco County?

2        A.    Correct.

3        Q.    And when you first moved in, you adopted a rule

4    as the head of household that while you're not there,

5    none of Robert's friends and nobody else for that matter

6    could be in the house?

7        A.    Right.

8        Q.    This appears to be an enforcement of your rule

9    by her -- by your wife; correct?

10       A.    Not really.

11       Q.    Okay.

12       A.    And you can see where the problem lies is that

13   the people were at the house, they were in our big

14   circle driveway on the corner, and obviously there to

15   see Bobby.  My wife works early.  This was 11:00 at

16   night.  It's literally less than eight seconds before

17   11:00.  So I'm pretty sure she was like, "Get out of

18   here," and he was like, "No, the rule is nobody's

19   allowed in the house."  And then she got up and said,

20   "Hey, don't make me call the cops."  And he was like,

21   "Go ahead.  There's nothing they can do."

22       Q.    Well, okay.  You're giving a lot of detail now.

23   Is that -- hold on.  Let me ask the question before you

24   answer.

25       A.    Uh-huh.

1      Q.   Do you actually know that that's what happened

2  on this, or is that your --

3      A.   My wife left my house.  She moved out because

4  of the Pasco County Sheriff's Department.

5           MR. JOHNSON:  You have to let him finish the

6      question.

7           THE WITNESS:  Sorry.

8  BY MR. POULTON:

9      Q.   You've got to let me finish the question.

10 Okay?

11          The description of events you gave that they

12 were in the driveway and --

13     A.   They're written right there.

14     Q.   Let me finish.  Okay?  Let me finish the

15 question.

16          The description of the events that you gave

17 that they were in the driveway, they were refusing to

18 leave, your wife has to be up early, she says to your

19 stepson, "If you don't get them out of here, I'm going

20 to call the cops or the Sheriff's Office."  They refuse.

21 She does -- she follows through with the threat and

22 calls the Sheriff's Office, and they all leave; right?

23     A.   Right.

24     Q.   Is that -- do you know -- do you have personal

25 knowledge of that like you were there and you saw it, or

1    -- hold on -- or is that what you surmise from all of

2    the circumstances you know plus this CAD report?

3        A.   It's what my wife told me.

4        Q.   Okay.  That was -- Thank you.  That's actually

5    going to be my next question is was this incident

6    reported to you by Donna Jones?

7        A.   Yes.

8        Q.   What did your wife tell you about what

9    happened?

10       A.   Exactly as I stated.  It was late at night.

11   She was asleep.  She heard noises outside.  She looked

12   out there.  There was a car full of people.  She called

13   for Bobby to get rid of them.  They had words.  They

14   exchanged words that the rule wasn't that nobody could

15   be at the house.  It was nobody's allowed in the house.

16   They squabbled about that rule because it was already

17   late at night.  She told him, "Hey, if they don't leave,

18   I'm gonna call the cops and make them leave."  You know,

19   there was obviously some words enough that she said,

20   okay, I'm not dealing with this, I'll let the police

21   deal with it.  At that point she called the police, and

22   as soon as she said, "I called the police, y'all better

23   get out of here," they scooted out of there.

24       Q.   Gotcha.  Do you know whether -- there's

25   reference here to Robert IV subject has a local JPO

1    10-49.  Do you happen to know whether in October of 2015

2    there might have been any sort of a warrant out for

3    Robert IV from Pinellas or Pasco?

4        A.    No.

5        Q.    Okay.  Was there any discussion of that with

6    your wife when she relayed this particular incident to

7    you?

8        A.    We were -- I mean, honestly, we weren't sure

9    that there was any warrants at all.  I mean --

10       Q.    Okay.

11       A.    -- this -- the only time I know of it is just

12   looking at this paper now.

13             MR. POULTON:  All right.  All right.  Tell you

14       what.  This is a -- why don't we take lunch now.

15       It's 11:50.  We'll go off the record.

16             (Lunch break was taken at 11:52 a.m., and the

17       deposition resumed at 1:06 p.m.)

18             (Exhibit 27 was marked for identification.)

19   BY MR. POULTON:

20       Q.    All right.  So we're back on the record.  This

21   is now Exhibit No. 27.  This is an incident report for

22   September 22, 2015 for Case Number 15-035257.  This

23   references -- I think we've talked a little bit about

24   this before, but I wanted to ask you a little bit more

25   detail about this.

1     A.    Uh-huh.

2     Q.    This was -- the deputy report indicates on page

3  3 that on 9-22-15 at 2200 hours the deputy made contact

4  with and it's blanked out but I think we all understand

5  that is Robert Jones IV because it was a prolific

6  offender -- is listed as a prolific offender.  He says,

7  "We spoke about getting him on the right path as he does

8  not want to go to prison.  Detective Shadrick received

9  permission to search, and then it's blanked out, but it

10  would be Bobby's room to verify there were no other

11  stolen items or drugs in his room, and Detective

12  Shadrick located 10 plastic baggies in the room.  Three

13  of the baggies appeared to have reside of a green leafy

14  substance.

15     A.    Uh-huh.  You see the disposition on this?

16     Q.    Well, let's get there.  Actually, no, because

17  these are the juvenile records, part of the problem.  So

18  we'll talk about -- I wanted to know what your --

19     A.    He was acquited of all charges.

20     Q.    Well, hang on.  First of all, do you -- the

21  first thing I wanted to ask about was whether you

22  remember this particular incident where they came and

23  searched?

24     A.    Yes.

25     Q.    Okay.  Okay.  Do you remember speaking to

```
 1    Detective Shadrick and giving permission to search Bobby

 2    Junior's room to verify there were no other stolen items

 3    or drugs in his room?

 4         A.   I remember speaking to the officer.

 5         Q.   Okay.

 6         A.   I allowed him to speak to my son.  I do not

 7    remember allowing them to freely search my home.

 8         Q.   Okay.  Is it possible you did and you just

 9    don't remember --

10         A.   No.

11         Q.   -- or you flat out didn't do it?

12         A.   I didn't do it.

13         Q.   Okay.

14              (Off-the-record discussion.)

15    BY MR. POULTON:

16         Q.   Setting aside the permission issue, do you have

17    any reason to disagree with the report that ten plastic

18    baggies were found in his room --

19         A.   I was --

20         Q.   Hold on.

21         A.   Go ahead.

22         Q.   -- and that three of the baggies appeared to

23    have residue of a green leafy substance?  Do you have

24    any reason to dispute that?

25         A.   Absolutely.
```

1        Q.    Okay.  Why is that?

2        A.    Because as you can -- well, you can't tell by

3    what we see right here.

4        Q.    Uh-huh.

5        A.    But the disposition shows the baggies have

6    nothing in them.

7        Q.    Now --

8        A.    Also, take a look at the date.

9        Q.    Uh-huh.

10       A.    The incident occurred on the 26th.

11       Q.    Actually 20 --

12       A.    No.  The incident happened on the 26th.  The

13   officer came back three days later and arrested my

14   son --

15       Q.    Right.

16       A.    -- claiming there was residue of marijuana.  So

17   they never arrested -- they never arrested him at this

18   time.

19       Q.    Right.

20       A.    And they didn't tell me that there was any

21   baggies taken from the property.  At this time they

22   spoke to my son.  They left.  Three days later they

23   called -- they came back and they arrested my son

24   without me being there.

25       Q.    Were you in the room when --

```
 1        A.   No.
 2        Q.   Hold on.  Were you in the room when the
 3   deputies performed the search --
 4        A.   No.
 5        Q.   -- on September 22nd?
 6        A.   No.
 7        Q.   So you cannot say that they did not in fact
 8   find ten baggies, three of which appeared to have a
 9   green leafy substance in them; correct?
10        A.   No.  I could tell you right now that in the
11   court of law which went before a judge, they looked at
12   all the baggies and zero marijuana was found in all ten
13   of the bags.
14        Q.   So your recollection of the disposition of the
15   criminal case when Bobby was arrested several days later
16   was that he was acquitted -- affirmatively acquitted by
17   the judge?
18        A.   Yes.
19        Q.   Okay.  Do you acknowledge that he admitted
20   that --
21        A.   No.
22        Q.   Hold on.  Do you acknowledge that Bobby
23   admitted that the substance was probably going to test
24   positive for marijuana and that he smoked marijuana in
25   the past?
```

1    A.    No.

2    Q.    Were you present when he spoke with the deputy

3    or the detective?

4    A.    I was in the home, but I wasn't in the room.

5    Q.    Okay.

6    A.    Mainly because there was 18 other officers in

7    my house.

8    Q.    Do you dispute that three of the baggies tested

9    positive for marijuana?

10    A.    I dispute that absolutely.

11         MR. POULTON:   Okay.   Let's go ahead and turn on

12    the TV and I'll connect up so I can show some video.

13         (Exhibit 28 was marked for identification.)

14    BY MR. POULTON:

15    Q.    So let me show you this video which I have

16    labeled it as that.   I understand you're saying that you

17    dispute that it's search by consent.   I'm just letting

18    the court reporter know with this video on it and that's

19    how it's labeled on the flash drive.   Jones 9-22-15

20    Search by Consent, and that's my label but we'll watch.

21         (Video was played at this time.)

22    BY MR. POULTON:

23    Q.    Let me ask you first of all here -- and we're

24    stopping at 41 seconds -- do you recognize this to be

25    Bobby Junior's room, or do we need to go further?

1    A.   Yes.  No, this -- this is Little Bobby's room

2    where he shares it with his little brother.

3    Q.   All right.  Did you see the baggies that were

4    found, and so far we're up to 41 seconds?

5    A.   Yeah.  All the kids brought school lunch to

6    school.  So I buy the sandwich baggies for their peanut

7    butter and jelly sandwiches.  It looks normal.  They

8    don't have lunch boxes either, so --

9         (Video was played at this time.)

10   A.   Does this video show the beginning where they

11   claim I gave consent to search?

12   BY MR. POULTON:

13   Q.   I don't think this one does, but there are

14   other videos associated with the incident, but I don't

15   have them pulled up here.  So I don't know if I have

16   that or not.

17        (Video was played at this time.)

18   BY MR. POULTON:

19   Q.   All right.  Now at 2 minutes and 40 seconds

20   into this video, that's -- we see a young man there.

21   That's Bobby Junior; right?

22   A.   The fourth.

23   Q.   Robert Jones IV?

24   A.   Yes.

25        (Video was played at this time.)

1  BY MR. POULTON:

2      Q.   Now at 7:15 we see somebody sitting on a couch

3  there.  Is that you?

4      A.   I believe so.

5      Q.   Okay.

6           (Video was played at this time.)

7  BY MR. POULTON:

8      Q.   Okay.  Now we see at 7:53 they're speaking to

9  two people.  That looks like Robert Jones Junior there

10 on the left as we look at the screen and then that -- is

11 that you there just to the left of him standing there?

12     A.   I think so.

13     Q.   Okay.  So they're talking to you now about what

14 they found, right, as we start this?

15     A.   I --

16     Q.   Well, we'll listen all the way through.  That's

17 fine.

18          (Video was played at this time.)

19 BY MR. POULTON:

20     Q.   Try to listen to that again because

21 Robert Jones makes some comment here I'm trying to get.

22          (Video was played at this time.)

23 BY MR. POULTON:

24     Q.   This sounds like he says they're older; right?

25 This is at about 8:15-ish -- 8:15 or so in the video,

1    and the deputy had written that they were probably going

2    to test positive for marijuana and that he smoked

3    marijuana in the past.  Did you see that?  Did you see

4    that?

5        A.   Well, earlier in the video it stated that the

6    drawer was being used by his friends.

7        Q.   Okay.  Do you dispute that he told the deputy

8    at some point during this process, whether it was

9    captured by the video or not, that he had used marijuana

10   in the past and that they were probably going to test

11   positive for marijuana?

12       A.   I don't know.  I don't know.  I heard what he

13   said there.  He said if there's any of them that come up

14   with drugs in them, it could be from the past.

15       Q.   Okay.

16            (Video was played at this time.)

17   BY MR. POULTON:

18       Q.   Now at about the 9 minute mark there, there's

19   discussion of him trying to get probation.  Do you know

20   what that was in reference to?

21       A.   We moved from Pinellas County to go to -- to

22   move to this location because he had gotten problems in

23   Pinellas.

24       Q.   Right.

25       A.   But Pasco had zero idea until Pinellas let them

1    know that I was there.

2         Q.    Was -- is your understanding that Robert Jones

3    IV, Bobby Junior --

4         A.    Uh-huh.

5         Q.    -- was trying to get a probation sentence on

6    charges that had stemmed from Pinellas before you moved

7    to Pasco County?

8         A.    I believe that the mentality was probation is

9    better than jail.

10        Q.    Right.

11        A.    And at the time, you know, they're giving the

12   scared straight speech is that, "Hey, we're going to

13   make sure you do the right thing so that we can make

14   sure that you don't go to jail."

15        Q.    Well, let me ask you this.  Would you agree as

16   we watch this video -- and we watched all the way

17   through, but to this point, I mean, would you agree with

18   me that they were being polite --

19        A.    Yes, I agree they're harassing me.

20        Q.    Okay.  You --

21             MR. JOHNSON:  Just let him finish the question.

22             THE WITNESS:  Okay.

23   BY MR. POULTON:

24        Q.    Would you agree with me that they're being

25   polite and cordial as they talk about the issues with

1    you and your son?

2        A.    On only the videos they gave you.

3              (Video was played at this time.)

4        A.    But he's not on probation, and they're at the

5    house searching inside my home.

6              MR. JOHNSON:  You have to wait for him to ask

7        the question.

8              THE WITNESS:  Oh.

9              MR. JOHNSON:  It's fine, but just it will be

10       better for the record if you just let him ask a

11       question.

12   BY MR. POULTON:

13       Q.    I'll rewind it just a little bit here to 9:15.

14   We'll pick back up and watch for a little bit.

15             (Video was played at this time.)

16   BY MR. POULTON:

17       Q.    Let me stop there.  We watched a few seconds at

18   about 9:05 to 9:08, and there was a comment by the

19   deputy that if he did get probation, meaning Bobby

20   Junior, a condition would probably be that he consents

21   to search, and I believe you said, "Oh, yeah?"  Is that

22   correct?

23       A.    Yes.

24       Q.    All right.  Do you remember that?

25       A.    Yes.

```
 1              (Video was played at this time.)
 2    BY MR. POULTON:
 3         Q.   All right.  So for about 10 seconds there we
 4    heard the deputy talking to Bobby Jones Junior.  Would
 5    you agree that the deputy there is strongly urging Bobby
 6    to make good choices as opposed to bad choices for his
 7    future?
 8         A.   Yes, but he's -- but he's lying.
 9         Q.   Well --
10         A.   I mean it's clear.  He comes back and arrests
11    him after he says, "Hey, look we're not going to do
12    anything to you.  This is to show you that, hey, look,
13    this is stuff you can't be doing."  He clearly says it
14    right here.
15         Q.   I understand what you're -- I understand what
16    you're saying.  I'm just -- I'm just asking you about a
17    distinct period of time.
18         A.   Okay.  No problem.
19              (Video was played at this time.)
20    BY MR. POULTON:
21         Q.   Now we just heard a -- we're stopping at 12
22    minutes roughly, and there's been a whole -- there's
23    been a lengthy discussion of the deputy encouraging
24    Bobby Jones Junior to set a good example for his
25    siblings, including cleaning his room.
```

1      A.    Uh-huh.

2      Q.    Correct?

3      A.    Absolutely.

4      Q.    Okay.  And then I think -- do I hear you

5   chiming in --

6      A.    Yes.

7      Q.    Did you -- hold on.  Let me ask the question.

8   Do I hear you chiming in at about the 12 minute mark,

9   "Did you hear that?  You should clean your room"?

10     A.    They're not wrong.

11          (Video was played at this time.)

12  BY MR. POULTON:

13     Q.    And I think the comment was, "Do you hear that?

14  You're going to go inside and clean your room; right?"

15  And that was right at 12 minutes; correct?

16     A.    Uh-huh.  Yep.

17          (Video was played at this time.)

18  BY MR. POULTON:

19     Q.    Now what was that comment about dating an

20  18-year-old?  Was that in reference to your daughter?

21     A.    I don't know.  I don't know what it was in

22  reference to.

23     Q.    Okay.

24          (Video was played at this time.)

25  BY MR. POULTON:

1    Q.   Okay.  And then we're at the end of the video

2    about 13:36.  It looks like you stepped forward and

3    shook the deputy's hand; is that correct?

4    A.   Correct.

5          (Video was played at this time.)

6          MR. POULTON:  All right.  Let's see here.

7          (Off-the-record discussion.)

8          (Video was played at this time.)

9    Q.   All right.  So I got them backwards in order,

10   but we'll make this video which I have labeled Jones

11   9-22-15 Encouraging to Avoid Crime -- we'll make this

12   Exhibit 29.

13          (Exhibit 29 was marked for identification.)

14   BY MR. POULTON:

15   Q.   I couldn't -- just watching this -- watch it

16   again.  Would you agree with me first of all though that

17   -- towards the end of the video we'll look at.

18          (Video was played at this time.)

19   BY MR. POULTON:

20   Q.   We're at 28:16, and there's conversation asking

21   whether first Bobby Junior has his own room, and he says

22   yes.  Right?

23   A.   Uh-huh.

24   Q.   You have to say yes or no for the court

25   reporter.

1        A.    Yes.

2              (Video was played at this time.)

3    BY MR. POULTON:

4        Q.    All right.  So that was at 28:24 that he said

5    he had his own room --

6              COURT REPORTER:  28:24?

7    BY MR. POULTON:

8        Q.    28:24 that he said he had his own room, and I

9    believe the witness acknowledged that that's correct;

10   right?

11       A.    Yes.

12             (Video was played at this time.)

13   BY MR. POULTON:

14       Q.    All right.  So they ask whether they could come

15   in and check the room and make sure you're keeping your

16   nose clean, and at 28:33 it appears that Bobby Junior

17   said yes; correct?

18       A.    That's what he said.  Uh-huh.

19             (Video was played at this time.)

20   BY MR. POULTON:

21       Q.    And then the deputy asked him, "Yes what?"  And

22   Bobby Jones Junior said, "Yes, you can come in."

23   Correct?

24       A.    Did he say that?  I'm not exactly sure.

25       Q.    That's okay.  We'll go back.  That's fine.

1    A.   I'm not sure what he said.

2         (Video was played at this time.)

3  BY MR. POULTON:

4    Q.   I'll back it up a little bit.  Did he say,

5  "Yeah, you can come in"?

6    A.   (No response.)

7    Q.   All right.  So about 28:38 give or take they

8  asked is that -- you all start working towards the door,

9  and the deputy asks, "Are you okay with that, Dad?"  And

10  you've turned away.  I can't hear what you said.

11    A.   Obviously I can't -- even listening, I am not

12  quite sure.  I remember hearing Bobby saying, "Yes, you

13  can come to my room."  And at that point I'd already

14  turned away.  I just figured they were going in to talk.

15    Q.   Okay.

16    A.   Because there's more of the content missing in

17  this video.

18    Q.   In terms of what?

19    A.   They wanted to speak to my children.

20    Q.   Right.

21    A.   All of them.

22    Q.   Okay.

23    A.   And you missed that here.  So in my mind, I

24  thought they were coming over here to speak to all of my

25  children.  Literally they say scared straight moment

1    within the video, and they're trying to tell me that,

2    you know, the influence that Bobby has over all of my

3    other children will make a big difference if they can

4    show that, hey, look, these are the things that you're

5    not supposed to do, and these are -- you know, and we're

6    gonna make sure that we --

7              MR. JOHNSON:  We can see your email, Tom.

8              MR. POULTON:  Huh?

9              MR. JOHNSON:  We can see your email.

10             MR. POULTON:  That's okay.  Would you answer it

11     for me, please?

12         A.  And honestly, I thought that's what they were

13    coming in to do, to talk to my youngest children in

14    regards to the issues that weren't at hand at the

15    moment, which were, you know, Bobby missing school, and

16    not being the best big brother and, you know, whether he

17    should watch out for his younger sisters.  Like

18    everything in the video that the officer was talking

19    about earlier in that video they speak of wanting to --

20    The team was in essence there to educate younger

21    generation of children.

22    BY MR. POULTON:

23         Q.  All right.  Notwithstanding your understanding

24    of it at the time, would you acknowledge that on the

25    video we see the deputies ask, and then ask for

1    clarification from your son, is it okay for them to come

2    into his room and check and make sure that he's not

3    lying about what's going on, that sort of thing?

4        A.    Yeah.   Clearly at the moment Bobby didn't think

5    there was anything to hide, and I had nothing to hide.

6    They were asking to enter my home to speak to the kids.

7    I had no problems with that.

8             Again, I know what happened.   They left.   They

9    did not arrest anybody.   Then three days later they came

10   back and arrested my son while I was at work claiming

11   the baggies that they had found had trace amounts of

12   marijuana.   However, after the 21 days in JDC and after

13   we took it to trial, during the trial the disposition

14   was there was zero trace amounts of anything found in

15   any of the baggies on the property.   So --

16       Q.    This is -- this is one of the reasons we've

17   been asking your attorneys to help us help you or

18   somehow everybody help each other get ahold of --

19       A.    Nobody was helping me --

20       Q.    Hang on.

21       A.    -- ever.

22       Q.    Right now Bobby Jones Junior, because he's an

23   adult, he has control over his juvenile records, and

24   we're all trying to get those.

25       A.    He didn't have control over them at this time

1    either.

2        Q.   At the time he was a juvenile, so you would

3    have had control.

4        A.   No, I understand that.

5        Q.   But now he's an adult, so he has control over

6    those juvenile records.

7        A.   I didn't have control over them.

8            MR. JOHNSON:  Tom, we've been talking with

9        Robert about the issue with the juvenile records.  I

10       don't know -- you know, I think those conversations

11       should probably --

12           MR. POULTON:  Okay.

13           MR. JOHNSON:  -- you know.

14           MR. POULTON:  Okay.  All right.  All right.  So

15       we're I think on 29.

16           COURT REPORTER:  29 was the last video.  This

17       will be 30.

18           MR. POULTON:  You're right.

19           (Exhibit 30 was marked for identification.)

20   BY MR. POULTON:

21       Q.   Okay.  Exhibit 30 is a CAD report for October

22   9, 2015, which indicates a prolific offender check.  The

23   notes indicate Robert Arthur Jones IV.  That's your son;

24   right?

25       A.   Right.  Which is saying he's a prolific

1    offender.

2        Q.    Right.

3        A.    And the date is October 9, 2015.

4        Q.    All right.  We've talked a little bit about it.

5    Do you have a -- notwithstanding your earlier testimony

6    about generally that there were a lot of prolific

7    offender checks or other visits, do you happen to

8    remember this particular one on October 9, 2015?

9        A.    No.  I just want to verify though that this

10   does say the nature of the search was a prolific

11   offender check.

12       Q.    Right.

13       A.    So they already deemed him prolific offender.

14   I mean, by the time they were writing all this stuff, he

15   was a prolific offender; right?

16       Q.    Well, I mean I --

17       A.    Even though he was never convicted of any

18   crimes.

19       Q.    I understand what you're saying.  I'm just --

20       A.    I don't understand what the definition of that

21   nature is.  Prolific offender check, does that mean he's

22   an offender of something?  I mean, it must mean that

23   he's definitely broke the law and he's guilty of

24   something.

25       Q.    We'll move on.  It's a term of art I think

1   within the agency, and it means something different to

2   different agencies, but that's an argument for me to

3   have with your lawyers later.

4           Let me give you the next one, which will be

5   number 31.

6           (Exhibit 31 was marked for identification.)

7   BY MR. POULTON:

8       Q.   I'll give you a minute to look that over.  Are

9   you ready?

10      A.   Uh-huh.

11      Q.   All right.  So Exhibit 31 is an incident report

12  for October 12, 2015.

13          (Cell phone interruption.)

14      A.   Sorry.  I thought I shut it off.

15  BY MR. POULTON:

16      Q.   And on page 3, the narrative there is that

17  there were five warrants for Bobby Jones Junior's

18  arrest --

19      A.   Uh-huh.

20      Q.   -- for failure to appear for burglary, grand

21  theft, failure to appear for possession of marijuana,

22  failure to appear attempted burglary, tampering with

23  physical evidence, possession of marijuana misdemeanor,

24  trespass in structure or conveyance, obstruct or resist

25  officer without violence.  Count five was failure to

1    appear possession of marijuana, possession of alcohol by

2    a person under 21, obstruct or resist officer without

3    violence, and this indicates that Robert was transported

4    to Land O' Lakes without incident and that Donna Jones,

5    your wife and his stepmother, was present for the arrest

6    and aware of the situation.

7         A.    Uh-huh.

8         Q.    I'm -- based on the context of this, it would

9    appear you were not home during this particular

10   incident; is that correct?

11        A.    Correct.

12        Q.    Did he hear that he had been arrested from

13   Donna?

14        A.    I actually know what happened.

15        Q.    Okay.  What happened?

16        A.    He was given a public defender for this case.

17        Q.    Okay.

18        A.    This was the original cases in Pinellas County,

19   and we moved from there.  And when we moved, his -- his

20   what's it called changed -- his public defender changed,

21   and it became Charles Green was the name of his

22   attorney.  Whatever happened with the paperwork, he

23   didn't file in time.  So when it come time to go to

24   court, we never received notice because his attorney

25   never sent any.  He must have failed to appear as it

1    states, and there was a warrant sent out for his arrest.

2        Q.    Okay.

3        A.    But that was, I mean, legitimately not because

4    he was missing court dates.  It was because the swap in

5    the public defender left -- left an opening that ended

6    up causing him to get a warrant and getting arrested due

7    to the warrant.

8        Q.    Okay.

9        A.    This is -- I mean, just to let you know, this

10   is October 12th, which is exactly three days after they

11   came the last time for the prolific offender check.

12       Q.    Okay.  Well, let me ask you this.  Do you know

13   what happened to these particular criminal charges with

14   Bobby, the burglary, the grand theft, possession of

15   marijuana?

16       A.    He ended up pleaing out, and this is what he

17   went to prison for.  All the times that he was arrested

18   by Pasco County, nobody ever -- there was no convictions

19   because there's no evidence.

20       Q.    Okay.  Well, there -- All right.  There's a --

21   I'm -- let's distinguish between Pinellas and Pasco.

22       A.    Sure.

23       Q.    So if I understand you correctly, the warrants

24   for failure to appear -- and there's one just listed as

25   grand theft --

1      A.    Uh-huh.

2      Q.    -- for on October 12, 2015.

3      A.    Uh-huh.

4      Q.    Those warrants were from Pinellas County; is

5   that right?

6      A.    Correct.

7      Q.    The arrest was by Pasco County?

8      A.    Yes.

9      Q.    On those warrants from Pinellas?

10      A.    Yes.

11      Q.    And my question to you is, do you know what

12   happened to these charges in Pinellas ultimately?

13      A.    Ultimately I think they were pleaed out.

14      Q.    Okay.  Well -- Okay.

15            (Exhibit 32 was marked for identification.)

16   BY MR. POULTON:

17      Q.    All right.  So 32 is an incident report, or I'm

18   sorry, a CAD report dated October 18, 2015.  The nature

19   of the call is unwanted guest, and again this is --

20   appears to be Donna Jones.  If you look at page 3, the

21   call appears to be that there are kids between 13 and 18

22   years olds.  Son and friends are out of control,

23   cyphening gas out of jet skis, wants the friends to

24   leave.

25            At the top of the notes the boys left with the

 1    gas -- left the gas in and without incident.  Made

 2    contact with the caller and she said she wanted the kids

 3    gone.  Made contact with six teens:  Robert Jones that

 4    would be Junior given the date of birth, and then

 5    several others.

 6          Were you present for this incident?

 7    A.   I don't think I was present for this incident,

 8    no.

 9    Q.   Did you hear about it?

10    A.   I heard about it, yeah.

11    Q.   Okay.  I'm assuming from Donna?

12    A.   Yeah.

13    Q.   Okay.  Doesn't seem like something Robert would

14    talk about, but do you know -- I mean --

15    A.   So --

16    Q.   -- what do you know about it?  Yeah.

17    A.   So I get a phone call saying that there's kids

18    cyphening gas out of my jet ski.  I didn't know who the

19    kids were.  I mean, I didn't see them, but she said

20    somebody's doing it, and I said call the cops.

21    Q.   Okay.

22    A.   Lo and behold Bobby's saying, "Hey, I know

23    you're out of gas.  Cyphen some from the jet skis," you

24    know, to his buddies.  So that's what happened there.

25    Q.   Did you talk to Robert about it later?

1        A.    After the fact, yeah.

2        Q.    And he told you that he had told his friends it

3    was okay to take some of your gas?

4        A.    She wanted -- my wife wanted them to leave.

5    They couldn't leave because they didn't have any gas.

6    So this was an attempt to get them to leave, but the

7    only way they could was to get the gas from the jet ski.

8        Q.    Okay.  We'll move on to 33.

9            MR. POULTON:  Off the record.

10            (Exhibit 33 was marked for identification.)

11            (Off-the-record discussion.)

12   BY MR. POULTON:

13       Q.    All right.  So now we're looking at Exhibit 33.

14       A.    Which is four days after Exhibit 32.

15       Q.    Right.

16       A.    Four days.

17       Q.    And the nature field says, "SO investigation

18   for October 22, 2015," and then the note is negative

19   contact.  Do you happen to have any independent

20   recollection of this specific date?

21       A.    No.

22            (Exhibit 34 was marked for identification.)

23   BY MR. POULTON:

24       Q.    All right.  Now this one is dated -- number 34

25   is dated November 13, 2015.  The nature field says

1   prolific offender check, but I see no other information

2   at all here including whether they even made any contact

3   with anybody.  Do you happen to know one way or the

4   other whether contact was made on that particular day?

5       A.   No.

6            (Exhibit 35 was marked for identification.)

7   BY MR. POULTON:

8       Q.   Okay.  Number 35 is similar to our last

9   exhibit.  There's an indication on November 14, 2015 --

10      A.   So this is the day after, and actually the last

11  on Exhibit 34 --

12      Q.   Okay.

13      A.   -- that was 11:00 almost -- yeah, 11:00 at

14  night.

15      Q.   Well --

16      A.   And this is the next day at 1:00 in the

17  afternoon.  That was less than thirteen hours --

18  fourteen hours later another report prolific offender

19  check with no information.

20      Q.   I'm not sure you're right on the time, but

21  regardless I'm just asking you whether you have any

22  independent recollection of this particular day?

23      A.   No, I don't.  And that's a different person

24  too; right?  Yeah, STAR32.  The other one's STAR30.

25  It's a different person next day.

1       MR. JOHNSON:  Just wait for him to ask his

2    question before you -- I know you're excited to

3    explain what you're seeing, but just let him ask his

4    questions.

5       (Exhibit 36 was marked for identification.)

6  BY MR. POULTON:

7    Q.   And this is a -- number 36 is an incident

8  report dated November 24, 2015.  If you will go to page

9  3, there's a short description of what the purpose was.

10  I'll just have you look at that, and there's a

11  discussion there for you or with you.

12    A.   Uh-huh.

13    Q.   Okay.  This indicates that the deputy was

14  dispatched to 3810 Headsail Drive in reference to

15  juvenile pickup orders from Pinellas County Sheriff's

16  Office.

17    A.   Uh-huh.

18    Q.   And then there's discussion of making contact

19  with Bobby Jones Junior -- Robert Jones IV, and they

20  confirmed that he had seven warrants from Pinellas

21  County.  Last sentence there or last two sentences

22  states, "I advised Robert's father, Robert Jones III, of

23  the warrants, and he stated he understood."  And then

24  Robert IV was arrested and transported to the Juvenile

25  Assessment Center.  Do you have a memory of that

1    particular incident?

2        A.    I believe I do have that memory, yes.

3        Q.    Okay.  Was that the same charges as we looked

4    at before --

5        A.    Correct.

6        Q.    -- or were they different?

7        A.    They're the same ones.  It was due to the same

8    issue.  As a matter of fact, if you look, the date's not

9    even a month later from the last arrest for the same

10   failure to appear.  This is right in the realm of them

11   transferring Charles Green, which was the attorney that

12   I think was on the case originally, and then changed to

13   a different one.

14       Q.    Okay.

15       A.    They knew where he was the entire time.  It's

16   not that they didn't know where he was.  The problem was

17   receiving notice of the actual court dates that he was

18   missing.

19            (Exhibit 37 was marked for identification.)

20            (Off-the-record discussion.)

21   BY MR. POULTON:

22       Q.    All right.  So back on the record.  Number 37

23   is a CAD report indicates prolific offender check on

24   December 11, 2015.  Notes just says Bobby Jones and has

25   his date of birth.  Do you happen to remember this

1    particular incident?

2        A.   No.

3             (Exhibit 38 was marked for identification.)

4             (Off-the-record discussion.)

5    BY MR. POULTON:

6        Q.   All right.  Exhibit No. 38 is a CAD report

7    dated 12-21-15.  The nature is indicated as prolific

8    offender check.  The notes indicate there was an attempt

9    to contact Bobby Jones, and there was no contact.  Do

10   you have any reason to --

11       A.   Yes.

12       Q.   -- disagree with that particular one?

13       A.   No.

14       Q.   Go ahead.

15       A.   He was still in jail.

16       Q.   Okay.  That's why they couldn't make contact?

17       A.   Yeah.  He was in JDC still 21 days.  This is

18   ten days after they arrested him.

19       Q.   All right.  Thank you.

20            (Exhibit 39 was marked for identification.)

21   BY MR. POULTON:

22       Q.   All right.  So number 39 is labeled in the

23   nature field as a prolific offender check, and it's

24   dated 12-22-15.  I do see that on the second page there

25   a comment subject not home.

1       A.   Uh-huh.

2       Q.   Is it your recollection that Bobby Junior was

3   still in detention at that point?

4       A.   Yeah, I believe he was.

5       Q.   Okay.  So you have no independent recollection

6   of this particular incident then?

7       A.   No.

8            (Exhibit 40 was marked for identification.)

9       A.   So this event was the next day.

10  BY MR. POULTON:

11      Q.   Well, right.

12      A.   12-22 to 12-23, two days before Christmas.

13      Q.   Now on Exhibit 40, which is a CAD report dated

14  December 23, 2015 --

15      A.   Uh-huh.

16      Q.   -- this is -- nature field is prolific offender

17  check, and the comment is Bobby Jones still in

18  Jacksonville.  No contact.

19      A.   Uh-huh.

20      Q.   Do you have a recollection of Bobby being in

21  Jacksonville in late December of 2015?

22      A.   So my sister lives in Jacksonville with my

23  brother, and at Christmastime we use Christmas day for

24  our immediate family -- people we live with, and then

25  the days leading up to it we do Christmas in other

1    places.  And I think this Christmas Bobby was visiting

2    his aunt, and that's the reason why they couldn't

3    contact anyone.  And I -- I -- I don't remember speaking

4    to anybody because I was there as well.

5         Q.   You read my mind, and you anticipated my

6    question.  I take it you have no memory of that

7    particular incident?

8         A.   No.

9         Q.   Okay.

10             (Exhibit 41 was marked for identification.)

11   BY MR. POULTON:

12        Q.   Before we move on to 41, going back to that one

13   on December 23 where the indication was that Bobby was

14   in Jacksonville, do you have any memory of that

15   particular interaction with deputies on December 23,

16   2015?

17        A.   I don't have any recollection, no.

18        Q.   Thank you.

19             All right.  41 then, turning to that, that is

20   also on December 23.

21        A.   Same day that night.

22        Q.   Right.  The indication in the nature field is

23   SO investigation.  There are no other notes.  Any

24   recollection of that particular visit or interaction?

25        A.   Not of this harassment.

1           (Exhibit 42 was marked for identification.)

2           (Off-the-record discussion.)

3    BY MR. POULTON:

4       Q.   Going back on the record, do you remember

5    whether Bobby returned home -- Bobby -- Robert Jones

6    Junior or Robert Jones IV, having returned home just

7    prior to Christmas on -- of that year?

8       A.   I don't remember if he showed up the day before

9    Christmas or the day of Christmas.  I couldn't tell you

10   exactly the date he returned.

11      Q.   Okay.

12      A.   I mean --

13      Q.   The reason I ask is that if you look at page 3

14   of Exhibit 42 --

15      A.   Uh-huh.

16      Q.   -- there was an anonymous caller from 3810

17   Headsail Drive.  The nature is information for deputy.

18   And the call was caller advised there is a person with a

19   warrant at location.  Could this have been Donna Jones

20   calling the Sheriff's Office to let --

21      A.   No.

22      Q.   Let me finish the question.  Could this have

23   been Donna Jones calling the Sheriff's Office to let

24   them know that Bobby believed to have a warrant at that

25   point in time was back at the location at 3810 Headsail

1    Drive?

2        A.   No.

3        Q.   Okay.  Do you happen to have any knowledge of

4    this particular incident?

5        A.   I do, and I think it's in regards to me.

6        Q.   Okay.

7        A.   I think they have written it down as him, but I

8    believe you'll find -- and I'll wait till we get there

9    to say any more.

10       Q.   Sure.

11       A.   But I think some of the information on here has

12   been misconstrued.  As you see, they came to the house

13   I'm looking at four times in two days.  Am I right?  The

14   23rd, 22nd, 24th -- 23rd had two times they came.

15       Q.   Well --

16       A.   I'm only making mention of that because they're

17   not quite done.  They'll be done here in a minute as

18   soon as you get to the next couple.

19       Q.   All right.  But while we're just -- and we'll

20   look at it a minute.  We can always come back, but as we

21   sit here right now, your thinking is that this might

22   have been a warrant in relationship to you as opposed to

23   Junior?

24       A.   Correct.

25       Q.   Okay.  And you just think there's confusion?

1   Because I do see that it says age 16 there in the

2   description; right?

3       A.   Yes.

4       Q.   Okay.  And you were not 16 years old at the

5   time?

6       A.   No.

7       Q.   Okay.

8       A.   No.  And this is the day before Christmas.

9   This is Christmas Eve, December 24th.

10      Q.   All right.

11           (Exhibit 43 was marked for identification.)

12   BY MR. POULTON:

13      Q.   Okay.  This is -- number 43 is December 26,

14   2015.

15      A.   The day after Christmas.

16      Q.   Okay.  Let's look at page 3.  Let's start

17   there.  That indicates the reporting officer was

18   Bollenbacher, who we've seen a number of times I think

19   in some of the other CAD reports, but he indicates here

20   that he was attempting to serve a warrant, and you

21   believe that that was a warrant for you?

22      A.   Correct.

23      Q.   On -- because he -- Okay.  Do you know what the

24   warrant was for?

25      A.   I don't want to speculate because I can't

1    remember the exact times and dates of every single one

2    of these arrests, but the jet ski trailer -- let me look

3    at it.  Is this the date they actually arrested me?

4        Q.   No.  If you look, you'll see the citations.

5        A.   Right.  I see -- I see the ones -- this -- this

6    is the only citation that I think I ever received that I

7    actually signed.  I believe the next -- they come and

8    arrest me like the next day for failure to appear for an

9    ordinance violation that I never received a citation

10   for.

11       Q.   All right.  Well, let's look at the citation.

12       A.   Sure.

13       Q.   So on 12-26-15 --

14       A.   You.

15       Q.   And this is I guess the fifth page now of

16   Exhibit 43 -- there is a citation, and an officer's

17   statement of facts states, "The tenant, lessee, owner or

18   occupant did unlawfully park a jet ski trailer bearing

19   Florida plate," and there's a plate number, "forward of

20   his house in the yard."  And that was issued on

21   12-26-15.  There's arraignment information for 2-25-16,

22   but that's the court date, and there's defendant's

23   signature down there at the bottom.  Is that your

24   signature?

25       A.   That is.

1    Q.   All right.  So you acknowledge that you did

2  receive that citation?

3    A.   I did receive the citation.

4    Q.   Okay.  And you knew you were supposed to be in

5  court on February 25, 2016?

6    A.   And I was there.  I wrote a letter to the judge

7  that same day.

8    Q.   Okay.  We'll get to that.  I have that.

9    A.   Okay.

10   Q.   Just want to make sure that we're all on the

11  same page.

12       Well, you're saying you were -- well, we might

13  as well talk about it now.

14   A.   Sure.

15   Q.   So you were supposed to be in court on that

16  day.  Did you make it to court?

17   A.   Yes.  They wouldn't let me in courtroom.

18   Q.   Why not?

19   A.   They told me that I wasn't allowed in courtroom

20  because court already started, and I was there with my

21  whole entire family, and I knew that if I wasn't allowed

22  in the courtroom, then I was going to have to justify me

23  there.  So I actually wrote a note.  I wrote a letter to

24  judge on that same day stating that I was there.

25   Q.   Okay.  So your court date was 2-25-16?

```
 1        A.   Uh-huh.

 2        Q.   You need to say yes or no for the court

 3   reporter.

 4        A.   Yes.

 5        Q.   And you went, but you weren't able to get in.

 6   And you're saying that you were there, and they just

 7   wouldn't let you in; right?

 8        A.   Right.

 9        Q.   Is this the letter that you wrote to the judge

10   -- I've got other copies.

11        A.   Uh-huh.

12        Q.   You need to say yes or no for the court

13   reporter.

14        A.   Yeah, that was one of the major plain reasons

15   was the fire department kicked everybody out the

16   building.

17             MR. POULTON:  We will make that exhibit what

18        ever I'm on.

19             (Exhibit 44 was marked for identification.)

20   BY MR. POULTON:

21        Q.   All right.  So this is exhibit -- I'm sorry.

22   What did you say it is?

23             COURT REPORTER:  44.

24   BY MR. POULTON:

25        Q.   -- 44, and it's dated 2-25-16, which is the
```

1    date you're supposed to be in court; right?

2        A.   Right.

3        Q.   And at the bottom you write, "Sorry so short.

4    Fire department has kicked everyone out of the building,

5    and I had to write this on the concrete outside."

6        A.   Yeah.

7        Q.   Are you saying so you were at court and the

8    fire department kicked everyone out?

9        A.   Yes.

10       Q.   In the text of the letter though, you say --

11   state that you had a court date for an ordinance

12   violation this morning in Courtroom 2B.  The original

13   notice was served on my son at 11 p.m. on cited date.  I

14   missed it due to not -- to no knowledge.

15       A.   There's -- again, there's a reason.  If you --

16   because we're going chronological, you'll see this is

17   one -- this was one issue of an ordinance violation of a

18   multitude that came, and I believe when I was writing

19   this as I was getting kicked out, I was -- I was

20   misconstrued with a few of the other items that we have

21   yet to talk about.

22       Q.   I know that you wrote a longer typewritten

23   letter to the judge.

24       A.   Right.  Showing that there was a habeas corpus

25   sent out for my arrest for a non- -- a failure to

1    appear.

2        Q.   Failure to appear on -- there were a group of

3    about four or five citations on one day.

4        A.   Right.  That were not never given to me.

5            MR. JOHNSON:  Let him finish.

6    BY MR. POULTON:

7        Q.   But here's my -- you're telling the judge you

8    didn't get the -- the reason that you didn't show up is

9    because you didn't get --

10       A.   I did show up.

11       Q.   Hold on.  You're saying -- well, you're saying

12   that I missed it due to no knowledge because it was

13   given to your son for that morning for 2-25-16; right?

14       A.   Correct.

15       Q.   But we know that you got the citation because

16   you signed it; right?

17       A.   Correct.

18       Q.   All right.  What ultimately happened with this

19   citation for the jet ski trailer being parked forward of

20   the front of the house?

21       A.   I was thrown in jail.

22       Q.   Okay.  So a failure to appear warrant was

23   issued?

24       A.   A habeas corpus was issued, yes.

25       Q.   Hold on.  So am I correct then that you --

1    because you didn't appear on February 25, 2016, the

2    judge, presumably Judge Wansboro, issued a failure to

3    appear warrant for you?

4         A.   Yes.

5         Q.   And so you were subsequently arrested on that?

6         A.   Yes.

7         Q.   And -- this is starting to make sense.  Did you

8    pay a bond of about $130 for that one?

9         A.   Yes.

10        Q.   Okay.  So you paid $130 bond; right?

11        A.   Uh-huh.

12        Q.   You need to say yes or no for the court

13   reporter.

14        A.   Yes.

15        Q.   All right.  I don't want to confuse the record

16   if I'm -- we'll have to piece it together.

17             Let me ask you this.  At the end of the day the

18   final conclusion of it was the judge took the $130 that

19   you paid for bond and used it to satisfy the code

20   violation fines?

21        A.   Yes.

22        Q.   Did this also include the other code violations

23   which occurred on a different date?

24        A.   No.

25        Q.   Okay.  We'll piece it together.

1          I think I'm up to 45.

2          (Exhibit 45 was marked for identification.)

3     BY MR. POULTON:

4      Q.   Why don't you read through.  I'm going to use

5     the restroom.  Do you guys want to take a five-minute

6     break anyway?

7          MR. JOHNSON:  Sounds good.

8          (A break was taken at 2:19 p.m., and the

9      deposition resumed at 2:23 p.m. in Volume 2.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
2                           TAMPA DIVISION

3    DALANEA TAYLOR; TAMMY
     HEILMAN; DARLENE DEEGAN;
4    and ROBERT A. JONES, III,

5       Plaintiffs,

6    vs.                     Case No.: 8:21-cv-00555-SDM-CPT

7    CHRIS NOCCO, in his
     official capacity as
8    Pasco County Sheriff,

9       Defendant.
     _____/
10

11                         VOLUME 2 OF 2

12

     PROCEEDINGS:           Deposition of
13                          ROBERT JONES, III

14

     DATE:                  January 27, 2022
15

16   TIME:                  9:10 a.m. - 5:12 p.m.

17

     PLACE:                 New Port Richey Executive Suites
18                          8520 Government Drive, Suite 1
                            New Port Richey, Florida
19

20   REPORTED BY:           Judy Anderson, Court Reporter
                            Notary Public
21                          State of Florida at Large

22

23                  ANDERSON COURT REPORTING
                         P.O. Box 2426
24                  Dade City, FL 33526-2426
                Judy@andersoncourtreporting.com
25                     (352) 567-5484

```
 1    APPEARANCES:

 2    ROBERT E. JOHNSON, ESQUIRE
      Institute for Justice
 3    16781 Chagrin Boulevard, Ste. 256
      Shaker Heights, OH 44120
 4    703-682-9320
      Rjohnson@ij.org
 5          Counsel for Plaintiffs

 6    CAROLINE GRACE BROTHERS, ESQ.
      Institute for Justice
 7    901 N. Glebe Road, Ste. 900
      Arlington, VA 22203
 8    703-682-9320
      Cgbrothers@ij.org
 9          Co-counsel for Plaintiffs

10    THOMAS W. POULTON, ESQUIRE
      Debevoise & Poulton, P.A.
11    1035 S. Semoran Blvd., Ste. 1010
      Winter Park, FL 32792-5512
12    407-673-5000
      Poulton@debevoisepoulton.com
13    Holborn@debevoisepoulton.com
      Cook@debevoisepoulton.com
14          Counsel for Defendant

15

16

17

18

19

20

21

22

23

24

25
```

1                      I N D E X

2                                              Page
   Volume 1 of 2
3   Direct Examination by Mr. Poulton            8

4   Volume 2 of 2
   Direct Examination by Mr. Poulton (continued)  158
5   Cross Examination by Mr. Johnson             255
   Redirect Examination by Mr. Poulton          268
6   Stipulation                                  269
   Certificate of Oath                          270
7   Certificate of Reporter                      271
   Deponent's Signature Page                    272
8   Errata Sheet                                 273

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **E X H I B I T S**

2                                          Page

3     1 -  Plf's First Supplemental Rule 26(a)(1)      30
           Initial Disclosures
4
      2 -  CAD Report                                  34
5
      3 -  CAD Report                                  36
6
      4 -  CAD Report                                  36
7
      5 -  CAD Report                                  38
8
      6 -  CAD Report                                  39
9
      7 -  Incident Report                             44
10
      8 -  Incident Report                             56
11
      9 -  Incident Report                             57
12
      10 - Incident Report                             59
13
      11 - Incident Report                             64
14
      12 - Incident Report                             66
15
      13 - CAD Report                                  67
16
      14 - CAD Report                                  68
17
      15 - CAD Report                                  72
18
      16 - Google Map                                  76
19
      17 - Google Map                                  77
20
      18 - Incident Report                             84
21
      19 - CAD Report                                  88
22
      20 - CAD Report                                  89
23
      21 - CAD Report                                  90
24
      22 - CAD Report                                  91
25

```
1                    E X H I B I T S

2                                          Page

3   23 - CAD Report                         94

4   24 - CAD Report                         96

5   25 - CAD Report                        101

6   26 - CAD Report                        103

7   27 - Incident Report                   109

8   28 - Jones 9-22-15 Search by Consent Video   114

9   29 - Jones 9-22-15 Encouraging to Avoid     122
        Crime Video
10
    30 - CAD Report                        127
11
    31 - Incident Report                   129
12
    32 - CAD Report                        132
13
    33 - CAD Report                        134
14
    34 - CAD Report                        134
15
    35 - CAD Report                        135
16
    36 - Incident Report                   136
17
    37 - CAD Report                        137
18
    38 - CAD Report                        138
19
    39 - CAD Report                        138
20
    40 - CAD Report                        139
21
    41 - CAD Report                        140
22
    42 - CAD Report                        141
23
    43 - Incident Report                   143
24
    44 - Letter                            146
25
```

```
1                    E X H I B I T S

2                                        Page
```

```
3    45 - Incident Report                    150

4    46 - CAD Report                         164

5    47 - CAD Report                         166

6    48 - CAD Report                         167

7    49 - CAD Report                         168

8    50 - CAD Report                         168

9    51 - CAD Report                         169

10   52 - CAD Report                         173

11   53 - CAD Report                         175

12   54 - Incident Report                    176

13   55 - CAD Report                         180

14   56 - CAD Report                    182, 185

15   57 - CAD Report                         186

16   58 - CAD Report                         187

17   59 - CAD Report                         188

18   60 - CAD Report                         189

19   61 - CAD Report                         190

20   62 - CAD Report                         191

21   63 - CAD Report                         192

22   64 - CAD Report                         194

23   65 - CAD Report                         194

24   66 - CAD Report                         195

25   67 - CAD Report                         196
```

1                        **E X H I B I T S**

2                                                **Page**

3      68 – CAD Report                                198

4      69 – CAD Report                                200

5      70 – CAD Report                                201

6      71 – CAD Report                                203

7      72 – Incident Report                           204

8      73 – Body Cam Extraction 1.116012033 Video     207

9      74 – Pasco County Ordinance Citation           216

10     75 – Letter to Judge Wansboro                  227

11     76 – Incident Report                           233

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              DIRECT EXAMINATION (CONTINUED)

2   BY MR. POULTON:

3       Q.    All right.  So Exhibit 45 references an arrest

4   incident on December 26, 2015.

5       A.    Uh-huh.

6       Q.    Let me begin by asking you if you know Kamal

7   Campbell?

8       A.    I've heard of the name, yes.

9       Q.    K-A-M-A-L C-A-M-P-B-E-L-L.  You said you'd

10  heard his name.

11      A.    Uh-huh.

12      Q.    How did you hear his name or in what --

13            MR. JOHNSON:  I don't know if -- if you heard

14      it from your attorneys, I don't know if --

15            THE WITNESS:  Oh.

16  BY MR. POULTON:

17      Q.    I'm sorry.  So any question I ask is not for

18  any sort of communication you had with your attorney.

19  You said you've heard the name.

20      A.    Oh, yeah.  But I mean, other than that, I --

21  no, I don't know who that is.

22      Q.    Okay.  On that date, was there a black male in

23  your house smoking?

24      A.    Not -- no.

25      Q.    Were you present for a conversation between

1    Corporal Rodgers and a juvenile through a window where

2    the juvenile stated that he was 17 years old?  Could you

3    hear that?

4        A.    No.

5        Q.    Was there anybody in the house besides your

6    family?

7        A.    To my knowledge, the only people there were me

8    and my family.

9        Q.    Is it possible that there might have been

10   somebody else in the home, you just didn't know it?

11       A.    I mean, before I got home from work, it's

12   always possible.

13       Q.    Do you remember the deputies coming to the door

14   originally stating that they were there to check on

15   Robert Jones, Junior?

16       A.    No, they came -- they said they wanted to

17   search my house.  If not, they were gonna harass me

18   until I did.  And it's on the 7 minute mark on that

19   video right there if you'd like to look at that.

20            MR. JOHNSON:  It may not be the video literally

21       on your computer right now.

22            MR. POULTON:  Okay.  Is it -- well, I have one

23       pulled up now.  I haven't -- I can't play it right

24       now because I don't know how, but maybe he's -- he

25       can see the screen.

1    BY MR. POULTON:

2        Q.   Is that the one you're talking about?

3        A.   I -- I general -- this is the case that they

4    claimed that I resisted arrest.

5        Q.   Right.  Okay.  This is -- actually I think is a

6    different video, but they --

7        A.   Oh.  Specifically regards to this case if you

8    were talking about the video that came along with it,

9    that's the one I was referring to --

10       Q.   Okay.

11       A.   -- which I thought was the incident that you're

12   talking about, which this happens to be just the day

13   after Christmas at 11:00 at night.

14       Q.   The reality is if we tried to watch every

15   single video, we would never leave.  We're just not

16   going to be able to do that, but do I understand

17   correctly that your recollection is that there is a

18   video -- a body cam video that goes with Exhibit 45,

19   that is the incident on 12-26-15 where you were arrested

20   for resisting without?

21       A.   Yes.

22       Q.   And what is your understanding of what that

23   video shows?

24       A.   It shows that I was going to either do what the

25   cops told me to do or I was going to end up in jail.

1     Q.    You said before that they said you had to

2  search or be a --

3     A.    That's it.

4     Q.    Hold on.  Let me get the question out.

5           Are you saying that on that video they said you

6  either had to consent to a search or you'd go to jail?

7     A.    I was going to do what they told me to do, or I

8  was going to jail.

9     Q.    All right.  Is this part true that you were

10  told that there was a minor smoking in your house and

11  you needed to have the minor step outside?

12     A.    So I don't know what they tried to iterate

13  here --

14     Q.    Uh-huh.

15     A.    -- but they'd already lied to me a multitude of

16  times, and I refused in front of them to allow them to

17  go into my home anymore ever again.  After that time

18  with the baggies, they never ever, ever, by my accord,

19  my wife's, by anybody in my family allowed to go into my

20  home.

21     Q.    Did you shut the door and refuse to come back

22  outside?

23     A.    Yes, sir.

24     Q.    Okay.  The next statement right after that on

25  page 3 of 45 is that he refused to take action to stop

1    the juvenile, who was later identified as Kamal

2    Campbell, from smoking or exit the residence.  I advised

3    Robert Jones III if he did not come out, he would be

4    subject to arrest.  He then came to the front door,

5    refused to step out or allow me to place cuffs on him.

6    Robert Jones III refused to follow verbal commands to

7    step out, turn around and be placed in cuffs.  Are those

8    statements accurate?

9        A.    No.

10       Q.    Okay.  What parts are not accurate?

11       A.    I closed the door, and the officer stuck his

12   foot in the door.  And he said, "Mr. Jones, I'm going to

13   arrest you in your house or outside of your house."  And

14   when I asked him, "Well, for what," he told me resisting

15   arrest.  And I turned around and looked at my wife.  I

16   said, "Call my lawyer."  I opened the door.  I put my

17   hands behind my back, and they walked me politely to the

18   police car where they stuck me in the back and they

19   told me that I was a smart guy, and they knew for a fact

20   that I was gonna beat the rap, but I would never beat

21   the ride, and that I was gonna learn to start abiding by

22   their rules, or they were gonna continue to harass me.

23       Q.    And you believe all of that is on video?

24       A.    I know it's on video.  I saw it.

25       Q.    Okay.  And is that the totality of what's on

1   the video?

2       A.   Well, I mean, in regards to what happens here?

3       Q.   Yes.

4       A.   There was no resisting of any arrest.  I freely

5   gave myself up when they said you're under arrest, and

6   when I asked them for what and they said resisting

7   arrest, I could only assume that, you know, they're

8   going to do whatever it takes to put me in cuffs because

9   they already said that.  Even on that video on that

10  arrest, they legitimately tell me, "Hey, guy.  You're

11  either gonna do what we tell you to do, or we're gonna

12  keep harassing you."  That's not my words.  That's

13  theirs.  Would you like to see the video for that?

14      Q.   The --

15      A.   Timestamp it if we can.

16      Q.   The next paragraph, well, after the discussion,

17  identification of Kamal, states that it was also found

18  Robert Jones III intentionally and willfully lied about

19  the last time his son was seen by him.  He initially

20  advised he did not see him since they returned to town

21  and his son jumped from his truck.  Do you know what

22  that's about?

23      A.   Yeah.  It's a made up lie just like the rest of

24  it.

25      Q.   Okay.  Was it true that Robert Jones Junior was

1    frequenting the address on Headsail at that point in

2    time?

3          A.    My son the day the after Christmas?

4          Q.    Well, the question is did he frequently visit

5    that residence, either live there or otherwise?

6          A.    My son lived with me.

7          Q.    Okay.  Did you believe at the time this

8    occurred on December 26, 2015, when you were arrested,

9    that the deputies had acted wrongfully?

10         A.    Yes.  Why were they at my house at 11:00 at

11   night?

12         Q.    Well, did you believe that they had arrested

13   you without probable cause?

14         A.    Absolutely.  What were they doing peeking

15   through my windows at 11:00 at night?  Just saying.

16               (Exhibit 46 was marked for identification.)

17   BY MR. POULTON:

18         Q.    All right.  46 is a CAD report dated December

19   29, 2015.

20         A.    Three days later.

21         Q.    The nature of the field is SO investigation,

22   but there are -- let's see.  I don't see any other

23   comments there.  Do you have an independent recollection

24   of that event?

25         A.    Just more harassment.

1    Q.   How long were you in jail, by the way, on that

2   arrest on the 26th?

3    A.   I bonded myself out immediately.  I probably

4   served a day in jail for each time they put me there.

5    Q.   You were in jail roughly a day?

6    A.   A day.

7    Q.   You had to bond out and go through the booking

8   in and out?

9    A.   Yes, every time.

10    Q.   How much bond did you pay for that arrest?

11    A.   I don't know offhand.

12    Q.   Did you get it back after the State nolle

13   prossed?

14    A.   No, no.  I never got anything back.

15    Q.   Did you have to pay the full amount --

16    A.   Yes.

17    Q.   Let me finish.  Did you have to pay the full

18   amount of the bond or 10 percent?

19    A.   I paid the -- I paid my boss back.  My boss

20   bonded me out, and I believe he paid the full amount,

21   and I paid him back.  So I was never paid back by

22   anybody, but I paid my back boss for the funds.

23    Q.   All right.  Is there any documentation of the

24   amount of bond that was paid or who paid it to your

25   knowledge?

1      A.   I may have a paycheck where they removed the

2   amount of funds from my paycheck to pay off the bond,

3   and I believe there was a bond statement somewhere

4   showing what was paid.  I just --

5      Q.   There probably is.  I'm just -- part of the

6   process here is to --

7      A.   Document.

8      Q.   -- sort of figure out what documents might

9   exist --

10      A.   Sure.

11      Q.   -- to show what the amount was because you're

12   telling me you don't remember.

13      A.   Yeah, I don't remember.  I was -- again, this

14   is -- all these things happened in such a short amount

15   of time that it's hard to place an exact amount on each

16   and every thing that happened.

17           (Exhibit 47 was marked for identification.)

18   BY MR. POULTON:

19      Q.   All right.  So Exhibit 47 is --

20      A.   Same day six hours later -- five hours later.

21           MR. JOHNSON:  It's just -- I know -- I totally

22      understand how you're feeling like you just --

23      you're seeing the document and you want to explain

24      it.  It's just the format of this is question and

25      answer, and I think it will just be easier --

1          THE WITNESS:  Sure.

2          MR. JOHNSON:  -- to let him ask his questions.

3    BY MR. POULTON:

4     Q.    The date of it is December 29, 2015, and the

5    nature says prolific offender check.  It says no contact

6    in the notes section.  Do you see that?

7     A.    Uh-huh.

8     Q.    Do you have a recollection of any particular

9    visit at -- what would that be -- about 9:00, 2100,

10   9 p.m.?

11         MR. JOHNSON:  That is 9:46 p.m..

12   BY MR. POULTON:

13    Q.    Yeah, 9:46 p.m. on that particular day?

14    A.    You mean the same officer that showed up five

15   hours beforehand?  Yeah, I -- I don't -- I -- they all

16   seem the same to me.  I don't think they ever left.

17    Q.    So the answer though is you don't have a

18   particular recollection of that?

19    A.    No specific recollection.  One, two, three,

20   well, five officers who were there I guess.

21         (Exhibit 48 was marked for identification.)

22   BY MR. POULTON:

23    Q.    All right.  So number 48 is also listed as a

24   prolific offender check on the nature field.  The date

25   is 12-30-15.  The notes section says, "On TAC 3-no

1    status checks needed.  STAR32 and STAR31 will be in UC

2    vehicles-not on AVL."

3         A.    Unmarked.  Unmarked?

4         Q.    It could be undercover.  I'm not certain.

5         A.    Yeah.

6         Q.    But my question to you is whether or not you

7    recall having an interaction with Pasco deputies that

8    correlates to this CAD report on December 30, 2015?

9         A.    Other than the constant harassment, no, nothing

10   specific about that.

11        Q.    Okay.

12        A.    This is a day after the other one; right?

13   Yeah.

14             (Exhibit 49 was marked for identification.)

15   BY MR. POULTON:

16        Q.    All right.  And Exhibit 49 is a CAD report for

17   -- a CAD report for December 31, 2015.  Nature field is

18   prolific offender check, and the notes state no one

19   home.  Do you have any recollection of any incident on

20   that date?

21        A.    This date would be the day after Exhibit 48.

22   This is New Year's.  Yeah, this is New Year's Eve.  I

23   don't have any recollection of this.

24        Q.    Okay.

25             (Exhibit 50 was marked for identification.)

1    BY MR. POULTON:

2        Q.   All right.  So this is -- Exhibit 50 is a CAD

3    report dated December 31, 2015.  Once again, nature is

4    prolific offender check, and note is no contact.  Do you

5    have any knowledge of anything that went on on this

6    particular visit?

7        A.   So this one was five hours after the last

8    Exhibit 49.  16:07 which makes it 4:07.  On the same day

9    11:34, no, I don't -- nothing stands out from that other

10   than them showing up multiple times a day.

11            (Exhibit 51 was marked for identification.)

12            MR. POULTON:  I might have gotten these

13       reversed in time.  Yeah, I did.  No, I didn't.

14            MR. JOHNSON:  No, I think you did.

15            MR. POULTON:  Yeah, I got it right.

16            MR. JOHNSON:  No, I think this one is earlier

17       than -- 51 is two hours earlier than 50.

18            MR. POULTON:  I don't think they are.  I don't

19       think they are.  I think 50 is at 11.

20            MR. JOHNSON:  No, you're right.  You're right.

21       I'm sorry.  You're right.

22            MR. POULTON:  This needs to be on the record

23       though.  Assuming the timestamp is correct, 50 was

24       at 11:34 in the morning, and 51 was at 7:41 in the

25       evening.

1           MR. JOHNSON:  You're correct.

2           THE WITNESS:  Right.  It was 49 that was wrong.

3       49 shows at 4:07 in the afternoon, and 50 shows at

4       11:30 in the morning.

5           MR. JOHNSON:  There we go.

6           THE WITNESS:  That's the mistake.

7           MR. POULTON:  49 and 50 maybe should be

8       reversed chronologically.  We can take care of that

9       later, Rob, when we put together the --

10          MR. JOHNSON:  It'll be confusing but, yeah, if

11      we do a consolidated exhibit, we can switch that.

12          MR. POULTON:  Right.

13      A.   So this one's at 7:41 on the same day New

14  Year's Eve.

15  BY MR. POULTON:

16      Q.   Right.  Well, assuming the timestamp is

17  correct.

18      A.   So this would be the third incident the same

19  day.

20      Q.   The nature filed states prolific offender

21  check, and the note states, "Upon arrival, I could see

22  Bobby III and a teenage female inside the home.  Once

23  they saw me, they shut off all the lights and refused to

24  come to the door.  We banged on the doors and windows,

25  but they would not answer and would not come out.

1    Attempt to contact Bobby Jones III and Bobby Jones IV."

2    Do you see that?

3         A.    Yeah, I see it.

4         Q.    Is that --

5         A.    Normal behavior?  Yeah.

6         Q.    Hang on.  Do you have a memory of this

7    particular interaction on December 31st?

8         A.    I don't have any recollection of this happening

9    on December 31st.

10        Q.    You've had -- you've testified before that

11   there were times when they banged on the doors and

12   windows.  Is this an example of what you're talking

13   about?

14        A.    This is one example of what I was talking

15   about, yes.

16        Q.    Okay.  Okay.  When that would happen, would --

17   and it -- did you refuse to come outside any particular

18   time?

19        A.    Only if it was at 11:00 at night and later.

20        Q.    Okay.  Well, this indicates that it was at 7:41

21   p.m.

22        A.    Uh-huh.

23        Q.    And you know you turned -- this indicates that

24   who -- who -- the people that were in the house when

25   they saw him turned off the lights and refused to come

1    to the door.  Is that what you would do though is turn

2    off the lights and refuse to come to the door?

3         A.   I mean, not me.  I'd be the only one that would

4    answer the door.  It looks like here on New Year's Eve

5    at 7:00 in the evening I may have brought my family out,

6    and because Bobby had an ankle monitor on, he wasn't

7    allowed to go anywhere, so we kept him at the house.  I

8    guess maybe he had a girl or a friend come over and it

9    happened while we were not there --

10        Q.   Right.

11        A.   -- and he decided to hide because he didn't

12   want to be arrested.

13        Q.   Well, that -- and that actually -- when it says

14   upon arrival I could see Bobby III and a teenage female

15   in the home, you're saying that may have actually been

16   your son Bobby IV?

17        A.   Right.  I think that's what they meant to say.

18        Q.   Okay.  So you would not have been home for this

19   incident which is marked Exhibit 51 on December 31,

20   2015?

21        A.   Right.

22        Q.   Do you want to take a quick break or keep

23   going?

24        A.   Keep going, man.

25        Q.   We don't care what your lawyers think, whether

1    they're ready or not.

2         A.    So we're finally through 2015?

3         Q.    We're through 2015.  Yes, sir.

4              MR. JOHNSON:  51 exhibits later.

5    BY MR. POULTON:

6         Q.    Except we have to -- well, not all of them are

7    incidents don't forget.  All right.

8         A.    They're incidents of harassment.

9         Q.    All right.

10             (Exhibit 52 was marked for identification.)

11   BY MR. POULTON:

12        Q.    All right.  So Exhibit No. 52 is dated January

13   2, 2016.  This is listed in the nature field as

14   information for deputy.  The caller was Maria Kammenos,

15   K-A-M-M-E-N-O-S.  Do you know who Maria Kammenos is?

16        A.    No, no.

17        Q.    Okay.  Do you know what the nature of this call

18   was, what had gone on?

19        A.    I don't understand why the address is my

20   address and it has some other unknown person.

21             MR. JOHNSON:  It indicates the STAR team had

22        asked this person to call if somebody was at your

23        address with the truck.

24             THE WITNESS:  Oh.  I see they were talking to

25        the neighbors and told the neighbors that if they

1       saw the white truck, have them call.

2   BY MR. POULTON:

3       Q.   Okay.  And whose -- did you have a white truck?

4       A.   Yes.

5       Q.   All right.  And this indicates that you had an

6   active warrant at that time?

7       A.   Right.

8       Q.   Do you know what that warrant was in relation

9   to?

10      A.   I mean, I could speculate right now what it is,

11  but honestly I'll wait till you figure it out here in a

12  second because we'll figure it out together.

13      Q.   Well, this indicates you had a warrant for your

14  arrest out on January 2, 2016, as of then; right?

15      A.   Yes.  Does it say what the warrant's for?

16      Q.   That's -- I wanted to know if you knew.

17      A.   I think I found out after I went to jail.

18      Q.   Okay.  What is your understanding?

19  Understanding that we still have other documents to go

20  through, but what's your understanding of what it was

21  for?

22      A.   It was for an ordinance violation that I had

23  never received a actual warning for that had a court

24  date that I was demanded to be at, but because I never

25  received the document or the warning -- and I have seen

1    the document that does not have my signature on it, but

2    that's what happened.  The court date came and went.  I

3    didn't go to the court date because I had no hearing

4    notice.  They came out and they knew what they were

5    doing.  They obviously came and said, "Hey, look.  When

6    you see this guy, arrest him."

7        Q.   Okay.  The original code violation, do you know

8    what it was for?

9        A.   Overgrown grass.

10       Q.   Okay.  Did you have any conversation with Bobby

11   Jones Junior, Robert Jones IV --

12       A.   Uh-huh.

13       Q.   -- to the effect that he had taken the code

14   violations and was supposed to give them to you?

15       A.   No, because I have no recollection that there

16   was any code violations to begin with.  If I'd a known,

17   I would've said, "Hey, you get any code violations, give

18   them to me."

19       Q.   Okay.

20       A.   Nobody let me know that any had been received.

21   Therefore, I had no idea.  And they don't -- they don't

22   send any notices.  The notice is the warning.  If I

23   didn't receive the warning, I didn't receive the notice.

24            (Exhibit 53 was marked for identification.)

25   BY MR. POULTON:

1        Q.   All right.  So this is fifty -- Exhibit No. 53

2    is dated January 3, 2016.  It's listed as a prolific

3    offender check, and the notes state, "Observed two kids

4    walking around in front of the sliding glass door at the

5    front of the house.  Did not observe offender Bobby

6    Jones or his father.  Should be noted the white pickup

7    truck is parked in front of house."  So that would have

8    been your pickup truck is what you're telling us; right?

9        A.   Yeah, because I was in jail.

10       Q.   You were in jail on January 3rd?

11       A.   The next day after they arrested me.  They

12   arrested me the day before on this warrant -- on this.

13       Q.   Oh, okay.  So they arrested you on January 2nd?

14       A.   Second, yes.  And then the next day they wrote

15   this report.  Yes, my truck was there because I was

16   still sitting in jail.

17            (Exhibit 54 was marked for identification.)

18       A.   And this is the day after, the 4th.

19   BY MR. POULTON:

20       Q.   All right.  If you'll take a look at -- this is

21   Exhibit 54.  It's an incident report dated January 4,

22   2016, and if you'll take a look at page 3.

23       A.   Yes.  Yes.

24       Q.   Okay.  So just a few minutes ago you testified

25   that on January 2nd you were in jail on the failure to

1   appear warrant that they arrested you then?

2        A.   Uh-huh.

3        Q.   Hold on.  Having looked at this, does this

4   refresh your recollection that perhaps the date of

5   arrest was January 4, two days later?

6        A.   No, they arrested me two days later for a

7   different ordinance violation.

8        Q.   Okay.

9        A.   They legitimately -- they were harassing me.

10  They told me they were going to do it and they did it.

11       Q.   So this was --

12       A.   Every single day for a week now they came to my

13  house and arrested somebody --

14       Q.   Okay.  Did you --

15       A.   -- up to this point right here.

16       Q.   Had you received this --

17       A.   No.

18       Q.   Hold on.  Let me finish.  Had you received this

19  code violation documentation?

20       A.   No.

21       Q.   And so you were arrested and you had a bond of

22  $113?

23       A.   That's what it says.

24       Q.   All right.  How long did you stay in jail for

25  that on January 4th?

1      A.   I mean, I tried to bond out immediately and

2    probably got out the next day.

3      Q.   Okay.  Do you know what happened to this

4    particular code violation?

5      A.   Yeah.  It got paid off and then that was it.

6      Q.   So the hundred and -- or the code violation

7    itself, the fine was paid out of the $113?

8      A.   Yes.

9      Q.   Okay.  On any of those code violations where

10   they used bond money from failure to appear bond for an

11   arrest if you paid a bond, as I understand it, you're

12   telling me -- and I'm not arguing with you, but if I

13   understand correctly, each time you had a code violation

14   there was later an arrest for failure to appear?

15     A.   So I -- can I talk?  I mean --

16     Q.   Well, let's start there.  How many different

17   times were you arrested for code violations?

18     A.   Five.

19     Q.   Five times or five code violations?

20     A.   Five times I was arrested for different code

21   violations.

22     Q.   In Pasco County?

23     A.   In Pasco County.

24     Q.   Okay.  On each of those five, you failed to

25   appear; correct?

1    A.   No.   On each of those five the only one that

2    you showed me -- the only ordinance violation I signed

3    my name to was that one document.   That's the only

4    warning I ever received.

5         These arrests here, they're for claimed court

6    dates for ordinance violations that I was supposed to

7    have received, but even up to this point you haven't

8    showed me any document or where there was a warning

9    received for any of this.

10   Q.   Well --

11   A.   I mean, you can see that I was arrested clearly

12   for an ordinance violation that they claimed that I

13   failed to appear for a warning that you're not even

14   gonna be able to show me that has any kind of a clue

15   that I was actually served notice.

16   Q.   Well, we'll go through them.   I think I have

17   the documentation that you're asking about, but I'm just

18   trying to get your memory here to start.

19   A.   The memory is this is the sixth or seventh day

20   in a row where they came by to arrest somebody, and this

21   time it was me.

22   Q.   Okay.   On failure to appear because you did not

23   show up at the code enforcement hearing?

24   A.   Because I never received a code -- I never

25   received any warning.   I never received it, period.

1    Q.   Was the arrest pursuant to a warrant for

2    failure to appear?

3    A.   That was the arrest.

4    Q.   Okay.  And you say that happened five times?

5    A.   Over and over again, yeah.

6    Q.   And each time you had to pay a bond to get out

7    of jail for the failure to appear; correct?

8    A.   Yes.

9    Q.   And am I correct that each time your

10   understanding is that what the judge did was to take the

11   money that you paid for the bond and apply it to the

12   code violation?

13   A.   Correct.

14   Q.   Did you ever appeal that?

15   A.   There's no appeal process.  There is none.  You

16   can hire an attorney if you want, but you can't get that

17   money back.  There is no process.

18   Q.   That's not my question.  My question is did you

19   ever appeal any of those code violations or those --

20   taking of the money from the bond and applying it to

21   the code violations?

22   A.   Not until now.

23        (Exhibit 55 was marked for identification.)

24   BY MR. POULTON:

25   Q.   Actually, that might be the same thing.

1      A.   It's definitely the same date.

2      Q.   Yeah, it's the same.  Before we get into this

3   particular exhibit, I think it's the same -- actually I

4   know it's the same.  It's got the same case number, but

5   let me ask you.  You were saying as the court reporter

6   was marking the exhibit that you don't know how you're

7   supposed to appeal --

8      A.   Something that's unappealable.

9      Q.   Okay.  Let's be specific about what you could

10   have appealed and couldn't.  Okay?  Did you ever make

11   any attempt to --

12      A.   I wrote the judge a letter twice.  I don't know

13   what else to do.

14      Q.   Did you believe at the time that the code

15   violations were unjustified?

16      A.   Yes.

17      Q.   And that was in 2015 and 2016?

18      A.   Yes.

19      Q.   All right.  I think -- I think Exhibit 55

20   simply correlates to -- well --

21      A.   It's already -- I --

22      Q.   Oh, you already put it in there?

23      A.   Yeah.

24      Q.   This look likes the actual arrest affidavit

25   that correlates to that 1-4-2016 arrest on failure to

```
 1    appear with $113 bond; correct?

 2        A.   Uh-huh.

 3        Q.   You need to say yes or no for the court

 4    reporter.

 5        A.   Yes.

 6             MR. POULTON:  Rob, you're -- feel free if

 7        there's something that you guys want to point out

 8        because I'm -- we're -- I'm trying to get this in

 9        cohesive form for all of us.  So don't feel

10        constrained to --

11             MR. JOHNSON:  Okay.  Thank you.

12             (Exhibit 56 was marked for identification.)

13             (Off-the-record discussion.)

14    BY MR. POULTON:

15        Q.   All right.  So we're back on the record, and in

16    the break counsel pointed out to me that we had a couple

17    of documents mixed up.  So just to clarify, Exhibit 54

18    is now a total of five pages, the first four of which

19    are the incident report for Case Number 16000387 on

20    1-4-2016.  The fifth page is the Pasco County complaint

21    affidavit that correlates to that particular incident,

22    and actually it's the same language I believe

23    substantively as in the incident report itself.  So it's

24    just a repeat of that information.  We're just keeping

25    that together.
```

1              And then our new number 55 is the CAD report

2     for 1-4-16 at 16:02:45.  Okay?

3              COURT REPORTER:  Was that previously marked as

4        something else?

5              THE WITNESS:  Chronological order.

6              MR. POULTON:  We'll have a new 56.  We're going

7        to get to it.  Right now we have a 54 and a 55.  We

8        don't have a 56.

9              MR. JOHNSON:  Just off the record.

10             (Off-the-record discussion.)

11    BY MR. POULTON:

12       Q.   And just to elaborate a little bit, Exhibit No.

13    55, which is the CAD report on January 4, 2016 with a

14    timestamp of 16:02:45 chronologically would be in front

15    of Exhibit 54, which is the incident report dated

16    1-4-2016 at 16:23.  Okay?

17       A.   Just so that I'm assured with the documents,

18    they arrested me first for the ordinance violation

19    failure to appear, and then twenty minutes after they

20    arrested me they did a prolific offender check according

21    to the documents.

22       Q.   I think it's actually the reverse.  I think

23    that according to the document, the CAD report, the

24    prolific offender check occurred at 16:02:45 if you --

25    if assuming this timestamp is correct and that it was a

1    prolific offender check that occurred on that date and

2    at that time, which would be approximately 20 minutes

3    prior to service of the arrest warrant for failure to

4    appear.

5        A.   Okay.

6        Q.   And I just would also point out just so we keep

7    it straight in our own heads when we're reading this

8    later and trying to put everything in order is that it's

9    different deputies.

10       A.   Yeah.  Always different deputies.

11       Q.   Well, what I mean is it wasn't necessarily an

12   extension of the prolific offender check.  We're just

13   kind of speculating at that point.  It's just a note.

14   Okay?

15            MR. JOHNSON:  Actually, I mean, it's not

16       actually a different deputy.

17            MR. POULTON:  Oh, isn't it?

18            MR. JOHNSON:  No.  If you look at the CJIS

19       number Collins you'll see it's 4834 on the incident

20       report.  Then if you look at the CAD report, you'll

21       see that STAR34 has the same CJIS number.  It's 4834

22       and arrived the first to arrive at 4:02 p.m.

23   BY MR. POULTON:

24       Q.   Okay.  And just so we're clear.  This arrest

25   which occurred on January 4, 2016, you believed was

1    wrongful --

2        A.   I do.

3        Q.   -- at the time?  And you believed that at the

4    time?

5        A.   Yes.

6        Q.   And you believed that they arrested you without

7    probable cause?

8        A.   I do.

9        Q.   Did you believe that at the time?

10       A.   Yes.

11       Q.   And that was also true of the arrest two days

12   earlier on January 2, 2016; correct?

13       A.   I had never received any notice.  So,

14   therefore, I don't know how I failed to appear.

15       Q.   My point is or my point -- my question is did

16   you feel at the time that you were being unlawfully

17   arrested?

18       A.   Yes.

19       Q.   Okay.

20            (A new document was marked at Exhibit 56 at

21       this time.)

22   BY MR. POULTON:

23       Q.   All right.  This is labeled as a prolific

24   offender check.  This is Exhibit 56 dated February 10,

25   2016.  The notes state attempted to make contact with

1    Robert Jones.  Doesn't indicate which one, but it says,

2    however, no one would answer the front door.  There were

3    no cars in the driveway.  The lights were on in the

4    house however.

5         Were you -- do you have any recollection of

6    this particular event?

7         A.   No.

8         Q.   Okay.

9              (Exhibit 57 was marked for identification. )

10   BY MR. POULTON:

11        A.   Valentine's Day.

12        Q.   All right.  57 is a CAD report dated February

13   14, 2016.  The nature field is marked as prolific

14   offender check, and the notes are -- I think it's I2,

15   which is the unit prolific offender check at 3810

16   Headsail Drive, New Port Richey.  It says first shift

17   Deputy Holcomb attempted contact with Robert Jones, date

18   of birth of ███████.  And that's Robert Jones IV;

19   correct?

20        A.   Correct.

21        Q.   Negative results.  Young child came to the

22   front sliders, closed the blind, did not return.  Prior

23   dealings with Robert's father Robert Jones and it's

24   ███████.  That can't be right.

25        A.   That's a typo.

```
 1        Q.    Okay.  What year is it?

 2        A.    ███.

 3        Q.    ███, okay.  But it's ███████████████?

 4        A.    Uh-huh.

 5        Q.    You need to say yes or no.

 6        A.    Yes.

 7        Q.    Had shown disdain for law enforcement and

 8   highly likely he was inside ignoring our presence.

 9              Do you happen to remember this incident --

10        A.    No.

11        Q.    -- in particular?  No?  Thank you.

12              (Exhibit 58 was marked for identification.)

13   BY MR. POULTON:

14        Q.    All right.  58 is labeled a prolific offender

15   check February 17, 2016.  The notes state attempted

16   contact with Bobby Jones.  No answer at the door.  No

17   vehicles present.  Small amount of junk and debris in

18   the yard.  In reference to prolific offender Bobby

19   Jones.  That's it.

20              Do you have any particular knowledge as to what

21   occurred on this date?

22        A.    No, just more harassment.

23        Q.    Well, do we even know -- I mean, for example,

24   do we even know if they went -- other than it says no

25   answer at the door and no vehicles were present, other
```

1    than knocking at the door, do we know if they did

2    anything else?

3        A.   It seems like harassment to me.  I mean, they

4    weren't investigating a crime, so I don't know why

5    they're knocking on my door, knocking on my windows.

6        Q.   Well, in this particular case it says knocking

7    at the door; right?

8        A.   Which means they were knocking at the windows.

9        Q.   Well, how do you know if you weren't there?

10       A.   I'd been there plenty of times to see what they

11   did.  They don't stop by just knocking on the door.

12       Q.   But I'm correct that in this particular

13   instance you don't have any knowledge --

14       A.   I don't remember exactly what happened.

15       Q.   Am I correct that you don't have knowledge that

16   banging on the windows, for example, happened, do you?

17       A.   In this case.

18       Q.   I'm right?  You don't know that, do you?

19       A.   In this case I don't know.

20       Q.   Okay.

21           (Exhibit 59 was marked for identification.)

22   BY MR. POULTON:

23       Q.   Okay.  My point is it stands to reason that if

24   you were not there and you have no memory of this event,

25   you cannot testify that they banged on the windows on

1    that occasion; correct?

2        A.    Right, unless testimony by the officer states

3    he banged on the door.

4        Q.    Okay.

5        A.    I don't have to know that to read that, and

6    that's exactly what you're showing me to read.  Yes, he

7    banged on the door at least -- at the very least for a

8    fact.

9        Q.    All right.  Do you have any knowledge that on

10   that day he banged on the windows?  Do you have any

11   personal knowledge of that?

12       A.    Not on the windows.

13       Q.    Thank you.

14             All right.  So Exhibit 59, this is February 24,

15   2016, stated as a prolific offender check, but there's

16   no note there.  Does this fall into that camp of you

17   don't have any particular knowledge of that date?

18       A.    Just more harassment.

19             (Exhibit 60 was marked for identification.)

20   BY MR. POULTON:

21       Q.    All right.  Exhibit 60 is a CAD report dated

22   February 29, 2016, and the nature field is SO

23   investigation.  The note states negative contact.  Do

24   you have any personal knowledge of what occurred on that

25   particular date at 3810 Headsail Drive as far as

1   deputies are concerned?

2       A.   Nope, no -- none.

3            (Exhibit 61 was marked for identification.)

4   BY MR. POULTON:

5       Q.   All right.  So 61 is a prolific offender check

6   according to the nature field on 3-1-16.  The notes here

7   indicate that at approximately 0150 hours on 3-1-16

8   they -- somebody -- this particular unit conducted

9   surveillance on Robert Jones' residence.  I did not

10  observe any activity at the residence.

11           Do you have any knowledge of what occurred on

12  that incident other than what's in the CAD report?

13      A.   Just the CAD report states 1:45.  At 1:45

14  everybody would have been at school or at work, which

15  would make sense nobody was there.

16           MR. JOHNSON:  Actually it's military time.

17           THE WITNESS:  Oh.

18  BY MR. POULTON:

19      Q.   Assuming the timestamps are correct --

20      A.   2:00 in the morning?

21      Q.   Right.

22      A.   I'm sure everybody was asleep.

23      Q.   All right.  So you don't have any particular

24  knowledge?

25      A.   No particular knowledge, no.

1      Q.   All right.  62.

2           (Exhibit 62 was marked for identification.)

3    BY MR. POULTON:

4      Q.   All right.  62 is also labeled as prolific

5    offender check for March 4, 2016.  The note says 54

6    contact, movement inside, would not answer the door.

7           Do you know if you were home during this time?

8    This would have been at 3:00 in the afternoon.

9      A.   Without exactly knowing what I was doing that

10   specific date, again, I can tell you 3:00 in the

11   afternoon I would have most likely been at work, and if

12   there was anybody at home, it would have been -- it

13   would have been most likely one of the children --

14     Q.   Okay.

15     A.   -- just getting home from school.  At 3:00 it

16   could only be Bobby.

17     Q.   Do you -- Bobby would have been the only one

18   who would have been home at 3:00 in the afternoon?

19     A.   He's the only high schooler.  High school gets

20   out before 3:00  they're the only ones that do.

21     Q.   The other children would have gotten out later

22   in the day?

23     A.   3:50, 4:00, somewhere around there.

24     Q.   Do you have any knowledge of what occurred in

25   this incident other than what's in the CAD report?

1      A.   I mean, they're knocking on the door it states,

2   and they see movement inside.  So I'm guessing they were

3   staring through windows.  I have no recollection of that

4   exact time and what they were doing there.

5           (Exhibit 63 was marked for identification.)

6   BY MR. POULTON:

7      Q.   All right.  Exhibit 63 is a CAD report dated

8   March 4, 2016.  The nature field indicates -- did I make

9   another mistake?

10     A.   No, no.  I'm just --

11     Q.   Okay.  Okay.  The nature field indicates SO

12  investigation, and the note just says Robert Jones.  Do

13  you know whether they actually made contact with either

14  you or with Robert Jones IV on March 4, 2016?

15     A.   I mean, again, just from this report, looking

16  at the timestamp to try to figure out where I might have

17  been that day, this is the same exact date.  Is it same

18  exact officer?  Different officers.

19     Q.   Well --

20     A.   I'm just trying to gather heads or tails.

21          MR. JOHNSON:  There are multiple officers.  So

22      it's some of the same officers.

23  BY MR. POULTON:

24     Q.   Assuming the timestamp is correct on Exhibit 63

25  it's 8:30 in the evening?

1      A.   Yeah.  I think these officers never left.

2  They're the same exact ones for five years.  The date

3  time on Exhibit 62 states that it was 3:02, and if you

4  look it's STAR31, 34, 30.

5      Q.   Well --

6      A.   And it's the same exact ones on this side, and

7  they date stamped this exactly five hours and twenty --

8  five hours and thirty minutes -- thirty-one minutes

9  later.

10      Q.   I appreciate your comments, but just so the

11  record is clear, at the bottom of Exhibit 62 it has the

12  radio log, and the deputies are clearing that visit at

13  3:02 at approximately 3:19, another one at 3:27,

14  others -- Yeah.  Well, actually it only looks like -- it

15  only looks like two arrived, STAR30 and STAR31, and they

16  both were gone within fifteen minutes it would appear

17  based on the radio log.

18           I just wanted to address your concern that they

19  might have been there for five hours.

20      A.   Well, because they normally did.  The times I

21  recognize it, they definitely did.

22      Q.   Well, you don't know that they did on that

23  date, do you?

24      A.   Not on this date, no.

25      Q.   64.

1              (Exhibit 64 was marked for identification.)

2    BY MR. POULTON:

3        Q.   All right.  So --

4        A.   The next day.

5        Q.   -- Exhibit 64 is a CAD report for March 5.

6    Nature field is SO investigation.  Note says attempt

7    contact Bobby Jones.  This would have been at 5:30

8    roughly.

9        A.   Uh-huh.

10       Q.   17:29:38 is the time.

11       A.   Uh-huh.

12       Q.   And it says attempt contact Bobby Jones.  Do

13   you know if any contact was actually made?

14       A.   I don't know.

15       Q.   Okay.

16             (Exhibit 65 was marked for identification.)

17   BY MR. POULTON:

18       Q.   All right.  So Exhibit 65 is identified -- is a

19   CAD report which identifies in the nature field as a

20   prolific offender check on 3-8-16.  It says attempt

21   contact Bobby Jones.

22       A.   Uh-huh.

23       Q.   Do you see that?

24       A.   I do.

25       Q.   Okay.  Do you have any knowledge of what

```
1    occurred on that particular date?

2        A.   Harassment.

3        Q.   I'm asking you if you -- if you had personal

4    knowledge of what occurred on that date?

5        A.   Just that they came out and it looks like they

6    tried to attempt to contact Bobby Jones.  They were

7    doing that every time, either me or him both the same

8    name.

9             (Exhibit 66 was marked for identification.)

10   BY MR. POULTON:

11       Q.   66, same question.  Just indicates prolific

12   offender check.  Doesn't even indicate a subject.  That

13   was on March 8, 2016.  Do you have any knowledge of what

14   occurred on that date?

15       A.   No, but it was 40 minutes after the last guy,

16   and it's a different person.  Yeah, it's exactly 40

17   minutes after the last person came by to do a

18   communications or event report.

19       Q.   When you keep making these comments about how

20   long it was --

21       A.   I'm just -- I'm looking specifically at the

22   documents you have me staring at to see if I can jar any

23   memory, and I remembered them coming multitude times a

24   day, and now this confirms it.  However, exactly what

25   they did is harassment.  That's all I can think of.
```

1   That's all they ever did.

2        Q.   And you're basing your comments on the timing

3   as based on what is written on the CAD report in the

4   upper right-hand corner; correct?

5        A.   But also by memory.  Memory serves me right,

6   they did come over more than one time on multitude of

7   occasions, and this was one of those times apparently,

8   and this I would have been home.

9        Q.   But you don't remember that particular one;

10  correct?

11       A.   It's hard to remember any specific one unless

12  they put me in handcuffs and put me in the back of a

13  police car.  Yeah, it's not --

14       Q.   Okay.  I'm not asking you why you might not

15  remember it.  I'm just asking you whether I am correct

16  that you do not have a specific recollection of that

17  particular visit?

18       A.   No.

19       Q.   Thank you.  Okay.

20            All right.  So number 67.

21            (Exhibit 67 was marked for identification.)

22  BY MR. POULTON:

23       Q.   And as we've going through these, you keep

24  describing it as harassment.

25       A.   No, I didn't describe it.  That's what they

```
 1   call it.  Their own officers, Pasco County Sheriff's

 2   Department said it, not me.

 3        Q.   Did you believe as --

 4        A.   I believed them.

 5        Q.   Did --

 6        A.   Yes.

 7        Q.   Did you believe as all this was occurring in

 8   2015 and on through until about May of 2016 when you

 9   moved -- did you believe that the attention that you

10   were getting from the Sheriff's Office was wrongful?

11        A.   Yes.

12        Q.   Did you feel that your constitutional rights

13   were being violated?

14        A.   I do.

15        Q.   I'm asking you if you felt that at the time?

16        A.   I did.

17        Q.   All right.  67 is labeled a prolific offender

18   check.

19        A.   And this was the same day at 11:00 at night.

20        Q.   March 8, 2016, the notes reflect on 3-8-16 I

21   responded to a prolific offender check for Robert Jones.

22   There was no activity at the home, and I did not make

23   contact with Robert.  Do you see that?

24        A.   Yes.

25        Q.   Do you have any reason to dispute what is
```

1    reported there?

2        A.   That they came by at 11:30 at night and nobody

3    responded, yeah, that's correct.  That's three times in

4    the same day.

5             (Exhibit 68 was marked for identification.)

6    BY MR. POULTON:

7        Q.   Before we move on to 68, you mentioned that

8    there were three visits on a particular day.  You seem

9    I don't know if angry is the right word, but let's say

10   bothered by that.

11       A.   That's definition of harassment.

12       Q.   Okay.  As we sit here today though, do you

13   remember being home for each of those three visits

14   yourself?

15       A.   I remember being home for a lot of visits that

16   we didn't answer the door for.  Do I remember what

17   specific days?  I don't.  But do I remember them coming

18   three times in a day?  I sure do.

19       Q.   Okay.

20       A.   Was it this day?  According to your paperwork

21   it was.

22       Q.   How many times -- how many different days did

23   they visit you three times in one day?

24       A.   We honestly never thought they ever left.  So

25   when you say did they leave or come back, legitimately I

1    seriously just thought they were hanging out at my house

2    because they were allowed to.

3        Q.   All right.  Let's keep going.  We're making

4    good progress here.  I think we can --

5        A.   Good.

6        Q.   -- try to move it along.

7             So 68 is labeled in the nature field as a

8    prolific offender check on 3-15-16.

9        A.   Were they checking on me for the prolific

10   offender check?

11       Q.   No.

12       A.   So they were checking on Little Bobby.

13       Q.   I've not seen anything in the paperwork to

14   indicate that you were ever designated as a prolific

15   offender.

16       A.   I just -- at this point I'm not sure if they're

17   doing a prolific offender check on me --

18       Q.   I understand.

19       A.   -- or my son.

20       Q.   I understand.  You just can't tell from the

21   paperwork is what you're saying; correct?

22       A.   Right.  Correct.

23       Q.   All right.  So do you have any knowledge of

24   what occurred during the prolific offender check as

25   reported on 3-15-16?

1      A.   No.

2      Q.   Exhibit 68 that was.  Okay.  So we're up to 69.

3           (Exhibit 69 was marked for identification.)

4  BY MR. POULTON:

5      Q.   This one's different.  Now document 69 is a CAD

6  report 3-15-16.  March 15, 2016 that is.  It's by

7  Bollenbacher who we've seen on other reports use the

8  prolific offender designation, but on this particular

9  one it's suspicious person.  Do you have any

10  recollection of a report of a suspicious person at your

11  home on mid March of 2016?

12     A.   No.

13     Q.   So you wouldn't be able to tell us what this

14  relates to?

15     A.   Harassment.  Does it say who called?

16     Q.   I don't see anything --

17     A.   Right.

18     Q.   -- there about exactly what it was.  So I was

19  just trying to find out from you whether you have any

20  information about what it might have been about?

21     A.   Well, I mean, according to all the other

22  paperwork, anybody living at my house was a suspicious

23  person.  So I mean --

24     Q.   So your speculation is that when they wrote

25  suspicious person, they were referring to somebody in

1    your house?

2        A.    I don't want to make assumptions.  You know,

3    they're obviously a suspicious person written on this

4    document with no name.

5        Q.    Okay.  I just wanted to know if you knew

6    anything in particular about that incident, and it

7    sounds like you don't.

8        A.    No.

9             (Exhibit 70 was marked for identification.)

10   BY MR. POULTON:

11       Q.    Similar to a number that we've seen before,

12   number 70 -- now this one is listed as SO investigation,

13   and on it's March 16th at 1:43 it would appear to be in

14   the morning.

15       A.    Yeah.  Three hours after the last communicated

16   report by Bollensbacher or Bollenbacher.

17       Q.    Well --

18       A.    Yeah, three hours later at 1:43.

19       Q.    Okay.  But let me ask you this.  The radio log

20   shows that he arrived -- only one person responded.  He

21   arrived at 1:43:52 and left at 1:43:58.  So according to

22   the timestamps he was there for six seconds.  Do you see

23   that?

24       A.    Yeah.  But if you look at Exhibit 69, it shows

25   the other guy received a phone call at 12:01 for the

```
 1    suspicious person.
 2        Q.   Well, and that is my --
 3        A.   And on scene at 2:28.  First to arrive to
 4    clear -- to clear -- to last clear.
 5        Q.   You're looking at Exhibit 69?
 6        A.   Exhibit 69.  It shows on scene at 2:28 in the
 7    morning.
 8        Q.   Well, now wait.  Where are you looking at?
 9        A.   I'm looking at the time from call received at
10    times.
11        Q.   Okay.
12        A.   Calls received 3-15.  This is at night, but
13    then it states -- oh, is that increment of time?
14        Q.   It would appear, Mr. Jones.
15        A.   So these two, they're not related to one
16    another, but they're on the same day or --
17        Q.   We don't know that, Mr. Jones.  My point is --
18        A.   I'm trying to figure out what the paperwork is
19    too.  I'm right here with you.
20        Q.   All right.  So assuming the timestamps are
21    correct and assuming the nature field is correct,
22    there's a report of a suspicious person.  We don't know
23    who --
24        A.   Yeah.
25        Q.   We don't know who made the call but --
```

1       A.   Well, at 2:00 in the morning the suspicious

2   person is David Murphy knocking on my door at 2:00 in

3   the morning three hours after the last guy left.

4       Q.   How do you know that?

5       A.   I don't know.  It says suspicious person.

6       Q.   Right.

7       A.   Maybe one guy was looking at the other guy

8   wondering what he was doing.  I mean, it was 2:00 in the

9   morning.  I'm sure it was really hard to see what he

10  looked like.

11      Q.   Do you have knowledge that somebody knocked on

12  your door at 2:00 in the morning?

13      A.   The only knowledge I have is this is

14  harassment.  I don't know exactly.

15      Q.   Okay.  Just listen.  Hear here me out.  Okay?

16           MR. JOHNSON:  Maybe we should take a break.

17           MR. POULTON:  Do you want to take a break?

18           MR. JOHNSON:  Yeah.

19           MR. POULTON:  Okay.  Let's do that.

20           MR. JOHNSON:  It might not be a bad time.

21           MR. POULTON:  Okay.  All right.  Five minutes.

22      Yeah, that's fine.

23           (Short break.)

24           (Exhibit 71 was marked for identification.)

25  BY MR. POULTON:

1        Q.    All right.  So Exhibit 71 is a CAD report,

2     excuse me, dated March 22, 2016.  Nature field is

3     prolific offender check.  The indication is there was an

4     attempted contact with Robert Jones, but he was not home

5     at this time, do you have any additional information

6     beyond what's on the CAD report for that incident?

7        A.    No.

8              MR. POULTON:  All right.  And I believe -- Hang

9        on because I think that this --

10             MR. JOHNSON:  Is actually part of this.

11             MR. POULTON:  That's what I think.  Yep.

12        That's what happened.

13             MR. JOHNSON:  Yeah, that's right.

14             THE WITNESS:  Good deal.  Caught it.

15             MR. POULTON:  So I'm going to put that with

16        this for the court reporter.  In fact, the pages

17        match up because it says one, two here and then

18        picks up at three.  So you're exactly right.

19             THE WITNESS:  Excellent.

20             (Exhibit 72 was marked for identification.)

21     BY MR. POULTON:

22        Q.    All right.  So Exhibit 72 is an incident report

23     dated 3-28-16, and it actually covers two days I

24     believe.  If you look at the reporting officer narrative

25     on page 3, this is from Mark Celeste who at the time I

1    believe was a code enforcement corporal, and he

2    indicates that approximately 3:28 -- I'm sorry -- on

3    3-28-16 at approximately 1349 hours, which would be

4    approximately 1:49 in the afternoon, he responded with

5    other units to 3810 Headsail in reference to multiple

6    county ordinance violations.  And he recounts observing

7    the jet skis on a trailer on one side of the house, and

8    the garage door open.  Did not see anybody there.  He

9    saw grass around the jet ski to be overgrown and over 12

10   inches tall.  He observed a long snake inside the garage

11   and go underneath a few objects.  He could not see the

12   house numbers clearly from the roadway due to an outside

13   light blocking them.  Knocked on the door.  Did not get

14   an answer.  Eventually they made contact with Robert

15   Jones Junior, who said that your fa- -- that you were

16   inside sleeping, and he asked if Robert Jones Junior

17   would wake you up, and he said he could not.  So he

18   wrote citations and gave them to Robert Jones Junior to

19   give to you, asked if he had any questions.  He said he

20   did not.  Photographs were taken, and then the corporal

21   additionally writes that he went back on 3-29-16, which

22   would be the next day, in reference to a search warrant.

23          Before we go on let me ask you this.  Do you

24   know anything about there having been a search warrant

25   on 3-29-16?

1       A.   Not until the morning that I woke up and tried

2  to go to work and they detained me.

3       Q.   Okay.  This 3-29-16 search warrant, was that

4  when you say that there were items taken and --

5       A.   Correct.

6       Q.   -- returned to you broken or not returned to

7  you at all?

8       A.   Correct.

9       Q.   All right.  We'll talk about that separately.

10  Okay?

11       A.   Okay.

12       Q.   Let's talk about right now the code violations.

13  I made contact with Robert Jones Sr. and asked him if

14  his son gave him the county ordinance citations.  Robert

15  Jones Sr. said he received the citations from his son.

16  I explained the citations to him and asked him if he had

17  any questions, and he did not.

18            Robert Jones Sr. was arrested and did not sign

19  the citations.  I later completed an affidavit of

20  attempted service.

21            Let me ask you this first.  Did you get the

22  citations from --

23       A.   No.

24       Q.   Let me finish.  Okay?

25            Did you receive the citations that were issued

```
 1    on March 28th for the grass being over 12 inches tall

 2    and the jet ski violations?  Did you get those from your

 3    son?

 4        A.   No.

 5        Q.   You're sure?

 6        A.   I'm positive.

 7        Q.   Did you tell the deputy on March 29, 2016, that

 8    you had received the citations?

 9        A.   No.

10        Q.   You're certain?

11        A.   I never received any citations from anyone.

12        Q.   And you wrote a letter to the judge saying that

13    you didn't get the citations?

14        A.   Correct.

15        Q.   And that's why you didn't show up?

16        A.   Correct.

17        Q.   And that's why the failure to appear was

18    written?

19        A.   Yes.

20             MR. POULTON:  Give me -- can I have the room

21        for just a couple minutes?  Because I have to figure

22        out an issue here on this computer thingy.

23             (Short break.)

24             (Exhibit No. 73 was marked for identification.)

25    BY MR. POULTON:
```

1    Q.   So Exhibit 73 is going to be a video -- a body

2    cam video extraction 1.116012033.

3         All right.  Just so we're clear, the letter

4    that you wrote to the judge and what you're telling me

5    here is that you did not know of the code violations for

6    the tall grass and for the jet skis prior to the hearing

7    on those, and that's why the failure to got done?

8    A.   Correct.

9    Q.   Okay.

10   A.   Well --

11   Q.   Go ahead.

12   A.   We haven't admitted my letter into exhibits;

13   right?

14   Q.   All right.

15        MR. JOHNSON:  We think we did, or at least one

16        of them.

17   BY MR. POULTON:

18   Q.   No, no, no.  There's a second letter.  There's

19   a more elaborate one.  We'll get to that in a minute.

20   A.   Okay.

21   Q.   Although, if you would like to talk about it

22   first, we could do it right now as far as I'm concerned.

23   A.   No, because it's going to -- it's all right.

24   Q.   The letter speaks for itself.  In there you,

25   again, tell the judge that you did not know that you

1    needed to be in court.

2        A.   Well, the law states a blank means that no

3    warning has been issued, therefore, no habeas corpus

4    shall be issued.   They needed to issue an actual notice

5    to me that there was a hearing because it was unsigned,

6    but go ahead.

7        Q.   But you --

8        A.   No, it doesn't matter.   The law states if it's

9    unsigned, you have to have served notice.

10       Q.   But you've testified to me and you told the

11   judge that you just didn't even know about the code

12   violations.

13       A.   I had no idea.   Well, I mean, I had no idea of

14   the violations.

15       Q.   And where the deputy said that on 3-29 when he

16   came back that you said that he -- you received the

17   citations from your son, it's not -- you're testimony is

18   that is not true?

19       A.   Yeah.   I'd never -- I didn't receive any.

20       Q.   Okay.   There's no audio until a ways.   I'll go

21   up to about 30 seconds.

22           (Video was played at this time.)

23       A.   Oh, this is when they served the warrant at the

24   house; right?   Look at all those cops.

25           (Video was played at this time.)

1    BY MR. POULTON:

2        Q.    All right.  So from about one minute to 1:40

3    there's conversation with you from the deputy.  He asks

4    you whether you received the citations.  There's

5    discussion of you not coming out the day before.  You

6    said -- it was reference the tall grass, the jet skis,

7    the no numbers on the house, and you said you had them

8    and they were in your back pocket, and you were reminded

9    of the court date; right?

10       A.    All I -- what I see here is they're talking

11   about things that I had been served tickets for in the

12   past, and what I'm understanding is that I had received

13   notices of citations, and they're in the original

14   exhibits for the jet ski trailers.  They're asking for

15   things that I've been cited for within the last six

16   months already.

17            Now as far as the citations that I received, I

18   hadn't seen citations still up to this point.  I mean,

19   they were handed to me and I was put in handcuffs.  They

20   basically asked Bobby, they said, "Bobby, did you give

21   your dad those papers?"  And he said, "No."  Said, "Why

22   not?  They're still sitting right there."  So he grabbed

23   the papers and he said, "Dad.  They gave me these

24   yesterday."  I had my hands behind my back all day from

25   7 a.m., so they shoved them in my back pocket.

```
 1          Q.    So you're saying the deputies gave you the
 2     citations?
 3          A.    They -- the ones that put them in my back
 4     pocket.
 5          Q.    Do you agree with me that the deputy told you
 6     what the court date was?
 7          A.    I heard something come out of his mouth saying
 8     some dates about some kind of court, but at this time
 9     here I don't think the one minute and 40 seconds really
10     justifies what's happening at this moment.  At this
11     moment there's legitimately 80 police offices at my
12     house destroying everything I own.
13          Q.    Well, here's --
14          A.    I'm more worried about what they're going to do
15     to my kids than whether or not they're telling me I
16     received a citation.
17          Q.    Well --
18          A.    I could care less about the citation.  I care
19     about my kids that are literally being sat on the front
20     doorstep of my house in the middle of the day telling us
21     that we don't belong here.
22          Q.    Well, part of your -- part of your claim is --
23          A.    That I'm being harassed.
24          Q.    Hold on.  Part of your claim is that you want
25     to be reimbursed for bond and other expenses associated
```

 1    with being arrested.

 2         A.    I didn't have my day in court.

 3         Q.    Right.  And one of those arrests was a failure

 4    to appear on these code violations we're discussing,

 5    which is the tall grass, the jet skis, and the no

 6    numbers on the house that was from March 28, 2016;

 7    correct?

 8         A.    Don't know.

 9         Q.    Well, that's --

10         A.    No.

11         Q.    I mean, that's --

12         A.    But the jet ski trailer citation here isn't

13    from that date.  I mean, what's in exhibit -- I don't

14    know what exhibit that is but --

15              Is that the same citation number?

16              MR. JOHNSON:  This is the March 28th, yeah.

17              THE WITNESS:  I was really just looking for the

18         citation number from the previous ordinance

19         violation for the same thing.

20    BY MR. POULTON:

21         Q.    Mr. Jones, all I'm trying to establish is --

22    and we can listen to the video again if you want.

23         A.    You can watch the whole video.  You'll --

24    you'll see.

25              MR. JOHNSON:  Tom, I don't mean to --

```
 1              MR. POULTON:  Right.

 2              MR. JOHNSON:  I think part of the confusion may

 3        be I'm not sure that the 3-28 citation is one of the

 4        ones that he was arrested for.

 5              MR. POULTON:  He's -- I believe that he was

 6        failure to appear; right?

 7              MR. JOHNSON:  There's the 3-29 warrants, and

 8        then he moved out shortly thereafter.

 9              THE WITNESS:  Right.

10              MS. BROTHERS:  Well, there's a failure to

11        appear on April 5th, but it's --

12              MR. JOHNSON:  But it would be for a different

13        one.

14              MS. BROTHERS:  Yeah, it was a week after that.

15              MR. JOHNSON:  He wouldn't have a failure to

16        appear a week after the citation.

17              THE WITNESS:  I did.

18              MR. POULTON:  Hold on.

19              MR. JOHNSON:  I don't mean to testify, but if

20        you don't mind --

21              MR. POULTON:  That's okay.

22              MR. JOHNSON:  I mean, I --

23              MR. POULTON:  Let's listen again.

24              (Video was played at this time.)

25      BY MR. POULTON:
```

1    Q.   Okay.   There was no grass in that earlier one.

2    There was no numbers in that earlier one.   These are

3    March 28, 2016.   This is going to be -- I have to pull

4    the video, but it's going to be March 29, 2016, when

5    they came back out.   Let's keep listening.

6    A.   Isn't this March 29th they're talking about

7    right now?

8    Q.   Yeah, it has to be because those are the only

9    ones where those particular violations were issued, the

10   tall grass, the --

11   A.   Jet ski trailers?

12   Q.   Yeah.   And the --

13   A.   That's not true.

14   Q.   And the numbers on the house.

15        (Video was played at this time.)

16   BY MR. POULTON:

17   Q.   Snake in the garage, remember that?

18   A.   Yeah, it's made up bullshit.

19   Q.   That's from 3-28.

20   A.   Yeah.

21   Q.   That's from 3-28.   There's no other snake in

22   the garage.

23        MR. JOHNSON:   I don't see how you could be

24        arrested or April 5th for a failure to appear on

25        code citations that were issued on March 28th.

1          MR. POULTON:  Let's listen to rest of it, okay,

2     and we can go back.  We can look at the docket

3     because I -- she's saying it's -- well --

4          (Video was played at this time.)

5  BY MR. POULTON:

6     Q.   May 19th.  Did you miss court on May 19th?

7     A.   I don't know.

8     Q.   You wrote this letter to Judge Wansboro May 21;

9  right?

10    A.   Yeah, because I had never had -- because I

11 never notice of the court date.  I never received -- you

12 have to receive written notice.  Verbal means nothing.

13 I'm in handcuffs literally standing on the -- standing

14 in the middle of my yard while a warrant is being

15 searched on my house with --

16    Q.   Okay.

17    A.   -- the 38 officers.  I never received any

18 notice other than what you're trying to say here, and I

19 don't think this was the number one important thing

20 going on.

21    Q.   All right.  So this was exhibit what?

22         COURT REPORTER:  73.

23 BY MR. POULTON:

24    Q.   All right.  So Exhibit 74 will be a copy of the

25 ordinance violation and disposition.

1      A.   You mean the one video where the guy says, "Oh,

2   yeah.  The numbers are written right there on the house,

3   but I still think we can get him"?

4      Q.   Here's the lack of posted address violation for

5   March 28.  Okay?  So we'll make that -- and then I'll --

6          MR. JOHNSON:  Hold on.  I might have a copy of

7      it.

8          MR. POULTON:  I'm sure you do.

9          MR. JOHNSON:  No, no.  I mean I think you might

10     have just handed it me.

11         (Off-the-record discussion.)

12         (Exhibit 74 was marked for identification.)

13         MR. JOHNSON:  Oh, and this has the letter

14     attached to it.

15         MR. POULTON:  Right.  Because they're in the

16     same court file.  My associate put them like that.

17         MR. JOHNSON:  And I'll just note the date on --

18     well, never mind.

19         MR. POULTON:  Go ahead.

20         MR. JOHNSON:  No, no.  That's fine.

21   BY MR. POULTON:

22     Q.   So that was Exhibit 74 now.  Exhibit 74 is the

23   particular ordinance citation for the lack of posted

24   address.

25     A.   That's clearly posted on the house in the

1   video.

2       Q.   Well, if you'll look at -- if you'll look at

3   the exhibit, Mr. Jones --

4       A.   Yeah.

5       Q.   -- it states that the arraignment information

6   is May 19, 2016, which is also what's repeated I believe

7   on the video; right?

8       A.   Again, I've never seen this before, so yeah.

9       Q.   And then on May 21 you wrote a letter to the

10  judge saying that you happened to check your records in

11  Pasco County --

12      A.   Uh-huh.  And I happened to check the law, and

13  the law stated a refusal --

14      Q.   Right.

15      A.   -- shall not give out a habeas corpus.

16      Q.   If you were correct on that -- Okay.  Let's say

17  you're correct, all right, for the sake of argument.

18  The warrant got issued by the judge.

19      A.   The same one that wasn't supposed to issue one.

20  Yes, I know that.

21      Q.   But my point is when you -- if the judge wrote

22  a warrant for your arrest for failure to appear on May

23  19, 2016 --

24      A.   Against the law.

25      Q.   Hold on -- and your argument is that it

1    shouldn't have been issued because you didn't get the

2    written notice you believe you were entitled to --

3        A.    Sure.

4        Q.    -- apart from the citation, and apart from

5    being reminded of it here on the video, if your claim

6    was that was inadequate, the problem is not with the

7    Sheriff's Office.  It's with --

8        A.    With the law.

9        Q.    It's with the judge who wrote the ordinance;

10   correct?  I mean not the ordinance, but the judge that

11   wrote the failure to appear warrant; correct?

12       A.    That judge never came to my house, so --

13       Q.    Let's mark the letter.

14            MR. JOHNSON:  The letter is in the same packet

15       as the --

16            MR. POULTON:  Yeah, but I'm not sure it's

17       attached.  I'm not sure it's attached.

18            THE WITNESS:  All right.  Can I ask a question

19       about 12 --

20            MR. JOHNSON:  Hold on.  We're figuring out the

21       exhibit, and then --

22            MR. POULTON:  We'll circle back.  Don't worry.

23       You'll have an opportunity to clarify anything you

24       want.

25            MR. JOHNSON:  I don't -- yeah.  Just --

1          MR. POULTON:  Can I see 74?

2          MR. JOHNSON:  You know, Robert, rather than

3      asking questions, why don't -- if you have something

4      you want to talk about, we can do a redirect.  I

5      think we probably will have a few things on redirect

6      anyway.  So it'll be -- I don't want this to turn

7      into a debate between --

8          THE WITNESS:  I understand.  I understand.  I'm

9      just trying to understand too.  I got an Exhibit 43

10     that states there was an incident where there was a

11     code violation for parking and storage of

12     recreational vehicles.  Is this the same or not the

13     same as what you're quoting in March on this video?

14 BY MR. POULTON:

15     Q.   It's the same citation at a different time --

16 same violation at a different time.  This --

17     A.   So it's a secondary violation with the same

18 violation.

19     Q.   Let me finish.  The violation on March 28th was

20 for the RVs, but it was also for -- the reason we know

21 it's distinct is because there was the tall grass, there

22 was the lack of posted numbers, and in fact even the

23 reference to the snake being in the garage which is

24 referenced in the deputy's report.  And I'm just -- you

25 need to understand what I'm trying to establish is

1    because you've sued the sheriff in part over being

2    arrested --

3         A.    Because I'm being harassed.

4         Q.    Hold on -- in part for being arrested for

5    failure to appear, and your argument seems to be that

6    you didn't get the notice, but the video and the report

7    suggest at least otherwise, and that whatever your

8    reason for failing to appear, whatever argument you had

9    about not getting proper notice is better directed at

10   the court than it is against the Sheriff's Office that

11   simply issued the citation to begin with.  Okay?

12        A.    Well, the Sheriff's Office is the one who

13   demonized the ordinance violations and not turning in

14   documents with written -- or writing refused for

15   defendant's signature and still throwing people in jail

16   illegally.

17        Q.    Well, would you agree with me that you, as of

18   March 29, 2016, had copies of the ordinance violations?

19   You said on the video they were in your back pocket.

20        A.    The day after they were given, they might have

21   been in my pocket --

22        Q.    Okay.

23        A.    -- but I never received notice from the actual,

24   what's it called, reports.

25        Q.    It's on the violations though.

1       A.    It's not -- nothing's written on the document,

2    brother.  It literally states in the law a refusal --

3    right here -- refusal -- you see no signature.  I never

4    received notice.  I was sitting in jail.

5       Q.    We'll move on.  We're going around in circles.

6    So 74 is the --

7       A.    Going around in circles.

8       Q.    -- code violation particularly for the numbers,

9    and then attached to that there is a infraction

10   disposition.

11      A.    There's a video.  If you keep playing, you'll

12   see that the numbers are visible on the side.

13           MR. JOHNSON:  I think there's a certain amount

14      of confusion because in May -- I mean, do you mind

15      if I ask a question?

16           MR. POULTON:  Go ahead.

17           MR. JOHNSON:  Where were you living in May?

18           THE WITNESS:  In a hotel.

19           MR. JOHNSON:  Okay.  And were you ever arrested

20      after --

21           THE WITNESS:  In the hotel?

22           MR. JOHNSON:  In the hotel?

23           THE WITNESS:  No.

24           MR. JOHNSON:  So were you arrested for the

25      failure to appear in May?

1          THE WITNESS:  Not to my knowledge.

2          MR. JOHNSON:  You wouldn't because it would be

3     after you moved out of house.

4          THE WITNESS:  Right.

5          MR. JOHNSON:  So the times that you were

6     arrested for failure to appear were not -- those

7     were not in May of 2016.

8          THE WITNESS:  Yes.  Agreed.

9          MR. JOHNSON:  So we're arguing about whether

10    you received notice of May court date, but that's

11    not when you were arrested; is that correct?

12         THE WITNESS:  Correct.

13         MR. POULTON:  But why are you then writing a

14    letter to Judge Wansboro on May 21, 2016, which is

15    just coincidently two days after he's missed his

16    hearing?

17         MR. JOHNSON:  The letter doesn't say that he

18    was arrested.

19         THE WITNESS:  Right.

20         MR. JOHNSON:  We're debating.  This is a

21    deposition, not a debate.  I just --

22         MR. POULTON:  Right.

23         MR. JOHNSON:  You know, if it's okay with you.

24    I mean, it's your deposition, but --

25         MR. POULTON:  Right.  I don't think that he had

1       been arrested as of May 21, 2016, anyway.  The

2       failure to appear warrant had been issued.  And

3       he's --

4  BY MR. POULTON:

5       Q.   Well, let me ask you this.

6            MR. JOHNSON:  That's not the --

7  BY MR. POULTON:

8       Q.   Let me ask you this.  Okay?  Let's look at your

9  letter to Judge Wansboro.

10      A.   I don't have it.

11      Q.   In the end, if you're not making a claim for

12  damages related to the arrest -- well, related to the

13  issuance of a failure to appear warrant or an arrest

14  that might have occurred as a result of missing the

15  court date on May 19, 2016, it likely doesn't matter

16  since you're not making a claim for that.

17           MR. JOHNSON:  I don't -- I don't -- there were

18      arrests for failure to appear.  I don't think one of

19      them occurred in May 2016.

20           MR. POULTON:  Okay.  All right.  Well, but I

21      think there's a reasons for that; right?  And let's

22      walk through this because I think --

23           MR. JOHNSON:  I think this is a -- we don't

24      need to debate it all now.

25           MR. POULTON:  Okay.

```
 1    BY MR. POULTON:
 2        Q.    Let me ask you this.  Well, okay.  Exhibit 74
 3    you see that?
 4        A.    Uh-huh.
 5        Q.    The first page is the code violation; right?
 6        A.    Seems to be.
 7        Q.    Okay.  Look at the second page.
 8        A.    Uh-huh.  October 27, 2016.
 9        Q.    It says you did not appear for arraignment, and
10    having failed to appear the judge withheld adjudication
11    and ordered that you were to pay $30 and then a couple
12    of costs, and then at the bottom you see it says from
13    cash bond?
14        A.    Uh-huh.
15        Q.    You need to say yes or no.
16        A.    Yes.
17        Q.    All right.  Correct me if I'm wrong.  We talked
18    about this at the very beginning.
19        A.    Uh-huh.
20        Q.    If a warrant was issued for your arrest for
21    failure to appear and then you also didn't appear -- and
22    that was in May --
23        A.    Right.
24        Q.    -- and then you also didn't appear in October
25    of 2016 --
```

1        A.    Uh-huh.

2        Q.    -- the judge's resolution of that was to take

3   whatever bond you had paid --

4        A.    Uh-huh.

5        Q.    You need to say -- and applied it to your code

6   violation --

7        A.    Uh-huh.

8        Q.    You need to say yes or no.

9        A.    Yes.

10       Q.    But in order for that to have occurred, you

11   must have paid a bond somewhere along the way.

12       A.    Yeah.  I was arrested on this day.  When they

13   had me in the front yard, they arrested me for felony

14   child neglect and possession of marijuana.

15       Q.    Okay.  So you're saying that the judge took the

16   bond that you paid for child abuse and possession of

17   marijuana and applied it to the code violation?

18       A.    No.  I don't know --

19       Q.    If you don't know, that's okay.

20       A.    I don't know.  And this is why I think you

21   think I'm trying to be argumentative, but I'm not.  I'm

22   trying to understand where the other ordinance violation

23   came from from earlier on.  I think it was exhibit forty

24   something or other that happened earlier on.

25       Q.    Right.  But that had long since been taken care

1    of; right?

2        A.    Right.  So the --

3        Q.    That's when you wrote the first handwritten

4    letter to Judge Wansboro --

5        A.    Correct.

6        Q.    -- wherein you said I didn't get the notice --

7        A.    Right.

8        Q.    -- and I was kicked out by the --

9        A.    Fire marshal.

10       Q.    -- fire marshal?

11       A.    Yes.

12       Q.    So you were -- you just happened to be in court

13   that day?

14       A.    I was, yeah.

15       Q.    Okay.  So -- but that had been taken care of

16   because they took the bond amount and they applied it to

17   the code violation and that was it?

18       A.    They arrested me.

19       Q.    And they took your bond amount --

20       A.    Right.  And they paid off whatever they wanted

21   to pay off, and then I got out of jail.

22       Q.    That one was over?

23       A.    Right.

24       Q.    Okay.  This was a new one in March of 2016, a

25   new set of about four or five different violations which

1    included the RV, the grass being too high next to the

2    jet skis, whatever it was, and then not having the

3    numbers posts; right?

4        A.   Yes.

5        Q.   And we know that you wrote a letter to the

6    judge two days after you failed to appear claiming once

7    again not to have received notice; right?

8        A.   Yes.

9        Q.   Even though we have you on video acknowledging

10   you received the code citations and the deputy reminding

11   you of the May 19th court date?

12       A.   Yeah.  I never -- I never signed it because I

13   never received it.

14       Q.   Okay.

15       A.   I got some folded up papers shoved in my back

16   pocket on my way to jail.

17       Q.   Let me ask you this as well.  And this will be

18   exhibit -- what are we on, 75?

19            COURT REPORTER:  Yes.

20            MR. POULTON:  Let's use the -- we'll use the

21       letter as 75.  Okay.

22            (Exhibit 75 was marked for identification.)

23            (Off-the-record discussion.)

24   BY MR. POULTON:

25       Q.   Mr. Jones, do you recognize Exhibit 75?

1        A.    Yes.

2        Q.    This is a letter that you wrote to Judge

3   Wansboro on May 21, 2016?

4        A.    Uh-huh.

5        Q.    You need to say yes or no.

6        A.    Yes.

7        Q.    The first sentence is that my name is Robert A.

8   Jones III, and I'm writing to you today because I

9   happened to check my records in Pasco County and there

10  seem to be five warrants out for my arrest for not

11  showing up to court in city ordinance matters.

12       A.    Uh-huh.

13       Q.    You need to say yes or no.

14       A.    Yes.

15       Q.    Okay.  How is that you happened to check your

16  records in Pasco County within two days of a court date

17  that you are saying you didn't know about?

18       A.    Did you not already see the last 80 or 75

19  documents where people just show up at my house every

20  day and they're doing a -- they're doing a check for

21  anybody there that might have warrants?  So every day

22  was common theme to make sure that they didn't create

23  more lies about us to have us go to jail, and that's

24  exactly what's been happening with the overgrown grass

25  and the jet ski trailers and the snake crawling in my

1   garage and 3:00 in the morning all these parties going

2   on.  But, you know, there's no evidence of it by --

3   other than these same guys with badges and guns, you

4   know, trying to get me to move from my neighborhood

5   because, you know, Sheriff Nocco don't like our kind

6   around here.  And I don't know what our kind is.  I

7   asked and they told me to shut the hell up in the same

8   video that you were just showing.

9       Q.   Midway through the first full paragraph after

10  the listing of issues, you discuss -- for whatever

11  reason, you start talking about the search of the home

12  and the arrest of Bobby Junior for the marijuana

13  baggies.  We'll just call it the baggies.  Okay?

14      A.   Uh-huh.

15      Q.   And you wrote, "At that point they asked to

16  search my home, and I said, yes, no problem."

17      A.   Well, this is after the -- after they already

18  lost the court case.

19      Q.   My question is did you write to Judge Wansboro

20  and tell her that you --

21      A.   If that's what you see out of this whole

22  letter, that's -- that's good.  Yeah, I mean, it's

23  written in there.  I wrote it.  Yes.  Keep going.

24      Q.   You admitted -- Mr. Jones, you admitted in your

25  own writing to Judge Wansboro that you had given consent

1    for the search of your home in connection with those

2    marijuana baggies we saw the video about earlier;

3    correct?

4         A.   That's what it says.

5         Q.   All right.  Is that -- was that true?

6         A.   Yeah, that I was being harassed, absolutely,

7    every single day.  All of it's true.  The second I would

8    arrive, there would be five to eight hours there looking

9    to want to re-search my home every day, every day, every

10   day that they came.

11        Q.   Your letter reads, "At that point they asked to

12   search my home, and I said, yes, no problem."

13        A.   Uh-huh.

14        Q.   You see that?

15        A.   Yeah, I see it.

16        Q.   Is that true?

17        A.   Yes.

18        Q.   "They left with eleven small empty bags.  Three

19   days later they came and arrested him for three of the

20   bags they claimed contained marijuana residue."

21        A.   Right.

22        Q.   "Robert A. Jones IV (Bobby) has since beat the

23   charge as there was not enough evidence to charge him."

24        A.   There was no evidence at all.  Go ahead.

25        Q.   Okay.  Well, that's -- then why didn't you say

1    that?  Why did you say there was not enough evidence to

2    charge him?

3         A.   Well, I mean, bags by themselves aren't

4    evidence at all.

5         Q.   Well, your testimony earlier was that there

6    were --

7         A.   Right.  If the bags contained traces of

8    something like they claimed it did when they were lying,

9    you're right, it would have -- they would have stuck.

10        Q.   As I understood your testimony earlier, you

11   said there was a full-blown hearing --

12        A.   There was.  It was --

13        Q.   Hold on.  At which it was determined that there

14   was no marijuana whatsoever --

15        A.   Correct.

16        Q.   -- in the bags.

17        A.   Correct.  Yes, sir.  100 percent.  They were

18   lying about it.

19        Q.   Lying about finding it?

20        A.   About finding any marijuana in any baggies.

21        Q.   And you say that despite --

22        A.   No.

23        Q.   Hold on.

24        A.   I stay it because it's the truth.

25        Q.   And you say that despite Bobby Junior on the

1    video saying, well, there may be marijuana in there, but

2    if there is, it's old.

3        A.    There may be guns in it.  Do you see any guns?

4    Maybe crack cocaine.  There could be, you know,

5    imaginary ghosts in there.

6        Q.    All right.

7            MR. POULTON:  And I'll just ask plaintiff's

8        counsel if we can do this, we move on.  All right.

9        But at some point what we need to do is we need to

10       figure out what bonds were paid and what happened to

11       those bonds.  Okay?  Fair enough?  We could do

12       that --

13           MR. JOHNSON:  That's fair.

14           MR. POULTON:  -- collectively?  Okay.

15           MR. JOHNSON:  Yeah.

16   BY MR. POULTON:

17       Q.    But as I understand Mr. Jones's testimony, each

18   time that he had a failure to appear, the money that he

19   paid towards bond ended up getting used to pay off a

20   code violation.

21       A.    Uh-huh.

22       Q.    Is that right, Mr. Jones?

23       A.    Yes.

24       Q.    Okay.  And you never appealed any of those;

25   right?

```
 1        A.    What appeal hearing is there?

 2        Q.    I'm just asking you if you appealed them?

 3        A.    Well, you can't ask me that question because

 4    there's no appeal process.

 5        Q.    All right.  Let's move on then.

 6              (Exhibit 76 was marked for identification.)

 7              (Off-the-record discussion.)

 8    BY MR. POULTON:

 9        Q.    Okay.  So this is an incident report dated

10    March 29, 2016, and it probably correlates to that video

11    we just saw because that correlated back to the day

12    before, March 28th, and this was when there was a search

13    warrant.  You see that?

14        A.    Right.  Yes, I do.

15        Q.    Do you know what occasioned the search warrant

16    on March 29th?

17        A.    No.

18        Q.    And actually, the reconstruction is that it

19    occurred on March 31st.  I don't -- it --

20              Okay.  If the video's from -- if the code

21    citations are March 28th, the video is March 29th, but

22    then they came back.  They had a search warrant.

23        A.    They were -- no, they were there that morning.

24        Q.    I understand.

25        A.    That video right there is from eight hours of
```

1    me sitting on the lawn.

2         Q.   Right.  I --

3         A.   They had already been there.

4         Q.   And that was on March 29th, right, the day

5    after?  Because you talked about --

6         A.   No, that's that day.  The day you see me in

7    there, is the day -- I was on my way to work at

8    7 a.m. --

9         Q.   Okay.

10        A.   -- when there was police cars in my driveway

11   claiming they had a warrant to search my property and my

12   home.

13        Q.   Well, regardless, March 29th, March 31st,

14   either way, there's a search warrant, and you don't know

15   what the search warrant was about or what it was

16   occasioned by; correct?

17        A.   No.

18        Q.   All right.  All right.  The subject in care,

19   custody, or control of the residence was defendant

20   Robert Jones III who is listed on the warrant.  So you

21   must have been the subject of the search warrant.  Do

22   you see that?

23        A.   Yeah.

24        Q.   But you just don't know what it was about;

25   right?

1      A.    Right.

2      Q.    Okay.

3      A.    Harassment probably.

4      Q.    Okay.  Upon entering the residence, all

5   detectives present smelled what we recognized to be an

6   overwhelming scent of marijuana.  Marijuana was located

7   in several locations throughout the residence, including

8   in Robert's room, truck, and the room of -- and it's

9   blacked out.  Interviews revealed Robert consumed

10  marijuana in the presence of -- and it's blacked out --

11  a juvenile who also consumed marijuana.  Marijuana was

12  located in Robert's vehicle along with in the freezer

13  directly next to the food in a common area of the

14  kitchen.

15         Let me ask you this.  I'm not -- understand

16  that I don't have any criminal anything to do with

17  anything.  All right?  But was there marijuana in your

18  house when they did this search warrant?

19     A.    No.

20         MR. JOHNSON:  Well, hold on.  Hold on.  I

21      understand you're not --

22         MR. POULTON:  Yeah.

23         MR. JOHNSON:  -- you're not --

24         MR. POULTON:  Okay.

25         MR. JOHNSON:  -- asking this as a criminal

1      thing, but I just don't think we should go into --

2           MR. POULTON:  Want to talk to him for a minute?

3           MR. JOHNSON:  Well, I'm going to advise --

4           MR. POULTON:  Well --

5           MR. JOHNSON:  -- I'm going to advise that we're

6      just not going to answer any questions --

7           MR. POULTON:  Okay.

8           MR. JOHNSON:  -- about whether there was

9      marijuana present anywhere, whether anybody smoked

10     marijuana.  I understand that you are not asking

11     because you want to prosecute anybody.

12          MR. POULTON:  The statute's probably run my

13     guess.

14          MR. JOHNSON:  The statute probably has run

15     but --

16          MR. POULTON:  Yeah.  And actually, the case was

17     dismissed, so --

18          MR. JOHNSON:  And the case was dismissed, but

19     we're just -- I don't think that's something that we

20     need to go into, and I'm going to advise him not to

21     answer it unless you feel very strongly in which

22     case we can talk about it, but --

23   BY MR. POULTON:

24     Q.   Well, let me try it this way.  Do you dispute

25   that the deputies would have believed that they found

1    marijuana in your house or in your vehicle?  I'm not

2    asking if there actually was, but do you dispute that

3    the deputies would reasonably have believed that they

4    found that?

5        A.    This is a hard question for me to answer

6    because they sent my son to jail for 21 days for the

7    same thought process when they took ten baggies or

8    eleven baggies claiming there was tons of marijuana when

9    there was absolutely zero traces found.  So you're

10   asking me -- and I know it's a really good -- you're not

11   meaning it in a harm way, but me answering that

12   question, I honestly -- I don't believe a word anything

13   they said.

14       Q.    Okay.

15       A.    I mean, they whispered in my ear, and I -- you

16   could probably see it on that video if you continued

17   playing it.  They said, "Have you ever been arrested for

18   a felony before?"  Because they found nothing in my home

19   and literally I said no.  And they told me, "Well, you

20   will be today."

21       Q.    Let me ask you this.  Do you know who Talia

22   Jablon is?

23       A.    It was some girl my son was dating --

24       Q.    Okay.

25       A.    -- during that time, yeah.

1      Q.   Do you disagree that Talia told the deputies

2   that she did not smoke marijuana or maybe Robert Junior

3   didn't smoke marijuana but that you did and that you

4   were always smoking marijuana inside the residence with

5   juveniles present?

6           MR. JOHNSON:   Only answer if you know.

7           THE WITNESS:   Sure.

8   BY MR. POULTON:

9      Q.   I'm only asking if whether or not you know

10   whether Talia -- one way or the other whether Talia told

11   them that?

12     A.   I don't know whether she told them that.

13     Q.   Okay.

14     A.   I will reiterate that Talia herself, she was

15   one of those people that weren't allowed at the house.

16     Q.   Okay.

17     A.   So, I mean, again it's not like we were any

18   kind of friends here.  So I don't know what anybody

19   might be saying about me.  I'm looking at the document

20   that you've given me here and --

21     Q.   There's a -- there a -- I don't know how to ask

22   these questions, so I'll just pose them, and if counsel

23   doesn't want you to answer, I understand.  But on page 5

24   of Exhibit 76 it states that the search of the residence

25   revealed marijuana all throughout the residence to

1     include every bedroom and the freezer, and then also a

2     search of Robert -- the next sentence says a search of

3     Robert's personal vehicle, which was listed in the

4     warrant, revealed two grams of marijuana hidden under

5     the dash mat of the driver's side.

6           I'm not asking you whether there was actually

7     marijuana there.  All right?

8     A.    Uh-huh.

9     Q.    But I'm asking you whether you would dispute

10    that the deputies could reasonably have believed that to

11    be the case?

12    A.    Yeah, I don't know.

13    Q.    Okay.  So you're arrested on that date when

14    they did the search warrant and found what they

15    represented in the report to be marijuana; right?

16    A.    Do you have the search warrant?  Is that in

17    evidence --

18    Q.    I don't.

19    A.    -- or an exhibit?

20    Q.    I don't have it.

21    A.    Because I believe that they were looking for

22    stolen items.  That's the whole reason for the warrant

23    to search my vehicle and property, and when they didn't

24    find anything, they created these new items like

25    possession of marijuana, two grams found or --

1     Q.   So you're saying that --

2     A.   -- felony child neglect.  They didn't have

3   anything else.  They had 40 people search my house for

4   twelve hours, and all they found was me.

5     Q.   All right.  And the outcome of this as I

6   understand it was that ultimately the State --

7     A.   Just let it go.

8     Q.   -- what they called nolle prossed the case?

9     A.   Just like every other time they arrested us.

10    Q.   Did you have an attorney for this case?

11    A.   Nope.  Didn't need one.

12    Q.   It just dismissed on the --

13    A.   They didn't have any evidence.

14    Q.   Okay.  Do you know when it was dismissed?

15    A.   I don't.

16    Q.   All right.  Was it during the execution of that

17  search warrant to your recollection that the items that

18  you're complaining were broken or not returned were

19  taken?

20    A.   Yes.

21    Q.   Okay.  Do we have a list of that?  I've seen it

22  somewhere before, but it's not jumping out at me in the

23  paperwork that I have right in front of me right now.

24         MR. JOHNSON:  I believe that part of the

25    paperwork for the seizure -- the search and the

1      seizure includes an inventory.

2           MR. POULTON:  I've seen it as well.  I just --

3      I don't have it in front of me.

4           MR. JOHNSON:  I think you guys provided it.

5           MR. POULTON:  I'm sure.  Yeah.

6           MR. JOHNSON:  I don't see it here, obviously.

7           MR. POULTON:  There's no way I'm going to be

8      able to locate it.  I don't want to delay if I don't

9      need to.

10 BY MR. POULTON:

11      Q.   Let me ask you this.  In your discovery

12 responses you indicated that some items were not

13 returned at all and then some were returned broken.  So

14 let's break that down a little.  Okay?

15      A.   Sure.

16      Q.   What items are you claiming were never

17 returned?

18      A.   This is really simple for me, a lot harder for

19 other people.  I don't have a whole lot of -- at the

20 time especially didn't have a whole lot of cash to buy

21 any items.

22      Q.   Okay.

23      A.   As you can see, these things happened around

24 Christmastime.  I happened go to T-Mobile where I had my

25 phone service, and they had given me a $6,600 credit

1   limit.  Lo and behold you can buy a lot of stuff with

2   6,600 bucks.  So I bought new cell phones, new tablet

3   computers, and then at Best Buy for Christmas I bought

4   them laptops.  The really funny thing about this whole

5   case is I had none of it paid off.  Literally I was

6   making payments every month for all the stuff I never

7   even received.  I mean literally I got it for Christmas,

8   and then within a month and half later, two months

9   later, they took everything thinking that the items

10  could have been stolen from somebody else's house.

11       Q.  Okay.

12       A.  I had six cell phones in my home:  Mine, my

13  wife's, and all four of my children.  They took all six

14  of them.  They said, "Why do you need six phones?"

15       Q.  How many of those phones were not returned?

16       A.  Only one phone was returned.

17       Q.  Okay.  So you're saying you're missing five

18  cell phones?

19       A.  Right.

20       Q.  Do you have any documentation that the five

21  cell phones were not returned?

22       A.  I have the five documentations where I bought

23  the phones.

24       Q.  Okay.  But my question is is there any

25  documentation to show that they weren't returned?

1      A.   I'll have to look.

2      Q.   All right.  Let me ask you this.  Did you

3  notice when -- how did you get your property back?

4      A.   I never got it back until I called my buddy

5  who's a lawyer who's my family attorney Benjamin DeBerg,

6  and he filed documents with the court, and then the

7  judge said, "We're not giving him anything back until he

8  can show proof that it belongs to him," which I never

9  could understand because they took it from my house.

10     Q.   So the judge --

11     A.   I showed proof.

12     Q.   Okay.  So the judge originally said, "I'm not

13  returning anything until he shows proof that they're

14  his"?

15     A.   Right.  So I went and I found all the bills,

16  and I sent them up there, and I sat at the -- I sat

17  right around the corner from here for about five hours

18  while they came back to me with a bag with a few items

19  in it.  My car keys were there, my -- literally the

20  three garage door openers for my garage were there.

21     Q.   Okay.

22     A.   One cell phone was there.

23     Q.   All right.  So let's slow down.  Let's take it

24  one at a time.

25     A.   Yeah.

1    Q.    So the first thing that you've mentioned to me

2    that you say was not returned would be five cell phones?

3    A.    Uh-huh.

4    Q.    You need to say yes or no for the court

5    reporter.

6    A.    Yes.

7    Q.    All right.  One of six was, but the other five

8    were not?

9    A.    Correct.

10    Q.    All right.  What else was taken during the

11    search that was not returned to you besides the five

12    cell phones?

13    A.    Four tablet computers, three laptops, two home

14    computers, one my office and one my personal, and I know

15    there was other items I just can't remember offhand.

16    Q.    All right.  And so five cell phones, four

17    tablet computers, three laptops and two home computers?

18    A.    Yes.

19    Q.    And maybe a couple other smaller miscellaneous

20    items?

21    A.    Correct.  Because they legitimately -- you

22    know, I think everybody means good to do their job.

23    They could definitely not tell what was the difference

24    between what might have been stolen, what might be ours.

25    So anything that was mechanical, anything that was

1    computerized, anything that looks like it was worth

2    money they took.

3        Q.   All right.  And you're -- okay.  So your

4    attorney filed at some point a motion to have the

5    property returned, and you got everything back except

6    for these electronic items that you identified plus a

7    few smaller items; fair?

8        A.   Right.

9        Q.   Have I got it right?

10       A.   Correct.

11       Q.   First question:  Is there going to be

12   documentation of the value of those items?

13       A.   Sure.  Yes.

14       Q.   All right.  Can we get that?

15       A.   I can -- I think I can definitely get it.

16           MR. JOHNSON:  If we haven't already listed it.

17           MS. BROTHERS:  Yeah, we haven't had a list of

18       items.  So we could --

19           MR. POULTON:  Thank you.  If I could get a copy

20       of that, that would be helpful.

21   BY MR. POULTON:

22       Q.   Second, when those items -- did you notice that

23   those items had not been returned to you?

24       A.   Of course.

25       Q.   Immediately you noticed that?

1      A.   Immediately, yeah.

2      Q.   What did you do about it?

3      A.   Ask I asked my attorney what can we do about

4  it?  He looked to me and said, "It's me and my mom.  We

5  can't fight Pasco County.  Sorry.  You're going to have

6  to deal with what you got."

7      Q.   Did you ask the --

8      A.   Yes.

9      Q.   Hold on.  Did you ask anybody, you know, in

10  quotes in the system about being able to get this other

11  property back?

12      A.   If you heard me correctly, immediately when

13  they handed me my items back, I knew there was property

14  not given.  So I said what about this, this, this, this,

15  this, this down the list, and the lady said, "We don't

16  know where it is."  The stuff went to the department

17  that's supposed to go through everything and look for

18  any clues and never came back.  That's what they said.

19      Q.   You said the lady?

20      A.   The lady that was working at the office where I

21  was supposed to retrieve my items with the pass given to

22  me signed off by a judge to receive my items if I could

23  show proof.  So I showed them the bill, and then she

24  went through the bill and got everything that was on the

25  list that she could find.  The items that weren't on the

1    list, she told me that those items had never come back

2    from check department or whoever the department was

3    that's supposed to retrieve information off the items.

4         Q.   And we'll talk about that in a minute --

5         A.   Sure.

6         Q.   -- but where was that office?

7         A.   That was here Pasco County next to the

8    jailhouse.  Not the jail itself but right next door

9    there's an office that houses all the items.

10        Q.   Is this out by the Land O' Lakes Jail?

11        A.   Yes, right next door to the jail.

12        Q.   And so do you know whether this was a sheriff's

13   employee that you had this conversation with?

14        A.   It was a sheriff's employee.

15        Q.   And she told you that those items were not on

16   the list of property that they had there?

17        A.   No.  They were on the list.

18        Q.   Okay.  And she just said you couldn't have them

19   back yet?

20        A.   The reason why it took so long is because she

21   couldn't find them.  That's what she said.

22        Q.   Okay.  So did you eventually then get them

23   back?

24        A.   No, no, because there was nobody else to call.

25        Q.   So after the -- I'm confused.  The lady at

1   the -- from the Sheriff's Office facility next to

2   Land O' Lakes Jail told you what about these electronic

3   items?

4       A.   All right.  I'll make it simple.  Here's

5   layman's terms.  I walked in with the document with a

6   list of items they took from me.

7       Q.   Right.

8       A.   I also had a judge sign off to give me my items

9   back with my attorney and an order.  I handed her the

10  order.  I said, "Ma'am, everything you need is right

11  there."  I gave her a list.  The list was those items

12  that I had paid for.  They were literally a credit card

13  bill because I was still paying on them.  So I showed

14  proof of ownership with the actual bills of those items.

15          She disappeared for about an hour and a half,

16  then came back with a couple of things and said, "Look,

17  I'm looking for the other items.  I'll be right back."

18  Disappeared for another two hours, then came back and

19  said, "Well, this is all I can get for you.  Everything

20  else was brought to tech, and we don't know where it

21  is."

22      Q.   And what followup did you do after that?

23      A.   I called my attorney.  I asked, "What should I

24  do?"  She said, "Well, you can call your attorney and

25  find out if there's anything that you can do."  And I

1    called him, and he was like, "There's nothing I can do."

2         Q.   Did you ever follow up with the Sheriff's

3    Office after that?

4         A.   No.

5         Q.   Do you know whether anybody on your behalf

6    filed any sort of motion or followed up with the

7    Sheriff's Office on your behalf about it?

8         A.   The only motions filed, the only things filed

9    was by Benjamin DeBerg at that time, and I was to

10   retrieve any of the items that were taken from me prior

11   that had not been given back.

12        Q.   We heard testimony from one of the deputies

13   that there had been a search of a cell phone belonging

14   to Robert, and it included --

15        A.   Which Robert?

16        Q.   Robert Junior.  Sorry.  Robert IV which -- and

17   I don't know any other way to say this -- included a

18   video which he described as pornographic that involved

19   Robert Junior and some other male juveniles engaged in a

20   sexual act with a juvenile female.

21        A.   Okay.  This is the first I'm hearing of this.

22        Q.   Well, that's what I was going to ask you is had

23   you heard anything about that?

24        A.   No.

25        Q.   Did you know like that anything like that might

1    have been going on in your house?

2        A.    No.

3        Q.    There was I believe a suspicion that you would

4    have parties at your house that you were aware of where

5    alcohol and drugs were present; is that true?

6        A.    Never happened.

7        Q.    Okay.

8        A.    I don't even drink.

9        Q.    Okay.  Have you ever complained to the

10   Sheriff's Office about what was going on during all the

11   prolific offender checks or the arrests or the code

12   violations?

13       A.    Say that one more time.

14       Q.    Did you ever complain to the Sheriff's Office

15   about -- Hold on.  Let me get it out.

16            Did you ever complain to the Sheriff's Office

17   about the prolific offender checks, the frequency of

18   them, for example, or the code violations or the

19   arrests?

20       A.    Yes.

21       Q.    Who did you talk to?

22       A.    Every single officer that harassed me.

23       Q.    Did you ever ask to speak to a supervisor?

24       A.    Sure.  The supervisor was the one harassing me.

25       Q.    Did you ever then -- Okay.  Did you feel that

1    you got a satisfactory response from that supervisor?

2         A.    No.

3         Q.    Did you call anybody?  Did you pick up the

4    phone and call the Sheriff's Office rather than just

5    dealing with the deputies on scene?

6         A.    I wrote the judge.  I don't know how much

7    higher up I need to do to be able to expose what the

8    harassment was happening with me and the body cam

9    videos.  These guys are the ones that legitimately

10   defined it as harassment, not me.  I'm not saying

11   harassment.  They're saying harassment.  They

12   legitimately -- the supervisor is telling me that

13   they're going to continue to harass me unless I do what

14   they tell me to do.  And I mean, I don't know.  We're on

15   74 or 75 items that happened within five months, and a

16   few of these you've seen three times in the same day.

17        Q.    Okay.  I don't -- my question is whether you

18   called the Sheriff's Office to go -- to complain about

19   what was going on beyond these conversations you had

20   with the deputies on scene?

21        A.    The Sheriff's Department's the problem.

22             MR. JOHNSON:  You can answer his question.

23        It's fine.

24        A.    Did I call 911 when the cops were there?  Yes,

25   I called 911, and the cops were like, "I'm right here,

```
 1    dispatch."  That's it.
 2    BY MR. POULTON:
 3         Q.   Did you call and complain?  Did you ask to
 4    speak --
 5         A.   "I'm being harassed" --
 6         Q.   Did you --
 7         A.   -- "by guys with badges and guns.  What can I
 8    do about it?  Please call somebody out here.  This guy
 9    says he's a supervisor.  Can you call another officer
10    out here?"
11         Q.   Let me ask it this way.
12         A.   That's not good enough?
13              MR. JOHNSON:  Can we just take a quick break?
14              MR. POULTON:  Yeah.
15              (Short break.)
16              (Ms. Brothers left at this time and was not
17         present for the remainder of the deposition.)
18    BY MR. POULTON:
19         Q.   All right.  So we'll go back on the record, and
20    my question was whether -- when these -- well, let me
21    back up.
22              You've described situations where there was an
23    ongoing interaction and you asked to speak to a
24    supervisor, and the supervisor was there, and you felt
25    the supervisor was part of the problem.  You've also
```

 1   commented that you called 911 during incidents and the

 2   deputies would intervene and say, "Hey, we're already

 3   there," and that would be the end of that; right?

 4       A.   Yes.

 5       Q.   Okay.  Was there ever a time when there wasn't

 6   an interaction going on, there wasn't a prolific

 7   offender check, there wasn't a as you put it harassment

 8   going on, when you picked up the phone and called the

 9   Sheriff's Office to complain about what you felt was

10   unfair treatment?

11       A.   No.

12       Q.   Okay.  Did you ever write a letter to the

13   Sheriff's Office to complain about it?

14       A.   The only letters I wrote were to the judge.

15       Q.   Judge Wansboro?

16       A.   Correct.

17       Q.   Okay.  After you moved out of the residence at

18   Headsail Drive in May I believe it was of 2016 you

19   said --

20       A.   I believe so.

21       Q.   Okay.  May or June; right?  Because I know

22   there are some records that they went there and there

23   were new people in the house?

24       A.   Right.  They were still harassing the new

25   residents at the location.

1      Q.   So after you had moved then back to St. Pete,

2  did you have any more interaction with the Pasco County

3  Sheriff's Office?

4      A.   Not a one.

5      Q.   You've moved back since?

6      A.   I moved back in December of last year or

7  January.

8      Q.   All right.  Have you had any interaction with

9  the Pasco Sheriff's Office since you moved back in last

10  year?

11      A.   I've seen them sit at the end of my street.

12  I've seen them stare at me, but they have not pulled me

13  over, and they have not showed up at my house.

14      Q.   And they've not spoken to you?

15      A.   They have not spoken to me because I sued.

16      Q.   Okay.

17      A.   That's what -- they're -- they're going to come

18  and visit me and harass me until I move or I sue.  I

19  moved the first time.  I only moved back to Holiday

20  because it was the nineteenth place in line, and we had

21  to get the heck out of where we were at.  So, yeah, we

22  moved back to Pasco, but the key is that Robert Jones,

23  my son, was already over the age of 18 and living on his

24  own.

25      Q.   Give me just one moment here to look over my

1    notes.

2        A.   Sure.

3        Q.   Okay.  That's all the questions that I have for

4    you today.  Your attorney may have some.  As we've done

5    in the past at other depositions, if anything else comes

6    up that we need to ask you about, we'll try to do it

7    informally through counsel, or we might have to do just

8    a quick update.  If we do, it will be by Zoom, something

9    that will be convenient for you.  Okay?

10       A.   Yep.

11                       CROSS EXAMINATION

12   BY MR. JOHNSON:

13       Q.   I have a few questions.

14       A.   Uh-huh.  Sure.

15       Q.   You mentioned a few times specific numbers of

16   officers.  For instance, one time you messaged 18

17   officers who you believe were on the STAR team.  When

18   you say 18, is that an exact number?

19       A.   Depends on the day.  I mean, I say 18.  I've

20   seen more, I've seen less depending upon the day.  Did

21   that answer your question?

22       Q.   Yeah.

23       A.   Sorry.

24       Q.   You also mentioned that you think officers were

25   on the STAR team.  Are you familiar with the exact

1    designation of every officer within the Pasco County

2    Sheriff's Office?

3        A.    No.   The only reason why I keep mentioning STAR

4    team by name is they're the ones who came to my house

5    initially with no warrant, knocking on my door to

6    introduce themselves to my family.   At that point there

7    no crimes were being committed, and they admitted

8    there's no crime being committed.   We heard about your

9    son from Pinellas County, and we wanted to come by and

10   we wanted to say hey.   We wanted to introduce ourselves,

11   let us know we're the STAR team, and you'll be seeing a

12   lot of us.   And when I asked why, they told me because

13   they were in charge of making sure that any juvenile

14   delinquents in the neighborhood were kept an eye on, and

15   to make sure that there was no crime happening.   And I

16   thought, great, I'm going to live in a crimeless

17   neighborhood.   Perfect.

18       Q.    Okay.

19       A.    I mean, I was all for it.   I didn't think

20   anything bad of them.   I was thinking, you know, finally

21   my son's 15, he's going to grow up, he's going to have a

22   chance that he was supposed to have.   And instead they

23   kept harassing and they kept arresting him.   Every time

24   they would arrest him they would arrest him for 21 days

25   at which he would fail at his new school, and then he

1    doesn't have a school to go to.  So then I'm left with

2    trying to find ways to be able to educate him in a place

3    that didn't want him.  You know, that's the same problem

4    I kind of had with the last place in Pinellas, which is

5    why I moved to Pasco.  I had no idea Pasco was going to

6    overwhelmingly make him a criminal.  And then, of

7    course, again, I didn't even last there a year and we

8    moved as far and as fast and we could.

9        Q.   One question you mentioned that every time the

10   officers would be there they would want to show videos

11   or pictures.  Did you mean that literally?

12       A.   No.  I mean, I -- the times I remember them

13   coming over, truthfully, they all -- they had one thing

14   on their mind.  They wanted to search my house.  That's

15   it.  When they came, they were like, "Could we search

16   your house?"  And I said no, and then they got mad.

17            You know, looking at all of the exhibits, I can

18   tell you that after they lost that first case against my

19   son, they started coming three times a day.  I mean,

20   there was overwhelming response that they had to get me.

21       Q.   Similar question.  You said at one point that

22   you thought there was 38 officers from the STAR team.

23   Does that -- I mean do you know for a certainty that all

24   of those officers were associated with the STAR team?

25       A.   I know they were associated with Pasco County.

1    Q.   Right.

2    A.   And to me I guess I wrongfully believed that

3    they all worked for the STAR team; but if the STAR team

4    are there and the ACE team is there and the Pasco County

5    Sheriffs are there and there's 38 of them, I mean, you

6    can call them all Pasco County Sheriffs, can't you?  I

7    mean, I may not be able to call them all STAR team

8    members.  But, you know, you're right, I don't know that

9    there's 38 STAR team members.  I just know that there's

10   a lot of police officers at my house for absolutely no

11   reason.

12   Q.   I want to show you just quickly Exhibit 25.

13   A.   Sure.

14   Q.   You testified you weren't sure who was

15   arrested --

16   A.   Uh-huh.

17   Q.   -- in this report.  Could this be when they

18   arrested Bobby for the marijuana in the room?  Is that

19   possible?

20   A.   It is possible.

21        MR. POULTON:  That's right.  The transport;

22   right?

23   A.   And I say that because the date September 28th

24   would have been the beginning of the school year, and

25   this right here, this arrest is actually what suspended

1    him for 21 days of JDC.

2    BY MR. JOHNSON:

3         Q.    I'll just show you Exhibit 27 quickly.

4         A.    Sure.  Oh, this was three days later.

5         Q.    Yeah.  And if you see it says at the beginning.

6         A.    28th.  Yeah, yeah.

7         Q.    So does that help refresh what this might have

8    been on the 28th?

9         A.    Yeah.  So the only thing -- it was a mistake.

10   I was looking at the date it was printed, not received.

11   So I was looking at the correlation between dates, and I

12   was obviously wrong.

13        Q.    So just having looked at these two documents,

14   does that refresh your recollection as to what happened

15   on the 28th?

16        A.    Again, the 28th would be the day he was

17   arrested; right?  I'm saying this because it was three

18   days --

19        Q.    I'm asking you.

20        A.    It was three days before that the police came

21   and took the baggies, and then three days later when I

22   wasn't there anymore they came and they arrested Bobby

23   claiming that those baggies contained marijuana.  But I

24   wasn't there.  I was at work.  They came I believe at

25   3:00, 2:20 in the afternoon, 2:12.  Yeah.  Correct.

1         MR. JOHNSON:  Do you mind if I take just like

2     five minutes to talk to him about a couple of

3     things?

4         MR. POULTON:  Uh-huh.

5         (Short break.)

6   BY MR. JOHNSON:

7     Q.   You mentioned at one point that the issue with

8   the ankle monitor occurred multiple times.  What would

9   happen when that would occur?

10    A.   So I believe what you're asking about is

11  whenever the ankle monitor had a dysfunction of any

12  kind, whether the battery was dying or whether it was an

13  area where the whatever signal wasn't being reached

14  where it was supposed to, the first enacting issue was

15  they would contact the phone number, which would be my

16  son's or mine, to say, "Hey, plug your monitor in.

17  We're not -- for whatever reason, we're not receiving a

18  signal."  Normally that would take care of the problem.

19        There was one or two instances where maybe my

20  phone was dead, and because they couldn't receive any

21  phone correspondence from anybody, they sent out a

22  sheriff or the Pasco County Sheriff to come see whether

23  or not he was there or not, but I believe that only

24  happened like twice.

25    Q.   Okay.  There was some testimony about the

1  question of whether you consented to allow them into the

2  house, and you suggested that you did not consent.  What

3  did you mean by that?

4      A.   So when that was happening, I was on the fence

5  on which side the law was on.  I mean, were they on the

6  side of a parent raising four children by himself pretty

7  much, or were they on the side of making criminals?  And

8  I honestly sat there and debated it in my head because I

9  knew exactly what they wanted to do.  But in my mind I

10 thought, well, maybe there's an inkling of a chance they

11 go in here and they speak to my children and my children

12 actually gain some kind of positive influence by these

13 stellar men in badges, and that moment I did allow them

14 in my house to speak to my children.  I had no idea they

15 were going ransack my drawers and they were going to

16 start looking for anything they could find to arrest

17 people.  I honestly thought they were coming there and

18 anybody who sees the video can hear how nice the

19 officers were.  They were really nice.  They really

20 sounded like they wanted to help a guy out, and I'm just

21 a human.  I mean, yeah, they have a badge and a gun, but

22 you think that because they have this badge and a gun

23 they're there in an honorable fashion.  I had no idea

24 they were snakes in the grass.  They're the ones that

25 should have taken a picture of themselves crawling in my

1    garage.  But that was the only correspondence I had with

2    them with agreeing to let them come into my house, not

3    ransack it, not search for what they wanted, not any of

4    that other stuff.  So to clear it up, that's what I

5    meant.

6        Q.   There's been a number of different code

7    citations discussed today.  I mean, as you're sitting

8    here today, do you clearly remember which citations you

9    were arrested for and when?

10       A.   The truth is I can't remember any specifics as

11   far as date goes.  Of course, I can tell you there was

12   -- every single day that they arrested me, they put me

13   in handcuffs and they stuck me in a car and took me to

14   jail.  But if you're going to ask me what time of day it

15   was, if it was raining, the actual date, I don't have

16   any of those without actually looking at some kind of

17   documents because I just -- my brain doesn't work like

18   that.

19       Q.   A couple times you were asked if you have

20   personal knowledge about things, and you testified --

21   you might have answered no.  What did you, when you said

22   that, understand you were saying?

23       A.   So I think what you're asking me is whether I

24   had personal knowledge of why these officers were

25   choosing to come to my house two, three, four, five, ten

1    times a day or week.  And in the beginning before it was

2    seven, ten times, whatever it was, however many times it

3    was a week, I initially thought maybe this was them

4    trying to put their thumb on my son and trying to really

5    keep an eye on him to keep him from doing anything bad,

6    until I realized that that's not exactly what was

7    happening.

8         So I don't know what made them come to my house

9    and arrest everybody there constantly every single day

10   other than maybe they don't like the way I look.  I

11   mean, I'm not going to speculate, but -- and that's why

12   I told you I don't know.  I have no idea what reason it

13   would have been.  My breath stunk?  You know, my kid

14   wasn't tall enough?  I don't know.  I don't know the

15   reason.

16   Q.    Okay.  At one point there was a question about

17   whether you felt your rights were being violated at the

18   time that all this was occurring, and you said that you

19   did.  Did you at that time know why all of this was

20   happening to you?

21   A.    No, I have no idea why these things were

22   happening to me.  Do I believe that my rights were being

23   violated?  I believe my rights were being violated.  I

24   just don't know why.  I mean, I legitimately thought

25   that I was doing everything that I was supposed to.  I

264

```
 1   was taking care of my family.  We were living in a good
 2   neighborhood.  My son was making straight A's in school.
 3   I was working at an aerospace company doing auditing
 4   work.  Everything in my life was fine except for the
 5   fact that every single day I have to deal with somebody
 6   in the family with having an interaction with the
 7   police, whether it be my seven-, eight-, nine-year-old
 8   daughter hiding under the bed because police officers
 9   are banging on the window, and the only other people
10   that are there, you know, are her brothers and sisters.
11   You know, no adults.  Fifteen year old, the thirteen
12   year old, all -- everybody shuttling in the closet
13   hiding while they're screaming, "Hey, little boy, hey,
14   little girl, come out here and talk to us."  I have no
15   idea why anybody would ever do that.  And again, I -- no
16   understanding, no concept of why..  just that there's no
17   way on earth a cop can come to your house and say
18   they're going to keep arresting you and keep harassing
19   you until you do what they tell me to do.  In my mind, I
20   thought that was wrong.  It seemed to me one hundred
21   percent like it was a gang mentality and it's like
22   exactly what somebody on the other side of the law would
23   do to somebody to extort money from them.  It's like,
24   "Hey, give me money or I'm gonna beat you up, kid."  And
25   that's kind of how I felt with the ordinance violations,
```

1    give me your money or go to jail, and then when you go

2    to jail, we're going to take your money from you because

3    there's no recourse of action for you to get it back.

4        Q.   Okay.

5        A.   So they would just continually write ordinance

6    violations, not serve me with the notice.  It would go

7    to the judge.  The judge would write a warrant for my

8    arrest.  They would show up at my house, tell me that

9    there's a warrant and the only way to get rid of it is

10   to take me to jail.  To bond out, I would have to pay

11   the bond.  The bond would pay for the fine, and then

12   there you go.  There's no recourse of action for anyone.

13       Q.   Yeah.  And at the time did you know why the

14   Sheriff's Office was doing all of this to you?

15       A.   I had no idea why.

16       Q.   There's also been some discussion of the claims

17   for damages.  What is the main thing that you're hoping

18   to achieve with this lawsuit?

19       A.   So I thought about this a lot too even when we

20   started, and the truth is I'm grown, I'm old, I'm not

21   worried about me.  What I'm worried about is that

22   there's some fifteen or fourteen-year-old kid out there

23   that's going to be arrested by the Pasco County

24   Sheriff's Department and they're going to ruin that

25   kid's life, and they're going to pipeline him to be a

1    prisoner his entire life.

2           Let's be honest.  When you go to JDC out here,

3    they put you in jail for 21 days.  What do you think

4    happens to a kid after he's in JDC for 21 days?  He's

5    suspended from school, so he can't go back there.

6           Now every time that he would get out, they

7    would rearrest him, and then he would go right back to

8    JDC for 21 days.  So after the 16 times he was arrested

9    by the Pasco County Sheriff's Department and nothing was

10   ever filed, he'd serve 21 days every time.  They'd let

11   him out.  They'd drop the charges, arrest him for

12   something else.  He'd go to JDC for 21 days.  They'd let

13   him out.  He'd get arrested for something else.  He'd do

14   21 days in jail.  Then they would let him out.  He

15   served about 400 days in JDC with zero crimes ever

16   being -- he never was charged with any of those crimes.

17   Yeah, he served 21 days at a time doing over 400 days in

18   JDC.

19          Now, again, I'm not the smartest man in the

20   world, but if you stick a kid in room full of

21   astronauts, I'm pretty sure that kid's going to come out

22   an astronaut.  If you stick that kid in a room full of

23   JDC members and kids that want to do no good, then he's

24   probably not going to come out very well.

25          And to answer your question, after 400 days in

1    JDC, I don't even know who my son is anymore.  And if I

2    can stop that from happening to anybody else, I want to.

3             So if you want to ask me what I want from this,

4    I don't care about the money.  It's the justice.  How

5    does my son get his innocence back?  He'll never get it

6    back.  No dollar amount will do that.  Me?  I'll be all

7    right.  I'm not worried about me.  I'm fine.  I'm doing

8    just fine.  But my kid and other kids just like him that

9    fit in the same category who their only guilt is being

10   fourteen years old, because any of those things that

11   they claim that my son did is stuff that, you know, kids

12   deserve to spend the rest of their life in prison, I'm

13   pretty sure every single one of us would be there right

14   now.

15            I mean, kids, it's their job to make mistakes.

16   It's their job to find those lines in life, those

17   boundaries, those laws, those rules that parents make.

18   A kid's job is to press those bounds every single day

19   until they learn why they're there.

20            The process the Pasco County Sheriff's got

21   going on is 100 percent wrong.  If they think they can

22   take a fourteen year old kid, throw him in JDC for 21

23   days and expect him to be all right when he comes out,

24   no.  Especially if there's no reason for him to be there

25   to begin with.

1          So, yeah, I seek justice.  I want to make sure

2     that this program never exists in any way, shape, or

3     form again, and hopefully there's a kid named Bobby out

4     there in another dimension that doesn't have to go

5     through what my kid went through, period.

6          MR. JOHNSON:  I don't have anything else.

7                    REDIRECT EXAMINATION

8     BY MR. POULTON:

9          Q.   Do you seriously blame the Pasco Sheriff's

10    Office for Bobby's criminality?

11         A.   One million percent.

12         Q.   How do you explain all the arrest warrants from

13    Pinellas County and all the arrests in Pinellas County

14    prior to ever coming to Pasco?

15         A.   He was arrested three times in Pinellas County.

16    He was arrested sixteen times in Pasco with no

17    conviction, zero.  All this evidence you speak of, even

18    a prosecutor couldn't prosecute because they didn't have

19    anything.

20         Q.   Do you --

21         A.   You can look crazy like that if you want to,

22    but I stood in jail for nothing getting fingers poked in

23    my butt hole for overgrown grass, and if you think

24    that's okay, then there's something wrong with you, not

25    me.

1          MR. JOHNSON:  Okay.  Let's just --

2    BY MR. POULTON:

3      Q.   All right.  You mentioned -- I neglected to

4    ask.  You mentioned in the Rule 26 disclosure you wanted

5    to be compensated for the expense of moving from Pasco

6    to Pinellas in 2016.  Do you have documentation of the

7    moving expenses?

8      A.   I'm sure I can come up with bank statements.

9      Q.   Okay.  I appreciate that.  We'd ask you to do

10   that and ask your counsel to forward that to us if you

11   can.

12          All right.  That's it.  Read?  Waive?

13          MR. JOHNSON:  We'll read.

14                  *   *   *   *   *   *

15          (THEREUPON, THE TAKING OF THE DEPOSITION WAS

16      CONCLUDED AT 5:11 P.M.)

17                  *   *   *   *   *   *

18                S T I P U L A T I O N

19      It was thereupon stipulated and agreed by and

20   between counsel present for the respective parties and

21   the deponent that the reading and signing of this

22   deposition is not waived.

23                  *   *   *   *   *   *

24

25

1                          CERTIFICATE OF OATH

2     STATE OF FLORIDA

3     COUNTY OF PASCO

4          I, the undersigned authority, certify that

5     ROBERT JONES, III, personally appeared before me and was

6     duly sworn on January 27, 2022.

7          WITNESS my hand and official seal this 29th

8     day of February, 2022.

9

10

11     _____

                    Judy Anderson
12                  Notary Public - State of Florida
                    Commission No.:  GG 276821
13                  My Commission Expires:  1-5-2023

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF PASCO

5

6         I, JUDY ANDERSON, Court Reporter, certify that I

7    was authorized to and did stenographically report the

8    foregoing deposition and that the transcript is a true

9    record of the testimony given by the witness.

10

11        I further certify that I am not a relative,

12   employee, attorney, or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties'

14   attorney or counsel connected with the action, nor am I

15   financially interested in the action.

16

17        Dated this 29th day of February, 2022.

18

19        _____

20        Judy Anderson, Court Reporter

21

22

23

24

25

1    DALANEA TAYLOR; TAMMY
     HEILMAN; DARLENE DEEGAN;
2    and ROBERT A. JONES, III,

3      Plaintiffs,

4    vs.                        Case No.: 8:21-cv-00555-SDM-CPT

5    CHRIS NOCCO, in his
     official capacity as
6    Pasco County Sheriff,

7      Defendant.
     _____/
8

9

10                   DEPONENT'S SIGNATURE PAGE

11

12         I HAVE READ THE FOREGOING TRANSCRIPT OF MY

13     DEPOSITION AND HEREBY SUBSCRIBE TO THE FOREGOING

14     DEPOSITION, SAID SUBSCRIPTION TO INCLUDE ANY

15     CORRECTIONS AND/OR AMENDMENTS HERETO.

16

17

     _____        _____
18   Robert Jones, III                           Date

19

20

21

22

23

24

25

1                                ERRATA SHEET

2      PAGE      LINE                    CORRECTION

3      _____    _____    _____

4      _____    _____    _____

5      _____    _____    _____

6      _____    _____    _____

7      _____    _____    _____

8      _____    _____    _____

9      _____    _____    _____

10     _____    _____    _____

11     _____    _____    _____

12     _____    _____    _____

13     _____    _____    _____

14     _____    _____    _____

15     _____    _____    _____

16     _____    _____    _____

17     _____    _____    _____

18     _____    _____    _____

19     _____    _____    _____

20     _____    _____    _____

21     _____    _____    _____

22     _____    _____    _____

23     _____    _____    _____

24     _____    _____    _____

25     _____    _____    _____

**A**

A's 264:2
a.m 1:16 97:21 99:7
  109:16 151:16 210:25
  234:8
abandon 97:15 98:5
abiding 162:21
able 17:25 62:24 63:13
  64:1 146:5 160:16
  179:14 200:13 241:8
  246:10 251:7 257:2
  258:7
absolutely 111:25 114:10
  121:3 164:14 230:6
  237:9 258:10
abuse 225:16
AC 87:4
access 40:22 81:6
accidental 37:25
accidentally 36:13,20
accord 161:18
accurate 86:6 162:8,10
ACE 95:10,16,18,23
  258:4
ACE32-transport
  101:16
achieve 265:18
acknowledge 71:1
  113:19,22 125:24
  145:1
acknowledged 123:9
acknowledging 227:9
acquited 110:19
acquitted 113:16,16
act 249:20
acted 164:9
action 161:25 265:3,12
  271:14,15
active 95:22 174:6
activity 15:5 53:12 64:3
  97:15,19 98:7 100:3
  190:10 197:22
actual 11:22 13:3,6 38:9
  40:14 75:23 82:14
  99:3 137:17 174:23
  181:24 209:4 220:23
  248:14 262:15
add 9:3 77:24
added 55:19 57:17
addendum 104:3,25
additional 204:5
additionally 205:21
address 9:5 10:14,16
  12:24 13:4,7 15:13
  19:14,15 20:24 21:5
  21:12,25 52:16 59:21
  74:23 75:5,7 76:20
  77:13 84:2 103:1
  106:1 164:1 173:19,20
  173:23 193:18 216:4
  216:24
addresses 76:21
adjudication 224:10
admitted 84:18 87:1
  113:19,23 208:12
  229:24,24 256:7
adopted 106:3
adult 97:20 98:8 100:4
  126:23 127:5
adults 264:11
advise 236:3,5,20
advised 40:23,24 51:13
  97:18 100:2 136:22
  141:18 162:2 163:20
advocate 83:9
advocated 82:23

aerospace 11:5 264:3
affidavit 181:24 182:21
  206:19
affirmatively 113:16
afternoon 135:17 170:3
  191:8,11,18 205:4
  259:25
age 43:3 143:1 254:23
agencies 129:2
agency 71:3 129:1
ago 61:23 78:20 80:10
  176:24
agree 68:2 118:15,17,19
  118:24 120:5 122:16
  211:5 220:17
agreed 222:8 269:19
agreeing 262:2
ahead 9:3 27:4 72:16
  92:13 95:15 106:21
  111:21 114:11 138:14
  208:11 209:6 216:19
  221:16 230:24
ahold 42:10 69:25
  126:18
ain't 73:10
air 84:19
alcohol 130:1 250:5
allow 161:16 162:5 261:1
  261:13
allowed 63:24 83:10,15
  106:19 108:15 111:6
  145:19,21 161:19
  172:7 199:2 238:15
allowing 111:7
Amberlea 13:1,2,3
ambiguous 55:23 56:1,4
AMENDMENTS 272:15
amount 87:13 165:15,18
  165:20,24 166:2,11,14
  166:15 187:17 221:13
  226:16,19 267:6
amounts 126:11,14
Amy 87:9,16
AND/OR 272:15
Anderson 1:20,23
  151:20,23 270:11
  271:6,19
Andrew 47:20,23 48:3,10
angry 198:9
ankle 27:19,25 69:11,22
  70:5 172:6 260:8,11
anonymous 141:16
answer 8:22,23 26:6,7
  29:2 41:14 60:16
  65:19 82:5 91:9,17
  93:10 95:13 99:2
  106:24 125:10 166:25
  167:17 170:25 172:4
  186:2 187:16,25 191:6
  198:16 205:14 236:6
  236:21 237:5 238:6,23
  251:22 255:21 266:25
answered 262:21
answering 90:2 237:11
anticipated 140:5
anybody 12:12 25:1
  42:15 50:10 59:5
  63:25 69:10 75:24
  76:11 83:13 99:20
  101:20,24 102:10
  105:3 126:9 135:3
  140:4 159:5 161:19
  165:22 191:12 200:22
  205:8 228:21 236:9,11
  238:18 246:9 249:5
  251:3 260:21 261:18
  264:15 267:2

anymore 161:17 259:22
  267:1
Anything's 63:21
anyway 18:12 56:15
  150:6 219:6 223:1
apart 218:4,4
apologetic 87:11
apologized 84:19 87:10
apparently 64:20 71:24
  196:7
appeal 180:14,15,19
  181:7 233:1,4
appealed 181:10 232:24
  233:2
appear 58:12 129:20,21
  129:22 130:1,9,25
  131:24 137:10 144:8
  148:1,2,22 149:1,3
  177:1 178:10,14,25
  179:13,22 180:2,7
  182:1 183:19 184:4
  185:14 193:16 201:13
  202:14 207:17 212:4
  213:6,11,16 214:24
  217:22 218:11 220:5,8
  221:25 222:6 223:2,13
  223:18 224:9,10,21,21
  224:24 227:6 232:18
APPEARANCES 2:1
  152:1
appeared 58:20 60:19
  110:13 111:22 113:8
  270:5
appears 33:8,8 60:22
  73:4 77:6 104:7,25
  106:8 123:16 132:20
  132:21
applied 33:10 225:5,17
  226:16
apply 180:11
applying 180:20
appreciate 193:10 269:9
approximately 19:25
  184:2 190:7 193:13
  205:2,3,4
April 213:11 214:24
April-May-ish 14:6
area 24:13 40:24 60:9
  73:21,24 74:8 104:16
  235:13 260:13
argued 82:24
arguing 178:12 222:9
argument 42:22 129:2
  217:17,25 220:5,8
argumentative 225:21
Arlington 2:7 152:7
arraignment 144:21
  217:5 224:9
arrest 16:11,25 17:12
  25:14 28:2 51:7 81:15
  82:4 83:13 100:4
  126:9 129:18 130:5
  131:1 132:7 137:9
  144:8 147:25 158:3
  160:4 162:4,13,15
  163:4,5,7,10 165:2,10
  174:14 175:6 177:5
  178:11,14 179:20
  180:1,3 181:24,25
  184:3,24 185:11
  217:22 223:12,13
  224:20 228:10 229:12
  256:24,24 258:25
  261:16 263:9 265:8
  266:11 268:12
arrested 16:12,13,14,22
  16:24 17:16,18 21:20

22:19,23 25:13,24
  34:6 43:9 47:6 48:17
  51:14 52:4,15,20,22
  52:23,24 63:4 79:8
  80:3,22,24 101:21,23
  101:25 102:4,11,15
  112:13,17,17,23
  113:15 126:10 130:12
  131:6,17 136:24
  138:18 144:3 149:5
  160:19 164:8,12
  172:12 176:11,12,13
  177:1,6,13,21 178:17
  178:20 179:11 183:18
  183:20 185:6,17
  206:18 212:1 213:4
  214:24 220:2,4 221:19
  221:24 222:6,11,18
  223:1 225:12,13
  226:18 230:19 237:17
  239:13 240:9 258:15
  258:18 259:17,22
  262:9,12 265:23 266:8
  266:13 268:15,16
arresting 256:23 264:18
arrests 31:9 101:23
  120:10 144:2 179:5
  212:3 223:18 250:11
  250:19 268:13
arrival 89:11 90:11
  104:11,11 170:21
  172:14
arrive 184:22 202:3
  230:8
arrived 67:17 76:14 104:9
  184:22 193:15 201:20
  201:21
art 128:25
Arthur 8:10 47:18
  127:23
aside 101:10,11 111:16
asked 17:9 49:3 55:22
  61:6 86:15,20 99:21
  123:21 124:8 162:14
  163:6 173:22 205:16
  205:19 206:13,16
  210:20 229:7,15
  230:11 246:3 248:23
  252:23 256:12 262:19
asking 38:15,18 52:9
  54:4 62:9 71:4 81:18
  87:8 88:13 92:15
  96:11,18 101:24
  102:21 103:6 120:16
  122:20 126:6,17
  135:21 158:9 179:17
  195:3 196:14,15
  197:15 210:14 219:3
  233:2 235:25 236:10
  237:2,10 238:9 239:6
  239:9 259:19 260:10
  262:23
asks 124:9 210:3
asleep 108:11 190:22
Assessment 71:19 136:25
assist 74:17
associate 92:8 216:16
associated 54:8 57:15
  58:22 105:9,22 115:14
  211:25 257:24,25
assume 65:19 163:7
assuming 103:13 133:11
  169:23 170:16 183:25
  190:19 192:24 202:20
  202:21
assumptions 201:2
assured 183:17

astray 26:25
astronaut 266:22
astronauts 266:21
at-risk 27:2,8,12
ate 55:17
attached 65:1 66:17
  216:14 218:17,17
  221:9
attempt 37:4,10 134:6
  138:8 171:1 181:11
  194:6,12,20 195:6
attempted 89:10 90:10
  129:22 185:25 186:17
  187:15 204:4 206:20
attempting 97:17 98:6
  100:14,17 143:20
attention 197:9
attorney 33:17,21 34:8
  130:22,24 137:11
  158:18 180:16 240:10
  243:5 245:4 246:3
  248:9,23,24 255:4
  271:12,14
attorneys 8:14 29:7
  30:10 34:18 67:23
  126:17 158:14
audio 209:20
auditing 264:3
August 19:5,11 23:7 84:9
  85:20 88:6,10 89:5,16
aunt 140:2
authority 270:4
authorized 271:7
auto 53:20 57:3,15 60:8
  64:24 66:17 100:18
automatically 69:24
automobile 55:6
automobiles 53:9
available 93:5
AVL 168:2
avoid 5:9 8:25 90:13
  122:11 155:9
award 30:16
aware 15:5 81:18 100:14
  130:6 250:4

**B**

B 4:1 5:1 6:1 7:1 154:1
  155:1 156:1 157:1
back 9:24,24 10:25 13:16
  13:17 17:18,20 18:16
  18:19 19:1 21:10,12
  22:12 25:13,15 26:3,8
  28:21 29:22 31:19,19
  34:1 45:3 57:2 58:1
  65:6 72:18,21 78:21
  79:19 82:9 86:8 89:14
  100:6 103:19 104:16
  109:20 112:13,23
  119:14 120:10 123:25
  124:4 126:10 137:22
  140:12 141:4,25
  142:20 161:21 162:17
  162:18 165:12,14,19
  165:21,21,22 180:17
  182:15 196:12 198:25
  205:21 209:16 210:8
  210:24,25 211:3 214:5
  215:2 218:22 220:19
  227:15 233:11,22
  243:3,4,7,18 245:5
  246:11,13,18 247:1,19
  247:23 248:9,16,17,18
  249:11 252:19,21
  254:1,5,6,9,19,22
  265:3 266:5,7 267:5,6
backtrack 69:9

backwards 122:9
backyard 85:24
bad 25:8 62:17 72:5
105:22 120:6 203:20
256:20 263:5
badge 261:21,22
badges 229:3 252:7
261:13
bag 243:18
baggies 82:18 110:12,13
111:18,22 112:5,21
113:8,12 114:8 115:3
115:6 126:11,15
161:18 229:13,13
230:2 231:20 237:7,8
259:21,23
bags 113:13 230:18,20
231:3,7,16
bail 31:8 32:22
bang 89:17
banged 170:24 171:11
188:25 189:3,7,10
banging 64:4 188:16
264:9
bank 269:8
barring 40:21
based 103:13 104:24
130:8 193:17 196:3
basically 30:17 210:20
basing 196:2
battery 260:12
bearing 144:18
bearings 75:22 77:4
beast 46:8
beat 79:13,14,14 162:20
162:20 230:22 264:24
bed 264:8
bedroom 239:1
began 58:4
beginning 65:6 86:7
101:17 115:10 224:18
258:24 259:5 263:1
behalf 249:5,7
behavior 13:19 171:5
behold 83:11 133:22
242:1
believe 11:21,25 12:9,17
13:20 14:2 23:19,25
25:9 33:5 34:17 43:10
44:15 52:7 57:3 66:14
68:1 70:23 73:21
78:15 82:5,19,21 87:7
116:4 118:8 119:21
123:9 137:2 139:4
142:8 143:21 144:7
147:18 162:23 164:7
164:12 165:20 166:3
181:14 182:22 185:9
197:3,7,9 204:8,24
205:1 213:5 217:6
218:2 237:12 239:21
240:24 250:3 253:18
253:20 255:17 259:24
260:10,23 263:22,23
believed 141:24 184:25
185:3,6 197:4 236:25
237:3 239:10 258:2
bell 51:18 75:2 84:23
belong 211:21
belonging 249:13
belongs 102:24 243:8
benefit 83:1
Benjamin 33:25 34:2
243:5 249:9
best 15:2 42:14 49:14
55:8 125:16 242:3
better 77:20 108:22

118:9 119:10 220:9
beyond 204:6 251:19
big 106:13 125:3,16
bill 84:20 246:23,24
248:13
bills 243:15 248:14
biological 41:8
birth 133:4 137:25
186:18
birthday 92:21,24
bit 14:10 32:2 40:21
44:17 48:6 89:14
109:23,24 119:13,14
124:4 128:4 183:12
black 158:22
blacked 235:9,10
blame 268:9
blank 209:2
blanked 110:4,9
blanks 29:15
blind 186:22
blinking 70:5,9
blocking 51:3 205:13
blue 83:23
Blvd 2:11 152:11
Bobby 44:9 47:14,15,20
47:22 48:2,3,10 70:4
83:2,3 89:10 90:11,12
99:24 105:8 106:15
108:13 111:1 113:15
113:22 114:25 115:21
118:3 119:19 120:4,5
120:24 122:21 123:16
123:22 124:12 125:2
125:15 126:4,22
129:17 131:14 136:19
137:24 138:9 139:2,17
139:20 140:1,13 141:5
141:5,24 170:22 171:1
171:1 172:6,14,16
175:10 176:5 187:16
187:18 191:16,17
194:7,12,21 195:6
199:12 210:20,20
229:12 230:22 231:25
258:18 259:22 268:3
Bobby's 76:11 110:10
115:1 133:22 268:10
body 7:8 25:5,6 80:6,9,11
80:15 157:8 160:18
208:1 251:8
Bollenbacher 143:18
200:7 201:16
Bollensbacher 201:16
bond 31:8 32:18 33:9
149:8,10,19 165:7,10
165:18,24 166:2,3
177:21 178:1,10,10,11
180:6,11,20 182:1
211:25 224:13 225:3
225:11,16 226:16,19
232:19 265:10,11,11
bonded 165:3,20
bonds 32:22 232:10,11
booking 165:7
boss 165:19,19,22
bothered 198:10
bottom 47:24 103:18
144:23 147:3 193:11
224:12
bought 19:2,11,22 21:12
242:2,3,22
Boulevard 2:3 152:3
boundaries 267:17
bounds 267:18
Box 1:23 151:23
boxes 115:8

boy 43:4 264:13
Boyd 72:16 74:21
boys 100:21,22 101:1,2
132:25
brain 105:10 262:17
branding 100:12
break 29:10 39:25 46:9
48:6 64:16 72:19
79:15 84:13,25 85:16
109:16 150:6,8 172:22
182:16 203:16,17,23
207:23 241:14 252:13
252:15 260:5
breaking 54:9 61:19
breath 263:13
briefly 57:8
bring 56:9
bringing 24:11
broke 128:23
broken 22:20 206:6
240:18 241:13
brother 55:5 115:2
125:16 139:23 221:2
brother-in-law 9:10
brothers 2:6 33:3 152:6
213:10,14 245:17
252:16 264:10
brought 75:8 115:5
172:5 248:20
bucks 242:2
buddies 133:24
buddy 243:4
building 146:16 147:4
bullshit 214:18
bunch 26:14
burglaries 53:9,20 55:7
57:3 58:22 60:9 61:8
62:12 66:18 100:19
burglary 57:15 60:2,17
64:24 66:6 129:20,22
131:14
butt 268:23
butter 115:7
buy 115:6 241:20 242:1
242:3

C

C-A-M-P-B-E-L-L
158:9
C-U-R-T-I-C-E 35:14
CAD 4:4,5,6,7,8,15,16,17
4:21,22,23,24 5:3,4,5,6
5:10,12,13,14,15,17,18
5:19,20,21,22 6:4,5,6,7
6:8,9,10,11,13,14,15
6:16,17,18,19,20,21,22
6:23,24,25 7:3,4,5,6
35:3,4 67:11 72:23
76:16 88:4,21 89:4
90:21,22 92:4 94:22
108:2 127:21 132:18
137:23 138:6 139:13
143:19 154:4,5,6,7,8
154:15,16,17,21,22,23
154:24 155:3,4,5,6,10
155:12,13,14,15,17,18
155:19,20,21,22 156:4
156:5,6,7,8,9,10,11,13
156:14,15,16,17,18,19
156:20,21,22,23,24,25
157:3,4,5,6 164:18
168:8,16,17 169:2
183:1,13,23 184:20
186:12 189:21 190:12
190:13 191:25 192:7
194:5,19 196:3 200:5
204:1,6

Caleb 9:9 53:8,11,19
54:9,10,13,18 55:5,11
55:12,13,21 56:3 57:9
57:20 58:19,20
caliber 20:19
call 37:23 40:23 41:14
57:3 69:7 71:3,25
72:15 74:17 103:6
104:16 106:20 107:20
108:18 132:19,21
133:17,20 141:18
162:16 173:17,22
174:1 197:1 201:25
202:9,25 229:13
247:24 248:24 251:3,4
251:24 252:3,8,9
258:6,7
called 28:13 41:15,24
47:21 51:1,2 69:17
70:4 74:13 78:3 90:3
101:1 104:4,25 108:12
108:21,22 112:23
130:20 200:15 220:24
240:8 243:4 248:23
249:1 251:18,25 253:1
253:8
caller 40:16,21,23,24
71:11,12 75:15 103:14
104:15 133:2 141:16
141:18 173:14
Caller/mother 104:14
calling 74:16 84:15
141:20,23
calls 43:20,23 44:5 60:1
107:22 202:12
cam 7:8 25:5,6 80:6,9,11
80:15 157:8 160:18
208:2 251:8
camp 189:16
Campbell 158:7 162:2
capacity 1:7 151:7 272:5
Captain 97:13 99:8
captured 117:9
car 17:19,20 25:13 54:18
54:20 55:21 60:1,2,17
61:8 62:12,16 66:6
79:20 108:12 162:18
196:13 243:19 262:13
card 248:12
care 105:17 170:8
172:25 211:18,18
225:25 226:15 234:18
260:18 264:1 267:4
CAROLINE 2:6 152:6
cars 54:9 55:22 73:16
75:17 186:3 234:10
case 1:6 32:6,12 33:11,21
34:4 51:14 52:16,25
58:7 61:15 65:2,4,12
66:13 109:22 113:15
130:16 137:12 151:6
160:3,7 181:4 182:19
188:6,17,19 229:18
236:16,18,22 239:11
240:8,10 242:5 257:18
272:4
cases 32:23 58:9 59:10
59:20 60:5,7 65:8,8
66:11 130:18
cash 224:13 241:20
category 267:9
caught 13:12,15,15
204:14
cause 164:13 185:7
caused 13:13
causing 131:6
Cayman 73:5,10,11,12

73:25 74:2
celebrated 92:23 93:1
Celeste 97:6 99:9 204:25
cell 129:13 242:2,12,18
242:21 243:22 244:2
244:12,16 249:13
center 71:15,19 136:25
certain 168:4 207:10
221:13
certainty 257:23
Certificate 3:6,7 153:6,7
270:1 271:1
certify 270:4 271:6,11
Cgbrothers@ij.org 2:8
152:8
Chagrin 2:3 152:3
challenged 64:20
chance 64:22 68:25 69:4
256:22 261:10
change 28:20
changed 15:17 130:20,20
137:12
characters 14:22
charge 16:25 28:3
230:23,23 231:2
256:13
charged 266:16
charges 17:9 22:11,14
110:19 118:6 131:13
132:12 137:3 266:11
Charles 130:21 137:11
chat 85:14
check 71:4 92:8 95:25
97:5 104:19 123:15
126:2 127:22 128:11
128:21 131:11 135:1
135:19 137:23 138:8
138:23 139:17 159:14
167:5,24 168:18 169:4
170:21 176:3 183:20
183:24 184:1,12
185:24 186:14,15
187:15 189:15 190:5
191:5 194:20 195:12
197:18,21 199:8,10,17
199:24 204:3 217:10
217:12 228:9,15,20
247:2 253:7
checked 72:2
checking 199:9,12
checks 128:7 168:1
250:11,17
chicken 55:17
child 186:21 225:14,16
240:2
children 15:20 41:9,22
42:19 81:7 83:2
105:17 124:19,25
125:3,13,21 191:13,21
242:13 261:6,11,11,14
chiming 121:5,8
choices 120:6,6
choose 17:14
choosing 262:25
CHRIS 1:7 151:7 272:5
Christmas 139:12,23,25
140:1 141:7,9,9 143:8
143:9,15 160:13 164:3
242:3,7
Christmastime 139:23
241:24
chronological 45:1 58:2
64:21 101:22 147:16
183:5
chronologically 44:20
170:8 183:14
circle 106:14 218:22

**circles** 221:5,7
**circumstances** 108:2
**citation** 7:9 144:6,9,11
   144:16 145:2,3 148:15
   148:19 157:9 211:16
   211:18 212:12,15,18
   213:3,16 216:23 218:4
   219:15 220:11
**citations** 31:1 144:4
   148:3 205:18 206:14
   206:15,16,19,22,25
   207:8,11,13 209:17
   210:4,13,17,18 211:2
   214:25 227:10 233:21
   262:7,8
**cited** 147:13 210:15
**citizen** 74:17
**city** 1:24 151:24 228:11
**civil** 35:5 36:1 37:1,2,4
   37:10 39:3
**CJIS** 184:18,21
**claim** 115:11 211:22,24
   218:5 223:11,16
   267:11
**claimed** 160:4 179:5,12
   230:20 231:8
**claiming** 112:16 126:10
   227:6 234:11 237:8
   241:16 259:23
**claims** 265:16
**clarification** 126:1
**clarify** 60:25 182:17
   218:23
**clean** 121:9,14 123:16
**cleaning** 120:25
**clear** 42:15 55:13 81:17
   120:10 184:24 193:11
   202:4,4,4 208:3 262:4
**cleared** 76:5
**clearing** 193:12
**clearly** 8:24 120:13
   126:4 179:11 205:12
   216:25 262:8
**clever** 102:22
**Clifford** 94:23
**close** 17:11 23:15
**closed** 19:5 162:11
   186:22
**closet** 264:12
**Club** 100:21 101:1
**clue** 179:14
**clues** 246:18
**Co-counsel** 2:9 152:9
**cocaine** 232:4
**code** 31:1,4 32:16 33:8
   33:10 95:23 149:19,22
   175:7,13,16,17 177:19
   178:4,6,9,13,17,19,20
   179:23,24 180:12,19
   180:21 181:14 205:1
   206:12 208:5 209:11
   212:4 214:25 219:11
   221:8 224:5 225:5,17
   226:17 227:10 232:20
   233:20 250:11,18
   262:6
**cohesive** 182:9
**coincidently** 222:15
**collaboratively** 98:21
**collectively** 232:14
**Collins** 184:19
**come** 36:1 39:14 40:20
   42:20,24 47:3 64:1
   69:7 74:6 76:11 87:19
   117:13 123:14,22
   124:5,13 126:1 130:23
   142:20 144:7 161:21

162:3 170:24,25
   171:17,25 172:2,8
   196:6 198:25 211:7
   247:1 254:17 256:9
   260:22 262:2,25 263:8
   264:14,17 266:21,24
   269:8
**comes** 50:2,3 120:10
   255:5 267:23
**coming** 24:21 41:16 49:8
   52:12 64:4 78:21 79:3
   82:9,24 105:11 124:24
   125:13 159:13 195:23
   198:17 210:5 257:13
   257:19 261:17 268:14
**commands** 81:2 162:6
**comment** 16:23 62:23
   80:19 116:21 119:18
   121:13,19 138:25
   139:17
**commented** 253:1
**comments** 25:2 80:5
   164:23 193:10 195:19
   196:2
**Commission** 270:12,13
**commit** 49:15 100:18
**commitment** 97:14
**committed** 53:9 256:7,8
**common** 43:2,20 70:22
   228:22 235:13
**communicated** 201:15
**communication** 24:16
   28:16 158:18
**communications** 29:12
   195:18
**commute** 35:24
**commuted** 10:25
**company** 11:5 21:2 264:3
**compensated** 269:5
**compensation** 30:5
**compensatory** 30:18
**complain** 31:18 250:14
   250:16 251:18 252:3
   253:9,13
**complained** 250:9
**complaining** 240:18
**complaint** 182:20
**completed** 206:19
**completely** 67:21
**compliance** 11:3
**Components** 11:3,4,12
   12:23
**Computation** 30:13
**computer** 159:21 207:22
**computerized** 245:1
**computers** 242:3 244:13
   244:14,17,17
**concept** 264:16
**concern** 193:18
**concerned** 190:1 208:22
**concerning** 65:21
**CONCLUDED** 269:16
**conclusion** 149:18
**concrete** 147:5
**condition** 119:20
**conditioner** 84:19
**condo** 15:9
**conducted** 190:8
**confirm** 25:2
**confirmed** 136:20
**confirms** 195:24
**confuse** 149:15
**confused** 103:21 247:25
**confusing** 170:10
**confusion** 142:25 213:2
   221:14
**connect** 114:12

**connected** 60:19 62:11
   271:14
**connection** 27:16,23 54:5
   63:10 77:4 82:13
   230:1
**consent** 5:8 114:17,20
   115:11 155:8 161:6
   229:25 261:2
**consented** 261:1
**consents** 119:20
**consequences** 79:13
**consolidated** 170:11
**constant** 168:9
**constantly** 24:13 263:9
**constitutional** 197:12
**constrained** 182:10
**consumed** 235:9,11
**contact** 44:12 51:12,20
   51:25 58:15 69:24
   70:1 89:10 90:10 92:7
   93:6 104:15 110:3
   133:2,3 134:19 135:2
   135:4 136:18 138:9,9
   138:16 139:18 140:3
   167:5 169:4 171:1
   185:25 186:17 187:16
   189:23 191:6 192:13
   194:7,12,13,21 195:6
   197:23 204:4 205:14
   206:13 260:15
**contacted** 78:4 84:17
   85:21 97:13
**contained** 24:8 230:20
   231:7 259:23
**content** 61:24 124:16
**context** 60:21 130:8
**continually** 265:5
**continue** 80:20 162:22
   251:13
**continued** 3:4 81:5,6
   153:4 158:1 237:16
**continues** 60:12
**control** 43:25 126:23,25
   127:3,5,7 132:22
   234:19
**convenient** 255:9
**conversation** 47:10
   48:14 49:24 52:10
   80:2 86:3,4,7 87:5
   98:1 99:3,4 122:20
   158:25 175:10 210:3
   247:13
**conversational** 8:20 44:1
**conversations** 26:9
   127:10 251:19
**conveyance** 129:24
**convicted** 128:17
**conviction** 268:17
**convictions** 131:18
   Cook@debevoisepoult...
   2:13 152:13
**cooperative** 51:14
**cop** 264:17
**copies** 146:10 220:18
**cops** 61:14 74:13 89:17
   106:20 107:20 108:18
   133:20 160:25 209:24
   251:24,25
**copy** 215:24 216:6
   245:19
**cord** 85:5,21,24
   86:8,19 87:1
**cordial** 18:25
**corner** 18:23,24 24:10
   75:3 106:14 196:4
   243:17
**corporal** 159:1 205:1,20

**corporals** 95:23
**corpus** 147:24 148:24
   209:3 217:15
**correct** 9:22,25 10:19
   11:17 12:5 16:2 18:19
   18:25 19:7 22:13
   26:23 29:21 31:5 32:9
   41:21 42:1,5 47:13
   50:22 53:4,5 62:7 63:7
   71:22 82:1,12 84:4,5
   86:21 90:25 93:2,7,8
   99:16 103:13 106:2,9
   113:9 119:22 121:2,15
   122:3,4 123:9,17,23
   130:10,11 132:6 137:5
   142:24 143:22 148:14
   148:17,25 169:23
   170:1,17 178:25 180:7
   180:9,13 182:1 183:25
   185:12 186:19,20
   188:12,15 189:1
   190:19 192:24 196:4
   196:10,15 198:3
   199:21,22 202:21,21
   206:5,8 207:14,16
   208:8 212:7 217:16,17
   218:10,11 222:11,12
   224:17 226:5 230:3
   231:15,17 234:16
   244:9,21 245:10
   253:16 259:25
**CORRECTION** 273:2
**CORRECTIONS**
   272:15
**correctly** 19:18 105:18
   131:23 160:17 178:13
   246:12
**correlate** 50:20,25
**correlated** 233:11
**correlates** 75:5 168:8
   181:20,25 182:21
   233:10
**correlation** 77:12 259:11
**correspondence** 260:21
   262:1
**costs** 31:9 32:18,23
   224:12
**couch** 116:2
**counsel** 2:5,14 42:13
   46:4 68:1 152:5,14
   182:16 232:8 238:22
   255:7 269:10,20
   271:12,14
**Count** 129:25
**county** 1:8 7:9 9:18,21
   9:23,23,24 10:5,15
   11:15 12:25 13:18,8
   13:25 14:9 16:10,16
   17:24 20:19 21:15,18
   21:21 22:9,12 23:5,15
   24:6 26:17 27:8 32:1
   33:22 49:16 50:10
   51:8 63:1 68:3 78:14
   79:6 95:17 99:20,24
   100:12 102:6 106:1
   107:4 117:21 118:7
   130:18 131:18 132:4,7
   136:15,21 151:8 157:9
   178:22,23 182:20
   197:1 205:6 206:14
   217:11 228:9,16 246:5
   247:7 254:2 256:1,9
   257:25 258:4,6 260:22
   265:23 266:9 267:20
   268:13,13,15 270:3
   271:4 272:6
**couple** 8:15 24:15 64:7

76:5 87:4 142:18
   182:16 207:21 224:11
   244:19 248:16 260:2
   262:19
**course** 30:2 43:6 57:1
   245:24 257:7 262:11
**court** 1:1,20,23 8:18,24
   28:20 29:22,25 31:9
   32:18,22 35:8 64:12
   67:8,23 72:10,25
   86:12 90:24 91:19,25
   96:2 100:7 113:11
   114:18 122:24 123:6
   127:16 130:24 131:4
   137:17 144:22 145:5
   145:15,16,20,25 146:2
   146:12,23 147:1,7,11
   149:12 151:1,20,23
   174:23 175:2,3 179:5
   181:5 182:3 183:3
   204:16 209:1 210:9
   211:6,8 212:2 215:6
   215:11,22 216:16
   220:10 222:10 223:15
   226:12 227:11,19
   228:11,16 229:18
   243:6 244:4 271:6,19
**courtesy** 8:22
**courtroom** 145:17,19,22
   147:12
**covers** 204:23
**crack** 232:4
**crawling** 228:25 261:25
**crazy** 268:21
**create** 50:10 228:22
**created** 47:23 83:8
   239:24
**credit** 241:25 248:12
**crew** 97:18 98:6 100:9
**crews** 100:11
**crime** 5:9 17:10 81:4
   99:22 122:11 155:9
   188:4 256:8,15
**crimeless** 256:16
**crimes** 49:15 61:19
   128:18 256:7 266:15
   266:16
**criminal** 14:18 15:5
   21:18 28:3 32:23
   33:21 34:4 97:15,16
   97:18 98:5,7 100:3
   105:9,12 113:15
   131:13 235:16,25
   257:6
**criminality** 268:10
**criminals** 261:7
**cross** 3:5 75:1,6 153:5
   255:11
**crowd** 14:24
**cuffs** 162:5,7 163:8
**curfew** 88:25
**current** 9:5
**currently** 11:8 15:25
   20:9
**Curtice** 35:12,17,19 36:2
   37:5 39:3,9,13
**custody** 101:18 234:19
**cut** 69:18 72:1
**Cyphen** 133:23
**cyphening** 132:23 133:18

───────────────
                D
───────────────

**D** 3:1 153:1
**D-E-A-N** 9:11
**D-U-N-E-D-I-N** 12:8
**dad** 36:20 102:19 210:21
   210:23

**Dade** 1:24 151:24
**DALANEA** 1:3 151:3 272:1
**damaged** 31:20
**damages** 30:3,13,17,17 30:18,22 32:6,9,12 223:12 265:17
**Darlene** 1:3 30:25 151:3 272:1
**dash** 239:5
**date** 1:14 11:20,22 28:8 38:9 45:4 59:18 61:15 66:6 73:24 74:11 91:12,15 95:5 97:7 98:20 99:8 101:24,25 102:3 112:8 128:3 133:4 134:20 137:25 141:10 144:3,22 145:25 147:1,11,13 149:23 151:14 158:22 167:4,24 168:20,21 174:24 175:2,3 177:4 181:1 184:1 186:17 187:21 189:17,25 191:10 192:17 193:2,7 193:23,24 195:1,4,14 210:9 211:6 212:13 215:11 216:17 222:10 223:15 227:11 228:16 239:13 258:23 259:10 262:11,15 272:18
**date's** 137:8
**dated** 36:12 38:3 40:5 61:23 69:5 85:19 92:4 94:23 132:18 134:24 134:25 136:8 138:7,24 139:13 146:25 164:18 169:3 173:12 176:2,21 183:15 185:24 186:12 189:21 192:7 204:2,23 233:9 271:17
**dates** 10:2 23:9 61:25 70:16 102:1 105:5 131:4 137:17 144:1 179:6 211:8 259:11
**dating** 121:19 237:23
**daughter** 9:10 64:1 121:20 264:8
**David** 203:2
**Dawson** 46:25 58:25 65:4
**day** 18:22 24:11,11,21 26:14 45:15 51:24 52:1 56:24 57:16 58:8 58:9 61:15 64:3,8,19 64:25 90:5 94:13 96:12,19 98:10,11 99:19 102:15 103:7 135:4,10,16,22,25 139:9,23 140:21 141:8 141:9 143:8,15 144:8 145:7,16,24 148:3 149:17 160:12 164:3 165:4,5,6 166:20 167:13 168:12,21 169:8,10 170:13,19 176:11,12,14,18 177:12 178:2 179:19 186:11 189:10 191:22 192:17 194:4 195:24 197:19 198:4,8,18,20 198:23 202:16 205:22 210:5,24 211:20 212:2 220:20 225:12 226:13 228:20,21 230:7,9,9 230:10 233:11 234:4,6 234:6,7 251:16 255:19 255:20 257:19 259:16

262:12,14 263:1,9
264:5 267:18 270:8 271:17
**days** 80:10 87:4 89:6,7 89:24 95:6 96:25 101:14,14 112:13,22 113:15 126:9,12 131:10 134:14,16 138:17,18 139:12,25 142:13 164:20 177:5,6 185:11 198:17,22 204:23 222:15 227:6 228:16 230:19 237:6 256:24 259:1,4,18,20 259:21 266:3,4,8,10 266:12,14,15,17,17,25 267:23
**dead** 260:20
**deal** 44:6 108:21 204:14 246:6 264:5
**dealing** 64:2 108:20 251:5
**dealings** 186:23
**Dean** 9:10
**debate** 59:14 219:7 222:21 223:24
**debated** 261:8
**debating** 222:20
**DeBerg** 33:25 34:2,11,12 243:5 249:9
**Debevoise** 2:10 152:10
**debris** 187:17
**December** 9:16 19:16 137:24 139:14,21 140:13,15,20 143:9,13 158:4 164:8,18 167:4 168:8,17 169:3 171:17 171:9 172:19 254:6
**decide** 20:17
**decided** 55:17,21 172:11
**Deegan** 1:3 30:25 151:3 272:1
**deemed** 128:13
**defendant** 1:9 2:14 151:9 152:14 234:19 272:7
**defendant's** 144:22 220:15
**defender** 130:16,20 131:5
**Defense** 28:16 30:6
**defined** 251:10
**definitely** 99:5 128:23 181:1 193:21 244:23 245:15
**definition** 128:20 198:11
**delay** 241:8
**delinquents** 256:14
**demanded** 174:24
**demonized** 220:13
**demonstrated** 71:24
**department** 16:11,16 26:18 58:4 70:1 74:15 78:15 79:7 83:7 99:21 100:11 105:7 107:4 146:15 147:4,8 197:2 246:16 247:2,2 265:24 266:9
**Department's** 251:21
**depending** 255:20
**Depends** 255:19
**deponent** 269:21
**Deponent's** 3:7 153:7 272:10
**deposition** 1:12 8:12 109:17 150:9 151:12 222:21,24 252:17 269:15,22 271:8

272:13,14
**depositions** 68:8 255:5
**deputies** 25:9,25 26:9,10 26:13 31:2,15 32:1 35:25 39:13 41:18,19 42:3,7 60:1,16 76:4 80:4 90:14 98:4 113:3 125:25 140:15 159:13 164:9 168:7 184:9,10 190:1 193:12 211:1 236:25 237:3 238:1 239:10 249:12 251:5 251:20 253:2
**deputy** 35:25 37:11,16 47:3,11 48:10,14,15 49:2,9,12 51:15 60:18 65:21 66:11,23 67:16 71:2 79:9,17 80:2 81:10,14 82:3,7 85:8,8 86:3,4,24 87:6 88:5,9 95:4 110:2,3 114:2 117:1,7 119:19 120:4 120:5,23 123:21 124:9 136:13 141:17 173:14 184:16 186:17 207:7 209:15 210:3 211:5 227:10
**deputy's** 122:3 219:24
**describe** 196:25
**described** 92:18 249:18 252:22
**describing** 196:24
**description** 56:25 58:21 107:11,16 136:9 143:2
**deserve** 267:12
**designated** 27:2,8,12 199:14
**designation** 200:8 256:1
**despite** 231:21,25
**destroying** 211:12
**detail** 38:11 106:22 109:25
**details** 59:13
**detained** 206:2
**detective** 110:8,11 111:1 114:3
**detectives** 235:5
**detention** 139:3
**determined** 72:2 231:13
**dial** 37:25
**dialed** 36:13,20
**difference** 125:3 244:23
**different** 15:8 18:8,9 28:6 32:20 50:10 56:18 57:1 58:7,8 59:10,20,20 60:1,16 78:24 129:1,2 135:23 135:25 137:6,13 149:23 160:6 177:7 178:16,20 184:9,10,16 192:18 195:16 198:22 200:5 213:12 219:15 219:16 226:25 262:6
**differentiate** 89:21
**dilemma** 75:3
**dimension** 268:4
**direct** 3:3,4 8:6 97:19 98:8 153:3,4 158:1
**directed** 89:8 220:9
**directly** 235:13
**disagree** 111:17 138:12 238:1
**disappeared** 248:15,18
**disclosure** 30:9 32:5 269:4
**Disclosures** 4:3 154:3
**discovered** 51:17

**discovery** 241:11
**discrete** 45:15
**discuss** 40:1 229:10
**discussed** 29:8 262:7
**discussing** 212:4
**discussion** 35:1 47:2 58:17,18 69:2 72:15 94:19 100:5 101:4 109:5 111:14 117:19 120:23 122:7 134:11 136:11,18 137:20 138:4 141:2 163:16 182:13 183:10 210:5 216:11 227:23 233:7 265:16
**disdain** 187:7
**dismissed** 14:3 236:17,18 240:12,14
**dispatch** 35:4 252:1
**dispatched** 136:14
**dispatcher** 68:15
**dispatchers** 68:3
**disposition** 110:15 112:5 113:14 126:13 215:25 221:10
**dispute** 37:3,14,18,24 38:1 111:24 114:8,10 114:17 117:7 197:25 236:24 237:2 239:9
**distinct** 120:17 219:21
**distinguish** 38:8 131:21
**district** 1:1,1 60:9 151:1 151:1
**DIVISION** 1:2 151:2
**docket** 215:2
**document** 37:19 40:15 42:2 45:7 74:13 77:1 96:5 166:7,23 174:25 175:1 179:3,8 183:23 185:20 200:5 201:4 221:1 238:19 248:5
**documentation** 32:22 34:16 45:22 57:16 60:23 165:23 177:19 179:17 242:20,25 245:12 269:6
**documentations** 242:22
**documents** 32:24 57:15 58:6 93:17 98:25 102:25 166:8 174:19 182:17 183:17,21 195:22 220:14 228:19 243:6 259:13 262:17
**doing** 24:20 44:1,6 52:8 83:1 100:6 120:13 133:20 164:14 175:5 191:9 192:4 195:7 199:17 203:8 228:20 228:20 263:5,25 264:3 265:14 266:17 267:7
**dollar** 30:16 87:13 267:6
**Donna** 9:9 15:24 16:7 18:12 40:17,17 44:5 103:14 104:4 108:6 130:4,13 132:20 133:11 141:19,23
**door** 17:11,12 24:14 40:21,21 51:3 89:25 90:1,3 91:3,5,8,9,17 93:10 94:15 99:2,24 124:8 159:13 161:21 162:4,11,12,16 170:24 172:1,2,4 176:4 186:2 187:16,25 188:1,5,7 188:11 189:3,7 191:6 192:1 198:16 203:2,12 205:8,13 243:20 247:8

247:11 256:5
**doors** 57:5 62:16 64:5 89:18 170:24 171:11
**doorstep** 211:20
**doorway** 17:19
**dot** 55:5,5,5
**double** 95:25
**drank** 55:16
**drawer** 117:6
**drawers** 261:15
**dressers** 83:12
**drink** 250:8
**drinks** 54:17 55:16
**drive** 1:18 9:6,7,15 10:16 10:18 13:11 15:9 18:16 19:15,15 20:3,7,8 35:20 76:23 85:23 102:11 114:19 136:14 141:17 142:1 151:18 186:16 189:25 253:18
**driver's** 239:5
**driveway** 92:7 106:14 107:12,17 186:3 234:10
**drop** 266:10
**drugs** 110:11 111:3 117:14 250:5
**due** 22:3 97:14 131:6 137:7 147:14 148:12 205:12
**DUI** 21:22
**duly** 8:2 270:6
**Dunedin** 12:7,8,10 13:1,6 13:14,17 14:4,17 15:4 18:21 19:1 20:7,11,14 22:4
**duplicate** 42:12 65:4
**dying** 260:12
**dysfunction** 260:11

**E**

**E** 2:2 3:1 4:1 5:1 6:1 7:1 152:2 153:1 154:1 155:1 156:1 157:1
**E-R-I-C** 35:16
**ear** 25:11 237:15
**earlier** 51:1 55:9 56:3 117:5 125:19 128:5 169:16,17 185:12 214:1,2 225:23,24 230:2 231:5,10
**early** 23:19 106:15 107:18
**earth** 264:17
**easier** 35:23 166:25
**educate** 125:20 257:2
**effect** 175:13
**eight** 106:16 230:8 233:25
**eight-** 264:7
**either** 9:2 31:18 42:13 46:23,24 55:25 57:9 57:20 65:21 79:2 95:24 102:20 115:8 127:1 160:24 161:6 163:11 164:5 192:13 195:7 234:14
**elaborate** 32:19 34:21 38:14 80:21,23 183:12 208:19
**electrical** 85:2,21 86:8
**electricity** 84:16,20 87:12,13,23
**electronic** 245:6 248:2
**element** 105:22
**eleven** 230:18 237:8
**else's** 242:10

**email** 125:7,9
**embarrass** 12:12
**emotional** 32:8,12
**employed** 10:21 11:9
20:25 26:17
**employee** 35:18,22
247:13,14 271:12,13
**employment** 10:23
**empty** 230:18
**enacting** 260:14
**encompassed** 60:10
**encouraged** 97:15
**encouraging** 5:9 120:23
122:11 155:9
**ended** 23:19 131:5,16
232:19
**ends** 29:23
**enforcement** 31:1 32:16
53:8 91:10 95:23
104:9,11 106:8 179:23
187:7 205:1
**engaged** 98:7 249:19
**enroll** 20:18
**enter** 71:11 126:6
**entered** 40:16 97:25
**entering** 235:4
**enters** 45:22
**entire** 23:5 137:15
145:21 266:1
**entitled** 30:13 46:1 218:2
**entries** 68:3
**Eric** 35:12,16,17,19 36:1
37:5 39:3,8,13
**Errata** 3:8 153:8 273:1
**escape** 32:1
**especially** 241:20 267:24
**ESQ** 2:6 152:6
**ESQUIRE** 2:2,10 152:2
152:10
**essence** 125:20
**establish** 212:21 219:25
**estimated** 70:17
**Eve** 143:9 168:22 170:14
172:4
**evening** 94:25 103:12
169:25 172:5 192:25
**event** 42:12 94:12 104:2
139:9 164:24 186:6
188:24 195:18
**events** 13:23 104:24
107:11,16
**eventually** 205:14 247:22
**everybody** 90:1 91:9
93:10 99:2 105:8
126:18 146:15 190:14
190:22 244:22 263:9
264:12
**evidence** 61:10 78:9,10
129:23 131:19 229:2
230:23,24 231:1,4
239:17 240:13 268:17
**evidently** 51:1
**exact** 20:23 23:8 61:24
70:15 74:11 91:12
144:1 166:15 192:4,17
192:18 193:2,6 255:18
255:25
**exactly** 18:1 26:15 47:16
74:1,9,11,12 75:4
78:17 99:3,8,25
102:17 108:10 123:24
131:10 141:10 188:14
189:6 191:9 193:7
195:16,24 200:18
203:14 204:18 228:24
261:9 263:6 264:22
**Examination** 3:3,4,5,5

8:6 153:3,4,5,5 158:1
255:11 268:7
**examined** 8:3
**example** 30:4,5 33:5
50:21 60:3 120:24
171:12,14 187:23
188:16 250:18
**Excellent** 204:19
**exchange** 30:3
**exchanged** 108:14
**excited** 136:2
**excuse** 85:20 204:2
**execution** 240:16
**Executive** 1:17 151:17
**exhibit** 30:7 34:25 36:7,8
36:23 37:9 38:24
39:24 44:19 51:11
56:19 57:12 59:22
60:3 64:15 66:3 67:9
68:23 72:11,22 76:19
77:2,22,23 83:19 84:7
85:18 88:2,4 89:2,4
90:19 91:19,20 94:20
94:22 96:3 101:5,12
103:9,11 104:3 109:18
109:21 114:13 122:12
122:13 127:19,21
129:6,11 132:15
134:10,13,14,22 135:6
135:9,11 136:5 137:19
138:3,6,20 139:8,13
140:10 141:1,14
143:11 144:16 146:17
146:19,21 150:2 158:3
160:18 164:16 166:17
166:19 167:21 168:14
168:16,21,25 169:2,8
169:11 170:11 172:19
173:10,12 175:24
176:1,17,21 180:23
181:3,6,19 182:12,17
183:12,15 185:20,24
186:9 187:12 188:21
189:14,19,21 190:3
191:2 192:5,7,24
193:3,11 194:1,5,16
194:18 195:9 196:21
198:5 200:2,3 201:9
201:24 202:5,6 203:24
204:1,20,22 207:24
208:1 212:13,14
215:21,24 216:12,22
216:22 217:3 218:21
219:9 224:2 225:23
227:18,22,25 233:6
238:24 239:19 258:12
259:3
**exhibits** 173:4 208:12
210:14 257:17
**exist** 166:9
**exists** 89:23 268:2
**exit** 162:2
**expect** 67:22 267:23
**expense** 269:5
**expenses** 31:25 211:25
269:7
**Expires** 270:13
**explain** 136:3 166:23
268:12
**explained** 8:14 55:16
87:11 206:16
**explaining** 105:8
**explanation** 9:3 65:5
**expose** 251:7
**expressed** 87:11 98:13
99:11,12
**extend** 8:22

**extension** 85:24 184:12
**extent** 62:16
**extort** 264:23
**extraction** 7:8 157:8
208:2
**extremely** 55:19
**eye** 61:18 256:14 263:5

**F**

**F-L-O-R-A-M-A-R**
74:25
**fa-** 205:15
**facility** 248:1
**fact** 50:3 55:4 65:18
113:7 134:1 137:8
162:19 189:8 204:16
219:22 264:5
**facts** 144:17
**fail** 256:25
**failed** 130:25 178:24
179:13 185:14 224:10
227:6
**failing** 220:8
**failure** 33:7 129:20,21,22
129:25 131:24 137:10
144:8 147:25 148:2,22
149:2 176:25 178:10
178:14 179:22 180:2,7
181:25 183:19 184:3
207:17 208:7 212:3
213:6,10,15 214:24
217:22 218:11 220:5
221:25 222:6 223:2,13
223:18 224:21 232:18
**fair** 29:18 38:10 39:16
54:22 98:12 232:11,13
245:7
**fall** 189:16
**false** 47:5,12 48:15 58:17
65:21 66:24
**familiar** 54:20 65:1
84:23 93:17 255:25
**familiarize** 103:20
**family** 18:21,22 20:19
31:25 139:24 145:21
159:6,8 161:19 172:5
243:5 256:6 264:1,6
**far** 43:19 115:4 189:25
208:22 210:17 257:8
262:11
**Fargo** 19:9,9,13 20:1
21:13 22:1
**fashion** 261:23
**fast** 257:8
**father** 40:25 83:6 136:22
176:6 186:23
**fear** 16:11
**February** 145:5 149:1
185:24 186:12 187:15
189:14,22 270:8
271:17
**feel** 40:1 182:6,9 185:16
197:12 236:21 250:25
**feeling** 166:22
**fees** 31:8,8 32:18,22
**felony** 225:13 237:18
240:2
**felt** 197:15 252:24 253:9
263:17 264:25
**female** 170:22 172:14
249:20
**fence** 261:4
**field** 67:11 88:7 89:7
104:24 134:17,25
138:23 139:16 140:22
164:21 167:24 168:17
173:13 186:13 189:22

190:6 192:8,11 194:6
194:19 199:7 202:21
204:2
**fifteen** 43:9 100:10
193:16 264:11 265:22
**fifteen-year-old** 43:4
**fifth** 144:15 182:20
**fifty** 34:10 176:1
**fight** 14:13,17 15:6 41:13
100:11 246:5
**fighting** 13:12
**fights** 75:10
**figure** 32:17 166:8
174:11,12 192:16
202:18 207:21 232:10
**figured** 124:14
**figuring** 218:20
**file** 130:23 216:16
**filed** 97:19 98:8 100:4
170:20 243:6 245:4
249:6,8,8 266:10
**fill** 29:14 103:7
**final** 149:18
**finally** 173:2 256:20
**financially** 211:15
**find** 80:8 83:13 113:8
142:8 200:19 239:24
246:25 247:21 248:25
257:2 261:16 267:16
**finding** 231:19,20
**fine** 67:21 101:9 116:17
119:9 123:25 178:7
203:22 216:20 251:23
264:4 265:11 267:7,8
**fines** 31:1,4 32:16 149:20
**fingers** 268:22
**finish** 8:21 13:22 25:22
26:5,6 27:5 50:23
52:11 100:17 107:5,9
107:14,14 118:21
141:22 148:5 165:17
177:18 206:24 219:19
**fire** 146:15 147:4,8 226:9
226:10
**firearm** 22:21
**first** 4:3 8:2,17 10:6,7,8
10:12,15 11:18 14:8
15:14 20:12,13 23:4
24:16 25:14,23 28:12
28:13 30:15,24 34:13
34:24 35:3 39:1 40:11
46:5,16 47:4,7 52:3
59:24 62:12 73:23
74:18 89:24 98:1,10
99:19,19 106:3 110:20
110:21 114:23 122:16
122:21 154:3 182:18
183:18 184:22 186:16
202:3 206:21 208:22
224:5 226:3 228:7
229:9 244:1 245:11
249:21 254:19 257:18
260:14
**fiscal** 11:25
**fit** 267:9
**five** 32:5 70:21,22 95:6
96:25 129:17,25 148:3
166:20 167:14,20
169:7 178:18,19,19,20
178:24 179:1 180:4
182:18 193:2,7,8,19
203:21 226:25 228:10
230:8 242:17,20,22
243:17 244:2,7,11,16
251:15 260:2 262:25
**five-minute** 150:5
**fix** 28:19

**FL** 1:24 2:11 151:24
152:11
**flash** 114:19
**flat** 111:11
**Floramar** 74:24 75:4,5
77:5,7,8 84:3
**Florida** 1:1,18,21 9:6,8
13:1 19:3 86:16
144:19 151:1,18,21
270:2,12 271:3
**folded** 227:15
**follow** 83:5 162:6 249:2
**followed** 249:6
**follows** 8:4 107:21
**followup** 248:22
**food** 235:13
**foot** 17:12 162:12
**foregoing** 271:8 272:12
272:13
**Forever** 18:14
**forget** 32:5 173:7
**form** 182:9 268:3
**format** 166:24
**forth** 10:25
**forty** 225:23
**forward** 122:2 144:19
148:19 269:10
**found** 14:16 15:10,11
51:15 82:17 111:18
113:12 115:4 116:14
126:11,14 163:17
174:17 236:25 237:4,9
237:18 239:14,25
240:4 243:15
**four** 15:20 19:14 32:4
44:21 55:16 83:2 94:5
105:17 134:14,16
142:13 148:3 182:18
226:25 242:13 244:13
244:16 261:6 262:25
**fourteen** 47:6 48:17
135:18 267:10,22
**fourteen-year-old**
100:10 265:22
**fourth** 115:22
**framework** 38:16
**free** 40:1 182:6
**freely** 111:7 163:4
**freezer** 235:12 239:1
**frequency** 250:17
**frequenting** 164:1
**frequently** 164:4
**friend** 46:18 49:14 54:1
55:8 62:25 67:1,2
172:8
**friends** 14:19 41:10,25
50:6,7,10,17 63:14
76:11 104:6 105:1
106:5 117:6 132:22,23
134:2 238:18
**front** 25:15 32:21 40:21
73:16 74:14 75:17
79:20 102:14 148:20
161:16 162:4 176:4,5
176:7 183:14 186:2,22
211:19 225:13 240:23
241:3
**full** 8:8,21 23:20 51:16
108:12 165:15,17,20
229:9 266:20,22
**full-blown** 231:11
**fully** 8:23
**funds** 165:22 166:2
**funny** 59:9 242:4
**further** 21:18 40:22
55:15 83:20 102:8
114:25 271:11

**future** 97:18 98:7 120:7

**G**

**gain** 81:6 261:12
**gang** 264:21
**garage** 58:20 73:6 75:16
205:8,10 214:17,22
219:23 229:1 243:20
243:20 262:1
**gas** 132:23 133:1,1,18,23
134:3,5,7
**gather** 192:20
**geez** 24:2
**general** 90:7 92:17 160:3
**generally** 90:6 128:6
**generation** 125:21
**genre** 64:14
**getting** 26:25 39:9 72:1
103:21 110:7 131:6
147:19 191:15 197:10
220:9 232:19 268:22
**GG** 270:12
**ghosts** 232:5
**girl** 172:8 237:23 264:14
**give** 8:15 15:2 28:21
59:17 65:5 68:25
103:21 124:7 129:4,8
175:14,17 205:19
207:20 210:20 217:15
248:8 254:25 264:24
265:1
**given** 18:2 47:5 48:15
58:17 59:1 65:21
66:24,24 105:2 130:16
133:4 148:4,13 220:20
229:25 238:20 241:25
246:14,21 249:11
271:9
**giving** 106:22 111:1
118:11 243:7
**Glad** 34:22
**glass** 176:4
**Glebe** 2:7 152:7
**go** 8:16 9:3 13:19 14:10
18:10 21:10 27:4 28:8
30:12 32:19 34:24
36:25 38:11 40:6,15
46:8 66:7 68:7 71:4
72:14,16 82:20,22
83:10 84:12 92:13
95:15 103:19 106:21
109:15 110:8 111:21
114:11,25 117:21
118:14 121:14 123:25
130:23 136:8 138:14
161:6,17,19 165:7
170:5 172:7 174:19
175:3 179:16 205:11
205:23 206:2 208:11
209:6,20 215:2 216:19
221:16 228:23 230:24
236:1,20 240:7 241:24
246:17 251:18 252:19
257:1 261:11 265:1,1
265:6,12 266:2,5,7,12
268:4
**goes** 49:12 58:1 68:16
160:18 262:11
**going** 11:21 17:12 28:13
29:6 33:15 35:22
38:16 42:22 44:14
45:23 52:2 56:16,17
56:23 59:17 61:19,20
63:10 67:19 72:13,17
72:21 73:6 78:18,21
80:13 82:4,8 100:1
102:13 103:5 107:19

**108**:5 113:23 117:1,10
118:12 120:11 121:14
124:14 126:3 140:12
141:4 145:22 147:16
150:4 160:16,24,25
161:7,8 162:12 163:8
172:23,24 177:10
183:6 196:23 199:3
204:15 208:1,23
211:14 214:3,4 215:20
221:5,7 229:1,23
236:3,5,6,20 241:7
245:11 246:5 249:22
250:1,10 251:13,19
253:6,8 254:17 256:16
256:21,21 257:5
261:15,15 262:14
263:11 264:18 265:2
265:23,24,25 266:21
266:24 267:21
**gonna** 79:2,3,3,12 82:25
108:18 125:6 159:17
162:20,21,22 163:11
163:11 179:14 264:24
**good** 8:8 10:7 32:14
42:14 64:13 75:8
76:18 83:8 96:24
120:6,24 150:7 199:4
199:5 204:14 229:22
237:10 244:22 252:12
264:1 266:23
**Google** 4:18,19 77:5
154:18,19
**Gorman** 46:13,16,21
51:16 53:3,7,25 54:5,8
63:11 65:23
**Gotcha** 65:16 68:17
108:24
**gotten** 61:13 117:22
169:12 191:21
**Government** 1:18 151:18
**grabbed** 210:22
**GRACE** 2:6 152:6
**grade** 14:21 20:16
**graduated** 20:13
**grams** 239:4,25
**grand** 129:20 131:14,25
**grass** 175:9 205:9 207:1
208:6 210:6 212:5
214:1,10 219:21 227:1
228:24 261:24 268:23
**great** 256:16
**green** 70:5 110:13
111:23 113:9 130:21
137:11
**ground** 8:15
**group** 22:22 45:15 62:3
66:5 67:5,5 100:15,17
100:22,23 101:1,2
104:6 105:1 148:2
**grow** 256:21
**grown** 265:20
**guess** 11:22 23:8 32:4
58:9 65:3 84:21 94:24
97:24 144:15 167:20
172:8 236:13 258:2
**guessing** 192:2
**guest** 132:19
**guilt** 267:9
**guilty** 128:23
**Gulf** 60:10,10 77:9 83:22
**gun** 261:21,22
**guns** 229:3 232:3,3 252:7
**guy** 162:19 163:10 175:6
195:15 201:25 203:3,7
203:7 216:1 252:8
261:20

**guy's** 24:2
**guys** 24:20 150:5 182:7
229:3 241:4 251:9
252:7

**H**

**H** 4:1 5:1 6:1 7:1 154:1
155:1 156:1 157:1
**H-O-R-A-C-E** 9:14
**H-O-R-R-I-S** 9:13
**habeas** 147:24 148:24
209:3 217:15
**half** 242:8 248:15
**hand** 102:1 122:3 125:14
270:7
**handcuffs** 196:12 210:19
215:13 262:13
**handed** 210:19 216:10
246:13 248:9
**hands** 17:18 162:17
210:24
**handwritten** 226:3
**hang** 110:20 126:20
171:6 204:8
**hanging** 14:23 22:23
50:11 199:1
**happen** 21:5 28:7 32:21
35:25 38:4,18 70:13
70:16 72:5 88:8 91:1
92:11 98:21 101:20
109:1 128:7 134:19
135:3 137:25 142:3
171:16 187:9 260:9
**happened** 10:17 13:23
14:21,25 22:3 29:15
33:9,13 41:5,6 49:23
63:19 70:18 71:6
87:10 88:22 89:21
92:16 99:7 107:1
108:9 112:12 126:8
130:14,15,22 131:13
132:12 133:24 148:18
166:14,16 172:9 175:2
178:3 180:4 188:14,16
204:12 217:10,12
225:24 226:12 228:9
228:15 232:10 241:23
241:24 250:6 251:15
259:14 260:24
**happening** 171:8 211:10
228:24 251:8 256:15
261:4 263:7,20,22
267:2
**happens** 52:9 160:12
163:2 266:4
**harass** 80:20 82:9 96:15
159:17 162:22 251:13
254:18
**harassed** 81:7 211:23
220:3 230:6 250:22
252:5
**harassing** 78:18 79:4
80:13 118:19 163:12
177:9 250:24 253:24
256:23 264:18
**harassment** 32:1 91:16
140:25 164:25 168:9
173:8 187:22 188:3
189:18 195:2,25
196:24 198:11 200:15
203:14 235:3 251:8,10
251:11,11 253:7
**Harbors** 60:10,11 77:9
**hard** 38:6 62:18 73:7
105:16,16 166:15
196:11 203:9 237:5
**harder** 241:18

**harm** 237:11
**He'll** 267:5
**head** 8:25 9:1 106:4
261:8
**heads** 184:7 192:20
**Headsail** 10:16,18 11:16
11:19 12:17 15:9,14
18:16,18,24 19:19,19
21:11 35:20 52:16
69:11 75:1,4 76:23
77:5,6 84:3,4 85:23
102:11 106:1 136:14
141:17,25 164:1
186:18 189:25 205:5
253:18
**hear** 17:25 36:14 52:22
52:25 53:6 121:4,8,9
121:13 124:10 130:12
133:9 158:12 159:3
203:15 261:18
**heard** 37:20 99:23
100:21 108:11 117:12
120:4,21 133:10 158:8
158:10,13,19 211:7
246:12 249:12,23
256:8
**hearing** 52:19 85:1
124:12 175:3 179:23
208:6 209:5 222:16
231:11 233:1 249:21
**heck** 254:21
**Heights** 2:3 152:3
**Heilman** 1:3 30:25 31:7
151:3 272:1
**hell** 229:7
**help** 8:16 60:19,25 62:5
62:10 63:15 77:17
93:13 126:17,17,18
259:7 261:20
**helpful** 33:15 34:22
56:11 94:6,9 245:20
**helping** 126:19
**HERETO** 272:15
**hey** 24:19 36:19 43:24,25
43:25 69:24 72:1
82:22 99:25 106:20
108:17 118:12 120:11
120:12 125:4 133:22
163:10 175:5,17 253:2
256:10 260:16 264:13
264:13,24
**hidden** 239:4
**hide** 126:5,5 172:11
**hiding** 264:8,13
**high** 12:7 13:14,17 14:4
14:17,20 20:14,20
191:19,19 227:1
**higher** 251:7
**highly** 187:8
**hire** 33:21 34:8 180:16
**history** 12:14
**hit** 55:22
**Hmm** 84:11
**Holborn@debevoisepo...**
2:13 152:13
**Holcomb** 186:17
**hold** 25:22 78:12,12
81:13,13 106:23 108:1
111:20 113:2,22 121:7
148:11,25 161:4 177:3
177:18 211:24 213:18
216:6 217:25 218:20
220:4 231:13,23
235:20,20 246:9
250:15
**hole** 268:23
**Holiday** 9:6,8,18 12:17

**13**:22 15:4 16:3 20:8
20:21 50:9 254:19
**home** 18:6 35:22 41:9
52:14 55:6,17,21 56:3
64:5 67:16 69:21 70:2
83:15 89:13 104:15
111:7 114:4 119:5
126:6 130:9 138:25
141:5,6 159:10,11
161:17,20 168:19
170:22 172:15,18
191:7,12,15,18 196:8
197:22 198:13,15
200:11 204:4 229:11
229:16 230:1,9,12
234:12 237:18 242:12
244:13,17
**homes** 24:12
**honest** 266:2
**honestly** 52:18 85:3
103:24 109:8 125:12
174:11 198:24 237:12
261:8,17
**honorable** 261:23
**hooded** 62:14
**hook** 87:3
**hopefully** 268:3
**hoping** 62:4 265:17
**hopping** 54:18,20 55:21
**Horace** 9:10
**hot** 87:3 100:21,22 101:1
101:2
**hotel** 18:23,24 19:22
221:18,21,22
**hour** 248:15
**hours** 55:18 110:3
135:17,18 166:20,20
167:15 169:7,17 190:7
193:7,8,19 201:15,18
203:3 205:3 230:8
233:25 240:4 243:17
248:18
**house** 15:9 16:21 17:13
17:13 18:17 19:6,10
19:11,22 24:10,20
35:24 40:23 41:17,19
41:25 42:3,7,20,24
50:3,14,17 58:5,10
59:9,11 63:24 64:4
73:12 74:14 75:24
76:12 78:5,6,19 79:11
81:1 82:22,24 83:10
84:16 85:2,22,22 87:2
90:13 91:12 98:11,23
99:22 104:8 105:3,6
105:12 106:6,13,19
107:3 108:15,15 114:7
119:5 142:12 144:20
148:20 158:23 159:5
159:17 161:10 162:13
162:13 164:10 171:24
172:7 176:5,7 177:13
184:19 199:1 200:22
201:1 205:7,12 209:24
210:7 211:12,20 212:6
214:14 215:15 216:2
216:25 218:12 222:3
228:19 235:18 237:1
238:15 240:3 242:10
243:9 250:1,4 253:23
254:13 256:4 257:14
257:16 258:10 261:2
261:14 262:2,25 263:8
264:17 265:8
**household** 43:2 83:1,13
90:2 106:4
**houses** 247:9

housesitting 73:4
Huh 125:8
Huh-uh 39:12
human 261:21
hundred 178:6 264:20
hung 16:13

**I**

I2 186:14
idea 10:1 36:3 39:21
  44:11 77:13 117:25
  175:21 209:13,13
  257:5 261:14,23
  263:12,21 264:15
  265:15
identification 30:7 34:25
  36:8,23 38:24 39:24
  44:19 56:19 57:12
  59:22 64:15 66:3 67:9
  68:23 72:11 76:19
  77:23 84:7 88:2 89:2
  90:19 91:20 94:20
  96:3 101:5 103:9
  109:18 114:13 122:13
  127:19 129:6 132:15
  134:10,22 135:6 136:5
  137:19 138:3,20 139:8
  140:10 141:1 143:11
  146:19 150:2 163:17
  164:16 166:17 167:21
  168:14,25 169:11
  173:10 175:24 176:17
  180:23 182:12 186:9
  187:12 188:21 189:19
  190:3 191:2 192:5
  194:1,16 195:9 196:21
  198:5 200:3 201:9
  203:24 204:20 207:24
  216:12 227:22 233:6
identified 49:13 54:9
  65:22 162:1 194:18
  245:6
identifies 194:19
identify 62:24
identifying 67:1
ignored 94:16
ignoring 187:8
III 1:4,13 8:1,10 14:15
  30:25 31:14,24 136:22
  151:4,13 162:3,6
  163:18 170:22 171:1
  172:14 228:8 234:20
  270:5 272:2,18
illegally 220:16
illusion 86:17
imaginary 232:5
immediate 139:24
immediately 49:13 62:24
  165:3 178:1 245:25
  246:1,12
important 8:17,19 79:15
  215:19
impression 46:5
improvement 83:9
inadequate 218:6
inches 205:10 207:1
incident 4:9,10,11,12,13
  4:14,20 5:7,11,16,23
  6:3,12 7:7,11 17:22
  29:6 31:16 34:24
  37:21 38:5,13 39:17
  39:20 40:13 50:20,25
  57:14 62:6 66:13
  68:20 69:5,17 73:4
  76:15 83:17 84:9,24
  85:19 88:14 89:15
  90:12,21 91:1,7 93:9

95:2,2,6 108:5 109:6
  109:21 110:22 112:10
  112:12 115:14 129:11
  130:4,10 132:17 133:1
  133:6,7 136:7 137:1
  138:1 139:6 140:17
  142:4 154:9,10,11,12
  154:13,14,20 155:7,11
  155:16,23 156:3,12
  157:7,11 158:4 160:11
  160:19 168:19 170:18
  172:19 176:21 182:19
  182:21,23 183:15
  184:19 187:9 190:12
  191:25 201:6 204:6,22
  219:10 233:9
incidents 10:17 17:1 18:5
  29:16 32:20 38:6
  44:14 72:6 173:7,8
  253:1
include 104:13 149:22
  239:1 272:14
included 227:1 249:14
  249:17
includes 241:1
including 120:25 135:2
  235:7
incorrect 48:11
increment 202:13
independent 134:19
  135:22 139:5 164:23
indicate 42:2 127:23
  138:8 186:1 190:7
  195:12 199:14
indicated 55:12 138:7
  241:12
indicates 36:12 37:9 47:4
  56:3 85:20 88:5,21,22
  93:6,24 101:12,17
  104:3 110:2 127:22
  130:3 136:13 137:23
  143:17,19 171:20,23
  173:21 174:5,13 192:8
  192:11 195:11 205:2
indication 37:3 47:19
  57:4 76:4,9 90:10 92:5
  135:9 140:13,22 204:3
indicator 72:1 77:20
individual 17:1 18:4 28:6
  93:21
individuals 26:24 62:15
influence 125:2 261:12
informally 255:7
information 43:11 74:5
  102:14 103:7 135:1,19
  141:17 142:11 144:21
  173:14 182:24 200:20
  204:5 217:5 247:3
infraction 221:9
initial 4:3 14:7 154:3
initially 163:19 256:5
  263:3
inkling 261:10
innocence 267:5
inside 27:24 89:10 90:11
  119:5 121:14 170:22
  187:8 191:6 192:2
  205:10,16 238:4
insight 46:6
insinuating 47:23
instance 70:3 188:13
  255:16
instances 71:1 103:5
  260:19
Institute 2:2,6 152:2,6
instruction 105:2
intel 97:16 98:5

intentionally 163:18
interacted 79:10
interacting 95:4
interaction 65:20 94:12
  103:6 105:5 140:15,24
  168:7 171:7 252:23
  253:6 254:2,8 264:6
interactions 14:8
interested 43:16 271:15
interpret 31:3
interruption 129:13
intervene 253:2
interview 51:8 75:24
interviewed 61:5,8
Interviews 235:9
intoxicated 54:16 55:19
introduce 98:11 256:6,10
introduces 44:23
inventory 241:1
investigated 65:17
investigating 17:10 81:4
  99:22 188:4
investigation 38:4 57:2
  60:18 67:12 88:7
  90:23 92:6 94:23 96:5
  101:13 134:17 140:23
  164:21 189:23 192:12
  194:6 201:12
investigator 58:13 60:4
investigatory 66:10
invite 41:10
involved 53:11,20 54:10
  54:14 55:6,11,12,13
  57:1,10,21 85:4
  249:18
involves 102:18
Islands 73:5,10,11,13,25
  74:2
issuance 223:13
issue 28:5 70:11,22
  111:16 127:9 137:8
  147:17 207:22 209:4
  217:19 260:7,14
issued 31:1 144:20
  148:23,24 149:2
  206:25 209:3,4 214:9
  214:25 217:18 218:1
  220:11 223:2 224:20
issues 13:20 22:3 118:25
  125:14 229:10
it'll 170:10 219:6
item 39:21
items 34:9 110:11 111:2
  147:20 206:4 239:22
  239:24 240:17 241:12
  241:16,21 242:9
  243:18 244:15,20
  245:6,7,12,18,22,23
  246:13,21,22,25 247:1
  247:3,9,15 248:3,6,8
  248:11,14,17 249:10
  251:15
iterate 161:12
IV 12:4 20:22 21:17,20
  23:3 27:1,7,11,16,19
  42:23 44:6 48:3,7,7
  51:6,12,20 52:15 63:3
  69:10 84:17 85:8
  86:17,25 88:24 104:13
  108:25 109:3 110:5
  115:23 118:3 127:23
  136:19,24 141:6 171:1
  172:16 175:11 186:18
  192:14 230:22 249:16

**J**

Jablon 237:22

JAC 71:14,15,25
Jacksonville 20:12 35:21
  74:8 139:18,21,22
  140:14
jail 27:25 61:20 102:6
  118:9,14 138:15
  148:21 160:25 161:6,8
  165:1,4,5 174:17
  176:9,10,16,25 177:24
  180:7 220:15 221:24
  226:21 227:16 228:23
  237:6 247:8,10,11
  248:2 262:14 265:1,2
  265:10 266:3,14
  268:22
jailhouse 247:8
January 1:14 9:16 19:17
  151:14 173:12 174:14
  176:2,10,13,21,25
  177:5,25 183:13
  184:25 185:12 187:3
  254:7 270:6
jar 195:22
JDC 126:12 138:17
  259:1 266:2,4,8,12,15
  266:18,23 267:1,22
jelly 115:7
Jenkins 97:13 99:8
jet 132:23 133:18,23
  134:7 144:2,18 148:19
  205:7,9 207:2 208:6
  210:6,14 212:5,12
  214:11 227:2 228:25
Jimmy 24:2,4,17,18 25:2
Jimmy's 24:24
job 11:2,11 244:22
  267:15,16,18
jog 29:14 39:8 62:5 94:9
Johnson 2:2 3:5 8:7 23:8
  28:22,25 29:19 39:25
  42:2 44:22,25 45:13
  46:1,6 53:14 55:1,3,10
  55:23 56:1,6,9,14 68:6
  68:11,16 81:17,20
  85:11,14 93:13,16,20
  93:24 94:2,5,8 95:13
  95:16 107:5 118:21
  119:6,9 125:7,9 127:8
  127:13 136:1 148:5
  150:7 152:2 153:5
  158:13 159:20 166:21
  167:2,11 169:14,16,20
  170:1,5,10 173:4,21
  182:11 183:9 184:15
  184:18 190:16 192:21
  203:16,18,20 204:10
  204:13 208:15 212:16
  212:25 213:2,7,12,15
  213:19,22 214:23
  216:6,9,13,17,20
  218:14,20,25 219:2
  221:13,17,19,22,24
  222:2,5,9,17,20,23
  223:6,17,23 232:13,15
  235:20,23,25 236:3,5
  236:8,14,18 238:6
  240:24 241:4,6 245:16
  251:22 252:13 255:12
  259:2 260:1,6 268:6
  269:1,13
Jones 1:4,13 5:8,9 8:1,10
  8:11 9:9,9,10 12:3
  15:24 20:22 21:17,20
  27:7,19 29:5 30:25
  31:8,14,24 40:17,17
  47:14,15,20,22 48:2,3
  48:7,7,10 51:6,20,25

52:15 53:8 69:10
  84:17 85:8 86:25
  88:24 89:10 92:8
  97:12 103:14 104:4
  108:6 110:5 114:19
  115:23 116:9,21 118:2
  120:4,24 122:10
  123:22 126:22 127:23
  129:17 130:4 132:20
  133:3 136:19,19,22
  137:24 138:9 139:17
  141:5,6,19,23 151:4
  151:13 155:8,9 159:15
  162:3,6,12 163:18,25
  171:1,1 175:11,11
  176:6 186:1,17,18,23
  187:16,19 192:12,14
  194:7,12,21 195:6
  197:21 202:14,17
  204:4 205:15,16,18
  206:13,15,18 212:21
  217:3 227:25 228:8
  229:24 230:2 232:22
  234:20 254:22 270:5
  272:2,18
Jones' 190:9
Jones's 92:21 232:17
JPO 51:14 52:16 104:14
  108:25
judge 7:10 33:9 113:11
  113:17 145:6,24 146:9
  147:23 148:7 149:2,2
  149:18 157:10 180:10
  181:12 207:12 208:4
  208:25 209:11 215:8
  217:10,18,21 218:9,10
  218:12 222:14 223:9
  224:10 225:15 226:4
  227:6 228:2 229:19,25
  243:7,10,12 246:22
  248:8 251:6 253:14,15
  265:7,7
judge's 225:2
Judy 1:20 151:20 270:11
  271:6,19
Judy@andersoncourtr...
  1:24 151:24
July 72:23 73:24 76:15
  86:1
jumped 163:21
jumping 240:22
June 36:25 38:3,5 39:2
  40:5 45:7 47:3 51:5,10
  52:6 58:15,16 67:14
  67:17 69:5 253:21
Junior 14:14,14 15:6
  27:1 58:17 63:2,3
  86:17 98:3,13 99:13
  100:14,25 105:1,21
  115:21 116:9 118:3
  119:20 120:4,24
  122:21 123:16,22
  126:22 133:4 136:19
  139:2 141:6 142:23
  159:15 163:25 175:11
  205:15,16,18 229:12
  231:25 238:2 249:16
  249:19
Junior's 82:17 111:2
  114:25 129:17
junk 187:17
justice 2:2,6 152:2,6
  267:4 268:1
justifies 211:10
justify 145:22
juvenile 18:6 22:4 40:20
  40:22,24 49:4,14

51:17 58:21 71:18
110:17 126:23 127:2,6
127:9 136:15,24 159:1
159:2 162:1 235:11
249:20 256:13
**juveniles** 13:19 42:19,23
59:1 60:11 100:18
238:5 249:19

---

**K**

**K-A-M-A-L** 158:9
**K-A-M-M-E-N-O-S**
173:15
**Kamal** 158:6 162:1
163:17
**Kammenos** 173:14,15
**keep** 14:15 41:24 58:18
61:1 63:1,15 64:19
67:22 78:18,21 79:3
80:13 82:8 83:3 100:6
163:12 172:22,24
184:6 195:19 196:23
199:3 214:5 221:11
229:23 256:3 263:5,5
264:18,18
**keeping** 61:17 64:21
123:15 182:24
**kept** 172:7 256:14,23,23
**key** 254:22
**keys** 243:19
**kicked** 12:2 13:12,13
146:15 147:4,8,19
226:8
**kid** 13:21 100:10 263:13
264:24 265:22 266:4
266:20,22 267:8,22
268:3,5
**kid's** 265:25 266:21
267:18
**kids** 22:23 43:24 82:21
83:2,4 115:5 126:6
132:21 133:2,17,19
176:3 211:15,19
266:23 267:8,11,15
**kind** 17:9 26:25 33:20
43:5 44:17 53:12 58:1
60:15,25 62:18 73:13
77:13 83:9 101:10
179:14 184:13 211:8
229:5,6 238:18 257:4
260:12 261:12 262:16
264:25
**kitchen** 235:14
**knew** 16:13 51:13 137:15
145:4,21 162:19
174:16 175:4 201:5
246:13 261:9
**knocked** 89:25 91:3
94:15 203:11 205:13
**knocking** 91:5,8 188:1,5
188:5,6,8,11 192:1
203:2 256:5
**know** 11:20,23 14:22,23
15:8 16:17,20,23
17:21 18:3 20:23,25
21:1,5 23:2 24:9,12,16
24:18,20,23 27:1,3,4,7
27:11,22,23 28:2,4,10
28:15,25 29:9,11 30:5
32:25 33:5 34:16
35:16,25 36:19 42:4,7
42:11,13 43:5,12,16
43:19 44:12 45:21
46:6,15,16 48:5 51:9
52:8,9,12 53:3,11,14
53:19,21 58:8 59:8,12
59:16 61:6,10,18

62:16,19 63:6,14 64:2
64:6,20 67:5,25 68:4,6
68:7 69:22 71:5 73:9
73:11 74:1,1,4,5,19,20
75:5,6 76:10 77:3,17
78:5,5,12 79:18,19,21
80:6 81:2,24,24 83:8
85:3,24 86:8 87:22
88:12 89:20 90:2
91:14 92:7 93:16 96:9
99:1,5,6,7,13 100:8
102:15,22 104:22
105:8,12,16 107:1,24
108:2,18,24 109:1,11
110:18 114:18 115:15
117:12,12,19 118:1,11
121:21,21 125:2,5,15
125:16 126:8 127:10
127:10,13 130:14
131:9,12 132:11
133:14,16,18,22,24
135:3 136:2 137:16
141:24 143:23 147:22
148:15 158:6,13,14,21
159:10,24 161:12
162:24 163:7,21
165:11 166:21 171:23
173:15,17 174:8,16
175:7,20 178:3 181:4
181:6,12 185:14
187:23,24 188:1,4,9
188:18,19 189:5 191:7
192:13 193:22 194:13
194:14 198:9 201:2,5
202:17,22,25 203:4,5
203:14 205:24 208:5
208:25 209:11 212:8
212:14 215:7 217:20
219:2,20 222:23
225:18,19,20 227:5
228:17 229:2,4,5,6
232:4 233:15 234:14
234:24 237:10,21
238:6,9,12,18,21
239:12 240:14 244:14
244:22 246:9,16
247:12 248:20 249:5
249:17,25 251:6,14
253:21 256:11,20
257:3,17,23,25 258:8
258:8,9 263:8,12,13
263:14,14,19,24
264:10,11 265:13
267:1,11
**knowing** 13:20 83:2
191:9
**knowledge** 21:24 39:17
39:20 51:6 54:5,23
57:9,20,22 67:14
68:20 69:7 73:3 76:15
81:9,13 92:16 96:12
96:18 100:25 107:25
142:3 147:14 148:12
159:7 165:25 169:5
187:20 188:13,15
189:9,11,17,24 190:11
190:24,25 191:24
194:25 195:4,13
199:23 203:11,13
222:1 262:20,24
**known** 175:16
**knows** 29:2,3 105:9
**Kylie** 9:10

---

**L**

**L** 269:18
**label** 114:20

**labeled** 88:7 94:22
114:16,19 122:10
138:22 185:23 187:14
191:4 197:17 199:7
**lack** 216:4,23 219:22
**lady** 246:15,19,20 247:25
**Lakes** 130:4 247:10
248:2
**Land** 130:4 247:10 248:2
**landlord** 23:17,17 24:1
24:17,18 25:3
**language** 182:22
**laptops** 24:2,4 244:13,17
**Large** 1:21 151:21
**larger** 77:11
**late** 28:19 73:21 108:10
108:17 139:21
**laughing** 25:15
**law** 53:7 91:10 104:8,11
113:11 128:23 187:7
209:2,8 217:12,13,24
218:8 221:2 261:5
264:22
**lawn** 234:1
**laws** 267:17
**lawsuit** 12:13 265:18
**lawyer** 162:16 243:5
**lawyers** 32:17 129:3
172:25
**layman's** 248:5
**lead** 97:19 100:3
**leading** 82:3 139:25
**leafy** 110:13 111:23
113:9
**lean** 43:8
**leaning** 44:5
**learn** 162:21 267:19
**learning** 60:8
**lease** 23:18,20,21
**leases** 24:22
**leave** 11:11 104:7 105:2
107:18,22 108:17,18
132:24 134:4,5,6
160:15 198:25
**led** 86:19
**left** 40:20 62:1 75:14
104:9,10 107:3 112:22
116:10,11 126:8 131:5
131:5 132:25 133:1
167:16 193:1 198:24
201:21 203:3 230:18
252:16 257:1
**Legacy** 11:3,4,6,11 12:23
**legal** 31:8 32:18,22
**legitimately** 131:3
163:10 177:9 198:25
211:11 244:21 251:9
251:12 263:24
**legs** 40:3
**lengthy** 120:23
**LEO** 104:10
**lessee** 144:17
**let's** 10:1 45:19 48:6
64:13 110:16 114:11
122:6 131:21 143:16
143:16 144:11 164:22
178:16 181:9 198:9
199:3 203:19 206:12
213:23 214:5 215:1
217:16 218:13 223:8
223:21 227:20 233:5
241:14 243:23,23
262:6 269:1
**letter** 5:24 7:10 145:6,23
146:9 147:10,23
155:24 157:10 181:12
207:12 208:3,12,18,24

215:8 216:13 217:9
218:13,14 222:14,17
223:9 226:4 227:5,21
228:2 229:22 230:11
253:12
**letters** 253:14
**letting** 8:23 26:5 114:17
**levels** 24:15
**lie** 163:23
**lied** 161:15 163:18
**lies** 106:12 228:23
**lieu** 27:24
**life** 50:12 264:4 265:25
266:1 267:12,16
**light** 205:13
**lights** 170:23 171:25
172:2 186:3
**likes** 181:24
**limit** 242:1
**line** 40:16 65:10 70:8
254:20 273:2
**lines** 267:16
**list** 30:3 34:10 240:21
245:17 246:15,25
247:1,16,17 248:6,11
248:11
**listed** 30:15,18 33:1
42:12 67:12 74:23
97:5 103:14 104:21
110:6 131:24 167:23
173:13 176:2 201:12
234:20 239:3 245:16
**listen** 29:5 56:12 116:16
116:20 203:15 212:22
213:23 215:1
**listening** 124:11 214:5
**listing** 229:10
**lists** 60:7 65:8
**literally** 59:11 73:17
106:16 124:25 159:20
211:19 215:13 221:2
237:19 242:5,7 243:19
248:12 257:11
**litigation** 30:2
**little** 23:23 32:2 40:21
43:5 44:16 48:6 55:5
55:15 69:9 77:21
89:14 109:23,24 115:1
115:2 119:13,14 124:4
128:4 183:12 199:12
241:14 264:13,14
**live** 15:13 19:6,12 20:22
21:25 139:24 164:5
256:16
**lived** 9:15,21,22 11:15
12:16,22,24 13:7
19:25 20:11,13,13
22:4,12 35:21 62:13
69:11 75:3 76:25
164:6
**lives** 9:7 15:25 20:24
21:6 86:15 139:22
**living** 23:3 24:9 55:19
61:14 200:22 221:17
254:23 264:1
**Lo** 83:11 133:22 242:1
**local** 104:14 108:25
**locate** 241:8
**located** 10:23 110:12
235:6,12
**location** 28:1 104:10,18
117:22 141:19,25
253:25
**locations** 235:7
**Loco** 54:17 55:16
**log** 39:4 76:3 93:18
102:6 193:12,17

201:19
**long** 9:15 10:13 13:7
19:12 21:25 23:21
165:1 177:24 195:20
205:10 225:25 247:20
**longer** 95:24 147:22
**longstanding** 97:14
**look** 17:15 30:9 36:10
40:19 45:17,19,19
46:11 47:25 49:4
53:22 54:3 56:21 60:5
64:22 65:6 66:11,12
68:16,25 69:4 71:7,12
72:16 76:23 77:5
79:24 83:19 85:5
91:23 93:17 98:20
99:25 102:5 103:18,20
105:4,13 112:8 116:10
120:11,12 122:17
125:4 129:8 132:20
136:10 137:8 141:13
142:20 143:16 144:2,4
144:11 159:19 175:5
176:20,22 181:24
184:18,20 193:4
201:24 204:24 209:24
215:2 217:2,2 223:8
224:7 243:1 246:17
248:16 254:25 263:10
268:21
**looked** 17:14 40:11 41:2
108:11 113:11 137:3
162:15 177:3 203:10
246:4 259:13
**looking** 43:10 61:22
62:15 74:12 85:9,18
109:12 134:13 142:13
192:15 195:21 202:5,8
202:9 203:7 212:17
230:8 238:19 239:21
248:17 257:17 259:10
259:11 261:16 262:16
**looks** 65:1 70:3 71:6
73:14 74:13 90:16
103:12 104:17 115:7
116:9 122:2 172:4
193:14,15 195:5 245:1
**lost** 229:18 257:18
**lot** 17:23 28:6 38:11 43:5
45:18 49:6 61:25 64:2
67:19 68:2 88:17 91:8
106:22 128:6 198:15
241:18,19,20 242:1
256:12 258:10 265:19
**lots** 38:6
**lower** 20:18
**lunch** 109:14,16 115:5,8
231:18,19
**lying** 120:8 126:3 231:8
231:18,19

---

**M**

**Ma'am** 248:10
**mad** 257:16
**Madame** 90:24
**main** 265:17
**major** 146:14
**making** 24:21 61:18
136:18 142:16 195:19
199:3 223:11,16 242:6
256:13 261:7 264:2
**male** 49:5,14 158:22
249:19
**malfunction** 72:3
**Malfunctioned** 70:7
**malfunctioning** 70:24
**man** 115:20 172:24
266:19

**map** 4:18,19 77:6,19
83:19 154:18,19
**March** 191:5 192:8,14
194:5 195:13 197:20
200:6,11 201:13 204:2
207:1,7 212:6,16
214:3,4,6,25 216:5
219:13,19 220:18
226:24 233:10,12,16
233:19,21,21 234:4,13
234:13
**Maria** 173:14,15
**marijuana** 13:16 14:13
14:16 15:6 112:16
113:12,24,24 114:9
117:2,3,9,11 126:12
129:21,23 130:1
131:15 225:14,17
229:12 230:2,20
231:14,20 232:1 235:6
235:6,10,11,11,17
236:9,10 237:1,8
238:2,3,4,25 239:4,7
239:15,25 258:18
259:23
**mark** 28:16,18 44:15
97:6 99:9 117:18
121:8 159:18 204:25
218:13
**marked** 30:7 34:25 36:8
36:23 38:24 39:24
44:19,22 56:19 57:12
59:22 64:15 66:3 67:9
68:23 72:11 76:19,20
76:21 77:23 84:7 88:2
89:2 90:19 91:20
94:20 96:3 101:5
103:9 109:18 114:13
122:13 127:19 129:6
132:15 134:10,22
135:6 136:5 137:19
138:3,20 139:8 140:10
141:1 143:11 146:19
150:2 164:16 166:17
167:21 168:14,25
169:11 172:19 173:10
175:24 176:17 180:23
182:12 183:3 185:20
186:9,13 187:12
188:21 189:19 190:3
191:2 192:5 194:1,16
195:9 196:21 198:5
200:3 201:9 203:24
204:20 207:24 216:12
227:22 233:6
**marking** 181:6
**marshal** 226:9,10
**mat** 239:5
**match** 58:20 204:17
**matter** 56:13 106:5
137:8 209:8 223:15
**matters** 228:11
**May-June** 14:9
**mean** 10:5 13:25 15:2
22:22 25:6,18 43:21
51:20,24 52:23 53:14
59:11,14 61:22 63:2
63:24 69:22 70:18
71:5 73:10 75:20,24
78:16 81:17,20 91:3
95:7 96:23 100:24
103:13 109:8,9 118:17
120:10 128:14,16,21
128:22,22 131:3,9
133:14,19 141:12
158:20 159:11 163:2
167:14 172:3 174:10

178:1,15 179:11
184:11,15 187:23
188:3 192:1,15 200:21
200:23 203:8 209:13
210:18 212:11,13,25
213:19,22 216:1,9
218:10 221:14 222:24
229:22 231:3 237:15
238:17 242:7 251:14
255:19 256:19 257:11
257:12,19,23 258:5,7
261:3,5,21 262:7
263:11,24 267:15
**meaning** 83:3 119:19
237:11
**means** 29:9 74:19 92:7
129:1 188:8 209:2
215:12 244:22
**meant** 12:12 55:24 56:2
68:4 100:8 172:17
262:5
**mechanical** 244:25
**meeting** 42:11 85:7
**meetings** 27:15
**Megan** 71:13
**member** 95:12 101:1
**members** 26:22 94:5
99:21 258:8,9 266:23
**memory** 29:14 39:8
40:12 41:3 62:5 64:7
87:20 88:9 94:9
136:25 137:2 140:6,14
171:6 179:18,19
188:24 195:23 196:5,5
**men** 261:13
**mentality** 118:8 264:21
**mention** 142:16
**mentioned** 31:13 198:7
244:1 255:15,24 257:9
260:7 269:3,4
**mentioning** 256:3
**messaged** 255:16
**met** 99:20
**Mexico** 83:22 85:25
**mid** 200:11
**middle** 1:1 20:14 47:17
48:8 85:9 98:25 151:1
211:20 215:14
**midnight** 89:17 90:1,3,15
93:12 94:14 95:6
**Midway** 229:9
**mileage** 101:17
**miles** 13:21
**military** 190:16
**million** 268:11
**mind** 46:4 85:11 95:14
124:23 140:5 213:20
216:18 221:14 257:14
260:1 261:9 264:19
**mine** 35:18 242:12
260:16
**minor** 161:10,11
**minute** 45:18,20,24
103:21,22 117:18
121:8 129:8 142:17,20
159:18 208:19 210:2
211:9 236:2 247:4
**minutes** 15:22 76:5
115:19 120:22 121:15
176:24 183:19 184:2
193:8,8,16 195:15,17
203:21 207:21 260:2
**mirror** 56:17
**miscellaneous** 244:19
**misconstrued** 142:12
147:20
**misdemeanor** 129:23

**mislead** 60:23
**misreading** 55:15
**missed** 124:23 147:14
148:12 222:15
**missing** 124:16 125:15
131:4 137:18 223:14
242:17
**mistake** 28:17 170:6
192:9 259:9
**mistakes** 267:15
**mixed** 182:17
**mom** 43:6 246:4
**moment** 78:20 82:25
124:25 125:15 126:4
211:10,11 254:25
261:13
**money** 178:10 180:11,17
180:20 232:18 245:2
264:23,24 265:1,2
267:4
**monitor** 27:19,25 69:12
69:23 70:5 172:6
260:8,11,16
**monitored** 28:1 97:14
**monitoring** 71:3,16,17
**month** 61:13 62:12 137:9
242:6,8
**months** 23:22,24 210:16
242:8 251:15
**morning** 8:8 97:2,4
98:17,22 147:12
148:13 169:24 170:4
190:20 201:14 202:7
203:1,3,9,12 206:1
229:1 233:23
**mother** 41:8 43:4
**motion** 245:4 249:6
**motions** 249:8
**mouth** 211:7
**move** 20:19 23:5 24:5,13
31:25 49:16 56:15
64:10 65:18 79:2
117:22 128:25 134:8
140:12 198:7 199:6
221:5 229:4 232:8
233:5 254:18
**moved** 9:22,23,24 10:4
10:15 11:14,15,18
12:1,25 13:8,21,24
15:4,14,15,18,21,21
18:12,16,19,21,22,22
19:1,10,14,16,19 20:3
20:12,21 21:11,21
22:8 50:9 78:7,22
105:25,25 106:3 107:3
117:21 118:6 130:19
130:19 197:9 213:8
222:3 253:17 254:1,5
254:6,9,19,22
257:5,8
**movement** 191:6 192:2
**moving** 12:16 16:7 23:19
31:25 269:5,7
**multiple** 60:8 98:14
169:10 192:21 205:5
260:8
**multitude** 16:19 99:1
147:18 161:15 195:23
196:6
**Murphy** 60:11 203:2

— **N** —

**N** 2:7 3:1 152:7 153:1
269:18
**name** 8:8 15:23 19:10
24:2,3,24 40:16 46:13
46:23,24,25 47:5,12

47:13,15,16,17,19
48:16 51:16 58:17
63:12 65:22 66:24
80:4 130:21 158:8,10
158:12,19 179:3 195:8
201:4 228:7 256:4
**named** 268:3
**names** 24:19 26:15 80:7
102:18
**narrative** 65:7 129:16
204:24
**narrow** 83:4
**Nathan** 46:13,16 49:14
49:15 50:2,7 51:16,16
53:7,8,25 54:5,7 55:3
55:15,19,22 57:4
58:19 63:11 65:23
**nature** 14:18 39:11 46:7
67:11 74:17 88:6 89:7
90:22 104:24 128:10
128:21 132:18 134:17
134:25 138:7,23
139:16 140:22 141:17
164:21 167:5,24
168:17 169:3 170:20
173:13,17 186:13
189:22 190:6 192:8,11
194:6,19 199:7 202:21
204:2
**necessarily** 28:15 33:7
50:7 68:4 184:11
**need** 10:10 12:20 16:5
28:25 35:8 59:13,14
67:25 68:7 72:25
78:12 83:25 86:12
91:25 114:25 146:2,12
149:12 182:3 187:5
219:25 223:24 224:15
225:5,8 228:5,13
232:9,9 236:20 240:11
241:9 242:14 244:4
248:10 251:7 255:6
**needed** 23:18 34:7
161:11 168:1 209:1,4
**needs** 90:2 169:22
**negative** 134:18 186:21
189:23
**neglect** 225:14 240:2
**neglected** 269:3
**neighbor** 73:14 74:13,21
77:15 78:5 84:14 87:9
87:23
**neighbor's** 85:2,22 87:2
**neighborhood** 24:8 49:3
61:9,17 79:21 229:4
256:14,17 264:2
**neighbors** 24:17 25:2,8
25:10,17,18 26:10,11
77:16 78:2 79:21,22
79:24 173:25,25
**never** 16:12 18:16,19
28:23,23 34:6,7,8
37:18 49:23 73:10
74:1 79:14 81:8
112:17,17 128:17
130:24,25 144:9 148:4
160:15 161:18 162:20
165:14,21 174:23,24
179:24,24,25 185:13
193:1 198:24 207:11
209:19 215:10,11,11
215:17 216:18 217:8
218:12 220:23 221:3
227:12,12,13 232:24
241:16 242:6 243:4,8
246:18 247:1 250:6
266:16 267:5 268:2

**new** 1:17,18 14:19,20
19:14 20:19,20 50:10
50:12 76:24 151:17,18
168:22,22 170:13
172:4 183:1,6 185:20
186:16 226:24,25
239:24 242:2,2 253:23
253:24 256:25
**nice** 261:18,19
**Nicole** 46:21 53:3,6
**night** 55:9 73:21 88:20
88:23 90:17 91:4,6,10
98:22,25 106:16
108:10,17 135:14
140:21 160:13 164:11
164:15 171:19 197:19
198:2 202:12
**nine-year-old** 64:1 264:7
**nineteenth** 254:20
**ninth** 14:20 20:16
**nobody's** 106:18 108:15
**Nocco** 1:7 151:7 229:5
272:5
**nods** 8:25
**noises** 108:11
**nolle** 165:12 240:8
**nominal** 30:17
**non-** 147:25
**Nope** 36:18 190:2 240:11
**normal** 115:7 171:5
**normally** 193:20 260:18
**nose** 123:16
**Notary** 1:20 151:20
270:12
**note** 28:22 36:2 37:4,7
39:3,4 51:10 90:25
97:25 101:16 134:18
145:23 169:4 170:21
184:13 189:16,23
191:5 192:12 194:6
216:17
**noted** 58:25 176:6
**notes** 38:3 40:19 66:10
67:13 68:2,2 73:8 88:8
89:9 92:6 97:12 98:13
99:11 104:2,2,24
127:23 132:25 137:24
138:8 140:23 167:6,25
186:14 187:15 190:6
197:20 255:1
**nothing's** 221:1
**notice** 130:24 137:17
147:13 175:4,22,23
179:15 185:13 209:4,9
215:11,12,18 218:2
220:6,9,23 221:4
222:10 226:6 227:7
243:3 245:22 265:6
**noticed** 245:25
**notices** 175:22 210:13
**notwithstanding** 125:23
128:5
**November** 11:13 134:25
135:9 136:8
**number** 8:19 13:5,6 26:9
28:18 29:5,21,24
31:13,24 34:22 36:22
38:2 39:23 51:14
52:16 56:16,17 62:7
64:18 65:12 94:8
109:22 129:5 134:24
135:8 136:7 137:22
138:22 143:13,18
144:19 167:23 181:4
182:19 183:1 184:19
184:21 196:20 201:11

201:12 212:15,18
215:19 255:18 260:15
262:6
numbered 30:19
numbers 32:4 205:12
210:7 212:6 214:2,14
216:2 219:22 221:8,12
227:3 255:15

**O**

O 269:18
O' 130:4 247:10 248:2
Oath 3:6 153:6 270:1
obeying 44:7
objects 205:11
observe 176:5 190:10
observed 60:11 176:3
205:10
observing 70:2 205:6
obstruct 129:24 130:2
obtain 17:23,24
obviously 14:19 29:2
41:15 105:9,16 106:14
108:19 124:11 175:5
201:3 241:6 259:12
occasion 70:14 89:19,20
90:4,5 189:1
occasioned 233:15
234:16
occasions 71:24 99:12
196:7
occupant 144:18
occur 260:9
occurred 54:24 67:13,14
88:8 89:19 112:10
149:23 164:8 183:24
184:1,25 187:21
189:24 190:11 191:24
195:1,4,14 199:24
223:14,19 225:10
233:19 260:8
occurring 89:16 91:2
197:7 263:18
October 103:12 104:20
105:5 109:1 127:21
128:3,8 129:12 131:10
132:2,18 134:18 224:8
224:24
Off-the-record 35:1 69:2
94:19 101:4 111:14
122:7 134:11 137:20
138:4 141:2 182:13
183:10 216:11 227:23
233:7
offender 97:5 104:13,17
104:19 110:6,6 127:22
128:1,7,11,13,15,21,22
131:11 135:1,18
137:23 138:8,23
139:16 167:5,24
168:18 169:4 170:20
176:3,5 183:20,24
184:1,12 185:24
186:14,15 187:14,18
189:15 190:5 191:5
194:20 195:12 197:17
197:21 199:8,10,15,17
199:24 200:8 204:3
250:11,17 253:7
offense 25:14
offered 27:25 81:2 84:20
87:12
offhand 11:20 22:7 24:25
80:7 165:11 244:15
office 14:9 16:18 24:5
25:24 27:13 42:11
51:2 69:8,17 71:2,25

95:17 104:4 107:20,22
136:16 141:20,23
197:10 218:7 220:10
220:12 244:14 246:20
247:6,9 248:1 249:3,7
250:10,14,16 251:4,18
253:9,13 254:3,9
256:2 265:14 268:10
officer 11:3 17:11 27:16
47:22 56:2 59:20
68:11 73:11 79:16
89:24 93:22 104:11
111:4 112:13 125:18
129:25 130:2 143:17
162:11 167:14 189:2
192:18 204:24 250:22
252:9 256:1
officer's 58:7 144:16
officers 25:14,19 26:16
58:8 59:9 67:15 75:24
78:14 79:6 94:4,8
114:6 167:20 192:18
192:21,22 193:1 197:1
215:17 255:16,17,24
257:10,22,24 258:10
261:19 262:24 264:8
offices 211:11
official 1:7 151:7 270:7
272:5
oh 2:3 16:15 24:2 33:25
43:21 50:15 53:15
68:9,12 76:20 83:21
85:7 92:14,24 119:8
119:21 152:3 158:15
158:20 160:7 173:24
176:13 181:22 184:17
190:17 202:13 209:23
216:1,13 259:4
okay 9:3,4,18 10:7,25
11:8,23,24 12:3,8,22
13:24 14:13 15:1,8,19
15:25 16:7 17:5,7,17
18:3,10 19:4,8,18
20:15 22:5,8,25 24:1
24:15 25:9,19 26:20
26:20,24 27:4,6 28:5,5
28:9,24 29:16,17,21
29:25 30:11,15,23
31:22 33:6,18,19,24
34:21 36:22 37:7,7,13
37:20 38:23 39:23
40:5,10,11,15 41:6,12
41:18 42:4,13,18
44:10,24 45:13 47:19
47:25 48:20,23 50:24
51:5 52:12,13 53:3,24
54:4 57:8,23 59:5,13
60:22 61:4 62:21
63:17,22 64:6 66:5,18
66:22 67:5,16,21
68:12,22 69:20 70:13
70:17 71:18 72:8
73:19 74:3,10,23,25
75:19 76:8,18 77:10
77:19 78:12,13,17,20
78:24 79:15,18 80:1
80:18 82:7 83:18,22
85:7,13 86:6,19,23
87:8 88:1,13,16,17,18
89:13 90:4,8,18 92:20
93:6 94:18 95:9,20,24
96:10,16,17,22,24
97:1,3,11,24 98:3,19
99:10,18 100:25
101:10,11 102:16,19
102:25 103:3 104:24
106:11,22 107:10,14

108:4,20 109:5,10
110:25,25 111:5,8,13
112:1 113:19 114:5,11
116:5,8,13 117:7,15
118:20,22 120:18
121:4,23 122:1 123:25
124:9,15,22 125:10
126:1 127:12,14,21
130:15,17 131:2,8,12
131:20 132:14,14
133:11,13,21 134:3,8
135:8,12 136:13 137:3
137:14 138:16 139:5
140:9 141:11 142:3,6
142:25 143:4,7,13,16
143:23 145:4,8,9,25
148:22 149:10,25
158:22 159:22 160:5
160:10 161:24 162:10
162:25 163:25 164:7
168:11,24 171:16,16
171:20 172:18 173:17
174:3,18 175:7,10,19
176:13,24 177:8,14
178:3,9,24 179:22
180:4 181:9,10 182:11
183:2,16 184:5,14,24
185:19 186:8 187:1,3
188:20,23 189:4
191:14 192:11,11
194:15,25 196:14,19
198:12,19 200:2 201:5
201:19 202:11 203:15
203:15,19,21 206:3,10
206:11,24 208:9,20
209:20 213:21 214:1
215:1,16 216:5 217:16
220:11,22 221:19
222:23 223:8,20,25
224:2,7 225:15,19
226:15,24 227:14,21
228:15 229:13 230:25
232:11,14,24 233:9,20
234:9 235:2,4,24
236:7 237:14,24
238:13,16 239:13
240:14,21 241:14,22
242:11,17,24 243:12
243:21 245:3 247:18
247:22 249:21 250:7,9
250:25 251:17 253:5
253:12,17,21 254:16
255:3,9 256:18 260:25
263:16 265:4 268:24
269:1,6,9
old 43:9 143:4 159:2
232:2 264:11,12
265:20 267:10,22
older 116:24
oldest 83:2
olds 132:22
once 169:3 170:22 227:6
one's 64:12 135:24
170:13 200:5
ones 21:11 59:17 71:16
137:7 144:5 191:20
193:2,6 211:3 213:4
214:9 251:9 256:4
261:24
ongoing 16:8 252:23
open 57:5 62:15 75:16
205:8
opened 162:16
openers 243:20
opening 131:5
opportunity 46:11 72:22
91:22 218:23

opposed 92:17 120:6
142:22
ordeal 105:11
order 28:8 44:16,16,23
45:1,12 58:2 64:21
67:22 101:22 122:9
183:5 184:8 225:10
248:9,10
ordered 224:11
orders 136:15
ordinance 7:9 144:9
147:11,17 157:9
174:22 177:7 179:2,6
179:12 183:18 205:6
206:14 212:18 215:25
216:23 218:9,10
220:13,18 225:22
228:11 264:25 265:5
original 58:1,25 130:18
147:12 175:7 210:13
originally 10:6 12:24
137:12 159:14 243:12
outcome 240:5
outside 17:13 108:11
147:5 161:11,22
162:13 171:17 205:12
overgrown 175:9 205:9
228:24 268:23
overwhelming 235:6
257:20
overwhelmingly 257:6
owned 24:7
owner 24:7 147:14
ownership 248:14

**P**

P 269:18
P.A 2:10 152:10
p.m 1:16 109:17 147:13
150:8,9 151:16 167:10
167:11,13 171:21
184:22 269:16
P.O 1:23 151:23
packet 218:14
packs 59:1,2
page 3:2,7 4:2 5:2 6:2 7:2
30:12 40:6,15 45:22
47:2 51:11 53:22
57:19 60:2,6,6 65:1,6
66:7 71:7 72:14 74:18
76:9 84:12 103:18,24
103:25 104:3 110:2
129:16 132:20 136:8
138:24 141:13 143:16
144:15 145:11 153:2,7
154:2 155:2 156:2
157:2 161:25 176:22
182:20 204:25 224:5,7
238:23 272:10 273:2
pages 76:3 182:18
204:16
paid 31:4 32:16,23 33:10
34:13 67:15 149:10,19
165:19,19,20,21,21,22
165:24,24 166:4 178:5
178:7,11 180:11 225:3
225:11,16 226:20
232:10,19 242:5
248:12
pain 32:8,12
paper 109:12
papers 210:21,23 227:15
paperwork 32:18 130:22
198:20 199:13,21
200:22 202:18 240:23
240:25
paragraph 47:14,24

163:16 229:9
paragraphs 30:19
Pardon 18:15
parent 261:6
parents 267:17
park 2:11 144:18 152:11
176:7
parking 73:16 219:11
part 10:12 12:13 26:18
28:5 54:7 57:6 62:4
91:16 102:21 110:17
161:9 166:5 204:10
211:22,22,24 213:2
220:1,4 240:24 252:25
particular 37:21 39:17
39:20 40:12,14 52:25
57:18 60:4,17 62:3,5
65:12 67:13,20 68:5
68:20 73:3 83:16 88:8
89:15 90:25 91:1 93:3
94:13 95:1 96:12,12
98:15 99:14 109:6
110:22 128:8 130:9
131:13 135:4,22 137:1
138:1,12 139:6 140:7
140:15,24 142:4 167:8
167:13,18 169:6 171:7
171:17 178:4 181:3
182:21 186:6 187:11
187:20 188:6,12
189:17,25 190:8,23,25
195:1 196:9,17 198:8
200:8 201:6 214:9
216:23
particularly 72:5,14
221:8
parties 229:1 250:4
269:20 271:12
parties' 271:13
parts 162:10
Pasco 1:8 7:9 9:18,23
10:4,5,15 12:25 13:8
13:25 14:9 16:10,16
17:24 21:11,21 22:9
22:12 23:5,15 24:4,6
25:24 26:17 27:2,8,12
32:1 33:22 58:4 71:25
78:14 79:6 80:2 81:14
95:4,17 99:20 100:12
102:6 106:1 107:4
109:3 117:25 118:7
131:18,21 132:7 151:8
157:9 168:7 178:22,23
182:20 197:1 217:11
228:9,16 246:5 247:7
254:2,9,22 256:1
257:5,5,25 258:4,6
260:22 265:23 266:9
267:20 268:9,14,16
269:5 270:3 271:4
272:6
pass 246:21
path 110:7
patrol 89:8
patrolling 60:10
pay 33:17 34:11,12 84:20
87:12 149:8 165:10,15
165:17 166:2 180:6
224:11 226:21 232:19
265:10,11
paycheck 166:1,2
paying 30:25 31:8,24
248:13
payments 242:6
PCSO 31:2,15 32:1
40:23

**peanut** 115:6
**peeking** 164:14
**people** 10:13 15:13,17
24:21 25:4 50:11
59:10 65:3 78:7
106:13 108:12 116:9
139:24 159:7 171:24
220:15 228:19 238:15
240:3 241:19 253:23
261:17 264:9
**percent** 165:18 231:17
264:21 267:21 268:11
**Perfect** 256:17
**performed** 89:8 113:3
**period** 9:20 18:13 20:11
27:18 68:14 84:21
120:17 179:25 268:5
**permission** 82:16,19,20
110:9 111:1,16
**person** 15:8 16:17 53:6
55:4 58:23,24 63:13
65:22 67:1,2 75:25
130:2 135:23,25
141:18 173:20,22
195:16,17 200:9,10,23
200:25 201:3,20 202:1
202:22 203:2,5
**personal** 31:14 39:5,16
39:20 107:24 189:11
189:24 195:3 239:3
244:14 262:20,24
**personally** 270:5
**persons** 62:25
**Pete** 19:23 21:12 23:7
254:1
**Petersburg** 19:3,10
**phone** 41:15 42:9 43:20
129:13 133:17 201:25
241:25 242:16 243:22
249:13 251:4 253:8
260:15,20,21
**phones** 242:2,12,14,15
242:18,21,23 244:2,12
244:16
**photo** 59:1,2 67:1
**photographs** 49:4,13
62:10,11 205:20
**photos** 62:17
**phrase** 54:20 100:8,21
**physical** 13:3 75:7
129:23
**pick** 59:2 105:12 119:14
251:3
**picked** 253:8
**picks** 204:18
**pickup** 136:15 176:6,8
**picture** 45:22 49:10
261:25
**pictures** 49:9 257:11
**piece** 76:12 149:16,25
**Pinellas** 9:21,23,24 11:15
12:22 13:18 21:15,18
47:7 48:18 49:16 51:7
63:1 71:13,14,21,25
105:23 109:3 117:21
117:23,25 118:6
130:18 131:21 132:4,9
132:12 136:15,20
256:9 257:4 268:13,13
268:15 269:6
**pinpoint** 38:9
**pipeline** 265:25
**place** 1:17 19:2 20:13
21:12 71:15 151:17
162:5 166:15 254:20
257:2,4
**placed** 162:7

**places** 140:1
**plain** 164:14
**plaintiff** 30:16
**plaintiff's** 232:7
**plaintiffs** 1:5 2:5,9 30:11
151:5 152:5,9 272:3
**plastic** 110:12 111:17
**plate** 144:19,19
**play** 14:22 159:23
**played** 114:21 115:9,17
115:25 116:6,18,22
117:16 119:3,15 120:1
120:19 121:11,17,24
122:5,8,18 123:2,12
123:19 124:2 209:22
209:25 213:24 214:15
215:4
**playing** 221:11 237:17
**pleaed** 132:13
**pleaing** 131:16
**please** 8:9 29:9 125:11
252:8
**plenty** 25:4 78:16 188:10
**Plf's** 4:3 154:3
**plug** 69:25 260:16
**plugged** 69:23 70:9
84:15 85:2 87:2
**plus** 26:21 108:2 245:6
**pocket** 210:8,25 211:4
220:19,21 227:16
**point** 20:17 22:20 29:13
42:14 45:21 56:4 57:4
63:23 75:8 78:3 100:5
105:6,6 108:21 117:8
118:17 124:13 139:3
141:25 164:1 177:15
179:7 182:7 184:6,13
185:15,15 188:23
199:16 202:17 210:18
217:21 229:15 230:11
232:9 245:4 256:6
257:21 260:7 263:16
**pointed** 182:16
**points** 56:24
**poked** 268:22
**police** 17:20 25:13 41:16
44:8 64:3,3 73:14,16
78:14 79:6,19 83:7
85:3 90:3 93:11
108:20,21,22 162:18
196:13 211:11 234:10
258:10 259:20 264:7,8
**polite** 118:18,25
**politely** 162:17
**poorly** 32:11 39:19 53:18
**pop** 100:23
**pornographic** 249:18
**Port** 1:17,18 76:24
151:17,18 186:16
**pose** 238:22
**positive** 89:25 113:24
114:9 117:2,11 207:6
261:12
**possession** 129:21,23
130:1,1 131:14 225:14
225:16 239:25
**possible** 48:20,24 63:19
63:21 78:7 111:8
159:9,12 258:19,20
**possibly** 54:1
**posted** 216:4,23,25
219:22
**posts** 227:3
**potential** 42:11
**Poulton** 2:10,10 3:3,4,5
23:11 28:17,24 29:3,4
29:18,20,23 30:1,8

33:4 35:2 36:9,24
38:25 40:2 42:4,6
44:23 45:2,14 46:4,7
46:10 53:16 55:2,8,14
55:25 56:5,8,12,15,20
57:13 59:23 64:11,13
64:17 66:4 67:6,10
68:9,13,18,24 69:1,3
72:9,12,20 76:22
77:25 81:18,22,23
84:8 85:13,17 88:3
89:3 90:20 91:18,21
93:15 94:10,11,21
95:15,21 96:6 101:6
103:10 107:8 109:13
109:19 111:15 114:11
114:14,22 115:12,18
116:1,7,19,23 117:17
118:23 119:12,16
120:2,20 121:12,18,25
122:6,14,19 123:2,7
123:13,20 124:3 125:8
125:10,22 127:12,14
127:18,20 129:7,15
132:16 134:9,12,23
135:7 136:6 137:21
138:5,21 139:10
140:11 141:3 143:12
146:17,20,24 148:6
150:3 152:10,10 153:3
153:4,5 158:2,16
159:22 160:1 164:17
166:18 167:3,12,22
168:15 169:1,12,15,18
169:22 170:7,12,15
173:5,11 174:2 175:25
176:19 180:24 182:6
182:14 183:6,11
184:17,23 185:22
186:10 187:13 188:22
189:20 190:4,18 191:3
192:6,23 194:2,17
195:10 196:22 198:6
200:4 201:10 203:17
203:19,21,25 204:8,11
204:15,21 207:20,25
208:17 210:1 212:20
213:1,5,18,21,23,25
214:16 215:1,5,23
216:8,15,19,21 218:16
218:22 219:1,14
221:16 222:13,22,25
223:4,7,20,25 224:1
227:20,24 232:7,14,16
233:8 235:22,24 236:2
236:4,7,12,16,23
238:8 241:2,5,7,10
245:19,21 252:2,14,18
258:21 260:4 268:8
269:2
**Poulton@debevoisepo...**
2:12 152:12
**power** 70:11
**precursor** 33:20
**prelude** 18:3,5
**presence** 66:25,25 73:15
98:14 99:13 187:8
235:10
**present** 36:4,17 52:3,15
87:6 98:15,16 99:11
114:2 130:5 133:6,7
158:25 187:17,25
235:5 236:9 238:5
250:5 252:17 269:20
**presenting** 58:6
**press** 267:18
**presumably** 74:24 86:17

149:2
**pretextual** 31:1
**pretty** 31:10 75:8 89:25
98:17,23 106:17 261:6
266:21 267:13
**previous** 212:18
**previously** 183:3
**printed** 259:10
**prior** 12:16 13:10 22:12
22:15,15 23:6 104:10
141:7 184:3 186:22
208:6 249:10 268:14
**prison** 22:2,6 110:8
131:17 267:12
**prisoner** 266:1
**probable** 164:13 185:7
**probably** 8:17 14:23 26:1
47:5 48:16 57:5 65:3
70:12,22 74:15 103:24
113:23 117:1,10
119:20 127:11 165:3
166:5 178:2 219:5
233:10 235:3 236:12
236:14 237:16 266:24
**probation** 117:19 118:5
118:8 119:4,19
**problem** 34:8 41:16 43:2
45:16 73:22 89:23
106:12 110:17 120:18
137:16 218:6 229:16
230:12 251:21 252:25
257:3 260:18
**problems** 13:10 14:18
21:18 44:6 49:3 83:7
117:22 126:7
**PROCEEDINGS** 1:12
151:12
**process** 35:5 36:1 37:1,2
37:4,10 39:3 71:5
117:8 166:6 180:15,17
233:4 237:7 267:20
**program** 31:2,10,15 32:2
268:2
**progress** 76:10 199:4
**prolific** 92:8 97:5 104:13
104:17,18,19 110:5,6
127:22,25 128:6,10,13
128:15,21 131:11
135:1,18 137:23 138:7
138:23 139:16 167:5
167:24 168:18 169:4
170:20 176:2 183:20
183:24 184:1,12
185:23 186:13,15
187:14,18 189:15
190:5 191:4 194:20
195:11 197:17,21
199:8,9,14,17,24
200:8 204:3 250:11,17
253:6
**proof** 243:8,11,13
246:23 248:14
**proper** 220:9
**properties** 24:7
**property** 10:20 23:7,16
23:18 24:7 31:14,17
34:5 73:15 81:6
112:21 126:15 234:11
239:23 243:3 245:5
246:11,13 247:16
**prosecute** 236:11 268:18
**prosecuted** 34:7
**prosecutor** 268:18
**prossed** 165:13 240:8
**provided** 241:4
**public** 1:20 13:18 130:16
130:20 131:5 151:20

270:12
**pull** 214:3
**pulled** 75:14 115:15
159:23 254:12
**pulling** 73:15
**purchase** 19:16 23:6
**purpose** 136:9
**purposes** 67:23
**pursuant** 180:1
**put** 10:7 17:18 44:5
60:21 76:14 79:1
97:17 98:6 100:8
162:16 163:8 165:4
170:9 181:22 184:8
196:12,12 204:15
210:19 211:3 216:16
253:7 262:12 263:4
266:3
**putting** 105:10

## Q

**question** 8:21,23 21:19
25:22 26:6 27:5 32:11
33:6 39:19 44:2 48:24
50:23 52:2,11 53:17
53:18 55:10 57:8,24
59:16 60:16 66:22
82:2 96:4 99:10
106:23 107:6,9,15
108:5 118:21 119:7,11
121:7 132:11 136:2
140:6 141:22 158:17
161:4 164:4 166:24
168:6 180:18,18
185:15 195:11 218:18
221:15 229:19 233:3
237:5,12 242:24
245:11 251:17,22
252:20 255:21 257:9
257:21 261:1 263:16
266:25
**questions** 12:11 46:12
136:4 167:2 205:19
206:17 219:3 236:6
238:22 255:3,13
**quick** 29:9 36:10 72:14
72:17 85:15 172:22
252:13 255:8
**quickly** 85:12 258:12
259:3
**quite** 43:10 61:6,21
70:16 124:12 142:17
**quote** 97:17,18
**quotes** 246:10
**quoting** 219:13

## R

**R-O-D-G-E-R-S** 90:24
**radio** 39:4 76:3 93:18
102:6 193:12,17
201:19
**raining** 262:15
**raising** 261:6
**ran** 85:22 89:10 90:11
**ransack** 261:15 262:3
**rap** 79:14 162:20
**re-search** 230:9
**reach** 69:24
**reached** 260:13
**read** 40:6 45:23 53:23,24
54:11 55:15 57:6
72:13 73:7 84:13,24
140:5 150:4 189:5,6
269:12,13 272:12
**reading** 62:4 184:7
269:21

reads 30:24 230:11
ready 45:25 129:9 173:1
real 36:10 72:13,17
  85:14
reality 160:14
realize 59:24 83:11
realized 263:6
really 23:15 33:15 62:18
  106:10 203:9 211:9
  212:17 237:10 241:18
  242:4 261:19,19 263:4
realm 137:10
rearrest 266:7
reason 12:1 16:12 29:8
  37:3,14,18,24 38:1
  52:8 70:25 83:8 93:3
  102:21 103:1 105:25
  111:17,24 138:10
  140:2 141:13 147:15
  148:8 188:23 197:25
  219:20 220:8 229:11
  239:22 247:20 256:3
  258:11 260:17 263:12
  263:15 267:24
reasonably 237:3 239:10
reasons 49:7 126:16
  146:14 223:21
recall 11:18 12:23 13:5
  18:5 22:6,7,18 28:7
  34:13 47:10 48:13
  49:2 50:2 52:18 67:16
  82:5,6,13,14 87:14,24
  87:25 91:1 168:7
receive 145:2,3 175:23
  175:23 206:25 209:19
  215:12 246:22 260:20
received 21:22 43:20
  71:2 102:3 110:8
  130:24 144:6,9 174:23
  174:25 175:20 177:16
  177:18 179:4,7,9,24
  179:25,25 185:13
  201:25 202:9,12
  206:15 207:8,11
  209:16 210:4,12,17
  211:16 215:11,17
  220:23 221:4 222:10
  227:7,10,13 242:7
  259:10
receiving 137:17 260:17
recognize 28:14,15 46:18
  46:23,24,25 63:11
  114:24 193:21 227:25
recognized 235:5
recollection 36:14 41:19
  53:25 61:5,7 65:20,24
  66:23 67:21 69:16
  70:14 71:23 72:7 73:8
  76:14 88:11 95:1,3
  102:10 113:14 134:20
  135:22 139:2,5,20
  140:17,24 160:17
  164:23 167:8,18,19
  168:19,23 171:8
  175:15 177:4 186:5
  192:3 196:16 200:10
  240:17 259:14
reconstruction 233:18
record 8:9 46:8 55:1
  69:1 72:21 101:8
  103:5 109:15,20
  119:10 134:9 137:22
  141:4 149:15 169:22
  182:15 183:9 193:11
  252:19 271:9
records 110:17 126:23
  127:6,9 217:10 228:9

228:16 253:22
recounts 205:6
recourse 265:3,12
recreational 219:12
red 70:9
redirect 3:5 153:5 219:4
  219:5 268:7
refer 14:14
reference 35:11 53:1
  104:17,17 108:25
  117:20 121:20,22
  136:14 187:18 205:5
  205:22 210:6 219:23
referenced 219:24
references 35:5 109:23
  158:3
referring 160:9 200:25
reflect 197:20
refresh 53:25 177:4
  259:7,14
refusal 217:13 221:2,3
refuse 107:20 161:21
  171:17 172:2
refused 13:20 161:16,25
  162:5,6 170:23 171:25
  220:14
refusing 104:6 107:17
regard 64:20
regarding 37:1 61:8
regardless 61:15 97:25
  135:21 234:13
regards 125:14 142:5
  160:7 163:2
regularly 98:23
reimbursed 31:5 211:25
reimbursement 31:22
reiterate 238:14
relate 44:17 57:2
related 16:10 37:5 44:6
  57:17 58:11 60:5,7
  65:8 66:11 202:15
  223:12,12
relates 200:14
relation 174:8
relationship 77:4 142:22
relative 271:11,13
relayed 98:13 109:6
released 34:9
remainder 252:17
remark 68:5 101:7
remarks 76:8
remember 8:19 11:20
  13:3 16:25 17:7 18:8
  22:17,19,22,25 24:3
  24:24 26:13 34:15
  36:18 38:5,6,18 41:5
  42:18,19 48:19,21,25
  49:9,21 51:19 52:19
  61:24,24 62:10,14
  63:8,12,20 68:10
  70:15 74:6 85:1,7 86:2
  86:4,23 87:5,8 88:13
  89:15 90:4,5,12 91:5,9
  92:11 95:22 97:25
  101:20,24 110:22,25
  111:4,7,9 119:24
  124:12 128:8 137:25
  140:3 141:4,8 144:1
  159:13 166:12,13
  187:9 188:14 196:9,11
  196:15 198:13,15,16
  198:17 214:17 244:15
  257:12 262:8,10
remembered 34:23
  91:15 195:23
reminded 210:8 218:5
reminding 227:10

removed 166:1
renew 24:22
renters 24:8
renting 10:19 15:9 19:21
repeat 182:24
repeated 217:6
rephrase 21:19 53:17
  95:3 99:10
replacing 31:14
report 4:4,5,6,7,8,9,10
  4:11,12,13,14,15,16,17
  4:20,21,22,23,24 5:3,4
  5:5,6,7,10,11,12,13,14
  5:15,16,17,18,19,20,21
  5:22,23 6:3,4,5,6,7,8,9
  6:10,11,12,13,14,15,16
  6:17,18,19,20,21,22,23
  6:24,25 7:3,4,5,6,7,11
  35:3,4 47:2 57:14 58:7
  60:13 64:18 65:2 66:6
  66:13,15 67:11 68:14
  69:5 72:23 73:13,14
  75:10,15 76:16 84:25
  85:19,19 88:4,21 89:4
  90:22 92:4 94:22 95:8
  108:2 109:21 110:2
  111:17 127:21 129:11
  132:17,18 135:18
  136:8 137:23 138:6
  139:13 154:4,5,6,7,8,9
  154:10,11,12,13,14,15
  154:16,17,20,21,22,23
  154:24 155:3,4,5,6,7
  155:10,11,12,13,14,15
  155:16,17,18,19,20,21
  155:22,23 156:3,4,5,6
  156:7,8,9,10,11,12,13
  156:14,15,16,17,18,19
  156:20,21,22,23,24,25
  157:3,4,5,6,7,11
  164:18 168:8,16,17
  169:3 176:15,21
  182:19,23 183:1,13,15
  183:23 184:20,20
  186:12 189:21 190:12
  190:13 191:25 192:7
  192:15 194:5,19
  195:18 196:3 200:6,10
  201:16 202:22 204:1,6
  204:22 219:24 220:6
  233:9 239:15 258:17
  271:7
reported 1:20 56:23
  108:6 151:20 198:1
  199:25
reporter 1:20 3:7 8:18
  8:24 28:20 29:22,25
  35:9 64:12 67:8 72:10
  73:1 86:13 90:24
  91:19 92:1 96:2 100:7
  114:18 122:25 123:6
  127:16 146:3,13,23
  149:13 151:20 153:7
  181:5 182:4 183:3
  204:16 215:22 227:19
  244:5 271:1,6,19
reporting 1:23 73:14
  143:17 151:23 204:24
reports 14:8 28:6 38:14
  44:13,14 61:16,22,23
  62:5,10,24 143:19
  200:7 220:24
represent 33:21 34:4
represented 239:15
reset 67:24
reside 20:9 110:13
residence 37:12 39:14

51:12 61:14,18 67:17
  88:6 162:2 164:5
  190:9,10 234:19 235:4
  235:7 238:4,24,25
  253:17
resident 76:1 77:1
residents 253:25
residue 111:23 112:16
  230:20
resist 129:24 130:2
resisted 160:4
resisting 16:25 25:14
  160:20 162:14 163:4,6
resolution 225:2
resource 27:16
respective 269:20
respond 104:9
responded 41:18,19
  42:15 60:1,17 88:5
  197:21 198:3 201:20
  205:4
response 124:6 251:1
  257:20
responses 241:12
responsible 71:3 87:1
rest 163:23 215:1 267:12
restitution 87:23
restroom 40:3 72:17
  150:5
result 31:2,9,15 32:2
  223:14
results 186:21
resumed 109:17 150:9
retrieve 246:21 247:3
  249:10
return 34:5 186:22
returned 86:1 141:5,6,10
  163:20 206:6,6 240:18
  241:13,13,17 242:15
  242:16,21,25 244:2,11
  245:5,23
returning 243:13
returns 104:15
reunite 18:20
revealed 235:9 238:25
  239:4
reverse 183:24
reversed 169:13 170:8
review 60:4 72:22
rewind 119:13
Richey 1:17,18 76:24
  151:17,18 186:16
rid 108:13 265:9
ride 79:14 162:21
right 8:11 9:18 10:1,14
  11:14 15:12 16:7
  18:12 19:12 20:6,10
  21:17 22:10,16 23:14
  23:25 24:16,25 26:7
  30:21 31:20 32:14,25
  34:18 35:3 36:6,19
  37:17 38:2,10,10 41:2
  42:9,16 43:13,17,18
  44:13,25 45:6,9,17
  46:11 47:21,24 48:4
  48:13 50:16,18 51:10
  51:21,23 52:14 53:17
  53:24 55:10 56:5,5,14
  57:14 58:24 59:4,16
  59:18,19 60:23,24
  61:11 62:2,9 63:6,6,8
  63:10 64:18 65:5 66:1
  66:2 67:4 68:13 69:4
  70:6,10 72:9,18,21
  73:17 75:8 80:7 81:20
  81:24 83:16 84:2,6
  85:18 87:18,19,22

88:4 89:4 90:21 91:14
  91:22 92:4 94:13
  95:24 96:1,7,20,23
  97:9,10 100:2 101:12
  102:2,5,7 103:23
  104:2 105:3,4,15,18
  105:24 106:7 107:13
  107:22,23 109:13,13
  109:20 110:7 112:3,15
  112:19 113:10 115:3
  115:19,21 116:14,24
  117:24 118:10,13
  119:24 120:3,14
  121:14,15 122:6,9,22
  123:4,10,14 124:7,20
  125:23 126:22 127:14
  127:14,18,24,25 128:2
  128:4,12,15 129:11
  131:20 132:5,17
  134:13,15,24 135:20
  135:24 137:10,22
  138:6,19,22 139:11
  140:19,22 142:13,19
  142:21 143:2,10 144:5
  144:11 145:1 146:7,8
  146:21 147:1,2,24
  148:4,13,16,18 149:10
  149:15 158:3 159:19
  159:21,23 160:5 161:9
  161:24 164:18 165:23
  166:19 167:23 168:12
  168:16 169:2,15,20,20
  169:21 170:2,12,16
  172:10,17,21 173:7,9
  173:12 174:5,7,10,14
  176:1,8,20 177:15,24
  181:19 182:15 183:7
  185:23 186:12,24
  187:14 188:7,18 189:2
  189:9,14,21 190:5,21
  190:23 191:1,4 192:7
  194:3,18 196:5,20
  197:17 198:9 199:3,22
  199:23 200:17 202:19
  202:20 203:6,21 204:1
  204:8,13,18,22 206:9
  206:12 208:3,13,14,22
  208:23 209:24 210:2,9
  210:22 212:3 213:1,6
  213:9 214:7 215:9,21
  215:24 216:2,15 217:7
  217:14,17 218:18
  221:3 222:4,19,22,25
  223:20,21 224:5,17,23
  225:25 226:1,2,7,20
  226:23 227:3,7 230:5
  230:21 231:7,9 232:6
  232:8,22,25 233:5,14
  233:25 234:2,4,18,18
  234:25 235:1,17 239:7
  239:15 240:5,16,23,23
  242:19 243:2,15,17,23
  244:7,10,16 245:3,8,9
  245:14 247:8,11 248:4
  248:7,10,17 251:25
  252:19 253:3,21,24
  254:8 258:1,8,21,22
  258:25 259:17 266:7
  267:7,13,23 269:3,12
right-hand 196:4
rights 197:12 263:17,22
  263:23
ring 51:18 75:2 84:23
Rjohnson@ij.org 2:4
  152:4
Road 2:7 152:7
roadway 205:12

**Rob** 170:9 182:6
**Robert** 1:4,13 2:2 8:1,10
   12:3 13:10 14:14,14
   14:15 15:6 20:22
   21:17,20 23:3 27:1,1,7
   27:11,16,18,19 30:25
   31:7,14,24 42:23 44:6
   48:2,7,7 49:15,15,16
   50:8,17 51:6,12,13,20
   51:25 52:4,15 54:2,5
   54:16 55:8,16,20 57:9
   57:20 58:17 63:1,2,2,3
   63:3,3,14 65:21 66:24
   69:10 82:17 84:17
   85:8 86:17,17,24
   87:10,22 88:24 92:8
   92:21 97:12,16 98:3
   98:13 99:13 100:14,25
   104:13 105:1,21
   108:25 109:3 110:5
   115:23 116:9,21 118:2
   127:9,23 130:3 133:3
   133:13,25 136:19,22
   136:24 141:5,6 151:4
   151:13 152:2 159:15
   162:3,6 163:18,25
   175:11 186:1,17,18,23
   190:9 192:12,14
   197:21,23 204:4
   205:14,16,18 206:13
   206:14,18 219:2 228:7
   230:22 234:20 235:9
   238:2 239:2 249:14,15
   249:16,16,19 254:22
   270:5 272:2,18
**Robert's** 16:8 41:25
   47:17 49:14 54:1 55:4
   62:25 67:2 106:5
   136:22 186:23 235:8
   235:12 239:3
**Rodgers** 88:5,10 89:8
   90:23 91:3 159:1
**rolled** 25:15
**room** 82:17 86:16 87:3
   110:10,11,12 111:2,3
   111:18 112:25 113:2
   114:4,25 115:1 120:25
   121:9,14 122:21 123:5
   123:8,15 124:13 126:2
   207:20 235:8,8 258:18
   266:20,22
**roommate** 20:24 21:8,9
**roughly** 23:13 120:22
   165:5 194:8
**row** 179:20
**Royce** 88:5,9 89:8 90:23
**ruin** 265:24
**rule** 4:3 50:14,15,16,19
   90:7 91:11 106:3,8,18
   108:14,16 154:3 269:4
**rules** 8:15 70:2 162:22
   267:17
**run** 54:1 84:18 236:12,14
**running** 84:16 90:13,13
**runs** 77:6
**RV** 227:1
**RVs** 219:20

**S**

**S** 2:11 4:1 5:1 6:1 7:1
   152:11 154:1 155:1
   156:1 157:1 269:18
**safety** 68:11
**sake** 217:17
**salesman** 21:1
**Sandhill** 9:6,7,15 19:15
   19:15 20:3,7,8

**Sandra** 72:15 74:21
**sandwich** 115:6
**sandwiches** 115:7
**sat** 25:12,17 79:19,20,23
   211:19 243:16,16
   261:8
**satisfactory** 87:16 251:1
**satisfy** 149:19
**saw** 16:11 48:2,2 107:25
   162:24 170:23 171:25
   174:1 205:9 230:2
   233:11
**saying** 25:23 43:24 48:19
   48:23 49:21,25 50:2
   51:24 59:8 62:6 71:10
   78:16 79:22 90:13
   95:11 98:10 114:16
   120:16 124:12 127:25
   128:19 133:17,22
   145:12 146:6 147:7
   148:11,11 161:5
   164:15 172:15 181:5
   199:21 207:12 211:1,7
   215:3 217:10 225:15
   228:17 232:1 238:19
   240:1 242:17 251:10
   251:11 259:17 262:22
**says** 38:4 39:4 40:16,20
   55:3,13 60:7 75:25
   81:14 89:9 90:16 91:7
   93:20 102:6 104:10,24
   107:18 110:6 116:24
   120:11,13 122:21
   134:17,25 137:24
   143:1 167:5,5,25
   172:13 177:23 186:1
   186:16 187:24 188:6
   191:5 192:12 194:6,12
   194:20 203:5 204:17
   216:1 224:9,12 230:4
   239:2 252:9 259:5
**scare** 41:16 43:11
**scared** 82:25 118:12
   124:25
**scenario** 92:17
**scene** 40:20 202:3,6
   251:5,20
**scent** 235:6
**school** 12:1,2,6,7 13:12
   13:14,17,18,19,22
   14:3,4,5,17,20 20:14
   20:14,17,19,20,25
   27:9,15 41:10 115:5,6
   125:15 190:14 191:15
   191:19 256:25 257:1
   258:24 264:2 266:5
**schooler** 191:19
**scooted** 108:23
**scoured** 79:20
**screaming** 264:13
**screen** 116:10 159:25
**seal** 270:7
**search** 5:8 16:21 17:15
   31:17 78:19 79:11
   80:7 81:1,11,15 82:4,8
   82:16,20,22 110:9
   111:1,7 113:3 114:17
   114:20 115:11 119:21
   128:10 155:8 159:17
   161:2,6 205:22,24
   206:3 229:11,16 230:1
   230:12 233:12,15,22
   234:11,14,15,21
   235:18 238:24 239:2,2
   239:14,16,23 240:3,17
   240:25 244:11 249:13
   257:14,15 262:3

**searched** 110:23 215:15
**searching** 83:12 119:5
**second** 8:25 29:11 31:7
   69:1 138:24 174:12
   176:14 208:18 224:7
   230:7 245:22
**secondary** 219:17
**seconds** 106:16 114:24
   115:4,19 119:17 120:3
   201:22 209:21 211:9
**section** 30:12 36:2 37:7
   39:3,4 40:19 58:14
   76:3 89:9 101:16
   167:6,25
**see** 28:14 29:13 30:12,13
   30:19 35:6 40:25 54:7
   56:24 58:14 60:3,13
   64:24 65:6,8,9,12,15
   66:7,10,13 67:12
   74:18 75:10,15,20
   76:6 77:6,12 84:2 88:7
   89:11 90:24 92:9
   93:20 102:22 103:16
   106:12,15 110:15
   112:3 115:3,20 116:2
   116:8 117:3,3 122:6
   125:7,9,25 133:19
   135:1 138:24 142:12
   143:1 144:4,5,5
   147:16 159:25 163:13
   163:20 164:22,22
   167:6 170:21 171:2,3
   172:14 173:24 175:6
   179:11 184:19,21
   188:10 192:2 194:23
   195:22 197:23 200:16
   201:22 203:9 205:8,11
   210:10 212:24 214:23
   219:1 221:3,12 224:3
   224:12 228:18 229:21
   230:14,15 232:3
   233:13 234:6,22
   237:16 241:6,23 259:5
   260:22
**seeing** 61:1 62:14 136:3
   166:23 256:11
**seek** 31:11,22 32:6,8
   268:1
**seeking** 30:5,11 31:3
   32:11
**seeks** 30:16
**seen** 28:23 29:12 32:25
   37:19 59:25 80:9 81:9
   82:2,7,11 143:18
   163:19 174:25 199:13
   200:7 201:11 210:18
   217:8 240:21 241:2
   251:16 254:11,12
   255:20,20
**sees** 261:18
**seized** 31:15,17
**seizure** 240:25 241:1
**self-explanatory** 31:10
**Semoran** 2:11 152:11
**send** 175:22
**sense** 14:7 46:3 56:12
   66:20 78:2 149:7
   190:15
**sent** 130:25 131:1 147:25
   237:6 243:16 260:21
**sentence** 23:1 48:1 118:5
   136:21 228:7 239:2
**sentences** 136:21
**sentiments** 98:12 99:11
**separate** 79:2
**separately** 206:9
**September** 90:22 91:2

92:5,17,22 94:24 97:7
98:4 101:21 102:12
109:22 113:5 258:23
**sequence** 44:15 64:19
   65:15
**series** 44:13 61:8
**seriously** 199:1 268:9
**serve** 36:1 37:4,10 39:5
   39:14 143:20 265:6
   266:10
**served** 39:9 147:13 165:4
   179:15 209:9,23
   210:11 266:15,17
**serves** 196:5
**service** 184:3 206:20
   241:25
**serving** 35:5 37:2 39:2
   59:2
**set** 83:19 100:1 120:24
   226:25
**Setting** 111:16
**seven** 44:18,20 136:20
   263:2
**seven-** 264:7
**seventh** 179:19
**sexual** 249:20
**Shadrick** 110:8,12 111:1
**Shaker** 2:3 152:3
**shakes** 9:1
**shape** 268:2
**shared** 97:16
**shares** 115:2
**she'd** 16:13
**she'll** 17:16
**Sheet** 3:8 153:8 273:1
**sheriff** 1:8 24:6 81:10
   100:13 151:8 220:1
   229:5 260:22,22 272:6
**sheriff's** 14:9 16:11,16
   16:17 17:24 24:5 25:9
   25:24 26:17 27:12
   51:2 58:4 69:8,17 70:1
   71:2,25 74:15 78:15
   79:6 95:4,17 99:20
   100:11 104:4 105:7
   107:4,20,22 136:15
   141:20,23 197:1,10
   218:7 220:10,12
   247:12,14 248:1 249:2
   249:7 250:10,14,16
   251:4,18,21 253:9,13
   254:3,9 256:2 265:14
   265:24 266:9 267:20
   268:9
**sheriffs** 23:16 24:10,13
   24:21 25:7 258:5,6
**shift** 186:16
**shook** 122:3
**short** 46:9 64:16 72:19
   85:16 136:9 147:3
   166:14 203:23 207:23
   252:15 260:5
**shortly** 213:8
**shot** 20:20
**shots** 62:14
**shoved** 210:25 227:15
**show** 28:14 44:8 56:23
   59:9 114:12,15 115:10
   120:12 125:4 148:8,10
   166:11 179:14,23
   207:15 228:19 242:25
   243:8 246:23 257:10
   258:12 259:3 265:8
**showed** 49:12 58:10 70:4
   70:4 98:11 99:19,22
   104:19 141:8 167:14
   179:2,8 243:11 246:23

248:13 254:13
**showing** 29:13 35:4 49:9
   58:5 147:24 166:4
   169:10 189:6 228:11
   229:8
**shown** 62:10 187:7
**shows** 65:4 112:5 160:23
   160:24 170:3,3 201:20
   201:24 202:6 243:13
**shut** 129:14 161:21
   170:23 229:7
**shuttling** 264:12
**siblings** 120:25
**sick** 55:5
**side** 193:6 205:7 221:12
   239:5 261:5,6,7
   264:22
**sides** 30:3
**sign** 206:18 248:8
**signal** 260:13,18
**signature** 3:7 144:23,24
   153:7 175:1 220:15
   221:3 272:10
**signed** 144:7 148:16
   179:2 227:12 246:22
**signing** 269:21
**similar** 39:1 90:25 135:8
   201:11 257:21
**similarity** 45:18
**simple** 241:18 248:4
**simply** 33:9 38:3 94:16
   181:20 220:11
**single** 26:18 33:14 58:9
   61:14 64:3 78:4 79:9
   80:3 144:1 160:15
   177:12 230:7 250:22
   262:12 263:9 264:5
   267:13,18
**sir** 10:11 11:1 17:12
   161:23 173:3 231:17
**sister** 139:22
**sisters** 125:17 264:10
**sit** 48:25 102:9 142:21
   198:12 254:11
**sitting** 81:24 116:2
   176:16 210:22 221:4
   234:1 262:7
**situation** 130:6
**situations** 252:22
**six** 32:5 62:3 65:8 133:3
   166:20 201:22 210:15
   242:12,13,14 244:7
**sixteen** 268:16
**sixth** 179:19
**ski** 133:18 134:7 144:2
   144:18 148:19 205:9
   207:2 210:14 212:12
   214:11 228:25
**skis** 132:23 133:23 205:7
   208:6 210:6 212:5
   227:2
**sleeping** 205:16
**sliders** 186:22
**sliding** 176:4
**slow** 243:23
**small** 187:17 230:18
**smaller** 55:4 244:19
   245:7
**smart** 162:19
**smartest** 266:19
**smelled** 235:5
**smoke** 238:2,3
**smoked** 113:24 117:2
   236:9
**smoking** 18:6 158:23
   161:10 162:2 238:4
**smoothly** 8:16

snake 205:10 214:17,21 219:23 228:25
snakes 261:24
somebody 18:6 51:2 54:18 62:20 64:4 68:16 69:24 73:4,6,9 84:15 102:3,11 116:2 159:10 173:22 177:13 179:20 190:8 200:25 203:11 242:10 252:8 264:5,22,23
somebody's 133:20
son 9:9 12:1 20:13 40:24 41:9 43:3,9 45:22 47:5 47:12,13 48:9 51:6,22 53:8 54:10 64:2 80:16 83:3,11 84:19 85:25 86:16,20 87:9,12 101:25 111:6 112:14 112:22,23 119:1 126:1 126:10 127:23 132:22 147:13 148:13 163:19 163:21 164:3,6 172:16 199:19 206:14,15 207:3 209:17 237:6,23 254:23 256:9 257:19 263:4 264:2 267:1,5 267:11
son's 46:19 256:21 260:16
sons 57:20
soon 18:20 78:7 108:22 142:18
sorry 29:23 45:8,12 55:18 58:16,16 73:2 90:22 100:7 103:11,19 104:5 107:7 129:14 132:18 146:21 147:3 158:17 169:21 205:2 246:5 249:16 255:23
sort 32:21 53:20 56:10 90:12 109:2 126:3 158:18 166:8 249:6
sought 30:4
sound 23:14 100:24
sounded 261:20
sounds 100:23 116:24 150:7 201:7
south 60:12
spats 43:5
speak 21:4 29:7 46:5 47:3 64:4 82:20,21 83:10 86:20 87:8 111:6 124:19,24 125:19 126:6 250:23 252:4,23 261:11,14 268:17
speaking 25:7 42:25 58:19 79:21 110:25 111:4 116:8 140:3
speaks 208:24
special 13:19
specific 88:11,14 90:5 91:12,15 103:7 134:20 167:19 168:10 181:9 191:10 196:11,16 198:17 255:15
specifically 24:19 38:22 80:18 91:8 95:5 96:19 98:9 160:7 195:21
specifics 262:10
speculate 102:13 143:25 174:10 263:11
speculating 184:13
speculation 200:24
speech 118:12
spelled 35:16 58:13

spend 54:2 267:12
spoke 23:17 25:10 26:2 85:8 86:24 110:7 112:22 114:2
spoken 62:7 84:17 99:5 254:14,15
spree 57:3
sprung 46:2
spurred 64:6 105:11
squabbled 108:16
Sr 206:13,15,18
St 19:3,10,23 21:12 23:7 254:1
stamped 193:7
standing 116:11 215:13 215:13
stands 17:8 95:7 169:9 188:23
STAR 26:19,22 60:9,11 73:20,20,21 75:23 78:3,15 83:8 88:9 89:9 89:9 90:10 94:6 95:11 95:12,18 99:21 173:21 255:17,25 256:3,11 257:22,24 258:3,3,7,9
STAR30 135:24 193:15
STAR31 94:2 168:1 193:4,15
STAR32 94:2 135:24 168:1
STAR33 93:21,25
STAR34 93:21,25 184:21
stare 254:12
staring 192:3 195:22
start 22:6,6 50:12 60:2 116:14 124:8 143:16 162:21 178:16 179:18 229:11 261:16
started 40:9 54:17 55:18 55:20 145:20 257:19 265:20
starting 149:7
starts 60:8
state 1:21 8:8 49:12 76:1 76:2 97:12 147:11 151:21 165:12 168:18 176:3 185:25 187:15 240:6 270:2,12 271:3
stated 25:16 47:15 49:7 55:10 70:8 85:9 86:16 108:10 117:5 136:23 159:2 189:15 217:13
statement 47:8,23 75:25 144:17 161:24 166:3
statements 54:3 162:8 269:8
states 1:1 47:14,21 73:17 92:6 96:5 131:1 136:22 144:17 151:1 163:17 170:20,21 189:2,23 190:13 192:1 193:3 202:13 209:2,8 217:5 219:10 221:2 238:24
stating 53:7 54:8 145:24 159:14
status 168:1
statute 236:14
statute's 236:12
stay 35:23 177:24 231:24
stayed 19:21
Ste 2:3,7,11 152:3,7,11
steal 22:21
stellar 261:13
stemmed 22:11 118:6
stemming 31:9

stenographically 271:7
step 29:1 43:8 85:12 161:11 162:5,7
stepmother 41:20 130:5
stepped 122:2
stepson 104:5,5,6 107:19
stick 266:20,22
stipulated 269:19
Stipulation 3:6 153:6
stole 34:9
stolen 56:25 110:11 111:2 239:22 242:10 244:24
stood 268:22
stop 73:12 86:2 119:17 161:25 188:11 267:2
stopped 81:8
stopping 114:24 120:21
storage 219:11
straight 13:11,21 14:15 82:25 83:4 100:2 118:12 124:25 184:7 264:2
street 19:9,9,13 20:1 21:13 22:1 59:6 75:1 254:11
streets 75:6
stretch 40:3
strongly 120:5 236:21
structure 129:24
stuck 17:11 162:11,18 231:9 262:13
student 13:11,21
stuff 34:1 63:25 120:13 128:14 242:1,6 246:16 262:4 267:11
stunk 263:13
subject 59:3 75:25 76:2 104:14,15,16 108:25 138:25 162:4 195:12 234:18,21
Subjects 104:10
SUBSCRIBE 272:13
SUBSCRIPTION 272:14
subsequently 149:5
substance 110:14 111:23 113:9,23
substantiates 71:10
substantively 182:23
sue 79:3 254:18
sued 78:23 220:1 254:15
suffered 79:12
suffering 32:8,12
suggest 102:8 220:7
suggested 97:17 98:6 261:2
Suite 1:18 151:18
Suites 1:17 151:17
sum 32:5
summary 86:6
summer 22:15
summons 39:9
supervisor 250:23,24 251:1,12 252:9,24,24 252:25
supplement 65:2
supplemental 4:3 58:7 61:16 65:2 154:3
suppose 36:7
supposed 75:9 125:5 145:4,15 147:1 175:14 179:6 181:7 217:19 246:17,21 247:3 256:22 260:14 263:25
sure 8:14 10:3 12:15 14:12 18:1 21:20 25:4

28:11 30:21 34:18 44:3 46:1 55:2 57:25 61:3,18,20 63:23 64:9 67:20 68:1,19 70:2 74:4,9 75:4 77:11 78:1 78:6 79:12 80:8 93:15 94:7 95:11 98:16,17 98:23 99:3,8 100:1 102:17 106:17 109:8 118:13,14 123:15,24 124:1,12 125:6 126:2 131:22 135:20 142:10 144:12 145:10,14 166:10 167:1 190:22 198:18 199:16 203:9 207:5 213:3 216:8 218:3,16,17 228:22 238:7 241:5,15 245:13 247:5 250:24 255:2,14 256:13,15 258:13,14 259:4 266:21 267:13 268:1 269:8
surely 100:3
surmise 108:1
surprised 47:4,11 48:15 66:24
surveillance 49:5 58:21 190:9
suspended 258:25 266:5
suspicion 250:3
suspicious 200:9,10,22 200:25 201:3 202:1,22 203:1,5
swap 70:23 131:4
switch 170:11
sworn 8:2 270:6
symbolic 93:17
system 27:9 71:16 246:10

**T**

T 4:1 5:1 6:1 7:1 154:1 155:1 156:1 157:1 269:18,18
T-Mobile 241:24
tablet 242:2 244:13,17
TAC 167:25
tails 192:20
take 29:9,22 36:10 39:25 45:24 55:18,21 56:21 61:20 62:18 72:16 79:24 84:13,25 85:5 103:22 105:4 109:14 112:8 124:7 134:3 140:6 150:5 161:25 170:8 172:22 176:20 176:22 180:10 203:16 203:17 225:2 243:23 252:13 260:1,18 265:2 265:10 267:22
taken 8:12 49:5 87:13 109:16 112:21 150:8 175:13 205:20 206:4 225:25 226:15 240:19 244:10 249:10 261:25
takes 163:8
Talia 237:21 238:1,10,10 238:14
talk 32:3 43:25 46:2 58:15 77:15 104:23 110:18 118:25 124:14 125:13 133:14,25 145:13 147:21 175:15 206:9,12 208:21 219:4 236:2,22 247:4 250:21 260:2 264:14
talked 32:2 103:4 109:23

128:4 224:17 234:5
take 16:13 30:22 33:6 70:18,21 80:15,17 81:6 116:13 120:4 125:18 127:8 160:2,8 160:12 171:12,14 173:24 210:10 214:6 229:11
tall 205:10 207:1 208:6 210:6 212:5 214:10 219:21 263:14
Tammy 1:3 30:24 31:7 151:3 272:1
Tampa 1:2 10:24 20:23 151:2
tampering 129:22
TAYLOR 1:3 151:3 272:1
team 26:19,22 73:20,21 78:4,15 83:8 89:9 94:6 125:20 173:21 255:17 255:25 256:4,11 257:22,24 258:3,3,4,7 258:9
tech 248:20
teenage 170:22 172:14
teens 133:3
telemarketing 21:2
tell 8:2 24:9,18 26:15,16 29:14 39:13 41:6 43:6 43:19,22 54:13 56:16 79:22 80:14 81:1 88:12 98:3 101:23 105:19 108:8 109:13 112:2,20 113:10 125:1 141:9 163:10,11 191:10 199:20 200:13 207:7 208:25 229:20 244:23 251:14 257:18 262:11 264:19 265:8
telling 49:2 61:16 91:9 148:7 166:12 176:8 178:12 208:4 211:15 211:20 251:12
ten 13:21 15:22 70:22 111:17 113:8,12 138:18 237:7 262:25 263:2
tenant 144:17
tend 8:20
Ter 74:24
term 22:6 23:20 128:25
terms 124:18 248:5
Terrace 74:24,25 75:4 84:3
test 113:23 117:2,10
tested 114:8
testified 8:4 171:10 176:24 209:10 258:14 262:20
testify 188:25 213:19
testimony 68:1 79:9 128:5 189:2 209:17 231:5,10 232:17 249:12 260:25 271:9
text 147:10
Thank 92:3 108:4 138:19 140:18 182:11 187:11 189:13 196:19 245:19
Thanks 38:23 72:8
theft 129:21 131:14,25
theirs 163:13
theme 43:20 44:17 228:22
they'd 161:15 266:10,11 266:12
thing 8:17,25 26:5 29:11

30:15 37:23 42:12
43:7 44:1 56:10 61:1
69:25 81:4 93:16
110:21 118:13 126:3
166:16 180:25 212:19
215:19 236:1 242:4
244:1 257:13 259:9
265:17
things 8:19 12:12 29:5
30:3 31:19 34:10
57:17 58:2 61:25
78:24 100:18 125:4
166:14 210:11,15
219:5 241:23 248:16
249:8 260:3 262:20
263:21 267:10
thingy 207:22
think 14:23 23:15,23
24:23 25:1,12,12,16
25:17 26:11,11 31:10
32:17 41:15 42:9
44:17 48:22 55:14,23
56:1 57:17 64:7 68:7
71:9 72:9,14 79:24,25
88:16 95:21,24 102:20
103:2 109:23 110:4
115:13 116:12 121:4
121:13 126:4 127:10
127:15 128:25 132:13
133:7 137:12 140:1
142:5,7,11,25 143:18
144:6 150:1 160:5
166:25 167:16 169:14
169:16,18,19,19
172:17,25 174:17
179:16 181:3,19,19
183:22,22 186:14
193:1 195:25 199:4
204:9,11 208:15 211:9
213:2 215:19 216:3,9
219:5 221:13 222:25
223:18,21,22,23
225:20,21,23 236:1,19
241:4 244:22 245:15
255:24 256:19 261:22
262:23 266:3 267:21
268:23
thinking 83:7 142:21
242:9 256:20
thinks 73:9
third 40:16 60:6 170:18
thirteen 135:17 264:11
thirty 193:8
thirty-one 193:8
THOMAS 2:10 152:10
thought 20:10,10 75:16
77:10,19 78:9 92:14
105:14 124:24 125:12
129:14 160:11 198:24
199:1 237:7 256:16
257:22 261:10,17
263:3,24 264:20
265:19
threat 107:21
threatened 41:14
three 18:23 19:25 32:4
45:11,11 70:19 78:24
98:24,24 110:12
111:22 112:13,22
113:8 114:8 126:9
131:10 164:20 167:19
198:3,8,13,18,23
201:15,18 203:3
204:18 230:18,19
243:20 244:13,17
251:16 257:19 259:4
259:17,20,21 262:25

268:15
three-quarters 39:5
throw 267:22
throwing 54:17 55:20
220:15
thrown 148:21
thumb 263:4
tickets 210:11
till 142:8 174:11
time 1:16 9:21 10:6,7,8
10:15,21 14:19,21
15:19 18:13 20:11
21:4,4 25:23 27:18
35:20 38:9 44:4,15
49:6 50:3 51:5 52:24
54:2,16 56:24 59:24
60:13 64:2,19 68:14
69:11 79:7,8 80:3 81:5
83:14 89:22,24 91:13
93:4 96:14 99:7,20
102:3 103:13 105:17
109:11 112:18,21
114:21 115:9,17,25
116:6,18,22 117:16
118:11 119:3,15 120:1
120:17,19 121:11,17
121:24 122:5,8,18
123:2,12,19 124:2
125:24 126:25 127:2
128:14 130:23,23
131:11 135:20 137:15
141:25 143:5 151:16
161:17 163:19 164:2,7
165:4,9 166:15 169:13
171:18 174:6 178:13
179:21 180:6,9 181:14
184:2 185:3,4,9,16,21
190:16 191:7 192:4
193:3 194:10 195:7
196:6 197:15 202:9,13
203:20 204:5,25
209:22,25 211:8
213:24 214:15 215:4
219:15,16 232:18
237:25 240:9 241:20
243:24 249:9 250:13
252:16 253:5 254:19
255:16 256:23 257:9
262:14 263:18,19
265:13 266:6,10,17
timeframe 14:10
timer 67:24 68:6
times 23:16 47:7 48:17
62:7 70:17 98:14,21
99:1 103:4 131:17
142:13,14 143:18
144:1 161:16 169:10
171:11 178:17,19,20
180:4 188:10 193:20
195:23 196:7 198:3,18
198:22,23 202:10
222:5 251:16 255:15
257:12,19 260:8
262:19 263:1,2,2
266:8 268:15,16
timestamp 163:15
169:23 170:16 183:14
183:25 192:16,24
timestamps 61:15 190:19
201:22 202:20
timing 196:2
today 48:25 77:17 82:3
102:10 198:12 228:8
237:20 255:4 262:7,8
told 16:14,15,18 17:10
17:12 23:17 24:4,19
25:11 36:19 40:23

43:12 47:11 48:9,14
55:3 66:23 69:20
78:10,10,20 79:10,23
79:23 80:20,25 93:9
97:13 98:4 99:2,23,23
108:3,17 117:7 134:2
134:2 145:19 160:25
161:7,10 162:14,19
173:25 177:10 209:10
211:5 229:7 237:19
238:1,10,12 247:1,15
248:2 256:12 263:12
Tom 95:14 125:7 127:8
212:25
tons 237:8
top 60:5 76:9 104:10
132:25
Topsail 60:12
total 182:18
totality 79:7 162:25
totally 18:9 166:21
touch 21:3
town 73:12 86:10 163:20
trace 126:11,14
traces 231:7 237:9
trailer 144:2,18 148:19
205:7 212:12
trailers 210:14 214:11
228:25
transcript 271:8 272:12
transferring 137:11
translate 9:2
transport 258:21
transported 130:3
136:24
treatment 253:10
trespass 129:24
trespassed 104:8
trespassing 76:10
trial 126:13,13
tried 17:24 22:20 42:10
49:16 57:5 160:14
161:12 178:1 195:6
206:1
trouble 20:17
troubles 16:8
truck 163:21 173:23
174:1,3 176:7,8,15
235:8
true 47:8 67:19 161:9
163:25 185:11 209:18
214:13 230:5,7,16
250:5 271:8
truth 8:2,3,3 231:24
262:10 265:20
truthfully 42:25 257:13
try 8:21,22 10:1 26:6
44:1 45:8 52:11 64:19
81:5 83:13 105:7
116:20 192:16 199:6
236:24 255:6
trying 13:22 16:24 28:8
40:20,22 41:10,24
42:20 43:11 50:8,12
51:2 54:2 58:18 60:25
62:15 63:1,14 67:22
73:6 76:12 77:3 87:3
95:21 105:21 116:21
117:19 118:5 125:1
126:24 179:18 182:8
184:8 192:20 200:19
202:18 212:21 215:18
219:9,25 225:21,22
229:4 257:2 263:4,4
turn 26:10 114:11 162:7
172:1 219:6
turned 17:14 124:10,14

162:15 171:23,25
turning 43:13 140:19
220:13
TV 114:12
twelve 23:22,24 240:4
twenty 183:19 193:7
twice 181:12 260:24
two 8:19 13:9 29:5,24
32:4,5 45:10 59:1
60:11 62:14 64:10
70:18 75:13 79:2
80:10 89:6,7,24
101:14,14 116:9
136:21 139:12 142:13
142:14 167:19 169:17
176:3 177:5,6 185:11
193:15 202:15 204:17
204:23 222:15 227:6
228:16 239:4,25 242:8
244:13,17 248:18
259:13 260:19 262:25
typewritten 147:22
typo 186:25

U

U 269:18
UC 168:1
uh-huh 9:1 10:9 12:10,19
14:1 16:4 19:20,24
20:2,4 21:14 35:7,13
36:11 37:8 38:12 39:7
40:8,18 41:23 55:2
58:3 60:14 61:12 63:5
65:11,14 66:9,16 69:6
72:24 83:24 85:4
86:11 91:24 93:19,23
101:19 103:15 104:12
105:20,24 106:25
110:1,15 112:4,9
118:4 121:1,16 122:23
123:18 129:10,19
130:7 132:1,3 136:12
136:17 139:1,15,19
141:15 146:1,11
149:11 158:5,11
161:14 167:7 171:22
175:12 177:2 182:2
187:4 194:9,11,22
217:12 224:4,8,14,19
225:1,4,7 228:4,12
229:14 230:13 232:21
239:8 244:3 255:14
258:16 260:4
uh-uhs 9:1
ultimately 132:12,13
148:18 240:6
um 17:3
unannounced 50:4
unappealable 181:8
undercover 168:4
underneath 205:11
undersigned 270:4
understand 12:13 19:18
31:16 37:6 38:17 44:4
48:23 56:8 59:25
60:15 62:2,6 67:25
75:21 81:22 103:8
104:22,23 105:18
110:4 114:16 120:15
120:15 127:4 128:19
128:20 131:23 160:16
166:22 173:19 178:11
178:13 199:18,20
219:8,8,9,25 225:22
232:17 233:24 235:15
235:21 236:10 238:23
240:6 243:9 262:22

understanding 9:20
118:2 125:23 160:22
174:18,19,20 180:10
210:12 264:16
understood 136:23
231:10
unfair 253:10
unheard 99:16
unique 92:16
unit 60:9,11 87:4 95:16
95:18,18,19 186:15
190:8
UNITED 1:1 151:1
units 73:20 205:5
universe 30:22
unjustified 181:15
unknown 73:15 98:9
173:20
unlawfully 144:18
185:16
Unmarked 168:3,3
unrelated 16:9
unsigned 209:5,9
unspecified 87:13
unsure 101:25
unverified 37:23
unwanted 132:19
update 255:8
upper 196:4
urging 120:5
use 40:3 72:17 139:23
150:4 200:7 227:20,20
uses 100:13

V

VA 2:7 152:7
vacate 23:18
vacation 74:7 85:25
Valentine's 186:11
value 24:12 245:12
various 56:24
vehicle 22:20 26:8 56:25
57:18 75:13 235:12
237:1 239:3,23
vehicles 56:18 73:15
74:14 75:14 187:17,25
219:12
vehicles-not 168:2
verbal 162:6 215:12
verbally 78:11
verify 110:10 111:2
128:9
Vernon 46:25 58:25 65:4
versus 89:21
video 5:8,9 7:8 17:21,23
25:5,6 49:5,10 54:8
55:4 58:21 62:11
65:23 78:16 80:6,9,11
80:15 81:10,14,19
82:2,11,14 114:12,15
114:18,21 115:9,10,17
115:20,25 116:6,18,22
116:25 117:5,9,16
118:16 119:3,15 120:1
120:19 121:11,17,24
122:1,5,8,10,17,18
123:2,12,19 124:2,17
125:1,18,19,25 127:16
155:8,9 157:8 159:19
159:20 160:6,8,15,18
160:18,23 161:5
162:23,24 163:1,9,13
208:1,2 209:22,25
212:22,23 213:24
214:4,15 215:4 216:1
217:1,7 218:5 219:13
220:6,19 221:11 227:9

229:8 230:2 232:1
233:10,21,25 237:16
249:18 261:18
**video's** 233:20
**videos** 18:1 81:21 82:7
115:14 119:2 251:9
257:10
**viewed** 81:21
**violated** 197:13 263:17
263:23,23
**violation** 144:9 147:12
147:17 149:20 174:22
175:7 177:7,19 178:4
178:6,13 179:2,12
180:12 183:18 212:19
215:25 216:4 219:11
219:16,17,18,19 221:8
224:5 225:6,17,22
226:17 232:20
**violations** 31:4 33:8,10
149:22 175:14,16,17
178:9,17,19,21 179:6
180:19,21 181:15
205:6 206:12 207:2
208:5 209:12,14 212:4
214:9 220:13,18,25
226:25 250:12,18
264:25 265:6
**violence** 129:25 130:3
**visible** 221:12
**visit** 88:9 140:24 164:4
167:9 169:6 193:12
196:17 198:23 254:18
**visiting** 74:7 140:1
**visits** 128:7 198:8,13,15
**Volume** 1:11 3:2,4 150:9
151:11 153:2,4
**vs** 1:6 151:6 272:4

**W**

**W** 2:10 152:10
**wait** 40:9 66:7 77:21
119:6 136:1 142:8
174:11 202:8
**Waive** 269:12
**waived** 269:22
**wake** 205:17
**walk** 223:22
**walked** 17:19,19 162:17
248:5
**walking** 60:12 176:4
**Wansboro** 7:10 149:2
157:10 215:8 222:14
223:9 226:4 228:3
229:19,25 253:15
**want** 11:22 13:16,17
24:22 29:1,6 30:21
36:10 39:25 43:15
45:17,23 46:6 56:7,9
60:23 63:25 72:13
73:9 82:23 84:14,24
85:14 87:17 104:23
110:8 128:9 143:25
145:10 149:15 150:5
166:23 172:12,22
180:16 182:7 201:2
203:17 211:24 212:22
218:24 219:4,6 230:9
236:2,11 238:23 241:8
257:3,10 258:12
266:23 267:2,3,3
268:1,21
**wanted** 13:18 20:18 24:5
24:12 28:18 44:7
55:11,12 64:6 68:19
77:10,12 78:6 79:11
80:24,25 81:2 91:14
101:7 104:7,7 109:24
110:18,21 124:19
133:2 134:4,4 159:16
174:16 193:18 201:5
226:20 256:9,10,10
257:14 261:9,20 262:3
269:4
**wanting** 67:15 83:6
125:19
**wants** 46:4 132:23
**warning** 174:23,25
175:22,23 179:4,8,13
179:25 209:3
**warrant** 31:17 47:6
48:16,17 51:7,7,13
52:4,16 53:1 63:4
66:25 109:2 131:1,6,7
141:19,24 142:22
143:20,21,24 148:22
149:3 174:6,8,13
176:12 177:1 180:1
184:3 205:22,24 206:3
209:23 215:14 217:18
217:22 218:11 223:2
223:13 224:20 233:13
233:15,22 234:11,14
234:15,20,21 235:18
239:4,14,16,22 240:17
256:5 265:7,9
**warrant's** 174:15
**warrants** 109:9 129:17
131:23 132:4,9 136:20
136:23 213:7 228:10
228:21 268:12
**wasn't** 42:8,17,21 51:25
60:24 69:23 81:7
98:16 108:14 114:4
145:19,21 172:6
184:11 217:19 253:5,6
253:7 259:22,24
260:13 263:14
**watch** 114:20 118:16
119:14 122:15 125:17
160:14 212:23
**watchdog** 67:24 68:6
**watched** 118:16 119:17
**watching** 61:17 122:15
**way** 8:24 10:7 31:3 39:5
53:19 54:23 55:25
57:10 60:6 61:7 65:5
66:1 76:14 77:8,8 84:3
87:24 105:13 116:16
118:16 134:7 135:3
165:1 225:11 227:16
234:7,14 236:24
237:11 238:10 241:7
249:17 252:11 263:10
264:17 265:9 268:2
**ways** 79:2 97:16 98:5
209:20 257:2
**we'll** 14:10 17:1 18:4,10
18:10 21:10 26:24
28:12,16,24 29:9 32:3
33:1 34:24 40:4 46:8
56:15 82:15 83:16
89:14 95:25 109:15
110:18 114:20 116:16
119:14 122:10,11,17
123:25 128:25 134:8
142:19 145:8 149:16
149:25 174:12 179:16
183:6 206:9 208:19
216:5 218:22 221:5
227:20 229:13 247:4
252:19 255:6 269:13
**we're** 26:25 29:6 30:22
33:6 38:2 44:1,18 52:8
52:10 63:14 72:1
76:12 78:18 79:3
80:13 82:8 100:1
109:20 114:23 115:4
118:12 120:11,21
122:1,20 125:5 126:24
127:15 134:13 142:19
145:10 147:16 160:15
163:11 173:2,3 182:8
182:15,24 183:6 184:7
184:12,24 199:3 200:2
208:3 212:4 218:20
221:5 222:9,20 236:5
236:19 243:7 251:14
253:2 256:11 260:17
260:17 265:2
**we've** 32:2 66:13 103:4
109:23 126:16 127:8
128:4 143:18 196:23
200:7 201:11 255:4
**wear** 69:11
**wearing** 27:19
**website** 17:25
**week** 35:22 177:12
213:14,16 263:1,3
**weekends** 35:23
**weeks** 18:23 19:22 98:24
**went** 17:11 20:14 22:12
55:6,17,20 56:3 72:2
76:15 82:17 113:11
131:17 146:5 169:5
174:17 175:2 187:24
205:21 243:15 246:16
246:24 253:22 268:5
**weren't** 42:16 98:14
109:8 125:14 146:5
188:4,9 238:15 242:25
246:25 258:14
**west** 83:23
**whatnot** 32:16 38:14
**whatsoever** 231:14
**whispered** 25:11 237:15
**white** 49:4,14 174:1,3
176:6
**wife** 9:9 15:18,21 17:14
25:4 41:8,20 42:23
43:7,11,24 44:11
50:21 51:1 104:25
105:5 106:9,15 107:3
107:18 108:3,8 109:6
130:5 134:4 162:15
**wife's** 15:23 161:19
242:13
**willfully** 163:18
**Williams** 94:23
**window** 25:16 90:1 159:1
264:9
**windows** 64:5 89:18
164:15 170:24 171:12
188:5,8,16,25 189:10
189:12 192:3
**wings** 55:17
**Winter** 2:11 152:11
**withheld** 224:10
**witness** 8:5 23:10 29:1
44:20,24 53:15 56:6
58:25 68:12,17 93:14
93:19,23 94:1,4,7
95:10,20 107:7 118:22
119:8 123:9 158:15
167:1 170:2,6 173:24
183:5 190:17 204:14
204:19 212:17 213:9
213:17 218:18 219:8
221:18,21,23 222:1,4
222:8,12,19 238:7
270:7 271:9
**woke** 206:1
**wonder** 76:13
**wondering** 63:12 102:9
102:24 203:8
**word** 198:9 237:12
**worded** 32:11 39:19
53:18
**words** 108:13,14,19
163:12
**work** 11:6 126:10 159:11
190:14 191:11 206:2
234:7 259:24 262:17
264:4
**worked** 258:3
**working** 12:23 35:22
73:20 105:7 124:8
246:20 264:3
**works** 21:1 106:15
**world** 266:20
**worried** 211:14 265:21
265:21 267:7
**worry** 218:22
**worth** 245:1
**would've** 175:17
**wouldn't** 41:11 145:17
146:7 200:13 213:15
222:2
**write** 147:3,5 229:19
253:12 265:5,7
**writes** 205:21
**writing** 128:14 147:18
220:14 222:13 228:8
229:25
**written** 102:18 107:13
117:1 142:7 196:3
201:3 207:18 215:12
216:2 218:2 220:14
221:1 229:23
**wrong** 9:22 14:24 100:1
105:19 121:10 170:2
224:17 259:12 264:20
267:21 268:24
**wrongful** 185:1 197:10
**wrongfully** 164:9 258:2
**wrote** 145:6,23,23 146:9
147:22 176:14 181:12
200:24 205:18 207:12
208:4 215:8 217:9,21
218:9,11 226:3 227:5
228:2 229:15,23 251:6
253:14

**X**

**X** 3:1 4:1 5:1 6:1 7:1
153:1 154:1 155:1
156:1 157:1
**X97** 104:16

**Y**

**y'all** 108:22
**Y-U-N-G-A-I-T-I-S**
58:14 65:7
**yard** 25:15 144:20
187:18 215:14 225:13
**yeah** 13:6 14:5,23 23:10
27:24 33:3 41:8 42:13
43:1 44:22 50:19
52:21 54:25 60:20
62:19,22 66:19 71:8
74:19 75:20 76:25
77:15 80:22 81:20
83:21 86:5 88:22
93:12 94:5 97:4 98:22
101:14 102:17 104:1
115:5 119:21 124:5
126:4 133:10,12,16
134:1 135:13,24
138:17 139:4 146:14
147:6 158:20 163:23
166:13 167:13,15
168:5,13,22 169:13,15
170:10 171:3,5 176:9
178:5 180:5 181:2,23
184:10 193:1,14
195:16 196:13 198:3
201:15,18,24 202:24
203:18,22 204:13
209:19 212:16 213:14
214:8,12,18,20 215:10
216:2 217:4,8 218:16
218:25 225:12 226:14
227:12 229:22 230:6
230:15 232:15 234:23
235:22 236:16 237:25
239:12 241:5 243:25
245:17 246:1 252:14
254:21 255:22 259:5,6
259:6,9,25 261:21
265:13 266:17 268:1
**year** 9:17 12:1 14:3,5
22:2 23:13 141:7
187:1 254:6,10 257:7
258:24 264:11,12
267:22
**Year's** 168:22,22 170:14
172:4
**years** 13:9 19:14 20:1
43:9 62:3 132:22
143:4 159:2 193:2
267:10
**yelled** 68:14
**yelling** 40:25 41:13
**Yep** 9:12 121:16 204:11
255:10
**yesterday** 210:24
**young** 115:20 186:21
**younger** 125:17,20
**youngest** 125:13
**youth** 27:2,8,12 83:9
**Yungaitis** 58:13 65:7
66:11

**Z**

**zero** 113:12 117:25
126:14 237:9 266:15
268:17
**Zoom** 255:8

**0**

**0100** 55:18
**0150** 190:7

**1**

**1** 1:11,18 3:2 4:3 28:16
30:6,7 47:3 58:16 76:4
151:18 153:2 154:3
**1-14-97** 186:24
**1-4-16** 183:2
**1-4-2016** 181:25 182:20
**1-5-2023** 270:13
**1.116012033** 7:8 157:8
208:2
**1:00** 135:16
**1:05** 97:21
**1:06** 109:17
**1:30** 98:17,22 99:7
**1:40** 210:2
**1:43** 201:13,18
**1:43:52** 201:21
**1:43:58** 201:21
**1:45** 190:13,13

**1:49** 205:4
**10** 4:12 59:22 60:3 61:10
  64:11 110:12 120:3
  154:12 165:18 185:24
**10-49** 104:14 109:1
**100** 231:17 267:21
**101** 5:5 155:5
**1010** 2:11 152:11
**103** 5:6 155:6
**1035** 2:11 152:11
**109** 5:7 155:7
**11** 4:13 35:5 37:2,10 39:2
  64:12,13,14,15,18
  137:24 147:13 154:13
  169:19
**11:00** 88:20,22 91:4,5,10
  98:21 106:15,17
  135:13,13 160:13
  164:10,15 171:19
  197:19
**11:11** 90:16,17
**11:30** 170:4 198:2
**11:34** 169:9,24
**11:50** 109:15
**11:52** 109:16
**1120** 19:9,12 20:1 22:1
**113** 177:22 178:7 182:1
**114** 5:8 155:8
**11th** 45:7
**12** 4:14 64:14 66:3
  103:12 120:21 121:8
  121:15 129:12 132:2
  154:14 205:9 207:1
  218:19
**12-21-15** 138:7
**12-22** 139:12
**12-22-15** 138:24
**12-23** 139:12
**12-26-15** 144:13,21
  160:19
**12-30-15** 167:25
**12:00** 98:22
**12:01** 201:25
**12:30** 97:2,4
**12:45** 91:7
**122** 5:9 155:9
**127** 5:10 155:10
**129** 5:11 155:11
**12th** 104:20 105:5
  131:10
**13** 4:15 53:22 67:7,9
  132:21 134:25 154:15
**13:36** 122:2
**130** 149:8,10,18
**132** 5:12 155:12
**134** 5:13,14 155:13,14
**1349** 205:3
**135** 5:15 155:15
**136** 5:16 155:16
**137** 5:17 155:17
**138** 5:18,19 155:18,19
**139** 5:20 155:20
**13th** 59:20
**13v** 92:6
**14** 4:16 68:23 135:9
  154:16 186:13 187:3
**140** 5:21 155:21
**141** 5:22 155:22
**143** 5:23 155:23
**146** 5:24 155:24
**15** 4:17 72:9,11,22 77:2
  154:17 200:6 256:21
**15-035257** 109:22
**15-19958** 65:9
**15-19991** 66:12
**15-20618** 51:15 52:17
**15-year-old** 40:24

**150** 6:3 156:3
**15019958** 65:13
**15019991** 66:13
**158** 3:4 153:4
  92:23
**16** 4:18 76:19 92:5,17,22
  143:1,4 154:18 266:8
**16:02:45** 183:2,14,24
**16:07** 169:8
**16:23** 183:16
**16000387** 182:19
**164** 6:4 156:4
**166** 6:5 156:5
**167** 6:6 156:6
**16781** 2:3 152:3
**168** 6:7,8 156:7,8
**169** 6:9 156:9
**16th** 92:23 201:13
**17** 4:19 36:12 40:5 57:19
  77:22,23 83:19,21
  154:19 159:2 187:15
**17:29:38** 194:10
**173** 6:10 156:10
**175** 6:11 156:11
**176** 6:12 156:12
**18** 4:20 25:14,19,24 26:1
  26:20,22 59:9,10
  67:14,17 73:17 84:7
  85:19 114:6 132:18,21
  154:20 254:23 255:16
  255:18,19
**18-year-old** 121:20
**180** 6:13 156:13
**182** 6:14 156:14
**185** 6:14 156:14
**186** 6:15 156:15
**187** 6:16 156:16
**188** 6:17 156:17
**189** 6:18 156:18
**19** 4:21 88:2,4 154:21
  217:6,23 223:15
**190** 6:19 156:19
**191** 6:20 156:20
**192** 6:21 156:21
**194** 6:22,23 156:22,23
**195** 6:24 156:24
**196** 6:25 156:25
**1977** 187:3
**198** 7:3 157:3
**19th** 215:6,6 227:11

**2**

**2** 1:11 3:2,4,4 4:4 34:25
  37:1,9 38:3,5 40:6,15
  71:7 84:9 85:20 90:22
  91:2 103:18,25 115:19
  150:9 151:11,11 153:2
  153:4,4 154:4 173:13
  174:14 185:12
**2-25-16** 144:21 145:25
  146:25 148:13
**2:00** 190:20 203:1,2,8,12
**2:12** 259:25
**2:19** 150:8
**2:20** 259:25
**2:23** 150:9
**2:28** 202:3,6
**20** 4:22 89:2,4 112:11
  154:22 184:2
**200** 7:4 157:4
**2000** 22:15 52:6
**201** 7:5 157:5
**2015** 10:4,8,15 11:21
  13:8,25 14:10 15:5,14
  22:15 23:13 28:12
  35:5 36:2,12 37:1,2,11
  38:3,5 39:2 40:6 44:14

**47:3** 51:5,11 56:23
  67:14,17 69:5 72:23
  73:24 76:16 84:9
  85:20 88:6,10 89:5,10
  90:22 91:2 92:5,17,22
  94:24 97:9 98:4
  101:21 102:12 103:12
  104:20 109:1,22
  127:22 128:3,8 129:12
  132:2,18 134:18,25
  135:9 136:8 137:24
  139:14,21 140:16
  143:14 158:4 164:8,19
  167:4 168:8,17 169:3
  172:20 173:2,3 181:17
  197:8
**2016** 15:14 19:5,11 23:6
  23:7,13 145:5 149:1
  173:13 174:14 176:2
  176:22 181:17 183:13
  184:25 185:12,25
  186:13 187:15 189:15
  189:22 191:5 192:8,14
  195:13 197:8,20 200:6
  200:11 204:2 207:7
  212:6 214:3,4 217:6
  217:23 220:18 222:7
  222:14 223:1,15,19
  224:8,25 226:24 228:3
  233:10 253:18 269:6
**2017** 22:7
**2019** 11:13 19:16 20:5
**2020** 9:17 19:17
**2022** 1:14 151:14 270:6,8
  271:17
**203** 7:6 157:6
**204** 7:7 157:7
**207** 7:8 157:8
**21** 4:23 90:19 94:24
  126:12 130:2 138:17
  154:23 215:8 217:9
  222:14 223:1 228:3
  237:6 256:24 259:1
  266:3,4,8,10,12,14,17
  267:22
**2100** 167:9
**216** 7:9 157:9
**22** 4:24 91:19,20 109:22
  134:18 154:24 204:2
**2200** 110:3
**22203** 2:7 152:7
**227** 7:10 157:10
**22nd** 113:5 142:14
**23** 5:3 94:20,22 139:14
  140:13,15,20 155:3
**233** 7:11 157:11
**23rd** 142:14,14
**24** 5:4 96:1,3 136:8 155:4
  189:14
**24-hour** 71:17
**24/7** 28:1
**2426** 1:23 151:23
**24th** 142:14 143:9
**25** 5:5 101:5,12 145:5
  149:1 155:5 258:12
**255** 3:5 153:5
**256** 2:3 152:3
**26** 5:6 97:7 98:4 103:9,11
  104:3 143:13 155:6
  158:4 164:8 269:4
**26(a)(1)** 4:3 154:3
**268** 3:5 153:5
**269** 3:6 153:6
**26th** 97:8 101:15 112:10
  112:12 165:2
**27** 1:14 5:7 109:18,21
  151:14 155:7 224:8

**259:3** 270:6
**270** 3:6 153:6
**271** 3:7 153:7
**272** 3:7 153:7
**273** 3:8 153:8
**276821** 270:22
**28** 5:8 101:21 102:12
  114:13 155:8 212:6
  214:3 216:5
**28:16** 122:20
**28:24** 123:4,6,8
**28:33** 123:16
**28:38** 124:7
**28th** 86:1 101:15 207:1
  212:16 214:25 219:19
  233:12,21 258:23
  259:6,8,15,16
**29** 5:9 69:5 122:12,13
  127:15,16 155:9
  164:19 167:4 189:22
  207:7 214:4 220:18
  233:10
**29th** 214:6 233:16,21
  234:4,13 270:7 271:17
**2B** 147:12
**2nd** 176:13,25

**3**

**3** 4:5 36:7,8 60:9 72:14
  76:4,9 84:12 103:19
  103:24 104:3 110:3
  129:16 132:20 136:9
  141:13 143:16 154:5
  161:25 176:2,22
  204:25
**3-1-16** 190:6,7
**3-15** 202:12
**3-15-16** 199:8,25 200:6
**3-28** 213:3 214:19,21
**3-28-16** 204:23 205:3
**3-29** 209:15 213:7
**3-29-16** 205:21,25 206:3
**3-8-16** 194:20 197:20
**3-no** 167:25
**3:00** 191:8,10,15,18,20
  229:1 259:25
**3:02** 193:3,13
**3:19** 193:13
**3:27** 193:13
**3:28** 205:2
**3:50** 191:23
**30** 4:3 5:10 44:14 56:23
  57:5 72:23 73:24
  76:16 127:17,19,21
  154:3 155:10 168:8
  193:4 209:21 224:11
**30th** 45:5
**31** 5:11 94:1 129:5,6,11
  155:11 168:17 169:3
  172:19
**3114** 9:6,7,15 19:15
**31st** 171:7,9 233:19
  234:13
**32** 5:12 94:1 132:15,17
  134:14 155:12
**32792-5512** 2:11 152:11
**33** 5:13 134:8,10,13
  155:13
**33526-2426** 1:24 151:24
**34** 4:4 5:14 134:22,24
  135:11 154:4 155:14
  193:4
**34691** 9:6
**35** 5:15 135:6,8 155:15
**352** 1:25 151:25
**36** 4:5,6 5:16 136:5,7
  154:5,6 155:16

**37** 5:17 137:19,22 155:17
**3773** 74:23
**38** 4:7 5:18 78:4 79:7
  138:3,6 154:7 155:18
  215:17 257:22 258:5,9
**3810** 10:18 11:19 12:16
  35:19 76:23 84:3
  85:23 102:11 136:14
  141:16,25 186:15
  189:25 205:5
**39** 4:8 5:19 138:20,22
  154:8 155:19
**3rd** 176:10

**4**

**4** 4:6 30:12 36:22,23 38:2
  51:10 52:6 58:15
  154:6 176:21 177:5
  183:13 184:25 191:5
  192:8,14
**4:00** 191:23
**4:02** 184:22
**4:07** 169:8 170:3
**40** 5:20 115:19 139:8,13
  155:20 195:15,16
  211:9 240:3
**400** 266:15,17,25
**407-673-5000** 2:12
  152:12
**41** 5:21 114:24 115:4
  140:10,12,19 155:21
**42** 5:22 141:1,14 155:22
**43** 5:23 143:11,13 144:16
  155:23 219:9
**44** 4:9 5:24 146:19,23,25
  154:9 155:24
**44120** 2:3 152:3
**45** 6:3 150:1,2 156:3
  158:3 160:18 161:25
**46** 6:4 156:4 164:16,18
**47** 6:5 156:5 166:17,19
**48** 6:6 156:6 167:21,23
  168:21
**4834** 184:19,21
**49** 6:7 156:7 168:14,16
  169:8 170:2,3,7
**4th** 176:18 177:25

**5**

**5** 4:7 31:14 38:24 88:6,10
  154:7 194:5 238:23
**5-30-15** 60:8
**5:11** 269:16
**5:12** 1:16 151:16
**5:30** 194:7
**50** 6:8 57:5 156:8 168:25
  169:2,17,19,23 170:3
  170:7
**51** 6:9 156:9 169:11,17
  169:24 172:19 173:4
**52** 6:10 156:10 173:10,12
**53** 6:11 156:11 175:24
  176:1
**54** 6:12 156:12 176:17,21
  182:17 183:7,15 191:5
**55** 6:13 156:13 180:23
  181:19 183:1,7,13
**56** 4:10 6:14 154:10
  156:14 182:12 183:6,8
  185:20,24
**567-5484** 1:25 151:25
**57** 4:11 6:15 154:11
  156:15 186:9,12
**58** 6:16 156:16 187:12,14
**59** 4:12 6:17 154:12
  156:17 188:21 189:14

**5th** 213:11 214:24

---
**6**
---

**6** 4:8 31:24 39:23,24
  154:8
**6,600** 241:25 242:2
**60** 6:18 156:18 189:19,21
**61** 6:19 156:19 190:3,5
**62** 6:20 156:20 191:1,2,4
  193:3,11
**63** 6:21 156:21 192:5,7
  192:24
**64** 4:13 6:22 154:13
  156:22 193:25 194:1,5
**65** 6:23 156:23 194:16,18
**66** 4:14 6:24 154:14
  156:24 195:9,11
**67** 4:15 6:25 154:15
  156:25 196:20,21
  197:17
**68** 4:16 7:3 154:16 157:3
  198:5,7 199:7 200:2
**69** 7:4 157:4 200:2,3,5
  201:24 202:5,6

---
**7**
---

**7** 4:9 44:19 45:19 51:11
  56:17 89:5,16 154:9
  159:18 210:25 234:8
**7:00** 94:24 172:5
**7:15** 116:2
**7:30** 94:24
**7:41** 169:24 170:13
  171:20
**7:53** 116:8
**70** 7:5 157:5 201:9,12
**703-682-9320** 2:4,8
  152:4,8
**71** 7:6 157:6 203:24
  204:1
**72** 4:17 7:7 154:17 157:7
  204:20,22
**73** 7:8 157:8 207:24
  208:1 215:22
**74** 7:9 157:9 215:24
  216:12,22,22 219:1
  221:6 224:2 251:15
**75** 7:10 157:10 227:18,21
  227:22,25 228:18
  251:15
**76** 4:18 7:11 154:18
  157:11 233:6 238:24
  ▮ 4:19 154:19 187:2,3

---
**8**
---

**8** 3:3 4:10 56:16,19 65:6
  153:3 154:10 195:13
  197:20
**8:15** 116:25
**8:15-ish** 116:25
**8:21-cv-00555-SDM-C...**
  1:6 151:6 272:4
**8:30** 192:25
**80** 211:11 228:18
**84** 4:20 154:20
**8520** 1:18 151:18
**88** 4:21 154:21
**89** 4:22 154:22

---
**9**
---

**9** 4:11 45:23 47:2 51:11
  57:12 60:2,6 65:1 66:7
  117:18 127:22 128:3,8
  154:11 167:10
  ▮ 92:24
  ▮ 186:18

**9-16** 93:1
**9-21-15** 95:5
**9-22-15** 5:8,9 110:3
  114:19 122:11 155:8,9
**9-28-15** 101:13
**9:00** 103:12 167:9
**9:05** 119:18
**9:08** 119:18
**9:10** 1:16 151:16
**9:15** 119:13
**9:46** 167:11,13
**90** 4:23 154:23
**900** 2:7 152:7
**901** 2:7 152:7
**91** 4:24 154:24
**911** 36:13,20 37:23,25
  251:24,25 253:1
**94** 5:3 155:3
**96** 5:4 155:4