UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES, III,

  Plaintiffs,

vs.                      Case No.: 8:21-cv-00555-SDM-CPT

CHRIS NOCCO, in his
official capacity as
Pasco County Sheriff,

  Defendant.
_____/


PROCEEDINGS:        Deposition of
                    DAVID KENNEDY


DATE:               March 21, 2022


TIME:               1:00 p.m. - 4:59 p.m.


PLACE:              Via Zoom


REPORTED BY:        Judy Anderson, Court Reporter
                    Notary Public
                    State of Florida at Large




ANDERSON COURT REPORTING
P.O. Box 2426
Dade City, FL 33526-2426
Judy@andersoncourtreporting.com
(352) 567-5484

```
 1   APPEARANCES VIA ZOOM:

 2   ROBERT E. JOHNSON, ESQUIRE
     Institute for Justice
 3   16781 Chagrin Boulevard, Ste. 256
     Shaker Heights, OH 44120
 4   703-682-9320
     Rjohnson@ij.org
 5          Counsel for Plaintiffs

 6   JOSHUA HOUSE, ESQ.
     Institute for Justice
 7   901 N. Glebe Road, Ste. 900
     Arlington, VA 22203
 8   703-682-9320
     Jhouse@ij.org
 9          Co-counsel for Plaintiffs

10   THOMAS W. POULTON, ESQUIRE &
     ROBERT HOLBORN, II, ESQUIRE
11   Debevoise & Poulton, P.A.
     1035 S. Semoran Blvd., Ste. 1010
12   Winter Park, FL 32792-5512
     407-673-5000
13   Poulton@debevoisepoulton.com
     Holborn@debevoisepoulton.com
14   Cook@debevoisepoulton.com
             Counsel for Defendant
15

16

17

18

19

20

21

22

23

24

25
```

1                        **I N D E X**

2                                                        Page

3     Direct Examination by Mr. Poulton            5
      Cross Examination by Mr. Johnson           120
4     Stipulation                                129
      Certificate of Oath                        130
5     Certificate of Reporter                    131
      Deponent's Signature Page                  132
6     Errata Sheet                               133

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **E X H I B I T S**

2                                        **Page**

3    1 - Taylor Video 2-25-18                    55

4    2 - Taylor Video 3-31-18                    55

5    3 - Heilman Video 3-3-2016                  67

6    4 - Heilman Video 9-18-18                   68

7    5 - Heilman Video 8-9-20                    94

8    6 - Report                                  99

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    DAVID KENNEDY,

2      being first duly sworn to tell the truth, the whole

3      truth, and nothing but the truth, was examined and

4      testified as follows:

5              THE WITNESS:  I do.

6                    DIRECT EXAMINATION

7    BY MR. POULTON:

8      Q.    Mr. Kennedy, my name is Tom Poulton, and I

9    represent Sheriff Nocco in this case.  Before we get

10   started let me ask you have you ever had your deposition

11   taken before?

12     A.    I have not.

13     Q.    All right.  Well, first let's get your full

14   name.

15     A.    David, middle name MacLean, M-A-C-L-E-A-N,

16   capital L, Kennedy.

17     Q.    And what is your professional address?

18     A.    Let's call it 899 Tenth Avenue, New York,

19   New York 10019.

20     Q.    Okay.  Couple of principles to help this move

21   along.  First of all, the court reporter is trying to

22   write down everything we say.  That's the most important

23   thing to remember.  So try to let me finish asking my

24   question before you start to answer, and I'll try to let

25   you finish answering before I ask the next question.

1    Okay?

2        A.    Yes.

3        Q.    All right.  The other thing is that the court

4    reporter cannot take down nods of the head or shakes of

5    the head or uh-huh or uh-uh.  So it's important to

6    answer verbally with words.

7        A.    Understood.

8        Q.    Thank you.

9              All right.  Have you ever been a certified law

10   enforcement officer?

11       A.    No.

12       Q.    Have you ever taken classes in a certified law

13   enforcement academy, and if so, did you graduate?

14       A.    I never have so taken.

15       Q.    Have you ever been certified by a state or

16   other jurisdiction to train law enforcement officers?

17       A.    No.

18       Q.    And just to clarify, for example, what I mean

19   by that is Florida has the Criminal Justice and Training

20   Commission.  Different states have their other

21   organizations, or maybe a large city might have their

22   own.

23             So with that understanding, were there any

24   agencies that ever certified you in order to train law

25   enforcement?

1      A.    No.  I've worked with those sort of folks.

2    I've taught them, I've helped prepare materials for

3    them, that kind of thing, but, no, I've never been

4    certified.

5      Q.    Okay.  What is your highest level of education?

6      A.    A bachelor's degree, Swathmore College.

7      Q.    And what was that in?

8      A.    Philosophy and history.

9      Q.    And what is your current position?

10     A.    I am a full professor of criminal justice at

11   John Jay College of Criminal Justice in New York City

12   and the director there of the National Network for Safe

13   Communities.

14     Q.    All right.  I've looked over your expert report

15   and kind of checked into things a little bit, and I

16   understand that you've worked with a number of cities,

17   and we'll talk about that in a minute to address their

18   particular crime problems.  But am I correct that the

19   first city that you worked with was Boston with

20   Operation Ceasefire?

21     A.    That was my first applied work.  I worked as a

22   researcher in cities across the country and

23   internationally before that, but, yes, that was my first

24   applied work.

25     Q.    And when you say applied work, can you

1  elaborate what you did with Operation Ceasefire in

2  Boston?

3      A.   So what I mean by applied work is work that is

4  designed to produce actual violence reduction and crime

5  control benefits, and the Boston Gun Project which --

6  and my colleague at the Kennedy School Ann Piehl and I

7  designed and which was funded by the United States

8  Department of Justice was the first attempt to unpack a

9  homicide problem at a city level and design an

10 operational intervention to address homicide and gun

11 violence at a city level.

12     Q.   Because you referred to it as the gun project,

13 and I thought Operation Ceasefire.  Are they the same

14 thing or were they different?

15     A.   The action research undertaken, the umbrella

16 for the undertaking was called the Boston Gun Project.

17 The Boston Gun Project produced the intervention that we

18 then called Operation Ceasefire.

19     Q.   How were you contacted or did you reach out to

20 Boston to begin that process?

21     A.   We were looking -- so this is pretty much the

22 height of the crack epidemic.  It was pretty much the

23 height of the violence spike that came with the crack

24 epidemic.  We were looking for a city that both had that

25 problem on the ground and was interested in

1    participating in this undertaking.

2           We talked to a number of different such

3    agencies which I in particular was familiar with because

4    of my work with the Kennedy School of Government

5    Policing Executive Session, and we ultimately settled on

6    Boston.

7        Q.   So did you reach out to them initially?

8        A.   Reached out to them as part of an existing

9    relationship with senior staff at BPD, yes.

10       Q.   Was there a particular crime problem that they

11   were trying to address and that you made your applied

12   effort to?

13       A.   So, again, this was the crack epidemic.  It was

14   the violent spike that came with the crack epidemic.

15   That violent spike was generally considered to be the

16   most important public safety problem in the country.

17   Every city that was dealing with a crack epidemic was

18   trying to deal with that violence.  So Boston was

19   already focused on that, we were already focused on it,

20   and therefore that was a natural fit.

21       Q.   And what timeframe was this?

22       A.   The gun project began in 1995.  We had the

23   Operation Ceasefire as it came to be called intervention

24   pretty much framed out by the fall of that year, and

25   implementation began formally in May of 1996.

1      Q.   All right.  And so my understanding is that

2   this was a series of steps that were taken in order to

3   try to reduce gun violence in Boston; fair?

4      A.   Yes, that's correct.

5      Q.   And correct me if I'm wrong.  My understanding

6   -- and fill in the gaps, please.  But my understanding

7   is that the sorts of things that you did were get

8   members of particularly the Black ministry to reach out

9   to gang members.  You had federal prosecutors that were

10   brought in to kind of wield the possibility of federal

11   sentencing over gang members, and you also had community

12   activists that reached out to the gangs as just three

13   examples of the sorts of things that you were doing to

14   address gun violence in Boston; is that accurate?

15      A.   Not really.

16         MR. JOHNSON:  Object to form.

17   BY MR. POULTON:

18      Q.   Okay.  What do I have wrong there?

19      A.   Pretty much all of it.

20      Q.   Okay.  Well, then help me understand.  I'll

21   tell you what.  Let me rephrase the question.

22         And by the way, counsel had in the midst of our

23   discussion objected to form.  You can still answer.

24   It's only if he tells you not to that it's an issue, but

25   I don't anticipate that will happen.  However --

1          MR. JOHNSON:  Judy, were you able to hear the

2     crosstalk?  I just want to make sure with the Zoom

3     format that you're able to hear.  Okay.

4          MR. POULTON:  I heard it.

5          MR. JOHNSON:  Okay.

6          MR. HOUSE:  I actually did not, but that might

7     have just been on my end and not the computer's

8     fault.

9  BY MR. POULTON:

10     Q.   Well, I'll rephrase the question.  What were

11  the specific mechanisms that were put into place to

12  address gun violence in Operation Ceasefire?

13     A.    So there were essentially two tracks.  So one

14  was an unpacking of and steps to address the trafficking

15  in firearms -- trafficking and diversion of firearms

16  that were making their way to illicit use in Boston,

17  particularly by the crack crews that were so emblematic

18  of that time.

19          So that was a set of steps that involved

20  comprehensive tracing of all crime guns recovered in

21  Boston that was a partnership between the Boston Police

22  Department and the Bureau of Alcohol, Tobacco, and

23  Firearms, analysis of those traces in conjunction with

24  information about violent crime and gang and group

25  membership and localities in Boston, layered with

1   information about the sorts of guns most being used in

2   violent crime in Boston and most preferred by gang crew

3   and group members, and then a variety of steps to focus

4   on those high risk guns and use law enforcement to

5   address their movement from the illicit market to the

6   licit market.

7            There was a second traunche which was a

8   mechanism to put the crews on notice that certain acts

9   of violence would result in responses to the group as

10  such to inform high-risk folks about their existing

11  legal vulnerabilities, many of which they didn't

12  understand, to create around certain acts of group

13  violence a new formal response which would be focused on

14  the group as such rather than on individuals to match

15  that with what we called the moral voice of the

16  community and what academics call informal social

17  control, which was getting folks respected by the group

18  members to communicate community norms against violence

19  and for their well-being, and then a carefully-developed

20  range of social services and supports to serve and

21  support high-risk members in their daily lives to keep

22  them safe, to make them succeed, if they wanted to exit

23  gang life to assist them in doing that.

24       Q.   Was any type of randomized controlled study

25  ever done to determine the effect on the crime rate of

1    any of those different mechanisms that you've just

2    listed?

3         A.   The intervention was not conducive either to

4    RCTs for those individual elements nor to RCTs with

5    respect to the intervention as a whole.  The different

6    elements of the intervention were considered one -- one

7    consolidated intervention that those elements make up

8    the treatment, and the treatment area was the City of

9    Boston, and it's well accepted in evaluation methodology

10   that you can't use cities as control for other cities.

11   They're not congruent enough.

12         And the diagnosis of the problem was that it

13   required intervention with all of the high-risk groups

14   and potentially high-risk groups.  So it wasn't possible

15   to set groups aside as controls.

16         Later evaluations of a revisited version of

17   this intervention and others like it have gotten pretty

18   close to RCTs.  There have been RCTs for later versions

19   of this that were focused on individuals and thus

20   allowed random assignment.

21         Q.   So with regard though to Operation Ceasefire,

22   the answer to my question is, no, there have not been

23   any randomized control studies of the effects of any

24   individual aspect of those interventions; correct?

25         A.   It couldn't be done.  So, no, it's never been

1    done.

2        Q.    So, for example, we don't know what effect the

3    use of social services and support had versus moral

4    values and social control -- informal social control

5    had?

6        A.    No.  We know from later work that the kind of

7    social services that that version of Operation Ceasefire

8    used has not been very effective.  We don't know that

9    from RCTs.  We simply know it from takeup rates in

10   correlation with movements in violence in other cities.

11   That's led to a pretty complete reinvention of the idea

12   of social services when it comes to these sorts of

13   issues.

14       Q.    So would I be correct that the only way to

15   really know whether a given person did not commit a

16   given crime would be to ask that person why they didn't

17   commit that given crime and that they would -- go ahead.

18       A.    No, that won't do it either.

19       Q.    So there's no way to know?

20       A.    If the question is can we say with assurance

21   what the counterfactual is with respect to an

22   individual, then the answer is pretty much no.

23       Q.    You mentioned putting the crews on notice that

24   there would be a response to the group on the whole.

25   Can you elaborate on that?

1      A.   So the main thing that has turned out to be

2  true about homicide and gun violence is that it's

3  concentrated on very small numbers of very active and

4  identifiable people.  Most of those folks are not

5  operating as individuals.  They're operating in

6  different sorts of groups and networks, and that's an

7  issue that is completely resistant to any of our normal

8  system activities.  Our normal criminal justice system

9  can't produce reliable responses to that kind of

10 violence.  Our prevention systems can't produce reliable

11 and effective responses to those at risk.  So those

12 mechanisms just don't work.

13      What turned out to be true was that if you

14 could say to a population of groups at a given moment

15 under certain circumstances which we will tell you about

16 now, going forward acts of violence may trigger a

17 response at a group level, and that meant in practice

18 things like saying to multiple groups at the same time

19 the next group in Boston that kills somebody and the

20 most consistently violent group in Boston that kills

21 somebody may be drawing upon themselves a range of legal

22 and nonlegal sanctions that are allowed because of the

23 chronic offending nature of the individuals and the

24 groups involved.  And that turned out to have tremendous

25 deterrent power when routine activities did not.

1    Q.   Was there a component to that whereby they were

2    told that federal prosecutors would be brought to bear?

3    A.   No, there was not.

4    Q.   No?  Okay.  Was that a different agency?  I

5    have some note that indicates that at one point Janet

6    Reno was involved or prosecutors under Janet Reno were

7    involved and that there were warnings given to gang

8    members that they might be subject to federal

9    prosecution as opposed to local or state prosecution.

10   Was that a different agency?

11   A.   It was important, as I noted earlier, to let

12   people who might not understand their legal environment

13   what that legal environment was, and there's an

14   extensive body of research as well as everybody who does

15   this knows this is true.  Many people do not know the

16   sanction environment that they're in particularly when

17   that sanction environment isn't utilized very much, and

18   both of those things are true for the federal legal

19   environment around gun crime.

20        So part of the intervention frequently was

21   informing people what the federal law was.  There were

22   no promises that that law would be employed.

23   Q.   But they were more or less warned that they

24   were in jeopardy of federal criminal charges which might

25   be more severe than what they thought would be

1    applicable to their criminal activity?

2        A.   They were informed of the law and the ways in

3    which they and their conduct might be brought under that

4    law.  Yes, that's correct.

5        Q.   Was it in connection with this particular

6    operation that you coined the phrase focused deterrence?

7        A.   Yes, that's right.

8        Q.   And just as an example, not meaning to be

9    completely exclusive, but this advising the gang members

10   of the potential legal environment they faced in terms

11   of criminal charges, was that part of focused

12   deterrence?

13       A.   Yes.

14       Q.   In all of these different cities and agencies

15   that you worked with, and we'll talk about some more of

16   them in a minute, but when you use that phrase focused

17   deterrence in connection with those projects, is it

18   always in connection with dealing with violent crime?

19       A.   Not necessarily violent crime.  The work that

20   certainly is at the core of focused deterrence has been

21   about violent crime in the U.S.  It's been

22   overwhelmingly about homicide, gun violence.

23            There are versions that have looked at less

24   legally and maybe objectively serious offending.  Nearly

25   all of that has been at the pretty extreme end of the

1    spectrum.  So it's been focused on the most toxic kinds

2    of overt drug markets.  It's been focused on making sure

3    that people know they will not successfully graduate to

4    the most extreme forms and violent forms within that

5    department of violence.  There have been versions that

6    have been adapted for individual gun and gang offenders

7    as opposed to such folks involved or known to be

8    involved in groups.  There's a version that's been

9    developed for safety and security in maximum security

10   gang prisons, that sort of thing.

11        Q.   Is the fundamental principle that you were

12   trying to dissuade the person from committing crime in

13   the future?

14        A.   It's one of the fundamental principles.  Other

15   fundamental principles include recognizing that a lot of

16   the behavior in question, particularly again for the

17   central issues of homicide and gun violence, are felt in

18   communities and populations that are estranged from the

19   law for historical and present reasons and trying to

20   address that estrangement and address the actual action

21   and the legitimacy of those institutions.

22             It's been predicated on again particularly for

23   these most intense settings a realization that a lot of

24   this violent behavior is driven by objective

25   victimization and risk because what we do has not kept

1   people safe.  So the core goal is to keep people safe.

2         We are seeking to minimize the role of policing

3   and law enforcement in this and shift it to support and

4   outreach and to informal social control.  So all -- I'd

5   say the main goal is to produce public safety in a way

6   that works better for everybody involved.

7         Q.   By getting people to not commit crime as moving

8   forward?

9         A.   Or to make them safer so they don't have to

10  protect themselves, or to support them in their daily

11  lives so that their lives are more stable.  It's as I

12  said.

13        Q.   You mentioned that the focused deterrence

14  principles are used primarily in homicides dealing with

15  homicide problems and violent crime environments, but

16  it's also been used in less severe criminal

17  environments, but still on the extremes I think is the

18  way you put it; right?

19        MR. JOHNSON:  Object as to form.  I just

20     objected to form.

21  BY MR. POULTON:

22        Q.   What was that, Professor?

23        A.   Largely, yes.

24        Q.   Okay.  In your own work, have you ever worked

25  with a city on dealing with a crime problem that was not

1    based in either homicides or violent crimes?

2        A.    Yes, I have.

3        Q.    Okay.   Which cities were those?

4        A.    So I don't consider drug markets -- overt drug

5    markets to be innately violent crimes.   The issue there

6    is the overt and disorderly nature of the drug market,

7    and I've worked with scores of cities on drug market

8    issues.

9            In the prison work that I've done, I think the

10   people that I was working with would consider violent

11   crimes inmate on inmate and inmate on guards and by

12   extension guards on inmates to be part of the picture.

13   I think they probably would have framed that more in

14   terms of security and of order of which violence is a

15   subset.

16           I've done work in opioid markets in which the

17   main outcome of concern was overdose death.   There are

18   probably others like that.

19       Q.    I'll ask it this way.   Have you done any work

20   with cities or with prisons or any other agencies that

21   focused entirely on property crimes?

22       A.    I'd have to think harder to be precise about

23   that.   I do a lot of this, and there are outliers, but

24   nothing's coming to mind right now.

25       Q.    Well, specifically with focused deterrence,

1    have you ever worked with an agency or a city applying

2    principles of focused deterrence to property crimes?

3         A.    I don't believe I have, no.

4         Q.    You're affiliated with the National Network for

5    Safe Communities.  What is that exactly?

6         A.    It's an organization at John Jay that develops

7    these interventions and support cities and other

8    entities, sometimes states and the federal government,

9    these days several -- several foreign states in applying

10   these public safety approaches.

11             We do other work in police community relations

12   in legitimacy and reconciliation and such adjacent to

13   that.

14        Q.    When you say reconciliation, what do you mean?

15        A.    So I said earlier that one of the -- in the

16   terms that people use, one of the root causes of these

17   serious issues is the estrangement between affected

18   populations and especially the police, and that's bad

19   enough in many places.  Maybe in the U.S. it's bad

20   enough in all places that have a serious crime problem

21   that we think it requires the kind of depth of

22   recognition and attention that other kinds of formal

23   reconciliation processes have developed in settings such

24   as post apartheid, post conflict, that kind of thing.

25        Q.    Does the National Network for Safe Communities

1    focus just on violent crime?

2         A.   No, not just on violent crime.

3         Q.   Drugs?

4         A.   Drug -- drug markets and drug harms, yes.

5         Q.   How about property crimes?

6         A.   In the world that I work in, until people can

7    deal with serious violent crime, property crime is not

8    usually at the top of their list.

9         Q.   Okay.  I noticed that on the website it

10   mentions working with cities through the National

11   Network for Safe Communities, but have you ever worked

12   with any sheriff's offices?

13        A.   We work with sheriff's offices pretty routinely

14   as part of these larger interventions.  We're setting up

15   to work with a sheriff's office as we speak, and that

16   will be -- I think this is true -- the first such

17   undertaking in which the sheriff's office is the

18   principle contact and principle organizer at the local

19   level, but we work with sheriff's departments all the

20   time.

21        Q.   So in the prior applications for lack of a

22   better phrase they might -- a sheriff's office might be

23   a satellite issue to working with a city?

24        A.   No, I would never say that.  These

25   comprehensive interventions require a lot of equal and

1    willing partners, and sheriff's have frequently been

2    part of that partnership.

3        Q.   Can you tell me what -- you said you're about

4    to engage with the first incident where the sheriff's

5    office is the primarily agency; right?

6        A.   Yes.

7        Q.   And could you tell me what sheriff's office

8    that is?

9        A.   I can.  I'm not -- I'm not quite sure where my

10   boundaries here.

11       Q.   Well, let me ask you this.  Is it in Florida?

12       A.   No.

13       Q.   Okay.  Have you ever worked with a sheriff's

14   office in Florida?

15       A.   I'm quite sure that we've worked with sheriff's

16   offices in Florida as part of larger partnerships.

17       Q.   Where the primary agency would have been a city

18   or a locality like say Miami Police Department?

19       A.   Jacksonville, for example.  We're doing -- have

20   done and are doing work in Jacksonville where the

21   primary law enforcement agency is the sheriffs.

22       Q.   Well, but I mean the original entity with which

23   you were working would have been, for example, the City

24   of Jacksonville's Police Department and the Sheriff

25   would participate?

1      A.   No.  It was the Sheriff's Department.

2      Q.   Okay.  What did you do with them?

3      A.   We're working on homicide and gun violence.

4      Q.   Homicide and -- okay.  Does any of that involve

5    property crimes?

6      A.   All these things involve property crimes.

7    Property crimes are a routine part of the mix with these

8    sorts of very high-risk folks.  The focus of the

9    intervention is on homicide and gun violence.

10     Q.   Can you explain what is meant by the phrase

11   person-focused intervention?

12     A.   So in crime prevention in the kind of

13   approximate more or less near term crime prevention that

14   I and my community is part of, there is a fundamental

15   division into what are called place-based focuses and

16   person-based focuses, and place-based generally means a

17   piece of geography, the built environment of

18   communities, neighborhoods, areas within those

19   communities what are called problem places.

20          The person-focused work is on the people

21   involved in these dynamics.

22     Q.   Have you ever studied the effects of

23   person-focused intervention in dealing primarily with

24   property crime as opposed to homicide or violence?

25     A.   There is a relatively small amount of work in

1     this area on repeat burglary on -- certainly on --

2             So sorry.  I've lost my train.  Would you ask

3     the question again?

4        Q.   Sure, sure.  I'm asking you whether you have

5     conducted research or studied person-focused

6     intervention when it comes solely to property crime, not

7     including homicide or drugs?

8        A.   No, no, I have not.

9        Q.   Okay.  What is lever pulling?

10       A.   So in focused deterrence, one of the key -- so

11    in attention to crime, one of the central empirical

12    facts is that folks who are at highest risk for any of

13    the most serious kind of offending, tend to be what the

14    literature calls repeat and chronic offenders across a

15    wide variety of legal dimensions.

16            So if somebody is at highest risk of the most

17    serious violent crime, and we can usually extend this to

18    other issues generally considered, you know, the most

19    extreme public safety matters, there's a tendency for

20    those folks to commit crimes and do other dangerous and

21    disorderly things across a wide variety of legal

22    dimensions, which has meant that if one wants to create

23    a change in risk and sanction for the most violent act,

24    it's possible to put people on notice that they could

25    face enforcement for the other things they're doing and

1    their other legal exposures, and that is the basic

2    framework for pulling levers.

3         Q.   How about lever pulling amongst groups, is that

4    also --

5         A.   Same answer.  Same answer.

6              (Court reporter asked for clarification.)

7              MR. POULTON:  I'm sorry.  I was asking what

8         about lever pulling amongst groups, and I believe

9         his answer is it's the same principle.

10        A.   Same answer.  That's right.

11   BY MR. POULTON:

12        Q.   So if a member of a group is believed to be

13   engaged in criminal activity, then discussing that and

14   the potential consequences of that with other people in

15   the group is part of lever pulling?

16        A.   It can be, yes.

17        Q.   Are you familiar with the phrase

18   community-oriented policing?

19        A.   I am.  I co-authored the first book on

20   community-oriented policing in 1991.

21        Q.   And what is community-oriented policing?

22        A.   Nobody knows.

23        Q.   Okay.  Can you elaborate?

24        A.   It's a term that has lost all meaning because

25   people have used it in every possible meaning, and it's

1   ceased to have any definitive or operational

2   significance.

3        Q.   Well, you know, you've kind of predicted my

4   next several questions related to that.  I was going to

5   ask you whether or not you would agree with me that

6   there are 18,000 law enforcement agencies in the United

7   States give or take?

8        A.   I can't answer that 'cause I still don't think

9   anybody knows, but it's going to be in that neighborhood

10  somewhere.

11       Q.   Okay.  Virtually all of them have to some

12  degree or another what they would consider to be

13  community-oriented policing; correct?

14       A.   No, not even close.  As vague as this is, most

15  places still don't even try to practice it.

16       Q.   Well, community-oriented policing can include

17  connecting with other organizations in the community,

18  for example, neighborhood watch, faith-based

19  organizations; fair?

20       A.   No, that doesn't mean anything.  Every -- most

21  every police department does that.  They can't function

22  if they don't do it.  That doesn't make anything

23  community policing or anything else.

24       Q.   Well, what do you consider to be community-

25  oriented policing?  And you could use your original

1    definition if you'd like or just tell us what you think

2    it is now or both.

3        A.   I've stopped thinking that the term can be

4    rehabilitated.

5        Q.   Would you agree with me that the needs of those

6    18,000 law enforcement agencies, approximate, are going

7    to differ depending on their unique crime environments?

8        A.   So that's inevitably true.  There's a threshold

9    I would say below which discretion is no longer

10   permissible constitutionally, criminologically,

11   operationally, and with respect to pure simple common

12   sense.  So having 18,000 agencies does not mean that

13   people can do anything they want.

14       Q.   Do you consider yourself qualified to draw the

15   line on what is a lawful or constitutional approach to

16   crime in a given environment?

17       A.   I am better than most any -- even within my

18   field and in my professional environment, I've got a

19   uniquely capable record of coming up with good answers

20   to hard problems, and all of that work has involved me

21   in a domain in which both law formally in terms of

22   constitutional practice and the law in practice in terms

23   of what professionals consider to be within the bounds

24   of acceptable conduct.  And, yes, I absolutely consider

25   myself so qualified.

1    Q.   Well, you're not an attorney or a law

2    enforcement officer; right?

3    A.   That's correct.

4    Q.   Do you feel qualified to render opinions in

5    this case that some particular action by a law

6    enforcement officer at the Pasco Sheriff's Office under

7    the rubric of intelligence-led policing was or was not

8    lawful or constitutional?

9    A.   Given the conduct that I've had a chance to

10   review, yes, I absolutely feel myself qualified.  There

11   might be something closer to the boundaries of what's

12   lawful where one would need to have more formal legal

13   training than I've got, but nothing that I've seen comes

14   anywhere near that boundary.

15   Q.   All right.  Can you list for me the examples of

16   unlawful or unconstitutional conduct to which you'll

17   testify in this case coming from the Pasco Sheriff's

18   Office?

19   A.   I'm trying to figure out -- I'm trying to

20   figure out why simply saying I wrote extensively about

21   this in the opinion I submitted isn't a good answer,

22   because I have fifty pages addressing this.

23   Q.   Right.  But I don't recall reading in your

24   report you coming to a conclusion that a particular

25   action by a particular deputy on a particular date was

1    unconstitutional.  Am I wrong?

2         A.   I consider the pattern and practice of conduct

3    that I have had a chance to review to be in its totality

4    absolutely outside the bounds of good professional

5    practice completely unsupported by research in

6    criminology.  And as I said in one particular instance,

7    the kinds of -- and I could have said this about many

8    other such instances, but that the pattern of repeated

9    and abusive and intrusive visits to a particular address

10   would, if conducted by a private individual, absolutely

11   support the issuance of a restraining order.

12        Q.   And you equate that to being unconstitutional?

13        A.   If not unconstitutional, then illegal, yes.

14        Q.   Wouldn't it be more accurate to say that your

15   criticism of the program on the whole comes from your

16   belief that they are taking a wrong approach, that they

17   have the wrong general concept, as opposed to there is a

18   particular aspect of the program or a particular

19   incident that involved unconstitutional conduct?

20             MR. JOHNSON:  I'm just going to -- well, go

21        ahead.

22             THE WITNESS:  No, go ahead.

23             MR. JOHNSON:  Well, I was just going to object

24        as to form.

25   BY MR. POULTON:

1      Q.   Go ahead.  You can answer.

2      A.   Question again, please.

3      Q.   I'll rephrase it.

4           I've read your report, and you're critical at a

5      fundamental level about the agency's understanding of

6      some of the concepts like focused deterrence, and I read

7      criticisms of particular interactions with -- between

8      deputies and the plaintiffs, and I hear your general

9      criticism of the program on the whole, but my question

10     is wouldn't you agree that those criticisms that you're

11     offering are based on your disagreement with the

12     approach that the agency is taking from a criminology

13     standpoint as opposed to your declaring that some

14     particular aspect of this program is unconstitutional?

15     A.    I take the behavior and the policies that I

16     have now had a chance to review and I think of them in

17     the same way that the Justice Department brings pattern

18     and practice actions.

19          The totality of this behavior is outrageous,

20     and in a life spent in applied policing and prosecution

21     and corrections and judicial behavior governed by the

22     Constitution of the United States, nobody I have ever

23     worked with would consider this acceptable.  If that's

24     not unconstitutional, I don't know -- I don't know what

25     is.

1          And if I can add that on top of that, if we

2     know that all of these actions and policies are driven

3     by demonstrably false frameworks and might be calculated

4     to do damage at the community and family and individual

5     level, that has to count.

6          Q.   I understand what you're saying, but isn't that

7     a political question rather than a legal one?

8          A.   No.  If a doctor goes into her operating

9     theater and with all good intentions cuts the wrong leg

10    off her patient, that's malpractice, and it doesn't

11    matter what the intent is.  What matters is the conduct

12    and the outcome, and the Pasco County Sheriff is

13    committing malpractice.

14         Q.   When you say malpractice -- and I'm sorry to

15    drill this down so much, but it's a big issue in the

16    case.  You say malpractice.  You're basing that on what

17    you consider to be best practices if you will for --

18         A.   No.

19         Q.   Let me finish the question.

20         A.   Yeah.

21         Q.   Okay.  You're basing that on what you consider

22    to be best practices for police agencies to deal with

23    violent crime; isn't that true?

24         A.   No, that's not correct.  We have established --

25    you have established that the main focus of my work has

1    been serious violence and other serious threats to

2    community harm.  That's correct.

3            I work in policing.  I work with prosecutors.

4    I work with corrections.  I work with the criminological

5    theories and practices that have developed over decades

6    around crime prevention and control.

