UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES, III,

  Plaintiffs,

vs.                      Case No.: 8:21-cv-00555-SDM-CPT

CHRIS NOCCO, in his
official capacity as
Pasco County Sheriff,

  Defendant.
_____/


PROCEEDINGS:         Deposition of
                     30(b)(6) JUSTIN ROSS


DATE:                January 26, 2022


TIME:                2:22 p.m. - 5:44 p.m.


PLACE:               New Port Richey Executive Suites
                     8520 Government Drive, Suite 1
                     New Port Richey, Florida


REPORTED BY:         Judy Anderson, Court Reporter
                     Notary Public
                     State of Florida at Large


ANDERSON COURT REPORTING
P.O. Box 2426
Dade City, FL 33526-2426
Judy@andersoncourtreporting.com
(352) 567-5484

```
 1    APPEARANCES:

 2    ROBERT E. JOHNSON, ESQUIRE
      Institute for Justice
 3    16781 Chagrin Boulevard, Ste. 256
      Shaker Heights, OH 44120
 4    703-682-9320
      Rjohnson@ij.org
 5           Counsel for Plaintiffs

 6    CAROLINE GRACE BROTHERS, ESQ.
      Institute for Justice
 7    901 N. Glebe Road, Ste. 900
      Arlington, VA 22203
 8    703-682-9320
      Cgbrothers@ij.org
 9           Co-counsel for Plaintiffs

10    ARI S. BARGIL, ESQUIRE (Appearing via telephone)
      Institute for Justice
11    2 S. Biscayne Blvd., Ste. 3180
      Miami, FL 33131
12    305-721-1600
      Abargil@ij.org
13           Co-counsel for Plaintiffs

14    THOMAS W. POULTON, ESQUIRE
      Debevoise & Poulton, P.A.
15    1035 S. Semoran Blvd., Ste. 1010
      Winter Park, FL 32792-5512
16    407-673-5000
      Poulton@debevoisepoulton.com
17    Holborn@debevoisepoulton.com
      Cook@debevoisepoulton.com
18           Counsel for Defendant

19

20

21

22

23

24

25
```

1                          I N D E X

2                                                    Page

3    Direct Examination by Mr. Johnson            6
     Stipulation                                122
4    Certificate of Oath                        123
     Certificate of Reporter                    124
5    Deponent's Signature Page                  125
     Errata Sheet                               126

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               E X H I B I T S

2                                         Page

3   2 - ILP Manual 2-2016      (Marked in depo of L. Kraus)

4   3 - ILP Manual 1-2018      (Marked in depo of L. Kraus)

5   15 - CAD Reports           (Marked in depo of L. Kraus)

6   34 - Intelligence-Led Policing Section          27

7   35 - Email                                      27

8   36 - Email                                      29

9   37 - Email                                      30

10  38 - Email                                      32

11  39 - Email                                      33

12  40 - Email                                      35

13  41 - Email                                      38

14  42 - Email                                      51

15  43 - Email                                      57

16  44 - Email                                      75

17  45 - Tip                                        78

18  46 - AIM Slides                                 81

19  47 - AIM Slides                                 86

20  48 - Email                                      92

21  49 - CAD Reports                                96

22  50 - Incident Reports & Support Documents       98

23  51 - Tip                                        99

24  52 - AIM Slides                                113

25

1                    E X H I B I T S

2                                        Page

3

53 - AIM Slides                          116

54 - Email                               121

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       JUSTIN ROSS,

2     being first duly sworn to tell the truth, the whole

3     truth, and nothing but the truth, was examined and

4     testified as follows:

5            THE WITNESS:  I do.

6                  DIRECT EXAMINATION

7 BY MR. JOHNSON:

8     Q.   Good afternoon.

9     A.   Good afternoon.

10     Q.   Could you state your name for the record,

11 please?

12     A.   Sure.  Justin Ross.

13     Q.   And you're currently employed by the Pasco

14 County Sheriff's Office?

15     A.   I am.

16     Q.   And what is your position there?

17     A.   Currently I'm a captain over -- in the office

18 of the chief deputy.

19     Q.   Okay.  So you're a captain?

20     A.   Yes, sir.

21     Q.   How long have you been a captain?

22     A.   Since October 2017.  So four -- four years and

23 a few months.

24     Q.   Okay.  And in your current position, do you

25 have any responsibilities with respect to the

1    intelligence-led policing section?

2        A.    I do not.

3        Q.    Okay.  Did you previously?

4        A.    I did.

5        Q.    And what was your role with respect to the

6    program?

7        A.    So from August 2016 to October 2017 when I got

8    promoted to captain, I was the lieutenant over the

9    intelligence-led policing section, and then Director

10   Kraus took over after I got promoted.

11       Q.    And what was your role at the Pasco County

12   Sheriff's Office prior to August 2016?

13       A.    So do you want -- I started here when I was 15

14   years old.  Do you want me to start there?

15       Q.    Very briefly.

16       A.    So immediately preceding my assignment in the

17   ILP, I got promoted to lieutenant probably four or five

18   months before then.  I was assigned initially as my

19   first promotion as lieutenant to forensic property

20   evidence.

21       Q.    Uh-huh.

22       A.    Prior to that I was a sergeant in our major

23   crimes section, one of the three squads I supervised

24   that which crimes against persons.  Prior to that I was

25   a sergeant in our economic crimes unit overseeing the

1    detectives in their financial crimes, fraud, things like

2    that.  Prior to that I was a sergeant on the road.

3        Q.   Okay.

4        A.   And then I was detective, deputy, civilian in

5    forensics and then a Explorer volunteer.

6        Q.   Okay.  Are you familiar with the term prolific

7    offender?

8        A.   I am.

9        Q.   And what is a prolific offender?

10       A.   So the concept of prolific offender is --

11   generates from the idea that there is a small portion of

12   offenders who are responsible for significant amount of

13   the crime.  So roughly in the research it's 6 percent of

14   offenders are responsible for 60 percent of the crime.

15            You know, I don't know who initially coined the

16   term prolific offender, but through ILP and Jerry

17   Ratcliffe, that's where the term came to be for us.

18       Q.   When did you first become aware of the term?

19       A.   Through my employment here.  I mean, I couldn't

20   give you -- couldn't give you an exact date.

21       Q.   Was it before you were -- became the lieutenant

22   for the ILP section?

23       A.   Yes.  Yeah.

24       Q.   Okay.  In the time that you've been aware of

25   the term, has the way that it's used within the

1     Sheriff's Office changed?

2             MR. POULTON:  Objection to form.  Go ahead.  Go

3         ahead.

4         A.    Okay.  So the use -- I guess so like how do you

5     define use of the term I guess.  So like you have the

6     calculations for what makes up an offender, yes, has

7     evolved; right?  As research in the criminology fields

8     evolve, we have to continue to evolve with that.  But as

9     far as the use of the term to refer to offenders who are

10    responsible for a significant amount our crime

11    environment here, no, I don't think that that's changed.

12    BY MR. JOHNSON:

13        Q.    Okay.  So the term really always has referred

14    to offenders who, because of their history, are

15    responsible for a significant portion of the crime?

16            MR. POULTON:  Objection to form.  Go ahead.

17        A.    So the -- yeah.  So it's people who are active

18    in the criminal environment essentially that are -- that

19    through their actions have shown that they're out there

20    committing a lot of crime.

21    BY MR. JOHNSON:

22        Q.    Sure, sure.

23            Are you familiar with the term prolific

24    offender check?

25        A.    Yes.  Uh-huh.

1    Q.    Okay.  And what is a prolific offender check?

2    A.    So the concept of prolific offender check stems

3    from focused deterrence theory in criminology, and

4    essentially the theory of focused deterrence is the fact

5    that, right, people make rationale decisions.  So in

6    some of those decisions, the fact that the possibility

7    of getting apprehended weighs into whether or not you're

8    going to commit a crime, right?  If there's no

9    possibility -- if you could commit a crime and get away

10   with it, then what's -- you know, what is the -- you

11   know, the dissuasion against doing that?

12        So essentially what focused deterrence says is

13   that there -- that individuals need to believe that if

14   they commit crime that there's going to be a consequence

15   to that action.  So essentially through -- and so the

16   focused deterrence in law enforcement and programs

17   related to the application of focused deterrence theory

18   in law enforcement aren't new stuff.  It dates back to

19   the '90s.  Boston, Massachusetts, had done some stuff

20   with that.

21        Essentially, there's a notification piece that

22   people need to know that they're considered a prolific

23   offender.  There is an offering of services say, hey,

24   here's the options; right?  You don't always to be a

25   prolific offender.  Essentially the easiest way to not

1    be a prolific offender is stop committing crime.  We

2    know that's it's probably easier said than done.  So

3    here's some services that are in the community to help

4    you out with that.  That's our ultimate goal.  We would

5    love for you to stop committing crime.  But know that if

6    you continue to commit crime, that because you have been

7    responsible for all this crime and considered a prolific

8    offender, you're going to get the extra attention of the

9    Sheriff's Office.  So that's the concept of focused

10   deterrence; right?

11           And then where prolific offender check comes in

12   is there's three kind of main things that could happen

13   during a prolific offender check; right?  It doesn't

14   just mean one thing; right?  So the first thing is to

15   have that initial notification and provide them

16   services; right?  Then make sure that, hey, you know,

17   periodically that they're -- that they're still there.

18   See if they need checkup.  Do they need any additional

19   information on services?  Hey, how you been doing, that

20   sort of thing; right?

21       Q.   Uh-huh.

22       A.   Then you have, obviously, they're a resource

23   for crime information in the community.  You know, many

24   times you'll find offenders are networked together.

25   They talk; right?  So if crime is happening in a

1    community, then we may go over there to say, hey, what

2    do you know?  What have you heard?  Are you responsible

3    for this?  Or you know, what have you heard?  Help us.

4    You know, your ears are to the ground as well, kind of

5    help us out.

6          And then the -- and then obviously if they're

7    suspected of committing crimes, then we'll go back out

8    and check on them as well.

9      Q.   Okay.  So the second one, the information on

10   crimes in the community --

11     A.   Uh-huh.

12     Q.   -- that would not necessarily be a crime that

13   they are suspected of committing themselves?

14     A.   Correct.

15     Q.   Okay.  Does a prolific offender check also

16   involve asking for information about a person's current

17   employment?

18          MR. POULTON:  Objection to form.  Go ahead.

19       Then or now?  Well, because he may have more

20       knowledge about then than he does about now.  I'm

21       just speculating, but --

22   BY MR. JOHNSON:

23     Q.   I mean, are you able to speak -- what period of

24   time would you be able to speak to what a prolific

25   offender check consists of?

1    A.   So I can answer this that there's no defined

2    set of questions like, hey, you need go through all of

3    this, these things -- you're going to ask these things

4    when you do a prolific offender check; right?

5         The guidance of what the prolific offender

6    check is is exactly what I told you; right?

7    Q.   Uh-huh.

8    A.   This is what we want to accomplish.

9    Q.   Sure.

10   A.   We want you to let them know that they're a

11   prolific offender, and we want you to offer them

12   services.

13        Now, hypothetically, could some -- could a

14   deputy be like, hey, do you work?  Can I help you get a

15   job; right?

16        Is the fact that gainful employment is gonna

17   help somebody not commit crimes to make ends meet or

18   something like that, you know, what I mean?  Yeah.  So I

19   mean in theory, yeah, it absolutely could.  But as far

20   as like an actual direction of here's a set of

21   questions, I don't -- I'm not aware of it.  I was never

22   in patrol to do an actual prolific offender check.  That

23   piece came after I was out of patrol.  So I mean my role

24   even -- you know, my role when I was a lieutenant in

25   there was to read the literature and provide guidance on

1    why we need to be out there doing things.

2         Q.   So you're, obviously, familiar with the January

3    2018 version of the ILP manual?

4         A.   Uh-huh.  Yes.

5         Q.   Okay.  That manual suggests that deputies

6    should be essentially gathering information on prolific

7    offenders?

8         A.   I mean, I don't -- is it just like a specific

9    -- what do you mean by gathering?

10        Q.   I can --

11        A.   Yeah.  Sure.

12        Q.   So before we do this, I maybe should have

13   mentioned this at the outset, but we've -- these are all

14   exhibits that were introduced during the deposition this

15   morning --

16        A.   Okay.

17        Q.   -- of Inspector Kraus.  So we're just going to

18   use the same exhibits because it's all legally

19   technically one big deposition.

20             MR. POULTON:  Uh-huh.

21   BY MR. JOHNSON:

22        Q.   So I'm going to show you -- don't worry.  I

23   won't ask you about most of these.

24        A.   Page by page.

25             MR. POULTON:  About half.

1    BY MR. JOHNSON:

2        Q.   I'm going to show you what was marked as

3    Exhibit 3.

4        A.   Sure.

5        Q.   Actually you have to look at your copy.

6        A.   Mine?  Okay.

7        Q.   So is this the 2018 ILP manual?

8        A.   Yes, it is revised January 2018.

9        Q.   Okay.  So if you look on page 19 of the

10   manual --

11       A.   Okay.

12       Q.   So there's a set of performance expectations.

13       A.   Sure.

14       Q.   And are these expectations for deputies to

15   follow in the field?

16       A.   Yeah, these are expectations in general for

17   people and their interactions.

18       Q.   And specifically their interactions with

19   prolific offenders?

20       A.   Yes.

21       Q.   Okay.  And when you say people, you mean Pasco

22   County Sheriff's Office employees?

23       A.   Right.

24       Q.   Okay.  If you read the bullet point that's the

25   third from the bottom, it says to learn as much as

1   possible about prolific offenders in your assigned area

2   to include their acquaintances, vehicles, locations

3   frequented, M.O. for offenses, vehicles owned,

4   et cetera, and document accordingly the information that

5   you learned so it can become shared information and

6   among fellow deputies, investigators, and analysts.

7        A.   Correct.

8        Q.   Is that part of what deputies would do during

9   prolific offender checks?

10       A.   Yes.  And I think it's part of what deputies or

11  law enforcement in general do with offenders -- with

12  anybody who's committing crimes in their areas of

13  responsibility.

14       Q.   Okay.  So deputies would be asked to --

15  encouraged to ask questions about those types of issues

16  during prolific offender checks?

17       A.   Yes.

18       Q.   Okay.  Again, just to the extent that you're

19  aware, has the use of the term prolific offender check

20  within the Pasco County Sheriff's Office changed over

21  time?

22            MR. POULTON:  I'm going to object to the form.

23       I think you already asked that, but --

24            MR. JOHNSON:  Well, I asked about the term

25       prolific offender.

1           MR. POULTON:  I'm sorry.  You said -- oh, I

2      misunderstood.  Okay.  Go ahead.

3      A.   So I apologize.  You're asking now -- just to

4  make sure I know -- that has the term of prolific

5  offender check --

6  BY MR. JOHNSON:

7      Q.   Yes.

8           MR. POULTON:  And I object to the form.  Go

9      ahead.

10      A.   So, again, I'm probably going to have to give

11  you kind of a situation.  So I haven't done prolific

12  offender checks; right?  You know, we provide guidance

13  of this is -- this is what a prolific offender check

14  should entail.

15           The intent of what the prolific offender check

16  should be I don't think has changed.  Prior -- so I'll

17  tell you this.  Obviously, this manual was revised and

18  written during my time; right?

19      Q.   Uh-huh.

20      A.   So this is my work product.  The -- I don't

21  know.  You know, it's been a long time, obviously, since

22  I've read any of the previous versions of the manual

23  what was there, but when we looked here to try to

24  identify, try to capture the true reason behind what we

25  want to be accomplished out of a prolific offender

1   check, and so whether the performance expectations here

2   -- if there's performance expectations in another one,

3   whether this got bigger, we have to look at those

4   documents.  So specific objectives and then obviously

5   there's -- you know, I'm one person providing guidance.

6   You have the rest of everybody in the agency and

7   supervisors and things like that that may ask for

8   different things or may bring up different things, but

9   overall intent of a prolific offender check backed by

10  the theory of focused deterrence I don't feel has

11  changed.

12      Q.    Okay.

13      A.    Hopefully that answers your question.

14      Q.    That's helpful.  Thank you.

15            And are you familiar with the term Top 5

16  offender?

17      A.    I am.

18      Q.    What is a Top -- or excuse me.  Is the term

19  currently in use at the Sheriff's Office that you're

20  aware?

21      A.    I'm not sure.

22      Q.    Okay.  When you were -- when you've heard the

23  term used, what does it refer to?

24      A.    So the concept of a Top 5 offender is somebody

25  who is currently active within the district.  So they

1    were divided up by district -- our three districts.  So

2    it is an offender that is currently active in the

3    district that the -- between the district commanders,

4    detectives in the districts, patrol deputies in the

5    districts working with their analysts, you know, they

6    look to identify kind of who's impacting the crime

7    environment in that area of responsibility the most and

8    then they'll determine that.

9         Q.   Okay.  So it's somebody who is impacting the

10   crime environment the most within the district?

11        A.   Uh-huh.

12        Q.   Okay.  And that's based on past offense data?

13        A.   So data in consultation with kind of like your

14   stakeholders in the district.  So as I mentioned, the

15   detectives, analysts, deputies, detectives.

16        Q.   Does the individual have to be the subject of

17   an ongoing criminal investigation to be a Top 5

18   offender?

19        A.   So I'm not sure.  So there needs to be a

20   criminal predicate.

21        Q.   Uh-huh.

22        A.   But when you say an ongoing criminal

23   investigation, that criminal predicate and ongoing

24   criminal investigation probably have two different

25   meanings.

1    Q.   By criminal predicate what do you mean?

2    A.   That there has to be a suspicion of the

3    commission of crimes.  Like so it's not just -- it can't

4    be somebody that is a citizen -- law abiding citizen

5    going about their day minding their own business.

6    Q.   Right.  Sure.  But there doesn't have to be an

7    investigation that's currently active?

8    A.   I wouldn't think -- I mean, so the problem

9    is -- again, it goes back to is that person currently

10   impacting crime in that district.  So, you know,

11   investigations get inactivated at a patrol level for

12   something that, you know, at the point in time there may

13   be no leads.  But then names come up, somebody is

14   suspect- -- that names come up and there's suspicion

15   there that there's a tie there.  And if all that comes

16   together and they believe that this person is

17   responsible for a lot of things in the area, then they

18   could make that list.

19   Q.   Okay.  Yeah, I understand.  I understand the

20   distinction that you're drawing.  I just want to see if

21   I can get so that I understand it.

22        There has to be -- for someone to be a Top 5

23   offender, there has to be some crime that they're

24   suspected of having committed at some point?

25   A.   Uh-huh.  Correct.

1    Q.    Okay.

2    A.    Yes.

3    Q.    I guess what I'm just getting at is it doesn't

4  have to be a crime that is currently the focus of --

5  there's not -- being listed as a Top 5 offender does not

6  mean there's a particular crime that the individual is

7  currently being investigated for?

8    A.    Right.  So you -- they could be -- yeah, so I

9  guess the on- -- probably what it is, it's the

10  terminology in ongoing; right?  So for me an ongoing

11  criminal investigation is one that's active, detectives

12  are assigned, and they're continuously following up

13  leads; right?  You can have an investigation that is

14  inactive.  So somebody could be the suspect of an

15  investigation, right, maybe and there's no leads.

16  Somebody goes and commits car burglaries.  We have

17  information from people that say, hey, this person did

18  it, but maybe they wore gloves, there's no fingerprints,

19  and these cases get inactive.  This case gets inactive.

20  This case gets inactive.  But you may have other

21  information out there, you know, from street sources,

22  other offenders in the area, things that they're hearing

23  that are saying that, hey, this person is likely

24  responsible for these crimes, but it may not rise to the

25  level of a prosecutable case.  Doesn't mean that there's

1    still not suspicions or valid reasonable suspicion.

2    When we talk about reasonable suspicion, probable cause,

3    right, there's still not articulable facts that they

4    don't have a link or tie to this case.

5            So again, to separate that out, for me when I

6    hear ongoing criminal investigation, it's something

7    that's active.  They're there.  There's leads that

8    they're following.  But there does come a time where you

9    may have to close a file inactive, although you still

10   had -- you're at reasonable suspicion here, but you

11   haven't gotten to level of a prosecutable case.  You may

12   even have probable cause.  It's just, hey, facts and

13   circumstances don't warrant prosecution type of thing.

14       Q.   Uh-huh.

15       A.   So that's the distinction.  So when I say

16   criminal predicate, right, the fact that there's

17   reasonable suspicions or you had probable cause or

18   there's an arrest or there's not -- the State no filed

19   that, that that person could still be a Top 5.

20           Hopefully, that makes sense.

21       Q.   I think it does.

22       A.   Okay.

23       Q.   I think it does.

24           I want to kind of go through the history of the

25   program a little bit and, you know, obviously to the

1    extent that you're able to answer.

2        A.    Sure.

3        Q.    When did the Sheriff's Office first compile a

4    prolific offender list?

5        A.    That I won't be -- I'm not sure.

6        Q.    So when you took over the program in August of

7    2016, there was already a prolific offender list?

8        A.    That is correct.

9        Q.    Had there been a prolific offender list for

10   some time at that point?

11       A.    Yeah.  So, yeah, I'm not sure.

12       Q.    Okay.

13       A.    I mean I can -- I can tell you that if for some

14   time means longer than a year, yes, it's been around

15   longer than year at that point.  But the concept of

16   ILP came in -- I think that was first introduced around

17   2010-11-ish in there.  I'm just trying to think.

18            So I was detective like in 2010.  I would

19   probably say more maybe it's 2011-12-ish; right?  So

20   then obviously there's a significant amount of time

21   between that and then when I come -- came in.  So when

22   you talk about the concept of prolific offender, that's

23   been around since the concept of ILP; right?  You read

24   Jack Ratcliffe's book, that's what ILP is based off of.

25   That term is in there.

1           But I could not tell you definitively at what

2    point in time the quantification or list of prolific

3    offenders actually came up.

4        Q.   Sure.  That makes sense.

5             Why don't we take a look at --

6        A.   Put this back here to keep it in order.

7        Q.   Sure.  Let's look at what was marked as

8    Exhibit 2.

9        A.   Okay.

10       Q.   Are you familiar with this document?

11       A.   Yes.  This would be the ILP manual preceding

12   the version -- the version that we just looked at.

13       Q.   Okay.  And was this the effective version of

14   the manual when you took over the program?

15       A.   Yes.

16       Q.   Okay.  Do you know who was the primary drafter

17   of this document?

18       A.   I do not.

19       Q.   Is this the first prolific offender -- or

20   excuse me -- ILP manual?

21       A.   I don't know.

22       Q.   You don't know.  Okay.

23            So you don't know if there was one before this?

24       A.   There could have been others before this.  This

25   has a revision date.  There could have been other

1    revisions, but I'm not sure.

2         Q.   Okay.  Are you familiar with the term CONDOR?

3    Obviously, it's the bird, but it's an acronym.

4         A.   Yeah.  So that's -- it was another law

5    enforcement agency's prolific offender program.  I don't

6    remember -- I don't recall which one, Hillsborough,

7    Pinellas, something like that.

8         Q.   Okay.  While we have this here, I'm just going

9    to -- so was this version the effective version of the

10   manual from -- I'm referring to this as Exhibit 2.  Is

11   this the effective version of the manual from February

12   2016 through the adoption of the revised manual in

13   January 2018?

14        A.   Yes.  Yeah.

15        Q.   Okay.  And prior to the adoption of the revised

16   manual, deputies were required to or encouraged to read

17   this manual?

18        A.   Yeah.  Yes.

19        Q.   Okay.  And analysts were also encouraged to

20   read it?

21        A.   So I can't say definitively; right?

22        Q.   Okay.  And it includes performance expectations

23   for deputies?

24        A.   Yes.

25        Q.   Okay.  And it also sets out the methodology to

1   be followed by the analysts when they're identifying

2   prolific offenders; is that correct?

3       A.   Yeah.  So it -- it offers the definition of

4   prolific offender.  You know, for example, in the 2018

5   version, right, it doesn't give you a full definition

6   of, you know, what analysts would do.  It's -- this is

7   more geared toward -- the 2018 version is more geared

8   toward, you know, providing a basic understanding to law

9   enforcement officers of kind of generally how this is

10  done, but yeah.

11          So you refer to that.  Again, specifically in

12  here with the -- it may be more detailed, less detailed,

13  but it does provide kind of a definition --

14      Q.   Uh-huh.

15      A.   -- but may not be the full methodology if that

16  makes sense.

17      Q.   Sure.  But that was the definition that

18  analysts would follow when they were identifying

19  prolific offenders?

20      A.   Yes, in both of them they provided definition.

21  But if there was any -- I don't how detailed -- maybe we

22  could look at it if you want, but I don't know how

23  detailed this is, but if there was any other guidance

24  given from leadership at the point in time that would

25  influence a final product of what a list would be, I'm

1    not aware of that.

2         Q.   Okay.  I'll come back to the 2016 manual, but I

3    wanted to first -- why don't -- try to roughly go in

4    chronological order.  So I'm going to introduce a new

5    exhibit.  This will be Exhibit 34.  The court reporter

6    will mark it, and then you'll get.

7              (Exhibit 34 was marked for identification.)

8    BY MR. JOHNSON:

9         Q.   Are you familiar with this document?

10        A.   I am not.

11        Q.   Okay.  This might have been even before your

12   time.

13        A.   It looks like 2011.  So I see a date there.  If

14   that is the date, then yes.

15        Q.   Okay.  So this would have been part of the

16   implementation of the ILP philosophy that you mentioned

17   in 2011?

18        A.   Okay.

19        Q.   Does that seem right to you?

20        A.   Yes.  Yeah.  I was just thinking that's a

21   pretty good estimate then of timeframe.

22        Q.   You were right on the money there, I guess.

23             All right.  I'm going mark this as Exhibit 35.

24             (Exhibit 35 was marked for identification.)

25   BY MR. JOHNSON:

1    Q.   Now this may be before your time, but so just

2 answer to the extent that you can.

3    A.   Sure.

4    Q.   Is this an email between personnel at the Pasco

5 County Sheriff's Office?

6    A.   Yes.

7    Q.   Okay.  Who is Troy Fergueson?

8    A.   Currently do you want?  I mean, I don't know

9 who -- well, I guess I can tell you who he was at the

10 time.  He is a lieutenant in district one patrol.

