1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES, III,

  Plaintiffs,

vs.                      Case No.: 8:21-cv-00555-SDM-CPT

CHRIS NOCCO, in his
official capacity as
Pasco County Sheriff,

  Defendant.
_____/



PROCEEDINGS:          Deposition of
                      30(b)(6) LARRY KRAUS


DATE:                 January 26, 2022


TIME:                 9:00 a.m. - 1:45 p.m.


PLACE:                New Port Richey Executive Suites
                      8520 Government Drive, Suite 1
                      New Port Richey, Florida


REPORTED BY:          Judy Anderson, Court Reporter
                      Notary Public
                      State of Florida at Large



ANDERSON COURT REPORTING
P.O. Box 2426
Dade City, FL 33526-2426
Judy@andersoncourtreporting.com
(352) 567-5484

```
 1    APPEARANCES:

 2    ROBERT E. JOHNSON, ESQUIRE
      Institute for Justice
 3    16781 Chagrin Boulevard, Ste. 256
      Shaker Heights, OH 44120
 4    703-682-9320
      Rjohnson@ij.org
 5         Counsel for Plaintiffs

 6    CAROLINE GRACE BROTHERS, ESQ.
      Institute for Justice
 7    901 N. Glebe Road, Ste. 900
      Arlington, VA 22203
 8    703-682-9320
      Cgbrothers@ij.org
 9         Co-counsel for Plaintiffs

10    ARI S. BARGIL, ESQUIRE (Appearing via telephone)
      Institute for Justice
11    2 S. Biscayne Blvd., Ste. 3180
      Miami, FL 33131
12    305-721-1600
      Abargil@ij.org
13         Co-counsel for Plaintiffs

14    THOMAS W. POULTON, ESQUIRE
      Debevoise & Poulton, P.A.
15    1035 S. Semoran Blvd., Ste. 1010
      Winter Park, FL 32792-5512
16    407-673-5000
      Poulton@debevoisepoulton.com
17    Holborn@debevoisepoulton.com
      Cook@debevoisepoulton.com
18         Counsel for Defendant

19

20

21

22

23

24

25
```

1                     I N D E X

2                                              Page

3    Direct Examination by Mr. Johnson           6
     Stipulation                             211
4    Certificate of Oath                     212
     Certificate of Reporter                 213
5    Deponent's Signature Page               214
     Errata Sheet                            215

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **E X H I B I T S**

2                                     Page

3    1 - Notice                                        6

4    2 - ILP Manual 2-2016                              8

5    3 - ILP Manual 1-2018                             11

6    4 - ILP Manual 7-2021                             17

7    5 - Prolific Offender Selection Process           31

8    6 - New Member Orientation Briefing Packet        40

9    7 - AIM Slides                                    64

10   8 - PSO General Order                             72
         Misconduct Investigations & Disciplinary
11       Procedures

12   9 - Rankings of Plfs in Historical Prolific Lists  78

13   10 - Prolific Status                              79

14   11 - CAD Reports                                  84

15   12 - Extract from Notes Section of Global Prolifics  90

16   13 - AIM Slides                                   97

17   14 - AIM Slides                                  100

18   15 - CAD Reports                                 117

19   16 - Global Profile of Donnie McDougall          123

20   17 - Global Profile of Anthony McDougall         124

21   18 - Incident Reports - Tammy Heilman            133

22   19 - Web Tip Crime Notes                         137

23   20 - AIM Slides                                  140

24   21 - CAD Reports                                 146

25   22 - Global Profile - Tyler Paneson              147

1                          E X H I B I T S

2                                              Page

3    23 - Incident Reports - Darlene Deegan           149

4    24 - AIM Slides                                  151

5    25 - AIM Slides                                  152

6    26 - Email                                       153

7    27 - AIM Slides                                  155

8    28 - AIM Slides                                  159

9    29 - AIM Slides                                  165

10   30 - AIM Slides                                  166

11   31 - ILP 5 Year Study                            171

12   32 - Email                                       180

13   33 - Zone Focus Offender                         183

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | LARRY KRAUS, |
| 2 | being first duly sworn to tell the truth, the whole |
| 3 | truth, and nothing but the truth, was examined and |
| 4 | testified as follows: |
| 5 | THE WITNESS:  I do. |
| 6 | DIRECT EXAMINATION |
| 7 | BY MR. JOHNSON: |
| 8 | Q.   Okay.  Could you please state your name for the |
| 9 | record. |
| 10 | A.   Larry Kraus. |
| 11 | Q.   And I'm just going to start by marking our |
| 12 | first exhibit. |
| 13 | (Exhibit 1 was marked for identification.) |
| 14 | BY MR. JOHNSON: |
| 15 | Q.   Okay.  Are you familiar with this document? |
| 16 | It's okay if you're not. |
| 17 | A.   Yeah, no.  It looks like a subpoena -- I mean, |
| 18 | it looks like a subpoena, but -- or some kind of thing |
| 19 | and a disposition.  I've seen multiple -- I mean, so |
| 20 | many documents right now.  They're all a blur. |
| 21 | Q.   That's okay.  You don't have to be familiar |
| 22 | with it. |
| 23 | A.   Okay. |
| 24 | Q.   This is the notice that was provided to counsel |
| 25 | for the defendant -- |

1      A.   Okay.

2      Q.   -- for this deposition.

3      A.   Okay.

4      Q.   I just want to draw your attention to the fact

5  if you read the first line it says that we're here to

6  take the oral deposition of the designated

7  representatives of the Office of the Pasco County

8  Sheriff.

9      A.   Uh-huh.

10      Q.   Are you aware that you've been designated for

11  that purpose today?

12      A.   Yes.

13      Q.   Okay.  I want to draw your attention on page 2.

14      A.   Okay.

15      Q.   There's just a list of topics starting on page

16  2 over to page 3.

17      A.   Okay.

18      Q.   Those are the topics that you've been

19  designated to speak about today.

20      A.   Okay.

21      Q.   Do you have any questions about that before we

22  start?

23      A.   No.

24      Q.   Is there any reason you can't testify to those

25  topics?

1      A.   No.  I mean, some of the stuff that says

2  creation would be -- I wasn't here during the creation

3  of the original stuff.  Right?

4      Q.   Uh-huh.

5      A.   I can only testify to what -- when September --

6  September 2016, that's when I came in.  '17 I took over

7  ILP as a director.  So I can only testify to what when I

8  came in to now.  So I can't testify to anything prior to

9  2016.

10      Q.   Okay.  And we'll ask Justin Ross about those

11  issues.

12      A.   Yeah, yeah.  Okay.  Sounds good.

13      Q.   Now you are currently the director of the

14  intelligence-led policing section; is that correct?

15      A.   I am, yes.

16      Q.   And you've been in that position since late

17  2017?

18      A.   Yes.  I was originally manager.

19      Q.   And you've been involved in the section since

20  September of 2016?

21      A.   Yes.

22           MR. JOHNSON:  Okay.  I'm marking this as

23      Exhibit 2.

24           (Exhibit 2 was marked for identification.)

25  BY MR. JOHNSON:

1      Q.   Is this a copy of the Pasco Sheriff's Office

2   ILP manual from February 2016?

3      A.   Yeah, this is -- I mean, the date's on the

4   manual, yeah.

5      Q.   Okay.  So it's a yes?

6      A.   Yes.

7      Q.   Okay.  Now is it accurate to say this is a

8   document that if I have questions about it, it would be

9   better to ask Captain Ross?

10     A.   So Captain Ross -- I don't know if this was the

11   one that he went off of when he came in to redo it, but

12   yes.  I mean, I can answer, I mean, some of the

13   questions depending on what the questions are, but he's

14   the one that actually rewrote the manual.

15     Q.   Okay.

16     A.   So it might be better for Captain Ross, or if,

17   you know, you have a question, if I can answer it, I'll

18   answer it.  If I can't, I won't.

19     Q.   Okay.  I do have one question.  If you could

20   turn -- it helps to look at the table of contents -- to

21   page 50.

22          This addendum is titled Strategic Targeted Area

23   Response (STAR) Team Manual.  Are you familiar with this

24   document?

25     A.   Am I familiar with this page, or am I familiar

1    with the STAR manual?

2         Q.   The STAR manual.

3         A.   Yes, I know it exists.

4         Q.   Okay.  Is this -- this document obviously is

5    from the 2016 manual.

6         A.   Uh-huh.

7         Q.   Is there a more current version of the STAR

8    manual?

9         A.   I'm not 100 percent sure.  I know there's a

10   manual.  I just don't know what the last revision date

11   is.

12        Q.   So there is still currently a STAR manual?

13        A.   As far as I know, yes.

14             MR. JOHNSON:  Tom, if there's a more current

15        version, could you please provide it?

16             MR. POULTON:  Sure.  You're on page 50 of the

17        exhibit?

18             MR. JOHNSON:  Yes.

19             MR. POULTON:  Okay.  Let me make a note here.

20        I probably should have a separate sheet because I

21        suspect this is going to happen more than once.  All

22        right.  Let's see here.

23             THE WITNESS:  Like I said, not one hundred

24        percent sure, but I don't know what version we're

25        on.

1            MR. POULTON:  All right.  STAR manual.

2    BY MR. JOHNSON:

3        Q.   So as far as you know, this is the most current

4    version?

5        A.   I couldn't say.  Unfortunately, I couldn't say

6    if this is the current version or not.  I mean, this is

7    from 2016.  So, I mean, we would just -- I'm not going

8    to assume that it's been updated.  We're not responsible

9    for updating in an ILP, if that makes sense.

10       Q.   It does.

11           MR. JOHNSON:  So again, Tom, you'll provide us

12       with a more current version if there is one?

13           MR. POULTON:  Yes.

14           MR. JOHNSON:  Okay.

15           MR. POULTON:  I mean, I don't know how long

16       it'll take me to find out, but, you know, when we're

17       done with the depos, I'm going to forward these

18       questions, so --

19   BY MR. JOHNSON:

20       Q.   Okay.  And there is currently a STAR manual?

21       A.   As far as I know, yes.

22           MR. JOHNSON:  Okay.  I'm going to go ahead and

23       mark Exhibit 3.

24           (Exhibit 3 was marked for identification.)

25   BY MR. JOHNSON:

1      Q.   Okay.  Is this the January of 2018 version of

2  the ILP manual?

3      A.   Yes.

4      Q.   Okay.  And this version was developed shortly

5  after you arrived at the ILP section?

6      A.   Yes.  I would say it's more updated.

7      Q.   Okay.  And it was in process -- the drafting of

8  this was in process in 2017?

9      A.   I believe so.  You'd have to ask Captain Ross

10  'cause again Captain Ross redid and drafted this up

11  until he left the unit.  Well, even after he was in the

12  unit.  I think I had -- I had more involvement in the

13  newer manual.

14      Q.   So is it fair to say that this was the -- this

15  reflects the operation of the ILP program around the

16  time that you became --

17      A.   Yes.

18      Q.   I apologize.  If you could let me finish the

19  question, I think it will just be clearer.

20      A.   Okay.

21      Q.   Is it fair that this reflects the operation of

22  the ILP program around the time that you became involved

23  with the program?

24      A.   Yes.

25      Q.   Was this document drafted by Pasco County

1    Sheriff's Office employees?

2        A.   Yes.

3        Q.   And was it approved by Sheriff Nocco?

4        A.   I don't know if Sheriff -- the sheriff approved

5    it or someone else under him approved it.  I couldn't

6    tell you.

7        Q.   Was it approved under the procedures set up by

8    the Pasco County Sheriff's Office for the approval of

9    internal documents of this sort?

10       A.   Say that again.

11       Q.   Was this approved by the Sheriff's Office under

12   the procedures that the Sheriff's Office has adopted for

13   adopting manuals of this sort?

14       A.   I would say, yes, someone had to approve it, of

15   course.  So I just don't know if the -- if the sheriff

16   did it himself or if it was chief deputy or the major.

17       Q.   So the appropriate person within the Sheriff's

18   Office would have approved this document?

19       A.   Yes, yes.

20       Q.   And that would be somebody who had authority --

21   if it wasn't the sheriff himself, it would be somebody

22   who had authority that was delegated by the sheriff?

23            MR. POULTON:  Object to the form.  Go ahead.

24       A.   Yes.

25   BY MR. JOHNSON:

1    Q.   Okay.  So either the sheriff or somebody who

2  was delegated authority would approve this?

3         MR. POULTON:  Object to the form.  Go ahead.

4    A.   I would assume so, yes.

5         MR. POULTON:  I'll find out.  It's my next

6    question.

7  BY MR. JOHNSON:

8    Q.   Did any other governmental agency apart from

9  the Sheriff's Office have a role in drafting this

10  manual?

11   A.   Not to my knowledge.

12   Q.   Okay.  Deputies are expected to read the

13  manual?

14   A.   Yes.

15   Q.   And analysts are expected to read the manual?

16   A.   Yes.

17   Q.   Okay.  The manual includes performance

18  expectations for deputies?

19   A.   Yes.

20   Q.   And includes performance expectations for

21  analysts?

22   A.   No.  I don't believe we outlined performance

23  for analysts in here.

24   Q.   Does it outline procedures that analysts are to

25  follow when identifying prolific offenders?

1    A.   I don't believe it goes into that detail.  I

2    mean, you can refer to a page.  I'll --

3    Q.   Yeah.  Why don't we look at page 16?

4    A.   Where are you looking at?

5    Q.   I looked at pages 16, 17, and then also

6    actually appendix B, which starts "remember" at page 75.

7    A.   So 75 is the scoring.  So, yes, that would be

8    Steve.  That's scoring set.  That's how -- that's the

9    process in which we score prolifics.  So -- but as far

10   as outlining procedures for analysts, I mean,

11   performance expectations you're looking at identifying

12   trends.  That's a common analytical trait graph.  Review

13   focus offensive was signor's responsibility.  That's

14   common day-to-day for us.

15        MR. POULTON:  Can you speak a little more

16        slowly for our court reporter?  Trust me, if I don't

17        tell you now, she will throw something at you.

18        THE WITNESS:  Okay.

19   A.   Yes.  I mean, they could be -- I mean, this is

20   common stuff that we would teach the analyst, but the

21   manual wasn't designed for the analysts themselves.

22   BY MR. JOHNSON:

23   Q.   Okay.  But this does communicate performance

24   expectations to deputies?

25   A.   To deputies, yes.

1    Q.   And it sets out the methodology that's followed

2    by analysts who identify prolific offenders?

3    A.   On page 75, yes, there is a scoring criteria,

4    yes.

5    Q.   Okay.

6    A.   But only specific analysts.  Not every analyst

7    does the scoring.  Steve Hiebert's the only one that

8    does the scoring.

9    Q.   Okay.  We'll come back to that.

10   A.   Okay.

11   Q.   Does this also set out performance expectations

12   for deputies during prolific offender checks?

13        MR. POULTON:  Object to the form.  Go ahead.

14   BY MR. JOHNSON:

15   Q.   You can turn to page 19.

16   A.   Okay.  Yes, I would say, yes.

17   Q.   Okay.  If you want to turn to page 26, does it

18   set out performance expectations for Top 5 offenders or,

19   excuse me, for interactions by deputies with Top 5

20   offenders?

21   A.   Yes.

22   Q.   Okay.  And this is probably pedantic, but a

23   performance expectation is a -- sets out an expectation

24   for how the deputies will perform their duties as

25   employees at the Sheriff's Office?

```
 1        A.    Yes.

 2        Q.    Okay.  We'll come back to that document, but

 3    for now --

 4        A.    Okay.

 5              MR. JOHNSON:  Go ahead and mark this as Exhibit

 6        4.

 7              (Exhibit 4 was marked for identification.)

 8    BY MR. JOHNSON:

 9        Q.    Are you familiar with this document?

10        A.    Yes.  This is the newer ILP manual.

11        Q.    Okay.

12        A.    A revision of the newer ILP manual.

13        Q.    Is this the currently operative version of the

14    ILP manual?

15        A.    Yes.

16        Q.    Was this version of the ILP manual drafted by

17    Pasco County Sheriff's Office employees?

18        A.    It was.

19        Q.    Okay.  Was it approved by the appropriate

20    individual within the Pasco County Sheriff's Office?

21        A.    Yes, it was.

22        Q.    Do you know who specifically approved this?

23        A.    I know my major signed off on it.  I don't know

24    if the chief -- I'm -- I'm assuming the chief deputy

25    did.
```

1   Q.   Okay.

2   A.   We would have to check ultimately.

3   Q.   Okay.  But it would have been the appropriate

4   person within the Sheriff's Office to approve this type

5   of document?

6   A.   Yes.

7   Q.   Okay.  Did any other governmental agency have

8   -- other than the Pasco County Sheriff's Office have a

9   role in drafting this manual?

10   A.   No.

11   Q.   Okay.  Does this completely supercede the 2018

12   version of the manual?

13       MR. POULTON:  Object to the form.

14   A.   So it's a newer -- yes, it's a newer reversion,

15   so I would -- I would -- I would say yes.

16   BY MR. JOHNSON:

17   Q.   Okay.  So the 2018 version is no longer an

18   operative document for the Pasco County Sheriff's

19   Office?

20   A.   No, it's not an operative ILP manual.  It's

21   been split up.

22   Q.   Okay.  So was there any version of the ILP

23   manual between this version and the 2018 version?

24   A.   Not to my knowledge, no.

25   Q.   Okay.  So the 2018 version remained the current

1   version of the manual up until July of 2021?

2       A.   Yes.

3       Q.   Okay.  Now you said that this was split up.

4       A.   Yes.

5       Q.   What do you mean by that?

6       A.   There's a law enforcement directive.

7       Q.   Okay.  Can you elaborate on what that law

8   enforcement directive involves?

9       A.   So trade craft, you know, different units that

10  have been established since, you know, we've actually

11  evolved, of course, right, over the years.  So things

12  with behavioral health, things with mental health

13  resources, things of that nature that have been added to

14  the law enforcement directive resource capabilities.  So

15  it's just -- it's just been kind of split and put in a

16  law enforcement directive and the rest of our law

17  enforcement directive.  So same thing as like if we got

18  into a pursuit or if you were investigating a sex crime,

19  it gives guidance on how to handle that.

20      Q.   So does the law enforcement directive discuss

21  prolific offender checks?

22      A.   Yes, I believe it's still in there.

23      Q.   Does it discuss the identification of prolific

24  offenders?

25      A.   There's a score -- yeah, the scoring system's

1    still in there if I'm not mistaken.

2              MR. JOHNSON:  Okay.  Tom, could we be provided

3         with that, please?

4              MR. POULTON:  I have a recollection that there

5         would have been an issue with whether or not that is

6         exempt under Chapter 119, but I don't know enough

7         details on that.  I'll note your request, and I'll

8         get back to you on whether I can do that or not.  I

9         think there was some concern about criminal

10        investigative methods being within that.  I think

11        that's part of the reason for the split, but I don't

12        know that for certain.  So I'll check into it for

13        you.  I'll add it to the list.  So what is it

14        called?

15             THE WITNESS:  It's the --

16             MR. POULTON:  -- law enforcement directive?

17             THE WITNESS:  Yeah, it's a law enforcement

18        directive.  I can't remember the title.

19             MR. POULTON:  Okay.

20             THE WITNESS:  Unfortunately, I don't look at it

21        every day, so I have to --

22             MR. POULTON:  I understand.  Well, it sounds

23        like it's broader than -- but, all right, I'll look

24        into it.

25    BY MR. JOHNSON:

1      Q.   So just to be clear before -- well, let me

2  divide this up.  So to be clear, the law enforcement

3  directive was also adopted in July of 2021?

4      A.   Yeah, roughly about the same time.  They just,

5  again, split, turned it into different documents.  So

6  roughly around that time, yes.

7      Q.   Okay.  So before -- prior to the time that this

8  law enforcement directive was adopted, the material --

9  the relevant discussion of prolific offender checks

10  would have been contained in the ILP manual?

11      A.   Yes.

12      Q.   Okay.  And the material involving prolific

13  offender checks was transferred in 2021 to an ILP

14  directive?

15      A.   Yes.

16      Q.   And perhaps in the process revised somewhat?

17      A.   Are you asking if the scoring has been revised

18  or the --

19      Q.   Yeah.  Let me be more specific.  That's a fair

20  point.

21      A.   Yeah.

22      Q.   Okay.  So at this time the manual does not

23  discuss prolific offenders; is that correct?

24      A.   This one does not.

25           MR. POULTON:  When you say this one, you mean

1       the 2021, just to be clear?

2               THE WITNESS:  Yeah.  Yeah, like I said, let me

3       just double check because, again, I don't look at

4       this document every day.  So I believe the prolifics

5       are in there.  I think the concept of -- I think the

6       core competencies of ILP are in here, but that's

7       about it.

8               Yeah, I don't want to say no until -- yeah, no,

9       I'm not seeing it in here.

10  BY MR. JOHNSON:

11      Q.   Okay.  But at this time the Pasco Sheriff's

12  Office does still identify prolific offenders?

13      A.   Yes.

14      Q.   And the Pasco Sheriff's Office still uses

15  scoring criteria to identify prolific offenders?

16      A.   Yes.  It hasn't changed.

17      Q.   The scoring criteria have not changed since

18  during the process of adopting the 2021 manual?

19      A.   No.

20      Q.   Okay.  So the currently operative policy

21  document that would set out the scoring criteria would

22  be the general directive?

23      A.   Yes.

24      Q.   And that's true as well for conducting prolific

25  offender checks?

1          MR. POULTON:  Object to the form.

2     BY MR. JOHNSON:

3          Q.   The currently operative policy document for

4     conducting prolific offender checks would be the general

5     directive?

6          MR. POULTON:  Same objection.  Go ahead.

7          A.   So I'd have to -- I am not -- I don't have the

8     document in front of me.  So I would have to make sure

9     nothing's truly changed, but ILP doesn't guide that, if

10    that makes sense.  So I don't tell people how to do

11    prolific checks.  I don't train them how to do prolific

12    checks.  That's not ILP's function.  ILP's function is

13    the scoring and identifying the repeat offenders, and

14    that's where it ends.

15    BY MR. JOHNSON:

16         Q.   Right.  No, I understand that, but you're here

17    today as the representative of the Sheriff's Office.

18    Obviously, if we need to designate another

19    representative, we can do that, but hopefully we can

20    avoid it.

21         A.   Yeah.  I'd have to look at the document.  If

22    you have the document, I could look at it and I could

23    answer the questions.  But again, I don't look at that

24    document every day.  So I wouldn't feel comfortable

25    saying, yeah, it's still in there.  Again, I haven't

1    looked at the document in a while.

2        Q.    Okay.

3            MR. POULTON:  I think this was the reason that

4    we had -- remember when we had Tait Sanborn when we

5    did that first sort of pre 30(b)(6) just, you know,

6    to familiarize ourselves with the system approach is

7    because of the fact that you're -- there's a

8    distinction between --

9            MR. JOHNSON:  Right.

10           MR. POULTON:  -- the ILP and the, you know,

11   identification of prolific offenders versus how

12   prolific offender checks are actually, you know,

13   boots-on-the-ground done.

14           MR. JOHNSON:  Right.  Well, yeah.  So I don't

15   have a lot of boots-on-the-ground questions, but I

16   do --

17           MR. POULTON:  I understand.

18           MR. JOHNSON:  I would like to at least

19   establish what the policy document is currently.

20           MR. POULTON:  Fair enough.

21           MR. JOHNSON:  Okay.

22  BY MR. JOHNSON:

23       Q.    So prior to the change in 2021, the 2018 manual

24   that we've marked as Exhibit 3 was the policy document

25   to guide the scoring process for prolific offenders; is

1    that correct?

2        A.    Yes, it was in there.  Yes.

3        Q.    Okay.  And was this also the policy document to

4    guide prolific offender checks?

5            MR. POULTON:  Object to the form.

6        A.    I would say, yes, there's an expectation in

7    there, but the guidance would ultimately be up to the

8    district commanders.

9    BY MR. JOHNSON:

10       Q.    But it did set -- it set expectations to follow

11   in prolific offender checks?

12       A.    It did, yes.

13       Q.    Okay.  And those expectations were communicated

14   to deputies through the manual?

15       A.    Well, through their manual or their chain of

16   command, yes.

17       Q.    And it's also included performance expectations

18   for their supervisors; is that correct?

19       A.    Yes.

20       Q.    And the supervisors were expected to follow

21   those performance expectations?

22       A.    Yes.

23       Q.    So when you say that they would have received

24   directions from their supervisors, those supervisors

25   would also be reading and following the manual?

1      A.   Yes, the expectations that are actually listed

2  in the manual, yes.

3      Q.   Okay.  At this time is the Pasco Sheriff's

4  Office considering any changes to the definition of a

5  prolific offender?

6      A.   The definition, no.  The scoring, yes.

7      Q.   So the Pasco Sheriff's Office is considering

8  changes to the scoring for prolific offenders?

9      A.   Yes.  We're still in research and development.

10     Q.   Okay.  Would that include focusing more on

11  violent crimes?

12     A.   The current scoring focuses on violent crimes

13  as well.

14     Q.   Is it fair to say the current scoring focuses

15  primarily on property crimes?

16     A.   Not necessarily because -- well, it does, yes.

17  But you've got to look at the way the scoring goes;

18  right?  So you get more points for violent crimes,

19  violent crimes with firearms, things of that nature.  It

20  goes to the crimes harm index.  So when you're looking

21  at scoring the crime, right, you go to the most violent

22  crime, and then you go down.  Like we're not looking at

23  people for jaywalking.  What happens is the crime

24  environment changes, right, ultimately.  So property

25  crimes are down this year, violent crime is going up.

1    However, Pasco's violent crime is primarily recognizing

2    domestic violence.

3          We already have domestic violence grants and

4    domestic violence detectives that primarily focus on

5    domestic violence.  We also have victim's advocates that

6    focus on that.  So, yeah.  So when we look at the change

7    stuff, we don't change just to change.  We change that,

8    hey, listen, the research is driving us in that

9    direction.  So if the crime environment changes,

10   ultimately we've got to look and see, hey, are we

11   focusing on the right group of individuals at the right

12   time?

13         So ultimately, again like we said, we're in the

14   research and development stage of this, myself and Ross

15   Brummett.  So we don't just deploy things.  Since I've

16   been in command here, we're not deploying things just to

17   deploy things; right?  We're gonna go through, look at

18   the research, see what it does, see if we're focusing on

19   the right individuals, and that's the way we're gonna

20   go.

21      Q.   And one of the things that you're considering

22   is changing the scoring system to place more value, for

23   lack of a better word, on violent offenses?

24      A.   It'll still have the same makeup.  It'll focus

25   on -- it will focus on violent crime, but it's always

1   going to focus on violent crime if that makes sense.

2   Right?  You can't ignore violent crime.  It's absolutely

3   inconceivable to do so.  So it's going to focus on

4   violent crime just like the last one does.  What it'll

5   end up doing is looking at all crimes, all hazards

6   approach due to our property crimes going down and

7   proper strategies being deployed to effectively reduce

8   our property crime issue in Pasco County, which we have

9   done over the course of the last four or five years.

10      Q.   Okay.  And you haven't made these changes yet?

11      A.   No.

12      Q.   So the current version of the manual also does

13   not discuss Top 5 offenders?

14      A.   It does not.

15      Q.   And the Pasco County Sheriff's Office no longer

16   identifies Top 5 offenders; is that right?

17      A.   I wouldn't necessarily say we don't call it

18   that.  I would say we look at associates.  We look at

19   crime associates.  We look at criminal networks.  But we

20   don't necessarily call it the Top 5; right?  Again,

21   that's evolved just like anything else in law

22   enforcement.  It's more looking at the criminal networks

23   and dealing with them from a different lens rather than

24   looking at it from a smaller lens.

25      Q.   Okay.  When did that change?

1    A.   Almost probably legitimately it started

2    gradually changing in '16 when I got here.  We started

3    looking at social network analysis a little bit more

4    through the Naval post graduate school.  So they had a

5    program where they kind of came in and taught social

6    network analysis to look at criminal networks and how

7    they operated, looking more at violent criminal

8    networks, narcotic networks, things of that nature,

9    gangs, stuff like that, more organized crime type

10   mentality.  So it kind of evolved a little bit.  It went

11   toward more of a latent investigation rather than more

12   of a patrol function, if that makes sense.

13       Q.   So you testified that the Pasco Sheriff's

14   Office no longer uses the term Top 5; is that correct?

15       A.   Yes.

16       Q.   When did the Sheriff's Office stop using the

17   term Top 5?

18       A.   I couldn't give you an exact date.  I just know

19   we kind of adapted a lot of our daily operations to

20   streamline it.  We didn't -- we shortened some of our

21   meetings because there was a lot of fluff going into it.

22   We basically kind of went to more of an executive

23   briefing style:  These are our problems, these are our

24   solutions, these are our strategies.  Right?  So, again,

25   a lot of it evolved.  It just kind of became more

1    streamlined as we went along.  Probably I would say

2    maybe 2017 it started evolving a little bit deeper into

3    a more streamlined approach, but I couldn't give you

4    exact dates because it was very fluid.

5        Q.   Again, I appreciate the description of how it

6    evolved, but I'm just focused on the term Top 5.  Are

7    you aware of the Sheriff's Office using the term Top 5

8    after 2017?

9        A.   I'd have to look.  I think we -- I think at the

10   beginning of 2017 we might have had some slides that

11   said Top 5, but I'm not 100 percent sure.  I'd have to

12   see something to tell you.

13       Q.   Are Top 5 offenders discussed in the 2018

14   version of the manual?

15       A.   Yes.

16       Q.   Okay.  So at least in January 2018 the

17   Sheriff's Office was using the term?

18       A.   It was still in the manual, yes.  It hadn't

19   been updated.

20       Q.   Well, this manual was adopted in January 2018.

21       A.   Yes.

22       Q.   Okay.  We can come back to that along the way.

23            MR. POULTON:  Off the record.

24            (Off-the-record discussion.)

25   BY MR. JOHNSON:

1    Q.   The 2021 version of the manual discusses an

2    individual called the constitutional policing advisor.

3    A.   Yes.

4    Q.   Okay.  Is that a position that was created

5    around the time of the adoption of the 2021 manual?

6    A.   I don't know how long we've had that.  I know

7    who it is, but I just don't know how long we've had it.

8    You would have to ask.

9    Q.   And who is that?

10   A.   I think it's Lindsey Moore if I'm not mistaken.

11   She runs that.

12   Q.   Is she an attorney?

13   A.   Yes.

14   Q.   Okay.  Has that position always existed in the

15   time that you've been at the Sheriff's Office?

16   A.   I can't answer that.  I'm not sure.

17   Q.   Okay.  The position is not discussed in the

18   2018 version of the manual; is that correct?

19       MR. POULTON:  Object to the form.  Go ahead.

20   A.   I don't believe so.

21       MR. JOHNSON:  Okay.  I'm going to go ahead and

22   mark this as Exhibit 5.

23       (Exhibit 5 was marked for identification.)

24   BY MR. JOHNSON:

25   Q.   Are you familiar with this document?

1    A.   I am.

2    Q.   Is this the policy document setting out the

3    scoring process for prolific offenders?

4    A.   It is.

5    Q.   Okay.  Is this still an active policy document

6    for the Pasco County Sheriff's Office?

7    A.   Yeah, for the most part.  There's been some

8    minor changes.

9    Q.   Has this document been revised?

10   A.   No.

11   Q.   So when you say there have been minor changes,

12   you mean changes that would be reflected in the general

13   directive?

14   A.   No.  Just internal to review as far as how

15   analysts operate in looking at the individual vetting.

16   Q.   Are you referring to the step that has been

17   alluded to where analysts determine whether someone is

18   contributing to the criminal environment?

19   A.   Yes.

20   Q.   So apart from that, this is still an accurate

21   reflection of the scoring process?

22   A.   Yes.  And the top 100 is not necessarily

23   accurate.

24   Q.   So it's also not accurate in the sense that

25   there might be more than 100 or fewer?

1    A.   Yes.

2    Q.   Okay.  So other than those two things, is this

3  an accurate policy document?

4    A.   Yes.

5    Q.   Okay.  This looks like it's a revision from

6  January of 2017 looking at the top right corner; is that

7  correct?

8    A.   Yes, that's what's on there, yes.

9    Q.   Okay.  So this would reflect the -- other than

10  the two things that we've discussed --

11    A.   Uh-huh.

12    Q.   -- this would reflect the scoring process from

13  the period from 2017 through the present?

14    A.   Yes.

15    Q.   Okay.  So we alluded to the step of determining

16  whether an individual is contributing to the crime

17  environment.

18    A.   Uh-huh.

19    Q.   Is that process set guided by any written

20  policy document?

21    A.   No.

22    Q.   Okay.  When did that become a part of the

23  prolific offender selection process?

24    A.   When I became director, we kind of had some

25  conversations internally about looking at the prolifics.

1    And, you know, again, it should have been a -- it

2    ultimately should be understood that someone has to be

3    -- you know, either have suspicion of committing a crime

4    or have committed a crime in order to even focus on

5    them, right, from a law enforcement perspective.  So

6    just guidance that I've made it perfectly clear to all

7    of our analysts like, hey, if we're going to identify a

8    prolific and we're going to have deputies go focus on

9    that person, they need to be active in the criminal

10   environment, period.  So that was guidance from myself,

11   my leadership staff, all the way down to everybody in

12   ILP.

13       Q.   So you said that those discussions began when

14   you became director; is that correct?

15            MR. POULTON:  Well, object to the form.  Go

16       ahead.

17       A.   Yes.  And I'm pretty sure Captain Ross or,

18   well, Lieutenant Ross at the same time had the same

19   concept.  So you'd have to ask him the same thing, but

20   that was pretty much our guidance and our understanding.

21   BY MR. JOHNSON:

22       Q.   Okay.  And are you saying that you began to

23   discuss whether to provide that guidance when you became

24   director?

25       A.   No.  That was always our kind of leadership

1    guidance to everybody in the unit.

2         Q.   So you're testifying that you -- and again I

3    just want to be clear -- that you provided that guidance

4    when you became director?

5         A.   Yes.

6         Q.   Okay.  If an ILP analyst testified that she

7    became aware of that guidance a year to a year and a

8    half ago, is she just mistaken?

9         A.   Possibly, yes.

10        Q.   Possibly.  So in your view, she should have

11   been of aware of this guidance?

12        A.   Oh, absolutely.

13        Q.   Okay.

14        A.   Yeah.

15        Q.   But this guidance would not have been

16   communicated to her in any written way?

17        A.   Not in writing, no.

18        Q.   Okay.  Is the determination of whether someone

19   is contributing to the criminal environment looked to

20   whether that individual has appeared in recent incident

21   reports?

22        A.   In what manner?

23        Q.   What sources are analysts supposed to use to

24   make this determination?

25        A.   So reports from the deputies, tips from the

1    public, intelligence reports from the deputies, field

2    interview or field contact reports.  So, basically,

3    anything internal.  We don't use anything external from

4    any other agencies to determine that.

5        Q.   So if an individual had appeared in a recent

6    incident report, that would suggest that they are

7    contributing to the criminal environment?

8        A.   Depends how they're documented in that incident

9    report.

10       Q.   If they were documented as a person who was,

11   for instance, arrested for an offense?

12       A.   Yes.  If they are arrested as an offense, yes.

13       Q.   Okay.  So how recently would that have had to

14   happen for them to be contributing to the criminal

15   environment?

16       A.   I don't think there's a -- I mean, there's not

17   a time frame.  It should be current; right?  It should

18   be what we're looking at.  I mean, we do weeklies and

19   dailies and things of that nature.  So if they're

20   looking to focus on it, it's like we should be providing

21   that history to the individual captain or lieutenants

22   and sergeants to determine whether or not that person is

23   actually active in the crime environment or --

24       Q.   If a person was -- appeared in a report a week

25   ago, would they still be contributing to the criminal

1    environment?

2        A.   Yes.

3        Q.   If they appeared in a report two weeks ago,

4    would they still be contributing to the criminal

5    environment?

6        A.   So I think it depends on the totality of the

7    circumstances.  I think there's a lot of variables

8    there.  I mean, you're asking a broad question that

9    potentially has a lot of variables that could change the

10   dynamic of what that thought process is.

11       Q.   So it depends?

12       A.   I would say, yeah, everything depends.

13       Q.   Okay.  If they appeared in a report a month

14   ago, is the answer that it would depend?

15       A.   Yes.  Is the case still active?

16       Q.   So it would depend?

17       A.   I would say it would vary.  Yes, absolutely.

18       Q.   Okay.

19       A.   I mean, we would have to look at specific cases

20   for me to kind of go, yeah, that person is or that

21   person isn't.  That's why we have the analyst involved.

22       Q.   And then once a person has been put on the

23   list, they remain on the list until a new list is

24   generated?

25       A.   Every quarter the list is ran, yes.

1    Q.   Okay.  So this determination is made only once

2  a quarter?

3    A.   The list is ran every once a quarter, yes.

4    Q.   Okay.  And the determination of whether someone

5  is contributing to the criminal environment is made once

6  a quarter?

7         MR. POULTON:  Object to the form.  Go ahead.

8    A.   No, that should be consistent.  That should be

9  constant.  So if you're analyzing something every day,

10  you should have an idea of who's active in the crime

11  environment and who's not active in the crime

12  environment.

13  BY MR. JOHNSON:

14    Q.   But the list is only revised once a quarter?

15    A.   Yes.  But you don't have to be on a list in

16  order for people to be affecting the crime environment.

17  So we're -- the list identifies repeat offenders; right?

18  We have hundreds of other offenders that are doing the

19  same thing; right?  It could be someone from out of

20  county.  It could be someone from out of state.  It

21  could be someone that is not on the list, has no history

22  in Pasco County.  So, yeah, there's a lot of variables

23  going there.  So the analysts are -- I mean, this is not

24  a -- this is not a job where they kind of hit the brakes

25  and hit a pause button because we have 24/7 operation

1    capability.

2        Q.   I understand.  I just want to get a few things

3    just to be clear for my own understanding.

4        A.   Yeah.

5        Q.   What you're saying is the analysts are

6    constantly determining whether individuals who they're

7    analyzing are contributing to the criminal environment?

8        A.   Yeah.

9        Q.   Okay.  But that doesn't mean that they're

10   constantly revising the list?

11       A.   No.

12       Q.   Okay.  The list is revised once a quarter?

13       A.   Yes, the list itself.  Okay.

14       Q.   Okay.

15       A.   I was confused because you kind of gelled them

16   together.

17            MR. POULTON:  Yeah.  And that was going to

18       be -- the objection to -- well, they're not mutually

19       exclusive.  You know, you have the list, and if your

20       question is narrowed to the list, there's your

21       answer.  But if you mean -- you know, we've heard

22       from the other deponents that they are interacting

23       all the time with command staff and deputies.

24            MR. JOHNSON:  Right.

25   BY MR. JOHNSON:

1      Q.   So there are individuals who contribute to the

2   criminal environment who are not on the list?

3      A.   Yes.

4      Q.   Okay.  The list is limited to people who both

5   contribute to the criminal environment and are

6   identified by the selection process?

7      A.   Yes, repeat offenders.

8      Q.   And by repeat offenders you mean individuals

9   who are identified as repeat offenders by the algorithm

10  set out in Exhibit 5?

11     A.   Yes, the scoring, yes.

12          MR. JOHNSON:  I'm going to go ahead and mark

13     Exhibit 6.

14          (Exhibit 6 was marked for identification.)

15  BY MR. JOHNSON:

16     Q.   Are you familiar with this document?

17     A.   Yes.  This is our NMO briefing packet.

18     Q.   This is a -- is this the slide show that you

19  use to train new deputies?

20     A.   Yes.

21     Q.   And is it also used to train new analysts?

22     A.   The analysts see it, yes.

23     Q.   Okay.  It's provided to new analysts?

24     A.   Yes.

25     Q.   And they're expected to review it?

1      A.   I provide the training myself.

2      Q.   So you provide this to them as part of their

3  training.

4           (Off-the-record discussion.)

5  BY MR. JOHNSON:

6      Q.   I don't know if this made its way into the

7  record or not.  So you used the acronym NMO.  Does that

8  stand for new member orientation?

9      A.   It does, yes.

10      Q.   Okay.  I'm going to direct you to page 16686.

11      A.   Let me see what it looks like.

12           MR. POULTON:  Here you go.  It's down at the

13      bottom if you look down at the bottom to the page

14      numbers.

15           THE WITNESS:  Got it.

16           MR. POULTON:  Defendant 16686.

17           THE WITNESS:  Okay.

18  BY MR. JOHNSON:

19      Q.   If you read under it says What Intelligence

20  Cannot Do --

21      A.   Uh-huh.

22      Q.   -- it says predict the future.  Then it says

23  intelligence can provide assessments of probable

24  scenarios or developments, but there is no way to

25  predict what will happen with absolute certainty.  Is

1    that accurate?

2        A.   Absolutely accurate, yes.

3        Q.   Did you write that?

4        A.   I did not.

5        Q.   Who wrote that?

6        A.   That came from an intelligence manual that I've

7    had.  I can't remember exact source.

8        Q.   I see.  So you quoted that in this document.

9    Did you create this document?

10       A.   I did create this document, yes.

11       Q.   And this is a quotation?

12       A.   Yes.  This is from other intelligence training

13   and things of that nature that we brief when we talk

14   about what can intelligence do and what can't

15   intelligence do.

16       Q.   Okay.

17       A.   There's a lot of misnomers that people think we

18   have crystal balls that we can predict the future, and

19   that's not the case.

20       Q.   Right.  I understand that.

21            This says that intelligence can provide an

22   assessment of probable scenarios.

23       A.   Yes.

24       Q.   What does that mean?

25       A.   So, basically, we're forecasting or we're

1    providing assessments on, you know, the current crime

2    environment.  It depends what you're assessing; correct?

3    Right?  So if I'm assessing a threat, right, I have to

4    assess the likelihood of that threat being carried out

5    by an individual.  If I'm assessing a crime, it's based

6    on pattern analysis.  So, for example, if I have ten

7    burglaries, right, and they have the same -- the same

8    pattern across the board, right, they happened within

9    the same timeframe, they happened on the same day, they

10   happened within an hour of each other, we may have

11   surveillance that indicates that it appears to be the

12   same suspect going through each and every car.  That's

13   where we look at the pattern analysis.

14         So then let's say those said burglaries, right,

15   continue over a span of three months and they continue

16   in the same place or the same similar geographical

17   location maybe roughly -- maybe let's say it happens

18   within a half a mile or a mile of each other and

19   multiple subdivisions, the suspects are all the same on

20   surveillance.  What the analysts can do is narrow the

21   focus of how a commander would deploy resources into

22   that area.

23       Q.   And I understand the analysts are not solely

24   involved in the prolific offender selection process.  So

25   I understand that.

1       A.   Yes.

2       Q.   But I want to focus on the prolific offender

3   selection process for purposes of today.

4       A.   Okay.

5       Q.   Is it relevant to say that the prolific

6   offender scoring process is a type of pattern analysis?

7       A.   Well, it does take into account when they're

8   committing crimes.  So it would be a pattern of crime,

9   yes.

10      Q.   So it's a type of assessment of a probable

11  scenario; is that accurate?

12           MR. POULTON:  Object to the form.  Go ahead.

13      A.   No, because they're actually committing the

14  crime.

15  BY MR. JOHNSON:

16      Q.   Okay.

17      A.   Now if they're suspicion of committing the

18  crime, that's different.  But if we actually have

19  evidence to say that they are committing that crime,

20  which we go based on arrest -- the prolific scoring is

21  based on arrest.  It's not based on whether or not we

22  think they're going to be arrested.  It's based on

23  actual arrest to even get into the pool.  So they would

24  have to have been arrested.

25      Q.   Well, I understand that they've been identified

1     as a prolific offender --

2         A.   Yes.

3         Q.   -- based on things that happened in the past.

4     But is it fair to say that then the purpose of that is

5     to conduct a type of pattern analysis to determine what

6     might happen in the future?

7              MR. POULTON:  Object to the form.  Go ahead.

8         A.   Not necessarily I would say there's a history

9     of that arrest.  Is there a higher likelihood that we

10    believe that person would commit a crime in the future?

11    Yes.  If I have a person that's created -- you know,

12    committed 52 burglaries and I have a person that's

13    committed one burglary, there's probably a higher

14    likelihood that the person that's committing 52

15    burglaries would be a suspect in another burglary.  But

16    you would still have to have probable cause or

17    reasonable suspicion to believe that that person is

18    actually responsible for that crime that we are looking

19    at or making an assessment on.

20    BY MR. JOHNSON:

21        Q.   Okay.  Just generally, is the theory of ILP

22    that it's possible to use pattern analysis of things

23    that happened in the past to create forecasts of what

24    might happen in the future?

25             MR. POULTON:  Object to the form.  Go ahead.

1        A.    I mean, I think it would be taken into account,

2    but to a certain extent that's why when you look at the

3    ILP scoring it's within the three-year period; right?

4    Anything outside that block would ultimately not -- not

5    count towards the scoring.  I would say, yeah,

6    historical would be looked at from an assessment

7    standpoint, but there's still -- again, there's a lot of

8    variables that go into that assessment that, you know,

9    would be left out if you just kind of looked at it and

10   assumed that we were just going based on historical.

11        You know, there's times where people age out of

12   their behavior, right, from a juvenile mentality.  They

13   age out of that criminal behavior; right?  They commit

14   crimes when they're juveniles.  There's been tons of

15   studies that have talked about how they've aged out of

16   that behavior, and it just depends.  It could be

17   life-changing environment:  They get married, they have

18   kids.  But you wouldn't always take that historical into

19   what's happening in the present.  We still have to have

20   kind of a present understanding of that are they

21   currently involved in the crime environment.  So that's

22   the purpose is to kind of the here and now.  I mean, you

23   could look at the historical.  Ultimately, the answer

24   would be yes, but I think there's a lot of variables

25   that go into that assessment.  I don't think it's just

1   black and white from that perspective.

2       Q.   So the purpose of the prolific offender

3   selection process is to look at what happened in the

4   past in order to then draw conclusions about the here

5   and now?

6           MR. POULTON:  Object to the form.

7       A.   Well, it looks at their three-year history in

8   Pasco.  And again, that's why we put in -- like that's

9   why the guidance to the analysts was, hey, you know, if

10  we're going to deploy resources smartly, we need to make

11  sure that they're actively engaged in the crime

12  environment now.

13          You know, if we have one guy that scores in the

14  pool that was only arrested three years ago and they're

15  not active anymore, then should we put resource on

16  there?  The answer is, no, we should not.

17  BY MR. JOHNSON:

18      Q.   So why does the process look at the last three

19  years of history at all?

20      A.   That's just the way we created the scoring

21  capability.  I mean, you can always change it.  There's

22  multiple different scoring mechanisms across the board

23  in law enforcement; right?  I mean, we could change it

24  to a year.  We could change it to six months.  We could

25  change it -- it depends what we're looking -- because

1   we've -- I mean, it depends on what their thought

2   process was then.  I mean, if you're getting hit by

3   property crimes that have not been addressed for a

4   couple years, it just allows you to have a pool.  So you

5   have to have some kind of criteria to create that pool.

6       Q.    I think you testified that analysts are always

7   looking at who is currently affecting the criminal

8   environment even apart from the prolific offender

9   process?

10      A.    Yes, they should.  Yeah, absolutely.

11      Q.    So what makes the prolific offender process

12  different is that it also looks at past data on three

13  years of crimes within Pasco County?

14      A.    It does.  It does look at the past data, yes.

15      Q.    And what is the purpose of looking at that past

16  data?

17      A.    To describe their criminal history.  To look at

18  their criminal history and how that -- what they've done

19  over the course of those three years.

20      Q.    And what's the purpose of looking at their

21  criminal history?

22      A.    To look at the repeat -- if they're a repeat --

23  if they're truly a repeat offender or not.

24      Q.    What's the purpose of looking at whether

25  they're a repeat offender or not?

1      A.    Because ultimately there are studies out there

2    that say that individuals that have committed crimes in

3    the past will ultimately reoffend within a certain

4    amount of time.

5      Q.    Okay.  On the same document I just want to turn

6    to page 16694.  This says that intelligence-led policing

7    emphasizes analysis and intelligence as pivotal to an

8    objective, decision-making framework that prioritizes

9    crime hot spots, repeat victims, prolific offenders, and

10   criminal groups.  What does it mean to prioritize

11   prolific offenders?

12     A.    So ultimately your repeat offenders are going

13   to be the individuals that are creating -- are offending

14   the most; right?  So the goal is to off ramp -- either

15   off ramp or deter that crime from occurring.  So, I

16   mean, you're prioritizing a lot -- it's a lot though.

17   It's not just prolifics.  I mean, you're looking at the

18   totality of the circumstances here; right?  You're

19   looking at problem people, problem places, and problem

20   groups.  So the prolifics are just a fraction of what

21   everything that we focus on.

22     Q.    Is it fair to say that prolific offenders are

23   problem people?

24           MR. POULTON:  Object to the form.

25     A.    I mean, yeah.  I mean, we would ultimately say

1    that they're committing crime.  So, I mean, if they're

2    creating a problem, then, yeah, we could say yes.

3    BY MR. JOHNSON:

4        Q.   Okay.  This training spreadsheet refers to

5    problem people and problem places; is that correct?

6        A.   Uh-huh.

7        Q.   Okay.  And problem people would include,

8    obviously not only, but it would include people who have

9    been listed as prolific offenders?

10       A.   Yes, if they're currently active in the crime

11   environment, yes.

12       Q.   Are there people who are listed as prolific

13   offenders who are not currently active in the crime

14   environment?

15       A.   There would be people that make the pool due to

16   their history that we would not focus on, yes.

17       Q.   But those people would not have been listed as

18   prolific offenders?

19       A.   They would not be flagged as prolific

20   offenders, no.

21       Q.   Okay.  If somebody is flagged as a prolific

22   offender, that means they're a problem person?

23           MR. POULTON:  Object to the form.

24       A.   I would say if they're active, yes, that would

25   be a problem we would be focusing on.  So crime doesn't

1    commit itself.  A person has to commit the crime.  So

2    ultimately we have to focus on a person.

3    BY MR. JOHNSON:

4        Q.   Yeah.  What I'm struggling with is that your

5    answer suggests that there are people who are flagged

6    who are not active.

7            MR. POULTON:  Can you define flagged for us?

8        A.   So that's not the case.  So I have said

9    multiple times that if they're affecting -- that we

10   should not flag a prolific offender unless they are

11   actually affecting the crime environment, right, or

12   active in the crime environment.  So that's my guidance;

13   right?  Whether written or not, it was verbal guidance

14   to my unit if they are active in the crime environment,

15   they are flagged.  If they're not active in the crime

16   environment, we should not be flagging them because we

17   should not focus on those individuals because they are

18   not currently active.

19           When you're looking at resource management,

20   resource deployment, why are we going to -- why are we

21   to go look at someone that is not active in the crime

22   environment?  It makes no sense.

23   BY MR. JOHNSON:

24       Q.   Okay.  That's helpful.

25           And just to be clear about it, if an individual

1    has been properly flagged as a prolific offender,

2    they're an individual who should be prioritized?

3        A.   Yes, I would say we would prioritize those

4    individuals.  Yes.

5        Q.   Okay.  And what does it mean to prioritize

6    those individuals?

7        A.   Well, the goal -- I mean, another goal too is

8    if they are involved in crimes, our goal is to increase

9    the solvability level so we can solve that crime.  And

10   then if they're the ones that are actually affecting

11   committing that crime, then we've got to figure out what

12   that strategy is; right?  Is it an arrest?  Is it a

13   notice to appear?  Is it -- you know, ultimately if

14   they're committing property crimes, they're going to be

15   arrested, right, by a detective.  It's ensuring that

16   we're identifying the right suspects that are committing

17   these crimes and going through the criminal justice

18   system to make sure that we're deterring that from

19   happening again.

20       Q.   I think you mentioned earlier the goal is

21   either to off ramp them --

22       A.   Uh-huh.

23       Q.   -- or -- which presumably would mean to

24   convince them not to commit future crimes; is that

25   correct?

1      A.    Yeah, to provide resources -- I mean, you have

2    to understand like the -- from our perspective, it's not

3    just what crime is happening.  We've got to like kind of

4    identify why the crime is happening.  And if it's --

5    there's again multiple different things that go into

6    this; right?  We look at crime attractors, crime

7    enhancers, things of that nature.  So crime enhancers

8    would be something as substance abuse, mental health,

9    alcoholism, things of that nature.  Is there something

10   that we can get that individual help?  Is this a

11   behavioral health thing?  Can we assign our BHIT team to

12   it?  Can we --

13           MR. POULTON:  Your what team?

14      A.    I'm sorry.  Behavioral health intervention

15   team.  If we can off ramp them somewhere else, right,

16   rather than them being in jail.  I think there's a

17   misnomer that law enforcement wants individuals in jail.

18   That's not the case here.  We would rather them not go

19   to jail because our jail is absolutely packed right now.

20   So it's about like maybe a 1 to 75 ratio for deputies,

21   not really officer safety friendly for the most part.

22   So the goal is to either defect, you know, it's either

23   to disrupt that criminal pattern or to off ramp them in

24   some other program or behavioral health mentality and

25   move in that direction.

1    BY MR. JOHNSON:

2         Q.   Okay.  So the goal is to either off ramp them

3    by providing some sort of alternative to criminal

4    behavior or --

5         A.   Yeah.

6         Q.   -- disrupt the pattern of criminal behavior?

7         A.   Yes.

8         Q.   And by disrupting the pattern of criminal

9    behavior, do you mean by arresting by them?

10        A.   Ultimately that would be the next solution,

11   yes, arrest.

12        Q.   Okay.  And when you refer to the pattern of

13   criminal behavior, that's the pattern that led to them

14   being designated as a prolific offender?

15        A.   Yes.

16        Q.   Okay.  Okay.  So as far as you've -- as long as

17   you have been involved in this program or this ILP

18   division --

19        A.   Uh-huh.

20        Q.   -- the Sheriff's Office has been conducting

21   prolific offender checks; is that correct?

22        A.   Yes.

23        Q.   Okay.  So that's true from 2016 through the

24   present?

25        A.   Yes.

1    Q.   Okay.  Does the Pasco Sheriff's Office also

2  have a zero arrest policy for prolific offenders?

3    A.   Yes.  I believe there is a zero tolerance

4  policy that was listed in the manual.

5    Q.   Okay.  Is that still true today?

6    A.   I believe so.  You'd have to ask Major Sanborn.

7         MR. JOHNSON:  Tom, do you think it might be

8    possible to get Major Sanborn in for like an hour at

9    the end of the day today?  If it's not, it's not,

10   but --

11        MR. POULTON:  Uh.

12        MR. JOHNSON:  I'd like to get this done today

13   if we can.

14        MR. POULTON:  I understand.  So what is it you

15   want him to -- is it just to talk about the --

16        MR. JOHNSON:  Or maybe we don't need him, but

17   the problem is that I want to know what the current

18   policy is for prolific offender checks, and I don't

19   know if he's really the --

20        MR. POULTON:  Well, when you -- see what is the

21   -- see that's part of the problem here is when you

22   say what is the current policy, in what respect?  Do

23   you mean like how often they're done?  You know, how

24   did the deputies know to go -- STAR team, for

25   example, how do they know to go do them?  I mean,

1       you know --

2           MR. JOHNSON:  All right.

3           MR. POULTON:  The direction, again, I don't

4       know -- I don't know what you mean by that.  I'm not

5       saying no.  I just -- I'm happy to call him, but I

6       just don't know what to tell him.

7           MR. JOHNSON:  I don't know if he'll be able to

8       answer these questions either.  Let's talk about

9       it --

10          MR. POULTON:  All right.  Well, keep going and

11      we'll talk about it on Friday.

12          MR. JOHNSON:  Okay.

13  BY MR. JOHNSON:

14      Q.   So sitting here today, you believe that the

15  Sheriff's Office still has a zero arrest tolerancy

16  policy -- zero tolerance arrest policy for prolific

17  offenders?

18      A.   I would say it was mentioned in the manual.  I

19  don't know if that's generally the case right now.

20  Again, we've evolved over the last several years.

21  Again, we've got a behavioral health intervention team.

22  I know they engage with a lot of individuals to off

23  ramp.  I know we have a lot of reentry programs from the

24  jail.  So if a prolific does get arrested, even if they

25  do get arrested, they're trying to offer them services

1    from what I'm understanding.  So I couldn't tell you the
2    current -- again, I couldn't tell you the current
3    guidance from the district, and I don't want to
4    misspeak.  So, you know, I will tell you we still -- we
5    still identify prolific offenders.  We still flag the
6    prolific offenders.  I'm not 100 percent sure how the
7    prolific offenders are handled within the district as
8    far as guidance to deputies.  You know, since COVID and
9    all that stuff, why I haven't been able to get out with
10   the deputies as much as I want to.  We've kind of
11   reduced the risk out there.  My analysts haven't been
12   able to ride with the deputies because usually it was
13   mandatory for them to ride at least once a year just to
14   see what was going on, you know, how the deputies are
15   responding to certain things, but we haven't been able
16   to do that in a little while just due to the safety
17   precautions.
18        Q.   Okay.  So the zero arrest -- zero tolerance
19   arrest policy was in the 2018 version of the manual?
20        A.   Yes.
21        Q.   Okay.  So that would have been in the manual up
22   until July of 2021?
23        A.   Yes.
24        Q.   And so the uncertainty is just whether it
25   continues to be the policy after July of 2021?

1    A.   Yeah.  And I'll be honest with you, I haven't

2  looked at the LED in a while.  I know, again, we rewrote

3  the manual, we rewrote the LED and just changed some --

4  I don't think it's significant.  It's some minor things,

5  but I would have to go back and read it in order to

6  properly answer.

7    Q.   What is the LED?

8    A.   The law enforcement directive that I told you

9  guys about.  Sorry.

10    Q.   The general directive.

11         Okay.  Now there was a time when the Pasco

12  Sheriff's Office also flagged people as Top 5 offenders;

13  is that correct?

14    A.   Yes, as associates.  Yes.

15    Q.   Okay.  They flagged people as both Top 5

16  offenders and as associates of Top 5 offenders --

17    A.   Uh-huh.

18    Q.   -- is that right?

19    A.   Yes.

20    Q.   Okay.  Those individuals were the focus of --

21  they were prioritized in the same way as prolific

22  offenders?

23    A.   Yes.

24         MR. POULTON:  Object to the form.  Go ahead.

25    A.   Yes.  It was based on the co-offender models of

```
1    individuals committing crime together in groups.
2    BY MR. JOHNSON:
3         Q.   So those individuals also would have been
4    prioritized?
5         A.   Yes.
6         Q.   Okay.  And there was also a zero tolerance
7    arrest policy for Top 5 offenders and their associates?
8              MR. POULTON:  Object to the form.  Go ahead.
9    BY MR. JOHNSON:
10        Q.   I can direct you to the manual.
11        A.   Yeah.  I would say, yes, that I think the
12   manual did talk about the expectations were zero
13   tolerance.
14             MR. POULTON:  My objection is not to that.
15        It's to the definition of prioritize.  We don't know
16        what that means yet.
17             MR. JOHNSON:  Well, I think we spent a long
18        time talking about what it is.
19             MR. POULTON:  Well, I don't know that I agree,
20        but okay.  That's my objection.  We'll move on.  You
21        wanted to point us to something?
22   BY MR. JOHNSON:
23        Q.   Well, I think we -- why don't we just for the
24   record -- I think you answered this already, but let's
25   just make sure we have it clearly.
```

1      A.    Uh-huh.

2      Q.    The 2018 manual had a zero tolerance arrest

3  policy for Top 5 offenders and their associates.

4      A.    It does state that, yes.

5      Q.    Okay.  So that would have been the policy up

6  until the Pasco Sheriff's Office ceased using the term

7  Top 5 offenders?

8      A.    Yes.

9      Q.    Okay.  And we don't know when exactly that was?

10     A.    No.  Like I said, I think the overall process

11  evolved.  So it just kind of, you know, dissipated.  We

12  just -- you know, we looked at criminal networks rather

13  than looking at, you know, calling it a Top 5.

14     Q.    Okay.  Now I want to talk about the actionable

15  intelligence meetings.

16     A.    Okay.

17     Q.    Are those commonly referred to as AIM meetings?

18     A.    Yes.

19     Q.    Okay.  There's a little redundancy in there,

20  the meeting meeting.

21          MR. POULTON:  Just lawyer nerd talk.  I laughed

22     as well.

23  BY MR. JOHNSON:

24     Q.    And the AIM meetings are held weekly; is that

25  correct?

1    A.   Yes.

2    Q.   They're held on Wednesdays?

3    A.   Yes.

4    Q.   Are they held in the morning?

5    A.   No.

6    Q.   When are they held?

7    A.   Afternoons.

8    Q.   What time in the afternoon?

9    A.   It varies.  Each district varies.  It would

10   probably go from like 3:00 to roughly 4:30-ish.

11   Q.   Has that always been the case?  I mean as far

12   as you're aware?

13   A.   Yeah.  So we had -- we had a couple other

14   meetings that we used to do.  We used to do like a

15   quarterly meeting, but we stopped it.  Again, it became

16   redundant and information was just passed.  It was being

17   regurgitated.  It became circular reporting.  We spent a

18   lot of time preparing for it, and it just didn't have a

19   good effect.  So we -- again, streamlining processes and

20   things of that nature, so -- but, yeah, the AIMs

21   ultimately happened in the afternoon for as long as I've

22   been here.

23   Q.   Okay.  And these meetings are used in part to

24   communicate information about prolific offenders?

25   A.   No.  Well, not necess- -- yes, but that's not

1    the only thing they focus on.  It's anything.  It's

2    basically what currently goes on and, you know, when

3    they go over, you know, whether we had X number of

4    burglaries, do we have a spree.  Are we seeing a large

5    amount of overdoses?  You know, are we seeing any

6    external crime?  Do we have retail theft?  What's the

7    regional environment look like?  What's the national

8    environment look like?  So if we have any kind of

9    bulletins that need to be passed out or intelligence.

10            It's basically an intelligence-sharing meeting,

11   right, and the topics vary.  So the topics are anything

12   from, hey, we had 10 burglaries today or this week.

13   This is -- you know, we have one suspect in custody.

14   This is who the other suspects are.  It's not primarily

15   focused just on prolific offenders.

16       Q.   Okay.  For those meetings, there's a PowerPoint

17   slide that is used to organize the meeting; is that

18   correct?

19       A.   Yes.

20       Q.   Okay.  And those are called the AIM slides?

21       A.   Yes.

22       Q.   Okay.  So if I wanted to know what was

23   discussed at the meetings, I could look at the AIM

24   slides?

25       A.   Yes.

1     Q.   Okay.  And if you wanted to know whether an

2  individual was discussed at a meeting, you might look at

3  the AIM slides to see if the individual is listed?

4     A.   Yes.

5     Q.   And so these AIM meetings, everybody across the

6  organization is encouraged to attend; is that correct?

7     A.   Yes.  It's a little difficult due to scheduling

8  sometimes, yes.

9     Q.   Right.  And these meetings are attended by

10  deputies?

11     A.   Yes, if they can attend, yeah.  If they're

12  available, if they're not out for calls.

13     Q.   They're attended by criminal environment

14  personnel?

15          MR. POULTON:  Object to the form.

16     A.   So we don't have code enforcement personnel

17  anymore, but they were, yes.

18  BY MR. JOHNSON:

19     Q.   When they existed?

20     A.   Yes.

21     Q.   Okay.  They're attended by SROs?

22     A.   Yes.

23     Q.   They're attended by analysts?

24     A.   Yes.

25          MR. JOHNSON:  I'm going to ahead and mark

1          Exhibit 7.

2               (Exhibit 7 was marked for identification.)

3     BY MR. JOHNSON:

4          Q.   Are these AIM slides?

5          A.   Yes.

6          Q.   Okay.  And these are AIM slides for a quarterly

7     AIM meeting; is that correct?

8          A.   Yes.

9          Q.   Okay.  So just so I understand, the Sheriff's

10    Office no longer holds quarterly AIMs?

11         A.   No.

12         Q.   When did the Sheriff's Office stop holding

13    quarterly AIMs?

14         A.   I don't have an exact date.

15         Q.   Do you know roughly when it would have been?

16         A.   So, I mean, this is March '17.  So I would say

17    sometime between March 2017 and probably March --

18    probably like 2018 we actually stopped and ceased.  I

19    would have to see when the last slide deck was actually

20    created for the quarterly to tell you the truth to be

21    even in the ballpark.

22         Q.   They're still mentioned in the 2018 version of

23    the manual; correct?

24         A.   I believe so, yes.

25         Q.   Okay.  And even after the Sheriff's Office

1    stopped doing quarterly AIMs, the Sheriff's Office

2    continued doing weekly AIMs?

3         A.   Yes.

4         Q.   Okay.  I just want to draw your attention to

5    page 20673.

6         A.   Okay.

7         Q.   Does this page identify noteworthy prolific

8    offenders?

9         A.   Yes, that's what it says.

10        Q.   This is for district three?

11        A.   Yes.

12        Q.   Okay.  Is one of those individuals Dalanea

13   Taylor?

14        A.   Yeah, she's on there --

15        Q.   Okay.

16        A.   -- under gang members.

17        Q.   Right.  And if you turn to the next page --

18        A.   Okay.

19        Q.   -- does this also identify D3 noteworthy

20   prolific offenders?

21        A.   Yes.

22        Q.   Is Donnie McDougall on there?

23        A.   Yes.

24        Q.   It says that he was recently active; is that

25   correct?

1    A.    That's what it says, yes.

2    Q.    Okay.  And then under his name in lighter

3 italic font it says "other" in marijuana possession

4 2017?

5    A.    Yes.

6    Q.    Is that what would make him recently active?

7    A.    I can't be for certain.  I would have to talk

8 to the analyst who actually put this together.

9    Q.    Okay.  Just sitting here reading it, does that

10 seem right to you, understanding that you are not

11 certain?

12    A.    No.  All that does is give me a picture and

13 tells me, hey, other -- that he had an other charge of

14 marijuana possession in 2017, but we don't -- if it's a

15 misdemeanor marijuana possession, that doesn't go on to

16 the scoring of prolific offender.

17    Q.    But might it make him recently active?

18    A.    Yes.  If we have cases open on him, yes,

19 absolutely, or we have reasonable suspicion to believe

20 that he's involved in some of these cases.

21    Q.    So that might be the sort of thing that would

22 make somebody contributing to the crime environment?

23    A.    Yeah, if they're actively committing crime,

24 yes.

25    Q.    So, for instance, showing up in a marijuana

1    possession?

2        A.    It could be, yes.

3        Q.    Okay.  And this is from March of 2017, is that

4    accurate?  There's a date on the cover.

5        A.    Yeah, it's the date on the cover.  I don't --

6    again, I don't know the -- they don't have listed the

7    timeframe when the data was pulled, so --

8        Q.    But there's a date on the cover?

9        A.    There is a date on the cover, yes.

10       Q.    And that would be the date when the meeting was

11   held?

12       A.    Yes.

13       Q.    Okay.  This would have been shown to everybody

14   at the quarterly AIM meeting?

15       A.    Everybody that attended, yes.

16       Q.    Okay.  Are they put up on a projector?

17       A.    Yes.  We would go through the -- commonly go

18   through the slides.

19       Q.    Okay.

20       A.    We may not -- depending on what it was, the

21   analyst -- we usually had the analyst brief their

22   districts out.  They could have either excluded slides

23   or went over and just talked about what's active

24   currently.  So I have -- again, we don't record the

25   meetings.  So I don't remember what went down in 2017 on

1   this to tell you the truth I'll be completely honest.

2       Q.   But the purpose of these slides is that they're

3   shown at the meetings?

4       A.   Yeah.  They should be talked about if there's

5   something significant going on currently right now,

6   yeah.

7       Q.   And the purpose of these meetings is to

8   communicate information across the organization?

9       A.   Yes, just to share information and then kind of

10  create a dialogue to see if anybody else in the agency

11  has anything related to any of the issues that are going

12  on in the slides or any contact, any open cases, things

13  of that nature.

14      Q.   Okay.  Does the Sheriff's Office have any

15  policy to ensure that individuals are notified when they

16  are listed as a prolific offender?

17      A.   No.

18      Q.   Okay.  Does the Sheriff's Office have any

19  policy that would create a procedure for individuals to

20  ask to be de-identified as a prolific offender?

21          MR. POULTON:  Object to the form.

22      A.   No.  I mean, other than contacting the

23  Sheriff's Office, there's no written policy that I'm

24  aware of.

25  BY MR. JOHNSON:

1    Q.   Okay.  So other than contacting the Sheriff's

2    Office, there's no procedure that individuals could

3    follow to ask to be de-listed as a prolific offender?

4    A.   No.

5    Q.   When you say contacting the Sheriff's Office,

6    you just mean that they would call up the Sheriff's

7    Office?

8         MR. POULTON:  Object to the form.

9    A.   Yes.

10   BY MR. JOHNSON:

11   Q.   There's no specific procedure for how they

12   might contact the Sheriff's Office?

13   A.   No, except for the numbers that are publicly

14   listed and calling a supervisor, things of that nature

15   that happens on a regular basis if someone's

16   dissatisfied with what's going on in law enforcement.

17   Q.   So other than the sort of general procedures

18   for contacting the Sheriff's Office about anything,

19   there's no procedure to ask to be de-listed as a

20   prolific offender?

21   A.   No.

22   Q.   Are you aware of anybody ever asking to be

23   de-listed as a prolific offender?

24   A.   I believe there's an email of someone emailing

25   some of our command staff asking for their child or

1   loved one to be taken off -- to be removed as a prolific

2   offender, but it was before my time.  So I can't -- I

3   can't testify to how it went, what happened with it,

4   things of that nature.

5       Q.   Yeah.  I'll ask Justin Ross about that.

6       A.   Okay.

7       Q.   But in your time overseeing the ILP section,

8   you're not aware of anybody ever asking to be

9   de-identified as a prolific offender?

10      A.   Not to my knowledge, no.

11      Q.   Okay.  And for the time when the district was

12  identifying Top 5 offenders, was there ever -- was there

13  any policy to notify individuals that they'd been

14  identified as a Top 5 offender?

15      A.   No.

16      Q.   And other than the general way of to contact

17  the Sheriff's Office, was there any procedure whereby

18  people could ask to be de-identified?

19      A.   No.

20      Q.   Okay.

21      A.   And usually the deputies would tell them that

22  they're a prolific offender or a Top 5 offender.  I'm

23  sure you've seen it on body cam.  So they were aware,

24  but there's no known policy that allows them to be

25  de-identified as far as I know.

1      Q.   And when you say that generally deputies would

2   tell them that they were a prolific offender, you just

3   mean that they might say it in the course of

4   interaction?

5      A.   Yeah, just in the course of their conversation

6   with that individual.

7      Q.   Would they necessarily explain what that

8   process -- how that process works?

9      A.   I can't be positive if they went into full

10   detail of the explanation.

11      Q.   Okay.  And when they did that, they would not

12   tell them of any way that they could challenge the

13   designation?

14      A.   Not to my knowledge.

15      Q.   Okay.

16           MR. POULTON:  We've been going about an hour

17      and a half.  Can we take like just a quick five-

18      minute stretch-our-legs break?

19           MR. JOHNSON:  Do you mind if I just do this?

20           MR. POULTON:   Sure.  Go ahead.

21           MR. JOHNSON:  It's sort of the same line of

22      questions.

23           MR. POULTON:  No, no, no.  Keep going then.

24           MR. JOHNSON:  I'm going to mark this as Exhibit

25      8.

1            (Exhibit 8 was marked for identification.)

2    BY MR. JOHNSON:

3        Q.    Are you familiar with this document?

4        A.    I'm familiar with it, yes.

5        Q.    Is this a Pasco Sheriff's policy document?

6        A.    It is.

7        Q.    And is this the general policy for making

8    complaints about deputies or other Sheriff's Office

9    employees?

10       A.    Yes.

11       Q.    Okay.  So this doesn't have anything in it

12   specifically about challenging your designation as a

13   prolific offender?

14       A.    No.

15            MR. JOHNSON:  Okay.  Nothing further.

16            MR. POULTON:  Well, for that line.

17            MR. JOHNSON:  Right, right, right.  Yeah

18            MR. POULTON:  I understand.  Good point.

19            MR. JOHNSON:  I'm not done.

20            MR. POULTON:  No, no.  I didn't think you were.

21            (Short break.)

22   BY MR. JOHNSON:

23       Q.    If an individual is listed as a prolific

24   offender, they are then subject to prolific offender

25   checks; correct?

1      A.    Yes.

2      Q.    Okay.  And they're also subject to the zero

3  tolerance arrest policy?

4      A.    Yes.

5      Q.    Okay.  And they're generally subject to

6  heightened enforcement by Pasco County Sheriff's Office?

7           MR. POULTON:  Object to the form.  Generally

8      heightened?  Go ahead.

9      A.    I would say it -- again, it depends; right?  So

10  every interaction is different, of course.  I mean,

11  could it be heightened enforcement?  Yes, depending on

12  the totality of the circumstances.  I couldn't say

13  always.  It just depends on how the deputy interacts

14  with that prolific when they go out there.  So that

15  would be -- I think that would be dependent on the

16  individual going out investigating, completing the

17  prolific check, so -- or whatever guidance was passed

18  down to that specific deputy.

19  BY MR. JOHNSON:

20      Q.    Okay.

21      A.    I couldn't really specify whether everybody's

22  gonna be subject to heightened enforcement or it's just

23  the totality of the circumstances during the encounter.

24      Q.    Are prolific offenders also sometimes referred

25  to as focused offenders?

1     A.   Yes, they can be.  So it just -- the focused

2    offenders was looked upon to shrink the geographical

3    location that a deputy had to focus on.  So if they had

4    a prolific in their zone, that would be the focused

5    offender rather than them having to focus on the entire

6    county, you know, for that prolific.

7     Q.   Right.  So does the 2018 version of the ILP

8    manual discuss the concept of focused deterrence?

9     A.   In general, yes.  It goes through -- there is

10   some academic writing for focused deterrence in there,

11   yes.

12    Q.   Does it also say that the purpose of prolific

13   offender checks is focused deterrence?

14    A.   Yes, I believe it says something to that

15   extent.

16    Q.   Okay.

17    A.   I don't know the exact verbiage, but it is

18   based on a focused deterrence in the co-offender models.

19    Q.   So is it fair to say that prolific offenders

20   receive greater attention from law enforcement than

21   individuals who have not been identified as prolific

22   offenders?

23    A.   I would say yes and no.  Again, it's highly

24   dependent.  I would say, yes, there is a zero tolerance.

25   There is more focus on repeat offenders, but you would

1    probably also focus on somebody that's committing a rash

2    of burglaries or a rash of, you know, robberies and

3    things of that nature that doesn't necessarily live in

4    Pasco maybe that you would focus on as well.

5        Q.   Okay.

6        A.   So I think it would be highly dependent on the

7    circumstances.

8        Q.   So if there's an individual who's not listed as

9    a prolific offender and they're not currently suspected

10   of a crime, would there be any reason for sheriff's

11   deputies to interact with that person?

12           MR. POULTON:  Object to the form.

13       A.   Just like a normal citizen?

14   BY MR. JOHNSON:

15       Q.   Yeah.

16       A.   So you're asking me if there is an expectation

17   for deputies not to interact with them?

18       Q.   Would there be a reason for deputies to

19   interact with them?

20           MR. POULTON:  Object to the form.

21   BY MR. JOHNSON:

22       Q.   Would they be subjected to prolific offender

23   checks?

24       A.   No.

25       Q.   Okay.  So only an individual who's listed is

1    going to be subjected to these prolific offender checks?

2        A.   Yes.

3        Q.   And that's -- okay.

4             So is it fair to say that being on the list has

5    consequences for the individuals who are listed?

6        A.   I would -- I mean, I think anytime you commit a

7    crime there's a consequence, so I would say yes.

8        Q.   And being on the list has consequences?

9        A.   I would say yes.  If you're identified as a

10   prolific offender, I'd say there would be consequences.

11       Q.   What are those consequence?

12       A.   They couldn't be defined until you understand

13   -- again, it's a case-by-case scenario.  So I couldn't

14   identify a specific consequence for each person.  It's

15   contact dependent.

16       Q.   One of the consequence would be being subject

17   to prolific offender checks; correct?

18       A.   Yes.  I mean, ultimately that's a -- that's a

19   strategy, yes.

20       Q.   And another consequence would be zero tolerance

21   arrest policy?

22       A.   Yes.  But zero tolerance arrests have been

23   placed on other key factors too, so --

24       Q.   Okay.  But not everybody is subject to a zero

25   tolerance arrest policy?

1    A.   I would say it's dependent.  Again, even with

2    the -- even with the prolifics, you know, we would have

3    to go back and see if that's the case; right?  Every

4    prolific check and, you know, we had they committed a

5    crime, whether they are arrested or not.

6    Q.   Well, it's in the manual that they're subject

7    to zero --

8    A.   It's in the manual, yes.  But I'd have to see

9    the data to -- again to support like, you know, is there

10   ever a time that we went out to do a prolific or looked

11   at a prolific or they were suspect in a crime and we

12   completely went another direction?  I don't know.  I'd

13   have to -- we'd have to pull the data and look.

14   Q.   But it's listed as a performance expectation?

15   A.   It is, yes.

16   Q.   It's not listed as a performance expectation

17   for citizens at large?

18   A.   No.

19   Q.   Okay.  And so one of the consequences of being

20   on the list is that there's a performance expectation

21   that you are subject to a zero tolerance arrest policy?

22   A.   I would say you could be subject to it, yes.

23   Q.   Okay.  Are there any other consequences of

24   being listed as a prolific offender?

25   A.   I can't think of any right off hand other than,

1    again, like if there's -- you know, if the guidance is

2    zero tolerance, then the guidance is zero tolerance that

3    you're gonna be arrested if you can prove that you

4    committed that crime and then the fact that you are

5    subject to prolific offender checks.  I can't think of

6    anything else unless you have something specific.

7        Q.   What's the purpose of subjecting individuals on

8    the list to those consequences that you've discussed?

9        A.   Deterrence.

10       Q.   Okay.  Deterrence of future crimes?

11       MR. POULTON:  Object to the form.

12       A.   Well, deterrence of current behavior if you're

13    identifying them being active in the crime environment.

14    So I would say deterrence of their current criminal

15    behavior.

16    BY MR. JOHNSON:

17       Q.   So the purpose is to disrupt the pattern of

18    criminal behavior?

19       A.   Yes.

20       Q.   Because otherwise that pattern would presumably

21    continue?

22       A.   Could continue, yes.

23       Q.   All right.  I want to get into some other

24    specifics now.  I'm going to mark this Exhibit 9.

25         (Exhibit 9 was marked for identification.)

 1  BY MR. JOHNSON:

 2      Q.   Are you familiar with this document?

 3      A.   I feel like I've seen it.  I just don't

 4  remember where it came from.

 5      Q.   Okay.  Are you familiar with what it shows?

 6      A.   I mean, it's talking about the rankings of the

 7  plaintiffs on our prolific list.

 8      Q.   Okay.  Are you familiar with whether these are

 9  vetted or unvetted lists?

10      A.   I'm not 100 percent sure.  I think this would

11  be more of a question for Steve.

12      Q.   Steve Hiebert?

13      A.   Uh-huh.

14      Q.   Okay.  We'll move on.

15           I'm going to mark this as Exhibit 10.

16           (Exhibit 10 was marked for identification.)

17  BY MR. JOHNSON:

18      Q.   Are you familiar with this document?

19      A.   I believe I've seen it before.

20      Q.   What is this document?

21      A.   So ultimately it's talking about prolific

22  status.  It looks like it has a person ID number.  It

23  has a zone code where they are either living in or

24  active in.  It has a district.  The modified dates are

25  all there.  I believe this might have been like a

1    request that came in and we pulled.

2        Q.   Okay.  And this was created by Pasco County

3    Sheriff's Office employees?

4        A.   I believe so, yeah.  I think Steve may have

5    created this.

6        Q.   Okay.  And this is created based on data that's

7    in the Pasco Sheriff's Office IT system?

8        A.   Yeah.  It's either in our -- it's most likely

9    in our records management system.

10       Q.   So this would summarize data in your record

11   management system?

12       A.   It would have to come from there, yeah.  I

13   mean, that's where everything comes from in the first

14   place, so --

15           MR. POULTON:  Can we go off the record for just

16       a second because I want to clarify something in my

17       own mind that would be relevant to you.  Is that

18       okay?

19           (Off-the-record discussion.)

20   BY MR. JOHNSON:

21       Q.   So this is created based on data that's in the

22   Pasco Sheriff's Office records?

23       A.   Yeah.  I'd have to go back and exactly ask them

24   exactly where they pulled it and what data fields they

25   pulled it from, but, yeah, if there's data being pulled,

1    it's coming from our Sheriff's Office databases.

2        Q.   Okay.  And you're familiar that this document

3    shows when individuals were first tagged as prolific

4    offenders?

5        A.   Yeah.  It appears that the created date on this

6    one -- this specific was on 2017.

7        Q.   Right.  So it says for Dalanea Taylor that she

8    was first tagged in March -- on March 30, 2017?

9        A.   That's what it appears, yes.

10       Q.   And then the three others are all January 12,

11   2017; is that correct?

12       A.   Yes, it appears so.  Talking about the -- are

13   you talking about McDougall, Paneson and Jones?

14       Q.   Yes.

15       A.   Yes.

16       Q.   Is it possible that data from prior to January

17   2017 has simply been purged from the Pasco County

18   Sheriff's system?

19       A.   It is possible.  It runs every five years.  So

20   when we hit the five-year ticker, we review and we do a

21   purge.  We've been on hold for the purge.  Considering

22   the current lawsuit environment, we're not allowed to

23   purge anything.

24       Q.   Okay.  But we're currently in 2012, so -- or

25   2022 rather, so --

1    A.   Yeah, completely understand.

2    Q.   Yeah.

3    A.   It absolutely could have been.  I'd have to go

4  back and check.

5    Q.   Okay.  So it would at least be possible that

6  that's what explains the fact that three of them are all

7  January 2012?

8    A.   Yes, it's possible.  Again, I'd have to go back

9  and double check just to make sure, but it is possible.

10        MR. POULTON:  You mean January 2017.

11        MR. JOHNSON:  Excuse me.

12        MR. POULTON:  You're saying January 2012.

13        MR. JOHNSON:  Excuse me.  January 12, 2017.

14   A.   Okay.  So just so I'm clear, you're looking to

15  determine whether or not we purged documentation prior

16  to that date and that's why it goes to 2017?

17  BY MR. JOHNSON:

18   Q.   Yes.

19   A.   Okay.

20   Q.   But just sitting here today, it's at least

21  possible that that would explain this?

22   A.   It is possible, but I'm not 100 percent sure.

23  I'd have to go back and check.

24   Q.   Okay, okay.  But for dates after 2017 or dates

25  after January 2017, there's no reason to think that

1    would have been purged?

2        A.   No.  And I have to go back to where we kind of

3    got the halt to where we -- yeah, we'd be right up on --

4    '17 would be right up on the current purge capability.

5        Q.   Okay.  I'm going to refer back to this.  So I

6    don't know if you want to put it somewhere so it doesn't

7    get lost.

8        A.   Okay.

9        Q.   Oh, one other thing about that.  Anthony

10    McDougall does not appear on this list; is that correct?

11        A.   I don't see Anthony.  I see Donnie.

12        Q.   Okay.  Are you aware whether Anthony McDougall

13    was ever tagged as a prolific offender?

14        A.   I couldn't tell you right now.  I think that

15    was more of the questions earlier, right, where we

16    asked --

17            MR. POULTON:  I've asked that -- I've emailed

18        him a reminder --

19            THE WITNESS:  Yeah.

20            MR. POULTON:  -- to look for that.  But if you

21        look at him on the rankings, Anthony McDougall is

22        like in the nine hundreds and the twelve hundreds.

23            MR. JOHNSON:  Well, I understand that, but --

24            MR. POULTON:  So it's unlikely, but we'll

25        check.  We'll check that and Top 5.

1         MR. JOHNSON:  Okay.

2      A.    Like I said, I couldn't tell you.

3  BY MR. JOHNSON:

4      Q.    Okay.  But you'll check?

5      A.    Yes.

6         MR. POULTON:  That's why I have this very

7      expensive laptop right here, to send email

8      reminders.

9         MR. JOHNSON:  Can we go ahead and introduce

10      Exhibit 11?

11         (Exhibit 11 was marked for identification.)

12  BY MR. JOHNSON:

13      Q.    Now, are you familiar with this type of

14  document?

15      A.    It looks like a CAD report or something from

16  our communications sector.

17      Q.    Is this a compilation of CAD reports?

18      A.    It appears to be, yeah.  There's a radio log.

19  Yeah, it appears to be.

20      Q.    Okay.  And if you want to take some time to

21  look through them, do these pertain to one of the

22  plaintiffs in this lawsuit?  You can look through the

23  stack.  Take your time.

24         MR. POULTON:  And just to help you with that,

25      some of them don't have the name but have the same

1      address.

2  BY MR. JOHNSON:

3      Q.   It might be helpful to look at page 23965.

4      A.   Yeah.  I mean, there's notes that identify

5  Dalanea Taylor.

6      Q.   Okay.  So are these -- these are CAD reports

7  that are associated with Dalanea Taylor, at least some

8  of them?

9      A.   It appears to be, yes.

10     Q.   Okay.  Now a CAD report is a report generated

11 by Pasco County Sheriff's deputies?

12          MR. POULTON:  Object to the form.

13     A.   It can be.

14 BY MR. JOHNSON:

15     Q.   Okay.  The Pasco County Sheriff's Office uses

16 CAD reports as records in its operations?

17     A.   How so?

18     Q.   Do Pasco County Sheriff's deputies generate CAD

19 reports in their duties?

20          MR. POULTON:  Go ahead.

21     A.   So they can or they can put themselves on

22 calls, they can put themselves on an SO investigation.

23 CAD is ran by our communication center.  So deputies

24 have access to CAD, but ultimately the calls for service

25 from 911 or anything that comes in from a 911 dispatcher

1    would be -- would generate a CAD report.

2            Now they can generate their own investigation

3    on an address, and it will go to CAD, so --

4    BY MR. JOHNSON:

5        Q.    Right.  But these are records that would be

6    generated in the course of regular operations at the

7    Pasco County Sheriff's Office.

8        A.    Yes, yes.

9        Q.    Okay.  And employees of the Sheriff's Office

10   would refer to CAD reports to determine what happened at

11   particular incidents?

12           MR. POULTON:  Object to the form.

13       A.    It's one of the resources we could use, yes.

14   BY MR. JOHNSON:

15       Q.    Okay.  So if you wanted to know what happened

16   in interactions with Dalanea Taylor, these are records

17   that you would look at?

18       A.    I would probably say vague records; right?

19   Because sometimes they don't capture every single thing.

20   They wouldn't capture a conversation on body cam.  They

21   would capture minor details, right, anything that came

22   -- anything the deputy entered themselves, anything the

23   call taker or the dispatcher entered, anything that

24   someone actually enters into this program.  But as far

25   as interaction, it's not going to be documented.  I

1     mean, they may put notes in here, you know, like -- I

2     gotta -- I gotta read the note.  Like if they said no

3     contact, sometimes they'll put their own little notes

4     that say attempted to make contact, no contact made, you

5     know, will retry X, Y and Z, or spoke to a specific

6     person at the residence, residents say they no longer

7     live there, things of that nature.

8              So those notes could be put into the CAD, but I

9     wouldn't say it would display like a full accurate

10    record of the actual engagement or interaction, period.

11    It's kind of minor notes depending on how detailed the

12    person is.

13        Q.    Okay.  But these are notes that are made --

14    that are generated by the Sheriff's Office and that

15    reflect what happened in these interactions?

16        A.    And the communication center, yes, could be.

17        Q.    Okay.  And they are records that are kept by

18    the Sheriff's Office and that are used by the Sheriff's

19    Office in the course of its operations?

20        A.    They are used by the Sheriff's Office.  The

21    County runs the CAD, if that makes sense.  So Pasco

22    County runs our CAD and our communication center.  We

23    have a representative from the Sheriff's Office that

24    works there --

25        Q.    Uh-huh.

1      A.    -- as a captain, but the County runs the CAD,

2   but we have access to it.

3      Q.    And you have access to it?

4      A.    We do.

5      Q.    Okay.  And the data, when it's inputted by a

6   deputy, is inputted by a deputy in their capacity as an

7   employee of the Sheriff's Office?

8      A.    Yes, yes.

9      Q.    Okay.

10          MR. POULTON:  And just FYI on that, because

11      you'd asked -- you'd sent some requests for

12      admissions.  Just to clarify, the Sheriff is not a

13      county official; right?  So like you can have county

14      employees that do CAD like a dispatch center, and

15      they might do it for different municipalities too as

16      well as for the Sheriff's Office.

17          MR. JOHNSON:  Well, I think that's a legal

18      point that we don't need to debate right now.

19          MR. POULTON:  No, but I wanted to make it clear

20      for your purposes in case you needed to follow up on

21      it.  Now would be the time.  Okay.  But go ahead.

22      You can follow up later in another form if you'd

23      like.

24          MR. JOHNSON:  Yeah.

25          MR. POULTON:  Florida Sheriff's are a strange

1        creature by constitution and statute.

2   BY MR. JOHNSON:

3        Q.   Okay.  Now when deputies input information into

4   these CAD reports, that's expected to be accurate;

5   correct?  They shouldn't -- let me rephrase that.

6   Deputies should not enter inaccurate information into

7   the CAD reports; correct?

8        A.   I would say, yeah.  I would say, I mean, these

9   are notes.  I mean, I would say they should be as

10  accurate as possible, of course.

11       Q.   Right.  Okay.

12            And again, people within the Sheriff's Office

13  would look at these to determine what happened in an

14  interaction?

15            MR. POULTON:  Object to the form.

16       A.   So they could; right?  It would be just one of

17  the many.

18  BY MR. JOHNSON:

19       Q.   Right.

20       A.   Ultimately, you know, we wear body cams.  So

21  the most accurate depiction of that would be on body cam

22  compared to what their notes are later on or during.

23       Q.   This, for instance, would give you information

24  if there was not a body cam.  In a situation where there

25  was no body cam, you might look at the CAD report?

1    A.   So you could look -- yes, you could look at the

2  CAD report, but if there's no body cam, like a body

3  cam's down or something of that nature, that has to be

4  documented in whatever report like an official --

5  usually it's documented in an official report that your

6  body cam -- or your supervisor knows that that body cam

7  is down for whatever reason, right, technology, things

8  of that nature.

9    Q.   Along with the body cam footage, this is one of

10  the sources of information that you would look at?

11        MR. POULTON:   Object to the form.

12    A.   Yes.  We can pull CAD reports if that's what

13  you're asking.

14  BY MR. JOHNSON:

15    Q.   And this would include information in the notes

16  that are -- that's entered by the deputies to describe

17  what happened in the interactions?

18    A.   Yes.  So the same thing you have here we could

19  ultimately pull.

20    Q.   Okay.  And it includes time -- information on

21  the time and the date of interactions?

22    A.   Yes.

23    Q.   Okay.  We might come back to this as well.  I'm

24  going to go ahead and introduce Exhibit 12.

25        (Exhibit 12 was marked for identification.)

1    BY MR. JOHNSON:

2        Q.   Now are you familiar with this document?

3        A.   You would have to tell me where this came from.

4        Q.   So this was provided to us in discovery.  It

5    was provided to us as an Excel spreadsheet, and my

6    understanding is that it was generated as a data export

7    from the note section of the global profiles.

8        A.   Okay.  I'm familiar with the note section of

9    the global profiles.

10       Q.   Okay.  And does this appear to you to be an

11   extract from the note section of the global profiles?

12       A.   If you're telling me it's an extract from the

13   global profiles, then I would say yes.  I've never seen

14   it out of -- I've never seen an extract from the global

15   profiles because I have access to global profiles.  So

16   I've never accessed the data outside of the shell that

17   we have it, the user interface.

18       Q.   Do you want to take a minute to confer with

19   your attorney to see if you can verify that this is an

20   extract?

21            MR. POULTON:  I don't know how we would do that

22       here.

23            MR. JOHNSON:  You provided this in discovery.

24            MR. POULTON:  That doesn't --

25            MR. JOHNSON:  I think we need to verify what it

1     is.

2          MR. POULTON:  I mean, I don't -- who would we

3     contact?

4          MR. JOHNSON:  Do you want me to -- I mean, I

5     can just show you what you sent us.

6          MR. POULTON:  I believe you.  Don't

7     misunderstand, but it's just I don't know -- I mean,

8     so much has gone back and forth.  I don't know

9     whether -- I mean, I can't -- it's really not for me

10    to answer anyway, but what would you need to do to

11    verify where it came from or -- you said global

12    profile?  How would we --

13         THE WITNESS:  So IT would -- IT would have

14    provided this, right, if that's the case.  Because

15    IT runs the back side of that data.  So IT would

16    have provided this.  So if IT provided this as that

17    extract, then it's the extract.  I just can't tell

18    you 'cause I haven't seen this.  I've never seen an

19    extract --

20         MR. POULTON:  In this form?

21         THE WITNESS:  -- in this form.  Like I have --

22    I have direct access to global profile, so I see it

23    in the user interface.

24         MR. POULTON:  Let me ask you this.  Can we --

25    can you proceed with the deposition with the

1     assumption that it is and he can go back and verify,

2     and if there's an issue -- because he says he can

3     look at it.  He can go back to his office later and

4     look at it.  If it's different and, you know, it's

5     not matching up, he can let us know.

6         MR. JOHNSON:  Right.  Yeah, I think that's

7     fine.  My main thing is that I want -- I don't have

8     a ton of questions about the document.

9         MR. POULTON:  Okay.

10        MR. JOHNSON:  I want to have clear what the

11    document is.  So I think why don't we do this:

12    We're going to put this in the deposition as an

13    exhibit, and if it is not an extract from the notes

14    of the global profiles, you let us know, and

15    otherwise can we just stipulate that that is what it

16    is?

17        MR. POULTON:  Yes.

18        MR. JOHNSON:  Okay.

19    A.    Like I said, I'm not disbelieving you.  If it

20 is -- that's what they gave you, that's what they gave

21 you.

22 BY MR. JOHNSON:

23    Q.    Right.

24    A.    There are some documents that came directly

25 from my shop, and there are some documents that came

1    from elsewhere in the agency.  So like I don't have

2    backside access to this as the director of ILP.  That's

3    not my role.  So if you're telling me that's that -- I

4    mean, I can tell you if you ask me about the notes

5    section of global profiles and how it got developed and

6    moved, then, yes, I can tell you that we do have a note

7    section in global profiles.

8            MR. POULTON:  Do you happen to have an extra

9        copy that he could take with him?

10           MR. JOHNSON:  I have three.  So I have one for

11       him, one for me, and one for you.

12           MR. POULTON:  Okay.  I'll give him mine to --

13       well, when you leave, take this.  You can take it

14       with you.

15           THE WITNESS:  Okay.

16           MR. POULTON:  And if you can just then verify

17       that that is exactly what it is.

18           THE WITNESS:   Yeah, I'll run across the street

19       and get with them and just double check.

20           MR. POULTON:  Okay.

21           THE WITNESS:  But if you're saying it is, it

22       is.

23           MR. JOHNSON:  Just for the clarity of the

24       record, unless there's something further, we were

25       just going to stipulate that this is the note

1     section of the global profile.

2          THE WITNESS:  Okay.

3          MR. JOHNSON:  Okay.

4          MR. POULTON:  Did you have questions, or you

5     just wanted to get it in?

6          MR. JOHNSON:  No, I just want to get --

7          MR. POULTON:  Okay.

8          MR. JOHNSON:  I just want to basically identify

9     what it is.

10   BY MR. JOHNSON:

11        Q.   Now the global profile is a database that's

12   maintained by the Pasco County Sheriff's Office; is that

13   correct?

14        A.   So, yeah, it's a user interface; right?  It

15   comes directly from RMS, and in our data it basically

16   runs off the content of a data lake; right?  All the

17   data flows into the lake, and then this user interface

18   pulls everything out so you have like a one-stop shop.

19   So if I looked up Dalanea Taylor, I would have all her

20   involvements within the Sheriff's Office.  If I looked

21   up another suspect or subject or anybody that's been

22   involved in the Sheriff's Office, whether it be a

23   witness or anything, they would be in there as well.

24        MR. POULTON:  And to clarify, RMS is records

25     management system.

1          THE WITNESS:  Oh, record management system.

2     Sorry.

3          MR. POULTON:  I'm just trying to -- there's a

4     lot of acronyms and I'm just --

5          THE WITNESS:  Yes.

6          MR. POULTON:  -- where I hear them and I think

7     about it, I want to put it into the record for the

8     benefit of the Court so I don't have to hunt for it.

9  BY MR. JOHNSON:

10     Q.   So where it says the notes column of this, that

11  would be data that would be inputted by a Pasco County

12  Sheriff's Office employee?

13     A.   Yes.

14     Q.   Okay.  And then where it says create name, that

15  would be the identity of the individual who entered that

16  data?

17     A.   Yes.

18     Q.   Okay.  And this is something -- this is data

19  that Pasco County Sheriff's Office employees would enter

20  in the course of their employment?

21     A.   Yes.

22     Q.   Okay.  And the expectation would be that this

23  would be accurate?

24     A.   Yes.

25     Q.   Okay.  Now if we look at Exhibit 10 --

1    A.    Okay.

2    Q.    -- it appears that Dalanea Taylor was listed as

3    a prolific offender in March of 2017; is that accurate?

4    A.    That's what it appears, yes.   That created date

5    means that's when they were entered into the prolific.

6    Q.    Okay.   I'm going to go ahead and mark another

7    exhibit.   This will be --

8         MR. POULTON:   You said March of 2017?

9         MR. JOHNSON:   No, I believe I -- Yes, I did.

10    I did say 2017.

11         MR. POULTON:   Okay.

12         (Exhibit 13 was marked for identification.)

13    BY MR. JOHNSON:

14    Q.    Are you familiar with this type of document?

15    A.    Yes.

16    Q.    What is this type of document?

17    A.    This was like one of the first iterations of

18    our daily -- our daily activity report for the

19    districts.

20    Q.    And who would this be distributed to?

21    A.    To the deputies.

22    Q.    And who would it be created by?

23    A.    The analyst.

24    Q.    Okay.   So this is a communication from the

25    analyst to the deputies?

1  A. Yes.

2  Q. Would it be sent to every deputy in the

3 district?

4  A. Yes.

5  Q. Okay.  On district 3 here?

6  A. Yes.

7  Q. And does this indicate that Dalanea Taylor was

8 listed as a Top 5?

9  A. It does.

10  Q. Okay.

11  A. Well, it looks like she's -- it looks like they

12 said she was replacing somebody as a Top 5.

13  Q. So that means she would have been listed as a

14 Top 5?

15  A. Yes, it appears so

16  Q. And that would have been in April 2017?

17  A. Yes, that's the date.

18  Q. Okay.  So she was listed a prolific offender

19 March 30, 2017, and as a Top 5 shortly thereafter?

20  A. Yes.

21  Q. Okay.  Does this say that she was released from

22 DOC on 3-26-17?

23  A. Yes.

24  Q. And DOC would be Department of Corrections?

25  A. Department of Corrections.

1      Q.   So that means she was released from jail on

2   3-26-17?

3      A.   It appears so, yes.

4      Q.   Okay.  And then four days after her release she

5   was listed as a prolific offender?

6      A.   It appears so.  I'd have to -- yeah, I'd have

7   to determine what that is.

8      Q.   That's what the records indicate?

9      A.   It appears so

10      Q.   Okay.  And these are records of the Pasco

11   Sheriff's Office?

12      A.   Yes.

13      Q.   Okay.  And then she would have been listed as a

14   Top 5 in early April?

15      A.   Yes, it appears so

16      Q.   Okay.  So is it your position that a

17   determination would have been made that she was actively

18   contributing to the crime environment when these

19   designations were made?

20      A.   That should have been the case, yes.

21      Q.   Okay.  Do you know how long she was a Top 5

22   offender?

23      A.   I do not.

24          MR. JOHNSON:  I'm going to mark another

25      exhibit.

1          (Exhibit 14 was marked for identification.)

2     BY MR. JOHNSON:

3          Q.   All right.  Looking at what's tab 14, the

4     original files of these have dates on them.

5     Unfortunately, that's not part of the printout.  It's in

6     the file name of the file.  But if you look at page --

7     the second page of this --

8          A.   Okay.

9          Q.   -- it includes a week span for the data.

10         A.   Yeah.  It's six days, five days.  Yep.

11         Q.   So does it appear that these are AIM slides

12    from an AIM meeting in April of 2017?

13         A.   It appears that way.

14         Q.   Okay.  You can go ahead and turn to page 15967.

15    Does this page list district 3 Top 5 offenders?

16         A.   It.

17         Q.   And this is April 2017.  So it appears the Top

18    5 designation was still in use at that time?

19         A.   Yes.

20         Q.   Is Dalanea Taylor listed as a Top 5 offender?

21         A.   She is.

22         Q.   Okay.  It indicates at number 7 that she was

23    listed for seven days at this point?

24         A.   Yes, it appears so.

25         Q.   This is information that was valid from

```
1    4-18-17?

2        A.   Yeah, it appears so

3        Q.   Okay.  I'm not sure the dates fully match up,

4    but seven days would be April 11th.  The bulletin went

5    out on April 5th, but regardless can we conclude from

6    this that she was listed as a Top 5 offender for at

7    least a portion of April of 2017?

8        A.   It appears so, yes.

9            MR. POULTON:  Yeah.  Actually, if you look down

10       below, there's a 4-4-17 Dalanea Taylor replaces

11       Ben Ceda.

12           MR. JOHNSON:  Right.  Which is also not --

13       well, yeah.  Right.

14           MR. POULTON:  Right.

15           MR. JOHNSON:  Bennetton Ceda.  Okay.

16           THE WITNESS:  Right.

17   BY MR. JOHNSON:

18       Q.   Okay.  I want to turn forward a couple pages

19   to page 15970.

20       A.   Okay.

21       Q.   And this lists Dalanea Taylor again; is that

22   correct?

23       A.   Uh-huh.

24       Q.   Does this list her associates?

25       A.   Yes.
```

1      Q.   Okay.  If you look on the right, is one of her

2  associates Dominique Taylor?

3      A.   Where are you seeing it?  Oh, yes, yes.

4  Dominique, yep.

5      Q.   And she's identified as Dalanea Taylor's

6  sister?

7      A.   Yes.

8      Q.   Okay.  Turn the page.  Is another of her

9  associates Donna Tabor?

10     A.   Yes.

11     Q.   T-A-B-O-R.  And that's identified as her aunt?

12     A.   Yes.

13          MR. POULTON:  Object to the form.

14  BY MR. JOHNSON:

15     Q.   Is Donna Tabor identified as her aunt?

16     A.   On the document, yes.

17     Q.   Okay.

18          MR. POULTON:  Oh, well, among other things.

19  BY MR. JOHNSON:

20     Q.   And then there's another name Marnie Tabor; is

21  that correct?

22     A.   Yes.

23     Q.   Identified as her mother?

24     A.   Yes.

25     Q.   Okay.  So this lists her mother, her sister,

1    and her aunt?

2         A.   Yes.

3         Q.   Okay.  And these are again slides from an AIM

4    meeting?

5         A.   It is.

6         Q.   These are the AIM slides that we were

7    discussing previously?

8         A.   Yes.

9         Q.   Okay.  Is this a weekly AIM meeting?

10        A.   Yes.

11        Q.   So this would have been for personnel of the

12   district 3?

13        A.   Yes.

14        Q.   Okay.  It would have been attended by analysts,

15   deputies, and code enforcement personnel?

16        A.   It depends.  Depends if code enforcement was

17   there.

18        Q.   Those individuals would be encouraged to

19   attend?

20        A.   Yeah, I would assume so, yes.

21        Q.   Just like any AIM meeting?

22        A.   Yes.

23        Q.   Okay.  I want to go back to the CAD reports

24   Exhibit 11.

25                MR. POULTON:  Exhibit 11.

1      A.   Wait.  Hang on one second.  Let me just -- I

2  misplaced it.  Got it.

3  BY MR. JOHNSON:

4      Q.   So if you look at the first two CAD reports,

5  they're both dated April 5, 2017; is that correct?

6      A.   Yes.

7      Q.   Do these indicate that Dalanea Taylor was

8  subject of a prolific offender check on April 5, 2017?

9           MR. POULTON:  Object to the form.  Go ahead.

10     A.   Yeah, that seems to be what the nature code is.

11 BY MR. JOHNSON:

12     Q.   Okay.  Do the notes section -- does the notes

13 section include information on Dalanea Taylor?

14     A.   The first one doesn't appear to, the first

15 page --

16     Q.   The second one?

17     A.   -- but the second page does.

18     Q.   Okay.

19     A.   It does -- does have notes, yes.

20     Q.   Okay.  So it appears that the deputy spoke to

21 someone at the residence about Dalanea Taylor?

22     A.   It appears so, yes.

23     Q.   And this is on April 5th, which is the day

24 after she was designated as a Top 5 offender according

25 to the notes?

1    A.    Yeah, according to the documents, yes.

2    Q.    Okay.  And this prolific offender check was

3    conducted by a member of the STAR team?

4    A.    Yes.

5    Q.    Okay.

6    A.    Well, now former.  He doesn't work with the

7    agency anymore.

8    Q.    Okay.  So following her designation as a

9    prolific offender, Dalanea Taylor was subjected to

10   prolific offender checks by the deputies from the Pasco

11   County Sheriff's Office?

12   A.    I mean, it appears so on this date, yes.

13   Q.    If you want to look through the other dates,

14   are there additional prolific offender checks?

15   A.    There appears to be a couple more.

16   Q.    Okay.

17   A.    Some of them have notes.  Some of them do not.

18   So I don't know what the -- well, it appears these are

19   all prolific offender checks.

20   Q.    Now if you wanted to know what happened during

21   these interactions, you would look at these notes as

22   well as the body came footage?

23   A.    Yes, you could.  I mean, you could probably get

24   a little bit from the notes, but you wouldn't understand

25   what the interaction is.

1    Q.    Well, the notes are one thing that you would

2    look at in addition to body cam footage?

3    A.    Yes, if one was looking at them, yes.

4    Q.    Say if someone from the Sheriff's Office was to

5    ask you what happened with Dalanea Taylor on April 5,

6    2017.  You would look at this, and you would look at the

7    body cam footage; correct?

8    A.    They would probably pull body cam footage

9    first.

10    Q.    But you would look at both?

11    A.    Yes.  I mean, I can't 100 percent say they

12    would, but I mean it makes sense to.

13    Q.    Okay.  Is there anything else you would look

14    at?

15    A.    I guess any arrest reports, any field contact

16    reports.

17    Q.    Would you also look at the offender notes?

18    A.    Yes, we would look at the offender notes.

19    Q.    Okay.

20    A.    Are you asking are we looking at the offender

21    notes in CAD, or are you asking if we're looking at the

22    offender notes in the other document you referred to

23    earlier?

24    Q.    The other document.

25    A.    Okay.  Yes.

1    Q.   Okay.  Are there any other documents you would

2    look at to determine what happened in these

3    interactions?

4    A.   No, not to my knowledge.  I think any kind of

5    report -- if there was a report, the contact's usually

6    not documented in the AIM slides unless the actual

7    deputy or detective are there to kinda say what contact

8    was made and how it was made and what the conversation

9    looked like.  But, yeah, I mean, CAD, any kind of

10   report, any kind of field contact, and the body cam.

11   Q.   Okay.  And if you wanted to know what body cam

12   -- if you wanted to pull the body cam, you would need an

13   incident number; correct?

14   A.   Or the deputy's name.

15   Q.   Or the deputy's name.  So you would need to

16   know when or where it happened.  When it happened -- you

17   would either need to know the CAD data, the incident

18   report from the CAD data --

19   A.   Yeah.

20   Q.   -- or the deputy's name?

21   A.   Yes.  You'd have to have a generalized

22   understanding of when the deputy went out there --

23   Q.   Okay.

24   A.   -- or if you pull all the deputies -- we can

25   pull every single body cam from those deputies as long

1    as they still exist and they're not purged.

2        Q.   Okay.  So generally the way that you would go

3    about it is, if you didn't know who the deputy involved

4    in the interaction was, you would start with the CAD

5    report, and then using the info in the CAD report, you

6    would pull the body cam footage?

7        A.   We could.  When you say they, are you meaning

8    ILP?

9        Q.   I'm asking if you were -- if you personally

10   were looking into an incident, what would you do?

11       A.   Well, I personally wouldn't look into an

12   incident.  That's what I'm trying to clarify.

13       Q.   If an analyst was looking into an incident?

14       A.   To what extent?  So I think we're kinda

15   conflating things and putting things together.  So just

16   some clarification, are you asking if an analyst is

17   going to look at what the encounter between a deputy and

18   the prolific looks like?

19       Q.   No.  I just want to know, not specific for

20   prolific offender checks necessarily, but if an analyst

21   say in researching a question for the Sheriff's Office

22   wanted to know what happened during an interaction.

23       A.   So that would have to come from a specific

24   request.  It's not daily battle rhythm type things that

25   an analyst would do.  Right?  The analyst doesn't dive

1    deep into the weeds of what that prolific check looked

2    like.

3        Q.   Okay.  Let me ask it a --

4        A.   Again, they're providing intelligence --

5             MR. POULTON:  Let him finish.

6        A.   -- they're providing intelligence to the field,

7    right, information or intelligence to the field.  That

8    information intelligence is digested by the command, and

9    then those strategies are pushed out; right?

10            So the analysts are providing intelligence

11   products and intelligence to guide action, but they're

12   not directing the action, if that makes sense.  So I

13   just don't want there to be any confusion --

14   BY MR. JOHNSON:

15       Q.   I understand.

16       A.   -- between who's doing what because I

17   personally, on a daily basis, do not go into every CAD

18   call and to see what a prolific check looks like.

19            Now, if someone asked me specifically to

20   research a prolific offender check, then, yes, we would

21   use all these resources to go through with CAD and

22   things of that nature.  But there's a common

23   misconception that intel is guiding actual actions of a

24   deputy in the field.  That's not the case.

25       Q.   Okay.  Well, I -- that's -- my purpose in this

1    line of questioning is just to determine what you would

2    do if you were researching what happened during a

3    prolific offender check, and so we can come back to the

4    question that you just raised, which is a fair line of

5    questioning, but just if you were researching what

6    happened in a prolific offender check, you would pull

7    the CAD report, and then you would use that information

8    to then pull the body cam footage?

9        A.   Yes.  If requested, we would do that depending

10   for the requester, but commonly that doesn't fall on us.

11   It would fall on the district to do that, like a

12   district commander or a sergeant, a corporal, things of

13   that nature.  They would carry out that function.

14       Q.   I just want to understand what the universe of

15   records are that the Pasco Sheriff's Office uses to

16   document these types of interactions.

17       A.   Yeah, so everything you talked about, CAD,

18   police reports, incident reports, intel reports, tips,

19   leads, things of that nature that come in from external

20   sources as far as the public.  Yeah, internal systems.

21   I mean, everything else would be like our record

22   management system, our jail management system.  That's

23   when they're booked in and things like that.

24       Q.   Right.

25       A.   So, yes, there's not a lot of external sources

1     we use as far as looking at prolifics or doing prolific

2     checks.  It's all internal data.

3         Q.   Now, you were talking earlier -- you were

4     saying that analysts don't guide enforcement.  Is that a

5     fair summary of what you were saying?

6         A.   They don't guide the actions of the

7     enforcement.  So they will help through data and

8     intelligence development to guide a strategy, but

9     they're not the ones going, hey, Deputy A, you have to

10    go do a prolific check, you've got to do these number of

11    prolific checks, these numbers of days; right?

12        Q.   Right.

13        A.   That's not our role.  And so I'll give a

14    perfect example of how intelligence works; right?  And

15    this is not a knock on anybody.  This is not is not a

16    knock on administration.

17             Two administrations got information from the

18    intelligence community that Afghanistan was gonna fall

19    within six months if they did certain actions; correct?

20    So when those actions occurred, the government folded.

21    They didn't listen to the intelligence; right?  Or they

22    didn't use the intelligence in a proper manner.

23             The intelligence is set out to enhance decision

24    making.  It's not set out for me to tell a captain,

25    Captain, you have to go focus on this person, you have

1   to go focus on this person.

2          Here's the problem, right, because we're

3   identifying the problem.  We're looking at ways to

4   assess the problem.  You're creating the strategy, and

5   then what will happen is the analyst on the backside

6   will assess that strategy to see if that strategy was

7   successful.  If it didn't work, did it mean that it's

8   never going to work?  Not necessarily.  It just means it

9   didn't work at that time.

10          So if you're looking at a large retail theft

11   ring and you go set out to make a couple arrests and you

12   make two arrests and then there's 17 more people behind

13   that individual to carry out that retail theft ring, a

14   strategy may not have been as effective.

15          So I just want to make sure we're understanding

16   what the true analytical role is of an analyst compared

17   to what the guidance from that commander in that

18   district would be; right?  We're not guiding these

19   deputies to go do the prolific check.  We're telling

20   them, hey, this is a prolific offender, this is where we

21   believe they're active, and then that goes to the

22   district.  The district makes up the strategy, and then

23   the strategy is deployed to affect that crime

24   environment.

25          Q.   Okay.

1     A.   So just wanted to kind of push that out there

2  because I think there's some -- there are sometimes a

3  confusion.  Even in the law enforcement arena there's

4  some confusion of how the analytics work, so --

5     Q.   Right.  And that's information that is provided

6  to the deputies to help guide their decision making?

7     A.   Yes.

8     Q.   Right?

9     A.   Well, to commanders.  Deputies are ultimately

10  the consumer of a lot of these intel products, but

11  ultimately we are not responsible for the deputies;

12  right?  Their corporals or sergeants, their district

13  lieutenants or captains are responsible for them and

14  their actions.  I'm not responsible for how a deputy

15  operates.

16         Now, if one of my detectives that I supervise

17  does something, then, yes, I'm responsible for that

18  because those detectives report directly to me.

19     Q.   Right.  But just to be clear, the intelligence

20  division and deputies are all part of the Sheriff's

21  Office?

22     A.   We are, yes.

23     Q.   Okay.  And they're all overseen ultimately by

24  the sheriff?  The sheriff is the ultimate official

25  responsible for both the deputies and the analysts?

1      A.   Well, yeah, of course.  Just like the chief and

2  the colonel and on the Highway Patrol, I mean,

3  ultimately he is the representative.  The problem is

4  you're looking at 60,000 -- actually 100,000 feet;

5  right?  He's looking at global, and then you have people

6  that are looking down and into the organization; right?

7  It's just organizational leadership.  There's a reason

8  that we have hierarchies.  There's a reason that we have

9  organizational structures.  There's a reason we have

10  command and control.  Could you imagine 1,200 people

11  reporting to you at one time?

12      Q.   Right.

13      A.   You would be crushed.

14      Q.   But my question is just that these are all --

15  when you refer to the analysts and deputies --

16      A.   Uh-huh.

17      Q.   -- they're all part of the same organization?

18      A.   Yes.  We all work for the Pasco County

19  Sheriff's Office, yes.  Absolutely.

20      Q.   Okay.  And that organization is ultimately

21  overseen by the sheriff?

22      A.   Yes.  He's the -- I mean, he's the sheriff, so

23  absolutely.  He's the head of the agency.

24      Q.   Okay.

25      A.   But everybody has a different function inside

1   the Sheriff's Office.

2       Q.   No, I understand.

3            And when deputies receive information from ILP,

4   the performance expectations for what they should do

5   with that data are set out in the ILP manual?

6       A.   Some of them, yes.

7       Q.   Okay.  If we can go back to Dalanea Taylor's

8   CAD reports.

9       A.   Okay.

10      Q.   If you want to look towards the end, if you

11  look at page 24001, is this marked as a prolific

12  offender check?

13      A.   It is.

14      Q.   And the date on this is September 25, 2019?

15      A.   It is.

16      Q.   Okay.  And if you read the notes, does it

17  indicate that the deputy was there looking for Dalanea,

18  initially made contact with her, quote, surrogate

19  mother, and then later came back and made contact with

20  Dalanea?

21      A.   Yes, it says that.

22      Q.   Okay.  If we refer back to Exhibit 10, it

23  appears that Dalanea Taylor was de-listed as a prolific

24  offender on September 30, 2019 --

25      A.   Okay.

1      Q.   -- is that correct?

2      A.   It appears so, yes.

3      Q.   So is it fair to say that the Sheriff's Office

4  continued to make prolific offender checks on Dalanea

5  Taylor up until the time that she was de-listed?

6      A.   Yeah, it appears so.  Well, this was listed as

7  a prolific check, so it appears so, yes.

8      Q.   Okay.  Now I'm not going to go through all of

9  the CAD reports in here --

10      A.   Okay.

11      Q.   -- because we don't have time.  Is it fair to

12  say that these records, between the CAD reports, the

13  offender notes, and the body cam footage, that those

14  records speak for themselves?

15          MR. POULTON:  Object to the form.

16      A.   As far as what?  What do you mean?

17  BY MR. JOHNSON:

18      Q.   I mean, there's nothing you could add to those

19  records sitting here today, is there?

20      A.   No.

21      Q.   Okay.

22          MR. POULTON:  Never heard that question before.

23          MR. JOHNSON:  All right.

24          MR. POULTON:  I've heard that objection.  I've

25      never heard that question.

1    BY MR. JOHNSON:

2        Q.   Based on these records, is it accurate to say

3    that Dalanea was subjected to prolific offender checks

4    after she was listed as a prolific offender?

5        A.   It appears so based on the dates.  I mean,

6    again, I would have to go find out what occurred.  So

7    I'd have to do some research on that to see what

8    happened.

9        Q.   But based on these records that appears to be

10   what happened?

11       A.   Based on the record here today, yes.

12       Q.   Okay.  And that also during these prolific

13   offender checks deputies also spoke to members of her

14   family?

15       A.   It appears so, yes.

16       Q.   And during those interactions, they asked

17   members of the family for information about Dalanea?

18       A.   It appears so, yes.

19       Q.   Okay.  I'm going to move on.  I'm going to mark

20   this as Exhibit 17.

21            COURT REPORTER:  No, this will be 15.

22            MR. JOHNSON:  Oh, I'm sorry.

23            (Exhibit 15 was marked for identification.)

24   BY MR. JOHNSON:

25       Q.   All right.  Is this another set of CAD reports?

1        A.    It is.

2        Q.    Okay.  So same as we discussed before, these

3   are records that are used by the Sheriff's Office in the

4   course of its operations?

5        A.    It is.

6        Q.    I actually want to circle back to something

7   that was brought up earlier.  The CAD reports -- the CAD

8   system is maintained by what you referred to as the

9   dispatch office; is that correct?

10       A.    Yes, county communications.

11       Q.    Okay.  And that's an agency of the county

12   government?

13       A.    Yes.

14       Q.    And so a sheriff's deputy inputs information

15   into this record or into the system and --

16       A.    Can, yes.

17       Q.    -- and that then generates a record at the --

18   in the dispatch system?

19       A.    Yes.  If they enter it through CAD, yes.  Like

20   so if they self-initiate a call -- so I can

21   self-initiate a call, right, roving patrol, I can

22   self-initiate.  I'm out with the, you know, subject that

23   needs a ride.  I'm out with a homeless person, you know,

24   whatever the case may be, I can self-initiate that call.

25   Then it will feed into CAD so dispatch can see where I'm

1     at, and that prompts them to do checks on me to make

2     sure that -- one, primarily for officer safety to make

3     sure they have an understanding of what I'm doing, where

4     I'm doing it, and how I'm doing it.

5          Q.   So if an officer enters notes about a prolific

6     offender check --

7          A.   Okay.

8          Q.   -- those notes are then maintained in a system

9     that is maintained by the County dispatch office?

10         A.   Yes.

11         Q.   Okay.  Do these CAD reports appear to pertain

12    -- do they pertain to one of the clients or one of the

13    plaintiffs in this lawsuit or the family?

14         A.   This appears to be Donnie McDougall at least

15    from some of the names I'm seeing, so --

16         Q.   Okay.  And if you look towards the end, if you

17    want to look at the last report, is there also a report

18    in here for Anthony McDougall at the end?

19         A.   Are you talking about -- is it --

20         Q.   Well, it's not the very last page, but that

21    report.  So it would be the second to last page.

22         A.   So was it call reference 464 on the top page?

23         Q.   Yes.

24              MR. POULTON:  I'm just going to object to the

25         form to the extent that this -- that -- I mean, we

1   know that the labels aren't always perfect, but that

2   one has probable cause on it, not prolific offender.

3   I'm just -- I don't know that it --

4        MR. JOHNSON:  That's fine.

5        MR. POULTON:  I appreciate what -- your point.

6   I just want to make it clear for the record that

7   some of these are not always labeled that way, and

8   think it works both ways.  I think sometimes they're

9   prolific offender checks and they're labeled as SO

10  investigation, and sometimes it's the other way

11  around.

12       MR. JOHNSON:  Well, to be clear for the record,

13  I'm not suggesting that everything in this set are

14  all prolific offender checks.  I just want to

15  introduce these into the deposition record really

16  just, I mean, for purposes of both sides here to

17  make clear that these are the CAD reports that are

18  associated with Tammy Heilman and her children

19  Donnie and Anthony.

20  A.   And what was the question again?  I'm sorry.

21       MR. JOHNSON:  Well, I really maybe -- I mean,

22  Tom, can we just -- if you guys have an objection to

23  this, you could --

24       MR. POULTON:  No, go ahead.  You could attach

25  it.  I think that for purposes of the Court, when we

1       do summary judgment and/or trial, we'll probably be

2       able to agree on that one submission to the Court

3       of, okay, here's the entirety of, you know, Donnie

4       McDougall.

5               MR. JOHNSON:  Right.

6               MR. POULTON:  Here's the entirety of Tyler

7       Paneson.  Here's the entirety of Dalanea Taylor.  I

8       envision doing that anyway.  But if your purpose is

9       just to kind of expedite that or have that be part

10      of this process, I don't have any problem with that.

11              MR. JOHNSON:  That's exactly what we're hoping

12      to do.

13              MR. POULTON:  Yeah.

14              MR. JOHNSON:  Okay.

15              MR. POULTON:  Yeah.

16              MR. JOHNSON:  Okay.  Yeah, we likely will be

17      introducing this at the summary judgment record, and

18      I just want to put it in here today.

19 BY MR. JOHNSON:

20      Q.   So these are CAD reports -- these appear to be

21 CAD reports associated with Donnie McDougall, Anthony

22 McDougall, and Tammy Heilman?

23      A.   Yes.  I mean, this one I'm looking at

24 specifically that reference 464 has his name in it.  It

25 says probable cause.  I'm not sure what that is to tell

1   you the truth.  It would be dependent on the deputy.

2       Q.   Okay.  And same as with the other records, you

3   know, these would be expected to be accurate?

4       A.   Yes, I would assume so.  Like whatever they

5   told dispatch or however they entered the notes, it

6   would be accurate from their account.  Correct.

7       Q.   Okay.

8            MR. POULTON:  I mean, unless you and Ari are

9       back there at the Hampton Inn in Trinity printing up

10      fake CAD reports.

11           MR. JOHNSON:  Not happening.

12           MR. POULTON:  All right.

13           MR. JOHNSON:  Not happening.

14           THE WITNESS:  It looks like a normal CAD

15      report.

16           MR. POULTON:  Yeah.  Let the record reflect I

17      was completely joking.  We're all laughing.

18  BY MR. JOHNSON:

19      Q.   Okay.  And as with the others, sitting here

20  today, you don't have anything to add to these

21  documents?

22      A.   No.

23      Q.   Okay.

24      A.   They're already completed documents.  So

25  there's nothing I could add.  This is not an assessment.

1   This is not -- these are -- it's either in here or it's

2   not.

3       Q.   Right.  And to know what happened in these

4   interactions, you know, if somebody had asked you to

5   research it, you would look at these, you would look at

6   the body cam footage.  Would you also look at the

7   offender notes?

8       A.   Yes.  If I was specifically asked to look at a

9   specific individual, we would try to look at everything

10  that we have in our holdings to determine what

11  occurred --

12      Q.   Okay.

13      A.   -- if it was available.

14          MR. JOHNSON:  I'm just going to mark this as

15      Exhibit 16.

16          (Exhibit 16 was marked for identification.)

17          MR. JOHNSON:  And this is -- similar to before,

18      you know, I can let you know this was the extract

19      from the global data for Donnie McDougall, or at

20      least that's what was provided to us.  And why don't

21      we just do the same as before?  If you guys think

22      this is not that, you'll scream.

23          MR. POULTON:  Squawk, yeah.  We'll confirm, but

24      I assume that's correct.

25          MR. JOHNSON:  Okay.

1       MR. POULTON:  And you could attach it for that

2   purpose now, and we'll let you know if there's an

3   issue.

4       MR. JOHNSON:  Okay.  Okay.  And I'm going to

5   mark this as Exhibit 17.

6       (Exhibit 17 was marked for identification.)

7       MR. POULTON:  Is there a 16?

8       MR. JOHNSON:  Yes.

9       MR. POULTON:  Oh, I'm sorry.  That was -- okay.

10      MR. JOHNSON:  And same deal here.  This is from

11  the global profile of Anthony McDougall.  If you

12  guys disagree, you let us know.

13      MR. POULTON:  Right.  But it -- the only thing

14  is is that it might not be -- well, I don't -- we

15  don't know right now as we sit here today what his

16  designations were.  You know, that one document that

17  showed the -- where he scored would suggest he was

18  not, but that doesn't mean that he still wasn't, as

19  has been testified, otherwise a person of focus for

20  whatever reason.  So it could be -- this is part of

21  -- I think part of the problem we all have -- we

22  struggle with is they could be -- a CAD report might

23  call it a prolific offender check when it isn't.

24      MR. JOHNSON:  Well, to be clear, let me ask the

25  witness.

1    BY MR. JOHNSON:

2        Q.    The Sheriff's Office would generate offender

3    notes for someone even if they're not a prolific

4    offender in the global profile?

5        A.    So global profile is fairly new, and I think

6    Captain Ross might have a better date because he's the

7    one that helped design it prior to, you know, right when

8    I was here.   I think there was a transition maybe

9    between CAD and then the offender notes and global

10   profiles when it became active, right, when IT built the

11   user interface so it could actually go on there.

12       Q.    Okay.

13       A.    And I don't have an exact date.   We might be

14   able to get that from IT on when that was actually

15   developed through maybe their records.   You know, again,

16   this is -- I got 40 people that I oversee, and it's --

17   it's -- you know, these doc- -- I get thousands of

18   documents a day that we look at, you know, hundreds of

19   emails.   So I would just have to determine dates and

20   stuff, but it does look like it's coming from the

21   offender notes section of it.   It looks similar, but my

22   interface doesn't look like this --

23       Q.    Okay.

24       A.    -- ultimately, and it doesn't look like a

25   spreadsheet.

1    Q.   Right.  But again, if you guys have a problem

2    with this, you'll let us know.

3    A.   Yeah.  I mean, on the surface I don't have an

4    issue with it.  It appears to be that, so -- and if you

5    guys are saying that's what we provided to you, then --

6    I know we talked about it last time where we did provide

7    you in my first depo -- I think we talked about this.

8    We provided you a screenshot, and then I know IT was

9    pulling some backside data for you guys so you could

10   actually see the clients.

11   Q.   Right.

12   A.   Right?

13   Q.   Now, do deputies enter information into the

14   notes section of the global profile for individuals

15   other than prolific offenders?

16   A.   Warrant checks, probation checks, things of

17   that nature.  So, yes, they do.

18   Q.   Okay.

19   A.   There's warrant checks if they're going out to

20   look for someone for a warrant.  Probation, parole will

21   put those in there.  Violation of curfew, if it's like

22   specific to their release, right, you know with DJJ

23   we'll help the -- the DJ -- Department of Juvenile

24   Justice out in, you know, doing those, you know, curfew

25   checks if possible.  So like in the past, we have done

1    that, yes.

2        Q.   Okay.  Other than the things that you

3    mentioned, warrant checks, curfew checks, are there

4    other things that deputies would enter into the notes

5    section for individuals who are not prolific offenders?

6        A.   Not to my immediate knowledge.  I would

7    literally have to go back and look at the notes and see

8    if it doesn't coincide with like a prolific check.

9        Q.   Okay.

10       A.   But not to my knowledge except for what I

11   mentioned, but I'd have to verify.

12       Q.   So other than warrant checks, probation checks,

13   the primary purpose of the notes section is to record

14   information about prolific offenders?

15       A.   I wouldn't say the primary focus.  I think it's

16   -- it's -- it's that encompassed, right, everything you

17   just said.  That's the whole purpose of it.  So if I go

18   out and the whole purpose of this was to go out, if you

19   make a check, hey, I've -- they've already been checked,

20   so we shouldn't go back time and time again if they're

21   not home; right?

22       Q.   Uh-huh.

23       A.   Now if we get called out there, that's a

24   different story like if the parents call us.  Because

25   there is a big difference of self-initiated calls and

1    then us getting called by 911, family members, things of

2    that nature, public complaint, you know, neighbor

3    dispute, things of that nature.

4            So in the CAD world, you know, like you talked

5    about, there was a probable cause.  One was listed as

6    probable cause, one was listed as a prolific offender,

7    and then if it's SO investigation compared to whether

8    where we were called to that address for that -- for

9    that time period; right?

10   Q.   Right.

11   A.   And they could've potentially -- you know, they

12   could've been called to a domestic or disturbance and

13   then, you know, hey, this is one of our prolifics, so

14   they could have conducted a check.

15           So it just depends on the totality of the

16   circumstances again.  Like I think every encounter is

17   potentially different, and without going through every

18   single encounter, I would not be able to fully tell you

19   that that is the case.

20           But the notes section was not specifically

21   designed for prolifics alone.  It was designed for -- to

22   keep track of all that; right?  Because at the time we

23   had a warrants unit, and the warrants unit was going out

24   and checking to make sure that these people -- you know,

25   can we find these individuals.  So they were putting

1   those notes in there to allow other deputies to say,

2   hey, look, we went to this address, we made contact with

3   this person, and this person has a warrant for felony

4   domestic battery, whatever the case may be.

5       Q.   Uh-huh.

6       A.   So it wasn't designed for prolifics in general.

7   I think it was designed for everything.

8       Q.   Is it fair to say it's designed for individuals

9   where the Sheriff's Office is making regular checks on

10  those individuals?

11          MR. POULTON:   Object to the form.   Go ahead.

12      A.   I don't want to necessarily say regular checks.

13  I think it's just -- it's a place to where we can

14  document encounters.   I think that would be fair to say.

15  BY MR. JOHNSON:

16      Q.   So if a deputy is working an investigation --

17      A.   Yes.

18      Q.   -- and interviews a suspect --

19      A.   Yes.

20      Q.   -- and that suspect is not a prolific or a Top

21  5 offender, would that be documented in the notes

22  section?

23      A.   By the deputy, not -- well, are you asking by

24  the deputy or the detective?

25      Q.   By anybody?

1    A.   I don't know like general investigations.  I

2    don't believe so.  I think it has to have -- I think, I

3    mean, like when you talk about that specific category,

4    like when you talk about warrants, probation checks,

5    things of that nature, what are they, curfew checks,

6    things of that nature, yes, it would have a specific

7    designation.  But I don't believe like every single

8    investigation a deputy does is going to be put in the

9    notes section.

10   Q.   So notes section is used for -- I'm trying to

11   think if there's an overarching way to describe it.

12   It's things where the deputies are -- they're all

13   essentially checks, right, of some sort?

14   A.   Yeah.  I think that it's more designed for to

15   provide increased awareness for those things, right,

16   because what we don't want, especially in a warrant

17   situation, right -- let's say the guy has a violent

18   criminal warrant, right, and we don't want deputies

19   going by themselves to a call that this person has, you

20   know, history of violence and he has no backup.  So

21   ultimately it's kind of almost like a watch and warning

22   capability to say, hey, look, we've been to this house.

23   This is -- you know, let's say that person has anti-LEO

24   sentiment and has threatened to kill every deputy that

25   has come to the front door.  We definitely don't want a

1    deputy responding to that by themselves.

2        Q.   Okay.

3        A.   So I would say it's probably more for awareness

4    on those specific categories rather than day-to-day

5    operations and notes.  Does that make sense?  But it

6    wasn't designed specifically for prolifics.  So in my

7    mind it was designed to have increased awareness in

8    things that people need to be aware of, like deputies

9    need to be aware of at the time.

10       Q.   Uh-huh.

11       A.   So if it's a prolific, if it's a probationary

12   check, if it's a violent criminal offender check, career

13   offender, things of that nature that they're dealing

14   with, they need to have some kind awareness.

15       Q.   So it wouldn't necessarily be somebody who is a

16   threat to law enforcement because they're violent?

17       A.   Not always.  No, it's not.

18       Q.   So it's used for -- but it's not used for

19   general investigations?

20       A.   No, not typically.  I don't believe so.

21       Q.   Okay.  So it's used for this category of

22   interactions that would include prolific offender

23   checks, warrant checks, probation checks, and things of

24   that nature?

25       A.   Yeah.  Things that we'd have to pay attention

1    to to kind of share with other other partners in the

2    case.  Because, you know, if it's a juvenile probation

3    check, we would ultimately get with their probation

4    officer and saying, hey, we went to check.  They weren't

5    home.  Here's the reason they weren't home.

6            You do what you need to do on your

7    administrative side to determine whether they violated

8    probation, and then we -- you know, a lot of times

9    they'll contact their attorney if they have a defense

10   attorney and say, hey, they're violating the terms and

11   conditions that they were released from court.  You may

12   want to check into it.

13           It's not always that kind of hard, you know,

14   like, hey, that person's going back to jail.  A lot of

15   stuff from the Department of Juvenile Justice is

16   administrative.  So it's more of like an administrative

17   violation rather than a hard violation.  It's unique,

18   but it categories all that.  But I wouldn't say that it

19   was just put into place just for prolific notes.  It's

20   used for that, but I don't think that was the primary

21   focus of creating it.

22       Q.   Okay.  And when was it created?

23       A.   That I'd have to get back to you on.  Like I

24   said, global profiles -- when global profiles stood up,

25   that's when all that capability came in, and I'd have to

1    double check.  I want to say global profiles was here

2    probably beginning of '17, maybe late 2016, like really

3    late, like close to being December 31st type of

4    mentality.  Captain Ross may have a better date range,

5    but we can get with IT and check when that was developed

6    if they have that document --

7        Q.   Okay.

8        A.   -- because, again, a lot of projects, a lot of

9    things going on.

10       Q.   It's not important.  Just asking.

11            I'll mark this as Exhibit 18.

12            (Exhibit 18 was marked for identification.)

13   BY MR. JOHNSON:

14       Q.   Now if you want to look through these, are

15   these incident reports?

16       A.   Yes.

17       Q.   Okay.  And incident reports are generated by

18   Pasco County Sheriff's deputies?

19       A.   Yes.

20       Q.   Okay.  And are they kept in the records of the

21   Pasco County Sheriff's Office?

22       A.   Yes.

23       Q.   Okay.  They're expected to be accurate?

24       A.   Yes.

25       Q.   Okay.  And if you wanted to know what happened

1    during an incident, you would look at the incident

2    report, the CAD report, the body cam?

3        A.    Yes.

4        Q.    Okay.

5        A.    And these documents are actually attested to,

6    at least the incident reports.  These are actually

7    signed by the deputy.

8        Q.    And when you say they're attested to, you mean

9    that they are --

10       A.    Accurate to their -- to the best of their

11   ability, yes.

12       Q.    Okay.  Are they attested under oath?

13       A.    They can be when they're brought into court.

14       Q.    Okay.  And these appear to be incident reports

15   that pertain to the same address as the CAD reports that

16   we've marked as Exhibit 15?

17       A.    I'm assuming because you have a big thing that

18   says Tammy Heilman on this.  So I'm assuming that

19   they're all related to the person, but, yeah, it

20   appears.

21           MR. JOHNSON:  All right.  And if you guys have

22       a problem with this, same thing, just let us know.

23           MR. POULTON:  I think we're, you know, going to

24       try to get to the same point where we can have all

25       the CADs and incidents all merged together for each

1      plaintiff or kid as the case may be in date sequence

2      would be the idea; right --

3          MR. JOHNSON:  Uh-huh.

4          MR. POULTON:  -- I think to give to the Court.

5      Otherwise, they'll be jumping around too much.

6      A.   Yes.  They all appear to have deputies that are

7      currently working or have worked with us here.  So, yes,

8      I would say these are our incident reports.

9      BY MR. JOHNSON:

10     Q.   Okay.  If you wanted to look back at Exhibit 10

11     for Donnie McDougall, it appears that he was listed as a

12     prolific offender in January of 2017; is that correct?

13     A.   Yes.  It appears that he came on in '17, and

14     then there's another modified date for 2020.

15     Q.   Okay.  And we discussed earlier that we're not

16     sure if he might have been listed before 2017, but we

17     know at least 2017 he was listed.

18     A.   Yeah.  I would have to see if we have anything

19     that indicates that he was or wasn't.

20     Q.   Okay.  I want to look at the CAD report.  Let's

21     see.  Date is May 14, 2017.

22     A.   And this is for McDougall?

23     Q.   Yes.

24         MR. POULTON:  May what?

25         MR. JOHNSON:  May 14, 2017.

```
 1              THE WITNESS:  Is that 15?

 2              MR. POULTON:  He said '17.

 3              THE WITNESS:  No, no.  I'm talking about

 4       Exhibit -- it's Exhibit 17?

 5              MS. BROTHERS:  It's 15.

 6              THE WITNESS:  15, okay.

 7              MS. BROTHERS:  Uh-huh.

 8       A.   And what page?

 9  BY MR. JOHNSON:

10       Q.   I can let you know in a second.

11              MR. POULTON:  Well, now I'm confused.

12              MR. JOHNSON:  This would be 24041.

13       A.   Okay.

14  BY MR. JOHNSON:

15       Q.   Okay.  So does this indicate that a prolific

16  offender check was conducted on Donnie McDougall in May

17  of 2017?

18       A.   It appears so, yes.

19       Q.   Okay.  And the deputy ended up speaking with

20  Tammy Heilman?

21       A.   Yes, it appears so, yes.

22       Q.   Okay.  She asked -- Excuse me.  The deputy

23  asked Tammy Heilman about Donnie McDougall?

24       A.   It appears so, yes.

25       Q.   Okay.  And this is after Donnie was listed as a
```

1    prolific offender in January of 2017?

2        A.   Yeah, it appears so

3        Q.   Okay.  I'm not going to go through all of

4    these, but as with before, is it fair to say that these

5    records contain -- that these are the records that the

6    Pasco County Sheriff's Office uses in conjunction with

7    the other types of records we've discussed like the

8    offender notes and incident reports to record these

9    interactions?

10       A.   Yes.

11       Q.   I'm going to introduce now Exhibit 19.

12            MR. POULTON:  Can we go off the record while

13       you're looking for that?

14            MR. JOHNSON:  Yes.

15            (Off-the-record discussion.)

16            (Exhibit 19 was marked for identification.)

17   BY MR. JOHNSON:

18       Q.   Are you familiar with this type of document?

19       A.   Looks like it was pulled from our tip program.

20       Q.   Okay.  And this is a database that -- the tip

21   program is a database that's maintained by the Pasco

22   County Sheriff's Office?

23       A.   Yes.

24       Q.   Okay.  And --

25       A.   Hold on.  Yeah.  So 17, yeah.  I don't know if

1   this came out of our old system or our new system.

2        Q.   Information from the old system was uploaded to

3   the new system; is that correct?

4        A.   Yes.

5        Q.   Okay.  And so these again would be -- if it was

6   uploaded from the old system, it would still be a record

7   that's maintained by the Sheriff's Office --

8        A.   Yes.

9        Q.   -- of tips that are submitted concerning

10  individuals in the community?

11       A.   Yes.

12       Q.   Okay.  And where it says member's name, does

13  that indicate that this is a tip that was submitted by a

14  Pasco County Sheriff's Office deputy?

15       A.   Yes.

16            MR. POULTON:  Well, object to the form, but go

17       ahead.

18  BY MR. JOHNSON:

19       Q.   Was this a tip submitted by a Pasco County

20  Sheriff's deputy?

21       A.   It appears so, yes, in the member's name.

22       Q.   Okay.

23            MR. POULTON:  But -- well, I don't understand

24       because right below -- just four or five below it

25       has tipster's name.

1    BY MR. JOHNSON:

2        Q.   Does it have a notes section?

3        A.   It does.

4        Q.   And does it say that during a prolific offender

5    check with the tipster, Lindsay Carter, advised that

6    Megan Chissell --

7        A.   Yes.

8        Q.   Okay.  And it includes information if you read

9    it about Donnie McDougall?

10       A.   Yes.

11       Q.   Okay.  So this is information about Donnie that

12    was gathered during a prolific offender check?

13       A.   It appears so, yes.

14       Q.   And it was submitted as a tip?

15       A.   Yes.

16       Q.   Okay.  By a deputy?

17       A.   Yes.

18       Q.   Okay.  And then it was maintained in the Pasco

19    County Sheriff's Office records?

20       A.   Yes.

21       Q.   Okay.  And that would have been May 2017?

22       A.   Yes.

23       Q.   Okay.  And it says that Donnie has been known

24    as a prolific offender in the past?

25       A.   Yes.

1          MR. JOHNSON:  Okay.  I'm going to mark this as

2      Exhibit 20.

3          (Exhibit 20 was marked for identification.)

4  BY MR. JOHNSON:

5      Q.   Are these AIM slides?

6      A.   Yes.

7      Q.   Okay.  So these are the type of document we

8  discussed earlier that would be shown at an AIM meeting?

9      A.   Yes.

10      Q.   And if you look at the second page, looking at

11  the date range there, does it appear that these are from

12  mid September of 2018?

13      A.   Yes.

14      Q.   Okay.  If you turn to page 16024 --

15      A.   Okay.

16      Q.   -- does it list Donnie McDougall as a Top 5

17  offender?

18      A.   It does.

19      Q.   And it says the number one after his name?

20      A.   It does.

21      Q.   Does that indicate that he was listed as a Top

22  5 offender on September 17, 2018?

23      A.   Yeah, at least for -- yeah, within that week or

24  that day, yes, it looks like it appears to be.

25      Q.   Okay.  Because it says info valid as of 9-18?

1       A.   Yes.

2       Q.   So as of 9-18 he had been a prolific offender

3    for one day?

4       A.   Yes.

5       Q.   Or excuse me --

6            MR. POULTON:  Top 5.

7       A.   A Top 5.

8    BY MR. JOHNSON:

9       Q.   Yes.

10      A.   And if you look at the top of that, it says

11   probable cause exists.  It's in shadow lettering almost.

12   It's hard to see it not colored.  It says PC exists

13   right above his hairline.

14      Q.   Ah, it's in his picture.

15      A.   Yeah.

16      Q.   And he's listed as a Top 5 offender during this

17   time?

18      A.   He is.

19           MR. POULTON:  I mean, not to interrupt you, but

20      that could be partly a function of what's that page

21      16015 which is like the third or fourth page in.

22           MR. JOHNSON:  Yeah.  Can we -- I don't mean --

23      I --

24           MR. POULTON:  No, I'm sorry.  Go ahead.

25           MR. JOHNSON:  Sometimes I think your

1       interjections are often helpful, but I actually

2       just --

3              MR. POULTON:  You need to move on.

4              MR. JOHNSON:  I just want to get through this.

5              MR. POULTON:  I'll be quiet.

6  BY MR. JOHNSON:

7       Q.   Can we turn to page 16031?

8       A.   Okay.

9       Q.   Okay.  Does this again list Donnie McDougall as

10  a Top 5 offender?

11      A.   It doesn't say Top 5 on here.

12      Q.   Okay.  Well, he's -- the previous slide it

13  listed him as a Top 5 offender?

14      A.   Yes, it just -- but on this slide that you're

15  referring to it does not.

16      Q.   Okay.

17      A.   So previously he is, but in this one it's just

18  showing his associates.

19      Q.   Right.  So this is a slide that shows Donnie

20  McDougall's associates?

21      A.   Yes.

22      Q.   And this would have been from -- would have

23  been used at the AIM meeting?

24      A.   It would have, yes.

25      Q.   And actually while we're on this topic, these

1    slides are from September 2018.  Does that indicate that

2    the Top 5 designation was still in use in September of

3    2018?

4         A.   Yes.

5         Q.   Okay.  Is Tammy Heilman listed as an associate

6    of Donnie McDougall?

7         A.   As a mother, yes.

8         Q.   Okay.  She's listed as his mother?

9         A.   Yes.

10        Q.   And it also notes that she has, quote, anti-LEO

11   sentiment?

12        A.   It does.

13        Q.   Okay.  I want to look at back at Exhibit 18.

14   If you look, the second sort of stapled packet within

15   the exhibit has a cover that says Tammy Heilman

16   9-16-2016 -- or excuse me, no.

17        A.   10-18-17?

18        Q.   I'm looking at the wrong one.  Do you want to

19   look at 9-18-18, the last one?

20        A.   Okay.

21        Q.   So this incident report would have been

22   generated on September 18, 2018; is that correct?

23        A.   Yeah, 9-18-2018.  Yes.

24        Q.   Okay.  And that's either the day after that

25   Donnie McDougall was listed as a Top 5 offender?

 1      A.   Yes.

 2      Q.   And if I wanted to know what happened at this

 3  incident, I would read the incident report?

 4      A.   Yes.

 5      Q.   And if we look at page 10165, there's a

 6  narrative?

 7      A.   There is.

 8      Q.   That's one of the things that I would read to

 9  determine what happened in this incident?

10      A.   Yes.

11      Q.   And I would also look at the body worn camera

12  footage?

13      A.   Yes.

14      Q.   And the CAD report?

15      A.   Yes, you could.   Yes.

16      Q.   Okay.   Very quickly I want to look at Exhibit

17  15, second to last page, or excuse me, fourth to last

18  page.

19      A.   What's the page number you have for it?

20      Q.   24117.

21      A.   Okay.

22      Q.   Is this marked as a prolific offender check?

23      A.   It is.

24      Q.   Does it indicates that it was an attempt to

25  contact Anthony McDougall?

```
 1       A.   Yes.  It says made contact and provided a
 2   community resource guide.
 3       Q.   Is it the policy of the Pasco County Sheriff's
 4   Office to provide prolific offenders with community
 5   resource guides?
 6       A.   I believe the manual says something about
 7   resource guides.  There's like an appendix of the
 8   resource guide.  It's like small with some numbers and
 9   things of that nature, so yes.
10       Q.   Okay.  So, and I recognize that you guys are
11   going to look into this, but without any further data
12   does this suggest that Anthony McDougall was listed as a
13   prolific offender?
14       A.   Yes, based on the nature call alone, yes.
15       Q.   And also the fact that he was provided with a
16   community resource guide?
17       A.   He was, yes.
18       Q.   Okay.  That would be consistent with him being
19   listed as a prolific offender?
20       A.   I mean, according to the nature call, I would
21   have to assume, yes.  I mean, again, if it was another
22   nature, then that would have to be watched and, yeah,
23   they'd have to assess this contact.  I mean, it also
24   talks about us helping him try to get a job.  So I don't
25   know what that context was either.  So, I mean,
```

1    ultimately, again, this would be something you'd have to

2    look at, but it is on the nature code identified as a

3    prolific offender.

4        Q.   Uh-huh.  Okay.  I'm going to go ahead now and

5    introduce another exhibit.  It's Exhibit 21.  It's

6    another set of CAD reports.  If you look on the first

7    page, it has the name Tyler Paneson.

8        A.   Okay.

9             MR. JOHNSON:  Why don't just we do this.  If.

10            (Exhibit 21 was marked for identification.)

11            MR. JOHNSON:  You guys have any problems with

12        this exhibit, you'll let us know.

13            MR. POULTON:  We'll let you know, but I'm sure

14        it's right.

15   BY MR. JOHNSON:

16       Q.   Okay.  These are also CAD reports generated by

17   the Pasco County Sheriff's Office?

18       A.   Yes.

19       Q.   Maintained by the office?

20       A.   Yes.

21       Q.   Expected to be accurate?

22       A.   Yes.

23       Q.   Okay.  Hold on to that.

24            I'm also going to introduce another exhibit

25   which will be Exhibit 22.

1          (Exhibit 22 was marked for identification.)

2          MR. JOHNSON:  It's hard to keep the tab and

3      exhibit number straight.

4          All right.  Same deal.  This is from the global

5      profiles.  If you have any concerns about it, you

6      guys will let us know.

7          MR. POULTON:  Yes.

8  BY MR. JOHNSON:

9      Q.   This indicates this is a global profile for

10  Tyler Paneson?

11     A.   Uh-huh.  Yes, it appears so.

12     Q.   If you read on the third page there's a

13  description of events on June 6, 2018, and it references

14  Tyler Paneson's mother.

15     A.   Yes.

16     Q.   What would be the purpose of referencing Tyler

17  Paneson's mother in the offender notes?

18          MR. POULTON:  I'm going to object to the form.

19  BY MR. JOHNSON:

20     Q.   You can answer.

21     A.   I mean, possibly it looks like the deputy was

22  trying to determine whether they were leaving with Tyler

23  in the car.  It seems like he might have had active PC

24  at this time or probable cause.  I'm not 100 percent

25  sure.  I'd have to look at the full -- the full case.

1   So ultimately, again, I mean these are the deputy's

2   notes.  So I think you would have to ask the deputy what

3   the purpose of him putting Tyler's mom in there, but

4   ultimately he's -- I don't know if he's a juvenile at

5   this time.

6          But, you know, the parents are ultimately

7   responsible for some of their children, for where

8   they're at and their whereabouts.  If we have probable

9   cause for arrest, it could have been something similar

10  to that.  But, I mean, I couldn't tell you without

11  talking to the deputy on why.  You know, I mean, with a

12  juvenile, you're ultimately going to have no choice but

13  to make contact with their parents at some form,

14  fashion, or time.  That goes with every juvenile we come

15  in contact with.  A lot of times we do contact -- we

16  have contact with their parents in some way, especially

17  if you're going to their house because they don't own

18  it.  So it just depends on the totality of the

19  circumstances.  Again, I couldn't -- you'd have to ask

20  the deputy.  I'm sorry.

21      Q.   If you are going to a house, fair to say that

22  you're, by the nature of the interaction, going to have

23  contact with the other people who live at the house?

24      A.   Yes, absolutely.  I mean, if someone lives

25  there and they have contact with you.  There's times

1    when we go to houses and we don't have contact with

2    everybody because they come outside the house and

3    there's no legal, you know, viable reason to enter.

4    Then, you know, shouldn't be going in, so --

5        Q.   Right.  But if you knock on the door -- the

6    deputy knocks on the door, anybody at the house who

7    lives there could be the one to answer?

8        A.   Absolutely.  I mean, it could be the cleaning

9    lady, and it's happened, so --

10       Q.   And the documents that we've looked at suggest

11   that -- not specifically this exhibit but the documents

12   that we've looked at in general today, they indicate

13   that deputies will interact with the individual who

14   opens the door and ask them questions about the prolific

15   offender?

16       A.   It appears that way, yes.

17           MR. JOHNSON:  Okay.  I'm going to mark these as

18       Exhibit 23.

19           (Exhibit 23 was marked for identification.)

20   BY MR. JOHNSON:

21       Q.   These are incident reports.  These appear to be

22   incident reports that are generated by the Pasco County

23   Sheriff's Office?

24       A.   Yeah.

25       Q.   Okay.

1     A.   Yes.  Sorry.  Yes, deputy's name and they look

2  like the same incident report that we have.

3     Q.   And the same deal would be that these are

4  maintained by the Pasco County Sheriff's Office?

5     A.   Yes.

6     Q.   Okay.  And they're expected to be accurate?

7     A.   They are.

8     Q.   Okay.  Now if you look at the spreadsheet,

9  Exhibit 10, it indicates Tyler Paneson was listed as a

10  prolific offender in January of 2017.  Is that accurate?

11     A.   It appears so.  Yes.

12     Q.   Okay.  And it indicates that he was still

13  listed as a prolific offender up until October --

14     A.   2021.

15     Q.   -- 15, 2021?

16     A.   It appears so, yes.

17     Q.   Okay.

18     A.   And I'm going to check on all that.  I'm going

19  to get with the analyst just to determine that that is

20  indeed the fact.

21     Q.   Okay.  But if it's not the case, you'll let us

22  know?

23     A.   I will, yes.

24          MR. JOHNSON:  I'm going to go ahead and mark

25     Exhibit 24.

1              (Exhibit 24 was marked for identification.)

2      BY MR. JOHNSON:

3          Q.    These are AIM slides again?

4          A.    Yes.

5          Q.    Okay.  And they would have been shown at an AIM

6      meeting?

7          A.    Yes.

8          Q.    Okay.  I'm looking currently at page 14539.  If

9      you go ahead a couple pages to 14541 --

10         A.    Okay.

11         Q.    -- is this listing associates of Melissa

12     Whiteman?

13         A.    Yes, it appears so

14         Q.    If you look back a few pages, was Melissa

15     Whiteman listed as a Top 5 offender at this time?  Page

16     14533.

17         A.    Yes.

18         Q.    Okay.  So Tyler Paneson at this time listed an

19     associate of a Top 5 offender?

20         A.    Where are you seeing Tyler's name at?

21         Q.    14541 he's in the second column, second name

22     down.

23         A.    Yes.

24         Q.    And is he also listed as a prolific offender?

25         A.    He is.

1      Q.   Okay.  And that information was communicated to

2   deputies through these AIM slides?

3      A.   Yes.

4           MR. JOHNSON:  Okay.  I'll mark this as Exhibit

5      25.

6           (Exhibit 25 was marked for identification.)

7   BY MR. JOHNSON:

8      Q.   Are these also AIM slides?

9      A.   Yes.

10     Q.   And these would have been shown at an AIM

11  meeting?

12     A.   Yes.

13     Q.   And this meeting appears to be from August

14  2017?

15     A.   Yes.  It would have been whatever the Wednesday

16  was --

17     Q.   Okay.

18     A.   -- in that timeframe.

19     Q.   If you look at page 14413, is Tyler Paneson

20  listed as an associated of a Top 5 offender?

21     A.   He is.

22     Q.   Okay.  And this would have been information for

23  the deputies?

24     A.   Yes.

25     Q.   Okay.  At this time is he not listed as a

1    prolific offender anymore?

2        A.   He doesn't seem to have the flag on there, so

3    he may have fell -- he may have fallen off.

4        Q.   But he's still being listed as an associate?

5        A.   Yes.

6        Q.   And Melissa Whiteman was a Top 5 offender

7    during this time?

8        A.   Yes.

9        Q.   And he's listed as her associate?

10       A.   Yeah.

11       Q.   Okay.

12       A.   I believe she was actually detained at this

13   time as well.

14       Q.   Okay.  But she's still being listed on the

15   slides?

16       A.   Yes.

17       Q.   So she was listed on the slides even though she

18   was detained?

19       A.   Yes.

20       Q.   And her associates were listed?

21       A.   Yes.

22            MR. JOHNSON:  Okay.  I'm going to go ahead and

23       mark another exhibit.  This will be Exhibit 26.

24            (Exhibit 26 was marked for identification.)

25   BY MR. JOHNSON:

1    Q.    Is this an email?

2    A.    Yeah.  It appears to be from Melinda Werner.

3    Q.    Is she an analyst?

4    A.    She's the realtime crime center supervisor.

5    Q.    And she works in the ILP section?

6    A.    Yes.

7    Q.    She reports to you?

8    A.    She reports to my number two.

9    Q.    Your number two, okay.  And it says morning

10   report.  What is the morning report?

11   A.    It's just a wrap up of what occurred overnight.

12   Q.    And who is sent -- who is this morning report

13   sent to?

14   A.    It's sent to multiple people throughout the

15   agency, command staff, sergeants, supervisors, things of

16   that nature.

17   Q.    Okay.  So it's sent to both people on the

18   analyst side and the people that oversee deputies?

19   A.    Yes.

20   Q.    Okay.  And are the morning reports regularly

21   created by officials within the Pasco County Sheriff's

22   Office?

23   A.    Yes.

24   Q.    Are they sent every morning?

25   A.    Yes.

1      Q.   Is it always sent by email?

2      A.   Yes.

3      Q.   Okay.  If you read the first entry here, it

4   says that deputies encountered Tyler Paneson and Steven

5   Gibson in possession of a kayak under questionable

6   circumstances.

7      A.   Yes.

8      Q.   So that indicates that Tyler Paneson at this

9   time on June 2, 2018, was a focus of the Pasco County

10  Sheriff's Office because it was suspected that he had

11  stolen a kayak?

12     A.   Yes.

13          MR. JOHNSON:  Okay.  All right.  Going to now

14      do another exhibit.  This will be Exhibit 27.

15          (Exhibit 27 was marked for identification.)

16  BY MR. JOHNSON:

17     Q.   Are these AIM slides?

18     A.   Yes, they are.

19     Q.   Okay.  These have been shown the an AIM

20  meeting?

21     A.   Yes.

22     Q.   And the purpose of that is to communicate

23  information to deputies?

24     A.   Yes, and command, yes.

25     Q.   If you look forward, page 13943 has Tyler

1    Paneson listed as a Top 5 offender?

2         A.   Yes.

3         Q.   Okay.  And it indicates that he was listed as a

4    Top 5 offender at that point for three days?

5         A.   Three days at the time, yes.

6         Q.   And that would have been as of June 6, 2018?

7         A.   Possibly or -- yeah, it's valid as of 6-6-18.

8    Yes.

9         Q.   So that would indicate that he was listed on

10   June 3, 2018?

11        A.   Yes, possibly.

12        Q.   Is that what the record indicates?

13        A.   Well, it says info is valid as of 6-6-2018.  So

14   where are you getting the other date from?

15        Q.   It says three days after his name.

16        A.   Yes, it's possible.  Yeah.

17        Q.   And it says number after name represents days

18   on target list?

19        A.   It does.

20        Q.   Does that indicate that he was listed on the

21   Top 5 offender on June 3, 2018?

22        A.   Yes, that appears that's when he was put on the

23   Top 5.

24        Q.   Does that correspond with this incident with

25   the kayak that we were looking at in Exhibit 26?

1    A.   It appears that he has an active PC for grand

2    theft.  So I don't know if that's -- if that's the same

3    case or not.  Again, we would have to do some research.

4    Q.   But it lines up datewise?

5    A.   It appears to, yes.

6    Q.   Would stealing a kayak be included as grand

7    theft?

8    A.   Yes.  Kayaks are super expensive.

9    Q.   Right.  So stealing a kayak would be grand

10   theft?

11   A.   Yes.  So it's changed over the -- it's changed

12   over the course, and I don't remember when it changed.

13   It went from like 300 to 750 in the state of Florida.

14   So, yeah, most kayaks are well over $300.  Without

15   reading the case, I don't know how much the kayak was --

16   Q.   Uh-huh.

17   A.   -- what the estimated cost was, how the

18   detective -- how the detective went through his

19   investigation.

20   Q.   Okay.  But at least the dates line up.  And it

21   would be in your experience conceivable that a person

22   would be listed as a Top 5 offender in those

23   circumstances?

24       MR. POULTON:  Object to the form.

25   A.   Yes, if we believed there -- I mean, again,

1    pattern -- pattern dictates or the history of his crimes

2    dictate that, hey, we've had prior, here's what we're

3    doing currently.  He's still committing burglaries or

4    things of that nature.  So, yes, it would dictate the

5    Top 5.

6    BY MR. JOHNSON:

7        Q.   So the combination there concerning regarding

8    the kayak, probable cause regarding the kayak and his

9    past incidents would have led him to be listed as a Top

10   5?

11       A.   Yes.  Ultimately, we would have to ask the

12   analyst what the conversation looked like in the

13   district because, again, I'm not in those daily

14   conversations every day.

15       Q.   But hypothetically that's a thing that you

16   could see happening?

17       A.   Depending on the circumstances, yes, I could

18   see it happening.

19       Q.   Okay.  And that would be because it's part of a

20   pattern of criminal behavior?

21       A.   Yes.

22       Q.   Okay.  I want to refer back to the incident

23   reports or, excuse me, the offender notes which is

24   Exhibit 22.  There's an offender note for 6-6-18.  This

25   corresponds with that same time when Donnie, or excuse

1    me, when Tyler Paneson was listed a Top 5 offender?

2        A.   This looks like it.  Do you have 5-22-2018 on

3    what you're looking at?

4        Q.   So if you look at the AIM slides that we were

5    looking at, Exhibit 27 --

6        A.   Yeah.  So 6-6 and then 6-6 the days correspond

7    from that event.

8        Q.   Okay.  So this event on 6-6-18 in the offender

9    notes would have been the same time that Tyler was being

10   listed on the AIM slides?

11       A.   Yes.  So that appears -- that appears where the

12   grand theft is coming from, yes.

13       Q.   Okay.  Does this state later on Detective

14   Pfenninger and I accessed the property by stepping over

15   some fencing due to the front gate being locked?

16       A.   It does state that.

17       Q.   Okay.  And that was written by a deputy?

18       A.   It appears so.

19       Q.   And that's the Pasco County Sheriff's Office

20   records?

21       A.   It appears so

22       Q.   Okay.  I'm going to Tab 38.  Excuse me.  And

23   this is Exhibit 28.

24            (Exhibit 28 was marked for identification.)

25   BY MR. JOHNSON:

1    Q.   Are these AIM slides?

2    A.   Yes.

3    Q.   Okay.  They would have been shown at the AIM

4  meeting?

5    A.   Yes.

6    Q.   Now they include notes.

7    A.   Minus the notes they would have been showed.

8    Q.   Right.

9    A.   The notes are for the briefer.

10    Q.   The notes are for the analyst who presents the

11  briefing?

12    A.   The analyst or captain.  So the captain's

13  usually -- analysts start out the AIM slides, and then

14  the captain has an opportunity to run it.  It's

15  different in every district so whether the captain lets

16  the analyst move forward and brief everything or whether

17  the captain does it himself.

18    Q.   And just so we're clear, on this document as

19  with many of the AIM slides, there's a box at the top,

20  and that box at the top would depict the slide that

21  would be shown to the participants in the meeting; is

22  that correct?

23    A.   Yes.

24    Q.   And when we refer to the notes, that is the

25  text in the box?

1    A.   Yes.

2    Q.   Okay.  And the text you indicated would be

3    notes for the presenter?

4    A.   Yes, the presenter.

5    Q.   Which could either be a sergeant or an analyst?

6    A.   It could be the analyst or the captain or the

7    captain's designee.

8    Q.   And do these notes reflect things that they

9    would talk about at the meeting?

10   A.   Yes.  They would've -- I don't know if they

11   would have read the notes verbatim.  They may have

12   already had knowledge of it and then spoke about it.  So

13   whether the notes are verbatim, you would have had to

14   been in the meeting to determine whether or not they're

15   read verbatim.

16   Q.   But they're generated during the meeting?

17   A.   They're generated for the meeting, yes.

18   Q.   Okay.  And they would be generated by an

19   employee of the Pasco County Sheriff's Office?

20   A.   Yes.

21   Q.   Okay.  And if we look on page 13958 --

22   A.   Yes.

23   Q.   -- does this list code enforcement citations?

24   A.   It does.

25   Q.   Okay.  And this -- code enforcement citations

1     are discussed at AIM meetings?

2         A.   They can be, yes.

3         Q.   Okay.  And is that discussion led by the code

4     enforcement deputy when they existed?

5         A.   If they're present, they'll make mention of it.

6         Q.   Okay.

7         A.   As far as status goes or whether or not, you

8     know, fine, warning-type mentality.  So, yes, it can be

9     if they're present.

10        Q.   If they're not present, who would lead that

11    portion of the meeting?

12        A.   Whoever is briefing.  There's times it has been

13    glanced over where like, hey, we have Code, nothing

14    significant to report, and then they'll pass over it.

15        Q.   But it also could be discussed by an analyst?

16        A.   It could be, yes.

17        Q.   And could it be discussed by a captain?

18        A.   It could be, yes.

19        Q.   Does this indicate that on June 6, 2018,

20    Darlene Deegan was issued code citations?  Is that on

21    the slide?

22        A.   It appears so, yeah.  Her name's here.  It has

23    an address, violation accumulation of junk and debris,

24    permitted use violation.  Yeah, it appears to have that

25    and the fine amount.

1    Q.   And do the notes also mention Darlene Deegan?

2    A.   Yeah.  Yes, it does.  It says she was issued

3  five citations totaling $1,840.

4    Q.   So this would indicate that the presenter put

5  in their notes for the presentation the citations to

6  Darlene Deegan?

7    A.   Yes.  Doesn't necessarily mean it was actually

8  discussed, but it's in the presentation, and it's in the

9  notes.

10    Q.   Okay.  And this is -- June 6, 2018 is the same

11  date that we were discussing where Tyler Paneson would

12  have been listed as a Top 5 offender?

13    A.   Yeah, same date.

14    Q.   And actually if we switch forward to page

15  13965, does this indicate that Tyler Paneson was still

16  listed as a Top 5 offender?

17    A.   Yes.

18    Q.   And this is on June 12th?

19    A.   Yes.

20    Q.   Okay.  Does this also indicate that Pasco

21  County Sheriff's corporal made contact with Tyler's

22  mother in the notes?

23    A.   Yes, it appears so.  Detective Brooks attempted

24  to make contact with Paneson at his residence.

25    Q.   And that would be Darlene Deegan?

1      A.   Does it mention her?

2      Q.   Are you familiar with the plaintiffs in this

3  lawsuit?

4      A.   I am.

5      Q.   Is Darlene Deegan Tyler Paneson's mother?

6      A.   As far as I know, yes.

7      Q.   Okay.

8      A.   I mean, when you say familiar, what do you mean

9  familiar?  Like do I have intimate knowledge of every

10  one of these plaintiffs?

11      Q.   Yeah.

12      A.   Absolutely not.  Have I seen their names

13  before?  Yes.

14      Q.   Okay.

15      A.   I just want to be clear.

16      Q.   I understand.  I understand.

17          Okay.  So does it say that Tyler's mother,

18  which would be Darlene, refused to let the law

19  enforcement on the property to search her house or RV?

20      A.   Yes, it does appear to say that.

21      Q.   And does it say that she was, quote,

22  uncooperative?

23      A.   It does say that, yes.

24      Q.   Okay.  And this is in the same set of AIM

25  slides that discusses code citations to Darlene Deegan?

1    A.   Yes.

2    Q.   Okay.  And when I said the note about her being

3  uncooperative, that's in the notes section?

4    A.   It's in the notes section, yes.

5    Q.   Which also would be for the presenter?

6    A.   Yes.  It depends on who was presenting it

7  whether or not they would have mentioned that.

8         MR. JOHNSON:  Okay.  I'm going to mark this

9    Exhibit 29.

10        (Exhibit 29 was marked for identification.)

11  BY MR. JOHNSON:

12   Q.   Okay.  Is this another set of AIM slides?

13   A.   It is.

14   Q.   Are these from July 2018?

15   A.   Yes.  It looks like from July, and then this

16  has a monthly comparison on it as well, so yes.

17   Q.   Okay.  Go ahead to page 14441.  Is Tyler

18  Paneson listed here?

19   A.   Yes.

20   Q.   Is he listed as a Top 5 offender?

21   A.   He is.

22   Q.   So this indicates as of July 31, 2018, Tyler

23  Paneson was stilled as a Top 5 offender?

24   A.   Yes.

25   Q.   And that means the Sheriff's Office was still

1    using the Top 5 designation at this time?

2        A.   At this time, yes.

3             (Exhibit 30 was marked for identification.)

4    BY MR. JOHNSON:

5        Q.   Are these AIM slides?

6        A.   Yes.

7        Q.   So these would have been used at an AIM

8    meeting?

9        A.   Yes.

10       Q.   Okay.  And the purpose of that meeting is to

11   communicate across the organization?

12       A.   Yes.

13       Q.   Let's see.  If you look at page 13618 --

14       A.   Yes.

15       Q.   -- does this discuss an incident involving

16   Tyler Paneson?

17       A.   Yes.  It appears to discuss him being a person

18   of interest in a burglary --

19       Q.   And their address on that --

20       A.   -- or a theft.

21       Q.   Excuse me.  Didn't mean to interrupt you.

22       A.   That's all right.  Either a burglary or a

23   theft.

24       Q.   And the address on that incident where the

25   theft was suspected of occurring was 14137 Amanda

1    Avenue?

2        A.    Yes.

3        Q.    And if you look at -- well, that's okay.

4              Does this indicate that the victim was the

5    mother of Tyler Paneson if you look at the second

6    paragraph?

7        A.    It doesn't say her name, but it just says the

8    victim.

9        Q.    It that says her son Tyler Paneson?

10       A.    Yeah.  I mean, it's -- it's insinuating that

11   it's her, that she was the victim, that she hid her

12   jewelry from her son, yes.

13       Q.    Does this indicate that Tyler at this time was

14   listed as a prolific offender?

15       A.    He does have the prolific offender tag under

16   his name, yes.

17       Q.    And this indicates that Tyler -- this incident

18   involving Tyler and his mother was discussed at the AIM

19   meeting?

20       A.    Yes.

21       Q.    I'm just going to do these records for Robert

22   Jones with Justin Ross given the timeframe.  I think

23   that will be fine.

24             So does Pasco County Sheriff's Office require a

25   warrant to conduct a prolific offender check?

1    A.    No.

2    Q.    Does it require that deputies have probable

3  cause?

4    A.    In order to what?  To do a physical encounter?

5    Q.    To do a prolific offender check?

6    A.    I mean, they would have to be identified as a

7  prolific for us to go knock a door per se.  We could do

8  that to any citizen.  We do neighborhood checks when we

9  have crimes and things of that nature, so it wouldn't

10  require a warrant.

11    Q.    And it doesn't require probable cause?  And to

12  be clear, I'm not asking you for a legal conclusion.

13  I'm asking you what the policy of the Pasco County

14  Sheriff's Office is.

15    A.    So, no, you have to -- I mean, they would have

16  to be documented as a prolific, yes.  But probable

17  cause, no.  I mean, a lot of these things are

18  investigated for it has to do with checking on that

19  person or individual, you know, to ensure that we have

20  that focused deterrence model moving.

21    Q.    It doesn't require reasonable suspicion.  It's

22  a matter of policy?

23    A.    To just go knock on the door, no.  To talk to

24  somebody, no.

25    Q.    Does the Pasco County Sheriff's Office have a

1    policy that deputies have to ask prolific offenders if

2    they consent to those interactions?

3              MR. POULTON:  Object to the form.  Go ahead.

4        A.   No, because it's the same thing with a citizen.

5    If I'm in uniform and I go talk to a citizen, unless

6    they object on their own, I can talk to that citizen all

7    day long.  So, yeah, if it's a citizen encounter, yes.

8    If it goes beyond that and to where that person objects

9    and then I still continue, then, yeah, I would probably

10   be suspicious of that activity.

11   BY MR. JOHNSON:

12       Q.   Does Pasco County Sheriff's Office conduct

13   prolific offender checks early in the morning?

14             MR. POULTON:  Object to the form.

15       A.   I'm sure there's all times.  I'd have -- you

16   would have to look at the totality of it.

17   BY MR. JOHNSON:

18       Q.   So if I wanted to know the timing of the

19   checks, I would look at the CAD reports?

20       A.   Look at the CAD reports, yes.

21       Q.   Does the AIM slides also -- do the AIM slides

22   contain information on the identities of associates of

23   Top 5 offenders or when that was a designation that was

24   in use?

25       A.   Yeah, there would be criminal -- there would be

1    associates and criminal associates, you know, in the

2    event that we were looking for that specific individual.

3        Q.   Would that information on the AIM slides

4    include family members of Top 5 offenders?

5        A.   It can, yes, but there should be a designation

6    that says criminal associate compared to an associate.

7        Q.   So family member could be included even if

8    they're not a criminal associate?

9        A.   Yes, just as information only.

10       Q.   Okay.  Is it fair to say that the

11   identification of a person as a prolific offender

12   necessarily affects the individuals who live in the

13   house with that individual?

14            MR. POULTON:  Object to the form.

15       A.   In what way?

16   BY MR. JOHNSON:

17       Q.   If the Pasco County Sheriff's Office conducts

18   prolific offender checks on those individuals; right?

19       A.   Yes.

20       Q.   And those checks are done at the place where

21   the person lives?

22       A.   Yes.

23       Q.   Okay.  So that would affect the other people

24   who live in the house?

25            MR. POULTON:  Object to the form.

1      A.   I mean, I couldn't testify it would affect or

2   not.  I mean, you would have to ask each individual

3   person that lived in the home and say, hey, does this

4   affect you?  Ultimately I can't pass that judgment;

5   right?  Some may say yes.  Some may say no.  It's highly

6   dependent on the totality of the circumstances.

7   BY MR. JOHNSON:

8      Q.   Other than these plaintiffs, are you aware of

9   other individuals who have complained to the Sheriff's

10   Office about prolific offender checks?

11      A.   No.  Again, that's not the role of the

12   intelligence-led policing section.  That wouldn't come

13   to me or my staff.

14      Q.   Okay.  Fair enough.

15           I'm going to -- I'm going to ask you some

16   questions about a document that was produced to us in

17   discovery, and I just want to be clear that by asking

18   questions about this in deposition, I'm not suggesting

19   that it's necessarily admissible into evidence, because

20   I think there's a question as to whether this would fall

21   under the heading of expert testimony, but I want to ask

22   you questions about it just for the record.

23           This will be Exhibit 31.

24           (Exhibit 31 was marked for identification.)

25   BY MR. JOHNSON:

1    Q.    Are you familiar with this document?

2    A.    I am.

3    Q.    And what is this document?

4    A.    This our ILP 5 year study.  This is an

5  assessment of what we've done in ILP, determine if the

6  strategies and practices are effective.

7    Q.    And did you produce this document?

8    A.    I did not.

9    Q.    Who produced this documents?

10   A.    Ross Brummett.

11   Q.    Who is Ross Brummett?

12   A.    He is one of our strategic analysts.

13   Q.    Okay.  How do you spell his last name?

14   A.    B-R-U-M-M-E-T-T.

15         MR. POULTON:  I think it's at the bottom of the

16   first page.

17         THE WITNESS:  It is.

18  BY MR. JOHNSON:

19   Q.    Ah, okay.  Are you able to answer questions

20  about this document?

21   A.    Yeah, I should be able to answer some questions

22  about it.

23   Q.    Okay.  If you look at page 2, it indicates that

24  certain types of offenses have declined.

25   A.    Yes.

1      Q.    Does this compare that decline to any other

2   jurisdictions?

3      A.    No.

4      Q.    Okay.  I want to turn to page 4.

5      A.    Okay.

6      Q.    And also to page 5.  Oh, excuse me.  Yes, page

7   4 indicates that measuring the amount of time since an

8   offender was tagged with the equal amount of time before

9   an offender was tagged there's a 75 percent reduction in

10  arrests.

11     A.    Yes.

12     Q.    Does that -- is that analysis solely focused on

13  individuals who were tagged as prolific offenders?

14     A.    Yes.

15     Q.    Okay.  Does that do any sort of comparison with

16  individuals who are not tagged?

17     A.    Not in this study, no.

18     Q.    Okay.  I want to look at page 8.  This has an

19  arrest history of prolific offenders?

20     A.    Yes.

21     Q.    So this indicates the types of things prolific

22  offenders have been arrested for; is that accurate?

23     A.    It appears so, yes.

24     Q.    Okay.  And this says it looks at their complete

25  arrest history.  Does that mean they would look at both

1  the time they were tagged and the time they were not

2  tagged?

3         MR. POULTON:  Well, object to the form.

4     There's a date range right there.

5         MR. JOHNSON:  Right.

6  BY MR. JOHNSON:

7     Q.   Their complete arrest history from 1-1-2016 to

8  1-1-2020?

9     A.   Yeah, that's something you would have to ask

10 Ross on where he pulled the data.  So all the data

11 extractions and where he pulled it and the methodology

12 you would have to ask Ross specifically.  He would be

13 able to speak to this a little bit more eloquently.

14    Q.   So we don't know if this was when they were

15 tagged or not tagged, but does this indicate the types

16 of things that prolific offenders were arrested for?

17    A.   Yes.

18    Q.   Okay.  This would indicate that of all the

19 arrests of these prolific offenders, twelve percent of

20 them were for drug violations; is that correct?

21    A.   It appears so, yes.

22    Q.   And it would indicate that seven percent were

23 for county ordinance violations?

24         MR. POULTON:  Object to the form.

25    A.   Yeah, it appears so.  That's what's there.

1    BY MR. JOHNSON:

2        Q.   So the percentage of arrests for county

3    ordinance violations is the same as the percentage for

4    simple assault?

5             MR. POULTON:   Object to the form.

6        A.   As listed in this document, yes.

7    BY MR. JOHNSON:

8        Q.   And --

9             MR. POULTON:   I don't think that means what you

10       think it means.  Okay?

11   BY MR. JOHNSON:

12       Q.   What does it mean by county ordinance

13   violations?

14       A.   I would have to see how he pulled that.  So I

15   think in our system they are considered an arrest, but

16   it depends how they're weighed.  So the county ordinance

17   I believe are stripped out of the actual scoring for

18   prolifics, but again I would have to go -- this would be

19   a better question for Ross on the methodology and the

20   explanation of it.  Like I said, he could discuss this a

21   little bit more eloquently.

22       Q.   Okay.

23            MR. POULTON:   That was my point.  I think we

24       had testimony before that it goes to the system as

25       an arrest if there's an issue of a violation even

1         though there's not someone taken into custody.

2              MR. JOHNSON:  I understand.

3    BY MR. JOHNSON:

4         Q.   But this would indicate that the -- regardless

5    of the definition, understanding that an arrest is

6    defined to include some types of citations that taking

7    that universe of arrest as the Pasco County Sheriff's

8    Office defines it, seven percent of them are county

9    ordinance violations?

10        A.   Yeah, like I said, we'd have to ask -- we'd

11   have to talk to Ross.

12        Q.   All right.  That's fair.  I don't think I have

13   anything more on that document.

14             MR. POULTON:  That's 31; right?

15             THE WITNESS:  Yes.

16             MR. POULTON:  Okay.

17   BY MR. JOHNSON:

18        Q.   I'm going to mark another exhibit.  I want to

19   ask you some questions about it.  I have serious

20   concerns about whether it would be admissible if it was

21   offered by the defense, but I want to ask some

22   questions.

23        A.   Okay.

24        Q.   Certainly not suggesting that it's admissible.

25             (Exhibit No. 32 was marked for identification

1          and a different document was remarked as Exhibit 32

2          on page 179.)

3      BY MR. JOHNSON:

4          Q.   Are you familiar with this document?

5          A.   I ma.

6          Q.   What is this document?

7          A.   This was created to identify the contacts with

8      the plaintiffs in the case, just kind of a breakdown of

9      the arrest, the complaint initiated, household members,

10     calls, things of that nature, to kind of separate what

11     was self-initiated and what was not self-initiated to

12     give everybody a better understanding of what occurred

13     on the calls for service.  I believe this was created to

14     kind of separate who's who.

15         Q.   Who requested it?

16         A.   I honestly can't remember.  I know we had it

17     done for the attorneys to kind of look at all the calls

18     for service.  It might have been our legal department to

19     take a look at so they had knowledge of it.

20         Q.   Okay.  This might have been actually created

21     for the legal department?

22         A.   Yes, just to take a look at it because they're

23     not intimately familiar with all the cases either.  So

24     when this the stuff comes out, this might have been

25     created for them specifically.

1          MR. JOHNSON:  Okay.  If you want to claim that

2     it was inadvertently produced, you can.

3          MR. POULTON:  I -- I -- let me do that for now

4     because I don't know the circumstances of its

5     production.  I don't know -- I mean, obviously, it's

6     for the purpose of the case because it's got the

7     plaintiffs here.  So, yes, I -- let me claw back for

8     the moment.

9          MR. JOHNSON:  Okay.

10         MR. POULTON:  Yeah, let me --

11         (Telephone interruption.)

12         MR. JOHNSON:  Hey, Ari.

13         MR. BARGIL:  Sorry.  This is Ari.  I got cut

14    off.  I'll be on mute.

15         MR. JOHNSON:  Okay.  Thank you.

16         MR. POULTON:  So I appreciate counsel bringing

17    that to my attention.  It's currently marked as

18    Exhibit 32, but I'm going to go ahead and request

19    that we claw this back until we figure out the exact

20    circumstances of it being generated.  You know, if

21    your concern is about us trying to admit it like as

22    evidence or something like that, we wouldn't do that

23    anyway if that was your worry.

24         (Exhibit 32 was undesignated at this time.)

25         MR. JOHNSON:  Yeah.  I'm not sure -- I'm not

1    certain that it's accurate.  So I was going to ask

2    some questions to determine -- I have concerns that

3    it's not accurate.  But if you're not going to use

4    it, then I wouldn't do that.

5        MR. POULTON:  No, I wouldn't use this as a

6    compendium of everything, no.

7        MR. JOHNSON:  Okay.

8        MR. POULTON:  I wouldn't do that anyway.

9        MR. JOHNSON:  Okay.  So I'll just give you --

10   I'll give it to you.

11       MR. POULTON:  Thanks.  But, no, we wouldn't do

12   that.

13       (Exhibit 32 was undesignated.)

14       MR. JOHNSON:  So now Exhibit 32 has been

15   undesignated.  Do you want keep the sticker and put

16   it on something else?  Is that -- do you want to

17   have a new Exhibit 32, or do you want to go right to

18   33?

19       MR. POULTON:  Let's put it on a new 32.

20       MR. JOHNSON:  Okay.  So we'll take that sticker

21   off.

22       MR. POULTON:  Otherwise we'll be looking at it

23   going, "Where's 32?  Where's 32?"

24       MR. JOHNSON:  Yeah.

25       MR. POULTON:  I appreciate you bringing that to

1       my attention.  Very -- right in the spirit of the

2       profession.

3              MR. JOHNSON:  There we go.

4              MR. POULTON:  Thank you.  Appreciate it.

5              MR. JOHNSON:  All right.

6              MR. POULTON:  I'm surprised there's only one.

7       Maybe there's more.

8              (A new document was marked as Exhibit 32 for

9       identification which replaced the prior Exhibit 32.)

10  BY MR. JOHNSON:

11      Q.    Is this an email?

12      A.    It appears to be an email.

13      Q.    It looks like it was drafted by Brian Prescott?

14      A.    It appears so

15      Q.    And that is from March 2017?

16      A.    It it appears so

17      Q.    Okay.  And what was Brian Prescott's role at

18  the Pasco County Sheriff's Office in March of 2017?

19      A.    I don't know if he was here to tell you the

20  truth.  I don't know if this -- if that's a Sheriff's

21  Office email or his personal email.  March of 2017 I was

22  here.  I believe he was not.

23      Q.    Okay.  When he was at the Sheriff's Office,

24  what was his role?

25      A.    I believe he was actually the lieutenant over

1    intelligence-led policing at one time.

2        Q.    Okay.  So at this point he might have been a

3    former employee of the Sheriff's Office?

4        A.    Yes.  I don't know Brian personally.

5        Q.    Okay.  And the individuals who were copied on

6    this one would be Christopher Nocco?

7        A.    Uh-huh.

8        Q.    Is that Sheriff Nocco?

9        A.    Yes.

10       Q.    Had who is Jeffrey Harrington?

11       A.    He is the chief deputy.

12       Q.    And he's still the chief deputy?

13       A.    Yes, he is.

14       Q.    Okay.  Then another is Jeffrey Peake?

15       A.    He is the current major over ICIB, which is our

16   investigative division.

17       Q.    Does that include ILP?

18       A.    No.

19       Q.    No.  Okay.

20       A.    At the time of this email, yes.

21       Q.    Okay.  So at the time he would have been --

22       A.    He would have been my major, yes.

23       Q.    Okay.  For ILP.  And at the time you were in

24   the ILP division?

25       A.    So still in the ILP division, but ILP shifted

1    from the ICIB bureau, which is Intelligence Criminal

2    Investigations Bureau, and we shifted to Future

3    Operations Bureau, so I switched.

4        Q.   And when did that happen?

5        A.   I don't have the exact date.

6        Q.   Was it in 2017?

7        A.   Possibly 2017, 2018.  Again, I don't have the

8    exact date.

9        Q.   Okay.  But at this time he would have been

10   overseeing the ILP division?

11       A.   Yeah.  Depending on the date of the switch, I

12   would say, yes, he would have been our major at this

13   time.

14       Q.   Okay.  Okay.  And in this email Brian Prescott

15   seems to be sending Jerry Ratcliffe a copy of the ILP

16   manual?

17       A.   Yes, it appears so

18       Q.   Okay.  Was he involved in creating the ILP

19   manual in 2017, the 2018 version?

20       A.   You would have to ask Captain Ross at that

21   time.

22       Q.   Okay.  I'll save that for Captain Ross.  We'll

23   get back to that.

24            MR. POULTON:  That's the new 32; right?  Okay.

25            MR. JOHNSON:  I'm going to mark a new 33.

```
 1                  (Exhibit 33 was marked for identification.)
 2      BY MR. JOHNSON:
 3           Q.   Are you familiar with this document?
 4           A.   I am.
 5           Q.   What is this document?
 6           A.   So this was discussing the zone focused
 7      offenders talking about narrowing the geographic
 8      location of individuals.
 9           Q.   When was this produced?
10           A.   I don't know the date.
11           Q.   Do you know roughly when it was produced?
12           A.   I don't.  I'd have to go back and -- I'd have
13      to go back and look.
14           Q.   Well, was it produced at the time that you were
15      supervising the ILP division?
16           A.   Yes.  I created this document.
17           Q.   You created this document, okay.  Was it
18      created before this lawsuit was filed?
19           A.   I don't remember.
20           Q.   So it could have been created after?
21           A.   It could have been.
22           Q.   Okay.  And what is it discussing?
23           A.   It's just talking about zone focussed
24      offenders.  When I -- like I said before, I was talking
25      about narrowing the focus of the focus in each
```

1   individual zone so deputies had that responsibility of

2   their zone.  Rather than having to focus globally, they

3   could focus solely into their zone and then if -- the

4   zone focus offender had to match.  We talked about the

5   fundamental idea.  We didn't want to create another

6   scoring system.  We wanted to make sure it matched our

7   current processes.  That's when we came up with kind of

8   the idea of looking at it.  So if they fit into a

9   specific zone, they would identify that zone and that

10  would be it.

11      Q.   Okay.  This indicates that a zone offender is

12  someone who both scores as a prolific offender and is

13  impacting or suspected of impacting the crime

14  environment?

15      A.   Yes.

16      Q.   Okay.  Now this says zone focused must qualify

17  as a prolific offender, and then it says see definition.

18      A.   Yes.

19      Q.   What definition is that?

20      A.   The definition right here that talks about --

21  it says definition.  Definition and scoring.  It's the

22  same that's in the manual.

23      Q.   Okay.  So the definition of a prolific offender

24  is -- it's listed on this sheet?

25      A.   Yes.

1    Q.   Okay.  And in addition to that, they must also

2    be suspected of impacting the crime environment or be

3    impacting it?

4    A.   Yes.

5    Q.   Okay.  And that's to be a zone focused

6    offender?

7    A.   Yes.

8    Q.   Okay.  Did ILP analysts have contact with

9    school resource officers?

10   A.   Yes.  One of our analysts has more contact with

11   school resource officers than normal.  She's a juvenile

12   analyst.

13   Q.   Who is the juvenile analyst?

14   A.   Brooke Erbe, E-R-B-E.

15   A.   Yes.

16   Q.   Okay.  What is the role of the juvenile

17   analyst?

18   A.   So right now she primarily focuses on providing

19   information to the school board reference threats.  So

20   it's more of -- it's threat-related as well.  So any

21   kind of threat to staff, school members, threat to self

22   is reported.  Anytime a student is arrested for a felony

23   or above, that is shared with the school board for

24   awareness.  They basically look at the juvenile crime

25   environment, see what it looks like, and then to ensure

1    that the school board and the juvenile investigative

2    division has an understanding of what's going on inside

3    the juvenile crime environment basically.  She focuses

4    primarily on juvenile crime.

5        Q.    How long has there been a juvenile analyst?

6        A.    Since I've gotten here, so since 2016.  It's

7    changed.  The first juvenile analyst was -- I want to

8    say it was Jen Shadrick, and then it went to Jordan

9    Schroeder, and then Brooke took over.

10       Q.    Okay.  Many -- some proportion of prolific

11   offenders are juveniles; correct?

12       A.    Can be, yes.

13       Q.    Okay.  Does the juvenile analyst have any role

14   when a juvenile is identified as a prolific offender?

15       A.    Not primarily.  I mean, the SRO's are aware

16   only because they sit in the meetings and they

17   understand those flags, but that's not a -- that's a

18   primary function of the districts, not necessarily a

19   primary function of the juvenile analyst.  I mean there

20   is an awareness that is brought to the SRO's, but the

21   SRO's are not designed to primarily deal with the

22   criminal nature of that side; right?  So school resource

23   officers that's in there, they're there to provide

24   resources, you know, how can the school help those

25   individuals?  You know, if there's a kid committing

1    crime, can the school interject?  Is there services they

2    can provide for them and the family that the community

3    has access to rather than just the Sheriff's Office?  So

4    there's a little -- there's a little bit of a separation

5    of church and state in that matter.  That's designed to

6    specifically -- again, that off ramping mechanism

7    because we have to use diversion that's involved in

8    there.

9          The juvenile analyst will also assist in CPI

10   cases if there's a, you know, request of abuse.  We have

11   a handle with care mechanism to where if a juvenile

12   witnesses a like significantly violent crime, murder,

13   they're victims of sexual assault, things of that

14   nature, the school is made aware to ensure that

15   everybody knows how to handle that individual when they

16   come back to school.  Or if we have a suicide -- we had

17   a young lady -- there was a suicide.  Young lady heard

18   it on the phone.  We let the school know that that has

19   occurred too so no one's talking about that in open air

20   and that young lady doesn't have to hear it so she

21   doesn't have to be traumatized again.  It's kind of a

22   reduction in trauma format.

23         So the SRO's are a little different than what

24   you would say your normal patrol guys.  They're there to

25   overly mentor.  If they have to make arrests, they have

1    to make arrests, but you're not going to see an over

2    abundance of arrests come from school resource officers

3    especially when it deals with in a prolific nature;

4    right?  If they're out committing burglaries outside of

5    school, primarily that's going to district focus.

6         Q.   Do the juvenile analysts provide input on who

7    should be listed as a prolific offender?

8         A.   No.  That's the districts.

9         Q.   When an analyst is determining if somebody is

10   affecting the crime environment, can they consider

11   information that's provided by SRO's?

12        A.   In what forum?

13        Q.   An analyst makes a determination if someone is

14   affecting the crime environment; correct?

15        A.   Yes.

16        Q.   Can they in that process consider information

17   that's provided by SRO's?

18        A.   So they could, yeah.  The SRO's could advise

19   like, hey, they're -- you know, this kid is suspected of

20   graffitiing the school.  This kid is suspected of

21   burglarizing lockers.  This kid has gang ties to X, Y

22   and Z.  So, yes, they would have some info- -- if they

23   had information to provide, yeah, that can be taken into

24   consideration.

25        Q.   Does having gang ties to somebody who's in a

1    gang constitute affecting a criminal environment?

2         A.   If it meets statutory -- if it meets statutory

3    requirements, yes.

4         Q.   Someone doesn't have to be convicted for that

5    to be considered, does it?

6         A.   No.

7         Q.   So there doesn't have to be a finding that it,

8    meets the statutory requirements?

9              MR. POULTON:  Object to the form.

10        A.   How so?

11   BY MR. JOHNSON:

12        Q.   When you say they have to meet the statutory

13   requirements, what you mean is an analyst has to

14   determine that they meet the statutory requirements?

15        A.   No.  There are statutory requirements that

16   identifies you as a gang member and identifies you as a

17   gang associate, and we stick to those guidelines very

18   strictly.

19        Q.   What statute is that?

20        A.   I would have to get it to you.  Right off the

21   top of my head I don't remember it.

22        Q.   And when you say you stick to it, you mean you

23   follow it as an internal matter?

24        A.   Yes, it's internal.  So that's how

25   documentation goes for gang documentation and associate

1    documentation.

2        Q.    All right.  And if a person is a gang

3    associate, that would go into the analysis of whether

4    they are affecting the criminal environment?

5        A.    It could play a factor.  Again, it's highly

6    circumstantial depending on what the totality is; right?

7    So like if we know that they're active and there's been,

8    you know, indications of gang activity, then yes.  But

9    there's a separation; right?  So just because you're a

10   gang member and you commit a burglary doesn't mean

11   you've committed a burglary in furtherance of that gang.

12       Q.    And just to be clear --

13       A.    It just means you committed a crime.

14       Q.    I didn't mean to interrupt you.  I apologize.

15            Just to be clear, none of what you're

16   discussing is written down anywhere as a policy?

17       A.    I believe the gang statute is written down in

18   the documentation -- written down somewhere in

19   documentation.

20       Q.    But the policy about what it means to be

21   affecting the criminal environment is not written down?

22       A.    No, there's no -- there's no formal -- like

23   formal policy to understand like they -- they have to be

24   active in the crime; right?  Committing crime or

25   suspected of committing crime.

1     Q.   Or suspected of being in a gang?

2          MR. POULTON:  Object to the form.

3     A.   No.  You're either a gang member or you're not.

4   You're either a gang associate or you're not.  There's

5   stipulations to identify that.

6   BY MR. JOHNSON:

7     Q.   But it's not -- you're not suggesting that they

8   have to be --

9     A.   There's criteria.

10    Q.   -- convicted of being a gang member?

11    A.   No, you don't have to be convicted of being a

12  gang member.

13    Q.   They have to be determined by the Sheriff's

14  Office to be a gang member?

15    A.   So under statute, they have to be identified as

16  a gang member per Florida statute, and then you have to

17  prove that the crime that they are committing in order

18  to -- it's an enhancer.  It's not -- it's a crime

19  enhancer.  It's not necessarily -- like if you commit a

20  murder, okay, and you are a gang member, there is an

21  enhancement in the state of Florida if we can prove that

22  was in furtherance of your gang.

23    Q.   Okay.  But I guess I'm trying to understand in

24  the context of the ILP program, you're not proving it to

25  a judge, are you?

1      A.   So under the ILP philosophy, that has nothing

2   to do with the gangs.  It's we're documenting a gang

3   member or we're not documenting a gang member.  We're

4   documenting a gang associate or we're not documenting a

5   gang associate based on criteria outlined in Florida

6   statute.

7      Q.   But I guess what I'm trying to establish is

8   that determination is made by the analyst?

9      A.   It's -- yes, it's made by the agency, the gang

10  detective.  We have a gang detective.  It's made by the

11  gang analyst.  Yes.  We have an organized crime analyst

12  that looks at that and determines whether or not it

13  meets the criteria based on Florida statute.  It's like

14  a career criminal.  Career criminals are identified in

15  statute by the State of Florida through legislation.

16     Q.   All right.  And the fact that that analyst

17  makes that determination that somebody is a gang

18  associate would be a reason that they could be listed

19  as -- could be a reason that they could be affecting the

20  criminal environment?

21     A.   Yes.  If they're actually engaged in gang

22  activity and we can prove that they're actively engaged

23  in gang activity, yes, they would be affecting the crime

24  environment at that point in time.

25     Q.   What if they were -- would it be affecting the

1    crime environment to be an associate of the gang but not

2    personally involved in the activity?

3         A.   No.  Just being an associate, no.  We have to

4    have the criteria to document as an associate.  But it

5    doesn't mean you're involved in any criminal activity at

6    that point in time.

7         Q.   And just to be clear, the lines that we are

8    drawing involving when it would or would not be enough

9    to be affecting the criminal environment, these are

10   things that are not written down in a policy?

11        A.   No.  It's a case-by-case basis; right?

12   Everything --

13        Q.   And the analyst --

14             MR. POULTON:  Let him finish.

15   BY MR. JOHNSON:

16        Q.   I apologize.

17        A.   Yeah, it's a case-by-case basis.  The analysts

18   would have to articulate why we believe that this person

19   is an associate of a gang member first and foremost,

20   right, that we're putting a gang associate tag on that

21   individual, and then, hey, are they currently committing

22   crime, and then the question then becomes are they

23   committing crime in furtherance of a gang.  Those are

24   the questions we ask when we look at documentation for

25   gang members.

1    Q.    And that determination about the criminal

2  environment is made by the analyst?

3    A.    Yes, made by the analyst, the detective.

4    Q.    Do you know that the analyst is applying the

5  same standards that you would apply?

6    A.    That's the guidance, yes.

7    Q.    And this is guidance that you provide

8  informally?

9    A.    This is the guidance that we provide in

10  training, and this is the guidance that when we go

11  review those gang entries that we look at for that

12  documentation.  If it's not documented properly, we

13  remove the tag.

14    Q.    Do you train every analyst?

15    A.    We train the gang analyst, and every analyst is

16  aware of the statute for the gang documentation and gang

17  associate.  So, yes, the analysts are aware, the jail

18  analysts are aware, and that's where we primarily get

19  our focus.  The gang stuff always comes to a specific

20  unit.  So there's checks and balances for that.  So if a

21  deputy says, "Hey, we need to document this person as an

22  associate," that goes to the gang analyst.  The gang

23  analyst then gets with the gang detective, and then the

24  supervisor looks at that and ensures that this is the

25  proper documentation.

1    Q.   So when somebody is being listed as a prolific

2    offender and the determination is being made at that

3    time of whether they're affecting the criminal

4    environment --

5    A.   Uh-huh.

6    Q.   -- that determination is made by the individual

7    analyst?

8    A.   It is made, yes.  They have to have proof.

9    They should have documentation stating that, hey, this

10   person is suspected of a crime or is committing a crime

11   or has committed a crime.

12   Q.   Again, that expectation is not written down?

13   A.   No, not -- it's not in any policy if that's

14   what you're asking.

15   Q.   And so you're saying that you communicate that

16   expectation through training?

17   A.   Through meetings, through training, through

18   face-to-face conversations, things of that nature.

19   Q.   How many analysts are there who are called upon

20   to make that determination?

21   A.   There are five analysts right now that

22   primarily would make that determination after they are

23   already scored out as a prolific through the list.

24   Q.   And they're trained -- their primary on-the-job

25   training is from other analysts; correct?

1    A.   Yes.  And supervision and conversations with

2  myself.

3    Q.   So you do not provide their primary on-the-job

4  training?

5    A.   I do not.

6    Q.   Okay.  That's provided by other analysts?

7    A.   That's provided by other senior analysts, yes.

8    Q.   So when you are discussing what you think it

9  means to be affecting the criminal environment --

10    A.   Uh-huh.

11    Q.   -- it's possible that other analysts might have

12  a different understanding in their head?

13    A.   They shouldn't because when they first come

14  into ILP and we hire them, I sit down with them, and

15  that NMO slide deck, that new member orientation slide

16  deck, we have that conversation.  In that conversation I

17  particularly -- when we go over prolifics, I

18  particularly say, hey, anybody we're looking at has to

19  have -- it doesn't matter prolific or not -- anybody we

20  look at should be either affecting the crime environment

21  right now or suspected of affecting the crime

22  environment.

23       We should not be spending our resources on

24  looking at jaywalkers if we don't have a problem with

25  jaywalkers; right?  If we have a problem with

1    burglaries, we should be looking at who's committing the

2    burglaries.  If we have a problem in violent crime, we

3    should be looking at people committing violent crime.

4    If we have a problem with gangs, we should be looking at

5    our gang members, and we should be looking at what

6    they're doing, how they're doing it, why they're doing

7    it, and looking to develop strategies to disrupt that

8    behavior.

9              MR. JOHNSON:  Why don't we take a quick

10        break --

11             MR. POULTON:  Okay.

12             MR. JOHNSON:  -- and then I might have a few

13        more things.

14             MR. POULTON:  Wrap up?  Okay.

15             (Short break.)

16   BY MR. JOHNSON:

17        Q.   So we were talking earlier about the

18   determination of when a prolific offender is affecting

19   the crime environment.

20        A.   Yes.

21        Q.   And you said that the analysts, in making that

22   determination, should not have a different understanding

23   of that than you have.

24        A.   No.  I mean, it's been spoken about.  It's been

25   talked about.  And again, it goes -- it goes back to

1    having the understanding of the overall what probable

2    cause is, right, our reasonable articulable suspicion,

3    so just reasonable suspicion of that a crime is being

4    committed or a crime has been committed.  So they have

5    that understanding of, you know, what kind of the rules

6    of engagement are from how we act as a Sheriff's Office

7    or law enforcement officer.  You know, again, I have to

8    have some kind of reasonable suspicion if I'm

9    investigating a crime.

10       Q.   Well, just to be clear, an individual can be

11   listed as a prolific offender even if there is no

12   current crime going investigation with respect to that

13   individual; correct?

14       A.   They can be in the pool, yes.  But that's --

15   that was the whole purpose of having analysts identify

16   that they are active in the crime environment.

17       Q.   So you're now saying that by active in the

18   crime environment, you mean they have to have reasonable

19   suspicion of a particular crime?

20       A.   I would say so, or what's the reasoning behind

21   us focusing on that specific person?

22       Q.   Is that written down anywhere?

23       A.   No, I don't believe so.

24       Q.   Is it reasonable suspicion or probable cause?

25       A.   So it's a reasonable suspicion to believe that

1    -- because you're going to have people that are

2    suspected for crimes, and then you're going to have

3    people that we know for a fact that you committed that

4    crime.  So if you're a person of interest --

5        Q.   So when Dalanea was released from the

6    Department of correction on June in March --

7            (Court reporter asked for clarification.)

8    BY MR. JOHNSON:

9        Q.   I'm sorry.  In -- gosh.  In March of 2017 --

10       A.   Uh-huh.

11       Q.   -- was she already the subject of an

12   investigation?

13       A.   I'm not aware of any.  I don't know.  I mean,

14   if she got out of DOC, they'll do a check for DOC

15   inmates that are released just to make sure that they

16   have an understanding that, hey, we know you just got

17   released from prison.

18       Q.   And she remained a prolific offender up through

19   2019?

20       A.   I believe so in that document.  I'd have to

21   double check on to why.

22       Q.   And was she a subject of an active criminal

23   investigation that entire time?

24       A.   I'm not sure.  I have no idea.

25       Q.   Okay.  So she was listed as a prolific offender

1    and she was subject to a prolific offender check during

2    that time?

3        A.   Yeah, I would have to check.  Because based on,

4    again, a three-year history, they can be listed as a

5    prolific, but again when you add, hey, are they

6    currently active when you're looking to deploy

7    resources --

8        Q.   And you have no reason to believe that she was

9    the subject of an active criminal investigation that

10   entire time?

11       A.   I don't know.  I'd have to look if she has any

12   -- there was any kind of -- any kind of documentation

13   saying that she was part of a report.

14       Q.   Presumably that documentation would be produced

15   to us if it existed?

16           MR. POULTON:  Well, not necessary if she was a

17       juvenile.  That's part of that problem.  I don't

18       know what the timing is on that for her.

19   BY MR. JOHNSON:

20       Q.   But just to be clear, she did not have to be

21   the subject in an active criminal investigation in order

22   to be listed as a prolific offender during that time?

23       A.   No.  There could have been an accusation of her

24   still hanging out with her same old associates or same

25   associates that were committing crimes.  You know,

1     again, when you're -- that's being active in that crime

2     environment.  You're an associate of those individuals

3     committing crime.  There's an allegation of you

4     committing crime.  There could have been an intel report

5     involved.  I have no idea what was involved with it,

6     so --

7          Q.   But these are different things.  She could have

8     been affecting the criminal environment by hanging out

9     with those people even if she herself was not suspected?

10         A.   Yeah, she could be involved.  Yes, she could

11    have an involvement with other individuals committing

12    crimes.

13         Q.   So if she was involved with other individuals

14    committing crimes, that would be enough for her to be

15    affecting the criminal environment, even if she

16    personally was not suspected of those crimes?

17              MR. POULTON:  Object to the form.  Go ahead.

18         A.   It would potentially have -- would be enough to

19    have that analyst look at that and to determine whether

20    or not she is still active in that environment.  Do we

21    believe she is still active in the criminal environment?

22    BY MR. JOHNSON:

23         Q.   But again, she doesn't have to be suspected of

24    a crime to be active in the criminal environment; is

25    that correct?

1        A.    No.  She could associate with other criminals,

2   things of that nature.

3        Q.    And by no you mean you agree that that's

4   correct?

5        A.    Yes.

6        Q.    Okay.

7             MR. POULTON:  A little of that low sugar issue

8        you mentioned.

9             MR. JOHNSON:  No reads like a no when you

10       reflect it a certain way.

11  BY MR. JOHNSON:

12       Q.    So, and this is important because you indicated

13  at one point that you were suggesting that to be

14  affecting the criminal environment, there has to be

15  reasonable suspicion that you personally committed a

16  crime.

17       A.    So there's got to be a why.  Right?  Why are we

18  focusing on you?  If we can't articulate that why, then

19  we shouldn't be focusing on you.  Right?  There's got to

20  be a why to it.  There's a why to all this.  There's a

21  the so what.  Why is it important to focus on this

22  individual?  Why is it not important to focus on this

23  individual?  Right?  Is this person currently active in

24  the crime environment?  Are they not currently active in

25  the crime environment?  Right?  Are they hanging out

1    with criminal associates still?  Are we still getting

2    reports or tips that this person may be engaged in

3    criminal activity?

4           It's all investigatory, and the analyst has to

5    approach it from that perspective; right?  They're

6    providing an assessment on why a district should focus

7    on a specific individual.  This could be from other

8    deputies' encounters.  This could be from other deputies

9    saying that, hey, I got this information from a source,

10   I got this information from an associate that, you know,

11   this subject was with us.  So if that analyst believes

12   at that time that there should be that primarily focus,

13   then that needs to be addressed to the district, and the

14   district needs to make that decision on whether or not

15   they're going to go out and make that person a priority.

16   So there has to be some why to what we're doing.

17      Q.   So a few questions.  And, one, I don't want to

18   be harping on this, but I want to -- I think I

19   understand what you're saying.  I just want it to be

20   clear.

21      A.   Uh-huh.

22      Q.   The why does not have to be reasonable

23   suspicion of a particular crime on the part of that

24   individual?

25      A.   I would say no.  I would say if we have it, it

1      needs to be -- that needs to be primarily identified.

2      Especially if we have with a crime we think they

3      committed, that would be first.  If we have suspicion of

4      a crime they've committed and then the reason why they

5      should be a focus, right, in that order.  Because

6      priority should take you've committed a crime, second

7      priority is, hey, we have reasonable suspicion to

8      believe you're still committing crimes, and the third

9      one is why are we focusing on this person.  So those are

10     the three things we need to answer to make sure that

11     again why are we -- why are we putting deputy resources

12     when we have limited resources on a person that we

13     should not focus on.

14             And that's the whole focus of ILP in general is

15     to focus on the key problems and reasoning that are

16     affecting your crime environment.  So these are

17     individuals that are suspected of committing crime,

18     these are individuals that have committed crime and

19     there's got to be some kind of why.  Are they hanging

20     out with criminal associates?  Are we getting additional

21     information in that maybe that person is not turning

22     their life around or going to the off ramp instead of

23     circling back and going back onto the criminal route.

24     So, yeah, I would say in that priority, that's what

25     we're looking for.

1      Q.   Okay.  But there is no requirement that a

2   prolific offender be --

3      A.   There's no --

4      Q.   -- suspected of a specific crime?

5      A.   No, there's no requirement.

6      Q.   Now when you talk about the determination being

7   made by deputies of where to focus their resources, that

8   determination is made in part based on the fact that

9   somebody has been listed as a prolific offender?

10     A.   It could be.

11     Q.   It's a piece of input for them to consider?

12     A.   It is a piece of input for them to consider.

13  It would not always be the case.

14     Q.   And it's considered when they're determining

15  where to focus their resources?

16     A.   Yes.  For that commander, yes.

17     Q.   And when we say focus their resources, that

18  would include what types of crimes to investigate?

19     A.   Yes.

20     Q.   And it would include what houses to visit?

21     A.   What do you mean by what houses to visit?

22     Q.   For checks?

23     A.   Yes.

24     Q.   Would it include where to direct code

25  enforcement?

1      MR. POULTON:  Object to the form.

2      A.   It could.  Again, that's not my role.  So I

3  don't know how those meetings went down or how those

4  meetings occurred, but that wasn't an ILP function to

5  say, hey, we have a code problem here, we have a code

6  problem here.

7           Code enforcement issues can come from multiple

8  different arenas; right?  We do get a number of

9  complaints from dilapidated houses, people dropping

10  waste in their yards, individuals having livestock they

11  shouldn't have, things of that nature; right?

12  Ultimately, that was a two-prong approach between county

13  code enforcement and Pasco County Sheriff's Office.  So

14  there's a wide array of calls for service that could

15  have triggered that; right?  Could it have been

16  prolific?  Yes.  Are there other calls for service that

17  dealt with code?  Yes.  So without pulling those numbers

18  and seeing what that looked like, I really couldn't tell

19  you.  That's something to ask the code enforcement guys

20  on their part of the house what it looked like.

21      Q.   Okay.  Is the purpose of making these prolific

22  offender designations to guide the activities of the

23  deputies in the field?

24           MR. POULTON:  Object to the form.

25      A.   Guide in what way?

1    BY MR. JOHNSON:

2        Q.    Provide information for them to use when

3    focusing their resources?

4        A.    I would say, yes, to an extent.

5        Q.    And is the ultimate goal that deputies do a

6    better job keeping the community safe?

7        A.    Yeah.  The goal is again to disrupt that crime

8    pattern; right?  The goal is to ensure we reduce

9    victimization, because there are victims on the other

10   side of these crimes.  Especially with the auto

11   burglaries, I mean, we have tons of victims, you know.

12   So there is a victimization role here; right?  There's

13   no true victimless crimes in the grand scheme of things.

14           So that's the whole purpose is to -- you know,

15   when you -- I mean, there's been tons of articles,

16   right, even from the Tampa Bay Times about what they

17   call -- I think they called it an epidemic or pandemic

18   at the time about multiple auto burglaries throughout

19   this specific region of Florida, right, which is called

20   region four from the Florida Department of Law

21   Enforcement, and it encompasses roughly about seven to

22   eight counties.  So there is a large amount of vehicle

23   burglaries between I want to say like 2012 up until like

24   2018-ish, '19-ish that's were just rampant crime stats.

25           Unfortunately, primarily juveniles commit that

1    specific crime at a higher rate than their adult

2    counterparts when it comes to auto burglaries, right,

3    that they jiggle the door handle, the door opens, they

4    look inside, they take their stuff and then they take

5    off, and they hit multiple houses along the way.

6           So, yeah, at the time property crimes was one

7    of the highest things we dealt with.  There was a lot of

8    victims we were dealing with.  People were getting fed

9    up about having their stuff missing.  So, you know, that

10   was part of the -- some of the cry from the community of

11   like what are you going to do about the crime issue, and

12   ultimately that's, you know, what it looks like

13   sometimes.  You know, it's, hey, you're a prolific

14   because of these ILP focus crimes.  You're automatically

15   going to be a prolific I think for that fact that if you

16   commit multiple violent crimes.

17          We've tooken some crimes out of it like

18   misdemeanor marijuana because that's so rampant you

19   can't really gauge, and a lot of those things are

20   changing.  As new laws come in and new presidents come

21   in, it will change again.  Unfortunately, this world is

22   super fluid right now, and ultimately we'll change

23   processes here in the future, and we're going to

24   continue to change them as long as we adopt to what

25   current society looks like.

1    Q.    So ultimately the purpose of the prolific

2    offender program is to reduce crime in the community?

3    A.    Reduce crime in the community.

4    Q.    And by the community we mean Pasco County?

5    A.    Pasco County, yes.

6    Q.    You mentioned that you would automatically be a

7    prolific offender for certain violent crimes.  When you

8    say automatically, do you mean without any consideration

9    of whether you're affecting the criminal environment?

10   A.    No.  I'm sorry.  You have to score out

11   ultimately; right?  But violent crimes will heavily be

12   looked at.  You know, if you have a high violent crime

13   score, there's gonna -- if you have a high violent

14   crime, regardless of whether you're prolific or not, if

15   you have repetitive violence in your history, ultimately

16   you're going to be looked at by law enforcement

17   regardless of where you're at, whether you're here in

18   Pasco, whether you're outside in some other community.

19   Violent crime always kind of scores out top on

20   everybody's offender list.  So if you're committing

21   multiple drive-bys, if you're involved in gang activity

22   that's committing multiple drive-bys, you would have to

23   score out.  We're definitely going to focus on those

24   violent crimes as well.

25   Q.    Does Pasco County Sheriff's Office maintain a

1    list of at-risk youth?

2         A.   Yes, we have.

3         Q.   And what is that list?

4         A.   So that is individuals that have been involved

5    in adverse childhood experiences, victims of crimes,

6    offenders in crimes like serious violent criminal

7    engagements, sexual assault, things of that nature, and

8    then it's compared -- it's added with whether they're on

9    track or off track at school, and then that goes back to

10   the school.  So student services basically look at that,

11   and they could determine if they can add additional

12   resources to these kids and their parents.  Has nothing

13   to do with the criminal side of the house.  It's not

14   used for any kind of -- it's not used for anything

15   criminal related.  The deputies don't get to see it.

16   The only people that get to see it are the SRO's and the

17   school board and the schools themselves.  So it's a

18   program similar to Operation Street Cred out of

19   New Zealand where they provide resources and wrap around

20   services to lower their risk of dropping out of school,

21   letting them try to become more successful, engaging

22   resources with the families.  This could be anywhere

23   from getting them to appointments or ensuring they had

24   mental health services if the kids had signs of violence

25   or signs of suicide, things of that nature.  So it's

1    solely based on school-based resources.

2       Q.   And when did the Pasco County Sheriff's Office

3    begin using that list?

4       A.   I want to say 2017 that's -- Captain Ross

5    started that, and then we took it, and then ultimately

6    we shared it with the schools.

7          MR. JOHNSON:  Okay.  I'll ask Captain Ross

8      about that.

9          Okay.  I think we're ready to take a break.

10      Probably need some food.

11         MR. POULTON:  I know I do.

12         MR. JOHNSON:  And appreciate your time.

13         THE WITNESS:  No, no problem.

14         MR. POULTON:  He'll read.  Yeah.

15           *  *  *  *  *  *

16        (THEREUPON, THE TAKING OF THE DEPOSITION WAS

17      CONCLUDED AT 1:45 P.M.)

18           *  *  *  *  *  *

19           S T I P U L A T I O N

20      It was thereupon stipulated and agreed by and

21    between counsel present for the respective parties and

22    the deponent that the reading and signing of this

23    deposition is not waived.

24           *  *  *  *  *  *

25

1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA

3    COUNTY OF PASCO

4         I, the undersigned authority, certify that

5    LARRY KRAUS personally appeared before me and was

6    duly sworn on January 26, 2022.

7         WITNESS my hand and official seal this 22nd

8    day of February, 2022.

9

10

11    _____

                      Judy Anderson
12                    Notary Public - State of Florida
                      Commission No.:  GG 276821
13                    My Commission Expires:  1-5-2023

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF PASCO


        I, JUDY ANDERSON, Court Reporter, certify that I

was authorized to and did stenographically report the

foregoing deposition and that the transcript is a true

record of the testimony given by the witness.


        I further certify that I am not a relative,

employee, attorney, or counsel of any of the parties,

nor am I a relative or employee of any of the parties'

attorney or counsel connected with the action, nor am I

financially interested in the action.


        Dated this 22nd day of February, 2022.



_____
Judy Anderson, Court Reporter

1    DALANEA TAYLOR; TAMMY
     HEILMAN; DARLENE DEEGAN;
2    and ROBERT A. JONES, III,

3      Plaintiffs,

4    vs.                        Case No.: 8:21-cv-00555-SDM-CPT

5    CHRIS NOCCO, in his
     official capacity as
6    Pasco County Sheriff,

7      Defendant.
     _____/

8

9

10
                     DEPONENT'S SIGNATURE PAGE
11

12         I HAVE READ THE FOREGOING TRANSCRIPT OF MY

13      DEPOSITION AND HEREBY SUBSCRIBE TO THE FOREGOING

14      DEPOSITION, SAID SUBSCRIPTION TO INCLUDE ANY

15      CORRECTIONS AND/OR AMENDMENTS HERETO.

16

17
     _____        _____
18   LARRY KRAUS                             Date

19

20

21

22

23

24

25

1                              ERRATA SHEET

2     PAGE      LINE                    CORRECTION

3     _____    _____    _____

4     _____    _____    _____

5     _____    _____    _____

6     _____    _____    _____

7     _____    _____    _____

8     _____    _____    _____

9     _____    _____    _____

10    _____    _____    _____

11    _____    _____    _____

12    _____    _____    _____

13    _____    _____    _____

14    _____    _____    _____

15    _____    _____    _____

16    _____    _____    _____

17    _____    _____    _____

18    _____    _____    _____

19    _____    _____    _____

20    _____    _____    _____

21    _____    _____    _____

22    _____    _____    _____

23    _____    _____    _____

24    _____    _____    _____

25    _____    _____    _____

**A**

**a.m** 1:15
**Abargil@ij.org** 2:12
**ability** 134:11
**able** 56:7 57:9,12,15
121:2 125:14 128:18
172:19,21 174:13
**absolute** 41:25
**absolutely** 28:2 35:12
37:17 42:2 48:10
53:19 66:19 82:3
114:19,23 148:24
149:8 164:12
**abundance** 188:2
**abuse** 53:8 187:10
**academic** 74:10
**access** 85:24 88:2,3
91:15 92:22 94:2
187:3
**accessed** 91:16 159:14
**account** 44:7 46:1 122:6
**accumulation** 162:23
**accurate** 9:7 32:20,23,24
33:3 42:1,2 44:11 67:4
87:9 89:4,10,21 96:23
97:3 117:2 122:3,6
133:23 134:10 146:21
150:6,10 172:22 179:1
179:3
**accusation** 200:23
**acronym** 41:7
**acronyms** 96:4
**act** 198:6
**action** 109:11,12 213:14
213:15
**actionable** 60:14
**actions** 109:23 111:6,19
111:20 113:14
**active** 32:5 34:9 36:23
37:15 38:10,11,17 47:15
50:10,13,24 51:6,12
51:14,15,18,21 65:24
66:6,17 67:23 78:13
79:24 112:21 125:10
147:23 157:1 190:7,24
198:16,17 199:22
200:6,9,21 201:1,20
201:21,24 202:23,24
**actively** 47:11 66:23
99:17 192:22
**activities** 206:22
**activity** 97:18 169:10
190:8 192:22,23 193:2
193:5 203:3 209:21
**actual** 44:23 87:10 107:6
109:23 175:17
**adapted** 29:19
**add** 20:13 116:18 122:20
122:25 200:5 210:11
**added** 19:13 210:8
**addendum** 9:22
**addition** 106:2 185:1
**additional** 105:14 204:20
210:11
**address** 85:1 86:3 128:8
129:2 134:15 162:23
166:19,24
**addressed** 48:3 203:13
**administration** 111:16
**administrations** 111:17
**administrative** 132:7,16
132:16
**admissible** 171:19
176:20,24
**admissions** 88:12
**admit** 178:21

**adopt** 208:24
**adopted** 13:12 21:3,8
30:20
**adopting** 13:13 22:18
**adoption** 31:5
**adult** 208:1
**adverse** 210:5
**advise** 188:18
**advised** 139:5
**advisor** 31:2
**advocates** 27:5
**affect** 112:23 170:23
171:1,4
**Afghanistan** 111:18
**afternoon** 61:8,21
**Afternoons** 61:7
**age** 46:11,13
**aged** 46:15
**agencies** 36:4
**agency** 14:8 18:7 68:10
94:1 105:7 114:23
118:11 154:15 192:9
**ago** 35:8 36:25 37:3,14
47:14
**agree** 59:19 121:2 202:3
**agreed** 211:20
**Ah** 141:14 172:19
**ahead** 11:22 13:23 14:3
16:13 17:5 23:6 31:19
31:21 34:16 38:7
40:12 44:12 45:7,25
58:24 59:8 63:25
71:20 73:8 84:9 85:20
88:21 90:24 97:6
100:14 104:9 120:24
129:11 138:17 141:24
146:4 150:24 151:9
153:22 165:17 169:3
178:18 201:17
**AIM** 4:9,16,17,23 5:4,5,7
5:8,9,10 60:17,24
62:20,23 63:3,5 64:4,6
64:7 67:14 100:11,12
103:3,6,9,21 107:6
140:5,8 142:23 151:3
151:5 152:2,8,10
155:17,19 159:4,10
160:1,3,13,19 162:1
164:24 165:12 166:5,7
167:18 169:21,21
170:3
**AIMs** 61:20 64:10,13
65:1,2
**air** 187:19
**alcoholism** 53:9
**algorithm** 40:9
**allegation** 201:3
**allow** 129:1
**allowed** 81:22
**allows** 48:4 70:24
**alluded** 32:17 33:15
**alternative** 54:3
**Amanda** 166:25
**AMENDMENTS** 214:15
**amount** 49:4 62:5 162:25
173:7,8 207:22
**analysis** 29:3,6 43:6,13
44:6 45:5,22 49:7
173:12 190:3
**analyst** 15:20 16:6 35:6
37:21 66:8 67:21,21
97:23,25 108:13,16,20
108:25,25 112:5,16
150:19 154:3,18
158:12 160:10,12,16
161:5,6 162:15 185:12
185:13,17 186:5,7,13

186:19 187:9 188:9,13
189:13 192:8,11,11,16
193:13 194:2,3,4,14
194:15,15,22,23 195:7
201:19 203:4,11
**analysts** 14:15,21,23,24
15:10,21 16:2,6 32:15
32:17 34:7 35:23
38:23 39:5 40:21,22
40:23 43:20,23 47:9
48:6 57:11 63:23
103:14 109:10 111:4
113:25 114:15 160:13
172:12 185:8,10 188:6
193:17 194:17,18
195:19,21,25 196:6,7
196:11 197:21 198:15
**analytical** 15:12 112:16
**analytics** 113:4
**analyzing** 38:9 39:7
**and/or** 121:1 214:15
**Anderson** 1:19,22
212:11 213:6,19
**answer** 9:12,17,18 23:23
31:16 37:14 39:21
46:23 47:16 51:5 56:8
58:6 92:10 147:20
149:7 172:19,21
204:10
**answered** 59:24
**Anthony** 4:20 83:9,11,12
83:21 119:18 120:19
121:21 124:11 144:25
145:12
**anti-LEO** 130:23 143:10
**anybody** 68:10 69:22
70:8 95:21 111:15
129:25 149:6 196:18
196:19
**anymore** 47:15 63:17
105:7 153:1
**anytime** 76:6 185:22
**anyway** 92:10 121:8
178:23 179:8
**apart** 14:8 32:20 48:7
**apologize** 12:18 190:14
193:16
**appear** 52:13 83:10
91:10 100:11 104:14
119:11 121:20 134:14
135:6 140:11 149:21
164:20
**APPEARANCES** 2:1
**appeared** 35:20 36:5,24
37:3,13 212:5
**Appearing** 2:10
**appears** 43:11 81:5,9,12
84:18,19 85:9 97:2,4
98:15 99:3,6,9,15
100:13,17,24 101:2,8
104:20,22 105:12,15
105:18 115:23 116:2,6
116:7 117:5,9,15,18
119:14 126:4 134:20
135:11,13 136:18,21
136:24 137:2 138:21
139:13 140:24 147:11
149:16 150:11,16
151:13 152:13 154:2
156:22 157:1,5 159:11
159:11,18,21 162:22
162:24 163:23 166:17
173:23 174:21,25
180:12,14,16 182:17
**appendix** 15:6 145:7
**apply** 194:5
**applying** 194:4

**appointments** 210:23
**appreciate** 30:5 120:5
178:16 179:25 180:4
211:12
**approach** 24:6 28:6 30:3
203:5 206:12
**appropriate** 13:17 17:19
18:3
**approval** 13:8
**approve** 13:14 14:2 18:4
**approved** 13:3,4,5,7,11
13:18 17:19,22
**April** 98:16 99:14 100:12
100:17 101:4,5,7
104:5,8,23 106:5
**area** 9:22 43:22
**arena** 113:3
**arenas** 206:8
**Ari** 2:10 122:8 178:12,13
**Arlington** 2:7
**array** 206:14
**arrest** 44:20,21,23 45:9
52:12 54:11 55:2
56:15,16 57:18,19
59:7 60:2 73:3 76:21
76:25 77:21 106:15
148:9 173:19,25 174:7
175:15,25 176:5,7
177:9
**arrested** 36:11,12 44:22
44:24 47:14 52:15
56:24,25 77:5 78:3
173:22 174:16 185:22
**arresting** 54:9
**arrests** 76:22 112:11,12
173:10 174:19 175:2
187:25 188:1,2
**arrived** 12:5
**articles** 207:15
**articulable** 198:2
**articulate** 193:18 202:18
**asked** 83:16,17 88:11
109:19 117:16 123:4,8
136:22,23 199:7
**asking** 21:17 37:8 69:22
69:25 70:8 75:16
90:13 106:20,21 108:9
108:16 129:23 133:10
168:12,13 171:17
195:14
**assault** 175:4 187:13
210:7
**assess** 43:4 112:4,6
145:23
**assessing** 43:2,3,5
**assessment** 42:22 44:10
45:19 46:6,8,25
122:25 172:5 203:6
**assessments** 41:23 43:1
**assign** 53:11
**assist** 187:9
**associate** 143:5 151:19
153:4,9 170:6,6,8
189:17,25 190:3 191:4
192:4,5,18 193:1,3,4
193:19,20 194:17,22
201:2 202:1 203:10
**associated** 85:7 120:18
121:21 152:20
**associates** 28:18,19
58:14,16 59:7 60:3
101:24 102:2,9 142:18
142:20 151:11 153:20
169:22 170:1,1 200:24
200:25 203:1 204:20
**assume** 11:8 14:4 103:20
122:4 123:24 145:21

**assumed** 46:10
**assuming** 17:24 134:17
134:18
**assumption** 93:1
**at-risk** 210:1
**attach** 120:24 124:1
**attempt** 144:24
**attempted** 87:4 163:23
**attend** 63:6,11 103:19
**attended** 63:9,13,21,23
67:15 103:14
**attention** 7:4,13 65:4
74:20 131:25 178:17
180:1
**attested** 134:5,8,12
**attorney** 31:12 91:19
132:9,10 213:12,14
**attorneys** 177:17
**attractors** 53:6
**August** 152:13
**aunt** 102:11,15 103:1
**authority** 13:20,22 14:2
212:4
**authorized** 213:7
**auto** 207:10,18 208:2
**automatically** 208:14
209:6,8
**available** 63:12 123:13
**Avenue** 167:1
**avoid** 23:20
**aware** 7:10 30:7 35:7,11
61:12 68:24 69:22
70:8,23 83:12 131:8,9
171:8 186:15 187:14
194:16,17,18 199:13
**awareness** 130:15 131:3
131:7,14 185:24
186:20

**B**

**B** 4:1 5:1 15:6
**B-R-U-M-M-E-T-T**
172:14
**back** 16:9 17:2 20:8
30:22 58:5 77:3 80:23
82:4,8,23 83:2,5 90:23
92:8,15 93:1,3 103:23
110:3 115:7,19,22
118:6 122:9 127:7,20
132:14,23 135:10
143:13 151:14 158:22
178:7,19 182:23
183:12,13 187:16
197:25 204:23,23
210:9
**backside** 94:2 112:5
126:9
**backup** 130:20
**balances** 194:20
**ballpark** 64:21
**balls** 42:18
**BARGIL** 2:10 178:13
**based** 43:5 44:20,21,21
44:22 45:3 46:10
58:25 74:18 80:6,21
117:2,5,9,11 145:14
192:5,13 200:3 205:8
211:1
**basically** 29:22 36:2
42:25 62:2,10 95:8,15
185:24 186:3 210:10
**basis** 69:15 109:17
193:11,17
**battery** 129:4
**battle** 108:24
**Bay** 207:16
**began** 34:13,22

**beginning** 30:10 133:2
**behavior** 46:12,13,16
54:4,6,9,13 78:12,15
78:18 158:20 197:8
**behavioral** 19:12 53:11
53:14,24 56:21
**believe** 12:9 14:22 15:1
19:22 22:4 31:20
45:10,17 55:3,6 56:14
64:24 66:19 69:24
74:14 79:19,25 80:4
92:6 97:9 112:21
130:2,7 131:20 145:6
153:12 175:17 177:13
180:22,25 190:17
193:18 198:23,25
199:20 200:8 201:21
204:8
**believed** 157:25
**believes** 203:11
**Ben** 101:11
**benefit** 96:8
**Bennetton** 101:15
**best** 134:10
**better** 9:9,16 27:23 125:6
133:4 175:19 177:12
207:6
**beyond** 169:8
**BHIT** 53:11
**big** 127:25 134:17
**Biscayne** 2:11
**bit** 29:3,10 30:2 105:24
174:13 175:21 187:4
**black** 47:1
**block** 46:4
**blur** 6:20
**Blvd** 2:11,15
**board** 43:8 47:22 185:19
185:23 186:1 210:17
**body** 70:23 86:20 89:20
89:21,24,25 90:2,2,6,6
90:9 105:22 106:2,7,8
107:10,11,12,25 108:6
110:8 116:13 123:6
134:2 144:11
**booked** 110:23
**boots-on-the-ground**
24:13,15
**bottom** 41:13,13 172:15
**Boulevard** 2:3
**box** 1:23 160:19,20,25
**brakes** 38:24
**break** 71:18 72:21
197:10,15 211:9
**breakdown** 177:8
**Brian** 180:13,17 181:4
182:14
**brief** 42:13 67:21 160:16
**briefer** 160:9
**briefing** 4:8 29:23 40:17
160:11 162:12
**bringing** 178:16 179:25
**broad** 37:8
**broader** 20:23
**Brooke** 185:14 186:9
**Brooks** 163:23
**BROTHERS** 2:6 136:5,7
**brought** 118:7 134:13
186:20
**Brummett** 27:15 172:10
172:11
**built** 125:10
**bulletin** 101:4
**bulletins** 62:9
**bureau** 182:1,2,3
**burglaries** 43:7,14 45:12
45:15 62:4,12 75:2

158:3 188:4 197:1,2
207:11,18,23 208:2
**burglarizing** 188:21
**burglary** 45:13,15
166:18,22 190:10,11
**button** 38:25

**C**

**CAD** 4:14,18,24 84:15
84:17 85:6,10,16,18
85:23,24 86:1,3,10
87:8,21,22 88:1,14
89:4,7,25 90:2,12
103:23 104:4 106:21
107:9,17,18 108:4,5
109:17,21 110:7,17
115:8 116:9,12 117:25
118:7,7,19,25 119:11
120:17 121:20,21
122:10,14 124:22
125:9 128:4 134:2,15
135:20 144:14 146:6
146:16 169:19,20
**CADs** 134:25
**call** 28:17,20 56:5 69:6
86:23 109:18 118:20
118:21,24 119:22
124:23 127:24 130:19
145:14,20 207:17
**called** 20:14 31:2 62:20
127:23 128:1,8,12
195:19 207:17,19
**calling** 60:13 69:14
**calls** 63:12 85:22,24
127:25 177:10,13,17
206:14,16
**cam** 70:23 86:20 89:21
89:24,25 90:2,6,6,9
106:2,7,8 107:10,11
107:12,25 108:6 110:8
116:13 123:6 134:2
**cam's** 90:3
**camera** 144:11
**cams** 89:20
**capabilities** 19:14
**capability** 39:1 47:21
83:4 130:22 132:25
**capacity** 1:7 88:6 214:5
**captain** 9:9,10,16 12:9,10
34:17 36:21 88:1
111:24,25 125:6 133:4
160:12,14,15,17 161:6
162:17 182:20,22
211:4,7
**captain's** 160:12 161:7
**captains** 113:13
**capture** 86:19,20,21
**car** 43:12 147:23
**care** 187:11
**career** 131:12 192:14,14
**CAROLINE** 2:6
**carried** 43:4
**carry** 110:13 112:13
**Carter** 139:5
**case** 1:6 37:15 42:19 51:8
53:18 56:19 61:11
77:3 88:20 92:14
99:20 109:24 118:24
128:19 129:4 132:2
135:1 147:25 150:21
157:3,15 177:8 178:6
205:13 214:4
**case-by-case** 76:13
193:11,17
**cases** 37:19 66:18,20
68:12 177:23 187:10
**categories** 131:4 132:18

**category** 130:3 131:21
**cause** 12:10 45:16 92:18
120:2 121:25 128:5,6
141:11 147:24 148:9
158:8 168:3,11,17
**ceased** 60:6 64:18
**Ceda** 101:11,15
**center** 85:23 87:16,22
88:14 154:4
**certain** 20:12 46:2 49:3
57:15 66:7,11 111:19
172:24 179:1 202:10
209:7
**Certainty** 176:24
**certainly** 41:25
**Certificate** 3:4,4 212:1
213:1
**certify** 212:4 213:6,11
**Cgbrothers@ij.org** 2:8
**Chagrin** 2:3
**chain** 25:15
**challenge** 71:12
**challenging** 72:12
**change** 24:23 27:6,7,7,7
28:25 37:9 47:21,23
47:24,25 208:21,22,24
**changed** 22:16,17 23:9
58:3 157:11,11,12
186:7
**changes** 26:4,8,24 27:9
28:10 32:8,11,12
**changing** 27:22 29:2
208:20
**Chapter** 20:6
**charge** 66:13
**check** 18:2 20:12 22:3
73:17 77:4 82:4,9,23
83:25,25 84:4 94:19
104:8 105:2 109:1,18
109:20 110:3,6 111:10
112:19 115:12 116:7
119:6 124:23 127:8,19
128:14 131:12,12
132:3,4,12 133:1,5
136:16 139:5,12
144:22 150:18 167:25
168:5 199:14,21 200:1
200:3
**checked** 127:19
**checking** 128:24 168:18
**checks** 16:12 19:21 21:9
21:13 22:25 23:4,11
23:12 24:12 25:4,11
54:21 55:18 72:25
74:13 75:23 76:1,17
78:5 105:10,14,19
108:20 111:2,11 116:4
117:3,13 119:1 120:9
120:14 126:16,16,19
126:25 127:3,3,12,12
129:9,12 130:4,5,13
131:23,23,23 168:8
169:13,19 170:18,20
171:10 194:20 205:22
**chief** 13:16 17:24,24
114:1 181:11,12
**child** 69:25
**childhood** 210:5
**children** 120:18 148:7
**Chissell** 139:6
**choice** 148:12
**CHRIS** 1:7 214:5
**Christopher** 181:6
**church** 187:5
**circle** 118:6
**circling** 204:23

**circular** 61:17
**circumstances** 37:7
49:18 73:12,23 75:7
128:16 148:19 155:6
157:23 158:17 171:6
178:4,20
**circumstantial** 190:6
**citations** 161:23,25
162:20 163:3,5 164:25
176:6
**citizen** 75:13 168:8 169:4
169:5,6,7
**citizens** 77:17
**City** 1:23
**claim** 178:1
**clarification** 108:16
199:7
**clarify** 80:16 88:12 95:24
108:12
**clarity** 94:23
**claw** 178:7,19
**cleaning** 149:8
**clear** 21:1,2 22:1 34:6
35:3 39:3 51:25 82:14
88:19 93:10 113:19
120:6,12,17 124:24
160:18 164:15 168:12
171:17 190:12,15
193:7 198:10 200:20
203:20
**clearer** 12:19
**clearly** 59:25
**clients** 119:12 126:10
**close** 133:3
**Co-counsel** 2:9,13
**co-offender** 58:25 74:18
**code** 63:16 79:23 103:15
103:16 104:10 146:2
161:23,25 162:3,13,20
164:25 205:24 206:5,5
206:7,13,17,19
**coincide** 127:8
**colonel** 114:2
**colored** 141:12
**column** 96:10 151:21
**combination** 158:7
**come** 16:9 17:2 30:22
80:12 90:23 108:23
110:3,19 130:25
148:14 149:2 171:12
187:16 188:2 196:13
206:7 208:20,20
**comes** 80:13 85:25 95:15
177:24 194:19 208:2
**comfortable** 23:24
**coming** 81:1 125:20
159:12
**command** 25:16 27:16
39:23 69:25 109:8
114:10 154:15 155:24
**commander** 43:21
110:12 112:17 205:16
**commanders** 25:8 113:9
**Commission** 212:12,13
**commit** 45:10 46:13 51:1
51:1 52:24 76:6
190:10 191:19 207:25
208:16
**committed** 34:4 45:12,13
49:2 77:4 78:4 190:11
190:13 195:11 198:4,4
199:3 202:15 204:3,4
204:6,18
**committing** 34:3 44:8,13
44:17,19 45:14 50:1
52:11,14,16 59:1
66:23 75:1 158:3

186:25 188:4 190:24
190:25 191:17 193:21
193:23 195:10 197:1,3
200:25 201:3,4,11,14
204:8,17 209:20,22
**common** 15:12,14,20
109:22
**commonly** 60:17 67:17
110:10
**communicate** 15:23
61:24 68:8 155:22
166:11 195:15
**communicated** 25:13
35:16 152:1
**communication** 85:23
87:16,22 97:24
**communications** 84:16
118:10
**community** 111:18
138:10 145:2,4,16
187:2 207:6 208:10
209:2,3,4,18
**compare** 173:1
**compared** 89:22 112:16
128:7 170:6 210:8
**comparison** 165:16
173:15
**compendium** 179:6
**competencies** 22:6
**compilation** 84:17
**complained** 171:9
**complaint** 128:2 177:9
**complaints** 72:8 206:9
**complete** 173:24 174:7
**completed** 122:24
**completely** 18:11 68:1
77:12 82:1 122:17
**completing** 73:16
**conceivable** 157:21
**concept** 22:5 34:19 74:8
**concern** 20:9 178:21
**concerning** 138:9 158:7
179:2
**concerns** 147:5 176:20
179:2
**conclude** 101:5
**CONCLUDED** 211:17
**conclusion** 168:12
**conclusions** 47:4
**conditions** 132:11
**conduct** 45:5 167:25
169:12
**conducted** 105:3 128:14
136:16
**conducting** 22:24 23:4
54:20
**conducts** 170:17
**confer** 91:18
**confirm** 123:23
**conflating** 108:15
**confused** 39:15 136:11
**confusion** 109:13 113:3,4
**conjunction** 137:6
**connected** 213:14
**consent** 169:2
**consequence** 76:7,11,14
76:16,20
**consequences** 76:5,8,10
77:19,23 78:8
**consider** 188:10,16
205:11,12
**consideration** 188:24
209:8
**considered** 175:15 189:5
205:14
**considering** 26:4,7 27:21
81:21
**consistent** 38:8 145:18

constant 38:9
constantly 39:6,10
constitute 189:1
constitution 89:1
constitutional 31:2
consumer 113:10
contact 36:2 68:12 69:12
   70:16 76:15 87:3,4,4
   92:3 106:15 107:7,10
   115:18,19 129:2 132:9
   144:25 145:1,23
   148:13,15,15,16,23,25
   149:1 163:21,24 185:8
   185:10
contact's 107:5
contacting 68:22 69:1,5
   69:18
contacts 177:7
contain 137:5 169:22
contained 21:10
content 95:16
contents 9:20
context 145:25 191:24
continue 43:15,15 78:21
   78:22 169:9 208:24
continued 65:2 116:4
continues 57:25
contribute 40:1,5
contributing 32:18 33:16
   35:19 36:7,14,25 37:4
   38:5 39:7 66:22 99:18
control 114:10
conversation 71:5 86:20
   107:8 158:12 196:16
   196:16
conversations 33:25
   158:14 195:18 196:1
convicted 189:4 191:10
   191:11
convince 52:24
Cook@debevoisepoult...
   2:17
copied 181:5
copy 9:1 94:9 182:15
core 22:6
corner 33:6
corporal 110:12 163:21
corporals 113:12
correct 8:14 21:23 25:1
   25:18 29:14 31:18
   33:7 34:14 43:2 50:5
   52:25 54:21 58:13
   60:25 62:18 63:6 64:7
   64:23 65:25 72:25
   76:17 81:11 83:10
   89:5,7 95:13 101:22
   102:21 104:5 106:7
   107:13 111:19 116:1
   118:9 122:6 123:24
   135:12 138:3 143:22
   160:22 174:20 186:11
   188:14 195:25 198:13
   201:25 202:4
correction 199:6 215:2
Corrections 98:24,25
   214:15
correspond 156:24 159:6
corresponds 158:25
cost 157:17
could've 128:11,12
counsel 2:5,18 6:24
   178:16 211:21 213:12
   213:14
count 46:5
counterparts 208:2
counties 207:22
county 1:8 7:7 12:25

13:8 17:17,20 18:8,18
   28:8,15 32:6 38:20,22
   48:13 73:6 74:6 80:2
   81:17 85:11,15,18
   86:7 87:21,22 88:1,13
   88:13 95:12 96:11,19
   105:11 114:18 118:10
   118:11 119:9 133:18
   133:21 137:6,22
   138:14,19 139:19
   145:3 146:17 149:22
   150:4 154:21 155:9
   159:19 161:19 163:21
   167:24 168:13,25
   169:12 170:17 174:23
   175:2,12,16 176:7,8
   180:18 206:12,13
   209:4,5,25 211:2
   212:3 213:4 214:6
couple 48:4 61:13 101:18
   105:15 112:11 151:9
course 13:15 19:11 28:9
   48:19 71:3,5 73:10
   86:6 87:19 89:10
   96:20 114:1 118:4
   157:12
court 1:1,19,22 15:16
   96:8 117:21 120:25
   121:2 132:11 134:13
   135:4 199:7 213:6,19
cover 67:4,5,8,9 143:15
COVID 57:8
CPI 187:9
craft 19:9
create 42:9,10 45:23
   48:5 68:10,19 96:14
   184:5
created 31:4 45:11 47:20
   64:20 80:2,5,6,21 81:5
   97:4,22 132:22 154:21
   177:7,13,20,25 183:16
   183:17,18,20
creating 49:13 50:2
   112:4 132:21 182:18
creation 8:2,2
creature 89:1
Cred 210:18
crime 4:22 19:18 26:21
   26:22,23,25 27:1,9,25
   28:1,2,4,8,19 29:9
   33:16 34:3,4 36:23
   38:10,11,16 43:1,5
   44:8,14,18,19 45:10
   45:18 46:21 47:11
   49:9,15 50:1,10,13,25
   51:1,11,12,14,15,21
   52:9,11 53:3,4,6,6,7
   59:1 62:6 66:22,23
   75:10 76:7 77:5,11
   78:4,13 99:18 112:23
   154:4 184:13 185:2,24
   186:3,4 187:1,12
   188:10,14 190:13,24
   190:24,25 191:17,18
   192:11,23 193:1,22,23
   195:10,10,11 196:20
   196:21 197:2,3,19
   198:3,4,9,12,16,18,19
   199:4 201:1,3,4,24
   202:16,24,25 203:23
   204:2,4,6,16,17,18
   205:4 207:7,24 208:1
   208:11 209:2,3,12,14
   209:19
crimes 26:11,12,15,18,19
   26:20,25 28:5,6 44:8
   46:14 48:3,13 49:2

52:8,14,17,24 78:10
   158:1 168:9 199:2
   200:25 201:12,14,16
   204:8 205:18 207:10
   207:13 208:6,14,16,17
   209:7,11,24 210:5,6
criminal 20:9 28:19,22
   29:6,7 32:18 34:9
   35:19 36:7,14,25 37:4
   38:5 39:7 40:2,5 46:13
   48:7,17,18,21 49:10
   52:17 53:23 54:3,6,8
   54:13 60:12 63:13
   78:14,18 130:18
   131:12 158:20 169:25
   170:1,6,8 182:1
   186:22 189:1 190:4,21
   192:14,20 193:5,9
   194:1 195:3 196:9
   199:22 200:9,21 201:8
   201:15,21,24 202:14
   203:1,3 204:20,23
   209:9 210:6,13,15
criminals 192:14 202:1
criteria 16:3 22:15,17,21
   48:5 191:9 192:5,13
   193:4
crushed 114:13
cry 208:10
crystal 42:18
curfew 126:21,24 127:3
   130:5
current 10:7,14 11:3,6
   11:12 18:25 26:12,14
   28:12 36:17 43:1
   55:17,22 57:2,2 78:12
   78:14 81:22 83:4
   181:15 184:7 198:12
   208:25
currently 8:13 10:12
   11:20 17:13 22:20
   23:3 24:19 46:21 48:7
   50:10,13 51:18 62:2
   67:24 68:5 75:9 81:24
   135:7 151:8 158:3
   178:17 193:21 200:6
   202:23,24
custody 62:13 176:1
cut 178:13

_____

                D

D 3:1
D3 65:19
Dade 1:23
dailies 36:19
daily 29:19 97:18,18
   108:24 109:17 158:13
Dalanea 1:3 65:12 81:7
   85:5,7 86:16 95:19
   97:2 98:7 100:20
   101:10,21 102:5 104:7
   104:13,21 105:9 106:5
   115:7,17,20,23 116:4
   117:3,17 121:7 199:5
   214:1
Darlene 1:3 5:3 162:20
   163:1,6,25 164:5,18
   164:25 214:1
data 48:12,14,16 67:7
   77:9,13 80:6,10,21,24
   80:25 81:16 88:5 91:6
   91:16 92:15 95:15,16
   95:17 96:11,16,18
   100:9 107:17,18 111:2
   111:7 115:5 123:19
   126:9 145:11 174:10
   174:10

database 95:11 137:20
   137:21
databases 81:1
date 1:14 10:10 29:18
   64:14 67:4,5,8,9,10
   81:5 82:16 90:21 97:4
   98:17 105:12 115:14
   125:6,13 133:4 135:1
   135:14,21 140:11
   156:14 163:11,13
   174:4 182:5,8,11
   183:10 214:18
date's 9:3
dated 104:5 213:17
dates 30:4 79:24 82:24
   82:24 100:4 101:3
   105:13 117:5 125:19
   157:20
datewise 157:4
day 20:21 22:4 23:24
   38:9 43:9 55:9 104:23
   125:18 140:24 141:3
   143:24 158:14 169:7
   212:8 213:17
day-to-day 15:14 131:4
days 99:4 100:10,10,23
   101:4 111:11 156:4,5
   156:15,17 159:6
de-identified 68:20 70:9
   70:18,25
de-listed 69:3,19,23
   115:23 116:5
deal 124:10 147:4 150:3
   186:21
dealing 28:23 131:13
   208:8
deals 188:3
dealt 206:17 208:7
debate 88:18
Debevoise 2:14
debris 162:23
December 133:3
decision 111:23 113:6
   203:14
decision-making 49:8
deck 64:19 196:15,16
decline 173:1
declined 172:24
Deegan 1:3 5:3 162:20
   163:1,6,25 164:5,25
   214:1
deep 109:1
deeper 30:2
defect 53:22
defendant 1:9 2:18 6:25
   41:16 214:7
defense 132:9 176:21
define 51:7
defined 76:12 176:6
defines 176:8
definitely 130:25 209:23
definition 26:4,6 59:15
   176:5 184:17,19,20,21
   184:21,23
delegated 13:22 14:2
department 98:24,25
   126:23 132:15 177:18
   177:21 199:6 207:20
depend 37:14,16
dependent 73:15 74:24
   75:6 76:15 77:1 122:1
   171:6
depending 9:13 67:20
   73:11 87:11 110:9
   158:17 182:11 190:6
depends 36:8 37:6,11,12
   43:2 46:16 47:25 48:1

73:9,13 103:16,16
   128:15 148:18 165:6
   175:16
depict 160:20
depiction 89:21
deploy 27:15,17 43:21
   47:10 200:6
deployed 28:7 112:23
deploying 27:16
deployment 51:20
depo 126:7
deponent 211:22
Deponent's 3:5 214:10
deponents 39:22
depos 11:17
deposition 1:12 7:2,6
   92:25 93:12 120:15
   171:18 211:16,23
   213:8 214:13,14
deputies 14:12,18 15:24
   15:25 16:12,19,24
   25:14 34:8 35:25 36:1
   39:23 40:19 53:20
   55:24 57:8,10,12,14
   63:10 70:21 71:1 72:8
   75:11,17,18 85:11,18
   85:23 89:3,6 90:16
   97:21,25 103:15
   105:10 107:24,25
   112:19 113:6,9,11,20
   113:25 114:15 115:3
   117:13 126:13 127:4
   129:1 130:12,18 131:8
   133:18 135:6 149:13
   152:2,23 154:18 155:4
   155:23 168:2 169:1
   184:1 203:8 205:7
   206:23 207:5 210:15
deputies' 203:18
deputy 13:16 17:24
   73:13,18 74:3 86:22
   88:6,6 98:2 104:20
   107:7,22 108:3,17
   109:24 111:9 113:14
   115:17 118:14 122:1
   129:16,23,24 130:8,24
   131:1 134:7 136:19,22
   138:14,20 139:16
   147:21 148:2,11,20
   149:6 159:17 162:4
   181:11,12 194:21
   204:11
deputy's 107:14,15,20
   148:1 150:1
describe 48:17 90:16
   130:11
description 30:5 147:13
design 125:7
designate 23:18
designated 7:6,10,19
   54:14 104:24
designation 71:13 72:12
   100:18 105:8 130:7
   143:2 166:1 169:23
   170:5
designations 99:19
   124:16 206:22
designed 15:21 128:21
   128:21 129:6,7,8
   130:14 131:6,7 186:21
   187:5
designee 161:7
detail 15:1 71:10
detailed 87:11
details 20:7 86:21
detained 153:12,18
detective 52:15 107:7

129:24 157:18,18
159:13 163:23 192:10
192:10 194:3,23
**detectives** 27:4 113:16
113:18
**deter** 49:15
**determination** 35:18,24
38:1,4 99:17 188:13
192:8,17 194:1 195:2
195:6,20,22 197:18,22
205:6,8
**determine** 32:17 36:4,22
45:5 82:15 86:10
89:13 99:7 107:2
110:1 123:10 125:19
132:7 144:9 147:22
150:19 161:14 172:5
179:2 189:14 201:19
210:11
**determined** 191:13
**determines** 192:12
**determining** 33:15 39:6
188:9 205:14
**deterrence** 74:8,10,13,18
78:9,10,12,14 168:20
**deterring** 52:18
**develop** 197:7
**developed** 12:4 94:5
125:15 133:5
**development** 26:9 27:14
111:8
**developments** 41:24
**dialogue** 68:10
**dictate** 158:2,4
**dictates** 158:1
**difference** 127:25
**different** 19:9 21:5 28:23
44:18 47:22 48:12
53:5 73:10 88:15 93:4
114:25 127:24 128:17
160:15 177:1 187:23
196:12 197:22 201:7
206:8
**difficult** 63:7
**digested** 109:8
**dilapidated** 206:9
**direct** 3:3 6:6 41:10
59:10 92:22 205:24
**directing** 109:12
**direction** 27:9 53:25 56:3
77:12
**directions** 25:24
**directive** 19:6,8,14,16,17
19:20 20:16,18 21:3,8
21:14 22:22 23:5
32:13 58:8,10
**directly** 93:24 95:15
113:18
**director** 8:7,13 33:24
34:14,24 35:4 94:2
**disagree** 124:12
**disbelieving** 93:19
**Disciplinary** 4:10
**discovery** 91:4,23 171:17
**discuss** 19:20,23 21:23
28:13 34:23 74:8
166:15,17 175:20
**discussed** 30:13 31:17
33:10 62:23 63:2 78:8
118:2 135:15 137:7
140:8 162:1,15,17
163:8 167:18
**discusses** 31:1 164:25
**discussing** 103:7 163:11
183:6,22 190:16 196:8
**discussion** 21:9 30:24
41:4 80:19 137:15

162:3
**discussions** 34:13
**dispatch** 88:14 118:9,18
118:25 119:9 122:5
**dispatcher** 85:25 86:23
**display** 87:9
**disposition** 6:19
**dispute** 128:3
**disrupt** 53:23 54:6 78:17
197:7 207:7
**disrupting** 54:8
**dissatisfied** 69:16
**dissipated** 60:11
**distinction** 24:8
**distributed** 97:20
**district** 1:1,1 25:8 57:3,7
61:9 65:10 70:11
79:24 98:3,5 100:15
103:12 110:11,12
112:18,22,22 113:12
158:13 160:15 188:5
203:6,13,14
**districts** 67:22 97:19
186:18 188:8
**disturbance** 128:12
**dive** 108:25
**diversion** 187:7
**divide** 21:2
**division** 1:2 54:18 113:20
181:16,24,25 182:10
183:15 186:2
**DJ** 126:23
**DJJ** 126:22
**DOC** 98:22,24 199:14,14
**doc-** 125:17
**document** 6:15 9:8,24
10:4 12:25 13:18 17:2
17:9 18:5,18 22:4,21
23:3,8,21,22,24 24:1
24:19,24 25:3 31:25
32:2,5,9 33:3,20 40:16
42:8,9,10 49:5 72:3,5
79:2,18,20 81:2 84:14
91:2 93:8,11 97:14,16
102:16 106:22,24
110:16 124:16 129:14
133:6 137:18 140:7
160:18 171:16 172:1,3
172:7,20 175:6 176:13
177:1,4,6 180:8 183:3
183:5,16,17 193:4
194:21 199:20
**documentation** 82:15
189:25,25 190:1,18,19
193:24 194:12,16,25
195:9 200:12,14
**documented** 36:8,10
86:25 90:4,5 107:6
129:21 168:16 194:12
**documenting** 192:2,3,4,4
**documents** 6:20 13:9
21:5 93:24,25 105:1
107:1 122:21,24
125:18 134:5 149:10
149:11 172:9
**doing** 28:5 38:18 65:1,2
109:16 111:1 119:3,4
119:4 121:8 126:24
158:3 197:6,6,6
203:16
**domestic** 27:2,3,4,5
128:12 129:4
**Dominique** 102:2,4
**Donna** 102:9,15
**Donnie** 4:19 65:22 83:11
119:14 120:19 121:3
121:21 123:19 135:11

136:16,23,25 139:9,11
139:23 140:16 142:9
142:19 143:6,25
158:25
**door** 130:25 149:5,6,14
168:7,23 208:3,3
**double** 22:3 82:9 94:19
133:1 199:21
**drafted** 12:10,25 17:16
180:13
**drafting** 12:7 14:9 18:9
**draw** 7:4,13 47:4 65:4
**drawing** 193:8
**Drive** 1:17
**drive-bys** 209:21,22
**driving** 27:8
**dropping** 206:9 210:20
**drug** 174:20
**due** 28:6 50:15 57:16
63:7 159:15
**duly** 6:2 212:6
**duties** 16:24 85:19
**dynamic** 37:10

**E**

**E** 2:2 3:1 4:1 5:1
**E-R-B-E** 185:14
**earlier** 52:20 83:15
106:23 111:3 118:7
135:15 140:8 197:17
**early** 99:14 169:13
**effect** 61:19
**effective** 112:14 172:6
**effectively** 28:7
**eight** 207:22
**either** 14:1 34:3 49:14
52:21 53:22,22 54:2
56:8 67:22 79:23 80:8
107:17 123:1 143:24
145:25 161:5 166:22
177:23 191:3,4 196:20
**elaborate** 19:7
**eloquently** 174:13
175:21
**email** 5:6,12 69:24 84:7
154:1 155:1 180:11,12
180:21,21 181:20
182:14
**emailed** 83:17
**emailing** 69:24
**emails** 125:19
**emphasizes** 49:7
**employee** 88:7 96:12
161:19 181:3 213:12
213:13
**employees** 13:1 16:25
17:17 72:9 80:3 86:9
88:14 96:19
**employment** 96:20
**encompassed** 127:16
**encompasses** 207:21
**encounter** 73:23 108:17
128:16,18 168:4 169:7
**encountered** 155:4
**encounters** 129:14 203:8
**encouraged** 63:6 103:18
**ended** 136:19
**ends** 23:14
**enforcement** 19:6,8,14
19:16,17,20 20:16,17
21:2,8 28:22 34:5
47:23 53:17 58:8
63:16 69:16 73:6,11
73:22 74:20 103:15,16
111:4,7 113:3 131:16
161:23,25 162:4
164:19 198:7 205:25

206:7,13,19 207:21
209:16
**engage** 56:22
**engaged** 47:11 192:21,22
203:2
**engagement** 87:10 198:6
**engagements** 210:7
**engaging** 210:21
**enhance** 111:23
**enhancement** 191:21
**enhancer** 191:18,19
**enhancers** 53:7,7
**ensure** 68:15 168:19
185:25 187:14 207:8
**ensures** 194:24
**ensuring** 52:15 210:23
**enter** 89:6 96:19 118:19
126:13 127:4 149:3
**entered** 86:22,23 90:16
96:15 97:5 122:5
**enters** 86:24 119:5
**entire** 74:5 199:23
200:10
**entirety** 121:3,6,7
**entries** 194:11
**entry** 155:3
**environment** 26:24 27:9
32:18 33:17 34:10
35:19 36:7,15,23 37:1
37:5 38:5,11,12,16
39:7 40:2,5 43:2 46:17
46:21 47:12 48:8
50:11,14 51:11,12,14
51:16,22 62:7,8 63:13
66:22 78:13 81:22
99:18 112:24 184:14
185:2,25 186:3 188:10
188:14 189:1 190:4,21
192:20,24 193:1,9
194:2 195:4 196:9,20
196:22 197:19 198:16
198:18 201:2,8,15,20
201:21,24 202:14,24
202:25 204:16 209:9
**envision** 121:8
**epidemic** 207:17
**equal** 173:8
**Erbe** 185:14
**Errata** 3:5 215:1
**especially** 130:16 148:16
188:3 204:2 207:10
**ESQ** 2:6
**ESQUIRE** 2:2,10,14
**essentially** 130:13
**establish** 24:19 192:7
**established** 19:10
**estimated** 157:17
**event** 159:7,8 170:2
**events** 147:13
**everybody** 34:11 35:1
63:5 67:13,15 76:24
114:25 149:2 177:12
187:15
**everybody's** 73:21
209:20
**evidence** 44:19 171:19
178:22
**evolved** 19:11 28:21
29:10,25 30:6 56:20
60:11
**evolving** 30:2
**exact** 29:18 30:4 42:7
64:14 74:17 125:13
178:19 182:5,8
**exactly** 60:9 80:23,24
94:17 121:11
**Examination** 3:3 6:6

**examined** 6:3
**example** 43:6 55:25
111:14
**Excel** 91:5
**excluded** 67:22
**exclusive** 39:19
**excuse** 16:19 82:11,13
136:22 141:5 143:16
144:17 158:23,25
159:22 166:21 173:6
**executive** 1:17 29:22
**exempt** 20:6
**exhibit** 6:12,13 8:23,24
10:17 11:23,24 17:5,7
24:24 31:22,23 40:10
40:13,14 64:1,2 71:24
72:1 78:24,25 79:15
79:16 84:10,11 90:24
90:25 93:13 96:25
97:7,12 99:25 100:1
103:24,25 115:22
117:20,23 123:15,16
124:5,6 133:11,12
134:16 135:10 136:4,4
137:11,16 140:2,3
143:13,15 144:16
146:5,5,10,12,24,25
147:1,3 149:11,18,19
150:9,25 151:1 152:4
152:6 153:23,23,24
155:14,14,15 156:25
158:24 159:5,23,24
165:9,10 166:3 171:23
171:24 176:18,25
177:1 178:18,24
179:13,14,17 180:8,9
183:1
**exist** 108:1
**existed** 31:14 63:19
162:4 200:15
**exists** 10:3 141:11,12
**expectation** 16:23,23
25:6 75:16 77:14,16
77:20 96:22 195:12,16
**expectations** 14:18,20
15:11,24 16:11,18
25:10,13,17,21 26:1
59:12 115:4
**expected** 14:12,15 25:20
40:25 89:4 122:3
133:23 146:21 150:6
**expedite** 121:9
**expensive** 84:7 157:8
**experience** 157:21
**experiences** 210:5
**expert** 171:21
**Expires** 212:13
**explain** 71:7 82:21
**explains** 82:6
**explanation** 71:10
175:20
**export** 91:6
**extent** 46:2 74:15 108:14
119:25 207:4
**external** 36:3 62:6
110:19,25
**extra** 94:8
**extract** 4:15 91:11,12,14
91:20 92:17,17,19
93:13 123:18
**extractions** 74:11

**F**

**face-to-face** 195:18
**fact** 7:4 24:7 78:4 82:6
145:15 150:20 192:16
199:3 205:8 208:15

factor 190:5
factors 76:23
fair 12:14,21 21:19 24:20
26:14 45:4 49:22
74:19 76:4 110:4
111:5 116:3,11 129:8
129:14 137:4 148:21
170:10 171:14 176:12
fairly 125:5
fake 122:10
fall 110:10,11 111:18
171:20
fallen 153:3
familiar 6:15,21 9:23,25
9:25 17:9 31:25 40:16
72:3,4 79:2,5,8,18
81:2 84:13 91:2,8
97:14 137:18 164:2,8
164:9 172:1 177:4,23
183:3
familiarize 24:6
families 210:22
family 117:14,17 119:13
128:1 170:4,7 187:2
far 10:13 11:3,21 15:9
32:14 54:16 57:8
61:11 70:25 86:24
110:20 111:1 116:16
162:7 164:6
fashion 148:14
February 9:2 212:8
213:17
fed 208:8
feed 118:25
feel 23:24 79:3
feet 114:4
fell 153:3
felony 129:3 185:22
fencing 159:15
fewer 32:25
field 36:1,2 106:15
107:10 109:6,7,24
206:23
fields 80:24
figure 52:11 178:19
file 100:6,6
filed 183:18
files 100:4
financially 213:15
find 11:16 14:5 117:6
128:25
finding 189:7
fine 93:7 120:4 162:8,25
167:23
finish 12:18 109:5
193:14
firearms 26:19
first 6:2,12 7:5 24:5
80:13 81:3,8 97:17
104:4,14,14 106:9
126:7 146:6 155:3
172:16 186:7 193:19
196:13 204:3
fit 184:8
five 28:9 81:19 100:10
138:24 163:3 195:21
five- 71:17
five-year 81:20
FL 1:23 2:11,15
flag 51:10 57:5 153:2
flagged 50:19,21 51:5,7
51:15 52:1 58:12,15
flagging 51:16
flags 186:17
Florida 1:1,18,20 88:25
157:13 191:16,21
192:5,13,15 207:19,20

212:2,12 213:3
flows 95:17
fluff 29:21
fluid 30:4 208:22
focus 5:13 15:13 27:4,6
27:24,25 28:1,3 34:4,8
36:20 43:21 44:2
49:21 50:16 51:2,17
58:20 62:1 74:3,5,25
75:1,4 111:25 112:1
124:19 127:15 132:21
155:9 183:25,25 184:2
184:3,4 188:5 194:19
202:21,22 203:6,12
204:5,13,14,15 205:7
205:15,17 208:14
209:23
focused 30:6 62:15 73:25
74:1,4,8,10,13,18
168:20 173:12 183:6
184:16 185:5
focuses 26:12,14 185:18
186:3
focusing 26:10 27:11,18
50:25 198:21 202:18
202:19 204:9 207:3
focussed 183:23
folded 111:20
follow 14:25 15:20,20
69:3 88:20,22 189:23
followed 16:1
following 25:25 105:8
follows 6:4
font 66:3
food 211:10
footage 90:9 105:22
106:2,7,8 108:6 110:8
116:13 123:6 144:12
forecasting 42:25
forecasts 45:23
foregoing 213:8 214:12
214:13
foremost 193:19
form 13:23 14:3 16:13
18:13 23:1 25:5 31:19
34:15 38:7 44:12 45:7
45:25 47:6 49:24
50:23 58:24 59:8
63:15 68:21 69:8 73:7
75:12,20 78:11 85:12
86:12 88:22 89:15
90:11 92:20,21 102:13
104:9 116:15 119:25
129:11 138:16 147:18
148:13 157:24 169:3
169:14 170:14,25
174:3,24 175:5 189:9
191:2 201:17 206:1,24
formal 190:22,23
format 187:22
former 105:6 181:3
forth 92:8
forum 188:12
forward 11:17 101:18
155:25 160:16 163:14
four 28:9 99:4 138:24
207:20
fourth 141:21 144:17
fraction 49:20
frame 36:17
framework 49:8
Friday 56:11
friendly 53:21
front 23:8 130:25 159:15
full 71:9 87:9 147:25,25
fully 101:3 128:18
function 23:12,12 29:12

110:13 114:25 141:20
186:18,19 206:14
fundamental 184:5
further 72:15 94:24
145:11 213:11
furtherance 190:11
191:22 193:23
future 41:22 42:18 45:6
45:10,24 52:24 78:10
182:2 208:23
FYI 88:10

G

gang 65:16 188:21,25
189:1,16,17,25 190:2
190:8,10,11,17 191:1
191:3,4,10,12,14,16,20
191:22 192:2,3,4,5,9
192:10,11,17,21,23
193:1,19,20,23,25
194:11,15,16,16,19,22
194:22,23 197:5
209:21
gangs 29:9 192:2 197:4
gate 159:15
gathered 139:12
gauge 208:19
gelled 39:15
general 4:10 22:22 23:4
32:12 58:10 69:17
70:16 72:7 74:9 129:6
130:1 131:19 149:12
204:14
generalized 107:21
generally 45:21 56:19
71:1 73:5,7 108:2
generate 85:18 86:1,2
125:2
generated 37:24 85:10
86:6 87:14 91:6
133:17 143:22 146:16
149:22 161:16,17,18
178:20
generates 118:17
geographic 183:7
geographical 43:16 74:2
getting 48:2 128:1
156:14 203:1 204:20
208:8 210:23
GG 212:12
Gibson 155:5
give 29:18 30:3 66:12
89:23 94:12 111:13
135:4 177:12 179:9,10
given 167:22 213:9
gives 19:19
glanced 162:13
Glebe 2:7
global 4:15,19,20,25 91:7
91:9,11,13,14,15
92:11,22 93:14 94:5,7
95:1,11 114:5 123:19
124:11 125:4,5,9
126:14 132:24,24
133:1 147:4,9
globally 184:2
go 11:22 13:23 14:3
16:13 17:5 23:6 26:21
26:22 27:17,20 31:19
31:21 34:8,15 37:20
38:7 40:12 41:12
44:12,20 45:7,25 46:8
46:25 51:21 53:5,18
55:24,25 58:5,24 59:8
61:10 62:3 66:15
67:17,17 71:20 73:8
73:14 77:3 80:15,23

82:3,8,23 83:2 84:9
85:20 86:3 88:21
90:24 93:1,3 97:6
100:14 103:23 104:9
108:2 109:17,21
111:10,25 112:1,11,19
115:7 116:8 117:6
120:24 125:11 127:7
127:17,18,20 129:11
137:3,12 138:16
141:24 146:4 149:11
150:24 151:9 153:22
165:17 168:7,23 169:3
169:5 175:18 178:18
179:17 180:3 183:12
183:13 190:3 194:10
196:17 201:17 203:15
goal 49:14 52:7,7,8,20
53:22 54:2 207:5,7,8
goes 15:1 26:17,20 62:2
74:9 82:16 112:21
148:14 162:7 169:8
175:24 189:25 194:22
197:25,25 210:9
going 6:11 10:21 11:7,17
11:22 26:25 28:1,3,6
29:21 31:21 34:7,8
38:23 39:17 40:12
41:10 43:12 44:22
46:10 47:10 49:12
51:20 52:14,17 56:10
57:14 63:25 68:5,11
69:16 71:16,23,24
73:16 76:1 78:24
79:15 83:5 86:25
90:24 93:12 94:25
97:6 99:24 108:17
111:9 112:8 116:8
117:19,19 119:24
123:14 124:4 126:19
128:17,23 130:8,19
132:14 133:9 134:23
137:3,11 140:1 145:11
146:4,24 147:18
148:12,17,21,22 149:4
149:17 150:18,18,24
153:22 155:13 159:22
165:8 167:21 171:15
171:15 176:18 178:18
179:1,3,23 182:25
186:2 188:1,5 198:12
199:1,2 203:15 204:22
204:23 208:11,15,23
209:16,23
gonna 27:17,19 73:22
78:3 111:18 209:13
good 8:12 61:19 72:18
gosh 199:9
gotta 87:2,2
gotten 186:6
government 1:17 111:20
118:12
governmental 14:8 18:7
GRACE 2:6
gradually 29:2
graduate 29:4
graffitiing 188:20
grand 157:1,6,9 159:12
207:13
grants 27:3
graph 15:12
greater 74:20
group 27:11
groups 49:10,20 59:1
guess 106:15 191:23
192:7
guidance 19:19 25:7 34:6

34:10,20,23 35:1,3,7
35:11,15 47:9 51:12
51:13 57:3,8 73:17
78:1,2 112:17 194:6,7
194:9,10
guide 23:9 24:25 25:4
109:11 111:4,6,8
113:6 145:2,8,16
206:22,25
guided 33:19
guidelines 189:17
guides 145:5,7
guiding 109:23 112:18
guy 47:13 130:17
guys 58:9 120:22 123:21
124:12 126:1,5,9
134:21 145:10 146:11
147:6 187:24 206:19

H

H 4:1 5:1
hairline 141:13
half 35:8 43:18 71:17
halt 83:3
Hampton 122:9
hand 77:25 212:7
handle 19:19 187:11,15
208:3
handled 57:7
Hang 104:1
hanging 200:24 201:8
202:25 204:19
happen 10:21 36:14
41:25 45:6,24 94:8
112:5 182:4
happened 43:8,9,10 45:3
45:23 47:3 61:21 70:3
86:10,15 87:15 89:13
90:17 105:20 106:5
107:2,16,16 108:22
110:2,6 117:8,10
123:3 133:25 144:2,9
149:9
happening 46:19 52:19
53:3,4 122:11,13
158:16,18
happens 26:23 43:17
69:15
happy 56:5
hard 132:13,17 141:12
147:2
harm 26:20
harping 203:18
Harrington 181:10
hazards 28:5
he'll 56:7 211:14
head 114:23 189:21
196:12
heading 171:21
health 19:12,12 53:8,11
53:14,24 56:21 210:24
hear 96:6 187:20
heard 39:21 116:22,24
116:25 187:17
heavily 209:11
heightened 73:6,8,11,22
Heights 2:3
Heilman 1:3 4:21 120:18
121:22 134:18 136:20
136:23 143:5,15 214:1
held 60:24 61:2,4,6 67:11
help 53:10 84:24 111:7
113:6 126:23 186:24
helped 125:7
helpful 51:24 85:3 142:1
helping 145:24
helps 9:20

**HERETO** 214:15
**hey** 27:8,10 34:7 47:9
  62:12 66:13 111:9
  112:20 127:19 128:13
  129:2 130:22 132:4,10
  132:14 158:2 162:13
  171:3 178:12 188:19
  193:21 194:21 195:9
  196:18 199:16 200:5
  203:9 204:7 206:5
  208:13
**hid** 167:11
**Hiebert** 79:12
**Hiebert's** 16:7
**hierarchies** 114:8
**high** 209:12,13
**higher** 45:9,13 208:1
**highest** 208:7
**highly** 74:23 75:6 171:5
  190:5
**Highway** 114:2
**hire** 196:14
**historical** 4:12 46:6,10
  46:18,23
**history** 36:21 38:21 45:8
  47:7,19 48:17,18,21
  50:16 130:20 158:1
  173:19,25 174:7 200:4
  209:15
**hit** 38:24,25 48:2 81:20
  208:5
**Holborn@debevoisepo...**
  2:17
**hold** 81:21 137:25
  146:23
**holding** 64:12
**holdings** 123:10
**holds** 64:10
**home** 127:21 132:5,5
  171:3
**homeless** 118:23
**honest** 58:1 68:1
**honestly** 177:16
**hopefully** 23:19
**hoping** 121:11
**hot** 49:9
**hour** 43:10 55:8 71:16
**house** 130:22 148:17,21
  148:23 149:2,6 164:19
  170:13,24 206:20
  210:13
**household** 177:9
**houses** 149:1 205:20,21
  206:9 208:5
**hundred** 10:23
**hundreds** 38:18 83:22,22
  125:18
**hunt** 96:8
**hypothetically** 158:15

**I**

**ICIB** 181:15 182:1
**ID** 79:22
**idea** 38:10 135:2 184:5,8
  199:24 201:5
**identification** 6:13 8:24
  11:24 17:7 19:23
  24:11 31:23 40:14
  64:2 72:1 78:25 79:16
  84:11 90:25 97:12
  100:1 117:23 123:16
  124:6 133:12 137:16
  140:3 146:10 147:1
  149:19 151:1 152:6
  153:24 155:15 159:24
  165:10 166:3 170:11
  171:24 176:25 180:9

183:1
**identified** 40:6,9 44:25
  70:14 74:21 76:9
  102:5,11,15,23 146:2
  168:6 186:14 191:15
  192:14 204:1
**identifies** 28:16 38:17
  189:16,16
**identify** 16:2 22:12,15
  34:7 53:4 57:5 65:7,19
  76:14 85:4 95:8 177:7
  184:9 191:5 198:15
**identifying** 14:25 15:11
  23:13 52:16 70:12
  78:13 112:3
**identities** 169:22
**identity** 96:15
**ignore** 28:2
**III** 1:4 214:2
**ILP** 4:4,5,6 5:11 8:7 9:2
  11:9 12:2,5,15,22
  17:10,12,14,16 18:20
  18:22 21:10,13 22:16
  23:9 24:10 34:12 35:6
  45:21 46:3 54:17 70:7
  74:7 94:2 108:8 115:3
  115:5 154:5 172:4,5
  181:17,23,24,25,25
  182:10,15,18 183:15
  185:8 191:24 192:1
  196:14 204:14 206:4
  208:14
**ILP's** 23:12,12
**imagine** 114:10
**immediate** 127:6
**impacting** 184:13,13
  185:2,3
**important** 133:10 202:12
  202:21,22
**inaccurate** 89:6
**inadvertently** 178:2
**incident** 4:21 5:3 35:20
  36:6,8 107:13,17
  108:10,12,13 110:18
  133:15,17 134:1,1,6
  134:14 135:8 137:8
  143:21 144:3,3,9
  149:21,22 150:2
  156:24 158:22 166:15
  166:24 167:17
**incidents** 86:11 134:25
  158:9
**include** 26:10 50:7,8
  90:15 104:13 131:22
  160:6 170:4 176:6
  181:17 205:18,20,24
  214:14
**included** 25:17 157:6
  170:7
**includes** 14:17,20 90:20
  100:9 139:8
**inconceivable** 28:3
**increase** 52:8
**increased** 130:15 131:7
**index** 26:20
**indicate** 98:7 99:8 104:7
  115:17 136:15 138:13
  140:21 143:1 149:12
  156:9,20 162:19 163:4
  163:15,20 167:4,13
  174:15,18,22 176:4
**indicated** 161:2 202:12
**indicates** 43:11 100:22
  135:19 144:24 147:9
  150:9,12 155:8 156:3
  156:12 165:22 167:17
  172:23 173:7,21

184:11
**indications** 190:8
**individual** 17:20 31:2
  32:15 33:16 35:20
  36:5,21 43:5 51:25
  52:2 53:10 63:2,3 71:6
  72:23 73:16 75:8,25
  96:15 112:13 123:9
  149:13 168:19 170:2
  170:13 171:2 184:1
  187:15 193:21 195:6
  198:10,13 202:22,23
  203:7,24
**individuals** 27:11,19
  39:6 40:1,8 49:2,13
  51:17 52:4,6 53:17
  56:22 58:20 59:1,3
  65:12 68:15,19 69:2
  70:13 74:21 76:5 78:7
  81:3 103:18 126:14
  127:5 128:25 129:8,10
  138:10 170:12,18
  171:9 173:13,16 181:5
  183:8 186:25 201:2,11
  201:13 204:17,18
  206:10 210:4
**info** 108:5 140:25 156:13
**info-** 188:22
**informally** 194:8
**information** 61:16,24
  68:8,9 89:3,6,23 90:10
  90:15,20 100:25
  104:13 109:7,8 110:7
  111:17 113:5 115:3
  117:17 118:14 126:13
  127:14 138:2 139:8,11
  152:1,22 155:23
  169:22 170:3,9 185:19
  188:11,16,23 203:9,10
  204:21 207:2
**initially** 115:18
**initiated** 177:9
**inmates** 199:15
**Inn** 122:9
**input** 89:3 188:6 205:11
  205:12
**inputs** 118:14
**inputted** 88:5,6 96:11
**inside** 114:25 186:2
  208:4
**insinuating** 167:10
**instance** 36:11 66:25
  89:23
**Institute** 2:2,6,10
**intel** 109:23 110:18
  113:10 201:4
**intelligence** 36:1 41:19
  41:23 42:6,12,14,15
  42:21 49:7 60:15 62:9
  109:4,6,7,8,10,11
  111:8,14,18,21,22,23
  113:19 182:1
**intelligence-led** 8:14
  49:6 171:12 181:1
**intelligence-sharing**
  62:10
**interact** 75:11,17,19
  149:13
**interacting** 39:22
**interaction** 71:4 73:10
  86:25 87:10 89:14
  105:25 108:4,22
  148:22
**interactions** 16:19 86:16
  87:15 90:17,21 105:21
  107:3 110:16 117:16
  123:4 131:22 137:9

169:2
**interacts** 73:13
**interest** 166:18 199:4
**interested** 213:15
**interface** 91:17 92:23
  95:14,17 125:11,22
**interject** 187:1
**interjections** 142:1
**internal** 13:9 32:14 36:3
  110:20 111:2 189:23
  189:24
**internally** 33:25
**interrupt** 141:19 166:21
  190:14
**interruption** 178:11
**intervention** 53:14 56:21
**interview** 36:2
**interviews** 129:18
**intimate** 164:9
**intimately** 177:23
**introduce** 84:9 90:24
  120:15 137:11 146:5
  146:24
**introducing** 121:17
**investigate** 205:18
**investigated** 168:18
**investigating** 19:18
  73:16 198:9
**investigation** 29:11
  85:22 86:2 120:10
  128:7 129:16 130:8
  157:19 198:12 199:12
  199:23 200:9,21
**investigations** 4:10 130:1
  131:19 182:2
**investigative** 20:10
  181:16 186:1
**investigatory** 203:4
**involved** 8:19 12:22
  37:21 43:24 46:21
  52:8 54:17 66:20
  95:22 108:3 182:18
  187:7 193:2,5 201:5,5
  201:10,13 209:21
  210:4
**involvement** 12:12
  201:11
**involvements** 95:20
**involves** 19:8
**involving** 21:12 166:15
  167:18 193:8
**issue** 20:5 28:8 93:2
  124:3 126:4 175:25
  202:7 208:11
**issued** 162:20 163:2
**issues** 8:11 68:11 206:7
**it'll** 11:16 27:24,24 28:4
**italic** 66:3
**iterations** 97:17

**J**

**jail** 53:16,17,19,19 56:24
  99:1 110:22 132:14
  194:17
**January** 1:14 12:1 30:16
  30:20 33:6 81:10,16
  82:7,10,12,13,25
  135:12 137:1 150:10
  212:6
**jaywalkers** 196:24,25
**jaywalking** 26:23
**Jeffrey** 181:10,14
**Jen** 186:8
**Jerry** 182:15
**jewelry** 167:12
**jiggle** 208:3
**job** 38:24 145:24 207:6

**Johnson** 2:2 3:3 6:7,14
  8:22,25 10:14,18 11:2
  11:11,14,19,22,25
  13:25 14:7 15:22
  16:14 17:5,8 18:16
  20:2,5,22 22:10 23:2,15
  24:9,14,18,21,22 25:9
  30:25 31:21,24 34:21
  38:13 39:24,25 40:12
  40:15 41:5,18 44:15
  45:20 47:17 50:3 51:3
  51:23 54:1 55:7,12,16
  56:2,7,12,13 59:2,9,17
  59:22 60:23 63:18,25
  64:3 68:25 69:10
  71:19,21,24 72:2,15
  72:17,19,22 73:19
  75:14,21 78:16 79:1
  79:17 80:20 82:11,13
  82:17 83:23 84:1,3,9
  84:12 85:2,14 86:4,14
  88:17,24 89:2,18
  90:14 91:11,23,25 92:4
  93:6,10,18,22 94:10
  94:23 95:3,6,8,10 96:9
  97:9,13 99:24 100:2
  101:12,15,17 102:14
  102:19 104:3,11
  109:14 116:17,23
  117:1,22,24 120:4,12
  120:21 121:5,11,14,16
  121:19 122:11,13,18
  123:14,17,25 124:4,8
  124:10,24 125:1
  129:15 133:13 134:21
  135:3,9,25 136:9,12
  136:14 137:14,17
  138:18 139:1 140:1,4
  141:8,22,25 142:4,6
  146:9,11,15 147:2,8
  147:19 149:17,20
  150:24 151:2 152:4,7
  153:22,25 155:13,16
  158:6 159:25 165:8,11
  166:4 169:11,17
  170:16 171:7,25
  172:18 174:5,6 175:1
  175:7,11 176:2,3,17
  177:3 178:1,9,15,18,25
  178:25 179:7,9,14,20
  179:24 180:3,5,10
  182:25 183:2 189:11
  191:6 193:15 197:9,12
  197:16 199:8 200:19
  201:22 202:9,11 207:1
  211:7,12
**joking** 122:17
**Jones** 1:4 81:13 167:22
  214:2
**Jordan** 186:8
**judge** 191:25
**judgment** 121:1,17 171:4
**Judy** 1:19 212:11 213:6
  213:19
**Judy@andersoncourtr...**
  1:24
**July** 19:17 136:15 57:22,25
  165:14,15,22
**jumping** 135:5
**June** 147:13 155:9 156:6
  156:10,21 162:19
  163:10,18 199:6
**junk** 162:23
**jurisdictions** 173:2
**justice** 2:2,6,10 52:17
  126:24 132:15
**Justin** 8:10 70:5 167:22

**juvenile** 46:12 126:23
132:2,15 148:4,12,14
185:11,13,16,24 186:1
186:3,4,5,7,13,14,19
187:9,11 188:6 200:17
**juveniles** 46:14 186:11
207:25

**K**

**kayak** 155:5,11 156:25
157:6,9,15 158:8,8
**kayaks** 157:8,14
**keep** 56:10 71:23 128:22
147:2 179:15
**keeping** 207:6
**kept** 87:17 133:20
**key** 76:23 204:15
**kid** 135:1 186:25 188:19
188:20,21
**kids** 46:18 210:12,24
**kill** 130:24
**kind** 6:18 19:15 29:5,10
29:19,22,25 33:24
34:25 37:20 38:24
39:15 46:9,20,22 48:5
53:3 57:10 60:11 62:8
68:9 83:2 87:11 107:4
107:9,10 113:1 121:9
130:21 131:14 132:1
132:13 177:8,10,14,17
184:7 185:21 187:21
198:5,8 200:12,12
204:19 209:19 210:14
**kinda** 107:7 108:14
**knock** 111:15,16 149:5
168:7,23
**knocks** 149:6
**know** 9:10,17 10:3,9,10
10:13,24 11:3,15,16
11:21 13:4,15 17:22
17:23,23 19:9,10 20:6
20:12 24:5,10,12
29:18 31:6,6,7 34:1,3
39:19,21 41:6 43:1
45:11 46:8,11 47:9,13
52:13 53:22 55:17,19
55:23,24,25 56:1,4,4,6
56:7,19,22,23 57:4,8
57:14 58:2 59:15,19
60:9,11,12,13 62:2,3,5
62:13,22 63:1 64:15
67:6 70:25 74:6,17
75:2 77:2,4,9,12 78:1
83:6 86:15 87:1,5
89:20 91:21 92:7,8
93:4,5,14 99:21
105:18,20 107:11,16
107:17 108:3,19,22
118:22,23 120:1,3
121:3 122:3 123:3,4
123:18,18 124:2,12,15
124:16 125:7,15,17,18
126:2,6,8,22,24,24
128:2,4,11,13,24
130:1,20,23 132:2,8
132:13 133:25 134:22
134:23 135:17 136:10
137:25 144:2 145:25
146:12,13 147:6 148:4
148:6,11 149:3,4
150:22 157:2,15
161:10 162:8 164:6
168:19 169:18 170:1
174:14 177:16 178:4,5
178:20 180:19,20
181:4 183:10,11
186:24,25 187:10,18

188:19 190:7,8 194:4
198:5,7 199:3,13,16
200:11,18,25 203:10
206:3 207:11,14 208:9
208:12,13 209:12
211:11
**knowledge** 14:11 18:24
70:10 71:14 107:4
127:6,10 161:12 164:9
177:19
**known** 70:24 139:23
**knows** 90:6 187:15
**Kraus** 1:12 6:1,10 212:5
214:18

**L**

**L** 211:19
**labeled** 120:7,9
**labels** 120:1
**lack** 27:23
**lady** 149:9 187:17,17,20
**lake** 95:16,17
**laptop** 84:7
**large** 1:20 62:4 77:17
112:10 207:22
**Larry** 1:12 6:1,10 212:5
214:18
**late** 8:16 133:2,3
**latent** 29:11
**laughed** 60:21
**laughing** 122:17
**law** 19:6,7,14,16,16,20
20:16,17 21:2,8 28:21
34:5 47:23 53:17 58:8
69:16 74:20 113:3
131:16 164:18 198:7
207:20 209:16
**laws** 208:20
**lawsuit** 81:22 84:22
119:13 164:3 183:18
**lawyer** 60:21
**lead** 162:10
**leadership** 34:11,25
114:7
**leads** 110:19
**leave** 94:13
**leaving** 147:22
**led** 54:13 58:2,3,7 158:9
208:24
**left** 12:11 46:9
**legal** 88:17 149:3 168:12
177:18,21
**legislation** 192:15
**legitimately** 29:1
**lens** 28:23,24
**let's** 10:22 43:14,17 56:8
59:24 130:17,23
135:20 166:13 179:19
**lettering** 141:11
**letting** 210:21
**level** 52:9
**lieutenant** 34:18 180:25
**lieutenants** 36:21 113:13
**life** 204:22
**life-changing** 46:17
**lighter** 66:2
**likelihood** 43:4 45:9,14
**limited** 40:4 204:12
**Lindsay** 189:5
**Lindsey** 31:10
**line** 7:5 71:21 72:16
110:1,4 157:20 215:2
**lines** 157:4 193:7
**list** 7:15 20:13 37:23,23
37:23,25 38:3,14,15
38:17,21 39:10,12,13
39:19,20 40:2,4 76:4,8

77:20 78:8 79:7 83:10
100:15 101:24 140:16
142:9 156:18 161:23
195:23 209:20 210:1,3
211:3
**listed** 26:1 50:9,12,17
55:4 63:3 67:6 68:16
69:14 72:23 75:8,25
76:5 77:14,16,24 97:2
98:8,13,18 99:5,13
100:20,23 101:6 116:6
117:4 128:5,6 135:11
135:16,17 136:25
140:21 141:16 142:13
143:5,8,25 145:12,19
150:9,13 151:15,18,24
152:20,25 153:4,9,14
153:17,20 156:1,3,9
156:20 157:22 158:9
159:1,10 163:12,16
165:18,20 167:14
175:6 184:24 188:7
192:18 195:1 198:11
199:25 200:4,22 205:9
**listen** 27:8 111:21
**listing** 151:11
**lists** 4:12 79:9 101:21
102:25
**literally** 127:7
**little** 15:15 29:3,10 30:2
57:16 60:19 63:7 87:3
105:24 174:13 175:21
187:4,4,23 202:7
**live** 75:3 87:7 148:23
170:12,24
**lived** 171:3
**lives** 148:24 149:7
170:21
**livestock** 206:10
**living** 79:23
**location** 43:17 74:3
183:8
**locked** 159:15
**lockers** 188:21
**log** 84:18
**long** 11:15 31:6,7 54:16
59:17 61:21 99:21
107:25 169:7 186:5
208:24
**longer** 18:17 28:15 29:14
64:10 87:6
**look** 9:20 15:3 20:20,23
22:3 23:21,22,23
26:17 27:6,10,17
28:18,18,19 29:6 30:9
37:19 41:13 43:13
46:2,23 47:3,18 48:14
48:17,22 51:21 53:6
62:7,8,23 63:2 77:13
83:20,21 84:21,22
85:3 86:17 89:13,25
90:1,1,10 93:3,4 96:25
100:6 101:9 102:1
104:4 105:13,21 106:2
106:6,6,10,13,17,18
107:2 108:11,17
115:10,11 119:16,17
123:5,5,6,8,9 125:18
125:20,22,24 126:20
127:7 129:2 130:22
133:14 134:1 135:10
135:20 140:10 141:10
143:13,14,19 144:5,11
144:16 145:11 146:2,6
147:25 150:1,8 151:14
152:19 155:25 159:4
161:21 166:13 167:3,5

169:16,19,20 172:23
173:18,25 177:17,19
177:22 183:13 185:24
193:24 194:11 196:20
200:11 201:19 208:4
210:10
**looked** 15:5 24:1 35:19
46:6,9 58:2 60:12 74:2
77:10 95:19,20 107:9
109:1 149:10,12
158:12 206:18,20
209:12,16
**looking** 15:4,11 26:20,22
28:5,22,24 29:3,7
32:15 33:6,25 36:18
36:20 45:18 47:25
48:7,15,20,24 49:17
49:19 51:19 60:13
82:14 100:3 106:3,20
106:21 108:10,13
111:1 112:3,10 114:4
114:5,6 115:17 121:23
137:13 140:10 143:18
151:8 156:25 159:3,5
170:2 179:22 184:8
196:18,24 197:1,3,4,5
197:7 200:6 204:25
**looks** 6:17,18 33:5 41:11
47:7 48:12 79:22
84:15 98:11,11 108:18
109:18 122:14 125:21
137:19 140:24 147:21
159:2 165:15 173:24
180:13 185:25 192:12
194:24 208:12,25
**lost** 83:7
**lot** 24:15 29:19,21,25
37:7,9 38:22 42:17
46:7,24 49:16,16
56:22,23 61:18 96:4
110:25 113:10 132:8
132:14 133:8,8 148:15
168:17 208:7,19
**loved** 70:1
**low** 202:7
**lower** 210:20

**M**

**ma** 177:5
**main** 93:7
**maintain** 209:25
**maintained** 95:12 118:8
119:8,9 137:21 138:7
139:18 146:19 150:4
**major** 13:16 17:23 55:6
55:8 181:15,22 182:12
**makeup** 27:24
**making** 45:19 72:7
111:24 113:6 129:9
197:21 206:21
**management** 51:19 80:9
80:11 95:25 96:1
110:22,22
**manager** 8:18
**mandatory** 57:13
**manner** 35:22 111:22
**manual** 4:4,5,6 9:2,4,14
9:23 10:1,2,5,8,10,12
11:1,20 12:2,13 14:10
14:13,15,17 15:21
17:10,12,14,16 18:9
18:12,20,23 19:1
21:10,22 22:18 24:23
25:14,15,25 26:2
28:12 30:14,18,20
31:1,5,18 42:6 55:4
56:18 57:19,21 58:3

59:10,12 60:2 64:23
74:8 77:6,8 115:5
145:6 182:16,19
184:22
**manuals** 13:13
**March** 64:16,17,17 67:3
81:8,8 97:3,8 98:19
180:15,18,21 199:6,9
**marijuana** 66:3,14,15,25
208:18
**mark** 11:23 17:5 31:22
40:12 63:25 71:24
78:24 79:15 97:6
99:24 117:19 123:14
124:5 133:11 140:1
149:17 150:24 152:4
153:23 165:8 176:18
182:25
**marked** 6:13 8:24 11:24
17:7 24:24 31:23
40:14 64:2 72:1 78:25
79:16 84:11 90:25
97:12 100:1 115:11
117:23 123:16 124:6
133:12 134:16 137:16
140:3 144:22 146:10
147:1 149:19 151:1
152:6 153:24 155:15
159:24 165:10 166:3
171:24 176:25 178:17
180:8 183:1
**marking** 6:11 8:22
**Marnie** 102:20
**married** 46:17
**match** 101:3 184:4
**matched** 184:6
**matching** 93:5
**material** 21:8,12
**matter** 168:22 187:5
189:23 196:19
**McDougall** 4:19,20
65:22 81:13 83:10,12
83:21 119:14,18 121:4
121:21,22 123:19
124:11 135:11,22
136:16,23 139:9
140:16 142:9 143:6,25
144:25 145:12
**McDougall's** 142:20
**mean** 6:17,19 8:1 9:3,12
9:12 11:6,7,15 15:2,10
15:19,19 19:5 21:25
32:12 36:16,18 37:8
37:19 38:23 39:9,21
40:8 42:24 46:1,22
47:21,23 48:1,2 49:10
49:16,17,25,25 50:1
52:5,7,23 53:1 54:9
55:23,25 56:4 61:11
64:16 68:22 69:6 71:3
73:10 76:6,18 79:6
80:13 82:10 85:4 87:1
89:8,9 92:2,4,7,9 94:4
105:12,23 106:11,12
107:9 110:21 112:7
114:2,22 116:16,18
117:5 119:25 120:16
120:21 121:23 122:8
124:18 126:3 130:3
134:8 141:19,22
145:20,21,23,25
147:21 148:1,10,11,24
149:8 157:25 163:7
164:8,8 166:21 167:10
168:6,15,17 171:1,2
173:25 175:12 178:5
186:15,19 189:13,22

190:10,14 193:5
197:24 198:18 199:13
202:3 205:21 207:11
207:15 209:4,8
**meaning** 108:7
**means** 50:22 59:16 97:5
98:13 99:1 112:8
165:25 175:9,10
190:13,20 196:9
**measuring** 173:7
**mechanism** 187:6,11
**mechanisms** 47:22
**meet** 189:12,14
**meeting** 60:20,20 61:15
62:10,17 63:2 64:7
67:10,14 100:12 103:4
103:9,21 140:8 142:23
151:6 152:11,13
155:20 160:4,21 161:9
161:14,16,17 162:11
166:8,10 167:19
**meetings** 29:21 60:15,17
60:24 61:14,23 62:16
62:23 63:5,9 67:25
68:3,7 162:1 186:16
195:17 206:3,4
**meets** 189:2,2,8 192:13
**Megan** 139:6
**Melinda** 154:2
**Melissa** 151:11,14 153:6
**member** 4:8 41:8 105:3
170:7 189:16 190:10
191:3,10,12,14,16,20
192:3,3 193:19 196:15
**member's** 138:12,21
**members** 65:16 117:13
117:17 128:1 170:4
177:9 185:21 193:25
197:5
**mental** 19:12 53:8
210:24
**mentality** 29:10 46:12
53:24 133:4 162:8
**mention** 162:5 163:1
164:1
**mentioned** 52:20 56:18
64:22 127:3,11 165:7
202:8 209:6
**mentor** 187:25
**merged** 134:25
**methodology** 16:1
174:11 175:19
**methods** 20:10
**Miami** 2:11
**mid** 140:12
**MIDDLE** 1:1
**mile** 43:18,18
**mind** 71:19 80:17 131:7
**mine** 94:12
**minor** 32:8,11 58:4
86:21 87:11
**Minus** 160:7
**minute** 71:18 91:18
**misconception** 109:23
**Misconduct** 4:10
**misdemeanor** 66:15
208:18
**misnomer** 53:17
**misnomers** 42:17
**misplaced** 104:2
**missing** 208:9
**misspeak** 57:4
**mistaken** 20:1 31:10 35:8
**misunderstand** 92:7
**model** 168:20
**models** 58:25 74:18
**modified** 79:24 135:14

**mom** 148:3
**moment** 178:8
**month** 37:13
**monthly** 165:16
**months** 43:15 47:24
111:19
**Moore** 31:10
**morning** 61:4 154:9,10
154:12,20,24 169:13
**mother** 102:23,25
115:19 143:7,8 147:14
147:17 163:22 164:5
164:17 167:5,18
**move** 53:25 59:20 79:14
117:19 142:3 160:16
**moved** 94:6
**moving** 168:20
**multiple** 6:19 43:19
47:22 51:9 53:5
154:14 206:7 207:18
208:5,16 209:21,22
**municipalities** 88:15
**murder** 187:12 191:20
**mute** 178:14
**mutually** 39:18

### N

**N** 2:7 3:1 211:19
**name** 6:8 66:2 84:25
96:14 100:6 102:20
107:14,15,20 121:24
138:12,21,25 140:19
146:7 150:1 151:20,21
156:15,17 167:7,16
172:13
**name's** 162:22
**names** 119:15 164:12
**narcotic** 29:8
**narrative** 144:6
**narrow** 43:20
**narrowed** 39:20
**narrowing** 183:7,25
**national** 62:7
**nature** 19:13 26:19 29:8
36:19 42:13 53:7,9
61:20 68:13 69:14
70:4 75:3 87:7 90:3,8
104:10 109:22 110:13
110:19 126:17 128:2,3
130:5,6 131:13,24
145:9,14,20,22 146:2
148:22 154:16 158:4
168:9 177:10 186:22
187:14 188:3 195:18
202:2 206:11 210:7,25
**Naval** 29:4
**necess-** 61:25
**necessarily** 26:16 28:17
28:20 32:22 45:8 71:7
75:3 108:20 112:8
129:12 131:15 163:7
170:12 171:19 186:18
191:19
**necessary** 200:16
**need** 23:18 34:9 47:10
55:16 62:9 88:18
91:25 92:10 107:12,15
107:17 131:8,9,14
132:6 142:3 194:21
204:10 211:10
**needed** 88:20
**needs** 118:23 203:13,14
204:1,1
**neighbor** 128:2
**neighborhood** 168:8
**nerd** 60:21
**network** 29:3,6

**networks** 28:19,22 29:6,8
29:8 60:12
**never** 91:13,14,16 92:18
112:8 116:22,25
**new** 1:17,18 4:8 37:23
40:19,21,23 41:8
125:5 138:1,3 179:17
179:19 180:8 182:24
182:25 196:15 208:20
208:20 210:19
**newer** 12:13 17:10,12
18:14,14
**nine** 83:22
**NMO** 40:17 41:7 196:15
**Nocco** 1:7 13:3 181:6,8
214:5
**normal** 75:13 122:14
185:11 187:24
**Notary** 1:20 212:12
**note** 10:19 20:7 87:2
91:7,8,11 94:6,25
158:24 165:2
**notes** 4:15,22 85:4 87:1,3
87:8,11,13 89:9,22
90:15 93:13 94:4
96:10 104:12,12,19,25
105:17,21,24 106:1,17
106:18,21,22 115:16
116:13 119:5,8 122:5
123:7 125:3,9,21
126:14 127:4,7,13
128:20 129:1,21 130:9
130:10 131:5 132:19
137:8 139:2 143:10
147:17 148:2 158:23
159:9 160:6,7,9,10,24
161:3,8,11,13 163:1,5
163:9,22 165:3,4
**noteworthy** 65:7,19
**nothing's** 23:9
**notice** 4:3 6:24 52:13
**notified** 68:15
**notify** 70:13
**number** 62:3 79:22
100:22 107:13 111:10
140:19 144:19 147:3
154:8,9 156:17 206:8
**numbers** 41:14 69:13
111:11 145:8 206:17

### O

**O** 211:19
**oath** 3:4 134:12 212:1
**object** 13:23 14:3 16:13
18:13 23:1 25:5 31:19
34:15 38:7 44:12 45:7
45:25 47:6 49:24
50:23 58:24 59:8
63:15 68:21 69:8 73:7
75:12,20 78:11 85:12
86:12 89:15 90:11
102:13 104:9 116:15
119:24 129:11 138:16
147:18 157:24 169:3,6
169:14 170:14,25
174:3,24 175:5 189:9
191:2 201:17 206:1,24
**objection** 23:6 39:18
59:14,20 116:24
120:22
**objective** 49:8
**objects** 169:8
**obviously** 10:4 23:18
50:8 178:5
**occurred** 111:20 117:6
123:11 154:11 177:12
187:19 206:4

**occurring** 49:15 166:25
**October** 150:13
**Off-the-record** 30:24
41:4 80:19 137:15
**offender** 4:7 5:13 16:12
19:21 21:9,13 22:25
23:4 24:12 25:4,11
26:5 33:23 43:24 44:2
44:6 45:1 47:2 48:8,11
48:23,25 50:22 51:10
52:1 54:14,21 55:18
66:16 68:16,20 69:3
69:20,23 70:2,9,14,22
70:22 71:2 72:13,24
72:24 74:5,13 75:9,22
76:1,10,17 77:24 78:5
83:13 97:3 98:18 99:5
99:22 100:20 101:6
104:8,24 105:2,9,10
105:14,19 106:17,18
106:20,22 108:20
109:20 110:3,6 112:20
115:12,24 116:4,13
117:3,4,13 119:6
120:2,9,14 123:7
124:23 125:2,4,9,21
128:6 129:21 131:12
131:13,22 135:12
136:16 137:1,8 139:4
139:12,24 140:17,22
141:2,16 142:10,13
143:25 144:22 145:13
145:19 146:3 147:17
149:15 150:10,13
151:15,19,24 152:20
153:1,6 156:1,4,21
157:22 158:23,24
159:1,8 163:12,16
165:20,23 167:14,15
167:25 168:5 169:13
170:11,18 171:10
173:8,9 184:4,11,12
184:17,23 185:6
186:14 188:7 195:2
197:18 198:11 199:18
199:25 200:1,22 205:2
205:9 206:22 209:2,7
209:20
**offenders** 14:25 16:2,18
16:20 19:24 21:23
22:12,15 23:13 24:11
24:25 26:8 28:13,16
30:13 32:3 38:17,18
40:7,8,9 49:9,11,12,22
50:9,13,18,20 55:2
56:17 57:5,6,7 58:12
58:16,16,22 59:7 60:3
60:7 61:24 62:15 65:8
65:20 70:12 73:24,25
74:2,19,22,25 81:4
100:15 126:15 127:5
127:14 145:4 169:1,23
170:4 173:13,19,22
174:16,19 183:7,24
186:11 210:6
**offending** 49:13
**offense** 36:11,12
**offenses** 27:23 172:24
**offensive** 15:13
**offer** 56:25
**offered** 176:21
**office** 7:7 9:1 13:1,8,11
13:12,18 14:9 16:25
17:17,20 18:4,8,19
22:12,14 23:17 26:4,7
28:15 29:14,16 30:7
30:17 31:15 32:6

54:20 55:1 56:15
58:12 60:6 64:10,12
64:25 65:1 68:14,18
68:23 69:2,5,7,12,18
70:17 72:8 73:6 80:3,7
80:22 81:1 85:15 86:7
86:9 87:14,18,19,20
87:23 88:7,16 89:12
93:3 95:12,20,22
96:12,19 99:11 105:11
106:4 108:21 110:15
112:13 114:19 115:1
116:3 118:3,19 119:9
125:2 129:9 133:21
137:6,22 138:7,14
139:19 145:4 146:17
146:19 149:23 150:4
154:22 155:10 159:19
161:19 165:25 167:24
168:14,25 169:12
170:17 171:10 176:8
180:18,21,23 181:3
187:3 191:14 198:6
206:13 209:25 211:2
**officer** 53:21 119:2,5
132:4 198:7
**officers** 185:9,11 186:23
188:2
**official** 1:7 88:13 90:4,5
113:24 212:7 214:5
**officials** 154:21
**Oh** 2:3 35:12 83:9 96:1
102:3,18 117:22 124:9
173:6
**okay** 6:8,15,16,21,23 7:1
7:3,13,14,17,20 8:10
8:12,22 9:5,7,15,19
10:4,19 11:14,20,22
12:14,7,20 14:1,12,17
15:18,23 16:5,9,10,16
16:17,22 17:2,4,11,19
18:1,3,7,11,17,22,25
19:3,7 20:2,19 21:7,12
21:22 22:11,20 24:2
24:21 25:3,13 26:3,10
28:10,25 30:16,22
31:4,14,17,21 32:5
33:2,5,9,15,22 34:22
35:6,13,18 36:13
37:13,18 38:1,4 39:9
39:12,13,14 40:4,23
41:10,17 42:16 44:4
44:16 45:21 49:5 50:4
50:7,21 51:24 52:5
54:2,12,16,16,23 55:1
55:5 56:12 57:18,21
58:11,15,20 59:6,20
60:5,9,14,16,19 61:23
62:16,20,22 63:1,21
64:6,9,25 65:4,6,12,15
65:18 66:2,9 67:3,13
67:16,19 68:14,18
69:1 70:6,11,20 71:11
71:15 72:11,15 73:2,5
73:20 74:16 75:5,25
76:3,24 77:19,23
78:10 79:5,8,14 80:2,6
80:18 81:2,24 82:5,14
82:19,24,24 83:5,8,12
84:1,4,20 85:6,10,15
86:9,15 87:13,17 88:5
88:9,21 89:3,11 90:20
90:23 91:8,10 93:9,18
94:12,15,20 95:2,3,7
96:14,18,22,25 97:1,6
97:11,24 98:5,10,18
98:21 99:4,10,13,16

99:21 100:8,14,22
101:3,15,18,20 102:1
102:8,17,25 103:3,9
103:14,23 104:12,18
104:20 105:2,5,8,16
106:13,19,25 107:1,11
107:23 108:2 109:3,25
112:25 113:23 114:20
114:24 115:7,9,16,22
115:25 116:8,10,21
117:12,19 118:2,11
119:7,11,16 121:3,14
121:16 122:2,7,19,23
123:12,25 124:4,4,9
125:12,23 126:18
127:2,9 131:2,21
132:22 133:7,17,20,23
133:25 134:4,12,14
135:10,15,20 136:6,13
136:15,19,22,25 137:3
137:20,24 138:5,12,22
139:8,11,16,18,21,23
140:1,7,14,15,25
142:8,9,12,16 143:5,8
143:13,20,24 144:16
144:21 145:10,18
146:4,8,16,23 149:17
149:25 150:6,8,12,17
150:21 151:5,8,10,18
152:1,4,17,22,25
153:11,14,22 154:9,17
154:20 155:3,13,19
156:3 157:20 158:19
158:22 159:8,13,17,22
160:3 161:2,18,21,25
162:3,6 163:10,20
164:7,14,17,24 165:2
165:8,12,17 166:10
167:3 170:10,23
171:14 172:13,19,23
173:4,5,15,18,24
174:18 175:10,22
176:16,23 177:20
178:1,9,15 179:7,9,20
180:17,23 181:2,5,14
181:19,21,23 182:9,14
182:14,18,22,24
183:17,22 184:11,16
184:23 185:1,5,8,16
186:10,13 191:20,23
196:6 197:11,14
199:25 202:6 205:1
206:21 211:7,9
**old** 138:1,2,6 200:24
**on-the-job** 195:24 196:3
**once** 10:21 37:22 38:1,3
38:5,14 39:12 57:13
**one's** 187:19
**one-stop** 95:18
**ones** 52:10 111:9
**open** 66:18 68:12 187:19
**opens** 149:14 208:3
**operate** 32:15
**operated** 29:7
**operates** 113:15
**operation** 12:15,21 38:25
210:18
**operations** 29:19 85:16
86:6 87:19 118:4
131:5 182:3
**operative** 17:13 18:18,20
22:20 23:3
**opportunity** 160:14
**oral** 7:6
**order** 4:10 34:4 38:16
47:4 58:5 168:4
191:17 200:21 204:5

**ordinance** 174:23 175:3
175:12,16 176:9
**organization** 63:6 68:8
114:6,17,20 166:11
**organizational** 114:7,9
**organize** 62:17
**organized** 29:9 192:11
**orientation** 4:8 41:8
196:15
**original** 8:3 100:4
**originally** 8:18
**outline** 14:24
**outlined** 14:22 192:5
**outlining** 15:10
**outside** 46:4 91:16 149:2
188:4 209:18
**overall** 60:10 198:1
**overarching** 130:11
**overdoses** 62:5
**overly** 187:25
**overnight** 154:11
**oversee** 125:16 154:18
**overseeing** 70:7 182:10
**overseen** 113:23 114:21

_____

**P**

**P** 211:19
**P.A** 2:14
**p.m** 1:15 211:17
**P.O** 1:23
**packed** 53:19
**packet** 4:8 40:17 143:14
**page** 3:2,5 4:2 5:2 7:13
7:15,16 9:21,25 10:16
15:2,3,6 16:3,15,17
41:10,13 49:6 65:5,7
65:17 85:3 100:6,7,14
100:15 101:19 102:8
104:15,17 115:11
119:20,21,22 136:8
140:10,14 141:20,21
142:7 144:5,17,18,19
146:7 147:12 151:8,15
152:19 155:25 161:21
163:14 165:17 166:13
172:16,23 173:4,6,6
173:18 177:2 214:10
215:2
**pages** 15:5 101:18 151:9
151:14
**pandemic** 207:17
**Paneson** 4:25 81:13
121:7 146:7 147:10
150:9 151:18 152:19
155:4,8 156:1 159:1
163:11,15,24 165:18
165:23 166:16 167:5,9
**Paneson's** 147:14,17
164:5
**paragraph** 167:6
**parents** 127:24 148:6,13
148:16 210:12
**Park** 2:15
**parole** 126:20
**part** 20:11 32:7 33:22
41:2 53:21 55:21
61:23 100:5 113:20
114:17 121:9 124:20
124:21 158:19 200:13
200:17 203:23 205:8
206:20 208:10
**participants** 160:21
**particular** 86:11 198:19
203:23
**particularly** 196:17,18
**parties** 211:21 213:12
**parties'** 213:13

**partly** 141:20
**partners** 132:1
**Pasco** 1:8 7:7 9:1 12:25
13:8 17:17,20 18:8,18
22:11,14 26:3,7 28:8
28:15 29:13 32:6
38:22 47:8 48:13 55:1
58:11 60:6 72:5 73:6
75:4 80:2,7,22 81:17
85:11,15,18 86:7
87:21 95:12 96:11,19
99:10 105:10 110:15
114:18 133:18,21
137:6,21 138:14,19
139:18 145:3 146:17
149:22 150:4 154:21
155:9 159:19 161:19
163:20 167:24 168:13
168:25 169:12 170:17
176:7 180:18 206:13
209:4,5,18,25 211:2
212:3 213:4 214:6
**Pasco's** 27:1
**pass** 162:14 171:4
**passed** 61:16 62:9 73:17
**patrol** 29:12 114:2
118:21 187:24
**pattern** 43:6,8,13 44:6,8
45:5,22 53:23 54:6,8
54:12,13 78:17,20
158:1,1,20 207:8
**pause** 38:25
**pay** 131:25
**PC** 141:12 147:23 157:1
**Peake** 181:14
**pedantic** 16:22
**people** 23:10 26:23 38:16
40:4 42:17 46:11
49:19,23 50:5,7,8,12
50:15,17 51:5 58:12
58:15 70:18 89:12
112:12 114:5,10
125:16 128:24 131:8
148:23 154:14,17,18
170:23 197:3 199:11,3
201:9 206:9 208:8
210:16
**percent** 10:9,24 30:11
57:6 79:10 82:22
106:11 147:24 173:9
174:19,22 176:8
**percentage** 175:2,3
**perfect** 111:14 120:1
**perfectly** 34:6
**perform** 16:24
**performance** 14:17,20
14:22 15:11,23 16:11
16:18,23 25:17,21
77:14,16,20 115:4
**period** 33:13 34:10 46:3
87:10 128:9
**permitted** 162:24
**person** 13:17 18:4 34:9
36:10,22,24 37:20,21
37:22 45:10,11,12,14
45:17 50:22 51:1,2
75:11 76:14 79:22
87:6,12 111:25 112:1
118:23 124:19 129:3,3
130:19,23 134:19
157:21 166:17 168:19
169:8 170:11,21 171:3
190:2 193:18 194:21
195:10 198:21 199:4
202:23 203:2,15 204:9
204:12,21
**person's** 132:14

**personal** 180:21
**personally** 108:9,11
109:17 181:4 193:2
201:16 202:15 212:5
**personnel** 63:14,16
103:11,15
**perspective** 34:5 47:1
53:2 203:5
**pertain** 84:21 119:11,12
134:15
**Pfenninger** 159:14
**philosophy** 192:1
**phone** 187:19
**physical** 168:4
**picture** 66:12 141:14
**piece** 205:11,12
**pivotal** 49:7
**place** 1:17 27:22 43:16
80:14 129:13 132:19
170:20
**placed** 76:23
**places** 49:19 50:5
**plaintiff** 135:1
**plaintiffs** 1:5 2:5,9,13
79:7 84:22 119:13
164:2,10 171:8 177:8
178:7 214:3
**play** 190:5
**please** 6:8 10:15 20:3
**Plfs** 4:12
**point** 21:20 59:21 72:18
88:18 100:23 120:5
134:24 156:4 175:23
181:2 192:24 193:6
202:13
**points** 26:18
**police** 110:18
**policing** 8:14 31:2 49:6
171:12 181:1
**policy** 22:20 23:3 24:19
24:24 25:3 32:2,5 33:3
33:20 55:2,4,18,22
56:16,16 57:19,25
59:7 60:3,5 68:15,19
68:23 70:13,24 72:5,7
73:3 76:21,25 77:21
145:3 168:13,22 169:1
190:16,20,23 193:10
195:13
**pool** 44:23 47:14 48:4,5
50:15 198:14
**Port** 1:17,18
**portion** 101:7 162:11
**position** 8:16 31:4,14,17
99:16
**positive** 71:9
**possession** 66:3,14,15
67:1 155:5
**possible** 45:22 55:8
81:16,19 82:5,8,9,21
82:22 89:10 126:25
156:16 196:11
**possibly** 35:9,10 147:21
156:7,11 182:7
**post** 29:4
**potentially** 37:9 128:11
128:17 201:18
**Poulton** 2:14,14 10:16,19
11:1,13,15 13:23 14:3
14:5 15:15 16:13
18:13 20:4,16,19,22
21:25 23:1,6 24:3,10
24:17,20 25:5 30:23
31:19 34:15 38:7
39:17 41:12,16 44:12
45:7,25 47:6 49:24
50:23 51:7 53:13

55:11,14,20 56:3,10
58:24 59:8,14,19
60:21 63:15 68:21
69:8 71:16,20,23
72:16,18,20 73:7
75:12,20 78:11 80:15
82:10,12 83:17,20,24
84:6,24 85:12,20
86:12 88:10,19,25
89:15 90:11 91:21,24
92:2,6,20,24 93:9,17
94:8,12,16,20 95:4,7
95:24 96:3,6 97:8,11
101:9,14 102:13,18
103:25 104:9 109:5
116:15,22,24 119:24
120:5,24 121:6,13,15
122:8,12,16 123:23
124:1,7,9,13 129:11
134:23 135:4,24 136:2
136:11 137:12 138:16
138:23 141:6,19,24
142:3,5 146:13 147:7
147:18 157:24 169:3
169:14 170:14,25
172:15 174:3,24 175:5
175:9,23 176:14,16
178:3,10,16 179:5,8
179:11,19,22,25 180:4
180:6 182:24 189:9
191:2 193:14 197:11
197:14 200:16 201:17
202:7 206:1,24 211:11
211:14
**Poulton@debevoisepo...**
2:16
**PowerPoint** 62:16
**practices** 172:6
**pre** 24:5
**precautions** 57:17
**predict** 41:22,25 42:18
**preparing** 61:18
**Prescott** 180:13 182:14
**Prescott's** 180:17
**present** 33:13 46:19,20
54:24 162:5,9,10
211:21
**presentation** 163:5,8
**presenter** 161:3,4 163:4
165:5
**presenting** 165:6
**presents** 160:10
**presidents** 28:20
**presumably** 52:23 78:20
200:14
**pretty** 34:17,20
**previous** 142:12
**previously** 103:7 142:17
**primarily** 26:15 27:1,4
62:14 119:2 185:18
186:4,15,21 188:5
194:18 195:22 203:12
204:1 207:25
**primary** 127:13,15
132:20 186:18,19
195:24 196:3
**printing** 122:9
**printout** 100:5
**prior** 8:8 21:7 24:23
81:16 82:15 125:7
158:2 180:9
**prioritize** 49:10 52:3,5
59:15
**prioritized** 52:2 58:21
59:4
**prioritizes** 49:8
**prioritizing** 49:16

priority 203:15 204:6,7
204:24
prison 199:17
probable 41:23 42:22
44:10 45:16 120:2
121:25 128:5,6 141:11
147:24 148:8 158:8
168:2,11,16 198:1,24
probably 10:20 16:22
29:1 30:1 45:13 61:10
64:17,18 75:1 86:18
105:23 106:8 121:1
131:3 133:2 169:9
211:10
probation 126:16,20
127:12 130:4 131:23
132:2,3,8
probationary 131:11
problem 49:19,19,19,23
50:2,5,5,7,22,25 55:17
55:21 112:2,3,4 114:3
121:10 124:21 126:1
134:22 196:24,25
197:2,4 200:17 206:5
206:6 211:13
problems 29:23 146:11
204:15
procedure 68:19 69:2,11
69:19 70:17
procedures 4:11 13:7,12
14:24 15:10 69:17
proceed 92:25
PROCEEDINGS 1:12
process 4:7 12:7,8 15:9
21:16 22:18 24:25
32:3,21 33:12,19,23
37:10 40:6 43:24 44:3
44:6 47:3,18 48:2,9,11
60:10 71:8,8 121:10
188:16
processes 61:19 184:7
208:23
produce 172:7
produced 171:16 172:9
178:2 183:9,11,14
200:14
production 178:5
products 109:11 113:10
profession 180:2
profile 4:19,20,25 92:12
92:22 95:1,11 124:11
125:4,5 126:14 147:9
profiles 91:7,9,11,13,15
91:15 93:14 94:5,7
125:10 132:24,24
133:1 147:5
program 12:15,22,23
29:5 53:24 54:17
86:24 137:19,21
191:24 209:2 210:18
programs 56:23
projector 67:16
projects 133:8
prolific 4:7,12,13 14:25
16:2,12 19:21,23 21:9
21:12,23 22:12,15,24
23:4,11,11 24:11,12
24:25 25:4,11 26:5,8
32:3 33:23 34:8 43:24
44:2,5,20 45:1 47:2
48:8,11 49:9,11,22
50:9,12,18,19,21
51:10 52:1 54:14,21
55:2,18 56:16,24 57:5
57:6,7 58:21 61:24
62:15 65:7,20 66:16
68:16,20 69:3,20,23

70:1,9,22 71:2 72:13
72:23,24 73:14,17,24
74:4,6,12,19,21 75:9
75:22 76:1,10,17 77:9
77:10,11,24 78:5 79:7
79:21 81:3 83:13 97:3
97:5 98:18 99:5 104:8
105:2,9,10,14,19
108:18,20 109:1,18,20
110:3,6 111:1,10,11
112:19,20 115:11,23
116:4,7 117:3,4,12
119:5 120:2,9,14
124:23 125:3 126:15
127:5,8,14 128:6
129:20 131:11,22
132:19 135:12 136:15
137:1 139:4,12,24
141:2 144:22 145:4,13
145:19 146:3 149:14
150:10,13 151:24
153:1 167:14,15,25
168:5,7,16 169:1,13
170:11,18 171:10
173:13,19,21 174:16
174:19 184:12,17,23
186:10,14 188:3,7
195:1,23 196:19
197:18 198:11 199:18
199:25 200:1,5,22
205:2,9 206:16,21
208:13,15 209:1,7,14
prolifics 4:15 15:9 22:4
33:25 49:17,20 77:2
111:1 128:13,21 129:6
131:6 175:18 196:17
prompts 119:1
proof 195:8
proper 28:7 111:22
194:25
properly 52:1 58:6
194:12
property 26:15,24 28:6,8
48:3 52:14 159:14
164:19 208:6
proportion 186:10
prove 78:3 191:17,21
192:22
provide 10:15 11:11
34:23 41:1,2,23 42:21
53:1 126:6 130:15
145:4 186:23 187:2
188:6,23 194:7,9
196:3 207:2 210:19
provided 6:24 20:2 35:3
40:23 91:4,5,23 92:14
92:16,16 113:5 123:20
126:5,8 145:11,15
188:11,17 196:6,7
providing 36:20 43:1
54:3 109:4,6,10
185:18 203:6
proving 191:24
PSO 4:10
public 1:20 36:1 110:20
128:2 212:12
publicly 69:13
pull 77:13 90:12,19
106:8 107:12,24,25
108:6 110:6,8
pulled 67:7 80:1,24,25
80:25 137:19 174:10
174:11 175:14
pulling 126:9 206:17
pulls 95:18
purge 81:21,21,23 83:4
purged 81:17 82:15 83:1

108:1
purpose 7:11 45:4 46:22
47:2 48:15,20,24 68:2
68:7 74:12 78:7,17
109:25 121:8 124:2
127:13,17,18 147:16
148:3 155:22 166:10
178:6 198:15 206:21
207:14 209:1
purposes 44:3 88:20
120:16,25
pursuit 19:18
push 113:1
pushed 109:9
put 19:15 37:22 47:8,15
66:8 67:16 83:6 85:21
85:22 87:1,3,8 93:12
96:7 121:18 126:21
130:8 132:19 156:22
163:4 179:15,19
putting 108:15 128:25
148:3 193:20 204:11

_____

_____Q_____

qualify 184:16
quarter 37:25 38:2,3,6
38:14 39:12
quarterly 61:15 64:6,10
64:13,20 65:1 67:14
question 9:17,19 12:19
14:6 37:8 39:20 79:11
108:21 110:4 114:14
116:22,25 120:20
171:20 175:19 193:22
questionable 155:5
questioning 110:1,5
questions 7:21 9:8,13,13
11:18 23:23 24:15
56:8 71:22 83:15 93:8
95:4 149:14 171:16,18
171:22 172:19,21
176:19,22 179:2
193:24 203:17
quick 71:17 197:9
quickly 144:16
quiet 142:5
quotation 42:11
quote 115:18 143:10
164:21
quoted 42:8

_____

_____R_____

radio 84:18
raised 110:4
ramp 49:14,15 52:21
53:15,23 54:2 56:23
204:22
rampant 207:24 208:18
ramping 187:6
ran 37:25 38:3 85:23
range 133:4 140:11
174:4
rankings 4:12 79:6 83:21
rash 75:1,2
Ratcliffe 182:15
rate 208:1
ratio 53:20
read 7:5 14:12,15 41:19
58:5 87:2 115:16
139:8 144:3,8 147:12
155:3 161:11,15
211:14 214:12
reading 25:25 66:9
157:15 211:22
reads 202:9
ready 211:9

really 53:21 55:19 73:21
92:9 120:15,21 133:2
206:18 208:19
realtime 154:4
reason 7:24 20:11 24:3
75:10,18 82:25 90:7
114:7,8,9 124:20
132:5 149:3 192:18,19
200:8 204:4
reasonable 45:17 66:19
168:21 198:2,3,8,18
198:24,25 202:15
203:22 204:7
reasoning 198:20 204:15
receive 74:20 115:3
received 25:23
recognize 145:10
recognizing 27:1
recollection 204:4
record 6:9 30:23 41:7
59:24 67:24 80:10,15
87:10 94:24 96:1,7
110:21 117:11 118:15
118:17 120:6,12,15
121:17 122:16 127:13
137:8,12 138:6 156:12
171:22 213:9
records 80:9,22 85:16
86:5,16,18 87:17
95:24 99:8,10 110:15
116:12,14,19 117:2,9
118:3 122:2 125:15
133:20 137:5,5,7
139:19 159:20 167:21
redid 12:10
redo 9:11
reduce 28:7 207:8 209:2
209:3
reduced 57:11
reduction 173:9 187:22
redundancy 60:19
redundant 61:16
reentry 56:23
refer 15:2 54:12 83:5
86:10 114:15 115:22
158:22 160:24
reference 119:22 121:24
185:19
references 147:10
referencing 147:16
referred 60:17 73:24
106:22 118:8
referring 32:16 142:15
refers 50:4
reflect 33:9,12 87:15
122:16 161:8 202:10
reflected 32:12
reflection 32:21
reflects 12:5,21
refused 164:18
regarding 158:7,8
regardless 101:5 176:4
209:14,17
region 207:19,20
regional 62:7
regular 69:15 86:6 129:9
129:12
regularly 154:20
regurgitated 61:17
related 68:11 134:19
210:15
relative 213:11,13
release 99:4 126:22
released 98:21 99:1
132:11 199:5,15,17
relevant 21:9 44:5 80:17
remain 37:23

remained 18:25 199:18
remarked 177:1
remember 15:6 20:18
24:4 42:7 67:25 79:4
157:12 177:16 183:19
189:21
reminder 83:18
reminders 84:8
remove 194:13
removed 70:1
reoffend 49:3
repeat 23:13 38:17 40:7
40:8,9 48:22,22,23,25
49:9,12 74:25
repetitive 209:15
rephrase 89:5
replaced 180:9
replaces 101:10
replacing 98:12
report 36:6,9,24 37:3,13
84:15 85:10,10 86:1
89:25 90:2,4,5 97:18
107:5,5,10,18 108:5,5
110:7 113:18 119:17
119:17,21 122:15
124:22 134:2,2 135:20
143:21 144:3,14 150:2
154:10,10,12 162:14
200:13 201:4 213:7
reported 1:19 185:22
reporter 1:19 3:4 15:16
117:21 199:7 213:1,6
213:19
reporting 1:22 61:17
114:11
reports 4:14,18,21,24
5:3 35:21,25 36:1,2
84:17 85:6,16,19
86:10 89:4,7 90:12
103:23 104:4 106:15
106:16 110:18,18,18
115:8 116:9,12 117:25
118:7 119:11 120:17
121:20,21 122:10
133:15,17 134:6,14,15
135:8 137:8 146:6,16
149:21,22 154:7,8,20
158:23 169:19,20
203:2
representative 23:17,19
87:23 114:3
representatives 7:7
represents 156:17
request 20:7 80:1 108:24
178:18 187:10
requested 110:9 177:15
requester 110:10
requests 88:11
require 167:24 168:2,10
168:11,21
requirement 205:1,5
requirements 189:3,8,13
189:14,15
research 26:9 27:8,14,18
109:20 117:7 123:5
157:3
researching 108:21
110:2,5
residence 87:6 104:21
163:24
residents 87:6
resource 19:14 47:15
51:19,20 145:2,5,7,8
145:16 185:9,11
186:22 188:2
resources 19:13 43:21
47:10 53:1 86:13

109:21 186:24 196:23
200:7 204:11,12 205:7
205:15,17 207:3
210:12,19,22 211:1
respect 55:22 198:12
respective 211:21
responding 57:15 131:1
Response 9:23
responsibility 15:13
184:1
responsible 11:8 45:18
113:11,13,14,17,25
148:7
rest 19:16
retail 62:6 112:10,13
retry 87:5
reversion 18:14
review 15:12 32:14 40:25
81:20 194:11
revised 21:16,17 32:9
38:14 39:12
revising 39:10
revision 10:10 17:12
33:5
rewrote 9:14 58:2,3
rhythm 108:24
Richey 1:17,18
ride 57:12,13 118:23
right 6:20 8:3 10:22 11:1
19:11 20:23 23:16
24:9,14 26:18,21,24
27:11,11,17,19 28:2
28:16,20 29:24 33:6
34:5 36:17 38:17,19
39:24 42:20 43:3,3,7,8
43:14 46:3,12,13
47:23 49:14,18 51:11
51:13 52:12,15,16
53:6,15,19 56:2,10,19
58:18 62:11 63:9
65:17 66:10 68:5
72:17,17,17 73:9 74:7
77:3,25 78:23 81:7
83:3,4,14,15 84:7 86:5
86:18,21 88:13,18
89:11,16,19 90:7
92:14 93:6,23 95:14
95:16 100:3 101:12,13
101:14,16 102:1
108:25 109:7,9 110:24
111:11,12,14,21 112:2
112:18 113:5,8,12,19
114:5,6,12 116:23
117:25 118:21 121:5
122:12 123:3 124:13
124:15 125:7,10 126:1
126:11,12,22 127:16
127:21 128:9,10,22
130:13,15,17,18
134:21 135:2 138:24
141:13 142:19 146:14
147:4 149:5 155:13
157:9 160:8 166:22
170:18 171:5 174:4,5
176:12,14 179:17
180:1,5 182:24 184:20
185:18 186:22 188:4
189:20 190:2,6,9,24
192:16 193:11,20
195:21 196:21,25
198:2 202:17,19,23,25
203:5 204:5 206:8,11
206:15 207:8,12,16,19
208:2,22 209:11
ring 112:11,13
risk 57:11 210:20
Rjohnson@ij.org 2:4

RMS 95:15,24
Road 2:7
robberies 75:2
Robert 1:4 2:2 167:21
214:2
role 14:9 18:9 94:3
111:13 112:16 171:11
180:17,24 185:16
186:13 206:2 207:12
Ross 8:10 9:9,10,16 12:9
12:10 27:14 34:17,18
70:5 125:6 133:4
167:22 172:10,11
174:10,12 175:19
176:11 182:20,22
211:4,7
roughly 21:4,6 43:17
61:10 64:15 183:11
207:21
route 204:23
roving 118:21
rules 198:5
run 94:18 160:14
runs 31:11 81:19 87:21
87:22 88:1 92:15
95:16
RV 164:19

S

S 2:10,11,15 4:1 5:1
211:19
safe 207:6
safety 53:21 57:16 119:2
Sanborn 24:4 55:6,8
save 182:22
saying 23:25 34:22 39:5
56:5 82:12 94:21
111:4,5 126:5 132:4
195:15 198:17 200:13
203:9,19
says 7:5 8:1 41:19,22,22
42:21 49:6 65:9,24
66:1,3 74:14 81:7 93:2
96:10,14 115:21
121:25 134:18 138:12
139:23 140:19,25
141:10,12 143:15
145:1,6 154:9 155:4
156:13,15,17 163:2
167:7,9 170:6 173:24
184:16,17,21 194:21
scenario 44:11 76:13
scenarios 41:24 42:22
scheduling 63:7
scheme 207:13
school 29:4 185:9,11,19
185:21,23 186:1,22,24
187:1,14,16,18 188:2
188:5,20 210:9,10,17
210:20
school-based 211:1
schools 210:17 211:6
Schroeder 186:9
score 15:9 19:25 209:10
209:13,23
scored 124:17 195:23
scores 47:13 184:12
209:19
scoring 15:7,8 16:3,7,8
19:25 21:17 22:15,17
22:21 23:13 24:25
26:6,8,12,14,17,21
27:22 32:3,21 33:12
40:11 44:6,20 46:3,5
47:20,22 66:16 175:17
184:6,21
scream 123:22

screenshot 126:8
se 168:7
seal 212:7
search 164:19
second 80:16 100:7
104:1,16,17 119:21
136:10 140:10 143:14
144:17 151:21,21
167:5 204:6
section 4:15 8:14,19 12:5
70:7 91:7,8,11 94:5,7
95:1 104:12,13 125:21
126:14 127:5,13
128:20 129:22 130:9
130:10 139:2 154:5
165:3,4 171:12
sector 84:16
see 10:22 27:10,18,18
30:12 40:22 41:11
42:8 55:20,21 57:14
63:3 64:19 68:10 77:3
77:8 83:11,11 91:19
92:22 109:18 112:6
117:7 118:25 126:10
127:7 135:18,21
141:12 158:16,18
166:13 175:14 184:17
185:25 188:1 210:15
210:16
seeing 22:9 62:4,5 102:3
119:15 151:20 206:18
seen 6:19 70:23 79:3,19
91:13,14 92:18,18
164:12
selection 4:7 33:23 40:6
43:24 44:3 47:3
self 185:21
self-initiate 118:20,21,22
118:24
self-initiated 127:25
177:11,11
Semoran 2:15
send 84:7
sending 182:15
senior 196:7
sense 11:9 23:10 28:1
29:12 32:24 51:22
87:21 106:12 109:12
131:5
sent 88:11 92:5 98:2
154:12,13,14,17,24
155:1
sentiment 130:24 143:11
separate 10:20 177:10,14
separation 187:4 190:9
September 8:5,6,20
115:14,24 140:12,22
143:1,2,22
sequence 135:1
sergeant 110:12 161:5
sergeants 36:22 113:12
154:15
serious 176:19 210:6
service 85:24 177:13,18
206:14,16
services 56:25 187:1
210:10,20,24
set 13:7 15:8 16:11,18
22:21 25:10,10 33:19
40:10 111:23,24
112:11 115:5 117:25
120:13 146:6 164:24
162:13
sets 16:1,23
setting 32:2
seven 100:23 101:4
174:22 176:8 207:21

sex 19:18
sexual 187:13 210:7
shadow 141:11
Shadrick 186:8
Shaker 2:3
share 68:9 132:1
shared 185:23 211:6
sheet 3:5 10:20 184:24
215:1
shell 91:16
sheriff 1:8 7:8 13:3,4,4
88:12 113:24,24
114:21,22 181:8 214:6
sheriff's 6:9 11:8,11,12
13:17 14:9 16:25
17:17,20 18:4,8,18
22:11,14 23:17 26:3,7
28:15 29:13,16 30:7
30:17 31:15 32:6
54:20 55:1 56:15
58:12 60:6 64:9,12,25
65:1 68:14,18,23 69:1
69:5,6,12,18 70:17
72:5,8 73:6 75:10 80:3
80:7,22 81:1,18 85:11
85:15,18 86:7,9 87:14
87:18,18,20,23 88:7
88:16,25 89:12 95:12
95:20,22 96:12,19
99:11 105:11 106:4
108:21 110:15 113:20
114:19 115:1 116:3
118:3,14 125:2 129:9
133:18,21 137:6,22
138:7,14,20 139:19
145:3 146:17 149:23
150:4 154:21 155:10
159:19 161:19 163:21
165:25 167:24 168:14
168:25 169:12 170:17
171:9 176:7 180:18,20
180:23 181:3 187:3
191:13 198:6 206:13
209:25 211:2
shifted 181:25 182:2
shop 93:25 95:18
Short 72:21 197:15
shortened 29:20
shortly 12:4 98:19
show 40:18 92:5
showed 124:17 160:7
showing 66:25 142:18
shown 67:13 68:3 140:8
151:5 152:10 155:19
160:3,21
shows 79:5 81:3 142:19
shrink 74:2
side 92:15 132:7 154:18
186:22 207:10 210:13
sides 120:16
Signature 3:5 214:10
signed 17:23 134:7
significant 58:4 68:5
162:14
significantly 187:12
signing 211:22
signor's 15:13
signs 210:24,25
similar 43:16 123:17
125:21 148:9 210:18
simple 175:4
simply 81:17
single 86:19 107:25
128:18 130:7
sister 102:6,25
sit 124:15 186:16 196:14

sitting 56:14 66:9 82:20
116:19 122:19
situation 89:24 130:17
six 47:24 100:10 111:19
slide 40:18 62:17 64:19
142:12,14,19 160:20
162:21 196:15,15
slides 4:9,16,17,23 5:4,5
5:7,8,9,10 30:10 62:20
62:24 63:3 64:4,6
67:18,22 68:2,12
100:11 103:3,6 107:6
140:5 143:1 151:3
152:2,8 153:15,17
155:17 159:4,10 160:1
160:13,19 164:25
165:12 166:5 169:21
169:21 170:3
slowly 15:16
small 145:8
smaller 28:24
smartly 47:10
social 29:3,5
society 208:25
solely 43:23 173:12
184:3 211:1
solution 54:10
solutions 29:24
solvability 52:9
solve 52:9
somebody 13:20,21 14:1
50:21 66:22 75:1
98:12 123:4 131:15
168:24 188:9,25
192:17 195:1 205:9
someone's 69:15
somewhat 21:16
son 167:9,12
sorry 53:14 58:9 96:2
117:22 120:20 124:9
141:24 148:20 150:1
178:13 199:9 209:10
sort 13:9,13 24:5 54:3
66:21 69:17 71:21
130:13 143:14 173:15
sounds 8:12 20:22
source 42:7 203:9
sources 35:23 90:10
110:20,25
span 43:15 100:9
speak 7:19 15:15 116:14
174:13
speaking 136:19
specific 16:6 21:19 37:19
69:11 73:18 76:14
78:6 81:6 87:5 108:19
108:23 123:9 126:22
130:3,6 131:4 170:2
184:9 194:19 198:21
203:7 205:4 207:19
208:1
specifically 17:22 72:12
109:19 121:24 123:8
128:20 131:6 149:11
174:12 177:25 187:6
specifics 78:24
specify 73:21
spell 172:13
spending 196:23
spent 59:17 61:17
spirit 180:1
split 18:21 19:3,15 20:11
21:5
spoke 87:5 104:20
117:13 161:12
spoken 197:24
spots 49:9

spreadsheet 50:4 91:5
125:25 150:8
spree 62:4
Squawk 123:23
SRO's 186:15,20,21
187:23 188:11,17,18
210:16
SROs 63:21
stack 84:23
staff 34:11 39:23 69:25
154:15 171:13 185:21
stage 27:14
stand 41:8
standards 194:5
standpoint 46:7
stapled 143:14
STAR 9:23 10:1,2,7,12
11:1,20 55:24 105:3
start 6:11 7:22 108:4
160:13
started 29:1,2 30:2 211:5
starting 7:15
starts 15:6
state 1:20 6:8 38:20 60:4
157:13 159:13,16
187:5 191:21 192:15
212:2,12 213:3
STATES 1:1
stating 195:9
stats 207:24
status 4:13 79:22 162:7
statute 89:1 189:19
190:17 191:15,16
192:6,13,15 194:16
statutory 189:2,2,8,12,14
189:15
Ste 2:3,7,11,15
stealing 157:6,9
stenographically 213:7
step 32:16 33:15
stepping 159:14
Steve 15:8 16:7 79:11,12
80:4
Steven 155:4
stick 189:17,22
sticker 179:15,20
stilled 165:23
stipulate 93:15 94:25
stipulated 211:20
Stipulation 3:3
stipulations 191:5
stolen 155:11
stood 132:24
stop 29:16 64:12
stopped 61:15 64:18 65:1
story 127:24
straight 147:3
strange 88:25
strategic 9:22 172:12
strategies 28:7 29:24
109:9 172:6 197:7
strategy 52:12 76:19
111:8 112:4,6,6,14,22
112:23
streamline 29:20
streamlined 30:1,3
streamlining 61:19
street 94:18 210:18
stretch-our-legs 71:18
strictly 189:18
stripped 175:17
structures 114:9
struggle 124:22
struggling 51:4
student 185:22 210:10
studies 46:15 49:1
study 5:11 172:4 173:17

stuff 8:1,3 15:20 27:7
29:9 57:9 125:20
132:15 177:24 194:19
208:4,9
style 29:23
subdivisions 43:19
subject 72:24 73:2,5,22
76:16,24 77:6,21,22
78:5 95:21 104:8
118:22 199:11,22
200:1,9,21 203:11
subjected 75:22 76:1
105:9 117:3
subjecting 78:7
submission 121:2
submitted 138:9,13,19
139:14
subpoena 6:17,18
SUBSCRIBE 214:13
SUBSCRIPTION
214:14
substance 53:8
successful 112:7 210:21
sugar 202:7
suggest 36:6 124:17
145:12 149:10
suggesting 120:13
171:18 176:24 191:7
202:13
suggests 51:5
suicide 187:16,17 210:25
Suite 1:17
Suites 1:17
summarize 80:10
summary 111:5 121:1,17
super 157:8 208:22
supercede 18:11
supervise 113:16
supervising 183:15
supervision 196:1
supervisor 69:14 90:6
154:4 194:24
supervisors 25:18,20,24
25:24 154:15
support 77:9
supposed 35:23
sure 10:9,16,24 23:8
30:11 31:16 34:17
47:11 52:18 57:6
59:25 70:23 71:20
79:10 82:9,22 101:3
112:15 119:2,3 121:25
128:24 135:16 146:13
147:25 169:15 178:25
184:6 199:15,24
204:10
surface 126:3
surprised 180:6
surrogate 115:18
surveillance 43:11,20
suspect 10:21 43:12
45:15 62:13 77:11
95:21 129:18,20
suspected 75:9 155:10
166:25 184:13 185:2
188:19,20 190:25
191:1 195:10 196:21
199:2 201:9,16,23
204:17 205:4
suspects 43:19 52:16
62:14
suspicion 34:3 44:17
45:17 66:19 168:21
198:2,3,8,19,24,25
202:15 203:23 204:3,7
suspicious 169:10
switch 163:14 182:11

switched 182:3
sworn 6:2 212:6
system 24:6 27:22 52:18
80:7,9,11 81:18 95:25
96:1 110:22,22 118:8
118:15,18 119:8 138:1
138:1,2,3,6 175:15,24
184:6
system's 19:25
systems 110:20

T

T 4:1 5:1 211:19,19
T-A-B-O-R 102:11
tab 100:3 147:2 159:22
table 9:20
Tabor 102:9,15,20
tag 167:15 193:20
194:13
tagged 81:3,8 83:13
173:8,9,13,16 174:1,2
174:15,15
Tait 24:4
take 7:6 11:16 44:7 46:18
71:17 84:20,23 91:18
94:9,13,13 177:19,22
179:20 197:9 204:6
208:4,4 211:9
taken 46:1 70:1 176:1
188:23
taker 86:23
talk 42:13 55:15 56:8,11
59:12 60:14,21 66:7
130:3,4 161:9 168:23
169:5,6 176:11 205:6
talked 46:15 67:23 68:4
110:17 126:6,7 128:4
184:4 197:25
talking 59:18 79:6,21
81:12,13 111:3 119:19
136:3 148:11 183:7,23
183:24 187:19 197:17
talks 145:24 184:20
Tammy 1:3 4:21 120:18
121:22 134:18 136:20
136:23 143:5,15 214:1
Tampa 1:2 207:16
target 156:18
Targeted 9:22
taught 29:5
Taylor 1:3 65:13 81:7
85:5,7 86:16 95:19
97:2 98:7 100:20
101:10,21 102:2 104:7
104:13,21 105:9 106:5
115:23 116:5 121:7
214:1
Taylor's 102:5 115:7
teach 15:20
team 9:23 53:11,13,15
55:24 56:21 105:3
technology 90:7
telephone 2:10 178:11
tell 6:2 13:6 15:17 23:10
30:12 56:6 57:1,2,4
64:20 68:1 70:21 71:2
71:12 83:14 84:2 91:3
92:17 94:4,6 111:24
121:25 128:18 148:10
180:19 206:18
telling 91:12 94:3 112:19
tells 66:13
ten 14:20
term 29:14,17 30:6,7,17
60:6
terms 132:10
testified 6:4 29:13 35:6

48:6 124:19
testify 7:24 8:5,7,8 70:3
171:1
testifying 35:2
testimony 171:21 175:24
213:9
text 160:25 161:2
Thank 178:15 180:4
Thanks 179:11
theft 62:6 112:10,13
157:2,7,10 159:12
166:20,23,25
theory 45:21
they'd 70:13 145:23
thing 6:18 19:17 34:19
38:19 53:11 62:1
66:21 83:9 86:19
90:18 93:7 106:1
124:13 134:17,22
158:15 169:4
things 29:11,12,13 26:19
27:15,16,17,21 29:8
33:2,10 36:19 39:2
42:13 45:3,22 53:5,7,9
57:15 58:4 61:20
68:12 69:14 70:4 75:3
87:7 90:7 102:18
108:15,15,24 109:22
110:12,19,23 126:16
127:2,4 128:1,3 130:5
130:6,12,15 131:8,13
131:23,25 133:9 144:8
145:9 154:15 158:4
161:8 168:9,17 173:21
174:16 177:10 187:13
193:10 195:18 197:13
201:7 202:2 204:10
206:11 207:13 208:7
208:19 210:7,25
think 12:12,19 20:9,10
22:5,5 24:3 30:9,9
31:10 36:16 37:6,7
42:17 44:22 46:1,24
46:25 48:6 52:20
53:16 55:7 58:4 59:11
59:17,23,24 60:10
72:20 73:15 75:6 76:6
77:25 78:5 79:10 80:4
82:25 83:14 88:17
91:25 93:6,11 96:6
107:4 108:14 113:2
120:8,8,25 123:21
124:21 125:5,8 126:7
127:15 128:16 129:7
129:13,14 130:2,2,11
130:14 132:20 134:23
135:4 141:25 148:2
167:22 171:20 172:15
175:9,10,15,23 176:12
196:8 203:18 204:2
207:17 208:15 211:9
third 141:21 147:12
204:8
THOMAS 2:14
thought 37:10 48:1
thousands 125:17
threat 43:3,4 131:16
185:21,21
threat-related 185:20
threatened 130:24
threats 185:19
three 43:15 47:14,18
48:12,19 65:10 81:10
82:6 94:10 156:4,5,15
204:10
three-year 46:3 47:7
200:4

throw 15:17
ticker 81:20
ties 188:21,25
time 1:15 12:16,22 21:4
21:6,7,22 22:11 26:3
27:12 31:5,15 34:18
36:17 39:23 49:4
58:11 59:18 61:8,18
70:2,7,11 77:10 84:20
84:23 88:21 90:20,21
100:18 112:9 114:11
116:5,11 126:6 127:20
127:20 128:9,22 131:9
141:17 147:24 148:5
148:14 151:15,18
152:25 153:7,13 155:9
156:5 158:25 159:9
166:1,2 167:13 173:7
173:8 174:1,1 178:24
181:1,20,21,23 182:9
182:13,21 183:14
192:24 193:6 195:3
199:23 200:2,10,22
203:12 207:18 208:6
211:12
timeframe 43:9 67:7
152:18 167:22
times 46:11 51:9 132:8
148:15,25 162:12
169:15 207:16
timing 169:18 200:18
tip 4:22 137:19,20
138:13,19 139:14
tips 35:25 110:18 138:9
203:2
tipster 139:5
tipster's 138:25
title 20:18
titled 9:22
today 7:11,19 23:17 44:3
55:5,9,12 56:14 62:12
82:20 116:19 117:11
121:18 122:20 124:15
149:12
told 58:8 122:5
tolerance 55:3 56:16
57:18 59:6,13 60:2
73:3 74:24 76:20,22
76:25 77:21 78:2,2
tolerancy 56:15
Tom 10:14 11:11 20:2
55:7 120:22
ton 93:8
tons 46:14 207:11,15
tooken 208:17
top 16:18,19 28:13,16,20
29:14,17 30:6,7,11,13
32:22 33:6 58:12,15
56:18 59:7 60:3,7,13
70:12,14,22 83:25
98:8,12,14,19 99:14
99:21 100:15,17,20
101:6 104:24 119:22
129:20 140:16,21
141:6,7,10,16 142:10
142:11,13 143:2,25
151:15,19 152:20
153:6 156:1,4,21,23
157:22 158:5,9 159:1
160:19,20 163:12,16
165:20,23 166:1
169:23 170:4 189:21
209:19
topic 142:25
topics 7:15,18,25 62:11
62:11
totaling 163:3

totality 37:6 49:18 73:12
  73:23 128:15 148:18
  169:16 171:6 190:6
track 128:22 210:9,9
trade 19:9
train 23:11 40:19,21
  194:14,15
trained 195:24
training 41:1,3 42:12
  50:4 194:10 195:16,17
  195:25 196:4
trait 15:12
transcript 213:8 214:12
transferred 21:13
transition 125:8
trauma 187:22
traumatized 187:21
trends 15:12
trial 121:1
triggered 206:15
Trinity 122:9
true 22:24 54:23 55:5
  112:16 207:13 213:8
truly 23:9 48:23
Trust 15:16
truth 6:2,3,3 64:20 68:1
  122:1 180:20
try 123:9 134:24 145:24
  210:21
trying 56:25 96:3 108:12
  130:10 147:22 178:21
  191:23 192:7
turn 9:20 16:15,17 49:5
  65:17 100:14 101:18
  102:8 140:14 142:7
  173:4
turned 21:5
turning 204:21
twelve 83:22 174:19
two 33:2,10 37:3 104:4
  111:17 112:12 154:8,9
two-prong 206:12
Tyler 4:25 121:6 146:7
  147:10,14,16,22 150:9
  151:18 152:19 155:4,8
  155:25 159:1,9 163:11
  163:15 164:5 165:17
  165:22 166:16 167:5,9
  167:13,17,18
Tyler's 148:3 151:20
  163:21 164:17
type 18:4 29:9 44:6,10
  45:5 84:13 97:14,16
  108:24 133:3 137:18
  140:7
types 110:16 137:7
  172:24 173:21 174:15
  176:6 205:18
typically 131:20

U

U 211:19
Uh 55:11
Uh-huh 7:9 8:4 10:6
  33:11,18 41:21 50:6
  52:22 54:19 58:17
  60:1 79:13 87:25
  101:23 114:16 127:22
  129:5 131:10 135:3
  136:7 146:4 147:11
  157:16 181:7 195:5
  196:10 199:10 203:21
ultimate 113:24 207:5
ultimately 18:2 25:7
  26:24 27:10,13 34:2
  46:4,23 49:1,3,12,25
  51:2 52:13 54:10

totality 37:6 49:18 73:12

61:21 76:18 79:21
  85:24 89:20 90:19
  113:9,11,23 114:3,20
  125:24 130:21 132:3
  146:1 148:1,4,6,12
  158:11 171:4 206:12
  208:12,22 209:1,11,15
  211:5
uncertainty 57:24
uncooperative 164:22
  165:3
undersigned 212:4
understand 20:22 23:16
  24:17 39:2 42:20
  43:23,25 44:25 53:2
  55:14 64:9 72:18
  76:12 82:1 83:23
  105:24 109:15 110:14
  115:2 138:23 164:16
  164:16 176:2 186:17
  190:23 191:23 203:19
understanding 34:20
  39:3 46:20 57:1 66:10
  91:6 107:22 112:15
  119:3 176:5 177:12
  186:2 196:12 197:22
  198:1,5 199:16
understood 34:2
undesignated 178:24
  179:13,15
Unfortunately 11:5
  20:20 100:5 207:25
  208:21
uniform 169:5
unique 132:17 165:14
unit 12:11,12 35:1 51:14
  128:23,23 194:20
UNITED 1:1
units 19:9
universe 110:14 176:7
unvetted 79:9
updated 11:8 12:6 30:19
updating 11:9
uploaded 138:2,6
use 35:23 36:3 40:19
  45:22 86:13 100:18
  109:21 110:7 111:1,22
  143:2 162:24 169:24
  179:3,5 187:7 207:2
user 91:17 92:23 95:14
  95:17 125:11
uses 22:14 29:14 85:15
  110:15 137:6
usually 57:12 67:21
  70:21 90:5 107:5
  160:13

V

VA 2:7
vague 86:18
valid 100:25 140:25
  156:7,13
value 27:22
variables 37:7,9 38:22
  46:8,24
varies 61:9,9
vary 37:17 62:11
vehicle 207:22
verbal 51:13
verbatim 161:11,13,15
verbiage 74:17
verify 91:19,25 92:11
  93:1 94:16 127:11
version 10:7,15,24 11:4
  11:6,12 12:1,4 17:13
  17:16 18:12,17,22,23
  18:23,25 19:1 28:12

30:14 31:1,18 57:19
  64:22 74:7 182:19
versus 24:11
vetted 79:9
vetting 32:15
viable 149:3
victim 167:4,8,11
victim's 27:5
victimization 207:9,12
victimless 207:13
victims 49:9 187:13
  207:9,11 208:8 210:5
view 35:10
violated 132:7
violating 132:10
violation 126:21 132:17
  132:17 162:23,24
  175:25
violations 174:20,23
  175:3,13 176:9
violence 27:2,3,4,5
  130:20 209:15 210:24
violent 26:11,12,18,19
  26:21,25 27:1,23,25
  28:1,2,4 29:7 130:17
  131:12,16 187:12
  197:2,3 208:16 209:7
  209:11,12,13,19,24
  210:6
visit 205:20,21
vs 1:6 214:4

W

W 2:14
Wait 104:1
waived 211:23
want 7:4,13 16:17 22:8
  35:3 39:2 44:2 49:5
  55:15,17 57:3,10
  60:14 65:4 78:23
  80:16 83:6 84:20
  91:18 92:4 93:7,10
  95:6,8 96:7 101:18
  103:23 105:13 108:19
  109:13 110:14 112:15
  115:10 118:6 119:17
  120:6,14 121:18
  129:12 130:16,18,25
  132:12 133:1,14
  135:20 142:4 143:13
  143:18 144:16 158:22
  164:15 171:17,21
  173:4,18 176:18,21
  178:1 179:15,16,17
  184:5 186:7 203:17,18
  203:19 207:23 211:4
wanted 59:21 62:22 63:1
  86:15 88:19 95:5
  105:20 107:11,12
  108:22 113:1 133:25
  135:10 144:2 169:18
  184:6
wants 53:17
warning 130:21
warning-type 162:8
warrant 126:16,19,20
  127:3,12 129:3 130:16
  130:18 131:23 167:25
  168:10
warrants 128:23,23
  130:4
wasn't 8:2 13:21 15:21
  124:18 129:6 131:6
  135:19 206:4
waste 206:10
watch 130:21
watched 145:22

way 26:17 27:19 30:22
  34:11 35:16 41:6,24
  47:20 58:21 70:16
  71:12 100:13 108:2
  120:7,10 130:11
  148:16 149:16 170:15
  202:10 206:25 208:5
ways 112:3 120:8
we'll 8:10 16:9 17:2
  56:11 59:20 79:14
  83:24,25 121:1 123:23
  124:2 126:23 146:13
  179:20,22 182:22
  208:22
we're 7:5 10:24 11:8,16
  26:9,22 27:13,16,17
  27:18,19 34:7,8 36:18
  38:17 42:25,25 47:10
  47:25 52:16,18 81:22
  81:24 93:12 106:21
  108:14 112:2,3,15,18
  112:19 121:11 122:17
  134:23 135:15 142:25
  158:2 160:18 192:2,3
  192:3,4 193:20 196:18
  203:16 204:25 208:23
  209:23 211:9
we've 19:10 24:24 27:10
  31:6,7 33:10 39:21
  48:1 52:11 53:3 56:20
  56:21 57:10 71:16
  81:21 130:22 134:16
  137:7 149:10,12 158:2
  172:5 208:17
wear 89:20
Web 4:22
Wednesday 152:15
Wednesdays 61:2
weeds 109:11
week 36:24 62:12 100:9
  140:23
weeklies 36:18
weekly 60:24 65:2 103:9
weeks 37:3
weighed 175:16
went 9:11 29:10,22 30:1
  67:23,25 70:3 71:9
  77:10,12 101:4 107:22
  129:2 132:4 157:13,18
  186:8 206:3
weren't 132:4,5
Werner 154:2
whereabouts 148:8
white 47:1
Whiteman 151:12,15
  153:6
wide 206:14
Winter 2:15
witness 6:5 10:23 15:18
  20:15,17,20 22:2
  41:15,17 83:19 92:13
  92:21 94:15,18,21
  95:2,23 96:1,5 101:16
  122:14 124:25 136:1,3
  136:6 172:17 176:15
  211:13 212:7 213:9
witnesses 187:12
word 27:23
work 105:6 112:7,8,9
  113:4 114:18
worked 135:7
working 129:16 135:7
works 71:8 87:24 111:14
  120:8 154:5
world 128:4 208:21
worn 144:11
worry 178:23

would've 161:10
wouldn't 23:24 28:17
  46:18 86:20 87:9
  105:24 108:11 127:15
  131:15 132:18 168:9
  171:12 178:22 179:4,5
  179:8,11
wrap 154:11 197:14
  210:19
write 42:3
writing 35:17 74:10
written 33:19 35:16
  51:13 68:23 159:17
  190:16,17,18,21
  193:10 195:12 198:22
wrong 143:18
wrote 42:5

X

X 3:1 4:1 5:1 62:3 87:5
  188:21

Y

Y 87:5 188:21
yards 206:10
yeah 6:17 8:12,12 9:3,4
  15:3 19:25 20:17 21:4
  21:19,21 22:2,2,8,8
  23:21,25 24:14 27:6
  32:7 35:14 37:12,20
  38:22 39:4,8,17 46:5
  48:10 49:25 50:2 51:4
  53:1 54:5 58:1 59:11
  61:13,20 63:11 65:14
  66:23 67:5 68:4,6 70:5
  71:5 72:17 75:15 80:4
  80:8,12,23,25 81:5
  82:1,2 83:3,19 84:18
  84:19 85:4 88:24 89:8
  93:6 94:18 95:14 99:6
  100:10 101:2,9,13
  103:20 104:10 105:1
  107:9,19 110:17,20
  114:1 116:6 121:13,15
  121:16 122:16 123:23
  126:3 130:14 131:25
  134:19 135:18 137:2
  137:25,25 140:23,23
  141:15,22 143:23
  145:22 149:24 153:10
  154:2 156:7,16 157:14
  159:6 162:22,24 163:2
  163:13 164:11 167:10
  169:7,9,25 172:21
  174:9,25 176:10
  178:10,25 179:24
  182:11 188:18,23
  193:17 200:3 201:10
  204:24 207:7 208:6
  211:14
year 5:11 26:25 35:7,7
  47:24 57:13 172:4
years 19:11 28:9 47:14
  47:19 48:4,13,19
  56:20 81:19
yep 100:10 102:4
young 187:17,17,20
youth 210:1

Z

Z 87:5 188:22
Zealand 210:19
zero 55:2,3 56:15,16
  57:18,18 59:6,12 60:2
  73:2 74:24 76:20,22
  76:24 77:7,21 78:2,2

**zone** 5:13 74:4 79:23 183:6,23 184:1,2,3,4,9 184:9,11,16 185:5

**0**

**1**

**1** 1:17 4:3 6:13 53:20
**1-1-2016** 174:7
**1-1-2020** 174:8
**1-2018** 4:5
**1-5-2023** 212:13
**1,200** 114:10
**1,840** 163:3
**1:45** 1:15 211:17
**10** 4:13 62:12 79:15,16 96:25 115:22 135:10 150:9
**10-18-17** 143:17
**100** 4:17 10:9 30:11 32:22,25 57:6 79:10 82:22 106:11 147:24
**100,000** 114:4
**1010** 2:15
**10165** 144:5
**1035** 2:15
**11** 4:5,14 84:10,11 103:24,25
**117** 4:18
**119** 20:6
**11th** 101:4
**12** 4:15 81:10 82:13 90:24,25
**123** 4:19
**124** 4:20
**12th** 163:18
**13** 4:16 97:12
**133** 4:21
**13618** 166:13
**137** 4:22
**13943** 155:25
**13958** 161:21
**13965** 163:15
**14** 4:17 100:1,3 135:21 135:25
**140** 4:23
**14137** 166:25
**14413** 152:19
**14441** 165:17
**14533** 151:16
**14539** 151:8
**14541** 151:9,21
**146** 4:24
**147** 4:25
**149** 5:3
**15** 4:18 117:21,23 134:16 136:1,5,6 144:17 150:15
**151** 5:4
**152** 5:5
**153** 5:6
**155** 5:7
**159** 5:8
**15967** 100:14
**15970** 101:19
**16** 4:19 15:3,5 29:2 123:15,16 124:7
**16015** 141:21
**16024** 140:14
**16031** 142:7
**165** 5:9
**166** 5:10
**16686** 41:10,16
**16694** 49:6
**16781** 2:3
**17** 4:6,20 8:6 15:5 64:16

83:4 112:12 117:20 124:5,6 133:2 135:13 136:2,4 137:25 140:22
**171** 5:11
**179** 177:2
**18** 4:21 133:11,12 143:13 143:22
**180** 5:12
**183** 5:13
**19** 4:22 16:15 137:11,16
**19-ish** 207:24

**2**

**2** 2:11 4:4 7:13,16 8:23 8:24 155:9 172:23
**2-2016** 4:4
**20** 4:23 140:2,3
**2012** 81:24 82:7,12 207:23
**2016** 8:6,9,20 9:2 10:5 11:7 54:23 133:2 186:6
**2017** 8:17 12:8 30:2,8,10 33:6,13 64:17 66:4,14 67:3,25 81:6,8,11,17 82:10,13,16,24,25 97:3,8,10 98:16,19 100:12,17 101:7 104:5 104:8 106:6 135:12,16 135:17,21,25 136:17 137:1 139:21 150:10 152:14 180:15,18,21 182:6,7,19 199:9 211:4
**2018** 12:1 18:11,17,23,25 24:23 30:13,16,20 31:18 57:19 60:2 64:18,22 74:7 140:12 140:22 143:1,3,22 147:13 155:9 156:6,10 156:21 162:19 163:10 165:14,22 182:7,19
**2018-ish** 207:24
**2019** 115:14,24 199:19
**2020** 135:14
**2021** 19:1 21:3,13 22:1 22:18 24:23 31:1,5 57:22,25 150:14,15
**2022** 1:14 81:25 212:6,8 213:17
**20673** 65:5
**21** 4:24 146:5,10
**211** 3:3
**212** 3:4
**213** 3:4
**214** 3:5
**215** 3:5
**22** 4:25 146:25 147:1 158:24
**22203** 2:7
**22nd** 212:7 213:17
**23** 5:3 149:18,19
**23965** 85:3
**24** 5:4 150:25 151:1
**24/7** 38:25
**24001** 115:11
**24041** 136:12
**24117** 144:20
**2426** 1:23
**25** 5:5 115:14 152:5,6
**256** 2:3
**26** 1:14 5:6 16:17 153:23 153:24 156:25 212:6
**27** 5:7 155:14,15 159:5
**276821** 212:12
**28** 5:8 159:23,24
**29** 5:9 165:9,10

**3**

**3** 4:5 7:16 11:23,24 24:24 98:5 100:15 103:12 156:10,21
**3-26-17** 98:22 99:2
**3:00** 61:10
**30** 5:10 81:8 98:19 115:24 166:3
**30(b)(6)** 1:12 24:5
**300** 157:13,16
**305-721-1600** 2:12
**31** 4:7 5:11 165:22 171:23,24 176:14
**3180** 2:11
**31st** 133:3
**32** 5:12 176:25 177:1 178:18,24 179:13,14 179:17,19,23,23 180:8 180:9 182:24
**32792-5512** 2:15
**33** 5:13 179:18 182:25 183:1
**33131** 2:11
**33526-2426** 1:23
**352** 1:24
**38** 159:22

**4**

**4** 4:6 17:6,7 173:4,7
**4-18-17** 101:1
**4-4-17** 101:10
**4:30-ish** 61:10
**40** 4:8 125:16
**407-673-5000** 2:16
**44120** 2:3
**464** 119:22 121:24

**5**

**5** 4:7 5:11 16:18,19 28:13 28:16,20 29:14,17 30:6,7,11,13 31:22,23 40:10 58:12,15,16 59:7 60:3,7,13 70:12 70:14,22 83:25 98:8 98:12,14,19 99:14,21 100:15,18,20 101:6 104:5,8,24 106:5 129:21 140:16,22 141:6,7,16 142:10,11 142:13 143:2,25 151:15,19 152:20 153:6 156:1,4,21,23 157:22 158:5,10 159:1 163:12,16 165:20,23 166:1 169:23 170:4 172:4 173:6
**5-22-2018** 159:2
**50** 9:21 10:16
**52** 45:12,14
**567-5484** 1:24
**5th** 101:5 104:23

**6**

**6** 3:3 4:3,8 40:13,14 147:13 156:6 162:19 163:10
**6-6** 159:6,6
**6-6-18** 156:7 158:24 159:8
**6-6-2018** 156:13
**60,000** 114:4
**64** 4:9

**7**

**7** 4:9 64:1,2 100:22

**7-2021** 4:6
**703-682-9320** 2:4,8
**72** 4:10
**75** 15:6,7 16:3 53:20 173:9
**750** 157:13
**78** 4:12
**79** 4:13

**8**

**8** 4:4,10 71:25 72:1 173:18
**8:21-cv-00555-SDM-C...** 1:6 214:4
**84** 4:14
**8520** 1:17

**9**

**9** 4:12 78:24,25
**9-16-2016** 143:16
**9-18** 140:25 141:2
**9-18-18** 143:19
**9-18-2018** 143:23
**9:00** 1:15
**90** 4:15
**900** 2:7
**901** 2:7
**911** 85:25,25 128:1
**97** 4:16