UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


DALANEA TAYLOR;
TAMMY HEILMAN;
DARLENE DEEGAN;
and ROBERT A.
JONES, III,

   Plaintiffs,

vs.                          Case No.:  8:21-cv-00555-SDM-CPT

CHRIS NOCCO, in his
official capacity as
Pasco County Sheriff,

   Defendant.
_____/



PROCEEDINGS:          Deposition of
                      MAJOR TAIT SANBORN

DATE:                 September 23, 2021

TIME:                 1:57 P.M. - 4:52 P.M.

PLACE:                New Port Richey Executive Suites
                      8520 Government Drive
                      New Port Richey, Florida


REPORTED BY:          Jacquelyn Altilio, Court Reporter
                      Notary Public
                      State of Florida at Large



ANDERSON COURT REPORTING
14150 Third Street
P.O. Box 2426
Dade City, FL 33526-2426
AndersonCourtReporting.com

Phone (352) 567-5484                    Fax (352) 567-9151

1   APPEARANCES:

2   ROB JOHNSON, ESQUIRE
    Institute for Justice
3   16781 Chagrin Boulevard, #256
    Shaker Heights, Ohio 44120
4   703-682-9320
    Rjohnson@ij.org
5        Co-counsel for Plaintiffs

6   ARI S. BARGIL, ESQUIRE
    Institute for Justice
7   2 S. Biscayne Boulevard, Suite 3180
    Miami, Florida 33131
8   305-721-1600
    Abargil@ij.org
9        Co-counsel for Plaintiffs

10

    THOMAS W. POULTON, ESQUIRE
11   DeBevoise & Poulton, P.A.
    1035 S. Semoran Boulevard, Suite 1010
12   Winter Park, Florida 32792
    407-673-5000
13   Poulton@debevoisepoulton.com
       Counsel for Defendant
14

    LINDSAY MOORE, ESQUIRE
15   Pasco Sheriff's Office
    8700 Citizens Drive
16   New Port Richey, Florida 34654
    727-844-7701
17   Lmoore@pascosheriff.org
       General Counsel for Pasco Sheriff's Office
18

19                I N D E X
20
                                  Page
21
  Direct Examination by Mr. Johnson       4
22   Cross Examination by Mr. Poulton       99
    Redirect Examination by Mr. Johnson     100
23   Stipulation                   101
    Certificate of Oath          102
24   Certificate of Reporter      103
    Errata Sheet               104
25

1                              **E X H I B I T S**

                                                            Page
2    Exhibit 1- Image                                       9
     Exhibit 2- Image                                       11
3    Exhibit 3- Job Posting                                 16
     Exhibit 4- Event Report                                32
4    Exhibit 5- Incident Report                             46
     Exhibit 6- Event Report                                58
5    Exhibit 7- Event Report                                64
     Exhibit 8- Event Report                                67
6    Exhibit 9- Event Report                                68
     Exhibit 10- Event Report                               71
7    Exhibit 11- Event Report                               73
     Exhibit 12- Event Report                               76
8    Exhibit 13- Event Report                               77
     Exhibit 14- ILP Manual                                 87

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MAJOR TAIT SANBORN,

2      being first duly sworn to tell the truth, the whole

3      truth, and nothing but the truth, was examined and

4      testified as follows:

5              THE WITNESS:  I do.

6                    DIRECT EXAMINATION

7    BY MR. JOHNSON:

8      Q.   Would you state your full name for the record?

9      A.   Tait Sanborn.

10     Q.   And are you currently employed by the Pasco

11   County Sheriff's Office?

12     A.   I am.

13     Q.   What is your position?

14     A.   I'm currently the Field Operations Bureau

15   major.

16     Q.   What is the Field Operations Bureau?

17     A.   In short, it's patrol.  We also have property

18   crimes and STAR teams.

19     Q.   And how many people do you oversee in that

20   position?

21     A.   Depends on the day, but approximately 360.

22     Q.   And are those all uniformed officers?

23     A.   With the exception of roughly 21 property

24   crimes detectives, yes.

25     Q.   And who is your supervisor?

1      A.    My supervisor is Colonel Jeff Harrington.

2      Q.    So in your position, do you supervise deputies

3  who conduct prolific offender checks?

4      A.    I do.

5      Q.    What is a prolific offender check?

6      A.    A prolific offender check is, frankly, just

7  what it sounds like.  We go and check on folks who have

8  been identified as prolific offenders.  We check on

9  their status, see how they're doing, ask about any

10  crimes that they may be aware of or have committed,

11  offer them resources as needed, encourage them to seek

12  gainful employment, and things of that nature.

13      Q.    When you say you check on their status, what

14  does that mean?

15      A.    Again, just how they're doing.  You know,

16  oftentimes, there's any number of things that could be

17  going on in their life.

18      Q.    What types of things would you be interested

19  in?

20      A.    The things I mentioned already.  Primarily, you

21  know, do they have a job?  Are they looking at reducing

22  recidivism?  Are they in need of any sort of resources?

23  Are they aware of any crimes in their community or any

24  of their associates that they're willing to give

25  information on?

1    Q.   Okay.  Does that also include asking if they're

2    going to school?

3    A.   If they're of school age, then certainly, yeah.

4    That would be a substitute for gainful employment.

5    Q.   So what individuals are subject to prolific

6    offender checks?

7    A.   Prolific offenders.

8    Q.   How are you -- from your perspective, how do

9    deputies identify who is a prolific offender?

10   A.   So the deputies don't necessarily identify who

11   is a prolific offender.  The identification of prolific

12   offenders is done through the intelligence-led policing

13   section.  The analysts do that.  The deputies -- yeah,

14   the deputies don't identify them necessarily.

15   Q.   How is it communicated to the deputies who is a

16   prolific offender?

17   A.   Essentially, there's a list.  You know, there's

18   a -- folks say, "Hey, these are prolific offenders."

19   There's different search functionalities.  And just to

20   be clear, I want to make sure we're talking about

21   present day, or is there a timeframe we're looking at?

22   Q.   Is the answer different depending on the

23   timeframe?

24   A.   So it potentially is because of the different

25   -- for example, the system that we used currently that

1    they're going to give you came into creation like 2018,

2    the global profile.

3        Q.   Okay.  So the global profile was put in place

4    in 2018.  What was the system before 2018?

5        A.   I don't know that there really was a

6    sophisticated system.  There really just was a list of

7    these are prolific offenders.

8        Q.   How was that list conveyed to deputies?

9        A.   It's usually provided electronically.  Again,

10   it's very similar to what is used now where, basically,

11   you go in, and you do a search of a geographic area, and

12   it says, hey, these are the people that are on the

13   prolific offender list within this geographical area.

14           It can be searched by county, zone, district,

15   you know, any subset of geography.  But that's the way

16   it would be done is a geographical search, or you can

17   punch in a name directly if you happen to know one and

18   see if they are on the list or not.

19       Q.   And how would deputies access that list?

20       A.   Just through their mobile computer.

21       Q.   Was it up on the intranet?

22       A.   Unfortunately, I'm not -- I mean, I don't want

23   to assume.  I'm not an IT guy, so I'm not entirely sure

24   what the difference between intranet and internet and

25   all those other things are, but it's on the computer.

1      Q.   So it's a list.  And was it just a list of

2   names, or how was it formatted?

3      A.   The way I described.  It was basically -- it

4   depended on your search criteria.  If you plug in a

5   name, Tait Sanborn for example, then it would be

6   formatted by a name, Tait Sanborn, or no response

7   because there is no name of that type on the list.

8           Otherwise, you would punch in the geography,

9   you know, a zone designator.  For example, a Yankee two

10  is north Land O' Lakes.  You would say everybody that

11  lives in this geographical boundary has a home of record

12  in there, it would populate, and say here it is.  And, I

13  mean, if we're going down into the weeds, typically, it

14  would be alphabetical because that's just the way that

15  computers do things.

16     Q.   Do you know the name of the electronic database

17  that you would be entering the name into?

18     A.   No.  I mean, not -- no.  The global profile is

19  what we're using.

20     Q.   Right.  But I'm asking before 2018.  Do you

21  know the name of what you would have been using?

22     A.   I don't.  Prolific offender list.  I'm sure it

23  was something painfully obvious.

24          MR. POULTON:  Some acronym.

25          THE WITNESS:  I don't know if we even got that

1      complex.  Probably just words.

2  BY MR. JOHNSON:

3      Q.    I understand.

4          MR. JOHNSON:  I'm just going to mark this as

5      Exhibit -- let's do numbers -- Exhibit 1.

6          (Exhibit 1 was marked for identification.)

7  BY MR. JOHNSON:

8      Q.    So we're looking at a screen here.  Is this

9  what you refer to as the mobile computer?

10      A.    Yes, sir.  You're talking about the screen

11  that's in my upper right-hand corner?  There's a couple

12  different screens on there.

13      Q.    Yes.  So you said that the global profile was

14  implemented in 2018.  This picture, would this be before

15  the global profile was implemented?

16      A.    It appears to be.  So this is -- this is a

17  picture of the -- of central command.  Global profile is

18  found on central command.  And so, again, I'm not

19  necessarily the best one to explain the technology, but

20  I'll do what I can for you.  This central command

21  basically -- I don't want to use the wrong words.

22          In my terms and how I would describe it, it

23  basically aggregates a bunch of different functions, and

24  it pulls a bunch of different data sets from a bunch of

25  different places, and it just makes it into a dashboard

1    is the phrase that I hear often to where you can access

2    different things.  Through this central command, I can

3    schedule my vehicle maintenance.  I can schedule my

4    in-service training.  I can do a variety of things.  One

5    of those things would also be a prolific offender

6    search, yes.

7        Q.   And again, this is before the global profile.

8    But if you clicked on one of the pictures of an

9    individual on the screen, what would that pull up?

10       A.   It's going to pull up information on that

11   individual.  And again, the system is not -- is not

12   terribly different.  Again, I'm not an IT guy.  I would

13   describe the global profile as a slight refinement of

14   this system.

15            But what it's going to pull up is historical

16   activity and police reports.  Like I said, everything

17   that this central command is pulling from is within our

18   records management system, really, already.  So it's

19   going to pull up any documented activity that we have on

20   whoever that individual is, good, bad, or indifferent.

21       Q.   So if you conducted a prolific offender check

22   on somebody and then you had information following the

23   check, where would you input that information?

24       A.   Typically, when you click on the picture, one

25   of the things that's going to pop up is it's going to be

1    a button that says offender notes or something to that

2    effect, and that gives you an opportunity to say

3    whatever it is that you need to say in basically a

4    free-form text box.

5         Q.   And was that true both before and after 2018?

6         A.   Yes.

7              MR. JOHNSON:  I'll mark this as Exhibit 2.

8              (Exhibit 2 was marked for identification.)

9    BY MR. JOHNSON:

10        Q.   So this picture is from 2018; correct?

11        A.   According to the time stamp on the top, yes,

12   sir.

13        Q.   Is this a picture of a global profile?

14        A.   To be perfectly honest, it appears to be.  My

15   eyes aren't what they once were, but that is -- I would

16   say with some degree of certainty, yes, that appears to

17   be a global profile.

18        Q.   So on a global profile like this, what is the

19   information at the very top of the screen next to the

20   picture?

21        A.   I don't --

22        Q.   Not specifically.

23        A.   I don't know specifically.

24        Q.   I mean in general.

25        A.   It should be just biographical data.  Do we

1   have anything that's maybe enlarged?

2       Q.   No.  It's okay.  This is what we've been

3   produced so far.  We already went over that with

4   Mr. Kraus, so I don't need to --

5       A.   Okay.

6       Q.   Okay.  What training does the Pasco County

7   Sheriff's Office provide to deputies to conduct prolific

8   offender checks?

9       A.   Certainly.  It's primarily through the ILP

10  manual.

11      Q.   And how are they trained through the manual?

12      A.   Well, we ask them to read the manual.

13      Q.   So all deputies are asked to read the manual?

14      A.   Asked and checked -- you know, basically,

15  tested on it for comprehension.  The testing is really

16  more of a Socratic method.  What happens is as

17  individuals are going through the field training

18  program, there's a couple of -- first off, the training

19  officer's in the car with them, and they're passing on

20  what they do; right?  "Hey, this is what I do."  And

21  there's some basic steps, "Hey, do we stand right in

22  front of the door, or do we kind of stand off to the

23  side?  How do we approach people?  Do we park right in

24  front of the house, or do we park a little further

25  down?"

1          So there's a lot that goes into just training

2    deputies in general.  But the primary training that

3    would come to the deputy as a trainee would be through

4    their field training officer in accordance with the ILP

5    manual.  There are a couple of different points during

6    the field training program where they actually sit down

7    with the district captain, and we ask them various

8    questions.  There's a whole lot of things that are going

9    on through the program, and intelligence-led policing is

10   one of the top -- and the manual is one of the top

11   things that is evaluated by the district captain as far

12   as comprehension at that time.

13          What the captains will do, typically, is

14   they'll -- and again, it's a fairly expansive document

15   for a 20-minute oral interview.  So what they'll do is

16   they'll pull items out of that to check on

17   comprehension.  They'll validate with the FTO, "Hey, is

18   this something that you've been training them on?  Have

19   you been covering this material?"  And so there's a --

20   again, a high degree of certainty that folks that are

21   coming through that field training program are familiar

22   with the intelligence-led policing manual.

23       Q.   So are there particular parts of the manual

24   that they would be more or less likely to pull out to

25   check for comprehension?

1     A.   The short version is no.  No, not particularly.

2     Q.   Is there any kind of written evaluation that is

3  filled out at the end of that process?

4     A.   In regards to what?

5     Q.   The Socratic testing?

6     A.   No.  The evaluations that are done are daily

7  evaluations from the field training officer on the

8  trainee, and then there are kind of capstone evaluations

9  from the trainee that are filled out on the training

10  officer.  But those are not done really in relation to

11  intelligence-led policing at all.  It's just part of

12  ensuring the documentation through the field training

13  program and that the field training officers themselves

14  are treating people reasonably.

15     Q.   Does the person who's doing the training fill

16  out something to attest to the fact that the person that

17  they're training understands the ILP manual?

18     A.   The checklist has a lot -- I don't believe

19  there's any checkbox, no.  I don't believe there's any

20  checkbox specifically that says ILP manual.

21     Q.   Okay.  So there is a checklist though?

22     A.   There's a checklist within the field training

23  program that covers an extensive amount of things.

24     Q.   Does it cover prolific offender checks?

25     A.   I'm not certain.

1    Q.   Does it cover the concept of the prolific

2    offender?

3    A.   I'm not certain.  Again, it's several hundred

4    individual items.

5    Q.   Who would you ask to find out?

6    A.   So we could find out relatively quickly.  We'd

7    just have to pull up the checklist and look and see if

8    it's on there.

9    Q.   Is that -- is there one checklist that's used

10   for all deputies?

11   A.   Yes, sir.

12   Q.   How about for deputies in the STAR unit?  Is it

13   the same checklist?

14   A.   So again, there is no checklist going into the

15   STAR unit.  We're talking about entry-level deputies in

16   the field training program for the field training

17   program checklist.  So the answer would be no.  There is

18   no checklist for STAR deputies.

19   Q.   So the STAR deputies go through the same field

20   training as other deputies?

21   A.   Several years prior to becoming STAR deputies,

22   yes.

23   Q.   So what is the STAR unit?

24   A.   So it stands for strategic targeted area

25   response.  The concept behind the STAR unit is that they

1    are areas that traditionally are more prone to crime

2    than other areas.  Those are called the strategic

3    targeted area response areas, the STAR boxes per se.

4    There's some math that goes into that that the analysts

5    handle, and they come in and say, "This is what we're

6    recommending as your STAR box."  They present that to

7    the district captain.

8            The STAR team is responsible for suppressing

9    crime within the STAR box.  And so they spend a majority

10   of their time working within the STAR box, and that's

11   what they do.

12       Q.   Okay.  Do STAR deputies assist with identifying

13   prolific offenders?

14       A.   No, no.  That's -- again, that's based --

15   that's based solely on criminal history and involvement

16   with reports.  I don't know.

17            MR. JOHNSON:  Let's mark this as Exhibit 3.

18            (Exhibit 3 was marked for identification.)

19   BY MR. JOHNSON:

20       Q.   Are you familiar with this document?

21       A.   I am.

22       Q.   What is it?

23       A.   It's the job vacancy posting for a STAR deputy.

24       Q.   Do you see the top?  It says, "Duties include

25   but are not limited to identifying and targeting

1    prolific offenders."

2        A.   I do.

3        Q.   So how does the STAR deputy help identify

4    prolific offenders?

5             MR. POULTON:   Object to the form.

6    BY MR. JOHNSON:

7        Q.   Does a STAR deputy help to identify prolific

8    offenders?

9        A.   No.  It's a mathematical formula based on their

10   criminal history.

11       Q.   So it's your understanding that the

12   identification of prolific offenders is solely based on

13   the mathematical formula?

14       A.   Correct.

15       Q.   Do STAR deputies target prolific offenders?

16       A.   Yes.

17       Q.   How do STAR deputies target prolific offenders?

18       A.   It depends greatly on who the offender is and

19   what types of offenses they're committing.  It's a

20   fairly broad question.

21       Q.   Could you give me some examples of how a STAR

22   deputy would target prolific offenders?

23       A.   If we believe that -- you know, if there's --

24   so again, it depends.  I mean, I can give some

25   speculative for instances, if that's what you're asking.

1    Q.   Can you think of past instances where the STAR

2    unit has targeted prolific offenders?

3    A.   Certainly.  There's a belief potentially that

4    someone is stealing motorcycles within an area.  The

5    STAR team would create what we call a bait bike

6    operation where there's a tracking unit, and they would

7    -- within a motorcycle that has maybe a kill switch with

8    an ability to be disabled.  They would leave that

9    motorcycle out in a parking lot or something close to

10   where, potentially, a prolific offender lived and see if

11   they bite, see if they steal a bike or not.  So that's

12   an example of how they could do that.

13   Q.   Can you think of any other examples?

14   A.   So again, the, you know, prolific offender --

15   not particularly, no.  There's a variety of -- the

16   notion behind the STAR team is the response has to

17   mirror the crime.  If we believe that there's an auto

18   burglary spree that's occurring between 3:00 and 5:00 in

19   the morning, we're going to go ahead and dedicate

20   resources to that area between 3:00 and 5:00 in the

21   morning.

22        They may use not undercover operation, per se,

23   but what we'd call cool cars where they're not obviously

24   police cars.  Still uniformed deputies, but driving in a

25   vehicle that is more discreet where people aren't going

1    to necessarily just turn around and go back to where

2    they came from at the mere sight of them, but those

3    types of things.  Again, there's a variety of ways,

4    depending on the variety of crimes that are being

5    committed.

6        Q.   How does the Pasco County Sheriff's Office keep

7    track of how many prolific offender checks have been

8    conducted on a particular individual?

9        A.   So within that -- within that note-taking

10   system, there's two primary ways that it really can and

11   should be done.  One is a location history through our

12   CAD.  So if you live at -- or if I live at 123 Main

13   Street, then I could punch in 123 Main Street, do an

14   address query, and see, hey, when was the last time we

15   had any sort of documented activity out there?

16            The other way is to take the notes based on

17   your prolific offender check, say, "Hey, I was out here

18   this date, this time, talked to this person.  He's

19   working at Burger King."  And then prior to whoever the

20   next deputy might be going out there, you would pull it

21   up again, click on it, see all the notes.  Okay.  Well,

22   somebody was there yesterday.

23       Q.   Sure.  You mentioned the CAD history.  Is there

24   a documented CAD report created for every prolific

25   offender check?

1          MR. POULTON:  I'll object to the form, but go

2     ahead.

3     A.    Yeah.  The policy is that, yes, you would

4     document your activity.  Yeah, there's no reason to be

5     out someplace -- and again, that's for a variety of

6     reasons, primarily officer safety.  There's no reason to

7     be somewhere where people don't know where you are.

8     BY MR. JOHNSON:

9     Q.    Do deputies always follow that policy?

10    A.    With 100 percent certainty?  I can't get

11    deputies to always do their time sheets the right way,

12    and that's getting you paid.  So again, I -- I don't

13    have any definitive examples of when they didn't, but

14    people are people.

15    Q.    Does the Pasco County Sheriff's Office keep

16    location data on deputies separate from the CAD data?

17    A.    What do you mean by location data?

18    Q.    So, for instance, if you wanted to know whether

19    a deputy had been to a particular address on a

20    particular date, is there a way that you could find that

21    out?

22    A.    Yes, I believe there is.

23    Q.    How would you do that?

24    A.    So the cars are equipped with what's called an

25    automated vehicle locator.  And again, technologies have

1    changed.  We refer to it as an AVL.  It's actually not

2    particularly an AVL anymore.  We use a company named

3    Sincera, but the concept is still the same.  I don't

4    know when that program went into effect and they started

5    putting what we lovingly refer to as the hockey pucks on

6    the car.  And there's -- again, there's been an

7    evolution of ways that that goes.

8            Sometimes they used to have the hockey puck on

9    the car, and that had to be connected to the computer.

10   Now there's a device in the computer where I don't know

11   that you necessarily need the car.  And I'm sure at some

12   point, you know, technology will evolve again.  But the

13   answer to your question if I remember correctly, which

14   was is the automatic vehicle locator separate from the

15   computer-aided dispatching?  It is.

16   Q.   Is that data available to deputies?

17   A.   Is it available to deputies?

18   Q.   Yes.

19   A.   As far as where everybody is at a given moment,

20   or archive data?

21   Q.   Archive data.

22           MR. POULTON:  Object to form.  I don't think

23       that's his -- correct me if I'm wrong.  I don't

24       think that's your --

25   A.   It's not.  Well, the technology is -- so the

1    technology is not my forte.  However, I don't know the

2    way -- I don't believe that there's a way for a

3    deputy -- it requires -- it requires a level of access

4    that the traditional deputy doesn't have for archived

5    data.

6           Now if the locator is plugged in correctly and

7    operating the way it should -- which, again, if we can

8    get our cell phones to work all the time, then there's

9    some variability there -- the deputies can look on the

10   screen moment to moment and say, "My zone partner is

11   over here.  My backup deputy is over here.  This guy's

12   five minutes away from me."  But he wouldn't go back and

13   say, "Hey, when I was here at noon yesterday, where were

14   you at noon yesterday?"  That's not a functionality that

15   the deputy would have.

16   BY MR. JOHNSON:

17      Q.   Does anyone within the Pasco County Sheriff's

18   Office have that functionality?

19           MR. POULTON:  Object to form.

20   BY MR. JOHNSON:

21      Q.   You can answer.

22      A.   I believe that they can find out through ILP or

23   fleet.

24      Q.   What is fleet?

25      A.   Just a maintenance shop.  They're the people

1    that outfit the cars.

2       Q.   When you say through ILP, you mean the analysts

3    might have access to that?

4       A.   So I know dispatch has it.  But again, I don't

5    know if they have the ability to go back through archive

6    data.  And again, the technology kind of escapes me.

7       Q.   When you say dispatch, is the dispatch function

8    run within the Pasco County Sheriff's Office?

9       A.   It's a separate entity.  It's actually run

10   through the county.

11      Q.   Do officers -- or excuse me.  Do deputies use

12   prolific offender checks to gather information on crimes

13   committed by other people other than the prolific

14   offenders?

15      A.   Potentially, yes.

16      Q.   Okay.  And in what kind of circumstances would

17   they do that?

18      A.   So everybody knows somebody.  I don't

19   necessarily understand the question exactly.  But

20   certainly, if there was some crime geographically going

21   on in the neighborhood where the prolific offender

22   lived, that might be somebody that we might want to go

23   talk to and say, "Hey, have you heard anything?"

24           If there is somebody that is known to be

25   involved with a certain crime that is also a known

1    associate of the prolific offender, that would be an

2    opportunity to go and talk to that individual, not

3    unlike if you were to meet me on the street and say,

4    "Hey, how's your wife?"  You would know how she's doing

5    because I know how she's doing, and you asked me.

6         Q.   What's the difference between a prolific

7    offender check and a probation check?

8         A.   A prolific offender check is someone that's

9    identified as a prolific offender, and a probation check

10   is somebody that's on probation.

11        Q.   Is there any other difference?

12        A.   A probation check would typically involve

13   probation officers.

14        Q.   Do deputies also conduct probation checks?

15        A.   They can, certainly.  Yeah, they're under court

16   order to be a certain place and certain time with

17   certain restrictions, so that's something that's

18   certainly within our purview to check on.

19        Q.   But typically, it would involve the probation

20   officer?

21        A.   Not necessarily.  It could.  Sometimes they're

22   done in conjunction with probation officers.  Sometimes

23   we get requests from probation officers to go check on

24   this person, and sometimes we just happen to know that a

25   person has a condition of probation, and we go check on

1    them on our own.

2        Q.   What's the purpose of a probation check?

3        A.   Well, it's to ensure that they're following the

4    limitations of their probation.

