UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES, III,

  Plaintiffs,

vs.                      Case No.: 8:21-cv-00555-SDM-CPT

CHRIS NOCCO, in his
official capacity as
Pasco County Sheriff,

  Defendant.
_____/

PROCEEDINGS:        Deposition of
                    PEDRO OJEDA


DATE:               January 12, 2022


TIME:               9:00 a.m. - 1:34 p.m.


PLACE:              New Port Richey Executive Suites
                    8520 Government Drive, Suite 1
                    New Port Richey, Florida


REPORTED BY:        Judy Anderson, Court Reporter
                    Notary Public
                    State of Florida at Large


ANDERSON COURT REPORTING
P.O. Box 2426
Dade City, FL 33526-2426
Judy@andersoncourtreporting.com
(352) 567-5484

```
 1   APPEARANCES:

 2   ROBERT E. JOHNSON, ESQUIRE (Appearing via telephone)
     Institute for Justice
 3   16781 Chagrin Boulevard, Ste. 256
     Shaker Heights, OH 44120
 4   703-682-9320
     Rjohnson@ij.org
 5           Counsel for Plaintiffs

 6   CAROLINE GRACE BROTHERS, ESQUIRE
     Institute for Justice
 7   901 N. Glebe Road, Ste. 900
     Arlington, VA 22203
 8   703-682-9320
     Cgbrothers@ij.org
 9           Co-counsel for Plaintiffs

10   ARI S. BARGIL, ESQUIRE
     Institute for Justice
11   2 S. Biscayne Blvd., Ste. 3180
     Miami, FL 33131
12   305-721-1600
     Abargil@ij.org
13           Co-counsel for Plaintiffs

14   THOMAS W. POULTON, ESQUIRE (Appearing via Phone & Zoom)
     Debevoise & Poulton, P.A.
15   1035 S. Semoran Blvd., Ste. 1010
     Winter Park, FL 32792-5512
16   407-673-5000
     Poulton@debevoisepoulton.com
17   Holborn@debevoisepoulton.com
     Cook@debevoisepoulton.com
18           Counsel for Defendant

19

20

21

22

23

24

25
```

1                          **I N D E X**

2                                                   Page

3    Direct Examination by Ms. Brothers              5
     Stipulation                                    108
4    Certificate of Oath                            109
     Certificate of Reporter                        110
5    Deponent's Signature Page                      111
     Errata Sheet                                   112

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            **E X H I B I T S**

                                                    Page
2
     A - MPR Pedro Ojeda                             23
3
     B - ILP Manual 2018                             39
4
     C - ILP Manual 2016                             39
5
     D - CAD Report                                  54
6
     E - Offender Notes Spreadsheet                  56
7
     F - CAD Report                                  60
8
     G - CAD Report                                  62
9
     H - Body-worn Camera Video                      67
10
     I - Extraction 1.1 Code Invest-2 mp4            71
11
     J - Email                                       78
12
     K - List of Code Citations                      79
13
     L - AIM Slides                                  80
14
     M - Email Thread                                83
15

16

17

18

19

20

21

22

23

24

25

1                              PEDRO OJEDA,

2          being first duly sworn to tell the truth, the

3          whole truth, and nothing but the truth, was

4          examined and testified as follows:

5              THE WITNESS:  I do.

6                         DIRECT EXAMINATION

7    BY MS. BROTHERS:

8          Q.   All right.  Thank you for coming this morning.

9    Like I said, my name is Caroline Grace Brothers.  Can

10   you please state your full name for the record?

11         A.   Pedro Ojeda.

12         Q.   Have you ever had your deposition taken before?

13         A.   Yes.

14         Q.   Okay.  When was that?

15         A.   I can't recall.

16             MR. BARGIL:  I don't want to interrupt again,

17         but we're here to articulate on the record just

18         really quickly --

19             MS. BROTHERS:  Oh, right.  Go ahead.

20             MR. BARGIL:  So just really quickly, I want the

21         record to show that counsel for the deponent isn't

22         in the room but is on the phone, and we've agreed

23         that he may reserve objections to questions as they

24         may be asked for -- subsequent to the deposition,

25         and if we need to remedy or address any of those

1    objections via interrogatory, we can, provided as

2    Tom did earlier that they will waive any limitation

3    on interrogatories that might exist as a result or

4    any concerns about --

5         MR. JOHNSON:  Right.  Ari, can I jump in here?

6         MR. BARGIL:  Yeah, go ahead.

7         MR. JOHNSON:  This is Rob.  Let me just jump

8    in.  I think -- I hate to interject, but could we

9    just also add to that that, obviously, you know,

10   we've already agreed to this that the deposition

11   remain open.  So, you know, another way we could

12   remedy that is to call the witness back to reask

13   questions in a reformulated way.

14        MR. POULTON:  Well, I -- if a question in and

15   of itself is objectionable -- this is Tom -- I would

16   be able to deal with it then.  It's only if there's

17   like a document that he's shown and I have some

18   objection to that, I can't see the document of

19   course because I'm not there.

20        And just to elaborate on that real quick, I

21   feel the need to, the reason I'm not there is after

22   depositions yesterday I started to feel some

23   symptoms that are either a cold, which I hope it is,

24   or possibly COVID, which I hope it is not.  I tested

25   negative, but because not everybody is comfortable

1       with me being there, we've agreed to this solution

2       of me appearing by telephone.  And it's just -- my

3       only concern is if he's shown something that I can't

4       see at the time, that I have the ability to object

5       to that after the fact.

6            Now the local rules for the Middle District --

7       the Middle District Handbook does not allow standing

8       discovery or standing objections rather.  So this is

9       the only solution that I can think of to come up

10      with that would let us go forward without me being

11      there and seeing the documents and objecting

12      contemporaneously.  But I think Ari's point is well

13      taken, and if we come up with something that can be

14      fixed by a quick phone call and extension of the

15      deposition as Rob suggests, that's fine too.

16      Probably won't be an issue anyway, but we'll see.

17           MS. BROTHERS:  Okay.

18           MR. POULTON:  Everybody good with that?

19           MR. BARGIL:  Yes, I think we are.

20           MS. BROTHERS:  Uh-huh.

21           MR. JOHNSON:  Yeah.

22           MR. POULTON:  Okay.  Good.

23  BY MS. BROTHERS:

24      Q.   All right.  So you said you've had your

25  deposition taken before?

1    A.   Yeah.  It was some years ago.  I can't remember

2  exactly when though.

3    Q.   Okay.

4    A.    It was for another case.

5    Q.   Okay.  So I'll just review the ground rules

6  pretty quickly.

7    A.   All right.

8    Q.   I'm just going to be asking some questions, and

9  we'll be referring to some documents.  I'm going to try

10  not to talk -- let's try not to talk over each other.

11  So if you could let me finish my question before

12  answering, and then I'll let you finish your answer

13  before asking another question.  Try not to use

14  nonverbal communication.  So if you're answering a yes

15  or a no, say yes or no rather than nodding or shaking

16  your head.  And if you don't understand a question, just

17  let me know and I'll be happy to try and rephrase it.

18  Does that all make sense?

19    A.   Yes.

20    Q.   Okay.  Is there any reason you think you can't

21  testify truthfully today?

22    A.   No.

23    Q.   Okay.  Did you do anything to prepare for this

24  deposition?

25    A.   Yes.

```
1        Q.   What did you do?

2        A.   I spoke to Tom Poulton.

3        Q.   Okay.  You don't have to tell me about that.

4        A.   Okay.  And I spoke to -- just refamiliarize

5   myself with the case because it was several years ago.

6        Q.   What do you mean refamiliarizing yourself with

7   the case?

8        A.   Just reviewed my body cam, looked over my

9   report.  I spoke to the County Attorney's Office to see

10  the outcome of the case that I worked on, so --

11       Q.   Which case are you referring to?

12       A.   It was like a county ordinance violation.

13       Q.   For whom?

14       A.   For Darlene Deegan.

15       Q.   Okay.  So you reviewed your body cam, and you

16  said you spoke to the County Attorney?

17       A.   Yeah.  The County Attorney's Office, yeah.

18       Q.   Did you speak to anyone else?

19       A.   No.

20       Q.   Did you review any other documents?

21       A.   No.

22       Q.   Okay.  All right.  Are you currently employed

23  by the Pasco County Sheriff's Office?

24       A.   Yes.

25       Q.   What is your title?
```

1      A.    Detective for the sex offender unit.

2      Q.    Okay.  How long have you held that position?

3      A.    Probably about nine months.

4      Q.    Okay.  And what was your title before that?

5      A.    I was a code corporal that was part of the

6  street crimes unit.

7      Q.    Okay.  How long were you a code enforcement

8  corporal?

9      A.    Probably maybe four years.

10     Q.    Four years?

11     A.    Possibly, approximately.

12     Q.    Were you with the street crimes unit that whole

13  time?

14     A.    No.  It changed.  It was once attached to the

15  property crimes division, and then it went over to the

16  street crimes.  So I changed supervisors.

17     Q.    Okay.  So when did you start as a code

18  enforcement corporal?

19     A.    I don't remember what year.  Maybe -- seventeen

20  maybe.

21     Q.    Okay.

22     A.    I'm not positive on the year.

23     Q.    Okay.

24     A.    I'm on my seventeenth year.  So it all -- you

25  know, I've done some different duties during the years.

1     Q.   Yeah.  Did you start out in the property crimes

2  unit?

3     A.   No, ma'am.

4     Q.   Where did you start out?

5     A.   Working in the jail.

6     Q.   I'm sorry.  As a code enforcement corporal, did

7  you start out in the property crimes unit?

8     A.   Yes.

9     Q.   Okay.

10     A.   It was originally attached to the property

11  crimes unit.

12     Q.   Okay.  And then when did you switch to the

13  street crimes unit?

14     A.   Maybe 2018, '19 maybe.  I'm not sure.

15     Q.   Is there a difference between your work for the

16  property crimes unit and the street crimes unit?

17     A.   Just the supervisor really changed for the most

18  part, just a different supervisor.

19     Q.   Did your responsibilities change at all?

20     A.   No, not really.  Not really, no, not really.

21  Didn't really change.  Hours changed, things like that,

22  but not really.

23     Q.   Who is your supervisor in the property crimes

24  unit?

25     A.   My first supervisor was Billy Lawless, and then

1    it changed to Burberidge, and then Bookalu I think might

2    have been the last supervisor.

3        Q.   Could you spell each of those names for the

4    court reporter, please?

5        A.   Bookalu I couldn't -- I -- honestly, I couldn't

6    spell it.  Burberidge, gosh, honestly, I couldn't

7    even -- I couldn't even give an attempt.  I'll butcher

8    their name.  I don't want to do that.

9        Q.   We can look them up later.

10       A.   Yeah, yeah.  Let's do it.

11       Q.   Okay.  So you switched from being a code

12   enforcement corporal to a detective about nine months

13   ago?

14       A.   About nine months ago, yes.

15       Q.   Okay.  Why did you switch?

16       A.   Just career, you know, evolvement.  I was doing

17   that a while.  I tried to transfer prior, but it didn't

18   work out.  Couple things weren't really lining up.  So I

19   tried to transfer to another detective position, but it

20   didn't pan out.

21       Q.   And I'm sorry, to go back to the code

22   enforcement corporal, were you assigned to a particular

23   district?

24       A.   Yes.  It was the west side district one, which

25   is the northwest side of the county.

1    Q.   The west side of district one, or just district

2    one?

3    A.   Of the county itself.

4    Q.   I see.

5    A.   It's on the west side -- the northwest side.

6    Q.   That's where district one is?

7    A.   Right.

8    Q.   Okay.

9    A.   And then south is district three.

10   Q.   Gotcha.  Are there still code enforcement

11   corporals employed by the Pasco County Sheriff's Office?

12   A.   No, there was like some organizational changes,

13   and they expanded the drug interdiction team.  So I

14   believe they utilized those positions for that to expand

15   that team -- that unit.

16   Q.   So do code enforcement corporals now work for

17   the drug interdiction unit?

18   A.   No, no, no.  Those responsibilities lie within

19   the street crimes team I believe, and then there are

20   other positions that -- like the administrative duties

21   were given to other corporals within the agency.

22   Q.   What administrative duties do you mean?

23   A.   So we had like trespass agreements, you know,

24   community relations.  When you're assigned a tip or a

25   complaint, you know, follow-up if you have to call back

1    the complainant or, you know, things of that nature.

2    Because usually, you know, depending on what kind of

3    complaint you get, sometimes they could last several

4    months, sometimes they don't.  It depends.

5         Q.   Okay.  So there's no longer a position of a

6    code enforcement corporal?

7         A.   No.

8         Q.   When was that position eliminated?

9         A.   Probably -- probably actually nine -- probably

10   like nine months ago, right when I transferred out.

11        Q.   Is part of the reason that you transferred out

12   because the position was eliminated?

13        A.   No.  Actually -- I actually transferred -- put

14   my transfer request before.

15        Q.   Okay.

16        A.   Like I said, I'd been trying to get out of the

17   position for awhile, but like those other detective

18   spots didn't line up with personal things and stuff like

19   that, so I didn't pursue them.  So this -- this one --

20   this position is a different type of detective that I'm

21   more passionate about anyway, so it's something on that

22   list.

23        Q.   Okay.  Do you know why the position of code

24   enforcement corporal was eliminated?

25        A.   Right.  I was just explained that it was --

1    those positions were going to be allocated to expanding

2    the drug interdiction unit, that it's like a hit team

3    but a traffic drug interdiction team.

4         Q.   Right.  But do you know why that was

5    reallocated?

6         A.   I guess just because they needed the -- they

7    needed the positions for that team, you know.

8         Q.   Do you know who decided to eliminate the code

9    enforcement corporal decision?

10        A.   No.

11        Q.   I'm sorry.  Position?

12        A.   No.

13        Q.   Do you know who would typically have the

14   authority to eliminate a position within the Pasco

15   Sheriff's Office?

16        A.   No.  I know that the sheriff sends out -- when

17   organizational changes, he'll send them out, but I don't

18   know who actually makes the actual decision to do it, if

19   it is the sheriff or a colonel or a major.  Like I said,

20   it's a -- it's above me.  I don't really get involved

21   with that.

22        Q.   Uh-huh.  Okay.  How long have you been at the

23   Pasco Sheriff's Office?

24        A.   I'm in my seventeenth year, so I started in end

25   of '05.

1    Q.    Okay.  And I think you said you worked in the

2  jail; is that right?

3    A.    Yeah, I started working in the jail.

4    Q.    How long were you there?

5    A.    About nine years.

6    Q.    And what was your job title there?

7    A.    I worked the -- I worked, you know, regular

8  like inmate housing, so assorted housing, and then the

9  booking department, juvenile assessment center, and then

10  that was pretty much it, and then I went to patrol after

11  that.

12    Q.    When did you move to patrol?

13    A.    2015.

14    Q.    What unit did you work in when you were in

15  patrol?

16    A.    On patrol?

17    Q.    Uh-huh.

18    A.    Just -- I just worked Dade City, Zephyrhills,

19  Wesley Chapel area.

20    Q.    Okay.  Did you do anything between patrol and

21  becoming a code enforcement corporal?

22    A.    No.  No, ma'am.

23    Q.    Okay.  So you became a code enforcement

24  corporal 2015, 2016, does that sound right?

25    A.    It might have been -- yeah, it might have been

1    somewhere in there.

2        Q.   Okay.

3        A.   It was -- I was on patrol for a little while

4    before.  It wasn't -- maybe -- maybe a couple years

5    after patrol, I believe, because I changed districts,

6    too.  I was on -- I started over there.  So, yeah, I

7    think it was about a couple years.

8        Q.   You started where?  I'm sorry.

9        A.   In the east side of the county, and then when I

10   made code corporal, I had to come over to the west side

11   of the county, so --

12       Q.   And the east side is which district?

13       A.   District two.

14       Q.   Okay.  What were your responsibilities when you

15   were on patrol?

16       A.   Calls for service.  Calls for service was

17   primary.

18       Q.   All right.  So going back to your work as a

19   code enforcement corporal, what were your

20   responsibilities in that position?

21       A.   A lot of it was you dealt with either community

22   complaints, problem houses, low-level like I guess drug

23   houses, drug activity, just more like community-related

24   problems, whatever was occurring at that moment in time.

25   It could be sometimes, you know, a traffic violator, you

1    know, someone in communities, you know, dealing with

2    someone coming through the community that's, you know --

3    it's usually the complainant is identified as the same

4    person, but things like that, you know.

5            And then we worked hand in hand with county

6    code enforcement.  So sometimes they had issues with

7    folks that were -- had -- were either violent or, you

8    know, aggressive and stuff like that.

9            So we dealt with homelessness, you know,

10   assisting with -- it was panhandling issues, assorted --

11   assorted homelessness problems, property owners, you

12   know, dealing with homelessness, vandalism, things like

13   that.  So it was -- it was assorted stuff.

14       Q.   When you say you worked with county code,

15   how often would you say your job involved coordinating

16   with them?

17       A.   It really depends.  Sometimes it was -- it

18   could be, you know, often, and sometimes you wouldn't

19   talk to them.  You know, we would talk, but we wouldn't

20   work something together for, you know, weeks, maybe

21   months at a time.  It really depended, you know.  If it

22   was like a community issue, like if we were doing a

23   large subdivision and they were doing like a -- we call

24   it a sweep where they go through the neighborhood and

25   they just identify the worst ordinance violations, you

1   know, the ones that are more prevalent, you know, that

2   are causing issues, like maybe like roadway obstruction

3   or, you know, commercial vehicles.  We would sometimes

4   assist them with, you know, sweeps just for manpower,

5   you know.

6       Q.   Would you work with them on anything other than

7   sweeps?

8       A.   Yeah.  We worked with them.  Like sometimes

9   undeveloped properties we would -- you know, sometimes

10  we would go out there because they would run across

11  folks living in the woods in undeveloped parcels and

12  stuff like that.

13      Q.   And what would you do about -- or how would you

14  address the undeveloped properties?

15      A.   It depends.  Sometimes we would -- we would

16  bring out, you know, county aid, you know, try to get

17  them housing.  We would bring the coalition out, you

18  know, things like that.  It really depends on what kind

19  of problems they were having, you know.  Drug addiction,

20  sometimes we'd bring, you know, NA -- NA resources,

21  things like that.

22      Q.   Coalition is the homeless coalition?

23      A.   There's a -- yeah.

24      Q.   Okay.

25      A.   The coalition -- Pasco County --

1      Q.    Yeah.

2      A.    -- Homeless Coalition.

3      Q.    Anything else that you would work with the

4  County on?

5      A.    We also did like human -- a little bit with

6  human trafficking awareness.  We have sexually oriented

7  businesses in Pasco.  So we would, you know, go into

8  these businesses, make sure there's ordinances that they

9  had to go by as in posting human trafficking signage in

10  the restrooms and lobbies.  You know, we would do that,

11  talk to employees there to see, you know, if human

12  trafficking was occurring.  Those were some complaints

13  we got -- we would get.

14      Q.    How did your job as a code enforcement corporal

15  differ from a county code enforcement employee?

16      A.    County was -- it was a little different.

17  County like -- so I covered the whole district.  They

18  actually had smaller zones and they were -- it was kind

19  of more of them, but they were, you know, assigned to

20  smaller parts of the county, you know.  They were

21  divided up more.  Like I was, you know, in charge of the

22  entire district --

23      Q.    Um-hum.

24      A.    -- per se.  There was more of that.

25      Q.    Did your work differ from the county code

1    enforcement employees?

2        A.   Yeah, Yeah.

3        Q.   How so?

4        A.   Obviously, you know, we dealt with more stuff

5    that was more of like a criminal element, you know, more

6    crime because that was -- really, you know, that's what

7    we were there for, you know, to prevent crime.

8        Q.   How do you prevent crime as a code enforcement

9    corporal?

10       A.   Gathering information, trying to get ahead --

11   ahead of the curve, especially like the drug houses or

12   like squatter situations.  People would squat on -- we

13   would have people that owned property out of state, and

14   people would just move into their property and squat,

15   and sometimes sell drugs, use drugs, vandalize, demolish

16   the home.  You know, the home would be deplorable by the

17   time they were done with it.  So we would try to prevent

18   issues like that.

19       Q.   I think you said you would use code enforcement

20   to stay ahead of the curve.  What did you mean by that?

21       A.   That's what I mean like -- like situations like

22   that, you know, because a lot of the squatting stuff, a

23   lot of people, they wouldn't have no trash service.  So

24   they were putting, you know, an excessive amount of

25   trash just on the property, which was, you know, a

1    county ordinance violation.  So we would address that,

2    and at the same time, you know, sometimes uncover other

3    things.  It really depends.  Every situation was not the

4    same, so --

5        Q.   Were there any other ways you would use code

6    enforcement to fight crime?

7        A.   Just honestly it made -- it was an open line

8    for property owners and community folks, you know,

9    one-on-one.  So that helped a lot, having that constant

10   communication with your complainant and stuff.

11       Q.   What do you mean that that helped a lot?

12       A.   Just having that open door, you know,

13   communication.  As in like patrol people change

14   districts, people move around.  I was, you know, like a

15   code enforcement corporal for a while.  So, you know, I

16   was usually the same person.  Sometimes, you know, we

17   could take care of a complaint, but it can arise -- you

18   know, like I said, it can arise, you know, four or five

19   months later, or a different type of complaint can arise

20   so, you know.

21       Q.   So, I'm sorry, I'm -- it's probably just me not

22   understanding.  When you say having an open line of

23   communication with property owners helped fight crime,

24   what did you mean by that?

25       A.   It was like a -- you know, they had my email.

1    They had my phone number.  They knew I was part of the

2    district.  So if they had a issue, they would usually

3    reach out to me, or they pretty much, you know, knew who

4    I was in that aspect so -- because some -- some folks

5    were out of state.  Some people were out of county, you

6    know.  Not all the people were, you know, directly here

7    in Pasco, so --

8         Q.   Okay.  I'm going to introduce the first exhibit

9    here.

10             (Exhibit A was marked for identification.)

11             (Off-the-record discussion.)

12   BY MS. BROTHERS:

13        Q.   All right.  So this -- we're looking at

14   Exhibit A.  Do you recognize this document?

15        A.   Yes.

16        Q.   Okay.  And what is it?

17        A.   Looks like a yearly eval.

18        Q.   Okay.  Looks like it is for a couple years; is

19   that right?

