```
                  UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
                        TAMPA DIVISION
```

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES, III,

  Plaintiffs,

vs.                      Case No.: 8:21-cv-00555-SDM-CPT

CHRIS NOCCO, in his
official capacity as
Pasco County Sheriff,

  Defendant.
_____/



PROCEEDINGS:          Deposition of
                      DALANEA TAYLOR


DATE:                 May 18, 2022


TIME:                 1:00 p.m. - 2:40 p.m.


PLACE:                Via Zoom


REPORTED BY:          Judy Anderson, Court Reporter
                      Notary Public
                      State of Florida at Large




```
                  ANDERSON COURT REPORTING
                    14150 Third Street
                    Dade City, FL 33525
              Judy@andersoncourtreporting.com
                      (352) 567-5484
```

```
 1   APPEARANCES VIA ZOOM:

 2   CAROLINE GRACE BROTHERS, ESQUIRE
     Institute for Justice
 3   901 N. Glebe Road, Ste. 900
     Arlington, VA 22203
 4   703-682-9320
     Cgbrothers@ij.org
 5        Counsel for Plaintiffs

 6   ARI S. BARGIL, ESQUIRE
     Institute for Justice
 7   2 S. Biscayne Blvd., Ste. 3180
     Miami, FL 33131
 8   305-721-1600
     Abargil@ij.org
 9        Co-Counsel for Plaintiffs

10   THOMAS W. POULTON, ESQUIRE
     Debevoise & Poulton, P.A.
11   1035 S. Semoran Blvd., Ste. 1010
     Winter Park, FL 32792-5512
12   407-673-5000
     Poulton@debevoisepoulton.com
13   Holborn@debevoisepoulton.com
     Cook@debevoisepoulton.com
14        Counsel for Defendant

15

16   ALSO PRESENT VIA ZOOM:

17   JOSH KOBRIN, INTERN AT DEBEVOISE & POULTON

18

19

20

21

22

23

24

25
```

1                           I N D E X

2                                                    Page

3      Direct Examination by Mr. Poulton          5
       Cross Examination by Ms. Brothers          52
4      Stipulation                                53
       Certificate of Oath                        54
5      Certificate of Reporter                    55
       Deponent's Signature Page                  56
6      Errata Sheet                               57

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   E X H I B I T S

                                                Page
2
1 - Plaintiffs' First Supplemental            15
3      Rule 26(a)(1) Initial Disclosures

4   2 - 1-1-2018 Body Cam Video                  27

5   3 - 3-3-2018 Body Cam Video                  35

6   4 - 2-25-2018 Body Cam Video                 36

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              DALANEA TAYLOR,

2     being first duly sworn to tell the truth, the whole

3     truth, and nothing but the truth, was examined and

4     testified as follows:

5              THE WITNESS:  Yes, ma'am.

6                   DIRECT EXAMINATION

7     BY MR. POULTON:

8       Q.    Good afternoon, Ms. Taylor.  My name is Tom

9     Poulton.  I'm one of the attorneys that represents

10    Sheriff Nocco in the lawsuit that you've brought along

11    with Mr. Jones, Ms. Deegan, and Ms. Heilman.

12             I understand you just gave birth not too long

13    ago.

14      A.    I did.

15      Q.    Congratulations.  But please be aware if you

16    need to take a break for any reason, let us know.  Okay?

17    Certainly under the circumstances we'll stop wherever

18    you need to stop if you need to go take care of

19    anything.  Okay?

20      A.    Okay.  Thank you.

21      Q.    Sure.

22             I have with me -- just so the record's clear, I

23    have with me an intern that's new to my office Josh

24    Kobrin.  He's just sitting in to observe, and he'll

25    probably leave in about an hour.  He's not in -- he's

1    not on camera, won't be doing anything, but I just

2    wanted to note that he's present.

3         COURT REPORTER:  Can you spell his name for me,

4       sir?

5         MR. POULTON:  Sure.  It's K-O-B-R-I-N, first

6       name is Joshua, common spelling.

7         COURT REPORTER:  Thank you, sir.

8    BY MR. POULTON:

9       Q.    Before we went on the record, we discussed some

10   reports that I wanted to refer to, and it appears that

11   the plaintiffs' attorneys do not have these reports.

12   Some of them go back quite far in about the 2012

13   timeframe, and I -- and since we're not certain and we

14   haven't had a chance to completely compare, what we're

15   going to do -- we won't be attaching them as exhibits,

16   but I'm going to do my best to have my office reach out

17   to plaintiffs' counsel either later today or tomorrow to

18   make sure that we've produced them either subject to

19   confidentiality agreement or in redacted form as would

20   be our responsibility in response to requests for

21   production or under Federal Rule 26.  So we will talk

22   about what's in the reports, but I won't attach the

23   reports as exhibits just because I have only the

24   unredacted versions right now and they do involve

25   juveniles.  Okay.

1          Ms. Taylor, have you ever had your deposition

2     taken before?

3     A.    No.

4     Q.    A couple of ground rules:  Your attorney

5     probably discussed this with you, but it's important

6     that you answer audibly.  That's probably the most

7     important thing because the court reporter is taking

8     down what we say, and if you shake your head or nod your

9     head or say uh-huh or uh-uh, that's doesn't translate

10    well onto paper.

11    A.    Okay.

12    Q.    Right.  So please answer audibly.  And if I --

13    we get to a point where I detect us going off the rails

14    on that, I'll let you know.

15         One other thing is to try to let me finish

16    asking the question before you start to answer it.

17    A.    Okay.

18    Q.    And I'll extend you the same courtesy of

19    letting you finish your answer before I ask the next

20    question.

21    A.    Okay.

22    Q.    So let me begin by asking you where you

23    currently reside.

24    A.    I reside at 5532 Baroque Drive.

25    Q.    How do I --

1     A.   (Inaudible.)

2     Q.   I'm sorry.  How do I spell the name of that

3  street?

4     A.   B-A-R-O-Q-U-E.  I'm -- I just moved in

5  literally yesterday.

6     Q.   Oh, is that right?  Okay.  And it's 5532

7  Baroque Drive?

8     A.   Yes.

9     Q.   What city is that in?

10    A.   Holiday, Florida.

11    Q.   All right.  Who lives with you at 5532 Baroque

12  Drive?

13    A.   My man and my children.

14    Q.   How many children do you have?

15    A.   Three.

16    Q.   And you said there's a gentleman that lives

17  with you as well?

18    A.   Yes.

19    Q.   All right.  I won't ask for the name of the

20  children, but can you give me the name of the gentleman

21  that resides with you?

22    A.   Eric.

23    Q.   And his last name?

24    A.   Wright.

25    Q.   How do I spell that?

1       A.   W-R-I-G-H-T.

2       Q.   Where did you reside before 5532 Baroque Drive?

3       A.   With my sister.

4       Q.   What's her name?

5       A.   Vanessa.

6       Q.   Same last name Taylor?

7       A.   Yes.

8       Q.   Where did the two of you live?

9       A.   At her house.

10      Q.   Okay.  Prior to that did you live with your

11  sister and your grandmother?

12      A.   Yes.

13      Q.   What's your grandmother's name?

14      A.   Dana Jones.

15      Q.   All right.  I'm going to show you some video a

16  little bit later on.  You've probably seen some of it

17  from the body-worn camera of the deputies, and there's

18  an older woman that comes out and talks periodically,

19  and I'll ask you whether or not that's Dana Jones, okay,

20  when we get to it.

21      A.   Okay.

22      Q.   Did your mother live with you at any time say

23  in the 2013 period forward?

24      A.   Off and on.

25      Q.   Okay.  What's her name?

1    A.    Marnie Tabor.

2    Q.    How do I -- and Marnie is spelled how?

3    A.    M-A-R-N-I-E.

4    Q.    And the last name?

5    A.    T-A-B-O-R.

6    Q.    Okay.  And you said she lived with you off and

7 on?

8    A.    Yes.

9    Q.    And what was the address that you lived at with

10 Dana Jones, your sister Vanessa, and occasionally

11 Ms. Tabor?

12    A.    6029 Dublin Drive.

13    Q.    And when did you first move into 6029 Dublin

14 Drive?

15    A.    I'm not sure the exact date.

16    Q.    You were -- were you a teenager or even a

17 little younger than that when you first moved in?

18    A.    Yes, I was a little bit younger.

19    Q.    Okay.  And when did you move out of 6029 Dublin

20 Drive?

21    A.    Again, I'm still not sure of the exact date.  I

22 was there on and off per se for a long time.

23    Q.    Period of at least a few years; right?

24    A.    Yes.

25    Q.    Is Ms. Jones still alive?

1    A.   Yes.

2    Q.   Okay.  There was a -- the reason I ask is there

3    was some reference in some of the videos to her having

4    some health problems, so I just wanted to be sure.

5         Does she still live at 6029 Dublin Drive?

6    A.   Yes.

7    Q.   Why did you leave 6029 Dublin Drive?

8    A.   I just -- I just found a better place to stay

9    with somebody else.  That's about it.

10   Q.   I'm sorry I interrupted you.  I did exactly

11   what I said not to do at the beginning.  So go ahead and

12   finish your answer.  I'm sorry.

13   A.   No -- no specific per se reason, not really.

14   Q.   Did you move from 6029 Dublin to the location

15   to your sister's house?

16   A.   Yes.

17   Q.   And I understand at one point that you had

18   twins?

19   A.   Yes.

20   Q.   Did you having the twins have anything to do

21   with moving out from 6029 Dublin and over to your

22   sister's?

23   A.   At a point, yes, but I lived there with them as

24   well.

25   Q.   Okay.  So there was a period of time where you

1    and the twins lived at 6029 Dublin Drive along with your

2    grandmother?

3         A.   Yes.

4         Q.   Do you know about how long that was before you

5    moved out after you had the twins?

6         A.   A few months.

7         Q.   Are you currently employed?

8         A.   No, sir.  Right now I'm not employed because of

9    my newborn and me having to breastfeed.

10        Q.   All right.  I'm going to ask you -- I'm trying

11   to under the circumstances curtail this as much as

12   possible and make it as brief as possible.  So I'm just

13   going to kind of dive right into some of the criminal

14   matters that you were -- that you had interaction with

15   the Sheriff's Office regarding, and it's -- none of this

16   is meant to embarrass you.  I'm just trying to in my own

17   mind get the sequence down of events and then to

18   understand some the interactions.

19             Let me begin by asking, my understanding is you

20   went to prison for a period of time?

21        A.   Yes.

22        Q.   Was that state prison?

23        A.   Yes.

24        Q.   Was that juvenile prison or an adult prison?

25        A.   An adult prison.

1       Q.   What was -- did they send you to one in

2   particular, you stayed there the whole time, or did they

3   move you around?

4       A.   I went to Lowell CI for my whole time.

5       Q.   Lowell?

6       A.   Lowell CI.

7       Q.   How do I spell that?

8       A.   L-O-W-E-L-L.

9       Q.   Okay.  Where is Lowell CI?

10      A.   In Ocala, Florida.

11      Q.   Did you need to -- you looked off.  Did you

12   need to go do something?

13      A.   No.  Somebody came in, and I'm just telling

14   them to give us privacy.

15      Q.   Okay.  Again, if you need to take a break for

16   any reason, let us know.  Okay?

17           All right.  How long were you in Lowell

18   Correctional Institute?

19      A.   I got sentenced to do two years.

20      Q.   How long did you actually serve?

21      A.   I'm not sure how many months.  Probably about

22   fourteen.

23      Q.   So a little over a year?

24      A.   Yes.

25      Q.   What were the charges on which you were

1   sentenced to prison?

2       A.   They were multiple grand theft autos and auto

3   burglaries.

4       Q.   Was there a violation of probation charge in

5   there as well do you recall?

