UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES, III,

  Plaintiffs,

vs.                Case No.: 8:21-cv-00555-SDM-CPT

CHRIS NOCCO, in his
official capacity as
Pasco County Sheriff,

  Defendant.
_____/

PROCEEDINGS:      Deposition of
                  PAUL REAGAN

DATE:             January 11, 2022

TIME:             9:00 a.m. - 12:51 p.m.

PLACE:           New Port Richey Executive Suites
                  8520 Government Drive, Suite 1
                  New Port Richey, Florida

REPORTED BY:      Judy Anderson, Court Reporter
                  Notary Public
                  State of Florida at Large

ANDERSON COURT REPORTING
P.O. Box 2426
Dade City, FL 33526-2426
Judy@andersoncourtreporting.com
(352) 567-5484

```
1    APPEARANCES:

2    ROBERT E. JOHNSON, ESQUIRE (Appearing via telephone)
     Institute for Justice
3    16781 Chagrin Boulevard, Ste. 256
     Shaker Heights, OH 44120
4    703-682-9320
     Rjohnson@ij.org
5         Counsel for Plaintiffs

6    CAROLINE GRACE BROTHERS, ESQ.
     Institute for Justice
7    901 N. Glebe Road, Ste. 900
     Arlington, VA 22203
8    703-682-9320
     Cgbrothers@ij.org
9         Co-counsel for Plaintiffs

10   ARI S. BARGIL, ESQUIRE
     Institute for Justice
11   2 S. Biscayne Blvd., Ste. 3180
     Miami, FL 33131
12   305-721-1600
     Abargil@ij.org
13        Co-counsel for Plaintiffs

14   THOMAS W. POULTON, ESQUIRE
     Debevoise & Poulton, P.A.
15   1035 S. Semoran Blvd., Ste. 1010
     Winter Park, FL 32792-5512
16   407-673-5000
     Poulton@debevoisepoulton.com
17   Holborn@debevoisepoulton.com
     Cook@debevoisepoulton.com
18        Counsel for Defendant

19

20

21

22

23

24

25
```

1                           I N D E X

2                                                       Page

3    Direct Examination by Mr. Bargil            5
     Stipulation                              167
4    Certificate of Oath                      169
     Certificate of Reporter                  170
5    Deponent's Signature Page                171
     Errata Sheet                             172

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       **E X H I B I T S**

2                                     Page

3       1 - ILP Manual                                16

        2 - STAR Team Manual July 2015                52

4       3 - ILP Slides 4-4-2016 to 4-10-2016          85

5       4 - CAD Report 3-4-16                         92

6       5 - CAD Report 3-8-16                         97

7       6 - CAD Report 3-5-16                         100

8       7 - CAD Report 9-14-16                        102

9       8 - PSO Public Records Exemptions             103

10      9 - Video Axonflex 2x8 12-29-2017             136

11      10 - PSO Public Records Exemptions            136

12      11 - Video Extraction_1.1 Battery_on_LEO_4    147

13      12 - MPR's - Paul Reagan                      147

14      13 - Email 9-10-18                            159

15      14 - District 3 STAR Nightly 9-17-18 to 9-18-18   162

16      15 - District 3 STAR Nightly 9-18-18 to 9-19-18   165

17

18

19

20

21

22

23

24

25

1                    PAUL REAGAN,

2      being first duly sworn to tell the truth, the whole

3      truth, and nothing but the truth, was examined and

4      testified as follows:

5              THE WITNESS:  I do.

6                    DIRECT EXAMINATION

7   BY MR. BARGIL:

8      Q.    Okay.  Good morning, Detective Reagan.  It's

9   detective; correct?

10     A.    Yes.

11     Q.    All right.  My name is Ari Bargil.  I'll be

12  taking your deposition today.

13          Have you had your deposition taken before?

14     A.    Yes.

15     Q.    Ever in your non-law enforcement capacity?

16     A.    No.

17     Q.    Okay.  So I'm sure you're familiar with some of

18  this stuff, so I won't belabor it, but there's some

19  basic ground rules.  First, please try to speak slowly.

20  Make sure that the court reporter is able to get down

21  everything that you're saying.  Make sure to answer

22  every question verbally, and if it's a yes on no

23  question, with a clear yes or no as opposed to uh-huh or

24  an uh-uh because it's hard for her to get that down.

25          We'll try not to interrupt each other.  Let me

1   finish my question.  I'll let you finish your answer.

2   We'll take breaks as you need them.  Just let me know.

3   And that's about it.  Does all that sound good?  You got

4   all that?

5        A.   Yes.

6        Q.   Okay.  That's the test.  You passed it.

7        A.   All right.

8        Q.   What did you do to prepare for this deposition?

9        A.   I got an email about -- belonging to this is

10  reference to Taylor.

11       Q.   Uh-huh.

12       A.   I just looked up who it was, and that was it.

13  And, obviously, whatever the depo prep that I had.

14       Q.   Okay.  And you don't need to get into all that.

15            Did you talk to anybody else besides your

16  attorney?

17       A.   No.  Celeste, that was it.

18       Q.   Okay.  And what did you talk about with

19  Celeste?

20       A.   He said he was here for a long time.  That was

21  it.

22       Q.   It was a conversation about, you know, what his

23  experience was?

24       A.   Yes.

25       Q.   Okay.  Did he tell you what to expect?

```
 1        A.   He said bring a snack.

 2        Q.   Did he tell you what kind of questions he was

 3   being asked?

 4        A.   No, no.  He didn't talk about that at all.

 5        Q.   Did you bring snacks?

 6        A.   Yes, I did.

 7        Q.   How long have you been with the Pasco County

 8   Sheriff's Office?

 9        A.   A little over seven years.  Seven years is

10   October.

11        Q.   Okay.  And I think we established at the

12   beginning that you're a detective; is that correct?

13        A.   Yes.

14        Q.   Can you just kind of quickly bring me through

15   your evolution from whatever your first starting rank

16   was and job up to detective?

17        A.   Yes.  So in terms of how long I was in those

18   positions?

19        Q.   Yes.

20        A.   All right.  I'm not -- I normally will chop

21   that up --

22        Q.   Okay.

23        A.   -- unless I had like that piece of paper in

24   front of me.  So I just know I started with patrol, was

25   there for a year or so.
```

1      Q.    And that was in what year?

2      A.    I started in 2014.

3      Q.    Okay.

4      A.    Then before there I went to our street crime

5   unit STAR.

6      Q.    And what year was that in?

7      A.    Probably mid 2015, early 2016.

8      Q.    -- okay.

9      A.    From STAR was promoted to corporal.  Then I

10   went to the road, back to corporal on patrol.  I was

11   then an FTO.  I mean that's probably at two and a half

12   to three year timeframe, probably two and a half maybe.

13   Then from there I went to corporal for the STAR team.  I

14   was there for about two and a half years too.

15      Q.    Okay.

16      A.    After doing the math --

17      Q.    Well, we're rapidly approaching 2022, so --

18      A.    So my current position I've been there in

19   property crimes from STAR corporal -- I've been there

20   for about a year, year and half.

21      Q.    Okay.  Now you explained sort of the movement

22   through the ranks, but as you were advancing, you know,

23   in title, were you staying in those departments?  I'll

24   ask a better question.

25            So in 2015, you started with the STAR team.

| 1 | How long were you on the STAR team for regardless of |
|---|---|

1   How long were you on the STAR team for regardless of
2   rank?
3       A.   I would -- oh, okay.  Regardless of rank?
4       Q.   Right.
5       A.   I would say total probably, shoot, I think like
6   four years --
7       Q.   Okay.
8       A.   -- total.
9       Q.   Any other any other jobs or -- I don't know the
10  right terminology to use but team affiliations that you
11  had while with the Sheriff's Office?
12      A.   Yes.
13      Q.   What were those?
14      A.   The ISR team.
15      Q.   And what is that?
16      A.   The intelligence surveillance and
17  reconnaissance team.  It's basically just a team that
18  gets called out to conduct surveillance on high priority
19  targets like with warrants.
20      Q.   Okay.  And what years was that?
21      A.   We're in 2022, so like 2020.  I was only on the
22  team for a few -- like six months.  And then the SWAT
23  team, I was on that for almost three years.
24      Q.   Are you still on the SWAT team?
25      A.   No.

1    Q.   The intelligence services recon team, can you

2    describe to me -- you gave me a little bit of a

3    description.  Can you tell me a little bit more about

4    what that is?

5    A.   Yeah.  I mean, essentially it's a team that

6    is -- gets I guess mobilized in terms of if it's going

7    to be a long-term surveillance mission or if we're going

8    to have to follow somebody like in their vehicle or if

9    we're following -- if we have to conduct surveillance on

10   residences for SWAT team, if the SWAT team's going to be

11   conducting a search warrant on that residence.

12   Q.   When you say you would be mobilized, who would

13   mobilize you?

14   A.   So we would get a call from Sergeant Denbo.

15   Q.   Okay.  And he would explain?

16   A.   Yeah, briefly.  I mean, you get a call.  It's

17   an automated message saying, hey, respond to this

18   location by this time, and then we'd get where we would

19   follow up with a briefing.

20   Q.   Okay.  And why were you only on that for six

21   months?

22   A.   I had a -- I have a family life.  Same reason

23   why I quit SWAT.  I just -- I have to focus on one thing

24   and just want to be with my family.

25   Q.   I see.  So that entailed odd hours?

1      A.   Yes, very odd hours.

2      Q.   And was it time consuming?

3      A.   Yes, very.

4      Q.   Okay.  I understand that.

5           Were you at any point either assigned to be on

6    the ACE team or actually on the ACE team?

7      A.   No.  I put a memo in for the ACE team.

8      Q.   Okay.  What is the ACE team?

9      A.   It's -- I don't even remember.  I can't even

10   remember what the acronym is.  It's something I put in

11   for a long time ago, but during the time me putting in

12   the unit was dissolved.

13     Q.   Do you know why the unit was dissolved?

14     A.   No.

15     Q.   Had you been approved for it and then it was

16   dissolved?

17     A.   No, no, no.  I mean, I was confident I may have

18   gotten the position, but personally -- I mean I don't

19   know what kind of decisions were made above me of why we

20   don't have that unit anymore.

21     Q.   What was the job of the ACE team?

22     A.   I think that's open to different opinions.  I

23   mean, I just focus on offenders within an area.  I think

24   that there was some type of drug nexus.  Again,

25   without -- I don't really recall exactly what it was

1    used for, what we were supposed to be doing.

2        Q.   Was it similar to STAR?

3            MR. POULTON:  Object to the form.  Go ahead.

4        A.   So, yeah, I think so.  To a certain point, I

5    think that they -- I think they focused more on a drug

6    nexus.

7    BY MR. BARGIL:

8        Q.   I see.  Have you ever been disciplined for

9    anything?

10       A.   Yes.

11       Q.   What have you been disciplined for?

12       A.   Improper search, improper transport, car

13   accidents, loss of equipment.  I mean, I'm sure that

14   there's more, but that's the first thing that come to

15   mind.

16       Q.   How many times have you been disciplined for

17   improper searches?

18       A.   Once.

19       Q.   Can you tell me how it happened?

20       A.   Yeah.  Didn't search a guy well enough that had

21   a gun in the back seat of my car.

22       Q.   I see.  And that resulted in what?

23       A.   I got in trouble.  Well, I mean, obviously, he

24   didn't shoot me or himself.  So we caught it when he got

25   in the x-ray scanner at the jail.

1    Q.   Okay.  Any other improper search citations or

2    disciplines?

3    A.   No.

4    Q.   What about improper transport?  Is it the same?

5    A.   It's the same incident.

6    Q.   Okay.  Any other ones besides that?

7    A.   No.

8    Q.   How many car accidents have you been in in your

9    patrol vehicle?

10   A.   Probably six maybe.

11   Q.   Is that above average?

12   A.   Yeah, yeah.

13   Q.   And the loss of equipment that you were I want

14   to the say cited.  I don't know if that's the right

15   term, but disciplined for what --

16   A.   It was a -- I lost a set of car keys for -- and

17   received I think it was a POR for it.

18   Q.   What's a POR?

19   A.   It's a performance observation report.  It's a

20   negative POR.

21   Q.   Okay.  Anything else besides the improper

22   search and improper transport, your accidents and your

23   loss of equipment and the car keys?

24   A.   Yeah.  Actually, I think there was a -- I don't

25   recall the juvenile or the mom, but I think she wrote

1   like a formal letter to the sheriff because I called her

2   son a shit bag.  I don't recall the exact -- what the

3   letter said, but I think I was -- I got in trouble for

4   that.

5       Q.   You don't remember the name of either of the

6   people?

7       A.   I honestly -- I have tried to remember who this

8   kid was, but I really just don't recall.

9       Q.   So did you even remember who it was at the time

10  that the letter was written?

11      A.   Oh, yeah, I remembered that.  I mean this is --

12  yeah, I remember getting the letter from Sergeant

13  Formoso at the time.  I can't remember -- I just can't

14  remember the kid's name.

15      Q.   About what year if you can place that was it?

16      A.   Well, I was a corporal for the STAR team.  I

17  think I had Deputy Bronson on the team, so like 2017

18  maybe.

19      Q.   What makes you think that Deputy Bronson was on

20  the team at the time?

21      A.   I just recall her being there.

22      Q.   What was the penalty for that?

23      A.   I honestly don't recall.  I think it was the

24  same negative POR documentation.  I don't recall like

25  what the title of the POR was.  I just remember

1    obviously receiving a letter.  It was like a photocopy

2    from what the mother sent up.  I was verbally counseled

3    and then received paperwork for it.

4        Q.   Was there a formal reprimand?

5        A.   I mean, aside from the negative POR, no.  I

6    mean, no suspension or loss of pay or anything like

7    that.

8        Q.   Okay.  Was it ever communicated to you that if

9    it happens again, there will be a different consequence?

10        A.   I mean, I would -- I would think so.  I don't

11   know.

12        Q.   Okay.  And to be clear, that was -- that

13   incident took place while you were the corporal of the

14   STAR team; is that right?

15        A.   Correct.

16        Q.   And what district were you working in?

17        A.   Three.

18        Q.   Okay.  And you don't recall the name of the

19   mother or the juvenile?

20        A.   I don't.

21        Q.   But it was -- you do recall that it was a

22   juvenile?

23        A.   Yes.

24        Q.   Okay.  Do you remember about how old he was?

25        A.   Fifteen, seventeen, like anywhere from -- I

1    don't recall.

2         Q.   That's okay.  That's okay if you don't

3    remember.

4         A.   I could probably bring you to the kid's house.

5    I just don't -- for some reason it just slips my mind.

6         Q.   Did you visit the kid's house frequently?

7         A.   Honestly, no, I had not been there too often.

8    I just know we have had interactions with him.  His name

9    had come up quite a bit with investigations, and I think

10   it was just a visit to his home.

11        Q.   I see.  Okay.  I'm going to pull out our first

12   exhibit here.

13             (Exhibit 1 was marked for identification.)

14   BY MR. BARGIL:

15        Q.   So this will be Exhibit 1.  Does this document

16   look familiar to you?

17        A.   Yeah.  Yes.

18        Q.   And what is it?

19        A.   The ILP manual.  The intelligence-led policing

20   manual.

21        Q.   And that's abbreviated ILP; correct?

22        A.   Yes.

23        Q.   Was there an expectation that you familiarize

24   yourself with this?

25        A.   Yes.

1      Q.   When did you first hear about -- well, let me

2   back up.  Is ILP a policing methodology applied by or

3   used by the Sheriff's Office?

4      A.   Yes.

5      Q.   And when did you first sort of become familiar

6   with ILP as being the policy of the Sheriff's Office?

7      A.   Well, getting hired knowing that it was part of

8   the -- it was our policing policy, but I would say I got

9   more acclimated or affiliated with the ILP manual with

10  the STAR team.

11     Q.   Okay.  So everybody upon hire is made aware

12  that this is sort of the policy of the Sheriff's Office;

13  is that right?

14     A.   Yes.

15          MR. POULTON:  Object to the form.  Go ahead.

16  BY MR. BARGIL:

17     Q.   You can answer.

18          MR. POULTON:  Go ahead.

19     A.   Yes.

20  BY MR. BARGIL:

21     Q.   Okay.  I was just wanted to make sure we got

22  it.

23          As you became a member of the STAR team, was it

24  all the more important that you be familiar with ILP in

25  general?

1     A.    Yes.

2     Q.    Was there a general expectation that you would

3  familiarize yourself with ILP and sort apply its tenets

4  as you went about your day-to-day work?

5          MR. POULTON:  Object to the form.

6     A.    What do you -- I'm sorry.  What do you mean

7  by --

8  BY MR. BARGIL:

9     Q.    Well, does ILP sort of govern the overall

10  policing philosophy of the Pasco County Sheriff's

11  Office?

12          MR. POULTON:  Object to the form.

13     A.    Yes.

14  BY MR. BARGIL:

15     Q.    Okay.  Now if you open the document --

16     A.    Okay.

17     Q.    -- you'll see it's Bates stamped at the bottom

18  right corner.  You could either look at the Bates stamp

19  or it's page 20 of the document itself.  It might be

20  easier if the clip doesn't get in the way to do it that

21  way.

22     A.    Okay.  You want me to go to page 20?

23     Q.    Go to page 20, please, yes.

24     A.    Sorry.  Almost there.

25     Q.    Take your time.

1       A.   I'm assuming this isn't titled or labeled?  Oh,

2   here we go.  I'm sorry.

3       Q.   Yeah.

4       A.   All right.  I'm here, 20.

5       Q.   If you look towards basically the middle of the

6   page where it says performance expectations --

7       A.   Yes.

8       Q.   -- will you read through those quickly?

9       A.   Out loud.

10      Q.   No.  You can read them to yourself, just the

11  three bullets.

12      A.   Okay.  Yes.

13      Q.   And as far as, you know, this section of the

14  ILP manual, is it your understanding that each of those

15  things was expected of a deputy or an officer in Pasco

16  County?

17          MR. POULTON:  Object to the form.

18      A.   Yes.

19  BY MR. BARGIL:

20      Q.   Okay.  If you look at the third bullet, that

21  says, "As soon as a target is apprehended" -- excuse me

22  -- "As soon as the target is apprehended, notify your

23  district analyst so a replacement target can be

24  selected."  We agree that's what that says; right?

25      A.   Yes.

1   Q.   Can you tell me a little bit more about that

2   process, specifically, what would you do as far as

3   notifying your district analyst?  How did that work?

4   A.   Well, okay.  If he or she is arrested and there

5   needs to be somebody else put into that person's spot,

6   the district target spots, it would consist of an email

7   saying, hey, FYI, the district target was caught.  And

8   then we would send, I guess, options of -- or they would

9   have options of who to replace that target with.

10   Q.   Okay.  And when we're talking about targets

11   here --

12   A.   Yes.

13   Q.   -- who -- what are the different

14   classifications that the Sheriff's Office has of

15   potential targets?

16       MR. POULTON:  Object to the form.  Go ahead.

17   A.   So there's a -- there's like a numbering

18   system.

19   BY MR. BARGIL:

20   Q.   Okay.

21   A.   And I couldn't tell you what -- how you -- what

22   the point scale is.  I just know that there -- certain

23   things qualify for certain crimes will mean, you know, X

24   points.  You know, involvement with law enforcement

25   would be Y points, and then it's totaled up to where you

1    could be identified as a --

2           I'm sorry.  You're talking about district

3    target.  I'm thinking prolific offender right now.  I'm

4    sorry.

5       Q.   Well, the two were kind of -- it was probably a

6    rotten question.  What I'm trying to get at is what are

7    the --- so prolific offender you just mentioned.

8       A.   Yes.

9       Q.   And is a prolific offender one type of

10   classification that could be referred to when you talk

11   about a target in this bullet point?

12          MR. POULTON:  Object to the form.

13      A.   They're two different things.  A prolific

14   offender I don't think would be -- is labeled prolific

15   offender for whatever reasons, and then the district

16   target is more so with heavy criminal involvement or

17   they have excess warrants or warrants like a Big 4

18   warrant, something to that effect.

19   BY MR. BARGIL:

20      Q.   Okay.  Would people who are classified TOP 5 be

21   considered targets?

22          MR. POULTON:  Object to the form.

23      A.   No.

24   BY MR. BARGIL:

25      Q.   Okay.

1      A.   They're just those.  They're -- prolific

2  offenders are TOP 5 offenders within those areas.

3      Q.   Okay.  So these are all separate

4  classifications:  Prolific offender, TOP 5 and target?

5      A.   So, yeah.  I mean, I would not -- I would not

6  qualify a target as a prolific offender.  Does that make

7  -- is that accurate?

8      Q.   That makes sense in my mind.

9      A.   Okay.

10     Q.   So can a prolific offender be a target?

11     A.   That target, if they were to have warrants, if

12 they were something that we were targeting to capture or

13 apprehend.

14     Q.   Okay.  So just to make sure we're understanding

15 each other --

16     A.   Okay.

17     Q.   -- the answer is, yes, they could be?

18     A.   Okay.  Yes, yes.

19     Q.   And could a TOP 5 -- someone who's TOP 5, could

20 they also be a target under certain circumstances?

21     A.   Correct.

22     Q.   Okay.  Now can somebody be a target if they are

23 neither TOP 5 nor prolific offender?

24     A.   Yes.

25     Q.   And who decides whether someone becomes a

1    target?

2        A.    So generally if we don't have -- I mean,

3    there's been circumstances to where we don't have the --

4    an email or something will be sent or we have a sit down

5    or whether it's any type of meeting, we'll sit down,

6    okay, this person has been captured by patrol, STAR,

7    whoever, out of county, we will have any type of

8    suggestions on who could replace that person.

9    Generally, we just go through the people that have

10   active warrants.

11       Q.    Okay.  Is there discussion amongst deputies or

12   folks of any rank in the Sheriff's Office about who

13   would be the next target?

14       A.    Yes.

15       Q.    What are some things you would consider in

16   saying, you know, we should look at -- we should go

17   after this person over that person?

18           MR. POULTON:  Object to the form.  Go ahead.

19       A.    It would be the -- it would be the warrants.

20   BY MR. BARGIL:

21       Q.    Okay.  So at any given time is there -- is

22   there a limit on the number of targets who you'll be

23   focusing on at any given time?

24       A.    Are we referring to -- is this the STAR

25   reference or is this an -- are we --

1      Q.   Let's confine it to STAR for now.

2      A.   Okay.

3      Q.   Yeah.  So let me make sure I'm understanding

4  you correctly.  So the STAR team will have targets

5  within the district; is that right?

6      A.   Correct.

7      Q.   Is there a limit on the number of, quote,

8  unquote, targets that the STAR team will be focussing on

9  within a district at a given time?

10      A.   In a nutshell, yes.  That's part of the STAR

11  team's job is to focus on the 5 -- the TOP 5, but it's

12  not solely limited to the TOP 5 because we would also

13  make contact with any type of their criminal associates.

14      Q.   Okay.  And if any one of those targets was

15  apprehended, then there would be discussion about who to

16  add back in?

17      A.   Well, they would stay on the TOP 5 for -- in

18  determining what it is that the status is, if they're

19  going to be incarcerated for, you know, an excess amount

20  of time, there's no need or reason to keep that person

21  in that position.

22      Q.   Who else besides people in the field and the

23  district analysts would participate in discussion about

24  who to elevate as a replacement target?

25      A.   I'm sorry.  You said aside from STAR and

1    analysts?

2        Q.    Yeah.   Is there anybody else besides?

3        A.    Yeah, it would be patrol.

4        Q.    Okay.   About how long would it take for you all

5    to kind of reach a consensus on who that person would

6    be?

7        A.    That varies.   It really does.   I mean, we can't

8    -- there's times where it can be very immediate.

9    Sometimes we don't even have conversations and the

10   target is already replaced before there's a discussion

11   that's even had.

12       Q.    And other times it can take much longer?

13       A.    Correct.

14       Q.    Over a week?

15       A.    I don't want to put -- I really don't want to

16   put a -- I just -- I recall there's been times where we

17   just -- we've had a district target that has already

18   been apprehended or there has been no replacement, and

19   we just were not able to replace anybody with that

20   person.

21       Q.    Okay.   If you don't mind, turn to page 22 of

22   your -- of the manual.

23       A.    Okay.

24       Q.    And we are looking at the performance

25   expectations section about a third of the way down or

1    two-thirds of the way down.

2         A.   Yes.

3         Q.   Was it your understanding that in your

4    capacity, as a member of the STAR team, that you were

5    expected to learn the location of the STAR for your

6    assigned district?

7         A.   I'm assuming this applies to the STAR box.

8         Q.   I'm assuming as well, yes.

9         A.   I feel like there might be a little typo here,

10   but yes.

11        Q.   Okay.  Was it your understanding that it was

12   your obligation to, quote, strive to gain understanding

13   of the STAR with a focus on whether the problem is due

14   to the location, offender or victim and the opportunity

15   being seized by the offender?

16        A.   Yes.

17        Q.   Was it your understanding that you were

18   expected to, quote, develop knowledge of offenders

19   living or frequenting the area?

20        A.   Yes.

21        Q.   Was it your understanding that you were

22   expected to, quote, develop and maintain rapport with

23   deputies assigned to the STAR?

24        A.   Yes.

25        Q.   And this is a mouthful, but we're going to do

1    it.

2        A.    All right.

3        Q.    Was it your understanding that you were

4    expected to use Central Command, One Solution, and other

5    available resources to remain abreast of existing and

6    emerging crime trends in your area?

7        A.    Yes.

8        Q.    I'm going to stop right there.  So, basically,

9    everything that's in the ILP manual is something that

10   you were expected to understand and apply in your

11   practice as a STAR deputy and STAR member; is that

12   right?

13       A.    Yes.

14       Q.    Okay.  If you read a little bit down in the

15   final bullet point, it says that you're expected to

16   think outside of the box and understand that not every

17   solution needs to be a law enforcement solution.  Do you

18   see where I'm looking?

19       A.    Okay.  Where it starts "think outside the box"

20   or --

21       Q.    The third to last sentence, yeah.

22       A.    Yeah, I see that.

23       Q.    What does that mean?

24            MR. POULTON:  Object to the form only because

25        if you would read the next two sentences, I think it

1     might be --

2     A.   Yeah, I don't -- I don't --

3          MR. POULTON:  -- but I'll -- go ahead.

4     A.   Yeah.  So, I mean, continue reading.  I mean,

5     that applies to the use -- I mean, the first thing that

6     comes to my mind would be utilizing probation, you know,

7     probation for or other outside agencies or utilizing

8     other resources that we don't have direct access to.  So

9     Linx is a system we use, and we can identify any type of

10    involvement that this person has been involved in or any

11    criminal involvement.  We would obviously focus in on

12    that where it occurred.  I mean, there's so many, I

13    guess, kind of like avenues that this -- that kind of

14    travels down of what we -- like thinking outside the

15    box.

16    BY MR. BARGIL:

17    Q.   If you look at the sentence that follows it

18    says, "There may be other services or agencies

19    throughout the county that may be able to assist with

20    addressing the issues."  In your experience on the STAR

21    team and as a STAR corporal, do you recall instances

22    where you were seeking non-law enforcement solutions?

23    A.   No.

24    Q.   Okay.  Let's turn to page 26.

25    A.   Okay.

1    Q.   Again, in the middle of the page, we're looking

2    at performance expectations.  Do you see where I'm

3    looking?

4    A.   Yes.

5    Q.   Was it your understanding that as part of your

6    role on the STAR team, you were expected to learn your

7    district's TOP 5 and their associates?

8    A.   Yes.

9    Q.   Is it your understanding that as part of your

10   role in the STAR team, you were expected to use the list

11   as an ongoing collection requirement to learn the

12   network's criminal activity, where they hang out, where

13   are the most influential members, and what are the

14   network's vulnerabilities?

15   A.   Yes.

16   Q.   The bullet point after that says, "There is a

17   zero tolerance arrest policy for members of the district

18   TOP 5 and their associates."  Is that right?

19   A.   Yes.

20   Q.   What is a zero tolerance arrest policy?

21   A.   If a crime's committed, they go to jail.

22   Q.   How does that differ from a non-zero tolerance

23   policy?

24   A.   I think that the policy is that there's -- it's

25   zero tolerance.  I mean, I see that it says that here,

1    but that applies throughout the agency.  We have posters

2    posted in our district offices probable cause exists you

3    go to jail.  I think that they just zone in on zero

4    tolerance as it being associated with the TOP 5 or their

5    members that that person is going to jail.

6         Q.   Do you have discretion or I should say do

7    deputies and people on patrol and really at any level

8    within the department is there discretion to arrest or

9    not arrest?

10        A.   Yes.

11        Q.   Is there discretion to charge or not charge?

12        A.   Yes.  Yeah, there should be.  Yes.

13        Q.   Is that as true within STAR boxes?

14        A.   So, generally, no.

15        Q.   Okay.  So if you're in a STAR box and you see

16   something that you're sure based on your law enforcement

17   training is criminal in nature, you do not have

18   discretion in that scenario.  You are obligated --

19   you're required by policy to make an arrest; is that

20   right?

21        A.   That would be the goal, yes.

22        Q.   So is that yes?

23        A.   Yes.  Sorry.

24        Q.   The second to last bullet point in the

25   performance expectations there says, "When in custody,

1    detention deputies should use the opportunity to build a

2    rapport and cultivate intelligence about the networks

3    and their activities."  We agree that's what it says?

4        A.   Yes.

5        Q.   Are detention deputies part of the STAR team?

6             MR. POULTON:  Object to the form.  Go ahead.

7        A.   No.

8    BY MR. BARGIL:

9        Q.   Do you rely on detention deputies to extract

10   information from people after you arrest them?

11       A.   So I personally, no, do not rely.

12       Q.   Why do you not rely on them?

13       A.   I've never -- I've never utilized detention

14   deputies for information.  When you bring it up, I mean,

15   there are -- I know that they are used as information

16   collectors to where they are able to help patrol out in

17   terms of where people might be located, things like

18   that.

19       Q.   Do you do your own interviews after you make

20   arrests?

21       A.   Well, it depends.  So if I'm just picking up

22   somebody for a warrant, likely no.

23       Q.   Okay.

24       A.   It kind of falls on the case detective or the

25   person that initially wrote the report.

1    Q.   Okay.  In general, when you were on the STAR

2    team, did you see it as a job responsibility to build

3    rapport with the people that you were interacting with

4    within the STAR boxes?

5    A.   Yes.

6    Q.   What was the purpose of building that rapport?

7    A.   Familiarity.  I mean, one is typically wanting

8    to build a relationship.

9    Q.   Why did you want to build a relationship?

10   A.   I mean, could have been, obviously, just making

11   sure -- you know, we want people to know who we are, you

12   know, I mean we're not -- whether it's good or bad.  I

13   mean, it's to -- either we can get information from them

14   or they're willing to give us information.

15   Q.   So there is an information motive built into

16   developing the rapport and building relationships with

17   the people within the boxes?

18   A.   Well, and the safety.  I also want to feel

19   comfortable when I'm going into certain areas that, hey,

20   I know this cop and, you know, let's not give him a hard

21   time type of scenario.

22   Q.   Okay.  The final bullet point in that

23   performance expectations list says, "Document any

24   information related to the TOP 5 and their associates in

25   Central Command; is that right?

1     A.   Yes.

2     Q.   How would you go about doing -- first of all,

3  in your capacity as member of the STAR team, is it

4  correct that you are required to, quote, document any

5  information related to the TOP 5 and their associates in

6  Central Command?

7     A.   Yes.

8     Q.   How would you do that?

9     A.   So Central Command I want to say came on a --

10  the requirement for the documentation in Central Command

11  came a little bit towards the end of my tenure with

12  STAR, but we documented most of our information on like

13  district daily -- like STAR dailies.

14     Q.   Okay.  And I guess we'll get to that in a

15  little bit.  So when you were on STAR, you primarily --

16  I shouldn't say primarily -- the overall requirement, is

17  it fair to say, was that you feed information on a

18  regular basis to some sort of repository?

19     A.   Yes.

20     Q.   And who would review that information?

21     A.   It would be patrol.  I mean, anybody within the

22  district has access to review the information that's put

23  onto -- well, anybody in the county.

24     Q.   Were you specifically reporting to a department

25  and to a person or just putting it out into the ether?

1      A.   Putting it out there.

2      Q.   Do you know who regularly reviewed those

3  reports?

4      A.   In Central Command?

5      Q.   Yeah.

6      A.   No.

7      Q.   Do you know who regularly reviewed the daily

8  and nightly reports that you would do?

9      A.   No, I would -- it would be a mass email

10 distribution.

11     Q.   Okay.  Did you ever get responses to those

12 emails?

13     A.   Yeah, I'm sure.

14     Q.   Do you remember who would respond to them?

15     A.   No.

16     Q.   Okay.  What is the purpose behind documenting

17 any information relating to the TOP 5 and their

18 associates in Central Command or in another repository?

19          MR. POULTON:  Object to the form.

20     A.   The information, you know, just to -- I'm

21 sorry.  Can you repeat the question again?  What's the

22 purpose of documenting the information?

23 BY MR. BARGIL:

24     Q.   Yeah, yeah.

25     A.   So, I mean, if something changes, if -- I mean,

1    I'm just thinking of -- just trying to think of a

2    specific incident when we would do something like this.

3    I mean, making contact -- I made contact with this

4    individual at this location.  This individual was with

5    this person at this time.  We discussed, you know, XYZ.

6    You know, it's just we don't know what their -- what

7    that person's criminal involvement and how involved that

8    person was with committing criminal acts.  You never

9    know when we were going to need to talk to that person

10   again.  So it was important for us to document that

11   information so that way the other STAR team when they

12   came in or the patrol when we would utilize other

13   resources to help us either locate or ask, we want to

14   know a question about the criminal activity in this

15   specific area, then it's a location that we might be

16   able to follow up with.

17        Q.   Okay.  And as far as, you know, gather or

18   documenting information about associates, is it the goal

19   of the department with respect to this performance

20   expectation to develop an understanding of who, you

21   know, certain people interact with on a regular basis?

22        A.   I'm sorry.  I didn't understand the question.

23   I'm sorry.

24        Q.   It's probably that's my fault, not yours.

25             Is it the goal of the department to develop an

1    understanding of the social networks and familial

2    networks of the people that it targets?

3        A.    Yes.

4        Q.    Okay.  And what is the reason for that?

5        A.    Like a social -- social networking.  You know,

6    we just want to see who is connected to who.

7        Q.    What does that tell you?

8        A.    Again, so it's all -- I think it's -- it's a

9    determination on criminal -- criminal activity and their

10   -- and their nexus.  Like what is it that that person is

11   -- if we can't find this person or there's criminal --

12   criminal activity is occurring in this area, well,

13   person one was just hanging out with person two who

14   lives in this area where all this criminal act just

15   occurred.  So why don't we go talk to this person to see

16   if they had any information on where this person was

17   last night.  It's just connecting people.

18       Q.    Does a person have to be suspected of any

19   wrongdoing in order to be included within -- as an

20   associate of a targeted person?

21       A.    No.

22       Q.    Okay.  Does a person need to have a warrant for

23   their arrest in order to be included as an associate of

24   a targeted person?

25       A.    No.

1    Q.   Did you -- were you required to document

2  information related to targets and their associates with

3  respect to TOP 5 individuals?

