UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| DALANEA TAYLOR; TAMMY HEILMAN; DARLENE DEEGAN; and ROBERT A. JONES III,<br><br>*Plaintiffs*,<br><br>v.<br><br>CHRIS NOCCO, in his official capacity as Pasco County Sheriff,<br><br>*Defendant*. | Case No. 8:21-cv-00555-SDM-CPT |

**DECLARATION OF DALANEA TAYLOR IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND INCORPORATED MEMORANDUM OF LAW**

I, Dalanea Taylor, hereby declare as follows:

1. I am a citizen of the United States, a resident of Florida, over the age of 18 years old, and fully competent to make this declaration. I knowingly and voluntarily make this declaration based on my personal knowledge. If called as a witness, I could and would testify competently under oath as to the facts set forth below.

2. I was born in July 1999. I have lived in Pasco County ever since.

3. When I was a teenager, I became involved with a bad crowd. I was arrested and charged as an adult for several property crimes, including a series of auto thefts in 2014.

1

4. I was never suspected of, arrested for, or charged with any violent criminal offenses.

5. After being charged as an adult for my offenses, I ended up going to prison in 2015 when I was 15 years old. I was released in March 2017, when I was 17 years old.

6. I have stayed out of trouble since I was released. I am now the mother of three young children.

7. After I was released, I stayed at the homes of family friends for a few years.

8. Beginning just a couple weeks after I was released, PSO deputies began making unannounced visits to the home where I was staying, looking for me and asking to speak with me.

9. Between March 2017 and mid-2019, PSO deputies visited the house where I was staying—while I was there—about a dozen times. They also visited several times while I wasn't there.

10. The frequency of the deputies' visits varied; sometimes they were at the house every few days and sometimes a few weeks went by between visits.

11. The deputies visited at all hours of the day—sometimes as late as 11:00 p.m. and sometimes as early as 7 a.m.

12. Every time they visited me, the deputies asked me questions. The questions were often intrusive and personal, seeking information about my social circles and my relationship status. I did not want to answer those types of questions, but felt I had no choice.

13. The deputies' questions frequently included what I was up to, whether I was working, whether I had plans to go to school, whether I had plans to move, whether I was spending time with the crowd I used to hang out with, and whether I knew about any criminal activity going on. Again, I did not want to answer their personal questions, but felt I had no choice. And even though I had no information about my old crowd or criminal activity in the neighborhood, they kept asking me anyway.

14. During visits when I was not home, PSO deputies also asked the family friend with whom I was staying questions about me, including what I was up to and whether I was involved in any criminal activity.

15. In 2017, I became pregnant. In 2018, my twin daughter and son were born.

16. When PSO deputies found out I was pregnant, they asked me repeatedly—over the course of a few different visits—to give them the name of the father of my babies. I was reluctant to give his name, as I feared he would also become the focus of deputies' attention because of his connection to me. They also

3

asked about whether he was involved in the pregnancy and whether he was involved in any criminal activity. These questions were extremely invasive and made me feel very uncomfortable.

17. Once, when a deputy visited, he warned me about code violations for trash in the yard and missing house numbers at the house where I was staying.

18. On New Year's Day in 2018, PSO deputies visited the house where I was staying around 7:30AM. The family friend with whom I was staying, Dana Jones, became upset about how early the deputies were there and how often they were coming to her house to visit me. Dana asked them how long they would keep coming and they said they would have to keep coming for a few more years. She told them that I was staying out of trouble and that they didn't need to keep checking on me. She also told them the visits were disruptive and that, if they persisted, she might have to kick me out—even though she knew I had nowhere else to go. The deputy got irritated by her response and insisted he was just doing his job.

19. These visits impacted my relationship with Dana. By late 2018, I had moved out of the house.

20. On New Year's Day in 2020, PSO deputies came to the house where I was staying to ask me questions about my cousin. They wanted me to let them inside to look for him, but when I said I wouldn't do that because I was not the

4

homeowner, the deputies threatened to write me code citations for missing house numbers and junk in the yard.

21. During one visit, a deputy told me that she knew that we didn't like having the deputies around asking questions, but that they had to because they were told to do it.

22. The deputies never said during any of the visits that they had a warrant for a particular visit.

23. The deputies never told me during any of the visits that they suspected me of committing any crime.

24. The deputies never asked me if I was OK with talking with them. I was often extremely uncomfortable during the deputies' visits, but their presence was intimidating and I didn't feel like I could end the conversation or ask the deputies to leave.

25. The visits continued even though I wasn't getting into trouble and I hadn't been in trouble since before I went to jail.

26. The deputies told me that the visits were happening because I was on a list of people who used to get in trouble.

27. While I was aware that I was receiving frequent visits, I did not understand the reason for those visits until I was contacted by a reporter for the *Tampa Bay Times* in 2020. That's when I learned that PSO had placed me on a list

of prolific offenders based on the application of an algorithm, and that all of those visits PSO deputies made to my house were "prolific offender checks."

28. I was never formally notified by PSO that I had been placed on a prolific offender or "Top 5" list, and PSO never explained the nature of its list, the way that I was selected for the list, or the consequences of being included on the list.

29. I was never given the opportunity to contest my placement on the prolific offender list. Nobody told me about any way that I could challenge the fact that I was on the list.

30. Until recently, I worked for a company that provides house cleaning and other services. Because of PSO deputies' visits, I had to miss or arrive late to jobs that I had been assigned a several times. As a result, I missed out on the income that I would have received from those jobs.

31. This experience has been very difficult for me. I live in fear that PSO deputies will begin harassing me once again and that they might arrest me or punish my family and friends if deputies believe I am uncooperative.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 02, 2022.

_____
Dalanea Taylor