UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES III,

    *Plaintiffs*,

v.

CHRIS NOCCO, in his official
capacity as Pasco County Sheriff,

    *Defendant*.

Case No. 8:21-cv-00555-SDM-CPT

**DECLARATION OF TAMMY HEILMAN IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON LIABILITY
AND INCORPORATED MEMORANDUM OF LAW**

I, Tammy Heilman, hereby declare as follows:

1. I was born in August 1974. I am a citizen of the United States, a resident of Florida, over the age of 18 years old, and fully competent to make this declaration. I knowingly and voluntarily make this declaration based on my personal knowledge. If called as a witness, I could and would testify competently under oath as to the facts set forth below.

2. I have lived in Pasco County since 2005.

3. I have two sons, named Donnie McDougall and Anthony McDougall.

4. Donnie was born in January 2000. He is currently 22 years old. Anthony was born in September 2002. He is currently 19 years old.

1

5. In the summer of 2015, when Donnie was 15 years old, PSO deputies started making regular visits to my house looking for Donnie.

6. PSO deputies regularly came to my house between the middle of 2015 and 2020. Sometimes they came multiple times per week and sometimes they even came multiple times per day.

7. The deputies' visits were often late at night, around 10:00 p.m. or later.

8. The deputies also often walked around to the side of my house and looked through the fence into my backyard. They would also look into the windows, sometimes shining a flashlight into them at night.

9. During each visit, the deputies demanded to talk with Donnie.

10. If Donnie wasn't home, the deputies would ask me (or anyone else who was home) questions about him, including where he was, what he was up to, whether he was going to school, whether he was working, where he was working, who he was hanging out with, and who he was dating.

11. In one of the visits in September 2016, Deputy Andrew Denbo came to my house asking me questions about Donnie and a bike that Deputy Denbo believed had been purchased using stolen money. He thought Donnie was involved in using the stolen money, and didn't believe that I was telling the truth when I told him that I didn't think Donnie was involved.

12. I told him that I couldn't answer any more questions without my attorney there and that I had to take my daughter to Girl Scouts. I left in my car. Deputy Denbo yelled after me to stop because he thought my daughter and I weren't wearing seatbelts, even though we were. He then pulled my car over and informed me I was under arrest.

13. Deputy Denbo and a few other deputies tried to drag me out of the car. I was so scared that I called 911, but one of the deputies took my phone and told the dispatcher to hang up. They ended up yanking me out of my car and arresting me for allegedly giving false information to a law enforcement officer, for battery on a law enforcement officer, and for resisting arrest without violence.

14. When he was taking me to jail in his car, Deputy Denbo told me that the policy of the agency was to tell PSO deputies to go out to houses where criminal activity was occurring and enforce every single violation they saw there. This experience left me with the impression that if I attempted to end an unwanted encounter with a PSO deputy, I could be arrested or cited for any reason—or no reason—at all.

15. I ended up pleading guilty to the charges and I was placed on probation.

16. Once, during a late-night visit in May 2017, PSO deputies came to my house looking for Donnie. When I told them that he wasn't there and that I didn't

know where he was, they started looking for violations around my house. They asked me whether my dog was vaccinated, and they even checked the tint of the windows on my car.

17. In December 2017, several deputies came to my house to speak with Donnie. One of them went around to the side of my house and looked through the fence. She said that she saw people in the back "breaking up" marijuana. But no one was in my back yard with marijuana and the deputies never actually arrested anyone on drug-related charges or seized any drug paraphernalia. They arrested Donnie anyway, for violating his probation by being in the same house as people allegedly possessing marijuana. They also told me they were going to report me to Child Protective Investigations based on the alleged presence of marijuana on the property.

18. During another visit in September 2018, PSO deputies came to my house again looking for Donnie. I told them that Donnie wasn't there, but the deputies wanted to come inside the house to look for him. They told me that because I was still on probation from when I was arrested in September 2018, that I had to let them inside.

19. The deputies were standing right in front of my screen door, and because sometimes the latch would get stuck, when I opened it to let them in the door hit one of them. It did not hit him hard at all, and the door was stopped by his

heavy boot, but nevertheless the deputies immediately told me that I was under arrest. They charged me with felony battery on a law enforcement officer and for violating my probation. I ended up spending a couple of months in jail, and I accepted a plea deal so that I could get out in time to spend Christmas with my family. Because of that, I am now a convicted felon.

20. I made it clear to the deputies multiple times that I thought they were harassing my family and that I did not want the visits to continue. But the deputies told me they were required to keep coming, and they did.

21. Beginning around 2019, PSO deputies started visiting my home looking for my son Anthony too.

22. Donnie went to prison in 2019.

23. The deputies never told me during any of the visits that they had a warrant for a particular visit.

24. For most of the visits, the deputies never said that they suspected Donnie or Anthony of committing a particular crime.

25. With the exception of the time in September 2016 when Deputy Denbo thought I had given him incorrect information about Donnie, PSO deputies never told me during a visit that I was suspected of committing a particular crime.

26. As a result of my two arrests by PSO deputies, I have had to make bond payments and probation payments. I also had to hire an attorney to represent me.

27. After I was arrested in 2016, I had to pay to get my car back after PSO impounded it.

28. After I was arrested in 2018, I had to pay for court-ordered anger management classes.

29. Because those arrests are on my record, I have been unable to find a job.

30. PSO deputies also issued me code citations during several of these visits. I was under the impression that we had paid for those violations, but now I am receiving collections letters for them.

31. In March 2016, a PSO deputy gave me citations for missing mailbox numbers and for having chickens in my backyard.

32. During one visit in October 2017, after I told the deputy that I didn't have time to talk with him, the deputy cited me for "junk" in my yard. The "junk" was a few pieces of metal and wood, a child's toy car, and a cinderblock in my yard. There had just been a hurricane. Other neighbors on the street plainly had visible debris, but as far as I know, I was the only one cited.

33. I knew that my son and my family was being targeted, but I didn't understand about the PSO's Intelligence-Led Policing Program, the prolific offender list, or prolific offender checks until 2020, when I was contacted by a reporter for the *Tampa Bay Times*. That's when I learned that PSO had placed my son Donnie on a list of offenders based on the results of a computer algorithm, and that's when I learned that all of those visits PSO deputies made to my house were "prolific offender checks."

34. I never received any formal notice that PSO had placed my then-juvenile son Donnie on a list of prolific offenders or Top 5 offenders.

35. I never received any formal notice that PSO had placed my then-juvenile son Anthony on a list of prolific offenders.

36. I was never given the opportunity to contest Donnie's or Anthony's placement on that list. Although both Donnie and Anthony were under 18 when they were first listed, nobody told me about any way that I could challenge the fact that they were listed.

37. This ordeal has caused tremendous stress and hardship for my family and me. I believe that my son's legal problems were partially created and made worse by the PSO's constant harassment. And I am still fearful that the PSO's behavior will resume, and that deputies will harass, punish, or even arrest me if they believe that I am not sufficiently complying with their demands.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 2, 2022.

_____
Tammy Heilman