UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| DALANEA TAYLOR; TAMMY HEILMAN; DARLENE DEEGAN; and ROBERT A. JONES III,<br><br>*Plaintiffs*,<br><br>v.<br><br>CHRIS NOCCO, in his official capacity as Pasco County Sheriff,<br><br>*Defendant*. | Case No. 8:21-cv-00555-SDM-CPT |

**DECLARATION OF DARLENE DEEGAN IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND INCORPORATED MEMORANDUM OF LAW**

I, Darlene Deegan, hereby declare as follows:

1. I was born in January 1951. I am a citizen of the United States, a resident of Florida, over the age of 18 years old, and fully competent to make this declaration. I knowingly and voluntarily make this declaration based on my personal knowledge. If called as a witness, I could and would testify competently under oath as to the facts set forth below.

2. I have lived in Pasco County since 1981.

3. My late son, Tyler Paneson, was born in November 1984. Following a severe accident, Tyler developed an opioid addiction after receiving pain medication.

1

4. To fund his addiction, Tyler committed non-violent crimes in Pasco County.

5. Beginning in 2016, PSO deputies regularly visited my house looking for Tyler, though he did not live with me for most of that time.

6. Sometimes the visits occurred every few weeks, but sometimes the deputies were at my house every day for several consecutive days or even multiple times per day.

7. In October 2017, PSO deputies conducted a raid on the house where Tyler was staying, which I owned. The deputies arrested Tyler and impounded our family dog. I had to go pay a fee to get the dog back.

8. When the deputies left after the raid, they left the front door to the house ajar. The house was then robbed of its contents, which included my personal property.

9. The summer of 2018, PSO deputies increased the frequency of their visits. They came to my house multiple times per week and sometimes multiple times per day. I did not know where Tyler was, and did not want to speak with the deputies, but I felt I had no choice.

10. Though Tyler was not living with me at the time, PSO deputies frequently asked to speak with Tyler during visits to my home. If he wasn't there, they asked me questions about him.

11. In June 2018, I got a call from a neighbor that several PSO deputies were at my house looking for Tyler, because they thought he was living in the RV trailer behind my house. The deputies were running their siren and using the loudspeaker in their patrol car to try to get Tyler to come outside.

12. Tyler wasn't there that day, and he wasn't living in the trailer. I just let him store his belongings there.

13. I came home from work, and when I opened the gate to drive in, the deputies quickly followed me through the gate. I didn't want them on my property, but they did not ask my permission to enter.

14. The deputies went back to the trailer and told me that the door wouldn't open. I told them that it gets stuck and that I didn't want them to break it down.

15. At that point, a code enforcement corporal told me that he had observed several violations around my yard. He issued several code citations to me, totaling about $3,000. When I asked why I was getting code citations when there hadn't been a complaint, the code enforcement corporal told me I was getting the citations because Tyler was a "Top 5" offender.

16. A few days later, deputies came to my house looking for Tyler. I was busy trying to fix the code violations in my yard that the code enforcement corporal had cited me for, so I told them I didn't have time to talk to them and that

I felt that I was being harassed. I wanted them to leave, but they stayed and kept asking me questions over the fence. They said that they could work with me on the code citations if I helped them find Tyler.

17. I ended up working with the County Attorney to eliminate the fines for the code citations, and I agreed to pay the County Attorney's Office $250 for costs incurred.

18. Tyler was in jail during the fall of 2018, but PSO deputies came to my house several times in 2019 after he was released.

19. Deputies would sometimes come to my house in the middle of the night, and they would shine flashlights onto and into my property. On at least one occasion, my security camera captured images of deputies wandering around my property in the dark.

20. Once, in June 2019, I called PSO deputies because of a dispute with my neighbor. The deputy ended up citing me for overgrown grass in the easement on the side of the road, even though the grass was not over 12 inches. I had to pay that fine.

21. When PSO deputies spoke with my neighbors during their visits to my home, they always told them to call the police if they ever saw Tyler at my home. In fact, they routinely shared sensitive information about Tyler and me with my neighbors and suggested to them that we were bad people. I believe deputies also

included derogatory statements about me and my character in various police records. I believe this damaged my reputation in the community.

22. In December 2019, Tyler died of an accidental overdose. I believe that PSO's harassment through its prolific offender program contributed to his death.

23. PSO deputies also came to my house in October 2021. They were called there because my truck was parked at the end of the road in front of my home—apparently on land that belongs to the county. While standing at my fence, a deputy told me that I had to trim the foliage around my mailbox and stated that I could be cited for this. One deputy told me that he knew I had been cited for that before.

24. The deputies never said during any of the visits that they had a warrant for a particular visit.

25. The deputies never told me during any of the visits that they suspected me of committing any crime.

26. I do not recall ever hearing the term "prolific offender" until 2020. Other than the code enforcement corporal telling me that he was issuing code citations because Tyler was "Top 5," I did not know that PSO kept a list of offenders or why PSO deputies were repeatedly visiting my home.

27. As far as I know, Tyler was never given formal notice that PSO had placed him on a list of prolific offenders or Top 5 offenders.

28. As far as I know, Tyler was never given the opportunity to contest his placement on a list of prolific offenders or Top 5 offenders.

29. I was never given formal notice of Tyler's placement on a list of prolific offenders or Top 5 offenders or given the opportunity to contest those designations.

30. This experience has caused tremendous stress and hardship for me. PSO deputies harmed my reputation within the community and targeted me for code enforcement based on their belief that I was refusing to share information. I am still fearful that the PSO's behavior will resume, and that deputies will harass or punish me if they believe that I am not sufficiently complying with their demands.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 2, 2022.

_____
Darlene Deegan