UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES III,

    *Plaintiffs*,

v.

CHRIS NOCCO, in his official
capacity as Pasco County Sheriff,

    *Defendant*.

Case No. 8:21-cv-00555-SDM-CPT

### DECLARATION OF ROBERT A. JONES III IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND INCORPORATED MEMORANDUM OF LAW

I, Robert A. Jones III, hereby declare as follows:

1. I was born in January 1977. I am a citizen of the United States, a resident of Florida, over the age of 18 years old, and fully competent to make this declaration. I knowingly and voluntarily make this declaration based on my personal knowledge. If called as a witness, I could and would testify competently under oath as to the facts set forth below.

2. I lived in Pasco County from April 2015 until April 2016, and from December 2020 to the present.

3. One of my sons is named Robert A. Jones IV. He usually goes by "Bobby." He was born in September 1999.

1

4. Bobby is currently 22 years old.

5. A couple weeks after we moved to Pasco County, PSO deputies began regularly visiting my home looking for Bobby. The visits began in June 2015 and ended only after I moved my family out of Pasco County in April 2016.

6. At first, when deputies visited in September 2015, I thought they would be a good influence on Bobby. I even let them into my home and into Bobby's room, thinking they would help me keep my son on the straight and narrow.

7. But when they came back a few days later and arrested Bobby for possession of marijuana—based on traces of marijuana they allegedly found in plastic baggies in Bobby's room—I realized they were just trying obtain evidence of crimes. Bobby's charges were later nolle prossed.

8. After that, I would not allow the deputies inside my house when they came looking for Bobby.

9. The deputies' visits were seldom more than a week apart, and often the deputies made several visits on consecutive days. Sometimes they even came multiple times per day.

10. The visits often occurred late at night, at 11:00 p.m., 12:00 a.m., or even 2:00 a.m.

11. During these visits, deputies frequently walked around behind my house and tried to look inside the windows without permission. They would also bang on the windows and yell at the people inside to come out. These visits routinely involved multiple marked vehicles and eight or more deputies who would remain on my property for hours at a time.

12. It got so bad that my three younger children became terrified of PSO deputies.

13. Each time, the deputies wanted to talk with Bobby, asking him questions about what he was up to, whether he was going to school, and who he was associating with.

14. If Bobby was not home, the deputies would try to ask whoever was at the house to give them information about where Bobby was and what he was up to.

15. During one visit in December 2015, PSO deputies came to my house looking for Bobby. I told them Bobby was not home. They thought he was inside the house, but I wouldn't let them inside. The deputies looked in the windows of my house and saw an employee of mine smoking a cigarette. After I tried to end the encounter and go inside, they immediately arrested me for "contributing to the delinquency of a minor" and "resisting arrest." They told my wife they would arrest her too if she didn't tell Bobby to come outside. Both of those charges were later dropped after state prosecutors examined the facts and found no basis to

proceed. But that experience left me with the feeling that I'd be arrested or punished if I tried to end an unwanted encounter with a PSO deputy.

16. The Deputies also issued two code citations during that visit, based on the placement of my trailer and jet ski in my yard.

17. In January 2016, PSO deputies arrested me again, based on a warrant for "failure to appear" at a court hearing for a code citation. But I don't remember receiving notice of a citation or a court date.

18. During a visit on March 28, 2016, PSO deputies came to my house looking for Bobby and ended up writing me three more code citations—for the trailer in my yard, for tall grass, and for missing house numbers.  Though there were some isolated patches of weeds, my grass was cut and there were house numbers; they were just slightly obscured by an outdoor light. I was asleep inside the house at the time, so the code deputy gave Bobby the citations. But I do not remember ever receiving them.

19. The next day, on March 29, 2016, PSO deputies came back to my house to execute a search warrant. They seized a large amount of my personal property—including laptops, tablets, and phones—and destroyed some of the furniture I had recently purchased. I never received all of the electronics that were seized, and the ones that were returned were not returned in working condition.

20. On that same day, the deputies also arrested me for possession of marijuana and child neglect. Both of those charges were later dropped after state prosecutors found no basis to proceed on the facts of the case.

21. Immediately after my third arrest, I moved my family out of the house we had been renting and into a hotel. We then moved out of Pasco County to escape the harassment from PSO deputies.

22. In August 2016, when I was living in Pinellas County, I was arrested by Pinellas Sheriff's deputies pursuant to a failure-to-appear warrant issued by a Pasco County judge based on code citations issued by PSO deputies.

23. Apart from the failure-to-appear warrant in January 2016 and the search warrant in March 2016, PSO deputies never told me during a visit that they had a warrant to be at my home.

24. For most of the visits, PSO deputies never said that they suspected Bobby of committing a particular crime.

25. As a result of my three arrests by PSO deputies, I have had to make bond payments.

26. As a result of code citations issued by PSO deputies, I have had to pay fines for those citations.

27. I felt that my son and I were being targeted by PSO, but I didn't understand that my son had been placed on a list of "Top 5 offenders" or "prolific

offenders" until a reporter for the *Tampa Bay Times* reached out to me in 2020 to discuss PSO's ILP Program. That was when I learned the reason for the frequent visits to my home.

28.  I never received any formal notice that PSO had placed my then-juvenile son Bobby on a list of prolific offenders or Top 5 offenders.

29.  I was never given the opportunity to contest Bobby's placement on either list. Nobody ever told me about any way that I could challenge the fact that he was on the list.

30.  This experience has caused tremendous stress and hardship for my family and me. I had to hire attorneys as a result of the numerous arrests, and I ultimately had to flee Pasco County altogether just to try to keep my family together.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 2, 2022.

_____
Robert A. Jones III