## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES III,

       *Plaintiffs*,

v.

CHRIS NOCCO, in his official
capacity as Pasco County Sheriff,

       *Defendant*.

Case No. 8:21-cv-00555-SDM-CPT

## DECLARATION OF MICHAEL CARRASCO IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND INCORPORATED MEMORANDUM OF LAW

I, Michael Carrasco, hereby declare as follows:

1.     I am a citizen of the United States, a resident of Texas, over the age of 18 years old, and fully competent to make this declaration. I knowingly and voluntarily make this declaration based on my personal knowledge. If called as a witness, I could and would testify competently under oath as to the facts set forth below.

2.     The opinions below were primarily disclosed in my expert disclosure and report, which is attached as Exhibit 1 to this declaration. Attached to that report, as Exhibit B, is my curriculum vitae.

3.     The opinions below were also discussed in my supplemental rebuttal report, which is attached as Exhibit 2 to this declaration.

## I.     Background and Qualifications

4.     My name is Michael Carrasco and I am a Managing Director with Alvarez & Marsal Public Sector Services. My expertise is in developing and implementing technology-based solutions in the delivery of public sector services. I specialize in organizational-transformation advisement and oversight, information technology strategy, program design, risk management, complex investigations and the adoption and application of technology to organizational change. I have applied my expertise in several professional industries: education, law, government, and management consulting.

5.     Of particular relevance to this matter, I have worked extensively with law enforcement agencies on complex investigations, including counterterrorism operations. I also have experience as a legal advocate and advisor. I have tried over 30 cases in criminal and civil courts. While a civil trial attorney, I represented cities, towns, and other government entities. In 2003, I received an appointment as a Special Assistant U.S. Attorney in New Jersey. I have also served as chief military prosecutor and a criminal defense attorney.

6.     The other fields to which I have applied my expertise include serving as a diplomat in the Middle East, Asia, and Latin America and advising foreign

governments on ways to strengthen the rule of law by focusing on building the capacity of the judiciary, prosecutors, defense bar, police, and law schools. Currently, I am a senior advisor to the Director of the Rhode Island Department of Health in the daily execution of the state's COVID-19 Testing and Vaccines programs, overseeing a team of 34 consultants, analysts, and subject matter experts.

7.     A detailed list of my qualifications can be found in my curriculum vitae, which is attached to Exhibit 1 at Ex. B.

## II.     Statement of Compensation

8.     I am being paid $550 per hour for any study or testimony I provide in this case.

9.     Other professionals working under me on this matter are being compensated at rates between $250 and $550 per hour.

## III.     Statement of Opinions, Bases for Opinions, and Facts and Data Considered in Forming Opinions.

### A.     Data and Materials Used and Considered in Forming My Opinions

10.     The opinions provided here are the result of decades of experience in public-sector consulting, information technology strategy, and criminal justice. To prepare this testimony and my expert report, my team and I also reviewed the following items:

3

- The complaint, motion-to-dismiss briefing, and order denying the motion to dismiss;

- Records of the Sheriff's Office' "Prolific Offender" Data set, including all records of Sheriff's Office visits to addresses identified as "Prolific Offender Checks" from September 18th, 2015, until November 17th, 2021. File Name PRRCAD12142021, including a total of 13,093 records;

- Records of Code Enforcement Citations[1] issued by code enforcement officers assigned to the Sheriff's Office from January 6, 2015, until November 18th, 2021. File Name "PRRRMS12142021" including a total of 2,615 records; and

- To provide additional context on the number of total households within Pasco County, A&M referenced The United States Census Bureau's Quick Facts for Pasco County, Florida retrieved as of January 26th, 2020.

- Expert Disclosures of the Defendant's Witnesses "03-25-22 Taylor - Deft. Sheriff's Expert Disclosures – TWP".

- Transcript of the Deposition of Ross Brummett, dated April 13, 2022.

- Records of the Sheriff's Office's Dispatch Data system, identified as "CAD" – this data set expanded on the initial analysis of CAD entries for "Prolific Offender Checks" from September 18th, 2015, until November 17th, 2021 and includes entries of every nature over the same date range. This expanded data set included a total of 2,544,501 records. Provided via electronic file transfer site.

