## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES III,

      *Plaintiffs*,

v.

CHRIS NOCCO, in his official
capacity as Pasco County Sheriff,

      *Defendant*.

Case No. 8:21-cv-00555-SDM-CPT

## DECLARATION OF DAVID KENNEDY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND INCORPORATED MEMORANDUM OF LAW

I, David Kennedy, hereby declare as follows:

1.     I am a citizen of the United States, a resident of New York, over the age of 18 years old, and fully competent to make this declaration. I knowingly and voluntarily make this declaration based on my personal knowledge. If called as a witness, I could and would testify competently under oath as to the facts set forth below.

2.     The opinions below were primarily disclosed in my expert disclosure and report, which is attached as Exhibit 1 to this declaration. Attached to that report, as Exhibit B, is my curriculum vitae.

1

3.     The opinions below were also discussed in my supplemental rebuttal report, which is attached as Exhibit 2 to this declaration.

## I.     Background and Qualifications

4.     My name is David Kennedy and I am a professor of criminal justice at John Jay College of Criminal Justice in New York City.

5.     I created the "focused deterrence" intervention framework—the same "focused deterrence" referenced by the Pasco Sheriff's Office in its 2018 Intelligence-Led Policing Manual.[1] I developed that framework from my experience as a principal in the Boston Gun Project in the mid-1990s, which pioneered a high-level action-research approach to public safety and the groundbreaking "Operation Ceasefire" homicide prevention strategy.

6.     I have also developed interventions focused on group and gang violence, individual violent offenders, intimate partner violence, street drug markets, opioid markets, prison safety, and other public safety issues.

7.     I have served two commissions of inquiry into police misconduct, the St. Claire Commission with respect to the Boston Police Department and the Mollen Commission with respect to the New York City Police Department.

---

[1] Defendant05149. All record citations are to Bates-stamped excerpts from the discovery productions in this case, and those excerpts are attached as Exhibit 3 to this declaration.

8.      I am currently the director of the National Network for Safe Communities at John Jay. With the National Network, I support cities implementing strategic interventions to reduce violence, minimize arrest and incarceration, enhance police legitimacy, and strengthen relationships between law enforcement and communities. These interventions have been proven effective in a variety of settings, have amassed a robust evaluation record, and are widely employed nationally and internationally.

9.      I have further worked with numerous cities and states, and with the federal government, to design and implement the Treasury Department's Youth Crime Gun Interdiction Initiative and the Department of Justice's Strategic Approaches to Community Safety Initiative, Drug Market Intervention Program, and National Initiative for Building Community Trust and Justice.

10.      I launched John Jay's Institute for Innovation in Prosecution, now a stand-alone entity at the college.

11.      My work has won two Ford Foundation Innovations in Government awards, two Webber Seavey Awards from the International Association of Chiefs of Police, and two Herman Goldstein Awards for Problem-Oriented Policing. I was awarded the 2011 Hatfield Scholar Award for scholarship in the public interest.

12.      I have authored two books, Don't Shoot: One Man, a Street Fellowship, and the End of Violence in Inner-City America (Bloomsbury 2011) and Deterrence

and Crime Prevention: Reconsidering the Prospect of Sanction (Routledge 2008); and I have co-authored another two, A Framework for Addressing Violence and Serious Crime: Focused Deterrence, Legitimacy, and Prevention (Cambridge University Press 2021) and Beyond 911: A New Era for Policing (Basic Books 1992). I have also published numerous articles on group and gang violence, drug markets, domestic violence, firearms trafficking, deterrence theory, crime prevention, police/community relations, and other public safety issues, as well as on action-research methodology. A list of my publications can be found in my curriculum vitae, in Exhibit 1 at Ex. B.

## II.   Statement of Compensation

13.   I am not being paid for any study or testimony I provide in this case.

## III.   Statement of Opinions, Bases for Opinions, and Facts and Data Considered in Forming Opinions.

### A.   Data and Materials Used and Considered in Forming My Opinions

14.   The opinions provided here are the result of decades of study and experience in criminology and policing.

15.   I have reviewed the legal filings in this case, particularly the Complaint, as well as documents produced to the Plaintiffs in discovery in this case, particularly the list of prolific offender checks, the Intelligence-Led Policing Manuals from 2016 and 2018, dispatch reports, and Pasco County Sheriff's deputies' body-cam video

4

recordings. Excerpts of the discovery documents to which I refer in this declaration are attached as Exhibit 3.

16.    I also reviewed the March 25, 2022, expert report of Richard Hough, which is attached to this declaration as Exhibit 4.

### B.    Pasco County Sheriff's Policies and Practices Misunderstand and Misrepresent Basic Criminology and Crime Prevention Frameworks

#### 1)    *It Is Impossible to Predict Serious Criminality at an Early Age.*

[T]the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside…juvenile offenders cannot with reliability be classified among the worst offenders.

-The United States Supreme Court, *Roper v. Simmons*.

17.    The entirety of the Pasco County Sheriff's Office's (PSO) "Intelligence-led policing" strategy is built on profoundly fallacious misrepresentations of the central findings in criminology and of evidence-based crime prevention. The core tenets of PSO's approach are simply wrong. Since the rest of the PSO's approach is built on these errors, they infect the policies and practices built on that approach.

18.    PSO commits the foundational error of holding that individuals, including children and juveniles, can be identified as "prolific offenders" based on brief snapshots of arrest and other criminal justice records. This position undergirds the rest of PSO's surveillance and enforcement strategy, which is based on

identifying, surveilling, and taking law-enforcement action against identified prolific offenders (as well as, to a lesser extent, focusing on place-based "hot spots," also erroneously, as will be addressed below).

19.     The January 2018 version of PSO's operations manual ("Intelligence-Led Policing Manual," 2018) makes a general case for intelligence-led policing, notes general facts about the concentration of criminal activity by person and place, and then says that "Accurate identification and intervention of at-risk youth can set them on the right path."[2] The key "fact" on which this is based comes from a quote from a book by criminologist Jerry Ratcliffe to the effect that *"David Farrington has pointed out that our knowledge of offending patterns is such that 'potential offenders can be identified at an early age with a reasonable degree of accuracy'."*[3] Later in the same document, PSO states that "A prolific offender is someone who is not likely to reform and has taken to a career of crime,"[4] presenting as fact the position that such "prolific offenders" can be identified and—given the preponderance of the manual's attention to juveniles and young people—can be identified at an early age.

---

[2] Defendant05145.

[3] *Id.* (citation omitted, emphasis added).

[4] Defendant05207.

20.     *This is absolutely, entirely wrong*, as has been proven by generations of research and applied practice. The quoted Farrington research—the only research PSO cites in support of this critical point—in fact shows the opposite.

21.     Farrington's research, like much of the social science in this area, looks at population-level tendencies and—not surprisingly—finds them: young people exposed to certain risk factors will, on the whole, show likelihoods of certain adverse outcomes, including criminal offending.[5] This is utterly uncontroversial, as it is in other settings: people who smoke are at heightened risk of lung cancer. In the latter setting, however, that clear fact says nothing whatsoever about whether *any particular person* will get lung cancer, or that those who will get cancer later in life can be identified early in their smoking careers.

22.     The same thing is true for Farrington's findings. He found that a set of risk factors—chiefly "socio-economic deprivation, deficit, poor parenting, family deviance, school problems, hyperactivity-impulsivity-attention deficit and antisocial child behavior"—created a tendency in later life toward a range of bad outcomes, including criminal offending.[6]

_____

[5] Farrington, David P. "Implications of criminal career research for the prevention of offending." *Journal of Adolescence* 13, no. 2 (1990): 93-113.

[6] *Id.* at 93.

23.     Several central features of Farrington's research, however, stand in direct contradiction to PSO's interpretation. Farrington looked at a cohort of young men and then looked at their behavior as it stood later in their lives, in their early 30s: that is, he was in no way finding "prolific offending" amongst children and adolescents. He did not even use criminality as a predictor of later offending; his bundle of risk factors was comprised of "low family income, large family size, convicted parents, low non-verbal intelligence, and poor parental child-rearing behaviour."[7] Most important, his findings about the *group* had no predictive value for any given *individual*: of his identified group of "vulnerable boys," more than a quarter had no criminal convictions at age 32, while of the group of boys deemed *not* at risk, fully 30 per cent *had* been convicted.[8] PSO's statement of fact that Farrington's research shows that "prolific offending" can be predicted for individuals, early in life, is thus completely unfounded.

24.     That findings about a group have no predictive value for a given individual is in keeping with a long-standing, broad range of research. An extensive attempt within criminology to identify individual "dangerous offenders" for enforcement attention foundered on the same shoals. It is true that serious offending is concentrated within a relatively small number of chronic, repeat offenders. So it

---

[7] *Id.* at 101.

