# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES III,

     *Plaintiffs*,

v.

CHRIS NOCCO, in his official
capacity as Pasco County Sheriff,

     *Defendant*.

Case No. 8:21-cv-00555-SDM-CPT

## <u>PLAINTIFFS' CORRECTED\* MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND INCORPORATED MEMORANDUM OF LAW</u>

Joshua A. House (CA Bar No. 284856)\*\*
Caroline Grace Brothers
(DC Bar No. 1656094)\*\*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Tel.: (703) 682-9320
Fax: (703) 682-9321
jhouse@ij.org
cgbrothers@ij.org

Ari S. Bargil (FL Bar No. 71454)
INSTITUTE FOR JUSTICE
2 S. Biscayne Boulevard, Suite 3180
Miami, FL 33131
Tel: (305) 721-1600
Fax: (305) 721-1601
abargil@ij.org

Robert E. Johnson (OH Bar No. 0098498)\*\*
INSTITUTE FOR JUSTICE
16781 Chagrin Boulevard, Suite 256
Shaker Heights, OH 44120
Tel.: (703) 682-9320
Fax: (703) 682-9321
rjohnson@ij.org

\*Plaintiffs sought leave to file this corrected filing in order to correct several citations to exhibits in Plaintiffs' original filing. Those citations are identified in the parties' joint motion for leave to file corrected motions for summary judgment.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

INTRODUCTION ......................................................................................... 1

UNDISPUTED MATERIAL FACTS ............................................................. 2

    A.    PSO's Intelligence-Led Policing Philosophy ............................. 2

    B.    PSO's Focus On "Problem People" .......................................... 3

    C.    PSO's Policy of Prolific Offender Checks .................................. 6

    D.    PSO's Policy of Enhanced Enforcement .................................. 13

LEGAL STANDARD .................................................................................. 22

ARGUMENT .............................................................................................. 22

    I.    PSO's Policy Of Conducting Suspicionless And Warrantless
        "Prolific Offender Checks" Violates The Fourth Amendment .............. 23

        A.    The Prolific Offender Checks Are Unreasonable Seizures ............. 24

        B.    The Prolific Offender Checks Are Unreasonable Searches ............ 28

    II.    PSO's Policy Of Harassing Parents And Other Associates Of
        Targeted Persons Violates The First Amendment .................................... 32

    III.    PSO's Policy Of Listing Targeted Persons Without Notice Or
        A Hearing Violates Procedural Due Process ........................................... 35

        A.    PSO's Policy Infringes on Plaintiffs' Protected Interests ............... 36

        B.    PSO's Policy Failed to Provide Plaintiffs with *Any* Notice or
            Process, Rendering a Full *Mathews* Analysis Unnecessary ............ 36

    IV.    PSO's Policy Of Harassing Targeted Persons And Their
        Associates Violates Substantive Due Process .......................................... 37

A.   PSO's Policy Violates the Fundamental Right to Be Free From Punishment for the Wrongdoing of Others ............................ 38

B.   PSO's Policy is Arbitrary, Pretextual, and Designed to Harass ....... 39

CONCLUSION ......................................................................................... 40

CERTIFICATE OF SERVICE .............................................................. 42

## TABLE OF AUTHORITIES

<u>**Case**</u>                                                                                                <u>**Page(s)**</u>

*Adler v. Pataki*,
   185 F.3d 35 (2d Cir. 1999) ................................................................32

*Bengini v. City of Hemet*,
   879 F.2d 473 (9th Cir. 1988) ............................................................29

*Bd. of Regents v. Roth*,
   408 U.S. 564 (1972)...................................................................35, 36

*Beach Blitz Co. v. City of Miami Beach*,
   Case No. 1:17-cv-23958-UU, 2018 WL 11260453
   (S.D. Fla. Feb. 5, 2018)..............................................................39, 40

*Brendlin v. California*,
   551 U.S. 249 (2007)........................................................................24

*Brennan v. Dawson*,
   752 F. App'x 276 (6th Cir. 2018) ...............................................30, 31

*Catron v. City of St. Petersburg*,
   658 F.3d 1260 (11th Cir. 2011) ......................................................37

*Celotex Corp. v. Catrett*,
   477 U.S. 317, 322 (1986)...............................................................22

*Chalfy v. Turoff*,
   804 F.2d 20 (2d Cir. 1986) ............................................................39

*Chrysler Corp. v. Fedders Corp.*,
   670 F.2d 1316 (3d Cir. 1982) ........................................................35

*City of Indianapolis v. Edmond*,
   531 US. 32 (2000)...............................................................24, 29, 32

*Cook v. Stewart*,
  Case No. 1:13-cv-72-MW-GRJ, 2014 WL 12521335
  (N.D. Fla. Apr. 22, 2014)...........................................................................38

*Doe v. Moore*,
  410 F.3d 1337 (11th Cir. 2005) .............................................................38

*Eisenberg v. City of Miami*,
  54 F. Supp. 3d 1312 (S.D. Fla. 2014)....................................................35

*Espanola Way Corp. v. Myerson*,
  690 F.2d 827 (11th Cir. 1982) ..........................................................39, 40

*Florida v. Bostick*,
  501 U.S. 429 (1991)...........................................................................24, 25

*Florida v. Jardines*,
  569 U.S. 1 (2013)............................................................28, 29, 30, 31, 32

*H & J Land Invs., Inc. v. City of Jacksonville*,
  No. 3:13-cv-1174-J-34PDB, 2014 WL 4540200
  (M.D. Fla. Sept. 11, 2014) ......................................................................40

*Kyllo v. United States*,
  533 U.S. 27 (2001)...................................................................................28

*M.A.K. Inv. Grp., LLC v. City of Glendale*,
  897 F.3d 1303 (10th Cir. 2018) ..............................................................37

*Mathews v. Eldridge*,
  424 U.S. 319 (1976)..................................................................................37

*Mohamed v. Holder*,
  995 F. Supp. 2d 520 (E.D. Va. 2014) ......................................................37

*Monell v. Dep't of Social Servs.*,
  436 U.S. 658 (1978)............................................................................22, 23

*Morgan v. Fairfield County*,
  903 F.3d 553 (6th Cir. 2018) ...................................................................23

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
   339 U.S. 306 (1950)...................................................................37

*Post v. City of Fort Lauderdale*,
   7 F.3d 1552 (11th Cir. 1993) ....................................................39

*Ramirez v. Hillsborough Cnty. Sheriff's Office*,
   No. 8:10-cv-1819-T-23TBM, 2011 WL 976380 (M.D. Fla. Mar. 18, 2011).......1

*Richardson v. City of Antioch*,
   722 F. Supp. 2d 1133 (N.D. Cal. 2010)............................................28

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984)...................................................................32

*Rogers v. Pendleton*,
   249 F.3d 279 (4th Cir. 2001) ................................................29, 31

*Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*,
   746 F.3d 538 (2d Cir. 2014) .....................................................35

*Sawyer v. Sandstrom*,
   615 F.2d 311 (5th Cir. 1980) ....................................................32

*Schepers v. Comm'r, Ind. Dep't of Corr.*,
   691 F.3d 909 (7th Cir. 2012) ....................................................37

*Singleton v. Cecil*,
   155 F.3d 983 (8th Cir. 1998) ....................................................34

*St. Ann v. Palisi*,
   495 F.2d 423 (5th Cir. 1974) ................................................35, 38

*Statewide Bonding, Inc. v. U.S. Dep't of Homeland Sec.*,
   980 F.3d 109 (D.C. Cir. 2020)...................................................35

*Tyson v. New York City Hous. Auth.*,
   369 F. Supp. 513 (S.D.N.Y. 1974) ..............................................35

*United States v. Al-Azzawy,*
    784 F.2d 890 (9th Cir. 1985) ...................................................................26

*United States v. Mendenhall,*
    446 U.S. 544 (1980)..................................................................................25

*United States v. Mills,*
    372 F. Supp. 3d 517 (E.D. Mich. 2019) ..................................................27

*United States v. Morgan,*
    743 F.2d 1158 (6th Cir. 1984) ................................................................26

*United States v. Ratcliff,*
    725 F. App'x 894 (11th Cir. 2018)..........................................................24

*United States v. Thomas,*
    430 F.3d 274 (6th Cir. 2005) .......................................................25, 26, 32

*United States v. Wells,*
    648 F.3d 671 (8th Cir. 2011) ..................................................................30

*Wilson v. Taylor,*
    733 F.2d 1539 (11th Cir. 1984) ..............................................................32

## **Rules**

Fed. R. Civ. P. 56 ....................................................................................22

# INTRODUCTION

Discovery has produced a significant factual record that testifies to a sustained campaign of harassment against these Plaintiffs—as well as other individuals—who were targeted by the Pasco Sheriff's Office ("PSO") based on a dystopian "intelligence-led policing" philosophy.[1] Over six years, PSO conducted over *thirteen thousand* "prolific offender checks," which are warrantless, suspicionless visits to the homes of individuals flagged (typically by a computer algorithm) as supposedly likely to commit future crimes. PSO's own records document hundreds of visits to the homes of these Plaintiffs, and hours of body-worn camera footage shows deputies interrogating Plaintiffs, snooping around their properties, and subjecting Plaintiffs to citations and arrests.

The factual record also leaves no dispute as to the reason for this years-long pattern of harassment. PSO sets out its operative policies in the Intelligence-Led Policing Manual ("ILP Manual"), which expressly directs PSO employees to draw up lists of likely future criminals, who are to be subjected to "relentless pursuit, arrest, and prosecution." The record contains testimony from PSO employees who apply these policies, personnel documents evaluating PSO employees based on their fidelity to these policies, and presentations from weekly meetings used to coordinate

---

[1] Defendant Sheriff Chris Nocco is sued in his official capacity as head of the PSO and is hereinafter referred to as the "PSO." *See Ramirez v. Hillsborough Cnty. Sheriff's Office*, No. 8:10-cv-1819-T-23TBM, 2011 WL 976380, at *1–2 (M.D. Fla. Mar. 18, 2011); *see also* Bargil Decl. Ex. 57 at 8 (admitting "that the Sheriff is the final policymaker for the Sheriff's Office.").

the implementation of these policies. Internal PSO documents also confirm that these Plaintiffs or their children were flagged as prolific offenders and subjected to these polices. None of this is in dispute.

