UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES III,

        Plaintiffs,

v.                               CASE NO.: 8:21-cv-00555-SDM-CPT

CHRIS NOCCO, in his official
capacity as Pasco County Sheriff,

        Defendant.                ***Dispositive Motion***
_____/

### DEFENDANT SHERIFF NOCCO'S AMENDED MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS

      Defendant Pasco County Sheriff Nocco, by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56 and the Court's Case Management Orders, hereby moves the Court for entry of summary judgment in his favor on all remaining claims in the case, and states:

      1.    Plaintiffs allege that their rights under the First, Fourth, and Fourteenth Amendments have been violated and that the Sheriff is liable for those violations under *Monell v. Dep't of Social Services of the City of New York,* 436 U.S. 658 (1978) as "caused by" the Sheriff's Intelligence Led Policing Program (ILP). The central claim is that ILP designated certain persons as "prolific offenders" and the Sheriff visits the homes of prolific offenders to "harass" them.

2.     The Court should grant summary judgment to the Sheriff on all claims first because the Plaintiffs have not shown a violation of their constitutional rights.

3.     Independently, Plaintiffs cannot show that an official policy or custom of the Sheriff "caused" any given violation as contemplated by *Monell*.  To the contrary, the evidence is that there is no formal policy of the Sheriff that instructs deputies how to engage in any given prolific offender check and there is no consistent pattern to the interactions such as to conclude that there was an unconstitutional *Monell* custom that caused a violation of Plaintiffs' rights.

4.     It is anticipated that Plaintiffs will file with the Court excerpts of body worn camera (BWC) videos of interactions that Plaintiffs had with Pasco deputies. Defendant will file with the Court all of the available BWC footage. (See Dkt. 114.)[1] Akin to a qualified immunity analysis, the Court will have to "slosh its way through the factbound morass"[2] of these interactions.

5.     Plaintiffs seek reimbursement for fines they paid for code violation citations.  But they paid the fines and fixed the deficiencies noted in the citations, and otherwise make no claim that the citations were objectively incorrect.  Their claims for such relief are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994).

---

[1] Defendant anticipates sending the flash drive to the Court this week, which Plaintiffs' counsel states is acceptable to Plaintiffs, but will advise if there is any delay.

[2] *Scott v. Harris*, 550 U.S. 372, 383 (2007).

6. Plaintiffs lack standing as to future injunctive relief because none of them or their family members are currently designated as prolific offenders and none has established a likelihood that they (or a family member) will be characterized as a prolific offender in the future.

7. If Plaintiffs' request is that the Court direct the Sheriff to generally discontinue or to modify ILP in some specific way, Plaintiffs have failed to justify such relief and it would violate principles of federalism and separation of powers.

8. The Sheriff is entitled to summary judgment on claims of individual Plaintiffs for a variety of reasons.

9. Plaintiff Heilman has no viable Fourth Amendment claim related to her two arrests as she pled or was found guilty of, and convicted of, offenses in all cases in which she was arrested such that *Heck* defeats any claim that her Fourth Amendment rights were violated.

10. All of Plaintiff Jones' claims in the case are barred by the statute of limitations as all incidents involving him or his son Robert Jones occurred more than four years prior to the filing of the lawsuit. That is beyond the statute of limitations applicable to §1983 claims in Florida.

11. The Sheriff should be granted summary judgment on any claim by Jones that he was unconstitutionally arrested for failure to appear for code citation hearings, claiming that he did not receive the citations or notice of the hearings. The

evidence shows that the warrants were lawfully issued, barring any Fourth Amendment claim by him as a matter of law.

WHEREFORE, Defendant Sheriff Nocco moves the Court for summary judgment in his favor on all claims against him.

## MEMORANDUM OF LAW

### I.  Key *Monell* principles

 "To impose *Monell* liability, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation…"  *Underwood v. City of Bessemer,* 11 F.4th 1317, 1333 (11th Cir. 2021) (internal quotations and citations omitted).

> Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice ***is so widespread as to have the force of law.***
>
> *Board of County Comm'rs of Bryan County, Okla. V. Bryan*, 520 U.S. 397, 403-04 (1997) (citations omitted).

For a custom to be widespread to the point that it is a *Monell* custom, Plaintiffs

must show that it is so common that it can fairly be said to represent "official" policy.

> *Monell* limits what may constitute "custom." Custom consists of those practices of city officials that are "so permanent and well settled" as to have "the force of law." In defining custom in this fashion the *Monell* Court borrowed language from *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970), which defines the term "custom" as "persistent and widespread ... practices" or practices that are "permanent and well settled" or "deeply embedded traditional ways of carrying out ... policy." *Monell* additionally teaches that the city custom which may serve as the basis for liability may only be created by city "lawmakers or those whose edicts or acts may fairly be said to represent official policy."

> *Gilmere v. City of Atlanta*, 737 F.2d 894, 901-02 (11th Cir. 1984) (internal citations and footnotes omitted).

 "But for" causation has repeatedly been held to be insufficient for *Monell*

liability to attach.  See *Bryan*, 520 U.S. at 410;  *City of Springfield, Mass. v. Kibbe*,

480 U.S. 257, 267–68 (1987) (same); see also *Pembaur v. City of Cincinnati*, 475

U.S. 469, 484 n.11 (1986), citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808

(1985) (same).

To the extent that Plaintiffs' argument is that but for either a prolific offender

designation or but for the performance of a prolific offender check a given

constitutional violation would not have occurred, the *Monell* causation linkage is

insufficient.  *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 599 (7th Cir. 2019) (citing

*Wilson v. Cook Cty.*, 742 F.3d 775, 784 (7th Cir.2014)).  See also *Wilson v. Longview*

*School District,* 775 Fed. Appx. 277, 280 (9th Cir.2019) (citing *Van Ort v. Estate of*

*Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) ("Pointing to a municipal policy action or inaction as a 'but-for' cause is not enough to prove a causal connection under *Monell*. Rather, the policy must be the proximate cause of the section 1983 injury.")

## I.   Undisputed Facts.

### A. How a person is designated a prolific offender.

The ILP written policy is the ILP manual.  The relevant versions here were adopted in 2016, 2017, 2018, and 2021.  The 2016, '17, and '18 versions are attached as Exhibits A, B, and C.  The last of these, the 2021 version, was split into two documents.  The manual, which is a shorter descriptor of ILP, and then a directive, which describes in greater detail the law enforcement operation of ILP.  The descriptor, still called the manual, is attached as Exhibit D.  The directive, however, is subject to a confidentiality agreement by the parties and is considered by the agency to be law enforcement privileged and will be filed under seal. (See Dkt. 114).

