Case 8:21-cv-00555-CPT    Document 161-3    Filed 06/28/22    Page 1 of 83 PageID 12289



| **PASCO SHERIFF'S OFFICE** | **INTELLIGENCE-LED POLICING MANUAL** |
|---|---|

**REVISED 01/2018**

# Foreword

"Improvise, Adapt, and Overcome" is a mantra engrained in organizations that constantly address complex situations and then develop solutions to be successful.  Since the Pasco Sheriff's Office implemented Intelligence Led Policing (ILP) in 2011, we have continuously been in the process of improvising, adapting, and overcoming to consistently create positive results in our operations.

Early on, we learned that processes in ILP must continuously adapt as the nature of crime and the threats to our community change rapidly.  What may have worked yesterday, may not work as well today, and will be ineffective tomorrow.  We know that we must consistently look and create best practices to address issues, design guidelines that will allow for innovative and creative solutions, and utilize intelligence and information to help us make the best decisions.

An element of success is innovation.  It is the ability of our members and citizens to be able to develop strategies to address emerging issues, formulate a plan, and quickly implement it.  Speed is critical to success and bureaucratic processes that delay implementation must be overcome.  To allow innovation to flourish, we must be brilliant at the basics and in our operations.  There should be standard procedures in place to address the issues we routinely face. Once we instinctively handle common issues, we can flourish in innovation on how to proactively address future concerns before they arise.

Communications between our members and citizens is also a key component to success.  Through crime prevention measures or just simple open dialogue of crime in the community, we can work together to find solutions.  If we do not provide our citizens information, they will receive it another way that may not be factually accurate.  Communication through technology is rapid and our law enforcement agency should be the first to inform the public of emerging issues, how to protect themselves, and how we are serving them.  If we do not communicate the message to our citizens, someone else will.

One of the most important elements to success is our members understanding and believing in the mission along with valuing their input. Every member of this agency should be able to answer the question: Why?  Why do we operate the way we do? Why do we follow the doctrines of intelligence-led policing? Why am I important to the process?  When a member of this organization can answer the "why" they will then proceed with:  How can I make us better?  Our philosophy is not just a "saying", it is our business model.  It is imperative that supervisors understand our model and continuously teach it and allow feedback on how we can improve it.

The process of intelligence-led policing will continue to change as threats emerge, technology advances, and innovation leads to new processes to address issues.  We will continue to improve and this living document will continue to transform.  When we see a new crime trend developing, bureaucratic issues getting in the way of progress, or a quality of life issue affecting our citizens, we will find a way to improvise, adapt, and overcome.  This is the foundation of continuous process improvement and of how our organization operates.


Chris Nocco, Sheriff
Pasco Sheriff's Office
We Fight As One

Page | 2

## TABLE OF CONTENTS

**Foreword**................................................................................................................1

**Section 1: An Overview of Intelligence-led Policing** ...............................................4

**Section 2: Operationalizing the Core Components of ILP** ......................................11

Inform Decision-Making....................................................................................... 11

Crime Prevention ................................................................................................. 12

Focused Offenses................................................................................................. 15

Problem People – Priority Offenders.................................................................... 16

Problem Places – Targeted Areas ......................................................................... 21

Problem Groups – Criminal Networks .................................................................. 25

Problem Solving ................................................................................................... 28

Information Sharing ............................................................................................. 32

Community Engagement ...................................................................................... 37

Homeland Security............................................................................................... 39

**Section 3: Intelligence** ..........................................................................................41

What is Intelligence?............................................................................................ 41

Levels of Intelligence:.......................................................................................... 42

Sources of Intelligence:........................................................................................ 42

Evaluating Intelligence ........................................................................................ 45

The Intelligence Cycle .......................................................................................... 46

Legal Considerations ........................................................................................... 49

PSO Intelligence Products .................................................................................... 49

Virtual Intelligence Center ................................................................................... 55

**Section Four:  What's Your Role?**..........................................................................57

Intelligence-led Policing Division ......................................................................... 57

Intelligence Liaison Officers ................................................................................. 59

Deputies and Detectives - Law enforcement and Detention ................................ 62

Supervisors – Sergeants and Lieutenants ............................................................ 64

Forensics ............................................................................................................. 64

Inner Perimeter Security Team ............................................................................ 65

School Resource Officers (SRO) ........................................................................... 65

Strategic Targeted Area Response (STAR) Teams ................................................................ 66

**Section Five: Key Terms and Definitions ........................................................................68**

**Appendix A: Identification of At-Risk Youth ....................................................................70**

**Appendix B: Prolific Offender Calculation ......................................................................75**

**Appendix C: Prolific Offender Palm Card .......................................................................76**

**Appendix D: Enforcement Action Plan ...........................................................................77**

Page | 4

# Section 1: An Overview of Intelligence-led Policing

Policing paradigms have evolved greatly since the origins of the modern-day police force. Pioneered by Sir Robert Peel in England in the 19th Century and in America by the City of Boston in 1838, the first role of a police officer was to prevent crime and maintain order. As time progressed and technology advanced, the role of the police began to transition from that of preventing crime to one of responding to crime.

The traditional model of policing emerged placing police in a reactive role of crime fighting focused on responding to citizens' calls for service and conducting latent investigations aimed at arresting criminals. The emphasis on crime fighting relegated the role of crime prevention to the periphery. Commanders assumed that increased arrests would reduce the number of offenders and act as a deterrent to those still at large, an assumption that most law enforcement officers today would agree is false (Ratcliffe, 2016). It is a common saying that you cannot arrest your way out of a crime problem. In the traditional or standard model of policing, law enforcement agencies were bureaucratic in nature, centrally organized, and positioned the decision-making authority at the top of the ranks. Technological advancements such as phones, dedicated emergency lines, mobile radios, and police cars, began to fill the daily activities of police with responding to calls for assistance from citizens (Ratcliffe, 2016). Policing methods included rapid response to calls for service, random patrols during down time to prevent crime, and latent investigations to identify and apprehend offenders.

In the 1970s and '80s, academia began to focus on policing strategies and their effectiveness. Studies such as the Kansas City Preventative Patrol Experiment and Spellman and Brown's Rapid Response Study began to challenge the basic assumptions of the standard model of policing. Researchers in the Kansas City Preventative Patrol Experiment divided the beats within the city into three categories: proactive, reactive, and control. In the reactive beats, the police were instructed to only enter when responding to a call and when finished, leave the area. In the proactive beats the number of officers were doubled or tripled and the officers were instructed to patrol their areas when they were not on calls. In the control beats, the level of officers was kept the same and they were instructed to not change their daily routines. The results revealed increased police presence and random preventative patrols did not have the crime prevention effect everyone thought it would. There was no significant impact on burglaries, vehicle theft, robberies, or vandalism. Spellman and Brown's study into the strategy of rapidly responding to crimes in progress as a means of increasing on-scene apprehensions found similar results. The study concluded that due to numerous factors outside of the control of the police, the primary one being delays in citizens reporting incidents to police, rapid response had no impact on reducing overall crime. Further research highlighted the ineffectiveness of latent investigations, pro-arrest policies, and the criminal justice system as a whole to deter crime.

Around the same time, in the United States the relationship between police and the community they swore to protect and serve was eroding. Response to protests over the US's involvement in the Vietnam War and the civil rights movement placed police in the unfortunate position of "Us vs. Them." In addition, violent interactions between police and citizens depicted by the media further divided police

and the community. Tarnished relationships between the police and public coupled with research challenging the traditional tactics of policing lay the framework for reimagining the role of policing in the United States – Community Policing hoped to accomplish that.

The philosophy of Community Policing looked to reestablish a positive relationship between the community and police. Agencies began to decentralize and delegate more decision-making authority to line-level officers. Many law enforcement agencies established satellite or community offices around their jurisdiction in lieu of a more traditional centralized police department. Police officers were asked to get out of their vehicles, attend community meetings and events, interact with citizens, and learn what problems plagued the community. The decision and prioritization of what problems the police should address was primarily left to the community and many times this significantly differed from the problems the police felt they truly should be focused on. Again, the primary aim of Community Policing was community engagement not crime fighting.

As technology continued to advance and the US began to move into the information-age, law enforcement agencies began to recognize the benefits data collection and analysis could bring to policing. Policing strategies such as Problem Oriented Policing and CompStat looked to use data to inform decisions and drive crime control strategies (Ratcliffe, 2016). Problem Oriented Policing introduced the concept of SARA – Scan, Analyze, Respond, and Assess – as a means to solve problems. Problem Oriented Policing called for law enforcement agencies to apply the SARA problem-solving method and identify crime hot spots through the use of data analysis. The goal was to look deeper than the symptom of the crime, which historically is all police had addressed, and solve the underlying issues causing the crime.

CompStat originated from the New York Police Department in 1994 under the direction of Police Commissioner William Bratton. The four primary principles of CompStat are timely and accurate intelligence, effective tactics, rapid deployment, and relentless follow-up and assessment (Ratcliffe, 2016). CompStat initially emerged as an accountability mechanism, a way for Commissioner Bratton to hold the precinct commanders accountable for the crime occurring in their areas. Commanders attended monthly Crime Control Strategy Meetings during which they were required to present to the Commissioner on crime problems in their precinct and the methods they were using to address them. CompStat was criticized for having a theatrical component, one in which commanders were concerned more about surviving the meeting than truly trying to have a significant impact on crime. Regardless, no one can deny how successful CompStat was at NYPD and other large police departments. In New York, police attributed CompStat to an approximate 60% reduction in crime from 1993 to 1998 (Ratcliffe, 2016). CompStat continues to be a popular policing methodology among US law enforcement agencies today.

After the tragic events on 9/11, there was a call for US law enforcement agencies at all levels to increase information and intelligence sharing. Arguments were made that the tragedies across the country may have been prevented if law enforcement agencies hadn't fostered information silos and been better at sharing information. In addition, not long after 9/11 the US experienced the Great Recession, which left many local governments, to include law enforcement agencies, looking for ways to increase efficiency

Page | 6

and effectiveness with dwindling resources. Intelligence-led policing emerged as a model to do just that. ILP had already shown to be successful in the UK in increasing police efficiency and focusing limited police resources on the most serious criminals rather than on individual crimes.

The below figure, adopted from Jerry Ratcliffe's book, Intelligence-led Policing (2016) illustrates why it is so important for law enforcement to be effective at dealing with crime. The figure depicts the increase in recorded crime from 1960 to 2013 and the unmatched increase in number of police officers. The difference is identified as the demand gap and represents a significant increase in workload by police without additional resources to help. Although these numbers are from the UK, the concept remains true in the United States.



Figure 2.1  Change in UK police strength and recorded crime since 1960 (index year) showing the demand gap in resource availability, 1960–2013.

To relate the concept of the demand gap to the Pasco Sheriff's Office, the below figure shows the number of man hours required to handle the calls for service that our patrol divisions are responsible for compared to the number of man hours available in patrol to handle these calls. The resulting demand gap represents a deficit of approximately 94 deputies in the three patrol districts alone.



There are two ways to address a demand gap. The first is to increase the number of officers. This requires money, which in the public sector comes from taxes. Most local governments cannot afford to just add hundreds of law enforcement positions nor would it be a fiscally responsible thing to do. The other option is to reduce the workload of law enforcement officers and to do that you must positively impact crime.

In an environment of increasing demands for government to do *more* with less, Intelligence-led Policing provides law enforcement an opportunity to tackle *less* with less. Ultimately, by operating more effectively, we can work to close the demand gap by having a more significant impact on crime.

The crime funnel is a concept Ratcliffe uses to describe how crime and criminals flow through the criminal justice system. It highlights the inefficiencies and ineffectiveness of the criminal justice system to deal with criminals and have an impact on crime. At the top of the funnel you start with 1,000 actual crimes committed by criminals. Of the thousand, only about half of the crimes committed will be reported to law enforcement. Already, this puts the criminal justice system at a severe disadvantage by only providing an opportunity to intervene just over half of the time. Of the 530 crimes reported to police, 429 crimes will be officially documented in report management systems and only 99 will result in arrest or referral. From there, 60 offenders will be prosecuted in court, 50 of them will either plea or be found guilty, while only four will receive a custodial sentence.



There are two important lessons to learn from the crime funnel. First, the current criminal justice system is no model of efficiency and cannot be relied upon as the solution to deterring crime. Furthermore, albeit these numbers are just generalizations, we talk about jail and prison overcrowding when they are currently only dealing with less than half a percent of criminals. The court systems are overloaded and they are only interacting with 10% of the cases, and our law enforcement resources are taxed beyond their limits as illustrated by the demand gap, and they are only called to 50% of the crimes. If we were to increase the bottom six layers of the crime funnel to their maximum potential of 530, what impact would that have on the criminal justice system? We would need more law enforcement officers, more

Page | 8

prosecutors, more judges, more courthouses, and more prisons. Economically, this would cripple the US as the funding for all of these components comes from taxes.

This leads into the second lesson. Impacts at any level within the crime funnel only flow down. A law enforcement agency could implement a community engagement campaign aimed at increasing the reporting rates of crime, a newly elected Sheriff could vow a 25% increase in arrests, the State Attorney's Office could promote a zero tolerance on crime campaign and increase prosecutions, or a tough judge could sentence everyone to jail or prison; however, those strategies will only impact the levels below. None will have an impact on the overall 1,000 crimes committed. The only strategy that can impact the actual number of crimes committed is crime prevention.

So, if our criminal justice system is struggling to deal with the 4 people at the bottom of the crime funnel, wouldn't it be more prudent for us to identify and ensure we go after the right four people for those spots? Could we have a more significant impact on crime if the criminal justice system focused on the most serious and prolific criminals who have the largest impact on our crime picture?

Intelligence-led Policing offers a methodology for not only law enforcement, but the entire criminal justice system to answer the call for increased efficiency and effectiveness in their response to crime. ILP emphasizes analysis and intelligence as pivotal to an objective, decision-making framework that prioritizes crime hot spots, repeat victims, prolific offenders, and criminal groups. It facilitates crime and harm reduction, disruption, and prevention through strategic and tactical management, deployment, and enforcement (Ratcliffe, 2016).

ILP embraces a "top down" management approach to determining priorities through extensive use of intelligence analysis with additional prioritization on prolific offenders and problem areas (Ratcliffe, 2016). Essentially, ILP looks to focus law enforcement on problem people, problem places, and problem groups. The model depends on analyzing information gathered from a multitude of sources at every level of the agency to create useful and actionable intelligence. ILP is not information sharing alone, it is not just holding meetings to discuss intelligence, and it is not just the name of a division. ILP is everything an agency does. As a management philosophy, ILP places greater emphasis on information sharing and collaborative, strategic solutions to policing problems using limited resources. It calls for law enforcement to adopt a business-like approach to fighting crime. Businesses have been using market research and data analytics (intelligence) for years to identify the specific groups of consumers in their industry who would be more likely to utilize their product and in turn direct their limited resources toward those individuals with an aim at increasing their bottom line. The better a business is at cultivating, analyzing, and reacting to this intelligence, the more successful they will be. Law enforcement should be no different. Our market is crime and criminals, and we are in the business of crime prevention and reduction. So it should make sense that we should direct our limited resources at the top utilizers (prolific offenders, repeat victims, hot spots, and organized crime groups) of our services in order to produce the greatest impact to our bottom line.

The four original tenets of Intelligence-led Policing are (Ratcliffe, 2016):

- Target prolific and serious criminals

- Triage out most crime from further investigation
- Make greater strategic use of surveillance and informants
- Position intelligence central to decision-making

Ratcliffe uses the 3-i model to conceptualize Intelligence-led Policing and explain the role of the key players within.



Ratcliffe (2003)

Essentially, the model conceptualizes ILP as a process in which everyone within the agency assist crime intelligence analysts in constantly *interpreting* the criminal environment with the goal of developing an accurate picture to provide to decision-makers. Analysts *influence* decision-makers through actionable intelligence products, who in turn use the intelligence to create crime control strategies to have an *impact* on crime.

In order to have an impact on crime, police must reduce, prevent, or disrupt criminal activity (Ratcliffe, 2016). Crime reduction is defined as an enforcement action that brings net benefits after considering the displacement and diffusion of crime along with any other external factors that may have contributed to the observed crime reduction (Chainey and Ratliffe, 2005). Crime disruption occurs when an enforcement action or tactic hinders criminal activity for a period of time, but does not permanently stop it (Ratcliffe, 2016). Crime prevention is an action that attempts to eliminate crime before it happens or before any additional activity occurs (Ratcliffe, 2016).

Intelligence-led policing places the police back in a role of crime fighters. It places the prioritization of crime problems in the hands of law enforcement commanders who have a better understanding of the criminal environment predicated upon criminal intelligence rather than the public. It provides commanders with the intelligence necessary to make decisions as they relate to the allocation of resources, crime control strategies, and tactical operations (Ratcliffe, 2016). ILP further tries to re-image law enforcement officers from a role as first responders to one as first preventers, requiring them to take a step-back, look to identify the underlying causes of crime, and develop strategies that are both targeted and future-oriented.

Page | 10

To gain a better understanding of ILP and how it differs from other established models, the table below illustrates the five well known policing models described earlier in this section and their unique characteristics.

| | Standard Model of Policing | Community Policing | Problem-Oriented Policing | CompStat | Intelligence-Led Policing |
|---|---|---|---|---|---|
| Easily Defined? | Yes | No | Fairly easy | Yes | Fairly easy, but still evolving |
| Easily Adopted? | Yes | Superficially | Difficult | At the technical level but managerially challenging | Managerially challenging |
| Orientation? | Police administrative units | Neighborhoods | Problems | Police administrative units | Criminal groups, prolific and serious offenders |
| Hierarchical focus? | Top down | Bottom-Up | As appropriate for the problem | Top Down | Top Down |
| Who determines priorities? | Police management | Community Concerns/demands | Sometimes crime analysis, but varies from problem to problem | Police management from crime analysis | Police management from crime intelligence analysis |
| Target? | Offense detection | Unclear | Crime and disorder problems, and other areas of concern for police | Crime and disorder hot spots | Prolific offenders and crime problems, and other areas of concern for police |

(Ratcliffe, 2016)

In summary, ILP calls for law enforcement agencies to be more business-like in their approach to fighting crime and focus limited resources in the areas where they can have the largest impact. Intelligence guides decisions of law enforcement commanders and allows them to optimize the allocation of resources and concentrate enforcement efforts in a more structured manner. It requires decision-makers to develop innovative approaches to impact crime that are strategic, targeted, and future-oriented. ILP places an emphasis on problem people, problem places, and problem groups and recognizes that crime prevention is critical to producing long-term crime reduction.

Our operationalization of ILP has a proven track record of success. Like any successful initiative, ILP will continue to be effective only if our approach remains flexible to the constantly changing criminal environment and it is supported by leaders within our organization. Though by design ILP is a top-down approach, the most influential leaders in this process are our sergeants and lieutenants. Therefore, it is paramount that front-line supervisors cultivate an atmosphere of accountability to principles outlined in this guide and the overall mission of the Pasco Sheriff's Office.

The remaining sections of this guide detail the processes adopted by the Pasco Sheriff's Office in order to operationalize the principles of Intelligence-led Policing. It was written to ensure that all members share the same understanding of the methodology we have embraced to institutionalize intelligence as the foundation of all operations.

