```
 1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                       TAMPA DIVISION

 3

 4   DALANEA TAYLOR, et al.,          )
                                      )
 5                 Plaintiff,         )
                                      )
 6                                    ) Case No.
           vs.                        ) 8:21-CV-00555-SDM-CPT
 7                                    )
                                      )
 8   CHRIS NOCCO, in his official     )
     capacity as Pasco County Sheriff,)
 9                                    )
                   Defendant.         )
10

11
     _____
12
                       STATUS CONFERENCE
13              (held via Zoom videoconference)
           BEFORE THE HONORABLE CHRISTOPHER P. TUITE
14              UNITED STATES MAGISTRATE JUDGE

15                     OCTOBER 5, 2021
                         10:06 A.M.
16                     TAMPA, FLORIDA
     _____
17

18

19

20

21          Proceedings transcribed via courtroom digital audio
     recording by transcriptionist using computer-aided
22   transcription.
     _____
23
                   DAVID J. COLLIER, RMR, CRR
24              FEDERAL OFFICIAL COURT REPORTER
              801 NORTH FLORIDA AVENUE, 7TH FLOOR
25                 TAMPA, FLORIDA  33602
```

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFFS:

 4            Robert E. Johnson

 5            Ari Bargil

 6            Caroline Grace Brothers

 7            Institute for Justice

 8            16781 Chagrin Boulevard, Suite 256

 9            Shaker Heights, Ohio  44120

10            (703) 682-9320

11

12

13    FOR THE DEFENDANT:

14            Thomas W. Poulton

15            DeBevoise & Poulton, PA

16            1035 South Semoran Boulevard, Suite 1010

17            Winter Park, Florida  32792-5512

18

19            Natalie Scruggs

20            Pasco County Sheriff's Office, Assistant General

21            Counsel

22

23

24

25
```

```
1                    P R O C E E D I N G S
2                    - - - o0o - - -
3           THE COURT:  Good morning, everyone.
4           Madam Clerk, if you could kindly call the case,
5    please.
6           COURTROOM DEPUTY:  Dalanea Taylor, et al. versus
7    Chris Nocco, Civil Case Number 8:21-CV-555.
8           THE COURT:  If I could please have the appearances of
9    counsel for the record, beginning with the plaintiff.
10          MR. JOHNSON:  Good morning, Your Honor.  This is
11   Robert Johnson for plaintiffs, Dalanea Taylor, Darlene Deegan,
12   Tammy Heilman and Robert Jones, and I'm joined by my co-counsel
13   Ari Bargil and Caroline Grace Brothers.
14          THE COURT:  Good morning to you all.
15          And for the defense?
16          MR. POULTON:  Good morning, Your Honor.  I'm
17   Tom Poulton, I'm here for Defendant Sheriff Nocco.  I have with
18   me Ms. Natalie Scruggs, who is Assistant General Counsel to
19   Sheriff Nocco.
20          THE COURT:  Thank you as well.
21          I apologize for the brief delay this morning in
22   getting started.  The Court had another item of court business
23   to which to attend.
24          I've reread the transcript from the last proceeding
25   and read the joint status report filed on October 1st, and
```

```
 1   I think the best way to handle this particular conference is to
 2   start off with one of the two items of discovery, and that is
 3   the incidents, I'll call them the underlying incidents, of
 4   which I understand that there are 138.
 5           Mr. Poulton, is that the correct number?
 6           MR. POULTON:  That's the number that were identified
 7   by the plaintiffs in their -- as we negotiated the scope of the
 8   discovery, yes.
 9           THE COURT:  Okay.  Mr. Johnson, any disagreement
10   there, that there are 138 incidents here?
11           MR. JOHNSON:  I don't want to be pedantic, but
12   I think there are -- there may well be other incidents.  Those
13   are the ones that we've been able to identify through discovery
14   so far.
15           So, for instance, in body worn cameras of the
16   incidents deputies reference other visits to these homes that
17   occurred, you know, one -- a deputy may say "I was here a week
18   ago."  I may have no record of them being there a week ago.
19   So just to be clear, we're not conceding that these are the
20   only visits that occurred at the plaintiffs' homes, but I think
21   this is certainly -- these are certainly a large number of
22   them, and I think given that these are the ones that we know
23   exist and that we have records of, a reasonable place to be
24   focusing right now in discovery.
25           THE COURT:  What I'm going to attempt to do today is,
```

1  instead of leaving things perhaps as open-ended as they were

2  before, see if I can narrow and winnow down the scope of what

3  remains to be sought by way of discovery.

4          Mr. Johnson, just to be clear, have you specifically

5  requested the documentation relating to all incidents involving

6  your four clients during the pertinent time period?

7          MR. JOHNSON:  Yes, we have, Your Honor, and we've not

8  received that.

9          THE COURT:  And, Mr. Poulton, let me return to you.

10          You mentioned in your answer that these are the 138

11  incidents, and I believe you then said "identified by the

12  plaintiff," so just so that I am comfortable with being on the

13  same page as the parties, do you agree with Mr. Johnson's

14  assertion that he and his clients have sought all the incidents

15  involving those four individuals during the relevant time

16  period?

17          MR. POULTON:  Yes.

18          THE COURT:  Okay.  And is there any reason to believe

19  that there are more than the 138 for which documentation has

20  been produced?

21          MR. POULTON:  You mean is there -- I know there are

22  more than 138 incidents, we all know that, because we have a

23  list of calls that number closer, I believe, to 400.  Some of

24  those are calls for service from the plaintiffs themselves,

25  they could be service of a warrant, they might be a witness,

```
 1   and it's unrelated -- at least I think the attorneys believe at
 2   this point that those are unrelated to ILP.  The ones that they
 3   are focused on, the 138, is because somewhere in the paperwork,
 4   for example, on a CAD report, there is a reference to a
 5   prolific offender check, and that's why I suspect those are the
 6   138 that the plaintiff has focused upon.
 7            I agree that plaintiffs have asked for the
 8   documentation as to all incidents involving them.  I think as
 9   we work through this, and realizing the volume of material we
10   were talking about, the plaintiffs' counsel wanted us to focus
11   on the 138 to start with, and so that's been where everybody
12   has been sort of not exclusively but primarily focused, I think
13   would be the way to put it.
14            THE COURT:  And, Mr. Johnson, let me come back to
15   you.  Is there a reason why at this juncture you're not able to
16   discern with some clarity that the 138 incidents which the
17   parties have been discussing does not fairly represent in all
18   likelihood the universe of incidents that are going to be at
19   issue?  In other words, I recognize that there may be a
20   reference by an officer or somebody else to another incident,
21   but it could have been situations Mr. Poulton explained, where
22   somebody came out for some unrelated reason that didn't connect
23   up with the Intelligence Led Policing program.  Do you have
24   enough information in front of you to make a fairly confident
25   estimation that the 138 represents the expected universe?
```

1           MR. JOHNSON:  I'm not sure that we do, Your Honor.

2   So, for instance, when an officer references having been out

3   the week before, we just have no documents to then look at and

4   see what happened a week before.  I mean, we have this --

5   I believe I mentioned during the last hearing the spreadsheet

6   that we obtained through the public records request, and so we

7   can look at that to, you know, determine some amount of

8   information about other incidents, but it appears to me that

9   there are just times when the law enforcement visited and it

10  may not have generated any paper trail, or at least not one

11  that ended up in the spreadsheet that we obtained through the

12  records request.

13          So, you know, I guess what I'm just trying to say

14  is that I do think, from our purposes -- for our purposes this

15  138 incidents probably is the right place to be focusing for

16  discovery.  I just don't want to say anything to suggest that

17  these are the only times that these law enforcement officials

18  came to these houses in connection with the program.  I believe

19  there may be others, in fact, I believe there almost certainly

20  are others, and I just don't want to concede that these 138 are

21  the only ones, but in terms of where we're focusing for

22  discovery, at the very least I think this is a representative

23  sample of the visits and I think it's a place where we can be

24  focused.

25          THE COURT:  My concern is that, looking at the

1    discovery timeline here, time moves forward and there's not an

2    infinite amount of time left, and when I hear phrasing to the

3    extent of "it's a good starting point," we're fairly far along

4    now for that terminology to be used.

5         Mr. Poulton, let me return to you.

6         We had talked at the last conference about focusing

7    on discovery that is relevant to a claim or defense.  Of the

8    other incidents beyond the 138, you obviously have the ability

9    to review the documentation that's available.  Are you able to

10   represent that, outside of the 138, the other incidents

11   don't -- or are not, rather, relevant to a claim or defense

12   here?

13        MR. POULTON:  Your Honor, I cannot.  We've been so

14   focused on the 138 that there's just been no opportunity to

15   look at the others.  We know they exist, but, you know,

16   for example, recently, you know, I promoted the idea of a

17   preliminary 30(b)(6), and all the lawyers got together, we got

18   together with Larry Kraus, who is the inspector for ILP, we got

19   together with Major Tait Sanborn, who oversees road patrol, and

20   they walked us through how a deputy would access, for example,

21   information from the sheriff's system or input information into

22   the sheriff's system, and I think that was helpful for all the

23   attorneys because it -- including General Counsel's office,

24   frankly, because it gave us insight into the databases that we

25   don't ordinarily deal with, which is good on the one hand, but

1   on the other hand, when we got done with that about a week

2   later, last week, Plaintiffs counsel generated 13 requests to

3   drill down further into the technical aspects of things.

4          For example, if a deputy entered a comment into a

5   particular type of a screen, now they want us to go look for

6   those particular types of screens.  And that's all being worked

7   on, but we're all doing this from the perspective of the 138,

8   because that's the universe we know about.  And, you know,

9   we're collecting, for example -- and I assume plaintiff is as

10  well, we're trying to connect that we might have an incident

11  report by a deputy where they actually write out a narrative;

12  you might have a CAD report which shows simply deputies

13  responding, might have some detail, might not; and then there

14  may be body cam video; and I think we're trying to connect up

15  to as many of the 138 as we can, one-by-one, all of the

16  documentation, all of the body cam, you know, so that everybody

17  has the same universe -- is working from the same universe of

18  documentation as to every single one of those.  But we spend so

19  much time looking at those 138 that we just haven't been able

20  to go beyond that, and I think that's kind of where we're at

21  from the defense perspective.

22          THE COURT:  Let me just, if I could, back up a little

23  bit, Mr. Poulton.

24          How did you arrive at the 138?  You mentioned that's

25  a number that sounded to me like it was derived from the

1  plaintiffs.  Let me just, if I could, understand better where

2  the parties came up with the 138, and I'll begin with you.

3         MR. POULTON:  The -- as we've worked through

4  discovery, plaintiffs' counsel sent what I would -- I'll say a

5  reformed interrogatory, I guess would be the way to put it,

6  where they listed out the particular incident numbers that they

7  were -- incident report numbers that they were relate --

8  related to each of the four plaintiffs.  The total between the

9  four plaintiffs was 138.  So, for example, I'll just -- it

10  might say I-2014 and a case number, and there would be 30 as to

11  one plaintiff, 45 as to another, et cetera, and the total was

12  138.

13         THE COURT:  Okay.  And the 400 number that you came

14  up with, roughly, where did that number -- what is its source?

15         MR. POULTON:  They just -- the agency just ran a name

16  search through their system, and it goes much further back than

17  I think plaintiffs are perhaps even interested in here, it

18  would go back to 2010, 2012, and generate each of the

19  interactions that are on record as having occurred as between

20  deputies and named plaintiffs.

21         As I say, many of these, I suspect -- and I think

22  Mr. Johnson would agree.  Many of these will probably not be

23  relevant because they would be something generated by something

24  other than ILP.  The reason that the 138 are believed to be

25  linked to ILP is primarily because of the use of the phrase

1  "prolific offender" appearing somewhere in the paperwork for

2  that 138.

3          THE COURT:  So going back to the 400 in the data or

4  printout that you receive, is there some indication on that

5  paperwork as to whether it's linked to the ILP program or

6  anything else?

7          MR. POULTON:  Honestly, it's been a little while

8  since I've looked at that spreadsheet.  I don't recall.  If it

9  happened, it was very infrequently that the particular

10  spreadsheet that I looked at referenced prolific offender.  It

11  usually referenced perhaps a criminal charge that grew out of

12  it, a code enforcement violation that grew out of it, or

13  service of an arrest warrant, that level of documentation.

14  I think that the prolific offender notation comes from a little

15  bit further down the line in the paperwork, particularly

16  I think the CAD reports, because it might indicate that a

17  prolific offender check was going on.

18          THE COURT:  Okay.  Mr. Johnson, coming back to you,

19  in a cursory review of the Amended Complaint it appeared to me

20  that the earliest time frame was roughly in or around 2015.

21  Is that about right?

22          MR. JOHNSON:  Yes, that's about right, Your Honor.

23          THE COURT:  So if I understand Mr. Poulton, there's

24  documentation that goes back to 2010.

25          MR. POULTON:  Thereabouts.

