1           **IN THE UNITED STATES DISTRICT COURT**
2               **MIDDLE DISTRICT OF FLORIDA**
                     **TAMPA DIVISION**
3

4   **DALANEA TAYLOR, et al.,**            )
                                           )
5                **Plaintiff,**            )
                                           )
6                                          ) **Case No.**
         **vs.**                           ) **8:21-CV-00555-SDM-CPT**
7                                          )
                                           )
8   **CHRIS NOCCO,** *in his official*     )
    *capacity as Pasco County Sheriff*,    )
9                                          )
                 **Defendant.**            )
10

11
    _____
12
                     **STATUS CONFERENCE**
13              *(held via Zoom videoconference)*
         **BEFORE THE HONORABLE CHRISTOPHER P. TUITE**
14             **UNITED STATES MAGISTRATE JUDGE**

15                 **NOVEMBER 18, 2021**
                       **11:31 A.M.**
16                  **TAMPA, FLORIDA**
    _____
17

18

19

20

21          Proceedings transcribed via courtroom digital audio
    recording by transcriptionist using computer-aided
22  transcription.
    _____
23
                   **DAVID J. COLLIER, RMR, CRR**
24              FEDERAL OFFICIAL COURT REPORTER
            801 NORTH FLORIDA AVENUE, 7TH FLOOR
25                TAMPA, FLORIDA  33602

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFFS:

