1        **IN THE UNITED STATES DISTRICT COURT**
         **MIDDLE DISTRICT OF FLORIDA**
2              **TAMPA DIVISION**

3


4   **DALANEA TAYLOR, et al.,**           )
                                          )
5                **Plaintiff,**           )
                                          )
6                                         ) **Case No.**
          **vs.**                         ) **8:21-CV-00555-SDM-CPT**
7                                         )
                                          )
8   **CHRIS NOCCO,** *in his official*    )
    *capacity as Pasco County Sheriff*,   )
9                **Defendant.**           )
                                          )
10

11
    _____
12
                    **STATUS CONFERENCE**
13             *(held via Zoom videoconference)*
        **BEFORE THE HONORABLE CHRISTOPHER P. TUITE**
14          **UNITED STATES MAGISTRATE JUDGE**

15                 **DECEMBER 9, 2021**
                      **9:03 A.M.**
16                  **TAMPA, FLORIDA**
    _____
17

18

19

20

21        Proceedings transcribed via courtroom digital audio
    recording by transcriptionist using computer-aided
22   transcription.
    _____
23
                  **DAVID J. COLLIER, RMR, CRR**
24            FEDERAL OFFICIAL COURT REPORTER
             801 NORTH FLORIDA AVENUE, 7TH FLOOR
25                TAMPA, FLORIDA  33602

1    **APPEARANCES:**

2

3    **FOR THE PLAINTIFFS:**

4            *Robert E. Johnson*

5            *Ari Bargil*

6            *Caroline Grace Brothers*

7            Institute for Justice

8            16781 Chagrin Boulevard, Suite 256

9            Shaker Heights, Ohio  44120

10           (703) 682-9320

11

12

13   **FOR THE DEFENDANT:**

14           *Thomas W. Poulton*

15           DeBevoise & Poulton, PA

16           1035 South Semoran Boulevard, Suite 1010

17           Winter Park, Florida  32792-5512

18

19           *Lindsay Moore*

20           Pasco County Sheriff's Office, Assistant General

21           Counsel

22

23

24

25

```
 1                    P R O C E E D I N G S
 2                    – – – o0o – – –
 3             THE COURT:  Good morning, everyone.
 4             Madam Clerk, if you would kindly call the case,
 5    please.
 6             COURTROOM DEPUTY:  Dalanea Taylor, et al. versus
 7    Chris Nocco, Case Number 8:21-CV-555.
 8             THE COURT:  If I could please have the appearances of
 9    counsel for the record, beginning with the plaintiff.
10             MR. JOHNSON:  Good morning, Your Honor.
11    Robert Johnson for the plaintiffs, and I'm joined by my
12    co-counsel Caroline Grace Brothers and Ari Bargil.
13             THE COURT:  Good morning --
14             MR. POULTON:  Good morning, Your Honor.
15             THE COURT:  -- to you all.
16             MR. POULTON:  Good morning, Your Honor.  I'm
17    Tom Poulton, here on behalf of the Sheriff, and I have with me
18    Lindsay Moore, who is General Counsel to Sheriff Nocco.
19             THE COURT:  Good morning to you two as well.
20             The Court had scheduled this for another status
21    conference, and it's in receipt of the parties' joint status
22    report.
23             Mr. Poulton and Mr. Johnson, as previously, are you
24    both taking the lead on the argument here?  Mr. Johnson?
25             MR. JOHNSON:  Today, Your Honor, yes.
```

```
 1                THE COURT:  Okay.  And Mr. Poulton?

 2                MR. POULTON:  Yes, Your Honor.

 3                THE COURT:  Okay.  Well, it's a joint status report.

 4    In the interest of equity here, who would like to start going

 5    through perhaps those matters on which there is an agreement,

 6    and then we'll touch upon, as I understand, a number of matters

 7    for which there is some disagreement.

 8                MR. JOHNSON:  I'll be happy to do that, Your Honor.

 9                THE COURT:  Okay.

10                MR. JOHNSON:  So I think the first item is the

11    production of e-mails, and on that item I think there is

12    significant agreement.  We had yesterday our first session of

13    reviewing documents over Zoom jointly, the plaintiffs and the

14    defendant, and I think that went fairly well.  Obviously we're

15    still concerned, we just need to keep moving this along so that

16    we can get documents in time to have them for actual

17    depositions in early January, so, you know, it's important that

18    we keep moving with it, but so far it's going pretty well and

19    I think it's a positive step.

20                On the question of depositions, we're also making

21    progress on scheduling.  In the scheduling report we noted that

22    defendant had not yet provided availability for witnesses.

23    That's now been resolved for, I think, most of the witnesses at

24    least, so we're going to get those scheduled pretty soon, and

25    it looks like early January should work for the first -- for
```

1    what may be the first and perhaps last round of depositions, so

2    I think, you know, agreement on that issue as well.

3            I think there are really two areas where there is

4    significant disagreement and concern on the plaintiffs' side.

