```
 1                IN THE UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
 2                        TAMPA DIVISION

 3

 4   DALANEA TAYLOR, et al.,          )
                                      )
 5              Plaintiff,            )
                                      )
 6                                    ) Case No.
        vs.                           ) 8:21-CV-00555-SDM-CPT
 7                                    )
                                      )
 8   CHRIS NOCCO, in his official     )
     capacity as Pasco County Sheriff, )
 9                                    )
                Defendant.            )
10

11

12   _____

13                      STATUS CONFERENCE
                  (held via Zoom videoconference)
          BEFORE THE HONORABLE CHRISTOPHER P. TUITE
14              UNITED STATES MAGISTRATE JUDGE

15                     FEBRUARY 9, 2022
                          11:04 A.M.
16                     TAMPA, FLORIDA
     _____
17

18

19

20

21        Proceedings transcribed via courtroom digital audio
     recording by transcriptionist using computer-aided
22   transcription.
     _____
23
                   DAVID J. COLLIER, RMR, CRR
24              FEDERAL OFFICIAL COURT REPORTER
              801 NORTH FLORIDA AVENUE, 7TH FLOOR
25                  TAMPA, FLORIDA  33602
```

**APPEARANCES:**


**FOR THE PLAINTIFFS:**

     *Robert E. Johnson*

     *Ari Bargil*

     Institute for Justice

     16781 Chagrin Boulevard, Suite 256

     Shaker Heights, Ohio  44120

     (703) 682-9320


**FOR THE DEFENDANT:**

     *Thomas W. Poulton*

     DeBevoise & Poulton, PA

     1035 South Semoran Boulevard, Suite 1010

     Winter Park, Florida  32792-5512

```
 1                   P R O C E E D I N G S

 2                    – – – o0o – – –

 3          THE COURT:  Good morning, everyone.

 4          Madam Clerk, if you could kindly call the case.

 5          COURTROOM DEPUTY:  Dalanea Taylor, et al. versus

 6   Chris Nocco, Civil Case Number 8:21-CV-555.

 7          THE COURT:  And if I could have the appearances of

 8   counsel for the record, beginning with the plaintiff.

 9          MR. JOHNSON:  Good morning, Your Honor.  This is

10   Robert Johnson for the plaintiffs, joined by my co-counsel

11   Ari Bargil.

12          THE COURT:  Good morning to you both.

13          And for the defense?

14          MR. POULTON:  Tom Poulton for Sheriff Nocco.

15          THE COURT:  Good morning as well, Mr. Poulton.

16          We're here for another status conference, and I've

17   read the joint status report of the parties.

18          Mr. Poulton, I guess I'll begin with you.  Do you

19   want to take the lead here this morning?  I want to be fair to

20   both sides in sharing that option.

21          MR. POULTON:  Well, thank you, Your Honor.  I think

22   that things are -- well, we had some hiccups along the way, as

23   reflected in the motion, which was granted.  I had a family

24   illness I had to attend to that made me actually at the

25   twelfth hour cancel a deposition of one of the plaintiffs, then
```

1   one of the plaintiffs became ill, so we had to move that

2   deposition and we're working on rescheduling those.

3        In terms of the documentary discovery, we are --

4   I mean, that's -- it's pretty much status quo.  I think

5   things -- there's nothing urgent, as far as I know, to be

6   discussed with Your Honor.  I think that we're going to circle

7   back next week with Counsel to handle any lingering issues and

8   to reschedule the depositions that had to be moved for those

9   health reasons.  And I think that's kind of where we're at.

10       There were -- there's an expert disclosure deadline

11  now in place, and summary judgment has been moved accordingly,

12  I believe, so I think we're in pretty good shape as far as

13  having to bring anything to Your Honor's attention.

