IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


DALANEA TAYLOR, et al.,          )
                                 )
                Plaintiff,       )
                                 )
                                 )  Case No.
        vs.                      )  8:21-CV-00555-SDM-CPT
                                 )
                                 )
CHRIS NOCCO, *in his official*   )
*capacity as Pasco County Sheriff,* )
                                 )
                Defendant.       )

_____

STATUS CONFERENCE
*(held via Zoom videoconference)*
BEFORE THE HONORABLE CHRISTOPHER P. TUITE
UNITED STATES MAGISTRATE JUDGE

MARCH 8, 2022
11:09 A.M.
TAMPA, FLORIDA
_____






        Proceedings transcribed via courtroom digital audio
recording by transcriptionist using computer-aided
transcription.
_____

DAVID J. COLLIER, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER
801 NORTH FLORIDA AVENUE, 7TH FLOOR
TAMPA, FLORIDA  33602

1   **APPEARANCES:**

2

3   **FOR THE PLAINTIFFS:**

4           *Robert E. Johnson*

5           *Ari Bargil*

6           Institute for Justice

7           16781 Chagrin Boulevard, Suite 256

8           Shaker Heights, Ohio  44120

9           (703) 682-9320

10

11

12   **FOR THE DEFENDANT:**

13           *Thomas W. Poulton*

14           DeBevoise & Poulton, PA

15           1035 South Semoran Boulevard, Suite 1010

16           Winter Park, Florida  32792-5512

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                    –  –  –  o0o  –  –  –

 3            THE COURT:  Good morning, everyone.

 4            Madam Clerk, if you could please call the case.

 5            MR. JOHNSON:  Dalanea Taylor, et al. versus

 6   Chris Nocco, Civil Case Number 8:21-CV-555.

 7            THE COURT:  If I could please have the appearances of

 8   counsel for the record, beginning with the plaintiff.

 9            MR. JOHNSON:  Good morning, Your Honor.  This is

10   Robert Johnson appearing for the plaintiffs.  I'm joined by my

11   co-counsel Ari Bargil.

12            THE COURT:  Good morning to you both.

13            And for the defense?

14            MR. POULTON:  Tom Poulton on behalf of Defendant

15   Sheriff, Your Honor.

16            THE COURT:  Good morning as well, Mr. Poulton.

17            The Court apologizes for the delay here in getting

18   started.  It had a criminal matter scheduled at 10:30 that ran

19   over.  The Court prides itself on being punctual because we

20   realize that your time is as valuable as anybody's.

