```
 1                 IN THE UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
 2                          TAMPA DIVISION

 3

 4   DALANEA TAYLOR, et al.,          )
                                      )
 5              Plaintiff,            )
                                      )
 6                                    ) Case No.
           vs.                        ) 8:21-CV-00555-SDM-CPT
 7                                    )
                                      )
 8   CHRIS NOCCO, in his official     )
     capacity as Pasco County Sheriff,)
 9                                    )
                Defendant.            )
10

11

12   _____

13                       STATUS CONFERENCE
                   (held via Zoom videoconference)
         BEFORE THE HONORABLE CHRISTOPHER P. TUITE
14              UNITED STATES MAGISTRATE JUDGE

15                       MAY 10, 2022
                          11:04 A.M.
16                      TAMPA, FLORIDA
     _____
17

18

19

20

21        Proceedings transcribed via courtroom digital audio
     recording by transcriptionist using computer-aided
22   transcription.
     _____
23
                   DAVID J. COLLIER, RMR, CRR
24              FEDERAL OFFICIAL COURT REPORTER
                801 NORTH FLORIDA AVENUE, 7TH FLOOR
25                  TAMPA, FLORIDA  33602
```

```
1    APPEARANCES:

2

3    FOR THE PLAINTIFFS:

4            Robert E. Johnson

5            Ari Bargil

6            Caroline Grace Brothers

7            Institute for Justice

8            16781 Chagrin Boulevard, Suite 256

9            Shaker Heights, Ohio  44120

10           (703) 682-9320

11

12

13   FOR THE DEFENDANT:

14           Thomas W. Poulton

15           Robert D. Holborn, II

16           DeBevoise & Poulton, PA

17           1035 South Semoran Boulevard, Suite 1010

18           Winter Park, Florida  32792-5512

19

20

21   ALSO PRESENT:

22   Susan Bodner, Florida Department of Juvenile Justice

23   Stacy Osborne, Pasco County Clerk of Court

24

25
```

```
1                    P R O C E E D I N G S
2                    – – – o0o – – –
3            THE COURT:  Good morning, everyone.
4            Madam Clerk, if you could please call the case.
5            COURTROOM DEPUTY:  Dalanea Taylor versus Chris Nocco,
6    Civil Case Number 8:21-CV-555.
7            THE COURT:  If I could please have the appearances of
8    counsel for the record, beginning with plaintiff.
9            MR. JOHNSON:  Good morning, Your Honor.
10   Robert Johnson for the plaintiffs, joined by my co-counsel
11   Ari Bargil.
12           THE COURT:  Good morning to you both.
13           And for the defense?
14           MR. POULTON:  Good morning, Your Honor.  I'm
15   Tom Poulton here on behalf of Sheriff Nocco, and I have also on
16   the line with me my associate Rob Holborn.
17           THE COURT:  Good morning to you both.
18           And we have two other individuals.  Mr. Poulton, can
19   you just state for the record who they are.
20           MR. POULTON:  I know one is Susan Bodner with the --
21   counsel with the Department of Juvenile Justice.  The other,
22   I believe, is, if I'm not mistaken -- well, let's see, because
23   I'm going to be mistaken.  Is it -- I'm not sure if it's
24   Stacy Osborne or Wilma Metcalf from the -- from the Clerk's
25   Office, the Pasco Clerk's Office, one or the other, I'm not
```

1    sure which.

2            Unfortunately, I'm having computer difficulties today

3    and having to do this from my phone, so I can't pull up the

4    prior e-mails or documents that we filed with the Court.

5            THE COURT:  Not a problem, Mr. Poulton.  I think

6    Mr. Johnson has gotten tired of that blind that you had as a

7    backdrop.  The bookcase is a much better look for you here.

8            MR. POULTON:  Thank you.

9            THE COURT:  I see that we have Stacy Osborne,

10   Ms. Metcalf is my law clerk, and then we have Caroline Grace

11   Brothers as well, and Ms. Bodner on the telephone.

12   Good morning to you all.

13           The Court appreciates very much, Mr. Poulton, you

14   arranging to have Ms. Osborne and Ms. Bodner here with us.

15           Ms. Osborne and Ms. Bodner, the Court has an issue

16   before it involving a subpoena issued under a Federal Rule

17   known as Rule 45 seeking certain juvenile records relating to

18   individuals claimed to be related to the matter that

19   Mr. Johnson and his colleagues have brought against

20   Sheriff Nocco and others.

21           The statute that governs the disclosure of those

22   records does not have a tremendous amount of authority out

23   there interpreting the contours of what it authorizes.  The

24   Court is aware that the statute allows for the disclosure of

25   juvenile records which are otherwise confidential upon order of

1    a court, but there's no standard set forth in the statute

2    itself that informs the Court as to what type of showing needs

3    to be made.  So I know the two of you are experienced, or so

4    I've been informed through Mr. Poulton's filings, and the Court

5    is trying to rule on Mr. Poulton's motion and has put a fair

6    amount of time into that exercise.

7              So I'll begin, Ms. Bodner, with you.

8              Are you aware of the Federal statute to which I'm

9    referring?

