UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES III,
     *Plaintiffs,*

 v.

 CHRIS NOCCO, in his official
capacity as Pasco County Sheriff,
     *Defendant*.

 Case No. 8:21-cv-00555-SDM-CPT

AFFIDAVIT OF DR. RICHARD M. HOUGH, SR.

STATE OF TENNESSEE
COUNTY OF WASHINGTON

PERSONALLY APPEARED before me via Zoom, the undersigned authority, DR.

RICHARD M. HOUGH, SR. who, after being duly sworn upon his oath, states and

affirms as follows:

1.  My name is Dr. Richard M. Hough, Sr.  My current CV and fee policy are attached

    as Exhibits "A" and "B."  I was retained by the law firm of DeBevoise & Poulton,

    P.A., to review Pasco County Sheriff's Office ("ECSO") policies, procedures,

practices and training in place regarding the Intelligence-Led Policing programs of the agency.

2. The opinions in this affidavit are, in part, from my initial report in this matter and, in part, in response to Plaintiff's expert report by Professor David Kennedy.

3. During the past four years, I have been retained or consulted on cases and testified at depositions, hearings, and trials at the state and federal court levels for both Plaintiff and Defendant clients.  The cases in which I have testified are noted on my CV.

4. I have reviewed the documents referenced on Exhibit "A" attached hereto.

5. The analysis is based upon those documents and the current practices and professional standards of law enforcement. The review of said materials, my assessment, and my report are based upon my knowledge of law enforcement and investigative practices combined with my education, training, experience, and my ongoing research and teaching of law enforcement issues, policies, and practices to practitioners, academy recruits, and university students over several decades.

I.   Background and Qualifications

6. I began my career as a law enforcement officer in 1979 in the State of Florida. I have been continuously training law enforcement and corrections officers in various topics since 1980. I have specifically taught law enforcement procedures and practices in the Florida Basic Recruit Training Programs (academy) for more than thirty-five years. I have specifically taught patrol and investigative practices for more than thirty-five years to law enforcement academy recruits, in-service law enforcement officers, and college students. I have specifically conducted training as a criminal investigations instructor for two Florida Sheriff's Offices. I

have conducted training as a criminal investigations instructor in two regional and
one agency law enforcement academies over a thirty-five-year period. I have
taught police procedure courses at the college and university level since 1989.

7.     I have been teaching de-escalation and communications techniques for nearly my
entire career. I am trained as an instructor in the Integrating Communications,
Assessment, and Tactics (ICAT) program of the Police Executive Research
Forum (PERF), and I am a former Verbal Judo instructor. I created and teach the
university course *The Use of Force in Criminal Justice,* and I authored the
textbook of the same name, published by Routledge. I created and teach the
university course *Police Use of Force and Intersectionality*. I have published
peer-reviewed journal articles on topics including policies addressing, and the
dynamics of, criminal investigations. I have constructed and collaborated on
policies for patrol and criminal investigations by criminal justice personnel, and I
have reviewed hundreds of such policies. I have been retained as an expert in
cases involving the training of law enforcement in criminal investigation events,
and the agency policies and procedures addressing such matters.

8.     I have published peer-reviewed journal articles on topics including policies
addressing, and the functions of, law enforcement investigations. I have been
retained as an expert in cases involving the training of law enforcement officers,
and specifically in patrol practices and criminal investigations, and the agency
policies and procedures addressing such matters.

9.      I have specifically taught and trained academy recruits in law enforcement and corrections, in-service officers, and university students on the dynamics of gang culture to include the element of violence, as well as gang structure including traditional, non-traditional, and hybrid gangs. I created and taught the university courses *Homicide*, *Gangology* and *Violence*. In addition, the courses I teach on *Policing*, *Corrections*, *Juvenile Justice*, *Criminal Investigations*, and others, incorporate aspects of the individuals drawn to gang membership and association, and the prevention, intervention, and suppression efforts of society vis-à-vis gangs. In regard to policy and management issues in criminal justice, I teach courses that include *Criminal Justice Policy,* and *Criminal Justice Management*.

10.     I specifically have taught the training blocks on Community-Oriented Policing, Problem-Oriented Policing, and Intelligence-Led Policing in the Florida Law Enforcement Basic Recruit Training Academy. I am a member of the International Association of Chiefs of Police (IACP), the Police Executive Research Forum (PERF), the Justice Research and Statistics Association (JRSA), and the International Law Enforcement Education and Training Association (ILEETA). In additional to law enforcement and corrections academy training, my university courses for more than thirty years have incorporated the dynamics of interactions during interviews and investigations. In my expert witness work I have been retained in cases involving patrol and investigative practices.

11.     I have specifically conducted internal/professional standards investigations, I have supervised employees in the conduct of such investigations, and I have reviewed such investigations as a command-level officer. I am certified as an internal

affairs investigator, and I am a member of the National Internal Affairs Investigators Association. In my various supervisory and command roles during my career I have specifically administered and approved counseling, training, and discipline up to and including termination for employees.

12.     In case analysis, as a consultant, I utilize recommended national standards, model policies, handbooks, and guides put forth by various professional organizations such as the International Association of Chiefs of Police (IACP), the Police Executive Research Forum (PERF), the National Sheriffs Association (NSA), National Tactical Officers Association (NTOA), the Commission on the Accreditation of Law Enforcement Agencies (CALEA), American Jail Association (AJA), and others. I am a member of a number of these organizations, and I have served as a member of the Education and Training Committee of the IACP, staff of the International Law Enforcement and Education Training Association (ILEETA), and as research advisor to *Calibre Press*, the national training group that also published the text *Street Survival II*.

13.     As an academician and forensic criminologist with more than thirty years of teaching police policies, procedures, and practices, my analyses are further informed by the national and international bodies of literature from peer-reviewed academic journals, as well as government sources such as the Bureau of Justice Statistics, National Institute of Justice, National Criminal Justice Reference Service, the Government Accountability Office, the Congressional Research Service Reports, and others. My own authorship of peer-reviewed academic journal articles, and textbooks, on criminal justice topics are components of my

subject matter expertise. I am one of two American academics named as International Ambassador of the British Society of Criminology (BSC). In the Fall of 2019, I lectured throughout the U.K. on American police major case investigative methods and the use of force by police.

14.    My experience as a former officer, investigator, supervisor, command-level administrator, director of law enforcement and corrections academies, director of law enforcement, chief of training, together with my experience training officers over the past forty years, combine to provide substantive experience to support my qualifications to conduct such reviews and analyses. Each of these qualifications, and all these together, provide me with a broad knowledge of generally accepted practices and procedures, which I apply to analyze whether the facts in a case fall above or below those standards, articulate such standards, and explain to a jury or court how they apply to the facts in a specific case.

15.    My methodology in reviews is to list all case materials, an assumed set of facts-not fact finding nor credibility judgement- and to provide opinions comparing specific case facts to accepted practices, never legal conclusions nor personal opinions. As a professor teaching criminal justice and public policy, I am aware of the importance of social science research to the outcome of many such public and criminal justice policies. The empirical research methods- quantitative, qualitative, or mixed- provide useful information that can be explained to jurors. This research is open inquiry, rigorously tested (peer-review), and reported publicly for further scrutiny. I have served (and continue to) as editorial (peer) reviewer for numerous academic journals, and I sit on the editorial board of the

journal *Homicide Studies*. I was guest editor of a special edition of this journal focused on the investigation of homicide. Review of science, like the testimony of an expert, must be the product of reliable principles and methods.

16.     To the extent that police work as a vocation has been examined by social science researchers and criminologists routinely since only the 1970s, the research and observations are scholarly, and employ all the rigor of peer-review. The past fifty years has demonstrated the general acceptance within the social science community of the methods and theories developed. The body of scientific knowledge that I draw upon and focus through my qualifications to apply and explain, is well established.

17.     Some facts in this case may be disputed and I attempt to identify these while incorporating them and undisputed facts in my own case analysis. I have conducted case analysis and been proffered as an expert witness in criminal justice practices in state and federal court since 1991. My qualifications to conduct case analysis, draw conclusions and render expert opinions such as the ones in this report are based on my personal and professional knowledge, education, specialized training, and ongoing research and teaching in these areas.

