UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES III,

　　　　　　Plaintiffs,

v.                                            CASE NO.:  8:21-cv-00555-SDM-CPT

CHRIS NOCCO, in his official
capacity as Pasco County Sheriff,

　　　　　　Defendant.                    *Dispositive Motion*

_____/

## DEFENDANT SHERIFF NOCCO'S SECOND AMENDED MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS

Defendant Pasco Sheriff Chris Nocco, by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56 and the Court's Case Management Orders, hereby moves the Court for entry of summary judgment in his favor on all remaining claims in the case, and states:

### Summary

Plaintiffs allege that Pasco Sheriff's deputies violated their rights under the First, Fourth, and Fourteenth Amendments in the 2017 through 2021 timeframe.  They contend that the Sheriff's then-existing policies, based on Intelligence Led Policing (ILP), render the Sheriff liable for those constitutional violations under *Monell v. Dep't of Social Services of the City of New York,* 436 U.S. 658 (1978).  Plaintiffs urge that the Sheriff's ILP unit designated them or their children as "prolific offenders" and that

Sheriff's deputies visited their homes to conduct randomized prolific offender checks so as "harass" them.

Plaintiffs' operative complaint seeks money damages for prolific offender checks and related practices in the past, and also for prospective injunctive relief. The latter has always been vaguely expressed, but as Defendant understands it Plaintiffs sought either an end to the prolific offender designation process and checks, or that it be modified in some undefined way.

In a nutshell, Plaintiffs' claims for retrospective relief fail because Plaintiffs cannot show constitutional violations which were caused, in the *Monell* sense, by an official policy or custom of the Sheriff. Indeed, it is apparent upon a review of the record that Plaintiffs are cherry picking from literally hundreds of deputy interactions with the Plaintiffs perhaps a handful of instances of such interactions they label as "harassment" and attempting to then paint with a broad brush all prolific offender checks as harassing to the point that they are unconstitutional. The record simply does not support it. And, there is no evidence that an official policy or custom of the Sheriff was the actual cause – again, in the *Monell* sense – of any actual underlying constitutional violation.

As to prospective relief, the Plaintiffs had standing problems to begin with because none of them or their children has been a prolific offender for years when summary judgment was originally sought in 2022. And more significantly, the Pasco Sheriff's Office in 2021 and into 2022 phased out the prolific offender designation

2

process or prolific offender checks, altogether.  There is nothing to enjoin as far as the prior experiences of the Plaintiffs are concerned, nor is there a basis for relief now.

As explained below, due to the changing needs to the community and in particular an epidemic of drug activity, PSO now uses its ILP staff to gather intelligence from agency documentation and to identify what it terms "focused offenders."  These are persons who are contributing to the criminal environment and for whom at least reasonable suspicion exists to believe they have committed a particular crime under investigation.  The PSO does not perform the same randomized checks of *focused offenders* that Plaintiffs complained about with *prolific offenders*.  And other practices have changed over time since 2021 and into 2022 and 2023, some related to focused offenders, but other changes having occurred even earlier.

These changes have mooted Plaintiffs' claims to prospective relief. Significantly, none of the Plaintiffs is a focused offender so they have no standing to challenge that current process at the PSO.  Plaintiffs have suggested an attempt to keep prospective injunctive relief on the table with allusion to the theoretical possibility that policy changes could be made at some undefined point in the future, either reverting back to the former processes in whole or in part, or some other currently unforeseen process to which they might object.  None of these hypothetical policies is sufficient to invoke the Court's jurisdiction to enjoin imaginary future policies.

Plaintiffs also mistakenly claim that, any action taken against a prolific offender or their parents – even if completely lawful and justified or unrelated to prolific offender status – was "caused by" the Sheriff's ILP approach to policing.    The

3

fundamental problem with this case is that *Monell* does not work well when plaintiffs try to group incidents together and avoid the finer points, which matter both as to whether there was a constitutional violation to begin with, and as to whether the defendant agency is liable under the difficult standards of *Monell*.  It is not permissible to gloss over the meaningful differences in the individual events which comprise this case and to then blur it all together loosely as a *Monell* custom.

## Motion

1.     The Court should grant summary judgment to the Sheriff on all claims first because the Plaintiffs have not shown an underlying violation of their constitutional rights.

2.     Independently, Plaintiffs cannot show that an official policy or custom of the Sheriff "caused" any given constitutional violation as contemplated by *Monell*.  No formal written policy of the Sheriff instructed deputies how to engage in any given prolific offender check and there is no consistent pattern to the interactions such as to conclude that there was an unconstitutional *Monell* custom that caused a violation of Plaintiffs' rights.

3.     Plaintiffs refer to the interactions at many places in collective fashion but that cannot substitute for the inquiry as to whether a given Plaintiff's constitutional rights was violated in a given instance.  Plaintiffs chose to sue over scores of incidents: they cannot group them together when they are so different for either custom or policy purposes under *Monell*.  Defendant has filed with the Court all of the available BWC

footage. (See Dkt. 114.)  Akin to a qualified immunity analysis, the Court will have to "slosh its way through the factbound morass"[1] of these interactions.

4.      Plaintiffs seek reimbursement for fines they paid for code violation citations.  But they paid the fines and fixed the deficiencies noted in the citations, and otherwise make no claim that the citations were objectively incorrect.  Their claims for such relief are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994).

5.      The PSO no longer identifies persons as prolific offenders and no longer conducts the randomized prolific offender checks of which Plaintiffs complained in the past.  Plaintiffs lacked standing as to future injunctive relief under the previous prolific offender process because none of them or their family members have been prolific offenders for years and none established a likelihood that they (or a family member) would be characterized as a prolific offender in the future.

6.      Similarly, none of the plaintiffs or their children is a focused offender under the focused offender directive, embodied in the January 31, 2023, RAD directive.  The RAD directive did not even exist during deputy interactions with Plaintiffs in years past and so by definition that policy could not have caused a violation of their rights for purpose of retrospective relief.  And, because they are not focused offenders subject to the RAD directive, plaintiffs have no standing to challenge RAD or obtain injunctive or other prospective relief as to RAD.

---

[1] *Scott v. Harris*, 550 U.S. 372, 383 (2007).

7.     Of the four named Plaintiffs, only Dalanea Taylor was ever a prolific offender.  As to Plaintiffs Deegan, Heilman, and Jones, it was their children who were, for a time, designated prolific offenders due to substantial criminal activity by them. Deegan, Heilman, and Jones do not have standing to pursue claims applicable to their children's designation as prolific offenders.

8.     If Plaintiffs' request for future relief is that the Court direct the Sheriff to generally discontinue or modify ILP in some specific way, Plaintiffs have not actually ever described such relief and they have failed to justify any such relief.  Entry of prospective relief under these circumstances would violate basic principles of federalism and separation of powers.

9.     The Sheriff is entitled to summary judgment on claims of individual Plaintiffs for a variety of reasons.  For example:

    a.  Plaintiff Heilman has no viable Fourth Amendment claim related to her two arrests as there was probable cause for the arrests and she pled guilty to, and/or was found guilty and convicted of, offenses such that *Heck* defeats any claim that her Fourth Amendment rights were violated.

    b.  All of Plaintiff Jones' claims in the case are barred by the statute of limitations as all incidents involving him or his son Robert Jones occurred more than four years prior to the filing of the lawsuit.  That is beyond the statute of limitations applicable to §1983 claims in Florida.

    c.  The Sheriff should be granted summary judgment on any claim by Jones that he was unconstitutionally arrested for failure to appear for code citation

hearings, claiming that he did not receive the citations or notice of the hearings.   The evidence shows that the warrants were lawfully issued, barring any Fourth Amendment claim by him as a matter of law.   He has also testified untruthfully as to his lack of knowledge of such hearings in advance of them.

