# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES III,

     *Plaintiffs*,

v.

CHRIS NOCCO, in his official
capacity as Pasco County Sheriff,

     *Defendant*.

Case No. 8:21-cv-00555-SDM-CPT

## JOINT STATEMENT OF FACTS

Pursuant to this Court's Order of December 28, 2022, the parties hereby submit this statement of facts for the Court's consideration in connection with the parties' motions for summary judgment.

## INTRODUCTION

This statement is divided into two sections. In Part I, the parties present the facts that the parties agree are undisputed. In Part II, the parties separately provide additional facts and factual context—the materiality, relevance, or accuracy of which may be in dispute—each deems necessary for the Court's consideration of the issues.

## THE PARTIES' STATEMENTS

## I.   JOINT FACTS

### A.   THE WRITTEN POLICIES AND DIRECTIVES OF THE PSO.

1.   The ILP written policies are reflected in the Intelligence Led Policing Manual ("ILP Manual") (Ex. 1), the ILP Directive (Ex. 32), the Strategic Targeted Area Response Team Manual ("STAR Manual") (Ex. 2), and the Research and Analysis Division Directive ("RAD Directive") (Ex. 73). The relevant versions of the ILP Manual were adopted in 2013 (Ex. 35), 2016 (Ex. 34), 2018 (Ex. 1), and 2021 (Ex. 82).[1]

2.   The 2018 version of the ILP Manual was in effect at the time this lawsuit was filed on March 10, 2021. It described the Sheriff's policing philosophy relative to use of intelligence gathering and assessment ("PSO"). Ex. 1.[2]

3.   PSO employees were required to read and apply the ILP Manual. *See, e.g.*, Ex. 22 at 27:8–13 (agreeing that "everything that's in the ILP manual is something you were expected to understand and apply"); *see also* Ex. 20 at 15:14–17, 25:15–24; Ex. 19 at 12:6–14, 84:3–4, 86:16–18.

---

[1] Citations to "Ex." refer to exhibits to the Declaration of Ari Bargil in Support of Plaintiffs' Renewed Motion for Summary Judgment, which is filed contemporaneously with Plaintiff's Motion.

[2] PSO's policies are now reflected in two primary documents: The ILP Manual and the RAD Directive. The RAD Directive was adopted on January 31, 2023, and supersedes the 2021 ILP Directive.

4.      The 2018 ILP Manual required that deputies perform a check at least once a quarter for a person designated a "prolific offender." Ex. 1 at 19.

5.      Juveniles could be listed as prolific offenders. Ex. 1 at 17 ("[A] Prolific Offender is a person of any age . . . ."); *see also* Ex. 34 at 7; Ex. 32 at 6.

6.      Performance reviews for PSO employees included an expectation that employees read the ILP Manual and assess the employee's application of the ILP philosophy. *See, e.g.*, Ex. 29 at 3, 7, 9, 16, 18, 29, 32–33, 35–36, 50, 59, 68, 75.

7.      An earlier version of the Manual was adopted in 2016 and was in place at the time of some of the interactions between Plaintiffs and PSO deputies. The 2016 Manual also called for the identification of prolific offenders, and any differences between the 2016 and 2018 versions of the Manual are not thought by the parties to be germane to this litigation. *See* Ex. 17 at 13:21–14:6.

8.      The 2018 Manual remained in place until July 2021, when PSO split up the 2018 Manual into two documents—a 2021 ILP Manual and a new "ILP Directive." Ex. 18 at 18:25–19:6, 21:1–15. The 2021 ILP Manual came into effect on July 1, 2021; the ILP Directive came into effect on July 13, 2021.

9.      Following that 2021 split, the policies that Plaintiffs maintain are the subject of this litigation were relocated to the new 2021 ILP Directive. *See* Ex. 18 at 19:20–20:1, 22:11–23; *see also, e.g.*, Ex. 32 at 6–7 (the 2021 ILP Directive required identification of prolific offenders who would be subject to enhanced scrutiny, which

3

included prolific offender checks); 9 (2021 ILP Directive requiring quarterly prolific offender checks, directing information gathering concerning prolific offenders, and adopting a zero-tolerance arrest policy for prolific offenders).

10.    PSO's 30(b)(6) witness agreed that the 2021 ILP Manual was approved according to the regular procedures of the Pasco County Sheriff's Office. Ex. 18 at 13:11–24; *see also* Ex. 20 at 71:25–72:2.

11.    Defendant Sheriff Nocco oversees the ILP program and is the final policymaker for the PSO. *See* Ex. 57 at 8; ECF No. 89 at 8; *see also* Ex. 5 at 0:34, Ex. 7 at 46:02.

12.    Defendant Sheriff Nocco personally signed the forward to the 2016, 2018, and 2021 ILP Manuals. Ex. 1 at 1; Ex. 34 at 5; Ex. 82 at 2–3.

13.    When it was in effect, the ILP Manual adopted a "zero-tolerance arrest policy for crimes committed by prolific offenders" as well as "for members of the district Top 5 and their associates." Ex. 1 at 19, 26; *see also* Ex. 32 at 9, 16 (2021 ILP Directive adopting a zero-tolerance arrest policy for prolific offenders, Zone Focused Offenders, and "Zone Focused Associates").[3]

---

[3] "Zone focused offenders," according to the 2021 ILP Directive, were a subset of prolific offenders. *See* Ex. 32 at 16. The "zone focused offender" designation used in the 2021 ILP Directive is therefore distinct from the "focused offender" designation used in the 2023 RAD Directive because PSO no longer uses the "prolific offender" designation.

14.   The ILP Manual stated that deputies should "communicate" that prolific offenders must either "stop committing crimes" or else face "relentless pursuit, arrest, and prosecution." Ex. 1 at 17.

15.   PSO also has a separate "STAR Manual" for members of the STAR Team. Ex. 2.

16.   Members of the STAR Team are instructed that "[t]his document [the STAR Manual], coupled with the ILP Manual, should be read, reread and read again." Ex. 2 at 9.

17.   The STAR Team is a specialized unit which, during a period of time relevant to this lawsuit, had a mission to "target prolific offenders" and to "develop missions to target the 'Top 5.'" Ex. 2 at 2. The "Top 5" designation is no longer in use. Ex. 17 at 64:21–65:4. The task of conducting checks on prolific offenders was reassigned several times before the designation itself was ultimately eliminated. *See* Ex. 76 (February 2021 Nocco memo transferring primary responsibility to STAR); Ex. 77 (April 2021 Nocco memo transferring primary responsibility to the Behavioral Health Intervention Team).

18.   The record contains a copy of the STAR Manual dated July 2015, as well as a substantially identical version of the STAR Manual that was appended to the 2016 ILP Manual. *See* Ex. 2; Ex. 34 at 50.

19.    The responsibility of conducting prolific offender checks was transferred to the STAR Team on or about February 17, 2021. Ex. 76. It was then proposed that it would be transferred to the Behavioral Health and Intervention Team ("BHIT") on or about April 19, 2021. Ex. 77; *see also* Ex. 75 at 62:16–24 (Sanborn 2023 30(b)(6) Dep.). That transition, however, was never implemented. *Id.* at 20:16–21:3. And during this time, deputies outside of these teams still had the ability to conduct prolific offender checks; however, it was not an expectation. *See* Ex. 75 at 8:3–9:5. PSO deemphasized performance of such checks and they began to decline around this time.

20.    On October 7, 2021, Major Sanborn directed his subordinate supervisors to stop recommending that deputies conduct prolific offender checks as part of their duties to "work more proactively." Major Sanborn instructed that "the most recent guidance" instructs that "prolific offender contacts incidental to patrol responsibilities should be documented as they always have been, but there is no expectation or desire to have patrol units proactively monitoring prolific offenders." Ex. 78.

21.    According to PSO records, prolific offender checks began to decline in 2021. *See* Ex. 81.

22.    According to PSO records, there were a total of two prolific offender checks in 2022. *See* Ex. 80.

23.     Among other changes in policy, "in approximately March of [2022]," the PSO ended "use[] [of] the prolific offender designation," ended its "requirement for a quarterly check of prolific offenders," suspended its "'zero tolerance' policy of arrests toward prolific offenders" and suspended its policy of "zero tolerance for County Code Violations." Kraus Supplemental Affidavit ¶ 4 (ECF No. 204-1).[4]

24.     These changes are reflected in the Research and Analysis Division ("RAD") Directive, which was adopted by PSO on January 31, 2023. *See* Ex. 73.

25.     While the PSO no longer uses the "prolific offender" designation, it now identifies "focused offenders." *See, e.g., id.* at 9–10.

## B.     PSO's LISTS AND RELATED CHECKS AS TO EACH PLAINTIFF[5]

26.     PSO keeps a database that logs when people were flagged as prolific offenders, which it began to maintain beginning in January 2017. *See* Ex. 39; *see also* Ex. 17 at 69:4–11 (changes in PSO information technology occurred in 2016).

---

[4] The parties disagree on how to characterize the changes and for purposes of this section have settled on "ended" to describe certain changes in policies and practices.

[5] The prolific offender checks identified in this section are based upon CAD data that were generated any time a PSO deputy selected "Prolific Offender Check" from a dropdown screen when identifying the nature of a given visit. The parties agree, however, that not all prolific offender checks were properly coded as such, and the parties further agree that there were visits to Plaintiffs' respective properties that were not prolific offender checks. To the extent the parties believe that such visits are relevant, they address them in their respective sections below.

i.   *Plaintiff Dalanea Taylor:*

27.    Dalanea Taylor has been a resident of Pasco County since she was born in 1999. Taylor Decl. ¶ 2.[6]

28.    Dalanea was identified as a prolific offender at least as early as April 2017. *See* Exs. 39, 65; *see also* Ex. 26 at 103:18–21.

29.    Dalanea was also listed as a Top 5 Offender in April 2017. *See* Ex. 16 at 55.

30.    PSO records show that deputies performed at least 19 prolific offender checks on Dalanea between April 2017 and September 2019. *See* Ex. 8. The records reflect "prolific offender check" selections made from a drop-down menu in the "nature" field of PSO's CAD Reports. These records show that deputies coded visits to Dalanea' residence as prolific offender checks at the following dates and times:

(a) April 5, 2017, at 6:04 p.m. by a STAR deputy. Ex. 8 at 1.

(b) April 5, 2017, at 6:37 p.m. by a STAR deputy. Ex. 8 at 3.

(c) April 11, 2017, at 2:56 p.m. by a STAR deputy. Ex. 8 at 5.

(d) April 25, 2017, at 8:25 p.m. by a STAR Deputy. Ex. 8 at 9.

(e) May 14, 2017, at 3:57 p.m. Ex. 8 at 11.

(f) June 16, 2017, at 11:27 a.m. Ex. 8 at 13.

---

[6] All citations to Plaintiffs' declarations refer to their respective declarations in support of Plaintiffs' Renewed Motion for Summary Judgment.

(g) June 26, 2017, at 9:00 a.m. Ex. 8 at 15.

(h) August 30, 2017, at 10:15 p.m. Ex. 8 at 17.

(i) September 29, 2017, at 8:13 a.m. Ex. 8 at 19; Ex. 15 at 1–5.

(j) October 15, 2017, at 10:09 a.m. Ex. 8 at 23.

(k) November 1, 2017, at 7:24 p.m. Ex. 8 at 25.

(l) November 2, 2017, at 5:53 p.m. Ex. 8 at 27.

(m)   November 20, 2017, at 12:05 a.m. Ex. 8 at 29.

(n) November 24, 2017, at 9:14 a.m. Ex. 8 at 31.

(o) January 1, 2018, at 7:32 a.m. Ex. 8 at 33.

(p) February 25, 2018, at 10:58 a.m. Ex. 8 at 35.

(q) March 31, 2018, at 8:04 a.m. Ex. 8 at 37.

(r) July 14, 2018, at 12:08 p.m. Ex. 8 at 39.

(s) September 25, 2019, at 8:07 a.m. Ex. 8 at 41.

Deputies also conducted a visit to Dalanea's residence on September 25, 2019, at 12:46 p.m. Ex. 8 at 43. It was coded as an "SO Investigation," but the Notes section includes a "Prolific Check Dalanea Taylor" notation. *Id.*

     ii.   *Plaintiff Tammy Heilman:*

    31.   Tammy Heilman has been a resident of Pasco County since 2005. Heilman Decl. ¶ 2.

32.     Tammy has two sons, Donnie McDougall and Anthony McDougall. Donnie was born in 2000 and Anthony was born in 2002. Heilman Decl. ¶¶ 2–4.

33.     Donnie was first identified as a prolific offender as early as September 2016, when he was 16 years old. *See* Ex. 46 at 2 (email from September 18, 2016, referring to Tammy as "Prolific Offender Donnie McDougall's mother").

34.     Donnie was listed in PSO's database as a prolific offender at least as early as January 2017. *See* Ex. 39; *see also* Ex. 26 at 104:6–7. He was last designated a "prolific offender" by PSO as of September 2020. Ex. 39.

35.     Donnie was listed as a Top 5 Offender in 2018, at age 18. *See* Ex. 16 at 63.

36.     Anthony McDougall was identified as a "target of the month" for a brief period, but PSO does not have a record of him ever being listed in its database as a prolific offender.

37.     Anthony received at least one visit from PSO that was demarcated as a prolific offender check in PSO records. *See* Ex. 9 at 111; *see also* Ex. 5 at 40:45.

38.     PSO records show that deputies performed at least 22 prolific offender checks at Tammy's home between 2017 and 2020. *See* Ex. 9. The records reflect "prolific offender check" selections made from a drop-down menu in the "nature" field of PSO's CAD Reports. These records show that deputies coded visits to Tammy's residence as prolific offender checks at the following dates and times:

(a) May 14, 2017, at 7:50 a.m. Ex. 9 at 35.

(b) May 23, 2017, at 7:41 a.m. Ex. 9 at 39.

(c) May 30, 2017, at 5:58 p.m. Ex. 9 at 41.

(d) May 31, 2017, at 10:21 p.m. by a STAR deputy. Ex. 9 at 43.

(e) June 15, 2017, at 7:52 a.m. Ex. 9 at 45.

(f) July 22, 2017, at 10:12 a.m. Ex. 9 at 47.

(g) October 11, 2017, at 9:26 a.m. Ex. 9 at 51.

(h) October 18, 2017, at 7:40 a.m. Ex. 9 at 53.

(i) November 7, 2017, at 4:54 a.m. Ex. 9 at 55.

(j) December 2, 2017, at 8:02 a.m. Ex. 9 at 57.

(k) December 28, 2017, at 9:21 p.m. Ex. 9 at 59.

(l) December 29, 2017, at 6:53 p.m. by STAR deputies. Ex. 9 at 61, 63.

(m)    January 22, 2018, at 2:45 p.m. Ex. 9 at 70.

(n) January 27, 2018, at 8:05 a.m. Ex. 9 at 72; *see also* Ex. 3 at 13.

(o) March 14, 2018, at 7:57 a.m. Ex. 9 at 79.

(p) April 11, 2018, at 8:39 a.m. Ex. 9 at 83.

(q) May 23, 2018, at 3:23 p.m. Ex. 9 at 85.

(r) July 25, 2018, at 9:48 p.m. Ex. 9 at 87.

(s) August 16, 2018, at 7:02 p.m. Ex. 9 at 89.

(t) September 29, 2018, at 3:05 p.m. Ex. 9 at 97.

(u) December 16, 2018, at 9:45 a.m. Ex. 9 at 99.

(v) August 9, 2020, at 3:35 p.m. Ex. 9 at 111; *see also* Ex. 5 at 40:45.

  iii.   *Plaintiff Darlene Deegan:*

39.   Darlene Deegan has lived in Pasco County since 1981. Deegan Decl. ¶ 2.

40.   Darlene's son, Tyler Paneson, was born in 1984. Deegan Decl. ¶ 3.

41.   Tyler Paneson was listed in PSO's database as a "prolific offender" at least as early as January 2017 and was last designated as a "prolific offender" by PSO as of October 2021. *See* Ex. 39.

42.   Tyler was listed as a Top 5 Offender in June 2018. *See* Ex. 16 at 68.

43.   PSO records show that deputies performed at least 8 prolific offender checks at Darlene's home over the course of four months in 2018. *See* Ex. 10. The records reflect "prolific offender check" selections made from a drop-down menu in the "nature" field of PSO's CAD Reports. These records show that deputies coded visits to Darlene's residence as prolific offender checks at the following dates and times:

(a) June 6, 2018, at 7:49 a.m. Ex. 10 at 5.

(b) June 11, 2018, at 6:09 a.m. Ex. 10 at 25.

(c) June 12, 2018, at 9:57 p.m. Ex. 10 at 27.

(d) June 21, 2018, at 8:18 a.m. Ex. 10 at 29.

(e) June 23, 2018, at 2:59 a.m. Ex. 10 at 31; *see also* Ex. 3 at 27.

(f) July 2, 2018, at 10:30 p.m. Ex. 10 at 33; *see also* Ex. 3 at 27.

(g) August 8, 2018, at 3:33 a.m. Ex. 10 at 35.

(h) September 8, 2018, at 10:37 p.m. Ex. 10 at 37.

iv.   *Plaintiff Robert A. Jones III:*

44.    Robert A. Jones III lived in Pasco County from April 2015 to April 2016, and from December 2020 to the present. Jones Decl. ¶ 2.

45.    One of Robert's sons is named Robert A. Jones IV. He was born in 1999 and usually goes by "Bobby." Jones Decl. ¶ 3.

46.    Robert Jones's son, Bobby, was first identified as a prolific offender as early as September 2015, when he was 16 years old. *See* Ex. 11 at 19 (documenting "prolific offender check" on Bobby Jones in September 2015).

47.    Bobby was listed as a Top 5 Offender in February 2016, at age 16. *See* Ex. 16 at 6.

48.    Bobby was last designated as a "prolific offender" by PSO as of March 2017. Ex. 39.

49.    PSO records show that deputies performed at least thirty prolific offender checks on Bobby at Robert's home between September 2015 and April 2016. *See* Ex. 11. The records reflect "prolific offender check" selections made from a drop-down menu in the "nature" field of PSO's CAD Reports. These records show

that deputies coded visits to Robert's residence as prolific offender checks at the

following dates and times:

(a) September 26, 2015, at 12:35 a.m. Ex. 11 at 19.

(b) October 9, 2015, at 6:47 p.m. Ex. 11 at 25.

(c) October 12, 2015, at 8:59 p.m. Ex. 11 at 27.

(d) October 20, 2015, at 8:30 p.m. Ex. 11 at 32.

(e) November 13, 2015, at 10:57 p.m., by a STAR corporal. Ex. 11 at 36.

(f) November 14, 2015, at 1:42 a.m., by a STAR corporal. Ex. 11 at 38.

(g) December 11, 2015, at 7:05 p.m., by a STAR corporal. Ex. 11 at 40.

(h) December 21, 2015, at 9:07 p.m., by members of the STAR unit. Ex. 11 at 42, 44.

(i) December 22, 2015, at 7:33 p.m., by a STAR corporal. Ex. 11 at 46.

(j) December 23, 2015, at 3:14 p.m., by a STAR corporal. Ex. 11 at 48.

(k) December 26, 2015, at 12:14 p.m., by a STAR corporal. Ex. 11 at 52.

(l) December 26, 2015, at 8:29 p.m., by members of the STAR unit. Ex. 11 at 54, 57, 58.

(m)   December 29, 2015, at 9:46 p.m., by a STAR corporal. Ex. 11 at 61.

(n) December 30, 2015, at 5:32 p.m., by a member of the STAR unit. Ex. 11 at 63.

(o) December 31, 2015, at 11:34 a.m., by a STAR corporal. Ex. 11 at 65.

14

(p) December 31, 2015, at 4:07 p.m., by a STAR corporal. Ex. 11 at 67.

(q) December 31, 2015, at 7:41 p.m., by a STAR corporal. Ex. 11 at 69.

(r) January 3, 2016, at 9:29 p.m. Ex. 11 at 71.

(s) January 4, 2016, at 4:02 p.m., by a STAR corporal. Ex. 11 at 73.

(t) February 10, 2016, at 7:40 p.m. Ex. 11 at 77.

(u) February 14, 2016, at 6:39 a.m. Ex. 11 at 79.

(v) February 17, 2016, at 1:44 p.m., by a member of the STAR unit. Ex. 11 at 81.

