UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES III,

          Plaintiffs,

v.                              CASE NO.:  8:21-cv-00555-SDM-CPT

CHRIS NOCCO, in his official
capacity as Pasco County Sheriff,

          Defendant.

_____/

## DEFENDANT SHERIFF NOCCO'S RESPONSE TO PLAINTIFFS' RENEWED MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND INCORPORATED MEMORANDUM OF LAW

Defendant Pasco Sheriff Chris Nocco, by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56, Local Rule 3.01(b), and the Court's Case Management Orders (see Doc. 213), hereby responds in opposition to Plaintiffs' March 14, 2023, Renewed Motion for Summary Judgment on Liability and Incorporated Memorandum of Law (Doc. 224).

### Summary

Plaintiffs sue over execution of the Sheriff's Intelligence Led Policing (ILP) approach to dealing with crime in Pasco County, and particularly designations of persons as "prolific offenders," or a subset thereof designated as "Top 5 offenders." Plaintiffs criticize the number of prolific offender checks or what occurred during specific checks as to their children or Plaintiff Taylor, directly.  A *careful* review of the

facts of these incidents shows that Plaintiffs impermissibly blur the critical distinction between, on the one hand, deputy visits to their residences for purposes of prolific offender checks, versus on the other hand deputy responses to the residences to serve arrest or search warrants, to investigate specific crimes, or often in response to calls for service from the Plaintiffs or their children.  Only the former and not the latter, are at issue and so when Plaintiffs point to a claimed unique instance of actual unconstitutional conduct, a deep dive into the facts of the incident is necessary to ensure that the incident was caused, in the *Monell* sense, by ILP policy or custom.

Importantly, plaintiffs in this case sued the Pasco Sheriff under §1983 and did not sue individual deputies based on their actions in specific circumstances.  The case is thus entirely a *Monell* claim based on whether Plaintiffs' constitutional rights were violated in the first place, and if so whether an official policy or custom of the Sheriff was the actual cause, the "moving force," behind a constitutional violation.  *Monell v. Dep't of Social Services of the City of New York,* 436 U.S. 658 (1978);  *Underwood v. Bessemer*, 11 F.4th 1317, 1333 (11th Cir. 2021); *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

"To impose *Monell* liability, 'a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation.'" *Underwood*, 11 F.4th at 1333 (quoting *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004)).

As expressed in his own motion for summary judgment (Dkt. 219), Defendant maintains Plaintiffs have failed at all levels of *Monell* proof:  that is, they have not

shown underlying constitutional violations and they have not shown that an official policy or custom of the Sheriff caused any constitutional violations.  Failure of proof on any of the level of *Monell* liability should result in a grant of summary judgment to the Sheriff.  Defendant now addresses Plaintiffs' arguments in support of their motion for summary judgment (Dkt. 224) with these basic *Monell* standards in mind.

## I.   NEITHER THE ILP MANUAL NOR ANY OTHER POLICY DOCUMENT REPRESENTS AN UNCONSTITUTIONAL POLICY.

At pages 2-3, Plaintiffs describe the ILP Manual as a generalized paradigm shift away from simply sending deputies out to react to crime after it has occurred, to interdiction and prevention of crime by recidivists.  Defendant does not disagree that this is one general premise of Intelligence Led Policing, but note a few points.  First, Plaintiffs cite, with no context, a policy document which states that under ILP deputies are "hunting criminals."

Plaintiffs' reference to this harsh sounding rhetoric in the quoted language, but out of context, is a recurring theme in this case.  Plaintiffs omit that the same document states that deputies seek to gather information to build intelligence and utilize technology to assist agency members to be more proactive in preventing crime, rather than just react to it after it has occurred.  (Dkt. 225-31, p. 1) (noting "If we prevent crime we reduce the number of victims.")  It also omits that part of the document which urges agency members to follow up with citizens and make sure their needs are addressed.  (Dkt. 225-1, p. 3).

3

Plaintiffs cite to the 2018 ILP manual and the concept of "problem people" simply as focusing on persons with criminal pasts who are likely to reoffend. (Dkt. 224, p. 3). But, the concept of recidivism is hardly novel to this case. And the ILP Manual identifies academic studies which have repeatedly demonstrated the value of proactive, as opposed to simply reactive, policing, especially using technology to best use law enforcement's often limited resources. (See e.g. 2018 ILP Manual, Dkt. 225-1, pp. 6-12, explaining history of policing models and ILP).

At page 4 of their motion, Plaintiffs reference an "algorithm" as the quarterly means of selection of prolific offenders. They use that term "algorithm" in a pejorative fashion so as to paint the Sheriff's Office as robotic, monolithic, and unfeeling. They do this in their statement of Additional Facts, as well, Dkt. 223, beginning at page 16. But this rhetorical device tells an incomplete and unfair story of how prolific offenders were initially designated.

Under this process, which as the parties have discussed has changed over the last two years, the agency initially generated a pool of approximately 1,100 to 1,800 persons who were identified as having been arrested two or more times in Pasco County in the prior three years. (Joint Statement of Facts, Defendant's Additional Facts, Dkt. 223, p. 89, ¶4). While the agency then applied scores to the prolific pool based on involvement in serious crimes or in certain property crimes so as to identify the worst 100 or so recent offenders (Id., ¶ 5), the ultimate conclusion to identify a person as a "prolific offender" was a *subjective* determination by a district crime analyst

that the person was actively contributing to the criminal environment in Pasco County.
(Id., pp. 89-90, ¶ 6-8).

