# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

|  |  |
|---|---|
| DALANEA TAYLOR; TAMMY HEILMAN; DARLENE DEEGAN; and ROBERT A. JONES III, | |
| *Plaintiffs*, | Case No. 8:21-cv-00555-SDM-CPT |
| v. | |
| CHRIS NOCCO, in his official capacity as Pasco County Sheriff, | |
| *Defendant*. | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT SHERIFF NOCCO'S SECOND AMENDED MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS

Joshua A. House (CA Bar No. 284856)*
Caroline Grace Brothers
(DC Bar No. 1656094)*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Tel.: (703) 682-9320
Fax: (703) 682-9321
jhouse@ij.org
cgbrothers@ij.org

Ari S. Bargil (FL Bar No. 71454)
INSTITUTE FOR JUSTICE
2 S. Biscayne Boulevard, Suite 3180
Miami, FL 33131
Tel: (305) 721-1600
Fax: (305) 721-1601
abargil@ij.org

Robert E. Johnson (OH Bar No. 0098498)*
INSTITUTE FOR JUSTICE
16781 Chagrin Boulevard, Suite 256
Shaker Heights, OH 44120
Tel.: (703) 682-9320
Fax: (703) 682-9321
rjohnson@ij.org

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................1

ARGUMENT .........................................................................................1

I.    This Is A Quintessential *Monell* Case..........................................1

    A.    PSO Attempts To Sidestep A Critical Question—Whether The ILP Manual And Related Directives Establish A Policy Under *Monell* ........................................................................2

        1.    Plaintiffs have in fact argued that the ILP Manual and related directives establish a policy under *Monell*................2

        2.    The policy reflected in the ILP Manual and related directives triggers *Monell* liability because that policy is the "moving force" behind PSO's constitutional violations..............................................................3

    B.    PSO Wrongly Insists That There Can Be No Custom Unless Every Prolific Offender Check Is Exactly The Same ........................4

        1.    The checks themselves, as well as the way they were conducted, establishes *Monell* liability..................................5

        2.    PSO invites error by asking this Court to treat this like a qualified immunity case ......................................................8

    C.    PSO's Argument That There Can Be No Policy Or Custom, Because PSO Never Trained Anyone How To Do Prolific Offender Checks, Concedes *Monell* Liability For Failure To Train...9

II.    PSO's Policies And Customs Directly Caused, "In A *Monell* Sense," Harm to Plaintiffs' Constitutionally Protected Rights..............................11

    A.    Plaintiffs' Fourth Amendment rights were violated, "in a *Monell* sense," because every prolific offender check began the same way—with an unconstitutional search and seizure ..........................12

1.   Prolific offender checks are not knock and talks. Every prolific offender check is an unconstitutional search, pursuant to official policy, thus triggering *Monell* Liability ............................................................................. 12

(a)   Prolific offender checks are not knock and talks. They are searches without reasonable suspicion ......... 12

(b)   Prolific offender checks are not knock and talks. There is no "implied license" to gather evidence or harass ...................................................................... 13

2.   Prolific offender checks are not knock and talks. Every prolific offender check is an unconstitutional seizure, pursuant to official policy, thus triggering *Monell* liability ................................................................................. 16

B.   Plaintiffs' First Amendment rights were violated, "in a *Monell* sense," because each of Plaintiffs' arrests and code citations resulted from written, formal policy to punish associates ................ 18

C.   Plaintiffs' Procedural Due Process rights were violated, "in a *Monell* sense," because PSO's policy is to not provide notice or an opportunity to be heard despite impairing basic liberties ............ 20

D.   Plaintiffs' Substantive Due Process rights were violated, "in a *Monell* sense," because PSO has a policy and custom of harassment .......................................................................... 22

III.   PSO's Host Of Procedural Arguments All Fail ........................................ 25

A.   None of Plaintiffs' claims are *Heck* barred ........................................ 25

B.   Robert's claims are not barred by the statute of limitations ............. 26

C.   Plaintiffs' claims are not moot and they have standing .................... 27

1.   This is a textbook example of voluntary cessation .............. 27

2.    Plaintiffs have standing for injunctive relief .......................29

CONCLUSION ........................................................................................30

CERTIFICATE OF SERVICE ................................................................32

# TABLE OF AUTHORITIES

**<u>Case</u>**                                                                                                    **<u>Page(s)</u>**

*Bates v. Harvey*,
    518 F.3d 1233 (11th Cir. 2008) ........................................................................16

*Bd. of Regents v. Roth*,
    408 U.S. 564 (1972)...........................................................................20, 21, 22

*Beach Blitz Co. v. City of Miami Beach*,
    No. 1:17-cv-23958-UU, 2018 WL 11260453 (S.D. Fla. Feb. 5, 2018) .......23, 24

*Benigni v. City of Hemet*,
    879 F.2d 473 (9th Cir. 1988) ............................................................................23

*Brendlin v. California*,
    551 U.S. 249 (2007)...........................................................................................17

*Buckner v. Toro*,
    116 F.3d 450 (11th Cir. 1997) ...........................................................................9

*Chalfy v. Turoff*,
    804 F.2d 20 (2d Cir. 1986) ...............................................................................23

*Church v. City of Huntsville*,
    30 F.3d 1332 (11th Cir. 1994) ...........................................................................8

*City of Canton v. Harris*,
    489 U.S. 378 (1989)...........................................................................................10

*City of Springfield v. Kibbe*,
    480 U.S. 257 (1987)..........................................................................................3

*Collins v. City of Harker Heights*,
    503 U.S. 115 (1992)...........................................................................................24

*Connick v. Thompson*,
    563 U.S. 51 (2011).............................................................................................10

v

*Craig v. Floyd County*,
   643 F.3d 1306 (11th Cir. 2011) ............................................................8

*Depew v. City of St. Marys*,
   787 F.2d 1496 (11th Cir. 1986) ............................................................7

*Doe v. Sullivan County*,
   956 F.2d 545 (6th Cir. 1992) ...............................................................9

*Dyer v. Lee*,
   488 F.3d 876 (11th Cir. 2007) ........................................................25, 26

*Espanola Way Corp. v. Meyerson*,
   690 F.2d 827 (11th Cir. 1982) ........................................................23, 24

*Florida v. Bostick*,
   501 U.S. 429 (1991)............................................................................18

*Florida v. Jardines*,
   569 U.S. 1 (2013)..................................................................13, 14, 20

*French v. Merrill*,
   15 F.4th 116 (1st Cir. 2021)................................................................16

*Friedson v. State*,
   207 So. 3d 961 (Fla. 5th DCA 2016)...................................................15

*Genesis Healthcare Corp. v. Symczyk*,
   569 U.S. 66 (2013)...............................................................................27

*Harden v. Pataki*,
   320 F.3d 1289 (11th Cir. 2003) ..........................................................25

*Heard v. Martin Cnty. Sheriff's Off.*,
   No. 13-cv-14364, 2014 WL 12770093 (S.D. Fla. Aug. 8, 2014)........26

*Heck v. Humphrey*,
   512 U.S. 477 (1994).......................................................................25, 26

*Heid v. Rutkoski*,
  857 F. App'x 558 (11th Cir. 2021) ....................................................26

*Herrera v. Santa Fe Pub. Schs.*,
  41 F. Supp. 3d 1027 (D.N.M. 2014) ...............................................8, 9

*In re: N.Y.C. Policing During Summer 2020 Demonstrations*,
  548 F. Supp. 3d 383 (S.D.N.Y. 2021) ...............................................8

*Jenkins v. City of New York*,
  478 F.3d 76 (2d Cir. 2007) ...............................................................10

*Johnson v. Morales*,
  No. 17-CV-12405, 2021 WL 949524 (E.D. Mich. Mar. 12, 2021)......................9

*Katz v. United States*,
  389 U.S. 347 (1967)...........................................................................20

