UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DALANEA TAYLOR, et al,

    Plaintiffs,

v.                                                      CASE NO.:  8:21-cv-00555-SDM-CPT

CHRIS NOCCO, in his official
capacity as Pasco County Sheriff,

    Defendant.

_____/

**DEFENDANT SHERIFF NOCCO'S REPLY IN SUPPORT OF SECOND
AMENDED MOTION FOR SUMMARY JUDGMENT (DKT. 219)**

Defendant Pasco Sheriff Chris Nocco, by and through undersigned counsel, submits the following reply memorandum in support of his Second Amended Motion for Summary Judgment on All Claims (Dkt. 219).

    I.    **There was no official policy under *Monell* that violated Plaintiffs' constitutional rights.**

"A plaintiff … has two methods by which to establish a county's policy: identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." *Grech v. Clayton County, Ga.*, 335 F.3d 1326, 1329-30 (11th Cir. 2003). A local government agency "rarely will have an officially-adopted policy of permitting a particular constitutional violation" and so "most plaintiffs … must show that the county has a custom or practice of permitting it and that the county's custom or

practice is 'the 'moving force [behind] the constitutional violation.'" *Grech*, 335 F.3d at 1330 (citations omitted).

Plaintiffs contend in their response (Dkt. 240)¹ to the Sheriff's motion for summary judgment that the ILP Manual is not the only policy document and that *all* documents in any way related to ILP are also official policy and are themselves unconstitutional.² However, a thorough review of their arguments demonstrates that their real *Monell* claim is not based on any specific directive in official policy; it is *execution* of the policy, most obviously framed in the ILP Manual, that is the basis for their claim. Execution of the policy is a custom argument, not a policy one. *Grech*.

Plaintiffs' threshold criticism is that prolific offender or Top 5 offender checks under the former process were too many in number, and often harassing in nature. But as to policy (as opposed to execution of same), the ILP Manual stated that deputies should perform at least one prolific offender check per quarter. It did not require more. The manual stated that deputies should ask whether the offender was aware of criminal activity, but it did not specify the demeanor of deputies, how many were to appear for a check, or direct their actions.

---

¹ Plaintiffs' included brief-like tables at the start of their response. This causes a mismatch between their filing and the docket pages. References herein to pages of Plaintiffs' response will be to the docket page number as opposed to the original document page number. i.e. a reference to Dkt. 240, p. 14, is to page 14 as it appears on the docket, corresponding to page 4 of the response.

² Plaintiffs state in their response to Defendant's Additional Facts that documents other than the ILP Manual, such as performance reviews and the AIM slides used in weekly district meetings, represent official *Monell* policy. That is simply not correct. A policy in this context is something approved by the final policymaker, most often the Sheriff, not an employee performance review by a line supervisor or a slide at a weekly meeting of deputies. *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016). And, those documents do not announce any formal policy.

Plaintiffs note that the Manual included a zero-tolerance policy towards prolific offenders and their associates. But, neither the ILP Manual nor any other policy document, at any level, called for arrests where there was no objective probable cause.[3]

Further, nothing in official policy caused Heilman's arrests to occur in the *Monell* sense because neither of Heilman's arrests occurred in the context of a prolific offender check. Her 2016 arrest occurred in the midst of a criminal investigation of her son Donnie McDougall for his role in a burglary. Her second, in 2018, occurred when deputies went to the residence on a juvenile pick up order and Heilman flung her door open, striking a deputy. All arrests of Heilman or Jones were supported either by probable cause or were pursuant to a warrant, which renders any arrest lawful.

Plaintiffs complain about deputy "visits," generally, but the majority of those visits were not prolific offender checks or otherwise generated by the ILP Manual or any other official policy. Plaintiffs have not demonstrated that any Sheriff's official "policy," in the *Monell* sense of that word, was on its face unconstitutional. As in *Grech*, their real claim is that it was the custom of executing the checks that was unconstitutional.

---

[3] The only two named plaintiffs arrested in this case were Tammy Heilman and Robert Jones. Heilman was arrested twice and the Defendant has amply demonstrated probable cause for both arrests. (Dkt. 223, pp. 108-09). She also pled guilty in both, convicted in the first and *Heck v. Humphrey*, 512 U.S. 477 (1994) bars any claim on at least that arrest. Plaintiffs cite *McClish v. Nugent*, 483 F.3d 1231, 1250 (11th Cir. 2007) for the proposition that *Heck* applies only where there is a conviction *and* imprisonment. (Dkt. 240, p. 35). But, the Court in *McClish* was distinguishing in part between a claim based on wrongful arrest versus one for wrongful imprisonment. The claims here have to do with wrongful initial arrest and Heilman' conviction or guilty plea conflicts with any claim that the arrest was not supported by probable cause.

