UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DALANEA TAYLOR, TAMMY
HEILMAN, DARLENE DEEGAN,
and ROBERT A. JONES III,

       Plaintiffs,

v.                                         Case No. 8:21-cv-555-SDM-CPT

CHRIS NOCCO, in his official capacity
as Pasco County Sheriff,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

Before me on referral is Defendant Sheriff Chris Nocco's second amended motion for summary judgment on all claims (Doc. 219), Plaintiffs Dalanea Taylor, Tammy Heilman, Darlene Deegan, and Robert A. Jones III's response in opposition (Doc. 240), and Nocco's reply (Doc. 249). Also before me is the Plaintiffs' renewed motion for summary judgment as to liability only (Doc. 224), Nocco's response in opposition (Doc. 238), and the Plaintiffs' reply (Doc. 247).[1] For the reasons set forth below, I respectfully recommend that Nocco's second amended motion (Doc. 219) be

_____

[1] The Plaintiffs were later permitted to supplement the record with additional exhibits. *See* (Docs. 253, 254, 257). Nocco filed a response to that filing (Doc. 261), to which the Plaintiffs replied (Doc. 264).

granted in part and denied in part and that the Plaintiffs' renewed summary judgment motion (Doc. 224) be denied.

I.

This action stems from the Pasco County Sheriff's Office's (PCSO) Intelligence-Led Policing Program (ILP Program or Program) that Nocco adopted in or around 2013. (Doc. 223 at 2). The goal of the Program was "to re-imag[in]e law enforcement officers from a role as first responders to one as first preventers" by, among other things, focusing on "problem people." (Doc. 223 at 16–18); (Doc. 239 at 2–5); (Doc. 225-1 at 11). The Program was governed by a number of documents, including the ILP Manual and the ILP Directive. (Doc. 223 at 2); (Doc. 225-1); (Doc. 225-32). The ILP Manual was revised periodically[2] but remained materially the same during the relevant period. (Doc. 223 at 2); (Doc. 224 at 10 n.3).[3] All versions of the ILP Manual were signed by Nocco as the PCSO's final decisionmaker.[4] (Doc. 223 at 4). The ILP Directive came into existence in July 2021 and also contained the ILP policies. (Doc. 223 at 2–3).

As reflected in these materials, the ILP Program was intended to represent a new approach to policing that combined the best practices of traditional law enforcement, including solving crimes, being responsive to the community's needs,

---

[2] The pertinent versions of the ILP Manual were adopted in 2013 (Doc. 225-35), 2016 (Doc. 225-34), 2018 (Doc. 225-1), and 2021 (Doc. 225-82). (Doc. 223 at 2). The 2018 version of the ILP Manual was in effect when the Plaintiffs filed this lawsuit. *Id.*

[3] In light of the lack any material differences between the ILP Manuals, I will refer to them simply as the "ILP Manual" or "Manual."

[4] I will refer to Nocco and the PCSO interchangeably throughout my report and recommendation.

and prioritizing police resources.  (Doc. 225-1 at 6–12); (Doc. 225-32); (Doc. 225-34 at 7).  One of the hallmarks of the ILP program was its emphasis on thwarting future crime.  (Doc. 225-1 at 6–17); (Doc. 225-34 at 13).  To that end, the ILP program relied on intelligence gathering to enable the PCSO's executive decision-maker to more effectively allocate his office's personnel and assets and to fulfill the PCSO's goals of decreasing crime in Pasco County.  (Doc. 225-1 at 13); (Doc. 225-32); (Doc. 225-34 at 7).  This was accomplished, in part, by identifying and targeting criminal hot spots, criminal networks, and—of significance here—persons designated as "prolific offenders" and their associates.  (Doc. 225-1 at 13); (Doc. 225-32); (Doc. 225-34 at 8).

The ILP Manual defined a "prolific offender" as follows:

> A person of any age who me[t] or exceed[ed] a threshold calculated by weighing his or her three[-]year history of arrests and suspicions for criminal offenses in Pasco County.  Additional weight [was] awarded for violation of probation or parole . . . , failure to appear . . . , length of time between offenses, repetitive appearance in criminal incident reports listed as a victim, witness, or other involved, and for having a known gang affiliation.

> To qualify for consideration as a prolific offender, an individual must have been arrested at least twice for any of the . . . *ILP-focused offense* types.  Once qualified, individuals [were] scored and ranked by the number and severity of [the] offenses committed, gang affiliation, and time since most recent arrest which [might have] diminish[ed] or increase[d] the potential for an individual to reoffend.

(Doc. 225-1 at 19) (emphasis added); *see also* (Doc. 225-32); (Doc. 225-34 at 8–10).

"ILP-focused offenses" were those that Nocco believed were the most serious and

3

frequently committed in Pasco County, including violent crime, car theft, firearm theft, and burglary.  (Doc. 225-1 at 18); (Doc. 225-32); (Doc. 225-34 at 9).

As part of the ILP program, a list of prolific offenders was generated on a quarterly basis using a combination of a computer algorithm and human analysis.  (Doc. 223 at 3, 19–20); (Doc. 239 at 5–6).  This list was not limited to adults or to members of the community who were the subject of an ongoing investigation.  (Doc. 223 at 3, 20); (Doc. 239 at 5–6).

Analysts also created a subset of five prolific offenders to whom the PCSO paid even greater attention.  (Doc. 223 at 21–22); (Doc. 239 at 7).  Prior to 2019, this subset was referred to as the "Top 5" offenders.  (Doc. 223 at 21); (Doc. 239 at 7).  In 2019, the PCSO divided up the county into zones and identified certain "zone focused offenders" for each of these areas.  (Doc. 223 at 21–22); (Doc. 239 at 7).  While the ILP Manual did not require that prolific offenders, Top 5 offenders, zone focused offenders,[5] or their parents be afforded notice or a hearing to challenge these designations, these persons could file complaints with the PCSO just like any other member of the public.  (Doc. 223 at 22–23); (Doc. 239 at 7–9).

The Plaintiffs in this action either were classified at one time or another as a prolific offender, Top 5 offender, or zone focused offender (as was the case with Taylor) or were the parent of a child denominated as such (as was the case with Heilman, Deegan, and Jones).  (Doc. 223 at 8, 10, 12–13).  Taylor was placed on the

_____

[5] For ease of reference, I will refer to these individuals collectively as prolific offenders, except where the distinction is relevant.

prolific offender list at age 17.  (Doc. 223 at 8, 166); (Doc. 224 at 11–12); (Doc. 239 at 34).  Heilman's son, Donnie McDougall, was designated as a prolific offender as early as September 2016.  (Doc. 223 at 10).  Jones's son, Bobby McDougall, was identified as a prolific offender as early as September 2015.  *Id.* at 13.  And Deegan's son, Tyler Paneson, was classified as a prolific offender sometime in or around January 2017.  *Id.* at 12.

Once an individual was deemed to be a prolific offender, the PCSO conducted at least one face-to-face "prolific offender check" with that person every three months.  (Doc. 223 at 3); (Doc. 225-1 at 21).  These checks—which often involved the prolific offender's parents—were predicated on the theory of focused deterrence and sought to influence an offender's understanding of the risks and costs associated with engaging in illicit activity.  (Doc. 223 at 30–31); (Doc. 239 at 20).  To accomplish this task, deputies were instructed:

> [To] communicate to these offenders that because of their criminal activity, they ha[d] been identified for an enhanced focus by the [PCSO] and they ha[d] only two options.  First, [the] preferred option [was that] they stop committing crimes and become a productive member of society.  To this effort, [the PCSO] . . . developed palm cards . . . to pass out to prolific offenders, which identif[ied] resources in the community to assist them on the road to becoming a law-abiding citizen.  Otherwise, the second option [was] to bear the consequences of their criminal ways through relentless pursuit, arrest, and prosecution[,] and to ensure they [were] no longer in a position to harm the citizens of Pasco County.  In order for focused deterrence to be effective, law enforcement and the criminal justice system [had to] remain true to their promise.  If the [prolific] offender [did] not feel the pressure, if the offender [was] not arrested when they commit[ted] their next crime, or if the offender [was]

> left to feel their punishment [was] menial, the [ILP] strategy [would] have no impact.
>
> In addition to operationalizing the theory of focused deterrence, prolific offender checks also offer[red] the opportunity to cultivate information about the criminal environment: who [was] committing crimes, where, when, and how.   [PCSO deputies were] encouraged to develop information to help analysts identify where and who [the PCSO] should be focused on, help solve crimes that ha[d] already been committed, and ultimately help [the PCSO] prevent future crimes from occurring.

(Doc. 225-1 at 19–20); *see also* (Doc. 225-32).

The ILP Manual did not restrict the number of prolific offender checks that the PCSO deputies could conduct.  (Doc. 223 at 36); (Doc. 239 at 28).  Nor did Manual require deputies to have probable cause or reasonable suspicion to perform these checks, even if the checks took place at an individual's residence.  (Doc. 223 at 27); (Doc. 239 at 15).  The information collected by the deputies during their checks was recorded via reports, "tips," and a database of "offender notes."  (Doc. 223 at 36); (Doc. 239 at 27).

The fact that a deputy was visiting a prolific offender for another purpose did not foreclose the deputy from turning the visit into a prolific offender check.  (Doc. 223 at 28, 39); (Doc. 239 at 18, 30–31).  And the policies surrounding the prolific offender checks were distinct from those regulating probation checks that the deputies also performed.  (Doc. 223 at 28); (Doc. 239 at 18).

As a component of the ILP program's goal of gathering information about the "criminal environment," deputies were charged with "[l]earn[ing] as much as possible

6

about prolific offenders in [the deputies'] assigned area[s,] to include [the prolific offender's] acquaintances, vehicles, locations frequented, [modus operandi] for offenses, vehicles owned, etc." (Doc. 223 at 30); (Doc. 239 at 20). Deputies were also directed to memorialize this information so that it could be shared among their fellow deputies, investigators, and analysts. (Doc. 223 at 30); (Doc. 239 at 20). The deputies were additionally responsible for compiling and documenting all the information they secured about the associates of the Top 5 offenders. (Doc. 225-1 at 28).

The PCSO employed a specialized unit known as the STAR Team to target prolific offenders. (Doc. 223 at 5). The actions of the STAR Team were dictated by the STAR Team Manual, as well as the ILP Manual. *Id.* Although there were at least two versions of the STAR Team Manual during the pertinent time frame, each version was substantially identical. *Id.*; *see* (Docs. 225-2, 225-34).

To coordinate its efforts in managing the criminal element in Pasco County, the PCSO also convened weekly Actionable Intelligence Meetings (AIM). (Doc. 223 at 24); (Doc. 239 at 10). The participants in those meetings included analysts, STAR team members, deputies, school resource officers, and code enforcement officials. (Doc. 223 at 24); (Doc. 239 at 10). Among other things, the attendees at these meetings reviewed the steps being taken against prolific offenders and their associates and distributed that information amongst themselves. (Doc. 223 at 24); (Doc. 239 at 10).

Along with these responsibilities, deputies were prompted to "[u]tilize County Ordinance citations as a strategic tool to target prolific offenders and problem locations within the STAR box." (Doc. 223 at 39); (Doc. 225-2 at 9); (Doc. 239 at 32). STAR

boxes were "locations where crime [was] persistently dense [for] an extended period of time" and which accounted for approximately fifty percent of certain delineated offenses of interest to the PCSO for each district.  (Doc. 223 at 93); (Doc. 245 at 14–15).  "Deputies were expected to learn the location of the STAR boxes and the deputies working within them, to develop knowledge of [the] offenders living within STAR boxes, and to stay abreast of emerging crime trends in the area to prevent future calls." (Doc. 223 at 93); (Doc. 245 at 14–15).

Deputies were urged as well to "[c]oordinate missions with . . . Code Enforcement to conduct STAR box Code Enforcement blitzes."  (Doc. 225-2 at 9). The PCSO utilized performance expectations for its deputies in assessing locations for "county code violations[ ] and[,] when applicable, . . . [for] owner/tenant[s]."  (Doc. 223 at 40); (Doc. 225-32); (Doc. 239 at 32).  These tenant/owners frequently included the parents of prolific offenders.  (Doc. 223 at 41); (Doc. 239 at 32–33).

In addition to the prolific offender checks, the PCSO employed a zero-tolerance policy related to illicit activity engaged in by prolific offenders.  (Doc. 223 at 7); (Doc. 225-1 at 21); (Doc. 225-32).   Deputies were instructed to conduct "thorough investigation[s]" into offenses committed by prolific offenders and to "follow-through with the State Attorney's Office or other prosecuting authority."  (Doc. 225-1 at 20); (Doc. 225-32).  This zero-tolerance policy was also applied to associates of the Top 5 who participated in criminal behavior.  (Doc. 225-1 at 28).

To facilitate the achievement of the objectives of the ILP Program, the PCSO supplied two lists to its deputies, one detailing prolific offender arrests and the other

containing prolific offender involvement in any interactions with the PCSO as either a suspect, victim, witness, or in another role.  (Doc. 225-1 at 20); (Doc. 225-32).  The PCSO intended these lists to provide deputies and their supervisors with a running tabulation of all the "cases involving these priority offenders to ensure they [did] not fall through the cracks[,] and they [were] investigated with a sense of urgency."  (Doc. 225-1 at 20); (Doc. 225-32).  This information was also used "to track the sentencing of prolific offenders to [make sure the PCSO] ke[pt] true to [its] promises."  (Doc. 225-1 at 20); (Doc. 225-32).

The contours of the ILP Program were not only defined by the ILP Manual, the ILP Directive, and the STAR Team Manual, but also by the manner in which the PCSO's written policies were implemented.  As a practical matter, prolific offender checks were typically conducted at the home of the offender's parents if the offender lived there or where the offender was otherwise staying.  (Doc. 223 at 32); (Doc. 239 at 21).  An analysis of these checks revealed that deputies visited 255 addresses at least ten times and thirty addresses at least thirty times during the relevant period.  (Doc. 223 at 36–37); (Doc. 239 at 28).

Roughly seventy to eighty of these prolific offender checks involved the Plaintiffs.  (Doc. 223 at 8, 10, 12–13).  Taylor was the focus of at least nineteen checks between April 2017 and September 2019, with four of the checks occurring in one month.  (Doc. 223 at 8–9).  Heilman's home was the subject of more than twenty checks between 2017 and 2020 (Doc. 223 at 10–12), while Deegan was the target of at least eight checks over a four month period in 2018 (Doc. 223 at 12–13).  As for Jones,

9

the PCSO conducted prolific offender checks at his residence at least thirty times between September 2015 and April 2016.  (Doc. 223 at 13–15).  In total, the PCSO performed more than 13,000 prolific offender checks over the course of six years. (Doc. 223 at 36); (Doc. 239 at 28).

The PCSO carried out these checks at various times, including late at night or early in the morning.  (Doc. 223 at 37); (Doc. 239 at 29).  By the Plaintiffs' estimate, approximately seventeen percent of the PCSO's visits between September 2015 and November 2021 transpired between 10 p.m. and 6 a.m.  (Doc. 223 at 37); (Doc. 239 at 29).  These checks included those performed by the STAR team, which regularly worked 2 p.m. to 2 a.m.  (Doc. 223 at 37); (Doc. 239 at 29).

When conducting prolific offender checks, deputies spoke with the listed individual, as well as with their family members and other residents.  (Doc. 223 at 34); (Doc. 239 at 27).  The topics discussed during these checks included whether the prolific offenders were in school or had a job, as well as the individuals with whom they associated or dated.  (Doc. 223 at 35); (Doc. 239 at 27).  Deputies also sought to identify the persons at the residence and to determine whether they had warrants or were on probation.  (Doc. 223 at 33); (Doc. 239 at 23).

Parents of Top 5 offenders were arrested, referred to child protective services, and/or issued code enforcement citations.  The STAR Team arrested Heilman twice, and she pleaded guilty to those charges.  (Doc. 223 at 58–59, 61–62); (Doc. 239 at 46–47, 50–51).  While transporting Heilman to jail after her first arrest, a STAR Team deputy told her, "[O]ur goal is to get you to do something to keep your kid from

committing crime." (Doc. 223 at 58); (Doc. 239 at 46–47). Jones was also arrested on several occasions during the pertinent time frame but was not convicted of any of those charges. (Doc. 223 at 118–21); (Doc. 239 at 11–15); (Doc. 245 at 77, 80, 84). During one of Jones's arrests, he was told that the deputies were "talking about parenting issues. You've done little or nothing to help out with this situation, while your kid runs around here victimizing people. That's why . . . all this is today. And we'll just continue on this shit, because you're messing around with an aggressive sheriff. Sheriff Nocco is not playing games, and that's the bottom line." (Doc. 223 at 32, 80); (Doc. 239 at 21, 68).

In connection with one of the visits where Jones was arrested, deputies called the Florida child abuse hotline to report him. (Doc. 223 at 26); (Doc. 239 at 14–15). Heilman was referred to child protective services after a visit by the deputies as well. (Doc. 223 at 26–27); (Doc. 239 at 15). Following this referral of Heilman, a deputy acknowledged that child protective services was unlikely to act on his report but stated that he was "doing it as a big fuck you" to Heilman. (Doc. 223 at 26–27); (Doc. 239 at 15).

As to the deputies' enforcement of code violations, those who shared their homes with offenders were cited. Until 2021, PCSO utilized its own in-house "Code Enforcement Corporals" to issue citations for violations of Pasco County ordinances. (Doc. 223 at 40); (Doc. 239 at 32–33). These Corporals were separate from the standard code enforcement officials employed by the county. (Doc. 223 at 40); (Doc. 239 at 32–33). The Code Enforcement Corporal position was eliminated in 2021,

11

however, and the responsibilities for that position were reassigned to the PCSO's street crimes unit.  (Doc. 223 at 43); (Doc. 239 at 32–34).

Notwithstanding these specialized code enforcement operations, any PCSO deputy could write a code citation.  (Doc. 223 at 43); (Doc. 239 at 34).  Further, unlike standard code enforcement officers, PCSO deputies had the discretion to decide which homes to target, did not normally have to "take citizen-generated complaints for code enforcement issues," and were also not compelled to provide a warning before issuing a citation.  (Doc. 223 at 40); (Doc. 239 at 32–33).  In the end, PCSO's code enforcement officials were instructed to "actively purs[ue] prolific offenders and their associates."  (Doc. 223 at 41); (Doc. 239 at 32–33).

In situations where the prolific offenders were minors, citations were directed to the children's parents.  (Doc. 223 at 41); (Doc. 239 at 32–33). Heilman, Deegan, and Jones all received code citations from PCSO deputies while their children were designated as prolific offenders.  (Doc. 223 at 43); (Doc. 239 at 33).  In an internal performance evaluation, a Code Enforcement Corporal listed one of his "most significant work[-]related accomplishments" to be the issuance of so many citations to a prolific offender's mother that she was evicted.  (Doc. 223 at 41); (Doc. 239 at 32–33).  Deputies "use[d] code enforcement to sort of light a fire under the homeowner [i.e., the parent (in most cases)] to do a better job in keeping [his or her] juvenile out of trouble."  (Doc. 223 at 42); (Doc. 239 at 32–33).  As for Taylor, a code enforcement corporal visited the address where she was staying to look for code violations.  (Doc. 223 at 43); (Doc. 239 at 33).

