UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DALANEA TAYLOR; TAMMY
HEILMAN; DARLENE DEEGAN;
and ROBERT A. JONES III,

        Plaintiffs,

v.                          CASE NO.:  8:21-cv-00555-SDM-CPT

CHRIS NOCCO, in his official
capacity as Pasco County Sheriff,

        Defendant,

_____/

**DEFENDANT SHERIFF NOCCO'S OBJECTIONS TO
REPORT AND RECOMMENDATION ON MOTIONS FOR SUMMARY
JUDGMENT (DKT. 273)**

Defendant Sheriff Nocco, by and through undersigned counsel and pursuant to

the provisions of 28 U.S.C. §636 respectfully submits his objections to the Report and

Recommendation (R & R) by United States Magistrate Judge Christopher Tuite,

issued on March 31, 2024 (Dkt.273).

The Court recently ordered that each side may file objections up to 25 pages in

length as to the Report and Recommendation ("R & R") but that no "objection may

merely re-argue an issue resolved in the report and recommendation." (Dkt. 277).  On

the other hand where, as here, the parties are advised of deadlines for lodging

objections, "[a] party failing to object to a magistrate judge's findings or

recommendations contained in a report and recommendation in accordance with the

provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district

court's order based on unobjected-to factual and legal conclusions …" 11th Cir. R. 3-1. Moreover, such objections "must specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for the objection." *Heath v. Jones*, 863 F.2d 815, 822 (11th Cir.1989).

Defendant endeavors below to make his objections as to both conclusions of fact and conclusions of law, and especially as to the Magistrate Judge's process of evaluating the facts and the law, but will not simply re-argue the positions previously advanced.

**Objection 1:  The Report and Recommendation fails to a) evaluate and to identify which incidents complained of by each Plaintiff was actually a prolific offender check or otherwise causally traceable to the policy and custom claims in the case, b) represented an underlying constitutional violation in that specific incident, and c) otherwise forms the basis for a claim of an unconstitutional *Monell* policy or custom.  The Court should either grant summary judgment on all claims to the Sheriff or at a minimum recommit the matter to the Magistrate Judge so as to properly identify the *Monell* custom at issue.**

All claims in this case are brought against the Sheriff in his official capacity under *Monell v. Dep't. of Social Services of New York*, 436 U.S. 653 (1978).  Each count of the operative complaint depends on a showing by *each* Plaintiff "(1) that *his* [or her] constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (emphasis added).  Critically for purposes of these objections, a custom depends on showing that a particular practice is so widespread as to "have the force of law." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997). "A pattern

of similar constitutional violations ... is ordinarily necessary," to make such a showing. *Craig v. Floyd County*, 643 F.3d 1306, 1310 (11th Cir. 2011) (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)).[1]

Defendant Sheriff begins with these principle because his ***primary objection*** is that, rather than review the "roughly 70 to 80" incidents identified as germane to the lawsuit (R & R, p. 9) so as to determine exactly what custom might actually be at issue, and which custom is relevant to which Plaintiff(s),  Judge Tuite's R & R points out that both Plaintiffs and Defendants have cited incidents which they argue cut both ways, i.e. *some* incidents are cited to support Plaintiffs' claims, but *other* incidents are cited to support Defendant's position.  For example, the R & R notes that Plaintiffs claim that some visits to them were unwelcome, or that the Plaintiffs did not believe they could end the encounter; but then the R & R notes that the Sheriff has highlighted incidents where Plaintiffs were "seemingly at ease" with deputies or where Plaintiffs ended the encounters.  (R & R, pp. 58-59).

---

[1] "[A] custom must be such a longstanding and widespread practice [that it] is deemed authorized by the policymaking officials because they must have known about it but failed to stop it.   This requirement of proof prevents the imposition of liability based upon an isolated incident and ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality…. In the absence of a series of constitutional violations from which deliberate indifference can be inferred, the plaintiff must show that the policy itself is unconstitutional."  *Craig v. Floyd County, Ga.*, 643 F.3d. 1306, 1310-11 (11th Cir.2011) (quotation marks and citations omitted).

The R & R notes that Plaintiffs point to some, but not all incidents to *argue* that these incidents support various claims   But there is no conclusion that a given incident, or series of incidents, involved unconstitutional conduct.   Nor is there a conclusion that any represented a *Monell* custom attributable to the final policymaker.   In the entire 98 pages, the R & R does not identify a single incident in which the Magistrate Judge actually concluded that there was a constitutional violation, much less a pattern of them that meets *Monell*.  (See e.g. R & R, p. 59, noting that the ILP manual does not direct deputies as to how to conduct checks.)

