# STATEMENT OF ADMITTED FACTS

*Joint Final Pretrial Statement*

## STATEMENT OF ADMITTED FACTS

Sections A and B of this document reflect facts to which both parties have agreed previously in this litigation. *See* Joint Statement of Facts (Dkt. 223). In Part C, Defendant expresses separately its concerns with now describing those facts as previously agreed. And in Part D, the parties express their joint agreement on several minor housekeeping matters.

### A.    THE WRITTEN POLICIES AND DIRECTIVES OF THE PSO

1.    As a threshold matter, Plaintiffs advise that the facts identified in Paragraphs 3–52 were previously agreed by the parties to be "undisputed." *See* Parties' Joint Statement of Facts, Dkt. 223 at 1. As noted in Section C, however, Defendant takes issue with the characterization of some of these facts as agreed for purposes of their consideration at trial.

2.    However, in light of the parties' prior agreement, and despite Defendant's unwillingness to acknowledge these facts as true at this stage, Defendant's prior concession that they were "undisputed" in a prior court filing establishes them as true for purposes of trial. *See, e.g.*, *BRP Colleague Inc. v. Gillen*, No. 1:20-CV-3695-LMM, 2023 WL 8507683, at *2 (N.D. Ga. Oct. 31, 2023) (by labeling some of the defendants' facts as "undisputed" in their responses to the defendants' statement of material facts during summary judgment, the

1

plaintiffs "clearly and unequivocally consented to the Court considering those facts 'admitted'" at trial). Those facts are as follows:

3.      The ILP written policies are reflected in the Intelligence Led Policing Manual ("ILP Manual"), the ILP Directive, the Strategic Targeted Area Response Team Manual ("STAR Manual"), and the Research and Analysis Division Directive ("RAD Directive"). The relevant versions of the ILP Manual were adopted in 2013, 2016, 2018, and 2021.

4.      The 2018 version of the ILP Manual was in effect at the time this lawsuit was filed on March 10, 2021. It described the Sheriff's policing philosophy relative to use of intelligence gathering and assessment ("PSO").[1]

5.      PSO employees were required to read and apply the ILP Manual. *See,* Reagan Dep. 27:8–13 (agreeing that "everything that's in the ILP manual is something you were expected to understand and apply"); Ross Dep. 15:14–17, 25:15–24; Sanborn Dep. (I) 12:6–14, 84:3–4, 86:16–18.

6.      The 2018 ILP Manual required that deputies perform a check at least once a quarter for a person designated a "prolific offender."

7.       Juveniles could be listed as prolific offenders. *See* 2018 ILP Manual at 17 ("[A] Prolific Offender is a person of any age . . . ."); *see also* 2016 ILP Manual

---

[1] PSO's policies are now reflected in two primary documents: The ILP Manual and the RAD Directive. The RAD Directive was adopted on January 31, 2023, and supersedes the 2021 ILP

at 7; 2021 ILP Directive at 6.

8.      Performance reviews for PSO employees included an expectation that employees read the ILP Manual and assess the employee's application of the ILP philosophy.

9.      An earlier version of the Manual was adopted in 2016 and was in place at the time of some of the interactions between Plaintiffs and PSO deputies. The 2016 Manual also called for the identification of prolific offenders, and any differences between the 2016 and 2018 versions of the Manual are not thought by the parties to be germane to this litigation.

10.     The 2018 Manual remained in place until July 2021, when PSO split up the 2018 Manual into two documents—a 2021 ILP Manual and a new "ILP Directive." The 2021 ILP Manual came into effect on July 1, 2021; the ILP Directive came into effect on July 13, 2021.

11.     Following that 2021 split, the policies that Plaintiffs maintain are the subject of this litigation were relocated to the new 2021 ILP Directive. *see e.g.*, 2021 ILP Directive at 6–7 (requiring identification of prolific offenders who would be subject to enhanced scrutiny, which included prolific offender checks); 9 (requiring quarterly prolific offender checks, directing information gathering concerning prolific offenders, and adopting a zero-tolerance arrest policy for prolific offenders).

12.     PSO's 30(b)(6) witness agreed that the 2021 ILP Manual was approved

according to the regular procedures of the Pasco County Sheriff's Office. Kraus Dep. (II) 13:11–24; *see also* Ross Dep. 71:25–72:2.