7            There's a lot of bad policing out there.  The

8    reason that my field exists is because these

9    institutions need to do better.  I spent a lot of time

10   working with places that are not doing a great job.

11   That is within the realm of the expected and the

12   mainstream.  This is not.  This is abhorrent.

13       Q.   Are you going to testify at trial in this case

14   or by affidavit that any particular action by any

15   particular deputy dealing with a plaintiff was

16   unconstitutional?

17       A.   I don't know.  I don't know what I'll be asked.

18       Q.   Have you so far written or given any opinion in

19   this case that a particular action by a particular

20   deputy in dealing with a plaintiff was unconstitutional?

21       A.   I don't know whether what I've written can be

22   summed to that conclusion.  I do believe that the

23   actions of the agency are dramatically out of bounds.

24       Q.   Well, I mean, Professor Kennedy, I have to say,

25   I mean, that's great rhetoric, but that doesn't mean

1    anything legally.  I mean, what does dramatically out of

2    bounds mean in terms of the United States Constitution?

3    That's what the district court would be concerned with.

4         MR. JOHNSON:  Objection as to form.

5    BY MR. POULTON:

6         Q.   Do you understand my point or you -- I'll

7    rephrase it as a question.

8         Would you agree with me that the phrase -- what

9    was it -- dramatically -- I've already forgotten it.

10        MR. POULTON:  Madam Court Reporter, what was

11     his phrase?

12        COURT REPORTER:  Out of bounds, I believe.

13   BY MR. POULTON:

14        Q.   I'll use that phrase whether it's the right one

15   or not.

16        That phraseology and criticism such as

17   dramatically out of bounds is not intended by you to be

18   a comment on the constitutionality of any particular

19   aspect of the program; is it?

20        A.   I don't know what the district court will

21   consider constitutionally relevant.

22        Q.   Okay.  So therefore you cannot comment on it;

23   correct?

24        A.   I don't think I've been asked a question that I

25   can answer yet, not on that point.

1    Q.   Do you contend that Dalanea Taylor or Dalana

2  Taylor did not meet the agency's threshold for inclusion

3  in the initial prolific offender pool?

4    A.   I don't know her record, and whether she did or

5  whether she didn't in my opinion would be completely

6  irrelevant because the standards are meaningless.

7    Q.   Do you contend that Dalanea Taylor did not meet

8  the agency's threshold for being designated as a

9  prolific offender?

10    A.   I don't know the answer to that question.  I

11  don't have access to her record.

12    Q.   Did you know that at one point Dalanea Taylor

13  was a member of a group of other juveniles that called

14  themselves The Squad?

15    A.   I believe I came across that in the record.

16    Q.   Do you know what The Squad did?

17    A.   I do not.

18    Q.   Did you know that at one point Dalanea Taylor

19  confessed to committing fifty car burglaries?

20    A.   I do not.

21    Q.   I'm going to ask you the same question with

22  regard to Donnie McDougall.  Do you contend that Donnie

23  McDougall did not meet the agency's threshold for

24  inclusion in the initial prolific offender pool?

25    A.   So what I contend is that the metrics that

1  promoted them to this illusory prolific offender status

2  and that the actions that were then taken as a result

3  were ungrounded and unjustified.

4      Q.   Okay.  Let's talk about that.  In the programs

5  that you work with -- and we didn't -- you know what,

6  forgive me.  I meant to ask you about some of the

7  others.  I know you did Boston in Operation Ceasefire.

8  Did you do something with Cincinnati?

9      A.   Yes.

10     Q.   Was there a name for that or --

11     A.   It was the Cincinnati Initiative to Reduce

12  Violence.

13     Q.   Okay.  And how about New York?

14     A.   NYC Ceasefire, yes.

15     Q.   Also violent crime?

16     A.   Also violent crime.

17     Q.   High Point, North Carolina, I noticed in the

18  list.

19     A.   That's correct.

20     Q.   What was High Point, North Carolina's issue?

21     A.   Over about a twenty-year span individual gun

22  offenders, group-involved gun offenders, robbery, gun

23  violence or drug markets and domestic violence.

24     Q.   In any of those cities when you were involved

25  in this project, did those cities have any sort of

1   criteria or scoring system to help them decide how to

2   deploy their resources?

3        A.   With respect to the initiatives we've just

4   named, I believe the answer is, no, they did not.

5        Q.   Were there some --

6        A.   There --

7        Q.   Go ahead.

8        A.   There might be exceptions to that I'm not aware

9   of, but certainly with respect to the core of the work

10  that I was part of, no, they did not.

11       Q.   Have you ever worked with an agency that had a

12  scoring system in place to help them identify problem

13  offenders?

14       A.   I have.  I've worked in L.A. which had such a

15  system.  I worked in Chicago which had such a system.

16  Both of them have been shut down because of both

17  effectiveness and civil rights concerns.

18       Q.   Did you make any complaints about their use of

19  scoring systems?

20       A.   I did in Chicago.  My office was part of

21  shutting that project down.

22       Q.   Okay.  What about the others?  You said L.A.

23  and what was the other one?

24       A.   L.A. comes after the time of my involvement.

25       Q.   Okay.  Would you agree with me though that a

1    law enforcement agency that is going to employ the

2    strategies that you're talking about, focused deterrence

3    with regard to violent crime, would have to identify the

4    persons who are committing the violent crime?

5        A.    The work that I've been part of sometimes

6    identifies individuals doing particular things.  That's

7    been part of the drug market work, for example, which

8    focuses on active drug dealers.  The larger body of

9    focused deterrence focuses on a small but larger than

10   individually active people at high risk.  None of them

11   involve a scoring system.  So you're right that people

12   need to be identified.

13           Both the research and the frontline practice in

14   this area has pretty conclusively demonstrated that no

15   such scoring or ranking system works, and a range of

16   different methods needs to be employed to find the right

17   folks.

18       Q.   So it's okay to use a scoring system as long as

19   you use it in tandem with perhaps more subjective

20   considerations to help identify the persons who are at

21   risk?

22           MR. JOHNSON:  Object to form.

23       A.    None of the work I've used has employed a

24   scoring system.

25   BY MR. POULTON:

1    Q.   But it has used some sort of a mechanism by

2    which the law enforcement agency identifies particular

3    people that are at high risk?

4    A.   Yes.  And actually I'm thinking that an aspect

5    of our domestic violence work in some places has used an

6    examination of records.  I think it's still true that

7    that is not a scoring system, so statement's still true.

8    Yeah, go ahead.

9    Q.   Well, whether we call it a scoring system or

10   just criteria, the premise is the same; right?  You're

11   using some objective standard by which to at least

12   initially identify the group of people that you might

13   need to look at.  Fair?

14   A.   I think not in the way that you are framing it.

15   So none -- none of these interventions -- none of these

16   successful interventions focus purely or simply either

17   on people's records or a scoring system, and there's a

18   tremendous amount of work in this field that's gone into

19   trying to develop those kinds of algorithms.  None of

20   them have worked.  All of them generate very large

21   numbers of misidentifications.  All of them miss people

22   who are in fact of concern, and all of them were done

23   more carefully than Pasco County's.

24   Q.   Name them.

25   A.   There's -- so the Pasco County Sheriff's Office

1    asserts that it is producing predictive policing -- that

2    it is practicing predictive policing.  I would say

3    that's absolutely false.  Intelligence-led policing is

4    entirely false, but they use those frameworks.

5         As I said, in L.A., in Chicago, in other

6    places, people have attempted to produce these

7    algorithms.  None of them have worked.  They have all

8    failed on both what academics call type one and type two

9    errors.  They generate false positives and false

10   negatives.

11   Q.   Do those agencies use any sort of objective

12   criteria to help them identify initially the group of

13   people they might need to look at more subjectively?

14   A.   In the successful work that I've been part of,

15   no, they do not.  They begin with actual violent crime

16   and other behavior, and then they ask a range of

17   questions to figure out whether they think a person or a

18   group is of concern.

19   Q.   What would those questions include?

20   A.   So in our violent crime work, when there has

21   been a homicide or a shooting, we say do we know what

22   happened here?  What do we know about the victim?  What

23   do we know about the victim's activity?  What do we know

24   about the victim's network?  Same questions if there is

25   a known perpetrator.  Is there a pattern of violence

1  here?  Has then been violent events that led up to this

2  incident?  Based on what we know about the networks

3  involved, do we think there's likely to be subsequent

4  violence?  We would ask do we know enough to know what's

5  going on?  Do we need to gather more information?

6  Questions like that.

7      Q.   You're familiar with the question that the

8  Pasco Sheriff's Office crime analysts ask when they're

9  given the initial list of persons to look at; correct?

10     A.   No, I'm not.

11     Q.   Well, don't you think you should know that in

12  order to say that they are not doing this correctly?

13     A.   No, I don't because any kind of action taken

14  with the input of how that list is generated in the

15  first place are going to be hopelessly compromised.

16     Q.   How do you know that if you don't know what

17  subsequent questions are being asked by the crime

18  analysts?

19     A.   There are no questions that could be asked that

20  would make this correct.

21     Q.   But if I understood you correctly, you don't

22  know what the process is once they stop with the initial

23  list of they call it I believe the prolific offender

24  pool.  Am I correct?

25     A.   That's correct.  And there is no process that

1    could then be undertaken to make that work.

2        Q.   And you say that without knowing what their

3    process is; correct?

4        A.   I say it knowing crime and criminology and

5    methods and analysis and the history of attempts to do

6    the thing that they are talking about.  So, yes, with my

7    expertise and experience, it cannot be done.

8        Q.   And I'll ask the question again.  You say that

9    not knowing what the Pasco Sheriff's Office crime

10   analysts do once they have that list; correct?

11            THE WITNESS:  Don't you guys say asked and

12       answered?  I think that's been asked and answered.

13   BY MR. POULTON:

14       Q.   It's a simple yes or no question.

15            MR. JOHNSON:  Objection, asked and answered.

16   BY MR. POULTON:

17       Q.   Okay.  Does the ILP manual tell deputies the

18   exact manner of how to interact with prolific offenders

19   or their family members in a given interaction?

20       A.   It certainly offers guidance, and the guidance

21   is maximum enforcement criminal and otherwise, repeated

22   visits, attention to friends and family and associates,

23   the application of pressure to gather intelligence, the

24   maximal use of civil steps to impose fines and fees, and

25   that's what I saw those officers doing.

1      Q.   I'll ask the question again.  Does the ILP

2   manual tell deputies the exact manner of how to interact

3   with prolific offenders or their family members in a

4   given interaction?

5      A.   I'd say, yeah, pretty much so, and then they go

6   do it.

7      Q.   Does it tell them what words to use?

8      A.   I didn't see that.

9      Q.   Does it tell them how to enter a property or

10   when to enter a property?

11      A.   I don't believe so.  I've never seen any

12   operations manual that operates at that level of detail.

13   That's just knowing your job for better or for worse.

14      Q.   Well, have you ever seen any formal written

15   policy from the Pasco Sheriff's Office that states the

16   manner in which deputies are to interact with prolific

17   offenders or their families in each instance?

18      A.   In every instance, which means in each

19   instance.  Yeah, I'd say yes, they're pretty clear about

20   that.

21      Q.   You've seen a formal written policy that tells

22   them what to say?

23      A.   They are very clearly directed in what to do

24   and what to accomplish.

25      Q.   Okay.  What does very clearly mean?

1      A.    They are -- they are --

2      Q.    Well, let me put it this way.

3      A.    They are told to do particular things.  Those

4  particular things are elucidated.

5      Q.    And those lists of specific things they're

6  supposed to be doing are zero tolerance, for example, on

7  criminal behavior; correct?

8      A.    That is -- that is one of the things they are

9  directed to do.  That's correct.

10      Q.    And they had code enforcement corporals for a

11  period of time.  Are you familiar with that?

12      A.    I know that there were code enforcement

13  corporals, yes.

14      Q.    But it didn't tell deputies, did it, that it's

15  okay to breach a fence line in a given situation in

16  violation of the fourth amendment just because somebody

17  is a prolific offender or a Top Five offender; correct?

18           MR. JOHNSON:  Objection, vague.  I don't know

19      -- I'm not sure what the it that you're asking about

20      is there.

21  BY MR. POULTON:

22      Q.    I'll rephrase the question.  Okay.

23           Well, let me ask you this.  Did you see video

24  of --

25           Actually, let me ask it this way.  You

1    mentioned in your report interaction with Tammy Heilman

2    and Donnie McDougall on a particular incident where the

3    deputies believed that they had spotted somebody smoking

4    marijuana in the backyard.  Do you recall that one?

5           You need to say yes or no for the court

6    reporter?

7       A.   Yes.  Yes, I do.

8       Q.   Okay.  And then there was discussion amongst

9    the deputies which you felt to be problematic,

10   offensive?

11      A.   Grossly offensive.

12      Q.   That was amongst the deputies themselves;

13   right?

14      A.   I don't know the ranks of everybody there, but

15   amongst sheriff's staff, yes.

16      Q.   Okay.  Does the ILP manual tell the deputies

17   exactly how they were supposed to carry out that

18   interaction with Tammy Heilman or Donnie McDougall?

19      A.    No operations manual operates at that level of

20   specificity.  That's what training and supervision and

21   attention to culture and performance review and quality

22   control and review of camera footage is for.  That --

23   that -- that is a management function, not a manual kind

24   of function.  That's the way police agencies operate.

25      Q.   Do you know whether Tammy Heilman or Donnie

1    McDougall lodged any sort of a complaint at the

2    Sheriff's Office regarding that incident?

3        A.    I do not know.  I know it was absolutely clear

4    to me from the written reports and incident reports

5    before I saw the camera footage and then -- and not just

6    for this incident but for others -- and then absolutely

7    reinforced by the camera footage that explicitly or

8    implicitly the office had absolutely convinced the

9    people that they were dealing with that there was

10   nothing they could do about the way they were being

11   treated.  That was absolutely self-evident.

12       Q.    Okay.  You say that in a pretty broad sense.  I

13   mean, how many videos did you watch?

14       A.    Several days worth of aggregate viewing on

15   my --

16       Q.    Were they all --

17       A.    -- on my -- on my part.

18       Q.    Okay.  How did you get the videos?

19       A.    I was provided by counsel here.

20       Q.    Do you know whether you were provided all of

21   the videos that are available of the interaction

22   between Pasco deputies and the plaintiffs?

23       A.    I believe I was provided with the entirety of

24   footage.  I didn't have time as part of this process to

25   watch every single one.  I watched days of this

1    disturbing footage.

2        Q.   Did you see any videos where you thought that

3    the interaction between law enforcement officers and the

4    plaintiffs or their children was appropriate?

5        A.   I saw several that appeared to me to be

6    relatively benign.  I'm not sure that I thought any of

7    it was appropriate.  So the incidents I saw that did not

8    seem to me to be overtly abusive and harmful generally

9    involved deputies visiting, having essentially

10   meaningless colloquy with folks, and going on about

11   their business, which probably didn't do a tremendous

12   amount of harm as an individual incident.  Having those

13   incidents in the aggregate, no matter how benign each of

14   them is appeared is itself an issue, and I think that

15   that pattern is itself abusive.

16          The other that I saw involved the delivery by a

17   deputy or deputies of a kind of pathetic services are

18   available card, and as somebody who's been involved in

19   developing support and outreach approaches for people at

20   risk, we know for a fact that that doesn't work.  And in

21   the one that I saw most clearly, the young man involved

22   took one look at it and was clearly extremely disturbed

23   by what he saw on it.  I had a hard time following

24   exactly what was going on.  It appeared to me that he'd

25   seen a reference to the availability of cancer treatment

1    or something like that, and that clearly triggered

2    something pretty traumatic for him.

3        Q.   I think the know the video you're talking

4    about.  We'll watch it here in a little bit.  I think it

5    involved Anthony McDougall.  Does that sound right?

6        A.   That sounds right.

7        Q.   Was there anything that you contend was

8    unconstitutional about providing those community

9    resources and pamphlets to that juvenile?

10       A.   So I would be concerned both as a matter of

11   practice and a matter of law about a pattern of repeated

12   unsolicited visits by officers who implicitly or

13   explicitly had made people think that they had to put up

14   with this and couldn't do anything about it.

15       Q.   When you had the program in Boston and you let

16   the gang members know of the consequences -- potential

17   consequences to them of the legal environment, did you

18   schedule appointments with them first to sit down and

19   talk to them or -- and when I say you, I mean law

20   enforcement -- or did law enforcement?

21       A.   Yes.  This was done in cooperation with the

22   probation and parole and youth services agencies, and

23   the people brought in were brought in as a condition of

24   their court supervision.

25       Q.   So they were forced to come in to listen to

1    warnings about what could happen to them if they

2    continued to commit crime?

3        A.   They were brought in as a condition of their

4    court supervision, yes.

5        Q.   Were they warned ahead of time you're going to

6    have an appointment on Tuesday and you're going to have

7    to come in and listen to this, or was there any sort of

8    a lack of notice or randomness to it?

9        A.   No, there was formal communication worked out

10   with the community corrections agency.

11       Q.   Let's take a look at some of the videos and see

12   if you've seen these.  I'm going to try to screen share.

13   I'll try to do this in a way that you could hear the

14   audio, but forgive me if I don't get it right the first

15   time, and we'll fix it if I don't.  But I think --

16            Let me just try --

17            MR. JOHNSON:  Can we take a break maybe before

18       the video?

19            MR. POULTON:  Sure.

20            MR. JOHNSON:  I'd like to use the little boy's

21       room.

22            MR. POULTON:  Yeah.  Professor Kennedy, so you

23       know, if at any point you want to take a break, let

24       me know.

25            Can we just -- why don't we take a break and

1        let's see whether this plays or not, and we can just

2        go back to the beginning when we come back together.

3        Do you want to take like a ten-minute break?  Okay?

4             MR. JOHNSON:  That would be great if you don't

5        mind.

6             MR. POULTON:  Sure.  Off the record then.

7             (A break was taken at 2:09 p.m., and the

8        deposition resumed at 2:21 p.m.)

9    BY MR. POULTON:

10       Q.   Before we look at the videos, Professor

11   Kennedy, I wanted to follow up here so I don't lose my

12   place.  Do you contend that any given code violation

13   citation issued to any of the plaintiffs in this case

14   was objectively unjustified?

15       A.   So this is the issue with the pretext use of

16   the law; right?  The whole point of pretext is

17   enforcement is that it is taking advantage of a legal

18   opportunity for a purpose not envisioned by the framing

19   of that law.

20            So do I think that somebody had five chickens

21   in their yard?  Yes, they probably had five chickens in

22   their yard.  Does using that as an excuse to put

23   pressure on a mother to give up information about her

24   kid okay?  No, I don't think it's okay.

25       Q.   Do you contend that any arrest of any of the

1    plaintiffs in this case was objectively unjustified?

2         A.   So of the arrests that I'm familiar with, I

3    strongly suspect that the arrest of one person for being

4    in the presence of narcotics, the marijuana in the

5    backyard instance, and the arrest of a father for

6    harboring because somebody was smoking in his house are

7    probably very likely both legally unjustified.

8         Q.   Are you under the impression that Tammy Heilman

9    was arrested as a result of that incident with the

10   marijuana being smoked in the backyard?

11        A.   Her son was arrested on a probation violation

12   if I remember correctly.

13        Q.   Well, my question was as arrest of the

14   plaintiffs.  All right?  So let's go one by one.  I

15   don't believe Darlene Deegan was arrested, and I don't

16   believe Dalanea Taylor was arrested.  Is that your

17   understanding as well?

18        A.   I would have to defer to the record on that.  I

19   don't know.

20        Q.   Well, let me ask you this.  Are you aware of

21   any arrests involving Dalanea Taylor stemming from ILP?

22        A.   So I don't have information about the

23   plaintiffs.  I was given information about the Sheriff's

24   Office and its practices.

25        Q.   Okay.  Well, then is it fair to say that you're

1   not in a position to judge the presence or absence of

2   probable cause for the arrest of a given plaintiff in a

3   given situation?

4       A.   I would have to know the fact pattern for that

5   arrest.  I may or may not know that.  I'm not sure.

6       Q.   As we sit here today, you're not rendering an

7   opinion that a particular arrest of a particular

8   plaintiff on a particular occasion was without probable

9   cause, are you?

10      A.   I'd have to know which arrests we're talking

11  about.

12      Q.   Well, any arrest.  Are you -- let me explain.

13  I only have one opportunity to depose you.  Okay?

14      A.   Yeah.

15      Q.   I have your report.  I don't believe your

16  report claims anywhere that somebody was arrested

17  without probable cause; correct?

18      A.   I don't think I make -- no, I don't think I

19  make that claim.

20      Q.   So I'm here in your deposition and I'm

21  asking --

22      A.   If those people are the plaintiffs.  I have

23  seen arrests in the record which I was provided which I

24  think are probably improper.

25      Q.   Okay.  Which ones?

1       A.    As I just said, the probation violation arrest

2    around the alleged backyard marijuana, and I think it's

3    the elder Robert Taylor.

4       Q.    Right.  Well, handling the person that's first,

5    Donnie McDougall, who was the one who was arrested for

6    the probation violation is not a plaintiff.  Okay?

7    Tammy Heilman, his mother, is but Donnie McDougall was

8    not.  Do you understand that?

9       A.    Yes, of course.

10      Q.    Okay.  And do you know -- did you watch the

11   video of Mr. Taylor's arrest?

12      A.    Yes.

13      Q.    Were you aware of anything other than marijuana

14   being found in the son's room or being smoked by others

15   as a ground for his arrest?

16      A.    I'm sorry.  The question again?

17      Q.    Sure.  Are you under the impression that the

18   only reason that Mr. Taylor was arrested was because --

19   I'm sorry.  I misspoke.  I'll start over.

20           Are you under the impression that the only

21   reason that Mr. Jones was arrested on the videotape that

22   you reviewed was because his son had marijuana in his

23   room?

24           MR. JOHNSON:  Objection.  I don't even know

25      which incident we're talking about.

1                    THE WITNESS:  Yeah, I'm not sure either.

2                    MR. JOHNSON:  It's unclear to me.

3       BY MR. POULTON:

4            Q.   All right.  Well, maybe we'll get to it when we

5       go through the report.

6                    Okay.  Okay.  So let's look at some of the

7       videos, and I'm going to try to screen share again.  I'm

8       going to -- I had the wrong order before.  So we'll --

9       just I'm going to look at several of these from Dalanea

10      Taylor, the first one being dated February 25, 2018, and

11      I'll ask you first to look at this and tell me if you've

12      seen this one before?

13                   Sorry.  I didn't hit share screen.

14                   MR. JOHNSON:  There it is.

15                   MR. POULTON:  All right.

16                   (A video was played at this time.)

17      BY MR. POULTON:

18           Q.   All right.  Was that one of the videos that you

19      had watched before?

20           A.   No.  First time for this one.

21           Q.   This would be one of the interactions which I

22      think you had earlier classified as benign?

23           A.   No, I would not.  I don't think that's benign

24      at all.  It's not nearly as overtly abusive as many of

25      the others involving this same person, but, yeah, I have

1    spent close to forty years with police departments, and

2    I have never seen any of them do anything remotely like

3    this.  Cops, sheriffs do not show up at the homes of

4    members of the public, call them out with a marked unit

5    in plain sight for all of their neighbors to see and ask

6    them intrusive questions about their personal life.  It

7    just doesn't happen.  There's no good purpose here.

8    There's no good that can come of this, a lot of harm,

9    and I do not consider this benign, not at all.

10       Q.    Next one is 3-31-2018.  Ask you if you've seen

11   this video?  Skip to where there's conversation.  All

12   right.  I'm going to go to 1:55 into the video and we'll

13   pick it up from there, and this is the one dated

14   3-31-2018.

15           MR. POULTON:  Madam Court Reporter, we'll send

16       you these in order so that you can include them as

17       exhibits.  Okay?  So the first video that we watched

18       for 2-25-2018 Dalanea Taylor will be Exhibit 1.

19       Exhibit 2 will be 3-31-2018.

20           (Exhibit No. 1 and Exhibit No. 2 were

21       designated to be marked for identification.)

22           (Video was played at this time.)

23   BY MR. POULTON:

24       Q.    All right.  Had you seen that video before?

25       A.    No, not this one either.

1     Q.   Okay.  I'll ask you the same question.  Do you

2  consider that interaction to be benign or harmful?

3     A.   I do not consider it to be benign.  It's

4  ludicrous.  The officer who spoke there -- well,

5  probation and parole officers do home visits sometimes.

6  They do them for a very, very small subset of the

7  supervisee population.  It's extremely uncommon for

8  community corrections to operate in such a fashion that

9  probation and parole officers will leave their offices,

10  go to somebody's home and make any kind of -- that kind

11  of direct contact in the community.

12          When they do it, they do it for a reason.

13  There are particular things that they're trying to

14  ascertain.  They're trying to figure out what the home

15  environment looks like, how people are doing with

16  respect to their formal terms and conditions.  They're

17  offering meaningful support.  They may be doing drug

18  tests and that kind of inspection that will give some

19  insight into whether people are first and foremost in

20  compliance and then whether they are in fact doing all

21  right.

22          You would never a probation or parole officer

23  show up not knowing the name of the person that they're

24  talking to, not knowing that one of their fellow

25  officials has recently been there, ask a bunch of

1     formless questions about somebody's plans and

2     pregnancies, do it in a way that draws attention of

3     everybody in the neighborhood to what's going on, not

4     offer any kind of meaningful assistance, not do any kind

5     of actual work around compliance and conditions and then

6     wander off.  This -- it's ludicrous.

7          Q.   You said not do any work in terms of compliance

8     with conditions?

9          A.   Yes.

10         Q.   Well, did you hear the deputy ask her was she

11    staying out of trouble, did she know of anybody

12    committing crime?  Did you hear those questions?

13         A.   Those -- as far as I know, those are not terms

14    and conditions that the department has any purview over.

15         Q.   You don't think the Sheriff's Office should be

16    asking people who've got a long history of committing

17    auto burglaries, you know, are you aware of any crime

18    going on or are you staying out of trouble?  Do you

19    think those questions are problematic?

20         A.   I think (A) it's not the job of the sheriff's

21    department to ask those questions of essentially random

22    members of the public, and it's not going to do any

23    useful work.  Right?  Ask you somebody standing on their

24    porch whether they're doing okay, what do you think

25    they're going to say to you?  They have no authority

1    there.

2        Q.   Is it one of the principles of all of the

3    concepts we talk about before, focused deterrence,

4    letting people know about the consequences of crime,

5    person-specific interventions, isn't it a principle of

6    those to let the persons who you believe might be

7    committing crime, let them know if your presence and

8    that you're paying attention to them?

9        A.   It is not the purpose of any of these things to

10   make essentially random formless contact with members of

11   the public.

12       Q.   Okay.  With respect, I don't think you're

13   answering my question.  Am I not correct that an

14   underlying principle of all of those concepts we've

15   talked about is letting the person know that law

16   enforcement is paying attention to them?

17       A.   It is in fact not that except with respect to

18   certain very narrowly constructed and defined issues,

19   and saying to somebody are you staying out of trouble is

20   not that.

21       Q.   Okay.  You're devolving to the specific

22   question.  The criticism as I understand it that you're

23   in part offering is that merely going to their residence

24   with a marked police unit and asking them questions

25   serves no particular purpose; right?

1    A.   That's part of it.

2         MR. JOHNSON:   Objection.

3   BY MR. POULTON:

4    Q.   But as I understand it, part of the concept of

5   person-specific interventions or focused deterrence is

6   to let persons with a history of offending know that law

7   enforcement is paying attention to them in hopes that it

8   dissuades them from reengaging or reoffending?

9    A.   No.  I think in fact that's not correct.  What

10  focused deterrence does is put people on notice about

11  particular consequences in prospect about future

12  behavior.

13        Simply continuing to spend endless amounts of

14  attention to somebody because they have done something

15  in the past is not part of anything that we've been

16  talking about that we know works.

17   Q.   Well, would you agree that one of the factors

18  that goes into how these individual interactions play

19  out is the level of cooperation that is shown by the

20  person the deputy's interacting with?

21   A.   Sorry.  Ask again.

22   Q.   Sure.  Well, we know about the Tammy Heilman

23  video where the deputy believes that they detect

24  marijuana being smoked in the backyard.  Donnie

25  McDougall ends up getting violated or getting arrested

1    for violation of probation.  You remember that video;

2    right?

3         A.   I do.

4         Q.   That's far different in terms of tenor -- just

5    general tenor than the two videos we just watched with

6    Dalanea Taylor, would you agree?

7              MR. JOHNSON:  Object.

8         A.   Yes.  They're even worse.  That's right.

9    BY MR. POULTON:

10        Q.   They're completely different scenarios, would

11   you not agree?

12        A.   I'm not sure they are.  So those began -- so

13   let's talk about the incident in which -- so I believe

14   it was Donnie Taylor was arrested on a probation

15   violation because --

16        Q.   It's Donnie McDougall.

17        A.   Donnie McDougall.  Sorry.  Thank you.

18             So that interaction began in the same way that

19   this did, although those deputies were far more

20   aggressive.  But they went to the home for, as far as I

21   know, no reason other than that Donnie had been noted by

22   the Sheriff's Department.  They observed the premises,

23   and the departure point it seems to me is that one of

24   the deputies believed that she saw other people smoking

25   marijuana or dividing marijuana in the backyard.  They

1    then put pressure on Donnie.

2            The deputy later said, "I arrested him because

3    he didn't go into the backyard when I asked him to."

4    She in fact never asked him to.  She set him up.  She

5    asked him what was going on.  He said, "I don't know

6    what's going on."  She turned that later on for an

7    excuse for arresting him for not taking on his own

8    initiative action to go look at his backyard, cobbled up

9    what is clearly a fictitious probation violation and

10   arrested him.

11           You know, we know that this was ill-intentioned

12   because the body cam picked up the byplay in which they

13   boasted about making his mother cry on a previous visit,

14   where they boasted about using this incident to stir

15   trouble.  They were abusive.  They cursed at him.  And

16   that visit began in the same way that this began.  I

17   have no confidence whatsoever that if these deputies had

18   seen something that they thought they could turn into an

19   incident that they would not have done so because that's

20   clearly their pattern of action.

21      Q.   Well, you say it's their pattern of action, but

22   we just watched two videos where there was about two

23   minutes worth of interaction, how's your pregnancy

24   going, are you staying out of trouble, and the deputies

25   leave versus the incident you're talking about with

1     Tammy Heilman and Donnie McDougall which ends in an

2     arrest.  So they're not all the same, are they?

3         A.    They are not all the same.  The difference

4     there could be explained by the fact that they saw no

5     opportunity in these two videos to act on those

6     pretexts.  When they see the pretext, they act.

7         Q.    It could be the explanation; right?

8         A.    It certainly could be.

9         Q.    Another factor could be the demeanor and the

10    attitude of the responding party too; correct?

11        A.    I read the demeanor of both of the parties in

12    this as hoping desperately that this will be over and

13    they can stop it.  I think any reasonable observer would

14    draw that conclusion, and nothing that's intended to

15    help anybody will succeed under those circumstances.