11    Q.   Okay.  Who is he currently?

12    A.   A lieutenant over our school safety section.

13    Q.   Okay.  And if you look at the recipients of

14 this email --

15    A.   Uh-huh.

16    Q.   -- looks like there's Christine Fremer, Frank

17 Laton and Erik Anthes.

18    A.   Anthes, uh-huh.

19    Q.   Who are those individuals?

20    A.   All retired.

21    Q.   Okay.

22    A.   So I don't know.  They're likely lieutenants.

23 So they were all -- they would have been lieutenants for

24 a while.  So those all look like they were lieutenants

25 in patrol.

1    Q.   Okay.  Does this -- if you read this -- and

2  again I realize this is maybe before your time, but does

3  this suggest that they might have begun doing prolific

4  offender checks around 2013?

5    A.   I'll review it.

6         So I would say that it -- that this document

7  would say that they were doing prolific offender checks

8  in 2013.  Whether or not that was the creation of it or

9  not, I couldn't tell you, but --

10   Q.   That's a fair point.  I mean, at the very

11 least, this reflects that they were occurring in 2013?

12   A.   Uh-huh.

13   Q.   Okay.  I'm just trying to put a timeline on it.

14        I'm going to mark this as Exhibit 36.

15        (Exhibit 36 was marked for identification.)

16 BY MR. JOHNSON:

17   Q.   Now again recognizing this is before your time,

18 I just want to ask you the individuals who are listed

19 here in the from and the to fields, are these all Pasco

20 County Sheriff's Office employees?

21   A.   Yes --

22   Q.   Okay.  Do you know what --

23   A.   -- at the time.

24   Q.   Okay.

25   A.   Some of them are not here.

1    Q.   Do you know what was meant by the term falcon

2    prolific offenders?

3    A.   Where are you at?  I'm sorry.

4    Q.   Read the first line.

5    A.   Oh, okay, in the subject line in prolifics?

6    Q.   And then the first line that says "Guys".

7    A.   This is a list of all of our falcon prolific

8    offenders.  So falcon at the time was a sector name.  So

9    in district one you had sectors of eagle and falcon,

10   so --

11   Q.   Okay.  So this would be providing a list of

12   prolific offenders in a particular district?

13   A.   In a particular sector.

14   Q.   Sector of a district?

15   A.   Correct, yes.

16   Q.   And who is Brian Welshans?

17   A.   At this time he was a field training officer

18   for the Pasco Sheriff's Office.

19   Q.   Okay.

20   A.   Deputy, district one.

21   Q.   Okay.  I'm going mark this as Exhibit 37.

22        (Exhibit 37 was marked for identification.)

23   BY MR. JOHNSON:

24   Q.   Are you familiar with the individuals who are

25   in the from and to fields of this email discussion?

1      A.   Do you want me -- in both of them?  It looks

2   like there's two forwarded.

3      Q.   Sure.

4      A.   Yes.

5      Q.   Are these all employees of the Pasco County

6   Sheriff's Office?

7      A.   At this point -- at -- when this was made, yes.

8      Q.   Okay, okay.  Who is Sergeant Steve or at the

9   time Sergeant Steve Greiner?

10      A.   Uh-huh.  So that would be -- let me see.  I

11   have to read and see if it provides some content.  So he

12   was both a patrol sergeant in district 2 and a property

13   crimes sergeant in district 2 before he retired.  So I

14   don't know at this point in time.

15      Q.   He does have a signature block.

16      A.   Yeah.  So I looked at that, but it doesn't say.

17   Property crimes is part of law enforcement.  That's what

18   I was saying.  I don't know if he was patrol or property

19   crimes sergeant at that time.

20      Q.   I see.  But he would have worked in district 2?

21      A.   Yeah.

22      Q.   Okay.  Would he have overseen deputies in his

23   position?

24      A.   As a sergeant, you supervise a squad of

25   deputies or detectives.

1    Q.   Okay.  Is he sending this to other -- to

2  deputies within the office?

3    A.   Sent it to other members.  I don't know.

4  Unfortunately, it doesn't give you ranks or -- I don't

5  know what their organizational assignment is.

6    Q.   Fair enough.  Fair enough.  And just what we've

7  marked as Exhibit -- just for the clarity of the record,

8  this is a March 30, 2015 email from Steve Greiner.

9         I'm going to mark another exhibit.  This is

10  going to be Exhibit 38.

11         (Exhibit 38 was marked for identification.)

12  BY MR. JOHNSON:

13    Q.   Now this is an email.  Hans Bollenbacher, he

14  was a Pasco County Sheriff's Office employee at the time

15  of this email?

16    A.   Yes.

17    Q.   Okay.  And the other individuals listed in the

18  to and from fields of both emails, they were also Pasco

19  County Sheriff's Office employees at this time?

20    A.   Yes.

21    Q.   Okay.  Who is William Elders or what was his

22  role at the time?

23    A.   A sergeant in district 3 patrol.

24    Q.   Okay.  So he also would have overseen deputies?

25    A.   That is correct.

1      Q.   Okay.  And just again marked as an exhibit, but

2   this is an email from Hans Bollenbacher sent April 25,

3   2015.

4           Do you know what squad 35 would refer to?

5      A.   It's -- I don't know which one in district 3.

6   So just it would be a district 3 patrol squad.  They're

7   given numbers generally in the tens if you will, like

8   15, 16 in district 1.  The twos are in district 2.  The

9   threes -- 35 is in district 3.

10      Q.   So this would be an email from -- not the first

11   message but the forwarded email is the email from

12   William Elders to the members of squad 35?

13      A.   I mean, that would have to be an assumption.  I

14   don't know without looking at a roster.

15      Q.   That's fair.  But he addresses the email --

16      A.   Yes.

17      Q.   -- squad 35?

18      A.   Yeah, he does.

19      Q.   Okay.  I'm going to mark this as Exhibit 39.

20           (Exhibit 39 was marked for identification.)

21   BY MR. JOHNSON:

22      Q.   So same question for these.  Is this an email

23   to and from Pasco County Sheriff's Office employees?

24      A.   Yes.

25      Q.   Okay.  And does this indicate that at the time

1    James Mallo, the author of the email, was a captain of

2    the patrol division or the patrol division commander?

3         A.   For district 3, correct.

4         Q.   What is a patrol division commander?

5         A.   So the captain runs operations within the

6    patrol district.  So the patrol is broken down to three

7    districts, one, two and three.  Each district is led by

8    a captain.

9         Q.   Okay.  So he would lead patrol for the district

10   3?

11        A.   That is correct.

12        Q.   Okay.  Is he emailing this to -- do you know

13   the rank of the individuals who he's emailing it to?

14        A.   Again, contextually the assumption would be

15   lieutenants, but again without looking at their

16   assignments and dates, I'm not sure exactly.

17        Q.   And you say that because he says to review it

18   with your platoon?

19        A.   Yeah.  So between platoon and, you know, again

20   generally -- so I do -- the names listed were all

21   lieutenants.  It's possible Davis, depending on time,

22   right, he was a lieutenant.  He's currently a captain

23   here, so I don't know.  But based on again generally

24   usually we only forward lieutenants in the district.

25   There was a point in time where we only had three

1    lieutenants in a district.  So, again, some of these

2    people could have different ranks as well.  So just kind

3    of like an F -- it would be an FYI then; right?  So if

4    you would get this and you're not a lieutenant that says

5    -- because a platoon is run by a lieutenant.

6        Q.   Uh-huh.

7        A.   So I'll give you that's right contextually, but

8    it's possible that somebody else may get this that's not

9    a lieutenant, doesn't have a platoon, and that to you

10   that's like, hey, this is an FYI, read through it.

11   Obviously, you don't have a platoon to talk to.

12       Q.   Sure.  Just again for the clarify of the

13   record, this is the April 30, 2015, email sent by James

14   Mallo.

15       A.   Yes.

16       Q.   Okay.  I'll just go ahead and mark this as

17   Exhibit 40.

18           (Exhibit 40 was marked for identification.)

19   BY MR. JOHNSON:

20       Q.   Is this another email between people who were

21   at the time employees of the Pasco County Sheriff's

22   Office?

23       A.   Yes.

24       Q.   Okay.  And it's forwarding -- there's an email

25   at the top, but it's forwarding an email by James Mallo,

1    so, obviously, he was still the division command- --

2    patrol division commander for district 3 at this time?

3        A.    Correct.

4        Q.    Okay.  And can you tell from this who this

5    email is being sent to?

6        A.    So the email from Lieutenant Fremer or --

7    because the lieutenant --

8        Q.    Yeah.  Really more I suppose the email from

9    James Mallo?

10       A.    So email from Captain Mallo again there's Art

11   Fremer, Bill Davis, Shane Collier, Eric Seltzer, Mike

12   Jones.

13       Q.    So it's the same group?

14       A.    Same group.  Ken Kilian is not sworn law

15   enforcement.

16       Q.    Okay.

17       A.    He's over child protection investigations, and

18   then James Law is law enforcement.

19       Q.    Okay.

20       A.    And the copies, I don't know if you're -- so

21   S. Olds is Shawna Olds.  I don't think she goes by

22   Shawna Olds anymore.

23       Q.    Uh-huh.

24       A.    I'm not sure her assignment.  She's been

25   forensics, ILP and CPI.  So she's been around.  I don't

1    know point in time.  Then --

2        Q.   How about Jeff Peake?

3        A.   Yeah, he's law enforcement.  I don't know again

4    whether he's lieutenant, captain, major.  He's been

5    same thing.  So Mike Jenkins has been a lieutenant and

6    captain.  Ken Gregory, lieutenant, captain, major.  I

7    don't know at what point in time who is here.

8        Q.   Uh-huh.

9        A.   James Steffens just a captain or in charge of

10   forensics.

11       Q.   Right.

12       A.   Beaman has been a lieutenant, captain; John

13   Corbin, lieutenant, captain, major; and Karen Lueders is

14   the bureau secretary for field operations.

15       Q.   You didn't know this was going to be a quiz

16   on --

17       A.   Yeah, I know.  It's a history of the -- ugh.

18       Q.   I actually want to go back briefly to Exhibit

19   35.

20       A.   Okay.

21       Q.   And this email references an EAP?

22       A.   Sure.

23       Q.   What is an EAP?

24       A.   That is an acronym that stands for enforcement

25   action plan.

1      Q.    Okay.  And what does that refer to?

2      A.    It is essentially a proactive enforcement

3  effort geared at any type of thing.  So it could be a

4  holiday and we want to do an enforcement action plan

5  geared toward drunk driving; right?  So that's where you

6  get your wolf packs and things like that.

7      Q.    Uh-huh.

8      A.    It could be -- it's just really a specialized

9  enforcement --

10      Q.    Okay.

11      A.    -- plan.  Not -- so specialized activity

12  outside of your routine handling of calls for service.

13      Q.    Okay.

14      A.    If that makes sense.

15      Q.    It does.

16            I'm going to go ahead and mark this as Exhibit

17  41.

18            (Exhibit 41 was marked for identification.)

19  BY MR. JOHNSON:

20      Q.    Is this an email between employees of the Pasco

21  County Sheriff's Office?

22            MR. POULTON:  It's a long bunch --

23            MR. JOHNSON:  Yeah.  I was going to go through

24      what I'm referring to.

25            MR. POULTON:  I can't help you.

1   BY MR. JOHNSON:

2       Q.   Is the first page of this an email between

3   employees the Pasco County Sheriff's Office?

4       A.   Yes.  Page one is an email between Anthony

5   Gallo and Jeffrey Peake, who are both at the time

6   employees of the Pasco Sheriff's Office.

7       Q.   Okay.  Was Anthony Gallo in charge of the ILP

8   program at this time?

9       A.   Yes.

10      Q.   Okay.  And was Jeffrey Peake his supervisor?

11      A.   Again, contextually I would --

12           MR. POULTON:  Well, don't guess if you don't

13      know.

14           THE WITNESS:  Sure.

15  BY MR. JOHNSON:

16      Q.   Okay.  What is Jeffrey Peak's current role at

17  the Pasco County Sheriff's Office?

18      A.   He's a major over criminal investigations.

19      Q.   Did he oversee ILP in that role?

20      A.   No.

21      Q.   I'm thinking of a different --

22           MR. POULTON:  Hmm?

23           MR. JOHNSON:  Nothing.

24  BY MR. JOHNSON:

25      Q.   Okay.  So this first email is an email by

1   Anthony Gallo, who at the time oversaw the ILP program

2   or section?

3        A.   Yes.

4        Q.   Okay.  If you turn to page 2 of this, there's

5   an email from John Corbin to Anthony Gallo.  Who is John

6   Corbin?

7        A.   He was an employee of the Sheriff's Office.

8        Q.   Do you know if he had any role in the ILP

9   program at this time?

10        A.   Again, I don't without, you know, looking at

11   times.  So he was both a major over investigations and

12   he was a major in patrol.  He's been around.  So I don't

13   know the timeframes.

14        Q.   Is there any time when he had a role with

15   respect to the ILP program?

16        A.   Yes.  So he was -- at this point in time it was

17   under criminal investigation.  So at whatever he was

18   over the major over the criminal investigations bureau,

19   he would have overseen ILP.

20        Q.   Okay.  So at some point he oversaw ILP?

21        A.   Uh-huh.  Correct.

22        Q.   We don't know if it was during this time?

23        A.   Correct.

24        Q.   But it could be.

25             Okay.  Do you know who -- now on page 3 --

1    Melbourne Eakley is?

2         A.   I do.

3         Q.   Who is Melbourne Eakley?

4         A.   Eakley.  He -- I mean he -- he retired here as

5    a major.  So again, he's been from deputy to major.

6         Q.   Okay.

7         A.   Uh-huh.

8         Q.   When did -- do you know when he retired

9    roughly?

10        A.   I don't remember.  Several years ago.  I can

11   say that, but --

12        Q.   Okay.  If we turn to another page, there's an

13   email from Candace Vreeland to Anthony Gallo and Stephen

14   Hiebert?

15        A.   Yes.

16        Q.   Stephen Hiebert is an analyst in the ILP

17   section?

18        A.   That is correct.

19        Q.   Okay.  Anthony Gallo, as we've said, was the

20   head of the program?

21        A.   Correct.

22             MR. POULTON:  Well, he's manager.

23             THE WITNESS:  The manager, yes.

24   BY MR. JOHNSON:

25        Q.   Fair enough.  Candace Vreeland, was she an

1    analyst at this time?

2        A.   Yes.

3        Q.   Okay.  So she would have been an analyst in the

4    program?

5        A.   Yes.

6        Q.   Okay.  I want to sort of skip ahead.  If you

7    want to read -- I think it might actually just be

8    productive if you wan to take a little bit of time, go

9    ahead and read this email.  There's an email at the

10   bottom of the chain from Sheriff Nocco or, excuse me, to

11   Sheriff Nocco and then there's an email from

12   Sheriff Nocco.

13            Then the question that I want to ask you is did

14   anything to your knowledge ever come of this discussion?

15       A.   So email with Sheriff Nocco and then did

16   anything ever come of it.  Is that accurate?

17       Q.   You can read the whole thing.

18       A.   Yeah, I'll read it, but --

19       Q.   Take your time.  Take your time.

20       A.   Okay.  So can you repeat your question?

21       Q.   Yes.  Sure.  The question is do you know if

22   anything further ever came out of this discussion?

23       A.   I don't.  I don't know.

24       Q.   Okay.

25       A.   This was before my time.

1    Q.   Just since you took the time to read it --

2    A.   Yes, sir.

3    Q.   -- the first email is from an individual who is

4  sent from a verizon.net email address; is that correct?

5    A.   Yes.

6    Q.   And based on the email, he is not an employee

7  of the Pasco County Sheriff's Office?

8    A.   No.

9    Q.   Okay.  And then in the email he is complaining

10  about prolific offender checks on his son.

11    A.   Yes.

12    Q.   Okay.  And that email is then forwarded by

13  Sheriff Nocco to two individuals?

14    A.   Yes.

15    Q.   Jeffrey Harrington and Melbourne Eakley?

16    A.   Yes.

17    Q.   And they're both employees of the Sheriff's

18  Office?

19    A.   Yes.

20    Q.   Do you know what Jeffrey Harrington's role

21  would have been at this time?  Or I already asked you

22  that.

23    A.   No, but he is the colonel.

24    Q.   Ah.

25    A.   Right.

1    Q.   He's a colonel, chief deputy?

2    A.   Yes.  Same thing, yes.  Sorry.

3    Q.   And that says that on the next page.

4    A.   Yes.

5    Q.   So at the time he was the chief deputy?

6    A.   Correct.

7    Q.   What is the role of the chief deputy within the

8  Pasco County Sheriff's Office?

9    A.   It's the like commanding officer or the

10 executive officer.  The sheriff -- so like an official

11 provides guidance, overall directives, initiatives,

12 things like that, and the chief deputy carries it out.

13   Q.   Okay.  And then Jeffrey Harrington asks John

14 Corbin to research what was happening in the situation.

15 Is that accurate?

16   A.   Yes.

17   Q.   Okay.  And then there's an email from Candace

18 Vreeland providing her understanding of why this

19 individual was listed or her lack of understanding why?

20        MR. POULTON:  I was going to say object to the

21     form because I think the answer was that it didn't

22     appear to --

23        THE WITNESS:  Correct.

24        MR. JOHNSON:  Right.  Okay.

25 BY MR. JOHNSON:

1    Q.   And then there's an email from Melbourne Eakley

2    to John Corbin on the second -- no, third page, that

3    lists as I read it the types of people who would be

4    subject to checks; Top 5, offender of the month,

5    associates (Pin Wheel), probation list on the district

6    sites and diligent search of those wanted.  And then it

7    also says there's also personal knowledge of an offender

8    in their area.

9         When you started with the program and became

10   familiar with these, is that a fair summary of the type

11   of people who would have been subject to prolific

12   offender checks at the time that you first became

13   involved with the program?

14   A.   So I'm -- I don't -- so you're -- so you see --

15   Q.   I should rephrase.

16   A.   Yes.  So you see the email from John Corbin in

17   there as well that says that it references associates

18   that if they're going to be checked need to have

19   criminal histories or there needs to be, again, that

20   criminal predicate or if there's some sort of suspicion

21   that they're involved in crimes or related to crimes or

22   would have information in crimes.  So, yes, those --

23   those are people that would be the subject of checks

24   from law enforcement.

25        Personal knowledge of offender in the area,

1    again, you know, that just -- that comment -- the

2    problem is Eakley's email doesn't have any context;

3    right?  You see it's just a list.  There's a question

4    asked by Major Corbin, but then he just lists it out,

5    but -- so the personal knowledge of an offender in the

6    area is -- that goes back to the origins of policing;

7    right?  If you think somebody has information about

8    crime or they're a criminal in your area, you're going

9    to go talk to them.  It doesn't necessarily need to be a

10   prolific offender check.

11       Q.   Just because this email from John Corbin to

12   Anthony Gallo he says that the question for an associate

13   is do they have criminal histories or are they just

14   associate's friend.  Is that correct?

15       A.   That question is asked, yes.

16       Q.   Okay.  That indicates that you could check on

17   someone because they have -- the question of whether an

18   associate should be checked depends on whether they have

19   a criminal history?

20            MR. POULTON:  I'm going to object to the form

21       as to what other people meant.

22            MR. JOHNSON:  It says what it says.

23            MR. POULTON:  It says what it says.  I mean,

24       you can read it, but I think trying to, you know --

25            MR. JOHNSON:  It says what it says.  That's

1   fine.

2       A.   So again, that -- I mean, that's my -- that's

3   going to be my response is I don't know what is in John

4   Corbin's mind and what he means by that.

5   BY MR. JOHNSON:

6       Q.   Okay.  Now there's an email from Anthony Gallo

7   to Jeffrey Peake, and it says that prolific offender

8   definition includes a threshold of arrests or suspicious

9   persons over the past three years and that some of the

10  other groups of people that need to be checked should

11  meet similar criteria.  Does that suggest that the

12  criteria for checking a person involves offenses in the

13  past?

14      A.   So everything would involve offenses in the

15  past because if they didn't commit an offense in the

16  past, then they haven't committed an offense yet.  So

17  there should be no check.

18      Q.   Right.

19      A.   But yes.  So also this email that is to Major

20  which I believe is Gallo just forwarded to the captain.

21  I think this email that you're referencing was the email

22  that he sent to the major 'cause he just says per

23  captain, which would be Peake because that's who it was

24  to.  Per your request, below is my response to the

25  major.  But, yes, so the definition is the arrests or

1    suspicions over the past three years.

2        Q.    Just to be clear, you mentioned the criminal

3    predicate.  There's nothing in here about criminal

4    predicate being suspicion of a particular crime at the

5    moment, is there?

6        A.    Yeah, so --

7            MR. POULTON:  I'm going to object to the form

8        though because -- well --

9            MR. JOHNSON:  I'm sorry, Tom, but actually I'm

10       asking the witness.  You can object, but I don't

11       want you to summarize the document.

12           MR. POULTON:  I'm not summarizing the document.

13       It's just --

14           MR. JOHNSON:  You can object.  Your objection

15       is noted.

16           MR. POULTON:  Okay.  Go ahead.

17       A.    So the criminal predicate that I spoke about

18   earlier includes suspicions; right?  That is what I was

19   describing to you.  They could be suspected of

20   committing a crime could be there, so reasonable

21   suspicion, whatever the case -- the facts.  There's so

22   much that goes out in an investigation; right?  But it

23   doesn't rise to the level of a prosecutable case in the

24   eyes of an attorney, then that's a suspicion.  So that's

25   what we talked about.

1      Q.    And just to be clear, the purpose of the

2    prolific offender check is not to investigate those

3    crimes?

4      A.    Correct.  Yeah.  The purpose of a prolific

5    offender check could help out with the investigation of

6    those crimes.

7            The other thing that, you know, I think is

8    important to note is the difference between the concept

9    of what the prolific offender check is and maybe what a

10   CAD classification that says prolific offender check is;

11   right?

12           So when you brought up the investigation of a

13   crime, right, if somebody's suspected of being involved

14   in the commission of a crime and they're a prolific

15   offender, the deputy could check out a prolific offender

16   check or an SO investigation.  I really have no control

17   over that of, you know, what they choose and why and --

18     Q.    Uh-huh.

19     A.    But yeah.  So the concept again of prolific

20   offender check is to -- that based on focused

21   deterrence, which is what we spoke about, but could --

22   and that could also include gathering information about

23   crimes that they know of in the area or crimes that they

24   committed.

25     Q.    So the criminal predicate that you're referring

1    to is the basis for listing somebody as a prolific

2    offender?

3        A.   Yes.

4        Q.   Okay.  And then once a person is listed as a

5    prolific offender, the check -- the purpose of the check

6    is what you have outlined and not to gather to

7    investigate that criminal predicate?

8        A.   So the criminal predicate is what's required

9    for somebody to be considered and then evaluated based

10   on whatever the criteria is; right?

11       Q.   Uh-huh.

12       A.   The criteria has changed as we spoke about

13   before.  As we read the literature and things like that,

14   you know it has to evolve.

15       Q.   Right.

16       A.   So if we want people to -- you know, from --

17   again, I have no -- in 2015, I don't have control over

18   guiding direction or anything that has anything to do

19   with ILP.

20       Q.   Right.

21       A.   I can only speak to you about my time in there.

22       Q.   Right.

23       A.   What I want somebody to do a prolific offender

24   check is based on that concept of focused deterrence.

25   What else they do and talk about during that time, you

1   know, it's how -- whatever they want to provide.  You

2   know what I mean?

3       Q.   Right.  So they might use it to investigate a

4   crime, but they don't necessarily have to?

5       A.   Correct.

6       Q.   Okay.  You will be delighted to learn that

7   we're now going to actually get into emails that you

8   might be familiar with.

9       A.   All right.

10           MR. POULTON:  Can he stretch his legs for five

11       minutes?

12           MR. JOHNSON:  Sure.

13           (Short break.)

14           MR. JOHNSON:  I'm going to designate this as

15       Exhibit 42.

16           (Exhibit 42 was marked for identification.)

17   BY MR. JOHNSON:

18       Q.   So there's an email -- disregarding the top --

19       A.   Sure.

20       Q.   -- there's an email here from Melissa Ortiz to

21   Jeffrey Peake and John Corbin?

22       A.   Yes.

23       Q.   And you were copied on that email?

24       A.   I am.  I know that person.

25       Q.   These are all obviously employees of the Pasco

1    County Sheriff's Office?

2         A.   Yes, sir.

3         Q.   Okay.  And if you look at the next page, this

4    is an attachment --

5         A.   Okay.

6         Q.   -- to the email.  Are you familiar with this

7    document?

8         A.   It's a training bulletin.

9         Q.   Okay.  And under approved by you see that is

10   blank?

11        A.   Yes.

12        Q.   Does that mean it was not yet approved?

13        A.   Yeah, I would assume.  You'd have to assume

14   that, I believe.

15        Q.   Is this a draft?

16        A.   I don't know.  I mean, you could assume if it's

17   not approved it would be a draft, but --

18        Q.   Do you know if this was ever sent out?

19        A.   I don't know.

20        Q.   Okay.  If you look at the last page, there's a

21   question mark highlighted under where it says frequency.

22   It says if active warrants, probable cause, or reasons

23   associated with any active investigation (i.e. crime

24   sprees/trends in area) are not applicable, periodic

25   checks should be limited to no more than question mark

1    times per quarter.

2        A.   Uh-huh.

3        Q.   So does that sort of confirm that this is a

4    draft?

5        A.   Yeah, I would -- I would say.  I would hope a

6    final document wouldn't go out like that, but yeah.

7        Q.   Okay.  Do you know if a final policy was ever

8    set to whether there should be a limit on the frequency

9    of checks?

10       A.   No, during -- yeah, during this timeframe I do

11   not.

12       Q.   Okay.  Do you know of such a policy ever being

13   set?

14       A.   Not in policy.  In the performance expectations

15   in the 2018 manual, I believe it references quarterly.

16       Q.   Does it say at least quarterly?

17       A.   Yeah, at least once per quarter.

18       Q.   Okay.  This is actually different.  It's

19   referring to no more than one time or X times per

20   quarter.  That would be different; right?

21       A.   Correct.  So again, the difference -- so the

22   check for the address verification and the, hey, by the

23   way, you're still a prolific offender or, well, if

24   they're not a prolific offender, we would be -- if they

25   fell off the list, we wouldn't be going to do a check.

1    And so, hey, you're still prolific offender, validating

2    all of the information, providing resources again, if

3    they're still on, hey, what's the deal, you know, how

4    you been doing, that sort of stuff, that interaction

5    once per quarter.