5        Q.   If a deputy was conducting a prolific offender

6    check, what information would they view before

7    conducting the check?

8        A.   In a perfect world, they would look to see the

9    history of the location, history with the individual,

10   any sort of recent intel reports from the districts

11   produced by the analysts, and then their own personal

12   knowledge of crime trends in the area.  It's very likely

13   that, you know, somebody that's previously stolen

14   vehicles lives two blocks away from a vehicle that was

15   stolen, and so they would obviously do a personal memory

16   check of those types of things.

17       Q.   Separate from the field training that we

18   discussed earlier, is there any additional training

19   provided to members of the STAR teams?

20           MR. POULTON:  Object to the form.  Do you mean

21       specific to prolific offenders or just generally?

22           MR. JOHNSON:  Just generally.

23       A.   So there's training that's provided outside of

24   field training that's provided to all members of the

25   sheriff's office.

1    BY MR. JOHNSON:

2        Q.   Okay.  That's fair.  My question is training

3    that's specific -- is there any training that is

4    specific to members of the STAR teams?

5        A.   Not unless it's -- not unless it's something

6    organized by the individual sergeant who says, "Hey,

7    I've noticed that the last time we were out on perimeter

8    we, you know, zigged when we should have zagged, so

9    we're going to go out, and we're going tighten up on

10   this real quick."  But again, I don't want to interpret

11   the question --

12       Q.   Let me try to -- is there any training that's

13   provided to members to the STAR team upon becoming a

14   member of the STAR team?

15       A.   Nothing formalized or documented that I'm aware

16   of, no.  What -- it's really just -- it's an internal

17   transfer.  It's not even a promotion.  It's a deputy

18   position to a deputy position.  The presumption is that

19   you have an understanding of how to be a deputy.  So,

20   really, what happens is a process of kind of on-the-job

21   training where you integrate with that team.  You learn

22   and work with that team.  But the skills and ability of

23   a STAR team member are common and consistent for all

24   deputy sheriffs.  We just expect them, based on their

25   tenure and opportunity, to work together to be a little

1    bit better at the fundamental skills.

2        Q.   Sure.  What are the procedures for uploading

3    body cam footage?

4        A.   At the -- so the physical procedure is you take

5    the camera, and you stick it in the docking station, and

6    it recharges the battery, and it uploads directly to

7    Axon.  Again, I'm not a technology expert.  But what

8    I've been told is that it's an alterable direct pipeline

9    that goes directly into Axon's database.  That's pretty

10   much as far as the policy.

11        It's supposed to be uploaded at the end of each

12   shift and then has to be basically tagged and identified

13   within five days of the date of occurrence.  And if, for

14   any reason, it malfunctions, there's a couple of

15   different notifications that have to be made, one to the

16   supervisor and one to the body-worn camera

17   administrator.  And it has to be documented in the

18   report that you forgot to turn it on or that it failed.

19        Q.   And how is the body cam footage tagged and

20   identified?

21        A.   Every event has either an event number or a

22   case number, depending on if a report is pulled or not.

23   So it would be tagged with either the event number,

24   which is a longer numeric, or a case number, which is a

25   little bit of a shorter numeric.  That way, there's no

1    duplication.  You can't have an event number and a case

2    number as the same.  Otherwise, you would have an issue

3    there.

4            So it's given a unique number of one of those

5    two types.  And then, like I said, within five days --

6    the cameras are often paired to the phones, so you can

7    either go into the Axon system through the internet, or

8    you can, right there on scene with your phone, tag the

9    video, and then it will be tagged when it uploads.  So

10   there's a couple different ways to do that.

11       Q.   Okay.  Is there any geolocation data associated

12   with the body cam footage?

13       A.   It's outside of my purview.  I don't know.

14       Q.   Do you know who I would ask to get that

15   information?

16       A.   Would be our body-worn camera administrator,

17   Rob Gartenberg.

18       Q.   Can you spell his last name?

19       A.   G-A-R-T-E-N-B-E-R-G.

20       Q.   The event number and case numbers, do those

21   correspond with numbers in any other database?

22       A.   So they correspond with the numbers that are

23   assigned to the event or case within the CAD.  So every

24   time -- every time I check out somewhere, that is given

25   an event number.  If I do a traffic stop, it's given an

1    event number.  If I say, "Hey, I'm stopping for lunch,"

2    and I log it in the computer, it's given an event

3    number.  Case numbers are only given when you

4    specifically request one because not every police

5    activity results in a report.

6        Q.   So the event number would correspond with CAD

7    -- and this is going to be a compound question -- and

8    the case number would correspond with an incident

9    report?

10       A.   A report, correct.  And, obviously, the implied

11   task there is that everything is going to have an

12   incident number.  Not everything will have case number.

13   And if you have a case number, you should have a

14   corresponding incident number with it.  And you can

15   generate multiple cases on the same incident.

16       Q.   Okay.  How would the body cam footage be stored

17   if a deputy had not created a CAD incident for a visit

18   to a house?

19       A.   It would typically be labeled nonevent.  Like

20   say, for example, I'm getting out of the car, and a seat

21   belt drags, and the button gets pressed.  Again, you

22   can't -- you can't eliminate the video, so you just have

23   to tag it nonevent.

24       Q.   Is it possible to search the CAD database by

25   location?

1     A.   It is.  Yes, that's when I talked about the

2   address history.

3     Q.   Right.  So it would be possible to generate a

4   list of all CAD reports at a particular address?

5          MR. POULTON:  Just to clarify, maybe I

6       misunderstood.  I thought you were asking like could

7       a deputy do that in his car?  But are you asking

8       more generically, like could we now, after the fact,

9       go and make that inquiry?  I'm just clarifying for

10      my own edification.

11    A.   Yeah, the address history should be good in

12  perpetuity.  I don't think there's any limit as far as

13  an address history goes.  And certainly, if we're only

14  talking about a couple of years, there would be an

15  address history that would be there.  So address history

16  is a good way to find historical activity documented at

17  a residence.

18  BY MR. JOHNSON:

19    Q.   And deputies are able to make that -- to create

20  that kind of an address history?  A deputy on their

21  field computer is able to make that kind of address

22  history?

23    A.   When you say -- so I don't know what you --

24    Q.   Are they able to generate --

25    A.   Yes.  They can pull a location and do a history

1    search of that location, yes.

2        Q.   Okay.  In your experience, are the time stamps

3    on body cam footage generally accurate?

4        A.   They are, as long as you have the ability to

5    periodically interpret from the prime meridian.  As long

6    as you can do the math from Zulu time.

7        Q.   And to make sure I understand what you mean by

8    that, would you use a CAD report to kind of figure out a

9    starting point and then calculate from there?  What is

10   the prime meridian in your analogy?

11       A.   So -- so the prime meridian is where Greenwich

12   time is.

13            MR. BARGIL:  He wasn't speaking metaphorically.

14   BY MR. JOHNSON:

15       Q.   I see what you mean.  I thought that was an

16   analogy.

17       A.   It's going to give the time, and so I would

18   have to look and see if this is the time local or time

19   Zulu.

20       Q.   Okay.  Thank you.  That is helpful.  So in

21   that -- we were looking there at Exhibit 2.

22       A.   And again, all of them are going to have the Z

23   at the end.  And so, again, we would have to look at --

24   we would have to look at what this was associated with

25   to know if this is, again, time local or time Zulu.  And

1    I think we're six and a half hours off Zulu if I'm not

2    mistaken, or something like that.  It's a half for

3    whatever reason, but it's something like that.  So the

4    time stamp that you're looking at is possibly the real

5    time.  And if for any reason there's a discrepancy, the

6    first thing I would do would be to look at Zulu time.

7         Q.    Does the Z at the end indicate that that is

8    time Zulu?

9         A.    I'm not sure how this system does it.  When I

10   was flying airplanes, that's exactly what that would

11   mean.  And when I was in the Army, that's exactly what

12   that would mean.  As far as how Axon does their time

13   stamping, I don't know.  With the military, I mean,

14   whenever I see the Z, you've got to figure out where

15   that is in relation to where you're at.

16        Q.    And if I wanted more information on the time

17   stamps, I'd probably talk to Rob Gartenberg?

18        A.    Yes, sir.

19        Q.    Well, that clears up a mystery for me.

20        A.    Glad I could help.

21             MR. JOHNSON:  I'll mark this as Exhibit 4.

22             (Exhibit 4 was marked for identification.)

23   BY MR. JOHNSON:

24        Q.    So are you familiar with this type of document?

25        A.    Yes.  This is an event report from our CAD.

1    Q.    Okay.  So this is from the CAD database?

2    A.    Correct.

3    Q.    Okay.  I'm just going to go through item by

4  item on the report.  And I'm not going to ask you

5  questions about the specific incident because I know

6  you're not familiar with it, but I just want to

7  understand how to interpret this type of report.

8          So the first number at the very top, it says

9  event ID.  Is that the number you were talking about

10  earlier that would correspond with the body cam footage?

11    A.    Unless there's a case number drawn, yes.

12  That's the event ID.

13    Q.    What is the second number that says call ref

14  number?

15    A.    There's the event number, and there's the call

16  number.  The call number is -- you're going to have --

17  that will be a nonunique number, and that basically

18  refers to, typically, the number of call that is that

19  day.  So this would be something along the lines of the

20  653rd call that we handled that day.  So the first call

21  after midnight would be call 001, and so on.

22          So that number is going to recycle every day.

23  So it's great for that day.  If you're a supervisor, you

24  say, "Hey, send me call 653.  I'm going to go back up

25  that deputy."  After that day, it doesn't mean anything.

1   So the event number is a unique number that is a much

2   better number.

3       Q.   Got it.  The next item, date/time received,

4   what does that refer to?

5       A.   That's the time that the call was initiated,

6   and you should see that number parallel down here at the

7   call received time.

8       Q.   Who initiates a call?

9       A.   Either the deputy or dispatchers.

10      Q.   Is there a way to tell on the report whether it

11  was initiated by the deputy?

12      A.   Under event ID, if you look two spots down,

13  there's a report number, which is blank, so there isn't

14  one.  And then it says call source is self, so that

15  would be a self-initiated call.

16      Q.   And by self-initiated, you mean initiated by

17  the deputy?

18      A.   Correct.

19      Q.   And so this is -- this is obvious, but just --

20  sometimes I have to ask stupid questions.  The date/time

21  received would be the time that the deputy initiated the

22  call?

23      A.   Correct.

24      Q.   And the deputy does that by doing something

25  within CAD?

1      A.    Yeah, within the -- so this is -- I apologize

2   for the acronym.  Within the MDB, mobile data browser,

3   which is, again, the terminal itself, within the CAD

4   functionality, there's a self-initiate button.  You type

5   in the location, the purpose code, and then just hit

6   send, and it sends the call to the dispatcher so they

7   can track where you are, what you're doing.

8      Q.    Okay.  So then the next thing over from where

9   it says self, it says prime unit.

10      A.    Primary, yes.

11      Q.    What does that refer to?

12      A.    1I2.  That's the zone designator.  One is the

13   first shift, I is the sector, and two is the zone.

14      Q.    And then below that there's a name?

15      A.    That's the deputy.

16      Q.    And just obvious question, but that's the

17   deputy who initiated the event?

18      A.    Correct -- or that -- well, it's the deputy

19   that's assigned as primary.

20      Q.    What's the difference?

21      A.    Well, I could initiate the event.  Typically,

22   there wouldn't be one.  But say two of us go together,

23   and I initiate it, and we find somebody that has a

24   warrant potentially at that location.  Well, I need to

25   pull the case number so I can get the warrant served.  I

1  initiated it, but I'm leaving because I've got a dentist

2  appointment, or I've got a depo, or something else.  So

3  the other deputy can go on the radio and say, "Hey,

4  switch me to primary, and assign that case number to

5  me."  Then you can leave.  I'll take and transport the

6  arrestee, serve a warrant, and that's how it goes.

7          So again, in most cases, the primary unit and

8  the initiating unit are going to be the same, but there

9  is an opportunity to become primary during the course of

10  the call if there's a need.

11      Q.    Understood.  To just go back a minute, the

12  date/time received, just to be clear, that's local time?

13      A.    It is, absolutely.  Yes, sir.

14      Q.    And then services involved, what does that

15  refer to?

16      A.    So we share a CAD and dispatching program with

17  fire rescue, so ours are always going to say law.

18  You're going to see the same thing below that where it

19  says service, law.  The fire department is going to have

20  a similar event report, but theirs is going to say FD or

21  fire or something.  I've never actually seen one of

22  theirs, but it wouldn't say law because that's not one

23  of them.  So, basically, that's going to autopopulate on

24  all of ours, as with the agency, PSO.

25      Q.    And then when it says location, is that

```
1    location entered by the deputy?
2         A.   On a self-initiated call, yes, it is, sir.
3         Q.   Okay.  Is there any kind of geolocation data
4    recorded here?
5         A.   In this -- not that I'm aware of, no.
6         Q.   So location data is all entered by the deputy?
7         A.   This is really kind of free-form.  So, yeah.
8         Q.   Okay.  Now if we go over to the right, across
9    from the location, there's a parentheses, S --
10             MR. POULTON:  I'm sorry.  I didn't mean to -- I
11        have an answer on the time stamp issue.  Prior to
12        March 2020, the time stamps are Zulu.  But after
13        March 2020, the time stamps are local time.
14             MS. MOORE:  On the BWC.
15             THE WITNESS:  Well, that's good for me to know.
16        I'm glad we changed it because I look at some old
17        stuff sometimes for complaint resolution, things
18        like that, and that helps me as well.  So thank you.
19   BY MR. JOHNSON:
20        Q.   So where it says parentheses, S, and then
21   Casson Heights, what does all that on that line refer
22   to?
23        A.   So I'm not familiar with this specific
24   geographical area.  I believe that's going to be a
25   subdivision, and then the N is going to be a
```

1    neighborhood.  So it's the -- basically, it stands on

2    its own.  There's no explanation needed.

3        Q.    Understood.  And then underneath that, it says

4    JUR?

5        A.    Jurisdiction.

6        Q.    And then it says CAD?  What does that mean?

7        A.    CAD.  It's just -- there's -- our CAD is set up

8    for all of Pasco County.  So my understanding is that

9    you're going to get that same CAD as your jurisdiction

10   regardless.  The agency could change.  So Dade City

11   Police Department is on our same CAD and dispatch radio

12   system, so they will be a DCPD instead of a PSO.  But

13   the jurisdiction I believe is always going to be CAD.

14   The service is going to be law, unless it's fire rescue,

15   and then the agency is going to be how you identify what

16   agency is there.

17       Q.    And if it says PSO under agency, that means

18   it's the Pasco County Sheriff's Office?

19       A.    Yes.  Jason Beldon at the time was a Pasco

20   County sheriff's deputy.

21       Q.    And beneath that, there's three items.  Could

22   you just go through those three and tell us what they

23   are?

24       A.    The STB is the zone that we talked about, Ida

25   two.  The RA is the sector, and then the district is

1    district three.  So those are just -- in descending

2    order, it should be really the district, the sector, the

3    zone.  So it's district three, Ida sector, zone Ida two.

4        Q.   Then underneath, it says nature, prolific

5    offender check.  How is that field populated?

6        A.   By whoever dispatches the call, whether it be

7    self-initiated or -- you know, so as I mentioned

8    previously, you're going to -- you're going to plug in

9    an address and a nature code, basically, like what type

10   of event it is that you're doing.  It could be a traffic

11   stop or illegal parking or a citizen walk-up, what we

12   call a citizen assist, and that's just the broad heading

13   of what they're doing there.

14       Q.   So the deputy who self-initiates selects what

15   to populate in that field?

16       A.   Correct.

17       Q.   And then this would indicate that this was a

18   prolific offender check?

19       A.   It was, yes, sir.

20       Q.   The next field is alarm level?

21       A.   I don't know what that one is.

22       Q.   Okay.  How about priority?

23       A.   Yeah.  The calls are basically stacked in level

24   of priority between one to seven if I'm not mistaken.

25   So what I'm doing now is like a seven.

1        MR. BARGIL:  Thanks.

2     A.   It's based on safety.  Priority one calls, your

3  in-progress crimes, burglary in progress, fight in

4  progress, they're going to get dispatched differently.

5  They're going to get toned out.  When you look at the

6  call screen, it's going to be identified in a different

7  color than other calls.

8        So there's red, yellow, and green calls.  So

9  your red calls are your priority ones.  Your yellows,

10  prolific offender check.  Traffic stop is also a

11  priority three.  Anything where you're kind of going

12  into a little bit of an element of the unknown, you

13  know, is going to fall into that priority category.

14  Again, it's based on safety and level of risk.

15  BY MR. JOHNSON:

16     Q.   So then we have some blank fields here.  Call

17  taker, does that refer, again, to the unit that

18  initiated the call?

19     A.   In this case it does, yes, sir.  And keep in

20  mind, the reason that those fields exist is because

21  through dispatch, you're going to have a call taker, a

22  dispatcher, and then a responding deputy.  When you

23  self-initiate a call, those things are all the same

24  people.

25     Q.   Okay.  Console?

1    A.   That's the identifier for the deputy's

2   computer.

3    Q.   Do the deputies generally -- does one deputy

4   generally use the same computer?

5    A.   Yeah.  They're assigned by individual.

6    Q.   And then the notes -- oh, actually, I'm sorry.

7   Geoverified address, what does that refer to?

8    A.   So sometimes new roads get built, and sometimes

9   addresses are bad.  So we'll get a caller that says,

10  "Hey, come to 123 Main Street."  Well, 123 Main Street

11  is not an address that's a registered address with the

12  county.  It doesn't exist.  So what they're saying is

13  this is a real address.  According to our computer, it's

14  an actual place that we believe exists as a real place.

15   Q.   It says nature summary code.  What does that

16  refer to?

17   A.   Again, it's the same as before.  It's the

18  prolific offender check.  P-R-O-L is the short

19  identifier for prolific offender.

20   Q.   And then it says disposition?

21   A.   OAC is other action.

22   Q.   And just to be clear, the disposition means how

23  the call was resolved?

24   A.   Right.  It didn't end in a report, didn't end

25  in an arrest, didn't end in a warning.  It's just

1    something else.  Other action is just a catchall for

2    anything that's not those other things.

3         Q.    Now the next field, notes, is that entered by

4    the deputy who initiated the call?

5         A.    Yes, sir, it is.

6         Q.    And at the very end of the first thing, it says

7    -- the first paragraph, it says NFA?

8         A.    No further action.

9         Q.    Okay.  What is 4044?

10        A.    That should be the CJIS of the deputy that

11   entered it.

12        Q.    Is that the identification number?

13        A.    Correct.  It's what's commonly referred to a

14   badge number or an employee number.

15        Q.    Okay.  And then at the end of that, there's a

16   set of brackets.  And inside of that, there's a time and

17   a unit.  Does that just record who entered that note and

18   when?

19        A.    Yes, sir.  It's the -- it's the time stamp

20   of -- yeah, you're exactly right.  It's the time stamp

21   of when the notes were entered and by whom.

22        Q.    All right.  We can skip down to where it says

23   times.  So the first time, you indicated earlier, is the

24   time that the call was initiated by the deputy?

25        A.    Correct.

1    Q.    Okay.   What are the other times that are listed

2    there?

3    A.    So you'll notice that the first one, two,

4    three, four, five of them are all the same.   And again,

5    keep in mind that this is a self-initiated call.

6    Otherwise, we would have a call received by a call taker

7    through our dispatcher, and we'd have to mark that time.

8         The call gets routed to the dispatcher, which

9    would be a different time.   The call taker could

10   potentially still be taking information.   A fight in

11   progress, you know, we want to get deputies going there,

12   but the call taker still needs to figure out how many

13   people.   So they'll be like, "Hey, get some deputies

14   moving," and now we're saying, "Hey, how many people are

15   there?   What's the story?"

16        The first dispatched is the time stamp of the

17   first deputy that gets sent the call.   So again, it's

18   self-initiated, so the deputy is the same time.   The

19   first en route is when the first deputy acknowledges the

20   call and says, "I'm on my way."   So when he entered the

21   call, he put himself en route automatically.   And the

22   arrival time is the time that it takes you from the time

23   you're en route to the time you get there.

24        So one could reasonably assume from looking at

25   this he's two blocks away, he types in the call, he hits

1    it that, hey, I'm on my way, and roughly nine minutes

2    later, he arrives.  And then he clears 13 and a half

3    minutes or so after that, 14 minutes, something like

4    that.

5        Q.    And the deputy clears when they're leaving the

6    location typically?

7        A.    Correct.  So then we can bounce back up and say

8    he typed his notes in at 7:52, put his seat belt on,

9    adjusted his cup holder, you know, whatever the case may

10   be, and then started to drive away and said, "Hey, I'm

11   done."

12       Q.    And, actually, I guess we can look at the time

13   stamp and see that he entered in the name and date of

14   birth at the same time that he initiated the call?

15       A.    He did, yes, sir.  And that would be common

16   because, again, if you're going to do a prolific

17   offender check, it'd be nice for everybody to know who

18   you're going to check on.  If the deputy doesn't come

19   back, who's the last person they were going to see?

20   That's good information.

21       Q.    So then below that is a radio log.  What is the

22   radio log?

23       A.    So the radio log is all those same things

24   again, the dispatch time, the en route time.  It's

25   possible at times that somebody gets pulled off a call

1    for a higher priority call in that priority listing that

2    we said.  So then it would have another time or a

3    truncated time and then a re-dispatched time, so that

4    can actually -- or there could be 15 units going to a

5    call at all of those times, so this is the first of

6    everything.

7            But now you're on your way, and you're first,

8    and that gets counted up here.  Well, two minutes later,

9    this is getting bad.  Now he's going, she's going, and

10   she's going, and all of those times are going to get

11   logged as well.  So everybody that's on that call who

12   has an action related to responding to that call is

13   going to get logged through that bottom section.

14   Q.   Now there's a column there for comments?

15   A.   Correct.

16   Q.   What would be -- how is that column used?

17   A.   So those are all autopopulated, and you'll see

18   that the only comment is the beat and the zone, so Ida

19   two.  It looks like they just pulled -- it looks like

20   they just pulled from the notes page, whatever, the

21   original data that was inputted.

22   Q.   And then the last set of events or set of data

23   is this event log.  What is the event log?

24   A.   So again, it's just duplication, right, the

25   time the call was received, same as it was entered, the

1    time they finished taking the call, and then the added

2    remarks.  I could potentially go to one location looking

3    for a suspect of a burglary, and I talk to their mother,

4    and they say, "Oh, he's actually at his dad's.  It's two

5    blocks away."  Now I'm headed over here.  And you can

6    keep a running log, and it'll just track each time you

7    made an entry into the case so that no information gets

8    lost, and you have it time stamped the entire way.

9        Q.   So when a deputy adds remarks, does that refer

10   to adding the remarks in notes section?

11       A.   Yes.  And you'll see those times, the 7:52:53,

12   are the same.

13       Q.   So if they added remarks in some other

14   database, that wouldn't necessarily be recorded in the

15   CAD report?

16       A.   This is only for the CAD.

17            MR. POULTON:  Can we take a quick restroom

18       break?

19            (Whereupon, a short recess was taken.)

20            MR. JOHNSON:  I'm going to mark this as

21       Exhibit 5.

22            (Exhibit 5 was marked for identification.)

23   BY MR. JOHNSON:

24       Q.   So I just want to -- and I know it's tedious,

25   so I apologize.  I want to do basically the same thing

1   for this.  So are you familiar with this type of

2   document?

3        A.    This is one of our incident reports, yes, sir,

4   what we would commonly refer to as a police report.

5        Q.    All right.  Are these stored within RMS?

6        A.    Yes.

7        Q.    Is there a corresponding entry in CAD for this

8   type of report?

9        A.    I believe that there should be, yes.  I mean, I

10  haven't read the report.  I'm assuming that, as a result

11  of a report being there, that they actually went

12  somewhere and met with people and spoke with them.  So,

13  yes, there should be a corresponding entry.

14       Q.    And would that entry be stored in CAD under the

15  case number?

16       A.    It could be accessed through the case number,

17  yes.

18       Q.    So that's the number on the upper right-hand

19  side here?

20       A.    Correct.

21       Q.    So if we were to take that number and enter it

22  into CAD, that would likely pull up a CAD report?

23       A.    It should, yes.

24       Q.    So let's just go through this again.  At the

25  very top, agency name, who populates that field?  Is

1    that autopopulated?

2        A.    It's autopopulated, yes, sir.

3        Q.    And then the next field below that says ORI?

4        A.    That's also autopopulated.

5        Q.    What is it?

6        A.    That's the number that FDLE uses to identify

7    our agency.  So each law enforcement agency in the state

8    of Florida has an ORI.  It's assigned through our

9    Teletype.  There's all kind of stuff that works through

10   our ORI.  So anything that's associated with the Pasco

11   Sheriff's Office is going to have the ORI FL0510000.

12       Q.    The next field over on the right, it says date

13   and time reported?