20        A.   Is it?

21        Q.   You can take a minute to --

22        A.   From '19 to '20?

23        Q.   Actually, if you look --

24        A.   There's another one in there?

25        Q.   Yeah.  If you look at --

```
1         A.    Okay.  I see it.

2         Q.    19165, I think.

3         A.    Yeah.

4         Q.    Yeah.

5         A.    I see what you're saying.

6         Q.    Uh-huh.  Yeah.  So it's 2018 to 2020.  Does

7    that look right to you?

8         A.    Yeah.

9         Q.    Okay.  All right.  So I wanted to ask you a

10   question.  First of all, flipping back to page 19165

11   there in the bottom right corner.

12        A.    Okay.  Okay.

13        Q.    In the bottom left-hand corner, it says

14   Section:  Property crimes.

15        A.    Uh-huh.

16        Q.    And we talked about that's where you started

17   out as a code enforcement corporal; right?

18        A.    Yeah.

19        Q.    And then flipping to 19151, which is the 2019

20   review --

21        A.    Yeah.

22        Q.    -- it says -- in the bottom left-hand corner it

23   says Section:  STAR.

24        A.    Uh-huh.

25        Q.    Is that what you meant by street crimes unit?
```

1    A.   Yeah.   Yeah.

2    Q.   Okay.

3    A.   Yeah.   That's what I meant by that.

4    Q.   Okay.   Gotcha.

5         Was it just you that made the switch to STAR,

6    or were code enforcement corporals, in general,

7    integrated into STAR from property crimes in 2019?

8    A.   Yeah, I believe all.

9    Q.   All of them; right?

10   A.   Yeah.

11   Q.   Okay.

12   A.   There's one per district -- or two rather, two

13   per district at the end.

14   Q.   Do you know why code enforcement corporals were

15   integrated into the STAR team?

16   A.   No, I don't know the reasoning behind it, no.

17   Q.   Do you know who made that decision?

18   A.   No, ma'am.

19   Q.   Okay.  Do you know who would typically make

20   that decision?

21   A.   Maybe district captain.  I don't -- I don't

22   know.

23   Q.   Who is -- is there anyone in charge of STAR

24   teams broadly?

25   A.   Yeah, the district lieutenant and captain,

1    yeah.

2        Q.    Okay.  I think we touched on this a little bit,

3    but were there differences between your work as a code

4    enforcement corporal and property crimes unit and your

5    work as a code enforcement corporal on the STAR team?

6        A.    No, not too much.  I mean, I did aid.  You

7    know, whatever unit I was working with, I aided them

8    in their duties.  So I know property crimes was one

9    short a detective, and I assisted them in properties --

10   in property crime cases working a case that was -- it

11   was like a air compressor theft ring going on, and I

12   assisted them with that.

13       Q.    When you say you assisted them, you mean the

14   property crimes unit?

15       A.    Right.

16       Q.    Okay.

17       A.    Property crimes detectives, yeah.

18       Q.    Okay.  So because they were short a detective,

19   did you take on some investigative --

20       A.    Well, I kind of uncovered the case, so I just

21   became the case agent on it.

22       Q.    On the air compressors?

23       A.    Right, on the -- right, the leads that I came

24   across.

25       Q.    Your responsibilities included some

1   investigation?

2       A.   Yes, yeah.

3       Q.   Okay.  Did you take on any other investigative

4   work, other than one ring that you mentioned?

5       A.   I aided in some other ones, but not -- that one

6   was more of the pronounced one that I assisted in at the

7   time, you know.

8       Q.   And what do you mean by you aided them?

9       A.   I helped with like pawnshop inspections.  I

10  aided them like with burglary sprees, canvassing --

11  doing like canvassing the neighborhood or securing the

12  neighborhood.  It just depends.  Like if there was like

13  a district issue, it would be like all hands on deck.

14  So everyone, you know, in the unit, would get involved

15  somehow, or like search warrants and stuff like that.

16      Q.   Did you ever execute search warrants?

17      A.   Yes.

18      Q.   In the property crimes unit or in STAR?

19      A.   I believe -- I think it was in STAR.  I was in

20  STAR at the time.

21      Q.   Okay.

22      A.   I did like help out with the -- I wasn't the

23  case agent in the search warrant, but I helped out in

24  property crimes on some search warrants.

25      Q.   I'm sorry.  What did you say?

1          A.    On some search warrants in property crimes, I

2    assisted them.

3          Q.    Okay.  So did you have some of the same

4    investigative responsibilities when you were on the STAR

5    team as well?

6          A.    Yeah.

7          Q.    You stayed in district one, is that right, when

8    you switched from property crimes to STAR?

9          A.    Yes.

10         Q.    Okay.  Was there any difference when you

11   actually issued citations -- was there any difference in

12   your responsibilities involving code citations between

13   property crimes and STAR?

14         A.    No.

15         Q.    What were your responsibilities as far as

16   issuing code citations?

17         A.    What do you mean?

18         Q.    How did you decide when to issue code

19   citations?

20         A.    It depends on like the severity of the

21   violations, the demeanor of the violator, you know,

22   if -- sometimes, you know -- you know, it -- it was, you

23   know, just -- it was like a collective kind of thing.

24   It depends how many times we've been out there, how many

25   times the County's been out there, how long the problems

1    existed.  It varied.

2         Q.   How would -- how would the demeanor of the

3    violator change the decision to issue a code citation?

4         A.   I've had situations --

5              MR. POULTON:  Object to the form.  Sorry.  I'm

6         just interjecting an objection to the form.  Go

7         ahead.  Go ahead.

8    BY MS. BROTHERS:

9         Q.   You can answer.

10        A.   It depends on.  Like I've issued folks

11   warnings, and they right to my face tell me, you know, I

12   don't care, you're going to have to write a citation or

13   kind of basically it wasn't going to go nowhere.  You

14   can come back in 7 to 14 days, and the violation's still

15   going to be there or it will be worse.  You know, I've

16   had folks like that.  In that case, it's kind of like,

17   you know, I'll just, you know, let the judge decide, you

18   know.

19        Q.   So in that situation you would go ahead and

20   issue the citation, is that what you're saying?

21        A.   Sometimes.  Or sometimes I would just let the

22   warning run out, you know, just let the warning -- let's

23   say, all right, I'll give you seven days, and when I

24   come back in seven days, you know.

25        Q.   And I believe you said it would also depend on

1    whether you've been out there several times before?

2        A.   Sometimes.  Some problems, I mean, some I've --

3    you know, you can visit some properties more than once,

4    sure.

5        Q.   What did you mean by that?  Like whether you

6    would issue a citation would depend on whether you've

7    been out there before?

8        A.   Right.  Sometimes if they've been issued a

9    citation -- also, if they've been issued a citation

10   before, usually I just issue another one because

11   sometimes they can come in compliance and they can go

12   back right out of compliance, so it depends.

13       Q.   Would you be more likely to issue another

14   citation if you've been out there before?

15       A.   Sometimes, yeah.  Especially if the violation's

16   gotten worse or there's a different type of violation.

17   Sometimes another violation occurs.

18       Q.   So when you were on the STAR team, starting in

19   twenty nine- -- is that right that that started in 2019?

20       A.   Probably.

21       Q.   Okay.

22       A.   Probably.

23       Q.   How did your responsibility as a code

24   enforcement corporal differ from the responsibilities of

25   the other members of the STAR team?

1    A.   Well, I mean, I aided the STAR team.

2   Responsibilities didn't change too much.  It was, you

3   know, kind of more of a collective effort.  If I needed

4   assistance from them or them from me, you know, it

5   would -- I could, you know, ask for aid, you know,

6   depending on what it was we were dealing with.  If --

7   you know, sometimes it was like an EAP or like a, you

8   know, enforcement action plan, which, you know, where

9   you're trying to make an impact.

10        I know I had an issue with some businesses

11   dealing with homelessness.  So I needed more manpower to

12   cover that area to, you know, canvass the area.  We were

13   like trying to go back around and check for folks that

14   were trespassed to see if they were back on the

15   property.  So, you know, I would use, you know, them for

16   that, things like that.

17    Q.   But then how would your -- how did your work as

18   a code enforcement corporal, how was that different from

19   just a normal STAR deputy?

20    A.   STAR deputies were -- I mean, they were managed

21   by an actual -- there was another corporal on the team

22   that would -- they were managed separately.  So they

23   dealt with, you know, it depends, a crime trend or if

24   they were looking for a wanted person, things like that.

25    Q.   You said they had -- I'm sorry.  Go ahead.

1    A.   Or if they were working like an open case,

2    follow up on a case.

3    Q.   Did you have a separate manager from the other

4    members of the STAR team?

5    A.   Did I?

6    Q.   Or a separate supervisor?

7    A.   No, no.  We all had the same sergeant.

8    Q.   Okay.

9    A.   We all had the same sergeant.

10    Q.   But you said they were managed separately,

11   so --

12    A.   I mean, they did have their own corporal that

13   was over them.  There was a corporal and sergeant that

14   was over them.

15    Q.   I see.

16         Flipping to page 19144, just towards the

17   beginning at the top it looks like it says

18   Self-Evaluation Questionnaire; is that right?

19    A.   Yeah.

20    Q.   Does that mean these answers are yours?

21    A.   Yes.

22    Q.   Okay.  So under Section G it says, What

23   feedback or suggestions do you have to improve your area

24   of assignment?  And can you read what your response was

25   there?

1        A.   Have additional code corporals in district and

2   being a part of the STAR team has broadened the scope of

3   our investigations.  The results have been great with

4   information sharing and generally working on the focus

5   offender locations.

6        Q.   Okay.  So, first, was there an additional code

7   corporal added in --

8        A.   Yes.

9        Q.   -- 2020?

10       A.   Yes.

11       Q.   Okay.  So there were two of you in district

12   one?

13       A.   At the time, yeah.

14       Q.   Okay.  In the second sentence there, you

15   mentioned focused offender locations.

16       A.   Uh-huh.

17       Q.   What did you mean by focused offenders?

18       A.   Pretty much where the crime was occurring, they

19   were identified, you know.  If it was a drug house, you

20   know, those focused offenders in that house or that area

21   were, you know -- sometimes a STAR deputy would be

22   working that house, and we would work in conjunction

23   with them whether it was, you know, watching the house

24   for activity, traffic stops.

25       Q.   Could focused offenders refer to prolific

1    offenders?

2        A.    Prolific, yeah.  I mean sometimes focused

3    offenders were prolific offenders, yeah, or classified

4    as prolific offenders, sure.

5        Q.    Okay.  And what did you mean when you talked

6    about jointly working on the focused offender locations?

7        A.    Like I said, information sharing.  Sometimes if

8    we couldn't sit on a house, they could sit on a house.

9    They could watch buys, they could watch, you know, who's

10   going in, who's coming into the house, who's leaving the

11   house, you know, trying to identify folks to see, you

12   know -- sometimes they were -- they would be part of a

13   certain area to see where they were coming and going

14   from.  You know, different -- just to identify, you

15   know, the pattern and stuff, things like that.

16          So we would work -- you know, if I couldn't

17   watch a house, sometimes they could.  And also, like

18   hours changed.  So like I get off -- you know, I would

19   get off in the evening.  Sometimes I would stay out

20   late, but the STAR guys -- the STAR deputies stay out

21   till like 2:00 a.m., you know, late in the morning.  So

22   they could watch the house at different hours.

23       Q.    Did you have more of an eight-to-five schedule,

24   and then they had the two-to-two schedule?

25       A.    I did, but it changed a little bit --

1    Q.    Okay.

2    A.    -- with that supervisor.  I started -- we could

3  stay out later, come in later --

4    Q.    Uh-huh.

5    A.    -- to -- it depended.  Like I said, what we

6  were working on the house and how the progression was

7  going would dictate that sometimes.

8    Q.    But you didn't have the same two-to-two shift

9  as the STAR?

10   A.    No, no.

11   Q.    Okay.

12   A.    Huh-uh.  When you work shift work, no.

13   Q.    Okay.  And you were talking about watching the

14  house or sitting on a house, you were talking about

15  conducting surveillance on --

16   A.    Yeah.  Doing surveillance or, you know, trying

17  to gather information on a certain location that was the

18  problem.

19   Q.    Other than surveillance, were there any other

20  ways that you would jointly work on the focused offender

21  locations?

22   A.    I mean, sometimes knock and talks.  We would do

23  those sometimes.  You know, we try to do two deputies to

24  a call for safety.  So sometimes they would pull us to

25  go to a house or something like that.

1      Q.    Did you ever conduct prolific offender checks?

2      A.    I have, but not -- I mean, not regularly, not

3   regularly.

4      Q.    Was this with STAR team or before when you were

5   on patrol?

6      A.    Probably throughout the whole time.

7      Q.    Okay.  How often would you conduct prolific

8   offender checks when you were working with STAR?

9      A.    I really -- not often.  I really couldn't say.

10  I really couldn't say.

11     Q.    Okay.

12     A.    I couldn't give a definitive number.

13     Q.    That's fair.

14           Would you ever go conduct a prolific offender

15  check like on your own, or if you wanted to go conduct a

16  prolific offender check, or did you --

17     A.    I mean, I could, but I -- I often didn't.  Like

18  I said, I was -- I dealt -- like kind of had my own work

19  already.  So I was kind of involved with that, so --

20     Q.    Were you ever called to a house while other

21  deputies were conducting a prolific offender check?

22     A.    Occasionally, yeah.  Sure, yeah.

23     Q.    Okay.  And why would that be?

24     A.    Depends really.  Sometimes for transport.  I

25  mean, it really depended on what was going on.  If there

1    was charges, you know, if they were actively looking for

2    the person, do a canvass.  I mean, it'd really depend on

3    what was going on.

4         Q.   Were you ever called for code enforcement

5    issues?

6         A.   Yep, sure, yeah.  Sometimes they would uncover

7    code enforcement issues.  Absolutely, yeah.  They would

8    uncover code enforcement issues, violations.  So, yeah.

9         Q.   During a prolific offender check?

10        A.   Yeah, prolific offender checks, search

11   warrants.  It depended, you know, on what was going on.

12        Q.   Okay.  We'll come back to talking about that in

13   a little bit.

14             When you were in the property crimes unit as a

15   code enforcement corporal, did you work with STAR in

16   that capacity?

17        A.   Occasionally, occasionally.

18        Q.   Doing what?

19        A.   It really depends.  I can't think of nothing

20   significant.  At this moment I can't think of anything

21   significant.

22        Q.   Okay.  How often would you say you would work

23   with STAR when you were in the property crimes unit?

24        A.   Not too often.  Not too often.

25        Q.   Did you mainly work with property crimes

1  detectives?

2     A.   Yeah.

3     Q.   Okay.

4     A.   And sometimes if I needed help, I would get

5  another code corporal -- district code corporal to help

6  me sometimes.

7     Q.   Okay.

8     A.   So it depends.

9     Q.   From a different district?

10    A.   Yeah.

11    Q.   Yeah.

12         Okay.  So page 19141, you're getting closer to

13  the beginning.  I'm looking at the top under Section E

14  where it says, What are the supervisor's goals for the

15  member's next evaluation period?

16    A.   Uh-huh.

17    Q.   Can you read number four in that list?

18    A.   Read both the STAR manual as well as the ILP

19  manual and stay current on any updates.

20    Q.   Okay.  Is it fair to say that you were expected

21  to read and be familiar with the ILP manual and the STAR

22  manual?

23    A.   Yeah.  I know they -- I think they wrote us

24  into it -- into the manual, our position.  So I think

25  that's part of it, also.

```
1        Q.   Wrote the position of code enforcement corporal
2   into the STAR manual?
3        A.   Yeah, I believe so.
4        Q.   What do you mean by that?
5        A.   They just wrote it into the position as in I
6   guess like duties and responsibilities.  Like before we
7   were never really mentioned in there, so --
8        Q.   So integrating code enforcement corporals into
9   ILP?
10       A.   Right.
11       Q.   Okay.  Okay.  This will be Exhibit B.
12            (Exhibit B was marked for identification.)
13  BY MS. BROTHERS:
14       Q.   Do you recognize this?
15       A.   Yes.
16       Q.   What is it?
17       A.   The intelligence-led policing manual.
18       Q.   Okay.  Is this the manual that you were
19  expected to read and be familiar with?
20       A.   Yes.
21       Q.   Okay.  We'll come back to that.  This is going
22  to be Exhibit C.
23            (Exhibit C was marked for identification.)
24  BY MS. BROTHERS:
25       Q.   Do you recognize this document?
```

1    A.    Yes.

2    Q.    Okay.  And then I want to flip back to page

3    496.  See where it says Strategic Targeted Area Response

4    STAR Team Manual?

5    A.    Right.

6    Q.    Is this the STAR manual that you were expected

7    to read and be familiar with?

8    A.    Yes.

9    Q.    Okay.

10        So looking in the third section on that page,

11   where it says Strategic Focus --

12   A.    Uh-huh.

13   Q.    -- can you read -- can you read that first

14   paragraph?

15   A.    The STAR team is expected to actively work with

16   the PSO members and outside agencies to identify and

17   target prolific offenders.  They will also assist in

18   responding to emerging crime patterns and trends.  They

19   will regularly develop missions to target the Top 5 and

20   target of the month.  Due to the fact that 6 percent of

21   the crime -- criminals commit 60 percent of the crime,

22   targeting prolific offenders should be an important part

23   of daily crime fighting strategies.

24   Q.    Okay.  So in that first sentence it says the

25   STAR team is expected to identify and target prolific

1    offenders.  So how would STAR identify prolific

2    offenders?

3        A.   Usually, you know, with that -- with the

4    information that either analysts would compile or, you

5    know, or they would compile the information themselves,

6    it depends.  Most of the time they were compiled by like

7    an analyst.  They were -- you know, it was like a

8    district thing, you know, district meetings and they

9    would, you know, go on the trends in crimes going on and

10   identify these folks.

11       Q.   So STAR would send information about potential

12   prolific offenders to the analysts?

13       A.   Yeah, sometimes, yeah.  Or it -- or it just --

14   it could be just collectively from other areas, you

15   know, on the patrol level.

16       Q.   But so STAR's role specifically, how would they

17   identify prolific offenders?  Would they gather

18   information and then forward that to the analysts?

19       A.   Sometimes, sure, yeah.

20       Q.   Okay.  Were there any other ways that they

21   would identify prolific offenders?

22       A.   Or it could be the other way around.  Analysts

23   would identify these prolific offenders, or a person of

24   focus that is committing, you know, a particular crime.

25       Q.   When you were on the STAR team, would you ever

```
 1    help identify prolific offenders?
 2        A.   Sure, yeah.
 3        Q.   And how would you do that?
 4        A.   You mean identify them?
 5        Q.   Yes.
 6        A.   As in gather information?  No, I didn't do
 7    that.  Usually they were already like identified as a
 8    focus offender or a prolific offender.
 9        Q.   I see.
10             Did you gather information on existing or
11    people who are already classified as prolific offenders?
12             MS. BROTHERS:  Did we lose someone?
13             MR. BARGIL:  Yeah.
14             MS. BROTHERS:  Tom, are you there?  It looks
15        like it's just Rob.
16             MR. BARGIL:  Rob, are you there?
17             MR. JOHNSON:  I am here.
18             MR. BARGIL:  We can go off the record.
19             (Off-the record discussion.)
20             (The last question was read back by the court
21        reporter.)
22             MR. POULTON:  That's the question.  I objected
23        to the form.
24             (Off-the-record discussion.)
25    BY MS. BROTHERS:
```

1    Q.   All right.  So we're back on the record.

2         What is a prolific offender?

3    A.   Usually a person that's committing like, you

4    know, a large portion of the crime.  It depends because,

5    like I said, an analyst usually will classify them as

6    that as you will because I think it's like -- I don't

7    know the exact amount of arrests they have to have or --

8    I think there's a few things that go into it.

9    Q.   Okay.

10    A.   And it's changed throughout -- you know, it's

11    changed throughout the years, so I can't say for

12    certain.

13    Q.   You can't say what for certain?

14    A.   What classifies them --

15    Q.   I see.

16    A.   -- as a prolific offender.

17    Q.   Okay.  How did you find out what a prolific

18    offender was?

19    A.   As learning the ILP manual, you know, started

20    to become more familiar with these folks.

21    Q.   Okay.

22    A.   I think -- I mean, I think years and years ago

23    they used to call them career offenders, you know.

24    Q.   Uh-huh.  All right.  Is it your understanding

25    that there is a list of prolific offenders that's

1    distributed by analysts?

2        A.   Right.

3        Q.   Okay.  As a code enforcement corporal, did you

4    interact with prolific offenders?

5        A.   Sure.

6        Q.   How so?

7        A.   Sometimes they occupied properties that I was

8    investigating.

9        Q.   As a code enforcement corporal, was part of

10   your job issuing citations to prolific offenders?

11           MR. POULTON:  Object to the form.  Go ahead.

12       A.   I can answer?

13   BY MS. BROTHERS:

14       Q.   Uh-huh.

15       A.   No.

16           MR. POULTON:  Hello?

17           MS. BROTHERS:  We're here.

18           MR. POULTON:  Oh, okay.  I'm sorry.  Wasn't

19       sure if I had gotten disconnected again.

20           MS. BROTHERS:  No, you're good.

21           MR. POULTON:  Yeah, you can go ahead and

22       answer, Detective.

23   BY MS. BROTHERS:

24       Q.   I believe you answered; right?

25       A.   Yeah, I answered no.

1          MR. POULTON:  Okay.  I missed that.  Thank you.

2    BY MS. BROTHERS:

3      Q.    Looking back to Exhibit I believe it's C, the

4    STAR team manual --

5      A.    Yeah.

6      Q.    -- looking at page 501.  So this is a bulleted

7    list, and the heading is Strategic Practices.  Are you

8    seeing that?

9      A.    Yeah, I'm seeing it.

10     Q.    Can you read the last bullet point for me?

11     A.    Utilize county ordinance citations as strategic

12   tool to target prolific offenders and problem locations

13   within the STAR box.  Coordinate missions with Corporal

14   Art Madden and code enforcement to conduct STAR box

15   enforcement blitzes.

16     Q.    Was part of your job issuing county ordinance

17   citations a strategic tool to target prolific offenders?

18     A.    According to this, yes.  According to the

19   manual.

20     Q.    You mentioned going on prolific offender checks

21   or responding to prolific offender checks when other

22   deputies were conducting prolific offender checks.  Was

23   part of your job to issue code citations during prolific

24   offender checks?

25     A.    No.

1          MR. POULTON:  Object to the form.  Go ahead.  I

2     think he answered yes; is that correct?

3          THE WITNESS:  No, no.

4          MR. POULTON:  Okay.  I couldn't hear your

5     answer.  I was objecting at the time.

6  BY MS. BROTHERS:

7     Q.   How much of your job as code enforcement

8  corporal involved issuing code citations to prolific

9  offenders or other --

10         MR. POULTON:  Object.

11  BY MS. BROTHERS:

12    Q.   -- or Top 5 or district targets?

13    A.   I can't recall.

14         Oh, I think we lost him.

15    Q.   No, it says he's still there.

16         MS. BROTHERS:  Tom, are you there?

17         (Off-the-record discussion.)

18  BY MS. BROTHERS:

19    Q.   I'm actually going to ask you to look at

20  Exhibit A, the member performance report, on page 19167.

21    A.   Uh-huh.  Okay.

22    Q.   All right.  So I'm looking at section E that

23  says, What are the supervisor's goals for the member's

24  next evaluation period?  Can you read the last sentence

25  there?

1     A.    On E?

2     Q.    Uh-huh.

3     A.    I encourage Corporal to continue inventing new

4  ways when obtaining tips, ILP information, and/or

5  strategies during his code enforcement duties, and then

6  in parentheses, which include actively pursing prolific

7  offenders and their associates.