6       A.   Yes.

7       Q.   Okay.  And do you recall the date that you went

8   into prison and the date you got out?

9       A.   I went in August -- August 18th of 2016.  I'm

10  not -- I'm not sure of the exact dates.  I'm not gonna

11  tell you and then it be wrong.

12      Q.   Well, that's fine.  I understand what you're

13  saying.  If you could give me like a --

14      A.   I think the date that I got out was March 26th

15  of 2017.

16      Q.   Okay.  Would it be fair to say it was -- well,

17  couldn't have been August of 2016.  Could it have been

18  August of 2015?

19      A.   Possibly.  Like I said, I'm not -- I'm not

20  really sure exactly when I went in.

21      Q.   Well, I'm sure that we can find the

22  documentation on it.  I was just -- if you don't

23  remember, that's fine.  But you do remember you got out

24  on March 26, 2017?

25      A.   Yes.

1    Q.    And you went back then to 6029 Dublin Drive?

2    A.    Yes.

3    Q.    All right.  In the -- share -- well, let me do

4    this first, pull this up.

5          Your attorneys at one point in the case

6    provided information as to what your own individual

7    claim was as to damages, and I'm going to show you that

8    document and ask you just to make sure we're all on the

9    same page about what it is you're seeking in terms of

10   compensation.

11         This is going to be Exhibit 1, and it's

12   Plaintiffs' First Supplemental Rule 26(a)(1) Initial

13   Disclosures dated July 26, 2001.

14              (Exhibit No. 1 was marked for identification.)

15   BY MR. POULTON:

16   Q.    Referring you to page 4, can you see that?

17   A.    Yes.

18   Q.    Okay.  This indicates that you're -- the

19   plaintiff requests an award of $1 in nominal damages for

20   each separate plaintiff.  Compensatory damages to be

21   calculated from the following list of costs, which we'll

22   get to in a minute.  And then to streamline the

23   litigation, plaintiffs have updated their list of costs

24   to remove damages for lost future income and emotional

25   and reputational harm.  Do you see that?

1    A.    Yes.

2    Q.    Okay.  So there's several different types of

3  damages people can claim in lawsuits.  As you may have

4  heard before, it's like economic versus non-economic

5  damages, non-economic damages being things like

6  emotional pain and suffering.

7         And my understanding is you are not claiming

8  that kind of damage in this case.  You're just claiming

9  economic loss; is that correct?

10   A.    Correct.

11   Q.    So when I look down here, they're broken out a

12 little bit more elaborately.  You are listed as far as I

13 can see only in section paragraph three.  It's on page

14 four.  It says Dalanea Taylor for missing work and

15 arriving late to work because of visits by PCSO deputies

16 as a result of the program.  Do you see that?

17   A.    Yes, sir.

18   Q.    Okay.  Can you elaborate on that?  Were you

19 employed at some point and you were late to work because

20 you had interactions with Pasco deputies?

21   A.    Yes, sir.  There's been I'm not going to say

22 quite a few times but there have been a few times where

23 I had to miss work or was late to work because when I do

24 self-employment and they -- the person would have to be

25 home for me to come and do everything that's needed to

1    be done, and if I'm not there on time, they have

2    something to do, that's when they leave, and then I miss

3    that day.  It's not -- it's timed out, but if I'm there

4    on their time, then I just will miss that work.

5         Q.   Was there a -- was there a company that you

6    were working for when this happened?

7         A.   A company?  It's not per se a company.  It's a

8    LLC.  Basically, I want to -- I work under somebody that

9    has clients, and that's where we would go.  They call us

10   and tell us the address, and we go there, and we do any

11   type of home work that they may need, grocery runs.

12        Q.   Was this like a lot of helping -- helping

13   elderly persons --

14        A.   Yes.

15        Q.   -- or disabled persons?

16        A.   Yes.

17        Q.   Do you recall the name of the LLC or the person

18   that you worked for?

19        A.   Yes, I do.

20        Q.   Which one or both?

21        A.   Both.

22        Q.   Okay.  What was the name of the LLC?

23        A.   Cleaning Homes, LLC.  There's two people but I

24   can give you Darlene.

25        Q.   What's Darlene's last name?

1     A.   Bachelor.

2     Q.   Okay.  She's one of the persons that directed

3 you where to go?

4     A.   Yes.

5     Q.   And you said there was a second one?

6     A.   I didn't really go under her, so I would not

7 know her last name, but Denise.

8     Q.   Okay.  Denise, and you just don't know the last

9 name?

10     A.   Yes.

11     Q.   When you worked for LLC, how were you paid?

12 Were you paid in cash or paid, you know, hourly at

13 certain intervals, or did you get a salary?

14     A.   It was all cash.

15     Q.   Okay.  Do you know if there were any records of

16 the cash that you made?

17     A.   Sir?

18     Q.   Well, when you say you were paid in cash, does

19 that mean that somebody, for example, Darlene Bachelor

20 would simply at some point hand you money?

21     A.   After the job was done we would get paid every

22 day.

23     Q.   And you were paid in like -- in like twenty and

24 hundred dollar and fifty dollar and ten dollar bills?

25     A.   Yes.

1    Q.   All right.  As opposed to by check?

2    A.   A check?  No, we would never get -- we would

3    never get checks.

4    Q.   Okay.  Do you know whether or not there was any

5    record kept of the time that you worked and what you got

6    paid?

7    A.   I'm not sure.  Like I said, I just worked and

8    got my money and went about my way.

9    Q.   Okay.  Was this something that you did on a

10   routine basis like every Tuesday, Wednesday, Thursday,

11   or was this more something that you did you would call

12   up and say, hey, I'm available, and if they had a job,

13   they would send you?

14   A.   Almost every day we would get a job.

15   Q.   Where -- and who paid you?  Was it Darlene

16   herself that paid you directly or somebody else?

17   A.   No.  Our clients, before we'd leave their

18   house, they would pay us.

19   Q.   I got you.  Okay.

20        See, the reason I'm asking these questions,

21   just so you understand, is I'm -- you know, when you

22   make a claim like this, I'm trying to figure out how it

23   could be documented in some way, you know, how you lost

24   time from not being there or being late.

25        So let me just ask you is there -- to your

1    knowledge are there any documents that demonstrate

2    what -- when you were late to work because of an

3    interaction with deputies or that you missed work

4    because of an interaction with deputies?

5        A.   I don't -- I have no idea how she would keep

6    that.

7        Q.   Okay.  Did you write down whenever you missed

8    work or were late for work because of interactions with

9    deputies?

10       A.   No, I did not.

11       Q.   Do you have an estimate of how much work you

12   missed out on or pay you lost out on because of

13   interactions with deputies?

14       A.   I'm not exactly sure to the dollar because

15   I'm -- it's not something that I would just sit there

16   and write down or keep track of at the moment.

17       Q.   Well, let me ask you this.  Were there other

18   reasons besides interactions with deputies that might

19   have caused you to be late or to miss work on any given

20   particular day?

21       A.   No, I don't -- I go to work, and I don't have

22   nothing that would stop in between that.

23       Q.   Okay.  When -- well, let me ask you this.  When

24   was the last time that you worked for Cleaning Homes,

25   LLC?

1      A.   It's been a few months.

2      Q.   Do you have any idea --

3      A.   I stopped --

4      Q.   Sorry about that.

5      A.   I stopped working for them once I found out I

6  was pregnant, and I was two months into my pregnancy.

7      Q.   Do you have any plans to go back to work with

8  them?

9      A.   As of right now, no, due to the breastfeeding,

10 and I'm only able to produce so much at a time, so I

11 have to stay with the kid right now.

12     Q.   Okay.  All right.  Thank you.

13          And I don't know exactly how to just get into

14 this, so I'll just ask it the best way that I can think

15 of.

16          It's my understanding from all the different

17 documentation that we have is that at some point you

18 became involved with a group of other young people that

19 called themselves The Squad and committed some auto

20 burglaries and similar crimes.

21          First of all, is that just generally correct at

22 some point you were with The Squad?

23     A.   I -- I was with -- there was a few people, but

24 I don't want to call ourself The Squad.

25     Q.   Okay.  Have you ever heard that name for the

 1    group of people that you were hanging out with?

 2        A.   I -- I don't -- I don't know.  I've never heard

 3    that before.

 4        Q.   Okay.  My understanding is that at least two of

 5    the people that you were involved with in criminal

 6    activity when you were much younger were some cousins,

 7    the Keeven brothers?

 8        A.   Yes.

 9        Q.   And there was a Justin Keeven I think?

10        A.   Yes.

11        Q.   And who was the other one?

12        A.   Austin.

13        Q.   Are you in touch with them?

14        A.   Yes.

15        Q.   What sorts -- and we don't have to get into all

16    of the details necessarily today, but what sorts of

17    criminal activity did you engage in with Justin and with

18    Austin?

19             MS. BROTHERS:  I'm going to object to that.

20        You don't have to answer anything that you weren't

21        convicted of.

22    BY MR. POULTON:

23        Q.   Okay.  That's fair.  And to understand, this is

24    -- again, this is not for purposes of embarrassing you

25    or anything like that.  I'm just trying to establish

1    that there was some criminal activity that occurred.  If

2    you'd like, we can approach it a different way so that

3    it's not so difficult.

4             Let me ask you this.  Do you remember a time

5    when you got arrested and you admitted to deputies that

6    you had committed at least 50 car burglaries?

7        A.   Yes.

8        Q.   Okay.  What were the circumstances of you

9    explaining that to the deputy, do you recall?

10       A.   No.  Probably just pressure.

11            MS. BROTHERS:  Objection.

12   BY MR. POULTON:

13       Q.   Okay.  Was that true though when you made that

14   statement to the deputy that you had committed at least

15   50 car burglaries?

16       A.   No.  No, that was just me just saying whatever

17   to him.

18            MR. BARGIL:  Tom, we might need to step off the

19       record for a second to discuss this line of

20       questions.

21            MR. POULTON:  That's fine.  We can go off the

22       record.

23            (Off-the-record discussion.)

24   BY MR. POULTON:

25       Q.   Mrs. Taylor, we went off the record to discuss

1    some documents and what's reflected in the documents

2    regarding prior criminal history, and your counsels

3    expressed some concern about you testifying to anything

4    for which you were not already convicted, and I think

5    that the solution we're going to come to, because we

6    also are not 100 percent sure of which documents you

7    have versus what we have or your attorneys have, so what

8    we're going to do is we're going to just abstain from

9    that for the moment, and we will confer with counsel

10   and make sure we're all working off the same universe of

11   documents.  And then if there's a question about whether

12   something expressed in this document is accurate or not,

13   we'll come back maybe with a short follow-up deposition

14   just to confirm it on the order of five minutes.

15   Hopefully, we can work around it.  We've worked around

16   these kinds of issues before.

17           Fair enough, Ms. Brothers?

18           MS. BROTHERS:  Yes.

19   BY MR. POULTON:

20       Q.   Okay.  So let me ask you then in this respect

21   for what crimes have you ever been convicted?

22       A.   There's been grand theft auto and auto

23   burglaries.  I was convicted of 21 charges as an adult.

24       Q.   And that's what led to your incarceration in

25   Lowell?

1      A.    Yes.

2      Q.    Have you ever heard the phrase car hopping?

3      A.    Yes.

4      Q.    What's car hopping?  What is car hoping?

5      A.    I don't know.  Everybody has their own

6   perspective on it.

7      Q.    Are auto burglaries car hopping or can be car

8   hopping?

9      A.    If you look at it that way.

10      Q.    So I mean, for example, if you saw a group of

11   cars parked on the side of the road, you might test to

12   see which ones were open and which weren't, and the ones

13   that were open, car hoping would involve going into that

14   car and taking loose change, anything of value?