4    A.   Was I required to document information with --

5  I'm sorry.

6    Q.   Well, I mean, the bullet point kind of says you

7  were, but I guess what I'm trying to gather is I want to

8  make sure that this was consistent.

9    A.   Okay.

10    Q.   What I'm asking is whether this was

11  consistent --

12    A.   Okay.

13    Q.   -- whether it was a target -- a, quote,

14  unquote, target or a TOP 5 member or a prolific

15  offender?

16    A.   For documentation?

17    Q.   Yeah.

18    A.   Okay.  I understand the question.

19        As related to the STAR team, then yes.

20    Q.   Okay.  I'll break that down so we can get it

21  more clearly.  So as a member of the STAR team, if you

22  interacted with a prolific offender, you were required

23  to document that interaction as well as provide whatever

24  information you had regarding their associates?

25    A.   Correct.  Yes.

1     Q.   Okay.  And that is also true of individuals who

2     were TOP 5?

3     A.   Yes.

4     Q.   And that is, of course, also true of

5     individuals who were district targets?

6     A.   Yes.

7     Q.   Okay.  We've talked about district targets, TOP

8     5 and prolific offenders, and I think we'll get a little

9     bit more into those classifications later.  Are there

10    other classifications that you are familiar with that

11    were relevant in your capacity as STAR team member?

12    A.   When you say in my capacity of STAR, so I

13    don't -- I really -- it's almost as if I forget maybe.

14    Q.   Yeah.

15    A.   But I know that we have zone focus offenders,

16    but I don't know if that was at the same time now or if

17    that was something after I left.

18    Q.   Why don't I do this?  A lot of this is just me

19    asking you bad questions.  Tom agrees.

20          Are there other classifications that you're

21    familiar with, you know, that you -- that you were

22    familiar with while you were on STAR team besides the

23    three that I just mentioned?

24    A.   No.

25    Q.   You mentioned zone focus offender?

1    A.    Yes.

2    Q.    What is that?

3    A.    So each unit or district has specific zones

4    from IDA 2 to IDA 6, ZULU 2 to ZULU 6.  So, again, I

5    don't recall if this has transitioned.  I don't know.  I

6    just know that you'd have a -- in a specific zone there

7    was somebody that had been identified as the -- as a

8    nucleus basically or the source of, you know, of law

9    enforcement calls or presence or that person's

10   involvement within that specific zone.

11   Q.    Okay.  And that person, in order to be

12   classified as zone focus offender, did they need to be

13   on any of the other lists?

14   A.    I honestly -- I couldn't -- I really don't

15   know.

16   Q.    Would you make unprompted visits to those

17   people's residences?

18        MR. POULTON:  Object to the form.  Go ahead.

19   A.    To prolific offenders?

20   BY MR. BARGIL:

21   Q.    No.  Sorry.  Again, bad question.

22        So dealing with a zone focused offender who

23   might or might not have been on another one of the

24   lists, was part of your job responsibility to visit

25   those people?

1    A.   Honestly, I could barely recall that we turned

2    it into zone focus or when that transition was, so I

3    don't -- I couldn't even answer.

4    Q.   Okay.  Turn to page 27 in the manual if you

5    don't mind.

6    A.   Okay.

7    Q.   If you look down to the sort of second to last

8    subheading there it says Performance Expectations again.

9    A.   Yes.

10   Q.   The first bullet directs you to familiarize

11   yourself with definitions of gangs, gang members, gang

12   associates, and gang related activity as outlined in

13   Florida Statute.  Is that -- can we agree that's what it

14   says?

15   A.   Yes.

16   Q.   Okay.  I think that statute there might be a

17   typo, but is it fair to say that you were expected to

18   know the Florida statutory definition of gang, gang

19   member, gang associate?

20   A.   Based on what this says, yes.

21   Q.   Okay.  And did you do that?

22   A.   No.

23   Q.   Do you know why you didn't do that?

24   A.   No.  Maybe we didn't have too many gangs.

25   Q.   Well, that was kind of my next question.  Do

1  you know whether gang affiliation was relevant to

2  someone's inclusion on either the prolific offender list

3  or TOP 5 list?

4      A.    So I think it would apply -- it would be

5  mentioned at times, yes.

6      Q.    Okay.  The fourth bullet point says, "If you

7  feel an individual meets the requirements to be

8  documented as a gang member or associate, notify your

9  gang liaison."  Did you personally do that in your

10  capacity as a member of the STAR team?

11      A.    So I was -- I was pretty close with the gang

12  liaison at the time, which was David Murphy.  He was

13  also previously on the STAR team.  So I would notify him

14  directly, you know, but he -- I mean, he was pretty good

15  at what he did.  He kind of kept track of who we were

16  coming in contact with, follow social media.  He would

17  kind of do that on his own.

18      Q.    Okay.  So I don't want to put words in your

19  mouth, but is it fair to say that you kind of -- would

20  you say you loosely identified networks and then

21  forwarded that information to your gang liaison?

22      A.    No, not directly.

23          MR. POULTON:  Object to the form.  Go ahead.

24      A.    No.

25  BY MR. BARGIL:

1    Q.   Okay.  So you would just -- what determined

2  whether you would give information to your gang liaison?

3    A.   So -- so that we can answer the question, I

4  personally have never identified anybody as a gang

5  member or tried to link anybody to any sort of gang.

6  That information had been dealt with outside of what I

7  would deal with.

8    Q.   Am I understanding correctly though that like

9  the reason why you didn't do that is because you left

10  that to the gang liaison to make those determinations?

11    A.   Yes, I would -- I would say that that's

12  somewhat accurate, but also to where it's -- I -- I just

13  did not focus on that.

14    Q.   Okay.  Do you feel like there was much gang

15  activity within the STAR boxes?

16    A.   So there's only -- and if you're asking again

17  ask the question of what the gang was, I'm not going to

18  know, but I just recall that there was one in particular

19  when we were dealing with specific prolific offenders or

20  TOP 5's at the time.

21    Q.   Okay.  And you just said you don't remember the

22  name of the gang?

23    A.   No.  Well, it might have been Hot Boy Squad.

24    Q.   Okay.

25    A.   May have been.

1     Q.   How did you know they were a gang?

2     A.   That information was relayed to me.  I had

3   no -- no involvement.  I was -- I see that it says that

4   here, but I did not focus on that.

5     Q.   Okay.  What kind of crimes or suspected crimes

6   did the Hot Boy Squad commit?

7     A.   Vehicle burglaries, gun thefts, residential

8   burglaries.

9     Q.   So speaking more broadly about ILP now, we've

10  gone through the performance expectations.  Just to be

11  clear, you know, it was your understanding that you were

12  expected to, you know, internalize and apply the ILP

13  philosophy in your work; is that right?

14    A.   As a -- yes.

15    Q.   And it sounded like you started to say as a

16  STAR team member, but is it fair to say that all sworn

17  law enforcement officers in Pasco County are in one way

18  or another expected to, you know, internalize and apply

19  the ILP principles?

20         MR. POULTON:  Object to the form.  Go ahead.

21    A.   Yes.

22  BY MR. BARGIL:

23    Q.   As you understood it, is there -- was whether

24  you, you know, applied ILP on a day-to-day basis, was

25  that something that played a role in performance

1    evaluations?

2        A.    No.

3        Q.    It never came up in your evaluations whether

4    you were -- whether you understood the philosophy?

5        A.    Yes.  Maybe I misunderstood your first question

6    then when you said how I would -- like -- what was the

7    first thing that you said?  I'm not taking back my

8    answer.  I just want to -- it almost sounded as if the

9    first question you asked meant have I been -- was I

10   trying to justify like a purpose.

11       Q.    No, no.

12           MR. BARGIL:  Are you able to read it back?  I

13       can ask it again.

14           (The question on page 43, line 23, was read

15       back.)

16   BY MR. BARGIL:

17       Q.    I'll ask a better question.  I need to work on

18   my diction.

19           Did ILP come up in performance reviews?

20       A.    Yes.

21       Q.    And was part of the performance review a

22   discussion of how well you applied ILP as a philosophy

23   in your capacity as a STAR team member?

24       A.    Yes.

25       Q.    As you understood it, was successful

```
1    application of ILP linked to promotion or career

2    advancement?

3        A.   No.

4        Q.   So if you did -- if -- strike that.

5             While working with the STAR team, did you

6    periodically speak with school resource officers?

7        A.   What's periodically?

8        Q.   Did you ever speak with school resource

9    officers?

10       A.   I'm sure that I have.

11       Q.   Did you sit in meetings with them?

12       A.   Yes.

13       Q.   Did you send emails maybe with school resource

14   officers?

15       A.   Yes.

16       Q.   Did you ever physically go to schools?

17       A.   Probably.

18       Q.   Okay.  What role do school resource officers

19   play in ILP?

20            MR. POULTON:  Object to the form.  Go ahead.

21       A.   I don't know.

22   BY MR. BARGIL:

23       Q.   Okay.  Are you familiar with the term AIM

24   meetings?

25       A.   Yes.
```

1     Q.   What is an AIM meeting?

2     A.   Actionable intelligence meeting.

3     Q.   Okay.  Were you required to attend those?

4     A.   Yes.

5     Q.   Were you required to attend those while you

6   were on the STAR team?

7     A.   Yes.

8     Q.   Were you required to attend those while not on

9   the STAR team?

10    A.   No.  I don't think so, no.

11    Q.   Was your attendance encouraged at any point but

12   not required?

13    A.   Outside of patrol or outside of STAR?

14    Q.   Yes.

15    A.   So I would believe it's probably encouraged,

16   yes.

17    Q.   Okay.  While you were on the STAR team, what

18   was your role in the AIM meetings?

19    A.   To -- information collection or dissemination.

20    Q.   Okay.  Can you go into a little bit more detail

21   there?

22    A.   We would generally just -- it would be -- we

23   would discuss what happened the week prior or a

24   couple -- the way that it's broken down is like at

25   either a week and a half or two weeks we would discuss

1    what was done, what criminal sprees or trends that we're

2    having.  It was basically just to discuss like the

3    criminal activity and, obviously, we would have other

4    agencies or other resources that were there, and they

5    would either provide their insight on what was going on

6    in those areas, and we would just basically have a

7    discussion about the couple weeks prior, like how many

8    burglaries we had, you know, how many residential

9    burglaries we had.  There would be bar graphs and would

10   just be information.

11        Q.   Who would lead those meetings?

12        A.   So they stopped a while ago, but Captain

13   Jenkins would be the lead.

14        Q.   And what was his -- was he captain of the STAR

15   team?

16        A.   Well, he was captain of district three.

17        Q.   Okay.  So each head -- each district head would

18   run the AIM meetings?

19        A.   I don't -- I would -- I don't know for two or

20   one, but for three it was Captain Jenkins, and I believe

21   after that it would have been Hartnett.

22        Q.   That would that have been Captain Hartnett?

23        A.   Yes.

24        Q.   Did you -- I'm just trying to get a sense --

25        A.   No, I understand.

1    Q.   -- for what these meetings were like.  As a

2    STAR team member, were you actively providing

3    information to the group?

4    A.   No.

5    Q.   Or was -- so was your job to receive

6    information from those presenting it?

7    A.   No.  It would be -- again, it's all case by

8    case.  I mean if -- if we had something to -- it would

9    be something to share so that other agencies or the

10   other resources that were there could either help, or we

11   were just telling them like, hey, can you guys keep an

12   eye out for this type of activity.  But we would not

13   always participate.  There would be questions that went

14   -- it was a round table.

15   Q.   Okay.

16   A.   Anything, anything, anything?  No, no, no.  And

17   then we would leave.

18   Q.   Okay.  Would you sometimes meet before the AIM

19   meeting?

20   A.   Yes.

21   Q.   Was there such a thing as a pre-AIM meeting?

22   A.   Yes.

23   Q.   What was the purpose of the pre-AIM meeting?

24   A.   To discuss the AIM meeting.

25   Q.   Was it -- were decisions made about what would

1    happen in the AIM meeting while in the pre-AIM meeting?

2        A.    Would decisions happen in the actual AIM

3    meeting?

4        Q.    I'll rephrase.

5        A.    I'm sorry.

6        Q.    Yeah, let me rephrase.

7              While in the pre-AIM meeting, were decisions

8    made about what would be presented in the actual AIM

9    meeting afterward?

10       A.    So to my knowledge, no.

11       Q.    What to your knowledge got discussed in the

12   pre-AIM meetings?

13       A.    Honestly, it was -- it was the exact meeting

14   that we were heading into -- to the actual AIM meeting.

15   It would just be as if an information for the captain to

16   say, hey, look, this is what we're talking about, almost

17   as if just so that the capital knew what we were talking

18   about like.

19       Q.    Was it a smaller group of people?

20       A.    Yes.

21       Q.    Who typically attended the pre-AIM meetings?

22       A.    So it -- again, that varied, but, you know, our

23   captain, couple -- the patrol lieutenants, patrol

24   sergeants, generally the sergeant for the STAR team.  If

25   not, then the corporal for the STAR team would fill in,

1    and the ILP analyst.

2        Q.   Okay.  And who typically attended the AIM

3    meetings but not the pre-AIM meetings?

4        A.   Outside -- either outside agencies, the SRO's,

5    and the rest of the STAR team, and anybody else from

6    patrol that would trickle in or, you know, take the time

7    to come in and sit in on it.

8        Q.   So were the people in the pre-AIM meetings sort

9    of the leadership contingents?

10       A.   I mean, if you -- yeah.

11       Q.   Okay.  Did you ever make decisions about who

12   would be included on various lists in the pre-AIM

13   meetings?

14       A.   I don't understand.

15       Q.   Well, you're familiar with, of course, the

16   creation of the different lists that we talked about

17   today; right?

18       A.   Referring to the prolific offender, TOP --

19       Q.   Well, there are prolific -- right.  You're

20   familiar with prolific offenders?

21       A.   Yes.

22       Q.   You're familiar with TOP 5?

23       A.   Yes.

24       Q.   For example, in a pre-AIM meeting, would you

25   discuss who would be on put on the TOP 5 list?

1    A.   That would have been a -- yes, there would be

2    some type of discussion.

3    Q.   Okay.  What would you take into consideration

4    or what would -- what would folks in the pre-AIM meeting

5    take into consideration when discussing who to put on

6    the TOP 5 list?

7    A.   Well, essentially that decision should have

8    already been made prior to that because we're presenting

9    what we are discussing to the captain.  So all these

10   decisions are handled at a different level.  So that way

11   when we present it to the captain, hey, we're -- this is

12   the person that we're putting up, it's not a discussion

13   when he looks at it, well, no, I don't want that person.

14   The decision's already been made prior to the pre-AIM.

15   Q.   Okay.  If in the pre-AIM members or if during

16   the pre-AIM meeting individuals in attendance wanted to

17   make adjustments to something like the membership on the

18   TOP 5 list, is that something that could be on the

19   table?

20        MR. POULTON:  Object to the form.  Go ahead.

21   A.   I was rarely -- I sat in those meetings

22   sometimes.  I don't know.

23   BY MR. BARGIL:

24   Q.   Okay.  Let's transition a bit.  I want to talk

25   about the STAR team and the STAR members.  I've got

1    another exhibit here in a moment.

2          MR. POULTON:  Are we at a good break point?

3          MR. BARGIL:  We can be, yes.

4          MR. POULTON:  Okay.  Just for just like five

5      minutes?

6          MR. BARGIL:  Sure.

7          MR. POULTON:  Off the record.

8          (Short break.)

9          (Exhibit 2 was marked for identification.)

10   BY MR. BARGIL:

11       Q.   All right.  We are back on the record.  You

12   acknowledge that you're still under oath?

13       A.   Yes.

14       Q.   Okay.  I'd like to present you with what is

15   Exhibit 2 that was marked before.  Do you recognize this

16   document?

17       A.   Yes.

18       Q.   Okay.  And what is it?

19       A.   The STAR team manual.

20       Q.   Okay.  And this is dated July 2015; is that

21   right?

22       A.   Yes.

23       Q.   And that would have been -- would this have

24   been the active document or the governing document while

25   you were on the STAR team?

1    A.    Yes.

2    Q.    At least for a period of time?

3    A.    Yes.

4    Q.    If you open up to page 1 --

5    A.    Okay.

6    Q.    -- if you look at the bottom, do you see where

7    it says pro-arrest philosophy?

8    A.    Yes.

9    Q.    Will you read the first sentence, please?

10   A.    Out loud?

11   Q.    Yeah, sure.

12   A.    "When operating the STAR box, our philosophy

13   will be pro-arrest in nearly every situation where

14   probable cause exists."

15   Q.    Okay.  Is this for everyone within the STAR

16   box?

17   A.    Yes.

18   Q.    Would it matter if someone was -- the following

19   sentence talks about exceptions to this mentality; is

20   that right?

21   A.    (No response.)

22   Q.    Is that right?

23   A.    Yes.

24   Q.    Okay.  What would be some examples where you

25   would not arrest somebody within a STAR box?

1    A.    Certain misdemeanors.

2    Q.    Like what?

3    A.    Be like a misdemeanor possession marijuana.  I

4    mean, honestly, that's really the only thing I can think

5    of.  Like a misdemeanor -- maybe a traffic offense, you

6    know, criminal misdemeanor, something like that.

7    Q.    And what would be the reason for not arresting

8    for that?

9    A.    It's kind of counter-productive by pulling

10   somebody from the road to effect the arrest to transport

11   that person 45 minutes to an hour away to the jail.

12   Q.    If somebody were a TOP 5 offender, does that

13   calculous shift at all?  Were you instructed to --

14   strike that.

15        If somebody were a TOP 5 offender, were you

16   instructed to always arrest where probable cause

17   existed?

18   A.    I wouldn't say instructed.  I mean, I think it

19   was more we would -- if that person is committing a

20   criminal act and --

21        Sorry.  Yes, yes.  The answer is yes.

22   Q.    Okay.  And if a -- same question, but for a

23   prolific offender.  You would arrest them if probable

24   cause existed?

25   A.    Yes.

1          Q.    Because that is the policy established under

2     the STAR team system; is that right?

3          A.    Yes.

4          Q.    Let me back up really quickly.  What is the

5     STAR team?

6          A.    Like the acronym?

7          Q.    Yeah.  We can start there.

8          A.    The strategic target area response team.

9          Q.    Okay.  And what is the purpose of the STAR

10    team?

11         A.    To focus on, I mean, in a nutshell, the worst

12    people, the worst places, crime sprees and crime trends.

13         Q.    Do you know whose idea it was to implement STAR

14    teams in Pasco County?

15         A.    I believe Captain Jenkins.

16         Q.    Was it his idea and his idea alone or --

17         A.    I don't know.

18         Q.    Okay.  Who would need to provide sort of the

19    final approval for the implementation of something like

20    this as far as you understand it?

21         A.    I really don't know.

22         Q.    Would the sheriff need to approve this type of

23    approach?

24              MR. POULTON:  Object to the form.

25         A.    I don't know.  I really don't.

1    BY MR. BARGIL:

2         Q.   Okay.

3         A.   I'm sorry.

4         Q.   That's okay.

5              How does policing within the STAR box -- strike

6    that.

7              Does policing within a STAR box differ from

8    policing outside of a STAR box?

9         A.   Yes.

10        Q.   Can you tell me how?

11        A.   Again, from a STAR team perspective, it's high

12   visibility in these specific targeted areas just to

13   establish a more -- more of a presence.  So that

14   consists of, by high visibility, more traffic

15   enforcement in these areas, responding to specific -- I

16   mean other call -- I mean, I guess it's just a little

17   bit more -- a little bit more attention within these --

18   within that targeted area.

19        Q.   And when you say a little bit more attention,

20   does that --

21        A.   Yes.

22        Q.   Is one of the ways that manifests itself with

23   this is zero tolerance policy?

24        A.   I'm sorry.  The zero tolerance policy applies

25   -- are you asking if zero tolerance policy applies only

1    in the STAR box, not outside the STAR box?

2        Q.   Well, I guess what I'm asking is is one of the

3    things that makes policing within the STAR box unique

4    the fact that you have a policy that requires arrest

5    upon the existence of probable cause in every instance.

6        A.   No.

7             MR. POULTON:  Object to the form.

8        A.   No.

9    BY MR. BARGIL:

10       Q.   And the -- okay.

11            Does code enforcement -- municipal code

12   enforcement operate a little bit differently within a

13   STAR box than outside a STAR box?

14            MR. POULTON:  Object to the form.

15       A.   I don't know.

16   BY MR. BARGIL:

17       Q.   Do you know whether members of the STAR team

18   were instructed to use code enforcement as part of the

19   their policing of within the STAR box?

20            MR. POULTON:  Object to the form.

21       A.   Yes, there -- yes, we have used code

22   enforcement or STAR has assisted code enforcement.

23   BY MR. BARGIL:

24       Q.   Okay.  Is that part of policing within a STAR

25   box?

1              MR. POULTON:  Object to the form.

2        A.    It's not just the STAR box.  I mean, it doesn't

3    have to just consist of the STAR box.  It could be

4    anywhere.

5    BY MR. BARGIL:

6        Q.    Okay.  We looked at the ILP manual before.  Do

7    you know if anywhere in that manual there's discussion

8    about using code enforcement to target properties?

9        A.    I don't know.

10       Q.    Within the STAR box, do you prioritize

11   properties -- certain properties or certain people?

12       A.    Yes.

13       Q.    Who are the people you prioritize?

14       A.    Again, that's kind of based on a -- on a

15   system, interactions with somebody, how frequently we're

16   interacting with that person, how often that person's

17   name has been mentioned.  Obviously, I mean, I guess the

18   houses -- I mean same thing.  Like how many times are we

19   going to this person's house?  We need to affect some

20   type of strategy to where we don't have to be spending

21   hours on end during a shift at a specific location.

22       Q.    Okay.  Do you, when working within a STAR box,

23   wait to be dispatched to go to various properties or to

24   see certain people?

25       A.    No.

1    Q.   Do you make that decision on your own?

2    A.   Yes.

3    Q.   Are many of your calls self-initiated?

4         MR. POULTON:  Object to the form.

5    A.   In terms of responding to just a call?

6    BY MR. BARGIL:

7    Q.   No.  When you're within a STAR box say you know

8    -- well, I guess I'll back up.

9         Is one of the ways that you end up at a

10   property because you were dispatched there?

11   A.   There are times, yes, that we've been

12   dispatched, yes.

13   Q.   And are there other instances where you end up

14   at a property or visiting a person because that was just

15   something that you self-initiated?

16   A.   Correct.

17   Q.   Was it part of your job responsibility when you

18   were on the STAR team to self-initiate, you know,

19   certain calls?

20   A.   Was it a requirement to have these certain

21   calls?  I wouldn't say it was a -- I don't know if I was

22   actually told or --

23   Q.   Okay.

24   A.   -- or directed to do something specific that

25   night, you know.

1      Q.   I'm just speaking generally about when you're

2    on a STAR team, do you sit in your car and wait to be

3    sent somewhere, or is there an expectation that you'll

4    be more proactive in the way that you --

5      A.   STAR team's a proactive unit.  So we're

6    required to be out there and be visible in responding to

7    prolific offenders' residences or houses or areas, yes.

8      Q.   When you say responding to prolific offenders'

9    houses or areas, would you sometimes, quote, unquote,

10   respond to those locations without actually having been

11   called there?

12     A.   Yes.

13     Q.   And that was, in fact, part of what you were

14   expected to do; is that right?

15     A.   Yes.

16          MR. POULTON:  Object to the form.  Go ahead.

17     A.   Yes.  Being proactive is required, yes.

18   BY MR. BARGIL:

19     Q.   Okay.  Turn to page 2 of the manual.  If you

20   look at the top where it says Strategic Focus, will you

21   read that first sentence?

22     A.   "The STAR team is expected to actively work

23   with other PSO members (particularly ACE and ILP) and

24   outside agencies to identify and target prolific

25   offenders."

1    Q.   Okay.  Now you mentioned before that ACE no

2    longer exists; right?

3    A.   Correct.

4    Q.   Was that a team within the STAR team?

5    A.   No.

6    Q.   Okay.  So when it says here the STAR team is

7    expected to actively work with ILP, who does that refer

8    to?

9    A.   I believe that would probably -- that would

10   apply to our -- the district's analysts.

11   Q.   Okay.  And anyone else?  Okay.

12   A.   I mean, no, not -- I mean, directly from my

13   point of view from that would be the analysts.

14   Q.   Okay.  And it says that part of the purpose --

15   paraphrasing a little bit, but the goal there is to work

16   with them, quote, to identify and target prolific

17   offenders?

18   A.   Yes.

19   Q.   So who would -- was identification of prolific

20   offenders a team activity?

21   A.   Yes.  It would be discussed, yes.

22   Q.   Okay.  So it wasn't just like here's the list,

23   go find these people?

24   A.   Correct.

25   Q.   Who would be involved in that process of

1    identifying prolific offenders?

2         A.   Well, I mean, STAR teams, patrol.  I mean, they

3    would just kind of send up a group names of people that

4    have been kind of emerging or they have been having

5    issues with, and then out of those names be sent up, and

6    then it would be calculated to determine who I guess is

7    replaced or who comes up as a prolific offender.

8         Q.   Okay.  And would -- you know, in your capacity

9    on a STAR team, was part of your job to review that list

10   and kind of weigh who you felt was more deserving to be

11   a prolific offender as opposed to who wasn't given your

12   knowledge of the community?

13            MR. POULTON:  Object to the form.

14        A.   I mean, I would have an -- I would have an

15   opinion, yeah.

16   BY MR. BARGIL:

17        Q.   Okay.  And that would be something that

18   prolific offender classification -- strike all that.

19            So prolific offender classification would be

20   the result of a discussion between STAR team members,

21   intelligence analysts; is that right?

22            MR. POULTON:  Object to the form.

23        A.   I mean, patrol as well.

24   BY MR. BARGIL:

25        Q.   Okay.  Anyone else?

1      A.    Maybe.  I don't know.  I --

2      Q.    Okay.  And it says in the following sentence

3   STAR team, quote, will regularly develop missions to

4   target the TOP 5 and target of the month.

5           Sort of like with the prolific offenders, was

6   the development and identification of TOP 5 and target

7   of the month individuals -- was that a team activity?

8           MR. POULTON:  Object to the form.

9      A.    Team activity to identify a TOP 5 or district

10  target?

11  BY MR. BARGIL:

12     Q.    Yeah, that's a terribly worded question, but

13  would you -- would the STAR team members work in

14  conjunction with the ILP analysts to identify who the

15  TOP 5 and target of the month would be?

16          MR. POULTON:  Object to the form.  Go ahead.

17     A.    There would be discussions.

18  BY MR. BARGIL:

19     Q.    Okay.  And what would be some of the things you

20  would discuss?

21     A.    I mean, hey, here's this person.  You know, I

22  mean, it -- I really don't know specifically because,

23  again, each person is different.  Sometimes there would

24  be absolutely no discussion.  Sometimes I would have no

25  involvement.

1    Q.   I see.  So here's a better way to ask it.  You

2    mentioned a minute ago that with prolific offenders

3    sometimes you would be furnished with a list of name --

4    A.   Yeah.

5    Q.   -- and then you could opine on who you thought

6    was more deserving of prolific offender classification;

7    is that right?

8    A.   Yes.

9    Q.   Okay.  Did the TOP 5 or targeted -- or target

10   of the month, did that operate similarly?

11   A.   Yes.

12   Q.   And sometimes -- I shouldn't say sometimes, but

13   just speaking informally, would you review that list and

14   say, hey, like I know person X to be somebody that we

15   would want to keep an eye on.  I think that person

16   should be within the TOP 5?

17   A.   Yes, I would -- I would relay my thoughts or

18   views on this specific person to the analyst, and we

19   would kind of go back and forth with it and determine.

20   Q.   Was it expected that you do that given that you

21   would be a person who has knowledge of the, quote,

22   unquote, criminal environment?

23   A.   Yes.

24   Q.   And that was, in fact, part of your job; right?

25   A.   Identifying prolific offenders?

1    Q.   Yeah.

2    A.   Yes.

3    Q.   Okay.  Will you please turn to page 4?

4    A.   Okay.

5    Q.   Under Effective Communication --

6    A.   Yes.

7    Q.   -- the second paragraph there.

8    A.   Okay.

9    Q.   Would you read the first sentence in that

10   paragraph?

11   A.   "Therefore, it is incumbent for STAR team

12   members to make a concerted effort to share information

13   regularly with members of other units as part of a

14   formal and informal process."

15   Q.   Okay.  What are some of the formal ways that

16   you would share information?

17   A.   I mean, I guess emails, you know.

18   Q.   Are the daily and nightly reports that we

19   talked about before part of that?

20   A.   Yes.

21   Q.   Okay.  And in later years as the program

22   evolved, would posting in Central Command be part of

23   that?

24   A.   Yeah.  Yes.

25   Q.   Okay.  Did you do this in realtime?  Strike

1    that.

2            So who would you share information with as part

3    of this obligation on your part to constantly

4    communicate what was going on within STAR boxes?

5        A.   So this information was put onto a STAR daily.

6    We had a mass email distribution, and I would -- that

7    was it.

8        Q.   Okay.

9            (Court reporter asked for clarification.)

10       A.   I just send it.

11   BY MR. BARGIL:

12       Q.   How frequently did you interact with ILP

13   analysts while on the STAR team?

14       A.   I would say daily.

15       Q.   Multiple times a day?

16       A.   Could be.

17       Q.   Would you ever contact an ILP analyst and say,

18   hey, who's somebody I should go check in on?

19       A.   No.

20       Q.   What was the purpose of your communication with

21   the ILP analysts?

22       A.   For research analysis.  I mean, they -- they

23   were a little bit quicker at -- if I sent them an

24   address, hey, can you tell me who lived here, who lives

25   here?  Can you tell me if they're on probation?  I mean,

1    they'd be -- that's just something I could think of off

2    the top of my head.

3        Q.   Okay.  Would that information be available to

4    you in your -- via your computer in your car?

5        A.   Yeah.

6        Q.   Okay.  If you look further down on page 4, you

7    will see a subheading that says Attendance at AIM.

8        A.   Yes.

9        Q.   We talked about this a little earlier, but I'm

10   just curious and want to confirm.

11       A.   Yeah.

12       Q.   STAR team members were obligated to attend AIM

13   meetings; correct?

14       A.   It was encouraged, yes.  There are times where

15   I -- we were not in attendance.

16       Q.   I think I noticed that in your performance

17   review or whatever -- maybe we'll talk about it later,

18   but the time where you were not in attendance, you were

19   supposed to have been in attendance; right?

20       A.   Correct.  Yes.

21       Q.   Okay.  If you look at page 5 --

22       A.   Okay.

23       Q.   -- at the subheading that says Strategic

24   Partnerships.

25       A.   Yes.

1      Q.   Who is PRPD?

2      A.   Port Richey PD.  Port Richey Police Department.

3      Q.   Okay.  Is NPRPD New Port Richey Police

4  Department?

5      A.   Yes.

6      Q.   What's TSPD?

7      A.   Tarpon Springs Police Department.

8      Q.   Okay.  And are these -- is this list here under

9  strategic partnerships, is this groups of people who

10  were encouraged to -- or organizations whose

11  representatives were encouraged to attend AIM meetings?

12      A.   Yes.

13      Q.   Was code enforcement -- well, I see that code

14  enforcement is on this list.  Did code enforcement

15  personnel typically attend AIM meetings?

16      A.   Yes.

17      MR. POULTON:  Object to the form.

18  BY MR. BARGIL:

19      Q.   Was the ATF typically present at AIM meetings?

20      A.   I don't know.

21      Q.   Can you remember a time when ATF was at an AIM

22  meeting?

23      A.   No.

24      Q.   Alcohol, Beverage and Tobacco, is that a

25  Florida -- what is that?  Do you know what that agency

1    is?

2        A.    No.

3        Q.    Do you know whether homeowners associations

4    were typically present at AIM meetings?

5        A.    I do not.

6        Q.    Can you remember a time where a representative

7    from a homeowners association was at an AIM meeting?

8        A.    No.

9        Q.    Do you recall a time where county attorney

10   Kristi Sims or another sitting county attorney was

11   present at an AIM meeting?

12       A.    I mean, specifically, no.

13       Q.    Okay.  And do you know whether building

14   officials, either Rune Lero or Jim Lloyd or anyone else

15   who was a building official, do you recall a time when

16   they were at an AIM meeting?

17       A.    No.

18       Q.    And the other municipal sheriff's office -- or

19   police departments, were they at AIM meetings?

20       A.    Yes.

21       Q.    Okay.  So it was STAR team, other police

22   departments within Pasco County, and code enforcement,

23   and STAR team members.  Was that the typical crew at an

24   AIM meeting?

25       A.    Juvenile -- well, parole and probation and

1    SRO's.

2        Q.   Okay.  So I missed that.  I should have gone

3    over those.  So Pinellas -- or so parole and probation

4    were typically at AIM meetings?

5        A.   Yes.

6        Q.   And Juvenile Justice (Probation) were they

7    typically at AIM meetings?

8        A.   With Juvenile Justice, at times I know that

9    they have been there, but --

10       Q.   Okay.  Who from code enforcement do you recall

11   appearing at AIM meetings?

12       A.   I know that we would have the county code

13   enforcement, and at times Celeste would be there.

14       Q.   Was Celeste typically there?

15           MR. POULTON:  Object to the form.

16       A.   Generally.  I mean, from what I recall, yes.

17   BY MR. BARGIL:

18       Q.   Okay.  Do you know if part of his job

19   responsibilities was to attend AIM meetings?

20       A.   I don't.

21       Q.   But nevertheless, he was typically there?

22       A.   Yes.

23       Q.   Will you turn to page -- I guess we should

24   start at page 6.  This is examples of strategies.

25       A.   Yes.

1     Q.    And turning to page 7 --

2     A.    Okay.

3     Q.    -- can you look at the second sort of bullet

4     there, second paragraph from the top?

5     A.    Okay.

6     Q.    Can you read that whole bullet as one of the --

7     what did we say it was -- strategies?  Yeah, what does

8     that bullet as an example of a strategy say?

9     A.    It says, "Utilize county ordinance citations as

10    a strategic tool to target prolific offenders and

11    problem locations within the STAR box.  Coordinate

12    missions with Corporal Art Madden and code enforcement

13    to conduct STAR box code enforcement blitzes."

14    Q.    Okay.  Who is Corporal Art Madden?

15    A.    He's in charge of like I think several or like

16    -- like civil service unit.  I mean, he has a couple

17    titles here.  It's like a citizens service unit.

18          I should kind of backtrack.  I don't exactly

19    know.

20    Q.    Okay.  That's fine.  That's totally fine.

21          So, first of all, what is a code enforcement

22    blitz?