- County Code Enforcement Data – Record of 2,347 code enforcement activities conducted by the County Code Enforcement officials. This data reflects the activities of a separate agency, not

---

[1] This data is a subset of citations generated by the Sheriff's Office by searching the Sheriff's Office records for a set of particular code violations. The list of violations included in this search can be found in Appendix A.

4

the activities of the Sheriff's Office (Defendant). This data included:

- o   489 records provided in the file "(2022.03.11) PRR00553-564 - Accela Citations 2020-03-20 to Present" and
- o   1,858 records in the file "(2022.03.11) PRR00565-601 - Gov QA Citations 2015-2022-03-09".

- Records of All Code Enforcement Citations issued by code enforcement officers assigned to the Sheriff's Office from January 6, 2015, until November 18th, 2021. This data expands on the data provided for my original expert report (which was limited to 7 code violations) to include all 6,662 total citations over the same date range. Provided in file "ALL ORDINANCE VIOLATIONS DATE RANGE".

### B.   Methodology and Approach to Analysis

11.    In performing this analysis, my team and I first developed summary analysis of each data set identified, combined address and city information into a unique identifier for each address, and then created unique identifiers or "tags" in each data set which allowed us to compare the characteristics of data pertaining to the overlapping populations. We have compiled the key takeaways into the opinions in Part III.C., below. In this section I detail our methods for compiling and analyzing this data.

### 1)    *"Prolific Offender Checks" Data Set Summary Analysis*

12.    We identified the full city names associated with the Sheriff's department abbreviations for each city or town (HOL= Holiday, etc.).

13.    We combined this new "City" lookup with the "Street" field to create unique "Full Address" for each location.

14.     We created additional fields to separate the Year, Month, Date, and Time of Day for individual analysis.

15.     We created a specific indicator to identify visits which took place between 10PM and 6AM.

16.     We analyzed the number of unique addresses visited, the number of visits to each unique address, the timing and seasonality of PO check visits.

17.     We created an indicator for all PO check addresses visited more than once and more than ten times to perform additional analysis focused only on those addresses with "multiple PO checks."

18.     We compared the PO data to publicly available information from the US Census Bureau related to the communities in which PO checks occurred.

19.     And we identified addresses associated with named Plaintiffs and analyzed data specific to those addresses.

### 2)     Citation Data Set Summary Analysis

20.     We combined the street number and street attributes to create a new "Street Number and Street" field, which was combined with the city indicator to create a full address field matching the format of the "Prolific Offender" data.

21.     We created a lookup table which identifies the ordinance referenced by the "arr_chrg" field and adds the description of the ordinance (901.09F= Co. Ord. – Standards for Numbering, etc.).

22.     We created additional fields to separate the Year, Month, Date, and Time of Day for individual analysis.

23.     We created a specific indicator to identify citations which took place between 10PM and 6AM.

24.     We analyzed the number of unique addresses cited, the number of visits to each unique address, the timing and seasonality of citations.

25.     We created an indicator for all citation data set addresses receiving more than one citation to perform additional analysis focused only on those addresses with "multiple citations."

26.     We summarized the number and frequency of PO visits per city.

27.     We analyzed the number of citations by ordinance.

28.     And we identified addresses associated with named Plaintiffs and analyzed data specific to those addresses.

*3)     Sample vs. Population Analysis of Citation Data*

29.     In each data set, we added an indicator to each record and each unique address signifying that the address in the record matched an address in the opposite data set (added "PO" indicator to "Code Enforcement" data and vice versa).

30.     We analyzed the total number of records, and the total number of unique addresses in each data set which were found in the other data set or were not.

31.    We examined the correlation between data sets, including:

- The number and frequency of citations at "sample" addresses (included in the PO set) compared to "population" – addresses with citations but not included on the PO list;

- The occurrence of multiple citations at "sample" addresses vs. "population"; and

- The occurrence of citations at PO addresses as compared to all households in Pasco County.