[8] *Id*.

seemed reasonable to seek to identify and give such offenders special attention. But in practice, the project proved impossible. The best prediction protocols were less than 50 percent effective, and by the time such offenders' criminal records could be used to identify that extreme seriousness, perpetrators were old enough that the natural process of "aging out" of crime meant that on balance they were no longer particularly active.[9] Exactly *contra* the PSO's practices and policies, it was not possible to identify such serious offenders early on, or in fact at all in any useful way.[10]

25.    It is worth noting that Farrington was in fact clearly aware of these issues. Farrington was interested in predicting serious offending and offenders for the sake of *prevention*: "special welfare services designed to help them."[11] Given that misapplied special welfare services would, he thought, probably not be such a bad thing, he simply accepted any flaws in the prediction mechanisms. Shifting the focus to *enforcement*, he thought, changed that picture profoundly. "On the other hand," he wrote, "if the treatment consisted of sending identified children away to an institution, the costs would probably outweigh the benefits and prevent the use of

---

[9] Estrich, S., M. H. Moore, D. McGillis, and W. Spelman. "Dealing with dangerous offenders-executive summary." *Rockville, MD: National Criminal Justice Reference Service (NCJRS)* (1983).

[10] *Id.*

[11] Farrington, 106.

prediction in this context."[12] Yet that kind of enforcement focus is how PSO uses its "predictions."

26.     Beyond this, the protocols PSO is using to "identify" "prolific offenders" are arbitrary and meaningless. As has been noted, serious criminological and analytic efforts, over generations, have been unsuccessful in producing analytic methods that can predict prolific, chronic, and dangerous offenders.

27.     Part of the issue is that snapshots of relatively short periods frequently do not persist over time, such that one period of *active* offending does not predict *persistent* offending. Persistent and serious offending is not always signaled early on. This basic difficulty is exacerbated by the pattern of, especially, offending by males, which is typified by peak activity in adolescence typically followed by slowing and then "aging out" in the mid- and late twenties.

28.     PSO's "protocol" of picking an arbitrary window of three years and looking for at least two arrests in that window[13] is thus essentially guaranteed to sweep a large number of people into designation as "prolific offenders," with absolutely no reason to believe that they are in any way serious, much less "prolific" or dangerous. The point-scoring system that follows is completely arbitrary and has

---

[12] *Id.*

[13] Defendant05207.

no grounding in criminology, research, or proven field practice; neither does the application of "enhancements."[14]

29.     This "protocol" is largely based on arrests and does not require any verified criminal activity whatsoever. It includes (and could be built entirely on) "suspicions of an offense." And it expressly includes people in no way even suspected of criminality but who have *reported, witnessed, or been victims* of crimes ("(Involved Other, Reporting Person, Victim, Witness)").[15] It should go without saying that there is no justification whatsoever for designating someone as a "prolific offender" because he or she reported a crime to the police.

30.     As groundless as its "protocol" is, PSO expressly sets up alternative pathways to being designated a "prolific offender." PSO documentation states that "A person of any age with 7 or more verifiable instances of criminal activity from reliable intelligence sources related to violent crime, burglary, theft, narcotics violations within a three year period; or a gang member or gang affiliate with 5 or more verifiable instances of criminal activity from reliable intelligence sources related to violent crime, burglary, theft, narcotics violation, VOP, or FTA within a three year period" can be designated a "prolific offender."[16]

---

[14] *Id.*

[15] Defendant05207.

[16] Defendant00383.

31.     To anybody with even a passing familiarity with how criminal violations and criminal justice agencies work in practice, this is chilling. A "gang affiliate"—a category without any meaningful definition in law or practice—on probation who is known to his probation officer—a "reliable intelligence source"— to have over three years ago smoked marijuana three times and missed two probation meetings is by this definition a "prolific offender." (To underscore the casual nature of the information evidently deemed supportive in this process, the PSO document setting out this protocol contains the handwritten note, "Volunteer can go through Facebook," apparently as a source for evidence of gun involvement.)[17]

32.     Despite the apparent specificity of these "protocols," they can evidently be sidestepped in practice in order to widen PSO's net. A separate PSO manual for the "STAR Team" tasks members of the STAR Team to "use the above noted resources to regularly identify potential prolific offenders that our members need to target. STAR Team members will forward this information up the chain with an explanation as to why the person(s) should be targeted."[18]

33.     The 2018 version of the ILP Manual likewise states that the STAR "team is expected to actively work with other PSO members (particularly ILP and

---

[17] *Id.*

[18] Defendant00498.

detectives) and outside agencies to identify and target prolific offenders."[19] Similarly, school resource officers (SROs) are tasked with "offender identification and intelligence gathering," identifying "students who are at-risk of developing into prolific offenders . . . ," and collecting information about "associates of "priority offenders."[20] On the latter point, PSO expressly extends the office's surveillance and intelligence-gathering process to "associates" of "prolific offenders." "An Associates Profile will include basic information on an identified individual and his or her immediate associates to include addresses, prior criminal activity, and associate identifiers (i.e. criminal associate, friend, family, or codefendant)."[21]

34.    In sum, with respect to PSO's stated focus on a small number of "prolific offenders," there is no basis in criminology or other social science for the early identification of such persons; the office's actual "protocols" are groundless and in practice open-ended; the office establishes grounds for ignoring them to bring in other persons not covered by those porous definitions; and then extends those practices to undefined "associates."

---

[19] Defendant05199.

[20] Defendant05198.

[21] Defendant05184.

2)   *The Practices and Policies of PSO Misuse Social Network
     Analysis.*

35.   This same fundamental flaw—that serious and "prolific" offending
cannot be predicted at an individual level, particularly at a young age—applies to
the PSO's misuse of all the other criminology it cites, including its social network
analysis.

36.   PSO notes the importance of social network analysis (SNA) to its work,
through identifying criminal gangs and networks. It is correct that social network
analysis can be used to model victim, offender, and other relationships. Law
enforcement agencies typically build such networks by using existing criminal
justice data to make connections between individuals. They will take, for example,
a number of known offenders or victims; look at agency data showing that those
individuals have been arrested with or interviewed with other individuals; and thus
produce social networks ("sociograms") of linked people. Those depictions can be
very informative and useful.

37.   As with the prior picture, however, not all the people in such networks
are offenders (a grandmother driving a car with her "gang member" grandson in it
when the car is pulled over, leading to a police record that they had been stopped
together, is not thus a gang member). Not all offenders in such networks are
particularly important. And there is no protocol for automatically determining the
difference. In extensive criminal SNA, the most important individuals are in fact

very few. One study showed that fewer than four percent of the network in question accounted for half of the crime produced.[22]

38.    It is thus entirely unjustified to put in place an SNA protocol, as PSO does, that begins with the "District Top 5" offenders; conducts SNA to produce a network of the "District Top 5" and their associates; and put in place a protocol such that "There is a zero tolerance arrest policy for members of the district Top 5 and their associates."[23] Such a protocol is guaranteed to bring unjustified enforcement attention.

### 3)    The Policies and Practices of PSO Misuse "Hot Spots."

39.    PSO notes that criminology focusing on places has found profound concentration of crime by place, or "hot spots." PSO cites older research showing that about three percent of addresses in a city can account for around half of all calls for service.[24] Newer, not cited but along the same lines, has shown that even more concentrated "micro-places"—particular intersections and blocks representing around five percent of a city—will consistently be associated with around half of all

---

[22] Frydensberg, C., Ariel, B. & Bland, M. "Targeting the Most Harmful Co-Offenders in Denmark: a Social Network Analysis Approach." *Camb J Evid Based Policing* 3**,** 21–36 (2019) https://doi.org/10.1007/s41887-019-00035-x.

[23] Defendant05158.

[24] Defendant05153.

crime.[25] Crime has long been known to be concentrated by neighborhood. This research then shows that, even within such neighborhoods, criminal activity occurs in very small, concentrated areas.

40.     There is thus no justification for designating much larger areas as "hot spots," which PSO does with its "Strategic Targeted Area Response," or "STAR" strategy. "STAR boxes" are areas of "roughly 7–10 square miles."[26] An area some three miles on a side is, by definition, not an identified high-activity address, intersection, or block. Nearly all of the very large number of addresses, intersections, and blocks in that area will not be high activity. Making such a large, diverse area a "hot spot" is guaranteed to bring unjustified enforcement attention.

41.     Broad enforcement attention is expressly part of the STAR Team strategy. The teams are tasked with regularly liaising with a wide range of law enforcement agencies, including:

a.  Municipal Law enforcement agencies inside and adjacent to Pasco County.

b.  Area Sheriffs Offices

c.  Parole and Probation

d.  Juvenile Justice (Probation)

---

[25] Weisburd, David, Michael Davis, and Charlotte Gill. "Increasing collective efficacy and social capital at crime hot spots: New crime control tools for police." *Policing: A Journal of Policy and Practice* 9, no. 3 (2015): 265-274.

[26] Defendant05154.

e.  Code Enforcement

f.  ATF (gun related charges), ICE and other federal agencies

g.  Alcohol, Beverage and Tobacco

h.  HOA and other community organizations (in and related to the STAR Box)

i.  County Attorney

j.  Building Officials.[27]

42.    The teams are so tasked in order to focus broad surveillance and enforcement actions on these large areas. Specifically, as set out in the PSO's manual for the STAR Teams:

a.  Strategic, directed patrol in the STAR box in a marked unit. Traffic stops and citizen contacts should be driven by a desire to prevent crime, reduce the public's fear of crime and solving crime, with particular emphasis on the Big 4.

b.  Strategic directed patrol and surveillance in unmarked units. Traffic stops and citizen contacts should be driven by a desire to prevent crime, reduce the public's fear of crime and solve crime, with particular emphasis on the Big 4.

c.  Targeted knock and talks (with emphasis on identifying and targeting Big 4 offenders, even if the location is narcotics related).

d.  Request a list of recent Big 4 cases in the STAR box that have been recently inactivated. Review cases and consider strategies to develop leads. This will likely include enhanced neighborhood checks. Pathways to and from the incident location should be thoroughly examined for surveillance cameras and other leads that may have been overlooked during the initial LEO response.