While these undisputed facts involve distinctly modern phenomena—including data aggregation, algorithms, and intelligence analysis—they ultimately raise simple and traditional constitutional questions about the power of the police: Can the police persistently come to your home and—without a warrant or even reasonable suspicion—investigate the area surrounding your house and interrogate you and your family? Can they harass parents in retaliation for the conduct (or future conduct) of their children? Can they put individuals on a list—analogous to being on probation for future crimes—without notice or a hearing? Can they subject listed individuals, and their associates, to relentless harassment?

The answer to each of these questions is "no." Because the undisputed facts demonstrate that PSO's policy of relentless harassment violated the First, Fourth, and Fourteenth Amendments to the U.S. Constitution, Plaintiffs respectfully ask the Court to enter summary judgment on the issue of liability.

## UNDISPUTED MATERIAL FACTS

### A.   PSO's Intelligence-Led Policing Philosophy.

An internal PSO policy document explains that "Intelligence Led Policing" or "ILP" involves a "paradigm shift" away from traditional "reactionary" policing

under which "we will now be hunting criminals." Ex. 31 at 1.[2] "Every member and area of our agency is a part of this." *Id.*

PSO's Intelligence-Led Policing Manual ("ILP Manual") serves as "a practitioner's guide detailing the processes adopted by the [PSO] in order to operationalize ILP's core principles." Ex. 36; *see also* Ex. 20 at 71:14–18.[3] Witnesses consistently testified that PSO employees are required to read and apply the ILP Manual. *See, e.g.*, Ex. 22 at 27:8–13 (agreeing that "everything that's in the ILP manual is something you were expected to understand and apply"); *see also* Ex. 20 at 15:14–17, 25:15–24; Ex. 19 at 12:6–14, 84:3–4, 86:16–18. Performance reviews for PSO employees also direct employees to read the Manual and assess the employee's application of the ILP philosophy.[4]

## B. PSO's Focus On "Problem People."

PSO's ILP philosophy "calls for a strategic focus on problem people." Ex. 1 at 16; *see also* Ex. 37 at 15 (identifying "Problem People" as a "Focus of ILP"). PSO focuses on these individuals based on its belief that they will "ultimately reoffend

---

[2] Citations to "Ex." refer to the exhibits to the Declaration of Ari Bargil, which is filed contemporaneously with this motion.

[3] The record contains four versions of the Manual, adopted in 2013 (Ex. 35), 2016 (Ex. 34), 2018 (Ex. 1), and 2021 (Ex. 32). However, PSO's 30(b)(6) representative testified that "I don't think you're going to find much of a difference between" at least the 2016 and 2018 versions, *see* Ex. 17 at 13:21–14:6, and this brief generally cites the 2018 version.

[4] *See, e.g.*, Ex. 29 at 3,7, 9, 16–17, 29, 32–33, 35, 50, 59, 68, 75; *see also* Ex. 44 at 2 (email stating that "any member desiring promotion is rated during an interview with the sheriff on their knowledge and demonstrated support of ILP").

within a certain amount of time." Ex. 18 at 48:20–49:4; *see also* Ex. 27 at 68:12–24 (the purpose of identifying focused offenders is to "prevent crime from happening," or to "skate[] to where the puck is going to be").[5] Two categories of "Problem People" are particularly relevant here.

1. <u>Prolific Offenders</u>. Once per quarter, PSO's intelligence analysts generate a list of so-called "prolific offenders." Ex. 18 at 37:22–38:3. This list is generated through a computer algorithm, which assigns points for various "criteria," including arrests and suspected past crimes. *See* Ex. 1 at 75; Ex. 38 at 1–2; Ex. 26 at 16:3–21.[6] The algorithm also adds "enhancements" based on a person's "involvement" in an offense, which includes being listed in an offense report as a witness, a victim, or a reporting party. Ex. 1 at 75. The algorithm generates a ranked list of names, and analysts then select individuals from the list to designate as prolific offenders.

There is no age minimum to be listed as a prolific offender. To the contrary, PSO seeks to identify and engage "at-risk youth who are destined to a life of crime." Ex. 1 at 13, 18. Dalanea Taylor was incarcerated for her involvement in nonviolent property crimes at 15 years old, *see* Taylor Decl. ¶¶ 3–5, and she was placed on the prolific offender list when she was released at age 17, *see* Ex. 39; *see also* Ex. 26 at

---

[5] *See also* Ex. 18 at 45:9–11 ("Is there a higher likelihood that we believe [a person labeled a "prolific offender"] would commit a crime in the future? Yes."); Ex. 1 at 75 ("A prolific offender is someone who is not likely to reform . . . .").

[6] The 2016 Manual also allowed for individuals to be designated as prolific offenders even if they were not flagged by the algorithm. *See* Ex. 34 at 9, 50, 52; *see also* Ex. 20 at 67:10–18.

103:18–21. Tammy Heilman's son, Donnie, was first identified as a prolific offender as early as September 2016, when he was 16 years old.[7] Robert Jones's son, Bobby, was first identified as a prolific offender as early as September 2015, when he was 16 years old.[8] Only Darlene Deegan's son, Tyler Paneson, was no longer a juvenile when he was designated a prolific offender sometime prior to January 2017.[9]

2. Top 5 Offenders. Until late 2019, PSO also maintained a list of the "Top 5 Offenders" within each of the three districts in Pasco County. *See* Ex. 1 at 26; Ex. 17 at 64:21–65:7. Identification of these offenders was based on a subjective assessment by PSO analysts and deputies. *See* Ex. 20 at 19:9–15. As with the prolific offender list, an individual did not need to be the subject of an ongoing investigation to be listed as a Top 5 Offender. *See id.* at 19:16–22:20.

Juveniles could also be designated as Top 5 Offenders. Dalanea was listed as a Top 5 Offender in April 2017, at age 17. *See* Ex. 16 at 55. Bobby was listed as a Top 5 Offender in February 2016, at age 16. *See id.* at 6. Donnie was listed as a Top

---

[7] *See* Ex. 46 at 2 (email from September 18, 2016, referring to Tammy as "Prolific Offender Donnie McDougall's mother"). It can be difficult to determine the exact date that individuals were first listed as prolific offenders, due to PSO's imperfect recordkeeping; while PSO maintains a database of when people were flagged as prolific offenders, it does not appear to go back past January 2017. *See* Ex. 39; *see also* Ex. 17 at 69:4–11 (changes in PSO information technology occurred in 2016). In any event, that database leaves no doubt that Donnie was listed as a prolific offender as of January 2017, when he was still a juvenile. *See* Ex. 39; *see also* Ex. 26 at 104:6–7.

[8] *See* Ex. 11 at 19 (documenting "prolific offender check" on Bobby Jones in September 2015 and stating that "HE WAS TOLD HE WAS BEING MONITORED DUE TO HIS LONG STANDING COMMITMENT TO CRIMINAL ACTIVITY").

[9] *See* Ex. 39. As noted in note 7, *supra*, PSO's database of listed offenders appears to go back only to January 2017, and it is possible that Tyler was listed prior to that date.

5 Offender in 2018, at age 18. *See id.* at 63. Only Darlene's son, Tyler, was older than 18 when he was listed as a Top 5 Offender in June 2018. *See id.* at 68.

PSO has no process for notifying individuals (or their parents, if the individuals are juveniles) when they have been designated as a Prolific Offender or a Top 5 offender. *See* Ex. 18 at 68:14–17, 70:11–15. PSO also has no procedure to allow individuals (or their parents) to contest their designation as a Prolific Offender or a Top 5 Offender. *See id.* 68:18–69:21, 70:16–19.

### C.   PSO's Policy of Prolific Offender Checks.

The ILP Manual states that "[o]ne way we look to have an impact on the actions of prolific offenders is through periodic *prolific offender checks*." Ex. 1 at 17. These checks are designed to "communicate" that prolific offenders will be subjected to "relentless pursuit, arrest, and prosecution." *Id.* Checks "also offer the opportunity to cultivate information about the criminal environment." *Id.* at 18.

1. <u>Prolific offender checks are home visits</u>. Prolific offender checks are almost always conducted at the home of the listed individual, or the home where the listed individual is staying. *See, e.g.*, Ex. 25 at 38:3–5; Ex. 23 at 17:16–18.

During these checks, deputies speak not just with the listed individual but also with family members. PSO's database of "offender notes" for Tammy's son, Donnie, includes copious notes documenting interactions with Tammy at her home. *See, e.g.*, Ex. 3 at 10–11 ("I made contact with his mother, Tammy Heilman . . . Tammy then

said she was busy and did not have time to speak with me . . . I informed Tammy I would be issuing Tammy a County Ordinance Citation"); *see also id.* at 8 ("Tammy . . . did not wish to wake him up"); 9 ("Donnie's mother, Tammy"); 12 ("[h]is mother . . . was not pleased to see the sight of law enforcement"); 13 ("Donnie's mother"); 15 ("Donnie's mom"); 16 ("Donnie's mother"); 17 ("Donnie's Mother, Tammy, who appeared to be inconvenienced by my presence"). Robert Jones and Darlene Deegan likewise had numerous interactions with PSO during checks ostensibly focused on their children. *See* Deegan Decl. ¶¶ 5, 6, 10; Jones Decl. ¶¶ 5, 9.