The most significant repeating crime problems in Pasco County, designated as the "Big Four," are auto burglary, burglary of a residence or structure, burglary of a business, and vehicle theft.  The ILP philosophy is that law enforcement resources are better spent not simply reacting to crime but to identify those circumstances and persons where crime is ongoing and likely to recur.  (Exhibit C, pp. 4, 15-16)

Plaintiffs' opening comment in the operative complaint is that ILP "predicts that certain people may commit future crimes, and then it harasses these people…." (Dkt. 41, p, 1).  The process of deploying resources to interrupt ongoing criminal environment and activity is far more sophisticated than Plaintiffs describe.  ILP relies on *ongoing* behavior to assess probable scenarios and developments but does not have a "crystal ball[]" to predict the future.  (January 26, 2022, Deposition of Krause, p. 40, lines 1 through p. 42, line 19).

1)     Every quarter, the ILP unit uses a computerized database of the Pasco County Sheriff's own documents to create a prolific offender pool.  All persons who have been arrested two or more times in Pasco County within the prior three years are in that general pool. It is typically comprised of approximately 1,100 to 1,800 persons.  (September 23, 2021, Kraus Deposition, p. 25, lines 3-9; Exhibit C, p. 75; p. 17)

2)     The agency applies scoring parameters to the prolific offender pool, which assigns higher points for certain type of criminal activity.  (See e.g. Exhibit C, p. 75.)  Five points are assigned for arrests involving homicide or firearms or human trafficking, 3 or 4 points are assigned for Big Four offenses, 2 points assigned for grand theft pawn/scrap violation offenses, narcotics (except marijuana), with moderated enhancements for failure to appear and violation of probation, or where

7

the person appears in five or more reports as "other involvement."  (September 23, 2021, Kraus Deposition, p. 26, line 23 through p. 27, line 5).

3)     By applying the scoring system, the agency identifies the approximately top 100 offenders, and distributes that list to staff crime analysts within each district for further review.  The crime analysts review each person on the list of top offenders and reviews agency reports concerning each person.  The crime analysts may consult with command staff as to their own experience with each person and the role that person plays in the criminal environment. (September 23, 2021, Kraus Deposition, p. 27, line 13 through p. 28, line 16).

4)     The ultimate criteria applied to a given person on the list so as to determine whether that person will be designated a prolific offender is whether that person is "active in the current crime environment."  (September 23, 2021, Kraus Deposition, p.28, lines 14-16;  See also 2021 ILP Directive, filed under seal, p. 7); (Deposition of Burch, p. 16, line 16, through p.  17, line 16).

5)     Analysts typically receive a list for their own district of 30 to 50 names and often the analyst will recognize the names.  There is no set number of persons to be so designated.  (Burch, p. 17, line 17, through p. 19, line 10).

6)      Those persons identified as prolific offenders[3] are typically included in briefings for deputies or command staff in each district, often on power points, or slides, called Actionable Intelligence Meeting (AIM) slides.  The AIM slides will recount for deputies and command staff recent criminal activity in the district and also identify prolific offenders and their associates.  (Exhibit C, p. 42; Deposition of Gardner, p. 49, line 11 through p. 50, line 6).

7)      A prolific offender may be a juvenile.  Juveniles prolific offenders are calculated in the same manner as an adult prolific offender.  The agency recommends to the State Attorney's Office that a juvenile prolific offender be charged and adjudicated as an adult when the juvenile meets the definition of prolific offender and has committed a serious and violent offense or has had a significant impact on crime.  (Exhibit C, pp. 18-19)

8)      Agency personnel are required by the manual to perform a face-to-face prolific offender check (hereinafter "POC") a minimum of once every quarter.  The manual includes performance expectations for POCs, and deputies are to learn as much as possible about prolific offenders, including acquaintances, locations

---

[3] For a time, the Sheriff's Office utilized other designations besides prolific offender, including "Top 5 Offenders" but use of that designation has been discontinued. (Gardner deposition, p. 61, lines 10-15). Another is Target of the Month.  That designation refers to a person who is wanted on warrants and may or may not be a prolific offender.  (Kraus affidavit).

frequented, etc. (Exhibit C, p. 19). The ILP manual suggests that deputies use enhanced interviews to obtain information about the criminal environment. This might include knowledge of other criminal activity in the area. (Id., p. 43) (Deposition of Sanborn, p. 23, line 11 through p. 24, line 5).

9)    The ILP Manual *DOES NOT* direct deputies on how to conduct POCs. It does not direct deputies with any specificity as to their demeanor or actions during a POC; it does not contain any direction or information as to when or how to conduct searches or conduct any particular investigation; it does not direct their frequency (other than once a quarter). It does not direct deputies that constitutional rights of prolific offenders or their families are in any way lessened by the prolific offender status. No ILP manual or other written material directs deputies to deviate in any way from the Sheriff's General Orders. (Affidavit of Krause).

10)    The Sheriff's General Orders provide, among other things, that deputies must respect the constitutional rights of all citizens. (Exhibit D, General Order 1.2: "It is the policy of the Sheriff's Office to comply with all state and federal laws, and to preserve and protect the constitutional rights of all citizens.") Plaintiffs have not identified any written policies to the contrary.

11)    The ILP manual also encourages deputies to offer or promote local services to prolific offenders. (Exhibit C, pp.14-15). It is a goal of ILP to reduce

recidivism, including through the offer of services.  (Deposition of Sanborn, p. 80, line 20, through p. 81, line 2).

12)     However, where criminal offenses are committed by prolific offenders, the Sheriff's Office has a zero-tolerance arrest policy.  Exhibit C, p. 19;  Deposition of Sanborn, p. 88, lines 5-13).  The policy remains the same in the 2021 directive. (To be filed under seal, p. 9, see Dkt. 114).

13)     ILP also uses Strategic Targeted Area Response (STAR) to identify problem areas, called "STAR boxes," which are defined as "locations where crime is persistently dense over an extended period of time."  As of the 2018 ILP manual, agency records reflected that each district had two STAR boxes, each covering approximately 7 to 10 square miles.  These areas account for approximately 50 percent of the Big Four and violent crime-focused offenses for that district.

14)     Deputies are expected to learn the location of the STAR boxes and the deputies working within them, to develop knowledge of offenders living within STAR boxes, and to stay abreast of emerging crime trends in the area so as to prevent future calls.  (Exhibit C, p. 22).

15)     The 2015 STAR manual further breaks down the statistics and notes that 20 to 25 percent of the Big Four crimes in the district are committed there.  As a result, deputies working in areas which include the STAR boxes were expected to spend half of their time working in the STAR boxes and the surrounding area.  STAR

11

Team members have a zero tolerance for crimes committed within the STAR boxes. (Exhibit E, p. 1).