# Section 2: Operationalizing the Core Components of ILP

## Inform Decision-Making

In a typical crime analysis section, analysts provide investigative support and attempt to link events through various types of analysis. A majority of these products tend to remain descriptive in nature and summarize what happened in the past. In this traditional operation, patrol deputies and detectives are the primary consumer of products, and the work of analysts does little to drive the operation and strategy of the agency. Essentially, analysis supports the reactive efforts of a more traditional law enforcement strategy. While it will probably never be possible for analysts in local law enforcement agencies to totally divert from providing individualized investigative support, in an Intelligence-led agency, the primary aim of intelligence products must be to inform decision-making on strategy rather than individual arrests.

**Command and Executive Staff** – It is the primary goal of the analysts in ILP to provide products that help determine strategy. To do this, the analysts liaison with the division commanders to ensure they understand the environment in which they operate. With a better understanding of crime trends, hot spots, and the offenders who cause both, commanders can make well-informed decisions on manpower and resource allocation as well as develop effective crime control strategies to impact crime. Criminal Intelligence Analysts provide weekly products to commanders based upon the data and information received to help influence their decisions. In addition, they cultivate intelligence to drive the overall tactics and initiatives that the Pasco Sheriff's Office subscribes to in an effort to reduce, disrupt, or prevent crime. These initiatives, tactics, and strategies are described throughout the remainder of this section. Strategic analysts provide products that allow the executive staff to forecast the needs of the agency and develop agency-wide strategic plans. These products include staffing analysis; district, sector, and zone sizing; and assessments on the effectiveness of our crime control strategies and manpower deployments.

**Agents/Operators** – We would be amiss if we said ILP did not support deputies and detectives. After all, they are the backbone of our agency. Analysts provide a myriad of actionable intelligence products to support the day-to-day operation of the agency. From BOLOs, Situational Awareness bulletins and Officer Safety alerts to Daily Intelligence Briefs and Actionable Intelligence Meetings, Intelligence Analysts try to provide complete situational awareness of the criminal environment and inform the decisions made by deputies throughout their shift. In addition, these products can inform the case assignment and prioritization decisions of detective divisions. The Pasco Sheriff's Office also utilizes criminal analysts in a Real Time Crime Center (RTCC) to support the front lines of the agency. Analysts are responsible for leveraging technology to provide real-time analytics, situational awareness, and investigative support for calls for service. The hope is greater knowledge about the background of where deputies are responding and who they are likely to encounter will positively impact their decisions and safety in real-time.

# Crime Prevention

The overwhelming majority of crime occurring in the United States is that of opportunity based offenses in which crime prevention can play a role in reduction and displacement. Crime Prevention is the key to long-term crime control and is the only strategy designed to work at the top of the crime funnel. It is the most efficient way to lessen the demand gap without increasing personnel. Therefore, crime prevention must be an integral part of every action, strategy, and response the Sheriff's Office employs.

Recognizing patterns and working to disrupt those patterns though public awareness efforts can occur in many forms. From increased tactical patrol of high crime areas to attending community meetings and social media postings, all members should innovatively and collaboratively focus on preventing future crime from occurring.

Traditionally law enforcement executives (decision makers) have not maintained a great deal of enthusiasm for crime prevention. The majority of law enforcement management policies tend to stress a bias for enforcement action [solely] as a first step in controlling criminal activity and little attention is given to instituting mechanisms that would promote crime prevention or reduction. The Pasco Sheriff's Office embarked on a paradigm shift by utilizing the Intelligence-Led Policing model to achieve a holistic and layered approach to crime control, prevention, and reduction. Ratcliffe cites crime prevention as the key to achieving meaningful long-term crime reduction and when institutionalized, crime prevention can also be a catalyst for improving an agency's ability to bring serious and prolific offenders to justice. Prevention is a vitally important, yet often overlooked, component of the Intelligence-Led Policing management model that must be implemented by any agency desiring to achieve meaningful crime control.

Recognizing crime patterns and working to disrupt those patterns is key to crime prevention. Likewise, identifying attractive targets (present or future crime victims) and instituting mechanisms intended to improve the environments capacity to displace opportunistic offenders can also lead to a reduction. The success of these prevention measures may be realized through a variety of means. This may involve the training and education of law enforcement personnel in modern crime prevention techniques and principles such as Crime Prevention Through Environmental Design (CPTED).

Community education and engagement is one method of crime prevention. By understanding how crime is committed, recommendations can be provided to citizens on what actions they can take to prevent the crime from happening. For example, the overwhelming majority of auto burglaries occur to unlocked vehicles. By simply locking doors and keeping valuables out of view, most auto burglaries could be prevented. The Pasco Sheriff's Office has a robust Public Information section tasked with the timely sharing of critical information pertaining to crime sprees, trends, offenders, and prevention techniques in an effort to prevent additional crimes from occurring. Social media is a free and easy way for crime prevention tips to be shared with citizens. Our public information office started a 9:00 PM routine, reminding our citizens via Facebook and Twitter to check their doors at 9 o'clock every night, a routine imitated around the world and one that frequently trends on Twitter. We also strategically place message boards throughout the community to share crime prevention messages. Other forms of

community engagement include the use of business and community meetings as well as holding community based training initiatives to spread crime prevention strategies.

Identifying at-risk youth who are destined to a life of crime and engaging them to prevent them from developing into prolific offenders also has significant crime prevention potential. Accurate identification and intervention of at-risk youth can set them on the right path. In Ratcliffe's book, he writes:

> David Farrington has pointed out that our knowledge of offending patterns is such that 'potential offenders can be identified at an early age with a reasonable degree of accuracy' (1990: 105-106).  He estimated that the best predictors in 10-year-olds of having a criminal conviction later in life are socio-economic deprivation, antisocial parents and siblings, poor parental supervision and child rearing, coming from broken homes, low intelligence and a poor school record.  However, many of these variables are unlikely to be available to police departments, so this information has little value from an intelligence-led policing perspective. (Ratcliffe, 2016: 44)

Fortunately, these records are available to us. The Pasco Sheriff's Office has partnered with the Pasco County School Board and Department of Children and Families (through our CPI Division) to identify juveniles who are at-risk of becoming prolific offenders. The school board uses an Early Warning System, which identifies underperforming students who are at risk of failing. The system takes into account a student's grades, attendance, and behavior. Through DCF's Florida Safe Families Network (FSFN), we are able to identify juveniles who have had adverse childhood experiences (ACEs), which significantly increase their likelihood of developing into serious, violent, and chronic (SVC) offenders. Research suggests that with each additional ACE a child experiences their risk of becoming a SVC offender increases by 35 and children who have experienced four or more are at significant risk of developing into a SVC offender (Fox et al., 2015). Last, our records management system can identify predictors of criminal behavior such as arrests at an early age, arrests for certain offenses, frequently running away, and a juvenile's social network. We combine the results of these three systems to identify those juveniles who are most at-risk to fall into a life of crime. The table below adopted from Ratcliffe's book outlines the background and systemic risk factors that could cause a juvenile to develop into a prolific offender. Appendix A outlines how the Pasco Sheriff's Office in collaboration with CPI and the Pasco County School Board identify at-risk youth.

| Background risk factors | Systemic identifiable risk factors |
| --- | --- |
| Socio-economically deprived | Early age of first conviction |
| Antisocial parents and siblings | History of court appearances |
| Received poor rearing as a child | History of drug usage |
| Coming from broken homes | Hanging around in public |
| Low intelligence | Having delinquent friends |
| Poor school record | Excessive drinking |
| Being truant or excluded from school | Being  a victim of personal crime |
| Lack of parental supervision | Antisocial behavior |

Table 3.3 Background and systemic identifiable risk factors for prolific offenders (Ratcliffe, 2016: 45)

Page | 14

School Resource Officers are encouraged to coordinate with school officials, guidance counsellors, and school-based intervention teams to offer services in an attempt to get these juveniles back on track. The earlier we can engage at-risk youth the more successful we can be at preventing crime. When possible, we must explore all alternatives to arrest, and interventions must be consistent both in and out of school. The analysts in the Real Time Crime Center act as a screening center to ensure our efforts are consistent and the same services offered for similar incidents in school are offered for incidents outside of school. By utilizing community resources and diversion programs to keep juveniles out of detention centers, we can have a more significant impact on their success and reserve the limited resources of the Department of Juvenile Justice for those who need it most.

Analyzing repeat victimization is another strategy that can be used to prevent crime. Repeat victimization occurs when the same victim or target experiences another criminal incident within a specific period of time. Some targets (ie. people, residences, businesses, and vehicles) are more vulnerable to crime and therefore experience victimization rates far greater than others in the community. This vulnerability is often related to factors such as substance abuse, engaging in risky behaviors or associating with risky people, failing to take appropriate steps to secure a potential target of crime, being in an isolated area or having surroundings that would hide crime from general view, or being in close proximity to likely offenders. While most people and places do not get victimized by crime, those who are victimized consistently face the highest risk of being victimized again (Weisel, 2005). When trying to analyze whether an individual could be a potential victim of crime, previous victimization is the single best predictor (Weisel, 2005). Numerous crime prevention efforts have been shown to be effective, but many are adopted by those least at risk of being victimized. Crime prevention strategies would be more effective if directed at those most likely to be victimized.  Our analysts attempt to link crime prevention strategies with likely victims through analysis on repeat victimization. The Victim Advocate Unit is then engaged to offer targeted interventions to try to reduce the prevalence of repeat victimization.

Last, we look to prevent crime by pursuing the most serious and prolific offenders who have the largest impact on crime and ensure they are held accountable to the fullest extent of the law. The longer they are incarcerated, the less opportunity they have to commit crime, thus having a preventative effect. The section on Priority Offenders explains this strategy in more detail.

For additional information about the offender problem and predicting prolific offenders, we encourage you to read *Chapter 3: The Magnitude of the crime challenge* of Intelligence-led Policing (Ratcliffe, 2016: 37-48).

**Performance Expectations:**
- Politely share crime prevention techniques with citizens on every call for service. By educating citizens on how crime is committed, we have an opportunity to prevent crime. Not everyone will listen, but anything helps.
- Become familiar with the various community resources that can be offered to help rehabilitate individuals and reduce their dependency on crime to get by.
- Engage the Public Information Office to share information on crime sprees and trends

- Share information about individuals on the path to becoming prolific offenders. Provide community resources to the individual and/or guardians and loved ones to intervene.
- Examine trends in your respective area of assignment and try to determine what opportunity the criminal is exploiting and plan prevention efforts accordingly. Crime patterns will relate to an "offender, place, or victim" problem.
- If it is an offender problem and there are no commonalities among the victims, pursue opportunities to strategically patrol the area during opportune times, visit prolific offenders in area, etc.
- If it is a place problem, try to identify what about the place is attracting crime and take appropriate measures. For example, if there are numerous foreclosed houses in the area in disrepair, work with Code Enforcement to address. Determine if the crimes are occurring along frequently traveled routes that criminal may use and determine if there are opportunities to alter or impact these paths.
- If it is a victim problem, consider marketing campaigns directed at the residents/businesses outlining what they can do to mitigate their potential for victimization. Examples include flyers, electronic signage, community meetings, newsletters, etc.
- Be sure to have a coordinated effort that is approved by your District Commander to guard against duplication of efforts.

**<u>Supervisory Expectations:</u>**

- Look for opportunities to be proactive and lead. This is a tremendous opportunity for supervisors to provide lasting problem solving options beyond merely arresting people. Supervisors should recognize this is historically an area where deputies have limited experience and expertise. The results may not be immediately apparent or even effective.
- It is incumbent on supervisors to look at a problem holistically and not limit the focus solely on enforcement. Recognize as a problem solver it is possible to make many arrests and be unsuccessful and it is possible to make no arrests and be entirely successful. The goal is to reduce crime and fear.
- Seek to determine the root cause of each issue and how to prevent it from recurring.
- Remain resourceful and make evidence-based decisions after referring to successful options as found in popcenter.org or other internal agency initiatives.
- Track the successes or failures of each initiative for which you are responsible through statistical comparative analysis. The ILP Section can be of tremendous value in this area.

# Focused Offenses

Intelligence-led Policing prioritizes limited resources and one of many ways we look to do that is by placing a strategic focus on certain offenses. This does not mean other offenses are not important; however, as a generalized, agency-wide strategy we cannot prioritize everything. So, we must focus on the most frequently occurring crimes and those that stand to have the most significant impact on the safety of our communities. The table below identifies our strategic focus on crime:

Page | 16

| **Big 4** | **Violent Crime** |
|---|---|
| Burglary, Auto | Burglary, Battery |
| Burglary, Residence/Structure | Robbery, Person |
| Burglary, Business | Robbery, Business |
| Vehicle Theft | Robbery, Home Invasion |
| | Robbery, Carjacking |
| | Aggravated Assault |
| **Firearm Theft** | Aggravated Battery |
| | Any discharge of a firearm (crime or non) |

**Performance Expectations:**
- Pay particular attention to modus operandi to assist in identification of trends
- Review focused offenses that occurred within your assigned area of responsibility for awareness
- Think about how these offenses could have been prevented

**Supervisory Expectations:**
- Prioritize the submission of reports for focused offenses and ensure the accuracy of data entry

# Problem People – Priority Offenders

Intelligence-led Policing calls for a strategic focus on problem people by targeting the criminal elite, those offenders who if incarcerated will net the largest benefit of crime reduction. The Pasco Sheriff's Office brings a strategic focus to the criminal elite by identifying Prolific Offenders, Top 5 Offenders, District Targets, Abusive Offenders, and Priority Warrants. In addition, Florida Statutes provide a focus on Sex Offenders, Career Offenders, and Prolific Juvenile Offenders. Collectively, we refer to these categories of offenders as **Priority Offenders**. The following sections outline how these offenders are identified and the strategies used to target them.

## PROLIFIC OFFENDERS

While a standardized definition of a "Prolific Offender" helps align our agency's strategy, it is important to recognize that crime and criminals are ever-changing and no definition written can capture every type of situation. Criminal events such a violent crime spree, serial rapist, or homicide for example may necessitate temporary realignment of focus as well as the allocation of additional manpower and resources.

The Pasco Sheriff's Office's definition of a prolific offender is based on the frequency and types of offenses an individual has committed or is suspected of having committed. RMS/JMS data is the most viable source for evaluation of chronic offending in Pasco County at this time; however, a limitation is criminal activity outside of the county is not considered.  While offenders may have committed offenses in other jurisdictions, or for which they were not suspected, using RMS/JMS data will allow for a snapshot of verifiable crime and provide an objective dataset.

According to the Pasco Sheriff's Office, a **Prolific Offender** is a person of any age who meets or exceeds a threshold calculated by weighing his or her three year history of arrests and suspicions for criminal offenses in Pasco County. Additional weight is awarded for violation of probation or parole (VOP), failure to appear (FTA), length of time between offenses, repetitive appearance in criminal incident reports listed as a victim, witness, or other involved, and for having a known gang affiliation.

To qualify for consideration as a prolific offender, an individual must have been arrested at least twice for any of the previously identified ILP-focused offense types. Once qualified, individuals are scored and ranked by the number and severity of offenses committed, gang affiliation, and time since most recent arrest which may diminish or increase the potential for an individual to reoffend.

If an individual will be detained throughout the upcoming evaluation period as determined by PSO's JMS or via a manual review of Department of Corrections or Federal Bureau of Prisons data, he/she is assigned an inactive prolific status. If an individual is deceased, he or she is removed from the selection pool.

Lastly, identification as a prolific offender does not guarantee that the individual will reoffend.  The relationship is a correlation between past and present behavior which may or may not predict future behavior. After individual vetting, the top 100 active individuals by point value under these criteria are assessed as Prolific Offenders in Pasco County.

Appendix B outlines in more detail the calculation PSO uses to identify prolific offenders. It is important to note that a true definition of a "prolific offender" would include unreported offenses such as those that occurred in other jurisdictions. However, PSO determined that the best course is to take an objective approach in analyzing information verified by the PSO to identify prolific offenders.

One way we look to have an impact on the actions of prolific offenders is through periodic **prolific offender checks**. In order for these checks to be effective, however, it is important members understand the reasoning behind and purpose of conducting prolific offender checks.

Prolific offender checks are based on the theory of focused deterrence. In criminology, the deterrence theory suggests that crime can be prevented if potential offenders believe the costs of committing a crime outweigh the benefits. This cost-benefit analysis is based upon the offender's perception of the certainty, severity, and swiftness of punishment. Focused deterrence strategies look to directly influence a select, or "focused", group of offenders' perception of the risk of committing crime. At PSO, our efforts are focused on those we identify as prolific offenders. During checks, it is important we communicate to these offenders that because of their criminal activity, they have been identified for an enhanced focus by the Pasco Sheriff's Office and they have only two options. First, our preferred option is they can stop committing crimes and become a productive member of society. To this effort, PSO has developed palm cards (see Appendix C) to pass out to prolific offenders, which identify resources in the community to assist them on the road to becoming a law-abiding citizen. Otherwise, the second option is to bear the consequences of their criminal ways through relentless pursuit, arrest, and prosecution and to ensure they are no longer in a position to harm the citizens of Pasco County. In order for focused deterrence to be effective, law enforcement and the criminal justice system must remain true to their promise. If the

offender does not feel the pressure, if the offender is not arrested when they commit their next crime, or if the offender is left to feel their punishment is menial, the strategy will have no impact.

In addition to operationalizing the theory of focused deterrence, prolific offender checks also offer the opportunity to cultivate information about the criminal environment: who is committing crimes, where, when, and how. Members are encouraged to develop information to help analysts identify where and who we should be focused on, help solve crimes that have already been committed, and ultimately help us as an agency to prevent future crimes from occurring.

Another way we look to have an impact on prolific offenders is through ensuring thorough investigation into their crimes and intentional follow-through with the State Attorney's Office or other prosecuting authority. To help accomplish this, we have made two reports available on the Intranet for members to access.

- Prolific Offender Arrests – This report will identify arrests or SAO referrals of cases where a Prolific Offender, Top 5 Offender, or District Target was listed as the arrestee or suspect.
- Prolific Offender Involvements – This report will identify any investigation in which a Prolific Offender, Top 5 Offender, or District Target was involved regardless of the type of involvement (i.e. Suspect, victim, witness, other, etc).

The intention is to provide an easy way for members and supervisors to identify cases involving these priority offenders to ensure they do not fall through the cracks and they are investigated with a sense of urgency. In addition, the ILP section uses this information to track the sentencing of prolific offenders to ensure we are keeping true to our promises.

**Juvenile Prolific Offenders**

Our definition of a prolific offender does not exclude juveniles. All offenders regardless of age are calculated equally. However, Florida has further defined a **Prolific Juvenile Offender** through F.S. 985.255. According to Florida law, a juvenile will be deemed a Prolific Juvenile Offender if he/she:

- Is charged with a delinquent act that would be a felony if committed by an adult;
- Has been adjudicated or had adjudication withheld for a felony offense, or delinquent act that would be a felony if committed by an adult, before the charge under subparagraph 1.; and
- In addition to meeting the above requirements, has five or more of any of the following, at least three of which must have been for felony offenses or delinquent acts that would have been felonies if committed by an adult:
    o An arrest event for which a disposition, as defined in s. 985.26, has not been entered;
    o An adjudication; or
    o An adjudication withheld.