```
1              THE COURT:  I'm trying to -- I'm sorry.  Mr. Poulton?

2              MR. POULTON:  Thereabouts.  I haven't --

3              THE COURT:  I understand.

4              MR. POULTON:  -- looked back at it in a little while,

5    but it's further back than plaintiffs -- than I would maintain

6    for example, plaintiffs would be able to sue upon, based on the

7    statute of limitations, for example, would be four years, so --

8              THE COURT:  Okay.  And so what I'm trying to do is

9    cabin this a little bit.

10             So from that, Mr. Johnson, in your Amended Complaint,

11   and for perhaps other reasons, whether they're bars that exist

12   or things are too attenuated for whatever reason, it sounds to

13   me like of the remaining incidents, once you subtract 138 from

14   400 or thereabouts, you would be down to a far lesser number.

15             MR. JOHNSON:  That may be right, Your Honor.  One

16   thing I would say though, I think Mr. Poulton indicated that

17   the 400 was generated by doing a name search.  I think if we

18   were really looking to generate the full list of incidents we

19   would also be interested in a location search for all --

20             THE COURT:  I'm sorry.  I couldn't quite hear.  On a

21   what search?

22             MR. JOHNSON:  A location search, to search for all

23   visits to these plaintiffs' homes, because really what this

24   case is about is a pattern of frequent law enforcement visits

25   to these particular individuals' homes simply because they or a
```

1   family member is on the list, and we do know from the 30(b)(6)

2   deposition several weeks ago that it's possible to search these

3   databases by location, so I -- you know, again, I'm not trying

4   to complicate things, I just -- I don't know that the 400 that

5   Mr. Poulton has referenced -- if that was generated by doing a

6   name search, I don't know that that captures the full universe

7   of things that we'd be really interested in here.  But, yes,

8   I -- to answer your question, I think we -- I don't think we're

9   interested in anything that comes from before 2015, and

10  I apologize for the digression.

11          THE COURT:  Mr. Poulton, just your response to the

12  thought that the search, as opposed to by name, ought to

13  include a location.

14          MR. POULTON:  Well, I -- that might have been in the

15  recent 13 that they sent to me, but until -- I mean, if so,

16  it's very recent that they would ask that we do a search by

17  location.  It's always been the four plaintiffs or their

18  children, because some of the interactions were generated by

19  offender checks because the children were designated as

20  prolific offenders or had some other designation.  So

21  I don't -- I don't -- honestly don't know how to respond to

22  that.  You know, certainly we will make that effort if it's

23  doable.  I just don't know the answer to that.

24          THE COURT:  Let me ask -- if I could tease this out a

25  little bit, Mr. Poulton, it sounds to me like Mr. Johnson's

1  timeframe is no earlier than 2015, and if you're talking about

2  running a location through a database, that doesn't -- that

3  doesn't entail in the first instance, as a threshold matter,

4  your reviewing the underlying documents.  Do I understand that

5  correctly?

6           MR. POULTON:  We -- right.  If we had a cutoff, we

7  could -- we could just exclude from search results things prior

8  to 2015, but I think that there is a -- if I may, the biggest

9  problem in the searches that we're doing is not documentation

10  related to a particular incident.  We're focused on that right

11  now, that's true, but a lot of the information that plaintiff

12  is asking for, particularly as relates to e-mail searches and

13  whatnot, is not information that is necessarily about a

14  particular incident, and I -- I want to illustrate for the

15  Court, and I don't know if I can -- if there's a share screen

16  option.

17           THE COURT:  Can I just have you pause for a moment --

18           MR. POULTON:  Sure.

19           THE COURT:  -- Mr. Poulton?  I want to make sure

20  I hear you out fulsomely, but I started off by suggesting that,

21  at least in the Court's view, initially the best way to proceed

22  is to look at what I believe to be the -- one of two main areas

23  of discovery.  The first are the incidents, and then the second

24  is the policy itself and related material.  So I'm just

25  focusing on the incidents, which is something that we talked at

1   some length about at the last hearing.  So if I could have you

2   for the moment just address that issue.

3          So if we were to include the location and put a

4   temporal limit on the breadth of the request, how quickly could

5   you produce a list that included location, assuming that is

6   something that has been specifically requested?

7          MR. POULTON:  Your Honor, I don't know the answer to

8   that question.  That's the first time it's been posed to me.

9   But, I mean, I -- as soon as we finish up, I will contact the

10  agency and I will -- and I will ask them to pull the addresses

11  of the plaintiffs from the paperwork, you know, that's already

12  been identified and ask them if they can do a search for

13  responses to a particular address.  I think -- knowing from

14  other cases, I think there's a risk that we're talking -- that

15  we're going to assume the deputies used the same address, that

16  they -- that they fill in Able Avenue as A-V-E-N-U-E and not

17  Ave period or A-V-E period, I think there's some risk there,

18  but I -- I just know that from other cases, but I'll inquire.

19         THE COURT:  Let me just -- before you do that,

20  Mr. Poulton, let me just make sure that -- Mr. Johnson, the

21  predicate for my question of Mr. Poulton was that was

22  information that had been requested, by location.  Has that

23  been the case?

24         MR. JOHNSON:  Well, I think we asked for all

25  interactions involving these plaintiffs, I'm sure that we did,

1   and I think that -- I don't know that we specifically said to

2   do a location search, but any visit to the plaintiffs' home

3   would be a visit involving these plaintiffs, and the case --

4   I mean, it's throughout the Complaint, this case is about

5   frequent visits to these individuals' homes.  So, you know, no,

6   I don't think we've asked, you know, specifically can you run a

7   location search in the database, but I certainly think it's

8   requested in the discovery requests.

9           THE COURT:  Mr. Poulton, just coming back to you,

10  is -- the form of the information that you get as a result of

11  this search for name or location, what information is indicated

12  on -- and I'll just call it a printout or the response that you

13  get.  And where I'm getting here is is there enough in that

14  return of information that you can get some sense -- and I know

15  I've asked this before, but there can be some narrowing of

16  incidents that would be relevant to a claim or defense?

17          In other words, like you mentioned, it could be

18  perhaps a 911 call, and maybe there's an agreement that that is

19  not an Intelligence Led Policing program type of encounter,

20  maybe not, but what I'm trying to do is -- to a concern that

21  you raised, which is arriving at an understanding of what are

22  the incidents that are at issue here, so you can mount your own

23  defense and the plaintiffs know the limits of what they need to

24  pursue.

25          MR. POULTON:  I think in the majority of instances

1   where we do have documentation, it's evident from -- going to

2   be evident either from the incident report, the CAD report or

3   body-worn camera or some combination thereof, whether it's got

4   a connection to -- for example, the most popular one, or the

5   most frequent one, I should say, is prolific offender check.

6   I think most of the time we're able to do that.

7          The level of detail that would be within a given

8   incident report or the documentation varies greatly.  You know,

9   I think that the more that occurred in terms of -- for example,

10  if there were an arrest, if there were a code violation,

11  you know, anything substantive occurred, I think you get a lot

12  more information than if there was just a casual -- you know, a

13  relatively casual interaction, but I think that we -- I would

14  suspect that between myself and plaintiffs' counsel, at some

15  point we'll be able to sit down and say this is the group that

16  looks like post-2015 have some connection to ILP, may not be

17  the only reason for a visit, but there's some connection there.

18          THE COURT:  Okay.  Mr. Johnson, and what I want to do

19  is get to that point as quickly as possible, because it seems

20  to me to be one of the rate limiting steps in the discovery

21  here.

22          So Mr. Poulton is suggesting that there may be a way,

23  based upon what he's able to access and perhaps review with you

24  in an overarching manner, that it can be discerned this is

25  where we want to focus our discovery.

1      MR. JOHNSON:  I think that's right, Your Honor.
2  I think we're close with the 138, and if I think if we could do
3  a location search and then also a name search in the database
4  and then we could use -- we could figure out a way to
5  essentially narrow down the universe of that.
6      I mean, ideally, what I would suggest is that the
7  defendant just run the name search and the location search and
8  just produce all of the dispatch reports and all of the
9  incident reports, and we'll just, you know, review them
10  ourselves, but I understand that they take the position that
11  they have to go through and carefully redact all of these
12  reports of things like if an officer claims that he was,
13  you know, battered by somebody opening the screen door into
14  him, for instance, they go through and they redact the
15  officer's name.  So, you know, with that level of redaction,
16  obviously it becomes a painstaking process on their side, but
17  ideally, on my side, I think we could -- especially if we'd
18  enter into a confidentiality agreement, when they could just --
19  you know, whether it's 400 or 600, just produce all of them and
20  then, you know, both sides can just have the big universe, that
21  seems like the easiest way to do it.
22      THE COURT:  Let me pause there.
23      Mr. Poulton, I'm operating under a number of
24  assumptions, and I want to make -- and maybe Mr. Johnson as
25  well, so I want to understand your viewpoint here as best

1    I can.

2         Let's say you run location, and in addition to the

3    number of incidents that have been identified there are

4    50 more.  It's just a hypothetical.  So, in other words, in

5    your initial search it revealed X number, but now it's X plus

6    50, when you add location as a delimiter.

7         The printout that -- or response that you get, does

8    that in and of itself have some information on it that helps

9    you ascertain what the nature of the incident is?

10        MR. POULTON:  Well, without having done it, it's

11   a little hard to answer, but I suspect that the best item on

12   there will be if there is an incident report number or

13   something that we can then correlate to other documentation

14   that might -- for example, I think that what Counsel is talking

15   about is if we've run the names of the plaintiffs and their

16   children but there was also a response to their home address

17   for a third person that none of us are thinking about, so that

18   would not have come up when we did the name searches, so if we

19   do a location search, we have an incident number, and we go and

20   we look and we find the reason -- you know, we'll get more

21   information by doing it that way than going and looking to find

22   out why there was a response to that location that might not

23   name the plaintiffs or their children.

24        THE COURT:  Well, let me just have you pause there.

25        Now, once you get -- you go back and you look at the

1   incident report, would you be able to ascertain whether that's

2   discoverable, in other words, relevant to a claim or defense?

3           MR. POULTON:  I would think so, but I -- again, one

4   thing that I think that we would all agree on, Counsel and I,

5   is that there's -- the level of detail that might exist between

6   the reports varies so much that it's hard for me to commit that

7   for sure we would be able to trace a location incident report

8   number to a report and look at the report and determine exactly

9   whether it's connected to ILP or not.  I would hope we would be

10  able to, but without having done it, I can't say for sure.

11          THE COURT:  And just to be clear, I'm not gathering

12  that you're going to be able to perfectly correlate every

13  incident and arrive at a definitive determination, but it

14  sounds to me like -- and I don't want to put words in your

15  mouth -- that by looking at the underlying report you would

16  have a fairly good idea as to whether something was related or

17  not, to make a determination as to whether it's discoverable.

18  There might be another segment of what you review that would be

19  in more of a gray area, where it would be challenging to figure

20  that out, but would that be a fair characterization --

21          MR. POULTON:  Yes.

22          THE COURT:  -- about what you might expect -- okay.

23          MR. POULTON:  Yes.

24          THE COURT:  And it would only be where you felt

25  something -- based upon the parameters of Rule 26 and

1    otherwise, that something that was discoverable would have to

2    be redacted.  So I'm just making sure that we're all operating

3    on the same assumption.  If it wasn't discoverable, would there

4    be any reason to have to go through a line-by-line redaction

5    process?

6              MR. POULTON:  Well, it depends -- yes, because the --

7    it's -- we're not redacting based upon relevance, we're -- the

8    issue that arises is whether -- the first issue that arises --

9    and this is why I want to do the screen share, to give you an

10   example, but the first issue that arises is whether or not the

11   item that we are locating involves active criminal

12   intelligence.  Then there --

13             THE COURT:  Let me just have you -- can I just have

14   you pause?  I want to make sure that you understand my

15   hypothetical.

16             MR. POULTON:  Okay.

17             THE COURT:  Because I may not have explained it well.

18             My question was -- what I'm proposing here is a

19   scenario in which you ascertain that the report or the incident

20   is not discoverable.  If it is not discoverable then why would

21   you have to engage in any redaction process?

22             MR. POULTON:  I misunderstood.  Yes, if we weren't

23   going to produce it, then we wouldn't have to worry about any

24   of those subsidiary issues.

25             THE COURT:  So just going back to my hypothetical, if

1  there were 50 additional incidents that came up with -- that

2  you came up with, rather, that were tied to a particular

3  plaintiff just by location, of those some percentage, it sounds

4  to me like, and it's difficult to know at this point, some you

5  would be able to tell were non-discoverable because they

6  weren't relevant to a claim or defense.

7          MR. POULTON:  Yes.

8          THE COURT:  Okay.  And then of the ones that were

9  discoverable, you'd have to engage in the redaction process,

10 and as we discussed at the last conference, there are at least

11 two areas of sensitivity, as I understand, one would be PII, or

12 personally identifying information; the second would have to do

13 with, among other things, an active investigation or actionable

14 information; would that be fair?

15         MR. POULTON:  Yes.  I -- it's a little broader than

16 that.  It would include if there is tip information, the name

17 of a person who was providing information, or if there were

18 report information that was problematic, for example, if there

19 were a 911 caller information or some third-party source of

20 information, those are the primary areas that we -- that we

21 feel we have to look at these documents to see if there's a

22 problem.

23         I will say between the last hearing and this hearing,

24 and I would think Counsel would agree, we did produce quite a

25 bit of material, quite a few incident reports, quite a few CAD