 4            Robert E. Johnson

 5            Ari Bargil

 6            Caroline Grace Brothers

 7            Institute for Justice

 8            16781 Chagrin Boulevard, Suite 256

 9            Shaker Heights, Ohio  44120

10            (703) 682-9320

11

12

13    FOR THE DEFENDANT:

14            Thomas W. Poulton

15            DeBevoise & Poulton, PA

16            1035 South Semoran Boulevard, Suite 1010

17            Winter Park, Florida  32792-5512

18

19            Natalie Scruggs

20            Pasco County Sheriff's Office, Assistant General

21            Counsel

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2                     – – – o0o – – –
 3            THE COURT:  Good morning, everyone.
 4            Madam Clerk, if you could please call the case.
 5            COURTROOM DEPUTY:  Dalanea Taylor, et al. versus
 6   Chris Nocco, Civil Case Number 8:21-CV-555.
 7            THE COURT:  If I could please have the appearances of
 8   counsel for the record, beginning with the plaintiff.
 9            MR. JOHNSON:  Good morning, Your Honor.
10   Robert Johnson for plaintiffs, and I'm joined by my co-counsel,
11   Mr. Bargil, as well.
12            THE COURT:  Good morning to you both.
13            MR. POULTON:  Good morning, Your Honor.  I'm
14   Tom Poulton here on behalf of the Sheriff, and I have with me
15   Ms. Natalie Scruggs, and she is with General Counsel's Office
16   at the Sheriff's Office.
17            THE COURT:  Good morning to you both as well.
18            Mr. Johnson, are you taking the lead this morning?
19            MR. JOHNSON:  Yes, Your Honor.
20            THE COURT:  Mr. Poulton, you as well?
21            MR. POULTON:  Yes, Your Honor.
22            THE COURT:  Thank you.
23            The Court has before it the joint status report
24   recently filed by the parties.  The Court has reviewed that.
25            I've allotted no more than one hour for today's
```

 1    hearing.  I'll need to stop the hearing prominently -- or

 2    promptly, rather, at 12:30.

 3            Mr. Johnson, I'm going to begin with you.  I've

 4    identified a number of concerns that you have raised, so I want

 5    to go through those.

 6            And if Counsel would kindly just focus on each

 7    individual issue that they have raised in the joint notice so

 8    that we can do this efficiently.

 9            You indicate, Mr. Johnson, that plaintiffs are still

10    awaiting production of the results of a number of e-mail

11    searches, including a search of the plaintiffs' names.  Is

12    there expected to be any issue in that regard?

13            MR. JOHNSON:  Only timing, Your Honor.  I mean,

14    I think, you know, we understand that reviewing these takes

15    time and that, you know, defendant has been working diligently

16    on it, but obviously we're eager to get those e-mails in time

17    to conduct depositions and are hoping that we can get the

18    results of the e-mail search in time.  You know, currently the

19    parties have depositions scheduled beginning in January, the

20    first few days of January, so we're hoping we can wrap up the

21    document discovery in advance of that.

22            THE COURT:  I couldn't quite hear the end of that,

23    Mr. Johnson.

24            MR. JOHNSON:  Sorry.  Our hope is to wrap up document

25    discovery in advance of the beginning of depositions in early

1    January.

2         THE COURT:  Obviously, Mr. Poulton, I'll hear from

3    you on all of these topics.  Let me just focus here on

4    Mr. Johnson.

5         So when is it anticipated that the e-mail search

6    production is to arrive?

7         MR. JOHNSON:  Well, I think that is probably a

8    question that's best addressed to Mr. Poulton, but as I said,

9    our hope is that we can wrap that up by the end of December.

10   I just don't know on defendant's side whether that's realistic

11   or not.

12        THE COURT:  Okay.  Mr. Poulton, I know that you have

13   a number of concerns, so I'm going to deal with those, and I

14   realize there will also be some overlap here, but just on this

15   singular issue, just help me out as to where things stand.

16        MR. POULTON:  All right.  Well, we had -- Mr. Johnson

17   and I spoke yesterday, and I think we came up with a good

18   solution to help expedite things, I can get into detail if

19   you'd like, but basically narrowing the number of e-mails that

20   have to be reviewed and then produced, and I think that's

21   really going to help a lot, because right now I'd be looking at

22   over 5,000 e-mails and attachments, which would be many, many

23   thousands of pages, but I think we're going to cull that down

24   quite a bit with the suggestions from Mr. Johnson from

25   yesterday.  We, you know, just -- it was yesterday, so I can't

1   tell you for sure what that's going to yield, but I would

2   expect that it would slim it down quite a bit and make it a lot

3   easier to get done.

4        I agree with Mr. Johnson, I would think we would be

5   able to get this done by the end of December, if not maybe even

6   a little earlier.

7        THE COURT:  Okay.  The next thing that's identified

8   is, Mr. Johnson, on your end the defendant's responses to

9   plaintiffs' fourth set of requests for production.  You

10   indicated that you had received those on November 15th, today

11   is November 18th, and you had indicated you were determining

12   whether those responses necessitate additional follow-up

13   requests or motion practice.  So what, if anything, have you

14   been able to discern on that second issue?

15        MR. JOHNSON:  Well, I think there's a potential issue

16   that -- you know, we did speak yesterday and we're trying to

17   work through this, but there is a potential issue with respect

18   to plaintiffs' request for -- I think it's best described as

19   global data about prolific offender checks as well as property

20   ordinance citations, so --

21        THE COURT:  In short, what is global data?

22        MR. JOHNSON:  What we're asking for is essentially an

23   Excel printout showing the addresses and dates of prolific

24   offender checks for the last five years, as well as the

25   addresses and dates for a variety of ordinance citations for

1    the last five years.

2              It's our understanding --

3              THE COURT:  Are these restricted to the named

4    plaintiffs or are these beyond that?

5              MR. JOHNSON:  No, it's beyond the named plaintiffs.

6    And the reason for that is to hopefully be able to do some kind

7    of an analysis to show that prolific offenders are being

8    targeted for heightened enforcement, you know, as opposed to

9    other people in the general population.

10             And, you know, the reason that we've asked for this

11   is that we've determined that similar data was provided to the

12   Tampa Bay Times, you know, as they were preparing the article

13   that first brought many of these practices to light, and it was

14   provided in Excel format by a database search, so, you know,

15   having seen that, you know, a small sample of the data that was

16   provided to the -- to the media, you know, we determined that

17   it should be feasible, without any kind of undue burden on the

18   defendant, for the defendant to put together a similar

19   Excel database or Excel spreadsheet of data to produce in this

20   case as well.

21             THE COURT:  Let me just have you pause.  Is that part

22   of the fourth set of requests for production or is that

23   something new?

24             MR. JOHNSON:  No, that was part of the fourth set of

25   requests for production.