5    The first of those does pertain to depositions.

6            The issue here is that in defendant's interrogatory

7    responses, where we asked that they identify, you know,

8    witnesses with relevant information who may testify at trial,

9    the response suggested that any deputy who is named in any of

10   the incident reports that had been produced in discovery may be

11   called as a witness, and this is over 90 deputies who have had

12   various interactions with these plaintiffs.  And, you know,

13   obviously we understand where defendant is coming from in the

14   sense that there are a lot of incidents and a lot of deputies

15   who have touched those incidents; on the other hand, on

16   plaintiffs' side, what we need is to just have an understanding

17   of who defendant intends to call as the relevant witnesses to

18   speak to that universe of incidents.

19           On our side what we've done is we've gone through

20   those 90 deputies and we've identified five of them who we are

21   seeking to depose as part of our depositions in this case, and

22   these are five who have had multiple interactions with some of

23   the multiple of the plaintiffs, so they're well-positioned to

24   speak to these events and to provide context for the documents

25   that we've already obtained through discovery.  So, you know,

1   in our view those five -- and obviously we haven't taken the

2   depositions yet, but assuming the depositions go as we expect,

3   you know, those five deputies will hopefully provide the kind

4   of context that we need without having to depose every single

5   witness.

6          The problem on our side though is that we don't know

7   who is going to be called at trial, and we want to avoid having

8   a surprise witness on the -- on the defense, and so, you know,

9   if we can't narrow it down -- you know, obviously I don't want

10  to take 90 depositions, but I also don't know what the

11  alternative is if we don't know who the witnesses are.

12         So that's sort of the first issue, and I indicated

13  there were two.

14         THE COURT:  Let me just have you pause there, if I

15  could, Mr. Johnson.

16         Mr. Poulton, I suspect I know what your response is,

17  but if you could help me out a little bit with that.

18         MR. POULTON:  Right.  Well, Your Honor, they've

19  identified 90 incidents, but my expectation would be that at

20  trial they would not focus -- they would not go through the

21  details of all 90 incidents.  They are critical of all 90 for,

22  you know, big picture reasons, but my assumption is that they

23  will be zeroing in on some, and we're setting up the

24  depositions of the plaintiffs and I wanted to get into the

25  detail with them of the incidents that they might claim are

1    particularly problematic, either an arrest that they feel was

2    not justified, a code citation they feel was not justified, a

3    trespass, what have you.  Until I know what that universe is,

4    I really can't say which of the deputies in the different

5    90 events might be called to trial, because I can't anticipate

6    right now which incidents the plaintiff would actually get into

7    detail in at the trial.

8            THE COURT:  Mr. Johnson?

9            MR. JOHNSON:  I mean, I think, you know, we have

10   provided defendant with interrogatory responses that go into

11   detail on what these incidents consist of.  Many of the

12   incidents are, you know, quite similar.  Some of them are

13   unique.  You know, I think certainly I've explained to

14   defendant how we intend to present the case, essentially by

15   producing documentary evidence, body cam footage, putting all

16   that in the record, and then, as I've said, we've identified

17   these five witnesses who we think can provide additional

18   context for, you know, the sort of documentary evidence that

19   we'll be putting into the record.

20           I think knowing how we intend to present our case,

21   defendant should be able to provide some insight into what

22   witnesses they intend to call in response, if any.

23           THE COURT:  Do you intend to put in evidence on all

24   90 incidents?

25           MR. JOHNSON:  I think we intend to put all of it into

the record, yes.  We have documents documenting all of these
incidents, and we have body cam footage for many of them, and
we intend to -- it's not that we intend to show it all at
trial, but we intend to put it all into the record, yes.

THE COURT:  So how would you propose Mr. Poulton
address the concern that in his own case he may want to present
testimony presumably to explain or attempt to explain those
events?

MR. JOHNSON:  Well, I think if he is going to show
all 90 -- he's going to present testimony on all of those
events, then I guess we have to depose all of those witnesses.
That to me seems cumulative, to try -- I mean, I can't imagine
that each of these deputies has something relevant or
particularly, you know, helpful to the defense to say about
every single one of these incidents, but if defendant believes
that they do, then I guess we'd have to depose them, but,
I mean, I think it's on defendants --

THE COURT:  Let me just have you -- let me just have
you pause there for a moment.

So what authority do you have that a plaintiff or a
party is entitled to depose all witnesses who testify at trial?

MR. JOHNSON:  Well, we can certainly look and provide
you with authority for that.  I don't have that in my pocket
with me today, but I think --

THE COURT:  Do you think you -- do you think

1   that's -- let me -- if I could just interject.

2          Do you think you have strong authority for the fact

3   that you are entitled --

4          MR. JOHNSON:  I think that what --

5          THE COURT:  -- and there's no discretion on whether

6   you're entitled to depose every single witness that a party

7   calls?  And the same would apply to defendant.

8          MR. JOHNSON:  Well, I think it's -- to me it's just a

9   matter of both, one, fairness to the parties, that if a witness

10  is going to be called at trial that there be an opportunity to

11  determine, you know, through a deposition what it is they're

12  going to say.  I mean, if they're -- these witnesses are so

13  critical that they're going to be called at trial, then I think

14  we should have an opportunity to depose them.