14       THE COURT:  Okay.  I'm sorry to hear about the

15  illness, obviously, Mr. Poulton.  I hope all are well on all

16  fronts.  I know with respect to the plaintiffs there was some

17  COVID exposure there, it sounds like, and on your end,

18  Mr. Poulton.  No need to comment.  I realize these things are

19  sensitive, and so I don't want to inquire, but I'll just say

20  I hope all are well, on the plaintiff and the defense side.

21       Mr. Johnson, anything you wish to add?  I do have a

22  couple of questions, which I'll pursue, Mr. Johnson, after

23  hearing from you.

24       MR. JOHNSON:  No, I -- I think Mr. Poulton summed it

25  up fairly well.  I think things are moving along.  I think

```
 1   we -- because of the interruptions with the various health
 2   issues, which are obviously, you know, unavoidable and
 3   completely understandable, it necessitated the extension, and
 4   with the extension I think we, you know, sort of hit a bit of a
 5   pause button in terms of rescheduling things, but whenever both
 6   parties are in a position to get things scheduled, we're ready
 7   to move forward and get this wrapped up.
 8            THE COURT:  Okay.  Let me just follow up on something
 9   that we've discussed previously, and I'll assume for the moment
10   that I -- I know the two are referred to here as children,
11   Donnie McDougall and Robert Jones.  Are they both incarcerated,
12   do I understand?
13            MR. JOHNSON:  One of them is incarcerated.
14            THE COURT:  Okay.  And which one is that, again?
15            MR. JOHNSON:  Donnie McDougall.
16            THE COURT:  Okay.  And as far as Mr. McDougall, it's
17   my understanding, Mr. Johnson, and Mr. Poulton, that you're
18   both working on trying to connect up with Mr. McDougall to get
19   his consent relative to the records?
20            MR. JOHNSON:  We are, Your Honor.  We haven't made
21   a lot of progress on it, obviously, between the need to
22   reschedule things, and then also, you know, on plaintiffs' side
23   we were quite busy with the expert issues, because we weren't
24   sure if we were going to get an extension on that.
25            You know, I think, if it -- if you don't mind, if I
```

1    could just say, I think there really are two concerns with
2    respect to receiving these waivers.  I think one of them is
3    just the sort of simple practical realities of getting in touch
4    with these individuals, securing the waivers.  I think the
5    second concern is essentially more of a substantive concern.
6    You know, these aren't my clients and so I can't advise them on
7    whether they should or should not waive their rights.  I think
8    they might naturally look to, you know, plaintiffs' counsel for
9    some sort of advice on that, because we represent their
10   parents, although they're, you know, no longer minor children,
11   so it puts, I think, everybody, including plaintiffs' counsel
12   and also the parents, in a sort of awkward position of
13   essentially asking these people to waive their rights when
14   these individuals have no legal representation in that.

15           Also I just -- I think one thing just to emphasize
16   is that they're being asked to sign a blanket waiver and it's
17   not tailored to anything that would be specific to this case or
18   specific documents, it's just a blanket waiver of their rights
19   with respect to their juvenile records, and I -- I think,
20   you know, on plaintiffs' side everybody is a bit uncomfortable
21   with asking them to sign that blanket waiver when they don't
22   have any representation in the process and they're not
23   themselves party to the case.

24           So I think -- you know, I don't know, maybe we can
25   work through that, but I just wanted to put out there that that

1   is something that we're concerned with and that we're trying to

2   work through, and I think it may be that the best way to go

3   through this is just to request those documents, you know,

4   following the appropriate procedures, which I think, you know,

5   may be for Mr. Poulton to send -- essentially send a subpoena

6   for those records and then, you know, to just follow the

7   process, to essentially -- you know, I think that would have

8   several benefits.  One would be that it would specifically

9   request particular documents, which would give everybody an

10  opportunity to see what's being requested, and then there are

11  procedures to either, you know, object or not object, and,

12  you know, we can follow those procedures.  The agency would

13  have the opportunity to either object or not object at just

14  being asked for the records.

15          You know, I think those procedures may be in place

16  for a reason, and I -- you know, I don't know that we have a

17  definitive position on this yet, but I think, having talked to

18  it -- talked to our clients and thought about it a bit,

19  you know, it may be that at the end of the day it's just not

20  feasible for us to ask these individuals to waive their rights,

21  or really appropriate for us to be in that role.