21            So, with that, I have read the status report that's

22   been submitted.  It's apparently not entirely ripe for the

23   Court's consideration, but is aware that there does seem to be

24   some back and forth, if you will, on two requests for

25   production.
```

1          Mr. Johnson, I'll begin with you, because

2   I understand the requests for production come from the

3   plaintiff.  Where do things stand there?  And I'll hear from

4   Mr. Poulton.  And what, if anything, can the Court do to assist

5   or facilitate a resolution?

6          MR. JOHNSON:  Well, at this point, Your Honor, the

7   parties are continuing to discuss these requests.  You know, in

8   a nutshell, the issue is that, you know, we had earlier

9   requests which we -- in discussions in these conferences I've

10  referred to as the request for global data, and those requests

11  sought a particular slice of data from the Pasco County

12  Sheriff's Office recordkeeping systems.  One component of that

13  was data from the CAD or automated dispatch system concerning

14  what are called prolific offender checks, which is a certain

15  subset of interactions between the Pasco County Sheriff's

16  Office and various members of the public.  And then the other

17  set of data that we requested and obtained involved records

18  from the RMS or Record Management System concerning citations

19  for a subset of about half a dozen county ordinance violations.

20          The reason for asking for that data was that our

21  expert then was able to compare those two sets of data, and

22  what our expert found was that the number of people who were

23  being subjected -- the people who were being subjected to

24  prolific offender checks were also being subjected to a very

25  high amount of county ordinance citations, and about half of

1   the county ordinance citations in the sample actually were

2   directed at people who were also receiving prolific offender

3   checks.

4          So, you know, that was kind of the first dispute

5   about data that we had in these conferences, and that was

6   resolved, you know, by an agreement between the parties.

7          The reason that we're seeking expanded data is

8   essentially anticipating what the defendant may say in response

9   to these experts, either, you know, through its own -- likely

10  through its own experts.

11         You know, obviously at this point we don't know what

12  the defendant is going to do in expert discovery, you know, the

13  expert reports for the defendant are not due for some time yet,

14  but once we get the defendant's expert reports, on the

15  plaintiffs' side we're going to be on a very tight timeline to

16  turn around our own rebuttal reports, so we're trying right now

17  to get data that we think might be relevant to essentially

18  respond to points that the defendant makes.

19         With that in mind, the defendant has indicated -- and

20  I believe it's in one of these conferences defendant indicated

21  that the central tack that the defendant would be taking in

22  expert discovery is to try to put the data that we've already

23  obtained into a larger context, and so, you know, from

24  plaintiffs' side we're essentially at a bit of a disadvantage,

25  because we have the data that we have and then defendant has

1    all of the context, so if the defendant wants to put everything

2    into a broader context, we don't have that context.

3            So the point of these discovery requests is, without

4    asking for, you know, obviously everything that the defendant

5    knows, which would be unreasonable, we're trying to get a

6    broader slice of the data so that we have some context in order

7    to essentially anticipate the arguments that the defendant will

8    be making or may be making and then respond to them.

9            So that's where things stand.

10           THE COURT:  Okay.  So there's request for production,

11   as I understand it, 35.  What specifically does that ask for?

12           MR. JOHNSON:  So 35 seeks essentially an expanded

13   universe of the data from the CAD system.  So we previously had

14   asked for, you know, an Excel document, a spreadsheet that

15   provided data from the CAD system for prolific offender checks,

16   and that has been provided; and then what this asks is

17   essentially to expand that to include all interactions in the

18   CAD database, you know, all interactions, not just

19   prolific offender checks.  And we're not asking for all of the

20   data, we're asking for certain data fields, specifically the

21   address, the date, the time, and the nature of the interaction,

22   which would be prolific offender check, or it could be,

23   you know, control, or self-initiated investigation, it's just

24   kind of a -- there's a limited subset of nature, it's like a

25   drop-down field, essentially, they can select a limited number

1   of natures.

2        We're not asking for anything that would be

3   confidential.  We're not asking for -- there's a Notes section

4   where the deputies would put confidential data, and we're not

5   asking for that.  So it shouldn't require a lot of review.