10             MS. BODNER:  I am, Your Honor.  And, first off, I'd

11   like to apologize that I had to appear by phone.  I had some

12   technical difficulties with my computer.  But, yes, I am aware

13   of the -- of the Federal statute.

14             We do have, I believe it's the statute that you are

15   referring to, Chapter 985.04 of our Florida statutes, that

16   requires us to only provide confidential records in certain

17   circumstances, so that is the authority that I am relying on.

18             THE COURT:  And just for the record, can you identify

19   the entity with which you're associated.

20             MS. BODNER:  Yes.  Florida Department of Juvenile

21   Justice, Assistant General Counsel and Supervisor, our

22   supervising attorney of the Public Records Unit.

23             THE COURT:  So if I could ask you a series of

24   questions.  Ms. Osborne, I'll then turn to you, merely to ask

25   you the same questions.  This isn't an effort to grill you with

1    difficult inquiries, it's just simply so that the Court can
2    understand the issue better.
3            Does your office, Ms. Osborne -- or Ms. Bodner,
4    rather, interpret 985.04 to allow for any court, including a
5    Federal Court, to issue the requisite order referenced in the
6    statute?
7            MS. BODNER:  We do, Your Honor.
8            THE COURT:  And what type of showing do you believe
9    the statute requires before a court can issue such an order?
10           MS. BODNER:  Your Honor, when you say "showing,"
11   could you clarify what you mean by that?  Do you mean as far as
12   asking length?
13           THE COURT:  Lawyers are intentionally vague, so by
14   "showing" -- in other words, it's one thing for the Court to
15   issue an order, and you can appreciate the language in the
16   statute that allows or authorizes the Court to do so, but the
17   question is what does the Court need to be shown by the party
18   asking for the order before the Court issues the order itself?
19   That's what I mean by "showing."
20           MS. BODNER:  Okay.  Not sure how to answer that
21   question, Your Honor.  Generally in public records I have dealt
22   with this issue before where attorneys are trying to seek
23   confidential records, and we -- um, we ask for, um, court
24   orders.  The language that we ask for is fairly simple.  We
25   believe that the statute stands on its own to provide that the

1    records for juveniles are confidential, so just the --

2    I believe the Court would just need to establish that those

3    records are confidential based on the statute and then

4    authorize that disclosure.

5            I'm not sure if that answers your question,

6    Your Honor.

7            THE COURT:  Let me just follow up, if I could, before

8    we turn to the question.

9            You're aware of the records that are being sought

10   here by Mr. Poulton?

11           MS. BODNER:  I am.

12           THE COURT:  Any reason to think those records do not

13   fall within the ambit of Section 985.04?

14           MS. BODNER:  No, Your Honor.

15           THE COURT:  Okay.  So then the question is:  Do you

16   have any experience or opinion, based upon your working with

17   the statute, as to what showing a party presents to the Court

18   in order to secure the order that you then require?

19           MS. BODNER:  Um, we don't really have a position on

20   that, Your Honor.  Since you're asking me directly, as a

21   representative of Department of Juvenile Justice, there are,

22   you know, records for the individuals that the attorney did

23   request on three of the -- the subpoenas that were issued, so

24   I believe just establishing that, yes, there are records, and,

25   yes, there are -- they are held confidential pursuant to that

1  statute would be all that would need to be shown in order to

2  have a court order issued.

3         THE COURT:  In other words, your office doesn't

4  involve itself on the determination as to whether the records

5  are sought for a legitimate purpose?

6         MS. BODNER:  Our -- because the attorney is asking

7  for the records and they're in pending litigation, we are

8  taking the attorney's word for it, generally, that the records

9  are being sought for the purpose of litigation in that

10  particular case.  We don't generally -- you know, I didn't ask

11  questions on the specific case, as to what the records are

12  being sought for, outside of the fact that they appear to be

13  sought for the specific litigation that they are requested in.

14         I think that if the Court or Your Honor wants to

15  explore that just to get more facts on the record, that would

16  certainly, you know, help just in case, but we are of the

17  position that if the attorney is vouching that they need the

18  records, that we're, you know, trusting the attorney that

19  there -- that there is a legitimate purpose for the records.

20         THE COURT:  Okay.  How routinely does the Department

21  of Juvenile Justice receive such requests and turn over such

22  documents?

23         MS. BODNER:  Um, we receive requests probably weekly

24  for these files from attorneys.  A lot of our requests are from

25  the Public Defender's Office, so they typically just send over

1  their notices of appearance, and because they actually

2  represent that child, it's a lot simpler.

3            As far as requests where I have had to appear or

4  request a court order, I would say that we probably get those

5  every several months or so, maybe every couple of months.

6            Generally someone is providing a release or they have

7  a court order, but I have been asked to appear before a judge

8  before in the year and a half that I've been here to basically

9  state our position and let the judge know that, you know, the

10 court order is needed.

11           I would say I've had to do that once in the year and

12 a half that I've been here, excluding this -- this proceeding,

13 but I have sent probably a handful of times language to other

14 attorneys letting them know what the court order needs to say

15 when they've had questions.