## II.     The Issue

18.     The following initial information is utilized for purposes of analysis in this matter:

The Pasco County, Florida Sheriff's Office serves as a geographical jurisdiction of 868 square miles on the coast of West Central Florida. The population is more than 560,000, and since the year 2000 has grown by more than 200,000 residents. The county is both rural and suburban. The largest incorporated municipality

within Pasco County is New Port Richey with a population of approximately 17,000. Pasco County is bordered by Hernando, Sumter, Polk, Pinellas, and Hillsborough Counties, and is considered a bedroom community to Tampa. Vehicle travel in and through Pasco County occurs on local roads and state highways, and notably by I-75, the Suncoast Parkway, US 19, US 301, US 41, and US 98.[1]

Since taking office in 2011, Sheriff Nocco has implemented several innovations at the Pasco Sheriff's Office. The Pasco Sheriff's Office was the first agency in the Tampa Bay Area to adopt body worn cameras. The Pasco Sheriff's Office also has one of the largest Behavioral Health Intervention Teams in the state of Florida, this team works directly with those who are homeless, suffer from mental health concerns and substance abuse to connect them to resources available in the community. Nocco also led the way to develop FIRST (Florida's Forensic Institute for Research, Security and Tactics), a one of a kind training center to create synergy between academia, public safety and the private sector. FIRST is also engaged in creating jobs for the region and opportunities for students to further pursue their interest in the different fields of science and animal care. Nocco also championed hiring practices that lead to the Pasco Sheriff's Office hiring numerous veterans and has also been recognized by a local media outlet as the most diverse law enforcement agency in the Tampa Bay Area.[2]

In addition, the agency:

In September 2019, the Pasco Sheriff's Office fully implemented a Behavioral Health Intervention Team (BHIT), which works collaboratively with BayCare Behavioral Health, a not-for-profit health care system in the Tampa Bay Area, to coordinate services for vulnerable and under-served individuals with mental health and substance use concerns. Under prior federal grant programs, PSO and BayCare conducted site visits to other law enforcement agencies to observe and evaluate several different best practice models of coordinating law enforcement and mental health activities. BHIT brings together community-based resources to help individuals who are high utilizers of emergency services because of a diagnosable mental illness, substance user, homelessness, or special circumstances.

**Mission**

The mission of the Behavioral Health Intervention Team is to connect those in the community who are at risk due to mental health and/or substance use with

---

[1] U.S. Census and other sources
[2] Pasco Sheriff's Office official website

services, and make their lives better. This is accomplished through collaboration between law enforcement officers trained in crisis management and Behavioral Health Community Providers.

**Vision**

The Behavioral Health Intervention Team seeks to be a premier law enforcement and behavioral health collaboration, connecting individuals at risk with community based resources for improved stability and quality of life.[3]

The PSO has a dedicated intimate partner and domestic violence unit, InVEST, community safety program including the Juvenile Choice Program, and a range of other citizen resources.

In 2011, the Pasco Sheriff's Office launched an Intelligence-Led Policing section to:

"… advance the agency's crime fighting initiatives to a modern-day philosophy. The Intelligence-led Policing Section (ILP) informs critical decisions across all components of the Pasco Sheriff's Office through the cultivation and dissemination of strategic, operational, and tactical intelligence. Analysts provide actionable intelligence aimed at crime and harm reduction, disruption, and prevention. The Intelligence-led Policing Section consists of 30 members, including a director, manager, and two analysts' supervisors, and 20 analyst in varying levels and roles."

19.     A lawsuit was filed by Plaintiffs alleging that the Intelligence-Led Policing program violated the First, Fourth, and Fourteenth Amendments through it policies and practices.

20.     "Focused deterrence strategies honor core deterrence ideas… while finding new and creative ways of deploying traditional and non-traditional law enforcement tools."[4] This quote that opens the 2012 report by the Community Oriented

---

[3] Pasco Sheriff's Office official website.
[4] Braga, Anthony A., and David L. Weisburg. 2012. Pulling Levers Focused Deterrence Strategies to Prevent Crime. No. 6 of Crime Prevention Research Review. Washington, D.C.: U.S. Department of Justice, Office of Community Oriented Policing Services.

Policing Services office of the U.S. Department of Justice, frames the continued idea of "deterrence" and recognizes the varied response captured in the phrase "…traditional and non-traditional law enforcement tools."[5]

21.    Identifying or responding to hazards to community members are perhaps the most important functions of a community's officers. Responding to calls for service and crimes is expected of a community's law enforcement agency and officers. But in the last 50-60 years academic researchers and entrepreneurial law enforcement agency administrators have experimented with techniques and programs that go beyond the response to 9-1-1 calls.

22.    The decisions made by the individuals who perpetrate crime have been theorized to arise from many factors and dynamics in the life, environment, neurobiology, and social network of the individual. The array of potentially correlated contributors to deviant, delinquent, or criminal behavior is considered within the context of the individual understanding right from wrong and making a rational choice to commit an act. Communicating to potential offenders sanctions they might face if they continue illegal behaviors allows a "knowing" choice by the person of whether to commit crime. The sanction's arrival, however, must be certain, swift, and proportional to the offense. This forms the basis in Western criminology and law, of deterrence theory. Research has questioned the impact of sanction severity on crime decision-making,[6] but finds supports on the component

---

[5] Ibid. p. 3
[6] Laub, J. H., & Sampson, R. J. (2003). Shared beginnings, divergent lives: Delinquent boys to age 70. Cambridge, MA: Harvard University Press.

of certainty.[7] Most property crime, such as burglary, in the United States each

year is unreported.[8]

23.     Specifically, the property crime of burglary has been shown to be influenced by a

burglar's perceived risk versus reward,[9] major thefts, and auto thefts.[10]

Addressing a review of the literature, Loughran, Paternoster, and Weiss stated:

The police may also deter crime through the use of specific strategies. There is a
large body of research on the effectiveness of various police strategies in regards
to crime prevention. This research has primarily been conducted using either (1)
quasi-experimental designs which compare crime rates before and after an
intervention or (2) randomized experiments. *This body of research suggests
policing strategies that are focused on particular geographic areas or offenders
are effective in deterring crime*, [*emphasis added*] while strategies that lack a
clear crime-control focus have little impact on crime rates.[11]


24.     Agency policies and procedures coupled with officer training and experience

provide the framework for officer responses. While this allows for effective

actions in most instances, the conscious decisions and actions of the subjects who

officers encounter significantly affect how individual interactions are resolved.

With the complications that come with physical interaction, it can be easy for

many people to believe a certain outcome was more predictable and thus that the

responses of officers to individuals may be viewed as incorrect rather than

objectively reasonable. Interacting with a subject with the hope of gaining

---

[7] Jacobs, B. & Piquero, A. R. (2013). Boundary-Crossing in Perceptual Deterrence: Investigating the Linkages
Between Sanction Severity, Sanction Certainty, and Offending. *International Journal of Offender Therapy and
Comparative Criminology*, *57*(7), 792–812.
[8] National Crime Victimization Survey
[9] Piquero, A., & Rengert, G. F. (1999). Studying Deterrence with Active Residential Burglars. *Justice
Quarterly, 16*(2), 451-471.
[10] Lochner, Lance. 2007. Individual perceptions of the criminal justice system. American Economic Review 97:444–
60.
[11] Thomas A. Loughran, Ray Paternoster, and Douglas B. Weiss, in *The Handbook of Criminological Theory*, edited
by Melissa L. Rorie, John Wiley & Sons, Incorporated, 2015.

compliance can be blocked by the behavior of the subject, as in the instant case.
Each of the documents and individual investigative efforts in the case represent
the information-gathering expected and routinely seen during cases with any
potential or actual repeat (prolific) offender, such as the instant one.[12] The case
management process was typical and expected.[13] The expected and standard
documentation of actions and information in such events serve a number of
purposes of citizen accountability and legitimacy, agency review of policies and
procedures – and officers, media scrutiny, court review, and others.[14]

III.     Community-Oriented Policing and Problem-Oriented Policing

25.     Law enforcement officers in Florida are trained in the basic law enforcement
academy regarding the factors routinely considered components of community-
and problem-oriented policing, as well as Intelligence-Led Policing (ILP).[15] The
selection and implementation of a particular crime prevention strategy has long
been recognized by the courts as within the purview of an agency and its elected
or appointed administrators.