10.    Plaintiffs updated their Rule 26 reports to state that they are not seeking mental pain or suffering or non-economic damages.  Each of the four plaintiffs was asked in deposition to confirm this and each agreed.  (Doc. 131, Jones Deposition, p. 30 line 2 – p. 32, line 13; Doc. 137, Taylor Deposition, p. 16, lines 2-10; Doc. 124, Heilman Deposition, p. 13, lines 8-25; Doc. 123, Deegan Deposition, p. 9, lines 16-19).  Causation is an essential element of any §1983 claim.  *Reimer v. Smith*, 663 F.2d 1316, 1322 & n. 4 (5th Cir.1981)(it is axiomatic that a plaintiff cannot succeed in a § 1983 action if he or she fails to demonstrate a causal connection between the state official's alleged wrongful act and the alleged deprivation).  *See generally,* Randall R. Rader, *Section 1983, The Civil Rights Action: Legislative and Judicial Directions,* 15 CUMB. L. REV. 571, 601–607 (1985); *Morton v. Becker,* 793 F.2d 185, 187 (8th Cir.1986).  A review of the few instances in which Plaintiffs even have an arguable claim of an underlying constitutional violation and weak claim of *Monell* linkage to that violation, there is no evidence of causation of economic damages, which defeats those claims.

WHEREFORE, Defendant Sheriff Nocco moves the Court for summary judgment in his favor on all claims against him.

## <u>MEMORANDUM OF LAW</u>

This is purely a *Monell* case and several hallmarks of a claim based on *Monell* are worth noting at the outset.

"To impose *Monell* liability, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation…"  *Underwood v. City of Bessemer,* 11 F.4th 1317, 1333 (11th Cir. 2021) (internal quotations and citations omitted).

> Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.
>
> *Board of County Comm'rs of Bryan County, Okla. V. Bryan*, 520 U.S. 397, 403-04 (1997) (citations omitted).

Below, Defendant delves into the incidents involved in this case and explains why there were no underlying constitutional violations.  Where there is no underlying constitutional violation then by definition there can be no *Monell* liability.  *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996); *Vineyard v. County of Murray, Ga.,* 990 F.2d 1207, 1211 (11th Cir.), *cert. denied,* 510 U.S. 1024 (1993).  If none of Plaintiffs' underlying constitutional rights were violated, then the PSO's policies and customs are irrelevant. *See Los Angeles v. Heller,* 475 U.S. 796, 799 (1986).

The relevant ILP Manuals and 2021 Directive called for a minimum of one prolific offender check per month. But beyond that, no official written policy directed the circumstances of a given check (or checks), i.e. how many to be performed, when they would be performed, the number of deputies responding, or the actions or demeanor of deputies. The simple fact is that there is no basis for Plaintiffs to contend that an *official policy* of the Sheriff caused any constitutional violations.

Rather, in this case, Plaintiffs' claims are based on a contention that there was a custom of performing the checks in such a manner as to be the "moving force" behind their claimed constitutional violations. But to establish a *Monell* custom as causing an underlying violation , Plaintiffs must show for each such instance that, predating that incident, there were a sufficient number of "substantially similar" incidents to conclude that there was a definitive custom of conducting checks in an unconstitutional manner. *Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005) (affirming summary judgment in §1983 case where Plaintiff had list of prior uses of excessive force, but they were not shown to be sufficiently similar as to represent a custom).

"When attempting to state a *Monell* claim based on custom, "[a] pattern of similar constitutional violations... is ordinarily necessary, because a single violation is not so pervasive as to amount to a custom." *Gurrera v. Palm Beach Cty. Sheriff's Office*, 657 F. App'x 886, 892-93 (11th Cir. 2016) (citing *Craig v. Floyd Cty.*, 643 F.3d 1306, 1310 (11th Cir. 2011) and *Grech*, 335 F.3d at 1330). Only a thoroughly engrained

pattern of unconstitutional violations satisfies this standard." *Diaz v. Miami-Dade County*, 424 F.Supp.3d 1345, 1362 (S.D.Fla. 2019).

It is important to emphasize here that the prior pattern of substantially similar conduct must be *of constitutional violations*. It is not enough for Plaintiffs to simply repeat their claim that there were many checks and they were harassing in some sense or another, depending on the circumstances, and that eventually there was one rising to the level of unconstitutional. A custom is the *Monell* equivalent of a policy only when the unconstitutional "practice is so widespread as to have the force of law." *Board of County Com'rs of Bryan County. Okl. v. Brown*, 520 U.S. 397, 403 (1997).

Rather, Plaintiffs must show a pattern of substantially similar constitutional violations, predating any for which they seek relief, which represents a custom. In other words, Plaintiffs cannot simply point to a dozen prior prolific offender checks and say they were generally harassing, but it was the 13th one that was actually unconstitutional. That involved Plaintiff would have to show that the prior 12 (or a significant subset of them) were unconstitutional in a sufficiently similar way as to constitute a *Monell* custom. *Ireland v. Prummell*, 53 F.4th 1274, 1290 (11th Cir. 2022) (proof of a single constitutional violation is insufficient to establish a custom: "Rather, a plaintiff must establish the existence of *a pattern of similar violations*. Indeed, "[i]n the absence of a series of constitutional violations from which deliberate indifference can be inferred, the plaintiff must show that the policy itself is unconstitutional") (emphasis added) (internal citations omitted).

For a custom to be widespread to the point that it is a *Monell* custom, Plaintiffs

must show that it is so common that it can fairly be said to represent "official" policy.

> *Monell* limits what may constitute "custom." Custom consists of those practices of city officials that are "so permanent and well settled" as to have "the force of law." In defining custom in this fashion the *Monell* Court borrowed language from *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970), which defines the term "custom" as "persistent and widespread ... practices" or practices that are "permanent and well settled" or "deeply embedded traditional ways of carrying out ... policy." *Monell* additionally teaches that the city custom which may serve as the basis for liability may only be created by city "lawmakers or those whose edicts or acts may fairly be said to represent official policy."

> *Gilmere v. City of Atlanta*, 737 F.2d 894, 901-02 (11th Cir. 1984) (internal citations and footnotes omitted).

 "But for" causation has repeatedly been held to be insufficient for *Monell*

liability to attach.  See *Bryan*, 520 U.S. at 410;  *City of Springfield, Mass. v. Kibbe*, 480

U.S. 257, 267–68 (1987) (same); see also *Pembaur v. City of Cincinnati*, 475 U.S. 469,

484 n.11 (1986), citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) (same).

To the extent that Plaintiffs' argument is that, but for either a prolific offender

designation  or  but  for  the  performance  of  a  prolific  offender  check,  a  given

constitutional  violation  would  not  have  occurred,  the  *Monell*  causation  linkage  is

insufficient.  *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 599 (7th Cir. 2019) (citing

*Wilson v. Cook Cty.*, 742 F.3d 775, 784 (7th Cir.2014)).  See also *Wilson v. Longview School*

*District,* 775 Fed. Appx. 277, 280 (9th Cir.2019) (citing *Van Ort v. Estate of Stanewich*, 92

F.3d 831, 837 (9th Cir. 1996) ("Pointing to a municipal policy action or inaction as a

'but-for' cause is not enough to prove a causal connection under *Monell.* Rather, the

policy must be the proximate cause of the section 1983 injury.")