(w)    February 24, 2016, at 2:11 p.m. by a STAR corporal. Ex. 11 at 83.

(x) March 1, 2016, at 1:45 a.m. Ex. 11 at 87.

(y) March 4, 2016, at 3:02 p.m., by a STAR corporal. Ex. 11 at 89.

(z) March 8, 2016, at 5:42 p.m., by a member of the STAR unit. Ex. 11 at 95.

(aa)    March 8, 2016, at 6:24 p.m., by a STAR corporal. Ex. 11 at 97.

(bb)    March 8, 2016, at 11:03 p.m. Ex. 11 at 99.

(cc)    March 15, 2016, at 5:53 p.m., by a STAR corporal. Ex. 11 at 101.

(dd)    March 22, 2016, at 3:26 p.m. Ex. 11 at 107.

(ee)    May 3, 2016, at 1:25 a.m. Ex. 11 at 127.

50.    Deputies also conducted a "prolific associate check" at Robert's home on September 16, 2015, at 11:54 p.m. Ex. 11 at 13.

## II.   THE PARTIES' ADDTIONAL FACTS

### A.   PLAINTIFFS' ADDITIONAL FACTS

i.   *Plaintiffs' Additional Facts Regarding the Intelligence-Led Policing Manual, STAR Manual, and the RAD Directive*

51.   PSO's Intelligence-Led Policing Manual ("ILP Manual") served as "a practitioner's guide detailing the processes adopted by the [PSO] in order to operationalize ILP's core principles." Ex. 36; *see also* Ex. 20 at 71:14–18; *see also* Ex. 44 at 2 ("[A]ny member desiring promotion is rated during an interview with the sheriff on their knowledge and demonstrated support of ILP.").

52.   The ILP Manual reflected PSO's "'top down' management approach to determining priorities," which it distinguished from other styles of policing, like community-based policing, which was "decentralize[d] and delegate[d] more decision-making authority to line-level officers." Ex. 1 at 5, 8. In practice, this "top down management approach" employed a system by which "[a]nalysts *influence* decision-makers through actionable intelligence products, who in turn use the intelligence to create crime control strategies to have an *impact* on crime." *Id.* at 9 (emphasis in original).

53.   According to the ILP Manual, by limiting officer discretion, ILP "place[d] the prioritization of crime problems in the hands of law enforcement commanders who have a better understanding of the criminal environment." Ex. 1 at 9. By using this "top down management approach," ILP aimed "to re-image [sic]

16

law enforcement officers from a role as first responders to one as first preventers, requiring them to . . . develop strategies that are both targeted and future-oriented." *Id.* Initially, whether someone was then-currently impacting the criminal environment was not taken into consideration. Ex. 18 at 33:22–34:17 (Kraus 2022 30(b)(6) Dep.).

54. The 2015/2016 version of the STAR Manual remained in force until around the time this litigation was filed, but then, after Plaintiffs sued, PSO adopted a revised version of the STAR Manual. *See* Ex. 33.

55. There was no formal communication of the change in policy prior to the release of the 2023 RAD Directive; prolific-offender checks only ceased as a natural consequence of Captain Kraus's decision to have his team stop creating the prolific offender lists. Ex. 74 at 75:21–80:5 (Kraus 2023 30(b)(6) Dep.); Ex. 75 at 29:2–4 (Sanborn 2023 30(b)(6) Dep.) ("I mean, I don't—I don't recall anybody saying that prolific offender checks will not be done."). Similarly, Captain Kraus does not remember communicating to Patrol that the checks—in the absence of a prolific offender list—would become practically impossible. Ex. 74 at 79:21–80:5.

56. Ultimately, the change in policy was accomplished by Captain Kraus' decision to "unilaterally stop[] generating a list that the deputies relied on in order to conduct the checks that they were required . . . to do by a written policy document." Ex. 74 at 76:17–24; *see also id.* at 77:9–16.

57.     Nobody asked Captain Kraus why the prolific offender designations went away. *Id*. at 80:6–9. According to Major Sanborn, that is because most deputies lacked either the time or desire to prioritize prolific offender checks, and so nobody inquired about the cessation of the checks once the means to conduct them disappeared. Ex. 75 at 23:11–25:3 ("[A]t some point you've got a lot going on, and it's not your responsibility, and you're like, all right . . . So to the best of my knowledge, nobody proactively sought a conversation with anybody about, hey, where's—where's our list because there's plenty of other things to do."); *see also id.* at 24:8–25:3; 27:11–12 ("At some point we just didn't do it anymore."); 31:23–32:12.

### ii.     *Plaintiffs' Additional Facts Regarding Enhanced Scrutiny and Prolific Offender Checks*

58.     An internal PSO policy document explained that "Intelligence Led Policing" or "ILP" involves a "paradigm shift" away from traditional "reactionary" policing under which "we will now be hunting criminals." Ex. 31 at 1. "Every member and area of our agency is a part of this." *Id.*

59.     The ILP Manual, at the time this lawsuit was filed, explained that PSO's ILP philosophy "calls for a strategic focus on problem people." Ex. 1 at 16; *see also* Ex. 32 at 6 (ILP Directive stating that "ILP calls for a strategic focus on repeat offenders"); Ex. 37 at 15 (training slides identifying "Problem People" as a "Focus of ILP").

60.    The ILP Manual, at the time this lawsuit was filed, further explained that in order to "focus law enforcement on problem people, problem places, and problem groups," the ILP system depends on "analyzing information gathered from a multitude of sources at every level of the agency." Ex. 1 at 8.

61.    PSO thus focused on certain individuals based on its belief that they were currently impacting the criminal environment in a manner that made them likely to commit future crimes. *See* Ex. 18 at 48:20–49:4 (testimony of 30(b)(6) witness that PSO believes listed individuals will "ultimately reoffend within a certain amount of time"); *see also* Ex. 27 at 68:12–24 (testimony of PSO official that the purpose of identifying focused offenders is to "prevent crime from happening," or to "skate[] to where the puck is going to be"); Ex. 32 at 6 (ILP Directive stating, in section on "Focused (Repeat) Offenders" that the "goal is to discourage further criminal behavior"); *id.* at 7 ("Members are encouraged to . . . help us as an agency deter future crimes."); Ex. 18 at 45:9–11 ("Is there a higher likelihood that we believe [a person labeled a "prolific offender"] would commit a crime in the future? Yes."); Ex. 1 at 75 ("A prolific offender is someone who is not likely to reform . . . .").

62.    Pursuant to both the ILP Manual in effect at the time this lawsuit was filed and the 2021 ILP Directive, PSO's intelligence analysts generated a list of "prolific offenders" once per quarter. Ex. 18 at 37:22–38:3; *see also* Ex. 34 at 7–8

(2016 Manual); Ex. 1 at 75 (2018 Manual); Ex. 32 at 6–7 (2021 ILP Directive). A computer algorithm generated a ranked list of names, and analysts then select individuals from the list to designate as prolific offenders. Ex. 1 at 75.

63.    PSO's prolific-offender algorithm assigned points for various "criteria," including arrests, suspected past crimes, and added "enhancements" based on a person's "[i]nvolvement" in an offense—including being listed in an offense report as a witness, a victim, or a reporting party. *See* Ex. 1 at 75; Ex. 38 at 1–2; Ex. 26 at 16:3–21.

64.    An individual did not need to be the subject of an ongoing investigation to be listed as a prolific offender. Ex. 20 at 19:16–22:20; *see also* Ex. 34 at 7–8 (2016 Manual); Ex. 1 at 75 (2018 Manual); Ex. 32 at 6–7 (2021 ILP Directive). The 2016 Manual also allowed for individuals to be designated as prolific offenders even if they were not flagged by the algorithm. *See* Ex. 34 at 9, 50, 52; *see also* Ex. 20 at 67:10–18.

65.    There was no age minimum to be listed as a prolific offender. To the contrary, PSO sought to identify and engage "at-risk youth who are destined to a life of crime." Ex. 1 at 13, 18.

66.    Placement on the prolific offender list had consequences akin to being on probation. Ex. 18 at 76:4–78:6 (acknowledging that being placed on a list has

consequences); *see also* Ex. 48 (email from PSO's 30(b)(6) representative treating "focused offenders" status as an "alternative option to going to jail").

67.     The 2016 and 2018 Manuals also required identification of an additional list of "Top 5" offenders. Ex. 1 at 26; Ex. 34 at 40. The PSO stopped using the "Top 5" designation in 2019. Ex. 17 at 64:21–65:7; *see also* Ex. 27 at 70:16–22.

68.     Identification of Top 5 offenders was based on a subjective assessment by PSO analysts and deputies. See Ex. 20 at 19:9–15. When choosing who to list as a Top 5 offender, analysts were directed to ask, "[I]f this person is removed from the area, will it result in a significant impact by decreasing crime in the area?" Ex. 34 at 40. As with the prolific offender list, an individual did not need to be the subject of an ongoing investigation to be listed as a Top 5 Offender. *See* Ex. 20 at 19:16–22:20.

69.     Around the same time that PSO stopped identifying Top 5 offenders in 2019, it began identifying a new category of "Zone Focused Offenders." Ex. 17 at 64:21–65:7; Ex. 18 at 184:11–185:7; Ex. 32 at 16 (2021 ILP Directive discussing "Zone Focused Offenders").

70.     As with Top 5 Offenders, Zone Focused Offenders were identified based on a subjective assessment by PSO that they were "Impact[ing] our Current Crime Environment." Ex. 32 at 16.

71.     The change from "Top 5" offender to "Zone Focused" offenders reflected a decision that deputies should not have to "focus globally" on all offenders

within Pasco County and should instead "focus solely into their zone" within the county. Ex. 18 at 183:23–184:10.

72.     An individual did not need to be the subject of a criminal investigation to be listed as a Top 5 or Zone Focused offender. Ex. 20 at 19:16–22:20; *see also* Ex. 34 at 40; Ex. 1 at 26; Ex. 32 at 16–17.

73.     For the period during which the PSO identified Top 5 offenders, juveniles could be listed as Top 5. *See* Ex. 16 at 6 (Bobby listed as Top 5 at age 16), 55 (Dalanea listed as Top 5 at age 17). Similarly, the 2021 ILP Directive likewise did not set any minimum age limit for a person to be listed as a Zone Focused Offender. *See* Ex. 32 at 16 (listing criteria to qualify as a Zone Focused Offender).

iii.     *Plaintiffs' Additional Facts Regarding PSO's Creation of Lists Involving Plaintiffs*

74.     PSO had no process for notifying individuals (or their parents, if the individuals are juveniles) when they were designated as a Prolific Offender or a Top 5/Zone Focused offender. *See* Ex. 18 at 68:14–17, 70:11–15.

75.     PSO had no procedure to allow individuals (or their parents) to contest their designation as a Prolific Offender or a Top 5/Zone Focused Offender. *See* Ex. 18 at 68:18–69:21, 70:16–19.

76.     In response to a request for admission, Defendant contended that listed individuals could file a complaint, Ex. 57 at 5, but that policy does not provide a procedure to challenge designation as a prolific offender. *See* Ex. 18 at 72:5–14

(PSO's 30(b)(6) representative agreeing that PSO's "general policy for making complaints . . . doesn't have anything in it specifically about challenging your designation as a prolific offender"). As noted in Paragraph 312, there was one instance in which a Top 5 offender was advised of his designation, and that checks would occur as a result; but that information was provided informally and without additional information about how to contest the Top 5 classification (because, again, there was no process in place to do so).

77.     Plaintiff Tammy Heilman's daughter filed a complaint about PSO's harassment after her mother's September 2018 arrest. Ex. 56. The complaint did not expressly seek a hearing. However, no such hearings were available to complainants. Ex. 57 at 5 (Def.'s RFA Responses) ("No formal hearing is required[.]").

78.     In September 2018, Plaintiff Darlene Deegan filed a complaint about PSO's harassment with the Florida Department of Law Enforcement, but that complaint did not result in any kind of hearing. Ex. 55.

iv.     *Plaintiffs' Additional Facts Regarding Prolific Offender Checks and Enhanced Enforcement, Generally*

79.     The ILP Manual required PSO deputies to conduct "prolific offender checks" on listed individuals. Ex. 1 at 17, 19. The ILP Manual stated that "[o]ne way we look to have an impact on the actions of prolific offenders is through periodic *prolific offender checks*." *Id.* at 17. The Manual required PSO deputies to "[c]onduct

a face-to-face prolific offender check *at least* once quarterly with each active prolific offender." *Id.* at 19 (emphasis added).

80.    The ILP Directive adopted in 2021 continued to require prolific offender checks. *See* Ex. 32 at 9.

81.    Among other things, the STAR Team had a mandate to "target prolific offenders" and to "develop missions to target the 'Top 5.'" Ex. 2 at 2. STAR team members were also directed to "learn as much as possible about prolific offenders," as well as "TOP 5," and to "identify potential prolific offenders that our members need to target." *Id.* at 3; *see also* Ex. 30. As discussed further in Section II.A.vi., the prolific offender checks and the Top 5 designation have been suspended. However, the STAR Team still exists.

82.    PSO held weekly meetings, called Actionable Intelligence Meetings ("AIM meetings"), to coordinate its enforcement efforts against listed individuals and their associates. *See* Ex. 1 at 33–34; Ex. 2 at 4–5. Although the titles of the various designations have changed, AIM meetings still take place. Ex. 74 at 129:24–130:1 (explaining that focused offenders will still be discussed at AIM meetings).

83.    These meetings are open to all members of the agency, and they were regularly attended by analysts, STAR team members, deputies, school resource officers, and code enforcement officials, among others. Ex. 18 at 62:10, 63:5–24;

*see also* Ex. 51 (email instructing Child Protective Investigators and School Resource Officers to monitor and provide information on listed individuals).

84.   The presentation slides for the weekly AIM meetings include photo line-ups of listed individuals and their associates, which included photographs of Tammy (identified as Donnie's mother) and Robert (identified as Bobby's father). *See* Ex. 16 at 25, 30, 64; *see also id.* at 56–57 (listing Dalanea's mother, sister, and aunt as associates).

85.   In practice, PSO's "Performance Expectation" for its deputies to enforce the zero-tolerance arrest policy for prolific offenders, Top 5 offenders, and the associates of Top 5 offenders, *see* Ex. 1 at 20, 27, meant that if "probable cause exists you go to jail," *see* Ex. 22 at 30:2–3. In other words, if a deputy believed there was probable cause that a crime had been committed, pursuant to the zero-tolerance policy, that deputy did not have discretion to decide whether to arrest. Instead the deputy was "required by policy to make an arrest." Ex. 22 at 30:15–23.

86.   PSO deputies—typically STAR team members—arrested listed individuals and their family members on numerous instances. *See* Heilman Decl. ¶¶ 13, 17, 19; Jones Decl. ¶¶ 7, 16, 18, 21.

87.   As one example, in an email, the head of the STAR unit stated that they had two Top 5 offenders "feeding us reliable info" and explained that they "are

actively seeking info we need on recent burglaries and sending it to us due to actions taken against their families in the last few shifts." Ex. 46 at 2.

88.   In that same email, the head of the STAR unit described actions taken against a Top 5 offender's father, including arresting the father for child neglect, and stated that they were able to leverage the father's arrest by "us[ing] the situation to gain intel." Ex. 46 at 2.

89.   In that same email, the head of the STAR unit also described how the STAR unit had arrested "Tammy Heilman (Prolific Offender Donnie McDougall's mother)." Ex. 46 at 2.

90.   The record also shows that PSO deputies used referrals to the Child Protective Investigation Division ("CPI") to further harass family members of listed individuals:

      (a) After deputies looked in Robert's windows and arrested him because they claimed to see a minor inside smoking, deputies contacted the Florida Abuse hotline. *See* Ex. 14 at 62.

      (b) Similarly, after a deputy looked through Tammy's fence during a prolific offender check and claimed to see people breaking apart marijuana, deputies referred the incident to CPI. *See* Ex. 12 at 56.

(c) In Tammy's case, the deputy acknowledged that CPI was unlikely to take action based on the report, but stated that he was "doing it as a big fuck you." Ex. 5 at 19:55.

91.    PSO did not require deputies to have probable cause, reasonable suspicion, or consent to conduct a prolific offender check. *See* Ex. 57 at 2 (admitting that "[n]either probable cause, reasonable suspicion, nor consent is required 'to visit residences to conduct prolific offender checks'"); *see also* Ex. 18 at 167:24–168:1 (warrants), 168:2–24 (probable cause and reasonable suspicion), 205:1–5. In PSO's view, such constitutional obligations are not implicated where deputies just "go knock [on] a door" because, PSO believes, it "could do that to any citizen." *Id.* at 168:6–8.

92.    PSO did not require a warrant to conduct a prolific offender check. Ex. 18 at 167:24–168:1 ("Q: So does Pasco County Sheriff's Office require a warrant to conduct a prolific offender check? A: No.").

93.    While deputies did mention specific investigations during a handful of visits, *see, e.g.*, Ex. 9 at 1, 9, 31, the vast majority of notes documenting the checks included no reference to any specific investigation, *see* Exs. 3, 8–11.

94.    Deputies often explicitly stated they were not there to investigate any allegation of wrongdoing. *See, e.g.*, Ex. 4 at 3:52 ("She's not in any trouble or anything."), 0:18; Ex. 5 at 14:41 ("He's not in trouble."), 25:10, 27:30, 40:51; *see*

27

*also* Ex. 4 at 1:50 ("[T]hey have like a list of people that used to get in trouble but don't anymore, and we just make sure everyone is doing good.").

95.     Deputies did not produce a warrant authorizing *any* of the visits to Plaintiffs that were marked in their records as prolific offender checks. *See* Taylor Decl. ¶ 22; Deegan Decl. ¶ 24; Heilman Decl. ¶ 23; Jones Decl. ¶ 24.

96.     Prolific offender checks were also distinct from probation checks. *See* Ex. 19 at 24:6–25:4; *see also* Ex. 57 at 2 (admitting "that a probation or supervised release status is not required in order for a prolific offender check . . . ."); Ex. 5 at 29:40 (deputy noting that "it doesn't matter" that Donnie was not on probation and "we still check up on him" because "he's been identified as a prolific offender").

97.     Body-camera footage shows that Plaintiffs are on record telling deputies that the visits to their homes constituted harassment. *See* Ex. 5 at 3:21, 5:51 ("This is harassment."); *see also id.* at 0:09, 21:54, 30:54; Ex. 4 at 18:10; Ex. 6 at 34:48; Ex. 7 at 33:16, 34:43; Ex. 7 at 34:57 (deputies saying they told Robert that they were "going to keep harassing them, every single day"). Even when the visits were not negative or argumentative, however, they were still unwanted. Taylor Decl. ¶¶ 12, 13, 24; Heilman Decl. ¶ 20; Deegan Decl. ¶¶ 9, 13, 16; Jones Decl. ¶¶ 16, 22.

98.     Body-camera footage shows deputies apologizing for the visits, which they acknowledged were unwelcome. *See, e.g.*, Ex. 4 at 0:11 ("Sorry to freak you out."), 21:55, 26:15 ("I'm sorry, but we're told to do it."); Ex. 5 at 28:30 ("So you're

probably tired of seeing us . . . I'm sorry to bother you."), 38:45 ("We don't enjoy bugging everybody . . . .").

99.    One PSO deputy who conducted prolific offender checks testified that if an individual refused to answer his questions, he still would not stop conducting prolific offender checks on that individual. *See* Ex. 25 at 46:20–25.

100.    An internal PSO report recounts an interaction with an individual who resided at the same home as a Top 5 offender (when that classification was still in use) and who "requested that STAR stop coming by because it did not look good for the neighborhood." Ex. 71 at 2. The report states that this individual "was advised of [the offender's] status as being on the TOP 5 list and the need for checks." *Id.* The report also states that the offender was subsequently "reminded [that] as long as he was on the TOP 5 list, periodical checks would be done on him." *Id.*

101.    Deputies often showed up "in force"—that is, arrived in numbers—during prolific offender checks. *See, e.g.*, Ex. 5 at 15:18, 22:26; Ex. 6 at 1:11; Ex. 7 at 38:47.

102.    For example, body-worn camera footage of one prolific offender check at Tammy's house shows the deputies saying they intended to convey a "show of force" when "coming to [Tammy's] shithole house." Ex. 5 at 22:26.