Plaintiffs are correct that juveniles could be identified as prolific offenders. They
have never articulated why it is unconstitutional for a police agency to do so. And,
frankly, Plaintiffs' children are unfortunate examples of juveniles engaged in a long
series of crimes, some of them quite serious offenses. Heilman's son, Donnie
McDougall, had well over 50 reported charges, ranging from single arrests on multiple
felony violation of probation charges to felony grand theft of a motor vehicle, to
burglary. Bobby Jones, son of Plaintiff Robert Jones, had approximately 20 reported
charges, including nine felonies and multiple pick-up orders or warrants from Pinellas
County. (See also Doc. 154, Under Seal, Confidential Juvenile Records, Donnie
McDougall, Robert Jones, IV). Plaintiff Taylor was a member of "The Squad," a
group of youths who burglarized cars in Pasco County, sometimes stealing them.
Taylor admitted in 2012 to committing approximately 50 car burglaries. (Dkts. 115-
14 and 115-15.) [1]

---

[1] Plaintiff Deegan's son, Tyler Paneson, was not a juvenile but according to Plaintiffs
became addicted to drugs, causing him to commit crimes to support his addiction.
(Joint Statement of Facts, Dkt. 223, Plaintiff's Additional Facts, p. 65, ¶270 to 271).
As noted in Defendant's response, this in fact led to calls for service by Plaintiff
Deegan, herself, reporting crimes against her by her son. Defendant points this out
because, as noted in Defendant's response to Plaintiff's Additional Facts and below, a
large number – the majority in some instances – of deputy interactions with the
Plaintiffs or their families had nothing to do with prolific offender checks or ILP, but
rather were unrelated police matters including, as observed here, calls for assistance
by the Plaintiffs, themselves.

Plaintiffs' motion correctly notes that the "Top 5 Offender" designation was based on a subjective analysis by district crime analysts (Dkt. 224, p. 5), and that Taylor, Bobby Jones, Donnie McDougall, and Paneson were Top 5 offenders at different points.  Plaintiffs state that there was "no process" to formally advise prolific offenders or their parents of the prolific offender or Top 5 designations, and Defendant agrees that there was no formal process, i.e. no document formally announcing that for example Donnie McDougall was a prolific offender.

But, as noted in Defendant's Response to paragraph 74 of Plaintiffs' Additional Facts, each of the Plaintiffs or their children was notified in various forms and to different degrees of the status of their children as prolific offenders or as subject to checks.  For example, on June 6, 2018, Plaintiff Deegan was told by a deputy that "Tyler is a Top 5 Offender. . . . Okay, every offender that we have in the county, especially a Top 5, we go to their house and . . . we ensure that all the laws are being followed and the ordinances are being followed." (Plaintiff's Exhibit 6, video excerpts for Degan, at 32:07.)

Plaintiffs state that there was no formal process specific as to a hearing for persons designated as prolific offenders, but fail to mention that persons could complain about the designations or particular incidents just as anyone could.  And in fact in September 2018, Plaintiff Darlene Deegan filed a complaint about PSO's interactions with her with the Florida Department of Law Enforcement (FDLE). (Dkt. 223, p. 23, ¶ 78).  FDLE replied to Deegan that it did not have jurisdiction to consider the complaint and told Deegan that she should make complaints of misconduct to the

6

Sheriff's Office or complaints of civil right violations to the Department of Justice. (Plaintiffs' Ex. 55, found at Dkt. 225-55).   There is no evidence she did. [2]

Plaintiffs state that deputy "visits" were "frequent" and occurred at all hours. (Dkt. 7).  As discussed in the next section, this is where the proverbial rubber begins to meet the proverbial road because, while Plaintiffs at many points refer generically to "visits," only a *subset* of all visits to the residence of the Plaintiffs were actually prolific offender checks or otherwise caused, in the *Monell* sense, by ILP.

## II. PLAINTIFFS' MOTION (AND STATEMENT OF ADDITONAL FACTS) BLURS THE DISTINCTION BETWEEN "VISITS" TO THE PLAINTIFFS' RESIDENCES FOR PARTICULAR INVESTIGATIONS OR CALLS FOR SERVICE, VERSUS ACTUAL PROLIFIC OFFENDER CHECKS OR OTHER ILP RELATED INCIDENTS.

Plaintiffs recite the number of "visits" which were either recorded by deputies in the CAD report drop down menus for the nature field as "prolific offender checks" or which other documentation shows was a prolific offender check, even if that drop down selection was not made.  (Dkt. 224, p. 6).  But, many of the individual visits of which Plaintiffs complain the most were NOT prolific offender checks.  Many were service of warrants or specific criminal investigations.  Many were calls for service from the Plaintiffs, themselves, or their children.  It is thus necessary, given the way in

---

[2] Plaintiff Heilman's daughter on September 18, 2018, submitted an email to a customer service specialist at the Sheriff's Office complaining of "harassment" following arrest of Heilman on that date.  (See Plaintiff's proposed additional fact ¶ 77; Dkt. 223, p. 23); see also Defendant's Response to Plaintiff's Additional Facts, ¶ 75 and 76.

which this case has been brought, for the Court to delve into the specifics of the interactions between Pasco Sheriff's Deputies and the Plaintiffs so as to determine:

a) whether a constitutional violation occurred in any specific incident;

b) ) whether THAT specific incident was actually a prolific offender check or was a response to the residence for some other reason; and

c) whether there is an actual custom of such constitutional violations, as defined under *Monell*.

To begin with, consider the prolific offender checks relative to other calls to the Plaintiff's residences for service or response completely unrelated to prolific offender checks or ILP.

Plaintiffs state that there were 22 prolific offender checks to Heilman's residence between 2017 to 2020.  (Dkt.223, p. 7).  But that compares to a *total* of 96 visits to the Heilman residence over the same period.  (Deposition of Brummett, Dkt. 120-5, pp. 3-4 (spreadsheet attached to Brummet deposition showing all calls to that residence, the prolific offender checks highlighted in yellow).