*Latif v. Holder*,
  28 F. Supp. 3d 1134 (D. Or. 2014) ...................................................21

*Leather v. Eyck*,
  180 F.3d 420 (2d Cir. 1999) ..............................................................25

*Lozman v. City of Riviera Beach*,
  39 F. Supp. 3d 1392 (S.D. Fla. 2014) ................................................7

*Malone v. City of Atlanta*,
  No. 21-12410, 2022 WL 1122859 (11th Cir. Apr. 15, 2022)............................10

*McCabe v. Sharrett*,
  12 F.3d 1558 (11th Cir. 1994) ...........................................................18

*McClish v. Nugent*,
  483 F.3d 1231 (11th Cir. 2007) .........................................................25

*McKinney v. Pate*,
  20 F.3d 1550 (11th Cir. 1994) ...........................................................23

*Mercado v. City of Orlando*,
   407 F.3d 1152 (11th Cir. 2005) .........................................................5, 7

*Mohamed v. Holder*,
   995 F. Supp. 2d. 520 (E.D. Va. 2014) ....................................................21

*Moore v. Pederson*,
   806 F.3d 1036 (11th Cir. 2015) ...........................................................13

*Monell v. Dep't of Soc. Servs.*,
   436 U.S. 658 (1978).................................................................*passim*

*Mueller v. Auker*,
   576 F.3d 979 (9th Cir. 2009) ..............................................................21

*Oklahoma City v. Tuttle*,
   471 U.S. 808 (1985).......................................................................4

*Osorio v. State*,
   244 So. 3d 1115 (Fla. 4th DCA 2018)......................................................15

*Parker v. Town of Palm Beach*,
   No. 9:17-cv-80176-RLR, 2017 WL 11537901 (S.D. Fla. Aug. 16, 2017) ........25

*Pasco CWHIP Partners, LLC v. Pasco County*,
   No. 8:13-cv-2377-T-23EAJ, 2014 WL 3805667 (M.D. Fla. Aug. 1, 2014) ......23

*Pinaud v. County of Suffolk*,
   52 F.3d 1139 (2d Cir. 1995) ...........................................................26, 27

*Poulin v. Bush*,
   No. 8:21-cv-1516-WFJ-AEP, 2023 WL 185122 (M.D. Fla. Jan. 13, 2023)........8

*Ramirez v. El Paso*,
   No. EP-17-CV-00193-DCG, 2022 WL 16557646 (W.D. Tex. Oct. 31, 2022)....9

*Rich v. Sec'y, Fla. Dep't of Corr.*,
   716 F.3d 525 (11th Cir. 2013)............................................................28

*Rivas v. Figueroa*,
    No. 11-cv-23195, 2012 WL 1378161 (S.D. Fla. Apr. 20, 2012) ........................7

*Sheely v. MRI Radiology Network, P.A.*,
    505 F.3d 1173 (11th Cir. 2007) .................................................................28, 29

*Silva v. Baptist Health S. Fla., Inc.*,
    856 F.3d 824 (11th Cir. 2017) ............................................................................26

*Singleton v. Cecil*,
    155 F.3d 983 (8th Cir. 1998) .............................................................................20

*Smith v. Duff & Phelps, Inc.*,
    5 F.3d 488 (11th Cir. 1993) ...............................................................................27

*Speight v. Griggs*,
    620 F. App'x 806 (11th Cir. 2015) .......................................................................3

*St. Ann v. Palisi*,
    495 F.2d 423 (5th Cir. 1974) .............................................................................19

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ............................................................................................30

*Swint v. City of Wadley*,
    51 F.3d 988 (11th Cir. 1995) ..............................................................................23

*United States v. Daoust*,
    916 F.2d 757 (1st Cir. 1990) ..............................................................................15

*United States v. Hammett*,
    236 F.3d 1054 (9th Cir. 2001) ...........................................................................15

*United States v. Lundin*,
    817 F.3d 1151 (9th Cir. 2016) ...........................................................................16

*United States v. Maxi*,
    886 F.3d 1318 (11th Cir. 2018) .........................................................................14

*United States v. Perea-Rey*,
    680 F.3d 1179 (9th Cir. 2012) ..................................................14, 16

*United States v. Purcell*,
    236 F.3d 1274 (11th Cir. 2001) ......................................................18

*United States v. Ratcliff*,
    725 F. App'x 894 (11th Cir. 2018) ............................................12, 13

*United States v. Robinson*,
    414 U.S. 218 (1973)........................................................................14

*United States v. Taylor*,
    458 F.3d 1201 (11th Cir. 2006) ..........................................14, 15, 16

*United States v. Walker*,
    799 F.3d 1361 (11th Cir. 2015) ......................................................14

*Uzuegbunam v. Preczewski*,
    141 S. Ct. 792 (2021)......................................................................30

*West v. Davis*,
    767 F.3d 1063 (11th Cir. 2014) ......................................................24

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022)..............................................................27, 28

*Young v. City of Augusta*,
    59 F.3d 1160 (11th Cir. 1995) ..........................................................7

**INTRODUCTION**

The evidence in this case paints a clear picture of a policy and custom of police harassment. The goal of that policy—a program of warrantless and suspicionless visits—was to bring new charges on targeted individuals and their associates or drive them out of town. On that evidence, PSO is liable under *Monell*.

But that is not the case that Defendant Sheriff Nocco ("PSO") wants to defend. Under PSO's preferred framework, this Court must consider more than just PSO's written policies and its undisputed pattern of misbehavior pursuant to them. Instead, PSO argues, the Court must weigh each individual interaction to determine whether that interaction might violate the Constitution on some *other* theory that Plaintiffs did not bring (*i.e.*, wrongful arrest), and then ask whether that violation can be linked to an official policy. In doing so, PSO simply ignores the policies and customs that actually are at issue in this case—and the appropriate legal standards that courts must apply when considering them. But at the end of the day, this is a standard *Monell* case: the Manual is the policy and its implementation is the custom. This Court should decline PSO's invitation that it reimagine it otherwise.

**ARGUMENT**

## I.     This Is A Quintessential *Monell* Case.

PSO characterizes Plaintiffs' facts as a diffuse collection of "literally hundreds of interactions," from which Plaintiffs have "cherry pick[ed]" the worst. Def.'s MSJ

2. This matters, in PSO's view, because there are "meaningful differences in the individual events" such that this Court simply cannot "blur it all together loosely as a *Monell* custom." Def.'s MSJ 4. Instead, PSO argues, this Court's review must be "[a]kin to a qualified immunity analysis" in that it must "slosh its way through the factbound morass," Def.'s MSJ 5 (citation omitted).

That is wrong for at least three reasons. First, it completely forgets that there *is* a written policy—several, in fact—mandating the harassment Plaintiffs describe, making a blow-by-blow comparison needless. Second, Plaintiffs show that those policies, when put into practice, created an unconstitutional *custom* under *Monell*. And third, if the Court accepts one of PSO's main arguments—that there is no policy or custom because, supposedly, no one was ever taught how to do a prolific offender check—it triggers failure-to-train liability under *Monell*.

### A. PSO Attempts To Sidestep A Critical Question—Whether The ILP Manual And Related Directives Establish A Policy Under *Monell*.