### II. There was no custom under *Monell* that caused or represented a violation of Plaintiffs' constitutional rights.

Plaintiffs take issue with Defendant Sheriff's citation to *Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir.2005) for the proposition that the incidents relied upon by Plaintiffs must be "sufficiently similar" so as to constitute a custom. They note that *Mercado* was a training case and they attempt to distinguish it on that grounds, though they cite no legal authority for that proposition. Plaintiffs argue instead that it is enough that they show "a general practice of unconstitutional conduct" to satisfy *Monell*. (Dkt. 240, p. 17, n. 7).

Plaintiffs mischaracterize the Sheriff's argument to be that *all* prolific offender checks must be "exactly the same" in order to represent a custom under *Monell*. (Dkt. 240, p. 14). This is classic straw man argument in that the Sheriff does not insist that all incidents be exactly the same. But, the Sheriff does rightfully insist that as a *Monell* custom claim Plaintiffs show both underlying constitutional violations *and* that the violations represented a custom which was so "pervasive and well-settled" as to have "the force of law." *Denno v. School Bd. of Volusia County*, 218 F.3d 1267, 1277 (11th Cir.2000) (citation omitted).

In support of their argument that they must show only a "general practice of unconstitutional conduct" Plaintiffs at Dkt. 240, p. 17 cite *Depew v. City of St. Marys Ga.*, 787 F.2d 1496 (11th Cir. 1986), as an example of a case where only four incidents were held to be a custom. But that case turned on the fact that there had been multiple violations of agency rules with virtually no investigation or sanction. *Id.*, p. 1499. In

4

fact, subsequent cases have cited both *DePew* and *Mercado* together for the proposition that random or isolated acts are insufficient to establish a custom. See e.g. *Shehada v. Tavss*, 965 F.Supp.2d 1358 (S.D.Fla. 2013) (citing *Mercado*, *Depew*, and *Gold v. City of Miami*, 151 F.3d 1346 (11th Cir. 1998) all for the proposition that prior incidents must be substantially similar, and not isolated or random, to represent a *Monell* custom.) [4]

Plaintiffs next argue that, because the Manual did not specify how deputies were to conduct checks, then the Sheriff unconstitutionally failed to train. (Dkt. 240, pp. 9-11). First, this assumes underlying constitutional violations occurred. Second, Plaintiffs have heretofore made no issue of training and it's a new criticism offered too late in the litigation. The operative complaint (Dkt. 41) doesn't mention training.

Even then, no deputy has testified for example that he or she was trained to arrest other than with probable cause – deputies were not even asked about such things by Plaintiffs. And, Plaintiffs have yet to articulate a reason any particular arrest was actually without probable cause or justified by warrant. Third, the Defendant has provided the Court with a Sheriff's policy expressly requiring deputies to, among other things, preserve and protect the constitutional rights of citizens. (Dkt. 115-4, p. 1).

Plaintiffs frequently refer to the prolific offender checks globally, cite one or two examples, but then it turns out on close inspection that at least some of the examples

---

[4] Plaintiffs in note 1 equate peering through Heilman's fence with "snooping" in Deegan's yard and "banging" on Jones' windows. (Dkt. 240, p. 14, n.1). Aside from the fact that this amalgam of complaints cannot form a "custom," this is an example of the threshold problem with Plaintiffs' lumping together unconnected singular incidents because the incident cited as to "snooping" in Deegan's property, and described in Plaintiff's Additional Facts ¶ 280-284, was not even a prolific offender check or related to ILP. (Defendant's response to those paragraphs, Dkt. 239, pp. 55- 56.)

5

cited weren't even prolific offender checks or part of ILP to start with. Thus, for each incident of a claimed constitutional violation, the Court should determine first whether the incident actually involved a constitutional violation; second whether it was actually even a prolific or Top 5 offender check; and, third whether it was isolated and random, versus so prevalent and well settled as to have the force of law.

### III. Plaintiffs fail to show underlying violations of their constitutional rights, and particularly fail to show that there was a *Monell* custom of them.

With regard to the individual claims of underlying constitutional violations, Plaintiffs' response to the Defendant's motion for summary judgment largely repeats their own arguments in support of their own summary judgment motion. Defendant will address a few points. First as to knock and talks versus searches, knock and talks do not require reasonable suspicion and Plaintiffs are misreading the cited cases on the point. Second, Plaintiffs are improperly equating any deputy request for information, for example about crimes an offender might know of, as a "search" under the Fourth Amendment. Third, Plaintiffs have themselves cited examples where Plaintiffs or others declined to answer deputy knocks at the door and video filed by the Plaintiffs showed deputies sometimes seeking a response, getting none, and simply leaving.