12

The fact that the family members of listed individuals received code citations, however, did not mean that their neighbors were likewise cited. This was true even if those residents committed the same violations. (Doc. 223 at 42); (Doc. 239 at 32–33).

Enforcement efforts against prolific offenders and their associates, including their parents, were also discussed at AIM meetings. (Doc. 223 at 24–25); (Doc. 239 at 10–11). Photo line-ups of prolific offenders and their associates were displayed at these meetings, including photographs of Heilman and her son, of Jones and his son, as well as of Taylor, her mother, her sister, and her aunt. (Doc. 223 at 25); (Doc. 239 at 11). Deegan's son was additionally discussed at an AIM meeting as being a Top 5 offender, while it was noted that Deegan had herself likewise received code citations. (Doc. 223 at 44); (Doc. 239 at 34). Heilman was similarly referenced at a meeting as having been fined more than $2,500 for five code citations. (Doc. 223 at 44); (Doc. 239 at 34). As for Jones, the deputies discussed him and the need to take a code enforcement officer with them on Jones's next prolific offender check. (Doc. 223 at 44); (Doc. 239 at 34). Taylor was reviewed as a Top 5 Offender at an AIM meeting as well, and the attendees at the meeting were told that she had been warned about her ordinance violations. (Doc. 223 at 44); (Doc. 239 at 34).

In March 2021, the Plaintiffs initiated this action pursuant to 42 U.S.C. § 1983 against Nocco in his official capacity as the Sheriff for Pasco County. (Doc. 1). In their operative complaint filed in August 2021, the Plaintiff asserted claims under (1) the Fourth Amendment for violations of their right against "[u]nreasonable [s]earch [a]nd [s]eizure;" (2) the First Amendment for violations of their right to

13

"[f]reedom of association;" (3) the Fourteenth Amendment for violations of their right to "[p]rocedural [d]ue [p]rocess;" (4) the Fourteenth Amendment for violations of their right to "[s]ubstantive [d]ue [p]rocess;" and (5) the Fourteenth Amendment for violations of their right to "equal protection." (Doc. 41). Four of these counts were brought on behalf of all the Plaintiffs, while the procedural due process count was brought only on behalf of Taylor, Heilman, and Jones. (Doc. 41 at 49). Based on these claims, the Plaintiffs sought declaratory and injunctive relief, compensatory and nominal damages, and attorneys' fees and costs. (Doc. 41).[6]

The next month, in September 2021, Nocco moved to dismiss the Plaintiffs' Equal Protection claim. (Doc. 42). That count averred that Nocco's "official policy and widespread custom" failed "to treat similarly situated individuals similarly" and resulted in a "classification that burden[ed] the fundamental rights of" prolific offenders and other listed individuals. (Doc. 41). The "fundamental rights" allegedly burdened were the Plaintiffs' fundamental rights (1) "to be free from punishment for hypothetical future crimes," (2) "to be presumed innocent," (3) "to be secure in their homes and [their] property," and (4) "to be free from arrest." *Id*.

In his motion to dismiss, Nocco asserted, *inter alia*, that the Plaintiffs lacked standing to raise their Equal Protection claim and that they also did not allege facts

---

[6] According to the Plaintiffs, the same month that they filed their amended complaint, the United States Department of Justice (DOJ) sent a letter to the PCSO, directing it to "immediately pause" the ILP Program until the Department could "work with PCSO to provide an intensive review of several aspects of the [ILP] program." (Doc. 241-2 at 3). Nocco maintains that this letter was unrelated to the ILP Program and instead pertained to the PCSO's participation in a separate program run by a component of the DOJ known as the Bureau of Judicial Assistance. *See* (Doc. 249 at 10); (Doc. 250).

showing that they were "treated differently based on being members of a suspect class." (Doc. 42). Nocco additionally contended that the Plaintiffs did not "describe[ ] violations of 'fundamental rights' so as to warrant a heightened scrutiny standard." *Id.* Although the Court rejected Nocco's standing challenge, it was persuaded by Nocco's latter two arguments and granted Nocco's motion to dismiss. (Doc. 81).

In March 2022, roughly seven months after the Plaintiffs filed their amended complaint, the PCSO ceased "us[ing] the prolific offender designation," stopped requiring quarterly prolific offender checks, terminated its "'zero tolerance' policy of arrests toward prolific offenders," and ended its policy of "zero tolerance for County Code Violations." (Doc. 223 at 7). These changes were reflected in a document called the "RAD Directive," which was adopted by the PCSO at the end of January 2023. (Doc. 223 at 7); (Doc. 225-73). While the PCSO no longer uses the "prolific offender" moniker, it still maintains a program directed at "focused offenders." (Doc. 223 at 7).

After engaging in extensive discovery about the above factual matters, the parties—as noted—filed cross motions for summary judgment. (Docs. 219, 224). I turn to those motions now, beginning with the law governing such requests for relief.

## II.

Summary judgment is appropriate where the movant can show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1356 (11th Cir. 2007). A moving party ordinarily discharges its burden by demonstrating that there is an absence of evidence

to buttress the non-movant's case. *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001) (citation omitted).

When a movant has satisfied its burden, the non-movant must then designate specific facts (by its own affidavits, depositions, answers to interrogatories, or admissions on file) evidencing that there is a disputed question as to a material fact for trial. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citation omitted). To do so, the non-movant must rely on more than conclusory statements or allegations. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value.") (citations omitted). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," a court may "grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to" such relief. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Welding Servs.*, 509 F.3d at 1356. That is, it must credit the evidence tendered by the non-movant and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted). In doing so, a court may not "weigh conflicting evidence or make credibility determinations" regarding a party or its presentation of the facts. *Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2016) (citations omitted).

III.

The parties' motions for summary judgment (Docs. 219, 224) pose a number of threshold issues.  The first of these is whether the PCSO's transition from the ILP Program to its current emphasis on "focused offenders" as memorialized in the RAD Directive forecloses the Plaintiffs' request for prospective relief.  Citing the doctrines of standing and mootness, Nocco argues that it does, while the Plaintiffs maintain the opposite.

It is well settled that judicial power under Article III of the United States Constitution "extends only to actual cases and controversies," that is, to matters which are "justiciable." *Baughcum v. Jackson*, 92 F.4th 1024, 1030 (11th Cir. 2024) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016)).  Justiciability consists of several "strands," two of which—standing and mootness—are relevant here.  *Id.* (quoting *Strickland v. Alexander*, 772 F.3d 876, 883 (11th Cir. 2014)).  The absence of either of these strands can deprive a federal court of jurisdiction.  *Id.*

To have standing, a plaintiff must show that (1) he has suffered an injury in fact, (2) the injury is fairly traceable to the defendant's conduct, and (3) the injury would likely be redressed by the sought-after relief.  *Thole v. U.S. Bank N.A.*, 590 U.S. ____, 140 S. Ct. 1615, 1618 (2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)); *Spokeo*, 578 U.S. at 338 (citing *Lujan*, 504 U.S. at 560); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).  A plaintiff must establish that he has standing at the time the suit was filed, as well as  "throughout all stages of [the] litigation."  *United States v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019)

17

(quoting *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013)); *see also West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 718 (2022) ("Although most disputes over standing concern whether a plaintiff has satisfied the requirement when filing suit, Article III demands that an actual controversy persist throughout all stages of litigation.") (internal quotation marks and citations omitted).  Further, a plaintiff must prove each of the standing elements "in the same way as any other matter on which [a] plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at successive stages" of a lawsuit.  *Lujan*, 504 U.S. at 561 (citations omitted).  In multi-plaintiff cases, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint."  *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017).

The only element of standing challenged here is the injury in fact requirement. An injury in fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).  For an injury to be "concrete," it must be concrete "in both a qualitative and temporal sense," *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990), and "must actually exist," *Spokeo*, 578 U.S. at 340.  An injury is "particularized" where it "affect[s] the plaintiff in a personal and individual way."  *Id.* at 339 (quoting *Lujan*, 504 U.S. at 560 n.1).  "An actual or imminent injury, unlike a conjectural or hypothetical one, is one which has occurred, is certainly impending, or has substantial risk of occurring."  *Baughcum*, 92 F.4th at 1031 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).  Where, as here, a future harm is alleged,

the Supreme Court has made clear that mere averments of a "possible future injury" or even an "objectively reasonable likelihood" of a future injury are insufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–10 (2013) (internal quotation marks, alterations, and emphasis omitted).

With respect to the doctrine of mootness, "'[a] case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief.'" *Baughcum*, 92 F.4th at 1037 (quoting *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1216 (11th Cir. 2000)). "[A] federal court has no authority to give opinions upon moot questions . . . or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 531 (11th Cir. 2013) (quoting *Church of Scientology of Cal. v. United States,* 506 U.S. 9, 12 (1992)). This is because "[a]ny decision on the merits of a moot case or issue would be an impermissible advisory opinion." *Djadju v. Vega*, 32 F.4th 1102, 1108 (11th Cir. 2022) (internal quotation marks and citation omitted).

Although mootness has been characterized as "the doctrine of standing set in a time frame," *Friends of the Earth*, 528 U.S. at 189 (internal quotation marks and citation omitted), mootness is conceptually distinct from standing, *Silva v. Baptist Health S. Fla., Inc.*, 838 F. App'x 376, 384 (11th Cir. 2020) (per curiam) (quoting *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1189 n.16 (11th Cir. 2007). Accordingly, there may be instances where "the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative

to overcome mootness.'"  *Silva*, 838 F. App'x at 384  (quoting *Friends of the Earth*, 528 U.S. at 190); *see also Sheely*, 505 F.3d at 1189 n.10) ("Even though a case is not moot, that does not mean that injunctive relief follows automatically; undoubtedly, injunctive relief requires something more than the mere possibility which serves to keep the case alive.") (internal quotation marks and citation omitted).  Mootness is also distinguishable from standing in that the defendant, not the plaintiff, "bears the burden to establish that a once-live case has become moot."  *West Virginia*, 597 U.S. at 719 (citations omitted); *Friends of the Earth*, 528 U.S. at 190.

An important exception to the mootness requirement is the voluntary cessation doctrine.  Under this doctrine, if events "occur subsequent to the filing of a lawsuit [that] deprive the court of the ability to give [a] plaintiff . . . meaningful relief, then the case is moot and must be dismissed."  *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001) (citations omitted).  Since a defendant claiming to have terminated the offending behavior is "free to return to his old ways," *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1265 (11th Cir. 2010) (citation omitted), a defendant's burden to demonstrate mootness is generally a "heavy" one, *Friends of the Earth*, 528 U.S. at 189; *see also West Virginia*, 597 U.S. at 719.  That burden is met only if: (1) "it can be said with assurance that there is no reasonable expectation . . . that the alleged violation will recur;" and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  *Harrell*, 608 F.3d at 1265 (quoting *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979)).  In other words, a defendant must establish that the subsequent events upon which it relies in advancing its mootness argument "ma[k]e it *absolutely*

*clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 189 (emphasis added) (quoting *United States v. Concentrated Phosphate Exp. Assoc.*, 393 U.S. 199, 203 (1968)); *see also West Virginia*, 597 U.S. at 720 (stating that "'voluntary cessation does not moot a case' unless it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur'") (quoting *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007)); *Harrell*, 608 F.3d at 1265 (same) (citation omitted).

The Eleventh Circuit takes "a somewhat different approach when a governmental entity voluntarily ceases the challenged action." *Djadju*, 32 F.4th at 1108. In such cases, the court has held that there is a rebuttable "'presumption . . . the government will not later resume the action,'" and that "the opposing party must [thus] show [there is] a reasonable expectation . . . the government will reverse course." *Id.* (quoting *Walker v. City of Calhoun*, 901 F.3d 1245, 1270 (11th Cir. 2018)); *see also Troiano v. Supervisor of Elections in Palm Beach Cnty., Fla.*, 382 F.3d 1276, 1283 (11th Cir. 2004) ("[W]hen the defendant is not a private citizen but a government actor, there is a rebuttable presumption that the objectionable behavior will *not* recur. . . . [C]essation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties. . . . Courts are more apt to trust public officials than private defendants to desist from future violations") (internal quotation marks and citations omitted)); *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1328–29 (11th Cir. 2004) ("[G]overnmental entities and

officials have been given considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities."); *Rich*, 716 F.3d at 531 (noting that government actors "carry a lesser burden than others when they have unambiguously terminated the challenged policy").  The government actor is entitled to this presumption, however, "only after it has shown *unambiguous* termination of the complained of activity."  *Doe v. Wooten*, 747 F.3d 1317, 1322 (11th Cir. 2014) (emphasis added) (citing *Harrell*, 608 F.3d at 1267–68).[7]

The Eleventh Circuit looks at "three broad factors" in determining whether the government has unambiguously ended the contested conduct and whether a "reasonable expectation" exists that it will reverse course.  *Walker*, 901 F.3d at 1270; *Doe*, 747 F.3d at 1322–23.

> First, whether the change in conduct resulted from substantial deliberation or is merely an attempt to manipulate [the court's] jurisdiction.  This requires examining the timing of the repeal, the procedures used in enacting it, and any explanations independent of this litigation which may have motivated it.  Second, whether the government's decision to terminate the challenged conduct was unambiguous—i.e., whether the actions that have been taken to allegedly

---

[7] In raising the issue of a rebuttable presumption, Nocco relies on language from *Troiano* for the proposition that "[a]n assertion of mootness by a government actor should be rejected 'only when there is a substantial likelihood that the offending policy will be reinstated if the suit is terminated.'" (Doc. 219 at 39) (quoting *Troiano*, 382 F.3d at 1283).  The Eleventh Circuit subsequently clarified in *Doe*, however, that "while it is true that this language does appear in *Troiano*[,] . . . this is not the standard [it] applied in *Troiano* or in later cases involving voluntary cessation by government actors." *Doe*, 747 F.3d at 1323 (citing *Troiano*, 382 F.3d at 1283–84).  The court explained in *Doe* that it only held in *Troiano* that "a challenge to a government policy *that has been unambiguously terminated* will be moot in the absence of some reasonable basis to believe that the policy will be reinstated if the suit is terminated," *Doe*, 747 F.3d at 1323 (quoting *Troiano*, 382 F.3d at 1285), and emphasized that "the government is—and always has been—required to justify application of the presumption before benefiting from it," *id.*

> moot the case reflect a rejection of the challenged conduct that is both
> permanent and complete.  And, third, whether the government has
> consistently maintained its commitment to the new policy or legislative
> scheme.

*Walker*, 901 F.3d at 1270 (internal quotation marks and citation omitted).  These factors are not "exclusive," and no "single factor [should] be viewed as dispositive[.]" *Djadju*, 32 F.4th at 1109 (internal quotation marks and citation omitted).

In the end, a court should find a request for prospective relief to be moot only "'when the totality of the circumstances persuades the court that there is no reasonable expectation that the government entity will reenact the challenged policy.'" *Id*. (quoting *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020)).  "The remote possibility that an event might recur is not enough to overcome mootness." *Al Najjar*, 273 at 1336.  If, on the other hand, an analysis of the relevant factors shows that "there is a reasonable expectation the [state actor's] alleged violations will reoccur, then the . . . presumption does not apply, and the voluntary cessation doctrine does, so the 'heavy burden' remains on the government[al entity] to prove that the request for injunctive relief is moot." *Lutrario v. City of Hollywood*, ___ F. Supp. 3d ___, 2023 WL 9423845, at *4 (S.D. Fla. July 24, 2023) (citing *Harrell*, 608 F.3d at 1265).

I begin my justiciability analysis with mootness, as it appears to be the more applicable doctrine.  *West Virginia*, 597 U.S. at 719 ("It is the doctrine of mootness, not standing, that addresses whether 'an intervening circumstance [has] deprive[d] the plaintiff of a personal stake in the outcome of the lawsuit.'") (quoting *Genesis HealthCare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013) and citing *Friends of the Earth*, 528

U.S. at 189–92).  Before deciding whether the request for injunctive relief is moot, however, I must address a related procedural issue.  Although Nocco raises mootness in the context of his summary judgment motion, the Eleventh Circuit has "repeatedly said that when a district court disposes of a case on justiciability (mootness) grounds[, the Eleventh Circuit] will treat the district court's determination as if it was ruling on a motion to dismiss for lack of subject matter jurisdiction under [Federal Rule of Civil Procedure 12(b)(1)], even if the district court mistakenly has labeled its ruling a grant of summary judgment."  *Sheely*, 505 F.3d at 1182; *see also Troiano*, 382 F.3d at 1278 n.2 ("The district court's finding of mootness was embodied in an order granting the defendant's motion for summary judgment.  Subject matter jurisdiction is appropriately dealt with by means of a motion to dismiss under [Rule] 12(b)(1), and we will treat the district court's summary judgment ruling as if it were a ruling on a Rule 12(b)(1) motion.").  Accordingly, I treat Nocco's motion as one for lack of subject matter jurisdiction under Rule 12(b)(1).

Challenges to subject matter jurisdiction under Rule 12(b)(1) are either "facial" or "factual."  *Lawrence v. Dunbar,* 919 F.2d 1525, 1528–29 (11th Cir.1990).  A factual attack—as Nocco levies here—"challenge[s] 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.'"  *Id.* (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir.1980)).  When the attack is factual, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case," and "the existence of disputed material facts will not preclude the trial

court from evaluating for itself the merits of jurisdictional claims." *Id.* (quoting *Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th Cir. 1981)).

There is an exception, however, where the jurisdictional question implicates an element of a claim. *Lawrence*, 919 F.2d at 1529. The "proper course of action" in such instances is for the district court "to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case." *Id.* (quoting *Williamson v. Tucker*, 645 F.2d 404, 415–16 (5th Cir. 1981)).

Having clarified the proper procedural framework, I return to the three "broad" factors used to assess whether a governmental entity—in this case, the PCSO—has unambiguously terminated the complained of behavior and whether there is a reasonable expectation it will revert to its prior ways. *Doe*, 747 F.3d at 1322–23. On one side of the ledger, there is evidence that the PCSO has been phasing out the ILP Program for a number of years in favor of other investigative tools, that the ILP Program was ultimately terminated, and that the January 2023 RAD Directive is materially different because there are no longer prolific offender designations or checks. (Doc. 223 at 7) (citations omitted); (Doc. 225-18 at 29–30); (Doc. 204–1).