In his Second Amended Motion for Summary Judgment, the Sheriff urged that one may not "gloss over the meaningful differences in the individual events" of these 70 + incidents so as to "blur them all together loosely as a *Monell* claim." (Dkt. 219, p. 4).  Plaintiffs responded that they may show a "general practice of unconstitutional conduct," (Dkt. 240, p. 7) but that is simply not the law.  Without an examination of each incident, to determine whether that incident was a constitutional violation  and was caused by a policy or a custom of other materially similar violations, there is no *Monell* claim under any count.

The Magistrate resisted the Sheriff's request that "for each incident of a claimed constitutional violation, the Court should determine first whether the incident actually involved a constitutional violation; second whether it was actually even a prolific or Top 5 offender check; and, third whether it was isolated and random, versus so prevalent and well settled as to have the force of law." (Dkt. 249, p. 6).  This is the

foundation of the first and foremost objection: the universe of relevant incidents, pertaining to which Plaintiff, on which claim, remains unknown.

The Magistrate Judge's approach of recognizing that the incidents themselves are different, but then declining to actually identify which incidents would theoretically support a claim of a specific custom for a given Plaintiff, prevents meaningful consideration of whether the Plaintiffs have identified a custom, in the *Monell* sense of the word, with sufficient definition to determine the Sheriff's entitlement to summary judgment or to define for the Court and the parties exactly what is to be tried, i.e. what is the custom at issue and which incidents are relevant to that claimed custom.

As noted in the R & R, the Sheriff's Office adheres to a philosophy, widely recognized in the law enforcement community, called Intelligence Led Policing (ILP). The Sheriff's official written ILP materials at the time, discussed in the R & R, called for the Sheriff's Office's to identify "prolific offenders." The manuals themselves may be "policy," but ILP is a philosophy and is commonplace in law enforcement. [2] The

---

[2] The ILP philosophy is nothing new.  At bottom, it is based on community policing and attempts to shift the focus from the old models of simply reacting to crime after it has occurred, to preventing reoffending through focused deterrence. (Depo. of Krause, Dkt. 134, p. 74, lines 1 through 18);  Dkt.  130, p. 6, lines 4-11; p. 13, line 12 through p. 14, line 25; p. 62, line 15 through p. 64, line 2).  It is ubiquitous to law enforcement and by way of recent example, Defendant notes that the Sheriff of Pinellas County has a similar approach to youthful offenders. https://myemail-api.constantcontact.com/HOME-Tracks-the-Most-Serious-Young-Offenders.html?soid=1112875713762&aid=84Sveb4tTCs (discussing randomized visits to youthful recidivists identified as at risk of reoffending.)

ILP Manuals provided that deputies perform a "prolific offender check" (POC) for each offender at least once per quarter.

The Plaintiffs began this case focusing their criticism of ILP on the contention that the initial selection of prolific offenders was unconstitutionally determined by computer.  (See Amended Complaint, alleging that targeted offenders, such as prolific offenders, are selected purely by a criminal-history algorithm, Dkt. 41, ¶ 122- 130). That central thesis has turned out to be incorrect in that, as noted in the R & R, the identification of a given person as contributing to the criminal environment in Pasco County only *began* by compiling a list of persons who had recently had criminal charges, but then depended on a subjective determination by crime analysts in each district in the County as to whether that offender was *currently* contributing to the criminal environment.

Plaintiffs have therefore now shifted their focus to be criticism of *the manner* of conducting prolific offender checks.  Their threshold claim is that the act of walking up to the door of a person so designated, knocking, and speaking to that person or others who live there is unconstitutional, even as a knock and talk. Plaintiffs claim a deputy must have reasonable suspicion to conduct a knock and talk but as noted in the R & R, Plaintiffs are incorrect and reasonable suspicion is not required.

The R & R correctly determined that the Sheriff's official, written policies concerning ILP or the mere fact of prolific offender checks are not themselves unconstitutional.  This is squarely a custom case based on how the checks were carried out.  As the R & R states, "[t]he contours of the ILP Program were not only defined"

by the written manuals, "but also by the manner in which the PCSO's written policies were implemented." (R & R, p. 9). In rejecting an incident-by-incident examination of the case, the R & R recognizes, but fails to account for, important differences in the factual detail of the incidents.

Defendant has filed with the Court video for a large number of incidents. Defendant filed documentation for each of the incidents, which ranged from detailed reports to minimal entries in a call log. Defendant also filed reports of incidents which Plaintiffs sue over, but which have no demonstrable causal linkage to ILP or checks and, for example, represented responses to calls for service by Plaintiffs themselves.[3]

To represent a custom, in the *Monell* sense, the challenged practice must represent "a thoroughly engrained pattern of unconstitutional violations…" *Diaz v. Miami-Dade County*, 424 F.Supp.3d 1345, 1362 (S.D.Fla. 2019). There must be a sufficient number of "substantially similar" incidents to conclude that there was a definitive custom of conducting checks in an unconstitutional manner. *Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005); *Ireland v. Prummell*, 53 F.4th 1274, 1290 (11th Cir. 2022) (proof of a single constitutional violation is insufficient to establish a custom: "Rather, a plaintiff must establish the existence of *a pattern of similar violations*.