13.    Defendant Sheriff Nocco oversees the ILP program and is the final policymaker for the PSO.

14.    Defendant Sheriff Nocco personally signed the forward to the 2016, 2018, and 2021 ILP Manuals.

15.    When it was in effect, the ILP Manual adopted a "zero-tolerance arrest policy for crimes committed by prolific offenders" as well as "for members of the district Top 5 and their associates." 2018 ILP Manual at 19, 26; *see also* 2021 ILP Directive at 9, 16 (adopting a zero-tolerance arrest policy for prolific offenders, Zone Focused Offenders, and "Zone Focused Associates").[2]

16.    The ILP Manual stated that deputies should "communicate" that prolific offenders must either "stop committing crimes" or else face "relentless pursuit, arrest, and prosecution." 2018 ILP Manual at 17.

17.    PSO also has a separate "STAR Manual" for members of the STAR Team.

18.    Members of the STAR Team are instructed that "[t]his document [the STAR Manual], coupled with the ILP Manual, should be read, reread and read

---

[2] "Zone focused offenders," according to the 2021 ILP Directive, were a subset of prolific offenders. The "zone focused offender" designation used in the 2021 ILP Directive is therefore distinct from the "focused offender" designation used in the 2023 RAD Directive because PSO no longer uses the "prolific offender" designation.

again." 2015 STAR Manual at 9.

19.     The STAR Team is a specialized unit which, during a period of time relevant to this lawsuit, had a mission to "target prolific offenders" and to "develop missions to target the 'Top 5.'" 2015 STAR Manual at 2. The "Top 5" designation is no longer in use. The task of conducting checks on prolific offenders was reassigned several times before the designation itself was ultimately eliminated.

20.     The record contains a copy of the STAR Manual dated July 2015, as well as a substantially identical version of the STAR Manual that was appended to the 2016 ILP Manual.

21.     The responsibility of conducting prolific offender checks was transferred to the STAR Team on or about February 17, 2021. It was then proposed that it would be transferred to the Behavioral Health and Intervention Team ("BHIT") on or about April 19, 2021. That transition, however, was never implemented. And during this time, deputies outside of these teams still had the ability to conduct prolific offender checks; however, it was not an expectation. PSO deemphasized performance of such checks and they began to decline around this time.

22.     On October 7, 2021, Major Sanborn directed his subordinate supervisors to stop recommending that deputies conduct prolific offender checks as part of their duties to "work more proactively." Major Sanborn instructed that "the most recent guidance" instructs that "prolific offender contacts incidental to patrol responsibilities should be documented as they always have been, but there is no

5

expectation or desire to have patrol units proactively monitoring prolific offenders."

*See* Sanborn email, Oct. 7, 2021.

23.     According to PSO records, prolific offender checks began to decline in 2021.

24.     According to PSO records, there were a total of two prolific offender checks in 2022.

25.     Among other changes in policy, "in approximately March of [2022]," the PSO ended "use[] [of] the prolific offender designation," ended its "requirement for a quarterly check of prolific offenders," suspended its "'zero tolerance' policy of arrests toward prolific offenders" and suspended its policy of "zero tolerance for County Code Violations." Kraus Supplemental Affidavit ¶ 4 (ECF No. 204-1).[3]

26.     These changes are reflected in the Research and Analysis Division ("RAD") Directive, which was adopted by PSO on January 31, 2023.

27.     While the PSO no longer uses the "prolific offender" designation, it now identifies "focused offenders."

---

[3] The parties disagree on how to characterize the changes and for purposes of this section have settled on "ended" to describe certain changes in policies and practices.

B.    **PSO's Lists and Related Checks As to Each Plaintiff**[4]

28.    PSO keeps a database that logs when people were flagged as prolific offenders, which it began to maintain beginning in January 2017.

*Plaintiff Dalanea Taylor*

29.    Dalanea Taylor has been a resident of Pasco County since she was born in 1999.

30.    Dalanea was identified as a prolific offender at least as early as April 2017.

31.    Dalanea was also listed as a Top 5 Offender in April 2017.

32.    PSO records show that deputies performed at least 19 prolific offender checks on Dalanea between April 2017 and September 2019. The records reflect "prolific offender check" selections made from a drop-down menu in the "nature" field of PSO's CAD Reports. These records show that deputies coded visits to Dalanea' residence as prolific offender checks at the following dates and times:

(a)   April 5, 2017, at 6:04 p.m. by a STAR deputy.