16        Q.    Do you think that the attitude -- well, let me

17    ask you this.  How would you characterize the attitude

18    of Dalanea Taylor in the two videos we watched on

19    February 25, 2018 and March 31, 2018?

20        A.    So are we talking about the two videos we just

21    watched?

22        Q.    Right.

23        A.    I think she's trapped and miserable.

24        Q.    When did you learn to read minds?

25              MR. JOHNSON:  Objection.

1  A. Sorry?  I've now been asked to offer my

2 judgment about demeanor.  That is my judgment about

3 demeanor.

4 BY MR. POULTON:

5  Q. Well, let me ask you this.  Would you

6 characterize her demeanor as cooperative?

7  A. She answered all the questions.

8  Q. Polite?

9  A. Polite, respectful, despite the fact I would

10 say she wanted nothing do with what was going on here.

11  Q. Were the deputies cordial with her, polite?

12  A. I'd say the first deputy was.  Given the

13 direction that her line of questioning took at the end,

14 I wouldn't be at all convinced that that wasn't in all

15 or partially respect an attempt to gain her confidence

16 and gather intelligence.

17   I found the second deputy pretty brusque.

18  Q. You mentioned the -- in your report Tammy

19 Heilman and the code citation for the violation of the

20 ordinance on livestock.  Do you recall that?

21  A. Yes.

22  Q. And you pointed out that the fine was -- let's

23 see here.  Look at a particular part of your report and

24 I'll direct you to the page if I can locate it.  Give me

25 just a moment.

1        Do you happen to remember where that was?  Oh,

2   here we go.  Never mind.  I found.  Well, actually

3   that's a slightly different one.  I'm sorry.

4        Well, let me ask you this.  Do you recall

5   opining in your report without me having to go find it

6   how much Darlene Deegan was fined?  I'm sorry, not

7   Darlene Deegan -- Tammy Heilman was fined?

8        A.   This is the chickens and the home address and

9   such?

10       Q.   Yes.

11       A.   Yeah, I remember that.

12       Q.   Do you know how much she actually -- it was --

13   was it $2,000 per chicken or $500 per chicken?

14       A.   $500 per chicken and then some other things.

15       Q.   All right.  So it's $2,500 for the chickens and

16   then some other things on top of that?

17       A.   That's my recollection.

18       Q.   Okay.  Do you remember how much she actually

19   paid?

20       A.   I don't know.

21       Q.   Do you think it would be important to know

22   that?

23       A.   It would be important to know that.  No matter

24   what the answer to that is, it happened that was the

25   result of repeated visits to her property by deputies,

1    and in those visits and in others it was made clear to

2    her that the civil fines were being imposed because she

3    wouldn't give up information on I believe her son.  And

4    when some sort of accommodation with respect to those

5    fines was dangled in front of her, the deputies made it

6    clear that that was routine practice, and she in fact

7    gave up information that she had not wanted to give up

8    on the prospect of having those adjustments made.

9        Q.    I think you might be talking about Darlene

10   Deegan now, but we'll dig into that a little bit more.

11   But going back to Tammy Heilman --

12       A.    Yeah, I think you're right.  I think I'm

13   conflating those.  But the fact pattern holds that

14   repeatedly the deputies go after family members with

15   civil actions in order to make them give up information

16   on their family members.  I've never seen anything like

17   this.

18       Q.    Would you agree with me that in some of the

19   videos where deputies are interacting with Tammy Heilman

20   she's extremely hostile towards law enforcement

21   resulting in law enforcement action?

22       A.    I'd have to know exactly what we're looking at

23   or talking about.

24       Q.    By the way, you mentioned on page 43 of your

25   report that Darlene Deegan was fined more than $2,500 in

1    2018.  Do you recall that?

2        A.    I believe so, yes.

3        Q.    Do you know how much she actually paid, if

4    anything?

5        A.    I do not know.

6        Q.    Would that be meaningful to you?

7        A.    It could make an unacceptable situation not as

8    bad as it already is.  But again, this kind of

9    pretextual use of the law, including the civil law, to

10   put people -- to put pressure on people to give up

11   information or to take action that the deputies want

12   them to, not around criminal offending, not about their

13   own behavior but around their family members, there's

14   nothing that can make that okay.

15       Q.    You're -- No, no.  To go back to what we said

16   earlier, you're not contending in this case that in fact

17   Tammy Heilman didn't have five chickens in her backyard;

18   right?

19       A.    As far as I know, the chickens were real.

20       Q.    And you're not claiming that the citations that

21   Darlene Deegan were given were in accurate in some

22   respect objectively, are you?

23       A.    I am not.

24       Q.    All right.  Let's take a look at -- let's look

25   at a video for -- this will be Exhibit 3.  This is --

1    2-25-18 for Taylor is Exhibit 1.  3-31-18 for Taylor is

2    Exhibit 2.  I'm going to make 3-3-2016 for Tammy Heilman

3    Exhibit 3.

4            (Exhibit No. 3 was designated to be marked for

5        identification.)

6    BY MR. POULTON:

7        Q.   All right.  Let me call this up.  We're going

8    to go to one minute and 33 seconds into the video and

9    watch it.  I'll ask you if you've seen this and for some

10   comment?

11           (Video was played at this time.)

12   BY MR. POULTON:

13       Q.   I'm going to stop here for a moment at 3:15 or

14   actually go back a little bit further 3:10.  Here's

15   Tammy Heilman saying --

16           (Video was played at this time.)

17   BY MR. POULTON:

18       Q.   -- keep your fucking nose out of my goddamn

19   something, yard maybe.  And then we see a young child

20   there next to her.  Do you know who that is?

21       A.   I don't.

22           (Video was played at this time.)

23   BY MR. POULTON:

24       Q.   That was at 3:28.  The gentleman there that

25   came from in Ms. Heilman's residence said, "You're a

1    fucking cock sucker."  Right?  Did you hear that?

2        A.    I did.

3              (Video was played at this time.)

4    BY MR. POULTON:

5        Q.    All right.  We stopped at 20 seconds left.  Had

6    you seen that video before?

7        A.    Not that one.

8              (Exhibit No. 4 was designated to be marked for

9        identification.)

10   BY MR. POULTON:

11       Q.    Exhibit 4 will be Tammy Heilman.  This is on

12   9-18-2018.  Ask if you've seen this one.  We'll start 35

13   seconds into the video.

14             (Video was played at this time.)

15   BY MR. POULTON:

16       Q.    All right.  We stopped at 58 seconds.  Have you

17   seen that video before?

18       A.    No.

19       Q.    I'll represent to you that Tammy Heilman was

20   arrested for battery on this date.  Do you contend that

21   there wasn't probable cause to arrest her for battery on

22   September 9th or September 18, 2018?

23       A.    So I don't know Florida law.  Are they calling

24   the screen door a battery?

25       Q.    I think it's her slamming it into the deputy.

1    Did you see that?

2         A.    That's what I meant by the screen door, yes.

3         Q.    She was on probation.  Did you --

4              MR. JOHNSON:  Objection to I think the word

5         slamming.  I don't know that the witness used that

6         word.  I just want it to be clear for the record.

7    BY MR. POULTON:

8         Q.    Do you think that's a fair characterization of

9    what happened?

10        A.    I am not -- So if this is -- Is her opening the

11   door a deliberate assault on the deputy?  That's not at

12   all clear to me.

13        Q.    Watching at 48 seconds.

14              (Video was played at this time.)

15   BY MR. POULTON:

16        Q.    Really?  My question is really?  It's not clear

17   to you?

18        A.    That she meant to the use the door to assault

19   the deputy?  No, that's not clear to me.  What is clear

20   to me is that based on everything that I've seen that

21   they -- the Sheriff's Office would use this as a way to

22   bring an assault charge.  That seems very predictable.

23        Q.    Okay.  Stop screen share for a minute.

24              Do you have knowledge that many law enforcement

25   agencies partner with, among others, code enforcement to

1   implement community-oriented policing beginning in the

2   1980's?

3        A.   Absolutely, yes.

4        Q.   Are you familiar with repeat offender squads in

5   law enforcement units and within prosecutor's offices?

6        A.   In some places, yes.   Sure.

7        Q.   When did those programs first begin to your

8   knowledge?

9        A.   The, you know, attention to serious violent

10  repeat offenders has been around forever in policing.   A

11  lot of the focus on civil action really came along with

12  the crack epidemic and issues with crack houses and open

13  air drug markets and that kind of thing.

14       Q.   So '70s or '80s you think it started to really

15  ramp up?

16       A.   Yeah.   I think this focus on utilizing code

17  enforcement and such is more of an '80s and '90s thing.

18       Q.   Repeat offender squads though --  I'm sorry.   I

19  had shifted to that.   Would you agree that repeat

20  offender squads really started to blossom in the '70s

21  and '80s?

22       A.   No, I don't think that's right.   That's been in

23  policing probably since Robert Piehl (phonetic).

24       Q.   Okay.   What would be the purpose of a repeat

25  offender squad?

1    A.    To identify and act upon that small number of

2    chronic violent serious offenders that is present pretty

3    much anywhere.

4    Q.    And it's in part to try to prevent them from

5    committing crime in the future; correct?

6    A.    No.  Most of those units are just trying to

7    arrest people.

8    Q.    Even within a law enforcement agency they

9    wouldn't use a repeat offender squad to keep tabs on

10   people who are actively engaged in criminal activity in

11   the community?

12   A.    Very little.  In most places not at all.

13   Mostly units like that are, you know, in effect warrant

14   teams and that kind of thing for people who have been

15   identified as extremely serious folks, and usually

16   people who have an outstanding criminal liability like

17   an open case or an outstanding warrant or something like

18   that.

19   Q.    Well, you know, your focus is on very serious

20   crime, homicides, gang violence, drug trafficking that

21   is connected to violence, but isn't it true that that's

22   largely a consequence of the problems with the

23   communities that you're working with?

24   A.    Well, no.  The question was repeat -- repeat --

25   yeah, repeat offenders squad.  Those are out there.

1    They're in my experience always focused on violent and

2    close to violent offenders.  They're never focused on

3    low-level offending.  They're never focused on kids.

4         Q.   That's your experience; right?

5         A.   No, that's the field.  That's how the field

6    works.  People don't do the kind of thing that Pasco

7    County Sheriff is doing.

8         Q.   I think you're one step ahead of me.  My

9    question is would you agree with me that the problems of

10   a relatively rural county in Florida with property

11   crimes, whether they're committed by juveniles or not,

12   are going to be different than the problems that say

13   Boston or Cincinnati or New York have in dealing with

14   homicides and violent crime?

15        A.   The problems of those larger jurisdictions

16   always include property and other nonviolent, nonserious

17   offending, and most of the work of a police agency in

18   either an urban or a rural setting is about those other

19   things.  The amount of the overall effort that any

20   agency puts into serious violence is a very small part

21   of its overall portfolio and its overall work, and what

22   you're describing, serious repeat offender teams for

23   property crimes for low-level offending for juveniles

24   are not a thing.  They don't exist.

25        Q.   When you talk about Pasco County, do you

1     dispute that the sheriff made the judgment that based on

2     the calls he was getting from the community, the

3     complaints he was getting from the community, that they

4     had a problem with, for example, auto burglaries or

5     residential burglaries?

6         A.   I don't dispute that.  I have no reason to

7     think otherwise.

8         Q.   During the period of the time that you were

9     involved with the Boston Police Department and Operation

10    Ceasefire, were the Boston Police Department officers

11    equipped with body-worn cameras?

12        A.   No.

13        Q.   What about in the other intervention projects

14    that you've been involved in?

15        A.   No.  As I think we all know, body-worn cameras

16    especially in wide utilization are a relatively new

17    thing, excuse me, a relatively recent thing.

18        Q.   What do you think about body-worn cameras?

19        A.   I'm glad that Pasco County Sheriff's officers

20    were wearing them.

21        Q.   What is the size of the average police agency

22    in the United States?

23        A.   I don't even know the answer to that question.

24    There's such a range.  I'm not sure where the middle

25    ground on that would be.  Relatively small.

1    Q.   How many agencies would you say nationwide,

2    police agencies or jurisdictions, have some form of an

3    intelligence-led policing program?

4    A.   Very few.  It's a kind of fad within policing

5    that has never really taken hold.  Lots and lots and

6    lots of agencies don't even have any kind of meaningful

7    crime analysis much less anything you'd call

8    intelligence-led policing.

9    Q.   What was the basis of broken windows policing?

10    A.   I don't know how to answer that question.  Is

11    there something within that that you're interested in?

12    Q.   Well, I'm just asking academically or if there

13    was an article or something in your own research about

14    targeting property crimes based on residential

15    burglaries?

16    A.   So --

17    Q.   Tell you what.  Why don't I rephrase that?

18    A.   Yeah, please.

19    Q.   No, no.  It's a poorly worded question.

20         Did any part of your work with any of these

21    different cities have anything to do with residential

22    burglaries?

23    A.   Glancingly but no more than that.

24    Q.   How about with auto burglaries?

25    A.   Again, glancingly but largely no more than

1    that.

2        Q.   Okay.

3        A.   If I may.

4        Q.   Sure.

5        A.   The particular form of the crime issue at

6    question doesn't change any of the rest of the things

7    that we're talking about.  It doesn't change the fact

8    that you can't predict that kids will become the people

9    who do this.  It doesn't mean that looking at a snapshot

10   of time can identify somebody as a prolific offender or

11   a problem going forward.  It doesn't mean that the sorts

12   of abusive interventions that we're seeing here are a

13   legitimate response to those problems, and it doesn't --

14   it does in fact mean that in the norm in policing where

15   people deal with this stuff that they do anything

16   remotely like what we're seeing here.

17          That's partly because when you look at things

18   like residential burglaries and the thefts of and from

19   motor vehicles, the tendency is for those problems to be

20   driven by very small and shifting groups of people.

21   This is typically something that you see from folks in

22   late adolescence and early adulthood.  You'll get two or

23   three or four people who will do a plethora of this kind

24   of thing.  It's usually over as soon as it begins, and

25   that snapshot doesn't mean that any of those people are

1    going to be a long-term problem, and there's generally

2    no need for extensive intervention with them because

3    they just stop for the most part.

4        Q.    Snapshot in time, you used that phrase a lot in

5    your report.  You just used it now.

6        A.    Yeah.

7        Q.    What's the time period you mean by a snapshot

8    in time?

9        A.    Well, the core methodology that the sheriff's

10   manuals lay out begins with two arrests over three

11   years.  So that's the snapshot and that's the metric.

12   Then as far as I can tell, although that's stated, they

13   then have enough addenda and qualifications to that that

14   they can bring in pretty much anybody they want.

15           Beginning with the fact that an arrest doesn't

16   mean that a crime's been committed, lots and lots and

17   lots of people get arrested and haven't done the thing

18   and aren't convicted for the thing.  But then they go

19   into this kind of baroque series of criteria as supplied

20   by knowledgeable law enforcement personnel or language

21   to that effect, and then they extend to associates, and

22   then they extend it to people they can identify through

23   network analysis, and then they say it's clear that

24   they're asking officers and school resource officers and

25   such to just use their judgment to identify, quote,

1    prolific offenders, unquote.  The net gets so wide that

2    there's no center to it as far as I can tell.

3        Q.   Let's talk about the school resource officer

4    aspect of this for a minute before we go back to my own

5    train of thought, but what is your understanding of the

6    exact mechanism in place as between the Sheriff's Office

7    school resource officers and the schools that you

8    consider to be problematic?

9        A.   I don't know the exact mechanism.  What the

10   documents make clear is several extremely disturbing

11   things.  So one is that they use and instruct school

12   resource officers to employ general surveillance for

13   crime and suspects of crime and associates of known

14   criminals in the schools.  They are employing SRO,

15   school resource officer, access to school records to do

16   broad searches for people identified by officers and,

17   quote, confidential informants, unquote, which is

18   something that, again, I've never heard of and wouldn't

19   have believed if it hadn't been written down.

20        The idea that a confidential informant unnamed

21   and without any knowledge of the validity of their

22   information could provide a last name, that could go to

23   a school resource officer and SROs would then use

24   privileged access to the education system to search for

25   everybody with that name, just it's surreal.

1          School resource officers are instructed, as I

2     said a moment ago, to search for and identify prolific

3     offenders in a protocol, if we can call it that, that

4     seems to be completely different from even the

5     nonsensical standards around three years and two arrests

6     and everything that comes from that.  And then in some

7     fashion, and I do not know exactly what this mechanism

8     is, the sheriff's documents say that they scrape school

9     attendance, behavior, misbehavior, discipline, grades,

10    absences out of the school and use it to drive this

11    incomprehensible adverse child experience, quote,

12    method, unquote, for identifying students destined to a

13    life of crime.

14         Q.   Let's break that down a little bit.  First of

15    all, are you aware of any basis to believe that any of

16    the plaintiffs themselves, the named plaintiffs, were

17    the subject of any SRO, school resource officer, action

18    or activity?

19         A.   I don't know that one way or the other.

20         Q.   Do you know whether any of the children of the

21    named plaintiffs were ever subjected to any of the

22    mechanisms of the SRO program that you just mentioned?

23         A.   I don't know that one way or the other.  I do

24    know that one of the juveniles involved was arrested,

25    and the deputy in question explicitly said that he was

1    arresting the juvenile because he believed that he had

2    not been going to school and did not believe the

3    juvenile's colloquy about that.  So that told me that

4    that deputy had access to school's information.

5         Q.   Okay.  Do you remember who -- which juvenile

6    that was?

7         A.   I'd have to go back into my statement to

8    identify that.

9         Q.   Is it your understanding that that's the only

10   reason that he -- that this juvenile was arrested?

11        A.   The officer told him and it was caught on body

12   camera that that is why he was arresting the juvenile,

13   yes.

14        Q.   Do you know what the charge would have been

15   related to not going to school?

16        A.   There is no charge.  This is -- this is again

17   the sheriff taking pretextual enforcement action because

18   he said you're lying to me about your school attendance.

19        Q.   So what would the offence be?

20        A.   Let's -- shall we look at the record?

21        Q.   Yeah.  If you can help me find what you're

22   talking about, that would be helpful.

23             MR. JOHNSON:  Do you mind if I chime in?

24             MR. POULTON:  Sure.

25             MR. JOHNSON:  I can point you.  This is the

1    Robert Jones, IV's arrest that occurred.

2         MR. POULTON:  Okay.

3         MR. JOHNSON:  They searched the house, and then

4    there's the arrest when they come back the second

5    time.

6         MR. POULTON:  They come back the second time.

7    That was the marijuana charge though I thought.

8         MR. JOHNSON:  Yeah, but Professor Kennedy is

9    discussing the body camera footage of that arrest.

10        A.   That's right.  That's the incident.  So there

11   had been the pretextual entry into the house.  They

12   found bags they thought that had residue.  They told the

13   father outside that this was not a big deal and they

14   weren't gonna take any enforcement action and they

15   wanted to help the kid.

16        They came back at a subsequent visit,

17   interrogated the boy about his school attendance, which

18   again tells me they had access to school information,

19   didn't believe his responses, arrested him on the

20   marijuana charges and told him that they were making

21   that arrest because he had, they thought, lied to him

22   about his school attendance.

23        Q.   Did you read the deposition of Robert Jones,

24   Sr.?

25        A.   I did not.

1      Q.   Did you watch the video of the -- you called it

2    a pretextual entry.  Do you recall that?

3      A.   I absolutely do.  Yes.

4      Q.   Isn't it true that he gave permission for them

5    to come in?

6      A.   He gave permission after they led him to

7    believe that they were there on his son's behalf and

8    that they were offering assistance in trying to keep him

9    out of trouble.  They were explicit about that.

10          When they found the bags, they went outside and

11   told as I recall the father that this was not a problem

12   and they were not going to act on it.  Then they went

13   and tested the bags, came back, tried to get information

14   out of the son which he would not or could not provide,

15   and so they arrested him.  It's the whole thing in a

16   nutshell.

17     Q.   When you say pretextual, if he gives

18   permission, if consent is granted to enter the

19   residence, which it was -- and by the way, Mr. Jones

20   initially lied about that in his deposition.  We had to

21   show him the video before he finally admitted he had

22   given permission.  But if he'd given permission --

23          MR. JOHNSON:  Objection to the characterization

24      of the testimony.

25   BY MR. POULTON:

1    Q.   Well, the record will speak for itself on his

2    level of truthfulness or lack thereof, but my question

3    is this:  If law enforcement asks for consent to enter

4    and to search and it is granted, what does pretext have

5    to do with it?

6    A.   Those officers were clearly going in with an

7    intent of searching for and finding evidence of a crime,

8    evidence of criminal activity.  They very deliberately

9    and cleverly led the father to believe that that was not

10   what was on their mind.  They maintained that fiction

11   after they left, and then they came back and arrested

12   their kid for -- his kid for conditions that is he had

13   unknowingly facilitated.

14        If they had said to him, "We think there may be

15   drug residue in your son's room.  Can we come in and

16   search it?" it's very likely that he would have given a

17   very different answer.  Cops do this with serious

18   offenders.

19        I should say out loud that I recognize a lot of

20   this deputy behavior throughout their methods of

21   beginning conversations, their demeanor and content

22   while they have those conversations, the way they lied

23   or deceived people about what their legal risks were.

24   They're talking to, for example, children to let them

25   know that they could hurt their mother and that the

1      children should give up information.  Those are all very

2      familiar techniques.  They're the techniques that --

3          Q.   What --

4          A.   They're techniques -- can I finish?

5          Q.   Go ahead.

6          A.   They're techniques that police investigators

7      and interrogators use around murderers and rapists and

8      high-level drug dealers and homicide cases.  It's

9      unheard of to speak ordinary members of the public -- to

10     treat ordinary members of the public this way for the

11     purposes that the sheriff is elucidating.

12         Q.   When did a Pasco Sheriff's deputy threaten a

13     juvenile that that they would hurt that juvenile's

14     mother?

15         A.   Can we go to the record?

16         Q.   You may.  I'm asking you.  You made the claim.

17     Where is it?  Is it in your report?

18         A.   Yeah.

19         Q.   Okay.

20         A.   So I will go to page 39 in my report.

21         Q.   Let me catch up to you.  Hang on.  Okay.

22         A.   So midway through that page after the footnote

23     74, there's a body of text that begins, "During their

24     visit," and that's what I'm referring to.

25         Q.   Help your mom out, man?

1      A.    The officer has asked the mother whether she's

2  still on probation.  She has said that she is.  And they

3  use that to pressure her, her son, and then to get

4  access to the missing son's girlfriend while explicitly

5  conveying that if they don't get the information they

6  want that they will either take action themselves under

7  the probation status or put pressure on her probation

8  officer.  It could not be clearer.

9      Q.    Really?  You don't think you're reading just a

10 ton into that?

11     A.    Not at scintilla.  That is exactly what was

12 going on.

13     Q.    All right.  Is that it?  Is that the only

14 example of threatening one of the juveniles that they're

15 gonna hurt their mother as you put it?

16     A.    I think that's the only example I'm aware of of

17 threatening a juvenile to hurt their mother, yes.

18     Q.    Is the only example of use of the SRO mechanism

19 that you can attach to this case the comment on the

20 video for the arrest of Robert Jones, IV?

21     A.    Well, other than the extensive attention to

22 this in the written documents, that's the only thing I'm

23 aware of in the body camera footage because it's clearly

24 department protocol.

25     Q.    Let's talk about ACE.  ACE is adverse childhood

1   experience; right?

2        A.   That's correct.

3        Q.   Okay.  And ACE factors are mentioned in the

4   appendix to the ILP manual?

5        A.   What they say are, yes.

6        Q.   Okay.  But then if you read the scoring, none

7   of that's actually included in it, is it?

8        A.   And this is supposed to be a good thing?

9        Q.   Well, you're critical of use of ACE to identify

10  potential prolific offenders; correct?

11       A.   I absolutely am, yes.

12       Q.   All right.  And my question is does the Pasco

13  Sheriff's Office actually use adverse childhood

14  experiences as part of the determination of who is and

15  who is not a prolific offender?

16       A.   I think it's quite likely that depending on

17  what information they're getting from the State

18  Department of Family Services or whatever the correct

19  title is that they are in fact using what the literature

20  would consider adverse childhood experiences because

21  they are expressly talking about divorce, running away,

22  family abuse, that sort of thing, which is absolutely

23  considered ACE in any of the literature.

24            They are calling information that they are

25  getting from the school relevant under their adverse

1   childhood experiences framework, and that is also

2   completely unjustified.

3       Q.   Can you point to any particular juvenile son or

4   daughter of any of the named plaintiffs where adverse

5   childhood experiences played a role in determining that

6   that person was a prolific offender?

7       A.   Not to my knowledge, no.

8       Q.   The ILP manual on the list of ACE includes

9   household member incarceration, physical abuse,

10  emotional abuse, witness household violence, physical

11  neglect, household substance abuse and sexual abuse;

12  correct?

13      A.   I'll take your word for it.

14      Q.   Okay.  Would you agree with me that those are

15  -- each of those is recognized in the literature as an

16  ACE?

17          MR. JOHNSON:  Objection, compound.

18  BY MR. POULTON:

19      Q.   Is there any that is not recognized in the

20  literature as ACE?

21      A.   None of those are recognized in any literature

22  as a basis for predicting criminality at the individual

23  level or extending surveillance or official enforcement

24  attention.  The adverse childhood experiences literature

25  points in exactly the opposite direction.  Now the

1    sheriff could have with real, you know, theoretical and

2    research justification logged all or most of the

3    sheriff's visits where children are involved as adverse

4    childhood experiences because that's what they are.

5        Q.   We'll talk about that in a minute.  Let's go

6    back though because you're transitioning away from my

7    original question.

8            Did you just say that there is no correlation

9    between ACE, adverse childhood experiences, and risk of

10   becoming a serious chronic violent juvenile offender?

11       A.   Nothing -- so there is in fact.  So this one's

12   easier than I thought it might be.  No, there is nothing

13   in the ACE literature that can predict or has ever been

14   used to predict prolific juvenile offending.

15           The ACE literature is expressly about what

16   happens to kids who have been traumatized as they get

17   older and go into adulthood.  So the answer to that

18   question is, no, there is nothing in the literature that

19   can predict juvenile or prolific offending.

20       Q.   Did you cite the article by I guess it's

21   Dr. Fox --

22       A.   That's sounds right.

23       Q.   -- on child abuse and neglect --

24       A.   Yes.

25       Q.   -- in your -- in your --

1    Okay.  Did you read it?

2    A.   Yes, I read it.

3    Q.   Let me read a quote from that article from you

4    and see if that might have any influence on your

5    testimony.

6    I'm quoting.  Okay?  "Data on the history of

7    childhood trauma, abuse, neglect, criminal behavior, and

8    other criminological risk factors for offending among

9    22,575 delinquent youth referred to the Florida

10   Department of Juvenile Justice are analyzed with results

11   suggesting that each additional adverse experience of

12   child experiences increases the risk of becoming a

13   serious violent and chronic juvenile offender by 35 when

14   controlling for other risks factors for criminal

15   behavior."  Do that you recall that in that article?

16   A.   I'll take your word for it.

17   Q.   Do you still say that there's no literature

18   which correlates adverse childhood experiences to being

19   at risk for offending in the future?

20   A.   There is nothing in what you just read or in

21   any of the rest of the science here that can identify an

22   individual as at that sort of risk.  This is purely a

23   group and population phenomena.

24   Q.   Okay.  In your expert report, you added some

25   added categories to ACE that -- well, let me ask you

1    this:  You seemed to add categories of ACE for, for

2    example, repeated hostile encounters with deputies,

3    arrested, incarceration and eviction.  Would you agree?

4        A.   Do I consider those within the ACE boundaries?

5    Yeah, absolutely.

6        Q.   Are they included in the literature anywhere?

7        A.   The literature has a wide range of particular

8    items, experiences that it considers traumatic.  The

9    main point here, so again, in any of the formal studies

10   in order to trace cause and effect you need protocols

11   that name particular of those instances.  They have to

12   be things that usually there's formal administrative

13   information on.  You have to be able to code them, all

14   that kind of thing.  There's no single bundle of things

15   that are and aren't adverse childhood experiences.  The

16   point here is the childhood trauma causes trouble later

17   on.

18       Q.   I thought you just said that there's nothing

19   that demonstrates that to be true?

20       A.   I said there's nothing that can predict those

21   outcomes at the individual level, which is what the

22   sheriff purports to be doing.

23       Q.   Is repeated hostile encounters with law

24   enforcement identified anywhere in the literature as

25   ACE, or is that something that you made up for this

1    case?

2        A.    There's another option which is that it's

3    elsewhere in the literature, and we have a pretty

4    extensive literature that even ordinary police contacts

5    with juveniles can lead to bad outcomes later is a

6    pretty strong effect.  There's every reason to think

7    that traumatic encounters are even worse.

8        Q.    Well, where in the literature is repeated

9    hostile encounters with deputies listed as a factor as

10   an ACE?

11       A.    In the policing literature rather than

12   expressly in the ACE literature there is that causal

13   connection between both ordinary police encounters and

14   police encounters that are perceived by those subject to

15   them as disrespectful and illegitimate.  Both of those

16   are connected to bad outcomes later on.

17       Q.    Is there any way for you to measure whether the

18   encounters that the plaintiffs and their sons had with

19   law enforcement caused an adverse effect to the

20   juvenile?

21       A.    In principle there might well be.  I don't see

22   any way that that could be done with these particular

23   folks retroactively, but --

24       Q.    Well, for example -- for example, Donnie

25   McDougall I believe is in prison right now as we speak.

1    Okay?

2        A.   Is that right?

3        Q.   I think that's correct.  Well, assuming that

4    were correct that he's in prison, is there any way for

5    you to state that the cause of him having committed

6    whatever crime he committed was because of his

7    interactions with Pasco Sheriff's deputies?

8        A.   I'd have to know what happened, and I don't

9    know what happened.  The kind of thing that does happen

10   a lot is that young people -- not only young people but

11   this is particularly easy and dangerous with young

12   people -- learn through experience that the police are

13   not to be trusted, that the law that they represent is

14   not to be respected.  They get in a situation later on

15   in which, for example, they could use the help of the

16   police and the criminal justice system.  They don't take

17   advantage of that because they've been taught not to

18   trust the police or the law.  They will often take what

19   the literature calls self-help measures.  We know who

20   stole my bicycle.  I'm not gonna call the cops.  I'm

21   gonna go get it back myself.  That turns into a

22   burglary.  I know who's trying to hurt myself and my

23   family.  I'm not gonna call the cops.  I'm gonna take

24   action.  That turns into a violent offense.  I don't

25   trust any of those people.  I don't trust what they

1    represent.  Their rules don't mean anything.  So I'm

2    gonna break them.  Those patterns are very well

3    understood.

4        Q.    All right.  I'm trying glean from that whether

5    you're claiming that you can testify to whether Donnie

6    McDougall is in prison because of his interactions with

7    deputies?

8        A.    I can't.  Could I testify to the fact that

9    that's the kind of bad outcome that comes from

10   illegitimate and abusive policing?  Yes, I can testify

11   to that.

12       Q.    How about your mother and father calling

13   deputies cock suckers and telling them to get the fuck

14   out of your property when you're, whatever, seven, eight

15   years old, could that be an adverse childhood

16   experience?

17       A.    The entire fact pattern here could be an

18   adverse childhood experience, the repeated visits, the

19   bad behavior by the deputies, the pressure put on

20   families, the fines and fees.