6            But the reason that you have at least is we

7    don't want that to say -- something to say you can't go

8    back more than once a quarter if there's some sort of

9    investigative function those other -- remember we talked

10   about the other purposes behind.  There's one purpose.

11   You have the other purposes whether they committed --

12   they're suspected of committing a crime or may have

13   information about crime in the area.  You don't want to

14   be restrictive of that; right?  But the commander's

15   intent or the intent of that is that that check would

16   happen once a quarter.

17       Q.   So the 2018 manual --

18       A.   The main primary check would happen once a

19   quarter.

20       Q.   You're saying that's the intent?

21       A.   Right.

22       Q.   Is that intent stated in the document?

23       A.   In that -- so where it says at least once a

24   quarter.

25       Q.   But it doesn't say no more than once a quarter?

1 A. Right.

2 Q. And it doesn't say that you need any particular

3 conditions to do more than once a quarter?

4 A. Correct.

5 Q. Okay.  It just says no more than once a

6 quarter?

7 A. Correct.

8 Q. Okay.  And it would be different --

9 A. Well, incorrect.  It says --

10 Q. Excuse me.

11 A. -- at least once a quarter, yes.

12 Q. It just says once per quarter.

13 And it would be different to have a document

14 like this one that says absent particular circumstances,

15 checks should be limited to no more than question mark

16 times per quarter?  That would be different.

17 A. That be would different.

18 Q. So we agree they're different?

19 A. Uh-huh.

20 Q. The 2018 manual does not set conditions that

21 there have to be present to exceed once per quarter?

22 A. Correct.

23 Q. Okay.  And you're not aware of any policy

24 document that limits the frequency of prolific offender

25 checks?

1    A.    No.

2    Q.    Okay.  So if you're not aware of any policy

3    document that sets a limit, does that mean that to your

4    knowledge this training bulletin was never sent?

5    A.    No, I couldn't draw that conclusion.  I mean,

6    so as we said, things evolve over time; right?  So just

7    because this wasn't ever sent, this also wouldn't

8    necessarily be a policy document; right?  This is a

9    training bulletin providing guidance, which is no

10   different than any other manual.  You know what I mean?

11   Doesn't mean it wasn't ever sent just because I'm not --

12   you know, just because there's no policy -- actual

13   policy.

14   Q.    Are you aware of any training bulletin that

15   suggested there should be a limit on the number of

16   prolific offender checks?

17   A.    No, I'm not aware.  Again, not because it

18   doesn't happen, but bulletins in general -- this is

19   2015.  You know what I mean?

20   Q.    But you're not aware of any training bulletin

21   that suggests there should be a limit?

22   A.    No, I'm not aware unless this draft went out.

23        MR. POULTON:  I made a note to check on that.

24   I think I already had, but I'll just redouble my

25   efforts on that.

1        MR. JOHNSON:  Okay.

2   BY MR. JOHNSON:

3        Q.   But just -- you know, and again I realize

4   you're not aware of everything, but as far as you're

5   aware, this never went out.  You're not aware of it

6   having gone out?

7        A.   And I'm not aware of it not having gone out

8   either.  You know what I mean?

9        MR. JOHNSON:  I'm going to go ahead and mark

10      this as Exhibit 43.

11          (Exhibit 43 was marked for identification.)

12   BY MR. JOHNSON:

13       Q.   Are you familiar with this document?

14       A.   It's an email.  There's more here.  It's some

15   emails I'm sending.

16       Q.   Yeah.  Start with the bottom of the chain.

17       A.   Yep.

18       Q.   There's an email from you --

19       A.   Yes, sir.

20       Q.   -- to Jeffrey Peake, Christopher Beaman and

21   Anthony Gallo.  I think we've been over Jeffrey Peake

22   and Anthony Gallo, but who is Christopher Beaman?

23       A.   Beaman?  So at the time -- so he's currently a

24   captain over criminal investigations.  At the time I'm

25   not sure of his exact rank.

1    Q.   Was he involved in the ILP program?

2    A.   So I mean, technically, everybody in the agency

3    is involved with ILP since it's our philosophy.

4    Q.   Okay.

5    A.   But, yeah -- I don't know if he -- I don't know

6    if -- so if you're asking if he supervised Tony Gallo or

7    that, I'm not sure.

8    Q.   Okay, okay.

9    A.   And so like -- and there's William Henshilwood

10   as well.  He was IT director.

11   Q.   Uh-huh.  So this -- the first one here is an

12   email that you drafted?

13   A.   Yes.

14   Q.   And what was your -- what was your role at this

15   time?

16   A.   So my assignment was the sergeant over major

17   crimes in district one.  However, this email is related

18   to one of the projects that I was working on with IT

19   called central command.

20   Q.   Okay.  So this is when you were putting central

21   command -- working on the central command?

22   A.   Correct.

23   Q.   Okay.  There's another email.  I'm looking at

24   page 2 of this.

25   A.   Okay.

1    Q.   Is this also an email that you wrote?

2    A.   Yes.

3    Q.   Okay.

4    A.   Yep.

5    Q.   And you write here, "My opinion on time frames

6    is I really think it should be something that is no more

7    frequent than quarterly unless there is a crime issue in

8    their area" --

9         MR. POULTON:  I've lost where you are.  I'm

10        sorry.

11             THE WITNESS:  Page 2.

12             MR. POULTON:  Okay.  Thank you.

13   BY MR. JOHNSON:

14   Q.   -- "and we want to go talk to them about the

15   intelligence about the trend."

16   A.   Yes, sir.

17   Q.   Did you write that?

18   A.   I did.

19   Q.   Did anybody ever respond to that opinion?

20   A.   I don't know.  If it's not in here, I would not

21   know.

22   Q.   You don't remember anybody ever responding to

23   that opinion?

24   A.   I don't recall.

25   Q.   Okay.

1    A.    Doesn't mean nobody did, but --

2    Q.    You said -- I'm going to read -- continue

3  reading.  "I have heard from numerous deputies and

4  detectives that because we are going out to these

5  offenders' houses several times a week, they are

6  starting to resent our agency and say we are harassing

7  them."  Did you write that?

8    A.    I did.

9    Q.    Was that accurate?

10   A.    Yes.  Yeah.  So --

11   Q.    Okay.  Those are conversations you had with

12 deputies and detectives in the Pasco County Sheriff's

13 Office?

14   A.    Yes.

15   Q.    Okay.

16   A.    So just so -- as this -- as a sergeant over

17 major crimes, I supervised detectives in major crimes.

18   Q.    And would these be conversations with

19 individuals who you supervised?

20   A.    Detectives -- so it doesn't always have to be,

21 but --

22   Q.    But it would have been --

23   A.    -- it could be detectives -- things I hear from

24 detectives, things I hear from what detectives hear from

25 deputies.

1    Q.   Okay.  And these are conversations with people

2  who would be conducting prolific offender checks?

3    A.   Our detectives typically don't do prolific

4  offender checks.  Them it was really a patrol function.

5    Q.   So they would have been passing on what they

6  also had encountered in the community or heard from

7  other deputies?

8    A.   Correct.

9    Q.   Okay.  And detectives might have heard that

10  people were frustrated -- I mean, in some way I'm asking

11  you -- well, did any of the detectives indicate -- did

12  any of the detectives indicate that they had had

13  conversations with people in the community, maybe they

14  weren't doing a check but they were talking to people in

15  the community who indicated that they were frustrated?

16    A.   Yes.

17    Q.   Okay.  About how many deputies and detectives

18  did you have these conversations with?

19    A.   That I couldn't -- couldn't tell you.

20    Q.   Okay.  Now you say, "Now I get there's a

21  positive to this if they finally decide to move out, but

22  that isn't happening."  Why would it be a positive if

23  they decided to move out?

24    A.   Because if people that are committing crimes

25  against our citizens decide to move out of our county

1    and don't commit crimes to our citizens anymore, I think

2    that's a positive.

3        Q.   Okay.  Then you say, "So what we are really

4    doing is crippling future investigation where we require

5    the assistance of these offenders to give us

6    intelligence."  Did you write that?

7        A.   Yes.

8        Q.   Do you think that's accurate?

9        A.   So, yeah, so as far as accuracy of that.  Now,

10   you know, again, if -- detectives have a way of

11   rebuilding rapport with the people.  So if somebody

12   feels that, hey, patrol's harassing them because they're

13   going out there, we can rebuild a rapport with people.

14   But essentially trying to illustrate what a negative

15   impact would be that if people that they're being -- if

16   they feel that they're being harassed by a prolific

17   offender check --

18       Q.   Okay.  That could be -- that feeling of

19   harassment could be counterproductive from a law

20   enforcement perspective?

21       A.   It could be.

22       Q.   It says, "When we go out there now, no one

23   wants to help us because we harass them."  You wrote

24   that?

25       A.   I did.  And so again, that's the continuation

1   of so I've heard from numerous deputies and detectives

2   that.  So that's kind of continuating that thought.

3       Q.   Okay.  And that's based on your conversations

4   with other deputies and detectives in the Pasco County

5   Sheriff's Office?

6       A.   Correct.

7       Q.   Okay.  And just to be clear, you did have those

8   conversations?  This is an accurate statement of what

9   you heard in those conversations?

10      A.   Correct.  Yes.  Uh-huh.

11      Q.   Okay.  It says, "We also need to come up with

12  questions for the quarterly checks and instruct deputies

13  on the purpose of these checks and how they can be

14  effective."  I think you testified earlier that there's

15  no list of questions for checks; is that correct?

16      A.   Uh-huh.

17      Q.   So obviously this advice was never taken;

18  correct?

19      A.   Right.  Yeah, so --

20      Q.   "I can tell you we really do not have buy in

21  from the troops right now and there is a lot of

22  contention around these checks."  Did you write that?

23      A.   Yes.

24      Q.   And that's, again, based on your conversations

25  with these deputies and detectives?

1          A.    Correct.

2          Q.    Okay.  When you say that we don't have, quote,

3     buy in from the troops, what does that mean?

4          A.    So it's a lack of understanding, and they don't

5     support the added requirement of having new

6     responsibilities to have to go out and do it, and

7     sometimes it's generally speaking, right, when you --

8     people hate when things change from the way things are.

9     So generally speaking, it's something that causes added

10    work and not necessarily the understanding or seeing

11    immediate benefit to it.

12              So in this particular case, they weren't

13    supportive of having to go out and do this extra task.

14         Q.    The extra task is the prolific offender checks?

15         A.    Prolific offender checks.

16         Q.    I want to ask you some questions about the 2016

17    ILP manual, which again is Exhibit 2.

18         A.    Okay.

19         Q.    Turn to page 9.

20              MR. POULTON:  Which one?  Which exhibit?

21              THE WITNESS:  Exhibit 2.

22              MR. POULTON:  Okay.

23              MR. JOHNSON:  The 2016 manual.

24         A.    All right.  Page 9.  Correct?

25    BY MR. JOHNSON:

1    Q.   Okay.  On page 9 is says, "If an individual" --

2    and this is in bold.  "If an individual is not

3    considered a prolific offender by ILP:" --

4    A.   Okay.

5    Q.   "If an individual has not been identified as a

6    prolific offender by ILP because of a limitation in

7    criminal history, RMS data, or any other indicator, the

8    following prolific offender definition may apply.  A

9    person of any age with seven or more verifiable

10   instances of criminal activity related to residential

11   burglary, auto burglary, grand theft auto, and forcible

12   felonies within a three-year period."

13          Does this indicate that an individual can be --

14   under the 2016 manual can be labeled a prolific offender

15   without having met the criteria set out for the ILP

16   analysts analyzing their criminal history within Pasco

17   County?

18   A.   So, I mean, earlier we referenced this as being

19   the criteria for analysts as well.  So technically it

20   would be within that.  But, yes, without -- it says that

21   as you read it as the manual says an individual has not

22   been identified as prolific offender by the ILP section

23   because of a limitation in criminal history, RMS data or

24   any other indicator, if they have seven or more

25   verifiable instances of criminal activity related to

1    residential burglary, auto burglary, grand theft auto,

2    and forceable felonies within a three-year period that

3    is -- it says that's a definition of a prolific

4    offender.

5         Q.   Does this -- it says --

6         A.   At the time.

7         Q.   And it says this is if an individual is not

8    considered a prolific offender by ILP.

9         A.   Right.

10        Q.   So is this something that would be applied by

11   individuals outside of ILP?

12             MR. POULTON:  Objection to form.

13        A.   It could be applied by anything.  It's an

14   agency manual; right?  It says that if they're not

15   considered a prolific offender by ILP, then the

16   definition of a prolific offender is this person, these

17   criteria.

18   BY MR. JOHNSON:

19        Q.   So would this be applied by deputies?

20        A.   It could be.

21        Q.   So a deputy could --

22        A.   It could be by district analyst too.

23        Q.   Okay.  But a deputy could identify somebody as

24   a prolific offender using this definition?

25        A.   Yeah.  That's what it says.

1    Q.   And that's even if that person's not been
2    tagged as a prolific offender by ILP?
3    A.   Yeah.
4    Q.   Okay.  Now, there's no similar language in the
5    2018 manual; correct?
6    A.   Correct.
7    Q.   Okay.  So this is something that was taken out
8    of the manual in the revisions?
9    A.   That is correct.
10   Q.   Okay.  But at least at this 2016 timeframe it
11   appears to be the case that deputies identify --
12   A.   Refer to somebody, yes.  Anybody could refer to
13   somebody.
14   Q.   Okay.  So during this 2016 timeframe, a deputy
15   could refer to somebody as a prolific offender even if
16   they hadn't been labeled as such by ILP?
17   A.   But met the criteria outlined in that
18   definition, yes.
19        (Off-the-record discussion.)
20   BY MR. JOHNSON:
21   Q.   Okay.  Why don't we turn to page 50 of the same
22   document.
23   A.   Okay.
24   Q.   Are you familiar with this addendum to the 2016
25   manual?

1     A.    I'm aware of it, I can't say familiar with it.

2     Q.    Is this the STAR manual?

3     A.    It is.

4     Q.    Okay.  Do you know who created this document?

5     A.    I don't.

6     Q.    Okay.  This says the STAR team is expected to

7  actively work with other --

8     A.    Where are you?

9     Q.    We're at page 50.

10    A.    All right.  I got it now.

11    Q.    Okay.  "The STAR team is expected to actively

12  work with other PSO members, particularly ACE and ILP

13  and outside agencies to identify and target prolific

14  offenders."

15          Does this suggest that the STAR team was

16  expected to identify people as prolific offenders?

17    A.    I can -- I mean, I can only tell you based on

18  same thing with what you have here.  I mean, you could

19  draw collusions based off the sentence, but at this

20  point in time I didn't -- didn't have anything -- you

21  know, I wasn't on STAR, wasn't with STAR.  I don't know

22  what the actual expectations were.

23    Q.    Right.  Okay.  Let's go to page 52.

24    A.    Okay.

25    Q.    There's the last full paragraph it says, "STAR

1    team members will use the above-noted resources to

2    regularly identify potential prolific offenders that our

3    members need to target.  STAR team members will forward

4    this information up the chain with an explanation as to

5    why the person should be targeted."

6          Do you know what it means to forward

7    information in this context up the chain?

8          A.   So in some form or fashion, depending on --

9    because it doesn't say what medium, but you would get it

10   to -- if I'm a deputy -- so chain of command; right?  If

11   I'm a deputy, then you would have your sergeant,

12   lieutenant, captain, over to -- or could go to major,

13   then major down, but -- so it's going up your chain to

14   supervisors.

15         Then it says -- well, in the next sentence it

16   gives you that will be further vetted by ILP.  So

17   essentially it's forwarded up the chain with the

18   intentions of it getting to ILP.

19         Q.   Okay.  That is helpful.  Thank you.

20         I'm going to ask some questions now about what

21   was Exhibit 3.

22         A.   Okay.

23         Q.   Okay.  So this is, again, the January 2018

24   version of the manual.  Okay.  You mentioned earlier

25   this is your work product.  Is that accurate?

```
 1        A.   Yes, sir.

 2        Q.   So you drafted this?

 3        A.   I did.

 4        Q.   Okay.  Did you draft all of it?

 5        A.   I would say most of it; right?  I sent it for

 6   review or edit or comment and --

 7        Q.   So it's a lot of work?

 8        A.   It is a lot of work.

 9        Q.   You're a published author.

10        A.   I don't know about that.

11        Q.   Well, believe me, we have lots of copies of

12   this that we've used.

13        A.   Where's my royalties?

14             MR. POULTON:  Probably all of them.  You're a

15        wealthy man if they would pay you a dime for each

16        one.

17             THE WITNESS:  Yeah, yeah.

18   BY MR. JOHNSON:

19        Q.   Okay.

20        A.   Parts of this are from the Exhibit 2, right,

21   the earlier one too, but were enhanced and reframed.

22        Q.   Okay.  Did this largely reflect the policies

23   that were in place at the time that you were drafting

24   it?

25        A.   So this reflected the overall guidance and
```

1    vision of what intelligence-led policing should be.

2    This is -- this was, hey, here's -- here's a good

3    background, you know, trying to convey understanding of

4    what the philosophy of intelligence-led policing is and

5    how we may be able to apply it and operationalize the

6    concept in a textbook.  It also contains some verbiage

7    in there of where we should go in the future; right?

8    You know, we call out data gaps if you will within the

9    manual of, you know, information that would be nice to

10   have or information that's limiting, but all of that is

11   centered around hopefully giving people a better

12   understanding of what intelligence-led policing is and

13   why we use it.

14       Q.   In addition to the academic background, it also

15   contains specific directions for how to implement ILP;

16   is that correct?

17       A.   Yes, sir.  Yes.  So those are the steps to

18   operationalize it.

19       Q.   Okay.  I assume somebody within the Sheriff's

20   Office approved this after you wrote it?

21       A.   Yeah.  So again, so that chain of command we

22   talked about, I send it to my captain, and then they

23   will -- wherever it goes from there, it comes back and

24   then I get back it was approved and ready to go.

25       Q.   So it was approved according to the procedures

1    of the chain of command?

2        A.    Correct.

3        Q.    Okay.  Do you know who within the chain of

4    command was involved in that decision?

5        A.    I don't.  So at the time my captain was I was

6    just going to say Major Peake.  He is Major Peake now,

7    but at the time Captain Peake, Jeff Peake.

8        Q.    You know that he was involved in the decision

9    or --

10       A.    Well, so like when I was done with my draft --

11       Q.    Yeah.

12       A.    -- I sent it to at the time Captain Peake --

13       Q.    Uh-huh.

14       A.    -- for review --

15       Q.    Right.

16       A.    -- and then approval.  Then I would wait until

17   I get the all right, or if there was comments back, we

18   would update the comments if he sent it out; right?

19   That's --

20       Q.    And then at some point you heard from Jeff

21   Peake --

22       A.    At some point --

23       Q.    -- it had been approved?

24       A.    -- if we're good to go.

25       Q.    Okay.

1          MR. POULTON:  Do me a favor and for the court

2     reporter, try to let him finish the question --

3          THE WITNESS:  Yes, sir.

4          MR. POULTON:  -- before you answer --

5          THE WITNESS:  Sorry.

6          MR. POULTON:  -- and he'll do the same just so

7     the court reporter can --

8          THE WITNESS:  Sorry.

9          MR. POULTON:  -- keep those straight.

10          THE WITNESS:  My apologies.

11          MR. POULTON:  Happens all the time.

12          (Off-the-record discussion.)

13   BY MR. JOHNSON:

14     Q.   Does any governmental agency other than the

15   Pasco County Sheriff's Office have any role in creating

16   this manual?

17     A.   That I'm not aware of.

18     Q.   Okay.  Does any other governmental agency have

19   any role in the conducting of the generation of the

20   prolific offender list?

21     A.   At the -- so during the time I was in ILP, no.

22     Q.   Okay.

23     A.   No.  Prior to and now, I'm not sure.

24     Q.   How about conducting prolific offender checks?

25          MR. POULTON:  Object to the form.

1    BY MR. JOHNSON:

2        Q.    Did any other governmental agency have any role

3    in the process of conducting prolific offender checks?

4        A.    I mean, so I guess by governmental agency

5    parole and probation could be one.  You know, deputies

6    may take a parole and probation officer out with them on

7    a prolific offender check if that particular offender's

8    on probation.

9        Q.    Uh-huh.

10       A.    So I guess in that case, sure.

11       Q.    And that would be something that the deputy

12   would initiate?

13       A.    Sure.  Yeah.

14       Q.    Okay.

15       A.    But as far as another governmental agency

16   dictating the definition of a prolific offender check,

17   then no.

18       Q.    Okay.  We're done with that for a little bit.

19       A.    Okay.

20       Q.    All right.  Before I begin with this, are you

21   familiar with Donnie McDougall, the name?

22       A.    It sounds vaguely familiar, but no.

23       Q.    Okay.

24       A.    Yeah.  So it sounds familiar, but --

25       Q.    Okay.  He's a child of one of the plaintiffs in

1   the suit, but --

2       A.   Okay.

3       Q.   I'm just -- for context for you.

4       A.   Sure.

5           MR. JOHNSON:  Go ahead and mark this 44.

6           (Exhibit 44 was marked for identification.)

7   BY MR. JOHNSON:

8       Q.   Is this an email?

9       A.   It is an email.

10      Q.   Okay.  And at the top there's Melissa Werner?

11      A.   Melinda, yes.  Yes, sir.

12      Q.   Oh, excuse me.  And she was an analyst at the

13  time?

14      A.   Yes.

15      Q.   Okay.  And then she's emailing James Law?

16      A.   Yes.

17      Q.   Who is James Law?

18      A.   An employee at the Sheriff's Office, a

19  lieutenant, district 3.  He's a lieutenant in district

20  three.

21      Q.   Okay.  And he is then forwarding another email

22  if you look at page 2; is that correct?

23      A.   So forward from him to Chris Thomas, yeah.  So

24  they're -- so this he forwarded here, yes.  So top of

25  page 2 --

1    Q.   Okay.  And the email that he is forwarding was

2    from William Vedral; is that correct?

3    A.   Yes.

4    Q.   Okay.  Who is William Vedral?

5    A.   From the email, at this point a school resource

6    officer.

7    Q.   Okay.  So he was a school resource officer at

8    the Pasco County Sheriff's Office?

9    A.   Yes.

10   Q.   Okay.  And then the other individuals in this

11   email chain are also employees of the Pasco County

12   Sheriff's Office?

13   A.   Yes.

14   Q.   Okay.  I'm going to read the last paragraph of

15   Corporal Vedrol's email.  He says, "The name Donnie

16   McDougall w/m, dob 01-04-2000, 3229 Primrose Drive,

17   Holiday, came up.  He is an at-risk youth with numerous

18   school discipline and stints in alternative schools."

19   What is an at-risk youth?

20   A.   So I can give you literature definition, but at

21   the time here I wouldn't be able to tell you what he

22   means by that.

23   Q.   Okay.  Is there an at-risk youth list?

24   A.   At one point in time we did have an at-risk

25   youth program, yes.

1      Q.   And what time was that?

2      A.   It was during my time in ILP, so around the

3   2017 time up until -- I don't know when it -- when it

4   finished but recently.

5      Q.   Okay.

6      A.   2019, 2020.

7      Q.   Okay.  So in the context of this email, you

8   don't know what he means?

9      A.   No, I don't.

10      Q.   Okay.  And just for the clarity of the language

11   that I was reading was written -- in the email was

12   written by a school resource officer?

13      A.   Yes.

14      Q.   Okay.  And then that email was ultimately sent

15   to Melinda Werner, who was an analyst in the ILP

16   section?

17      A.   Correct.

18      Q.   Okay.

19      A.   At the time looks like assigned to district 3.

20      Q.   Okay.  And Anclote High School, is that where

21   he was a school resource officer?

22      A.   Yes, based on the email.

23           MR. POULTON:  Well, don't guess.  If you

24      don't --

25           THE WITNESS:  Yeah.

1            MR. POULTON:  If you don't know --

2            THE WITNESS:  Yeah.

3            MR. POULTON:  -- that's a perfectly fine

4   answer.

5            THE WITNESS:  Sure.

6  BY MR. JOHNSON:

7     Q.   In his email, he discusses Anclote High School.

8  Or actually --

9     A.   Yes, he does.  He discusses Anclote --

10  Lieutenant Law discusses Anclote High School.

11     Q.   Right.  Yeah.  Lieutenant Law says, "Follow up

12  from Corporal Vedral at Anclote High."

13     A.   Yes.

14     Q.   Okay.  Okay.  Is Anclote -- if you know, is

15  Anclote High School in district 3?

16     A.   It is.

17            MR. JOHNSON:  We can mark this as Exhibit 45.

18            (Exhibit 45 was marked for identification.)

19  BY MR. JOHNSON:

20     Q.   Are you familiar with in type of document?

21     A.   Yes.

22     Q.   Okay.  Is this a tip?

23     A.   Yes.

24     Q.   Okay.  Is this from the tip system that's

25  maintained by the Pasco County Sheriff's Office?

1      A.   At the time, yes.  I don't believe we use

2   TipSoft anymore.

3      Q.   But this would have been a tip that was

4   submitted and then kept in the Pasco County Sheriff's

5   Office records?

6      A.   Yes.

7      Q.   Okay.  And this tip was submitted by Corporal

8   Vedral?

9      A.   Yes.

10     Q.   Okay.  And he was a school resource officer at

11  the time?

12     A.   Yes.

13     Q.   Okay.  If you look down on the second page

14  number five it says, "Donnie McDougall (in reference to

15  car hopping, thefts from vehicles) - Donnie is a student

16  at Anclote High School and has many discipline issues.

17  He engages in many risky activities.  I can see Donnie

18  car hoping."  Is that text also written by Corporal

19  Vedral?

20     A.   I don't know because if I remember -- I don't

21  recall how the notes -- like so if analysts add notes

22  into a -- into a tip, I don't remember.  So I'm just

23  looking through.  Let me just review it if you don't

24  mind.

25     Q.   Please.  Take your time.

1    A.   Yeah, so that -- that would be from him.

2    Q.   Okay.  And again, it's Corporal Vedral?

3    A.   Yes.

4    Q.   So he would have written that part about Donnie

5  McDougall?

6    A.   Correct.

7    Q.   Okay.  At the top it says -- sort of a line on

8  the page, and then above that it says, "Delivered to"?

9    A.   Yes.

10   Q.   And it says, "D3 property crimes/STAR (5034)

11 Sergeant Chris Thomas."  What does that mean?  What does

12 that refer to?

13   A.   In the system, you would send tips to an area

14 so they would have awareness.