14       A.    Yes, sir.

15       Q.    Is that entered by a deputy?

16       A.    It's not.  It's autopopulated, but deputies

17   have the opportunity to amend it if needed.

18       Q.    Okay.  And why would a deputy need to amend it?

19       A.    Again, for something like this, they wouldn't.

20   But the -- imagine, for example, that you went out of

21   town for a week.  So you come back, and you've now

22   reported a burglary to your house at 8:13 on 9/29, and I

23   go and say, "Hey, when did you leave, sir?"  You're

24   like, "Well, I left on the 23rd."

25            And so I need to go back and say, "Okay.  Well,

1    the last time you knew your house was secured was on the

2    23rd at --" you left at 8:00 in the morning, for

3    example.  And then you found it an hour before you

4    called me because you took the kids off to their

5    grandma's or something because now you've got to deal

6    with police.

7            So the reason that that exists is because not

8    everything is reported immediately or done immediately.

9    I could go out there and say, "Hey, my brother-in-law

10   punched me in the face two weeks ago."  Well, we can't

11   have it autostamped with today's date without the

12   ability to go back and say it actually happened two

13   weeks ago.

14       Q.   So just so I understand, this field, it says

15   date/time reported.  Does this refer to the time that it

16   was reported to the Pasco County Sheriff's Office?

17       A.   Correct.  It's usually -- so again, this should

18   correspond with the time of the call -- call received.

19   So when we look back at Exhibit 4, this date/time

20   received should be the same as the date/time reported --

21       Q.   Okay.  I see.

22       A.   -- and an autopopulated environment.

23       Q.   And if a deputy was changing this to something

24   else, would that be because the information was reported

25   to the Pasco County Sheriff's Office before the report

1   was generated?

2       A.   I don't understand the question.

3       Q.   Yeah, I'm sorry.  I guess --

4       A.   I think the example I gave you is probably the

5   best one.  You wouldn't really necessarily change the

6   date and time reported because that's going to

7   autopopulate with the call for service.  So we first

8   learned about it when somebody called us and told us

9   about it.  There's no reason to really alter that.

10          The only things that you would necessarily

11  change were the last known secure and the found at, and

12  that's for the reason we said because at some point, the

13  crime occurred.  You don't know when.  You were gone

14  from the house for a week.  You just know that from this

15  date to this date, somebody took your stuff.  So that's

16  how we have the ability to capture those in the report.

17      Q.   So there would be a reason to change the last

18  known secure and the at found, but there's really no

19  reason to change the date/time reported?

20      A.   Correct, because our first indication that

21  something is amiss is because somebody picks up the

22  phone and says, "Hey, something's amiss."

23      Q.   The location of incident, is that data entered

24  by a deputy?

25      A.   That autopopulates from the CAD as well.  But

1    again, with the opportunity to amend it if needed

2    because you could call me from your mother-in-law's

3    house because you didn't want to touch anything in your

4    house three doors down.  And so the place that you're

5    calling from is not -- the place that I responded to is

6    not necessarily the place where the incident occurred.

7         Q.   Okay.  So it autopopulates from CAD but could

8    be amended?

9         A.   Correct.

10        Q.   The next field, gang related -- I assume that's

11   gang R-E-L-A-T?

12        A.   Gang related, yes.

13        Q.   Is that entered in by the deputy?

14        A.   Yes.  There is a checkbox, so you either check

15   the box or you don't.  And if the box is unchecked -- my

16   understanding is that it autopopulates to no, and then

17   you have to make a conscious effort to say, yes, it's

18   gang-related, which, again, without having read this

19   report or security threat through the investigation, I'm

20   not sure.

21        Q.   So the next box is premise type.  What does

22   that refer to?

23        A.   The type of structure, whether it's a house, an

24   apartment.  They chose other.  I don't know why they

25   choose that, but that's what it is.  Some other choices

1    are gas station, convenience store, retail

2    establishment, just common places where things happen.

3         Q.   And then the next box, zone trapped, that

4    appears to correspond with --

5         A.   Ida two, yes, sir.

6         Q.   And is that autopopulated from CAD?

7         A.   It is.

8         Q.   The next box down, it says crime incident, and

9    it says security threat group investigation.  How is

10   that field populated?

11        A.   So that's going to typically autopopulate,

12   again, with the same caveat that it can be changed

13   because you may have called me and told me that, "Hey,

14   somebody burglarized my house while I was on vacation."

15   And during the course of the investigation, we realized

16   that your aunt came over to the feed the dogs and just

17   moved your stuff.  So we now have this thing that's not

18   what it originally appeared to be, so you have to be

19   able to amend that.

20            But it's going to -- as a convenience to the

21   deputy -- and it didn't used to do this stuff.  But as a

22   convenience to the deputy, it's going to say, hey, we

23   think you were at this place doing this that occurred

24   during this timeframe.  And the deputy's going to be

25   like, yeah, that's great.  I don't have to change

1    anything, or, you know, I have to go back, versus when I

2    was a young deputy where it was just a blank everything.

3    You had to, you know, here's where I was.  This is what

4    I was doing.  This is why I came.  So it's really a time

5    saver more than anything else, but all of it has the

6    ability to be amended.

7        Q.   So I think in the middle is somewhat

8    self-explanatory.  Down towards the bottom, there's an

9    officer ID number.  Is that the name and then

10   identifying number of the individual who created this

11   report?

12       A.   Yes.

13       Q.   Okay.  And then underneath that, there's an

14   I-N-V-E-S-T ID number.  What does that refer to?

15       A.   That's the investigator ID.  So using my

16   burglary example, I'm a patrol deputy.  I've been on the

17   job for a year.  I come out to your house.  I take an

18   initial report.  It then gets approved by a supervisor

19   and sent to a detective.  The detective that's assigned

20   to the case has to get added to that as well.  So

21   there's an investigator potentially.  The case could get

22   assigned to the person who initiated it, in which case

23   they're going to fill both lines.

24       Q.   Okay.  So they could be the same, but if

25   they're different, it's just these are two different

1   officers who are both involved in this?

2       A.   Correct.

3       Q.   So then below that, it says case status.  What

4   does that refer to?

5       A.   So there are a couple of different case

6   clearances, cleared with arrest, exceptionally cleared,

7   administratively cleared.  Administratively cleared is

8   used for all noncrime reports and inactive, but that's

9   not a clearance.

10      Q.   Okay.  So then in the narrative, if we turn to

11  page three, it says that -- I'm paraphrasing -- that I

12  arrived in order to conduct a prolific offender check.

13  If I was to pull a CAD report that corresponds with

14  this, would that CAD report be marked as a prolific

15  offender check?

16      A.   I mean, it depends entirely on how the deputy

17  entered it.  What date was on this one here?  Oh, this

18  was from January.

19      Q.   We have not been provided with a corresponding

20  CAD report, but I'm sure that we can be.

21      A.   Yeah, I would just pull it off of the case

22  number.  They won't give you a case number if you're not

23  checked out on something.  You can't just say, "Give me

24  a case number," and they say, "Okay.  Here's your case

25  number."

1        Even when we used to do legitimate protected

2    investigations, services of high-risk search warrants,

3    and things like that, you still have to check out on

4    something.  We would check out on a sheriff's office

5    investigation at the office, but you have to have

6    something to pin that case number to.  So I'm very

7    confident that if you say, "Hey, can I have the CAD

8    report associated with this case number," we should be

9    able to provide it.

10        Q.   And again, I just want to -- so this says it

11    was to conduct a prolific offender check, and you said

12    that whether it would be marked as such depended on what

13    the deputy did.  Do deputies always mark in the CAD

14    report a prolific offender check as a prolific offender

15    check?

16        A.   So I would like to reference my last comment on

17    getting paid.  I don't know that I can say deputies

18    always this, that, and the other, but the directive --

19    the policy is to always check out on what you're on,

20    where you're at.

21        Q.   And then this is somewhat self-evident.  At the

22    very bottom here, it says, "My agency-issued BWC

23    captured this event."  That refers to the body-worn

24    camera?

25        A.   Correct.

1    Q.    And then when it says it was uploaded to

2    evidence.com, does that refer to the system that --

3    A.    Correct.  He put it on the dock, and it went

4    off, yeah.

5    Q.    Okay.  Then the next page has a supplemental

6    report.  In what circumstances would a supplemental

7    report be used?

8    A.    So as we discussed, there's an initiating

9    deputy that went out and took a report, and then there's

10   an investigating deputy.  So either the report got

11   assigned or reviewed by an investigator, in this case

12   Deputy Schuler.

13         I would like -- well, as a point of

14   clarification, there's a little bit of confusion down

15   here.  This shows Deputy Aaron Polster with a CJIS

16   number, and it shows him assigned to patrol two.  That's

17   what PAT2 means.  Well, Aaron Polster's working at a

18   little department outside of Houston.  If I'm not

19   mistaken, he's in Georgia.  When I was the captain of

20   district two, he transferred over to work for me.  So at

21   the time, he was assigned in Ida two, which is in our

22   district three.

23         So whenever this was pulled, it actually pulled

24   the last assignment for whoever this is.  So Monty

25   Schuler is currently a patrol deputy in district three,

1    which is where this comes from.  At the time the report

2    was done in 2017, he was a gang detective within our

3    vice narcotics unit.  And so -- and this Sergeant

4    Fenstemacher, it says SOD, which is special operations

5    division, Highway Interdiction Team.  Well, why is a

6    district two deputy initiating a call followed up on by

7    a district three deputy, approved by a traffic

8    supervisor?  It's not.  He was assigned at the time in

9    district three.  He was a detective.  He was the patrol

10   supervisor also assigned to district three.

11         So I'm not sure why the computer has that

12   particular -- but it appears as if whenever you pull the

13   report, it's going to give you a time now or a most

14   recent assignment, as opposed to their assignment at the

15   time.  In case anybody's wondering, that's what's

16   happening down there.

17         So if you would refresh my memory on your

18   question, when would a supplement be generated?  Is that

19   the question?

20   Q.   Yes.

21   A.   When it's assigned to an investigator, and the

22   investigator does some sort of follow-up and has a need

23   to document that follow-up.

24   Q.   I see.  And so the initial narrative on page

25   three would have been entered by the officer who made

1    the initial report?

2         A.   Deputy Polster, yes, sir.

3         Q.   And the supplement would be made by the

4    investigator who followed up?

5         A.   Correct.

6         Q.   That makes sense.  And what you were talking

7    about in terms of autopopulating the assignment, would

8    that also be an issue with where it says unit on the CAD

9    report?

10        A.   No.

11        Q.   Okay.  So that should actually tell us the unit

12   that was responding?

13        A.   It's what they were CADed up as that day, yes.

14        Q.   Okay.  Great.

15             MR. JOHNSON:  I'm going to mark this as

16        Exhibit 6.

17             (Exhibit 6 was marked for identification.)

18   BY MR. JOHNSON:

19        Q.   So on this document -- and this is another CAD

20   report; correct?

21        A.   It is.  It appears to be, yes, sir.

22        Q.   In this document there's a -- where it says

23   call taker, K-S-K-A-G-G-S, and that appears to be

24   different from the deputy's name at the top, can you

25   explain what's going on with that?

1          A.    Yes.   It appears as if -- so Pfenninger is a

2     detective.   He would have gotten on the radio and said

3     -- so, basically, when I key up on the radio and say

4     anything at all, you know, "Hey, I'm 10-4," which is

5     what happened here, the dispatcher on the other end of

6     the radio is going to make the note that I'm 10-4

7     because I'm not entering it in my computer.

8              So the parentheses is who entered that comment.

9     For example, the lowercase writing that we have here

10    entered by unit PCU -- Property Crimes Unit -- 103,

11    that's Detective Pfenninger.   So you can see that she's

12    using caps.   He's using lowercase.   His stuff is stamped

13    with what he entered, and her stuff -- or his stuff,

14    depending on who the dispatcher is.   I don't know who

15    Skaggs is.   So that's the differentiation there, if that

16    makes sense.

17         Q.    So on this report, the call was initiated by a

18    Pasco County Sheriff's deputy?

19         A.    Detective, yes.

20         Q.    But then some of these notes were made by a

21    dispatcher?

22         A.    Based on radio communication, yes, sir.

23         Q.    And when it says X4, X6, are those codes that

24    are used in radio communication?

25         A.    No.   It means 10-4, 10-6.   The X is just -- I

1    don't know why we need to abbreviate ten.  It's one

2    extra keystroke.  So 10-4, 10-6, it means my status is

3    good.  I'm okay.  I'm busy.

4        Q.   Got it.  Are those codes pretty standard across

5    different agencies?

6        A.   No.  I mean, 10-4 is because it just is.  So

7    10-4, truckers use it.  But there is no statewide

8    standardization of codes.  It's really why we've

9    eliminated almost all of our codes at this point because

10   it allows for continuity of operations.  We can talk

11   about critical incident management, but that's not why

12   we're here.

13       Q.   Is there like a code book or something that we

14   could use to interpret these?

15       A.   I'm sure there is somewhere.  Somewhere around

16   circa 2015 when maybe I was a lieutenant, I sat on a

17   committee where they bumped us down from 80 codes to 10.

18   But, yeah, there's not a lot of codes out there.

19            You will see some -- like Pfenninger's been

20   around for -- what's his CJIS?  He's 2338, so he's been

21   around a little bit longer than I have.  He's like a

22   19-year guy.  You'll see some of us old-timers still use

23   the old codes just because we can't get them out of our

24   blood.  And the dispatchers, rather than correct us,

25   will just enter them in for us.

1          But, yeah, I'm sure that we've got something

2    floating around, but none of the codes that we use at

3    this point are crime-related.  We kept a couple like --

4    yeah, we kept a couple.  We can get them for you.  I

5    don't want to babble, but we can get them for you if we

6    need to.

7          Q.    Cool.  So to go back up to the top, where it

8    says primary unit and then it says PCU103, what does

9    that refer to?

10         A.    So that's his radio identifier.  So if I'm in a

11   zone -- so like I'm not going to be Ida two.  I'm a

12   major.  So my identifier is MAJ1.  I'm major one.  He's

13   a property crimes detective.  The one means he's

14   assigned to district one, and the three just happens to

15   be, you know, you got three.  So we have districts --

16   PCU100, that would be the sergeant of unit, and then

17   there would be 101, 102, 103, 104, 105, 106.  The

18   district three guys would be PCU300, 301, 302, 303, and

19   so on and so forth.

20         Q.    Down in the notes, the very last entry says top

21   five.  What does that refer to?

22         A.    That the individual that he's dealing with is

23   identified as one of our District Top 5s.

24         Q.    Okay.  We haven't really talked about the Top

25   5s.  Just briefly, what are the District Top 5s?

1      A.   So the District Top 5 are individuals that have

2   been identified, and there are a variety of people.

3   This isn't quite as -- strictly as mathematical as the

4   prolific offender designation.

5           These are individuals that are active within

6   the crime environment, have networks that are active

7   within the crime environment, and are just good people

8   to know, you know, good people to kind of have an

9   understanding of, you know, like I said, whether they're

10  gainfully employed and things of that nature.

11     Q.   And on this entry here, if I'm reading the time

12  stamps right, does this indicate that the very first

13  entry in the notes was that Detective Pfenninger

14  indicated to the dispatcher that this was a Top 5?

15     A.   Correct.  Based on the time stamps, yes.

16     Q.   So down in the radio log, there's -- it says

17  unit IG3 dispatched, stat/beat G3.  Does that indicate

18  that another person was dispatched to the same location?

19     A.   It was.  The I is a one.

20     Q.   Oh, sorry.

21     A.   So it's 1G3.

22     Q.   What is the stat/beat?  Does that refer to

23  the -- what does that refer to?

24     A.   That's the area that it's occurring in.  It's

25  within gulf three, the zone of gulf three.

1      Q.   Would that be the location that the person was

2  in at the time they were dispatched?

3      A.   It appears to be, yes, because the incident of

4  occurrence is within gulf four.

5      Q.   Then under it, it says closed code.  There are

6  two that say -- so there's one that says PCU107, and

7  it's closed BU.  Does that indicate that there's some

8  individual whose code is PCU107 who closed out with this

9  code BU?

10     A.   Correct.

11     Q.   What does BU stand for?

12     A.   Backup.

13     Q.   What does that mean when they say backup?

14     A.   It means that they're not the primary on the

15  call.

16     Q.   I see.  Looking at the bottom under event log,

17  what does it mean viewed hot-spots?

18     A.   Where are you looking at?

19     Q.   So under event log, three lines from the

20  bottom.

21     A.   That's something that the dispatcher accessed.

22     Q.   Okay.  I see.  And then what is the watchdog

23  timer?

24     A.   That's an officer safety mechanism.  So again,

25  depending on the priority, priority one, they're going

1    to check on you very often and, really, as soon as you

2    get there, like, "Hey, are you okay?"  Otherwise, there

3    are -- otherwise, you can set your checks, or the

4    dispatchers can set their checks.  I'm not very familiar

5    with exactly how it works on their end.

6              But generically, I show up, and there's

7    15-minute checks.  They're kind of standard throughout

8    the agency.  So if I go out on a call, and you haven't

9    heard from me in 15 minutes, the dispatcher's going to

10   say, "Major one, what's your status?"  "Hey, I'm still

11   fine.  Don't worry about me."  So you'll hear some

12   deputies when they go out like, "Hey, I'm conducting an

13   investigation.  I'm doing an interview.  Please, set the

14   status checks out as long as possible."  Well, now we're

15   going to check in every 30 minutes with you.  But that's

16   generically what that means.  The technical ins and outs

17   I'm not intimately aware of, but that's good enough for

18   government work.

19             MR. JOHNSON:  So I'll mark this as Exhibit 7.

20             (Exhibit 7 was marked for identification.)

21   BY MR. JOHNSON:

22        Q.   Okay.  So on this one, under the unit --

23   primary unit, it says STAR18.  Does that indicate that

24   this is a member of the STAR team?

25        A.   It does.

1    Q.   When it says nature, SO investigation, what

2  does that mean?

3    A.   So the SO just means sheriff's office

4  investigation, so they're doing an investigation of some

5  type.

6    Q.   Could that be a prolific offender check?

7    A.   It depends on what the deputy's trying to

8  accomplish.  It could be that they're looking for

9  somebody with a warrant, so that gets plugged in.  The

10  last one that we looked at was an SO investigation as

11  well.  That was a detective actually conducting an

12  investigation.  So SO investigation is -- it's not a

13  catch-all, but there are things that don't fit neatly

14  into any other category.

15    Q.   And to be clear, you were saying the last one

16  was an investigation.  Is that based on the fact that it

17  says felony PC?

18    A.   And the fact that its nature code is SO

19  investigation right here.

20    Q.   Right.  But you can tell that it's an actual

21  investigation?

22    A.   Right.  He's already got -- yeah, similar to a

23  warrant pickup.  A felony PC means somebody's going to

24  jail if we find him.

25        MR. POULTON:  And that was in reference to the

1    prior exhibit, Exhibit 6.

2  BY MR. JOHNSON:

3    Q.   And now Exhibit 7, there's nothing in the

4  notes?

5    A.   Right.  And we can also look at the time stamp

6  that they were on the call for 40 seconds exactly.

7    Q.   So we don't know --

8    A.   We have a pretty good indication that

9  absolutely nothing happened.  I don't know why he was on

10 the call for 40 seconds.  I just know that you can't do

11 much in 40 seconds.

12   Q.   Well, is it possible that he initiated the call

13 prior to leaving the location so that he got there, he

14 did something, and then before he left, he realized he

15 forgot to initiate the call?

16   A.   I don't want to speculate.  I don't know why he

17 was only there for 40 seconds.

18   Q.   Is that possible?

19   A.   Again, I mean, there's all kinds of things that

20 are possible.

21   Q.   That would be consistent with the report?

22   A.   So there's a lot of other things that would be

23 consistent with the report as well, like he punched it

24 in, and then his buddy said, "Hey, let's go eat lunch

25 instead," and he just cleared the call and decided not

1    to go.  Like I said, I really don't want to speculate.

2    There's any number of things that could have caused

3    that.

4        Q.   So we just don't know.  We don't know that he

5    was only there for 40 seconds.  He could have been there

6    for two hours, or he could have not been there at all?

7        A.   There's a variety of -- and anything in

8    between, certainly.

9             MR. JOHNSON:  This will be Exhibit 8.

10            (Exhibit 8 was marked for identification.)

11   BY MR. JOHNSON:

12       Q.   So this document looks like it was entered as

13   an SO investigation; is that right?

14       A.   It was, yes.

15       Q.   And then in the notes, it says prolific check?

16       A.   That's what it says, yes, sir.

17       Q.   Is this an instance where a prolific offender

18   check was entered as an SO investigation?

19       A.   It could be.  It also says there's a possible

20   new address.  It looks like he's not sure whether it's

21   an actual new address or not.  So it could be that --

22   again, without asking the deputy, I don't know what his

23   line of thinking was, but it's equally possible that

24   he's just looking to see, hey, did this person move?

25       Q.   So if they were checking -- if a deputy was

1    checking somebody's address, that would be a reason to

2    mark it as an SO investigation?

3             MR. POULTON:  Object to the form.  Go ahead.

4        A.   Again, I don't know what the deputy was

5    thinking when they entered that in, so I don't really

6    have a good answer for that.  I can tell you that the

7    policy and the preference is always to identify what

8    you're doing so we know what you're doing.

9    BY MR. JOHNSON:

10       Q.   But it's possible a deputy might sometimes

11   enter a prolific offender check as an SO investigation?

12       A.   We live in a world of vast possibilities.

13       Q.   I can't argue with that.

14            MR. JOHNSON:  I'll mark this as Exhibit 9.

15            (Exhibit 9 was marked for identification.)

16   BY MR. JOHNSON:

17       Q.   So this -- the unit at the top says STAR33.

18   Does this indicate this was a member of the STAR team?

19       A.   It does.

20       Q.   And this is marked SO investigation?

21       A.   Correct.

22       Q.   Okay.  And then in the notes, it says prolific

23   associate check Robert Jones; is that correct?

24       A.   That's what it says, yes, sir.

25       Q.   So does this also appear to be an instance

1    where a prolific offender check was marked as an SO

2    investigation?

3         A.   I would say no.  So this is an associate check.

4    I don't know if Robert Jones is a prolific offender or

5    not.  I don't know who Robert Jones is.

6         Q.   What is an associate check?

7         A.   So that's not a thing that I've ever read

8    about.  I'm assuming that they have an associate of a

9    prolific offender that they've decided to go check on.

10        Q.   Is that a thing that happens?

11        A.   It appears that it is.

12        Q.   And just to make sure -- and again, I know that

13   you're not personally familiar with these incidents.

14   But just to make sure I'm reading this right, I'm

15   looking at the units involved in the radio log, and

16   there's STAR33, STAR34, STAR32, STAR31.  So that's

17   four units involved in this?

18        A.   That seems accurate, yes, sir.

19        Q.   Now is it possible that there would have been

20   more than four deputies involved in this check if they

21   -- for instance, if two deputies were driving in the

22   same car?

23        A.   Again, I don't -- I can't think of a reason why

24   they would be doing that.  That's not normally what we

25   do is drive two to a car, certainly in the STAR team.

1    But again, I don't know any of the specifics on this.

2        Q.   So normally, the deputies are driving one to a

3    car?

4        A.   Yes, unless you're in the field training

5    program, but you would still only have one unit

6    identifier.

7        Q.   If there were two in the car?

8        A.   Right.  You would have one unit identifier, and

9    that would be -- and it wouldn't be on a STAR team.  And

10   I can tell you based on the size and structure of our

11   STAR teams, that's pretty much everybody.  There weren't

12   too many more people available, at least on STAR team.

13   If there was a non-STAR deputy or something, I don't

14   know.  We'd have to check body-worn camera.  But four

15   people checked out on it.

16       Q.   And just -- again, based on the time stamp,

17   does it look like this began at 11:54 at night?

18       A.   It was entered at 11:54 at night.

19       Q.   And it looks like the call was cleared at 1:00

20   in the morning on the next page?

21       A.   That's what it looks like, yes, sir.

22       Q.   So the first time at 11:54 at night would have

23   been the time that the officer STAR33, which would be

24   Joshua Yungaitis --

25       A.   Yeah, I don't believe he works here anymore.

1    Q.   So 11:54 would be the time that Joshua

2    initiated this report, and then 1:03 a.m. would be the

3    time that he cleared it?

4    A.   On the following day, yes, sir.

5        MR. JOHNSON:   I'll mark this as Exhibit 10.

6        (Exhibit 10 was marked for identification.)

7    BY MR. JOHNSON:

8    Q.   So on this one, I wanted to ask you about the

9    first entry in the notes.  It says, "On TAC 3 no status

10   checks needed."  What does that mean?