8     Q.    Okay.  So does that mean that your code

9  enforcement duties included actively pursing prolific

10  offenders and their associates?

11     A.    Yeah, I would say so, yeah.  Not necessarily

12  with code enforcement violations, per se.  You know what

13  I'm saying?  That wasn't always the case.

14     Q.    How else would you actively pursue prolific

15  offenders and their associates?

16     A.    Just developing information, intel.

17     Q.    What part of your job -- Part of actively

18  pursuing prolific offenders and their associates was

19  issuing them code citations?

20     A.    Sometimes.

21          MR. POULTON:  Object to the form.  Object to

22     the form.  Go ahead.

23     A.    Sometimes.

24  BY MS. BROTHERS:

25     Q.    Okay.  How often would you issue code

1    enforcement citations to prolific offenders?

2        A.   I couldn't say.  I couldn't give a number.

3    There would be weeks where I wouldn't have contact with

4    any prolific offenders.  It depends what I was working.

5        Q.   How often would you interact with prolific

6    offenders?

7        A.   Like I said, occasionally.  It depends.  It

8    really does.

9        Q.   Once a week?

10       MR. POULTON:  Object to the form.  Go ahead.

11       A.   Maybe.  I guess maybe once a week.  I mean, I

12   couldn't say for certain.

13   BY MS. BROTHERS:

14       Q.   Would it be more than once a week or --

15       A.   Sometimes.  Like I said, it depends on what I'm

16   working.  I remember, for example, I worked a homeless

17   case where one of the homeless guys was a prolific

18   offender, and I was seeing him more than once a week.

19   So, yeah, I mean, but I wasn't -- you know what I mean?

20       Q.   Uh-huh.  How often in your interactions with

21   prolific offenders would you issue code citations to

22   them?

23       MR. POULTON:  Object to the form.

24       A.   How often would I issue them citations?

25   BY MS. BROTHERS:

1    Q.   Yes.

2    A.   I don't know.  You want a percentage or like --

3 I don't know how to answer that.  Like it really was

4 like a case-by-case basis, you know.  Sometimes it would

5 lead to a citation, sometimes a warning, or sometimes a

6 citation in the future.  It just depended.

7    Q.   When would it lead to a citation?

8    A.   If it wasn't satisfied.  If it wasn't

9 satisfied.  If the violation wasn't satisfied.  If they

10 didn't come in compliance, then it would lead to a

11 citation.

12    Q.   You mean if you issued them a warning?

13    A.   Right.

14    Q.   When you were -- when you interacted with

15 prolific offenders, was it part of your job to look for

16 code citations?

17    A.   Yeah, quality of life was important, yeah.

18 That was, you know, something that I, you know, was

19 responsible for.

20    Q.   So it was part of your job when interacting

21 with prolific offenders to look for code violations?

22    A.   I would address them if there was some, yeah.

23    Q.   Okay.  When it says actively pursuing prolific

24 offenders and their associates, who would associates

25 include or what is that referencing?

1       A.    Probably just their network.

2       Q.    What do you mean by that?

3       A.    Like folks that, you know, that conduct crime

4    with them or --

5       Q.    Would it include family members?

6       A.    Sometimes.

7            MR. POULTON:  Object.  Object to the form.

8    BY MS. BROTHERS:

9       Q.    Would it include people that they live with?

10           MR. POULTON:  Object to the form.  Object to

11      the form.

12      A.    Yeah, sometimes, yeah.

13   BY MS. BROTHERS:

14      Q.    Why would you -- why would you include or why

15   would you actively pursue associates for prolific

16   offenders?

17      A.    Just information.  Getting information from

18   them.  Sometimes they would, you know, use them per se,

19   use associates.

20      Q.    How would you use them?

21      A.    Kind of I guess victimize them in a way.  You

22   know what I mean?  So they can conduct their crimes.

23      Q.    No.  What do you mean by victimize them?

24      A.    Like elderly folks, you know, or people that

25   are, you know, kind of like, you know, don't speak up

1    for themselves, you know, things like that, manipulate,

2    you know, stuff like that.  Sometimes they would use

3    their associates.

4        Q.    You're saying prolific offender would do this

5    to their associates?

6        A.    Right.

7        Q.    I see.  Okay.

8              Would you issue code violations to associates

9    of prolific offenders?

10       A.    If they're responsible for the violation, sure.

11       Q.    And why would you issue those citations to the

12   associates of prolific offenders?

13       A.    Like I said, depending if they're

14   responsibility of a violation.  Sometimes they're

15   property owner, sometimes they're property manager, or

16   they're the primary responsible of the property.  It

17   depends.

18       Q.    Would part of it be because they were

19   associating with a prolific offender?

20       A.    No.

21             MR. POULTON:  I'm sorry.  I couldn't hear that

22       question.  Could you repeat that question?  I

23       couldn't hear it.  I'm sorry.

24             MS. BROTHERS:  I said would part of it be

25       because they were associating with a prolific

```
1          offender?
2               MR. POULTON:  Okay.  I object to the form.  Go
3          ahead.  I object.  Okay.
4     BY MS. BROTHERS:
5          Q.   Why would you be at the house of an associate
6     of a prolific offender to issue code citations?
7               MR. POULTON:  Object to the form.  Go ahead.
8          A.   If violations exist you mean?
9     BY MS. BROTHERS:
10         Q.   Uh-huh.
11         A.   To -- I mean, to address them with the, you
12    know, with the parties that were there.
13         Q.   So why would you address those code violations
14    of an associate of a prolific offender -- well, this
15    says -- the member performance report says actively
16    pursuing prolific offenders and their associates.
17         A.   Uh-huh.
18         Q.   So why is it important to actively pursue the
19    associates of prolific offenders?
20              MR. POULTON:  Object to the form.  This has
21         been asked and answered several times.  Go ahead.
22         A.   So sometimes it varies on what kind of case --
23    how you're -- how you're -- or how I'm, you know,
24    gathering information.  Sometimes it can come out during
25    code enforcement investigation and both parties are
```

1    involved in the violations that are current on the

2    property, or sometimes they could just be, you know,

3    just information gathering, just a knock and talk or

4    something like that.

5          MR. POULTON:  Is now a good time to take a

6       two-minute break so I can get gas and use the

7       restroom?

8          MS. BROTHERS:  That's fine.

9          (Short break.)

10   BY MS. BROTHERS:

11      Q.   All right.  So we're back on the record.

12          So earlier I asked whether part of your job as

13   a code enforcement corporal was to issue code citations

14   to prolific offenders, and I believe you said no.  But

15   then later we looked at your member performance report,

16   and we read that part of your code enforcement duties

17   included actively pursuing prolific offenders and their

18   associates.

19      A.   Mmm.

20      Q.   So just to clarify, part of your job according

21   to your member performance report was to issue code

22   citations to prolific offenders and their associates?

23          MR. POULTON:  Object.  Object to the form.  Go

24       ahead.

25      A.   Yeah.  I mean, yes and -- it's kind of like yes

1    and no.  So according to the -- to the ILP manual.

2    BY MS. BROTHERS:

3         Q.   According to the ILP manual or the member

4    performance report?

5         A.   Or the -- yeah, the member performance report.

6         Q.   So according to the member performance report,

7    that was part of your job?

8         A.   Right.  It was part of my duties, yeah.

9         Q.   Okay.

10             (Exhibit D was marked for identification.)

11   BY MS. BROTHERS:

12        Q.   Do you recognize this document?

13        A.   Yes.

14        Q.   What is it?

15        A.   Looks like a call log.

16        Q.   Okay.  So it's a CAD report?

17        A.   Right.

18        Q.   Okay.  What's the date on at the top of the

19   report?

20        A.   June 5th.

21        Q.   Of 2018?

22        A.   Correct.

23        Q.   Okay.  What is the name under the prime unit at

24   the top?

25        A.   One Golf Two.

1     Q.   And what's the name?

2     A.   Sharon Ioppolo.

3     Q.   Okay.  I'm glad you pronounced that before I

4  had to.

5     A.   No, it's all right.

6     Q.   And what's the location, the address right

7  here?

8     A.   14137 Amanda Avenue.

9     Q.   Okay.  And do you see the notes section towards

10  the middle there?

11     A.   Yes.

12     Q.   Where it says district number one Top 5 and

13  then Tyler Paneson?

14     A.   Yes.  Uh-huh.

15     Q.   Okay.

16     A.   Yeah.

17     Q.   Are you familiar with the name Tyler Paneson?

18     A.   Yeah, I recall that name, yeah.

19     Q.   Who was that?

20     A.   He was a -- an offender that was wanted for

21  some grand theft charges I believe at the time I was at

22  that location.

23     Q.   On this day?

24     A.   No.  No, I don't think it was on that day.

25     Q.   Okay.  I'm going to introduce Exhibit E.

1          (Exhibit E was marked for identification.)

2   BY MS. BROTHERS:

3       Q.   Do you recognize this document?

4       A.   No.

5       Q.   I'll represent that this is a spreadsheet

6   provided to you in discovery --

7       A.   Okay.

8       Q.   -- that contains notes entered by PSO deputies

9   after they visited the homes of prolific offenders.

10      A.   Okay.

11      Q.   Can you look at page 17455?

12           MR. POULTON:  I'm sorry.  You're cutting out a

13      little bit on me.  Can you speak a little bit more

14      clearly or loudly?

15           MS. BROTHERS:  Sure.

16           MR. POULTON:  I don't think the speaker phone

17      picked it up.  I don't know what you're looking at.

18      It's a spreadsheet of some kind.

19           MS. BROTHERS:  Sure.  It's the offender notes

20      spreadsheet that you all provided to us.

21           MR. POULTON:  Okay.

22   BY MS. BROTHERS:

23      Q.   Are you on page 17455?

24      A.   Yeah.

25      Q.   Okay.  So looking at the fourth paragraph --

1      A.    Yeah.

2      Q.    -- do you want to just read that to yourself

3  real quickly?

4            MR. POULTON:  Can he do it out loud just so I

5      know the context?

6            MS. BROTHERS:  Sure.

7      A.    On June 5, 2018, I attempted to make contact

8  with Tyler Paneson regarding a PC warrant for grand

9  theft.  Tyler resides in a mobile home or mobile trailer

10 behind his mother's residence on the property located at

11 14137 Amanda Avenue, which was confirmed by neighbors.

12 I made contact at the residence with a white female

13 Denise Rohlfs, who informed me she was only there using

14 the shower to bathe and was not really close with Tyler.

15 She was identified as Wayne Rutherford's ex-girlfriend/

16 baby mama.  Denise said he was not inside the mobile

17 trailer.  Neighbors confirmed Tyler was inside mother's

18 house.  The property at the address has many county

19 ordinances and Corporal Ojeda was notified.

20           MR. POULTON:  Thank you.

21 BY MS. BROTHERS:

22     Q.    So this document is a PDF of an Excel

23 spreadsheet --

24     A.    Uh-huh.

25     Q.    -- and so some of the columns are kind of

1    chopped up.  If you look at page 17457 --

2        A.   Uh-huh.

3        Q.   -- the entry on June 5, 2018 says Sharon

4    Ioppolo.

5        A.   Yeah.

6        Q.   Okay.  So this looks like it was entered on

7    June 5, 2018 at 4:35 p.m.

8        A.   Uh-huh.

9        Q.   Is that right?

10       A.   Yeah.

11       Q.   Okay.  And it looks like Deputy Ioppolo entered

12   these notes that you just read?

13       A.   Uh-huh.

14       Q.   Do those notes look like they were made on the

15   same day as the CAD report we just looked at?

16       A.   Yeah, I believe so.

17       Q.   Okay.

18       A.   Yeah.  Uh-huh.

19       Q.   Concerning the same visit?

20       A.   Yeah.

21       Q.   Okay.  So the last sentence says --

22            MR. POULTON:  I'm sorry.  I can't hear

23       anything.  I can't hear anything.

24            MS. BROTHERS:  Let me move it closer.

25            MR. POULTON:  Thank you.

1    BY MS. BROTHERS:

2        Q.    So second to last sentence in the paragraph you

3    just read says, The property at this address has many

4    county ordinances and Corporal Ojeda was notified.

5        A.    Uh-huh.

6        Q.    This would have been when you were on the

7    property crimes unit, correct, as a code enforcement

8    corporal?

9        A.    Yes.   Correct.

10       Q.    Okay.   So when deputies in the property -- when

11   deputies in the property crimes unit called you to a

12   residence because they noticed county ordinance

13   violations, you would respond?

14       A.    Sometimes, yeah.

15       Q.    Well, I mean, when they called, would you go to

16   that address?

17       A.    If I was available, yeah, sure.

18       Q.    Okay.

19       A.    Yeah.

20       Q.    Do you remember being notified about county

21   ordinances or county ordinance violations at 14137

22   Amanda Avenue on June 5th?

23       A.    No, I don't.   I don't recall that.

24       Q.    Is it fair to say that when property crimes

25   deputies noticed code violations in district one that

1    you were the person that they called about that?

2         A.   Yeah, they would bring it to my attention.

3    Sure.

4         Q.   Okay.

5              (Exhibit F was marked for identification.)

6    BY MS. BROTHERS:

7         Q.   I'll give you a second to look at the document.

8         A.   Okay.

9         Q.   Do you recognize it?

10        A.   Yes.

11        Q.   What is it?

12        A.   It's the CAD call from the time I visited the

13   residence.

14        Q.   Okay.  And what's the date on that?

15        A.   June 6th.

16        Q.   2018?

17        A.   2018 at 8:34 a.m.

18        Q.   Okay.  And this is showing a visit that you

19   made to 14137 Amanda Avenue?

20        A.   Correct.

21        Q.   Okay.  Were you called to 14137 Amanda Avenue?

22        A.   Not necessarily to that address per se.  I

23   believe we spotted him at another location which led us

24   back to that address.

25        Q.   So you were there looking for someone?

1      A.    Yeah.   We responded there looking for Tyler.

2   Correct.

3      Q.    For Tyler Paneson?

4      A.    Yeah.

5      Q.    Had you been notified of county ordinance

6   violations before you went to 14137 Amanda Avenue?

7      A.    I don't recall.   I'm not certain on that.

8      Q.    Do you remember what happened during that

9   visit?

10      A.    Yeah.   We responded to the location, spoke to

11   some neighbors.   He was recently seen in the area, and

12   he was suspected to be in the RV camper, which was on

13   that property of the 14137 Amanda Avenue.

14          And then the property owner Darlene Deegan was

15   notified of us being there.   She responded thereafter,

16   and then she allowed us onto the property to check if he

17   was on the property and if he was in the RV, and the

18   ordinance violations were addressed also.

19      Q.    Okay.   And I should have mentioned before is

20   this your name under prime unit at the top?

21      A.    Correct.   That was my call sign, yeah.   My

22   name, yeah.

23      Q.    Okay.   So were these notes written by you in

24   the CAD report?

25      A.    Yeah.

```
 1              (Exhibit G was marked for identification.)

 2    BY MS. BROTHERS:

 3         Q.   Do you recognize this document?

 4         A.   Yes.

 5         Q.   What is it?

 6         A.   It's the ordinance report.

 7         Q.   I'm sorry.  It's the what?

 8         A.   A police report of the ordinance violations and

 9    then some ordinance citation copies.

10         Q.   Is this the incident report for the same visit

11    on June 6, 2018 to 14137 Amanda Avenue?

12         A.   Yes.

13         Q.   Okay.

14              MR. POULTON:  Can you speak a little more

15         slowly and a little more loudly for about another 20

16         minutes while I'm still on the road here?  It's

17         still chopping up pretty bad.

18              MS. BROTHERS:  Sure.

19              THE WITNESS:  Yes, sir.

20              MR. POULTON:  Thank you.

21              MR. JOHNSON:  I'm having trouble hearing as

22         well.

23              MR. POULTON:  Yeah.  Okay, it's not just me

24         then.  Good.

25    BY MS. BROTHERS:
```

1      Q.   So turning to page 8757 it says Reporting

2  Officer Narrative at the top.

3      A.   Yeah.  Yes.

4      Q.   Did you write this narrative?

5      A.   Yes.

6      Q.   Okay.  Can you read the first sentence of this

7  first paragraph?

8      A.   On 6/6/18 I responded to 14137 Amanda Avenue,

9  Hudson, Florida, in reference to county ordinance

10  violations and also to locate wanted person Tyler

11  Paneson for grand theft.

12          MS. BROTHERS:  Did we lose him?

13          MR. POULTON:  I'm sorry.  I'm here.  I'm sorry.

14      I hit mute because I'm trying to correct this.  It's

15      still very, very choppy.  I don't know if Rob's

16      having the same problem.  Sorry.  I hit mute just

17      now to try to see if cutting off my mic would help.

18          (Off-the-record discussion.)

19  BY MS. BROTHERS:

20      Q.   When it says in reference -- you responded in

21  reference to county ordinance violations, had someone

22  notified you that there were county ordinance violations

23  at 14137 Amanda Avenue?

24      A.   I don't recall --

25      Q.   Okay.

1      A.   -- that, no.

2      Q.   Is that what that would typically mean,

3   responding in reference to code violations?

4      A.   Just what was addressed, I guess.

5      Q.   You mean that's what happened during the visit

6   or --

7      A.   Right.

8      Q.   -- why you were there?

9      A.   Right.  What happened during the visit, right.

10     Q.   Okay.  Can you read the second paragraph for me

11  out loud so that Tom can hear?

12     A.   Detective Pfenninger had information that Tyler

13  was living in an RV on the property.  Detective

14  Pfenninger and I went over the fence and knocked on the

15  RV camper.  There was no response.  The RV camper was

16  set up for housekeeping with water and electric.  I

17  exited off the property and attempted to call Tyler's

18  mother and occupant/property owner Darlene Deegan.  I

19  left Darlene a voicemail.  I spoke with neighbor who

20  called Darlene, and which Darlene advised she would call

21  my agency phone.

22     Q.   So it sounds like you and Detective Pfenninger

23  knocked on the RV camper door and then exited the

24  property?

25          MR. POULTON:  I can't -- I can't -- you're not

1     -- you're -- I'm getting every fifth word now.

2          MS. BROTHERS:  Okay.  Let me try one more time,

3     but if you're still not getting the words --

4          MR. POULTON:  I can hear you great.  I can hear

5     you great right now.

6          MS. BROTHERS:  Okay.

7  BY MS. BROTHERS:

8     Q.   So it looks like you and Detective Pfenninger

9  went and knocked on the RV camper, and then you exited

10 the property, and then you called Darlene Deegan; is

11 that right?

12    A.   Correct.

13    Q.   Okay.

14         MS. BROTHERS:  Did you hear that, Tom?

15         MR. POULTON:  I have to object.  I can't -- I

16    can't hear the question.  The first sentence of what

17    you just said I heard clearly and then breaking up

18    again as though you're looking down and your voice

19    is directed into the page maybe or something.  I

20    can't tell.  I'm just guessing.

21         (Off-the-record discussion.)

22         (Short break.)

23 BY MS. BROTHERS:

24    Q.   Did you issue code citations to Darlene Deegan

25 during this visit?

1    A.   Yes, ma'am.

2    Q.   Are the citations attached to this incident

3  report, the citations that you issued to Darlene Deegan?

4  You can take a second to look through and check that.

5    A.   Yeah, that looks correct.  Yeah.

6    Q.   Okay.  And what were those citations for?

7    A.   Accumulation of junk and debris, permitted use

8  violations, failure the use of public sewer, lack of

9  address numbers posted, and storage of commercial

10  containers.

11         MS. BROTHERS:  Okay.  I'm going to show some

12     body-worn camera footage.

13         MR. BARGIL:  So you need the TV?

14         MS. BROTHERS:  Yes.

15         MR. POULTON:  Could the video be turned on for

16     that Zoom so I can see?

17         MS. BROTHERS:  We're going to show it on the

18     TV.  Can you see the TV?

19         MR. POULTON:  I don't have any video.

20         MR. BARGIL:  That's on your end.

21         MR. JOHNSON:  Yeah, I have video, Tom.

22         MR. POULTON:  Got it now.

23         MS. BROTHERS:  Okay.

24         MR. POULTON:  Thank you.

25  BY MS. BROTHERS:

1      Q.   All right.  So I'm just starting at the

2   beginning of the video.

3           (Video was played at this time.)

4           DET. OJEDA:  I guess we can felony PC; right?

5           DEPUTY:  Yeah.

6           (Video was paused at this time.)

7   BY MS. BROTHERS:

8      Q.   Okay.  Do you recognize this footage?

9      A.   Yes, ma'am.  Yes.

10     Q.   Okay.  And I should say this footage is going

11  to be introduced as Exhibit H.

12          (Exhibit H was designated to be attached at a

13      later date.)

14  BY MS. BROTHERS:

15     Q.   I'm sorry.  You said you did recognize this

16  footage?

17     A.   Yes, ma'am.

18     Q.   Do you know whose body camera this is?

19     A.   I believe it's mine.

20     Q.   Okay.  I'm going to go to about the six second

21  mark.

22          (Video was played at this time.)

23          DET. OJEDA:  I guess we could felony PC; right?

24          DEPUTY:  Yeah.

25          (Video was paused at this time.)

1    BY MS. BROTHERS:

2        Q.   It sounded like you said, "It's only PC,

3    right?"  Is that correct?

4        A.   I believe it said, "It's felony PC."

5        Q.   Let's play it one more time.

6             (Video was played at this time.)

7             DET. OJEDA:  Felony PC, right?

8             (Video was paused at this time.)

9        A.   Yeah.

10   BY MS. BROTHERS:

11       Q.   Yeah, he did.  And PC refers to what?

12       A.   Probable cause.

13       Q.   Okay.  Okay.  We're resuming the video.

14            (Video was played at this time.)

15            DET. OJEDA:  Chiuauas?

16            MALE:  What?

17            DET. OJEDA:  Any Chiuauas?

18            MALE:  Uh (inaudible).

19            DET. OJEDA:  Oh, is there?

20            MALE:  He stays in that trailer back there to

21       the left.

22            DEPUTY:  Over here?

23            MALE:  Yeah.

24            (Video was paused at this time.)

25   BY MS. BROTHERS:

1      Q.   Okay.  What we just watched there, was that you

2  stepping over the fence into Darlene Deegan's yard?

3      A.   Yeah, it was.  It's all one property, yeah.

4      Q.   Okay.  And I should clarify the date of this

5  video is June 6, 2018; is that correct?

6      A.   Yes.

7      Q.   This was from the same incident that we've been

8  discussing at Darlene Deegan's home at 14137 Amanda Ave?

9      A.   Correct.

10      MR. POULTON:  I'm going to object to the form.

11  Go ahead.  I think there's been more than one

12      incident discussed is my point, but go ahead.

13  BY MS. BROTHERS:

14      Q.   Is this the same -- is this the body camera

15  footage from the -- that accompanies the incident report

16  that we were just looking at?

17      A.   Yes, ma'am.

18      Q.   Okay.  Do you know who else was in the video,

19  Detective Ojeda?

20      A.   I recognize Detective Pfenninger.  I don't know

21  who the other deputy was.