15      A.    Sure.  Yeah.

16      Q.    I'm sorry?  Okay.

17      A.    Yeah.

18      Q.    Is that the kind of thing that was going on

19   with the auto burglaries that you were convicted of?

20           MS. BROTHERS:  Object to form.

21   BY MR. POULTON:

22      Q.    Do you understand my question?

23      A.    Yes.

24      Q.    So that is -- that's what the auto burglaries

25   were was that sort of crime?

1    A.   Yes.

2    Q.   All right.  Let me show you -- let's talk about

3  sometimes when the deputies would come out to talk to

4  you after you got out of prison.  And before I get into

5  those specific instances, let me ask you was there --

6  did you have deputies before you went to prison ever

7  come out to your house there at Dublin Drive to speak to

8  you about criminal activity that either you might be

9  involved in or that you might be able to point them

10 towards?

11   A.   Say that again.

12   Q.   Well, when you got out of prison, that's when

13 you went on the prolific offender list.  Is that your

14 understanding?

15   A.   Yes.

16   Q.   Before you went to prison, you weren't on the

17 prolific offender list as far as you know; correct?

18   A.   No.

19   Q.   All right.  Let me rephrase the correction or

20 the question.  Prior to you going to prison, were you on

21 the prolific offender list?

22   A.   Not that I know of.  I wasn't made aware until

23 somebody told me.

24   Q.   And this was after you were out of prison?

25   A.   Yes.

1     Q.   Before you went to prison, did deputies ever

2     come to your house there on Dublin Drive and speak to

3     you about either criminal activity that you might be

4     involved in and try to discourage you from doing that or

5     asking you questions about other persons that you might

6     be connected to that were committing criminal activity?

7     A.   No, I don't believe so.

8     Q.   All right.  I'm going to show -- do my best to

9     show you some video of some of the interactions that

10    were captured on body-worn camera from deputies on

11    different occasions.  Okay?  And I don't know that these

12    are necessarily in date order because I just saved them

13    to the file for use today.  I've got about five of them.

14         If you need to take a break at any point, let

15    me know.  I think they are typically on the order of

16    four, five, six minutes long.  Okay?

17    A.   Okay.

18         COURT REPORTER:  Do you need me to take these

19    videos down, or what are you doing here?

20         MR. POULTON:  No, you don't need to write --

21    you don't need to do that.  They're going to be

22    attached as exhibits.  Exhibit 1 was the Rule 26.

23    Exhibit 2 will be this video dated January 1, 2018.

24         (Exhibit No. 2 was designated to be marked for

25    identification.)

1          (Video was played at this time.)

2          MR. POULTON:  Can you see that on the screen by

3     the way?

4          MS. BROTHERS:  Yes.

5          MR. POULTON:  I'm sorry.  Somebody said no?

6          COURT REPORTER:  We can see it.

7          MR. POULTON:  I'm going to advance it a bit.

8          (Video was played at this time.)

9  BY MR. POULTON:

10     Q.    Okay.  Now is the house that we see on screen

11  there at the 46 second mark -- is that 6029 Dublin

12  Drive?

13     A.    Yes.

14          (Video was played at this time.)

15  BY MR. POULTON:

16     Q.    Can you hear the knocking and then the dog

17  barking?  I just want to make sure you can hear it on

18  your end.

19     A.    Yes.

20          (Video was played at this time.)

21  BY MR. POULTON:

22     Q.    Okay.  Now we were just at about 1:30, 1:45

23  there.  There was a reference to somebody that was

24  apparently sleeping in the carport, and you said it

25  might be your dad.  Did your dad live with you during

1    this time period in January of 2018?

2         A.   No, he never lived there.  He would just come

3    there, you know, once in a while.

4         Q.   Okay.

5         A.   That's it.

6         Q.   What's your father's name?

7         A.   Jeff.

8         Q.   Taylor?

9         A.   Yes.

10        Q.   Okay.  Thanks.

11             (Video was played at this time.)

12   BY MR. POULTON:

13        Q.   Okay.  Now at 2:01 we see somebody coming out

14   the front door.  Is that Dana Jones, your grandmother?

15        A.   Yes.

16             (Video was played at this time.)

17   BY MR. POULTON:

18        Q.   Here at about 3:20 to 3:29 there's discussion.

19   Ms. -- you see Ms. Jones there is complaining about

20   frequent visits in -- too early for her, and the deputy

21   advised her that if she wanted to, she could call the

22   Sheriff's Office to complain.  Did you see that?

23        A.   Yes.

24             MS. BROTHERS:  I'm just going to object that

25        the video speaks for itself.

1    BY MR. POULTON:

2        Q.   Well, did you understand that if you wanted to,

3    you or Ms. Jones could have called the Sheriff's Office

4    to complain about the frequency of visits or the time of

5    the visits?

6        A.   Okay.

7        Q.   I'm asking you did you understand that you

8    could have called the Sheriff's Office -- you or

9    Ms. Jones could have called the Sheriff's Office to

10   complain if you'd wanted to?

11           MS. BROTHERS:  I'm going to object to the form.

12   BY MR. POULTON:

13       Q.   Do you understand my question?

14       A.   Yes.

15       Q.   All right.  So can you answer for me, please?

16   Did you -- did you understand that you could have called

17   the Sheriff's Office if you wanted to to complain?

18           MS. BROTHERS:  Same objection.

19           You can answer if you can, Dalanea.

20       A.   Okay.

21           Yes.  But then again, he still made me feel

22   very uncomfortable in coming there.  That was not the

23   first time they'd been there doing the same thing over

24   and over and over.  I don't understand what they wanted

25   -- what response they wanted.

BY MR. POULTON:

Q.   Did you call the Sheriff's Office to complain?

A.   No, sir.

Q.   Do you know whether or not --

A.   Because when you call -- when you call the
Sheriff's Office, you get the same results.

Q.   Well, how do you know if you didn't call the
Sheriff's Office what the result would have been?

A.   I've called -- I haven't called them about this
incident, but I've called them before and I've gotten
the same result.

Q.   Which is?

A.   Nothing.

Q.   Did you ever call the --

A.   (Inaudible).

Q.   Okay.  I'm sorry.  I didn't mean to interrupt
you.

A.   You're good.

Q.   Okay.  Did you ever call the Sheriff's Office
to complain about prolific offender checks?

A.   No.  I thought they all run together.  I didn't
know you can really call and complain about something
that I knew nothing about.

Q.   Did you send any sort of a letter or fill out
any sort of a grievance at the Sheriff's Office about

1    the prolific offender checks?

2        A.   No.

3              (Video was played at this time.)

4    BY MR. POULTON:

5        Q.   Now right there at -- I'm going to back that up

6    a little bit -- at 4:40 -- it's like about -- well,

7    about 4:40 or so here the deputy's going to say he's

8    sorry, and you indicate it's okay.  Did you hear that?

9    I'm going to play it again for you.

10             (Video was played at this time.)

11       A.   You don't have to play it again.  I heard it.

12   But I said in the beginning -- I asked him when he was

13   -- when the whole thing was going to stop, meaning when

14   are they going to stop coming by.  Meaning I was not

15   okay with his visit.

16   BY MR. POULTON:

17       Q.   Okay.  But you would agree with me that later

18   on when he said he was sorry to cause trouble with your

19   grandmother there that you said it was okay?

20             MS. BROTHERS:  I'm going to object that the

21        video speaks for itself.

22       A.   What she said.

23             (Video was played at this time.)

24             MR. POULTON:  All right.  So that's going to be

25        Exhibit 1 to the deposition.

```
 1              COURT REPORTER:  Exhibit 2.

 2              MR. POULTON:  I'm so sorry.  Exhibit 2.

 3              The next one will be 3-31-2018 video.

 4              (Video was played at this time.)

 5    BY MR. POULTON:

 6         Q.   Now this does not look like the same house.  Is

 7    this a different house that the deputy's walking up to

 8    now about ten to fifteen seconds?

 9         A.   Yeah.  They're walking up to the wrong house.

10         Q.   I'm sorry.  To the wrong house?

11         A.   Yeah.

12              (Video was played at this time.)

13    BY MR. POULTON:

14         Q.   All right.  All right.  I just wanted to

15    clarify that.  So then they go over to -- here we get to

16    about 49 seconds here, and this house they're at now,

17    that's the 6029 Dublin Drive house?

18         A.   Yes.

19              (Video was played at this time.)

20    BY MR. POULTON:

21         Q.   Okay.  At the two minute mark somebody else has

22    come out of the house there.  Who's that?

23         A.   That's my mom.

24         Q.   Okay.  So that is Mannie Tabor?

25         A.   Marnie Tabor.
```

1        Q.    Sorry, sorry, sorry.  Marnie Tabor, okay.

2              (Video was played at this time.)

3    BY MR. POULTON:

4        Q.    So at about 2:45 or so there's discussion that

5    the deputy says that the last time he was there was at

6    the beginning of January.  We saw that video, and you

7    reference somebody else having come out in between

8    January 1 and March 31.  Do you recall that?

9              MS. BROTHERS:  I'm going to object that it

10            speaks for itself.

11   BY MR. POULTON:

12       Q.    Well, I'm just asking whether you remember this

13   sequence of events where this particular deputy came and

14   visited you on January 1, 2018, and then showed up a few

15   months later, and you pointed out, hey, somebody had

16   come out in the interim.  Do you remember it?

17       A.    I just remember a whole bunch of stops.  I

18   don't -- I -- I can't tell you exactly.

19       Q.    Okay.

20       A.    But like I said in the video, I know I

21   probably -- I wasn't lying about it.

22       Q.    I understand.  Okay.

23             (Video was played at this time.)

24             MR. POULTON:  All right.  So that's going to be

25            Exhibit 3, Madam Court Reporter.  That is the body

1       cam for March 31, 2018.  Okay?

2              (Exhibit No. 3 was designated to be marked for

3       identification.)

4   BY MR. POULTON:

5       Q.   All right.  And then did you catch the

6   reference in there, Ms. Taylor, to a female deputy

7   having come out in between the time that that same male

8   deputy had come out in January and then in March?  Did

9   you hear that?

10      A.   Yes.

11             MS. BROTHERS:  Objection.  Speaks for itself.

12             MR. POULTON:  I think we're going to see that

13      now.  This will be Exhibit I guess 4 now.

14             (Video was played at this time.)

15  BY MR. POULTON:

16      Q.   During the -- around the two minute mark did

17  you just -- as we listened to that, did you hear the

18  deputy encouraging you not to give up on school?

19             MS. BROTHERS:  I'm going to object that the

20      video speaks for itself and that the -- to the --

21      that the word encouraging is vague.

22  BY MR. POULTON:

23      Q.   Do you understand what I mean?  Do you take

24  that to be -- that little snip-it we just saw, and I

25  could play it again -- Ms. Taylor, would you agree with

1   me that the deputy is encouraging you not to give up on

2   school?

3         MS. BROTHERS:  Object that the video speaks for

4     itself.

5         MR. POULTON:  I'm asking Ms. Taylor her

6     perception.

7     A.   I feel -- I feel like she was trying to be nice

8   to get the answers that she wanted.

9         MR. POULTON:  So that's, what, Exhibit 4 now I

10     guess.  That's the February 25, 2018 video.  And

11     we'll get these shipped to you, Madam Court

12     Reporter.

13         (Exhibit No. 4 was designated to be marked for

14     identification.)

15  BY MR. POULTON:

16     Q.   Now in the videos that we watched -- well, let

17  me ask you this.  Not in terms of the videos, but on the

18  occasions that the deputies came out to talk to you --

19  and I'm speaking holistically now, not just the ones we

20  saw but all the others -- were the deputies polite to

21  you?