23    A.    I have no idea.

24          MR. POULTON:  Object to the form.  There you

25    go.  Sustained.

```
 1   BY MR. BARGIL:

 2        Q.   Did the STAR team have a dedicated position for

 3   code enforcement within a STAR box?

 4        A.   No.

 5        Q.   Do you know what Captain -- I don't want to get

 6   his rank wrong.  Do you know what Celeste's role was

 7   with -- as far as code enforcement goes?

 8             MR. POULTON:  Object to the form.

 9        A.   Role?

10             MR. POULTON:  Object to the form.  At a

11        specific time?  Because it's -- that's changed now.

12   BY MR. BARGIL:

13        Q.   Yeah.  While you were there, you mentioned that

14   you would -- that Celeste typically attended AIM

15   meetings.

16        A.   Yes.

17        Q.   And he -- am I correct that he was typically

18   attending AIM meetings in his capacity as someone who

19   worked primarily on code enforcement?

20        A.   Yes.

21        Q.   And I guess my question is, was Celeste

22   assigned to a STAR team for purposes of code

23   enforcement?

24        A.   No.

25        Q.   He had broader responsibilities?
```

```
 1      A.    Yes.

 2      Q.    Did he focus primarily on code enforcement?

 3            MR. POULTON:   Object to the form.

 4      A.    That was his title.   I hope so.

 5   BY MR. BARGIL:

 6      Q.    Well, what was his title as far as you know?

 7      A.    Code enforcement.

 8      Q.    Okay.

 9      A.    Code corporal.

10      Q.    Okay.   Now going to the first sentence in that

11   bullet where it says, "Utilize county ordinance

12   citations as a strategic tool to target prolific

13   offenders," what does that mean?

14            MR. POULTON:   I'm going to object to the form.

15      There was more to it than that.

16   BY MR. BARGIL:

17      Q.    -- "as a strategic tool to target prolific

18   offenders and problem locations within the STAR box."   I

19   don't know if that changes your answer, but what is

20   it -- what does that -- how do you -- what do you take

21   that instruction to mean?

22      A.    To utilize code at these locations when -- when

23   we're at a prolific offender's residence as a tool or a

24   technique for -- for compliance I guess I would say.

25      Q.    Compliance with what?
```

1      A.   I don't -- I don't even know how to answer the

2   question.  I guess if we're -- if there's a violation,

3   it's -- there's a -- I'm trying think of the right

4   verbiage here -- I guess a discretionary method to see

5   if code, while they're on scene, if there is a violation

6   at the residence, if we're not getting compliance with

7   the prolific offender's behavior or if they're not -- if

8   they're still out there committing criminal acts, you

9   know, the way that I would view it is it's not fair to

10  other people, I guess, to -- that we have people that

11  are -- don't lock their doors, and you have this person

12  that lives there who is creating criminal acts, and it's

13  not fair they keep getting victimized.  So it's kind of

14  putting the pressure onto the residents of where this

15  prolific offender is.  Then I don't know what code

16  enforcement would do with their violations.  It would

17  just -- he would come with us and see if he found

18  anything.

19      Q.   So if we're talking hypothetically like with a

20  juvenile, is the idea that because that person is

21  suspected of certain wrongdoing, like you can use code

22  enforcement to sort of light a fire under the homeowner

23  to do a better job in keeping that juvenile out of

24  trouble?

25      A.   Yes, that's -- that is what we have used.

1    That's what we used it for, yes.

2        Q.    Okay.  And when you go out to a residence, if

3    you're going to do -- say you're doing a prolific

4    offender check, would you bring along Celeste or someone

5    who works in that capacity at the time you're doing the

6    check?

7            MR. POULTON:  Object to the form.

8        A.    Not every time.

9    BY MR. BARGIL:

10       Q.    If you were not getting compliance from the

11   homeowner or if you were getting a little bit of, you

12   know -- if it got contentious, would you then in some

13   instances say, hey, Celeste, why don't you come over

14   here?

15           MR. POULTON:  Object to the form.  Go ahead.

16       A.    Not in every circumstance because, I mean,

17   again we have the ability to write the violations as

18   well.  So, I mean, if we're on scene -- I mean, because

19   our hours were also pretty different.  He was more of

20   like an eight to five.  We didn't come in until two.

21   Sometimes we'd get to the office, try to plan out our

22   day, so it's just -- it varied.

23   BY MR. BARGIL:

24       Q.    Okay.  Were you -- when you would go out to a

25   house to do either a prolific offender check or to look

1    for a TOP 5 person or something like that, did you go

2    there with the intention of looking for code violations?

3        A.    No.

4        Q.    But in some instances you ended up doing that;

5    is that right?

6        A.    Yes.

7        Q.    And if you can identify it, what would be sort

8    of the trigger for when you would transition from just

9    doing a check to, okay, now I'm looking for code

10   violations?

11           MR. POULTON:  Object to the form.

12       A.    I think it all -- it all depends.  You know, it

13   varies.  I don't think that there's a trigger, you know.

14   I think that there's already been a trigger with why

15   we're even there.  This person has already been

16   identified.  The residence has already been identified.

17   I mean, for us to continuously visit and there's been no

18   changes, and then now we -- there's alternative methods

19   to maybe help you guys understand that we don't want to

20   have to keep coming here.  So, again, the violations

21   would vary.

22   BY MR. BARGIL:

23       Q.    I see.  Do you know what the penalties were?

24       A.    The violations?

25       Q.    What a typical cope enforcement fine would be?

1           MR. POULTON:  Object to the form.

2      A.   Oh, no, I don't.

3  BY MR. BARGIL:

4      Q.   Turn to page 8.

5      A.   Yes.

6      Q.   If you look at the bottom where it says ILP

7  Manual --

8      A.   Yes.

9      Q.   -- this is sort of rehashing some questions I

10 asked you earlier about the ILP manual, but --

11     A.   Okay.

12     Q.   -- is it correct that STAR team members should

13 know and master the ILP manual found on the PSO intranet

14 website?

15     A.   Yes.

16     Q.   And it's fair to say that was kind of your

17 Bible?

18          MR. POULTON:  Object to the form.

19     A.   It was something that we were supposed to be

20 familiar with.

21 BY MR. BARGIL:

22     Q.   Okay.  And as a STAR team member, were you --

23 was the expectation the same that you would be -- that

24 you should be familiar with the STAR team manual?

25     A.   Yes.

1      Q.   And if you look at the conclusion on page 9

2   there --

3      A.   Okay.

4      Q.   -- the first line in the conclusion, will you

5   read that out loud, please?

6      A.   I'm sorry.  The second paragraph you're saying?

7      Q.   Yeah, the first sentence of the final paragraph

8   there under Conclusion.

9      A.   "This document will likely receive many

10  additions and minor modifications" --

11     Q.   I'm sorry.  I'm sorry.  Just right under where

12  it says Conclusion, that very first sentence.

13     A.   "This document, coupled with the ILP manual,

14  should be read, reread, and read again."

15     Q.   Okay.  Fair to say that that's -- it's been

16  emphasized to you here that you need to master the

17  manual on the STAR manual?

18     A.   Yes.

19     Q.   And did you do that?

20     A.   I'd like to think so.

21     Q.   Okay.  Oh, what is Operation Fall Harvest?  Is

22  that something that you were involved in?

23     A.   I think -- I think it was an operation that

24  I -- that I was in charge of for the collection of -- it

25  was like a parole and probation check.

1    Q.   Okay.  Was that something that you were in

2    charge of when you were in command of the STAR team?

3    A.   I was the corporal for the STAR.

4    Q.   I'm sorry.  Corporal for the STAR team?

5    A.   Yes, yes.

6    Q.   And do you recall what that entailed?

7    A.   I know there's a PowerPoint on it.  It was

8    just -- I mean, I'm sure on like the first slide I'm

9    sure that there like was a mission of what it was that

10   we were doing.

11   Q.   Okay.

12   A.   So I don't know specifically.

13   Q.   Okay.  I want to talk a little bit about --

14        Oh, are you -- do you know whether there's an

15   updated STAR manual?

16   A.   Yes.

17   Q.   And have you familiarized yourself with that as

18   well?

19   A.   Yes.

20   Q.   Okay.  But again, the one that we just went

21   over would have been the one that you would have been

22   required to read when you were on the STAR team; right?

23   A.   Yes.

24   Q.   Do you know how frequently the STAR team manual

25   was updated?

1    A.    No.

2    Q.    Every two years?  Quarterly?

3          MR. POULTON:  Object to the form.

4    A.    No, I don't really know.

5  BY MR. BARGIL:

6    Q.    That's okay.

7          So prolific offenders -- what is a prolific

8  offender as far as you know?

9    A.    Somebody just -- it's somebody that's been

10 given that title based on their criminal involvement or

11 criminal activity.

12   Q.    Okay.  Do you know the process by which someone

13 ends up classified as a prolific offender?

14   A.    No, not verbatim.  I just know from what I

15 recall it's a point system.

16   Q.    Okay.  And at some point in that process,

17 seemingly toward the end, you get the opportunity to

18 weigh in; is that right?

19         MR. POULTON:  Object to the form.

20   A.    I'm sorry.  Weigh in as identifying them as --

21 I would say that I would -- we say, hey, look, this guy

22 is -- we've been to his house this many times.  He's

23 been mentioned in this many crimes.  He's been --

24 obviously, he's -- something is drawing us to where he's

25 at.  That name is forwarded up --

1   BY MR. BARGIL:

2        Q.   Okay.

3        A.   -- to an analyst basically to determine what

4   other outside sources he may have for criminal activity.

5        Q.   I see.  So you can recommend to either an

6   analyst or to somebody who does this calculation -- you

7   can recommend that they review a person for inclusion on

8   the list?

9             MR. POULTON:  Object to the form.

10       A.   Yes.

11  BY MR. BARGIL:

12       Q.   Can you recommend that somebody be removed from

13  a list?

14       A.   I would -- I think I have.

15       Q.   Okay.

16       A.   I think I have.

17       Q.   Do you remember --

18       A.   No.

19       Q.   -- who that person was?

20       A.   No.

21       Q.   What is a prolific offender check?

22       A.   Just a routine check on a -- a prolific

23  offender, just a contact.

24       Q.   What is the purpose of doing that?

25       A.   To find -- to -- it could be, I guess, a bunch

1   of things.  It could be they were just released from

2   either JDC or whatever, you know, speaking outside of

3   juvenile or an adult released from jail.  Could be their

4   name has come up in an investigation.  It could be just

5   to ensure that they're staying out of criminal --

6   they're not involving themselves in any kind of criminal

7   activity.

8       Q.   How do you make sure that they're not involving

9   themselves in criminal activity by making a prolific

10  offender check?

11      A.   We're a deterrent.  It's just a, hey, how you

12  doing?  Everything's good.  Okay.  Just making sure

13  you're staying out of trouble.  You need anything?  I

14  think that's where the building -- the relationship

15  building kind of comes in.

16      Q.   Do you ever look around a property when you're

17  there for a prolific offender check?

18          MR. POULTON:  Object to the form.

19      A.   What do you mean?  Like what do you mean?

20  BY MR. BARGIL:

21      Q.   Well, is it -- when you make a prolific

22  offender check, apart from looking for the person who is

23  the prolific offender, do you ever look, you know, into

24  a house or into a rear yard?  Is that something that you

25  could do?

1          MR. POULTON:  Object to the form.

2     A.   All circumstances I think are so -- they're so

3     different.  I really don't -- I don't know exactly what

4     we're referring to.  I mean, is this a standard prolific

5     offender check?  I mean, I don't know why I'm there.

6     Like I said, there's a bunch of reasons why I'm there to

7     visit this person.  So a circumstance where I'm looking

8     through a back -- a patio or whatever it is that you're

9     describing, possibly.  Maybe we had information that

10    somebody's being held there, they're hiding somebody

11    there, and they might flee when we get there.  So, I

12    mean, I think all the circumstances are just different.

13    BY MR. BARGIL:

14         Q.   Do you ever recall being on a prolific offender

15    check and like looking into a window of a home?

16         A.   No.

17         Q.   Do you ever recall being on a prolific offender

18    check and looking peering into a yard?

19              MR. POULTON:  Object to the form.

20         A.   No.

21    BY MR. BARGIL:

22         Q.   When you would do prolific offender checks, do

23    you -- did you typically get warrants before you

24    would -- would you obtain a warrant before doing a

25    prolific offender check?

1      A.    No.

2      Q.    Did you feel as though you needed to get a

3   warrant before doing a prolific offender check?

4           MR. POULTON:  Object to the form.

5      A.    No.

6   BY MR. BARGIL:

7      Q.    Did you, before doing a prolific offender

8   check, determine whether there was a suspicion of

9   wrongdoing on the part of the prolific offender before

10   going there?

11      A.    Not every time.

12      Q.    Did you need to have suspicion of wrongdoing?

13           MR. POULTON:  Object to the form.

14      A.    To make contact?

15   BY MR. BARGIL:

16      Q.    Yeah.

17           MR. POULTON:  I'm sorry.  I missed the

18       question.  What was the question?  Did he what?

19   BY MR. BARGIL:

20      Q.    I'll ask it more fully.  When conducting a

21   prolific offender check, was it your understanding that

22   you needed suspicion of wrongdoing before initiating the

23   check?

24      A.    No.

25      Q.    Okay.

1                (Exhibit 3 was marked for identification.)

2    BY MR. BARGIL:

3         Q.    Okay.  These are -- actually, why don't you

4    take a look at this document and tell me if you can

5    identify what this is?

6         A.    Yeah, it's our ILP -- the ILP spreadsheet

7    that's for like our meetings.

8         Q.    Okay.

9         A.    Slides.

10        Q.    So this is a printed up PowerPoint

11   presentation?

12        A.    Yes.

13        Q.    Okay.  And is there a date on this?  There

14   should be.

15        A.    That's what I was looking -- oh, yeah.  April

16   4th to April 10, 2016.

17        Q.    Okay.  And the date of the meeting is April 14,

18   to 2016; is that right?

19        A.    Yes.

20        Q.    Okay.  I think it might be easier to go by the

21   Bates numbers on this one.  Can you turn to what is

22   listed as Defendant 15562?  It's about ten pages in I

23   think.

24        A.    Oh.

25        Q.    Do you see the number at the bottom right

1    there?

2         A.   Oh, okay.  Yes.

3         Q.   Yeah.

4         A.   15526?

5         Q.   Yeah.

6         A.   All right.  I'm there.

7         Q.   Okay.  The third line there -- why don't you

8    give this a quick read up to about line three or four

9    and then tell me when you're done.

10             So do you see the line there that says

11   Jones/Regan?

12        A.   Yeah.

13        Q.   Does that indicate that -- why don't you tell

14   me what that indicates, what those two names mean?

15        A.   That that prolific offender was assigned to me.

16        Q.   Okay.  So that was my question.  Were prolific

17   offenders assigned to specific deputies or members of

18   the STAR team?

19        A.   At this time, yes.

20        Q.   Did that change?

21        A.   Yes.

22        Q.   When did that change?

23        A.   When I was doing it, I didn't have that.  I

24   didn't -- we didn't assign prolific offenders.

25        Q.   Okay.  Well, wait.  Can you say that again?

1    When you were doing it, you didn't --

2        A.   When I was the -- when I became the corporal of

3    the STAR team, I did not have it this way.

4        Q.   I see.  But when you were -- before that this

5    is how it was done?

6        A.   Yes.

7        Q.   Do you know why it changed?

8        A.   No.

9        Q.   So was the job -- when somebody is a TOP 5

10   offender, is the goal to arrest that person?

11       A.   No.

12       Q.   What is -- what is the -- what is your

13   responsibility as it relates to a TOP 5 offender to whom

14   you're assigned?

15       A.   So from my understanding, it would be to focus

16   on this individual to ensure that they are staying out

17   of criminal activity.

18       Q.   Okay.  And that individual here is Jones?

19       A.   Yes.

20       Q.   Do you know -- do you recall the first name of

21   this person?

22       A.   I'm assuming it's Bobby Jones.

23       Q.   Okay.  Do you know how Bobby Jones ended up TOP

24   5?

25       A.   I'm going to be completely honest.  I don't

1    recall.  I think I may have been extremely new to this.

2    I -- I honestly barely recall Bobby Jones.  I remember a

3    very in-depth investigation that I was like barely a

4    part of for like a big spree, and I know that there was

5    a search warrant on his house.  I don't think I -- I

6    don't even recall ever talking to the kid.

7        Q.   Okay.  Would you have been required at some

8    point to go and talk to him if he were TOP 5 and

9    assigned to you?

10       A.   Yes.

11       Q.   So although you might not remember it, is it

12   possible that you did speak with him?

13       A.   Yeah, I mean, definitely.  Yeah, I'm not -- I'm

14   not disputing that.  I just --

15       Q.   That's okay.

16       A.   Very, very old to me.

17       Q.   Yeah.

18            Will you now turn to what is Bates number

19   15572?  You can just probably just pay attention to the

20   last two digits.

21       A.   Okay.  I'm there.

22       Q.   And what is this a slide depicting?

23       A.   The district three's TOP 5.

24       Q.   Okay.  And to the top right that's Bobby Jones,

25   IV, right, or Robert Jones, IV, a/k/a Bobby Jones?

1       A.    Yes.

2       Q.    Does seeing this photo bring back any memories?

3       A.    Yeah.  I mean, I'm familiar with what he looked

4   like.  Yeah.

5       Q.    Okay.  The number 64 there, what does that

6   denote?

7       A.    Oh, the amount of days that they've been a TOP

8   5.

9       Q.    Okay.  And if you look at his last known

10  address there, there's another -- at the end of that

11  line there's another number in parentheses, the number

12  12.  Do you know what that --

13      A.    That's not a 12.  That's IDA 2.

14      Q.    Oh, okay.

15      A.    That's the zone.

16      Q.    I see.  Okay.  That makes more sense.

17            Was that your zone?

18      A.    No.  We didn't have zones.

19      Q.    Okay.

20      A.    It was just the offenders and where they were

21  located.  They were identified as TOP 5, and STAR team

22  was responsible.

23      Q.    I see.

24            Do you know what he was -- what Bobby Jones was

25  suspected of being involved in that landed him on the

1    TOP 5?

2         A.    A lot of burglaries.

3         Q.    And is that just based on what you're looking

4    at on the slide right here?

5         A.    No.  I just -- I -- am I -- can I answer it?

6         Q.    Sure.

7              MR. POULTON:  Go ahead.

8         A.    No.  I just -- well, I mean, I just recall

9    doing -- there was a trash pull involved.  There was

10   keys located from the trash pull that were linked to

11   other vehicle burglaries.  I just -- I remember being a

12   part of -- I mean, he was just involved in a lot of

13   criminal acts.

14        Q.    Okay.  Go to page 15576.

15        A.    Okay.

16        Q.    What would you describe this slide as

17   depicting?

18        A.    Bobby Jones and his associates.

19        Q.    Okay.  If you look sort of to the bottom left,

20   do you see Robert Arthur Jones, III?

21        A.    Yes.

22        Q.    And as far as you know, who is that person?

23        A.    His dad.

24        Q.    Okay.  Do parents typically end up as

25   identified associates?

1        MR. POULTON:  Object to the form.

2     A.   I don't know.

3  BY MR. BARGIL:

4     Q.   Is this a depiction of social network analysis?

5        MR. POULTON:  Object to the form.

6     A.   I don't know.  It's -- what this appears to be

7  is his close associates.

8  BY MR. BARGIL:

9     Q.   Who would have made that determination?

10    A.   Could have been -- I mean, that's -- that's --

11 that's based on who he's been arrested with or who he's

12 been in contact -- not contact but, I mean, it could

13 have been -- yeah, I mean, honestly, I don't know.  I

14 really don't.

15    Q.   Okay.

16    A.   I'm sorry.

17    Q.   Do you know who would have been tasked with

18 making this specific slide?

19    A.   Not specifically.  I would -- we definitely had

20 -- STAR definitely played a part in assisting in the

21 identification of who he is associated with.

22    Q.   Okay.  Could a STAR deputy or member of the

23 STAR team have recommended that his dad be included as

24 part of his network?

25        MR. POULTON:  Object to the form.

1          A.   I don't know.

2     BY MR. BARGIL:

3          Q.   Okay.

4               MR. POULTON:   Was that number three?

5               MS. BROTHERS:   Yeah.

6               MR. POULTON:   Okay.   Thank you.

7               (Exhibit 4 was marked for identification.)

8     BY MR. BARGIL:

9          Q.   Does this document look familiar to you at all,

10    or can you identify what this document is?

11         A.   Yeah.   It's obviously a printout of the

12    dispatch of the call.

13         Q.   Okay.   At the top left where it says Call

14    Source, can you tell me what it says there?

15         A.   Call Source:   Self.

16         Q.   Okay.   What is that?

17         A.   I believe it implies self-initiated.

18         Q.   Okay.   It's still called a call even when

19    nobody calls?

20         A.   I don't know.

21         Q.   Okay.   That was just sort of --

22              MR. POULTON:   Funny.

23    BY MR. BARGIL:

24         Q.   No, no.   I wasn't even -- that was just a --

25    you know, sometimes your own personal curiosity ends up

```
1    being introduced in depositions.

2         A.   It's hard to bring in a joke with this

3    situation.

4    BY MR. BARGIL:

5         Q.   No, I'm not -- I'm not -- well, it wasn't a

6    joke.  It was just a bad question.

7         A.   Okay.  Sorry.

8         Q.   So under a few lines down do you see where it

9    says Nature?

10        A.   Yes, sir.

11        Q.   And what does it say there?

12        A.   SO investigation.

13        Q.   Okay.  What does that classification mean?

14        A.   Generally, it's just an internal response, like

15   kind of a generic selection --

16        Q.   Okay.

17        A.   -- for calls.

18        Q.   Is this a -- could a prolific offender check or

19   a TOP 5 check be classified as an SO investigation?

20             MR. POULTON:  Object to the form.

21        A.   I don't know.  Yeah, I think.  I don't know.

22   BY MR. BARGIL:

23        Q.   Do you know based on this document what the

24   purpose of this self-initiated call was?

25        A.   Yeah.  Based on what I'm reading, it was
```

1   obviously to make contact with Robert Jones.

2       Q.   You say based on what you're reading.  Where

3   are you looking?

4       A.   I'm sorry.  I'm looking under the Notes

5   section --

6       Q.   Okay?

7       A.   -- where it mentions Robert Jones.

8       Q.   Okay.  And that alone indicates to you that you

9   were there just to make contact with him?

10      A.   Yes.

11      Q.   Do you know based on this document whether that

12  attempt to make contact was successful or not?

13      A.   I do not.

14      Q.   And do you know based on this document what the

15  purpose of attempting to make contact was?

16      A.   No.

17      Q.   Could this have been a prolific offender check?

18      A.   Could have been.

19      Q.   Could this have been a TOP 5 check?

20      A.   I don't know.  At the top -- I mean if I was --

21  if I get -- compare with this -- this timeframe to this,

22  I mean, yeah.  Yes.

23      Q.   Okay.  Here's maybe a better way to ask the

24  question.  If he were suspected of a specific crime,

25  would that be noted differently than the way you've

```
 1   written it here?
 2              MR. POULTON:  Object to the form.
 3        A.   It could be.
 4   BY MR. BARGIL:
 5        Q.   Okay.  How could it be noted differently?
 6        A.   I mean, it's -- I can't answer for -- for
 7   somebody else's response to how they would label it or
 8   the notes that they would put in.  I mean, from what I
 9   can tell, I responded to this location to make contact
10   with Robert Jones reference an investigation, and I have
11   no additional notes.
12        Q.   Okay.  What would you have done if this were
13   part of a -- you know, if you were going there to serve
14   a warrant, for example, would this document look the
15   same, or would something be different about it?
16        A.   If I was going to serve a warrant?
17        Q.   That's just an example.  It could be -- but for
18   purposes of this question, would you fill out the form
19   the same way?
20        A.   I think for like investigative techniques or
21   like so that things aren't -- so people can't see what
22   it is that we're doing, because I've heard that there
23   are sites or access like things that you can actually
24   see what law enforcement is doing, like a response area.
25   So, I mean, it could just say SW.
```

```
1     Q.    Okay.  Which would stand for?
2     A.    Search warrant.
3     Q.    Okay.  Do you see sort of in the middle of that
4  upper block there where it says priority?
5     A.    Yes.
6     Q.    What is -- and you have it says priority three.
7  What does that mean?
8     A.    I think that -- I don't know specifically.  I
9  think it might apply something to do with dispatch on
10 how they categorize the -- I don't know -- like routine
11 calls like checkups.
12    Q.    Are there different degrees of priority?
13    A.    I believe so.
14    Q.    What are those degrees?
15    A.    I don't know what that -- I think -- I don't
16 know what they go to.  Honestly, I couldn't even tell
17 you.  I think priority one, obviously, is the -- like an
18 emergency-type priority.
19    Q.    Okay.
20    A.    But again I don't -- I couldn't tell you the
21 levels.
22    Q.    Okay.  Do you know -- so this is not something
23 that you put in?  It's something that's --
24    A.    Yeah, that's not -- yeah, I don't put any of
25 that in.
```

1        Q.   Okay.  Looking at that document quickly at the

2   bottom where it says radio log --

3        A.   Yes.

4        Q.   -- on the left-hand side it says -- there's two

5   listings for two different STAR units.  There's STAR 34

6   and STAR 32.

7        A.   Yes.

8        Q.   Does that mean that two different units went

9   out on this particular occasion?

10       A.   Yes.

11       Q.   Okay.

12            (Exhibit 5 was marked for identification.)

13   BY MR. BARGIL:

14       Q.   And a very similar looking document.  Do you

15   recognize what this document is?

16       A.   Yes.

17       Q.   Again for call source what does it say?

18       A.   Self.

19       Q.   Okay.  And so this would have been an instance

20   where you self-initiated a visit to this address?

21       A.   Yes.

22       Q.   And is this, as far as you can tell, Bobby

23   Jones's address?

24       A.   Yes.

25       Q.   And under Nature what does it say?

1       A.    Prolific offender check.

2       Q.    Okay.  And under Notes what does it say?

3       A.    Attempt contact Bobby Jones.

4       Q.    Okay.  Is there any way to glean from this

5   document whether that attempt was successful?

6       A.    No.  The disposition is other action, so --

7             MR. POULTON:  Okay.  Well -- okay.  I can't

8       answer.  I think I know.  Look at radio log.

9             MR. BARGIL:  Okay.  Well, it says --

10  BY MR. BARGIL:

11      Q.    Why don't you look at the radio log, Detective,

12  and tell me what you think that means?

13      A.    Well, looking at the time stamps from the radio

14  log and to when the call was made, those look like added

15  notes or it's something from dispatch.  That's --

16      Q.    Okay.

17      A.    Because it's literally -- it's time stamped the

18  same exact time that the call was --

19            MR. POULTON:  Well --

20            MR. BARGIL:  Okay.  Well, if he doesn't know,

21      you can't answer, Tom.

22            MR. POULTON:  All right.  You're right.  You're

23      right.

24  BY MR. BARGIL:

25      Q.    Okay.  That's fine.

1           Is there anything in there to indicate that you

2     made contact with Bobby Jones at this date and time?

3           A.   Oh, okay.  This is obviously reference a

4     different event of why I was trying to make contact.

5           Q.   And how do you know that?

6           A.   There's a call number.

7           Q.   Okay.  And what does that call number tell you?

8           A.   Well, I don't know what that -- I -- sorry.

9           Q.   Okay.  But this nevertheless is a -- is a --

10          A.   It's reference another -- it's reference an

11    incident.

12          Q.   Okay.

13          A.   Something -- something.  I don't know what it

14    is.

15          Q.   So would this have been a prolific offender

16    check related to some incident identified in that

17    number?

18          A.   Possibly.  I would -- I would -- I would think

19    so.

20          Q.   I mean, would you ever record something as a

21    prolific offender check if it wasn't a prolific offender

22    check?

23               MR. POULTON:  Object to the form.

24          A.   What do you -- I'm sorry.  I don't -- what do

25    you mean?

1    BY MR. BARGIL:

2        Q.   Well, in the event report, the nature of the

3    event says prolific offender check?

4        A.   Correct.

5        Q.   Is there any reason to think that this wasn't a

6    prolific offender check?

7             MR. POULTON:   Object to the form.

8        A.   No.

9    BY MR. BARGIL:

10       Q.   Okay.

11            (Exhibit 6 was marked for identification.)

12   BY MR. BARGIL:

13       Q.   Okay.  Can you take a look at this document and

14   tell me what it depicts?

15       A.   Self-initiated call to attempt contact with

16   Bobby Jones.

17       Q.   Okay.  And what is the nature according to this

18   event report?

19       A.   An SO invest.

20       Q.   Okay.  Could this be a prolific offender check

21   as well?

22       A.   I -- I mean, I listed it as SO investigation,

23   so I --

24       Q.   If you were investigating anything in

25   particular, would you link it to like a case number or

 1    something like that or a matter number?

 2        A.   Generally, there should be something listed if

 3    I'm -- if it's some -- if it's related to something

 4    else.

 5        Q.   Okay.  Did you do that here?

 6        A.   So generally it would be added in the notes,

 7    which I don't -- I don't see.

 8        Q.   Okay.  Is there anything in this document to

 9    indicate whether that attempt to contact Bobby Jones was

10    successful?

11        A.   Nope.  I was there for a while.

12        Q.   How long were you there for?

13        A.   It looks like about an hour.  Over an hour.

14        Q.   If you made contact with anyone while you were

15    there, would you put that in the notes?

16        A.   I should.  I should have.

17        Q.   Is that part of protocol to do something -- to

18    do that?

19        A.   I don't know if there's like an internal policy

20    about it.  I mean, that's just more for documentation

21    purposes for the next person that responds, but it looks

22    like I did not do that.

23        Q.   Okay.  Is there -- Okay.  Could this have been

24    a TOP 5 visit?

25        A.   Could have been.

1    Q.   Okay.

2         (Exhibit 7 was marked for identification.)

3    BY MR. BARGIL:

4    Q.   Okay.  Take a look at this document.  Does

5    this -- what does this document depict as far as you

6    know?

7    A.   A self-initiated call to I believe Donnie

8    McDougall's house.

9    Q.   Okay.  And under Nature what does that say?

10   A.   SO investigation.

11   Q.   Okay.  Was Donnie McDougall a prolific

12   offender?

13   A.   I have no idea.

14   Q.   Do you know why you would have been going to

15   his house?

16   A.   No.

17   Q.   When you look at the units there, does a unit

18   refer to a vehicle or to --

19   A.   No.  It's our call signs.

20   Q.   Okay.  So STAR which one are you?

21   A.   I would be -- I don't known specifically.

22   STAR 30 would have been the sergeant.  Oh, hold on.  My

23   CJIS is here.  STAR 33.

24   Q.   Okay.  And there were how many units dispatched

25   here?

1        A.    Looks like three.

2        Q.    Okay.  Do you know how many physical sworn law

3    enforcement officers that means?  Is it also three?

4        A.    Yes.

5        Q.    Do you know why you don't have any notes

6    written in this event report?

7        A.    I do not.

8        Q.    And based on this, how long were you at the

9    residence for?

10       A.    It looks like two hours or one hour.

11       Q.    Okay.  Any reason to think it wasn't a prolific

12   offender check?

13       A.    I don't know.

14       Q.    But based on this document, it may well have

15   been?

16            MR. POULTON:  Object to the form.

17   BY MR. BARGIL:

18       Q.    It's okay.  It's okay.  If you don't know, you

19   don't know.

20            (Exhibit 8 was marked for identification.)

21   BY MR. BARGIL:

22       Q.    Can you take a look at this report quickly and

23   familiarize yourself with it?  Do you know what this is?

24       A.    Yes.  It's a -- looks like a juvenile pickup

25   order for Donnie McDougall.

1    Q.   Okay.  Can you tell based on this document what

2   you were there to pick him up for?

3    A.   It looks like a violation.  Looks like a

4   violation of probation.

5    Q.   I'm not telling you you're wrong, but let's

6   maybe flip to what is page 3 of report itself.  Do you

7   know what this is?

8    A.   Are we on this?  Okay.  Yeah, it looks like

9   it's a report by Thomas Garmon.

10    Q.   Okay.  And is that a colleague of yours?

11    A.   Yes.

12    Q.   Can you read that first sentence there?

13    A.   "On 12-29-17 at approximately 18:50 hours, I

14   self-dispatched to 3229 Primrose Drive, Holiday, Florida

15   34691, in reference to a prolific offender check on

16   Donnie McDougall."

17    Q.   Okay.  So fair to say that the purpose of this

18   visit was a prolific offender check?

19        MR. POULTON:  Object to the form.

20    A.   Well, if I continue reading though, it seems

21   like he -- Donnie had violated his probation.

22    Q.   Well, let's -- we're going to break it up.

23    A.   Okay.

24    Q.   I'm not disputing that this -- the outcome was

25   that there was a violation of probation.

 1          A.    Okay.  I'm sorry.  All right.

 2          Q.    Just to establish what the purpose for being

 3     there was --

 4          A.    Okay.  I understand.

 5          Q.    -- this was a prolific offender check; is that

 6     right?

 7          A.    Yes, yes.

 8          Q.    Okay.  And it's also true that it ended in a

 9     charge or, you know, he was advised of a violation of

10     probation at the conclusion of this; is that right?

11          A.    Yes.

12              MR. POULTON:  Object to the form.

13              MR. BARGIL:  I don't know the terminology I

14         should use there.

15              MR. POULTON:  Well, I think there many be a

16         misunderstanding, and it's not clear to me.  Is it

17         saying that he committed the violation during the

18         visit or is it --

19              MR. BARGIL:  Well, I think we'll get to that.

20              MR. POULTON:  Okay.

21     BY MR. BARGIL:

22          Q.    So if you look to page -- I think it's page 5

23     of the report and it's Bates 12385.

24          A.    Okay.  Yes.

25          Q.    Do you see where -- do you see the first two

1    lines there?  Can you -- can you read those?  Well, I'll

2    read them.  It says, "On December 29, 2018 at 19:57

3    hours, I responded to 3229 Primrose Drive, Holiday,

4    Florida 34691, in reference to collecting information

5    regarding Justin Vazquez from Donnie McDougall.  Justin

6    has an active PC pickup in place regarding residential

7    burglary."  Would you agree that that's what it says?

8        A.   Yes.

9        Q.   Okay.  Who wrote that?

10       A.   Based on the report, it looks like Bronson.

11       Q.   Okay.  What is Bronson's first name?

12       A.   Tiffany.

13       Q.   Okay.  And she -- she's reporting -- is there

14   any reason to think that this is incorrect, that this

15   -- the purpose of this visit is to talk to Donnie about

16   Justin Vazquez?

17       A.   I have no idea.  I can't even recall who that

18   is.

19       Q.   But that's not my question.  Based on this

20   report, the purpose of this visit is to talk to Donnie

21   about Justin Vazquez; right?

22       A.   From her writing, yes.

23       Q.   Okay.  Do you know whether a warrant is needed

24   for that sort of inquiry?

25       A.   To make -- just to contact Donnie?

1    Q.   Yeah.

2    A.   No.

3    Q.   Okay.  And was there any sort of warrant or

4    probable cause in contacting Donnie in this instance

5    that you can tell?

6         MR. POULTON:  Object to the form.

7    A.   Are we still on this page?

8    BY MR. BARGIL:

9    Q.   Yeah.  And maybe I should give you more time to

10   read the report, but just based on your understanding of

11   prolific offender checks -- I think we already answered

12   this honestly -- would it have been necessary to obtain

13   a warrant or to develop probable cause before contacting

14   him or knocking on his door?

15   A.   No.

16   Q.   Okay.  I'd like to see if we can pull up a

17   video here, and if we can't -- maybe I should have done

18   this during a break.  Okay.  Let's just do it on my

19   laptop for now.

20        (Off-the-record discussion.)

21        (Video was played at this time.)