32.    We examined the relationship of timing of citations relative to PO visits to the same addresses.

33.    And we combined summary statistics for each data set to identify any noticeable trends in the frequency of activity and frequency of repeat PO visits / code enforcement citations.

    4)    *Rebuttal Analysis*

34.     In order to provide a rebuttal to the report of Ross Brummett, my team and I followed a methodology consistent to that used in the development of my own opinions. In this section I detail our methods for compiling and analyzing data to highlight any additional analysis we completed using new data.

    a)    <u>"Prolific Offender Checks" Data Set Summary Analysis – No additional analysis was performed on this original data set.</u>

35.    We used CAD Data 2015-2021 reflecting the Call Time and Nature of all activities from September 18th, 2015 to November 17th, 2021.

36.     We combined data sets for each year into one master data set.

37.     We created a summary of all "natures" for the entire period covered in the data.

> b) Citation Data Set Summary Analysis – Updated to Reflect all 6,662 Citations included in the newly provided data set.

38.     We combined the street number and street attributes to create a new "Street Number and Street" field, which was combined with the city indicator to create a full address field matching the format of the "Prolific Offender" data.

39.     We created a lookup table which identifies the ordinance referenced by the "arr_chrg" field and adds the description of the ordinance (901.09F= Co. Ord. – Standards for Numbering, etc.).

40.     We created additional fields to separate the Year, Month, Date, and Time of Day for individual analysis.

41.     We created a specific indicator to identify citations which took place between 10PM and 6AM.

42.     We analyzed the number of unique addresses cited, the number of visits to each unique address, the timing and seasonality of citations;

43.     We created an indicator for all citation data set addresses receiving more than one citation to perform additional analysis focused only on those addresses with "multiple citations."

44.     We analyzed the number of citations by ordinance.

45.     And we identified addresses associated with named Plaintiffs and analyzed data specific to those addresses.

c) Sample vs. Population Analysis of Citation Data – Updated to include all 6,662 Citations included in the newly provided data set.

46.     In each data set, we added an indicator to each record and each unique address signifying that the address in the record matched an address in the opposite data set (added "PO" indicator to "Code Enforcement" data and vice versa).

47.     We analyzed the total number of records, and the total number of unique addresses in each data set which were found in the other data set or were not.

48.     We examined the correlation between data sets, including:

- The number and frequency of citations at "sample" addresses (included in the PO set) compared to "population" – addresses with citations but not included on the PO list;

- The occurrence of multiple citations at "sample" addresses vs. "population"; and

- The occurrence of citations at PO addresses as compared to all households in Pasco County.

49.     We examined the relationship of timing of citations relative to PO visits to the same addresses.

50.     And we combined summary statistics for each data set to identify any noticeable trends in the frequency of activity, frequency of repeat PO visits / code enforcement citations.

> d)  County Code Enforcement Data – Newly Provided data reflecting the activities of Pasco County Code Enforcement Officers - not the activities of the Sheriff's Office.

51.     We combined data sets from Gov QA and Accela, and updated formatting of dates and addresses to match between the data sets to allow combined analysis.

52.     We updated the address formatting associated with each record to match the formatting of other data sets and analyzed "Address, Street, City" in once combined field.

53.     We used new address field to add the number of Prolific Offender Checks conducted at each address.

54.     We added a binary indicator (0=no, 1=yes) representing whether or not an address the County cited was also subject to Prolific Offender violations.

55.     And we compared the number of unique addresses which had been subjected to Prolific Offender Checks with County citations vs. Sheriff's office citations.

### C.    Findings and Opinions

56.    My analysis of the above data leads me to conclude, to a reasonable degree of scientific certainty, that the Pasco County Sheriff's Department exhibited a pattern of frequent and repetitive police activity focused on a small subset of the population. This small subset of the population was subjected to disproportionately high levels of citations for the code enforcement violations in my analysis (those violations in Appendix A). My analysis also yielded the following findings:

> 1)    *The Sheriff's Intelligence-Led Policing" Program resulted in the practice of frequent and often repetitive visits to the homes of those identified as "Prolific Offenders."*

57.    The Sheriff's "Intelligence-Led Policing" Program identified specific residents as "Prolific Offenders" and included a practice of "Prolific Offender Checks" in which Sheriff's office employees would conduct "checks" of those listed. This resulted in the practice of frequent and often repetitive visits to the homes of those identified as "Prolific Offenders."