---

[27] Defendant00500.

e.  Regularly obtaining lists of active JPOs in and around the STAR box (priority given to Big 4 offenders). Serve the JPOs and plan sweeps when appropriate.

f.  Regularly searching for and executing warrants in and around the STAR box (priority given to Big 4 offenders).

g.  STAR Team members have flexibility in regards to vehicles used, uniforms worn (PSO related or dressed down, when appropriate) and resources needed. Be creative as you pursue effectiveness. Some of your strategies will involve trial and error, which is acceptable and expected.

h.  Consider utilizing strategies that involve resources that are not readily available. We can explore ways to obtain and/or borrow needed resources, if necessary. For instance, if we are having problems with vehicle thefts, consider taking steps to find and utilize a bait car with a kill switch.

i.  Check BWI and research top pawners. Many of these people live in the STAR Box and are solid targets. Top pawners who live outside the STAR Box can be documented in an ILP tip for follow up by ACE or others.

j.  Identify adults on probation in the STAR box (with particular emphasis on Big 4 offenders). Conduct probation checks (in cooperation with Parole and Probation) to ensure compliance and strict accountability.

k.  Identify juveniles on probation in the STAR box (with particular emphasis on Big 4 offenders). Conduct probation checks (in cooperation with JPOs) to ensure compliance and strict accountability.

l.  STAR Team members should consider using strategic trash pulls on narcotics related residences located in the STAR box. The emphasis should always be to use our response to narcotics and other criminal activity with a clear motivation and focus on obtaining BIG 4 information as we address the other issues.

m. Utilize County Ordinance citations as a strategic tool to target prolific offenders and problem locations within the STAR box. Coordinate missions with Cpl. Art Madden and Code Enforcement to conduct STAR box Code Enforcement blitzes.

n.  Explore utilizing Nuisance Abatement and Minimal Housing standards to target prolific offenders and problem locations within the STAR box. This

will require active cooperation with the County Attorney and Building Officials.[28]

43.    The above instructions is a recipe for high levels of profligate, undifferentiated pressure on these large STAR areas.

> 4)    *PSO's Practices and Policies Misunderstand and Misuse Adverse Childhood Experiences, School Data, Child Protective Services, and Related Juvenile Criminology*

44.    PSO extends its profound misuse of core social science framings and literatures to invert understandings of child development, child protection, and education, and produce an unprecedented abuse of public systems designed to support, educate, and protect children. In a career spent theorizing about, researching, and designing interventions around crime and violence, I have never come across anything like this, have never heard anyone else voice the prospect of or apply practices like these, and would have been incapable of imagining anything of the kind absent PSO's policies and practices.

45.    PSO correctly notes that a large body of work in what is called "adverse childhood experiences" (ACEs) connects early childhood exposure to such experiences to troubles later in life. ACEs include a wide range of harmful and potentially harmful events, such as physical, emotional, and mental abuse; substance abuse; mental illness; divorce; a family member going to prison; emotional and

---

[28] Defendant00501–02.

physical neglect; and the like.[29] ACEs, and especially multiple ACEs, have demonstrable connections to later-in-life issues in health, well-being, school performance, social development, risky behaviors, and morbidity and mortality. These include such connections to criminality, victimization, and violence.[30] This work has been important in identifying and highlighting the importance of trauma in child development and its often-lasting implications into adolescence and adulthood. It has also helped develop a body of trauma-informed care and frameworks for prevention and therapeutic intervention.

46.     As with the other frameworks addressed here, this work is not predictive at the individual level: There is no way of looking at any ACEs experienced early in life by an individual and making a prediction about any such outcomes for that individual later in life. There is no way of making a prediction about that person's experiences of any ACEs and any future criminality, much less serious or "prolific" criminality. This impossible move is precisely what PSO claims to be making. Beyond that, it describes itself as drawing on special access to school,

---

[29] Boullier, Mary, and Mitch Blair. "Adverse Childhood Experiences." *Paediatrics and Child Health* 28.3 (2018): 132–37.

[30] Perez, Nicholas M, Wesley G Jennings, and Michael T Baglivio. "A Path to Serious, Violent, Chronic Delinquency: The Harmful Aftermath of Adverse Childhood Experiences." *Crime and Delinquency* 64.1 (2018): 3–25.

student performance, and state child protective services data and information to make these "predictions" and to label children as "prolific offenders."

47.     All of this is utterly ungrounded and unscientific. These pieces of information cannot, through any analysis or manipulation, predict any young person's future behavior. *There is nothing that can predict that a child will become a dangerous or prolific offender.* **Nothing**. Each of the PSO's manipulations of its "data"—the naming of categories, the three- and four-level "scales," the summing into "overall scores"—is completely arbitrary. The process has absolutely no validity; the outcome is meaningless. It is deeply, fundamentally misguided—and, absent this case, completely unimaginable—to use the framing and literature on adverse childhood experiences, with its deep recognition of the importance of trauma in a child's development, to target children as "destined to a life of crime."[31]

### C.     PSO's Policies and Practices Are Ineffective at Stopping Crime and Ultimately Harm the County's Residents

#### 1)     PSO's Policies and Practices Are Not "Focused Deterrence" as Understood and Accepted by Mainstream Criminology

48.     One of, and perhaps the main, practice PSO deploys against individuals labeled as "prolific offenders" is what the office calls "prolific offender checks": surveillance and enforcement actions taken by deputies against those individuals, their families, and their associates. The 2018 version of the ILP Manual states:

---

[31] Defendant05145.

"Prolific offender checks are based on the theory of focused deterrence."[32] The

Manual goes on to explain:

> Focused deterrence strategies look to directly influence perception of the risk
> of committing crime. At PSO, our efforts are focused on those we identify as
> prolific offenders. During checks, it is important we communicate to these
> offenders that because of their criminal activity, they have been identified for
> an enhanced focus by the Pasco Sheriff's Office and they have only two
> options. First, our preferred option is they can stop committing crimes and
> become a productive member of society. To this effort, PSO has developed
> palm cards (see Appendix C) to pass out to prolific offenders, which identify
> resources in the community to assist them on the road to becoming a law-
> abiding citizen. Otherwise, the second option is to bear the consequences of
> their criminal ways through relentless pursuit, arrest, and prosecution and to
> ensure they are no longer in a position to harm the citizens of Pasco County.[33]

49.     But PSO's practices and policies are absolutely, and emphatically, *not*

focused deterrence. I created the "focused deterrence" framework out of my

experiences in the Boston Gun Project and have been at the forefront of an expanding

body of theory, practice, and social science, and an international community of

practice, for the nearly three decades since. I have consulted a variety of police

departments on focused deterrence and its implementation. I've never once spoken

with PSO.

---

[32] Defendant05149.

[33] *Id.*

50.    As I detail below, focused deterrence is an evidence-based prevention framework aimed at violence and other extremely serious public-safety issues. It has been successfully employed with respect to homicide, gun violence, overt drug markets, intimate partner violence, and other such issues.[34] It has, by definition, a severely limited operational scope; the "focus" in question is with respect to a small number of people and a particular type and severity of behavior.

51.    The original focused deterrence strategy operated with respect to the gangs and drug crews that were central to homicide and gun violence in Boston in the mid-1990s—not on any of the much larger categories of even serious offenders in the city—and then only on any actual violence. It did not operate on gang membership, drug activity, or any other criminality in which they might be involved.[35] That intervention operated with a focus on groups, not on individuals as such, as have most subsequent applications of the approach. They are typically designed and implemented by robust partnerships that comprise a range of law

[34] *See generally* Braga, Anthony A., and David M. Kennedy (2021). *A Framework for Addressing Violence and Serious Crime: Focused Deterrence, Legitimacy, and Prevention*. Cambridge University Press.