2. <u>PSO conducts prolific offender checks frequently—and at all hours of the day</u>. PSO's records show that the agency performed 13,093 prolific offender checks over the course of six years. *See* Carrasco Decl. ¶ 58. While PSO deputies are required to "[c]onduct a face-to-face prolific offender check *at least* once quarterly with each active prolific offender," Ex. 1 at 19 (emphasis added), no PSO policy caps their frequency, *see* Ex. 20 at 55:23–56:1. For instance:

- PSO deputies performed at least 19 prolific offender checks on Dalanea between April 2017 and September 2019. *See* Carrasco Decl. ¶ 74; *see also* Ex. 8. The visits varied in frequency from about once per week to every few weeks. *See* Taylor Decl. ¶ 10.

- PSO deputies performed at least 22 prolific offender checks at Tammy's home between 2017 and 2020. *See* Carrasco Decl. ¶ 74; *see also* Ex. 9. The visits were sometimes as frequent as multiple times per week or even multiple times per day. *See* Heilman Decl. ¶ 6.

- PSO deputies conducted at least 8 prolific offender checks at Darlene's home over the course of four months in 2018, *see* Carrasco Decl. ¶ 74; *see also* Ex.

10. The visits were sometimes as often as every day for consecutive days. *See* Deegan Decl. ¶ 6.

- PSO deputies conducted 34 prolific offender checks on Bobby at Robert's home between September 2015 and April 2016. *See* Carrasco Decl. ¶ 74. Sometimes they even visited several times in a row on consecutive days or multiple times in the same day. *See, e.g.*, Ex. 11 at 52–70.

PSO's own 30(b)(6) witness observed in an email that "because we are going out to these offenders['] houses several times a week, they are starting to resent our agency and say we are harassing them." Ex. 45 at 2; *see also* Ex. 20 at 60:2–14.

In addition, deputies regularly conducted checks late at night or in the early in the morning. Plaintiffs' expert Michael Carrasco found that 17.5 percent of prolific offender checks between September 2015 and November 2021 occurred between 10PM and 6AM. Carrasco Decl. ¶ 61. Plaintiffs' experience was consistent with that finding. *See* Ex. 8 at 17, 29, 33 (records of checks on Dalanea at 10:15 PM, 12:05 AM, and 7:32 AM); Ex. 9 at 9, 21, 31, 43, 55 (records of checks occurring at Tammy's residence at 10:00 PM, 10:06 PM, 10:21 PM, 11:55 PM, and 4:54 AM); Ex. 10 at 21, 31, 35 (records of checks occurring at Darlene's residence at midnight, 2:59 AM, and 3:33 AM); Ex. 11 at 13, 19, 38, 87 (records of checks occurring at Robert's residence at 11:54 PM, 12:35 AM, 1:42 AM, and 1:45 AM).

3. <u>PSO deputies use prolific offender checks to gather information.</u> During prolific offender checks, PSO deputies are instructed to "cultivate information about the criminal environment" and "[l]earn as much as possible about prolific

offenders." Ex. 1 at 18–19; Ex. 20 at 15:24–16:17. This includes gathering information about who listed individuals are associating with. *See* Ex. 1 at 19; *see also id.* at 52; Ex. 22 at 35:25–36:3 (agreeing that PSO seeks to "develop an understanding of the social networks and familial networks of the people that it targets"). Information is recorded via reports, "tips," and a database of "offender notes." *See* Ex. 17 at 50:6–51:8, 90:1–12, 108:8–109:12; *see also* Ex. 3 (offender notes); Exs. 42, 43 ("tips").

Deputies, again, would seek this information from both the listed offender and family members. *See, e.g.*, Ex. 3 at 15 ("offender notes" stating that "Tammy was unwilling to give any additional information regarding Donnie's whereabouts or activities").[10] Even on occasions when the listed individual was home, deputies would sometimes speak to their parents to seek additional information. *See, e.g.*, *id.* at 10 (recording conversation with Donnie and adding that "Donnie's mother . . . stated Donnie has been staying out of trouble and going to school").

During prolific offender checks, deputies often ask vague, open-ended questions seeking information about unspecified criminal activity. *See, e.g.*, Ex. 3 at 8–16, Ex. 4 at 1:55, 5:11, 13:33, 15:45, 21:12, 30:10. They often ask questions about the listed individual's activities, including whether they are in school or have a job.

---

[10] *See also* Ex. 3 at 7 ("I spoke to Dana at the residence, who stated Dalanea has been staying out of trouble, and taking care of her twins."); Ex. 4 at 30:34, 34:21; Ex. 5 at 8:09, 14:58, 23:17, 24:59, 25:46, 27:33, 29:12, 32:15, 34:31, 39:59; Deegan Decl. ¶ 10; Jones Decl. ¶ 14.

*See* Taylor Decl. ¶¶ 12, 13; Ex. 4 at 2:18, 5:31, 8:22, 13:46, 21:17, 23:10, 29:43; Heilman Decl. ¶¶ 9, 10; Ex. 5 at 7:56, 10:59, 11:37, 13:48, 26:17, 28:44, 42:11; Deegan Decl. ¶ 10; Jones Decl. ¶ 13. They also seek information about the listed individual's associations, including who they are hanging out with or who they are dating. *See, e.g.*, Taylor Decl. ¶ 12; Ex. 4 at 2:33, 3:08, 5:17, 10:41, 23:39; Ex. 5 at 8:00, 33:16, 38:59; Jones Decl. ¶ 13. When Dalanea became pregnant with twins, PSO deputies repeatedly asked her for information about the father, as well as details about her pregnancy. *See, e.g.*, Ex. 3 at 3 ("offender notes" recording that "the father's name is Kevin Jones and he is somewhat involved in the pregnancy").[11]

4. <u>PSO deputies examine the property seeking evidence of violations and sometimes also seek entrance to the home.</u> Body-worn camera footage shows that, during prolific offender checks, PSO deputies routinely look into the windows of residences, look over and through fences, and otherwise look into private spaces of the home and its curtilage. For instance:

- Body-worn camera footage shows deputies shining flashlights or looking into the windows of multiple Plaintiffs. *See* Ex. 5 at 33:54 (Tammy Heilman); Ex. 6 at 43:10, 44:24, 46:02 (Darlene Deegan); Ex. 7 at 19:02, 20:49, 22:29, 25:46, 27:30, 32:57 (Robert Jones). Deputies would sometimes knock on the windows and attempt to speak to people inside. *See, e.g.*, Ex. 7 at 0:39, 2:10, 5:42, 30:10.[12] On one occasion, deputies arrested Robert Jones because they

---

[11] *See also* Ex. 4 at 6:01, 13:37, 14:22 (asking if the father would be "in the picture" and scoffing when Dalanea said the father's last name was not important), 21:24, 22:42, 25:30, 29:47, (asking about the sex of her twin babies).

[12] *See also* Ex. 7 at 2:33 (deputies spending almost half an hour walking around to the back of the house and looking in back windows, after Robert's daughter told the deputy that neither Bobby nor Robert were at the house); *id.* at 30:10 (banging on back windows of the house).

claimed to see a minor smoking a cigarette inside the home. *See* Ex. 14 at 20; Ex. 7 at 5:42, 32:57, 35:05, 35:15.

- During visits to Tammy's house, deputies would walk alongside her house and look over the fence. *See* Ex. 5 at 15:16, 23:38, 34:14; *see also id.* at 18:02 (deputy stating "I sneak around to the back and look through the fence"). Deputies arrested Tammy's son because they claimed to see other individuals (not her son) with marijuana in the back yard. *See infra* p. 18.

- Deputies would walk around inside the curtilage looking for evidence of property code violations. *See* Ex. 6 at 12:15, 12:53 (Darlene Deegan); Ex. 7 at 37:51, 38:13 (Robert Jones). During a visit to Darlene's home, deputies crossed over her fence to access the property and spent several minutes walking around her backyard taking pictures. *See* Ex. 6 at 5:00, 11:14; *see also id.* at 17:16 (deputy saying a court might "throw . . . out" the pictures), Ex. 13 at 4, Ex. 3 at 25 (deputies "accessed the property by stepping over some fencing due to the front gate being locked").

Deputies would also sometimes seek entrance into the home during these visits. During one visit to Robert's home, deputies asked for access to the home. Jones Decl. ¶ 15. After Robert refused to let deputies into the home, he was arrested. *Id.*; *see also* Ex. 7 at 35:05, 35:15. On another occasion, deputies demanded that Tammy grant them access to her home to look for her son and—when the door hit one of the deputies as she opened it—arrested her as well. Ex. 5 at 30:09. On yet another occasion, deputies asked that Darlene give them access to the inside of a trailer parked on her property and, after she declined, cited her for a variety of property code violations. Ex. 6 at 22:13, 27:46, 27:58.

5. <u>PSO conducts prolific offender checks without a warrant, probable cause, reasonable suspicion, or consent</u>. PSO admits that "[n]either probable cause,

reasonable suspicion, nor consent is required 'to visit residences to conduct prolific offender checks.'" Ex. 57 at 2; *see also* Ex. 18 at 167:24–168:1, 168:21–24 (testimony of 30(b)(6) representative).[13]

Consistent with that policy, PSO conducted prolific offender checks on Plaintiffs without a warrant, probable cause, reasonable suspicion, or consent. Deputies did not produce a warrant authorizing *any* of the visits that were marked in their records as prolific offender checks.[14] Similarly, while deputies did mention specific investigations during a handful of visits, *see, e.g.*, Ex. 9 at 1, 9, 31, the vast majority of notes documenting the checks include no reference to any specific investigation, *see* Exs. 8–11, 3. Rather, deputies explicitly stated they were *not* there to investigate any allegation of wrongdoing. *See, e.g.*, Ex. 4 at 3:52 ("She's not in any trouble or anything."), 0:18; Ex. 5 at 14:41 ("He's not in trouble."), 25:10, 40:51. As one deputy told Dalanea, "they have like a list of people that used to get in trouble but don't anymore, and we just make sure everyone is doing good." Ex. 4 at 1:50.