B. The prolific offenders at issue in this case.

The agency has a database, begun in 2017, which shows when a person was first designated a prolific offender and when that person was last removed from the system as a prolific offender. It cannot show whether a person went off the list and went back on within those bookended dates. Additionally, a person could have been a prolific offender prior to 2017, and that can be determined through other documentation, though not as precisely in terms of dates on an and off such designation. Of the four named plaintiffs, only Dalanea Taylor was *ever* identified as a prolific offender. She is listed in the above-referenced database from March 30, 2017, to January 11, 2018.

Tammy Heilman's son, Donnie McDougall was designated a prolific offender on January 12, 2017, and dropped from that designation on September 21, 2020. Tammy Heilman's other son, Anthony, was not designated a prolific offender, although for a very brief time he was identified as a "Target of the Month" because he had a warrant out for his arrest.[4] Darlene Deegan's son, Tyler Paneson, was

---

[4] That designation is unrelated to prolific offender status or prolific offender checks. Anthony McDougall was identified as a Target of the Month for 8 minutes because, almost as soon as he was so identified, the arrest warrant at issue was served, taking him off the Target of the Month designation. (Affidavit of Brummett.)

identified as a prolific offender beginning on January 12, 2017, and last removed from the list on October 15, 2021. (Affidavit of Brummett). Mr. Paneson has since passed away. Robert Jones IV's son, Robert Jones III, was a prolific offender for a period of time, but the family moved out of the area in April/May of 2016, more than four years before filing of the initial complaint on March 10, 2021. (Dkt. 1).

None of the Plaintiffs or their children are currently prolific offenders. (Affidavit of Kraus). Plaintiff has adduced no evidence that they are ever likely to have that designation again.

Though it is Defendant's understanding that Plaintiffs do not contest the prolific offender designations, Defendant notes the following:

Plaintiff Dalanea Taylor was a self-admitted member of "The Squad," which was a group of young people who engaged in numerous car burglaries ("car hopping"). Sometimes, they stole the cars to joy ride. Taylor admitted in 2012 to committing approximately 50 car burglaries. (Exhibits N and O). As to Paneson, as noted above, it was sometimes Plaintiff Deegan who called to report that Paneson was stealing from her and that she wanted him trespassed from her property.

Donnie McDougall's Pasco County Clerk and Juvenile Justice records show that beginning in 2012 he had well over 50 reported charges, ranging from single arrests on multiple felony violation of probation charges to felony grand theft of a motor vehicle, to burglary. There are many misdemeanor charges as well, which are

protected by statute.  Bobby Jones' Pasco County Clerk and Juvenile Justice records show that he had approximately 20 reported charges, including nine felonies and multiple pick-up orders or warrants from Pinellas County.   (Both to be filed under seal, see Dkt. 114).

C. <u>Visits to residences of Plaintiffs or their children, if designated prolific offenders.</u>

The agency generated a spreadsheet of all visits to the residences of the Plaintiffs and their children, from the time each was first designated, beginning as early as 2017 when the database began, showing among other things the date of the visit and the reason for the visit as indicated by the drop-down menu in the CAD report (selected either by dispatch or the deputy).  (See Exhibit D to Deposition of Brummet, testimony at p. 65, line 22, through p. 67, line 18).  The total generated among the addresses for the four plaintiffs was 506 reports.  Those designated as prolific offender checks are highlighted in yellow.  Other than reviewing each of the 506 CAD or incident reports for those involving deputy interactions, this is the best means of getting an overview of the nature of the interactions between deputies and persons at the residences.  (Deposition of Brummett, p. 60, lines 7-15;  p. 67, line 19, through p. 72, line 4).

There is great diversity as between the percentage of visits to one of the Plaintiffs' addresses designated as a prolific offender check, versus a different cause as indicated in the nature field of the CAD report.  For example, in cells 401-425,

the visits for Dalanea Taylor and her address are listed.  Fifteen of the visits are indicated in the CAD nature field as prolific offender checks, and ten are for reasons varying from "person down" (cell 414, dated 9/11/2017) to a report of a prowler dated 12/5/2017 (cell 424).

Compare that to visits generated to Tammy Heilman's residence, noted to have occurred during the time that Donnie McDougall was identified as a prolific offender.  (See Exhibit D to Brummett deposition, pp. 3-4).  There are 107 total visits, the vast majority of which are *not* identified in the CAD nature fields as prolific offender checks.  Only 23 of the 107 total for the Heilman residence visits are identified as prolific offender checks.  The other reasons cover a wide range of calls for service, including domestic violence (cell 104, 4/25/2020), suicide attempt (cell 47, 8/26/2018), and burglary of a residence (cell 17, 7/8/17).

The depositions of the Plaintiffs confirm that the reasons for visits to these residences often had absolutely nothing to do with prolific offender status of any resident at Plaintiffs' home.  Ms. Heilman in deposition acknowledged dozens of visits to her home by Pasco deputies that had nothing to do with prolific offender status of any of her children.  Many included Heilman, her husband, or her children affirmatively calling the Pasco Sheriff's Office for assistance.  These included:

On June 6, 2016, there was a call for service by Donnie to the PCSO regarding his girlfriend threatening suicide.  (Deposition of Heilman, Exhibit 11).  On

September 28, 2016, Donnie McDougall called EMS to report that Heilman was not breathing.  (Id., Exhibit 12). On November 17, 2016, Heilman's daughter, Tyler, called 911 because Donnie McDougall was "going crazy" and spitting on her. (Id., Exhibit 13).  Twelve days later, on November 29, 2016, Donnie called 911 because Tyler sprayed Donnie with Mace. (Id., Exhibit 14).  On May 6, 2017, Heilman's Husband Jeff Zander, called 911 requesting that Pasco County Sheriff's remove six juveniles from the residence, including Donnie. (Deposition of Heilman, p. 54, line 18 through p. 55, line 6; Exhibit 16).

On March 13, 2018, deputies responded to Heilman's residence because Mr. Zander called the Sheriff's Office and reported that Donnie had pointed a revolver at him.  (See Exhibit F to this motion; Heilman, p. 63, lines 5-20).  On March 25, 2019, deputies responded to Heilman's residence due to a report that, among other things, Heilman's nephew threatened to slit her throat.  (Heilman deposition, Exhibit 21;  p. 69, line 14, through p. 70, line 19).  Other calls for service are attached to her deposition and Heilman readily agreed that many visits to her home were not prolific offender checks.  (Heilman, p. 76, lines 9-10).[5]

---

[5] There were many others.  For example, n June 26, 2019, Pasco County Sheriff's responded to Heilman's residence due to a call from Donnie's girlfriend who stated that an individual made threats to either shoot up or burn the house down. (Deposition of Heilman, p. 77, line 9 through p. 79, line 6; Exhibit 23).   On April 25, 2020, deputies responded to a domestic violence disturbance between Heilman's husband and her son Anthony. Anthony was arrested for Battery – Domestic Violence. (Deposition of Heilman, p. 89, line 4 through p. 90, line 6; Exhibit 27).