Juveniles who meet this definition are added to the list of prolific offenders for each district.

One of the strategies we use specifically for juvenile prolific offenders is recommending the juvenile be adjudicated as an adult. When a member identifies a juvenile who meets the criteria for a prolific

offender, has committed a serious and violent offense, or has had a significant impact on crime, they should forward the juvenile's name to their respective analyst to conduct a review of F.S. 985.557(1)(b). The analyst will compare the juvenile's criminal history to determine if the juvenile meets the criteria to be direct filed as an adult. If the analyst determines the criteria appears to be met, the analyst will notify the respective Division Commander. The Division Commander will send a letter to the State Attorney's Office (SAO) requesting the juvenile be charged as an adult.

The letter faxed over to the SAO should be on official PSO letterhead and contain the following narrative:

> *Our team has identified a chronic juvenile offender, which I respectfully request the SAO Direct File as an adult in reference to any and all pending and future criminal charges.*
>
> *A Pasco Sheriff's Office analyst has conducted a review of the criteria listed in F.S. 985.557(1)(b) and determined the below juvenile appears to meet the requirements to direct file as an adult. The name of the juvenile is:*
>
> > *1.) Name of juvenile, DOB, SS #*
>
> *I am making this request due to the offender's extensive criminal history and in response to the adverse impact this individual has on the community.*
>
> *If you have any questions or concerns about this request, please contact me.*

**Performance Expectations**
- There is a zero-tolerance arrest policy for crimes committed by prolific offenders.
- Deputies and detectives should be extra thorough with investigations involving prolific offenders. Don't stop at probable cause; go the extra mile to ensure you build a prosecutable case.
- When setting Invests with the SAO, make sure you notify them the case involves a prolific offender.
- Have intentional conversations at Invest with ASAs. Ask for feedback on how to strengthen your case if the ASA seems reluctant to prosecute. Engage your supervisor if you disagree with a filing decision.
- Ensure follow-through by the State Attorney's Office on arrests and referrals.
- Conduct a face-to-face prolific offender check at least once quarterly with each active prolific offender.
- Learn as much as possible about prolific offenders in your assigned area to include their acquaintances, vehicles, locations frequented, M.O. for offenses, vehicles owned, etc. Document accordingly the information you learn so it can become shared information among fellow deputies, investigators, and analysts.
- Provide timely documentation of contact with offenders via reports, tips, etc.
- Participate in actionable intelligence meetings to further discuss and share your knowledge on prolific offenders.

**Supervisory Expectations**

- Ensure and reinforce subordinate's knowledge of prolific offenders within area of responsibility through briefings at read-offs, small group intelligence sharing, etc.
- Manage the process of prolific offender monitoring through effective strategies that do not create unnecessary redundancy.
- Review the prolific offender involvement and arrest reports to ensure cases receive the necessary attention and follow-up.
- Follow-up with members on arrests to ensure appropriate filing and prosecution decisions are being made by the SAO.
- Consider assigning prolific offenders to members for ownership and to develop an expert source on the offender.
- Review the custom priority offender reports to identify cases involving prolific offenders and ensure the investigations are thorough.

## DISTRICT TARGETS

The District Target is identified through the collaboration of the district analysts, district commander, and district-based investigative unit supervisors. In order to be selected, the offender must have an active warrant or local probable cause pick-up order. In addition, this offender should satisfy the question: "if this person is apprehended, will it result in a significant impact on crime in the area?"

**Performance Expectations**

- Members across all sections of the agency should work collaboratively to apprehend the District Target as soon as possible.
- Share information about search efforts in Central Command to avoid a duplication of effort.
- As soon as the target is apprehended, notify your district analyst so a replacement target can be selected.

## CAREER OFFENDERS

As of January 1, 2003, under the Florida Career Offender Registration Act, a select group of convicted felons, the "worst-of-the-worst", are required to register their residences with law enforcement. Career Offenders are individuals who have been designated by a court as a habitual violent felony offender, a violent career criminal, or a three-time violent felony offender under s. 775.084 or as a prison releasee reoffender under s. 775.082(9) AND who are serving or have been released from sanction in the State of Florida on or after July 1, 2002. These offenders, by virtue of their histories of offenses, present a threat to the public and to communities. Failure of a Career Offender to register their residence with the local jurisdiction within 2 days of release from incarceration is a third degree felony. After initial registration, career offenders must update the address on their driver's license or ID card within 2 days of changing residency. There are approximately 70 career offenders living within Pasco County. These individuals are added to each district's list of prolific offenders.

**Performance Expectations**
- There is a zero-tolerance arrest policy for crimes committed by career offenders
- Have intentional conversations at Invest with ASAs. Ask for feedback on how to strengthen your case if the ASA seems reluctant to prosecute. Engage your supervisor if you disagree with a filing decision.
- Ensure follow-through by the State Attorney's Office on arrests and referrals.
- Conduct a face-to-face career offender check at least once quarterly with each active career offender.

### SEX OFFENDERS

There are approximately 1,000 registered sex offenders and predators living in Pasco County. These individuals have already evidenced they pose significant harm to the community. As a result, designated sex offenders and predators are required to register with the Pasco Sheriff's Office within 48 hours of establishing residency (permanent, temporary, or transient) within the county. Sex offenders and predators are also required to obtain a driver's license or ID card with a sex offender designation within 10 days of registering and must update their DL or ID within 10 days of changing addresses. Some offenders have residency requirements prohibiting them from living within 1,000 feet of schools, daycares, parks, and playgrounds. Knowledge of where sex offenders and predators live within your zone will help provide accountability and could represent leads for missing persons investigations. The Sex Offender Unit is tasked with conducting quarterly compliance checks. Deputies can assist by notifying detectives in the sex offender unit of any contacts with registered sex offenders and predators.

**Performance Expectations**
- When in contact with sex offenders and predators, conduct an NCIC/FCIC check to learn the offender's stipulations.
- Verify residency requirements are being met.
- Notify sex offender detectives if you encounter a sex offender on a criminal complaint.

## Problem Places – Targeted Areas

As evidenced by the Kansas City Preventative Patrol Study (discussed in Section 1), random patrols have no significant impact on crime; however, having a targeted focus on areas of high crime can be an effective policing strategy. Research overall strongly supports the position that hot spots policing can have a meaningful effect on crime without simply displacing crime-control benefits to nearby areas.

A small amount of hot spot locations, about 3%, in a city may be host to half of the citizen reported calls for service (Sherman, Gartin, Buerger, 1989). Active offenders, vulnerable marks and poor target hardening in an area increase the likelihood of crime occurrence according to Routine Activities Theory (Cohen and Felson, 1979). With a seemingly overabundance of data and innate desire to access more sources for crime analysis, agencies must utilize smart data management tools and analytical

techniques. Geo-spatial analysis is critical to the identification of problem people, places, and times. If an agency can determine where and when crimes occur, a more intelligence-led, targeted patrol deployment design can be achieved.

In order to strategically address crime for efficient and actionable resource allocation, spatial and temporal analysis of crime incidents may be combined with the criminogenic features of the micro environments within the larger geographic backcloth. Risk terrain modeling (RTM) allows for this by the testing of a criminal outcome, such as armed robbery incidents over a period of six months, against risk factors, such as ATM locations, liquor stores and/or bus stops, present in a geographic boundary to determine whether there is or is not a positive correlation of the outcome to the suspected risk factors. Resources may be deployed down to the partial street level where future crimes are most likely to occur in an effort to intercept and deter. These law enforcement techniques form the basis for our agency's analysis into problem places.

## Strategic Targeted Area Response (STAR)

Strategic analysts in collaboration with the district analysts and district commanders apply the concept of targeting hot spots by designating areas in each district as STAR Boxes. The STAR boxes are locations where crime is persistently dense over an extended period of time. Currently each district has two STAR boxes, and while each district's STAR areas only cover roughly 7 -10 square miles, they account for approximately 50% of the total amount of Big 4 and violent crime focused offenses for that district.

We have enhanced our approach to impacting crime within the STAR boxes by adding offender-focused analysis to inform strategy. Once we determine where the STAR boxes will be, the next question to answer is *who* are the offenders making these areas a hot spot for crime? We look to see where priority offenders live within the STAR boxes as well as where the offenders live within the county who have impacted crime within the STAR boxes. Many times, this identifies hot spots of offenders outside of the STAR box, which can offer additional areas of focus, especially for members who do not work directly in one of the STAR boxes.

## Performance Expectations:
- Learn the location of the STAR for your assigned district.
- Strive to gain understanding of the STAR with a focus on whether the problem is due to the location, offender, or victim and the opportunity being seized by the offender.
- Develop knowledge of offenders living or frequenting the area.
- Develop and maintain rapport with deputies assigned to the STAR.
- Use Central Command, One Solution, and other available resources to remain abreast of existing and emerging crime trends in your area. If you continuously respond to the same location, try to identify the underlying cause of the problem and what options are available to adequately address the issue to prevent future calls. Think outside of the box and understand that not every solution needs to be a law enforcement solution. There may be other services or agencies throughout the county that may be able to assist with addressing the issue. Law Enforcement may just need to be the impetus to bring about a solution to the problem.

**Rapid Response to Areas of Emerging Crime Trends**

Rapid deployment is a simple, yet effective crime fighting technique rooted in three simple goals: preventing crime; reducing the public's fear of crime; and solving crime.

Rapid deployment of resources is designed to address existing and emerging crime patterns, sprees or trends. Studies have shown that a rapid, targeted, and comprehensive response will significantly increase our ability to impact crime.

Scenario:

Day shift deputies respond to six auto burglaries in the Forest Lakes subdivision. It appears all the vehicles were left unlocked and there were no signs of forced entry. The burglaries did not all occur on one street, however, they were in relative close proximity to one another.

Traditional Response:

In the past, we would conduct our normal neighborhood check and then contact night shift and say, "Hey…we were hit hard in Forest Lakes last night, keep an eye out." As we all know, this response is ineffective and inefficient.

Our Expectation:

Shift Commanders need to be engaged in operations to be able to identify areas of emerging crime trends immediately to put us in the best possible position to initiate a rapid, strategic response. Shift commanders are responsible for developing a Rapid Response Plan to address the emerging crime trend. Listed below is an example of a Rapid Response Plan using the same scenario.

- On-duty shift commander of the affected area develops a rapid response plan and logs the plan in Central Command. The shift commander needs to notify all relevant components of the agency to include the Real Time Crime Center (RTCC) of the Rapid Response Plan. The plan will contain the following:
  - A synopsis of the event, such as "multiple auto burglaries in Forest Lakes between the hours of 0330 and 0500 hours."
  - A list of the units that responded out to the initial scene, such as Patrol, Forensics, K9, Air, etc.
  - Any potential evidence, such as video surveillance, fingerprints, etc.
  - Items stolen (i.e. GPS, keys), if any, during the event or other important MO data.
  - List of any potential suspects, persons-of-interest information
- Each shift commander, or anyone who has new information to report for the Rapid Response Plan will add the information to the blog in Central Command. Suggested actions to be completed include, but are not limited to:
  - Provide the RTCC and ILP with BOLO information, to include videos or photos to be placed on Caught on Camera.

- o Contacting PIO with information to be placed on the Sheriff's Office Facebook page to include  photos or video footage, if available.
- o Contacting RTCC/ILP Analyst to provide a list of warrants, juvenile pick up orders, potential subjects, etc. in the affected area so we can be begin to target criminal offenders who may be involved, or have information on who was involved in the criminal activity.
- o Contacting CSU to have license plate readers and/or a message board put in the affected area requesting citizens provide information, lock their cars, etc
- o Arranging for neighborhood canvassing, enhanced neighborhood checks, distributing "lock your door" hangers in affected area.  Any additional information on additional criminal activity should be submitted via a tip submission to Tipsoft.
- o Check for homes with video surveillance.  Ask to see video if there is any possibility the suspects may have passed by to and from the location of occurrence.
- o Contacting the SRO's to help develop intelligence and leads from students.
- o Contacting Classification section at jail to identify associates of people being sought, through things like visitor's lists, inmate mail, etc.
- o Consider contacting other agencies (if appropriate), such as Code Enforcement for assistance, or other nearby agencies (i.e. NPRPD, Pinellas S.O., TSPD to determine if they have experienced similar problems and if they have developed any leads).
- o Contacting that subdivision's HOA/CDD board member, if applicable, to provide and solicit information.
- o Contacting that subdivision's private contract security, if applicable, to provide and solicit information.
- o Arranging for specialized units to assist with targeted enforcement patrols and to blanket the area, such as:
  - Warrants
  - Motors/Step
  - STAR
  - CSU (can help with neighborhood canvass)
  - SRO
  - Sex Offender Unit
  - DOC (Probation and Parole) for probation checks

Many of these tasks can and should be implemented immediately. Rapidly mobilizing resources is the key. Delaying implementation allows the possibility for the criminal activity to continue unabated.

It is understood that all of the aforementioned tasks will not be completed during one operational period nor in every circumstance. Effective collaboration and communication is key to seamlessly integrating these strategies and preventing redundant efforts. Incomplete tasks should be updated in the Rapid Response Plan and passed through to the next operational period. The process continues until all necessary tasks are completed.

It is also understood that as new information arises, the plan may change. Therefore, it is crucial that the plan remain fluid and flexible to adjust accordingly. For this approach to be effective, all lieutenants must focus on the following:

- Know what crimes your members are responding to.
- Determine if the crimes are isolated or part of an emerging crime spree, pattern or trend.
- If determined to be an emerging crime trend, you will need to develop a strategic and comprehensive response.
- Immediately implement this plan and prepare to pass this plan on to the next shift.

## Problem Groups – Criminal Networks

Criminal networks are becoming more and more sophisticated, so law enforcement tactics must do the same. Social Network Analysis serves as a powerful tool for law enforcement agencies to enhance their crime enforcement efforts and bring a more strategic focus to the most serious and prolific offenders impacting their jurisdictions. Social Network Analysis is the collection of theories and methods that assume that the behaviors of actors, or in our case, criminals, are profoundly affected by their ties to others and the networks in which they are imbedded. SNA assumes these ties, or relationships, will have a profound effect on choices the actors make, which is why the study of these relationships is so critical for law enforcement.

The Pasco Sheriff's Office has found Social Network Analysis to be a great complement to its Intelligence-led Policing philosophy; it provides an empirically-based and methodologically sound process to highlight the key impact players within criminal networks so appropriate responses can be drafted. Just as we have learned a small minority of offenders commit the majority of the crimes in our community, we have also come to understand these same prolific and chronic offenders are socially connected and their actions are often influenced or facilitated through various members of their networks. By understanding these relationships, we will be much more effective with our ILP crime reduction and prevention strategies. According to Dr. Fox, Mc Hale and Novak (2015), "accurately identifying and controlling deviant social networks can not only effectively reduce crime rates, but would also guide allocation of scarce resources to effectively accomplish crime prevention."

There is great value in identifying criminal networks and formulating crime prevention strategies by focusing on the relationships and connections within the networks. SNA offers a unique analytical strategy for crime analysts to explore the social relationships between individuals and groups, and visually represent the relationships using sociograms. These visual maps allow analysts to examine complex data sets to discover the social structures of the network and identify members with the most influence or importance within the group. Unlike link analysis, SNA allows us to impact these human networks in the way we strategically engage members based on the group dynamics. For example, link analysis simply helps us take out the bad guy, but every time we take out the bad guy another one is waiting in the wings. SNA goes further to offer an understanding of the trusted offender network and consider the best strategies to disrupt, dismantle, or influence the group as a whole. If we can visually

map out the relationship types, affiliations, business ties, and other connections, we begin to identify strategic opportunities to control the behavior of the network. Using RMS data, field intelligence, and feedback from our members on each sociogram, analysts and law enforcement can work together to illuminate these offender groups and plan effective interdiction strategies to prevent crime. Below are some of the many ways we look to provide a focus on problem groups impacting Pasco County.

## District Top 5

The District Top 5 are criminal networks actively impacting the crime picture in each district. The Top 5 are identified through the collaboration of the strategic analysts, district analysts, district commander, and district-based investigative unit supervisors. The Top 5 is intended to inform a more long-term strategy and act as an on-going collection requirement for members of the network. Tools such as Social Network Analysis assist in identifying the most influential members of these networks and provide for a more strategic and targeted approach to deterring, disrupting, and ultimately dismantling these criminal networks.

**Performance Expectations:**
- Learn your District's Top 5 and their associates.
- Use the list as an on-going collection requirement to learn the networks criminal activity, where they hang out, who are the most influential members, and what are the networks vulnerabilities.
- There is a zero tolerance arrest policy for members of the district Top 5 and their associates.
- Inform the SAO of a member's status when making arrests and attending the Invest to ensure appropriate prosecution.
- When in custody, Detention Deputies should use the opportunity to build a rapport and cultivate intelligence about the networks and their activities.
- Document any information related to the Top 5 and their associates in Central Command.

**Supervisory Expectations:**
- Facilitate discussions about the Top 5 networks in read-off
- Ensure thorough investigations are completed on members of Top 5 and their associates.

## Court Services District Focus

The Court Services Analyst in conjunction with the District Analysts and ILOs identify a District Focus Inmate for each patrol district. Inmates are identified based upon their criminal activity and the impact they and their network have on Pasco County. Once identified, they become the focus of our detention intelligence team. Through the use of SNA and leveraging enhanced interviews and all of the technologies within the jail, the goal of the District Focus is to build out the inmates' criminal networks and learn as much about the network's actors and criminal footprint as possible. Once an inmate's network is complete, the respective district's ILO looks to identify an investigative unit to follow through with dismantling the network.

**Performance Expectations:**
- Detention Deputies should be familiar with the District Focus inmates.
- Pay particular attention to relationships that develop between the District Focuses and other inmates within the facility. Document these relationships in an Intel Report.
- Communicate intelligence to the Court Services Analyst and IPS teams.

## Criminal Gangs

According to Florida statute, a gang is defined as an ongoing organization, association, or group (formal or informal) that has as one of its primary activities the commission of criminal or delinquent acts, and that consists of three or more persons who have a common name or common identifying signs, colors, or symbols, including, but not limited to, terrorist organizations and hate groups. To date, PSO has identified 57 different criminal gangs with over 600 certified members and associates, and this number continues to grow daily. Gangs are known for their involvement in drug trafficking, human trafficking, and reckless acts of violence, which is why their identification and interdiction is critical. The Intelligence-led Policing Division has a Gang Intelligence Detective whose primary duties are the proper documentation of criminal gangs as well as their members and associates. The Gang Intelligence Detective oversees PSO's Gang Liaison Program, which acts as a force multiplier by identifying members in patrol and the detention center who specialize in the identification of gang members and cultivation of gang related intelligence. In addition, the Gang Intelligence Detective is tasked with reviewing gang-related investigations to ensure a thorough investigation is completed and appropriate filing decisions are made to include applicable enhancements by prosecuting authorities. Two organized crime analysts help by producing actionable intelligence products that map out the organizational structures of documented gangs, identify potential rival organizations, and help to drive interdiction strategies.