```
 1   reports.  The amount of redaction was minimal.  We have told
 2   plaintiffs' counsel as well that if in reviewing some
 3   documentation they feel the need to know the name of a person
 4   that's redacted, to let us know and we would try to work that
 5   out.  That's not -- we've not encountered that problem.  So
 6   I think that in terms of the volume of material that's been
 7   produced, responsive material, I think plaintiffs' counsel
 8   would agree that that's been working well, it's just that we,
 9   for example, get into the 30(b)(6) deposition and we hear from
10   the witnesses that there is a screen that people enter things
11   in on that nobody thought of, so the plaintiff has asked us to
12   go look for those screens, and that just takes a lot of time,
13   and then we have to make these examinations when we come across
14   that kind of information.
15         THE COURT:  Okay.  And as far as the PII and the
16   actionable information and other information you have, to what
17   extent can you facilitate the production by way of a
18   confidentiality order?  And just to propose a number of
19   mechanisms, one could include an Attorneys' Eyes Only
20   situation.  Would that provide your office with the level of --
21   or your client with a level of confidence, or would that still
22   be something that would give you pause?
23         MR. POULTON:  It still gives us pause, because
24   although that can -- let's say there's a universe of six things
25   we have to screen for.  The confidential -- confidentiality
```

1    agreement might cover three or four of those.  The problem is

2    we still have to look at every single document for the other

3    two, because we can't -- there's no way to screen that out

4    without a, you know, eyes-on review.

5            So, for example, personally identifying information,

6    Social Security number, driver's license number, we actually

7    have already produced quite a bit of documentation with that

8    information in it.  What we had to do, a review for things like

9    NCIC, FCIC information, which the agency believes under its

10   agreements with CJIS and the organizations that compile

11   criminal information, they can't just agree with somebody,

12   we'll give that to you, you don't share that with anybody else,

13   they -- the agency believes it's not able to do that.  So we

14   would have --

15           THE COURT:  Let me just have you pause there though.

16           NCICs are routinely turned over in criminal discovery

17   without any limitation on defense counsel's ability to share

18   that information.

19           MR. POULTON:  Well, that could be because that agency

20   that's getting that information is licensed or is given the

21   right certification to review that information.

22           THE COURT:  But it's not that it's the agency that

23   entitled to review the information.  The U.S. Attorney's Office

24   routinely turns over NCIC and -- I assume FCIC is just Florida,

25   the Florida equivalent.  That criminal history information is

1  routinely disclosed in criminal discovery without limitation.

2           MR. POULTON:  Your Honor, my understanding is that

3  there are -- they're not supposed to be doing that to people

4  that are not recognized by the agencies -- the entities that

5  create that information, they're not supposed to be providing

6  that without the agreement of those agencies, and it's --

7  I don't want to focus too much on that because that's just one

8  example --

9           THE COURT:  No, I'm just saying --

10          MR. POULTON:  Okay.

11          THE COURT:  And I'm not trying to put you in a

12 difficult spot.

13          MR. POULTON:  Right.

14          THE COURT:  What I'm trying to gather is where the

15 real browbeater is, and you've articulated a number of areas

16 where, understandably, there's hesitation and where there can

17 be an agreement that could be struck that would satisfy the

18 concerns that you have.

19          MR. POULTON:  Well, I'm happy to -- in the particular

20 case of NCIC, FCIC, I am happy to go back to the agency and to

21 nail that down a little bit more, as to why -- you know, what

22 the restrictions are.  There are some things that are not

23 reduced to writing in terms of restrictions, which would be in

24 particular the active criminal intelligence information that

25 has to be -- we have to go one-by-one, and I -- I'll wait until

1  you let me do the screen share, but I really think it will help

2  if you'd let me show you the doc -- an example of a document

3  where that comes up.

4        THE COURT:  I wasn't -- I wasn't trying to prohibit

5  you or prevent you from doing something.  I wanted to get a

6  bigger sense --

7        MR. POULTON:  Right.

8        THE COURT:  -- of things before we drilled down on

9  anything that was particularly granular.

10        Mr. Johnson, I know that in an ideal world you would

11  want 600, 700 reports, if there were, and I'm not suggesting

12  this is the situation here, but some Courts address that by way

13  of cost shifting.  In other words, one way of getting both

14  sides to focus on discovery, particularly the proportionality

15  component, is by beginning a discussion of cost shifting.  It's

16  not before the Court, it hasn't been raised, but what I'm

17  trying to get a sense from Mr. Poulton and yourself is what is

18  the discovery that you really care about, and if there was some

19  proportionality concern that was raised and the Court had to

20  entertain the issue of cost shifting, under that scenario --

21  sometimes that adds an additional level of focus for all

22  concerned about what do you really envision that you'll be able

23  to utilize in terms of investigating or pursuing your claims

24  here, rather, and also at trial.

25        So I'm just encouraging the parties to use that as a

1    prism through which to view all this, because as I articulated

2    at the last hearing, the difficulties that Mr. Poulton has at

3    the front end, you may have at the back end, which is you just

4    have an overwhelming amount of information and you go down one

5    rabbit hole, perhaps, or another.  I don't know that that will

6    be the situation, although I have been in your shoes where

7    sometimes you have too much information and it's -- you know,

8    we don't have an infinite amount of time.

9            So with that framework, based on what Mr. Poulton has

10   shared with you and with the Court, is there some way beyond

11   the 138 that we can winnow this down so that some of these

12   concerns that have been raised about moving this case forward

13   so you can pursue more fulsomely the incidents that really are

14   of concern or that you really believe you'll be pursuing,

15   Mr. Poulton can conduct whatever he has to on those, in other

16   words, to drill down and start talking to officers, if that's

17   what he envisions?  It's been referenced in the submissions

18   that that's one item that needs to be done here.  And then this

19   case can move along, because at some point I'm sure you're

20   going to be wanting to do depositions, and that's going to take

21   time, and, left unbounded, you would be working years on this

22   case, and so would Mr. Poulton.  We don't want that, and the

23   Court is not going to want that either, so --

24           MR. JOHNSON:  Well, so I think --

25           THE COURT:  I'll turn to you.

```
 1          MR. JOHNSON:  So I think from plaintiffs'
 2   perspective, you know, at first I would say that the 138 is a
 3   good place to start, and while we work on this issue of making
 4   sure that we have the full universe, I think it's important to
 5   keep moving forward with the 138.
 6          THE COURT:  Let me just have you pause for a moment.
 7          When you say it's a good place to start, that sounds
 8   to me like we're years away from completing discovery, and
 9   that's not the timeframe that Judge Merryday has set, so when
10   you uses the phrase "that's a good place to start," are you
11   talking about that's a good place that you would anticipate you
12   would have 90 percent of what you -- I'm not asking a specific
13   percentage, but if we're talking about something that 138 is
14   merely a starting point for a multi-year discovery process,
15   that's not why I've been brought in.  Let me just say that.
16          MR. JOHNSON:  I understand, Your Honor.  I think what
17   I'm trying to say is that the 138 is a good universe -- let me
18   back up.
19          I think there are two things that from plaintiffs'
20   perspective we want to do here, and one is that we want to
21   develop specific incidents to have a full record of what
22   happened in those incidents so that we can present that to the
23   Court in a -- in a sort of fulsome way so that the Court
24   understands, for instance, what does a prolific offender check
25   look like, why do they make prolific offender checks, how do
```

1   they happen, what do they involve, things like that, and so for

2   the purpose of developing that kind of full factual record,

3   I think the 138 incidents is a good place for us to focus.

4           THE COURT:  Do you envision at trial putting on

5   evidence of individual incidents?

6           MR. JOHNSON:  Some, Your Honor.  I think that it will

7   be necessary to introduce some evidence of some individual

8   incidents, and I think that --

9           THE COURT:  How many do you envision using, ballpark?

10          MR. JOHNSON:  At this point, I couldn't say, but

11  I think that --

12          THE COURT:  Well, certainly not 138.

13          MR. JOHNSON:  No.  No, Your Honor.

14          THE COURT:  I think you would run into a cumulative

15  problem, so --

16          MR. JOHNSON:  No, I think, you know --

17          THE COURT:  Less than 138, and it's more than zero.

18  So where roughly would you envision that you would propose to

19  Judge Merryday that you be allowed to introduce?  And obviously

20  he'll have to decide what, if any, he would allow.

21          MR. JOHNSON:  I think some of these incidents --

22  sorry, Your Honor.  So I think some of these -- my sense is it

23  would be somewhere -- it wouldn't be a simple number, but it

24  might be, you know, a handful, say, you know, a few for each

25  plaintiff that we would go into in detail, and then there are

1    others that we would be able to cover quite quickly,

2    for instance, it's just a report that says that there was a

3    prolific offender check that was conducted and they asked

4    questions about, you know, who is the father of Dalanea's

5    child, or things like that, and those could be covered quite

6    quickly.

7              Then there's other incidents that we wouldn't go into

8    in any detail at all, we would just say there were ten prolific

9    offender checks that occurred over, you know, this particular

10   span of time, things like that.

11             So I guess what I'm trying to say then is from our

12   perspective there are two things that we want to do, and one is

13   to drill down on particular incidents, and with that we're

14   really focused on the 138, but what I'm just trying to avoid is

15   to say, well -- because I think another question the Court may

16   have is, well, how many incidents were there, and --

17             THE COURT:  I'm sorry.  I couldn't quite hear the end

18   of that.  How many --

19             MR. JOHNSON:  How many incidents were there?  I think

20   the Court may want to know how many prolific offender checks,

21   for instance, occurred at these particular addresses over,

22   you know, the relevant time period, and I just don't know that

23   we have that answer yet.  And so I think there -- there really

24   are two things.  I mean, we don't --

25             THE COURT:  Well, let me just have you pause there.

1    Forgive me, I never want to seem impolite, but I do want to

2    focus in on a number of concepts here.

3           If Mr. Poulton were to run a check by location,

4    I haven't heard any additional identifiers that either you or

5    Mr. Poulton would be aware of that would unearth additional

6    prolific offender checks.  Can you think of any --

7           MR. JOHNSON:  So I --

8           THE COURT:  -- based on --

9           MR. JOHNSON:  Sorry, Your Honor.  I didn't mean to --

10          THE COURT:  Can you sort of -- based on what you

11   heard at a 30(b)(6) witness deposition or otherwise.

12          MR. JOHNSON:  So I do think we -- you know,

13   for instance, a location search, and then identifying reports

14   that are marked as prolific offender checks in the -- in the

15   Pasco County Sheriff's Office records, that would be a simple

16   way to do it.

17          THE COURT:  Let me have you pause there.

18          I understand from Mr. Poulton that that's one of the

19   items that he has specifically looked for.

20          Did I understand that correctly, Mr. Poulton?

21          MR. POULTON:  That is one of the items that we would

22   look for.  I didn't -- I don't -- I think Counsel has conceded

23   they have not previously asked for a location search yet, and

24   I'm going to get that ball rolling.  I don't know the

25   parameters, I don't know how it would work, but start that, and

1    then my idea is that if that generates 50-ish reports, or

2    incident numbers, let's say, that then we could go look at the

3    incident reports to see if there is reference to prolific

4    offender check within them.

5            THE COURT:  And certain -- and let me just go back to

6    two things that would function as a practical matter to be

7    limiting.  One, I understand there to be a temporal limitation

8    that the parties can agree on; and, secondly, some of these

9    location search items that are going to come up are going to be

10   duplicative of those that you've already produced, I would

11   assume.

12           MR. POULTON:  That's true.

13           THE COURT:  In fact, you would imagine that a large

14   majority of them would be duplicative.

15           Obviously you can't commit to something that you

16   haven't seen, Mr. Poulton, but it seems to me that -- from what

17   I've heard so far, that that would likely be the case.

18           MR. POULTON:  Yes, you've -- I think you're right.

19   I think that that's an additional layer of labor that would be

20   involved here, because we would -- to find the extra 50, the

21   theoretical extra 50, we have to go through and notice the 138

22   we've already -- or whatever of the number is, let's say 100

23   that we've already found and produced, because we would just be

24   getting location searches, and a lot of those would be

25   duplicative of what's already been produced.