```
 1              THE COURT:  And what, if any, issue is there then
 2    with that matter?
 3              MR. JOHNSON:  Well, the issue was that defendant
 4    objected to that request and declined to produce the requested
 5    data.
 6              THE COURT:  Mr. Poulton?
 7              MR. POULTON:  Yes, Your Honor.
 8              THE COURT:  So just your thoughts on --
 9              MR. POULTON:  Well, the -- first of all, with regard
10    to the material sent to the Tampa Bay Times, we can't -- I
11    can't figure out even what that is.  It's just a -- just a list
12    of incident reports and some addresses.  We're not even sure
13    that's what the Tampa Bay Times thought it was when they --
14    when they did their story.  We're still looking at that, trying
15    to figure that out.
16              The point is that the agency doesn't keep a running
17    list of prolific offender checks, so the agency would have to
18    go and search various databases, CAD reports, incident reports,
19    for search terms, for example, prolific offender checks, there
20    might be a few others, and then they would have to review each
21    of those documents to determine whether there was anything that
22    needed to be redacted in terms of some of the criminal database
23    restrictions and whatnot that we've talked about in other
24    hearings, and in our view it's not necessary because the
25    custom, if you will, I guess that's what we're talking about,
```

1   the custom of doing prolific offender checks, more broadly than

2   just the plaintiffs, can be established through deposition.

3            I mean, the agency would acknowledge it does prolific

4   offender checks, you know, and I don't think that the volume of

5   those is really going to be the issue, particularly because the

6   plaintiffs point to various prolific offender checks done as to

7   them, and their -- I understand their larger point is that it's

8   a -- that they're frequent, and I think that that's relevant as

9   to the plaintiffs, and that's been the focus of the discovery

10  so far, but to go beyond that to other people doesn't make

11  a lot of sense.

12           We're going to try to do a search and see where that

13  leads us, but in terms of responding to the requests for

14  production, I objected that it was unduly burdensome, out of

15  proportion to the needs of the case and the like.  We might be

16  able to work something out, it just was in the last few days,

17  as Your Honor pointed out, that we got to this point on this

18  issue, so we might still be able to work something out without

19  the need for Court intervention, but it is an issue.

20           THE COURT:  I'll return to you, Mr. Johnson.  Why do

21  you think this is something that can be readily done in the

22  manner that you suggest?

23           MR. JOHNSON:  Yeah.  I mean, it really just comes

24  down to the fact that what we -- what we came across in

25  discovery was an e-mail from the Tampa Bay Times to the

1    Sheriff's Office describing that they had received this data,

2    so I e-mailed Mr. Poulton and asked him to provide us with a

3    copy of what had been provided to the Tampa Bay Times.

4         He then provided what is a PDF printout of an Excel

5    spreadsheet.  It is limited -- the Tampa Bay Times in their

6    e-mail that we obtained suggested that they were able to obtain

7    several years of data.  The spreadsheet printout that was

8    provided by Mr. Poulton is limited to two months.  So it's not

9    the full set that was provided to the Tampa Bay Times, but it

10   does indicate that it is possible to generate -- and it's

11   actually -- what it is is it contains all of the data that

12   would be present in a CAD report, a dispatch report, except

13   that it extracts from each field of the data the contents and

14   then puts that into an Excel spreadsheet.

15        THE COURT:  Let me just have you pause for a moment.

16        Mr. Poulton, have you shown the spreadsheet to your

17   tech people to see if they can recognize how such a thing would

18   have generated and what it represents?

19        MR. POULTON:  Well, that particular aspect of this

20   issue just came up very recently, so the answer is no, I have

21   not done that.  I can tell you that with regard to the aspect

22   of the other data that Mr. Johnson referenced that's implied in

23   this earlier e-mail, we've looked for, the agency looked for

24   and can't find what they're talking about in that exchange past

25   this one -- one document that's just -- I mean, it's literally

1  numbers, numbers, numbers, and it doesn't substantively tell

2  you anything, and so we're not even convinced that it is

3  what -- amongst counsel, we're not convinced it is what

4  everybody seems to assume it is, but we are checking into that.

5          THE COURT:  Okay.  It was clear in just reading the

6  joint notice, and so far it's even clearer, that we'll need to

7  meet in a couple of weeks, sometime in December, and I may ask

8  for briefing on some of these issues in advance of that.

9  So I appreciate counsel sharing thoughts, but we're coming up

10  on deadlines that are fast approaching for concluding