15         THE COURT:  Don't you have reports -- don't you have

16  reports and things that you have in hand that would allow you

17  to cross-examine a witness once they testify?  I'm just curious

18  on this point, because I see that as a -- there are a number of

19  overlays here and background concepts in terms of how the

20  parties are approaching this.  One of them is the breadth of

21  the depositions that are being posited as necessary for the

22  case.

23         I've tried many cases where I've never had a

24  deposition of a witness and I've had documentary evidence, and

25  I didn't feel as if I was -- it was an element of unfairness,

1    per se, or some other issue of great moment that I wasn't in a

2    position to adequately cross-examine a witness with what

3    I would assume would be a fair amount of documentary evidence

4    and perhaps video footage and other such items to utilize, so

5    I'm just curious as to the concept that -- you already have

6    that opportunity at trial to cross-examine the witness, but for

7    every one of them -- the same, again, would apply to the

8    defendant -- you're entitled, and I use that word, to a

9    deposition as well.

10          Wouldn't some of these depositions that you take here

11   and there about a number of those witnesses give you a pretty

12   good sense of the type of documents that are out there and the

13   type of information that they reflect that set you up for Cross

14   from one to the next?

15          MR. JOHNSON:  Yeah.  Well, I think if the -- it

16   really just depends on what the witnesses are going to say,

17   which is the -- you know, the point of the deposition, in my

18   mind, is to determine what the witness's testimony is.  It may

19   be that these witnesses will interject issues that, you know,

20   when we understand their testimony, we will realize, oh,

21   there's other documents that we should have asked for,

22   you know, and so that --

23          THE COURT:  That's a different reason.

24          MR. JOHNSON:  In my mind --

25          THE COURT:  Let me just have you pause though.

 1          That's a different reason.  The first reason you gave
 2    is you're entitled to know what they have to say in preparation
 3    for trial, in other words so you have a roadmap of exactly what
 4    they're going to say, so that's one reason, a different reason
 5    to argue on the grounds of discovery, but --
 6          MR. JOHNSON:  Well, I think --
 7          THE COURT:  -- (inaudible) highlight this as an issue
 8    moving forward, that I don't know that it's a given, at least
 9    on what I've seen so far, it hasn't been previewed, that it's
10    necessarily the case that you get a deposition of every single
11    trial witness.
12          MR. JOHNSON:  Well, I do think those are separate
13    reasons.  I think they're both reasons.  We'd be happy to brief
14    this issue.
15          I also just would like to point out, I mean, I don't
16    think all 90 of these witnesses are going to testify at trial,
17    I think the reality is that perhaps two or three of them will,
18    and I think that it would be both, you know, fair and helpful
19    to the progress of the case for defendant to, you know, simply
20    identify which witnesses they think, on their side, if there
21    are any in addition to the ones who we've already identified,
22    that they're going to call at trial.  I think that -- it's
23    not -- it's not actually a matter that we need to take that in
24    depositions, it's a matter that we need for defendant to
25    identify who the witnesses are so that we can have an

1    opportunity to depose them, and we have asked the defendant to

2    do that in our interrogatories.  It's also something that

3    defendant should have done in the initial disclosures, which

4    were never provided at the outset of the case.

5         THE COURT:  Let me just -- we're bleeding from one

6    issue to the next, so let me just go back to what you said.

7         You have an idea, you've indicated, as to how you

8    intend to present your case through a variety of evidentiary

9    means, video and documents and the like, a fairly good sense at

10   this point as to what incidents you're going to present and in

11   what form?

12        MR. JOHNSON:  Yes, I think we -- I mean, I think the

13   answer is we're going to present all of them but in different

14   forms.

15        THE COURT:  So let me just -- let me just -- let me

16   just tell you where I'm going here.

17        Have you and Mr. Poulton sat down and conferred about

18   the matter?  So, for example, have you sat down and said,

19   look it, this is the -- right now, without wedding ourselves to

20   something, this is the evidence that we're looking to present

21   about these 90 incidents here, this is the video, this is each

22   of the documents, allow Mr. Poulton to look at it, and then the

23   two of you confer about that, so Mr. Poulton has a better sense

24   about what he might do in response, and then perhaps he's in a

25   position to identify or at least narrow the people who he would

1  likely call?

2          MR. JOHNSON:  So we have provided Mr. Poulton with

3  interrogatory responses that identify the incidents that we are

4  focusing on at trial, and that includes the incident numbers,

5  which are the numbers that the defendant uses in its own

6  recordkeeping system to identify these incidents and the

7  numbers that defendant used to identify the documents and the

8  video for this case.

9          THE COURT:  Let me just have you pause for a moment.

10          There are 90 such incidents.

11          MR. JOHNSON:  I believe there are more than 90.

12  There are 90 deputies, over 90 deputies.  I believe the number

13  of incidents is more than 90.