22          THE COURT:  Mr. Poulton?

23          MR. POULTON:  Well, Your Honor, first, I would note

24  that we would, of course, agree on the defense side to maintain

25  the confidentiality of any records that were obtained via the

1  release and to submit those under seal only to the Court.  The

2  reason they're important is because, as we've proceeded through

3  this, an issue has arisen as to the appropriateness of the

4  designation of those two gentlemen, Mr. McDougall and

5  Mr. Jones, as either prolific offenders or as top five

6  offenders, which would then, you know, generate the

7  interactions with the Pasco Sheriff's Office that is the

8  subject of the lawsuit, so we feel a need to explain to the

9  Court what happened in those interactions between the Pasco

10  deputies and the juveniles at the time, and the only way we

11  know to do that is via the records.

12          The --

13          THE COURT:  Let me just have you pause for a moment,

14  Mr. Poulton.

15          MR. POULTON:  Sure.  Sure.

16          THE COURT:  Just so I understand this, Mr. Johnson,

17  I didn't hear an argument about relevance or

18  non-discoverability of the records.

19          MR. JOHNSON:  No, I think we'd have to see -- if

20  there were a subpoena and it asked for specific records, we

21  would see what was asked for, but I don't -- you know, I don't

22  anticipate that we would object to a subpoena or seek to quash

23  it or anything of that manner.

24          THE COURT:  Okay.

25          MR. JOHNSON:  It's impossible to say without seeing

1    it, of course.

2          THE COURT:  And on what grounds would you have an

3    argument to quash, if they're not a record of your clients?

4          MR. JOHNSON:  Well, that's a fair point, Your Honor.

5    I haven't --

6          THE COURT:  It's akin to -- I mean, essentially,

7    Mr. Poulton, wouldn't it be a Rule 45 subpoena?

8          MR. POULTON:  That's right, but then I'm -- then

9    I have to give notice to the incarcerated son of the plaintiff

10   that I'm subpoenaing his records and that he has an opportunity

11   to object.  It's just awfully laborious, and so many things

12   could go wrong time-consuming-wise, that's why I was hoping

13   that they would simply give consent, you know, to plaintiffs'

14   counsel, to myself, to have those records, so we could just

15   know the background of those -- those interactions and what

16   happened in those criminal cases that led up to -- in

17   particular that led up to those designations or were, you know,

18   part of that ongoing process of being designated as prolific

19   offender or top five.

20         THE COURT:  Let me just have you pause for a moment

21   and go back to Mr. Johnson.

22         So, as I understand it, one of your concerns is the

23   breadth of the waiver, and the second concern, among others, is

24   the position it puts yourself in, being a part of this

25   waiver-seeking process, that's how I'll refer to it.  I don't

1    know if either side -- if you had any discussions with the Bar

2    about -- the Florida Bar about -- if you're barred here, or in

3    the state in which you're barred, as to whether there's an

4    ethical issue at all in seeking a waiver.

5            MR. JOHNSON:  We're certainly willing to look into

6    that.  I think it's also a concern with the position it puts

7    the parents in, essentially being asked to use their

8    relationship with their children to, you know, ask the children

9    to waive a legal right in connection with a lawsuit where the

10   children aren't a party.

11           THE COURT:  Let me just -- let me just -- because I'm

12   assuming that these two individuals, Mr. McDougall and

13   Mr. Jones, are of maturity.  No?

14           MR. JOHNSON:  No, they are.  They're -- they're

15   adults, yes.

16           THE COURT:  So why does that necessarily involve the

17   plaintiffs, the parents of the children, if Mr. McDougall and

18   Mr. Jones are adults?

19           MR. JOHNSON:  Well, so I'm not in contact with these

20   witnesses directly, and I have no -- you know, I spoke to

21   Mr. McDougall, we could contact him directly, we know where he

22   is, so we can reach out to the prison to try to speak with him.