6   It's essentially just exporting from Excel the sort of full

7   universe of this data, reflecting interactions between the

8   Pasco County Sheriff's Office and the members of the public.

9        THE COURT:  Over a certain time period, I assume.

10       MR. JOHNSON:  Yes.  Yeah, I believe it's 2015 through

11   the present.

12       THE COURT:  Okay.  Mr. Poulton, there's a lot there.

13       MR. POULTON:  Yeah.

14       THE COURT:  I'll leave it in your able hands to

15   unpack that, if you will.

16       MR. POULTON:  Well, I think Counsel fairly -- with

17   just a couple of exceptions, which I'll explain, I think

18   Counsel's description of the situation is accurate.

19        Just to give a -- what it's about is that we

20   provided, as Counsel said, a spreadsheet of all of the

21   interactions that are labeled as prolific offender checks.

22   Now, not all of them are, that's a problem we have to deal with

23   independently, sometimes the deputies would put that in there

24   and that's not accurate, or sometimes they wouldn't put that in

25   there when they should have, another problem.  But anyway, of

1  those that are labeled as prolific offender checks over about a

2  six year period, there were 13,000, and what I've expressed to

3  plaintiffs' counsel is that that sounds like a large number,

4  but the total number of interactions between Pasco deputies and

5  the public during that time is probably in the high

6  six figures, if not seven figures, and so I explained that we

7  would probably be pointing that out, that even though that

8  number sounds high, in context it's not, and so I think that

9  that's largely what generated then this request.

10          The request for production is for all of the

11  CAD reports for a seven year period, and what I think matters

12  is the whole number.  Like why the individual interactions

13  occurred beyond prolific offender check isn't particularly

14  relevant.  For example, we don't need to know why Deputy,

15  you know, Bob Jones stopped Ellen Sue and gave her a traffic

16  ticket on June 13, two thousand and, you know, nineteen.

17  The circumstances of it don't matter.  The address doesn't

18  matter.  The date doesn't matter as long as it's within the

19  period that we're talking about.  It's just the simple fact

20  that there was a non-prolific offender interaction, to compare

21  to the number that, you know, we've cited, the 13,000 number.

22          So what the concern is -- Counsel said that they

23  weren't asking for anything confidential, and I agree that in

24  most cases that's going to be true, but if you're talking about

25  having to generate either a spreadsheet or the actual reports,

1    you know, hundreds of thousands of them, the agency, I can tell

2    you, is not comfortable with just doing that on the assumption

3    that the deputy did not list in one of these other fields

4    something that would need to be reviewed and redacted, so

5    they're going to want to -- you know, I don't know at what

6    level they have to go through each one, but at some level

7    they're going to need to examine them before they just turn

8    over that amount of data, and so we get into a proportionality

9    issue, in our view.

10          I spoke with Counsel last week.  We are still working

11   on this issue to see if we can come to some compromise.

12          So that's kind of where we're at.  It's not that

13   we're not willing to give the total number, I mean, I'd like it

14   myself, I think it's important, I think their own expert would

15   probably say that it's important, but the underlying

16   circumstances, the date, the location, you know, all these

17   other fields just don't seem, to us, to really enter into the

18   relevance discussion enough to justify the amount of work that

19   would have to be done to produce it.

20          We're also talking about the form that it would take,

21   as Counsel said, would it be the actual CAD reports themselves

22   or would it be a spreadsheet.  I'm sure Counsel would much

23   prefer a spreadsheet than me drop-boxing a million CAD reports

24   to him, you know, for him to go through one-by-one or to try to

25   compile.  I'm sure he'd prefer that.  So it's just a question,

1    I think, of how deep a dive we take into these other incidents,

2    at the end of the day, and we're talking about that.

3              THE COURT:  So help me out here, Mr. Poulton, because

4    I always go back to just the Rule itself, Rule 26(b).

5              How are these additional encounters relevant?  I know

6    that you've alluded to their importance, but just if you could

7    anchor it in the actual claims that have been made by the

8    plaintiff, and then I'll turn to Mr. Johnson as to what he

9    believes would be relevant in response.

10             MR. POULTON:  I'll give you -- if you take,

11   for example, the plaintiffs' recent expert disclosure, they had

12   a statistician, and he says that the percentage of

13   prolific offender checks to people that are listed as

14   prolific offender, meaning those interactions, and also the

15   number of code citations is disproportionate to what I assume