16                 THE COURT:  Okay.  Thank you, Ms. Bodner.

17                 Ms. Osborne, really the same set of questions.

18                 Is it the position of the Pasco County Clerk of

19 Courts -- that's the entity with which you're associated?

20                 Your microphone is on mute.

21                 MS. OSBORNE:  Can you hear me now?

22                 THE COURT:  We can.  Thank you.

23                 MS. OSBORNE:  Okay.  Thank you.

24                 So along with Statute 985, we also follow the Florida

25 Rule of Judicial Administration 2.420.

1          THE COURT:  2.420?

2          MS. OSBORNE:  Yes, sir.

3          THE COURT:  And what does that statute or provision

4     state?

5          MS. OSBORNE:  That is the Florida Rule of Judicial

6     Administration.

7          THE COURT:  And what does that rule provide?

8          MS. OSBORNE:  It's the determination of confidential

9     court records.  The Clerk of the Court shall maintain as

10    confidential information described by all the subdivisions.

11         THE COURT:  Okay.  And any dispute or disagreement as

12    to whether the records sought by Mr. Poulton fall within the

13    ambit of 985.04?

14         MS. OSBORNE:  Yes, we feel that they do fall under

15    statute 985.

16         THE COURT:  Okay.  And do you also, like Ms. Bodner

17    said on behalf of the Department of Juvenile Justice, take a

18    position that any court, including a Federal Court, can issue

19    the requisite order required by Rule 985.04?

20         MS. OSBORNE:  Yes.  We just require a court order to

21    release these documents.

22         THE COURT:  By any court?

23         MS. OSBORNE:  I believe so, yes.

24         THE COURT:  Okay.  And how routinely do you --

25         MS. OSBORNE:  I personally?  I've been a supervisor

```
 1    in Records for seven years and this is the second time I have
 2    had to ask for a court order.  We do get public records
 3    requests for juvenile, but it's usually from the Public
 4    Defender or the State Attorney's office, and they get those
 5    free --
 6              THE COURT:  Okay.
 7              MS. OSBORNE:  -- and without order.
 8              THE COURT:  And the same question that I asked of
 9    Ms. Bodner.  Do you require a particular showing be made before
10    the Court issues an order?
11              MS. OSBORNE:  No, sir.
12              THE COURT:  You just leave it up to the Court?
13              MS. OSBORNE:  Yes, sir.
14              THE COURT:  Mr. Poulton, any additional questions for
15    either Ms. Bodner or Ms. Osborne?
16              MR. POULTON:  Well, no, Your Honor, except that I --
17    I filed at the end of the day yesterday a copy of that Florida
18    Rule of Judicial Administration, and what occasioned that was
19    that we got a call from outside counsel for the Clerk's Office,
20    and I -- I may make this more complicated than it already is,
21    but Counsel indicated that he had received a call from the
22    Clerk and that the Clerk in fact believed that under that
23    Rule of Judicial Administration -- perhaps it's changed since
24    we spoke, but I was under the impression that the Clerk was
25    taking the position that the only court that could order the
```

1  release of the records would be a Pasco County Circuit Court.

2  That's the last I heard.  It was the very end of the day

3  yesterday.

4          I didn't -- other than filing something with the

5  Court to put the Court on notice that we had gotten this

6  indication, that was all I could do, but it's my understanding

7  that in fact the Clerk may -- well, and the reason I say "may"

8  is because of Ms. Osborne's comments, but it was my

9  understanding at the end of the day yesterday the Clerk would

10 prefer an order from the Court directing the Clerk to refer the

11 matter to the Chief Judge or the Administrative Judge in the

12 Circuit, and they would route it to the right judge to execute

13 the order, whether they felt -- go ahead.

14         MS. OSBORNE:  It was my understanding as well that

15 once we received the Federal court order, we would take it to

16 our judge and have him issue a local order, is my

17 understanding.

18         THE COURT:  Okay.  Thank you for that clarification.

19         I'm just trying to think if that impacts the Court's

20 analysis, Mr. Poulton, at all.  Any reason to think that would

21 impact the Court's analysis?  It could be that it's simply a

22 mechanical matter.

23         MR. POULTON:  Right.  I agree, Your Honor.

24         THE COURT:  Okay.  Mr. Johnson, I know you're

25 well-versed in these matters.  Anything that you wish to ask of

1      Ms. Bodner or Ms. Osborne?

2                  MR. JOHNSON:  No, Your Honor.

3                  THE COURT:  Okay.  If I could have just a brief

4      moment, I am going to recess for a minute or two.

5                  Ms. Osborne and Ms. Bodner, if you could kindly

6      remain a part of the videoconference, or in your case,

7      Ms. Bodner, telephonically, until I return, I would appreciate

8      it.  Thank you.

9                              - - - - -

10                 (Brief recess taken by the Court.)

11                             - - - - -

12                 THE COURT:  The record should reflect the Court has

13     taken roughly a minute or two here to confer internally.

14                 Mr. Poulton and Ms. Osborne, in light of the position

15     taken by outside counsel for the Pasco County Clerk's Office,

16     is it necessary for the Court, Mr. Poulton, to rule on your

17     request?