26.     Plaintiff's expert, Professor Kennedy, selects a few words from the ILP Manual
regarding School Resource Officers that attempt to evoke a question about the job

---

[12] Ibid., begins with Table of Contents
[13] International Association of Chiefs of Police, Training Key 558 Criminal investigations
[14] Yu, & Monas, N. (2020). Recreating the Scene: An Investigation of Police Report Writing. *Journal of Technical Writing and Communication*, *50*(1), 35–55.
[15] Florida Basic Recruit Training Program, Fundamentals of Patrol, Unit 2 Crime Reduction and Prevention

functions of a law enforcement officer.[16] A balanced reading of the ILP Manual section provides [*emphasis added*]:

School Resource Officers (SRO) SROs interact with middle school and high school students from within their school's geographic boundaries on a daily basis and are in a unique position to augment the agency's ILP efforts in several ways.

SROs can offer valuable assistance in areas such as offender identification and intelligence gathering. Often SROs will hear about past, present or future crimes well before others in the law enforcement community. *In addition to scanning for information that may assist with active investigations, it is critical that SROs also look to identify students who are at-risk of developing into prolific offenders and engaging those students in an effort to get them back on the right track.*

*SROs are uniquely positioned to overcome a significant barrier* that exists concerning police-community partnerships in modern society, *especially with younger people.* An *SRO's outreach efforts provide for opportunities to build relationships based on mutual trust, and honest, open communication.* These connections, properly cultivated, can help us develop a clearer picture of the environment, and where the seeds of criminal activity are. This can aid deputies and commanders to more effectively interpret, influence, and impact the criminal environment. *Healthy police-community relationships are vital for active crime prevention, officer safety, and solving crimes.*[17]

27.    There is no copyright on government efforts to address crime. There is also no evidence-based program shown to prevent or eradicate all crime – or any of the very many different crimes. It is very much the lot for the approximately 18,000 separate local-level law enforcement agencies in the United States to pursue multiple strategies to address myriad crime/person/location/dynamics scenarios. For hot spots interventions, Braga et al. noted that 20 of 25 they examined "…reported noteworthy crime and disorder reductions."[18] Focused deterrence is one in a very long line of approaches to address crime, notably by those involved

---

[16] Ibid. page 183
[17] ILP Manual pages 65-66
[18] Braga, A., Papachristos, A., & Hureau, D. Hot spots policing effects on crime. Campbell Systematic Reviews 2012:8

in a group (Kennedy, 1997), but also, even if related to violent crime, "There have also been examples of focused deterrence strategies applied to individual repeat offenders."[19]

28.     Intelligence-led policing is described by the International Association of Chiefs of Police this way:

Intelligence led policing combines the collection and analysis of information to produce intelligence guided operations at both the tactical and strategic levels to prevent and detect crime rather than simply to react to it. It is driven by information provided by line officers who are in a unique position to gather basic criminal information.[20]

29.     There is not an absolute method of identifying potential offenders. Innovative policing approaches, such as the PSO Intelligence-Led Policing approach, takes "…the statistical analysis of large amounts of historical data and serve to anticipate new crime events or phenomena."[21]

30.     Repeat offender statutes do not punish for future potential behavior. Rather, the development of enhanced penalties by legislatures also relies on the concept of specific deterrence to communicate sanctions to potential offenders if they continue to violate laws and rules. Plaintiff expert Professor David Kennedy in his report states that deputies discovering probation violations- which is a portion of their normal duties – were "violations that would otherwise have gone unobserved and unpunished…"[22] I read this as being critical of deputies noting violations of

---

[19] Braga, A., Weisburd, D.L. (2012). The effects of focused deterrence strategies on crime: A systematic review and meta-analysis of the empirical evidence. *Journal of Research in Crime and Delinquency, 49*(3, Page 327
[20] IACP Training Key #601 (2006)
[21] Hardyns, & Rummens, A. (2017). Predictive Policing as a New Tool for Law Enforcement? Recent Developments and Challenges. *European Journal on Criminal Policy and Research*, *24*(3), 201–218.
[22] Expert report of David Kennedy, page 29

court-imposed probation requirements. Deterrence as enforcement of laws and punishment is once again foundational to criminal justice systems the world over. That the Intelligence-Led Policing program boosts the "certainty" component of deterrence is aligned with the roles of criminal justice system actors.[23]

31.   Professor Kennedy asserts in his report that "Deputies note how many evictions they have achieved as part of their performance evaluations."[24] And that "One deputy cited as an accomplishment the eviction of a "prolific offender's" *mother*." [*emphasis Kennedy's*][25] While the former document citation is incorrect, I did review the "Self-Evaluation Questionnaire" at both locations. These agency forms, completed prior to a supervisor evaluation, are where deputies list, among others, tasks accomplished within their assigned job duties. In a commentary on deputies speaking to a girlfriend of an identified prolific offender deputies were seeking to talk to, Kennedy in addressing one deputy's comment about the young woman lying to cover the offender's whereabouts, says "It would appear, in fact, that *the deputies were lying*."[26] [*emphasis Kennedy's*] He then cites FS 837.05(1)(a). Likely, if a charge were to be followed through on, it would be under FS 843.02, Resisting officer without violence to his or her person not False reports to law enforcement authorities.

32.   Piquero noted that:

In these relationships, researchers – typically criminologists with a university affiliation – develop a close relationship with a criminal justice agency, provide process and outcome evaluation, and advise the agency on the progress and

---

[23] Loughran, T.A., Pogarsky, G., Piquero, A.R., & Paternoster, R. (2012). Reassessing the functional form of the certainty effect in deterrence theory. Justice Quarterly, 29 , 712– 741.
[24] Expert report of David Kennedy, page 30
[25] Ibid.
[26] Expert report of David Kennedy

impact of a program, policy, or practice. In return, the agency or agencies involved provides access to their data. Such relationships provide ample opportunity for criminologists to sway the course of public policy, guide interventions toward more scientifically sound foundations, and test criminological theory. An excellent example of this can be found in the work that has been done in focused deterrence. Such work stems from attention to hotspots that dates (at least) to the 1980s but was more formally developed by Anthony Braga and colleagues. Under Braga's leadership, the Boston Police department identified both high-crime areas (hotspots) *and highrate offenders* **[emphasis added]** within those areas and *targeted* both (areas and *persons*) **[emphasis added]** *with increased police attention and the threat (i.e., focused deterrence)* **[emphasis added]** of increased police attention if levels of violence continue at high levels. Braga and colleagues worked as partners with the Boston Police department, Suffolk County Probation, a clergy group, and others to develop a deterrence message and deliver it in a way that was consistent with principles of deterrence such as certainty, severity, and celerity.[27]

33.     Though not mentioned in the above summary, Plaintiff's expert in this matter, Professor Kennedy, asserts a central role in the project.[28]

34.     Examination of, among other aspects of deterrence, whether criminal involvement is ongoing based on delinquent or criminal record, potentially, indicates someone who has chosen to commit acts that are proscribed by society. Working to effectively prevent some crime is expected of police agencies, high-capacity offenders are understood to be disproportionately responsible for property crimes such as burglary and auto theft. While target-hardening against crime by individual citizens may be effective, it is not widely found in most communities. Notable in the last forty years are police-implemented approaches including community-oriented policing (COP), problem-oriented policing (POP), hot-spot policing, and intelligence-led policing.[29] Various data-driven policing strategies

---

[27] Piquero, Alex R.. *The Handbook of Criminological Theory*, edited by Melissa L. Rorie, John Wiley & Sons, Incorporated, 2015.
[28] See, among many, Don't Shoot: One Man, a Street Fellowship, and the End of Violence in Inner-City America by David M. Kennedy, 2011
[29] Lum, Kristian, and William Isaac. 2016. To predict and serve? Significance 13: 14–19.

are other efforts to leverage information (think big data here) using algorithms to focus the limited resources of law enforcement on places and people that analysis marks as having higher likelihood of crime involvement. According to a RAND Corporation study, the main objectives of the approach are: (1) predicting perpetrators, (2) predicting victims, and (3) predicting when and where there is a higher risk of new crime events.[30] In the early-ish years of such policing, scholars, citizens, and practitioners look to the lessons of other disciplines using data-based prediction to guide the inevitable debate around ethics and transparency.