With these *Monell* principles in mind, Defendant turns to the Plaintiffs' claims of underlying constitutional violations.

## I.   PLAINTIFFS HAVE NOT SHOWN AN UNDERLYING VIOLATION OF THEIR CONSTITUTIONAL RIGHTS.

The Court previously dismissed the original Count V from the initial Complaint, which was an equal protection claim. (Dkts. 30, 81). The operative complaint is the August 27, 2021, Amended Complaint (Dkt. 41), but omitting the equal protection claim. Thus, Defendant will address the remaining First, Fourth, and Fourteenth Amendment claims from the Amended Complaint (Dkt. 41) in the sequence raised in that Amended Complaint.

### A.   NO VIOLATION OF FOURTH AMENDMENT RIGHTS.

**1.    Knock and talks are not themselves searches or seizures and, even if a particular small number of knock and talks involving the Plaintiffs could be argued to have amounted to or led to a search or seizure, and even if Plaintiffs could raise a colorable claim that any of them was actually unconstitutional, *Monell* liability has not been established as to them.**

As to the previous prolific offender designation and check process, Plaintiffs argue that the sheer fact of prolific offender checks or their frequency was itself a violation of the Fourth Amendment (or the Fourteenth, as discussed below). But a knock and talk unconnected to a search does not implicate the Fourth Amendment. *United States v. Radcliffe*, 725 F.App'x 894, 901 (11th Cir. 2018) ("The Fourth Amendment is not implicated by a 'knock and talk' that is unconnected with a search.") (quoting *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006)). The

only requirement is that police have a "legitimate police purpose" and in that event they may "enter onto private land, knock on the door of a residence, and seek to speak with the inhabitants, just as any private citizen may." *Id.*

The Fourth Amendment, which prohibits unreasonable searches and seizures by the government, is not implicated by consensual encounters with police. *United States v. Taylor,* 458 F.3d 1201, 1204 (11th Cir.2006). Police conduct in such instances is analogized to, and delimited by, the regular conduct of ordinary private citizens. *See id.* This means that, absent express orders from the person in possession, "[o]fficers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just a[s] any private citizen may." *Id.* (alteration in original).

While a "knock and talk" may, by the terms of its designation, presuppose an encounter at the residence's front door, officers may move away from the front door so long as they do so for a legitimate purpose unconnected to a search of the premises. *See id.* at 1205 (noting that officers may depart from the front door as part of a legitimate attempt to contact the occupants of a residence). Importantly, as has long been recognized, officer safety is a concern whenever officers and arrestees or potential arrestees are in close proximity. *See, e.g., United States v. Robinson,* 414 U.S. 218 (1973) (adopting search-incident-to-arrest rule in part for reasons of officer safety).

If the citizen's cooperation is induced by "coercive means" or if a reasonable person would not "feel free to terminate the encounter," then the encounter is no longer consensual and the citizen's Fourth Amendment rights are implicated. *United States v. Drayton,* 536 U.S. 194, 201 (2002). In determining whether a police-citizen

encounter was consensual or whether a seizure has occurred, the Court considers the following factors: whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police. *United States v. Jordan,* 635 F.3d 1181, 1186 (11th Cir.2011).

These factors are not applied rigidly, but are instead used as guidance. *Id.* "The ultimate inquiry remains whether a person's freedom of movement was restrained by physical force or by submission to a show of authority." *Id.* A review of the body cam videos in this case reveals that in the vast majority of prolific offender checks deputies walked to the front door, knocked, and spoke with whoever answered the door and then with the prolific offender if present. (See BWC videos and Joint Statement of Facts, defense facts # 27(a); 27(b); 50; 55, 64, 65, 66; 84). A review of the BWC, reports, and deposition testimony as to these incidents demonstrates that prolific offender checks were, to borrow a phrase, all over the map in terms of duration, intensity, and demeanor of deputies. There is simply not enough similarity as between Plaintiffs, or even just as to a given Plaintiff to say that there were constitutional violations or that there was a sufficiently similar pattern of constitutional violations simply in the form of the checks themselves, to be a *Monell* custom.

14

2.     **No violation of constitutional rights in individual instances of prolific offender checks.**

Plaintiffs have identified several specific instances in which they argue that deputies violated the Fourth Amendment during prolific offender checks and these are addressed in turn.

### a.   The breach of Deegan's fence on June 6, 2018.

In June 2018, deputies were searching for Plaintiff Deegan's son, Tyler Paneson, based on probable cause that he had stolen a kayak.  (Joint Statement of Facts, defense facts # 72, 73, 74, 75, 76, 77, 78).   On June 6, 2018, deputies went to Deegan's home looking for Paneson.  (Joint Statement of Facts, defense fact # 75).

BWC video shows that her home has a fence with a no trespassing sign at the front of the home, with a wooden stick propped up by another wooden stick at the end of the chain link fence.  (Doc. 154, Non-Electronic Filing, BWC, #10, (Extraction 1.1) AXON Flex_2_2018-06-06_0836).  The video at the 1:50 mark shows deputies climbing over the wooden portion of the fence and going onto the property, looking for Paneson.  (Joint Statement of Facts, defense fact # 74).

On other occasions in the same week, deputies stayed on the street-side of the fence.  For example, on June 5, 2018, the day before the above-referenced incident, deputies came to the residence, looking for Paneson based on the same probable cause, and spoke to a young lady, who claimed he was not there.  Deputies remained on the street side of the fence.   (Joint Statement of Facts, defense facts # 73).  Similarly, on June 8, 2018, two days after the fence breach incident, deputies returned looking for

Paneson and BWC shows they stayed on the street side of the fence yet again.  (Joint Statement of Facts, defense facts # 77).

This time they spoke with Deegan, who was home cleaning up debris in her front yard, for which she had apparently been cited.  (Doc. 154, Non-Electronic Filing, BWC, #19, (Extraction_1.1)_AXON_Flex_2_Video_2018-06-08_1031).  Deputies asked if they could come on to the property but Deegan declined to give permission and they stayed on the public side of the fence.

Plaintiffs may contend that, because a responding deputy or dispatch selected "prolific offender check" from the drop down menu for the CAD report that this June 6, 2018, incident was a prolific offender check.  But, the underlying video and documentation do not support that conclusion.  As noted in Defendant's statement of facts, multiple CAD reports and a deputy report for the incident state that deputies were there searching for Paneson based on probable cause for theft of the kayak. (Joint Statement of Facts, defense facts # 72, 73, 74, 76, 76).  The one drop down menu entry in a CAD report that the June 6, 2018 incident was a prolific offender check does not overcome the video and documentary evidence that the true nature of the incident was a search for Paneson based on probable cause to arrest him is clear from the deputy reports and BWC.

*Even if* the breach of the Deegan fence line on June 6, 2018, was *solely* for purposes of a prolific offender check – and the evidence is otherwise -- there is no *Monell* causal linkage.   No written policy called for deputies to breach her fence line in order to execute a prolific offender check or any other ILP-related function.  And,

16

there is no custom of doing so as on other occasions in the same period, deputies stayed on the street-side of the fence.