103.    The ILP Manual also instructed deputies conducting checks to "cultivate information about the criminal environment: who is committing crimes,

29

where, when, and how." Ex. 1 at 18; *see also* Ex. 20 at 15:24–16:17. It also instructed deputies to "[l]earn as much as possible about prolific offenders." Ex. 1 at 19. This included gathering information about those who listed individuals are associating with. *See* Ex. 1 at 19; *see also id.* at 52; Ex. 22 at 35:25–36:3 (agreeing that PSO seeks to "develop an understanding of the social networks and familial networks of the people that it targets").

104.   The ILP Manual stated that deputies conducting checks should "develop information to help analysts identify where and who we should be focused on, help solve crimes that have already been committed, and ultimately help us as an agency to prevent future crimes from occurring." Ex. 1 at 18.

105.   The 2021 ILP Directive likewise instructed deputies to "[l]earn as much as possible about prolific offenders in your assigned area to include their acquaintances, vehicles, locations frequented, M.O. for offenses, vehicles owned, etc." and to "[d]ocument the information you learn." Ex. 32 at 9–10.

106.   The Manual further stated that, based on the theory of focused deterrence, deputies should use prolific offender checks to "communicate" that prolific offenders must either "stop committing crimes" or else face "relentless pursuit, arrest, and prosecution." Ex. 1 at 17; *see also id.* at 17–18 ("If the offender does not feel the pressure, if the offender is not arrested when they commit their next

crime, or if the offender is left to feel their punishment is menial, the strategy will have no impact.").

107.   In an internal email, a PSO official directed deputies to "focus on the top 5 identified as prooooolific offenders" and further stated: "Send a message. We are going to keep watching you. If we can['t] get them to stop criminal behavior, the goal is to get them to move away or go to prison on new charges we discover, that's what we are looking for!" Ex. 50 at 1.

108.   In another internal email, in reference to the now-suspended Top 5 designation, a PSO official stated that "[t]he Top 5 are individuals who we must pay attention to in our shift. We need to make contact with them as often as possible, and put them on notice that we are watching! Let's not just be reactive to what these individuals are doing in our areas of responsibility, but PROACTIVE!" Ex. 60 at 1.

109.   As one PSO deputy explained to Tammy: "Here's the policy of the agency. I'll explain it to you so it makes sense. If people have themselves or their— people that live in the house are committing crimes and victimizing the community, then the direction we receive from our Sheriff's Office—from the top down—is to go out there and for every single violation that person commits, to enforce it upon them. So we have people like code enforcement specialists, traffic enforcement specialists . . . ." Ex. 5 at 0:34.

110.   Robert was told: "Your kid [is] out here victimizing people. That's why, that's why all this [code enforcement and searching] today." Ex. 7 at 45:55.

111.   Darlene was told: "Tyler is a Top 5 Offender. . . . Okay, every offender that we have in the county, especially a Top 5, we go to their house and . . . we ensure that all the laws are being followed and the ordinances are being followed." Ex. 6 at 32:07.

112.   Prolific offender checks were almost always conducted at the home of the listed individual, or the home where the listed individual is staying. *See, e.g.*, Ex. 25 at 38:3–5; Ex. 23 at 17:16–18.

113.   During some checks, deputies entered onto the curtilage of the home—typically the front porch—in order to speak with residents inside the home. *See generally* Exs. 4–7 (body camera footage of well over a dozen prolific offender checks showing deputies approaching homes and knocking in order to speak with residents).

114.   During some checks, deputies entered onto the curtilage to search for evidence of crimes. *See* Heilman Decl. ¶ 8; Ex. 5 at 15:16, 23:38, 34:14; *see also id.* at 18:02 (deputy stating "I sneak around to the back and look through the fence"); Ex. 6 at 5:00, 11:14 (deputies crossing over Darlene Deegan's fence to access the property and spending several minutes walking around her backyard taking pictures to support code enforcement), 17:16 (deputy saying a court might "throw . . . out"

32

the pictures); Ex. 7 at 2:30, 29:55 (deputies spending almost half an hour in Robert's back yard without consent).

115.   During some checks, deputies entered onto the curtilage—including the side and rear yards—to look into the windows of the home. *See, e.g.*, Heilman Decl. ¶ 8; Ex. 5 at 33:54; Ex. 6 at 33:54, 43:10, 44:24, 46:02; Jones Decl. ¶¶ 12, 16; Ex. 7 at 4:32, 19:02, 20:49, 22:29, 25:46, 27:30, 32:57; Ex. 68 at 2 (email summarizing prolific offender check and stating that "mother" was observed "inside of the home").

116.   During some checks, deputies sought to identify inhabitants to determine whether they have warrants or are on probation. *See* Ex. 1 at 18; Jones Decl. ¶¶ 12, 16; Heilman Decl. ¶¶ 16–17; Deegan Decl. ¶¶ 9–10; Ex. 7 at 1:46; Ex. 5 at 30:09.

117.   Deputies also sought entrance into the home during some checks. Jones Decl. ¶ 16; Ex. 5 at 30:09; Ex. 6 at 22:13, 27:46, 27:58; *see also* Deegan Decl. ¶¶ 11–14; Ex. 6 at 11:39, 22:13, 27:45 (deputies seeking entry into RV in Darlene's back yard), 27:58; *see also* Ex. 62 at 4 (email summarizing check and noting that "all doors locked").

118.   During some checks, deputies also knocked on windows or attempted to speak to people inside. *See, e.g.*, Ex. 7 at 0:39, 2:10, 5:42, 30:10.

119.   On several occasions, deputies either arrested or cited Plaintiffs when they refused to allow the deputies inside the home. Jones Decl. ¶ 16; Ex. 7 at 35:05, 35:15; Ex. 5 at 30:09; Ex. 6 at 22:13, 27:46, 27:58.

120.   During these checks, deputies spoke not just with the listed individual but also with family members. *See, e.g.*, Ex. 3 at 10–11 ("I made contact with his mother, Tammy Heilman . . . . Tammy then said she was busy and did not have time to speak to me. . . . I informed Tammy I would be issuing Tammy a County Ordinance Citation"); *see also id.* at 8 (Tammy "did not wish to wake him up"); 9 ("Donnie's mother, Tammy"); 12 ("[h]is mother . . . was not pleased to see the sight of law enforcement"); 13 ("Donnie's mother"); 15 ("Donnie's mom"); 15 ("Tammy was unwilling to give any additional information regarding Donnie's whereabouts or activities"); 16 ("Donnie's mother"); 17 ("Donnie's Mother, Tammy, who appeared to be inconvenienced by my presence"); *see also* Ex. 3 at 7 ("I spoke to Dana at the residence, who stated Dalanea has been staying out of trouble, and taking care of her twins."); Ex. 4 at 30:34, 34:21; Ex. 5 at 8:09, 14:58, 23:17, 24:59, 25:46, 27:33, 29:12, 32:15, 34:31, 39:59; Deegan Decl. ¶¶ 5, 6, 10; Jones Decl. ¶¶ 5, 15. Reports of prolific offender checks on individuals other than the Plaintiffs likewise recorded interactions with relatives or other close associates. *See, e.g.*, Ex. 62 at 2 ("aunt"), at 3 ("mother" and "girlfriend"), at 4 ("dad"); *see also* Ex. 63 at 3; Ex. 64 at 2; Ex. 66 at 5, 6; Ex. 71 at 3.

34

121.   The Manual's zero-tolerance arrest policy extended to "associates" of individuals who have been identified as Top 5 offenders. Ex. 1 at 26.

122.   PSO records show that one mother, not a Plaintiff, was "not pleased with our visit" but was "reminded, that due to [her son's] Top 5 prolific offender status there will likely be regular visits." Ex. 66 at 5.

123.   During prolific offender checks, deputies often asked residents vague, open-ended questions seeking information about unspecified criminal activity. *See, e.g.*, Ex. 3 at 8–16, Ex. 4 at 1:55, 5:11, 13:25, 15:45, 21:12, 30:10.

124.   They often asked questions about the listed individual's activities, including whether they were in school or had a job. *See* Taylor Decl. ¶¶ 12, 13; Ex. 4 at 2:18, 5:31, 8:22, 13:46, 21:17, 23:10, 29:43; Heilman Decl. ¶¶ 9, 10; Ex. 5 at 7:56, 10:59, 11:37, 13:48, 26:17, 28:44, 42:11; Deegan Decl. ¶ 10; Jones Decl. ¶ 14.

125.   They also sought information about the listed individual's associations, including who they were hanging out with or who they were dating. *See, e.g.*, Taylor Decl. ¶ 12; Ex. 4 at 2:33, 3:08, 5:17, 10:41, 23:39; Ex. 5 at 8:00, 33:16, 38:59; Jones Decl. ¶ 14.

126.   Sometimes, deputies arrived at the plaintiffs' homes with no evident purpose except to ask invasive questions. *See, e.g.*, Ex. 4 at 3:47; Ex. 7 at 33:26, 34:43. In others, PSO deputies arrived with no initial objective and then conducted surveillance to try to develop probable cause for an arrest. Ex. 5 at 15:16. And in

still other instances, deputies approached properties with one stated intention—like searching for an occupant or an occupant's associate—before shifting their focus to something else, like code enforcement. *See, e.g.*, Jones Decl. ¶¶ 7, 16–17, 19; Heilman Decl. ¶¶ 11–15, 16, 30; Ex. 5 at 15:16, 30:09; Ex. 52.

127.   Information gathered via prolific offender checks was recorded by deputies via reports, "tips," and a database of "offender notes." *See* Ex. 17 at 50:6–51:8, 90:1–12, 108:8–109:11; *see also* Ex. 3 (offender notes); Exs. 42, 43 ("tips"); Exs. 62–64 (morning reports).

128.   Prolific offender checks occurred more frequently than the Manual required, as the PSO placed a minimum—but not a cap, *see* Ex. 20 at 55:23–56:1—on the number or frequency of prolific offender checks that could be conducted. Ex. 1 at 19 (2018 Manual); Ex. 32 at 9 (2021 ILP Directive).

129.   Plaintiffs' expert Michael Carrasco, a managing director with Alvarez & Marsal Public Sector Services, reviewed and analyzed PSO records and compiled findings relating to, among other things, the occurrence and frequency of prolific offender checks and code enforcement in Pasco County. *See* Ex. 1 to Carrasco Decl.

130.   PSO's records show that the agency performed 13,093 prolific offender checks over the course of six years. *See* Carrasco Decl. ¶ 58.

131.   PSO's records show that there were 255 addresses that were visited by deputies 10 or more times for prolific offender checks. *See* Carrasco Decl. ¶ 60.

132.   PSO's records show that there were 30 addresses that were visited by deputies 30 or more times for prolific offender checks. *See* Carrasco Decl. ¶ 60.

133.   The PSO's 30(b)(6) representative suggested capping the number of prolific offender checks, but no action was taken based on that suggestion. Ex. 20 at 59:5–24.

134.   In an email to Sheriff Nocco, a father (not a Plaintiff) expressed "frustration" because PSO deputies conducted prolific offender checks on his son "4 times in less than one month." Ex. 59 at 7–8.

135.   That email to Sheriff Nocco sparked internal discussion of how the agency identifies prolific offenders, *see* Ex. 59 at 1–6, but ultimately no change in approach, *see* Ex. 20 at 42:13–23.

136.   The STAR team, charged with targeting prolific offenders, regularly worked 2 p.m. to 2 a.m. *See* Ex. 22 at 163:7–11. And deputies regularly conducted checks late at night or early in the morning. Plaintiffs' expert Michael Carrasco found that 2,109—or 17.5 percent of—prolific offender checks between September 2015 and November 2021 occurred between 10 p.m. and 6 a.m. Carrasco Decl. ¶ 61. This is due in part to many deputies' understanding that prolific offender checks had to be conducted routinely, though they often did not have time to conduct the checks until late in their shifts. Ex. 75 at 66:19–67:8 ("[W]e're busy . . . . And so if a deputy believes that they are being evaluated on the amount of doors that they knock on,

and the only time they have to knock on a door is 3:00 a.m., they're gonna knock on the door at 3:00 a.m.").

137.   Major Sanborn described this approach as "foolishness" because it would lead to "zero level of cooperation." Ex. 75 at 67:17–18.

138.   At one point, the PSO's 30(b)(6) representative stated in an email that "I have heard from numerous deputies and detectives that because we are going out to these offenders['] houses several times a week, they are starting to resent our agency and say we are harassing them." Ex. 45 at 2; *see also* Ex. 20 at 60:2–14.

139.   In that same internal email, the PSO's representative suggested that the repeated visits might undermine their long-term law enforcement objectives because they alienate individuals whose assistance may be needed in future cases. As the official stated, "So what we are really doing is crippling future investigation where we require the assistance of these offenders to give us intelligence. When we go out there now, no one wants to help us because we harass them." Ex. 45 at 2.

140.   In that same email, the PSO representative stated, "I can tell you we really do not have buy in from the troops right now and there is A LOT of contention around these checks." Ex. 45 at 2.

141.   Not every call to a residence was for a prolific offender check. However, many incidents not designated "prolific offender check," might still have been affected by the challenged policies, which, as set forth in detail above, call for

enhanced attention to prolific offenders in a number of ways beyond just conducting prolific offender checks. Indeed, everything PSO does is in some sense related to ILP. Ex. 1 at 8–10 (explaining that ILP "is everything [the] agency does . . . [and is] the foundation of all operations.").

142.   And even when deputies visited listed individuals for other reasons, they might "self-initiate[] a prolific offender check" after that initial basis for the call was resolved. Ex. 9 at 99; *see also id.* at 77; Ex. 3 at 13–14.

143.   To the extent that there were other calls to Plaintiffs' respective residents that were not denoted as prolific offender checks or as otherwise related to the challenged policies, the specifics of those interactions are unknowable without "the underlying CAD report." ECF 120 at 60:20–23. Ultimately, records for such incidents are not fully reflected by the record, primarily because Defendant resisted discovery on such topics on the ground that they were not relevant. *See* ECF 36, 46; *see also* Ex. 72 at 14, 32, 46 (transcript of Oct. 5, 2021 Status Conference).

144.   In addition to prolific offender checks, targeted individuals and their families were also subject to increased code enforcement. To that end, PSO's manual for the STAR team, when it was still tasked with targeting prolific offenders, directed the team to "[u]tilize County Ordinance citations as a strategic tool to target prolific offenders." Ex. 2 at 7.

145.   The 2021 ILP Directive also included a performance expectation directing deputies to assess locations "for the existence of county code violations, and when applicable, cite the owner/tenant." Ex. 32 at 21; *see also* Ex. 6 at 52:38 (body-camera footage of code enforcement activity by PSO targeted at Darlene Deegan in October 2021).

146.   Until 2021, PSO employed its own in-house "Code Enforcement Corporals" to issue citations for violations of Pasco County ordinances (separate from the standard code enforcement officials then-employed, and still currently employed, by the County). *See* Ex. 23 at 9:6–10:2, 110:10–15; *see also* Ex. 22 at 72:17–73:9, Ex. 24 at 34:5–22.

147.   Unlike standard county code enforcement officers, PSO officials have discretion as to what homes to target for code enforcement. *See* Ex. 6 at 35:05 (deputy noting that it "doesn't matter" if neighbors have similar violations); *id.* at 47:30 (deputy explaining that county code enforcement officials, in contrast to PSO code enforcement, "can't discriminate").

148.   Unlike standard county code enforcement officers, PSO officials are not required to issue a warning before issuing a citation. *See* Ex. 23 at 9:12–10:2.

149.   Additionally, unlike standard county code enforcement officers, PSO officials "don't typically take citizen-generated complaints for code enforcement issues." Ex. 23 at 9:18–19.

150.   PSO's code enforcement officials were specifically instructed to "actively purs[ue] prolific offenders *and their associates*." Ex. 29 at 39 (emphasis added); *see also* Ex. 21 at 87:18–21 (it was a "common practice" for deputies to "direct the code personnel to go assess [the houses of listed individuals] for violations"); Ex. 16 at 3–4, 17, 73–74, 84 (AIM slides listing code citations issued); *see also* Ex. 16 at 34 (noting that code enforcement corporal "issued citations" and "advised of the upcoming sweep . . . concerning Top 5 and associates").

151.   Particularly when listed individuals are minors, citations are directed to the individuals' parents. *See* Ex. 23 at 41:13–17 (deposition testimony that, if "the problem person is a juvenile," the citation would be issued to the "parents" or "whoever is responsible"); Ex. 5 at 0:34 (statement of deputy to Tammy that policy of increased code enforcement applies if "people have themselves or their—people that live in the house are committing crimes").

152.   In one internal performance evaluation, Code Enforcement Corporal Mark Celeste listed as one of his "most significant work related accomplishments" that he issued so many citations to a prolific offender's mother that she was evicted. Ex. 29 at 19; *see also* Ex. 23 at 38:22–25. He added that the mother was "unfortunately" still living in the same Pasco County district. *See* Ex. 29 at 19; *see also* Ex. 23 at 39:1–3.

153.   If deputies perceived that family members of listed individuals were not cooperating, deputies would utilize code citations as "a technique for . . . compliance." *See* Ex. 22 at 73:17–24; *see also id.* at 74:13–15 ("So it's kind of putting the pressure on the residents of where this prolific offender is."). Similarly, deputies would "use code enforcement to sort of light a fire under the homeowner to do a better job in keeping that juvenile out of trouble." *Id.* at 74:19–75:1.

154.   PSO deputies targeted listed individuals and their family members for citations even when other neighboring homes have the same violations. *E.g.*, Ex. 6 at 35:05 (deputy noting that it "doesn't matter" if neighbors have similar violations); Ex. 5 at 8:48 (deputy citing Tammy for "debris" based on trash that she put out for collection after a hurricane, when neighbors had done the same).

155.   A PSO deputy explained that, by contrast, the County's code enforcement officials (who are separate from the PSO code enforcement deputies) "can't discriminate." Ex. 6 at 47:30.

156.   PSO's code enforcement disproportionately targeted listed individuals and their families: Plaintiffs' expert Michael Carrasco found that addresses where prolific offender checks occurred were more likely to receive code citations. *See* Carrasco Decl. ¶ 68.

157.   While addresses that were not targeted for prolific offender checks had a 0.5% chance of receiving a code citation from PSO deputies between 2016 and

2021, addresses that received more than one prolific offender check had a 14.7% chance of receiving code citations, while addresses that received ten or more prolific offender checks had a 36% chance of receiving a code citation. *Id.* ¶ 65.

158.   Addresses associated with prolific offender checks were 20 times more likely to receive code enforcement citations than other addresses in Pasco County. *See* Carrasco Decl. ¶ 90; *see also id.* ¶¶ 76–108, 109–17.

159.   Consistent with that pattern, three of four Plaintiffs received citations from PSO deputies. See Ex. 12 at 4, 7–14, 39–44 (Tammy); Ex. 13 at 1–27 (Darlene); Ex. 14 at 7–24, 31–48 (Robert). A code enforcement corporal also visited the address where Dalanea was staying to look for code enforcement violations. Ex. 8 at 7. In most cases, Plaintiffs had to correct the offending conditions or, as in Darlene's case, challenge their legitimacy to resolve the citation. Deegan Decl. ¶ 17. As discussed in Paragraphs 235 and 259, however, Tammy recently received collection calls concerning failure to pay costs/fines associated with her code enforcement cases.

160.   With the elimination of the Code Enforcement Corporal position in 2021, the responsibilities of those officials were moved over to PSO's street crimes unit. *See* Ex. 24 at 13:16–21. But any PSO deputy can still write a code citation. Ex. 74 at 98:3–22.

v. *Plaintiffs' Additional Facts Regarding PSO's Enhanced Enforcement and Interactions Involving Plaintiffs, Specifically*

161.   Slides from the AIM meetings discuss enforcement efforts against all four Plaintiffs. *See, e.g.*, Ex. 16 at 73, 75–81, 84 (identifying Darlene's son as a Top 5 Offender and noting her code citations); 3 (noting that Tammy was fined $2,518 for five code citations); 10 (noting that Robert was "not answering door" and stating that deputy "[w]ill be taking Cpl. Celeste (code enforcement) with him to visit Dad"); 55 (identifying Dalanea as a Top 5 Offender and stating that she "received verbal warnings regarding her county ordinance violations").

162.   PSO deputies performed frequent prolific offender checks at the homes of the Plaintiffs. *See, e.g.*, Ex. 11 at 77–100 (Robert, nine checks in one month's time); Ex. 10 at 25–32 (Darlene, four checks in 12 days); Ex. 9 at 59–62 (Tammy, two checks in two days); Ex. 8 at 1–10 (Dalanea, four checks in one month).