Examples of other calls for service -- as opposed to prolific offender, Top 5 offender, or other ILP generated checks-- vary widely.  In the case of Heilman, calls for service unrelated to ILP are outlined at length in Defendant's Additional Facts, Dkt. 223, pp.103 to 106, but included a call to deputies by the son, Donnie McDougall, that his girlfriend was threatening suicide; a call by McDougall that Heilman was not breathing; a call from one son that another had sprayed him with mace; numerous

service of arrest warrants; and a call from Heilman's husband that McDougall had pointed a revolver at him.

Plaintiffs also omit critical details when discussing these incidents in their Statement of Plaintiffs' Additional Facts (Dkt. 223). An excellent example of this is in paragraph 242 of Plaintiffs' Additional Facts wherein Plaintiffs state that Donnie McDougall was Baker Acted on July 22, 2017, after Heilman declined to participate in a prolific offender check, implying that the Baker Act was retaliatory. But, the incident report for this event states that a Pinellas County deputy contacted the Pasco Sheriff because Donnie had attempted suicide in Palm Harbor. (Report found in Defendant's filing under seal, Dkt. 154, Heilman folder, 2017-07-22, Incident Report, 17-028191).

Contact was made with Donnie, who had cuts on his arm. He told the deputy that he had been cutting himself to get attention from his girlfriend. Based on his statements, his appearance, and the cuts, the deputy Baker Acted Donnie for his own safety. (Report found in Defendant's filing under seal, Dkt. 154, Heilman folder, 2017-07-22, Incident Report, 17-028191). This was simply not a prolific offender check and is but one of many examples of Plaintiffs sloppily linking all incidents to ILP or prolific offender checks when in reality this was simply excellent police work totally unrelated to prolific offender checks or ILP.

The point is, the prolific offender checks cannot be "lumped in together" with the non-prolific offender calls for service. Each one has to be examined to determine

whether *that* "visit" was a prolific offender check or caused in the *Monell* sense by ILP, or was for some unrelated reason.

Other examples include Plaintiffs' complaints about arrests.  Again using Heilman as an example, she was arrested twice, but in neither event did the arrest occur in the context of a prolific offender check:  the first was when she lied to a deputy investigating her son Donnie McDougall in connection to the theft of a motorbike, the second was when deputies came to the home to pick up McDougall on probable cause and she slammed a door into a deputy. [3]

Plaintiffs also cite to arrests of Jones, who was arrested on warrants or on probable cause for marijuana use and possession, not arising in the context of prolific offender checks.  (Defendant's Additional Facts, Dkt. 223, p. 120-121, ¶ 90 to 94 (describing March 29, 2016 arrest of Jones on probable cause after service of a search warrant yielded marijuana throughout the residence and in Jones' car, with a juvenile female stating that Jones smoked marijuana in her presence.)

Other examples of Plaintiffs citing to non-prolific offender checks in their general allusion to complaints about "visits," include deputies entering on to Deegan's property on June 6, 2018, to look for her son, Tyler Paneson.  Plaintiffs contend this was a prolific offender check because one deputy used that drop down menu selection,

---

[3] In both events, Plaintiffs unpersuasively strain to tie the arrests to ILP, but their efforts fail as the documentation and video establish probable cause for the arrests and explain their basis and that the context of both was not ILP-related.  (See Defendant's Response to Plaintiff's Additional Facts, ¶ 237 to 240, 252-253).

but all of the reports and video for the incident show that deputies responded to the residence on that date looking for Paneson based on probable cause for grand theft. (Defendant's Statement of Facts, Dkt. 223, pp. 113 -114, ¶ 74 through 76, demonstrating that the June 6, 2018, "visit" was not a prolific offender check or otherwise caused by ILP).

Plaintiffs also complain that some prolific offender checks occurred at off hours. (Plaintiffs' Motion for Summary Judgment, Dkt. 244, p. 15).[4]  This is discussed more fully at paragraph 136 of Plaintiffs' Additional Facts, wherein they assert that, because STAR members worked from 2 p.m. to 2 a.m., their shifts might cause them to make checks "late at night or early in the morning."  In the motion for summary judgment, they cite their expert, Mr. Carrasco, as concluding that 17.5 percent of prolific offender checks occurred between 10 p.m. and 6 a.m.

However, this analysis accounts only for attempts at checks, not that contact was actually made.[5]  It also does not control for the possibility (indeed in many cases

---

[4] Page citations to Plaintiffs' Motion for Summary Judgment will be to the ECF page number for the docket entry.

[5] For example, BWC shows a nighttime visit to the Heilman residence on January 12, 2019.  The video shows a deputy approaching the front door and a dog barks and he shines his light up to the barking noise twice, for a matter of seconds, then turns the light off and leaves. This is found at the 33:50 mark of Plaintiff's non-electronic filing, Exhibit 5.  The same thing occurred at the Deegan residence on June 12, 2018.  See Plaintiff's non-electronic filing, Exhibit 6, as showing deputies coming to the house at night and leaving with no contact.

probability) that the prolific offender is on curfew related to probation, making checks during the day impossible.

Indeed, Mr. Carrasco acknowledged in his deposition that he did not know why any given prolific offender check occurred between 10 p.m. and 6 a.m. (Deposition of Carrasco, Dkt. 122, p. 22, line 24 through p. 25, line 1). He further acknowledged that he could not make a collective qualitative judgment as to whether any of those visits, occurring at those hours, was justified or unjustified. (Id., p. 23, lines 2 through 18).