#### 1. Plaintiffs have in fact argued that the ILP Manual and related directives establish a policy under *Monell*.

PSO presumes that *Monell* is not triggered here simply because "[t]he relevant ILP Manuals and 2021 Directive" are silent on the most outrageous aspects of the prolific offender checks. Def.'s MSJ 9. Based on that assumption, PSO asserts, Plaintiffs' claims can only be "based on a contention that there was a custom" since "there is no basis for Plaintiffs to contend that an *official policy* of the Sheriff caused

any constitutional violations." Def.'s MSJ 9. That is just wrong. Plaintiffs have provided extensive briefing showing that the relevant manuals and directives, in and of themselves, establish an official policy of constitutional violations. *See, e.g.*, Pls.' MSJ 24 n.29 (arguing the Manual itself requires warrantless searches); Pls.' Resp. to Def.'s Facts ¶ 13. That is all Plaintiffs need to show, as PSO can be liable on the basis of the policies described in the Manual alone. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

> **2.      The policy reflected in the ILP Manual and related directives triggers *Monell* liability because that policy is the "moving force" behind PSO's constitutional violations.**

*Monell* liability applies here, on the strength of the Manual alone, because "there is an 'affirmative link' between" the ILP Manual and directives "and the constitutional violation—that is . . . the custom or policy is the 'moving force' behind the constitutional violation." *Speight v. Griggs*, 620 F. App'x 806, 810 (11th Cir. 2015) (quoting *City of Springfield v. Kibbe*, 480 U.S. 257, 267 (1987)). Here, the reason PSO engaged in searches that violate the Fourth Amendment is because *there is a written policy* that requires suspicionless visits to people's properties, *see* JSF ¶¶ 4, 9, 79–80, 91, without a warrant, *id.* ¶ 92, designed to gather information about criminal behavior, *id.* ¶¶ 81, 103–05.

Likewise, parents of prolific offenders were subject to a zero-tolerance arrest policy and targeted by code enforcement because *there was written policy* that

required it. *See* JSF ¶¶ 9, 13, 85, 121 (arrest), ¶¶ 23, 144–45 (code enforcement).

Thus, just as in *Monell* itself, it is enough that there is "a statement of the policy by

[the agency], and its exercise." *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23

(1985) (citing *Monell*). That the Manual and directives do not explicitly "call[] on

deputies," to go even further, Def.'s MSJ 25—by instructing them to "bang[] on

windows and doors," *id.*, be rude, use profanity, or show up repeatedly or late at

night—is beside the point. (That is where *Monell* "customs" come into play.) The

initial violation lies in the *checks themselves*, a practice expressly required by official

policy. So *Monell* applies on the basis of those written policies alone.

## B.   PSO Wrongly Insists That There Can Be No Custom Unless Every Prolific Offender Check Is Exactly The Same.

Though it accuses the Plaintiffs of cherry-picking, PSO's case focuses only

on a handful of events, like arrests or citations, that PSO says were too infrequent or

too dissimilar to reflect a custom.[1] This fails for two reasons. First, even setting aside

the existence of a clear policy—the Manual—there is a consistent pattern as to how

and when checks were performed to establish a custom under *Monell*. And second,

---

[1] PSO's attempted distinctions between the checks is, at times, mystifying. PSO admits that deputies "looked into [Robert's] windows," Def.'s MSJ 24, but argues that is somehow different from peering through Tammy's fence, JSF ¶¶ 114, 219, 246, or snooping in Darlene's yard, *id.* ¶¶ 280–83, and it distinguishes between banging on Robert's windows and rapping on Darlene's camper door and windows, *id.* ¶¶ 282, 320, 322, 336; *see also* Def.'s MSJ 24–25 (arguing that "no one banged on Deegan's or Taylor's windows—certainly not to the point of an unconstitutional custom.")

PSO's preferred analysis invites error, asking the Court to substitute a qualified immunity-like standard in place of *Monell*.[2]

### 1. The checks themselves, as well as the way they were conducted, establishes *Monell* liability.

PSO says the Court must "slosh its way through" each visit, Def.'s MSJ 5 (citation omitted), to find "a sufficient number of 'substantially similar' incidents," before it can conclude that "there was a definitive custom of conducting checks *in an unconstitutional manner*." Def.'s MSJ 9 (citing *Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005) (emphasis added)).

The problem with this argument is that it skips straight to the "manner" of the checks, presupposing that they are constitutional. They aren't. Virtually every interaction (even those PSO describes as "benign") began with and shares the same "customary" constitutional violation—a warrantless, suspicionless visit at a prolific offender's home in violation of the Fourth Amendment.[3] And here, that violation happened over 13,000 times from 2015 to 2021. *See* JSF ¶ 130.

---

[2] PSO devotes extensive space to explaining how those incidents are not independently actionable, essentially a response to arguments—like false arrest—Plaintiffs have not raised.

[3] As described in greater detail in Section II.A., prolific offender checks are *not* knock and talks and, when done according to policy, *every* prolific offender check is an unconstitutional search and seizure. Likewise, as described in Sections II.B., II.C., and II.D., every arrest or code citation, if a result of Plaintiffs' connection to or association with a prolific offender or Top 5 offender, violates the First and Fourteenth Amendments. PSO's suggestion that this Court skip over the prolific offender check itself and look only to see whether it was conducted in "an unconstitutional manner," is thus beside the point. There is of course no "constitutional manner" in which to violate the First, Fourth, or Fourteenth Amendments.

On top of the unconstitutionality of conducting the checks at all, the manner and frequency of the checks also reflects a custom. As one supervisor testified, frequent prolific offender checks were "consistent with the goals of ILP." Pls.' Resp. to Def.'s Facts ¶ 13. Likewise, PSO conducted 2,109 prolific offender checks between the hours of 10 p.m. and 6 a.m. *See* JSF ¶ 136. And prolific offenders were 20 times more likely to receive code citations than others in the county. *See id.* ¶ 158.[4] Plaintiffs' experiences—repeated visits at odd hours, code enforcement, etc.—thus fully aligned with PSO practice. And if Plaintiffs were not home, or were perceived noncompliant, another custom—"open up and comply, or else"—emerged.[5] In fact, in Robert's and Tammy's cases, they were cited (Tammy) and arrested (Robert) shortly after ending an encounter. JSF ¶ 244, 338.

Along with targeted individuals, the application of these practices to their family and associates also reflected a widespread custom. Deputies said as much. One STAR team supervisor praised a deputy for making multiple, repeated visits to Robert's home, including yelling through windows and walking around the house. *See* JSF ¶ 321. That officer admitted this reflected "a portion of the overall [ILP]

---

[4] *See also* JSF ¶ 150 (it was a "common practice" for deputies to "direct the code personnel to go assess [the houses of listed individuals] for violations"); *id.* (AIM slides listing code citations issued); *see also id.* (noting that a code enforcement corporal "issued citations" and "advised of the upcoming sweep . . . concerning Top 5 and associates").

[5] Deputies invaded the curtilage, looked inside, or attempted entry at all of Plaintiffs' homes. Pls.' MSJ 10–11. All were either cited or threatened with code citations. *See id.* at 19–20. And except for Dalanea, all were either arrested or threatened with arrest. *See id.* at 15–18.

philosophy, yes." *Id.* In another review, a code officer listed as an *accomplishment* that he issued so many citations to a prolific offender's mother that she was evicted. *Id.* ¶ 152. That is consistent with reports of checks on non-Plaintiffs. *See, e.g.*, *id.* ¶ 120. Another mother was similarly "reminded, that due to [her son's] Top 5 prolific offender status there will likely be regular visits." *Id.* ¶ 122.

This shows that Plaintiffs' experience is part of a custom of routine and aggressive visitation and heightened enforcement. And it exceeds what is necessary to establish a *Monell* custom or practice. *See, e.g.*, *Depew v. City of St. Marys*, 787 F.2d 1496, 1497–98, 1501 (11th Cir. 1986) (four similar incidents sufficient).[6] PSO contends that Plaintiffs' experiences were too diffuse and unique; but even if there are *some* inevitable variations, multiple incidents need not be "precisely identical . . . to make out a claim that [PSO] has adopted a widespread practice." *Rivas v. Figueroa*, No. 11-cv-23195, 2012 WL 1378161, at *3 (S.D. Fla. Apr. 20, 2012).[7] Courts are quite able to identify a common thread within supposedly

---

[6] *See also Young v. City of Augusta*, 59 F.3d 1160, 1172–73 (11th Cir. 1995); *Lozman v. City of Riviera Beach*, 39 F. Supp. 3d 1392, 1408 (S.D. Fla. 2014) ("a string of unrelated incidents" or even "repeated, constitutional failures with respect to *one* individual . . . may be sufficient" (emphasis added; cleaned up)).