As to the First Amendment association claims, the Plaintiffs cite the same cases and argue the right to association was unconstitutionally burdened by "punishment" of parents for acts of their children. (Dkt. 240, pp. 28-29.) Defendant has distinguished those cases or provided more recent caselaw on the subject, cited at Dkt. 238, pp. 28-29. As to the procedural and substantive due process claims, Defendant has pointed

6

out that Plaintiffs have not identified a protected liberty or property interest rising to the level of requiring particular procedural due process, nor an act so heinous as to represent a substantive due process violation. Plaintiffs' response is to simply recast their other claims, for example searches and punishment for the crimes of others, as the liberty interests entitled to due process. But those claims are made elsewhere in the case and Plaintiffs have not quarreled with the Defendant's point that procedural due process is implicated only where a protected interest is at stake.[5]

As to the statute of limitations issue,[6] Plaintiffs argue that, although they knew that Sheriff's deputies were violating their constitutional rights as the incidents occurred and that it was Pasco deputies doing it, they did not know that an official policy in the form of ILP was the cause until 2020. (Dkt. 240, pp. 36-37). Plaintiffs cite *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1157 (2d Cir. 1995) in support of a delayed accrual theory for *Monell* liability.

However, the Second Circuit subsequently described that holding in *Pinaud* as "demonstrably dictum" and squarely disavowed it. *Lawson v. Rochester City School Dist.*, 446 Fed. Appx. 327, 329 (2d Cir. 2011) ("We have previously held that a § 1983 cause

---

[5] Simply citing the other constitutional claims as protected interests is no answer because making a claim for a due process violation where there is already a more applicable constitutional amendment is at the very least redundant. It is well settled for example that claims for Fourth Amendment violations rest on the Fourth Amendment because the text of that amendment describes the right more so than a generalized notion of due process. *Graham v. Connor*, 490 U.S. 386, 395 (1989).

[6] Plaintiffs state that the defense applies only to Jones, but the defense was raised by Defendant in his Answer as to *all* untimely claims. (Dkt. 89, p. 22.) Jones is the easiest example as all of his incidents occurred more than four years prior to the filing of the complaint, but the defense was raised as to *any* incident occurring more than four years prior to the filing of the complaint, not just Jones'.

of action accrues when 'the plaintiff becomes aware that [he] is suffering from a wrong for which damages may be recovered in a civil action.' We decline to eviscerate that rule by holding that the limitations period for a cause of action against a municipality runs anew upon the future discovery of facts tangentially related to a *Monell* claim." *Lawson* at 329 (internal citation omitted).[7]

### IV. The evolution of the changes to ILP and elimination of prolific offender designations and checks moots the claim for prospective relief.

The Plaintiffs lack standing to seek injunctive relief (or their injunctive relief claims are moot) as to either the former process for prolific offender designations and checks, or as to the current "focused offender" approach. None of the Plaintiffs or their children has been a prolific offender for years and none of the Plaintiffs or their family members is a focused offender as memorialized in the RAD Directive.

Plaintiffs first argue in response that the changes represent voluntary cessation subject to possible reinstitution in the future. Plaintiffs argue that the burden is heavy on the Sheriff to show that the former policies will not be reinstituted. (Dkt. 240, pp. 37-38, citing *West Virginia v. EPA*, 142 S.Ct. 2587, 2607 (2022). Unlike the instant case, the cited *EPA* case involved mootness based on a new regulatory rule which was only contemplated in the future. *Id.* at 2607 ("So the Government's mootness

---

[7] The Fifth Circuit has since agreed with the court in *Lawson* and declined to follow the delayed accrual theory as dictum in *Pinaud*. *King-White v. Humble Independent School Dist.*, 803 F.3d 754, 763 (5th Cir.2015). Florida federal district courts on motions to dismiss have offered only passing analysis as to the issue. *Boling v. City of Longwood*, Case No. 6:21- cv-129, 2021 WL 7287614 * 14 (M.D.Fla. December 20, 2021) (adopted 2022 WL 671512 (M.D.Fla. March 7, 2022)), *Derossett v. Ivey*, No. 6:20-cv-716-Orl-37GJK, 2020 WL 4547780, *2 (M.D. Fla. Aug. 6, 2020) and *Desrouleaux v. Vill. of Biscayne Park*, No. 18-cv-23797-GAYLES/OTAZO-REYES, 2019 WL 2076189, *3 (S.D. Fla. May 10, 2019).

argument boils down to its representation that EPA has no intention of enforcing the Clean Power Plan *prior to promulgating a new Section 111(d) rule.*") (emphasis added).