On the other side of the ledger, however, there is evidence that the RAD Directive still targets "focused offenders," which are defined as "person(s) who ha[ve] demonstrated a pattern of criminal behavior and [who are] currently affecting the crime environment." (Doc. 225-73 at 11). Further, although focused offender checks are not required under the RAD Directive, they are permitted. (Doc. 223 at 7); (Doc. 225-73). The RAD Directive was also created after the Plaintiffs filed this case and

after the DOJ sent its August 2021 letter directing the PCSO to "immediately pause" the ILP program until the Department could "work with PCSO to provide an intensive review of several aspects of the PCSO program." (Doc. 241-2 at 3); *see also Sheely*, 505 F.3d at 1186 ("[W]e are more likely to find that cessation moots a case when cessation is motivated by a defendant's genuine change of heart rather than his desire to avoid liability.") (collecting cases). Moreover, one of the two sharpest declines in prolific offender checks occurred between February and March 2021, which was around the time the instant litigation was filed. (Doc. 239 at 71). In addition, following the initiation of this action, the PCSO issued the letters to targeted individuals informing them of their "prolific offender" status and listed a phone number to call for questions regarding involvement in the program. (Doc. 241-1).[8]

It is noteworthy as well that there is more recent record evidence that the PCSO visited Heilman subsequent to the filing of the parties' summary judgment motions and, among other things, made inquiries about her son's activities and whereabouts. (Doc. 248); (Doc. 254-1). In particular, the Plaintiffs assert that in April 2023, two deputies visited Heilman's home looking for her son, stated that they were there to "check on" him, handed Heilman's husband a "resource guide" to give her son, and asked questions about where the son was living. (Docs. 253, 254). Although the deputies claimed it was a "probation check," the son apparently was not on probation

---

[8] As noted above, Nocco maintains that the August 2021 DOJ letter, as well the 2021 prolific offender notice letter, were unrelated to the ILP Program and were instead regarding a separate program run by the Bureau of Judicial Assistance. *See* (Doc. 249 at 10); (Doc. 250).

at the time   (Docs. 253, 254).   And lastly, Nocco has not acknowledged any wrongdoing in instituting the ILP Program, has never promised not to resume the Program, and, in fact, maintains in his summary judgment filings that the program was entirely lawful.  *Rich*, 716 F.3d at 532 (noting that "Florida 'continue[s] to press . . . that the voluntarily ceased conduct should be declared constitutional' and has 'never promised not to resume the prior practice'") (quoting *Jager v. Douglas Cnty. Sch. Dist.*, 862 F.2d 824, 833–34 (11th Cir. 1981)); *Sheely*, 505 F.3d at 1187 ("[A] defendant's failure to acknowledge wrongdoing similarly suggests that cessation is motivated merely by a desire to avoid liability, and furthermore ensures that a live dispute between the parties remains.") (collecting cases).

In light of all the evidence,  Nocco has not met his "heavy" burden to show that he *unambiguously* terminated the ILP program, and has not "made it *absolutely* clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 189 (emphasis added) (internal quotation marks and citation omitted); *Doe*, 747 F.3d at 1323–24 ("The BOP has not met its 'formidable' or 'heavy' burden of establishing 'that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur' or that the challenged conduct has been unambiguously terminated.") (quoting *Friends of the Earth, Inc.*, 528 U.S. at 189–90).  I therefore recommend that Nocco's request for summary judgment on this issue be denied at this juncture.

This does not mean, however, that the Court cannot revisit the matter after it has further information before it.  Indeed, it would be wholly appropriate for the Court

27

to await deciding the mootness question until receiving evidence on the matter at trial to the extent the Plaintiffs' request for injunctive relief "implicates" an element of one of their causes of action. *Lawrence*, 919 F.2d at 1529.

Regarding the question of standing, the thrust of Nocco's argument similarly appears to be that the threat of future harm to the Plaintiffs is too speculative because of the proof that the prolific offender designation and the prolific offender checks were deemphasized beginning in 2021, the RAD Directive's policies and procedures are materially distinct from the ILP Program, and neither the Plaintiffs nor their children are currently classified as "focused offenders." (Doc. 219 at 36–37). The Plaintiffs counter by highlighting the history of past enforcement against Taylor and the other Plaintiffs' children, *Susan B. Anthony List*, 573 U.S. at 164 (finding that the plaintiff satisfied the injury-in-fact requirement in part where there was a history of past enforcement), as well as certain circumstances involving Heilman's son and the PCSO's visit to Heilman's home in 2023 (Doc. 240 at 37–40); (Doc. 253 at 2–4); (Doc. 264 at 1–2); (Doc. 245 at 23). Specifically, Heilman, Jones, and Deegan have submitted declarations asserting that even though their children are no longer deemed to be prolific or focused offenders, Heilman and Jones are still receiving visits from the PCSO that are akin to prolific offender checks. (Doc. 245 at 23–25) (citations omitted); *see also* (Docs. 242, 243, 244). Jones likewise avers that his residence was surrounded by PCSO cars, and Deegan likewise alleges that she is still subject to code enforcement. (Doc. 245 at 23–25) (citations omitted); *see also* (Docs. 242, 243). Nocco argues in response that these incidents are vaguely described and do not demonstrate a linkage

28

to the Program, much less establish a constitutional violation.  (Doc. 249 at 9).  Yet, as noted above, there are similarities between the RAD Directive and the ILP Manual, such as PCSO's classification of targeted individuals as "focused offenders" and the goal of seeking information from and about them.  (Doc. 223 at 2, 7, 84) (citations omitted).

After careful review, I find that there is a genuine issue of material fact as to whether the Plaintiffs' have standing at this point relative to their claim for prospective relief.  *Bischoff v. Osceola Cnty., Fla.*, 222 F.3d 874, 881 (11th Cir. 2000) ("[I]n a case where the evidence relating to standing is squarely in contradiction as to central matters *and* requires credibility findings, a district court cannot make those findings simply by relying on the paper record[.]"); *Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale*, 11 F.4th 1266, 1286 (11th Cir. 2021) ("If there is a genuine issue of material fact as to whether the [p]laintiffs have standing, summary judgment against them on standing grounds is inappropriate.") (citing *Bischoff*, 222 F.3d at 844).  I therefore recommend that Nocco's request for summary judgment on this issue be denied as well.

IV.

In addition to the standing and mootness challenges, Nocco raises two other threshold defenses—namely, that the Plaintiffs' claims stemming from code violations and arrests are barred by the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994) and that all of Jones's claims are time-barred under the applicable statute of limitations.  (Docs. 219, 249).  Each of these contentions will be addressed in turn.

A.

In *Heck*, the Supreme Court held:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a [section] 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under [section] 1983. Thus, when a state prisoner seeks damages in a [section] 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

*Id.* at 486–87 (footnote omitted).

The purpose of the rule in *Heck* is "to 'avoid the problem inherent in two potentially conflicting resolutions arising out of the same set of events by foreclosing collateral attacks on convictions through the vehicle of a [section] 1983 suit.'" *Harrigan v. Metro Dade Police Dep't Station #4*, 977 F.3d 1185, 1192 (11th Cir. 2020) (quoting *McClish v. Nugent*, 483 F.3d 1231, 1250 (11th Cir. 2007)). As a result, under *Heck*, a court must dismiss a section 1983 claim that "would necessarily imply the invalidity of [a plaintiff's] conviction or sentence" if that claim is brought before that conviction or sentence has been invalidated by the state court. *Heck*, 512 U.S. at 487. Stated differently, for *Heck* to have a preclusive effect, "it must be the case that a successful

30

[section] 1983 suit and the underlying conviction [are] logically contradictory." *Dyer v. Lee*, 488 F.3d 876, 884 (11th Cir. 2007).  "'[A]s long as it is *possible* that a [section] 1983 suit would not negate the underlying conviction, then the suit is not *Heck*-barred.'"  *Harrigan*, 977 F.3d at 1193 (quoting *Dyer*, 488 F.3d at 879–80).

The Supreme Court in *Heck* provided a helpful example of when a successful section 1983 claim would necessarily imply the invalidity of a plaintiff's criminal conviction:

> A state defendant is convicted of and sentenced for the crime of resisting arrest, defined as intentionally preventing a peace officer from effecting a *lawful* arrest. . . .  He then brings a [section] 1983 action against the arresting officer, seeking damages for violation of his Fourth Amendment right to be free from unreasonable seizures.  In order to prevail in this [section] 1983 action, he would have to negate an element of the offense of which he has been convicted.  Regardless of the state law concerning res judicata[,] . . . the [section] 1983 action will not lie.

*Heck*, 512 U.S. at 486 n.6.  The section 1983 claim in this example is foreclosed because:

> [a]lthough th[e] individual [in the example] would not be directly seeking damages for her conviction, . . . her conviction and her section 1983 claim would share a common element—both require a determination of the lawfulness of her arrest.  More important, to succeed on her section 1983 claim, she would have to show that her arrest was unlawful, a showing in conflict with a criminal conviction that necessarily came to the opposite conclusion on the same issue.

*McClish*, 483 F.3d at 1250–51; *see also Harrigan*, 977 F.3d at 1193 (observing that the "'concern [animating *Heck*] simply does not arise unless there is a necessary logical

connection between a successful [section] 1983 suit and the negation of the underlying conviction'") (quoting *Dyer*, 488 F.3d at 880).[9]

Applying these principles here, it is evident that the Plaintiffs' claims founded on the code citations are not premised on the invalidity of the citations themselves but on the averment that Nocco engaged in the "pretextual use of code enforcement as a means of harassment and intimidation." (Doc. 41 at 32). Accordingly, "it is *possible* that the facts could allow a successful [section] 1983 [claim] and the underlying [citation] both to stand without contradicting each other." *Harrigan*, 977 F.3d at 1193 (quoting *Dyer*, 488 F.3d at 881); *see also McClish*, 483 F.3d at 1251–52.[10]

The court's decision in *Hollywood Cmty. Synagogue, Inc. v. City of Hollywood*, 2005 WL 8154693 (S.D. Fla. Mar. 21, 2005) is instructive in this regard. In that case, the plaintiff, a synagogue, sued a city commissioner under section 1983 on the grounds that he allegedly abused his position by requesting that the city's code enforcement and its police department target the plaintiff and its members for possible parking violations. *Id.* at *3–4. Based on this allegation, the plaintiff asserted constitutional claims for violations of its members' rights to freedom of speech, freedom of religion,

---

[9] The Plaintiffs contend that *Heck* only applies if a plaintiff is still incarcerated. (Doc. 240 at 35). This appears to be incorrect. *See Butler v. Georgia*, 2022 WL 17484910, at *4 (11th Cir. Dec. 7, 2022) ("Butler argues that the Supreme Court has limited *Heck* to 'only those prisoners who were still incarcerated,' and that it does not apply to those who, like Butler, allege unconstitutional confinement but are 'unable to petition for habeas corpus relief.' This argument fails for[, among other] reasons[,] . . . this exception was set forth in a concurring opinion in *Spencer v. Kemna*, 523 U.S. 1, 21 (1998) (Souter, J., concurring), and neither the Supreme Court nor this Court has applied this exception in a published opinion."); *Reilly v. Herrera*, 729 F. App'x 760, 763 (11th Cir. 2018) (same).

[10] For purposes of my analysis, I assume without deciding that—as Nocco argues—*Heck* could be found to apply to code citations where there has been some sort of payment. *See* (Doc. 219 at 26).

freedom of assembly, substantive due process, and equal protection of the laws. *Id.* at *3. The defendant moved to dismiss the complaint under *Heck*, arguing that the plaintiff "failed to show that any of the parking citations issued to [the s]ynagogue members were invalidated, overturned, or otherwise called into question." *Id.* at *6. The court rejected that contention, noting that the synagogue's claims were "not predicated on a theory that the parking citations issued to [s]ynagogue members were invalid." *Id.* Rather, as the court pointed out, they rested on the plaintiff's assertion that, at the defendant's direction, "city employees on numerous occasions selectively prosecuted the [s]ynagogue and its members in order to chill or discourage them from their religious practices." *Id.* The court therefore deemed *Heck* to be inapplicable. *Id.*

In light of the above, I find the Plaintiffs' claims that predicated on the code citations are not *Heck*-barred. In reaching this conclusion, I am mindful of the Eleventh Circuit's admonition in *McClish* that *Heck* should not be stretched "beyond the limits of its reasoning." *McClish*, 483 F.3d at 1252.

Nocco also invokes *Heck* in an effort to foreclose the Plaintiffs' claims arising from the arrests of Jones and Heilman. (Doc. 219 at 6, 21–24); (Doc. 249 at 3 n.3). This argument fails with respect to Jones. While it appears uncontested that Jones was arrested on several occasions, *see, e.g.*, (Doc. 223 at 25, 77–78, 80–81); (Doc. 231 at 3–5); (Doc. 239 at 12–13, 66, 68–69), there is insufficient evidence at this juncture that any of his arrests resulted in a conviction or sentence. (Doc. 223 at 81); (Doc. 239

at 68–69); *see also* (Doc. 219 at 23) ("*To the extent* that Jones paid fines or otherwise pled guilty, false arrest claims are barred by *Heck*.") (emphasis added).[11]

Heilman is another story.  She was first arrested and convicted for giving false information to an officer, resisting arrest without violence, and battery on a law enforcement officer.  (Doc. 223 at 58–59, 62, 108); (Doc. 227 at 2–3, 8); (Doc. 239 at 46–47, 51); (Doc. 245 at 51).  She was later arrested and convicted a second time for battery on a law enforcement officer and was sentenced to twenty-four months of probation.  (Doc. 223 at 61–62, 109); (Doc. 227 at 4–5, 8); (Doc. 239 at 50–51); (Doc. 227 at 4–5, 8); (Doc. 245 at 52–53).  Because Heilman's arrests resulted in convictions, the Court must determine if a judgment in her favor on one or more of the asserted claims would invalidate her convictions.  *See Weaver v. Geiger*, 294 F. App'x 529, 533 (11th Cir. 2008) (stating that *Heck* precludes those claims "that 'if successful, would necessarily imply the invalidity of the conviction because they would negate an element of the offense.'") (quoting *Hughes v. Lott*, 350 F.3d 1157, 1160 n.2 (11th Cir. 2003)); *McClish*, 483 F.3d at 1252.

As alluded to above, a "court must look both to the claims raised under [section] 1983 and to the specific offenses for which the [section] 1983 claimant was

---

[11] Nocco separately argues the Plaintiffs cannot rely on allegations that Jones was falsely arrested to bolster their Fourth Amendment claim where Jones's arrests were based on a warrant founded upon probable cause. (Doc. 219 at 17–19, 22–23).  Although there is case authority to buttress Nocco's argument, *see Spinnenweber v. Williams*, 825 F. App'x 730, 732–33 (11th Cir. 2020) (noting that a "claim of false arrest or imprisonment under the Fourth Amendment concerns seizures without legal process, such as warrantless arrests . . .[and] [t]he fact that a state judge issued a warrant . . . thus extinguishes [a plaintiff's] false arrest claim"), the Plaintiffs insist they do not raise a false arrest argument (Doc. 240 at 15 n.2, 22 n.9); (Doc. 269 at 24).

convicted." *Hughes,* 350 F.3d at 1160 n.2.  As pertinent here, a person commits battery on a law enforcement officer under Florida law if she:

> (1) intentionally touched or struck the victim or intentionally caused bodily harm to the victim; (2) the victim was a law enforcement officer; (3) [she] knew that the victim was a law enforcement officer; and (4) the law enforcement officer was *engaged in the lawful performance of his or her duties* when the battery was committed.

*Pinto v. Collier Cnty.*, 2022 WL 2289171, at *3–4 (11th Cir. June 24, 2022) (emphasis added) (citation omitted).[12]  Similarly, the elements for the crime of resisting an officer without violence under Florida law necessitates a showing that "(1) [an] officer was *engaged in the lawful execution of a legal duty*; and (2) the defendant's action, by [her] words, conduct, or a combination thereof, constituted obstruction or resistance of that lawful duty." *C.E.L v. State*, 24 So. 3d 1181, 1185–86 (Fla. 2009) (emphasis added).

Because both the resisting an officer and battery offenses require an officer to have been engaged in the "lawful" execution or performance of his or her duties and because it appears that Heilman's arrests for these crimes have not been reversed, expunged, or otherwise declared invalid, Heilman's success on those constitutional claims involving these elements would necessarily imply her convictions for these offenses were unlawful.  *Heck*, 512 U.S. at 486 n.6; *McClish*, 483 F.3d at 1250. Accordingly, Heilman is *Heck*-barred from pursuing such causes of action in this case.[13]

---

[12] Unpublished opinions are not considered binding precedent but may be cited as persuasive authority.  11th Cir. R. 36-2.

[13] In light of this finding, I need not address Nocco's assertion that Heilman's claims based upon her first conviction are beyond the statute of limitations.  (Doc. 219 at 20).

B.

As for Nocco's contention that Jones's claims are time-barred, federal courts apply the forum state's statute of limitations for actions brought pursuant to section 1983.  *See* 42 U.S.C. § 1988(a); *Salas v. Pierce*, 297 F. App'x 874, 877 (11th Cir. 2008) ("All constitutional claims brought under [section] 1983 are tort actions, subject to the statute of limitations governing personal injury actions in the state where the [section] 1983 action has been brought.") (quoting *McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008)).  The governing limitations period here is four years.  *See* Fla. Stat. § 95.11(3); *Chappell v. Rich*, 340 F.3d 1279, 1283 (11th Cir. 2003) (per curiam).  For section 1983 claims, this limitations period is deemed to commence on "the date 'the facts which would support a cause of action are apparent or should be apparent to a person with reasonably prudent regard for his rights.'"  *Salas*, 297 F. App'x at 877 (quoting *Brown v. Ga. Bd. of Pardons & Paroles*, 335 F.3d 1259, 1261 (11th Cir. 2003)).

Nocco argues that Jones knew, or should have known, of the existence of a possible section 1983 claim against the PCSO as early as 2015 because he testified in his deposition that he believed in 2015 and 2016 that his constitutional rights had been violated.  (Doc. 131 at 181, 197); (Doc. 219 at 24); (Doc. 231 at 7).  Nocco thus maintains that the deadline for Jones's section 1983 claims should be 2019, which is well before this lawsuit was brought.  (Doc. 219 at 24).  Jones, however, asserts that because he did not learn about the PCSO's policies that governed many of his interactions with the deputies until he read a newspaper article in 2020, the statute of

limitations for him did not begin to run until that time frame.  (Doc. 223 at 81–82); (Doc. 231 at 6); (Doc. 240 at 36–37); (Doc. 245 at 69–70).