---

[3] Just by way of example, there were 107 totals responses to the Heilman residence, but the vast majority were *not* prolific offender checks. There were numerous calls to the Sheriff's Office from within the Heilman residence for help with domestic violence, burglary, a threatened suicide, a call when Heilman herself was found, not breathing, a call that one of Heilman's children sprayed another with mace, a call that Donnie McDougall had pointed a revolver at Heilman's husband, and on and on. (Dkt. 223, pp. 103-105.

7

Indeed, "[i]n the absence of a series of constitutional violations from which deliberate indifference can be inferred, the plaintiff must show that the policy itself is unconstitutional") (emphasis added) (internal citations omitted).

The Sheriff should be granted summary judgment on all claims on the basis that the Plaintiffs have not coherently or with any precision identified the specific custom at issue.[4]

**Objection 2:   Failure to confine the relevant *Monell* inquiry to the final policymaker.**

The R& R correctly notes that Sheriff Nocco is the only final policymaker.  (R & R, p. 2).  Sheriff Nocco approved the ILP manual, which the defense agrees is correct.  But then the R & R states that Judge Tuite would "refer to Nocco and the PCSO interchangeably," (Id., fn. 4).  That is incorrect in that one cannot simply assume that all tasks undertaken under ILP (including frequency or manner of checks) are approved by Sheriff Nocco, in the *Monell* sense.

A *Monell* custom is one which is "that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker." *Church v. City of Huntsville*, 30 F.3d 1332, 1342–43 (11th Cir. 1994). A plaintiff may establish a policy or custom

---

[4] And it cannot be as vague as that *some* prolific offender checks involved visits at off hours, or that *some others* involved code violation citations, or that *some others* caused family disharmony, ergo every prolific offender check is unconstitutional in theory. To represent a custom, in the *Monell* sense, the challenged practice must represent "a thoroughly engrained pattern of unconstitutional violations…"  *Diaz v. Miami-Dade County*, 424 F.Supp.3d 1345, 1362 (S.D.Fla. 2019).  There must be a sufficient number of "substantially similar" incidents to conclude that there was a definitive custom of conducting checks in an unconstitutional manner.  *Mercado* 407 F.3d at  1162.

8

exists by showing a "persistent and wide-spread practice" and the government's actual or constructive knowledge of that practice. *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986). Generally, "random acts or isolated incidents are insufficient to establish a custom or policy." *Id.*

This is important when the issue boils down, as here, to custom, because the lack of similarity as between incidents (other than the mere fact of them being prolific offender checks) means that Plaintiffs have not demonstrated a custom with such repetition as to be attributable to the final policymaker. The Court should reject the R & R and award summary judgment to the Sheriff on grounds that the Plaintiffs have not described with any precision exactly what it is about a given set of prolific offender checks that make them unconstitutional, and that they were sufficient in number to be a discrete custom under *Monell* attributable to the final policymaker.

**Objection 3:  The R & R misapplied the test for mootness as to injunctive relief and the R&R imposes an incorrect standard for public officials to modify their policies but face open-ended risk of unwarranted injunctive relief.**

As to mootness, it is undisputed but that policies and the implementation of policy have changed since the complained-of practices. There are no longer random checks of persons designated as prolific offenders. The number of such checks plummeted from 229 in 2021, to just two in all of 2022. No list of prolific offenders has been generated since March of 2022. The zero tolerance policy as to code enforcement has also been eliminated. (Dkt. 222 Deposition of Sanborn, Exhibits 13 and 14; p. 69, line 22 through p. 72, line 18; p. 20, line 16 though p. 22, line 22; p. 56, line 19, through p. 60, line 8; p. 68, line 24, through p. 69, line 21);  (Dkt. 221,

Deposition of Kraus (February 2, 2023), p. 24, lines 11 – 17; p. 28, lines 2-25, p. 98, line 23 through p. 101, line 2; p. 28, lines 2-6; RAD directive, attached to deposition of Kraus as Exhibit 7, p. 10).

In its place, the agency may respond to a person's home if that person is a "focused offender," but only if there is reasonable suspicion of a particular recent crime or activity; there are no randomized checks of such persons.    (Kraus, Dkt. 221, Exhibit 7, p. 10; p. 30, lines 2-25; p. 33, line 23 through p. 35, line 21; p. 74, line 16 through p. 75, line 29).  None of the Plaintiffs or their family members carry that designation and there has been no showing that it is reasonably foreseeable that they might, in the future. (Affidavit of Brummett, Dkt. 220, ¶ 3)

The R & R recommends denying the Sheriff's motion for summary judgment on grounds that these changes do not moot the request for injunctive relief because "Nocco has not acknowledged any wrongdoing in instituting the ILP Program, has never promised not to resume the Program, and, in fact, maintains in his summary judgment filings that the program was entirely lawful." (R & R, p. 27).  The R & R bases this recommendation on a series of cases which state that the change must be "unambiguous" in order to moot the issue.  (*Id.*, citing *Friends of the Earth, Inc. v. Laidlaw Environmental Sciences (TOC), Inc.*, 528 U.S. 167 (2000), *Doe v. Wooten*, 747 F.3d 1317 (11th Cir.2014), and *Rich v. Secretary, Florida Dept. of Correctrions*,716 F.3d 525 (11th Cir. 2013).