(b)   April 5, 2017, at 6:37 p.m. by a STAR deputy.

(c)   April 11, 2017, at 2:56 p.m. by a STAR deputy.

---

[4] The prolific offender checks identified in this section are based upon CAD data that were generated any time a PSO deputy selected "Prolific Offender Check" from a dropdown screen when identifying the nature of a given visit. The parties agree, however, that not all prolific offender checks were properly coded as such, and the parties further agree that there were visits to Plaintiffs' respective properties that were not prolific offender checks.

(d)  April 25, 2017, at 8:25 p.m. by a STAR Deputy.

(e)  May 14, 2017, at 3:57 p.m.

(f)  June 16, 2017, at 11:27 a.m.

(g)  June 26, 2017, at 9:00 a.m.

(h)  August 30, 2017, at 10:15 p.m.

(i)  September 29, 2017, at 8:13 a.m.

(j)  October 15, 2017, at 10:09 a.m.

(k)  November 1, 2017, at 7:24 p.m.

(l)  November 2, 2017, at 5:53 p.m.

(m)  November 20, 2017, at 12:05 a.m.

(n)  November 24, 2017, at 9:14 a.m.

(o)  January 1, 2018, at 7:32 a.m.

(p)  February 25, 2018, at 10:58 a.m.

(q)  March 31, 2018, at 8:04 a.m.

(r)  July 14, 2018, at 12:08 p.m.

(s)  September 25, 2019, at 8:07 a.m.

Deputies also conducted a visit to Dalanea's residence on September 25, 2019, at 12:46 p.m. It was coded as an "SO Investigation," but the Notes section includes a "Prolific Check Dalanea Taylor" notation.

*Plaintiff Tammy Heilman*

33.    Tammy Heilman has been a resident of Pasco County since 2005.

34.    Tammy has two sons, Donnie McDougall and Anthony McDougall. Donnie was born in 2000 and Anthony was born in 2002.

35.    Donnie was first identified as a prolific offender as early as September 2016, when he was 16 years old. *See* PSO email, Sept. 17, 2019 at 2 (email from September 18, 2016, referring to Tammy as "Prolific Offender Donnie McDougall's mother").

36.    Donnie was listed in PSO's database as a prolific offender at least as early as January 2017. He was last designated a "prolific offender" by PSO as of September 2020.

37.    Donnie was listed as a Top 5 Offender in 2018, at age 18.

38.    Anthony McDougall was identified as a "target of the month" for a brief period, but PSO does not have a record of him ever being listed in its database as a prolific offender.

39.    Anthony received at least one visit from PSO that was demarcated as a prolific offender check in PSO records.

40.    PSO records show that deputies performed at least 23 prolific offender checks at Tammy's home between 2017 and 2020. *See* Heilman CAD at 9. The records reflect "prolific offender check" selections made from a drop-down menu

9

in the "nature" field of PSO's CAD Reports. These records show that deputies coded visits to Tammy's residence as prolific offender checks at the following dates and times:

(a)  February 12, 2017, at 7:10 p.m.

(b)  May 14, 2017, at 7:50 a.m.

(c)  May 23, 2017, at 7:41 a.m.

(d)  May 30, 2017, at 5:58 p.m.

(e)  May 31, 2017, at 10:21 p.m. by a STAR deputy.

(f)  June 15, 2017, at 7:52 a.m.

(g)  July 22, 2017, at 10:12 a.m.

(h)  October 11, 2017, at 9:26 a.m.

(i)  October 18, 2017, at 7:40 a.m.

(j)  November 7, 2017, at 4:54 a.m.

(k)  December 2, 2017, at 8:02 a.m.

(l)  December 28, 2017, at 9:21 p.m.

(m)  December 29, 2017, at 6:53 p.m. by STAR deputies.

(n)  January 22, 2018, at 2:45 p.m.

(o)  January 27, 2018, at 8:05 a.m.

(p)  March 14, 2018, at 7:57 a.m.

(q)  April 11, 2018, at 8:39 a.m.