21            One of the things that is really striking to me

22   about the record as I've been able to see it is the

23   almost unalloyed escalation that the sheriffs and the

24   deputies policies and procedures and protocols

25   represent.  In every instance I think in which I've been

1  able to track what's going on, things get worse and

2  worse and worse and worse and worse.  The kind of

3  language and behavior that we saw from the residents in

4  that tape is what happens when people feel like they've

5  been pushed too far and they can't do anything about it,

6  and there's ample evidence in the record that the

7  deputies like that and they're trying to make it happen.

8  I see almost no evidence in any of this of any of the

9  deescalation approaches that policing, you know, these

10  days routinely embraces and teaches its personnel.

11      Q.   So you're referring now back to the chicken

12  ordinance violation?

13      A.   The one to which you just spoke, yes.

14      Q.   The video of that you're referring to?

15      A.   Yeah.

16      Q.   Okay.  And you're talking about deescalation.

17  Did the deputies ever show any hostility towards Tammy

18  Heilman or the gentleman that came out and was yelling

19  at them and cursing at them?

20      A.   I'm speaking of the arc of contact between the

21  department and that family which took some time and

22  steadily worsened.

23      Q.   Now let's take a look at what will be now

24  Exhibit --

25           MR. JOHNSON:  Five.  You're on five.

1    BY MR. POULTON:

2        Q.   -- 5.  Thank you.  Let me make sure I have the

3    right one.  Hang on one second here.

4            All right.  So this is Exhibit 5.  This is

5    going to be the video of Tammy Heilman interaction on

6    August 9, 2020, which is about a year -- actually it's

7    about four years after the chicken ordinance violation

8    and roughly one year after the battery charge.  I want

9    you to examine this in connection with your comment

10   about the arc of interaction with deputies.

11           (Exhibit No. 5 was designated to be marked for

12      identification.)

13           (Video was played at this time.)

14   BY MR. POULTON:

15       Q.   We'll go up to 2:11.

16           (Video was played at this time.)

17   BY MR. POULTON:

18       Q.   I'm going to stop here at 2:43.  You had

19   mentioned before the pamphlet that had the cancer

20   information on it.  Is this the video you're talking

21   about?

22       A.   I believe it is, yes.

23       Q.   Okay.  And I'm looking just here at 2:38, and

24   it looks like a number of pages here and the last one

25   says Department of Health in Pasco County Locations, and

1    said you thought it had something to do with cancer?

2        A.   My recollection is that when I think it's

3    Anthony comes out, there's a colloquy with the deputy

4    about -- it's a little bit muffled, but I heard it as a

5    cancer reference.

6        Q.   Okay.  Well, do you have any reason to dispute

7    the deputy's statement that within these materials that

8    he's providing there's information on, for example,

9    jobs?

10       A.   I have no reason to dispute that, no.

11           (Video was played at this time.)

12   BY MR. POULTON:

13       Q.   You see that he says to the gentleman it helps

14   people make better decisions there at about 2:35, 2:36?

15       A.   Yes.

16       Q.   And his response was what?

17       A.   I'm not sure exactly what he said.

18       Q.   Play it again.

19           (Video was played at this time.)

20   BY MR. POULTON:

21       Q.   Did he say, "That would be great"?

22       A.   Yeah.  Yes, I heard that.

23           (Video was played at this time.)

24   BY MR. POULTON:

25       Q.   All right.  We're now at 4:26.  In the last

1    twenty seconds or so would you agree with me that the

2    deputy is saying that he's going to provide him some

3    resource materials to try to help him not make the same

4    mistakes that he made in the past?

5        A.   Yep, that's what he said.

6        Q.   Okay.  He said, "Not everything here applies to

7    you."  Right?

8        A.   Yep.

9        Q.   Any problem with that?

10       A.   Let's finish this up and we can discuss it.

11            (Video was played at this time.)

12   BY MR. POULTON:

13       Q.   And there at 4:28, 4:30, right in there he says

14   there's some information about job assistance trying to

15   find a job; correct?

16       A.   Correct.

17            (Video was played at this time.)

18   BY MR. POULTON:

19       Q.   He says, "The first thing I've seen on this is

20   cancer."  Did you hear that?

21       A.   That's what I was referring to.

22       Q.   But prior that he said thanks, didn't he?  He

23   thanked the deputy for the information; correct?

24       A.   He did.

25       Q.   All right.  And we know from earlier

1    conversation that not everything in that -- we saw the

2    deputy flipping pages; right?

3         A.    Yes.

4         Q.    Okay.

5               (Video was played at this time.)

6    BY MR. POULTON:

7         Q.    Anthony McDougall thanks the deputy for the

8    information; correct?

9         A.    That's what he said.

10        Q.    I mean, I just -- is this part of this arc

11   of --

12        A.    So I don't know what the arc here is.  I don't

13   know what comes before this more recently.  I don't know

14   what comes after this more recently.  I signalled -- I

15   said earlier that this particular encounter stood out to

16   me because, unlike almost everything else I viewed, it

17   was not obviously abusive.

18               What we know about this kind of thing is it

19   won't work.  This kind of simple provision of

20   information turns out not to have any very helpful

21   impact, particularly if somebody's in any kind of

22   trouble.  This is not enough to gain them any kind of

23   real advantage.  And the father and the son here are

24   being very compliant.  I would not take at face value

25   that that means that they like this, that they're okay

1    with it, that they think this is really helpful.  But by

2    now a lot of the other members of the public here, they

3    have learned that is gonna happen, they can't do

4    anything about it, that they can't make it stop, and

5    that this is to be endured so it goes away.  And the

6    only thing I can say about this is that it was not as

7    hostile as the norm.

8        Q.   In your -- Well, tell you what.  Let's take --

9    Well, you want to take a quick break or no?  Because I

10   was going to go through some parts of your report with

11   you.

12            MR. JOHNSON:  I wouldn't mind a break.

13            MR. POULTON:  All right.  Why don't we take

14       like a -- let's just do five minutes so we can try

15       to get back and finish up, you know, reasonably

16       quickly.  Okay?  Five minutes.

17            MR. JOHNSON:  Great.

18            (A break was taken at 3:51 p.m., and the

19       deposition resumed at 3:57 p.m.)

20   BY MR. POULTON:

21       Q.   Okay.  Professor Kennedy, we will attach your

22   expert report as Exhibit 6.  Okay?  We don't need the --

23   Madam Court Reporter, we'll send you a copy.  It will

24   start on page one Expert Witness Report of David

25   Kennedy.  We'll skip the precursor info.

1          (Exhibit No. 6 was designated to be marked for

2      identification.)

3  BY MR. POULTON:

4      Q.   So, Professional Kennedy, do you have your

5  report in front of you?

6      A.   I have it.  Yes.

7      Q.   Okay.  Great.  Let me direct you to page 5 and

8  try to go in order here as much as I can.

9          You state that -- and this is in the data and

10  materials used and considered in forming my opinion

11  section.  You state that to prepare your report you

12  reviewed the complaint, legal filings, and the list of

13  prolific offender checks, and manuals from 2016 and '18,

14  and then also dispatch reports.

15          Are you aware of any calls for service by the

16  plaintiffs themselves to the Sheriff's Office asking

17  that the Sheriff's Office come to their residence?

18      A.   Don't think I am.  I think to that roster I

19  should add I was able to review some of the I believe

20  weekly intelligence sharing information documents.

21      Q.   This took a lot of different forms.  Can you be

22  a little more -- can you describe what you looked at?

23  Like what did they look like physically?

24      A.   They looked like probably they were a

25  translation into PDF of PowerPoint slides.  I think

1    that's probably what they were.

2        Q.   All right.  That's helpful.  Thank you.

3             Page 6, the second full paragraph you state

4    that PSO commits the foundational error of holding that

5    individuals, including children and juveniles, can be

6    identified as prolific offenders based on brief

7    snapshots of arrests and other criminal justice records.

8    Do you see that?

9        A.   Yes.

10       Q.   Okay.  What makes it brief?

11       A.   In the consideration of anything like a

12   criminal career on the one hand or the duration of

13   somebody's let's call it criminal offending record that

14   it would take to make a judgment about whether somebody

15   is either a prolific or a dangerous offender, the

16   three-year period that the protocol uses is brief in

17   both respects.

18            So it's not enough to predict future behavior,

19   and it's too brief to understand what somebody's actual

20   so-called criminal career might be.

21       Q.   Are you under the impression that if a person

22   meets that criteria of two arrests in three years that

23   they are then considered a prolific offender?

24       A.   My understanding is that that gets them into

25   the rest of the Sheriff's consideration as we've

1    discussed.

2        Q.   And what is your understanding of the rest of

3    the Sheriff's consideration?

4        A.   You've already spoken to some analytic work

5    that I don't know about.  The rest of it seems to be as

6    defined by the exceptions to this core so-called

7    protocol so completely open-ended that pretty much

8    anything would go.

9        Q.   Are you familiar with the role that the crime

10   analysts within each district play in identifying

11   prolific offenders from that initial grouping?

12       A.   So I think we spoke about this earlier.  No,

13   no, I'm not.  And as I said, at that point anything that

14   begins with this methodology cannot be revived.

15       Q.   And you say that without knowing what they do;

16   correct?

17       A.   As I said, yeah.  Can't get there from here.

18       Q.   Okay.  Page 9 kind of midway through your first

19   full paragraph you state, and I quote, "It is true that

20   serious offending is concentrated within a relatively

21   small number of chronic, repeat offenders.  So it seems

22   reasonable to seek to identify and give such offenders

23   special attention."  See that?

24       A.   Yes.

25       Q.   Then you say in the next sentence, "In

1    practice, the project proved impossible."  And then you

2    go on to quantify some of the limitations on that --

3    that effort.  Do you see that, pages 9 and 10?

4         A.   Yes.

5         Q.   Okay.  So, and this is based on your experience

6    or in the research?

7         A.   This is the criminological literature around

8    this project, yes.

9         Q.   Okay.  Would you agree that in theory a small

10   percentage of the population commits the majority of the

11   crime?

12        A.   Depends on what crime we're talking about.

13   That's absolutely true for the more serious crimes.  So,

14   you know, as you know, legal theory divides crime into

15   mala in se offenses and mala in lex offenses.  So mala

16   in se offenses are those offenses that are so grievous

17   that our natural moral sense tells us this is a bad

18   thing and we shouldn't do it and the State should take

19   an interest in that kind of thing.  Mala in lex offenses

20   are offenses that are offenses because the law says

21   they're criminal.

22             If we're talking about a lot of mala in lex

23   offenses, that concentration does not obtain.  So

24   everybody speeds on the highway for all practical

25   purposes.  We are all recidivists when it comes to

1    certain things.  So that kind of criminality is not

2    necessarily so concentrated.

3              That fact about concentration has really come

4    from, you know, a natural focus on the most extreme

5    offenses, the most extreme public safety problems.  It's

6    true there.  It's not necessarily true in other domains.

7         Q.   Are you familiar with the criminal environment

8    in Pasco County say between 2016 and 2021?

9         A.   I am not.

10        Q.   Page 12.  If you look at your second full

11   paragraph, you seem to be criticizing the agency there

12   for paying attention to gang affiliates or gang

13   associates.

14        A.   Uh-huh.

15        Q.   Can you articulate this for me kind of in a

16   nutshell of what the problem is with trying to identify

17   gang associates?

18        A.   Sure.  Sorry.  My machine isn't cooperating.

19        Q.   No problem.

20        A.   I'm having a hard time getting to that, but I

21   remember what it is.

22             Yeah.  So this is a massive and central problem

23   both in academic work on gangs and in law enforcement

24   work on gangs, and the central problem is that neither

25   in law nor in common sense or in the literature has

1    anybody been able to figure out a meaningful definition

2    of a gang.  So all the academic attempts on this have

3    floundered because it's impossible to come up with a

4    definition of a gang that doesn't include, for example,

5    violence.  Because if we're just looking at groups that

6    have cohesiveness and wear colors and know who their

7    enemies are and that kind of thing, you get these kind

8    of ludicrous arguments that the NFL is a network of

9    gangs because they know who their enemies are and they

10   wear uniforms and they engage in ritual combat and that

11   kind of thing, and that's obviously nonsensical.

12            In law, people generally at the state level

13   establish protocols that will name particular

14   characteristics, and the typical formulation is three of

15   the following lists of 13 items, and if you meet 13 --

16   you know, three of the 13 then you're considered a gang

17   member.  Those will be things like self-admitted gang

18   affiliation, tattoos, association with other known gang

19   members, known to be in photographs, known to be in

20   correspondence, that kind of stuff.

21            What we know about those is that they are

22   typically hugely overinclusive.  They scoop a lot of

23   people into these gang definitions and gang databases

24   who don't belong there, and they will often miss some

25   important people.  So that's bad enough when it is about

1    gang membership.

2          The term gang affiliate, which means -- who

3    knows what it means; right -- some sort of connection

4    with people that either the law or some other process

5    has identified as a gang member, that has no meaning

6    whatsoever.  Most gangs, most places, most of the time

7    don't have the kind of organization and structure that

8    even allows you to identify something like a real member

9    and an affiliate.  Most of what people think is true

10   about gangs are on structure and hierarchy and rules for

11   getting in and rules for getting out, recruiting and

12   that kind of thing, stages of membership, none of that

13   actually happens outside of a few very rare instances.

14          So you might be able to name -- for example, if

15   there's an outlaw motorcycle club, they may actually

16   have real protocols for saying who's a member and who is

17   on the road to entry.  Outside of things like that, this

18   concept of affiliate means absolutely nothing.

19     Q.   Are you aware of whether Florida has statutory

20   definitions of these items?

21     A.   I am not sure.  What I do know is those

22   statutory definitions are meaningless in practice.  They

23   are everywhere.

24     Q.   Well, certainly you don't fault the Sheriff's

25   Office for following the state statute on the

1   definitions, do you?

2       A.   I absolutely would if that's leading to bad

3   practice, and I'll just leave it there.

4       Q.   Page 16, your discussion of hot spots.  Okay?

5   I'll let you catch up if you're still have been

6   problems.

7       A.   I am there, yes.

8       Q.   All right.  And there at the end of the first

9   full paragraph and into the second full paragraph you

10  express some criticism of the STAR boxes of roughly

11  seven to ten square miles.  Do you see that?

12      A.   Yeah.

13      Q.   Okay.  Now doesn't the definition of hot spot

14  depend in large part on the geographic nature of where

15  the crime is occurring?

16      A.   I'm not sure what that means.

17      Q.   Well, population density would play a role in

18  what is a reasonably-sized hot spot, wouldn't it?

19      A.   Not so much density.  What matters is actual

20  behavior on the ground.

21      Q.   All right.

22      A.   And in nearly any setting in any kind of

23  meaningful population density, the individuals that give

24  rise to higher rates in that place are going to be very

25  few, and the places where they're going to be active are

1    going to be very few and very small, and that's not

2    going to change very much with respect to overall

3    population density.

4        Q.   Well, I guess part of what I'm driving at here,

5    and I'm doing a poor job of articulating it, is your

6    criticism that the hot spots are too large

7    geographically, well, is that influenced by your

8    experience dealing with, for example, criminal activity

9    in a relatively concentrated area, for example, in

10   Boston or Cincinnati or New York?

11       A.   No, it's not.  The work that I've done in rural

12   settings shows the same kind of very small numbers of

13   drivers of important stuff even in more diffuse areas,

14   and the protocol that goes along with this is aimed at

15   massive surveillance and enforcement pressures on these

16   STAR areas.  In order for that to make sense, you have

17   to conclude really the opposite which is everybody in

18   this area is a problem and deserve that kind of

19   attention and is going to be subjected to this

20   indiscriminate activity, which just can't be right.

21       Q.   Do you think that everybody within a STAR hot

22   box is given prolific offender checks?

23       A.   The roster of activity is surveillance street

24   stops, pedestrian stops looking for informants, looking

25   for associates.  It goes on and on and on and on.  This

1    feels in some ways even more indiscriminate than the

2    prolific offender nonsense.

3        Q.   Okay.  Can you cite some evidence that the

4    Sheriff's Office is subjecting random members of the

5    STAR boxes to some sort of abusive treatment simply

6    because they live within the STAR box?

7        A.   Well, the direction for the team's activities

8    in those boxes calls for exactly that.  That's in the

9    record, and it's in my statement.

10       Q.   Well, doesn't it just call for them to do

11   increased patrols, have an increased physical presence,

12   try to develop tips on information on who might be

13   committing crimes within those areas?

14           MR. JOHNSON:  Objection, compound.

15   BY MR. POULTON:

16       Q.   Do you understand my question?

17       A.   I do.  And by the time you take up all those

18   individual items, which I think on my statement cover

19   two pages and more, that is as I say a recipe for an

20   enormous amount of attention devoted to these areas in

21   which not many people and not many places will actually

22   be at issue.

23       Q.   How do you know that?

24       A.   Because that's the way crime works.

25       Q.   Can you cite any evidence in this case that

1    there have been abuses of random other people because of

2    their presence in a STAR box?

3        A.   I can speak as I have to what the Sheriff's

4    policies tells its deputies to do, which is completely

5    out of alignment with what we know about crime

6    concentration.

7        Q.   Is it problematic for them to look for people

8    that are pawning items a lot within those areas?

9        A.   The larger menu of things that they direct

10   deputies to do is in its aggregate really troublesome.

11       Q.   Okay.  I don't know what that means

12   troublesome.  I don't -- it's kind of -- what does it

13   mean troublesome?

14       A.   It means that the area and people in it are

15   going to get attention that is not going to be about

16   addressing whatever -- whatever crime has created the

17   designation of the area as a hot spot and is going to

18   involve a lot of people who are not part of that crime

19   problem.  So they're -- just as with the Sheriff's other

20   strategies, it's going to bring surveillance attention

21   and very likely enforcement and sanctions to people who

22   are in no way deserving of it.

23       Q.   Do you have any evidence that any person has

24   ever been unjustifiably arrested, i.e., without probable

25   cause because they lived in a STAR box?

1      A.   I know what the protocol is designed to do, and

2   I know that that is out of alignment with what we know

3   about crime and crime prevention.

4      Q.   Can you answer a simple question?  Do you have

5   any evidence that any person has ever been arrested

6   without probable cause simply because they lived in a

7   STAR box?

8           MR. JOHNSON:  Object to the form.

9      A.   I don't know that they have, and I don't know

10  that they haven't.  Our experience with this kind of

11  thing would absolutely suggest that it's pretty common.

12  And it's not just arrests.  It's stops, it's inquiry,

13  it's surveillance, it's looking after people's friends

14  and family.  This is what the document says deputies are

15  supposed to do.  So it's pretty reasonable to expect

16  that that's what happens.

17  BY MR. POULTON:

18      Q.   Okay.  So it's absolutely whatever likely to be

19  common but you can't cite me a single example of any

20  person who has ever been arrested within a STAR box

21  without probable cause simply because they lived in a

22  STAR box; correct?

23           MR. JOHNSON:  Objection.

24      A.   Of course I can't.  I don't have access to that

25  information.

1    BY MR. POULTON:

2         Q.    So how can you say it's common if you can't

3    cite a single example?

4         A.    The behavior of the department that this

5    protocol calls for is going to cause harm in these areas

6    if deputies actually do what they're supposed to do.

7         Q.    How do you know that if you can't cite an

8    example?  You're speculating, aren't you?

9         A.    I know how crime happens.  I know how these

10   sorts of tactics are deployed, and it doesn't go well.

11            There's a reason policing doesn't direct

12   officers to these big areas anymore.  There's a reason

13   that policing no longer talks about dangerous

14   neighborhoods.  There's a reason that criminology and

15   the profession has developed this more refined picture

16   of what used to be thought of as bad places because both

17   criminology and the profession recognizes that these are

18   not in fact full of bad people.  There's a reason that

19   the profession has turned its back on zero tolerance.

20   There's a reason that NYPD says, "We don't do what we

21   used to do.  We now practice precision policing."  These

22   are bad ideas that are informing this practice.

23        Q.    Well, isn't that a political debate for the

24   agency and the voters of Pasco County and not a legal

25   debate?

1          MR. JOHNSON:  Object to form.

2      A.   I take it as a practical realization of the way

3  crime does and doesn't happen and what sort of

4  approaches are appropriate and effective for addressing

5  it.

6  BY MR. POULTON:

7      Q.   Okay.  On page 30, halfway down the first full

8  paragraph there at the top page 30, let me know when

9  you're there.

10      A.   Here.

11      Q.   "Deputies note how many evictions they have

12  achieved as part of their performance evaluations,

13  including prolific offenders, with the thus explicit

14  recognition that some such evictions are not offenders,

15  even by PSO's spurious definitions."  Do you see that?

16      A.   Yeah, I do.

17      Q.   And then you say, "One deputy cited as an

18  accomplishment the eviction of a prolific offender's

19  mother."  Do you see that?

20      A.   Yep, I do.

21      Q.   Do you know what the circumstances were of that

22  eviction?

23      A.   I do not.

24      Q.   Do you know why the eviction occurred?

25      A.   I do not.

1        Q.    Could it have been nonpayment of rent?

2        A.    I don't know what it was.  I do know that any

3    system in which deputies routinely refer to the number

4    of evictions that they have performed as part of their

5    regular duties and something that justifies promotion

6    and in language that makes it clear that while according

7    to this reading none of the people who have been evicted

8    are prolific offenders, some of the -- those who have

9    been evicted are prolific offenders' mothers.  And not

10   even all of those who have been evicted have any

11   connection to prolific offenders.  This was one of the

12   most appalling parts of the record as far as I was

13   concerned.

14       Q.    Do you know whether any of these prolific

15   offender mothers were evicted due to an excessive number

16   of code violations that they were engendering to the

17   property?

18       A.    I don't know.  Again, what I do know is in my

19   decades of working in policing, I have never once run

20   across anything like this.  And in concert with other

21   language in these written protocols that talk about

22   making people leave and sending them to prison or

23   driving them away, this is very much in keeping with

24   that overall thrust, and I find it almost unbelievable.

25       Q.    The next full paragraph you state and I'm going

1    to quote, "Escalation is clearly evident in most of the

2    encounters present in the record.  Deputies consistently

3    became more aggressive and make things worse."  Do you

4    see that?

5         A.   I do.

6         Q.   Okay.  You say escalation is clearly evident in

7    most of the encounters present in the record.  What is

8    the percentage of encounters present in the record where

9    escalation is clearly evident?

10        A.   So I think it's the case -- and I could go back

11   and make sure this is right, but I believe it's true --

12   that if we're taking escalation in the sense that I

13   meant it and that we discussed earlier --

14        Q.   Uh-huh.

15        A.   -- which is an initial encounter with a person

16   or a family, followed by repeated visits by deputies in

17   which things get worse, people are arrested, people are

18   fined, people get code violations, people are pressed

19   for information about their friends and families,

20   they're threatened, I think all of these core arcs that

21   I've been able to review escalate and get worse.

22             That's also true for a lot of the individual

23   encounters, of course.

24        Q.   What is the percentage of incidents that you

25   reviewed where escalation occurred?

1      A.   Well, I believe it's the case that if we're

2  talking about the families and the contacts of the

3  office with particular prolific offenders and then their

4  friends and associates, I think all of them get worse.

5  I can't give a point estimate for each individual

6  incident or body cam.  I would say the very large

7  majority of them.

8      Q.   On page 43 you mentioned the fines for Darlene

9  Deegan.  In 2018 she was given citations for $2,500.  Do

10  you recall that?

11      A.   Let me find that.

12      Q.   Sure.  It's page 43.

13      A.   Yeah, getting there.

14          So I found that.  I'm looking for the previous

15  account of that encounter and those fines.

16      Q.   Sure.  Well, don't get confused between Heilman

17  and Deegan.  Heilman was the chicken.  Deegan is I

18  believe mostly debris and the trailer.

19      A.   This is the trailer in the backyard and that,

20  yeah.  Okay.

21      Q.   And you say for context in 2018, the year that

22  Darlene Deegan was fined more than $2,500, do you see

23  that?

24      A.   Yep.

25      Q.   Do you think she paid $2,500?

1      A.   I don't know.  I know that that was -- those

2   were the fines imposed upon her by the Sheriff's Office.

3      Q.   Would it be meaningful to you to know that in

4   fact she came into compliance and the County dropped the

5   citations?

6      A.   I'm glad that she didn't have to pay the

7   citations.  The larger pattern here remains, which is

8   that the Sheriff instructs its deputies to impose as

9   much of this kind of penalty as they are capable of

10   doing, that we know because we know how communities work

11   that lots of those people are going to have trouble

12   paying those fines and fees.  We know that there's a

13   very strong tendency for those to build on themselves,

14   to gather more fines and fees, to lead to deliberate or

15   inadvertent failures to appear, which turn into criminal

16   offenses, and people will go to jail over this.  We know

17   that this affects people's credit ratings.  We know it

18   affects their household finances.  We know that

19   especially the criminal violations can permanently

20   damage people's ability to get work and housing, and we

21   know that in this particular instance the deputies were

22   explicit that they were doing this to pry information

23   about I believe it was her son out of her and made it

24   explicit that that use of this as leverage on family

25   members was standard practice within the office.

1        Q.    The --

2        A.    So I'm glad she didn't pay the fees.

3        Q.    All right.  It's your impression that the

4   reason the code citations were initially written was to

5   create pressure on Darlene Deegan to provide the

6   whereabouts of her son Tyler Paneson?

7        A.    So I know that the deputies came looking for

8   her son.  They asked her to appear.  She did.  She

9   couldn't or wouldn't say where her son was.  They

10  leveled the violations and the fines and fees so

11  described, and then they came back and said to her,

12  "Tell us where he is.  Tell us where he is.  Tell us

13  where he is."  They were relentless and I would say

14  badgered her about that, and then said to her -- and

15  this is on the body camera footage -- "We'll do

16  something" -- I'm -- what's the word I'm looking for --

17  I am capturing the sense here.  "We will do something

18  about these fines and fees" -- paraphrasing here we go.

19  "We will do something about these fines and fees if you

20  telling us where your son is.  We do that -- if people

21  don't tell us information, then we cite them."  That is

22  all in the body camera record.  There's nothing about

23  that that's okay.

24       Q.    How sure are you of what you just testified to

25  factually?

1      A.   It's in the record.  It's in the body cam

2   footage.

3      Q.   Okay.  The do something about the fines, do you

4   recall exactly what the discussion was on that?

5      A.   We could bring up the video.  It's all on the

6   video.

7      Q.   Well, I'll represent to --

8           MR. JOHNSON:  Remember the witness said he was

9      paraphrasing.

10  BY MR. POULTON:

11     Q.   Okay.  Well, I'll represent to you that the

12  discussion wasn't that the fines could be eliminated.

13  It was that she could be given more time to come into

14  compliance to work with the agency -- that the agency

15  would work with her to create another -- more

16  opportunity for her to come into compliance and then go

17  to the judge and have the fines relaxed or --

18     A.   My sense was that the deputies were dancing

19  around what they would and wouldn't do, and it seemed

20  very clear to me that they were used to this.

21     Q.   All right.  Page 49.

22     A.   Yes.

23     Q.   The summary of opinions your first sentence

24  there you say, "PSO's practices and policies shock the

25  conscience and have no place in contemporary criminology

1    or policing."  Do you see that?

2        A.   I do.

3        Q.   All right.  That phrase "shock the conscience"

4    has particular meaning in my world, the legal world, and

5    I'm wondering where you got that phrase from?

6        A.   It's in my lexicon.

7        Q.   Do you know what it means in the context of a

8    case called DeShaney v Winnebego County?

9        A.   I do not.

10       Q.   Okay.  And at this close of your report pages

11   50 to 51 you say, "Some of my closest law enforcement

12   friends and colleagues have followed the press coverage

13   of PSO and, to a person, they have been repulsed."  Do

14   you see that?

15       A.   I do.

16       Q.   Okay.  Do you cite to any of those persons in

17   your report?

18       A.   I don't.

19       Q.   And their basis of knowledge was what they read

20   in the press?

21       A.   What they've read in the press and in some

22   instances what I've shared about what I know.

23       Q.   What did you share with them?  Did you show

24   them video?

25       A.   Yeah, I'm -- Oh, did I share any of the

1    information supplied to me as part of this?  No,

2    nothing.

3        Q.    Okay.

4        A.    Absolutely nothing.

5        MR. POULTON:  All right.  That is all the

6    questions that I have.  I appreciate your time.  I

7    don't know if counsel has any follow-up questions

8    they want to ask you.

9        MR. JOHNSON:  Would it be all right if we just

10   took a quick break?  I'd like to talk to my

11   co-counsel.

12       MR. POULTON:  All right.  How about five

13   minutes or ten?  Do you want ten?

14       MR. JOHNSON:  How about ten if you don't mind?

15       MR. POULTON:  All right, ten.  We'll come back

16   in ten minutes.

17       (Short break.)

18                    CROSS EXAMINATION

19   BY MR. JOHNSON:

20       Q.    So just a couple quick questions.  So at first

21   I wanted to ask you there was some discussion of what

22   you term lever pulling, and I just wanted to ask how

23   does that differ from what you see in the record

24   involving the Pasco County Sheriff's Office?

25       A.    Greatly.  So the whole logic of focused

1    deterrence is that it is deterrence.  It's intended to

2    both do better and to obviate the necessity for

3    traditional enforcement, and this is simple stuff in its

4    essence.  The government couldn't get Al Capone for his

5    murderous behavior, and so they put him in jail on tax

6    evasion charges.  That wasn't focused deterrence.  That

7    was clever use of enforcement tools.  The point of that

8    was to let other figures know that if they kept up with

9    what they were doing, there were ways that the legal

10   system could get at them.

11          So in focused deterrence we go through a

12   process of identifying the very small number of most

13   extreme and important folks that we've talked about that

14   has never done with a reference purely to existing

15   criminal justice information or their record.  It takes

16   all kinds of information to sort out who these people

17   are and aren't.  They're then put on notice ahead of

18   time of the thing that the strategy is designed to

19   prevent, say gun violence.  And with the group focus of

20   a lot of focussed deterrence because the groups that

21   tend to be violent are selling drugs and breaking all

22   kinds of other laws and have outstanding criminal cases

23   and such, you can say to them we'll focus our discretion

24   as authorities on those levers if your group kills

25   somebody.  So the essence of this is small particular

1    people, particular offenses or behaviors prior notice,

2    and then the goal is to do as little actual enforcement

3    as is consistent with getting that intended outcome.

4            What we're seeing with Pasco County is none of

5    the above.  It's broadly based.  It scoops up a lot of

6    people.  They are not some kind of elite dangerous

7    offender.  They are not put on prior notice.  The intent

8    is not any kind of identifiable outcome.  There's

9    nothing they can do not to get treated like this or to

10   stop being treated like this, and the goal clearly is as

11   much punishment of as many kinds as the Sheriff's Office

12   can bring to bear, much of which is addressed not even

13   to people that the Sheriff's Office has identify as

14   offenders of any kind but to their family and friends,

15   and none of that is pulling levers to focused

16   deterrence.  There is no excuse whatsoever for punishing

17   somebody's mother because of what their son has done

18   already, and this is what we're dealing with here.

19       Q.   One of the things that you discussed was making

20   sure that people know the legal consequences of their

21   actions, and I wondered if you could describe the format

22   that those types of discussions usually take?