15   Q.   Okay.

16   A.   So this information -- this tip would have been

17 sent to district 3 property crimes/STAR -- it was all

18 supervised by the same people -- so that area for

19 review.  So Sergeant Chris Thomas was over that.  So he

20 would review this tip and action it as he saw fit.

21   Q.   Who would have routed the tip to Sergeant

22 Thomas?

23   A.   Analysts review and route the tip.

24   Q.   Okay.

25   A.   I don't know who specifically.

```
 1        Q.   But it would have been an analyst in the ILP

 2   section?

 3        A.   Yes.

 4             MR. JOHNSON:  We'll mark this as Exhibit 46.

 5             (Exhibit 46 was marked for identification.)

 6   BY MR. JOHNSON:

 7        Q.   Are you familiar with this type of document?

 8        A.   Yes, generally.

 9        Q.   Okay.  What is this?

10        A.   These are the slides to drive a district's ILP

11   -- weekly ILP -- periodic ILP meeting.

12        Q.   Is that sometimes call the AIM meeting?

13        A.   AIM, yes.

14        Q.   Okay.  Yeah.  We were laughing earlier that

15   it's not the AIM --

16        A.   AIM period?

17        Q.   Yeah.

18        A.   ATM machine?

19        Q.   Right.  Exactly.

20             MR. POULTON:  Even worse with the STAR team,

21        too.

22             MR. JOHNSON:  Yeah.

23             MR. POULTON:  That was another one.

24             MR. JOHNSON:  Exactly.

25             MR. POULTON:  I guess it's not quite the same,
```

1     but it --
2              MR. JOHNSON:  Yeah.
3              MR. POULTON:  Strategic area response team
4     team.
5  BY MR. JOHNSON:
6     Q.   Do you know during this time when you were in
7  charge of the ILP -- this is actually before you were in
8  charge, but duration the time that you were in charge --
9     A.   Uh-huh.
10    Q.   -- what time of day were AIM meetings held?
11    A.   So I believe it varied.  So it ultimately was
12 up to the district commander.  So the district captain
13 of the area, it's their responsibility to address crime
14 within their district.  So they would set that meeting,
15 coordinate with the analysts.
16    Q.   Okay.
17    A.   Generally in the afternoons --
18    Q.   Okay.
19    A.   -- but on different days of the week.
20    Q.   So it wasn't always on a Wednesday in that
21 time?
22    A.   During my time, no.
23    Q.   Okay.
24    A.   There was a point in time where they were all
25 on the say day if it was Wednesday then, but --

1       Q.    Okay.  But there was a time when it was -- it

2   floated more?

3       A.    Yeah, during my time it floated, yeah.

4       Q.    Okay.  And the time also could be variable?

5       A.    Varies.  Yeah.  Uh-huh.

6       Q.    Okay.  If you could turn to page 15331.

7       A.    15331?

8       Q.    Yes.

9       A.    Okay.

10      Q.    Are these notes from one of the AIM meetings?

11      A.    This slide says AIM meeting notes, yes.

12      Q.    Okay.  Do you know who would keep these type of

13  notes?

14      A.    I don't know specifically where -- so it would

15  get compiled by the analysts.  Whether the analysts took

16  all of the notes or if somebody else in the meeting took

17  the notes and passed to the analyst, but --

18      Q.    Okay.  But an analyst would have compiled these

19  to reflect what happened at the AIM meeting?

20      A.    Correct.  Uh-huh.

21      Q.    And that would have been the AIM meeting -- I'm

22  sorry.  This is obvious.

23      A.    Sure.

24      Q.    This would have been the AIM meeting on March

25  1, 2018?

1     A.   Yes.

2     Q.   Okay.  And it does mention Donnie McDougall

3  here about one, two, three, four, five lines from the

4  bottom?

5     A.   Yes.

6     Q.   Okay.  So that would suggest that Donnie

7  McDougall was discussed at an AIM meeting on March 1,

8  2016?

9     A.   Yes.  So his name was brought up during that.

10  Yes.

11     Q.   Okay.  I'm going to turn to Exhibit 15.  If we

12  could turn to page --

13     A.   Okay.

14     Q.   If we could turn to page 24017.

15     A.   240 -- yes.

16     Q.   Okay.  This is a CAD report; is that correct?

17     A.   Yes, that is correct.  Uh-huh.

18     Q.   Okay.  And this indicates that Deputy Mark

19  Celleste came by this address 3229 Primrose Drive on

20  March 1, 2016?

21     A.   Yes, that is accurate.

22     Q.   And that's the same day that we were just

23  discussing that there was the AIM meeting?

24     A.   Yes.

25     Q.   Okay.  And this occurred at 5:53 p.m.; correct?

1    A.    Yes.

2    Q.    Okay.

3    A.    Let me see here.  So it was self-initiated

4    activity.  You'll see call received, call routed.  Those

5    are all -- that's when the call was generated.

6    Q.    Uh-huh.

7    A.    When a call is self-initiated then, an MCT is

8    automatically dispatched, but then you see the arrive

9    time.  So it's possible that they weren't there until

10   18:27.

11   Q.    Uh-huh.

12   A.    It's also possible that they were there at

13   17:53 but it wasn't checked -- status checked by

14   dispatch.  They figured it out and they saw, oh, they're

15   still en route on the CAD, so they're on scene, but

16   let's just point out the differences in the times there.

17   Q.    Sure.  So we know this was initiated at 5:53 --

18   A.    Yes.

19   Q.    -- p.m.?  So it wouldn't have been --

20   A.    Between those times, uh-huh.

21   Q.    Sometime between 5:53 and 6:27 they visited

22   this house?

23   A.    Yes.

24   Q.    Okay, okay.  Is the AIM meeting generally held

25   prior to 5:00 p.m.?

1      A.   Yes.

2      Q.   So the AIM meeting would have occurred before

3  this CAD report was generated?

4      A.   Yes.

5      Q.   Okay.  Let's enter another exhibit.

6           (Exhibit 47 was marked for identification.)

7  BY MR. JOHNSON:

8      Q.   This has been marked as Exhibit 47.  Are you

9  familiar with this type of document?

10     A.   Yes.

11     Q.   These are more AIM slides?

12     A.   Yes.

13     Q.   Okay.  We could turn to page 15709.

14     A.   Okay.

15     Q.   Does this identify the Top 5 offenders for

16  district 3 at the time of this AIM meeting?

17     A.   Yes.

18     Q.   Okay.  Very next page, okay?

19     A.   Okay.

20     Q.   It says info valid as of 9-13-16; is that

21  correct?

22     A.   Yes.

23     Q.   So that would indicate this was compiled around

24  the time of September 13th?

25     A.   Correct.

1      Q.    So this AIM meeting --

2      A.    Around that time, yes.

3      Q.    So this AIM meeting occurred around that time?

4      A.    Should be, yeah.  It usually says on it.  Yes,

5  it would be around that time.  Yep.

6      Q.    Okay.  And this page that we're currently

7  looking at, which is 15710, does this list the

8  associates of Top 5 offender Dominic Putnam?

9      A.    Yes.

10     Q.    Okay.  And one of those associates is Donnie

11  McDougall?

12     A.    Yes.

13     Q.    Okay.  It lists him as an associate; is that

14  correct?

15     A.    It does.

16     Q.    And then Antonio Nogueras is listed as a

17  criminal associate?

18     A.    Yes.

19     Q.    In this context, what is the difference between

20  an associate and a criminal associate?

21     A.    So at this point in time -- again, I can only

22  talk to you about, you know, during when I was in there.

23  So the criminal associate is somebody that has a prior

24  arrest versus the other associate could be related to

25  them in their -- in current crimes that are under

1    investigation or with them but did not have an arrest.

2        Q.   Okay.

3        A.   Hopefully that makes sense.

4        Q.   So criminal associate they both show up in the

5    report where they were both arrested?

6        A.   Not necessarily together; right?  It could've

7    -- he could be an associate but that individual has been

8    arrested before.

9        Q.   Who has to be arrested for it to be a criminal

10   associate?

11       A.   The person listed as criminal associate.

12       Q.   Okay.  And if somebody was not arrested, then

13   they might be listed as an associate?

14       A.   Just an associate.

15       Q.   Okay.  So this would suggest that Donnie was

16   viewed as an associate of Dominic Putnam, but had not

17   been arrested in conjunction with whatever made him an

18   associate?

19           MR. POULTON:  Object to the form.

20       A.   Yeah, so -- Correct.  Yeah, so he --

21           MR. POULTON:  If you know.

22       A.   At this point this time, no.  I don't know.

23   Yeah.

24   BY MR. JOHNSON:

25       Q.   Okay.  That's fine.

1         Just so I understand, this is from September

2    2016.  So you would have been the head of the ILP

3    division at this time; is that correct?

4         A.   Yes, I would have.

5         Q.   Okay.  You don't have to know everything.

6         A.   Yeah.

7         Q.   But I just -- this isn't the time frame that

8    you might know, so --

9              MR. POULTON:  I don't --

10   BY MR. JOHNSON:

11        Q.   I'm not saying you've got to know it.  I just

12   wanted to make that --

13             Okay.  But your understanding again is a

14   criminal associate would indicate that there was an

15   arrest for the offense, whereas an associate would

16   indicate that perhaps there was not an arrest?

17             MR. POULTON:  Object to the form.

18   BY MR. JOHNSON:

19        Q.   I just want to -- I'm having trouble -- I'm

20   having trouble understanding.

21             MR. POULTON:  It's fine.

22        A.   My understanding is a criminal associate has a

23   criminal history.  A regular associate does not have a

24   criminal history.  Both of them are associated and could

25   -- both could potentially be associated in current

1    criminal activity.  Just obviously the one that is a

2    regular associate would not have been arrested yet.

3    BY MR. JOHNSON:

4        Q.   Okay.

5        A.   So if you go -- I guess he's just -- like if

6    you go out and burglarize cars, you and two other

7    people, right, one person's been arrested before, the

8    other person hasn't, we haven't determined there was

9    crimes but your name comes up as an associate with them

10   from other sources and things like that.  So somebody --

11   a fourth person is saying your friend who has never been

12   arrested before is responsible for these crimes, he was

13   there, I've got their information, whatever the case is,

14   and you become an associate of this person but have not

15   been arrested before, you're an associate versus the

16   friend that has -- the criminal associate has been

17   arrested before.  In future iterations of this you would

18   see their criminal activity listed below, what they've

19   been arrested before.

20       Q.   Okay.  I'm going to go back to 15 and turn to

21   page 24029.

22       A.   Just trying to keep the best organized here.

23   24 --

24       Q.   -- 029.

25       A.   Yes, sir.

1      Q.    Okay.  So this is an incident that occurred on

2  September 16, 2016?

3      A.    Yes.

4      Q.    Okay.  And so that's around the time of the AIM

5  slides that we were just looking at?

6      A.    That is accurate.

7      Q.    Okay.  If I wanted know what happened at this

8  incident, it would make sense to look at the incident

9  report?

10      A.    Yeah.  There was a case number pulled.

11      Q.    Okay.

12      A.    There's notes in the CAD call too.

13      Q.    Right.  So it makes sense to look at both the

14  CAD notes and the incident report?

15      A.    Yes.

16      Q.    And if there was any body cam footage, I would

17  want to look at that too?

18      A.    Yes.

19      Q.    Okay.  Is there anything else -- any other

20  category of documents that you think it would make sense

21  to look at?

22      A.    Arrest records if an arrest came out of that,

23  but --

24      Q.    Sure.  Okay.  I'm just going to introduce

25  another exhibit.  This will be Exhibit 48.

1         (Exhibit 48 was marked for identification.)

2    A.   Okay.

3  BY MR. JOHNSON:

4    Q.   Is this an email?

5    A.   It is an email.

6    Q.   Okay.  And if you look on the second page of

7  this sort of down in the email chain, there's an email

8  from Andrew Denbo to Tait Sanborn, and then there's a

9  list of other names.

10    A.   Yes.

11    Q.   Are these Pasco County Sheriff's Office

12  employees?

13    A.   They are.

14    Q.   Okay.  And the subject of the email is STAR

15  Activity 9-17-16; is that right?

16    A.   Yes.

17    Q.   Okay.  Are you familiar with this type of

18  email?

19    A.   It's formatted as a morning report.

20    Q.   Okay.  This is a report on the STAR team?

21    A.   Yes.

22    Q.   Okay.  If you look down at the third item --

23    A.   Got it.

24    Q.   -- it says, "Members of the D3 STAR team

25  responded to the listed location to arrest Tammy Heilman

1   (Prolific Offender Donnie McDougall's mother) for

2   providing false information in a felony investigation."

3          Does this -- well, would this have been written

4   by Andrew Denbo?

5      A.   This -- the email itself is written by

6   Andrew Denbo.

7      Q.   Okay.  And, obviously, he was an employee of

8   the Sheriff's Department at the time?

9      A.   Yes.

10     Q.   Okay.  Excuse me.  The Sheriff's Office.

11     A.   Yes.

12     Q.   Okay.  Now does this suggest that Donnie

13  McDougall was being treated as a prolific offender at

14  the time of this email?

15     A.   So the author of this refers to him as a

16  prolific offender.

17     Q.   Okay.  And that would presumably be either

18  because ILP had labeled him as prolific offender or

19  because deputies labeled him as a prolific offender

20  under the definition that we looked at earlier in the

21  2016 manual?

22          MR. POULTON:  Object to the form.

23     A.   It could be any one of things, or deputies just

24  referred to him as prolific offender because he's on

25  slides.

1   BY MR. JOHNSON:

2       Q.   Okay.  So it might be because he was on the

3   slides that we looked at?

4       A.   It could be for -- I don't know why somebody

5   would do something without -- if they weren't a prolific

6   offender, why they would call them one.

7       Q.   Right.  Well, would that be consistent with

8   your experience?

9            MR. POULTON:  Object to the form.

10  BY MR. JOHNSON:

11      Q.   Do you have experience with people using the

12  term prolific offender within the Pasco County Sheriff's

13  Office?

14      A.   Yeah, I think.  So, again, the term prolific

15  offender in the def- -- from conceptually, right, is

16  also different than a list of individuals, you know,

17  that a section within the agency comes up with; right?

18  So --

19      Q.   Uh-huh.  And would it be consistent for

20  somebody to use that term to reference someone who had

21  been listed as an associate in the slides?

22           MR. POULTON:  Object to the form.

23  BY MR. JOHNSON:

24      Q.   You can answer.

25           MR. POULTON:  If you can answer.

1      A.    Right.  So I mean, again, the term prolific

2   offender, right, is somebody that -- conceptually refers

3   that 6 percent are responsible for 60 percent of the

4   crime equate to essentially somebody that's actively

5   committing crime in an area.  And so the -- although

6   they're not on the list within the definition of what

7   ILP defines a prolific offender, if somebody -- yeah, I

8   mean I'm just hypothesizing now, you know, but --

9          MR. POULTON:  Well, don't.

10         THE WITNESS:  Yeah, that's what I'm saying.

11      I'm just like -- yeah, I'm getting to the point

12      where I'm like, yeah, I'm just --

13         MR. POULTON:  Guessing.

14         THE WITNESS:  Yeah.  I can't guess.  Yeah.

15   BY MR. JOHNSON:

16      Q.    That's fine.

17          Now later in the chain it appears that one of

18   the recipients of this email from Andrew Denbo was

19   Melinda Werner.  Melinda Werner was an ILP analyst at

20   this time?

21      A.    Yes.  Yeah.

22      Q.    Okay.  All right.  We did a lot of this with

23   Mr. Kraus, but I'm going to do some of this with you.

24   I'm going to introduce some exhibits.  I'm going to mark

25   this as Exhibit 49.

1            (Exhibit 49 was marked for identification.)

2      BY MR. JOHNSON:

3           Q.   Is this a CAD -- is this a set of CAD reports?

4           A.   Yes.

5           Q.   Okay.

6           A.   It is.

7           Q.   And these are records that are used by the

8      Pasco County Sheriff's Office in the course of its

9      operations?

10          A.   Yes.  Yeah.  So CADs shared by the Sheriff's

11     Office and Fire Rescue, but --

12          Q.   Right.  And when information's in the CAD

13     report, if it pertains to the Sheriff's Office deputy,

14     it would be entered by the deputy into the system?

15          A.   Yes.  Uh-huh.

16          Q.   Okay.  And it's expected to be accurate?

17          A.   Yes.  There's --

18          Q.   It should be?

19               MR. POULTON:  Well, let him finish his answer.

20          A.   So, I mean, there's obviously times that

21     there's going to be errors or things that happened.

22     There's some system issues as well that are out there.

23     So that, unfortunately, can't be cured, but information

24     entered by our members is expected to be accurate.

25     BY MR. JOHNSON:

1    Q.   Do you ever look at CAD reports in your work at

2    the Sheriff's Office?

3    A.   I have, yes.  So as major crimes,

4    investigators, the detectives, stuff like that, we would

5    review CAD reports, yeah.

6    Q.   Do you --

7    A.   Yeah.

8    Q.   Sorry.  Go for it.

9    A.   Yeah, so in just about every -- every aspect.

10   So in my current role, I get notified if there's issues

11   where there's issues, and I look to try to solve stuff.

12   I'm involved in our process of looking for a new CAD.

13   So I look at documents like that too, so --

14   Q.   Okay.  If you are looking at a CAD report, do

15   you ever look at CAD reports to get information about

16   incidents?

17   A.   Yes.  Uh-huh.

18   Q.   Okay.  And so you would rely on the CAD reports

19   as a source of information?

20   A.   Yeah.  Yes.

21   Q.   Okay.

22   A.   We should always validate information, but it's

23   definitely a source for sure.

24   Q.   Okay.  I'll come back to this.  We'll mark this

25   as Exhibit 50.

1          (Exhibit 50 was marked for identification.)

2    BY MR. JOHNSON:

3        Q.   Now if you look past the cover -- and feel free

4    to look through these -- are these incident reports?

5        A.   There's a ordinance citation, one of them too.

6    So incident reports, ordinance citations, arrest

7    affidavit.

8             So it's a -- incident reports, arrest

9    affidavits, probable cause citations.  There's a JAC

10   Center thing, which are generally referred to as support

11   documents to an incident report, but yes.

12       Q.   Okay.  So it's a mix of incident reports and

13   support documents?

14       A.   Correct.

15       Q.   Okay.  And these are all records of the Pasco

16   County Sheriff's Office?

17            MR. POULTON:  Object to the form.

18   BY MR. JOHNSON:

19       Q.   Are these all reports of the Pasco County

20   Sheriff's Office?

21            MR. POULTON:  Sorry.  It was a bad objection.

22       A.   Yes.

23            MR. POULTON:  Now I'm thinking -- never mind --

24   BY MR. JOHNSON:

25       Q.   And the information in these records would be

1    entered by Pasco County Sheriff's Office employees?

2        A.   Yes.

3        Q.   Are you familiar with the name Robert Jones?

4        A.   No.

5        Q.   Okay.  Again, just for your background,

6    Robert Jones is one of the plaintiffs in this case.  His

7    son is Bobby Jones.

8        A.   Okay.

9            MR. POULTON:  It's also Robert Jones, III, is

10       the father.  And Robert Jones, IV, is the son.  So

11       you'll see it referred to both ways sometimes:

12       Robert or Bobby for the son, but it's always Robert

13       for the father.  Right?  Until tomorrow when we

14       depose him.  I guarantee there will be confusion.

15           MR. JOHNSON:  I'm going to mark this as Exhibit

16       51.

17           (Exhibit 51 was marked for identification.)

18   BY MR. JOHNSON:

19       Q.   Is this another tip?

20       A.   Yes.

21       Q.   Who submitted this tip?

22       A.   Just making sure.  It looks like Arthur

23   Morrison.

24       Q.   Okay.  Is he an employee of the Pasco County

25   Sheriff's Office?

1      A.    He was.

2      Q.    He was?

3      A.    He's retired.

4      Q.    Okay.  At this time he was an employee of the

5    Sheriff's Office?

6      A.    Yes.

7      Q.    Okay.  Does this indicate that he was on the

8    STAR team at the time?

9      A.    I don't know.

10     Q.    Does this indicate that this was -- at least

11   pertained to the STAR district?

12     A.    He references D3 STAR area in here, yes.

13     Q.    Okay.  And this says, "Nicholas Surace is

14   currently a prolific offender in the D3 STAR.  A

15   Facebook search and interview of the father has provided

16   additional information on known associates.  Robert

17   Jones (a/k/a Bobby) who lives on Headsail Drive and is

18   currently on an ankle monitor, is confirmed to be a new

19   associate."  Is that text that would have been submitted

20   by this Pasco County Sheriff's deputy?

21     A.    Yes.

22     Q.    Okay.  And it would have been submitted by a

23   deputy as a tip?

24     A.    Yes.

25     Q.    Okay.  And the date on that is July 2, 2015?

1    A.   Yes.

2    Q.   Okay.  Who would have had access to this

3  document or this tip after it was submitted?

4    A.   I do not know.

5    Q.   Would it have gone to an analyst?

6    A.   So at this time -- so in July I'm not sure.

7    Q.   I want to turn now to Exhibit 49.  If you look

8  at page 24173 --

9    A.   Yes.

10    Q.   Okay.  Does this reflect a visit by member of

11  the STAR team to the address 3810 Headsail Drive on

12  August 7, 2015?

13    A.   Yes.

14    Q.   Okay.  So that's a little more that a month

15  after the tip that we were just looking at?

16    A.   Yes.

17    Q.   Okay.  The nature field here says, "Directed

18  patrol performed."  What does that mean?

19    A.   So directed patrols are proactive, so like if

20  you're driving to the area or sitting in an area on

21  unallocated patrol time looking for anything that could

22  be suspicious or could be looking for traffic

23  complaints.

24    Q.   Okay.  So it's distinct from an investigation?

25    A.   Yeah.  So there's -- well, so there's a CAD

1     classification called SO investigation, yes.  Again

2     whether, you know, the intent is if you're going to be

3     at a location looking for self-initiated activity, then

4     that's what directed patrol means.  If you're going to a

5     location for an SO investigation, that's what SO

6     investigation means.  People do use those proactive

7     generic things for different things, but generally

8     that's what it's meant for.

9          Q.    Right.  But if the categories are being used

10    correctly, this would indicate that it was not an

11    investigation of a particular criminal incident?

12               MR. POULTON:  Object to the form.

13    BY MR. JOHNSON:

14         Q.    You can answer.

15         A.    You would look for also CAD notes.  In this

16    case the CAD notes say STAR attempted contact with Bobby

17    Jones, but he ran inside upon our arrival.  So, again,

18    classifications are good, gives you a general idea, but

19    you always kind of look to the notes and you can draw

20    your own conclusion about --

21         Q.    Yeah.  Well, that makes sense.  I guess as

22    somebody from the outside, I also want to understand --

23    understanding that the classification is not always the

24    best guide, what information can -- are we able to draw

25    from it that it says directed patrol?  Obviously, I

1     understand what you're saying that there's other

2     information you would want to look at too.

3         A.    Uh-huh.

4         Q.    Does this suggest that the nature of what the

5     deputy was doing here was proactive and --

6         A.    Self-initiated.

7         Q.    Self-initiated?

8              MR. POULTON:  Well, I'm going to object to the

9         form of the question.  Go ahead.

10    BY MR. JOHNSON:

11        Q.    So let me rephrase it.  Does this suggest that

12    what the deputy was doing here was self-initiated?

13             MR. POULTON:  Object to the form.  Go ahead.

14        A.    Yes.

15    BY MR. JOHNSON:

16        Q.    And it was distinct from the investigation?

17             MR. POULTON:  Object to the form.

18        A.    So an investigation could be self-initiated as

19    well.

20    BY MR. JOHNSON:

21        Q.    Right.  But this is not.  I just --

22        A.    I don't -- so I don't -- yeah, the -- there's

23    so many variables in what law enforcement officers do

24    out there.  I don't know; right?  There's just -- could

25    be a million different things just within the four

1    corners of this sheet, so --

2        Q.   We turn to the next page --

3        A.   Okay.

4        Q.   -- or the next report, this is from two days

5    later.

6        A.   Okay.

7        Q.   Excuse me, six days later.  Is this another

8    incident involving the STAR -- same member of the STAR

9    team coming to the same address?

10       A.   Yes.

11       Q.   And again, it's six days after the last

12   incident?

13       A.   Yes.

14       Q.   This one is also labeled as directed patrol

15   performed?

16       A.   Yes.

17       Q.   Okay.  So just putting aside the report, what

18   does the term directed patrol mean within the Pasco

19   County Sheriff's Office?

20       A.   Directed patrol means that you are patrolling

21   at an area.  So you're -- it's self-initiated,

22   noncommitted patrol time that could be aimed at various

23   things; right?  Again, you could be doing a directed

24   patrol between -- in a high crime area.  You could be

25   doing a directed patrol to deal with traffic complaints.

1    You could be doing directed patrols through a

2    subdivision, just patrolling -- driving around making

3    sure people are safe or doing directed -- it's Halloween

4    and you're gonna do a directed patrol to make sure the

5    kids are trick-or-treating safe, driving through an

6    area.  It's self-initiated activity.

7        Q.   Okay.

8        A.   And then generally, you know, there could be

9    some other activity related to it, another related call

10   comes up; right?  If I'm on a directed patrol in an area

11   doing traffic and I call out a traffic stop, you call

12   associated with that kind of directed patrol.

13       Q.   Okay.  And then if we go forward to page 24179.

14       A.   Okay.

15       Q.   Is this another incident involving a visit by a

16   member of the STAR team to that same address?

17       A.   Yes.

18       Q.   And this is on September 16, 2015?

19       A.   Yes.

20       Q.   Okay.  And this is -- in the notes section it

21   says prolific associate check Robert Jones; is that

22   correct?

23       A.   Yes.

24       Q.   And that would have been written by this member

25   of the STAR team?

1    A.   It does, yeah.  It tells you.

2    Q.   Okay.  STAR 33?

3    A.   Correct.

4    Q.   And STAR 33 here is Joshua Yungaitis?

5    A.   Yungaitis, yes.

6    Q.   Okay.  And he was a member of the STAR team at

7    that time?

8    A.   Yes.  Yeah, STAR 33.

9    Q.   Okay.  Are you familiar with the term prolific

10   associate check?

11        MR. POULTON:  Which page are you on by the way?

12   I've lost you.

13        MR. JOHNSON:  24179.

14        MR. POULTON:  Okay.  That's why.  Go ahead.

15   A.   Specifically, no.  Right?  I mean, let's see.

16   The prolific associate is an associate of a prolific

17   offender.  I can tell you that.