11   A.   So within the radio system, there are -- there

12   are a couple of different types of channels.  There are

13   mutual aid channels, incident command channels, which

14   are IC channels, LEO channels, which are law enforcement

15   channels, and then TAC channels.

16        So it's a channel that's monitored and

17   recorded, but not on the main channel.  And, basically,

18   it's typically utilized for some sort of

19   incident-related or internal communications that we

20   don't want to tie up normal dispatch with because

21   there's a lot of stuff going on.

22   Q.   So this would be recorded?  The radio chatter

23   on TAC 3 would be recorded?

24   A.   It would.  It would also get -- I believe that

25   it would.  I'm not an expert in the communications.

1    I've never worked over there, but -- yeah, I'm not an

2    expert over there.  I believe that those are -- I

3    believe that those are recorded.

4        Q.   Who would --

5        A.   I don't know how long they keep those

6    recordings for.

7        Q.   When you say they, who are you referring to?

8        A.   Communications.

9        Q.   Is that within dispatch?

10       A.   Correct, yeah.  The whole entity is called

11   Public Safety Communications.  That encompasses the call

12   takers, the dispatchers, the fire rescue call takers and

13   dispatchers.

14       Q.   So they might have a recording?

15            MR. POULTON:  2015?

16       A.   Again, I can't verify the purge data.

17   BY MR. JOHNSON:

18       Q.   Right, but they might.  Now next line, when it

19   says, "STAR32 and STAR31 will be in UC vehicles," what

20   is that?  What would that refer to?

21       A.   So remember, we talked about the concept of --

22   not necessarily of doing an undercover operation, but a

23   more discrete vehicle that's not obviously identified as

24   a sheriff's office vehicle?  That's what they're talking

25   about.  They're in a nontraditional police vehicle that

1    is not equipped with a locator.

2        Q.   What is AVL?

3        A.   That's the automatic vehicle locator.

4        Q.   Okay.  Got it.

5            MR. JOHNSON:  I'll mark this as Exhibit 11.

6            (Exhibit 11 was marked for identification.)

7    BY MR. JOHNSON:

8        Q.   So on this one, what does ACE32 refer to?

9        A.   ACE32 is a designator for the active crime

10   enforcement.  It's units that don't exist anymore.

11       Q.   What was the Active Crime Enforcement Unit?

12       A.   So active crime enforcement was something that

13   was formed under the umbrella of vice and narcotics, in

14   where the STAR deputies are uniformed deputies doing

15   deputy-type activities.  The ACE units were considered

16   to be detectives within the narcotics unit.  So they

17   traditionally wore plainclothes.

18           And again, they didn't do undercover operations

19   so much as they did plainclothes operations.  Most of

20   them had their badges tucked down in their chests.

21   Their vests with the sheriff's office writing were in

22   the backseat of the car.  But they drove around in

23   unmarked vehicles, and their focus was narcotics and

24   violent crimes and the nexus between narcotics and

25   violent crime.

1      Q.   Now I'm looking at the note.  It says, "UDTS,

2   ACE32, in custody."  Does that indicate that somebody

3   was taken into custody?

4      A.   It does.

5      Q.   And then that's in the radio log as well?

6      A.   Correct.

7      Q.   It says one, two, three, four -- the fifth item

8   says in custody?

9      A.   Yes, sir.

10      Q.   Is there any way to determine who was in

11   custody?

12      A.   From this report right here, or just in

13   general?

14      Q.   First, from this report?

15      A.   I don't see any indication of who's in custody

16   from this report.

17      Q.   In general, how would you determine that?

18      A.   Well, the only way I can think of is to go back

19   to the date.  And is there a case number associated with

20   this?

21      Q.   There is an event ID.

22      A.   But no case number?

23      Q.   Not that I see.

24      A.   I'm not sure if there's going to be a record

25   that exists.

1     Q.   Now I understand that the radio may or may not

2     be available from 2015.  But if the radio recording was

3     still retained, would that be one way to figure that

4     out?

5     A.   No, because this L. Dodd is Lyndsie Dodd.  She

6     was a dispatcher at the time.  She's a deputy now.

7     She's noting the -- she's noting all the radio traffic.

8     That information would have to come from -- the

9     dispatcher would have no way of knowing who that is.

10    And if he goes ahead and says, "Hey, this person's in

11    custody," then that would get -- that would be added in

12    there.

13          So, yeah, I don't know what records the jail

14    keeps.  That would be the way that you do it.  You'd

15    have to look at who was taken into custody in that

16    timeframe on that date by Detective Williams.

17    Q.   And not to be pedantic, but it says here,

18    "Transport to Pasco County Jail."  So that would mean

19    we'd have to look for records at the Pasco County Jail?

20    A.   Correct.  So that's sloppy data entry.

21    Q.   Did you say -- I'm sorry.  I didn't hear what

22    you were saying.

23    A.   I believe that that's sloppy data entry.  I

24    don't think that that's a good way to document that at

25    all.  Again, I don't know if I've said it two or three

1    times yet.  It's really nice to know where you are and

2    what you're doing for a variety of reasons, so that's --

3    you know, the saving grace is that this guy doesn't nor

4    did he at the time work for me.  So that's quite

5    frustrating.

6              MR. JOHNSON:  I'll mark this as Exhibit 12.

7              (Exhibit 12 was marked for identification.)

8    BY MR. JOHNSON:

9        Q.   So on this one, the main question that I wanted

10   to ask you was just under disposition, it says SUP?

11       A.   Supplement.

12       Q.   What does that mean?

13       A.   It means he did a supplement to a case.

14       Q.   Could we determine from this what case that

15   would be?

16       A.   I don't see a way to determine from this what

17   case that was, no.

18       Q.   Okay.  And just to be clear, that means there's

19   -- out of this interaction, there came some supplement

20   that was added to an incident report?

21       A.   Correct.

22       Q.   What does the disposition UTL mean?

23       A.   Can you give me a for instance?  That doesn't

24   ring a bell.

25             MR. JOHNSON:  We can mark this as Exhibit 13.

1           (Exhibit 13 was marked for identification.)

2      A.   Yeah, sorry -- even without looking, my brain's

3  firing now.  It would traditionally mean unable to

4  locate.

5  BY MR. JOHNSON:

6      Q.   This is marked as a prolific offender check?

7      A.   Correct.

8      Q.   What does ATC stand for in the notes section?

9      A.   Attempt to contact.

10      Q.   And then above that, there's a long --

11      A.   That appears to be -- I don't know if Tyler's

12  male or female, but that appears to be Tyler Paneson's

13  driver's license number.

14           MR. JOHNSON:  Why don't we take a quick break?

15           (Whereupon, a short recess was taken.)

16  BY MR. JOHNSON:

17      Q.   Have you ever conducted field training to train

18  deputies how to perform prolific offender checks?

19      A.   Personally?

20      Q.   Yes.

21      A.   No.

22      Q.   Who has performed that kind of training?

23      A.   Field training officers.

24      Q.   Who are the field training officers?

25           MR. POULTON:   Currently?

1    A.   All of them?

2  BY MR. JOHNSON:

3    Q.   Yeah, How many field training --

4    A.   There are 30, and each deputy is going to train

5  with multiple different officers to get a variety of

6  perspectives.

7    Q.   And would all of those 30 field training

8  officers conduct training -- provide training in how to

9  conduct prolific offender checks?

10    A.   I mean, if it's part of the checklist, they

11  would.  It's not the focus of the field training

12  program.

13    Q.   Okay.  Could you -- is there a particular field

14  training officer who would be able to provide

15  information on how that training works who you think we

16  should talk to?

17    A.   Oh, he's going to hate me for it, but Sergeant

18  Macomber has been a field training sergeant for eight

19  years.

20    Q.   How do we spell that?

21    A.   M-A-C-O-M-B-E-R.  I sent him a note yesterday

22  on his annual eval just thanking him for all those years

23  of good work, and I'm glad I put those chips in the bank

24  because he just got depoed.  He's good people.  If you

25  need him, he'll answer your questions.

```
 1            MR. JOHNSON:  Tom, if I provided you with a

 2       list of the officers who are involved in these

 3       various incidents that we've been looking at, could

 4       you cross-check that against the list of field

 5       training officers?

 6            MR. POULTON:  How many are we talking about?

 7            MR. JOHNSON:  The list?  I think I identified

 8       about 20 or so.  It just would be a matter of

 9       holding the two lists side to side.

10            MS. MOORE:  Are we talking about currently?

11       Somebody may not be an FTO now.

12            MR. POULTON:  Why don't you start with

13       Macomber, and then if there's a particular -- you

14       know, as we go through this -- let's go off the

15       record.

16            (Whereupon, an off-the-record discussion was

17       held.)

18  BY MR. JOHNSON:

19       Q.   So what would be included in an officer's

20  personnel file?

21       A.   So there is -- when you say personnel file, are

22  you talking about their HR file?

23       Q.   Yes.

24       A.   So HR-related documents, I mean, there's a --

25  I'm not the expert in HR in this room, but HR keeps your
```

1    annual evaluations, things like that.  The only way I

2    know of to -- and a lot of this may not exist, depending

3    on how long ago the deputy was -- so, for example, my

4    field training book is in an actual three-ring binder.

5    And the only way for anybody to know which field

6    training officers I had is for me to tell you.

7            We moved in circa 2008-9-ish to a system called

8    a door that we moved away from relatively recently.  So

9    we have -- we have archived some of those things.  But,

10   for example, I had four different training officers, one

11   of whom is a lieutenant, one of whom is a corporal down

12   in district three, one of whom is a pharmaceutical rep.

13   So -- I'm sorry.  I had three.  Some people have four to

14   six.

15           And again, to try and go back and find which

16   deputy it was versus who trained him -- and that's only

17   assuming that prolific offender checks is even on the

18   checklist at all, which is still something that I'm not

19   100 percent sure actually exists.  It's a big task with

20   limited return.  The primary -- the primary mechanism

21   for instructing prolific offender checks is the ILP

22   manual.

23           And, basically, what it says is the goal of

24   prolific offender checks is to offer services, try and

25   reduce recidivism, and it specifically says in there

1    that the notion behind it is to check the history;

2    right?  Because ILP at its core is designed to help make

3    us more efficient.  And so what we don't want to do from

4    an efficiency standpoint is at 8:00 at night, 2:00 in

5    the morning, and 7:00 the following -- you know, later

6    on, show up at the exact same place to ask the exact

7    same questions.  That's the least efficient thing I've

8    ever heard of.

9            So the goal is whatever the opposite of that

10   is.  Is this person still active in the criminal

11   environment, yes or no?  If yes, go check, document it.

12   Next guy comes on shift, how do we find out what the guy

13   in front of us did?  You look it up, right, either by

14   address or through the prolific offender.  And if

15   somebody was just there, then find someplace else to go.

16   There's plenty of other things to do.

17           So that's really the notion behind it, and

18   that's the way that the training goes.  You know, the

19   answer to your question is exactly the one I gave you.

20   By the time we implemented prolific offender checks, I

21   was well beyond my FTO years.  So if you go -- circa

22   2009 I was, in fact, the FTO of the year.  But I didn't

23   train prolific offender checks because it wasn't a

24   thing.  And I actually was in a training unit, so it

25   still wasn't a thing.

1          But that's -- again, when you're looking at

2    what the kind of the overarching document for the

3    philosophy behind prolific offender checks -- but we

4    also don't -- outside of the academy and new member

5    orientation and anything like that, the field training

6    program is where you pick all of those nuances up, and a

7    lot of it is dialogue-driven.  It's kind of

8    checklist-driven, and the checklist isn't even -- the

9    way the checklist is set up is it will have a task.  For

10   example, traffic stops.  Taught, basically -- and then

11   there's three categories, basically, taught, I forget

12   what the middle column is, but it's like recited

13   essentially, and then performed.

14          So you and I are going to sit here.  We're

15   going to talk about traffic stops.  Tomorrow, you're

16   going to tell me, hey, you know, what are you looking

17   for at a traffic stop?  Well, I've got to get the tag,

18   the location, and the description of the vehicle.

19   Great -- or the location, the tag, the description of

20   the vehicle.  And then I'm going to say, "All right.  Go

21   do one."  And then I'm going to check those three boxes

22   off.  You've been trained on traffic stops, and that's

23   kind of how that's going to work.

24          It's not -- it's not a process that -- I mean,

25   it's OJT.  That's like asking the McDonald's clerk,

1    like, "Hey where's your --"  "Well, I've been trained on

2    the register."  "How?"  "Somebody stood over me and

3    said, 'Push this button.'"  I mean, that's how the

4    training goes.  Somebody stood next to you and said,

5    "Hey, ask this question.  Hey, ask this question."

6    You've been through academy, and you've been through the

7    basic state certification.

8           We're doing OJT, so there's not a lot of -- so

9    speculative only, but the prolific offender check

10   training is, "Hey, who are the prolific offenders in our

11   zone?  When was the last time that guy's been checked

12   on?  All right.  Let's go knock on the door."  "Hey.  Do

13   you know of any crimes in your area?  No?  All right.

14   You got a job?  Great.  Sounds good.  Staying out of

15   trouble?  Perfect."  Off we go, you know, or whatever

16   else -- I mean, that's kind of the gist of -- of what

17   I'm looking for as a commander of how those things work.

18          Now if there's information that's different

19   from that that's like, "Hey, everybody in your

20   neighborhood except you has had their lawn mower stolen,

21   and you have six lawn mowers in your front yard," then

22   that's a different conversation, you know, and it could

23   entitle an SO investigation.  It could entitle a

24   prolific offender check, but it's a different type of

25   conversation.

1           So I don't know if that helps or hurts, but

2   generically, that's what we're looking for out of those

3   types of things.  And the overarching document is going

4   to be the ILP manual, and the OJT training is going to

5   be -- as much as I hate to say this, it's very different

6   from McDonald's in liability and everything else, but

7   the process of on-the-job training is like, "Hey,

8   initiate us a call."  "Great.  How do I do that?"  "Push

9   this button."

10          There's not going to be a comprehensive

11  PowerPoint or lesson plan for every time you have to

12  push a button or knock on a door.  There just isn't.

13  And so, you know, that's why -- I'm not trying to be

14  evasive to any of your questions.  What you're asking

15  about is somebody sat in the car next to somebody and

16  said, "Hey, let's go knock on this door."  That's how

17  that went.

18      Q.   Understood.  And how does the training go --

19  let me back up just a step.  You and I haven't really

20  discussed tips or intel reports.  Can you just briefly

21  explain what that refers to?

22      A.   Tips and intel reports, they're -- it's a form

23  of self-initiated activity.  So if we're out, and we're

24  having a talk and one of those conversations of like,

25  "Hey, do you know anything," or, "Hey, not for nothing,

1    but so-and-so just started a lawn business, and it's all

2    push mowers."  Well, it's not necessarily enough to

3    launch a full investigation.  It's not necessarily

4    enough to do anything with, and it doesn't rise to the

5    level of a police report, but it's still good

6    information to have, something to just tuck away in your

7    back pocket in case you needed it later.

8         And that happens a lot.  We're out patrolling a

9    neighborhood, somebody is out wearing all black.  "Hey,

10   what are you doing?"  "I'm looking for my dog."  Okay.

11   No reason to -- I can't prove that you are.  I can't

12   prove that you aren't.  The absence of a dog means that

13   you very well may be out looking for your dog.  And then

14   the next morning, eight cars got broken into.  Well, now

15   I've got to capture that somehow, and so I do that in an

16   intel report, a field interview is an option, or some

17   sort of a tip.

18        We get a lot of citizens that want to tell us

19   things.  You know, we go to a Publix or whatever and

20   we're like, you know, "How are you?"  "Oh, the neighbor

21   two doors down from me --"  "Great.  Where do you live?

22   Do you know the address two doors down?"  We capture

23   that information.  It's articulated in the ILP manual as

24   well what constitutes a good tip and what doesn't,

25   what's actionable and what isn't.  You know, "Hey, Jim

1   says people are selling drugs in his neighborhood."  I

2   don't know who Jim is, and I don't know where his

3   neighborhood is.  It's not helpful.

4        So those things are captured in there.  But

5   again, just very broadly, those are tips, intel reports.

6   And as with everything else where there's sort of an

7   evolution, you know, we used to have deputies go in and

8   submit tips, and then they would get routed right back

9   through the district for the deputies to investigate.

10  Well, that's silly.  Just investigate the tip, do an

11  intel report, and we can skip the middle process.  So we

12  don't actually have deputies do tips anymore.  We have

13  deputies submit intel reports.  That changed maybe two

14  and a half, three years ago.  But the concept as an

15  overarching concept is unchanged.

16      Q.   Is the training similar to where it's primarily

17  through the manual?

18      A.   Again, yes.  It's primarily through the manual.

19  It doesn't mean that there wouldn't be -- again, from an

20  OJT standpoint, subject matter experts, I know that when

21  intel reports first came out, the various district

22  analysts -- you know, there has to be like, hey, push

23  this button.

24        And rather than sitting in the car with every

25  single individual when you're trying to retrain an

1    entire district, there has to be an organized training

2    session because you're not doing one-on-one.  You don't

3    have one individual that's coming into the fold.  You've

4    got everybody that needs to do things differently.

5            So the training for that is going to look very

6    different than the training for something else where

7    it's just, you need to know everything there is to know

8    about being a cop, and I'm the one that's supposed to

9    walk you through it, versus you guys know how to be

10   cops.  You just need to be shown instead of pushing that

11   button like you used to, you need to push this button.

12           So that's where some of that analyst training

13   -- but the training was really more geared towards the

14   mechanics of getting the report entered as opposed to

15   the content of the report because that was already a

16   well-established concept.

17           MR. JOHNSON:  This is Exhibit 14.

18           (Exhibit 14 was marked for identification.)

19   BY MR. JOHNSON:

20       Q.   Are you familiar with this document?

21       A.   This is the ILP manual.

22       Q.   And just to make things clear, when you

23   referred to the manual earlier as the bedrock of

24   training, this is the document you were referring to?

25       A.   The foundational document, yeah.  This is where

1    the concepts are articulated.

2        Q.    I wanted to just turn to page 19.

3        A.    I'm sorry.  The numbers on the bottom got me

4    for a second.

5        Q.    The first bullet point here says, "There is a

6    zero-tolerance arrest policy for crimes committed by

7    prolific offenders."  What does that mean?

8        A.    That means if a prolific offender commits a

9    crime, then the preference is that they be arrested for

10   that crime.

11       Q.    Is there any other policy document that

12   provides more information on that policy?

13       A.    No, sir.

14       Q.    The one, two, three, four, five, six -- sixth

15   bullet point says to, "Conduct a face-to-face prolific

16   offender check at least once quarterly with each active

17   prolific offender."  How does the Pasco County Sheriff's

18   Office determine whether it's meeting that expectation?

19       A.    As an organization?  So there aren't really --

20   so, basically, the prolific offender checks get

21   documented within the designated area where you put your

22   offender notes or -- and that's the tracking mechanism.

23       Q.    Okay.  Earlier, we had a couple of exhibits

24   that were marked as SO investigations where it was

25   unclear what the purpose was.  Would one way to figure

1    out whether those were prolific offender checks be to

2    look at the notes on central command?

3         A.   It's possible.  I mean, that would be a

4    reasonable cross-reference.

5         Q.   What is the actionable intelligence meeting?

6         A.   The actionable intelligence meeting --

7    essentially, the district captain along with detectives,

8    STAR team members, supervisors from the districts, along

9    with any outside agency partners, patrol and probation,

10   the Department of Juvenile Justice, school resource

11   officers come in, outside jurisdictions have been known

12   to attend those, and it's essentially an

13   information-sharing meeting.  It's an intel meeting.

14        We talk about things that are going on, things

15   that are relevant.  When I was a district captain, I was

16   a district captain for district two.  We had Dade City

17   and Zephyrhills that very frequently attended those

18   meetings.  For the most part, the folks that are

19   committing crimes within the county and the folks that

20   are committing crimes on the other side of the invisible

21   line that only we see are the same folks.  So that's

22   what those meetings are designed for.  It's really a

23   roundtable discussion.

24        A couple of different philosophies on that, you

25   know, the intel folks will tell you that intel meetings

1    are run by intel analysts.  The district captains will

2    tell you that district meetings are run by the district

3    captain.  So I happen to be a former district captain,

4    not an analyst, so it's my meeting.

5        Q.    And from a district captain's perspective or

6    from the perspective of a former district captain, what

7    do you see as the purpose of that type of a meeting?

8        A.    So there's a lot of times where it's a good

9    time to kind of face-to-face people.  There's usually a

10   product that goes with that, any BOLOs that come around,

11   and it's a time to say, "Hey, you know --" because the

12   property crimes detectives don't necessarily know that

13   the SROs or -- so how about this?  Our property crimes

14   detectives don't necessarily know that Dade City's

15   property crimes detectives are working two stolen

16   vehicle cases on the same guy that we're also working a

17   stolen vehicle case on.  So it's a good time for them to

18   get together, and so now instead of two parallel

19   investigations, why don't you guys just go look for this

20   individual, run one investigation, clear out

21   three cases?  That's more better.

22            The other thing is there was a lot of feedback

23   just for different people.  It's a good time where, you

24   know, what I'm aware of potentially on my shift or

25   within my sphere of responsibility and what you're aware

1    of on your shift and your sphere of responsibility are

2    not necessarily the same.  So what we're trying to do is

3    merge that Venn diagram and create more overlap than

4    not.

5            So I may say, "Hey, look.  I found these kids

6    out walking at night."  And the SRO can say, "Well,

7    those are like straight-A students that are football

8    players.  I'm pretty sure that based on my knowledge of

9    those kids, they're just out walking at night," or

10   anything really.  But you don't -- I guess the best way

11   to describe it is you don't know what connections are

12   going to be made until you sit down, and you have a

13   meeting.  And we solve a lot of really good connections

14   through the course of that process, which is why I

15   explained to you earlier when we talked about different

16   platforms for this and different systems for that, those

17   meetings still occur largely unchanged.

18       Q.   Are there -- is there like a written agenda for

19   the meeting?

20       A.   Not usually.  Like I said, there's usually a

21   product created, and that product is really kind of a

22   rehashing of the week in review.  Again, there's no --

23   you know, we can't really talk about tomorrow because it

24   hasn't happened yet.  What we talk about is what

25   happened yesterday, and then the only time that tomorrow

1     comes in is what are we going to do to resolve what

2     happened yesterday?

3               So it's an opportunity for the district captain

4     to give some guidance, so there's going to be a lot of

5     different things that occur.  There's going to be a lot

6     of different things that were stolen, there's going to

7     be cars that are taken.  Well, this one was taken by

8     somebody's nephew.  And although we don't necessarily

9     have the car back -- or maybe we do have the car back

10    already.  He dropped it at his mom's house, and the aunt

11    just went and got it.  So it's important to know, hey,

12    this kid stole a car.  There's an accountability process

13    for that.

14              Then you've got somebody that stole six cars

15    from people that they've never met, and that's a

16    different sort of thing.  So I have the opportunity

17    then, or the district captain has the opportunity to

18    say, "Hey, look.  Go ahead and hang the probable cause

19    for this kid.  We'll arrest him when we get to him.  But

20    these folks have stolen three cars in the last five

21    days, and if we don't find them tonight, they're gonna

22    steal two more, and two more the next day.  So this is

23    where our area of focus is."  And that's articulated in

24    a couple of different spots through the manual as well.

25    The district captain is really the center of the agenda

1    for the resources to be used within the district.

2         Q.    When you say it's a rehashing of the week in

3    review, is that a separate report, the week in review?

4         A.    No, no, no.  That's just my own terminology.

5    So we have a meeting on a Wednesday, and then a week

6    passes, and then we have a meeting on a Wednesday.  So

7    we just talk about the different incidents that occurred

8    from the previous week.

9         Q.    And is that product a PowerPoint slide?

10         A.    Yeah, whatever format they put it in.  I'm sure

11    it's some PowerPoint something or other.  That's what I

12    remember it as, some sort of PowerPoint.

13         Q.    Is that produced by the analysts?

14         A.    That's produced by the analysts, and it changes

15    every week.  Like I said, it's really just pulling

16    incidents that have already occurred.

17         Q.    Do you discuss prolific offender checks at the

18    AIMs?

19         A.    I don't recall ever discussing prolific

20    offender checks, no.

21         Q.    Do you discuss prolific offenders?

22         A.    If it's relevant to the conversation as far as

23    what's occurred in the crime environment for the last

24    week, then absolutely, yes.

25              MR. JOHNSON:  Why don't we take just a quick

1    five-minute break, and I'll see if I have anything

2    to finish up with.  We're almost there.

3         (Whereupon, a short recess was taken.)

4  BY MR. JOHNSON:

5    Q.   So do you oversee SROs?

6    A.   I do not.

7    Q.   So in the manual, Exhibit A, if we turn to

8  page --

9    A.   Exhibit 14?

10    Q.   Oh, I'm sorry.  Yeah, Exhibit 14.  That was the

11  last deposition.  It's been a long day.