22      Q.   Okay.

23      MR. POULTON:  You might want to spell

24      Pfenninger for her if you haven't already.

25      MS. BROTHERS:  She said she would get it from

```
 1        the documents later.
 2             MR. POULTON:  Okay.
 3             MS. BROTHERS:  Yeah, I offered.
 4             MR. POULTON:  Okay.  It's just an unusual
 5        spelling, so that's fine.
 6             MS. BROTHERS:  Yeah, understood.
 7   BY MS. BROTHERS:
 8        Q.   Okay.  So you said that what we just saw was
 9   you stepping over the fence into the backyard?
10        A.   Right.  Stepping on -- yeah.
11        Q.   Okay.  Did you -- did you have a warrant to go
12   into the backyard of Darlene Deegan's house?
13        A.   No.
14        Q.   Okay.  Did you have Darlene Deegan's consent to
15   go into the backyard of the house?
16        A.   No.
17        Q.   Okay.  All right.  And this was before you
18   called Darlene Deegan on the phone; right?
19        A.   Correct.
20        Q.   Okay.  Okay.  I'm going to about the 7 minute
21   mark.
22             (Video was played at this time.)
23             DET. OJEDA:  It's pretty bad.  Got a ton of
24        stuff here.
25             DEPUTY:  They have what?
```

1          DET. OJEDA:  They got a ton of violations here.

2          (Video was paused at this time.)

3     BY MS. BROTHERS:

4          Q.   So is that a -- did you say they have a ton of

5     violations here?

6          A.   Yeah.  Yeah, you could -- yeah.

7          Q.   Okay.  So at this point were you walking around

8     the yard and seeing what code violations were there?

9          A.   Yeah.  I observed, yeah, violations, and then

10    we walked off the property.

11         Q.   Okay.

12         A.   It wasn't clear it was all one parcel.

13         Q.   Parcel of property?

14         A.   Right.  I thought maybe it could have been two

15    parcels, but once you're back there, you can see it's

16    all kinda one --

17         Q.   Okay.

18         A.   -- based on my experience.

19         MS. BROTHERS:  I'm going to pull up the next

20    video.  So this is I; right?

21         (Exhibit I was designated to be attached at a

22    later date.)

23         MS. BROTHERS:  This one, Judy, is going to be

24    the top one.  It's titled

25    Extraction_1.1_code_invest_X49.mp4.

```
 1            Okay.  And I'm just going to start at the

 2       beginning.

 3            (Video was played at this time.)

 4            (Video was paused at this time.)

 5   BY MS. BROTHERS:

 6       Q.   Does this look like body cam footage from the

 7   same day?

 8       A.   Yeah.  I believe it was later on.

 9       Q.   Okay.  Is this still your body cam footage?

10       A.   I believe so.

11       Q.   Okay.  I'm going to start it at the 10:13 mark.

12            (Video was played at this time.)

13            DET. OJEDA:  So your mandatory court date's

14       gonna be July 26th at 9 a.m. at the west courthouse.

15       Okay?  So --

16            MS. DEEGAN:  The one right there on Little

17       Road?

18            DET. OJEDA:  On Little Road, yes.

19            (Video was paused at this time.)

20   BY MS. BROTHERS:

21       Q.   So is this you speaking with Darlene Deegan?

22       A.   Yeah.  I was issuing her citations.  Correct.

23       Q.   Okay.

24            (Video was played at this time.)

25            DET. OJEDA:  Your -- this -- this --
```

1          MS. DEEGAN:  So now were they called with

2     complaints or they just decided to come here?

3          DET. OJEDA:  They -- well, we were actually

4     here looking for Tyler.

5          MS. DEEGAN:  Yeah.

6          DET. OJEDA:  And then that's what brought us

7     here, and the violations were noticed, so --

8          (Video was paused at this time.)

9   BY MS. BROTHERS:

10    Q.    It sounded like you said you were there looking

11  for Tyler and you said and that's what brought us here,

12  and then the violations were noticed.  Is that what you

13  said?

14    A.    Yep.

15    Q.    Okay.

16         (Video was played at this time.)

17         MS. DEEGAN:  So then you guys called?

18         DET. OJEDA:  So we were called out, and we

19    came, and we have to address them at this time.

20         MS. DEEGAN:  Well, no.  How -- how did they

21    initially decide to come here and go and check

22    everything on my property?

23         DET. OJEDA:  It was visible from the -- a lot

24    of your violations are visible from the roadway.  We

25    don't have to actually go onto the property.

1          MS. DEEGAN:  Well, yeah.  But normally it's a

2      -- it's a neighbor that calls with something that

3      (inaudible).

4          DET. OJEDA:  Oh, oh, the reason why?

5          MS. DEEGAN:  Yes.

6          DET. OJEDA:  Okay.  Tyler's a Top 5 offender.

7      He's considered one of the Top 5 offenders in the

8      county.

9          MS. DEEGAN:  Okay.

10         DET. OJEDA:  Okay?  Every offender we have in

11     the county, especially a Top 5, we go to their house

12     and we visit them.

13         MS. DEEGAN:  Yeah.

14         (Video was paused at this time.)

15  BY MS. BROTHERS:

16     Q.   Okay.  So it sounded like you said the reason

17  we're here is that Tyler is a TOP 5 offender; is that

18  right?

19     A.   He was at that time.

20         MR. POULTON:  Object to the form.

21     A.   He was at that time.

22         MR. POULTON:  Go ahead.

23  BY MS. BROTHERS:

24     Q.   And you said he's one of the top offenders in

25  the county?

1    A.    He was, yeah, I believe at that time, yeah.

2    Q.    And that's what you said on the video?

3    A.    Yeah.

4    Q.    And you said -- we can play it again if you'd

5    like, but it sounded like you said for every offender we

6    have in the county, especially Top 5, we go to their

7    house and we visit them?

8    A.    Right.  That would be the prolific offender

9    checks.

10   Q.    Right.

11   A.    Sure.

12   Q.    And that's what you said in the video?

13   A.    Right.

14   Q.    Okay.  Okay.  I'm going to resume and the 11:26

15   mark.

16         (Video was played at this time.)

17         DET. OJEDA:  We make sure that the laws are

18   being followed, the ordinances are being followed,

19   and if they have active warrants, they go to jail.

20         MS. DEEGAN:  Right.

21         (Video was paused at this time.)

22   BY MS. BROTHERS:

23   Q.    And there it sounded like you said and we

24   ensure that the laws are being followed and the

25   ordinances are being followed; is that right?

1    A.    Right.

2    Q.    Okay.  And by ensuring that ordinances are

3  being followed, did you mean code ordinances?

4    A.    Right.  Local -- yeah.

5    Q.    Okay.

6    A.    Local law, yeah.

7    Q.    Okay.  So is this -- strike that.

8          Okay.  Resuming at the 11:33 mark.

9          (Video was played at this time.)

10         DET. OJEDA:  That's what brought us here.  He

11      has active warrants.

12         MS. DEEGAN:  Oh, yes.  (Inaudible) I know,

13      yeah.

14         DET. OJEDA:  So --

15         MS. DEEGAN:  But then what about on my property

16      for these violations?  Because this is not his

17      property.

18         DET. OJEDA:  Right.  That's why it's being

19      addressed with you.  He actually can -- if he's

20      living on the property --

21         (Video was paused at this time.)

22  BY MS. BROTHERS:

23    Q.    So it sounded like Darlene said what about --

24  what about my property?  This isn't his property.  And

25  then you said, right, that's why it's being addressed

1    with you.  Does that sound like what you said?

2        A.   Uh-huh.

3        Q.   Okay.

4        A.   Yeah.

5        Q.   Okay.

6        A.   Because the ordinance says you can cite all

7    parties, the property owner, renter, so on and so forth.

8    So he wasn't there, so he wasn't being cited at the

9    time.

10       Q.   Right.  Would Darlene have received those code

11   violations if you weren't there looking for Tyler?

12            MR. POULTON:  Object to the form.

13       A.   If we -- I mean, if we came across for any

14   other complaint, sure, noise complaint, animal

15   complaint, you know, anything.  It just so happened that

16   we saw the -- we were looking for him for PC.

17   BY MS. BROTHERS:

18       Q.   But you were there that day looking for Tyler?

19       A.   Correct.

20       Q.   Okay.  And part of the reason that you issued

21   the code citations was because Tyler was a Top 5

22   offender?

23       A.   No, not just because of that.  Because there

24   was violations that existed, but he was -- the primary

25   objective was to get him in custody.  That was the

1    primary objective.

2         Q.   Okay.  And in the video you said that you were

3    there because Tyler was a Top 5 offender in the county,

4    and that when you visit Top 5 offenders, you ensure that

5    the laws are being followed and that the ordinances are

6    being followed.

7         A.   Right.

8         Q.   So is part of the reason you were issuing code

9    citations at that property on that day because Tyler was

10   Top 5?

11        A.   Not entirely, no.

12        Q.   But that was part of the reason?

13        A.   It was part, yeah.

14        Q.   Okay.  Okay.

15             For now, I believe that I'm done with body cam

16   footage, so I'm just going to disconnect that.

17             (Exhibit J was marked for identification.)

18   BY MS. BROTHERS:

19        Q.   So you're looking at Exhibit J.  Do you

20   recognize this?

21        A.   Yes.

22        Q.   What is it?

23        A.   A email signature.

24        Q.   Looks like it's an email; is that right?

25        A.   Okay.

```
 1        Q.   A printout of an email?

 2        A.   Right.

 3        Q.   Is it from you?

 4        A.   Yes.

 5        Q.   Okay.  And then who are you sending it to?

 6        A.   To a ILP analyst.

 7        Q.   Okay.  Are they the analyst for district one?

 8        A.   Yes.

 9        Q.   Okay.  And what does the subject line say?

10        A.   D1 ILP code slide.

11        Q.   Okay.  And in the body of the email it says,

12   See attachment?

13        A.   Correct.

14        Q.   Okay.  That's what this is going to be.

15             (Exhibit K was marked for identification.)

16   BY MS. BROTHERS:

17        Q.   Does this look like the attachment to the email

18   that we just looked at?

19        A.   Yep.  That's correct.

20        Q.   Okay.  What is this attachment?

21        A.   Just an activity -- like an activity report for

22   the ILP meeting on what I conducted throughout the week.

23        Q.   Is it a list of code citations?

24        A.   Correct.

25        Q.   Okay.  And you prepared this spreadsheet?
```

1     A.   Yeah.

2     Q.   Okay.  And what did you say the spreadsheet was

3  prepared for?

4     A.   A ILP meeting.

5     Q.   Would that be an AIM meeting?

6     A.   An AIM meeting, correct.

7     Q.   Okay.  Were you expected to prepare a list like

8  this summarizing code violations in your district for

9  each AIM meeting?

10     A.   Yeah, my activity, correct.  Yeah.

11     Q.   Okay.

12          (Exhibit L was marked for identification.)

13  BY MS. BROTHERS:

14     Q.   Do you recognize this document?

15     A.   Yes.

16     Q.   Okay.  What is it?

17     A.   Just a slide that they go over in the meeting

18  as in trends -- crime trends.

19     Q.   Slides for the AIM meeting you mean?

20     A.   Correct.

21     Q.   Okay.  And looking on 14013 --

22     A.   Yep.

23     Q.   -- are we looking at the same list of code

24  violations that you -- that we looked at that was the

25  attachment to the email?

1    A.   Yep.  That's correct.

2    Q.   Okay.  So this is -- do these look like the AIM

3  slides --

4    A.   Uh-huh.

5    Q.   Okay.  So looking at page 14020 --

6    A.   Uh-huh.

7    Q.   -- looking below where it says district one Top

8  5, it says info valid as of 6-12-18.  Does that mean

9  these AIM slides are dated June 12th or June 13, 2018?

10    A.   Yes, ma'am.

11    Q.   Okay.  That's when the meeting was held?

12    A.   I believe so.

13    Q.   Okay.  So that would be six or seven days after

14  the incident we just looked at where you visited Darlene

15  Deegan's home?

16    A.   Right.

17    Q.   Okay.  All right.  Looking at page 14020, does

18  this show that Tyler Paneson is listed as one of the

19  district one Top 5?

20    A.   Correct.

21    Q.   What does the ten days next to his name

22  indicate?

23    A.   I guess that's how long he's been an offender.

24    Q.   Okay.

25    A.   Or categorized as Top 5.

1    Q.   Okay.  So does that mean based on the date at

2   the top of the page that Tyler Paneson had been a Top 5

3   offender since --

4    A.   Well --

5    Q.   I'm sorry.

6    A.   I'm sorry.  I'm not sure.  That might be also

7   how long he's been wanted for.  I'm not sure --

8    Q.   Okay.

9    A.   -- if that's how long he's been wanted or how

10   long they categorized him as a Top 5 offender.  I'm not

11   too sure.

12    Q.   Yeah.  Looking at that box towards the top

13   middle of the page where it says number after name

14   represents days on target list --

15    A.   Uh-huh.

16    Q.   -- does that indicate the Top 5 target?

17    A.   Correct.

18    Q.   Okay.  So the ten days would mean that Tyler

19   has been a Top 5 offender since at least June 2, 2018.

20   Is that right by your math?

21    A.   Maybe.  I'm not great at it, but maybe.

22    Q.   Okay.  But so ten days before this slide was

23   made; right?

24    A.   Uh-huh.

25    Q.   Okay.  It's hard to see on the printout.  I

1    don't know if you can even -- do you see the letters at

2    the top of his head on his picture?  You might not be

3    able to see it, and that's fine.

4        A.    Yeah, I see what you're saying.  I can't make

5    out what it is, but --

6        Q.    Okay.

7        A.    -- I see something on his head, yeah.

8        Q.    If it said PC, what would that indicate?

9        A.    Probable cause, I think.

10       Q.    Okay.  And so based on this, this would

11   indicate that Tyler was a -- was a district one Top 5

12   during the incident that we were just talking about on

13   June 6th --

14       A.    Yes, ma'am.

15       Q.    -- 2018?  Okay.

16             (Exhibit M was marked for identification.)

17   BY MS. BROTHERS:

18       Q.    This is Exhibit M.  Do you recognize this

19   document?

20       A.    Yes.

21       Q.    And what is it?

22       A.    A email thread.

23       Q.    Okay.

24       A.    From me to the County Attorney secretary.

25       Q.    Is that Lauri Skinner?

1      A.   Yes.  Yep.

2      Q.   Okay.  You said she's the County -- the

3  secretary to the County Attorney?

4      A.   Correct.

5      Q.   Okay.  Do you remember this email?

6      A.   No, honestly, I don't.

7      Q.   Okay.  So looking at this second email on the

8  thread on this first page from Lauri Skinner to you and

9  with Mark Celeste cc'd --

10     A.   Yes.

11     Q.   -- can you -- can you just read that really

12  quickly?

13     A.   Good morning, Pedro.  I just spoke with Patrick

14  and he wants to discuss the motion to suppress hearing

15  on 12-19 at 9 a.m. for Darlene Deegan with you.  Please

16  be prepared for that on 12-11.

17     Q.   Okay.  That's enough.

18          What is Ms. Skinner referring to when she's

19  talking about the motion to suppress hearing for Darlene

20  Deegan?

21     A.   I don't remember, honestly.  I don't recall.

22     Q.   Okay.  Do you remember preparing for or

23  attending a motion to suppress hearing for Darlene

24  Deegan?

25     A.   No, I don't.

1    Q.   Okay.  Do you know what this could be referring

2    to?

3    A.   No, ma'am.

4    Q.   Okay.

5    A.   Just -- well, just maybe the ordinance case --

6    Q.   Right.

7    A.   -- obviously but --

8    Q.   So we just looked at some AIM slides a moment

9    ago.

10   A.   Uh-huh.

11   Q.   I believe that was Exhibit L.  Did you attend

12   AIM meetings when you were as a code enforcement

13   corporal?

14   A.   Yes, ma'am.

15   Q.   Did you attend regularly?

16        MR. POULTON:  Object to the form.  Go ahead.

17   A.   Yes.

18   BY MS. BROTHERS:

19   Q.   Were you expected to attend AIM meetings?

20   A.   Yes.

21   Q.   Okay.  Did you participate in the meetings?

22   A.   Not all the time, no, besides providing just

23   the slide.  That's about it.

24   Q.   So other than providing the slides, did you

25   speak or provide any other -- any information during the

1    meetings?

2         A.   Yeah.  I mean, if information was gathered that

3    week, yeah.  Sure.

4         Q.   What kind of information?

5         A.   Whatever I was working that week.  If, you

6    know, new leads were found on a case or any other people

7    were involved with a certain complaint I was dealing

8    with, or sometimes a prolific offender would -- or a

9    focus offender would, you know, become known in my

10   complaint.  Sometimes it's not always, you know, what I

11   mean --

12        Q.   What do you mean become known?

13        A.   They'll relocate from property to property.

14   I've had one that he pops up -- he would pop up at a few

15   different properties.  Like he's went from one side of

16   the neighborhood and he's all the way across town on the

17   other side of the neighborhood living.  You know what I

18   mean?

19        Q.   Uh-huh.  Like he was moving addresses or --

20        A.   Right.

21        Q.   Okay.

22        A.   Right.

23        Q.   What other kinds of information would you

24   provide in the meetings?

25        A.   Just basically, you know, just whatever

1    complaint I was working.

2        Q.   Okay.  During the meetings you would sometimes

3    provide information that you had gathered on prolific

4    offenders?

5        A.   Or -- yeah, or complaints I was working.

6    Sometimes they weren't -- there wasn't prolific

7    offenders involved, but it was like maybe a community

8    issue that the district needed to be aware of.

9        Q.   But part of it was you providing information on

10   prolific offenders?

11       A.   Right.

12       Q.   Okay.  Was it part of your job to gather

13   information about prolific offenders?

14       A.   Yeah, yeah.

15       Q.   Okay.  Where would you document that

16   information other than perhaps at an AIM meeting?

17       A.   There was a global profile sometimes that they

18   would have it, sometimes to an analyst, it depends -- an

19   analyst, district analyst, CAD notes, you know, things

20   like that.

21       Q.   So when you say to analysts, would that mean

22   you sending an email to them or something?

23       A.   Email, right.  Email or sometimes in person.

24   It depends.

25       Q.   But you would pass that information on to

1    analysts?

2        A.   Right.

3        Q.   Okay.

4        A.   Yeah.

5        Q.   Would you ever document it in a -- document the

6    information gathered about prolific offenders in a field

7    contact report?

8        A.   Excuse me.  Sometimes, but rarely.  I didn't

9    really do a lot of FIR's.

10       Q.   Okay.  What about an intel report?

11       A.   Intel reports?  I didn't do a lot of those

12   either.  I didn't do a lot of intel reports.

13       Q.   Okay.

14       A.   Unless it was like a long, you know,

15   investigation.

16       Q.   What about TipSoft?  Did you enter anything

17   like that?

18       A.   That's how we like -- that's how we got like

19   assigned our tips, and then we would close them out.

20   Yeah, we did use that for a little while.  Yeah, I

21   forgot about that program.

22       Q.   What do you use now for tips?

23       A.   I don't recall.  I don't know.  Honestly, I

24   don't remember what it is now.

25       Q.   But you would generally pass on information

1    that you learned about prolific offenders in the form of

2    tips; is that right?

3        A.   I don't think I ever have.  I've closed out my

4    complaints like through there, but I've never -- I don't

5    think so.

6        Q.   Okay.

7        A.   I don't remember to be honest with you.

8        Q.   So you just wouldn't use the tips to pass on

9    the information.  You would use, like you said, global

10   profile and emails to analysts primarily?

11       A.   Yes.

12       Q.   Okay.  What training do you have to go through

13   to be a code enforcement corporal?

14       A.   I did -- there was a -- there was a code

15   enforcement corporal before, and we had to ride -- you

16   know, to ride with him and pretty much get trained by

17   him, and then we rode with the County I believe a little

18   bit too.

19       Q.   Okay.  So it was --

20       A.   And some time in field.  We would go do time in

21   the field with them.

22       Q.   Okay.  Was it primarily field training like

23   that?

24       A.   Yeah.  I mean, as a deputy, you can do code

25   enforcement action on your own, which I did do

1    occasionally in the Dade City area.

2         Q.    Was this when you were on patrol?

3         A.    Correct.

4         Q.    Okay.  When would you use code enforcement when

5    you were on patrol?

6         A.    Just to do activity.  Just to get activity.

7    Just to do -- you know, because there was a -- you know,

8    some areas where, you know, more deplorable than others.

9    You know what I mean, a little more run down.  You know,

10   the one street on the house with all the garbage out

11   front, we would use that.  We would use it to address

12   situations like that.

13        Q.    Other than doing field training, did you have

14   to review any other documents to become a code

15   enforcement corporal or sit through any other types of

16   formal training?

17        A.    Yeah.  You learned Land Development Code, you

18   know, obviously the ordinances, and also there was a --

19   you know, a field training book the code corporal had.

20        Q.    A field training book specifically for --

21        A.    Code enforcement.

22        Q.    -- code enforcement?

23        A.    Yeah.

24        Q.    Okay.  And was that just called a code

25   enforcement manual, or what was that called?

1      A.   Yeah, I think it was -- I think it was a manual

2  he made up.

3      Q.   Who's he?

4      A.   The code corporal before.

5      Q.   What's his name?

6      A.   Corporal Madden.

7      Q.   Okay.  Was he the district one code enforcement

8  corporal before you?

9      A.   I believe he was all over the whole entire

10  Pasco County.

11     Q.   Okay.  Is he still?

12     A.   No.

13     Q.   Okay.  So he was in charge of all of code

14  enforcement --

15     A.   Right.  He was doing --

16     Q.   -- by the Sheriff's Office?

17     A.   Correct.

18     Q.   Okay.  Is he employed at Pasco anymore?

19     A.   Yes.

20     Q.   What is his current position?

21     A.   I couldn't tell you.  I'm not sure.

22     Q.   Okay.  But he was the one that created the code

23  enforcement manual?

24     A.   Right.  He had a manual.  Yeah.

25     Q.   Okay.  Was there any other training other than

1    field training and reading that manual that we

2    discussed?

3        A.   Yeah, that was basically it.

4        Q.   Okay.

5        A.   Yeah.  We did go through crime prevention

6    through environmental design courses too through the

7    Attorney General's office.

8        Q.   Crime prevention for environmental design?

9        A.   Yeah.

10       Q.   Okay.  Did part of your training include

11   reading the ILP manual?

12       A.   Yes.

13       Q.   Okay.  Have you ever served as a field training

14   officer before?

15       A.   In the jail.

16       Q.   Okay.

17       A.   In the jail I have.

18       Q.   Just in the jail?

19       A.   Just in the jail.  Yeah.

20            MS. BROTHERS:  Okay.  I think we can take like

21       a five-minute break.

22            (Short break.)

23   BY MS. BROTHERS:

24       Q.   So before the break we were talking about the

25   training that you went through as a code enforcement

1    corporal.

2        A.   Yes.

3        Q.   Were you ever tested on your knowledge of the

4    code of ordinances?

5        A.   No, there was no test, no.

6        Q.   Were you expected to be knowledgeable of the

7    code of ordinances?

8        A.   Correct.

9        Q.   Okay.  Is it fair to say that as a code

10   enforcement corporal, you had like a specialist's

11   knowledge in code enforcement?