22         MS. BROTHERS:  Object to the form.

23  BY MR. POULTON:

24     Q.   Do you know what I mean?

25     A.   Yes.

1      Q.    Dalanea, you could -- you could --

2      A.    No, not all of them.

3      Q.    Okay.  So some were polite and some were not?

4            MS. BROTHERS:  Objection to form.  You can

5      answer, Dalanea.

6      A.    I feel -- I feel like they were only polite

7   when they wanted the answer -- I mean the answers that

8   they were asking.

9   BY MR. POULTON:

10     Q.    Okay.  So did you feel at the time that they

11  were sincere and being cordial to you?

12           MS. BROTHERS:  Same objection.

13     A.    They just made me feel uncomfortable to answer

14  their questions, so I did.

15  BY MR. POULTON:

16     Q.    Did you ever tell them you're making me feel

17  uncomfortable?

18     A.    No, that's not something I -- I mean I -- I

19  wouldn't come off to a officer and say you're making me

20  feel uncomfortable.  That's just the feeling.

21     Q.    Did any deputy ever demand to come into the

22  residence there at 6029 Dublin Drive?

23     A.    Not at 620 -- I mean whatever, but they have at

24  7208 Adare Drive.

25     Q.    7208 Adare?

```
 1        A.    Yes.

 2        Q.    Who lives at 7208 Adare?

 3        A.    Karen Hodges.

 4        Q.    Who is Karen Hodges?

 5        A.    Also somebody I used to live with.

 6        Q.    Did you live at 7208 Adare Drive?

 7        A.    Yes.

 8        Q.    Were you there when they demanded to come

 9   inside?

10        A.    Yes.

11        Q.    When did this happen?

12        A.    I'm not sure the exact date.

13        Q.    Was it before you went to prison or after?

14        A.    After.

15        Q.    Okay.  I thought that we had established that

16   you lived at 6029 Dublin Drive when you got out of

17   prison?

18        A.    I --

19        Q.    Okay.

20        A.    I never really had any -- sorry.  I never

21   really had a -- a steady -- a steady home.  Like I was

22   from -- I was jumping from house to house to house.  I

23   did stay at 7208 for a -- off and on.  It was never a

24   permanent address that I lived at.

25        Q.    What do you remember about the deputies coming
```

1   there and wanting to come inside?

2       A.   The same thing.  What do you mean exactly what

3   do I remember?

4       Q.   Well, what do you remember about the

5   circumstances?  Was it day or night, more than one

6   deputy, why they were there?  Do you know -- can you

7   give me any details?

8       A.   It was nighttime.

9       Q.   Okay.  And was there more than one deputy

10  there?

11      A.   Yes.

12      Q.   And what did the deputy say?

13      A.   He wanted to come inside and search the house

14  and make sure the person they were looking for was not

15  there.  There was nobody there.  It was not my house to

16  allow them in.  And then they threatened to write me a

17  citation for the numbers on the house and a stove that

18  was sitting outside.

19      Q.   Okay.  So let's back up just a little bit and

20  kind of break that down.  So the deputy -- let me ask

21  you, did you answer the door?

22      A.   No, I was already outside.

23      Q.   Okay.  So you were sitting outside.  Were you

24  in the front area of the house?

25      A.   I was on the front porch.

1    Q.   Have you seen video of this interaction?

2    A.   No, I have not.

3    Q.   Okay.  So you're sitting outside on the front

4    porch and a deputy came up; correct?

5    A.   Yes.

6    Q.   And the deputy said he was looking for

7    somebody?

8    A.   Yes.

9    Q.   Did he say who?

10   A.   He was my cousin, my cousin Justin Keevan.

11   Q.   Okay.  Did he say why he was looking for Justin

12   Keevan?

13   A.   They had got a call that he did something and

14   that he was --

15   Q.   Okay.

16   A.   -- that was the only place that they thought he

17   would have been.

18   Q.   Was this -- I recollect seeing some

19   documentation at one point that he had made some

20   comments that were perhaps suicidal in nature.  Is that

21   in relation to that incident?

22   A.   Yes.

23   Q.   Okay.  Correct me if I'm wrong, but my

24   recollection is that he made (unintelligible) and ran

25   off from his house.

1      A.    (Unintelligible).

2            (Court reporter asked for clarification.)

3   BY MR. POULTON:

4      Q.    I said that it was my understanding that he

5   made some comments about self-harm and then ran off, and

6   I believe that Ms. Taylor was explaining the background

7   a bit more.  So if she can just go ahead back in and do

8   that, that would be great.

9            Go ahead, Ms. Taylor.

10           MS. BROTHERS:  I'll just place an objection to

11      form as well.

12           MR. POULTON:  Okay.

13           MS. BROTHERS:  You can go ahead.

14      A.    He -- him and his girlfriend, well, they had a

15   lot of complications in their relationship or whatever,

16   and my cousin would say things just for her -- to make

17   her feel bad or whatever the case may be.  But he is --

18   he was no -- he wasn't suicidal or nothing like that.  I

19   had already spoken with him.  He just didn't want her to

20   think that he was okay at the moment.  And then she

21   ended up calling the police and sending them over to

22   that house.  I made the police aware that he was not

23   there or anywhere around, that I've already spoken to

24   him, but he doesn't want to speak to them.  And they

25   thought I was lying and demanded to go inside the house,

1    and I told them I was not allowing them inside someone

2    else's house.  It wasn't until she wanted to allow them

3    into the house then she would.

4           They still threatened me to -- threatened to

5    write citations.  Then the owner pulled up, and she told

6    them that, you know, Justin was not in the house.  Some

7    reason they believed her and didn't have to do a home

8    check.  Yeah, that's about it.

9       Q.   Okay.  Did they actually issue a citation?

10      A.   I left right after the homeowner pulled up.

11   She never really told me if they wrote her a citation or

12   not because she told them you can't really write me the

13   citation because it's not my house and it's not my

14   property.

15      Q.   Whose house was it?

16      A.   It was hers, Karen Hodges'.

17      Q.   But Karen told them, "This is not my house, so

18   don't" --

19      A.   Karen told them that it wasn't -- it wasn't my

20   house, it wasn't my property.

21      Q.   Well, let me be clear -- a little bit clearer

22   in my question, and I'll break it down a little bit so I

23   understand what you're saying.  Did you get written a

24   citation yourself that day?

25      A.   No.

1      Q.    To your knowledge, did Ms. Hodges get issued a

2  citation that day?

3      A.    Like I said, I'm not sure.  If she did, I don't

4  know about it.

5      Q.    Were you ever issued at any point -- not just

6  this day but ever issued a code citation violation or

7  code violation citation, I'm sorry, by the Pasco

8  Sheriff's Office?

9      A.    No.

10     Q.    Do you know whether Ms. Jones, your

11  grandmother, was ever issued a citation?

12     A.    No.

13     Q.    Okay.  Other than this one incident where you

14  were at 7208 Adare Drive and there was the report

15  regarding Mr. Keevan and them wanting to come into the

16  house, was there ever any other occasion where deputies

17  wanted to enter a house where you were living?

18     A.    No.  Sorry, I have to plug this in.

19     Q.    No problem.  You want -- we've been going about

20  an hour and fifteen minutes.  Are you good to keep

21  going?  I really am not going to have that many

22  questions.  We can wrap it up, or if you want to take a

23  five- or ten-minute break, we can do that.

24     A.    We could keep going.  My baby is still

25  sleeping.  He would have came in here and --

1      Q.   Okay.  I understand.

2           All right.  So just to be clear though, that

3      was the only time when deputies -- when you interacted

4      with deputies when they wanted to come into one of the

5      residences that you were living at; correct?

6      A.   Yes.

7      Q.   Okay.  Were the other interactions that you had

8      with deputies during the prolific offender checks after

9      you got out of prison -- would you describe them as

10     similar in tone to the ones that we saw, the three that

11     we watched?

12          MS. BROTHERS:  Objection to form.

13     BY MR. POULTON:

14     Q.   Do you understand my question?

15     A.   No, not really.

16     Q.   Okay.  The three videos we watched, was that

17     pretty typical of the interaction that you had with the

18     deputies?

19          MS. BROTHERS:  Object to the form.  You can

20          answer.

21     A.   Where they -- they asked me multiple questions

22     about my life, yes.

23     BY MR. POULTON:

24     Q.   Okay.  But in terms of their demeanor towards

25     you, was that pretty consistent with what you saw in

1    those three videos?

2              MS. BROTHERS:  Same objection.

3        A.    No.  There was -- there have been other ones

4    that were just frankly just rude and made me even feel

5    more uncomfortable.

6    BY MR. POULTON:

7        Q.    Do you remember their names?

8        A.    No, I really don't remember anybody's name.

9        Q.    Do you remember -- can you give me any

10   information on the dates or anything that would help us

11   pin down when those particular interactions might have

12   occurred?

13       A.    No, sir, I do not.

14       Q.    You said that they made you feel uncomfortable

15   or were -- well, we'll stick with that for now.  You

16   said they made you feel more uncomfortable than on these

17   other occasions.  How so?

18       A.    Just the questions they would have.

19       Q.    Were the questions primarily about whether you

20   knew about other people committing crime in the area and

21   whether you were staying out of crime, or were they

22   personal, or it was a mix?

23             MS. BROTHERS:  Same objection.

24       A.    It was a mix.

25             MR. POULTON:  Okay.  Madam Court Reporter, did

1      you get there was an objection but she also

2      answered?

3              COURT REPORTER:  Yes, sir.

4    BY MR. POULTON:

5      Q.   Okay.  So sometimes they would ask you just

6    questions -- if I'm correct you tell me or incorrect let

7    me know.  But am I right that sometimes they would just

8    ask you questions about whether you were committing

9    criminal activity and whether other people were, some

10   other times they would ask you personal questions, and

11   sometimes they would ask you a mix of the two; is that

12   fair?

13              MS. BROTHERS:  Same objection.

14              You can answer, Dalanea.

15      A.   Yes.

16   BY MR. POULTON:

17      Q.   Okay.  So that's a fair characterization that

18   it varied by deputy and occasion as to how intrusive

19   they were?

20              MS. BROTHERS:  Same objection.

21              Unless I instruct you not to answer, you can

22      answer, Dalanea.

23   BY MR. POULTON:

24      Q.   Well, just explain to you -- that's okay.  I'll

25   just -- Dalanea, can you hear me?

1    A.   Yes.

2    Q.   Okay.  Just what she's pointing out is that

3  from time to time I'll ask a question that Counsel wants

4  to preserve an objection for for later.  If you

5  understand the question and can answer it, you can go

6  ahead.  It's only if she tells you not to answer that

7  you should not.  Okay?

8    A.   Yes.

9         MS. BROTHERS:  That's right.

10  BY MR. POULTON:

11    Q.   Okay.  So the question that I was asking was

12  whether or not it would be fair to say that the

13  intrusiveness of the questions that you would face

14  during these different encounters varied from deputy to

15  deputy and from encounter to encounter?

16         MS. BROTHERS:  Same objection.

17    A.   Yes.

18  BY MR. POULTON:

19    Q.   Did any deputy ever use force on you in any of

20  these -- physical force on you in any of your encounters

21  with them during prolific offender checks?

22    A.   No.

23         MS. BROTHERS:  Objection.

24  BY MR. POULTON:

25    Q.   I'll rephrase the question.  For those

1   occasions which you thought you were undergoing a

2   prolific offender check, did any deputy ever use

3   physical force on you?

4           MS. BROTHERS:  Same objection.

5           MR. POULTON:  Can I ask what the objection is

6       just so we can try to fix it?

7           MS. BROTHERS:  Just characterizing the

8       encounters as like talking about -- I'm sorry --

9       characterizing the tone of the encounters and

10      grouping them together.