22   BY MR. BARGIL:

23   Q.   All right, Detective, whenever you're ready.

24   A.   I think so.

25   Q.   I'm going to show you a video and ask you a

1    couple questions about it.

2        A.   All right.

3             (Video was played at this time.)

4    BY MR. BARGIL:

5        Q.   For ease of this, I'm going to fast forward a

6    little bit to one minute and then go.

7             (Video was played at this time.)

8    BY MR. BARGIL:

9        Q.   Did you just hear that question on the video?

10       A.   Is your mom home?

11       Q.   Yeah.

12       A.   Okay.

13       Q.   Did you recognize the voice asking is your mom

14   home?

15       A.   Yeah.  It sounds like Garmon.

16       Q.   Okay.  And do you know who he was directing

17   that question too?

18       A.   No.

19       Q.   Okay.  Going to one minute in the video now.

20            (Video was played at this time.)

21   BY MR. BARGIL:

22       Q.   Okay.  Do you have any idea what this is

23   depicting?

24       A.   Looks like Donnie McDougall's house.

25       Q.   Okay.  And do you know what this particular

1    deputy is doing in this moment in this video?

2        A.   Look like he's by a fence.

3        Q.   Okay.  I think it's a she.  I think we'll find

4    that out in a minute, but yeah.

5        A.   Okay.

6        Q.   Okay.  I'm going to three and a half minutes

7    into the video.

8             (A video was played at this time.)

9             MS. HEILMAN:  Can I help you?  Is there a

10       reason you're on the side of my house?

11            DEPUTY BRONSON:  Yeah.  Because I feel like I

12       see some illegal activity going on back in the

13       backyard.

14            MS. HEILMAN:  Oh, you do?

15            DEPUTY BRONSON:  I do.

16            MALE:  Bella.

17            MS. HEILMAN:  Wow.  Like what?  There's no --

18            DEPUTY BRONSON:  Call CPI.

19            MS. HEILMAN:  Really?

20            (Video was paused at this time.)

21   BY MR. BARGIL:

22       Q.   Okay.  Do you recognize the voice of the

23   deputy?

24       A.   Yes.

25       Q.   And who is it?

1        A.    Tiffany Bronson.

2        Q.    Okay.  And is it correct that in the segment

3   that we just watched she was on the side of the house?

4             MR. POULTON:  Object to the form.

5   BY MR. BARGIL:

6        Q.    Verbally answer.  I'm asking you to verbally

7   answer that whether it's correct that in the video

8   segment we just watched she was on the side of the

9   house?

10       A.    Yes.

11       Q.    Okay.  And now she's talking to Tammy Heilman;

12  is that correct?

13       A.    Tammy Heilman, yes.

14       Q.    Okay.  And did she just advise Tammy Heilman,

15  based on what we just saw, that she thinks that she's

16  witnessed some illegal activity on the side of the

17  house?

18       A.    Yes.

19       Q.    And at the end did you catch Detective Bronson

20  explaining that she's going to call CPI?

21       A.    I heard the mention of CPI.

22       Q.    Okay.  Do you want to play it again?

23       A.    Yeah.

24       Q.    Play it back real quickly.

25             (Video was played at this time.)

```
 1              MALE:  Bella.

 2              MS. HEILMAN:  Wow.  Like what?  There's no --

 3              DEPUTY BRONSON:  Call CPI.

 4              MS. HEILMAN:  Really?

 5              (Video was paused at this time.)

 6      A.   Yes.

 7   BY MR. BARGIL:

 8      Q.   Okay.  Just to confirm, it sounded like she

 9   said I'm calling CPI?

10              MR. POULTON:  Object to the form.

11      A.   I didn't hear -- it sound like she said -- I

12   don't know if it's exactly what you said, but I'm

13   hearing, "Thinking of calling CPI."

14      Q.   You heard, "Thinking of call CPI"?

15      A.   Yes.

16      Q.   Okay.

17      A.   I mean, I think we're on the same page.

18      Q.   Okay.

19              (Video resumed at this time.)

20              MS. HEILMAN:  Really?

21              DEPUTY BRONSON:  Yeah.

22              MS. HEILMAN:  All right.

23              MALE:  For what?

24              MS. HEILMAN:  What is it that you see?

25              DEPUTY BRONSON:  (Inaudible).
```

1          MALE:  (Inaudible) back there.

2          MS. HEILMAN:  You see -- coming home?

3          DEPUTY BRONSON:  There's no one back there?

4     (Inaudible.)

5          MS. HEILMAN: (Inaudible).

6          DEPUTY BRONSON:  Oh, okay.  Yeah, there's

7     people home.  There's people back there.  Who's back

8     there?  They're breaking apart weed in the back.

9          (Video was paused at this time.)

10   BY MR. BARGIL:

11     Q.   Guess that was about at 4:30 in the video.

12   Did Deputy Bronson just say that she thinks she saw them

13   breaking up weed in the back?

14     A.   Yes.

15     Q.   Okay.

16          (Video resumed at this time.)

17          MALE:  I don't know who is in the backyard.

18          DEPUTY BRONSON:  You don't know who's at your

19     house?

20          MALE:  I sit inside.  No.  (Inaudible).

21          DEPUTY BRONSON:  They're back there breaking

22     apart weed.

23          MALE:  There's nobody out there (inaudible).

24          DEPUTY BRONSON:  I see three people right

25     there.  Who's that?

```
 1              MALE:  I highly doubt anybody's back there
 2      breaking up weed.
 3              DEPUTY BRONSON:  I can see it.
 4              MS. HEILMAN:  So you're trespassing in my yard?
 5              DEPUTY BRONSON:  I can see it.
 6              MALE:  No, she's standing at the front door
 7      right there, ma'am, where we saw her at.
 8              MS. HEILMAN:  So (inaudible).
 9              DEPUTY BRONSON:  There's a bunch of cracks.  I
10      sees what's going on.  That's fine.  I'll call CPI.
11              (Video was paused at this time.
12  BY MR. BARGIL:
13      Q.   That's about five minutes in the video.  Did
14  Deputy Bronson just say, "I'll call CPI"?
15      A.   Yes.
16      Q.   And for the record who is CPI?
17      A.   Child protective investigators.
18      Q.   Okay.  I'm going to fast forward to another
19  spot.
20              (Video resumed was played at this time.)
21              DEPUTY BRONSON:  Fucking kids.  (Inaudible)
22      there's like three kids breaking apart --
23              MALE:  Hello?
24              DEPUTY BRONSON:  Hey.  So (inaudible) and
25      there's like three kids breaking apart weed and --
```

1          (Video was paused.)

2     BY MR. BARGIL:

3          Q.   So she's now on a phone call, Deputy Bronson

4     is.  Do you know who she called?

5          A.   No.

6          Q.   Okay.  Who would she call in that situation?

7               MR. POULTON:  Object to the form.

8          A.   I don't know.

9     BY MR. BARGIL:

10         Q.   Okay.

11              (Video resumed at this time.)

12              DEPUTY BRONSON:  So I have the mom comes home.

13         She's all fucking pissed.  (Inaudible) who's in your

14         backyard breaking apart weed?  Looks like juveniles.

15         She's like, "There no one in my backyard."  I was

16         like, "They're right there.  I can see them.

17         There's like three of them."  She said, "There's no

18         one in my backyard."  I'm like, "Okay.  Fuck you.

19         I'm gonna call CPI then."

20              (Video was paused.)

21    BY MR. BARGIL:

22         Q.   Did -- just to confirm, so it sounded like she

23    said Tammy Heilman insisted there was nobody in her

24    backyard, and her response was, "Fuck you.  I'm gonna

25    call CPI then"?

1          MR. POULTON:  Object to the form.

2      A.   She didn't say that to Tammy.

3  BY MR. BARGIL:

4      Q.   Correct.  But she's saying to whoever --

5      A.   She said that, yes.

6      Q.   Okay.

7          MR. POULTON:  Let him finish the question

8      before you start to answer so we have a clear

9      record.

10          THE WITNESS:  Okay.

11          MR. POULTON:  Okay?

12          THE WITNESS:  Yeah.

13  BY MR. BARGIL:

14      Q.   Is there -- is she calling CPI because of

15  Tammy's non-cooperation in her mind?

16          MR. POULTON:  Object to the form.

17      A.   I don't know.

18  BY MR. BARGIL:

19      Q.   Why is she calling CPI?

20          MR. POULTON:  Object to the form.

21      A.   I don't know.

22          (Video resumed at this time.)

23          MALE:  Hey, hold on.  Let's stir something up

24      with this.

25          DEPUTY BRONSON:  With what?

1          MALE:  Whatever.

2          (Video was paused.)

3    BY MR. BARGIL:

4      Q.   Do you recognize the voice that said, "Let's

5    stir something up with this"?

6      A.   No.  I actually didn't even hear that.

7      Q.   Okay.  Let's play it again.

8          (Video resumed at this time.)

9          DEPUTY BRONSON:  Backyard.  I'm like, "Okay.

10   Fuck you.  I'm going to call CPI then."

11         MALE:  Hey.  Hey, hold on.  Let's stir

12   something up with this.

13         (Video was paused at this time.)

14   BY MR. BARGIL:

15     Q.   Did you catch it then?

16     A.   Yep.

17     Q.   Okay.  And to confirm it's, "Let's stir

18   something up with this"?

19         MR. POULTON:  Object to the form.

20     A.   Sound like that.

21   BY MR. BARGIL:

22     Q.   Okay.  Do you recognize that voice?

23     A.   Yes.

24     Q.   Who is it?

25     A.   Thomas Garmon.

1    Q.   Okay.

2         (Video resumed at this time.)

3         DEPUTY BRONSON:  With what?

4         DEPUTY GARMON:  Whatever you saw.

5         DEPUTY BRONSON:  Oh, yeah.  It was definitely

6    weed.  They were breaking apart weed in the back.  I

7    was watching them for like 15 minutes.

8         DEPUTY REAGAN:  Who were the kids?

9         DEPUTY BRONSON:  I don't know.  I went to the

10   front.  It looks like -- I think it's one of

11   Donnie's brothers, and there's a girl.  There's

12   another guy.  But, yeah, they freaked out.  They

13   freaked out when I said that.

14        DEPUTY REAGAN:  What do you mean?

15        DEPUTY BRONSON:  Well, they became extremely

16   hostile.

17        DEPUTY GARMON:  You heard what he called you;

18   right?

19        DEPUTY BRONSON:  Oh, yeah, I heard him.  I

20   heard it.  That's fine.  It doesn't hurt my

21   feelings.

22        DEPUTY REAGAN:  What did they call you?

23        DEPUTY BRONSON:  Oh, a dike.

24        DEPUTY GARMON:  No.

25        DEPUTY REAGAN:  A dike?

```
 1              DEPUTY BRONSON:  No, she called you a cunt,
 2      but --
 3              DEPUTY BRONSON:  Oh, and a cunt.  A dike cunt.
 4              (Video was paused.)
 5   BY MR. BARGIL:
 6      Q.   Do you recognize who's on the phone now?
 7      A.   Yes.
 8      Q.   Who is that?
 9      A.   That is me.
10      Q.   Oh, okay.
11              (Video resumed at this time.)
12              DEPUTY REAGAN:  Donnie was breaking up weed?
13              DEPUTY BRONSON:  No, it wasn't Donnie.  But he
14      and those other people, a bunch of kids were the
15      only ones home at the time before the adults came
16      home.
17              DEPUTY GARMON:  I think we should call CPI.
18              DEPUTY REAGAN:  For what?
19              DEPUTY GARMON:  Because there's no adult
20      supervision while there's narcotics being
21      distributed inside the household, which is police
22      talk for they're a bunch of fucking assholes.  So
23      we --
24              (Video was paused at this time.)
25   BY MR. BARGIL:
```

1      Q.   So is this a -- so you're on -- to clarify

2  what's going on at this segment of the video, you're on

3  the phone with Deputy Bronson, and Deputy Garmon is also

4  there?

5      A.   Yes.

6      Q.   And Deputy Garmon just suggested that you call

7  -- that they call CPI; is that correct?

8      A.   It's what it sounds like, yes.

9      Q.   Okay.  And your understanding -- I'm asking,

10  well, is your understanding that the reason they'd be

11  calling CPI is based on the validation that there's

12  unsupervised children and narcotics in the house?

13         MR. POULTON:  Object to the form.

14      A.   I mean, I can't -- it's hard for me to answer

15  to what exactly their thought process is.

16  BY MR. BARGIL:

17      Q.   Okay.  Do we agree that she said, "That's cop

18  speak for they're a bunch of fucking assholes"?

19      A.   That is what was said, yes.

20      Q.   Okay.

21         (Video resumed at this time.)

22         DEPUTY GARMON:  Okay.  I mean, so we'll think

23      about the scenario how --

24         DEPUTY REAGAN:  What I was trying to do is

25      contacting CPI when there's a child at the home and

1    they're smoking.

2              DEPUTY BRONSON:  Yeah, I know.

3              DEPUTY:  I'm not gonna -- I'm not gonna -- an

4      emergency response is gonna happen because we're not

5      trying to play that card right now.  I'm just doing

6      it as a big fuck you.

7              DEPUTY REAGAN:  Yeah.  I mean, you can call --

8              (Video was paused at this time.)

9    BY MR. BARGIL:

10     Q.   So Garmon there -- well, before Garmon says

11   what he says, are you speaking about an experience you

12   had where you called CPI in reference to there being

13   children in a house where people were smoking marijuana?

14     A.   Sounds like that's what I was saying, yes.

15     Q.   Okay.  And I think we're going to get this in a

16   minute, but is the suggestion that like this is -- it

17   would be pointless to call CPI for something like this?

18             MR. POULTON:  Object to the form.

19     A.   Yeah.  I think from my point of view, yes.

20   BY MR. BARGIL:

21     Q.   Okay.  I'm going to restart it at about 8:05.

22   We'll listen to the last part again.

23             (Video resumed at this time.)

24             DEPUTY:  I know.  I'm not saying -- I'm not

25     saying that an emergency response is gonna happen

1      because we're not trying to play that card right

2      now.  I'm just doing it as a big fuck you.

3              DEPUTY REAGAN:  Yeah, I mean, you can call

4      them, but from my -- from my knowledge what I've

5      been told, they probably won't even make a report.

6              DEPUTY BRONSON:  Yeah, I know.  That's what --

7      remember I told you that's what happened to me.

8              DEPUTY REAGAN:  She said it -- yeah, exactly.

9      She said it wasn't Donnie.

10             DEPUTY BRONSON:  Yeah, it wasn't Donnie.

11             DEPUTY REAGAN:  Because I was going to say fuck

12     him, dude.  Call the PO and all that.

13             DEPUTY BRONSON:  No, it's his brother and --

14             DEPUTY GARMON:  They're (inaudible) associate

15     with criminals; right?

16             DEPUTY REAGAN:  So he -- Gorman went to go make

17     contact.  (Inaudible).

18             (Video was paused at this time.)

19             MR. BARGIL:  Okay, so unintelligible there.

20     BY MR. BARGIL:

21     Q.  So based on what's happening in the

22     conversation at this point, fair to say that you're

23     suggesting to them like nothing will come of this if you

24     call CPI?

25             MR. POULTON:  Object to the form.

1          A.    It sounds like I'm suggesting that, yes.

2     BY MR. BARGIL:

3          Q.    And is it also fair to say that their response

4     to that is something along the lines of we understand

5     that, but we don't care?

6               MR. POULTON:   Object to the form.

7          A.    No.

8     BY MR. BARGIL:

9          Q.    Okay.  What is your understanding of their

10    response when you told them nothing will come of this?

11    What --

12         A.    So, I mean, to answer the scenario in a whole,

13    from my perspective, I still feel that they still would

14    make the right decision if I was doing a notification of

15    CPI because I feel it's still a responsibility that

16    falls on law enforcement to say, hey, look, there's

17    illegal activity occurring here.  There are children.

18    They're unsupervised.  From the scenario again that was

19    given to me, I don't think that they're wrong.  If they

20    want to -- if they felt the need to do that to report

21    it.

22         Q.    Okay.  Is it your understanding that they felt

23    there would be an immediate response from CPI --

24              MR. POULTON:   Object to the form.

25    BY MR. BARGIL:

1      Q.    -- if they reported it?

2            MR. POULTON:  Object to the form.

3      A.    From what Garmon was saying, I mean, it seems

4   like it.

5   BY MR. BARGIL:

6      Q.    Well -- okay.  Well, then let's listen to that

7   part again.  I'm going to start again at about 8:15.

8            DEPUTY REAGAN:  From my knowledge and what I've

9        been told, they probably won't even make a report.

10           DEPUTY BRONSON:  Yeah, I know.  That's what --

11       remember I told you that's what happened to me.

12           DEPUTY REAGAN:  She said it wasn't -- yeah,

13       exactly.  She said it wasn't Donnie.

14           DEPUTY BRONSON:  Yeah, it wasn't Donnie.

15           DEPUTY REAGAN:  Because I was gonna say fuck

16       him, dude.  Call the PO and all that.

17           DEPUTY BRONSON:  Nah, it's his brother and --

18           DEPUTY GARMON:  (Inaudible) associate with

19       criminals; right?

20           DEPUTY REAGAN:  So he -- Garmon went to go make

21       contact.  (Unintelligible).

22   BY MR. BARGIL:

23      Q.    Okay.  We kind of missed the -- but, you know,

24   we don't need to belabor it, but did Garmon say that

25   part the reason why they would be contacting CPI would

 1    be as a big fuck you?

 2            MR. POULTON:  Object to the form.

 3        A.    That's what I heard.

 4    BY MR. BARGIL:

 5        Q.    Okay.  And do you then at -- I'm sorry.  It's

 6    about 8:40 now.  Do you then ask whether it was Donnie

 7    who was spotted with weed?

 8        A.    Yes.

 9        Q.    And why was that information relevant to you?

10        A.    Probably because of his status -- his prolific

11    offender status or TOP 5 status, whatever it was at the

12    time.

13        Q.    Okay.  And your response --

14        A.    And he's on probation I think at the time.

15        Q.    Okay.  Do you know from this video and from

16    what you're reading in the report whether the deputies

17    on the scene are aware that Donnie is on probation at

18    this time?

19        A.    Yeah, we -- yeah, we -- I'm confident that we

20    knew.  I mean, she called me and I -- I mean, if I'm

21    heard saying to contact his PO.

22            MR. BARGIL:  Okay.

23            (Video resumed at this time.)

24            DEPUTY REAGAN:  -- the backyard.  Then mom

25        shows up.  She's like, hey (inaudible) the backyard.

```
 1        She got really hostile (inaudible) back there and
 2        basically told --
 3              Is he on probation, Donnie?
 4              DEPUTY BRONSON:  Garmon's gonna check.
 5              (Video was paused at this time.)
 6   BY MR. BARGIL:
 7        Q.   That's about nine minutes in.  Do you recognize
 8   what you just asked right there?
 9        A.   Yes.
10        Q.   What did you say?
11        A.   I asked if he was on probation.
12        Q.   Okay.  And do you know what Deputy Bronson
13   responds?
14        A.   No, I missed it.
15        Q.   Okay.  We'll play it again.
16              (Video resumes at this time.)
17              DEPUTY BRONSON:  Garmon's gonna check.
18              (Video was paused at this time.)
19        A.   Garmon's gonna check.
20   BY MR. BARGIL:
21        Q.   Okay.  So fair to say you asked whether Donnie
22   was on probation?
23        A.   Yes.
24        Q.   Fair to say to Detective or Deputy Bronson
25   said, "Garmon's gonna go check"?
```

1      A.   Yes.

2      Q.   Would that indicate that Deputy Bronson doesn't

3   know whether he's on probation?

4           MR. POULTON:  Object to the form.

5      A.   I don't know.

6   BY MR. BARGIL:

7      Q.   Okay.  And the fact that Garmon is gonna go

8   check, would that indicate that he might not know

9   whether --

10     A.   No.

11     Q.   -- Donnie's on probation?

12          MR. POULTON:  Object to the form.

13     A.   No, because even though that this is coming up

14   or being asked, this could be us confirming that he's on

15   probation.

16   BY MR. BARGIL:

17     Q.   Okay.  But just so we're clear, she doesn't say

18   we're gonna confirm he's on probation; right?

19          MR. POULTON:  Object to the form.

20     A.   Yeah, I don't hear that.

21     Q.   Okay.

22          (Video resumed at this time.)

23          DEPUTY REAGAN:  I mean, yeah, I see

24   what Schell's saying.  I mean, you --

25          (Inaudible.)

```
 1              DEPUTY REAGAN:  No, I know he's definitely not
 2        on felony probation.  There's no way.
 3              (Video was paused at this time.)
 4              MR. BARGIL:  We're at 9:15 about.
 5              (Video resumed at this time.)
 6              DEPUTY BRONSON:  The house (inaudible).
 7              Don't you -- a PO?
 8              FEMALE:  It's M-C-D-O-E -- M-C-D-O-U-G-A-L-L.
 9              (Inaudible)
10              DEPUTY:  Here you go.  I don't have CJIS so I
11        can't check.  He's not showing up.  I don't know.
12              (Inaudible).
13              FEMALE:  No, it's --
14              (Video was paused at this time.)
15   BY MR. BARGIL:
16        Q.   Okay.  Stopped at about ten minutes.  Does it
17   appear at this time that there's some confusion about
18   whether or not he's on probation?
19              MR. POULTON:  Object to the form.
20        A.   I don't know.
21   BY MR. BARGIL:
22        Q.   Okay.
23              (Video resumed at this time.)
24              DEPUTY BRONSON:  How old is he?  Is he still a
25        juvie?  Yeah, he's still juvie.
```

```
 1              DEPUTY GARMON:  It's not gonna show up on my
 2         thing.  I don't have CJIS.
 3              DEPUTY BRONSON:  Garmon doesn't have CJIS to
 4         check it.
 5              DEPUTY REAGAN:  Check what?
 6              DEPUTY BRONSON:  I guess to see if -- because
 7         he's still a juvenile to see if he's still on
 8         probation.
 9              (Video was paused at this time.)
10    BY MR. BARGIL:
11         Q.   So now we're at 10:20.  Fair to say that they
12    can't determine whether he's on probation?
13              MR. POULTON:  Object to the form.
14         A.   I don't know.  I mean, it sounds like she just
15    said to check and see if he's still on probation.
16    BY MR. BARGIL:
17         Q.   Okay.  Does Garmon indicate to Bronson that he
18    can't actually verify or confirm one way or the other?
19         A.   Through that resource that he had, yes.
20         Q.   Right.  And that doesn't have the appropriate
21    resource to be able to check that?
22         A.   Yes.
23         Q.   Okay.  And so nobody at this point knows with
24    certainty whether Donnie is on probation or not?
25              MR. POULTON:  Object to the form.
```

```
 1        A.   Yeah, I can't confirm just based on what

 2   they're saying.  You know what I mean?  I don't know at

 3   this point.

 4   BY MR. BARGIL:

 5        Q.   Okay.

 6        A.   I really don't.

 7             (Video resumed at this time.)

 8             DEPUTY REAGAN:  Is that CJIS OR JJIS?

 9             DEPUTY BRONSON:  Ah, JJIS.  I don't think I

10        have access to it either.

11             DEPUTY REAGAN:  Yeah.  Hey, do you have -- can

12        you run him in JJIS?  Yeah, stand by.  Schell's

13        gonna check.

14             DEPUTY BRONSON:  All right.

15             (Video was paused at this time.)

16   BY MR. BARGIL:

17        Q.   Okay.  Did you hear what you said at the end

18   there?

19        A.   Yeah.  Yes.

20        Q.   What was that?

21        A.   Schell's gonna check.

22        Q.   Okay.  Is that reference to one of your

23   analysts?

24        A.   No.  That's Deputy Schell.

25        Q.   Oh, okay.
```

1      A.    He no longer works here.

2      Q.    Okay.  So given the report that we're looking

3  at, switching back to the document --

4      A.    Which part of the report?

5      Q.    Well, we'll get there, but you can -- if you

6  stay open to page 5, I think that's --

7      A.    Okay.

8      Q.    -- maybe the most lengthy encapsulation of what

9  happened.  And we have more video that we can play,

10  but --

11      A.    Okay.

12      Q.    -- is it fair to conclude that ultimately it

13  was confirmed that Donnie was on probation?

14      A.    Based on the report by Garmon, yes.

15      Q.    Okay.  And he was picked up for violation of

16  probation?

17      A.    Yes.

18      Q.    And if we look at -- if you're looking at page

19  5 --

20      A.    Yes.

21      Q.    -- in one of the last paragraphs there, the

22  three-line paragraph --

23      A.    Yes.

24      Q.    -- a little bit up from the bottom, it says,

25  "Donnie was subsequently arrested for violation of

1   probation due to him being associated with criminal

2   activity."

3       A.   Okay.

4       Q.   So fair to say he was arrested for violation of

5   probation as a result of what Deputy Bronson identified

6   in the backyard?

7           MR. POULTON:   Object to the form.

8       A.   It looks like it, and I don't know.

9   BY MR. BARGIL:

10      Q.   Okay.  Is there anything else in this report

11  that would suggest it was anything other than Deputy

12  Bronson viewing what she believed to be marijuana in the

13  backyard?

14      A.   I have not read the report entirely.  I mean,

15  sh- --

16          Yes, Bronson was the one that makes her

17  observations.

18      Q.   Okay.  Going back to the purpose of the call

19  staying on Deputy Bronson's report --

20      A.   Okay.

21      Q.   -- the purpose of the call again was to collect

22  information regarding Justin Vazquez from Donnie

23  McDougall; is that right?

24      A.   Yes.

25      Q.   Do you know if anyone ever asked Donnie about

1    Justin Vazquez?

2         A.    No.

3         Q.    Would there be information in this report if

4    Donnie gave useful information about Justin Vazquez?

5              MR. POULTON:   Object to the form.

6         A.    I don't know.

7    BY MR. BARGIL:

8         Q.    If you take a look at the one, two -- I guess

9    it's the third paragraph up from the bottom on Detective

10   Bronson's report that begins with, "I then observed

11   Donnie's mother arrive home" --

12        A.    Yes.

13        Q.    If you look at the last sentence of that

14   paragraph it says, "I then advised Donnie's mother I

15   would be notifying CPI of the incident."

16        A.    Yes.

17        Q.    In parentheses there, it provides a case

18   number.

19        A.    Yes.

20        Q.    Is that case number the case number of the CPI

21   report or matter number?

22        A.    I have no idea.

23        Q.    Okay.  Could it be something else?

24        A.    No, I'm sorry.  In review then, I mean, it -- I

25   would see -- I would think that's what it applies to is

1   that specific case --

2        Q.   Okay.

3        A.   -- of the notifications of CPI, yes.

4        Q.   Okay.  Is it customary when cross-referencing

5   other cases or, you know, matters within a report to

6   cite the case number if you have one?

7        A.   It's good practice.

8        Q.   Okay.  Do you know if anyone -- do you know if

9   the house was ever searched?

10       A.   Before?  Like at all?

11       Q.   As a result of this interaction?

12       A.   No.

13       Q.   Would that be noted anywhere in any of the

14  reports?

15            MR. POULTON:  Object to the form.

16       A.   I don't know.  I would -- I think.  I don't

17  know.

18  BY MR. BARGIL:

19       Q.   In your experience, would viewing somebody

20  breaking up marijuana provide probable cause to search a

21  residence?

22       A.   I don't know.

23       Q.   In your experience --

24       A.   I wasn't -- yeah, I wasn't there.  You know

25  what I mean?

1    Q.   I see.

2         And typically do people who are on probation

3    have to consent to search of the residence?

4         MR. POULTON:   Object to the form.

5    A.   If there's a clause.

6    BY MR. BARGIL:

7    Q.   Okay.   Do you know whether there was a clause

8    in Donnie's case?

9    A.   No.

10   Q.   Ultimately do you know whether any marijuana

11   was seized from the residence?

12   A.   I do not know.

13   Q.   Do you know if anything came of this

14   interaction apart from Donnie being arrested for

15   violation of probation?

16   A.   I'm sorry.   I didn't -- what's the -- I'm

17   sorry.   I didn't hear the question.

18   Q.   Do you know if any -- if there was any --

19   anything relevant came of this interaction besides

20   Donnie being arrested for violation of probation?

21   A.   Relevant to what?   Like to -- aside from just

22   the arrest?   Like getting information or --

23   Q.   You can strike the question.

24        I guess what I'm asking is I just want to

25   confirm as far as you know, there's no cross-reference

1    in this report to any sort of narcotics prosecution

2    related to the marijuana; is that right?

3        A.   Correct.  In Bronson's -- he was arrested -- he

4    was arrested for the violation of probation.

5        Q.   And the violation of probation, just so we're

6    clear, is that he was associated with criminal activity;

7    is that right?

8        A.   That's what it says in the reports, yes.

9        Q.   And the criminal activity that we're talking

10   about is the presence of narcotics in his home, or

11   suspected presence of narcotics in his home I should

12   say?

13       A.   Yeah, I think so.  I mean, again, reading from

14   what the --

15            MR. POULTON:  If you don't know, you know.

16   Don't --

17       A.   Yeah, I don't know.

18   BY MR. BARGIL:

19       Q.   Okay.  One final question.  I think we know the

20   answer to this, but do you know if it was ever confirmed

21   what the substance that Deputy Bronson says she saw was?

22       A.   No.

23       Q.   Okay.  I might have asked you this.  Is there

24   anything in this report that indicates any of that

25   substance was actually seized on that night?

1     A.   No.

2     Q.   Okay.

3     A.   I don't see that.

4     Q.   Okay.

5          (Exhibit 9 was designated to be attached at a

6     later date.)

7          (Exhibit 10 was marked for identification.)

8  BY MR. BARGIL:

9     Q.   Take a look at this document if you can.  Okay.

10 Turning to page 1 of the document, I would like to --

11 what is this report depicting?

12    A.   It's a response to Donnie McDougall's

13 residence, and the incident is listed as a violation

14 probation or community control.

15    Q.   Okay.  I'm going to start at about 25 seconds

16 into this video.

17         MR. POULTON:  Before you do, this is off the

18    record real quick.

19         (Off-the-record discussion.)

20         (A video was played at this time.)

21         MS. HEILMAN:  He's not here.

22         DEPUTY REAGAN:  Do you know where he's at?

23         MS. HEILMAN:  No, I don't.

24         DEPUTY REAGAN:  All right.

25 BY MR. BARGIL:

1    Q.   Okay.  Do you recognize whose video we're

2  watching?

3    A.   Yes.

4    Q.   Okay.  And whose is it?

5    A.   Mine.

6    Q.   Okay.  And who are you speaking with in this

7  video?

8    A.   Tammy.

9    Q.   Okay.  What did you just ask her?

10   A.   Asked her if -- I don't know verbatim.  I

11 missed it.  I'm sorry.  I'm asking if Donnie's here.

12   Q.   Yeah, and she says basically what?

13   A.   She said Donnie's not here.

14   Q.   Okay.

15        (Video resumed at this time.)

16        DEPUTY REAGAN:  You still on probation?  You

17   still on probation?

18        MS. HEILMAN:  Yeah.

19        DEPUTY REAGAN:  You are?

20        MS. HEILMAN:  Yeah.

21        DEPUTY REAGAN:  All right.  Do you mind if I

22   can in and checked your house out real quick?

23        (Video was paused at this time.)

24 BY MR. BARGIL:

25   Q.   Okay.  You asked her, if I'm not mistaken, if

1    she's still on probation; is that right?

2         A.   Yes.

3         Q.   Why did you ask her that?

4         A.   Because she had submit to search clause.

5         Q.   Okay.  And so by asking her that, you're

6    confirming that you can search the house; is that right?

7         A.   Yes.

8         Q.   To search for Donnie presumably?

9         A.   Essentially, yes.

10        Q.   Okay.  That was about 44 seconds.

11             (Video resumed at this time.)

12             (Video paused at this time.)

13   BY MR. BARGIL:

14        Q.   Okay.  What just happened there?

15        A.   Tammy opened the door.

16        Q.   Okay.  And this ultimately forms the basis for

17   a charge against her of battery on a law enforcement

18   officer; is that right?

19        A.   Yes, sir.

20        Q.   Okay.  Were you hurt when she opened the door

21   on you?

22        A.   No.

23        Q.   Okay.

24             (Video resumed at this time.)

25             DEPUTY REAGAN:  Yeah.  No, no, no, no.  Get

```
1          out.  Get out of the house.  Get out of the house.

2               MS. HEILMAN:  I'm trying to.

3               (Indiscernible simultaneous crosstalk and

4          barking.)

5               MR. BARGIL:  It's going to be hard for you to

6          get all this.

7               COURT REPORTER:  Yeah.

8               MR. BARGIL:  That's okay.  This will be in the

9          record anyway.

10              (Video was paused at this time.)

11   BY MR. BARGIL:

12         Q.   Do you recognize what Garmon says to the young

13   man there?

14         A.   No.

15         Q.   Okay.  Do you recognize that young man?

16         A.   (No audible response.)

17         Q.   Okay.

18              MR. POULTON:  You need to say yes or no.

19         A.   No.  Sorry.

20              (Video resumed at this time.)

21              (Indiscernible simultaneous crosstalk and

22         barking.)

23   BY MR. BARGIL:

24         Q.   Did you catch it on that round?

25         A.   What Garmon said?
```

```
 1      Q.   Yeah.

 2      A.   Yeah, I heard it.

 3      Q.   What did he say?

 4      A.   Take the kid or you're going up for

 5   obstruction.

 6      Q.   Yeah.  That's what I heard as well.

 7           (Video resumed at this time.)

 8           (Indiscernible simultaneous crosstalk and

 9      barking.)

10           MS. HEILMAN:  Call the police.

11           DEPUTY:  We are the police.

12           MS. HEILMAN:  No, you're not.

13           DEPUTY:  Take that kid right now.

14           MS. HEILMAN:  Call.

15           (Indiscernible simultaneous crosstalk and

16      barking.)

17           DEPUTY:  Tammy, pick up the kid.

18           MALE:  Get off of my mother.

19           DEPUTY:  Pick up the kid.

20           (Indiscernible simultaneous crosstalk and

21      barking.)

22           MALE:  Jesus, he's not letting go.

23           DEPUTY:  Yeah, so let go.  (Inaudible)  Take

24      the baby, please.  You're under arrest, Tammy.

25      (Inaudible) assault, resisting.  We know what you
```

1      did, Tammy.

2           MS. HEILMAN:  Call your dad.  Call your dad.

3      Call your dad.

4           (Indiscernible simultaneous crosstalk and

5      barking.)

6           DEPUTY:  Look, Tammy, Tammy, listen.  Because

7      right now you are detained.  Okay.  Lawfully

8      detained.  Okay.

9           DEPUTY:  Bat LEO.

10          (Video was paused at this time.)

11  BY MR. BARGIL:

12     Q.   Could you hear what Tammy said there?

13     A.   At the end?

14     Q.   Yeah.

15     A.   Yeah.  "My son is not here."

16     Q.   Okay.  This is about 2:03.  We're going to

17  resume again.

18          (Video resumed at this time.)

19          DEPUTY:  Tammy, come here.

20          DEPUTY GARMON:  Come here, come here.

21          DEPUTY REAGAN:  Hey, am I -- I'm on red; right?

22          DEPUTY GARMON:  You're on red.

23          DEPUTY REAGAN:  Okay, okay.

24          (Video was paused at this time.)