58.    Records for visits identified in the Sheriff's Office record system as "Prolific Offender Checks" showed that Sheriff's Officers visited a total of 4,473 unique addresses a total of 13,093 times.

59.    58% of all "PO Check" addresses (2,573) were visited just once, these visits constituted only 20% of all PO check visits.

60.    Many addresses were visited much more frequently: 1,900 addresses were visited two or more times, 255 total addresses were visited 10 or more times, and 30 addresses were visited more than 30 times.

61.    "Prolific Offender" visits occurred at all hours of the day, with a total of 2,109 visits (or 17.5%) of visits occurring between the hours of 10PM and 6AM.

62.    The number of "Prolific Offender" checks was relatively consistent from 2016-2019, then reduced significantly in 2020.

>  2)    *Code Enforcement Officers were more likely to issue citations*
>          *at Prolific-Offender-associated addresses.*

63.    Code Enforcement Officers, also under the direction of the Sheriff's Department, were more likely to have issued citations at the addresses where they had conducted visits denominated as Prolific Offender Checks and were more likely to issue multiple citations to these addresses than at other addresses where they issued citations.

64.    The 4,473 unique addresses where the Sheriff's Office conducted visits denominated as Prolific Offender Checks (hereinafter, "Prolific Offender" addresses) represented just 2.19% of the 204,198[2] households in Pasco County. The 1,114 unique addresses included in the Sheriff's Office's data for the specified code enforcement citations represent just .55% of households.

---

[2] Households, 2015-2019- Census QuickFacts Jan-26022 - Pasco County, Florida

65.     During the period reviewed, citations at most addresses were rare. At addresses not identified as "Prolific Offender" residents had a 0.5% (1 in 182) chance of being issued one of the citations included the data provided by the Sheriff's office, comparatively:

- "Prolific Offender" addresses had a 8.7% (1 in 11.5) chance of being issued a code enforcement citation;

- "Prolific Offender" addresses which were checked more than once had a 14.7% (1 in 6.8) chance of being issued a citation; and

- "Prolific Offender" addresses which were checked ten or more times had a 36.0% (1 in 2.8) chance of being issued a citation.

66.     Unique "Prolific Offender" addresses represented a total of 35% of all unique addresses included in the code enforcement citation data obtained from the Sheriff's Office and represented 45% of all citations included in that data. That means over a third of *addresses* associated with code citations in the data were also associated with the addresses of "Prolific Offenders." And nearly half of all the code citations, regardless of address, were associated with Prolific Offenders' addresses.

67.     Unique "Prolific Offender" addresses which received 1 or more citations included in the data received an average of 50% more individual citations than other addresses where citations were issued.

68.    "Prolific Offender" addresses in general were more likely to be cited than other addresses and more likely to be cited multiple times than other addresses receiving citations.

69.    Addresses with multiple "Prolific Offender" checks were more likely to receive tickets, and more likely to receive multiple tickets than those with one "Prolific Offender" check:

- 279 Unique Addresses with 2+ PO checks receiving citations:
  - Represent just .14% of Pasco County households but make up 25% of unique addresses with citations and 35% of the total number of citations;
  - 71% received multiple citations;
  - Average of 3.24 citations per address;

- 87 Unique Addresses with 10+ PO checks receiving citations:
  - Represent just .04% of Pasco County households but make up 8% of unique addresses with citations and 12% of the total number of citations;
  - 72% received multiple citations; and
  - Average of 3.7 citations per address.

70.    "Prolific Offender" addresses were most likely to have extremely high numbers of citations, a total of 15 (4%) of "Prolific Offender" addresses were issued ten or more citations in the code enforcement data obtained from the Sheriff's Office, compared to a total of 5 (.7%) of other addresses receiving tickets.

71.    Among the "Prolific Offender" addresses that were "checked" ten times or more, 63 (24.7%) were also cited more than once.

15

72.     The number of citations issued by the Sheriff's Office was relatively consistent from 2016-2019 and reduced significantly in 2020.