[35] Braga, A.A., Kennedy, D.M., Waring, E.J. and Piehl, A.M., (2001). Problem-oriented policing, deterrence, and youth violence: An evaluation of Boston's Operation Ceasefire. *Journal of Research in Crime and Delinquency*, 38(3), pp.195–225.

enforcement partners, including local and federal prosecutors and probation and parole offices—not just police, community figures, and providers of social services. The express intent is to reduce violence and other extremely serious harms while also reducing enforcement, strengthening the affected community, and supporting those most at risk (the catchphrase for the focused deterrence strategies aimed at homicide and gun violence is that those at highest risk should be "safe, alive, and free"). I have written elsewhere that focused deterrence:

> is most fundamentally premised on the central finding across large numbers of jurisdictions that homicide and gun violence are concentrated among small numbers of extremely high-risk groups, with aggregate members of all such groups typically representing at or less than one half of 1% of the population while being connected to half to three quarters or more of all homicides. It is further premised on the recognition that the violence in question is driven by group dynamics that cannot be understood or addressed by attention to individuals: that, for example, a long-standing vendetta or "beef" between two such groups will not be much affected by, say, arresting and incarcerating each of the last shooters from each side because these actions leave both the groups and the vendetta in place and have little or no preventive effect on subsequent violence. It is further premised on the notion that homicide and other serious violence are special and deserve special attention, above and beyond other crime and public safety issues. Beyond that, it is informed by the realization that high-risk groups and group members experience shockingly high levels of victimization and trauma; that they and their communities have frequently been exposed to profligate and damaging policing and criminal justice practices; and that it is essential to reduce the exercise of state authority as much as possible, to build the legitimacy of the police and other authorities, and to build trust between the authorities and communities. (As the approach has evolved, some of its original authors now argue that the growing focus on supporting and protecting those at high risk, on strengthening communities, and on legitimacy makes the "focused deterrence" label a fundamental misnomer). And beyond that, it is in practice predicated on the fact that frontline law enforcement and community insight into group and violence

dynamics are invariably far richer and more accurate than any formal or administrative data, and it puts a premium on drawing on that insight.[36]

52.     Central features of focused deterrence strategies are that they seek to minimize enforcement, in part by ensuring that those at risk understand their legal exposures and the ways in which legal authorities intend to act; that community actors clearly communicate their support for those at risk, and their disapproval of violence, again partly to make enforcement unnecessary; and that robust, meaningful, and immediate support and resources are mobilized and made available (these resources typically include addressing immediate needs around safety; food, clothing, and shelter; assistance with essentials such as identification; help with outstanding warrants, fines, fees, child support, etc.; any such needs for immediate family; and pathways to school and employment).[37] All of this is explained face-to-face by members of the partnership to those at high risk, in collective and individual meetings carefully designed to be safe, respectful, and supportive, including through the application of the formal social science literature on procedural justice.[38]

---

[36] Kennedy, David M. "Response to 'What works with gangs: A breakthrough'". *Criminology & Public Policy* 18, no. 1 (2019).

[37] See, for example, https://nnscommunities.org/wpcontent/uploads/2017/10/ Support_and_Outreach_White_Paper.pdf.

[38] Wallace, D., Papachristos, A.V., Meares, T. and Fagan, J., 2016. Desistance and legitimacy: The impact of offender notification meetings on recidivism among high risk offenders. *Justice Quarterly*, *33*(7), pp.1237–64; Papachristos, Andrew V., Tracey L. Meares, and Jeffrey Fagan. "Why do criminals obey the law? The

53.     These direct engagements can be welcomed by the at-risk individuals involved. As one group member in Philadelphia said:

> I have nothing bad to say about [this initiative] or those a part of it. They out here delivering a message that everyone needs to receive; I definitely needed to receive it. If I could give the quality of their message a 1 out of 5, I would give it a 10.[39]

54.     Such direct contacts are special and rare events; cities typically conduct the collective meetings ("call-ins") no more than quarterly, and individual meetings ("custom notifications") once per person. Focused deterrence interventions typically rely centrally on informal communication amongst social networks to transmit the core information; most at-risk individuals will not be part of either call-ins or custom notifications.

55.     Where focused deterrence approaches are directed at individuals, a central feature is often a partnership with an "influential": someone already in the individual's life, usually a family member, who can participate in the intervention and support the individual during and after.[40]

---

influence of legitimacy and social networks on active gun offenders." *The Journal of Criminal Law and Criminology* (2012): 397–440; Kennedy, David M., Mark AR Kleiman, and Anthony A. Braga. "Beyond deterrence." *Handbook of crime prevention and community safety* 157 (2017).

[39] "Group Violence Intervention In Philadelphia: Update" City of Philadelphia, December 2021, https://www.phila.gov/media/20220105112259/ Jan32022GunViolence-003.pdf.

[40] Kennedy, D. M. (2009, March). Drugs, Race and Common Ground: Reflections on the High Point Intervention. *National Institute of Justice Journal*, No. 262.

56.     What PSO is doing through its "prolific offender checks" is not remotely focused deterrence.

57.     The "checks" are not aimed at violence or otherwise severe public safety issues; they not aimed at groups or group members, but instead individuals as such; they are not aimed at a narrow set of particularly serious harms, but instead any and all legal violations.

58.     Further, these "checks" employ as much enforcement as possible; they are intrusive, disrespectful, and clearly frequently traumatic; there is next to no help offered or available[41]; other family members are treated as targets and themselves subjected to enforcement action; and the "checks" are clearly and repeatedly deeply unwelcome. As with its other flagrant misinterpretations and misapplications of the criminological and crime prevention literatures, PSO has essentially taken focused deterrence and turned it on its head.

---

[41] The only concrete reference in the PSO materials is a small card listing providers; it itself begins with a threat—"Panhandling is prohibited in Pasco County." Defendant05208. And a review of the event and incident reports provided to me reveals only one instance amongst the scores of "checks" in which a deputy made any reference to help or services: the deputy "checking" on Anthony McDougall on 8.9.20 reported that he "made contact and provided community resource guide. Defendant24117.

2)   *PSO's Home Visits and Other Enforcement Practices and Policies Are Abusive, Deceptive, and Deviate from Typical Supervision Schemes.*

59.    It is widely recognized in community corrections that the overwhelming preponderance of technical probation violations in fact go unobserved and unpunished; probation supervision regimes are designed with the supervisee and his or her needs in mind, and with the expected supervision from the probation department, without any expectation that police or other authorities will extend surveillance and tip that balance.

60.    But PSO's policies systematically extend surveillance and link it to the most draconian sanctions possible. A number of the enforcement actions related in the record are the result of deputies surveilling "prolific offenders" and their families, discovering probation violations—violations that would otherwise have gone unobserved and unpunished—and mobilizing the probation system to sanction supervisees.

61.    PSO school resource officers (SROs) are instructed to use their trusted position in public schools to look for "offenders," share that "intelligence," surveil school parking lots for suspect vehicles, and the like.[42] PSO systematically pressures prosecutors to try juvenile "prolific offenders" as adults,[43] including a protocol to

---

[42] Defendant05197–98.

[43] Defendant05150–51.

send a form letter to prosecutors whenever it deems such elevation statutorily possible. The letter includes language that PSO has "identified a chronic juvenile offender" and that "the offender's extensive criminal history" and the "adverse impact this individual has on the community" justifies prosecution as an adult.[44] Given the spurious processes through which PSO identifies "prolific offenders," and the well-accepted fact that such elevations should be used rarely and with great discretion, the harm this practice could produce is incalculable.

62.    It is clear that these harms are not accidental or incidental, but rather are intentional and central outcomes of PSO's policies and culture. As PSO documents note, the goal is to "Send a message. We are going to keep watching you. If we can get them to stop criminal behavior [sic], the goal is to get them to move away or go to prison on new charges that we discover, that's what we are looking for!"[45]

63.    PSO deputies note how many evictions they have achieved as part of their performance evaluations, "including prolific offenders," with the thus explicit recognition that some such evictions are *not* offenders, even by PSO's spurious

---

[44] Defendant05151.

[45] Defendant24425.

definitions.[46] One deputy cited as an accomplishment the eviction of a "[p]rolific [o]ffender['s] . . . *mother*."[47]

64.   Escalation is clearly evident in most of the encounters present in the record. Deputies consistently become more aggressive and make things worse. It is clear that this is deliberate.

65.   In one example of a visit to Plaintiff Tammy Heilman's home, the deputies think that they have observed, in then-juvenile D.M.'s backyard, other juveniles with marijuana. When they regroup at their patrol units, one deputy says, "Let's stir something up with this." A deputy then advocates for calling Child Protective Investigations on the grounds of distribution of narcotics. "Which is police-speak for they're a bunch of fucking assholes," one says. The deputy who believes she saw marijuana says, "I'm just doing it as a big fuck-you." As the group of deputies walks back to the house, one of them says, "Hey, last time we made [D.M.'s mother] cry."

66.   "Prolific offenders" and their families are subjected to repeated, intrusive contacts. To take one brief window for R.J., then a juvenile: PSO deputies went to the house on November 13th, 2015; again on November 14th; again on December 11th; again on December 21st (two units and two reports); again on

---

[46] Defendant18582.

[47] Defendant18602 (emphasis added).

December 22nd; twice on December 23rd, at 3:00 PM and again at 9:45 PM; four times on December 26th—the day after Christmas—at 12:14 PM, again at 8:30 PM, again at 10:30 PM, and again at 11:30 PM; twice on December 29th, at 4:30 PM and again at 9:45 PM; again on December 30th; three times on December 31st, at 11:30 AM, again at 4:00 PM, and again at 7:40 PM; again on January 3rd; and twice on January 4th, at 4:02 PM and again at 4:23 PM. Not surprisingly, by the end of this the family would not even engage with the deputies; when a deputy went to the house at nearly 8:00 PM on December 31st—New Year's Eve—he wrote that, "Upon arrival I could see [R.J.] and a teenage female inside the home. Once they saw me, they shut off all the lights and refused to come to the door. We banged on the doors and windows but they would not answer and would not come out."[48]

67.    This pattern of multiple, frequent visits is repeated throughout the record. There is no conceivable legitimate purpose to be served in this fashion. The volume of contacts is itself abusive; this would be more than enough, for example, to support a restraining order were a member of the public behaving in like fashion.