---

[13] Prolific offender checks are also distinct from probation checks. *See* Ex. 19 at 24:6–25:4; *see also* Ex. 57 at 2 (admitting "that a probation or supervised release status is not required in order for a prolific offender check . . . ."); Ex. 5 at 29:40 (deputy noting that "it doesn't matter" that Donnie was not on probation and "we still check up on him" because "he's been identified as a prolific offender").

[14] *See* Taylor Decl. ¶ 22; Deegan Decl. ¶ 24; Heilman Decl. ¶ 23; Jones Decl. ¶ 23. A few reports connected to Robert Jones reference serving a warrant, but the need to serve a warrant would not authorize the other intrusive interactions that Robert experienced. *See, e.g.*, Ex. 11 at 30, 45. PSO did also produce a warrant authorizing a search of Jones's residence, but the visit to execute that warrant was not marked as a prolific offender check. *See id.* at 115.

The visits also were not consensual. Body-camera footage shows that Plaintiffs specifically told deputies that the visits to their homes constituted harassment. *See* Ex. 5 at 3:21, 5:51 ("This is harassment."); *see also id.* at 0:09, 21:54, 30:54; Ex. 4 at 18:10; Ex. 6 at 34:48; Ex. 7 at 33:16, 34:43. Footage also shows deputies apologizing for the visits, which they acknowledged were unwelcome. *See, e.g.*, Ex. 4 at 0:11 ("Sorry to freak you out."), 21:55, 26:15 ("I'm sorry, but we're told to do it."); Ex. 5 at 28:30 ("So you're probably tired of seeing us... I'm sorry to bother you."), 38:45 ("We don't enjoy bugging everybody ....").[15] Yet the visits continued.

### D.   PSO's Policy of Enhanced Enforcement.

The ILP Manual calls for "relentless pursuit, arrest, and prosecution" of prolific offenders. Ex. 1 at 17. To effectuate this policy, the ILP Manual includes as a "Performance Expectation" for deputies a "zero-tolerance arrest policy for crimes committed by prolific offenders" as well as "for members of the district Top 5 *and their associates*." *Id.* at 19, 26 (emphasis added). One PSO deputy explained the policy to Tammy as he transported her to jail:

> Here's the policy of the agency. I'll explain it to you so it makes sense. *If people have themselves or their—people that live in the house* are committing crimes and victimizing the community, then the direction we receive from our Sheriff's Office—from the top down—is to go out there and for every

---

[15] *See also* Ex. 7 at 34:57 (deputies saying they told Robert that they were "going to keep harassing them, every single day").

single violation that person commits, to enforce it upon them. So we have people like code enforcement specialists, traffic enforcement specialists . . . .

Ex. 5 at 0:34; *see also* Ex. 50 at 1 ("the goal is to get them to move away or go to prison"). This policy of enhanced enforcement against listed individuals and their associates manifests itself in several ways.

1. PSO employs a specialized unit to identify and target prolific offenders, and PSO holds weekly meetings to coordinate its targeting of listed individuals and their associates. The agency employs a specialized unit—called the "STAR" team—with a mission to "target prolific offenders" and to "develop missions to target the 'Top 5.'" Ex. 2 at 2. The agency directs STAR members to "learn as much as possible about prolific offenders," as well as "TOP 5," and to "identify potential prolific offenders that our members need to target." *Id.* at 3; *see also* Ex. 30.[16]

The agency also coordinates its enforcement efforts against listed individuals and their associates through weekly Actionable Intelligence Meetings, or "AIM" meetings. *See* Ex. 1 at 33–34; Ex. 2 at 4–5. These meetings are open to all members of the agency, and they were regularly attended by analysts, STAR team members, deputies, school resource officers, and code enforcement officials, among others.

---

[16] Consistent with this direction to "identify" prolific offenders, both Robert and Tammy received visits from STAR after their sons were flagged by deputies as potential offenders. Robert's home received repeated visits from STAR approximately one month after a deputy submitted a "tip" stating that Bobby had been identified (based on a "Facebook search") as an associate of a listed individual. *See* Ex. 11 at 5–10; Ex. 42. Similarly, a STAR deputy visited Tammy's home four days after a school resource officer identified Donnie in an internal PSO email as somebody who "engages in many risky activities." *See* Ex. 9 at 21; Ex. 47 at 2.

Ex. 18 at 62:10, 63:5–24.[17] The presentation slides for the weekly AIM meetings include photo line-ups of listed individuals and their associates, which included photographs of Tammy (identified as Donnie's mother) and Robert (identified as Bobby's father). *See* Ex. 16 at 25, 30, 64; *see also id.* at 56–57 (listing Dalanea's mother, sister, and aunt as associates). Slides from the meetings also discuss enforcement efforts against all four Plaintiffs.[18]

2. <u>Deputies arrest listed individuals and their family members.</u> The record contains numerous instances where PSO deputies—typically STAR team members—arrested listed individuals and their family members.

PSO deputies arrested Tammy Heilman on two occasions. First, on September 16, 2016, days after internal notes from the weekly AIM meeting identified Donnie as an associate of a Top 5 Offender, *see* Ex. 16 at 62, a member of the STAR team visited Tammy's home and, after Tammy declined to speak to him, arrested her for giving false information to a law enforcement officer, for battery on a law enforcement officer, and for resisting arrest without violence. Heilman Decl. ¶¶ 12–13. While transporting Tammy to jail, the STAR deputy told her, "[O]ur goal is to

---

[17] *See also* Ex. 51 (email instructing Child Protective Investigators and School Resource Officers to monitor and provide information on listed individuals).

[18] *See, e.g.*, Ex. 16 at 73, 75–81, 84 (identifying Darlene's son as a Top 5 Offender and noting her code citations); 3 (noting that Tammy was fined $2,518 for five code citations); 10 (noting that Robert was "not answering door" and stating that deputy "[w]ill be taking Cpl. Celeste (code enforcement) with him to visit dad"); 55 (identifying Dalanea as a Top 5 Offender and stating that she "received verbal warnings regarding her county ordinance violations").

get you to do something to keep your kid from committing crime." Ex. 5 at 1:10. In an internal email the next morning, the deputy reported that it was a "[v]ery busy night" and that one of the "top three events" was that they had arrested "Prolific Offender Donnie McDougall's mother." Ex. 46 at 2.

Second, on September 18, 2018, one day after Donnie was listed as a Top 5 Offender, *see* Ex. 16 at 63, members of the STAR team once again visited Tammy's home. *See also* Ex. 49 (email from 10 days prior stating that "Donnie should be getting some TLC from STAR"). Using the fact that Tammy was on probation from her first arrest, officers demanded to be let into the home, and, when Tammy opened the screen door in a manner that caused it to touch a deputy, arrested Tammy for felony battery on a law enforcement officer. Heilman Decl. ¶ 19; *see also* Ex. 5 at 30:09. The next day, an internal "Daily Activity Report" recounted the arrest and identified Tammy as a "TOP 5 ASSOCIATE/MOTHER OF DONNIE MCDOUGALL." Ex. 53; *see also* Ex. 54 (internal STAR report recounting arrest under "Cases Worked").[19]

Meanwhile, PSO deputies arrested Robert Jones three times in the space of about three months:

- On the day after Christmas in 2015, STAR deputies visited Robert's home for a prolific offender check and, after Robert refused to allow them to enter,

---

[19] While deputies claimed to be looking for Donnie—who at the time was subject to an active warrant for an alleged domestic violence incident—none of the deputies went inside the house to look for him. *See* Ex. 22 at 146:10–147:14.

arrested Robert on charges of contributing to delinquency of a minor. *See* Ex. 11 at 54; Ex. 14 at 7–24; Jones Decl. ¶ 15. The deputies had looked through the windows and claimed to see a minor inside smoking. Ex. 14 at 20. One of the deputies told Robert, "Little Bobby Jones is bringing this on this house." Ex. 7 at 33:26.

- About a week later, STAR deputies visited Robert's home for another prolific offender check. *See* Ex. 11 at 73–76. The deputies arrested Robert for failing to appear for a code citation which Robert does not remember receiving. *See* Ex. 14 at 25–30; Jones Decl. ¶ 17.

- In March 2016, PSO deputies executed a search warrant at Robert's house in connection with Bobby's alleged criminal activity, claimed to find marijuana in Robert's car and house, and arrested him again for possession of marijuana and child neglect. *See* Ex. 11 at 115; Ex. 14 at 49–64.

As Robert was being arrested this third time, body-worn camera footage shows that a deputy told him, "We're talking about parenting issues. You've done little or nothing to help out with this situation, while your kid runs around here victimizing people. That's why, that's why all this is today. And we'll just continue on this s–t, because you're messing around with an aggressive sheriff. Sheriff Nocco is not playing games, and that's the bottom line." Ex. 7 at 45:55 (profanity omitted).[20]

In addition to arresting Tammy and Robert, PSO deputies also arrested their children under pretextual circumstances. In September 2015, deputies came to see

---

[20] That visit also resulted in the arrest of Bobby's then-girlfriend. As she was being driven to jail, a deputy showed her how Bobby was on the Top 5 list on his laptop, and he showed her how there was a picture of her next to Bobby's name. Ex. 7 at 40:17. The deputy told her, "Because you're associated with him, you're gonna be on this page for a while." *Id.* at 41:32.

Darlene Deegan was likewise threatened with arrest if she did not sufficiently cooperate with PSO. On the same day that a PSO corporal issued her five code citations, *infra* p. 21, he told her, "I mean, you don't want to go to jail over [Tyler's] mess. So that's why it's best that—if you can call him and talk to him, and if you know where he is then that would help." Ex. 6 at 20:40; *see also id.* at 19:36 ("you can be arrested").