On April 10, 2018, Pasco deputies were dispatched to Deegan's residence reference an unwanted guest, her adult son Tyler Paneson. Deegan requested that Paneson be trespassed from the property because Deegan did not allow drugs in her residence. (Deposition of Deegan, p. 29, line 15 through p. 30, line 12; Exhibit 5).

On September 16, 2018, Deegan called the Pasco County Sheriff's Office to report that a man who was working on her roof stole items from her garage. The man was arrested and charged with grand theft. (Deposition of Deegan, p. 35, line 20 through p. 36, line 23; Exhibit 7). On October 27, 2018, Deegan called the Sheriff's Office to complain that a neighbor was illegally parking cars at the neighbor's residence. (Deegan deposition, Exhibit 8).

On March 29, 2019, Deegan called the Sheriff's Office because Paneson was in her garage throwing things around. Deputies responded. She asked that Paneson be trespassed from the home. Two days later, Deegan called back and complained that Paneson was stealing out of her garage and she again wanted him trespassed from the property. (Deegan deposition, Exhibits 11 and 12).

Other reports involving Deegan asking that the Sheriff's Office come to her home are attached to her deposition. Deegan emailed the agency on multiple occasions to make complaints and to seek services from the Sheriff's Office. On April 20, 2017, Deegan emailed the agency to ask for assistance complaining that attorneys in New York had fraudulently sought to foreclose on her real estate.

(Exhibit G).  On another occasion she asked to come in to discuss a theft at her property.  (Exhibit H).[6]

Defendant acknowledges that the great majority of visits to Dalanea Taylor's address, in contrast to Heilman and Deegan, were POCs.  (See Exhibit D to Brummett deposition.)  However, as will be seen below, there is no consistent pattern of the manner in which these visits or interactions occur, either amongst the Plaintiffs, or even in their own experiences over time.

The window of time involving Plaintiff Jones' connection to this case is narrow, less than one year.  Jones testified that the family moved to Pasco County in April-May of 2015.  (Jones, p. 11, line 18, through p. 12, line 10;  p. 14, lines 2-6.).  The then family moved *out of* Pasco County in 2016.  (Jones, p.23, lines 12-25).  This corresponds to agency records because the first call for service involving the Jones residence was dated May 11, 2015, and the last prolific offender check at Jones' residence was on May 3, 2016.  (Brummet Deposition, Exhibit D, pp. 10- 11, cells 2 and 80).

---

[6] On November 18, 2015, Deegan emailed the agency complaining about traffic on her street coming from a pawn shop.  She asked who would enforce laws about traffic from the pawn shop coming onto her road, stating "[a]s property owners, we have a right to the protection and quiet enjoyment of our property on Amanda Ave." (Exhibit I).

Some of the non-prolific offender visits to the Jones residence included:  On May 11 and June 11, 2015, deputies arrived at the residence to serve civil process. (Jones deposition, Exhibits 2 and 5, p. 35, line 16 through p. 36, line 3).   On June 17, 2015, Donna Jones, Plaintiff Jones' wife, called to ask for assistance because of a domestic disturbance between Plaintiff Jones and his son, Bobby.  (Exhibit 6).

On June 29, 2015, deputies responded because they received a report from the state's Juvenile Assessment Center that Bobby Jones' ankle monitor had been cut off.  (Exhibit 14).  Jones testified that this occurred because it was not plugged in correctly and that in fact between five- and 10-times deputies were called out to reports of that having occurred.  Nothing particularly bad occurred during those five to ten visits.  (Jones, p. 69, line 10 through p. 72, line 7).

On August 2, 2015, deputies responded to a call from Jones' neighbor, who advised that Bobby Jones was stealing electricity from her, using an extension cord from her home.  Jones apologized and offered to pay for the electricity.  (Exhibit 18).  On October 12, 2015, Donna Jones called deputies for assistance because numerous juveniles would not leave the house, including Bobby Jones.  (Jones deposition, Exhibit 26).  Bobby Jones was subsequently arrested on five out of county warrants.  (Jones deposition, exhibit 31).  And on November 24, 2015, deputies arrested Bobby at the residence on seven outstanding warrants from Pinellas County.  (Jones, deposition, Exhibit 36).

1. <u>Jones code citations and arrests</u>

Defendant contends that all claims by Jones, of any type, are barred by the statute of limitations. The last prolific offender interaction with Jones occurred in May 2016, more than four years prior to the filing of the initial complaint in March 2021, and so all of Jones' claims are barred by the statute of limitations applicable to §1983 actions in Florida.  *Chappell v. Rich,* 340 F.3d 1279, 1283 (11th Cir. 2003). To the extent that Jones would rely on the "continuing violation" doctrine to extend the statute he has several problems.  First, there is no authority that the doctrine applies based on alleged later violations as to *other* persons. Second, the doctrine does not apply to cases involving discrete violations.  Third, the doctrine is narrowly applied to cases where a reasonably prudent person would have been unable to determine that a violation occurred. *Lee v. Eleventh Judicial Circuit of Florida*, 669 Fed. Appx. 897 (11th Cir.,2017).  Jones has testified that he believed in 2015 and 2016 that his constitutional rights had been violated and so he cannot claim he did not realize he had a claim within the statute.  (Jones, p. 197 lines 7-1).

Jones was first issued a citation on October 5, 2015, not by the Sheriff's Office, but by County Code Enforcement, for failing to store a trailer with jet skis either in a garage or behind the residence.  Jones did not appear at the hearing, and he was arrested on a warrant for failure to appear on January 4, 2016.  (Exhibit J).

On December 26, 2015, a deputy went to the Jones residence to serve a warrant.  He observed jet skis on a trailer and issued citations for two violations (jet skis on a trailer, and a utility trailer parked in front of the house).  Jones took the citation and signed it.  (Jones Deposition, page 3 of Exhibit 43.)  Note that BWC for this event is to be filed with the Court, non-electronically.   (See Dkt. 114).  Jones once again failed to appear, and a warrant was issued for his arrest.  (Exhibit K).

Jones claimed in deposition that this was the only code violation citation he actually *ever* received.  (See Page 5 of Exhibit 43.)  Jones testified that he went to court on the scheduled day for the citations, February 25, 2016, but that he could not get into the courthouse.  He gave two different explanations:  first that it was because when he arrived court had already started and he was not allowed into the courtroom; second that the Fire Marshall ejected everyone from the building.  Jones, p. 143, line 13 through p. 145, line 7.

A warrant for failure to appear was issued and Jones was arrested.  He paid a $130 fine[7] in relation to the failure to appear and the judge took the fine proceeds and used them to satisfy the code citations.  (Jones, p. 148, line 18 through p. 149, line 21).  Jones did not protest this approach by the state court.  (Jones deposition, p. 232, line 17 through p. 233, line 4).