**Performance Expectations:**
- Familiarize yourself with definitions of gangs, gang members, gang associates, and gang related activity as outlined in F.S. 847.03.
- Learn who the Gang Liaison is for your respective area of responsibility.
- Communicate with the Gang Liaison on any gang related incident or investigation
- If you feel an individual meets the requirements to be documented as a gang member or associate, notify your Gang Liaison.
- Learn who the certified gang members and associates are who live within your zone or are in your housing units. Try to build a rapport and learn about the gang, gang's activity, and gang's rivals. Forward this information to your Gang Liaisons.

## Other Criminal Networks and Organized Crime Groups

In addition to focusing on the District Top 5 and gangs, PSO has a Strategic Investigations Unit whose detectives focus on the most active and violent criminal networks impacting Pasco County. Pasco also participates in the Tampa Bay Regional Intelligence Center (TBRIC), the regional Fusion Center in the

Tampa Bay area, which focuses on bringing a multi-agency approach to combating organized crime groups.

**Performance Expectations:**
- Document relationships between known offenders and their associates. This information is critical to building out a complete social network analysis database to fuel analysis into criminal networks.

# Problem Solving

*~ The solution to one problem often plants the seed for another.*

An effective means to assess known problems and problem areas is the use of the **SARA** model, which stands for Scan, Analyze, Respond and Assess. This is a valuable tool to use when assigned to address a specific issue or problem in the community. To have an impact on crime, it is necessary to reduce, prevent, or disrupt criminal activity. The most effective approach to law enforcement is an integrated strategy that combines some of the benefits of problem-oriented policing with the targeted and objective approach of proactive policing and Intelligence-led Policing. Intelligence should not only inform the strategies used to address identified problems, but it should also be used to help prioritize the problems needing to be addressed.

Scanning allows you to objectively identify a problem that needs to be addressed. This involves looking at data, talking to people, coordinating with intelligence analysts, and observing the community in order to identify, define, consolidate and prioritize the problem.

Analysis involves studying the problem to determine if it deserves concerted attention and, if so, trying to develop accurate descriptions and explanations. The analysis step is the heart of the SARA Model. Human nature is to go from the identification of a problem to a response without knowing everything there is to know about the problem.

Response involves searching for a wide range of solutions and choosing and implementing the ones with the most promise.

Assessment involves collecting data after the response to determine if the problem has been eliminated or at least reduced. If success has not been achieved, then further analysis and a different set of responses may be needed. This stage is often forgotten or people get so committed to the solution they designed that they are reluctant to go back to the drawing board.

**The Problem Solving Triangle**

In order for a crime to occur, you need to have an offender, a target or victim, and a crime-scene or location. These three elements make up the Crime Triangle. When looking to solve a problem, it is helpful to see which of the three elements has the most significant bearing on the problem.



*Problem-Solving Triangle www.popcenter.org*

We have already spent a lot of time on how we address the overall offender problem in Pasco County. However, as it relates to a specific problem, it is important to ensure you look as broadly as possible and not just focus on those offenders who have gained the attention of law enforcement in the past. In addition, it is important to try to understand what motivates the offender to commit the crime. Addressing the underlying motivation may be the most effective way to deal with the offender leg of the crime triangle.

If it is a "place" problem, try to identify what about the place is attracting crime. Try to determine what location and conditions are present at the time of each crime and what threads may connect the incidents? Once these causal factors are determined implement preventative measures that will reduce the potential for crime by adding appropriate "controls" that increase the risk of detection and apprehension; For example, if there are numerous foreclosed houses in the area in disrepair, work with Code Enforcement to address. Determine if the crimes are occurring along frequently traveled routes that criminal may use and determine if there are opportunities to alter or impact these paths.

If it is a "victim" problem, consider working with the Public Information Office to market campaigns directed at the residents/businesses outlining what they can do to mitigate their potential for victimization. Examples include flyers, electronic signage, community meetings, newsletters, etc. If a number of cars were burglarized, all of which were unlocked, or illegally parked on a street, consider an educational campaign throughout the community using crime prevention materials, social media, and

citizen contacts.  Be sure to have a coordinated effort that is approved by your District Commander to guard against duplication of efforts.

**Performance Expectations:**
- Focus on each individual step in the SARA process separately.
- Determine the impact of the problem on society.
- Break down the problem into smaller questions as part of the analysis process such as: "Why is it happening here and not somewhere else?" "How long has it been happening and why did it start?" "Will the problem recur or return once law enforcement leaves?" Will you eliminate, reduce, displace, prevent, or do something else with the problem?
- Be sure to consider all options. Even options that are not plausible as a whole may have aspects that are worth considering.
- Focus on the outcome achieved during your assessment. Do not focus merely on outputs or how much work was put into the problem.

**Supervisory Expectations:**
- Maintain an excellent working knowledge of the STAR within your area that goes beyond the geographic boundaries of the STAR.
- Know which crimes are causing the hotspot to occur within the STAR.
- Know time of day, day of week (TODDOW) and MO patterns that are existing within the STAR and coordinate with the STAR supervisors to address those issues specifically.

## Nuisance Abatement

An integral component of the sheriff's mission is the reduction of fear and quality of life issues brought to our attention by citizens. Most of these quality of life issues involve suspected illegal activity including but not limited to drug transactions occurring at locations.

**Performance Expectations:**
- Communicate with likely complainants, when possible, in order to determine and or confirm exactly what type of problem exists; is it a nuisance location or a drug location, or both.
- Research location to identify occupants and their associates.
- Employ surveillance techniques to confirm complaint and or obtain additional information concerning the location (ie: the utilization of unmarked, undercover type of vehicles).
- Complete directed patrols to conduct traffic stops for the purpose of evidence and/or intelligence gathering and potentially generating an informant.
- Assess the location for the existence of county code violations, and when applicable, cite the owner/tenant.
- Consider the employment of Knock and Talks.
- Consider the utilization of Parole and Probation, when applicable.
- Engage the respective district's Code Enforcement Corporal.

- Use ILP to help liaison with the county to help harden the location or make it a less attractive location for criminal activity (signs, street lighting, traffic control devices, etc).
- Consider the sharing of intelligence to other members in order that enforcement can occur at all hours of the day and all days of the week.
- Commit to the utilization of these resources and tactics for an extended period of time or until the location is no longer a nuisance.

**Supervisory Expectations:**
- Supervisors must assume control and responsibility over this process.
- Ensure proper notifications to appropriate units and the chain of command.
- Enact safeguards to prevent redundant efforts and to ensure proper de-confliction protocol are followed.

## Enforcement Action Plans

An Enforcement Action Plan (EAP) is designed to operationalize the SARA methodology to solve active crime problems in an identified area. Members are encouraged to use the Enforcement Action Plan form, which can be found on the Intranet [PSO 30121], to assist in working through a problem and developing a plan of action to permanently solving it. The EAP form is included as Appendix D.

## Enhanced Neighborhood Checks

Traditionally, neighborhood checks have been used as a means to determine if any neighbor in the immediate area might have valuable information regarding a particular crime a deputy is investigating. These contacts can have additional value as they can serve to not only elicit information from the public but they can also serve to inform the public. Through maintaining good situational awareness about crime patterns in their assigned zone, deputies can determine when an area is experiencing a crime trend and seek ways to inform other potential victims in the area. For example, if a deputy is investigating an auto burglary on Elm Street and knows there have been multiple burglaries in the area, the deputy can extend and expand the neighborhood check by distributing available crime prevention literature focusing on burglary prevention and awareness.

**Performance Expectations:**
- Approach the neighborhood check process as an opportunity to share information with the public in near real time about crimes in their area instead of merely a necessary component of an incident report.
- Identify "attractive targets" (potential future crime victims)
- Gather neighborhood intelligence; "Who do you know?"  "What has been going on?"
- Share information and resources that are available to the community i.e. Pasco Sheriff's Office website (Community Resources)
- Educate the public on the Tip Submission link

Page | 32

- Look for opportunities to discover unreported crimes and potential evidence or valuable witnesses to possible trends.
- Access Central Command to determine if there have been other similar crimes reported in the same general area and look for any similarities, possible leads, or property/evidence that may increase the solvability factors for the crime(s) being investigated.
- Identify location and environmental elements that are consistently present at crime scenes and make recommendations to victims to alter or remove elements that are attractive to criminal activity.

**Supervisory Expectations:**

- Supervisors must manage and direct this process to ensure efficient and proper utilization of this valuable tool. This may often mean returning to an area for follow up after the initial investigation is complete.

# Information Sharing

Inter-agency and intra-agency communication is a crucial component of the Pasco Sheriff's Office's ILP model. The elimination of "information silos" is an important first step and is echoed in the *Intelligence Reform and Terrorism Prevention Act of 2004* (National Counter Terrorism Center, 2004) and the National Criminal Intelligence Sharing Plan (US Department of Justice, 2003). Information silo is a term used throughout many business and governmental settings that refers to management systems incapable of reciprocal operation with other, related information systems. Moreover, it is an attitude found in some organizations that occurs when several departments or groups do not want to share information or knowledge with other individuals in the same company. Information silos are counter-productive to ILP and in stark contrast to our operational approach of "We fight as one."

In addition to breaking down information silos, sharing information allows everyone within the organization to operate with a shared understanding of the criminal environment. Perhaps the most significant asset a law enforcement agency has is human intelligence, or the knowledge line officers gain from the thousands of interactions they have across their various assignments. Every officer possess a different piece of the puzzle to the on-going process of interpreting the criminal environment. Information sharing is about getting this collective knowledge out of officers' heads and into a medium where not just analysts, but every member in the organization can benefit from the information and begin to assemble a holistic understanding of crime in Pasco County. Furthermore, it safeguards against the loss of mission critical information through the transfer, promotion, or retirement of senior officers.

It is therefore incumbent on every member to make a concerted effort to share information regularly as part of a formal and informal process. While sharing information is important, we should never lose sight that there are certain types of information that are sensitive and should remain confidential for officer safety and to protect the integrity of an investigation or source.

**Performance Expectations:**
- On every call for service, investigate and document thoroughly. Once complete, prior to leaving ask the persons interviewed if they have information about any other crime they may want to share about offenders or offenses occurring in the area. (Use judgment when pursuing this opportunity. Victims/witnesses of many crimes may be too emotional to offer information or may feel you are being dismissive of their original complaint.)
- While transporting arrestees to jail, develop a rapport with the arrestee. If he or she has invoked Miranda, do not ask any questions about their crime whatsoever. However, you may ask them if they know of other crimes committed by other people. Document your post-arrest debrief accordingly. Small pieces of information gathered this way has proven to be helpful toward solving crimes.
- Maintain situational awareness of your assigned area. Know the offenders, crime prone places and trends. As you gain information share it on a wide platform with your district and with ILP Analysts. While sharing with one detective is a good start, look for opportunities to share on a broader scale.

**Supervisory Expectations:**
- Time is not on your side! Once a crime of great significance or a trend, pattern or spree has been identified, supervisors are responsible for ensuring the proper stakeholders have the pertinent and necessary information to act accordingly. The swift, intentional notification of oncoming shifts, opposite sides of the schedule, neighboring agencies are crucial to effective communication.
- Sharing the results of successful (or unsuccessful) initiatives can lead to dramatically enhanced efficiency within the agency.
- Supervisors must maintain and must ensure deputies maintain effective situational awareness of crime trends and offenders within their area of responsibility

## Information and Intelligence Sharing Meetings

As discussed, information sharing is a critical component in Intelligence-led Policing and central to the successful cultivation of actionable intelligence. However, meeting for the sake of having a meeting with no clear purpose is both unproductive and inefficient, and contradicts the overarching aims of ILP. This section identifies the core meetings intended to drive our agency's ILP efforts and provide meaning and focus to their administration.

Weekly Meetings

Commander's Briefing – the goal of this meeting is for analysts to provide awareness to the key-decision makers of the crime picture for their area of responsibility. Participants of the meeting include the applicable captain, analysts from the ILP section, and Intelligence Liaison officers. It is the expectation that upon conclusion of the briefing, the commander will have a complete awareness of the type of crime and the key impact players in the district. Performance Expectations: Captains decide on crime priorities. Analysts generate collection requirements and prepare for secondary briefings.

Deconfliction – the purpose of this meeting is to provide a briefing to all stakeholders of the crime picture and identified priorities of the division commander. Participants of the meeting should include supervisors from the respective property crimes, major crimes, and narcotics squads as well as the division commander, ILP analysts, and district intelligence and gang liaison officers. The meeting is an open discussion of crime and offenders intended to break down information silos and provide an opportunity for deconfliction. The resulting intelligence of this meeting provides the basis for the final meeting, which will be aimed at directing the efforts of deputies and detectives. Often times and at the discretion of the commander, the Commander's briefing and deconfliction meetings will be combined.

District Actionable Intelligence Meetings (Mini-AIMs) – the purpose of the meeting is to provide a briefing of the actionable intelligence cultivated over the previous week. Participation is open to all members and attendance is strongly encouraged. Invitations are also extended to surrounding law enforcement agencies, the Department of Juvenile Justice, Department of Corrections, Parole and Probation, County Code Enforcement, and Child Protective Investigators. The meeting provides an opportunity for investigators to learn about the criminal environment, identified priorities, collection requirements, and formulated strategies that should guide their efforts during the course of the week. The meeting allows for open discussion and sharing of information amongst a cross-section of the agency as it pertains to crime trends, hot spots, prolific offenders, and other key players and criminal networks impacting the division. Performance expectations: members are expected to share relevant information to help inform understanding of the criminal environment and develop crime control strategies. Members should use the information gained from the meetings to drive their enforcement actions and act as a collection requirement to cultivate new information to further analysis.

Command Staff – each division commander presents on the current criminal environment and the crime control strategies he or she has employed to have an impact. The briefing informs bureau commanders, the colonel, and Sheriff and provides an opportunity to discuss manpower and resource deployments, agency-wide crime control strategies, and ensure everyone has the resources necessary to continue to be effective at impacting crime.

Monthly Meetings

Command ILP/Network Briefing – the last weekly Command Staff ILP meeting of every month is open to all certified members and surrounding agencies. The purpose of the meeting is two-fold. In addition to serving the purpose of the traditional weekly Command Staff ILP meeting, it provides an opportunity for members around the agency to see firsthand the level of commitment and engagement the command and executive staff have to the philosophy of Intelligence-led Policing. The Intelligence-led Policing Section also provides a brief update on future initiatives, crime control strategies, and the progress of impacting identified criminal networks.

Quarterly Meetings

Quarterly Actionable Intelligence Meeting (Quarterly AIM) – Once a quarter, we gather all components of the agency for a combined actionable intelligence sharing meeting. Invitations are also extended to surrounding law enforcement agencies (local, state and federal), the Department of Juvenile Justice,

Department of Corrections, Parole and Probation, and County Code Enforcement. In addition to information typically shared at the weekly mini-AIMs, the Quarterly AIM provides the opportunity to assess how effective our strategies have been over the previous quarter to see if adjustments need to be made. Also, the revised prolific offender lists and STAR box locations are revealed, updates are provided for the District Top 5 and Targets, and new initiatives are revealed to the agency.

Quarterly Gang Intelligence Sharing – the purpose of this meeting is to share intelligence about the active gang environment in Pasco County. The meeting is a collaboration between ILP's organized crime analysts, the gang detective, the district intelligence detectives, and the gang liaison deputies from both the law enforcement and detention sides of the house. Members look to build out the social networks of the most influential and active criminal gangs in Pasco County as well as plan and develop strategies for interdiction.

Periodic Meetings (As Needed)

Intelligence Fusion Meeting – this meeting is critical to the process of social network analysis. Deputies, detectives, and other members have far more information about impact players and relationships within a criminal network than is contained within a records management system. An intel fusion meeting provides the vessel to allow subject matter experts from around the agency to fact-check an initial sociogram completed via Social Network Analysis and further inform our understanding and future analysis of the criminal network.

**Performance Expectations:**
- When scheduled to attend an intelligence meeting, please bring information to share with the group on cases or persons of interest.

**Supervisory Expectations:**
- The information that goes into these meetings, as well as the products and initiatives that arise from these meetings are key components of a successful ILP program.
- Supervisors should ensure their deputies are prepared to share meaningful, actionable information when attending these meetings.
- Supervisors must provide a mechanism for the deputies attending these meetings to disseminate the information learned to the appropriate stakeholders within their area.
- Supervisors must coordinate with the chain of command to ensure a strategic operational plan is orchestrated from applicable information.

## Intel Reports (formerly Tips)

It is critical that a wide variety of data and information be collected at all levels of the organization. Much of this data and information comes from official records such as CAD events, incident reports, traffic warnings and citations, and field interviews, but this data is not all inclusive and cannot be relied upon alone as a reliable interpretation of the criminal environment. As discussed, it is important for an agency to be able to capture the human intelligence possessed by line-level officers as it relates to

offenders and their surrounding environment. The Pasco Sheriff's Office attempts to accomplish this through Intel Reports.

In our constant quest of scanning and interpreting the criminal environment, members will receive information that does not necessarily warrant an actual offense incident report or belong in the narrative of one. Examples include information received from a citizen about potential offenders of certain crimes in an area or information gained through the post-arrest debriefing of offenders. This information should be submitted in an Intel Report.

Intel reports should be guided by intelligence requirements, investigative needs, and threat identification, and:
- Contain only one topic or discuss a single event when possible
- Should reflect the statements of a single source
- Should document the who, where, and how of crime
- Are not a copy/paste from a report or a field contact and should represent information not contained anywhere else in our systems
- Guard against careless or inadvertent compromise of sensitive sources, collection methods, and law enforcement strategies.

It is important to remember that seemingly innocuous information might become critical in light of further analysis. In addition, when documenting information you received from other sources, it is necessary to indicate a level of confidence in the information provided. Consider determining how the source knows the information. What is the basis of their knowledge? Is it firsthand? Rumor? Who did they hear it from? This helps to put the information in context and assist in prioritizing future action.

Types of information to document:
- Credible allegations of criminal activity on the part of individuals or organizational entities
- Descriptions of or changes in traditional modus operandi (MO) employed in the conduct of specified criminal activity, either by specific suspects or in general
- Associations between known or suspected criminals and their social networks
- Associations between known or suspected criminals and organizational entities
- Locations frequented by known or suspected criminals
- Surveillance of individuals known to be connected to or suspected of criminal activity

Once Intel Reports are submitted, the Real Time Crime Center will review the report, provide additional analysis if necessary, and route the report to all appropriate areas within the agency for the purpose of providing situational awareness. The information will then be stored in a database for future use. If the report has current investigative value or relates to a specific investigation, it will be forwarded to the appropriate unit for follow-up. Members have access to the Intel Report database for investigative purposes.

Intel Report submissions are only one of many ways to show engagement in Intelligence-led Policing and the emphasis should remain on quality, not quantity. They should not be submitted in place of an

incident report or in addition to an FIR. Deputies should not use the Intel Report program as a replacement for taking immediate action or completing an offense incident report. Furthermore, supervisors and commanders should not rely on the number of tips submitted to evaluate a member's engagement in ILP.