```
 1              THE COURT:  Here is where the two of you could help
 2    each other out, if you could develop a spreadsheet, per se, or
 3    something that you could each work off of.  So, Mr. Poulton, if
 4    you did the printout, if they occurred on the same date at the
 5    same time, there's a good chance they are duplicative of
 6    something that you've already produced, you may have to
 7    doublecheck it quickly, but it seems to me that some of that
 8    effort wouldn't be as demanding if there could be some
 9    mechanism in place to ascertain quickly if something appears to
10    be duplicative.
11              MR. POULTON:  Right.  So we need to create a
12    spreadsheet with the 138 by date and time and location, then do
13    the location search and go one-by-one -- I'm trying to think
14    through how to do this.
15              THE COURT:  Well, this is something that the parties
16    could do together.
17              MR. POULTON:  Right.
18              THE COURT:  Mr. Johnson, I think, you know, you could
19    have an agreed-upon spreadsheet that both would concur is
20    accurate and that Mr. Poulton could then work off of, or
21    somebody in his office could work off of, and you'd get the
22    universe -- you would get a printout, I imagine, Mr. Poulton,
23    that wouldn't have the underlying reports, you would just have
24    dates and times, and then you'd go through and discern which
25    ones you would even have to look at.  You might be able to
```

1    eliminate a fair measure.

2            MR. POULTON:  I don't know what it would look like.

3            THE COURT:  Okay.

4            MR. POULTON:  I just don't know.

5            THE COURT:  That's fair.

6            And, again, I'm just trying to brainstorm with the

7    parties here to get to an end point, so that, Mr. Poulton, your

8    efforts at looking at how many possible incidents here are

9    relevant to a claim or defense comes to an end, and,

10   Mr. Johnson, you have that sense as well, you both have the

11   documentation then that you need, and we can start talking

12   about moving ahead to other items that -- well, there's no

13   reason these things can't proceed on a parallel route.  In

14   other words, you can still be working on the 138 and then --

15   this is -- Mr. Poulton, it appears to me simply to be a

16   back-check to make sure there's nothing that -- in your initial

17   search that's been left out based on location.  And it could be

18   something that may not be too time consuming.  We'll have to

19   see.

20           Mr. Johnson, just so we have an understanding here

21   though, I don't hear any other parameters that Mr. Poulton

22   would need to look for beyond plaintiff names, which he's

23   already gone by, and children, and then location.  If there's

24   some other item that you think that needs to be included, now

25   would be the time to articulate it and then we can move

1   forward, but I want to bring this side of the discovery and put

2   some finite time frame on it so things move forward.

3           MR. JOHNSON:  The other thing we would be -- so

4   I think a search by location, and then the names of the

5   plaintiffs and their children, and then within that result what

6   we would be interested in are either things that are marked as

7   prolific offender checks or incidents that involved the

8   STAR team, which is the team of deputies that's tasked with

9   targeting prolific offenders.

10          THE COURT:  So just so I understand, Mr. Poulton,

11  what I hear is if you do location in addition to what you've

12  already done, that would be the conclusion of gathering the --

13  these are not definitive things, but the universe of what you'd

14  be looking at, that would cabin it, and then what is being

15  proposed -- and I'll leave it for the parties to discuss about

16  what you would look for in the location, the new reports that

17  are not duplicative and that are relevant, because we talked

18  that some portion of them would likely be duplicative, some

19  portion of them would likely be irrelevant to a claim or

20  defense, and then of what remains, what needs to be tendered.

21          Mr. Poulton, did anything that I articulate strike

22  you as being problematic or something that I'm missing?

23          MR. POULTON:  I just think it's much more time

24  consuming than it might appear at first blush.

25          THE COURT:  And why do you think that might be?

1          MR. POULTON:  Well, I'm assuming that there are going

2     to be incident report numbers from the location search, which

3     we can then pull those reports.  I'm assuming that to be the

4     case.  Then we have to go through them, and I understand

5     plaintiffs' counsel -- you know, we can negotiate the specific

6     items, but it sounds like the two things they primarily want us

7     to look for are prolific offender or STAR team, and I just

8     don't know the size of that, I don't know -- I mean, because

9     the agency has to go through at least, what, three steps there

10    to get to that point --

11          THE COURT:  If I could have you pause right --

12          MR. POULTON:  Okay.

13          THE COURT:  -- for a moment.  You said something that

14    I forgot or didn't realize.

15          In ascertaining what is duplicative, wouldn't the

16    incident report number for a location -- wouldn't you be able

17    to discern whether it's duplicative, because it would have the

18    same incident report number?

19          MR. POULTON:  I don't know that we can do it in

20    automated fashion, is the problem.  I think it has -- I mean,

21    I'm -- you know, you're talking about having to create a

22    spreadsheet that lists out the incident report numbers and the

23    dates and the times and the locations and then comparing that

24    to the result from the location search and weeding out those

25    that have already been produced because the name search already

```
 1   caught it, so it just -- it's --
 2           THE COURT:  If Mr. Johnson were to put together the
 3   spreadsheet, he has the discovery to facilitate the review on
 4   your end.
 5           MR. POULTON:  If the plaintiffs' counsel put together
 6   a spreadsheet that had the incident report, the date and the
 7   time, while the agency was simultaneously running the location
 8   search -- and so far I have not seen Ms. Scruggs throw anything
 9   at the screen, so I'm hoping I'm right about the ability to do
10   this, I don't know, she may yell at me later, but the agency
11   could do the location search and try to pull some identifier
12   that would let us generate then the reports to compare to the
13   spreadsheet that the plaintiffs' counsel put together.  That
14   might cut down on the amount of time that it takes overall,
15   I agree.
16           THE COURT:  Ms. Scruggs, so that we do avoid any
17   throwing of items at the screen, I'll take it from
18   Mr. Poulton's comment that you have a strong familiarity with
19   what's involved here, so let me bring you in, if I could.
20           MS. SCRUGGS:  Yes, Judge.  Good morning.
21           THE COURT:  Good morning.
22           MS. SCRUGGS:  So I believe that we can run a location
23   search, and that should -- I mean, I apologize, I'm not great
24   with that system, but I believe that we can run a location
25   search and that should generate the calls to that location, and
```

1  then from there we would have to look at each and every report.

2  So I don't know if -- as an example, Ms. Taylor, right, so

3  let's say that we went out to her location but we made contact

4  with somebody else for an unrelated reason, we would obviously

5  have to weed that out, because that would not be responsive to

6  discovery.  Those reports would still have to be read through,

7  obviously, and then if we're able to, I guess, figure out

8  whether they're responsive or not, I mean, we still have the

9  same issues with active criminal intelligence, et cetera, so

10 whether those cases are still active.

11        THE COURT:  Let me have you pause for -- let me have

12 you pause for a moment, Ms. Scruggs.

13        MS. SCRUGGS:  All right.

14        THE COURT:  It seems to me the first thing that ought

15 to be done would be if you pulled reports by location, the

16 first thing that you would look for would be is it something

17 that's already been part of the 138; in other words, have you

18 already -- has it already been encompassed in something that

19 you've already reviewed.

20        MS. SCRUGGS:  Sure.  And if plaintiffs' counsel --

21        THE COURT:  And that would seem to me to eliminate

22 the speculating, that with some background in working in these

23 types of areas, that that would winnow it down fairly

24 substantially, I suspect.  Time will tell.

25        MS. SCRUGGS:  Yes, Judge.  And if we have that list

1   from plaintiffs' counsel, that would certainly be very helpful

2   to be able to winnow that down substantially.

3          And also, just a thought, if plaintiffs' counsel

4   could provide the addresses and a date range, that may be

5   helpful to be able to do that search and kind of, you know,

6   winnow that down, because if they didn't live at a location

7   then obviously we're wasting our time -- for a period of time,

8   we're going to be wasting our time in doing the search and

9   going through those.  So I think that that would be helpful

10  also, if that's possible, by plaintiffs' counsel.

11         THE COURT:  Mr. Johnson, I oh so subtly volunteered

12  you and your crew to put together a spreadsheet, but it would

13  seem to be in your best interest to have a hand in that, and

14  certainly Mr. Poulton and Ms. Scruggs can review that for

15  accuracy, but I think Ms. Scruggs' suggestion about not only a

16  temporal delimiter, let's say 2015 moving forward, from what

17  I can ascertain from your Complaint, but also talking to your

18  clients about were there any times when you did not reside at a

19  particular address, so that that can winnow it down even

20  further.

21         And I'm speculating here to all counsel, but removing

22  those things that are hopefully readily identified as

23  duplicative, that are excluded from the search because they're

24  temporally not relevant, and eliminating things, Mr. Poulton

25  and Ms. Scruggs, that perhaps you can look at with some more

1   immediate clarity that it's not relevant to a claim or defense,

2   not responsive, that may limit in the end what you're

3   ultimately looking at, and that, from what I'm hearing from

4   counsel, would conclude this aspect of the discovery process

5   and now you would have what you need.

6          Moving forward, Mr. Johnson, you would have what

7   you're going to work with, and Mr. Poulton and Ms. Scruggs, you

8   as well.  There could be something that would come up that

9   nobody has anticipated, but that could be addressed as a matter

10  down the road.  It would bring some closure to this aspect of

11  discovery, which is the Court's intent here.

12         Ms. Scruggs, anything I may have missed in that

13  regard?

14         MS. SCRUGGS:  I don't think so, Judge, as long as we

15  have that initial list of what's previously been -- I guess

16  I would think with the name search we would have captured

17  almost every interaction, especially if they're listed in a

18  report.  I don't believe we have a report entitled Prolific

19  Offenders, like a drop-down, as an example, you know, they're

20  titled by information for a deputy or something else, that that

21  unfortunately is unable to be searched by that report type.

22  Like I said, you know, we'll have to go through those to

23  determine whether that was a prolific offender check or not.

24  Some of those are not documented via report, they're documented

25  via CAD, and plaintiffs' counsel has been provided with all the