11  discovery.  I hear, you know, a discussion that all documentary

12  discovery will be concluded by the end of the year, at least

13  from the plaintiffs' perspective.  I don't know if that leaves

14  enough time to do the remaining discovery, which would have to

15  conclude by the end of -- well, in or around the end of

16  February.

17          With that, we'll just go to the third issue

18  Mr. Johnson identified, at least by my account.  Plaintiffs,

19  you write, are concerned that counsel for defendant has noted

20  that he has limited availability beyond the three days in early

21  January set aside for depositions, and then there is some

22  discussion about whether that's going to be sufficient.

23          There is an allusion there to the first set of

24  depositions, but what I hear you to say is, in a reasonably

25  anticipated world here, all documentary discovery from the

1   plaintiffs then will be concluded by the end of the year, so

2   when you're talking about depositions, you're just talking

3   about an initial round of depositions followed by a subsequent

4   round of depositions; is that a fair reading?

5           MR. JOHNSON:  Well, what I -- it depends in part on

6   the availability of witnesses and the availability of

7   defendant's counsel.  I think it's possible that we could

8   schedule all of the depositions for, you know, one go-around.

9   I don't know that we need to break them up necessarily other

10  than to accommodate the schedules of the witnesses, you know,

11  but, yes, we are -- our hope is that we can wrap up document

12  discovery and then with discovery closing on February 26th, so

13  I'd like to wrap up depositions, you know, by say January 20th

14  so that there's time, if there are any further document

15  requests that come out of the depositions, that we can serve

16  those and get an answer before the close of discovery.

17          THE COURT:  And, Mr. Poulton, your thoughts?

18          MR. POULTON:  Well, I have -- I have two -- in

19  December and January and into February I have two main problems

20  with scheduling.  Number one is I'm on a trial docket for

21  January 18th in State Court, don't know how likely it is we'll

22  be reached or what will happen on that, and then I have -- I'm

23  involved in a case in -- Seminole County Sheriff's Office, in

24  Federal Court here in Orlando Division, that involves a

25  gentleman that was convicted of double murder in 2006, was on

1   death row for ten years, got a new trial, the State nol prossed

2   that on the second go-round, so he's suing the Sheriff's Office

3   and a number of people.  He's got an army of lawyers, and every

4   deposition is seven hours, and there are about seven or eight

5   of those remaining as of now into January.

6           So if -- and part of the problem as well is I don't

7   know yet how many people the plaintiff wants to depose from the

8   agency.  You know, there are a couple people I'm sure of, but

9   I have not received a list of, for example, deputies they want

10  to depose, and those are more difficult to set up because of

11  the deputies' schedules, I mean, if they're road patrol in

12  particular.  Management is a lot easier, but if they're

13  road patrol that gets more difficult.  So I do have concerns

14  about being able to meet the February 25 deadline.

15          If I may, yesterday evening plaintiffs' counsel

16  e-mailed updated interrogatory answers for the individual

17  plaintiffs.  I think we mentioned this and that they were going

18  to do that.  They did do that.  Very helpful.  Very, very

19  helpful.  I think we're making a lot of progress in coming up

20  with a list of actual incidents that matter here, and I think

21  that that will expedite things.

22          So if I get that window in January, if that trial in

23  State Court doesn't go, for example, we might be able to put

24  a lot in there and get things done, but it's possible that

25  I would need to ask the Court to enlarge the discovery

1  deadline, not nearly by as much as I thought yesterday at

2  four o'clock, given these answers that we got on the updated

3  interrogatories, but I might have to ask for, just guessing

4  right now, maybe a 30 day enlargement of the two deadlines to

5  accommodate the depositions, and again, dependent on how many

6  the plaintiff wants to take and how we -- how well we do with

7  scheduling those.

8        THE COURT:  I'll remind the parties that, you know,

9  I'm the assigned magistrate judge, so I don't have any control

10  over the deadlines.  As far as I know, from reviewing

11  Judge Merryday's prior orders -- and we just did a Bar panel on

12  this topic here, myself and a number of the District Judges, on

13  the significance and importance of scheduling orders, those

14  deadlines.

15        Mr. Johnson, I know you're practicing or from another

16  area of the country, I believe, but I used to practice around

17  the country, one district predominantly, and every district and

18  division has its own culture.  Here it's cases move.  It's just

19  statistically too many cases are filed here, I think it's the

20  number two statistical filer in the country outside of the