14          THE COURT:  Mr. Poulton?

15          MR. POULTON:  Well, Your Honor, I -- you were hitting

16  on something that kind of struck me, because in speaking with

17  Mr. Johnson in the past what we were talking about doing at

18  some point was sitting down to collaborate over what the exact

19  universe of documentation would be that would go into -- go

20  into evidence, so we were all working from the same core

21  material.  I wouldn't anticipate there would be any problem

22  over that, because it's all agency material.  And so at that

23  point in time, it seems to me we would be able to perhaps

24  identify the specific incidents that the plaintiffs themselves

25  might want to focus on.

```
 1              I'm just looking -- while we were speaking, I was
 2      just looking here at Mr. Johnson's updated answers to
 3      interrogatories, and there are ten pages of multi columns,
 4      you know, of particular criticisms of particular incidents, and
 5      so, again, I -- to me it's a little bit of a chicken and the
 6      egg, which comes first.  Do they tell me which specific
 7      incidents we'll be talking about aside from the 90 or 90 plus
 8      generically, you know, or do I have to articulate who the
 9      individual deputies would be to talk -- to speak to every
10      single one.
11              So I think perhaps we could work this out when we get
12      to the point where we're going through the exercise I just
13      mentioned, where we're trying to come up with a universe of
14      documents to provide to the Court as evidence and limit it
15      then.  If -- you know, if we're talking about an additional two
16      or three or four deputies, I'm sure we can find a way to make
17      that happen in the discovery period, and if it went a week or
18      two over, I'm not going to complain or block that, if we needed
19      to do that to be able to give the plaintiff a sense that they
20      were -- they had a fair opportunity to understand who our
21      witnesses would be and what they would say.  I do just worry,
22      however, that we'll get into deposition with the individual
23      plaintiffs and they'll start elaborating and elaborating and
24      we'll find that there are particular incidents that the
25      plaintiffs themselves want to focus on, whether counsel have or
```

1    not.

2        THE COURT:  Well, there's two and a half months left

3    in discovery.  Mr. Johnson and Mr. Poulton, it seems, at least

4    at first blush, that the two of you, your respective teams,

5    should sit down -- Mr. Johnson, I'm sure you at this point have

6    a decent sense of what you're going to put on in your case, and

7    you could review that with Mr. Poulton and then -- this has to

8    happen at some point.  In other words, everybody reaches a

9    crossroads in a case like this, you have to decide who you're

10   actually going to call.  So if Mr. Poulton is so advised of the

11   scope and the particulars of the evidence that at least at this

12   point you intend to produce or admit, seek to admit at trial,

13   we'll have to make some determinations as to how he's going to

14   respond to that, in the form of witnesses.  That determination,

15   as I said, has to be made at some point.  This doesn't go on

16   ad infinitum in any case.  And then at that point, Mr. Poulton,

17   you could identify who you anticipate calling so those could be

18   deposed.  You can talk about how many depositions, Mr. Johnson,

19   you get, but -- the same would be true of Mr. Poulton, but it

20   seems to me that you're fairly far along in this case, that

21   you're at a position where you can engage in such a meaningful

22   control.

23        Mr. Johnson, I'll start with you.

24        MR. JOHNSON:  Yes, Your Honor.  I would be happy to

25   do that with defendant.  I do think we've already done that in

1    substance by providing the interrogatory responses, but we're

2    happy to go over those with defendant and discuss it in more

3    detail.

4              THE COURT:  There's something that I think is lost

5    though if you're just communicating in interrogatories and

6    e-mails as opposed to -- whether you do it in Zoom or in

7    person, by sitting down and going through your proof.

8              In civil cases there's not supposed to be any

9    surprises.  Mr. Johnson, at some point you lay your cards out,

10   at least as to where you stand now, Mr. Poulton can respond and

11   lay his cards out, okay, these are the people I envision we

12   will call.

13             MR. JOHNSON:  We're happy to do that.

14             THE COURT:  Nobody's -- and nobody's committed at

15   that point, but at least you're moving forward in an amicable

16   way and constructive way.

17             Mr. Poulton, what do you think about that?

18             MR. POULTON:  I agree.  We spent about four hours

19   yesterday on Zoom going through e-mails, we're scheduled twice

20   more, this coming Monday and the following Monday, and we've

21   also set up another conference -- and those will be longer

22   periods of time -- to go through e-mails, and as counsel

23   mentioned, I think we're making good progress on that, but

24   I don't see why we can't begin that process in that context as

25   well of those meetings.

```
1              THE COURT:  So let's put a timeframe on this.  What
2    I would think would be by the end of next week the parties
3    should meet and confer.  Mr. Johnson, lay your cards out,
4    Mr. Poulton, you can take that information, talk with Ms. Moore
5    and the rest of your team, and advise, in light of that
6    evidence that you've seen, here is who you expect or are likely
7    to call.  You can, I think, at this point make the appropriate
8    caveats.  But to a point I think, Mr. Poulton, that you made,
9    this may change, there may be some tweaks around the edges as
10   time progresses, and the parties can adjust, but at least the
11   bulk of what needs to get done will get done in short order,
12   because you've got a timeframe of January here and that's fast
13   approaching.
14              Mr. Poulton, if you were to have such a meeting,
15   would you be able to get back to Mr. Johnson within a couple of
16   days as to who you likely expect that you would --
17              MR. POULTON:  Well, it depends on how many there are.
18   If we're talking two or three, I would imagine I could.  If
19   we're talking 20 or 25, it would probably take longer than
20   that.
21              I'll tell you as well I'm in all-day depositions two
22   of the five days next week, and the one day we have set aside
23   to do the e-mail searches, so I'm not sure where I'm going to
24   have time to fit in this meeting with Mr. Johnson that would be
25   dedicated to isolating the incidents that would be at issue at
```