23   You know, I don't represent -- I have no contact with

24   Bobby Jones, I have no means of contacting him directly other

25   than through his father.

```
1              THE COURT:  I guess let me just have you pause.

2              Is there an ethical prohibition to having Mr. Poulton

3    reach out to either Mr. McDougall or Mr. Jones, both of whom

4    you've indicated are adults, to ask them if they would execute

5    a waiver?

6              You may as a lawyer view that in a certain way, but

7    do you know of a prohibition that would preclude Mr. Poulton

8    from doing that?

9              MR. JOHNSON:  Not that I'm aware of, no, Your Honor.

10             THE COURT:  Okay.  Mr. Poulton, is there anything

11   that you're aware of that would preclude you from asking for a

12   waiver?

13             MR. POULTON:  Not ethically.

14             THE COURT:  Okay.

15             MR. POULTON:  I think practically speaking it's not

16   likely to meet with a lot of success.  You know, Mr. McDougall

17   is incarcerated, Mr. Jones has been incarcerated, and I'm

18   calling from the Sheriff's Office saying "I want you to let me

19   see all your juvenile records, I'm going to send you the form."

20   Might not go over very well.

21             THE COURT:  Is it -- is it a -- is it agreed between

22   the parties that these records are not in the plaintiffs'

23   possession, custody and control, Mr. Johnson?

24             MR. JOHNSON:  I don't know if we've discussed it, but

25   I don't -- I mean, they're not in our custody or control,
```

1  because we -- I mean, the only way to get -- for us to get

2  access to these records is to obtain a waiver from the adult

3  children, who are not parties to the case.

4       THE COURT:  So the reason I bring this up, in part,

5  is because the Court has been able to arrange for Zoom

6  conferences with incarcerated defendants in the State system,

7  and I think we've done that through the case manager.  Once you

8  identify the case manager, you're, I think, in a position to

9  arrange that.

10       The Court can participate in that, but I don't see a

11  reason why the Court can't share that item of information with

12  the parties to facilitate an inquiry, if that is not ethically

13  prohibited or otherwise inappropriate.

14       Madam Deputy, I know that you're here with us.  Do

15  I understand correctly that in the past where we've done this

16  with individuals who are incarcerated in the State system, that

17  we've done so through the case manager?

18       COURTROOM DEPUTY:  That's how I did it.  I'm not

19  100 percent positive if they only allowed it because it was a

20  court proceeding or if they allow it for any meetings, but that

21  is who I arranged it through, was the case manager.

22       THE COURT:  Okay.  So I offer that just as an item

23  for the parties to consider, a piece of information that,

24  Mr. Poulton or Mr. Johnson, if you're aware of the facility and

25  the case manager, you may meet with success, just as a

1   mechanical or logistical matter, working through the case

2   manager.  If you were to follow through on that, assuming,

3   again, that it's not in any way ethically prohibited or

4   otherwise inappropriate, you would at least have an answer.

5          And then, Mr. Poulton, I haven't heard from you as to

6   whether you believe these records are within the possession,

7   custody or control, it's a legal determination, of the

8   plaintiffs; but assuming for the moment they are not, if the

9   McDougall consent and Jones consent don't work, then you would

10  at least have an answer on those matters.