16   he would say is an otherwise random simple of residents of

17   Pasco County.  Takes the total number of households, these are

18   the number of prolific offenders over a certain period of time,

19   these are how many checks they had, and these are how many code

20   citations they got, that's kind of in a nutshell.  And what

21   I want to do is I want to point out, well, okay, there are

22   a lot of prolific offender checks and there are a lot of visits

23   to the folks that are on that list, a lot of those

24   interactions, but you have to recognize, you know, in terms of

25   a policy or custom point of view, what is that in the big

1    picture?  Are we talking about one percent, two percent of all

2    law enforcement interactions, all Pasco Sheriff Deputy

3    interactions with the citizens of Pasco County over that period

4    of time, or a snapshot in time, you know, are we talking a

5    larger percentage.  And I think that that is meaningful to the

6    entire case, because it -- you know, the gist of their claim

7    is -- and I don't mean to speak for them, but the gist of their

8    claim is that it's heavy-handed and it's too much.  Now, where

9    is too much?  How many is too much?  We don't know, right?  So

10   knowing, you know, a good idea of what the total number of

11   interactions is versus, say, the 13,000 I think educates the

12   parties and the Court, come summary judgment or trial, as to

13   how frequent this is relative to other interactions.  So

14   that's -- that's why I think it's important to have that total

15   number.

16           THE COURT:  Mr. Johnson?

17           MR. JOHNSON:  Yeah.  Well, so, you know, I think

18   two thoughts.  One is I don't know that I -- obviously I would

19   dispute that the number -- the total number is all that

20   helpful.  I think from plaintiffs' perspective, you know, the

21   13,000 incidents are burdensome, you know, regardless of

22   however many other types of incidents are going on in the

23   county at any time, so, you know, obviously I don't want to

24   necessarily buy into that argument, but I think from

25   plaintiffs' perspective, once that argument is being made, then

1   there are arguments that we want to be able to make in

2   response.

3           THE COURT:  Such as?

4           MR. JOHNSON:  So, for instance -- and this is why we

5   can't just have the total number, we are asking for the

6   addresses and the dates and that type of basic detail, and also

7   the nature, so that we can know, for instance, you know, if

8   there are a million incidents in Pasco County but, you know,

9   say most of those incidents are responding to 911 calls, and

10  then a smaller fraction are actually initiated by the deputies,

11  I think that's relevant, because, you know, that puts the

12  number in a different context, to say, well, you know, sure,

13  there are a million total incidents, but of those 700,000 --

14  and I'm just making up numbers here, but 700,000 of those

15  involve responding to a 911 call, well, then you can kind of

16  put those aside, because that's very different from the sort of

17  self-initiated type of activity that we're talking about here.

18  So, you know, that sort of distinction matters.

19           Another reason we'd want the address is that,

20  you know, say of that million, I think we would be interested

21  to know what percentage of that is also directed at these same

22  addresses where they're also making prolific offender checks,

23  because part of what's going on in the case is that individuals

24  who are put on this prolific offender list are subjected to a

25  policy of heightened law enforcement attention, and part of

1   that heightened attention is the increased code enforcement,

2   which we've already seen, but part of that heightened

3   law enforcement attention is also that police officers are

4   showing up at their house for other purposes as well.

5           So if we're talking about the total set of, you know,

6   say, a million law enforcement interactions, then I think we

7   also want to know, well, how many of that -- those million

8   interactions, in addition to the prolific offender checks, are

9   directed at the people on the prolific offender list, so -- and

10  that's something that we can do using the address, we can

11  essentially -- you know, we have the addresses where the

12  prolific offender checks were conducted and the times that they

13  were conducted, the dates, and our expert can essentially use

14  that data to conduct that type of an analysis, to provide

15  that --

16          THE COURT:  Let me just interject for a moment.

17          How many addresses are there?

18          MR. JOHNSON:  Gosh.  On the -- it's in the report.

19  I don't want to give the wrong number, but I think the number

20  of addresses where they conducted prolific offender checks is

21  probably about 1,000, but I don't want to say -- I don't want

22  to be quoted on that, obviously, if I got it wrong.

23          THE COURT:  Can you filter out, Mr. Poulton, just

24  addresses of prolific offenders?

25          MR. POULTON:  Well, see, that's part of the problem,