18                 MR. POULTON:  As I understand it -- as I understand

19     it, Your Honor, what they would like is in terms -- in terms of

20     the Clerk, is they would like just an order requesting that the

21     matter be referred to the Chief Judge or to the Chief

22     Administrative Judge.  I think it would be helpful to have that

23     only in the sense that it would be coming from the Court that

24     is overseeing the current litigation.  I understand your

25     question to be "couldn't I just ask for that myself," but as

1   I say, I do think that it would be helpful to expedite matters

2   if we had an order from the Court overseeing the litigation.

3              THE COURT:  Ms. Osborne?

4              MS. OSBORNE:  We agree with that as well.

5              THE COURT:  Let me just ask Mr. Poulton and

6   Ms. Osborne, what precise language do you wish the Court, if it

7   were to rule in your favor, include in the order as it relates

8   to the County Court Judge in Pasco County?

9              MS. OSBORNE:  For us, if it would have maybe case

10  numbers or the juvenile's names to reflect, just so we know

11  what exactly we are allowed to give.

12             THE COURT:  Does it say anything in particular about

13  a referral, or can we -- can the Court simply issue its order

14  and then Mr. Poulton and you, Ms. Osborne, can take it from

15  there in terms of how to execute the order?

16             MS. OSBORNE:  Okay.

17             THE COURT:  Is that okay, Ms. Osborne?

18             MS. OSBORNE:  Yes.

19             THE COURT:  Okay.  Mr. Poulton, from your discussions

20  with outside counsel, any reason to think the Court simply

21  can't issue the order and then the mechanics of it will be

22  addressed internally by the Pasco County Clerk's Office?

23             MR. POULTON:  I think the only thing that I would ask

24  is that, for the comfort level of the Clerk, as I understand

25  from outside counsel, Your Honor contemplating an order and

1   then at the end include language along the lines of:  The Court

2   requests that the Clerk forward the order to the Chief Judge or

3   Administrative Judge for -- I don't know, for whatever action

4   the Court deems necessary or appropriate, something along those

5   lines, just to --

6               THE COURT:  How about for handling?

7               MR. POULTON:  Thank you.

8               THE COURT:  Or implementation of the order.

9               MR. POULTON:  Thank you.

10              THE COURT:  As they say, Mr. Poulton, even a blind

11  squirrel finds a nut once in a while.

12              MR. POULTON:  Broken clock.

13              THE COURT:  There are a number of them.

14              MR. POULTON:  Correct.

15              THE COURT:  Do any of these reports, Ms. Osborne, or

16  documents, or Ms. Bodner, involve children who were taken into

17  custody by a law enforcement officer for violation of law which

18  if committed by an adult would be a felony?

19              MS. OSBORNE:  I'm not exactly sure what records we

20  hold.  I just know that we do have some records of juveniles

21  that were requested.

22              THE COURT:  You don't know whether they involve a

23  felony or not?

24              MS. OSBORNE:  I do not, sir.

25              THE COURT:  Ms. Bodner, the same question.

1      MS. BODNER:  If you'll give me a moment, Your Honor,

2  I can tell you, but I have to get into our system.

3      Normally if there was a caveat in 985.04 that --

4  there's a caveat that if they involve a felony we can release

5  very limited records, but usually when someone requests the

6  whole file or a substantial portion of the file, that contains

7  more information than just the arrest report or the very

8  limited information that's outlined in 985.04 subsection --

9  sorry, I'm in the wrong statute.  Subsection (2)(A).  So we

10  would need a court order to release basically anything that's

11  not outlined in (2)(A).

12      THE COURT:  So just to be clear, is it possible that

13  the file that you have for these individuals contains items

14  covered by I think it's 985.041(c)(2)(A), which is the

15  exception dealing with reports that relate to felonies?  Is it

16  possible that some of the records in there might fall within

17  that exception but you deem the record requests broader than

18  that and therefore require an order?

19      MS. BODNER:  Yes.  I'm sorry, I'm trying to look up

20  the record and listen to your question.  You're asking,

21  Your Honor, is it possible that the records contain that

22  information as well as confidential information?

23      THE COURT:  Yes.  In other words, does it -- it

24  contains exempted information as well as nonexempt information.

25      MS. BODNER:  Yes.

```
 1            THE COURT:  Okay.  Okay.

 2            Mr. Poulton, anything further?

 3            MR. POULTON:  No, Your Honor.

 4            THE COURT:  Thank you.

 5            Mr. Johnson?

 6            MR. JOHNSON:  No, Your Honor.

 7            THE COURT:  Okay.  Ms. Osborne and Ms. Bodner,

 8   thank you very much for taking time out of what I'm sure is a

 9   busy day for you to participate in this proceeding.  It was

10   very helpful.

11            MS. BODNER:  Thank you, Your Honor.

12            MS. OSBORNE:  Thank you, Your Honor.

13            THE COURT:  You're welcome, like any member of the

14   public, to continue listening or participating -- not

15   participating, but listening in, or, if you wish, you can go

16   about the rest of your day.  Thank you again.

17            MS. BODNER:  Thank you, Your Honor.  I'm going to

18   go ahead and disconnect now.  This is Ms. Bodner.

19            MS. OSBORNE:  I as well will disconnect.  Thank you.

20            THE COURT:  Thank you again to you both.

21        (Ms. Bodner and Ms. Osborne exit virtual proceedings.)

22            THE COURT:  Mr. Poulton, just to stay on the subpoena

23   here, the Court has taken additional time to review the

24   request, and it heard some discussion on this at the last

25   status.
```

1      If you could remind me on the relevance of these

2   records.