IV.     Gang Violence and Homicide: What PSO's ILP is not about

35.     Plaintiff expert Professor David Kennedy has spent literally decades studying and participating in efforts to reduce group-located homicide. Membership in a gang is recognized as a homicide risk factor for the gang member or affiliate.[31] Research into the culture and behavior of gangs supports a gang-violence connection, to include homicide.[32]  The socialization of the gang as a primary group provides for certain needs of the young individual, including identity, companionship, and even "manhood" as part of the psyche of a member.[33] The use of violence, including and sometimes especially against police, can be

---

[30] Perry, W. L., McInnis, B., Price, C. C., Smith, S. C., & Hollywood, J. S. (2013). Predictive policing: The role of crime forecasting in law enforcement operations. RAND Research Report: RAND Corporation
[31] DeLisi, Spruill, Vaughn, & Trulson, 2014)
[32] Decker, S. H. and D. C. Pyrooz. 2010. "On the Validity and Reliability of Gang Homicide: A Comparison of Disparate Sources." Homicide Studies 14 (4):359–76.
[33] Miller, Jody, and Scott Decker. 2001. Young women and gang violence: Gender, street offender, and violent victimization in gangs. Justice Quarterly 18:115-40.; Stretesky, & Pogrebin, M. R. (2007). Gang-Related Gun Violence: Socialization, Identity, and Self. *Journal of Contemporary Ethnography*, *36*(1), 85–114.

reactions to a threat to status in the gang.[34] Notably, the use of a focused deterrence strategy involving gangs (sometimes called groups or networks) has been correlated with a *disruption* in shootings in some places during some years.[35] It is not settled social science that one approach or one formulation of focused deterrence caused the homicide reductions where the various permutations were employed for various time lengths.

36.     Risk-taking in youth is axiomatic. That the prefrontal cortex of the male brain does not reach development until the mid-twenties, is a factor in attributing risky, aggressive behavior with insufficient consideration of consequences.[36] There is the additional psychological aspect of the sense of invulnerability, the combination of which "…sets the adolescent up for an unusual proclivity for behavior."[37]

37.     The appearance of cooperation or even isolated moments of cooperation does not reflect the moment-to-moment thoughts of the individual who eventually resists any given effort of law enforcement or other governmental agencies.

38.     In their pre-service and in-service training in the dynamics of citizen interaction and response, deputies are trained in the Florida Basic Recruit Training.

## V.     Environment

---

[34] Howell, James. 1998. Youth gangs: An overview. Juvenile Justice Bulletin August 1998. Washington DC: U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention.
[35] *& Management, 32*(4), 739–757.
[36] See for example, Raine, A. (2013). The Anatomy of Violence: The Biological Roots of Crime. Random House: New York.
[37] Ibid. page 131

39.     The FBI and Bureau of Justice Statistics (BJS) maintain constant efforts to gather accurate and relevant data on crime. In 2019, BJS surveys revealed that only about 32.5% of household property crimes were reported. Crime rates in 2019 are reflected in Figure 1. Of the property crime reported, only 17.2% resulted in some form of clearance. In 2019 about 79.5% of motor vehicle thefts were reported (Figure 2), making it the most commonly reported according to BJS. Around half of household burglaries and thefts were reported that year. These percentages are relatively stable.



Figure 1



Figure 2

40.    The community in which police interact with citizens has clear implications for

the responses by government agencies and individual employees in their varying

roles in the justice system. What may not be frequent, or routine, in one

community, may be all too common in another. What police do matters in the

broad attempt to curtail crime.[38]  The reduction of crime and social disorder is generally favored by citizens.[39] This is the context of policing in Pasco County, Florida.

## VI.    Focused Deterrence

41.    The officers are entrusted by the citizens, and expected, to work to prevent crime. A majority of crime occurs out of the sight of law enforcement. This reality leaves the community's officers working to retroactively investigate crimes – when there is sufficient evidence or information to begin an investigation. Police agencies have been working to transition, where possible, to utilizing proactive approaches rather than the reactive models of traditional policing that have seen the low property crime clearance rates over the time such figures have been tracked.

42.    Deputies at the Pasco Sheriff's Office are expected and instructed to act within law, agency policy, and contemporary training. Importantly, bureaucratic controls over some aspects of police practices, for example search and seizure, have also been addressed by the U.S. Supreme Court (*City of Canton v. Harris*, 1989; *Monell v. New York City Department of Social Services*, 1978). While a retroactive view of an officer's decision-making is often officer-centered, this would fail to appropriately incorporate an unknown and dynamic thought process

---

[38] Ratcliffe, Jerry H., Ralph B. Taylor, Amber Perenzin Askey, Kevin Thomas, John Grasso, Kevin J. Bethel, Ryan Fisher, and Josh Koehnlein. 2020a. "The Philadelphia Predictive Policing Experiment." *Journal of Experimental Criminology* 17(1):15–41.

[39] Haberman, C. P., Groff, E. R., Ratcliffe, J. H., & Sorg, E. T. (2016). Satisfaction With Police in Violent Crime Hot Spots: Using Community Surveys as a Guide for Selecting Hot Spots Policing Tactics. *Crime and Delinquency*, *62*(4), 525–557. https://doi.org/10.1177/0011128713516840

by the subjects involved. Interacting with any subject with the hope of gaining

compliance can be blocked by the behavior of the subjects, as in the instant case.

43.     The concept of agency policies and administrator oversight being important to

employee functions is not new. If the Pasco County Sheriff's Office did not have

general orders and procedures, did not utilize a chain of command, failed to

require written documentation of enforcement activities carried out by employees

and maintain such paperwork, videos, CAD notations, etc., for review, they would

not be in step with other similarly situated agencies across the United States. This

is not the case. The Pasco County Sheriff's Office has policies and procedures in

place to address allegations of officer misconduct and policy violations. The

investigations by administrative investigators are common. The agency's website

further provides citizens a link of "Compliments, Complaints, Concerns." [40]

44.     The deputies responding to interact with individuals believed to be at risk of re-

offending acted within the law, their training, and the policies of the Pasco

County Sheriff's Office. The policies and standard practice of using task force

approaches of select law enforcement officers to increase the effectiveness of

enforcing the law are among the common practices of law enforcement agencies.

45.     The Pasco County Sheriff's Office follows research practices in the development

of policies that guide the actions of officers and management methods of the

agency. That different agencies utilize varied methods is within their discretionary

authority and vary by the needs of the jurisdiction. That criminologists and other

academics differ as to frameworks, theories, and outcome evaluations is as

---

[40] Compliments, Complaints, Concerns

predictable as the sun rising in the east. The "focused deterrence" of one academic

to the "focused deterrence" as a concept within the Intelligence-Led Policing

Program of an actual law enforcement agency, is Navel oranges to Valencia

oranges at most.

46.    In a criminal matter, the information assembled is compared against elements set

by a legislative body. Our public employees do not determine the guilt or

innocence of a matter investigated in the course of their duties, they determine,

based on the criteria of probable cause, if it is more likely than not that a person or

persons were responsible for a violation. These public employees coordinate with

other public employees – prosecutors – who then take up their specific task of

deciding if a matter should continue in the criminal justice system process, which

may or may not culminate in a trial, according to law and guided by yet more

public employees, the judiciary.