As noted above on both June 5 and June 8, 2018, deputies spoke with persons there, including Deegan on the 18th, and did not breach the fenceline. Thus, even if the breach of the fence line on June 6, 2018, were unconstitutional, there is no showing that an official policy or custom of the Sheriff, adopted by the final policymaker with deliberate indifference, was the moving force behind such violation. No ILP policy (or any policy for that matter) directs deputies to breach fence lines, in association with ILP or otherwise. There is no showing of a custom, so widespread as to have the force of law, of such breaches on other occasions or under sufficiently similar circumstances as to represent a *Monell* custom. And, there is no showing that Deegan suffered any economic loss in relation to the breach: it is therefore not compensable in any event.

**b. The two arrests of Heilman were not unconstitutional and are otherwise not actionable because probable cause existed for each arrest. Additionally, neither arrest was caused by a *Monell* policy or custom, and the first one, occurring in 2016, is barred by the statute of limitations. Finally, Heilman pled guilty as to charges in both, barring claims of false arrest.**

Heilman was arrested twice. The first occasion was September 16, 2016. In that instance, her son Donnie was suspected of involvement in a residential burglary and of using the proceeds to buy a motorbike. Heilman was interviewed concerning the matter the day before the arrest, on September 15, 2016, by Pasco Sheriff's Deputy Andrew Denbo. During this interview, she falsely claimed she had given Donnie the money for the motorbike. Donnie himself confirmed that Heilman lied when she

17

made that claim.  Denbo then went to the residence to arrest Heilman on the 16th for providing this false information.  Heilman tried to evade the deputy.  (Joint Statement of Facts, defense facts # 56, 57).

The incident was captured on Denbo's body worn camera and has been filed with the Court.  (Doc. 154, Non-Electronic Filing, BWC, #27, (Extraction_1.1)_BATTERY_ON_LEO-14)).  Heilman was arrested by Denbo on charges of battery on a law enforcement officer and resisting arrest without violence, ultimately pleading guilty and being convicted of battery, resisting an officer without violence, and giving false information to an officer.  (Joint Statement of Facts, defense fact # 58).

The second arrest occurred on September 18, 2018, when deputies came to Heilman's residence because they had a judicial order for pick up on one the children. Heilman intentionally swung her screen door open quite abruptly, striking a deputy. This was also captured on body worn camera, which has been filed with the Court. (Joint Statement of Facts, defense fact # 60).  She was arrested for battery on a law enforcement officer.  She pled guilty, adjudication was withheld but she sentenced to 24 months' probation.  (Id.)

A Fourth Amendment claim for false arrest is absolutely defeated by the presence of probable cause.  "The existence of probable cause, however, is an absolute bar to a section 1983 action for false arrest." *Marx v. Gumbinner*, 905 F.2d 1502, 1505-06 (11th Cir. 1990).  Probable cause to arrest exists when "law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable

belief that the suspect had committed or was committing a crime." *United States v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992). "This does not require an actual showing of criminal activity, but only a probability or substantial chance of criminal activity. And it does not require overwhelmingly convincing evidence, but only reasonably trustworthy information." *Baysa v. Gualtieri*, 786 Fed.Appx. 941 (11th Cir. 2019).

The standard for determining the existence of probable cause is the same under both Florida and federal law. The subjective belief of the arresting officer plays no role in a probable cause analysis; instead it exists when a reasonable officer could have believed probable cause existed based on the objective facts known by the arresting officer. *See Rankin v. Evans,* 133 F.3d 1425, 1433 (11th Cir.1998).

Video of both of these incidents clearly establishes probable cause for Heilman's arrest. The Court should find as a matter of law that probable cause existed for arrest and reject any claim that the arrests were unconstitutional.

Additionally, to the extent that Plaintiffs criticize the arrests as pursuant to the zero tolerance policy of the PSO when it came to prolific offenders or their family members, there are at least two problems with this argument. First, there is no constitutional right not to be arrested pursuant to a zero tolerance policy: if there is probable cause then the claim is barred as a matter of law. The zero-tolerance policy has no bearing on the constitutionality of the arrests. Second, neither arrest was caused by a policy or custom of the Sheriff, particularly in that neither occurred in the context of a prolific offender check.

Any claims in this case related to the arrests of Heilman on September 16, 2016, or September 18, 2018, fail because none was caused, in the *Monell* sense, by an official policy or custom the Sheriff.  First, neither was a result of or occurred in the context of a prolific offender check.  The first occurred after Heilman made untruthful statements to Deputy Denbo during an investigation of a burglary.  The second occurred when deputies went to the Heilman residence based on a court order to pick up one of Heilman's children.  There has certainly been no showing that the Sheriff's official written policies or customs caused arrests without probable cause.

Additionally, it must be noted that Heilman's first arrest occurred in September 2016, more than four years prior to the filing of the original March 10, 2021, complaint (Doc. 1).  Any claim based on the September 2016 arrest is beyond the statute of limitations applicable to §1983 claims in federal district courts based in Florida. *Chappell v. Rich,* 340 F.3d 1279, 1283 (11th Cir. 2003).   The statute of limitations on a §1983 false arrest claim brought in federal court in Florida is four years, and runs from when the cause of action accrues.  Under federal law, the §1983 federal false arrest claim accrues when the plaintiff is released from custody.  *Hayward v. Lee County Sheriff's Office*, Case No. 2:14-cv-244, 2-17 WL 6550866 * 2-3 (M.D.Fla. October 30, 3017) (citing *Wallace v. Kato*, 549 U.S. 384, 387 (2007) and *White v. Hiers*, 652 Fed.Appx. 784, 786 (11th Cir. 2016)).  "[A] false imprisonment ends once the victim becomes held pursuant to [legal] process—when, for example, he is bound over by a magistrate or arraigned on charges." *Wallace*, 549 U.S. at 389 (emphasis omitted).

Even if the record does not contain the exact date as to when the initial detention pursuant to arrest ended (as opposed to being held over by a magistrate), the Court can look to available public records and take judicial notice of the date, for example in state court records. *Hayward*, * 3.   The Court should take judicial notice that, according to the clerk's records for Heilman, she was released from the September 16, 2016, arrest in Case No. 512016MM006575, on September 17, 2016. [2]  Thus, her claim for §1983 false arrest accrued on September 17, 2016, more than four years prior to her filing suit on March 10, 2021, and the claim for that incident is barred.

Finally on these arrests, Heilman pled guilty in both arrest incidents, foreclosing a claim by her that the arrests occurred without probable cause. *Heck v. Humphrey*, 512 U.S. 477 (1994).  In the 2016 case, Heilman pled guilty and was convicted and there should be no doubt that any claim of false arrest stemming from it is barred by *Heck*.