(a)   Plaintiffs' Additional Facts Regarding PSO's Enhanced Enforcement and Interactions Involving Plaintiff Dalanea Taylor:

163.   Dalanea was incarcerated for her involvement in nonviolent property crimes at 15 years old. *S*ee Taylor Decl. ¶¶ 3–5.

164.   She was never suspected of, arrested for, or charged with any violent criminal offenses. Taylor Decl. ¶ 4.

165.   Since she was released in 2017, Dalanea has stayed out of trouble. She is now the mother of three young children. Taylor Decl. ¶ 6.

44

166.   Dalanea was placed on the prolific offender list when she was released from prison at age 17. *See* Exs. 39, 65; *see also* Ex. 26 at 103:18–21.

167.   Dalanea was also listed as a Top 5 Offender in April 2017, at age 17, immediately following her release from prison. *See* Ex. 16 at 55.

168.   PSO's AIM slides identified Dalanea's mother, sister, and aunt as her "associates." Ex. 16 at 56–57.

169.   Dalanea was never formally notified by PSO that she had been placed on a prolific offender or "Top 5" list. Taylor Decl. ¶ 28.

170.   Dalanea was never given the opportunity to contest her placement on either list. Taylor MSJ Decl. ¶ 29.

171.   Beginning just a couple of weeks after Dalanea was released from prison, PSO deputies began making unannounced visits to the home where Dalanea was staying, asking to speak with her. Taylor Decl. ¶ 8.

172.   As identified in Part I.B.i. above, PSO deputies performed at least 19 prolific offender checks on Dalanea between April 2017 and September 2019. *See* Carrasco Decl. ¶ 74; *see also* Ex. 8.

173.   The visits varied in frequency from about once per week to every few weeks. *See* Taylor Decl. ¶ 10.

174.   The visits often occurred late at night or early in the morning. *See* Ex. 8 at 17, 29, 33 (records of checks on Dalanea at 10:15 p.m., 12:05 a.m., and 7:32 a.m.); *see also* Taylor Decl. ¶ 11.

175.   Every time the deputies visited Dalanea, they asked her questions. The questions were often personal and intrusive, seeking information about her friends and relationship status. Taylor Decl. ¶¶ 12–13.

176.   During the visits, deputies would attempt to obtain information relevant to possible criminal activity. *See, e.g.*, Ex. 3 at 1 ("Subject had no information to provide regarding criminal activity."); *id.* ("No information on any criminal activity."); *id.* at 2 ("Dalanea said that she had not been involved in criminal activity and had not had any recent gang affiliation."); *id.* at 3 ("She has not been involved in any criminal activity."); *id.* at 5 ("She . . . could not provide any tips about criminal behavior"); *id.* at 6 ("she is not aware of any criminal activity"); Ex. 4 at 12:30 (asking for "tips" on "crime").

177.   During the visits, deputies ran warrants checks on individuals who Dalanea identified as her associates. *See, e.g.*, Ex. 3 at 2 ("She further advised that she had a new boyfriend named 'Jay' Johnson from Orlando, whom she met through her sister . . . . A wants and warrants check was conducted on all involved parties which met with negative results.").

178.   During the visits, deputies made notes about Dalanea's tattoos and other identifying characteristics. *See, e.g.*, Ex. 3 at 2 ("She had a tattoo on her right hand of an octopus that said 'Lil savage' above it.").

179.   When Dalanea became pregnant with twins, PSO deputies repeatedly asked Dalanea unwanted personal questions about the father, including what his name was, and whether he participated in criminal activity. Ex. 4 at 3:20; *see also* Ex. 3 at 3 ("offender notes" recording that "the father's name is Kevin Jones and he is somewhat involved in the pregnancy and does not participate in criminal activity"); *id.* at 5 ("She stated the father's name is Damien but could not provide the last name."); *see also* Ex. 4 at 6:01, 13:37, 14:22 (asking if the father would be "in the picture" and scoffing when Dalanea said the father's last name was not important), 21:24, 22:42, 25:30, 29:47 (asking about the sex of her twin babies); *see also* Taylor Decl. ¶¶ 15–16.

180.   Deputies asked Dalanea to provide her phone number and the phone number of the family friend who she was staying with. Ex. 4 at 11:23.

181.   Deputies asked questions about her activities, seemingly to assess if she was staying out of trouble. *See* Ex. 3 at 1 ("Subject stated she's been staying out of trouble."); *id.* ("advised she was been [sic] staying out of trouble"); *id.* at 2 ("Dalanea said that she had not been involved in criminal activity"); *id.* ("currently unemployed since being released from prison"); *id.* at 3 ("not working or going to school"); *id.*

("has not been involved in any criminal activity"); *id.* at 5 ("she has been staying out of trouble"); *id.* at 7 ("Dalanea has been staying out of trouble"); *id.* ("Dalanea stated her children have turned her life around for the better").

182.   Deputies also asked questions about who she was associating with, seemingly to assess if she was associating with the "wrong" people. *See* Ex. 3 at 1 ("She further advised she does not hang out with anyone from her associated gang."); *id.* at 2 ("she had been staying out of trouble and not hanging out with past criminal associates"); *id.* at 2 ("Dalanea advised she does not hang out with the old crowd anymore"); *id.* at 6 ("she does not talk with any criminals in the community").

183.   Deputies also asked questions about her whereabouts and her plans for where to live. *See* Ex. 3 at 1 ("they will be moving to a new residence next month"); *id.* at 5 ("she is focused on finding a place of her own and moving"); *id.* at 6 ("her sister is now pregnant and they want to get place [sic] together soon").

184.   Dalanea did not want to share such sensitive information. Ex. 4 at 14:52, 28:27. She only did so because she thought she had no choice. *See* Taylor Decl. ¶¶ 12–13. Thus, even on the handful of occasions in which the checks were not overtly intrusive or demeaning, they were still unwelcomed. Taylor Decl. ¶¶ 12, 13, 24.

185.   During one visit in 2017, Dalanea was visibly uncomfortable with the deputy's questioning concerning her pregnancy, and even turned and reached for the

doorknob to end the encounter, and yet the deputy nonetheless continued the questioning. Ex. 4 at 14:19.

186.   During a visit in January 2018, Dalanea's family friend objected to the deputies' visits; the deputy responded that PSO deputies would keep coming to visit Dalanea for "probably two years" and that he was "just trying to do [his] job." Ex. 4 at 19:10; Ex. 3 at 6 ("Her mother continued to yell at me for showing up too early and wanted to know how long the SO was going to continue coming to her house to check on Dalanea. I explained it would be a couple of years."). Her family friend, Dana Jones, suggested that she would throw Dalanea out of the house to avoid further visits. Ex. 4 at 19:10 ("Well then, she ain't gonna be living here. She ain't gonna be living in the state, or something. Because this—that's bullshit.").

187.   During another visit in February 2018 a deputy apologized for coming and asking so many questions, said "I know you guys aren't happy to see me," and said the deputies were "told to do it." Ex. 4 at 21:50, 26:20; *see also* Taylor Decl. ¶ 21.

188.   When Dalanea was not at home, the deputies would ask the family friend with whom she was staying similar questions about Dalanea. Taylor Decl. ¶ 14.

189.   Deputies did not produce a warrant authorizing any of the visits to Dalanea. Taylor Decl. ¶ 22.

49

190.   The deputies never told Dalanea that she was suspected of committing any crime during the visits. Taylor Decl. ¶ 23.

191.   The deputies never asked Dalanea's consent to speak with her. Taylor Decl. ¶ 24.

192.   The visits continued even though Dalanea was not getting into trouble after her release. Taylor Decl. ¶ 25.

193.   In addition to prolific offender checks, the STAR Unit made no fewer than two additional visits to the home where Dalanea was staying that were not marked as prolific offender checks. *See* Ex. 8 at 7, 21 (2 non-POC visits by STAR and code enforcement to Dalanea's residence).

194.   During one prolific offender check in April 2017 to 7208 Adare Drive (the house where Dalanea was staying with a friend), a STAR Deputy gave Dalanea "verbal warnings" about county ordinance violations for "junk/debris" and "no numbers on [the] house." Ex. 8 at 5.

195.   Later that same month, Code Enforcement Corporal Mark Celeste visited 7208 Adare Drive and noted in the CAD report that the home was missing house numbers and that he would come back later. Ex. 8 at 7. It is unclear whether any citation was ultimately issued at that address.

196.   When deputies came to the house where Dalanea was staying on New Year's Day 2020 looking for her cousin, deputies threatened to write her code

citations missing house numbers and junk in the yard if she did not let them inside. *See* Taylor Decl. ¶ 20; Ex. 8 at 45–46; Ex. 15 at 12.

197.   Dalanea's relationship with the close family friend with whom she lived was damaged as a result of PSO's visits. Taylor Decl. ¶¶ 18–19.

198.   During one visit, Dalanea's family friend stated that Dalanea would be forced to move out if visits to the home continued. Taylor Decl. ¶ 18; *see also* Ex. 4 at 19:10.

199.   Dalanea did in fact move out when visits continued. Taylor Decl. ¶ 19.

200.   Because of PSO's visits, Dalanea had to miss or arrive late to jobs that she worked for a company that provides house cleaning and other services. She missed out on the income from those jobs as a result. Taylor Decl. ¶ 30.

201.   Dalanea lives in fear that PSO's harassment will continue. Taylor Decl. ¶ 31.

202.   Although deputies informed Dalanea that she had been placed on some kind of list, Dalanea did not know the details of PSO's intelligence-led policing policies until 2020. Taylor Decl. ¶ 27.

(b)    Plaintiffs' Additional Facts Regarding PSO's Enhanced Enforcement and Interactions Involving Plaintiff Tammy Heilman:

203.   On September 10, 2015, when Tammy's son Donnie was 15 years old, a school resource officer identified Donnie in an internal PSO email as somebody who "engages in many risky activities." Ex. 47 at 2.

204.    A STAR deputy visited Tammy's home after the school resource officer's email, Ex. 9 at 21, and PSO deputies started making regular visits to Tammy's home looking for Donnie around this same time, Heilman Decl. ¶ 5; *see also* Ex. 9 at 7–9.

205.    Donnie was first identified as a prolific offender as early as September 2016, when he was 16 years old. *See* Ex. 46 at 2 (email from September 18, 2016, referring to Tammy as "Prolific Offender Donnie McDougall's mother").

206.    Donnie was listed in PSO's database as a prolific offender at least as early as January 2017. *See* Ex. 39; *see also* Ex. 26 at 104:6–7. He was last designated a "prolific offender" by PSO as of September 2020. Ex. 39.

207.    Donnie was listed as a Top 5 Offender in 2018, at age 18. *See* Ex. 16 at 63.

208.    AIM slides listed Tammy as one of Donnie's associates and included a photographic line-up that identified her as his "mother" and that she had "anti- law enforcement sentiment." *See* Ex. 16 at 64.

209.    Tammy's youngest son, Anthony McDougall, also received visits from PSO beginning in 2019. Heilman Decl. ¶ 21. At least one visit was demarcated as a prolific offender check in PSO records. *See* Ex. 9 at 111; *see also* Ex. 5 at 40:45. During that check, Anthony was handed a "resource guide" that included local services, *see, e.g.*, Ex. 87—an act consistent with prolific offender check protocol.

Ex. 1 at 17 (PSO deputies instructed to provide prolific offenders with "resources in the community to assist them on the road to becoming a law-abiding citizen"), 76; Ex. 19 at 5:6–12. Anthony questioned the usefulness of the guide, *see* Ex. 5 at 41:34 ("the first thing I seen on this is cancer"), but ultimately offered that he "really appreciate[d] that." Ex. 5 at 40:45.

210.   Tammy never received formal notice that PSO has placed either Donnie or Anthony (who were juveniles at the time) on a list of prolific offenders or Top 5 offenders. Heilman Decl. ¶ 35.

211.   Tammy was never given the opportunity to contest Donnie's or Anthony's placement on that list, even though they were under 18 at the time. Heilman Decl. ¶ 36.

212.   As identified in Part I.B.ii. above, in PSO deputies performed at least 22 prolific offender checks at Tammy's home between 2017 and 2020. *See* Carrasco Decl. ¶ 74; *see also* Ex. 9.

213.   Visits were sometimes as frequent as multiple times per week. *See* Heilman Decl. ¶ 6.

214.   The visits also often occurred late at night or early in the morning. Heilman Decl. ¶ 7; Ex. 9 at 9, 21, 31, 43, 55 (records of checks occurring at Tammy's residence at 10:00 p.m., 10:06 p.m., 10:21 p.m., 11:55 p.m., and 4:54 a.m.).

215.   During each visit, the deputies demanded to speak with Donnie. When Donnie was not home, they would ask Tammy (or anyone else who was at home) questions about him, including where he was, what he was up to, whether he was going to school, whether and where he was working, who he was hanging out with, and who he was dating. Heilman Decl. ¶ 10.

216.   Deputies asked questions designed to determine whether Donnie was engaged in criminal activity. Ex. 3 at 8 ("He has not been involved in any criminal activity."); *id.* at 9 ("He advised me that he has not been involved in criminal activity."); *id.* at 10 ("Donnie's mother Tammy Heilman stated Donnie has been staying out of trouble and going to school."); *id.* at 12 ("Donnie stated he was doing good and on track to get his GED. Donnie stated he was staying out of trouble."); *id.* at 13 ("He stated he was doing good and staying out of trouble. Donnie's mother confirmed that he was staying out of trouble."); *id.* at 17 ("Tammy said Donnie was staying out of trouble and is currently working at a Pizza place in Tarpon Springs (she did not know the name).").

217.   Deputies also asked questions about who Donnie was hanging out with, seemingly to determine if he was associating with the "wrong" people. *See* Ex. 9 at 45 (asking about associations); Ex. 3 at 14 ("Donnie stated he wants to keep any and all relationships with his exes clean. He has deleted his social media in an effort to stay away from all of the bad influences who he used to hang out with and the drama

54

that followed."); *id.* at 15 (stating that Tammy "was unable to provide any information about where he may be staying or any of his friends").

218.  Deputies also asked questions about Donnie's whereabouts. *See* Ex. 3 at 9 ("He said that he and his mother went to a water park in Tarpon Springs on 06/14/2017."); *id.* at 12 ("Donnie stated he was staying out of trouble. Donnie stated he was going out to get pictures with his family today."); *id.* at 15 ("Tammy advised she saw Donnie on 04/10/2018, but would not state where she saw him.").

219.  During the visits, deputies also walked around to the side of Tammy's house, looked through the fence into her backyard, and looked into the windows. Heilman Decl. ¶ 8; *see also* Ex. 5 at 15:16, 18:02 (deputy stating "I sneak around to the back and look through the fence"); 23:36; 33:53, 34:14.

220.  Deputies did not produce a warrant authorizing any of the visits to Tammy's home. Heilman Decl. ¶ 23.

221.  For most of the visits, the deputies never told Tammy that they suspected Tammy, Donnie, or Anthony of committing a particular crime. Heilman Decl. ¶¶ 24–25.

222.  Deputies would sometimes simply surveil her property for unspecified criminal activity. Heilman Decl. ¶ 8; Ex. 5 at 15:16, 23:37.

223.  Tammy made it clear to the deputies multiple times that she thought they were harassing her and her family and that she did not want the visits to

continue. Thus, even on the handful of occasions in which the checks were not overtly intrusive or demeaning, they were still unwelcomed. Heilman Decl. ¶ 20. But the deputies told her they were required to keep coming, and they did. *Id.*

224.   On one occasion, in May 2017, deputies continued asking Tammy questions even though they noted in their notes that she "appeared agitated with me right away." Ex. 3 at 9.

225.   On another occasion, in December 2017, deputies continued asking Tammy questions even though they noted in their notes that she "was not pleased to see the sight of law enforcement, did not want to talk to me and was very rude." Ex. 3 at 12.

226.   On another occasion, in August 2018, a deputy wrote in the notes that he was "questioned as to why the SO comes by to see Donnie" and responded that "Donnie had been identified as a prolific offender by the SO and we would check on him from time to time." Ex. 3 at 17; *see also* Ex. 5 at 29:30.

227.   During another prolific offender check, in September 2018, when Donnie was not at the home a deputy advised Anthony that he should "contact the SO if he finds Donnie's current location otherwise deputies will continue making visits to the home looking for Donnie." Ex. 9 at 97; *see also* Ex. 5 at 32:09.

228.   During another prolific offender check, in September 2019, a deputy told Tammy, "We don't enjoy bugging everybody, but we gotta find people and talk to them. This is how it has to be." Ex. 5 at 38:45.

229.   In addition to prolific offender checks, the STAR Unit made additional visits to Tammy's home that were not marked as prolific offender checks. *See* Ex. 9 at 3, 5, 21, 23, 26, 63, 81, 91, 94, 95, 103, 107, 109, 113 (documenting non-POC visits by STAR to Tammy's residence).

230.   On March 1, 2016, Donnie was mentioned in AIM slides as a juvenile allegedly involved in an auto theft. *See* Ex. 16 at 10.

231.   That same day, March 1, 2016, PSO's Code Enforcement Corporal visited Tammy's house. Ex. 9 at 11.

232.   The Code Enforcement Corporal issued Tammy a code citation for "lack of posted address" on her mailbox, Ex. 12 at 7, and gave her a verbal warning concerning chickens in her backyard, *id.* at 4.

233.   Two days later, the Code Enforcement Corporal issued Tammy a code citation for having chickens in her backyard. Ex. 9 at 13; Ex. 12 at 13; *see also* Ex. 16 at 3–4 (detailing citations issued to Tammy); Heilman Decl. ¶ 31.

234.   A deputy admitted, both in a report and in offender notes, that he targeted Tammy for code enforcement when she refused to wake up her son for a prolific offender check. Ex. 3 at 10–11; Ex. 12 at 42.

235.   Tammy believed she had paid all of her code citations, but recently received collection calls and a letter concerning those fines. *See* Heilman Decl. ¶ 30; Ex. 83.

236.   On September 13, 2016, internal notes from an AIM meeting identified Donnie as an associate of a Top 5 offender. *See* Ex. 16 at 47.

237.   Three days later, on September 16, 2016, STAR deputy Denbo visited Tammy's residence and inquired about a stolen motorbike. After attempting to terminate the encounter by driving away, Deputy Denbo arrested Tammy Heilman for giving "false information to a law enforcement officer," "battery on a law enforcement officer," and "resist officer, obstructing without violence." Ex. 12 at 16; *see also* Heilman Decl. ¶¶ 12–13; Ex. 86 (Tammy's written statement after her 2016 arrest). While transporting Tammy to jail in his squad car, Deputy Denbo explained "the policy of the agency" to her, *see* Paragraph 109, *supra*, and told her, "[O]ur goal is to get you to do something to keep your kid from committing crime." Ex. 5 at 1:10. He also told her that her citations were likely related to Donnie's prolific offender status. *See* Ex. 21 at 87:12–21. After that interaction, Tammy believed that she could be arrested or cited for any reason if she attempted to end an unwanted encounter with a PSO deputy. Heilman Decl. ¶ 14.

238.   In an internal email the next morning, Deputy Denbo reported that it was a "[v]ery busy night" and that one of the "top three events" was that they had arrested "Prolific Offender Donnie McDougall's mother." Ex. 46 at 2.

239.   After she was arrested, Tammy had to pay to retrieve her car after PSO impounded it. Heilman Decl. ¶ 27.

240.   Tammy ended up pleading guilty to the charges and she was placed on probation. Heilman Decl. ¶ 15.

241.   During a prolific offender check, also in May 2017, deputies began looking for code violations at Tammy's house because of her "attitude." See Ex. 5 at 4:52, 5:16 (mentioning house numbers), 6:10 (asking about her dog's vaccination status), 6:47 (checking the tint of the windows on her car); *see also* Heilman Decl. ¶ 16.

242.   After Tammy declined to participate in a prolific offender check on July 22, 2017, deputies "Baker Act-ed"—that is, involuntarily committed—her son Donnie later that same day. *See* Ex. 3 at 9; Ex. 9 at 49.

243.   After Tammy declined to participate in a prolific offender check on October 18, 2017, a deputy issued her a citation for "accumulation of junk for [a] cinder block" in her yard. Ex. 5 at 8:18, 9:55; *see also* Ex. 12 at 39–44; Heilman Decl. ¶ 32.