Plaintiffs later cite to Mr. Carrasco's analysis for the proposition that prolific offenders were much more likely to receive code citation violations than non-prolific offenders. (Plaintiffs' Motion for Summary Judgment, Dkt. 224, pp. 25-26). But Mr. Carrasco's statistical analysis is fundamentally flawed, as explained by the Defendant in his response to ¶ 156 through 158 of Plaintiffs' Additional Facts, Dkt. 223. Carrasco knows only that a citation was given to a residence that, at some unidentified point over a five year period, was connected to a prolific offender. But, he does not know whether, *when the citation was issued*, a prolific offender actually resided there; thus he cannot conclude that any citations were issued in connection with prolific offender checks. [6]

---

[6] Additionally, the Court previously dismissed the Plaintiffs' equal protection claim. (Dkts. 30, 81). Thus, the Plaintiffs cannot simply argue in global fashion that prolific offenders were treated differently than non-prolific offenders, even if alluding to non-prolific offender incidents. So, for example, Plaintiffs cannot claim that it is constitutionally meaningful that a deputy might have issued a citation or arrested a Plaintiff who was connected to a prolific offender, but would not, under the same circumstances, have cited or arrested a non-prolific offender.

But let's assume Plaintiffs' best case.  Even when an isolated incident can be found where Plaintiffs have identified an arguable claim for a constitutional violation, it is apparent that there is no *custom* of them, as is required under *Monell*.  Consider again the June 6, 2018, entry onto Deegan's property.  Even if one puts aside the fact that it was not actually a prolific offender check, and even if one assumes for purposes of argument that she could make out a claim of unconstitutional entry onto her land, neither she nor the other Plaintiffs can show a custom of it.

That incident occurred on June 6, 2018.  Body worn camera video from the day prior, June 5, 2018, shows deputies appearing at the Deegan residence and they speak to a young woman, with deputies remaining on the street side of Deegan's fencing throughout.  (Defendant's Additional Facts, Dkt. 223, p. 113, ¶ 73, including citation to BWC video).  And two days later, on June 8, 2018, deputies returned looking for Paneson, again staying on the public street side of the fencing, in fact abiding by Deegan's refusal to let them come on to the property to look for Paneson based on the grand theft charge.  (Defendant's Additional Facts, Dkt. 223, p. 114, ¶ 77, including citation to BWC video).

Thus, on June 5 and 8 they stayed on the street side of the fence, whereas on June 6 they crossed it.  And don't forget about all of the other visits to Deegan's property when deputies did not go on to her property.  (See e.g. Plaintiffs' reference to three episodes contained in Plaintiffs' Exhibit # 6, video excerpts as to Deegan, showing deputies staying on street side of fence).

A custom claim is not a loose-knit collection of dissimilar incidents that fit Plaintiffs' narrative or general rhetoric.  It depends on precision and a showing that Sheriff's deputies so frequently engaged in unconstitutional behavior as to represent an official custom.  *Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005) (affirming summary judgment in §1983 case where Plaintiff had list of prior uses of excessive force, but they were not shown to be sufficiently similar as to represent a custom).

"When attempting to state a *Monell* claim based on custom, "[a] pattern of similar constitutional violations... is ordinarily necessary, because a single violation is not so pervasive as to amount to a custom." *Gurrera v. Palm Beach Cty. Sheriff's Office*, 657 F. App'x 886, 892-93 (11th Cir. 2016) (citing *Craig v. Floyd Cty.*, 643 F.3d 1306, 1310 (11th Cir. 2011) and *Grech*, 335 F.3d at 1330). Only a thoroughly engrained pattern of unconstitutional violations satisfies this standard.  *Diaz v. Miami-Dade County*, 424 F.Supp.3d 1345, 1362 (S.D.Fla. 2019).

A custom meets the terms of *Monell* only when the unconstitutional "practice is so widespread as to have the force of law." *Board of County Com'rs of Bryan County. Okl. v. Brown*, 520 U.S. 397, 403 (1997).  District courts have frequently rejected *Monell* claims where the incidents cited by Plaintiff are too dissimilar to represent an official custom, in the *Monell* sense.  *Guzman v. City of Hialeah*, Case No. 15-cv-23985 2017 WL 4324632 *1 (September 29, 2017) "[The Court agrees with Judge Otazo-Reyes's finding that Plaintiff has failed to allege sufficient facts that would plausibly support

14

the existence of a policy, practice, or custom of excessive force on the part of the City. The incidents cited by Plaintiff are too remote and dissimilar to plausibly establish that the City maintained a wide-spread practice or custom of allowing its police officers to engage in excessive force, which is what is required to state a valid *Monell* claim"); *Darnell v. Rivera*, Case No. 6:15-cv-999, 2016 WL 3000819 * 3 (M.D.Fla. May 25, 2016) (citing *Mercado* and *Connick v. Thomps*on, 563 U.S. 51, 63 (2011).

Just as the facts of each incident in this case must be evaluated by the Court to determine whether it is even, in the first instance, a prolific offender check or ILP related, the Court will also then have to then evaluate the particular facts to determine whether it represents a *Monell* custom. *Page v. O'Leary*, Case No. 20-cv-14460, 2022 WL 18662712 * 5 (November 3, 2022) (court looked at prior incidents of alleged misconduct by deputy and distinguished them factually from the case at bar).

Generally speaking, Plaintiffs refer to the checks as "harassment." Defendant doubts something as vague as that descriptor could be used to describe a specific constitutional violation. But even if it could, the facts show that the checks varied tremendously and were often pleasant or otherwise non-confrontational. See e.g. February 25, 2018, prolific offender check of Taylor, described in Defendant's Additional Facts, Dkt. 223, p. 96, ¶ 27(b); an encouraging conversation with Jones and his son on September 22, 2015 (Id.); deputies providing a resource guide to Anthony McDougall on August 9, 2020, and McDougall and his father thanking them for it. To be sure, some were more confrontational than others. But that is not in and of itself enough to make all prolific offender checks "harassment" or per se

15

unconstitutional.  And given the wide variety of contexts, reactions, counter-reactions, etc., it cannot be said that there is such a sufficiently well-defined "custom" of checks as to conclude that the custom was unconstitutional in the *Monell* sense.