[7] PSO cites *Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005) to support its argument that "to establish a *Monell* custom as causing an underlying violation, Plaintiffs must show a sufficient number of 'substantially similar' incidents." *See* Def.'s MSJ 9. However, *Mercado* was a failure-to-train *Monell* case, where a greater showing of notice of similar past conduct would be required to establish liability. To show a policy or custom, it is enough that there is a general practice of unconstitutional conduct. And in any event, the thousands of prolific offender checks conducted by PSO would be sufficient to establish liability even under *Mercado*, as explained below in Part I.C.

disparate events, and thus courts decline to "narrow [their] view of the *Monell* claim to a single, individual tactic employed by police." *In re: N.Y.C. Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 402 (S.D.N.Y. 2021).

Ultimately, this case does not "rest[] entirely on a single incident of alleged unconstitutional activity." *Craig v. Floyd County*, 643 F.3d 1306, 1311 (11th Cir. 2011). Nor are the violations too diverse or "too numerous to give rise to a unified pattern of police misconduct." *N.Y.C. Policing*, 548 F. Supp. 3d at 401. *Monell* can be satisfied where, as here, "a variety of tactics were used to impede" Plaintiffs' constitutional rights and, if they resisted, "to punish them for doing so." *Id*. at 402. Thus, Plaintiffs have shown "'a persistent and widespread practice' of similar constitutional violations," *Poulin v. Bush*, No. 8:21-cv-1516-WFJ-AEP, 2023 WL 185122, at *18 (M.D. Fla. Jan. 13, 2023), "that is so pervasive, as to be the functional equivalent of a policy." *Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th Cir. 1994). *Monell* attaches.

### 2. PSO invites error by asking this Court to treat this like a qualified immunity case.

PSO urges this Court to substitute the *Monell* standard for something "[a]kin to a qualified immunity analysis." Def.'s MSJ 5. That invites error. To start, the two doctrines are not "akin" to one another. As courts have recognized, "*Monell* and qualified immunity occupy different analytical space: *Monell* is a fact-based causation standard, and qualified immunity is a legal defense." *Herrera v. Santa Fe*

*Pub. Schs.*, 41 F. Supp. 3d 1027, 1178 (D.N.M. 2014). As such, "*Monell* and qualified immunity turn on distinct issues of fact and law." *Johnson v. Morales*, No. 17-CV-12405, 2021 WL 949524, at *16 n.16 (E.D. Mich. Mar. 12, 2021) (citing *Doe v. Sullivan County*, 956 F.2d 545, 554 (6th Cir. 1992)).

Given these distinctions, other courts have (correctly) refused PSO's gambit here, rejecting "a municipality's defense under *Monell*," if it would seek to "import the protections afforded by qualified immunity." *Ramirez v. El Paso*, No. EP-17-CV-00193-DCG, 2022 WL 16557646, at *3 (W.D. Tex. Oct. 31, 2022). In fact, this Circuit has, rather categorically, "reject[ed] the notion that the policy or custom requirement imposed by *Monell* may be equated with qualified immunity." *Buckner v. Toro*, 116 F.3d 450, 453 (11th Cir. 1997). This Court should not, therefore, treat this case as though qualified immunity were an available defense.

### C. PSO's Argument That There Can Be No Policy Or Custom, Because PSO Never Trained Anyone How To Do Prolific Offender Checks, Concedes *Monell* Liability For Failure To Train.

PSO also argues that there can be no *Monell* policy or custom because "[t]he ILP Manual did not direct deputies how to conduct [prolific offender checks]," Def.'s Facts ¶ 13, nor was there any "official written policy direct[ing] the circumstances of a given check (or checks), i.e. how many to be performed, when they would be performed, the number of deputies responding, or the actions or demeanor of deputies." Def.'s MSJ 9. In other words, PSO's argument—indeed, its *defense*—is

that the worst instances of harassment are constitutionally insignificant because they occurred in contexts in which deputies were completely untrained.

That's a problem. After all, deputies were expressly instructed to visit prolific offenders *at their homes*, gather information, and look for bases on which to arrest or cite—a constitutionally fraught endeavor, to put it mildly. Yet PSO claims its deputies were provided virtually no guidance or training on how to perform this task—something that was both required by written policy and was done over 13,000 times in a six-year span. *See* JSF ¶¶ 79–80, 130. This is precisely the sort of scenario in which lack of training triggers *Monell* liability. *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (citing *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989)) (explaining that "the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform"). Failure to train under such circumstances "reflect[s] a deliberate or conscious choice or . . . deliberate indifference," *Malone v. City of Atlanta*, No. 21-12410, 2022 WL 1122859, at *3 (11th Cir. Apr. 15, 2022) (quotation marks omitted), to "the rights of persons with whom the [untrained employees] come into contact," *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011).

That is all the more apparent here, where the evidence reflects "[a] pattern of similar constitutional violations by untrained employees," *id*. at 62, all while "city policymakers [we]re on actual or constructive notice that a particular omission in

their training program cause[d] city employees to violate citizens' constitutional rights," *id*. at 61. Plaintiffs have provided extensive briefing showing that PSO officials knew that prolific offender checks were causing problems. Pls.' MSJ 7; JSF ¶¶ 134–35.[8] Even upon learning of these issues, PSO *still* did not provide any training. In fact, many who took part were *praised* for their efforts. *Id.* ¶¶ 150, 152, 321. This shows that deputies acted pursuant to a policy and custom, and it epitomizes deliberate indifference.

## II.   PSO's Policies And Customs Directly Caused, "In A *Monell* Sense," Harm to Plaintiffs' Constitutionally Protected Rights.

Throughout its motion, PSO tries to cabin numerous constitutional violations by insisting that they do not, "in a *Monell* sense," establish any liability. Plaintiffs have already addressed PSO's policies and customs in Sections I.A and I.B, above. In this section, Plaintiffs explain how those policies and customs either explicitly compelled, or implicitly allowed, repeated violations of Plaintiffs' rights.

---

[8] Some of this information was provided *internally*. PSO's 30(b)(6) representative—and primary architect of the 2018 Manual—noted numerous reports from "numerous deputies and detectives" that residents "are starting to resent our agency and say we are harassing them." JSF ¶ 138. The Sheriff himself received an email in 2015 complaining about precisely that. *See id.* ¶ 134. That led to some internal discussion, but no changes. *See id.* ¶ 135.

**A.    Plaintiffs' Fourth Amendment rights were violated, "in a *Monell* sense," because every prolific offender check began the same way—with an unconstitutional search and seizure.[9]**

**1.    Prolific offender checks are not knock and talks. Every prolific offender check is an unconstitutional search, pursuant to official policy, thus triggering *Monell* liability.**

PSO defends prolific offender checks by couching them as "knock and talks." Applying that label, PSO argues that the visits do not require a warrant, probable cause, or even reasonable suspicion—if they are "unconnected to a search." Def.'s MSJ 12. This argument fails for two reasons. First, prolific offender checks are not "unconnected to a search" and they *do* require reasonable suspicion. And second, the checks exceed the scope of any reasonable "implied license."

(a) Prolific offender checks are not knock and talks. They are searches without reasonable suspicion.

Prolific offender checks are not routine knock and talks because they are not "unconnected to a search." Just the opposite, their purpose is to gather information "about the criminal environment" and the prolific offender. JSF ¶ 103; *see also id.* ¶¶ 9, 105. Moreover, in this Circuit, a "knock and talk" requires *at least* reasonable suspicion. *See* Pls.' MSJ 24 (citing *United States v. Ratcliff*, 725 F. App'x 894, 901 (11th Cir. 2018) ("[o]fficers need . . . reasonable suspicion . . . to justify [a] knock

---

[9] Most of PSO's discussion of Plaintiffs' Fourth Amendment claim focuses on a handful of questionable (unconstitutional) searches and arrests. PSO tries to sever the link between those events and the challenged polices and customs by characterizing them as objectively legitimate. But those arguments mostly just refute claims—like false arrest—Plaintiffs did not bring.

and talk.")). This makes sense insofar as a "knock and talk" is analogous to a *Terry* stop conducted in the home, and, of course, a *Terry* stop requires reasonable suspicion.[10] Reasonable suspicion, therefore, is required here.