Here, the evidence is undisputed that the Sheriff's Office deemphasized prolific offender checks in 2021, they ended completely in 2022, and unlike the EPA case there *is* a new policy in effect – the RAD. And, even if the prolific offender process began all over again, exactly as it was, *none* of the Plaintiffs or their children is such an offender or has been for years. It is entirely speculative that they ever would be again.

Next, the individual Plaintiffs have submitted affidavits (declarations) in opposition to the Sheriff's motion for summary judgment, arguing that ongoing general harassment justifies prospective relief. First, the Sheriff objects to any of the declarations to the extent based on hearsay. [8]

Second, the declarations allude vaguely to incidents of "increased police activity" and the like. Some of the Plaintiffs do not even state that the vehicles they have seen in their neighborhoods are Sheriff's vehicles as opposed to municipal police departments. Only Jones cites a date for one of these visits. Heilman says she has received dunning letters but attaches none and cannot establish that they even come from the Sheriff's Office. Last, none is demonstrated factually to have any linkage to ILP. Certainly, there is no evidence that any of these incidents was a constitutional violation or caused, in the *Monell* sense, by an official policy or custom of the Sheriff.

---

[8] For example, Plaintiff Heilman's declaration (Dkt. 244) states that her son has moved out because he fears undescribed future action. That is hearsay and speculative. Deegan (Dkt.242) quotes an unnamed county code enforcement officer that he used to work for the Sheriff and remembers her, but that is hearsay. Jones' declaration (Dkt. 243) cites hearsay from an unidentified employee of his.

Last, Defendant must address a factual error by Plaintiffs as to how the ILP policy changes were made from 2022 into 2023. In their response to the Sheriff's motion for summary judgment and to the Defendant's additional facts, Plaintiffs suggest that the reason the Sheriff's Office discontinued prolific offender checks over the course of 2021 was not because of the RAD directive shift to "focused offenders," but because of correspondence to the Sheriff from the Bureau of Judicial Assistance (BJA) which Plaintiffs suggest criticized the Sheriff's prolific offender approach to ILP. (Dkt. 240, p. 32, n. 19; Dkt. 245, pp. 25-26). Plaintiffs cite two documents in support: a 2021 prolific offender notice letter and then August 6, 2021, correspondence to the Sheriff from the BJA asking that the Sheriff pause sending out those prolific offender notice letters. (See Declaration of Bargil, Dkt. 241, 241-1 and 241-2).

The affidavit of Captain Michael Jenkins is filed with this response. He explains and provides documentation that the prolific offender letter cited by the Plaintiffs was generated under a specific BJA grant. The grant was *separate and distinct from* the ILP prolific offender program. The notice letter went to prolific offenders under the grant program but did not have anything to do with or go to prolific offenders under ILP. [9]

The Court should grant the Sheriff's pending motion for summary judgment (Dkt. 219) and deny Plaintiffs' pending motion for summary judgment (Dkt. 224).

---

[9] This issue did not come up during the litigation, possibly because Plaintiffs were unaware of it until recently; but in any event the 2021 prolific offender notice and the August 2021 BJA correspondence cited are simply completely unrelated to the instant matter.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of April, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: **Ari S. Bargil, Esquire** (*abargil@ij.org*), Institute For Justice, 2 S. Biscayne Boulevard, Suite 3180, Miami, Florida 33131; **Joshua A. House, Esquire** (*jhouse@ij.org*) and **Caroline Grace Brothers, Esquire** (*cgbrothers@ij.org*), Institute For Justice, 901 N. Glebe Road, Suite 900, Arlington, Virginia 22203; and **Robert E. Johnson, Esquire** (*rjohnson@ij.org*), Institute For Justice, 16781 Chagrin Boulevard, Suite 256, Shaker Heights, Ohio 44120.

                            /s/ *Thomas Poulton*
                            THOMAS W. POULTON, ESQ.
                            Florida Bar No.: 0083798
                            *poulton@debevoisepoulton.com*
                            JEFFREY K. GRANT, ESQ.
                            Florida Bar No.: 0091197
                            *grant@debevoisepoulton.com*
                            ERIN M. TUECHE, ESQ.
                            Florida Bar No.: 0045104
                            *tueche@debevoisepoulton.com*
                            ROBERT D. HOLBORN, II, ESQ.
                            Florida Bar No.: 0044186
                            *holborn@debevoisepoulton.com*
                            DeBEVOISE & POULTON, P.A.
                            Lakeview Office Park, Suite 1010
                            1035 S. Semoran Boulevard
                            Winter Park, Florida 32792
                            Telephone: 407-673-5000
                            Facsimile: 321-203-4304
                            Attorneys for Defendant Sheriff Nocco