Jones has the better argument.  Simply because he believed his constitutional rights had been violated as early as 2015 does not mean that that he knew Nocco was responsible for such violations and that they were the product of a policy or custom. Accordingly, the statute of limitations for Jones's claims did not accrue until 2020 and were therefore timely filed.  *See Boling v. City of Longwood*, 2021 WL 7287614, at *14 (M.D. Fla. Dec. 20, 2021) (finding the statute of limitations did not bar a *Monell* claim based on when the plaintiff discovered the alleged policy or practice and collecting cases), *report and recommendation adopted*, 2022 WL 671512 (M.D. Fla. Mar. 7, 2022); *see also Birch v. City of New York*, 675 F. App'x 43, 45 (2d Cir. 2017) (reaffirming that the statute of limitations period in a *Monell* case does not necessarily begin "upon the occurrence of a harmful act, but only later when it is clear, or should be clear, that the harmful act is the consequence of a [municipality's] 'policy or custom'") (quoting *Pinaud v. Cty. of Suffolk*, 52 F.3d 1139, 1157 (2d Cir. 1995)).

## V.

I now turn to the merits of the Plaintiffs' section 1983 claims, which—as discussed previously—assert various constitutional violations.  (Doc. 224).  Before delving into the merits of the Plaintiffs' claims, a discussion of the law governing section 1983 liability is necessary.

"Section 1983 creates a private cause of action for deprivations of federal rights by persons acting under color of state law."  *Laster v. City of Tampa Police Dep't*, 575 F.

37

App'x 869, 872 (11th Cir. 2014).  The term "persons" has been interpreted to include municipalities and other local governmental units in addition to individuals.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

"'[T]o impose [section] 1983 liability on a municipality, a plaintiff must show: (1) that his [or her] constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation.'"  *Favors v. City of Atlanta*, 849 F. App'x 813, 817 (11th Cir. 2021) (quoting *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004)).  The first and third prongs are relatively straightforward but the second requires some elaboration.  As pertinent here, a policy is "a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality."  *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) (citing *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1479–80 (11th Cir. 1991)).  A custom, on the other hand, is a "practice [that] is so widespread as to have the force of law."  *Denham v. Corizon Health, Inc.*, 675 F. App'x 935, 941 (11th Cir. 2017) (citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997)); *see also Craig v. Floyd Cnty.*, 643 F.3d 1306, 1310–11 (11th Cir. 2011) ("[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability

on the theory that the relevant practice is so widespread as to have the force of law.")
(quoting *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 404).[14]

As for the matter of "deliberate indifference" to a constitutional right, *Favors*,
849 F. App'x at 817 (quoting *McDowell*, 392 F.3d at 1289), a municipality is deemed
to have crossed this threshold if it "deliberately [chooses] to ignore the problem." *D.P.
v. Sch. Bd. of Palm Beach Cnty.*, 658 F. Supp. 3d 1187, 1227 (S.D. Fla. Feb. 23, 2023)
(citing *Wright v. Sheppard*, 919 F.2d 665, 674 (11th Cir. 1990); *Warren v. District of
Columbia*, 353 F.3d 36 (D. C. Cir. 2004); *Bakst v. Tony*, 2019 WL 11497910, at *8 (S.D.
Fla. Mar. 18, 2019)).   This is "'a stringent standard of fault, requiring proof that a
municipal actor disregarded a known or obvious consequence of his action.'" *Bd. of
Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 410.

Local governments, however, "are responsible only for 'their *own* illegal acts.'"
*Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. Cincinnati*, 475 U.S.
469, 479 (1986)).   As a result, "a municipality cannot be held liable *solely* because it
employs a tortfeasor—or, in other words, a municipality cannot be held liable under
[section] 1983 on a respondeat superior theory." *Monell*, 436 U.S. at  691.   The entity
must instead be the factual and proximate cause of a plaintiff's injury. *Smith v. City of
Oak Hill*, 587 F. App'x 524, 527 (11th Cir. 2014).   To establish a defendant's conduct
was the cause-in-fact of the constitutional tort, a plaintiff must show that, except for
such a tort, his "'injuries and damages would not have occurred.'   To show that the

---

[14] There are other ways in which a plaintiff can establish the existence of a policy or custom.  *See
Denham*, 675 F. App'x at 941 (citing Erwin Chemerinsky, *Federal Jurisdiction* 511 (5th ed. 2007)).

constitutional tort was the legal or proximate cause of the injuries and damages claimed, a plaintiff must show that 'the injury or damage was a reasonably foreseeable consequence of the [officer's] act or omission.'" *Id.* (quoting *Jackson v. Sauls,* 206 F.3d 1156, 1168 n.16 (11th Cir. 2000)).

## A.

I will address the Plaintiffs' constitutional claims in the order in which they argue them in their summary judgment motion.  As they begin with their Fourth Amendment claim, I will too.

The Plaintiffs contend that the PCSO's policy and custom of frequently visiting their homes contravened the Fourth Amendment because they were involuntary and conducted in a manner that gave rise to both an unreasonable seizure and an unreasonable search.   (Doc. 224 at 31).  The Plaintiffs further assert that despite the nature of these visits, the PCSO did not mandate that its deputies secure warrants for them in advance, nor did it insist that the officers have probable cause or reasonable suspicion to perform them. (Doc. 224 at 31).  Nocco counters that the prolific offender checks were permissible under the Fourth Amendment as so-called "knock and talk[s]," which were unconnected to any search.  (Doc. 219 at 12).  Both parties seek summary judgment in their favor on this claim.  (Docs. 219, 224).

The Fourth Amendment safeguards people from unreasonable searches of their "persons, houses, papers, and effects."  U.S. Const. amend. IV.  While the Fourth Amendment extends to all sorts of property and other items associated with an individual, the "core" area it protects is an individual's home. *Florida v. Jardines*, 569

U.S. 1, 6 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals."); *United States v. Holmes*, 143 F. Supp. 3d 1252, 1258 (M.D. Fla. Nov. 11, 2015) ("A person's home is at the core of the Fourth Amendment's protection against unreasonable searches and seizures.") (citing *Jardines*, 596 U.S. at 6), *aff'd*, 770 F. App'x 1013 (11th Cir. 2019).  This protection encompasses not only the interior of a residence, but also the area "immediately surrounding and associated with the home," known as the curtilage.  *Jardines*, 569 U.S. at 6 ("We . . . regard the area 'immediately surrounding and associated with the home'—what our cases call the curtilage—as 'part of the home itself for Fourth Amendment purposes.'") (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)); *California v. Ciraolo*, 476 U.S. 207, 213 (1986) (noting that the curtilage is the area around the home which is "intimately linked to the home, both physically and psychologically," and is where "privacy expectations are most heightened"); *United States v. Taylor*, 458 F.3d 1021, 1206 (11th Cir.  2006) ("[T]he curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,' . . . and therefore has been considered part of the home itself for Fourth Amendment purposes.") (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)).  The "classic exemplar" of the curtilage is a residence's front porch.  *Jardines*, 569 U.S. at 7.

"Because the curtilage is a constitutionally protected space, the police must have an express or implied license to be there without a warrant."  *United States v. Maxi*, 886 F.3d 1318, 1326 (11th Cir. 2018) (citing *Jardines*, 569 U.S. at 7–8).  One such implied

license is the "knock and talk" rule.  *See Jardines*, 569 U.S. at 21 (Alito, J., dissenting).

This rule typically permits a member of law enforcement—just like any other visitor—

"to approach the home by the front path, knock promptly, wait briefly to be received,

and then (absent invitation to linger longer) leave."  *Maxi*, 886 F.3d at 1326–27

(quoting *Jardines*, 569 U.S. at 8).   The "knock and talk" rule is drawn from the

longstanding "habits of the country," which treated "the knocker on the front

door . . . as an invitation or license to attempt an entry, justifying ingress to the home

by solicitors, hawkers and peddlers of all kinds."  *Jardines*, 569 U.S. at 8 (internal

quotation marks and citation omitted).

  The knock and talk has become a common investigatory tool utilized by law

enforcement.  *Taylor*, 458 F.3d at 1204.  In a knock and talk, an officer may approach

a house and "knock on the door to, for example, question the resident about possible

criminal activity there or elsewhere, or try to obtain consent to search."  *Kentucky v.

King*, 563 U.S. 452, 466; *see also Taylor*, 458 F.3d at 1204 ("[O]fficers are allowed to

knock on a residence's door or otherwise approach the residence seeking to speak to

the inhabitants just as any private citizen may.") (internal quotation marks and citation

omitted).   A resident is free not to open the door and to refuse engaging in a

conversation if he does open the door.  *King*, 563 U.S. at 469.  "And even if an

occupant chooses to open the door and speak with the officers, the occupant need not

allow the officers to enter the premises and may refuse to answer any questions at any

time."  *King*, 563 U.S. at 470.  While properly conducting a knock and talk, officers

may make plain-view observations and use them to support a warrant application.

*United States v. Cha*, 431 F. App'x 790, 797 (11th Cir. 2011) (per curiam) (citation omitted); *United States v. Cox*, 391 F. App'x 756, 758 (11th Cir. 2010) (per curiam).

The scope of the knock and talk rule, however, is circumscribed in a number of respects.  First, it "is geographically limited to the front door or a 'minor departure' from it."  *United States v. Walker*, 799 F.3d 1361, 1363 (quoting *Taylor*, 458 F.3d at 1205).  Second, it is confined "not only to a particular area but also to a specific purpose," the parameters of which are defined by "background social norms." *Jardines*, 569 U.S. at 9.  Under this framework, a law enforcement official may perform a knock and talk "[f]or legitimate police purposes," *United States v. Ratcliff*, 725 F. App'x 894, 901 (11th Cir. 2018) (per curiam) (citing *Jardines*, 569 U.S. at 8; *Taylor*, 458 F.3d at 1204), but not solely to "conduct a search," *Jardines*, 569 U.S. at 9 & n.4 ("[N]o one is impliedly invited to enter the protected premises of the home in order to do nothing but conduct a search."); *see also United States v. Calderon-Fuentes*, 788 F. App'x 630, 633 (11th Cir. 2019) (per curiam) ("The Fourth Amendment is not implicated by a police officer's entry onto private land 'to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises.'  Unless the person in possession of the home expressly orders otherwise, 'an officer may walk up the steps and knock on the front door of any man's [home] with the honest intent of asking questions of the occupant thereof.'") (quoting *Taylor*, 458 F.3d at 1204) (internal citation omitted).  The operative inquiry in this regard is whether the officer's conduct was "objectively reasonable," not whether he was motivated by an impermissible reason.  *United States v. White*, 928 F.3d 734, 741 (8th Cir. 2019) ("*Jardines* did not hold

43

that the scope of a license is dependent on the officers' subjective intent.  To the contrary, it reiterated long-standing precedent holding that conduct 'that is objectively reasonable' will not be deemed unlawful simply because it may have, subjectively, been motivated by impermissible or pretextual reasons. . . .") (quoting *Jardines*, 569 U.S. at 10 and citing *Morgan v. Fairfield Cty.*, 903 F.3d 553, 563 (6th Cir. 2018)).  The party challenging a knock and talk bears the burden of demonstrating by a preponderance of the evidence that the knock and talk was illegal.  *Holmes*, 143 F. Supp. 3d at 1261.

Before delving into the more granular aspects of the Plaintiffs' Fourth Amendment claim, I must address three broader arguments that the Plaintiffs make which undergird this claim.  One of these contentions is that a knock and talk must be supported by reasonable suspicion.  (Doc. 224 at 31–32).  To buttress this assertion, the Plaintiffs point to the Eleventh Circuit's unpublished decision in *Ratcliff*, 725 F. App'x 894, in which the court stated the following:

> The Fourth Amendment is not implicated by a "knock and talk" that is unconnected with a search.  [*Taylor*, 458 F.3d at 1204].  For legitimate police purposes, police officers may enter onto private land, knock on the door of a residence, and seek to speak with the inhabitants, just as any private citizen may.  *See* [*Jardines*, 569 U.S. at 8]; *Taylor*, 458 F.3d at 1204.  *Officers need only reasonable suspicion, not probable cause, to justify a knock and talk.*  [*United States v.* ]*Tobin*, 923 F.2d [1506,] 1511 [(11th Cir. 1991) (en banc)].

*Id*. at 901 (emphasis added).  The Plaintiffs' reliance on *Ratcliff* is misplaced.

Because it is an unpublished decision, *Ratcliff* is not binding on the Court and need not be followed if it is independently determined to be unpersuasive. *McNamara v. GEICO*, 30 F.4th 1055, 1060–61 (11th Cir. 2022).  I do not find *Ratcliff* persuasive relative to the Plaintiffs' reasonable suspicion argument here.

As an initial matter, it is difficult to square *Ratcliff*'s pronouncement at the beginning of the above excerpt that "[t]he Fourth Amendment is not implicated by a 'knock and talk' [which] is unconnected with a search" with its subsequent position that "[o]fficers need . . . reasonable suspicion . . . to justify a knock and talk." *Ratcliff*, 725 F. App'x at 901.  If a knock and talk does not trigger the Fourth Amendment, it is unclear why it would necessitate a showing of reasonable suspicion.

Moreover, the decision upon which *Ratcliff* predicates its reasonable suspicion requirement, *Tobin*, did not directly confront the knock and talk rule and instead mainly addressed the propriety of a warrantless residential search based on probable cause and exigent circumstances.  *See Tobin*, 923 F.3d at 1510–13.  In *Tobin*, federal agents were in the midst of engaging in surveillance from a neighboring field when they spotted individuals unloading what they believed to be bags of cocaine from a vehicle and then placing them in the home's garage.  *Id*. at 1508.  After deciding to make contact with the occupants of the residence, three of the agents pulled up in front of the house in their unmarked vehicles, two of them then went to the door, and one went to the corner of the house near the garage to stand out of sight.  *Id*.  One of the two agents at the door was designated to knock on the door and to communicate with

the occupants. *Id.* at 1518 (Clark, J., concurring in part). That agent had his hand on his holstered gun at the time and knocked on the door for several minutes to no avail. *Id.* at 1518. According to the officer's testimony, he announced during this period that he was "a police officer," that he "would like to talk to [the occupants]," and that he "need[ed] for [them] to come here." *Id.* As this was occurring, the third officer standing at the side of the house had "his gun drawn" as he was "observing the proceedings." *Id.*

Someone ultimately answered the door and during the agent's ensuing conversation with that individual, the agent detected the smell of marijuana emanating from the residence. *Id.* at 1508 (majority opinion). The agent proceeded to accompany the individual through the home to the garage, where he met with the other two agents. *Id.* There, the agents discovered the bags of cocaine, along with more than $750,000 in cash. *Id.*

The en banc Eleventh Circuit in *Tobin* concluded that the warrantless search of the home was constitutional because even "[p]rior to their approach to the house, the agents had probable cause to believe that narcotics were in the garage" and appeared to be faced with exigent circumstances at that juncture as well. *Id.* at 1511. The court additionally went on to state, in dicta, that even assuming arguendo "the agents' observations considered in the totality of the circumstances did not immediately give rise to the necessary level of probable cause and exigent circumstances, the warrantless search should still be deemed justifiable . . . [because] the agents had, at a minimum, reasonable suspicion that criminal activity was afoot." *Id.* The court then added that

46

"[r]easonable suspicion cannot justify the warrantless search of a house, but it *can* justify the agents' approaching the house to question the occupants." *Id*. (emphasis added) (internal citations omitted).  To bolster its reasonable suspicion determination, the court cited *United States v. Knight*, 451 F.2d 275 (5th Cir. 1971)[15] and *Davis v. United States*, 327 F.2d 301, 303 (9th Cir. 1964).

Although the Ninth Circuit's decision in *Davis* involved a knock and talk-type situation, the Fifth Circuit's decision in *Knight* did not.  In *Knight*, the Dallas police received a tip from a reliable informant that a large amount of stolen spark plugs was to be transported to a certain residential address in Dallas.  *Knight*, 451 F.2d at 277. Through aerial surveillance, law enforcement observed a pick-up truck pulling a trailer traveling to that address, where the trailer was then seen backing up to a garage and several men getting out.  *Id*.

Officers were dispatched to the home in a marked police car and, upon their arrival, a man standing at the rear of the trailer shouted "Police!" and then moved quickly into the adjoining house.  *Id*.  Four men also ran from the garage to the rear of the yard.  *Id*.  One of the officers from the police car followed these men, while another officer—with his weapon holstered—walked toward the garage, where he saw a number of cartons with the words "Chrysler Spark Plugs" on them in plain view, along with a man standing there.  *Id*. at 277–78. The four men who fled were thereafter

---

[15] The Eleventh Circuit, in its en banc decision in *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981), adopted as precedent the opinions of the former Fifth Circuit rendered prior to October 1, 1981.

arrested and the stolen spark plugs in the garage were subsequently seized as well.  *Id.* at 277.

The issue on appeal was whether it was illegal for the officers to be on the property while acquiring the information which gave them probable cause for the arrests and the seizure of the stolen goods.  *Id.* at 278.  The court found the officers' conduct permissible, reasoning:

> The entry upon [the] property, even if made without probable cause, does not necessarily constitute a trespass.  When the performance of his duty requires an officer to enter upon private property, his conduct, otherwise a trespass, is justifiable.  Here the original tip plus the sighting from the air dictated a police investigation to determine whether stolen goods were being transported.  Under the circumstances an entry onto the property for the purpose of making a general inquiry was justifiable.

> Moreover, even if the officers were trespassing on private property, a trespass does not of itself constitute an illegal search.  Nothing in the officers' conduct when they entered the property can be considered a search.  [The officer], without his gun drawn, walked to the site of human activity, which was the garage adjoining the residence.  Prior to entering the garage, he saw the Chrysler Spark Plugs cartons.  This, however, was not a search since the cartons were in plain view.   Similarly since [the officer] did not enter or open the trailer, but merely looked into it and saw "Chrysler Spark Plugs" within his vision, there was no search of the trailer at that time.

*Id.* at 278 (internal citations omitted).  Conspicuously absent from this analysis is any reference to the knock and talk rule.

Against this backdrop, I cannot accept the Plaintiffs' argument that reasonable suspicion is necessary for a knock and talk based on the Eleventh Circuit's unpublished decision in *Ratcliff*.   As noted, this requirement runs counter to *Ratcliff*'s own

pronouncement that "[t]he Fourth Amendment is not implicated by a 'knock and talk' that is unconnected with a search."  725 F. App'x at 901.  Further, the Eleventh Circuit's en banc opinion in *Tobin*—upon which *Ratcliff* relies—did not state that reasonable suspicion "must" justify an officer's approach to the front door of a home, only that it "can."  *Tobin*, 923 F.3d at 1511.  This makes sense since the implied license underlying the knock and talk rule (which, as noted, authorizes an officer to go on private property to carry out legitimate police business), *Maxi*, 886 F.3d at 1326–27, represents a lower threshold than the reasonable suspicion standard.

Even putting aside this distinction, the court's reference to a "reasonable suspicion" showing in *Tobin* is merely dicta, *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010) ("[D]icta is not binding on anyone for any purpose."), and also lacks any meaningful examination of the knock and talk rule in the context of the facts of that case.  Additionally, the only in-circuit decision to which the *Tobin* court cites— *Knight*—is devoid of any such discussion as well.