But, the defendant in *Friends of the Earth* was not a government defendant, it was a private company which had purchased a wastewater treatment plant and was alleged

10

to be operating it outside of its permit requirements.  As noted in Sheriff Nocco's motion and acknowledged in the R & R, the fact that the defendant is a government agency affords it some weight in its assertion that policy and practice have changed, mooting the need for injunctive relief.  There is tension in the phraseology of these cases with the R & R emphasizing that the change must be "unambiguous," while in *Friends of the Earth* the Sheriff would have to show that "the allegedly wrongful behavior *could not reasonably be expected* to recur."  *Friends of the Earth*, 528 U.S. at 190 (emphasis added).  In the words of the Court in *Friends of the Earth*, "[t]he plain lesson of these cases is that there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." *Id.*

The decision in *Doe v. Wooten*, 747 F.3d 1317 (11th Cir. 2014), cited in the R & R, is a government defendant case, and supports the Sheriff's claim of mootness. There, the Eleventh Circuit summarized the factors for mootness:

> (1)   whether the termination of the offending conduct was unambiguous; (2) whether the change in government policy or conduct appears to be the result of substantial deliberation, or is simply an attempt to manipulate jurisdiction; and (3) whether the government has 'consistently applied' a new policy or adhered to a new course of conduct. The timing and content of the cessation decision are also relevant in evaluating whether the defendant's stopping of the challenged conduct is sufficiently unambiguous. We are also more likely to find a reasonable expectation of recurrence when the challenged behavior constituted a continuing practice or was otherwise deliberate. These factors are not exhaustive and the analysis may vary depending on the facts and circumstances of a particular case.

*Doe*, 747 F.3d at 1323.

11

The R & R acknowledges Defendant's argument that "the assertion of mootness involving government actors will only be rejected 'where there is a substantial likelihood that the offending policy will be reinstated if the suit is terminated.'" (R & R, p. 21, citing *Troiano v. Supervisor of Elections of Palm Beach Cnty., Fla.*, 382 F.3d 1276 (11th Cir. 2004)). But the R & R cites distinguishing language in *Doe* to the effect that this principle still depends on a threshold showing by the government defendant that it has unambiguously terminated the subject action. (R & R, p. 22, n. 7).

As discussed in *Doe*, drawing all of this together, the burden shifting approach requires that the government defendant show that it has unambiguously changed the subject practice through a deliberative process. The burden then shifts to the plaintiff to show that there is a "reasonable basis to believe that the policy will be reinstated if the suit is terminated." *Doe*, 747 F.3d at 1323. In the other case primarily cited in the R & R, *Rich*, the problem there was that there was grounds to believe that the defendant had changed the process of delivering kosher meals to an inmate solely to manipulate jurisdiction and that there was "nothing to suggest" that Florida would not simply end the kosher meal program. *Rich*, 716 F.3d at 532.

In contrast, in this case Sheriff Nocco has provided unambiguous evidence of changes which mirror what Plaintiffs have primarily advocated for: namely, no randomized checks of such offenders. They are not even so-designated anymore. The Sheriff has offered reasons for the changes, including manpower problems and a focus

12

on an alarming drug problem associated with fentanyl.[5]  He has explained the process that was followed to propose and approver the changes.  The changes occurred over time, with input from various officials within the agency.  The Sheriff has further demonstrated that the number of such checks has dwindled to zero in the last few years.

In response, Plaintiffs complain that there was one check of Heiman's son for probation when she believes he is not on probation and that she one time saw an unidentified vehicle drive by her house and take a photo, but she does not say it was a Pasco deputy.  (Dkt. 244, p.2, ¶5).  Jones states that on unspecified days he saw a number of police cruisers which he cannot even say were Pasco Sheriff's Office deputies and does not know the reason they were in his neighborhood.  (He states in his affidavit that he one time saw police cruisers near his home, Dkt. 243, ¶4, but "I have no idea why they were there.")  He does not claim any interaction with them.  Neither does Heilman.  None of these occasional sightings of law enforcement has been in any way linked to the prolific offender program, at all.

---

[5] Plaintiffs in response offered affidavits claiming they believed that there had been visits to their residences for prolific offender checks even after the policy changes and the R & R discusses them at pages 26-27, but these claims are extraordinarily thin and entirely speculative.  Heilman complains of a single visit when her sone was released from prison and Jones claims police vehicles, which may or may not have even been Sheriff's vehicles, responded to an unknown event in his neighborhood.  Neither describes any misconduct as to either event.  This is not enough to overcome the Sheriff's substantial documentary and testimonial evidence that the prolific offender check process ended several years ago.