(r)  May 23, 2018, at 3:23 p.m.

(s)  July 25, 2018, at 9:48 p.m.

(t)  August 16, 2018, at 7:02 p.m.

(u)  September 29, 2018, at 3:05 p.m.

(v)  December 16, 2018, at 9:45 a.m.

(w)  August 9, 2020, at 3:35 p.m.

### *Plaintiff Darlene Deegan*

41.  Darlene Deegan has lived in Pasco County since 1981.

42.  Darlene's son, Tyler Paneson, was born in 1984.

43.  Tyler Paneson was listed in PSO's database as a "prolific offender" at least as early as January 2017 and was last designated as a "prolific offender" by PSO as of October 2021.

44.  Tyler was listed as a Top 5 Offender in June 2018.

45.  PSO records show that deputies performed at least 8 prolific offender checks at Darlene's home over the course of four months in 2018. The records reflect "prolific offender check" selections made from a drop-down menu in the "nature" field of PSO's CAD Reports. These records show that deputies coded visits to Darlene's residence as prolific offender checks at the following dates and times:

(a)  June 6, 2018, at 7:49 a.m.

11

(b)   June 11, 2018, at 6:09 a.m.

(c)   June 12, 2018, at 9:57 p.m.

(d)   June 21, 2018, at 8:18 a.m.

(e)   June 23, 2018, at 2:59 a.m.

(f)   July 2, 2018, at 10:30 p.m.

(g)   August 8, 2018, at 3:33 a.m.

(h)   September 8, 2018, at 10:37 p.m.

### *Plaintiff Robert A. Jones III*

46.   Robert A. Jones III lived in Pasco County from April 2015 to April 2016, and from December 2020 to the present.

47.   One of Robert's sons is named Robert A. Jones IV. He was born in 1999 and usually goes by "Bobby."

48.   Robert Jones's son, Bobby, was first identified as a prolific offender as early as September 2015, when he was 16 years old.

49.   Bobby was listed as a Top 5 Offender in February 2016, at age 16.

50.   Bobby was last designated as a "prolific offender" by PSO as of March 2017.

51.   PSO records show that deputies performed at least thirty prolific offender checks on Bobby at Robert's home between September 2015 and April 2016. The records reflect "prolific offender check" selections made from a drop-

12

down menu in the "nature" field of PSO's CAD Reports. These records show that

deputies coded visits to Robert's residence as prolific offender checks at the

following dates and times:

(a)  September 26, 2015, at 12:35 a.m.

(b)  October 9, 2015, at 6:47 p.m.

(c)  October 12, 2015, at 8:59 p.m.

(d)  October 20, 2015, at 8:30 p.m.

(e)  November 13, 2015, at 10:57 p.m., by a STAR corporal.

(f)  November 14, 2015, at 1:42 a.m., by a STAR corporal.

(g)  December 11, 2015, at 7:05 p.m., by a STAR corporal.

(h)  December 21, 2015, at 9:07 p.m., by members of the STAR unit.

(i)  December 22, 2015, at 7:33 p.m., by a STAR corporal.

(j)  December 23, 2015, at 3:14 p.m., by a STAR corporal.

(k)  December 26, 2015, at 12:14 p.m., by a STAR corporal.

(l)  December 26, 2015, at 8:29 p.m., by members of the STAR unit.

(m)  December 29, 2015, at 9:46 p.m., by a STAR corporal.

(n)  December 30, 2015, at 5:32 p.m., by a member of the STAR unit.

(o)  December 31, 2015, at 11:34 a.m., by a STAR corporal.

(p)  December 31, 2015, at 4:07 p.m., by a STAR corporal.

(q)  December 31, 2015, at 7:41 p.m., by a STAR corporal.

(r)   January 3, 2016, at 9:29 p.m.

(s)   January 4, 2016, at 4:02 p.m., by a STAR corporal.

(t)   February 10, 2016, at 7:40 p.m.

(u)   February 14, 2016, at 6:39 a.m.

(v)   February 17, 2016, at 1:44 p.m., by a member of the STAR unit.

(w)   February 24, 2016, at 2:11 p.m. by a STAR corporal.

(x)   March 1, 2016, at 1:45 a.m.

(y)   March 4, 2016, at 3:02 p.m., by a STAR corporal.