23       A.   Yeah.  There are two quite well-developed

24   mechanisms for this kind of direct communication.  So

25   one is a collective engagement we call a call-in, and

1    that's generally for group members.  So your original

2    design here was to figure out a way to talk to multiple

3    potentially violent groups in a city all at once, and

4    there's no practical way of doing that in the ordinary

5    course of events.  It's not that hard it turns out.

6          Because of the nature of these most at risk

7    mostly men, every group tends to have somebody under

8    court supervision, every group will have somebody on

9    probation or parole.  That means that the probation and

10   parole authorities with the approval of the Court can

11   direct them to a meeting.  In that meeting you can speak

12   with them.  They're very carefully constructed.  They're

13   very carefully scripted.  Nobody who hasn't rehearsed

14   that meeting is allowed to participate.  They were

15   originally typically held in courtrooms.  They're now

16   typically held in what the literature calls places of

17   civic importance.  They'll be in many communities in a

18   Black History museum or a community college or something

19   that really signals the community's commitment and

20   aspirations.

21         The group members ordered to appear will be

22   directed to appear.  They're very -- there's very

23   careful attention paid to their physical security and

24   your areas of security for the place the meeting's being

25   held.  They will come in and be told up front

1    everybody's going home, this is nothing to worry about,

2    nobody's in any trouble.  They will be seated in an area

3    that's designed with respect to the formal academic

4    literature on procedural justice, which emphasizes

5    equivalence.  So you'll typically have the people

6    delivering the messages at the same level as those who

7    are called in.

8         They are told ahead of time that this initially

9    will be a one-way colloquy because people are brought in

10   on condition of their court supervision and there are

11   law enforcement people present, that means a

12   conversation could and perhaps should be interpreted as

13   a custodial interrogation so there is no colloquy.

14        They're told that they will hear some important

15   things and then they will be free to go.  If they want

16   to stay and ask and get questions answered, they will be

17   free to do that.  They hear three basic themes.  So one

18   of them is from people carefully selected because the

19   people called in respect them.  So with respect to

20   serious violence, this is typically mother's who have

21   lost their children, older, wiser gang members who have

22   turned their lives around and can represent that, the

23   neighborhood elders who are already working on violence

24   prevention, people who can speak to what the community

25   wants to be.  Those people say in effect we love you

1    dearly, we care about you, this is hurting us and

2    hurting people that you care about, this has got to

3    stop.

4            There's a very careful menu of immediate

5    granular supports offered.  So I said earlier that

6    handing somebody a pamphlet doesn't work.  We've learned

7    that the hard way.  People need to be safe.  They need

8    to have a chance to say who is threatening them so that

9    the authorities can do something about it.  We've had

10   instances in which people came in having been shot at

11   during the day and we get them out of there securely and

12   into a secure location so they're safe.

13           People who are living like this don't have

14   government ID.  They don't have a driver's license.

15   They've got outstanding warrants.  They've got unpaid

16   child support.  They can't get their car registered.

17   They often don't have a secure place to live.  So that

18   sort of thing is offered.  None of it's mandated.  It's

19   discretionary, and this very careful promise about what

20   will get special formal legal attention is communicated.

21           For example, we will say to a room full of

22   members of groups, "The next group in the city that

23   kills somebody is going to get this focused attention."

24   The idea is for people who get that to go back to their

25   groups, communicate the key elements.  We know that

1   happens whenever the information moves out along the

2   social networks.

3           The research says that people who go through

4   those meetings and are actually present show about 50

5   percent reduction in serious violent crime for several

6   years after that, and the social networks sometimes show

7   a greater impact.

8           There's a version of that meeting which is not

9   collective.  It's individual.  We call that a custom

10  notification.  And when somebody is in serious trouble

11  or looks like they're going to cause serious trouble,

12  when there's an outbreak of violence, it's usually

13  driven by very small numbers of people.  We will go and

14  deliver a version of that message individually to them,

15  sometimes to their families.  Those are also very

16  carefully designed.  They're scripted.  They have the

17  same core elements, but they're really customized to the

18  individual person.  I'll stop there.

19  Q.   There was some discussion of the fact that your

20  scholarship and your work has focused to a significant

21  extent on violent crimes.  Do you feel that you're

22  qualified to offer your opinion about Pasco County

23  Sheriff's program notwithstanding that it focuses on

24  property crimes?

25          MR. POULTON:  Object to the --

1    A.    Yeah.  So the --

2          MR. POULTON:  Just let me object to the form.

3    Go ahead, sir.  Sorry.

4    A.    Yeah.  So the fundamentals here are

5    fundamentals about crime and criminal justice

6    institutions and police community relations and what

7    works and what doesn't both with respect to enforcement

8    and with respect to services.

9          These core questions of the way police contacts

10   are taken by members of the public is a very important

11   question of legitimacy in procedural justice.  The

12   concentration of any kind of offending by small numbers

13   of people who are disproportionately active, the spatial

14   concentration, all of that is about the way crime and

15   crime prevention happens.  It's just that in most places

16   most of the time the most critical insoluble problems

17   are violent ones, and so that's where most of this

18   portfolio has gone.  But their versions of effective

19   ineffective crime prevention have been developed for

20   these more ordinary day-to-day questions.  So a lot of

21   the literature that's fed into current practice began

22   with that.

23         There's a very important tradition of repeat

24   victimization because that concentration tends to be

25   reflected in repeat victimization.  The same is true for

1    repeat offending.  There is a big literature on the way

2    victimization and offending is not in fact nearly as

3    separate as you think it is.  Yet in law and in a lot of

4    our sort of ordinary discourse we think pretty much

5    exclusively in terms of good people and bad people.

6    That's not the way the world works.  The worst

7    victimization and the worst offending overlaps

8    enormously across crime types.

9            A lot of what we're dealing with here is the

10   arc of what people used to call criminal careers, which

11   is a concept that's pretty much fallen out of favor

12   because it's not really the way people work, and it's

13   not the way these trajectories in fact play out.  So,

14   yeah, I know about this stuff.

15           MR. JOHNSON:  I don't think I have anything

16      further.  Tom, do you have anything?

17           MR. POULTON:  No, sir.  Thanks.  We will order.

18           MR. JOHNSON:  All right.  Thank you.

19           MR. POULTON:  And regular time is time.

20           Do you want to explain read or waive to him

21      since he's not dealt with that before, Rob, do you

22      want me to?

23           MR. JOHNSON:  No, we'll read.

24           MR. POULTON:  Very good.

25                     *  *  *  *  *  *

1          (THEREUPON, THE TAKING OF THE DEPOSITION WAS

2     CONCLUDED AT 4:59 P.M.)

3                 *  *  *  *  *  *

4              S T I P U L A T I O N

5        It was thereupon stipulated and agreed by and

6   between counsel present for the respective parties and

7   the deponent that the reading and signing of this

8   deposition is not waived.

9                 *  *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA

3    COUNTY OF PASCO

4         I, the undersigned authority, certify that

5    DAVID KENNEDY appeared before me via Zoom and was

6    duly sworn on March 21, 2022.

7         WITNESS my hand and official seal this 9th

8    day of April, 2022.

9

10

11    _____

12    Judy Anderson
      Notary Public - State of Florida
      Commission No.:  GG 276821
13    My Commission Expires:  1-5-2023

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF PASCO

5

6         I, JUDY ANDERSON, Court Reporter, certify that I

7    was authorized to and did stenographically report the

8    foregoing deposition and that the transcript is a true

9    record of the testimony given by the witness.

10

11        I further certify that I am not a relative,

12   employee, attorney, or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties'

14   attorney or counsel connected with the action, nor am I

15   financially interested in the action.

16

17        Dated this 9th day of April, 2022.

18

19                    _____

20                    Judy Anderson, Court Reporter

21

22

23

24

25

```
 1    DALANEA TAYLOR; TAMMY
      HEILMAN; DARLENE DEEGAN;
 2    and ROBERT A. JONES, III,

 3      Plaintiffs,

 4    vs.                    Case No.: 8:21-cv-00555-SDM-CPT

 5    CHRIS NOCCO, in his
      official capacity as
 6    Pasco County Sheriff,

 7      Defendant.
      _____/
 8

 9

10                    DEPONENT'S SIGNATURE PAGE

11          I HAVE READ THE FOREGOING TRANSCRIPT OF MY

12       DEPOSITION AND HEREBY SUBSCRIBE TO THE FOREGOING

13       DEPOSITION, SAID SUBSCRIPTION TO INCLUDE ANY

14       CORRECTIONS AND/OR AMENDMENTS HERETO.

15

16
        _David M. Kennedy_____
17      David Kennedy

18
        _____5/11/2022_____
19      Date

20

21

22

23

24

25
```

```
 1                              ERRATA SHEET

 2     PAGE        LINE                  CORRECTION

 3      9           14        "violent" should be "violence"

 4      9           15         "violent" should be "violence"

 5      12          7         "traunche" should be "tranche"

 6      30          5        "practice completely" should be "practice and completely"

 7      31          20       "and prosecution" should be "and with prosecution"

 8      33          9         "spent" should be "spend"

 9      41          1         "then" should be "there"

10      50          16       "is" should be "in"

11      61          9          "fictitious" should be "factitious"

12      70          23        "Piehl" should be "Peel"

13      72          23       "crimes for low-level" should be "crimes or low-level"

14      75          14        "does" should be "doesn't"

15      84          11       "at" should be "a"

16      107         24         "stops looking" should be "stops, looking"

17      122         1         "behaviors prior" should be "behaviors, prior"

18      124         20         "mother's" should be "mothers"

19     _____      _____     _____

20     _____      _____     _____

21     _____      _____     _____

22     _____      _____     _____

23     _____      _____     _____

24     _____      _____     _____

25     _____      _____     _____
```

**A**

abhorrent 33:12
ability 116:20
able 11:1,3 89:13 92:22
  93:1 99:19 104:1
  105:14 114:21
absence 52:1
absences 78:10
absolutely 28:24 29:10
  30:4,10 40:3 46:3,6,8
  46:11 70:3 81:3 85:11
  85:22 89:5 102:13
  105:18 106:2 110:11
  110:18 120:4
abuse 85:22 86:9,10,11
  86:11 87:23 88:7
abuses 109:1
abusive 30:9 47:8,15
  54:24 61:15 75:12
  92:10 97:17 108:5
academic 103:23 104:2
  124:3
academically 74:12
academics 12:16 40:8
academy 6:13
acceptable 28:24 31:23
accepted 13:9
access 35:11 77:15,24
  79:4 80:18 84:4
  110:24
accommodation 65:4
accomplish 43:24
accomplishment 112:18
account 115:15
accurate 10:14 30:14
  66:21
ACE 84:25,25 85:3,9,23
  86:8,16,20 87:9,13,15
  88:25 89:1,4,25 90:10
  90:12
achieved 112:12
act 25:23 62:5,6 71:1
  81:12
action 8:15 18:20 29:5
  29:25 33:14,19 41:13
  61:8,20,21 65:21
  66:11 70:11 78:17
  79:17 80:14 84:6
  91:24 131:14,15
actions 31:18 32:2 33:23
  36:2 65:15 122:21
active 15:3 38:8,10
  106:25 127:13
actively 71:10
activists 10:12
activities 15:8,25 108:7
activity 17:1 26:13 40:23
  71:10 78:18 82:8
  107:8,20,23
acts 12:8,12 15:16
actual 8:4 18:20 40:15
  57:5 100:19 106:19
  122:2
adapted 18:6
add 32:1 89:1 99:19
added 88:24,25
addenda 76:13
additional 88:11
address 5:17 7:17 8:10
  9:11 10:14 11:12,14
  12:5 18:20,20 30:9
  64:8
addressed 122:12
addressing 29:22 109:16
  112:4
adjacent 21:12

adjustments 65:8
administrative 89:12
admitted 81:21
adolescence 75:22
adulthood 75:22 87:17
advantage 50:17 91:17
  97:23
adverse 78:11 84:25
  85:13,20,25 86:4,24
  87:3,9 88:11,18 89:15
  90:19 92:15,18
advising 17:9
affidavit 33:14
affiliate 105:2,9,18
affiliated 21:4
affiliates 103:12
affiliation 104:18
agencies 6:24 9:3 17:14
  20:20 27:6 28:6,12
  32:22 40:11 45:24
  48:22 69:25 74:1,2,6
agency 16:4,10 21:1 23:5
  23:17,21 31:12 33:23
  37:11 38:1 39:2 49:10
  71:8 72:17,20 73:21
  103:11 111:24 118:14
  118:14
agency's 31:5 35:2,8,23
aggregate 46:14 47:13
  109:10
aggressive 60:20 114:3
ago 78:2
agree 27:5 28:5 31:10
  34:8 37:25 59:17 60:6
  60:11 65:18 70:19
  72:9 86:14 89:3 96:1
  102:9
agreed 129:5
ahead 14:17 30:21,22
  31:1 37:7 39:8 49:5
  72:8 83:5 121:17
  124:8 127:3
aimed 107:14
air 70:13
Al 121:4
Alcohol 11:22
algorithms 39:19 40:7
alignment 109:5 110:2
alleged 53:2
allowed 13:20 15:22
  123:14
allows 105:8
amendment 44:16
AMENDMENTS 132:14
amount 24:25 39:18
  47:12 72:19 108:20
amounts 59:13
ample 93:6
analysis 11:23 42:5 74:7
  76:23
analysts 41:8,18 42:10
  101:10
analytic 101:4
analyzed 88:10
AND/OR 132:14
Anderson 1:18,22
  130:11 131:6,19
Ann 8:6
answer 5:24 6:6 10:23
  13:22 14:22 26:5,5,9
  26:10 27:8 29:21 31:1
  34:25 35:10 37:4
  64:24 73:23 74:10
  82:17 87:17 110:4
answered 42:12,12,15
  63:7 124:16
answering 5:25 58:13

answers 28:19
Anthony 48:5 95:3 97:7
anticipate 10:25
anybody 27:9 57:11
  62:15 76:14 104:1
anymore 111:12
apartheid 21:24
appalling 113:12
appear 116:15 117:8
  121:22
APPEARANCES 2:1
appeared 47:5,14,24
  130:5
appendix 85:4
applicable 17:1
application 42:23
applications 22:21
applied 7:21,24,25 8:3
  9:11 31:20
applies 96:6
applying 21:1,9
appointment 49:6
appointments 48:18
appreciate 120:6
approach 28:15 30:16
  31:12
approaches 21:10 47:19
  93:9 112:4
appropriate 47:4,7 112:4
approval 123:10
approximate 24:13 28:6
April 130:8 131:17
arc 93:20 94:10 97:10,12
  128:10
arcs 114:20
area 13:8 25:1 38:14
  107:9,18 109:14,17
  124:2
areas 24:18 107:13,16
  108:13,20 109:8 111:5
  111:12 123:24
arguments 104:8
Arlington 2:7
arrest 50:25 51:3,5,13
  52:2,5,7,12 53:1,11,15
  62:2 68:21 71:7 76:15
  80:1,4,9,21 84:20
arrested 51:9,11,15,16
  52:16 53:5,18,21
  59:25 60:14 61:2,10
  68:20 76:17 78:24
  79:10 80:19 81:15
  82:11 89:3 109:24
  110:5,20 114:17
arresting 61:7 79:1,12
arrests 51:2,21 52:10,23
  76:10 78:5 100:7,22
  110:12
article 74:13 87:20 88:3
  88:15
articulate 103:15
articulating 107:5
ascertain 56:14
aside 13:15
asked 26:6 33:17 34:24
  41:17,19 42:11,12,15
  61:3,4,5 63:1 84:1
  117:8
asking 5:23 25:4 26:7
  44:19 52:21 57:16
  58:24 74:12 76:24
  83:16 99:16
asks 82:3
aspect 13:24 30:18 31:14
  34:19 39:4 77:4
aspirations 123:20
assault 69:11,18,22

asserts 40:1
assignment 13:20
assist 12:23
assistance 57:4 81:8
  96:14
associates 42:22 76:21
  77:13 103:13,17
  107:25 115:4
association 104:18
assuming 91:3
assurance 14:20
attach 84:19 98:21
attempt 8:8 63:15
attempted 40:6
attempts 42:5 104:2
attendance 78:9 79:18
  80:17,22
attention 21:22 25:11
  42:22 45:21 57:2 58:8
  58:16 59:7,14 70:9
  84:21 86:24 101:23
  103:12 107:19 108:20
  109:15,20 123:23
  125:20,23
attitude 62:10,16,17
attorney 29:1 131:12,14
audio 49:14
August 94:6
authorities 121:24
  123:10 125:9
authority 57:25 130:4
authorized 131:7
auto 57:17 73:4 74:24
availability 47:25
available 46:21 47:18
Avenue 5:18
average 73:21
aware 37:8 51:20 53:13
  57:17 78:15 84:16,23
  99:15 105:19

**B**

B 4:1
bachelor's 7:6
back 50:2,2 65:11 66:15
  67:14 77:4 79:7 80:4,6
  80:16 81:13 82:11
  87:6 91:21 93:11
  98:15 111:19 114:10
  117:11 120:15 125:24
backyard 45:4 51:5,10
  53:2 59:24 60:25 61:3
  61:8 66:17 115:19
bad 21:18,19 33:7 66:8
  90:5,16 92:9,19
  102:17 104:25 106:2
  111:16,18,22 128:5
badgered 117:14
bags 80:12 81:10,13
baroque 76:19
based 20:1 31:11 41:2
  69:20 73:1 74:14
  100:6 102:5 122:5
basic 26:1 124:17
basing 32:16,21
basis 74:9 78:15 86:22
  119:19
battery 68:20,21,24 94:8
bear 16:2 122:12
becoming 87:10 88:12
began 9:22,25 60:12,18
  61:16,16 127:21
beginning 50:2 70:1
  76:15 82:21
begins 75:24 76:10 83:23
  101:14
behalf 81:7

behavior 18:16,24 31:15
  31:19,21 40:16 44:7
  59:12 66:13 78:9
  82:20 88:7,15 92:19
  93:3 100:18 106:20
  111:4 121:5
behaviors 122:1
belief 30:16
believe 21:3 26:8 33:22
  34:12 35:15 37:4
  41:23 43:11 46:23
  51:15,16 52:15 58:6
  60:13 65:3 66:2 78:15
  79:2 80:19 81:7 82:9
  90:25 94:22 99:19
  114:11 115:1,18
  116:23
believed 26:12 45:3
  60:24 77:19 79:1
believes 59:23
belong 104:24
benefits 8:5
benign 47:6,13 54:22,23
  55:9 56:2,3
best 32:17,22
better 19:6 22:22 28:17
  33:9 43:13 95:14
  121:2
bicycle 91:20
big 32:15 80:13 111:12
  128:1
bit 7:15 48:4 65:10 67:14
  78:14 95:4
Black 10:8 123:18
blossom 70:20
Blvd 2:11
boasted 61:13,14
body 16:14 38:8 61:12
  79:11 80:9 83:23
  84:23 115:6 117:15,22
  118:1
body-worn 73:11,15,18
book 26:19
Boston 7:19 8:2,5,16,17
  8:20 9:6,18 10:3,14
  11:16,21,21,25 12:2
  13:9 15:19,20 36:7
  48:15 72:13 73:9,10
  107:10
Boulevard 2:3
boundaries 23:10 29:11
  89:4
boundary 29:14
bounds 28:23 30:4 33:23
  34:2,12,17
box 1:23 107:22 108:6
  109:2,25 110:7,20,22
boxes 106:10 108:5,8
boy 80:17
boy's 49:20
BPD 9:9
breach 44:15
break 49:17,23,25 50:3,7
  78:14 92:2 98:9,12,18
  120:10,17
breaking 121:21
brief 100:6,10,16,19
bring 69:22 76:14
  109:20 118:5 122:12
brings 31:17
broad 46:12 77:16
broadly 122:5
broken 74:9
brought 10:10 16:2 17:3
  48:23,23 49:3 124:9
brusque 63:17
build 116:13

built 24:17
bunch 56:25
bundle 89:14
Bureau 11:22
burglaries 35:19 57:17
73:4,5 74:15,22,24
75:18
burglary 25:1 91:22
business 47:11
byplay 61:12

**C**

calculated 32:3
call 5:18 12:16 39:9 40:8
41:23 55:4 67:7 74:7
78:3 91:20,23 100:13
108:10 122:25 126:9
128:10
call-in 122:25
called 8:16,18 9:23 12:15
24:15,19 35:13 81:1
119:8 124:7,19
calling 68:23 85:24 92:12
calls 25:14 73:2 91:19
99:15 108:8 111:5
123:16
cam 61:12 115:6 118:1
camera 45:22 46:5,7
79:12 80:9 84:23
117:15,22
cameras 73:11,15,18
cancer 47:25 94:19 95:1
95:5 96:20
capable 28:19 116:9
capacity 1:7 132:5
capital 5:16
Capone 121:4
capturing 117:17
car 35:19 125:16
card 47:18
care 125:1,2
career 100:12,20
careers 128:10
careful 123:23 125:4,19
carefully 39:23 123:12
123:13 124:18 126:16
carefully-developed
12:19
Carolina 36:17
Carolina's 36:20
carry 45:17
case 1:6 5:9 29:5,17
32:16 33:13,19 50:13
51:1 66:16 71:17
84:19 90:1 108:25
114:10 115:1 119:8
132:4
cases 83:8 121:22
catch 83:21 106:5
categories 88:25 89:11
caught 79:11
causal 90:12
cause 27:8 52:2,9,17
68:21 89:10 91:5
109:25 110:6,21 111:5
126:11
caused 90:19
causes 21:16 89:16
ceased 27:1
Ceasefire 7:20 8:1,13,18
9:23 11:12 13:21 14:7
36:7,14 73:10
center 77:2
central 18:17 25:11
103:22,24
certain 12:8,12 15:15
58:18 103:1

certainly 17:20 25:1 37:9
42:20 62:8 105:24
Certificate 3:4,5 130:1
131:1
certified 6:9,12,15,24 7:4
certify 130:4 131:6,11
Chagrin 2:3
chance 29:9 30:3 31:16
125:8
change 25:23 75:6,7
107:2
characteristics 104:14
characterization 69:8
81:23
characterize 62:17 63:6
charge 69:22 79:14,16
80:7 94:8
charges 16:24 17:11
80:20 121:6
checked 7:15
checks 99:13 107:22
Chicago 37:15,20 40:5
chicken 64:13,13,14
93:11 94:7 115:17
chickens 50:20,21 64:8
64:15 66:17,19
child 67:19 78:11 87:23
88:12 125:16
childhood 84:25 85:13
85:20 86:1,5,24 87:4,9
88:7,18 89:15,16
92:15,18
children 47:4 78:20
82:24 83:1 87:3 100:5
124:21
chime 79:23
CHRIS 1:7 132:5
chronic 15:23 25:14 71:2
87:10 88:13 101:21
Cincinnati 36:8,11 72:13
107:10
circumstances 15:15
62:15 112:21
citation 50:13 63:19
citations 66:20 115:9
116:5,7 117:4
cite 87:20 108:3,25
110:19 111:3,7 117:21
119:16
cited 112:17
cities 7:16,22 13:10,10
14:10 17:14 20:3,7,20
21:7 22:10 36:24,25
74:21
city 1:23 6:21 7:11,19 8:9
8:11,24 9:17 13:8
19:25 21:1 22:23
23:17,23 123:3 125:22
civic 123:7
civil 37:17 42:24 65:2,15
66:9 70:11
claim 52:19 83:16
claiming 66:20 92:5
claims 52:16
clarification 26:6
clarify 6:18
classes 6:12
classified 54:22
clear 43:19 46:3 65:1,6
69:6,12,16,19,19
76:23 77:10 113:6
118:20
clearer 84:8
clearly 43:23,25 47:21
47:22 48:1 61:9,20
82:6 84:23 114:1,6,9
122:10

clever 121:7
cleverly 82:9
close 13:18 27:14 55:1
72:2 119:10
closer 29:11
closest 119:11
club 105:15
co-authored 26:19
co-counsel 2:9 120:11
cobbled 61:8
cock 68:1 92:13
code 44:10,12 50:12
63:19 69:25 70:16
89:13 113:16 114:18
117:4
cohesiveness 104:6
coined 17:6
colleague 8:6
colleagues 119:12
collective 122:25 126:9
college 7:6,11 123:18
colloquy 47:10 79:3 95:3
124:9,13
colors 104:6
combat 104:10
come 48:25 49:7 50:2
55:8 80:4,6 81:5 82:15
99:17 103:3 104:3
118:13,16 120:15
123:25
comes 14:12 25:6 29:13
30:15 37:24 78:6 92:9
95:3 97:13,14 102:25
coming 20:24 28:19
29:17,24
comment 34:18,22 67:10
84:19 94:9
Commission 6:20 130:12
130:13
commit 14:15,17 19:7
25:20 49:2
commitment 123:19
commits 100:4 102:10
committed 72:11 76:16
91:5,6
committing 18:12 32:13
35:19 38:4 57:12,16
58:7 71:5 108:13
common 28:1 103:25
110:11,19 111:2
communicate 12:18
125:25
communicated 125:20
communication 49:9
122:24
communities 7:13 18:18
21:5,25 22:11 24:18
24:19 71:23 116:10
123:17
community 10:11 12:16
12:18 21:11 24:14
27:17,23 32:4 33:2
48:8 49:10 56:8,11
71:11 73:2,3 123:18
124:24 127:6
community's 123:19
community- 27:24
community-oriented
26:18,20,21 27:13,16
70:1
complaint 46:1 99:12
complaints 37:18 73:3
complete 14:11
completely 15:7 17:9
30:5 35:5 60:10 78:4
86:2 101:7 109:4
compliance 56:20 57:5,7

116:4 118:14,16
compliant 97:24
component 16:1
compound 86:17 108:14
comprehensive 11:20
22:25
compromised 41:15
computer's 11:7
concentrated 15:3
101:20 103:2 107:9
concentration 102:23
103:3 109:6 127:12,14
127:24
concept 30:17 59:4
105:18 128:11
concepts 31:6 58:3,14
concern 20:17 39:22
40:18
concerned 34:3 48:10
113:13
concerns 37:17
concert 113:20
conclude 107:17
CONCLUDED 129:2
conclusion 29:24 33:22
62:14
conclusively 38:14
condition 48:23 49:3
124:10
conditions 56:16 57:5,8
57:14 82:12
conducive 13:3
conduct 17:3 28:24 29:9
29:16 30:2,19 32:11
conducted 25:5 30:10
confessed 35:19
confidence 61:17 63:15
confidential 77:17,20
conflating 65:13
conflict 21:24
confused 115:16
congruent 13:11
conjunction 11:23
connected 71:21 90:16
131:14
connecting 27:17
connection 17:5,17,18
90:13 94:9 105:3
113:11
conscience 118:25 119:3
consent 81:18 82:3
consequence 71:22
consequences 26:14
48:16,17 58:4 59:11
122:20
consider 20:4,10 27:12
27:24 28:14,23,24
30:2 31:23 32:17,21
34:21 55:9 56:2,3 77:8
85:20 89:4
consideration 100:11,25
101:3
considerations 38:20
considered 9:15 13:6
25:18 85:23 99:10
100:23 104:16
considers 89:8
consistent 122:3
consistently 15:20 114:2
consolidated 13:7
Constitution 28:15,22
29:8
constitutional 28:15,22
29:8
constitutionality 34:18
constitutionally 28:10
34:21
constructed 58:18

123:12
contact 22:18 56:11
58:10 93:20
contacted 8:19
contacts 90:4 115:2
127:9
contemporary 118:25
contend 35:1,7,22,25
48:7 50:12,25 68:20
contending 66:16
content 82:21
context 115:21 119:7
continued 49:2
continuing 59:13
control 8:5 12:17 13:10
13:23 14:4,4 19:4 33:6
45:22
controlled 12:24
controlling 88:14
controls 13:15
conversation 55:11 97:1
124:12
conversations 82:21,22
conveying 84:5
convicted 76:18
convinced 46:8 63:14
Cook@debevoisepoult...
2:14
cooperating 103:18
cooperation 48:21 59:19
cooperative 63:6
cops 55:3 82:17 91:20,23
copy 98:23
cordial 63:11
core 17:20 19:1 37:9
76:9 101:6 114:20
126:17 127:9
corporals 44:10,13
correct 7:18 10:4,5
13:24 14:14 17:4
27:13 29:3 32:24 33:2
34:23 36:19 41:9,20
41:24,25 42:3,10 44:7
44:9,17 52:17 58:13
59:9 62:10 71:5 85:2
85:10,18 86:12 91:3,4
96:15,16,23 97:8
101:16 110:22
CORRECTION 133:2
corrections 31:21 33:4
49:10 56:8 132:14
correctly 41:12,21 51:12
correlates 88:18
correlation 14:10 87:8
correspondence 104:20
counsel 2:5,14 10:22
46:19 120:7 129:6
131:12,14
count 32:5
counterfactual 14:21
country 7:22 9:16
county 1:8 32:12 39:25
72:7,10,25 73:19
94:25 103:8 111:24
116:4 119:8 120:24
122:4 126:22 130:3
131:4 132:6
County's 39:23
couple 5:20 120:20
course 53:9 110:24
114:23 123:5
court 1:1,18,22 5:21 6:3
26:6 34:3,10,12,20
45:5 48:24 49:4 55:15
98:23 123:8,10 124:10
131:6,19
courtrooms 123:15

cover 108:18
coverage 119:12
crack 8:22,23 9:13,14,17
  11:17 70:12,12
create 12:12 25:22 117:5
  118:15
created 109:16
credit 116:17
crew 12:2
crews 11:17 12:8 14:23
crime 7:18 8:4 9:10
  11:20,24 12:2,25
  14:16,17 16:19 17:18
  17:19,21 18:12 19:7
  19:15,25 21:20 22:1,2
  22:7,7 24:12,13,24
  25:6,11,17 28:7,16
  32:23 33:6 36:15,16
  38:3,4 40:15,20 41:8
  41:17 42:4,9 49:2
  57:12,17 58:4,7 71:5
  71:20 72:14 74:7 75:5
  77:13,13 78:13 82:7
  91:6 101:9 102:11,12
  102:14 106:15 108:24
  109:5,16,18 110:3,3
  111:9 112:3 126:5
  127:5,14,15,19 128:8
crime's 76:16
crimes 20:1,5,11,21 21:2
  22:5 24:5,6,7 25:20
  72:11,23 74:14 102:13
  108:13 126:21,24
criminal 6:19 7:10,11
  15:8 16:24 17:1,11
  19:16 26:13 43:21
  44:7 66:12 71:10,16
  82:8 88:7,14 91:16
  100:7,12,13,20 102:21
  103:7 107:8 116:15,19
  121:15,22 127:5
  128:10
criminality 86:22 103:1
criminals 77:14
criminological 33:4 88:8
  102:7
criminologically 28:10
criminology 30:6 31:12
  42:4 111:14,17 118:25
criteria 37:1 39:10 40:12
  76:19 100:22
critical 31:4 85:9 127:16
criticism 30:15 31:9
  34:16 58:22 106:10
  107:6
criticisms 31:7,10
criticizing 103:11
Cross 3:3 120:18
crosstalk 11:2
cry 61:13
culture 45:21
current 7:9 127:21
cursed 61:15
cursing 93:19
custodial 124:13
custom 126:9
customized 126:17
cuts 32:9