18   BY MR. JOHNSON:

19   Q.   Okay.  And this is about a month and a half

20   after the tip that we looked at that was marked as

21   Exhibit 51?

22   A.   Correct.

23   Q.   Okay.  Or excuse me.  Actually two and a half

24   months?

25   A.   So -- oh, of the tip, yes.  I'm referring to

1    the last.  It was a month and a half over our first CAD

2    call.

3            Q.    I tricked you.

4            A.    So from July to September.

5                  MR. POULTON:  He tricked you.

6                  THE WITNESS:  Yeah.

7    BY MR. JOHNSON:

8            Q.    Okay.  Now if you flip forward to page 24185.

9            A.    Okay.

10           Q.    Does this reflect a visit by a Pasco County

11   Sheriff's Office deputy to that same address on

12   September 26, 2015?

13           A.    Yes.

14           Q.    Okay.  And in the notes section that would have

15   been written by the same deputy?

16           A.    Yes.

17           Q.    Okay.  And this is -- is it a prolific offender

18   check?

19           A.    Correct.

20           Q.    Okay.  Does this indicate that the individual

21   here, Robert Jones, was labeled as a prolific offender

22   at this time?

23                 MR. POULTON:  Object to the form.  Go ahead.

24           A.    So specifically, no.  So I can't testify to

25   what they told them.  So again, from here, what I read

1   is they told him that he was being monitored.

2   BY MR. JOHNSON:

3       Q.   So this -- I don't know what they told him.

4   That's not what I'm asking.  What I'm asking is this is

5   labeled as a prolific offender check.

6       A.   Uh-huh.

7       Q.   Does that in conjunction with the notes field

8   suggest that he was being labeled as a prolific offender

9   at this time?

10          MR. POULTON:  Objection the form.

11      A.   It could -- it could suggest that, but it

12  doesn't definitively indicate that, no.

13  BY MR. JOHNSON:

14      Q.   I want to go forward to page 24191.

15      A.   Okay.

16      Q.   And this is another visit on October 9, 2015,

17  by that same deputy?

18      A.   Yes.

19      Q.   Okay.  And it's also labeled as a prolific

20  offender check?

21      A.   Yes.

22      Q.   Okay.  Then if we go forward to the next CAD

23  report, page 24193, does this reflect a visit by a

24  different deputy to that same address on October 12,

25  2015?

1      A.   Yes.

2      Q.   And this is also labeled as a prolific offender

3    check?

4           MR. POULTON:  Object to the form.  Go ahead.

5    BY MR. JOHNSON:

6      Q.   Does the nature field reflect that this has the

7    nature of a prolific offender check?

8      A.   Yes.

9      Q.   Okay.

10          MR. POULTON:  That's a good example of why you

11       can't rely on it because if you read the notes for

12       the next two pages --

13          MR. JOHNSON:  Well --

14          MR. POULTON:  I'm just pointing out to you.

15       I'm not -- he --

16          MR. JOHNSON:  Okay.  If we read the notes --

17          MR. POULTON:  Look at pages 2 and 3.

18    BY MR. JOHNSON:

19      Q.   If we look at page 3 --

20          MR. POULTON:  Yeah.

21    BY MR. JOHNSON:

22      Q.   -- of this report --  and, Tom, I'd appreciate

23    it if you just let me get through my questions.

24          MR. POULTON:  Okay.  We can do it later.  We

25       can do it later.  Go ahead.

 1   BY MR. JOHNSON:

 2        Q.   It says, "The subjects left the location prior

 3   to LEO arrival, to include Robert IV (prolific

 4   offender)."

 5        A.   I apologize.  I must not be on the same --

 6             MR. POULTON:  Yeah.  Look at 24195.

 7             THE WITNESS:  Okay.

 8   BY MR. JOHNSON:

 9        Q.   So does this label suggest that Robert IV was a

10   prolific offender during this -- was being labeled a

11   prolific offender during this time?

12        A.   Yeah, it suggests that.

13        Q.   Okay.  And if we go forward to page 24202 --

14        A.   Okay.

15        Q.   -- is this a check or, excuse me, a visit by

16   another Pasco Sheriff's Office deputy to that same

17   address?

18        A.   Yeah.  So it's --

19        Q.   And this is from November 13, 2015?

20        A.   Yes.

21        Q.   And it's also labeled a prolific offender

22   check?

23        A.   Yes.

24        Q.   Okay.  If you look at the next report, is it

25   also a visit to the same address -- page 24204 --

1      A.    Uh-huh.

2      Q.    -- also a visit to the same address labeled as

3  a prolific offender check?

4      A.    Yes.

5      Q.    Is the same true with the next on page 24206?

6      A.    Yes.

7      Q.    And this includes the name Bobby Jones?

8      A.    It does.

9      Q.    If you look at the next one from December 21,

10  2015, is this also labeled as a prolific offender check?

11      A.    Yes.

12      Q.    And is it the same address?

13      A.    Yes.

14      Q.    And it also references Bobby Jones?

15      A.    Yes.

16      Q.    Okay.  Is the same true for the next one?

17  Well, doesn't reference Bobby Jones, but is the same one

18  also a prolific offender check at the same address?

19      A.    Just want to make sure.  24210?

20      Q.    Yes.

21      A.    Yes.

22      Q.    Same true of the next one?

23      A.    Yes.

24      Q.    Same true of the next one?

25      A.    Make sure.  24214, yes.

1      Q.   Okay.  I could keep going.

2      A.   Well, again, all of -- not -- I can't say all

3  of them, but so UTL unable to locate negative contact on

4  one.  So they're going out trying to make contact with

5  him is what it looks to me --

6      Q.   Okay.

7      A.   -- without actually making contact with him.

8  So they're going to continue until they do.

9      Q.   Okay.  And why would they do that?

10     A.   To try to make contact with him.  That's --

11     Q.   Does this indicate that they're trying to make

12  contact in order to conduct a prolific offender check?

13          MR. POULTON:  Object to the form.

14     A.   So the nature of the call is prolific offender

15  check.

16  BY MR. JOHNSON:

17     Q.   So is that a yes?

18          MR. POULTON:  Object to the form.

19     A.   I can't say exactly, again, what -- what the --

20  the intent is, but --

21  BY MR. JOHNSON:

22     Q.   Were these CAD reports all created by the same

23  deputy?

24     A.   No.

25     Q.   They were created by multiple deputies?

1     A.   The same team it looks like in patrol, was it?

2  Let me look back.  I can't remember.  This was -- I

3  looked at a lot now.

4          Yeah, so same team and patrol, same district,

5  yeah.

6     Q.   And all of those different deputies in these

7  reports labeled these as prolific offender checks?

8     A.   Uh-huh.

9          MR. POULTON:  You need to answer.

10    A.   Yes.

11         MR. JOHNSON:  Okay.  We'll label another

12     exhibit.  This will be Exhibit 52.

13         (Exhibit 52 was marked for identification.)

14         (Off-the-record discussion.)

15  BY MR. JOHNSON:

16    Q.   Is this another set of AIM slides?

17    A.   Yes.

18    Q.   Okay.  If you look at page 14824 --

19    A.   Okay.

20    Q.   -- at the top it says AIM slide and below that

21  there are notes; is that correct?

22    A.   Yes.

23    Q.   And the notes would have been written by -- for

24  the reference of the person presenting the AIM slides?

25    A.   I do not know.

1        Q.   Okay.  Are you familiar with the AIM slide

2    notes?

3        A.   So I'm used to seeing it as what we saw on that

4    other slide.  It was built into the slide.

5        Q.   Right.

6        A.   So I don't know that this is obviously built in

7    the notes of PowerPoint.

8        Q.   Right, right.  Does this indicate that Bobby

9    Jones was a Top 5 offender at the time?  And you can

10   also look at page 14820.

11       A.   Yes.

12       Q.   And that is as of March 7, 2016?

13       A.   Yes.

14       Q.   Okay.  And as of that date, he had been listed

15   for 29 days?  There's a number after his name.

16       A.   Yeah, so I know, yeah, that, but so around.

17       Q.   Right.

18       A.   Yes.

19       Q.   And the notes indicate he was listed on

20   February 9th?

21            MR. POULTON:  On page 14820.

22            THE WITNESS:  Yeah, I got it midway down.

23            MR. POULTON:  Okay.

24       A.   Yes.

25   BY MR. JOHNSON:

1     Q.   Okay.  And, yeah, these are AIM slides that

2   would have been shown -- the slide at the top would have

3   been shown at the AIM meeting.

4     A.   Yes.

5     Q.   Okay.

6     A.   And also it's important to note there's no such

7   thing as a CAD classification for Top 5 offender checks;

8   right?  So the only thing that -- that was in there is

9   prolific offender check.

10    Q.   Uh-huh.

11    A.   So it's possible that deputies use prolific

12  offender check to indicate any type of check.

13    Q.   Right.  So for some of -- I mean, this is after

14  the incidents that we were looking at earlier in the CAD

15  report; correct?

16    A.   Uh-huh.

17    Q.   But at least for instance after that --

18    A.   I just want to -- uh-huh -- just to point in

19  that.

20    Q.   Uh-huh.  So if there's a -- someone was labeled

21  as a Top 5 offender and a deputy made a check on that

22  individual, that could be labeled as a prolific offender

23  check?

24    A.   Correct.

25         MR. POULTON:  In the nature field you mean;

1      right?

2           THE WITNESS:  Yeah, the nature code.  Correct.

3   BY MR. JOHNSON:

4      Q.   And what would it mean for a deputy to make a

5   check on a Top 5 offender?

6      A.   To go out and make contact with them.

7      Q.   Similar to a prolific offender check?

8      A.   Yeah, similar.

9           MR. JOHNSON:  I'm going to label this as 53.

10          (Exhibit 53 was marked for identification.)

11  BY MR. JOHNSON:

12     Q.   If you want to turn to page 15453.

13     A.   Okay.

14     Q.   Bobby Jones is listed as a Top 5 offender here?

15     A.   Yes.

16     Q.   Okay.  And then if you turn forward to page

17  15458.  And before I ask, just I don't -- I'm getting to

18  the point in the day where my brain is starting to get

19  fried.  I don't think I asked you.  These are AIM

20  slides; correct?

21     A.   Yes, that is correct.

22          MR. POULTON:  We haven't done these yet though.

23          MR. JOHNSON:  Right.

24  BY MR. JOHNSON:

25     Q.   Okay.  So we're looking at page 15458.  This

1    indicates that this information was from May 9, 2016; is

2    that correct?

3         A.   Yes.

4         Q.   Okay.  And Bobby Jones is still listed as a Top

5    5 offender?

6         A.   Yes.

7         Q.   Okay.  And it's lists his associates?

8         A.   Yes.

9         Q.   And one of those associates is his father

10   Robert Jones, III?

11        A.   Correct.

12        Q.   Okay.  And another is -- directly below that is

13   Talia Jablon, his girlfriend?

14        A.   As in Robert Jones, IV's girlfriend; right?  Is

15   that what you're saying -- asking?

16        Q.   Yes.

17        A.   Yes.

18        Q.   Okay.  So that would be Bobby's girlfriend?

19        A.   According to the slides, yeah.

20        Q.   Okay.  Right.  And that's why she would be

21   listed?

22        A.   Yes.

23        Q.   Okay.  So she's his associate because she's his

24   girlfriend?

25        A.   Correct.

1    Q.   Okay.  And Robert Jones is associate because

2  he's his father?

3    A.   Correct.

4    Q.   Okay.  And this is a slide that would have been

5  shown at the AIM meeting around this time?

6    A.   Yeah, yeah.

7    Q.   I've got one more thing, and then we might just

8  need to take a quick break and probably won't have

9  anything else after that, but I just need to talk to my

10  team.

11    A.   Sure.

12        MR. JOHNSON:  Okay.  CG, what was the email --

13     do you have -- you have listed exhibits -- the one,

14     the Prescott email that was like one of the last

15     ones?

16        MS. BROTHERS:  32.

17        MR. JOHNSON:  32.

18        MR. POULTON:  No, no, no.  We don't have --

19     Wait.  Or is it in our -- you mean our 32?

20        MR. JOHNSON:  Yes.

21        MR. POULTON:  Oh, okay.  I thought you meant

22     your own 32.

23        THE WITNESS:  I don't think I --

24        MR. POULTON:  No, that's okay.  Wait.  No, 33

25     though; right?  No, that's right.  It's the

1    replacement.

2         MS. BROTHERS:  That was the replacement 32,

3    yeah.

4         MR. POULTON:  I got it.

5         THE WITNESS:  Oh, here's 32.

6    BY MR. JOHNSON:

7    Q.   Is this an email?

8    A.   Yes.

9    Q.   Okay.  And it's an email from Brian Prescott to

10   Jerry Ratcliffe.  Are you familiar with those names?

11   A.   I am.

12   Q.   Who are they?

13   A.   Brian Prescott was a lieutenant at the

14   Sheriff's Office and oversaw kind of starting up the

15   intelligence-led policing at our agency.

16   Q.   Uh-huh.

17   A.   And Jerry Ratcliffe is the author of

18   Intelligence-led Policing.

19   Q.   Okay.  And do you know during this time - this

20   was when you were in charge of the ILP program; is that

21   correct?

22   A.   Yes, that would be.

23   Q.   Okay.  And Brian Prescott, was he employed with

24   the agency during that time?

25   A.   No.

1     Q.    No?   Okay.   So was he retired at that time?

2     A.    Yes.

3     Q.    Okay.   He had previously been employed?

4     A.    Yes.

5     Q.    Okay.   Why don't we take like a ten-minute

6  break -- five-minute break and --

7     A.    Can I just correct --

8     Q.    Sure.

9     A.    I don't know if it's a correction of something

10  earlier, but you asked about the ILP meetings on

11  different days and stuff.

12     Q.    Uh-huh.

13     A.    So I do know when it all first -- the AIM

14  meetings first started, they were joint, all three

15  districts and everybody came together.   Obviously,

16  everybody was at the same date of the week and time.   I

17  don't recall specifically what those dates and times

18  were, but there was a point where everybody was meeting

19  together for AIM meetings, and then we broke them up

20  into individual districts.

21     Q.    Uh-huh.

22     A.    And then they were meeting same dates and

23  times, and we ended up changing that to multiple dates

24  and times.   So just to provide kind of that evolution

25  and make sure that --

1    Q.    That makes sense.  Yeah, that's helpful.

2    A.    Cool.

3          (Short break.)

4          MR. JOHNSON:  I'm going to label this as

5    Exhibit 54.

6          (Exhibit 54 was marked for identification.)

7    BY MR. JOHNSON:

8    Q.    Is this an email?

9    A.    It is.

10   Q.    Is this an email you drafted?

11   A.    Yes, sir.

12   Q.    Okay.  And do you recognize this email?

13   A.    Yes.

14   Q.    Okay.  What is this email?

15   A.    So it's an email from me as the lieutenant over

16   in intelligence-led policing to commanders in the agency

17   introducing the fact that we're revising that manual and

18   sending it out for review.

19   Q.    Okay.  And was Sheriff Nocco included as a

20   recipient to this email in the cc field?

21   A.    Yes.

22   Q.    Okay.  And this was part of the process of

23   drafting the January 2018 version of the ILP manual?

24   A.    Yes.

25   Q.    And would have attached a draft of the first

1   two sections of the manual?

2       A.   Yes.  Yeah.  It says attachments the ILP

3   manual.  And the intent is at this point not for people

4   in the cc line necessarily to review and provide

5   comments.  It's the commanders.  At this point I'm

6   working on finalizing the draft before I send the final

7   product out.

8       Q.   But you wanted to make sure that the people in

9   the cc field were kept apprised of what was going on?

10      A.   Knew that that's what I was doing.

11      Q.   Uh-huh.  Okay.  Nothing further.

12           MR. POULTON:  Okay.  He and Mr. Kraus will read

13      -- Inspector Kraus.

14                  *   *   *   *   *   *

15           (THEREUPON, THE TAKING OF THE DEPOSITION WAS

16      CONCLUDED AT 5:43 P.M.)

17                  *   *   *   *   *   *

18                  S T I P U L A T I O N

19        It was thereupon stipulated and agreed by and

20   between counsel present for the respective parties and

21   the deponent that the reading and signing of this

22   deposition is not waived.

23                  *   *   *   *   *   *

24

25

1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA

3    COUNTY OF PASCO

4         I, the undersigned authority, certify that

5    Justin Ross personally appeared before me and was

6    duly sworn on January 26, 2022.

7         WITNESS my hand and official seal this 20th

8    day of February, 2022.

9

10

11    _____

                  Judy Anderson

12                Notary Public - State of Florida

                  Commission No.:  GG 276821

13                My Commission Expires:  1-5-2023

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF PASCO

5

6         I, JUDY ANDERSON, Court Reporter, certify that I

7    was authorized to and did stenographically report the

8    foregoing deposition and that the transcript is a true

9    record of the testimony given by the witness.

10

11        I further certify that I am not a relative,

12   employee, attorney, or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties'

14   attorney or counsel connected with the action, nor am I

15   financially interested in the action.

16

17        Dated this 20th day of February, 2022.

18

19                              _Judy A. Anderson_

20                         Judy Anderson, Court Reporter

21

22

23

24

25

1   DALANEA TAYLOR; TAMMY
     HEILMAN; DARLENE DEEGAN;
2   and ROBERT A. JONES, III,

3    Plaintiffs,

4   vs.               Case No.: 8:21-cv-00555-SDM-CPT

5   CHRIS NOCCO, in his
     official capacity as
6   Pasco County Sheriff,

7    Defendant.
    _____/
8

9

                DEPONENT'S SIGNATURE PAGE
10

11      I HAVE READ THE FOREGOING TRANSCRIPT OF MY

12    DEPOSITION AND HEREBY SUBSCRIBE TO THE FOREGOING

13    DEPOSITION, SAID SUBSCRIPTION TO INCLUDE ANY

14    CORRECTIONS AND/OR AMENDMENTS HERETO.

15

16

    _____    _____
17   Justin Ross              Date

18

19

20

21

22

23

24

25

ERRATA SHEET

PAGE        LINE                        CORRECTION

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

**A**

a/k/a 100:17
**Abargil@ij.org** 2:12
**abiding** 20:4
**able** 12:23,24 23:1 71:5
76:21 102:24
**above-noted** 69:1
**absent** 55:14
**absolutely** 13:19
**academic** 71:14
**access** 101:2
**accomplish** 13:8
**accomplished** 17:25
**accuracy** 62:9
**accurate** 42:16 44:15
60:9 62:8 63:8 69:25
84:21 91:6 96:16,24
**ACE** 68:12
**acquaintances** 16:2
**acronym** 25:3 37:24
**action** 10:15 37:25 38:4
80:20 124:14,15
**actions** 9:19
**active** 9:17 18:25 19:2
20:7 21:11 22:7 52:22
52:23
**actively** 68:7,11 95:4
**activities** 79:17
**activity** 38:11 65:10,25
85:4 90:1,18 92:15
102:3 105:6,9
**actual** 13:20,22 56:12
68:22
**add** 79:21
**added** 64:5,9
**addendum** 67:24
**addition** 71:14
**additional** 11:18 100:16
**address** 43:4 53:22 82:13
84:19 101:11 104:9
105:16 107:11 108:24
110:17,25 111:2,12,18
**addresses** 33:15
**adoption** 25:12,15
**advice** 63:17
**affidavit** 98:7
**affidavits** 98:9
**afternoon** 6:8,9
**afternoons** 82:17
**age** 65:9
**agencies** 68:13
**agency** 18:6 58:2 60:6
66:14 73:14,18 74:2,4
74:15 94:17 119:15,24
121:16
**agency's** 25:5
**ago** 41:10
**agree** 55:18
**agreed** 122:19
**Ah** 43:24
**ahead** 9:2,3,16 12:18
17:2,9 35:16 38:16
42:6,9 48:16 57:9 75:5
103:9,13 106:14
107:23 109:4,25
**AIM** 4:18,19,24 5:3
81:12,13,15,16 82:10
83:10,11,19,21,24
84:7,23 85:24 86:2,11
86:16 87:1,3 91:4
113:16,20,24 114:1
115:1,3 116:19 118:5
120:13,19
**aimed** 104:22
**alternative** 76:18
**AMENDMENTS** 125:14

**amount** 8:12 9:10 23:20
**analyst** 41:16 42:1,3
66:22 75:12 77:15
81:1 83:17,18 95:19
101:5
**analysts** 16:6 19:5,15
25:19 26:1,6,18 65:16
65:19 79:21 80:23
82:15 83:15,15
**analyzing** 65:16
**Anclote** 77:20 78:7,9,10
78:12,14,15 79:16
**AND/OR** 125:14
**Anderson** 1:19,22
123:11 124:6,19
**Andrew** 92:8 93:4,6
95:18
**ankle** 100:18
**answer** 13:1 23:1 28:2
44:21 73:4 78:4 94:24
94:25 96:19 102:14
113:9
**answers** 18:13
**Anthes** 28:17,18
**Anthony** 39:4,7 40:1,5
41:13,19 46:12 47:6
57:21,22
**Antonio** 87:16
**anybody** 16:12 59:19,22
67:12
**anymore** 36:22 62:1 79:2
**apologies** 73:10
**apologize** 17:3 110:5
**appear** 44:22
**APPEARANCES** 2:1
**appeared** 123:5
**Appearing** 2:10
**appears** 67:11 95:17
**applicable** 52:24
**application** 10:17
**applied** 66:10,13,19
**apply** 65:8 71:5
**appreciate** 109:22
**apprehended** 10:7
**apprised** 122:9
**approval** 72:16
**approved** 52:9,12,17
71:20,24,25 72:23
**April** 33:2 35:13
**area** 16:1 19:7 20:17
21:22 45:8,25 46:6,8
49:23 52:24 54:13
59:8 80:13,18 82:3,13
95:5 100:12 101:20,20
104:21,24 105:6,10
**areas** 16:12
**ARI** 2:10
**Arlington** 2:7
**arrest** 22:18 87:24 88:1
89:15,16 91:22,22
92:25 98:6,8
**arrested** 88:5,8,9,12,17
90:2,7,12,15,17,19
**arrests** 47:8,25
**arrival** 102:17 110:3
**arrive** 85:8
**Art** 36:10
**Arthur** 99:22
**articulable** 22:3
**aside** 104:17
**asked** 16:14,23,24 43:21
46:4,15 116:19 120:10
**asking** 12:16 17:3 48:10
58:6 61:10 108:4,4
117:15
**asks** 44:13
**aspect** 97:9

**assigned** 7:18 16:1 21:12
77:19
**assignment** 7:16 32:5
36:24 58:16
**assignments** 34:16
**assistance** 62:5
**associate** 46:12,18 87:13
87:17,20,20,23,24
88:4,7,10,11,13,14,16
88:18 89:14,15,22,23
90:2,9,14,15,16 94:21
100:19 105:21 106:10
106:16,16 117:23
118:1
**associate's** 46:14
**associated** 52:23 89:24
89:25 105:12
**associates** 45:5,17 87:8
87:10 100:16 117:7,9
**assume** 52:13,13,16
71:19
**assumption** 33:13 34:14
**at-risk** 16:17,19,23,24
**ATM** 81:18
**attached** 121:25
**attachment** 52:4
**attachments** 122:2
**attempted** 102:16
**attention** 11:8
**attorney** 48:24 124:12,14
**August** 7:7,12 23:6
101:12
**author** 34:1 70:9 93:15
119:17
**authority** 123:4
**authorized** 124:7
**auto** 65:11,11 66:1,1
**automatically** 85:8
**aware** 8:18,24 13:21
16:19 18:20 27:1
55:23 56:2,14,17,20
56:22 57:4,5,5,7 68:1
73:17
**awareness** 80:14

**B**

**B** 4:1 5:1
**back** 10:18 12:7 20:9
24:6 27:2 37:18 46:6
54:8 71:23,24 72:17
90:20 97:24 113:2
**backed** 18:9
**background** 71:3,14 99:5
**bad** 98:21
**BARGIL** 2:10
**based** 19:12 23:24 34:23
43:6 49:20 50:9,24
63:3,24 68:17,19
77:22
**basic** 26:8
**basis** 50:1
**Beaman** 37:12 57:20,22
57:23
**begun** 29:3
**believe** 10:13 20:16
47:20 52:14 53:15
70:11 79:11 82:11
**benefit** 64:11
**best** 90:22 102:24
**better** 71:11
**big** 14:19
**bigger** 18:3
**Bill** 36:11
**bird** 25:3
**Biscayne** 2:11
**bit** 22:25 42:8 74:18
**blank** 52:10

**block** 31:15
**Blvd** 2:11,15
**Bobby** 99:7,12 100:17
102:16 111:7,14,17
114:8 116:14 117:4
**Bobby's** 117:18
**body** 91:16
**bold** 65:2
**Bollenbacher** 32:13 33:2
**book** 23:24
**Boston** 10:19
**bottom** 15:25 42:10
57:16 84:4
**Boulevard** 2:3
**Box** 1:23
**brain** 116:18
**break** 51:13 118:8 120:6
120:6 121:3
**Brian** 30:16 119:9,13,23
**briefly** 7:15 37:18
**bring** 18:8
**broke** 120:19
**broken** 34:6
**BROTHERS** 2:6 118:16
119:2
**brought** 49:12 84:9
**built** 114:4,6
**bullet** 15:24
**bulletin** 52:8 56:4,9,14
56:20
**bulletins** 56:18
**bunch** 38:22
**bureau** 37:14 40:18
**burglaries** 21:16
**burglarize** 90:6
**burglary** 65:11,11 66:1,1
115:9,12,12,21,23
116:5,7
**business** 20:5
**buy** 63:20 64:3

**C**

**CAD** 4:5,21 49:10 84:16
85:15 86:3 91:12,14
96:3,3,12 97:1,5,12,14
97:15,18 101:25
102:15,16 107:1
108:22 112:22 115:7
115:14
**CADs** 96:10
**calculations** 9:6
**call** 71:8 81:12 85:4,4,5,7
91:12 94:6 105:9,11
105:11 107:2 112:14
**called** 58:19 102:1
**calls** 38:12
**cam** 91:16
**Candace** 41:13,25 44:17
**capacity** 1:7 125:5
**captain** 6:17,19,21 7:8
34:1,5,8,22 36:10 37:4
37:6,6,9,12,13 47:20
47:23 57:24 69:12
71:22 72:5,7,12 82:12
**capture** 17:24
**car** 21:16 79:15,18
**CAROLINE** 2:6
**carries** 44:12
**cars** 90:6
**case** 1:6 21:19,20,25 22:4
22:11 48:21,23 64:12
67:11 74:10 90:13
91:10 99:6 102:16
125:4
**cases** 21:19
**categories** 102:9
**category** 91:20
**cause** 22:2,12,17 47:22
52:22 98:9