12    A.   Sounds like you would start there with him.

13    Q.   So we're on page 65 to 66.  So the second

14  paragraph, underneath where it says school resource

15  officers on page 65, it says that, "SROs should identify

16  students who are at-risk into developing into prolific

17  offenders."  Who should I talk to to get more

18  information about that aspect of an SRO's job?

19         MR. POULTON:  I'm going to object to the form.

20      There is a person that kind of oversees that.  I

21      cannot recall her name right now, but I can get you

22      that better than he can.

23         MR. JOHNSON:  I'm still interested to hear.

24    A.   The short version is somebody within the SRO

25  chain of command.  They've got a lieutenant, a captain,

1    and a major, so whichever one of them is closest to the

2    issue would have the best knowledge.

3    BY MR. JOHNSON:

4        Q.   So you wouldn't know which of them would be --

5        A.   I've never worked in that section,

6    unfortunately.  So I don't -- I don't know how they're

7    divided.  So the major of that unit, I honestly don't

8    know who that is.  So I have the benefit of having spent

9    a good portion of my career through patrol in various

10   capacities, like I said, former district captain and,

11   you know, oversaw STAR team at one point.  But I don't

12   know if the same could be said for that bureau.

13       Q.   Another question just about body cam footage,

14   does the Pasco County Sheriff's Office have a policy

15   about when deputies should engage their body cameras?

16       A.   It's a general order, yes.

17       Q.   And should a body camera be engaged during

18   every prolific offender check?

19       A.   I believe the way that the general order reads

20   is that it should actually be engaged in every citizen

21   encounter.

22       Q.   And what is the number of that general order?

23       A.   Oh, I don't know it off the top of my head.

24   It's the body-worn camera general order.  We have them

25   indexed, so I never went about the process of memorizing

1    it.

2         Q.    So if there is a CAD report that includes notes

3    to document a citizen encounter but no body-worn camera

4    that we've found so far, what would that indicate to

5    you?

6         A.    It would indicate that there is no body-worn

7    camera to be found.  You know, I don't understand what

8    you mean.

9         Q.    I mean, I just -- is it -- I just want to ask

10   you, is it more likely in that case that the body-worn

11   camera is just -- was never flagged and it somewhere

12   exists, or just that it was not engaged?

13             MR. POULTON:  Object to the form.  Go ahead.

14   BY MR. JOHNSON:

15        Q.    I just want to understand from your

16   perspective.

17        A.    So again, there's a variety of things.  Could

18   have been a equipment malfunction.  Some of these things

19   happen 2:00, 3:00 in the morning.  Could have been

20   mislabeled.  Could have hit a one instead of a two just

21   because you fat-thumbed the keyboard on either your

22   phone or your computer.  Could be that it occurred at a

23   time where we didn't have body-worn cameras.  Could be

24   that it was done by an individual that is not

25   necessarily issued a body-worn camera.  You'll notice

1    that I'm, for example, not wearing one.

2            So while all of the patrol staff has them --

3    and again, depending on -- I don't know because it's not

4    within my purview and never has been.  Detective

5    Williams from ACE, who we talked about earlier, I don't

6    know if a body-worn camera, for example, was part of

7    their standard issue or not.

8            And then there's other instances where you can

9    have some sort of a CAD report like 40 seconds of, hey,

10   no contact.  Well, I'm not going to turn my body-worn

11   camera on.  I'm not having a citizen encounter.  There's

12   nobody here.  I didn't do anything.

13           So there's any number of things that could lead

14   to a lack of body-worn camera, anywhere from -- yeah,

15   there's basically any number of things.  There's any

16   number of things.

17       Q.   That's helpful.  Thank you.  How long has it

18   been the policy of the Pasco County Sheriff's Office

19   that body-worn camera should be engaged for every

20   citizen encounter?

21       A.   So the body-worn camera policy -- and again,

22   the general orders and the general order revisions are

23   archived through our legal department.  But you don't

24   implement a body-worn camera program without a body-worn

25   camera policy.  So the policy has been in existence with

1    minor changes and adjustments.  I can't answer as far as

2    to what the original version said versus this version

3    versus that version, and I don't know even how many

4    revisions there have been.  But the policy was very well

5    flushed out prior to the implementation of body-worn

6    cameras because that's the right way to do it.

7           And from the very beginning, to the absolute

8    best of my recollection, there's been -- the sole reason

9    for using body-worn camera is to have an unalterable

10   recording of citizen interactions.  So it's -- you know,

11   best I can tell you is that I believe that that's been

12   in existence since the very beginning.  We've had to

13   refine some things.

14           You know, we have some things where, hey, if

15   you're on a static post, you don't have to run your

16   body-worn camera.  Some people have interpreted static

17   post to be, you know, hospital posts.  Well, you're in a

18   hospital post watching an arrestee or an inmate.  It's

19   going to be nine hours of boring footage, but you need

20   to run nine hours of boring footage because you're

21   constantly surrounded by people.  So we have had to

22   refine small segments of that policy over time to be

23   actually -- to be more inclusive of, hey, this is what

24   we want recorded.  It's everything.

25           There was a time when people would say, "Well,

1   I'm on my way to the call, and I'll hit the camera when

2   I get there."  Well, then they're in a traffic crash.

3   And I'm like, "Look, from the time that you're

4   dispatched to the time that you get back in the car,

5   just run the camera."

6           So from an organizational perspective, that is

7   the expectation.  That's what's communicated in the most

8   recent version.  And that's the kind of informal

9   interpretation of what a static post means, when the

10  camera's supposed to be on.  So the push from the

11  organization is that if you're interacting with people,

12  have your camera on.  I mean, have your camera on if

13  you're interacting with people.  That's policy.

14      Q.   And how long has the Pasco County Sheriff's

15  Office been using body cameras?

16      A.   So I heard recently that we implemented in

17  2015.  Don't quote me on that.  It's been awhile.  I

18  think we rolled them out when I was a lieutenant in

19  special operations, so that would be somewhere in that

20  vicinity.

21          MR. JOHNSON:  I think we're done.

22                      CROSS EXAMINATION

23  BY MR. POULTON:

24      Q.   I just want to clarify something, and then

25  we'll wrap up.  You were asked a question or two, or you

1    made a statement or two about the prolific offender

2    designation being mathematically driven.  Can you

3    elaborate on that?  What's your understanding of how

4    that works?

5        A.    So there's a -- there's sort of a mathematical

6    formula, and there's a scoring system.  It's done

7    through, basically, your arrest history.  And then in

8    order to kind of winnow that list down, there's an

9    analysis done through the ILP section where, again, we

10   don't want a list that's populated by people that have

11   passed away or anything like that.  So there has to be

12   some sort of evaluation of relevance, and so -- but you

13   don't -- you have to meet the mathematical criteria

14   before you even get evaluated for relevance.

15            So when I say there's a mathematical base,

16   there's no way to get onto the list -- and I believe the

17   question specifically was what role does STAR play in

18   that?  They don't.  You either score out, or you don't.

19   And then from there, there's an analytical of, you know,

20   hey, how relevant is this person?

21            MR. POULTON:  That was it.  I just want to

22       clarify that one point.

23            Any follow-up?

24                    REDIRECT EXAMINATION

25   BY MR. JOHNSON:

1      Q.   When you mentioned there's an analysis

2   relevance, are the district commanders involved in that?

3      A.   Not typically, no.  I've never -- no.  In my

4   experience, no.  That all happens with Inspector Kraus

5   and his folks.

6           MR. JOHNSON:  That's it.

7           MR. POULTON:  He'll read.

8           MR. JOHNSON:  We'll order.  PDF is good.

9           MR. POULTON:  I will order copies of both, an

10      ASCII and mini with word indexes.

11                *  *  *  *  *  *

12           (THEREUPON, THE TAKING OF THE DEPOSITION WAS

13      CONCLUDED AT 4:52 P.M.)

14                *  *  *  *  *  *

15              S T I P U L A T I O N

16      It was thereupon stipulated and agreed by and

17   between counsel present for the respective parties and

18   the deponent that the reading and signing of this

19   deposition is not waived.

20                *  *  *  *  *  *

21

22

23

24

25

1                          CERTIFICATE OF OATH

2     STATE OF FLORIDA

3     COUNTY OF PASCO

4           I, the undersigned authority, certify that

5     MAJOR TAIT SANBORN personally appeared before me and was

6     duly sworn on September 23, 2021.

7           WITNESS my hand and official seal this 26th

8     day of September, 2021.

9

10

11     _____
                     Jacquelyn Altilio
12                   Notary Public - State of Florida
                     Commission No.:  GG 363241
13                   My Commission Expires:  8-7-2023

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF PASCO

5

6            I, JACQUELYN ALTILIO, Court Reporter, certify

7    that I was authorized to and did stenographically report

8    the foregoing deposition and that the transcript is a

9    true record of the testimony given by the witness.

10

11           I further certify that I am not a relative,

12   employee, attorney, or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties'

14   attorney or counsel connected with the action, nor am I

15   financially interested in the action.

16

17           Dated this 26th day of September, 2021.

18

19   _____

20           Jacquelyn Altilio, Court Reporter

21

22

23

24

25

```
 1   Style:  Taylor v. Nocco
     Deposition of:  MAJOR TAIT SANBORN
 2   Date:  September 23, 2021

 3                        ERRATA SHEET

 4      I have read my testimony in the foregoing transcript

 5   pages 1 through 104, inclusive, and herewith subscribe

 6   to same as the correct transcription of the answers made

 7   by me to the questions recorded therein, unless noted.

 8   PAGE      LINE                 CORRECTION

 9   _____    _____     _____

10   _____    _____     _____

11   _____    _____     _____

12   _____    _____     _____

13   _____    _____     _____

14   _____    _____     _____

15   _____    _____     _____

16   _____    _____     _____

17   _____    _____     _____

18   _____    _____     _____

19   _____    _____     _____

20   _____    _____     _____

21   _____    _____     _____

22   _____    _____     _____

23   _____    _____     _____

24                        _____
                          MAJOR TAIT SANBORN
25   DATED: _____
```

## A

**a.m** 71:2
**Aaron** 56:15,17
**Abargil@ij.org** 2:8
**abbreviate** 60:1
**ability** 18:8 23:5 26:22
  31:4 49:12 50:16 53:6
**absence** 85:12
**absolute** 98:7
**absolutely** 36:13 66:9
  93:24
**academy** 82:4 83:6
**access** 7:19 10:1 22:3
  23:3
**accessed** 47:16 63:21
**accomplish** 65:8
**accountability** 92:12
**accurate** 31:3 69:18
**ACE** 73:15 97:5
**ACE32** 73:8,9 74:2
**acknowledges** 43:19
**acronym** 8:24 35:2
**action** 41:21 42:1,8
  45:12 103:14,15
**actionable** 85:25 89:5,6
**active** 62:5,6 73:9,11,12
  81:10 88:16
**activities** 73:15
**activity** 10:16,19 19:15
  20:4 29:5 30:16 84:23
**actual** 41:14 65:20 67:21
  80:4
**added** 46:1,13 53:20
  75:11 76:20
**adding** 46:10
**additional** 25:18
**address** 19:14 20:19 30:2
  30:4,11,13,15,15,20,21
  39:9 41:7,11,11,13
  67:20,21 68:1 81:14
  85:22
**addresses** 41:9
**adds** 46:9
**adjusted** 44:9
**adjustments** 98:1
**administratively** 54:7,7
**administrator** 27:17
  28:16
**age** 6:3
**agencies** 60:5
**agency** 36:24 38:10,15
  38:16,17 47:25 48:7,7
  64:8 89:9
**agency-issued** 55:22
**agenda** 91:18 92:25
**aggregates** 9:23
**ago** 49:10,13 80:3 86:14
**agreed** 101:16
**ahead** 18:19 20:2 68:3
  75:10 92:18 96:13
**aid** 71:13
**AIMs** 93:18
**airplanes** 32:10
**alarm** 39:20
**allows** 60:10
**alphabetical** 8:14
**alter** 50:9
**alterable** 27:8
**Altilio** 1:19 102:11 103:6
  103:19
**amend** 48:17,18 51:1
  52:19
**amended** 51:8 53:6
**amiss** 50:21,22

**amount** 14:23
**analogy** 31:10,16
**analysis** 100:9 101:1
**analyst** 87:12 90:4
**analysts** 6:13 16:4 23:2
  25:11 86:22 90:1
  93:13,14
**analytical** 100:19
**ANDERSON** 1:22
**AndersonCourtReport...**
  1:24
**annual** 78:22 80:1
**answer** 6:22 15:17 21:13
  22:21 37:11 68:6
  78:25 81:19 98:1
**answers** 104:6
**anybody** 80:5
**anybody's** 57:15
**anymore** 21:2 70:25
  73:10 86:12
**apartment** 51:24
**apologize** 35:1 46:25
**appear** 68:25
**APPEARANCES** 2:1
**appeared** 52:18 102:5
**appears** 9:16 11:14,16
  52:4 57:12 58:21,23
  59:1 63:3 69:11 77:11
  77:12
**appointment** 36:2
**approach** 12:23
**approved** 53:18 57:7
**approximately** 4:21
**archive** 21:20,21 23:5
**archived** 22:4 80:9 97:23
**area** 7:11,13 15:24 16:3
  18:4,20 25:12 37:24
  62:24 83:13 88:21
  92:23
**areas** 16:1,2,3
**argue** 68:13
**ARI** 2:6
**Army** 32:11
**arrest** 41:25 54:6 88:6
  92:19 100:7
**arrested** 88:9
**arrestee** 36:6 98:18
**arrival** 43:22
**arrived** 54:12
**arrives** 44:2
**articulated** 85:23 88:1
  92:23
**ASCII** 101:10
**asked** 12:13,14 24:5
  99:25
**asking** 6:1 8:20 17:25
  30:6,7 67:22 82:25
  84:14
**aspect** 54:18
**assign** 36:4
**assigned** 23:25 35:19
  41:5 48:8 53:19,22
  56:11,16,21 57:8,10
  57:21 61:14
**assignment** 56:24 57:14
  57:14 58:7
**assist** 16:12 39:12
**associate** 24:1 68:23 69:3
  69:6,8
**associated** 28:11 31:24
  48:10 55:8 74:19
**associates** 5:24
**assume** 7:23 43:24 51:10
**assuming** 47:10 69:8
  80:17
**at-risk** 94:16
**ATC** 77:8

## B

**B** 3:1
**babble** 61:5
**back** 19:1 22:12 23:5
  33:24 36:11 44:7,19
  48:21,25 49:12,19
  53:1 61:7 74:18 80:15
  84:19 85:7 86:8 92:9,9
  99:4
**backseat** 73:22
**backup** 22:11 63:12,13
**bad** 10:20 41:9 45:9
**badge** 42:14
**badges** 73:20
**bait** 18:5
**bank** 78:23
**BARGIL** 2:6 31:13 40:1
**base** 100:15
**based** 16:14,15 17:9,12
  19:16 26:24 40:2,14
  59:22 62:15 65:16
  70:10,16 91:8
**basic** 12:21 83:7
**basically** 7:10 8:3 9:21
  9:23 11:3 12:14 27:12
  33:17 36:23 38:1 39:9
  39:23 46:25 59:3
  71:17 80:23 82:10,11
  88:20 97:15 100:7
**battery** 27:6
**beat** 45:12
**becoming** 15:21 26:13
**bedrock** 87:23
**began** 70:17
**beginning** 98:7,12
**Beldon** 38:19
**belief** 18:3
**believe** 14:18,19 17:23
  18:17 20:22 22:2,22
  37:24 38:13 41:14
  47:9 70:25 71:24 72:2
  72:3 75:23 95:19
  98:11 100:16
**bell** 76:24
**belt** 29:21 44:8
**beneath** 38:21
**benefit** 95:8
**best** 9:19 50:5 91:10 95:2

**98:8,11**
**better** 27:1 34:2 90:21
  94:22
**beyond** 81:21
**big** 80:19
**bike** 18:5,11
**binder** 80:4
**biographical** 11:25
**birth** 44:14
**Biscayne** 2:7
**bit** 27:1,25 40:12 56:14
  60:21
**bite** 18:11
**black** 85:9
**blank** 34:13 40:16 53:2
**blocks** 25:14 43:25 46:5
**blood** 60:24
**body** 27:3,19 28:12
  29:16 31:3 33:10
  95:13,15,17 99:15
**body-worn** 27:16 28:16
  55:23 70:14 95:24
  96:3,6,10,23,25 97:6
  97:10,14,19,21,24,24
  98:5,9,16
**BOLOs** 90:10
**book** 60:13 80:4
**boring** 98:19,20
**bottom** 45:13 53:8 55:22
  63:16,20 88:3
**Boulevard** 2:3,7,11
**bounce** 44:7
**boundary** 8:11
**box** 1:23 11:4 16:6,9,10
  51:15,15,21 52:3,8
**boxes** 16:3 82:21
**brackets** 42:16
**brain's** 77:2
**break** 46:18 77:14 94:1
**briefly** 61:25 84:20
**broad** 17:20 39:12
**broadly** 86:5
**broken** 85:14
**brother-in-law** 49:9
**browser** 35:2
**BU** 63:7,9,11
**buddy** 66:24
**built** 41:8
**bullet** 88:5,15
**bumped** 60:17
**bunch** 9:23,24,24
**bureau** 4:14,16 95:12
**Burger** 19:19
**burglarized** 52:14
**burglary** 18:18 40:3 46:3
  48:22 53:16
**business** 85:1
**busy** 60:3
**button** 11:1 29:21 35:4
  84:9,12 86:23 87:11
  87:11
**button.'** 83:3
**BWC** 37:14 55:22

## C

**CAD** 19:12,23,24 20:16
  28:23 29:6,17,24 30:4
  31:8 32:25 33:1 34:25
  35:3 36:16 38:6,7,7,9
  38:11,13 46:15,16
  47:7,14,22,22 50:25
  51:7 52:6 54:13,14,20
  55:7,13 58:8,19 96:2
  97:9
**CADed** 58:13
**calculate** 31:9
**call** 18:5,23 33:13,15,16

**33:18,20,20,21,24**
  34:5,7,8,14,15,22 35:6
  36:10 37:2 39:6,12
  40:6,16,18,21,23
  41:23 42:4,24 43:5,6,6
  43:8,9,12,17,20,21,25
  44:14,25 45:1,5,11,12
  45:25 46:1 49:18,18
  50:7 51:2 57:6 58:23
  59:17 63:15 64:8 66:6
  66:10,12,15,25 70:19
  72:11,12 84:8 99:1
**called** 16:2 20:24 49:4
  50:8 52:13 72:10 80:7
**caller** 41:9
**calling** 51:5
**calls** 39:23 40:2,7,8,9
**cam** 27:3,19 28:12 29:16
  31:3 33:10 95:13
**camera** 27:5,16 28:16
  55:24 70:14 95:17,24
  96:3,7,11,25 97:6,11
  97:14,19,21,24,25
  98:9,16 99:1,5,12,12
**camera's** 99:10
**cameras** 28:6 95:15
  96:23 98:6 99:15
**capacities** 95:10
**capacity** 1:9
**caps** 59:12
**capstone** 14:8
**captain** 13:7,11 16:7
  56:19 89:7,15,16 90:3
  90:3,6 92:3,17,25
  94:25 95:10
**captain's** 90:5
**captains** 13:13 90:1
**capture** 50:16 85:15,22
**captured** 55:23 86:4
**car** 12:19 21:6,9,11
  29:20 30:7 69:22,25
  70:3,7 73:22 84:15
  86:24 92:9,9,12 99:4
**career** 95:9
**cars** 18:23,24 20:24 23:1
  85:14 92:7,14,20
**case** 1:7 27:22,24 28:1,20
  28:23 29:3,8,12,13
  33:11 35:25 36:4
  40:19 44:9 46:7 47:15
  47:16 53:20,21,22
  54:3,5,21,22,24,24
  55:6,8 56:11 57:15
  74:19,22 76:13,14,17
  85:7 90:17 96:10
**cases** 29:15 36:7 90:16
  90:21
**Casson** 37:21
**catch-all** 65:13
**catchall** 42:1
**categories** 82:13
**category** 40:13 65:14
**cause** 92:18
**caused** 67:2
**caveat** 52:12
**cell** 22:8
**center** 92:25
**central** 9:17,18,20 10:2
  10:17 89:2
**certain** 14:25 15:3 23:25
  24:16,16,17
**certainly** 6:3 12:9 18:3
  23:20 24:15,18 30:13
  67:8 69:25
**certainty** 11:16 13:20
  20:10
**Certificate** 2:23,24 102:1

103:1
**certification** 83:7
**certify** 102:4 103:6,11
**Chagrin** 2:3
**chain** 94:25
**change** 38:10 50:5,11,17 50:19 52:25
**changed** 21:1 37:16 52:12 86:13
**changes** 93:14 98:1
**changing** 49:23
**channel** 71:16,17
**channels** 71:12,13,13,14 71:14,15,15
**chatter** 71:22
**check** 5:5,6,7,8,13 10:21 10:23 13:16,25 19:17 19:25 24:7,7,8,9,12,18 24:23,25 25:2,6,7,16 28:24 39:5,18 40:10 41:18 44:17,18 51:14 54:12,15 55:3,4,11,14 55:15,19 64:1,15 65:6 67:15,18 68:11,23 69:1,3,6,9,20 70:14 77:6 81:1,11 82:21 83:9,24 88:16 95:18
**checkbox** 14:19,20 51:14
**checked** 12:14 54:23 70:15 83:11
**checking** 67:25 68:1
**checklist** 14:18,21,22 15:7,9,13,14,17,18 78:10 80:18 82:8,9
**checklist-driven** 82:8
**checks** 5:3 6:6 12:8 14:24 19:7 23:12 24:14 64:3 64:4,7,14 71:10 77:18 78:9 80:17,21,24 81:20,23 82:3 88:20 89:1 93:17,20
**chests** 73:20
**chips** 78:23
**choices** 51:25
**choose** 51:25
**chose** 51:24
**CHRIS** 1:8
**circa** 60:16 80:7 81:21
**circumstances** 23:16 56:6
**citizen** 39:11,12 95:20 96:3 97:11,20 98:10
**citizens** 2:15 85:18
**City** 1:23 38:10 89:16
**City's** 90:14
**CJIS** 42:10 56:15 60:20
**clarification** 56:14
**clarify** 30:5 99:24 100:22
**clarifying** 30:9
**clear** 6:20 36:12 41:22 65:15 76:18 87:22 90:20
**clearance** 54:9
**clearances** 54:6
**cleared** 54:6,6,7,7 66:25 70:19 71:3
**clears** 32:19 44:2,5
**clerk** 82:25
**click** 10:24 19:21
**clicked** 10:8
**close** 18:9
**closed** 63:5,7,8
**closest** 95:1
**Co-counsel** 2:5,9
**code** 35:5 39:9 41:15 60:13 63:5,8,9 65:18
**codes** 59:23 60:4,8,9,17

60:18,23 61:2
**Colonel** 5:1
**color** 40:7
**column** 45:14,16 82:12
**come** 13:3 16:5 41:10 44:18 48:21 53:17 75:8 89:11 90:10
**comes** 57:1 81:12 92:1
**coming** 13:21 87:3
**command** 9:17,18,20 10:2,17 71:13 89:2 94:25
**commander** 83:17
**commanders** 101:2
**comment** 45:18 55:16 59:8
**comments** 45:14
**Commission** 102:12,13
**commits** 88:8
**committed** 5:10 19:5 23:13 88:6
**committee** 60:17
**committing** 17:19 89:19 89:20
**common** 26:23 44:15 52:2
**commonly** 42:13 47:4
**communicated** 6:15 99:7
**communication** 59:22,24
**communications** 71:19 71:25 72:8,11
**community** 5:23
**company** 21:2
**complaint** 37:17
**complex** 9:1
**compound** 29:7
**comprehension** 12:15 13:12,17,25
**comprehensive** 84:10
**computer** 7:20,25 9:9 21:9,10 29:2 30:21 41:2,4,13 57:11 59:7 96:22
**computer-aided** 21:15
**computers** 8:15
**concept** 15:1,25 21:3 72:21 86:14,15 87:16
**concepts** 88:1
**CONCLUDED** 101:13
**condition** 24:25
**conduct** 5:3 12:7 24:14 54:12 55:11 78:8,9 88:15
**conducted** 10:21 19:8 77:17
**conducting** 25:5,7 64:12 65:11
**confident** 55:7
**confusion** 56:14
**conjunction** 24:22
**connected** 21:9 103:14
**connections** 91:11,13
**conscious** 51:17
**considered** 73:15
**consistent** 26:23 66:21 66:23
**Console** 40:25
**constantly** 98:21
**constitutes** 85:24
**contact** 77:9 97:10
**content** 87:15
**continuity** 60:10
**convenience** 52:1,20,22
**conversation** 83:22,25 93:22
**conversations** 84:24
**conveyed** 7:8