12            MR. POULTON:  Object to the form.  Go ahead.

13       A.   Yeah.

14   BY MS. BROTHERS:

15       Q.   What was your answer?

16       A.   Yes.

17       Q.   Okay.  And returning to the June 6, 2018,

18   incident at 1417 Amanda Avenue --

19       A.   Uh-huh.

20       Q.   -- you mentioned on the body-worn camera video

21   that you were there because Tyler had felony PC; is that

22   right?

23       A.   Correct.

24       Q.   Okay.  What was the probable cause there?

25       A.   Grand theft.

1    Q.   Grand theft of what?

2    A.   I believe it was involved in a -- maybe a kayak

3    or something to that effect.

4    Q.   Okay.  So he had -- you had probable cause to

5    believe that Tyler Paneson had stolen a kayak?

6    A.   Right.

7    Q.   Okay.  And when you came to Darlene Deegan's

8    property at 14137 Amanda Avenue, we talked about when

9    you stepped over Darlene's fence and onto the property

10   and at that point you just had probable cause; right?

11   A.   Correct.

12   Q.   And so when you stepped over Dolly's fence and

13   onto the property, you thought that Tyler -- you knew

14   that Tyler had probable cause because he was suspected

15   of stealing a kayak, and you thought that he might be in

16   the yard?

17   A.   Well, it was known he was in the RV.  So he was

18   known to stay in the RV.  I wasn't certain it was all

19   the same property.  It looked like a thoroughway, so

20   that's why we went towards that way, and he was seen by

21   a neighbor recently before we got there.

22   Q.   Was the RV on Dolly's property?

23   A.   Yes.  After gathering everything, yeah, it's

24   all one property.  It wasn't -- 'cause it sits a little

25   way from the actual -- where my vehicle was.  It's a

1   large -- pretty large lot.

2       Q.   Uh-huh.  So you stepped over the fence because

3   you thought that Tyler might be in the RV?

4       A.   In the -- right, in the RV.

5       Q.   Did you have any reason to think that Tyler was

6   fleeing?

7       A.   Yes, because, like I said, he was --

8   information was he was seen earlier, and that's the

9   location we came from.  It was, I believe, a store, a

10  pawnshop, something like that.

11      Q.   But you thought he was inside the RV as you

12  were looking at it?

13      A.   As -- right.

14      Q.   So you didn't see him --

15      A.   No.

16      Q.   -- leaving the RV?

17      A.   No.

18      Q.   Okay.  Did you have any reason to think that

19  Tyler was destroying evidence?

20      A.   Not at that time, no.

21      Q.   Okay.  Did you often enter a property looking

22  for code violations if you just had probable cause?

23         MR. POULTON:  Object to the form.

24      A.   No.  No.  I mean, that property was kind of

25  unique, but no -- every property's rather different.

1    That was a different type of situation.  No, not that I

2    can recall, no.

3    BY MS. BROTHERS:

4        Q.   Did you often go onto a property to look for

5    code violations without a warrant?

6        A.   No.

7             MR. POULTON:  Object to the form.  I'm sorry.

8        I objected.  I didn't hear the answer.

9        A.   No.

10            MR. POULTON:  Thank you.

11            MS. BROTHERS:  Did you have something?

12            MR. BARGIL:  No.

13            MS. BROTHERS:  Okay.  If you don't have

14        anything else, Rob, do you want to convene really

15        quickly or --

16            MR. JOHNSON:  Yeah, why don't we chat real

17        quick.

18            MR. POULTON:  Just an FYI.  This other

19        gentleman is going to be here in seven minutes for

20        his depo.

21            MR. BARGIL:  We're probably not going to be

22        able to start at the dot of one.

23            MR. POULTON:  I have no way to get ahold of him

24        though, so --

25            MR. BARGIL:  Well, he'll be in the lobby.

1          (Short break.)

2    BY MS. BROTHERS:

3        Q.   Okay.  So during the visit to 14137 Amanda

4    Avenue on June 6, 2018, after you stepped over Dolly's

5    fence, did you walk around the property?

6        A.   No.

7             MR. POULTON:  Object to the form.  Go ahead.

8        A.   Kind of went straight towards the RV, the --

9    the direction the RV was in and then, you know,

10   evaluated and realized it was all one property, and

11   exited off the property.

12   BY MS. BROTHERS:

13       Q.   Did you walk around and look at code violations

14   before you exited the property?

15       A.   On the way out, you could see them.  No, I

16   didn't walk around the property, just walked up, walked

17   out.

18       Q.   So after you walked up to the RV, did you

19   observe the code violations around Dolly's yard?

20       A.   Right.  Yeah.  And then -- and then we exited

21   off the property after that, yeah.

22       Q.   Okay.  So before the break I asked if you went

23   out on -- went to people's properties to look for code

24   violations without a warrant.  Is this the only occasion

25   in which you went onto a property without a warrant to

1    look for code citations?

2        A.   You mean code violations?

3        Q.   I'm sorry.  Yes.

4        A.   Did I need a warrant to do that?  Is that what

5    you're asking?

6        Q.   Were there other occasions when you went onto

7    private property looking for code violations without a

8    warrant?

9        A.   Without a warrant?  You wouldn't really need a

10   warrant to look for code violations.  That's why I don't

11   understand.

12       Q.   Okay.  What would you need to look for a code

13   violation?

14       A.   Sometimes you don't even have to go on the

15   property.  You could see them from the abutting property

16   or from the roadway.  It depends.

17       Q.   But to go onto a property and look for code

18   violations, you're saying that you wouldn't need a

19   warrant?

20       A.   A warrant -- well, I mean, most of the time

21   property owners will give you permission to go onto the

22   property.

23       Q.   Were there other occasions when you went onto

24   property to look for code violations without a warrant

25   or consent?

1      A.    No.

2      Q.    Did you get a warrant or consent every time you

3  wrote a code violation?

4      A.    No.  Consent?  Yeah, you would get consent, or

5  sometimes you wouldn't even go onto the property.  There

6  was times where you just didn't have to go onto the

7  property for the violation.

8      Q.    Yeah, I should have specified.  Every time you

9  go onto a private property to look for code violations,

10  every time you've done that as a code enforcement

11  corporal, did you get a warrant or consent each time?

12      A.    Consent.

13          MR. POULTON:  Object to the form.  Asked and

14      answered.

15  BY MS. BROTHERS:

16      Q.    What was your answer?  I'm sorry.

17      A.    Yeah, consent.  Yeah, consent.  Yeah.

18      Q.    Okay.  But before you -- sorry.  Excuse me.

19  But in this instance, you did not have a warrant or

20  consent before you stepped over Dolly's fence?

21      A.    Right.  I didn't know it was her fence.  Like I

22  said, I didn't know it was all one property.  It looked

23  like a thoroughway to an abutting property or easement

24  or something like that.  You know what I mean?  Then

25  once I realized, hey, this is all one property, exited

1    off the property and addressed it with her.

2        Q.   After you walked up to the RV and observed the

3    code enforcement violations?

4        A.   Right.  There were -- yeah, everything was

5    observed.  Yeah.

6        Q.   Okay.  So after you were on the -- after you

7    had stepped over the fence, did you determine that you

8    needed a warrant or consent to be there?

9        A.   Once it was all one property, yeah.

10       Q.   Okay.  So why were you looking at code

11   violations?

12       A.   Well, they were visible from both sides of the

13   property.  There was multiple violations.

14       Q.   But you observed some of them when you were in

15   the yard --

16       A.   Right.

17       Q.   -- after you had crossed the fence?

18       A.   Right.  And once I exited off the property, we

19   addressed all of them.  Why address just one and not the

20   others?  It just doesn't make sense.

21       Q.   Sure.

22           MS. BROTHERS:  Okay.  Do you have anything

23       else?

24           MR. BARGIL:  No.

25   BY MS. BROTHERS:

1    Q.   Okay.  That's all I have for now.

2    A.   Okay.

3    Q.   I think we've mentioned this, but --

4         MR. JOHNSON:  Could we take another quick

5    break?  I know we have another deponent, but I just

6    -- I think we might have a couple more things that

7    we might want to go through.  If you don't mind,

8    could we just have a quick break before you call it?

9         MS. BROTHERS:  Sure.

10        (Short break.)

11   BY MS. BROTHERS:

12   Q.   All right.  So we're going to look back at

13   Exhibit H.  We're just going to watch the whole video.

14        All right.  So I'm starting from the zero mark

15   in the very beginning.

16        (Video was played at this time.)

17        (Video was paused at this time.)

18   BY MS. BROTHERS:

19   Q.   So at this point you're stepping over Dolly's

20   fence?

21   A.   Uh-huh.

22   Q.   And it looks like you stepped on a chair to get

23   into Dolly's yard?

24   A.   Right.  It was like a step up, yeah.

25   Q.   Okay.

1      A.   Like a thoroughway.

2      Q.   So it was too high to step over without the

3   chair?

4      A.   Because it was like worn.  It looks like it's

5   been used to go on and off.

6      Q.   Okay.  So you just entered the yard; right?

7      A.   Right.  I didn't realize it was all one yard at

8   that point.

9      Q.   Right.

10          (Video was played at this time.)

11   BY MS. BROTHERS:

12      Q.   Okay.  So we're passing a bunch of stuff piled

13   right here; right?

14      A.   Right.

15      Q.   Okay.  Looks like a table and some chairs?

16      A.   Uh-huh.

17      Q.   Okay.

18          MR. POULTON:  I'm going to object to the form

19      to just a running description of what's in the

20      video.  The video speaks for itself.  If you have a

21      question about what he observed, that's fine.  But

22      just repeating what's on the video I object.  Go

23      ahead.

24          (Video was played at this time.)

25   BY MS. BROTHERS:

1      Q.   And it looks like that's Dolly's house right

2   there?

3      A.   To the right?

4      Q.   Yes.

5      A.   Right.

6      Q.   Which you're walking past?

7      A.   Yeah.  Later identified, yeah, it is.  At that

8   time I wasn't sure.

9           (Video was played at this time.)

10           (Video was paused at this time.)

11   BY MS. BROTHERS:

12      Q.   Is this the RV that you thought Tyler was in?

13      A.   Uh-huh.  Right.

14           (Video was played at this time.)

15           (Video was paused at this time.)

16   BY MS. BROTHERS:

17      Q.   That was you knocking on the trailer --

18      A.   Uh-huh.

19      Q.   -- where you thought Tyler was?

20           (Video was played at this time.)

21           (Video was paused at this time.)

22   BY MS. BROTHERS:

23      Q.   Did you just say you couldn't hear anything?

24      A.   I believe.  I don't know.

25      Q.   Is that what it sounds like you said on the

1    video?

2         MR. POULTON:  Object to the form.

3    A.   Honestly, I don't know.  I wasn't listening to

4    that part.

5    Q.   Going back a second starting at about the 4:31

6    mark.

7         (Video was played at this time.)

8         (Video was paused at this time.)

9    BY MS. BROTHERS:

10   Q.   Did you hear that?

11   A.   "Don't really hear anything."  I think I might

12   have said that, yeah.

13   Q.   Yeah.  Resuming.

14        (Video was played at this time.)

15        (Video was paused at this time.)

16   BY MS. BROTHERS:

17   Q.   Okay.  So there at the about 6 minutes and 8

18   second mark were you taking a picture there?

19   A.   Yeah.

20   Q.   Okay.  And were you walking around to the back

21   of the trailer?

22   A.   The RV, yeah.

23   Q.   Yes, the RV.

24        (Video was played at this time.)

25        (Video was paused at this time.)

1    BY MS. BROTHERS:

2        Q.   At about the 6 minute, 30 second mark, are you

3    knocking on the back of the RV there?

4        A.   Yeah.

5             (Video was played at this time.)

6             (Video was paused at this time.)

7    BY MS. BROTHERS:

8        Q.   Just going to rewatch this part starting at

9    about 5:48.

10            (Video was played at this time.)

11            (Video was paused at this time.)

12   BY MS. BROTHERS:

13       Q.   And this deputy is walking over here by Dolly's

14   house?

15       A.   He was walking over towards that undeveloped

16   part.  It's like more of a wooded area that way.

17       Q.   Is that Detective Pfenninger?

18       A.   Correct.

19            (Video was played at this time.)

20            (Video was paused at this time.)

21   BY MS. BROTHERS:

22       Q.   All right.  So about the 7 minute, 10 second

23   mark, you said there are a ton of violations here?

24       A.   Right.

25            (Video was played at this time.)

```
1              (Video was paused at this time.)

2    BY MS. BROTHERS:

3        Q.    And right now you're by Dolly's house --

4        A.    Right.

5        Q.    -- right there?

6              (Video was played at this time.)

7              (Video was paused at this time.)

8    BY MS. BROTHERS:

9        Q.    So we're at about the 8 minute mark, and you

10   were stepping back over the fence?

11       A.    Uh-huh.

12       Q.    So you spent about 8 minutes on the property?

13       A.    Uh-huh.

14       Q.    Is that yes or no for the record?

15       A.    Yes.  I apologize.

16             (Video was played at this time.)

17             (Video was paused at this time.)

18   BY MS. BROTHERS:

19       Q.    And you just said, "No answer," at about the

20   8:10 mark?

21       A.    Right.  Because a deputy came around from the

22   other side.

23       Q.    Had he just knocked on the front door?

24       A.    Possibly.  I don't know.

25       Q.    Would he have just gone around to the front of
```

1    the house?

2        A.    It looked like it, yeah.    That's when we

3    realized it was all one property, one physical address.

4            (Video was played at this time.)

5            (Video ended.)

6    BY MS. BROTHERS:

7        Q.    Okay.    In this video in the 8 minutes that you

8    were on the property, was there any discussion of

9    whether there were two parcels of property or whether --

10   or mention of a thoroughfare?

11       A.    No, I don't --

12            MR. POULTON:  Object to the form.  Video speaks

13       for itself.  Go ahead.

14       A.    Yeah, I don't recall seeing that, no.

15   BY MS. BROTHERS:

16       Q.    Okay.

17            MS. BROTHERS:  Okay.  Rob, Ari, did you all

18       have anything else?

19            MR. JOHNSON:  I'm good.

20            MR. BARGIL:  Likewise.

21            MS. BROTHERS:  Okay.  So like we said before,

22       we don't -- we're leaving this deposition open.  We

23       don't expect to have to haul you back in and ask you

24       more questions, but we're leaving it open just in

25       case because discovery is ongoing, but other than

```
 1        that we're done for today.

 2                THE WITNESS:  Okay.  Do I keep this?

 3                MS. BROTHERS:  She keeps it.

 4                MR. POULTON:  He will read.

 5                    *  *  *  *  *  *

 6                (THEREUPON, THE TAKING OF THE DEPOSITION WAS

 7        CONCLUDED AT 1:34 P.M.)

 8                    *  *  *  *  *  *

 9                    S T I P U L A T I O N

10        It was thereupon stipulated and agreed by and

11  between counsel present for the respective parties and

12  the deponent that the reading and signing of this

13  deposition is not waived.

14                    *  *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25
```

1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA

3    COUNTY OF PASCO

4         I, the undersigned authority, certify that

5    PEDRO OJEDA personally appeared before me and was

6    duly sworn on January 12, 2022.

7         WITNESS my hand and official seal this 6th

8    day of February, 2022.

9

10

11    _____
                            Judy Anderson
12                          Notary Public - State of Florida
                            Commission No.:  GG 276821
13                          My Commission Expires:  1-5-2023

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF PASCO

I, JUDY ANDERSON, Court Reporter, certify that I was authorized to and did stenographically report the foregoing deposition and that the transcript is a true record of the testimony given by the witness.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 6th day of February, 2022.

Judy Anderson, Court Reporter

1   DALANEA TAYLOR; TAMMY
    HEILMAN; DARLENE DEEGAN;
2   and ROBERT A. JONES, III,

3     Plaintiffs,

4   vs.                        Case No.: 8:21-cv-00555-SDM-CPT

5   CHRIS NOCCO, in his
    official capacity as
6   Pasco County Sheriff,

7     Defendant.
    _____/

8

9

10                  DEPONENT'S SIGNATURE PAGE

11

12        I HAVE READ THE FOREGOING TRANSCRIPT OF MY

13    DEPOSITION AND HEREBY SUBSCRIBE TO THE FOREGOING

14    DEPOSITION, SAID SUBSCRIPTION TO INCLUDE ANY

15    CORRECTIONS AND/OR AMENDMENTS HERETO.

16

17
    _____    _____
18  PEDRO OJEDA                          Date

19

20

21

22

23

24

25

```
 1                            ERRATA SHEET

 2     PAGE      LINE                    CORRECTION

 3     _____    _____    _____

 4     _____    _____    _____

 5     _____    _____    _____

 6     _____    _____    _____

 7     _____    _____    _____

 8     _____    _____    _____

 9     _____    _____    _____

10     _____    _____    _____

11     _____    _____    _____

12     _____    _____    _____

13     _____    _____    _____

14     _____    _____    _____

15     _____    _____    _____

16     _____    _____    _____

17     _____    _____    _____

18     _____    _____    _____

19     _____    _____    _____

20     _____    _____    _____

21     _____    _____    _____

22     _____    _____    _____

23     _____    _____    _____

24     _____    _____    _____

25     _____    _____    _____
```

**A**

**a.m** 1:15 34:21 60:17 72:14 84:15
**Abargil@ij.org** 2:12
**ability** 7:4
**able** 6:16 83:3 96:22
**Absolutely** 37:7
**abutting** 98:15 99:23
**accompanies** 69:15
**Accumulation** 66:7
**action** 31:8 89:25 110:14 110:15
**active** 75:19 76:11
**actively** 37:1 40:15 47:6 47:9,14,17 49:23 50:15 52:15,18 53:17
**activity** 17:23 33:24 79:21,21 80:10 90:6,6
**actual** 15:18 31:21 94:25
**add** 6:9
**added** 33:7
**addiction** 19:19
**additional** 33:1,6
**address** 5:25 19:14 22:1 49:22 52:11,13 55:6 57:18 59:3,16 60:22 60:24 66:9 73:19 90:11 100:19 107:3
**addressed** 61:18 64:4 76:19,25 100:1,19
**addresses** 86:19
**administrative** 13:20,22
**advised** 64:20
**agencies** 40:16
**agency** 13:21 64:21
**agent** 26:21 27:23
**aggressive** 18:8
**ago** 8:1 9:5 12:13,14 14:10 43:22 85:9
**agreed** 5:22 6:10 7:1 108:10
**agreements** 13:23
**ahead** 5:19 6:6 21:10,11 21:20 29:7,7,19 31:25 44:11,21 46:1 47:22 48:10 52:3,7,21 53:24 69:11,12 74:22 85:16 93:12 97:7 102:23 107:13
**ahold** 96:23
**aid** 19:16 26:6 31:5
**aided** 26:7 27:5,8,10 31:1
**AIM** 4:13 80:5,6,9,19 81:2,9 85:8,12,19 87:16
**air** 26:11,22
**allocated** 15:1
**allow** 7:7
**allowed** 61:16
**Amanda** 55:8 57:11 59:22 60:19,21 61:6 61:13 62:11 63:8,23 69:8 93:18 94:8 97:3
**AMENDMENTS** 111:15
**amount** 21:24 43:7
**analyst** 41:7 43:5 79:6,7 87:18,19,19
**analysts** 41:4,12,18,22 44:1 87:21 88:1 89:10
**and/or** 47:4 111:15
**Anderson** 1:19,22 109:11 110:6,19
**animal** 77:14
**answer** 8:12 29:9 44:12 44:22 46:5 49:3 93:15 96:8 99:16 106:19

**answered** 44:24,25 46:2 52:21 99:14
**answering** 8:12,14
**answers** 32:20
**anymore** 91:18
**anyway** 7:16 14:21
**apologize** 106:15
**APPEARANCES** 2:1
**appeared** 109:5
**appearing** 2:2,14 7:2
**approximately** 10:11
**area** 16:19 31:12,12 32:23 33:20 34:13 40:3 61:11 90:1 105:16
**areas** 41:14 90:8
**Ari** 2:10 6:5 107:17
**Ari's** 7:12
**Arlington** 2:7
**arrests** 43:7
**Art** 45:14
**articulate** 5:17
**asked** 5:24 52:21 53:12 97:22 99:13
**asking** 8:8,13 98:5
**aspect** 23:4
**assessment** 16:9
**assigned** 12:22 13:24 20:19 88:19
**assignment** 32:24
**assist** 19:4 40:17
**assistance** 31:4
**assisted** 26:9,12,13 27:6 28:2
**assisting** 18:10
**associate** 52:5,14
**associates** 47:7,10,15,18 49:24,24 50:15,19 51:3,5,8,12 52:16,19 53:18,22
**associating** 51:19,25
**assorted** 16:8 18:10,11 18:13
**attached** 10:14 11:10 66:2 67:12 71:21
**attachment** 79:12,17,20 80:25
**attempt** 12:7
**attempted** 57:7 64:17
**attend** 85:11,15,19
**attending** 84:23
**attention** 60:2
**attorney** 9:16 83:24 84:3 92:7 110:12,14
**Attorney's** 9:9,17
**authority** 15:14 109:4
**authorized** 110:7
**available** 59:17
**Ave** 69:8
**Avenue** 55:8 57:11 59:22 60:19,21 61:6,13 62:11 63:8,23 93:18 94:8 97:4
**aware** 87:8
**awareness** 20:6
**awhile** 14:17

**B**

**B** 4:1,3 39:11,12
**baby** 57:16
**back** 6:12 12:21 13:25 17:18 24:10 29:14,24 30:12 31:13,14 37:12 39:21 40:2 42:20 43:1 45:3 53:11 60:24 68:20 71:15 101:12 104:5,20 105:3 106:10

107:23
**backyard** 70:9,12,15
**bad** 62:17 70:23
**BARGIL** 2:10 5:16,20 6:6 7:19 42:13,16,18 66:13,20 96:12,21,25 100:24 107:20
**based** 71:18 82:1 83:10
**basically** 29:13 86:25 92:3
**basis** 49:4
**bathe** 57:14
**becoming** 16:21
**beginning** 32:17 38:13 67:2 72:2 101:15
**believe** 13:14,19 17:5 25:8 27:19 29:25 39:3 44:24 45:3 53:14 55:21 58:16 60:23 67:19 68:4 72:8,10 75:1 78:15 81:12 85:11 89:17 91:9 94:2 94:5 95:9 103:24
**Billy** 11:25
**Biscayne** 2:11
**bit** 20:5 26:2 34:25 37:13 56:13,13 89:18
**blitzes** 45:15
**Blvd** 2:11,15
**body** 9:8,15 67:18 69:14 72:6,9 78:15 79:11
**body-worn** 4:9 66:12 93:20
**book** 90:19,20
**Bookalu** 12:1,5
**booking** 16:9
**bottom** 24:11,13,22
**Boulevard** 2:3
**box** 1:23 45:13,14 82:12
**break** 53:6,9 65:22 92:21 92:22,24 97:1,22 101:5,8,10
**breaking** 65:17
**bring** 19:16,17,20 60:2
**broadened** 33:2
**broadly** 25:24
**Brothers** 2:6 3:3 5:7,9,19 7:17,20,23 23:12 29:8 39:13,24 42:12,14,25 44:13,17,20,23 45:2 46:6,11,16,18 47:24 48:13,25 50:8,13 51:24 52:4,9 53:8,10 54:2,11 56:2,15,19,22 57:6,21 58:24 59:1 60:6 62:2,18,25 63:12 63:19 65:2,6,7,14,23 66:11,14,17,23,25 67:7,14 68:1,10,25 69:13,25 70:3,6,7 71:3 71:19,23 72:5,20 73:9 74:15,23 75:22 76:22 77:17 78:18 79:16 80:13 83:17 85:18 92:20,23 93:14 96:3 96:11,13 97:2,12 99:15 100:22,25 101:9 101:11,18 102:11,25 103:11,16,22 104:9,16 105:1,7,12,21 106:2,8 106:18 107:6,15,17,21 108:3
**brought** 73:6,11 76:10
**bullet** 45:10
**bulleted** 45:6
**bunch** 102:12
**Burberidge** 12:1,6