11  BY MR. POULTON:

12      Q.   Okay.  Well, how about I -- you know what?  One

13  way to approach this would be this.  Has any Pasco

14  Sheriff's deputy ever on any occasion used physical

15  force against you?

16      A.   No.

17      Q.   Has anybody from the Pasco Sheriff's Office

18  ever made any comment to you about whether or not

19  prolific offender checks were necessary or a good or a

20  bad idea?

21          MS. BROTHERS:  Object to the form.

22      A.   I don't understand what you're saying.

23  BY MR. POULTON:

24      Q.   Okay.  Has any Pasco Sheriff's deputy or

25  anybody from the Pasco Sheriff's Office ever told you

1    that you should not have been on the prolific offender

2    list?

3        A.    No.

4        Q.    Do you know how it was that you came to be off

5    of the prolific offender list?

6        A.    What do you mean by that?

7        Q.    Well, in one of the videos we watched there was

8    discussion of you having found out that you were on a

9    list and asking how much longer these checks were going

10   to occur.  Do you recall that?

11       A.    Well, when I was -- when I was released from

12   prison, I was told that I -- they didn't give it no type

13   of name.  They just basically said that when you're

14   on -- when you get released from prison, they send out a

15   deputy a few months after you get released and then, you

16   know, that time will go away.  You know, the police will

17   stop coming.  I think they told me about a six-month

18   period.

19            Then I had somebody come and interview me.

20   That's when I found out I was on the list.

21       Q.    Okay.  So your -- am I correct that your

22   understanding was when you first got out of prison the

23   first maybe couple of visits that you had you thought

24   were in association with you having been released from

25   prison, it had some connection to that?

1    A.   Yes.

2    Q.   And then you found out later that you were also

3  on a list that was creating these other checks on you;

4  is that correct?

5    A.   Yes.

6    Q.   Do you remember roughly when it was that you

7  found out that you were on the list that would cause

8  more checks to occur?

9    A.   I'm not sure.  I'm not sure of the exact date.

10  Yeah.  No, I'm not sure at all.  It was the newspaper

11  people that came.

12    Q.   You found out from -- well, let me ask you

13  this.  When you first found out you were on the list,

14  was it from the newspaper people or was it --

15    A.   It was the newspaper, yes, reporter.

16    Q.   You're doing -- we're almost to the end.  We've

17  done so well.  This is the thing I talked about about

18  letting me finish the question before you answer.  Okay?

19    A.   Okay.

20    Q.   So let me finish the question again.

21    Did you first find out that you were on the

22  prolific offender list from somebody from the newspaper

23  or from the Pasco Sheriff's Office?

24    A.   The newspaper reporter.

25    Q.   Okay.  When you found out you were on the list,

1    did you take any action to get taken off the list?

2         A.    I just started working with other people.  I

3    mean, I'm not -- I don't know -- I wouldn't know how to

4    get myself off of that list.

5         Q.    Well, did you call the Sheriff's Office to ask

6    how would I get taken off the list?

7         A.    No.

8         Q.    Did you ask any of the deputies that came out,

9    hey, how can I get taken off the list?

10        A.    I -- the deputies stopped coming out after I

11   started working with the newspaper reporters.

12        Q.    Did you talk about the newspaper reporters with

13   any of the deputies?

14        A.    No.  It went viral on Facebook and stuff like

15   that.

16        Q.    Did any of the deputies that were coming out to

17   visit you talk about any of the things that had gone

18   viral on Facebook or in the newspaper?

19        A.    No.  I haven't seen a deputy since.

20        Q.    When you say since, you mean since what?

21        A.    Since my report.

22        Q.    You mean in the newspaper?

23        A.    Yes.

24        Q.    Do you know whether or not the newspaper report

25   had anything to do with the deputies stopping to come

1    visit other than the timing?

2        A.    No, I'm not sure.

3        Q.    Tell you what.  Let's take just a real quick

4    three-minute break, five-minute break.  You want to just

5    kind of check the baby and everything like that, and

6    let's come back in like five minutes, but I think I'm

7    probably done.  Okay?

8        A.    Okay.

9        Q.    Okay.  We'll come back in five.

10       A.    Okay.

11            (A break was taken at 2:30 p.m., and the

12            deposition resumed at 2:39 p.m.)

13   BY MR. POULTON:

14       Q.    All right.  Ms. Taylor, thank you very much for

15   your time.  I'm going to follow up with your attorneys

16   on some of these reports.  We were just discussing that.

17   And otherwise though, those are all the questions I have

18   for you.  Okay?

19       A.    Okay.

20       Q.    Thank you very much.

21            MS. BROTHERS:  I just have one question on --

22            MR. POULTON:  Oh, I'm so sorry.  Yeah.

23                       CROSS EXAMINATION

24   BY MS. BROTHERS:

25       Q.    So, Ms. Taylor, we were talking about some of

1    the videos of the prolific offender checks made on you.

2    Were you okay with the frequency of these visits and the

3    questions that you were asked during these visits?

4         A.   No, I was not.

5              MS. BROTHERS:  Okay.  That's all the questions

6         that I have.

7              MR. POULTON:  All right.  Thank you.

8                        *  *  *  *  *  *

9              (THEREUPON, THE TAKING OF THE DEPOSITION WAS

10        CONCLUDED AT 2:40 P.M.)

11                       *  *  *  *  *  *

12                   S T I P U L A T I O N

13        It was thereupon stipulated and agreed by and

14   between counsel present for the respective parties and

15   the deponent that the reading and signing of this

16   deposition is not waived.

17                     *   *   *   *   *   *

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA

3    COUNTY OF PASCO

4         I, the undersigned authority, certify that

5    DALANEA TAYLOR appeared before me via Zoom and was

6    duly sworn on May 18, 2022.

7         WITNESS my hand and official seal this 2nd

8    day of June, 2022.

9

10

11    _____
      Judy Anderson
12    Notary Public - State of Florida
      Commission No.:  GG 276821
13    My Commission Expires:  1-5-2023

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE OF REPORTER

2

3      STATE OF FLORIDA

4      COUNTY OF PASCO

5

6             I, JUDY ANDERSON, Court Reporter, certify that I

7      was authorized to and did stenographically report the

8      foregoing deposition and that the transcript is a true

9      record of the testimony given by the witness.

10

11            I further certify that I am not a relative,

12     employee, attorney, or counsel of any of the parties,

13     nor am I a relative or employee of any of the parties'

14     attorney or counsel connected with the action, nor am I

15     financially interested in the action.

16

17            Dated this 2nd day of June, 2022.

18

19            _____

20            Judy Anderson, Court Reporter

21

22

23

24

25

1    DALANEA TAYLOR; TAMMY
     HEILMAN; DARLENE DEEGAN;
2    and ROBERT A. JONES, III,

3      Plaintiffs,

4    vs.                        Case No.: 8:21-cv-00555-SDM-CPT

5    CHRIS NOCCO, in his
     official capacity as
6    Pasco County Sheriff,

7      Defendant.
     _____/

8

9

10                  DEPONENT'S SIGNATURE PAGE

11

12         I HAVE READ THE FOREGOING TRANSCRIPT OF MY

13     DEPOSITION AND HEREBY SUBSCRIBE TO THE FOREGOING

14     DEPOSITION, SAID SUBSCRIPTION TO INCLUDE ANY

15     CORRECTIONS AND/OR AMENDMENTS HERETO.

16

17

     _____
18   Dalanea Taylor

19

     _____
20   Date

21

22

23

24

25

1                          ERRATA SHEET

2     PAGE      LINE                    CORRECTION

3     _____   _____   _____

4     _____   _____   _____

5     _____   _____   _____

6     _____   _____   _____

7     _____   _____   _____

8     _____   _____   _____

9     _____   _____   _____

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23    _____   _____   _____

24    _____   _____   _____

25    _____   _____   _____

**A**

Abargil@ij.org 2:8
able 21:10 26:9
abstain 24:8
accurate 24:12
action 51:1 55:14,15
activity 22:6,17 23:1 26:8
  27:3,6 46:9
Adare 37:24,25 38:2,6
  43:14
address 10:9 17:10 38:24
admitted 23:5
adult 12:24,25 24:23
advance 24:9
advised 29:21
afternoon 5:8
ago 5:13
agree 32:17 35:25
agreed 53:13
agreement 6:19
ahead 11:11 41:7,9,13
  47:6
alive 10:25
allow 39:16 42:2
allowing 42:1
AMENDMENTS 56:15
AND/OR 56:15
Anderson 1:18,23 54:11
  55:6,19
answer 7:6,12,16,19
  11:12 22:20 30:15,19
  37:5,7,13 39:21 44:20
  46:14,21,22 47:5,6
  50:18
answered 46:2
answers 36:8 37:7
anybody 48:17,25
anybody's 45:8
apparently 28:24
APPEARANCES 2:1
appeared 54:5
appears 6:10
approach 23:2 48:13
area 39:24 45:20
ARI 2:6
Arlington 2:3
arrested 23:5
arriving 16:15
asked 32:12 41:2 44:21
  53:3
asking 7:16,22 12:19
  19:20 27:5 30:7 34:12
  36:5 37:8 47:11 49:9
association 49:24
attach 6:22
attached 27:22
attaching 6:15
attorney 7:4 55:12,14
attorneys 5:9 6:11 15:5
  24:7 52:15
audibly 7:6,12
August 14:9,9,17,18
Austin 22:12,18
authority 54:4
authorized 55:7
auto 14:2 21:19 24:22,22
  25:7,19,24
autos 14:2
available 19:12
award 15:19
aware 5:15 26:22 41:22

**B**

B 4:1
B-A-R-O-Q-U-E 8:4

**C**

baby 43:24 52:5
Bachelor 18:1,19
back 6:12 15:1 21:7
  24:13 32:5 39:19 41:7
  52:6,9
background 41:6
bad 41:17 48:20
BARGIL 2:6 23:18
barking 28:17
Baroque 7:24 8:7,11 9:2
basically 17:8 49:13
basis 19:10
beginning 11:11 32:12
  34:6
believe 27:7 41:6
believed 42:7
best 6:16 21:14 27:8
better 11:8
bills 18:24
birth 5:12
Biscayne 2:7
bit 9:16 10:18 16:12 28:7
  32:6 39:19 41:7 42:21
  42:23
Blvd 2:7,11
body 4:4,5,6 34:25
body-worn 9:17 27:10
break 5:16 13:15 27:14
  39:20 42:22 43:23 52:4
  52:4,11
breastfeed 12:9
breastfeeding 21:9
brief 12:12
broken 16:11
brothers 2:2 3:3 22:7,19
  23:11 24:17,18 25:20
  28:4 29:24 30:11,18
  32:20 34:9 35:11,19
  36:3,22 37:4,12 41:10
  41:13 44:12,19 45:2,23
  46:13,20 47:9,16,23
  48:4,7,21 52:21,24
  53:5
brought 5:10
bunch 34:17
burglaries 14:3 21:20
  23:6,15 24:23 25:7,19
  25:24

**C**

calculated 15:21
call 17:9 19:11 21:24
  29:21 31:2,5,5,7,14,19
  31:22 40:13 51:5
called 21:19 30:3,8,9,16
  31:9,9,10
calling 41:21
cam 4:4,5,6 35:1
camera 6:1 9:17 27:10
capacity 1:7 56:5
captured 27:10
car 23:6,15 25:2,4,4,7,7
  25:13,14
care 5:18
CAROLINE 2:2
carport 28:24
cars 25:11
case 1:6 15:5 16:8 41:17
  56:4
cash 18:12,14,16,18
catch 35:5
cause 32:18 50:7
caused 20:19
certain 6:13 18:13
Certainly 5:17