25  BY MR. BARGIL:

1       Q.    Did you just ask Garmon are you -- if you were

2   red?

3       A.    If we're on red.

4       Q.    On red.  What does that mean?

5       A.    Our body-worn camera.

6       Q.    Why did you ask him that?

7       A.    To ensure it was on.

8       Q.    Okay.

9             (Video resumed at this time.)

10            DEPUTY:  Tammy, come here.

11            MALE:  Why are you arresting her?

12            (Indiscernible simultaneous crosstalk and

13      barking.)

14            DEPUTY REAGAN:  Hey, Garmon, don't acknowledge

15      him.  Don't acknowledge him.

16            (Indiscernible simultaneous crosstalk and

17      barking.)

18            DEPUTY REAGAN:  Tammy.  I understand.  We're

19      gonna figure this out.

20            MS. HEILMAN:  I don't know where he's at.

21            Please go inside.

22            DEPUTY GARMON:  This isn't about Donnie right

23      now.  It's about you.

24            (Video was paused at this time.)

25   BY MR. BARGIL:

```
 1        Q.   Did you catch what Garmon said right there?

 2        A.   No.  I was not listening.

 3        Q.   Pick it up at about 2:34.

 4             (Video resumed at this time.)

 5             MS. HEILMAN:  Don't know where he's at.

 6             Please go inside.

 7             DEPUTY GARMON:  This isn't about Donnie right

 8        now.  It's about you.

 9             (Video was paused at this time.)

10   BY MR. BARGIL:

11        Q.   Did you catch what that was there?

12        A.   Yes.

13        Q.   What did Garmon say to Tammy at that point?

14        A.   Not about Donnie.  It's about you.

15             MR. POULTON:  Now.

16        A.   Now.  Now, yes.  Correct, sorry.

17             (Video resumed at this time.)

18             MS. HEILMAN:  Go inside.

19             DEPUTY GARMON:  This isn't about Donnie right

20        now.  This is about you now.

21             (Video was paused at this time.)

22   BY MR. BARGIL:

23        Q.   So let's make sure we got the quote right.

24   What do you think he says?

25        A.   It's not about Donnie right now.  It's about
```

1    you.

2        Q.   Okay.

3             (The video resumed at this time.)

4             DEPUTY REAGAN:  Nope, nope.  Shutting down.

5             (The video was paused at this time.)

6    BY MR. BARGIL:

7        Q.   So you make a phone call here; is that right?

8        A.   Yes.

9        Q.   Who do you call?

10       A.   Sounds like when I answered or when that person

11   answered I said, "Sarge."

12       Q.   Okay.  So who would that have been?

13       A.   I believe Formoso.

14       Q.   Okay.  And you then shut down your camera; is

15   that right?

16       A.   Yes.

17       Q.   Why do you do that?

18       A.   Because I'm passing information.

19       Q.   And is it policy to not record --

20       A.   If it's discussing -- if I'm discussing

21   privileged information about the investigation, then

22   yeah, it's not required to continue recording.

23       Q.   Okay.  What would you have told him in that

24   moment?

25       A.   I don't know.  Given him the rundown --

1     Q.   Okay.

2     A.   -- the scenario.

3     Q.   Okay.  Based on your review of the report, was

4  Tammy arrested for battery on a law enforcement officer?

5     A.   I mean, this -- this is a violation of

6  probation.

7     Q.   Okay.  If you look at what is Bates number

8  12438.

9     A.   Yes.

10    Q.   Is this the report of Deputy Garmon?

11    A.   The probable cause affidavit, yes.

12    Q.   That's right.  Can you read the sentence that

13  begins four lines up from the -- one, two, three,

14  four -- technically five lines up from the bottom at the

15  end of that line?

16    A.   She refused?

17    Q.   Next sentence.

18    A.   She was?

19    Q.   Yes.

20    A.   "She was then arrested for battery on a law

21  enforcement officer.  Defendant is currently on

22  misdemeanor probation in reference to Pasco Case

23  1606152:  Simple battery."

24    Q.   You can stop there.

25    A.   Oh.

1     Q.   So, based on our reading of this, is it the

2  case that she was arrested for battery on a law

3  enforcement officer?

4     A.   I'm sorry.  I'm not trying to get technical

5  here.  It says that, but in what I'm reading there's

6  nothing in here that shows a charge of bat LEO.

7     Q.   Okay, fair enough.  But she was arrested.  We

8  can agree on that; right?

9     A.   Yes.  Yes, sir.

10     Q.   Okay.  And just to confirm a couple of things

11  about the visit, was Donnie ever located in the house?

12     A.   I don't think so.

13     Q.   Okay.  Do you know whether anybody went in to

14  check?

15     A.   No.

16     Q.   Would you have been within your authority to

17  check the house for Donnie?

18     A.   I don't know that.  I don't know.

19     Q.   She had consented to search?

20     A.   Yes.

21     Q.   And she was on probation; is that right?

22     A.   Yes.

23     Q.   So at the time you thought that you had the

24  authority to go inside the house and search; is that

25  right?

```
 1        A.    Yes.

 2              MR. POULTON:  Object.  It's okay.  Go ahead.

 3    BY MR. BARGIL:

 4        Q.    Is there anything in the report to suggest that

 5    the house was ever searched?

 6        A.    I didn't read the entire report.

 7        Q.    Okay.  Do you want to?

 8        A.    Sure.  So that I can answer your question?

 9        Q.    Yeah.

10        A.    Yes, correct.  There's nothing in here that

11    says that the house was searched.

12        Q.    Okay.  And there's -- is there also nothing in

13    here to indicate whether Donnie was ever contacted?

14        A.    Correct.

15        Q.    Okay.

16              (Exhibit 11 was designated to be attached at a

17        later date.)

18              MR. BARGIL:  Couple other things.  I need to

19        take like a two-minute break if that's okay and use

20        the restroom.

21              MR. POULTON:  Sure.

22              (Short break.)

23              (Exhibit 12 was marked for identification.)

24    BY MR. BARGIL:

25        Q.    Detective, do you recognize you're still under
```

1    oath?

2        A.   Yes.

3        Q.   Okay.  In your hands you are holding a thick

4    document.  Do you recognize what it is?

5        A.   Yes.

6        Q.   What is it?

7        A.   Looks like several MPR's, member performance

8    reports.

9        Q.   Okay.  And are those essentially performance

10   reviews?

11       A.   Yes.

12       Q.   And how frequently does the Sheriff's Office do

13   those?

14       A.   Yearly.

15       Q.   Okay.  I'm going ask you to do something weird.

16   I think we're going to start from back to front.  This

17   is kind of in reverse chronological order.

18       A.   Okay.

19       Q.   The first page I'd like you to look at -- we'll

20   go by the Bates number here -- is 18878.

21       A.   Okay.

22       Q.   Actually, we should go to 18875.  I'm sorry.

23       A.   Okay.

24       Q.   And what year is this -- does this appear to be

25   for you?

1    A.   2016.

2    Q.   Okay.  And if you look down at item C, is this

3    where you are asked in what area of performance you

4    would most like to improve?

5    A.   Yes.

6    Q.   Okay.  And what is your response there?

7    A.   The area I would like to improve in would be

8    traffic laws and statutes.

9    Q.   Okay.  Read the next sentence, please.

10    A.   There are several traffic statutes which --

11    several traffic statutes which I have learned but there

12    still remains a mass amount I would like to learn to

13    help gather probable cause for traffic stops.

14    Q.   Okay.  Is that encouraged, mastery of the

15    traffic statutes, in order to gather probable cause for

16    task stops?

17    A.   No.

18    Q.   Is it something that you think increases your

19    chances of identifying someone who's committed a worse

20    violation?

21         MR. POULTON:  Object to form.

22         MR. BARGIL:  That's a bad -- that's bad -- bad

23    framing.

24    BY MR. BARGIL:

25    Q.   When you say there's a mass amount, I would

1    like to learn to help gather probable cause for traffic

2    stops, what do you mean by that?

3        A.    Traffic laws and statutes.

4        Q.    I know, but when you say I should focus on to

5    help gather probable cause for traffic stops, is this

6    your way of -- are you suggesting here that the goal is

7    to be able to find reasons to make more traffic stops?

8        A.    Yes.

9        Q.    Okay.  And you can do that by knowing more of

10   the traffic code; is that right?

11       A.    Yes.

12       Q.    Okay.  And I know you mentioned a moment ago

13   that this maybe isn't encouraged, but if you flip ahead

14   a few pages to Defendant 18878, if you look at part C,

15   Supervisor's Recommendation to Improve Member

16   Performance --

17       A.    Okay.

18       Q.    -- can you read the last line in that

19   subsection?

20       A.    "Deputy Reagan needs to concentrate on traffic

21   violations to become more familiar with same."

22       Q.    Okay.  And so is part of the reason why you

23   said you want to improve yourself in that area -- is

24   part of the reason why you said that because it was

25   recommended to you that you learn that?

1        A.    No.  Those notes are added based on my --

2        Q.    I see.

3        A.    -- answer.

4        Q.    If that sort of thing were discouraged, would

5     that be an opportunity for whoever is reviewing you to

6     say don't focus on that?

7              MR. POULTON:  Object to the form.

8        A.    I don't know.

9     BY MR. BARGIL:

10       Q.    Okay.  Can you look at 18869, please?

11       A.    Okay.

12       Q.    Subpart A, the second to last sentence, can you

13    read that -- or can you read the third to last and

14    second to last sentence?

15       A.    I'm sorry.  I also became?

16       Q.    Uh-huh.

17       A.    Okay.  "I also became FTO certified and had the

18    pleasure to train new deputies.  This was significant

19    because I was able to pass on specific training and

20    emphasize the importance of the agency's ILP

21    philosophy."

22       Q.    Okay.  That's good.  So as you understood it --

23    just for the record, what does FTO stand for?

24       A.    Field training officer.

25       Q.    Okay.  And really briefly, what does that

1    entail?

2        A.    Training deputies.

3        Q.    Okay.  Do they ride in the car with you?

4        A.    New deputies, yes.

5        Q.    And do you go to calls and things like that?

6        A.    Yes, for training and for phases, yes.

7        Q.    Okay.  Do they go on prolific offender checks

8    with you?

9        A.    Yes.

10       Q.    And are you expected to pass on specific

11   training and emphasize the importance of the agency's

12   ILP philosophy when you do that?

13       A.    No.

14       Q.    You just did that because you want to do it?

15       A.    Yes.  From my training from just coming from

16   STAR to the corporal and FTO, I felt that it was

17   important to ensure that new deputies understand our

18   policing.

19       Q.    Okay.  And because they're expected to

20   understand the ILP philosophy; is that right?

21       A.    Yes.

22       Q.    Okay.  Can you look at page -- I'm sorry.  I

23   don't think we actually established what -- on 18869,

24   can you see there what the date of that performance

25   evaluation is or what year?

1       A.    2017.

2       Q.    Okay.   Turning to 18867 --

3       A.    Okay.

4       Q.    -- it appears that this is also part of the

5   2017 MPR; is that right?

6       A.    Yes.

7       Q.    At the top where it says Member Comments, is

8   this where you respond to the -- why don't you tell me

9   what it is?

10      A.    Am I reading this or just briefly --

11      Q.    No.   Just tell me, Member Comments, what is

12  that section supposed to be for?

13      A.    Just to acknowledge that you reviewed what your

14  supervisor has written on your MPR.

15      Q.    Okay.   Can you read the second sentence?

16      A.    "I agree with all the content and will continue

17  to focus on applying the ILP philosophy."

18      Q.    Okay.   And again, is that because you expected

19  that applying the ILP philosophy is part of what you

20  were expected to do?

21      A.    Yes.

22      Q.    Okay.   Could we look at page 18859?

23      A.    Okay.

24      Q.    And what year's MPR does this appear to depict?

25      A.    2018.

1      Q.   And in subsection A, that's where you list your

2   most significant work-related accomplishments; is that

3   right?

4      A.   Yes.

5      Q.   If you look at the third line of your response

6   that begins with I have --

7      A.   Yes.

8      Q.   -- would you read that?

9      A.   "I have used this position to focus

10   specifically on big four crime, high crime areas,

11   prolific offenders, and the ILP philosophy."

12      Q.   Okay.  We'll pause there.  So, again, in your

13   position as STAR corporal in 2018, correct to say that

14   you used that position to apply the ILP philosophy; is

15   that right?

16      A.   Yes.

17      Q.   And can you pick up where you left off, read

18   the next sentence?

19      A.   "I have been able to utilize collection of

20   intelligence by our analyst to target prolific offenders

21   and district targets."

22      Q.   Okay.  And continue on the next sentence.

23      A.   "As the STAR corporal, I emphasize targeting

24   known offenders with big four history and identifying

25   big four crime with solvability factors to improve

1    investigation skills and using the resources available

2    such as:  Linx, TLO, Vigilant and Command Central."

3        Q.   Okay.  So where you say emphasize targeting

4    known offenders, does that refer to prolific offenders

5    or is that -- do you speak about these things

6    separately?

7        A.   It looks like I am adding them as a whole as a

8    group, so prolific offenders, district targets --

9        Q.   Okay.

10       A.   -- criminal associates.

11       Q.   Okay.  TOP 5 as well?

12       A.   Yes, sorry.  TOP 5.

13       Q.   Okay.  Are all TOP 5 offenders as far as you

14   understand it prolific offenders?

15           MR. POULTON:  Object to the form.  Asked and

16       answered.

17       A.   Yeah, I don't know.

18   BY MR. BARGIL:

19       Q.   Will you turn to 18840?

20       A.   Okay.

21       Q.   There's a specific question about how have you

22   applied ILP principles in your job performance.

23       A.   Yes.

24       Q.   And who provides this response?  Is this you or

25   is this a supervisor?

1       A.    This -- this would be a supervisor.

2       Q.    Okay.  And what -- I'm sorry.  What year is

3  this MPR?

4       A.    '21.  2021.

5       Q.    Okay.  Fair to say that this notes that you

6  consistently apply ILP principles in your day-to-day

7  duties?

8            MR. POULTON:  Object to the form.

9       A.    Based on this response, yes.

10  BY MR. BARGIL:

11      Q.    Okay.  And in that second to last sentence, it

12  says, "Detective Reagan said that ILP analysts

13  researching social media has yielded success in several

14  cases.  Detectives have used the social media info both

15  to identify suspects and establish timelines."

16           Do you personally use social media?

17      A.    Personally, no.  Well, I have an Instagram

18  account.

19      Q.    Let me rephrase.  Do you -- in your official

20  capacity, are you the one who's accessing social media,

21  or are the analysts doing that or someone else?

22      A.    I -- I -- we all do.

23      Q.    Okay.  How do you -- what account do you use to

24  go on social media?

25      A.    I don't even know.  Really I don't.  It's saved

1    on my work computer.

2         Q.   Is it a -- does it say --

3         A.   The account has been --

4         Q.   Does it say Detective Paul Reagan?

5         A.   No.

6         Q.   Is it a -- is it conspicuously law enforcement?

7              MR. POULTON:  Object to the form.

8         A.   No.  It's under -- it's a secret Facebook

9    account to gain access or to become friends with people

10   that we're looking for.

11        Q.   Do you send friend requests --

12        A.   Yes.

13        Q.   -- to potential people?

14             And so when they receive a friend request, what

15   is that -- it'll -- typically, it'll say so and so has

16   sent you a friend request.  In that line, who is the so

17   and so?

18        A.   I'm being 100 percent honest.  I literally open

19   my computer and I hit Facebook.  I am completely foreign

20   to it.  All I -- I literally am searching somebody --

21        Q.   Okay.

22        A.   -- and then trying to get a friend request to

23   review photos.

24        Q.   Okay.

25        A.   I don't comment.  I don't --

1    Q.   So they need to accept the request in order for

2  you to --

3    A.   Generally, yes.

4    Q.   Generally.  And do you know if this account

5  that you're using depicts an actual person?

6    A.   I would -- I mean, it looks like a real person.

7    Q.   Okay.

8    A.   Yeah.

9    Q.   Is it male or female?

10   A.   Female.

11   Q.   Is it an attractive female?

12        MR. POULTON:  Object to the form.

13   A.   I don't know.

14  BY MR. BARGIL:

15   Q.   And people receive that friend request, and if

16  they accept it, you're able to view things that only a

17  friend would be able to view; is that right?

18   A.   Yes.

19   Q.   Does everybody use the same account?

20   A.   No.

21   Q.   Who created your account?

22   A.   I got the account passed to me from Jeff Brown

23  who doesn't work here anymore.

24   Q.   Okay.  Do you exchange messages with people

25  using that account --

1    A.   No.

2    Q.   -- over Facebook?

3    A.   No.

4    Q.   And, of course, do any of the people who accept

5    the friend request, do they have any idea that they're

6    actually accepting a friend request from law

7    enforcement?

8         MR. POULTON:   Object to the form.

9    A.   I doubt it.

10        (Exhibit 13 was marked for identification.)

11   BY MR. BARGIL:

12   Q.   This is a -- well, is this an email?

13   A.   Yes.

14   Q.   Or an email thread?

15   A.   Yes.

16   Q.   Okay.  We'll start at the bottom.  Is this --

17   tell me who sent you this email and when?

18   A.   It looks like this is -- well, looks like it's

19   from Tiffany Bronson but to April Toney, I guess

20   forwarded to me.

21   Q.   Uh-huh.  And --

22   A.   Oh, it's -- well, I'm sorry.  We were cc'd.

23   I'm sorry.  I didn't see that part.  So from Bronson.

24   Q.   So where it says STAR All in the cc line, you

25   would have received that; right?

1     A.   Yes.

2     Q.   Okay.  Take a minute to just -- it's just a

3  paragraph.  Take a minute to read it, and tell me when

4  you're done.

5     A.   Yep, I got it.

6     Q.   Okay.  In the first line it says, "Donnie

7  McDougall was mentioned to be a passenger in this case

8  (S10)."  Is that right?

9     A.   Yes.

10    Q.   What is does S10 mean?

11    A.   That's our -- it's a code for a stolen vehicle.

12    Q.   Okay.  So he was mentioned as a passenger in a

13  stolen vehicle?

14    A.   Yes.

15    Q.   And this individual Sky Lozado was suspected as

16  being the person who stole the vehicle?

17    A.   Yes.

18    Q.   Okay.  And is there a recommendation here in

19  the second to last line or in the -- actually in the

20  final sentence that begins with "also," is this Tiffany

21  Bronson recommending that Donnie receive additional

22  attention?

23    A.   It appears to be so, yes.

24    Q.   Okay.  And she doesn't actually say additional

25  attention, does she?  What does she say?

1      A.    Her verbiage here says TLC.

2      Q.    Okay.  And what do you interpret that to mean?

3      A.    Tender loving care.

4      Q.    And do you think there's some sarcasm in that?

5            MR. POULTON:  Object to the form.

6      A.    I don't know.

7   BY MR. BARGIL:

8      Q.    Okay.  That's fine.  I think it's pretty clear.

9            And again, what is the date on this?  I'm

10  sorry.

11     A.    September 10, 2018.

12     Q.    Okay.  Is there also a recommendation here that

13  you include Jeffrey Harden as an associate of Donnie's

14  or of Sky Lozado's?

15           MR. POULTON:  Object to the form.

16     A.    Yeah, I'm not sure --

17  BY MR. BARGIL:

18     Q.    Okay.

19     A.    -- what she's referring to.

20     Q.    Now it says here that she's on the -- that

21  Detective Bronson is on the property crimes unit.  Was

22  she at one point on the STAR team?

23     A.    Yes.

24     Q.    And do detectives make recommendations to STAR

25  about who to focus on?

1      A.    We communicate because, I mean, they might see

2   things that we're not seeing.

3      Q.    And in some of those communications, one of the

4   things that you can communicate is to pay specific

5   attention to somebody; right?

6      A.    She's giving us an idea of what she's hearing.

7   So, yeah, I mean some specific focus.

8      Q.    Okay.

9      A.    Yes.

10           (Exhibit No. 14 was marked for identification.)

11   BY MR. BARGIL:

12      Q.    And quickly what is this document that we have

13   in front of us?

14      A.    This a district three STAR nightly.

15      Q.    Okay.  Did you do these at the conclusion of

16   your shift?

17      A.    Yes.

18      Q.    Okay.  So how many shifts are there in a day?

19      A.    One.

20      Q.    How long is that shift?

21      A.    Twelve hours.

22      Q.    Okay.  Is there a -- and then somebody else

23   comes on?

24      A.    Yeah.

25      Q.    Okay.

1    A.   Rotating shifts, yes.

2    Q.   So would there be a nightly report and a daily

3    report?

4    A.   No.  So we -- it's just called an -- it's like

5    to me it's daily nightly.

6    Q.   Got it.

7    A.   It's the same thing.  The shift was two to two.

8    Q.   Okay.

9    A.   So there's no -- after two in the morning

10   another STAR team doesn't come on at two in the morning.

11   It's the following 2:00 in the afternoon.

12   Q.   Okay.  So there's no STAR team operating

13   between 2 a.m. and 2 p.m.?

14   A.   Correct.

15   Q.   Okay.  So you come on at 2 p.m. and work until

16   2 a.m., and then this report is what results?

17   A.   Correct.

18   Q.   And what is the -- are these reports?  Whether

19   you call them dailies or nightlies, are they still in

20   use?

21   A.   Yes.

22   Q.   Okay.  And whose responsibility is it to do

23   these?

24   A.   It varies.  I mean, just whoever is working on

25   STAR.  I mean, it could be corporal or the STAR deputy.

164

```
1        Q.   Okay.  Turn to the next page where it says
2   Cases Worked.
3        A.   Yes.
4        Q.   Look at where it says DVI Violation.
5        A.   Yes.
6        Q.   Fair to say that on either the morning of
7   Tuesday, September 18th, or the night of September 17th,
8   STAR attempted to make contact with Donnie?
9             MR. POULTON:  Object to the form.
10       A.   Yeah.
11  BY MR. BARGIL:
12       Q.   Okay.  And was that attempt to make contact
13  successful?
14       A.   No.
15       Q.   And can you read the last line in that?
16       A.   "Based on reasonable suspicion Donnie may have
17  been in the vehicle, a traffic stop was conducted which
18  yielded negative results."
19       Q.   Was the basis of the traffic stop the belief
20  that Donnie was in the vehicle?
21       A.   Yes.
22       Q.   Okay.  So there was no separate traffic
23  violation?
24            MR. POULTON:  Object to the form.
25       A.   Yeah, I mean, from what I'm reading, reasonable
```

1    suspicion from Donnie in there, but I mean I don't know

2    if ran a stop sign, crossed lines.

3    BY MR. BARGIL:

4        Q.   Fair enough.

5             (Exhibit 15 was marked for identification.)

6    BY MR. BARGIL:

7        Q.   What are we looking at here?

8        A.   Another D3 -- district three STAR nightly.

9        Q.   For what day?

10       A.   This is sent in on the -- so it's from the 18th

11   into the 19th.

12       Q.   Okay.  Would you look at cases worked on the

13   next page?

14       A.   Yes.

15       Q.   In that Cases Worked section, that describes

16   the interaction with Tammy that we talked about a little

17   bit earlier; is that right?

18       A.   Yes.

19       Q.   And it says here, "Tammy was asked if we could

20   enter to search her home, at which time Tammy

21   intentionally pushed the door open striking law

22   enforcement.  Tammy was arrested for battery on law

23   enforcement officer and transported to Land O' Lakes

24   Jail."

25             Was there a response to this that you can

1    recall?

2         A.   No.  Like a response email?

3         Q.   Yeah.

4         A.   No, not that I'm aware of.

5         Q.   Okay.  And we looked at the email from Tiffany

6    Bronson a moment ago.

7         A.   Yes.

8         Q.   Is this -- strike that.

9              Based on this three STAR nightly report, does

10   it appear that contact was ever made with Donnie

11   McDougall in reference to this attempt to make contact

12   with Donnie McDougall?

13        A.   No.

14        Q.   Okay.  Same thing if you look down a few lines

15   where it says TOP 5/Prolific Offender/Problem Houses/

16   Probation Checks.

17        A.   Yes.

18        Q.   Anything there that indicates that any contact

19   was made with Donnie McDougall?

20        A.   No.

21        Q.   And anything anywhere on this report that

22   indicates whether a search was made of Donnie

23   McDougall's home to see whether you could locate Donnie

24   McDougall?

25        A.   No.

1          MR. BARGIL:  Okay.  Let me confer with Rob

2      really quickly.

3          MR. POULTON:  Okay.

4          MR. BARGIL:  But --

5          MR. POULTON:  Well, they tried to get ahold of

6      her and they couldn't.  So she's going to be here in

7      14 minutes.

8          MR. BARGIL:  Great.  I'll be ready.

9          (Short break.)

10  BY MR. BARGIL:

11     Q.   Well, I want to thank you for your time.  I

12  don't have any further questions at the moment, but as

13  we've done in the other depositions, we'll hold it open.

14  Don't think we'll have to haul you back in here, but

15  thank you for your time.

16     A.   Yeah, absolutely.

17          MR. POULTON:  He'll read.

18              *   *   *   *   *   *

19          (THEREUPON, THE TAKING OF THE DEPOSITION WAS

20      CONCLUDED AT 12:51 P.M.)

21              *   *   *   *   *   *

22              S T I P U L A T I O N

23      It was thereupon stipulated and agreed by and

24  between counsel present for the respective parties and

25  the deponent that the reading and signing of this

1    deposition is not waived.

2                    *   *   *   *   *   *

1                        CERTIFICATE OF OATH

2      STATE OF FLORIDA

3      COUNTY OF PASCO

4            I, the undersigned authority, certify that

5      PAUL REAGAN personally appeared before me and was

6      duly sworn on January 11, 2022.

7            WITNESS my hand and official seal this 22nd

8      day of January, 2022.

9

10

11      _____
                    Judy Anderson
12                  Notary Public - State of Florida
                    Commission No.:  GG 276821
13                  My Commission Expires:  1-5-2023

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF PASCO

5

6          I, JUDY ANDERSON, Court Reporter, certify that I

7    was authorized to and did stenographically report the

8    foregoing deposition and that the transcript is a true

9    record of the testimony given by the witness.

10

11         I further certify that I am not a relative,

12   employee, attorney, or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties'

14   attorney or counsel connected with the action, nor am I

15   financially interested in the action.

16

17         Dated this 22nd day of January, 2022.

18

19         _____

20         Judy Anderson, Court Reporter

21

22

23

24

25

1   DALANEA TAYLOR; TAMMY
    HEILMAN; DARLENE DEEGAN;
2   and ROBERT A. JONES, III,

3     Plaintiffs,

4   vs.                    Case No.: 8:21-cv-00555-SDM-CPT

5   CHRIS NOCCO, in his
    official capacity as
6   Pasco County Sheriff,

7     Defendant.
    _____/

8

9
                  DEPONENT'S SIGNATURE PAGE
10

11       I HAVE READ THE FOREGOING TRANSCRIPT OF MY

12    DEPOSITION AND HEREBY SUBSCRIBE TO THE FOREGOING

13    DEPOSITION, SAID SUBSCRIPTION TO INCLUDE ANY

14    CORRECTIONS AND/OR AMENDMENTS HERETO.

15

16

    _____        _____
17  PAUL REAGAN                          Date

18

19

20

21

22

23

24

25

1                          ERRATA SHEET

2    PAGE      LINE                  CORRECTION

3    _____    _____    _____

4    _____    _____    _____

5    _____    _____    _____

6    _____    _____    _____

7    _____    _____    _____

8    _____    _____    _____

9    _____    _____    _____

10   _____    _____    _____

11   _____    _____    _____

12   _____    _____    _____

13   _____    _____    _____

14   _____    _____    _____

15   _____    _____    _____

16   _____    _____    _____

17   _____    _____    _____

18   _____    _____    _____

19   _____    _____    _____

20   _____    _____    _____

21   _____    _____    _____

22   _____    _____    _____

23   _____    _____    _____

24   _____    _____    _____

25   _____    _____    _____

**A**

a.m 1:15 163:13,16
a/k/a 88:25
Abargil@ij.org 2:12
abbreviated 16:21
ability 75:17
able 5:20 25:19 28:19
   31:16 35:16 44:12
   128:21 150:7 151:19
   154:19 158:16,17
abreast 27:5
absolutely 63:24 167:16
accept 158:1,16 159:4
accepting 159:6
access 28:8 33:22 95:23
   129:10 157:9
accessing 156:20
accidents 12:13 13:8,22
acclimated 17:9
accomplishments 154:2
account 156:18,23 157:3
   157:9 158:4,19,21,22
   158:25
accurate 22:7 42:12
ACE 11:6,6,7,8,21 60:23
   61:1
acknowledge 52:12
   142:14,15 153:13
acronym 11:10 55:6
act 36:14 54:20
action 98:6 170:14,15
Actionable 46:2
active 23:10 52:24 106:6
actively 48:2 60:22 61:7
activities 31:3
activity 29:12 35:14 36:9
   36:12 40:12 42:15 47:3
   48:12 61:20 63:7,9
   80:11 81:4 82:7,9
   87:17 109:12 110:16
   122:17 131:2 135:6,9
acts 35:8 74:8,12 90:13
actual 49:2,8,14 158:5
add 24:16
added 98:14 101:6 151:1
adding 155:7
additional 95:11 160:21
   160:24
additions 78:10
address 66:24 89:10
   97:20,23
addressing 28:20
adjustments 51:17
adult 82:3 118:19
adults 118:15
advancement 45:2
advancing 8:22
advise 110:14
advised 105:9 132:14
affect 58:19
affidavit 145:11
affiliated 17:9
affiliation 41:1
affiliations 9:10
afternoon 163:11
afterward 49:9
agencies 28:7,18 47:4
   48:9 50:4 60:24
agency 30:1 68:25
agency's 151:20 152:11
ago 11:11 47:12 64:2
   150:12 166:6
agree 19:24 31:3 40:13
   106:7 119:17 146:8
   153:16

agreed 167:23
agrees 38:19
Ah 129:9
ahead 12:3 17:15,18
   20:16 23:18 28:3 31:6
   39:18 41:23 43:20
   45:20 51:20 60:16
   63:16 75:15 90:7 147:2
   150:13
ahold 167:5
AIM 45:23 46:1,18 47:18
   48:18,24 49:1,2,8,14
   50:2 67:7,12 68:11,15
   68:19,21 69:4,7,11,16
   69:19,24 70:4,7,11,19
   72:14,18
Alcohol 68:24
alternative 76:18
AMENDMENTS 171:14
amount 24:19 89:7
   149:12,25
analysis 66:22 91:4
analyst 19:23 20:3 50:1
   64:18 66:17 81:3,6
   154:20
analysts 24:23 25:1
   61:10,13 62:21 63:14
   66:13,21 129:23
   156:12,21
AND/OR 171:14
Anderson 1:19,22 169:11
   170:6,19
answer 5:21 6:1 17:17
   22:17 40:3 42:3 44:8
   54:21 73:19 74:1 90:5
   95:6 98:8,21 110:6,7
   115:8 119:14 122:12
   135:20 147:8 151:3
answered 107:11 144:10
   144:11 155:16
anybody 6:15 25:2,19
   33:21,23 42:4,5 50:5
   146:13
anybody's 113:1
anymore 11:20 158:23
anyway 139:9
apart 82:22 112:8,22
   113:22,25 114:14
   117:6 134:14
appear 127:17 148:24
   153:24 166:10
APPEARANCES 2:1
appeared 169:5
appearing 2:7 70:11
appears 91:6 153:4
   160:23
application 45:1
applied 17:2 43:24 44:22
   155:22
applies 26:7 28:5 30:1
   56:24,25 132:25
apply 18:3 27:10 41:4
   43:12,18 61:10 96:9
   154:14 156:6
applying 153:17,19
apprehend 22:13
apprehended 19:21,22
   24:15 25:18
approach 55:23
approaching 8:17
appropriate 128:20
approval 55:19
approve 55:22
approved 11:15
approximately 104:13
April 85:15,16,17 159:19

area 11:23 26:19 27:6
   35:15 36:12,14 55:8
   56:18 95:24 149:3,7
   150:23
areas 22:2 32:19 47:6
   56:12,15 60:7,9 154:10
Ari 2:10 5:11
Arlington 2:7
arrest 29:17,20 30:8,9,19
   31:10 36:23 53:25
   54:10,16,23 57:4 87:10
   134:22 140:24
arrested 20:4 91:11
   130:25 131:4 134:14
   134:20 135:3,4 145:4
   145:20 146:2,7 165:22
arresting 54:7 142:11
arrests 31:20
arrive 132:11
Art 71:12,14
Arthur 90:20
aside 15:5 24:25 134:21
asked 7:3 44:9 66:9
   77:10 125:8,11,21
   126:14 131:25 135:23
   137:10,25 149:3
   155:15 165:19
asking 37:10 38:19 42:16
   56:25 57:2 108:13
   110:6 119:9 134:24
   137:11 138:5
assault 140:25
assholes 118:22 119:18
assign 86:24
assigned 11:5 26:6,23
   72:22 86:15,17 87:14
   88:9
assist 28:19
assisted 57:22
assisting 91:20
associate 36:20,23 40:19
   41:8 121:14 123:18
   161:13
associated 30:4 91:21
   131:1 135:6
associates 24:13 29:7,18
   32:24 33:5 34:18 35:18
   37:2,24 40:12 90:18,25
   91:7 155:10
association 69:7
associations 69:3
assuming 19:1 26:7,8
   87:22
ATF 68:19,21
attached 136:5 147:16
attempt 94:12 98:3,5
   100:15 101:9 164:12
   166:11
attempted 164:8
attempting 94:15
attend 46:3,5,8 67:12
   68:11,15 70:19
attendance 46:11 51:16
   67:7,15,18,19
attended 49:21 50:2
   72:14
attending 72:18
attention 56:17,19 88:19
   160:22,25 162:5
attorney 6:16 69:9,10
   170:12,14
attractive 158:11
audible 139:16
authority 146:16,24
   169:4
authorized 170:7

automated 10:17
available 27:5 67:3 155:1
avenues 28:13
average 13:11
aware 17:11 124:17
   166:4
Axonflex 4:10

**B**

B 4:1
baby 140:24
back 8:10 12:21 17:2
   24:16 44:7,12,15 52:11
   55:4 59:8 64:19 83:8
   89:2 109:12 110:24
   112:1,3,7,7,8,13,21
   113:1 117:6 125:1
   130:3 131:18 148:16
   167:14
backtrack 71:18
backyard 109:13 112:17
   114:14,15,18,24 116:9
   124:24,25 131:6,13
bad 32:12 38:19 39:21
   93:6 149:22,22,22
bag 14:2
bar 47:9
barely 40:1 88:2,3
Bargil 2:10 3:3 5:7,11
   12:7 16:14 17:16,20
   18:8,14 19:19 20:19
   21:19,24 23:20 28:16
   31:8 34:23 39:20 41:25
   43:22 44:12,16 45:22
   51:23 52:3,6,10 56:1
   57:9,16,23 58:5 59:6
   60:18 62:16,24 63:11
   63:18 66:11 68:18
   70:17 72:1,12 73:5,16
   75:9,23 76:22 77:3,21
   80:5 81:1,11 82:20
   83:13,21 84:6,15,19
   85:2 91:3,8 92:2,8,23
   93:4,22 95:4 97:13
   98:9,10,20,24 100:1,9
   100:12 102:3 103:17
   103:21 105:13,19,21
   107:8,22 108:4,8,21
   109:21 110:5 111:7
   112:10 113:12 114:2,9
   114:21 115:3,13,18
   116:3,14,21 118:5,25
   119:16 120:9,20
   121:19,20 122:2,8,25
   123:5,22 124:4,22
   125:6,20 126:6,16
   127:4,15,21 128:10,16
   129:4,16 131:9 132:7
   133:18 134:6 135:18
   136:8,25 137:24
   138:13 139:5,8,11,23
   141:11,25 142:25
   143:10,22 144:6 147:3
   147:18,24 149:22,24
   151:9 155:18 156:10
   158:14 159:11 161:7
   161:17 162:11 164:11
   165:3,6 167:1,4,8,10
barking 139:4,22 140:9
   140:16,21 141:5
   142:13,17
based 30:16 40:20 58:14
   80:10 90:3 91:11 93:23
   93:25 94:2,11,14 103:8
   103:14 104:1 106:10