> 3)      *Plaintiffs' experience typifies the Sheriff's broader use of prolific offender checks and code citations.*

73.     The data concerning the individual Plaintiffs, taken as a subset of the data, reveals a pattern of prolific offender checks and code citations consistent with the above observations.

74.     Within this data set, addresses associated with Plaintiffs were visited a total of 83 times, 17 times between the hours and 10PM and 6AM. Within this data set:

- Darlene Deegan received 8 visits over the course of 4 months, including 4 visits between 10PM and 6AM;

- Robert Jones III received 34 visits over the course of 9 months, including 8 visits between 10PM and 6AM and 14 visits in less than 3 weeks during December of 2015;

- Tammy Heilman received 22 total visits over the course of 2017, 2018, 2020, including 3 visits between 10PM and 6AM; and

- Dalanea Taylor received 19 visits at 3 addresses, including 2 visits between 10PM and 6AM.

75.     Addresses associated with three out of the four Plaintiffs also received a total of ten code enforcement citations for the offenses included in the data set.

16

### D.    Rebuttal to Testimony of Ross Brummett

76.    In response to the disclosure of the Defense's expert witness, Ross Brummett, and the data used to support his assertions, my team carefully reviewed each of his claims, repeated our data analysis methodology on expanded data sets, and summarized all new data (as outlined above at part III.B.4) in order to test it against Mr. Brummett's claims.

77.    In addition to this analysis, we carefully reviewed the language of my initial expert report related to each claim in order to identify any potential misunderstandings or required clarifications.

78.    Upon completion of our review, we developed the following responses to the Defendant's key assertions.

### 1)    Sample vs. Population

79.    Brummett's critique of my analysis incorrectly focuses on basic limitations applicable to all data analysis which, based on my expertise in data analysis, I accounted for in my initial expert report.

80.    Brummett complains that my analysis looked only at data for seven code enforcement provisions, which were also the seven provisions applied to these specific Plaintiffs. However, this focus was an appropriate way to determine whether the experience of these Plaintiffs *with respect to those seven code*

*enforcement provisions* was reflective of a broader trend within the operations of the Sheriff's Office.

81.    My team analyzed each data set that was provided by the defendant at the time of the initial analysis. The intent of my analysis was to understand the activities associated with the Prolific Offender Program, and the activities of Sheriff's Office employees related to the addresses associated with Prolific Offender Checks. Specifically, I sought to understand whether the Pasco County Sheriff's Office exhibited a pattern of frequent and repetitive police activity focused on a small subset of the population, and whether this subset of the population was subjected to disproportionately high levels of code enforcement citations.

82.    The presence of additional code enforcement data does not lessen the validity of the analysis performed related to the data that was provided for the seven code enforcement provisions that were applied to these specific plaintiffs.

83.    The data provided in support of the rebuttal has, however, allowed me to expand my analysis to address the Defense's specific claims:

84.    **Defense Claim:** The Prolific Offender Check data did not include all CAD data for the time period reviewed.

85.    **Response:** The additional data on the total number of agency interactions with law enforcement show 2.5M records of anything that was logged

18

in the CAD system. This includes interactions of 361 unique natures, most of which are not similar to Prolific Offender Checks. The fact that the Sheriff's office performs a variety of other law enforcement duties outlined in this data in no way changes the impact that the PO Check program had on those living at PO check addresses.

86.    A summary of this data (included as Appendix C) includes the count of interaction by nature. Comparison of Prolific Offender Checks (13,093 calls) to calls of other Natures reveals that Prolific Offender Checks generated 26% more calls than Sex Offender Checks (10,327 calls) and 951% more calls than Probation Checks (1,376 calls).

87.    **Defense Claim:** By focusing only on specific code violations associated with the plaintiffs, I overstate the relative frequency of code enforcement activity at addresses associated with Prolific Offender Checks.

88.    **Response:** My report reflected analysis of the data assembled by the Defendant that are associated with the citations experienced by the plaintiffs. This analysis was performed in order to identify whether others were experiencing similarly disproportionate code enforcement, and the analysis demonstrated that the experiences of the Plaintiffs were like many others residing at addresses subjected to Prolific Offender visits.