68.    PSO's conduct during the "checks" is further abusive. There is no acceptable professional reason to "bang on the doors and windows" of a house known to be inhabited by two (frightened) juveniles. In one visit, a juvenile present asked if he was being detained; a deputy replied, "You're an idiot. You're inside a

---

[48] Defendant24235.

house. How are you being detained, moron?" (Given that the house had been surrounded by deputies for some time, it seems reasonable for a juvenile to wonder whether he is free to leave.) During that same visit, after a juvenile female told deputies through a window from inside the house that her father had told her to wait a short time for him to return and not to talk to deputies in the meantime—"we're kids," she said, "we can't answer anything"—deputies persisted in pressuring her to disobey her father and talk to them anyway. During one home visit to D.M., a deputy says to a family member, "You're fat and ugly, shut the hell up." After D.M. is arrested, handcuffed, and placed in a patrol unit, the deputy says, "Happy New Year, bro, fuck you."

69.     PSO frequently threatens the "prolific offenders" and others present: during one of the "checks" on Jones, officers "advised" the then-juvenile that "any future criminal activity would lead to him being direct filed as an adult."[49] Note that this represents at best misdirection on the part of the officers, since any such decision would be made by prosecutors, not by the sheriff's office. It seems unlikely that a juvenile would understand that the officer threatening him did not in fact have that power.

70.     There is a repeated pattern of—again, at best—misdirection deployed against juveniles. In one appalling encounter, deputies looking for D.M. visit his

---

[49] Defendant24185.

home, where his mother says he no longer lives; realize his juvenile sometime-girlfriend is there; ask D.M.'s mother for permission to speak to her; draw her away from D.M.'s mother, who is the responsible adult present; say to the girlfriend, "Can we have a word with you? You're not in trouble;" and proceed to interrogate her about her criminal history (none, she says). They then tell her to stay away from D.M.; repeatedly demand that she tell them where D.M. is; tell her that they know she is lying, and that lying is a crime and will lead to her arrest and incarceration; and warn her that they may return for her: "It may be your first trip to jail." It would appear, in fact, that *the deputies were lying*. Florida Statute § 837.05(1)(a) states that a person commits the offense when he or she "knowingly gives false information to a law enforcement officer concerning the alleged commission of any crime." The deputies were not investigating, or asking the girlfriend about, a crime. They wanted only the location of another juvenile. She was at the time sixteen years old and clearly frightened.

71.     PSO employs the same misdirection with juveniles' parents.

72.     After a long colloquy with Robert Jones III and his son R.J., in which they present themselves as there to help R.J., deputies ask for and are readily granted access to the family house. They then search R.J's room, going through drawers and his possessions, and ask him questions about his drug use—apparently without his father being present—which he readily answers. The deputies find a number of

empty plastic bags, which they take. They take the father and son outside and tell them they're not going to act with respect to the bags, which the deputies believe contain drug residue. In fact, the deputies have the bags tested and return several days later and arrest R.J.

73.    The office uses its powers to threaten and coerce family members and turn them into informants.

74.    In a report detailing a "check" on D.M., a deputy wrote that they "met with [D.M.'s brother] 9/10/02 and he advised [D.M.] does not live at the address any longer. He stated their step-dad kicked him out about a month ago. [D.M.'s brother] had no knowledge of who [D.M.] could be with or where he has been. I advised him to contact the SO if he finds [D.M.'s] current location otherwise deputies will continue making visits to the home looking for [D.M.]."[50] PSO regularly draws attention to the homes and families involved in these "checks"—"sounded siren and horn several times no response from homeowner"[51]—and involves friends and neighbors. A deputy conducting a "check" on Dalanea Taylor found the house empty and tracked her down through a "family friend, KAREN HODGES (5/25/73), at 7208 Adare Dr."[52] Going to friends and neighbors for such information is a pattern

---

[50] Defendant24103.

[51] Defendant24165.

[52] Defendant23987.

repeated in the reports. These abuses have predictable and harmful effects on the "prolific offenders" and their families: one report records that during a "check" on Dalanea Taylor, "Made contact with Dalanea Taylor at her listed address. Her mother came bursting out of the door yelling about the time (0745hrs). Her mother continued to yell at me for showing up too early and wanted to know how long the SO was going to continue coming to her house to check on Dalanea. I explained it would be a couple of years. At that time, she stated she was going to make Dalanea move."[53] Deputies gratuitously share sensitive and harmful information. Talking to a neighbor while looking for Tyler Paneson, a deputy says, "He'll be going back to jail as soon as we find him. He just got out of prison."

75.     PSO explicitly mobilizes this sort of adverse public presence against "prolific offenders" and their family members. As one deputy says to Darlene Deegan as they pressure her about her son's whereabouts, "He's bringing a lot of negative attention to you, and the neighbors are not even happy about it either."

76.     PSO repeatedly and apparently routinely questions "prolific offenders" and family members about their personal lives, romantic partners, and sexual behavior. Deputies "checking" on Dalanea Taylor on November 24th, 2017, wrote that she "is currently [pregnant] and is approximately 3 months along. She stated the

---

[53] Defendant23993.

father's name is Damien but could not provide the last name. She said she couldn't remember it off the top of her head."[54]

77.     In a subsequent visit, the deputy recorded that she "is currently dating a guy named Antonio who is not the father of the babies."[55] The colloquy between the deputy and Dalanea is excruciating. The deputy interrogates her at length about her pregnancy, who the father is, whether he's going to be "in the picture or not," and repeatedly laughs at her and snorts his disbelief at her answers.

78.     This pattern is repeated throughout the record. Reporting on a "check" on D.M., the deputy wrote that "[D.M.] advised he has been staying out of trouble and is currently in a relationship with [redacted], who was at one point listed as S8 (PSO 17018395)."[56] The reporting strongly suggests that the deputy ran a background check on the person in question. In another visit, with D.M. absent, deputies press D.M.'s brother A.M. about who D.M. has been seeing. There is no legitimate reason for this intrusion by law enforcement officers into the personal lives of members of the public.

79.     PSO's "prolific offender" protocol requires maximum enforcement action be taken where possible.

---

[54] Defendant23991.

[55] Defendant23995.

[56] Defendant24051.

80.    A particular aspect of this is the deliberate use of citations and fines directed at family members of "prolific offenders." Tammy Heilman, D.M.'s mother, was cited on March 1st, 2016, for a lack of house numbers on the family mailbox.[57] Two days later, she was cited for having five chickens in her yard.[58] Just the citation for five chickens alone ran to $2,518: five hundred dollars for each chicken, plus a court cost.[59]

81.    This is also a repeated pattern. PSO went to Tyler Paneson's home asserting that they had probable cause for his arrest, found nobody home, and used a neighbor to track down his mother, Darlene Deegan. Deegan responded promptly, cooperated, and was cited for five different code violations. Together they totaled $2,625, plus court costs.[60] Note that in each case the person sanctioned is not a "prolific offender," but the prolific offender's *mother*.

82.    Many of these citations are explicitly pretextual.

83.    Deputies directly explain that they are being imposed on "prolific offenders'" family members because of that association and in order to extract information from family members.

---

[57] Defendant24017.

[58] Defendant24019.

[59] Defendant10119.

[60] Defendant08755–80.

84.     When Darlene complains that she feels she's being harassed because of her son, deputies tell her that she in fact is: "Your son needs to take care of business," they tell her. "If you're able to cooperate a little bit, the corporal can work with you on the citations." The deputy in question makes it clear that this is routine and PSO policy. He used to be a PSO "code deputy," he explains. "Any time there was anybody that was uncooperative, we used to write citations to." He got the current "code deputy" on the phone, who confirmed that he would intercede with the county on the citations if she cooperated. The pressure was effective, and Darlene supplied the deputies with phone numbers. Similarly, when Tammy refused to produce D.M. for a deputy, a deputy cited her for "hurricane debris."

85.     This application of coercive pressure extends beyond mere *civil* enforcement to the abuse of PSO's *criminal* enforcement and arrest powers.

86.     Deputies regularly tell "prolific offenders" and their family and friends that they are using or will use their powers of arrest if they don't cooperate in giving up information.

87.     For instance, a deputy tells D.M. that he's being arrested on a probation violation for being in the presence of narcotics because he didn't go and check on his back yard when she asked if someone was there. "I tried to get his cooperation and he declined to do so," the deputy says. During another visit, deputies threaten Tammy with a probation violation if she lies about D.M.'s whereabouts. Beyond

that, they threaten to intervene through her probation officer: "Give me something," one deputy says. "Help me out so when I talk to your probation officer, I have something good to say." They then turn to her son, and D.M.'s brother, A.M., and threaten him with consequences to his mother: "Help your mom out, man," the deputy says. When they ask for access to question D.M.'s girlfriend, they say to Tammy, "Somebody's got to help you out, mom. Give us something." Note that throughout all this, there is no indication that Tammy has done anything wrong whatsoever. The deputies appear to be pressuring her and her family simply because they can.

88.     When R.J. is arrested on the residue charges, deputies explicitly say that it is because he is not being cooperative about his school attendance, and that they would not arrest him if he were being "honest with us" (R.J. maintains that he is being honest). When the elder Jones is arrested on the ludicrous grounds that having a juvenile in his home smoking a cigarette is "harboring," deputies explicitly tell him that they are bringing the charge because he was uncooperative in giving up information on his family and juvenile houseguest.

89.     Again, there is simply no professional reason for using these tactics of abuse and deception, especially towards juveniles.