Bobby because he had been absent from school and—because of his alleged absence—arrested him based on trace amounts of marijuana that they claimed to have found during an earlier search of his room. *See* Ex. 7 at 0:09; *see also* Jones Decl. ¶¶ 6–7. In addition, four days after Christmas in 2017, members of the STAR team came to Tammy's home to check on Donnie; after one of the deputies looked over the fence and claimed to see people in the backyard with marijuana, the deputies arrested Donnie for violating his probation (even though he was not in the backyard). *See* Ex. 9 at 61; Ex. 12 at 45–56. Nobody else was arrested, and no drugs were seized. *See* Ex. 22 at 134:24–136:1. On body camera, deputies discuss their plans to "stir something up with this" and characterize the allegations as "police talk for they're all a bunch of f—ing a—holes." Ex. 5 at 18:28, 19:30 (profanity omitted).

3. <u>Deputies subject family members of listed individuals to heightened code enforcement.</u> PSO's manual for the STAR team directs the team to "[u]tilize County Ordinance citations as a strategic tool to target prolific offenders." Ex. 2 at 7. To that end, until 2021, PSO employed its own in-house "Code Enforcement Corporals" to issue citations for violations of Pasco County ordinances (separate from the standard code enforcement officials employed by the County). *See* Ex. 23 at 9:6–10:2. These PSO corporals were specifically instructed to "actively pursu[e] prolific offenders and their associates." Ex. 29 at 39.

Particularly when listed individuals are minors, citations are directed to the individuals' parents. *See* Ex. 23 at 41:13–17 (if "the problem person is a juvenile," the citation would be issued to the "parents" or "whoever is responsible"). In one internal performance evaluation, Code Enforcement Corporal Mark Celeste listed as one of his "most significant work related achievements" that he issued so many citations to a prolific offender's mother that she was evicted. Ex. 29 at 19; *see also* Ex. 23 at 38:22–25. He added that the mother was "unfortunately" still living in the same Pasco County district. *See* Ex. 29 at 19; *see also* Ex. 23 at 39:1–3.

Further, PSO deputies target listed individuals and their family members for citations even when other neighboring homes have the same violations. *E.g.*, Ex. 6 at 35:05 (deputy noting that it "doesn't matter" if neighbors have similar violations); Ex. 5 at 8:48 (deputy citing Tammy for "debris" based on trash that she put out for collection after a hurricane, when neighbors had done the same).[21] As a result, PSO's code enforcement disproportionately targets listed individuals and their families: Mr. Carrasco found that addresses where prolific offender checks occurred were more likely to receive code citations. *See* Carrasco Decl. ¶ 68. While addresses that were not targeted for prolific offender checks had a 0.5% chance of receiving a code citation from PSO deputies between 2016 and 2021, addresses that received more

---

[21] A PSO deputy explained that, by contrast, the County's code enforcement officials (who are separate from the PSO code enforcement deputies) "can't discriminate." Ex. 6 at 47:30.

than one prolific offender check had a 14.7% chance of receiving code citations, while addresses that received ten or more prolific offender checks had a 36% chance of receiving a code citation. *Id.* ¶ 65.

Consistent with that pattern, three of four Plaintiffs received citations from PSO deputies. *See* Ex. 12 at 4, 7–14, 39–44 (Tammy); Ex. 13 at 1–27 (Darlene); Ex. 14 at 7–24, 31–48 (Robert).[22] A member of the STAR team told Tammy her citations were likely related to Donnie's prolific offender status. *See* Ex. 21 at 87:12–21.[23] Similarly, the corporal who wrote the citations for Darlene explained that she was targeted because her son was "a Top 5 offender," and that for "every offender that we have in the county, especially a Top 5, we go to their house" and "ensure that ... the ordinances are being followed." Ex. 6 at 32:07.[24]

4. <u>Deputies used code enforcement citations to punish perceived non-compliance with their program of prolific offender checks.</u> If deputies perceived that family members of listed individuals were not cooperating, deputies would utilize

---

[22] A code enforcement corporal also visited the address where Dalanea was staying to look for code enforcement violations. Ex. 8 at 7.

[23] Another of Tammy's citations was issued during a prolific offender check, *see* Ex. 12 at 42, and another was issued the same day that Donnie appeared in the weekly AIM notes as a juvenile allegedly involved in an auto theft, *see* Ex. 16 at 62; Ex. 9 at 13.

[24] For Darlene, this treatment continued for years. When she called about a year later to report what she believed was a code enforcement violation by her neighbor, the deputies ended up giving citations to Darlene—and not her neighbor—in part because she had a history of prior violations (which were issued because of her son's status as a listed individual). *See* Ex. 6 at 48:30, Ex. 13 at 31. In 2021 (after Tyler had died), a deputy responding to her street was captured on body camera telling another that "really special people live here." Ex. 6 at 52:02. Another deputy told Darlene that she needed to trim the landscaping around her mailbox, telling her, "You've been cited for that before, right? 'Yes' is the correct answer." *Id.* at 52:38.

code citations as "a technique for . . . compliance." *See* Ex. 22 at 73:17–24; *see also id.* at 74:13–15 ("So it's kind of putting the pressure on the residents of where this prolific offender is."). Similarly, deputies would "use code enforcement to sort of light a fire under the homeowner to do a better job in keeping that juvenile out of trouble." *Id.* at 74:19–75:1.

Deputies tried to strong-arm each of the Plaintiffs into cooperation—or to retaliate against Plaintiffs for a perceived lack of cooperation—using citations:

- During a prolific offender check on Donnie in October 2017, after Tammy told the deputy that Donnie was home and asleep and that she did not want to wake him, the deputy stated in his notes that Tammy "refused to get [Donnie] for me," Ex. 3 at 10–11, and issued her a citation for "accumulation of junk for [a] cinder block" in her yard. Ex. 5 at 8:18, 9:55; *see also* Ex. 12 at 39–44.

- During a prolific offender check in May 2017, a group of deputies began looking for code violations at Tammy's house because of her "attitude." *See* Ex. 5 at 4:52, 5:16 (mentioning house numbers), 6:10 (asking about her dog's vaccination status), 6:47 (checking the tint of the windows on her car).

- When Darlene refused to allow deputies to break down the door to a trailer on her property, to look for her son Tyler, she was hit with a number of code citations. *See* Ex. 16 at 73. Two days later, a group of deputies told Darlene that if she "cooperate[d] and work[ed] with" them, they could "work with [her]" on the code citations. Ex. 6 at 37:12; *see also id.* at 38:33, 39:59 (discussion of writing citations to "uncooperative" people).

- When deputies came to the house where Dalanea was staying on New Year's Day 2020 looking for her cousin, deputies threatened to write her code citations for missing house numbers and junk in the yard if she did not let them inside. *See* Taylor Decl. ¶ 20; Ex. 8 at 45–46.

- During a visit to Robert's home by a group of deputies, which resulted in code enforcement citations, one deputy was captured on body-worn camera footage

stating, "I told him if they give us 100% information, if it all turns out to be true . . . that's when we maybe, maybe won't write the [code violations]." Ex. 7 at 38:47; *see also* Ex. 23 at 65:8–16.

5. <u>Deputies contacted Child Protective Investigations ("CPI") regarding family members of listed individuals.</u> The record also shows that PSO deputies used referrals to CPI to further harass family members of listed individuals. After deputies looked in Robert's windows and arrested him because they claimed to see a minor inside smoking, deputies contacted the Florida Abuse hotline. *See* Ex. 14 at 62. Similarly, after a deputy looked through Tammy's fence during a prolific offender check and claimed to see people breaking apart marijuana, deputies referred the incident to CPI. *See* Ex. 12 at 56. One deputy acknowledged that CPI was unlikely to take action but stated, "I'm just doing it as a big f—k you." Ex. 5 at 19:55 (profanity omitted).

## LEGAL STANDARD

Summary judgment is appropriate if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a).

## ARGUMENT

PSO's policy of targeted harassment towards listed individuals and their family members is unconstitutional—and therefore the Defendant is liable—for at least four separate reasons. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658

(1978). Part I shows that PSO's policy of suspicionless and warrantless "checks" violates the Fourth Amendment. Part II shows that PSO's policy of harassing parents and associates of targeted persons violates the First Amendment. Part III shows that PSO's policy of listing targeted persons without notice or a hearing violates procedural due process. Finally, Part IV shows that PSO's policy of harassing targeted persons and their associates violates substantive due process.

## I.   PSO's Policy Of Conducting Suspicionless And Warrantless "Prolific Offender Checks" Violates The Fourth Amendment.

PSO's policy of frequent, warrantless, suspicionless visits to Plaintiffs' homes violates the Fourth Amendment.[25] PSO does not require deputies to obtain warrants for those visits. Ex. 18 at 167:24–168:1. Nor does it require deputies to have probable cause or reasonable suspicion. *Id*. at 168:2–24; *see also id.* at 205:1–5.[26] In PSO's view, such constitutional obligations are not implicated where deputies "just go knock on the door" because, PSO believes, it "could do that to any citizen." *Id*. at 168:6–8.

---

[25] *Monell* liability attaches "for injuries caused by a policy that directed officers to make warrantless entries onto constitutionally protected property with no regard for—or even recognition of—constitutional limits." *Morgan v. Fairfield County*, 903 F.3d 553, 558 (6th Cir. 2018).