---

[7] In an errata sheet he corrected this to $148.

21

Jones received three additional citations on March 28, 2016: for trailers visible on each side of the property, overgrown grass, and not having house numbers legible from the roadway. (Jones deposition, Ex. 72). The citation included a court date of May 19, 2016. (Jones Deposition, Ex. 74). On March 29, 2016, deputies returned with a search warrant. According to deputies' reports for the two interactions, Jones confirmed on March 29, 2016, that he had received the March 28, 2016, citations from his son. (Exhibit 72). In his deposition, however, Jones flatly denied having received the citations from his son. (Jones, p. 206, line 25 through p. 209, line 19).

Jones was then shown BWC from the deputies' visit to his residence in reference to the search warrant on March 29, 2016. This video clearly showed Jones admitting that he had received the citations from his son. He further stated that he understood the deputies, including the May 19, 2016, court date. (Exhibit 73 to the deposition, included in submitted BWC, Extraction 1.116012033, see time stamps 1:00 to 1:50).[8]

The Court should reject any claim by Jones that any of his arrests for failure to appear are unconstitutional at all because they were based on warrants. An arrest

---

[8] When confronted with his testimony as to these facts and the BWC showing it to be false, Jones offered an incoherent explanation that he believed the deputies were talking about some other citation: "I heard something come out of his mouth saying some dates about some kind of court." (Jones, p. 211, lines 5-8).

based on a facially valid warrant ordinarily does not violate the Fourth Amendment. *Williams v. Aguirre*, 965 F.3d 1147, 1162 (11th Cir.2020).

Jones was also arrested on March 29, 2016, after deputies executed a search warrant for the residence. When deputies entered the home the smell of marijuana was overwhelming. Deputies found marijuana in numerous places, including the freezer in the home and on the driver's side of Jones' vehicle. Interviews with the occupants established that Plaintiff Jones consumed marijuana in the presence of a juvenile. The charges were later dismissed. (Exhibit N to this motion).

In his deposition, Jones denied that marijuana was in the residence. (Jones deposition, p. 235, line 4 through p. 236, line 2). However, Jones admitted that he could not deny that Talia Jablon, who was dating Jones' son, told deputies during this incident that Plaintiff Jones "was always smoking marijuana inside the residence." (Exhibit 76 to deposition of Jones, p. 4, p. 237, line 21 through p. 238, line 12). Jones cannot deny that his arrest was supported by probable cause.

No arrest of Jones has been shown to be related to ILP, much less caused in the *Monell* sense by ILP. The Court should grant summary judgment to the Sheriff on all of his claims based on the statute of limitations and because they are meritless.

2. Heilman code citations and arrests.

The first code citation issued to Heilman occurred on March 1, 2016. Warnings were given to her that she had no numbers on her mailbox, and upon

recheck she still had no numbers.  (Deposition of Heilman, Exhibit 2).  She contested the citation, adjudication was withheld, but she was ordered to pay a fine of $30, plus $56 in fees, which she paid.  She was also ordered to come into compliance with code.  (Deposition of Heilman, p. 16, line 22, through p. 18, line 13; See also Exhibit 3 to the deposition).

Heilman received citations for having chickens in her backyard on March 3, 2016.  She admits she had five chickens in the backyard and acknowledges the citation.  Adjudication was withheld, she was fined $100, plus $56 in fees, and ordered to come into compliance, which she did.  (Deposition of Heilman, p. 18, line 15, through p. 21, line 4;  See also Exhibit 3 to deposition).  The issuance of this code violation citation was captured on BWC and Defendant urges the Court to review this four minute video as it is disturbing.  (See BWC Exhibit 28 to deposition, identified as "Body Cam Footage Extraction 1.1 County Ordinance Chickens.") (To be filed per Dkt. 114).

In the video, deputies approached the Heilman residence to deliver the citation.  Initially Heilman's husband, Mr. Zander, came to the door and began cursing at deputies stating he could have "backyard motherfucking chickens" in his backyard if he wanted to.  Plaintiff Heilman came to the door and told deputies to "Get the fuck out of here!"  Deputies were calm and professional throughout.

On October 18, 2017, Heilman was given a code violation citation for having an accumulation of junk in her front yard, including a cinder block, some fencing, and a child's toy car.  (Heilman deposition Exhibit 5, p. 25, lines 11-24).  She corrected the problem prior to the scheduled hearing and did not have to pay any fines.  (Id., p. 26, lines 8-19).

Heilman was arrested twice.  The first time was on September 16, 2016.  Prior to that, deputies were investigating an armed residential burglary and it was suspected that Heilman's son, Donnie, had used proceeds from the burglary to purchase a motorbike.  On September 15, 2016, Deputy Andrew Denbo spoke to Heilman concerning the investigation and she provided false information, claiming she purchased the dirt bike for Donnie using her own money.  (Deposition of Denbo, p. 80, lines 9-23;  Exhibit 21 to deposition).

Denbo returned to arrest Heilman for giving the false information and as he approached the residence Heilman quickly departed in her vehicle, with her young daughter.  Denbo pursued her and pulled her over, ordered her to step out as he was placing her under arrest.  She physically braced herself and pulled away from the deputy, scratching the deputy using her fingernails to dig into his skin, trying to get away.  (Exhibit M to this motion).

Heilman was arrested and charged with battery on a law enforcement officer and resisting arrest without violence.  (Exhibit M, p. 3-4).  Video of this incident

was captured on BWC. ((Extraction_1.1)_BATTERY_ON_LEO-14;  See Dkt. 114).

She pled guilty to and was convicted of three misdemeanors, battery, resisting an

officer without violence, and giving false information to an officer.  (Heilman, p. 21,

line 16, through p. 22, line 10;  Exhibit 4 to deposition, p. 3).

On September 18, 2018, deputies came to the Heilman residence because they

had a pick-up order for one of the children.  Heilman answered the door and abruptly

swung the door open and into Deputy Cpl. Paul Reagan with enough force that he

had to steady himself.  Heilman was arrested and charged with battery on a law

enforcement officer.  She pled guilty and adjudication was withheld, she was

sentenced to 24 months' probation.  (Deposition of Heilman, p. 26, line 20, through

p. 27, line 9;  see also Exhibit 6 to deposition of Heilman).  This incident was also

captured    on    BWC,    which    will    be    filed    with    the    Court.

((Extraction_1.1)_BATTERY_ON_LEO-6;  See Dkt. 114).

Heilman's guilty pleas or convictions foreclose any claim for a Fourth

Amendment violation under *Heck v. Humphrey*.  The first arrest, the 2016 arrest, is

beyond the statute of limitations.  And neither arrest actually has a causal connection

to ILP.  The first arrest was generated when Heilman lied to Sgt. Denbo during a

criminal investigation.   The second arrest occurred not when deputies were

conducting a prolific offender check but rather when deputies went to the residence

to pick up Donnie on a pick up order.