Example of a Good Intel Report:
*"While investigating a noise complaint at 123 Elm Street, the resident, James Smith, told me that his neighbor at 125 Elm Street, John Jones, approx age 35, has been bragging about all the stolen Ipads he has. Smith said Jones has even offered to sell him some iPads a few months ago."*

Example of an Intel Report with little value:
*"An anonymous subject approached me at 7-11 at Moog and US 19 and told me that a guy named Tommy is dealing drugs in the area."*

# Community Engagement

Community Engagement is just as, if not even more critical in Intelligence-led Policing as it is in Community Policing. Crime is a societal issue, one that law enforcement and the criminal justice system cannot tackle alone. In order to have a significant impact on crime, we have to establish a strong bond and foster trust between the Pasco Sheriff's Office and our citizens.

## Public Information Officers

Having an open and transparent agency is the primary method for building trust and a strong relationship between the Sheriff's Office and the citizens we have sworn to serve and protect. To accomplish this, the Sheriff as assembled a robust public information program with policies to ensure transparent and accountable to our citizens. The Public Information Officers send information daily about major incidents, initiatives, and investigations to inform the public of the crime in Pasco. They maintain the agency's Facebook, Twitter, Instagram, and other social media platform accounts to promote awareness. Fostering this great relationship with our citizens sets the state for information sharing and collaboration to help us accomplish our mutual goal of making Pasco County the safest place to live.

## Performance Expectations:
- Help the PIO office by sharing information about the positive interactions we have with the public on a daily basis, major incidents and arrests, and enlist the public's help in solving your cases or locating offenders and missing persons. When possible, send photographs for visual effect.

## Community Meetings

Developing rapport with, and informing, the public is a valuable tool in an intelligence-led policing environment. An effective way to accomplish this is to meet with the public in both formal and informal

settings. Community meetings can be large, pre-planned organized gatherings of hundreds of people or can be as simple as a handful of concerned residents meeting in a living room.

Traditionally, members have viewed this as an activity to be coordinated by personnel assigned exclusively to a crime prevention function and, in many instances; we have waited to be invited to such events. However, informal and formal community meetings are a quick and effective way for patrol deputies and detectives to communicate messages to the public about their communities and to receive information and feedback from the citizens based on how they perceive their community.

When a member determines a community meeting may be warranted, he or she should coordinate with their supervisor as well as the Community Relations Section to arrange the most appropriate venue, format and overall value before committing to such an effort.

**Performance Expectations:**
- Look for crime patterns and trends that are impacting certain specific areas or a particular demographic component of our community. Once identified, look for civic associations, professional groups, etc., that are comprised of those members who would at least be open to hosting a meeting. Coordinate with your supervisor to include the district commander.

**Supervisory Expectations:**
- Informing the public and reducing fear are responsibilities supervisors must consider or paramount importance.
- Supervisors should not wait to be assigned community meetings. Rather, supervisors should seek opportunities to engage the public in meaningful and relevant dialogue.
- Meetings can be elaborate agency-wide events or can simply be a handful of tenants in a shopping center or residents in an affected neighborhood. Often, the public is reluctant to request such meetings. Therefore, it is incumbent on deputies and supervisors to be assertive toward this goal.

## Public-Private Partnerships

Just as the criminals are expanding their social networks to accomplish their illicit goals, law enforcement needs to take on a more networked approach to our goal of public safety. With limited resources, we cannot combat crime and terrorism alone. In addition, the multitude of available community resources can help rehabilitate some offenders and provide solutions to problems that fall outside of the realm of law enforcement's expertise. Enlisting the help of the private sector, providing training on threat identification, and capitalizing on the services each has to offer can act as a force multiplier for law enforcement and translate to a cost savings for tax payers. Examples of public sector partners include area hospitals, mental health service providers, utility companies, and large attractions such as the Wiregrass Mall, Tampa Bay Premium Outlets, and Florida Hospital Center Ice. In addition, residential community development districts (CDDs) for the many new subdivisions around the county share a common goal of ensuring the safety of their residents. As a result, many employ security guards, both part-time and around the clock, pay for contract deputies, or look to partner by providing video

surveillance feeds and data from license plate readers directly back to the Sheriff's Office. Also, allowing businesses to share camera feeds directly to our Real Time Crime Center can provide real-time intelligence in the event of a crime in progress at those locations. The best thing – all of these resources come at no-cost to the Sheriff's Office.

**Citizen Crime Tips**

A strong relationship between the Pasco Sheriff's Office and our community significantly increases our ability to interpret the criminal environment and solve crime. PSO has a toll free tip line and provides citizens with the ability to submit tips electronically through our public website. In addition, PIOs and the RTCC monitor comments on our social media accounts for viable leads and information that can help us solve investigations and impact crime.

# Homeland Security

First responders are uniquely positioned to identify suspicious activity associated with terrorism due to the nature of their daily duties. With over 800,000 law enforcement officers and 1.2 million firefighters, first responders serve as a force multiplier in the mission to enhance national security.

The identification of suspicious activity or behavior has led to the disruption of terrorist attacks, the arrest of individuals intending to do harm, and the corroborations of existing intelligence. The ability to identify and understand current tactics, techniques, procedures, indicators, and behaviors of terrorists and terrorist organizations will enhance our ability to detect, deter, or disrupt terrorist plots and attacks.

A critical component in fulfilling our role in national security is the creation of enhanced intelligence sharing capabilities.  PSO has created sharing capabilities both internally and externally, as it relates to immediate reporting and vetting of suspicious activity.

- Suspicious activity should be reported to the ILP-Section immediately
- ILP will preliminarily vet all SAR reporting within 24 hours to determine a nexus to Terrorism or other Criminal Activities.
- If the reporting impacts another jurisdiction PSO will immediately notify the impacted agency and discuss coordination, deconfliction, investigation, and vetting procedures with the impacted agency (In the event another jurisdiction is impacted, PSO will identify any links to Pasco or surrounding counties).
- PSO will leverage our JTTF Task Force Officer to share information with our federal law enforcement partners for further vetting.

**Performance Expectations**
- Monitor the Virtual Intelligence Center and Situational Awareness Bulletins to maintain awareness about the threat picture impacting the agency.

- Notify your supervisor and the RTCC or the on-call ILP analyst if you respond to a suspicious incident with the potential to impact homeland security.

**Tampa Bay Regional Intelligence Center (TBRIC)**

The mission of the TBRIC is to protect and serve the citizens, visitors, infrastructure, and economy of the West Central Florida region by lawfully collecting and analyzing information from all available sources, to produce and disseminate actionable intelligence, and to provide added value to imminent threat reporting in support of regional efforts to detect and mitigate criminal and terrorist activity, while also ensuring the highest regard for and protection of the civil liberties of our citizens.

The TBRIC will serve as an intelligence clearinghouse to assist in combatting regional threats and criminal activity, which may impact the Tampa Bay area. The TBRIC will enhance regional information sharing and provide additional resources to PSO members when investigating criminal activity with a regional or multi-jurisdictional nexus. In addition, the TBRIC will assist in identifying current crime trends and patterns to include tactics, techniques, and procedures used by terrorist/terrorist organizations.

# Section 3: Intelligence

## What is Intelligence?

In an Intelligence-led agency, it is critical everyone has a shared understanding of what intelligence is and what it's not. In addition, all members should know how intelligence is cultivated and how it can be used to inform their daily decisions. This section looks to accomplish this by relating the academic terms and concepts with actual processes practiced throughout our agency.

**Key definitions:**

**Data** are the simplest observations or measurements we can make about crime, calls for service, or law enforcement action in general. Think of data as statistical information. Data form the basis for future analysis and it is critical that law enforcement records management systems be set up to collect as detailed of data as possible. Examples of data include the date and time of a crime or an arrest, how many units get dispatched to a call for service, what property is stolen, who is involved in incidents, weapons used, suspects of crimes, and descriptions of modus operandi.

**Information** takes data to the next level by providing meaning and context, or explaining how the data relates to the overall policing environment. For example, narratives in police reports provide additional meaning to the individualized data (who, what, when, and where) by painting a picture of how all of those pieces of data came together to formulate a criminal offense. Another example of information comes from Intel Reports submitted by our members and crime tips from our citizens. Although they provide additional insight into the overall criminal environment and can help identify or prioritize analytical requirements, most fall short of being actual intelligence because they lack the analysis required to inform decisions. It is critical that information be assessed by deputies as to the reliability of the source and validity of the content so unreliable and inaccurate data, or data that cannot be confirmed, is not relied upon during analysis.

**Intelligence** is the resulting product of the analysis of data and information. Intelligence requires an analyst take the data and information, provide understanding, relate it to the priorities of the agency, and present it in a manner to inform decisions and generate action. Intelligence is not what is collected, it is what is produced after data and information are evaluated and analyzed. The most simplistic definition of intelligence is:

DATA/INFORMATION + ANALYSIS = INTELLIGENCE

An **intelligence gap** is a void in information as it relates to an identified problem under analysis. Essentially, it is missing information a crime analyst needs to be able to provide a more complete understanding of a crime problem so an appropriate response can be crafted. Intelligence gaps could relate to a location, an offense, an offender, or a criminal group or organization.

A **collection requirement** is a product intended to generate action in an attempt to answer an intelligence gap. A collection requirement will identify the problem under analysis and what information

is needed. This acts as a trigger for deputies to fill the intelligence gap through their role as gatherers of information.

## Levels of Intelligence:

Intelligence products can take many shapes, but will typically fall into one of three different levels of intelligence: tactical, operational, or strategic.

Tactical intelligence is not completely what it sounds like as in it is not just intended to support SWAT operations. Although tactical-level intelligence can inform SWAT activities, it is way more than that. Tactical intelligence supports all front-line operations and case-specific investigations. For example, an analyst assisting with a wiretap to support a complex Vice and Narcotics investigation and using the information gained to develop additional suspects, locations, drug sources, and investigative steps is generating tactical intelligence. In addition, the Real Time Crime Center produces tactical-level intelligence in support of patrol's response to citizen generated calls for service and their preliminary investigations. In the SWAT example, a tactical-level product may provide team leaders with a floor plan of the target location and capitalize on sources who have been in the location recently or BWC video from deputies recently in the location to identify where other objects are to assist leaders in formulating an operations plan.

Operational intelligence informs mid-level commanders of the criminal environment, aids in formulating crime control strategies, and assists in manpower and resource deployment to achieve operational objectives. Operational level intelligence takes what is learned from tactical-level intelligence and activities and applies it to the larger picture. Examples of operational intelligence include the Daily Products, Weekly Actionable Intelligence Meetings (and their related slides), and Central Command. These products are intended to generate action aimed at reducing broader categories of crime (i.e our Focused Offenses) and assist commanders in making decisions on where they should deploy manpower (such as patrol, detectives, or STAR) or resources (such as message boards, speed trailers, door hangers, etc).

Strategic intelligence informs executive staff to assist with planning, formulating agency-wide strategies, developing policies and procedures, and agency-wide decisions on staffing, resource acquisition, and budgeting. Examples include a staffing study analyzing past calls for service and expected population growth to determine the need for additional deputies projected over the next five years, a manpower deployment study to determine the best times and locations to utilize a relief shift, and projecting inmate population growth to determine capacity implications and requirements for additional space.

## Sources of Intelligence:

It is important to understand the following sources are typically not intelligence in and of themselves. They are great sources of data and information that can be used to cultivate intelligence, and therefore, deputies should be familiar with each as a tool to aid analysts with accurately interpreting the criminal environment.

**Field Interview Reports (FIR)**

An integral part of solving crime is determining persons of interest in a particular area. An effective tool in doing so is the FIR. Often deputies use the FIR to document suspicious persons or vehicles. However, there is also value in using an FIR to document contact with nonsuspicious persons in a particular area at a particular time as a means of later contacting those persons as potential witnesses.

FIRs should be used to document the results of a consensual encounter or investigative stop during the course of your proactive patrols. They differ from Intel Reports because they are used to document police action rather than information or intelligence received by a deputy.

FIR Example: A neighborhood has been experiencing a high number of auto burglaries from 0100-0300 hours. While on patrol in that neighborhood during those times, you locate a male walking down the street who lives a few streets away. He states he is merely out for a walk. A quick criminal history indicates he has prior arrests for auto burglary. An FIR is completed to document the encounter.

Intel Report Example: Using the same scenario, while on patrol in the same neighborhood at the same time a resident exits her house and flags you down to tell you she has seen a white male on a red bike riding through the neighborhood every night between 0100-0300. A tip should be completed (And possibly an Area Watch.)

**Performance Expectations:**

- Quality is far more important than quantity.
- Document the basis of the FIR.

**Enhanced Interviews**

When engaging victims, witnesses and suspects, members should make every opportunity to explore learning about the criminal environment. For example: when transporting a subject to jail on a drug charge, the deputy should ask the subject about other crimes they may be aware of and willing to discuss. A part of the interview process with offenders should also include questioning the offender about victim selection. For example, "Why did you choose 123 Elm Street to burglarize instead of 125 Elm Street?" or "Why did you choose this particular neighborhood?"  As always, deputies should be mindful of Miranda concerns and not engage suspects about the crime for which they are suspected of committing once the suspect has invoked his or her rights.

**Post-Arrest Debriefings**

Criminals can be a great source of critical information about the criminal environment. Post arrest, an offender may not be willing to speak about the crime he or she was arrested for, but often times is willing to talk about crimes others have committed. Through post-arrest offender debriefings, deputies are encouraged to attempt to collect any information an arrestee knows about crime and criminals in the community. Remember, the purpose of the post-arrest debrief is to obtain information about the criminal environment (people, places, and groups; MO; etc.); not the incident for which the offender was arrested. Deputies should attempt to debrief separately from interviews related to the case, and

just because an offender has invoked Miranda doesn't mean he or she cannot still provide information about other crimes committed by other offenders. Be cautious of the motive of the arrestee and attempt to corroborate information provided through other sources, if possible. The results of post-arrest debriefings should be submitted through the Intel Report process described in section 2. Information from a post-arrest debrief should be treated as criminal intelligence information and should not be placed in the incident or arrest report.

### Jail Interviews

Review the jail logs for those who have recently been arrested. Based on a predetermined formula that should include charges for, or a history of, the "Big Four", respond to the jail to debrief the subject(s) on crimes aside from those for which he or she was arrested, unless they are willing to discuss the crimes they have committed. Approach the interview from an intelligence gathering mindset, not necessarily an attempt to enhance the case for which the subject is arrested.

### Knock and Talks

Knock and Talks are employed in instances where there are allegations, preferably supported by other credible information, that a location, usually a residence, houses contraband. Typically, these are locations that detectives do not have informants available to purchase contraband, and the only logical method to determine if the contraband exists is to knock on the door and attempt to talk to those inside. The goal is to obtain consent to search from a resident with staying in the residence in order to find the contraband.

**Performance Expectations:**

- Deputies seeking to utilize a knock and talk should coordinate with the respective investigative unit as a means of de-confliction.
- Identify target residence and corroborate location with potential offenders.
- Conduct wants and warrants check on people suspected of living / being at the residence.
- Requires two deputies at a minimum: one deputy to search and the other to monitor for officer safety.
- Although most deputies will have operational BWCs, consider the necessity of obtaining written consent along with the verbal consent that should be captured by the BWC.
- Considerations need to be made with reference to a person's authority to authorize consent, the time of day/night, number of deputies present when consent is authorized, and offenders' ability to withdraw consent, the restricting of offender movements and when limited consent is given.  For these considerations, reference the various case laws associated with the circumstance.

**Supervisory Expectations:**

- Supervisors must assume control and responsibility over this process.
- Ensure proper notifications to appropriate units and the chain of command.
- Enact safeguards to prevent redundant efforts and to ensure proper de-confliction protocol are followed.

**Surveillance**

Surveillance may come in the form of mobile, stationary, electronic, aerial or foot surveillance.  A pre-operative briefing should be conducted with all deputies involved to inform them of their expected duties and the goals of the operation. During this time**,** the lead deputy will communicate what the specified radio channel will be, who the target of the surveillance is and any other information pertinent to the target as well as the location or destination to be surveilled.  Consider the utilization of the unmarked /undercover vehicle assigned to each district.

**Cultivating Informants**

Informants are persons who wish to share information on crimes and offenders. Confidential informants (CI's) are vital to many types of investigations. The motives for becoming an informant can include financial gain, revenge, fear, reform, or expectation of a lighter sentence. The development and use of informants are largely discretionary, but the agency member must exercise the utmost care in the control of the informant. Informants are cultivated by several methods: telephone interviews, tips, arrests, intra and interagency employees. The informant process is vitally important to areas such as the Narcotics Section who oversee the confidential informant program. To determine the usefulness and reliability of an informant, the informant has to be fully debriefed to determine what criminal information he or she is able to provide.  After attempting to verify the validity of their information in order to help solidify their credibility, they have to be assessed in light of everything the detective knows, to include their motivation for wanting to be an informant; they have to be appropriately documented; and a complete background check needs to be completed. The confidential informant process is very valuable to the intelligence process and is a highly sensitive aspect of law enforcement. However, there are significant liabilities and legal guidelines associated with the use of Confidential Informants.  Prior to taking any action regarding cultivating informants, members should consult their supervisor and be fully knowledgeable of and compliant with Directive LED 680.2, Informants in Criminal Investigations.

**Performance Expectations:**
- Not every person providing helpful information or acting as a confidential source is a confidential informant.
- Routinely seek information from and encourage the public to provide information on crimes and criminals.
- Members of the public wishing to be compensated should be referred to the appropriate investigative unit.
- No promises should be made as to compensation.

# Evaluating Intelligence

Intelligence, and even the information used to develop it, should be assessed and evaluated in two ways: source reliability and content validity.

Source reliability refers to the reliability of the source providing the information. The member submitting the information should determine if the source is:

Page | 46

    A. Reliable: reliability of the source is unquestioned or has been well tested in the past.
    B. Usually reliable: the source can usually be relied upon.
    C. Unreliable: reliability of the source has been sporadic in the past.
    D. Unknown: reliability of the source cannot be judged.

Content validity refers to the accuracy or truthfulness of the information submitted. The member submitting the information should determine if the content is:

1. Confirmed: information has been corroborated by the investigator or another reliable source.
2. Probable: information is consistent with past accounts.
3. Doubtful: information is inconsistent with past accounts.
4. Cannot be judged: information cannot be judged.

A combination of source reliability "unreliable" or "unknown" and content validity "doubtful" or "cannot be judged" should not be used to cultivate intelligence or inform the basis of any law enforcement action.

## The Intelligence Cycle

The intelligence cycle is the process of developing unrefined data into polished intelligence for the use of command staff. While there are many versions of the intelligence cycle, the cycle articulated by the FBI best matches the philosophy and model of the Pasco Sheriff's Office. The intelligence cycle consists of the six steps, described below. The above graph shows the circular nature of this process, although movement between the steps is fluid. Intelligence uncovered at one step may require going back to an earlier step before moving forward.



**Requirements**

Requirements are identified information needs—what we must know to apprehend criminals, disrupt criminal patterns and prevent crime. Intelligence collection requirements are derived from many sources such as a detective requesting more information from a neighborhood experiencing daytime burglaries or a deputy requesting FIRs on any person riding a blue bicycle in a certain location on a certain day of week.