```
1    CADs, I believe, by their name search term.  We can certainly
2    run that.  Once we're provided with the address date range, we
3    can run that certainly that way, so -- with regard to the
4    STAR team, certainly those members change over the years, so we
5    probably are going to have to go back and determine who was on
6    STAR from 2015 going forward to --
7            THE COURT:  Let me just have you pause for a moment.
8            MS. SCRUGGS:  Yes, Judge.  I'm sorry.
9            THE COURT:  That's okay.  Every time -- and I don't
10   mean to be impolite, and I hopefully am not.
11           The parties should think about whether -- how much
12   you have to drill down on this or whether it just -- it's more
13   work than it's worth.  In other words, Ms. Scruggs, if it were
14   to be the situation that you and Mr. Poulton were to decide,
15   I can give you the document, you can go and look and see if
16   it's relevant, instead of having to drill down further on the
17   STAR team -- and Mr. Johnson may be amenable to that.
18           MS. SCRUGGS:  Sure.
19           THE COURT:  It could be -- so that would lessen what
20   you need to do on your end and Mr. Johnson could look into
21   that.
22           Mr. Johnson, how long would it take to generate --
23   I know your clients are very capably represented here.  How
24   long would it take to generate something that is akin to a
25   spreadsheet, it can be in whatever form the parties find it to
```

1    be most useful, that Ms. Scruggs and Mr. Poulton could utilize

2    as an accurate encapsulation of the discovery that's been

3    provided?

4            And Mr. Poulton, Ms. Scruggs, you're obviously very,

5    very capable attorneys, you could decide internally as to best

6    how to do this, but it would seem to me that if you talk to

7    your staff and the people who know these things, what

8    information you need to be included in that, so that you can

9    hopefully ascertain if something is duplicative and thereby

10   utilize the spreadsheet to your advantage in an expeditious

11   manner.

12           But, Mr. Johnson, returning to you, assuming that

13   Ms. Scruggs and Mr. Poulton can give you some parameters that

14   they know will help them winnow this down so that you're not

15   overwhelmed with additional stuff that you don't want in the

16   first place, how long would that take?

17           MR. JOHNSON:  I mean, I think we basically have that

18   spreadsheet.  The only thing, from what Mr. Poulton mentioned,

19   that he'd want in it that's not in there right now is the time,

20   so we'd just have to go through and add the time, but otherwise

21   we have that for all of these incidents.

22           THE COURT:  Mr. Poulton and Ms. Scruggs, you can

23   decide whether that temporal delimiter would really help you.

24   In other words, if the plaintiff said, well, I wasn't there for

25   a two week period, is that really going to help you, or -- and

1  you can make those decisions on your own, but I would just

2  encourage the parties to communicate as much as possible here,

3  because it sounds to me like we can, as I said, cabin this part

4  of the incident side of the discovery and move forward,

5  Mr. Poulton, to the point that you've made, I think, and

6  ascertain what are the defenses that you wish to levy in

7  response to those particular incidents that may be at issue.

8          MR. POULTON:  Well, let me -- that -- you're actually

9  hitting on where the real disconnect is in this case at the

10  35,000 foot point of view, and you -- to put it -- I mean, to

11  boil it down, you know, obviously the defense is approaching

12  this from the traditional *Monell* point of view, which is

13  is there an underlying incident where you're claiming you were

14  falsely arrested, excessive force was used, there was an

15  unconstitutional intrusion into your home, and then is that

16  causally related to ILP, traditional *Monell*.

17          The plaintiffs -- if you read the motion to dismiss,

18  Count Five of the most recent Complaint and plaintiffs'

19  response, you'll see where I think the disconnect is.

20  Plaintiffs' position is that the mere fact of the offender

21  check, the mere fact of going to the residence and speaking to

22  the plaintiffs, by itself is un -- is a violation of equal

23  protection rights because the plaintiffs are being treated

24  differently than people who are not prolific offenders.  And

25  so, for example, when plaintiffs' counsel said "We might point

1    to two or three incidents," I don't understand why the

2    plaintiffs' can't right now -- Ms. Heilman say, "I was falsely

3    arrested twice, this time and this time, they

4    unconstitutionally entered my home this time," and so we can

5    focus on those.  But what's really going on is plaintiff wants

6    to come in and say, you were visited 37 times over five years,

7    and you -- you know, that therefore you -- and you were

8    unfairly targeted because you were listed as a prolific

9    offender or you had someone in your family who was a prolific

10   offender, and so they have more of a birdseye view, if you

11   will, towards the mere existence of prolific offender checks.

12          I don't think that's correct under the law, because

13   I think it imprints onto what would be an ordinary

14   Fourth Amendment analysis, an additional level at equal

15   protection, and I'm sorry, I went way far afield, but I -- at

16   the end of the day, that's the difference in the philosophical

17   approach, if you will, that the two sides have to this process,

18   um, because in my view -- you asked the question what are my

19   affirmative defenses going to be.  I don't know from a

20   traditional *Monell* point of view because I don't know what the

21   claims are.

22          THE COURT:  Let me just have you pause there.

23          I understand -- I think you've articulated this

24   previously, at the last hearing.  I wasn't asking --

25          MR. POULTON:  Okay.

1          THE COURT:  I don't believe I did, but I appreciate

2     you offering, because I understand from both parties'

3     standpoints there is a lot here of interest and of concern, but

4     let me just say this.  I'll use your 35,000-foot perspective.

5     What the Court is trying to do here now is address discovery,

6     not decide claims.  What the Court understands is that the

7     parties had embarked down a road dealing with 135 or 138

8     incidents.  What I've simply been addressing for the last

9     better part of an hour is removing the ambiguity that's been

10    articulated in the status report as to whether the 138 is the

11    limit in a realistic and practical sense or if there's

12    something more.

13          So what I've been addressing is the additional search

14    for location and how best to quickly facilitate the review of

15    those documents to decide what additional incidents, if any,

16    are going to be at issue, and then down the road, Mr. Poulton,

17    to your point, and I'm sure Mr. Johnson will weigh in on this

18    at some point at the appropriate juncture, as to whether that

19    is something that is part of the case or should be part of the

20    case, so -- whether by way of summary judgment motion or

21    something by way of a motion in limine before trial.  So my

22    focus here is purely on discovery and making sure, Mr. Poulton,

23    Ms. Scruggs, Mr. Johnson, that all of the efforts of the

24    parties here with this area of incidents draws to a closure as

25    quickly as possible.

1         So, Mr. Johnson, you already have the spreadsheet.

2    I didn't know or I don't recall if you gave me a specific

3    timeframe, but I was thinking something like a week or less to

4    get that to Mr. Poulton and Ms. Scruggs, while they run

5    their -- the location using the temporal delimiters that we

6    talked about, and it would only be, from what I understand,

7    Mr. Johnson, the additional item of the location, and it could

8    be theoretically that there are no new documents at one end of

9    the spectrum, and there could be a more robust set possible,

10   but I suspect from experience there won't be an inordinate

11   amount of documentation.  Of course, time will tell.

12        So, Mr. Johnson, today is Tuesday.  Is that something

13   you could have to Mr. Poulton and Ms. Scruggs by the end of the

14   week?

15        MR. JOHNSON:  Yes, Your Honor, that is.

16        THE COURT:  Okay.  And, Mr. Poulton, Ms. Scruggs, do

17   you think you could move forward with what you need to do, or

18   do you need the temporal delimiters?  Ms. Scruggs, just because

19   of your obviously strong familiarity with this area, if you

20   want that information in advance, or --

21        MS. SCRUGGS:  I would just ask if plaintiffs' counsel

22   could send us the addresses and the time frame the plaintiffs

23   lived there, that would just exceptionally help, you know, our

24   search.

25        THE COURT:  Okay.  So the spreadsheet should

1    include -- and I would encourage, Ms. Scruggs and Mr. Poulton,

2    that you talk to your people that you need to talk to about

3    what information you need in that spreadsheet to ascertain,

4    among other things, whether something is duplicative, because

5    if it is then there's no further -- it would appear, no further

6    work that needs to be done, because, as you've suggested,

7    Ms. Scruggs, you've captured what you need and now we are back

8    to 138 as being a much firmer number than what we appear to

9    have now.

10          Any questions on that before we move on to the other

11   element of discovery?  Mr. Johnson, I saw you raise your hand.

12          MR. JOHNSON:  Yeah.  I just wanted to say -- so for

13   many of these incidents the only reports we have are from the

14   CAD database, and I understood Ms. Scruggs to be suggesting

15   that for many of these prolific offender checks there would

16   also be incident reports, so -- and that may not be the case,

17   but I guess all I would just say is that if there's an incident

18   for which we already have a CAD report but there's an incident

19   report that has not been produced, we obviously would want that

20   incident report.

21          So I think what we could do though, you know, in our

22   date -- in our spreadsheet that we -- that we create, we can