21  Central District of California, and cases, in order for them to

22  move, they have to stay on schedule, otherwise a parade of

23  horribles ensues.

24        So, Mr. Poulton, I appreciate your trial demands.

25  I've experienced that myself.  What's the likelihood that the

1    January 18 trial goes?  I know it's tough to anticipate that,

2    but -- or gets continued?

3          MR. POULTON:  It is -- it's -- I wish I could tell

4    you how annoyed I am by it, but I -- you know, I would say it's

5    less than 50/50, just because it's the first go-round and

6    I know that the State Courts are -- their dockets are just as

7    jammed up as the Federal are.

8          There are some very important depositions coming up

9    of some medical witnesses in the next two to three weeks, which

10   if they go the way that I hope that they go, the cases might

11   simply end, causation type issues.

12         So I -- by the time we get together for the next

13   hearing with Your Honor, I'll probably have a really good idea

14   of where that stands.

15         THE COURT:  And remind me, Mr. Poulton, what's the

16   setup in your office?  How many people do you have to assist

17   and --

18         MR. POULTON:  I have --

19         THE COURT:  I can't imagine you're a one-person show

20   there.

21         MR. POULTON:  No.  I have several associates who

22   could handle depositions, I think, for example, of deputies,

23   defending those depositions in a pinch, possibly the

24   plaintiffs.  I prefer to be very involved myself in the

25   depositions of management, simply because of the complexity of

1   the issues in the case, with Intelligence Led Policing, and

2   I think there needs to be some continuity there, but I do have

3   help available to me to do things, for example, like deputy

4   depositions about particular incidents.

5           THE COURT:  I would encourage the parties to begin

6   talking about this now.

7           I took from the joint notice that the specific

8   incidents at issue are crystalizing, and Mr. Poulton's comments

9   suggest that that's coming to a head, and so having worked with

10  law enforcement depos previously, I can imagine that's fairly

11  challenging, but you now are, you know, a month and a half out

12  from there, it may make sense to talk to the deputies, to

13  identify them, first of all, and then, Mr. Poulton, if your

14  trial breaks your way then you'll be free, but if you've got

15  staff that can handle some of those, then you can schedule them

16  now so the deputies know that they don't -- they know where

17  they'll need to be in early January.  I imagine just after the

18  holidays that can pose some additional issues.  So I think

19  that's a conversation that needs to be had now on those, and

20  I trust the parties will do that.

21          That appears, Mr. Johnson, by my read, to be the

22  central issues that you raised, so I'm going to turn to

23  Mr. Poulton.  Before I do that, did I leave anything out?

24          MR. JOHNSON:  No, Your Honor.

25          THE COURT:  Mr. Poulton, just going through your

1  remarks, you expressed a concern about the breadth of

2  discovery, that was one of the first issues.  I think that

3  I had made an allusion in the past to cost shifting, you had

4  mentioned that as well, so I'll turn to your first issue that

5  it appears you've identified, which is the breadth of discovery

6  and where things stand, so --

7          MR. POULTON:  Well, no, comes in a couple of forms.

8  With regard to the e-mail issue, as I stated earlier today,

9  I think that plaintiffs' counsel has come up with a -- what

10  will likely be an effective way to narrow that and make that go

11  much more quickly.

12          The issue with regard to looking for prolific

13  offender checks for non-plaintiffs is a sticking point, as

14  we've discussed, but it's only come up really amongst us in the

15  last week, so -- we've done a pretty good job so far of working

16  through these issues, so I'm hopeful we'd be able to work

17  through that, but if we need to have a motion filed or bring it

18  up to Your Honor's attention to resolve that, we can do that.

19          As I say, I do think that the -- what they're trying

20  to establish, that there is a custom of doing prolific offender

21  checks, I think that they can establish that easily through

22  depositions, I don't think there's going to be a question about

23  that, so saying that X deputy went to this, you know, twelfth

24  person that's unrelated to the case on such-and-such a date,

25  to me, doesn't have any value.  That's my concern.  And it

1   really has been quite a burden on the agency to gather up some

2   of these materials, because they're not housed or kept in

3   the -- in the manner that I think plaintiff expected them to

4   be.  For example, there's not a running list of all prolific

5   offender checks.

6           THE COURT:  One of the concerns I have is I really

7   don't know where the balance lies at this point, just not

8   sufficient information in front of the Court, about the breadth

9   here of discovery measured against some of the proportionality

10  elements, including burdensome and whether cost shifting is