1    trial until early the following week.  But if we're talking, as

2    I say, two or three incidents, then it's probably a much easier

3    task.  If we're talking 20 or 25, I've got to find out which

4    deputies are still there, you know, trace the incident reports

5    to identify them, to begin with, and it's -- it's just -- it's

6    not something that can be done easily if it's -- if we're

7    talking about that number.

8            THE COURT:  It sounds to me like there is going to

9    not just be two or three, there are going to be 90 incidents,

10   so -- but at some point, and I don't know how this will

11   proceed, and I'm not suggesting to you that the Court is

12   intimating one way or the other about how either side should

13   try its cases, but at some point, Mr. Poulton and Mr. Johnson,

14   I don't suspect Judge Merryday is going to allow you to call

15   90 witnesses a side, so, you know, at some point -- at least

16   when I was trying cases, you stay where you're strong, and,

17   Mr. Johnson, you have certain evidence that I suspect you

18   believe is stronger than others.  Mr. Poulton, that may be

19   where you focus your attention.  But I don't think that if

20   there are -- if there's evidence that touches on 100 or so

21   events, that a jury is going to consider all of those as

22   meaningful.  There may be ones, I suspect, that are more

23   important than others, and the point will be made.

24           I'll leave that for the parties to decide, but this

25   can't be this unwieldy a case.  At some point -- and this is

1  what I'm suggesting, to make -- put a fine point on it.

2  Mr. Johnson, you need to winnow your case to something that is

3  manageable so, in fairness to Mr. Poulton, that he can

4  designate people who he's expected are likely to testify in

5  response.  That's going to be some strategy on your end, some

6  strategy on Mr. Poulton's end.

7          Mr. Poulton mentioned the expression "chicken before

8  the egg," but somebody's got to make a start here, and by

9  putting two parties in a room, you can just have an honest and

10 candid dialogue about what's going to go in and what's going to

11 be the response on either side.

12         Mr. Johnson?

13         MR. JOHNSON:  I think that makes sense, Your Honor.

14 The only thing I would say is, from our perspective, this is a

15 case about -- part of what creates the Constitutional violation

16 is the sheer number of incidents, so, you know, we can't winnow

17 the case in the sense of eliminating incidents from the record,

18 and the incidents -- the number of incidents is an important

19 part of our case.

20         THE COURT:  Let me just --

21         MR. JOHNSON:  That being said --

22         THE COURT:  Yes.  Let me just have you pause.

23         When I use the word "winnow," it doesn't mean

24 eliminate or truncate it to the point that it's not meaningful,

25 but just hypothetically, let's say you started out with 1,000

1    incidents, you would have to convince Judge Merryday why you

2    want a six-month trial on 1,000 incidents.  I suspect that

3    there are certain incidents, and there could be many of them,

4    that you find to be stronger proof than others.

5          MR. JOHNSON:  Yes, I think -- I think what our plan

6    for trial is is to present the documentary evidence of all of

7    the incidents to establish the volume, and then, you know,

8    through testimony, to elicit testimony from our clients about,

9    you know, the pattern of incidents, and then to identify

10   specific incidents as they set essentially examples.  I think

11   those incidents for the most part should be pretty clear from

12   the interrogatory responses that we provided, but we can also

13   confer with defendant to provide more guidance on what

14   incidents we're looking at as examples that might be presented

15   at trial.

16         THE COURT:  How many examples do you envision

17   presenting?

18         MR. JOHNSON:  I don't have an exact number,

19   Your Honor, but we have four clients, so I think, you know,

20   something in the ballpark of 12 might be, you know, a

21   reasonable number and something that could be done without,

22   you know, drawing this out too much.  It could be higher, it

23   could be lower, probably not lower, but I think it's something

24   that we haven't narrowed it down completely but I think we can

25   certainly begin the process of winnowing in that sense.

1        THE COURT:  These incidents to which you've referred,
2   do they fall into any form of categories?
3        MR. JOHNSON:  I think so.  I think there are ways
4   that --
5        THE COURT:  You think so or you don't think so?
6        MR. JOHNSON:  I do think there are ways that they
7   could be categorized.
8        THE COURT:  Mr. Poulton and Mr. Johnson, if there are
9   categories of evidence, I'm not suggesting how you should try
10  your case, but that may be a mechanism for deciding on how to
11  deal with depositions.
12       Mr. Johnson, if outside of the 12 you're going to
13  focus on certain other ones -- at some point you have to make
14  an opening and a closing, and I suspect in that realm you're
15  going to highlight, Mr. Johnson, certain things outside of the
16  12 incidents involving your clients, and so that at some point,
17  as I said, that's, when I talk about winnowing, where the
18  points of emphasis are going to lie, and then Mr. Poulton can
19  make a decision about what he's going to do.
20       MR. JOHNSON:  I think we can provide some guidance on
21  that.
22       THE COURT:  Mr. Poulton, if you get such guidance or
23  a feel here of where the focus of the trial is, it would seem
24  to me that you would be better positioned anyway to begin
25  deciding who you're likely to call.