11         MR. POULTON:  Right.  Okay.

12         THE COURT:  Is Mr. -- do you know if Mr. Jones, like

13  Mr. McDougall, is of maturity?

14         MR. JOHNSON:  He is, Your Honor.

15         THE COURT:  Okay.

16         MR. POULTON:  But he's not incarcerated, so I --

17  I mean, I -- having deposed Mr. Jones, Sr. about, what,

18  two weeks ago, he said he is in contact with him occasionally,

19  so would we at least have a phone number or something we could

20  maybe jointly call him, Mr. Johnson, and sort of explain the

21  situation to him, both of us on the phone, and just kind of lay

22  out why it is the defense would like to have access to those

23  records, and not putting you on the spot, but just so that

24  you're there, so you're aware of that conversation, and then

25  let him make his decision, and again, just so we know where we

1  stand.  Maybe he would agree, if we all agree to keep it
2  confidential and just use it in the lawsuit, that he might be
3  amenable to that, I don't know.
4         MR. JOHNSON:  Well, I think this goes to the concern
5  that I've expressed, which is, you know, as Mr. Poulton
6  indicated, I think it's probably the case that if the Sheriff's
7  Office was just to reach out, asking, you know, Mr. Jones to
8  waive his legal rights, bearing in mind especially that
9  Bobby Jones was, you know, part of this pattern of harassment
10 that we're suing about and has had a number of negative
11 experiences with the Sheriff's Department or the Sheriff's
12 Office, I mean, I think he would say no, and the only way that
13 he would potentially say yes is, essentially, if he felt like,
14 you know, his father's attorney was asking him to do this to
15 help his father, and I think it puts everybody on the
16 plaintiffs' side in an awkward position, to be asked to do
17 that.
18         THE COURT:  I'll leave that issue for the parties to
19 resolve.
20         Of course the recourse then, Mr. Poulton and
21 Mr. Johnson, would be that the records presumably would then be
22 subpoenaed, so -- it's sometimes the case, I don't know if this
23 is an appropriate analogy or not, when law enforcement visits a
24 property and wishes to conduct a search, they'll ask for a
25 consent, and sometimes they'll get consent, with the

1  understanding as part of the dialogue that if there isn't

2  consent that they'll seek a search warrant, and so there are

3  some parties in those situations that will elect to consent

4  voluntarily.  Unless I'm misrecollecting the law in that area,

5  if the consent is voluntary and knowing, it is generally

6  upheld.

7  　　　　Mr. Johnson, do you have any reason to think that

8  analogy is not appropriate or --

9  　　　　MR. JOHNSON:  I think that in that sort of a

10  situation the consent is being asked for by the law enforcement

11  officer, you know, which I think in this case would be

12  analogous to, for instance, Mr. Poulton calling up to ask for

13  consent.

14  　　　　You know, I think that the difference -- the

15  difference is that in this case the consent would be asked for

16  by their -- the attorney who represents their close family

17  member, and I --you know, I think that as a layperson you might

18  have the impression that the attorney for your parent is also

19  your attorney, but I think in this instance, you know, the

20  child's -- the child's interests may be not to sign that

21  waiver, even though it certainly would save all of us in this

22  lawsuit, I think, a certain amount of effort of having to do a

23  subpoena, but I don't -- I think it's the child's own

24  determination or the individual's own determination whether

25  they want to give that consent, and I don't know that it's

1    appropriate for us on the plaintiffs' side to be essentially

2    creating the impression that we think that it's in their own

3    interest to give that consent, if that makes sense.

4         THE COURT:  Yeah, the reason I offered the analogy

5    was not to address so much the second concern, but the first,

6    which was somebody being approached about a waiver that you may

7    believe to be broad, for example, a lawyer at the home of an

8    individual who was a client sought -- seeking -- or was the

9    person for whom consent is sought, the lawyer might say, well,

10   I don't know that I would do that.  The Courts then require

11   that consent that is obtained at a property for a search be

12   done only after the consultation with a lawyer.  A general

13   sense of it is those are upheld as long as they're knowing and

14   voluntary or otherwise meet Fourth Amendment criteria.

15        So as to your first concern, about somebody reaching

16   out to somebody, I'll leave it to you to decide, Mr. Poulton

17   and Mr. Johnson, how best to proceed.  The Court only waded

18   into this matter because of its knowledge -- past experience,

19   anyway, of having contacting somebody at the facility, in an

20   effort to facilitate the resolution of the issue, so you at

21   least have an answer on that.

22        And as far as the Court is concerned, if there's some

23   concern there that the parties can resolve about a waiver of

24   confidentiality agreement, that may facilitate this process.

25        Mr. Poulton, how long does it take if you were to

1  subpoena these documents from whatever the institution is that

2  holds them?