```
1    every time we open one door, we're faced with five more,
2    because then the issue becomes -- we're talking about a
3    seven year period.  You know, they weren't prolific offenders
4    all seven years, right?  They might only be a prolific
5    offender -- there's one instance, I think we have, where they
6    were only on the list for six months.  So now we have to start
7    breaking down by date each address, was there a
8    prolific offender associated with that address in that snapshot
9    in time.  It's not going to be the whole seven years, or
10   six years, whatever the -- for the prior data.
11           So it's -- you know, once you start, as I say,
12   looking behind the data, you start to have more questions, and
13   I -- just to speak to Mr. Johnson's point, I don't disagree,
14   I mean, if I say, well, there were a million checks,
15   theoretically you could say, well, I'd like to know about check
16   number 523,408.  Well, okay, but then it's -- it becomes just a
17   never-ending search for more and more information, and we're
18   getting further and further afield from the four plaintiffs,
19   the period of time that they were prolific offenders, what
20   happened in their experience, you see my point, where it
21   just -- it goes on and on forever.
22           It's been a highly voluminous discovery process as
23   is, and when you start talking about this number of
24   interactions and having to try to in some meaningful way break
25   those down, it just -- it becomes problematic.
```

1          THE COURT:  Let me just, if I could -- and I don't

2     want to impair the parties' informal negotiations, but I'll

3     just go back to the Rule.

4          Mr. Poulton, is there a downside on the addresses?

5     Because I've only heard, admittedly with the caveat they were

6     given to me as examples, but -- and I understand the 9/11

7     argument, 911 argument, which I don't know, Mr. Poulton, if you

8     agree with, but it seems to be a limited subset, and the

9     addresses for 1,000 individuals, is there a downside about

10    just -- without worrying about a temporal restriction, just

11    providing information as it relates to the address?  And then

12    some of this strikes me as being subject of Cross or just an

13    examination.

14          MR. POULTON:  I mean, I don't -- I don't know that

15    there is a limit on just a search of every address where there

16    was an interaction for seven years, but I think that that data

17    standing alone is meaningless, because it takes out of the

18    equation was there a prolific offender living there at a

19    certain period of time and was the reason for the visit related

20    to that label, because there are -- there are plenty -- as

21    we've discussed since the very beginning of the case, there are

22    plenty of occasions where the plaintiffs themselves called for

23    law enforcement to come out, 911 calls by the plaintiffs

24    themselves, seeking assistance because they thought they were

25    the victim of a crime or needed help with something, right?  So

1    it's not -- you can't just go, that's a prolific offender list,

2    therefore every visit over seven years was related to that.

3    And that's -- that's the problem, is you then start having to

4    break it down temporally, you have to start looking behind the

5    documentation as to the whys.

6            I think when they talk about code violations, that's

7    a little bit easier, right, because the agency acknowledges in

8    its manual that people who are prolific offenders, their

9    residences are going to be subject to a heightened level of

10   scrutiny.  There's been testimony about that too.  That's no

11   secret, right?  So the fact of -- that generic fact, I think,

12   is not in dispute, right?

13           Now, the level to which it occurs, that's -- on the

14   edges, that's for summary judgment for trial, but my point

15   being that that's the low-hanging fruit, if you will, for

16   everybody, where we know what the policy is on that, we know

17   that that's the way that it is structured, but when you start

18   talking about why did these deputies go to this house on that

19   day, was it related to prolific offender, was there even a

20   prolific offender label attached to that residence or a person

21   in that residence at that time, those are all subsidiary

22   questions which define whether the inquiry is relevant at all,

23   right?  Because if -- you may still have the same address, but

24   if there was a person -- there was no one there that was listed

25   as a prolific offender, there's no indication it was a

1   prolific offender check, it's irrelevant, but we risk it being

2   tied back into the larger data pool of the plaintiff saying,

3   well, you went and looked at that address and that's a

4   prolific offender address at some point over seven years.

5           And I'm sorry if I'm --

6           THE COURT:  No.

7           MR. POULTON:  -- a little bit of train -- you know,

8   kind of train of thought there as we talk it through, but these

9   are the discussions I'm having with Mr. Johnson and his

10  co-counsel, and, you know, I mean, we are obviously all working

11  in good faith through all these issues, so, I mean, I --

12  I appreciate the Court's input on it, and I really -- I just

13  think that it's something that we're either going to have to

14  work out or come back before Your Honor and explain, you know,

15  I think in better detail when we have -- I have more

16  information, frankly, about what's involved.