3      MR. POULTON:  Right.  The primary reason -- what

4   triggered this request, and even at this stage, is there was

5   testimony from Robert Jones, Sr. -- there's two Robert Jones in

6   the case.  Robert Jones, III is the father, Robert Jones, IV is

7   the son, right?  And the records we're seeking are for Robert

8   Jones, IV.

9      There was testimony from Robert Jones, III as to the

10  outcome of criminal charges against his son in a particular

11  incident or set of incidents that I am, frankly, very sceptical

12  of, and it matters to his position in the litigation,

13  particularly with regard to the outcome of criminal charges

14  that arose from the search.

15      The other two persons that I'm interested in,

16  there -- I believe one of them -- it's difficult for me to

17  understand the exact sequence here, but I believe that we're

18  talking about now Donnie McDougall, now an adult, in State

19  prison, and he was charged, I believe, as an adult.  I'm not

20  sure if he was an adult when that occurred or not, it's -- or

21  if he was filed on as an adult for a charge that arose as a

22  juvenile.  That's part of the reason for wanting to see his

23  records, to understand that sequence of events.

24      I think as well, just generally speaking,

25  understanding the outcome of some of the criminal cases that

1    arose during the process where these young persons were

2    designated as prolific offenders or received another

3    designation would be helpful to the defense to understand.

4            I appreciate very much the observation from

5    plaintiffs' counsel that the agency might not have had that

6    same information so it wouldn't be relevant necessarily to the

7    agency's decision to make them -- or to designate them as a

8    prolific offender or some other designation, but I do think

9    that inherent in the plaintiffs' claims is an -- is an

10   undercurrent of an argument that the visits were over-the-top,

11   that they were unjustified, and I think that at that point the

12   seriousness, if you will, of their offenses does become

13   relevant in the case, just on a more holistic basis.

14           THE COURT:  Let me just, if I could, parse out the

15   two justifications.

16           Let me begin with what I understand to be Jones, IV.

17   Let's just call him "Junior" for just simplicity.

18           So let's say Senior, Jones, III, makes a comment that

19   the outcome of a prolific offender check of Jones, IV led to a

20   charge that was dismissed or otherwise disposed of adverse to

21   the County, just characterize it generally.  Why or how is

22   Senior's statement, though he may have made it in discovery,

23   how is that admissible?

24           MR. POULTON:  The --

25           THE COURT:  In other words, your relevance -- and

1    I'll ask Mr. Johnson this -- your relevance argument is

2    predicated on what arguably could be considered an aside

3    statement made by Jones, III, which, albeit made in discovery,

4    perhaps under oath, when it comes to trial, how does that come

5    in?  Isn't it based on hearsay?

6              MR. POULTON:  Well, if I could elaborate a little bit

7    about the circumstances, it might, I think, help.  And I don't

8    recall the date of the incident, but on a particular occasion

9    there was an interaction with -- and this was caught on body

10   cam, with Junior and also Senior present, and he was being --

11             THE COURT:  Your screen is frozen, Mr. Poulton, so

12   just -- we'll wait until it unfreezes.

13             MR. POULTON:  *(Inaudible)* -- gave consent to search.

14             THE COURT:  Mr. Poulton, forgive me.  Your screen

15   froze for roughly 10 or 15 seconds.

16             MR. POULTON:  Okay.

17             THE COURT:  You left off with Jones, III and

18   Jones, IV together.

19             MR. POULTON:  Right.  Okay.

20             THE COURT:  And then you said "he."  We weren't clear

21   as to who the "he" was, so --

22             MR. POULTON:  I'm sorry.

23             THE COURT:  -- if you'd just begin again --

24             MR. POULTON:  Sure.

25             THE COURT:  -- because that's where we lost you.

1      MR. POULTON:  I believe that the facts would show

2 that on a particular occasion deputies were speaking to

3 Jones Junior and Jones Senior, they were encouraging

4 Jones Junior to desist from criminal activity, they asked

5 Jones Senior can we come into the house and search, he said

6 okay.  They went into Jones Junior's room, they found a series

7 of baggies.  They came back outside, they spoke to both of them

8 about drug use.  The baggies field tested positive for

9 marijuana.  They came back I believe a day or two later and

10 arrested Jones Junior on marijuana charges.  Jones Senior

11 insists that the outcome of that case was that there was no

12 marijuana at all in the bags, that a judicial determination was

13 made that there was no marijuana, and from this he infers that

14 the entire episode was harassment, that, you know, is part of

15 a pattern of harassment via the prolific offender program and

16 associated interactions.

17      I am sceptical of that, and I can explain why, but

18 I have a good faith basis to question that and would like the

19 opportunity to see the records as to what actually came of the

20 criminal charge.  That being one example, the most prominent

21 example.

22      THE COURT:  Let me just have you pause there for a

23 moment.