47.    Guidance of the U.S. Constitution, state law, case law, contemporary patrol and

investigative training, and officer experience lead the way for a proper, and

hopefully effective, investigation. The assessment of case methods is framed by

legal options and constraints, not a post hoc opinion of what another person might

have done differently, and especially those without the responsibility of serving

the community. The available resources of various agencies, as well as the

parameters of each case, dictate the selection among legal options that officers are

tasked with making. The professional judgement of deputies and investigators to

select options has long been recognized by the courts. The actions of the

identified individuals and the totality of the circumstances in a given situation are

examined after the fact. Deputies and investigators are trained that courts have consistently ruled that such selections are the province of law enforcement officials.

48.     Plaintiff's expert Professor Kennedy claims unique knowledge of what is and is not "accepted" by (apparently all of) "mainstream criminology." This is unsupportable. Plaintiff's expert Professor Kennedy states that the PSO has not "developed a focused deterrence strategy appropriate to property crime." This is not accurate. Professor Kennedy is not he arbiter of program design. Plaintiff disagrees with PSO's version of its focused deterrence strategies, but that has no bearing on any individual community or its agencies pursuing the lawful policies it sees fit to implement.

49.     Plaintiff's expert Professor Kennedy asserts without support that PSO practices "cause harm." Plaintiff asserts that intensive supervision programs (ISP) have a "failed history of attempts to prevent crime and improve supervisee outcomes." This is inaccurate, over-simplified, and does not reflect a real world of probation and parole in which ISP has and *does* exist. In this assertion, Professor Kennedy also cites to a thirty-year old academic research article. Professor Kennedy states about ISP that "These intensive programs were, nonetheless, failures." This is not supported, and once again makes no representation as to *legality* of the practice, nor the administrative discretion authority for government agencies to pursue various strategies. Professor Kennedy goes on from this lack of *preference* for ISP-like monitoring, to assert "That history means it is predictable and well-

understood how PSO's policies and practices will cause harm." This is a logic fallacy, a weak analogy at best.

50.     Professor Kennedy states an uncontroversial observation that family and social networks are important. Professor Kennedy, however, then makes a categorical statement that "PSO deliberately sets family and friends against one another." This statement, unsupported in its scope and breadth, is also not supported by a handful of Plaintiff-interpreted conversation between family members of offenders. Again, there is no assertion about legality or common practice of interacting with family and acquaintances to acquire information or influence individuals.

51.     Hot spots may not be defined as a single location. If they were, no one would stand or park there. Offenders have mobility and spatio-temporal patterns (day, night, weekends, local convenience store, fast-food restaurant, work, school, etc.)

52.     Professor Kennedy conflates alleged unique deputy rudeness examples with the prolific-offender program. This is unsupportable.

53.     Professor Kennedy objects to law enforcement attention on individuals who have committed "X" number of acts, seemingly because the Plaintiff does not like such attention, not because the attention is unlawful or uncommon within criminal justice practices.

54.     PSO's protocols required enforcement actions in regard to prolific offenders balances with the ILP components of the Pasco Sheriff's Office which incorporates initiatives including community engagement; mental health/substance abuse; rehabilitation; threat assessment; and addressing

victimization. Each component is part of a multi-pronged approach to the complexity of actual criminal or delinquent behavior.

55. The use of lawfully issued citations to family members or others is a familiar tool in deterring behavior of some individuals, or leveraging intelligence information from others. Once again, Plaintiff, though asserting such citations to be pretextual, does not provide information of illegality. Professor Kennedy does state that "PSO often does this not because those people have done anything wrong…" Documentation seems to contradict this assertion of acting in the absence of a proscribed act or circumstance. The courts have been the venue to render such judgements.

56. Professor Kennedy utilizes a red herring fallacy to introduce (at para. 103 of his affidavit) to state "It is also well understood in the research literature that young people's early contacts with the criminal justice system are harmful." And that "…juveniles formally processed in the criminal justice system are as much as seven times more likely to continue to adult criminality than equivalent juveniles who are not." This misrepresents the research literature on juvenile delinquency and behavior. These statements would have the court believe that, rather than the complex and multi-faceted pathway that young people take to delinquent activity, that *mere* interaction with law enforcement, and *because of* formal processing, are the sole causes of adult criminality. This is not correct or empirically supported.

57. The behavior and eventual life-success of young people are influenced by many factors. Molding and guiding values is the primary responsibility of parents, guardians, and the individuals themselves.

58.  I reviewed no empirical evidence that the PSO, as stated by Professor Kennedy, "routinely puts pressure on prosecutors to try juveniles as adults."

50.  Professor Kennedy observes that the Pasco Sheriff's Office interacts with various other criminal justice system and other actors. This is accurate, appropriate, and should be expected of every law enforcement agency.

60.  While Professor Kennedy discusses, in broad terms, perceived legitimacy of law enforcement agencies, there is no offering of empirical evidence that the Pasco Sheriff's Office does not enjoy a perception of legitimacy by most of the jurisdiction's citizens.

61.  Acceptability, which Professor Kennedy makes a blanket claim is lacking in PSO's policies, is not the province of the Plaintiff to conclude.

62.  The straw man fallacy of taking much of my initial report discussion and opinions and saying that I was actually *making* Professor Kennedy's points, is not a strong presentation of the state of police practices.

63.  Professor Kennedy refers to deputy sheriffs- law enforcement officers - taking action on probation violations, as "self-appointed freelancers" supplanting the judgment and actions of probation and parole agencies. Law enforcement officers, in most U.S. jurisdictions, work closely with probation and parole agencies and officers. They have full legal authority to enforce the law. Given probation caseloads, such cooperative work is quite the norm.

64.  Violent crime is an issue for all communities and each law enforcement agency serving those communities. The matter under examination is not about violent crime nor a program to address violent crime specifically. Plaintiff's expert,

Professor David Kennedy, has devoted a great deal of his professional career involved in projects that partner with cities, police departments, probation and parole departments, and federal prosecutors to combat violent crimes (often homicide) by gang members. Professor Kennedy's work and efforts in this are laudable. Again, the Intelligence-Led Policing program of the Pasco County, Florida Sheriff's Office is not one that was designed or pursued to address the types of challenges faced by the many cities where Professor Kennedy worked with officials.

65.     Research and law enforcement efforts alike are replete with studies and projects that have tried to get at the underlying cause of violence. Much has been found to be systemic in regard to society, various criminological theory factors, and an age-trajectory observed as long as there has been recorded history. Once again, the Pasco Sheriff's Office, through the Intelligence-Led Policing program under examination here, made efforts, relying on research and public expectation, to address specific *property* crimes within their community.

66.     A review of programs recorded by the International Association of Chiefs of Police (IACP) under the rubric of focused deterrence speak exclusively to *violent personal crime*. In a sampling of programs, here was the focus of each under the rubric of focused deterrence:

Newark, NJ - **Challenges:** Violent Crime, Murder, Aggravated Assault

Cincinnati, OH - **Challenges:** Violent Crime, Gun Violence, Opioids, Shooting Victims, and Witnesses

Albuquerque, NM - **Challenges:** Violent Crime

Other projects that have attached themselves to, or have been attached to, the term focused deterrence, have largely dealt with issues of violent crime.

67.     Similar to programs identified by the IACP, the Police Executive Research Forum in 2021 spoke to a panel of experts about focused deterrence. The key takeaways included:

**--Focused deterrence means concentrating on the highest-risk people, places, and behaviors.** Mr. Abt noted that one advantage is that it is "actionable."  It's not asking police to be everywhere and do everything.