In the September 2018 case, Heilman pled guilty and adjudication was withheld.  She nonetheless received a sentence of 24 months' probation.  Under these conditions, it cannot be said that her criminal charge terminated favorably to her and *Heck* should bar her from making a claim based on that arrest, as well.  This is because a denial of her of probable cause for arrest would contradict her guilty plea. *Dyer v. Lee*, Case No. 2:05-cv-237, 2006 WL 2092264 (July 26, 2006) ("As a preliminary matter, it is clear that the *Heck v. Humphrey* principles apply even though Dyer's initial

---

[2] https://www.civitekflorida.com/ocrs/app/caseinformation.xhtml?query=3uFYR55_1ydISOoBGS vVzZpOUVy7ubnHH5bnLSapttU&from=partyCaseSummary

plea was nolo contendere with adjudication withheld. *Behm v. Campbell,* 925 So.2d 1070, 1073–75 (5th DCA 2006). *See also Ojegba v. Murphy,* 2006 WL 1117867 (11th Cir.2006) (*Alford* plea barred § 1983 excessive force claim under *Heck v. Humphrey* principles") (footnote omitted), overruled on other grounds, *Dyer v. Lee*, 488 F.4th 876 (11th Cir.2007).   At bottom, the second arrest had no connection to ILP or prolific offender checks and the BWC clearly shows Heilman violently swing open the door into the deputy standing there such that he had probable cause to arrest her.

   c.   **The arrests of Jones were pursuant to arrest warrants or the existence of probable cause such that he has no claim for unconstitutional arrest; moreover, he pled guilty to those charges, barring his claims under *Heck*. Additionally, *all* §1983 claims by Jones fall outside the four year statute of limitations.**

   Jones was arrested on warrants for failure to appear.  As a matter of law, those arrests cannot yield a viable §1983 false arrest claim because deputies have a non-discretionary duty to effectuate arrest warrants;  an arrest pursuant to a warrant cannot serve as the basis for a false arrest claim.  *Spinnenweber v. Williams*, 825 Fed. Appx. 730, 732-33 (11th Cir. 2020) (citing *Williams v. Aguirre*, 965 F.3d 1147, 1158 (11th Cir. 2020); see also *Jackson v. Navarro,* 665 So.2d 340, 342 (Fla.Dist.Ct.App.1995).

   To the extent that Jones claims that the warrants were issued improvidently based on his having not received notices of code violation citations, leading him to inadvertently miss court dates in state court, such a claim fails.  First, such an argument would not deny that he was arrested on facially valid warrants, barring the false arrest claims. Second, even if Jones would convert his claim to be some kind of failure to

apprise him of the warrants, the record evidence demonstrates such a claim to be meritless.   For example, Jones denied in his deposition that he received original citations in March, 2016.   He attempted to portray this as a failure on the part of Sheriff's deputies.   However, BWC from that date clearly shows Jones acknowledging receipt of the violations and he had no explanation for why he testified that he did not receive the citations when the video clearly shows him acknowledging that he had. (Joint Statement of Facts, defense facts # 90, 91, 92).

Jones claims that one arrest of him, on March 29, 2016, for possession of marijuana, was not pursuant to a warrant, but was instead pursuant to a search.   First, deputies had a warrant for that search.   (Joint Statement of Facts, defense facts # 93, 94).   Second, even if Jones wishes now to deny that he possessed marijuana, the fact is that probable cause existed that he did based on statements of then-present witnesses that Jones "was always smoking marijuana inside the residence."   (Doc. 131, Deposition of Jones, p. 4, p. 237, line 21 through p. 238, line 12;   Exhibit 76 to deposition).   There was clearly probable cause for that particular arrest and the others were occasioned by warrants such that he has no viable false arrest claims.

To the extent that Jones paid fines or otherwise pled guilty, false arrest claims are also barred by *Heck*, as was the case with Heilman's possible false arrest claims. Indeed, Jones testified that in every single case of an arrest of him for failure to appear, the state court judge simply took the bond he paid on the arrest and used it to satisfy code violations.   (Doc. 131, Deposition of Jones, p. 33, lines 5 through 14).   And, there is absolutely no evidence that any of Jones' arrests was caused, in the *Monell* sense, by

23

a policy or custom of the Sheriff.   That is, there was no policy (ILP Manual or otherwise) stating that persons should be arrested without probable cause or a warrant, and Jones has not demonstrated a pattern of sufficiently similar incidents to his incidents so as to constitute a *Monell* custom.

Ultimately, ***all*** claims by Jones of any kind under §1983 are barred by the four-year statute of limitations.  All incidents involving Jones or his son occurred in 2015 and into the summer of 2016, but the lawsuit was filed almost five years after Jones moved out of Pasco County, on March 10, 2021.  He has moved back, but there is no evidence that Bobby, the prolific offender, moved back.  To the contrary, Jones testified that Bobby is living somewhere in the Tampa area.  (Doc. 131, Deposition of Jones, p. 20, lines 22 through 24)., lines 5 through 14)  And, there is no evidence of any connection between Jones, his son, and ILP after the initial move out of the area in 2016. As a result, all claims of Jones are barred by the four-year statute of limitations on § 1983 claims in Florida.  *Chappell v. Rich,* 340 F.3d 1279, 1283 (11th Cir. 2003).

### d. Jones' claims of deputies looking into or banging on windows does not yield a viable Fourth Amendment claim and, even if they did, the circumstances are too varied to represent a *Monell* policy or custom.

Jones has contended that deputies sometimes looked into windows of his home or banged on windows to get a response.  First and foremost, Jones must establish that such incidents, if they even existed, were caused in the *Monell* sense by a policy or custom of the Sheriff.  In particular, Jones must establish proof that these alleged incidents occurred as caused by ILP.  In this regard, it is important to note that video

24

from other Plaintiffs would not support such a claim – no one banged on Deegan's or Taylor's windows – certainly not to the point of an unconstitutional custom.[3]

And even if Jones' claims were correct and there were particular incidents of deputies, as he puts it, banging on windows or doors, several points must be made. First, in terms of *Monell*, no written policy called on deputies to do so.  Second, and again as to *Monell*, these incidents are as juxtaposed to incidents where deputies did not engage in such behavior.  Even if one credits Jones' claims that it occurred on other occasions, the fact that it did not so often as to "have the force of law" belies any contention that it was a *Monell* custom.

### e. No Plaintiff has a viable claim of a Fourth Amendment violation as to a code violation citation:  there is no evidence that any was objectively unjustified and Plaintiffs paid the citations, negotiated them, and/or fixed the underlying issues.

Plaintiffs also complain about code violation citations they received at various points in the past.  They contend that their constitutional rights were violated in two respects:  a) they were more prone to receive a citation because the Sheriff's former ILP approach called on deputies to pay particularly close attention to the residences of prolific offenders; and b)  there are individual instances in some, but not all cases, that citations were used in a carrot and stick approach to seek assistance in locating their prolific offender children if they were not present at the time of a deputy visit.

First, the Court has previously dismissed the claim that would seem most apt to

---

[3] And even if they did, there is no evidence at all that any such incident led to any economic damages.  Any damages for emotional pain and suffering from such would be speculative and Plaintiffs are not claiming such damages, anyway.

these issues, the equal protection claim.  But assuming Plaintiffs now seek to recast this claim to be a Fourth Amendment or due process claim, it still fails.  In all instances, the record indicates Plaintiffs paid the citation fines, either directly, through compromise, or in the case of Plaintiff Jones, indirectly.  (Joint Statement of Facts, defense facts # 51, 79, 88); see also Doc. 131, Deposition of Jones, p. 33, lines 5 through 14 (describing use of bonds to pay code violation citations)).[4]

Because the code citation cases concluded with some sort of payment by them of fines and the Plaintiffs in fact admit that the citations were valid, *Heck v. Humphrey* bars any claim.  *Parker v. Town of Palm Beach*, 2017 WL 11537901, * 4 (S.D.Fla. August 16, 2017) (citing authorities that *Heck* bars federal claims seeking to undo citations, including ordinance violations).