244.   The entry in the Prolific Offender Notes database for this code citation states the following: "On 10/18/17 at 0813 hours, I arrived at 3229 Primrose Drive, Holiday, Florida 34691 to conduct a prolific offender check on, Donnie Mc[D]ougall. Upon arrival, I made contact with his mother, Tammy Heilman, who said Donnie was doing fine and refused to get him for me. Tammy then said she was busy and did not have time to speak to me. At this point I noted an accumulation of junk in her front yard . . . ." Ex. 3 at 10.

245.   The "junk" in Tammy's yard was there because there had just been a hurricane; though others on her street plainly had visible debris in their yards, Tammy was the only one cited. Heilman Decl. ¶ 32.

246.   During a prolific offender check, on December 29, 2017, four deputies came to Tammy's home to check on Donnie. A deputy walked through the curtilage alongside Tammy's house, looked over a fence—before knocking on the door—and claimed to see juveniles in the backyard with marijuana. Ex. 5 at 15:16, 18:02; *see also* Ex. 9 at 61; Ex. 12 at 45–56.

247.   Body-worn camera footage of the December 29, 2017, visit shows that one of the deputies then stated, "Let's stir something up with this." The deputies then discussed calling CPI, which Deputy Garmon said was "police talk for they're a bunch of fucking assholes." Deputy Garmon explained, "I'm not saying that an

emergency response is going to happen because we're not trying to play that card right now. I'm just doing it as a big fuck you." Ex. 5 at 19:26.

248.   During the December 29, 2017, prolific offender check, deputies arrested Donnie for violating his probation. Ex. 12 at 46; Heilman Decl. ¶ 17. After arresting Donnie, deputies ultimately did not charge anybody with possession of marijuana and the house was not searched. Heilman Decl. ¶ 17; Ex. 22 at 134:24–136:1.

249.   In the Incident Report for the visit on December 29, 2017, a PSO deputy requested that the case be forwarded to CPI. Ex. 12 at 56.

250.   On September 10, 2018, members of the STAR team sent an internal email in which they stated that that "Donnie should be getting some TLC from STAR." Ex. 49.

251.   On September 17, 2018, Donnie was listed as a Top 5 Offender and Tammy was included in the AIM slides' photo line-up of his associates as his "mother." Ex. 16 at 63–64.

252.   The next day, on September 18, 2018, deputies visited Tammy's home with a pickup for Donnie. Tammy ended up getting arrested her for felony battery on a law enforcement officer and for violating her probation. The charges were the result of Tammy opening her screen door into a deputy's boot or chest after the officers demanded to be let into the home using the fact that Tammy was on

probation from her first arrest. Heilman Decl. ¶ 19; *see also* Ex. 5 at 30:09; Ex. 12 at 63. The deputy was fine. Heilman Decl. ¶ 19. Even though the deputies claimed to be looking for Donnie—who was subject to an active warrant for an alleged domestic violence incident—none of the deputies went inside the house to look for him. *See* Ex. 22 at 146:10–147:14.

253.   The following day, an internal "Daily Activity Report" recounted the arrest and identified Tammy as a "TOP 5 ASSOCIATE/MOTHER OF DONNIE MCDOUGALL." Ex. 53; *see also* Ex. 54 (internal STAR report recounting arrest under "Cases Worked").

254.   Tammy spent a couple of months in jail awaiting trial before ultimately accepting a plea deal so that she could be released in time to spend Christmas with her family. Because of that, she is now a convicted felon. Heilman Decl. ¶ 19.

255.   As a result of the September 2018 arrest, Tammy had to pay for court-ordered anger management classes. Heilman Decl. ¶ 28.

256.   As a result of her 2018 arrest, Tammy is now a convicted felon. Heilman Decl. ¶ 19.

257.   Although Tammy's citations and arrests did lead to convictions (when she pled guilty), none of the convictions resulted in the imposition of a sentence for a term of imprisonment. Heilman Decl. ¶ 38.

258.   Because of the arrests on her record, Tammy has been unable to find a job. Heilman Decl. ¶ 29.

259.   Tammy believed she had paid everything she owed as a result of her interactions with PSO, but she recently received collection letters and her driver's license was temporarily suspended until she paid the $600 or so remaining of the total amount that she owed to reinstate it. Heilman Decl. ¶ 26; Ex. 83.

260.   Tammy's relationship with her sons was damaged as a result of PSO's visits. Heilman Decl. ¶ 39; *see also* Ex. 68 at 2 (Donnie "kicked out" by his stepfather).

261.   Tammy lives in fear that PSO's harassment will continue. Heilman Decl. ¶ 37.

262.   Donnie is no longer incarcerated. He is living with Tammy again and used her address when he was forced to register as a felon. Heilman Decl. ¶ 42. Tammy is concerned that PSO may begin checking on Donnie again now that he has been released, just as they began checking on Dalanea upon her release from prison. *Id.*; *see also* Ex. 39 (Dalanea designated a prolific offender on March 30, 2017); Ex. 8 at 1 (first prolific offender check on Dalanea on April 5, 2017). This is true even in light of PSO's recent policy change, which PSO's 30(b)(6) witness admitted could be reversed with ease. Ex. 74 at 154:6–10.

263.   Tammy's other son, Anthony, has been arrested twice since February 2020. Ex. 71 at 2; Ex. 3 at 22 (recounting Anthony's arrest for "auto burglary x3 and loitering and prowling"). Just as Dalanea received checks even after she was released and staying out of trouble, *see supra* ¶ 262, Tammy is concerned PSO may continue checking on him at her home. Heilman Decl. ¶ 41.

264.   Anthony's arrest in February 2020 was noted in the STAR unit's "Daily Activity Report," and the report specifically identified Anthony as the "Brother of previous top five Donnie McDougall." Ex. 71 at 3.

265.   Deputies conducted a visit for Anthony at Tammy's home in August 2020 that was recorded in PSO's records as a "prolific offender check." Ex. 9 at 111; *see also* Ex. 5 at 40:45.

266.   The PSO only stopped checking on Tammy's family around the same time that her story was published in the *Tampa Bay Times*, in September 2020. *See* Heilman Decl. ¶ 40.

267.   Anthony is currently living at Tammy's house, and Tammy is concerned that PSO may continue visiting her home looking for Anthony. Heilman Decl. ¶ 41.

268.   Even if Donnie and Anthony did not live at her home, PSO could still visit Tammy's home to check up on them just as they visited her house to check on Donnie even after Donnie left home in 2018. *See, e.g.*, Ex. 3 at 15 (notes from April

2018 stating, "Tammy stated Donnie McDougall no longer resides at the aforementioned address."); Ex. 9 at 85, 87, 89, 97, 99 (prolific offender checks on Donnie after April 2018); *see also id.* at 97 (report from September 2018 noting that a deputy "advised [Anthony McDougall] to contact the SO if he finds Donnie's current location otherwise deputies will continue making visits to the home looking for Donnie.").

269.   Tammy was not aware of PSO's intelligence-led policing policies until 2020. *See* Heilman Decl. ¶ 33.

(c)   <u>Plaintiffs' Additional Facts Regarding PSO's Enhanced Enforcement and Interactions Involving Plaintiff Darlene Deegan:</u>

270.   Following a severe accident, Darlene's son, Tyler, developed an opioid addiction after receiving pain medication. Deegan Decl. ¶ 3.

271.   Tyler committed non-violent crimes in Pasco County to fund his addiction. Deegan Decl. ¶¶ 3–4.

272.   As discussed in Part I.B.iii above, Tyler was identified, at different points, as both a prolific offender and as a Top 5 offender.

273.   Neither Darlene nor Tyler was ever given formal notice that PSO had placed Tyler on a list of prolific offenders or Top 5 offenders. Deegan Decl. ¶¶ 27, 29. Nor was Tyler ever given the opportunity to contest his placement on either list. *Id.* ¶ 28.

274.   Deputies began regularly visiting Darlene's home looking for Tyler beginning in 2016. Deegan Decl. ¶ 5.

275.   During the summer of 2018, PSO deputies increased their visits to Darlene's home, sometimes coming multiple times a week or multiples times a day. Deegan Decl. ¶ 9.

276.   In December 2019, Tyler died of an accidental overdose. Deegan Decl. ¶ 22.

277.   PSO conducted many visits to properties associated with Tyler. But as identified in Part I.B.iii. above, it is undisputed that PSO deputies conducted at least 8 prolific offender checks at Darlene's home over the course of four months in 2018. *See* Carrasco Decl. ¶ 74; *see also* Ex. 10.

278.   The visits were sometimes as often as every day for consecutive days. *See* Deegan Decl. ¶ 6.

279.   The visits often occurred late at night or early in the morning. Ex. 10 at 21, 31, 35 (records of checks occurring at Darlene's residence at 12:05 a.m., 2:59 a.m., and 3:33 a.m.); *see also* Ex. 84 (security camera stills of deputies in Darlene's back yard at 2:27 a.m. on March 12, 2019, and at 10:38 p.m. and 10:45 p.m. on March 13, 2019).

280.   Body-worn camera footage shows deputies looking and shining flashlights into Darlene's backyard and windows. Ex. 6 at 43:10, 44:24, 46:02.

281.   For one prolific offender check, on June 6, 2018, deputies wrote in the offender notes that they "observed Tyler's mom leave the residence in her dark colored Lexus car" and, when she was gone, "accessed the property by stepping over some fencing due to the front gate being locked" in order to attempt to make contact with Tyler. Ex. 3 at 25.

282.   While on Darlene's property for that June 6, 2018 prolific offender check, deputies surveyed the property and took photographs as evidence of potential code violations. *See* Ex. 6 at 5:05 (climbing over fence and walking through Darlene's back yard to the trailer); 6:23 (unplugging extension cords hooked up to the trailer); 8:02 (surrounding and knocking on the outside of the trailer); 8:35 (deputy asking the other deputies around the trailer, "You guys want to try knocking on the door of the house?"); 11:16 (taking photos); 12:20 ("They got a ton of violations here."); 12:29 (noting that the "chair" the deputies used to climb over the fence "is about to give out" and counting up violations); *see also* Ex. 13 at 4, Ex. 3 at 25 (deputies "accessed the property by stepping over some fencing due to the front gate being locked").

283.   Code Enforcement Corporal Ojeda, who took the photos of code violations, was captured on video stating, "I don't know if they'll throw [the pictures] out or not." Ex. 6 at 17:15.

284.   During the June 6, 2018 prolific offender check, deputies asked Darlene to allow them to break down the door to a trailer on her property, in order to search for Tyler, and told her, "the thing is there's information that you're harboring him and you could be arrested also . . . You don't want to go to jail for someone else's mess . . . I mean, you don't want to go to jail over his mess. So that's what it's best that—if you can call him and talk to him, and if you know where he is then that would help." Ex. 6 at 19:30. Darlene refused, because she did not want them to damage the door to the trailer. Deegan Decl. ¶ 14.

285.   Deputies discussed potential code enforcement citations during additional prolific offender checks at Darlene's home. *See* Ex. 6 at 43:00, 44:24.

286.   During one prolific offender check, deputies specifically discussed and acknowledged that they did not have probable cause to look for Tyler at the time of the check. Ex. 6 at 46:02.

287.   During multiple visits to Darlene's home, deputies sounded a horn or siren and spoke using a bullhorn in order to attempt to persuade Tyler to come out of the home to speak to them. *See* Deegan Decl. ¶ 11; Ex. 6 at 1:30 (body-worn camera footage of June 5, 2018 visit); Ex. 10 at 45 (report from April 17, 2019 visit noting that the deputy "sounded siren and horn several times" with "no response from homeowner").

288.   Deputies did not produce a warrant authorizing any of the visits to Darlene's home. Deegan Decl. ¶ 24.

289.   PSO deputies never told Darlene during any of the visits that they suspected her of committing any crime. Deegan Decl. ¶ 25.

290.   Darlene did not want to speak to the deputies when they asked her about Tyler, but she did not believe she had a choice. Deegan Decl. ¶¶ 9–10.

291.   When Darlene told deputies she thought their behavior was "harass[ment]," and asked them to leave, they stayed and continued questioning her. Deegan Decl. ¶ 16; Ex. 6 at 34:48, 36:20 (Darlene saying she "just want[ed] to be left alone" and a deputy responding, "That's not going to happen").

292.   In addition to prolific offender checks, the STAR Unit made additional visits to Darlene's home that were not marked as prolific offender checks. *See* Ex. 10 at 21, 23 (documenting non-POC visits by STAR to Darlene's residence). Many of the dispatch reports for non-POC visits also specifically note Darlene's son's Top 5 status. *See id.* at 3, 13, 15, 17, 19, 21.

293.   Numerous other visits have no explanation other than that deputies were at Darlene's home attempting to locate Tyler. *See, e.g.*, Ex. 10 at 1, 3, 17, 39, 41, 43.

294.   On June 5, 2018, deputies came to Darlene's house looking for Tyler, and the "notes" section for the visit specifically referred to Tyler as "district #1 top 5." Ex. 10 at 3.

295.   Deputies wrote in the offender notes database for this May 2018 visit that the "property at this address has many county ordinances and [Code Enforcement] Cpl. Ojeda was notified." Ex. 3 at 24.

296.   Body-worn camera footage for the June 5, 2018, visit shows a deputy stating that Tyler's "mom is not cooperative." Ex. 6 at 0:16. Later during the same visit, another deputy said, "I think mom needs to get a county ordinance for this shit." *Id.* at 3:39.

297.   On June 6, 2018, AIM slides identified Darlene's son as a Top 5 offender. *See* Ex. 16 at 68–70.

298.   That same day, at 8:34 a.m., Code Enforcement Corporal P.J. Ojeda was called to Darlene's residence "in reference to county ordinance violations and also to locate wanted person [] Tyler Paneson." Ex. 13 at 4; *see also* Ex. 10 at 7–14.

299.   Code Enforcement Corporal Ojeda issued five code enforcement citations to Deegan: Accumulation of Debris, Permitted Use Violation, Polluted Water Discharge, Parking/Storing Commercial, and Standards for Numbering. Ex. 13 at 2–27; *see also* Deegan Decl. ¶ 15.

300.   The citations issued on June 6, 2018 totaled about $3,000 in fines. Deegan Decl. ¶ 15. Her citations were later documented in AIM slides that also identified Tyler as a Top 5 offender. Ex. 16 at 75–81, 85.

301.   Body-worn camera footage for the June 6, 2018, visit shows that then-Corporal Ojeda explained to Deegan that he was issuing code citations because Tyler Paneson was a "Top 5" offender. He explained that for "every offender that we have in the county, especially a Top 5, we go to their house" and "ensure that . . . the ordinances are being followed." Ex. 6 at 32:07.

302.   During a subsequent visit, on June 8, 2018, deputies told Darlene that it "doesn't matter" if her neighbors have the same code enforcement violations because her house was the "problem right now." Ex. 6 at 34:57.

303.   The deputies told Darlene that if she "cooperate[d] and work[ed] with" them, they could "work with [her]" on the code citations. Ex. 6 at 37:12; *see also id.* at 38:33, 39:59 (discussion of writing citations to "uncooperative" people).

304.   Darlene's June 2018 code violations were ultimately dropped when she decided to fight them. Deegan Decl. ¶ 17.

305.   On June 27, 2019, Darlene Deegan called PSO to report what she believed was a code enforcement violation by her neighbor. Deegan Decl. ¶ 20. The deputy who responded ended up giving citations to Darlene—and not her

neighbor—in part because she had a history of prior violations (which were issued because of her son's status as a listed individual). *See* Ex. 6 at 48:30, Ex. 13 at 31.

306.   On October 25, 2021, at 11:34 a.m., PSO deputies were called to 14137 Amanda Avenue concerning Dolly Deegan's truck. Ex. 10 at 47. A deputy responding to her street was captured on body camera telling another that "really special people live here." Ex. 6 at 52:02.

307.   Another deputy told Darlene that she needed to trim the landscaping around her mailbox, telling her, "You've been cited for that before, right? 'Yes' is the correct answer." Ex. 6 at 52:38; *see also* Deegan Decl. ¶ 23.

308.   When they visited Darlene's home, PSO deputies made derogatory statements about Darlene and Tyler to her neighbors which damaged her relationship in the community. Deegan Decl. ¶¶ 21, 30.

309.   Darlene's relationship with her son was damaged as a result of PSO's visits. Deegan Decl. ¶¶ 31–34.

310.   Darlene lives in fear that PSO's harassment will continue. Deegan Decl. ¶ 30.

311.   Darlene was not aware of PSO's intelligence-led policing policies until 2020. Deegan Decl. ¶ 26.

(d)   Plaintiffs' Additional Facts Regarding PSO's Enhanced Enforcement and Interactions Involving Plaintiff Robert A. Jones III:

312.   As discussed in Part I.B.iv above, Robert's son Bobby was identified, at different points, as both a prolific offender and as a Top 5 offender. *See, e.g.*, Ex. 11 at 9 (documenting "prolific offender check" on Bobby Jones in September 2015 and stating that "HE WAS TOLD HE WAS BEING MONITORED DUE TO HIS LONG STANDING COMMITMENT TO CRIMINAL ACTIVITY"). Robert's home received repeated visits from STAR approximately one month after a deputy submitted a "tip" stating that Bobby had been identified (based on a "Facebook search") as an associate of a listed individual. *See* Ex. 11 at 5–10; Ex. 42.

313.   AIM slides listed Robert in a photographic line-up of his son Bobby's associations, identifying him as Bobby's "father." *See* Ex. 16 at 25.

314.   Robert never received any formal notice that PSO had placed his then-juvenile son on a list of prolific offenders or juvenile offenders. Jones Decl. ¶ 29.

315.   Robert was never given the opportunity to contest Bobby's placement on either list. Jones Decl. ¶ 30.

316.   As identified in Part I.B.iv. above, PSO deputies conducted no fewer than thirty prolific offender checks on Bobby at Robert's home between September 2015 and April 2016. *See* Carrasco Decl. ¶ 74.

317.   Deputies sometimes visited several times in a row on consecutive days or multiple times in the same day. *See, e.g.*, Ex. 11 at 52–70.

318.    The checks often occurred late at night or early in the morning. Ex. 11 at 13, 19, 38, 87 (records of checks occurring at Robert's residence at 11:54 p.m., 12:35 a.m., 1:42 a.m., and 1:45 a.m.); *see also* Jones Decl. ¶ 11.

319.    The visits routinely involved multiple marked vehicles and eight or more deputies. Jones Decl. ¶ 12.

320.    During these visits, deputies frequently walked around behind Robert's house, looked inside the windows, banged on the windows, and yelled at the people inside to come out. Jones Decl. ¶ 12; *see also* Ex. 7 at 0:39, 2:10, 5:42, 30:10.

321.    One STAR team supervisor praised a deputy in performance reviews after he made multiple, repeated visits to Robert's home, including yelling through windows and walking around the back of the house, and later agreed that this reflected "a portion of the overall [ILP] philosophy, yes." Ex. 21 at 65:23–66:9; *see also id.* at 47:4–64:25.

322.    Deputies' notes for one visit state that, "Upon arrival I could see Bobby III and a teenage female inside the home. Once they saw me, they shut off all the lights and refused to come to the door. We banged on the doors and windows but they would not answer and would not come out." Ex. 11 at 69.

323.    Deputies' notes for another visit state: "[O]bserved two kids walking around in front[] of the sliding glass door at the front of the house. Did not observe offender Bobby Jones or his father." Ex. 11 at 71.

324.   Deputies' notes for another visit state that it was "highly likely" that Robert was "inside, ignoring our presence." Ex. 11 at 79.

325.   As a result of these visits, Robert's children became terrified of PSO deputies. Jones Decl. ¶ 13.

326.   During each visit, the deputies wanted to talk to Bobby. If Bobby was not at home, the deputies would try to ask whoever was at home for information about Bobby. Their questions included what Bobby was up to, whether he was going to school, and who he was associating with. Jones Decl. ¶¶ 14–15.

327.   A few reports connected to Robert Jones reference serving a warrant, *see, e.g.*, Ex. 11 at 30, 45, but deputies did not produce a warrant authorizing any of the visits to Robert's home that were marked in their records as prolific offender checks. Jones Decl. ¶ 24.

328.   PSO did produce a warrant authorizing a search of Jones's residence on one occasion, but the visit to execute that warrant was not marked as a prolific offender check. *See* Ex. 11 at 115.