As to underlying documents concerning these matters, it must also be pointed out that Plaintiffs often take quotes out of context in meaningful ways.  For example, in their statement of additional facts, Plaintiffs at paragraph 250 cite an email in which a STAR deputy remarked that "Donnie should be getting some TLC from STAR." The Plaintiffs end their quotation there, but the full sentence actually reads "Also, I believe Donnie should be getting some TLC from STAR due to his recent criminal activity (this case and others), to include Jeffery Harden as an associate."  Plaintiffs thus unfairly omitted the important context as to *why* deputies would pay attention to McDougall.

Plaintiffs bear the entire burden in this case of showing *both* underlying constitutional violations *and* that an official policy or custom of the Sheriff caused those violations.   It is not one *or* the other.  The official written policies caused no constitutional violations in discreet instances.  Neither the ILP Manual nor any other policy document directed deputies as to *how* to conduct prolific offender checks.  No policy document directed deputies as to the specific things the Plaintiffs complain about in this case as "harassment:"  no policy document directed how many prolific offender checks to perform other than one per quarter.  No policy directed deputies

16

what questions to ask during a check,[7] where to go when performing checks, how many deputies to be present for each check, or what time of day they should occur.

Plaintiffs claim that deputies "routinely" looked into windows of residences, looked through fences, or otherwise looked into private spaces. (Plaintiffs' Summary Judgment Motion, Dkt. 224, p. 16). First, allusion to "routinely" is not helpful because it encourages the Court to make the very mistake Defendant is warning against here, which is lumping dissimilar incidents together. Moreover, those incidents may not be prolific offender checks or ILP related in the first place.

Consider: In their motion for summary judgment Plaintiffs cite to "a visit" to Deegan's residence when deputies crossed over her fence to access her property and take pictures. (Dkt. 224, p. 10). Use of that word "visit" is problematic because that incident took place on June 6, 2018, and was generated not by a prolific offender check or ILP but by deputies looking for Tyler Paneson based on probable cause for grand theft.

When the Court really looks at these incidents it will see that there were no discrete constitutional violations. Moreover, the Court will see that, in the context of the whole, not every "visit" to a prolific offender residence has any actual connection to this case or to ILP. And in the few instances where there is even an arguable criticism of constitutional dimension (as opposed to a general descriptor of

---

[7] In their summary judgment motion, Plaintiffs complain that deputies "often" asked open-ended questions. Dkt. 224, p. 16). But no policy called on them to do that. These vague kinds of descriptors of "often," sometimes," or the like, fail to show a custom in factually similar incidents to satisfy *Monell*.

"harassment"), Plaintiffs should not be permitted to describe a *Monell* custom based on so casually drifting back and forth between the incidents, blurring the critical distinction between prolific offender checks versus serving warrants, investigating specific criminal offense, or responding to calls for service from the Plaintiffs themselves.

### III.   PLAINTIFFS MISCHARACTERIZE THE 2021-23 CHANGES IN PSO POLICY SO AS TO MAINTAIN A CLAIM FOR PROSPECTIVE RELIEF.

At pages 21 through 23 of their motion for summary judgment, Plaintiffs carefully phrase their discussion of the 2021-2023 changes to Pasco Sheriff's policy discontinuing prolific offender designations and checks as merely a "suspension" of same.  They also imply that the changes were made because of the litigation.

The changes actually began in 2021.  The designation of prolific offenders was taking too much of the intelligence analysts' time to obtain, clean, and develop the prolific offender list. (Kraus Deposition February 2, 2023, Dkt. 221, p. 24, lines 11 through 17; p. 28, lines 2 through 25).  The County also suffers from a fentanyl epidemic, causing a rerouting of resources away from the prolific offender process. Kraus estimates deputies respond to 135 overdoses a month, and a third of those result in deaths.  The shift to a focus on drug hot spots, embodied in the January 31, 2023, RAD directive was part of the response to this. The ILP philosophy or problem people, places, and group remains, but the manner in which the PSO focuses on those things changed with the ending of prolific offender designations and shift to focused offenders. (Id., p. 98, line 23 through p. 101, line 2).

18

The change was also based in part on the pandemic.  The crime environment changed and the Sheriff's Office had to send two deputies to each call for service. In early 2021 the crime environment changed again as calls for service went up. Additionally, there was an explosion of population growth in the County. As a result, the agency could not devote resources to prolific offender checks, as it had in the past. (Sanborn Deposition February 2, 2023, Dkt. 222, p. 56, line 19 through p. 60, line 8; p. 68, line 24 through p. 69, line 21).  The Sheriff's Office no longer uses the prolific offender designation and in fact the computer generation of the initial prolific offender list ended in March, 2022. (Kraus Deposition, Dkt. 221, p.28, lines 2 through 6).

A focused offender under the new directive -- RAD -- is defined as a person who has demonstrated a pattern of repetitive criminal behavior and is currently affecting the crime environment. When identifying a focused offender, analysts consider whether there is at least reasonable suspicion to believe that the person is committing a particular crime. (RAD Directive, p. 10). There is no scoring of focused offenders and focused offenders are identified subjectively by the crime analysts within each district. (Kraus Deposition, Dkt. 221, p. 30, lines 2 through 25; p. 33, line 23 through p. 35, line 21).  The RAD does not require checks of "focused offenders," as the former approach did with "prolific offenders." (Id., p. 74, line 16 through p. 75, line 20).

## IV.   PROLIFIC OFFENDER CHECKS DO NOT REPRESENT A POLICY OR CUSTOM VIOLATING THE FOURTH AMENDMENT

Beginning at page 24, Plaintiffs argue that prolific offender checks represent a policy and custom of unconstitutional "visits" to Plaintiffs' homes.  (Dkt. 224, p. 31).

The claims here have to do with manner of prolific offender checks. Neither the ILP Manual nor any other official policy states the manner in which checks are to be conducted. Thus, this is ultimately a custom-based claim.