> (b) Prolific offender checks are not knock and talks. There is no "implied license" to gather evidence or harass.

The repeated, invasive, and targeted home visits at issue bear no resemblance to a traditional knock and talk. Nor is it a per se rule, as PSO vaguely contends, that all intrusions are permissible as long as there is some "legitimate police purpose." Def.'s MSJ 13. Rather, the well-established standard asks whether a "knock and talk" is consistent with the generally "implied license" to visit a property and knock on the door—a license that applies equally to "Girl Scouts," "trick-or-treaters," or any other member of the public. *Florida v. Jardines*, 569 U.S. 1, 8 (2013). PSO's visits well exceeded that implied license.

To begin, the implied license does not allow police to enter private property "in hopes of discovering incriminating evidence." *Id.* at 5. Yet that is precisely what deputies were instructed to do during prolific offender checks—gather information to assist in investigations, develop "expert[ise]" on an individual, Pls.' Resp. to Def.'s Facts ¶ 13, record that information for later use, *id.*; *see also* JSF ¶ 127, search

---

[10] In this Circuit, even reasonable suspicion may not be sufficient. *See Moore v. Pederson*, 806 F.3d 1036, 1039 (11th Cir. 2015) ("[I]n the absence of exigent circumstances, the government may not conduct the equivalent of a *Terry* stop inside a person's home.").

for code violations, JSF ¶¶ 144–45, 150, and "discover" new charges, *id.* ¶ 107. This alone is sufficient to show a Fourth Amendment violation, because "[w]hen 'the Government obtains information by physically intruding' on persons [or] houses, . . . 'a "search" within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" *Jardines*, 569 U.S. at 5; *see also United States v. Maxi*, 886 F.3d 1318, 1327 (11th Cir. 2018) (no knock and talk where "officers' intent in approaching the [home] wasn't that of an ordinary citizen"). In this way, every prolific offender check "objectively reveals a purpose to conduct a search," because it is a visit to a property "in hopes of discovering incriminating evidence," thus taking it outside the scope of a knock and talk. *Jardines*, 569 U.S. at 9–10.[11]

Moreover, because "[w]arrantless trespasses by the government into the home or its curtilage are Fourth Amendment searches," *United States v. Perea-Rey*, 680 F.3d 1179, 1185 (9th Cir. 2012), going onto the curtilage is permissible only if incident to contacting someone inside. *United States v. Taylor*, 458 F.3d 1201, 1204–05 (11th Cir. 2006). That is because the knock and talk exception "*is geographically limited to the front door or a 'minor departure from it.'*" *United States v. Walker*, 799 F.3d 1361, 1363 (11th Cir. 2015) (emphasis added) (quoting *Taylor*). Despite

---

[11] PSO seems to concede the purpose of a visit is to search and arrest, invoking officer safety concerns since "arrestees or potential arrestees are in close proximity." Def.'s MSJ 13 (citing *United States v. Robinson*, 414 U.S. 218 (1973) (adopting the search-incident-to-arrest rule)).

PSO's argument otherwise, the evidence reveals a custom of routine forays onto the curtilage that are not merely "a minor departure from the front door," *Taylor*, 458 F.3d at 1205, "in good faith," *United States v. Hammett*, 236 F.3d 1054, 1060 (9th Cir. 2001), "as part of a legitimate attempt to interview a person," *United States v. Daoust*, 916 F.2d 757, 758 (1st Cir. 1990). As Florida courts applying the Fourth Amendment have said, "[o]fficers are not permitted to exit the front door area and physically enter or look into other portions of the home or its curtilage pursuant to a 'knock and talk.'" *Osorio v. State*, 244 So. 3d 1115, 1120 (Fla. 4th DCA 2018) (collecting cases); *Friedson v. State*, 207 So. 3d 961, 965 (Fla. 5th DCA 2016) (finding a knock and talk became a warrantless search when officers left the porch and shined a light in an adjacent window).

The repeated, involuntary, and intrusive nature of prolific offender checks also distinguishes them from traditional knock and talks.[12] The checks often occurred late at night, involved invasive questions, resulted in arrests or citations, and were in no sense "voluntary." Officers sought to apply "pressure," JSF ¶ 106, "light a fire," *id.* ¶ 153, or "harass[]," *id.* ¶¶ 97, 341, to prod offenders and their families to "move away," *id.* ¶ 107. The visits persisted even after Plaintiffs complained they felt

---

[12] PSO frames Plaintiffs' claim as arguing that "the sheer number of prolific offender checks must mean that they are *all* constitutional violations." Def.'s MSJ 40. Not quite. While all the searches were unconstitutional in light of written policy, as the cases cited above illustrate, visit frequency is also relevant to show that the visits were harassing and thus cannot be justified as knock and talks because they were well beyond the scope of any implied license.

harassed, *see* Pls.' MSJ 12, 25. And deputies knew the visits were unwelcome but continued them anyway. *See id.* There is no implied license to engage in such behavior. *See United States v. Lundin*, 817 F.3d 1151, 1159 (9th Cir. 2016) (holding visits were not knock and talks in part because they occurred late at night); *French v. Merrill*, 15 F.4th 116, 131 (1st Cir. 2021) (noting "officers' repeated reentry onto the property and [their] aggressive actions"); *Perea-Rey*, 680 F.3d at 1189 (officers cannot "meander around the curtilage and engage in warrantless detentions and seizures").

### 2.   Prolific offender checks are not knock and talks. Every prolific offender check is an unconstitutional seizure, pursuant to official policy, thus triggering *Monell* liability.

As PSO notes, the Fourth Amendment is "not implicated by consensual encounters with police." Def.'s MSJ 13 (citing *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006)). But PSO does not point to any evidence to establish such consent, which cannot simply be assumed. *Bates v. Harvey*, 518 F.3d 1233, 1244 (11th Cir. 2008) ("we cannot imply consent from [a] failure to object"). To the contrary, PSO itself admitted that its policies did not require consent to conduct a prolific offender check. *See* JSF ¶ 91. As Plaintiffs have argued, none of their participation in prolific offender checks—"benign" or no—was consensual. *See id.* ¶¶ 97, 179, 191, 237.

In fact, far from being consensual, prolific offender checks amounted to involuntary seizures of the targeted individuals. That is because no "reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Brendlin v. California*, 551 U.S. 249, 255 (2007).[13] How could they? Checks involved "show[ings] of force," JSF ¶ 102; *see also id.* ¶ 101, raised voices, *id.* ¶¶ 287, 320–21, surrounding of homes, *id.* ¶¶ 114–15, 219, 246, 282, forceful knocking, *id.* ¶¶ 118, 282, 320, 322, 336, and ordering occupants outside, *id.* ¶¶ 117–18, 282, 287; *see also* Pls.' Resp. to Def.'s Facts ¶¶ 74, 86. And perceived noncompliance was met with arrest, code citations, or both—all factors that would inform any reasonable person's sense for whether she would "feel free to decline the officers' requests" or "terminate the encounter." *Brendlin*, 551 U.S. at 255.[14] And that makes sense, as PSO's written policies *required* prolific offender checks; deputies were under orders to conduct these checks regardless of whether the targeted individuals were willing participants or not.