Finally, the Plaintiffs' reading of *Ratcliff* conflicts with the decisions of multiple appellate courts and at least three other courts in this circuit which have rejected the contention that a knock and talk requires reasonable suspicion.  *See United States v. Shuck*, 713 F.3d 563, 567 (10th Cir. 2013) ("A 'knock and talk' is a consensual encounter and therefore does not contravene the Fourth Amendment, even absent reasonable suspicion.") (alteration adopted) (quoting *United States v. Cruz-Mendez*, 467 F.3d 1260, 1264 (10th Cir. 2006)); *United States v. Spotted Elk*, 548 F.3d 641, 655 (8th

Cir. 2008) (stating that a knock and talk is a form of a consensual encounter which does not require probable cause or reasonable suspicion); *United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2006) ("Consensual encounters do not lose their propriety . . . merely because they take place at the entrance of a citizen's home. A number of courts, including this one, have recognized 'knock and talk' consensual encounters as a legitimate investigative technique at the home of a suspect or an individual with information about an investigation.") (collecting cases); *United States v. Adeyeye*, 359 F.3d 457, 462 (7th Cir. 2004) (finding that where the police visit was a "consensual encounter," reasonable suspicion was not required) (citation omitted); *United States v. Cormier*, 220 F.3d 1103, 1109 (9th Cir. 2000) (concluding that because an encounter with police was consensual, suspicion was unnecessary to justify a knock and talk); *United States v. Horne*, 2015 WL 1754636, at *4 (M.D. Fla. Apr. 17, 2015) ("[E]ven if [the police] lacked reasonable suspicion that anyone at the residence was involved in illegal drug or gang-related activities, that is not the test under Eleventh Circuit law—there need only be 'legitimate police purposes' for conducting a 'knock and talk.'"); *United States v. Bearden*, 2013 WL 1970024, at *4 (N.D. Ga. Apr. 17, 2013) ("Police may conduct a 'knock and talk' without even reasonable suspicion of criminal activity.") (citing *Cormier,* 220 F.3d at 1109); *United States v. Sabinkse*, 2008 WL 11441848, at *7 (N.D. Ga. July 25, 2008) ("[A] 'knock and talk' . . . is a consensual encounter which does not contravene the Fourth Amendment and does not require even reasonable suspicion of criminal activity.") (collecting cases); *United States v. Reynolds*, 526 F. Supp. 2d 1330, 1336 n.4 (N.D. Ga. 2007) (stating that a knock and

talk "allows an officer to initiate a consensual encounter as an investigative technique or on reasonable suspicion of criminal activity") (citing *Jones,* 239 F.3d at 720).

Another broad contention made by the Plaintiffs is that the prolific offender checks, by their very nature, constituted a search and therefore required probable cause or a warrant.  (Doc. 224 at 36).  The Plaintiffs derive support for this argument on what they aver to be "[a] core goal of any prolific offender check," which was "'to cultivate information about the criminal environment' and 'to develop information to help analysts identify where and who [PCSO] should be focused on, help solve crimes that have already been committed, and ultimately help . . . to prevent future crimes from occurring.'"  *Id*. (citing, *inter alia*, *Jardines*, 569 U.S. at 11; *Kyllo v. United States*, 533 U.S. 27, 32 n.1 (2001)).  To the extent the Plaintiffs assert that law enforcement's efforts to "cultivate" and "develop" information as part of its mission to investigate and prevent crime alone amounts to a Fourth Amendment search, they are wrong.  Indeed, the Supreme Court's decision in *Jardines*—to which the Plaintiffs cite—makes this clear.  As the Court explained in that case, "it is not a Fourth Amendment search to approach the home in order to speak with the occupant, because all are invited to do that.  The *mere purpose of discovering information*, in the course of engaging in that permitted conduct does not cause it to violate the Fourth Amendment."  *Jardines*, 569 U.S. at 9 n.4. (alternation made and emphasis added) (internal quotation marks and citation omitted); *United States v. White*, 928 F.3d 734, 740 (8th Cir. 2019) ("[T]o the extent that [the party challenging the knock and talk] argues that the officers' '*purpose of discovering information*' about possible illegal activity renders the [knock and talk]

impermissible, that purpose, without more, cannot be enough to support [t]his conclusion.") (emphasis added).

Nor does *Kyllo* (to which the Plaintiffs also cite) provide any support for their contention. In that case, the Supreme Court held that police officers engaged in a search when they used a thermal-imaging device to detect heat emanating from a private home, even though they committed no trespass. *Kyllo*, 533 U.S. at 40. The Court reasoned that where "the [g]overnment uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." *Id*. There is no allegation here that as part of their prolific offender checks, the government employed a technologically advanced mechanism "not in general public use" to collect information which would not be discoverable "without physical intrusion."

Other cases further undermine the Plaintiffs' apparent claim that all prolific offender checks constituted a search or were otherwise per se unlawful. By my review, there was nothing inherently improper in the PCSO deputies performing knock and talks at the prolific offenders' homes and endeavoring to obtain information from the inhabitants about crime in the area and other matters of legitimate police business. *See* (Doc. 223 at 91–92); (Doc. 245 at 11); (Doc. 161-3 at 20) (directing PCSO deputies to conduct the prolific offender visits at least once per quarter and to "learn as much as possible [during those checks] about prolific offenders in [the deputies'] assigned area[s] to include [the prolific offenders'] acquaintances, vehicles, locations

frequented, [modus operandi] for offenses, vehicles owned, etc."); *see also King*, 563 U.S. at 466 (noting that an officer may question a resident during a knock and talk about possible criminal activity there or elsewhere, or try to obtain consent to search); *Taylor*, 458 F.3d at 1204 ("[O]fficers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just [as] any private citizen may.") (citation omitted); *United States v. Williams*, 731 F.3d 1222, 1231 (11th Cir. 2013) (holding that conducting a knock and talk to investigate unspecified narcotics complaints was for "legitimate police purposes"); *Horne*, 2015 WL 1754636, at *4 ("[A]s the Eleventh Circuit has held, investigating potential illegal drug activity . . . constitutes a legitimate police purpose for conducting a 'knock and talk.'") (citing *Williams*, 731 F.3d at 1231).

Beyond their more general Fourth Amendment challenges, the Plaintiffs argue that the prolific offender checks were unconstitutional to the extent they were harassing or were otherwise not for a legitimate police purpose, were performed late at night, involved more intrusive actions by the PCSO, or amounted to a seizure for Fourth Amendment purposes. (Doc. 224 at 31–39); (Doc. 240 at 22–28). Each of these claims will be addressed in turn.

I note at the outset that there appear to be two categories of prolific offender checks. The first category consists of the roughly seventy to eighty prolific offender checks that the parties agree are not materially different from each other and that were completed as part of the ILP Program. *See* (Doc. 223 at 8–9) (Taylor received nineteen checks); *id.* at 10–12, (Doc. 239 at 41) (Heilman received twenty-one checks after

accounting for the one visit that Nocco asserts is supported by probable cause and is not ILP-related); (Doc. 223 at 12–13), (Doc. 239 at 21) (Deegan received seven checks after allowing for the one visit that Nocco avers is supported by probable cause and is not ILP-related); (Doc. 223 at 13–15), (Doc. 239 at 24–25) (Jones received twenty-nine checks after accounting for the one visit that Nocco maintains is supported by probable cause and is not ILP-related).  The second category is comprised of those visits where the Plaintiffs were arrested or issued code citations and which Nocco insists were not ILP-related or were supported by either probable cause or reasonable suspicion.  *See* (Doc. 223 at 33, 55); (Doc. 239 at 14–15, 21–22, 41–42).

As to the Plaintiffs' first argument, there is case authority that a knock and talk performed in a harassing or objectively unreasonable manner is unconstitutional.  *See Horne*, 2015 WL 175463, at *4 (commenting that knock and talks conducted on the basis of  harassment would be unconstitutional).  That said, this issue, like many involving the Plaintiffs' Fourth Amendment claim, is fact-intensive and is ill-suited to being resolved on a summary judgment motion.  *See United States v. Drayton*, 536 U.S. 194, 201 (2002) (stating "that for the most part *per se* rules are inappropriate in the Fourth  Amendment  context"  and  that  "[t]he  proper  inquiry  necessitates  a consideration of 'all the circumstances surrounding the encounter'") (quoting *Florida v. Bostick*, 501 U.S. 429, 439 (1991)).  A reasonable fact-finder could find, for example, that the sheer number of prolific offender checks combined with the other evidence pertaining to the officers' behavior exceeded the implied license underlying the knock and talk rule.  On the other hand, a reasonable fact finder could arrive at a contrary

conclusion based on the instances where, for example, the deputies adhered to the limits of a proper knock and talk, where the Plaintiffs expressed gratitude for the officers' visits, and/or where the officers provided resource guides during the checks.

I reach a similar conclusion with respect to the Plaintiffs' challenge to the nighttime prolific offender checks. (Doc. 223 at 8–15) (asserting there were more than twenty visits performed as part of the ILP Program that occurred between 8:25 p.m. and 4:54 a.m.). The Plaintiffs cite no authority, nor have I found any, that stands for the proposition that such visits are unconstitutional as a matter of law. Instead, it appears from a survey of the case law that although the timing of a knock and talk may be relevant in assessing whether it was objectively reasonable, *see, e.g.*, *United States v. Lundin*, 817 F.3d 1151, 1159 (9th Cir. 2016) (finding it pertinent to the propriety of a challenged knock and talk that the officers knocked at "around 4:00 a.m. without evidence that [the defendant] generally accepted visitors at that hour, and without a reason for knocking that a resident would ordinarily accept as sufficiently weighty to justify the disturbance"); *United States v. Wells*, 648 F.3d 671, 680 (8th Cir. 2011) (observing that the knock and talk was not undertaken in the midst of some "pleasant summer evening," but at 4:00 a.m.), courts have not settled on time of night which is per se off-limits, *see, e.g.*, *Young v. Borders*, 850 F.3d 1274, 1286 (11th Cir. 2017) (Hull, J., concurring) (disagreeing with the dissent's assertion that the officer "exceeded the scope of the permissible knock and talk exception because it was 1:30 a.m., he unholstered his weapon, and he knocked so loudly"); *United States v. Walker*, 799 F.3d 1361, 1362–64 (11th Cir. 2015) (per curiam) (deeming it reasonable for officers to make

a third attempt to do a knock and talk at 5:00 a.m. where the first two knock and talks elicited no response and were conducted the prior evening—at 9:00 p.m. and at 11:00 p.m.— and the officers observed lights on in both the home and a car parked outside before reentering the property); *United States v. Rhone*, 2015 WL 471205, at *2–3 (D. Kan. Feb. 4, 2015) (rejecting the argument that knock and talks are impermissible late at night).  Accordingly, whether the nighttime prolific offenders checks fell outside the scope of the implied license underlying the knock and talk rule based on the totality of the circumstances will need to be decided by the factfinder at trial.

Nocco's unadorned assertion that these nighttime visits were reasonable because the prolific offender at the residence was likely on probation does not undermine this conclusion.  (Doc. 239 at 29).  Such an assertion is nothing more an unsupported factual allegation and thus cannot substantiate an award of summary judgment.  *See Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion.") (citation omitted).

To buttress their claim that PCSO deputies engaged in intrusive behavior beyond the parameters of a lawful knock and talk, the Plaintiffs aver that the officers (1) peered into and "banged on the windows" of Jones's home and walked around the house at night and yelled for an occupant to come outside; (2) entered into Deegan's backyard; and (3) looked through the windows and walked around Heilman's home to peer through her fence.  (Doc. 223 at 32–33, 55, 74).  And to bolster their claim that these events were caused by the ILP Program, *see Williams v. Aguirre*, 965 F.3d 1147,

1166 (11th Cir. 2020); *Favors*, 849 F. App'x at 817, 822, the Plaintiffs submit that the PCSO's database listed a prolific offender check on the same night as Jones's visit (Doc. 223 at 14, 75),[16] that the visit to Deegan was recorded in the PCSO system as a prolific offender check (Doc. 223 at 12, 67, 74) and that the deputy's report about the visit to Heilman's home classified it as a prolific offender check as well (Doc. 223 at 60).

There is evidence in the record though that these visits were not connected to the ILP Program.  Nocco, for example, points to portions of the record from which a factfinder could reasonably infer that the Jones visit was to serve an arrest warrant, that the visit to Deegan's residence was to question her son about the theft of a kayak, and that the Heilman visit stemmed from a juvenile pick up order.  *See* (Doc. 239 at 13–17, 21–22, 41–42); *see also Rauen v. City of Miami*, 613 F. Supp. 2d 1324, 1336 (S.D. Fla. 2007) (finding that, under the *Monell* framework, a genuine issue of material fact existed as to whether a city's policy or custom caused the alleged constitutional violation).  There is also evidence in the record that the PCSO had probable cause or reasonable suspicion to be on the property at the time of these visits in any event.  *See* (Doc. 239 at 21–23) (regarding the Deegan visit) (citing Docs. 154, 161-16); (Doc. 239 at 41–43) (regarding the Heilman visit) (citing Doc. 225-5; Doc. 120-5 at 3; Doc. 154) (Doc. 239 at 61–62) (regarding the Jones visit) (citing Docs. 154, 225-7); *see also*

---

[16] The bodycam footage relied upon by the Plaintiffs indicates the date on which it occurred but is not timestamped.  It is therefore impossible at this juncture to determine whether the footage captured the visit that was designated as a prolific offender check.  *See* (Doc. 225-7).

*Hardigree v. Lofton*, 992 F.3d 1216, 1229 (11th Cir. 2021) (deeming summary judgment to be inappropriate where there were genuine disputes of material fact as to whether the defendant had an adequate basis for engaging in the contested conduct).[17] Summary judgment relative to these visits is therefore inappropriate.

Summary judgment is likewise not warranted on the Plaintiffs' final Fourth Amendment argument that the prolific offender checks resulted in a seizure of their person. An individual is "seized" for Fourth Amendment purposes when an officer, by physical force or a show of authority, "terminates or restrains . . . [the individual's] freedom of movement." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (citing *Bostick*, 501 U.S. at 434). In a case like this one, where typically "an individual's submission . . . takes the form of passive acquiescence," the operative inquiry is "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 255 (internal quotation marks and citation omitted).

There are disputed issues of material fact on this matter as well. Relative to the visits which the parties agree were prolific offender checks, the Plaintiffs each attest that they did not welcome these checks and/or felt that they could end the encounter. *See* (Docs. 226, 227, 228, 231). They also point to evidence they claim establishes that the repeated nature of such visits, the fact that deputies did not stop conducting them even after someone complained about being harassed, and the PCSO's consistent

---

[17] The Plaintiffs do not otherwise challenge the propriety of the deputies' other reasons for being on the Plaintiffs' property.

show of force and authority establishes that a reasonable person would not feel free to end the encounters. *See* (Doc. 224 at 32–35) (citations omitted); *see, e.g.,* (Doc. 223 at 29, 69, 74). In addition to this proof, there is evidence that deputies at times apologized for conducting the prolific offender checks. *See, e.g.*, (Doc. 223 at 28–29); (Doc. 239 at 18). Nocco responds by highlighting evidence that he claims demonstrates the Plaintiffs were seemingly at ease with the deputies during some checks and that there were other instances where the Plaintiffs successfully terminated their interactions with deputies. (Doc. 238 at 20–21); *see, e.g.*, (Doc. 239 at 37). It thus appears that a genuine issue of material fact exists as to whether a reasonable person in the Plaintiffs' shoes "would feel free to decline the officers' requests or otherwise terminate the encounter." *Brendlin*, 551 U.S. at 255 (quoting *Bostick*, 501 U.S. at 435–36); *Pippin v. Kirkland*, 2013 WL 12153594, at *1 (M.D. Fla. Mar. 25, 2013) (finding a genuine issue of material fact where the plaintiff's testimony that she did not feel comfortable concluding her interaction with police was rebutted with evidence that she was agreeable with the officer).

Summary judgment on the Plaintiffs' Fourth Amendment claim is not justified for either party for another reason as well. Even assuming that there were visits where deputies violated the Fourth Amendment, the issue remains as to whether they were caused by a PCSO policy or custom. Here, the ILP Manual does not detail with precision how deputies are to conduct prolific offender checks or what their demeanor should be. *See generally* (Docs. 225-1, 225-2, 225-32, 225-34, 225-35, 225-73, 225-82). That the ILP Manual states that prolific offenders must "stop committing crimes" or

else face "relentless pursuit, arrest, and prosecution" (Doc. 223 at 5) is not on its face unconstitutional because the policy does not suggest that the PCSO deputies can engage in unconstitutional conduct, such as exceeding the scope of a proper knock and talk or arresting a prolific offender without probable cause (Doc. 225-1 at 17–18) ("In order for focused deterrence to be effective, law enforcement and the criminal justice system must remain true to their promise.  If the [prolific] offender does not feel the pressure, if the offender is not arrested when they commit their next crime, or if the offender is left to feel their punishment is menial, the [ILP] strategy will have no impact.").

Because the ILP Manual is not facially unconstitutional, the Plaintiffs must establish a custom or pattern of unconstitutional behavior.  This issue too is fact intensive, and involves the consideration of a number of factors, including the number and frequency of the deputies' prolific offender checks relating to the Plaintiffs, the deputies' physical movements while at a home, the nature and substance of their communications with the persons they encountered there, the residents' behavior, and any other reasons the deputies may have had for being at the home.  *See Perez v. Miami-Dade Cnty.*, 168 F. App'x 338, 341 (11th Cir. 2006) (per curiam) ("[A plaintiff's] evidence is sufficient to raise a genuine issue of material fact as to whether the [c]ounty had a custom of using excessive force, and therefore, summary judgment was not appropriate on this claim."); *cf. Drayton*, 536 U.S. at 201 (stating "that for the most part *per se* rules are inappropriate in the Fourth Amendment context" and that "[t]he proper inquiry necessitates a consideration of 'all the circumstances surrounding [an]

encounter'"); *Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996) ("Normally, the question of whether a policy or custom exists [is] a jury question."); *Corrigan v. District of Columbia*, 841 F.3d 1022, 1039 (D.C. Cir. 2016) (stating that whether an entity had a custom, policy, or practice that caused a constitutional violation "is a fact-intensive inquiry"); *Walls v. Starks*, 2020 WL 6675632, at *4 (E.D. Ark. Nov. 12, 2020) ("*Monell* claims that turn on proving a custom or practice . . . always involve a fact-intensive inquiry into other similar instances or cases which go toward proving the prevalence of the customs and practices[.]").[18]

    In an attempt to avoid this conclusion, Nocco argues that there is not enough similarity between the challenged prolific offender visits to constitute a *Monell* custom. (Doc. 219 at 14); (Doc. 238 at 14); (Doc. 249 at 4–5).  Although it is true that "[a] pattern of similar constitutional violations . . . is ordinarily necessary" to establish a custom under *Monell*, *see Gurrera v. Palm Beach Cnty. Sheriff's Off.*, 657 F. App'x 886, 893 (11th Cir. 2016) (per curiam) (quoting *Craig v. Floyd Cnty.*, 643 F.3d 1306, 1310 (11th Cir. 2011), such instances need not be identical, *Fisher v. Miami-Dade Cnty.*, 114

---

[18] The Plaintiffs' reliance on Heilman and Jones's arrests to bolster their summary judgment request is unavailing.  For the reasons stated previously, Heilman's arrests are *Heck*-barred.  As for Jones, the evidence before the Court indicates that he was arrested during a December 2015 visit, which at least one deputy described as a prolific offender check, allegedly because Jones would not allow the deputies into his home.  (Doc. 223 at 77); (Doc. 225-11 at 53).  Jones was also arrested in January 2016 for failing to appear on a code citation, and was arrested again in March 2016.  (Doc. 223 at 78, 80).  While the Plaintiffs maintain that both of the later arrests were part of the ILP program, Nocco asserts that they were not and adds that were supported by probable cause anyway.  (Doc. 239 at 66, 68).  Notably, the Plaintiffs do not meaningfully contest the propriety of any of Jones's three arrests and have accordingly not established that the incidents amounted to unconstitutional seizures as a matter of law.