Under these circumstances, the Sheriff has unambiguously shown he has changed the program and practice to date, whereas Plaintiffs have not shown even a reasonable possibility of a system of randomized checks of prolific offenders in the future who, it must also be pointed out, are no longer even identified by the agency. The Sheriff easily carried his burden, the Plaintiffs have not carried theirs based on such weak speculation that these encounters had anything whatsoever to do with prolific offender checks.   Thus, under the standards announced in the R & R, the Sheriff should have been granted summary judgment.

Finally, the Sheriff is an elected official.  He cannot bind the next Sheriff, or the one after that or the one after that, to a specific commitment as to how to conduct the office's law enforcement function ad infinitum.  As is, given the circumstances as they have now existed for several years, the Plaintiffs seek an order enjoining the Sheriff from continuing a practice which is a) still fairly undefined by them[6] and b) was discontinued three years ago, all in what amounts to an impermissible order to "obey the law" in the future.

Under the Plaintiffs' theory, a public agency that commits some constitutional error, no matter how large or how small, or how rare, faces perpetual risk of a threat of injunction because it is just theoretically possible that the agency, even under new leadership, might one day revert to a manner of operation alleged to have caused the

---

[6] What, exactly, gets enjoined – any check at the residence of any person?  A check absent reasonable suspicion or probable cause of a crime?  Three checks or more? Checks by more than two deputies?  Checks after 7 p.m.?

violation some years earlier.  The question, as the Supreme Court put it in *Friends of the Earth*, is whether the prospect of reverting back to the old policy is so speculative as to render the claim for injunctive relief moot.  In light of the lack of any evidence beyond such speculation, the Court should reject the R & R on this point and award the Sheriff summary judgment as to prospective injunctive relief.

**Objection 4:  The R & R does not properly address the Fourth Amendment claim because it fails to identify which incidents might represent Fourth Amendment violations, on what grounds, and with sufficient similarity and in numbers reflecting a *Monell* custom.**

First, the R & R observes that Plaintiffs are incorrect when they insist that a knock and talk requires reasonable suspicion, that in turn every prolific offender check implicates the Fourth Amendment and that there must be reasonable suspicion to perform it, or that the effort to "cultivate" and "develop" information about crimes during a prolific offender check converts each one into a "search" under the Fourth Amendment.  The mere fact of the prolific offender checks themselves, at this general level, do not represent a Fourth Amendment violation. (R & R, pp. 44-53).  As Judge Tuite states: "By my review, there was nothing inherently improper in the PCSO deputies performing knock and talks at the prolific offenders' homes and endeavoring to obtain information from the inhabitants about crime in the area and other matters of legitimate police business."  (R & R, p. 52).

The R & R then observes, however, that there are questions as to whether *individual* instances of prolific offender checks were "harassing," might involve a level of over-intrusion or unreasonable length of time so as to represent a full-blown

detention, or that for example the time of day for such interaction might yield a constitutional violation. (R & R, pp. 53-54; pp. 58-59). This misses the forest for the trees because, once again, the R & R only speaks to there being a dispute about individual incidents and whether they rose to that level – it does not make the crucial analysis of determining *which* incidents fall into those exemplar categories (length and time of day, for example) so as to identify a custom in the *Monell* sense of the word.

And the fact is, neither have the Plaintiffs. This has always been the shortcoming in this case in that Plaintiffs speak in terms of *all* prolific offender checks as generated by the prolific offender lists. They then isolate particular ones among the 70 or so attributable to them and criticize aspects of some, but not all of them. And then, Plaintiffs fail to identify with any precision what the custom is as to given Plaintiffs. How many and which ones represented too long a detention? Or were "harassing"? How many and which ones were at off hours where there was no justification, such as curfew considerations?

This shortcoming is supported by the fact that the R & R recognized that Plaintiffs were pointing to incidents of Pasco deputy interactions with the named Plaintiffs which they described as problematic for one reason or another, but then it turns out that the incidents had nothing to do with ILP or prolific offender checks. The starkest example of this is when deputies went to Deegan's home because they had probable cause to believe her son, Tyler Paneson, had stolen a kayak. The mere fact that, at the same time they sought Paneson based on probable cause he was also

listed as a Top 5 offender demonstrates an absence of *Monell* linkage to any policy or custom.  (R & R, pp. 56-57).[7]

This passage in the R & R is telling in that Judge Tuite acknowledges that the written official policies of the Sheriff are themselves constitutional.  It is only if there is a custom of unconstitutional that *Monell* liability could possibly attach in this case:

> Here, the ILP Manual does not detail with precision how deputies are to conduct prolific offender checks or what their demeanor should be. That the ILP Manual states that prolific offenders must "stop committing crimes" or else face "relentless pursuit, arrest, and prosecution" is not on its face unconstitutional because the policy does not suggest that the PCSO deputies can engage in unconstitutional conduct, such as exceeding the scope of a proper knock and talk or arresting a prolific offender without probable cause (Doc. 225-1 at 17–18) ("In order for focused deterrence to be effective, law enforcement and the criminal justice system must remain true to their promise. If the [prolific] offender does not feel the pressure, if the offender is not arrested when they commit their next crime, or if the offender is left to feel their punishment is menial, the [ILP] strategy will have no impact.").