(z)   March 8, 2016, at 5:42 p.m., by a member of the STAR unit.

(aa) March 8, 2016, at 6:24 p.m., by a STAR corporal.

(bb) March 8, 2016, at 11:03 p.m.

(cc) March 15, 2016, at 5:53 p.m., by a STAR corporal.

(dd) March 22, 2016, at 3:26 p.m.

(ee) May 3, 2016, at 1:25 a.m.

52.   Deputies also conducted a "prolific associate check" at Robert's home on September 16, 2015, at 11:54 p.m.

**C.   DEFENDANTS PROVISO REGARDING THE PARTIES' PREVIOUS AGREED STATEMENT OF FACTS**

To be clear, Defendant Sheriff does not disagree or take issue with the vast majority of the previous facts within the Joint Statement of Facts, as stated at the

14

time of filing them (Dkt. 223, filed March 14, 2023).   For example, the statements which discussed the prior manuals, that Chris Nocco is the Sheriff and is the final policymaker and signed off on the official written ILP manual, are all correct.  (See e.g. para. 3-14).  However, there are several areas of concern that prevent the Defendant from simply agreeing to carry the stipulation forward, as though frozen in time.

First, the relevant ILP Manual and directive have changed and the parties are including these documents in their joint exhibits.  The current version of these documents is relevant at least for purposes of Plaintiffs' request for injunctive or other equitable relief.

Second, and particularly with regard to the list of prolific offender checks for each Plaintiff, that submission was made in the context of the parties *also* being permitted to present facts they considered undisputed (or indisputable) as to whether each incident listed as a prolific offender check was, in fact, a prolific offender check under the ILP processes at the time.  Indeed, in the joint statement the parties noted that the "prolific offender check" designation was based on how a given deputy identified the basis for a visit, choosing that designation from a drop down menu list in a computer aided dispatch (CAD) document.  (See e.g. paragraph 32, listing prolific offender checks for Plaintiff Taylor, but specifying this was based only on the CAD report drop down menu choice by a deputy).

15

The problem is that the CAD reports are just *one piece* of the evidence for each visit identified as a prolific offender check. The Defendant was able to, in the context of submitting the Joint Statement of Facts, also able to point out that one cannot assume in all cases that the drop down menu selection of prolific offender check is completely accurate to the entirety of the cause for the visit.

To illustrate, the Joint Statement notes that there was a prolific offender check at Plaintiff Deegan's residence on June 6, 2018. (Paragraph 45(a)). But, the record reflects that this was just one deputy's selection of the drop down menu and that, in reality, deputies responded to the Plaintiff's address on that date (and in the following days), not for purposes of making the randomized prolific offender checks at issue in this case, but because they were affirmatively searching for Deegan's son Tyler Paneson based on probable cause to arrest him for grand theft. (Defendant Sheriff's Statement of Material Facts, Dkt. 202, pp. 7-8, paragraph 20).

Thus, when the Joint Statement was filed, it was in the context of the Defendant having the opportunity to protest that not everything identified in a CAD report by one deputy as a prolific offender check was actually a prolific check. In fact, as noted in Defendant Sheriff's Statement, the visit to Deegan's residence on June 6, 2018, or in the days that followed were not actually prolific offender checks under ILP, but instead were efforts to locate Paneson based on probable cause for his arrest for grand theft. (Dkt. 202, pp. 13-14). This is not the

16

only such example where the drop down menu selection by one deputy is incorrect in full context of the other documentation and video for a given incident.

The facts on summary judgment do not always perfectly match the facts at trial.  In this particular case it would be a mistake to simply accept the lists of prolific offender checks in the Joint Statement, based on imperfect CAD entries by one deputy in each incident.

### D.    ADDITIONAL UNDISPUTED GENERAL FACTS

53.    The parties stipulate that the records attached in the parties' respective exhibit lists are not the subject of any disputes regarding authenticity and are otherwise admissible (subject to the proviso noted in Section 4 of the Joint Pretrial Statement). Notwithstanding this stipulation, each party reserves the right to argue the relative weight to be given by the Court to each exhibit.

54.    The "PSO Offender Notes" identified at Plaintiffs' Exhibits 1, 2, 28, and 34 consist of data exported from the notes section of the global profile feature on PSO's intranet.