                D

D 3:1
Dade 1:23
daily 12:21 19:10
Dalana 35:1
Dalanea 1:3 35:1,7,12,18
  51:16,21 54:9 55:18
  60:6 62:18 132:1

damage 32:4 116:20
dancing 118:18
dangerous 25:20 91:11
  100:15 111:13 122:6
dangled 65:5
Darlene 1:3 51:15 64:6,7
  65:9,25 66:21 115:8
  115:22 117:5 132:1
data 88:6 99:9
databases 104:23
date 1:14 29:25 68:20
  132:19
dated 54:10 55:13
  131:17
daughter 86:4
David 1:12 5:1,15 98:24
  136:5 132:17
day 125:11 130:8 131:17
day-to-day 127:20
days 21:9 46:14,25 93:10
deal 9:18 22:7 32:22
  75:15 80:13
dealers 38:8 63:9
dealing 9:17 17:18 19:14
  19:25 24:23 33:15,20
  46:9 72:13 107:8
  122:18 128:9
dealt 128:21
dearly 125:1
death 20:17
debate 111:23,25
Debevoise 2:11
debris 115:18
decades 33:5 113:19
deceived 82:23
decide 37:1
decisions 95:14
declaring 31:13
Deegan 1:3 51:15 64:6,7
  65:10,25 66:21 115:9
  115:17,17,22 117:5
  132:1
deescalation 93:9,16
Defendant 1:9 2:14
  132:7
defer 51:18
defined 58:18 101:6
definition 28:1 104:1,4
  106:13
definitions 104:23
  105:20,22 106:1
  112:15
definitive 27:1
degree 7:6 27:12
deliberate 69:11 116:14
deliberately 82:8
delinquent 88:9
deliver 126:14
delivering 124:6
delivery 47:16
demeanor 62:9,11 63:2,3
  63:6 82:21
demonstrably 32:3
demonstrated 38:14
demonstrates 89:19
density 106:17,19,23
  107:3
department 8:8 11:22
  18:5 23:18,24 24:1
  27:21 31:17 57:14,21
  60:22 73:9,10 84:24
  85:18 88:10 93:21
  94:25 111:4
departments 22:19 55:1
departure 60:23
depend 106:14
depending 28:7 85:16

Depends 102:12
deploy 37:2
deployed 111:10
deponent 129:7
Deponent's 3:5 132:10
depose 52:13
deposition 1:12 5:10
  50:8 52:20 80:23
  81:20 98:19 129:1,8
  131:8 132:12,13
depth 21:21
deputies 31:8 42:17 43:2
  43:16 44:14 45:3,9,12
  45:16 46:22 47:9,17
  60:19,24 61:17,24
  63:11 64:25 65:5,14
  65:19 66:11 89:2 90:9
  91:7 92:7,13,19,24
  93:7,17 94:10 109:4
  109:10 110:14 111:6
  112:11 113:3 114:2,16
  116:8,21 117:7 118:18
deputy 29:25 33:15,20
  47:17 57:10 59:23
  61:2 63:12,17 68:25
  69:11,19 78:25 79:4
  82:20 83:12 95:3 96:2
  96:23 97:2,7 112:17
deputy's 59:20 95:7
describe 99:22 122:21
described 117:11
describing 72:22
deserve 107:18
deserving 109:22
DeShaney 115:5
design 8:9 123:2
designated 35:8 55:21
  67:4 68:8 94:11 99:1
designation 109:17
designed 8:4,7 110:1
  121:18 124:3 126:16
desperately 62:12
despite 63:9
destined 78:12
detail 43:12
detect 59:23
determination 85:14
determine 12:25
determining 86:5
deterrence 17:6,12,17,20
  19:13 20:25 21:2
  25:10 31:6 38:2,9 58:3
  59:5,10 121:1,1,6,11
  121:20 122:16
deterrent 15:25
develop 39:19 108:12
developed 18:9 21:23
  33:5 111:15 127:19
developing 47:19
develops 21:6
devolving 58:21
devoted 108:20
diagnosis 13:12
differ 28:7 120:23
difference 62:3
different 6:20 8:14 9:2
  13:1,5 15:6 16:4,10
  17:14 38:16 60:4,10
  64:3 72:12 74:21 78:4
  82:17 99:21
diffuse 107:13
dig 65:10
dimensions 25:15,22
direct 3:3 5:6 56:11
  63:24 99:7 109:9
  111:11 122:24 123:11
directed 43:23 44:9

123:22
direction 63:13 86:25
  108:7
director 7:12
disagreement 31:11
discipline 78:9
discourse 128:4
discretion 28:9 121:23
discretionary 125:19
discuss 96:10
discussed 101:1 114:13
  122:19
discussing 26:13 80:9
discussion 10:23 45:8
  106:4 118:4,12 120:21
  126:19
discussions 122:22
disorderly 20:6 25:21
dispatch 99:14
disproportionately
  127:13
dispute 73:1,6 95:6,10
disrespectful 90:15
dissuade 18:12
dissuades 59:8
district 1:1,1 34:3,20
  101:10
disturbed 47:22
disturbing 47:17 77:10
diversion 11:15
divides 102:14
dividing 60:25
division 1:2 24:15
divorce 85:21
doctor 32:8
document 110:14
documents 77:10 78:8
  84:22 99:20
doing 10:13 12:23 23:19
  23:20 25:25 33:10
  38:6 41:12 42:25 44:6
  56:15,17,20 57:24
  72:7 89:22 107:5
  116:10,22 121:9 123:4
domain 28:21
domains 103:6
domestic 36:23 39:5
Donnie 35:22,22 45:2,18
  45:25 53:5,7 59:24
  60:14,16,17,21 61:1
  62:1 90:24 92:5
door 68:24 69:2,11,18
Dr 87:21
dramatically 33:23 34:1
  34:9,17
draw 28:14 62:14
drawing 15:21
draws 57:2
drill 32:15
drive 78:10
driven 18:24 32:2 75:20
  126:13
driver's 125:14
drivers 107:13
driving 107:4 113:23
dropped 116:4
drug 18:2 20:4,4,6,7 22:4
  22:4,4 36:23 38:7,8
  56:17 70:13 71:20
  82:15 83:8
drugs 22:3 25:7 121:21
due 113:15
duly 5:2 130:6
duration 100:12
duties 113:5
dynamics 24:21

                E

E 2:2 3:1 4:1
earlier 16:11 21:15
  54:22 66:16 96:25
  97:15 101:12 114:13
  125:5
early 75:22
easier 87:12
easy 91:11
education 7:5 77:24
effect 12:25 14:2 71:13
  76:21 89:10 90:6,19
  124:25
effective 14:8 15:11
  112:4 127:18
effectiveness 37:17
effects 13:23 24:22
effort 9:12 72:19 102:3
eight 92:14
either 13:3 14:18 20:1
  39:16 54:1 55:25
  72:18 84:6 100:15
  105:4
elaborate 8:1 14:25
  26:23
elder 53:3
elders 124:23
elements 13:4,6,7 125:25
  126:17
eliminated 118:12
elite 122:6
elucidated 44:4
elucidating 83:11
emblematic 11:17
embraces 93:10
emotional 86:10
emphasizes 124:4
empirical 25:11
employ 38:1 77:12
employed 16:22 38:16,23
employee 131:12,13
employing 77:14
encounter 97:15 114:15
  115:15
encounters 89:2,23 90:7
  90:9,13,14,18 114:2,7
  114:8,23
endless 59:13
ends 59:25 62:1
endured 98:5
enemies 104:7,9
enforcement 6:10,13,16
  6:25 12:4 19:3 23:21
  25:25 27:6 28:6 29:2,6
  38:1 39:2 42:21 44:10
  44:12 47:3 48:20,20
  50:17 58:16 59:7
  65:20,21 69:24,25
  70:5,17 71:8 76:20
  79:17 80:14 82:3
  86:23 89:24 90:19
  103:23 107:15 109:21
  119:11 121:3,7 122:2
  124:11 127:7
engage 23:4 104:10
engaged 26:13 71:10
engagement 122:25
engendering 113:16
enormous 128:20
enormously 128:8
enter 43:9,10 81:18 82:3
entire 92:17
entirely 20:21 40:4
entirety 46:23
entities 21:8
entity 23:22

entry 80:11 81:2 105:17
environment 16:12,13
  16:16,17,19 17:10
  24:17 28:16,18 48:17
  56:15 103:7
environments 19:15,17
  28:7
envisioned 50:18
epidemic 8:22,24 9:13,14
  9:17 70:12
equal 22:25
equate 30:12
equipped 73:11
equivalence 124:5
Errata 3:6 133:1
error 100:4
errors 40:9
escalate 114:21
escalation 92:23 114:1,6
  114:9,12,25
especially 21:18 73:16
  116:19
ESQ 2:6
ESQUIRE 2:2,10,10
essence 121:4,25
essentially 11:13 47:9
  57:21 58:10
establish 104:13
established 32:24,25
estimate 115:5
estranged 18:18
estrangement 18:20
  21:17
evaluation 13:9
evaluations 13:16 112:12
evasion 121:6
events 41:1 123:5
everybody 16:14 19:6
  45:14 57:3 77:25
  102:24 107:17,21
everybody's 124:1
evicted 113:7,9,10,15
eviction 89:3 112:18,22
  112:24
evictions 112:11,14
  113:4
evidence 82:7,8 93:6,8
  108:3,25 109:23 110:5
evident 114:1,6,9
exact 42:18 43:2 77:6,9
exactly 21:5 45:17 47:24
  65:22 78:7 84:11
  86:25 95:17 108:8
  118:4
examination 3:3,3 5:6
  39:6 120:18
examine 94:9
examined 5:3
example 6:18 14:2 17:8
  23:19,23 27:18 38:7
  44:6 73:4 82:24 84:14
  84:16,18 89:2 90:24
  90:24 91:15 95:8
  104:4 105:14 107:8,9
  110:19 111:3,8 125:21
examples 10:13 29:15
exceptions 37:8 101:6
excessive 113:15
exclusive 17:9
exclusively 128:5
excuse 50:22 61:7 73:17
  122:16
Executive 9:5
Exhibit 55:18,19,20,20
  66:25 67:1,2,3,4 68:8
  68:11 93:24 94:4,11
  98:22 99:1

exhibits 55:17
exist 72:24
existing 9:8 12:10 121:14
exists 33:8
exit 12:22
expect 110:15
expected 33:11
experience 42:7 72:1,4
  78:11 85:1 88:11
  91:12 92:16,18 102:5
  107:8 110:10
experiences 85:14,20
  86:1,5,24 87:4,9 88:12
  88:18 89:8,15
expert 7:14 88:24 98:22
  98:24
expertise 42:7
Expires 130:13
explain 24:10 52:12
  128:20
explained 62:4
explanation 62:7
explicit 81:9 112:13
  116:22,24
explicitly 46:7 48:13
  78:25 84:4
exposures 26:1
express 106:10
expressly 85:21 87:15
  90:12
extend 25:17 76:21,22
extending 86:23
extension 20:12
extensive 16:14 76:2
  84:21 90:4
extensively 29:20
extent 126:21
extreme 17:25 18:4
  25:19 103:4,5 121:13
extremely 47:22 56:7
  65:20 71:15 77:10
extremes 19:17

F
face 25:25 97:24
faced 17:10
facilitated 82:13
fact 39:22 47:20 52:4
  56:20 58:17 59:9 61:4
  62:4 63:9 65:6,13
  66:16 75:7,14 76:15
  85:19 87:11 92:8,17
  103:3 111:18 116:4
  126:19 128:2,13
factor 62:9 90:9
factors 59:17 85:3 88:8
  88:14
facts 25:12
factually 117:25
fad 74:4
failed 40:8
failures 116:15
fair 10:3 27:19 39:13
  51:25 69:8
faith-based 27:18
fall 9:24
fallen 128:11
false 32:3 40:3,4,9,9
familiar 9:3 26:17 41:7
  44:11 51:2 70:4 83:2
  103:7
families 43:17 92:20
  114:19 115:2 126:15
family 32:4 42:19,22
  43:3 65:14,16 66:13
  85:18,22 91:23 93:21
  110:14 114:16 116:24

122:14
far 33:18 57:13 60:4,19
  60:20 66:19 76:12
  77:2 93:3 115:12
fashion 56:8 78:7
father 51:5 80:13 81:11
  82:9 92:12 97:23
fault 11:8 105:24
favor 128:11
February 54:10 62:19
fed 127:21
federal 10:9,10 16:2,8,18
  16:21,24 21:8
feel 29:4,10 93:4 126:21
feels 108:1
fees 42:24 92:20 116:12
  116:14 117:2,10,18,19
fellow 56:24
felt 18:17 45:9
fence 44:15
fiction 82:10
fictitious 61:9
field 28:18 33:8 39:18
  72:5,5
fifty 29:22 35:19
figure 29:19,20 40:17
  56:14 104:1 123:2
figures 121:8
filings 99:12
fill 10:6
finally 81:21
finances 116:18
financially 131:15
find 38:16 64:5 79:21
  96:15 113:24 115:11
finding 82:7
fine 63:22
fined 64:6,7 65:25
  114:18 115:22
fines 42:24 65:2,5 92:20
  115:8,15 116:2,12,14
  117:10,18,19 118:3,12
  118:17
finish 5:23,25 32:19 83:4
  96:10 98:15
firearms 11:15,15,23
first 5:2,13,21 7:19,21,23
  8:8 22:16 23:4 26:19
  41:15 48:18 49:14
  53:4 54:10,11,20
  55:17 56:19 63:12
  70:7 78:14 96:19
  101:18 106:8 112:7
  118:23 120:20
fit 9:20
five 44:17 50:20,21
  66:17 93:25,25 98:14
  98:16 120:12
fix 49:15
FL 1:23 2:12
flipping 97:2
Florida 1:1,19 6:19
  23:11,14,16 68:23
  72:10 88:9 105:19
  130:2,12 131:3
floundered 104:3
focus 12:3 22:1 24:8
  32:25 39:16 70:11,16
  71:19 103:4 121:19,23
focused 9:19,19 12:13
  13:19 17:6,11,16,20
  18:1,2 19:13 20:21,25
  21:2 25:10 31:6 38:2,9
  58:3 59:5,10 72:1,2,3
  120:25 121:6,11
  122:15 125:23 126:20
focuses 24:15,16 38:8,9

126:23
focussed 121:20
folks 7:1 12:10,17 15:4
  18:7 24:8 25:12,20
  38:17 47:10 71:15
  75:21 90:23 121:13
follow 50:11
follow-up 120:7
followed 114:16 119:12
following 47:23 104:15
  105:25
follows 5:4
footage 45:22 46:5,7,24
  47:1 80:9 84:23
  117:15 118:2
footnote 83:22
forced 48:25
foregoing 131:8 132:11
  132:12
foreign 21:9
foremost 56:19
forever 70:10
forgive 36:6 49:14
forgotten 34:9
form 10:16,23 19:20,20
  30:24 34:4 38:22 74:2
  75:5 110:8 112:1
  127:2
formal 12:13 21:22
  29:12 43:14,21 49:9
  56:16 89:9,12 124:3
  125:20
formally 9:25 28:21
format 11:3 122:21
forming 99:10
formless 57:1 58:10
forms 18:4,4 99:21
formulation 104:14
forty 55:1
forward 15:16 19:8
  75:11
found 53:14 63:17 64:2
  80:12 81:10 115:14
foundational 100:4
four 75:23 94:7
fourth 44:16
Fox 87:21
framed 9:24 20:13
framework 26:2 86:1
frameworks 32:3 40:4
framing 39:14 50:18
free 124:15,17
frequently 16:20 23:1
friends 42:22 110:13
  114:19 115:4 119:12
  122:14
front 65:5 99:5 123:25
frontline 38:13
fuck 92:13
fucking 67:18 68:1
full 5:13 7:10 100:3
  101:19 103:10 106:9,9
  111:18 112:7 113:25
  125:21
function 27:21 45:23,24
fundamental 18:11,14,15
  24:14 31:5
fundamentals 127:4,5
funded 8:7
further 67:14 128:16
  131:11
future 18:13 59:11 71:5
  88:19 100:18

G
gain 63:15 97:22
gang 10:9,11 11:24 12:2

12:23 16:7 17:9 18:6
  18:10 48:16 71:20
  103:12,12,17 104:2,4
  104:16,17,18,23,23
  105:1,2,5 124:21
gangs 10:12 103:23,24
  104:9 105:6,10
gaps 10:6
gather 41:5 42:23 63:16
  116:14
general 30:17 31:8 60:5
  77:12
generally 9:15 24:16
  25:18 47:8 76:1
  104:12 123:1
generate 39:20 40:9
generated 41:14
gentleman 67:24 93:18
  95:13
geographic 106:14
geographically 107:7
geography 24:17
getting 12:17 19:7 59:25
  59:25 73:2,3 85:17,25
  103:20 105:11,11
  115:13 122:3
GG 130:12
girlfriend 84:4
give 27:7 50:23 56:18
  63:24 65:3,7,15 66:10
  83:1 101:22 106:23
  115:5
given 14:15,16,17 15:14
  16:7 28:16 29:9 33:18
  41:9 42:19 43:4 44:15
  50:12 51:23 52:2,3
  63:12 66:21 81:22,22
  82:16 107:22 115:9
  118:13 131:9
gives 81:17
glad 73:19 116:6 117:2
glancingly 74:23,25
glean 92:4
Glebe 2:7
go 14:17 30:20,22 31:1
  37:7 39:8 43:5 50:2
  51:14 54:5 55:12
  56:10 61:3,8 64:2,5
  65:14 66:15 67:8,14
  76:18 77:4,22 79:7
  83:5,15,20 87:5,17
  91:21 94:15 98:10
  99:8 101:8 102:2
  111:10 114:10 116:16
  117:18 118:16 121:11
  124:15 125:24 126:3
  126:13 127:3
goal 19:1,5 122:2,10
goddamn 67:18
goes 32:8 59:18 98:5
  107:14,25
going 15:16 27:4,9 28:6
  30:20,23 33:13 35:21
  38:1 41:5,15 47:10,24
  49:5,6,12 54:7,8,9
  55:12 57:3,18,22,25
  58:23 61:5,6,24 63:10
  65:11 67:2,7,13 72:12
  75:11 76:1 79:2 81:5
  81:12 82:6 84:12 93:1
  94:5,18 96:2 98:10
  106:24,25 107:1,2,19
  109:15,15,17,20 111:5
  113:25 116:11 124:1
  125:23 126:11
gonna 80:14 84:15 91:20
  91:21,23,23 92:2 98:3

**good** 28:19 29:21 30:4
  32:9 55:7,8 85:8 128:5
  128:24
**gotten** 13:17
**governed** 31:21
**government** 9:4 21:8
  121:4 125:14
**grades** 78:9
**graduate** 6:13 18:3
**granted** 81:18 82:4
**granular** 125:5
**great** 33:10,25 50:4
  95:21 98:17 99:7
**greater** 126:7
**Greatly** 120:25
**grievous** 102:16
**Grossly** 45:11
**ground** 8:25 53:15 73:25
  106:20
**group** 11:24 12:3,9,12,14
  12:17 14:24 15:17,19
  15:20 26:12,15 35:13
  39:12 40:12,18 88:23
  121:19,24 123:1,7,8
  123:21 125:22
**group-involved** 36:22
**grouping** 101:11
**groups** 13:13,14,15 15:6
  15:14,18,24 18:8 26:3
  26:8 75:20 104:5
  121:20 123:3 125:22
  125:25
**guards** 20:11,12
**guess** 87:20 107:4
**guidance** 42:20,20
**gun** 8:5,10,12,16,17 9:22
  10:3,14 11:12 15:2
  16:19 17:22 18:6,17
  24:3,9 36:21,22,22
  121:19
**guns** 11:20 12:1,4
**guys** 42:11

**H**
**H** 4:1
**halfway** 112:7
**hand** 100:12 130:7
**handing** 125:6
**handling** 53:4
**Hang** 83:21 94:3
**happen** 10:25 49:1 55:7
  64:1 91:9 93:7 98:3
  112:3
**happened** 40:22 64:24
  69:9 91:8,9
**happens** 87:16 93:4
  105:13 110:16 111:9
  126:1 127:15
**harboring** 51:6
**hard** 28:20 47:23 103:20
  123:5 125:7
**harder** 20:22
**harm** 33:2 47:12 55:8
  111:5
**harmful** 47:8 56:2
**harms** 22:4
**head** 6:4,5
**Health** 94:25
**hear** 11:1,3 31:8 49:13
  57:10,12 68:1 96:20
  124:14,17
**heard** 11:4 77:18 95:4,22
**height** 8:22,23
**Heights** 2:3
**Heilman** 1:3 4:5,6,7 45:1
  45:18,25 51:8 53:7
  59:22 62:1 63:19 64:7

65:11,19 66:17 67:2
  67:15 68:11,19 93:18
  94:5 115:16,17 132:1
**Heilman's** 67:25
**held** 123:15,16,25
**help** 5:20 10:20 37:1,12
  38:20 40:12 62:15
  79:21 80:15 83:25
  91:15 96:3
**helped** 7:2
**helpful** 79:22 97:20 98:1
  100:2
**helps** 95:13
**HERETO** 132:14
**hierarchy** 105:10
**high** 12:4 36:17,20 38:10
  39:3
**high-level** 83:8
**high-risk** 12:10,21 13:13
  13:14 24:8
**higher** 106:24
**highest** 7:5 25:12,16
**highway** 102:24
**historical** 18:19
**history** 7:8 42:5 57:16
  59:6 88:6 123:18
**hit** 54:13
**HOLBORN** 2:10
**Holborn@debevoisepo...**
  2:13
**hold** 74:5
**holding** 100:4
**holds** 65:13
**home** 56:5,10,14 60:20
  64:8 124:1
**homes** 55:3
**homicide** 8:9,10 15:2
  17:22 18:17 19:15
  24:3,4,9,24 25:7 40:21
  83:8
**homicides** 19:14 20:1
  71:20 72:14
**hopelessly** 41:15
**hopes** 59:7
**hoping** 62:12
**hostile** 65:20 89:2,23
  90:9 98:7
**hostility** 93:17
**hot** 106:4,13,18 107:6,21
  109:17
**house** 2:6 11:6 51:6 80:3
  80:11
**household** 86:9,10,11
  116:18
**houses** 70:12
**housing** 116:20
**how's** 61:23
**hugely** 104:22
**hurt** 82:25 83:13 84:15
  84:17 91:22
**hurting** 125:1,2

**I**
**i.e** 109:24
**ID** 125:14
**idea** 14:11 77:20 125:24
**ideas** 111:22
**identifiable** 15:4 122:8
**identification** 55:21 67:5
  68:9 94:12 99:2
**identified** 38:12 71:15
  77:16 89:24 100:6
  105:5
**identifies** 38:6 39:2
**identify** 37:12 38:3,20
  39:12 40:12 71:1
  75:10 76:22,25 78:2

79:8 85:9 88:21
  101:22 103:16 105:8
  122:13
**identifying** 78:12 101:10
  121:12
**II** 2:10
**III** 1:4 132:2
**ill-intentioned** 61:11
**illegal** 30:13
**illegitimate** 90:15 92:10
**illicit** 11:16 12:5
**illusory** 36:1
**ILP** 42:17 43:1 45:16
  51:21 85:4 86:8
**immediate** 125:4
**impact** 97:21 126:7
**implement** 70:1
**implementation** 9:25
**implicitly** 46:8 48:12
**importance** 123:17
**important** 5:22 6:5 9:16
  16:11 64:21,23 104:25
  107:13 121:13 124:14
  127:10,23
**impose** 42:24 116:8
**imposed** 65:2 116:2
**impossible** 102:1 104:3
**impression** 51:8 53:17
  53:20 100:21 117:3
**improper** 52:24
**inadvertent** 116:15
**incarceration** 86:9 89:3
**incident** 23:4 30:19 41:2
  45:2 46:2,4,6 47:12
  51:9 53:25 60:13
  61:14,19,25 80:10
  115:6
**incidents** 47:7,13 114:24
**include** 18:15 27:16
  40:19 55:16 72:16
  104:4 132:13
**included** 85:7 89:6
**includes** 86:8
**including** 25:7 66:9
  100:5 112:13
**inclusion** 35:2,24
**incomprehensible** 78:11
**increased** 108:11,11
**increases** 88:12
**indicates** 16:5
**indiscriminate** 107:20
  108:1
**individual** 13:4,24 14:22
  18:6 30:10 32:4 36:21
  47:12 59:18 86:22
  88:22 89:21 108:18
  114:22 115:5 126:9,18
**individually** 38:10
  126:14
**individuals** 12:14 13:19
  15:5,23 38:6 100:5
  106:23
**ineffective** 127:19
**inevitably** 28:8
**influence** 88:4
**influenced** 107:7
**info** 98:25
**inform** 12:10
**informal** 12:16 14:4 19:4
**informant** 77:20
**informants** 77:17 107:24
**information** 11:24 12:1
  41:5 50:23 51:22,23
  65:3,7,15 66:11 77:22
  79:4 80:18 81:13 83:1
  84:5 85:17,24 89:13
  94:20 95:8 96:14,23

97:8,20 99:20 108:12
  110:25 114:19 116:22
  117:21 120:1 121:15
  121:16 126:1
**informed** 17:2
**informing** 16:21 111:22
**initial** 35:3,24 41:9,22
  101:11 114:15
**initially** 9:7 39:12 40:12
  81:20 117:4 124:8
**initiative** 36:11 61:8
**initiatives** 37:3
**inmate** 20:11,11,11
**inmates** 20:12
**inmately** 20:5
**input** 41:14
**inquiry** 110:12
**insight** 56:19
**insoluble** 127:16
**inspection** 56:18
**instance** 30:6 43:17,18
  43:19 51:5 92:25
  116:21
**instances** 30:8 89:11
  105:13 119:22 125:10
**Institute** 2:2,6
**institutions** 18:21 33:9
  127:6
**instruct** 77:11
**instructed** 78:1
**instructs** 116:8
**intelligence** 42:23 63:16
  99:20
**intelligence-led** 29:7
  40:3 74:3,8
**intended** 34:17 62:14
  121:1 122:3
**intense** 18:23
**intent** 32:11 82:7 122:7
**intentions** 32:9
**interact** 42:18 43:2,16
**interacting** 59:20 65:19
**interaction** 42:19 43:4
  45:1,18 46:21 47:3
  56:2 60:18 61:23 94:5
  94:10
**interactions** 31:7 54:21
  59:18 91:7 92:6
**interest** 102:19
**interested** 8:25 74:11
  131:15
**internationally** 7:23
**interpreted** 124:12
**interrogated** 80:17
**interrogation** 124:13
**interrogators** 83:7
**intervention** 8:10,17
  9:23 13:3,5,6,7,13,17
  16:20 24:9,11,23 25:6
  73:13 76:2
**interventions** 13:24 21:7
  22:14,25 39:15,16
  58:5 59:5 75:12
**intrusive** 30:9 55:6
**investigators** 83:6
**involve** 24:4,6 38:11
  109:18
**involved** 11:19 15:24
  16:6,7 18:7,8 19:6
  24:21 28:20 30:19
  36:24 41:3 47:9,16,18
  47:21 48:5 73:9,14
  78:24 87:3
**involvement** 37:24
**involving** 51:21 54:25
  120:24
**irrelevant** 35:6

**issuance** 30:11
**issue** 10:24 15:7 20:5
  22:23 32:15 36:20
  47:14 50:15 75:5
  108:22
**issued** 50:13
**issues** 14:13 18:17 20:8
  21:17 25:18 58:18
  70:12
**items** 89:8 104:15 105:20
  108:18 109:8
**IV** 84:20
**IV's** 80:1

**J**
**Jacksonville** 23:19,20
**Jacksonville's** 23:24
**jail** 116:16 121:5
**Janet** 16:5,6
**Jay** 7:11 21:6
**jeopardy** 16:24
**Jhouse@ij.org** 2:8
**job** 33:10 43:13 57:20
  96:14,15 107:5
**jobs** 95:9
**John** 7:11 21:6
**Johnson** 2:2 3:3 10:16
  11:1,5 19:19 30:20,23
  34:4 38:22 42:15
  44:18 49:17,20 50:4
  53:24 54:21,24 59:2
  60:7 62:25 69:4 79:23
  79:25 80:3,8 81:23
  86:17 93:25 98:12,17
  108:14 110:8,23 112:1
  118:8 120:9,14,19
  128:15,18,23
**Jones** 1:4 53:21 80:1,23
  81:19 84:20 132:2
**JOSHUA** 2:6
**judge** 52:1 118:17
**judgment** 63:2,2 73:1
  76:25 100:14
**judicial** 31:21
**Judy** 1:18 11:1 130:11
  131:6,19
**Judy@andersoncourtr...**
  1:24
**jurisdiction** 6:16
**jurisdictions** 72:15 74:2
**justice** 2:2,6 6:19 7:10,11
  8:8 15:8 31:17 88:10
  91:16 100:7 121:15
  124:4 127:5,11
**justification** 87:2
**justifies** 113:5
**juvenile** 48:9 79:1,5,10
  79:12 83:13 84:17
  86:3 87:10,14,19
  88:10,13 90:20
**juvenile's** 79:3 83:13
**juveniles** 35:13 72:11,23
  78:24 84:14 90:5
  100:5

**K**
**keep** 12:21 19:1 67:18
  71:9 81:8
**keeping** 113:23
**Kennedy** 1:12 5:1,8,16
  8:6 9:4 33:24 49:22
  50:11 80:8 98:21,25
  99:4 130:5 132:17
**kept** 18:25 121:8
**key** 25:10 125:25
**kid** 50:24 80:15 82:12,12

**kids** 72:3 75:8 87:16
**kills** 15:19,20 121:24
125:23
**kind** 7:3,15 10:10 14:6
15:9 21:21,24 24:12
25:13 27:3 41:13
45:23 47:17 56:10,10
56:18 57:4,4 66:8
70:13 71:14 72:6 74:4
74:6 75:23 76:19
89:14 91:9 92:9 93:2
97:18,19,21,22 101:18
102:19 103:1,15 104:7
104:7,11,20 105:7,12
106:22 107:12,18
109:12 110:10 116:9
122:6,8,14,24 127:12
**kinds** 18:1 21:22 30:7
39:19 121:16,22
122:11
**know** 14:2,6,8,9,15,19
16:15 18:3 25:18 27:3
31:24,24 32:2 33:17
33:17,21 34:20 35:4
35:10,12,16,18 36:5,7
40:21,22,23,23 41:2,4
41:4,11,16,16,22
44:12,18 45:14,25
46:3,3,20 47:20 48:3
48:16 49:23,24 51:19
52:4,5,10 53:10,24
57:11,13,17 58:4,7,15
59:6,16,22 60:21 61:5
61:11,11 64:12,20,21
64:23 65:22 66:3,5,19
67:20 68:23 69:5 70:9
71:13,19 73:15,23
74:10 77:9 78:7,19,20
78:23,24 79:14 82:25
87:1 91:8,9,19,22 93:9
96:25 97:12,13,13,18
98:15 101:5 102:14,14
103:4 104:6,9,16,21
105:21 108:23 109:5
109:11 110:1,2,2,9,9
111:7,9,9 112:8,21,24
113:2,2,14,18,18
116:1,1,3,10,10,12,16
116:17,18,21 117:7
119:7,22 120:7 121:8
122:20 125:25 128:14
**knowing** 42:2,4,9 43:13
56:23,24 101:15
**knowledge** 69:24 70:8
77:21 86:7 119:19
**knowledgeable** 76:20
**known** 18:7 40:25 77:13
104:18,19,19
**knows** 16:15 26:22 27:9
105:3