**causes** 64:9
**cc** 121:20 122:4,9
**Celleste** 84:19
**Center** 98:10
**centered** 71:11
**central** 58:19,20,21
**Certificate** 3:4,4 123:1
124:1
**certify** 123:4 124:6,11
**cetera** 16:4
**CG** 118:12
**Cgbrothers@ij.org** 2:8
**Chagrin** 2:3
**chain** 42:10 57:16 69:4,7
69:10,13,17 71:21
72:1,3 76:11 92:7
95:17
**change** 64:8
**changed** 9:1,11 16:20
17:16 18:11 50:12
**changing** 120:23
**charge** 37:9 39:7 82:7,8
82:8 119:20
**check** 9:24 10:1,2 11:11
11:13 12:8,15,25 13:4
13:6,22 16:19 17:5,13
17:15 18:1,9 46:10,16
47:17 49:2,5,9,10,15
49:16,20 50:5,5,24
53:22,25 54:15,18
56:23 61:14 62:17
74:7,16 105:21 106:10
107:18 108:5,20 109:3
109:7 110:15,22 111:3
111:10,18 112:12,15
115:9,12,12,21,23
116:5,7
**checked** 45:18 46:18
47:10 85:13,13
**checking** 47:12
**checks** 16:9,16 17:12
29:4,7 43:10 45:4,12
45:23 52:25 53:9
55:15,25 56:16 61:2,4
63:12,13,15,22 64:14
64:15 73:24 74:3
113:7 115:7
**checkup** 11:18
**chief** 6:18 44:1,5,7,12
**child** 36:17 74:25
**choose** 49:17
**Chris** 1:7 75:23 80:11,19
125:5
**Christine** 28:16
**Christopher** 57:20,22
**chronological** 27:4
**circumstances** 22:13
55:14
**citation** 98:5
**citations** 98:6,9
**citizen** 20:4,4
**citizens** 61:25 62:1
**City** 1:23
**civilian** 8:4
**clarify** 35:12
**clarity** 32:7 77:10
**classification** 49:10
102:1,23 115:7
**classifications** 102:18
**clear** 48:2 49:1 63:7
**close** 22:9
**Co-counsel** 2:9,13
**code** 116:2
**coined** 8:15
**Collier** 36:11
**collusions** 68:19
**colonel** 43:23 44:1

**come** 20:13,14 22:8
23:21 27:2 42:14,16
63:11 97:24
**comes** 11:11 20:15 71:23
90:9 94:17 105:10
**coming** 104:9
**command** 58:19,21,21
69:10 71:21 72:1,4
**command-** 36:1
**commander** 34:2,4 36:2
82:12
**commander's** 54:14
**commanders** 19:3
121:16 122:5
**commanding** 44:9
**comment** 46:1 70:6
**comments** 72:17,18
122:5
**commission** 20:3 49:14
123:12,13
**commit** 10:8,9,14 11:6
13:17 47:15 62:1
**commits** 21:16
**committed** 20:24 47:16
49:24 54:11
**committing** 9:20 11:1,5
12:7,13 16:12 48:20
54:12 61:24 95:5
**community** 11:3,23 12:1
12:10 61:6,13,15
**compile** 23:3
**compiled** 83:15,18 86:23
**complaining** 43:9
**complaints** 101:23
104:25
**concept** 8:10 10:2 11:9
18:24 23:15,22,23
49:8,19 50:24 71:6
**conceptually** 94:15 95:2
**CONCLUDED** 122:16
**conclusion** 56:5 102:20
**conditions** 55:3,20
**CONDOR** 25:2
**conduct** 112:12
**conducting** 61:2 73:19
73:24 74:3
**confirm** 53:3
**confirmed** 100:18
**confusion** 99:14
**conjunction** 88:17 108:7
**connected** 124:14
**consequence** 10:14
**considered** 10:22 11:7
50:9 65:3 66:8,15
**consistent** 94:7,19
**consists** 12:25
**consultation** 19:13
**contact** 102:16 112:3,4,7
112:10,12 116:6
**contains** 71:6,15
**content** 31:11
**contention** 63:22
**context** 46:2 69:7 75:3
77:7 87:19
**contextually** 34:14 35:7
39:11
**continuating** 63:2
**continuation** 62:25
**continue** 9:8 11:6 60:2
112:8
**continuously** 21:12
**control** 49:16 50:17
**conversations** 60:11,18
61:1,13,18 63:3,8,9,24
**convey** 71:3
**Cook@debevoisepoult...**
2:17

**Cool** 121:2
**coordinate** 82:15
**copied** 51:23
**copies** 36:20 70:11
**copy** 15:5
**Corbin** 37:13 40:5,6
44:14 45:2,16 46:4,11
51:21
**Corbin's** 47:4
**corners** 104:1
**Corporal** 76:15 78:12
79:7,18 80:2
**correct** 12:14 16:7 20:25
23:8 26:2 30:15 32:25
34:3,11 36:3 40:21,23
41:18,21 43:4 44:6,23
46:14 49:4 51:5 53:21
55:4,7,22 58:22 61:8
63:6,10,15,18 64:1,24
67:5,6,9 71:16 72:2
75:22 76:2 77:17 80:6
83:20 84:16,17,25
86:21,25 87:14 88:20
89:3 98:14 105:22
106:3,22 107:19
113:21 115:15,24
116:2,20,21 117:2,11
117:25 118:3 119:21
120:7
**correction** 120:9 126:2
**CORRECTIONS**
125:14
**correctly** 102:10
**could've** 88:6
**counsel** 2:5,18 122:20
124:12,14
**counterproductive** 62:19
**county** 1:8 6:14 7:11
15:22 16:20 28:5
29:20 31:5 32:14,19
33:23 35:21 38:21
39:3,17 43:7 44:8 52:1
60:12 61:25 63:4
65:17 73:15 76:8,11
78:25 79:4 92:11
94:12 96:8 98:16,19
99:1,24 100:20 104:19
107:10 123:3 124:4
125:6
**course** 96:8
**court** 1:1,19,22 27:5 73:1
73:7 124:6,19
**cover** 98:3
**CPI** 36:25
**created** 68:4 112:22,25
**creating** 73:15
**creation** 29:8
**crime** 8:13,14 9:10,15,20
10:8,9,14 11:1,5,6,7,23
11:25 12:12 19:6,10
20:10,23 21:4,6 46:8
48:4,20 49:13,14 51:4
52:23 54:12,13 59:7
82:13 95:4,5 104:24
**crimes** 7:23,24,25 8:1
12:7,10 13:17 16:12
20:3 21:24 31:13,17
31:19 45:21,21,22
49:3,6,23,23 58:17
60:17,17 61:24 62:1
87:25 90:9,12 97:3
**crimes/STAR** 80:10,17
**criminal** 9:18 19:17,20
19:22,23,24 20:1
21:11 22:6,16 39:18
40:17,18 45:19,20
46:8,13,19 48:2,3,17

**D**

**D** 3:1
**D3** 80:10 92:24 100:12
100:14
**Dade** 1:23
**DALANEA** 1:3 125:1
**DARLENE** 1:3 125:1
**data** 19:12,13 65:7,23
71:8
**date** 1:14 8:20 24:25
27:13,14 100:25
114:14 120:16 125:17
**Dated** 124:17
**dates** 10:18 34:16 120:17
120:22,23
**Davis** 34:21 36:11
**day** 20:5 82:10,25 84:22
116:18 123:8 124:17
**days** 82:19 104:4,7,11
114:15 120:11
**deal** 54:3 104:25
**Debevoise** 2:14
**December** 111:9
**decide** 61:21,25
**decided** 61:23
**decision** 72:4,8
**decisions** 10:5,6
**DEEGAN** 1:3 125:1
**def-** 94:15
**Defendant** 1:9 2:18
125:7
**define** 9:5
**defined** 13:1
**defines** 95:7
**definitely** 97:23
**definition** 26:3,5,13,17
26:20 47:8,25 65:8
66:3,16,24 67:18
74:16 76:20 93:20
95:6
**definitively** 24:1 25:21
108:12
**delighted** 51:6
**Delivered** 80:8
**Denbo** 92:8 93:4,6 95:18
**Department** 93:8
**depending** 34:21 69:8
**depends** 46:18
**depo** 4:3,4,5
**deponent** 122:21
**Deponent's** 3:5 125:9
**depose** 99:14
**deposition** 1:12 14:14,19
122:15,22 124:8
125:12,13
**deputies** 14:5 15:14 16:6
16:8,10,14 19:4,15
25:16,23 31:22,25
32:2,24 60:3,12,25

**deputy** 6:18 8:4 13:14
30:20 41:5 44:1,5,7,12
49:15 66:21,23 67:14
69:10,11 74:11 84:18
96:13,14 100:20,23
103:5,12 107:11,15
108:17,24 110:16
112:23 115:21 116:4
**describing** 48:19
**designate** 51:14
**detailed** 26:12,12,21,23
**detective** 8:4 23:18
**detectives** 8:1 19:4,15,15
21:11 31:25 60:4,12
60:17,20,23,24,24
61:3,9,11,12,17 62:10
63:1,4,25 97:4
**determine** 19:8
**determined** 90:8
**deterrence** 10:3,4,12,16
10:17 11:10 18:10
49:21 50:24
**dictating** 74:16
**difference** 49:8 53:21
87:19
**differences** 85:16
**different** 18:8,8 19:24
35:2 39:21 53:18,20
55:8,13,16,17,18
56:10 82:19 94:16
102:7 103:25 108:24
113:6 120:11
**diligent** 45:6
**dime** 70:15
**Direct** 3:3 6:6
**directed** 101:17,19 102:4
102:25 104:14,18,20
104:23,25 105:1,3,4
105:10,12
**direction** 13:20 50:18
**directions** 71:15
**directives** 44:11
**directly** 117:12
**director** 7:9 58:10
**discipline** 76:18 79:16
**discussed** 84:7
**discusses** 78:7,9,10
**discussing** 84:23
**discussion** 30:25 42:14
42:22 67:19 73:12
113:14
**dispatch** 85:14
**dispatched** 85:8
**disregarding** 51:18
**dissuasion** 10:11
**distinct** 101:24 103:16
**distinction** 20:20 22:15
**district** 1:1,1 18:25 19:1
19:3,3,10,14 20:10
28:10 30:9,12,14,20
31:12,13,20 32:23
33:5,6,8,8,9 34:3,6,7,9
34:24 35:1 36:2 45:5
58:17 66:22 75:19,19
77:19 78:15 80:17
82:12,12,14 86:16
100:11 113:4
**district's** 81:10
**districts** 19:1,4,5 34:7
120:15,20
**divided** 19:1
**division** 1:2 34:2,2,4 36:1
36:2 89:3

**dob** 76:16
**document** 16:4 24:10,17
27:9 29:6 48:11,12
52:7 53:6 54:22 55:13
55:24 56:3,8 57:13
67:22 68:4 78:20 81:7
86:9 101:3
**documents** 4:22 18:4
91:20 97:13 98:11,13
**doing** 10:11 11:19 14:1
29:3,7 54:4 61:14 62:4
103:5,12 104:23,25
105:1,3,11 122:10
**Dominic** 87:8 88:16
**Donnie** 74:21 76:15
79:14,15,17 80:4 84:2
84:6 87:10 88:15 93:1
93:12
**draft** 52:15,17 53:4
56:22 70:4 72:10
121:25 122:6
**drafted** 58:12 70:2
121:10
**drafter** 24:16
**drafting** 70:23 121:23
**draw** 56:5 68:19 102:19
102:24
**drawing** 20:20
**drive** 1:17 76:16 81:10
84:19 100:17 101:11
**driving** 38:5 101:20
105:2,5
**drunk** 38:5
**duly** 6:2 123:6
**duration** 82:8

**E**

**E** 2:2 3:1 4:1 5:1
**eagle** 30:9
**Eakley** 41:1,3,4 43:15
45:1
**Eakley's** 46:2
**EAP** 37:21,23
**earlier** 48:18 63:14
65:18 69:24 70:21
81:14 93:20 115:14
120:10
**ears** 12:4
**easier** 11:2
**easiest** 10:25
**economic** 7:25
**edit** 70:6
**effective** 24:13 25:9,11
63:14
**effort** 38:3
**efforts** 56:25
**either** 57:8 93:17
**Elders** 32:21 33:12
**email** 4:7,8,9,10,11,12,13
4:14,15,16,20 5:4 28:4
28:14 30:25 32:8,13
32:15 33:2,10,11,11
33:15,22 34:1 35:13
35:20,24,25 36:5,6,8
36:10 37:21 38:20
39:2,4,25,25 40:5
41:13 42:9,9,11,15
43:3,4,6,9,12 44:17
45:1,16 46:2,11 47:6
47:19,21,21 51:18,20
51:23 52:6 57:14,18
58:12,17,23 59:1 75:8
75:9,21 76:1,5,11,15
77:7,11,14,22 78:7
93:4,5,7,17,18 93:5
93:14 95:18 118:12,14
119:7,9 121:8,10,12

121:14,15,20
emailing 34:12,13 75:15
emails 32:18 51:7 57:15
employed 6:13 119:23
120:3
employee 32:14 40:7
43:6 75:18 93:7 99:24
100:4 124:12,13
employees 15:22 29:20
31:5 32:19 33:23
35:21 38:20 39:3,6
43:17 51:25 76:11
92:12 99:1
employment 8:19 12:17
13:16
en 85:15
encountered 61:6
encouraged 16:15 25:16
25:19
ended 120:23
ends 13:17
enforcement 10:16,18
16:11 25:5 26:9 31:17
36:15,18 37:3,24 38:2
38:4,9 45:24 62:20
103:23
engages 79:17
enhanced 70:21
entail 17:14
enter 86:5
entered 96:14,24 99:1
environment 9:11,18
19:7,10
equate 95:4
Eric 36:11
Erik 28:17
Errata 3:5 126:1
errors 96:21
ESQ 2:6
ESQUIRE 2:2,10,14
essentially 9:18 10:4,12
10:15,21,25 14:6 38:2
62:14 69:17 95:4
estimate 27:21
et 16:4
evaluated 50:9
everybody 18:6 58:2
120:15,16,18
evidence 7:20
evolution 120:24
evolve 9:8,8 50:14 56:6
evolved 9:7
exact 8:20 57:25
exactly 13:6 34:16 81:19
81:24 112:19
Examination 3:3 6:6
examined 6:3
example 26:4 109:10
exceed 55:21
excuse 18:18 24:20 42:10
55:10 75:12 93:10
104:7 106:23 110:15
executive 1:17 44:10
exhibit 15:3 24:8 25:10
27:5,5,7,23,24 29:14
29:15 30:21,22 32:7,9
32:10,11 33:1,19,20
35:17,18 37:18 38:16
38:18 51:15,16 57:10
57:11 64:17,20,21
69:21 70:20 75:6
78:17,18 81:4,5 84:11
86:5,6,8 91:25,25 92:1
95:25 96:1 97:25 98:1
99:15,17 101:7 106:21
113:12,12,13 116:10
121:5,6

exhibits 14:14,18 95:24
118:13
expectations 15:12,14,16
18:1,2 25:22 53:14
68:22
expected 68:6,11,16
96:16,24
experience 94:8,11
Expires 123:13
explanation 69:4
Explorer 8:5
extent 16:18 23:1 28:2
extra 11:8 64:13,14
eyes 48:24

F
F 35:3
Facebook 100:15
fact 10:4,6 13:16 22:16
facts 22:3,12 48:21
fair 29:10 32:6,6 33:15
41:25 45:10
falcon 30:1,7,8,9
false 93:2
familiar 8:6 9:23 14:2
18:15 24:10 25:2 27:9
30:24 45:10 51:8 52:6
57:13 67:24 68:1
74:21,22,24 78:20
81:7 86:9 92:17 99:3
106:9 114:1 119:10
far 9:9 13:19 57:4 62:9
74:15
fashion 69:8
father 99:10,13 100:15
117:9 118:2
favor 73:1
February 25:11 114:20
123:8 124:17
feel 18:10 62:16 98:3
feeling 62:18
feels 62:12
fell 53:25
fellow 16:6
felonies 65:12 66:2
felony 93:2
Ferguson 28:7
field 15:15 30:17 37:14
101:17 108:7 109:6
115:25 121:20 122:9
fields 9:7 29:19 30:25
32:18
figured 85:14
file 22:9
filed 22:18
final 26:25 53:6,7 122:6
finalizing 122:6
finally 61:21
financial 8:1
financially 124:15
find 11:24
fine 47:1 78:3 88:25
89:21 95:16
fingerprints 21:18
finish 73:2 96:19
finished 77:4
Fire 96:11
first 6:2 7:19 8:18 11:14
23:3,16 24:19 27:3
30:4,6 33:10 39:2,25
43:3 45:12 58:11
107:1 120:13,14
121:25
fit 80:20
five 7:17 51:10 79:14
84:3

five-minute 120:6
FL 1:23 2:11,15
flip 107:8
floated 83:2,3
Florida 1:1,18,20 123:2
123:12 124:3
focus 21:4
focused 10:3,4,12,16,17
11:9 18:10 49:20
50:24
follow 15:15 26:18 78:11
followed 26:1
following 21:12 22:8
65:8
follows 6:4
footage 91:16
forceable 66:2
forcible 65:11
foregoing 124:8 125:11
125:12
forensic 7:19
forensics 8:5 36:25 37:10
form 9:2,16 12:18 16:22
17:8 44:21 46:20 48:7
66:12 69:8 73:25
88:19 89:17 93:22
94:9,22 98:17 102:12
103:9,13,17 107:23
108:10 109:4 112:13
112:18
formatted 92:19
forward 34:24 69:3,6
75:23 105:13 107:8
108:14,22 110:13
116:16
forwarded 31:2 33:11
43:12 47:20 69:17
57:24
forwarding 35:24,25
75:21 76:1
four 6:22,22 7:17 84:3
103:25
fourth 90:11
frame 89:7
frames 59:5
Frank 28:16
fraud 8:1
free 98:3
Fremer 28:16 36:6,11
frequency 52:21 53:8
55:24
frequent 59:7
frequented 16:3
fried 116:19
friend 46:14 90:11,16
frustrated 61:10,15
full 26:5,15 68:25
function 54:9 61:4
further 42:22 69:16
122:11 124:11
future 62:4 71:7 90:17
FYI 35:3,10

G
gainful 13:16
Gallo 39:5,7 40:1,5 41:13
41:19 46:12 47:6,20
57:21,22 58:6
gaps 71:8
gather 50:6
gathering 14:6,9 49:22
geared 26:7,7 38:3,5
general 15:16 16:11
56:18 102:18
generally 26:9 33:7
34:20,23 64:7,9 81:8
82:17 85:24 98:10

102:7 105:8
generated 85:5 86:3
generates 8:11
generation 73:19
generic 102:7
getting 10:7 21:3 69:18
95:11 116:17
GG 123:12
girlfriend 117:13,14,18
117:24
give 8:20,20 17:10 26:5
32:4 35:7 62:5 76:20
given 26:24 33:7 124:9
gives 69:16 102:18
giving 71:11
Glebe 2:7
gloves 21:18
go 9:2,2,16 12:1,7,18
13:2 17:2,8 22:24 27:3
35:16 37:18 38:16,23
42:8 46:9 48:16 53:6
54:7 57:9 59:14 62:22
64:6,13 68:23 69:12
71:7,24 72:24 75:5
90:5,6,20 97:8 103:9
103:13 105:13 106:14
107:23 108:14,22
109:4,25 110:13 116:6
goal 11:4
goes 20:9 21:16 36:21
46:6 48:22 71:23
going 10:8,14 11:8 13:3
14:17,22 15:2 16:22
17:10 20:5 25:8 27:4
27:23 29:14 30:21
32:9,10 33:19 37:15
38:16,23 44:20 45:18
46:8,20 47:3 48:7 51:7
51:14 53:25 57:9 60:2
60:4 62:13 69:13,20
72:6 76:14 84:11
90:20 91:24 95:23,24
95:24 96:21 99:15
102:2,4 103:8 112:1,4
112:8 116:9 121:4
122:9
gonna 13:16 105:4
good 6:8,9 27:21 71:2
72:24 102:18 109:10
gotten 22:11
Government 1:17
governmental 73:14,18
74:2,4,15
GRACE 2:6
grand 65:11 66:1
Gregory 37:6
Greiner 31:9 32:8
ground 12:4
group 36:13,14
groups 47:10
guarantee 99:14
guess 9:4,5 21:3,9 27:22
28:9 39:12 74:4,10
77:23 81:25 90:5
95:14 102:21
Guessing 95:13
guidance 13:5,25 17:12
18:5 26:23 44:11 56:9
70:25
guide 102:24
guiding 50:18
Guys 30:6

H
H 4:1 5:1
half 14:25 106:19,23
107:1

Halloween 105:3
hand 123:7
handling 38:12
Hans 32:13 33:2
happen 11:12 54:16,18
56:18
happened 83:19 91:7
96:21
happening 11:25 44:14
61:22
Happens 73:11
harass 62:23
harassed 62:16
harassing 60:6 62:12
harassment 62:19
Harrington 43:15 44:13
Harrington's 43:20
hate 64:8
he'll 73:6
head 41:20 89:2
Headsail 100:17 101:11
hear 22:6 60:23,24,24
heard 12:2,3 18:22 60:3
61:6,9 63:1,9 72:20
hearing 21:22
Heights 2:3
Heilman 1:3 92:25 125:1
held 82:10 85:24
help 11:3 12:3,5 13:14,17
38:25 49:5 62:23
helpful 18:14 69:19
121:1
Henshilwood 58:9
HERETO 125:14
hey 10:23 11:16,19 12:1
13:2,14 21:17,23
22:12 35:10 53:22
54:1,3 62:12 71:2
Hiebert 41:14,16
high 77:20 78:7,10,12,15
79:16 104:24
highlighted 52:21
Hillsborough 25:6
histories 45:19 46:13
history 9:14 22:24 37:17
46:19 65:7,16,23
89:23,24
Hmm 39:22
Holborn@debevoisepo—
2:17
holiday 38:4 76:17
hope 53:5
hopefully 18:13 22:20
71:11 88:3
hoping 79:18
hopping 79:15
house 85:22
houses 60:5
hypothesizing 95:8
hypothetically 13:13

I
i.e 52:23
idea 8:11 102:18
identification 27:7,24
29:15 30:22 32:11
33:20 35:18 38:18
51:16 57:11 75:6
78:18 81:5 86:6 92:1
96:1 98:1 99:17
113:13 116:10 121:6
identified 65:5,22
identify 17:24 19:6 66:23
67:11 68:13,16 69:2
86:15
identifying 26:1,18
III 1:4 99:9 117:10 125:2

**illustrate** 62:14
**ILP** 4:3,4 7:17 8:16,22
14:3 15:7 23:16,23,24
24:11,20 27:16 36:25
39:7,19 40:1,8,15,19
40:20 41:16 50:19
58:1,3 64:17 65:3,6,15
65:22 66:8,11,15 67:2
67:16 68:12 69:16,18
71:15 73:21 77:2,15
81:1,10,11,11 82:7
89:2 93:18 95:7,19
119:20 120:10 121:23
122:2
**immediate** 64:11
**immediately** 7:16
**impact** 62:15
**impacting** 19:6,9 20:10
**implement** 71:15
**implementation** 27:16
**important** 49:8 115:6
**inactivated** 20:11
**inactive** 21:14,19,19,20
22:9
**incident** 4:22 91:1,8,8,14
98:4,6,8,11,12 102:11
104:8,12 105:15
**incidents** 97:16 115:14
**include** 16:2 49:22 110:3
125:13
**included** 121:19
**includes** 25:22 47:8
48:18 111:7
**incorrect** 55:9
**indicate** 33:25 61:11,12
65:13 86:23 89:14,16
100:7,10 102:10
107:20 108:12 112:11
114:8,19 115:12
**indicated** 61:15
**indicates** 46:16 84:18
117:1
**indicator** 65:7,24
**individual** 19:16 21:6
43:3 44:19 65:1,2,5,13
65:21 66:7 88:7
107:20 115:22 120:20
**individuals** 10:13 28:19
29:18 30:24 32:17
34:13 43:13 60:19
66:11 76:10 94:16
**influence** 26:25
**info** 86:20
**information** 11:19,23
12:9,16 14:6 16:4,5
21:17,21 45:22 46:7
49:22 54:2,13 69:4,7
71:9,10 80:16 90:13
93:2 96:23 97:15,19
97:22 98:25 100:16
102:24 103:2 117:1
**information's** 96:12
**initial** 11:15
**initially** 7:18 8:15
**initiate** 74:12
**initiated** 85:17
**initiatives** 44:11
**inside** 102:17
**Inspector** 14:17 122:13
**instance** 115:17
**instances** 65:10,25
**Institute** 2:2,6,10
**instruct** 63:12
**intelligence** 59:15 62:6
**intelligence-led** 4:6 7:1,9
71:1,4,12 119:15,18
121:16

**intent** 17:15 18:9 54:15
54:15,20,22 102:2
112:20 122:3
**intentions** 69:18
**interaction** 54:4
**interactions** 15:17,18
**interested** 124:15
**interview** 100:15
**introduce** 27:4 91:24
95:24
**introduced** 14:14 23:16
**introducing** 121:17
**investigate** 49:2 50:7
51:3
**investigated** 21:7
**investigation** 19:17,23
19:24 20:7 21:11,13
21:15 22:6 40:17
48:22 49:5,12,16
52:23 62:4 88:1 93:2
101:24 102:1,5,6,11
103:16,18
**investigations** 20:11
36:17 39:18 40:11,18
57:24
**investigative** 54:9
**investigators** 16:6 97:4
**involve** 12:16 47:14
**involved** 45:13,21 49:13
58:1,3 72:4,8 97:12
**involves** 47:12
**involving** 104:8 105:15
**issue** 59:7
**issues** 16:15 79:16 96:22
97:10,11
**item** 92:22
**iterations** 90:17
**IV** 99:10 110:3,9
**IV's** 117:14