**cool** 18:23 61:7
**cop** 87:8
**copies** 101:9
**cops** 87:10
**core** 81:2
**corner** 9:11
**corporal** 80:11
**correct** 11:10 17:14 21:23 29:10 33:2 34:18,23 35:18 39:16 42:13,25 44:7 45:15 47:20 49:17 50:20 51:9 54:2 55:25 56:3 58:5,20 60:24 62:15 63:10 68:21,23 72:10 74:6 75:20 76:21 77:7 104:6
**CORRECTION** 104:8
**correctly** 21:13 22:6
**correspond** 28:21,22 29:6,8 33:10 49:18 52:4
**corresponding** 29:14 47:7,13 54:19
**corresponds** 54:13
**counsel** 2:13,17 101:17 103:12,14
**counted** 45:8
**county** 1:9 4:11 7:14 12:6 19:6 20:15 22:17 23:8,10 38:8,18,20 41:12 49:16,25 59:18 75:18,19 88:17 89:19 95:14 97:18 99:14 102:3 103:4
**couple** 9:11 12:18 13:5 27:14 28:10 30:14 54:5 61:3,4 71:12 88:23 89:24 92:24
**course** 36:9 52:15 91:14
**court** 1:1,19,22 24:15 103:6,19
**cover** 14:24 15:1
**covering** 13:19
**covers** 14:23
**crash** 99:2
**create** 18:5 30:19 91:3
**created** 19:24 29:17 53:10 91:21
**creation** 7:1
**crime** 16:1,9 18:17 23:20 23:25 25:12 50:13 52:8 62:6,7 73:9,11,12 73:25 88:9,10 93:23
**crime-related** 61:3
**crimes** 4:18,24 5:10,23 19:4 23:12 40:3 59:10 61:13 73:24 83:13 88:6 89:19,20 90:12 90:13,15
**criminal** 16:15 17:10 81:10
**criteria** 8:4 100:13
**critical** 60:11
**Cross** 2:22 99:22
**cross-check** 79:4
**cross-reference** 89:4
**cup** 44:9
**currently** 4:10,14 6:25 56:25 77:25 79:10
**custody** 74:2,3,8,11,15 75:11,15

**D**

**D** 2:19
**dad's** 46:4
**Dade** 1:23 38:10 89:16

90:14
**daily** 14:6
**DALANEA** 1:3
**DARLENE** 1:4
**dashboard** 9:25
**data** 9:24 11:25 20:16,16 20:17 21:16,20,21 22:5 23:6 28:11 35:2 37:3,6 45:21,22 50:23 72:16 75:20,23
**database** 8:16 27:9 28:21 29:24 33:1 46:14
**date** 1:14 19:18 20:20 27:13 44:13 48:12 49:11 50:6,15,15 54:17 74:19 75:16 104:2
**date/time** 34:3,20 36:12 49:15,19,20 50:19
**Dated** 103:17 104:25
**day** 4:21 6:21 33:19,20 33:22,23,25 58:13 71:4 92:22 94:11 102:8 103:17
**days** 27:13 28:5 92:21
**DCPD** 38:12
**deal** 49:5
**dealing** 61:22
**DeBevoise** 2:11
**decided** 66:25 69:9
**dedicate** 18:19
**DEEGAN** 1:4
**Defendant** 1:10 2:13
**definitive** 20:13
**degree** 11:16 13:20
**dentist** 36:1
**department** 36:19 38:11 56:18 89:10 97:23
**depended** 8:4 55:12
**depending** 6:22 19:4 27:22 59:14 63:25 80:2 97:3
**depends** 4:21 17:18,24 54:16 65:7
**depo** 36:2
**depoed** 78:24
**deponent** 101:18
**deposition** 1:13 94:11 101:12,19 103:8 104:1
**deputies** 5:2 6:9,10,13,14 6:15 7:8,19 12:7,13 13:2 15:10,12,15,18 15:19,20,21 16:12 17:15,17 18:24 20:9 20:11,16 21:16,17 22:9 23:11 24:14 30:19 41:3 43:11,13 48:16 55:13,17 64:12 69:20,21 70:2 73:14 73:14 77:18 86:7,9,12 86:13 95:15
**deputy** 13:3 16:23 17:3,7 17:22 19:20 20:19 22:3,4,11,15 25:5 26:17,18,19,24 29:17 30:7,20 33:25 34:9,11 34:17,21,24 35:15,17 35:18 36:3 37:1,6 38:20 39:14 40:22 41:3 42:4,10,24 43:17 43:18,19 44:5,18 46:9 48:15,18 49:23 50:24 51:13 52:21,22 53:2 53:16 54:16 55:13 56:9,10,12,15,25 57:6 57:7 58:2 59:18 67:22 67:25 68:4,10 70:13

75:6 78:4 80:3,16
**deputy's** 41:1 52:24 58:24 65:7
**deputy-type** 73:15
**descending** 39:1
**describe** 9:22 10:13 91:11
**described** 8:3
**description** 82:18,19
**designated** 88:21
**designation** 62:4 100:2
**designator** 8:9 35:12 73:9
**designed** 81:2 89:22
**detective** 53:19,19 57:2,9 59:2,11,19 61:13 62:13 65:11 75:16 97:4
**detectives** 4:24 73:16 89:7 90:12,14,15
**determine** 74:10,17 76:14,16 88:18
**developing** 94:16
**device** 21:10
**diagram** 91:3
**dialogue-driven** 82:7
**difference** 7:24 24:6,11 35:20
**different** 6:19,22,24 9:12 9:23,24,25 10:2,12 13:5 27:15 28:10 40:6 43:9 53:25,25 54:5 58:24 60:5 71:12 78:5 80:10 83:18,22,24 84:5 87:6 89:24 90:23 91:15,16 92:5,6,16,24 93:7
**differentiation** 59:15
**differently** 40:4 87:4
**direct** 2:21 4:6 27:8
**directive** 55:18
**directly** 9:17 27:6,9
**disabled** 18:8
**discreet** 18:25
**discrepancy** 32:5
**discrete** 72:23
**discuss** 93:17,21
**discussed** 25:18 56:8 84:20
**discussing** 93:19
**discussion** 79:16 89:23
**dispatch** 23:4,7,7 38:11 40:21 44:24 71:20 72:9
**dispatched** 40:4 43:16 62:17,18 63:2 99:4
**dispatcher** 35:6 40:22 43:7,8 59:5,14,21 62:14 63:21 75:6,9
**dispatcher's** 64:9
**dispatchers** 34:9 60:24 64:4 72:12,13
**dispatches** 39:6
**dispatching** 21:15 36:16
**disposition** 41:20,22 76:10,22
**district** 1:1,1 7:14 13:7 13:11 16:7 38:25 39:1 39:2,3 56:20,22,25 57:6,7,9,10 61:14,18 61:23,25 62:1 80:12 86:9,21 87:1 89:7,15 89:16,16 90:1,2,2,3,5,6 92:3,17,25 93:1 95:10 101:2
**districts** 25:10 61:15 89:8

divided 95:7
division 1:2 57:5
dock 56:3
docking 27:5
document 13:14 16:20
  20:4 32:24 47:2 57:23
  58:19,22 67:12 75:24
  81:11 82:2 84:3 87:20
  87:24,25 88:11 96:3
documentation 14:12
documented 10:19 19:15
  19:24 26:15 27:17
  30:16 88:21
documents 79:24
Dodd 75:5,5
dog 85:10,12,13
dogs 52:16
doing 5:9,15 14:15 24:4
  24:5 34:24 35:7 39:10
  39:13,25 52:23 53:4
  64:13 65:4 68:8,8
  69:24 72:22 73:14
  76:2 83:8 85:10 87:2
door 12:22 80:8 83:12
  84:12,16
doors 51:4 85:21,22
drags 29:21
drawn 33:11
drive 1:17 2:15 44:10
  69:25
driven 100:2
driver's 77:13
driving 18:24 69:21 70:2
dropped 92:10
drove 73:22
drugs 86:1
duly 4:2 102:6
duplication 28:1 45:24
Duties 16:24

E

E 2:19 3:1
earlier 25:18 33:10
  42:23 87:23 88:23
  91:15 97:5
eat 66:24
edification 30:10
effect 11:2 21:4
efficiency 81:4
efficient 81:3,7
effort 51:17
eight 78:18 85:14
either 27:21,23 28:7 34:9
  51:14 56:10 81:13
  96:21 100:18
elaborate 100:3
electronic 8:16
electronically 7:9
element 40:12
eliminate 29:22
eliminated 60:9
employed 4:10 62:10
employee 42:14 103:12
  103:13
employment 5:12 6:4
en 43:19,21,23 44:24
encompasses 72:11
encounter 95:21 96:3
  97:11,20
encourage 5:11
enforcement 48:7 71:14
  73:10,11,12
engage 95:15
engaged 95:17,20 96:12
  97:19
enlarged 12:1
ensure 25:3

ensuring 14:12
enter 47:21 60:25 68:11
entered 37:1,6 42:3,11
  42:17,21 43:20 44:13
  45:25 48:15 50:23
  51:13 54:17 57:25
  59:8,10,13 67:12,18
  68:5 70:18 87:14
entering 8:17 59:7
entire 46:8 87:1
entirely 7:23 54:16
entitle 83:23,23
entity 23:9 72:10
entry 46:7 47:7,13,14
  61:20 62:11,13 71:9
  75:20,23
entry-level 15:15
environment 49:22 62:6
  62:7 81:11 93:23
equally 67:23
equipment 96:18
equipped 20:24 73:1
Errata 2:24 104:3
escapes 23:6
ESQUIRE 2:2,6,10,14
essentially 6:17 82:13
  89:7,12
establishment 52:2
eval 78:22
evaluated 13:11 100:14
evaluation 14:2 100:12
evaluations 14:6,7,8 80:1
evasive 84:14
event 3:3,4,5,5,6,6,7,7,8
  27:21,21,23 28:1,20
  28:23,25 29:1,2,6
  32:25 33:9,12,15 34:1
  34:12 35:17,21 36:20
  39:10 45:23,23 55:23
  63:16,19 74:21
events 45:22
everybody 8:10 21:19
  23:18 44:17 45:11
  70:11 83:19 87:4
evidence.com 56:2
evolution 21:7 86:7
evolve 21:12
exact 81:6,6
exactly 23:19 32:10,11
  42:20 64:5 66:6 81:19
Examination 2:21,22,22
  4:6 99:22 100:24
examined 4:3
example 6:25 8:5,9 18:12
  29:20 48:20 49:3 50:4
  53:16 59:9 80:3,10
  82:10 97:1,6
examples 17:21 18:13
  20:13
exception 4:23
exceptionally 54:6
excuse 23:11
Executive 1:16
exhibit 3:2,2,3,3,4,4,5,5,6
  3:6,7,7,8,8 9:5,5,6 11:7
  11:8 16:17,18 31:21
  32:21,22 46:21,22
  49:19 58:16,17 64:19
  64:20 66:1,1,3 67:9,10
  68:14,15 71:5,6 73:5,6
  76:6,7,25 77:1 87:17
  87:18 94:7,9,10
exhibits 88:23
exist 40:20 41:12 73:10
  80:2
existence 97:25 98:12
exists 41:14 49:7 74:25

80:19 96:12
expansive 13:14
expect 26:24
expectation 88:18 99:7
experience 31:2 101:4
expert 27:7 71:25 72:2
  79:25
experts 86:20
Expires 102:13
explain 9:19 58:25 84:21
explained 91:15
explanation 38:2
extensive 14:23
extra 60:2
eyes 11:15

F

face 49:10
face-to-face 88:15 90:9
fact 14:16 30:8 65:16,18
  81:22
failed 15:21
fair 26:2
fairly 13:14 17:20
fall 40:13
familiar 13:21 16:20
  32:24 33:6 37:23 47:1
  64:4 69:13 87:20
far 12:3 13:11 21:19
  27:10 30:12 32:12
  93:22 96:4 98:1
fat-thumbed 96:21
Fax 1:25
FD 36:20
FDLE 48:6
feed 52:16
feedback 90:22
felony 65:17,23
female 77:12
Fenstemacher 57:4
field 4:14,16 12:17 13:4
  13:6,21 14:7,12,13,22
  15:16,16,19 17:14 20:24
  20:21 39:5,15,20 42:3
  47:25 48:3,12 49:14
  51:10 52:10 70:4
  77:17,23,24 78:3,7,11
  78:13,18 79:4 80:4,5
  82:5 85:16
fields 40:16,20
fifth 74:7
fight 40:3 43:10
figure 31:8 32:14 43:12
  75:3 88:25
file 79:20,21,22
fill 14:15 53:23
filled 14:3,9
financially 103:15
find 15:5,6 20:20 22:22
  30:16 35:23 65:24
  80:15 81:12,15 92:21
fine 64:11
finish 94:2
finished 46:1
fire 36:17,19,21 38:14
  72:12
firing 77:3
first 4:2 12:18 32:6 33:8
  33:20 35:13 42:6,7,23
  43:3,16,17,19,19 45:5
  45:7 50:7,20 62:12
  70:22 71:9 74:14
  86:21 88:5
fit 65:13
five 22:12 27:13 28:5
  43:4 61:21 88:14
  92:20

five-minute 94:1
FL 1:23
FL0510000 48:11
flagged 16:24
fleet 22:23,24
floating 61:2
Florida 1:1,17,20 2:7,12
  2:16 48:8 102:2,12
  103:3
flushed 98:5
flying 32:10
focus 73:23 78:11 92:23
fold 87:3
folks 9:7 6:18 13:20
  89:18,19,21,25 92:20
  101:5
follow 20:9
follow-up 57:22,23
  100:23
followed 57:6 58:4
following 10:22 25:3
  71:4 81:5
follows 4:4
footage 27:3,19 28:12
  29:16 31:3 33:10
  95:13 98:19,20
football 91:7
foregoing 103:8 104:4
forget 82:11
forgot 27:18 66:15
form 17:5 20:1 21:22
  22:19 25:20 68:3
  84:22 94:19 96:13
formalized 26:15
format 93:10
formatted 8:2,6
formed 73:13
former 90:3,6 95:10
formula 17:9,13 100:6
forte 22:1
forth 61:19
found 9:18 49:3 50:11,18
  91:5 96:4,7
foundational 87:25
four 43:4 63:4 69:17,20
  70:14 74:7 80:10,13
  88:14
frankly 5:6
free-form 11:4 37:7
frequently 89:17
front 12:22,24 81:13
  83:21
frustrating 76:5
FTO 13:17 79:11 81:21
  81:22
full 4:8 85:3
function 23:7
functionalities 6:19
functionality 22:14,18
  35:4
functions 9:23
fundamental 27:1
further 12:24 42:8
  103:11

G

G-A-R-T-E-N-B-E-R-G
  28:19
G3 62:17
gainful 5:12 6:4
gainfully 62:10
gang 51:10,11,12 57:2
gang-related 51:8
Gartenberg 28:17 32:17
gas 52:1
gather 23:12
geared 87:13

general 2:17 11:24 13:2
  74:13,17 95:16,19,22
  95:24 97:22,22
generally 25:21,22 31:3
  41:3,4
generate 29:15 30:3,24
generated 50:1 57:18
generically 30:8 64:6,16
  84:2
geographic 7:11
geographical 7:13,16
  8:11 37:24
geographically 23:20
geography 7:15 8:8
geolocation 28:11 37:3
Georgia 56:19
Geoverified 41:7
getting 20:12 29:20 45:9
  55:17 87:14
GG 102:12
gist 83:16
give 5:24 7:1 17:21,24
  31:17 54:22,23 57:13
  76:23 92:4
given 21:19 28:4,24,25
  29:2,3 103:9
gives 11:2
glad 32:20 37:16 78:23
global 7:2,3 8:18 9:13,15
  9:17 10:7,13 11:13,17
  11:18
go 5:7 7:11 15:19 18:19
  19:1 20:1 22:12 23:5
  23:22 24:2,23,25 26:9
  28:7 30:9 33:3,24
  35:22 36:3,11 37:8
  38:22 46:2 47:24
  48:23,25 49:9,12 53:1
  61:7 64:8,12 66:24
  67:1 68:3 69:9 74:18
  79:14,14 80:15 81:11
  81:15,21 82:20 83:12
  83:15 84:16,18 85:19
  86:7 90:19 92:18
  96:13
goal 80:23 81:9
goes 13:1 16:4 21:7 27:9
  30:13 36:6 75:10
  81:18 83:4 90:10
going 5:17 6:2 7:1 8:13
  9:4 10:10,15,19,25,25
  12:17 13:8 15:14
  18:19,25 19:20 23:20
  26:9,9 29:7,11 31:17
  31:22 33:3,4,4,16,22,24
  36:8,17,18,19,20,22
  37:24,25 38:9,13,14
  38:15 39:8,8 40:4,5,6
  40:11,13,21 43:11
  44:16,18,19 45:4,9,9
  45:10,10,13 46:20
  48:11 50:6 52:11,20
  52:22,24 53:23 57:13
  58:15,25 59:6 61:11
  63:25 64:9,15 65:23
  71:21 74:24 78:4,17
  82:14,15,16,20,21,23
  84:3,4,10 87:5 89:14
  91:12 92:1,4,5,6 94:19
  97:10 98:19
gonna 92:21
good 10:20 30:11,16
  37:15 44:20 60:3 62:7
  62:8 64:17 66:8 68:6
  75:24 78:23,24 83:14
  85:5,24 90:8,17,23
  91:13 95:9 101:8

gotten 59:2
government 1:17 64:18
grace 76:3
grandma's 49:5
great 33:23 52:25 58:14
82:19 83:14 84:8
85:21
greatly 17:18
green 40:8
Greenwich 31:11
group 52:9
guess 44:12 50:3 91:10
guidance 92:4
gulf 62:25,25 63:4
guy 7:23 10:12 60:22
76:3 81:12,12 90:16
guy's 22:11 83:11
guys 61:18 87:9 90:19

**H**
H 3:1
half 32:1,2 44:2 86:14
hand 102:7
handle 16:5
handled 33:20
hang 92:18
happen 7:17 24:24 52:2
90:3 96:19
happened 49:12 59:5
66:9 91:24,25 92:2
happening 57:16
happens 12:16 26:20
61:14 69:10 85:8
101:4
Harrington 5:1
hate 78:17 84:5
he'll 78:25 101:7
head 95:23
headed 46:5
heading 39:12
hear 10:1 64:11 75:21
94:23
heard 23:23 64:9 81:8
99:16
Heights 2:3 37:21
HEILMAN 1:4
held 79:17
help 17:3,7 32:20 81:2
helpful 31:20 86:3 97:17
helps 37:18 84:1
herewith 104:5
hey 6:18 7:12 12:20,21
13:17 19:14,17 22:13
23:23 24:4 26:6 29:1
33:24 36:3 41:10
43:13,14 44:1,10
48:23 49:9 50:22
52:13,22 55:7 59:4
64:2,10,12 66:24
67:24 75:10 82:16
83:1,5,5,10,12,19 84:7
84:16,25,25 85:9,25
86:22 90:11 91:5
92:11,18 97:9 98:14
98:23 100:20
high 13:20
high-risk 55:2
higher 45:1
Highway 57:5
historical 10:15 30:16
history 16:15 17:10
19:11,23 25:9,9 30:2
30:11,13,15,15,20,22
30:25 81:1 100:7
hit 35:5 96:20 99:1
hits 43:25
hockey 21:5,8

holder 44:9
holding 79:9
home 8:11
honest 11:14
honestly 95:7
hospital 98:17,18
hot-spots 63:17
hour 49:3
hours 32:1 67:6 98:19,20
house 12:24 29:18 48:22
49:1 50:14 51:3,4,23
52:14 53:17 92:10
Houston 56:18
how's 24:4
HR 79:22,25,25
HR-related 79:24
hundred 15:3
hurts 84:1

**I**
I-N-V-E-S-T 53:14
IC 71:14
ID 33:9,12 34:12 53:9,14
53:15 74:21
Ida 38:24 39:3,3 45:18
52:5 56:21 61:11
identification 6:11 9:6
11:8 16:18 17:12
32:22 42:12 46:22
58:17 64:20 67:10
68:15 71:6 73:6 76:7
77:1 87:18
identified 5:8 24:9 27:12
27:20 40:6 61:23 62:2
72:23 79:7
identifier 41:1,19 61:10
61:12 70:6,8
identify 6:9,10,14 17:3,7
38:15 48:6 68:7 94:15
identifying 16:12,25
53:10
IG3 62:17
III 1:5
illegal 39:11
ILP 3:8 12:9 13:4 14:17
14:20 22:22 23:2
80:21 81:2 84:4 85:23
87:21 100:9
Image 3:2,2
imagine 48:20
immediately 49:8,8
implement 97:24
implementation 98:5
implemented 9:14,15
81:20 99:16
implied 29:10
important 92:11
in-progress 40:3
in-service 10:4
inactive 54:8
incident 3:4 29:8,12,14
29:15,17 33:5 47:3
50:23 51:6 52:8 60:11
63:3 71:13 76:20
incident-related 71:19
incidents 69:13 79:3 93:7
93:16
include 6:1 16:24
included 79:19
includes 96:2
inclusive 98:23 104:5
indexed 95:25
indexes 101:10
indicate 32:7 39:17
62:12,17 63:7 64:23
68:18 74:2 96:4,6
indicated 42:23 62:14

indication 50:20 66:8
74:15
indifferent 10:20
individual 10:9,11,20
15:4 19:8 24:2 25:9
26:6 41:5 53:10 61:22
63:8 86:25 87:3 90:20
96:24
individuals 6:5 12:17
62:1,5
informal 99:8
information 5:25 10:10
10:22,23 11:19 23:12
25:6 28:15 32:16
43:10 44:20 46:7
49:24 75:8 78:15
83:18 85:6,23 88:12
94:18
information-sharing
89:13
initial 53:18 57:24 58:1
initiate 35:21,23 66:15
84:8
initiated 34:5,11,16,21
35:17 36:1 40:18 42:4
42:24 44:14 53:22
59:17 66:12 71:2
initiates 34:8
initiating 36:8 56:8 57:6
inmate 98:18
input 10:23
inputted 45:21
inquiry 30:9
ins 64:16
inside 42:16
Inspector 101:4
instance 20:18 67:17
68:25 69:21 76:23
instances 17:25 18:1
97:8
Institute 2:2,6
instructing 80:21
integrate 26:21
intel 25:10 84:20,22
85:16 86:5,11,13,21
89:13,25,25 90:1
intelligence 89:5,6
intelligence-led 6:12
13:9,22 14:11
interacting 99:11,13
interaction 76:19
interactions 98:10
Interdiction 57:5
interested 5:18 94:23
103:15
internal 26:16 71:19
internet 7:24 28:7
interpret 26:10 31:5 33:7
60:14
interpretation 99:9
interpreted 98:16
interview 13:15 64:13
85:16
intimately 64:17
intranet 7:21,24
investigate 86:9,10
investigating 56:10
investigation 51:19 52:9
52:15 55:5 64:13 65:1
65:4,4,10,12,12,16,19
65:21 67:13,18 68:22
68:11,20 69:2 83:23
85:3 90:20
investigations 55:2 88:24
90:19
investigator 53:15,21
56:11 57:21,22 58:4

invisible 89:20
involve 24:12,19
involved 23:25 36:14
54:1 69:15,17,20 79:2
101:2
involvement 16:15
issue 28:2 37:11 58:8
95:2 97:7
issued 96:25
it'd 44:17
it'll 46:6
item 33:3,4 34:3 74:7
items 13:16 15:4 38:21

**J**
Jacquelyn 1:19 102:11
103:6,19
jail 65:24 75:13,18,19
January 54:18
Jason 38:19
Jeff 5:1
Jim 85:25 86:2
job 3:3 5:21 16:23 53:17
83:14 94:18
Johnson 2:2,21,22 4:7
9:2,4,7 11:7,9 16:17
16:19 17:6 20:8 22:16
22:20 25:22 26:1
30:18 31:14 32:21,23
37:19 40:15 46:20,23
58:15,18 64:19,21
66:2 67:9,11 68:9,14
68:16 71:5,7 72:17
73:5,7 76:6,8,25 77:5
77:14,16 78:2 79:1,7
79:18 87:17,19 93:25
94:4,23 95:3 96:14
99:21 100:25 101:6,8
Jones 1:5 68:23 69:4,5
Joshua 70:24 71:1
JUR 38:4
jurisdiction 38:5,9,13
jurisdictions 89:11
Justice 2:2,6 89:10
Juvenile 89:10