**burglary** 27:10
**businesses** 20:7,8 31:10
**butcher** 12:7
**buys** 34:9

**C**

**C** 4:4 39:22,23 45:3
**CAD** 4:5,7,8 54:16 58:15 60:12 61:24 87:19
**call** 6:12 7:14 13:25 18:23 35:24 43:23 54:15 60:12 61:21 64:17,20 101:8
**called** 36:20 37:4 59:11 59:15 60:1,21 64:20 65:10 70:18 73:1,17 73:18 90:24,25
**calls** 17:16,16 74:2
**cam** 9:8,15 72:6,9 78:15
**camera** 4:9 66:12 67:18 69:14 93:20
**camper** 61:12 64:15,15 64:23 65:9
**canvass** 31:12 37:2
**canvassing** 27:10,11
**capacity** 1:7 37:16 111:5
**captain** 25:21,25
**care** 22:17 29:12
**career** 12:16 43:23
**Caroline** 26:5
**case** 1:6 8:4 9:5,7,10,11 26:10,20,21 27:23 29:16 32:1,2 47:13 48:17 52:22 85:5 86:6 107:25 111:4
**case-by-case** 49:4
**cases** 26:10
**categorized** 81:25 82:10
**cause** 68:12 83:9 93:24 94:4,10,14,24 95:22
**causing** 19:2
**cc'd** 84:9
**Celeste** 84:9
**center** 16:9
**certain** 34:13 35:17 43:12,13 48:12 61:7 86:7 94:18
**Certificate** 3:4,4 109:1 110:1
**certify** 109:4 110:6,11
**Cgbrothers@ij.org** 2:8
**Chagrin** 2:3
**chair** 101:22 102:3
**chairs** 102:15
**change** 11:19,21 22:13 29:3 31:2
**changed** 10:14,16 11:17 11:21 12:1 17:5 34:18 34:25 43:10,11
**changes** 13:12 15:17
**Chapel** 16:19
**charge** 20:21 25:23 91:13
**charges** 37:1 55:21
**chat** 96:16
**check** 31:13 36:15,16,21 37:9 61:16 66:4 73:21
**checks** 36:1,8 37:10 45:20,21,22,24 75:9
**Chiuauas** 68:15,17
**chopped** 58:1
**chopping** 62:17
**choppy** 63:15
**CHRIS** 1:7 111:5
**citation** 29:3,12,20 30:6 30:9,9,14 49:5,6,7,11 62:9

**citations** 4:12 28:11,12 28:16,19 44:10 45:11 45:17,23 46:8 47:19 48:1,21,24 49:16 51:11 52:6 53:13,22 65:24 66:2,3,6 72:22 77:21 78:9 79:23 98:1
**cite** 77:6
**cited** 77:8
**City** 1:23 16:18 90:1
**clarify** 53:20 69:4
**classified** 34:3 42:11
**classifies** 43:14
**classify** 43:5
**clear** 71:12
**clearly** 56:14 65:17
**close** 57:14 88:19
**closed** 89:3
**closer** 38:12 58:24
**Co-counsel** 2:9,13
**coalition** 19:17,22,22,25 20:2
**code** 4:12,10 10:5,7,17 11:6 12:11,21 13:10 13:16 14:6,23 15:8 16:21,23 17:10,19 18:6,14 20:14,15,25 21:8,19 22:5,15 24:17 25:6,14 26:3,5 28:12 28:16,18 29:3 30:23 31:18 33:1,6 37:4,7,8 37:15 38:5,5 39:1,8 44:3,9 45:14,23 46:7,8 47:5,8,12,19,25 48:21 49:16,21 51:8 52:6,13 52:25 53:13,13,16,21 59:7,25 64:3 65:24 71:8 76:3 77:10,21 78:8 79:10,23 80:8,23 85:12 89:13,14,24 90:4,14,17,19,21,22,24 91:4,7,13,22 92:25 93:4,7,9,11 95:22 96:5 97:13,19,23 98:1,2,7 98:10,12,17,24 99:3,9 99:10 100:3,10
**cold** 6:23
**collective** 28:23 31:3
**collectively** 41:14
**colonel** 15:19
**columns** 57:25
**come** 7:9,13 17:10 29:14 29:24 30:11 35:3 37:12 39:21 49:10 52:24 73:2,21
**comfortable** 6:25
**coming** 5:8 18:2 34:10 34:13
**commercial** 19:3 66:9
**Commission** 109:12,13
**commit** 40:21
**committing** 41:24 43:3
**communication** 8:14 22:10,13,23
**communities** 18:1
**community** 13:24 17:21 18:2,22 22:8 87:7
**community-related** 17:23
**compile** 41:4,5
**compiled** 41:6
**complainant** 14:1 18:3 22:10
**complaint** 13:25 14:3 22:17,19 77:14,14,15 86:7,10 87:1
**complaints** 17:22 20:12

73:2 87:5 89:4
compliance 30:11,12
49:10
compressor 26:11
compressors 26:22
concern 7:3
Concerning 58:19
concerns 6:4
CONCLUDED 108:7
conduct 36:1,7,14,15
45:14 50:3,22
conducted 79:22
conducting 35:15 36:21
45:22
confirmed 57:11,17
conjunction 33:22
connected 110:14
consent 70:14 98:25 99:2
99:4,4,11,12,17,17,20
100:8
considered 74:7
constant 22:9
contact 48:3 57:7,12
88:7
containers 66:10
contains 56:8
contemporaneously 7:12
context 57:5
continue 47:3
convene 96:14
Cook@debevoisepoult...
2:17
Coordinate 45:13
coordinating 18:15
copies 62:9
corner 24:11,13,22
corporal 10:5,8,18 11:6
12:12,22 14:6,24 15:9
16:21,24 17:10,19
20:14 21:9 22:15
24:17 26:4,5 30:24
31:18,21 32:12,13
33:7 37:15 38:5,5 39:1
44:3,9 45:13 46:8 47:3
53:13 57:19 59:4,8
85:13 89:13,15 90:15
90:19 91:4,6,8 93:1,10
99:11
corporals 13:11,16,21
25:6,14 33:1 39:8
correct 46:2 54:22 59:7
59:9 60:20 61:2,21
63:14 65:12 66:5 68:3
69:5,9 70:19 72:22
77:19 79:13,19,24
80:6,10,20 81:1,20
82:17 84:4 90:3 91:17
93:8,23 94:11 105:18
CORRECTION 112:2
CORRECTIONS
111:15
counsel 2:5,18 5:21
108:11 110:12,14
county 1:8 9:9,12,16,17
9:23 12:25 13:3,11
17:9,11 18:5,14 19:16
19:25 20:4,15,16,17
20:20,25 22:1 23:5
45:11,16 57:18 59:4
59:12,20,21 61:5 63:9
63:21,22 74:8,11,25
75:6 78:3 83:24 84:2,3
89:17 91:10 109:3
110:4 111:6
County's 28:25
couple 12:18 17:4,7
23:18 101:6

course 6:19
courses 92:6
court 1:1,19,22 12:4
42:20 72:13 110:6,19
courthouse 72:14
cover 31:12
covered 20:17
COVID 6:24
created 91:22
crime 21:6,7,8 22:6,23
26:10 31:23 33:18
40:18,21,23 41:24
43:4 50:3 80:18 92:5,8
crimes 10:6,12,15,16
11:1,7,11,13,16,16,23
13:19 24:14,25 25:7
26:4,8,14,17 27:18,24
28:1,8,13 37:14,23,25
41:9 50:22 59:7,11,24
criminal 21:5
criminals 40:21
crossed 100:17
current 38:19 53:1 91:20
currently 9:22
curve 21:11,20
custody 77:25
cutting 56:12 63:17

D

D 3:1 4:5 54:10
D1 79:10
Dade 1:23 16:18 90:1
daily 40:23
DALANEA 1:3 111:1
Darlene 3:9 14 61:14
64:18,19,20,20 65:10
65:24 66:3 69:2,8
70:12,14,18 72:21
76:23 77:10 81:14
84:15,19,23 94:7
111:1
Darlene's 94:9
date 1:14 54:18 60:14
67:13 69:4 71:22 82:1
111:18
date's 72:13
dated 81:9 110:17
day 55:23,24 58:15 72:7
77:18 78:9 109:8
110:17
days 29:14,23,24 81:13
81:21 82:14,18,22
deal 6:16
dealing 18:1,12 31:6,11
86:7
dealt 17:21 18:9 21:4
31:23 36:18
Debevoise 2:14
debris 66:7
decide 28:18 29:17 73:21
decided 15:8 73:2
decision 15:9,18 25:17
25:20 29:3
deck 27:13
Deegan 1:3 9:14 61:14
64:18 65:10,24 66:3
70:18 72:16,21 73:1,5
73:17,20 74:1,5,9,13
75:20 76:12,15 84:15
84:20,24 111:1
Deegan's 69:2,8 70:12,14
81:15 94:7
Defendant 1:9 2:18
111:7
definitive 36:12
demeanor 28:21 29:2
demolish 21:15

Denise 57:13,16
department 16:9
depend 29:25 30:6 37:2
depended 18:21 35:5
36:25 37:11 49:6
depending 14:2 31:6
51:13
depends 14:4 18:17
19:15,18 22:3 27:12
28:20,24 29:10 30:12
31:23 36:24 37:19
38:8 41:6 43:4 48:4,7
48:15 51:17 87:18,24
98:16
deplorable 21:16 90:8
depo 96:20
deponent 5:21 101:5
108:12
Deponent's 3:5 111:10
deposition 1:12 5:12,24
6:10 7:15,25 8:24
107:22 108:6,13 110:8
111:13,14
depositions 6:22
deputies 31:20 34:20
35:23 36:21 45:22
56:8 59:10,11,25
deputy 31:19 33:21
58:11 67:5,24 68:22
69:21 70:25 89:24
105:13 106:21
description 102:19
design 92:6,8
designated 67:12 71:21
destroying 95:19
DET 67:4,23 68:7,15,17
68:19 70:23 71:1
72:13,18,25 73:3,6,18
73:23 74:4,6,10 75:17
76:10,14,18
detective 10:1 12:12,19
14:17,20 26:9,18
44:22 64:12,13,22
65:8 69:19,20 105:17
detectives 26:17 38:1
determine 100:7
develop 40:19
developing 47:16
Development 90:17
dictate 35:7
differ 20:15,25 30:24
difference 11:15 28:10
28:11
differences 26:3
different 10:25 11:18
14:20 20:16 22:19
30:16 31:18 34:14,22
38:9 86:15 95:25 96:1
Direct 3:3 5:6
directed 65:19
direction 97:9
directly 23:6
disconnect 78:16
disconnected 44:19
discovery 7:8 56:6
107:25
discuss 84:14
discussed 69:12 92:2
discussing 69:8
discussion 23:11 42:19
42:24 46:17 63:18
65:21 107:8
distributed 44:1
district 1:1,1 7:6,7 12:23
12:24 13:1,1,6,9 17:12
17:13 20:17,22 23:2
25:12,13,21,25 27:13

28:7 33:1,11 38:5,9
41:8,8 46:12 55:12
59:25 79:7 80:8 81:7
81:19 83:1 87:8,9,19
91:7
districts 17:5 22:14
divided 20:21
division 1:2 10:15
document 6:17,18 23:14
39:25 54:12 56:3
57:22 60:7 62:3 80:14
83:19 87:15 88:5,5
documents 7:11 8:9 9:20
70:1 90:14
doing 1:21 16 18:22,23
27:11 35:16 37:18
90:13 91:15
Dolly's 94:12,22 97:4,19
99:20 101:19,23 103:1
105:13 106:3
door 22:12 64:23 106:23
dot 96:22
Drive 1:17
drug 13:13,17 15:2,3
17:22,23 19:19 21:11
33:19
drugs 21:15,15
Due 40:20
duly 5:2 109:6
duties 10:25 13:20,22
26:8 39:6 47:5,9 53:16
54:8

E

E 2:2 3:1 4:1,6 38:13
46:22 47:1 55:25 56:1
EAP 31:7
earlier 6:2 53:12 95:8
easement 99:23
east 17:9,12
effect 94:3
effort 31:3
eight-to-five 34:23
either 6:23 17:21 18:7
41:4 88:12
elaborate 6:20
elderly 50:24
electric 64:16
element 21:5
eliminate 15:8,14
eliminated 14:8,12,24
email 4:11,14 22:25
78:23,24 79:1,11,17
80:25 83:22 84:5,7
87:22,23,23
emails 89:10
emerging 40:18
employed 9:22 13:11
91:18
employee 20:15 110:12
110:13
employees 20:11 21:1
encourage 47:3
ended 107:5
enforcement 10:7,18
11:6 12:12,22 13:10
13:16 14:6,24 15:9
16:21,23 17:19 18:6
20:14,15 21:1,8,19
22:6,15 24:17 25:6,14
26:4,5 30:24 31:8,18
37:4,7,8,15 39:1,8
44:3,9 45:14,15 46:7
47:5,9,12 48:1 52:25
53:13,16 59:7 85:12
89:13,15,25 90:4,15
90:21,22,25 91:7,14

91:23 92:25 93:10,11
99:10 100:3
ensure 75:24 78:4
ensuring 76:2
enter 88:16 95:21
entered 56:8 58:6,11
102:6
entire 20:22 91:9
entirely 78:11
entry 58:3
environmental 92:6,8
Errata 3:5 112:1
especially 21:11 30:15
74:11 75:6
ESQUIRE 2:2,6,10,14
eval 23:17
evaluated 97:10
evaluation 38:15 46:24
evening 51:19
everybody 6:25 7:18
evidence 95:19
evolvement 12:16
ex-girlfriend/ 57:15
exact 43:7
exactly 8:2
Examination 3:3 5:6
examined 5:4
example 48:16
Excel 57:22
excessive 21:24
Excuse 88:8 99:18
execute 27:16
Executive 1:17
exhibit 23:8,10,14 39:11
39:12,22,23 45:3
46:20 54:10 55:25
56:1 60:5 62:1 67:11
67:12 71:21 78:17,19
79:15 80:12 83:16,18
85:11 101:13
exist 6:3 52:8
existed 29:1 77:24
existing 42:10
exited 64:17,23 65:9
97:11,14,20 99:25
100:18
expand 13:14
expanded 13:13
expanding 15:1
expect 107:23
expected 38:20 39:19
40:6,15,25 80:7 85:19
93:6
experience 71:18
Expires 109:13
explained 14:25
extension 7:14
Extraction 4:10
Extraction_1.1_code_i...
71:25

F

F 4:7 60:5
face 29:11
fact 7:5 40:20
failure 66:8
fair 36:13 38:20 59:24
93:9
familiar 38:21 39:19
40:7 43:20 55:17
family 50:5
far 28:15
February 109:8 110:17
feedback 32:33
feel 6:21,22
felony 67:4,23 68:4,7
93:21

female 57:12
fence 64:14 69:2 70:9
  94:9,12 95:2 97:5
  99:20,21 100:7,17
  101:20 106:10
field 88:6 89:20,21,22
  90:13,19,20 92:1,13
fifth 65:1
fight 22:6,23
fighting 40:23
financially 110:15
find 43:17
fine 7:15 53:8 70:5 83:3
  102:21
finish 8:11,12
FIR's 88:9
first 5:2 11:25 23:8 24:10
  33:6 40:13,24 63:6,7
  65:16 84:8
five 22:18
five-minute 92:21
fixed 7:14
FL 1:23 2:11,15
fleeing 95:6
flip 40:2
flipping 24:10,19 32:16
Florida 1:1,18,20 63:9
  109:2,12 110:3
focus 33:4 40:11 41:24
  42:8 86:9
focused 33:15,17,20,25
  34:2,6 35:20
folks 18:7 19:11 22:8
  23:4 29:10,16 31:13
  34:11 41:10 43:20
  50:3,24
follow 32:2
follow-up 13:25
followed 75:18,18,24,25
  76:3 78:5,6
follows 5:4
footage 66:12 67:8,10,16
  69:15 72:6,9 78:16
foregoing 110:8 111:12
  111:13
forgot 88:21
form 29:5,6 42:23 44:11
  46:1 47:21,22 48:10
  48:23 50:7,10,11 52:2
  52:7,20 53:23 69:10
  74:20 77:12 85:16
  89:1 93:12 95:23 96:7
  97:7 99:13 102:18
  104:2 107:12
formal 90:16
forth 77:7
forward 7:10 41:18
found 86:6
four 10:9,10 22:18 38:17
fourth 56:25
front 90:11 106:23,25
full 5:10
further 110:11
future 49:6
FYI 96:18

G

G 4:8 32:22 62:1
garbage 90:10
gas 53:6
gather 35:17 41:17 42:6
  42:10 87:12
gathered 86:2 87:3 88:6
gathering 21:10 52:24
  53:3 94:23
general 25:6
General's 92:7

generally 33:4 88:25
gentleman 96:19
getting 38:12 50:17 65:1
  65:3
GG 109:12
give 12:7 29:23 36:12
  48:2 60:7 98:21
given 13:21 110:9
glad 55:3
Glebe 2:7
global 87:17 89:9
go 5:19 6:6 7:10 12:21
  18:24 19:10 20:7,9
  29:6,7,13,19 30:11
  31:13,25 35:25 36:14
  36:15 41:9 42:18 43:8
  44:11,21 46:1 47:22
  48:10 52:2,7,21 53:23
  59:15 67:20 69:11,12
  70:11,15 73:21,25
  74:11,22 75:6,19
  80:17 85:16 89:12,20
  92:5 93:12 96:4 97:7
  98:14,17,21 99:5,6,9
  101:7 102:5,22 107:13
goals 38:14 46:23
going 8:8,9 15:1 17:18
  23:8 26:11 29:12,13
  29:15 34:10,13 35:7
  36:25 37:3,11 39:21
  41:9 45:20 46:19
  55:25 66:11,17 67:10
  67:20 69:10 70:20
  71:19,23 72:1,11
  75:14 78:16 79:14
  96:19,21 101:12,13
  102:18 104:5 105:8
Golf 54:25
gonna 72:14
good 7:18,22 44:20 53:5
  62:24 84:13 107:19
gosh 12:6
Gotcha 13:10 25:4
gotten 30:16 44:19
Government 1:17
Grace 2:6 5:9
grand 55:21 57:8 63:11
  93:25 94:1
great 33:3 65:4,5 82:21
ground 8:5
guess 15:6 17:22 39:6
  48:11 50:21 64:4 67:4
  67:23 81:23
guessing 65:20
guys 34:20 48:17 73:17

H

H 4:1,9 67:11,12 101:13
hand 18:5,5 109:7
Handbook 7:7
hands 27:13
happened 61:8 64:5,9
  77:15
happy 8:17
hard 82:25
hate 6:8
haul 107:23
he'll 15:17 96:25
head 8:16 83:2,7
heading 45:7
hear 46:4 51:21,23 58:22
  58:23 64:11 65:4,4,14
  65:16 96:8 103:23
  104:10,11
heard 65:17
hearing 62:21 84:14,19
  84:23

Heights 2:3
HEILMAN 1:3 111:1
held 10:2 81:11
Hello 44:16
help 27:22 38:4,5 42:1
  63:17
helped 22:9,11,23 27:9
  27:23
HERETO 111:15
hey 99:25
high 102:2
hit 15:2 63:14,16
Holborn@debevoisepo..
  2:17
home 21:16,16 57:9 69:8
  81:15
homeless 19:22 20:2
  48:16,17
homelessness 18:9,11,12
  31:11
homes 56:9
honest 89:7
honestly 12:5,6 22:7 84:6
  84:21 88:23 104:3
hope 6:23,24
hours 11:21 34:18,22
house 33:19,20,22,23
  34:8,8,10,11,17,22
  35:6,14,14,25 36:20
  52:5 57:18 70:12,15
  74:11 75:7 90:10
  103:1 105:14 106:3
  107:1
housekeeping 64:16
houses 17:22,23 21:11
housing 16:8,8 19:17
Hudson 63:9
Huh-uh 35:12
human 20:5,6,9,11

I

identification 23:10
  39:12,23 54:10 56:1
  60:5 62:1 78:17 79:15
  80:12 83:16
identified 18:3 33:19
  42:7 57:15 103:7
identify 18:25 34:11,14
  40:16,25 41:1,10,17
  41:21,23 42:1,4
III 1:4 111:2
ILP 4:3,4 38:18,21 39:9
  43:19 47:4 54:1,3 79:6
  79:10,22 80:4 92:11
impact 31:9
important 40:22 49:17
  52:18
improve 32:23
inaudible 68:18 74:3
  76:12
incident 62:10 66:2 69:7
  69:12,15 81:14 83:12
  93:18
include 47:6 49:25 50:5,9
  50:14 92:10 111:14
included 26:25 47:9
  53:17
indicate 81:22 82:16
  83:8,11
info 81:8
information 21:10 33:4
  34:7 35:17 41:4,5,11
  41:18 42:6,10 47:4,16
  50:17,17 52:24 53:3
  64:12 85:25 86:2,4,23
  87:3,9,13,16,25 88:6
  88:25 89:9 95:8

informed 57:13
initially 73:21
inmate 16:8
inside 57:16,17 95:11
inspections 27:9
instance 99:19
Institute 2:2,6,10
integrated 25:7,15
integrating 39:8
intel 47:16 88:10,11,12
intelligence-led 39:17
interact 44:4 48:5
interacted 49:14
interacting 49:20
interactions 48:20
interdiction 13:13,17
  15:2,3
interested 110:15
interject 6:8
interjecting 29:6
interrogatories 6:3
interrogatory 6:1
interrupt 5:16
introduce 23:8 55:25
introduced 67:11
inventing 47:3
Invest-2 4:10
investigating 44:8
investigation 27:1 52:25
  88:15
investigations 33:3
investigative 26:19 27:3
  28:4
involved 15:20 18:15
  27:14 36:19 46:8 53:1
  86:7 87:7 94:2
involving 28:12
Ioppolo 55:2 58:4,11
issue 7:16 18:22 23:2
  27:13 28:18 29:3,20
  30:6,10,13 31:10
  45:23 47:25 48:21,24
  51:8,11 52:6 53:13,21
  65:24 87:8
issued 28:11 29:10 30:8
  30:9 49:12 66:3 77:20
issues 18:6,10 19:2 21:18
  37:5,7,8
issuing 28:16 44:10
  45:16 46:8 47:19
  72:22 78:8
it'd 37:2