Certificate 3:4,5 54:1
  55:1
certify 54:4 55:6,11
Cgbrothers@ij.org 2:4
chance 6:14
change 25:14
characterization 46:17
characterizing 48:7,9
charge 14:4
charges 13:25 24:23
check 19:1,2 42:8 48:2
  52:5
checks 19:3 31:20 32:1
  44:8 47:21 48:19 49:9
  50:3,8 53:1
children 8:13,14,20
CHRIS 1:7 56:5
CI 13:4,6,9
circumstances 5:17
  12:11 23:8 39:5
citation 39:17 42:9,11,13
  42:24 43:2,6,7,11
citations 42:5
city 1:8 4:9
claim 15:7 16:3 19:22
claiming 16:7,8
clarification 41:2
clarify 33:15
Cleaning 17:23 20:24
clear 5:22 42:21 44:2
clearer 42:21
clients 17:9 19:17
Co-Counsel 2:9
code 43:6,7
come 16:25 24:5,13 26:3
  26:7 27:2 29:2 33:22
  34:7,16 35:7,8 37:19
  37:21 38:8 39:11,13
  43:15 44:4 49:19 51:25
  52:6,9
comes 9:18
coming 29:13 30:22
  32:14 38:25 49:17
  51:10,16
comment 48:18
comments 40:20 41:5
Commission 54:12,13
committed 21:19 23:6,14
committing 27:6 45:20
  46:8
common 6:6
company 17:5,7,7
compare 6:14
compensation 15:10
Compensatory 15:20
complain 29:22 30:4,10
  30:17 31:2,20,22
complaining 29:19
completely 6:14
complications 41:15
concern 24:3
CONCLUDED 53:10
confer 24:9
confidentiality 6:19
confirm 24:14
Congratulations 5:15
connected 27:6 55:14
connection 49:22
consistent 44:25
convicted 22:21 24:4,21
  24:23 25:19
Cook@debevoisepoult...
  2:13
cordial 37:11
correct 16:9,10 21:21
  26:17 40:4,23 44:5

46:6 49:21 50:4
correction 26:19 57:2
Correctional 13:18
CORRECTIONS 56:15
costs 15:21,23
counsel 2:5,14 6:17 24:9
  47:3 53:14 55:12,14
counsels 24:2
County 1:8 54:3 55:4
  56:6
couple 7:4 49:23
court 1:1,18,23 6:3,7 7:7
  27:18 28:6 33:1 34:25
  36:11 41:2 45:25 46:3
  55:6,19
courtesy 7:18
cousin 40:10,10 41:16
cousins 22:6
creating 50:3
crime 25:25 45:20,21
crimes 21:20 24:21
criminal 12:13 22:5,17
  23:1 24:2 26:8 27:3,6
  46:9
Cross 3:3 52:23
currently 7:23 12:7
curtail 12:11

**D**

D 3:1
dad 28:25,25
Dade 1:24
Dalanea 1:3,12 5:1 16:14
  30:19 37:1,5 46:14,22
  46:25 54:5 56:1,18
damage 16:8
damages 15:7,19,20,24
  16:3,5,5
Dana 9:14,19 10:10
  29:14
Darlene 1:3 17:24 18:19
  19:15 56:1
Darlene's 17:25
date 1:14 10:15,21 14:7,8
  14:14 27:12 38:12 50:9
  56:20
dated 15:13 27:23 55:17
dates 14:10 45:10
day 17:3 18:22 19:14
  20:20 39:5 42:24 43:2
  43:6 54:8 55:17
Debevoise 2:10,17
Deegan 1:3 5:11 56:1
Defendant 1:9 2:14 56:7
demand 37:21
demanded 38:8 41:25
demeanor 44:24
demonstrate 20:1
Denise 18:7,8
deponent 53:15
Deponent's 3:5 56:10
deposition 1:12 7:1 24:13
  32:25 52:12 53:9,16
  55:8 56:13,14
deputies 9:17 16:15,20
  20:3,4,9,13,18 23:5
  26:3,6 27:1,10 36:18
  36:20 38:25 43:16 44:3
  44:4,8,18 51:8,10,13
  51:16,25
deputy 23:9,14 29:20
  34:5,13 35:6,8,18 36:1
  37:21 39:6,9,12,20
  40:4,6 46:18 47:14,15
  47:19 48:2,14,24 49:15

51:19
deputy's 32:7 33:7
describe 44:9
designated 27:24 35:2
  36:13
details 22:16 39:7
detect 7:13
different 16:2 21:16 23:2
  27:11 33:7 47:14
difficult 23:3
Direct 3:3 5:6
directed 18:2
directly 19:16
disabled 17:15
Disclosures 4:3 15:13
discourage 27:4
discuss 23:19,25
discussed 6:9 7:5
discussing 52:16
discussion 23:23 29:18
  34:4 49:8
DISTRICT 1:1,1
dive 12:13
DIVISION 1:2
document 15:8 24:12
documentation 14:22
  21:17 40:19
documented 19:23
documents 20:1 24:1,1,6
  24:11
dog 28:16
dollar 6:1 27:4,19 30:23
  50:16
dollar 18:24,24,24 20:14
door 29:14 39:21
Drive 7:24 8:7,12 9:2
  10:12,14,20 11:5,7
  12:1 15:1 26:7 27:2
  28:12 33:17 37:22,24
  38:6,16 43:14
Dublin 10:12,13,19 11:5
  11:7,14,21 12:1 15:1
  26:7 27:2 28:11 33:17
  37:22 38:16
due 21:9
duly 5:2 54:6

**E**

E 3:1 4:1
early 29:20
economic 16:4,9
either 6:17,18 26:8 27:3
elaborate 16:18
elaborately 16:12
elderly 17:13
else's 42:2
embarrass 12:16
embarrassing 22:24
emotional 15:24 16:6
employed 12:7,8 16:19
employee 55:12,13
encounter 47:15,15
encounters 47:14,20 48:8
  48:9
encouraging 35:18,21
  36:1
ended 41:21
engage 22:17
enter 43:17
Eric 8:22
Errata 3:6 57:1
ESQUIRE 2:2,6,10
establish 22:25
established 38:15
estimate 20:11

events 12:17 34:13
**Everybody** 25:5
**exact** 10:15,21 14:10
38:12 50:9
**exactly** 11:10 14:20
20:14 21:13 34:18 39:2
**Examination** 3:3,3 5:6
52:23
**examined** 5:3
**example** 18:19 25:10
**Exhibit** 15:11,14 27:22
27:23,24 32:25 33:1,2
34:25 35:2,13 36:9,13
**exhibits** 6:15,23 27:22
**Expires** 54:13
**explain** 46:24
**explaining** 23:9 41:6
**expressed** 24:3,12
**extend** 7:18

**F**

**face** 47:13
**Facebook** 51:14,18
**fair** 14:16 22:23 24:17
46:12,17 47:12
**far** 6:12 16:12 26:17
**father's** 29:6
**February** 36:10
**Federal** 6:21
**feel** 30:21 36:7,7 37:6,6
37:10,13,16,20 41:17
45:4,14,16
**feeling** 37:20
**female** 35:6
**fifteen** 33:8 43:20
**fifty** 18:24
**figure** 19:22
**file** 27:13
**fill** 31:24
**financially** 55:15
**find** 14:21 50:21
**fine** 14:12,23 23:21
**finish** 7:15,19 11:12
50:18,20
**first** 4:2 5:2 6:5 10:13,17
15:4,12 21:21 30:23
49:22,23 50:13,21
**five** 24:14 27:13,16 52:6
52:9
**five-** 43:23
**five-minute** 52:4
**fix** 48:6
**FL** 1:24 2:7,11
**Florida** 1:1,19 8:10 13:10
54:2,12 55:3
**follow** 52:15
**follow-up** 24:13
**following** 15:21
**follows** 5:4
**force** 47:19,20 48:3,15
**foregoing** 55:8 56:12,13
**form** 6:19 25:20 30:11
36:22 37:4 41:11 44:12
44:19 48:21
**forward** 9:23
**found** 11:8 21:5 49:8,20
50:2,7,12,13,25
**four** 16:14 27:16
**fourteen** 13:22
**frankly** 45:4
**frequency** 30:4 53:2
**frequent** 29:20
**front** 29:14 39:24,25 40:3
**further** 55:11
**future** 15:24

**G**

**generally** 21:21
**gentleman** 8:16,20
**GG** 54:12
**girlfriend** 41:14
**give** 8:20 13:14 14:13
17:24 35:18 36:1 39:7
45:9 49:12
**given** 20:19 55:9
**Glebe** 2:3
**go** 5:18 6:12 11:11 13:12
17:9,10 18:3,6 20:21
21:7 23:21 33:15 41:7
41:9,13,25 47:5 49:16
**going** 6:15,16 7:13 9:15
12:10,13 15:7,11 16:21
22:19 24:5,8,8 25:13
25:18 26:20 27:8,21
28:7 29:24 30:11 32:5
32:7,9,13,14,20,24
34:9,24 35:12,19 43:19
43:21,21,24 49:9 52:15
**gonna** 14:10
**good** 5:8 31:18 43:20
48:19
**gotten** 31:10
**GRACE** 2:2
**grand** 14:2 24:22
**grandmother** 9:11 12:2
29:14 32:19 43:11
**grandmother's** 9:13
**great** 41:8
**grievance** 31:25
**grocery** 17:11
**ground** 7:4
**group** 21:18 22:1 25:10
**grouping** 48:10
**guess** 35:13 36:10

**H**

**H** 4:1
**hand** 18:20 54:7
**hanging** 22:1
**happen** 38:11
**happened** 17:6
**harm** 15:25
**he'll** 5:24
**head** 7:8,9
**health** 11:4
**hear** 28:16,17 32:8 35:9
35:17 46:25
**heard** 16:4 21:25 22:2
25:2 32:11
**Heilman** 1:3 5:11 56:1
**help** 45:10
**helping** 17:12,12
**HERETO** 56:15
**hey** 19:12 34:15 51:9
**history** 24:2
**Hodges** 38:3,4 43:1
**Hodges'** 42:16
**Holborn@debevoisepo...**
2:13
**Holiday** 8:10
**holistically** 36:19
**home** 16:25 17:11 38:21
42:7
**homeowner** 42:10
**Homes** 17:23 20:24
**Hopefully** 24:15
**hoping** 25:4,13
**hopping** 25:2,4,7,8
**hour** 5:25 43:20
**hourly** 18:12
**house** 9:9 11:15 19:18

26:7 27:2 28:10 33:6,7
33:9,10,16,17,22 38:22
38:22,22 39:13,15,17
39:24 40:25 41:22,25
42:2,3,6,13,15,17,20
43:16,17
**hundred** 18:24

**I**

**idea** 20:5 21:2 48:20
**identification** 15:14
27:25 35:3 36:14
**III** 1:4 56:2
**important** 7:5,7
**Inaudible** 8:1 31:15
**incarceration** 24:24
**incident** 31:10 40:21
43:13
**INCLUDE** 56:14
**income** 15:24
**incorrect** 46:6
**indicate** 32:8
**indicates** 15:18
**individual** 15:6
**information** 15:6 45:10
**Initial** 4:3 15:12
**inside** 38:9 39:1,13 41:25
42:1
**instances** 26:5
**Institute** 2:2,6 13:18
**instruct** 46:21
**interacted** 44:3
**interaction** 12:14 20:3,4
40:1 44:17
**interactions** 12:18 16:20
20:8,13,18 27:9 44:7
45:11
**interested** 55:15
**interim** 34:16
**intern** 2:17 5:23
**interrupt** 31:16
**interrupted** 11:10
**intervals** 18:13
**interview** 49:19
**intrusive** 46:18
**intrusiveness** 47:13
**involve** 6:24 25:13
**involved** 21:18 22:5 26:9
27:4
**issue** 42:9
**issued** 43:1,5,6,11
**issues** 24:16