106:19 107:10 110:15
   119:11 121:21 129:1
   130:14 145:3 146:1
   151:1 156:9 164:16
   166:9
basic 5:19
basically 9:17 19:5 27:8
   39:8 47:2,6 81:3 125:2
   137:12
basis 33:18 35:21 43:24
   138:16 164:19
bat 141:9 146:6
Bates 18:17,18 85:21
   88:18 105:23 145:7
   148:20
battery 138:17 145:4,20
   145:23 146:2 165:22
Battery_on_LEO_4 4:12
beginning 7:12
begins 132:10 145:13
   154:6 160:20
behavior 74:7
belabor 5:18 123:24
belief 164:19
believe 46:15 47:20 55:15
   61:9 92:17 96:13 102:7
   144:13
believed 131:12
Bella 109:16 111:1
belonging 6:9
better 8:24 44:17 64:1
   74:23 94:23
Beverage 68:24
Bible 77:17
big 21:17 88:4 120:6
   121:2 124:1 154:10,24
   154:25
Biscayne 2:11
bit 10:2,3 16:9 20:1
   27:14 33:11,15 38:9
   46:20 51:24 56:17,17
   56:19 57:12 61:15
   66:23 75:11 79:13
   108:6 130:24 165:17
blitz 71:22
blitzes 71:13
block 96:4
Blvd 2:11,15
Bobby 87:22,23 88:2,24
   88:25 89:24 90:18
   97:22 98:3 99:2 100:16
   101:9
body-worn 142:5
bottom 18:17 53:6 77:6
   85:25 90:19 97:2
   130:24 132:9 145:14
   159:16
Boulevard 2:9
box 1:23 26:7 27:16,19
   28:15 30:15 53:12,16
   53:25 56:5,7,8 57:1,1,3
   57:13,13,19,25 58:2,3
   58:10,22 59:7 71:11,13
   72:3 73:18
boxes 30:13 32:4,17
   42:15 66:4
Boy 42:23 43:6
break 37:20 52:2,8
   104:22 107:18 147:19
   147:22 167:9
breaking 112:8,13,21
   113:2,22,25 114:14
   117:6 118:12 133:20
breaks 6:2
briefing 10:19
briefly 10:16 151:25

153:10
bring 7:1,5,14 16:4 31:14
  75:4 89:2 93:2
broader 72:25
broadly 43:9
broken 46:24
Bronson 14:17,19 106:10
  109:11,15,18 110:1,19
  111:3,21,25 112:3,6,12
  112:18,21,24 113:3,5,9
  113:14,21,24 114:3,12
  115:25 116:9 117:3,5,9
  117:15,19,23 118:1,3
  118:13 119:3 120:2
  121:6,10,13 123:10,14
  123:17 125:4,12,17,24
  126:2 127:6,24 128:3,6
  128:17 129:9,14 131:5
  131:12,16 135:21
  159:19,23 160:21
  161:21 166:6
Bronson's 106:11 131:19
  132:10 135:3
brother 121:13 123:17
brothers 2:6 92:5 117:11
Brown 158:22
build 31:1 32:2,8,9
building 32:6,16 69:13
  69:15 82:14,15
built 32:15
bullet 19:20 21:11 27:15
  29:16 30:24 32:22 37:6
  40:10 41:6 71:3,6,8
  73:11
bullets 19:11
bunch 81:25 83:6 113:9
  118:14,22 119:18
burglaries 43:7,8 47:8,9
  90:2,11
burglary 106:7

                 C

C 149:2 150:14
CAD 4:5,6,7,8
calculated 62:6
calculation 81:6
calculous 54:13
call 10:14,16 56:16 59:5
  92:12,13,15,18 93:24
  97:17 98:14,18 99:6,7
  100:15 102:7,19
  109:18 110:20 111:3
  111:14 113:10,14
  114:3,6,19,25 116:10
  117:22 118:17 119:6,7
  120:7,17 121:3,12,24
  123:16 131:18,21
  140:10,14 141:2,2,3
  144:7,9 163:19
called 9:18 14:1 60:11
  92:18 114:4 117:17
  118:1 120:12 124:20
  163:4
calling 111:9,13 115:14
  115:19 119:11
calls 39:9 59:3,19,21
  92:19 93:17 96:11
  152:5
camera 142:5 144:14
capacity 1:7 5:15 26:4
  33:3 38:11,12 41:10
  44:23 62:8 72:18 75:5
  156:20 171:5
capital 49:17
captain 47:12,14,16,20

47:22 49:15,23 51:9,11
  55:15 72:5
capture 22:12
captured 23:6
car 12:12,21 13:8,16,23
  60:2 67:4 152:3
card 120:5 121:1
care 122:5 161:3
career 45:1
CAROLINE 2:6
case 1:6 31:24 48:7,8
  100:25 132:17,20,20
  133:1,6 134:8 145:22
  146:2 160:7 171:4
cases 133:5 156:14 164:2
  165:12,15
catch 110:19 116:15
  139:24 143:1,11
categorize 96:10
caught 12:24 20:7
cause 30:2 53:14 54:16
  54:24 57:5 107:4,13
  133:20 145:11 149:13
  149:15 150:1,5
cc 159:24
cc'd 159:22
Celeste 6:17,19 70:13,14
  72:14,21 75:4,13
Celeste's 72:6
Central 27:4 32:25 33:6
  33:9,10 34:4,18 65:22
  155:2
certain 12:4 20:22,23
  22:20 32:19 35:21 54:1
  58:11,11,24 59:19,20
  74:21
certainty 128:24
Certificate 3:4,4 169:1
  170:1
certified 151:17
certify 169:4 170:6,11
Cgbrothers@ij.org 2:8
Chagrin 2:3
chances 149:11
change 86:20,22
changed 72:11 87:7
changes 34:25 73:19
  76:18
charge 30:11,11 71:15
  78:24 79:2 105:9
  138:17 146:6
check 66:18 75:4,6,25
  76:9 78:25 81:21,22
  82:10,17,22 83:5,15,18
  83:25 84:3,8,21,23
  93:18,19 94:17,19 98:1
  99:16,21,22 100:3,6,20
  103:12 104:15,18
  105:5 125:4,17,19,25
  126:8 127:11 128:4,5
  128:15,21 129:13,21
  146:14,17
checked 137:22
checks 83:22 107:11
  152:7 166:16
checkups 96:11
child 113:17 119:25
children 119:12 120:13
  122:17
chop 7:20
CHRIS 1:7 171:5
chronological 14:17
circumstance 75:16 83:7
circumstances 22:20
  23:3 83:2,12
citations 13:1 71:9 73:12

cite 133:6
cited 133:6
citizens 71:17
City 1:23
civil 71:16
CJIS 102:23 127:10
  128:2,3 129:8
clarification 66:9
clarify 119:1
classification 21:10
  62:18,19 64:6 93:13
classifications 20:14 22:4
  38:9,10,20
classified 21:20 39:12
  80:13 93:19
clause 134:5,7 138:4
clear 5:23 15:12 43:11
  105:16 115:8 126:17
  135:6 161:8
clearly 37:21
clip 18:20
close 41:11 91:7
Co-counsel 2:9,13
code 57:11,11,18,21,22
  58:8 68:13,13,14 69:22
  70:10,12 71:12,13,21
  72:3,7,19,22 73:2,7,9
  73:22 74:5,15,21 76:2
  76:9 150:10 160:11
colleague 104:10
collect 131:21
collecting 106:4
collection 29:11 46:19
  78:24 154:19
collectors 31:16
come 12:14 16:9 44:19
  50:7 74:17 75:13,20
  82:4 121:23 122:10
  141:19,20,20 142:10
  163:10,15
comes 28:6 62:7 82:15
  114:12 162:23
comfortable 32:19
coming 41:16 76:20
  112:2 126:13 152:15
command 27:4 32:25
  33:6,9,10 34:4,18
  65:22 79:2 155:2
comment 157:25
Comments 153:7,11
Commission 169:12,13
commit 43:6
committed 29:21 105:17
  149:19
committing 35:8 54:19
  74:8
communicate 66:4 162:1
  162:4
communicated 15:8
communication 65:5
  66:20
communications 162:3
community 62:12 136:14
compare 94:21
completely 87:25 157:19
compliance 73:24,25
  74:6 75:10
computer 67:4 157:1,19
concentrate 150:20
concerted 65:12
conclude 130:12
CONCLUDED 167:20
conclusion 78:1,4,8,12
  105:10 162:15
conduct 9:18 10:9 71:13
conducted 164:17

conducting 10:11 84:20
confer 167:1
confident 11:17 124:19
confine 24:1
confirm 67:10 111:8
  114:22 116:17 126:18
  128:18 129:1 134:25
  146:10
confirmed 130:13 135:20
confirming 126:14 138:6
confusion 127:17
conjunction 63:14
connected 36:6 170:14
connecting 36:17
consensus 25:5
consent 134:3
consented 146:19
consequence 15:9
consider 23:15
consideration 51:3,5
considered 21:21
consist 20:6 58:3
consistent 37:8,11
consistently 156:6
consists 56:14
conspicuously 157:6
constantly 66:3
consuming 11:2
contact 24:13 35:3,3
  41:16 66:17 81:23
  84:14 91:12,12 94:1,9
  94:12,15 95:9 98:3
  99:2,4 100:15 101:9,14
  106:25 121:17 123:21
  124:21 164:8,12
  166:10,11,18
contacted 147:13
contacting 107:4,13
  119:25 123:25
content 153:16
contentious 75:12
contingents 50:9
continue 28:4 104:20
  144:22 153:16 154:22
continuously 76:17
control 136:14
conversation 6:22 121:22
conversations 25:9
Cook@debevoisepoult...
  2:17
Coordinate 71:11
cop 32:20 119:17
cope 76:25
corner 18:18
corporal 8:9,10,13,19
  14:16 15:13 28:21
  49:25 71:12,14 73:9
  79:3,4 87:2 152:16
  154:13,23 163:25
correct 5:9 7:12 15:15
  16:21 22:21 24:6 25:13
  33:4 37:25 59:16 61:3
  61:24 67:13,20 72:17
  77:12 100:4 110:2,7,12
  115:4 119:7 135:3
  143:16 147:10,14
  154:13 163:14,17
CORRECTION 172:2
CORRECTIONS 171:14
correctly 24:4 42:8
counsel 2:5,18 167:24
  170:12,14
counseled 15:2
counter-productive 14:9
county 1:8 7:7 18:10
  19:16 23:7 28:19 33:23

43:17 55:14 69:9,10,22
  70:12 71:9 73:11 169:3
  170:4 171:6
couple 46:24 47:7 49:23
  71:16 108:1 146:10
  147:18
coupled 78:13
course 38:4 50:15 159:4
  139:7 170:6,19
CPI 109:18 110:20,21
  111:3,9,13,14 113:10
  113:14,16 114:19,25
  115:14,19 116:10
  118:17 119:7,11,25
  120:12,17 121:24
  122:15,23 123:25
  132:15,20 133:3
cracks 113:9
created 158:21
creating 74:12
creation 50:16
crew 69:23
crime 8:4 27:6 55:12,12
  94:24 154:10,10,25
crime's 29:21
crimes 8:19 20:23 43:5,5
  80:23 161:21
criminal 21:16 24:13
  28:11 29:12 30:17 35:7
  35:8,14 36:9,9,11,12
  36:14 47:1,3 54:6,20
  64:22 74:8,12 80:10,11
  81:4 82:5,6,9 87:17
  90:13 131:1 135:6,9
  155:10
criminals 121:15 123:19
cross-reference 134:25
cross-referencing 133:4
crossed 165:2
crosstalk 139:3,21 140:8
  140:15,20 141:4
  142:12,16
cultivate 31:2
cunt 118:1,3,3
curiosity 92:25
curious 67:10
current 8:18
currently 145:21
custody 30:25
customary 133:4

                 D

D 3:1
D3 165:8
dad 90:23 91:23 141:2,2
  141:3
Dade 1:23
dailies 33:13 163:19
daily 33:13 34:7 65:18
  66:5,14 163:2,5
DALANEA 1:3 171:1
DARLENE 1:3 171:1
date 1:14 85:13,17 99:2
  136:6 147:17 152:24
  161:9 171:17
dated 52:20 170:17
David 41:12
day 66:15 75:22 162:18
  165:9 169:8 170:17
day-to-day 18:4 43:24
  156:6
days 89:7
deal 42:7
dealing 39:22 42:19

dealt 42:6
Debevoise 2:14
December 106:2
decides 22:25
decision 51:7 59:1 122:14
decision's 51:14
decisions 11:19 48:25
  49:2,7 50:11 51:10
dedicated 72:2
DEEGAN 1:3 171:1
Defendant 1:9 2:18
  85:22 145:21 150:14
  171:7
definitely 88:13 91:19,20
  117:5 127:1
definition 40:18
definitions 40:11
degrees 96:12,14
Denbo 10:14
denote 89:6
department 30:8 33:24
  35:19,25 68:2,4,7
departments 8:23 69:19
  69:22
depends 31:21 76:12
depict 102:5 153:24
depicting 88:22 90:17
  108:23 136:11
depiction 91:4
depicts 100:14 158:5
depo 6:13
deponent 167:25
Deponent's 3:5 171:9
deposition 1:12 5:12,13
  6:8 167:19 168:1 170:8
  171:12,13
depositions 93:1 167:13
deputies 23:11 26:23
  30:7 31:1,5,9,14 86:17
  124:16 151:18 152:2,4
  152:17
deputy 14:17,19 19:15
  27:11 91:22 109:1,11
  109:15,18,23 111:3,21
  111:25 112:3,6,12,18
  112:21,24 113:3,5,9,14
  113:21,24 114:3,12
  115:25 116:9 117:3,4,5
  117:8,9,14,15,17,19,22
  117:23,24,25 118:1,3
  118:12,13,17,18,19
  119:3,3,6,22,24 120:22
  120:3,7,24 121:3,6,8
  121:10,11,13,14,16
  123:8,10,12,14,15,17
  123:18,20 124:24
  125:4,12,17,24 126:2
  126:23 127:1,6,10,24
  128:1,3,5,6 129:8,9,11
  129:14,24 131:5,11,19
  135:21 136:22,24
  137:16,19,21 138:25
  140:11,13,17,19,23
  141:6,9,19,20,21,22,23
  142:10,14,18,22 143:7
  143:19 144:4 145:10
  150:20 163:25
describe 10:2 90:16
describes 165:15
describing 83:9
description 10:3
deserving 62:10 64:6
designated 136:5 147:16
detail 46:20
detained 141:7,8
detective 5:8,9 7:12,16

31:24 98:11 107:23
  110:19 125:24 132:9
  147:25 156:12 157:4
  161:21
detectives 156:14 161:24
detention 31:1,5,9,13
determination 36:9 91:9
determinations 42:10
determine 62:6 64:19
  81:3 84:8 128:12
determined 42:1
determining 24:18
deterrent 82:11
develop 26:18,22 35:20
  35:25 63:3 107:13
developing 32:16
development 63:6
diction 44:18
differ 29:22 56:7
different 11:22 15:9
  20:13 21:13 50:16
  51:10 63:23 75:19 83:3
  83:12 95:15 96:12 97:5
  97:8 99:4
differently 57:12 94:25
  95:5
digits 88:20
dike 117:23,25 118:3
direct 3:3 5:6 28:8
directed 59:24
directing 108:16
directly 41:14,22 61:12
directs 40:10
disciplined 12:8,11,16
  13:15
disciplines 13:2
discouraged 151:4
discretion 30:6,8,11,18
discretionary 74:4
discuss 46:23,25 47:2
  48:24 50:25 63:20
discussed 35:5 49:11
  61:21
discussing 51:5,9 144:20
  144:20
discussion 23:11 24:15
  24:23 25:10 44:22 47:7
  51:2,12 58:7 62:20
  63:24 107:20 136:19
discussions 63:17
dispatch 92:12 96:9
  98:15
dispatched 58:23 59:10
  59:12 102:24
disposition 98:6
disputing 88:14 104:24
dissemination 46:19
dissolved 11:12,13,16
distributed 118:21
distribution 34:10 66:6
district 1:1,1 4:15,16
  15:16 19:23 20:3,6,7
  21:2,15 24:5,9,23
  25:17 26:6 29:17 30:2
  33:13,22 38:5,7 39:3
  47:16,17 63:9 88:23
  154:21 155:8 162:14
  165:8
district's 29:7 61:10
DIVISION 1:2
document 16:15 18:15,19
  32:23 33:4 35:10 37:1
  37:4,23 52:16,24,24
  78:9,13 85:4 92:9,10
  93:23 94:11,14 95:14
  97:1,14,15 98:5 100:13

101:8 102:4,5 103:14
  104:1 130:3 136:9,10
  148:4 162:12
documentation 14:24
  33:10 37:16 101:20
documented 33:12 41:8
documenting 34:16,22
  35:18
doing 8:16 12:1 33:2 75:3
  75:5 76:4,9 79:10
  81:24 82:12 83:24 84:3
  84:7 86:23 87:1 90:9
  95:22,24 109:1 120:5
  121:2 122:14 156:21
Donnie 102:7,11 103:25
  104:16,21 106:5,5,20
  106:25 107:4 108:24
  118:12,13 119:10
  123:13,14 124:6,17
  125:3,21 128:24
  130:13,25 131:22,25
  132:4 134:14,20
  136:12 138:8 142:22
  143:7,14,19,25 146:11
  146:17 147:13 160:6
  160:21 164:8,16,20
  165:1 166:10,12,19,22
  166:25
Donnie's 117:11 126:11
  132:11,14 134:8
  137:11,13 161:13
door 107:14 113:6
  138:15,20 165:21
doors 74:11
doubt 113:1 159:9
drawing 80:24
Drive 1:17 104:14 106:3
drug 11:24 12:5
dude 121:12 123:16
due 26:13 131:1
duly 5:2 169:6
duties 156:7
DVI 164:4

——————— E ———————
E 2:2 3:1 4:1
earlier 67:9 77:10 165:17
early 8:7
ease 108:5
easier 18:20 85:20
effect 21:18 54:10
Effective 65:5
effort 65:12
eight 75:20
either 11:5 14:5 18:18
  32:13 35:13 41:2 46:25
  47:5 48:10 50:4 69:14
  75:25 81:5 82:2 129:10
  164:6
elevate 24:24
else's 95:7
email 4:14 6:9 20:6 23:4
  34:9 66:6 159:12,14,17
  166:2,5
emails 34:12 45:13 65:17
emergency 120:4,25
emergency-type 96:18
emerging 27:6 62:4
emphasize 151:20 152:11
  154:23 155:3
emphasized 78:16
employee 170:12,13
encapsulation 130:8
encouraged 46:11,15
  67:14 68:10,11 149:14

150:13
ended 76:4 87:23 105:8
ends 80:13 92:25
enforcement 5:15 20:24
  27:17 28:22 30:16 39:9
  43:17 56:15 57:11,12
  57:18,22,22 58:8 68:13
  68:14,14 69:22 70:10
  70:13 71:12,13,21 72:3
  72:7,19,23 73:2,7
  74:16,22 76:25 95:24
  103:3 122:16 138:17
  145:4,21 146:3 157:6
  159:7 165:22,23
ensure 82:5 87:16 142:7
  152:17
entail 152:1
entailed 10:25 79:6
enter 165:20
entire 147:6
entirely 131:14
environment 64:22
equipment 12:13 13:13
  13:23
Errata 3:5 172:1
ESQ 2:6
ESQUIRE 2:2,10,14
essentially 10:5 51:7
  138:9 148:9
establish 56:13 105:2
  156:15
established 7:11 55:1
  152:23
ether 33:25
evaluation 152:25
evaluations 44:1,3
event 99:4 100:2,3,18
  103:6
everybody 17:11 158:19
Everything's 82:12
evolution 7:15
evolved 65:22
exact 14:2 49:13 98:18
exactly 11:25 71:18 83:3
  111:12 119:15 121:8
  123:13
Examination 3:3 5:6
examined 5:3
example 50:24 71:8
  95:14,17
examples 53:24 70:24
exceptions 53:19
excess 21:17 24:19
exchange 158:24
excuse 19:21
Executive 1:17
Exemptions 4:9,11
exhibit 16:12,13,15 52:1
  52:9,15 85:1 92:7
  97:12 100:11 102:2
  103:20 136:5,7 147:16
  147:23 159:10 162:10
  165:5
existed 54:17,24
existence 57:5
existing 27:5
exists 30:2 53:14 61:2
expect 6:25
expectation 16:23 18:2
  35:20 60:3 77:23
expectations 19:6 25:25
  29:2 30:25 32:23 40:8
  43:10
expected 19:15 26:5,18
  26:22 27:4,10,15 29:6
  29:10 40:17 43:12,18

60:14,22 61:7 64:20
  152:10,19 153:18,20
experience 6:23 28:20
  120:11 133:19,23
Expires 169:13
explain 10:15
explained 8:21
explaining 110:20
extract 31:9
Extraction_1.1 4:12
extremely 88:1 117:15
eye 48:12 64:15

——————— F ———————
Facebook 157:8,19 159:2
fact 57:4 60:13 64:24
  126:7
factors 154:25
fair 33:17 40:17 41:19
  43:16 74:9,13 77:16
  78:15 104:17 121:22
  122:3 125:21,24
  128:11 130:12 131:4
  146:7 156:5 164:6
  165:4
Fall 78:21
falls 31:24 122:16
familial 36:1
familiar 5:17 16:16 17:5
  17:24 38:10,21,22
  45:23 50:15,20,22
  77:20,24 89:3 92:9
  150:21
Familiarity 32:7
familiarize 16:23 18:3
  40:10 103:23
familiarized 79:17
family 10:22,24
far 19:13 20:2 35:17
  55:20 72:7 73:6 80:8
  90:22 97:22 102:5
  134:25 155:13
fast 108:5 113:18
fault 35:24
feed 33:17
feel 26:9 32:18 41:7
  42:14 84:2 109:11
  122:13,15
feelings 117:21
felony 127:2
felt 62:10 122:20,22
  152:16
female 127:8,13 158:9,10
  158:11
fence 109:2
field 24:22 151:24
Fifteen 15:25
figure 142:19
fill 49:25 95:18
final 27:15 32:22 55:19
  78:7 135:19 160:20
financially 170:15
find 36:11 61:23 81:25
  109:3 150:7
fine 71:20,20 76:25 98:25
  113:10 117:20 161:8
finish 6:1,1 115:7
fire 74:22
first 5:2,19 7:15 12:14
  16:11 17:1,5 28:5 33:2
  40:10 44:5,7,9 53:9
  60:21 65:9 71:21 73:10
  78:4,7,12 79:8 87:20
  104:12 105:25 106:11
  148:19 160:6

**five** 52:4 75:20 113:13
145:14
**FL** 1:23 2:11,15
**flee** 83:11
**flip** 104:6 150:13
**Florida** 1:1,18,20 40:13
40:18 68:25 104:14
106:4 169:2,12 170:3
**focus** 10:23 11:23 24:11
26:13 28:11 38:15,25
39:12 40:2 42:13 43:4
55:11 60:20 73:2 87:15
150:4 151:6 153:17
154:9 161:25 162:7
**focused** 12:5 39:22
**focusing** 23:23
**focussing** 24:8
**folks** 23:12 51:4
**follow** 10:8,19 35:16
41:16
**following** 10:9 53:18
63:2 163:11
**follows** 5:4 28:17
**foregoing** 170:8 171:11
171:12
**foreign** 157:19
**forget** 38:13
**form** 12:3 17:15 18:5,12
19:17 20:16 21:12,22
23:18 27:24 31:6 34:19
39:18 41:23 43:20
45:20 51:20 55:24 57:7
57:14,20 58:1 59:4
60:16 62:13,22 63:8,16
68:17 70:15 71:24 72:8
72:10 73:3,14 75:7,15
76:11 77:1,18 80:3,19
81:9 82:18 83:1,19
84:4,13 91:1,5,25
93:20 95:2,18 99:23
100:7 103:16 104:19
105:12 107:6 110:4
111:10 114:7 115:1,16
115:20 116:19 119:13
120:18 121:25 122:6
122:24 123:2 124:2
126:4,12,19 127:19
128:13,25 131:7 132:5
133:15 134:4 149:21
151:7 155:15 156:8
157:7 158:12 159:8
161:5,15 164:9,24
**formal** 14:1 15:4 65:14
65:15
**Formoso** 14:13 144:13
**forms** 138:16
**forth** 64:19
**forward** 108:5 113:18
**forwarded** 41:21 80:25
159:20
**found** 74:17 77:13
**four** 9:6 86:8 145:13,14
154:10,24,25
**fourth** 41:6
**framing** 149:23
**freaked** 117:12,13
**frequenting** 26:19
**frequently** 16:6 58:15
66:12 79:24 148:12
**friend** 157:11,14,16,22
158:15,17 159:5,6
**friends** 157:9
**front** 7:24 113:6 117:10
148:16 162:13
**FTO** 8:11 151:17,23
152:16

**fuck** 114:18,24 116:10
120:6 121:2,11 123:15
124:1
**fucking** 113:21 114:13
118:22 119:18
**fully** 84:20
**Funny** 92:22
**furnished** 64:3
**further** 67:6 167:12
170:11
**FYI** 20:7

## G

**gain** 26:12 157:9
**gang** 40:11,11,12,18,18
40:19 41:1,8,9,11,21
42:2,4,5,10,14,17,22
43:1
**gangs** 40:11,24
**Garmon** 104:9 108:15
116:25 117:4,17,24
118:17,19 119:3,6,22
120:10,10 121:14
123:3,18,20,24 126:7
128:1,3,17 130:14
139:12,25 141:20,22
142:1,14,22 143:1,7,13
143:19 145:10
**Garmon's** 125:4,17,19
125:25
**gather** 35:17 37:7 149:13
149:15 150:1,5
**general** 17:25 18:2 32:1
**generally** 23:2,9 30:14
46:22 49:24 60:1 70:16
93:14 101:2,6 158:3,4
**generic** 93:15
**getting** 14:12 17:7 74:6
74:13 75:10,11 134:22
**GG** 169:12
**girl** 117:11
**give** 32:14,20 42:2 86:8
107:9
**given** 23:21,23 24:9
62:11 64:20 80:10
122:19 130:2 144:25
170:9
**giving** 162:6
**glean** 98:4
**Glebe** 2:7
**go** 12:3 17:15,18 18:22
18:23 19:2 20:16 23:9
23:16,18 28:3 29:21
30:3 31:6 33:2 36:15
39:18 41:23 43:20
45:16,20 46:20 51:20
58:23 60:16 61:23
63:16 64:19 66:18
71:25 75:2,15,24 76:1
85:20 88:8 90:7,14
96:16 108:6 121:16
123:20 125:25 126:7
127:10 140:22,23
142:1 143:6,18
146:24 147:2 148:20
148:22 152:5,7 156:24
**goal** 30:21 35:18,25
61:15 87:10 150:6
**goes** 72:7
**going** 10:6,7,10 16:11
24:19 26:25 27:8 30:5
32:19 35:9 42:17 47:5
58:19 66:4 73:10,14
75:3 84:10 87:25 95:13
95:16 102:14 104:22

107:25 108:5,19 109:6
109:12 110:20 113:10
113:18 116:10 119:2
120:15,21 121:11
123:7 131:18 136:15
139:5 140:4 141:16
148:15,16 167:6
**gonna** 114:19,24 120:3,3
120:4,25 123:15 125:4
125:17,19,25 126:7,18
128:1 129:13,21
142:19
**good** 5:8 6:3 32:12 41:14
52:2 82:12 133:7
151:22
**Gorman** 121:16
**gotten** 11:18
**govern** 18:9
**governing** 52:24
**Government** 1:17
**GRACE** 2:6
**graphs** 47:9
**Great** 167:8
**ground** 5:19
**group** 48:3 49:19 62:3
155:8
**groups** 68:9
**guess** 10:6 20:8 28:13
33:14 37:7 56:16 57:2
58:17 59:8 62:6 65:17
70:23 72:21 73:24 74:2
74:4,10 81:25 112:11
128:6 132:8 134:24
159:19
**gun** 12:21 43:7
**guy** 12:20 80:21 117:12
**guys** 48:11 76:19

## H

**H** 4:1
**half** 8:11,12,14,20 46:25
109:6
**hand** 169:7
**handled** 51:10
**hands** 148:3
**hang** 29:12
**hanging** 36:13
**happen** 49:1,2 120:4,25
**happened** 12:19 46:23
121:7 123:11 130:9
138:14
**happening** 121:21
**happens** 15:9
**hard** 5:24 32:20 93:2
119:14 139:5
**Harden** 161:13
**Hartnett** 47:21,22
**Harvest** 78:21
**haul** 167:14
**He'll** 167:17
**head** 47:17,17 67:2
**heading** 49:14
**hear** 17:1 108:9 111:11
116:6 126:20 129:17
134:17 141:12
**heard** 95:22 110:21
111:14 117:17,19,20
124:3,21 140:2,6
**hearing** 111:13 162:6
**heavy** 21:16
**Heights** 2:3
**Heilman** 11:3 109:9,14,17
109:19 110:11,13,14
111:2,4,20,22,24 112:2
112:5 113:4,8 114:23

136:21,23 137:18,20
139:2 140:10,12,14
141:2 142:20 143:5,18
171:1
**held** 83:10
**Hello** 113:23
**help** 31:16 35:13 48:10
76:19 109:9 149:13
150:1,5
**HERETO** 171:14
**hey** 10:17 20:7 32:19
48:11 49:16 51:11
63:21 64:14 66:18,24
75:13 80:21 82:11
113:24 115:23 116:11
116:11 122:16 124:25
129:11 141:21 142:14
**hiding** 83:10
**high** 9:18 56:11,14
154:10
**highly** 113:1
**hire** 17:11
**hired** 17:7
**history** 154:24
**hit** 157:19
Holborn@debevoisepo...
2:17
**hold** 102:22 115:23
116:11 167:13
**holding** 148:3
**Holiday** 104:14 106:3
**home** 16:10 83:15 108:10
108:14 112:2,7 114:12
118:15,16 119:25
132:11 135:10,11
165:20 166:23
**homeowner** 74:22 75:11
**homeowners** 69:3,7
**honest** 87:25 157:18
**honestly** 14:7,23 16:7
39:14 40:1 49:13 54:4
88:2 91:13 96:16
107:12
**hope** 73:4
**hostile** 117:16 125:1
**Hot** 42:23 43:6
**hour** 54:11 101:13,13
103:10
**hours** 10:25 11:1 58:21
75:19 103:10 104:13
106:3 162:21
**house** 16:4,6 58:19 75:25
80:22 82:24 88:5 102:8
102:15 108:24 109:10
110:3,9,17 112:19
119:12 120:13 127:6
133:9 137:22 138:6
139:1,1 146:11,17,24
147:5,11
**household** 118:21
**houses** 58:18 60:7,9
**Houses/** 16:15
**hurt** 117:20 138:20
**hypothetically** 74:19

## I

**IDA** 39:4,4 89:13
**idea** 55:13,16,16 71:23
74:20 102:13 106:17
108:22 132:22 159:5
162:6
**identification** 16:13 52:9
61:19 63:6 85:1 91:21
92:7 97:12 100:11
102:2 103:20 136:7

147:23 159:10 162:10
165:5
**identified** 21:1 39:7
41:20 42:4 76:16,16
89:21 90:25 99:16
131:5
**identify** 28:9 60:24 61:16
63:9,14 76:7 85:5
92:10 156:15
**identifying** 62:1 64:25
80:20 149:19 154:24
**III** 1:4 90:20 171:2
**illegal** 109:12 110:16
122:17
**ILP** 4:2,4 16:19,21 17:2
17:6,9,24 18:3,9 19:14
27:9 43:9,12,19,24
44:19,22 45:1,19 50:1
58:6 60:23 61:7 63:14
66:12,17,21 77:6,10,13
78:13 85:6,6 151:20
152:12,20 153:17,19
154:11,14 155:22
156:6,12
**immediate** 25:8 122:23
**implement** 55:13
**implementation** 55:19
**implies** 42:17
**importance** 151:20
152:11
**important** 17:24 35:10
152:17
**improper** 12:12,12,17
13:1,4,21,22
**improve** 149:4,7 150:15
150:23 154:25
**in-depth** 88:3
**inaudible** 111:25 112:1,4
112:5,20,23 113:8,21
123:4 114:13 121:14
121:17 123:18 124:25
125:1 126:25 127:6,9
127:12 140:23,25
**incarcerated** 24:19
**incident** 13:5 15:13 35:2
99:11,16 132:15
136:13
**include** 161:13 171:13
**included** 36:19,23 50:12
91:23
**inclusion** 41:2 81:7
**incorrect** 106:14
**increases** 149:18
**incumbent** 65:11
**indicate** 86:13 99:1 101:9
126:2,8 128:17 147:13
**indicates** 86:14 94:8
135:24 166:18,22
**Indiscernible** 139:3,21
140:8,15,20 141:4
142:12,16
**individual** 35:4,4 41:7
87:16,18 160:15
**individuals** 37:3 38:1,5
51:16 63:7
**influential** 29:13
**info** 156:14
**informal** 65:14
**informally** 64:13
**information** 31:10,14,15
32:13,14,15,24 33:5,12
33:17,20,22 34:17,20
34:22 35:11,18 36:16
37:2,4,24 41:21 42:2,6
43:2 46:19 47:10 48:3
48:6 49:15 65:12,16

66:2,5 67:3 83:9 106:4
124:9 131:22 132:3,4
134:22 144:18,21
**initially** 31:25
**initiating** 84:22
**inquiry** 106:24
**inside** 112:20 118:21
142:21 143:6,18
146:24
**insight** 47:5
**insisted** 114:23
**Instagram** 156:17
**instance** 57:5 97:19
107:4
**instances** 28:21 59:13
75:13 76:4
**Institute** 2:2,6,10
**instructed** 54:13,16,18
57:18
**instruction** 73:21
**intelligence** 9:16 10:1
31:2 46:2 62:21 154:20
**intelligence-led** 16:19
**intention** 76:2
**intentionally** 165:21
**interact** 35:21 66:12
**interacted** 37:22
**interacting** 32:3 58:16
**interaction** 37:23 133:11
134:14,19 165:16
**interactions** 16:8 58:15
**interested** 170:15
**internal** 93:14 101:19
**internalize** 43:12,18
**interpret** 161:2
**interrupt** 5:25
**interviews** 31:19
**intranet** 77:13
**introduced** 93:1
**invest** 100:19
**investigating** 100:24
**investigation** 82:4 88:3
93:12,19 95:10 100:22
102:10 144:21 155:1
**investigations** 16:9
**investigative** 95:20
**investigators** 113:17
**involved** 28:10 35:7
61:25 78:22 89:25 90:9
90:12
**involvement** 20:24 21:16
28:10,11 35:7 39:10
43:3 63:25 80:10
**involving** 82:6,8
**ISR** 9:14
**issues** 28:20 62:5
**it'll** 157:15,15
**item** 149:2
**IV** 88:25,25