89.     The initial analysis was not a small subset of the total violations. The code violations analyzed in my initial report represented 2,615 out of 6,662 (39.2%) of total violations issued by the Sheriff's Office. Furthermore, as the defense expert conceded, the data represented *all* data for the seven code enforcement provisions that were the subject of the initial analysis.

90.     The new data on all code enforcement citations allowed my team to understand whether the correlations we identified extended to all code enforcement citations by the Sheriff's deputies, beyond just the seven code enforcement provisions that were the focus of the initial analysis. Additional analysis of recently provided data which includes all violations, demonstrates that:

- A total of 34% of all 6,662 Sheriff's Office code enforcement citations were issued to PO addresses.

- Among those cited, the average number of code enforcement citations issued to non-PO addresses was just 2.6, while PO addresses received an average of 4.6 code enforcement citations. This means that PO addresses received 78% more code enforcement citations than others cited.

- 2,196 total unique addresses were ticketed (1.1% of the households in Pasco County – or 1 in 92 households).

- 493 unique addresses associated with PO Checks were ticketed, representing 22% of all addresses with PO checks - or 1 in 4.5 households).

- Together, this means that addresses associated with PO checks were more than 20 times more likely to receive code enforcement citations than other addresses.

91.   While the correlation was somewhat reduced when considering all 6,662 violations, this analysis demonstrates that the connection between PO visits and code enforcement is significant even when viewing all code enforcement citations. Furthermore, this analysis further confirms that the seven code enforcement provisions that were applied to these specific Plaintiffs were disproportionately applied at addresses that were also the location of PO checks. In other words, this disproportionate focus holds true for *all* code enforcement citations but is particularly acute for the seven code enforcement provisions that were applied to these Plaintiffs.

92.   **Defense Claim:** The Code Enforcement Data analyzed did not include code violations issued by the County.

93.   **Response:** My initial analysis focused on the activities of the Sheriff's Office, not the entire County. Citations issued by another agency (in this case, the County) are only relevant in demonstrating the actions of that other agency, not the actions of the Defendant.

94.   However, we did evaluate the defense expert's claim and have now also reviewed data on County enforcement. And, in fact, the analysis of this additional data strengthens my original analysis as follows:

95.   The County issued citations for code enforcement violations to 9.5% of PO addresses.

96.    In contrast, the Sheriff's Office issued citations to 34% of PO addresses.

97.    These combined findings further support my original finding that Sheriff's Office employees disproportionately cited addresses associated with prolific offender visits.

98.    My evaluation of the Defense's critique using the data provided by the Defense expert in support of these claims demonstrates that the Defense data not only fails to invalidate my original analysis, but also demonstrates that the problematic correlations identified in my preliminary report are more widespread than initially reported.

### 2)    Prolific Offender Designation

99.    The defense expert's critique of my analysis also reflects a misunderstanding of the analysis as originally performed and presented in my report. My team and I understood the limitations of the data provided and adjusted our analysis approach and presentation of findings to reflect these limitations.

100.   **Defense Claim:** Analysis mistakenly assumes that 4,473 unique addresses where Prolific Offender Checks took place were associated with Prolific Offenders at the time of the Prolific Offender Check or at the time of a code violation (for the entire six-year period analyzed in the data).

101.   **Response:** The Pasco County Sheriff's Office has never provided data sufficient to identify all individuals designated as Prolific Offenders, their status as active or inactive on the PO list, or their addresses at the time of PO checks or Code Enforcement activities. Recognizing this limitation, my analysis focused on the experiences of individuals living at addresses which had at one point been subjected to a PO check.

102.   The results of my analysis do not attempt to reflect the experience of every person designated as a prolific offender for the period they are designated as such. My analysis finds that individuals living at addresses associated with Prolific Offender checks were subjected to a high concentration of Sheriff's Office activities through these checks, and that they were more likely than others to receive citations from the Sheriff's office.

103.   This focus on addresses, rather than individuals, is also appropriate insofar as the claims in this case involve individuals who were targeted because they lived at addresses associated with prolific offenders—not because they themselves were on the prolific offender list.