3)   *PCSO's Practice and Policy of Home Visits and Other Enforcement Practices and Policies Are Harmful and Not Accepted by Mainstream Criminology.*

90.    PSO's actual practices can be expected to, and clearly do, cause harm.

91.    While, as noted, there is no theoretical or operational precedent or justification for PSO's practices, a lesson can be drawn from the failed history of attempts to prevent crime and improve supervisee outcomes through intensive probation and parole supervision, or "intensive supervision programs" (ISP).

92.    These interventions, which were briefly in policy favor in the 1980s and 1990s, were much more limited, thoughtful, and careful versions of specialized, focused support and supervision.

93.    Selected probation and parole supervisees were given an enhanced menu of services and supervision. "Most programs call for some combination of multiple weekly contacts with a supervising officer, unscheduled drug testing, strict enforcement of probation or parole conditions, and requirements to attend treatment, to work, and to perform community service. Case-loads typically consist of thirty to fifty offenders per officer."[61]

---

[61] Petersilia, Joan, and Susan Turner. "Intensive probation and parole." *Crime and Justice* 17 (1993): 281-335, 282.

94.     *Contra* PSO, these interventions were applied by professional community corrections staff; were limited—by definition—to people who had sustained criminal convictions; mobilized carefully developed menus of supportive services; employed far more limited, focused, and professional surveillance and supervision protocols; and were expressly intended to substitute for traditional enforcement and incarceration regimes.

95.     These intensive programs were, nonetheless, failures. In practice, the enhanced attention to supervisees led to enforcement that swamped any supportive effects and led to more jail and prison. "Intensive supervision probation did not decrease the frequency or seriousness of new arrests but did increase the incidence of technical violations and jail terms. Stepped-up surveillance and frequent drug tests increased incarceration rates and drove up program and court costs compared with routine supervision."[62]

96.     In other words, a much more rational, limited, and supportive regime than the one PSO is practicing nevertheless made things worse.

97.     That history means it is predictable and well-understood how PSO's policies and practices will cause harm.

98.     PSO deliberately sets family and friends against one another, pressuring adults to inform on their children, children to inform on their parents, friends to

---

[62] *Id.* 281.

inform on friends. This disruption of normal social networks will inevitably lead to bad outcomes.

99.    The literature on corrections makes clear that those networks, particularly family networks, are central to successful outcomes:

> [T]he findings from the research consistently have demonstrated that family support is a powerful and substantively meaningful protective factor against recidivism (Shapiro and Schwartz, 2001). The family provides badly needed prosocial ties (Naser and La Vigne, 2006; Phillips and Lindsay, 2011), aids in helping an offender reenter and reestablish him- or herself within the community (Uggen, Manza, and Behrens, 2004), and offers a level of supervision and accountability for an offender (Western et al., 2015). The social context of the family often provides a means in which the returning individual can engage in identity transformation toward a prosocial, postincarceration identity (Ekland-Olson, Supancic, Campbell, and Lenihan, 1983). In summarizing findings from a groundbreaking study of returning individuals' statements on the importance of family, Nelson, Deess, and Allen (1999) concluded that "people with strong supportive families are more likely to succeed than those with weak or no family support . . . self-defined family support was the strongest predictor of in- dividual success" (p. 10). When we take this research as a whole, family support clearly exerts an independent effect on postrelease outcomes (see, generally, Visher and Travis, 2003).[63]

100.    It is in no way surprising that some families will choose to avoid PSO's pressure by severing ties with their children, as evidently happened in several of the cases addressed here.

---

[63] Boman IV, John H., and Thomas J. Mowen. "Building the ties that bind, breaking the ties that don't: Family support, criminal peers, and reentry success." *Criminology & Public Policy* 16, no. 3 (2017): 753-774, 755.

101.   There is broad recognition in criminal justice of the very serious and cascading impact of the fines and fees connected with the civil citations PSO emphasizes. For context, in 2018—the year that Darlene Deegan was fined more than $2,500—the Federal Reserve reported that "[f]our in 10 adults [nationally], if faced with an unexpected expense of $400, would either not be able to cover it or would cover it by selling something or borrowing money."[64] A United States Department of Justice publication says that:

> The effect of [fines and fees] on individuals, their families, and our communities can be devastating. In isolation, an individual fine or fee may appear insignificant, but for many people, paying a fine that, together with associated fees and assessments, can easily exceed several hundred dollars can be challenging. And the obligations can easily and rapidly add up. For example, a person ticketed for a municipal violation who cannot afford to pay the original fine can be charged late payment fees and compounding interest and be subjected to further consequences such as wage garnishment or driver's license revocation. The accumulation of obligations can result in hundreds, if not thousands, of dollars of debt. Moreover, some local and state courts across the United States also employ [fine and fee] collection practices that are not only unwise and harmful, but also unconstitutional. In certain jurisdictions, courts have routinely incarcerated individuals for nonpayment of fines they simply cannot afford, even though the Constitution prohibits it. Because of these practices, even individuals charged with non-criminal minor violations can suffer significant and prolonged harm if they have limited financial means.[65]

---

[64] "Report on the Economic Well-Being of US Households in 2017," Board of Governors of the Federal Reserve System, May 2018, p.2,

https://www.federalreserve.gov/publications/files/2017-report-economic-well-being-us-households-201805.pdf.

[65] "Resource Guide: Reforming the Assessment and Enforcement of Fines and Fees," OJP Diagnostic Center, Office of Justice Programs, US Department of Justice. Nd. p.2.

102.   PSO's practices are creating such burdens, as a matter of deliberate policy, on individuals and families. And PSO often does this not because those people have done anything wrong (even under the office's flawed methods) but instead because of their association with a "prolific offender."

103.   It is also well understood in the research literature that young people's early contacts with the criminal justice system are harmful. Studies have found that juveniles formally processed in the criminal justice system are as much as seven times more likely to continue to adult criminality than equivalent juveniles who are not.[66] Caufmann *et. al.* looked at a large sample of adolescent boys processed through the criminal justice system and found that, relative to an equivalent group who had instead been diverted, there were more likely to face a surfeit of negative consequences:

> [Y]outh who were formally processed during adolescence were more likely to be re-arrested, more likely to be incarcerated, engaged in more violence, reported a greater affiliation with delinquent peers, reported lower school enrollment, were less likely to graduate high school within 5 years, reported less ability to suppress aggression, and had lower perceptions of opportunities than informally processed youth. Importantly, these findings were not moderated by the age of the youth at his first arrest or his race and ethnicity. These results have important implications for juvenile justice policy by indicating that formally processing youth not only is costly, but it can reduce public safety and reduce the adolescent's later potential contributions to society.[67]

[66] Gatti, U., Tremblay, R. E., & Vitaro, F. "Iatrogenic effect of juvenile justice." *Journal of Child Psychology and Psychiatry*, 50, 991–998 (2009).

[67] Cauffman, Elizabeth, Jordan Beardslee, Adam Fine, Paul J. Frick, and Laurence Steinberg. "Crossroads in juvenile justice: the impact of initial processing decision

104.   PSO's surveillance and arrest practices can thus reliably be expected to have adverse consequences both for the individuals involved and for the broader community.

105.   PSO routinely puts pressure on prosecutors to try juveniles as adults.[68] Yet the weight of the research says that juveniles tried and sentenced as adults have worse outcomes than when they remain in the juvenile justice system.

106.   One such study, which avoided certain methodological challenges common to that literature, looked at a change in Connecticut state law in 2010, after which 16-year-old juveniles who would have been tried as adults under the prior law no longer were. The 16-year-olds tried under the new law, as juveniles, showed about half the recidivism of those who had gone through the adult system.[69] PSO's policy, again, is thus likely to lead to worse outcomes.

107.   As already noted, the adverse childhood experiences literature—misinterpreted by PSO—shows a strong connection between childhood trauma and a range of adverse outcomes later in life. PSO's policies and practices produce a

---

on youth 5 years after first arrest." *Development and Psychopathology* 33, no. 2 (2021): 700-713.

[68] Defendant05150–51.

[69] Fowler, Eric, and Megan C. Kurlychek. "Drawing the line: Empirical recidivism results from a natural experiment raising the age of criminal responsibility." *Youth Violence and Juvenile Justice* 16, no. 3 (2018): 263-278.

range of such adverse childhood experiences, including repeated hostile encounters with deputies, arrest and incarceration, family disruption, eviction, and so forth. These experiences can be expected to produce harms with respect to education, emotional and intellectual development, school performance, substance abuse, employment, criminality, and the like.

108. The criminological literature shows that adolescents' unwelcome encounters with police officers can lead to a wide variety of negative outcomes later in life:

> Police stops, whether experienced directly or vicariously (via witnessing an encounter or learning of one involving family or friends), can be particularly consequential for shaping future orientation—that is, how people see their future goals, hopes, and expectations (see Johnson et al., 2014; Numri, 1991, 2005)—during adolescence and the transition into young adulthood. Adolescence is a critical period of life-course development during which views are evolving and malleable, and experiences during this time can play a pivotal role in shaping an individual's outlook and behavior (Johnson et al., 2011; Steinberg & Morris, 2001). Prior research has suggested that police contact during adolescence and emerging adulthood can meaningfully alter one's life outcomes including substance use, romantic partnerships, job loss, socioeconomic status, and offending (Doherty et al., 2016; Lopes et al., 2012; Novak, 2019; Schmidt et al., 2015; Wiesner et al., 2010; Wiley, 2015). Thus, this emerging research suggests that long-lasting consequences can occur from "even minimally invasive contact with the criminal justice system during adolescence" (Schmidt et al., 2015, p. 977). There are good reasons to expect that police contact influences adolescents' future orientation. These are often negative experiences between a youth and an older authority figure that generate harmful consequences such as the internalization of stigma and worry about future police contacts (DeVylder et al., 2020; Jackson et al., 2019),

which can alter perceptions of future life chances (Corrigan et al., 2009; Merrill et al., 2016).[70]

109.   PSO's policies and practices produce large numbers of such unwelcome encounters, with foreseeable negative consequences. Notably, these negative effects can be expected to be felt not only by PSO's young "targets," but by those naturally aware of them—family members, friends, members of their school communities, and the like—with therefore broader community consequences.