[26] In place of individualized suspicion, the Manual requires that visits take place "at least once quarterly." Ex. 1 at 19. Sometimes, deputies arrived with no evident purpose except to ask invasive questions. *See, e.g.*, Ex. 4 at 3:47; Ex. 7 at 33:16, 34:43. In others, PSO deputies arrived with no initial objective and then conduct surveillance to try to develop probable cause for an arrest. Ex. 5 at 15:16. And in still other instances, deputies approach properties with one stated intention—like searching for an occupant or an associate of an occupant—before shifting their focus to something else, like code enforcement. *See, e.g.*, Jones Decl. ¶¶ 7, 15, 16, 18; Heilman Decl. ¶¶ 11–15, 16, 30; Ex. 5 at 15:16, 30:09; Ex. 52.

However, the pattern of harassment at issue here cannot be justified as a "knock and talk." To the contrary, the checks were non-voluntary and conducted in a manner that gave rise to an unreasonable seizure. They also sought evidence of criminal wrongdoing in a manner that exceeded any "implied license" to visit the Plaintiffs' homes and thus constituted an unreasonable search.

### A.   The Prolific Offender Checks Are Unreasonable Seizures.

The Eleventh Circuit has said that "[o]fficers need ... reasonable suspicion ... to justify [a] knock and talk." *United States v. Ratcliff*, 725 F. App'x 894, 901 (11th Cir. 2018). At *least* reasonable suspicion should be required to justify the interactions at issue here, which bear all the hallmarks of a seizure. *See City of Indianapolis v. Edmond*, 531 US. 32, 37, 41-42 (2000). PSO's policy, however, required these "checks" without any particularized suspicion at all.

"A person is seized by the police," when an officer, "by physical force *or a show of authority*, terminates or restrains. . . [one's] freedom of movement." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (cleaned up) (emphasis added) (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). In a case like this one, where typically "an individual's submission . . . takes the form of passive acquiescence" in a so-called "knock-and-talk," the propriety of an interaction turns on "whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" *Id*. at 255.

Under this standard, the pattern of prolific offender checks here gave rise to a Fourth Amendment seizure. The repeated nature of the visits—and the fact that they occurred pursuant to an official policy of periodic "checks"—meant that the Plaintiffs could not simply terminate the encounters. When Plaintiffs complained that they were being harassed, the visits continued. *See supra* p. 13. Moreover, the circumstances were such that Plaintiffs would reasonably "fear[ ] prosecution" if they declined to cooperate. *Bostick*, 501 U.S. at 437 (emphasis added). Indeed, all the Plaintiffs were either arrested or otherwise threatened for noncompliance. *See* Heilman Decl. ¶¶ 11–12, 30; Jones Decl. ¶¶ 15–16; Taylor Decl. ¶¶ 17, 20; Ex. 6 at 20:40.

The visits also involved "the threatening presence of several officers . . . or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554–55 (1980). Whether an encounter is a seizure may "turn[] on the show of force exhibited by the police," as evidenced by things like "raised voices[] or coercive demands," officers "surround[ing] the house," shining lights into a residence, forceful knocking, and ordering occupants to emerge. *United States v. Thomas*, 430 F.3d 274, 277–78 (6th Cir. 2005) (collecting cases). Virtually all of these things happened to Robert, who endured lengthy checks, at all hours, in which as many as over a dozen officers descended on the residence—shined lights in windows, pounded on doors,

demanded occupants to come outside, and used code enforcement to coerce compliance with PSO's information-gathering. *See* Jones Decl. ¶¶ 9–11, 15–18; Ex. 7 at 0:39, 2:10, 5:42, 19:02, 20:49, 22:29, 25:46, 27:30, 30:10, 32:57, 38:47. This is the very "coercive police conduct," that leads a person to "reasonably believe[] he ha[s] no choice but to comply*." Thomas*, 430 F.3d at 277.

The same is true for Darlene. In fact, in *Thomas*, the Sixth Circuit identified some factors characterizing the "show of force" that elevates a consensual encounter to an unlawful seizure. It reads like a list of tactics deployed by PSO. For example, PSO attempted to "summon[] [Darlene's son] from his mother's home with the blaring call of a bullhorn." *Id.* at 278 (citing *United States v. Morgan*, 743 F.2d 1158, 1161 (6th Cir. 1984)); *see* Deegan Decl. ¶ 11; Ex. 6 at 1:11. And they "completely surrounded [her] trailer . . . and ordered [Tyler] . . . to leave." *Thomas*, 430 F.3d at 278 (citing *United States v. Al-Azzawy*, 784 F.2d 890, 893 (9th Cir. 1985)). And when Darlene told deputies she thought their behavior was "harass[ment]," and asked them to leave, they stayed and continued questioning her. Deegan Decl. ¶ 16; Ex. 6 at 34:48, 36:20 (Darlene saying she "just want[ed] to be left alone" and a deputy responding, "That's not going to happen").

Tammy had a similar experience. Her property was sometimes surrounded, even surreptitiously, by PSO deputies. Heilman Decl. ¶¶ 7–8; Ex. 5 at 15:18. PSO deputies were aggressive, intending to convey a "show of force," they said, when

"coming to [her] s—thole house." Ex. 5 at 22:26. While there, deputies brainstormed how to use the law to harm Tammy. *Id*. at 18:28 (thinking of ways to "stir something up" to act "as a big 'f—k you'"). If Tammy was not fully cooperative, she was threatened with everything from code citations to trumped up investigations, charges, and even arrest. *See, e.g.*, Heilman Decl. ¶¶ 11–19, 28–30, 37; Ex. 5 at 4:52, 8:18. Under those circumstances, Tammy reasonably believed that she had no choice but to comply. *See* Heilman Decl. ¶ 14.

Dalanea's prolific offender checks were likewise textbook seizures. That is because, again, a seizure occurs where an officer "asserts his or her authority, refuses to leave, or otherwise makes 'the people inside feel they cannot refuse to open up.'" *United States v. Mills*, 372 F. Supp. 3d 517, 531 (E.D. Mich. 2019) (collecting cases). That "assertion of authority and refusal to leave" is what happened routinely with Dalanea. As just one example, body-worn camera footage depicts Dalanea—who was visibly uncomfortable with the deputy's presence—turning and reaching for the doorknob to end an encounter. Ex. 4 at 14:19. But instead, she stopped and faced his invasive questions about her pregnancy and romantic partners. *Id*. And despite Dalanea's obvious discomfort, the questioning persisted. Indeed, Dalanea was often reluctant to share such sensitive information. Ex. 4 at 14:52, 28:27. She only did so because she thought she had no choice. *See* Taylor Decl. ¶¶ 12–13.

To be clear, there were a handful of times when some of the Plaintiffs *did* try to cease an encounter. What happened in those instances is just as telling. Robert was arrested immediately. *See* Jones Decl. ¶ 15; Ex. 7 at 35:15. Tammy was both cited immediately and arrested immediately. *See* Heilman Decl. ¶¶ 11–13, 30–32; Ex. 5 at 8:18, 30:09. And Darlene was cited immediately and threatened with arrest. *See* Deegan Decl. ¶ 15, Ex. 6 at 19:36, 20:40, 38:43. This of course informs the "circumstances surrounding the encounter" for subsequent visits.[27] Moreover, the repeated nature of the interactions means that even if a targeted individual did somehow manage to terminate a particular interaction PSO deputies were required to—and always did—come back.

## B.   The Prolific Offender Checks Are Unreasonable Searches.

A core goal of any prolific offender check is "to cultivate information about the criminal environment" and "to develop information to help analysts identify where and who [PSO] should be focused on, help solve crimes that have already been committed, and ultimately help . . . to prevent future crimes from occurring." Ex. 1 at 18. That is a search. *Florida v. Jardines*, 569 U.S. 1, 11 (2013); *Kyllo v. United States*, 533 U.S. 27, 32 n.1 (2001) (defining a search to mean, among other

---

[27] In any case, perceived "non-compliant behavior . . . does not constitute grounds for a search." *Richardson v. City of Antioch*, 722 F. Supp. 2d 1133, 1140 n.2 (N.D. Cal. 2010). The government "may not use the fact that Plaintiffs asserted their Fourth Amendment rights as justification for the subsequent deprivation of those very same rights." *Id*. Yet retaliatory behavior is a hallmark of PSO's prolific offender checks, as deputies routinely look to penalize property owners for perceived noncompliance. *See, e.g.*, Ex. 5 at 4:52, 8:30.

things, "[t]o look over or through for the purpose of finding something; to explore" (citation omitted)). Because PSO conducted these searches without probable cause or a warrant, they are presumptively unreasonable. *Edmond*, 531 US. at 37.

While police may take advantage of the "implied license" to approach a house to speak with its inhabitants, the pattern of repeated, harassing visits at issue in this case far exceeds any such "implied license." *Jardines*, 596 U.S. at 10; *see also Bengini v. City of Hemet*, 879 F.2d 473, 477 (9th Cir. 1988) (upholding a jury verdict finding a Fourth Amendment violation where officers checked a bar "five or six times per evening," "went behind the bar," "searched in drawers," "shined flashlights in patrons' faces," thus supporting a finding that the "checks . . . were unreasonable because the[ir] manner . . . and their frequency.").

Indeed, a search occurs—and thus Fourth Amendment protections are triggered—where there is objective evidence of an attempt to "gather[] . . . information by physically entering and occupying" private property "to engage in conduct not explicitly or implicitly permitted by the homeowner." *Jardines*, 569 U.S. at 5–6. The police, rather, may act only as any private citizen may: they may "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent an invitation to linger longer) leave." *Id*. at 8; *see also Rogers v. Pendleton*, 249 F.3d 279, 289–90 (4th Cir. 2001) (officers may not continue a search "*after* officers have spoken to the owner of a home and been asked to leave.").