D.   <u>Notable videos.</u>

Plaintiffs intend to file brief videos, excerpted from BWC, one for each Plaintiff.  Defendant intends to file all BWC video as Defendant believes it necessary to demonstrate that there were many interactions between Plaintiffs, their prolific offender children, and Pasco deputies which were benign, pleasant, encouraging to the Plaintiffs or their children to avoid criminal activity, and even greeted sometimes with thanks.

In June 2018, deputies were searching for Paneson based on probable cause that he had stolen a kayak.  (Exhibit P).  On June 6, 2018, deputies went to Deegan's home looking for Paneson.  Video shows that her home has a fence with a no trespassing sign at the front of the home, with a wooden stick propped up by another wooden stick at the end of the chain link fence.  (BWC for 2018-06-06 Extraction 1.1 AXON Flex_2_2018-06-06_0836).  The video at the 1:50 mark shows deputies climbing over the wooden portion of the fence and going onto the property, looking for Paneson.  However, on other occasions in the same period, deputies stayed on the street-side of the fence.  For example, on June 5, 2018, the day before the above-referenced incident, deputies came to the residence, looking for Paneson, and spoke to a young lady, who claimed he was not there.  Deputies remained on the street side of the fence.  (BWC Extraction_1.1_AXON_2_Video_2018).

27

Similarly, on June 8, 2018, deputies returned looking for Paneson and BWC shows they stayed on the street side of the fence yet again.  This time they spoke with Deegan, who was home cleaning up debris in her front yard, for which she had apparently been cited.   (BWC Extraction_1.1_AXON_Flex_2_Video_2018-06-08_1031).  Beginning at the 4:20 mark deputies asked if they could come on to the property.  Deegan declined to give permission to deputies to enter and they stayed on the public side of the fence.

Beginning at the 16:30 mark, deputies called a code enforcement corporal and Deegan spoke to the corporal, who told her that if she helped locate Paneson deputies would work with her on the code citations by getting her more time to come into compliance or speaking to the County Attorney to resolve the citations.  Deputies reiterated that their goal was to get Paneson safely into custody.  At the 26:50 mark deputies again asked for permission to check the property, to look in the RV to make sure no one was living there, Deegan refused again and deputies did not enter the property.[9]

A prolific offender check was performed on Dalanea Taylor on September 29, 2017.  Taylor came to the door at the 7-minute mark on the video.  Deputies asked

---

[9] Deegan negotiated an agreement with the County Attorney whereby she paid $250 to resolve the referenced citation, among a total of five citations, plus came into compliance, i.e. put numbers on the house and removed debris from her yard. (Deegan deposition, p. 57, line 1 through p. 63, line 6.  See Exhibits 18, 19, and 20 to Deposition).

her how she was doing and if she was staying out of trouble. The interaction was benign and lasted less than three minutes. (BWC Extraction_1.1_AXON_Flex_2_Video_2017-09-29_0832).

A check of Dalanea was performed at 7:45 a.m. on January 1, 2018. Taylor's grandmother came to the door and complained about the hour of the check. A conversation with Taylor occurred and was benign. Taylor stated that she and her sister, who was also pregnant, were planning to move. The interaction lasted just a few minutes. Extraction_1.1_AXON_Flex_2_Video_1028-01-01_742).

A check of Dalanea was performed on February 25, 2018. She had a very pleasant conversation with a female deputy and the two discussed the best morning sickness drugs. Ms. Taylor was encouraged to stay away from crime. At the conclusion the deputy told her they were required to check on her from time to time and Taylor said she appreciated it. (Extraction_1.1_AXON_Flex_2_Video_2018-02-25_1115).

A prolific offender check was attempted at Heilman's residence on May 23, 2018. Heilman reported that Donnie was staying out of trouble and in touch with his probation officer. She joked with deputies about how "ferocious" her small "guard dog" was. The interaction was about two minutes long and was benign. (Extraction_1.1_AXON_Flex_2_Video__2018-05-23_1527).

There are several other notable examples of BWC showing deputies encouraging the children of Plaintiffs Heilman and Jones, in a positive way, not to commit criminal activity.   On November 7, 2017, deputies visited the Heilman residence and spoke to Donnie McDougall.  McDougall said his 18th birthday was coming up and deputies explained to him the advantage of not committing a crime after 18 because he would not have to report juvenile arrests to a potential employer. (Extraction 1.1 AXON_Flex_2_Video_2017-11-07_0516-2).

On September 22, 2015, deputies went to the Jones residence and spoke to Plaintiff and his son Bobby.  Beginning at the 7-minute mark, deputies explain that the Sheriff is placing Bobby and his friends who are committing crimes on notice that it will not be tolerated.  Deputies state that the Sheriff wants to encourage kids to grow up and become good citizens.  Bobby admits he knows that the majority of property crimes being committed are by juveniles and deputies encouraged Jones not to continue to commit crimes because he might face felony charges and miss out on years of his life.  At 18:40 mark, deputies reiterate that Jones "seem[s] like a good kid," his record is "not that bad."   ((Extraction_1.1)_Jones_interview).

On August 9, 2020, deputies came to the Heilman residence and provided Anthony McDougall with a resource guide of local services, including employment opportunities.  This was explained to Mr. Zander (at the 2:20 mark), who responded "That would be great."  Anthony came out and deputies explained that the guide was

provided to help Anthony from making mistakes in the future.  At the 4:35 mark,

Anthony states "I really appreciate that."

(Extraction_1.1)_Axon_Body_3_Video_2020-08-09_1539).

## II.   <u>Argument</u>

There is no constitutional violation under Count I.  Neither probable cause nor

reasonable suspicion is required to approach a citizen's door and knock with the

intention to ask questions.  "The Fourth Amendment, which prohibits unreasonable

searches and seizures by the government, is not implicated by entry upon private

land to knock on a citizen's door for legitimate police purposes unconnected with a

search of the premises. *U.S. v. Taylor*, 458 F.3d 1201, 1204 (11th Cir.2006) (internal

citations omitted).

There are cases which discuss reasonable suspicion in connection to knock

and talks, but they deal with situations where police have no prior reason to approach

the home and do so in connection with searches.  See e.g. *U.S. v. Ratcliff*, 725

Fed.Appx. 894, 901 (11th Cir.2018) and *U.S. v. Victores*, 2011 WL 3424449 * 2

(S.D.Fla.2011).  These cases seem to rely on *U.S. v. Tobin*, 923 F.2d 1506 (11th

Cir.1991) (en banc) for this point, but that case dealt with probable cause to make a

search, and only tangentially touched on reasonable suspicion as the reason that

agents approached a house under surveillance, not that such was necessary.  *Id*., p.