**Performance Expectations:**

- Relative to the "Offender, Place, Victim" try to determine what is causing problems and what we do not know that we need to know. Go beyond just "Who is doing the crime."

**Supervisory Expectations:**

- Supervisors must lead this process.
- Determine what you don't know that you need to know work closely with the ILP Section to observe year over year, month over month trends and patterns.

Through enhanced communications, ensure that a duplication of efforts do not occur such as two platoons working on obtaining the same information.

**Planning and Direction**

Planning and Direction is management of the entire effort, from identifying the need for information to delivering an intelligence product to a consumer. This step also is responsive to the end of the cycle because current and finished intelligence, which supports decision-making, generates new requirements. In the Pasco Sheriff's Office ILP environment, planning and direction is the responsibility of command staff acting on the needs of the county, crime trends and data provided by the ILP Section.

**Supervisory Expectations:**
- Though a top-down approach, supervisors below the command staff ranks must still plan accordingly.
- Supervisors should regularly provide command staff with ideas to address emerging and existing threats.
- Supervisors must remain abreast and knowledgeable of successful former initiatives and response plans for a variety of crime situations to help operationalize current command staff initiatives.

**Collection**

Collection is the gathering of raw information based on requirements. Activities such as interviews, technical and physical surveillances, tip submissions, FIRs, and developing positive work relationships with community groups are examples of collection of intelligence.

Page | 48

**Performance Expectations:**

- Review the collection requirements and develop a strategy and tactics to gather and submit the information.
- Gathering information goes beyond generating large volumes of tip submissions and FIRs. One high quality tip or FIR is more valuable than hundreds of tips of limited value.
- Focus on developing rapport with citizens in crime prone areas.
- Solicit information from inmates during booking and classification processes.
- Solicit information from Pasco County residents who call into the jail by asking if they are aware of any illegal activities going on in their neighborhoods.
- Document and photograph scars, marks, and tattoos into RMS for use in investigative purposes.
- Document as much information as possible into RMS during arrest and booking while assuring a master name record that is unique without any duplication.
- Use ILO and IPS to regularly solicit information.
- Awareness of detention deputies to listen for discussions between inmates that may spur additional conversations and information.

**Supervisory Expectations:**
- Supervisors need to play a leading role in the collection process by placing a great emphasis on quality of information gathered.
- Develop a strategy for deputies to access and develop rapport with community members in the areas they serve.
- Ensure deputies are always seeking new sources of information to support the intelligence cycle.

## Processing and Exploitation
Processing and Exploitation involves converting the vast amount of information collected into a form usable by analysts. Processing includes the entering of raw data into databases where it can be exploited for use in the analysis process.

## Analysis and Production
Analysis and Production is the conversion of raw information into intelligence. It includes integrating, evaluating, and analyzing available data for the production of intelligence products. The information's reliability, validity, and relevance is evaluated and weighed. The information is logically integrated, put in context, and used to produce intelligence. This includes both "raw" and finished intelligence. Raw intelligence is often referred to as "the dots"--individual pieces of information disseminated individually. Finished intelligence reports "connect the dots" by putting information in context and drawing conclusions about its implications.

## Dissemination
Dissemination is the last step and involves the distribution of raw or finished intelligence to the consumers. It takes the form of intelligence bulletins, BOLOs, situational awareness bulletins, etc. This also includes presentations to the command staff. The command staff makes decisions—operational,

strategic, and policy—based on the information. These decisions may lead to more intelligence requirements, thus continuing the intelligence cycle.

## Legal Considerations

Collecting quality information is a key component of ILP. However, it must be collected and maintained in strict compliance of federal law as outlined in 28 Code of Federal Regulations Part 23. 28 CFR Part 23 ensures that the submission/collection, use, access, storage, and dissemination of criminal intelligence information by intelligence projects and member or participating law enforcement and homeland security agencies conform to sound practices that protect the privacy and constitutional rights of individuals and organizations.

- All projects shall adopt procedures to assure that all information which is retained by a project has relevancy and importance.
- Such procedures shall provide for the periodic review of information and the destruction of any information which is misleading, obsolete or otherwise unreliable.
- Information retained in the system must be reviewed and validated for continuing compliance with system submission criteria before the expiration of its retention period, which in no event shall be longer than five (5) years.
- (a) A project shall collect and maintain criminal intelligence information concerning an individual only if there is reasonable suspicion that the individual is involved in criminal conduct or activity and the information is relevant to that criminal conduct or activity.
- (b) A project shall not collect or maintain criminal intelligence information about the political, religious or social views, associations, or activities of any individual or any group, association, corporation, business, partnership, or other organization unless such information directly relates to criminal conduct or activity and there is reasonable suspicion that the subject of the information is or may be involved in criminal conduct or activity.

**Supervisory Expectations:**
- Supervisors must ensure deputies are compliant with 28 CFR 23 by governing their actions and focusing only on those people and activities for which there is criminal predicate.

## PSO Intelligence Products

An **intelligence product** is the vessel that allows analysts to convey the results of their research and analysis to decision-makers, operators, or other audience. It represents the dissemination leg of the intelligence cycle and is often the impetus for additional inquiry or analysis. A product can be a templated set of information or customized to meet the unique needs of the requestor and can be completed periodically or on-demand to satisfy tactical, operational, or strategic objectives.

Page | 50

**Periodic Intelligence Products**

The **Unified Report** is completed daily and consists of a brief summary of major incidents and arrests from all divisions of the agency and from the New Port Richey, Port Richey, Dade City, Zephyrhills, and Tarpon Springs police departments. The purpose of the Unified Report is to bring situational awareness of major incidents, arrests, and crime sprees amongst all of the law enforcement agencies in Pasco County.

**Daily Intelligence Briefs**, commonly referred to as a Daily Report, are completed every weekday by the District Analysts. Monday's report covers Friday through Sunday. The Daily Report highlights any crime sprees, patterns, or trends of ILP Focused Offenses, updates to priority offenders and their contacts with deputies and involvements in PSO records, upcoming jail and prison releases of offenders who have a history of committing Big 4 and/or violent crimes, and awareness of criminal activity in surrounding counties, around the state, and across the country that may have an impact on Pasco County. The Daily Report also includes a table identifying all Priority Offenses reported so deputies and supervisors can conduct additional research if necessary.

A weekly **Actionable Intelligence** product is completed by the district analysts and court services analyst. Relevant work from the Juvenile Investigations Analyst and Organized Crime Analyst are provided to the appropriate analyst for inclusion in their weekly Actionable Intelligence product. For law enforcement, the weekly Actionable Intelligence product compares weekly numbers of priority offenses reported over the past 4 weeks to allow commanders to gauge the success of responses, initiatives, and strategies. Analysts also highlight sprees, patterns, and trends, activity in the STAR box, and provide updates on prolific offenders, the Top 5 and their associated networks, and the district target. The Court Services weekly Actionable Intelligence product reviews critical incident reports from the jail, identifies any threat concerns, and awareness of inmates within the facility and their social networks who are of critical interest to the patrol districts (District Focus). The products are intended to influence both operational and tactical-level decisions for the week. For example, in the jail, the product is intended to bring awareness of certain inmates and intelligence collection requirements so detention deputies can solicit information to fill intelligence gaps throughout the course of the week and influence actions of the Inner Perimeter Security teams. The law enforcement product assists district commanders in allocating resources to areas of emerging crime and develop enforcement strategies, helps deputies focus proactive patrol efforts and target key impact offenders, informs strategy for the STAR teams, and identifies criminal investigations for follow-up by detectives.

**On-Demand Intelligence Products**

On-demand intelligence products are completed in response to a request from an agency member. These products are typically requested generally as a "work-up"; however, this section is intended to outline the various products available to allow members to more specifically the right information responsive to their needs. And, in order for this to happen, both the requestor and analyst must understand the answer to the following question:

> # What is the investigative or operational objective behind the analysis? In other words, what do you intend to get out of the product?

**Target Profile:**

A Target profile can be on an individual or a location. It will include all available biographical information on a problem person, group, or place to include:

Person/Group

- Last known addresses
- Associates
- Relatives
- Frequented locations
- Social media profiles
- Employment (wage-and-hour)
- School attendance
- Criminal history (arrests and convictions)
- Probation status and stipulations
- DL status and history
- Tip History

Location

- Property owner information
- Utilities information
- Persons known to frequent location
- CAD history
- RMS history
- Tips history

**Associates Profile:**

An Associates Profile will include basic information on an identified individual and his or her immediate associates to include addresses, prior criminal activity, and associate identifiers (i.e. criminal associate, friend, family, or codefendant). This is not a Target Profile on each of the individuals; rather, it is a "Baseball Card" with minor stats to assist in further investigation.

**Network Profile:**

A network profile identifies the most central and influential people to a criminal network through the use of Social Network Analysis. It is intended to inform strategy aimed at deterring, disrupting, or dismantling the criminal activities of a criminal network or organization.

**Ego-Network Profile:**

An ego-network profile analyzes the social network of an identified individual rather than looking at an entire criminal network or organization. Depending on your investigative objective, the analyst will provide custom metrics to inform your investigation. An ego-network profile differs from an associates profile by providing analysis into how identified associates may influence the actions of the target and which associates to focus on to accomplish your mission. An associate profile just provides an overview of known associates to a target and some basic biographical information of the associate.

**Social Media Profile:**

Social Media Profiles will include an analysis of all available open source social media information on a specific person or organization. Please identify any specific information you may be looking for.

**Sentencing Profile:**

A sentencing profile is designed to demonstrate to the State Attorney's Office the impact a defendant who has been convicted of a crime has had on the Sheriff's Office and our citizens. The profile should be requested for key impact players before their sentencing hearing. The product will hopefully inform the prosecutor of who could be called to testify at the sentencing hearing to influence decisions by the judge as to the length of sentence the defendant will receive.

**Threat Analysis and Risk Assessment**

Threat analysis refers to an assessment related to potential or actual harm to people, events, or critical infrastructure. In addition, the assessment includes the probability of it occurring and the consequences or impact on the community if the threat was actually carried out.

ILP will conduct a threat analysis when a threat is made toward people, events, or critical infrastructure. A Threat Analysis and Risk Assessment product will attempt to identify the following.

- Identify the Threat
  - Identity of Subject Making the Threat

- o Capabilities
- o Intent
- Identify the Target
    - o Identify Who and/or what is in danger (Public, Police, Fire Rescue, Additional First Responders)
    - o Identify the Risks Associated with the Threat
    - o What is the likelihood of the threat being carried out?
    - o What would the severity be if the threat continued?
- Response Measures (Operational Capabilities if the Threat is Immanent)
    - o Patrol Response
    - o Special Operations Response
    - o PIO Response

**High Return Location Analysis:**

Code Enforcement Corporals sit on the Pasco County High Return Team (HRT), a countywide taskforce comprised of various governmental entities (code enforcement, Fire/Rescue, permitting, etc) who meet to evaluate the impact of nuisance locations around the county. The team identifies priorities for the County Attorney's Office's nuisance abatement litigation. A High Return Location analysis informs the County Attorney's Office of the impact an identified address has had on crime and sheriff's office resources as compared to similar locations nearby. High Return Location Analysis is the product of the analysis of data from RMS, CAD, and Tipsoft as well as any relevant open sources.

**Jail Technologies Exploitation:**

This product is intended to summarize the activity and communications an identified inmate has had while detained in the Pasco County Detention Center.

**Crime Analysis:**

Crime analysis looks to identify links between reported incidents in an identified area. The product will also attempt to identify potential persons of interest or priority offenders in the area to assist in developing enforcement action.

**Wage and Hour:**

A wage and hour report identifies quarterly earnings and associated employer for an identified individual. The earnings are based on what the employer reports to the government. In order to request a wage and hour, you must have a criminal predicate. Wage and Hour reports are useful in identifying historical employment and assisting in proving ill-gotten gains.

**Call Data Record Analysis:**

Call data record (CDR) analysis is a product that analyzes the phone call data received from a subpoena, phone toll, tower dump, or data extract from a cell phone. The analysis includes a summary of

incoming/outgoing calls and text messages and attempts to identify the owners of numbers. Location metadata may be included if captured.

**Financial Record Analysis:**

Financial record analysis provides a summary of income and expenditures for bank statements provided and attempts to follow the money between accounts.

**LInX Search:**

The Southeast Law Enforcement Information Exchange (LInX) provides access to records from law enforcement agencies all over the United States. Information cannot be included in case files and must requested from the providing agency to be used officially in your investigations.

**Vigilant LEARN – License Plate Recognition**

Vigilant's Law Enforcement Archival and Reporting Network (LEARN) holds all of the data from our license plate readers (LPRs), the LPRs from all law enforcement agencies on Vigilant's network, and the over 5 billion license plate reads from private companies such as tow trucks and repossession agents. Data from this system may help you in determining where a vehicle was located at various times. Alerts can also be placed on license plates for investigative purposes.

**Facial Recognition**

Facial recognition attempts to identify unknown victims or offenders.

**Photo Pack**

Photographic line-ups are completed through a contracted company, Facelogics. In the event you need a photo pack immediately, contact the RTCC or the respective district analyst.

**Immediate Notification Requests:**

Placed on people or locations for investigative purposes. If law enforcement contact is made with an individual or location, you will be notified.

**BOLOs/Bulletins:**

- Officer Safety – used to provide critical information that could impact the safety of our members or law enforcement in surrounding jurisdictions. An officer safety designation can be added to any BOLO or bulletin.
- Situational Awareness – used to provide critical information about crime trends, sprees, or patterns from Pasco or surrounding jurisdictions, modus operandi, relevant intelligence from outside sources and agencies, or any other general information impacting our operations.
- Attempt to Identify – used to solicit the assistance of agency members and/or surrounding agencies in identifying an unknown person(s) or vehicle(s) depicted in a photograph or video surveillance.

- Attempt to Locate – can be used to notify agency members and/or surrounding agencies of an active PC/Warrant or need to locate a missing person, person of interest, subject wanted for questioning, victim, or witness.

**Attempt to Locate:**

An attempt to locate report may be requested on a person, place, vehicle, or significant item of interest. (Note: Significant Items of interest must be indefinable and traceable i.e. stolen property w/serial numbers)

- **Person:** Attempt to locate on a person will include current addresses, prior addresses; work addresses, Place of Birth, and any known associates.
- **Place:** Residential or Business (Owner, Primary Business, Year of Inception, Code Violations, RMS History)
- **Vehicle:** Attempt to locate a vehicle  - Make, Model, Color, Owner(s), Previous Owner(s)
- **Significant Items of Interest:** Trackable items with serial numbers or physical description

**Custom Product:**

It is impossible to anticipate every analytical requirement. To have a custom analytical product created, contact your analyst to discuss your crime problem and investigative objectives.

**Important:** All products marked Law Enforcement Sensitive or Confidential are not for public release and should not be placed into Records, your investigative case file, or released outside of our agency without permission from Legal or the Intelligence-led Policing Section.

# Virtual Intelligence Center

The Virtual Intelligence Center is a compilation of all of the Actionable Intelligence Products generated or received by the ILP Section. PSO Intelligence Products, with the exception of BOLOs and Bulletins which can be accessed via Central Command or the Intranet homepage, are all located under the PSO Actionable Intelligence link. The Strategic Intelligence section houses studies and assessments conducted by the Strategic Analysts. This section also contains the latest definitions for our priority offenders. Situational Awareness contains products and information from other local, state, and federal law enforcement agencies. Terrorism contains products on the most recent trends, tactics, and strategies used by extremist groups around the world. The Drug, Gang, and Cybercrime sections contain relevant intelligence products in the respective areas. The Virtual Intelligence Center also provides a lists of links to investigative databases, references and resources, and the most recent version of the ILP Manual. The Virtual Intelligence Center can be accessed via SharePoint or the following link:

Virtual Intelligence Center:        https://pascosheriff.sharepoint.com/Intelligence-led%20Policing



**Performance Expectations:**

- Review the Actionable Intelligence thoroughly upon receipt and seek opportunities to gather information/intelligence needed.
- Develop credible sources in and affecting your respective area of responsibility.
- Submit valuable Intel Reports and FIRs.

# Section Four:  What's Your Role?

## Command Staff

As previously discussed, Intelligence-led Policing presents a "top down" approach to decision making for law enforcement agencies. However, this should not be implied to mean that input, ideas, and strategies at every level of the agency are not welcomed and encouraged. "Top down" in this context simply means that the authority to make manpower and resource allocation decisions, prioritize crime problems, and select which crime control strategies to employ to impact crime rests with the command staff. Commanders should be actively receiving relevant, analyzed data from analysts and other members throughout the agency to help develop a thorough understanding of the criminal environment and existing or emerging trends as a means of allocating resources and determining priorities. Commanders need to remain engaged with analysts, intelligence liaison officers, and investigative section supervisors who will assist with interpreting the criminal environment. Members of the command staff should remain abreast of the latest research in criminology and effective tactics being utilized by other law enforcement agencies around the world to assist in selecting effective strategies and initiatives to use here. It is important to keep in mind that as a commander, there is a need to be consistently innovative. Even when you find an initiative works, start developing the next. Don't wait for it to become stale. That is how we keep the criminals guessing, and how we stop responding to crime and start preventing crime. Commanders should also look for ways to more efficiently handle the most common tasks faced by officers and screen out unnecessary assignments to allow for more proactive targeted and strategic activity.

**Performance Expectations:**
- Daily discussions with analysts, ILOs
- Monitor reported crime for sprees, patterns, and trends
- Research and Develop innovative crime control strategies
- Engage supervisors and deputies to ensure understanding of ILP and our strategies

## Intelligence-led Policing Division

The Intelligence-led Policing Division (ILP) informs critical decisions across all components of the Pasco Sheriff's Office through the cultivation and dissemination of strategic, operational, and tactical intelligence. The ILP Division consists of 29 members, including a director, manager, four detectives, and 23 analysts in varying levels and roles.

Two strategic analysts (a Mid-level Strategic Analyst and a Senior Strategic Analyst) develop products that offer insight and understanding to help inform big-picture decisions pertaining to policy formation, planning, resource allocation, manpower deployment, and the agency's overall crime fighting efforts. The strategic analysts define and identify prolific offenders and assist in forming the district STAR boxes. The strategic analysts also conduct long range analysis and assessments such as population projections, staffing studies, deployment studies, and zone boundary studies to help inform executive-level planning.

Page | 58

The district analysts are responsible for having a broader understanding of crime problems facing the district. The Crime Analyst in each district is tasked with reviewing incident reports, field contacts, tips, and other sources of information and data with a targeted focus on the Big 4 and select violent crimes. The overarching goal of the Crime Analysts is to accurately interpret the criminal environment and determine what crime problems their respective district is truly facing. The Criminal Intelligence Analysts in each district are focused on identifying why the problem exists and providing actionable intelligence to influence members' decisions to reduce crime, disrupt criminal networks, and prevent future crimes from occurring. The Criminal Intelligence Analysts coordinate with the District Intelligence Liaison Detectives and Court Services Analyst to build out criminal networks impacting their districts. The District Analysts work periodically from their respective district offices to increase the effective and efficient flow of information with an effort to fill intelligence gaps and work more closely with District Commanders to influence decisions on resource allocation and deployment.