23   indicate whether we have an incident report or a CAD report or

24   both for these incidents, so that that would then help to

25   narrow down what we're looking for or --

1          MS. SCRUGGS:  If it's helpful, if there's a report

2    generated from a CAD, that would be listed in the CAD report,

3    if that's helpful.

4          THE COURT:  Both sides -- and I have been impressed

5    from the outset.  Both sides not only are very capably

6    represented, but, to your credit, it seems like there are,

7    you know, good lines of communication here, so the more

8    discussions that go back and forth between the parties -- I've

9    made this point before, Mr. Johnson, the more information you

10   supply as to what you're particularly looking for, and then

11   Ms. Scruggs and Mr. Poulton have that information, if they can

12   eliminate things, you're just going to get the information more

13   quickly, and you won't be weighed down by additional

14   documentation that you have to go through, and that's going to

15   be an expenditure of time and resources on your end, and nobody

16   wants that.

17          So I'm going to turn the page here, because the Court

18   does have other business today to attend to, a number of

19   hearings.  The other area was that having to do with policy and

20   documentation.

21          Mr. Poulton, you did lay out in the joint status

22   report where things stood on that end.  Do you envision a lot

23   more on the documentation pertaining to the policy and its

24   parameters and the like?

25          MR. POULTON:  I think that the depositions, the

1    Rule 30(b)(6) helped quite a bit on that to narrow the universe

2    of documents that might be available in terms of policy.

3    Plaintiffs' counsel followed up last week with some additional

4    requests based upon the depositions, and we're looking into

5    that, but it's -- it's a -- it's an issue on two fronts,

6    because you have the generic policy issues, you know, there's

7    a -- there's an ILP manual, which is really sort of the main

8    document, everything works from there, there's not a whole lot

9    else on top of that, they've asked though for -- is there a

10   training, for example, of FTO, field training officer -- is

11   there a checklist for an FTO for a Pasco deputy that includes

12   an element of ILP, when they're going through that two to

13   six week training --

14             THE COURT:  If you could just pause for a moment.

15             MR. POULTON:  Sure.

16             THE COURT:  Is an FTO a field training officer?

17             MR. POULTON:  Yes.  And as is typical when a -- when

18   a new deputy comes in, they go through a training program with

19   a number of other senior deputies, and it's really hands-on

20   training, it's go do a traffic stop, watch how they do a

21   traffic stop, et cetera.  But the question had arisen in the

22   30(b)(6) depositions, are they trained on ILP.  The answer is,

23   if so, it's not consistent.  But plaintiffs' counsel has

24   inquired, is there a checklist for FTO that might show an

25   element of ILP, and we're look -- we don't know the answer on

1    that quite yet, we haven't gotten to that.  It just came up

2    last week.

3            So we're looking into those things.  I think that

4    that -- as I say, I think the 30(b)(6) depositions were really

5    helpful to lawyers on both sides to understand that, how that

6    process works.

7            The second layer of it has to do with ESI that is

8    being directed at, for example, e-mails or documents attached

9    to e-mails, that's where the real problem is, that mentions the

10   plaintiffs.

11           THE COURT:  Can I just have you pause there,

12   Mr. Poulton?  And I appreciate you laying this out, because

13   I was going to ask you about the ESI remark that you include in

14   the joint status report.

15           Just going back to the initial documentation that

16   lays out in a -- I'll articulate it as a formal -- more formal

17   sense, like a manual, among other things that Mr. Johnson has

18   asked for that deal with a practical implementation of what is

19   in the manual, is it the case that what needs to be or what you

20   view as being responsive or what has been asked for, the manual

21   and these field training reports, is there anything else

22   besides that?

23           MR. POULTON:  I can't recall off the top of my head

24   if there was anything else that was identified in that list of

25   13 items.  Mr. Johnson can remind me.

1           I think we're really far along on that aspect of it

2    though.  I really do.  I think that those depositions, well,

3    particularly of Mr. Kraus, really helped compartmentalize that

4    for everybody.

5           THE COURT:  Okay.  Mr. Johnson, let me turn to you,

6    before Mr. Poulton discusses with you and the Court the ESI

7    concern, on these other elements, the manual and field training

8    reports, is there anything else that needs to be explored on

9    that end?

10          MR. JOHNSON:  No, I think that in terms of the

11   general policies what emerged from the depositions is that the

12   policies for the most part are encapsulated in the manual

13   itself, and so, you know, I think we're content with that.  We

14   do obviously have questions about the implementation,

15   for instance, training.  There's also a new version of the

16   manual, so we're asking for that.  There is -- there was a five

17   year retrospective assessment of the program to determine how

18   it's been working that was produced in 2021 which would be a

19   retrospective look at the period that this lawsuit covers, so

20   we're obviously looking for that.

21          THE COURT:  Many of these things --

22          MR. JOHNSON:  But for the most part --

23          THE COURT:  -- that you're mentioning -- let me just

24   have you pause, and I appreciate your elucidation on these

25   topics, but is there anything that has come up that the parties

1    disagree with as to whether it should be produced based on --
2    there was a reference to depositions, plural, but I understand
3    the Kraus 30(b)(6) deposition to be a singular item.  Is there
4    anything that came up in that deposition, Mr. Johnson, I'll
5    begin with you, that you've sought but have not been told
6    you've received?  And I don't want to suggest that you're
7    entitled to it, I just want to know if there's anything here
8    that the Court needs to be aware of, if it can.
9          MR. JOHNSON:  Yeah.  So I've not been told exactly
10   what of the list of items we gave we will receive, so I --
11   I expect that we will receive these items, but I don't know.
12   So, for instance, the items I just listed, I don't -- I've not
13   been told whether we will receive those or not.
14         THE COURT:  So, Mr. Poulton, in fairness to you,
15   I believe you had mentioned that you're still looking through
16   those items that have been given to you?
17         MR. POULTON:  Right.  We just received that request
18   last week.  I -- it is my understanding there may be a problem
19   with the production of the ILP manual that has just been done
20   because it's being done in a different format.  There is a
21   portion that is -- we would probably assert a
22   law enforcement -- not probably, I know we would assert a
23   law enforcement privilege aspect to, because it will be focused
24   on technique, but I think there's a -- a generic document that
25   is -- would be publicly available, so I don't have any

1    problem -- I'm sure that could be produced.  Whether there's an
2    extra layer of that that cannot be -- I've got -- I'm under the
3    impression that's true, but these are things that are
4    occurring -- you know, these revisions are occurring as -- as
5    this case is going, it's -- you know, it's dual track, so
6    I really don't know for sure the answer to that.
7         THE COURT:  Okay.  So obviously the next time -- by
8    the next time we meet, we'll have some closure or some greater
9    clarity on those matters.
10        So just returning, Mr. Poulton, you had put in one
11   subcategory that had to do with policy, the manual and the
12   field training reports and the like.  The other item that you
13   had mentioned was ESI.  What's left on that end?
14        MR. POULTON:  Well, quite a bit.  Plaintiffs' counsel
15   and I have worked together, and we do communicate on average
16   every two or three days, you know, working on these various
17   issues, and they've narrowed down by date and whatnot the --
18   and search terms what they want searched in agency e-mails for
19   their clients, and we're down to a point now where we've got --
20   and I'm going to use rough estimates, it's been a little while
21   since I looked at it -- I think around 5,000 documents attached
22   to e-mails, and these documents will reference in some way the
23   plaintiffs.  They may not be the focus of the document, they
24   may be tangentially mentioned, but we run into the big problem
25   of -- in our view, of looking at each -- we have to look at

1    each one to determine whether or not it includes active

2    intelligence, criminal intelligence information, and then we

3    have to look at, for example, tip information or information

4    coming from third parties.

5              I did share with plaintiffs' counsel prior to the

6    30(b)(6), because I wanted them to have it so they would see

7    what we're talking about, an example, and I'll go back and ask

8    to screen share an example of the document, the type of

9    document we're looking at, if I may, Your Honor.

10             THE COURT:  Sure, but I am just dealing with a time

11   constraint here, because --

12             MR. POULTON:  I understand.  I'll be very quick.

13             THE COURT:  Okay.

14             MR. POULTON:  You -- it's disabled.

15             THE COURT:  Madam Clerk, if you're there, can we

16   screen share?

17             COURTROOM DEPUTY:  I don't know if --

18             MR. POULTON:  I can describe it.  I'll save time.

19   I can describe it, Your Honor.

20             THE COURT:  I'm sorry.

21             MR. POULTON:  I can describe it.

22             THE COURT:  Okay.

23             MR. POULTON:  I'm trying to save time.

24             THE COURT:  I appreciate your efforts.

25             MR. POULTON:  It's a document dated September 18,