11  appropriate, but that always is something that can potentially

12  be in play in a case like this, so it will inform me as to when

13  we next get together because with the time fast approaching

14  here, if there's going to be briefing on some of these issues

15  it's going to have to be done quickly.  When I say "issues,"

16  about where things stand in discovery and claims of

17  burdensomeness or overbreadth or cost shifting will need to be

18  addressed and resolved.

19          That, Mr. Poulton, will likely take some form of an

20  affidavit.  I don't want to commit myself to anything in

21  particular, but when there are claims of something being overly

22  burdensome or too costly, we will likely need to see something

23  by way of an affidavit.  It's conceivable the Court could take

24  testimony on that.

25          Mr. Johnson, I'm sure you're conscious of this, you

1   and your clients would be well-served to keep an eye on what's

2   truly needed for the case, and keeping in mind that you're

3   dealing with a public entity that does have some limitations on

4   staffing and resources, so that everything remains focused here

5   with an eye towards, in the back of your head, do I really need

6   this, and if I had to pay for some of this would I still be

7   asking for it.  So not a bad calculus or thought process to

8   have as you move forward, particularly as we get towards the

9   end here.  Discovery is not promised to be perfect, it's what

10  you end up needing for your case to move forward to prosecute

11  the case.

12          Okay.  Mr. Poulton, you had also mentioned that you

13  would believe that any further discovery of a broad magnitude

14  of the type that had been experienced so far implicated, as

15  I mentioned, cost shifting.  I'm going to leave that issue on

16  the sidelines for a moment and see where we are in a week or

17  two ahead.

18          You also mentioned here, and this may be dated now,

19  and perhaps out-of-date, plaintiffs have yet to identify

20  specific incidents sued upon in this case, making it impossible

21  for the defense to prepare a defense to a given incident.  You

22  mentioned the interrogatories that you've received, and

23  Mr. Johnson's remarks had suggested that there had been a

24  winnowing down sharply to specific incidents, but I want to

25  make sure there's no ambiguity there or that I'm not missing

1    something that -- so --

2             MR. POULTON:  Well, I --

3             THE COURT:  -- if you could --

4             MR. POULTON:  I'm sorry.

5             THE COURT:  Go ahead.

6             MR. POULTON:  Well, there were four updated

7    interrogatories, one for each plaintiff, sent to us yesterday

8    evening.  I've only managed to look at one so far, but it was

9    extremely helpful, laid out the dates and, I gather, a lot of

10   the information that, you know, the plaintiffs themselves

11   remember or that they took from CAD and incident reports or

12   some combination thereof, and I think that that's really

13   helpful, because it's -- the case is somewhat diverging,

14   I think, from the way it's laid out in the Complaint in terms

15   of what the actual legal theories are ultimately going to be,

16   which is not unusual.  But in terms of, for example, setting

17   the depositions of plaintiffs, I think I can do that now, and

18   when it comes time to -- you know, the plaintiff says, well, we

19   want to look at a particular incident on a certain day, now

20   that we have that day and we have an allusion to a particular

21   deputy, we can go find that deputy and talk to him about what

22   happened, or look at the body cam video, if there happens to be

23   body cam for that incident.  So that was really helpful, what

24   came in yesterday evening, and I'm a lot more optimistic about

25   being able to move forward, given what was sent over yesterday,

1  assuming the other three are like the first one that I looked

2  at, and I would think they are.

3            THE COURT:  Okay.

4            MR. POULTON:  Okay.

5            THE COURT:  So those are the issues that I see you as

6  identifying, Mr. Poulton, in your set of remarks.  If you think

7  I missed something, if you would kindly let me know so we can

8  address it.

9            MR. POULTON:  No, we've covered it all.  I really

10 think we can work through these other issues too, and if not,

11 we'll either file a suitable motion or bring it to Your Honor's

12 attention at the next conference, and I -- and I will

13 especially work with plaintiffs' counsel to try to start

14 setting depositions between now and when we get together with

15 Your Honor again.

16            THE COURT:  If you'd look at the week of

17 December 6th.  We have not just Mr. Johnson and Mr. Poulton,

18 but we have Ms. Scruggs and Mr. Bargil, and if everybody could

19 look at their calendars.

20            Typically I hold court on Tuesdays and Thursdays,

21 although that is often excepted.  I would prefer to do that.

22 So I have hearings scheduled in the morning on both days, but

23 we could do it later in the morning or in the afternoon.

24            Let's look at the 7th.  Mr. Johnson, how does the 7th

25 of December work for you?