1          MR. POULTON:  I would agree.

2          THE COURT:  Okay.  Mr. Johnson, I'll return to you.

3   I'm going to push you a little bit.

4          You mentioned 12 incidents.  That would presumably

5   entail at least 12 depositions.  I realize multiple deputies

6   may have come to each incident, but I'm just going to say

7   assume that a deputy is involved in each of them.

8          MR. JOHNSON:  Yes, sir.

9          THE COURT:  How many beyond that -- how many beyond

10  that do you think you would be focusing your proof on in the

11  case?

12         I would suspect you would point out particularly

13  egregious -- or what you believe to be egregious events.  Those

14  might be ones that Mr. Poulton will want to address, more

15  likely.

16         MR. JOHNSON:  So it's my sense that with many of the

17  incidents we will -- our case will consist of testimony from

18  our clients as well as the body camera footage.  I think

19  whether we --

20         THE COURT:  Are those -- are the body -- let me just

21  hold on for a moment.

22         Is the body camera footage footage from the incidents

23  involving the named plaintiffs, or is that for different

24  events?

25         MR. JOHNSON:  It's from the named plaintiffs.

1           THE COURT:  Okay.

2           MR. JOHNSON:  So whether defendant would -- whether

3  we would need to take a deposition I think depends in part on

4  whether defendant would want to or seek to introduce evidence

5  beyond the body camera footage.  You know, I don't -- I don't

6  know -- I think, you know, for the number -- the number of

7  incidents -- I think, you know, some incidents I imagine

8  defendant will want to produce evidence that there is --

9  they're more complicated, there was more that happened, but

10 some of these incidents it's just a matter of essentially

11 playing the body camera footage, and I don't know that the

12 deputy would be able to add anything of particular relevance,

13 but obviously if defendant thought the deputy could add

14 something of relevance, we would want to know that before

15 trial.

16          THE COURT:  Let's go back to the timing of this

17 conferral.

18          Mr. Poulton, today is the 9th -- and I'll look to

19 Mr. Johnson.

20          You're taking depos beginning the week of the 3rd,

21 that's roughly three weeks away, three and a half weeks away,

22 maybe it's the 10th, but this needs to be decided in relatively

23 short order.

24          Mr. Poulton, when is the -- again, emphasizing the

25 priority that this case has, the scheduling order that's in

1    place, what's your schedule look like again?

2              MR. POULTON:  I was just looking at that.

3    I recollect that the main problem I have is next week.  Monday

4    we are set to work with plaintiffs' counsel to continue to work

5    through e-mails.  I anticipate that taking most of the day.

6    We're doing it again the following Monday.

7              I have depositions, all-day depositions Wednesday and

8    Thursday, and I really needed Tuesday to prepare for those, in

9    another matter.

10             We could confer Friday, next Friday, a week from

11   tomorrow.

12             THE COURT:  Mr. Johnson?

13             MR. JOHNSON:  We can do that.

14             THE COURT:  Does that work?  Okay.

15             MR. POULTON:  And then depending on the --

16             THE COURT:  (Inaudible.)

17             MR. POULTON:  I'm sorry.  I didn't mean to interrupt.

18             THE COURT:  No, that's okay, Mr. Poulton.  I didn't

19   mean to cut you off.  And, I'm sorry, it's difficult with Zoom.

20   At times I need to interject just to keep this moving along,

21   and Counsel is doing a wonderful job of focusing their

22   attention on things, but, Mr. Poulton, I didn't mean to cut you

23   off.

24             MR. POULTON:  I was just going to say, depending on

25   the final number that we are actually talking about, you know,

1    I would immediately -- if we narrowed that down on Friday and

2    I had the list, I would send that to the agency on that Friday

3    and get with them the following week to work through which

4    deputies are still there, you know, who we might need to track

5    down and talk to, because at that point presumably I would know

6    the substance of the criticism of a particular incident, and we

7    would have some time to do that.

8              THE COURT:  Okay.  So I'm going to direct the parties

9    to confer on this matter on the 17th.

10             And then, Mr. Poulton, to get back, next week is a

11   week in which there is a holiday, that may present certain

12   challenges, but how long do you think you need before getting

13   back -- and this is just -- this could be a fluid conferral

14   process about who you believe to be likely, who you would call,

15   and then you could just schedule the depositions accordingly.

16             MR. POULTON:  I'm hesitant to commit to a specific

17   timeframe because I don't know the number and I don't know the

18   scope, so I -- we will make it a priority.  I got Ms. Moore

19   here on the line with me.  I'm sure she'll agree we'll make it

20   a priority to locate the deputies who would be relevant to

21   those incidents.  We'll do the best we can, work as fast as we

22   can.