3          MR. POULTON:  I don't know.  Honest answer, I don't

4  know.  I obviously much prefer to try this, you know, route of

5  reaching out to the individuals directly to ask them if they

6  would agree -- you know, explain the situation and ask them if

7  they would agree to waive the confidentiality, on the premise

8  that they would be kept confidential, just within the lawsuit,

9  and not released publicly.

10         You know, I -- hopefully they'd want to let us have

11 those records, just explaining the reason why, and avoid that,

12 but I don't know the answer to that -- I mean, they'd have to

13 get notice of the fact that there was a subpoena, you know,

14 they'd have an opportunity to object, that would have to be

15 resolved.

16         THE COURT:  Yeah.

17         MR. POULTON:  I don't know off the top of my head.

18 I think I'd have to give -- it's been a little while since I've

19 done one where I had to give notice and there was a likely

20 adverse party.

21         I want to say ten days, but I could be mistaken.

22 That may be the State rule.

23         THE COURT:  I'm cognizant of the new discovery

24 deadline, which I believe to be April 18th.  Is that correct?

25         MR. JOHNSON:  (Nodding head yes.)

1          THE COURT:  So, again, I don't want to wade into a

2     matter and offer advice, but I -- at the same time I want to

3     manage this so that it doesn't end up being a matter that comes

4     up that creates -- the only word I can think of is agita, at

5     the end, but -- so, Mr. Poulton and Mr. Johnson, you've been

6     working well, it seems to me, together.  It may be the wise

7     approach to attack this on two fronts simultaneously, in other

8     words, one issue the Rule 45 subpoena and also seek consent,

9     and that way the matter of the Rule 45 subpoena is proceeding

10    forward.

11          I have the rule in front of me.  Among other things,

12    it states under Rule -- assuming that a Rule 45 subpoena is

13    appropriate here, under (a)(1), Command each person to whom it

14    is directed to do the following at a specified time and place:

15    Attend and testify; produce designated documents, ESI or

16    tangible things in the person's possession, custody or control;

17    or permit the inspection of premises.

18          And then there must be, among other things, notice to

19    the other party.  In particular, it reads:  If the subpoena

20    commands the production of documents, ESI, or tangible things,

21    or the inspection of premises before trial, then before it is

22    served on the person to whom it is directed, a notice and a

23    copy of the subpoena must be served on each party.

24          MR. POULTON:  I'm looking at (d)(2), so it would be

25    14 days for the -- for an objection, but that would be the

1    person who I'm sending it to.

2           THE COURT:  And I think, Mr. Johnson, it's an open

3    question as to what, if any, ability you have, or the

4    plaintiffs have, to oppose that.  I haven't heard that it's

5    necessarily opposed, but it seems to me, Mr. Poulton and

6    Mr. Johnson, that the issues of confidentiality and the issues

7    of scope of the subpoena or the waiver, these are things that

8    could be worked out, and if you approach it on parallel tracks

9    by way of a Rule 45 subpoena at the same time, if, again, it's

10   not inappropriate or unethical to do so, to seek consent, given

11   the deadline of April 18th and given what I understand,

12   Mr. Johnson, generally to be the position of your clients, that

13   these materials are not fair game for discovery, whether they

14   actually come in at trial may be another matter, so that would

15   seem to me to put the matter on a track where it's moving

16   forward, where you have a resolution one way or the other,

17   without hitting up against the April 18th deadline, which would

18   then cause a problem.

19           Just a thought, Mr. Poulton.

20           MR. POULTON:  Thank you, Your Honor.

21           THE COURT:  Both sides are very ably represented.

22   I'm not suggesting that you're not perfectly well-versed in all

23   these matters, but sometimes it helps to discuss them in

24   advance to avoid problems down the road.

25           So that would be that issue, which was the only one

 1    that really I saw that maybe I thought that we could use some

 2    discussion.

 3              With that, Mr. Poulton, I started with you, I'll end

 4    with you, anything further that you can think of?