17          You know, we might get to a point where Mr. Johnson

18  says the following would be acceptable; my agency is saying,

19  well, okay, except -- and that may be the point at which we

20  have to come before Your Honor to, you know, resolve some

21  narrower part of this dispute.

22          THE COURT:  In the broad observations, preliminary as

23  they are, without the benefit of any briefing, I suppose

24  multiple other caveats would be that I would encourage the

25  parties to tether or anchor their requests or limitations in a

1  claim or defense, or claims or defenses, keeping in mind

2  proportionality concerns, but also I think to some extent some

3  concerns here can be addressed by way of a motion in limine or

4  by examination.

5       In other words, discovery isn't always coincident

6  with what's admissible.  So I think the points made by both

7  sides are understandable, but it seems to me, Mr. Poulton --

8  I understand that you want to place the number in broad

9  context, so the first -- again, this is a preliminary view,

10  just without the benefit of any briefing, would be in the end

11  is that something that's relevant, you would argue that it is,

12  and then, Mr. Johnson, to what extent do you need to chip away

13  at that as relevant, or as discoverable anyway, at this stage?

14       It seems to me to be something that, I think -- with

15  the way the parties have been working things out, something

16  that the parties can resolve, so I don't want to interfere with

17  that, because you know the issue far better than I do at this

18  point.

19       It doesn't strike me as something that -- if the

20  parties keep it in the proper context, I think you can, in the

21  end, resolve it with the idea of what is actually going to be

22  the argument and what are you really going to utilize this

23  information for in the end, once you get to trial, even in a

24  best case scenario.

25       So I would just encourage the parties to look at that

1    in that light.

2              I've intentionally made that as vague as I can.

3              MR. JOHNSON:  Okay.

4              THE COURT:  But I'm just thinking -- Mr. Poulton and

5    Mr. Johnson, like you all, I've tried many cases, and I'm just

6    thinking about how this would play out in a trial, what would

7    you be allowed to admit and what would you be allowed to argue,

8    and that would be the large driver here, so that you don't

9    waste undue time on something that in the end the Court is not

10   going to be receptive to.

11             And I'm intentionally keeping this vague so that

12   neither side construes it as being favorable or unfavorable to

13   their position, because I don't intend it that way.  I just

14   simply mean that you both are experienced counsel and you both

15   have tried many cases, I'm sure, and know the context, but the

16   benefit of having tried many cases is that you understand

17   that down the road that while things sound one way here, either

18   in terms of the breadth or the limitations, when you get there

19   it doesn't -- it ends up being a lot simpler than that.

20             I don't know how Judge Merryday is going to rule on

21   it, so I don't want to --

22             MR. POULTON:  Well, one advantage we have,

23   Your Honor, is that I think we're -- even though I have yet to

24   file an answer, one advantage we have is that it's going to be

25   a bench trial, so, you know, 403 type considerations I think

1    are much less.  You know, I'm sure Judge Merryday will have

2    very pointed questions for both of us.

3          THE COURT:  They'll be very well-informed, I can

4    assure you.

5          MR. POULTON:  We'll be cross-examined, I'm sure,

6    pretty strictly.

7          THE COURT:  So the suggestion is simply that you keep

8    that in mind, because the further you get from the core of your

9    case, obviously, the less significant these issues may be, and

10   the point that's crying to be made either in favor of this

11   broader number or in limiting it, it may be relatively

12   straightforward, what do you think at the end the Court is

13   really going to care about?

14         And, again, very experienced counsel, I'm sure you

15   have kind of a sufficient 10,000-foot view of things so that

16   you know where to dedicate your resources and the Court's.

17         All right.  Well, I'll leave that in both of your

18   able hands to work on that.

19         When would that be ripe, Mr. Johnson, for the Court?

20   When are the responses due?

21         MR. JOHNSON:  Good question.

22         THE COURT:  Because your discovery deadline is

23   April 18th, so we're still more than a month out, but if the

24   responses are due in a week and then you're thinking about

25   briefing the matter, the briefing and argument are likely going

1    to extend beyond the discovery deadline.

2          MR. JOHNSON:  I believe the responses are due on the

3    30th.

4          THE COURT:  Would that be the end of what you

5    envision in terms of RFPs and other document requests on your

6    end, Mr. Johnson?  I'll ask the same question of Mr. Poulton.

7          MR. JOHNSON:  I don't anticipate having anything

8    significant at this point.  There are a few documents that came

9    up during the 30(b)(6) that I've been meaning to circle back

10   with Mr. Poulton about just to make sure that -- you know, that

11   we're getting those.  I don't think they necessarily require

12   new requests though.  These are things that came up that are