24      You've got one of the most capable District Judges in

25 the country presiding over this case.

1          Mr. Johnson, how would that statement by Jones Senior

2     come in?

3          MR. JOHNSON:  That's a good question, Your Honor, and

4     I don't know that we've fully thought through whether that's

5     something that we would even intend to offer as part of our

6     case in the -- in the trial.

7          I think to the extent that it would come in, it would

8     come in to show the impact of the visits to these plaintiffs'

9     homes and the consequences of that.  So I think, you know, to

10    the extent that these documents are relevant, they are relevant

11    because they go to that question of impact, so they show,

12    you know, interactions with the judicial system that the

13    plaintiffs or their children had as a result of the course of

14    interactions that were instigated by the challenged policies.

15         THE COURT:  Would it be fair to say of both

16    attorneys -- because now, Mr. Johnson, the suggestion here

17    is that they may be relevant to your case, not just the

18    defense's case.  Do I hear you correctly?

19         MR. JOHNSON:  Yes, I agree.  I think that the

20    documents that -- and that's partly why, you know, we've made

21    clear we would like to get copies of these documents, and

22    counsel for the defendant has agreed to provide them if they --

23    you know, when they obtain them, so, absolutely, to the extent

24    that they're relevant at all, I don't think there's any -- in

25    my mind there's no reason to think that they're going to be

1    universally helpful to the defendant.  I think some of these

2    documents may well be helpful to the plaintiffs to show exactly

3    what I was just saying.

4            THE COURT:  Would it be fair to say, as I listen to

5    the two of you, that at least there's an argument at this point

6    they fall within the ambit of Rule 26 insofar as they bear on

7    the merits of the challenged prolific offender checks that were

8    conducted that are the subject of the case?

9            Would that be fair, Mr. Poulton?  I'll begin with

10   you.

11           MR. POULTON:  Yes, I think that bears on the claims

12   and defenses of the parties.

13           THE COURT:  Okay.

14           MR. POULTON:  And we're both sensitive, I think, to

15   not wanting to introduce extraneous material.  We've got plenty

16   of material that will be -- both sides will be putting into the

17   record as is.  I don't think we want to waste the Court's time

18   with something that in the end doesn't matter, but without

19   seeing it, we don't know that.

20           THE COURT:  So as I see it, or what I'm hearing

21   anyway, it sounds to me like they're relevant to the claims or

22   defenses of the parties insofar as they are believed to pertain

23   to the merits of the underlying prolific offender checks that

24   are the subject of the lawsuit.

25           Would that be fair, Mr. Johnson?

```
 1              MR. JOHNSON:  Actually, I'm not sure, Your Honor.
 2    I think that -- I would say that they are relevant insofar as
 3    they show the consequences of the prolific offender checks, and
 4    so I would draw a distinction.  I think you suggested at
 5    one point that there were two -- there are essentially two
 6    justifications being offered by the defendant, and I think that
 7    is right.  I think the first justification, to show the outcome
 8    of proceedings that were initiated because of the prolific
 9    offender checks, to my mind that is relevant, or at least
10    potentially relevant.  It's relevant within the -- under
11    Rule 26.
12              But the second justification, to show the basis for
13    conducting the prolific offender checks, I don't believe that
14    these documents are relevant.  You know, as I've -- as I said
15    earlier, I think to the extent the Pasco Sheriff's Office had a
16    justification for making these checks, that has to be based on
17    what they knew at the time they made the checks.  So like they
18    can't, you know, search in documents retroactively to try to
19    justify years -- you know, potentially years after the fact
20    what they were doing at the time of the -- of the events at
21    issue.
22              And that -- you know, that might to some extent
23    indicate that the subpoena should be narrower than just the
24    entire file, perhaps it should be limited to interactions that
25    occurred or to cases that were filed after the events at issue
```

1   rather than before.

2           THE COURT:  I'm just trying to ascertain the merits

3   of what you're arguing, Mr. Poulton.

4           The record should reflect that I think Mr. Poulton's

5   screen has frozen again.

6           MR. POULTON:  Am I not on?

7           THE COURT:  You are now.

8           MR. POULTON:  Okay.  I apologize for the -- we're

9   having every imaginable computer problem there is this morning.

10          THE COURT:  That's okay, Mr. Poulton.

11          So I'll take Mr. Johnson's position to be that he

12  does not dispute that at least some of these records are

13  relevant to the plaintiffs' case, and I heard you before to

14  argue, without trying to reopen the matter completely, at least

15  not meaningfully, to contest the relevance for purposes of

16  discovery of these records as they relate to the defenses of

17  the sheriff and the other defendants.

18          Do I understand that correctly, Mr. Johnson?

19          MR. JOHNSON:  Yes.  We're not -- you know, I do think

20  the subpoenas, you know, could be narrower, and I think,

21  you know, it perhaps would be better if it had been narrower,

22  but we're not moving to quash the subpoena.  I think at least

23  many of the documents that are sought are at least potentially

24  relevant under Rule 26.