**--The strategy is not about creating a large list of gang members, but rather an evidence-based, closely vetted list for the specific purpose of saving lives by reducing shootings.**

**--The list is not a "most wanted" list for arrest and prosecution.** It's a list of individuals who will be offered resources to help them leave a life of violence.[41]

68.     In the PERF panel discussion, the chief of police in Stockton, California noted: "Stockton has one of the highest violent crime rates in the state and the nation. There are a lot of generational gang issues. But we've been making some great efforts to address the violent crime."[42]

VII.    Social Network Analysis

69.     The use by analysts of social networks to explore an individual's activities or ties to others is nothing new. There is simply more information now available through

---

[41] Police Executive Research Forum, Critical Issues, April 2021
[42] Stockton, CA Police Chief Eric Jones

multiple modes than has ever existed. Graphically displaying connections with nodes and varied length line with one or two arrow heads can be useful to analysts and investigators, not to mention for criminologists or anyone to examine almost anything that someone wanted to understand better.[43]

70.     When I was trained by the Florida Department of Law Enforcement in the mid-1980s to be a trainer-of-trainers for detectives, we used a plastic template punched through with various sized circles and lines. It is likely that almost every adult has seen similar displays on multiple police procedurals on television, with markers and photos comprising a network web of connections for the detectives to mull.


VIII.   Crime Hot Spots

71.     The use of pattern analysis by police to determine "hot posts" to track criminal activity is nothing new. It is simply far faster to tabulate and represent incidents via software, CAD systems, mobile computer terminals (MCT) and the like than has ever existed. Graphically displaying spatio-temporal event occurrence can be useful to analysts and investigators, not to mention to almost anyone that wanted to understand a pattern better. When I was a young police officer in the late 1970's and early-1980s, we used tiny pins with brightly colored heads to designate locations and types of crime. It is likely that almost every adult over a certain age has seen similar displays on multiple police procedurals on television. Occasionally, I had the solemn duty of looking at the stack of reports for

---

[43] McGloin, J. M., & Kirk, D. S. (2010). An overview of social network analysis. Journal of Criminal Justice Education, 21(2), 169–181.; McGloin, J. M., Sullivan, C. J., Piquero, A. R., & Bacon, S. (2008). Investigating the stability of co-offending and co-offenders among a sample of youthful offenders. Criminology, 46(1), 155-188.

addresses, and then pushing the pins into place on a map of the agency

jurisdiction. Risk terrain modeling (RTM),

72.     Professor Kennedy's conceptualization focuses on *violent* crime. PSO has

designed an approach to address *property* crime issues. The Intelligence-Led

Policing program of PSO contains a component or technique using "hot spots

policing." The National Institute of Justice, in their Crime Solutions program,

evaluates and rates practices across criminal justice.

**A Practice** is a general category of programs, strategies, or procedures that share similar characteristics with regard to the issues they address and how they address them. Practice profiles tell us about the average results from multiple evaluations of similar programs, strategies, or procedures. The programs, strategies, or procedures within a practice are similar because they share certain defining characteristics that are described for each practice profile on CrimeSolutions. Thus, practice profiles tell us the average result across multiple evaluations.[44] Green check boxes are evaluated effective, gold ones as promising. The current Summary by Crime Solutions includes the following Program and Practice profiles. The list below leads with a property crime program in Florida (not Pasco County), and Operation Ceasefire in Boston. The Summary reads as follows:

---

[44] U.S. Department of Justice, Office of Justice Programs, Rated Practices | CrimeSolutions, National Institute of Justice (ojp.gov)

| Title | Evidence Rating | Topics | Summary | RCT |
|-------|-----------------|--------|---------|-----|
| Program Profile: Offender Profiling (OP) Applied in Active Police Investigations in Burglaries in Florida | ✓ | Crime & Crime Prevention, Law Enforcement | This is a criminal investigation method used by law enforcement to increase burglary arrest rates using statistically derived offender profiles. The intervention was implemented in one police department in Florida for use in active burglary investigations. The program was rated Effective. Results showed a statistically significant increase in burglary arrest rates for the police department that implemented the program. Date Posted: 1/10/2018 | None |
| Program Profile: Operation Ceasefire (Boston, Mass.) | ✓ | Crime & Crime Prevention, Juveniles, Law Enforcement | This is a problem-solving police strategy, which was designed to reduce gang violence, illegal gun possession, and gun violence in communities in Boston, Mass. The program is rated Effective. There were statistically significant reductions in youth homicide, citywide gun assaults, calls for service, and recovered new guns following implementation of the intervention. Date Posted: 12/15/2011 | None |
| Practice Profile: Geographically Focused Policing Initiatives | ✓ | Crime & Delinquency - Multiple crime/offense types | Geographically focused policing initiatives increase the presence and visibility of police officers at specific high-crime locations to significantly reduce crime and disorder. This practice is rated Promising for reducing crime in treatment areas relative to control areas. Date Posted: 12/12/2019 | |
| Practice Profile: Hot Spots Policing | ✓ Crime & Delinquency - Multiple crime/offense types  ✓ Crime & Delinquency - Violent offenses  ✓ Crime & Delinquency - Property offenses  ✓ Crime & Delinquency - Public order offenses  ✓ Crime & Delinquency - Drug and alcohol offenses | | Hot spots policing strategies focus on small geographic areas or places, usually in urban settings, where crime is concentrated. Through hot spots policing strategies, law enforcement agencies can focus limited resources in areas where crime is most likely to occur. This practice is rated Effective for reducing overall crime and rated Promising for reducing violent, property, public order, and drug and alcohol offenses. Date Posted: 9/9/2013 | |
| Program Profile: High Point Drug Market Intervention | ✓ | Crime & Crime Prevention, Drugs & Substance Abuse, Law Enforcement, Technology & Forensics | A problem-oriented policing program that aims to eliminate overt drug markets and the problems associated with them through a deterrence-based, pulling-levers framework. The program is rated Effective. The intervention had a statistically significant impact on reducing violent incidents in the target areas. Date Posted: 7/29/2014 | None |

| | | | | |
|---|---|---|---|---|
| **Program Profile: Hot Spots Policing (Lowell, Mass.)** | ✅ | Crime & Crime Prevention, Law Enforcement, Technology & Forensics | This is a crime-reduction strategy that uses a disorder-policing approach to improve physical and social order in high-crime locations in Lowell, Mass. This program is rated Effective. High-crime locations experienced statistically significant reductions in calls for service and in social and physical disorder, compared with control areas. Date Posted: 12/20/2011 | Randomized Controlled Trial |
| **Program Profile: Minneapolis (MN) Hot Spots Experiment** | ✅ | Crime & Crime Prevention, Law Enforcement | This is a program that increased police presence in crime "hot spots" to reduce criminal activity in Minneapolis, Minn. Experimental hot spots experienced statistically significant reductions in citizen calls to police and observed disorder, compared with control hot spots. | Randomized Controlled Trial |

73.    Law enforcement officers do not have superhuman powers. Officers are daily put in positions of reacting and responding to crime. A startling reality for many citizens *and* officers is that most crime is neither prevented nor "solved." Given that much crime is never reported and what is reported is solved at less than 50%. Citizens call upon officers to intervene or investigate when fellow citizens break the social contract. Despite the legitimacy our democratic society provides police to use investigative authority, many offenders escape detection or accountability. This is the reality that cannot be conveniently dismissed.

74.    The Intelligence-Led Policing program of the Pasco County Sheriff's Office is adequately transparent as evidenced by the media coverage, and the record-keeping and commitment of the agency leadership to advertising the efforts of all of its organizational components. The Pasco County Sheriff's Office also provides its citizens with an annual report of the department that discusses many accomplishments and important issues including use of intelligence information.

IX.    Adverse Childhood Experience (ACE)

75.    Adverse childhood experiences (ACE) have been studied for their impacts on young people and adults for more than twenty years since the ACES study was published by the Centers for Disease Control and Prevention and Kaiser Permanente in 1998.[45] ACEs have been examined for various potential negative outcomes including health, suicide, drug abuse, unemployment, educational achievement and more. Importantly, aspects of community, society, family, and living conditions are studied to identify and understand origins of various experiences considered under the rubric. Over the lifespan, negative outcomes for health and social issues are complex and stem from myriad circumstances and factors. The actual scientific studies conducted utilize survey instruments that have been validated for most reliable results. A person, even a criminologist, in a report to the court may not simply start naming new categories thought up to imply legitimate scientific method.