Deegan claims that her rights were violated with a specific set of code citations because deputies on June 8, 2018, issued them after having crossed over her fence line without a warrant or exigent circumstances.  This was limited to one occasion and even if there are others, they are sparse and not nearly sufficient to represent an official custom of sufficiently similar instances to satisfy *Monell*.  Critically, she has not demonstrated that they were objectively incorrect and she negotiated and paid them. (Joint Statement of Facts, defense fact # 79).

Plaintiffs complain that they were more likely to receive code citation violations than non-prolific offender residences.  The Sheriff's Office deemed a variety of

---

[4] The record contains no evidence of code citation violations issued to Plaintiff Dalanea Taylor and so she has no claim on this issue.

locations to be problematic, including but not exclusively prolific offender residences. The ILP manual stated that the Sheriff's Office sought to improve quality of life by nuisance abatement, including the use of code enforcement corporals.   (Doc. 161-3, pp. 30-31).  As testified to by Mark Celeste, a code enforcement corporal from 2016 to 2019, he focused on homes with many calls for service, for drug activity, and the like. (Doc. 121, Deposition of Celeste deposition, p. 10, line 14, through p. 13, line 13.)

Plaintiffs employed a statistics professional, Michael Carrasco, to compare the frequency of issuance of code citations to residences where prolific offenders lived, versus frequency of citations to non-prolific offender residences.  But, there is no equal protection claim remaining in this case.  Second, no analysis was done as to whether the code citations issued were objectively correct.  (Doc. 122, Deposition of Carrasco, p. 8, lines 1-4).  And, in making the comparison of frequency of citations to prolific offender versus non-prolific offender addresses, the analysis assumed that code citations were issued to the subject addresses *during the same period* that a prolific offender had that as his or her address.  (Id., p. 36, lines 1-19).  We know this is incorrect by examining the Plaintiffs' prolific offenders because their periods of time as prolific offenders varied from months to several years. [5]

A given citation *may* have been issued at a residence when the prolific offender lived there, but Carrasco had no way to determine that critical underlying fact.  The

---

[5] As further proof that issuance of code citations was not so regular or systemic as to constitute an unconstitutional custom, note that there was no code violation citation ever issued for Plaintiff Taylor during the time she was a prolific offender.

analysis is not tied to the underlying reason for any given visit to a property which resulted in a code citation being issued.  Thus, there is no way for Mr. Carrasco to be able to conclude that a given citation, or any of them, was issued in connection to ILP. The code citations may just as well have been issued because the property was a nuisance drug location as much as because a prolific offender generated it.  (Id., p. 36, line 20, through p. 40, line 5).

Plaintiffs also do not have a procedural due process claim based in simple issuance of the code violation citations because they were provided a hearing for the citations and that satisfies procedural due process, even if they do not take advantage of such a hearing.   *Ficken v. City of Dunedin, Fla.*, Case No. 8:19-cv-1210, 2021 WL 1610408, *10-11 (M.D.Fla. April 26, 2021) (appeal filed, May 25, 2021).

In sum on this point, there is no viable Fourth or Fourteenth Amendment claim in this case as relates to code violation citations.

> **B.     PLAINTIFFS HAVE NOT DEMONSTRATED A VIOLATION OF THEIR FIRST AMENDMENT RIGHTS TO FAMILIAL ASSOCIATION.   TO THE EXTENT THEY CLAIM A PARTICULAR RELATIONSHIP SUFFERED, THIS MUST BE EVALUATED IN THE CONTEXT OF ALL OF THE OTHER CAUSES OF THEIR FAMILY RELATIONSHIP PROBLEMS. AND, THERE IS NO EVIDENCE THAT EVEN IF SUCH OCCURRED, IT WAS CAUSED, IN THE MONELL SENSE, BY A POLICY OR CUSTOM OF THE SHERIFF.**

There is no constitutional violation under Count II, the First Amendment freedom of association claim.  The First Amendment protects claims of personal relationship association, which involve "the freedom to carry on certain intimate or

private relationships," and these claims "may take various forms." *Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 545 (1987).  Plaintiffs here have not demonstrated that their rights of familial relationships have been interfered with to the point of being unconstitutional.  The mere fact that the parents of prolific offenders (or children with warrants) are incidentally burdened by prolific offender checks is not an unconstitutional infringement on such a right.  *Parks v. City of Warner Robins, Ga.*, 43 F.3d 609, 614 (11th Cir. 1995) (holding that policy which increased costs to marry created only an incidental burden on marriage).  See also *Johnson v. Pomeroy*, 294 Fed.Appx. 397 (10th Cir. 2008) (consideration of spousal income for benefits created only an incidental burden).

The Eleventh Circuit in *Parks* elaborated on the high standard for showing the level of burden required to show a violation of a First Amendment right to family association.  There, the court observed that the Supreme Court in *Lyng v. International Union, United Auto., Aerospace and Agric. Implement Workers,* 485 U.S. 360 (1988) had held that a food stamp statue restricting benefits in such a manner as to deny increased benefits to families of striking workers, though it affected families, did not burden them to the point implicating the First Amendment because it did not "'order' any individuals not to dine together; nor [did] it in any way ' "directly and substantially" interfere with family living arrangements.'"

Plaintiffs have not demonstrated any significant change in any of their relationships with their children as a *direct result of* prolific offender checks.  Deegan was estranged from her son because he was stealing from her and he has since died of

29

a drug overdose.  Donnie McDougall was, until recently, in state prison for various convictions.[6]  Robert Jones simply lost track of Bobby.  (Jones, p. 20, line 22 through p. 21, line 7).  Dalanea Taylor was not ordered to live with someone else.  None can connect a substantial change in their familial associations directly to or solely because of ILP. And critically none can link any claimed burden on family association to an economic loss.  They have no viable claim here for that level of intrusion into their personal relationships.

       **C.**    **PLAINTIFFS HAVE NOT DEMONSTRATED A VIOLATION OF THEIR PROCEDURAL OR SUBSTANTIVE DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT.**

       **1.**    **No procedural due process claim.  Plaintiff Taylor (and the other Plaintiffs as to their children) did not have a procedural due process right to a specific kind of notice or opportunity for a hearing when they or their children had been designated prolific offenders; moreover, the facts show that the Plaintiffs were told as to why they or their children were receiving the checks.  And, they knew how to complain to the point that the failure to provide specific notice and opportunity to be heard was satisfied.**

---

[6] The Court should take judicial notice of McDougall's arrest and conviction history under Federal Rule of Evidence 201.  Donnie McDougall was arrested on March 15, 2018, and subsequently charged by the State Attorney in Pasco County Case 2018CF1664 with Aggravated Assault with a Deadly Weapon (s. 784.021(1)(a) - Third Degree Felony) and Possession of a Weapon by Delinquent Adult Felon (s. 790.23(1)(b) – Second Degree Felony). Donnie pled guilty to these two charges on December 4, 2018, and received three years of probation. Donnie violated his probation on September 16, 2019, committing a new law criminal offense in which he was charged with Aggravated Battery on a Pregnant Victim (s. 784.045(1)(b) – Second Degree Felony) in Pasco County case 2019CF5924. On May 14, 2021, Donnie pled guilty in 2019CF5924 and admitted to violating his probation in 2018CF1664 and was sentenced to four years in the Department of Corrections.