329.   For most of the visits, PSO deputies never said they suspected Bobby of committing a particular crime. Jones Decl. ¶ 25.

330.   In addition to visits marked as prolific offender checks, Robert received *at least* 19 visits from the STAR Unit that were not marked as prolific offender checks. Ex. 11 at 1, 3, 5, 7, 9, 11, 13, 23, 30, 50, 59, 75, 91, 93, 103, 105, 115, 123,

125 (19 non-POC visits by STAR to Robert's residence); *see also* Ex. 11 at 13 (non-POC visit where dispatch notes state "PROLIFIC ASSOCIATE CHECK ROBERT JONES").

331.   During a September 22, 2015, visit, PSO deputies searched Bobby Jones's room after Robert A. Jones III gave them permission to search it. Jones Decl. ¶ 6; *see also* Ex. 14 at 4.

332.   Six days later, on September 28, 2015, deputies returned to Robert's home and arrested Bobby based on trace amounts of marijuana that they claimed to have found during the earlier search of his room. *See* Ex. 7 at 0:29; Jones Decl. ¶¶ 6–7.

333.   The deputies explained that they were arresting Bobby on marijuana charges because he had been absent from school. Ex. 7 at 0:29 ("We weren't gonna do anything about [the marijuana] if you were being honest with us.").

334.   Bobby's possession charges were later nolle prossed. Jones Decl. ¶ 7.

335.   About a week later, on October 5, 2015, a Pasco County code enforcement officer issued Robert a code citation based on the placement of his trailer and jet ski in his yard. Ex. 14 at 65; Jones Decl. ¶ 9.

336.   During a prolific offender check on December 26, 2015, deputies walked around the house, knocked on and looked in the windows, and tried to talk

to the people inside. Ex. 7 at 0:37, 2:08, 3:00, 4:42, 5:28, 19:00, 20:50, 22:28, 25:45, 27:28, 30:20, 32:58.

337.    Deputies claimed to have looked through the windows and seen a minor smoking inside. Ex. 14 at 20.

338.    During that December 26, 2015, prolific offender check, after Robert refused to allow them to enter the home, STAR deputies arrested Robert on charges of contributing to delinquency of a minor. *See* Ex. 11 at 54; Ex. 14 at 7–24; Jones Decl. ¶ 16; *see also* Ex. 7 at 35:24 (officers arresting Robert seconds after he refused to "continue [their] conversation").

339.    Body-worn camera footage from the December 26, 2015, prolific offender check shows that one of the deputies told the others, "And if he doesn't come out here, we're gonna write him for contributing [to the] delinquency of a minor, we'll take him to jail, and we'll have a nice day." Ex. 7 at 35:04; *see also id.* at 36:05 (deputy telling Robert's wife as Robert was being arrested that "unless [she] wants to go [to jail], [she] had better tell that 17-year-old to come outside").

340.    During the December 26, 2015, prolific offender check, another deputy told Robert, "Little Bobby Jones is bringing this on this house." Ex. 7 at 33:26.

341.    During the December 26, 2015, prolific offender check, another deputy said, "We going to keep harassing them every single day. I told him that." *Id.* at 34:55.

77

342.   During the December 26, 2015, prolific offender check, PSO deputies wrote Robert A. Jones III two code citations for "Co Land Dev Code – Parking/storing Recreational Vehicles." Ex. 14 at 8–17; *see also* Jones Decl. ¶ 17.

343.   On January 4, 2016, members of the STAR unit came to Robert's residence to conduct a prolific offender check on Bobby and, twenty minutes later, arrested Robert for failure to appear for a code citation. Ex. 14 at 25–30; Ex. 11 at 73-76.

344.   Robert does not remember receiving the code citation which led to his warrant for failing to appear. Jones Decl. ¶ 18.

345.   AIM slides from March 1, 2016, indicate that STAR Corporal Hans Bollenbacher "attempted [to] contact [Bobby], Dad not answering door. Will be taking Cpl Celeste (Code Enforcement) with him to visit Dad." Ex. 16 at 10.

346.   On March 28, 2016, Code Enforcement Corporal Mark Celeste, STAR Corporal Hans Bollenbacher, and other PSO deputies visited 3810 Headsail Drive. Ex. 11 at 109; *see also id.* at 111, 112. The "Notes" section of the CAD report references "CODE VIOLATIONS." *Id.* at 109.

347.   During the March 28, 2016, visit, Code Enforcement Corporal Mark Celeste walked around inside the curtilage of Robert's home looking for evidence of property code violations. Ex. 7 at 37:51, 38:13. That same day, Corporal Celeste issued Robert code citations for "Co Ord- Standards For Numbering" (for missing

78

house numbers), "Co Ord- Land Overgrown Conditions" (for tall grass), and "Co Land Dev Code- Parking/storing Recreational Vehicles" (for his trailers being stored on the wrong side of the house), and gave the citations to Bobby Jones. Ex. 14 at 32–48; *see also* Ex. 52 at 1 ("[C]itations were issued to Bobby Jones due to father refusing to come to the door. ([O]ver grown grass – trailer issue)"); Jones Decl. ¶ 19 (explaining that the grass was cut with the exception of a few patches of weeds and that an outdoor light only slightly obscured his already-existing house numbers).

348.   During this visit, body-worn camera footage shows a deputy stating to a group of other deputies: "I told him if they give us 100% information, if it all turns out to be true . . . that's when we maybe, maybe won't write the [code violations]." Ex. 7 at 38:47; *see also* Ex. 23 at 65:8–16.

349.   Two days later, a deputy sent an email concerning "Offender Bobby Jones" in which he recounted that "they refused to open the door. . . . I called Cpl. Celeste who found 2 code violations." Ex. 52 at 1 (ellipsis in original).

350.   Deputies admitted, both in an email and in slides for the department-wide AIM Meeting, that they targeted Robert for code enforcement because he did not answer the door when his son was targeted for prolific offender checks. Ex. 16 at 10; Ex. 52.

351.   On March 29, 2016, members of the STAR unit executed a search warrant at Robert's residence based upon suspicion of wrongdoing by Bobby. Ex. 11 at 113, 115, 120, 121.

352.   During the March 29, 2016, visit, PSO deputies arrested Robert for "marijuana – possess 20 grams or less" and "child neglect, no/minor injury." Ex. 14 at 56–64; Ex. 11 at 115.

353.   Both of those charges were later dropped after state prosecutors found no basis to proceed on the facts of the case. Jones Decl. ¶ 21.

354.   Body-worn camera footage from the March 29, 2016, arrest shows a deputy telling Robert, "We're talking about parenting issues. You've done little or nothing to help out with this situation, while your kid runs around here victimizing people. That's why, that's why all this is today. And we'll just continue on this shit, because you're messing around with an aggressive sheriff. Sheriff Nocco is not playing games, and that's the bottom line." Ex. 7 at 45:55.

355.   The March 29, 2016 visit also resulted in the arrest of Bobby's then-girlfriend. As she was being driven to jail, a deputy showed her how Bobby was on the Top 5 list on his laptop, and he showed her how there was a picture of her next to Bobby's name. Ex. 7 at 40:17. The deputy told her, "Because you're associated with him, you're gonna be on this page for a while." *Id.* at 41:32.

356.   When PSO deputies executed the search warrant on March 29, 2016, at 3810 Headsail Drive, the deputies seized personal property belonging to Robert and his family members. Jones Decl. ¶ 20.

357.   Some of that property was never returned. *Id.*

358.   In August 2016, Robert was arrested by Pinellas Sheriff's deputies pursuant to a failure-to-appear warrant issued by a Pasco County judge based on code citations issued by Pasco deputies. Jones Decl. ¶ 23; *see also* Ex. 85 (Robert's letters to Judge Ann Wansboro detailing PSO visits and citations).

359.   None of Robert's arrests led to a conviction. Jones Decl. ¶ 32.

360.   Immediately after his third arrest, Robert moved his family out of 3810 Headsail Drive and into a hotel. They moved out of Pasco County to escape PSO deputies' harassment soon after. Jones Decl. ¶ 22, 31.

361.   As a result of Robert's three arrests by PSO deputies, Robert had to make bond payments. Jones Decl. ¶ 26.

362.   As a result of the code citations issued by PSO deputies, Robert had to pay the fines for the citations. Jones Decl. ¶ 27.

363.   Robert was aware that his family was being harassed by PSO in 2015 and 2016, but he was not aware of PSO's Intelligence-led policing policies until 2020. Jones Decl. ¶ 28, 33. Thus Robert was not aware that others had been harassed

or had their rights infringed in the same way or otherwise had knowledge of the systemic nature of the harassment. *Id*.

364.   Robert's relationship with his son was damaged as a result of PSO's visits. Jones Decl. ¶¶ 35–36.

365.   Now that he lives in Pasco County again, Robert lives in fear that PSO's harassment will continue. Jones Decl. ¶ 34. This is true even in light of PSO's recent policy change, which PSO's 30(b)(6) witness admitted could be reversed at any moment. Ex. 74 at 154:6–10.

366.   PSO's harassment caused Robert and his family tremendous stress and hardship, and he ultimately had to move his family out of Pasco County. Jones Decl. ¶ 31. It also harmed his relationship with his son and caused his wife to move out of his home. Jones Decl. ¶¶ 35–36.

367.   Robert has younger kids who may be subjected to these policies. Jones Decl. ¶ 13.

vi.   *Plaintiffs' Additional Facts Regarding the Suspension of the Prolific Offender Designation and Prolific Offender Checks and the Adoption of the RAD Directive*

368.   According to testimony, around August of 2021, Major Sanborn announced to deputies that conducting prolific offender checks were no longer viewed as an "intentional obligation" for patrol deputies, as those duties had been moved to another unit. Ex. 75 at 60:24–61:7; *see also* Ex. 79.

82

369.   The number of prolific offender checks conducted by PSO decreased dramatically once the responsibility of conducting the checks was reassigned and, subsequently, after Captain Kraus and his team stopped generating the prolific offender list. Ex. 80 at 1 (email indicating two prolific offender checks conducted in 2022); Ex. 81 at 1 (email indicating 229 prolific offender checks conducted in 2021, with the number of checks performed per month dropping each month).

370.   Deputies did not resume prolific offender checks once the list-making stopped because "if you stop doing something and nobody tells you to start it again, then you just keep stopping." Ex. 75 at 27:16–19 (Sanborn 2023 30(b)(6) Dep.); *see also id.* at 27:20–28:2 (agreeing that, as a matter of resource management, "deputies weren't [going to] do the prolific offender checks unless somebody told them they had to.").

371.   Although the prolific offender designation has been suspended, "[c]rime analysists . . . still review reports of criminal activity and consult with command staff . . . to identify persons who are actively contributing to the criminal environment in Pasco County and still meets with district staff approximately once a week to discuss those persons." ECF No. 204-1 (Supplemental Affidavit of Larry Kraus ¶ 4(c)); *see also* Ex. 74 at 125:20–126:24.

372.   Thus, PSO analysts still work with deputies to identify certain individuals, and those individuals are then discussed at AIM Meetings—which still take place. Ex. 74 at 66:7–14; 125:20–126:24; 129:24–130:1.

373.   While the agency's "prolific offender" designation—and some of the policies that went along with it—has been suspended, the RAD Directive adopts a new term, "focused offender," which describes "a person(s) who has demonstrated a pattern of criminal behavior and is currently affecting the crime environment." Ex. 73 at 10 (RAD Directive).

374.   Per the 2023 RAD Directive, "[w]hen identifying Focused Offenders through analysis, the following should be considered:"

> Is there reasonable suspicion to believe the person is committing crime or is going to commit a crime, if so what information is known to support this[?]; How is this person, place, or group affecting the current crime environment[?]; Will identifying and focusing on said person have an impact on the current crime environment (e.g. reduce or mitigate harm, reduce criminal activity, reduce victimization)[?].

Id.

375.   As was the case with Prolific Offender/Top 5/Zone Focused Offender designations, someone identified using PSO's new "focused offender" classification does not receive notice that they have been identified as a focused offender nor is there any mechanism by which a focused offender could challenge their designation as such. Ex. 74 at 140:19–25.

84

376.   The primary difference between a "prolific offender" and a "focused offender" is the requirement of reasonable suspicion. *Id.* at 91:23–92:4. As Captain Kraus testified, an array of terms is used to describe essentially the same type of offender. *Id.* at 133:22–134:3 (explaining that a focused offender is referred to in the research as "different things. They'll call it prolific. They'll call it—you know, they'll call people targets. They'll call people . . . chronic consumers. There's really no like standard definition across the space in law enforcement that identifies it."). Thus, as Captain Kraus explained, "instead of calling it a prolific [offender] . . . we just chose to call them focused offenders." *Id*. at 134:7–9.

377.   Major Sanborn shared a similar understanding, explaining that "the logic and the rationale behind a focused offender is they're active in the crime environment," Ex. 75 at 37:11–13. Although not always the case, *see* Ex. 28 at 19:6–22, this was also a requirement to be a prolific offender, Ex. 18 at 47:10–12; Ex. 32 at 7 (prolific offenders), 16 (zone focused offenders) (2021 ILP Directive).

378.   The RAD Directive also contains a nomenclature-only change to the way it identifies "problem areas" for purposes of STAR involvement. Whereas the agency used to identify "STAR boxes," it now identifies named areas of interest ("NAIs"). Ex. 74 at 149:1–6 ("[T]hey're a little bit smaller. Same concept, just different name.").

379.   In sum, the PSO continues to focus on places and individuals it believes are currently impacting the criminal environment. Ex. 74 at 124:13–125:1 ("So the overall process [is] . . . not much different[.] . . . [T]he only difference really is that we are not—you know, we're not scoring them."); *see also id.* at 56:22–24 ("I mean, nothing's really changed for the battle rhythm except for the fact that we're not scoring anybody."). Beyond that, a "focused offender" shares the same characteristics as a prolific offender, but PSO officials must also have "reasonable suspicion" of criminal wrongdoing to classify them as a targeted offender. Ex. 73 at 10.

380.   According to testimony, several relevant changes to PSO policy were unilaterally adopted by Captain Larry Kraus. *See* Ex. 74 at 105:6–24 (Kraus 2023 30(b)(6) Dep.). Those policy changes, according to PSO, "were not made in response to the Taylor, et. al. lawsuit," and, relatedly, were not brought to anyone's attention because Captain Kraus was not "aware that there is legal significance to changes which have occurred to the practices of the Sheriff's Office in the last year." Kraus Supplemental Affidavit ¶ 4 (ECF No. 204-1).

381.   Under the RAD Directive, "focused offender" checks are not prohibited and a deputy is free to conduct one. *See* Ex. 74 at 137:17–139:11; 139:23–140:8; 155:4–14. They are not, however, required.

382.   Under the RAD Directive, "if the Sheriff's Office wanted to institute a zero tolerance arrest policy for focused offenders," it would be free to do that. *Id* at 155:16–21; Ex. 75 at 55:25–56:11.

383.   Under the RAD Directive, "[i]f the Sheriff's Office wanted to start doing regular routine checks on focused offenders," it would be free to do that. Ex. 74 at 155:4–8.

384.   Under the RAD Directive, "[i]f the Sheriff's Office wanted to target code enforcement at focused offenders," it would be free to do that. *Id*. at 155:23–156:2; Ex. 75 at 56:13–17.

385.   Ultimately, if Captain Kraus "wanted to change this policy going forward," he could do so the "[s]ame way we did it the first time." Ex. 74 at 154:7–12. That is, he could do so unilaterally. *Id.* at 106:8–10 (Q: Who—directed you to start preparing a revised written policy? A: I did it myself. Yeah, me.").; *see also id.* at 106:11–107:4.

**B.   DEFENDANT'S ADDITIONAL FACTS**

**Defendant's I. The former policies and process of prolific offender designations and prolific offender checks.**

1.      The ILP written policy is the ILP manual.  The relevant versions were adopted in 2016, 2017, 2018, and 2021.   The 2016, '17, and '18 versions were attached as Exhibits A, B, and C to Defendant's prior summary judgment submission.  (Doc. 161-1, 2, and 3).  The last of these, the 2021 version, was split into two documents.  The manual, which is a shorter descriptor of ILP, and then a directive, which describes in greater detail the law enforcement operation of ILP. The descriptor, still called the manual, was attached as Exhibit D.  (Doc. 161-4). The 2021 directive, however, was subject to a confidentiality agreement by the parties and filed under seal. (See Doc.. 114).

2.      For the period of time covered by these manuals, Pasco County had significant problems with "Big Four" crimes, which were auto burglary, burglary of a residence or structure, burglary of a business, and vehicle theft.   The ILP philosophy was that law enforcement resources were better spent not simply reacting to crime, including in particular these crimes, but to identify those circumstances and persons where crime was ongoing and likely to recur.  (Doc. 161-3, pp. 4, 15-16).

3.     ILP relies on *ongoing* behavior to assess probable scenarios and developments but does not have a "crystal ball[]" to predict the future.  (Doc. 134, January 26, 2022, Deposition of Kraus, p. 40, lines 1 through p. 42, line 19).

4.     Every quarter under this former process, the ILP unit used a computerized database of the Pasco County Sheriff's own documents to create a prolific offender pool.  All persons who had been arrested two or more times in Pasco County within the prior three years were in that general pool. It was typically comprised of approximately 1,100 to 1,800 persons. (Doc. 130, September 23, 2021, Kraus Deposition, p. 25, lines 3-9; Doc. 161-3, p. 75).

5.     The agency applied scoring parameters to the prolific offender pool, which assigned higher points for certain type of criminal activity.  (See e.g. Doc. 161-3, p. 75.)  Five points were assigned for arrests involving homicide or firearms or human trafficking, 3 or 4 points are assigned for Big Four offenses, 2 points assigned for grand theft pawn/scrap violation offenses, narcotics (except marijuana), with moderated enhancements for failure to appear and violation of probation, or where the person appeared in five or more reports as "other involvement."  (Doc. 130, September 23, 2021, Kraus Deposition, p. 26, line 23 through p. 27, line 5).

6.     By applying the scoring system, the agency identified the approximately top 100 offenders, and distributed that list to staff crime analysts within each district for further review.  The crime analysts reviewed each person on

the list of top offenders and reviewed agency reports concerning each person. The crime analysts could consult with command staff as to their own experience with each person and the role that person played in the criminal environment. (Doc. 130, September 23, 2021, Kraus Deposition, p. 27, line 13 through p. 28, line 16).

7.     The ultimate criteria applied to a given person on the list so as to determine whether that person would be designated a prolific offender is whether that person was "active in the current crime environment." (Doc 130, September 23, 2021, Kraus Deposition, p.28, lines 14-16; See also Doc. 154, 2021 ILP Directive, filed under seal, p. 7); (Doc. 118, Deposition of Burch, p. 16, line 16, through p. 17, line 16).

8.     Analysts typically received a list for their own district of 30 to 50 names and often the analyst would recognize the names. There was no set number of persons to be so designated. (Doc. 118, Burch, p. 17, line 17, through p. 19, line 10).

9.     Those persons identified as prolific offenders[7] were typically included in briefings for deputies or command staff in each district, often on power points, or slides, called Actionable Intelligence Meeting (AIM) slides. The AIM slides

---

[7] For a time, the Sheriff's Office utilized other designations besides prolific offender, including "Top 5 Offenders" but use of that designation was discontinued. (Doc. 130, Kraus Deposition, p. 62 line 16 through p. 63 line 1). Another was Target of the Month. That designation referred to a person who is wanted on warrants and may or may not be a prolific offender. (Doc. 117, Kraus affidavit, ¶ 8).

recounted for deputies and command staff recent criminal activity in the district and also identify prolific offenders and their associates.  (Doc. 161-3, p. 42; Doc 128, Deposition of Gardner, p. 49, line 11 through p. 50, line 6).

10.   The noting of associates would include the basis therefore, including whether the person was also committing crimes, or, in the case of Tammy Heilman, had previously expressed an anti-law enforcement sentiment.  The purpose was so that deputies would be prepared if they encountered associates, including family members, by knowing who they were and their connection to the offender.  (Doc. 134, Kraus Deposition, p. 130, lines 10-25; p. 143, lines 5-12; p. 200, line 20 thru p. 203, line 16).