Plaintiffs cite the unreported decision in *United States v. Ratcliff*, 725 Fed. Appx. 894 (11th Cir. 2018) for the proposition that a knock and talk requires reasonable suspicion. But the quote is taken out of context as, just before it, the Court stated that a knock and talk does not even implicate the Fourth Amendment if it is "unconnected with a search." *Id*., p. 901.[8]

Plaintiffs argue that "typically" the Plaintiffs would not feel free to disregard questions, rendering each prolific offender check a seizure. Plaintiffs cite *Brendlin v. California*, 551 U.S. 249, 254 (2007), and *Florida v. Bostick*, 501 U.S. 429 (1991) in support. (Plaintiffs' Motion for Summary Judgment, Dkt. 224, p. 32). But these cases emphasize that whether an encounter evolves into a seizure under the Fourth Amendment is a fact intensive and fact specific inquiry. *U.S. v. Drayton*, 536 U.S. 194, 201 (2002) ("*Bostick* first made it clear that for the most part *per se* rules are

---

[8] Plaintiffs state that at least reasonable suspicion should exist "to justify the interactions here" because they "bear all the hallmarks" of a seizure. (Dkt. 224, p. 32 (citing *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000)). First, *Edmonds* involved stopping motorists in transit for DUI checkpoints and walking drug dogs around their cars. Second, Plaintiffs again impermissibly group the incidents in this case, without precision, as shown in even Plaintiffs' non-electronically field excerpted videos. Many encounters were just a minute or two long and objectively consensual and do not fit the characterization as a seizure. Plaintiffs would need to show that *actual* prolific offender checks (as opposed to some other basis for an interaction) *actually* represented a seizure as contemplated in *Edmond* and then show that there were a sufficient number of them, in similar factual circumstances, to represent *Monell* liability on a custom.

inappropriate in the Fourth Amendment context. The proper inquiry necessitates a consideration of 'all the circumstances surrounding the encounter.'") (citing *Bostick*, 501 U.S. at 439.

Plaintiffs cite their own subjective belief that they could not leave such encounters, but the issue is not whether a Plaintiff simply could leave an encounter, it is whether a reasonable person would feel they could decline to answer questions. *Drayton*, 536 U.S. at 201-202.  This depends on the facts of each incident and there are many instances – notwithstanding their self-serving affidavits on the point --  in which Plaintiffs in fact refused to answer questions, did not answer knocks, or terminated their interactions.  On May 14, 2017, Plaintiff Heilman declined to answer questions because she was too busy and would not wake up her son Donnie McDougall for a prolific offender check (detailed in Plaintiffs' Additional Facts, paragraph 234 and Defendant's response thereto).  On January 1, 2020, Plaintiff Taylor declined to allow deputies to enter a third person's residence to search for a person threatening self-harm (Plaintiffs' Additional Facts, paragraph 196 and Defendant's response thereto; Defendant's filing under seal per Dkt. 154, Taylor folder, incident dated 01-01-2020; Taylor deposition, Dkt. 137, p. 37, line 21 through p. 42, line 14).  On June 8, 2018, Plaintiff Deegan refused requests by deputies to enter her property to search for Paneson (Plaintiffs' Additional Facts at paragraph 291, and Defendant's response thereto).

Plaintiffs claim on pp. 25 through 26 of their motion that if they did decline to answer questions, they would be cited or threatened in some manner and they rely on,

21

as an example, the Heilman incident on May 14, 2017. But, as noted by the Defendant in his response to paragraphs 234 through 235 in Plaintiffs' Additional Facts, Plaintiffs make this claim based on mischaracterization of agency documents (cited in Defendant's response).

And as is so often the case, the examples cited by Plaintiffs are incidents that were clearly *not* prolific offender checks or ILP related in the first place. For example, they cite to paragraph 237 of their Additional Facts, Dkt. 223, p. 58, as an illustration of a Plaintiff arrested or threatened for "noncompliance." But, the cited paragraph concerns the September 16, 2016, investigation of Donnie McDougall by Sheriff's Deputy Denbo for theft of the motorbike.

Deputy Denbo was not at the residence for a prolific offender check on that date and he was investigating McDougall's role in the theft. Heilman lied to the deputy and so she was arrested the next day, ultimately pleading guilty and was convicted. This is a prime example of Plaintiffs mixing all "visits" together to indict prolific offender checks but in doing so they rely on non-ILP incidents.

Plaintiffs' motion for summary judgment cites Deegan as an example of coercive behavior amounting to a seizure when they argue that, on June 5, 2018, deputies used a bullhorn to call for her son, Tyler Paneson, to come to the door. They in turn cite Plaintiffs' Additional Facts, paragraph 287, for that "visit" on June 5, 2018. (Dkt. 224, pp. 26-27).

Yet again, however, this was not a prolific offender check or caused by ILP. On that date, June 5, 2018, deputies were searching for Paneson based on probable cause

for his arrest for grand theft.  (See Defendant's Response to paragraph 287, with record citations demonstrating that deputies on that date were searching for Paneson based on probable cause).

They cite an example of Deegan saying she did not want to be asked any more questions but that she was told by a deputy "That's not going to happen."  (Plaintiffs' Motion for Summary Judgment, Dkt. 224, p. 34).  This misstates the circumstances and misquotes the deputy.   This occurred on June 8, 2018, and as noted above this was not a prolific offender check, this was a search for Paneson related to a grand theft charge.