Taken together, PSO deputies' behavior had the effect of "convey[ing] a message that compliance with the[] request is required," or else additional

---

[13] That is perhaps why, after noting some of the factors defining a seizure, PSO provides no analysis under them. It returns to its refrain that "[t]here is simply not enough similarity . . . to say that there were constitutional violations or that there was a sufficiently similar pattern of constitutional violations." Def.'s MSJ 14.

[14] As just one example, Robert's refusal to answer the door was specifically noted in AIM slides as a reason to target him for code enforcement. *See* JSF ¶ 347.

enforcement would result. *Florida v. Bostick*, 501 U.S. 429, 437 (1991).[15] That

matters because a seizure occurs if, as here, the supposed "consent" is obtained from

someone "fearing prosecution" for noncompliance. *Id*. After all, "'[c]onsent' that is

the product of official intimidation or harassment is not consent at all." *Id*. at 438.

None of the Plaintiffs wanted to cooperate with prolific offender checks and all of

them "complied" solely because they felt they had no choice. *See* JSF ¶¶ 97, 184,

237, 290. That is a nonconsensual seizure. *See United States v. Purcell*, 236 F.3d

1274, 1281–82 (11th Cir. 2001) (listing factors of involuntary consent).

> **B.    Plaintiffs' First Amendment rights were violated, "in a *Monell* sense," because each of Plaintiffs' arrests and code citations resulted from written, formal policy to punish associates.**

PSO argues that Plaintiffs' First Amendment claims fail because they have not

shown that their familial relationships were more than "incidentally burdened."

Def.'s MSJ 29. While that is not the standard, Plaintiffs have shown that anyway.

To establish a First Amendment violation, the parent-Plaintiffs need only

show that they were *themselves* harmed when they were targeted by PSO based on

their relationships with their children. *See McCabe v. Sharrett*, 12 F.3d 1558, 1562

(11th Cir. 1994) ("Obviously the government burdens a constitutional right when it

imposes a direct penalty such as a criminal fine on its exercise."). So, for instance,

---

[15] PSO focuses on each arrest and why they are supposedly barred due the existence of independent probable cause. But Plaintiffs' claims are not related to each individual arrest. They simply illustrate, among other things, that plaintiffs felt they could not terminate an encounter.

in *St. Ann v. Palisi*, 495 F.2d 423, 425 (5th Cir. 1974), the Fifth Circuit, prior to the establishment of the Eleventh, held that the constitutional rights of children were violated when they were punished because of their association with their mother. The court did not require a showing that their relationship with their mother were *harmed* as a result.[16] It is enough to show, as here, that Plaintiffs endured disproportionate enforcement solely because of their link to their children, and that those links are the reason for Robert's and Tammy's arrests and citations, and, for Darlene, the warrantless search of her property and issuance of citations.[17]

Dalanea, on the other hand, is claiming that her relationship with her close family friend was harmed by PSO—a claim that the record supports. Her relationship with that friend—the woman who took her in because she knew Dalanea had nowhere else to go—was so badly damaged by PSO's conduct that Dalanea was forced to move out. *See* JSF ¶¶ 198–99. She even said it was *because of* the checks. *See id.* ¶¶ 186, 198. The record also shows a similar impact on the other Plaintiffs:

_____

[16] As explained above, the record is clear that the parent-Plaintiffs were targeted because of their relationships with their children, as each was arrested or cited for reasons that are demonstrably related to their kids' status as listed individuals. *See supra* pp. 3–4. PSO documented the associates of listed offenders and listed both Robert and Tammy as "associates" of their children. *See* JSF ¶¶ 84, 208, 251, 313; *see also id.* ¶ 161. Deputies also openly acknowledged that PSO was targeting Plaintiffs because of their relationship to their children. *Id.* ¶¶ 109–11, 234, 350.

[17] Plaintiffs do not concede that those searches, arrests and citations might have been objectively valid, as PSO contends at some length. Def.'s MSJ 15–27. Rather, the legitimacy of those events, in a vacuum, is beside the point. What matters is that they only occurred because of Plaintiffs' association with their children.

Tammy's oldest son left the house as a result (and moved back in briefly before fleeing again in fear), and the constant visitation led to severe domestic strife in her home. *See* JSF ¶ 260. Darlene could not take in or care for her son because of her fear of PSO's harassment. *See id.* ¶ 309; *see also* Pls.' Resp. to Def.'s Facts ¶¶ 68, 70. And Robert's wife left him to escape the stress of constant police activity, and to this day he is afraid to have his son to come visit him in Pasco County. *See* JSF ¶¶ 364, 366; *see also* Pls.' Resp. to Def.'s Facts ¶ 80. These are not "incidental" harms.

### C. Plaintiffs' Procedural Due Process rights were violated, "in a *Monell* sense," because PSO's policy is to not provide notice or an opportunity to be heard despite impairing basic liberties.

PSO argues that its designations do not require notice or a hearing because there is no "deprivation or burdening as to a particular, established right." Def.'s MSJ 33. Instead, the argument goes, Plaintiffs only "refer vaguely to a right to peaceful enjoyment of their residences, not to be harassed, and the like." *Id.*

That is not true. As Plaintiffs have plainly alleged, PSO's policies implicate a number of protected liberty interests, including the right to be free from intrusion on their property, *Jardines*, 569 U.S. at 10, their expectation of privacy, *Katz v. United States*, 389 U.S. 347 (1967), their right not to be penalized for the wrongdoing of others, *Singleton v. Cecil*, 155 F.3d 983 (8th Cir. 1998), and their ability to "establish a home," *Bd. of Regents v. Roth*, 408 U.S. 564, 572 (1972). For these reasons, inclusion on the lists affects "liberty and property" interests—terms which the

Supreme Court has noted are "broad"—and for which "notice and an opportunity to be heard are essential." *Roth*, 408 U.S. at 571–73.[18]

PSO contends, circularly, that there is no right to due process unless a plaintiff identifies a right "that has already been recognized as a constitutional right." Notwithstanding that Plaintiffs have done just that, PSO's reference to the "no fly list cases," Def.'s MSJ 33 (quoting *Latif v. Holder*, 28 F. Supp. 3d 1134, 1148 (D. Or. 2014)), mistakes the significance of that threshold finding. True, in *Latif*, the court began by finding that a protectable interest—the right to travel—was implicated by inclusion on a no-fly list. But, the court held, that interest was unlawfully impaired because there were no "meaningful procedures to afford Plaintiffs the opportunity to contest their placement." 28 F. Supp. 3d at 1161; *see also Mohamed v. Holder*, 995 F. Supp. 2d. 520, 539 (E.D. Va. 2014) (a citizen has "countervailing liberty interests and is entitled to a meaningful opportunity to challenge" placement). The same is true here. Prolific offender classification, like probation, impaired basic liberties. Thus, the designation must be preceded—again,

---

[18] PSO also argues that Robert, Tammy, and Darlene did not suffer a deprivation because their children were the ones listed. *See* Def.'s MSJ 34. This argument has no application to Dalanea, who was listed as both a prolific and Top 5 offender. *See* JSF ¶¶ 28–29. Meanwhile, Robert and Tammy were entitled to a hearing because their children were minors at the time that they were listed. *See, e.g.*, *Mueller v. Auker*, 576 F.3d 979, 995 (9th Cir. 2009). Plaintiffs did not bring this claim on Darlene's behalf. *See* First Am. Compl. ¶¶ 257–66 (ECF 41).

like probation—by notice and opportunity to be heard.[19] *Roth*, 408 U.S. at 572 (procedural due process protections "extend well beyond . . . the sort of formal constraints imposed by the criminal process").

In the face of all this, PSO argues that Plaintiffs simply should have known to "make complaints to the Sheriff's Office." Def.'s MSJ 32. Except both Darlene and Tammy's daughter *did* file a complaint about the harassment—not realizing the harassment was compelled by agency policy—and the complaints did not result in a hearing of any kind. *See* JSF ¶¶ 77–78. As that experience shows, the ability to file a misconduct complaint is no substitute for notice and a hearing.