F. Supp. 3d 1247, 1251 (S.D. Fla. July 13, 2015) (quoting *Shehada v. Tavss*, 965 F. Supp. 2d 1358, 1374 (S.D. Fla. 2013)).

Here, as alluded to above, the Plaintiffs broadly assert that the prolific offender checks were conducted frequently and sometimes during the middle of the night, and that the prolific offenders and their parents were more likely to receive code citations. (Doc. 240 at 16). Nocco takes a much narrower view, arguing, for example, that the incidents involving a breach of Deegan's fence line in June 2018 and the banging on Jones' windows were limited instances. (Doc. 219 at 24–26). Nocco's contention is unpersuasive. *See In re N.Y. City Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 402 (S.D.N.Y. 2021) ("Defendants do not cite a single case requiring this [c]ourt to narrow its view of the *Monell* claim to a single, individual tactic employed by police. . . ."). Overall, as with the above factual matters, I find that there are disputed issues of material fact as to whether the challenged visits were sufficiently similar in nature.

### B.

In their operative complaint, the Plaintiffs alleged that Nocco "burdened" their associative rights under the First Amendment through his "formal policy of systematically targeting" listed individuals, along with their friends and family, for increased enforcement. (Doc. 41 at 47–48). The Plaintiffs averred that this enhanced scrutiny and repeated harassment by Nocco was aimed at securing the family and friends' compliance with the PCSO's demands for information and access to the listed individuals and was tantamount to imposing guilt by association. *Id*. The Plaintiffs

also argue in their summary judgment motion that these actions taken by Nocco impermissibly interfered with Heilman, Deegan, and Jones's relationships with their children and Taylor's relationship with a "close family friend" with whom she resided at one point.  (Doc. 224 at 32–35).

To prevail on this claim, the Plaintiffs must show as a threshold matter that their relationships with their family and friends were protected under the First Amendment. *McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th Cir. 1994).  Pertinent to that issue, the First Amendment shields from unwarranted state interference "two different forms of association[:] 'intimate association' and 'expressive association.'"  *McCabe*, 12 F.3d at 1562–63 (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 617–618 (1984); *City of Dallas v. Stanglin*, 490 U.S. 609, 617–18 (1984)); *see also Fla. Action Comm. v. Seminole Cnty.*, 212 F. Supp. 3d 1213, 1227 (M.D. Fla. 2016) ("The First Amendment protects two categories of association: intimate association and expressive association.") (citing *Moore v. Tolbert*, 490 F. App'x 200, 203 (11th Cir. 2012) (per curiam)).  The former safeguards an individual's right to make choices to enter into and maintain certain "intimate human relationships," while the latter protects an individual's right to associate for the purpose of engaging in activities protected by the First Amendment—namely, speech, assembly, petition for the redress of grievances, and the exercise of religion.  *Stanglin*, 490 U.S. at 24 (citing *Roberts*, 468 U.S. at 617–18); *Fla. Action Comm.*, 212 F. Supp. 3d at 1227 (citing *Roberts*, 468 U.S. at 617–18).  Both of these types of association are considered to be a "fundamental" aspect of personal liberty.  *McCabe*, 12 F.3d at 1563 (citation omitted); *see also Bd. of Dirs. of Rotary Int'l v. Rotary*

*Club of Duarte*, 481 U.S. 537, 546 (1987) ("The Court has recognized that the freedom to enter into and carry on certain intimate or private relationships is a fundamental element of liberty[.]") (citation omitted).

Only the right of intimate association is implicated here, however. Under longstanding Supreme Court and Eleventh Circuit precedent, this right encompasses, at a minimum, "the personal relationships that attend the creation and sustenance of a family—marriage, childbirth, the raising and education of children, and cohabitation with one's relatives." *McCabe*, 12 F.3d at 1563 (citing *Roberts*, 468 U.S. at 619); *see also Parks v. City of Warner Robins, Ga.*, 43 F.3d 609, 615 (11th Cir. 1995) ("Included in this First Amendment right of association is the right to enter into certain intimate or private relationships, such as family relationships."). As the Supreme Court explained in *Roberts*:

> Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life. Among other things, therefore, they are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship. . . . Conversely, an association lacking these qualities—such as a large business enterprise—seems remote from the concerns giving rise to this constitutional protection.

*Roberts*, 468 U.S. at 619–20.

The *Roberts* Court further explained that "[b]etween these poles . . . lies a broad range of human relationships that may make greater or lesser claims to constitutional

protection from particular incursions by the State." *Id.* at 620.  It then went on to state that "[d]etermining the limits of state authority over an individual's freedom to enter into a particular association therefore unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." *Id.*  Applying the teachings *Roberts*, one court in this Circuit has observed that the relationships deserving of protection under the First Amendment's right of intimate association "will exhibit traits which are quantitatively and qualitatively more akin to familial relationships, such as congeniality, a shared purpose, smallness in size relative to the relationship's shared purpose, selectivity in entering into and maintaining the relationship, and seclusion from others in making decisions important to the relationship." *Fla. Action Comm.*, 212 F. Supp. 3d at 1227–28 (citing *Roberts*, 468 U.S. at 620; *Rotary Club of Duarte*, 481 U.S. at 546).

Importantly for purposes of this case, the Supreme Court has "not held that constitutional protection is restricted to relationships among family members." *Rotary Club of Duarte*, 481 U.S. at 545.  In fact, courts have "recognized both personal friendships and non-marital romantic relationships as the types of 'highly personal relationships' within the ambit of intimate associations contemplated by *Roberts*." *Anderson v. City of LaVergne*, 371 F.3d 879, 882 (6th Cir. 2004) (citation omitted).[19]  Of

___

[19] Consistent with this authority, the Eleventh Circuit held in a lawsuit decided one month before *Roberts* that "dating is a type of association which must be protected by the First Amendment's freedom of association."  *Wilson v. Taylor*, 733 F.2d 1539, 1544 (11th Cir. 1984), *abrogated on other grounds as noted in Scala v. City of Winter Park*, 116 F.3d 1396, 1402 (11th Cir. 1997).  More recently, in

note as well, one circuit court has concluded that a roommate relationship is deserving of protection under the First Amendment's right of intimate association. *See Fair Hous. Council of San Fernando Valley v. Roommate.com*, LLC, 666 F.3d 1216, 1221 (9th Cir. 2012) (finding that a "roommate relationship easily qualifies" for constitutional protection as "[p]eople generally have very few roommates; they are selective in choosing roommates; . . . non-roommates are excluded from the critical aspects of the relationship, such as using the living spaces[; and] roommates share living rooms, dining rooms, kitchens, bathrooms, [and] even bedrooms") (internal quotation marks omitted)).

The fact that a plaintiff has a protected relationship under the First Amendment does not end the inquiry, however.   In *McCabe*, the Eleventh Circuit found that a plaintiff must also demonstrate the challenged governmental action infringed that right.  *McCabe*, 12 F.3d at 1564 ("Since [the plaintiff] has established that her asserted right [to be married] is a fundamental constitutional right and that she suffered adverse employment action solely because she exercised that right, the question for us to determine is whether the adverse employment action was taken in such a way as to infringe her asserted right.").   The Eleventh Circuit additionally noted in *McCabe* that even if a plaintiff makes the requisite showing of infringement, the governmental entity

---

*Starling v. Bd. of Cnty. Comm'rs*, 602 F.3d 1257, 1261 (11th Cir. 2010), the Eleventh Circuit—in affirming a grant of summary judgment—declined to "address whether the First Amendment protect[ed] [an] intimate, extramarital association" between a fire department officer and his subordinate, concluding that even assuming such a right was fundamental, the county's interest in discouraging such affairs was so critical to the effective functioning of its fire department that it outweighed the officer's interest in his relationship with his work colleague. *Id.* at 1261.

at issue can nonetheless escape liability by establishing that the challenged policy or action was narrowly tailored to serve a compelling state interest.  *McCabe*, 12 F.3d at 1566 ("Generally speaking, when a government action or regulation burdens fundamental constitutional rights, [such as the right to marry or other intimate association rights,] the action or regulation is subjected to strict scrutiny and is therefore deemed to infringe those rights unless shown to be narrowly tailored to serve a compelling government interest.")  (citations omitted).

Here, Nocco does not meaningfully dispute that Heilman, Deegan, and Jones's relationships with their minor children constituted a protected relationship under the First Amendment.  *See* (Doc. 219 at 28–30); (Doc. 238 at 25–26); (Doc. 249 at 6); *see also Roberts*, 468 U.S. at 619 (stating that the First Amendment right of association encompasses "cohabitation with one's relatives") (citing *Moore v. E. Cleveland*, 431 U.S. 494, 503–04 (1977) (plurality opinion)); *McCabe*, 12 F.3d at 1563 ("At a minimum, the right of intimate association encompasses the personal relationships that attend the creation and sustenance of a family," including "the raising . . . of children."); *A.J. v. Lancaster Cnty.*, 2019 WL 5102156, at *6 (E.D. Pa. Oct. 11, 2019) ("Since '[f]amily relationships are the paradigmatic form of protected intimate associations,' parents' association with children is a relationship that triggers protection under the First Amendment.") (quoting *Winston v. Children & Youth Servs. of Del.*, 948 F.2d 1380, 1390 (3d Cir. 1991)) (internal citation omitted).  Nor does Nocco appear to quarrel with the Plaintiffs' assertion that Taylor's cohabitation with her roommate is likewise shielded by the First Amendment.  *See* (Doc. 219 at 28–30); (Doc. 238 at 25–26); (Doc. 249 at

6); *see also Roommate.com, LLC*, 666 F.3d at 1221.[20]   As such, he has waived any such

challenges.  *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir.

2012) ("[T]he failure to make arguments and cite authorities in support of an issue

waives it."), *overruled on other grounds in part by United States v. Durham*, 795 F.3d 1329,

1330 (11th Cir. 2015); *Mendoza v. U.S. Att'y. Gen.*, 327 F.3d 1283, 1286 n.3 (11th Cir.

2003) (finding an issue to be abandoned where no argument was made) (citations

omitted).

Nocco does, however, contest whether, and the extent to which, the ILP

Program interfered with the Plaintiffs' First Amendment right of intimate association.

(Doc. 219 at 29) (arguing that the Plaintiffs "have not demonstrated that their rights of

familial relationships have been interfered with to the point of being unconstitutional.

The mere fact that the parents of prolific offenders (or children with warrants) are

incidentally burdened by prolific offender checks is not an unconstitutional

infringement on such a right").  To bolster this contention, Nocco cites the Eleventh

---

[20] Other courts have construed the First Amendment right of intimate association more narrowly.  *See, e.g., Daywitt v. Minn. Dep't of Hum. Servs.*, 2018 WL 8224922, at *6 (D. Minn. Dec. 14, 2018) ("Courts are split as to whether a roommate or friendship relationship is entitled to constitutional protection.") (collecting cases), *report and recommendation adopted as modified by*, 2019 WL 1417451 (D. Minn. Mar. 29, 2019); *Berrios v. State Univ. of N.Y. at Stony Brook*, 518 F. Supp. 2d 409, 418 (E.D.N.Y. Oct. 10, 2007) ("[T]he right of intimate association encompasses the husband/wife relationship . . . , as well as the familial relationships between parents, siblings and children.  Where, however, the relationship sought to be protected falls outside of the familial arena, it has been held to be not similarly protected.") (internal citations omitted).  Some courts do not analyze the right of intimate association involving the parent-child relationship under the First Amendment at all.  *See Dabah v. Franklin*, 2022 WL 973834, at *4 (S.D.N.Y. Mar. 31, 2022) ("[C]ourts within this Circuit specifically addressing the right to intimate association vis-a-vis parent-child relationships have analyzed the right under the principles of substantive due process rather than the First Amendment."), *aff'd*, 2023 WL 3577872 (2d Cir. May 22, 2023).

Circuit's decision in *Parks v. City of Warner Robins, Ga.*, 43 F.3d 609 (11th Cir. 1995). In *Parks*, the plaintiff was a city police department supervisor who was engaged to marry another, more senior supervisor in the same department. *Id.* at 611–12. She was informed, however, that she could not keep her job if she proceeded with her wedding plans because of the city's anti-nepotism policy, which "prohibit[ed] relatives of city employees in supervisory positions from working in the same department." *Id.* The plaintiff filed suit, alleging, *inter alia*, that the "policy infringed her First Amendment right of intimate association by conditioning her employment on the nonassertion of her right to marry." *Id.* at 612. The district court awarded summary judgment to the city, and the plaintiff appealed. *Id.*

In affirming the district court's decision, the Eleventh Circuit rejected the plaintiff's First Amendment claim on the grounds the plaintiff failed to show that the city's anti-nepotism policy "directly and substantially interfere[d] with her right to marry." *Id.* at 616. The court derived support for its ruling from the Supreme Court's decision in *Lyng v. Int'l Union, United Auto., Aerospace and Agric. Implement Workers*, 485 U.S. 360 (1988). In that case, the Supreme Court held that a Food Stamp Act provision which denied increased food stamp benefits to families of striking workers did not violate the workers' right to associate with their families because it did not "'order' any individuals not to dine together[;] nor [did] it in any other way 'directly and substantially' interfere with family living arrangements." *Id.* at 365–66 (quoting *Lyng v. Castillo*, 477 U.S. 635, 638 (1986)).

The Eleventh Circuit in *Parks* found that, as in *Lyng*, the city's "anti-nepotism policy d[id] not 'order' individuals not to marry, nor d[id] it 'directly and substantially' interfere with the right to marry." *Parks*, 43 F.3d at 616. While recognizing that "individuals forced by the [anti-nepotism] policy to leave their jobs may incur economic losses greater than the temporary denial of food stamp benefits" in *Lyng*, the court in *Parks* concluded that because the "policy d[id] not prevent [a spouse in the plaintiff's position] from working in another department or outside the [city's] municipal government, . . . it [was] unlikely that the policy [would] actually prevent affected couples from marrying." *Id*. In this respect, the *Parks* court deemed the anti-nepotism policy to be similar to the food stamp provision in *Lyng*, for which the Supreme Court concluded: "Even if isolated instances can be found in which a striking individual may have left the other members of the household in order to increase their allotment of food stamps, 'in the overwhelming majority of cases [the statute] probably has no effect at all.'" *Id.* (quoting *Lyng*, 485 U.S. at 365). As a result, the court in *Parks* held that the anti-nepotism policy did not infringe upon the plaintiff's First Amendment right of intimate association. *Id.*[21]

---

[21] The Sixth Circuit apparently employs a similar approach to claims involving the First Amendment right of intimate association. *See Beecham v. Henderson Cnty., Tenn.*, 422 F.3d 372, 376 (6th Cir. 2005) ("Government action that has a direct and substantial influence on intimate association receives heightened review. Government action is deemed to have direct and substantial burdens on intimate association only where a large portion of those affected by the rule are absolutely or largely prevented from [forming intimate associations], or where those affected by the rule are absolutely or largely prevented from [forming intimate associations] with a large portion of the otherwise eligible population of [people with whom they could form intimate associations].") (internal quotation marks and citations omitted).

The Plaintiffs argue that the Court should apply a different standard than the one utilized in *Parks*, at least for the parents (i.e., Heilman, Deegan, and Jones). (Doc. 240 at 28–30). Citing the Eleventh Circuit's decision in *McCabe* and the Fifth Circuit's opinion in *St. Ann v. Palisi*, 495 U.S. 423 (5th Cir. 1974), the Plaintiffs maintain that the parents "need only show that they were *themselves* harmed when they were targeted by [the PCSO] based on their relationships with their children." (Doc. 240 at 28–29). The Plaintiffs ' contention is unavailing.

In *McCabe*, the plaintiff claimed that the defendants violated her constitutional right to freedom of association by transferring her from her job as a secretary to the police chief to a less desirable job on account of her marriage to a police officer working for the police chief. 12 F.3d at 1559–60.[22] There was no discussion in *McCabe* about the extent of the harm suffered by the plaintiff because the defendants "concede[d] on appeal that for purposes of [the court's] constitutional analysis[, the plaintiff had] suffered adverse employment action." *Id*. at 1560; *see also id*. at 1564 ("The evidence . . . demonstrates, and appellees do not contest [or show otherwise], that [the plaintiff] was demoted [to a position with diminished eligibility for salary increases, less responsibility, and more menial tasks] solely because she exercised her right to be

---

[22] *See McGuire v. Marshall*, 512 F. Supp. 3d 1189, 1233 (M.D. Ala. 2021) (commenting that "[i]n th[e Eleventh] Circuit, the First Amendment right to intimate association often has been invoked when public employees allegedly have been subject to a adverse employment action for their familial association with a certain person) (citing, *inter alia*, *Shahar v. Bowers*, 114 F.3d 1097 (11th Cir. 1997) (involving a claim that a woman's employment offer was revoked because she was married to another woman); *Cummings v. DeKalb Cnty.*, 24 F.3d 1349, 1354 (11th Cir. 1994) (rejecting an assertion of the right to intimate association when the plaintiffs could not establish that their association with a disfavored employee was entitled to special constitutional protection)).

married to [her husband.]").  The only issue the court had to address in *McCabe* was therefore "whether the district court properly found that [the plaintiff's] transfer, although burdening her constitutional right to be married, was nonetheless justified." *Id*. at 1569.  *McCabe* is thus of no help to the Plaintiffs here.