> Because the ILP Manual is not facially unconstitutional, the Plaintiffs must establish a custom or pattern of unconstitutional behavior. This issue too is fact intensive, and involves the consideration of a number of factors, including the number and frequency of the deputies' prolific offender checks relating to the Plaintiffs, the deputies' physical movements while at a home, the nature and substance of their communications with the persons they encountered there, the residents' behavior, and any other reasons the deputies may have had for being at the home.

> (R & R, pp. 59-60) (some record citations omitted).

The R & R goes on to cite general cases about fact disputes in such scenarios, i.e., that the Fourth Amendment requires consideration of all of the circumstances of

---

[7] The same is true of the scores of incidents of deputy visits to Heilman or Jones because someone in their residences called and asked for help, generating an incident.

the incident.  But that still does not require that Plaintiffs have adduced a clearly-defined custom of alleged unconstitutional conduct at such a level of repetition that it could be called a *Monell* custom, and that was their burden on summary judgment. The bottom line is that Plaintiffs take all 70-80 of the incidents and describe some as "harassing," but for myriad different reasons.  And that is not sufficient to establish a triable case that there is a cognizable *Monell* custom at issue here.

The Court should reject the R & R as to any Fourth Amendment claim or, at a minimum, recommit the issue to the Magistrate Judge so as to identify the custom at issue and so as to identify with particularity which incidents represent the custom under *Monell*.

**Objection 5:  The R & R uses too general a standard for effect on familial relations as to represent a First Amendment violation.**

The R & R determines that the only First Amendment right at issue is the right of intimate association (R & R, p. 64).  Plaintiffs' contention is that the fact of prolific offender checks so burdened their familial relations as to unconstitutionally interfere with them.

The R & R recognizes Defendant's argument that the government action at issue must "directly and substantially interfere" with the intimate association.  (R & R, p. 69, citing *Parks v. City of Warner Robins, Ga.*, 43 F.3d 609, 612 (11th Cir. 1995)). The R & R cites *Parks* and *Lyng v. Int'l Union, United Auto., Aerospace and Agric. Implement Workers*, 485 U.S. 360 (1988) for the conclusion that, absent a policy actually ordering people not to have such relationships or prohibit such intimate behavior, such

18

as dining together, there is no constitutional violation.   An incidental effect to government policy on such relationships is insufficient.  (R & R, pp. 69-70).

The R & R then addressed Plaintiffs' contention that this high bar should not be applied to the instant matter, rejecting that contention.   (R & R, pp. 71-72).  However, rather than apply the correct standard to the instant matter, the R & R applies a simple incidental effect standard.  For example, the R & R notes that the parents were identified in internal Sheriff's Office meetings as being "associated" with their children, or that a deputy told Heilman that deputies were trying to get parents to "get you to do something to keep your kid from committing crime."  (R & R, p. 72).

It is difficult to imagine that telling a parent that she ought to work to stop her child – who is a relentless recidivist with increasing severity of crimes, including aiming a firearm at her spouse – is constitutionally wrong.  But, in any event, only one or two such incidents are noted.  And surely, neither being mentioned in a meeting of officials at the agency, nor being told she ought to help get Donnie McDougall under control, represents "ordering" Heilman (or Deegan, or Jones) to refrain from having such relationships.  In short, even if there was an incidental effect on such relationships based on several occasions, this all falls short of the *Parks* analysis requiring direct interference in those relationships.

As to the code citations, the R & R concludes that an issue of fact remains as to whether they were "retaliatory," precluding summary judgment to the Sheriff.  (R & R, pp. 75-76, citing *Eisenberg v. City of Miami Beach*, 54 F.Supp. 3d 1312 (S.D.Fla. 2014)).  First, this ignores the fact that the agency's policy – which the R & R concludes

19

was facially unconstitutional – called for zero tolerance for such violations at residences of prolific offenders. Second, this ignores the fact that there is no viable claim offered by Plaintiffs that any given citation was objectively unjustified. Certainly, there is no viable argument here that there was a "custom" sufficient in number and circumstance under *Monell*.[8]

Third, the citation to *Eisenberg* is inapposite. In that case, plaintiff had complained about an abandoned building and its code violations. City officials, later arrested for receiving bribes, pressured Plaintiff by issuing notices of violation and cease and desist orders as to his own property. This culminated in Plaintiff being arrested, allegedly in retaliation for his refusal to pay bribes. The issue there was the Plaintiffs' First Amendment right to protest unequal treatment, not a First Amendment right of intimate association. Moreover, the Court phrased the issue as one of whether the Plaintiff was retaliated against for engaging in "protected conduct," i.e. protesting the manner the other building was handled. *Eisenberg*, 54 F.Supp. 3d at 1323.