---

**L**

**L** 5:16 129:4
**L.A** 37:14,22,24 40:5
**lack** 22:21 49:8 82:2
**language** 76:20 93:3
113:6,21
**large** 1:19 6:21 39:20
106:14 107:6 115:6
**largely** 19:23 71:22
74:25
**larger** 22:14 23:16 38:8
38:9 72:15 109:9
116:7
**late** 75:22
**law** 6:9,12,16,24 12:4
16:21,22 17:2,4 18:19

19:3 23:21 27:6 28:6
28:21,22 29:1,5 38:1
39:2 47:3 48:11,19,20
50:16,19 58:15 59:6
65:20,21 66:9,9 68:23
69:24 70:5 71:8 76:20
82:3 89:23 90:19
91:13,18 102:20
103:23,25 104:12
105:4 119:11 124:11
128:3
**lawful** 28:15 29:8,12
**laws** 121:22
**lay** 76:10
**layered** 11:25
**lead** 90:5 116:14
**leading** 106:2
**learn** 62:24 91:12
**learned** 98:3 125:6
**leave** 56:9 61:25 106:3
113:22
**led** 14:11 41:1 81:6 82:9
**left** 68:5 82:11
**leg** 32:9
**legal** 12:11 15:21 16:12
16:13,18 17:10 25:15
25:21 26:1 29:12 32:7
48:17 50:17 82:23
99:12 102:14 111:24
119:4 121:9 122:20
125:20
**legally** 17:24 34:1 51:7
**legitimacy** 18:21 21:12
127:11
**legitimate** 75:13
**let's** 5:13,18 36:4 49:11
50:1 51:14 54:6 60:13
63:22 66:24,24 77:3
78:14 79:20 84:25
87:5 93:23 96:10 98:8
98:14 100:13
**letting** 58:4,15
**level** 7:5 8:9,11 15:17
22:19 31:5 32:5 43:12
45:19 59:19 82:2
86:23 89:21 104:12
124:6
**leveled** 117:10
**lever** 25:9 26:3,8,15
120:22
**leverage** 116:24
**levers** 26:2 121:24
122:15
**lex** 102:15,19,22
**lexicon** 119:16
**liability** 71:16
**license** 125:14
**licit** 12:6
**lied** 80:21 81:20 82:22
**life** 12:23 31:20 55:6
78:13
**limitations** 102:2
**line** 28:15 44:15 63:13
133:2
**list** 22:8 29:15 36:18 41:9
41:14,23 42:10 86:8
99:12
**listed** 13:2 90:9
**listen** 48:25 49:7
**lists** 44:5 104:15
**literature** 25:14 85:19,23
86:15,20,21,24 87:13
87:15,18 88:17 89:6,7
89:24 90:3,4,8,11,12
91:19 102:7 103:25
123:16 124:4 127:21
128:1

**little** 7:15 48:4 49:20
65:10 67:14 71:12
78:14 95:4 99:22
122:4
**live** 108:6 125:17
**lived** 109:25 110:6,21
**lives** 12:21 19:11,11
124:22
**livestock** 63:20
**living** 125:13
**local** 16:9 22:18
**localities** 11:25
**locality** 23:18
**locate** 63:24
**location** 125:12
**Locations** 94:25
**lodged** 46:1
**logged** 87:2
**logic** 120:25
**long** 38:18 57:16
**long-term** 76:1
**longer** 28:9 111:13
**look** 39:13 40:13 41:9
47:22 49:11 50:10
54:6,9,11 61:8 63:23
66:24,24 75:17 79:20
93:23 99:23 103:10
109:7
**looked** 7:14 17:23 99:22
99:24
**looking** 8:21,24 65:22
75:9 94:23 104:5
107:24,24 110:13
115:14 117:7,16
**looks** 55:16 94:24 126:11
**lose** 50:11
**lost** 25:22 26:24 124:21
**lot** 18:15,23 20:23 22:25
33:7,9 55:8 70:11 76:4
82:19 91:10 98:2
99:21 102:22 104:22
109:8,18 114:22
121:20 122:5 127:20
128:3,9
**loud** 82:19
**love** 124:25
**low-level** 72:3,23
**ludicrous** 56:4 57:6
104:8
**lying** 79:18

---

**M**

**M-A-C-L-E-A-N** 5:15
**machine** 103:18
**MacLean** 5:15
**Madam** 34:10 55:15
98:23
**main** 15:1 19:5 20:17
32:25 89:9
**mainstream** 33:12
**maintained** 82:10
**majority** 102:10 115:7
**making** 11:16 18:2 61:13
80:20 113:22 122:19
**mala** 102:15,15,15,19,22
**malpractice** 32:10,13,14
32:16
**man** 47:21 83:25
**management** 45:23
**mandated** 125:18
**manner** 42:18 43:2,16
**manual** 42:17 43:2,12
45:16,19,23 85:4 86:4
**manuals** 76:10 99:13
**March** 1:14 62:19 130:6

**marijuana** 45:4 51:4,10
53:2,13,22 59:24
60:25,25 80:7,20
**marked** 55:4,21 58:24
67:4 68:8 94:11 99:1
**market** 12:5,6 20:6,7
38:7
**markets** 18:2 20:4,5,16
22:4 36:23 70:13
**massive** 103:22 107:15
**match** 12:14
**materials** 7:2 95:7 96:3
99:10
**matter** 32:11 47:13
48:10,11 64:23
**matters** 25:19 32:11
106:19
**maximal** 42:24
**maximum** 18:9 42:21
**McDougall** 35:22,23
45:2,18 46:1 48:5 53:5
53:7 59:25 60:16,17
62:1 90:25 92:6 97:7
**mean** 6:18 8:3 21:14
23:22 27:20 28:12
33:24,25,25 34:1,2
43:25 46:13 48:19
75:9,11,14,25 76:7,16
92:1 97:10 109:13
**meaning** 17:8 26:24,25
105:5 119:4
**meaningful** 56:17 57:4
66:6 74:6 104:1
106:23 116:3
**meaningless** 35:6 47:10
105:22
**means** 24:16 43:18 97:25
105:2,3,18 106:16
109:11,14 119:7 123:9
124:11
**meant** 15:17 24:10 25:22
36:6 69:2,18 114:13
**measure** 90:17
**measures** 91:19
**mechanism** 12:8 39:1
77:6,9 78:7 84:18
**mechanisms** 11:11 13:1
15:12 78:22 122:24
**meet** 35:2,7,23 104:15
**meeting** 123:11,11,14
126:8
**meeting's** 123:24
**meetings** 126:4
**meets** 100:22
**member** 26:12 35:13
86:9 104:17 105:5,8
105:16
**members** 10:8,9,11 12:3
12:18,21 16:8 17:9
42:19 43:3 48:16 55:4
57:22 58:10 65:14,16
66:13 83:9,10 98:2
104:19 108:4 116:25
123:1,21 124:21
125:22 127:10
**membership** 11:25 105:1
105:12
**men** 123:7
**mentioned** 14:23 19:13
45:1 63:18 65:24
78:22 85:3 94:19
115:8
**mentions** 22:10
**menu** 109:9 125:4
**merely** 58:23
**message** 124:6
**messages** 124:6

**method** 78:12
**methodology** 13:9 76:9
101:14
**methods** 38:16 42:5
82:20
**metric** 76:11
**metrics** 35:25
**Miami** 23:18
**middle** 1:1 5:15 73:24
**midst** 10:22
**midway** 83:22 101:18
**miles** 106:11
**mind** 20:24 50:5 64:2
79:23 82:10 98:12
120:14
**minds** 62:24
**minimize** 19:2
**ministry** 10:8
**minute** 7:17 17:16 67:8
69:23 77:4 87:5
**minutes** 61:23 98:14,16
120:13,16
**misbehavior** 78:9
**miserable** 62:23
**misidentifications** 39:21
**missing** 84:4
**misspoke** 53:19
**mistakes** 96:4
**mix** 24:7
**mom** 83:25
**moment** 15:14 63:25
67:13 78:2
**moral** 12:15 14:3 102:17
**mother** 50:23 53:7 61:13
82:25 83:14 84:1,15
84:17 92:12 112:19
122:7
**mother's** 124:20
**mothers** 113:9,15
**motor** 75:19
**motorcycle** 105:15
**move** 5:20
**movement** 12:5
**movements** 14:10
**moves** 126:1
**moving** 19:7
**muffled** 95:4
**multiple** 15:18 123:2
**murderers** 83:7
**murderous** 121:5
**museum** 123:18

---

**N**

**N** 2:7 3:1 129:4
**name** 5:8,14,15 36:10
39:24 56:23 77:22,25
89:11 104:13 105:14
**named** 37:4 78:16,21
86:4
**narcotics** 51:4
**narrowly** 58:18
**National** 7:12 21:4,25
22:10
**nationwide** 74:1
**natural** 9:20 102:17
103:4
**nature** 15:23 20:6 106:14
123:6
**near** 24:13 29:14
**nearly** 17:24 54:24
106:22 128:2
**necessarily** 17:19 103:2
103:6
**necessity** 121:2
**need** 29:12 33:9 38:12
39:13 40:13 41:5 45:5
76:2 89:10 98:22

125:7,7
**needs** 28:5 38:16
**negatives** 40:10
**neglect** 86:11 87:23 88:7
57:3 124:23
**neighborhood** 27:9,18
111:14
**neighborhoods** 24:18
111:14
**neighbors** 55:5
**neither** 103:24
**net** 77:1
**network** 7:12 21:4,25
22:11 40:24 76:23
104:8
**networks** 15:6 41:2
126:2,6
**never** 6:14 7:3 13:25
22:24 43:11 55:2
56:22 61:4 64:2 65:16
72:2,3 74:5 77:18
113:19 121:14
**new** 5:18,19 7:11 12:13
36:13 72:13 73:16
107:10
**NFL** 104:8
**nobody's** 124:2
**Nocco** 1:7 5:9 132:5
**nods** 6:4
**nonlegal** 15:22
**nonpayment** 113:1
**nonsense** 108:2
**nonsensical** 78:5 104:11
**nonserious** 72:16
**nonviolent** 72:16
**norm** 75:14 98:7
**normal** 15:7,8
**norms** 12:18
**North** 36:17,20
**nose** 67:18
**Notary** 1:19 130:12
**note** 16:5 112:11
**noted** 16:11 60:21
**nothing's** 20:24
**notice** 12:8 14:23 25:24
49:8 59:10 121:17
122:1,7
**noticed** 22:9 36:17
**notification** 126:10
**notwithstanding** 126:23
**number** 7:16 9:2 71:1
94:24 101:21 113:3,15
121:12
**numbers** 15:3 39:21
107:12 126:13 127:12
**nutshell** 81:16 103:16
**NYC** 36:14
**NYPD** 111:20

**O**

**O** 129:4
**Oath** 3:4 130:1
**object** 10:16 19:19 30:23
38:22 60:7 110:8
112:1 126:25 127:2
**objected** 10:23 19:20
**Objection** 34:4 42:15
44:18 53:24 59:2
62:25 69:4 81:23
86:17 108:14 110:23
**objective** 18:24 39:11
40:11
**objectively** 17:24 50:14
51:1 66:22
**observed** 60:22
**observer** 62:13
**obtain** 102:23
**obviate** 121:2

**obviously** 97:17 104:11
**occasion** 52:8
**occurred** 80:1 112:24
114:25
**occurring** 106:15
**offence** 79:19
**offender** 35:3,9,24 36:1
41:23 44:11,17 70:4
70:18,20,25 71:9
72:22 75:10 85:15
86:6 87:10 88:13
91:13 100:15,23
107:22 108:2 113:15
122:7
**offender's** 112:18
**offenders** 18:6 25:14
36:22,22 37:13 42:18
43:3,17 70:10 71:2,25
72:2 77:1 78:3 82:18
85:10 100:6 101:11,21
101:22 112:13,14
113:8,11 115:3 122:14
**offenders'** 113:9
**offending** 15:23 17:24
25:13 59:6 66:12 72:3
72:17,23 87:14,19
88:8,19 100:13 101:20
127:12 128:1,2,7
**offense** 91:24
**offenses** 102:15,15,16,16
102:19,20,20,23 103:5
116:16 122:1
**offensive** 45:10,11
**offer** 57:4 63:1 126:22
**offered** 125:5,18
**offering** 31:11 56:17
58:23 81:8
**offers** 42:20
**office** 22:15,17,22 23:5,7
23:14 29:6,18 37:20
39:25 41:8 42:9 43:15
46:2,8 51:24 57:15
69:21 77:6 85:13
99:16,17 105:25 108:4
115:3 116:2,25 120:24
122:11,13
**officer** 6:10 29:2,6 56:4
56:22 77:3,15,23
78:17 79:11 84:1,8
**officers** 6:16 42:25 47:3
48:12 56:5,9 73:10,19
76:24,24 77:7,12,16
78:1 82:6 111:12
**offices** 22:12,13 23:16
56:9 70:5
**official** 1:7 86:23 130:7
132:5
**officials** 56:25
**Oh** 2:3 64:1 119:25
**okay** 5:20 6:1 7:5 10:18
10:20 11:3,5 16:4
19:24 20:3 22:9 23:13
24:2,4 25:9 26:23
27:11 32:21 34:22
36:4,13 37:22,25
38:18 42:17 43:25
44:15,22 45:8,16
46:12,18 50:3,24,24
51:25 52:13,25 53:6
53:10 54:6,6 55:17
56:1 57:24 58:12,21
64:18 66:14 69:23
70:24 75:2 79:5 80:2
83:19,21 85:3,6 86:14
88:1,6,24 91:1 93:16
94:23 95:6 96:6 97:4
97:25 98:16,21,22

**old** 92:15
**older** 87:17 124:21
**once** 41:22 42:10 113:19
122:3
**one's** 87:11
**one-way** 124:9
**ones** 52:25 127:17
**open** 70:12 71:17
**open-ended** 101:7
**opening** 69:10
**operate** 45:24 56:8
**operates** 43:12 45:19
**operating** 15:5,5 32:8
**operation** 7:20 8:1,13,18
9:23 11:12 13:21 14:7
17:6 36:7 73:9
**operational** 8:10 27:1
**operationally** 28:11
**operations** 43:12 45:19
**opining** 64:5
**opinion** 29:21 33:18 35:5
52:7 99:10 126:22
**opinions** 29:4 118:23
**opioid** 20:16
**opportunity** 50:18 52:13
62:5 118:16
**opposed** 16:9 18:7 24:24
30:17 31:13
**opposite** 86:25 107:17
**option** 90:2
**order** 6:24 10:2 20:14
30:11 41:12 54:8
55:16 65:15 89:10
99:8 107:16 128:17
**ordered** 123:21
**ordinance** 63:20 93:12
94:7
**ordinary** 83:9,10 90:4,13
123:4 127:20 128:4
**organization** 21:6 105:7
**organizations** 6:21 27:17
27:19
**organizer** 22:18
**oriented** 27:25
**original** 23:22 27:25 87:7
123:1
**originally** 123:15
**outbreak** 126:12
**outcome** 20:17 32:12
92:9 122:3,8
**outcomes** 89:21 90:5,16
**outlaw** 105:15
**outliers** 20:23
**outrageous** 31:19
**outreach** 19:4 47:19
**outside** 30:4 80:13 81:10
105:13,17
**outstanding** 71:16,17
121:22 125:15
**overall** 72:19,21,21
107:2 113:24
**overdose** 20:17
**overinclusive** 104:22
**overlaps** 128:7
**overt** 18:2 20:4,6
**overtly** 47:8 54:24
**overwhelmingly** 17:22

**P**

**P** 129:4
**P.A** 2:11

**99:**7 100:10 101:18
102:5,9 106:4,13
108:3 109:11 110:18
112:7 114:6 115:20
117:23 118:3,11
119:10,16 120:3
**p.m** 1:15,15 50:7,8 98:18
98:19 129:2
**P.O** 1:23
**page** 3:2,5 4:2 63:24
65:24 83:20,22 98:24
99:7 100:3 101:18
103:10 106:4 112:7,8
115:8,12 118:21
132:10 133:2
**pages** 29:22 94:24 97:2
102:3 108:19 119:10
**paid** 64:19 66:3 115:25
123:23
**pamphlet** 94:19 125:6
**pamphlets** 48:9
**Paneson** 117:6
**paragraph** 100:3 101:19
103:11 106:9,9 112:8
113:25
**paraphrasing** 117:18
118:9
**Park** 2:12
**parole** 48:22 56:5,9,22
123:9,10
**part** 9:8 16:20 17:11
20:12 22:14 23:2,16
24:7,14 26:15 37:10
37:20 38:5,7 40:14
46:17,24 58:23 59:1,4
59:15 63:23 71:4
72:20 74:20 76:3
85:14 97:10 106:14
107:4 109:18 112:12
113:4 120:1
**partially** 63:15
**participate** 23:25 123:14
**participating** 9:1
**particular** 7:18 9:3,10
17:5 29:5,24,25,25
30:6,9,18,18 31:7,14
33:14,15,19,19 34:18
38:6 39:2 44:3,4 45:2
52:7,7,8 56:13 58:25
59:11 63:23 75:5 86:3
89:7,11 90:22 97:15
104:13 115:3 116:21
119:4 121:25 122:1
**particularly** 10:8 11:17
16:16 18:16,22 91:11
97:21
**parties** 62:11 129:6
131:12
**parties'** 131:13
**partly** 75:17
**partner** 69:25
**partners** 23:1
**partnership** 11:21 23:2
**partnerships** 23:16
**parts** 98:10 113:12
**party** 62:10
**Pasco** 1:8 29:6,17 32:12
39:23,25 41:8 42:9
43:15 46:22 72:6,25
73:19 83:12 85:12
91:7 94:25 103:8
111:24 120:24 122:4
126:22 130:3 131:4
132:6
**pathetic** 47:17
**patient** 32:10
**patrols** 108:11
**pattern** 30:2,8 31:17
40:25 47:15 48:11
52:4 61:20,21 65:13
92:17 116:7
**patterns** 92:2
**pawning** 109:8

**pay** 116:6 117:2
**paying** 58:8,16 59:7
103:12 116:12
**PDF** 99:25
**pedestrian** 107:24
**penalty** 116:9
**people** 15:4 16:12,15,21
18:3 19:1,1,7 20:10
21:16 22:6 24:20
25:24 26:14,25 28:13
38:10,11 39:3,12,21
40:6,13 46:9 47:19
48:13,23 52:22 56:15
56:19 57:16 58:4
59:10 60:24 66:10,10
71:7,10,14,16 72:6
75:8,15,20,23,25
76:17,22 77:16 82:23
91:10,10,12,25 93:4
95:14 104:12,23,25
105:4,9 108:21 109:1
109:7,14,18,21 111:18
113:7,22 114:17,17,18
114:18 116:11,16
117:20 121:16 122:1,6
122:13,20 124:5,9,11
124:18,19,24,25 125:2
125:7,10,13,24 126:3
126:13 127:13 128:5,5
128:10,12
**people's** 39:17 110:13
116:17,20
**perceived** 90:14
**percent** 126:5
**percentage** 102:10 114:8
114:24
**performance** 45:21
112:12
**performed** 113:4
**period** 44:11 73:8 76:7
100:16
**permanently** 116:19
**permissible** 28:10
**permission** 81:4,6,18,22
81:22
**perpetrator** 40:25
**person** 14:15,16 18:12
40:17 51:3 53:4 54:25
56:23 58:15 59:20
86:6 100:21 109:23
110:5,20 114:15
119:13 126:18
**person-based** 24:16
**person-focused** 24:11,20
24:23 25:5
**person-specific** 58:5 59:5
**personal** 55:6
**personnel** 76:20 93:10
**persons** 38:4,20 41:9
58:6 59:6 119:16
**phenomena** 88:23
**Philosophy** 7:8
**phonetic** 70:23
**photographs** 104:19
**phrase** 17:6,16 22:22
24:10 26:17 34:8,11
34:14 76:4 119:3,5
**phraseology** 34:16
**physical** 86:9,10 108:11
123:23
**physically** 99:23
**pick** 55:13
**picked** 61:12
**picture** 20:12 111:15
**piece** 24:17
**Piehl** 8:6 70:23
**place** 1:17 11:11 37:12

41:15 50:12 77:6
106:24 118:25 123:24
125:17
**place-based** 24:15,16
**places** 21:19,20 24:19
27:15 33:10 39:5 40:6
70:6 71:12 105:6
106:25 108:21 111:16
123:16 127:15
**plain** 55:5
**plaintiff** 33:15,20 52:2,8
53:6
**plaintiffs** 1:5 2:5,9 31:8
46:22 47:4 50:13 51:1
51:14,23 52:22 78:16
78:16,21 86:4 90:18
99:16 132:3
**plans** 57:1
**play** 59:18 95:18 101:10
106:17 128:13
**played** 54:16 55:22 67:11
67:16,22 68:3,14
69:14 86:5 94:13,16
95:11,19,23 96:11,17
97:5
**plays** 50:1
**please** 10:6 31:2 74:18
**plethora** 75:23
**point** 16:5 34:6,25 35:12
35:18 36:17,20 49:23
50:16 60:23 79:25
86:3 89:9,16 101:13
115:5 121:7
**pointed** 63:22
**points** 86:25
**police** 11:21 21:11,18
23:18,24 27:21 32:22
45:24 55:1 58:24
72:17 73:9,10,21 74:2
83:6 90:4,13,14 91:12
91:16,18 127:6,9
**policies** 31:15 32:2 92:24
109:4 118:24
**policing** 9:5 19:2 26:18
26:20,21 27:13,16,23
27:25 29:7 31:20 33:3
33:7 40:1,2,3 70:1,10
70:23 74:3,4,8,9 75:14
90:11 92:10 93:9
111:11,13,21 113:19
119:1
**policy** 43:15,21
**polite** 63:8,9,11
**political** 32:7 111:23
**pool** 35:3,24 41:24
**poor** 107:5
**poorly** 74:19
**population** 15:14 56:7
88:23 102:10 106:17
106:23 107:3
**populations** 18:18 21:18
**porch** 57:24
**portfolio** 72:21 127:18
**position** 7:9 52:1
**positives** 40:9
**possibility** 10:10
**possible** 13:14 25:24
26:25
**post** 21:24,24
**potential** 17:10 26:14
48:16 85:10
**potentially** 13:14 123:3
**Poulton** 2:10,11 3:3 5:7,8
10:17 11:4,9 19:21
26:7,11 30:25 34:5,10
34:13 38:25 42:13,16
44:21 49:19,22 50:6,9

54:3,15,17 55:15,23
59:3 60:9 63:4 67:6,12
67:17,23 68:4,10,15
69:7,15 79:24 80:2,6
81:25 86:18 94:1,14
94:17 95:12,20,24
96:12,18 97:6 98:13
98:20 99:3 108:15
110:17 111:1 112:6
118:10 120:5,12,15
126:25 127:2 128:17
128:19,24
**Poulton@debevoisepo...**
2:13
**power** 15:25
**PowerPoint** 99:25
**practical** 102:24 112:2
123:4
**practice** 15:17 27:15
28:22,22 30:2,5 31:18
38:13 48:11 65:6
102:1 105:22 106:3
111:21,22 116:25
127:21
**practices** 32:17,22 33:5
51:24 118:24
**practicing** 40:2
**precise** 20:22
**precision** 111:21
**precursor** 98:25
**predicated** 18:22
**predict** 75:8 87:13,14,19
89:20 100:18
**predictable** 69:22
**predicted** 27:3
**predicting** 86:22
**predictive** 40:1,2
**preferred** 12:2
**pregnancies** 57:2
**pregnancy** 61:23
**premise** 39:10
**premises** 60:22
**prepare** 7:2 99:18
**presence** 51:4 52:1 58:7
108:11 109:2
**present** 18:19 71:2 114:2
114:7,8 124:11 126:4
129:6
**press** 119:12,20,21
**pressed** 114:18
**pressure** 42:23 50:23
61:1 66:10 84:3,7
92:19 117:5
**pressures** 107:15
**pretext** 50:15,16 62:6
82:4
**pretexts** 62:6
**pretextual** 66:9 79:17
80:11 81:2,17
**pretty** 8:21,22 9:24
10:19 13:17 14:11,22
17:25 22:13 38:14
43:5,19 46:12 48:2
63:17 71:2 76:14 90:3
90:6 101:7 110:11,15
128:4,11
**prevent** 71:4 121:19
**prevention** 15:10 24:12
24:13 33:6 110:3
124:24 127:15,19
**previous** 6:13 115:14
**primarily** 19:14 23:5
24:23
**primary** 23:17,21
**principle** 18:11 22:18,18
26:9 58:5,14 90:21
**principles** 5:20 18:14,15

19:14 21:2 58:2
**prior** 22:21 96:22 122:1
122:7
**prison** 20:9 90:25 91:4
92:6 113:22
**prisons** 18:10 20:20
**private** 30:10
**privileged** 77:24
**probable** 52:2,8,17 68:21
109:24 110:6,21
**probably** 20:13,18 47:11
50:21 51:17 52:24
70:23 99:24 100:1
**probation** 48:22 51:11
53:1,6 56:5,9,22 60:1
60:14 61:9 69:3 84:2,7
84:7 123:9,9
**problem** 8:9,25 9:10,16
13:12 19:25 21:20
24:19 37:12 73:4
75:11 76:1 81:11 96:9
103:16,19,22,24
107:18 109:19
**problematic** 45:9 57:19
77:8 109:7
**problems** 7:18 19:15
28:20 71:22 72:9,12
72:15 75:13,19 103:5
106:6 127:16
**procedural** 124:4 127:11
**procedures** 92:24
**PROCEEDINGS** 1:12
**process** 8:20 41:22,25
42:3 46:24 105:4
121:12
**processes** 21:23
**produce** 8:4 15:9,10 19:5
40:6
**produced** 8:17
**producing** 40:1
**profession** 111:15,17,19
**professional** 5:17 28:18
30:4 99:4
**professionals** 28:23
**professor** 7:10 19:22
33:24 49:22 50:10
80:8 98:21
**program** 30:15,18 31:9
31:14 34:19 48:15
74:3 78:22 126:23
**programs** 36:4 70:7
**project** 8:5,12,16,17 9:22
36:25 37:21 102:1,8
**projects** 17:17 73:13
**prolific** 35:3,9,24 36:1
41:23 42:18 43:3,16
44:17 75:10 77:1 78:2
85:10,15 86:6 87:14
87:19 99:13 100:6,15
100:23 101:11 107:22
108:2 112:13,18 113:8
113:9,11,14 115:3
**promise** 125:19
**promises** 16:22
**promoted** 36:1
**promotion** 113:5
**property** 20:21 21:2 22:5
22:7 24:5,6,7,24 25:6
43:9,10 64:25 72:10
72:16,23 74:14 92:14
113:17 126:24
**prosecution** 16:9,9 31:20
**prosecutor's** 70:5
**prosecutors** 10:9 16:2,6
33:3
**prospect** 59:11 65:8
**protect** 19:10

**protocol** 78:3 84:24
100:16 101:7 107:14
110:1 111:5
**protocols** 89:10 92:24
104:13 105:16 113:21
**proved** 102:1
**provide** 77:22 81:14 96:2
117:5
**provided** 46:19,20,23
52:23
**providing** 48:8 95:8
**provision** 97:19
**pry** 116:22
**PSO** 100:4 119:13
**PSO's** 112:15 118:24
**public** 1:19 9:16 19:5
21:10 25:19 55:4
57:22 58:11 83:9,10
98:2 103:5 127:10
130:12
**pulling** 25:9 26:2,3,8,15
120:22 122:15
**punishing** 122:11
**punishment** 122:11
**pure** 28:11
**purely** 39:16 88:22
121:14
**purports** 89:22
**purpose** 50:18 55:7 58:9
58:25 70:24
**purposes** 83:11 102:25
**purview** 57:14
**pushed** 93:5
**put** 11:11 12:8 19:18
25:24 44:2 48:13
50:22 59:10 61:1
66:10,10 84:7,15
92:19 121:5,17 122:7
**puts** 72:20
**putting** 14:23

**Q**

**qualifications** 76:13
**qualified** 28:14,25 29:4
29:10 126:22
**quality** 45:21
**quantify** 102:2
**question** 5:24,25 10:21
11:10 13:22 14:20
18:16 25:3 31:2,9 32:7
32:19 34:7,24 35:10
35:21 41:7 42:8,14
43:1 44:22 51:13
53:16 56:1 58:13,22
69:16 71:24 72:9
73:23 74:10,19 75:6
78:25 82:2 85:12 87:7
87:18 108:16 110:4
127:11
**questioning** 63:13
**questions** 27:4 40:17,19
40:24 41:6,17,19 55:6
57:1,12,19,21 58:24
63:7 120:6,7,20
124:16 127:9,20
**quick** 98:9 120:10,20
**quickly** 98:16
**quite** 23:9,15 85:16
122:23
**quote** 76:25 77:17 78:11
88:3 101:19 114:1
**quoting** 88:6