### J

**Jablon** 117:13
**JAC** 98:9
**Jack** 23:24
**James** 34:1 35:13,25
36:9,18 37:9 75:15,17
**January** 1:14 14:2 15:8
25:13 69:23 121:23
123:6
**Jeff** 37:2 72:7,20
**Jeffrey** 39:5,10,16 43:15
43:20 44:13 47:7
51:21 57:20,21
**Jenkins** 37:5
**Jerry** 8:16 119:10,17
**job** 13:15
**John** 37:12 40:5,5 44:13
45:2,16 46:11 47:3
51:21
**Johnson** 2:2 3:3 6:7 9:12
9:21 12:22 14:21 15:1
16:24 17:6 27:8,25
29:16 30:23 32:12
33:21 35:19 38:19,23
39:1,15,23,24 41:24
44:24,25 46:22,25
47:5 48:9,14 51:12,14
51:17 57:1,2,9,12
59:13 64:23,25 66:18
67:20 70:18 73:13
74:1 75:5,7 78:6,17,19
81:4,6,22,24 82:2,5
86:7 88:24 89:10,18
90:3 92:3 94:1,10,23
95:15 96:2,25 98:2,18
98:24 99:15,18 102:13
103:10,15,20 106:13

106:18 107:7 108:2,13
109:5,13,16,18,21
110:1,8 112:16,21
113:11,15 114:25
116:3,9,11,23,24
118:12,17,20 119:6
121:4,7
**joint** 120:14
**Jones** 1:4 36:12 99:3,6,7
99:9,10 100:17 102:17
105:21 107:21 111:7
111:14,17 114:9
116:14 117:4,10,14
118:1 125:2
**Joshua** 106:4
**Judy** 1:19 123:11 124:6
124:19
**Judy@andersoncourtr...**
1:24
**July** 100:25 101:6 107:4
**Justice** 2:2,6,10
**Justin** 1:12 6:1,12 123:5
125:17

### K

**Karen** 37:13
**keep** 24:6 73:9 83:12
90:22 112:1
**Ken** 36:14 37:6
**kept** 79:4 122:9
**kids** 105:5
**Kilian** 36:14
**kind** 11:12 12:4 17:11
19:6,13 22:24 26:9,13
35:2 63:2 102:19
105:12 119:14 120:24
**Knew** 122:10
**know** 8:15,15 10:10,11
10:22 11:2,5,6,23
12:2,3,4 13:10,18,24
17:4,12,21,21 18:5
19:5 20:10,12 21:21
22:25 24:16,21,22,23
26:4,6,8,22 28:8,22
29:22 30:11 31:14,18
32:3,5 33:4,5,14 34:12
34:19,23 36:20 37:1,3
37:7,15,17 39:13 40:8
40:10,13,22,25 41:8
42:21,23 43:20 46:1
46:24 47:3 49:7,17,23
50:14,16 51:1,2,24
52:16,18,19 53:7,12
54:3 56:10,12,19 57:3
57:8 58:5,5 59:20,21
62:10 68:4,21,21 69:6
70:10 71:3,8,9 72:3,8
74:5 77:3,8 78:11,14
79:20 80:25 82:6
83:12,14 85:17 87:22
88:21,22 89:5,8,11
91:7 94:4,16 95:8
100:9 101:4 102:2
103:24 105:8 108:3
113:25 114:6,16
119:19 120:9,13
**knowledge** 12:20 42:14
45:7,25 46:5 56:4
**known** 100:16
**Kraus** 4:3,4,5 7:10 14:17
95:23 122:12,13

### L

**L** 4:3,4,5 122:18
**label** 110:9 113:11 116:9
121:4

**labeled** 65:14 67:16
93:18,19 104:14
107:21 108:5,8,19
109:2 110:10,21 111:2
111:10 113:7 115:20
115:22
**lack** 44:19 64:4
**language** 67:4 77:10
**Large** 1:20
**largely** 70:22
**Laton** 28:17
**laughing** 81:14
**law** 10:16,16 16:11 20:4
25:4 26:8 31:17 36:14
36:18,18 37:3 45:24
62:19 75:15,17 78:10
78:11 103:23
**lead** 34:9
**leadership** 26:24
**leads** 20:13 21:13,15
22:7
**learn** 15:25 51:6
**learned** 16:5
**led** 34:7
**left** 110:2
**legally** 14:18
**legs** 51:10
**LEO** 110:3
**let's** 24:7 68:23 85:16
86:5 106:15
**level** 20:11 21:25 22:11
48:23
**lieutenant** 7:8,17,19 8:21
13:24 28:10,12 34:22
35:4,5,9 36:6,7 37:4,5
37:6,12,13 69:12
75:19,19 78:10,11
119:13 121:15
**lieutenants** 28:22,23,24
34:15,21,24 35:1
**limit** 53:8 56:3,15,21
**limitation** 65:6,23
**limited** 52:25 55:15
**limiting** 71:10
**limits** 55:24
**line** 30:4,5,6 80:7 122:4
126:2
**lines** 84:3
**link** 22:4
**list** 20:18 23:4,7,9 24:2
26:25 30:7,11 45:5
46:3 53:25 63:15
73:20 76:23 87:7 92:9
94:16 95:6
**listed** 21:5 29:18 32:17
34:20 44:19 50:4
87:16 88:11,13 90:18
92:25 94:21 114:14,19
116:14 117:4,21
118:13
**listing** 50:1
**lists** 45:3 46:4 87:13
117:7
**literature** 13:25 50:13
76:20
**little** 22:25 42:8 74:18
101:14
**lives** 100:17
**locate** 112:3
**location** 92:25 102:3,5
110:2
**locations** 16:2
**long** 6:21 17:21 38:22
**longer** 23:14,15
**look** 15:5,9 18:3 19:6
24:5,7 26:22 28:13,24
52:3,20 75:22 79:13

91:8,13,17,21 92:6,22
97:1,11,13,15 98:3,4
101:7 102:15,19 103:2
109:17,19 110:6,24
111:9 113:2,8 114:10
**looked** 17:23 24:12 31:16
93:20 94:3 106:20
113:3
**looking** 33:14 34:15
40:10 58:23 79:23
87:7 91:5 97:12,14
101:15,21,22 102:3
115:14 116:25
**looks** 27:13 28:16 31:1
77:19 99:22 112:5
113:1
**lost** 59:9 106:12
**lot** 9:20 20:17 63:21 70:7
70:8 95:22 113:3
**lots** 70:11
**love** 11:5
**Lueders** 37:13

### M

**M.O** 16:3
**machine** 81:18
**main** 11:12 54:18
**maintained** 78:25
**major** 7:22 37:4,6,13
39:18 40:11,12,18
41:5,5 46:4 47:19,22
47:25 58:16 60:17,17
69:12,13 72:6,6 97:3
**making** 99:22 105:2
112:7
**Mallo** 34:1 35:14,25 36:9
36:10
**man** 70:15
**manager** 41:22,23
**manual** 4:3,4 14:3,5 15:7
15:10 17:17,22 24:11
24:14,20 25:10,11,12
25:16,17 27:2 53:15
54:17 55:20 56:10
64:17,23 65:14,21
66:14 67:5,8,25 68:2
69:24 71:9 73:16
93:21 121:17,23 122:1
122:3
**March** 32:8 83:24 84:7
84:20 114:12
**mark** 27:6,23 29:14
30:21 32:9 33:19
35:16 38:16 52:21,25
55:15 57:9 75:5 78:17
81:4 84:18 95:24
97:24 99:15
**marked** 4:3,4,5 15:2 24:7
27:7,24 29:15 30:22
32:7,11 33:1,20 35:18
38:18 51:16 57:11
75:6 78:18 81:5 86:6,8
92:1 96:1 98:1 99:17
106:20 113:13 116:10
121:6
**Massachusetts** 10:19
**McDougall** 74:21 76:16
79:14 80:5 84:2,7
87:11 93:13
**McDougall's** 93:1
**MCT** 85:7
**mean** 8:19 11:14 12:23
13:18,19,23 14:8,9
15:21 20:1,8 21:6,25
23:13 28:8 29:10
33:13 41:4 46:23 47:2
51:2 52:12,16 56:3,5

56:10,11,19 57:8 58:2
60:1 61:10 64:3 65:18
68:17,18 74:4 80:11
95:1,8 96:20 101:18
104:18 106:15 115:13
115:25 116:4 118:19
**meanings** 19:25
**means** 23:14 47:4 69:6
76:22 77:8 102:4,6
104:20
**meant** 30:1 46:21 102:8
118:21
**medium** 69:9
**meet** 13:17 47:11
**meeting** 81:11,12 82:14
83:11,16,19,21,24
84:7,23 85:24 86:2,16
87:1,3 115:3 118:5
120:18,22
**meetings** 82:10 83:10
120:10,14,19
**Melbourne** 41:1,3 43:15
45:1
**Melinda** 75:11 77:15
95:19,19
**Melissa** 51:20 75:10
**member** 101:10 104:8
105:16,24 106:6
**members** 32:3 33:12
68:12 69:1,3,3 92:24
96:24
**mention** 84:2
**mentioned** 14:13 19:14
27:16 48:2 69:24
**message** 33:11
**met** 65:15 67:17
**methodology** 25:25
26:15
**Miami** 2:11
**MIDDLE** 1:1
**midway** 114:22
**Mike** 36:11 37:5
**million** 103:25
**mind** 47:4 79:24 98:23
**minding** 20:5
**Mine** 15:6
**minutes** 51:11
**misunderstood** 17:2
**mix** 98:12
**moment** 48:5
**money** 27:22
**monitor** 100:18
**monitored** 108:1
**month** 45:4 101:14
106:19 107:1
**months** 6:23 7:18 106:24
**morning** 14:15 92:19
**Morrison** 99:23
**mother** 93:1
**move** 61:21,23,25
**multiple** 112:25 120:23

**N**

**N** 2:7 3:1 122:18
**name** 6:10 30:8 74:21
76:15 84:9 90:9 99:3
111:7 114:15
**names** 20:13,14 34:20
92:9 119:10
**nature** 101:17 103:4
109:6,7 112:14 115:25
116:2
**necessarily** 12:12 46:9
51:4 56:8 64:10 88:6
122:4
**need** 10:13,22 11:18,18
13:2 14:1 45:18 46:9

47:10 55:2 63:11 69:3
113:9 118:8,9
**needs** 19:19 45:19
**negative** 62:14 112:3
**networked** 11:24
**never** 13:21 56:4 57:5
63:17 90:11 98:23
**new** 1:17,18 10:18 27:4
64:5 97:12 100:18
**nice** 71:9
**Nicholas** 100:13
**Nocco** 1:7 42:10,11,12
42:15 43:13 121:19
125:5
**Nogueras** 87:16
**noncommitted** 104:22
**Notary** 1:20 123:12
**note** 49:8 56:23 115:6
**noted** 48:15
**notes** 79:21,21 83:10,11
83:13,16,17 91:12,14
102:15,16,19 105:20
107:14 108:7 109:11
109:16 113:21,23
114:2,7,19
**notification** 10:21 11:15
**notified** 97:10
**November** 110:19
**number** 56:15 79:14
91:10 114:15
**numbers** 33:7
**numerous** 60:3 63:1
76:17

**O**

**O** 122:18
**Oath** 3:4 123:1
**object** 16:22 17:8 44:20
46:20 48:7,10,14
73:25 88:19 89:17
93:22 94:9,22 98:17
102:12 103:8,13,17
107:23 109:4 112:13
112:18
**objection** 9:2,16 12:18
48:14 66:12 98:21
108:10
**objectives** 18:4
**obvious** 83:22
**obviously** 11:22 12:6
14:2 17:17,21 18:4
22:25 23:20 25:3
35:11 36:1 51:25
63:17 90:1 93:7 96:20
102:25 114:6 120:15
**occurred** 84:25 86:2
87:3 91:1
**occurring** 29:11
**October** 6:22 7:7 108:16
108:24
**Off-the-record** 67:19
73:12 113:14
**offender** 8:7,9,10,16 9:6
9:24 10:1,2,23,25 11:1
11:8,11,13 12:15,25
13:4,5,11,22 16:9,16
16:19,25 17:5,12,13
17:15,25 18:9,16,24
19:2,18 20:23 21:5
23:4,7,9,22 24:19 25:5
26:4 29:4,7 43:10 45:4
45:7,12,25 46:5,10
47:7 49:2,5,9,10,15,15
49:20 50:2,5,23 53:23
53:24 54:1 55:24
56:16 61:2,4 62:17
64:14,15 65:3,6,8,14

65:22 66:4,8,15,16,24
67:2,15 73:20,24 74:3
74:7,16 87:8 93:1,13
93:16,18,19,24 94:6
94:12,15 95:2,7
100:14 106:17 107:17
107:21 108:5,8,20
109:2,7 110:4,10,11
110:21 111:3,10,18
112:12,14 113:7 114:9
115:7,9,12,21,22
116:5,7,14 117:5
**offender's** 74:7
**offenders** 8:12,14 9:9,14
11:24 14:7 15:19 16:1
16:11 21:22 24:3 26:2
26:19 30:2,8,12 62:5
68:14,16 69:2 86:15
**offenders'** 60:5
**offense** 19:12 47:15,16
89:15
**offenses** 16:3 47:12,14
**offer** 13:11
**offering** 10:23
**offers** 26:3
**office** 6:14,17 7:12 9:1
11:9 15:22 16:20
18:19 23:3 28:5 29:20
30:18 31:6 32:2,14,19
33:23 35:22 38:21
39:3,6,17 40:7 43:17,18
44:8 52:1 60:13 63:5
71:20 73:15 75:18
76:8,12 78:25 79:5
92:11 93:10 94:13
96:8,11,13 97:2 98:16
98:20 99:1,25 100:5
104:19 107:11 110:16
119:14
**officer** 30:17 44:9,10
74:6 76:6,7 77:12,21
79:10
**officers** 26:9 103:23
**official** 1:7 44:10 123:7
125:5
**oh** 2:3 17:1 30:5 75:12
85:14 106:25 118:21
119:5
**okay** 6:19,24 7:3 8:3,6,24
9:4,13 10:1 12:9,15
14:5,16 15:6,9,11,21
15:24 16:14,18 17:2
18:12,22 19:9,12
20:19 21:1 22:22
23:12 24:9,13,16,22
25:2,8,15,19,22,25
27:2,11,15,18 28:7,11
28:13,21 29:1,13,22
29:24 30:5,11,19,21
31:8,8,22 32:1,17,21
32:24 33:1,19,25 34:9
34:12 35:16,24 36:4
36:16,19 37:20 38:1
38:10,13 39:7,10,16
39:25 40:4,20,25 41:6
41:12,19 42:3,6,20,24
43:9,12 44:13,17,24
46:16 47:6 48:16 50:4
51:6 52:3,5,9,20 53:7
53:12,18 55:5,8,23
56:2 57:1 58:4,8,8,20
58:23,25 59:3,12,25
60:11,15 61:1,7,9,20
62:3,18 63:3,7,11 64:2
64:18,22 65:1,4 66:23
67:4,7,10,14,21,23
68:4,6,11,23,24 69:19

69:22,23,24 70:4,19
70:22 71:19 72:3,25
73:18,22 74:14,18,19
74:23,25 75:2,10,15
75:21 76:1,4,7,10,14
76:23 77:5,7,10,14,18
77:20 78:14,14,22,24
79:7,10,13 80:2,7,15
80:24 81:9,14 82:16
82:18,23 83:1,4,6,9,12
83:18 84:2,6,11,13,16
84:18,25 85:2,24,24
86:5,13,14,18,18,19
87:6,10,13 88:2,12,15
88:25 89:5,13 90:4,20
91:1,4,7,11,19,24 92:2
92:6,14,17,20,22 93:7
93:10,12,17 94:2
95:22 96:5,16 97:14
97:18,21,24 98:12,15
99:5,8,24 100:4,7,13
100:22,25 101:2,10,14
101:17,24 104:3,6,17
105:7,13,14,20 106:2
106:6,9,14,19,23
107:8,9,14,17,20
108:15,19,22 109:9,16
109:24 110:7,13,14,24
111:16 112:1,6,9
113:11,18,19 114:1,14
114:23 115:1,5 116:13
116:16,25 117:4,7,12
117:18,20,23 118:1,4
118:12,21,24 119:9,19
119:23 120:1,3,5
121:12,14,19,22
122:11,12
**old** 7:14
**Olds** 36:21,21,22
**on-** 21:9
**once** 50:4 53:17 54:5,8
54:16,18,23,25 55:3,5
55:11,12,21
**ones** 118:15
**ongoing** 19:17,22,23
21:10,10 22:6
**operationalize** 71:5,18
**operations** 34:5 37:14
96:9
**opinion** 59:5,19,23
**options** 10:24
**order** 24:6 27:4 112:12
**ordinance** 98:5,6
**organizational** 32:5
**organized** 90:22
**origins** 46:6
**Ortiz** 51:20
**outlined** 50:6 67:17
**outset** 14:13
**outside** 38:12 66:11
68:13 102:22
**overall** 18:9 44:11 70:25
**oversaw** 40:1,20 119:14
**oversee** 39:19
**overseeing** 7:25
**overseen** 31:22 32:24
40:19
**owned** 16:3

**P**

**P** 122:18
**P.A** 2:14
**p.m** 1:15,15 84:25 85:19
85:25 122:16
**P.O** 1:23
**packs** 38:6
**page** 3:2,5 4:2 5:2 14:24

14:24 15:9 39:2,4 40:4
40:25 41:12 44:3 45:2
52:3,20 58:24 59:11
64:19,24 65:1 67:21
68:9,23 75:22,25
79:13 80:8 83:6 84:12
84:14 86:13,18 87:6
90:21 92:6 101:8
104:2 105:13 106:11
107:8 108:14,23
109:19 110:13,25
111:5 113:18 114:10
114:21 116:12,16,25
125:9 126:2
**pages** 109:12,17
**paragraph** 68:25 76:14
**Park** 2:15
**parole** 74:5,6
**part** 16:8,10 27:15 31:17
80:4 121:22
**particular** 21:6 30:12,13
48:4 55:2,14 64:12
74:7 102:11
**particularly** 68:12
**parties** 122:20 124:12
**parties'** 124:13
**Parts** 70:20
**Pasco** 1:8 6:13 7:11
15:21 16:20 28:4
29:19 30:18 31:5
32:14,18 33:23 35:21
38:20 39:3,6,17 43:7
44:8 51:25 60:12 63:4
65:16 73:15 76:8,11
78:25 79:4 92:11
94:12 96:8 98:15,19
99:1,24 100:20 104:18
107:10 110:16 123:3
124:4 125:6
**passed** 83:17
**passing** 61:5
**patrol** 13:22,23 19:4
20:11 28:10,25 31:12
31:18 32:23 33:6 34:2
34:2,4,6,6,9 36:2
40:12 61:4 101:18,21
102:4,25 104:14,18,20
104:22,24,25 105:4,10
105:12 113:1,4
**patrol's** 62:12
**patrolling** 104:20 105:2
**patrols** 101:19 105:1
**pay** 70:15
**Peak's** 39:16
**Peake** 37:2 39:5,10 47:7
47:23 51:21 57:20,21
72:6,6,7,7,12,21
**people** 9:17 10:5,22
15:17,21 21:17 35:2
35:20 45:3,11,23
46:21 47:10 50:16
61:1,10,13,14,24
62:11,13,15 64:8
68:16 71:11 80:18
90:7 94:11 102:6
105:3 122:3,8
**percent** 8:13,14 95:3,3
**perfectly** 78:3
**performance** 15:12 18:1
18:2 25:22 53:14
**performed** 101:18
104:15
**period** 12:23 65:12 66:2
81:16
**periodic** 52:24 81:11
**periodically** 11:17
**person** 18:5 20:9,16

21:17,23 22:19 47:12
50:4 51:24 65:9 66:16
69:5 88:11 90:8,11,14
113:24
**person's** 12:16 67:1 90:7
**personal** 45:7,25 46:5
**personally** 123:5
**personnel** 28:4
**persons** 7:24 47:9
**perspective** 62:20
**pertained** 100:11
**pertains** 96:13
**philosophy** 27:16 58:3
71:4
**piece** 10:21 13:23
**Pin** 45:5
**Pinellas** 25:7
**place** 1:17 70:23
**plaintiffs** 1:5 2:5,9,13
74:25 99:6 125:3
**plan** 37:25 38:4,11
**platoon** 34:18,19 35:5,9
35:11
**please** 6:11 79:25
**point** 15:24 20:12,24
23:10,15 24:2 26:24
29:10 31:7,14 34:25
37:1,7 40:16,20 68:20
72:20,22 76:5,24
82:24 85:16 87:21
88:22 95:11 115:18
116:18 120:18 122:3,5
**pointing** 109:14
**policies** 70:22
**policing** 4:6 7:1,9 46:6
71:1,4,12 119:15,18
121:16
**policy** 53:7,12,14 55:23
56:2,8,12,13
**Port** 1:17,18
**portion** 8:11 9:15
**position** 6:16,24 31:23
**positive** 61:21,22 62:2
**possibility** 10:6,9
**possible** 16:1 34:21 35:8
85:9,12 115:11
**potential** 69:2
**potentially** 89:25
**Poulton** 2:14,14 9:2,16
12:18 14:20,25 16:22
17:1,8 38:22,25 39:12
39:22 41:22 44:20
46:20,23 48:7,12,16
51:10 56:23 59:9,12
64:20,22 66:12 70:14
73:1,4,6,9,11,25 77:23
78:1,3 81:20,23,25
82:3 88:19,21 89:9,17
89:21 93:22 94:9,22
94:25 95:9,13 96:19
98:17,21,23 99:9
102:12 103:8,13,17
106:11,14 107:5,23
108:10 109:4,10,14,17
109:20,24 110:6
112:13,18 113:9
114:21,23 115:25
116:22 118:18,21,24
119:4 122:12
**Poulton@debevoisepo...**
2:16
**PowerPoint** 114:7
**preceding** 7:16 24:11
**predicate** 19:20,23 20:1
22:16 45:20 48:3,4,17
49:25 50:7,8
**Prescott** 118:14 119:9,13

119:23
**present** 55:21 122:20
**presenting** 113:24
**presumably** 93:17
**pretty** 27:21
**previous** 17:22
**previously** 7:3 120:3
**primary** 24:16 54:18
**Primrose** 76:16 84:19
**prior** 7:12,22,24 8:2
17:16 25:15 73:23
85:25 87:23 110:2
**proactive** 38:2 101:19
102:6 103:5
**probable** 22:2,12,17
52:22 98:9
**probably** 7:17 11:2 17:10
19:24 21:9 23:19
70:14 118:8
**probation** 45:5 74:5,6,8
**problem** 20:8 46:2
**procedures** 71:25
**PROCEEDINGS** 1:12
**process** 74:3 97:12
121:22
**product** 17:20 26:25
69:25 122:7
**productive** 42:8
**program** 7:6 22:25 23:6
24:14 25:5 39:8 40:1,9
40:15 41:20 42:4 45:9
45:13 58:1 76:25
119:20
**programs** 10:16
**projects** 58:18
**prolific** 8:6,9,10,16 9:23
10:1,2,22,25 11:1,7,11
11:13 12:15,24 13:4,5
13:11,22 14:6 15:19
16:1,9,16,19,25 17:4
17:11,13,15,25 18:9
23:4,7,9,22 24:2,19
25:5 26:2,4,19 29:3,7
30:2,7,12 43:10 45:11
46:10 47:7 49:2,4,9,10
49:14,15,19 50:1,5,23
53:23,24 54:1 55:24
56:16 61:2,3 62:16
64:14,15 65:3,6,8,14
65:22 66:3,8,15,16,24
67:2,15 68:13,16 69:2
73:20,24 74:3,7,16
93:1,13,16,18,19,24
94:5,12,14 95:1,7
100:14 105:21 106:9
106:16,16 107:17,21
108:5,8,19 109:2,7
110:3,10,11,21 111:3
111:10,18 112:12,14
113:7 115:9,11,12
116:7
**prolifics** 30:5
**promoted** 7:8,10,17
**promotion** 7:19
**property** 7:19 31:12,17
31:18 80:10,17
**prosecutable** 21:25
22:11 48:23
**prosecution** 22:13
**protection** 36:17
**provide** 11:15 13:25
17:12 26:13 51:1
120:24 122:4
**provided** 26:20 100:15
**provides** 31:11 44:11
**providing** 18:5 26:8
30:11 44:18 54:2 56:9

93:2
**PSO** 68:12
**Public** 1:20 123:12
**published** 70:9
**pulled** 91:10
**purpose** 49:1,4 50:5
54:10 63:13
**purposes** 54:10,11
**put** 24:6 29:13
**Putnam** 87:8 88:16
**putting** 58:20 104:17

**Q**

**quantification** 24:2
**quarter** 53:1,17,20 54:5
54:8,16,19,24,25 55:3
55:6,11,12,16,21
**quarterly** 53:15,16 59:7
63:12
**question** 18:13 33:22
42:13,20,21 46:3,12
46:15,17 52:21,25
55:15 73:2 103:9
**questions** 13:2,21 16:15
63:12,15 64:16 69:20
109:23
**quick** 118:8
**quite** 81:25
**quiz** 37:15
**quote** 64:2

**R**

**ran** 102:17
**rank** 34:13 57:25
**ranks** 32:4 35:2
**rapport** 62:11,13
**Ratcliffe** 8:17 119:10,17
**Ratcliffe's** 23:24
**rationale** 10:5
**read** 13:25 15:24 17:22
23:23 25:16,20 29:1
30:4 31:11 35:10 42:7
42:9,17,18 43:1 45:3
46:24 50:13 60:2
65:21 76:14 107:25
109:11,16 122:12
125:11
**reading** 60:3 77:11
122:21
**ready** 71:24
**realize** 29:2 57:3
**really** 9:13 36:8 38:8
49:16 59:6 61:4 62:3
63:20
**reason** 17:24 54:6
**reasonable** 22:1,2,10,17
48:20
**reasons** 52:22
**rebuild** 62:13
**rebuilding** 62:11
**recall** 25:6 59:24 79:21
120:17
**received** 85:4
**recipient** 121:20
**recipients** 28:13 95:18
**recognize** 121:12
**recognizing** 29:17
**record** 6:10 32:7 35:13
124:9
**records** 79:5 91:22 96:7
98:15,25
**redouble** 56:24
**refer** 9:9 18:23 26:11
33:4 38:1 67:12,12,15
80:12
**reference** 79:14 94:20