**K**
K-S-K-A-G-G-S 58:23
keep 19:6 20:15 40:19
43:5 46:6 72:5
keeps 75:14 79:25
kept 61:3,4
key 59:3
keyboard 96:21
keystroke 60:2
kid 92:12,19
kids 49:4 91:5,9
kill 18:7
kind 12:22 14:2,8 23:6
23:16 26:20 30:20,21
31:8 37:3,7 40:11 48:9
62:8 64:7 77:22 82:2,7
82:23 83:16 90:9
91:21 94:20 99:8
100:8
kinds 66:19
King 19:19
knew 49:1
knock 83:12 84:12,16
know 5:15,21 6:17 7:5,15
7:17 8:9,16,21,25
11:23 12:14 16:16
17:23 18:14 20:7,18
21:4,10,12 22:1 23:4,5
24:4,5,24 25:13 26:8
28:13,14 30:23 31:25

32:13 33:5 37:15 39:7
39:21 40:13 43:11
44:9,17 46:24 50:13
50:14 51:24 53:1,3
55:17 59:4,14 60:1
61:15 62:8,8,9 66:7,9
66:10,16 67:4,4,22
68:4,8 69:4,5,12 70:1
70:14 72:5 75:13,25
76:1,3 77:11 79:14
80:2,5 81:1,5,18 82:16
83:13,15,22 84:1,13
84:25 85:19,20,22,25
86:2,2,7,20,22 87:7,7,9
89:25 90:11,12,14,24
91:11,23 92:11 95:4,6
95:8,11,12,23 96:7
97:3,6 98:3,10,14,17
100:19
knowing 75:9
knowledge 25:12 91:8
95:2
known 23:24,25 50:11,18
89:11
knows 23:18
Kraus 12:4 101:4

**L**
L 75:5 101:15
labeled 29:19
lack 97:14
Lakes 8:10
Land 8:10
Large 1:20
largely 91:17
launch 85:3
law 36:17,19,22 38:14
48:7 71:14
lawn 83:20,21 85:1
lead 97:13
learn 26:21
learned 50:8
leave 18:8 36:5 48:23
leaving 36:1 44:5 66:13
left 48:24 49:2 66:14
legal 97:23
legitimate 55:1
LEO 71:14
lesson 84:11
let's 9:5 16:17 47:24
66:24 79:14 83:12
84:16
level 22:3 39:20,23 40:14
85:5
liability 84:6
license 77:13
lieutenant 60:16 80:11
94:25 99:18
life 5:17
limit 30:12
limitations 25:4
limited 16:25 80:20
LINDSAY 2:14
line 37:21 67:23 72:18
89:21 104:8
lines 33:19 53:23 63:19
list 6:17 7:6,8,13,18,19
8:1,1,7,22 30:4 79:2,4
79:7 100:8,10,16
listed 43:1
listing 45:1
lists 79:9
little 12:24 26:25 27:25
40:12 56:14,18 60:21
live 19:12,12 68:12 85:21
lived 18:10 23:22
lives 8:11 25:14

Lmoore@pascosheriff....
2:17
local 31:18,25 36:12
37:13
locate 77:4
location 19:11 20:16,17
25:9 29:25 30:25 31:1
35:5,24 36:25 37:1,6,9
44:6 46:2 50:23 62:18
63:1 66:13 82:18,19
locator 20:25 21:14 22:6
73:1,3
log 29:2 44:21,22,23
45:23,23 46:6 62:16
63:16,19 69:15 74:5
logged 45:11,13
long 31:4,5 64:14 72:5
77:10 80:3 94:11
97:17 99:14
longer 27:24 60:21
look 15:7 22:9 25:8
31:18,23,24 32:6
34:12 37:16 40:5
44:12 49:19 66:5
70:17 75:15,19 81:13
87:5 89:2 90:19 91:5
92:18 99:3
looked 65:10
looking 5:21 6:21 9:8
31:21 32:4 43:24 46:2
63:16,18 65:8 67:24
69:15 74:1 77:2 79:3
82:1,16 83:17 84:2
85:10,13
looks 45:19,19 67:12,20
70:19,21
lost 46:8
lot 13:1,8 14:18 18:9
60:18 66:22 71:21
80:2 82:7 83:8 85:8,18
90:8,22 91:13 92:4,5
lovingly 21:5
lowercase 59:9,12
lunch 29:1 66:24
Lyndsie 75:5

M

M-A-C-O-M-B-E-R
78:21
Macomber 78:18 79:13
main 19:12,13 41:10,10
71:17 76:9
maintenance 10:3 22:25
MAJ1 61:12
major 1:13 4:1,15 61:12
61:12 64:10 95:1,7
102:5 104:1,24
majority 16:9
male 77:12
malfunction 96:18
malfunctions 27:14
management 10:18
60:11
manual 3:8 12:10,11,12
12:13 13:5,10,22,23
14:17,20 80:22 84:4
85:23 86:17,18 87:21
87:23 92:24 94:7
March 37:12,13
mark 9:4 11:7 16:17
32:21 43:7 46:20
55:13 58:15 64:19
68:2,14 71:5 73:5 76:6
76:25
marked 9:6 11:8 16:18
32:22 46:22 54:14
55:12 58:17 64:20

67:10 68:15,20 69:1
71:6 73:6 76:7 77:1,6
87:18 88:24
material 13:19
math 16:4 31:6
mathematical 17:9,13
62:3 100:5,13,15
mathematically 100:2
matter 79:8 86:20
McDonald's 82:25 84:6
MDB 35:2
mean 5:14 7:22 8:13,18
11:24 17:24 20:17
23:2 25:20 31:7,15
32:11,12,13 33:25
34:16 37:10 38:6 47:9
54:16 60:6 63:13,17
65:2 66:19 71:10
75:18 76:12,22 77:3
78:10 79:24 82:24
83:3,16 86:19 88:7
89:3 96:8,9 99:12
means 38:17 41:22 56:17
59:25 60:2 61:13
63:14 64:16 65:3,23
76:13,18 85:12 88:8
99:9
mechanics 87:14
mechanism 63:24 80:20
88:22
meet 24:3 100:13
meeting 88:18 89:5,6,13
89:13 90:4,7 91:13,19
93:5,6
meetings 89:18,22,25
90:2 91:17
member 26:14,23 64:24
68:18 82:4
members 25:19,24 26:4
26:13 89:8
memorizing 95:25
memory 25:15 57:17
mentioned 5:20 19:23
39:7 101:1
mere 19:2
merge 91:3
meridian 31:5,10,11
met 47:12 92:15
metaphorically 31:13
method 12:16
Miami 2:7
middle 1:1 53:7 82:12
86:11
midnight 33:21
military 32:13
mind 40:20 43:5
mini 101:10
minor 98:1
minute 36:11
minutes 22:12 44:1,3,3
45:8 64:9,15
mirror 18:17
mislabeled 96:20
mistaken 32:2 39:24
56:19
misunderstood 30:6
mobile 7:20 9:9 35:2
mom's 92:10
moment 21:19 22:10,10
monitored 71:16
Monty 56:24
MOORE 2:14 37:14
79:10
morning 18:19,21 49:2
70:20 81:5 85:14
96:19
mother 46:3

mother-in-law's 51:2
motorcycle 18:7,9
motorcycles 18:4
move 67:24
moved 52:17 80:7,8
moving 43:14
mower 83:20
mowers 83:21 85:2
multiple 29:15 78:5
mutual 71:13
mystery 32:19

N

N 2:19 37:25 101:15
name 4:8 7:17 8:5,6,7,16
8:17,21 28:18 35:14
44:13 47:25 53:9
58:24 94:21
named 21:2
names 8:2
narcotics 57:3 73:13,16
73:23,24
narrative 54:10 57:24
nature 5:12 39:4,9 41:15
62:10 65:1,18
neatly 65:13
necessarily 6:10,14 9:19
19:1 21:11 23:19
24:21 46:14 50:5,10
51:6 72:22 85:2,3
90:12,14 91:2 92:8
96:25
need 5:22 11:3 12:4
21:11 35:24 36:10
48:18,25 57:22 60:1
61:6 78:25 87:7,10,11
98:19
needed 5:11 38:2 48:17
51:1 71:10 85:7
needs 43:12 87:4
neighbor 85:20
neighborhood 23:21
38:1 83:20 85:9 86:1,3
nephew 92:8
networks 62:6
never 36:21 72:1 92:15
95:5,25 96:11 97:4
101:3
new 1:16,17 2:16 41:8
67:20,21 82:4
nexus 73:24
NFA 42:7
nice 44:17 76:1
night 70:17,18,22 81:4
91:6,9
nine 44:1 98:19,20
Nocco 1:8 104:1
non-STAR 70:13
noncrime 54:8
nonevent 29:19,23
nontraditional 72:25
nonunique 33:17
noon 22:13,14
normal 71:20
normally 69:24 70:2
north 8:10
Notary 1:19 102:12
note 42:17 59:6 74:1
78:21
note-taking 19:9
noted 104:7
notes 11:1 19:16,21 41:6
42:3,21 44:8 45:20
46:10 59:20 61:20
62:13 66:4 67:15
68:22 71:9 77:8 88:22
89:2 96:2

notice 43:3 96:25
noticed 26:7
notifications 27:15
noting 75:7,7
notion 18:16 81:1,17
nuances 82:6
number 5:16 27:21,22,23
27:24 28:1,2,4,20,25
29:1,3,6,8,12,12,13,14
33:8,9,11,13,14,15,16
33:16,17,18,22 34:1,1
34:2,6,13 35:25 36:4
42:12,14,14 47:15,16
47:18,21 48:6 53:9,10
53:14 54:22,22,24,25
55:6,8 56:16 67:2
74:19,22 77:13 95:22
97:13,15,16
numbers 9:5 28:20,21,22
29:3 88:3
numeric 27:24,25

O

O 101:15
O' 8:10
OAC 41:21
Oath 2:23 102:1
object 17:5 20:1 21:22
22:19 25:20 68:3
94:19 96:13
obvious 8:23 34:19 35:16
obviously 18:23 25:15
29:10 72:23
occur 91:17 92:5
occurred 50:13 51:6
52:23 93:7,16,23
96:22
occurrence 27:13 63:4
occurring 18:18 62:24
off-the-record 79:16
offender 5:3,5,6 6:6,9,11
6:16 7:13 8:22 10:5,21
11:1 12:8 14:24 15:2
17:18 18:10,14 19:7
19:17,25 23:12,21
24:1,7,8,9 25:5 39:5
39:18 40:10 41:18,19
44:17 54:12,15 55:11
55:14,14 62:4 65:6
67:17 68:11 69:1,4,9
77:6,18 78:9 80:17,21
80:24 81:14,20,23
82:3 83:9,24 88:8,16
88:17,20,22 89:1
93:17,20 95:18 100:1
offenders 5:8 6:7,12,18
7:7 16:13 17:1,4,8,12
17:15,17,22 18:2
23:14 25:21 83:10
88:7 93:21 94:17
offenses 17:19
offer 5:11 80:24
office 2:15,17 4:11 12:7
19:6 20:15 22:18 23:8
25:25 38:18 48:11
49:16,25 55:4,5 65:3
72:24 73:21 88:18
95:14 97:18 99:15
officer 13:4 14:7,10 20:6
24:20 53:9 57:25
63:24 70:23 78:14
officer's 12:19 79:19
officers 4:22 14:13 23:11
24:13,22,23 54:1
77:23,24 78:5,8 79:2,5
80:6,10 89:11 94:15
official 1:9 102:7

oftentimes 5:16
oh 41:6 46:4 54:17 62:20
78:17 85:20 94:10
95:23
Ohio 2:3
OJT 82:25 83:8 84:4
86:20
okay 6:1 7:3 12:2,5,6
14:21 16:12 19:21
21:16 26:2 28:11
29:16 31:2,20 33:1,3
35:8 37:3,8 39:22
40:25 42:9,15 43:1
48:18,25 49:21 51:7
53:13,24 54:10,24
56:5 58:11,14 60:3
61:24 63:22 64:2,22
68:22 73:4 76:18
78:13 85:10 88:23
old 37:16 60:23
old-timers 60:22
on-the-job 26:20 84:7
once 11:15 88:16
one-on-one 87:2
ones 40:9
operating 22:7
operation 18:6,22 72:22
operations 4:14,16 57:4
60:10 73:18,19 99:19
opportunity 11:2 24:2
26:25 36:9 48:17 51:1
92:3,16,17
opposed 57:14 87:14
opposite 81:9
option 85:16
oral 13:15
order 24:16 39:2 54:12
95:16,19,22,24 97:22
100:8 101:8,9
orders 97:22
organization 88:19 99:11
organizational 99:6
organized 26:6 87:1
ORI 48:3,8,10,11
orientation 82:5
original 45:21 98:2
originally 52:18
outfit 23:1
outs 64:16
outside 25:23 28:13
56:18 82:4 89:9,11
overarching 82:2 84:3
86:15
overlap 91:3
oversaw 95:11
oversee 4:19 94:5
oversees 94:20

P

P 101:15
P-R-O-L 41:18
P.A 2:11
P.M 1:15,15 101:13
P.O 1:23
page 2:20 3:1 45:20
54:11 56:5 57:24
70:20 88:2 94:8,13,15
104:8
pages 104:5
paid 20:12 55:17
painfully 8:23
paired 28:6
Paneson's 77:12
paragraph 42:7 94:14
parallel 34:6 90:18
paraphrasing 54:11
parentheses 37:9,20 59:8

**park** 2:12 12:23,24
**parking** 18:9 39:11
**part** 14:11 78:10 89:18 97:6
**particular** 13:23 19:8 20:19,20 30:4 57:12 78:13 79:13
**particularly** 14:1 18:15 21:2
**parties** 101:17 103:12
**parties'** 103:13
**partner** 22:10
**partners** 89:9
**parts** 13:23
**Pasco** 1:9 2:15,17 4:10 12:6 19:6 20:15 22:17 23:8 38:8,18,19 48:10 49:16,25 59:18 75:18 75:19 88:17 95:14 97:18 99:14 102:3 103:4
**passed** 100:11
**passes** 93:6
**passing** 12:19
**PAT2** 56:17
**patrol** 4:17 53:16 56:16 56:25 57:9 89:9 95:9 97:2
**patrolling** 85:8
**PC** 65:17,23
**PCU** 59:10
**PCU100** 61:16
**PCU103** 61:8
**PCU107** 63:6,8
**PCU300** 61:16
**PDF** 101:8
**pedantic** 75:17
**people** 4:19 7:12 12:23 14:14 18:25 20:7,14 20:14 22:25 23:13 40:24 43:13,14 47:12 62:2,7,8 70:12,15 78:24 80:13 86:1 90:9 90:23 92:15 98:16,21 98:25 99:11,13 100:10
**percent** 20:10 80:19
**perfect** 25:8 83:15
**perfectly** 11:14
**perform** 75:18
**performed** 77:22 82:13
**perimeter** 26:7
**periodically** 31:5
**perpetuity** 30:12
**person** 14:15,16 19:18 24:24,25 44:19 53:22 62:18 63:1 67:24 81:10 94:20 100:20
**person's** 75:10
**personal** 25:11,15
**personally** 69:13 77:19 102:5
**personnel** 79:20,21
**perspective** 6:8 90:5,6 96:16 99:6
**perspectives** 78:12
**Pfenninger** 59:1,11 62:13
**Pfenninger's** 60:19
**pharmaceutical** 80:12
**philosophies** 89:24
**philosophy** 82:3
**phone** 1:25 28:8 50:22 96:22
**phones** 22:8 28:6
**phrase** 10:1
**physical** 27:4
**pick** 82:6

**picks** 50:21
**pickup** 65:23
**picture** 9:14,17 10:24 11:10,13,20
**pictures** 10:8
**pin** 55:6
**pipeline** 27:8
**place** 1:16 7:3 24:16 41:14,14 51:4,5,6 52:23 81:6
**places** 9:25 52:2
**plainclothes** 73:17,19
**Plaintiffs** 1:6 2:5,9
**plan** 84:11
**platforms** 91:16
**play** 100:17
**players** 91:8
**Please** 64:13
**plenty** 81:16
**plug** 8:4 39:8
**plugged** 22:6 65:9
**pocket** 85:7
**point** 21:12 31:9 50:12 56:13 60:9 61:3 88:5 88:15 95:11 100:22
**points** 13:5
**police** 10:16 18:24 29:4 38:11 47:4 49:6 72:25 85:5
**policing** 6:12 13:9,22 14:11
**policy** 20:3,9 27:10 55:19 68:7 88:6,11,15,21 97:18,21,25,25 98:4 98:22 99:13
**Polster** 56:15 58:2
**Polster's** 56:17
**pop** 10:25
**populate** 8:12 39:15
**populated** 39:5 52:10 100:10
**populates** 47:25
**Port** 1:16,17 2:16
**portion** 95:9
**position** 4:13,20 5:2 26:18,18
**possibilities** 68:12
**possible** 29:24 30:3 44:25 64:14 66:12,18 66:20 67:19,23 68:10 69:19 89:3
**possibly** 32:4
**post** 98:15,17,18 99:9
**posting** 3:3 16:23
**posts** 98:17
**potentially** 6:24 18:3,10 23:15 35:24 43:10 46:2 53:21 90:24
**Poulton** 2:10,11,22 8:24 17:5 20:1 21:22 22:19 25:20 30:5 37:10 46:17 65:25 68:3 72:15 77:25 79:6,12 94:19 96:13 99:23 100:21 101:7,9
**Poulton@debevoisepo...** 2:13
**PowerPoint** 84:11 93:9 93:11,12
**preference** 68:7 88:9
**premise** 51:21
**present** 6:21 16:6 101:17
**pressed** 29:21
**presumption** 26:18
**pretty** 27:9 60:4 66:8 70:11 91:8
**previous** 93:8

**previously** 25:13 39:8
**primarily** 5:20 12:9 20:6 86:16,18
**primary** 13:2 19:10 35:10,19 36:4,7,9 61:8 63:14 64:23 80:20,20
**prime** 31:5,10,11 35:9
**prior** 15:21 19:19 37:11 66:1,13 98:5
**priority** 39:22,24 40:2,9 40:11,13 45:1,1 63:25 63:25
**probable** 92:18
**probably** 91:32:17 50:4
**probation** 24:7,9,10,12 24:13,14,19,22,23,25 25:2,4 89:9
**procedure** 27:4
**procedures** 27:2
**PROCEEDINGS** 1:13
**process** 14:3 26:20 82:24 84:7 86:11 91:14 92:12 95:25
**produced** 12:3 25:11 93:13,14
**product** 90:10 91:21,21 93:9
**profile** 7:2,3 8:18 9:13,15 9:17 10:7,13 11:13,17 11:18
**program** 12:18 13:6,9,21 14:13,23 15:16,17 21:4 36:16 70:5 78:12 82:6 97:24
**progress** 40:3,4 43:11
**prolific** 5:3,5,6,8 6:5,7,9 6:11,11,16,18 7:7,13 8:22 10:5,21 12:7 14:24 15:1 16:13 17:1 17:4,7,12,15,17,22 18:2,10,14 19:7,17,24 23:12,13,21 24:1,6,8,9 25:5,21 39:4,18 40:10 41:18,19 44:16 54:12 54:14 55:11,14,14 62:4 65:6 67:15,17 68:11,22 69:1,4,9 77:6 77:18 78:9 80:17,21 80:24 81:14,20,23 82:3 83:9,10,24 88:7,8 88:15,17,20 89:1 93:17,19,21 94:16 95:18 100:1
**promotion** 26:17
**prone** 16:1
**property** 4:17,23 59:10 61:13 90:12,13,15
**protected** 55:1
**prove** 85:11,12
**provide** 12:7 55:9 78:8 78:14
**provided** 7:9 25:19,23,24 26:13 54:19 79:1
**provides** 88:12
**PSO** 36:24 38:12,17
**Public** 1:19 72:11 102:12
**Publix** 85:19
**puck** 21:8
**pucks** 21:5
**pull** 10:9,10,15,19 13:16 13:24 15:7 19:20 30:25 35:25 47:22 54:13,21 57:12
**pulled** 27:22 44:25 45:19 45:20 56:23,23
**pulling** 10:17 93:15
**pulls** 9:24

**punch** 7:17 8:8 19:13
**punched** 40:16 66:23
**purge** 72:16
**purpose** 25:2 35:5 88:25 90:7
**purview** 24:18 28:13 97:4
**push** 83:3 84:8,12 85:2 86:22 87:11 99:10
**pushing** 87:10
**put** 7:3 43:21 44:8 56:3 78:23 88:21 93:10
**putting** 21:5

---

**Q**

**quarterly** 88:16
**query** 19:14
**question** 17:20 21:13 23:19 26:2,11 29:7 35:16 50:2 57:18,19 76:9 81:19 83:5,5 95:13 99:25 100:17
**questions** 13:8 33:5 34:20 78:25 81:7 84:14 104:7
**quick** 26:10 46:17 77:14 93:25
**quickly** 15:6
**quite** 62:3 76:4
**quote** 99:17

---

**R**

**R-E-L-A-T** 51:11
**RA** 38:25
**radio** 36:3 38:11 44:21 44:22,23 59:2,3,6,22 59:24 61:10 62:16 69:15 71:11,22 74:5 75:1,2,7
**re-dispatched** 45:3
**read** 12:12,13 47:10 51:18 69:7 101:7 104:4
**reading** 62:11 69:14 101:18
**reads** 95:19
**real** 26:10 32:4 41:13,14
**realized** 52:15 66:14
**really** 7:5,6 10:18 12:15 14:10 19:10 26:16,20 37:7 39:2 50:5,9,18 53:4 60:8 61:24 64:1 67:1 68:5 76:1 81:17 84:19 87:13 88:19 89:22 91:10,13,21,23 92:25 93:15
**reason** 20:4,6 27:14 32:3 32:5 40:20 49:7 50:9 50:12,17,19 68:1 69:23 85:11 98:8
**reasonable** 89:4
**reasonably** 14:14 43:24
**reasons** 20:6 76:2
**recall** 93:19 94:21
**received** 34:3,7,21 36:12 43:6 45:25 49:18,20
**recess** 46:19 77:15 94:3
**recharges** 27:6
**recidivism** 5:22 80:25
**recited** 82:12
**recollection** 98:8
**recommending** 16:6
**record** 4:8 8:11 42:17 74:24 79:15 103:9
**recorded** 37:4 46:14 71:17,22,23 72:3

**98:24 104:7
**recording** 72:14 75:2 98:10
**recordings** 72:6
**records** 10:18 75:13,19
**recycle** 33:2
**red** 40:8,9
**Redirect** 2:22 100:24
**reduce** 80:25
**reducing** 5:21
**ref** 33:13
**refer** 9:9 21:1,5 34:4 35:11 36:15 37:21 40:17 41:7,16 46:9 47:4 49:15 51:22 53:14 54:4 56:2 61:9 61:21 62:22,23 72:20 73:8
**reference** 55:16 65:25
**referred** 42:13 87:23
**referring** 72:7 87:24
**refers** 33:18 55:23 84:21
**refine** 98:13,22
**refinement** 10:13
**refresh** 57:17
**regardless** 38:10
**regards** 14:4
**register** 83:2
**registered** 41:11
**rehashing** 91:22 93:2
**related** 45:12 51:10,12
**relation** 14:10 32:15
**relative** 103:11,13
**relatively** 15:6 80:8
**relevance** 100:12,14 101:2
**relevant** 89:15 93:22 100:20
**remarks** 46:2,9,10,13
**remember** 21:13 72:21 93:12
**rep** 80:12
**report** 3:3,4,4,5,5,6,6,7,7 3:8 19:24 27:18,22 29:5,9,10 31:8 32:25 33:4,7 34:10,13 36:20 41:24 46:15 47:4,8,10 47:11,22 49:25 50:16 51:19 53:11,18 54:13 54:14,20 55:8,14 56:6 56:7,9,10 57:1,13 58:1 58:9,20 59:17 66:21 66:23 71:2 74:12,14 74:16 76:20 85:5,16 86:11 87:14,15 93:3 96:2 97:9 103:7
**reported** 1:19 48:13,22 49:8,15,16,20,24 50:6 50:19
**Reporter** 1:19 2:24 103:1,6,19
**REPORTING** 1:22
**reports** 10:16 16:16 25:10 30:4 47:3 54:8 84:20,22 86:5,13,21
**request** 29:4
**requests** 24:23
**requires** 22:3,3
**rescue** 36:17 38:14 72:12
**residence** 30:17
**resolution** 37:17
**resolve** 92:1
**resolved** 41:23
**resource** 89:10 94:14
**resources** 5:11,22 18:20 93:1
**respective** 101:17

responded 51:5
responding 40:22 45:12 58:12
response 8:6 15:25 16:3 18:16
responsibility 90:25 91:1
responsible 16:8
restrictions 24:17
restroom 46:17
result 47:10
results 29:5
retail 52:1
retained 75:3
retrain 86:25
return 80:20
review 91:22 93:3,3
reviewed 56:11
revisions 97:22 98:4
Richey 1:16,17 2:16
right 8:20 12:20,21,23 20:11 28:8 30:3 37:8 41:24 42:20,22 45:24 47:5 48:12 62:12 65:19,20,22 66:5 67:13 69:14 70:8 72:18 74:12 81:2,13 82:20 83:12,13 86:8 94:21 98:6
right-hand 9:11 47:18
ring 76:24
rise 85:4
risk 40:14
Rjohnson@ij.org 2:4
RMS 47:5
roads 41:8
Rob 2:2 28:17 32:17
Robert 1:16 68:23 69:4,5
role 100:17
rolled 99:10
room 79:25
roughly 4:23 44:1
roundtable 89:23
route 43:19,21,23 44:24
routed 43:8 86:8
run 23:8,9 90:1,2,20 98:15,20 99:5
running 46:6