J

J 4:11 78:17,19
jail 11:5 16:2,3 75:19
  92:15,17,18,19
January 1:14 109:6
job 16:6 18:15 20:14
  44:10 45:16,23 46:7
  47:17 49:15,20 53:12
  53:20 54:7 87:12
JOHNSON 2:2 6:5,7
  7:21 42:17 62:21
  66:21 96:16 101:4
  107:19
jointly 34:6 35:20
JONES 1:4 111:2
judge 29:17
Judy 1:19 71:23 109:11
  110:6,19
Judy@andersoncourtr..
  1:24
July 72:14
jump 6:5,7
June 54:20 57:7 58:3,7
  59:22 60:15 62:11

69:5 81:9,9 82:19
  83:13 93:17 97:4
junk 66:7
Justice 2:2,6,10
juvenile 16:9

K

K 4:12 79:15
kayak 94:2,5,15
keep 108:3
keeps 108:3
kind 14:2 19:18 20:18
  26:20 28:23 29:13,16
  31:3 36:18,19 50:21
  50:25 52:22 53:25
  56:18 57:25 86:4
  95:24 97:8
kinda 71:16
kinds 86:23
knew 23:1,3 94:13
knock 35:22 53:3
knocked 64:14,23 65:9
  106:23
knocking 103:17 105:3
know 6:9,11 8:17 10:25
  12:16 13:23,25 14:1,2
  14:23 15:4,7,8,13,16
  15:18 16:7 17:25 18:1
  18:1,2,4,8,9,12,18,19
  18:20,21 19:1,1,3,4,5,9
  19:16,16,18,19,20
  20:7,10,11,19,20,21
  21:4,5,6,7,16,22,24,25
  22:2,8,12,14,15,16,18
  22:18,20,25 23:3,6,6
  25:14,16,17,19,22
  26:7,8 27:7,14 28:21
  28:22,22,23 29:11,15
  29:17,17,18,22,24
  30:3 31:3,4,5,5,7,8,8
  31:10,12,15,15,23
  33:19,20,21,23 34:9
  34:11,12,14,15,16,18
  34:21 35:16,23 37:1
  37:11 38:23 41:3,5,7,8
  41:9,15,24 43:4,7,10
  43:13,23 47:12 48:19
  49:2,3,4,18,18 50:3,18
  50:22,24,25,25 51:1,2
  52:12,23 53:2 56:17
  57:5 63:15 67:18
  69:18,20 76:12 77:15
  83:1 85:1 86:6,9,10,17
  86:25 87:19 88:14,23
  89:16 90:7,7,8,9,9,18
  90:19 97:9 99:21,22
  99:24 101:5 103:24
  104:3 106:24
knowledge 93:3,11
knowledgeable 93:6
known 86:9,12 94:17,18

L

L 4:13 80:12 85:11 108:9
lack 66:8
Land 90:17
large 1:20 18:23 43:4
  95:1,1
late 34:20,21
Lauri 83:25 84:8
law 76:6
Lawless 11:25
laws 75:17,24 78:5
lead 49:5,7,10
leads 26:23 86:6
learned 89:1 90:17

**learning** 43:19
**leaving** 34:10 95:16
  107:22,24
**led** 60:23
**left** 64:19 68:21
**left-hand** 24:13,22
**let's** 8:10 12:10 29:22
  68:5
**letters** 83:1
**level** 41:15
**lie** 13:18
**lieutenant** 25:25
**life** 49:17
**Likewise** 107:20
**limitation** 6:2
**line** 14:18 22:7,22 79:9
  112:2
**lining** 12:18
**list** 4:12 14:22 38:17
  43:25 45:7 79:23 80:7
  80:23 82:14
**listed** 81:18
**listening** 104:3
**little** 17:3 20:5,16 26:2
  34:25 37:13 56:13,13
  62:14,15 72:16,18
  88:20 89:17 90:9
  94:24
**live** 50:9
**living** 19:11 64:13 76:20
  86:17
**lobbies** 20:10
**lobby** 96:25
**local** 7:6 76:4,6
**locate** 63:10
**located** 57:10
**location** 35:17 55:6,22
  60:23 61:10 95:9
**locations** 33:5,15 34:6
  35:21 45:12
**log** 54:15
**long** 10:2,7 15:22 16:4
  28:25 81:23 82:7,9,10
  88:14
**longer** 14:5
**look** 12:9 23:23,25 24:7
  46:19 49:15,21 56:11
  58:1,14 60:7 66:4 72:6
  79:17 81:2 96:4 97:13
  97:23 98:1,10,12,17
  98:24 99:9 101:12
**looked** 9:8 53:15 58:15
  79:18 80:24 81:14
  85:8 94:19 99:22
  107:2
**looking** 23:13 31:24 37:1
  38:13 40:10 45:3,6
  46:22 56:17,25 60:25
  61:1 65:18 69:16 73:4
  73:10 77:11,16,18
  78:19 80:21,23 81:5,7
  81:17 82:12 84:7
  95:12,21 98:7 100:10
**looks** 23:17,18 32:17
  42:14 54:15 58:6,11
  65:8 66:5 78:24
  101:22 102:4,15 103:1
**lose** 42:12 63:12
**lost** 46:14
**lot** 17:21 21:22,23 22:9
  22:11 73:23 88:9,11
  88:12 95:1
**loud** 57:4 64:11
**loudly** 56:14 62:15
**low-level** 17:22

---

**M**

**M** 4:14 83:16,18
**ma'am** 11:3 16:22 25:18
  66:1 67:9,17 69:17
  81:10 83:14 85:3,14
**Madden** 45:14 91:6
**major** 15:19
**MALE** 68:16,18,20,23
**mama** 57:16
**managed** 31:20,22 32:10
**manager** 32:3 51:15
**mandatory** 72:13
**manipulate** 51:1
**manpower** 19:4 31:11
**manual** 4:3,4 38:18,19
  38:21,22,24 39:2,17
  39:18 40:4,6 43:19
  45:4,19 54:1,3 90:25
  91:1,23,24 92:1,11
**mark** 67:21 70:21 72:11
  75:15 76:8 84:9
  101:14 104:6,18 105:2
  105:23 106:9,20
**marked** 23:10 39:12,23
  54:10 56:1 60:5 62:1
  78:17 79:15 80:12
  83:16
**math** 82:20
**mean** 9:6 13:22 21:20,21
  22:11,24 26:6,13 27:8
  28:17 30:2,5 31:1,20
  32:12,20 33:17 34:2,5
  35:22 36:2,17,25 37:2
  39:4 42:4 43:22 47:8
  48:11,19,19 49:12
  50:2,22,23 52:8,11
  53:25 59:15 64:2,5
  76:3 77:13 80:19 81:8
  82:1,18 86:2,11,12,18
  87:21 89:24 90:9
  95:24 98:2,20 99:24
**meant** 24:25 25:3
**meeting** 79:22 80:4,5,6,9
  80:17,19 81:11 87:16
**meetings** 41:8 85:12,19
  85:21 86:1,24 87:2
**member** 46:20 52:15
  53:15,21 54:3,5,6
**member's** 38:15 46:23
**members** 30:25 32:4
  40:16 50:5
**mention** 107:10
**mentioned** 27:4 33:15
  39:7 45:20 61:19
  93:20 101:3
**Miami** 2:11
**mic** 63:17
**middle** 1:1 7:6,7 55:10
  82:13
**mind** 101:7
**mine** 67:19
**minute** 23:21 70:20
  105:2,22 106:9
**minutes** 62:16 96:19
  104:17 106:12 107:7
**missed** 45:1
**missions** 40:19 45:13
**Mmm** 53:19
**mobile** 57:9,9,16
**moment** 17:24 37:20
  85:8
**month** 40:20
**months** 10:3 12:12,14
  14:4,10 18:21 22:19
**morning** 5:8 34:21 84:13
**mother** 64:18
**mother's** 57:10,17
**motion** 84:14,19,23

---

**move** 16:12 21:14 22:14
  58:24
**moving** 86:19
**mp4** 4:10
**MPR** 4:2
**multiple** 100:13
**mute** 63:14,16

---

**N**

**N** 2:7 3:1 108:9
**name** 5:9,10 12:8 54:23
  55:1,17,18 61:20,22
  81:21 82:13 91:5
**names** 12:3
**narrative** 63:2,4
**nature** 14:1
**necessarily** 47:11 60:22
**need** 5:25 6:21 66:13
  98:4,9,12,18
**needed** 15:6,7 31:3,11
  38:4 87:8 100:8
**negative** 6:25
**neighbor** 64:19 74:2
  94:21
**neighborhood** 18:24
  27:11,12 86:16,17
**neighbors** 57:11,17
  61:11
**network** 50:1
**never** 39:7 89:4
**new** 1:17,18 47:3 86:6
**nine** 10:3 12:12,14 14:9
  14:10 16:5
**nine-** 30:19
**NOCCO** 1:7 111:5
**nodding** 8:15
**noise** 77:14
**nonverbal** 8:14
**normal** 31:19
**normally** 74:1
**northwest** 12:25 13:5
**Notary** 1:20 109:12
**notes** 4:6 55:9 56:8,19
  58:12,14 61:23 87:19
**noticed** 59:12,25 73:7,12
  61:5,15 63:22
**notified** 57:19 59:4,20
  61:5,15 63:22
**number** 23:1 36:12
  38:17 48:2 55:12
  82:13
**numbers** 66:9

---

**O**

**O** 108:9
**Oath** 3:4 109:1
**object** 7:4 29:5 44:11
  46:1,10 47:21,21
  48:10,23 50:7,7,10,10
  52:2,3,7,20 53:23,23
  65:15 69:10 74:20
  77:12 85:16 93:12
  95:23 96:7 97:7 99:13
  102:18,22 104:2
  107:12
**objected** 42:22 96:8
**objecting** 7:11 46:5
**objection** 6:18 29:6
**objectionable** 6:15
**objections** 5:23 6:1 7:8
**objective** 77:25 78:1
**observe** 97:19
**observed** 71:9 100:2,5,14
  102:21
**obstruction** 19:2
**obtaining** 47:4
**obviously** 6:9 21:4 85:7

---

90:18
**occasion** 97:24
**occasionally** 36:22 37:17
  37:17 48:7 90:1
**occasions** 98:6,23
**occupant/property** 64:18
**occupied** 44:7
**occurring** 17:24 20:12
  33:18
**occurs** 30:17
**Off-the** 42:19
**Off-the-record** 23:11
  42:24 46:17 63:18
  66:21
**offender** 4:6 10:1 33:5
  33:15 34:6 35:20 36:1
  36:8,14,16,21 37:9,10
  42:8,8 43:2,16,18
  45:20,21,22,24 48:18
  51:4,19 52:1,6,14
  55:20 56:19 74:6,10
  74:17 75:5,8 77:22
  78:3 81:23 82:3,10,19
  86:8,9
**offenders** 33:17,20,25
  34:1,3,3,4 40:17,22
  41:1,2,12,17,21,23
  42:1,11 43:23,25 44:4
  44:10 45:12,17 46:9
  47:7,10,15,18 48:1,4,6
  48:21 49:15,21,24
  50:16 51:9,12 52:16
  52:19 53:14,17,22
  56:9 74:7,24 78:4 87:4
  87:7,10,13 88:6 89:1
**offered** 70:3
**office** 9:9,17,23 13:11
  15:15,23 91:16 92:7
**officer** 63:2 92:14
**official** 1:7 109:7 111:5
**oh** 2:3 5:19 44:18 46:14
  68:19 74:4,4 76:12
**Ojeda** 1:12 4:2 5:1,11
  57:19 59:4 67:4,23
  68:7,15,17,19 69:19
  70:23 71:1 72:13,18
  72:25 73:3,6,18,23
  74:4,6,10 75:17 76:10
  76:14,18 109:5 111:18
**okay** 5:14 7:17,22 8:3,5
  8:20,23 9:3,4,15,22
  10:2,4,7,17,21,23 11:9
  11:12 12:11,15 13:8
  14:5,15,23 15:22 16:1
  16:20,23 17:2,14
  19:24 23:8,16,18 24:1
  24:9,12,12 25:2,4,11
  25:19 26:2,16,18 27:3
  27:21 28:3,10 30:21
  32:8,22 33:6,11,14
  34:5 35:1,11,13 36:7
  36:11,23 37:12,22
  38:3,7,12,20 39:11,11
  39:18,21 40:2,9,24
  41:20 43:9,17,21 44:3
  44:18 45:1 46:4,21
  47:8,25 49:23 51:7
  52:2,3 54:9,16,18,23
  55:3,9,15,25 56:7,10
  56:21,25 58:6,11,17
  58:21 59:10,18 60:4,8
  60:14,18,21 61:19,23
  62:13,23 63:6,25
  64:10 65:2,6,13 66:6
  66:11,23 67:8,10,20
  68:13,13 69:1,4,18,22
  70:2,4,8,11,14,17,20

---

70:20 71:7,11,17 72:1
  72:9,11,15,23 73:15
  74:6,9,10,16 75:14,14
  76:2,5,7,8 77:5,3,20
  78:2,14,14,25 79:5,7,9
  79:11,14,20,25 80:2,7
  80:11,16,21 81:2,5,11
  81:13,17,24 82:1,8,18
  82:22,25 83:6,10,15
  83:23 84:2,5,7,17,22
  85:1,4,21 86:21 87:2
  87:12,15 88:3,10,13
  89:6,12,19,22 90:4,24
  91:7,11,13,18,22,25
  92:4,10,13,16,20 93:9
  93:17,24 94:4,7 95:18
  95:21 96:13 97:3,22
  98:12 99:18 100:6,10
  100:22 101:1,2,25
  102:6,12,15,17 104:17
  104:20 107:7,16,17,21
  108:2
**once** 10:14 30:3 48:9,11
  48:14,18 71:15 99:25
  100:9,18
**one-on-one** 22:9
**ones** 19:1 27:5
**ongoing** 107:25
**open** 6:11 22:7,12,22
  32:1 107:22,24
**ordinance** 9:12 18:25
  22:1 45:11,16 59:12
  59:21 61:5,18 62:6,8,9
  63:9,21,22 77:6 85:5
**ordinances** 20:8 57:19
  59:4,21 75:18,25 76:2
  76:3 78:5 90:18 93:4,7
**organizational** 13:12
  15:17
**oriented** 20:6
**originally** 11:10
**outcome** 9:10
**outside** 40:16
**owned** 21:13
**owner** 51:15 61:14 64:18
  77:7
**owners** 18:11 22:8,23
  98:21

---

**P**

**P** 108:9
**P.A** 2:14
**p.m** 1:15 58:7 108:7
**P.O** 1:23
**page** 3:2,5 4:1 24:10
  32:16 38:12 40:2,10
  45:6 46:20 56:11,23
  58:1 63:1 65:19 81:5
  81:17 82:2,13 84:8
  111:10 112:2
**pan** 12:20
**Paneson** 55:13,17 57:8
  61:3 63:11 81:18 82:2
  94:5
**panhandling** 18:10
**paragraph** 40:14 56:25
  59:2 63:7 64:10
**parcel** 71:12,13
**parcels** 19:11 71:15
  107:9
**parentheses** 47:6
**Park** 2:15
**part** 10:5 11:18 14:11
  23:1 33:2 34:12 38:25
  40:22 44:9 45:16,23
  47:17,17 49:15,20
  51:18,24 53:12,16,20

54:7,8 77:20 78:8,12
78:13 87:9,12 92:10
104:4 105:8,16
participate 85:21
particular 12:22 41:24
parties 52:12,25 77:7
108:11 110:12
parties' 110:13
parts 20:20
Pasco 1:8 9:23 13:11
15:14,23 19:25 20:7
23:7 91:10,18 109:3
110:4 111:6
pass 87:25 88:25 89:8
passing 102:12
passionate 14:21
Patrick 84:13
patrol 16:10,12,15,16,20
17:3,5,15 22:13 36:5
41:15 90:2,5
pattern 34:15
patterns 40:18
paused 67:6,25 68:8,24
71:7 72:4,19 73:8
74:14 75:21 76:21
101:17 103:10,15,21
104:8,15,25 105:6,11
105:20 106:1,7,17
pawnshop 27:9 95:10
PC 57:8 67:4,23 68:2,4,7
68:11 77:16 83:8
93:21
PDF 57:22
Pedro 1:12 4:2 5:1,11
84:13 109:5 111:18
people 21:12,13,14,23
22:13,14 23:5,6 42:11
50:9,24 86:6
people's 97:23
percent 40:20,21
percentage 49:2
performance 46:20
52:15 53:15,21 54:4,5
54:6
period 38:15 46:24
permission 98:21
permitted 66:7
person 18:4 22:16 31:24
37:2 41:23 43:3 60:1
63:10 87:23
personal 14:18
personally 109:5
Pfenninger 64:12,14,22
65:8 69:20,24 105:17
phone 2:14 5:22 7:14
23:1 56:16 64:21
70:18
physical 107:3
picked 56:17
picture 83:2 104:18
piled 102:12
PLACE 1:17
Plaintiffs 1:5 2:5,9,13
111:3
plan 31:8
play 68:5 75:4
played 67:3,22 68:6,14
70:22 72:3,12,24
73:16 75:16 76:9
101:16 102:10,24
103:9,14,20 104:7,14
104:24 105:5,10,19,25
106:6,16 107:4
please 5:10 12:4 84:15
point 7:12 45:10 69:12
71:7 94:10 101:19
102:8

police 62:8
policing 39:17
pop 86:14
pops 86:14
Port 1:17,18
portion 43:4
position 10:2 12:19 14:5
14:8,12,17,20,23
15:11,14 17:20 38:24
39:1,5 91:20
positions 13:14,20 15:1,7
positive 10:22
possibly 6:24 10:11
106:24
posted 66:9
posting 20:9
potential 41:11
Poulton 2:14,14 6:14
7:18,22 9:2 29:5 42:22
44:11,16,18,21 45:1
46:1,4,10 47:21 48:10
48:23 50:7,10 51:21
52:2,7,20 53:5,23
56:12,16,21 57:4,20
58:22,25 62:14,20,23
63:13 64:25 65:4,15
66:15,19,22,24 69:10
69:23 70:2,4 74:20,22
77:12 85:16 93:12
95:23 96:7,10,18,23
97:7 99:13 102:18
104:2 107:12 108:4
Poulton@debevoisepo...
2:16
Practices 40:24
prepare 8:23 80:7
prepared 79:25 80:3
84:16
preparing 84:22
present 108:11
pretty 8:6 16:10 23:3
33:18 62:17 70:23
89:16 95:1
prevalent 19:1
prevent 21:7,8,17
prevention 92:5,8
primarily 89:10,22
primary 17:17 51:16
77:24 78:1
prime 54:23 61:20
printout 79:1 82:25
prior 12:17
private 98:7 99:9
probable 68:12 83:9
93:24 94:4,10,14
95:22
probably 7:16 10:3,9
14:9,9,9 22:21 30:20
30:22 36:6 50:1 96:21
problem 17:22 35:18
45:12 63:16
problems 17:24 18:11
19:19 28:25 30:2
PROCEEDINGS 1:12
profile 87:17 89:10
program 88:21
progression 35:6
prolific 33:25 34:2,3,4
36:1,7,14,16,21 37:9
37:10 40:17,22,25
41:1,12,17,21,23 42:1
42:8,11 43:2,16,17,25
44:4,10 45:12,17,20
45:21,22,23 46:8 47:6
47:9,14,18 48:1,4,5,17
48:21 49:15,21,23
50:15 51:4,9,12,19,25

52:6,14,16,19 53:14
53:17,22 56:9 75:8
86:8 87:3,6,10,13 88:6
89:1
pronounced 27:6 55:3
properties 19:9,14 26:9
30:3 44:7 86:15 97:23
property 10:15 11:1,7,10
11:16,23 18:11 21:13
21:14,25 22:8,23
24:14 25:7 26:4,8,10
26:14,17 27:15 34:14
37:23,25 51:15,15,16
53:2 57:10,18 59:3,12
59:10,11,24 61:13,14
61:16,17 64:13,17,24
65:10 69:3 71:10,13
73:22,25 76:15,17,20
76:24,24 77:7 78:9
86:13,13 94:8,9,13,19
94:22,24 95:21,24
96:4 97:5,10,11,14,16
97:21,25 98:7,15,15
98:17,21,22,24 99:5,7
99:9,22,23,25 100:1,9
100:13,18 106:12
107:3,8,9
property's 95:25
provide 85:25 86:24 87:3
provided 6:1 56:6,20
providing 85:22,24 87:9
PSO 40:16 56:8
public 1:20 66:8 109:12
pull 35:24 71:19
pursing 47:6,9
pursue 14:19 47:14
50:15 52:18
pursuing 47:18 49:23
52:16 53:17
put 14:13
putting 21:24

Q

quality 49:17
question 6:14 8:11,13,16
24:10 42:20,22 51:22
51:22 65:16 102:21
Questionnaire 32:18
questions 5:23 6:13 8:8
107:24
quick 6:20 7:14 96:17
101:4,8
quickly 5:18,20 8:6 57:3
84:12 96:15

R

rarely 88:8
reach 23:3
read 32:24 38:17,18,21
39:19 40:7,13,13
42:20 45:10 46:24
53:16 57:2 58:12 59:3
63:6 64:10 84:11
108:4 111:12
reading 92:1,11 108:12
real 6:20 57:3 96:16
realize 102:7
realized 97:10 99:25
107:3
reallocated 15:5
really 5:18,20 11:17,20
11:20,20,21,22 12:18
15:20 18:17,21 19:18
21:6 22:3 36:9,9,10,24
36:25 37:2,19 39:7