**J**

**January** 27:23 29:1 34:6
34:8,14 35:8
**Jeff** 29:7
**job** 18:21 19:12,14
**Jones** 1:4 5:11 9:14,19
10:10,25 29:14,19 30:3
30:9 43:10 56:2
**Josh** 2:17 5:23
**Joshua** 6:6
**Judy** 1:18 54:11 55:6,19
**Judy@andersoncourtr...**
1:24
**July** 15:13
**jumping** 38:22
**June** 54:8 55:17
**Justice** 2:2,6
**Justin** 22:9,17 40:10,11
42:6
**juvenile** 12:24
**juveniles** 6:25

**K**

**K-O-B-R-I-N** 6:5
**Karen** 38:3,4 42:16,17
42:19
**keep** 20:5,16 43:20,24
**Keevan** 40:10,12 43:15
**Keeven** 22:7,9
**kept** 19:5
**kid** 21:11
**kind** 12:13 16:8 25:18
39:20 52:5
**kinds** 24:16
**knew** 31:23 45:20
**knocking** 28:16
**know** 5:16 7:14 12:4
13:16 18:7,8,12,15
19:4,21,23 21:13 22:2
25:5 26:17,22 27:11,15
29:3 31:4,7,22 34:20
36:24 39:6 42:6 43:4
43:10 46:7 48:12 49:4
49:16,16 51:3,3,24
**knowledge** 20:1 43:1
**Kobrin** 2:17 5:24

**L**

**L** 53:12
**L-O-W-E-L-L** 13:8
**Large** 1:19
**late** 16:15,19,23 19:24
20:2,8,19
**lawsuit** 5:10
**lawsuits** 16:3
**leave** 5:25 11:7 17:2
19:17
**led** 24:24
**left** 42:10
**let's** 26:2 39:19 52:3,6
**letter** 31:24
**letting** 7:19 50:18
**life** 44:22
**line** 23:19 57:2
**list** 15:21,23 26:13,17,21
49:2,5,9,20 50:3,7,13
50:22,25 51:1,4,6,9
**listed** 16:12
**listened** 35:17
**literally** 8:5
**litigation** 15:23
**little** 9:16 10:17,18 13:23
16:12 32:6 35:24 39:19
42:21,22
**live** 9:8,10,22 11:5 28:25
38:5,6
**lived** 10:6,9 11:23 12:1
29:2 38:16,24
**lives** 8:11,16 38:2
**living** 43:17 44:5
**LLC** 17:8,17,22,23 18:11
20:25
**location** 11:14
**long** 5:12 10:22 12:4
13:17,20 27:16
**longer** 49:9
**look** 16:11 25:9 33:6
**looked** 13:11
**looking** 39:14 40:6,11
**loose** 25:14
**loss** 16:9
**lost** 15:24 19:23 20:12
**lot** 17:12 41:15
**Lowell** 13:4,5,6,9,17
24:25
**lying** 34:21 41:25

**M**

**M-A-R-N-I-E** 10:3
**ma'am** 5:5
**Madam** 34:25 36:11
45:25
**making** 37:16,19
**male** 35:7
**man** 8:13
**Mannie** 33:24
**March** 14:14,24 34:8
35:1,8
**mark** 28:11 33:21 35:16
**marked** 15:14 27:24 35:2
36:13
**Marnie** 10:1,2 33:25 34:1
**matters** 12:1
**mean** 18:19 25:10 31:16
33:23 35:18 36:12,23
39:2 49:6 51:3,20,22
**meaning** 32:13,14
**meant** 12:16
**Miami** 2:7
**MIDDLE** 1:1
**mind** 12:17
**minute** 15:22 33:21
35:16
**minutes** 24:14 27:16
43:20 52:6
**missed** 20:3,7,12
**missing** 16:14
**mix** 45:22,24 46:11
**mom** 33:23
**moment** 20:16 24:9
41:20
**money** 18:20 19:8
**months** 12:6 13:21 21:1,6
34:15 49:15
**mother** 9:22
**move** 10:13,19 11:14
13:3
**moved** 8:4 10:17 12:5
**moving** 11:21
**multiple** 14:2 44:21

**N**

**N** 2:3 3:1 53:12
**name** 5:8 6:3,6 8:2,19,20
8:23 9:4,6,13,25 10:4
17:17,22,25 18:7,9
17:25 29:6 45:8 49:13
**names** 45:7
**nature** 40:20
**necessarily** 22:16 27:12
**necessary** 48:19
**need** 5:16,18,18 13:11,12
13:15 17:11 23:18
27:14,18,20,21
**needed** 16:25
**never** 19:2,3 22:2 29:2
38:20,20,23 42:11
**new** 5:23
**newborn** 12:9
**newspaper** 50:10,14,15
50:22,24 51:11,12,18
51:22,24
**nice** 36:7
**night** 39:5
**nighttime** 39:8
**Nocco** 1:7 5:10 56:5
**nod** 7:8
**nominal** 15:19
**non-economic** 16:4,5
**Notary** 1:19 54:12
**note** 6:2
**numbers** 39:17

**O**

O 53:12
Oath 3:4 54:1
object 22:19 25:20 29:24
  30:11 32:20 34:9 35:19
  36:3,22 44:19 48:21
objection 23:11 30:18
  35:11 37:4,12 41:10
  44:12 45:2,23 46:1,13
  46:20 47:4,16,23 48:4
  48:5
observe 5:24
Ocala 13:10
occasion 43:16 46:18
  48:14
occasionally 10:10
occasions 27:11 36:18
  45:17 48:1
occur 49:10 50:8
occurred 23:1 45:12
Off-the-record 23:23
offender 26:13,17,21
  31:20 32:1 44:8 47:21
  48:2,19 49:1,5 50:22
  53:1
office 5:23 6:16 12:15
  29:22 30:3,8,9,17 31:2
  31:6,8,19,25 43:8
  48:17,25 50:23 51:5
officer 37:19
official 1:7 54:7 56:5
Oh 8:6 52:22
okay 5:16,19,20 6:25
  7:11,17,21 8:6 9:10,19
  9:21,25 10:6,19 11:2
  11:25 13:9,15,16 14:7
  14:16 15:18 16:2,18
  17:22 18:2,8,15 19:4,9
  19:19 20:7,23 21:12,25
  22:4,23 23:8,13 24:20
  25:16 27:11,16,17
  28:10,22 29:4,10,13
  30:6,20 31:16,19 32:8
  32:15,17,19 33:21,24
  34:1,19,22 35:1 37:3
  37:10 38:15,19 39:9,19
  39:23 40:3,11,15,23
  41:12,20 42:9 43:13
  44:1,7,16,24 45:25
  46:5,17,24 47:2,7,11
  48:12,24 49:21 50:18
  50:19,25 52:7,8,9,10
  52:18,19 53:2,5
older 9:18
once 21:5 29:3
ones 25:12,12 36:19
  44:10 45:3
open 25:12,13
opposed 19:1
order 24:14 27:12,15
ourself 21:24
outside 19:18,22,23 40:3
owner 42:5

**P**

P 53:12
P.A 2:10
p.m 1:15,15 52:11,12
  53:10
page 3:2,5 4:1 15:9,16
  16:13 56:10 57:2
paid 18:11,12,12,18,21
  18:23 19:6,15,16
pain 16:6
paper 7:10

paragraph 16:13
Park 2:11
parked 25:11
particular 13:2 20:20
  34:13 45:11
parties 53:14 55:12
parties' 55:13
Pasco 1:8 16:20 43:7
  48:13,17,24,25 50:23
  54:3 55:4 56:6
pay 19:18 20:12
PCSO 16:15
people 16:3 17:23 21:18
  21:23 22:1,5 45:20
  46:9 50:11,14 51:2
percent 24:6
perception 36:6
period 9:23 10:23 11:25
  12:20 29:1 49:18
periodically 9:18
permanent 38:24
person 16:24 17:17 39:14
personal 45:22 46:10
persons 17:13,15 18:2
  27:5
perspective 25:6
phrase 25:2
physical 47:20 48:3,14
pin 45:11
place 1:17 11:8 40:16
  41:10
plaintiff 15:19,20
plaintiffs 1:5 2:5,9 15:23
  56:3
plaintiffs' 4:2 6:11,17
  17:12
plans 21:7
play 32:9,11 35:25
played 28:1 8,14,20
  29:11,16 32:3,10,23
  33:4,12,19 34:2,23
  35:14
please 5:15 7:12 30:15
plug 43:18
point 7:13 11:17,23 15:5
  16:19 18:20 21:17,22
  26:9 27:14 40:19 43:5
pointed 34:15
pointing 47:2
police 41:21,22 49:16
polite 36:20 37:3,6
porch 39:25 40:4
possible 12:12,12
Possibly 14:19
Poulton 2:10,10,17 3:3
  5:7,9 6:5,8 15:15 22:22
  23:12,21,24 24:19
  25:21 27:20 28:2,5,7,9
  28:15,21 29:12,17 30:1
  30:12 31:1 32:4,16,24
  33:2,5,13,20 34:3,11
  34:24 35:4,12,15,22
  36:5,9,15,23 37:9,15
  41:3,12 44:13,23 45:6
  45:25 46:4,16,23 47:10
  47:18,24 48:5,11,23
  52:13,22 53:7
Poulton@debevoisepo...
  2:12
pregnancy 21:6
pregnant 21:6
present 2:16 6:2 53:14
preserve 47:4
pressure 23:10
pretty 44:17,25
primarily 45:19

prior 9:10 24:2 26:20
prison 12:20,22,24,24,25
  14:1,8 26:4,6,12,16,20
  26:24 27:1 38:13,17
  44:9 49:12,14,22,25
privacy 13:14
probably 5:25 7:5,6 9:16
  13:21 23:10 34:21 52:7
probation 14:4
problem 43:19
problems 11:4
PROCEEDINGS 1:12
produce 21:10
produced 6:18
production 6:21
program 16:16
prolific 26:13,17,21
  31:20 32:1 44:8 47:21
  48:2,19 49:1,5 50:22
  53:1
property 42:14,20
provided 15:6
Public 1:19 54:12
pull 15:4
pulled 42:5,10
purposes 22:24

**Q**

question 7:16,20 24:11
  25:22 26:20 30:13
  42:22 44:14 47:3,5,11
  47:25 50:18,20 52:21
questions 19:20 23:20
  27:5 37:14 43:22 44:21
  45:18,19 46:6,8,10
  47:13 52:17 53:3,5
quick 52:3
quite 6:12 16:22

**R**

rails 7:13
ran 40:24 41:5
reach 6:16
READ 56:12
reading 53:15
real 52:3
really 11:13 14:20 18:6
  31:22 38:20,21 42:11
  42:12 43:21 44:15 45:8
reason 5:16 11:2,13
  13:16 19:20 42:7
reasons 20:18 40:4
recall 14:5,7 17:17 23:9
  34:8 49:10
recollect 40:18
recollection 40:24
record 6:9 19:5 23:19,22
  23:25 55:9
record's 5:22
records 18:15
redacted 6:19
refer 6:10
reference 11:3 28:23
  34:7 35:6
Referring 15:16
reflected 24:1
regarding 12:15 24:2
  43:15
relation 40:21
relationship 41:15
relative 55:11,13
released 49:11,14,15,24
remember 14:23,23 23:4
  34:12,16,17 38:25 39:3
  39:4 45:7,8,9 50:6

remove 15:24
rephrase 31:9 47:25
report 43:14 51:21,24
  55:7
REPORTED 1:18
reporter 1:18 3:5 6:3,7
  7:7 27:18 28:6 33:1
  34:25 36:12 41:2 45:25
  46:3 50:15,24 55:1,6
  55:19
reporters 51:11,12
REPORTING 1:23
reports 6:10,11,22,23
  52:16
represents 5:9
reputational 15:25
requests 6:20 15:19
reside 7:23,24 9:2
residence 37:22
residences 44:5
resides 8:21
respect 24:20
respective 53:14
response 6:20 30:25
responsibility 6:20
result 16:16 31:8,11
results 31:6
resumed 52:12
right 6:24 7:12 8:6,11,19
  9:15 10:23 12:8,10,13
  13:17 15:3 19:1 21:9
  21:11,12 26:2,19 27:8
  30:15 32:5,24 33:14,14
  34:24 35:5 42:10 44:2
  46:7 47:9 52:14 53:7
road 2:3 25:11
ROBERT 1:4 56:2
roughly 50:6
routine 19:10
rude 45:4
Rule 4:3 6:21 15:12
  27:22
rules 7:4
run 31:21
runs 17:11