**J**

**jail** 12:25 29:21 30:3,5
54:11 82:3 165:24
**January** 1:14 169:6,8
170:17
**JDC** 82:2
**Jeff** 158:22
**Jeffrey** 161:13
**Jenkins** 47:13,20 55:15
**Jesus** 140:22
**Jim** 69:14
**JJIS** 129:8,9,12
**job** 7:16 11:21 24:11 32:2
39:24 48:5 59:17 62:9
64:24 70:18 74:23 87:9

155:22
**jobs** 99:7
**JOHNSON** 2:2
**joke** 93:2,6
**Jones** 1:4 87:18,22,23
88:2,24,25,25 89:24
90:18,20 94:1,7 95:10
98:3 99:2 100:16 101:9
171:2
**Jones's** 97:23
**Jones/Regan** 86:11
**Judy** 1:19 169:11 170:6
170:19
Judy@andersoncourtr...
1:24
**July** 4:3 52:20
**Justice** 2:2,6,10 70:6,8
**justify** 44:10
**Justin** 106:5,5,16,21
131:22 132:1,4
**juvenile** 13:25 15:19,22
69:25 70:6,8 74:20,23
82:3 103:24 128:7
**juveniles** 114:14
**juvie** 127:25,25

**K**

**keep** 24:20 48:11 64:15
74:13 76:20
**keeping** 74:23
**kept** 41:15
**keys** 13:16,23 90:10
**kid** 14:8 88:6 140:4,13,17
140:19
**kid's** 14:14 16:4,6
**kids** 113:21,22,25 117:8
118:14
**kind** 7:2,14 11:19 21:5
25:5 28:13,13 31:24
37:6 40:25 41:15,17,19
43:5 54:9 58:14 62:3,4
62:10 64:19 71:18
74:13 77:16 82:6,15
90:15 123:23 148:17
**knew** 49:17 124:20
**knocking** 107:14
**know** 6:2,22 7:24 8:22
9:9 11:13,19 13:14
15:11 16:8 19:13 20:22
20:23,24 23:16 24:19
28:6 31:15 32:11,11,12
32:20,20 34:2,7,20
35:5,6,6,9,14,17,21
36:5 38:15,16,21 39:5
39:6,8,15 40:18,23
41:1,14 42:18 43:1,11
43:12,18,24 45:21 47:8
47:19 49:22 50:6 51:22
54:6 55:13,17,21,25
57:15,17 58:7,9 59:7
59:18,21,25 62:8 63:1
63:21,22 64:14 65:17
68:20,25 69:3,13 70:8
70:12,18 71:19 72:5,6
73:6,19 74:1,9,15
75:12 76:12,13,23
77:13 79:7,12,14,24
80:4,8,12,14 82:2,23
83:3,5 87:7,20,23 88:4
89:12,24 90:22 91:2,6
91:3,17 92:1,20,25
93:21,21,23 94:11,14
94:20 95:13 96:8,10,15
96:16,22 98:8,20 99:5
99:8,13 101:19 102:6

102:14 103:2,5,13,18
103:19,23 104:7 105:9
105:13 106:23 108:16
108:25 111:12 112:17
112:18 114:4,8 115:17
115:21 117:9 120:2,24
121:6 123:10,23
124:15 125:12 126:3,5
126:8 127:1,11,20
128:14 129:2,2 131:8
131:25 132:6 133:5,8,8
133:16,17,22,24 134:7
134:10,12,13,18,25
135:15,15,17,19,20
136:22 137:10 140:25
142:20 143:5 144:25
146:13,18,18 150:4,12
151:8 155:17 156:25
158:4,13 161:6 165:1
**knowing** 17:7 150:9
**knowledge** 26:18 49:10
49:11 62:12 64:21
121:4 123:8
**known** 89:9 102:21
154:24 155:4
**knows** 128:23
**Kristi** 69:10

**L**

**L** 167:22
**label** 95:7
**labeled** 19:1 21:14
**Lakes** 165:23
**Land** 165:23
**landed** 89:25
**laptop** 107:19
**Large** 1:20
**law** 20:24 27:17 30:16
39:8 43:17 95:24 103:2
122:16 138:17 145:4
145:20 146:2 157:6
159:6 165:21,22
**Lawfully** 141:7
**laws** 149:8 150:3
**lead** 47:11,13
**leadership** 50:9
**learn** 26:5 29:6,11
149:12 150:1,25
**learned** 149:11
**leave** 48:17
**left** 38:17 42:9 90:19
92:13 154:17
**left-hand** 97:4
**lengthy** 130:8
**LEO** 141:9 146:6
**Lero** 69:14
**let's** 24:1 28:24 32:20
51:24 104:5,22 107:18
115:23 116:4,7,11,17
123:6 143:23
**letter** 14:1,3,10,12 15:1
**letting** 140:22
**level** 30:7 51:10
**levels** 96:21
**liaison** 41:9,12,21 42:2
42:10
**lieutenants** 49:23
**life** 10:22
**light** 74:22
**limit** 23:22 24:7
**limited** 24:12
**line** 44:14 78:4 86:7,8,10
89:11 145:15 150:18
154:5 157:16 159:24
160:6,19 164:15 172:2

**lines** 93:8 106:1 122:4
145:13,14 165:2
166:14
**link** 42:5 100:25
**linked** 45:1 90:10
**Linx** 28:9 155:2
**list** 29:10 32:23 41:2,3
50:25 51:6,18 61:22
62:9 64:3,3,18 68:8,14
81:8,13 154:1
**listed** 85:22 100:22 101:2
136:13
**listen** 120:22 123:6 141:6
**listening** 143:2
**listings** 97:5
**lists** 39:13,24 50:12,16
**literally** 98:17 157:18,20
**little** 7:9 10:2,3 20:1 26:9
27:14 33:11,15 38:8
46:20 56:16,17,19
57:12 61:15 66:23 67:9
75:11 79:13 108:6
130:24 165:16
**lived** 66:24
**lives** 36:14 66:24 74:12
**living** 26:19
**Lloyd** 69:14
**locate** 35:13 166:23
**located** 31:17 89:21
90:10 146:11
**location** 10:18 26:5,14
35:4,15 58:21 95:9
**locations** 60:10 71:11
73:18,22
**lock** 74:11
**log** 97:2 98:8,11,14
**long** 6:20 7:7,17 9:1
11:11 25:4 101:12
103:8 162:20
**long-term** 10:7
**longer** 25:12 61:2 130:1
**look** 16:16 18:18 19:5,20
23:16 28:17 40:7 49:16
53:6 60:20 67:6,21
71:3 75:25 77:6 78:1
80:21 82:16,23 85:4
89:9 90:19 92:9 95:14
98:8,11,14 100:13
102:4,17 103:22
105:22 109:2 122:16
130:18 132:8,13 136:9
141:6 145:7 148:19
149:2 150:14 151:10
152:22 153:22 154:5
164:4 165:12 166:14
**looked** 6:12 58:6 89:3
166:5
**looking** 25:24 27:18 29:1
29:3 76:2,9 82:22 83:7
83:15,18 85:15 90:3
94:3,4 97:1,14 98:13
130:2,18 157:10 165:7
**looks** 51:13 101:13,21
103:1,10,24 104:3,3,8
106:10 108:24 114:14
117:10 131:8 148:7
155:7 158:6 159:18,18
**loosely** 41:20
**loss** 12:13 13:13,23 15:6
**lost** 13:16
**lot** 38:18 90:2,12
**loud** 19:9 53:10 78:5
**loving** 161:3
**Lozado** 160:15
**Lozado's** 161:14

**M**

**M-C-D-O-E** 127:8
**M-C-D-O-U-G-A-L-L**
127:8
**ma'am** 113:7
**Madden** 71:12,14
**maintain** 26:22
**making** 32:10 35:3 82:9
82:12 91:18
**male** 109:16 111:1,23
112:1,17,20,23 113:1,6
113:23 115:23 116:1
116:11 140:18,22
142:11 158:9
**man** 139:13,15
**manifests** 56:22
**manual** 4:2,3 16:19,20
17:9 19:14 25:22 27:9
40:4 52:19 58:6,7
60:19 77:7,10,13,24
78:13,17,17 79:15,24
**marijuana** 54:3 120:13
131:12 133:20 134:10
135:2
**marked** 16:13 52:9,15
85:1 92:7 97:12 100:11
102:7 103:20 136:7
147:23 159:10 162:10
165:5
**mass** 34:9 66:6 149:12,25
**master** 77:13 78:16
**mastery** 149:14
**math** 8:16
**matter** 53:18 101:1
132:21
**matters** 133:5
**McDougall** 102:11
103:25 104:16 106:5
131:23 160:7 166:11
166:12,19,24
**McDougall's** 102:8
108:24 136:12 166:23
**mean** 8:11 10:5,16 11:17
11:18,23 12:13,23
14:11 15:5,6,10 18:6
20:23 22:5,23 25:7
27:23 28:4,4,5,12
29:25 31:14 32:7,10,12
32:13 33:21 34:25,25
35:3 37:6 41:14 48:8
50:10 54:4,18 55:11
56:16,16 58:2,17,18
61:12,12 62:2,2,14,23
63:21,22 65:17 66:22
66:25 69:12 70:16
71:16 73:13,21 75:16
75:18,18 76:17 79:8
82:19,19 83:4,5,12
86:14 88:13 89:3 90:8
90:12 91:10,12,13
93:13 94:20,22 95:6,8
95:25 96:7 97:8 99:20
99:25 100:22 101:20
111:17 117:14 119:14
119:22 120:7 121:3
124:20 126:23,24
128:14 129:2 131:14
132:24 133:25 135:13
142:4 145:5 150:2
158:6 160:10 161:2
162:1,7 163:24,25
164:25 165:1
**means** 98:12 103:3
**meant** 44:9

media 41:16 156:13,14
  156:16,20,24
meet 48:18
meeting 23:5 46:1,2
  48:19,21,23,24 49:1,1
  49:3,7,9,13,14 50:24
  51:4,16 68:22 69:7,11
  69:16,24 85:17
meetings 45:11,24 46:18
  47:11,18 48:1 49:12,21
  50:3,3,8,13 51:21
  67:13 68:11,15,19 69:4
  69:19 70:4,7,11,19
  72:15,18 85:7
meets 41:7
member 17:23 26:4
  27:11 33:3 37:14,21
  38:11 40:19 41:8,10
  42:5 43:16 44:23 48:2
  77:22 91:22 148:7
  150:15 153:7,11
members 29:13,17 30:5
  40:11 51:15,25 57:17
  60:23 62:20 63:13
  65:12,13 67:12 69:23
  77:12 86:17
membership 51:17
memo 11:7
memories 89:2
mentality 53:19
mention 110:21
mentioned 21:7 38:23,25
  41:5 58:17 61:1 64:2
  72:13 80:23 150:12
  160:7,12
mentions 94:7
message 10:17
messages 158:24
method 74:4
methodology 17:2
methods 76:18
Miami 2:11
mid 8:7
middle 1:1 19:5 29:1
  96:3
mind 12:15 16:5 22:8
  25:21 28:6 40:5 115:15
  137:21
Mine 137:5
minor 78:10
minute 64:2 108:6,19
  109:4 120:16 160:2,3
minutes 52:5 54:11 109:6
  113:13 117:7 125:7
  127:16 167:7
misdemeanor 54:3,5,6
  145:22
misdemeanors 54:1
missed 70:2 84:17 123:23
  125:14 137:11
mission 10:7 79:9
missions 63:3 71:12
mistaken 137:25
misunderstanding
  105:16
misunderstood 44:5
mobilize 10:13
mobilized 10:6,12
modifications 78:10
mom 13:25 108:10,13
  114:12 124:24
moment 52:1 109:1
  144:24 150:12 166:6
  167:12
month 63:4,7,15 64:10
months 9:22 10:21

morning 5:8 163:9,10
  164:6
mother 15:2,19 132:11
  132:14 140:18
motive 32:15
mouth 41:19
mouthful 26:25
movement 8:21
MPR 153:5,14,24 156:3
MPR's 4:13 148:7
Multiple 66:15
municipal 57:11 69:18
Murphy 41:12

N

N 2:7 3:1 167:22
Nah 123:17
name 5:11 14:5,14 15:18
  16:8 42:22 58:17 64:3
  80:25 82:4 87:20
  106:11
names 62:3,5 86:14
narcotics 118:20 119:12
  135:1,10,11
nature 30:17 93:9 97:25
  100:2,17 102:9
nearly 53:13
necessary 107:12
need 6:2,14 24:20 35:9
  36:22 39:12 44:17
  55:18,22 58:19 78:16
  82:13 84:12 122:20
  123:24 139:18 147:18
  158:1
needed 84:2,22 106:23
needs 20:5 27:17 150:20
negative 13:20 14:24
  15:5 164:18
neither 22:23
network 91:4,24
network's 29:12,14
networking 36:5
networks 31:2 36:1,2
  41:20
never 31:13,13 35:8 42:4
  44:3
nevertheless 70:21 99:9
new 1:17,18 68:3 88:1
  151:18 152:4,17
nexus 11:24 12:6 36:10
night 36:17 59:25 135:25
  164:7
nighties 163:19
nightly 4:15,16 34:8
  65:18 162:14 163:2,5
  165:8 166:9
nine 125:7
NOCCO 1:7 171:5
non-cooperation 115:15
non-law 5:15 28:22
non-zero 29:22
nope 101:11 144:4,4
normally 7:20
Notary 1:20 169:12
noted 94:25 95:5 133:13
notes 94:4 95:8,11 98:2
  98:15 101:6,15 103:5
  151:1 156:5
noticed 67:16
notification 122:14
notifications 133:3
notify 19:22 41:8,13
notifying 20:3 132:15
NPRPD 68:3
nucleus 39:8

number 23:22 24:7 85:25
  88:18 89:5,11,11 92:4
  99:6,7,17 100:25 101:1
  132:18,20,20,21 133:6
  145:7 148:20
numbering 20:17
numbers 85:21
nutshell 24:10 55:11

O

O 167:22
O' 165:23
oath 3:4 52:12 148:1
  169:1
object 12:3 17:15 18:5,12
  19:17 20:16,21:12,22
  23:18 27:24 31:6 34:19
  39:18 41:23 43:20
  45:20 51:20 55:24 57:7
  57:14,20 58:1 59:4
  60:16 62:13,22 63:8,16
  68:17 70:15 71:24 72:8
  72:10 73:3,14 75:7,15
  76:11 77:1,18 80:3,19
  81:9 82:18 83:1,19
  84:4,13 91:1,5,25
  93:20 95:2 99:23 100:7
  103:16 104:19 105:12
  107:6 110:4 111:10
  114:7 115:1,16,20
  116:19 119:13 120:18
  121:25 122:6,24 123:2
  124:2 126:4,12,19
  127:19 128:13,25
  131:7 132:5 133:15
  134:4 147:2 149:21
  151:7 155:15 156:8
  157:7 158:12 159:8
  161:5,15 164:9,24
obligated 30:18 67:12
obligation 26:12 66:3
observation 13:19
observations 131:17
observed 132:10
obstruction 140:5
obtain 83:24 107:12
obviously 6:13 12:23
  15:1 28:11 32:10 47:3
  58:17 80:24 92:11 94:1
  96:17 99:3
occasion 97:9
occurred 28:12 36:15
occurring 36:12 122:17
October 7:10
odd 10:25 11:1
Off-record 107:20
  136:19
offender 21:3,7,9,14,15
  22:4,6,10,23 26:14,15
  37:15,22 38:35 39:12
  39:22 41:2 50:18 54:12
  54:15,23 62:7,11,18,19
  64:6 74:15 75:4,25
  80:8,13 81:21,23 82:10
  82:17,22,23 83:5,14,17
  83:22,25 84:3,7,9,14
  86:15 87:10,13 93:18
  94:17 98:1 99:15,21,21
  100:3,6,20 102:12
  103:12 104:15,18
  105:5 107:11 124:11
  152:7
offender's 73:23 74:7
Offender/Problem
  166:15

offenders 11:23 22:2,2
  26:18 38:8,15 39:19
  42:19 50:20 60:25
  61:17,20 62:1 63:5
  64:2,25 71:10 73:13,18
  80:7 86:17,24 89:20
  154:11,20,24 155:4,4,8
  155:13,14
offenders' 60:7,8
offense 54:5
office 7:8 9:11 17:3,6,12
  18:11 20:14 23:12
  69:18 75:21 148:12
officer 19:15 138:18
  145:4,21 146:3 151:24
  165:23
officers 43:17 45:6,9,14
  45:18 103:3
offices 30:2
official 1:7 69:15 156:19
  169:7 171:5
officials 69:14
oh 2:3 9:3 14:11 19:1
  77:2 78:21 79:14 85:15
  85:24 86:2 89:7,14
  99:3 102:22 109:14
  112:6 117:5,19,23
  118:3,10 129:25
  145:25 159:22
okay 5:8,17 6:6,14,18,25
  7:11,22 8:3,8,15,21 9:3
  9:7,20 10:15,20 11:4,8
  13:1,6,21 15:8,12,18
  15:24 16:2,2,11 17:11
  17:21 18:15,16,22
  19:12,20 20:4,10,20
  21:20,25 22:3,9,14,16
  22:18,22 23:6,11,21
  24:2,14 25:4,21,23
  26:11 27:14,19 28:24
  28:25 30:15 31:23 32:1
  32:22 33:14 34:11,16
  35:17 36:4,22 37:9,12
  37:18,20 38:1,7 39:11
  40:4,6,16,21 41:6,18
  42:1,14,21,24 43:5
  45:18,23 46:3,17,20
  47:17 48:15,18 50:2,11
  51:3,15,24 52:4,14,18
  52:20 53:5,15,24 54:22
  55:9,18 56:2,4 57:10
  57:24 58:6,22 59:23
  60:19 61:1,6,11,11,14
  61:22 62:8,17,25 63:2
  63:19 64:9 65:3,4,8,15
  65:21,25 66:8 67:3,6
  67:21,22 68:3,8 69:13
  69:21 70:2,10,18 71:2
  71:5,14,20 73:8,10
  75:2,24 76:9 77:11,22
  78:3,15,21 79:1,11,13
  79:20 80:6,12,16 81:2
  81:15 82:12 84:25 85:3
  85:8,13,17,20 86:2,7
  86:16,25 87:18,23 88:7
  88:15,21,24 89:5,9,14
  89:16,19 90:14,15,19
  90:24 91:15,22 92:3,6
  92:13,16,18,21 93:7,13
  93:16 94:6,8,23 95:5
  95:12 96:1,3,19,22
  97:1,11,19 98:2,4,7,7,9
  98:16,20,25 99:3,7,9
  99:12 100:10,13,17,20
  101:5,8,23,23 102:1,4
  102:9,11,20,24 103:2

103:11,18,18 104:1,8
  104:10,17,23 105:1,4,8
  105:20,24 106:9,11,13
  106:23 107:3,16,18
  108:12,16,19,22,25
  109:3,5,6,22 110:2,11
  110:14,22 111:8,16,18
  112:6,15 113:18 114:6
  114:10,18 115:6,10,11
  116:7,9,17,22 117:1
  118:10 119:9,17,20,22
  120:15,21 121:19
  122:9,22 123:6,23
  124:5,13,15,22 125:12
  125:15,21 126:7,17,21
  127:16,22 128:17,23
  129:5,17,22,25 130:2,7
  130:11,15 131:3,10,18
  131:20 132:23 133:2,4
  133:8 134:7 135:9,12
  136:2,4,9,15 137:1,4,6
  137:9,14,25 138:5,10
  138:14,16,20,23 139:8
  139:15,17 141:7,8,16
  141:23,23 142:8 144:2
  144:12,14,23 145:1,3,7
  146:7,10,13 147:2,7,12
  147:15,19 148:3,9,15
  148:18,21,23 149:2,6,9
  149:14 150:4,9,12,17,22
  151:10,11,17,22,25
  152:3,7,19,22 153:2,3
  153:15,18,22,23
  154:12,22 155:3,9,11
  155:13,20 156:2,5,11
  156:23 157:21,24
  158:7,24 159:16 160:2
  160:6,12,18,24 161:2,8
  161:12,18 162:8,15,18
  162:22,25 163:8,12,15
  163:22 164:1,12,22
  165:12 166:5,14 167:1
  167:3
old 15:24 88:16 127:24
Once 12:18
ones 13:6 118:15
ongoing 29:11
open 1:12 18:15 53:4
  130:6 157:18 165:21
  167:3
opened 138:15,20
operate 57:12 64:10
operating 53:12 163:12
operation 78:21,23
opine 64:5
opinion 62:15
opinions 11:22
opportunity 26:14 31:1
  80:17 151:5
opposed 5:23 62:11
options 20:8,9
order 36:19,23 39:11
  103:25 148:17 149:15
  158:1
ordinance 71:9 73:11
organizations 68:10
outcome 104:24
outlined 40:12
outside 27:16,19 28:7,14
  42:6 46:13,13 50:4,4
  56:8 57:1,13 60:24
  81:4 82:2
overall 18:9 33:16

P

**P** 167:22
**P.A** 2:14
**p.m** 1:15 163:13,15 167:20
**P.O** 1:23
**page** 3:2,5 4:1 18:19,22 18:23 19:6 25:21 28:24 29:1 40:4 44:14 53:4 60:19 65:3 67:6,21 70:23,24 71:1 77:4 78:1 90:14 104:6 105:22,22 107:7 111:17 130:6,18 136:10 148:19 152:22 153:22 164:1 165:13 171:9 172:2
**pages** 85:22 150:14
**paper** 7:23
**paperwork** 15:3
**paragraph** 65:7,10 71:4 78:6,7 130:22 132:9,14 160:3
**paragraphs** 130:21
**paraphrasing** 61:15
**parentheses** 89:11 132:17
**parents** 90:24
**Park** 2:15
**parole** 69:25 70:3 78:25
**part** 17:7 24:10 29:5,9 31:5 39:24 44:21 57:18 57:24 59:17 60:13 61:14 62:9 64:24 65:13 65:19,22 66:2,3 70:18 84:9 88:4 90:12 91:20 91:24 95:13 101:17 120:22 123:7,25 130:4 150:14,22,24 153:4,19 159:23
**participate** 24:23 48:13
**particular** 42:18 97:9 100:25 108:25
**particularly** 60:23
**parties** 167:24 170:12
**parties'** 170:13
**partnerships** 67:24 68:9
**Pasco** 1:8 7:7 18:10 19:15 43:17 55:14 69:22 145:22 169:3 170:4 171:6
**pass** 151:19 152:10
**passed** 6:6 158:22
**passenger** 160:7,12
**passing** 144:18
**patio** 83:8
**patrol** 7:24 8:10 13:9 23:6 25:3 30:7 31:16 33:21 35:12 46:13 49:23,23 50:6 62:2,23
**Paul** 1:12 4:13 5:1 157:4 169:5 171:17
**pause** 154:12
**paused** 109:20 111:5 112:9 113:11 114:1,20 116:2,13 118:4,24 120:8 121:18 125:5,18 127:3,14 128:9 129:15 137:23 138:12 139:10 141:10,24 142:24 143:9,21 144:5
**pay** 15:6 88:19 162:4
**PC** 106:6
**PD** 68:2
**peering** 83:18
**penalties** 76:23
**penalty** 14:22

**people** 14:6 21:20 23:9 24:22 30:7 31:10,17 32:3,11,17 35:21 36:2 36:17 39:25 49:19 50:8 55:12 58:11,13,24 61:23 62:3 68:9 74:10 74:10 95:21 112:7,7,24 118:14 120:13 134:2 157:9,13 158:15,24 159:4
**people's** 39:17
**percent** 157:18
**performance** 13:19 19:6 25:24 29:2 30:25 32:23 35:19 40:8 43:10,25 44:19,21 67:16 148:7,9 149:3 150:16 152:24 155:22
**period** 53:2
**periodically** 45:6,7
**person** 23:6,8,17,17 24:20 25:5,20 28:10 30:5 31:25 33:25 35:5 35:8,9 36:10,11,13,13 36:15,16,18,20,22,24 39:11 51:12,13 54:11 54:19 58:16 59:14 63:21,23 64:14,15,18 64:21 74:11,20 76:1,15 81:7,19 82:22 83:7 87:10,21 90:22 101:21 144:10 158:5,6 160:15
**person's** 20:5 35:7 39:9 58:16,19
**personal** 92:25
**personally** 11:18 31:11 41:9 42:4 156:16,17 169:5
**personnel** 68:15
**perspective** 56:11 122:13
**phases** 152:6
**philosophy** 18:10 43:13 44:4,22 53:7,12 151:21 152:12,20 153:17,19 154:11,14
**phone** 114:3 118:6 119:3 144:7
**photo** 89:2
**photocopy** 15:1
**photos** 157:23
**physical** 103:2
**physically** 45:16
**pick** 104:2 140:17,19 143:3 154:17
**picked** 130:15
**picking** 31:21
**pickup** 103:24 106:6
**piece** 7:23
**Pinellas** 70:3
**pissed** 114:13
**place** 1:17 14:15 15:13 106:6
**places** 55:12
**Plaintiffs** 1:5 2:5,9,13 171:3
**plan** 75:21
**play** 45:19 110:22,24 116:7 120:5 121:1 125:15 130:9
**played** 43:25 91:20 107:21 108:3,7,20 109:8 110:25 113:20 136:20
**please** 5:19 18:23 53:9 65:3 78:5 140:24 142:21 143:6 149:9

**pleasure** 151:10
**pleasure** 151:18
**PO** 121:12 123:16 124:21 127:7
**point** 11:5 12:4 20:22 21:11 27:15 29:16 30:24 32:22 37:6 41:6 46:11 52:2 61:13 80:15 80:16 88:8 120:19 121:22 128:23 129:3 143:13 161:22
**pointless** 120:17
**points** 20:24,25
**police** 68:2,3,7 69:19,21 118:21 140:10,11
**policing** 16:19 17:2,8 18:10 56:5,7,8 57:3,19 57:24 152:18
**policy** 17:6,8,12 29:17,20 29:23,24 30:19 55:1 56:23,24,25 57:4 101:19 144:19
**POR** 13:17,18,20 14:24 14:25 15:5
**Port** 1:17,18 68:2,2,3
**position** 8:18 11:18 24:21 72:2 154:9,13,14
**positions** 7:18
**possession** 54:3
**possible** 88:12
**possibly** 83:99 99:18
**posted** 30:2
**posters** 30:1
**posting** 65:22
**potential** 20:15 157:13
**Poulton** 2:14,14 12:3 17:15,18 18:5,12 19:17 20:16 21:12,22 23:18 27:24 28:3 31:6 34:19 39:18 41:23 43:20 45:20 51:20 52:2,4,7 55:24 57:7,14,20 58:1 59:4 60:16 62:13,22 63:8,16 68:17 70:15 71:24 72:8,10 73:3,14 75:7,15 76:11 77:1,18 80:3,19 81:9 82:18 83:1,19 84:4,11,13 90:7 91:1,5,25 92:4,6 92:22 93:20 95:2 98:7 98:19,22 99:23 100:7 103:16 104:19 105:12 105:15,20 107:6 110:4 111:10 114:7 115:1,7 115:11,16,20 116:19 119:13 120:18 121:25 122:6,24 123:2 124:2 126:4,12,19 127:19 128:13,25 131:7 132:5 133:15 134:4 135:15 136:17 139:18 143:15 147:2,21 149:21 151:7 155:15 156:8 157:7 158:12 159:8 161:5,5,15 164:9,24 167:3,5,17
**Poulton@debevoisepo...** 2:16
**PowerPoint** 79:7 85:10
**practice** 27:11 133:7
**pre-AIM** 48:23 49:1,7 49:12,21 50:3,8,12,24 51:4,14,15,16
**prep** 6:13
**prepare** 6:8
**presence** 39:9 56:13 135:10,11

**present** 51:11 52:14 68:19 69:4,11 167:24
**presentation** 85:11
**presented** 49:8
**presenting** 48:6 51:8
**pressure** 74:14
**presumably** 138:8
**pretty** 41:11,14 75:19 161:8
**previously** 41:13
**primarily** 33:15,16 72:19 73:2
**Primrose** 104:14 106:3
**principles** 43:19 155:22 156:6
**printed** 85:10
**printout** 92:11
**prior** 46:23 47:7 51:8,14
**prioritize** 58:10,13
**priority** 9:18 96:4,6,12 96:17,18
**privileged** 144:21
**pro-arrest** 53:7,13
**proactive** 60:4,5,17
**probable** 30:2 53:14 54:16,23 57:5 107:4,13 133:20 145:11 149:13 149:15 150:1,5
**probably** 8:7,11,12 9:5 13:10 16:4 21:5 35:24 45:17 46:15 61:9 88:19 121:5 123:9 124:10
**probation** 28:6,7 66:25 69:25 70:3,6 78:25 104:4,21,25 105:10 124:14,17 125:3,11,22 126:3,11,15,18 127:2 127:18 128:8,12,15,24 130:13,16 131:1,5 134:2,15,20 135:4,5 136:14 137:16,17 138:1 145:6,22 146:21 166:16
**problem** 26:13 71:11 73:18
**PROCEEDINGS** 1:12
**process** 20:2 61:25 65:14 80:12,16 119:15
**program** 65:21
**prolific** 21:3,7,9,13,14 22:1,4,6,10,23 37:14 37:22 38:8 39:19 41:2 42:19 50:18,19,20 54:23 60:7,8,24 61:16 61:19 62:1,7,11,18,19 63:5 64:2,6,25 71:10 73:12,17,23 74:7,15 75:3,25 80:7,7,13 81:21,22 82:9,17,21,23 83:4,14,17,22,25 84:3 84:7,9,21 86:15,16,24 93:18 94:17 98:1 99:15 99:21,21 100:3,6,20 102:11 103:11 104:15 104:18 105:5 107:11 124:10 152:7 154:11 154:20 155:4,8,14
**promoted** 8:9
**promotion** 45:1
**properties** 58:8,11,11,23
**property** 8:19 59:10,14 82:16 161:21
**prosecution** 135:1
**protective** 113:17
**protocol** 101:17
**provide** 37:23 47:5 55:18

133:20
**provides** 132:17 155:24
**providing** 48:2
**PRPD** 68:1
**PSO** 4:9,11 60:23 77:13
**Public** 1:20 4:9,11 169:12
**pull** 16:11 90:9,10 107:16
**pulling** 54:9
**purpose** 32:6 34:16,22 44:10 48:23 55:9 61:14 66:20 81:24 93:24 94:15 104:17 105:2 106:15,20 131:18,21
**purposes** 72:22 95:18 101:21
**pushed** 165:21
**put** 11:7,10 20:5 25:15 25:16 33:22 41:18 50:25 51:5 66:5 95:8 96:23,24 101:15
**putting** 11:11 33:25 34:1 51:12 74:14

**Q**

**qualify** 20:23 22:6
**Quarterly** 80:2
**question** 5:22,23 6:1 8:24 21:6 34:21 35:14,22 37:18 39:21 40:25 42:3 42:17 44:5,9,14,17 54:22 63:12 72:21 74:2 84:18,18 86:16 93:6 94:24 95:18 106:19 108:9,17 115:7 134:17 134:23 135:19 147:8 155:21
**questions** 7:2 38:19 48:13 77:9 108:1 167:12
**quick** 86:8 136:18 137:22
**quicker** 66:23
**quickly** 7:14 19:8 55:4 97:1 103:22 110:24 162:12 167:2
**quit** 10:23
**quite** 16:9
**quote** 24:7 26:12,18,22 33:4 37:13 60:9 61:16 63:3 64:21 143:23

**R**

**radio** 97:2 98:8,11,13
**ran** 165:2
**rank** 7:15 9:2,3 23:12 72:6
**ranks** 8:22
**rapidly** 8:17
**rapport** 26:22 31:2 32:3 32:6,16
**rarely** 51:21
**reach** 25:5
**read** 19:8,10 27:14,25 44:12,14 53:9 60:21 65:9 71:6 78:5,14,14 79:22 86:8 104:12 106:1,2 107:10 131:14 145:12 147:6 149:9 150:18 151:13,13 153:15 154:8,17 160:3 164:15 167:17 171:11
**reading** 28:4 93:25 94:2 104:20 124:16 135:13 146:1,5 153:10 164:25 167:25

ready 107:23 167:8
Reagan 1:12 4:13 5:1,8
  117:8,14,22,25 118:12
  118:18 119:24 120:7
  121:3,8,11,16 123:8,12
  123:15,20 124:24
  126:23 127:1 128:5
  129:8,11 136:22,24
  137:16,19,21 138:25
  141:21,23 142:14,18
  144:4 150:20 156:12
  157:4 169:5 171:17
real 110:24 136:18
  137:22 158:6
really 11:25 14:8 25:7,15
  30:7 38:13 39:14 54:4
  55:4,21,25 63:22 80:4
  83:3 91:14 109:19
  111:4,20 125:1 129:6
  151:25 156:25 167:2
realtime 65:25
rear 82:24
reason 10:22 16:5 24:20
  36:4 42:9 54:7 100:5
  103:11 106:14 109:10
  119:10 123:25 150:22
  150:24
reasonable 164:16,25
reasons 21:15 83:6 150:7
recall 11:25 13:25 14:2,8
  14:21,23,24 15:18,21
  16:1 25:16 28:21 39:5
  40:1 42:18 69:9,15
  70:10,16 79:6 80:15
  83:14,17 87:20 88:1,2
  88:6 90:8 106:17 166:1
receive 48:5 78:9 157:14
  158:15 160:21
received 13:17 15:3
  159:25
receiving 15:1
recognize 52:15 97:15
  108:13 109:22 116:4
  116:22 118:6 125:7
  137:1 139:12,15
  147:25 148:4
recommend 81:5,7,12
recommendation 150:15
  160:18 161:12
recommendations
  161:24
recommended 91:23
  150:25
recommending 160:21
recon 10:1
reconnaissance 9:17
record 52:7,11 99:20
  113:16 115:9 136:18
  139:9 144:19 151:23
  170:9
recording 144:22
Records 4:9,11
red 141:21,22 142:2,3,4
refer 61:7 102:18 155:4
reference 6:10 23:25
  95:10 99:3,10,10
  104:15 106:4 120:12
  129:22 145:22 166:11
referred 21:10
referring 23:24 50:18
  83:4 161:19
refused 145:16
regarding 37:24 106:5,6
  131:22
regardless 9:1,3
regular 33:18 35:21

regularly 34:2,7 63:3
  65:13
rehashing 77:9
related 32:24 33:5 37:2
  37:19 40:12 99:16
  101:3 135:2
relates 87:13
relating 34:17
relationship 32:8,9 82:14
relationships 32:16
relative 170:11,13
relay 64:17
relayed 43:2
released 82:1,3
relevant 38:11 41:1
  124:9 134:19,21
rely 31:9,11,12
remain 27:5
remains 149:12
remember 11:9,10 14:5,7
  14:9,12,13,14,25 15:24
  16:3 34:14 42:21 68:21
  69:6 81:17 88:2,11
  90:11 121:7 123:11
remembered 14:11
removed 81:12
repeat 34:21
rephrase 49:4,6 156:19
replace 20:9 23:8 25:19
replaced 25:10 62:7
replacement 19:23 24:24
  25:18
report 4:5,6,7,8 13:19
  31:25 100:2,18 103:6
  103:22 104:6,9 105:23
  106:10,20 107:10
  121:5 122:20 123:9
  124:16 130:2,4,14
  131:10,14,19 132:3,10
  132:21 133:5 135:1,24
  136:11 145:3,10 147:4
  147:6 163:2,3,16 166:9
  166:21 170:7
reported 1:19 123:1
reporter 1:19 3:4 5:20
  66:9 139:7 170:1,6,19
reporting 1:22 33:24
  106:13
reports 34:3,8 65:18
  133:14 135:8 148:8
  163:18
repository 33:18 34:18
representative 69:6
representatives 68:11
reprimand 15:4
request 157:14,16,22
  158:1,15 159:5,6
requests 157:11
required 30:19 33:4 37:1
  37:4,22 46:3,5,8,12
  60:6,17 79:22 88:7
  144:22
requirement 29:11 33:10
  33:16 59:20
requirements 41:7
requires 57:4
reread 78:14
research 66:22
researching 156:13
residence 10:11 73:23
  74:6 75:2 76:16 103:9
  133:21 134:3,11
  136:13
residences 10:10 39:17
  60:7
residential 43:7 47:8