3)   *Causation vs. Correlation*

104.   The distinction between causation and correlation in among the most critical concepts in data analysis and statistics. Correlation between one variable and another variable in analysis does not prove that a change in one variable causes

23

a change in the other variable. This is an important and valid consideration in all analysis. My initial analysis kept this distinction in mind and did not attempt to draw any conclusion beyond that supported by the data.

105. **Defense Claim:** Analysis mistakenly assumes that the encounters resulting in code violation citation occurred at the same time or in association with a POC or with Prolific Offender status.

106. **Response:** My analysis never directly stated or implied that the violation citations occurred at the same time or in association with the Prolific Offender status. We were not provided data that would allow us to determine whether a Prolific Offender resided at a particular address at the time of a citation, and the defense expert testified that the Defendant does not retain data to show the dates during which Prolific Offenders lived at particular addresses. As such I analyzed the available data to comment on the correlation between addresses which were subjected to Prolific Offender Checks, and addresses which received citations from Sheriff's Office employees.

107. My expertise in data analysis, and particularly regarding law enforcement data, informs my understanding of the issue of correlation vs. causation. Given this understanding, my report never stated or implied causation between the Predictive Policing program and citation activity. My analysis simply highlighted a problematic correlation which informed my opinion that individuals

at PO addresses were subjected to higher levels of citations than other addresses in the general population. I understand that the question of causation will be addressed by Plaintiffs through other types of evidence in the litigation.

108.   Brummett's critique misunderstands the findings of my original report in two separate ways. A careful review of my original report confirms that my findings of the correlation between PO checks and citations is statistically appropriate and well explained within the original report.

## IV.   Summary of Conclusions

109.   My analysis of data provided from the records of the Pasco County Sheriff's Office demonstrates that the Sheriff's Office subjects a subset of the population to a pattern of frequent and repetitive police activity.

110.   Specifically, I found that a small portion of addresses within the county were subjected to visits denominated in the Sheriff's Office records as "Prolific Offender Checks," and significant numbers within that group were subjected to multiple repeat visits—with 255 total addresses visited more than 10 times, and 30 addresses visited more than 30 times.

111.   Further, looking at the Sheriff's Office code enforcement data for a subset of seven county code provisions, I found that those *same* addresses were targeted for disproportionate code enforcement—accounting for 35% of all

addresses within the code enforcement data and 45% of all citations within that same data.

112.  Based on this statistical analysis, as well as my experience and expertise, I conclude that the Sheriff's Office subjected addresses associated with prolific offenders to heightened law enforcement attention that included heightened code enforcement.

113.  Further, I conclude that the data associated with the individual Plaintiffs is consistent with that broader pattern of disparate law enforcement focus.

114.  In addition, my review of the Defense Expert's testimony, and my analysis of the additional information provided in support of this testimony, both strengthen my initial findings and further highlight that the problematic trends visible in the initial data extend to larger data sets.

115.  Additional information provided on all policing activities confirms that activities associated with the "Intelligence-Led Policing" Program generated Sheriff's Office activity levels similar to, or in excess of, many other important law enforcement priorities, such as sex offender checks.

116.  My review of the data documenting additional code violations issued by the Sheriff's Office reveals that addresses associated with Prolific Offender checks are more likely to receive citations, and more likely to receive multiple

citations than others. This trend holds true across all code enforcement data but is particularly pronounced for the seven code enforcement provisions that were applied to these specific Plaintiffs. My comparison of Sheriff vs. County data further demonstrates that the Sheriff's Office concentrates code enforcement activity on addresses subjected to Prolific Offender checks at more than three times the rate of County officers.

117.   Based on this statistical analysis, as well as my experience and expertise, my conclusion is unchanged. I conclude that the Sheriff's Office subjected addresses associated with prolific offenders to heightened law enforcement attention that included heightened code enforcement. Further, I conclude that the data associated with the individual Plaintiffs is consistent with that broader pattern of disparate law enforcement focus.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June __2__, 2022.

*Michael Carrasco*

_____

Michael Carrasco