110.   Finally, there is *legitimacy*, which is a central idea in policing and crime prevention. Legitimacy refers to the standing that the police and the criminal justice system have (or do not have) to gain voluntary compliance from the public.

111.   In a variety of settings, research has shown that, as that perceived legitimacy goes up, voluntary compliance with the law and cooperation with the authorities also go up, and crime and violence go down. Where that perceived legitimacy goes down, compliance and cooperation also go down, and crime and violence go up. Tyler writes:

What encourages legitimacy? Studies again suggest that the public

---

[70] Testa, A, Turney, K, Jackson, DB, Jaynes, CM. "Police contact and future orientation from adolescence to young adulthood: findings from the pathways to desistance study." *Criminology* (2021); 1–28.

is very sensitive to the manner in which authorities exercise their authority - that is, to issues of procedural justice. Views about legitimacy are rooted in the judgment that the police and the courts are acting fairly when they deal with community residents. Interestingly, this is true both when the public makes general evaluations of the police and the courts in their community and when particular members of the public are reacting to their personal encounters with police officers or judges. On both levels, issues of process dominate public evaluations of the police, the courts, and social regulatory activities.[71]

112.   PSO is the very model of a kind of policing designed to undercut legitimacy. PSO targets children without justification, forces itself on them and their families, exacts criminal and civil penalties for factitious reasons, turns families and friends against one another, deceives and lies to members of the public, and abuses its authority.

113.   PSO's practices can be expected to have serious, lasting, and negative effects on individual and community respect for PSO and for the law itself, and quite directly for crime and violence.

### D.    Rebuttal to the Report of Richard Hough

   *1)    Most of Professor Hough's opinions do not address my opinions at all.*

114.   The larger body of Professor Hough's report (attached to this declaration as Exhibit 4) addresses a wide range of facts that have no bearing on the substantive issues on which I was asked to opine, such as whether the policies of the Pasco County

---

[71] Tyler, Tom R. "Procedural justice, legitimacy, and the effective rule of law." *Crime and Justice* 30 (2003): 283-357.

Sheriff's Office (PSO) conform to basic criminology and crime prevention
frameworks and whether those policies and practices conform to the theory and
practice of "focused deterrence" or are otherwise effective crime prevention
techniques.

115.   Many of Professor Hough's opinions are uncontroversial statements of
fact about basic criminology and criminal justice practice.[72] But these statements have
no bearing on PSO's policies and practices.

_____

[72] It is uncontroversial that police agencies both respond to and seek to prevent
crimes (Hough Report, page 9); that deterrence theory can inform such crime
prevention (9); that such theory can apply to burglary (10); that place-based and
person-based strategies have shown crime prevention effectiveness (10); that
agency policies and training are intended to shape officer behavior (10, 33); that
Pasco County sheriff personnel are subject to the law and such policies and
training (19); that the PSO has internal review and external complaint procedures
to guard against and respond to violations of law and policy (20); that the
documents in evidence in this case reflect typical police agency record-keeping
(10); that there are such things as community policing, problem-oriented policing,
and intelligence-led policing frameworks (11, 12, 19); that the many disparate
American law enforcement agencies pursue disparate strategies (12); that there is
no single method for identifying "potential offenders" (13); that juvenile and adult
criminal records can reflect underlying conduct (14–15); that "high capacity"
offenders can represent a disproportionate amount of criminal conduct (though
"high capacity" is not an accepted term of art in either criminology or criminal
justice) (15); that data-driven policing strategies attempt to make actionable sense
of such concentrations (15); that most focused deterrence strategies have focused
on serious violence and not on property crime (16, 32); that the public is generally
in favor of crime reduction (18–19); that social network analysis and hot spots are
both frameworks that have been used in crime analysis and preventions (23, 24);
that most crime is neither reported nor solved (26); that Adverse Childhood
Experiences is a framework used to understand negative events and outcomes in
the life course (27); and that various professions employ home visits (29).

116.   None of Professor's report addresses whether the policies and practices of the PSO are in fact informed – as the PSO itself claims – by mainstream criminology and reflect accepted and effective policing practice. None of it responds to the detailed substantive critique in my report (attached as Exhibit 1) and in this declaration that the PSO turns established criminology on its head, misuses core crime prevention and childhood development frameworks, uses utterly spurious methods to identify "prolific offenders," labels children as prolific offenders, employs strategies and tactics that can absolutely be expected to cause serious harm, and that the record reflects routinely abusive and unprofessional conduct by deputies.

> 2)   *Professor Hough's report in fact supports my opinions that PSO's practices misunderstand criminology and cause harm.*

117.   Professor Hough appears not to understand the ways in which his opinion underscores the facts that the PSO misuses fundamental criminology and crime prevention and deliberately fosters abusive and unprofessional conduct.

118.   He is correct that police agencies have policies, protocols, standards, and mechanisms for ensuring and assessing officers' compliance.

119.   In this case, those policies – as described above – set out in detail misrepresentations and misapplications of core criminology around criminal careers, chronic offending, hot spots, social network analysis, and focused deterrence. They set out utterly groundless "protocols" for identifying "prolific offenders" and using school and family welfare information to target children as career criminals. They

direct deputies to extend surveillance and enforcement to family, friends, and associates. They mandate maximal uses of home "checks," arrest, enforcement, civil violations, and adjudication of juveniles as adults.

120.    It is certainly the case that police agencies operate within policy. It is also the case, as Professor Hough correctly says, that there is appropriate discretion within those policies.

121.    It is absolutely not the case that this means that anything agencies, including PSO, choose to do is acceptable.

122.    What PSO has chosen to do is not acceptable, as is well established by exactly the policies to which Professor Hough refers. In that – as Professor Hough correctly presents – such policies, protocols, standards, and mechanisms are there to shape agency and officer conduct, the clearly stated policies of the PSO can be expected to drive conduct expressly contrary to core criminology, crime prevention, and professional policing, and to cause harm amongst those subject to that conduct.

123.    Professor Hough furnishes a number of examples which underscore this point.  He is correct that when a deputy noted in his self-evaluation report that he had succeeded in evicting a "prolific offender's" mother that the deputy was acting in alignment with agency procedure: as is usual, the PSO provides opportunities for staff to highlight actions the agency itself highlights and considers relevant to career advancement. "These agency forms, completed prior to a supervisor evaluation, are

where deputies list, among others, tasks accomplished within their assigned job duties."[73] This is of course exactly the point: It means that both the agency and the deputy consider evicting a "prolific offender's" mother to be within the deputies' assigned job duties.

124.   Professor Hough correctly notes that "[d]eputies at the Pasco Sheriff's Office are expected and instructed to act within law, agency policy, and contemporary training"[74] and that "[t]he Pasco County Sheriff's Office has policies and procedures in place to address allegations of officer misconduct and policy violations. The investigations by administrative investigators are common. The agency's website further provides citizens a link of 'Compliments, Complaints, Concerns.'"[75] This is again exactly the point: The abusive practices of the agency are explicitly part of the agency's protocols and policies, and following them is in alignment with those protocols and policies (and, by extension, not following them would constitute violations of policy).

125.   Professor Hough notes, in defense of the agency's practices, that "[r]epeat offender statutes do not punish for future potential behavior. Rather, the development of enhanced penalties by legislatures also relies on the concept of

---

[73] Hough Report, at 13.

[74] *Id.* at 19.

[75] *Id.* at 20.

specific deterrence to communicate sanctions to potential offenders if they continue to violate laws and rules."[76] This is correct, and highlights the fact that the PSO is not applying any sort of repeat offender statute. Rather, in its extralegal focus on "prolific offenders," it is applying what it takes to be its unfettered discretion, and is thus ungoverned by any such carefully considered statutory framework or associated judicial oversight.

126.   Professor Hough notes that:

In a criminal matter, the information assembled is compared against elements set by a legislative body. Because our public employees do not determine the guilt or innocence of a matter investigated in the course of their duties, they determine, based on the criteria of probable cause, if it is more likely than not that a person or persons were responsible for a violation. These public employees coordinate with other public employees - prosecutors - who then take up their specific task of deciding if a matter should continue in the criminal justice system process, which may or may not culminate in a trial.

Guidance of the U.S. Constitution, state law, case law, contemporary patrol and investigative training, and officer experience lead the way for a proper, and hopefully effective, investigation. The assessment of case methods is framed by legal options and constraints, not a post hoc opinion of what another person might have done differently, and especially those without the responsibility of serving the community.[77]

127.   This analysis only serves to highlight that the "prolific offender" checks and many other core activities of the PSO are ***not*** criminal matters, and the PSO is ***not*** in fact conducting "investigations" of "prolific offenders." The "prolific

---

[76] *Id.* at 13.