Moreover, the rule from *Jardines*—that law enforcement cannot linger on a property absent an invitation—extends to the curtilage as well. *Jardines*, 569 U.S. at 6 (explaining that the curtilage is "part of the home itself for Fourth Amendment purposes.") (quotation omitted). Quite simply, "there is no customary invitation" to enter the curtilage simply to conduct a search. *Id.* at 9; *Brennan v. Dawson*, 752 F. App'x 276, 283 (6th Cir. 2018) (finding that an officer, having knocked and not received a response, "overextended his stay" in violation of *Jardines*, when he "walked the perimeter of the home, pause[ed] to knock on and peer through the windows . . . made five to ten trips around the perimeter," and spent roughly ninety minutes on the property). After all, the Fourth Amendment "would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity . . . [or] observe [someone's] repose from just outside the front window." *Jardines*, 569 U.S. at 6.

There is also no implied license for another of PSO's routine practices— "forgo[ing] the knock at the front door and, without any reason to believe the homeowner will be found there, proceed[ing] directly to the back yard." *United States v. Wells*, 648 F.3d 671, 680 (8th Cir. 2011); *See* Heilman Decl. ¶ 8; Jones Decl. ¶ 11; Deegan Decl. ¶¶ 13–14; *see also, e.g.*, Ex. 7 at 2:30, 29:55; Ex. 5 at 15:16, 23:37, 34:14; Ex. 6 at 5:06, 43:08, 44:25, 46:01. The implied license does not include "linger[ing] and continu[ing] to search the curtilage of the home." *Brennan*,

752 F. App'x at 283 (citing *Jardines*, 569 U.S. at 8); *see also Rogers v. Pendleton*, 249 F.3d 279, 290 (4th Cir. 2001).

Taken together, there is "objective evidence" that PSO policy of repeated, warrantless, suspicionless visits to the home requires conduct that goes beyond the implied license described in *Jardines*. Rather than knock *promptly* and (absent an invitation to linger) leave, the evidence objectively shows that PSO policy requires deputies to go beyond the implied license and:

- Surveil properties for unspecified criminal activity. *See* Heilman Decl. ¶ 8; Jones Decl. ¶ 11; Ex. 5 at 15:16, 23:37.

- Peer through fence slats in search of unspecified criminal activity *before* knocking. *See* Heilman Decl. ¶ 8; Ex. 5 at 15:16.

- Use information gathered through surveillance as a basis to initiate an investigation by another state agency. *See* Heilman Decl. ¶ 17.

- Look through windows in search of unspecified criminal activity. *See* Jones Decl. ¶¶ 11, 15; Heilman Decl. ¶ 8; Ex. 5 at 33:54: Ex. 7 at 4:32.

- Identify inhabitants to determine whether they have warrants or are on probation. *See* Ex. 1 at 18; Jones Decl. ¶¶ 11, 15; Heilman Decl. ¶¶ 16–17; Deegan Decl. ¶¶ 9–10; Ex. 7 at 1:46; Ex. 5 at 30:09.

- Seek entry into campers, RVs, and the like in search of unspecified criminal activity. *See, e.g.*, Deegan Decl. ¶¶ 11–14; Ex. 6 at 11:39, 22:13, 27:45.

- Explore the interior and exterior of homes, including the curtilage, in search of unspecified criminal activity or municipal code violations. *See* Jones Decl. ¶¶ 11, 15; *see also, e.g.*, Ex. 7 at 0:39, 2:09, 2:30, 29:55, 32:57, 37:48, 38:16.

PSO's checks bear all the hallmarks of a search: surveillance, questioning, exploring the inside and outside of a property, and seeking to enter a home or speak with

occupants—all to gather information. Ex. 1 at 18–20. Again, PSO Deputies are *required* to do this. *Id*.; Ex. 4 at 19:34, 26:16; Ex. 7 at 45:55. Thus, PSO's stated policy—and its deputies' tactics in implementing that policy—"objectively reveals a purpose to conduct a search." *Jardines*, 569 U.S. at 10. After all, "no one is impliedly invited to enter the protected premises of the home in order to do nothing but conduct a search." *Jardines*, 569 U.S. at 9 n.4.[28] Similarly, no one is "impliedly invited to enter the protected premises of the home" in order to harass. This roving and unfocused "program whose primary purpose [is] to detect evidence of ordinary criminal wrongdoing," *City of Indianapolis*, 531 U.S. at 38, cannot be conducted in the absence of a warrant or probable cause and violates the Fourth Amendment.

## II.  PSO's Policy Of Harassing Parents And Other Associates Of Targeted Persons Violates The First Amendment.

The First Amendment protects the right "to enter into and maintain certain intimate human relationships." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984); *see also Adler v. Pataki*, 185 F.3d 35, 44–45 (2d Cir. 1999). And the Eleventh Circuit has historically "adopted an expansive view of an individual's [F]irst [A]mendment right of association." *Wilson v. Taylor*, 733 F.2d 1539, 1543 (11th Cir. 1984) (citing *Sawyer v. Sandstrom*, 615 F.2d 311 (5th Cir. 1980)).

---

[28] As at least one Court of Appeals has explained, "a consensual encounter at the doorstep may evolve into a 'constructive entry' when the police, while not entering the house, deploy overbearing tactics that essentially force the individual out of the home." *United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2005).

All four of the Plaintiffs have experienced some form of punishment for their association with others. Three plaintiffs—Robert, Tammy, and Darlene—were subjected to systematic harassment for the prior misdeeds of their children. *See* Jones Decl. ¶ 5; Heilman Decl. ¶ 5; Deegan Decl. ¶ 5; *see also, e.g.*, Ex. 7 at 33:26 ("Little Bobby Jones is bringing this on this house."); Ex. 5 at 0:34. Robert was told: "Your kid [is] out here victimizing people. That's why, that's why all this [code enforcement and searching] today." Ex. 7 at 45:55. Darlene was told: "Tyler is a Top 5 Offender. Okay, every offender that we have in the county, especially a Top 5, we go to their house and . . . we ensure that all the laws are being followed and the ordinances are being followed." Ex. 6 at 32:07. And, again, Tammy was told: "If people . . . that live in the house are committing crimes . . . the direction we receive from our Sheriff's Office . . . is to go out there and for every single violation that person commits, to enforce it upon them." Ex. 5 at 0:34. Thus, the enhanced scrutiny three of the plaintiffs received was the result of their children's inclusion on various lists—all for offenses that the Plaintiffs had nothing to do with.

Meanwhile, as a listed individual, Dalanea also found that her close associates were targeted pursuant to this same policy. In one instance, a PSO deputy's unwanted early-morning visit led Dalanea's family friend, Dana Jones, to suggest that she would throw out Dalanea out of the house to avoid further visits. Ex. 4 at 19:10. ("Well then, she ain't gonna be living here. She ain't gonna be living in the

state, or something. Because this—that's bulls—t."). The deputy responded that, "I'm just trying to do my job." *Id*. at 19:34. But in "just trying to do [his] job," he was effectively penalizing Ms. Jones for her association with Dalanea. So much so, in fact, that Ms. Jones indicated that she would have to throw Dalanea out to escape the harassment—even though she knew Dalanea had nowhere else to go. *Id*. Indeed, soon after that encounter, Dalanea moved out. *See* Taylor Decl. ¶ 19.[29]

Deputies understand that this is what the policy requires. That is why, when touting his accomplishments during a performance review, one deputy boasted that he helped get a prolific offender's *mother* evicted. Ex. 29 at 10. Another admitted that the point of the visits is to "pressure . . . the residents of where [a] prolific offender is." Ex. 22 at 74:13–15; *see also* Ex. 1 at 18–20; Carrasco Decl. ¶¶ 73–75.

This policy runs afoul of the principle that, "[i]n this country, guilt is individual." *Singleton v. Cecil*, 155 F.3d 983, 987 (8th Cir. 1998). Prior to the establishment of the Eleventh Circuit, the Fifth Circuit acknowledged as much, explaining that "[f]reedom from punishment in the absence of personal guilt is a fundamental element in the American scheme of liberty" and attributing one

---

[29] Others in Dalanea's circle had similar experiences. For example, a family friend who had taken in Dalanea, Karen Hodges, was threatened with code violations because Dalanea refused deputies entry to look for her cousin. *See* Taylor Decl. ¶ 20; Ex. 15 at 12. During prolific offender checks, deputies routinely asked Dalanea about old associates, current associates, and even romantic partners. *See* Taylor Decl. ¶¶ 12–14, 16. She was even asked, repeatedly, about the identity of the father of her unborn twins, whether he was involved in any criminal activity, and whether he would be "in the picture" to help rear the children.

individual's misconduct "to other family members is . . . guilt by association wholly alien to American liberty." *St. Ann v. Palisi*, 495 F.2d 423, 425 (5th Cir. 1974). Yet PSO has imposed consequences on Plaintiffs "on the basis of their children's acts." *Tyson v. New York City Hous. Auth*., 369 F. Supp. 513, 520 (S.D.N.Y. 1974). Such a policy "run[s] afoul of the First Amendment which guarantees to every person the right to freely associate with others, including members of his family, without interference from the state." *Id*.[30]

### III.    PSO's Policy Of Listing Targeted Persons Without Notice Or A Hearing Violates Procedural Due Process.

Procedural due process protections apply whenever "there has been a taking or deprivation of a protected interest." *Chrysler Corp. v. Fedders Corp*., 670 F.2d 1316, 1321 (3d Cir. 1982) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972)). Accordingly, "[i]n examining a procedural due process claim . . . [the court] must determine whether the plaintiffs were deprived of a protected interest, and, if so, whether they received the process they were due." *Statewide Bonding, Inc. v. U.S. Dep't of Homeland Sec.*, 980 F.3d 109, 118 (D.C. Cir. 2020). This section therefore proceeds in two parts. First, Plaintiffs establish that their right to procedural due

---

[30] It does not matter whether the code violations were "otherwise justified." *See Eisenberg v. City of Miami*, 54 F. Supp. 3d 1312, 1323 (S.D. Fla. 2014) ("Although the City contends its conduct was 'lawful,' such 'lawful conduct' does not preclude Plaintiffs' claim where 'a retaliatory motive can be inferred from a sequence of events, notwithstanding other non-retaliatory motives . . . the defendant may have." (citing *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014))).

process was implicated. And second, Plaintiffs show that the process PSO afforded— none—falls short of the process Plaintiffs were due.