1511.

There is no authority for the proposition that a certain number of knock and talks is constitutionally unreasonable.  And compare the disparity between Plaintiffs.  The majority of interactions with Taylor were prolific offender checks.  But the range of reasons for deputies to interact with Heilman or her family for other reasons, including calls for service initiated *by them*, significantly outnumber the prolific offender checks at her residence.

There is no constitutional violation under Count II, the First Amendment freedom of association claim.  The First Amendment protects expression but also protects claims of personal relationship association, which involve "the freedom to carry on certain intimate or private relationships," and these claims "may take various forms." *Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 545 (1987).  Plaintiffs here have not demonstrated that their rights of familial relationships have been interfered with to the point of being unconstitutional.  The mere fact that the parents of prolific offenders (or children with warrants) are incidentally burdened by prolific offender checks is not an unconstitutional infringement on such a right.  *Parks v. City of Warner Robins, Ga.*, 43 F.3d 609, 614 (11th Cir. 1995) (holding that policy which increased costs to marry created only an incidental burden on marriage).  See also *Johnson v. Pomeroy*, 294 Fed.Appx. 397 (10th Cir. 2008) (consideration of spousal income for benefits created only an incidental burden).

Plaintiffs have not demonstrated any significant change in any of their relationships with their children as a *direct result of* prolific offender checks. Deegan was estranged from her son because he was stealing from her and he has since died of a drug overdose. Donnie McDougall is in state prison. Robert Jones lost track of Bobby. (Jones, p. 20, line 22 through p. 21, line 7). None can connect a substantial change in their familial associations directly because of ILP.

There is no constitutional violation under Count III, procedural due process. To succeed on a procedural due process claim, a plaintiff must show (1) a deprivation of a constitutionally-protected liberty or property interest, (2) state action, and (3) constitutionally inadequate process. *Arrington v. Helms,* 438 F.3d 1336, 1347 (11th Cir.2006). First, Plaintiffs Jones, Heilman, and Deegan have not shown that by their children being on a prolific offender list they (meaning the Plaintiffs) were deprived of a constitutionally protected liberty or property interest.

Plaintiffs complain that they or their children were not given notice that they were on a prolific offender list or provided an opportunity to get off of it. Being so designated by the Sheriff's process of identifying prolific offenders does not entitle a person to formal notice or opportunity to be heard because there is no deprivation caused by the designation. *Arrington v. Helms*, 438 F.3d 1336, 1347-48 (11th Cir.2006). Moreover, Plaintiffs now claim that they thought their rights were being violated at the time but none made formal complaints to the Sheriff's Office.

Plaintiffs also complain about code violation citations they received at various points in the past.  They contend that their constitutional rights were violated in two respects:  a) they were more prone to receive a citation because the Sheriff's ILP approach called on deputies to pay particularly close attention to the residences of prolific offenders; and b)  there are individual instances in some, but not all cases, that citations were used in a carrot and stick approach to seek assistance in locating their prolific offender children if they were not present at the time of a deputy visit.

First, the Court has previously dismissed the claim that would seem most apt to these issues, the equal protection claim.  Plaintiffs did not seek to amend the complaint and so the equal protection claim is abandoned.  But assuming Plaintiffs now seek to shift this claim to be a due process claim, it still fails.  In all instances, the record indicates Plaintiffs paid the citation fines, either directly, through compromise, or in the case of Plaintiff Jones indirectly.  Plaintiffs do not have a procedural due process claim based in simple issuance of the code violation citations because they were provided a hearing for the citations and that satisfies procedural due process, even if they do not take advantage of such a hearing.  *Ficken v. City of Dunedin, Fla.*, Case No. 8:19-cv-1210, 2021 WL 1610408, *10-11 (M.D.Fla. April 26, 2021) (appeal filed, May 25, 2021).  Additionally, because the code citation cases concluded with some sort of payment by them of fines and the Plaintiffs in fact admit that the citations were valid, *Heck v. Humphrey* bars any claim.  *Parker v. Town of*

*Palm Beach*, 2017 WL 11537901, * 4 (S.D.Fla. August 16, 2017) (citing authorities that *Heck* bars federal claims seeking to undo citations, including ordinance violations).

Deegan claims that her rights were violated with a specific set of code citations because deputies in June 2018 issued them after having crossed over her fence line without a warrant or exigent circumstances.  This was limited to one occasion and even if there are others, they are sparse and not nearly sufficient to represent an official custom.  BWC within days on either side of that incident shows deputies not crossing the fence, belying a claim of a custom of doing so.    The Plaintiffs also have no evidence that the Sheriff, the final policymaker, was aware of any incident, or group of incidents, or of any unconstitutional conduct and that he was deliberately indifferent in failing to address it under *Monell*.

Plaintiffs complaint that they were more likely to receive code citation violations than non-prolific offender residences.  The Sheriff's Office deemed a variety of locations to be problematic, interfering with the quality of life for surrounding neighborhoods, including but not exclusively prolific offender residences.  The ILP manual states that the Sheriff's Office seeks to reduce fear and improve quality of life by nuisance abatement.  This includes knock and talks and engaging the use of the code enforcement corporals.   (Exhibit C, pp. 30-31).  As testified to by Mark Celeste, a code enforcement corporal from 2016 to 2019, he

focused on homes with many calls for service, for quality of life issues, for drug activity, and the like. (Celeste deposition, p. 10, line 14, through p. 13, line 13.) [10]

Plaintiffs employed a statistics professional, Michael Carrasco, to compare the frequency of issuance of code citations to residences where prolific offenders lived, versus frequency of code citations issued to non-prolific offender residences. There are several significant problems with this analysis which render the conclusions of Mr. Carrasco to be of no value to the Court.  First, no analysis was done as to whether any of the code citations issued were objectively correct or incorrect.  (Carrasco, p. 8, lines 1-4).  Second, in making the comparison of frequency of citations to prolific offender versus non-prolific offender addresses, the analysis assumed that code citations were issued to the subject addresses *during the same period* that a prolific offender had that as his or her address.  (Id., p. 36, lines 1-19).  We know this is incorrect simply from examining the Plaintiffs' prolific offenders because their periods of time as prolific offenders varied from months to several years. [11]   A given citation *may* have been issued at a residence when the prolific offender lived there, but Carrasco had no way to determine that critical

---

[10] The agency has since discontinued the code enforcement corporal positions.  The 2021 ILP directive, to be filed under seal, reflects this change in that it encourages deputies to engage county code enforcement, if applicable.