Two Criminal Intelligence Analysts are assigned to Organized Crime. Their focus is on organized crime groups operating within and from Pasco County. These analysts are tasked with coordinating intelligence involving gangs and organized theft, fraud, and drug rings. These types of groups operate without borders, so it is imperative to have an analyst who can liaison with other local, state, and federal law enforcement agencies to ensure we are connecting the dots between the various jurisdictions. The Organized Crime Analysts will routinely share intelligence with the district analysts so our members are informed of crime groups and their related activity as well as trends that other law enforcement agencies are seeing that have great potential to impact Pasco County. One of the Organized Crime Analysts works with the Strategic Investigations Unit detectives to help analyze criminal networks impacting Pasco County.

A Criminal Intelligence Analyst is assigned to Juvenile Investigations. This analyst works closely with Child Protective Investigators to assist with focusing investigations and ensuring our limited resources are best spent working with families to prevent children from falling into a life of crime or becoming dependent on social services. This analyst is also responsible for coordinating with the School Resource Officers and CPI Detectives in an attempt to identify trends in child victimization and juvenile crime with a focus on preventing future incidents.

A Crime Analyst is assigned to the Court Services Bureau. The Court Services Analyst is instrumental in continuing the collection of intelligence once our prolific and other targeted offenders enter the detention center. In addition, a plethora of information comes from inmates' phone calls, emails, visitations, and interactions with other inmates within the facility. Capitalizing on these information sources can better inform investigations and our tactics across the agency. The Court Services Analyst works closely with commanders in the jail to inform them of trends or potential problems that may impact the detention facility.

The Real-Time Crime Center (RTCC) consists of ten Crime Analysts and a RTCC Supervisor. The RTCC allows analysts to leverage and aggregate multiple data sources to improve situational awareness, enhance officer safety, and better inform decision making on calls for service in real-time. Analysts evaluate calls for known threats or other indicators known to law enforcement that may indicate a

perceived threat and have an impact on officer safety. Moreover, this real time awareness will provide analysts and deputies with a shared understanding of the crime environment, reduce time spent on investigations, and help to resolve cases in real-time by developing and providing suspect information and location data.

Lastly, there are four detectives assigned to the ILP Division. One detective is assigned to Gangs. The Gang Detective is responsible for overseeing the agency's gang liaison program and building out intelligence profiles on the active gangs within Pasco County. The Gang Detective reviews all incidents involving gang members and their associates scanning for incidents that may require additional follow-up investigation and coordinates with the SAO to ensure documented gang members receive applicable sentencing enhancements. The other three detectives are assigned to the Strategic Investigations Unit (SIU). The SIU is responsible for disrupting, displacing, and ultimately dismantling specific criminal networks operating in Pasco County, with special emphasis on networks involved in violent behavior. The detectives work with analysts, ILOs, and other stakeholders to identify criminal networks, develop and implement comprehensive strategies to dismantle the networks, and take complete ownership of this endeavor to ensure the mission is fully accomplished. Detectives utilize covert and overt investigative and enforcement activity, and coordinate with local, state and federal entities to leverage all available resources to ensure the best possible outcome.

# Intelligence Liaison Officers

### Intelligence Liaison Detectives – Law Enforcement

Each district is assigned an Intelligence Liaison Detective, also referred to as an ILO. These detectives provide a better understanding of the crime picture for our deputies. It further expands our intelligence collection capability and allows for more informed decision making by our commanders to prioritize responses to crime problems, more effectively deploy personnel, and allow us to be more adaptable and responsive in preventing, disrupting, and dismantling emerging crime and terrorism threats to Pasco County.

 The ILOs are tasked with developing a command understanding of the criminal environment within their assigned district to include the active criminal networks, gangs, and prolific offenders impacting the district; cultivating actionable intelligence on those offenders and networks; and then strategically disseminating the intelligence to the proper personnel with the ultimate goal of developing strong criminal cases and realizing the most significant sentences possible.

The ILOs also act as a liaison between the Pasco Sheriff's Office and outside agencies (DEA, FBI, ATF, FDLE, DOC, Probation and Parole, and surrounding local law enforcement agencies), as well as prosecutorial authorities (the County Attorney's Office, State Attorney's Office, Statewide Prosecutor's Office, and United States Attorney's Office) to gather information, establish/maintain strong working relationships, and cultivate intelligence to assist in interpreting the criminal environment and identifying key impact players within Pasco County.

The ILOs work with criminal intelligence analysts to develop information into viable, actionable intelligence. Once the information has been cultivated into intelligence, the liaisons look to the various sections within the agency (patrol, STAR, Property Crimes, Major Crimes, Cyber Crimes SID, etc) or outside agencies to work the intelligence into prosecutable cases. In some situations, the greatest prosecution is in the hands of other agencies such as state or federal law enforcement agencies. The liaisons must look at all criminal factors and coordinate with their respective district commander and analysts to prioritize the intelligence.

The ILOs should assist in identifying the criminal networks within their district, establish how those networks conduct criminal activity, and present a product to the unit best suited to handle the investigation/arrest. By utilizing human intelligence sources and confidential informants who may already be embedded in those organizations, coordinating with the Detention ILOs, detectives and criminal analysts, and exploiting communication systems within the jail, the ILOs can validate tips and information they receive.

**Performance Expectations:**

- Promote awareness and collect information on active offenders, criminal networks, crime locations, and assist with the coordinated and collaborative response of actionable intelligence.
- Manage confidential informants, debrief offenders, identify and develop intelligence gaps, and collect information pertaining to prolific offenders and STAR areas.
- Work closely with state and federal intelligence officers to manage intelligence information within the region or any other location that may impact Pasco County, while operating within the guidelines of the National Intelligence Model (NIM)and 28 CFR 23.
- Coordinate with ILOs in the detention center and the Detention Analyst to merge intelligence from the jail with criminal activity on the streets.
- Engage fusion centers, serve as liaisons to help facilitate our agency's participation in regional information exchanges.

## Intelligence Liaison Officers – Detention

Intelligence Liaison Officers are assigned to each area of the jail to include Intake and Release (Booking), Security Services (Inmate Housing), Bailiffs (East and West) and every member of the Inner Perimeter Security (IPS) team. When a newly arrested individual is processed, an ILO assigned to the area will complete an initial interview. The Intake and Release ILO should review the arrestee's charges and location of arrest prior to the interview to tailor their line of questioning in accordance to the inmate's site of arrest and geographic location. Upon the completion of the interview, the ILO should conduct research to corroborate the information provided. Inmates are not questioned about the charge for which they were arrested; they are only questioned about other crimes and offenders within the community.

Security Services ILO's conduct interviews with inmates wishing to speak with detectives or wanting to give information. In many cases, inmates requesting to talk with a detective don't have detailed

information. In this instance, the ILO is able to improve efficiency as it prevents the detective from making a wasted trip. Similar to Intake and Release ILO's, Security Services ILO's will conduct research prior to making contact with the inmate.

One of the more important roles of the ILO's is to be the liaison for their platoons or squads. Other deputies are able to approach the ILO's for assistance and guidance when interviewing inmates. It is preferred deputies coordinate with their respective ILO prior to submitting a tip to ensure duplicate information is not being submitted.

**Performance Expectations:**

- Review actionable intelligence documents concerning crime and offenders in the community. This will provide awareness to drive information collection within the jail.
- Become familiar with each of the District Focus inmates. Assist in building out their criminal networks and identifying the networks' criminal footprint.
- Respond to meeting requests from inmates to triage and validate information provided.
- Conduct targeted interviews of key impact inmates to obtain information relevant to the active criminal environment.
- Share information with law enforcement ILOs and the Court Services Analyst.

## Gang Intelligence Liaison Officers – Law Enforcement and Detention

The Gang ILOs help augment our agency's gang suppression efforts. PSO receives funds from the Edward Byrne Memorial Justice Assistance Grant to target and suppress serious and prolific criminal networks and gangs. The grant pays for a detective position, which is assigned to the ILP Division, as well as provides funds for training and overtime for related initiatives. It is the overarching goal to identify, disrupt, and dismantle criminal networks and gangs. However, in a county of over a half million people, one person cannot do it alone. As a result, we have identified Gang Intelligence Liaison Officers in both law enforcement and detention to help. The Gang ILOs receive advanced training in gang identification and assist the Gang Intelligence Detective in interpreting the criminal environment as it specifically relates to gangs and gang related crime. Gang ILOs assist in documenting gang members and their associates, hangouts/clubhouses, and activities. The Gang ILOs will also assist by following-up with criminal cases to ensure thorough investigations are completed for prosecution.

**Performance Expectations:**

- Identify undocumented gang members, associates, and hangouts.
- Coordinate with the Gang Detective to identify intelligence gaps and respond to collection requirements.
- Respond to gang related calls for service and investigations to provide support and ensure thorough investigations are conducted. Gang Liaisons should assume the lead investigative role when possible.
- Conduct periodic read-off trainings to inform agency members of the active criminal environment as it relates to gangs.

- Research gang involvements through the ILP Custom Reports program and review related incidents in your area of responsibility for necessary follow-up investigation. The intention is to tie up and loose ends and strengthen cases for prosecution.
- Coordinate with the ASA assigned to gang related cases in your area of responsibility and be a point of contact for assistance.
- Law Enforcement and Detention Gang ILOs should communicate with each other to share intelligence and fill intelligence gaps.

# Deputies and Detectives - Law enforcement and Detention

Deputies and detectives are the eyes and ears of our law enforcement efforts and must be encouraged to look and listen intelligently. It is the role of deputies and detectives to be gatherers of information and implementers of targeted enforcement. And to do that, they must first be better consumers of intelligence products. Every time you read a product, ask yourself how the information within the product can drive your activity throughout your shift. Gone are the days of random proactive patrols and traffic enforcement. Every activity must be directed by intelligence. Take for example, a product comes out for a pattern of boat motor thefts across the state. Depicted in the product is a screenshot from surveillance footage of the suspect vehicle, which appeared to be a white Dodge Caravan. A deputy could discard this information and continue to randomly run traffic, or set up on the major thoroughfares and try to find a reason to stop every white Dodge Caravan that passes by. If it's grandma, you can give her a warning and send her on her way. But, when there is a boat motor in the back, you have just found your perp. There are countless other possibilities of how intelligence products can drive your actions. In addition, gathering data such as quality FIRs and Intel Reports in response to collection requirements is a crucial role in helping us understand the criminal environment and solve crimes. Deputies and detectives can also engage the process by maintaining situational awareness about their respective area of assignment and scanning for information that may help inform future analysis.

**Performance Expectations:**

Law Enforcement

- Read the Daily Reports for your respective areas and ask yourself how the information can drive your actions for the shift.
- Review weekly AIM products for updates to priority offenders and crime problems within your district or assigned area of responsibility.
- Throughout your shift, scan for problems (whether it is a problem person, place, or group) that may need to be further addressed. Discuss your assessments with your supervisor and analyst(s).
- Detectives should review the priority offender custom report for cases involving prolific offenders, Top 5, and District Targets relevant to their assignment. Look for ways to strengthen cases involving these priority offenders.
- When conducting investigations involving priority offenders, go the extra mile to complete a thorough investigation. Consult with the State Attorney's Office to assist in building a strong, prosecutable case.

- During SAO Invest, make sure the SAO is aware if the case involves a priority offender.
- Learn as much as possible about prolific offenders, Top 5 offenders, probationers and other priority offenders in your assigned area to include known associates, vehicles, locations frequented, and previous M.O. for criminal activity, etc. Share this information via Intel Reports, Central Command, emails, or other forms of communication with other stakeholders.
- Learn the location of the STAR and strive to gain a full understanding of the nature of the problems occurring within. Develop and maintain rapport with deputies assigned to the STAR.
- Use Central Command, the Virtual Intelligence Center, the suite of One Solution applications, and other available resources to remain abreast of existing and emerging crime trends in your area. Review daily to see where and when crimes are occurring.
- On every call for service, investigate thoroughly and look beyond the call for service. Once complete, prior to leaving ask the persons interviewed if they have information about any other crime they may want to share regarding possible offenders or offenses occurring in the area. (Use judgment when pursuing this opportunity). Document accordingly via Intel Report or offense incident report.
- While transporting arrestees to jail, try to develop a rapport with the arrestee. If he or she has invoked Miranda, do not ask any questions about their crime. However, you may ask them if they know of other unrelated crimes committed by other people. Document accordingly.
- Approach the neighborhood check process as an opportunity to share information with the public in near real time about crimes in their area instead of merely a necessary component of an incident report. Crime prevention is key!
- Seek opportunities to generate Intel Reports and FIRs as a means of gathering information and intelligence. Remember: **<span style="color:red">Quality</span> is far more important than quantity**.
- Review collection requirements and seek opportunities to gather information/intelligence needed.

Detention

- Review the weekly intelligence products from the Court Services Analyst and become familiar with each of the District Focus inmates and their networks.
- Interview inmates processed in booking for potential information and intelligence about crime on the street. Special attention should be given to priority offenders.
- Review inmate communications for potential information that can assist with investigations or cultivation of intelligence.
- Take quality mug shots. Document scars, marks, and tattoos with good photos and descriptions. This is especially critical for documented gang members and associates.
- Enter as much information in JMS as possible during processing. Many times, this information is shared with RMS.
- Be cognizant of conversations amongst other inmates that may allow for investigative opportunities. Reach out to ILOs and IPS if needed. Allow these interviews to occur in an environment that is away from other inmates to help protect the inmate and make him feel more comfortable.
- When conducting cell searches and other security services within the jail, remain vigilant for information that may assist with investigations or be worthy of documentation in an Intel Report.

- Document close alliances and factions that develop in jail as these often boil over to the streets upon release. These relationships can be documented via Intel Reports. Identifying these relationships is critical to our social network analysis efforts and our ability to accurately interpret the criminal environment.
- If you feel that an inmate may have information to share, attempt to coordinate an interview with ILOs or IPS.

## Supervisors – Sergeants and Lieutenants

ILP cannot be successful without the full understanding and support of the mission by first line supervisors. It is important to make sure everyone understands *why* we chose ILP over other alternatives. I think every cop hates the phrase, "Do more with less," and in an environment of increasing demands for government to do *more* with less, Intelligence-led Policing provides law enforcement an opportunity *to be responsible for less* with less. Ultimately, by operating more effectively, we can work to close the demand gap by having a more significant impact on crime. ILP provides strategy to police work, a focus on the who of crime, the small percentage of criminals who commit the vast majority of crime. It is a complete departure from the random, unfocused, whack-a-mole policing style of the past. It places officers back in the role of crime fighters rather than responders and report-takers. After all, that is the reason most of them got into the profession in the first place. And, in order for ILP to be successful, everyone has to be engaged. So, it is incumbent upon our sergeants and lieutenants to ensure the front-line understands ILP and how to operationalize the concepts outlined in this manual in their daily duties. Accountability is key to making this a success.

**Performance Expectations:**
- Review the daily and weekly intelligence products and use as the basis for discussion in read-off.
- Ensure deputies understand the content of this manual.
- Ensure your deputies' proactive activities are guided by intelligence and the resources available (Central Command, Virtual Intelligence Center, etc).
- Encourage quality (over quantity) information collection through Intel Reports and FIRs.
- Remember that Intel Reports (formerly Tips) are only one way to show engagement with the ILP philosophy. Other ways include self-initiated activity based upon intelligence products; activity within the STAR or directed at priority offenders; prolific offender, probation and curfew checks; and looking for priority warrants.
- Develop EAPs in response to emerging crime trends and patterned crime within your area of responsibility.
- When approving incident reports, ensure deputies are conducting thorough investigations, debriefing arrestees, sharing crime prevention information, and diving deeper than just the surface of the complaint. We want deputies to be investigators, not just report takers.

## Forensics

Information collection is absolutely crucial to the success of ILP, and information can take many forms. A key form of information is the information and intelligence derived from crime scene evidence collection. Data gleaned from evidence such as tool pry marks, paint transfers, cloth marking, shoe/tire

impressions and DNA is invaluable. When using the applied theory that a small percentage of criminals commit the majority of crime in the affected neighborhoods – the modus operandi of those criminals becomes extremely valuable information. Using other data such as Point of Entry (POE) patterns may further develop the probable "profile" of the offender. Successfully targeting known offenders may be enhanced by identifying certain trends and mannerisms used by those offenders. This is further confirmed through the proper collection and thorough analysis of physical evidence connected to the offenders.

Matching Forensic Investigators and Latent Print Examiners as liaisons with deputies and detectives affords our agency the opportunity to work proactively to reduce crime. Case reviews and discussions at the weekly AIMs allow Forensic Investigators to gain better understanding and cross dissemination of the physical evidence collected at previous crime scenes. This proactive dialogue better enables deputies and detectives to be mindful of what to specifically look for when conducting their investigations and cultivating intelligence.

## Inner Perimeter Security Team

The Inner Perimeter Security Team (IPS) is maintained within the Court Services Division and each IPS Team is assigned to a schedule to assist as needed for intelligence gathering. IPS is the focal point of intelligence and each member of the IPS Team has intelligence duties assigned.  IPS Teams also lead the bureau's gang initiatives, coordinating all comprehensive gang-related missions, and serving as liaisons to the Gang Intelligence Detective. The Inner Perimeter Security Team facilitates intelligence gathering/sharing through a variety of means to include:

- Weekly AIM meetings, attending read-offs, and continual dialogue with ILP.
- Collaborate with detectives and investigators to assist with any intelligence gathering required.
- Weekly sharing of informal and documented information for intelligence vetting by ILP and awareness to all members in the Detention Center.
- Remain proactive while in housing areas looking for information and intelligence.
- Closely follow the requests from inmates.
- Interview inmates to forward the information to the proper channels.

## School Resource Officers (SRO)

SROs interact with middle school and high school students from within their school's geographic boundaries on a daily basis and are in a unique position to augment the agency's ILP efforts in several ways.

SROs can offer valuable assistance in areas such as offender identification and intelligence gathering. Often SROs will hear about past, present or future crimes well before others in the law enforcement community. In addition to scanning for information that may assist with active investigations, it is critical that SROs also look to identify students who are at-risk of developing into prolific offenders and engaging those students in an effort to get them back on the right track.

SROs are uniquely positioned to overcome a significant barrier that exists concerning police-community partnerships in modern society, especially with younger people. An SRO's outreach efforts provide for opportunities to build relationships based on mutual trust, and honest, open communication. These connections, properly cultivated, can help us develop a clearer picture of the environment, and where the seeds of criminal activity are. This can aid deputies and commanders to more effectively interpret, influence, and impact the criminal environment. Healthy police-community relationships are vital for active crime prevention, officer safety, and solving crimes.

**Performance Expectations:**

- Coordinate with patrol deputies and detectives who are responsible for the service area of your school. Healthy dialogue between SROs and the applicable deputies and detectives can assist with interpreting the criminal environment and ensure a shared understanding of the offenders and crime that may impact the school.
- Attend and organize community outreach efforts within the campus community.
- Identify any priority offenders who attend your school and look to collect information about their activities and associates in school. If a priority offender is absent from school, coordinate with the applicable zone deputy for a truancy check.
- Monitor crime trends in feeder communities.
- Review the At-Risk Youth list and coordinate a unified response from key personnel at your school. Monitor RMS for activity involving identified At-Risk youth. Utilize data generated through the identification of at-risk youth to match them with appropriate support interventions.
- Plan home visits for the most at-risk students to engage parents and identify additional risk factors for offending.
- Document formal meetings, counseling or mentoring sessions with at-risk youth and/or offenders.