```
 1   2018, it's a five page document, it was generated by ILP, and
 2   it dealt with a particular gentleman who was a person of
 3   interest in an aggravated assault and a suspect in an armed
 4   robbery at the Hard Rock Casino.  There was a warrant for his
 5   arrest, and it's got all sorts of information on him about
 6   prior incidents, the belief that he is armed, there's
 7   information from a quadrant called TipSoft, which gives
 8   information on tips they've received, that he's dealing crack
 9   and meth, cocaine, heroin and firearms out of a strip club in
10   New Port Richey, and then it's got some social media connected
11   to him, and then there are several pages of people who are
12   listed as associates, and you get to the last page and one of
13   the persons who was listed as an associate was Dalanea Taylor,
14   who is the plaintiff, and so when we -- when we ran the search
15   in the e-mails and the attachments, this document pops up.  No
16   problem producing it, but the reason that we don't have a
17   problem producing it is the agency went back and looked to find
18   out what was going on with this gentleman, his name was
19   Victor Castillo, and they determined that he is currently a
20   guest of the Pasco County Sheriff jail, so it wasn't active
21   intelligence in terms of looking for him, so we were able to
22   produce that.  We've -- it's got, let's see, personal
23   identifier information, driver's license, date of birth.  We
24   didn't redact any of that.
25              The problem is we have to go through each one of
```

1    these documents -- as I say, there's about 5,000 of them, by my

2    count -- and we have to -- for each one, is this active

3    criminal intelligence, which means the agency has to go and

4    look, is this active criminal intelligence for this gentleman,

5    Mr. Castillo, then they have to look and see do we have

6    information in here that is coming -- that identifies a tip, a

7    person giving a tip.

8          What my suggestion -- and, frankly, I haven't had a

9    full opportunity to talk about this with plaintiffs' counsel --

10   would be is that we search for documents which are

11   representative of this type of scenario, where a third person

12   has been identified as being sought on a warrant and a

13   plaintiff is listed as an associate, and then in discovery,

14   when we get further on down, they can ask the agency what does

15   it mean for Dalanea Taylor to be an associate, what is the

16   consequence to her in terms of ILP, rather than go through each

17   of those documents -- not all of them are going to be like

18   this.  I don't want to mislead the Court.  It's not 5,000 times

19   we have to check to see if they are active criminal

20   intelligence, but a certain number -- a large number of them

21   will be, and so what I'd rather do is just search for something

22   representative of these scenarios where they can be connected

23   up to another person as part of ILP and work from there.

24          THE COURT:  Mr. Johnson, I'm not going to suggest

25   that that is an answer, but even before Mr. Poulton proposed

1    that, you know, one question would be are you really interested

2    in this type of document, and if you are, is there something

3    that you would gather that would be fair to your client and

4    would allow you to zealously advocate for your client, but from

5    a proportionality standpoint that provides something that's

6    simpler, and, quite frankly, that if you ever got to a trial

7    and summary judgment motion, it would be more workable for you.

8         MR. JOHNSON:  So I think I just want to be careful.

9    I mean, for this particular type of document, where Dalanea

10   Taylor is being listed as an associate of, you know, another

11   individual, I think a representative sample would work, I think

12   that that's fair, but I just want to be careful that this is

13   not then used as a representative sample for something that's

14   completely different.

15        So, for instance, you know, one of the people who is

16   identified as an associate of this individual is his mother,

17   simply because she's his mother, and we have a First Amendment

18   association claim in the lawsuit that, you know, some of our

19   clients were targeted because they're the mothers of people who

20   are in the Sheriff's Office's crosshairs.  So, for instance, a

21   document that identified Tammy Heilman as the mother of

22   Donnie McDougall, you know, prolific offender Donnie McDougall,

23   that would be relevant and I wouldn't want that to not be

24   produced just because we've got this other document about

25   Dalanea Taylor.