```
 1              MR. JOHNSON:  I'm available in the morning on the

 2    7th.

 3              THE COURT:  How does the 7th of December look?  We

 4    can do it by Zoom to save time for you to travel.

 5              MS. SCRUGGS:  I'm available that day also.

 6              MR. POULTON:  I'm looking right now, Your Honor.

 7              MR. BARGIL:  We'll he's looking, Your Honor, my

 8    calendar is open as well.

 9              THE COURT:  You say it's open on the 7th?

10              MR. BARGIL:  That's correct, Your Honor.

11              THE COURT:  Mr. Poulton, you're the linchpin here.

12              MR. POULTON:  I'm just -- I'm looking right now,

13    Your Honor.

14              December the -- so you're talking about December 7.

15    I am in mediation in Ocala on the 7th.

16              Looking at the 9th, I am available in the morning on

17    the 9th, if that's agreeable to everybody.

18              THE COURT:  Mr. Johnson, the 9th?

19              MR. JOHNSON:  Yes, I can do the 9th.

20              THE COURT:  Mr. Bargil, how are you on those dates --

21    on the 9th, rather?

22              MR. BARGIL:  I'm not sure who those were directed to

23    Your Honor, but I --

24              THE COURT:  Both to you and Ms. Scruggs.  My

25    apologies, the reception here sometimes --
```

1           MR. BARGIL:  Quite all right.

2           I am available on that date.

3           MS. SCRUGGS:  I am as well, Judge.  Thank you.

4           THE COURT:  We will schedule it then for nine o'clock

5     on the 9th.  I have hearings beginning at 10:00, so, like

6     today, allot an hour for that.

7           If there's going to be a need for filing motions,

8     I want to address that at that time and set a briefing

9     schedule.  It may be that I'll ask for simultaneous briefing,

10    just to expedite it, but I would be looking to have any briefs

11    submitted fairly quickly, given the deadlines here that we're

12    looking at.  But I'm hoping that -- from what I hear from

13    Mr. Poulton and Mr. Johnson, that that won't be necessary at

14    all.

15          So we'll schedule it for December 9th, 9:00 a.m., and

16    we'll do it by Zoom.

17          Anything else, Mr. Johnson, that the Court has not

18    addressed that you would like it to?

19          MR. JOHNSON:  No, Your Honor.

20          THE COURT:  Mr. Poulton, same with you.

21          MR. POULTON:  No, Your Honor.

22          THE COURT:  Hearing nothing further from the parties,

23    we'll be in recess, and we'll see you all on December 9th, and

24    have a wonderful Thanksgiving in the meantime.

25                (Proceedings concluded at 12:03 p.m.)

```
 1                    C E R T I F I C A T E

 2

 3           This is to certify that the foregoing transcript of

 4    proceedings taken in a status conference in the United States

 5    District Court is a true and accurate transcript of the

 6    proceedings taken by me in machine shorthand from a digital

 7    audio recording and transcribed by computer under my

 8    supervision, this the 13th day of July, 2022.

 9

10

11                                   /S/ DAVID J. COLLIER

12

13                              DAVID J. COLLIER

14                              OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25
```