23             THE COURT:  Okay.  No, I appreciate that.

24             So it may be that the Court sets this for another

25   similar type of status conference during the week of the 27th,

1   keeping in mind the parties' schedule that they have

2   established for depositions, to make sure that that's moving

3   along.

4          I have another matter in a case that was a death

5   penalty eligible case, was a death penalty case, at

6   ten o'clock, so I'm just eyeing the clock, and I'm sure that

7   the parties have their own commitments.

8          So we touched upon what seems to be one of the main

9   focuses of the status report or joint status report.  The other

10  appears to be this prolific offender checks and code citations

11  data, for which there is some disagreement, so I'll hear

12  briefly from the parties on that.

13         Mr. Johnson, I'll begin with you.

14         MR. JOHNSON:  Yes, Your Honor.

15         On this issue, frankly, I'm just not sure what the

16  objection is to the production of the data.  This is data that

17  we know can be produced through a simple database search, it

18  can be produced in Excel format, it's possible to produce it

19  from Excel in a way that, you know, there's only one column of

20  data that would potentially require any type of review for

21  confidential law enforcement information, and it's possible to

22  simply delete that column, and we are willing to agree to that,

23  so it seems to us this should be relatively straightforward.

24         I haven't heard any type of burdensomeness objection

25  to this data, to the production of it.  It's highly relevant.

1    It's data that we can use to show that the Pasco County

2    Sheriff's Office was disproportionately targeting prolific

3    offenders for code enforcement citations.  This is something

4    that we allege as part of our substantive due process claim,

5    our First Amendment claim, as well as the Equal Protection

6    claim.

7            What I've heard from the other side is that this is

8    something that could potentially be proved with other evidence,

9    and specifically that it's possible that some witnesses in

10   depositions might admit that they disproportionately target

11   prolific offenders for code citations, but, you know, obviously

12   those depositions haven't happened yet, and it's difficult from

13   plaintiffs' perspective to simply abandon or pursue the

14   evidence that we would need to prove this, because it might be

15   something that we could prove through a deposition that hasn't

16   happened yet.

17           You know, we've also heard from defendant that in

18   defendant's eyes this data isn't reliable.  You know, I think

19   that's a question of weight that defendant could raise if we

20   were to use this data, but I don't think it changes the fact

21   that the data is relevant.  You know, obviously we disagree

22   with that.  It's also difficult for us to even assess that

23   without having the data.  But I don't see that as a reason to

24   not produce the data, particularly -- again, this all comes

25   back to the first point, which is that I haven't heard any

1    objection to burden.

2              THE COURT:  Okay.  Mr. Poulton?

3              MR. POULTON:  Well, first, Your Honor, just to be

4    clear, I would prefer that we were -- we were talking about

5    this in the context of an actual motion, because this is,

6    I think, more complicated than meets the eye.

7              This is cumbersome enough, dealing with the 90 plus,

8    but now we're talking about looking at other -- a whole other

9    universe of prolific offender checks that are not of the

10   plaintiff, code violations issued to persons other than the

11   plaintiff.  We are going to find ourselves in a situation where

12   we're going to want to defend that or defend individual ones.

13             I think that the question of whether or not a

14   prolific offender is going to have more attention paid to them

15   in terms of either a code violation or a -- or a misdemeanor

16   offense, they're going to get that in the depositions because

17   that will come out, because they're naturally going to be --

18   given the number of interactions they're having with prolific

19   offenders, they'll be able to establish that, yes, you're going

20   to see more code violations for prolific offender than another

21   person as a natural consequence of the interactions that are

22   occurring with the deputies.

23             And this is all part of -- none of this is secret,

24   it's all part of the philosophy of focused deterrence, which is

25   you're identifying the people that are contributing to criminal

1   activity, and so you're focusing your resources and your

2   attention on those people that are repeating -- repeat

3   offenders.  So all of that will be, I think, explained and

4   discussed, and, you know, fully elaborated upon in depositions,

5   but to have the agency go off and create documents that don't

6   exist, six years worth of prolific offender checks for people

7   that are not plaintiffs is just not justified, and again,

8   I would prefer we were doing this on a motion so we could lay

9   all this out to explain what our concerns are on that, but

10  that's the gist of it.

11          THE COURT:  I'm going to schedule it for briefing.

12  It's going to be expedited.

13          MR. POULTON:  Okay.

14          THE COURT:  I've looked, Mr. Poulton, at the joint

15  status report, so I'm not intimating one way or the other, but,

16  you know, objections on reliability, I'll be curious as to what

17  authority that is --

18          MR. POULTON:  Okay.

19          THE COURT:  -- or exists for that as a basis for

20  objecting.  I understand the argument on information that's not

21  specific to the named plaintiffs, to borrow the language, but

22  again, in the *Monell* case, I'll be curious as to authority as

23  to whether that objection in discovery carries the day, if you

24  will.

25          The argument that this information is unnecessary

1    I don't quite understand, and to your point, it may be more

2    complex than what can be gleaned be in a status conference such

3    as this.