 5              MR. POULTON:  No, Your Honor.

 6              THE COURT:  Okay.  Mr. Johnson, same question.

 7              MR. JOHNSON:  No, Your Honor.  The only question

 8    I would ask is I think under the current schedule we're

 9    scheduled to issue -- to file a case management report

10    tomorrow, in advance of the next conference next week, and

11    I don't know if -- I just wanted to raise that for your

12    attention.

13              THE COURT:  I'm aware that we have a status scheduled

14    for the 15th at 9:00, and I wanted to talk to you both about

15    moving that, particularly in light of the extension of the

16    discovery deadline.

17              We've normally scheduled these as we moved along

18    centered around events, so I think, Mr. Poulton and

19    Mr. Johnson, when you've had a slew of depositions scheduled or

20    something of moment, we've either scheduled it before that or

21    immediately after, and with an eye towards that approach,

22    Mr. Poulton, I keep coming back to you as an initial matter, so

23    I'll continue to do that here, next time I'll start with

24    Mr. Johnson, but anything that you see out there in the next

25    several weeks that would make a good time for us to come back

1    together?  I'm looking at the first or second week in March

2    maybe.

3              MR. POULTON:  I mean, the only thing that seems like

4    it could be problematic would be this issue of the juvenile

5    records, and I think Your Honor has correctly -- or accurately

6    apprized that we really haven't worked that collectively like

7    we probably should, so I think we -- Mr. Johnson and I,

8    you know, we'll try to speak this afternoon, I hope, and get

9    that process in motion.  That would be the only thing that

10   jumps out at me as likely to be -- or even possibly to be a

11   problem in the next two to three week timeframe.

12             THE COURT:  Okay.  And it may be that if you had a

13   discussion with Mr. McDougall and Mr. Jones and they were aware

14   of the Rule 45 subpoena and were made aware of a

15   confidentiality agreement -- and this could not involve,

16   Mr. Johnson, you overtly or your co-counsel in the discussions,

17   but a confidentiality agreement that was agreeable to your

18   clients and a waiver in terms of the discoverability of the

19   documents under the Rule 45 subpoena, that may facilitate the

20   consent.

21             MR. JOHNSON:  I think there might be a way we can

22   approach it.  We need to think about it.  You know, as

23   I indicated, I think there's just a number of concerns on our

24   end involving both sort of where it puts -- the position of

25   counsel, the position of the parents, and wanting to respect

1    the fact that these are, you know, independent individuals who,

2    you know, should make their own decision about this, but

3    I think we can -- we can give it some thought, Your Honor.

4         THE COURT:  A suggestion about something to think

5    about, Mr. Poulton, would be, whether it's yourself or another

6    individual with your office, if there was a discussion in

7    advance about the scope of the confidentiality agreement and

8    there was a discussion and an agreement on the scope of

9    confidentiality and on the waiver.

10        The discussion could be -- again, assuming there's no

11   ethical problem and it's not otherwise inappropriate, with

12   Mr. McDougall and Mr. Jones, would be we've pursued -- we're

13   pursuing this by way of a Rule 45 subpoena, which you'll find

14   out, or you may have gotten notice about already, we want to

15   let you know that we have worked out a confidentiality

16   agreement relative to these and we've discussed the waiver, and

17   so that overtly would not involve you, Mr. Johnson.  These are

18   just statements of fact.

19        The confidentiality and waiver would pertain to the

20   Rule 45 subpoena, to avoid any objection, to the extent you

21   would be in a position to make one, and so advising

22   Mr. McDougall and Mr. Jones, as independent and adult

23   individuals, might provide them with sufficient comfort, or it

24   may not, but those are just statements of fact, and it's

25   anchored or tethered to the Rule 45 subpoena, which would be an

1   appropriate matter for you to have a discussion with

2   Mr. Poulton on behalf of your clients, without implicating that

3   you're endorsing the idea of the waiver itself.