13   just encompassed within earlier requests, but I don't foresee

14   anything -- and certainly nothing voluminous in it between now

15   and the end of discovery.

16         THE COURT:  Mr. Poulton, on your end, do you envision

17   much by way of discovery moving forward?

18         MR. POULTON:  No, Your Honor.  I think -- I mean, one

19   benefit to me that makes my job a lot easier is that I'm

20   representing a public agency, so, for example, I anticipate

21   that I may be produce -- or wanting my expert to talk about

22   and/or to examine their expert about certain Sheriff's Office

23   policies about particular types of interactions, and to the

24   extent that that's not already been disclosed, I would just

25   send it over, because they could just do a public records

1   request anyway, so I would just Rule 26 it and produce it at

2   the same time, you know, as I go.  I don't think though that

3   I need anything -- well, the one exception -- issue we have,

4   and we'll get to it, I'm sure, is the issue of the juvenile

5   records, but that's not something that I think at this point

6   plaintiff has any input or control over.

7           THE COURT:  Okay.  That's probably a good time then

8   to move to that.  I've allotted about 15 more minutes for this

9   hearing, so -- I'm aware that -- I'll probably mispronounce her

10  name -- Dalanea Taylor provided a signed release.  Do I

11  understand that correctly?

12          MR. JOHNSON:  Yes.

13          THE COURT:  Okay.  And then my notes indicate, and

14  I believe from the joint submission, Mr. Poulton, that you're

15  still pondering whether to subpoena the juvenile records.  Do

16  I understand that correctly?

17          MR. POULTON:  Well, yes.  I think that Counsel's

18  point -- that I probably need to do that, just proceed with it,

19  to, you know, get us further down the road on that issue.

20  I think Counsel is right.

21          And I did have a question of Your Honor on that,

22  because I've not had this situation happen before, but if

23  discovery is closed and I've done a subpoena, let's say, to the

24  Court for the juvenile records and they don't respond and they

25  don't object and the time passes for that, and then I want to

1   file a motion to compel this third party to produce something,

2   even if we're outside the period of discovery, is that

3   something the Court would entertain doing?  Or if they filed an

4   objection, you know, a motion to -- for protective order,

5   for example, that we could come back before Your Honor, even

6   though we're outside the period of discovery, to resolve that,

7   so that it doesn't just fade away?

8           THE COURT:  I don't have an answer for you.

9           MR. POULTON:  Okay.

10          THE COURT:  I'll have to think about it.

11          I believe though -- and I realize it's very

12  challenging, given your respective practices, because you have

13  a lot of cases, and this is certainly a weighty case with a lot

14  of moving parts, but I believe, Mr. Poulton, I may misrecollect

15  this, but the last hearing or the one before that, a recent

16  hearing, when we talked about this, I think I pressed

17  Mr. Johnson on doing what he could on his end to secure a

18  release, but I believe I mentioned on a parallel track that you

19  pursue the subpoenas for that very reason, so that it didn't

20  get too late in the game.  But you are where you are.

21          I would just encourage you to move forward, if you're

22  intending to do that, purely to obviate as much agita, if you

23  will, for either you, for Mr. Johnson and/or the Court, and see

24  where it -- see where it falls.

25          MR. POULTON:  All right, Your Honor.  I'll jump on

1    that today.

2            THE COURT:  Let's see.  If you serve the subpoenas

3    today, their response would be due typically -- I'll have to

4    look at Rule 45, but typically within 14 days.  Do I have that

5    correctly?

6            MR. POULTON:  That's my recollection, but I --

7    I don't recall for sure.  I think that's right.

8            THE COURT:  So at that point you would know --

9    14 days from today would be inside of the end of the month,

10   would be the 22nd.  You'd still have almost a month until

11   discovery closed, so -- I'm trying to pay some heed to the old

12   expression not to be early to a calamity, but it sounds to me

13   like you still have some time here between the response date,

14   if you were to get the subpoena out very promptly, and the end

15   of discovery, so --

16           MR. POULTON:  I'll take care of that today,

17   Your Honor.

18           THE COURT:  Okay.  How many juveniles -- I realize

19   they're adults now.  As I recall, there were two others besides

20   Ms. Taylor?

21           MR. JOHNSON:  There -- yeah.  There might be three,

22   depending on whether they're going to seek records for

23   Tyler Panneson.  Two or three.

24           THE COURT:  And those aren't subject to Open Sunshine

25   Laws and the like?

1        MR. POULTON:  Well, my understanding has been from

2   the agency that when a juvenile -- while a juvenile is a

3   juvenile, the parents would have the authority to allow the

4   records to release, but once they become adult then the -- they

5   control their own records, is my understanding.  You know,

6   I admit I've not explored it greatly, but we'll find out.

7   If I issue the subpoenas and get a -- get a no, and they

8   explain that that's the situation, then we'll know that, but,

9   you know, I got to do that first, and I should have done that