25          THE COURT:  Okay.  So, Mr. Poulton, just to return to

1   you, Mr. Johnson would not agree with this characterization, it

2   appears, that -- but I take what you say to mean that the

3   relevance lies in the relationship of these records to the

4   prolific offender checks and the merits thereof.  Do

5   I understand that correctly?

6           MR. POULTON:  Yes.  On certain occasions prolific

7   offender checks or visits that were listed as prolific offender

8   checks led to arrests, and we don't know the outcome of the --

9   of the prosecutions, as they involve juveniles.

10          THE COURT:  Okay.  If you will give me a moment here.

11          Mr. Johnson, would it be fair to characterize the way

12  you view the IOP program as one by which the Pasco County

13  Sheriff's Office has sought to identify individuals who are

14  prolific offenders, including juveniles, and who therefore are

15  subject to offender checks by members of law enforcement?

16          MR. JOHNSON:  I think that's accurate, Your Honor.

17  I think there are other aspects to the program, but I think

18  that is -- that's an accurate description.

19          THE COURT:  Mr. Poulton, is the program still being

20  implemented as we speak?  I wasn't quite clear on that.

21          MR. POULTON:  Yes.  It changes over time.  There are

22  portions of it that have evolved in different ways.  One of

23  the -- as an aside, one of the issues that's I think of

24  particular interest to the plaintiffs is the issuance of code

25  citations.  They used to have Code Corporals that would do

1  that, but then they redeployed their resources and they no

2  longer have Code Corporals within the Sheriff's Office that

3  issue code citations.  Any deputy can, but they no longer have

4  the Code Corporals.  And they dropped -- one of the

5  designations was called Top Five Offender.  They dropped that

6  designation a year plus ago.  So it evolves, but it's still in

7  play, yes.

8         THE COURT:  Okay.  And your challenge here now, at

9  least in the operative Complaint, Mr. Johnson, is under the

10  First, Fourth and Fourteen Amendments?

11         MR. JOHNSON:  I believe that -- I believe that is all

12  of them, yes, Your Honor.

13         THE COURT:  Okay.  And the main relief you seek is

14  declaratory and injunctive relief as well as compensatory and

15  nominal damages?

16         MR. JOHNSON:  That is correct, Your Honor.

17         THE COURT:  Mr. Poulton, anything that you wish to

18  add with respect to the subpoena?

19         MR. POULTON:  No, Your Honor.  I think we've -- we've

20  covered it.

21         THE COURT:  And just returning to the question

22  I asked of Ms. Osborne and Ms. Bodner, any of these offenses

23  involve felonies or relate to felonies?

24         MR. POULTON:  I don't know for certain.  I would

25  suspect it's highly likely they do, but I don't know for

1   certain.

2        THE COURT:  Okay.  Let's turn, if we could, to the

3   matters that were the subject of the status report filed on

4   May 5th.

5        I don't know that there's much that needs to be

6   discussed here.  It appears that a number of efforts have been

7   undertaken to keep the discovery moving outside the discovery

8   period.  A fair number of items are either sought for

9   production as of today or soon thereafter.

10       Mr. Johnson, anything that you wish to raise or you

11  think the Court should concern itself with relative to the

12  seventh request for production and the second request for

13  admission, among other things?

14       MR. JOHNSON:  Well, so on the seventh request for

15  production, my understanding was that counsel for the defense

16  had been busy with another matter and was going to start

17  working on that on Thursday of last week.  We're still waiting

18  for some documents on that.  Hopeful they'll be produced.

19       The documents that we're seeking are really -- fall

20  into three categories, I think three major categories.  One --

21  we know that one of the plaintiffs' children,

22  Anthony McDougall, was listed as a prolific offender at one

23  point.  We've been told by counsel for the defendant that he

24  was listed for a period of about eight minutes, I believe, and

25  then was unlisted, and we would just ask for the documents to

1   show -- that they are using to make that statement, that he was

2   listed and then unlisted.  I still haven't actually seen the

3   actual documents that they're relying on to tell us that, so

4   we're looking to get those.

5          The second, just some e-mails between a Pasco County

6   code enforcement officer and employees of the Sheriff's Office

7   concerning Robert Jones and his residence.

8          And then the third category is charging letters,

9   letters that were sent from the Sheriff's Office asking that

10  these individuals be charged as adults.

11         So, you know, we're just still waiting to get those

12  three categories of documents.  I know that counsel for

13  defendant has been working on it, but I don't know exactly

14  where it stands.

15         THE COURT:  Mr. Poulton?

16         MR. POULTON:  Your Honor, actually I don't know the

17  full details of each of those, I know them peripherally, but

18  they're all being worked on, as Counsel says.  I don't think

19  we're at a point where we need to involve the Court.  I think

20  we'll be able to resolve those issues, and if there's something

21  that we can't to the satisfaction of the plaintiff, then we

22  could come back, but I -- I think we can work through that, as

23  we have before.

24         THE COURT:  Okay.  Mr. Johnson?

25         MR. JOHNSON:  Yeah, I think that's -- I'm sure that's

1    right.  Obviously time is growing short, you know, we're

2    already outside the discovery period, but I likewise am

3    confident that the parties can work this out, given the history

4    of how we've been able to work things out previously.

5            THE COURT:  Okay.  And with respect to the second

6    request for admission?