76.    On page 13 of the 2018 PSO ILP Manual, it reads that:

"Through DCF's Florida Safe Families Network (FSFN), we are able to identify juveniles who have had adverse childhood experiences (ACEs)"

On the same page, the manual read: that:

"Research suggests that with each additional ACE a child experiences their risk of becoming a SVC offender increases by 35 and children who have experienced four or more are at significant risk of developing into a SVC offender (Fox et al., 2015)"

---

[45] Felitti VJ, Anda RF, Nordenberg D, et al. Relationship of childhood abuse and household dysfunction to many of the leading causes of death in adults: the Adverse Childhood Experiences (ACE) Study. Am J Prev Med. 1998;14(4):245-258.

From the referenced article by Fox et al.:

"Data on the history of childhood trauma, abuse, neglect, criminal behavior, and other criminological risk factors for offending among 22,575 delinquent youth referred to the Florida Department of Juvenile Justice are analyzed, with results suggesting that each additional adverse experience a child experiences increases the risk of becoming a serious, violent, and chronic juvenile offender by 35, when controlling for other risk factors for criminal behavior."[46]

77.     The Intelligence-Led Policing Manual incorporates the list of ACEs, which

included:

Household member incarceration,
Physical abuse,
Emotional abuse,
Witness household violence,
Physical neglect,
Household substance abuse,
Sexual abuse.

78.     Positive childhood experiences have also been (and continue to be) studied.[47] I

reviewed no evidence in this matter that supports an assertion that the PSO

Intelligence-Led Policing program makes "…prediction about that person's

experiences of any ACEs and any future criminality, much less serious or

"prolific" criminality," or that "This impossible move is precisely what PSO

claims to be making."[48] The report of Plaintiff expert Professor Kennedy goes

further with the straw-man argument that *"There is nothing that can predict that a*

*child will become a dangerous or prolific offender. **Nothing.*"* [emphasis in the

---

[46] Fox, Perez, N., Cass, E., Baglivio, M. T., & Epps, N. (2015). Trauma changes everything: Examining the relationship between adverse childhood experiences and serious, violent and chronic juvenile offenders. *Child Abuse & Neglect*, *46*, 163–173. https://doi.org/10.1016/j.chiabu.2015.01.011
[47] Bethell, Jones, J., Gombojav, N., Linkenbach, J., & Sege, R. (2019). Positive Childhood Experiences and Adult Mental and Relational Health in a Statewide Sample: Associations Across Adverse Childhood Experiences Levels. *JAMA Pediatrics*, *173*(11), e193007–e193007.
[48] Report of David Kennedy, page 21

*original*]⁴⁹ Additionally indicating that the Pasco Sheriff's Office, based on acknowledging adverse childhood experiences in certain offenders, then uses that knowledge "to target children as 'destined to a life of crime.'"⁵⁰ I do not believe a faithful reading of the Intelligence-Led Policing manual in its entirety and in context, supports Professor Kennedy's assertion. Professor Kennedy creates a narrative around a quote of a quote within the ILP Manual. While Professor Kennedy selects the sentence "David Farrington has pointed out that our knowledge of offending patterns is such that 'potential offenders can be identified at an early age with a reasonable degree of accuracy," Professor Kennedy leaves out the rest of the quoted material. Including this concluding sentence attributed to Farrington by Ratcliffe: "However, many of these variables [mentioned in the quote] are unlikely to be available to police departments, so this information has little value from an intelligence-led policing perspective."

X.      PSO Home Visits

79.     The use of home visits by social workers, probation officers, parole officers, and others who maintain a caseload, to explore an individual's activities is nothing new. There remain circumstances in which staffing is not sufficient to effectively carry out such visits consistently. Providing accountability and monitoring of those assigned such check-ins are still useful to many, not to mention for criminologists or anyone to conduct direct fieldwork regarding almost anything that a researcher wanted to understand better. Professor Kennedy stated that home visits and "Other Practices and Policies Are Harmful and Not Accepted by

---

⁴⁹ Ibid., page 21
⁵⁰ Ibid., page 22

Mainstream Criminology."[51] "Home visits" are not something to be "accepted" by "criminology" or by criminologists. It is a tool, a method, among a multi-pronged approach to assigned duties from the community. Regardless, empirical evidence does not support a categorical contention that of "…the failed history of attempts to prevent crime and improve supervisee outcomes through intensive probation and parole supervision, or 'intensive supervision programs' (ISP)."[52]

80.    The use of knock-and-talk is common, with some larger agencies assigning officers to the method as a work assignment. It is not uncommon in the wake of a consensual knock-and-talk encounter for someone to claim that an interaction with an officer was unwanted.

81.    The National Institute of Justice commissioned a study of probation and parole home visits. The practice remains the norm, and evaluation of overall efficacy remains challenging. From the study:

> Despite long being a cornerstone of surveillance and corrective intervention in probation and parole (Lindner & Bonn, 1996; Ohlin, 1956), field work remains an understudied aspect of community corrections. Yet, field work accounts for a significant proportion of community corrections resources, and has been shown to be a primary source of stress for line officers (Finn & Kuck, 2003). While conducting probation and parole contacts in the field can be a way for officers to extend community supervision beyond the walls of government buildings and interact with the community they serve, such work is also resource-intensive and can expose officers to harm. Moreover, the application of home and field contacts varies across agencies, and the catch-all term includes widely divergent policies and practices that reflect differing goals and expected outcomes for field work (Campbell, Swan, and Jalbert, 2017). This variation in what constitutes field work has, in part, resulted in very few rigorous studies of the impact of field contacts on criminal justice outcomes. The gap in research on field contact effectiveness means policymakers face great uncertainty when they try to weigh the potential benefits of field work against costs such as officer stress and, safety, and the impact on staffing resources. The findings from this study will inform

---

[51] Expert report of David Kennedy, page 40
[52] Ibid. page 40

policymakers on the risks and benefits of field work, and inform avenues for future research.[53] [citations within the original article]

From the study survey:

- Most agencies conduct field visits at: the offender's home (95%), place of employment (89%), jail or prison (82%), and shelters/group residences (81%).

- 38% of agencies reported usually conducting field visits in pairs or teams.

- Most agencies (79%) reported that officers sometimes conduct field visits with a law enforcement escort.

- Having at least one successful field contact is associated with reductions in recidivism.

- Individuals receiving at least one field contact had a 47% reduction in the odds of any recidivism over a two-year period, and were 54% less likely to recidivate at any point in time.

- Receipt of multiple successful field contacts is less effective for low risk individuals than for very high/high risk individuals.

- Receipt of any field contacts is associated with reductions in the number of violations a supervisees receives.

- The reduction in violations associated the receipt of any field contacts are not altered by the supervision type. The contrast in the effect of field contacts on number of violations is not significant.

- The number of visits received depended on whether the client was in ISR or on some other form of supervision:

---

[53] Abt Associates, Evaluating the Impact of Probation and Parole Home Visits (2019)

o ISR: 26.5% received one visit, 22.1% received two; 51.5% received three or more

o Other supervision types: 80.6% received one visit; 13.4% received two visits; 6.0% received more than visits.[54]

82. Please note that this is only one study, though a large one and under the auspices of the National Institute of Justice. It is not responsible to assert that home visits, in a vacuum, have one result or another for each and every different person or category of person monitored post- or pre-incarceration. Collateral contact with family when an offender is not home is commonplace. From the section of the study incorporating focus groups, checklists and surveys, participants note that home visits are *field* contacts and part of *community* supervision, and that compliance is due to deterrence.[55] Leveraging code enforcement to gain compliance was a concept formally put forward at the beginning of the community-oriented policing era of the mid-1980s. Such an approach is neither new, nor unlawful.