"With any procedural due process challenge, we must first determine whether the injury claimed by the plaintiff is within the scope of the Due Process Clause. *Bass v. Perrin,* 170 F.3d 1312, 1318 (11th Cir.1999). The Due Process Clause protects against deprivations of "life, liberty, or property without due process of law." U.S. Const. Amend. XIV. Procedural due process applies "only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972).

If a property interest is at stake, the inquiry breaks down into two steps: (1) is there a property interest; and (2) if so, what process is due? *See id.* at 577; *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985); *Mathews v. Eldridge*, 424 U.S. 319, 332–35 (1976). A property interest is "a legitimate claim of entitlement." Roth, 408 U.S. at 577. Plaintiffs in this case have not identified any property of which they were deprived by Sheriff's deputies.[7]

As to a liberty interest sufficient to invoke procedural due process requirements, it is certainly not the case that every time the police suspect a person of criminal activity, or even surveil such person, that there is a constitutional obligation to advise that person the specifics of why they are being monitored or surveilled. There is no constitutional right to a hearing prior to knock and talks, even more than one over an

---

[7] Plaintiff Jones claimed certain evidence was seized from him, but he has not established any connection for that to ILP or prolific offender checks and he has not articulated any steps he took or was advised he could take to seek return of such property. In any event, in the context of this case it is irrelevant because the ILP policy documents do not direct that property be taken and there is no evidence of a widespread custom of it such that there is no *Monell* liability for that singular incident.

31

extended period.   So, the question that arises is whether inclusion on the former prolific offender list - or having that designation – resulted in a due process right to be notified of such or opportunity to be heard.

First, only Plaintiff Taylor was ever a prolific offender.  Thus, Defendant notes that none of the other named Plaintiffs has standing to challenge notice and opportunity to be heard as to their children.   Second, none of the Plaintiffs has established any economic loss uniquely caused by their children being designated a prolific offender and not receiving notice or opportunity to be heard.   Taylor does not even claim that to be the case.

Third, Plaintiffs did receive at least some notice of the substance of prolific offender status.   On September 22, 2015, during a check of Bobby Jones deputies told he and his father that he and his friends who were committing crimes were on notice that it would not be tolerated.  And, on February 25, 2018, Dalanea Taylor was told during a prolific check that deputies were required to check on her from time to time. (Joint Statement of Facts, defense fact # 27).

Fourth, Plaintiffs showed a willingness to make complaints to the Sheriff's Office about a myriad of issues through normal channels– they just never complained to the Sheriff's Office about the checks.   The irony of the situation is worth noting: Plaintiffs complain on the one hand about the hundred or so prolific offender checks performed as to they or to family members; yet, on the other hand they claim that they did not receive sufficient notice that the checks were occurring.  The fact of the checks and why they were occurring was never hidden from Plaintiffs.

The issues would seem to be more basic than even that:  did the former version of ILP, with prolific offender checks and the emphasis on code violations or zero tolerance for arrest actually ever implicate a due process right, at all?  And if it did, what process would be due?  In their original motion for summary judgment (and of course this might be re-cast upon amending of it), Plaintiffs argued that the mere fact of any consequence emanating from being designated a prolific offender resulted in a constitutional right to notice and an opportunity to be heard, but that is not true.

In prior discussions with the Court, there was mention of the so-called "no fly list cases," which dealt with notice and opportunity to be heard as to inclusion on a list which precluded international travel.  However, as Defendant understands it, in those cases the starting premise was that a right to international travel had *already* been recognized as a constitutional right subject to procedural due process.  See e.g. *Latif v. Holder*, 28 F.Supp.3d 1134, 1148 (D.Oregon 2014).

Here, Plaintiffs are not so specific in alleging deprivation or burdening as to a particular, established right.  They refer vaguely to a right to peaceful enjoyment of their residences, not to be harassed, and the like.  But not every single government action creates a due process right to specific formal notice and opportunity to be heard by some particular measure.  Due process "is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481 (1972).

In *Mathews v. Eldridge,* 424 U.S. 319 (1976), the Supreme Court explained that "identification of the specific dictates of due process generally requires consideration

of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.*, 334-35.

Rather than specify these things, Plaintiffs simply claim there is no formalized process and opportunity to be heard. But they do not articulate in what form it had to occur and the record has examples of notice conveyed by deputies and even an email complaint of harassment by Plaintiff Heilman's daughter (but no request for a hearing). (Joint Statement of Fact, defense fact # 25).

The defense cannot envision how this notice and opportunity would have occurred under *Matthews*: the Plaintiffs and/or their children know they have been charged with numerous crimes leading up to this. That a law enforcement officer or agency pays more attention to them – even a lot more – is to be expected. It does not create a constitutional right to receipt of a letter or the taking of testimony as to the manner in which that focus will occur. Plaintiffs have never articulated what that process would even look like, much less how it would be conducted or paid for a la *Matthews*.

**2.** <u>There is no constitutional violation under Count IV, the substantive</u>
<u>due process claim.</u>

To viably present a substantive due process claim, Plaintiffs must show that the
Plaintiffs' rights were violated in a manner that "can properly be characterized as
arbitrary, or conscience shocking, in a constitutional sense." *Collins v. City of Harker
Heights*, 503 U.S. 115, 118 (1992); *County of Sacramento v. Lewis*, 523 U.S. 833, 847, n.8
(1998) (the threshold question is "whether the behavior of the government officer is so
egregious, so outrageous, that it may fairly be said to shock the contemporary
conscience").

None of the conduct here comes close to the level required to show a substantive
due process violation.  The U.S. Supreme Court and the Eleventh Circuit have warned
against expanding the doctrine of substantive due process. *Collins*, 503 U.S. at 125
("The doctrine of judicial self-restraint requires us to exercise the utmost care whenever
we are asked to break new ground in this field."); *Waddell v. Hendry Cty. Sheriff's Off.*,
329 F.3d 1300, 1304 (11th Cir. 2003) ("We must take seriously the Supreme Court's
caution against expanding the concept of substantive due process."); *Nix v. Franklin
County School Dist.*, 311 F.3d 1373, 1379 (11th Cir. 2002) (" 'As a general matter, the
[Supreme] Court has always been reluctant to expand the concept of substantive due
process because guideposts for responsible decision making in this [uncharted] area
are scarce and open-ended.' " (quoting *Collins*, 503 U.S. at 125)).

This point also has to be tied back to basic *Monell* principles, articulated above.
While Plaintiffs point to a handful of specific instances in which they criticize deputy

actions or demeanor, *none of that* is directed by official policy. And those few, or even a handful of instances, scattered across hundreds of interactions by four different Plaintiffs or their families, over a half decade or more, was not so permanent and well settled as to "have the force of law." *Gilmere v. City of Atlanta*, 737 F.2d at 901-02.

## II.   PLAINTIFFS LACK STANDING TO SEEK ANY INJUNCTIVE RELIEF AS TO CURRENT PSO WRITTEN POLICIES OR PRACTICES.

"A case becomes moot−and therefore no longer a 'Case' or 'Controversy' for purposes of Article III−when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (internal citation and quotation marks omitted). "Mootness demands that there be something about the case that remains alive, present, real, and immediate so that a federal court can provide redress in some palpable way." *Gagliardi v. TJCV Land Tr.*, 889 F.3d 728, 733 (11th Cir. 2018) (citation omitted).