11.   Juvenile prolific offenders were identified in the same manner as adult prolific offenders.  The agency recommended to the State Attorney's Office that a juvenile prolific offender be charged and adjudicated as an adult when the juvenile met the definition of prolific offender and had committed a serious and violent offense or had a significant impact on crime.   (Doc. 161-3, pp. 18-19)

12.   Agency personnel were required by the manual to perform a face-to-face prolific offender check (hereinafter "POC") at least once every quarter.  The manual included performance expectations for POCs, and deputies were to learn as much as possible about prolific offenders, including acquaintances, locations frequented, etc. (Doc. 161-3, p. 19).  The ILP manual suggested that deputies seek

information about the criminal environment, including knowledge of other criminal activity in the area.   (Id., p. 43) (Doc. 135, Deposition of Sanborn, p. 23, line 11 through p. 24, line 5).

13.    The ILP Manual did not direct deputies on how to conduct POCs.  It did not direct deputies as to their demeanor or actions during a POC;  it did not contain any direction or information as to when or how to conduct searches or conduct any particular investigation;  it did not direct their frequency (other than once a quarter).  It did not direct deputies that constitutional rights of prolific offenders or their families were in any way lessened by the prolific offender status. No ILP manual or other written material directed deputies to deviate in any way from the Sheriff's General Orders.  (Doc. 117, Affidavit of Kraus, ⁋ 5).

14.    The Sheriff's General Orders provided, among other things, that deputies must respect the constitutional rights of all citizens.  (Doc. 161-4, General Order 1.2:  "It is the policy of the Sheriff's Office to comply with all state and federal laws, and to preserve and protect the constitutional rights of all citizens.")

15.    The ILP manual under the former process encouraged deputies to offer or promote local services to prolific offenders.  (Doc.161-3, pp.14-15).   It was a goal of ILP to reduce recidivism, including through the offer of services. (Doc. 135, Deposition of Sanborn, p. 80, line 20, through p. 81, line 2).

16.     Under the former process, where criminal offenses were committed by prolific offenders, the Sheriff's Office had a zero-tolerance arrest policy.  Doc. 161-3, p. 19; Doc 135, Deposition of Sanborn, p. 88, lines 5-13).

17.     ILP also used Strategic Targeted Area Response (STAR) to identify problem areas, called "STAR boxes," which were defined as "locations where crime is persistently dense over an extended period of time."  As of the 2018 ILP manual, agency records reflected that each district had two STAR boxes, each covering approximately 7 to 10 square miles.  These areas account for approximately 50 percent of the Big Four and violent crime-focused offenses for that district. (Doc. 161-3, p. 22).

18.     Deputies were expected to learn the location of the STAR boxes and the deputies working within them, to develop knowledge of offenders living within STAR boxes, and to stay abreast of emerging crime trends in the area so as to prevent future calls.  (Id., p. 22).

19.     The 2015 STAR manual further broke down the statistics and noted that 20 to 25 percent of the Big Four crimes in the district were committed there.  As a result, deputies working in areas which include the STAR boxes were expected to spend half of their time working in the STAR boxes and the surrounding area. STAR Team members have a zero tolerance for crimes committed within the STAR boxes. (Doc. 161-5, p. 1).

20.    As to documentation available to the parties in this case, PSO had a database, begun in 2017, which showed when a person was first designated a prolific offender and when that person was last removed from the system as a prolific offender.  It cannot show whether a person went off the list and went back on within those bookended dates.  Additionally, a person could have been a prolific offender prior to 2017, and that can be determined through other documentation, though not as precisely in terms of dates on an and off such designation.  Of the four named plaintiffs, only Dalanea Taylor was *ever* identified as a prolific offender.  She is listed in the above-referenced database from March 30, 2017, to January 11, 2018.  None of the other three plaintiffs- Deegan, Jones, or Heilman – ever carried any designation as a prolific offender. (Doc. 116, Affidavit of Ross Brummett, ℙ 3-4).

21.    PSO also generated a list of deputy responses to the addresses of the prolific offenders.  The dispatcher or the deputy could select the nature of the response to that address from a drop-down menu in the nature field and the list includes the drop-down menu selection for the reason for the response.  A dispatcher could make one selection, and the deputy change it.[8]

---

[8] The parties have found a small number of incidents in which either body camera or underlying dispatch or deputy documentation of a given incident differs from the dispatcher or deputy having chosen from the drop-down menu a prolific offender check when it really was not a prolific offender check, or where deputy notes indicate it had at least a prolific offender element to it, even if the call was initially for something else.  This is very incident- and fact- specific and so has to be examined case by case.  It will be noted below by Defendant and presumably by Plaintiffs, as well.

22.     If a person, prolific offender or otherwise, had a complaint that person could contact the Sheriff's Office via publicly available mechanisms to complain, including where that person believed they were receiving unwarranted attention from Sheriff's Deputies or had any complaint regarding prolific offender checks. (Plaintiffs' Ex. 18, p. 68, line 18 p. 69, line 21).

23.     There is at least one example of a person having done so by emailing the Sheriff to ask that their child be removed as a prolific offender.  (Plaintiffs' Ex. 18, p. 69, line 22 through p. 70, line 4).

24.     Additionally, Plaintiff Darlene Deegan used the publicly-available means of contacting the Sheriff's Office to lodge complaints about other things, such as an April 20, 2017, complaint when Deegan emailed the agency to ask for assistance complaining that attorneys in New York had fraudulently sought to foreclose on her real estate. (Doc. 161-7).  On another occasion she asked to come in to discuss a theft at her property.  (Doc. 161-8).

25.     Additionally, Plaintiff Heilman's daughter filed a complaint regarding "harassment" of Tammy Heilman concerning her arrest in 2018.  (Plaintiffs' Ex. 56).

26.     In September 2018, Plaintiff Darlene Deegan filed a complaint about PSO's interactions with her with the Florida Department of Law Enforcement (FDLE).  FDLE replied that it did not have jurisdiction to consider it.  FDLE instead advised Deegan that she should make complaints of misconduct to PSO and that she

should make complaints of civil right violations to the Department of Justice. (Plaintiffs' Ex. 55, p. 1).   She did neither.

27.   There are examples in the record where deputies had discussions with Plaintiffs about the fact that deputies would be checking up on them.

a.   On September 22, 2015, check of Bobby Jones during which both were told that the Sheriff was placing Bobby and his friends who were committing crimes on notice that it will not be tolerated.   Deputies stated that the Sheriff wanted to encourage kids to grow up and become good citizens.   Bobby admitted he knew that the majority of property crimes being committed was by juveniles and deputies encouraged Jones not to continue to commit crimes because he might face felony charges.   (Doc. 154,   Non-Electronic   Filing,   BWC,   #65, (Extraction_1.1)_Jones_interview).;

b.   A check of Dalanea was performed on February 25, 2018.   She had a very pleasant conversation with a female deputy and the two discussed the best morning sickness drugs.   Ms. Taylor was encouraged to stay away from crime. At the conclusion the deputy told her they were required to check on her from time to time and Taylor said she appreciated it. (Extraction_1.1_AXON_Flex_2_Video_2018-02-25_1115).

28.     None of the Plaintiffs or their children were prolific offenders even as of the date of filing of the first set of summary judgment motions by the parties in June, 2022.  (Doc. 117, Affidavit of Kraus, ₱ 10).

**Defendant's II. The 2021 change in priorities; PSO moves away from the prolific offender designation or checks process and towards identifying focused offenders, which are persons contributing to the criminal environment, particularly the drug trade (and even more particularly fentanyl), and who are suspected in specific criminal activity.**

29.     Beginning in 2021, the agency deemphasized prolific offender designation and the prolific offender check process and the number of checks declined dramatically over the course of the year, from 75 in January, to 20 in April, to just 2 in August and September, and 1 in December.  The total number of prolific offender checks reported agency wide in 2021 was 229, and just two were reported in all of 2022.   (Sanborn Deposition February 2, 2023, Exhibits 13 and 14; Deposition p. 69, line 22 through p. 72, line 18).

30.     There were a number of reasons for the change from the prolific offender designation/check approach to a focused offender approach. Larry Kraus, Captain of the Research and Analysis Division of the Pasco Sheriff's Office, was re-deposed by Plaintiffs on February 2, 2023, after the changes were formalized. Plaintiffs also re-deposed Major Tait Sanborn on the same day.[9]   The two men

---

[9] The February 2, 2023, depositions of Kraus and Sanborn will be filed along with the Second Amended Summary Judgment Motion.

explained the basis for the change in approach from "prolific offender" designations and checks on offenders, to "focused offenders," with no randomized checks, no special attention for code enforcement, and no zero tolerance arrest approach:

a.   The designation of prolific offenders was taking too much of the intelligence analysts' time to obtain, clean, and develop the prolific offender list.  It was an inefficient use of their time.  (Kraus Deposition February 2, 2023, p. 24, lines 11 through 17; p. 28, lines 2 through 25);

b.   Pasco County is suffering from an "extensive amount of overdoses, primarily from fentanyl."  Captain Kraus estimates deputies are responding to 135 overdoses a month, and a third of those result in deaths.  The shift to a focus on drug hot spots, embodied in the January 31, 2023, RAD directive was part of the response to this.  The ILP philosophy or problem people, places, and group remains, but the manner in which the PSO focuses on those things changed with the ending of prolific offender designations and shift to focused offenders.  (Kraus Deposition February 2, 2023, p. 98, line 23 through p. 101, line 2).

c.   The PSO stopped tracking prolific offenders.  The PSO has been "smacked in the face" by the "fentanyl pandemic," with people dying left and right.  The agency briefly shifted the responsibility for prolific

offender checks in this context to the behavioral intervention team, but no longer observes the prolific offender designation and there are no prolific offender checks.  (Sanborn Deposition February 2, 2023, p. 20, line 16, through p. 22, line 22).

    d.    Another reason for the change was that the covid pandemic began and closed business, disrupting the way people worked, drove, and lived. The crime environment "changed pretty dynamically at that point in 2020."  At that point, the PSO had to send two deputies to each call for service.  In early 2021 the crime environment changed again as things reopened and calls for service went up.   Additionally, there was an explosion of population growth in the County.  As a result, the Sheriff made the decision that something's got to give here:  the agency could not devote resources to prolific offender checks, as it had in the past. (Sanborn Deposition February 2, 2023, p. 56, line 19 through p. 60, line 8;  p. 68, line 24 through p. 69, line 21).

31.    As a result of all of this, the PSO no longer uses the prolific offender designation and in fact the computer generation of the initial prolific offender list ended in March, 2022. (Kraus Deposition February 2, 2023, p.28, lines 2 through 6).

32.    The Research and Analysis Division (RAD) of the PSO now identifies "focused offenders" and this is memorialized in the most recent Law Enforcement

directive on the subject.  The RAD directive, effective as of January 31, 2023, was attached to the February 2, 2023, deposition of Captain Kraus.

33.    A focused offender is defined within the RAD directive as a person who has demonstrated a pattern of repetitive criminal behavior and is currently affecting the crime environment.   When identifying a focused offender, analysts consider whether there is at least reasonable suspicion to believe that the person is committing crime or is going to commit crime and the basis for that information.   (RAD Directive, p. 10).

34.    The RAD memorializes elimination of the process of designating prolific offenders by the agency.[10]

35.    There is no scoring of focused offenders and focused offenders are identified subjectively by the crime analysts within each district.  (Kraus Deposition February 2, 2023, p. 30, lines 2 through 25; p. 33, line 23 through p. 35, line 21).

36.    The RAD does not require checks of "focused offenders," as the former approach did with "prolific offenders."  The process changed in 2022 when the list was no longer generated and is now reflected in the new RAD directive.  (Kraus Deposition February 2, 2023, p. 74, line 16 through p. 75, line 20).

---

[10] There is a citation to a state statute on "juvenile prolific offenders" under §985.255, Fla. Stat. (see p. 11 of the RAD), but that has no relationship to the prolific offender issues in this litigation.

37.     None of the named plaintiffs or their children is currently designated as a focused offender under the new process. (Affidavit of Brummett March 10, 2023, ⊩ 3).

38.     The agency generated a spreadsheet of all responses to the residences of the Plaintiffs and their children, from the time each was first designated, beginning as early as 2017 when the database began, showing among other things the date of the visit and the reason for the visit as indicated by the drop-down menu in the CAD report (selected either by dispatch or the deputy).   (Doc. 120, Deposition of Brummett, Exhibit D; Deposition of Brummett, p. 65, line 22, through p. 67, line 18).

39.     The total generated among the addresses for the four plaintiffs was 506 reports.  Those designated as prolific offender checks are highlighted in yellow. Other than reviewing each of the 506 CAD or incident reports for those involving deputy interactions, this is the best means of getting an overview of the nature of the interactions between deputies and persons at the residences.  (Doc 120., Deposition of Brummett, p. 60, lines 7-15;  p. 67, line 19, through p. 72, line 4).

40.     There is great diversity as between the percentage of visits to one of the Plaintiffs' addresses designated as a prolific offender check, versus a different cause as indicated in the nature field of the CAD report.  For example, in cells 401-425, the visits for Dalanea Taylor and her address are listed.   Fifteen of the visits are

indicated in the CAD nature field as prolific offender checks, and ten are for reasons varying from "person down" (cell 414, dated 9/11/2017) to a report of a prowler dated 12/5/2017 (cell 424). (Doc. 120, Deposition of Brummett, Exhibit D).

41.   Compare that to visits generated to Tammy Heilman's residence, noted to have occurred during the time that Donnie McDougall was identified as a prolific offender.  (See Exhibit D to Brummett deposition, Doc. 120, pp. 3-4).  There are 107 total visits, the vast majority of which are *not* identified in the CAD nature fields as prolific offender checks.  Only 23 of the 107 total for the Heilman residence visits are identified as prolific offender checks.  The other reasons cover a wide range of calls for service, including domestic violence (cell 104, 4/25/2020), suicide attempt (cell 47, 8/26/2018), and burglary of a residence (cell 17, 7/8/17). (Doc. 120, Deposition of Brummett, Exhibit D).

## **Defendant's III – Facts specific to the individual Plaintiffs under the former prolific offender designation and check process.**

### A.   **Tammy Heilman**

42.   Tammy Heilman was never identified as a prolific offender.  Rather, her son Donnie McDougall was designated a prolific offender on January 12, 2017, and dropped from that designation on September 21, 2020. (Doc. 116, Affidavit of Brummett, ⁋ 4).

43.   Donnie McDougall's Pasco County Clerk and Juvenile Justice records show that beginning in 2012 he had well over 50 reported charges, ranging from

single arrests on multiple felony violation of probation charges to felony grand theft of a motor vehicle, to burglary. There are many misdemeanor charges as well, which are protected by statute. Bobby Jones' Pasco County Clerk and Juvenile Justice records show that he had approximately 20 reported charges, including nine felonies and multiple pick-up orders or warrants from Pinellas County. (Doc. 154, Under Seal, Confidential Juvenile Records, Donnie McDougall).

44.     Tammy Heilman's other son, Anthony, was not designated a prolific offender, although for a very brief time he was identified as a "Target of the Month" because he had a warrant out for his arrest.[11] (Doc. 116, Affidavit of Brummett, ⁋ 4).

45.     During the time that Donnie was identified as a prolific offender, there were 107 total visits identified in the agency's database, the vast majority of which are *not* identified in the CAD nature fields as prolific offender checks. (Doc. 120, Brummett Deposition, Exhibit D, pp. 3-4). Only 23 of the 107 total for the Heilman residence visits are identified as prolific offender checks. The other reasons cover a wide range of calls for service, including domestic violence (cell 104, 4/25/2020), suicide attempt (cell 47, 8/26/2018), and burglary of a residence (cell 17, 7/8/17). (Doc. 120, Deposition of Brummett, Exhibit D).

---

[11] That designation is unrelated to prolific offender status or prolific offender checks. (Doc. 117, Affidavit of Kraus, ⁋ 8).

46.     Ms. Heilman in deposition acknowledged dozens of visits to her home by Pasco deputies that had nothing to do with prolific offender status of any of her children.  Many included Heilman, her husband, or her children affirmatively calling the Pasco Sheriff's Office for assistance.   These included:

a.  On June 6, 2016, there was a call for service by Donnie McDougall to the PSO regarding his girlfriend threatening suicide.  (Doc. 124, Deposition of Heilman, Exhibit 11).

b.  On September 28, 2016, Donnie McDougall called EMS to report that Heilman was not breathing.  (Id., Exhibit 12).

c.  On November 17, 2016, Heilman's daughter, Tyler, called 911 because Donnie McDougall was "going crazy" and spitting on her. (Id., Exhibit 13).

d.  Twelve days later, on November 29, 2016, Donnie called 911 because Tyler sprayed Donnie with Mace. (Id., Exhibit 14).

e.  On May 6, 2017, Heilman's Husband Jeff Zander, called 911 requesting that Pasco County Sheriff's remove six juveniles from the residence, including Donnie. (Id., p. 54, line 18 through p. 55, line 6; Exhibit 16).

f.  On March 13, 2018, deputies responded to Heilman's residence because Mr. Zander called the Sheriff's Office and reported that Donnie had pointed a revolver at him.  (Id., p. 63, lines 5-20; Exhibit F).

g.  On March 25, 2019, deputies responded to Heilman's residence due to a report that, among other things, Heilman's nephew threatened to slit her throat.  (Doc. 124, Deposition of Heilman, Exhibit 21;   p. 69, line 14, through p. 70, line 19).

47.    Other calls for service are attached to her deposition and Heilman readily agreed that many visits to her home were not prolific offender checks.  (Id., p. 76, lines 9-10).

48.    For example, on June 26, 2019, Pasco County Sheriff's responded to Heilman's residence due to a call from Donnie's girlfriend who stated that an individual made threats to either shoot up or burn the house down. (Id., p. 77, line 9 through p. 79, line 6; Exhibit 23).

49.    On April 25, 2020, deputies responded to a domestic violence disturbance between Heilman's husband and her son Anthony. Anthony was arrested for Battery – Domestic Violence. (Id., p. 89, line 4 through p. 90, line 6; Exhibit 27).

50.    On August 9, 2020, deputies came to the Heilman residence and provided Anthony McDougall with a resource guide of local services, including employment opportunities. (Doc. 154, Non-Electronic Filing, BWC, #50, (Extraction_1.1)_Axon_Body_3_Video_2020-08-09_1539).[12] This was explained

---

[12] The Defendant previously filed under seal all deputy reports and, where there is body worn camera video, that video, all under seal.  (Dkt. 154).  The files are first subdivided by Plaintiff,

to Mr. Zander (at the 2:20 mark), who responded "That would be great."  Anthony came out and deputies explained that the guide was provided to help Anthony from making mistakes in the future.  At the 4:35 mark, Anthony states "I really appreciate that."

51.     The first code citation issued to Heilman occurred on March 1, 2016. Warnings were given to her that she had no numbers on her mailbox, and upon recheck she still had no numbers. (Deposition of Heilman, Exhibit 2).  She contested the citation, adjudication was withheld, but she was ordered to pay a fine of $30, plus $56 in fees, which she paid.  She was also ordered to come into compliance with code.  (Doc. 124, Deposition of Heilman, p. 16, line 22, through p. 18, line 13; Id., Exhibit 3 to the deposition).

52.     Heilman received citations for having chickens in her backyard on March 3, 2016.  She admits she had five chickens in the backyard and acknowledges the citation.   Adjudication was withheld, she was fined $100, plus $56 in fees, and ordered to come into compliance, which she did.  (Doc. 124, Deposition of Heilman, p. 18, line 15, through p. 21, line 4;  Id., Exhibit 3).

---

then organized by date.  Each of those files contains any CAD report or incident reports, and correlated video, for that date.  Thus, in this statement of fact, the Defendant refers to incidents by Plaintiff, then by date, and then either the reports or the video (or both).  The reason these were filed under seal is because the CAD reports or deputy reports contain confidential or personal identifiers across a wide swath of documents and incidents.  Per the Court's Order the Defendant also filed – but not under seal – all of the body worn camera video.

53.     The issuance of this code violation citation was captured on BWC and Defendant urges the Court to review this four-minute video.  (Doc. 154, Non-Electronic Filing, Deposition Video Exhibits, Dkt. 124, Exhibit 28 - Body Cam Footage Extraction 1.1 County Ordinance Chickens). In the video, deputies approached the Heilman residence to deliver the citation.   Initially Heilman's husband, Mr. Zander, came to the door and began cursing at deputies stating he could have "backyard motherfucking chickens" in his backyard if he wanted to.  Plaintiff Heilman came to the door and told deputies to "Get the fuck out of here!"  Deputies were calm and professional throughout.   Small children came out from inside the home and witnessed Heilman and Zander relentlessly cursing at the deputies, who were polite throughout.