Plaintiffs also omit the full statement by the deputy in the context of seeking Paneson based on probable cause.  When Deegan asked to be left alone and a deputy responded "That's not going to happen," Plaintiffs did not provide the full quote, found at Plaintiffs' Non-electronic filing, Exhibit 6, 36:27 mark, which was "That's not going to happen *until he's picked up*" (emphasis added to show portion omitted by Plaintiffs) and Deegan said she understood that.[9]

Plaintiffs next contend that prolific offender checks are all "searches" because they seek to gain information and a search includes "to look over or through for purposes of finding something." (Plaintiffs' Motion for Summary Judgment, Dkt. 224,

---

[9] In fact in the cited portion of video Deegan declined permission to deputies to come onto the property to look in the RV for Paneson.  Deegan complained but stood there speaking to deputies at length.  Deegan said she texted her son and asked him to turn himself in, which *again* illustrates that *this* visit was probable cause-related and not a prolific offender check or ILP driven.

p. 36) (citing *Florida v. Jardines*, 569 U.S.1, 11 (2013) and *Kyllo v. United States*, 533 U.S. 27, 32 n.1 (2001)).  That is an oversimplification and if it were that simple it would mean that every single knock and talk in American history was a "search" under the Fourth Amendment.

Plaintiffs cite *Jardines* for the proposition that the knock and talks in this case went beyond the implied license to approach a house, but *Jardines* involved bringing a drug dog up to the house to sniff around it, which did not occur here in any instance. And they cite *Bengini v. City of Hemet*, 879 F.2d 473, 477 (9th Cir.1988) as upholding a jury verdict where officers checked a bar five or six times an evening and checks were conducted in an "unreasonable manner."  But there, officers searched in drawers and walked through the bar with hands on their guns.  *Id.*  The only physical searches here, for example in exploring the Jones home, occurred pursuant to a warrant or, in one case on May 29, 2016, Jones providing consent.  (See Plaintiffs' Additional Facts, ¶ 351 to 355 and Defendant's responses thereto).

Plaintiffs characterize *all* prolific offender checks as searches and seizures (Dkt 224, pp. 38-39), but objectively speaking, Plaintiffs cannot ignore the many instances when Plaintiffs or their family members were cooperative and joked with deputies during prolific offender checks, nor can they gloss over the distinctions between what actually generated a given visit, relying instead on misleading grouping of all "visits," including those that were not prolific offender checks or otherwise caused by ILP, to indict them all.

## V.    There is no viable First Amendment Claim of Right to Association under *Monell*.

Plaintiffs contend that they experienced "some form of punishment" for their relationships to their prolific offender children. (Dkt. 244, p. 33). They cite initially to heightened code enforcement and the zero tolerance arrest policy in place. However, the code enforcement policy applied broadly, not just to prolific offender residences based solely on a prolific offender living there, but because such residences represented problem locations. The Sheriff's Office deemed a variety of locations to be problematic, including but not exclusively prolific offender residences. The ILP manual stated that the Sheriff's Office sought to improve quality of life by nuisance abatement, including the use of code enforcement corporals. (Doc. 161-3, pp. 30-31). As testified to by Mark Celeste, a code enforcement corporal from 2016 to 2019, he focused on homes with many calls for service, for drug activity, and the like. (Doc. 121, Deposition of Celeste deposition, p. 10, line 14, through p. 13, line 13.)

The First Amendment protects personal relationship association, which involves "the freedom to carry on certain intimate or private relationships," and these claims "may take various forms." *Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 545 (1987). Plaintiffs here have not demonstrated that their rights of familial relationships have been interfered with to the point of being unconstitutionally disrupted and the mere fact that the parents of prolific offenders are incidentally burdened by prolific offender checks is not an unconstitutional infringement on such a right. *Parks v. City of Warner Robins, Ga.*, 43 F.3d 609, 614 (11th Cir. 1995) (holding

that policy which increased costs to marry created only an incidental burden on marriage).   See also *Johnson v. Pomeroy*, 294 Fed.Appx. 397 (10th Cir. 2008) (consideration of spousal income for benefits created only an incidental burden).

Plaintiffs have not demonstrated any significant change in any of their relationships with their children as a *direct result of* prolific offender checks.  None can connect a substantial change in their familial associations directly to or solely because of ILP. [10]

## VI.   There is no viable due process claim, procedural or substantive.

As to procedural due process, Plaintiffs must show (1) deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process. *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir.2003)  Plaintiffs note that neither they nor their children received "formal notice" of a prolific offender or Top 5 designation.[11]   But it is surely not the case that every

---

[10] In footnote 32, Plaintiff cite an incident in which Taylor's friend Karen Hodges was "threatened" with citations when Taylor refused to let deputies into Hodges' home to look for Taylor's cousin.   Even if this could represent intrusion into a family relationship at the requisite level, Plaintiffs' rendition of events is misleading.   This event occurred on January 1, 2020, when deputies came to the Hodges residence to locate Taylor's cousin Justin Keeven, who had threatened suicide.   (See filing under seal per Dkt. 154, Taylor folder, incident dated 01-01-2020).   The owner drove up and said Keeven was not there, and deputies left.   (Taylor deposition, Dkt. 137, p. 37, line 21 through p. 42, line 14).   In any event, as is a recurring problem for Plaintiffs' arguments, this encounter was *not* a prolific offender check and is irrelevant.

[11] The children are not Plaintiffs.   And the record shows to varying degrees that the Plaintiffs or their children were told of such designation.   (Defendant's Response to Plaintiffs' Additional Facts, ¶ 74).   For example, on June 6, 2018, Deegan was told that Paneson had been designated a Top 5 offender which would result in visits.

time law enforcement becomes aware of and pays attention to a person actively committing crimes that person must receive formal notice and opportunity to be heard.

Here, Plaintiffs do not identify deprivation of any liberty or property interest sufficient to trigger a right to specific procedural due process.  Not everything that might be described loosely as a "benefit" or a "right" falls within the scope of the Due Process Clause.  *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005).  For example, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Such entitlements are, " 'of course, ... not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."  Id., (internal citation omitted).