### D.  Plaintiffs' Substantive Due Process rights were violated, "in a *Monell* sense," because PSO has a policy and custom of harassment.

Plaintiffs' substantive due process claim has two aspects. The first—which PSO does not address—contends that PSO's system of harassment improperly punishes individuals for suspected *future* wrongdoing or the past wrongdoing of

---

[19] After this lawsuit was filed (and while, PSO officials say, prolific offender checks were winding down), PSO sent letters to prolific offenders advising them of their designation. *See* Pls.' Resp. to Def.'s Facts ¶ 29. The letters were congratulatory in tone: "We are pleased to inform you that you have been selected to participate in a Prolific Offender Program," they began. The letter then provided a number to call if a recipient questioned "the selection criteria used to determine [their] eligibility." *Id.* The Department of Justice launched an investigation into PSO soon after, citing its suggestion in that same letter that the program was being run "in cooperation with [DOJ's] Strategies for Policing Innovation Initiative." *Id.*

others. *See* Pls.' MSJ 38.[20] The second aspect contends that PSO's policies amount to "systemic and intentional harassment." Pls.' MSJ 39–40 (quoting *Chalfy v. Turoff*, 804 F.2d 20, 22–23 (2d Cir. 1986)).

As for the latter, PSO argues that Plaintiffs must show PSO's conduct was "conscience shocking." Def.'s MSJ 35 (citation omitted). But the "shocks the conscience" standard has no place here, "a civil case for money damages." *Pasco CWHIP Partners, LLC v. Pasco County*, No. 8:13-cv-2377-T-23EAJ, 2014 WL 3805667, at *2 n.* (M.D. Fla. Aug. 1, 2014) (quoting *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994)). To show a substantive due process violation here, Plaintiffs need only show that "excessive and unreasonable police conduct was intentionally directed" at them to achieve an improper end. *Benigni v. City of Hemet*, 879 F.2d 473, 478 (9th Cir. 1988); *see also Espanola Way Corp. v. Meyerson*, 690 F.2d 827 (11th Cir. 1982) (finding a Fourteenth Amendment claim where city used frequent inspections and citations to target undesirable businesses); *Swint v. City of Wadley*, 51 F.3d 988, 1001 (11th Cir. 1995) (finding a due process violation where police sought to force a nightclub out of business through the pretextual use of "repeated and improperly motivated raids"); *Beach Blitz Co. v. City of Miami Beach*,

---

[20] Specifically, Plaintiffs argued that "PSO's policy violated substantive due process," on the grounds that "it violated the fundamental right to be free from punishment for the misdeeds of others" and therefore is subject to strict scrutiny. Pls.' MSJ 37–38.

No. 1:17-cv-23958-UU, 2018 WL 11260453, at *5 (S.D. Fla. Feb. 5, 2018) (applying *Espanola Way*, 690 F.2d at 828–30).[21] Like the plaintiffs in the above cases, Plaintiffs' due process rights were violated because they were identified, targeted, harassed, and disproportionately subject to enforcement. Thus, a finding in their favor would not, as Defendants warn, "expand[] the doctrine." Def.'s MSJ 35.

To the extent the "shocks the conscious" standard applies, it is satisfied. PSO subjected Plaintiffs to warrantless, suspicionless "checks" simply because they (or their children) were selected by an algorithm as likely to commit future crimes. *See* Pls.' MSJ 2–12. PSO kept notes about Plaintiffs' private lives in an "offender notes" database. *See* JSF ¶¶ 127; *see also id.* ¶¶ 120, 123, 176, 178–79, 181–83, 216–18. PSO arrested Plaintiffs repeatedly, per its "zero-tolerance" arrest policy for *associates* of targeted individuals. *See* Pls.' MSJ 12–13. And PSO subjected Plaintiffs to heightened code enforcement, again solely due to their associations. *See id.* at 17–19. Deputies arrived in force, *see* JSF ¶¶ 101–02, asked personal questions, *id.* ¶¶ 123–26, 175, 179–84, 215–18, 326, shined lights in homes, *id.* ¶¶ 115, 219, 280, 336–37, banged on windows, *id.* ¶¶ 282, 320, 322, and peered through (or

---

[21] In support of its "shocks the conscience" standard, PSO cites *Collins v. City of Harker Heights*, 503 U.S. 115 (1992), Def.'s MSJ 35, but that case involved a wrongful-death-like claim by a government employee's widow and spoke only to the question of when, if ever, a party can shoehorn a substantive due process theory into what is "a fairly typical state-law tort claim." *Id.* at 128. That is nothing like this case. In fact, if the "shocks the conscience" standard applies at all, it is in excessive force cases. *West v. Davis*, 767 F.3d 1063, 1067 (11th Cir. 2014).

scaled) fences, *id.* ¶¶ 114, 219, 246, 282, fully effecting the Manual's "relentless

pursuit" requirement, *id.* ¶¶ 14, 106. That shocks the conscience.

## III.   PSO's Host Of Procedural Arguments All Fail.

### A.   None of Plaintiffs' claims are *Heck* barred.

Plaintiffs' claims are not barred by *Heck v. Humphrey*, 512 U.S. 477 (1994).

That is true for two reasons. First, *Heck* only applies when there is a conviction *and*

imprisonment. *See McClish v. Nugent*, 483 F.3d 1231, 1250 (11th Cir. 2007).[22] Here,

almost no prolific offender checks resulted in arrest or citation.[23] Fewer led to a

conviction. And none led to imprisonment.[24] So *Heck* simply does not apply.

Second, *Heck* does not apply since none of Plaintiffs' claims, if successful,

would "necessarily imply the invalidity of [a] conviction." *Dyer v. Lee*, 488 F.3d

876, 878–79 (11th Cir. 2007) (quoting *Heck*). In *Dyer*, the Eleventh Circuit applied

"the limited scope of the *Heck* holding," and rejected the notion that *Heck* applies

---

[22] This makes sense, as *Heck*'s rationale is that § 1983 should not supplant *habeas corpus*. *Harden v. Pataki*, 320 F.3d 1289, 1298 (11th Cir. 2003); *see also Leather v. Eyck*, 180 F.3d 420, 424 (2d Cir. 1999); *McClish*, 483 F.3d at 1251. PSO cites a Southern District decision, *Parker v. Town of Palm Beach*, No. 9:17-cv-80176-RLR, 2017 WL 11537901 (S.D. Fla. Aug. 16, 2017), for the proposition that *Heck* bars claims that would invalidate fines. Def.'s MSJ 25–26. But that decision cannot be squared with *Heck* or with the cases cited above—including the Eleventh Circuit's decision in *Harden*.

[23] This does not, as PSO argues, show the visits were "benign." Rather, it underscores the suspicionless and unnecessary nature of the visits. In fact, in all but one of the instances of arrest or citation for Tammy, Darlene, and Robert, the facts forming the basis of the arrest or citation were unknown to deputies until *after* they arrived.

[24] None of Robert's arrests led to a conviction. *See* JSF ¶ 359. Likewise for Darlene, whose code case was dropped. *Id.* ¶ 304; *see also* Pls.' Resp. to Def.'s Facts ¶ 79. Tammy's citations and arrests did lead to convictions (when she pled guilty), but none led to jailtime. *See* JSF ¶ 257.

any time a plaintiff "plead[s] guilty to resisting arrest." *Id.* at 879, 881. Rather, the actual rule is that "as long as it is possible that a § 1983 suit would not negate [an] underlying conviction, then the suit is not *Heck*-barred." *Heid v. Rutkoski*, 857 F. App'x 558, 562 (11th Cir. 2021). Thus, Plaintiffs' claims are not *Heck*-barred.