In *St. Ann*, the plaintiff brought a substantive due process challenge to a school board regulation that permitted school children to be suspended for their parents' misconduct.  495 F.2d at 424.  Notably, the plaintiff in *St. Ann* did not assert a First Amendment intimate association claim at all.  Moreover, the court found that the suspensions and school transfers meted out to the children constituted a "significant encroachment on a fundamental liberty guaranteed to them by the Fourth Amendment's due process clause—namely, the imposition of punishment based only upon personal guilt.  *Id*. at 425–27.  *St. Ann* therefore has no application to the Plaintiffs' First Amendment argument here either.

In light of the above analysis, I find that the Eleventh Circuit's decision in *Parks* provides the appropriate framework and that the Plaintiffs must establish that the ILP Program "directly and substantially" interfered with their First Amendment right of intimate association.  *Parks*, 43 F.3d at 616.  A careful review of the record reveals that there are disputed issues of material fact which preclude an award of summary judgment to either party on this question as well.

On one hand, there is evidence that the parent-Plaintiffs—Heilman, Deegan, and Jones—were all identified in AIM as being associates of their prolific offender children, with an emphasis being placed on code enforcement against Deegan and

Heilman and taking a code enforcement officer to Jones's home.  (Doc. 223 at 24–25, 44); (Doc. 239 at 10–11, 34).  Further, the Plaintiffs were visited roughly seventy to eighty times for prolific offender checks (Doc. 223 at 8, 10, 12–13), and Heilman, Deegan, and Jones received code citations from PCSO deputies.  (Doc. 223 at 43); (Doc. 239 at 33).

In addition, Heilman was also told by a STAR deputy after her first arrest that "[o]ur goal is to get you to do something to keep your kid from committing crime." (Doc. 223 at 58); (Doc. 239 at 46–47).  Heilman was similarly informed on another occasion that "[i]f people . . . [who] live in the house are committing crimes[,] . . . the direction we receive from our Sheriff's Office . . . is to go out there and for every single violation that person commits, to enforce it upon them."  (Doc. 223 at 31); (Doc. 239 at 20–21).  Deegan was likewise told that because her son, Tyler, was designated as a Top 5 Offender, deputies would be coming to Deegan's home—where Tyler also resided—to "ensure that all the laws . . . and the ordinances [were] being followed." (Doc. 223 at 32).  And, during one of Jones's arrests, he was advised—as discussed earlier—that the deputies are "talking about parenting issues.  You've done little or nothing to help out with this situation, while your kid runs around here victimizing people.  That's why . . . all this is today.  And we'll just continue on this shit[ ] because you're messing around with an aggressive sheriff.  Sheriff Nocco is not playing games, and that's the bottom line."  (Doc. 223 at 32, 80); (Doc. 239 at 21, 68).

With respect to Taylor, she was reviewed as a Top 5 Offender at an AIM, and the PCSO deputies were told that she had been warned about ordinance violations at

her home.  (Doc. 223 at 44); (Doc. 239 at 34).  Further, a code enforcement corporal visited the address where Taylor was staying with a family friend to look for code violations.  (Doc. 223 at 43); (Doc. 239 at 33).  In addition, a PCSO deputy's visit to that address led the close family friend to suggest to the deputy that she would throw Taylor out of the house to avoid subsequent visits.  (Doc. 223 at 49); (Doc. 239 at 35–36).  The deputy replied that he was "just trying to do [his] job."  (Doc. 223 at 49); (Doc. 239 at 35–36).  Soon thereafter, Taylor moved out because the visits persisted. (Doc. 223 at 51); (Doc. 239 at 38).

Along with this evidence, Jones and Heilman were both reported to child protective services following interactions with the PCSO, interactions which Jones and Heilman maintain were connected to the ILP Program.  (Doc. 223 at 26–27); (Doc. 239 at 14–15); (Doc. 224 at 28).  Indeed, Heilman was told that the deputy was making the report "as a big fuck you" to her.  (Doc. 223 at 26–27); (Doc. 239 at 14–15).

On the other hand, Nocco cites record evidence that undermines a finding of a causal link.  By way of example, the PCSO responded to calls to assist the Heilman residence "when the family members were committing crimes against one another, which would also presumably account for damaged relationships."  (Doc. 239 at 52). Deegan also called the PCSO "to complain about criminal activity by [her son] that caused a deputy response."  (Doc. 239 at 59).  Moreover, there is evidence of "strife within [Jones's] residence caused by the criminal activity there," and "there were many calls for service from inside the residence concerning domestic incidents or threats amongst family members, including as between [Jones] and his son."  (Doc.

239 at 69–70); (Doc. 223 at 116–17).  As for Taylor, Nocco points to the fact that there is no evidence that her roommate ever received a code citation and that Taylor cannot now claim that such enforcement resulted in any harm to her relationship.  (Doc. 239 at 36–38).

There is additionally a genuine issue of disputed fact pertaining to the harm allegedly suffered by the Plaintiffs as a result of any infringement of their right of intimate association.  For their part, the Plaintiffs' assert that their relationships were damaged by the visits from the PCSO.  (Doc. 223 at 51) (Taylor's "relationship with the close family friend with whom she living was damaged as a result of [the PCSO's] visits."); *id.* at 63 (same as to Heilman's relationship with her sons); *id.* at 72 (same as to Deegan's relationship with her son); *id.* at 82 (same as to Jones's relationship with his son) (Doc.  226 at 4); (Doc. 227 at 8); (Doc. 228 at 6); (Doc. 231 at 6–8).  By way of example, the Plaintiffs emphasize that Donnie McDougall was "kicked out" by his stepfather.  (Doc. 225-68 at 2); (Doc. 223 at 63).

For his part, Nocco counters that many of the visits were not prolific offender checks or ILP-related and that the Plaintiffs make no claim for noneconomic losses.  (Doc. 239 at 38, 52, 59, 69–70).  This issue must therefore be decided by the trier of fact.

That the underlying code citations and arrests may be otherwise justifiable does not entitle Nocco to summary judgment on the matter.  This is because a fact finder could still infer that those citations and arrests constituted a form of retaliation by the PCSO against Heilman, Deegan, and Jones for their children's criminal conduct and

against Taylor for her own illicit activity.  *See Eisenberg v. City of Miami Beach*, 54 F. Supp. 3d 1312, 1323 (S.D. Fla. 2014) ("Although the [c]ity contends its conduct was lawful, such 'lawful conduct' does not preclude [the p]laintiffs' claim where 'a retaliatory motive can be inferred from a sequence of events, notwithstanding other non-retaliatory motives . . . the defendant may have.") (citations omitted).

<h2 style="text-align:center">C.</h2>

The Plaintiffs' next claim is that Nocco's "policy and custom of listing targeted persons without notice or a hearing" violated the Plaintiffs' Fourteenth Amendment right to procedural due process.  (Doc. 224 at 42); (Doc. 41 at 49–50).[23]  The gist of this claim is that being classified as a prolific offender was "akin to being on probation—albeit for a future offense" (Doc. 224 at 43)—and that such a designation therefore had to "be preceded . . . by notice and [an] opportunity to be heard" (Doc. 240 at 31–32); *see also* (Doc. 224 at 43–44).  Nocco contends that this claim is both factually and legally infirm.  (Doc. 219 at 28, 30–34); (Doc. 238 at 6–7, 26).

The Fourteenth Amendment provides that no state shall deprive a person of life, liberty, or property without due process of law.  U.S. Const. amend. XIV, § 1.  As a

---

[23] The Plaintiffs bring their procedural due process claim only on behalf of Heilman, Jones, and Taylor, but not Deegan.  (Doc. 240 at 31 n.18).  In response, Nocco summarily asserts—without citing any authority—that only Taylor "has standing to challenge notice and opportunity to be heard" on the theory that she is the sole Plaintiff who "was ever a prolific offender."  (Doc. 219 at 32).  The Plaintiffs counter—in a footnote no less—that Heilman and Jones "were entitled to a hearing because their children were minors at the time they were listed."  *See* (Doc. 240 at 31 n.18) (citing *Mueller v. Auker*, 576 F.3d 979, 995 (9th Cir. 2009), in which the Ninth Circuit stated that "[p]arents generally have a procedural right to a judicial hearing if the State seeks to compel their minor child to undergo a medical treatment over their objection").  In light of the paltry briefing on this question, I do not attempt to resolve this matter here.

result, a state generally must afford "fair procedures and an impartial decisionmaker before infringing on a person's interest in life, liberty, or property." *McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir. 1994). The "fundamental requirement" in this respect "is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). While this typically means an opportunity to be heard must be supplied before the deprivation occurs, *see, e.g.*, *Goss v. Lopez*, 419 U.S. 565, 582–83 (1975); *Reams v. Irvin*, 561 F.3d 1258, 1263 (11th Cir. 2009), a governmental entity sometimes has an interest in acting more swiftly. When that occurs, the opportunity to be heard must be provided "as soon as practicable." *Goss*, 419 U.S. at 583.

"A [section] 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *J.R. v. Hansen*, 736 F.3d 959, 965 (11th Cir. 2013) (citation omitted). As I have already discussed the concept of state action under *Monell*, I will focus on the first and third elements here.

Starting with the first element, the initial "inquiry in every due process challenge is whether [a] plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citing, *inter alia*, *Mathews*, 424 U.S. at 332). "Only after finding the deprivation of [such] a protected interest do[es a court] look to see if the [s]tate's procedures comport[ed] with due

process." *Id.*; *see also Bldg. Empowerment by Stopping Trafficking, Inc. v. Jacobo*, 2013 WL 5435729, at *3 (S.D. Fla. Sept. 27, 2013) (noting that absent a deprivation of a constitutionally protected liberty or property interest, "there can be no denial of due process").

In *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972), the Supreme Court observed that while "'[l]iberty' and 'property' are broad and majestic terms," the "range of interests" they encompass are "not infinite" and are instead subject to "certain boundaries." *Id.* at 570–72. The Court defined the term "liberty" interests as clearly denoting "freedom from bodily restraint, [as well as] the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." *Id.* at 572 (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)).

The Court in *Roth* characterized protected property interests, by contrast, as "interests that a person has already acquired in specific benefits." *Id.* at 576. These interests, the Court explained, do not emanate from the Constitution but rather are created and circumscribed "by existing rules or understandings that stem from an independent source such as state law." *Id.* at 577. The Court cautioned, however, that "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it . . . or a unilateral expectation of it"—he must "have a legitimate claim of entitlement to it." *Id.*

As for the third element, where a plaintiff has shown a deprivation of a right protected by the due process clause and that the deprivation was caused by the state, a court must then assess "whether the available state procedures were adequate to correct the alleged procedural deficiencies." *Cotton v. Jackson*, 216 F.3d 1328, 1331 (11th Cir. 2000). "If adequate state remedies were available but the plaintiff failed to take advantage of them, the plaintiff cannot rely on that failure to claim that the state deprived him of procedural due process." *Id.* "To be adequate, . . . the state procedure must be able to correct whatever deficiencies exist and to provide [the] plaintiff with whatever process is due." *Id.*

In determining the contours of the due process needed, courts apply the balancing test set forth in *Mathews*. *See Catron v. City of St. Petersburg*, 658 F.3d 1260, 1267 (11th Cir. 2011). That test "generally requires consideration of three distinct factors." *Mathews*, 424 U.S. at 334–35.

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335.

In the end, "'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (quoting *Cafeteria & Rest. Workers v. McElroy*, 367 U.S. 886, 895 (1961)). Instead, it "is flexible and calls for such procedural protections as the

particular situation demands.'" *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

With these principles in mind, I turn to the elements necessary to sustain the Plaintiffs' procedural due process claim under section 1983. With respect to the first element, the Plaintiffs averred in their operative complaint that the "liberty interests" upon which they relied are, "[a]mong other things," the freedom from a "policy and custom of harassment in violation of their Fourth Amendment rights" and from "a distinct legal regime that alters and limits the enforcement discretion of deputies and prosecutors." (Doc. 41 at 50); *cf. Nunez v. City of Los Angeles*, 147 F.3d 867, 873 (9th Cir. 1998) ("There is no general liberty interest in being free from capricious government action."). In their summary judgment motion, however, the Plaintiffs redefined their liberty interests as the "right to be at peace in their own homes—or, in other words, to be free from unreasonable searches and seizures, to be free from punishment for the misdeeds (actual or predicted) of others, and to be free from pretextual and abusive government conduct." (Doc. 224 at 43–44). Importantly, the Plaintiffs did not articulate in their summary judgment motion how these asserted liberty interests fit within the framework announced in *Roth*, nor did they direct the Court to decisions which specifically recognized these identified interests in the context of a procedural due process claim.

In their response to Nocco's summary judgment motion, the Plaintiffs reframed their protected liberty interests once again, this time to include "the right to be free from intrusion on their property," (Doc. 240 at 30) (citing *Jardines*, 569 U.S. at 10); the

right to an "expectation of privacy," *id.* (citing *Katz v. United States*, 389 U.S. 347 (1967)); the "right not to be penalized for the wrongdoing of others," *id.* (citing *Singleton v. Cecil*, 155 F.3d 983 (8th Cir. 1998)), and the right to "establish a home," *id.* (citing *Roth*, 408 U.S. at 572).  While the Plaintiffs offered case authority to support each of their asserted liberty interests, most of those decisions did not explicitly buttress their position.[24]  The only opinion they did cite that appears to actually bolster the claimed liberty interest is *Roth*, in which the Supreme Court expressly recognized that the right to establish a home encompasses a liberty interest for purposes of procedural due process.  *See Roth*, 408 U.S. at 570–72.

Irrespective of this deficiencies, disputed issues of fact abound—for the reasons stated previously—as to whether the Plaintiffs were deprived of procedural due process at least with respect to their right to establish a home and whether the PCSO had a custom or pattern that caused that deprivation.  This alone is sufficient to defeat the parties' cross motions for summary judgment on this count.

In light of this finding, I need not address the potentially more involved question of what process the Plaintiffs were due, if any, under *Mathews*'s tri-part test.  I note only that there appears, at a minimum, to be a factual dispute as to whether the

---

[24] At one point in their response to Nocco's summary judgment, the Plaintiffs seemingly assert that their protected "property" interests are implicated by Nocco's ILP Program as well.  (Doc. 240 at 30). This argument is unsupported.  The Plaintiffs did not plead any protected "property" interests in their operative complaint.  (Doc. 41).  Moreover, as explained earlier, protected property interests are not created by the Constitution but are derived from "existing rules or understandings that stem from an independent source such as state law." *Roth*, 408 U.S. at 576.  The Plaintiffs conspicuously fail to delineate any such independent source in their filings.

Plaintiffs received adequate notice of the prolific offender designation. *Compare* (Doc. 223 at 45, 53, 65, 73), (Doc. 224 at 44), (Doc. 227 at 7), (Doc. 228 at 5–6), (Doc. 231 at 6), (Doc. 239 at 25–26, 35, 40, 53–54, 60–61), (Doc. 240 at 32 n.19) (averring that after this lawsuit was filed, Nocco—apparently for the first time—"sent letters to prolific offenders advising of their designation"), *and* (Doc. 241-1), *with* (Doc. 219 at 32) (arguing that the "Plaintiffs did receive at least some notice of the substance of" the challenged designation), (Doc. 238 at 26 n.11) (claiming that "the record shows to varying degrees that the Plaintiffs or their children were told of [their] designation"), (Doc. 239 at 7–8, 35, 40, 60–61), (Doc. 241-1), *and* (Doc. 154).

D.

The Plaintiffs' next claim is that Nocco's ILP Program violated their right to substantive due process. (Doc. 224 at 37–40). Nocco takes the opposite position. (Doc. 219 at 35–36).

Substantive due process protects rights that "are fundamental, that is, rights that are implicit in the concept of ordered liberty." *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)). To succeed on a substantive due process claim under section 1983, a plaintiff must prove (1) "a deprivation of a constitutionally protected interest;" and (2) "the deprivation was the result of an abuse of governmental power sufficient to raise an ordinary tort to the stature of a constitutional violation." *Hoefling v. City of Miami*, 811 F.3d 1271, 1282 (11th Cir. 2016).

In addressing the first prong, courts start by crafting a "'careful description of the asserted right.'" *Morrissey v. United States*, 871 F.3d 1260, 1269 (11th Cir. 2017) (quoting *Doe v. Moore*, 410 F.3d 1337, 1343 (11th Cir. 2005)).  Courts then determine whether the asserted right is "one of 'those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Id.* (quoting *Moore*, 410 F.3d at 1343).

Even "[w]here a fundamental liberty interest does not exist, substantive due process nonetheless protects against the arbitrary and oppressive exercise of government power." *Waldman v. Conway*, 871 F.3d 1283, 1292 (11th Cir. 2017) (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998)).[25]  "Executive action is arbitrary in a constitutional sense when it 'shocks the conscience.'" *Id.* (quoting *Lewis*, 523 U.S. at 846).  This is "a high bar" and is met only when "the most egregious official conduct" is involved.  *Maddox v. Stephens*, 727 F.3d 1109, 1119 (11th Cir. 2013) (quoting *Lewis*, 523 U.S. at 846) (internal quotation marks omitted); *Littlejohn v. Sch. Bd. of Leon Cnty.*, 647 F. Supp. 3d 1271, 1279 (N.D. Fla. 2022) ("The Eleventh Circuit has indicated that only 'extraordinary circumstances,' involving the 'most egregious' government conduct, can be considered conscience shocking as defined by binding case law.") (quoting *Nix v. Franklin Cty. Sch. Dist.*, 311 F.3d 1373, 1379 (11th Cir.

---

[25] If a fundamental right is implicated, the challenged action is subject to strict scrutiny.  *See Doe v. Moore*, 410 F.3d 1337, 1342–43 (11th Cir. 2005).  Otherwise, it is subject to only rational basis review.  *Id.* at 1345.

2002); *Maddox*, 727 F.3d at 1119).  "[E]ven intentional wrongs seldom" satisfy this standard.  *Waddell v. Hendry Cnty. Sheriff's Off.*, 329 F.3d 1300, 1305 (11th Cir. 2003).  Actions taken by a state actor which are "intended to injure in some way that is unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level," and courts must engage in an "exact analysis of [the] circumstances before any abuse of power is condemned as conscience shocking[.]"  *Maddox*, 727 F.3d at 1119.  Furthermore,  determinations as to what constitutes egregious conduct "must not be made in the glow of hindsight."  *Id*.  Rather, they "must be egregious—that is, shock the conscience—at the time the government actor made the decision."  *Id*.

Ultimately, "the measure of what is conscience shocking is no calibrated yard stick[.]"  *Waldron v. Spicher*, 954 F.3d 1297, 1306 (11th Cir. 2020) (quoting *Lewis*, 523 U.S. at 847).  "Context and the circumstances are significant, and the level of culpability required can vary with the context."  *Id*. (citing *Lewis*, 523 U.S. at 849–54).