---

[8] It seems relevant here to note that Plaintiffs paid or negotiated the fines of such citations, with the exception of Jones, who would receive the citations, not appear, get arrested on warrants for failure to appear, then offer excuses about fire drills at the courthouse or falsely claim he did not receive the citations when he is seen on body camera acknowledging receipt. See Dkt. 223, paragraphs 85 – 92, citing various portions of Jones' deposition at Dkt. 131 and associated body worn camera video, showing him acknowledging receipt of citations, but then claiming he had not received them. Even then, the result was that Jones would pay a fine, used to address the code citation, which was acceptable to Jones. (Deposition of Jones, Dkt.131, p. 148, line 18 through p. 149, line 21; p. 232, line 17 through p. 233, line 4). *Parker v. Town of Palm Beach*, 2017 WL 11537901, * 4 (S.D.Fla. August 16, 2017) (citing authorities that *Heck* bars federal claims seeking to undo citations, including ordinance violations).

This is not a case wherein Plaintiffs engaged in protected speech and allege that code citations were issued in retaliation for that speech.  Here, Plaintiffs had to show that their rights to familial association were burdened to the point that they were "ordered" not to have or continue them, and they have not shown anything other than, at most, an incidental burden to such relationships.

Finally, the use of increased code enforcement was not limited to prolific offender residences, as suggested in Plaintiffs' filings.  Rather, the ILP manual provided that the Sheriff's Office would deploy increased citations to improve quality of life by nuisance abatement, including the use of code enforcement corporals. (Doc. 161-3, pp. 30-31). As testified to by Mark Celeste, a code enforcement corporal from 2016 to 2019, he focused on homes with many calls for service, for drug activity, and the like. (Doc. 121, Deposition of Celeste deposition, p. 10, line 14, through p. 13, line 13.)  This was not limited to prolific offenders.

The Court should reject the R & R as to the First Amendment claim and grant summary judgment to the Sheriff.

**Objection 6:  As to procedural due process, the R & R fails to identify the process due, much less that constitutionally sufficient process was not offered.**

As to procedural due process, the R & R notes that Plaintiffs shifted their claim on this point throughout the litigation.  First, in the operative complaint, Plaintiffs originally identified the rights deserved of procedural due process as "freedom from a 'policy and custom of harassment in violation of their Fourth Amendment rights' and from 'a distinct legal regime that alters and limits the enforcement discretion of

deputies and prosecutors.'" On summary judgment, they changed it to be the "right to be at peace in their own homes—or, in other words, to be free from unreasonable searches and seizures, to be free from punishment for the misdeeds (actual or predicted) of others, and to be free from pretextual and abusive government conduct." And then, in response to the Sheriff's motion for summary judgment, the Plaintiffs again redefined the right at issue as "the right to be free from intrusion on their property." (R & R, p. 80).

The R & R then again relies on fact disputes as to the individual incidents and whether they represent intrusions into these rights such as to rise to the level of a due process violation absent notice and an opportunity to be heard. (R & R, p. 81).[9] The threshold objection here is that this conclusion assumes that the right, for example to be "free from intrusion on their property," is even at issue in the first place.

Recall, the policy does not define the manner of perfecting a prolific offender check. The question is whether there was a custom of doing them in such a manner as to represent an unconstitutional intrusion onto property, without notice and an opportunity to be heard. Plaintiffs fail to identify which incidents represent such a violation entitling the Sheriff to summary judgment based on lack of a custom.

---

[9] Defendant is unaware of any authority for the proposition that there must be advance notice and opportunity to be heard for a knock and talk. The claim then, would seem to be that if a certain number of these occur, then such a right arises. But no case establishes that rule. Neither the Plaintiffs nor the R & R articulate a point at which "too many" knock and talks yields a constitutional right to advance notice and opportunity to be heard.

Defendant is unaware of any authority for the proposition that there must be advance notice and opportunity to be heard for a knock and talk. The claim then, would seem to be that if a certain number of these occur, then such a right arises. But no case establishes that rule. Neither the Plaintiffs nor the R & R articulate a point at which "too many" knock and talks yields a constitutional right to advance notice and opportunity to be heard. Plaintiffs have not shown that there was a sufficient number of them, under similar circumstances, to represent a custom under *Monell*.