**R**

**ramp** 70:15
**random** 13:20 57:21

58:10 108:4 109:1
**randomized** 12:24 13:23
**randomness** 49:8
**range** 12:20 15:21 38:15
40:16 73:24 89:7
**ranking** 33:5
**ranks** 45:14
**rapists** 83:7
**rare** 105:13
**rate** 12:25
**rates** 14:9 106:24
**ratings** 116:17
**RCTs** 13:4,4,18,18 14:9
**reach** 8:19 9:7 10:8
**reached** 9:8 10:12
**read** 31:4,6 62:11,24
80:23 85:6 88:1,2,3,20
119:19,21 128:20,23
132:11
**reading** 29:23 84:9 113:7
129:7
**real** 66:19 87:1 97:23
105:8,16
**realization** 18:23 112:2
**really** 10:15 14:15 69:16
69:16 70:11,14,20
74:5 84:9 92:21 98:1
103:3 107:17 109:10
123:19 126:17 128:12
**realm** 33:11
**reason** 33:8 53:18,21
56:12 60:21 73:6
79:10 90:6 95:6,10
111:11,12,14,18,20
117:4
**reasonable** 62:13 101:22
110:15
**reasonably** 98:15
**reasonably-sized** 106:18
**reasons** 18:19
**recall** 29:23 45:4 63:20
64:4 66:1 81:2,11
88:15 115:10 118:4
**recidivists** 102:25
**recipe** 108:19
**recognition** 21:22 112:14
**recognize** 82:19
**recognized** 86:15,19,21
**recognizes** 111:17
**recognizing** 18:15
**recollection** 64:17 95:2
**reconciliation** 21:12,14
21:23
**record** 28:19 35:4,11,15
50:6 51:18 52:23 69:6
79:20 82:1 83:15
92:22 93:6 100:13
108:9 113:12 114:2,7
114:8 117:22 118:1
120:23 121:15 131:9
**records** 39:6,17 77:15
100:7
**recovered** 11:20
**recruiting** 105:11
**reduce** 10:3 36:11
**reduction** 8:4 126:5
**reengaging** 59:8
**refer** 113:3
**reference** 47:25 95:5
121:14
**referred** 8:12 88:9
**referring** 83:24 93:11,14
96:21
**refined** 111:15
**reflected** 127:25
**regard** 13:21 35:22 38:3
**regarding** 46:2

registered 125:16
regular 113:5 128:19
rehabilitated 28:4
rehearsed 123:13
reinforced 46:7
reinvention 14:11
related 27:4 79:15
relations 21:11 127:6
relationship 9:9
relative 131:11,13
relatively 24:25 47:6
72:10 73:16,17,25
101:20 107:9
relaxed 118:17
relentless 117:13
relevant 34:21 85:25
reliable 15:9,10
remains 116:7
remember 5:23 51:12
60:1 64:1,11,18 79:5
103:21 118:8
remotely 55:2 75:16
render 29:4
rendering 52:6
Reno 16:6,6
rent 113:1
reoffending 59:8
repeat 25:1,14 70:4,10
70:18,19,24 71:9,24
71:24,25 72:22 101:21
127:23,25 128:1
repeated 30:8 42:21
48:11 64:25 89:2,23
90:8 92:18 114:16
repeatedly 65:14
rephrase 10:21 11:10
31:3 34:7 44:22 74:17
report 4:8 7:14 29:24
31:4 45:1 52:15,16
54:5 63:18,23 64:5
65:25 76:5 83:17,20
88:24 98:10,22,24
99:5,11 119:10,17
131:7
REPORTED 1:18
reporter 1:18 3:5 5:21
6:4 26:6 34:10,12 45:6
55:15 98:23 131:1,6
131:19
REPORTING 1:22
reports 46:4,4 99:14
represent 5:9 68:19
91:13 92:1,25 118:7
118:11 124:22
repulsed 119:13
require 22:25
required 13:13
requires 21:21
research 8:15 16:14 25:5
30:5 38:13 74:13 87:2
102:6 126:3
researcher 7:22
residence 58:23 67:25
81:19 99:17
residential 73:5 74:14,21
75:18
residents 93:3
residue 80:12 82:15
resistant 15:7
resource 76:24 77:3,7,12
77:15,23 78:1,17 96:3
resources 37:2 48:9
respect 13:5 14:21 28:11
37:3,9 56:16 58:12,17
63:15 65:4 66:22
107:2 124:3,19,19
127:7,8

respected 12:17 91:14
respectful 63:9
respective 129:6
respects 100:17
responding 62:10
response 12:13 14:24
15:17 75:13 95:16
responses 12:9 15:9,11
80:19
rest 75:6 88:21 100:25
101:2,5
restraining 30:11
result 12:9 36:2 51:9
64:25
resulting 65:21
results 88:10
resumed 50:8 98:19
retroactively 90:23
review 29:10 30:3 31:16
45:21,22 99:19 114:21
reviewed 53:22 99:12
114:25
revisited 13:16
revived 101:14
rhetoric 33:25
right 5:13 6:3,9 7:14
10:1 17:7 19:18 20:24
23:5 26:10 29:2,15,23
34:14 38:11,16 39:10
45:13 48:5,6 49:14
50:16 51:14 53:4 54:4
54:15,18 55:12,24
56:21 57:23 58:25
60:2,8 62:7,22 64:15
65:12 66:18,24 67:7
68:1,5,16 70:22 72:4
80:10 84:13 85:1,12
87:22 90:25 91:2 92:4
94:3,4 95:25 96:7,13
96:25 97:2 98:13
100:2 105:3 106:8,21
107:20 114:11 117:3
118:21 119:3 120:5,9
120:12,15 128:18
rights 37:17
rise 106:24
risk 12:4 15:11 18:25
25:12,16,23 38:10,21
39:3 47:20 87:9 88:8
88:12,19,22 123:6
risks 82:23 88:14
ritual 104:10
Rjohnson@ij.org 2:4
road 2:7 105:17
Rob 128:21
robbery 36:22
Robert 1:4 2:2,10 53:3
70:23 80:1,23 84:20
132:2
role 19:2 86:5 101:9
106:17
room 49:21 53:14,23
82:15 125:21
root 21:16
roster 99:18 107:23
roughly 94:8 106:10
routine 15:25 24:7 65:6
routinely 22:13 93:10
113:3
rules 92:1 105:10,11
run 113:19
running 85:21
rural 72:10,18 107:11

──────────────
S
──────────────
S 2:11 4:1 129:4

safe 7:12 12:22 19:1,1
21:5,25 22:11 125:7
125:12
safer 19:9
safety 9:16 18:9 19:5
21:10 25:19 103:5
sanction 16:16,17 25:23
sanctions 15:22 109:21
satellite 22:23
saw 42:25 46:5 47:5,7,16
47:21,23 60:24 62:4
93:3 97:1
saying 15:18 29:20 32:6
58:19 67:15 96:2
105:16
says 94:25 95:13 96:13
96:19 102:20 110:14
111:20 126:3
scenarios 60:10
schedule 48:18
scholarship 126:20
school 8:6 9:4 76:24 77:3
77:7,11,15,15,23 78:1
78:8,10,17 79:2,15,18
80:17,18,22 85:25
school's 79:4
schools 77:7,14
science 88:21
scintilla 84:11
scoop 104:22
scoops 122:5
scores 20:7
scoring 37:1,12,19 38:11
38:15,18,24 39:7,9,17
85:6
scrape 78:8
screen 49:12 54:7,13
68:24 69:2,23
scripted 123:13 126:16
se 102:15,16
seal 130:7
search 77:24 78:2 82:4
82:16
searched 80:3
searches 77:16
searching 82:7
seated 12:4
second 12:7 63:17 80:4,6
94:3 100:3 103:10
106:9
seconds 67:8 68:5,13,16
69:13 96:1
section 99:11
secure 125:12,17
securely 125:11
security 18:9,9 20:14
123:23,24
see 43:8 44:23 47:2
49:11 50:1 55:5 62:6
63:23 67:19 69:1
75:21 88:4 90:21
92:22 93:8 95:13
100:8 101:23 102:3
106:11 112:15,19
114:4 115:22 119:1,14
120:23
seeing 75:12,16 122:4
seek 101:22
seeking 19:7
seen 29:13 43:11,14,21
47:25 49:12 52:23
54:12 55:2,10,24
61:18 65:16 67:9 68:6
68:12,17 69:20 96:19
selected 124:18
self-admitted 104:17
self-evident 46:11

self-help 91:19
selling 121:21
Semoran 2:11
send 55:15 98:23
sending 113:22
senior 9:9
sense 28:12 46:12 102:17
103:25 107:16 114:12
117:17 118:18
sentence 101:25 118:23
sentencing 10:11
separate 128:3
September 68:22,22
series 10:2 76:19
serious 17:24 21:17,20
22:7 25:13,17 33:1,1
70:9 71:2,15,19 72:20
72:22 82:17 87:10
88:13 101:20 102:13
124:20 126:5,10,11
serve 12:20
serves 58:25
service 99:15
services 12:20 14:3,7,12
47:17 48:22 85:18
127:8
Session 9:5
set 1:19 13:15 61:4
setting 22:14 72:18
106:22
settings 18:23 21:23
107:12
settled 9:5
seven 92:14 106:11
severe 16:25 19:16
sexual 86:11
Shaker 2:3
shakes 6:4
share 49:12 54:7,13
69:23 119:23,25
shared 119:22
sharing 99:20
Sheet 3:6 133:1
sheriff 1:8 5:9 23:24
32:12 72:7 73:1 79:17
83:11 87:1 89:22
116:8 132:6
sheriff's 22:12,13,15,17
22:19,22 23:1,4,7,13
23:15 24:1 29:6,17
39:25 41:8 42:9 43:15
45:15 46:2 51:23
57:15,20 60:22 69:21
73:19 76:9 77:6 78:8
83:12 85:13 87:3 91:7
99:16,17 100:25 101:3
105:24 108:4 109:3,19
116:2 120:24 122:11
122:13 126:23
sheriffs 23:21 55:3 92:23
shift 19:3
shifted 70:19
shifting 75:20
shock 118:24 119:3
shooting 40:21
Short 120:17
shot 125:10
show 55:3 56:23 81:21
93:17 119:23 126:4,6
shown 59:19
shows 107:12
shut 37:16
shutting 37:21
sight 55:5
signalled 97:14
signals 123:19
Signature 3:5 132:10

significance 27:2
significant 126:20
signing 129:7
simple 28:11 42:14 97:19
110:4 121:3
simply 14:9 29:20 39:16
59:13 108:5 110:6,21
single 46:25 89:14
110:19 111:3
sir 127:3 128:17
sit 48:18 52:6
situation 44:15 52:3 66:7
91:14
size 73:21
skip 55:11 98:25
slamming 68:25 69:5
slides 99:25
slightly 64:3
small 15:3 24:25 38:9
56:6 71:1 72:20 73:25
75:20 101:21 102:9
107:1,12 121:12,25
126:13 127:12
smoked 51:10 53:14
59:24
smoking 45:3 51:6 60:24
snapshot 75:9,25 76:4,7
76:11
snapshots 100:7
so-called 100:20 101:6
social 12:16,20 14:3,4,4
14:7,12 19:4 126:2,6
solely 25:6
somebody 15:19,21
25:16 44:16 45:3
47:18 50:20 51:6
52:16 57:23 58:19
59:14 75:10 100:14
121:25 123:7,8 125:6
125:23 126:10
somebody's 56:10 57:1
97:21 100:13,19
122:17
son 51:11 53:22 65:3
81:14 84:3 86:3 97:23
116:23 117:6,8,9,20
122:17
son's 53:14 81:7 82:15
84:4
sons 90:18
soon 75:24
sorry 25:2 26:7 32:14
53:16,19 54:13 59:21
60:17 63:1 64:3,6
70:18 103:18 127:3
sort 7:1 18:10 36:25 39:1
40:11 46:1 49:7 65:4
85:22 88:22 105:3
108:5 112:3 121:16
125:18 128:4
sorts 10:7,13 12:1 14:12
15:6 24:8 75:11
111:10
sound 48:5
sounds 48:6 87:22
span 36:21
spatial 127:13
speak 22:15 82:1 83:9
90:25 109:3 123:11
124:24
speaking 93:20
special 101:23 125:20
specific 11:11 44:5 58:21
specifically 20:25
specificity 45:20
spectrum 18:1
speculating 111:8

speeds 102:24
spend 59:13
spent 31:20 33:9 55:1
spike 8:23 9:14,15
spoke 56:4 93:13 101:12
spoken 101:4
spot 106:13,18 109:17
spots 106:4 107:6
spotted 45:3
spurious 112:15
squad 35:14,16 70:25
71:9,25
squads 70:4,18,20
square 106:11
Sr 80:24
SRO 77:14 78:17,22
84:18
SROs 77:23
stable 19:11
staff 9:9 45:15
stages 105:12
standard 39:11 116:25
standards 35:6 78:5
standing 57:23
standpoint 31:13
STAR 106:10 107:16,21
108:5,6 109:2,25
110:7,20,22
start 5:24 53:19 68:12
98:24
started 5:10 70:14,20
state 1:19 6:15 16:9
85:17 91:5 99:9,11
100:3 101:19 102:18
104:12 105:25 113:25
130:2,12 131:3
stated 76:12
statement 79:7 95:7
108:9,18
statement's 39:7
states 1:1 6:20 8:7 21:8,9
27:7 31:22 34:2 43:15
73:22
status 36:1 84:7
statute 105:25
statutory 105:19,22
stay 124:16
staying 57:11,18 58:19
61:24
Ste 2:3,7,11
steadily 93:22
stemming 51:21
stenographically 131:7
step 72:8
steps 10:2 11:14,19 12:3
42:24
stipulated 129:5
Stipulation 3:4
stir 61:14
stole 91:20
stood 97:15
stop 41:22 62:13 67:13
69:23 76:3 94:18 98:4
122:10 125:3 126:18
stopped 28:3 68:5,16
stops 107:24,24 110:12
strategies 38:2 109:20
strategy 121:18
street 107:23
striking 92:21
strong 90:6 116:13
strongly 51:3
structure 105:7,10
students 78:12
studied 24:22 25:5
studies 13:23 89:9
study 12:24

stuff 75:15 104:20
107:13 121:3 128:14
subject 16:8 78:17 90:14
subjected 78:21 107:19
subjecting 108:4
subjective 38:19
subjectively 40:13
submitted 29:21
SUBSCRIBE 132:12
SUBSCRIPTION
132:13
subsequent 41:3,17
80:16
subset 20:15 56:6
substance 86:11
succeed 12:22 62:15
successful 39:16 40:14
successfully 18:3
sucker 68:1
suckers 92:13
suggest 110:11
suggesting 88:11
summary 118:23
summed 33:22
supervisee 56:7
supervision 45:20 48:24
49:4 123:8 124:10
supplied 76:19 120:1
support 12:21 14:3 19:3
19:10 21:7 30:11
47:19 56:17 125:16
supports 12:20 125:5
supposed 44:6 45:17
85:8 110:15 111:6
sure 11:2 18:2 23:9,15
25:4,4 44:19 47:6
49:19 50:6 52:5 53:17
54:1 59:22 60:12 70:6
73:24 75:4 79:24 94:2
95:17 103:18 105:21
106:16 114:11 115:12
115:16 117:24 122:20
surreal 77:25
surveillance 77:12 86:23
107:15,23 109:20
110:13
suspect 51:3
suspects 77:13
Swathmore 7:6
sworn 5:2 130:6
system 15:8,8 37:1,12,15
37:15 38:11,15,18,24
39:7,9,17 77:24 91:16
113:3 121:10
systems 15:10 37:19

T

T 4:1 129:4,4
tabs 71:9
tactics 111:10
take 6:4 27:7 31:15 49:11
49:17,23,25 50:3
66:11,24 80:14 84:6
86:13 88:16 91:16,18
91:23 93:23 97:24
98:8,9,13 100:14
102:18 108:17 112:2
122:22
taken 5:11 6:12,14 10:2
36:2 41:13 50:7 74:5
98:18 127:10
takes 121:15
takeup 14:9
talk 7:17 17:15 36:4
48:19 58:3 60:13
72:25 77:3 84:25 87:5
113:21 120:10 123:2

talked 9:2 58:15 121:13
talking 38:2 42:6 48:3
52:10 53:25 56:24
59:16 61:25 62:20
65:9,23 75:7 79:22
82:24 85:21 93:16
94:20 102:12,22 115:2
talks 111:13
Tammy 1:3 45:1,18,25
51:8 53:7 59:22 62:1
63:18 64:7 65:11,19
66:17 67:2,15 68:11
68:19 93:17 94:5
132:1
TAMPA 1:2
tandem 38:19
tape 93:4
targeting 74:14
tattoos 104:18
taught 7:2 91:17
tax 121:5
Taylor 1:3 4:3,4 35:1,2,7
35:12,18 51:16,21
53:3,18 54:10 55:18
60:6,14 62:18 67:1,1
132:1
Taylor's 53:11
teaches 93:10
team's 108:7
teams 71:14 72:22
techniques 32:2,4,6
tell 5:2 10:21 15:15 23:3
23:7 28:1 42:17 43:2,7
43:9 44:14 45:16
54:11 74:17 76:12
77:2 98:8 117:12,12
117:12,21
telling 92:13 117:20
tells 10:24 43:21 80:18
102:17 109:4
ten 106:11 120:13,13,14
120:15,16
ten-minute 50:3
tend 25:13 121:21
tendency 25:19 75:19
116:13
tends 123:7 127:24
tenor 60:4,5
Tenth 5:18
term 24:13 26:24 28:3
105:2 120:22
terms 17:10 20:14 21:16
28:21,22 34:2 56:16
57:7,13 60:4 128:5
tested 81:13
testified 5:4 117:24
testify 29:17 33:13 92:5
92:8,10
testimony 81:24 88:5
131:9
tests 56:18
text 83:23
Thank 6:8 60:17 94:2
100:2 128:18
thanked 96:23
thanks 96:22 97:7 128:17
theater 32:9
thefts 75:18
themes 124:17
theoretical 87:1
theories 33:5
theory 102:9,14
thereof 82:2
thing 5:23 6:3 7:3 8:14
15:1 18:10 21:24 62:6
70:13,17 71:14 72:6
72:24 73:17,17 75:24

76:17,18 81:15 84:22
85:8,22 89:14 91:9
96:19 97:18 98:6
102:18,19 104:7,11
105:12 110:11 121:18
125:18
things 7:15 10:7,13
15:18 16:18 24:6
25:21,25 38:6 44:3,4,5
44:8 56:13 58:9 64:14
61:16 72:19 75:6,17
77:11 89:12,14 92:21
93:1 103:1 104:17
105:17 109:9 114:3,17
122:19 124:15
think 19:17 20:9,13,22
21:21 22:16 27:8 28:1
31:16 34:24 39:6,14
40:17 41:3,11 42:12
47:14 48:3,4,13 49:15
50:20,24 52:18,18,24
53:2 54:22,23 57:15
57:19,20,24 58:12
59:9 62:13,16,23
64:21 65:9,12,12
68:25 69:4,8 70:14,16
70:22 72:8 73:7,15,18
82:14 84:9,16 85:16
90:6 91:3 92:25 95:2
98:1 99:18,18,25
101:12 105:9 107:21
108:18 114:10,20
115:4,25 128:3,4,15
thinking 28:3 39:4
THOMAS 2:10
thought 8:13 16:25 47:2
47:6 61:18 77:5 80:7
80:12,21 87:12 89:18
95:1 111:16
threaten 83:12
threatened 114:20
threatening 84:14,17
125:8
threats 33:1
three 10:12 75:23 76:10
78:5 100:22 104:14,16
124:17
three-year 100:16
threshold 28:8 35:2,8,23
thrust 113:24
time 1:15 11:18 15:18
22:20 33:9 37:24
44:11 46:24 47:23
49:5,15 54:16,20
55:22 67:11,16,22
68:3,14 69:14 73:8
75:10 76:4,7,8 80:5,6
93:21 94:13,16 95:11
95:19,23 96:11,17
97:5 103:20 105:6
108:17 118:13 120:16
121:18 124:8 127:16
128:19,19
timeframe 9:21
tips 108:12
title 85:19
Tobacco 121:22
today 52:6
told 16:2 44:3 79:3,11
80:12,20 81:11 123:25
124:8,14
tolerance 44:6 111:19
Tom 5:8 128:16
ton 84:10
tools 121:7
top 22:8 32:1 44:17
64:16 112:8

totality 30:3 31:19
toxic 18:1
trace 89:10
traces 11:23
tracing 11:20
track 93:1
tracks 11:13
tradition 127:23
traditional 121:3
trafficking 11:14,15
71:20
trailer 115:18,19
train 6:16,24 25:2 77:5
training 6:19 29:13
45:20
trajectories 128:13
transcript 131:8 132:11
transitioning 87:6
translation 99:25
trapped 62:23
trauma 88:7 89:16
traumatic 48:2 89:8 90:7
traumatized 87:16
traunche 12:7
treat 83:10
treated 46:11 122:9,10
treatment 13:8,8 47:25
108:5
tremendous 15:24 39:18
47:11
trial 33:13
tried 81:13
trigger 15:16
triggered 48:1
trouble 57:11,18 58:19
61:15,24 81:9 89:16
97:22 116:11 124:2
126:10,11
troublesome 109:10,12
109:13
true 15:2,13 16:15,18
22:16 28:8 32:23 39:6
39:7 71:21 81:4 89:19
101:19 102:13 103:6,6
105:9 114:11,22
127:25 131:8
trust 91:18,25,25
trusted 91:13
truth 5:2,3,3
truthfulness 82:2
try 5:23,24 10:3 27:15
49:12,13,16 54:7 71:4
96:3 98:14 99:8
108:12
trying 5:21 9:11,18
18:12,19 29:19,19
39:19 56:13,14 71:6
81:8 91:22 92:4 93:7
96:14 103:16
Tuesday 49:6
turn 61:18 116:15
turned 15:1,13,24 61:6
111:19 124:22
turns 91:21,24 97:20
123:5
twenty 96:1
twenty-year 36:21
two 11:13 40:8 60:5
61:22,22 62:5,18,20
75:22 76:10 78:5
100:22 108:19 122:23
Tyler 117:6
type 12:24 40:8,8
types 122:22 128:8
typical 104:14
typically 75:21 104:22
123:15,16 124:5,20

**U**

U 129:4
U.S 17:21 21:19
uh-huh 6:5 103:14
  114:14
uh-uh 6:5
ultimately 9:5
umbrella 8:15
unacceptable 66:7
unalloyed 92:23
unbelievable 113:24
unclear 54:2
uncommon 56:7
unconstitutional 29:16
  30:1,12,13,19 31:14
  31:24 33:16,20 48:8
underlying 58:14
undersigned 130:4
understand 7:16 10:20
  12:12 16:12 32:6 34:6
  53:8 58:22 59:4
  100:19 108:16
understanding 6:23 10:1
  10:5,6 31:5 51:17 77:5
  79:9 100:24 101:2
understood 6:7 41:21
  92:3
undertaken 8:15 42:1
undertaking 8:16 9:1
  22:17
ungrounded 36:3
unheard 83:9
uniforms 104:10
unique 28:7
uniquely 28:19
unit 55:4 58:24
United 1:8 7 27:6
  31:22 34:2 73:22
units 70:5 71:6,13
unjustifiably 109:24
unjustified 36:3 50:14
  51:1,7 86:2
unknowingly 82:13
unlawful 29:16
unnamed 77:20
unpack 8:8
unpacking 11:14
unpaid 125:15
unquote 77:1,17 78:12
unsolicited 48:12
unsupported 30:5
urban 72:18
use 11:16 12:4 13:10
  14:3 17:16 21:16
  27:25 34:14 37:18
  38:18,19 40:4,11
  42:24 43:7 49:20
  50:15 66:9 69:18,21
  71:9 76:25 77:11,23
  78:10 83:7 84:3,18
  85:9,13 91:15 116:24
  121:7
useful 57:23
uses 100:16
usually 22:8 25:17 71:15
  75:24 89:12 122:22
  126:12
utilization 73:16
utilized 16:17
utilizing 70:16

**V**

v 119:8
VA 2:7
vague 27:14 44:18
validity 77:21

value 97:24
values 10:16
variety 12:3 25:15,21
vehicles 75:19
verbally 6:6
version 13:16 14:7 18:8
  126:8,14
versions 13:18 17:23
  18:5 127:18
versus 14:3 61:25
victim 40:22
victim's 40:23,24
victimization 18:25
  127:2,4,25 128:2,7
video 4:3,4,5,6,7 44:23
  48:3 49:18 53:11
  54:16 55:11,12,17,22
  55:24 59:23 60:1
  66:25 67:8,11,16,22
  68:3,6,13,14,17 69:14
  81:1,21 84:20 93:14
  94:5,13,16,20 95:11
  95:19,23 96:11,17
  97:5 118:5,6 119:24
videos 46:13,18,21 47:2
  49:11 50:10 54:7,18
  60:5 61:22 62:5,18,20
  65:19
videotape 53:21
viewed 97:16
viewing 46:14
violated 59:25
violation 44:16 50:12
  51:11 53:1,6 60:1,15
  61:9 63:19 93:12 94:7
violations 113:16 114:18
  116:19 117:10
violence 8:4,11,23 9:18
  10:3,14 11:12 12:9,13
  12:18 14:10 15:2,10
  15:16 17:22 18:5,17
  20:14 24:3,9,24 33:1
  36:12,23,23 39:5
  40:25 41:4 71:20,21
  72:20 86:10 104:5
  121:9 124:20,23
  126:12
violent 9:14,15 11:24
  12:2 15:20 17:18,19
  17:21 18:4,24 19:15
  20:1,5,10 22:1,2,7
  25:17,23 32:23 36:15
  36:16 38:3,4 40:15,20
  41:1 70:9 71:2 72:1,2
  72:14 87:10 88:13
  91:24 121:21 123:3
  126:5,21 127:17
Virtually 27:11
visit 61:13,16 80:16
  83:24
visiting 47:9
visits 30:9 42:22 48:12
  56:5 64:25 65:1 87:3
  92:18 114:16
voice 12:15
voters 111:24
vs 1:6 132:4
vulnerabilities 12:11

**W**

W 2:10
waive 128:20
waived 129:8
wander 57:6
want 11:2 28:13 49:23
  50:3 66:11 69:6 76:14
  84:6 94:8 98:9 120:8

120:13 124:15 128:20
  128:22
wanted 12:22 50:11
  63:10 65:7 80:15
  120:21,22
wants 25:22 124:25
warned 16:23 49:5
warnings 16:7 49:1
warrant 71:13,17
warrants 125:15
wasn't 13:14 63:14 68:21
  118:12 121:6
watch 27:18 46:13,25
  48:4 53:10 67:9 81:1
watched 46:25 54:19
  55:17 60:5 61:22
  62:18,21
Watching 69:13
way 10:22 11:16 14:14
  14:19 19:5,18 20:19
  31:17 39:14 44:2,25
  45:24 46:10 49:13
  57:2 60:18 61:16
  65:24 69:21 78:19,23
  81:19 82:22 83:10
  90:17,22 91:4 108:24
  109:22 112:2 123:2,4
  125:7 127:9,14 128:1
  128:6,12,13
ways 17:2 108:1 121:9
we'll 7:17 17:15 48:4
  49:15 54:4,8 55:12,15
  65:10 68:12 87:5
  94:15 98:23,25 117:15
  120:15 121:23 128:23
we're 22:14 23:19 24:3
  52:10 53:25 65:22
  67:7 75:7,12,16 95:25
  102:12,22 104:5
  114:12 115:1 122:4,18
  128:9
we've 23:15 37:3 58:14
  59:15 100:25 121:13
  125:6,9
wear 104:6,10
wearing 73:20
website 22:9
weekly 99:20
well-being 12:19
well-developed 122:23
went 60:20 81:10,12
weren't 80:14
whatsoever 61:17 105:6
  122:16
whereabouts 117:6
who've 57:16
wide 25:15,21 73:16 77:1
  89:7
wield 10:10
willing 23:1
windows 74:9
Winnebego 119:8
Winter 2:12
wiser 124:21
witness 5:5 30:22 42:11
  54:1 69:5 86:10 98:24
  118:8 130:7 131:9
wondered 122:21
wondering 119:5
word 69:4,6 86:13 88:16
  117:16
worded 74:19
words 6:6 43:7
work 7:21,24,25 8:3,3
  9:4 14:6 15:12 17:19
  19:24 20:9,16,19
  21:11 22:6,13,15,19

23:20 24:20,25 28:20
  32:25 33:3,3,4,4 36:5
  37:9 38:5,7,23 39:5,18
  40:14,20 42:1 47:20
  57:5,7,23 72:17,21
  74:20 97:19 101:4
  103:23,24 107:11
  116:10,20 118:14,15
  125:6 126:20 128:12
worked 7:1,16,19,21
  17:15 19:24 20:7 21:1
  22:11 23:13,15 31:23
  37:11,14,15 39:20
  40:7 49:9
working 20:10 22:10,23
  23:23 24:3 33:10
  71:23 113:19 124:23
works 19:6 38:15 59:16
  72:6 108:24 127:7
  128:6
world 22:6 119:4,4 128:6
worry 124:1
worse 43:13 60:8 90:7
  93:1,2,2,2,2 114:3,17
  114:21 115:4
worsened 93:22
worst 128:6,7
worth 46:14 61:23
wouldn't 30:14 31:10
  63:14 65:3 71:9 77:18
  98:12 106:18 117:9
  118:19
write 5:22
written 33:18,21 43:14
  43:21 46:4 77:19
  84:22 113:21 117:4
wrong 10:5,18 30:1,16
  30:17 32:9 54:8
wrote 29:20

**X**

X 3:1 4:1

**Y**

yard 50:21,22 67:19
yeah 32:20 39:8 43:5,19
  49:22 52:14 54:1,25
  64:11 65:12 70:16
  71:25 74:18 76:6
  79:21 80:3 83:18 89:5
  93:15 95:22 101:17
  103:22 106:12 112:16
  115:13,20 119:25
  122:23 127:1,4 128:14
year 9:24 94:6,8 115:21
years 55:1 76:11 78:5
  92:15 94:7 100:22
  126:6
yelling 93:18
Yep 96:5,8 112:20
  115:24
York 5:18,19 7:11 36:13
  72:13 107:10
young 47:21 67:19 91:10
  91:10,11
youth 48:22 88:9

**Z**

zero 44:6 111:19
Zoom 1:17 2:1 11:2
  130:5

**0**

**1**

1 4:3 55:18,20 67:1

1-5-2023 130:13
1:00 1:15
1:55 55:12
10 102:3
10019 5:19
1010 2:11
1035 2:11
12 103:10
120 3:3
129 3:4
13 104:15,15,16
130 3:4
131 3:5
132 3:5
133 3:6
16 106:4
16781 2:3
18 68:22 99:13
18,000 27:6 28:6,12
1980's 70:2
1991 26:20
1995 9:22
1996 9:25

**2**

2 4:4 55:19,20 67:2
2-25-18 4:3 67:1
2-25-2018 55:18
2,000 64:13
2,500 64:15 65:25 115:9
  115:22,25
2:09 50:7
2:11 94:15
2:21 50:8
2:35 95:14
2:36 95:14
2:38 94:23
2:43 94:18
20 68:5
2016 99:13 103:8
2018 54:10 62:19,19 66:1
  68:22 115:9,21
2020 94:6
2021 103:8
2022 1:14 130:6,8 131:17
21 1:14 130:6
22,575 88:9
22203 2:7
2426 1:23
25 54:10 62:19
256 2:3
276821 130:12

**3**

3 4:5 66:25 67:3,4
3-3-2016 4:5 67:2
3-31-18 4:4 67:1
3-31-2018 55:10,14,19
3:10 67:14
3:15 67:13
3:28 67:24
3:51 98:18
3:57 98:19
30 112:7,8
31 62:19
32792-5512 2:12
33 67:8
33526-2426 1:23
35 68:12 88:13
352 1:24
39 83:20

**4**

4 4:6 68:8,11
4:26 95:25
4:28 96:13

**4:30** 96:13
**4:59** 1:15 129:2
**407-673-5000** 2:12
**43** 65:24 115:8,12
**44120** 2:3
**48** 69:13
**49** 118:21

**5**

**5** 3:3 4:7 94:2,4,11 99:7
**50** 119:11 126:4
**500** 64:13,14
**51** 119:11
**55** 4:3,4
**567-5484** 1:24
**58** 68:16

**6**

**6** 4:8 98:22 99:1 100:3
**67** 4:5
**68** 4:6

**7**

**703-682-9320** 2:4,8
**70s** 70:14,20
**74** 83:23

**8**

**8-9-20** 4:7
**8:21-cv-00555-SDM-C...**
    1:6 132:4
**80s** 70:14,17,21
**899** 5:18

**9**

**9** 94:6 101:18 102:3
**9-18-18** 4:6
**9-18-2018** 68:12
**900** 2:7
**901** 2:7
**90s** 70:17
**94** 4:7
**99** 4:8
**9th** 68:22 130:7 131:17