111:17 113:24
**referenced** 65:18
**references** 37:21 45:17
53:15 100:12 111:14
**referencing** 47:21
**referred** 9:13 93:24
98:10 99:11
**referring** 25:10 38:24
49:25 53:19 106:25
**refers** 93:15 95:2
**reflect** 70:22 83:19
101:10 107:10 108:23
109:6
**reflected** 70:25
**reflects** 29:11
**reframed** 70:21
**regular** 89:23 90:2
**regularly** 69:2
**related** 10:17 45:21
58:17 65:10,25 87:24
105:9,9
**relative** 124:11,13
**rely** 97:18 109:11
**remember** 25:6 41:10
54:9 59:22 79:20,22
113:2
**repeat** 42:20
**rephrase** 45:15 103:11
**replacement** 119:1,2
**report** 84:16 86:3 88:5
91:9,14 92:19,20
96:13 97:14 98:11
104:4,17 108:23
109:22 110:24 115:15
124:7
**REPORTED** 1:19
**reporter** 1:19 3:4 27:5
73:2,7 124:1,6,19
**REPORTING** 1:22
**reports** 4:5,21,22 96:3
97:1,5,15,18 98:4,6,8
98:12,19 112:22 113:7
**request** 47:24
**require** 62:4
**required** 25:16 50:8
**requirement** 64:5
**Rescue** 96:11
**research** 8:13 9:7 44:14
**resent** 60:6
**residential** 65:10 66:1
**resource** 11:22 76:5,7
77:12,21 79:10
**resources** 54:2 69:1
**respect** 6:25 7:5 40:15
**respective** 122:20
**respond** 59:19
**responded** 92:25
**responding** 59:22
**response** 47:3,24 82:3
**responsibilities** 6:25 64:6
**responsibility** 16:13 19:7
82:13
**responsible** 8:12,14 9:10
9:15 11:7 12:2 20:17
21:24 90:12 95:3
**rest** 18:6
**restrictive** 54:14
**retired** 28:20 31:13 41:4
41:8 100:3 120:11
**review** 29:5 34:17 70:6
72:14 79:23 80:19,20
80:23 97:5 121:18
122:4
**revised** 15:8 17:17 25:12
25:15
**revising** 121:17
**revision** 24:25

**revisions** 25:1 67:8
**Richey** 1:17,18
**right** 9:7 10:5,8,24 11:10
11:13,14,16,20,25
13:4,6,15 15:23 17:12
17:18 20:6 21:8,10,13
21:15 22:3,16 23:19
23:23 25:21 26:5
27:19,22,23 34:22
35:3,7 37:11 38:5
43:25 44:24 46:3,7
47:18 48:18,22 49:11
49:13 50:10,15,20,22
51:3,9 53:20 54:14,21
55:1 56:6,8 63:19,21
64:7,24 66:9,14 68:10
68:23 69:10 70:5,20
71:7 72:15,17,18
74:20 78:11 81:19
88:6 90:7 91:13 92:15
94:7,15,17 95:1,2,22
96:12 99:13 102:9
103:21,24 104:23
105:10 106:15 114:5,8
114:8,17 115:8,13
116:1,23 117:14,20
118:25,25
**rise** 21:24 48:23
**risky** 79:17
**Rjohnson@ij.org** 2:4
**RMS** 65:7,23
**road** 2:7 8:2
**Robert** 1:4 2:2 99:3,6,9
99:10,12,12 100:16
105:21 107:21 110:3,9
117:10,14 118:1 125:2
**role** 7:5,11 13:23,24
32:22 39:16,19 40:8
40:14 43:20 44:7
58:14 73:15,19 74:2
97:10
**Ross** 1:12 6:1,12 123:5
125:17
**roster** 33:14
**roughly** 8:13 27:3 41:9
**route** 80:23 85:15
**routed** 80:21 85:4
**routine** 38:12
**royalties** 70:13
**run** 35:5
**runs** 34:5

**S**

**S** 2:10,11,15 4:1 5:1
36:21 122:18
**safe** 105:3,5
**safety** 28:12
**Sanborn** 92:8
**saw** 80:20 85:14 114:3
**saying** 21:23 31:18 54:20
89:11 90:11 95:10
103:1 117:15
**says** 10:12 15:25 30:6
34:17 35:4 44:3 45:7
45:17 46:12,22,22,23
46:23,25,25 47:7,22
49:10 52:21,22 54:23
55:5,9,12,14 62:22
63:11 65:1,20,21 66:3
66:5,7,14,25 68:6,25
69:15 76:15 78:11
79:14 80:7,8,10 83:11
86:20 87:4 92:24
100:13 101:17 102:25
105:21 110:2 113:20
122:2
**scene** 85:15

**school** 28:12 76:5,7,18
77:12,20,21 78:7,10
78:15 79:10,16
**schools** 76:18
**seal** 123:7
**search** 45:6 100:15
**second** 12:9 45:2 79:13
92:6
**secretary** 37:14
**section** 4:6 7:1,9,23 8:22
28:12 40:2 41:17
65:22 77:16 81:2
94:17 105:20 107:14
**sections** 122:1
**sector** 30:8,13,14
**sectors** 30:9
**see** 11:18 20:20 27:13
31:10,11,20 45:14,16
46:3 52:9 79:17 85:3,4
85:8 90:18 99:11
106:15
**seeing** 64:10 114:3
**self-initiated** 85:3,7
102:3 103:6,7,12,18
104:21 105:6
**Seltzer** 36:11
**Semoran** 2:15
**send** 71:22 80:13 122:6
**sending** 32:1 57:15
121:18
**sense** 22:20 24:4 26:16
38:14 88:3 91:8,13,20
102:21 121:1
**sent** 32:3 33:2 35:13 36:5
43:4 47:22 52:18 56:4
56:7,11 70:5 72:12,18
77:14 80:17
**sentence** 68:19 69:15
**separate** 22:5
**September** 86:24 89:1
91:2 105:18 107:4,12
**sergeant** 7:22,25 8:2
31:8,9,12,13,19,24
32:23 58:16 60:16
69:11 80:11,19,21
**service** 38:12
**services** 10:23 11:3,16
11:19 13:12
**set** 13:2,20 15:12 53:8,13
55:20 65:15 82:14
96:3 113:16
**sets** 25:25 56:3
**seven** 65:9,24
**Shaker** 2:3
**Shane** 36:11
**shared** 16:5 96:10
**Shawna** 36:21,22
**sheet** 3:5 104:1 126:1
**sheriff** 1:8 42:10,11,12
42:15 43:13 44:10
121:19 125:6
**Sheriff's** 6:14 7:12 9:1
11:9 15:22 16:20
18:19 23:3 28:5 29:20
30:18 31:6 32:14,19
33:23 35:21 38:21
39:3,6,17 40:7 43:7,17
44:8 52:1 60:12 63:5
71:19 73:15 75:18
76:8,12 78:25 79:4
92:11 93:8,10 94:12
96:8,10,13 97:2 98:16
98:20 99:1,25 100:5
100:20 104:19 107:11
110:16 119:14
**Short** 51:13 121:3
**show** 14:22 15:2 88:4

**shown** 9:19 115:2,3
118:5
**signature** 3:5 31:15
125:9
**significant** 8:12 9:10,15
23:20
**signing** 122:21
**similar** 47:11 67:4 116:7
116:8
**sir** 6:20 43:2 52:2 57:19
59:16 70:1 71:17 73:3
75:11 90:25 121:11
**sites** 45:6
**sitting** 101:20
**situation** 17:11 44:14
**six** 104:7,11
**skip** 42:6
**slide** 83:11 113:20 114:1
114:4,4 115:2 118:4
**slides** 4:18,19,24 5:3
81:10 86:11 91:5
93:25 94:3,21 113:16
113:24 115:1 116:20
117:19
**small** 8:11
**solve** 97:11
**somebody** 13:17 18:24
19:9 20:4,13 21:14,16
35:8 46:7 50:1,9,23
62:11 66:23 67:12,13
67:15 71:19 83:16
87:23 88:12 90:10
94:4,20 95:2,4,7
102:22
**somebody's** 49:13
**son** 43:10 99:7,10,12
**sorry** 17:1 30:3 44:2 48:9
59:10 73:5,8 83:22
97:8 98:21
**sort** 11:20 42:6 45:20
53:3 54:4,8 80:7 92:7
**sounds** 74:22,24
**source** 97:19,23
**sources** 21:21 90:10
**speak** 12:23,24 50:21
**speaking** 64:7,9
**specialized** 38:8,11
**specific** 14:8 18:4 71:15
**specifically** 15:18 26:11
80:25 83:14 106:15
107:24 120:17
**speculating** 12:21
**spoke** 48:17 49:21 50:12
**sprees/trends** 52:24
**squad** 31:24 33:4,6,12,17
**squads** 7:23
**stakeholders** 19:14
**stands** 37:24
**STAR** 68:2,6,11,15,21,21
68:25 69:3 81:20
92:14,20,24 100:8,11
100:12,14 101:11
102:16 104:8,8 105:16
105:25 106:2,4,6,8
**start** 7:14 57:16
**started** 7:13 45:9 120:14
**starting** 60:6 116:18
119:14
**state** 1:20 6:10 22:18
123:2,12 124:3
**stated** 54:22
**statement** 63:8
**STATES** 1:1
**status** 85:13
**Ste** 2:3,7,11,15
**Steffens** 37:9
**stems** 10:2

**stenographically** 124:7
**Stephen** 41:13,16
**steps** 71:17
**Steve** 31:8,9 32:8
**stints** 76:18
**stipulated** 122:19
**Stipulation** 3:3
**stop** 11:1,5 105:11
**straight** 73:9
**Strategic** 81:3
**street** 21:21
**stretch** 51:10
**student** 79:15
**stuff** 10:18,19 54:4 97:4
97:11 120:11
**subdivision** 105:2
**subject** 19:16 30:5 45:4
45:11,23 92:14
**subjects** 110:2
**submitted** 79:4,7 99:21
100:19,22 101:3
**SUBSCRIBE** 125:12
**SUBSCRIPTION**
125:13
**suggest** 29:3 47:11 68:15
84:6 88:15 93:12
103:4,11 108:8,11
110:9
**suggested** 56:15
**suggests** 14:5 56:21
110:12
**suit** 75:1
**Suite** 1:17
**Suites** 1:17
**summarize** 48:11
**summarizing** 48:12
**summary** 45:10
**supervise** 31:24
**supervised** 7:23 58:6
60:17,19 80:18
**supervisor** 39:10
**supervisors** 18:7 69:14
**support** 4:22 64:5 98:10
98:13
**supportive** 64:13
**suppose** 36:8
**Surace** 100:13
**sure** 6:12 9:22,22 11:16
13:9 14:11 15:4,13
17:4 18:21 19:19 20:6
23:2,5,11 24:4,7 25:1
26:17 28:3 31:3 34:16
35:12 36:24 37:22
39:14 42:21 51:12,19
57:25 58:7 73:23
74:10,13 75:4 78:5
83:23 85:17 91:24
97:23 99:22 101:6
105:3,4 111:19,25
118:11 120:8,25 122:8
**suspect** 21:14
**suspect-** 20:14
**suspected** 12:7,13 20:24
48:19 49:13 54:12
**suspicion** 20:2,14 22:1,2
22:10 45:20 48:4,21
48:24
**suspicions** 22:1,17 48:1
48:18
**suspicious** 47:8 101:22
**sworn** 6:2 36:14 123:6
**system** 78:24 80:13
96:14,22

_____

**T**

**T** 4:1 5:1 122:18,18
**tagged** 67:2

**Tait** 92:8
**take** 24:5 42:8,19,19 74:6
79:25 118:8 120:5
**taken** 63:17 67:7
**Talia** 117:13
**talk** 11:25 22:2 23:22
35:11 46:9 50:25
59:14 87:22 118:9
**talked** 48:25 54:9 71:22
**talking** 61:14
**Tammy** 1:3 92:25 125:1
**TAMPA** 1:2
**target** 68:13 69:3
**targeted** 69:5
**task** 64:13,14
**TAYLOR** 1:3 125:1
**team** 68:6,11,15 69:1,3
81:20 82:3,4 92:20,24
100:8 101:11 104:9
105:16,25 106:6 113:1
113:4 118:10
**technically** 14:19 58:2
65:19
**telephone** 2:10
**tell** 6:2 17:17 23:13 24:1
28:9 29:9 36:4 61:19
63:20 68:17 76:21
106:17
**tells** 106:1
**ten-minute** 120:5
**tens** 33:7
**term** 8:6,16,17,18,25 9:5
9:9,13,23 16:19,24
17:4 18:15,18,23
23:25 25:2 30:1 94:12
94:14,20 95:1 104:18
106:9
**terminology** 21:10
**testified** 6:4 63:14
**testify** 107:24
**testimony** 124:9
**text** 79:18 100:19
**textbook** 71:6
**Thank** 18:14 59:12 69:19
**theft** 65:11 66:1
**thefts** 79:15
**theory** 10:3,4,17 13:19
18:10
**thing** 11:14,14,20 22:13
37:5 38:3 42:17 44:2
49:7 68:18 98:10
115:7,8 118:7
**things** 8:1 11:12 13:3,3
14:1 18:7,8,8 20:17
21:22 38:6 44:12
50:13 56:6 60:23,24
64:8,8 90:10 93:23
96:21 102:7,7 103:25
104:23
**think** 9:11 16:10,23
17:16 20:8 22:21,23
23:16,17 36:21 42:7
44:21 46:7,24 47:21
49:7 56:24 57:21 59:6
62:1,8 63:14 91:20
94:14 116:19 118:23
**thinking** 27:20 39:21
98:23
**third** 15:25 45:2 92:22
**Thomas** 2:14 75:23
80:11,19,22
**thought** 63:2 118:21
**three** 7:23 11:12 19:1
34:6,7,25 47:9 48:1
75:20 84:3 120:14
**three-year** 65:12 66:2
**threes** 33:9

**threshold** 47:8
**tie** 20:15 22:4
**time** 1:15 8:24 12:24
16:21 17:18,21 20:12
22:8 23:10,14,20 24:2
26:24 27:12 28:1,10
29:2,17,23 30:8,17
31:9,14,19 32:14,19
32:22 33:25 34:21,25
35:21 36:2 37:1,7 39:5
39:8 40:1,9,14,16,22
42:1,8,19,19,25 43:1
43:21 44:5 45:12
50:21,25 53:19 56:6
57:23,24 58:15 59:5
66:6 68:20 70:23 72:5
72:7,12 73:11,21
75:13 76:21,24 77:1,2
77:3,19 79:11,21,25
82:6,8,10,21,22,24
83:1,3,4 85:9 86:14,24
87:2,3,5,21 88:22 89:3
89:7 91:4 93:8,14
95:20 100:4,8 101:6
101:21 104:22 106:7
107:22 108:9 110:11
114:9 118:5 119:19,24
120:1,16
**timeframe** 27:21 53:10
67:10,14
**timeframes** 40:13
**timeline** 29:13
**times** 11:24 40:11 53:1
53:19 55:16 60:5
85:16,20 96:20 120:17
120:23,24
**tip** 4:17,23 78:22,24 79:3
79:7,22 80:16,20,21
80:23 99:19,21 100:23
101:3,15 106:20,25
**tips** 80:13
**TipSoft** 79:2
**told** 13:6 107:25 108:1,3
**Tom** 48:9 109:22
**tomorrow** 99:13
**Tony** 58:6
**top** 18:15,18,24 19:17
20:22 21:5 22:19
35:25 45:4 51:18
75:10,24 80:7 86:15
87:8 113:20 114:9
115:2,7,21 116:5,14
117:4
**traffic** 101:22 104:25
105:11,11
**training** 30:17 52:8 56:4
56:9,14,20
**transcript** 124:8 125:11
**treated** 93:13
**trend** 59:15
**trick-or-treating** 105:5
**tricked** 107:3,5
**troops** 63:21 64:3
**trouble** 89:19,20
**Troy** 28:7
**true** 17:24 111:5,16,22
111:24 124:8
**truth** 6:2,3,3
**try** 17:23,24 27:3 73:2
97:11 112:10
**trying** 23:17 29:13 46:24
62:14 71:3 90:22
112:4,11
**turn** 40:4 41:12 64:19
67:21 83:6 84:11,12
84:14 86:13 90:20
101:7 104:2 116:12,16

**two** 19:24 31:2 34:7
  43:13 84:3 90:6 104:4
  106:23 109:12 122:1
**twos** 33:8
**type** 22:13 38:3 45:10
  78:20 81:7 83:12 86:9
  92:17 115:12
**types** 16:15 45:3
**typically** 61:3

**U**

**U** 122:18
**ugh** 37:17
**uh-huh** 7:21 9:25 11:21
  12:11 13:7 14:4,20
  17:19 19:11,21 20:25
  22:14 26:14 28:15,18
  29:12 31:10 35:6
  36:23 37:8 38:7 40:21
  41:7 49:18 50:11 53:2
  55:19 58:11 63:10,16
  72:13 74:9 82:9 83:5
  83:20 84:17 85:6,11
  85:20 94:19 96:15
  97:17 103:3 108:6
  111:1 113:8 115:10,16
  115:18,20 119:16
  120:12,21 122:11
**ultimate** 11:4
**ultimately** 77:14 82:11
**unable** 112:3
**unallocated** 101:21
**undersigned** 123:4
**understand** 20:19,19,21
  89:1 102:22 103:1
**understanding** 26:8
  44:18,19 64:4,10 71:3
  71:12 89:13,20,22
  102:23
**unfortunately** 32:4 96:23
**unit** 7:25
**UNITED** 1:1
**update** 72:18
**use** 9:4,5,9 14:18 16:19
  18:19 51:3 69:1 71:13
  79:1 94:20 102:6
  115:11
**usually** 34:24 87:4
**UTL** 112:3

**V**

**VA** 2:7
**vaguely** 74:22
**valid** 22:1 86:20
**validate** 97:22
**validating** 54:1
**variable** 83:4
**variables** 103:23
**varied** 82:11
**Varies** 83:5
**various** 104:22
**Vedral** 76:2,4 78:12 79:8
  79:19 80:2
**Vedrol's** 76:15
**vehicles** 16:2,3 79:15
**verbiage** 71:6
**verifiable** 65:9,25
**verification** 53:22
**verizon.net** 43:4
**version** 14:3 24:12,12,13
  25:9,9,11 26:5,7 69:24
  121:23
**versions** 17:22
**versus** 87:24 90:15
**vetted** 69:16
**viewed** 88:16

**vision** 71:1
**visit** 101:10 105:15
  107:10 108:16,23
  110:15,25 111:2
**visited** 85:21
**volunteer** 8:5
**Vreeland** 41:13,25 44:18
**vs** 1:6 125:4

**W**

**W** 2:14
**w/m** 76:16
**wait** 72:16 118:19,24
**waived** 122:22
**wan** 42:8
**want** 7:13,14 13:8,10,11
  17:25 20:20 22:24
  26:22 28:8 29:18 31:1
  37:18 38:4 42:6,7,13
  48:11 50:16,23 51:1
  54:7,13 59:14 64:16
  89:19 91:17 101:7
  102:22 103:2 108:14
  111:19 115:18 116:12
**wanted** 27:3 45:6 89:12
  91:7 122:8
**wants** 62:23
**warrant** 22:13
**warrants** 52:22
**wasn't** 56:7,11 68:21,21
  82:20 85:13
**way** 8:25 10:25 53:23
  61:10 62:10 64:8
  106:11
**ways** 99:11
**we'll** 12:7 81:4 97:24
  113:11
**we're** 14:17 51:7 68:9
  72:24 74:18 87:6
  116:25 121:17
**we've** 14:13 32:6 41:19
  57:21 70:12
**wealthy** 70:15
**Wednesday** 82:20,25
**week** 60:5 82:19 120:16
**weekly** 81:11
**weighs** 10:7
**Welshans** 30:16
**went** 56:22 57:5
**weren't** 61:14 64:12 85:9
  94:5
**Werner** 75:10 77:15
  95:19,19
**Wheel** 45:5
**William** 32:21 33:12
  58:9 76:2,4
**Winter** 2:15
**witness** 6:5 39:14 41:23
  44:23 48:10 59:11
  64:21 70:17 73:3,5,8
  73:10 77:25 78:2,5
  95:10,14 107:6 110:7
  114:22 116:2 118:23
  119:5 123:7 124:9
**wolf** 38:6
**wore** 21:18
**work** 13:14 17:20 64:10
  68:7,12 69:25 70:7,8
  97:1
**worked** 31:20
**working** 19:5 58:18,21
  122:6
**worry** 14:22
**worse** 81:20
**wouldn't** 20:8 53:6,25
  56:7 76:21 85:19
**write** 59:5,17 60:7 62:6

63:22
**written** 17:18 77:11,12
  79:18 80:4 93:3,5
  105:24 107:15 113:23
**wrote** 59:1 62:23 71:20

**X**

**X** 3:1 4:1 5:1 53:19

**Y**

**yeah** 8:23 9:17 13:18,19
  14:11 15:16 20:19
  21:8 23:11,11 25:4,14
  25:18 26:3,10 27:20
  31:16,21 33:18 34:19
  36:8 37:3,17 38:23
  42:18 48:6 49:4,19
  52:13 53:5,6,10,17
  57:16 58:5 60:10 62:9
  63:19 66:25 67:3
  70:17,17 71:21 72:11
  74:13,24 75:23 77:25
  78:2,11 80:1 81:14,17
  81:22 82:2 83:3,3,5
  87:4 88:20,20,23 89:6
  91:10 94:14 95:7,10
  95:11,12,14,14,21
  96:10 97:5,7,9,20
  101:25 102:21 103:22
  106:1,8 107:6 109:20
  110:6,12,18 113:4,5
  114:16,16,22 115:1
  116:2,8 117:19 118:6
  118:6 119:3 121:1
  122:2
**year** 23:14,15
**years** 6:22 7:14 41:10
  47:9 48:1
**Yep** 57:17 59:4 87:5
**youth** 76:17,19,23,25
**Yungaitis** 106:4,5

**Z**

**0**

**01-04-2000** 76:16
**029** 90:24

**1**

**1** 1:17 33:8 83:25 84:7,20
**1-2018** 4:4
**1-5-2023** 123:13
**1010** 2:15
**1035** 2:15
**113** 4:24
**116** 5:3
**12** 108:24
**121** 5:4
**122** 3:3
**123** 3:4
**124** 3:4
**125** 3:5
**126** 3:5
**13** 110:19
**13th** 86:24
**14820** 114:10,21
**14824** 113:18
**15** 4:5 7:13 33:8 84:11
  90:20
**15331** 83:6,7
**15453** 116:12
**15458** 116:17,25
**15709** 86:13
**15710** 87:7
**16** 33:8 91:2 105:18
**16781** 2:3

**17:53** 85:13
**18:27** 85:10
**19** 15:9

**2**

**2** 2:11 4:3 24:8 25:10
  31:12,13,20 33:8 40:4
  58:24 59:11 64:17,21
  70:20 75:22,25 100:25
  109:17
**2-2016** 4:3
**2:22** 1:15
**2010** 23:18
**2010-11-ish** 23:17
**2011** 27:13,17
**2011-12-ish** 23:19
**2013** 29:4,8,11
**2015** 32:8 33:3 35:13
  50:17 56:19 100:25
  101:12 105:18 107:12
  108:16,25 110:19
  111:10
**2016** 7:7,12 23:7 25:12
  27:2 64:16,23 65:14
  67:10,14,24 84:8,20
  89:2 91:2 93:21
  114:12 117:1
**2017** 6:22 7:7 77:3
**2018** 14:3 15:7,8 25:13
  26:4,7 53:15 54:17
  55:20 67:5 69:23
  83:25 121:23
**2019** 77:6
**2020** 77:6
**2022** 1:14 123:6,8 124:17
**20th** 123:7 124:17
**21** 111:9
**22203** 2:7
**24** 90:23
**240** 84:15
**24017** 84:14
**24029** 90:21
**24173** 101:8
**24179** 105:13 106:13
**24185** 107:8
**24191** 108:14
**24193** 108:23
**24195** 110:6
**24202** 110:13
**24204** 110:25
**24206** 111:5
**24210** 111:19
**24214** 111:25
**2426** 1:23
**25** 33:2
**256** 2:3
**26** 1:14 107:12 123:6
**27** 4:6,7
**276821** 123:12
**29** 4:8 114:15

**3**

**3** 4:4 15:3 32:23 33:5,6,9
  34:3,10 36:2 40:25
  69:21 75:19 77:19
  78:15 80:17 86:16
  117:19
**30** 4:9 32:8 35:13
**30(b)(6)** 1:12
**305-721-1600** 2:12
**3180** 2:11
**32** 4:10 118:16,17,19,22
  119:2,5
**3229** 76:16 84:19
**32792-5512** 2:15
**33** 4:11 106:2,4,8 118:24

**33131** 2:11
**33526-2426** 1:23
**34** 4:6 27:5,7
**35** 4:7,12 27:23,24 33:4,9
  33:12,17 37:19
**352** 1:24
**36** 4:8 29:14,15
**37** 4:9 30:21,22
**38** 4:10,13 32:10,11
**3810** 101:11
**39** 4:11 33:19,20

**4**

**40** 4:12 35:17,18
**407-673-5000** 2:16
**41** 4:13 38:17,18
**42** 4:14 51:15,16
**43** 4:15 57:10,11
**44** 4:16 75:5,6
**44120** 2:3
**45** 4:17 78:17,18
**46** 4:18 81:4,5
**47** 4:19 86:6,8
**48** 4:20 91:25 92:1
**49** 4:21 95:25 96:1 101:7

**5**

**5** 18:15,24 19:17 20:22
  21:5 22:19 45:4 86:15
  87:8 114:9 115:7,21
  116:5,14 117:5
**5:00** 85:25
**5:43** 122:16
**5:44** 1:15
**5:53** 84:25 85:17,21
**50** 4:22 67:21 68:9 97:25
  98:1
**5034** 80:10
**51** 4:14,23 99:16,17
  106:21
**52** 4:24 68:23 113:12,13
**53** 5:3 116:9,10
**54** 5:4 121:5,6
**567-5484** 1:24
**57** 4:15

**6**

**6** 3:3 8:13 95:3
**6:27** 85:21
**60** 8:14 95:3

**7**

**7** 101:12 114:12
**703-682-9320** 2:4,8
**75** 4:16
**78** 4:17

**8**

**8:21-cv-00555-SDM-C...**
  1:6 125:4
**81** 4:18
**8520** 1:17
**86** 4:19

**9**

**9** 64:19,24 65:1 108:16
  117:1
**9-13-16** 86:20
**9-17-16** 92:15
**900** 2:7
**901** 2:7
**90s** 10:19
**92** 4:20
**96** 4:21
**98** 4:22

**99** 4:23
**9th** 114:20