**S**

S 2:6,7,11 3:1 37:9,20 101:15
safety 20:6 40:2,14 63:24 72:11
Sanborn 1:13 4:1,9 8:5,6 102:5 104:1,24
sat 60:16 84:15
saver 53:5
saving 76:3
saying 41:12 43:14 65:15 75:22
says 7:12 11:1 14:20 16:24 26:6 33:8,13 34:14 35:9,9 36:19,25 37:20 38:3,6,17 39:4 41:9,15,20 42:6,7,22 43:20 48:3,12 49:14 50:22 52:8,9 54:3,11 55:10,22 56:1 57:4 58:8,22 59:23 61:8,8 61:20 62:16 63:5,6 64:23 65:1,17 67:15 67:16,19 68:17,22,24 71:9 72:19 74:1,7,8 75:10,17 76:10 80:23 80:25 86:1 88:5,15 94:14,15
scene 28:8

schedule 10:3,3
school 6:2,3 89:10 94:14
Schuler 56:12,25
score 100:18
scoring 100:6
screen 9:8,10 10:9 11:19 22:10 40:6
screens 9:12
se 16:3 18:22
seal 102:7
search 6:19 7:11,16 8:4 10:6 29:24 31:1 55:2
searched 7:14
seat 29:20 44:8
second 33:13 88:4 94:13
seconds 66:6,10,11,17 67:5 97:9
section 6:13 45:13 46:10 77:8 95:5 100:9
sector 35:13 38:25 39:2 39:3
secure 50:11,18
secured 49:1
security 51:19 52:9
see 5:9 7:18 15:7 16:24 18:10,11 19:14,21 25:8 31:15,18 32:14 34:6 36:18 44:13,19 45:17 46:11 49:21 57:24 59:11 60:19,22 63:16,22 67:24 74:15 74:23 76:16 89:21 90:7 94:1
seek 5:11
seen 36:21
segments 98:22
selects 39:14
self 34:14 35:9
self-evident 55:21
self-explanatory 53:8
self-initiate 35:4 40:23
self-initiated 34:15,16 37:2 39:7 43:5,18 84:23
self-initiates 39:14
selling 86:1
Semoran 2:11
send 33:24 35:6
sends 35:6
sense 58:6 59:16
sent 43:17 53:19 78:21
separate 20:16 21:14 23:9 25:17 93:3
September 1:14 102:6,8 103:17 104:2
sergeant 26:6 57:3 61:16 78:17,18
serve 36:6
served 35:25
service 36:19 38:14 50:7
services 36:14 55:2 80:24
session 87:2
set 38:7 42:16 45:22,22 64:3,4,13 82:9
sets 9:24
seven 39:24,25
Shaker 2:3
share 36:16
Sheet 2:24 104:3
sheets 20:11
Sheriff 1:9
sheriff's 2:15,17 4:11 12:7 19:6 20:15 22:17 23:8 25:25 38:18,20 48:11 49:16,25 55:4 59:18 65:3 72:24

73:21 88:17 95:14 97:18 99:14
sheriffs 26:24
shift 27:12 35:13 81:12 90:24 91:1
shop 22:25
short 4:17 14:1 41:18 46:19 77:15 94:3,24
shorter 27:25
show 64:6 81:6
shown 87:10
shows 56:15,16
side 12:23 47:19 79:9,9 89:20
sight 19:2
signing 101:18
silly 86:10
similar 7:10 36:20 65:22 86:16
Sincera 21:3
single 86:25
sir 9:10 11:12 15:11 32:18 36:13 37:2 39:19 40:19 42:5,19 44:15 47:3 48:2,14,23 52:5 58:2,21 59:22 67:16 68:24 69:18 70:21 71:4 74:9 88:13
sit 13:6 82:14 91:12
sitting 86:24
six 32:1 80:14 83:21 88:14 92:14
sixth 88:14
size 70:10
Skaggs 59:15
skills 26:22 27:1
skip 42:22 86:11
slide 93:9
slight 10:13
sloppy 75:20,23
small 98:22
so-and-so 85:1
Socratic 12:16 14:5
SOD 57:4
sole 98:8
solely 16:15 17:12
solve 91:13
somebody 10:22 19:22 23:18,22,24 24:10 25:13 35:23 44:25 50:8,15,21 52:14 65:9 74:2 79:11 81:15 83:2 83:4 84:15,15 85:9 92:14 94:24
somebody's 65:23 68:1 92:8
someplace 20:5 81:15
something's 50:22
somewhat 53:7 55:21
soon 64:1
sophisticated 7:6
sorry 37:10 41:6 50:3 62:20 75:21 77:2 80:13 88:3 94:10
sort 5:22 19:15 25:10 57:22 71:18 85:17 86:6 92:16 93:12 97:9 100:5,12
sounds 5:7 83:14 94:12
source 34:14
speaking 31:13
special 57:4 99:19
specific 25:21 26:3,4 33:5 37:23
specifically 11:22,23 14:20 29:4 80:25 100:17

specifics 70:1
speculate 66:16 67:1
speculative 17:25 83:9
spell 28:18 78:20
spend 16:9
spent 95:8
sphere 90:25 91:1
spoke 47:12
spots 34:12 92:24
spree 18:18
SRO 91:6 94:24
SRO's 94:18
SROs 90:13 94:5,15
stacked 90:2
staff 97:2
stamp 11:11 32:4 37:11 42:19,20 43:16 44:13 66:5 70:16
stamped 46:8 59:12
stamping 32:13
stamps 31:2 32:17 37:12 37:13 62:12,15
stand 12:21,22 63:11 77:8
standard 60:4 64:7 97:7
standardization 60:8
standpoint 81:4 86:20
stands 15:24 38:1
STAR 4:18 15:12,15,18 15:19,21,23,25 16:3,6 16:8,9,10,12,23 17:3,7 17:15,17,21 18:1,5,16 25:19 26:4,13,14,23 64:24 68:18 69:25 70:9,11,12 73:14 89:8 95:11 100:17
STAR18 64:23
STAR31 69:16 72:19
STAR32 69:16 72:19
STAR33 68:17 69:16 70:23
STAR34 69:16
start 79:12 94:12
started 21:4 44:10 85:1
starting 31:9
stat/beat 62:17,22
state 1:20 4:8 48:7 83:7 102:2,12 103:3
statement 100:1
STATES 1:1
statewide 60:7
static 98:15,16 99:9
station 27:5 52:1
status 5:9,13 54:3 60:2 64:10,14 71:9
Staying 83:14
STB 38:24
steal 18:11 92:22
stealing 18:4
stenographically 103:7
step 84:19
steps 12:21
stick 27:5
stipulated 101:16
Stipulation 2:23
stole 92:12,14
stolen 25:13,15 83:20 90:15,17 92:6,20
stood 83:2,4
stop 28:25 39:11 40:10 82:17
stopping 29:1
stops 82:10,15,22
store 52:1
stored 29:16 47:5,14
story 43:15
straight-A 91:7

strategic 15:24 16:2
street 1:22 19:13,13 24:3 41:10,10
strictly 62:3
structure 51:23 70:10
students 91:7 94:16
stuff 37:17 48:9 50:15 52:17,21 59:12,13,13 71:21
stupid 34:20
Style 104:1
subdivision 37:25
subject 6:5 86:20
submit 86:8,13
subscribe 104:5
subset 7:15
substitute 6:4
Suite 2:7,11
Suites 1:16
summary 41:15
SUP 76:10
supervise 5:2
supervisor 4:25 5:1 27:16 33:23 53:18 57:8,10
supervisors 89:8
supplement 57:18 58:3 76:11,13,19
supplemental 56:5,6
supposed 27:11 87:8 99:10
suppressing 16:8
sure 6:20 7:23 8:22 19:23 21:11 27:2 31:7 32:9 51:20 54:20 57:11 60:15 61:1 67:20 69:12,14 74:24 80:19 91:8 93:10
surrounded 98:21
suspect 46:3
switch 18:7 36:4
sworn 4:2 102:6
system 6:25 7:4,6 10:11 10:14,18 19:10 28:7 32:9 38:12 56:2 71:11 80:7 100:6
systems 91:16

**T**

T 3:1 101:15,15
TAC 71:9,15,23
tag 28:8 29:23 82:17,19
tagged 27:12,19,23 28:9
Tait 1:13 4:1,9 8:5,6 102:5 104:1,24
take 19:16 27:4 36:5 46:17 47:21 53:17 77:14 93:25
taken 46:19 74:3 75:15 77:15 92:7,7 94:3
taker 40:17,21 43:6,9,12 58:23
takers 72:12,12
takes 43:22
talk 23:23 24:2 32:17 46:3 60:10 78:16 82:15 84:24 89:14 91:23,24 93:7 94:17
talked 19:18 30:1 38:24 61:24 72:21 91:15 97:5
talking 6:20 9:10 15:15 30:14 33:9 58:6 72:24 79:6,10,22
TAMMY 1:4
TAMPA 1:2
target 17:15,17,22

**targeted** 15:24 16:3 18:2
**targeting** 16:25
**task** 29:11 80:19 82:9
**taught** 82:10,11
**Taylor** 1:3 104:1
**team** 16:8 18:5,16 26:13
  26:14,21,22,23 57:5
  64:24 68:18 69:25
  70:9,12 89:8 95:11
**teams** 4:18 25:19 26:4
  70:11
**technical** 64:16
**technologies** 20:25
**technology** 9:19 21:12,25
  22:1 23:6 27:7
**tedious** 46:24
**Teletype** 48:9
**tell** 4:2 34:10 38:22
  58:11 65:20 68:6
  70:10 80:6 82:16
  85:18 89:25 90:2
  98:11
**ten** 60:1
**tenure** 26:25
**terminal** 35:3
**terminology** 93:4
**terms** 9:22 58:7
**terribly** 10:12
**tested** 12:15
**testified** 4:4
**testimony** 103:9 104:4
**testing** 12:15 14:5
**text** 11:4
**thank** 31:20 37:18 97:17
**thanking** 78:22
**Thanks** 40:1
**theirs** 36:20,22
**thing** 32:6 35:8 36:18
  42:6 46:25 52:17 69:7
  69:10 81:7,24,25
  90:22 92:16
**things** 5:12,16,18,20 7:25
  8:15 10:2,4,5,25 13:8
  13:11 14:23 19:3
  25:16 37:17 40:23
  42:2 44:23 50:10 52:2
  55:3 62:10 65:13
  66:19,22 67:2 80:1,9
  81:16 83:17 84:3
  85:19 86:4 87:4,22
  89:14,14 92:5,6 96:17
  96:18 97:13,15,16
  98:13,14
**think** 18:1,13 21:22,24
  30:12 32:1 50:4 52:23
  53:7 69:23 74:18
  75:24 78:15 79:7
  99:18,21
**thinking** 67:23 68:5
**Third** 1:22
**THOMAS** 2:10
**thought** 30:6 31:15
**threat** 51:19 52:9
**three** 38:21,22 39:1,3
  40:11 43:4 51:4 54:11
  56:22,25 57:7,9,10,25
  61:14,15,18 62:25,25
  63:19 74:7 75:25
  80:12,13 82:11,21
  86:14 88:14 90:21
  92:20
**three-ring** 80:4
**tie** 71:20
**tighten** 26:9
**time** 1:15 11:11 13:12
  16:10 19:14,18 20:11
  22:8 24:16 26:7 28:24

**tuck** 85:6
**tucked** 73:20
**turn** 19:1 27:18 54:10
  88:2 94:7 97:10
**two** 8:9 19:10 25:14 28:5
  34:12 35:13,22 38:25
  39:3 43:3,25 45:8,19
  46:4 49:10,12 52:5
  53:25 56:16,20,21
  75:25 79:9 85:21,22
  86:13 88:14 89:16
  90:15,18 92:22,22
  96:20 99:25 100:1
**Tyler** 77:12
**Tyler's** 77:11
**type** 8:7 32:24 33:7 35:4
  39:9 47:1,8 51:21,23
  65:5 83:24 90:7
**typed** 44:8
**types** 5:18 17:19 19:3
  25:16 28:5 43:25
  71:12 84:3
**typically** 8:13 10:24
  13:13 24:12,19 29:19
  33:18 35:21 44:6
  52:11 71:18 101:3

28:24 31:2,6,12,17,18
  31:18,25,25 32:4,5,6,8
  32:12,16 34:5,7,21
  36:12 37:11,12,13,13
  38:19 42:16,19,20,23
  42:24 43:7,9,16,18,22
  43:22,22,23 44:12,14
  44:24,24 45:2,3,3,25
  46:1,6,8 48:13 49:1,15
  49:18 50:6 53:4 56:21
  57:1,8,13,15 62:11,15
  63:2 66:5 70:16,22,23
  71:1,3 75:6 76:4 81:20
  83:11 84:11 90:9,11
  90:17,23 91:25 96:23
  98:22,25 99:3,4
**timeframe** 6:21,23 52:24
  75:16
**timer** 63:23
**times** 42:23 43:1 44:25
  45:5,10 46:11 76:1
  90:8
**tip** 85:17,24 86:10
**tips** 84:20,22 86:5,8,12
**today's** 49:11
**told** 27:8 50:8 52:13
**Tom** 79:1
**tomorrow** 82:15 91:23
  91:25
**toned** 40:5
**tonight** 92:21
**top** 11:11,19 13:10,10
  16:24 33:8 47:25
  58:24 61:7,20,23,24
  61:25 62:1,14 68:17
  95:23
**touch** 51:3
**town** 48:21
**track** 19:7 35:7 46:6
**tracking** 18:6 88:22
**traditional** 22:4
**traditionally** 16:1 73:17
  77:3
**traffic** 28:25 39:10 40:10
  57:7 75:7 82:10,15,17
  82:22 99:2
**train** 77:17 78:4 81:23
**trained** 12:11 80:16
  82:22 83:1
**trainee** 13:3 14:8,9
**training** 10:4 12:6,17,18
  13:1,2,4,6,18,21 14:7,9
  14:12,13,15,17,22
  15:16,16,20 25:17,18
  25:23,24 26:2,3,12,21
  70:4 77:17,22,23,24
  78:3,7,8,8,11,14,15,18
  79:5 80:4,6,10 81:18
  81:24 82:5 83:4,10
  84:4,7,18 86:16 87:1,5
  87:6,12,13,24
**transcript** 103:8 104:4
**transcription** 104:6
**transfer** 26:17
**transferred** 56:20
**transport** 36:5 75:18
**trapped** 52:3
**treating** 14:14
**trends** 25:12
**trouble** 83:15
**truckers** 60:7
**true** 11:5 103:9
**truncated** 45:3
**truth** 4:2,3,3
**try** 26:12 80:15,24
**trying** 65:7 84:13 86:25
  91:2

**U**

**U** 101:15
**UC** 72:19
**UDTS** 74:1
**umbrella** 73:13
**unable** 77:3
**unalterable** 98:9
**unchanged** 86:15 91:17
**unchecked** 51:15
**unclear** 88:25
**undercover** 18:22 72:22
  73:18
**underneath** 38:3 39:4
  53:13 94:14
**undersigned** 102:4
**understand** 9:3 23:19
  31:7 33:7 49:14 50:2
  75:1 96:7,15
**understanding** 17:11
  26:19 38:8 51:16 62:9
  100:3
**understands** 14:17
**Understood** 36:11 38:3
  84:18
**unfortunately** 7:22 95:6
**uniformed** 4:22 18:24
  73:14
**unique** 28:4 34:1
**unit** 15:12,15,23,25 18:2
  18:6 35:9 36:7,8 40:17
  42:17 57:3 58:8,11
  59:10,10 61:8,16
  62:17 64:22,23 68:17
  70:5,8 73:11,16 81:24
  95:7
**UNITED** 1:1
**units** 45:4 69:15,17
  73:10,15
**unknown** 40:12
**unmarked** 73:23
**uploaded** 27:11 56:1
**uploading** 27:2
**uploads** 27:6 28:9
**upper** 9:11 47:18
**use** 9:21 18:22 21:2
  23:11 31:8 41:4 60:7
  60:14,22 61:2
**uses** 48:6

**usually** 7:9 49:17 90:9
  91:20,20
**utilized** 71:18
**UTL** 76:22

**V**

**v** 104:1
**vacancy** 16:23
**vacation** 52:14
**validate** 13:17
**variability** 22:9
**variety** 10:4 18:15 19:3,4
  20:5 62:2 67:7 76:2
  78:5 96:17
**various** 13:7 79:3 86:21
  95:9
**vast** 68:12
**vehicle** 10:3 18:25 20:25
  21:14 25:14 72:23,24
  72:25 73:3 82:18,20
  90:16,17
**vehicles** 25:14 72:19
  73:23
**Venn** 91:3
**verify** 72:16
**version** 14:1 94:24 98:2
  98:2,3 99:8
**versus** 53:1 80:16 87:9
  98:2,3
**vests** 73:21
**vice** 57:3 73:13
**vicinity** 99:20
**video** 28:9 29:22
**view** 25:6
**viewed** 63:17
**violent** 73:24,25
**visit** 29:17
**vs** 1:7

**W**

**W** 2:10
**waived** 101:19
**walk** 87:9
**walk-up** 39:11
**walking** 91:6,9
**want** 6:20 7:22 9:21
  23:22 26:10 33:6
  43:11 46:24,25 51:3
  55:10 61:5 66:16 67:1
  71:20 81:3 85:18 96:9
  96:15 98:24 99:24
  100:10,21
**wanted** 20:18 32:16 71:8
  76:9 88:2
**warning** 41:25
**warrant** 35:24,25 36:6
  65:9,23
**warrants** 55:2
**wasn't** 31:13 81:23,25
**watchdog** 63:22
**watching** 98:18
**way** 7:15 8:3,14 19:16
  20:11,20 22:2,2,7
  27:25 30:16 34:10
  43:20 44:1 45:7 46:8
  74:10,18 75:3,9,14,24
  76:16 80:1,5 81:18
  82:9 88:25 91:10
  95:19 98:6 99:1
  100:16
**ways** 19:3,10 21:7 28:10
**we'll** 41:9 92:19 99:25
  101:8
**we're** 6:20,21 8:13,19 9:8
  15:15 16:5 18:19 26:9
  26:9 30:13 32:1 43:14

60:12 64:14 82:14
  83:8 84:2,23,23 85:8
  85:20 90:16 91:2 94:2
  94:13 99:21
**we've** 12:2 60:8 61:1
  79:3 96:4 98:12
**wearing** 85:9 97:1
**Wednesday** 93:5,6
**weeds** 8:13
**week** 48:21 50:14 91:22
  93:2,3,5,8,15,24
**weeks** 49:10,13
**well-established** 87:16
**went** 12:3 21:4 47:11
  48:20 56:3,9 84:17
  92:11 95:25
**weren't** 70:11
**whichever** 95:1
**wife** 24:4
**Williams** 75:16 97:5
**willing** 5:24
**winnow** 100:8
**Winter** 2:12
**witness** 4:5 8:25 37:15
  102:7 103:9
**wondering** 57:15
**word** 101:10
**words** 9:1,21
**wore** 73:17
**work** 22:8 26:22,25
  56:20 64:18 76:4
  78:23 82:23 83:17
**worked** 72:1 95:5
**working** 16:10 19:19
  56:17 90:15,16
**works** 48:9 64:5 70:25
  78:15 100:4
**world** 25:8 68:12
**worry** 64:11
**wouldn't** 22:12 35:22
  36:22 46:14 48:19
  50:5 70:9 86:19 95:4
**wrap** 99:25
**writing** 59:9 73:21
**written** 14:2 91:18
**wrong** 9:21 21:23

**X**

**X** 2:19 3:1 59:25
**X4** 59:23
**X6** 59:23

**Y**

**Yankee** 8:9
**yard** 83:21
**yeah** 6:3,13 20:3,4 24:15
  30:11 35:1 37:7 39:23
  41:5 42:20 50:3 52:25
  54:21 56:4 60:18 61:1
  61:4 65:22 70:25 72:1
  72:10 75:13 77:2 78:3
  87:25 93:10 94:10
  97:14
**year** 53:17 81:22
**years** 15:21 30:14 78:19
  78:22 81:21 86:14
**yellow** 40:8
**yellows** 40:9
**yesterday** 9:22 22:13,14
  78:21 91:25 92:2
**young** 53:2
**Yungaitis** 70:24

**Z**

**Z** 31:22 32:7,14
**zagged** 26:8

**Zephyrhills** 89:17
**zero-tolerance** 88:6
**zigged** 26:8
**zone** 7:14 8:9 22:10
  35:12,13 38:24 39:3,3
  45:18 52:3 61:11
  62:25 83:11
**Zulu** 31:6,19,25 32:1,6,8
  37:12

---
**0**
---
**001** 33:21

---
**1**
---
**1** 9:5,6 104:5
**1-** 3:2
**1:00** 70:19
**1:03** 71:2
**1:57** 1:15
**10** 60:17 71:5,6
**10-** 3:6
**10-4** 59:4,6,25 60:2,6,7
**10-6** 59:25 60:2
**100** 2:22 20:10 80:19
**101** 2:23 61:17
**1010** 2:11
**102** 2:23 61:17
**103** 2:24 59:10 61:17
**1035** 2:11
**104** 2:24 61:17 104:5
**105** 61:17
**106** 61:17
**11** 3:2 73:5,6
**11-** 3:7
**11:54** 70:17,18,22 71:1
**12** 76:6,7
**12-** 3:7
**123** 19:12,13 41:10,10
**13** 44:2 76:25 77:1
**13-** 3:8
**14** 44:3 87:17,18 94:9,10
**14-** 3:8
**14150** 1:22
**15** 45:4 64:9
**15-minute** 64:7
**16** 3:3
**16781** 2:3
**19** 88:2
**19-year** 60:22
**1G3** 62:21
**1I2** 35:12

---
**2**
---
**2** 2:7 11:7,8 31:21
**2-** 3:2
**2:00** 81:4 96:19
**20** 79:8
**20-minute** 13:15
**2008-9-ish** 80:7
**2009** 81:22
**2015** 60:16 72:15 75:2
  99:17
**2017** 57:2
**2018** 7:1,4,4 8:20 9:14
  11:5,10
**2020** 37:12,13
**2021** 1:14 102:6,8 103:17
  104:2
**21** 4:23
**23** 1:14 102:6 104:2
**2338** 60:20
**23rd** 48:24 49:2
**2426** 1:23
**256** 2:3
**26th** 102:7 103:17

---
**3**
---
**3** 16:17,18 71:9,23
**3-** 3:3
**3:00** 18:18,20 96:19
**30** 64:15 78:4,7
**301** 61:18
**302** 61:18
**303** 61:18
**305-721-1600** 2:8
**3180** 2:7
**32** 3:3
**32792** 2:12
**33131** 2:7
**33526-2426** 1:23
**34654** 2:16
**352** 1:25,25
**360** 4:21
**363241** 102:12

---
**4**
---
**4** 2:21 32:21,22 49:19
**4-** 3:3
**4:52** 1:15 101:13
**40** 66:6,10,11,17 67:5
  97:9
**4044** 42:9
**407-673-5000** 2:12
**44120** 2:3
**46** 3:4

---
**5**
---
**5** 46:21,22 62:1,14
**5-** 3:4
**5:00** 18:18,20
**567-5484** 1:25
**567-9151** 1:25
**58** 3:4
**5s** 61:23,25,25

---
**6**
---
**6** 58:16,17 66:1
**6-** 3:4
**64** 3:5
**65** 94:13,15
**653** 33:24
**653rd** 33:20
**66** 94:13
**67** 3:5
**68** 3:6

---
**7**
---
**7** 64:19,20 66:3
**7-** 3:5
**7:00** 81:5
**7:52** 44:8
**7:52:53** 46:11
**703-682-9320** 2:4
**71** 3:6
**727-844-7701** 2:16
**73** 3:7
**76** 3:7
**77** 3:8

---
**8**
---
**8** 67:9,10
**8-** 3:5
**8-7-2023** 102:13
**8:00** 49:2 81:4
**8:13** 48:22
**8:21-cv-00555-SDM-C...**
  1:7
**80** 60:17
**8520** 1:17
**87** 3:8
**8700** 2:15

---
**9**
---
**9** 3:2 68:14,15
**9-** 3:6
**9/29** 48:22
**99** 2:22