48:8 49:3 57:14 84:11
88:9 96:14 98:9
104:11
reask 6:12
reason 6:21 8:20 14:11
74:4,16 77:20 78:8,12
95:5,18
reasoning 25:16
recall 5:15 46:13 55:18
59:23 61:7 63:24
84:21 88:23 96:2
107:14
received 77:10
recognize 23:14 39:14,25
54:12 56:3 60:9 62:3
67:8,15 69:20 78:20
80:14 83:18
record 5:10,17,21 42:18
42:19 43:1 53:11
106:14 110:9
refamiliarize 9:4
refamiliarizing 9:6
refer 33:25
reference 63:9,20,21
64:3
referencing 49:25
referring 8:9 9:11 84:18
85:1
refers 68:11
reformulated 6:13
regarding 57:8
regular 16:7
regularly 36:2,3 40:19
85:15
relations 13:24
relative 110:11,13
relocate 86:13
remain 6:11
remedy 5:25 6:12
remember 8:1 10:19
48:16 59:20 61:8 84:5
84:21,22 88:24 89:7
renter 77:7
repeat 51:22
repeating 102:22
rephrase 8:17
report 4:5,7,8 9:9 46:20
52:15 53:15,21 54:4,5
54:6,16,19 58:15
61:24 62:6,8,10 66:3
69:15 79:21 88:7,10
110:7
REPORTED 1:17
reporter 1:19 3:4 12:4
42:21 110:1,6,19
Reporting 1:22 63:1
reports 88:11,12
represent 56:5
represents 82:14
request 14:14
reserve 5:23
residence 57:10,12 59:12
60:13
resides 57:9
resources 19:20
respective 108:11
respond 59:13
responded 61:1,10,15
63:8,20
responding 40:18 45:21
64:3
response 32:24 40:3
64:15
responsibilities 11:19
13:18 17:14,20 26:25
28:4,12,15 30:24 31:2
39:6

responsibility 30:23
51:14
responsible 49:19 51:10
51:16
restroom 53:7
restrooms 20:10
result 6:3
results 33:3
resume 75:14
resuming 68:13 76:8
104:13
returning 93:17
review 8:5 9:20 24:20
90:14
reviewed 9:8,15
rewatch 105:8
Richey 1:17,18
ride 89:15,16
right 5:8,19 6:5 7:24 8:7
9:22 13:7 14:10,25
15:4 16:22,24 17:18
23:13,19 24:7,9,11,17
25:9 26:15,23,23 28:7
29:11,23 30:8,12,19
32:18 39:10 40:5 43:1
43:24 44:2,24 46:22
49:13 51:6 53:11 54:8
54:17 55:5,6 58:9 64:7
64:9,9 65:1,11 67:1,4
67:23 68:3,7 70:10,17
70:18 71:14,20 72:16
74:18 75:8,10,13,20
75:25 76:1,4,18,25
77:10 78:7,24 79:2
81:16,17 82:20,23
85:6 86:20,22 87:11
87:23 88:2 89:2 91:15
91:24 93:22 94:6,10
95:4,13 97:20 99:21
100:4,16,18 101:12,14
101:24 102:6,7,9,13
102:13,14 103:1,3,5
103:13 105:22,24
106:3,4,5,21
ring 26:11 27:4
Rjohnson@ij.org 2:4
road 2:7 62:16 72:17,18
roadway 19:2 73:24
98:16
Rob 6:7 7:15 42:15,16
96:14 107:17
Rob's 63:15
ROBERT 1:4 2:2 111:2
rode 89:17
Rohlfs 57:13
role 41:16
room 5:22
rules 7:6 8:5
run 19:10 29:22 90:9
running 102:19
Rutherford's 57:15
RV 61:12,17 64:13,15,15
64:23 65:9 94:17,18
94:22 95:3,4,11,16
97:8,9,18 100:2
103:12 104:22,23
105:3

S

S 2:10,11,15 4:1 108:9
safety 35:24
satisfied 49:8,9,9
saw 70:8 77:16
saying 24:5 29:20 47:13
51:4 83:4 98:18
says 24:13,22,23 32:17
32:22 38:14 40:3,11

40:24 46:15,23 49:23
52:15,15 55:12 58:3
58:21 59:3 63:1,20
77:6 79:11 81:7,8
82:13
schedule 34:23,24
scope 33:2
se 20:24 47:12 50:18
60:22
seal 109:7
search 27:15,16,23,24
28:1 37:10
second 33:14 59:2 60:7
64:10 66:4 67:20 84:7
104:5,18 105:2,22
secretary 83:24 84:3
section 24:14,23 32:22
38:13 40:10 46:22
55:9
securing 27:11
see 6:18 7:4,16 9:9 13:4
20:11 24:1,5 31:14
32:15 34:11,13 40:3
42:9 43:15 51:7 55:9
63:17 66:16,18 71:15
79:12 82:25 83:1,3,4,7
95:14 97:15 98:15
seeing 7:11 45:8,9 48:18
71:8 107:14
seen 61:11 94:20 95:8
Self-Evaluation 32:18
sell 21:15
Semoran 2:15
send 15:17 41:11
sending 79:5 87:22
sends 15:16
sense 8:18 100:20
sentence 33:14 40:24
46:24 58:21 59:2 63:6
65:16
separate 32:3,6
separately 31:22 32:10
sergeant 32:7,9,13
served 92:13
service 17:16,16 21:23
set 64:16
seven 29:23,24 81:13
96:19
seventeen 10:19
seventeenth 10:24 15:24
severity 28:20
sewer 66:8
sex 10:1
sexually 20:6
Shaker 2:3
shaking 8:15
sharing 33:4 34:7
Sharon 55:2 58:3
Sheet 3:5 112:1
sheriff 1:8 15:16,19
111:6
Sheriff's 9:23 13:11
15:15,23 91:16
shift 35:8,12
short 26:9,18 53:9 65:22
92:22 97:1 101:10
show 5:21 66:11,17
81:18
shower 57:14
showing 60:18
shown 6:17 7:3
side 12:24,25 13:1,5,5
17:9,10,12 86:15,17
106:22
sides 100:12
sign 61:21
signage 20:9

signature 3:5 78:23
111:10
significant 37:20,21
signing 108:12
sir 62:19
sit 34:8,8 90:15
sits 94:24
sitting 35:14
situation 22:3 29:19 96:1
situations 21:12,21 29:4
90:12
six 67:20 81:13
Skinner 83:25 84:8,18
slide 79:10 80:17 82:22
85:23
slides 4:13 80:19 81:3,9
85:8,24
slowly 62:15
smaller 20:18,20
solution 7:1,9
sorry 11:6 12:21 15:11
17:8 22:21 27:25 29:5
31:25 44:18 51:21,23
56:12 58:22 62:7
63:13,13,16 67:15
82:5,6 96:7 98:3 99:16
99:18
sound 16:24 77:1
sounded 68:2 73:10
74:16 75:5,23 76:23
sounds 64:22 103:25
south 13:9
speak 9:18 50:25 56:13
62:14 85:25
speaker 56:16
speaking 72:21
speaks 102:20 107:12
specialist's 93:10
specifically 41:16 90:20
specified 99:8
spell 12:3,6 69:23
spelling 70:5
spent 106:12
spoke 9:2,4,9,16 61:10
64:19 84:13
spots 14:18
spotted 60:23
spreadsheet 4:6 56:5,18
56:20 57:23 79:25
80:2
sprees 27:10
squat 21:12,14
squatter 21:12
squatting 21:22
standing 7:7,8
STAR 24:23 25:5,7,15
25:23 26:5 27:18,19
27:20 28:4,8,13 30:18
30:25 31:1,19,20 32:4
33:2,21 34:20,20 35:9
36:4,8 37:15,23 38:18
38:21 39:2 40:4,6,15
40:25 41:1,11,25 45:4
45:13,14
STAR's 41:16
start 10:17 11:1,4,7 72:1
72:11 96:22
started 6:22 15:24 16:3
17:6,8 24:16 30:19
35:2 43:19
starting 30:18 67:1
101:14 104:5 105:8
state 1:20 71:10,21
23:5 109:2,12 110:3
STATES 1:1
stay 21:20 34:19,20 35:3
38:19 94:18

stayed 28:7
stays 68:20
Ste 2:3,7,11,15
stealing 94:15
stenographically 110:7
step 101:24 102:2
stepped 94:9,12 95:2
97:4 99:20 100:7
101:22
stepping 69:2 70:9,10
101:19 106:10
stipulated 108:10
Stipulation 3:3
stolen 94:5
stops 33:24
storage 66:9
store 95:9
straight 97:8
strategic 40:3,11 45:7,11
45:17
strategies 40:23 47:9
street 10:6,12,16 11:13
11:16 13:19 24:25
90:10
strike 76:7
stuff 14:18 18:8,13 19:12
21:4,22 22:10 27:15
34:15 51:2 70:24
102:12
subdivision 18:23
subject 79:1
SUBSCRIBE 111:13
SUBSCRIPTION
111:14
subsequent 5:24
suggestions 32:23
suggests 7:15
Suite 1:17
Suites 1:17
summarizing 80:8
supervisor 11:17,18,23
11:25 12:2 32:6 35:2
supervisor's 38:14 46:23
supervisors 10:16
suppress 84:14,19,23
sure 11:14 20:8 30:4
34:4 36:22 37:6 41:19
42:2 44:5,19 51:10
56:15,19 57:6 59:17
60:3 62:18 75:11,17
77:14 82:6,7,11 86:3
91:21 100:21 101:9
103:8
surveillance 35:15,16,19
suspected 61:12 94:14
sweep 18:24
sweeps 19:4,7
switch 11:12 12:15 25:5
switched 12:11 28:8
sworn 5:2 109:6
symptoms 6:23

T

T 4:1 108:9,9
table 102:15
take 22:17 23:21 26:19
27:3 53:5 66:4 92:20
101:4
taken 5:12 7:13,25
talk 8:10,10 18:19,19
20:11 53:3
talked 24:16 34:5 94:8
talking 35:13,14 37:12
83:12 84:19 92:24
talks 35:22
TAMMY 1:3 111:1
TAMPA 1:2

target 40:17,19,20,25
45:12,17 82:14,16
Targeted 40:3
targeting 40:22
targets 46:12
TAYLOR 1:3 111:1
team 13:13,15,19 15:2,3
15:7 25:15 26:5 28:5
30:18,25 31:1,21 32:4
33:2 36:4 40:4,15,25
41:25 45:4
teams 26:21
telephone 2:2 7:2
tell 5:2 9:3 29:11 65:20
91:21
ten 81:21 82:18,22
test 93:5
tested 6:24 93:3
testified 5:4
testify 8:21
testimony 110:9
Thank 5:8 45:1 57:20
58:25 62:20 66:24
96:10
theft 26:11 55:21 57:9
63:11 93:25 94:1
thing 28:23 41:8
things 11:21 12:18 14:1
14:18 18:4,12 19:18
19:21 22:3 31:16,24
34:15 43:8 51:1 87:19
101:6
think 6:8 7:9,12,19 8:20
12:1 16:1 17:7 21:19
24:2 26:2 27:19 37:19
37:20 38:23,24 43:6,8
43:22,22 46:2,14
55:24 56:16 69:11
83:9 89:3,5 91:1,1
92:20 95:5,18 101:3,6
104:11
third 40:10
THOMAS 2:14
thoroughfare 107:10
thoroughway 94:19
99:23 102:1
thought 71:14 94:13,15
95:3,11 103:12,19
thread 4:14 83:22 84:8
three 13:9
till 34:21
time 1:15 7:4 10:13
17:24 18:21 21:17
22:2 27:7,20 33:13
36:6 41:6 46:5 53:5
55:21 60:12 65:2 67:3
67:6,22,25 68:5,6,8,14
68:24 70:22 71:2 72:3
72:4,12,19,24 73:8,16
73:19 74:14,19,21
75:1,16,21 76:9,21
77:9 85:22 89:20,20
95:20 98:20 99:2,8,10
99:11 101:16,17
102:10,24 103:8,9,10
103:14,15,20,21 104:7
104:8,14,15,24,25
105:5,6,10,11,19,20,25
106:1,6,7,16,17 107:4
times 28:24,25 30:1
52:21 99:6
tip 13:24
tips 47:4 88:19,22 89:2,8
TipSoft 88:16
title 9:25 10:4 16:6
titled 71:24
today 8:21 108:1

Tom 6:2,15 9:2 42:14
46:16 64:11 65:14
66:21
ton 70:23 71:1,4 105:23
tool 45:12,17
top 32:17 38:13 40:19
46:12 54:18,24 55:12
61:20 63:2 71:24 74:6
74:7,11,17,24 75:6
77:21 78:3,4,10 81:7
81:19,25 82:2,2,10,12
82:16,19 83:2,11
touched 26:2
town 86:16
traffic 15:3 17:25 33:24
trafficking 20:6,9,12
trailer 57:9,17 68:20
103:17 104:21
trained 89:16
training 89:12,22 90:13
90:16,19,20 91:25
92:1,10,13,25
transcript 110:8 111:12
transfer 12:17,19 14:14
transferred 14:10,11,13
transport 36:24
trash 21:23,25
trend 31:23
trends 40:18 41:9 80:18
80:18
trespass 13:23
trespassed 31:14
tried 12:17,19
trouble 62:21
true 110:8
truth 5:2,3,3
truthfully 8:21
try 8:9,10,13,17 19:16
21:17 35:23 63:17
65:2
trying 14:16 21:10 31:9
31:13 34:11 35:16
63:14
turned 66:15
turning 63:1
TV 66:13,18,18
twenty 30:19
two 17:13 25:12,12 33:11
35:23 54:25 71:14
107:9
two-minute 53:6
two-to-two 34:24 35:8
Tyler 55:13,17 57:8,9,14
57:17 61:1,3 63:10
64:12 73:4,11 74:17
77:11,18,21 78:3,9
81:18 82:2,18 83:11
93:21 94:5,13,14 95:3
95:5,19 103:12,19
Tyler's 64:17 74:6
type 14:20 22:19 30:16
96:1
types 90:15
typically 15:13 25:19
64:2

U

U 108:9
Uh 68:18
Uh-huh 7:20 15:22 16:17
24:6,15,24 33:16 35:4
38:16 40:12 43:24
44:14 46:21 47:2
48:20 52:10,17 55:14
57:24 58:2,8,13,18
59:5 77:2 81:4,6 82:15
82:24 85:10 86:19

93:19 95:2 101:21
102:16 103:13,18
106:11,13
**Um-hum** 20:23
**uncover** 22:2 37:6,8
**uncovered** 26:20
**undersigned** 109:4
**understand** 8:16 98:11
**understanding** 22:22
43:24
**understood** 70:6
**undeveloped** 19:9,11,14
105:15
**unique** 95:25
**unit** 10:1,6,12 11:2,7,11
11:13,16,16,24 13:15
13:17 15:2 16:14
24:25 26:4,7,14 27:14
27:18 37:14,23 54:23
59:7,11 61:20
**UNITED** 1:1
**unusual** 70:4
**updates** 38:19
**use** 8:13 21:15,19 22:5
31:15 50:18,19,20
51:2 53:6 66:7,8 88:20
88:22 89:8,9 90:4,11
90:11
**usually** 14:2 18:3 22:16
23:2 30:10 41:3 42:7
43:3,5
**Utilize** 45:11
**utilized** 13:14

**V**

**VA** 2:7
**valid** 81:8
**vandalism** 18:12
**vandalize** 21:15
**varied** 29:1
**varies** 52:22
**vehicle** 94:25
**vehicles** 19:3
**victimize** 50:21,23
**video** 4:9 66:15,19,21
67:2,3,6,22,25 68:6,8
68:13,14,24 69:5,18
70:22 71:2,20 72:3,4
72:12,19,24 73:8,16
74:14 75:2,12,16,21
76:9,21 78:2 93:20
101:13,16,17 102:10
102:20,22,22,24 103:9
103:10,14,15,20,21
104:1,7,8,14,15,24,25
105:5,6,10,11,19,20,25
106:1,6,7,16,17 107:4
107:5,7,12
**violation** 9:12 22:1 30:16
30:17 49:9 51:10,14
98:13 99:3,7
**violation's** 29:14 30:15
**violations** 18:25 28:21
37:8 47:12 49:21 51:8
52:8,13 53:1 59:13,21
59:25 61:6,18 62:8
63:10,21,22 64:3 66:8
71:1,5,8,9 73:7,12,24
76:16 77:11,24 80:8
80:24 95:22 96:5
97:13,19,24 98:2,7,10
98:18,24 99:9 100:3
100:11,13 105:23
**violator** 17:25 28:21
29:3
**violent** 18:7
**visible** 73:23,24 100:12

**visit** 30:3 58:19 60:18
61:9 62:10 64:5,9
65:25 74:12 75:7 78:4
97:3
**visited** 56:9 60:12 81:14
**voice** 65:18
**voicemail** 64:19
**vs** 1:6 111:4

**W**

**W** 2:14
**waive** 6:2
**waived** 108:13
**walk** 97:5,13,16
**walked** 71:10 97:16,16
97:18 100:2
**walking** 71:7 103:6
**want** 5:16,20 12:8 40:2
49:2 57:2 69:23 96:14
101:7
**wanted** 24:9 31:24 36:15
55:20 63:10 82:7,9
**wants** 84:14
**warning** 29:22,22 49:5
49:12
**warnings** 29:11
**warrant** 27:23 57:8
70:11 96:5 97:24,25
98:4,8,9,10,19,24
99:2,11,19 100:8
**warrants** 27:15,16,24
28:1 37:11 75:19
76:11
**wasn't** 17:4 27:22 29:13
44:18 47:13 48:19
49:8,8,9 71:12 77:8,8
87:6 94:18,24 103:8
104:3
**watch** 34:9,9,17,22
101:13
**watched** 69:1
**watching** 33:23 35:13
**water** 64:16
**way** 6:11,13 41:22 50:21
86:16 94:20,25 96:23
97:15 105:16
**Wayne** 57:15
**ways** 22:5 35:20 41:20
47:4
**we'll** 7:16 8:9 37:12
39:21
**we're** 5:17 23:13 43:1
44:17 53:11 66:17
68:13 74:17 96:21
101:12,13 102:12
106:9 107:22,24 108:1
**we've** 5:22 6:10 7:1
28:24 69:7 101:3
**week** 48:9,11,14,18 79:22
86:3,5
**weeks** 18:20 48:3
**went** 10:15 16:10 61:6
64:14 65:9 86:15
92:25 94:20 97:8,22
97:23,25 98:6,23
**weren't** 12:18 77:11 87:6
**Wesley** 16:19
**west** 12:24 13:1,5 17:10
72:14
**white** 57:12
**Winter** 2:15
**witness** 5:5 6:12 46:3
62:19 108:2 109:7
110:9
**wooded** 105:16
**woods** 19:11

**word** 65:1
**words** 65:3
**work** 11:15 12:18 13:16
16:14 17:18 18:20
19:6 20:3,25 26:3,5
27:4 31:17 33:22
34:16 35:12,12,20
36:18 37:15,22,25
40:15
**worked** 9:10 16:1,7,7,18
18:5,14 19:8 48:16
**working** 11:5 16:3 26:7
26:10 32:1 33:4,22
34:6 35:6 36:8 48:4,16
86:5 87:1,5
**worn** 102:4
**worse** 29:15 30:16
**worst** 18:25
**wouldn't** 18:18,19 21:23
48:3 89:8 98:9,18 99:5
**write** 29:12 63:4
**written** 61:23
**wrote** 38:23 39:1,5 99:3

**X**

**X** 3:1 4:1

**Y**

**yard** 69:2 71:8 94:16
97:19 100:15 101:23
102:6,7
**yeah** 6:6 7:21 8:1 9:17,17
11:1 12:10,10 16:3,25
17:6 19:8,23 20:1 21:2
21:2 23:25 24:3,4,6,8
24:18,21 25:1,1,3,8,10
25:25 26:1,17 27:2
28:6 30:15 32:19
33:13 34:2,3 35:16
36:22,22 37:6,7,8,10
38:2,10,11,23 39:3
41:13,13,19 42:2,13
44:21,25 45:5,9 47:11
47:11 48:19 49:17,17
49:22 50:12,12 53:25
54:5,8 55:16,18,18
56:24 57:1 58:5,10,16
58:18,20 59:14,17,19
60:2 61:1,4,10,21,22
61:25 62:23 63:3 66:5
66:5,21 67:5,24 68:9
68:11,23 69:3,3 70:3,6
70:10 71:6,6,6,9,9
72:8,22 73:5 74:1,13
75:1,1,3 76:4,6,13
77:4 78:13 80:1,10,10
82:12 83:4,7 86:2,3
87:5,14,14 88:4,20,20
89:24 90:17,23 91:1
91:24 92:3,5,9,19
93:13 94:23 96:16
97:20,21 99:4,8,17,17
99:17 100:4,5,9
101:24 103:7,7 104:12
104:13,19,22 105:4
107:2,14
**year** 10:19,22,24 15:24
**yearly** 23:17
**years** 8:1 9:5 10:9,10,25
16:5 17:4,7 23:18
43:11,22,22
**Yep** 37:6 73:14 79:19
80:2 81:1 84:1
**yesterday** 6:22

**Z**

**Zephyrhills** 16:18
**zero** 101:14
**zones** 20:18
**Zoom** 2:14 66:16

**0**

**05** 15:25

**1**

**1** 1:17
**1-5-2023** 109:13
**1.1** 4:10
**1:34** 1:15 108:7
**10** 105:22
**10:13** 72:11
**1010** 2:15
**1035** 2:15
**108** 3:3
**109** 3:4
**11:26** 75:14
**11:33** 76:8
**110** 3:4
**111** 3:5
**112** 3:5
**12** 1:14 109:6
**12-11** 84:16
**12-19** 84:15
**12th** 81:9
**13** 81:9
**14** 29:14
**14013** 80:21
**14020** 81:5,17
**14137** 55:8 57:11 59:21
60:19,21 61:6,13
62:11 63:8,23 69:8
94:8 97:3
**1417** 93:18
**16781** 2:3
**17455** 56:11,23
**17457** 58:1
**19** 11:14 23:22
**19141** 38:12
**19144** 32:16
**19151** 24:19
**19165** 24:2,10
**19167** 46:20

**2**

**2** 2:11 82:19
**2:00** 34:21
**20** 23:22 62:15
**2015** 16:13,24
**2016** 4:4 16:24
**2018** 4:3 11:14 24:6
54:21 57:7 58:3,7
60:16,17 62:11 69:5
81:9 82:19 83:15
93:17 97:4
**2019** 24:19 25:7 30:19
**2020** 24:6 33:9
**2022** 1:14 109:6,8 110:17
**22203** 2:7
**23** 4:2
**2426** 1:23
**256** 2:3
**26th** 72:14
**276821** 109:12

**3**

**30** 105:2
**305-721-1600** 2:12
**3180** 2:11
**32792-5512** 2:15
**33131** 2:11
**33526-2426** 1:23
**352** 1:24

**39** 4:3,4

**4**

**4:31** 104:5
**4:35** 58:7
**407-673-5000** 2:16
**44120** 2:3
**496** 40:3

**5**

**5** 3:3 40:19 46:12 55:12
57:7 58:3,7 74:6,7,11
74:17 75:6 77:21 78:3
78:4,10 81:8,9 83:15
82:2,10,16,19 83:11
**5:48** 105:9
**501** 45:6
**54** 4:5
**56** 4:6
**567-5484** 1:24
**5th** 54:20 59:22

**6**

**6** 40:20 62:11 69:5 93:17
97:4 104:17 105:2
**6-12-18** 81:8
**6/6/18** 63:8
**60** 4:7 40:21
**62** 4:8
**67** 4:9
**6th** 60:15 83:13 109:7
110:17

**7**

**7** 29:14 70:20 105:22
**703-682-9320** 2:4,8
**71** 4:10
**78** 4:11
**79** 4:12

**8**

**8** 104:17 106:9,12 107:7
**8:10** 106:20
**8:21-cv-00555-SDM-C...**
1:6 111:4
**8:34** 60:17
**80** 4:13
**83** 4:14
**8520** 1:17
**8757** 63:1

**9**

**9** 72:14 84:15
**9:00** 1:15
**900** 2:7
**901** 2:7