**S**

S 2:6,7,11 4:1 53:12
salary 18:13
saved 27:12
saw 25:10 34:6 35:24
  36:20 44:10,25
saying 14:13 23:16 42:23
  48:22
says 16:14 34:5
school 35:18 36:2
screen 28:2,10
se 10:22 11:13 17:7
seal 54:7
search 39:13
second 18:5 23:19 28:11
seconds 33:8,16
section 16:13
see 15:16,25 16:13,16
  19:20 25:12 28:2,6,10
  29:13,19,22 35:12
seeing 40:18
seeking 15:9
seen 9:16 40:1 51:19
self-employment 16:24
self-harm 41:5
Semoran 2:11
send 13:1 19:13 31:24
  49:14
sending 41:21

sentenced 13:19 14:1
separate 15:20
sequence 12:17 34:13
serve 13:20
shake 7:8
share 15:3
Sheet 3:6 57:1
Sheriff 1:8 5:10 56:6
Sheriff's 12:15 29:22
  30:3,8,9,17 31:2,6,8,19
  31:25 43:8 48:14,17,24
  48:25 50:23 51:5
shipped 36:11
short 24:13
show 9:15 15:7 26:2 27:8
  27:9
showed 34:14
side 25:11
Signature 3:5 56:10
signing 55:6
similar 21:20 44:10
simply 18:20
sincere 37:11
sir 6:4,7 12:8 16:17,21
  18:17 31:3 45:13 46:3
sister 9:3,11 10:10
sister's 11:15,22
sit 20:15
sitting 5:24 39:18,23 40:3
six 27:16
six-month 49:17
sleeping 28:24 43:25
snip-it 35:24
solution 24:5
somebody 11:9 13:13
  17:8 18:19 19:16 26:23
  28:5,23 29:13 33:21
  34:7,15 38:5 40:7
  49:19 50:22
sorry 8:2 11:10,12 21:4
  25:16 28:5 31:16 32:8
  32:18 33:2,10 34:1,1,1
  38:20 43:7,18 48:8
  52:22
sort 25:25 31:24,25
sorts 22:15,16
speak 26:7 27:2 41:24
speaking 36:19
speaks 29:25 32:21 34:10
  35:11,20 36:3
specific 11:13 26:5
spell 6:3 8:2,25 13:7
spelled 10:2
spelling 6:6
spoken 41:19,23
Squad 21:19,22,24
start 7:16
started 51:2,14
state 1:19 12:22 54:2,12
  55:3
statement 23:14
STATES 1:1
stay 11:8 21:11 38:23
stayed 13:2
staying 45:21
Ste 2:3,11
steady 38:21,21
stenographically 55:7
step 23:18
stick 45:15
stipulated 53:13
Stipulation 3:4
stop 5:17,18 20:22 32:13
  32:14 49:17
stopped 21:3,5 51:10
stopping 51:25

stops 34:17
stove 39:17
streamline 15:22
street 1:23 8:3
stuff 51:14
subject 6:18
SUBSCRIBE 56:13
SUBSCRIPTION 56:14
suffering 16:6
suicidal 40:20 41:18
Supplemental 4:2 15:12
sure 5:21 6:5,18 10:15,21
    11:4 13:21 14:10,20,21
    15:8 19:7 20:14 24:6
    24:10 25:15 28:17
    38:12 39:14 43:3 50:9
    50:9,10 52:2
sworn 5:2 54:6

T

T 4:1 53:12,12
T-A-B-O-R 10:5
Tabor 10:1,11 33:24,25
    34:1
take 5:16,18 13:15 27:14
    27:18 35:23 43:22 51:1
    52:3
taken 7:2 51:1,6,9 52:11
talk 6:21 26:2,3 36:18
    51:12,17
talked 50:17
talking 48:8 52:25
talks 9:18
TAMMY 1:3 56:1
TAMPA 1:2
Taylor 1:3,12 5:1,8 7:1
    9:6 16:14 23:25 29:8
    35:6,25 36:5 41:6,9
    52:14,25 54:5 56:1,18
teenager 10:16
tell 5:2 14:11 17:10 34:18
    37:16 46:6 52:3
telling 13:13
tells 47:6
ten 18:24 33:8
ten-minute 43:23
terms 15:9 36:17 44:24
test 25:11
testified 5:4
testifying 24:3
testimony 55:9
thank 5:20 6:7 21:12
    52:14,20 53:7
Thanks 29:10
theft 14:2 24:22
they'd 30:23
thing 7:7,15 25:18 30:23
    32:13 39:2 50:17
things 16:5 41:16 51:17
think 14:14 21:14 22:9
    24:4 27:15 35:12 41:20
    49:17 52:6
Third 1:23
THOMAS 2:10
thought 31:21 38:15
    40:16 41:25 48:1 49:23
threatened 39:16 42:4,4
three 8:15 16:13 44:10
    44:16 45:1
three-minute 52:4
Thursday 19:10
time 1:15 9:22 10:22
    11:25 12:20 13:2,4
    17:1,4 19:5,24 20:24
    21:10 23:4 28:1,8,14

28:20 29:1,11,16 30:4
    30:23 32:3,10,23 33:4
    33:12,19 34:2,5,23
    35:7,14 37:10 44:3
    47:3,3 49:16 52:15
timed 17:3
timeframe 6:13
times 16:22,22 46:10
timing 52:1
today 6:17 22:16 27:13
told 26:23 42:1,5,11,12
    42:17,19 48:25 49:12
    49:17
Tom 5:8 23:18
tomorrow 6:17
tone 44:10 48:9
touch 22:13
track 20:16
transcript 55:8 56:12
translate 7:9
trouble 32:18
true 23:13 55:8
truth 5:2,3,3
try 7:15 27:4 48:6
trying 12:10,16 19:22
    36:16 44:11,16
    49:7
Tuesday 19:10
twenty 18:23
twins 11:18,20 12:1,5
two 9:8 13:19 17:23 21:6
    22:4 33:21 35:16 46:11
type 17:11 49:12
types 16:2
typical 44:17
typically 27:15

U

U 53:12
uh-huh 7:9
uh-uh 7:9
uncomfortable 30:22
    37:13,17,20 45:5,14,16
undergoing 48:1
undersigned 54:4
understand 5:12 11:17
    12:18 14:12 19:21
    22:23 25:22 30:2,7,13
    30:16,24 34:22 35:23
    42:23 44:1,14 47:5
    48:22
understanding 12:19
    16:7 21:16 22:4 26:14
    41:4 49:22
unintelligible 40:24 41:1
UNITED 1:1
universe 24:10
unredacted 6:24
updated 15:23
use 27:13 47:19 48:2

V

VA 2:3
vague 35:21
value 25:14
Vanessa 9:5 10:10
varied 46:18 47:14
versions 6:24
versus 16:4 24:7
video 4:4,5,6 9:15 27:9
    27:23 28:1,8,14,20
    29:11,16,25 32:3,10,21
    32:23 33:3,4,12,19
    34:2,6,20,23 35:14,20
    36:3,10 40:1
videos 11:3 27:19 36:16

36:17 44:16 45:1 49:7
    53:1
violation 14:4 43:6,7
viral 51:14,18
visit 32:15 51:17 52:1
visited 34:14
visits 16:15 29:20 30:4,5
    49:23 53:2,3
vs 1:6 56:4

W

W 2:10
W-R-I-G-H-T 9:1
waived 53:16
walking 33:7,9
want 17:8 21:24 28:17
    41:19,24 43:19,22 52:4
wanted 6:2,10 11:24 29:21
    30:2,10,17,24,25 33:14
    36:8 37:7 39:13 42:2
    43:17 44:4
wanting 39:1 43:15
wants 47:3
wasn't 26:22 34:21 41:18
    42:2,19,19,20
watched 36:16 44:11,16
    49:7
way 19:8,23 21:14 23:2
    25:9 28:3 48:13
we'll 5:17 15:21 24:13
    36:11 45:15 52:9
we're 6:13,14 15:8 24:5,8
    24:8,10 35:12 50:16
we've 6:18 24:15 43:19
    50:16
Wednesday 19:10
went 6:9 12:20 13:4 14:7
    14:9,20 15:1 19:8
    23:25 26:6,13,16 27:1
    38:13 51:14
weren't 22:20 25:12
    26:16
Winter 2:11
witness 5:5 54:7 55:9
woman 9:18
word 35:21
work 16:14,15,19,23,23
    17:4,8,11 20:2,3,8,8,11
    20:19,21 21:7 24:15
worked 17:18 18:11 19:5
    19:7 20:24 24:15
working 17:6 21:5 24:10
    51:2,11
wouldn't 37:19 51:3
wrap 43:22
Wright 8:24
write 20:7,16 27:20
    39:16 42:5,12
written 42:23
wrong 14:11 33:9,10
    40:23
wrote 42:11

X

X 3:1 4:1

Y

Yeah 25:15,17 33:9,11
    42:8 50:10 52:22
year 13:23
years 10:23 13:19
yesterday 8:5
young 21:18
younger 10:17,18 22:6

Z

Zoom 1:17 2:1,16 54:5

0

1

1 4:2 15:11,14,19 27:22
    27:23 32:25 34:8,14
1-1-2018 4:4
1-5-2023 54:13
1:00 1:15
1:30 28:22
1:45 28:22
100 24:6
1010 2:11
1035 2:11
14150 1:23
15 4:2
18 1:14 54:6
18th 14:9

2

2 2:7 4:4 27:23,24 33:1,2
2-25-2018 4:6
2:01 29:13
2:30 52:11
2:39 52:12
2:40 1:15 53:10
2:45 34:4
2001 15:13
2012 6:12
2013 9:23
2015 14:18
2016 14:9,17
2017 14:15,24
2018 27:23 29:1 34:14
    35:1 36:10
2022 1:14 54:6,8 55:17
21 24:23
22203 2:3
25 36:10
26 6:21 14:24 15:13
    27:22
26(a)(1) 4:3 15:12
26th 14:14
27 4:4
276821 54:12
2nd 54:7 55:17

3

3 4:5 34:25 35:2
3-3-2018 4:5
3-31-2018 33:3
3:20 29:18
3:29 29:18
305-721-1600 2:8
31 34:8 35:1
3180 2:7
32792-5512 2:11
33131 2:7
33525 1:24
35 4:5
352 1:25
36 4:6

4

4 4:6 15:16 35:13 36:9,13
4:40 32:6,7
407-673-5000 2:12
46 28:11
49 33:16

5

5 3:3

50 23:6,15
52 3:3
53 3:4
54 3:4
55 3:5
5532 7:24 8:6,11 9:2
56 3:5
567-5484 1:25
57 3:6

6

6029 10:12,13,19 11:5,7
    11:14,21 12:1 15:1
    28:11 33:17 37:22
    38:16
620 37:23

7

703-682-9320 2:4
7208 37:24,25 38:2,6,23
    43:14

8

8:21-cv-00555-SDM-C...
    1:6 56:4

9

900 2:3
901 2:3