106:6
residents 74:14
resisting 140:25
resource 45:6,8,13,18
  128:19,21
resources 27:5 28:8
  35:13 47:4 48:10 155:1
respect 35:19 37:3
respective 167:24
respond 10:17 34:14
  60:10 153:8
responded 95:9 106:3
responding 56:15 59:5
  60:6,8
responds 101:21 125:13
response 53:21 55:8
  93:14 95:7,24 114:24
  120:4,25 122:3,10,23
  124:13 136:12 139:16
  149:6 154:5 155:24
  156:9 165:25 166:2
responses 34:1
responsibilities 70:19
  72:25
responsibility 32:2 39:24
  59:17 87:13 122:15
  163:22
responsible 89:22
rest 50:5
restart 120:21
restroom 147:20
result 62:20 131:5 133:11
resulted 12:22
results 163:16 164:18
resume 141:17
resumed 111:19 112:16
  113:20 114:11 115:22
  116:8 117:2 118:11
  119:21 120:23 124:23
  126:22 127:5,23 129:7
  137:15 138:11,24
  139:20 140:7 141:18
  142:9 143:4,17 144:3
resumes 125:16
reverse 148:17
review 33:20,22 44:21
  62:9 64:13 67:17 81:7
  132:24 145:3 157:23
reviewed 34:2,7 153:13
reviewing 15:1
reviews 44:19 148:10
Richey 1:17,18 68:2,2,3
ride 152:3
right 5:11 6:7 7:20 9:4,10
  13:14 15:14 17:13
  18:18 19:4,24 21:3
  24:5 27:2,8,12 29:18
  30:20 32:25 43:13
  50:17,19 52:11,21
  53:20,22 55:7 60:24
  61:2 62:21 64:7,24
  67:19 74:3 76:5 78:11
  79:22 80:18 85:18,25
  86:6 88:24,25 90:4
  98:22,22,23 105:1,6,10
  106:21 107:23 108:2
  111:22 112:24 113:7
  114:16 117:18 120:5
  121:1,15 122:14
  123:19 125:8 126:18
  128:20 129:14 131:23
  135:2,7 136:24 137:21
  138:1,6,18 140:13
  141:7,21 142:22 143:1
  143:7,19,23,25 144:7
  144:15 145:12 146:8

146:21,25 150:10
  152:20 153:5 154:3,15
  158:17 159:25 160:8
  162:5 165:15
Rjohnson@ij.org 2:4
road 2:7 8:10 54:10
Rob 167:1
Robert 1:4 2:2 88:25
  90:20 94:1,7 95:10
  171:2
role 29:6,10 43:25 45:18
  46:18 72:6,9
Rotating 163:1
rotten 21:6
round 48:14 139:24
routine 81:22 96:10
rules 5:19
run 47:18 129:12
rundown 144:25
Rune 69:14

                 S
S 2:10,11,15 4:1 167:22
S10 160:8,10
safety 32:18
sarcasm 16:4
Sarge 144:11
sat 51:21
saved 156:25
saw 110:15 112:12 113:7
  117:4 135:21
saying 5:21 10:17 20:7
  23:16 78:6 105:17
  115:4 120:14,24,25
  123:3 124:21 126:24
  129:2
says 19:6,21,24 27:15
  28:18 29:16,25 30:25
  31:3 32:23 37:6 40:8
  40:14,20 41:6 43:3
  53:7 60:20 61:6,14
  63:2 67:7,23 71:9
  73:11 77:6 78:12 86:10
  92:13,14 93:9 96:4,6
  97:2,4 98:9 100:3
  106:2,7 120:10,11
  130:24 132:14 135:8
  135:21 137:12 139:12
  143:24 146:5 147:11
  153:7 156:12 159:24
  160:6 161:1,20 164:1,4
  165:19 166:15
scale 20:22
scanner 12:25
scenario 30:18 32:21
  119:23 122:12,18
  145:2
scene 74:5 75:18 124:17
Schell 129:24
Schell's 126:24 129:12,21
school 45:6,8,13,18
schools 45:16
seal 169:7
search 10:11 12:12,20
  13:1,22 88:5 96:2
  133:20 134:3 138:4,6,8
  146:19,24 165:20
  166:22
searched 133:9 147:5,11
searches 12:17
searching 157:20
seat 12:21
second 30:24 40:7 65:7
  71:3,4 78:6 151:12,14
  153:15 156:11 160:19

seconds 136:15 138:10
secret 157:8
section 19:13 25:25 94:5
  153:12 165:15
see 10:25 12:8,22 16:11
  18:17 27:18,22 29:2,25
  30:15 32:2 36:6,15
  43:3 53:6 58:24 64:1
  67:7 68:13 74:4,17
  76:23 81:5 85:25 86:10
  87:4 89:16,23 90:20
  93:8 95:21,24 96:3
  101:7 105:25,25
  107:16 109:12 111:24
  112:2,24 113:3,5
  114:16 126:23 128:6,7
  128:15 132:25 134:1
  136:3 151:2 152:24
  159:23 162:1 166:23
seeing 89:2 162:2
seeking 28:22
seemingly 80:17
sees 113:10
segment 110:2,8 119:2
seized 26:15 134:11
  135:25
selected 19:24
selection 93:15
Self 92:15 97:18
self-dispatched 104:14
self-initiate 59:18
self-initiated 59:3,15
  92:17 93:24 97:20
  100:15 102:7
Semoran 2:15
send 20:8 45:13 62:3
  66:10 157:11
sense 22:8 47:24 89:16
sent 15:2 23:4 60:3 62:5
  66:23 157:16 159:17
  165:10
sentence 27:21 28:17
  53:9,19 60:21 63:2
  65:9 73:10 78:7,12
  104:12 132:13 145:12
  145:17 149:9 151:12
  151:14 153:15 154:18
  154:22 156:11 160:20
sentences 27:25
separate 22:3 164:22
separately 155:6
September 161:11 164:7
  164:7
sergeant 10:14 14:12
  49:24 102:22
sergeants 49:24
serve 95:13,16
service 71:16,17
services 10:1 28:18
set 13:16
seven 7:9,9
seventeen 15:25
sh- 131:15
Shaker 2:3
share 48:9 65:12,16 66:2
Sheet 3:5 172:1
sheriff 1:8 14:1 55:22
  171:6
sheriff's 7:8 9:11 17:3,6
  17:12 18:10 20:14
  23:12 69:18 148:12
shift 54:13 58:21 162:16
  162:20 163:7
shifts 162:18 163:1
shit 14:2
shoot 9:5 12:24

**Short** 52:8 147:22 167:9
**show** 107:25 128:1
**showing** 127:11
**shows** 124:25 146:6
**shut** 144:14
**Shutting** 144:4
**side** 97:4 109:10 110:3,8 110:16
**sign** 165:2
**Signature** 3:5 171:9
**significant** 151:18 154:2
**signing** 167:25
**signs** 102:19
**similar** 12:2 97:14
**similarly** 64:10
**Simple** 145:23
**Sims** 69:10
**simultaneous** 139:3,21 140:8,15,20 141:4 142:12,16
**sir** 93:10 138:19 146:9
**sit** 23:4,5 45:11 50:7 60:2 112:20
**sites** 95:23
**sitting** 69:10
**situation** 53:13 93:3 114:6
**six** 9:22 10:20 13:10
**skills** 155:1
**Sky** 160:15 161:14
**slide** 79:8 88:22 90:4,16 91:18
**Slides** 4:4 85:9
**slips** 16:5
**slowly** 5:19
**smaller** 49:19
**smoking** 120:1,13
**snack** 7:1
**snacks** 7:5
**social** 36:1,5,5 41:16 91:4 156:13,14,16,20,24
**solely** 24:12
**solution** 27:4,17,17
**solutions** 28:22
**solvability** 154:25
**somebody** 10:8 20:5 22:22 31:22 39:7 53:25 54:10,12,15 58:15 64:14 66:18 80:9,9 81:6,12 83:10 87:9 95:7 133:19 157:20 162:5,22
**somebody's** 83:10
**someone's** 41:2
**somewhat** 42:12
**son** 14:2 141:15
**soon** 19:21,22
**sorry** 18:6,24 19:2 21:2,4 24:25 30:23 34:21 35:22,23 37:5 39:21 49:5 54:21 56:3,24 78:6,11,11 79:4 80:20 84:17 91:16 93:7 94:4 99:8,24 105:1 124:5 132:24 134:16,17 137:11 139:19 143:16 146:4 148:22 151:15 152:22 155:12 156:2 159:22,23 161:10
**sort** 8:21 17:5,12 18:3,9 33:18 40:7 42:5 50:8 55:18 63:5 71:3 74:22 76:7 77:9 90:19 92:21 96:3 106:24 107:3 135:1 151:4
**sound** 6:3 111:11 116:20

**sounded** 43:15 44:8 111:8 114:22
**status** 8:15 114:22
**sounds** 108:15 119:8 120:14 122:1 128:14 144:10
**source** 39:8 92:14,15 97:17
**sources** 81:4
**speak** 5:19 45:6,8 88:12 119:18 155:5
**speaking** 43:9 60:1 64:13 82:2 120:11 137:19
**specific** 35:2,15 39:3,6,10 42:19 56:12,15 58:21 59:24 64:18 72:11 86:17 91:18 94:24 133:1 151:19 152:10 155:21 162:4,7
**specifically** 22:2 33:24 63:22 69:12 79:12 91:19 96:8 102:21 154:10
**spending** 58:20
**spot** 20:5 113:19
**spots** 20:6
**spotted** 124:7
**spreadsheet** 85:6
**spree** 88:4
**sprees** 47:1 55:12
**Springs** 68:7
**Squad** 42:23 43:6
**SRO's** 50:4 70:1
**stamp** 18:18
**stamped** 18:17 98:17
**stamps** 98:13
**stand** 96:1 129:12 151:23
**standard** 83:4
**standing** 113:6
**STAR** 4:3,15,16 8:5,9,13 8:19,25 9:1 12:2 14:16 15:14 17:10,23 23:6,24 24:1,4,8,10,25 26:4,5,7 26:13,23 27:11,11 28:20,21 29:6,10 30:13 30:15 31:5 32:1,4 33:3 33:12,13,15 35:11 37:19,21 38:11,12,22 41:10,13 42:15 43:16 44:23 45:5 46:6,9,13 46:17 47:14 48:2 49:24 49:25 50:5 51:25,25 52:19,25 53:12,15,25 55:2,5,9,13 56:5,7,8,11 57:1,1,3,13,13,17,19 57:22,24 58:2,3,10,22 59:7,18 60:2,5,22 61:4 61:6 62:2,9,20 63:3,13 65:11 66:4,5,13 67:12 69:21,23 71:11,13 72:2 72:3,22 73:18 77:12,22 77:24 78:17 79:2,3,4 79:15,22,24 86:18 87:3 89:21 91:20,22,23 97:5 97:5,6 102:20,22,23 152:16 154:13,23 159:24 161:22,24 162:14 163:10,12,25 163:25 164:8 165:8 166:9
**start** 55:7 70:24 115:8 123:7 136:15 148:16 159:16
**started** 7:24 8:2,25 43:15
**starting** 7:15
**starts** 27:19
**State** 1:20 169:2,12 170:3

**STATES** 1:1
**status** 24:18 124:10,11 124:11
**statute** 40:13,16
**statutes** 149:8,10,11,15 150:3
**statutory** 40:18
**stay** 24:17 130:6
**staying** 8:23 82:5,13 87:16 131:19
**Ste** 2:3,7,11,15
**stenographically** 170:7
**stipulated** 167:23
**Stipulation** 3:3
**stir** 115:23 116:5,11,17
**stole** 160:16
**stolen** 160:11,13
**stop** 27:8 145:24 164:17 164:19 165:2
**stopped** 47:12 127:16
**stops** 149:13,16 150:2,5,7
**strategic** 55:8 60:20 67:23 68:9 71:10 73:12 73:17
**strategies** 70:24 71:7
**strategy** 58:20 71:1
**street** 8:4
**strike** 45:4 54:14 56:5 62:18 65:25 134:23 166:8
**striking** 165:21
**strive** 26:12
**stuff** 5:18
**subheading** 40:8 67:7,23
**submit** 138:4
**Subpart** 151:12
**SUBSCRIBE** 171:12
**SUBSCRIPTION** 171:13
**subsection** 150:19 154:1
**subsequently** 130:25
**substance** 135:21,25
**success** 156:13
**successful** 44:25 94:12 98:5 101:10 164:13
**suggest** 131:11 147:4
**suggested** 119:6
**suggesting** 121:23 122:1 150:6
**suggestion** 120:16
**suggestions** 23:8
**Suite** 1:17
**Suites** 1:17
**supervision** 118:20
**supervisor** 153:14 155:25 156:1
**Supervisor's** 150:15
**supposed** 12:1 67:19 77:19 153:12
**sure** 5:17,20,21 12:13 17:21 22:14 24:3 30:16 32:11 34:13 37:8 45:10 52:6 53:11 79:8,9 82:8 82:12 90:6 143:23 147:8,21 161:16
**surveillance** 9:16,18 10:7 10:9
**suspected** 36:18 43:5 74:21 89:25 94:24 135:11 160:15
**suspects** 156:15
**suspension** 15:6
**suspicion** 84:8,12,22 164:16 165:1
**Sustained** 71:25
**SW** 95:25

**SWAT** 9:22,24 10:10,10 10:23
**switching** 130:3
**sworn** 5:2 43:16 103:2 169:6
**system** 20:18 28:9 55:2 58:15 80:15

---

**T**

**T** 4:1 167:22,22
**table** 48:14 51:19
**take** 6:2 18:25 25:4,12 50:6 51:3,5 73:20 85:4 100:13 102:4 103:22 132:8 136:9 140:4,13 140:23 147:19 160:2,3
**taken** 5:13
**talk** 6:15,18 7:4 21:10 35:9 36:15 51:24 67:17 79:13 88:8 106:15,20 118:22
**talked** 38:7 50:16 65:19 67:9 165:16
**talking** 20:10 21:2 49:16 49:17 74:19 88:6 110:11 135:9
**talks** 53:19
**Tammy** 1:3 110:11,13,14 114:23 115:2 137:8 138:15 140:17,24 141:1,6,6,12,19 142:10 142:18 143:13 145:4 165:16,19,20,22 171:1
**Tammy's** 115:15
**TAMPA** 1:2
**target** 19:21,22,23 20:6,7 20:9 21:3,11,16 22:4,6 22:10,11,20,22 23:1,13 24:24 25:10,17 37:13 37:14 55:8 58:8 60:24 61:16 63:4,4,6,10,15 64:9 71:10 73:12,17 154:20
**targeted** 36:20,24 56:12 56:18 64:9
**targeting** 22:12 154:23 155:3
**targets** 9:19 20:10,15 21:21 23:22 24:4,8,14 36:2 37:2 38:5,7 154:21 155:8
**Tarpon** 68:7
**task** 149:16
**tasked** 91:17
**Taylor** 1:3 6:10 171:1
**team** 4:3 8:13,25 9:1,10 9:14,17,17,22,23,24 10:1,5,10 11:6,6,7,8,21 14:16,17,20 15:14 17:10,23 24:4,8 26:4 28:21 29:6,10 31:5 32:2 33:3 35:11 37:19 37:21 38:11,22 41:10 41:13 43:16 44:23 45:5 46:6,9,17 47:15 48:2 49:24,25 50:5 51:25 52:19,25 55:2,5,8,10 56:11 57:17 59:18 60:2 60:22 61:4,4,6,20 62:9 62:20 63:3,7,9,13 65:11 66:13 67:12 69:21,23 72:22,22 77:12 77:22,24 79:2,4,22,24 86:18 87:3 89:21 91:23 161:22 163:10,12

**team's** 10:10 24:11 60:5
**teams** 55:14 62:2
**technical** 146:4
**technically** 145:14
**technique** 73:24
**techniques** 95:20
**telephone** 2:2
**tell** 5:2 6:25 7:2 10:3 12:19 20:1,21 36:7 56:10 66:24,25 85:4 86:9,13 92:14 95:9 96:16,20 97:22 98:12 99:7 100:14 104:1 107:5 153:8,11 159:17 160:3
**telling** 48:11 104:5
**ten** 85:22 127:16
**Tender** 161:3
**tenets** 18:3
**tenure** 33:11
**term** 13:15 45:23
**terminology** 9:10 105:13
**terms** 7:17 10:6 31:17 59:5
**terribly** 63:12
**test** 6:6
**testified** 5:4
**testimony** 170:9
**thank** 92:6 167:11,15
**thefts** 43:7
**they'd** 67:1 119:10
**thick** 148:3
**thing** 10:23 12:14 28:5 44:7 48:21 54:4 58:18 128:2 151:4 163:7 166:14
**things** 19:15 20:23 21:13 23:15 31:17 57:3 63:19 82:1 95:21,23 146:10 147:18 152:5 155:5 158:16 162:2,4
**think** 7:11 9:5 11:22,23 12:4,5,5 13:17,24,25 14:3,17,19,23 15:10 16:9 21:14 27:16,19,25 29:24 30:3 35:1 36:8 38:8 40:16 41:4 46:10 54:4,18 64:15 67:1,16 71:15 74:3 76:12,13,14 78:20,23,23 81:14,16 82:14 83:2,12 85:20,23 88:1,5 93:21 95:20 96:8,9,15,17 98:8,12 99:18 100:5 103:11 105:15,19,22 106:14 107:11,24 109:3,3 111:17 117:10 118:17 119:22 120:15,19 122:19 124:14 129:9 130:6 132:25 133:16 135:13,19 143:24 146:12 148:16 149:18 152:23 161:4,8 167:14
**thinking** 21:3 28:14 35:1 111:13,14
**thinks** 110:15 112:12
**third** 19:20 25:25 27:21 86:7 132:9 151:13 154:5
**Thomas** 2:14 104:9 116:25
**thought** 64:5 119:15 146:23
**thoughts** 64:17
**thread** 159:14
**three** 8:12 9:23 15:17

19:11 38:23 47:16,20
86:8 92:4 96:6 103:1,3
109:6 112:24 113:22
113:25 114:17 145:13
162:14 165:8 166:9
**three's** 88:23
**three-line** 130:22
**Tiffany** 106:12 110:1
159:19 160:20 166:5
**time** 1:15 6:20 10:18 11:2
11:11,11 14:9,13,20
18:25 23:21,23 24:9,20
32:21 35:5 38:16 41:12
42:20 50:6 53:2 67:18
68:21 69:6,9,15 72:11
75:5,8 84:11 86:19
98:13,17,18 99:2 107:9
107:21 108:3,7,20
109:8,20 110:25 111:5
111:19 112:9,16
113:11,20 114:11
115:22 116:8,13 117:2
118:11,15,24 119:21
120:8,23 121:18
124:12,14,18,23 125:5
125:16,18 126:22
127:3,5,14,17,23 128:9
129:7,15 136:20
137:15,23 138:11,12
138:24 139:10,20
140:7 141:10,18,24
142:9,24 143:4,9,17,21
144:3,5 146:23 165:20
167:11,15
**timeframe** 8:12 94:21
**timelines** 156:15
**times** 12:16 25:8,12,16
41:5 58:18 59:11 66:15
67:14 70:8,13 80:22
**title** 8:23 14:25 73:4,6
80:10
**titled** 19:1
**titles** 71:17
**TLC** 161:1
**TLO** 155:2
**Tobacco** 68:24
**today** 5:12 50:17
**told** 59:22 121:5,7 122:10
123:9,11 125:2 144:23
**tolerance** 29:17,20,22,25
30:4 56:23,24,25
**Tom** 38:19 98:21
**Toney** 159:19
**tool** 71:10 73:12,17,23
**top** 21:20 22:2,4,19,19,23
24:11,12,17 29:7,18
30:4 32:24 33:5 34:17
37:3,14 38:2,7 41:3
42:20 50:18,22,25 51:6
51:18 54:12,15 60:20
63:4,6,9,15 64:9,16
67:2 71:4 76:1 87:9,13
87:23 88:8,23,24 89:7
89:21 90:1 92:13 93:19
94:19,20 101:24
124:11 153:7 155:11
155:12,13 166:15
**total** 9:5,8
**totaled** 20:25
**totally** 71:20
**track** 41:15
**traffic** 54:5 56:14 149:8
149:10,11,13,15 150:1
150:3,5,7,10,20 164:17
164:19,22
**train** 151:18

**training** 30:17 151:19,24
152:2,6,11,15
**transcript** 170:8 171:11
**transition** 40:2 51:24
76:8
**transitioned** 39:5
**transport** 12:12 13:4,22
54:10
**transported** 165:23
**trash** 90:9,10
**travels** 28:14
**trends** 27:6 47:1 55:12
**trespassing** 113:4
**trickle** 50:10
**tried** 14:7 42:5 167:5
**trigger** 76:8,13,14
**trouble** 12:23 14:3 74:24
82:13
**true** 30:13 38:1,4 105:8
170:8
**truth** 5:2,3,3
**try** 5:19,25 75:21
**trying** 21:6 35:1 37:7
44:10 47:24 74:3 99:4
119:24 120:5 121:1
139:2 146:4 157:22
**TSPD** 68:6
**Tuesday** 164:7
**turn** 25:21 28:24 40:4
60:19 65:3 70:23 77:4
85:21 88:18 155:19
164:1
**turned** 40:1
**turning** 71:1 136:10
153:2
**Twelve** 162:21
**two** 8:11,12,14 21:5,13
27:25 36:13 46:25
47:19 75:20 80:2 86:14
88:20 97:4,5,8 103:10
105:25 132:8 145:13
163:7,7,9,10
**two-minute** 147:19
**two-thirds** 26:1
**type** 11:24 21:9 23:5,7
24:13 28:9 32:21 48:12
51:2 55:22 58:20
**typical** 69:23 76:25
**typically** 32:7 49:21 50:2
68:15,19 69:4 70:4,7
70:14,21 72:14,17
83:23 90:24 134:2
157:15
**typo** 26:9 40:17

**U**

**U** 167:22
**uh-huh** 5:23 6:11 151:16
159:21
**uh-uh** 5:24
**ultimately** 130:12 134:10
138:16
**undersigned** 169:4
**understand** 11:4 27:10
27:16 35:22 37:18
47:25 50:14 55:20
76:19 105:4 122:4
142:18 152:17,20
155:14
**understanding** 19:14
22:14 24:3 26:3,11,12
26:17,21 27:3 29:5,9
35:20 36:1 42:8 43:11
84:21 87:15 107:10
119:9,10 122:9,22

**understood** 43:23 44:4
44:25 151:22
**unintelligible** 121:19
123:21
**unique** 57:3
**unit** 8:5 11:12,13,20 39:3
60:5 71:16,17 102:17
161:21
**UNITED** 1:1
**units** 65:13 97:5,8 102:17
102:24
**unprompted** 39:16
**unquote** 24:8 37:14 60:9
64:22
**unsupervised** 119:12
122:18
**updated** 79:15,25
**upper** 96:4
**use** 9:10 27:4 28:5,9
29:10 31:1 57:18 74:21
105:14 147:19 156:16
156:23 158:19 163:20
**useful** 132:4
**utilize** 35:12 71:9 73:11
73:22 154:19
**utilized** 31:13
**utilizing** 28:6,7

**V**

**VA** 2:7
**validation** 119:11
**varied** 49:22 75:22
**varies** 25:7 76:13 163:24
**various** 50:12 58:23
**vary** 76:21
**Vazquez** 106:5,16,21
131:22 132:1,4
**vehicle** 10:8 13:9 43:7
90:11 102:18 160:11
160:13,16 164:17,20
**verbally** 5:22 15:2 110:6
110:6
**verbatim** 80:14 137:10
**verbiage** 74:4 161:1
**verify** 128:18
**victim** 26:14
**victimized** 74:13
**video** 4:10,12 107:17,21
107:25 108:3,7,9,19,20
109:1,7,8,20 110:25
111:5,19 112:9,11,16
113:11,13,20 114:1,11
114:20 115:22 116:2,8
116:13 117:2 118:4,11
118:24 119:2,21 120:8
120:23 121:18 124:15
124:23 125:5,16,18
126:22 127:3,5,14,23
128:9 129:7,15 130:9
136:16,20 137:1,7,15
137:23 138:11,12,24
139:10,20 140:7
141:10,18,24 142:9,24
143:4,9,17,21 144:3,5
**view** 61:13 74:9 120:19
158:16,17
**viewing** 131:12 133:19
**views** 64:18
**Vigilant** 155:2
**violated** 104:21
**violation** 74:2,5 104:3,4
104:25 105:9,17
130:15,25 131:4
134:15,20 135:4,5
136:13 145:5 149:20

164:4,23
**violations** 74:16 75:17
76:2,10,20,24 150:21
**visibility** 56:12,14
**visible** 60:6
**visit** 16:6,10 39:24 76:17
83:7 97:20 101:24
104:18 105:18 106:15
106:20 146:11
**visiting** 59:14
**visits** 39:16
**voice** 108:13 109:22
116:4,22
**vs** 1:6 171:4
**vulnerabilities** 29:14

**W**

**W** 2:14
**wait** 58:23 60:2 86:25
**waived** 168:1
**want** 10:24 13:13 18:22
25:15,15 32:9,11,18
33:9 35:13 36:6 37:7
41:18 44:8 51:13,24
64:15 67:10 72:5 76:19
79:13 110:22 122:20
134:24 147:7 150:23
152:14 167:11
**wanted** 17:21 51:16
**wanting** 32:7
**warrant** 10:11 21:18
31:22 36:22 83:24 84:3
88:5 95:14,16 96:2
106:23 107:3,13
**warrants** 9:19 21:17,17
22:11 23:10,19 83:23
**wasn't** 61:22 62:11 92:24
93:5 99:21 100:5
103:11 118:13 121:9
121:10 123:12,13,14
133:24,24
**watched** 110:3,8
**watching** 117:7 137:2
**way** 18:20,21 25:25 26:1
35:11 43:17 46:24
51:10 60:4 64:1 74:9
87:3 94:23,25 95:19
98:4 127:2 128:18
150:6
**ways** 56:22 59:9 65:15
**we'll** 5:25 6:2 23:5 33:14
38:8 67:17 105:19
109:3 119:22 120:22
125:15 130:5 148:19
154:12 159:16 167:13
167:14
**we're** 8:17 9:21 10:7,9
20:10 22:14 26:25 29:1
32:12 47:1 49:16 51:8
51:11,12 58:15 60:5
73:23 74:2,6,19 75:18
76:15 82:11 83:4 95:22
104:22 111:17 120:4
120:15 121:1 126:17
126:18 127:4 128:11
130:2 135:5,9 137:1
141:16 142:3,18
148:16 157:10 162:2
**we've** 25:17 38:7 43:9
59:11 80:22 167:13
**website** 77:14
**weed** 112:8,13,22 113:2
113:25 114:14 117:6,6
118:12 124:7
**week** 25:14 46:23,25

**weeks** 46:25 47:7
**weigh** 62:10 80:18,20
**weird** 148:15
**went** 8:4,10,13 18:4
48:13 79:20 97:8 117:9
121:16 123:20 146:13
**willing** 32:14
**window** 83:15
**Winter** 2:15
**witness** 5:5 115:10,12
169:7 170:9
**witnessed** 10:16
**worded** 63:12
**words** 41:18
**work** 18:4 20:3 43:13
44:17 60:22 61:7,15
63:13 157:1 158:23
163:15
**work-related** 154:2
**worked** 72:19 164:2
165:12,15
**working** 15:16 45:5
58:22 163:24
**works** 75:5 130:1
**worse** 149:19
**worst** 55:11,12
**wouldn't** 54:18 59:21
**Wow** 109:17 111:2
**write** 75:17
**writing** 106:22
**written** 14:10 95:1 103:6
153:14
**wrong** 72:6 104:5 122:19
**wrongdoing** 36:19 74:21
84:9,12,22
**wrote** 13:25 31:25 106:9

**X**

**X** 3:1 4:1 20:23 64:14
**x-ray** 12:25
**XYZ** 35:5

**Y**

**Y** 20:25
**yard** 82:24 83:18 113:4
**yeah** 10:5,16 12:4,20
13:12,12,24 14:11,12
16:17 19:3 22:5 24:3
25:2,3 27:21,22 28:2,4
30:12 34:5,13,24,24
37:17 38:14 49:6 50:10
53:11 55:7 62:15 63:12
64:4 65:1,24 67:5,11
71:7 72:13 78:7 84:16
85:6,15 86:3,5,12
88:13,13,17 89:3,4
91:13 92:5,11 93:21,25
94:22 96:24,24 104:8
107:1,9 108:11,15
109:4,11 110:23
111:21 112:6 115:12
117:5,12,19 120:2,7,19
121:3,6,8,10 123:10,12
123:14 124:19,19
126:20,23 127:25
129:1,11,12,19 133:24
135:13,17 137:12,18
137:20 138:25 139:7
140:1,2,6,23 141:14,15
144:22 147:9 155:17
158:8 161:16 162:7,24
165:10,25 166:3
167:16
**year** 7:25 8:1,6,12,20,20
14:15 148:24 152:25

156:2
**year's** 153:24
**Yearly** 148:14
**years** 7:9,9 8:14 9:6,20
    9:23 65:21 80:2
**Yep** 116:16 160:5
**yielded** 156:13 164:18
**young** 139:12,15

**Z**

**zero** 29:17,20,25 30:3
    56:23,24,25
**zone** 30:3 38:15,25 39:6
    39:10,12,22 40:2 89:15
    89:17
**zones** 39:3 89:18
**ZULU** 39:4,4

**0**

**1**

**1** 1:17 4:2 16:13,15 53:4
    136:10
**1-5-2023** 169:13
**10** 4:11 85:16 136:7
    161:11
**10:20** 128:11
**100** 4:7 157:18
**1010** 2:15
**102** 4:8
**103** 4:9
**1035** 2:15
**11** 1:14 4:12 147:16
    169:6
**12** 4:13 89:12,13 147:23
**12-29-17** 104:13
**12-29-2017** 4:10
**12:51** 1:15 167:20
**12385** 105:23
**12438** 145:8
**13** 4:14 159:10
**136** 4:10,11
**14** 4:15 85:17 162:10
    167:7
**147** 4:12,13
**15** 4:16 117:7 165:5
**15526** 86:4
**15562** 85:22
**15572** 88:19
**15576** 90:14
**159** 4:14
**16** 4:2
**1606152** 145:23
**162** 4:15
**165** 4:16
**167** 3:3
**16781** 2:3
**169** 3:4
**170** 3:4
**171** 3:5
**172** 3:5
**17th** 164:7
**18:50** 104:13
**18840** 155:19
**18859** 153:22
**18867** 153:2
**18869** 151:10 152:23
**18875** 148:22
**18878** 148:20 150:14
**18th** 164:7 165:10
**19:57** 106:2
**19th** 165:11

**2**

**2** 2:11 4:3 39:4,4 52:9,15

60:19 89:13 163:13,13
    163:15,16
**2:00** 163:11
**2:03** 141:16
**2:34** 143:3
**20** 18:19,22,23 19:4
**2014** 8:2
**2015** 4:3 8:7,25 52:20
**2016** 8:7 85:16,18 149:1
**2017** 14:17 153:1,5
**2018** 106:2 153:25
    154:13 161:11
**2020** 9:21
**2021** 156:4
**2022** 1:14 8:17 9:21
    169:6,8 170:17
**21** 156:4
**22** 25:21
**22203** 2:7
**22nd** 169:7 170:17
**23** 44:14
**2426** 1:23
**25** 136:15
**256** 2:3
**26** 28:24
**27** 40:4
**276821** 169:12
**29** 106:2
**2x8** 4:10

**3**

**3** 4:4,15,16 85:1 104:6
**3-4-16** 4:5
**3-5-16** 4:7
**3-8-16** 4:6
**30** 102:22
**305-721-1600** 2:12
**3180** 2:11
**32** 97:6
**3229** 104:14 106:3
**32792-55122:15**
**33** 102:23
**33131** 2:11
**33526-2426** 1:23
**34** 97:5
**34691** 104:15 106:4
**352** 1:24

**4**

**4** 4:5 21:17 65:3 67:6
    92:7
**4-10-2016** 4:4
**4-4-2016** 4:4
**4:30** 112:11
**407-673-5000** 2:16
**43** 44:14
**44** 138:10
**44120** 2:3
**45** 54:11
**4th** 85:16

**5**

**5** 3:3 4:6 21:20 22:2,4,19
    22:19,23 24:11,11,12
    24:17 29:7,18 30:4
    32:24 33:5 34:17 37:3
    37:14 38:2,8 41:3
    50:22,25 51:6,18 54:12
    54:15 63:4,6,9,15 64:9
    64:16 67:21 76:1 87:9
    87:13,24 88:8,23 89:8
    89:21 90:1 93:19 94:19
    97:12 101:24 105:22
    124:11 130:6,19
    155:11,12,13

**5's** 42:20
**5/Prolific** 166:15
**52** 4:3
**567-5484** 1:24

**6**

**6** 4:7 39:4,4 70:24 100:11
**64** 89:5

**7**

**7** 4:8 71:1 102:2
**703-682-9320** 2:4,8

**8**

**8** 4:9 77:4 103:20
**8:05** 120:21
**8:15** 123:7
**8:21-cv-00555-SDM-C...**
    1:6 171:4
**8:40** 124:6
**85** 4:4
**8520** 1:17

**9**

**9** 4:10 78:1 136:5
**9-10-18** 4:14
**9-14-16** 4:8
**9-17-18** 4:15
**9-18-18** 4:15,16
**9-19-18** 4:16
**9:00** 1:15
**9:15** 127:4
**900** 2:7
**901** 2:7
**92** 4:5
**97** 4:6