[77] *Id.* at 20–21.

offenders" are not charged with or being investigated for actual offenses, but are being subjected to extensive and abusive attention by the PSO as a result of an utterly spurious judgment made solely according to the internal workings of the PSO. The "elements" of this judgment and the actions that follow were not anticipated or set by a legislative body, are not reviewable or reachable by prosecutors or the bench, and are neither directed nor controlled by statute.

128.   As my report and this declaration explains, the surveillance and enforcement the PSO's targets are subjected to are not the result of actual or suspected criminal violations, but of their spurious designation as "prolific offenders." There is no probable cause in play; there is no mechanism by which prosecutors and the bench can make legal or procedural decisions (while individuals obviously can defend any charges eventually brought against them, the "prolific offender" status and associated surveillance and enforcement is entirely within the PSO purview and is unreviewable). Thus, Professor Hough's report underscores that the normal checks and balances the system is designed to produce simply cannot operate.

129.   Likewise, Professor Hough himself notes that "[r]isk-taking in youth is axiomatic. That the prefrontal cortex of the male brain does not reach development until the mid-twenties, is a factor in attributing risky, aggressive behavior with insufficient consideration of consequences. There is the additional psychological

aspect of the sense of invulnerability, the combination of which '…sets the adolescent up for an unusual proclivity for behavior.'"[78] These statements directly contradict the core position of the PSO, which, as I show in my report and in this declaration, is that children and young people can be identified as "prolific offenders" and "destined to a life of crime."

> 3) *The evidence around probation and parole home visits is not relevant to PSO's prolific offender checks and home visits.*

130. Professor Hough justifies the PSO's use of "prolific offender checks" by drawing on the literature around probation and parole visits, citing an evaluation that found them a general agency practice and generally supported by outcome evidence.[79] Even taking these findings at face value, those practices contrast in important ways with PSO's practices.

131. Probation and parole agencies act with respect to individuals under formal court supervision, operate with court-ordered supervision regimes and formal governance of their legal actions and administrative discretion, have formal and defined supervisory powers, can offer meaningful support and services, and engage with their supervisees in ways set out by statute and policy.

---

[78] *Id.* at 16.

[79] *Id.* at 30–31.

132.   Probation and parole officers are community corrections professionals governed by their own agency, professional standards, and culture. Supervisees, for their part, are informed by the court and by the probation and parole departments what their obligations are, how their supervision regime will be implemented, what the term of their supervision is to be, have administrative and legal recourse if they feel they need it, and are entitled to counsel should they face consequences for violations of their supervision. Home visits are a not uncommon feature of such supervision, though in practice they are relatively rare and generally reserved for the most serious and at-risk supervisees. Home visits, when employed, are relatively infrequent for any given supervisee.

133.   As should be clear, none of this applies to PSO's "prolific offender checks."

134.   Probation and parole officers do not impose themselves on members of the public not under court supervision; do not make harassing home visits multiple times a day and in cascades over short spans of time; do not advertise their presence to—and share sensitive information with—neighbors; do not make intrusive inquiries into supervisees' private and sexual lives; do not surround darkened houses with children inside, shine lights through and bang on doors and windows, and direct such children to disobey their parents; do not pressure supervisees' family members to give up information on their children; do not keep up this pressure for years on

end without legal justification, or any recourse for those being targeted; do not seek legal pretexts to arrest those being targeted, their family, and their friends; do not seek to bring civil code enforcement to bear on their families, or to evict their mothers from their homes; and do not boast of making those mothers cry. The one, it should be abundantly clear, is not like the other.

135.   On a related note, Professor Hough misrepresents my comments about PSO deputies enforcing, at second hand, probation violations. "Plaintiff expert Professor David Kennedy in his report states that deputies discovering probation violations—which is a portion of their normal duties—were 'violations that would otherwise have gone unobserved and unpunished…' I read this as being critical of deputies noting violations of court-imposed probation requirements."[80]

136.   The actual point, which I think was clear enough, is that probation and parole agencies design and implement supervision regimes with their own supervision in mind, and do not expect self-appointed freelancers—in law enforcement or anywhere else—to supplant their own judgment and actions.

> 4)   *That PSO is focusing on property crime does not vitiate the fact that they are not applying focused deterrence*

137.   Professor Hough makes much of the fact that focused deterrence, one of the claimed planks of the PSO's strategy, is largely about violent crime rather

---

[80] *Id.* at 13.

than property crime, as is my own experience with that approach. This is a difference that does not, in this case, make a difference.

138.   There is nothing about a focus on property crime that changes the basic tenets of focused deterrence, that transforms PSO's policies into focused deterrence, or that justifies PSO's misbegotten practices.

139.   Property crime offenders, like any others, cannot be identified as "prolific" based on the application of spurious protocols to brief windows of time. As my report and this declaration explain, there is no justification or deterrence logic for endless harassment of them, their families, and friends.

140.   Any application of focused deterrence to property crime would include deliberately respectful and procedurally just communication. Focused deterrence would also involve respected community figures and carefully developed regimes of supportive services. It would be designed and implemented with respect to a particular category of property crime, not general recidivism. And it would not explicitly extend surveillance and criminal and civil enforcement to parents or friends.

141.   It should be noted that Professor Hough does not in any way explain how the PSO has developed a focused deterrence strategy appropriate to property crime; it is evident that it has done no such thing.

>    5)    *No professional standards or best practices make it acceptable*
>          *for law enforcement officers to threaten young girls with*
>          *criminal enforcement for not providing information.*

142.   I'll end by noting that Professor Hough takes issue with my previous assessment that PSO deputies probably lied when they threatened a juvenile female with arrest – for "lying to a police officer" – when she was unable or unwilling to provide information on her ex-boyfriend's whereabouts. "He then cites FS 837.05(1)(a)," Professor Hough writes. He argues instead that "[l]ikely, if a charge were to be followed through on, it would be under FS 843.02, Resisting officer without violence to his or her person not False reports to law enforcement authorities."[81]

143.   A glance at that governing case law suggests this is wrong. "If a police officer is not engaged in executing process on a person, is not legally detaining that person, or has not asked the person for assistance with an ongoing emergency that presents a serious threat of imminent harm to person or property, the person's words alone can rarely, if ever, rise to the level of an obstruction."[82]

144.   We should not be surprised that despite this kind of statute-shopping, it is impossible to justify two armed deputies threatening a frightened young girl with arrest and jail because she can't or won't inform on a friend, whom the deputies had no reason to pursue other than his prolific offender designation: which is to say, no

---

[81] *Id.* at 14.

[82] *D.G. v. State*, 661 So. 2d 75, 76 (Fla. Dist. Ct. App. 1995).

legal reason. We should take this as a metaphor for the systematic abuses of the PSO against the community: It is not, despite every effort to make it so, OK.

## IV.   Summary of Opinions

145.   PSO's practices and policies shock the conscience and have no place in contemporary criminology or policing. There is no scientific, criminological, evaluative, operational, or professional grounding for PSO's appalling practices.

146.   It should not be necessary to mobilize what we know about crime and violence, criminal careers, effective interventions, and professional law enforcement practice to know that it is unconscionable to label children as career criminals; relentlessly harass them, their families, and their friends; deploy massive amounts of surveillance and enforcement against them, their families, and their friends; mine their school records for "evidence" to turn against them; and abuse them further after discovering evidence that they and their families have suffered trauma. Nevertheless, my professional opinion is that it is unconscionable and, importantly, that there is no criminological support whatsoever for those policies and practices.

147.   I have been working in criminal justice for over thirty years. I have worked in hundreds of police departments, and with equal numbers of prosecutors' offices, probation and parole departments, and the like. Not once in those decades have I seen anything remotely like PSO and its policies and practices. And had I not come across this case, I would not have believed any American governmental entity

capable of the kind of gross misfeasance PSO has crafted and institutionalized. I would not have believed that the decades of careful work that have gone into understanding and addressing violence, crime, and public safety could be so corrupted.

148.    My work is with the genuine "chronic offenders," who kill, maim, rape, and deal poisons. That includes murders, other gun violence, the very worst domestic and intimate partner violence, and the like. It is endless, exhausting, traumatic, and desensitizing work.

149.    In all my experience, in all those cities, with men and women who have spent their lives dealing with those same harms and those same people, I have never once heard any of them talk about children the way PSO does. I have never once heard any of them even contemplate the kind of surveillance and harassment PSO has made policy. I have never once heard any of them talk about punishing family and friends in the way PSO has made policy. I have never once heard any of them talk about turning school resource officers into engines of surveillance. I have never once heard any of them consider mining child protective services in order to profile children. I have been with them while specialists explain the developing work around trauma, adverse child experiences, and child development, and never once heard any of them so much as voice the thought that that work should be turned to profiling and enforcement.

150.   Some of my closest law enforcement friends and colleagues have followed the press coverage of PSO and, to a person, they have been repulsed.

151.   When I first encountered PSO and its actions in media reports, I said publicly that it was the worst intersection of junk science, bad policing, and an absolute failure of humanity and common sense that I had seen in my career. The opportunity to look more deeply into the record and facts of this case that filing this declaration has allowed me has served only to affirm my opinions.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June __3__, 2022.

*David M. Kennedy*
David Kennedy