### A. PSO's Policy Infringes on Plaintiffs' Protected Interests.

The requirements of procedural due process apply to the "interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Roth*, 408 U.S. at 569. And being on a PSO list has consequences akin to being on probation—albeit for a *future* offense. Ex. 18 at 76:4–78:6 (acknowledging that being placed on a list has consequences); *see also* Ex. 48 (email from PSO's 30(b)(6) representative treating "focused offenders" status as an "alternative option to going to jail"). Because those consequences implicate constitutional rights, "the right to some kind of prior hearing is paramount." *Roth*, 408 U.S. at 569–70. After all, Plaintiffs are arguing that PSO's policy violated their right to be at peace in their own homes—or, in other words, to be free from unreasonable searches and seizures, to be free from punishment for the misdeeds (actual or predicted) of others, and to be free from pretextual and abusive government conduct. Thus, Plaintiffs satisfy the threshold question of whether PSO's policy implicates the requisite "interests encompassed by the Fourteenth Amendment's protection of liberty and property."

### B. PSO's Policy Failed to Provide Plaintiffs with *Any* Notice or Process, Rendering a Full *Mathews* Analysis Unnecessary.

As a threshold matter, PSO violated Plaintiffs' right to be notified of their inclusion on PSO's lists where the consequence of that inclusion was the deprivation

of other constitutional rights. *Cf. M.A.K. Inv. Grp., LLC v. City of Glendale*, 897 F.3d 1303, 1312–19 (10th Cir. 2018) (applying *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306 (1950)). In addition to improper (nonexistent) *notice*, PSO has, relatedly, failed to afford Plaintiffs adequate *process*—a question that would typically be determined by applying the *Mathews* balancing test. *Catron v. City of St. Petersburg*, 658 F.3d 1260, 1267 (11th Cir. 2011) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). But where, as here, the government provides no process at all, a full *Mathews* analysis is unnecessary; the government simply loses. *See Schepers v. Comm'r, Ind. Dep't of Corr.*, 691 F.3d 909, 915–16 (7th Cir. 2012). Indeed, "[t]his deficiency alone" is enough to find that the "procedures are inadequate because they fail to provide any way for persons . . . to correct errors." *Id.*[31]

## IV.   PSO's Policy Of Harassing Targeted Persons And Their Associates Violates Substantive Due Process.

PSO's policy violates substantive due process in two ways. First, it violates the fundamental right to be free from punishment for the misdeeds of others. And

---

[31] Even applying *Mathews*, the outcome is the same. First, the nature of the private interest favors the Plaintiffs here. Plaintiffs have alleged harms to fundamental constitutional rights. *See, e.g.*, *Mohamed v. Holder*, 995 F. Supp. 2d 520, 539 (E.D. Va. 2014). Second, as to the sufficiency of "the procedures used," again, there were none. Nor was there any meaningful way to get off the lists. Jones Decl. ¶¶ 28–29; Heilman Decl. ¶¶ 34–36; Deegan Decl. ¶¶ 28–29; Taylor Decl. ¶ 29; *see also* Ex. 26 at 94:1–11. Finally, the third prong—the government's interest—also weighs in Plaintiffs' favor. The PSO has not asserted (because it cannot) that its interests go beyond general crime prevention or otherwise implicate "substantial" or "compelling" interests.

second, it violates the right to be free from arbitrary and pretextual enforcement that lacks any rational basis. Each argument is addressed in turn.

### A.   PSO's Policy Violates the Fundamental Right to Be Free From Punishment for the Wrongdoing of Others.

Because PSO's policy "implicates a 'fundamental liberty interest[]' by 'impos[ing] punishments and other legal burdens'" for the wrongdoing of others, it is "subject to strict scrutiny in a substantive due process analysis." *Cook v. Stewart*, Case No. 1:13-cv-72-MW-GRJ, 2014 WL 12521335, at *4 (N.D. Fla. Apr. 22, 2014) (citing *Doe v. Moore*, 410 F.3d 1337, 1342–43 (11th Cir. 2005)).

The punishments meted out by PSO in this case are the result of the alleged wrongdoing of others—specifically, the Plaintiffs' children. Deputies expressly told Robert that he was targeted because "[y]our kid [is] out here victimizing people," Ex. 7 at 45:55; told Darlene she was targeted for code enforcement because "Tyler is a Top 5 Offender," Ex. 6 at 32:07; and told Tammy she was targeted because, "[i]f people ... that live in the house are committing crimes . . . the direction we receive from our Sheriff's Office ... is to go out there and for every single violation that person commits, to enforce it upon them." Ex. 5 at 0:34. The enhanced scrutiny three of the plaintiffs received was the result of their children's inclusion on various lists— all for offenses that the Plaintiffs had nothing to do with. This runs afoul of the principle that any "legal burden[] should bear some relationship to individual responsibility or wrongdoing." *St. Ann*, 495 F. 2d at 426.

### B.   PSO's Policy is Arbitrary, Pretextual, and Designed to Harass.

PSO's policies also constituted unlawful harassment in violation of due process. Indeed, a party has a "section 1983 claim for violation of due process of law," where there is evidence of "systematic and intentional harassment." *Chalfy v. Turoff*, 804 F.2d 20, 22–23 (2d Cir. 1986) (citing *Espanola Way Corp. v. Myerson*, 690 F.2d 827, 829 (11th Cir. 1982)). And when it comes to code enforcement, even something as simple as "[i]ssuing an unreasonably high number of *fully warranted* citations might" be enough to violate due process. *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1560 (11th Cir. 1993) (emphasis added).

The evidence here indicates wrongful enforcement motives. PSO targeted listed individuals and their families by "forming a 'task force' . . . to conduct frequent [code] inspections . . . with the 'stated goal' of 'driving them out.'" *Beach Blitz Co. v. City of Miami Beach,* Case No. 1:17-cv-23958-UU, 2018 WL 11260453, at *5 (S.D. Fla. Feb. 5, 2018) (applying *Espanola Way*, 690 F.2d at 828–30). Indeed, PSO has a dedicated group of people—a code enforcement corporal, deputies, and the STAR Team—to target people for that very purpose. Ex. 45 at 3–5; Ex. 50 at 1 ("[T]he goal is to get them to move away or go to prison on new charges we discover, that's what we are looking for!"); Ex. 22 at 72:17–73:9; Ex. 23 at 110:10–15. There is also evidence that "Code Enforcement Officers who issued . . . violations were specifically dispatched" to certain targets. *Beach Blitz Co.*, 2018 WL 11260453, at

*5; Ex. 2 at 7 (requiring deputies to "[u]tilize County Ordinance citations as a strategic tool to target" individuals); Ex. 22 at 73:17–74:18 (testifying that they were required to "put[] the pressure onto the residents of where [a] prolific offender is."); Ex. 24 at 34:5–22; *see also* Ex. 52 at 1. And there is evidence of wrongful enforcement because code enforcement operated unevenly or was focused on a specific target. *Beach Blitz*, 2018 WL 11260453, at * 5 (citing *Espanola Way*, 690 F.2d at 828–30); *see also H & J Land Invs., Inc. v. City of Jacksonville*, No. 3:13-cv-1174-J-34PDB, 2014 WL 4540200, *9–10 (M.D. Fla. Sept. 11, 2014).[32] There is even stark statistical proof that PSO's code enforcement efforts were disproportionately directed at Plaintiffs and other targeted individuals. *See* Carrasco Decl. ¶¶ 63–75. PSO had a dedicated group of people, a list of targets, and a goal of driving those targets out. That is unconstitutional.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter summary judgment on the question of liability, while setting the case for a limited bench trial on the issue of remedy.[33]

---

[32] Each of these cases—*Espanola Way*, *Post*, *Beach Blitz*, and *H & J Land*—were ultimately resolved under various immunity doctrines. Because this is a *Monell* case, however, immunity-based rationales (like whether an agent's conduct was improper under "clearly established precedent") are not determinative. Rather, this Court's consideration is simply whether a constitutional violation took place.

[33] Plaintiffs do not seek damages for pain and suffering but, in addition to nominal damages and injunctive and declaratory, seek to recover a modest amount of compensatory damages to be proved at trial.

Dated: June 27, 2022.       Respectfully submitted,

/s/ Ari S. Bargil
Ari S. Bargil (FL Bar No. 71454)
INSTITUTE FOR JUSTICE
2 S. Biscayne Boulevard, Suite 3180
Miami, FL 33131
Tel: (305) 721-1600
Fax: (305) 721-1601
abargil@ij.org

Joshua A. House (CA Bar No. 284856)**
Caroline Grace Brothers (DC Bar No. 1656094)**
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Tel.: (703) 682-9320
Fax: (703) 682-9321
jhouse@ij.org
cgbrothers@ij.org

Robert E. Johnson (OH Bar No. 0098498)**
INSTITUTE FOR JUSTICE
16781 Chagrin Boulevard, Suite 256
Shaker Heights, OH 44120
Tel.: (703) 682-9320
Fax: (703) 682-9321
rjohnson@ij.org

** Admitted *Pro Hac Vice*

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of June, 2022, a true and correct copy of the foregoing document was served via electronic mail to the following counsel of record:

Thomas W. Poulton
poulton@debevoisepoulton.com

Jeffrey K. Grant
grant@debevoisepoulton.com

Erin M. Tueche
tueche@debevoisepoulton.com

Robert D. Holborn, II
holborn@debevoisepoulton.com

DEBEVOISE & POULTON, PA
1035 S Semoran Blvd, Suite 1010
Winter Park, FL 32792-5512


/s/ Ari S. Bargil