[11] As further proof that issuance of code citations was not so regular or systemic as to constitute an unconstitutional custom, note that there was no code violation citation ever issued for Plaintiff Taylor during the time she was a prolific offender.

underlying fact.  Third, the analysis is not tied to the underlying reason for any given visit to a property which resulted in a code citation being issued.  Thus, there is no way for Mr. Carrasco to be able to conclude that a given citation, or any of them, was issued in connection to ILP.  The code citations may just as well have been issued because the property was a nuisance drug location as much as because a prolific offender generated it.  (Id., p. 36, line 20, through p. 40, line 5).

There is no constitutional violation under Count IV, the substantive due process claim.  To viably present such a claim, Plaintiffs must show that the Plaintiffs' rights were violated in a manner that "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Collins v. City of Harker Heights*, 503 U.S. 115, 118 (1992); *County of Sacramento v. Lewis*, 523 U.S. 833, 847, n.8 (1998) (the threshold question is "whether the behavior of the government officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience").

None of the interactions documented here are a substantive due process violation, and even if Plaintiffs could find one or two such instances their causal connection to ILP would only be in a "but for sense," not a widespread practice with the force of law and therefore constituting a custom, defeating *Monell* causation.

To the extent the Court would still entertain some form of it despite the order dismissing the claim, there is no viable equal protection claim under Count V.  The

Sheriff's ILP and prolific offender programs do not target a suspect class. *U.S. v. Castillo*, 899 F.3d 1208. 1213 (11th Cir.2018). Suspect classification refers to such things as "race, alienage, national origin, gender, or illegitimacy." *Doe*, 410 F.3d at 1346 (quoting *Haves v. City of Miami,* 52 F.3d 918, 921 (11th Cir.1995)). Plaintiffs have not shown that they belong to a suspect class and therefore the Court should reject employing a heightened scrutiny test, instead employing a rational basis test, with ILP easily meeting that standard. (Dkt. 81).

Finally, Plaintiffs have more than once announced that their priority here is to seek declaratory and prospective injunctive relief. Declaratory relief is improper because ILP did not violate their constitutional rights. As to injunctive relief, none of the Plaintiffs or their children is currently a prolific offender and Plaintiffs have not shown they likely will be again. To satisfy the injury-in-fact requirement for constitutional standing, a plaintiff seeking injunctive relief in relation to future conduct "must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future." *Houston v. Marod Supermarkets, Inc*., 733 F.3d 1323, 1328 (11th Cir. 2013) (internal quotation marks omitted). This requires that plaintiff establish "a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury." *Id*. at 1334. (internal quotation marks omitted); *City of Los Angeles v. Lyons*, 461 U.S. 95, 97-98 (1983) (past injury insufficient to confer standing for prospective relief).

It is axiomatic that "[i]njunctive relief should be limited in scope to the extent necessary to protect the interests of the parties." *Keener v. Convergys Corp.,* 342 F.3d 1264, 1269 (11th Cir.2003). Plaintiffs have not articulated the precise contours of what injunctive relief would even look like in this case.   While the Court has the authority to restrain a local official from acting unconstitutionally, deputies are already legally bound to follow the Constitution.

Plaintiff's operative complaint seeks such vague prospective injunctive relief as forbidding the Sheriff from enforcing any aspect of ILP "insofar as it authorizes or requires PCSO deputies to initiate or engage in searches and seizures that violate the Fourth Amendment …." (Dkt. 41, ¶ F).   These are referred derisively in the caselaw as "obey-the-law" injunctions and are usually inappropriate because the inunction is no more specific than the law already is. *S.E.C. v. Goble*, 682 F.3d 934, 950 (11th Cir.2012).  The Court should not entertain injunctive relief for anything short of a well-established, well-defined, set of constitutional violations, grounded in concrete examples that truly compel the conclusion that an injunction or some sort of prospective relief is justified and required.

Nor should the Court simply substitute Plaintiffs' political judgment as to whether the program is effective or could be run differently for the Sheriff's law enforcement judgment as to deployment of his resources. Plaintiffs' subject matter expert, David Kennedy, issued a report in this case literally complaining about the

39

size of the STAR boxes, which is where focused deterrence is often centered based on high crime rates.  (Deposition of Kennedy, Exhibit 6, Expert Report, p. 16).  He also criticized the agency's decision to focus on Big Four crimes instead of his own version of focused deterrence from the likes of Baltimore, Boston, and New York, which centered around violent crime.  (Kennedy, p. 7, line 14, through p. 10, line 4).

The defense expert, Dr. Richard Hough, has explained that Pasco's version of ILP is an extension of well-recognized principles of focused deterrence for the unique needs of that County.  These principles are employed in some fashion by just about every one of the 18,000 law enforcement organizations in the country. (Hough, Exhibit A, pp. 8 (discussing focused deterrence), pp. 12-13 discussing use of same by all law enforcement agencies)).  "That criminologists and other academics differ as to frameworks, theories, and outcome evaluations is as predictable as the sun rising in the east." (Id., p. 20).

Mr. Kennedy's criticisms, even if he were absolutely right, are simply not of constitutional dimension.  Absent an unconstitutional policy or custom, that can be said to represent *Monell* policy or custom, the Court should not enter an injunction vaguely ordering the Sheriff and his deputies to "obey the law," or directing local law enforcement as to deployment of its resources, especially not based on the vague and inconsistent criticisms of Plaintiffs here.  The Court should grant summary judgment to the Sheriff on all claims, and deny all relief requested by Plaintiffs.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 28th day of June, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: **Ari S. Bargil, Esquire** (*abargil@ij.org*), Institute For Justice, 2 S. Biscayne Boulevard, Suite 3180, Miami, Florida 33131; **Joshua A. House, Esquire** (*jhouse@ij.org*) and **Caroline Grace Brothers, Esquire** (*cgbrothers@ij.org*), Institute For Justice, 901 N. Glebe Road, Suite 900, Arlington, Virginia 22203; and **Robert E. Johnson, Esquire** (*rjohnson@ij.org*), Institute For Justice, 16781 Chagrin Boulevard, Suite 256, Shaker Heights, Ohio 44120.

 *s/ Robert D. Holborn, II*
THOMAS W. POULTON, ESQ.
Florida Bar No.:  0083798
*poulton@debevoisepoulton.com*
JEFFREY K. GRANT, ESQ.
Florida Bar No.:  0091197
*grant@debevoisepoulton.com*
ERIN M. TUECHE, ESQ.
Florida Bar No.:  0045104
*tueche@debevoisepoulton.com*
ROBERT D. HOLBORN, II, ESQ.
Florida Bar No.:  0044186
*holborn@debevoisepoulton.com*
DeBEVOISE & POULTON, P.A.
Lakeview Office Park, Suite 1010
1035 S. Semoran Boulevard
Winter Park, Florida  32792
Telephone:  407-673-5000
Facsimile:  321-203-4304
Attorneys for Defendant Sheriff Nocco