# Strategic Targeted Area Response (STAR) Teams

The Strategic Targeted Area Response (STAR) Teams were created as an important part of the agency's crime fighting strategy. Each district has two STAR Teams led by a sergeant and two corporals. Each team is assigned a different STAR box within the district; however, the teams work collaboratively to bring a significant impact to both areas. STAR is dedicated to reducing the crime in the district, with particular emphasis inside the STAR box and the immediate surrounding area.

As a result, there is an expectation that the STAR Team will spend the majority of their time working inside the STAR box or focused on offenders who are impacting crime within the STAR box. The team will utilize various strategies centered on the following three objectives:

- Prevent crime (with particular emphasis on the Big 4 and violent crime)
- Reduce the public's fear of crime (with particular emphasis on the Big 4 and violent crime)
- Solve crime (with particular emphasis on the Big 4 and violent crime)

STAR Team members must engage all available resources to assist them in accomplishing their mission and objectives. The team is expected to actively work with other PSO members (particularly ILP and detectives) and outside agencies to identify and target prolific offenders. They will also assist in responding to emerging crime patterns and trends.  They will regularly develop missions to target the priority offenders who impact crime within the STAR boxes. Considering approximately 6% of the criminals commit 60% of the crime, targeting these offenders should be an important part of daily crime fighting strategies.

 **Performance Expectations:**
- Learn about the priority offenders (prolifics, Top 5, associates, etc) who live within the STAR boxes or are impacting crime within.
- Review and action ILP's daily and weekly intelligence products to understand the issues in your district, with particular emphasis and examination of the Big 4 and violent crime focused offenses inside the STAR box.
- Learn and regularly use the Central Command website to assess real time stats regarding STAR Box criminal activity and district wide crime trends.
- Engage detectives, platoon commanders, sergeants, community leaders and others to gain a better understand of the issues within the STAR box.

# Section Five: Key Terms and Definitions

**Hot Spot**
A group of similar crimes committed by one or more individuals at locations within close proximity to one another.

Examples: Eight daytime burglaries over the past four weeks at a suburban residential subdivision, with no notable similarities in method of entry or known suspects; ten commercial burglaries over the course of three weeks at businesses located within a half-mile radius during overnight hours.

**Information**
Information is raw data; it could be an item obtained from a newspaper report, a statement made by a confidential informant, or simply an observation made by a deputy during a traffic stop. In and of itself, it is rare that action can or should be taken on raw, unevaluated information on its own.

**Intelligence**
Information that has been analyzed becomes intelligence. The process that turns raw information into something useful is analysis; the product is intelligence. Information+Analysis = Intelligence.

**Pattern**
A crime pattern is a group of two or more crimes reported to or discovered by law enforcement that are unique because they meet each of the following conditions:

1. They share at least one commonality in the type of crime; behavior of the offenders or victims; characteristics of the offender(s), victims, or targets; property taken; or the locations of occurrence;
2. There is no known relationship between victim(s) and offender(s) (i.e., stranger-on-stranger crime);
3. The shared commonalities make the set of crimes notable and distinct from other criminal activity occurring within the same general date range;
4. The criminal activity is typically of limited duration, ranging from weeks to months in length; and
5. The set of related crimes is treated as one unit of analysis and is addressed through focused police efforts and tactics.

**Series**
A group of similar crimes thought to be committed by the same individual or group of individuals acting in concert.

Examples: Four commercial arsons citywide in which a black male, between the ages of 45-50, wearing yellow sweatpants, a black hooded sweatshirt and a yellow "Yankees" cap, was observed leaving the commercial structures immediately after the fire alarm was triggered; five home invasion-style robberies involving two to three white males in their 20s wearing stockings over their faces, displaying a silver, double-barreled shotgun, and driving a red 1980s Pontiac Trans Am.

**Spree**

A specific type of series characterized by high frequency of criminal activity within a remarkably short time frame to the extent that the activity appears almost continuous.

Examples: A rash of thefts from auto at a parking garage over the course of one hour; multiple apartments in a high-rise building burglarized during daytime hours on a single day.

**Trend**

A trend is a persistent, long-term rise or fall in data based on time and indicates a direction. Crime trend information can be useful in alerting us to increases and decreases in levels of activity. However, since crime trend analysis does not examine shared similarities between specific crime incidents, a crime trend is not a crime pattern.

Page | 70

## Appendix A: Identification of At-Risk Youth

At-risk youth are identified through the analysis of their risk in three primary categories: educational risk factors, criminogenic risk factors, and adverse childhood experiences. The criteria and scoring in each category are grounded on empirically-based research of behaviors and other indicators that are indicative of a juvenile at-risk for developing into a chronic recidivist offender. The following outlines the risk assessment criteria in each of the three categories.

### Educational Risk Factors

| | |
|---|---|
| COURSE | Course Performance |
| GPA | GPA |
| CREDITS | Credits |
| ATTND | Attendance |
| ODRs | Office Discipline Referrals |

**Course Performance**

| | |
|---|---|
| On Track | C's or better |
| At Risk | 1 or more D's |
| Off-Track | 1 or more F's |

**GPA**

| | |
|---|---|
| On Track | 2.5 + |
| At Risk | 2.0 - 2.49 |
| Off-Track | < 2.0 |

**Credits**

| | |
|---|---|
| On Track | Meets credits |
| At Risk | 1 behind |
| Off-Track | 2+ behind |

**Attendance**

| | |
|---|---|
| On Track | 0 -2 absences in a quarter/ <5% in a year |
| At Risk | 3 - 4 absences in a quarter/ 5% - 9% in a year |
| Off-Track | 5 + absences in a quarter/ 10% + in a year |

**Office Discipline Referrals**

| | |
|---|---|
| On Track | 0 in a quarter / 0 - 2 in a year |
| At Risk | 1 in a quarter / 3 in a year |
| Off-Track | 2 in a quarter / 2+ in a semester / 4+ in a year |

**Overall Scoring***

| |
|---|
| On Track |
| At Risk |
| Off-Track |
| Critical |

\* Matches highest level of any category
   Critical if off-track in every category

## Criminogenic Risk Factors

| | |
|---|---|
| AOO | Age of Onset |
| CRTP | Crime Type |
| CONV | Number of Convictions |
| DRUG | Drug or Alcohol |
| LOPS | Lack of Parental Supervision (truancy, curfew, 22J) |
| VTPC | Victim of Personal Crime |
| DLFR | Delinquent Friends |
| RNAW | History of Running Away |
| CUST | Custody Disputes |
| GANG | Certified Gang Member |

**Age of Onset**

| | |
|---|---|
| On Track | 17 + |
| At Risk | 13 - 16 |
| Off-Track | <13 |

**Crime Type**

| | |
|---|---|
| On Track | No arrests |
| At Risk | Arrests other than an off-track offense |
| Off-Track | Burglary, Theft, Robbery, Criminal Mischief |

**Number of Convictions**

| | |
|---|---|
| On Track | 0-1 |
| At Risk | 2-4 |
| Off-Track | 5-10 |
| Critical | 11+ |

**Drug or Alcohol**

| | |
|---|---|
| On Track | 0 |
| At Risk | 1 |
| Off-Track | 2+ |

**Victim of Personal Crime**

| | |
|---|---|
| On Track | 0 |
| Off-Track | 1+ |

**Lack of Supervision\***    \* incidents include truancy & curfew warnings, juvenile disturbances, VOP

| | |
|---|---|
| On Track | 0-3 |
| At Risk | 3-5 |
| Off-Track | 5+ |

**Delinquent Friends**

| | |
|---|---|
| On Track | 0 |
| Off-Track | 1+ |

**History of Running Away**

| | |
|---|---|
| On Track | 0-1 |
| At Risk | 2-3 |
| Off-Track | 4+ |

**Custody Disputes**

| | |
|---|---|
| On Track | 0 - 1 |
| At Risk | 2 |
| Off-Track | 3+ |

**Certified Gang Member**

| | |
|---|---|
| On Track | No |
| Off-Track | Yes |

**Overall Scoring\***

| | |
|---|---|
| On Track | 0 |
| At Risk | 1-3 |
| Off-Track | 4-5 |
| Critical | 6+ |

## Adverse Childhood Experiences (in order of statistical significance)

| | |
|---|---|
| HHIN | Household member incarceration |
| *PHAB* | Physical abuse |
| *EMAB* | Emotional abuse |
| *WIHV* | Witness household violence |
| *PHNG* | Physical neglect |
| *HHSA* | Household substance abuse |
| *SXAB* | Sexual abuse |

*note: emotional neglect and household mental illness were left out of the analysis due to those ACEs not showing a statistically significant difference in outcome.

**Overall Scoring***

| | |
|---|---|
| On Track | 0 |
| At Risk | 1-3 |
| Off-Track | 4-5 |
| Critical | 6+ |

*number of ACE's off-track

To start, we take the active rosters for each school in the county and match each student with data from the schoolboard's early warning system (EWS), our records management system (RMS), and DCF's Florida Safe Families Network (FSFN). Students who are on-track across all categories are removed from the analysis. For the remaining students, the actual tallies are removed from each category and replaced with the respective shading for on-track, at-risk, off-track, or critical. The purpose is to remove the focus on how many instances for each category a student has and place emphases on the student's overall risk assessment.

For the adverse childhood experiences category (ACEs), the total number of instances are combined into an overall category, which is the only category displayed since a majority of the categories are sensitive or prohibited from disclosure. The thought is, an overall evaluation will not point to any specific problem; however, it will be generally indicative of issues within the household that may prompt further discussion and self-disclosure.

# At-Risk Youth Spreadsheet

| First Name | Last Name | DOB | School | EDUCATIONAL RISK FACTORS (EWS) | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | COURSE | GPA | CREDITS | ATTND | ODRs | OVERALL |
| XXXX | XXXXXX | XXXXX | XXXXX | | | | | | |
| XXXX | XXXXXX | XXXXX | XXXXX | | | | | | |
| XXXX | XXXXXX | XXXXX | XXXXX | | | | | | |
| XXXX | XXXXXX | XXXXX | XXXXX | | | | | | |
| XXXX | XXXXXX | XXXXX | XXXXX | | | | | | |

| | CRIMINOGENIC RISK FACTORS (PSO RMS) | | | | | | | | | | | ACEs |
| | AOO | CRTP | CONV | DRUG | LOPS | VTPC | DLFR | RNAW | CUST | GANG | OVERALL | OVERALL |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

Page | 74

## At-Risk Youth References

Clarke, Stevens H. 1975. 'Some implications for North Carolina of recent research in juvenile delinquency.' *Journal of Research in Crime and Delinquency* 12 (1):51-60.

Coumarelos, Christine. 1994. Juvenile Offending: Predicting persistence and determining the cost-effectiveness of interventions. Sydney: NSW Bureau of Crime Statistics and Research.

Farrington, David P. 1987. 'Predicting individual crime rates.' *Crime and Justice* 9:55-101

Farrington, David P. 1990. 'Implications of criminal career research for the prevention of offending.' *Journal of Adolescence* 13:90-113.

Flood-Page, Claire, Siobhan Campbell, Victoria Harrington and Joel Miller. 2000. Youth crime: Findings from the 1998/99 Youth Lifestyles Survey. Londson: Home Office Research, Development and Statistics Directorate.

Fox, Bryanna H., Nicholas Perez, Elizabeth Cass, Michael T. Baglivio and Nathan Epps. 2015. 'Trauma changes everything: Examining the relationship between adverse childhood experiences and serious, violent and chronic juvenile offenders.' *Child Abuse & Neglect* (2015) http://dx.doi.org/10.1016/j.chiabu.2015.01.011

Mallett, Christopher A., Patricia S. Dare and Mamadou M. Seck. 2009. 'Predicting juvenile delinquency: The nexus of childhood maltreatment, depression and bipolar disorder.' *Criminal Behavior and Mental Health* 19(4):235-246.

Owen, Natalie and Christine Cooper. 2013. The start of a criminal career: Does the type of debut offense predict future offending? London: Home Office.

Ratcliffe, Jerry H. 2016. *Intelligence led Policing*. New York: Routledge. 44-47.

Wilson, Debbie, Clare Sharp and Alison Patterson. 2006. Young People and Crime: Findings from the 2005 Offending, Crime and Justice Survey. London. Home Office.

# Appendix B: Prolific Offender Calculation

According to the Pasco Sheriff's Office, a Prolific Offender is a person of any age who meets or exceeds a threshold calculated by weighing his or her three year history of arrests and suspicions for criminal offenses in Pasco County. To qualify for consideration as a prolific offender, an individual must have been arrested at least twice for any of the previously identified ILP-focused offense types. Once qualified, individuals are scored and ranked by the number and severity of offenses committed, gang affiliation, and time since most recent arrest which may diminish or increase the potential for an individual to reoffend.

**Scoring**

After being qualified to the pool of offenders, each individual is scored on three criteria:

- Criminal History
- Enhancements

Step 1: Criminal History

An offender's criminal history is scored based on the following. Multiple charges on the same arrest or booking are compressed into the highest point value. It is important to note, we have intentionally limited the scoring to the highest charge of a particular arrest or booking for two reasons. The first is to provide a more objective scoring as different law enforcement officers may charge offenders differently. Where one officer may charge an offender for every offense that applies, another may just choose the highest offense. By selecting the highest valued charge in each arrest, we can avoid skewing results due to differences in charging. Second, the purpose behind identifying prolific offenders is not necessarily to identify how bad a person's criminal history is. A prolific offender should be an individual who has evidenced through numerous arrests separated by time that he or she has not learned from their interactions with the criminal justice system. A prolific offender is someone who is not likely to reform and has taken to a career of crime. Therefore, more emphasis is placed on how often an individual re-offends and less on how many charges for which an individual has been arrested. The criminal history raw score is computed as follows:

- 5 points for a violent crime arrest involving a firearm or any homicide, racketeering, and human trafficking offense.
- 4 points for a violent crime arrest or a Big 4 arrest involving a firearm or aggravated circumstances.
- 3 points for a Big 4 arrest.
- 2 points for an arrest involving grand theft, pawn/scrap violation, violent crime outside of agency focus, or narcotics violation (except misdemeanor marijuana).
- Half of the applicable point values are awarded for suspicions of an offense listed in 1-4.
- 1 point for all other offense types (no value for suspicions).
- Moderated enhancement for each FTA and/or VOP.
- Moderated enhancement for each Other Involvement (Involved Other, Reporting Person, Victim, Witness) in 5 or more criminal reports.

Step 2: Enhancements

- A 10% enhancement is added to the final score for an active gang member.

## Appendix C: Prolific Offender Palm Card



## Appendix D: Enforcement Action Plan

**Pasco Sheriff's Office**                                    *ENFORCEMENT ACTION PLAN*

EAP Title: _____ EAP#: _____ Submitted by: _____ Date: _____

**Problem Identification** - Identify your selected target.

1. Selected Target(s):

2. Statement of the Problem:

3. Discussion of the Problem:

4. Assumptions:

PSO# 30121 (Rev. 5/17)                                                          Page ____ of ____

Page | 78

*Pasco Sheriff's Office*                    *ENFORCEMENT ACTION PLAN (Continued)*

**Research and Analysis** - Provide an assessment of the research. Include known threats, officer safety concerns, and any other significant considerations highlighted by the research.

5.  **Summary of Research**: (attach any addition analytical products to this form)

**Response** - Outline the intended plan of action and projected outcome (benefits as a result of executing plan).

Date(s): _____    Location: _____

6.  **Resources Requested:**

7.  **Action Plan:**

PSO# 30121 (Rev. 5/17)                                          Page ____ of ____

*Pasco Sheriff's Office*                    ***ENFORCEMENT ACTION PLAN*** *(Continued)*

7. **Action Plan:** *(continued)*

**Total Overtime Anticipated:**

**Approved by:** _____    **Date:** _____

Page | 80

**Pasco Sheriff's Office**                    *ENFORCEMENT ACTION PLAN* (Continued)

# Form Completion

*Scanning and Problem Identification – complete this section before starting your research.*

**1. Selected Target** – simply identify your selected target.

   a. Identify the person, place or group you have selected to be the subject of your enforcement action plan. Provide the information you think would be beneficial to properly identify your target (i.e. name, DOB, ssn for individuals, physical and legal address or boundaries for locations/hot spots).

**2. Statement of the Problem**

   a. This is a very brief statement (1-2 sentences) identifying how/why your target is a problem.

**3. Discussion of the Problem**

   a. This section is where you explain the WHO, WHERE, WHEN, and WHAT of your identified problem.

   b. Explain why you selected this as a problem to further address. What placed this problem on your radar? Why did you select this problem over all others? Include any known statistics or anecdotal evidence to support your selection of the problem (Consider: resource intensive, costs to agency, significant impact to crime, focused offenses, ILP targeted offenders, etc.)

**4. Assumptions**

   a. Provide a brief explanation of what/who do you think is the underlying problem or why do you think the problem is occurring.

*Research and Analysis* – Conduct your research on the problem. Depending on the complexity of the problem, you may want to solicit the help of ILP.

**5. Summary of Research**

   a. Briefly describe what you learned about the problem from your research.

   b. Did any of your assumptions about the problem change?

*Response – formulate a plan of action*

**6. Resources Requested**

   a. Identify the manpower and resources necessary to carry out your proposed action plan.

**7. Proposed Action**

   a. Outline your intended plan of action to resolve the identified problem. Summarize the proposed benefits to the Sheriff's Office and county. What is the intended impact of the EAP?

*After Action & Analysis – complete PSO 30123*

PSO# 30121 (Rev. 5/17)                                                        Page ____ of ____

Page | 81

*Pasco Sheriff's Office*                                    *AFTER ACTION REPORT*

**After Action Assessment** – Conduct an assessment of the Enforcement Action Plan.

1. **Process Review:** Was the EAP executed according to plan? Were there deviations from the plan? If so, do you feel that had an impact on the overall outcome? What would you do differently in the future if running the same operation?

2. **Outcome Review:** Did the EAP have the intended outcome? Summarize any major accomplishments during the EAP.

Case 8:21-cv-00555-CPT    Document 161-3    Filed 06/28/22    Page 83 of 83 PageID 12371

*Pasco Sheriff's Office*

## *AFTER ACTION REPORT*

Enforcement Plan Title: _____  Enforcement #: _____  Submitted by: _____

Submitted Date: _____  Date(s): _____  Paid OT: ☐ YES ☐ NO

## OUTPUT

| NAME | HOURS REG. | HOURS O.T. | VEH. MILES | AIR HOURS | CHARGES MIS | CHARGES FEL | WAR. | SUBJECTS ARRESTED | CIT. | WARN. | F.I.R. | CONTACTS ADULTS | CONTACTS CHILDREN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| **TOTALS** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

PSO# 30123b (5/17)    O & M COSTS: _____  SIGNATURE _____  DATE _____