```
 1          THE COURT:  So let me just suggest something, and
 2   I don't know if it's workable or not.  It could be that
 3   Mr. Poulton's solution is one that you would find workable for
 4   you, but if you knew the other -- the number of instances where
 5   it came up, your client was mentioned in this type of scenario,
 6   and you had a representative sample, then Mr. Poulton doesn't
 7   have to go through and redact information or make a phone call
 8   and try to ascertain whether something is active intelligence.
 9          MR. JOHNSON:  Right.
10          THE COURT:  It just seems to me, whether these are
11   things that the parties can agree on or not, that they're
12   worthy of discussion.  And, Mr. Poulton, I think you mentioned
13   that you hadn't had a chance to talk to plaintiffs' counsel
14   about it, but I think that that's a good idea, that as this
15   information, Mr. Poulton and Ms. Scruggs, is coming to light,
16   to have those kinds of discussions.  Do you really want this?
17   I've certainly been in those discussions myself, and often the
18   answer is, not really, I want something maybe that's more
19   concise or easier to work with, it could be, and then it saves
20   everybody a lot of time, because, again, I want to reinforce
21   something here from a proportionality standpoint, the Court is
22   not looking at it, but -- and that is the concept behind cost
23   shifting, is that it focuses the party on what they really
24   want, both from the defense and the plaintiffs' perspective,
25   and it often achieves greater clarity, and it's not before the
```

1    Court but it's a valuable prism through which to look at things

2    sometimes before we get there.

3            Am I missing anything else, Mr. Poulton, on the E --

4    forgive me, it's been a long time out here -- ESI front?

5            MR. POULTON:  I think that that's the main issue

6    right now.  There could be some ESI issues that arise with the

7    most recent requests, but I think that they would have to do

8    less with worrying about things like criminal intelligence and

9    more just how practical production is.  It's got to do with the

10   technical things we all learned in the depositions a couple

11   weeks ago about the way the deputies enter material into the

12   system or access material out of the system, and we're still --

13   that's so fresh that I don't think it's worth getting into

14   right now.  I don't think we'll get anywhere until we know

15   what's doable and what's not.

16           THE COURT:  Mr. Johnson, I appreciate your candor

17   about the extent to which you're looking for something in

18   particular or trying to gather information that is usable, in

19   the end, for your case.

20           Is there anything, Mr. Johnson, that I've missed on

21   that end?

22           MR. JOHNSON:  No, Your Honor.  The only thing I would

23   add to what's been said is just that I think that with respect

24   to these different types of reports -- you know, we've been

25   talking about the e-mails, but one thing that came out in the

1  deposition is that these reports are saved on a drive, and so

2  I think we can skip the -- you know, we can skip looking at the

3  e-mail attachments and just go directly to, you know, the

4  reports themselves that are on the drive, and then that may

5  allow us to identify, you know, the different types of reports

6  that are saved on the drive.  It might make sense to start with

7  representative samples of each type and then to figure out,

8  once we've looked at representative samples of each type of

9  report, you know, whether -- how to proceed separately with

10 respect to each type, and that's the road I would suggest.

11      THE COURT:  The documents, Mr. Poulton, are they OCI?

12 Are they searchable?

13      MR. POULTON:  Well, they must be, because they came

14 up when the agency did the search, and I see e-mails that don't

15 mention the plaintiffs but a document that's attached to it

16 did.

17      THE COURT:  Okay.  So, you know, the point there

18 is -- maybe to save some time is just to focus on the

19 documents.

20      MR. POULTON:  Well, that what I'm doing, and I --

21 I'll get with plaintiffs' counsel, but I do think there's a

22 little bit of a disconnect here.

23      These documents are reports that are generated, and

24 there's a lot of duplication because they'll go to all the

25 deputies, and, you know, we'll deal with that, but I'll try to

1    get representative examples of the types of documents that

2    would get generated that would list the plaintiffs, even if

3    they're not the main subject of the document, you know,

4    associates being the main one.

5         The -- what I think Counsel is referencing is that

6    there is a system not by which they're -- the deputies are

7    looking at the document I've described, but where they're

8    looking at generally available information within the agency,

9    arrest history, prior interactions, things of that nature, so

10   it's not this document they're looking at, so going into the

11   database of the agency to see what deputies would see is not

12   going to be -- wouldn't yield the same document.  It would be

13   additional.

14        THE COURT:  Well, we've been going for an hour and a

15   half.  Our next meeting, by way of the Court's prior order, is

16   November 18th at nine o'clock.  I'm going to leave that on.

17   It's roughly five weeks from now, if not six.  In some ways

18   I would prefer to meet sooner than that.

19        I want to remind the parties that these deadlines

20   that Judge Merryday has set are -- remain as they are, so what

21   the Court has endeavored to do here is to streamline this

22   process, and I would expect by November 18th that much of what

23   we discussed today has been resolved and that this case has

24   moved well beyond where we are now, that the number of

25   incidents have been identified, that documentation, keeping an

```
 1    eye on what's relevant to a claim or defense and
 2    proportionality, those -- the necessary documentation has been
 3    produced and things are proceeding robustly on that end, to the
 4    point of whatever the next step is the parties feel is
 5    appropriate by way of discovery, keeping in mind that the
 6    discovery deadline now is the end of February.  And the same
 7    thing true with the policy end.  Mr. Johnson and Mr. Poulton,
 8    along with co-counsel, can come up with a way to get this
 9    material and information quickly and easily without requiring a
10    disproportionate effort.
11            Anything further that the parties believe the Court
12    needs to address?
13            Mr. Johnson, I'll begin with you as the plaintiff.
14            MR. JOHNSON:  No, Your Honor.
15            THE COURT:  Mr. Poulton, anything further?
16            MR. POULTON:  Not at this time, Your Honor.
17            THE COURT:  With that, I would encourage the parties
18    again, and I'm not doing it as a politicking matter, but simply
19    to continue to review the matter of consenting to magistrate
20    judge jurisdiction.  This case looks like it will have a fair
21    amount of facets to it, and we are in a delayed trial posture
22    again now, so -- trials have been halted due to the delta
23    variant.  I expect that would change, but now the backlog of
24    cases is even greater than it has been in the past.  So I'll
25    leave it to the parties to discuss that matter.
```

```
1              If that were the case then we would talk at the
2   appropriate time about a date certain that would be convenient
3   for counsel, the Court and the witnesses.
4              So I'll leave that in your very able hands.
5              Hearing nothing further from either side, we'll be in
6   recess.
7              Thank you again to you all for your time and
8   attention.
9              We'll be in recess.
10                              - - - - -
11             (Proceedings concluded at 11:36 a.m.)
12                              - - - - -
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1               C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript of

4    proceedings taken in a status conference in the United States

5    District Court is a true and accurate transcript of the

6    proceedings taken by me in machine shorthand and transcribed by

7    computer under my supervision, this the 13th day of July, 2022.

8

9

10                              /S/ DAVID J. COLLIER

11

12                              DAVID J. COLLIER

13                              OFFICIAL COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25