4            The parties are going to be conferring on the 17th

5    anyway, and I'm just going to remind the parties -- this is not

6    some kind of veiled threat, this has come up a number of times

7    at Bar panels of which I've been a part, but I'll just remind

8    the parties that Rule 37(a)(5) provides as follows with respect

9    to motions to compel:  If the motion is granted, or if the

10   disclosure or request to discovery is provided after the motion

11   was filed, the Court must, in other words shall, is required

12   to, after giving an opportunity to be heard, require that the

13   party or deponent whose conduct necessitated the motion, the

14   party or attorney advising that conduct, or both, pay the

15   movant's reasonable expenses incurred in making the motion,

16   including attorney's fees.  And it has an exception, if the

17   opposing party's position was substantially justified, and

18   there's other exceptions, two others in particular, that

19   typically are not in play, but they may be.

20           It also further provides, if the motion is denied,

21   the Court must, after giving an opportunity to be heard,

22   require the movant, the attorney filing the motion, or both, to

23   pay the party or deponent who opposed the motion its reasonable

24   expenses incurred in opposing the motion, including attorney's

25   fees; and it has again an exception for positions being

1    substantially justified.

2           So there are a lot of arguments made here.  I often

3    talk to the parties in discovery disputes that you want to make

4    sure that your position is substantially justified, not just

5    justified, but substantially so, or else the Court is faced

6    with this language.  I did not write that rule.  It was written

7    by the committee and ultimately promulgated as it has been.

8           So the Court takes that language seriously.  I can't

9    ignore it.  It doesn't even require a request.  It says

10   "it must."  That is "it" being the Court.

11          Both parties are very ably represented here.

12   I appreciate the parties' efforts at conferral.  I would

13   suggest on this issue that there be a robust conferral, as

14   there must be under Rule 301(g) anyway in this district, so

15   that we avoid having to talk about Rule 37.

16          I don't take any great pleasure in citing this

17   language, and I know from having practiced it's challenging to

18   represent your client zealously and strike a balance here, but,

19   Mr. Johnson, I'm going to direct that if you want this data

20   you'll have to file a motion to compel by the 17th; and that,

21   Mr. Poulton, you respond by the 24th.  I realize it's the day

22   before a holiday, but the schedule -- this case is scheduled to

23   conclude on discovery in two months after that, and I know you

24   have depositions scheduled and all of this is impacting it.

25   So I'm hoping that the parties can reach an agreement on this.

1   If not, Mr. Poulton, as you've mentioned, the party -- the

2   parties can pursue it this way.

3          Once the Court has the parties' submissions, it may

4   schedule the matter for argument the following week or the week

5   after, depending on what is set forth there, and will decide

6   the matter as quickly as it can so that this case can move

7   forward.

8          Again, I would encourage the parties to confer, not

9   only as they're required to do, but also if you have case law,

10  Mr. Johnson or Mr. Poulton, to your respective positions, this

11  is the time to talk about it, so that these issues can be

12  hopefully laid to rest without Court intervention.

13         That appears to be all the matters that the Court has

14  before it in terms of the joint status report.

15         Mr. Johnson, did I miss out on anything?

16         MR. JOHNSON:  No, Your Honor.

17         THE COURT:  Mr. Poulton, anything that I missed out

18  on?

19         MR. POULTON:  No, Your Honor.

20         THE COURT:  Okay.  So just to put a fine point on it,

21  the conferral process or the conferral requirement on the

22  depositions -- and I'm going to refer to it as depositions, but

23  it's much more involved than that.  The discussion,

24  Mr. Johnson, about -- I used the phrase "putting your cards on

25  the table," Mr. Poulton being able to assess that and come back

1  to you.  I'm going to enter an endorsed order that refers to

2  "conferral regarding depositions," that's what I'm referring

3  to, and then the endorsed order will also indicate that if this

4  matter cannot be resolved otherwise, Mr. Johnson, that you'll

5  file a motion to compel.

6          I'll call it "prolific offender data."  Is that a

7  fair characterization?

8          Mr. Poulton, Mr. Johnson, you'll understand what I'm

9  referring to, and then the response thereto by the 24th.

10         Okay.  Hearing nothing else from the side -- the

11 parties, rather, Mr. Johnson, one final inquiry.  Anything

12 further?

13         MR. JOHNSON:  No, Your Honor.

14         THE COURT:  Okay.  Mr. Poulton, anything further?

15         MR. POULTON:  No, Your Honor.

16         THE COURT:  Okay.  I appreciate the parties working

17 together on these matters, and again, I hope that they can

18 resolve it.  If not, we'll move forward from there.

19         Hearing nothing further, we'll be in recess.

20 Thank you.

21                  - - - - -

22              (Proceedings concluded at 9:51 a.m.)

23                  - - - - -

24

25

```
 1                    C E R T I F I C A T E

 2

 3          This is to certify that the foregoing transcript of

 4   proceedings taken in a status conference in the United States

 5   District Court is a true and accurate transcript of the

 6   proceedings taken by me in machine shorthand from a digital

 7   audio recording and transcribed by computer under my

 8   supervision, this the 13th day of July, 2022.

 9

10

11                                   /S/ DAVID J. COLLIER

12

13                              DAVID J. COLLIER

14                              OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25
```