4           Perhaps that is something to think about.

5           MR. POULTON:  Yeah, I'm not sure that they would get

6   notice about the Rule 45 subpoena other than through their

7   parents, because as I'm -- as I'm thinking this through and

8   looking more closely at the Rule, the subpoena -- well, the

9   parties would be noticed, of course, and then the -- yeah, the

10  repository of the records would be subpoenaed, and they would

11  have 14 days to object, and my assumption is we'd get an

12  objection from them, you know, on grounds that they can't

13  release them without either a release or a court order, so

14  I think the only way that maybe Mr. McDougall and Mr. Jones

15  would be aware is if -- is via their parents, to begin with.

16          THE COURT:  The interesting question will be here

17  there may be an overlay under State law about what -- the

18  institution, who I assume has custody of the records, may have

19  their own notice requirements.  That is not briefed, and

20  I don't know, but the thought here is really more at a

21  10,000-foot view, which is to move on parallel tracks, try to

22  address your concerns, Mr. Johnson, and those of your clients

23  about being too intimately involved in this to provide -- to

24  give an impression or appearance that might impinge upon the

25  voluntariness of any waiver if it were to get to that point.

1          And the Rule 45 subpoena, I guess, Mr. Poulton, you'd

2    find out from the entity whether there's any notice

3    requirements under State law that they have to provide, and

4    then they'd have an opportunity to be heard, perhaps.

5          These all are things that need to be briefed, and

6    I'll wait to see if that comes to pass, but it may be that this

7    goes through more smoothly, but if you start now, it would seem

8    to me you'd have a much better chance here in early February,

9    the next two and a half months, of having the matter resolved

10   one way or the other, given the timeframes in the Rules.

11         Mr. Poulton, I interjected a little bit, so I didn't

12   mean to delimit or constrain you in any way.

13         MR. POULTON:  No, I just was making an observation

14   about it, as I looked at it.  Mr. Johnson had brought up the --

15   or the Court had contemplated the notice issue in that context

16   and I was just making a remark about it, but I think

17   I understand what we need to do and I'll get with Mr. Johnson.

18         THE COURT:  Okay.  All right.

19         Hearing nothing further from Mr. Poulton,

20   Mr. Johnson, anything on your end?

21         MR. JOHNSON:  No, Your Honor.

22         THE COURT:  Okay.  We were talking about a date

23   though in kind of a timeframe when you thought -- I'm looking

24   at the first -- either the week of the 28th, which is in three

25   weeks, or the week of the 7th, but if there's going to be

1  something that's coming up, I'd rather be more involved in an

2  effort to help you out, facilitate things moving forward, so

3  that there are not further issues on discovery.

4          Which of those two weeks do you think would work

5  best, Mr. Poulton?

6          MR. POULTON:  I'm looking at my calendar.  It would

7  definitely be the week of the February -- of March 7th, would

8  the most friendly to my calendar.

9          THE COURT:  Okay.  Mr. Johnson?

10         MR. JOHNSON:  Either of those weeks works on our end,

11  Your Honor.

12         THE COURT:  Okay.  Mr. Bargil, does it work for you

13  as well?

14         MR. BARGIL:  That's right, Your Honor.

15         THE COURT:  All right.  We'll schedule it then

16  probably either the 8th or the 10th, that's my -- that's my

17  guess.  So we'll more than likely send out an endorsed order

18  scheduling it on one of those two days, and I look forward to

19  seeing you all then.

20         Hearing nothing further from either side, we'll be in

21  recess.  Thank you.

22         MR. POULTON:  Thank you.

23                   - - - - -

24         (Proceedings concluded at 11:41 a.m.)

25                   - - - - -

```
1                       C E R T I F I C A T E

2

3            This is to certify that the foregoing transcript of

4     proceedings taken in a status conference in the United States

5     District Court is a true and accurate transcript of the

6     proceedings taken by me in machine shorthand from a digital

7     audio recording and transcribed by computer under my

8     supervision, this the 14th day of July, 2022.

9

10

11                                   /S/ DAVID J. COLLIER

12

13                                   DAVID J. COLLIER

14                                   OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25
```