10   earlier, and I will get on it right away.

11        THE COURT:  Okay.  And I didn't mean that in a

12   chiding way, but as I said, there are a lot of moving parts,

13   I've been there, and you're trying to stay on top of a number

14   of things, both you and Mr. Johnson.

15        Aside from those two issues, which were the only two

16   issues that I can identify, neither of which appears to be ripe

17   at this point, Mr. Johnson, is there anything else that you

18   think the Court ought to address?

19        MR. JOHNSON:  Not at the moment, Your Honor.

20        THE COURT:  Okay.  Mr. Poulton, anything further?

21        MR. POULTON:  No, Your Honor.

22        THE COURT:  I have, by look at the schedule, the next

23   status set for April 5th.  In light of what you've said, on

24   both the plaintiff and the defense side, it seems like an

25   appropriate date.  In other words, by that point, Mr. Poulton,

 1  by way of example, you would have already served the subpoenas

 2  and the response date of the individuals who would be the

 3  target of the subpoenas would have already passed, so we'd have

 4  some sense of where that stands.  And then the responses,

 5  Mr. Johnson, you indicated, to the requests for production were

 6  due at the end of the month, so we'd have a better idea

 7  five days into April as to where that stands.  Hopefully

 8  resolved at that point.

 9          Any reason, Mr. Johnson, to think that we should meet

10  earlier than the 5th of April, as much as I know you both enjoy

11  these conferences?

12          MR. JOHNSON:  Well, they've been extremely helpful,

13  actually, Your Honor, but, no, I don't see any reason that we

14  need to do that.

15          THE COURT:  Mr. Poulton, any reason you think that --

16  I'm happy to do it if you think it will help.

17          MR. POULTON:  Well, actually, kind of tangentially

18  related, you mentioned April 5 is our next meeting, and I'm

19  looking -- yeah.

20          And I don't know -- they've got it on here, I guess

21  my legal assistant didn't realize the overlap here, but I am

22  scheduled for oral argument at the Eleventh Circuit in Atlanta

23  on the morning of April 5.

24          THE COURT:  Are you suggesting that the Eleventh

25  Circuit is more important than --

1          MR. POULTON:  Well, they're harder to deal with.

2    They're a little -- they're a little less malleable.

3          THE COURT:  I would suggest not ordering the

4    transcript.

5          MR. POULTON:  Okay.  Good idea.

6          Is it -- and actually -- oh, I see what the problem

7    is.  It's the whole week.  I don't know that they've given me a

8    specific date yet.

9          I'll look into that, and, Your Honor, if I need to

10   ask to move it -- I don't want to waste Your Honor's time while

11   I check into this.  I'll let you know.  I'll file a motion, if

12   need be, or advise your assistant and coordinate with counsel

13   if I need to ask the Court to move that by a day or two.

14         As I say, right now when I look at my calendar it

15   just shows up for the whole week, so I'm not sure that they

16   have given me the specific day yet.

17         THE COURT:  Just a couple of thoughts.  I would

18   encourage, as you I'm sure will do, just to confer with

19   Mr. Johnson as to alternative dates, if necessary, and times

20   that you believe would work for both sides.  I generally try to

21   schedule as much as possible on Tuesdays and Thursdays, so if

22   the 5th doesn't work out, maybe look at the 7th.  That's the

23   preference ordinarily.

24         We have a substantial workload that will be due by

25   the end of the month, so there's generally some time that's

1  taken to catch up on some smaller things that have had to be
2  put by the wayside while we do that, but by the 5th or the 7th
3  we'll be well-prepared to move forward.
4        MR. POULTON:  Your Honor, I just looked and I -- they
5  still have it on the schedule for the whole week, but I looked
6  and there was a calendar that just came out earlier in
7  February, and I am -- I am up there on Wednesday the 6th, so
8  I will be able to attend the hearing as scheduled.  I apologize
9  for the distraction.
10       THE COURT:  Not a distraction at all.  I'd rather
11  talk about it now and save a lot of paperwork down the road.
12  So we'll leave it on the 5th.
13       I guess I'll just come back to you, Mr. Poulton.
14  Any reason the Court should meet with you and Mr. Johnson and
15  Mr. Bargil before the 5th?
16       MR. POULTON:  I can't think of any right now.  We'll
17  either work it out or file a motion if we need to.
18       THE COURT:  Okay.  Hearing nothing further from the
19  parties, we'll be in recess.  Thank you to you all.
20       MR. POULTON:  Thank you.
21       MR. JOHNSON:  Thank you.
22                    - - - - -
23            (Proceedings concluded at 11:48 a.m.)
24                    - - - - -
25

```
 1              C E R T I F I C A T E

 2

 3          This is to certify that the foregoing transcript of

 4    proceedings taken in a status conference in the United States

 5    District Court is a true and accurate transcript of the

 6    proceedings taken by me in machine shorthand from a digital

 7    audio recording and transcribed by computer under my

 8    supervision, this the 14th day of June, 2022.

 9

10

11                                  /S/ DAVID J. COLLIER

12

13                              DAVID J. COLLIER

14                              OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25
```