7            MR. JOHNSON:  I believe we've agreed to an extension

8    until the 13th.

9            THE COURT:  That's my understanding.

10           Mr. Poulton, is that yours as well?

11           MR. POULTON:  I am on request for admission number 78

12   right now, working through them.

13           THE COURT:  So are you on schedule for the May 13th

14   time frame?

15           MR. POULTON:  Yes, if I -- and if for some reason

16   I need a little bit of extra time, I'll provide what's already

17   done, and within, I'm sure, very shortly after that I'll get it

18   to them, but it's my intention to have it all done prior to

19   that.

20           THE COURT:  Okay.  And the Taylor deposition, that's

21   scheduled now, or is Ms. Taylor sufficiently healthy that that

22   can be undertaken?

23           MR. POULTON:  That's been set for May 18.

24           THE COURT:  Okay.  And the e-mails that are

25   referenced were supposed to be disclosed as of yesterday, if

1    there were any.

2              Mr. Poulton, what's the status of that?

3              MR. POULTON:  Well, that's -- I still have to go

4    through that.  I think that counsel for all parties believe

5    that that is not likely to provide anything additional that

6    needs to be dealt with.

7              There was extensive e-mail discovery prior, and

8    I think that more than enough information has been developed as

9    to enable the plaintiff to outline exactly how the program

10   works, how intelligence analysts would meet with district

11   commanders and provide information to the deputies, the

12   interconnectivity of the -- of the folks that are involved in

13   that process, and so I do need to get to that to look to see if

14   there is anything else that's particularly germane to the

15   plaintiffs and their situation, but I don't expect that to be

16   the case.

17             THE COURT:  Okay.  Mr. Johnson, anything you wish to

18   add?

19             MR. JOHNSON:  No.  Just on the e-mail review, I mean,

20   I agree with counsel for the defendant that many e-mails have

21   been produced.  Obviously if this last set of e-mails contains

22   anything new or additional, we still would hope that it would

23   be produced, but I trust that they will be.

24             THE COURT:  I guess the last order of business is

25   scheduling another status conference.  It seems to me, since

1  there are some outstanding matters, that that may make some

2  sense.

3          Counsel will have to remind me, do we have anything

4  scheduled as we sit here now for the end of May, sometime

5  before the discovery -- not discovery, but the dispositive

6  motion deadline of June 7th?

7          MR. JOHNSON:  On my calendar the next conference is

8  scheduled the day after the 6th, on the 7th.

9          THE COURT:  Okay.  The question is is that an

10  appropriate date for the next conference, in light of what we

11  have outstanding here, or should we move that up?

12          MR. JOHNSON:  I would think it would make sense to

13  move it up, Your Honor.

14          THE COURT:  It would appear that way.

15          We could do it the week of the 30th.

16          MR. POULTON:  I can't recall, what day is

17  Memorial Day?  I don't have a --

18          THE COURT:  The 30th.

19          MR. POULTON:  30th?

20          I have a brief due at the Eleventh Circuit on the

21  31st, so if it could be after that.  Either that or, if I could

22  offer it, the morning of the 18th, which is when we -- we have

23  the deposition of Ms. Taylor in the afternoon, if we did it in

24  the morning of the 18th, if that were available.

25          THE COURT:  Okay.  Mr. Johnson?

```
 1              MR. JOHNSON:  I would be happy to do the 18th, or,
 2    you know, it could make sense to do it, you know, perhaps the
 3    week of the 23rd.  I think either of those would make sense.
 4              THE COURT:  The idea here, Mr. Poulton, would be we
 5    would get beyond the date that you expect now to have turned
 6    over everything, so if any issue were to have arisen, it would
 7    have come to the fore by that point.  So if you think the 18th
 8    is enough time then that makes sense.  If you think the week of
 9    the 23rd may make more sense, just so that we have a better
10    picture of things, we could do it the morning of the 23rd.
11              MR. POULTON:  That would be fine, Your Honor.
12              THE COURT:  Mr. Johnson?
13              MR. JOHNSON:  That works for plaintiffs, Your Honor.
14              THE COURT:  Why don't we do it, since we love this
15    eleven o'clock time, in the morning, why don't we go with that.
16    Eleven o'clock on the 23rd.
17              Okay.  With that, Mr. Johnson, anything further?
18              MR. JOHNSON:  No, Your Honor.
19              THE COURT:  Mr. Poulton?
20              MR. POULTON:  No, Your Honor.
21              THE COURT:  Thank you to you all.
22              I appreciate the parties, again, working together,
23    and, Mr. Poulton, the efforts that you and your office
24    undertook to make Ms. Bodner and Ms. Osborne available.
25              Thank you to all.  We'll be in recess.
```

1          MR. POULTON:  Thank you.

2                    - - - - -

3          (Proceedings concluded at 11:54 a.m.)

4                    - - - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript of

4    proceedings taken in a status conference in the United States

5    District Court is a true and accurate transcript of the

6    proceedings taken by me in machine shorthand from a digital

7    audio recording and transcribed by computer under my

8    supervision, this the 15th day of July, 2022.

9

10

11                              /S/ DAVID J. COLLIER

12

13                              DAVID J. COLLIER

14                              OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25
```