83. In Professor Kennedy's use of a thirty-year-old journal article to both describe and condemn all intensive supervision, he overreaches. Petersilia and Turner, the study's authors, did not label, as Kennedy did, that "They [ISP] were, nonetheless, failures."[56] What the authors did say, in their article, included:

> The programs were implemented well, particularly with respect to probation and parole officers' contacts and drug testing but were less successful at increasing treatment participation. Intensive supervision probation did not decrease the frequency or seriousness of new arrests but did increase the incidence of technical violations and jail terms. Stepped-up surveillance and

---

[54] Abt Associates, Evaluating the Impact of Probation and Parole Home Visits (2019)
[55] Ibid.
[56] Expert report of David Kennedy, page 41

frequent drug tests increased incarceration rates and drove up program and court costs compared with routine supervision. Development of an array of sentencing options to create a graduated sentencing system should justify continued development and testing of ISP programs.[57]

XI.     Focused Deterrence, again

84.     The Pasco County Sheriff's Office operates, as any police agency must, on

multiple levels and with multiple approaches simultaneously. The Intelligence-

Led Policing program discussed was largely geared to identify and dissuade

offenders who commit property crimes. As interpreted by and noted by Professor

Kennedy: "…focused deterrence is an evidence-based prevention framework

aimed at violence and other extremely serious public-safety issues. It has been

successfully employed with respect to homicide, gun violence, overt drug

markets, intimate partner violence, and other such issues."[58]

85.     Putting aside that each community exercises the prerogative to state what are

"extremely serious public-safety issues," Professor Kennedy repeatedly makes the

point that *his* focused deterrence is largely about violent crime. Although

Professor Kennedy points to "The original focused deterrence strategy operated

with respect to gangs and drug crews that were central to homicide and gun

violence in Boston…"[59], it is important to point out that crime prevention has

certainly incorporated aspects of some version of focused deterrence since the

Peelian practices of London's Metropolitan Police of the early 1800s.

---

[57] Petersilia, & Turner, S. (1993). Intensive Probation and Parole. *Crime and Justice (Chicago, Ill.)*, *17*, 281–335.
[58] Expert report of David Kennedy, page 23
[59] Expert report of David Kennedy, page 24

86.     Professor Kennedy points to the project he was involved in in Boston, MA (gang homicide), High Point, NC (drug markets), high-risk offenders in Chicago gun violence, Indianapolis violence reduction, Stockton CA, Lowell MA, Cincinnati Initiative to Reduce Violence, Operation Ceasefire Newark, NJ, and others. And again, in his expert report in the matter of Pasco County, Florida and the PSO Intelligence-Led Policing program aimed at reduction of burglaries and auto thefts, Professor Kennedy says of *his* focused deterrence version:

> The express intent is to reduce violence and other extremely serious harms while also reducing enforcement, strengthening the affected community, and supporting the most at risk (the catchphrase for the focused deterrence strategies aimed at homicide and gun violence is that those at highest risk should be "safe, alive, and free").[60]

## XII.    Agency Management

87.     The concept of agency policies and administrator oversight being important to employee functions is not new. If the Pasco County Sheriff's Office and Intelligence-Led Policing program did not have general orders and procedures, did not utilize a chain of command, failed to require written reports of the various activities carried out by employees and review those reports, they would not be in step with other similarly situated agencies across the United States. This is not the case.

## XIII.   Opinions and Conclusions

88.     Through my experience as a law enforcement officer, trainer, and administrator, law enforcement academy director, field training officer/supervisor/commander,

---

[60] Ibid., page 24-5

more than thirty-five years of teaching law enforcement procedures to academy recruits, in-service officers, and college and university students, my personal experience of conducting and supervising the conduct of law enforcement business including investigative matters, my ongoing research and analysis of such policies and practices, my academic and professional presentations, my authorship of various documents, and based upon a reasonable degree of law enforcement and criminal justice certainty, I find that:

89.   Pasco County, Florida, a community of more than a half million people, is part of the Tampa Bay Metropolitan Area. Population has increased significantly in the past decade. Pasco Sheriff's Office resources (staffing) have not kept pace.

90.   The Intelligence-Led Policing (ILP) program of the Pasco Sheriff's Office is well-conceived, staffed, and operated pursuant to an agency-wide philosophy and manual. The program is open to public scrutiny.

91.   The crime challenges communities, agencies, and officers face daily call for a variety of responses. Aligned with tactical and strategic concerns, the Pasco Sheriff's Office appropriately utilizes traditional approaches and innovative methods to influence offenders, potential offenders, and criminogenic conditions that the agency can impact.

92.   Agency members that are part of the Intelligence-Led Policing section work within defined organizational policies and procedures, receive training, supervision, and are responsive to an established chain of command.

93.   The Strategic Targeted Area Response (STAR) Teams' actions by deputies in this case were objectively reasonable and appropriate and in accordance with

Constitutional guidance, state law, case law, PCSO policy, recruit academy training, and law enforcement practices.

94. Plaintiff describes a *specific* focused deterrence approach that has been utilized in other jurisdictions to address *homicide being committed by gang members*, *other gun violence*, *drug markets*, and *intimate partner violence*. Plaintiff asserts that any reference to the term "focused deterrence" or Plaintiff's expert's writings equates to a wholesale adoption of the exact approach used initially thirty years prior by Plaintiff's expert.

95. Every jurisdiction has the authority to and must devise its own approach to how it will deal with the unique crime problems of its jurisdiction. PSO has made the judgment it is entitled to make to address property crime through ILP. Neither the ILP manual nor written policies direct deputies on how to conduct a prolific offender check. It is clear from the materials that the circumstances vary greatly depending on, among other things, varied deputies carrying out checks, cause for the visits, and level of cooperation of those with whom deputies interact.

96. Crime deterrence and prevention strategies are pursued by approximately 18,000 separate local-level law enforcement agencies, and many more state and federal agencies, across the United States, and many more around the world.

97. The challenge of crime prevention does not alter the public expectation that their police officers work to accomplish what can be done in this objective, among many.

98. Communities, and by extension their elected and appointed public safety professionals, select public safety programs and strategies. Such decisions are

value-weighted locally and bound by resource constraints. Such efforts may not violate law or constitutional dictates.

99.     The documentation I have reviewed in this matter does not reveal a pattern of objectionable policies or behaviors that breach constitutional criteria routinely considered in local-level public safety policymaking.

100.    The initial design of the Intelligence-Led Policing program was articulated to be open to the evolving state of intelligence and data usage and techniques. There have been multiple versions of the ILP manual. This is appropriate.

101.    Based on preparations, policies, training, and proper supervisory action, the Pasco County Sheriff's Office responds to crime prevention in a manner consistent with contemporary law enforcement training and practices.

102.    The implementation of innovative crime prevention approaches in this case was reasonable and follows standard practice in ongoing public sector efforts to work within legislatively apportioned budgets. The use of various sources of data and information were conducted within law, Pasco County Sheriff's Office policy and contemporary law enforcement practices and training at the time of the complaint. In this matter, there was no indication that investigative methods were used inappropriately, improperly, unnecessarily, or in any way other than as authorized.

104.    The Pasco County Sheriff's Office uses acceptable management methods. Law enforcement bureaucracy is constrained by statute, case law, policy, training, supervision by higher authority, report review, and the proper conduct of the

officers who wield the authority to enforce laws. PSO deputies assigned to law enforcement duties have received training in appropriate practices.

105. Based on preparations, policies, training, and proper supervisory action, the PSO responds to reported crime incidents in a manner consistent with contemporary law enforcement practices.

106. The Pasco County Sheriff's Office provides in-service training regarding law enforcement functions to supplement and extend beyond that which Florida certified law enforcement officers already receive during their Academy training.

107. I viewed body-worn video (BWV) of deputies interacting with Dalenea Taylor and found them to be generally cordial, pleasant, cooperative. Some others may have a difference of opinion.

108. The official reports of PSO deputies in this matter are consistent and agree on the facts and do not contradict body-worn video in the case.

109. This information is based on my personal knowledge.


FURTHER AFFIANT SAYETH NOT.

*Richard M. Hough, Sr.*

RICHARD M. HOUGH, SR.


SWORN TO AND SUBSCRIBED before me by means of _____ physical presence OR ____ online notarization this 25th day of July, 2022. He is personally known to me/has produced TN DL ▓▓▓▓▓▓ as identification and did take an oath.

(SEAL)

NOTARY PUBLIC: _____
Print Name: BEVERLY H. DISTIN
My Commission Expires: 4-8-2023

Notary Public State of Florida
Beverly H Distin
My Commission GG 320822
Expires 04/08/2023