To satisfy the injury-in-fact requirement for constitutional standing, a plaintiff seeking injunctive relief in relation to future conduct "must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future." *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1328 (11th Cir. 2013) (internal quotation marks omitted). This requires that plaintiff establish "a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury." *Id.* at 1334. (internal quotation marks omitted); *City of Los Angeles v. Lyons*, 461 U.S. 95, 97-98 (1983) (past injury insufficient to confer standing for prospective relief). It is axiomatic

that "[i]njunctive relief should be limited in scope to the extent necessary to protect the interests of the parties." *Keener v. Convergys Corp.,* 342 F.3d 1264, 1269 (11th Cir.2003).

As to prospective relief, Plaintiffs would have had difficulty demonstrating standing even as of the parties' original summary judgment motions in 2022.  Paneson is deceased;   Jones moved out of the area and did not have a prolific offender designation after 2016.  McDougall was dropped from prolific offender status on September 21, 2020, and has been in prison.  And Taylor had not been designated a prolific offender since September, 2019 (Joint Statement of Facts, joint fact # 30; defense facts # 42, 67, 80).

They have even less of a basis for such relief now.  Beginning in 2021, the agency deemphasized the prolific offender designation and the prolific offender check process. The number of checks declined dramatically over the course of the year, from 75 in January, to 20 in April, to just 2 in August and September, and 1 in December.  The total number of prolific offender checks reported agency wide in 2021 was 229, and just two were reported in all of 2022.   The agency has now dropped the prolific offender designation process, including randomized checks of such offenders, and the generating of the list ended a year ago, in March, 2022.  This has also led to the elimination of code enforcement or a zero-tolerance arrest policy oriented towards prolific offenders. (Joint Statement of Facts, defense facts # 29, 31, 34).

The agency formalized this change in the RAD directive, adopted on January 31, 2023, and this policy eliminates the prolific offender process and instead has deputies draw their attention to "focused offenders."  Focused offenders are persons

37

who are suspected of contributing to the criminal environment and for whom reasonable suspicion exists to believe is involved in a specific crime.  (Joint Statement of Facts, defense facts # 33).  There is no objective scoring of focused offenders, as there was with the initial list of prolific offenders.  And there are no randomized checks of focused offenders, as with former prolific offenders.  (Joint Statement of Facts, defense facts # 33, 35, 36).

Critically, none of the named Plaintiffs or their children is currently designated as a focused offender.  (Joint Statement of Facts, defense facts # 36).

There were a number of reasons for the change from the prolific offender designation/check approach to a focused offender approach. The designation of prolific offenders was taking too much of the intelligence analysts' time.  Pasco County is also suffering from an "extensive amount of overdoses, primarily from fentanyl." Captain Kraus estimates deputies are responding to 135 overdoses a month, a third of those resulting in deaths.   The January 31, 2023, RAD shifted the focus.   (Joint Statement of Facts, defense facts # 30a.-d).

Plaintiffs have suggested that it is theoretically possible that the PSO could revert back to prolific offender designations and checks under the "voluntary cessation doctrine."  A party defendant cannot "automatically moot a case simply by ending its unlawful conduct once sued. Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Already, LLC*, 568 U.S. at 91 (citation omitted).

However, "when the defendant is not a private citizen but a government actor, there is a rebuttable presumption that the objectionable behavior will *not* recur." *Troiano v. Supervisor of Elections in Palm Beach Cty., Fla.*, 382 F.3d 1276, 1283 (11th Cir. 2004) (citations omitted).  An assertion of mootness by a government actor should be rejected "*only* when there is a substantial likelihood that the offending policy will be reinstated if the suit is terminated." *Id.* Indeed, "the Supreme Court has held almost uniformly that voluntary cessation [by a government defendant] moots the claim." *Beta Upsilon Chi Upsilon Chapter v. Machen*, 586 F.3d 908, 917 (11th Cir. 2009).

The Eleventh Circuit considers three factors when determining whether a government actor's voluntary cessation moots a claim:  whether the termination of the offending conduct was unambiguous; whether the change in government policy or conduct appears to be the result of substantial deliberation, or is simply an attempt to manipulate jurisdiction; and third whether the government has consistently applied a new policy or adhered to a new course of conduct. *Rich v. Sec'y, Fla. Dept. of Corr.*, 716 F.3d 525, 531-32 (11th Cir. 2013) (citations omitted).

Applying those factors here, concerns should not arise as to cessation.  Agency leadership have explained the basis for the change.  Prolific offender checks were no longer even promoted in 2021 and the number of prolific offender checks fell dramatically in 2021.  Just two were reported in 2022.  The intelligence section stopped generating prolific offender lists a year ago.  And, the agency has memorialized the new process as to focused offenders in the January 2023 RAD.

## CONCLUSION

A *Monell* claim has two basic components:  underlying constitutional violations and an official policy or custom that was the moving force in causing them.  They are distinct concepts, but Plaintiffs blur the distinction.  They argue that the sheer number of prolific offender checks must mean that they are *all* underlying constitutional violations.  Failing that, they identify a small number of the whole as including or generating constitutional violations on discrete occasions.  They impermissibly generalize from that small universe that all checks are unconstitutional.

But the Defendant's written policies did not direct a number beyond one a quarter or how they were to be performed.  The simple custom of performing checks is not itself unconstitutional.  The circumstances of individual checks, which are well documented for the Court, simply do not demonstrate any sort of distinct pattern of constitutional violations predating any sued upon here sufficient to give rise to *Monell* liability, nor did policy or custom direct how they were done.

None of the named Plaintiffs or their family members is designated as a focused offender under the new PSO approach to ILP and there is no evidence they ever will be.  Plaintiffs' speculation that the agency could, one day, return to a prolific offender approach, when even Plaintiffs have not been prolific offenders for three years or more, does not confer standing to challenge the current process embodied in the January 31, 2023, RAD Directive.  The Court should grant summary judgment to the Sheriff on all claims.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of March, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:   **Ari S. Bargil, Esquire** (*abargil@ij.org*), Institute For Justice, 2 S. Biscayne Boulevard, Suite 3180, Miami, Florida 33131; **Joshua A. House, Esquire** (*jhouse@ij.org*) and **Caroline Grace Brothers, Esquire** (*cgbrothers@ij.org*), Institute For Justice, 901 N. Glebe Road, Suite 900, Arlington, Virginia 22203; and **Robert E. Johnson, Esquire** (*rjohnson@ij.org*), Institute For Justice, 16781 Chagrin Boulevard, Suite 256, Shaker Heights, Ohio 44120.

*s/ Robert D. Holborn, II*
THOMAS W. POULTON, ESQ.
Florida Bar No.:  0083798
*poulton@debevoisepoulton.com*
JEFFREY K. GRANT, ESQ.
Florida Bar No.:  0091197
*grant@debevoisepoulton.com*
ERIN M. TUECHE, ESQ.
Florida Bar No.:  0045104
*tueche@debevoisepoulton.com*
ROBERT D. HOLBORN, II, ESQ.
Florida Bar No.:  0044186
*holborn@debevoisepoulton.com*
DeBEVOISE & POULTON, P.A.
Lakeview Office Park, Suite 1010
1035 S. Semoran Boulevard
Winter Park, Florida  32792
Telephone:  407-673-5000
Facsimile:   321-203-4304
Attorneys for Defendant Sheriff Nocco