54.     On October 18, 2017, Heilman was given a code violation citation for having an accumulation of junk in her front yard, including a cinder block, some fencing, and a child's toy car.  (Doc. 124, Heilman Deposition, p. 25, lines 11-24; Id., Exhibit 5).  She corrected the problem prior to the scheduled hearing and did not have to pay any fines.  (Id., p. 26, lines 8-19).

55.     A prolific offender check was attempted at Heilman's residence on May 23, 2018.  Heilman reported that Donnie was staying out of trouble and in touch with his probation officer.   She joked with deputies about how "ferocious" her small "guard dog" was.  The interaction was about two minutes long and was benign. Doc.

154, Notice of non-electronic filing, BWC # 39 (Extraction_1.1_AXON_Flex_2_Video__2018-05-23_1527).

56. Heilman was arrested twice.   The first time was on September 16, 2016.  Prior to that, deputies were investigating an armed residential burglary and it was suspected that Heilman's son, Donnie, had used proceeds from the burglary to purchase a motorbike.  On September 15, 2016, Deputy Andrew Denbo spoke to Heilman concerning the investigation and she provided false information, claiming she purchased the dirt bike for Donnie using her own money.  (Doc. 126, Deposition of Denbo, p. 80, lines 9-23; Id., Exhibit 21).

57. Denbo returned to arrest Heilman for giving the false information and as he approached the residence Heilman quickly departed in her vehicle, with her young daughter.  Denbo pursued her and pulled her over, ordered her to step out as he was placing her under arrest.  She physically braced herself and pulled away from the deputy, scratching the deputy using her fingernails to dig into his skin, trying to get away.  Doc. 161-13.

58. Heilman was arrested and charged with battery on a law enforcement officer and resisting arrest without violence.  (Doc. 161-13, pp. 3-4).  Video of this incident was captured on BWC. (Doc. 154, Non-Electronic Filing, BWC, #27, (Extraction_1.1)_BATTERY_ON_LEO-14).  She pled guilty to and was convicted of three misdemeanors: battery, resisting an officer without violence, and giving

false information to an officer.  (Doc. 124, Deposition of Heilman, p. 21, line 16, through p. 22, line 10; Id., Exhibit 4, p. 3).

59.    On November 7, 2017, deputies visited the Heilman residence and spoke to Donnie McDougall.  McDougall said his 18th birthday was coming up and deputies explained to him the advantage of not committing a crime after 18 because he would not have to report juvenile arrests to a potential employer. (Doc. 154, Non-electronic filing, BWC # 30, (Extraction 1.1) AXON_Flex_2_Video_2017-11-07_0516-2).

60.    On September 18, 2018, deputies came to the Heilman residence because they had a pick-up order for one of the children.  Heilman answered the door and abruptly swung the door open and into Deputy Cpl. Paul Reagan with enough force that he had to steady himself.  Heilman was arrested and charged with battery on a law enforcement officer.  She pled guilty and adjudication was withheld, she was sentenced to 24 months' probation.  (Doc. 124, Deposition of Heilman, p. 26, line 20, through p. 27, line 9; Id., Exhibit 6).  This incident was also captured on BWC.   (Doc.   154,   Non-Electronic   Filing,   BWC,   #43, (Extraction_1.1)_BATTERY_ON_LEO-6).

### B.    Dalanea Taylor.

61.    Of the named Plaintiffs only Dalanea Taylor was actually a prolific offender.

109

62.     Plaintiff Dalanea Taylor was a self-admitted member of "The Squad," which was a group of young people who engaged in numerous car burglaries ("car hopping"). Sometimes, they stole the cars to joy ride. Taylor admitted in 2012 to committing approximately 50 car burglaries. (Doc. 161-14, Exhibit N; Doc. 161-15, Exhibit O).

63.     There is great diversity as between the percentage of visits to one of the Plaintiffs' addresses designated as a prolific offender check, versus a different cause as indicated in the nature field of the CAD report. For example, in cells 401-425, the visits for Dalanea Taylor and her address are listed. Fifteen of the visits are indicated in the CAD nature field as prolific offender checks, and ten are for reasons varying from "person down" (cell 414, dated 9/11/2017) to a report of a prowler dated 12/5/2017 (cell 424). (Doc. 120, Deposition of Brummett, Exhibit D).

64.     A prolific offender check was performed on Dalanea Taylor on September 29, 2017. Taylor came to the door at the 7-minute mark on the video. Deputies asked her how she was doing and if she was staying out of trouble. The interaction was benign and lasted less than three minutes. (Doc. 154, Non-Electronic Filing, BWC, #2, (Extraction_1.1)_AXON_Flex_2_Video_2017-09-29_0832).

65.     A check of Dalanea was performed at 7:45 a.m. on January 1, 2018. Taylor's grandmother came to the door and complained about the hour of the check. A conversation with Taylor occurred and was benign. Taylor stated that she and her

sister, who was also pregnant, were planning to move.  The interaction lasted just a few minutes.   (Doc. 154, Non-Electronic Filing, BWC, #5, (Extraction_1.1)_AXON_Flex_2_Video_1028-01-01_742).

66.    A check of Dalanea was performed on February 25, 2018.  She had a very pleasant conversation with a female deputy and the two discussed the best morning sickness drugs.  Ms. Taylor was encouraged to stay away from crime. At the conclusion the deputy told her they were required to check on her from time to time and Taylor said she appreciated it.  (Doc. 154, Non-Electronic Filing, BWC, #6, (Extraction_1.1)_AXON_Flex_2_Video_2018-02-25_1115).

### C.   <u>**Darlene Deegan**</u>

67.    Darlene Deegan's son, Tyler Paneson, was identified as a prolific offender beginning on January 12, 2017, and last removed from the list on October 15, 2021.  (Doc. 116, Affidavit of Brummett, ¶ 4).  Mr. Paneson has since passed away.

68.    Paneson was designated a prolific offender beginning on January 12, 2017.  (Doc. 116, Affidavit of Brummet, ¶ 4). On April 10, 2018, Pasco deputies were dispatched to Deegan's residence reference an unwanted guest, her adult son Tyler Paneson. Deegan requested that Paneson be trespassed from the property because Deegan did not allow drugs in her residence. (Doc. 123, Deposition of Deegan, p. 29, line 15 through p. 30, line 12; Id., Exhibit 5).

69.     On September 16, 2018, Deegan called the Pasco County Sheriff's Office to report that a man who was working on her roof stole items from her garage. The man was arrested and charged with grand theft. (Doc. 123, Deposition of Deegan, p. 35, line 20 through p. 36, line 23; Id., Exhibit 7).  On October 27, 2018, Deegan called the Sheriff's Office to complain that a neighbor was illegally parking cars at the neighbor's residence.  (Doc. 123, Deposition of Deegan, Exhibit 8).

70.     On March 29, 2019, Deegan called the Sheriff's Office because her son, Paneson, was in her garage throwing things around.  Deputies responded.  She asked that Paneson be trespassed from the home.  Two days later, Deegan called back and complained that Paneson was stealing out of her garage and she again wanted him trespassed from the property. (Doc. 123, Deposition of Deegan, Exhibits 11 and 12).

71.     Other reports involving Deegan asking that the Sheriff's Office come to her home are attached to her deposition.   Deegan emailed the agency on multiple occasions to make complaints and to seek services from the Sheriff's Office.  On April 20, 2017, Deegan emailed the agency to ask for assistance complaining that attorneys in New York had fraudulently sought to foreclose on her real estate. (Doc. 161-7).  On another occasion she asked to come in to discuss a theft at her property. (Doc. 161-8). On November 18, 2015, Deegan emailed the agency complaining about traffic on her street coming from a pawn shop.  She asked who would enforce laws about traffic from the pawn shop coming onto her road, stating "[a]s property

owners, we have a right to the protection and quiet enjoyment of our property on Amanda Ave." (Doc. 161-9).

72.   In June 2018, the Sheriff's Office developed probable cause for grand theft based on information that Paneson had stolen a kayak. (Doc. 161-16).

73.    On June 5, 2018, deputies came to the residence, looking for Paneson, and spoke to a young lady, who claimed he was not there. Deputies remained on the public street side of the fence.  (Doc. 154, Non-Electronic Filing, BWC, #12, (Extraction_1.1)_AXON_Flex_2_Video_2018-06-05_1536).

74.   On June 6, 2018, deputies went to Deegan's home again looking for Paneson based on this probable cause. Video shows that Deegan's home has a fence with a no trespassing sign at the front of the home, with a wooden stick propped up by another wooden stick at the end of the chain link fence.  (Doc. 154, Non-Electronic Filing, BWC, #10, (Extraction 1.1) AXON Flex_2_2018-06- 06_0836). The video at the 1:50 mark shows deputies climbing over the wooden portion of the fence and going onto the property, looking for Paneson.

75.   The deputy narrative states "On 6/6/18 I responded to 14137 Amanda Avenue Hudson, Florida in reference to county ordinance violations and also to locate wanted person, Tyler Paneson for Grand Theft." (Doc. 154, Under Seal, CAD

Reports, Deegan, 2018-06-06, 06-06-2018 IR 18-022729). [13]

76.     One CAD report states in the drop-down menu selection in the nature field that the response on June 6, 2018, to Deegan's residence was for a prolific offender check.  However, numerous other CAD reports state "SO Investigation" or the like, and a full narrative states that deputies were there to arrest Paneson based on probable cause. (*See Reports*, Doc. 154, Under Seal, CAD Reports, Deegan, 2018-06-06).

77.     Similarly, on June 8, 2018, deputies returned looking for Paneson and BWC shows they stayed on the street side of the fence yet again.  This time they spoke with Deegan, who was home cleaning up debris in her front yard, for which she had apparently been cited. (Doc. 154, Non-Electronic Filing, BWC, #19, (Extraction_1.1)_AXON_Flex_2_Video_2018-06-08_1031).  Beginning at the 4:20 mark deputies asked if they could come on to the property.  Deegan declined to give permission to deputies to enter and they stayed on the public side of the fence.

78.     Beginning at the 16:30 mark of the June 8, 2018, BWC, deputies called a code enforcement corporal and Deegan spoke to the corporal, who told her that if

---

[13] It should be noted that the Defendant filed each BWC video, twice, under Doc. 154.  All BWCs were filed non-electronically.  Then, for ease of reference for the Court, the BWC was filed again along with the corresponding documents corresponding to that BWC, under seal as the reports contained privacy protected information.

she helped locate Paneson deputies would work with her on the code citations by getting her more time to come into compliance or speaking to the County Attorney to resolve the citations. Deputies reiterated that their goal was to get Paneson safely into custody. At the 26:50 mark deputies again asked for permission to check the property, to look in the RV to make sure no one was living there, Deegan refused again and deputies did not enter the property.

79.     Deegan negotiated an agreement with the County Attorney whereby she paid $250 to resolve the referenced citation, among a total of five citations, plus came into compliance, i.e. put numbers on the house and removed debris from her yard. (Deegan deposition, p. 57, line 1 through p. 63, line 6. See Exhibits 18, 19, and 20 to Deposition).

## D.    Robert Jones III

80.     Robert Jones III was not designated a prolific offender. His son, Robert Jones IV (a/k/a "Bobby"), was a prolific offender for a period of time, but the family moved out of the area in April/May of 2016, more than four years before filing of the initial complaint on March 10, 2021. (Doc. 1). The window of time involving Plaintiff Jones' connection to this case is narrow, less than one year. Jones testified that the family moved to Pasco County in April-May of 2015. (Doc. 131, Deposition of Jones, p. 11, line 18, through p. 12, line 10; p. 14, lines 2-6.). The family then

moved *out of* Pasco County in 2016. (Doc. 131, Deposition of Jones, p.23, lines 12-25).

81.    Bobby Jones' Pasco County Clerk and Juvenile Justice records show that he had approximately 20 reported charges, including nine felonies and multiple pick-up orders or warrants from Pinellas County. (Doc. 154, Under Seal, Confidential Juvenile Records, Robert Jones IV).

82.    This corresponds to agency records because the first call for service involving the Jones residence was dated May 11, 2015, and the last prolific offender check at Jones' residence was on May 3, 2016. (Doc. 120, Deposition of Brummett, Exhibit D, pp. 10- 11, cells 2 and 80).

83.    As with the other Plaintiffs, there were calls for service to the residence for reasons other than prolific offender checks or ILP.  Some of the non-prolific offender visits to the Jones residence included:

   a. On May 11 and June 11, 2015, deputies arrived at the residence to serve civil process. (Doc. 131, Deposition of Jones , Exhibits 2 and 5, p. 35, line 16 through p. 36, line 3).

   b. On June 17, 2015, Donna Jones, Plaintiff Jones' wife, called to ask for assistance because of a domestic disturbance between Plaintiff Jones and his son, Bobby.  (Doc. 131, Deposition of Jones, Exhibit 6).

c.  On June 29, 2015, deputies responded because they received a report from the state's Juvenile Assessment Center that Bobby Jones' ankle monitor had been cut off.  (Doc. 131, Deposition of Jones, Exhibit 14). Jones testified that this occurred because it was not plugged in correctly and that in fact between five- and 10-times deputies were called out to reports of that having occurred.   Nothing particularly bad occurred during those five to ten visits.  (Doc. 131, Deposition of Jones, p. 69, line 10 through p. 72, line 7).

d.  On August 2, 2015, deputies responded to a call from Jones' neighbor, who advised that Bobby Jones was stealing electricity from her, using an extension cord from her home.  Jones apologized and offered to pay for the electricity.  (Doc. 131, Deposition of Jones, Exhibit 18).

e.  On October 12, 2015, Donna Jones called deputies for assistance because numerous juveniles would not leave the house, including Bobby Jones.  (Doc. 131, Deposition of Jones, Exhibit 26).

f.  Bobby Jones was subsequently arrested on five out of county warrants. (Doc. 131, Deposition of Jones, Exhibit 31).

g.  On November 24, 2015, deputies arrested Bobby at the residence on seven outstanding warrants from Pinellas County.   (Doc. 131, Deposition of Jones, Exhibit 36).

84.     On September 22, 2015, deputies went to the Jones residence and spoke to Plaintiff and his son Bobby.  Beginning at the 7-minute mark, deputies explain that the Sheriff is placing Bobby and his friends who are committing crimes on notice that it will not be tolerated.  Deputies state that the Sheriff wants to encourage kids to grow up and become good citizens.  Bobby admits he knows that the majority of property crimes being committed are by juveniles and deputies encouraged Jones not to continue to commit crimes because he might face felony charges and miss out on years of his life.  At 18:40 mark, deputies reiterate that Jones "seem[s] like a good kid," his record is "not that bad."  (Doc. 154, Non-Electronic Filing, BWC, #65, (Extraction_1.1)_Jones_interview).

85.     Jones was first issued a citation on October 5, 2015, not by the Sheriff's Office, but by County Code Enforcement, for failing to store a trailer with jet skis either in a garage or behind the residence.  Jones did not appear at the hearing, and he was arrested on a warrant for failure to appear on January 4, 2016.  (Doc. 161-10).

86.     On December 26, 2015, a deputy went to the Jones residence to serve a warrant.  He observed jet skis on a trailer and issued citations for two violations (jet skis on a trailer, and a utility trailer parked in front of the house).  Jones took the citation and signed it.  (Doc. 131, Deposition of Jones, Exhibit 43, p. 3; Doc. 154,

Non-Electronic Filing, BWC, #53). Jones once again failed to appear, and a warrant was issued for his arrest. (Doc. 161-11).

87.     Jones claimed in deposition that this was the only code violation citation he actually *ever* received. (Doc. 131, Deposition of Jones, Exhibit 43, p. 5). Jones testified that he went to court on the scheduled day for the citations, February 25, 2016, but that he could not get into the courthouse. He gave two different explanations: first that it was because when he arrived court had already started and he was not allowed into the courtroom; second that the Fire Marshall ejected everyone from the building. (Doc. 131, Deposition of Jones, p. 143, line 13 through p. 145, line 7).

88.     A warrant for failure to appear was issued and Jones was arrested. He paid a $130 fine[14] in relation to the failure to appear and the judge took the fine proceeds and used them to satisfy the code citations. (Doc. 131, Deposition of Jones, p. 148, line 18 through p. 149, line 21). Jones did not protest this approach by the state court. (Doc. 131, Deposition of Jones, p. 232, line 17 through p. 233, line 4).

89.     Jones received three additional citations on March 28, 2016: for trailers visible on each side of the property, overgrown grass, and not having house numbers legible from the roadway. (Doc. 131, Deposition of Jones, Exhibit 72). The citation included a court date of May 19, 2016. (Doc. 131, Deposition of Jones, Exhibit 74).

---

[14] In an errata sheet he corrected this to $148.

90.     On March 29, 2016, deputies returned with a search warrant. According to deputies' reports for the two interactions, Jones confirmed on March 29, 2016, that he had received the March 28, 2016, citations from his son.  (Doc. 131, Deposition of Jones, Exhibit 72).   In his deposition, however, Jones flatly denied having received the citations from his son.  (Doc. 131, Deposition of Jones, p. 206, line 25 through p. 209, line 19).

91.     Jones was then shown BWC from the deputies' visit to his residence in reference to the search warrant on March 29, 2016.  This video clearly showed Jones admitting that he had received the citations from his son.  He further stated that he understood the deputies, including the May 19, 2016, court date.  (Doc. 154, Non-Electronic Filing, Deposition Video Exhibits, Dkt. 131, Exhibit 73 - Body Cam Extraction 1.116012033 Video).

92.     When confronted with his testimony as to these facts and the BWC showing it to be false, Jones offered an incoherent explanation that he believed the deputies were talking about some other citation: "I heard something come out of his mouth saying some dates about some kind of court." (Doc. 131, Deposition of Jones, p. 211, lines 5-8).

93.     Jones was also arrested on March 29, 2016, after deputies executed a search warrant for the residence.  When deputies entered the home the smell of marijuana was overwhelming.  Deputies found marijuana in numerous places,

120

including the freezer in the home and on the driver's side of Jones' vehicle. Interviews with the occupants established that Plaintiff Jones consumed marijuana in the presence of a juvenile. The charges were later dismissed.   (Doc. 131, Deposition of Jones, Exhibit 76 (Incident/Investigation Report)).

94.    In his deposition, Jones denied that marijuana was in the residence. (Doc. 131, Deposition of Jones, p. 235, line 4 through p. 236, line 2).   However, Jones admitted that he could not deny that Talia Jablon, who was dating Jones' son, told deputies during this incident that Plaintiff Jones "was always smoking marijuana inside the residence." (Doc. 131, Deposition of Jones, p. 4, p. 237, line 21 through p. 238, line 12; Id., Exhibit 76, p. 3).

95.    No arrest of Jones has even been shown to be causally related to ILP.

March 14, 2023.

/s/ Thomas W. Poulton
THOMAS W. POULTON, ESQ.
Florida Bar No.: 0083798
poulton@debevoisepoulton.com

JEFFREY K. GRANT, ESQ.
Florida Bar No.: 0091197
grant@debevoisepoulton.com

DeBEVOISE & POULTON, P.A.
1035 S. Semoran Blvd., Suite 1010
Winter Park, Florida 32792
Telephone: 407-673-5000
Facsimile: 321 -203-4304

*Attorneys for Defendant*

Respectfully submitted,

/s/ Ari S. Bargil
Ari S. Bargil (FL Bar No. 71454)
INSTITUTE FOR JUSTICE
2 S. Biscayne Boulevard, Suite 3180
Miami, FL 33131
Tel: (305) 721-1600
Fax: (305) 721-1601
abargil@ij.org

Joshua A. House (CA Bar No. 284856)*
Caroline Grace Brothers (DC Bar No. 1656094)*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Tel.: (703) 682-9320
Fax: (703) 682-9321
jhouse@ij.org
cgbrothers@ij.org

Robert E. Johnson (OH Bar No. 0098498)*
INSTITUTE FOR JUSTICE
16781 Chagrin Boulevard, Suite 256
Shaker Heights, OH 44120
Tel.: (703) 682-9320
Fax: (703) 682-9321
rjohnson@ij.org

*Admitted *Pro Hac Vice*

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of March 2023, a true and correct copy of the foregoing document was served via the Court's CM/ECF system upon all counsel of record.

/s/ Ari S. Bargil