To support a procedural due process claim, the claimant's protected interest must have been *directly* affected by governmental action; "[a]n indirect and incidental result of the Government's enforcement action," even with respect to a protected interest, "does not amount to a deprivation of any interest in life, liberty, or property" in the constitutional sense. *Id.* at 767 (quoting *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773 (1980)).  The procedural safeguards of the Due Process Clause do "not apply to the indirect adverse effects of governmental action."  *Id.*

Tellingly in this regard, Plaintiffs' motion states that being designated a prolific offender "has consequences akin to being on probation."  (Plaintiffs' Motion for Summary Judgment, Dkt. 244, p. 43).  Indirect consequences are not sufficient to

invoke procedural due process.  *Castelrock*; *O'Bannon*.   The burdens described by Plaintiffs are not *direct* deprivation of a protected liberty or property interest by the Sheriff's ILP policy.  And the interests described by Plaintiffs are too vague to meet the entitlement test, i.e. the Plaintiffs were denied their right to "be at peace in their own homes" or denied the "right to be free from punishment for the misdeeds of others." (Id.).

As "liberty interests," these descriptions of rights are "too ephemeral and insubstantial to trigger due process protections."  *Meachum v. Fano*, 427 U.S. 215, 228 (1976).  "We reject at the outset the notion that *any* grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause. *Id*. at 224 (emphasis in original).[12]  The incidents involved here (and that were actually prolific offender checks as opposed to some other type of interaction) do not represent a policy or custom that directly deprived Plaintiffs of a protected liberty or property interest sufficient to necessitate a procedure of formal notification and opportunity to be heard.

As to substantive due process, Plaintiffs argue that the Sheriff's policies and customs imposed "punishments" on the Plaintiffs for the crimes of others, requiring strict scrutiny in a substantive due process analysis.  (Plaintiffs' Summary Judgment

---

[12] Plaintiffs reference Fourth Amendment rights to be free from search and seizure, but Defendant has already addressed that above, and in particular reiterates that many of the instances of alleged Fourth Amendment violations did not occur during prolific offender checks or ILP generated interactions.

Motion, Dkt. 224, p. 45) (citing *Cook v. Stewart*, No. 1:13-cv-72-MW-GRJ, 2014 WL 12521335, at *4 (N.D. Fla. Apr. 22, 2014).  But that case dealt with teacher evaluations based on "student learning growth."  The debate was over how to measure scores of students to then evaluate the teachers.  The teachers sued because the evaluations affected rate of pay, contract renewals, and terminations. *Id.*, * 1-3.  Their claim as to injunctive relief was based on the "threat of imminent economic harm in the form of lost pay" due to low performance ratings.  *Id.*, * 4.

The "punishment" alluded to in *Cook* is different than the incidental effects of prolific offender checks in this case.   At pp. 4 to 5 of that opinion the court discussed a prior case, *St.Ann v. Palisi*, 495 F.2d 423 (5th Cir.1974) in which school children could be removed from school under a regulation "that allowed children to be punished for their guardians' misconduct." *Cook* at * 5.  But the district court in *Cook* saw through the same rhetorical device used by Plaintiffs here – labeling every consequence a "punishment" so as to invoke substantive due process concerns.

That parents of prolific offenders receive knocks on the door and are asked whether their prolific offender children are staying out of trouble is not "punishment" in this context.  That they have received code violation citations when circumstances objectively justify them is not "punishment" as contemplated in *Cook* or *St. Ann's* as it is not in the form of either criminal punishment or something so concrete as removing children from school where the objective facts don't support it.  It is not, in the words of *Cook*, "true punishment" for the acts of others.

29

To viably present a substantive due process claim, Plaintiffs must show that the Plaintiffs' rights were violated in a manner that "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Collins v. City of Harker Heights*, 503 U.S. 115, 118 (1992); *County of Sacramento v. Lewis*, 523 U.S. 833, 847, n.8 (1998).  The Supreme Court and the Eleventh Circuit have warned against expanding the doctrine of substantive due process. *Collins*, 503 U.S. at 125;  *Waddell v. Hendry Cty. Sheriff's Off.*, 329 F.3d 1300, 1304 (11th Cir. 2003) ("We must take seriously the Supreme Court's caution against expanding the concept of substantive due process.").

This Court should thus be reluctant to find any given deputy interaction at issue in this case so egregious as to be a substantive due process violation.  And even if scattered among the 100+  prolific offender checks, embedded within the over 500 total visits to the Plaintiffs' residence for all host of reasons, the parties might debate one or two, there is certainly no consistent pattern of them, sufficiently similar as to say they have the force of law in the *Monell* sense as to constitute an official custom.

The Court should deny Plaintiffs' motion for summary judgment and grant Defendant's motion for summary judgment on all claims.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of April, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: **Ari S. Bargil, Esquire** (*abargil@ij.org*), Institute For Justice, 2 S. Biscayne Boulevard, Suite 3180, Miami, Florida 33131; **Joshua A. House, Esquire** (*jhouse@ij.org*) and **Caroline Grace Brothers, Esquire** (*cgbrothers@ij.org*), Institute For Justice, 901 N. Glebe Road, Suite 900, Arlington, Virginia 22203; and **Robert E. Johnson, Esquire** (*rjohnson@ij.org*), Institute For Justice, 16781 Chagrin Boulevard, Suite 256, Shaker Heights, Ohio 44120.

<div style="margin-left:40%">

 *s/ Thomas Poulton*

THOMAS W. POULTON, ESQ.
Florida Bar No.:  0083798
*poulton@debevoisepoulton.com*
JEFFREY K. GRANT, ESQ.
Florida Bar No.:  0091197
*grant@debevoisepoulton.com*
ERIN M. TUECHE, ESQ.
Florida Bar No.:  0045104
*tueche@debevoisepoulton.com*
ROBERT D. HOLBORN, II, ESQ.
Florida Bar No.:  0044186
*holborn@debevoisepoulton.com*
DeBEVOISE & POULTON, P.A.
Lakeview Office Park, Suite 1010
1035 S. Semoran Boulevard
Winter Park, Florida  32792
Telephone:  407-673-5000
Facsimile:  321-203-4304
Attorneys for Defendant Sheriff Nocco

</div>