### B.    Robert's claims are not barred by the statute of limitations.

PSO argues that "all claims by Jones of any kind under §1983 are barred by the four-year statute of limitations." Def.'s MSJ 6, 24.[25] But Robert's claims are not barred for the simple reason that Robert sued promptly after learning of the factual basis for his claims. *See Heard v. Martin Cnty. Sheriff's Off.*, No. 13-cv-14364, 2014 WL 12770093, at *5 (S.D. Fla. Aug. 8, 2014) ("The Eleventh Circuit has held that 'the statute of limitations for a § 1983 action begins to run from the date '*the facts which would support a cause of action* are apparent or should be apparent[.]'" (citing cases)). Other courts agree. A *Monell* claim accrues when a plaintiff knows—or should know—about the policies or customs underlying the claim. *See, e.g.*, *Pinaud*

---

[25] Notably, this argument seemingly pertains only to Robert and not the other Plaintiffs—all of whom endured prolific offender checks and other related interactions within the same limitations period. And in any case, PSO records show that Bobby was listed as a prolific offender as late as March 30, 2017, *see* JSF ¶ 48, and STAR deputies noted that they would "visit periodically . . . to maintain pressure" after he left the county, Pls.' Resp. to Def.'s Facts ¶ 82. PSO does suggest elsewhere that any claim related to Tammy's first arrest "is beyond the statute of limitations." Def.'s MSJ 20. But this argument fails for the same reason that it does for Robert. Tammy was unaware of all the challenged policies until later—in 2020. *See* JSF ¶ 269; *see also id.* ¶¶ 202, 311. Regardless, conduct from before the limitations period can establish the unlawfulness of "policies and practices" that continued after. *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 841 n.16 (11th Cir. 2017).

*v. County of Suffolk*, 52 F.3d 1139, 1157 (2d Cir. 1995). Thus, Robert's belief that PSO violated his rights, *see* Pls.' Resp. to Def.'s Facts ¶ 80, did not put him on notice that he had a *Monell* case. He learned of these policies in 2020, from a news reporter. *See id.*; JSF ¶ 363.[26] He sued soon after.

### C.    Plaintiffs' claims are not moot and they have standing.

#### 1.    This is a textbook example of voluntary cessation.[27]

In discussing its recent policy shift, PSO speaks in both standing and mootness terms. Def.'s MSJ 36. But if a defendant argues that "an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit," as PSO does here, it is a question of mootness, not standing. *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013) (cleaned up). "The distinction matters because . . . the Government, not [plaintiffs], bears the burden to establish that a once-live case has become moot." *West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022).

That burden is heavy where, as here, "the only conceivable basis for a finding of mootness in the case is the [government's] voluntary conduct." *Id.* (cleaned up).

---

[26] Nor *could* Robert have known about these policies; there is no evidence that the Manual was made available to the public, and, in fact, PSO took the position that its ILP Directive—and much of its current RAD Directive—are confidential documents subject to law enforcement privilege. *See* Def.'s Facts ¶ 1. In any event, to the extent that there is any factual debate about when Robert should have become aware of the policies, PSO has the burden to prove that the claims are barred. *Smith v. Duff & Phelps, Inc.*, 5 F.3d 488, 492 n.9 (11th Cir. 1993) (per curiam).

[27] Setting aside the question of why PSO changed its policies, Plaintiffs pause to note the tension in PSO's various positions. In essence, PSO argues that there were no constitutional violations, but if there were, they have been fully resolved by purely coincidental policy changes that, on the one hand, had nothing to do with this lawsuit, but on the other hand, moot it.

As the Supreme Court has definitively said, voluntary cessation does not moot a case "unless it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," a standard that ***cannot be met*** in circumstances like these, where "the Government nowhere suggests that if this litigation is resolved in its favor it will not reimpose" the challenged conduct, and where it in fact "vigorously defends the legality of" what it claims it has stopped doing. *Id.* (internal quotations and citations omitted).[28]

The Eleventh Circuit applies the same approach. A case is not moot if it involved "a continuing and deliberate practice," the cessation occurred either "under imminent threat of [a] lawsuit" or before a decision, the defendant has "fail[ed] to acknowledge wrongdoing" and "had the discretion to change its policy back." *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1184–89 (11th Cir. 2007) (cleaned up) (collecting cases). All of those factors are present here. This is a textbook case

---

[28] PSO argues that the standard calls for a "rebuttable presumption" that any "assertion of mootness by a government actor" moots a claim. Def.'s MSJ 39 (citing Eleventh Circuit precedent from 2004 and 2009). To the extent it recently said otherwise in *West Virginia v. EPA* (2022), the Supreme Court's pronouncement on the matter of course governs. But even under PSO's preferred standard, this case is not moot. In *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525 (11th Cir. 2013), the case relied on by Defendants, this Circuit held that claims were not moot because, in part, the state "continued to press . . . that the voluntarily ceased conduct should be declared constitutional." JSF ¶ 23, 380; Def.'s Facts ¶¶ 13–14, 31–36.

of voluntary cessation, devised "to deprive the court of jurisdiction." *Id*. at 1188. This Court should treat it as such and grant injunctive relief.[29]

### 2. Plaintiffs have standing for injunctive relief.

PSO further asserts that "the PSO no longer uses the prolific offender designation," Def.'s Facts ¶ 31, and because "none of the named Plaintiffs or their children is currently designated as a [newly defined] focused offender," Def.'s MSJ 37–38; JSF ¶¶ 25, 376–79, Plaintiffs have lost standing. But there is no basis to assume that Plaintiffs are no longer subjected to enhanced scrutiny as a result of PSO's now-suspended practices.[30] That is especially true for Tammy, whose son Donnie would reside with her (and briefly did), but instead recently fled Pasco out of fear of PSO. As with Dalanea, who received enhanced attention immediately after her release from prison, Donnie may receive—or in fact has already received—the same. *See* Pls.' Resp. to Def.'s Facts ¶ 28 (describing recent increased police presence and attention to Tammy, Darlene, and Robert).

Not that Tammy is the only one who might—or, again, perhaps still is—subject to enhanced PSO scrutiny. Recently, Tammy began receiving collections letters for costs and fees—in connection with her code cases from 2016 and 2017—

---

[29] Plaintiffs are seeking injunctive relief that would bar application of the specific policies challenged as unconstitutional, including conducting prolific offender checks without a warrant or probable cause and targeting family members of prolific offenders for a heightened enforcement focus.

[30] *See* Pls.' Resp. to Def.'s Facts ¶ 28.

demanding hundreds of dollars on pain of license suspension. Unmarked police-like vehicles have driven by her home in the middle of the night and taken photos. Robert's home was inexplicably surrounded by six PSO vehicles, and Darlene has had immense trouble with code enforcement. *See id*. Given this backdrop and the "history of past enforcement," the "prospect of future enforcement is far from 'imaginary or speculative.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164–65 (2014). Not that any of this can end the case anyway; Plaintiffs have a nominal damages claim. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny PSO's motion for summary judgment.

Dated: April 4, 2023.            Respectfully submitted,

/s/ Ari S. Bargil
Ari S. Bargil (FL Bar No. 71454)
INSTITUTE FOR JUSTICE
2 S. Biscayne Boulevard, Suite 3180
Miami, FL 33131
Tel: (305) 721-1600
Fax: (305) 721-1601
abargil@ij.org

Joshua A. House (CA Bar No. 284856)*
Caroline Grace Brothers (DC Bar No. 1656094)*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Tel.: (703) 682-9320
Fax: (703) 682-9321

jhouse@ij.org
cgbrothers@ij.org

Robert E. Johnson (OH Bar No. 0098498)*
INSTITUTE FOR JUSTICE
16781 Chagrin Boulevard, Suite 256
Shaker Heights, OH 44120
Tel.: (703) 682-9320
Fax: (703) 682-9321
rjohnson@ij.org

* Admitted *Pro Hac Vice*

*Counsel for Plaintiffs*

31

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of April 2023, a true and correct copy of the foregoing document was served was served via the Court's CM/ECF system upon all counsel of record.


<u>/s/ Ari S. Bargil</u>