Several other points bear mentioning as well.  First, "substantive due process rights are created only by the Constitution."  *McKinney*, 20 F.3d at 1556 (internal quotation marks and citation omitted); *see also Hillcrest Prop., LLP v. Pasco Cnty.*, 915 F.3d 1292, 1297 (11th Cir. 2019) ("As we made clear in *McKinney*, fundamental rights in the constitutional sense do not include 'state-created rights.'").  Second, "where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process' must be the guide for analyzing these

84

claims." *Lewis*, 523 U.S. at 842 (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994));
*see also Graham v. Connor*, 490 U.S. 386, 395 (1989); *Echols v. Lawton*, 913 F.3d 1313,
1326 (11th Cir. 2019). And third, courts must approach substantive due process claims
with great caution. *See Maddox*, 727 F.3d at 1120. In fact, the Supreme Court has
warned courts not to expand the concept of substantive due process because the
"guideposts for responsible decision[ ]making in this uncharted area are scarce and
open-ended" and "judicial self-restraint requires [courts] to exercise the utmost care."
*Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).

Against this backdrop, I commence my analysis by attempting to formulate a
"careful description of the [Plaintiffs'] asserted [substantive due process]
right[s]." *Morrissey*, 871 F.3d at 1269. The Plaintiffs do not make this task easy. In
their submissions, the Plaintiffs averred that their substantive due process count is
predicated upon two separate rights. (Doc. 224 at 44–47). As to the first of these, they
alternately characterized it as the "fundamental right to be free from guilt by
association" (Doc. 247 at 13), the fundamental right to be free from punishment or
civil liability "based on mere association" (Doc. 247 at 13–14), "the fundamental right
to be free from punishment for the misdeeds of others," in particular, "the[ir]
children," (Doc. 224 at 44–45), and the fundamental right to be free from "future
wrongdoing or the past wrongdoing of others" (Doc. 240 at 32–33). The Plaintiffs
described the second right as the right to be free from "arbitrary" and "pretextual"
enforcement that is "designed to harass." (Doc. 224 at 44, 46–47). Neither of these
alleged rights survives scrutiny.

The threshold problem with the Plaintiffs' first asserted right is that it is not sufficiently specific or consistently delineated.   Indeed, each of the variants the Plaintiffs set forth in their filings appears to be dissimilar in some respect.   To illustrate the significance of the differences between them, were the Court to construe the Plaintiffs' first claimed right as the right to be free from guilt by association (as the Plaintiffs propose at one point), that right would seemingly fall within the ambit of the First Amendment and thus not be cognizable under the substantive due process framework.   *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 918–19 (1982) ("The First Amendment . . . restricts the ability of the State to impose liability on an individual solely because of his association with another.").   The Plaintiffs do not cite this authority, much less show how it does not apply.   The fact that the Plaintiffs do not define their first alleged right with the requisite level of clarity counsels in favor of denying this part of their substantive due process claim.

Even if the Court deems the Plaintiffs' first asserted right to be the right to be free from punishment for the wrongdoing of others, "*specifically,* [their] children" (Doc. 224 at 45) (emphasis added), I would still have concerns.   To buttress their contention that this constitutes a fundamental right, the Plaintiffs primarily rely again on *St. Ann v. Palisi*, 495 F.2d 423 (5th Cir. 1974).   (Doc. 224 at 45).   Recall that in *St. Ann*, the court ruled that a school board regulation which allowed school children to be suspended for their parents' misconduct infringed upon the children's right to be punished based solely on their own personal guilt.   *St. Ann*, 495 F.2d at 425.   The court in *St. Ann* suggested, however, that there is a distinction between laws which cause

children to pay for the sins of their parents and those that make parents liable for their offspring. *Id*. at 428. As to the latter scenario, the court observed that "parent[s] arguably ha[ve] the power and duty to control [their] children." *Id.*

Irrespective of this issue, not all legal burdens are "punishments," and only "true punishments" require heightened scrutiny under a substantive due process analysis. *See Cook v. Stewart*, 2014 WL 12521335, at *5 (N.D. Fla. Apr. 22, 2014). As one court has observed, the types of punishment that historically fall into this category are either "criminal in nature" or, "as in *St. Ann*, involve[ ] the special case of burdens imposed on children for their parents' conduct." *Id*. (citing *Scales v. United States*, 367 U.S. 203, 224–25 (1961); *In re Alien Children Ed. Litig.*, 501 F. Supp. 544, 573 (S.D. Tex. 1980), *aff'd sub nom. Plyler v. Doe*, 457 U.S. 202 (1982)).

Here, it appears that the "true punishments" which the Plaintiffs claim they suffered were the code citations and the arrests of Heilman and Jones. The code citations, however, were not imposed on the Plaintiffs for actions beyond their control. Rather, they were predicated—at least in part—on the Plaintiffs' violation of county ordinances and thus "bear some relationship to individual responsibility or wrongdoing." *St. Ann*, 495 F.2d at 426.

The same can be said of the arrests of Heilman and Jones. *See* (Doc. 247 at 13). While an arrest might rise to the level of a "true punishment," the Plaintiffs do not meaningfully dispute that these arrests were properly supported. *See* (Doc. 240 at 15

n.2, 22 n.9) (asserting that the Plaintiffs were not raising a "false arrest" argument); (Doc. 269 at 24) (same).  And Heilman's arrests are *Heck*-barred in any event.

Even were the Plaintiffs able to overcome these infirmities, they would still have to demonstrate that the PCSO's challenged conduct shocked the conscience.  In an effort to make such a showing, the Plaintiffs contend that Nocco kept notes about the Plaintiffs' private lives, shined lights in their homes, banged on windows, peered through and scaled fences, arrested the Plaintiffs repeatedly, and targeted them for heightened code enforcement. (Doc. 240 at 34–35).  This argument is unavailing.

I note as an initial matter that to the extent these allegations are covered by the Fourth Amendment, they cannot serve as a basis for the Plaintiffs' substantive due process claim.  *See Lewis*, 523 U.S. at 842 ("[W]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process' must be the guide for analyzing these claims.").  Regardless, there is little, if any, evidence that when the ILP Program was implemented, it was "intended to injure [the listed individuals] in some way *that is unjustifiable by any government interest*."  *Maddox*, 727 F.3d at 1119 (emphasis added).  I am persuaded in this respect by the ILP Manual's language describing the Program as intending to prevent crime, by the Program's distribution of resource guides to those individuals the PCSO deputies visited during checks, and by the neutral or even positive interactions the Plaintiffs themselves had with deputies.  *See* (Doc. 225-1 at 3, 19, 78); (Ex. 19 at 5:6-12);  (Doc. 154); (Doc. 225-87); (Doc. 225-19 at 5); *see also*  (Doc. 223 at

96); (Doc. 245 at 22).   Moreover, the apparent propriety of at least some of the encounters  between the Plaintiffs and the deputies undermines a finding of egregious behavior, as does the conflicting evidence indicating that there were other reasons for the deputies' visits to the Plaintiffs' homes.   While some incidents could be viewed as upsetting, like the ones involving the deputies' use of profanity or child protective services, *see, e.g.*, (Doc. 223 at 26–27, 29, 53, 60–62, 66, 70, 74); (Doc. 239 at 14–15, 20, 40, 48–49, 54–55, 58, 61), they do not rise to the level of conscience shocking conduct.   A survey of the case law bolsters this conclusion.   *See, e.g., Peterson v. Baker*, 504 F.3d 1331, 1337, 1340 (11th Cir. 2007) (finding a teacher choking a "defiant" student did not rise to the level of conscience shocking); *Lee v. Hutson*, 810 F.2d 1030, 1032 (11th Cir. 1987) (stating that conscience shocking behavior is that which is "brutal" and "offend[s] even hardened sensibilities"); *see also Littlejohn*, 647 F. Supp. 3d at 1277–81 (collecting cases).

The Plaintiffs' contention that the shock the conscience test does not apply here (Doc. 240 at 3–34) is likewise unconvincing.   Although there is case authority that this standard has "no place in a civil case for money damages," *McKinney*, 20 F.3d at 1556 n.7,[26] the Plaintiffs also seek declaratory and injunctive relief.   (Docs. 41, 224). Moreover, the Eleventh Circuit has, in the time since *McKinney*, applied the shock the conscience standard in a section 1983 action seeking *only* damages.   *Nix v. Franklin Cnty. Sch. Dist.*, 311 F.3d 1373 (11th Cir. 2002).

---

[26] Citing *McKinney*, the court in *Pasco CWHIP Partners, LLC v. Pasco Cnty.*, 2014 WL 3805667, at *2 n.1 (M.D. Fla. Aug. 1, 2014) (Merryday, J.) referenced this proposition in dicta.

Turning to the second component of the Plaintiffs' substantive due process claim, while also not a model of clarity, it seems to be based on the central allegation that Nocco "arbitrar[ily,]" "pretextual[ly,]" and deliberately harassed them through the ILP program to drive them out of their homes.  (Doc. 224 at 46–47).  To bolster this portion of their substantive due process claim, the Plaintiffs largely rely on two Eleventh Circuit decisions from several decades ago, *Espanola Way Corp. v. Meyerson*, 690 F.2d 827 (11th Cir. 1982) and *Post v. City of Ft. Lauderdale*, 7 F.3d 1552 (11th Cir. 1993), *opinion modified*, 14 F.3d 583 (11th Cir. 1994).  *Id.*

In *Espanola Way*, city commissioners in Miami Beach were alleged to have formed and expressly ordered a task force of building code and fire inspectors to harass local hotels by writing "numerous and burdensome" violations as a means of driving the hotels out of business.  690 F.2d at 828.  The reason the Commissioners purportedly implemented this plan was to address a "great influx of Cuban refugees" which "contained a large criminal element."  *Id.*  The plaintiff in the case, a hotel owner, asserted that the task force issued it hundreds of "unwarranted" citations that caused, *inter alia*, "a serious loss to the hotel," "bad publicity," and a "characterization of the hotel as a slum and a haven for criminals."  *Id.* at 828–29.

In deciding whether the Commissioners were entitled to qualified immunity on the grounds they were engaging in legislative activity, the Eleventh Circuit found the complaint adequately pleaded a section 1983 claim "that the Commissioners [were] taking [the plaintiff's] property in violation of due process of law."  *Id.* at 829.  Noting the sparse factual record before it and the fact that Commissioners did not actually

90

assert qualified immunity, the court concluded that these officials were not due summary judgment.  *Id.* at 830.

In *Post*, the city commissioner for Fort Lauderdale allegedly orchestrated a efforts by a "code team" to visit a restaurant that supported a candidate who ran against the commissioner.  7 F.3d at 1555.  The code team subsequently cited the restaurant owner, Post, on multiple occasions for exceeding the occupancy limit, and the owner was eventually arrested for violating the building code.  *Id.* at 1555–56.  The owner sued, asserting—as pertinent here—a deprivation of her procedural due process rights against all the defendants in the action.  *Id.* at 1556, 1560.  The district court denied the defendants' motion for summary judgment on that claim based on qualified immunity, and the Eleventh Circuit reversed.  In doing so, the court distinguished *Espanola Way*, stating:

> We have a different record in this case.  [Unlike in *Espanola Way*, t]he code team's acts were not *plainly unwarranted*.  From what plaintiffs have said, a code team could have reasonably believed that the max [occupancy] cap notices were justified.  And, someone like [the police officer who arrested the owner] could have reasonably believed he could arrest [the owner] because [the restaurant] was still over the max cap after having received three notices in a row. Plaintiffs claim defendants deliberately used the code team to try to ruin [the owner].  Even if this subjective motivation were true, no facts show the code team's objective conduct in inspecting for violations, issuing citations, or making arrests was *plainly unjustified*.  *Cf. United States v. Edenfield*, 995 F.2d 197 (11th Cir. 1993) (whether police violated due process turns on evidence of "outrageous misconduct," not evidence of officer's motive for investigating defendants).

*Id.* at 1560 (emphasis added).

*Espanola Way* and *Post*—both of which revolved around matter of qualified immunity—are of no help to the Plaintiffs here.  To start, it is not clear whether *Espanola Way* involved a procedural or substantive due process claim.  The fact that the court construed it as one pertaining to the "taking" of the plaintiff's "property," *Espanola Way*, 690 F.2d at 829, suggests that it was the former.  *See Sanders v. Henry Cnty., Ga.*, 484 Fed. App'x. 395, 398 (11th Cir. 2012) ("A substantive due process claim predicated on arbitrary and irrational deprivation of a property interest should be treated as a procedural due process claim.") (citing *Greenbriar Vill., L.L.C. v. Mountain Brook, City*, 345 F.3d 1258, 1263 n.4 (11th Cir. 2003)).

Furthermore, *Espanola Way* involved legislative, not executive action, which is the conduct at issue here.  And the Eleventh Circuit has made clear that "[e]xecutive action is arbitrary in a constitutional sense when it 'shocks the conscience.'" *Waldman*, 871 F.3d at 1292 (quoting *Lewis*, 523 U.S. at 846).

And finally, the code citations in *Espanola Way* were deemed to be "unwarranted" or, as Eleventh Circuit characterized them in *Post*, "plainly unwarranted." *Espanola Way*, 690 F.2d at 829–30; *Post*, 7 F.3d at 1560.  The same is not alleged to be the situation here.

As for *Post*, it is clear that action involved a procedural due process claim, not a substantive one.  7 F.3d at 1560.  This distinction alone renders it inapposite.  Even were not the case, the court in *Post* focused on the "code team's *objective* conduct" and not its "subjective motivation[s]," *id*. at 1560 (emphasis added), which is what the

Plaintiffs urge the Court to do here (Doc. 224 at 46) (asserting that the PCSO had "wrongful enforcement motives").  In addition, the standard the court applied in *Post* required that the violations, citations, and arrests be "plainly unjustified."  *Post*, 7 F.3d at 1560.[27]

The other decision upon which the Plaintiffs relied in their summary judgment motion—*Beach Blitz Co. v. City of Miami Beach*, 2018 WL 11260453 (S.D. Fla. Feb. 5, 2018)—is similarly unhelpful.  (Doc. 224 at 46–47).  In *Beach Blitz*, the plaintiff asserted a substantive due process claim predicated on the averment that the city of Miami Beach's suspension of the plaintiff's occupational license under a challenged code and ordinance "deprive[d the p]laintiff of the liberty and/or property interest in retaining such license, conduct[ing] sales of alcohol[,] . . . and/or receiv[ing] income . . . without any hearing or proceedings." *Beach Blitz*, 2018 WL 11260453, at *6.  The court rejected this claim, finding that two of the plaintiff's asserted rights (to retain its license and to run its business and derive income) were not protected at all under substantive due process.  *Id*. at 6–7.  As for the plaintiff's remaining contention that the ordinance's limitation on the sale of alcoholic beverages amounted to an "unreasonable and unconstitutional taking," the court considered that allegation actionable under the theory that substantive due process generally protects a person from arbitrary and irrational legislative action.  *Id*. at *7.  The court then rejected this claim as well. *Id.*

---

[27] It is true—as the Plaintiffs point out (Doc. 224 at 46)—that the court in *Post* stated in passing that "[i]ssuing an unreasonably high number of fully warranted citations might violate due process." *Post*, 7 F.3d at 1560.  It is fair to assume, however, that the court was referring to only procedural due process.  Regardless, the remark constitutes dicta.

Even assuming that *Espanola Way*, *Post*, and *Beach Blitz* have some relevance here, they cut against the Plaintiffs' substantive due process claim based on the PCSO's allegedly arbitrary, pretextual, and deliberately harassing conduct.  Beginning with the ILP Manual, that document encouraged deputies to maintain strategic relationships with County Code Enforcement and to "[u]tilize County Ordinance citations as a strategic tool to target prolific offenders and problem locations within the STAR box." (Doc. 223 at 39); (Doc. 225-2 at 9); (Doc. 239 at 32–33).  It also encouraged the deputies to "[c]oordinate missions with . . . Code Enforcement to conduct STAR box Code Enforcement blitzes." (Doc. 225-2 at 9).  In addition, the ILP Directive included performance expectations that deputies were to assess locations "for the existence of county code violations, *and when applicable*, cite the owner/tenant." (Doc. 223 at 40); (Doc. 225-32); (Doc. 239 at 32–33).  Nothing in these materials required that "plainly unwarranted" code citations be issued.  *Post*, 7 F.3d at 1560.

In an attempt to convince the Court to find otherwise, the Plaintiffs point to an email in which a PCSO official states "[i]f we can['t] get them to stop criminal behavior, the goal is to get them to move away or go to prison on new charges we discover, that's what we are looking for[.]"  (Doc. 223 at 31); (Doc. 239 at 20); (Doc. 225-50 at 2).  "[N]o facts show[, however, that] the code team's objective conduct in inspecting for violations, issuing citations, or making arrests was plainly unjustified." *Post*, 7 F.3d at 1560.

94

In light of the foregoing, the Defendant is entitled to summary judgment on both parts of the Plaintiffs' substantive due process claim.[28]

## VI.

In light of all the above, I respectfully recommend that the Court:

1.      Deny the Plaintiffs' renewed motion for summary judgment as to liability only (Doc. 224);

2.      Grant the Defendant's second amended motion for summary judgment (Doc. 219) relative to the Plaintiffs' substantive due process claim and to the application of *Heck v. Humphrey*, 512 U.S. 477 (1994) to Plaintiff Tammy Heilman's arrests; and

3.      Deny the Defendant's second amended motion for summary judgment (Doc. 219) in all other respects.

---

[28] To the extent the Plaintiffs allege that Nocco intended ILP Program to drive them out of their homes such that it was essentially a taking, that argument is not properly briefed and is therefore waived. *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."), *overruled on other grounds in part by United States v. Durham*, 795 F.3d 1329, 1330 (11th Cir. 2015); *Mendoza v. U.S. Att'y. Gen.*, 327 F.3d 1283, 1286 n.3 (11th Cir. 2003) (finding an issue to be abandoned where no argument was made) (citations omitted); *N.L.R.B. v. McClain of Ga., Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998) ("Issues raised in a perfunctory manner, without supporting arguments and citations to authorities, are generally deemed to be waived.") (citations omitted).  Even were that not the case, the Plaintiffs' argument would still fail.  There is only evidence of one Plaintiff leaving his home because of the ILP Program (Doc. 223 at 81); (Doc. 231 at 5–6); (Doc. 239 at 69), so even assuming a constitutional violation occurred, one instance of a constitutional violation is insufficient to form a pattern or custom under *Monell*.  *See McDowell*, 392 F.3d at 1290–91 (implying that more than one unconstitutional incident is needed to establish liability under *Monell*).

Respectfully submitted this 31st day of March 2024.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

## **NOTICE**

A party has fourteen (14) days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections, or to move for an extension of time to do so, waives that party's right to challenge on appeal any unobjected-to factual finding(s) or legal conclusion(s) the District Judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

Copies furnished to:
Honorable Steven D. Merryday, United States District Judge
Counsel of record