In light of the finding that the issue of entitlement to notice and opportunity to be heard turned on whether there were unconstitutional intrusions onto property, or the right to establish a home, the R & R expressly did not address whether the Plaintiffs had received sufficient process. (R & R, p. 81). Nonetheless, the R & R states that there is a dispute as to notice or opportunity to be heard. (Id.).

Defendant respectfully disagrees. Deegan made an actual complaint, as did a relative of Heilman's. As noted in the R & R, Heilman was explicitly told by a deputy as to the attention being paid to her son Donnie McDougall given his substantial criminal activity. (R& R, pp. 10-11). Jones and Taylor were told why deputies were coming by, and that is all captured on body worn camera. (See e.g. items cited in the Joint Statement of Undisputed Facts, Dkt. 223, p. 118, ¶84 (describing conversation wherein Jones was told that deputies were placing Jones' son and others on notice that their continuing conduct would not be tolerated)); Dkt. 223, p. 111, ¶66 Taylor was told that deputies were required to check on her.)

23

Each of the Plaintiffs was aware that the agency had focused on them.  Indeed, it would be self-contradictory for them to claim on the one hand that there had been so many visits as to be unconstitutional on its face, but on the other hand claim they had no notice that attention was being paid to them.  And, as stated above, they either complained or had the opportunity to complain.  The Court should reject the R & R and grant summary judgment to the Sheriff as to any procedural due process claim.

**Objection 7:  The R & R incorrectly concluded that Jones' claims are not time- barred based on his alleged discovery of policy or custom as the cause.**

There is no dispute but that Jones was aware of his claim that his constitutional rights were violated more than four years prior to the filing of the initial complaint, which is the statute of limitations for §1983 actions in Florida.  Jones' argument is that even if he knew that he had such a claim, he did not know of the *Monell* policy or custom aspect of the claim until 2020 when he read about it in the newspaper, within four years prior to the filing of the complaint.  The Magistrate Judge has agreed with Jones.  (R & R, pp. 36-37).

However, this conclusion ignores the fact that Jones was told by deputies, on body worn camera on September 22, 2015, (beginning at the 7-minute mark of the body worn camera video) that the Sheriff was placing Bobby and his friends who are committing crimes on notice that it will not be tolerated. Deputies stated that the Sheriff wants to encourage kids to grow up and become good citizens. He admitted he knew that the majority of property crimes being committed were by juveniles and deputies encouraged Jones not to continue to commit crimes because he might face

felony    charges.    (Doc.    154,    Non-Electronic    Filing,    BWC,    #65,

(Extraction_1.1)_Jones_interview).

This was more than sufficient to place Jones on notice of the policy and custom

aspect of his claim because the repeated visits plus the communication that the Sheriff

was placing the son and others on notice would have told him that the Sheriff, as an

office, was causing the visits to occur. *McGroarty v. Swearingen*, 977 F.3d 1302, 1309

(11th Cir. 2020) ("The statute of limitations on a section 1983 claim begins to run when

the facts which would support a cause of action are apparent or should be apparent to

a person with a reasonably prudent regard for his rights. As to which facts a plaintiff

must know, we have said plaintiffs must know or have reason to know that they were

injured, and must be aware or should be aware of who inflicted the injury.") (internal

quotation marks and citations omitted).

Here, Jones believed his rights were violated, he was subject to a number of such

checks, and he was told more than four years prior to the filing of the complaint that

the Sheriff was placing he and his son on notice that their criminal activity would not

be tolerated.  That he read an article in the newspaper five years later that refined or

further educated him as to the particulars of ILP does not resurrect the claim entirely

anew.  The Court should overrule the R & R and hold that all claims by Jones are

barred by the statute of limitations.

The Sheriff should be awarded summary judgment on all counts of the operative

complaint.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of April, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: **Ari S. Bargil, Esquire** (*abargil@ij.org*), Institute For Justice, 2 S. Biscayne Boulevard, Suite 3180, Miami, Florida 33131; and **Caroline Grace Brothers, Esquire** (*cgbrothers@ij.org*), Institute For Justice, 901 N. Glebe Road, Suite 900, Arlington, Virginia 22203; and **Robert E. Johnson, Esquire** (*rjohnson@ij.org*), Institute For Justice, 16781 Chagrin Boulevard, Suite 256, Shaker Heights, Ohio 44120.

*s/ Thomas W. Poulton*
THOMAS W. POULTON, ESQ.
Florida Bar No.: 83798
*poulton@debevoisepoulton.com*
JEFFREY K. GRANT, ESQ.
Florida Bar No.: 0091197
*grant@debevoisepoulton.com*
MATTHEW A. KOZYRA, ESQ.
Florida Bar No.: 93425
*kozyra@debevoisepoulton.com*
DeBEVOISE & POULTON, P.A.
Lakeview Office Park, Suite 1010
1035 S. Semoran Boulevard
Winter Park, Florida  32792
Telephone:  407-673-5000
Facsimile:   321-203-4304
Attorneys for Defendant Sheriff Nocco